LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA



**KENTUCKIANA**

— COURT REPORTERS —

**NO. 17-cv-84**

# AMANDA HOSKINS, ET AL.

V.

# KNOX COUNTY, ET AL.

**DEPONENT:**

**JOHN PICKARD**

**DATE:**

**March 22, 2018**



a courtroom
**powerhouse**

✉ schedule@kentuckianareporters.com

☎ 877.808.5856 | 502.589.2273

www.kentuckianareporters.com

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF KENTUCKY

3                     NO. 17-cv-84

4               HON. DAVID L. BUNNING

5               HON. CANDACE J. SMITH


7            AMANDA HOSKINS, ET AL.,

8                  PLAINTIFFS


10                      V.


12            KNOX COUNTY, ET AL.,

13                  DEFENDANTS














23   DEPONENT:  JOHN PICKARD

24   DATE:       MARCH 22, 2018

25   REPORTER:  JESSICA VAN TILBURG



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 2
```
1                    APPEARANCES
2
3   ON BEHALF OF THE PLAINTIFFS, AMANDA HOSKINS, ET AL.:
4   ELLIOT SLOSAR
5   AMY ROBINSON STAPLES
6   LOEVY & LOEVY
7   311 NORTH ABERDEEN STREET, THIRD FLOOR
8   CHICAGO, ILLINOIS 60607
9   TELEPHONE NO.:  (312) 243-5900
10  E-MAIL:  ELLIOT@LOEVY.COM
11
12  ON BEHALF OF THE DEFENDANTS, BRIAN JOHNSON, MARK
13  MEFFORD, JACKIE JOSEPH, AND DALLAS EUBANKS:
14  SHAWNA VIRGIN KINCER
15  CODY WEBER
16  KENTUCKY STATE POLICE GENERAL COUNSEL
17  919 VERSAILLES ROAD
18  FRANKFORT, KENTUCKY 40601
19  TELEPHONE NO.:  (502) 573-1636
20  E-MAIL:  SHAWNA.KINCER@KY.GOV
21
22
23
24
25
```

Page 3
```
1                 APPERANCES CONTINUED
2
3   ON BEHALF OF THE DEFENDANTS, REUBEN YORK AND JASON
4   BUNCH:
5   DERRICK T. WRIGHT
6   STURGILL, TURNER, BARKER & MOLONEY, PLLC
7   333 WEST VINE STREET, SUITE 1500
8   LEXINGTON, KENTUCKY 40507
9   TELEPHONE NO.:  (859) 255-8581
10  E-MAIL:  DWRIGHT@STURGILLTURNER.COM
11
12  ON BEHALF OF THE DEFENDANTS, MIKE BROUGHTON AND CITY OF
13  BARBOURVILLE:
14  LICHA H. FARAH, JR.
15  WARD, HOCKER & THORNTON
16  333 WEST VINE STREET, SUITE 1100
17  LEXINGTON, KENTUCKY 40507
18  TELEPHONE NO.:  (859) 422-6000
19  E-MAIL:  LFARAH@WHTLAW.COM
20
21
22
23
24
25
```

Page 4
```
1
2                APPEARANCES CONTINUED
3
4   ON BEHALF OF THE DEFENDANTS, JOHN PICKARD AND DEREK
5   EUBANKS:
6   JASON WILLIAMS
7   WILLIAMS, FARMER & TOWE
8   303 SOUTH MAIN STREET
9   LONDON, KENTUCKY 40743
10  TELEPHONE NO.:  (606) 877-5291
11  E-MAIL:  JOHN@WFTLAW.COM
12
13
14
15
16
17
18
19
20
21
22
23  ALSO PRESENT:  DEREK EUBANKS, DEFENDANT; MIKE BROUGHTON,
24  DEFENDANT; AMANDA HOSKINS, PLAINTIFF; LACEE TOWNSEND,
25  VIDEOGRAPHER
```

Page 5
```
1
2
3                     INDEX
4                                              Page
5   PROCEEDINGS                                   8
6   DIRECT EXAMINATION BY MR. SLOSAR              9
7   CROSS EXAMINATION BY MR. FARAH              247
8   EXAMINATION BY MS. KINCER                   254
9   EXAMINATION BY MR. WRIGHT                   258
10  EXAMINATION BY MR. WILLIAMS                 271
11  REDIRECT EXAMINATION BY MR. SLOSAR         275
12
13                    EXHIBITS
14                                              Page
15  1    LAWSUIT COMPLAINT                       40
16  2    LAWSUIT COMPLAINT                       42
17  3    STATUS UPDATE FORM                      43
18  4    POLICY AND PROCEDURES MANUAL            54
19  5    RESPONSES TO REQUEST FOR PRODUCTION OF
20       DOCUMENTS                               95
21  6    PL001309 STICKY NOTE FROM MIKE SIMPSON 133
22  7    PL015643-015648 CAR RENTAL RECEIPT     137
23  8    PL006455 PHOTO                         139
24  9    PL025647-025653 KYIBRS REPORT          149
25  10   KSP000362 - 000364 ARREST WARRANT      169
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 6

EXHIBITS (CONTINUED)

3  11    KSP00286 - CRIME SUPPLEMENT          180
4  12    PL015867-015875 TRANSCRIPT OF
5        KAYLA MILLS' STATEMENT              184
6  13    INTERROGATORIES                      15
7  14    PL018940-018944 CRIMINAL CASE JACKET 117
8  15    PL015103-015104 CRIME SUPPLEMENT     171
9  16    AUDIO CLIP OF ALLEN HELTON'S INTERVIEW 206
10 17    PL015840-015854 TRANSCRIPT OF
11       ALLEN HELTON'S STATEMENT            206
12 18    PL004844-004855 INFORMANT STATEMENT  228
13 19    PL002660 SKETCH                      187
14 20    PL005067-005074 PHOTO                238
15 21    AUDIO CLIP OF DAVID FOX'S INTERVIEW  244
16 22    AUDIO CLIP*                          12
17 23    DEPARTMENT OF CRIMINAL JUSTICE
18       TRAINING RECORDS                     28
19 24    PL005132 UNIFORM CITATION            249
20 25    PL003221 UNIFORM CITATION            249

23  *WILL PRODUCE UPON RECEIPT

---

Page 7

STIPULATION

4   THE VIDEOTAPED DEPOSITION OF JOHN PICKARD TAKEN AT THE
5   HOLIDAY INN EXPRESS & SUITES, 506 MINTON DRIVE, LONDON,
6   KENTUCKY 40741 ON THURSDAY, THE 22ND DAY OF MARCH, 2018
7   AT APPROXIMATELY 9:37 A.M.; SAID VIDEOTAPED DEPOSITION
8   WAS TAKEN PURSUANT TO THE FEDERAL RULES OF CIVIL
9   PROCEDURE.
10  IT IS AGREED THAT JESSICA VAN TILBURG, BEING A NOTARY
11  PUBLIC AND COURT REPORTER FOR THE STATE OF KENTUCKY, MAY
12  SWEAR THE WITNESS AND THAT THE READING AND SIGNING OF
13  THE COMPLETED TRANSCRIPT BY THE WITNESS IS NOT WAIVED.

---

Page 8

PROCEEDINGS

2       VIDEOGRAPHER:  My name is Lacee Townsend.  I'm
3   the video technician today.  Jessica Van Tilburg is
4   the court reporter.  Today is the 21st [sic] day of
5   March, 2018.  We are at the Holiday Inn Express
6   located in London, Kentucky to take the deposition
7   of John Pickard in the matter of Amanda Hoskins, et
8   al. v. Knox County, et al., pending in the United
9   States District Court of the Eastern District of
10  Kentucky, number 17-cv-84.  Will counsel please
11  identify themselves for the record?
12      MS. STAPLES:  Amy Robinson Staples and Elliot
13  Slosar for the plaintiffs.
14      MR. WILLIAMS:  Jason Williams, here on behalf
15  of Defendant Pickard, Derek Eubanks, and Knox
16  County.
17      MR. WRIGHT:  Derrick Wright on behalf of
18  Defendants Jason York and Jason Bunch.
19      MS. KINCER:  Shawna Kincer on behalf of
20  Defendants Mark Mefford, Dallas Eubanks, Kelly
21  Farris, Jackie Joseph, Brian Johnson.
22      MR. FARAH:  Licha Farah on behalf of Mike
23  Broughton and the City of Barbourville.
24      VIDEOGRAPHER:  Sir, will you please raise your
25  right hand to be sworn in by the reporter?

---

Page 9

1       COURT REPORTER:  Do you solemnly swear or
2   affirm the testimony you're about to give will be
3   the truth, the whole truth, and nothing but the
4   truth?
5       THE WITNESS:  Yes.
6       COURT REPORTER:  Thank you.
7           DIRECT EXAMINATION
8   BY MR. SLOSAR:
9       Q   Good morning, Mr. Pickard.
10      A   Good morning.
11      Q   I would like to go over some of the rules
12  first, before we get started.  Does that sound okay to
13  you?
14      A   That's fine.
15      Q   Okay.  Have you ever given a deposition
16  before?
17      A   One time.
18      Q   Okay.  And how long ago was that?
19      A   It was probably around 2007 or '8.
20      Q   Was it in a lawsuit?
21      A   Yes.
22      Q   Was that -- were you a party to that lawsuit?
23      A   Yes.
24      Q   What kind of case was that?
25      A   It was where two horses got taken by the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 10

1 county and I -- I kept the horses where I lived and took
2 care of them.
3     Q    And somebody filed a lawsuit about that?
4     A    Yeah.  The guy that owned the horses.
5     Q    Did that guy used to be a former officer at
6 the Knox County Sheriff's Department?
7     A    No.
8     Q    What was the person's name who filed that
9 lawsuit?
10    A    I -- I can't remember.  It's been -- it was an
11 over the road truck driver.  I don't remember his name.
12    Q    It'll -- I tend -- you've been to a couple of
13 depositions now, right?
14    A    Yes.
15    Q    Where you watched them --
16    A    Yes.
17    Q    And as you know, I'm sure, by now, I tend not
18 to ask questions perfectly.  So if I ask you a question
19 and you don't understand it, please let me know, and
20 I'll ask it a better way, okay?
21    A    Yes.
22    Q    If you answer the question, I'm going to under
23 -- I'm going to assume that you understood what I was
24 asking you.  Is that fair?
25    A    Yes.

Page 11

1     Q    Okay.  If at any point in time you want to
2 take a break and use the restroom or consult with your
3 lawyer, please just let me know, all right?
4     A    Yes.
5     Q    The only thing that I'll ask is if there's a
6 question pending, that you answer the question before
7 taking a break.  Is that okay?
8     A    Yes, that's fine.
9     Q    All right.  And you're doing a great job, but
10 just continuing answering questions verbally instead of,
11 you know, a head nod or a uh-huh, uh-uh --
12    A    Yes.
13    Q    -- you know.  Affirmative answers are helpful
14 for the court reporter, okay?
15    A    Yes.
16    Q    Okay.  Mr. Pickard, would you agree that
17 innocent people shouldn't be charged for crimes they
18 didn't commit?
19         MR. WRIGHT:  Object to form.
20         MR. WILLIAMS:  Join.
21    Q    You can answer.
22    A    Yes.
23    Q    Yeah.  And in fact, do you recall having a
24 conversation with a woman by the name of Lisa Evans,
25 before William Anderson's trial?

Page 12

1     A    Yes.
2     Q    And I'm going to -- is it your understanding
3 that that conversation is -- was recorded?
4     A    Yes.
5     Q    Okay.  I'm going to play a part of that
6 conversation.  This will be Exhibit number 22.  It's
7 PL29737.
8         (EXHIBIT 22 MARKED FOR IDENTIFICATION)
9         MR. WILLIAMS:  Elliot, let me just make a
10 continuing objection before you start, to the
11 extent that you intend to play snippets of
12 recordings that may be just portions are taken out
13 of context, that we may ask that other portions of
14 it, in fairness, be played in order that the
15 defendant can understand the context of the
16 question.
17         MR. SLOSAR:  Sure.
18         MR. WILLIAMS:  Thank you.
19         MR. WRIGHT:  Join that objection.
20 BY MR. SLOSAR:
21    Q    Please listen to this, and I'm going to ask
22 you a few questions --
23    A    Okay.
24    Q    -- when we're done, okay?
25         (AUDIO PLAYED)

Page 13

1     Q    Was that your voice on there?
2     A    Yes.
3     Q    Okay.  And do you agree with the statement
4 that you said on there, that if you're guilty, you
5 should hang, but if you're not, I don't think you should
6 get in trouble?
7     A    Yes.
8     Q    Okay.  At the time of the Katherine Mills
9 death in December of 2010, what agency were you employed
10 with?
11    A    Knox County Sheriff's Office.
12    Q    And what was your position at that time?
13    A    Knox County Sheriff.
14    Q    Is that an elected position?
15    A    Yes.
16    Q    Okay.  And Ms. Mills was found dead at her
17 home on December 20, 2010 in the City of Barbourville,
18 right?
19    A    Yes.
20    Q    And was the City of Barbourville, in 2010, a
21 part of Knox County?
22    A    Yes.
23    Q    Was Ms. Mills' residence within your sheriff's
24 department's jurisdiction?
25    A    Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 14

1    Q    Mr. Pickard, who was the lead investigator in
2  the investigation into Katherine Mills' death?
3    A    To best of my knowledge, it would have been
4  Jason York.
5    Q    And fair to say that you assisted Jason York
6  in his investigation?
7    A    I helped him some, locating people, yes.
8    Q    And is it fair to -- and did you help Mr. York
9  also interview some people, as well?
10    A    I sat in on one, I know for sure.
11    Q    Fair to say that your agency, the Knox County
12  Sheriff's Department, assisted Jason York and the
13  Kentucky State Police in the investigation into
14  Katherine Mills' death?
15    A    I -- we didn't assist in the investigation. We
16  just, you know, like I say, he was -- when he -- he had
17  some names he needed to talk, and he didn't know the
18  people he did, and I just rode with him and helped
19  him find them.
20    Q    Was one of those people Kayla Mills?
21    A    Yes.
22    Q    Was one of those people Allen Helton?
23    A    Yes.
24    Q    Was one of those people Jonathan Taylor?
25    A    Yes.

Page 15

1    Q    Was one of those people Bob Smith?
2    A    Yes.
3    Q    Mr. Pickard, I'm going to show you what we'll
4  mark as Exhibit number 13.  And this is the
5  interrogatory responses --
6        MS. STAPLES:  Is 13 correct?
7        COURT REPORTER:  It's from the previous.
8    Q    -- that you did in this case.  I'll give a
9  copy to your counsel.  Sir, do you recognize this
10  document?
11        (EXHIBIT 13 MARKED FOR IDENTIFICATION)
12    A    Yes.
13    Q    Okay.  And did you sign this document on the
14  last page?  It might be on the back of that.  Sorry,
15  it's double-sided.
16    A    Yeah.  That's my signature.
17    Q    Okay.  Sorry, I had to travel down here.  I
18  try to double-side things, save my back.  When you
19  signed that, did you understand that the -- that your
20  answers were done under oath?
21    A    Yes.
22    Q    Okay.  Just like you're under oath here today,
23  right?
24    A    Yes.
25    Q    I'm going to ask you to turn to -- it has page

Page 16

1  number 5 at the bottom, that's interrogatory number 6.
2  Are you there?
3    A    Yes.
4    Q    Okay.  And that question asks, "Do you contend
5  that Plaintiffs' participating -- bad question.  "Do you
6  contend that Plaintiffs' participating in killing in
7  Katherine Mills or committed any other illegal act
8  relating to the incidents in Plaintiffs' complaint." And
9  then there's a second part of that question.  Your
10  answer is, "I have no direct knowledge that either
11  Plaintiff acted in killing Katherine Mills."  Do you see
12  that, sir?
13    A    Yes.
14    Q    Okay.  Sitting here today, do you have any
15  direct knowledge that Amanda Hoskins or Jonathan Taylor
16  participated in -- participated in killing Katherine
17  Mills?
18    A    No, I don't have any direct knowledge.  No.
19    Q    Okay.  Mr. Pickard, you know Linda Taylor,
20  right?
21    A    Yes.
22    Q    Ms. Hoskins' mom, right?
23    A    Yes.
24    Q    Yeah.  And you had a conversation with Linda
25  Taylor outside of the courtroom in February of 2012; is

Page 17

1  that right?
2    A    Yes.  I remember being there, yes.
3    Q    Yeah.  And at the time, Ms. Hoskins was
4  actually inside the courtroom dealing with one of her
5  criminal cases at the time?
6    A    Yes.
7    Q    In your conversation with Ms. Taylor, isn't it
8  true that you told her that two years before, you would
9  have put Ms. Hoskins under the jail, but by that time,
10  you believe that she was actually innocent of the
11  Katherine Mills' homicide?
12    A    I don't remember that conversation.
13    Q    Well, did you ever tell Ms. Taylor anything to
14  the effect that you believe that Ms. Hoskins didn't have
15  anything to do with the murder of Katherine Mills?
16    A    I don't remember saying that.
17    Q    So you're not saying that you didn't say it,
18  you just don't recall, right?
19    A    I just don't recall.
20        MR. WRIGHT:  Object to form.
21        MR. WILLIAMS:  I'll join.
22    Q    Mr. Pickard, is it fair to say that you didn't
23  personally charge Amanda Hoskins and Jonathan Taylor
24  with the murder of Katherine Mills?
25    A    No, I did not.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 18

1    Q    And that's because in March of 2012, you
2  didn't believe that Amanda Hoskins and Jonathan Taylor
3  killed Katherine Mills, right?
4         MR. WRIGHT:  Object to form.
5         MR. WILLIAMS:  Join.
6    A    At that time, I didn't know.  I mean, I -- I
7  don't know.  I didn't know who killed her.  We were just
8  trying to -- you know, like I say, I -- I helped Jason -
9  - Detective York, but I mean, he worked the case.  And --
10 but I -- I don't know.
11   Q    You didn't have control over Jason York
12 charging Ms. Hoskins and Mr. Taylor, correct?
13   A    That's correct.
14   Q    And you didn't have the power to stop Jason
15 York from initiating those charges against Ms. Hoskins
16 and Mr. Taylor, right?
17   A    Right.  That was totally his case.
18   Q    And in fact, you know, a few moments ago, you
19 testified that you didn't know, as of March 2012, who
20 really did the murder, right?
21   A    Right.
22   Q    So, fair to say that in March of 2012, you
23 didn't believe that there was probable cause to initiate
24 charges against Amanda Hoskins and Jonathan Taylor for
25 the murder of Katherine Mills?

Page 19

1         MR. WRIGHT:  Object to form.
2         MR. WILLIAMS:  Join.
3    A    I -- I don't know what all the -- Jason worked
4  the case.  He had all -- a lot of information I don't
5  know about or didn't know about.
6    Q    Based on what you knew, and what you
7  participated in by that time, did you believe that there
8  was probable cause to initiate charges against Amanda
9  Hoskins and Jonathan Taylor for the murder of Katherine
10 Mills?
11        MR. WRIGHT:  I'll just object to form.
12        MR.WILLIAMS:  Join.
13   A    There could have been.
14   Q    Okay.  Well, you were present when Allen
15 Helton's statement was given, right?
16   A    Yes.
17   Q    Yeah.  And during that interview, Jason York
18 was telling Mr. Helton what to say, right?
19        MR. WRIGHT:  Object to form and foundation.
20        MR. WILLIAMS:  Join.
21   A    I don't remember telling him what to say, no.
22   Q    Okay.  We're going -- I'm going to play the
23 recording for you a little bit later, we'll listen to it
24 together, all right?
25   A    Okay.

Page 20

1    Q    Did you -- you were present during that March
2  8, 2012 interview with Jason York and Allen Helton,
3  correct?
4    A    Yes.
5    Q    It took place in your office, right?
6    A    Yes.
7    Q    Okay.  Did you believe the statement that
8  Allen Helton gave that day to Jason York?
9         MR. WILLIAMS:  Object to the form.
10        MR. WRIGHT:  Join.
11   A    At the time, I did.
12   Q    You did?
13   A    Yes.
14   Q    Okay.  Even though Allen Helton -- you talked
15 to Allen Helton a number of times before taking --
16 before you and Detective York took that statement from
17 him on March 8, 2012, right?
18   A    I think I maybe talked to him one time.
19   Q    Uh-huh.  And Allen Helton never told you
20 anything like what he said on March 8, 2012, correct?
21   A    Not before that, no.
22   Q    Sir, did you ever tell Detective York at any
23 time, that you believed Amanda Hoskins and Jonathan
24 Taylor did not commit the murder of Katherine Mills?
25   A    I don't ever remember saying something like

Page 21

1  that, no.
2    Q    Did you -- at any point in time, did you tell
3  Detective York that you didn't believe probable cause
4  existed to initiate or continue charges against Amanda
5  Hoskins or Jonathan Taylor?
6    A    No.
7    Q    Did you take any steps to stop the prosecution
8  of Amanda Hoskins and Jonathan Taylor for the murder of
9  Katherine Mills?
10        MR. WILLIAMS:  Object to the form of the
11 question.
12   A    No.
13   Q    Did you ever have any conversations with the
14 prosecutor, Jackie Steele, about stopping the
15 prosecution against Amanda Hoskins and Jonathan Taylor?
16        MR. WILLIAMS:  Object to the form.
17   A    No.
18   Q    Mr. Pickard, you've been to the Appalachian
19 Children's Home before, right?
20   A    Yes.
21   Q    Yeah.  And do you know a person there by the
22 name of Steve Erie (phonetic)?
23   A    Not off the top of my head, I don't.
24   Q    Do you know the owner of the children's home?
25   A    I don't, no.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 22

1    Q    During the underlying investigation into
2  Katherine Mills' death, do you recall going to the
3  children's home with Detective York to see if a blue car
4  was there?
5    A    Yes, I remember going there.
6    Q    What do you remember about going there with
7  Detective York?
8    A    I know we talked to some guy, but I can't
9  remember the name.  But I do remember -- I remember
10  being there to talk to him.  I just don't remember -- I
11  don't remember their conversation.
12    Q    Well, were you and Detective York there to see
13  if Amanda Hoskins had access to a blue vehicle?
14    A    Yes.
15    Q    Okay.  And did you have a conversation -- did
16  you and Detective York have a conversation with someone
17  at the children's home, about who was in possession of
18  the blue vehicle on the day in question?
19    A    Yes.
20    Q    Okay.  And were you and Detective York shown
21  receipts indicating that maintenance men from the
22  children's home had access to the car, the blue car, on
23  the day in question?
24    MR. WRIGHT:  I'll object to form and
25    foundation.

Page 23

1    MR. WILLIAMS:  Join.
2    A    I remember that vaguely, but yes.
3    Q    Just can't remember all the specifics, right?
4    A    Right.
5    Q    Okay.  Did you take any notes when you were
6  learning about these maintenance men having possession
7  of the car on December 20, 2010?
8    A    No.
9    MR. WRIGHT:  Object to form and foundation on
10    that.
11    Q    Did you take --
12    MR. WILLIAMS:  I'll join.
13    Q    -- any of the receipts that were show to you
14  by individuals of the children's home?
15    A    No, I didn't.
16    Q    Did Detective York?
17    A    I just -- I don't recall whether he did or
18  not.
19    Q    Okay.  Was Detective York taking any notes?
20    A    I can't remember.
21    Q    Did you and Detective York have any
22  conversation about who was going to be responsible for
23  drafting a police report based upon the information that
24  you and him learned that day?
25    A    No.

Page 24

1    MR. WILLIAMS:  Object to the form of the
2  question and to the word "responsibility," it has a
3  legal connotation.  Go ahead.
4    MR. WRIGHT:  I'll join.
5    A    No, I don't remember anything like that.
6    Q    Prior to conducting this interview, or this
7  investigation into who had the blue car from the
8  children's home on December 20, 2010, did you and
9  Detective York have a discussion about whether this
10  interview would be recorded or not recorded?
11    A    Not that I remember, no.
12    Q    And did you make any notes about this
13  interview that you would have kept in a police file?
14    A    No, I didn't.
15    Q    And was that consistent with the training that
16  you received?
17    A    No.
18    Q    So based on the training you received, should
19  you have taken notes during that interview?
20    A    No.  It wasn't my -- it was his case.  I just
21  -- I didn't take any notes at all.
22    Q    Okay.  So the fact that you didn't take notes,
23  was that consistent with your understanding of the
24  training that you received at the Knox County Sheriff's
25  Department?

Page 25

1    A    Yes.
2    Q    Okay.  It seems like you're saying that if
3  it's not -- if you're not in charge of the
4  investigation, that you're not required to take notes,
5  is that what your testimony is?
6    A    I guess you could say that, yes.
7    Q    Okay.  So the fact that you participated in
8  this interview but didn't take notes, was that
9  consistent with your understanding of the policies and
10  procedures at the Knox County Sheriff's Department?
11    A    Repeat that again.
12    Q    Sure.  With you not taking notes during this
13  interview at the Appalachian Children's Home, was that
14  consistent with your understanding of the policies and
15  procedures at the Knox County Sheriff's Department?
16    A    I'm not going -- no.  I mean, I just, you
17  know, I didn't take any notes, period, through this
18  whole thing, and -- I mean, Jason did all that.  I
19  didn't do any of that.  I was just there.
20    Q    Yeah.  In all these interviews, you never took
21  a single note, right?
22    A    No.
23    Q    All these interactions that you had with Kayla
24  Mills, Bob Smith, Allen Helton, Jonathan Taylor, never
25  created a single police report, right?



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 26

1    A    That's right.
2    Q    And is that consistent with the training that
3    you received at the Knox County Sheriff's Department?
4    A    I didn't get any training at the sheriff's
5    department.  I -- I went -- I went through some classes,
6    you know, through Eastern, but that's it.
7    Q    Well, in any of the classes that you went
8    through, were you ever instructed that you were required
9    to document interviews in a homicide investigation?
10   A    I don't ever remember taking a class like
11   that.
12   Q    Okay.  And I'm going to ask you some questions
13   about the -- you've seen policies and procedures at the
14   Knox County Sheriff's Department, right?
15   A    Yes.
16   Q    Okay.  I saw your signature on the top of one,
17   so I assumed that you were going to say yes to that.  I'm
18   going to be asking you some questions about the policies
19   and procedures.  You understand what those are, correct?
20   A    Yes, I understand what you're talking about.
21   Q    Okay.  And fair to say that there wasn't a
22   policy or procedure at Knox County that required you to
23   document information that you learned in a homicide
24   investigation?
25   A    I couldn't say.

Page 27

1    Q    We're going to go through it.  But sitting
2    here today, do you recall a single policy or procedure
3    that gives you instructions on how to conduct a homicide
4    investigation?
5    A    No.
6    Q    Okay.  Sitting here today, do you recall a
7    single policy or procedure that gives you instructions
8    to document interviews conducted during a homicide
9    investigation?
10   A    I don't recall anything like that.
11   Q    Uh-huh.  We're going to go through it, so I'll
12   -- we'll get there.  Mr. Pickard, when did you graduate
13   high school?
14   A    1971.
15   Q    Okay.  And where did you go to high school?
16   A    Knox Central.
17   Q    And after high school, did you receive any
18   other additional education?
19   A    No.
20   Q    Okay.  And at some point in your career, you
21   went to EKU; is that right?
22   A    No, I didn't go there.
23   Q    You took some courses relating to law
24   enforcement there?
25   A    Not there.  It was -- it -- that's where my

Page 28

1    records ended up.  I didn't go there for --
2    Q    You didn't go there.
3    A    No.
4    Q    Okay.  Sorry.  Let me -- where did you get
5    some law enforcement training at?
6    A    Most of the time, it was in Bowling Green or
7    sometimes it was in Louisville.  And that was the
8    sheriff's convention.  That's all I
9    Q    And you went there for three years, right?  The
10   sheriff's convention?  I think it was 2007, 2008, 2009.
11   Does that seem right?
12   A    No, I went more than that.
13   Q    You went more than that?
14   A    I went up to '13, I think.
15   Q    You think you went to 13 different
16   conventions?
17   A    No, up to 2013.
18   Q    Oh, to 2013.  Okay.
19   A    Yes.
20   Q    I see what you're saying.  I'll show you what
21   we'll mark as Exhibit number 23.  Here you go, Mr.
22   Pickard.
23   A    Thanks.
24   Q    Have you seen this before, this document?
25        (EXHIBIT 23 MARKED FOR IDENTIFICATION)

Page 29

1    A    I don't think so.
2    Q    Well, I'm going to, you know, this is -- these
3    documents have been handed over during the course of
4    this litigation, and this is apparently what the
5    Department of Criminal Justice Training produced when
6    your counsel requested your training files, okay?
7    A    Okay.
8    Q    All right.  So I'm going to ask you to turn to
9    page 3 of this.  Are you there?
10   A    I think so.
11   Q    Okay.  And it's got your name at the top,
12   right, John Pickard?
13   A    Yes.
14   Q    Okay.  And according to this training history,
15   it looks like you went to the sheriff's conference in
16   2009.  Does that seem right?
17   A    Yes.
18   Q    Do you recall what you learned at the
19   sheriff's conference in 2009?
20   A    I couldn't -- I can't recall what classes I
21   took, no.
22   Q    Okay.  Do you recall what topics you were
23   trained on there?
24   A    Not right off, no.
25   Q    Okay.  If I ask you those same questions about

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 30

1  the sheriff's conference in 2008, would you answer the
2  same way?
3      A    Same way.
4      Q    Okay.  I'm going to ask you, again, would you
5  give those same answers if I asked you about what you
6  learned at the sheriff's conference in 2007?
7      A    Yes.
8      Q    Okay.  Memory's not getting better the farther
9  back we go, right?
10     A    No, it's getting worse.
11     Q    Yeah.  Me, too.  It looks like in 2005, you
12  took a mandatory training by videotape.  Do you see
13  that?
14     A    Yes.
15     Q    Okay.  What did you learn on that videotape?
16     A    I don't -- I don't recall.
17     Q    Okay.  And it looks like you completed that in
18  May of 2005; is that right?
19     A    I guess so, yes.
20     Q    Yeah.  And it looks like you took a class on
21  stress management in 2004; is that right?
22     A    That's what it says, yes.
23     Q    Can you teach me how to manage some of my
24  stress from that course?
25     A    No, I need a dose of it myself.

Page 31

1      Q    Do you recall what you learned there?
2      A    No, I don't.
3      Q    Okay.  Do you recall if it helped you manage
4  your stress at all?
5      A    No.
6      Q    Okay.  Looks like you did some mandatory
7  training by videotape in 2004.  Do you recall what you
8  learned there?
9      A    No.
10     Q    Okay.  Aside from the training listed here,
11  Mr. Pickard, do you recall any additional training that
12  you received prior to the investigation into the death
13  of Katherine Mills?
14     A    No.
15     Q    Mr. Pickard, have you attended any outside
16  investigation schools?
17     A    Not that I recall, no.
18     Q    You have -- for instance, have you ever
19  attended the Reid Interrogation School?
20     A    No.
21     Q    Have you ever heard of the Reid Technique?
22     A    No.
23     Q    Have you ever served in the military?
24     A    No.
25     Q    When did you first join the Knox County

Page 32

1  Sheriff's Department?
2      A    January of 2003.
3      Q    And were you hired or elected?
4      A    Elected.
5      Q    Okay.  Prior to being elected as the Knox
6  County sheriff in January 2003, have you had any
7  experience in law enforcement?
8      A    No, sir.
9      Q    What did you do in your prior career?
10     A    Worked for Delta Natural Gas.
11     Q    Where's that at?
12     A    It's the main office in Winchester.
13     Q    What did you do there?
14     A    I was a customer service representative.
15     Q    And how long did you work as a customer
16  service representative?
17     A    18 years.
18     Q    That's a long time.
19     A    Long time.
20     Q    What made you want to be a sheriff?
21     A    It's just something I always wanted to do.
22     Q    Were you interested in law enforcement when
23  you were a kid?
24     A    Yeah, I was interested.  Yes.
25     Q    Ever want to be a cop?

Page 33

1      A    Yes.
2      Q    What sort of training did you receive after
3  being elected as the Knox County sheriff?
4      A    I can't remember.
5      Q    Were you sent to any outside training schools?
6      A    I went to the sheriff's convention is all I
7  did.
8      Q    Okay.  And you don't remember what you learned
9  at those conventions, right?
10     A    It was on different subjects.  No, I don't
11  remember.
12     Q    Did you ever have to take any tests there?
13     A    Yeah, I took tests.
14     Q    You took tests there.  You recall what you
15  took tests in, or on?
16     A    No, it's -- the classes they give us, at the
17  end of it, you just had a little, like, a one-page test
18  or something.
19     Q    After becoming the Knox County sheriff, were
20  you ever trained on how to interview witnesses?
21     A    No, I was never trained.
22     Q    After becoming the Knox County sheriff, were
23  you ever trained on how to document witness interviews?
24     A    No.
25     Q    After becoming Knox County sheriff, were you

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 34

1  ever trained on how to interview or interrogate
2  suspects?
3      A   Not that I recall.
4      Q   After you became Knox County sheriff, were you
5  ever trained on whether you're allowed to make promises
6  of leniency to witnesses or suspects in a homicide
7  investigation?
8      A   No.
9      Q   Were you ever provided any training, after
10  becoming the Knox County sheriff, on how to prepare
11  police reports?
12      A   No.
13      Q   After becoming Knox County sheriff, were you
14  ever provided any training on what information should be
15  documented in a police report?
16      A   Not that I recall.
17      Q   After becoming Knox County sheriff, did you
18  receive any training on interrogation techniques?
19      A   Not that I recall.
20      Q   After becoming Knox County sheriff, did you
21  receive any training on how do you conduct lineups?
22      A   No.
23      Q   After becoming Knox County sheriff, did you
24  receive any training on how to conduct photo arrays?
25      A   No.

Page 35

1      Q   After becoming Knox County sheriff, did you
2  receive any training on how to conduct lineups or photo
3  arrays without doing so in an unduly suggestive manner?
4      A   Not that I recall.
5      Q   After becoming Knox County sheriff, did you
6  have any training on the retention of physical evidence
7  in a homicide investigation?
8      A   Not that I recall.
9      Q   Mr. Pickard, have you ever heard of a Supreme
10  Court case named Brady v. Maryland?
11      A   Not that I recall.
12      Q   After becoming Knox County sheriff, did you
13  have any training on the requirements for police
14  officers to disclose exculpatory evidence to the
15  prosecution or defense?
16      A   Not that I recall.
17      Q   Do you know what Brady v. Maryland requires
18  police officers to do?
19      A   No, I don't.
20      Q   I'm going to ask you some questions about
21  preparing for today's deposition, Mr. Pickard, but I
22  don't want to invade the sacred space that you have with
23  your counsel, Mr. Williams, or Mr. Kelley.  So please
24  don't tell me anything about the conversations you've
25  had with them, okay?

Page 36

1      A   Okay.
2      Q   Okay.  What did you do to prepare for today's
3  deposition?
4      A   I just kind of rethought everything, looked
5  through a few papers that I have, and just kind of went
6  over it a little bit.
7      Q   Do you recall what papers you looked at?
8      A   Not really.
9      Q   Did you read any police reports?
10      A   No.
11      Q   Did you review any of your notes?
12      A   I didn't have any notes.
13      Q   Okay.  That was a trick question, right?
14      A   Yes.
15      Q   Did listen to any audio recordings?
16      A   No.  I don't have any recordings, either.
17      Q   No.  Did you read any of Mr. York's
18  deposition?
19      A   I read some of it.
20      Q   Okay.  What parts of it did you look at?
21      A   I just kind of looked through it.  I don't --
22  no particular part.
23      Q   It was a long day, right?
24      A   It was too long.
25      Q   You think I'm being a little bit nicer to you

Page 37

1  than I was to him?
2      A   You seem a little nicer, yeah.
3      Q   Okay.
4      A   I hope you stay that way.
5      Q   Did you meet with your lawyer to prepare?
6      A   Yes.
7      Q   Again, I'm not going to ask you anything about
8  your conversations, okay?
9      A   Okay.
10      Q   How many times did you meet with your lawyer
11  to prepare for the deposition?
12      A   I think twice.
13      Q   So how is it that you became sheriff in 2003?
14      A   I think -- I don't know, I just got a elected.
15  People wanted a change, I guess.
16      Q   Divine intervention?
17      A   I guess.  I just got lucky, I guess.  I don't
18  know.
19      Q   Who did you run against back then?
20      A   Wilbur Bingham.
21      Q   What's his name?
22      A   Wilbur Bingham.
23      Q   Wilbur, okay.  And when did you stop being
24  sheriff?
25      A   In January of 2014.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 38

1    Q    Was it just election related, or where you
2  retiring?
3    A    I got beat.
4    Q    Got beat.  I don't know.  Was it a close race?
5    A    Not real close.
6    Q    Not real close.  Were you the democratic
7  candidate or the republican candidate?
8    A    Republican.
9    Q    Okay.  I know very little about Knox County
10 politics, so I know Mr. Eubanks is running and that you
11 used to be sheriff, that's the extent of it.  As sheriff
12 of Knox County in 2010, when the Mills homicide
13 investigation began back in December of 2010, what were
14 your duties as sheriff?
15        MR. WILLIAMS:  Let me just make a continuing
16     objection as where duties may have a legal
17     connotation. With that objection made and
18     continuing, you can answer the question.
19   A    To my recollection, collect taxes and work the
20 courts.
21 BY MR. SLOSAR:
22   Q    Collect taxes and work the courts?
23   A    Yes.
24   Q    What does "work the courts" mean?
25   A    It's like a bailiff for trials, court hearings

Page 39

1  or whatever, yet -- you know, where the bailiffs that do
2  that.
3    Q    What -- were you in charge of supervising your
4  deputies, sheriffs?
5    A    Yes.
6    Q    Okay.  And in December of 2010, who were the
7  sheriffs at the Knox County -- sheriff's department that
8  you would have been supervising?  Do you remember who
9  was there?
10   A    I can't -- 2010, I went through a lot of
11 deputies.  I -- I can't remember.
12   Q    Was Derek Eubanks one of the deputies that you
13 supervised during the time of the Mills homicide
14 investigation?
15   A    Yes.
16   Q    Okay.  Do you recall the names of any of the
17 other deputies?
18   A    I think Jed Wagner was one, Gary Bates.
19   Q    Did any of those officers work on the Mills'
20 homicide investigation with you?
21   A    No.
22        MR. WILLIAMS:  Object to the form of the
23     question.
24        MR. SLOSAR:  Can we go off the record real
25     quick?

Page 40

1        VIDEOGRAPHER:  Off the record.
2        (OFF THE RECORD)
3        VIDEOGRAPHER:  Back on the record.
4  BY MR. SLOSAR:
5    Q    Mr. Pickard, I'm going to hand you what we'll
6  mark as Exhibit number 1.  This is a lawsuit by David
7  Cornett v. Ronnie Sizemore, yourself, Raven Smith [sic],
8  Knox County, Knox County Sheriff's Department, Knox
9  County Fiscal Court, that was filed March 26, 2004. Can
10 you take a look at this complaint, sir?  Have you seen
11 this document before?
12        (EXHIBIT 1 MARKED FOR IDENTIFICATION)
13   A    I don't recall seeing it, but I probably have.
14 I mean, I could have.
15   Q    Okay.  Well, you were -- that's one of the
16 lawsuits that you disclosed in your interrogatory
17 response, right, Mr. Pickard?
18   A    Yes.
19   Q    Okay.  And you're a defendant in that lawsuit?
20   A    Yes.
21   Q    Okay.  Do you recall what the ultimate
22 resolution of that lawsuit was?
23        MR. WILLIAMS:  And let me just enter an
24     objection to the extent of, if you know whether it
25     was a confidential settlement, Mr. Pickard, you

Page 41

1  also need to let him know that.
2  BY MR. SLOSAR:
3    Q    So you don't have to tell me the amount, but
4  did the case resolve itself through a settlement?
5    A    Yes.
6    Q    Okay.  And were you a defendant at the time
7  that it resolved itself in the settlement?
8    A    Yes.
9    Q    And was the settlement amount publicly known?
10   A    Not that I know of.  I don't know.
11   Q    Okay.  I'm going to hand you what we'll mark
12 as -- and generally, do you recall the allegations of
13 that lawsuit --
14   A    Yes.
15   Q    -- that settled?  What was it, generally?
16   A    It was over those horses I was talking about.
17   Q    This was the horse thing you were talking
18 about.
19   A    Yes.
20   Q    Okay.  All right.
21        MR. WRIGHT:  Elliot, before you move on, are
22     these documents that we don't -- not going to --
23     don't have extras?  I can just note that these are
24     Exhibits 1 and 2 to keep track of things?
25        MR. SLOSAR:  Yeah.  So this is 1, and I'll be

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 42

1  happy to send it to you electronically.
2       MR. WRIGHT:  You don't have to do that.
3       MR. SLOSAR:  Okay.
4       MR. WRIGHT:  We can get it through a copy with
5  the court reporter.
6       MR. SLOSAR:  Okay.
7       MR. WRIGHT:  I just don't want to lose track.
8  BY MR. SLOSAR:
9       Q    Okay.  Yeah.  No, this is Exhibit 1.  Exhibit
10  2, I'm going to hand you right now, Mr. Pickard.  This
11  is a lawsuit, it's 04-CV-278.  Reona Bledsoe v. James
12  Meyer [sic], Ronnie Sizemore, Charles Doan, the Knox
13  County Sheriff's Department, and Sheriff John Pickard.
14  That was filed in June of 2004.  Mr. Pickard, do you
15  recognize this document?
16            (EXHIBIT 2 MARKED FOR IDENTIFICATION)
17       A    Yes, I know about it.
18       Q    Okay.
19       A    I forgot it, but I did know about it.
20       Q    Were you a defendant in that case as well,
21  sir?
22       A    No, I don't think so.
23       Q    Okay.  At the bottom of the caption, it has
24  you, right?  Is that your name?
25       A    Oh, yeah.  Yes.

Page 43

1       Q    Okay.  I understand -- I'm not -- I haven't
2  looked deeply into the allegations of the complaint so
3  maybe you were just sued in your official capacity as
4  sheriff --
5       A    I -- I would think so.
6       Q    -- and not individually.  Do you recall what
7  the resolution of this lawsuit was?
8       A    No, I don't.
9       Q    Okay.  One of the co-defendants there is a
10  person by the name of Ronnie Sizemore, right?
11       A    Yes.
12       Q    What relation does Ronnie Sizemore have to
13  James Otis Sizemore?
14       A    I don't think that -- they may not -- if
15  they're kin, I don't know.
16       Q    Okay.
17       A    I don't think they were.
18       Q    Do you recall the general allegations of this
19  lawsuit, Mr. Pickard?
20       A    No, I don't.
21       Q    Do you recall how it resolved itself?
22       A    No, I don't.
23       Q    Okay.  I think that I gave you -- let me make
24  sure I did.  This -- I'm going to show you what's been
25  marked as Exhibit number 3.  This is a status update

Page 44

1  form.  Have you seen this document before today?
2            (EXHIBIT 3 MARKED FOR IDENTIFICATION)
3       A    Not that I recall, no.
4       Q    Okay.  It looks like Sheriff Mike Smith signed
5  this document at the bottom.  Do you see that?  The
6  bottom of the first page?
7       A    Yes, I see that.
8       Q    Okay.  And according to this document, you
9  resigned and/or were terminated, effective January 5,
10  2015, from the Knox County Sheriff's Department; is that
11  right?
12       A    Yes.
13       Q    Okay.  And why was that?  Was that because of
14  the election?
15       A    Yes.
16       Q    Sorry.  Not a trick question.  Did you have to
17  sign any documents at the time that you surrendered your
18  office to Sheriff Smith?
19       A    I'm sure I did.  I don't recall right off, no.
20       Q    When you were sheriff, was it your
21  understanding that every employee at the Knox County
22  Sheriff's Department was required to have a personnel
23  file?
24       A    Yes.
25       Q    Okay.  And while you were sheriff, did every

Page 45

1  employee at the Knox County Sheriff's Department have a
2  personnel file?
3       A    Yes.
4       Q    Okay.  And that was in accordance with one of
5  the policies and procedures for the Knox County
6  Sheriff's Department, correct?
7       A    I think so.
8       Q    Okay.  Did you yourself have a personnel file
9  while you were sheriff for the Knox County Sheriff's
10  Department?
11       A    Yes.
12       Q    Okay.  And did you ever look at that file?
13       A    I don't recall.
14       Q    Was it your understanding that if citizens
15  made complaints against officers of the Knox County
16  Sheriff's Department, that a copy of those complaints
17  were to be put into the personnel file?
18       A    They should have been, yes.
19       Q    Okay.  And the same would hold true for you,
20  correct?
21       A    Yes.
22       Q    Okay.  So if somebody -- and by the time of
23  the investigation into the death of Katherine Mills in
24  December of 2010, if citizens had made a -- complaints
25  against you, those complaints should have been made in

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 46

1  your -- those -- a copy of those complaints should have
2  been maintained as part of your personnel file, correct?
3      A    Yes, if they had any.
4      Q    Okay.  And by the time you left the Knox
5  County Sheriff's Department in March of 2015, is it fair
6  to say that any and all complaints that were ever made
7  against you should have been contained in the personnel
8  file?
9           MR. WILLIAMS:  Object to the form and the
10  foundation.  You can answer.
11      A    I don't remember any complaints.
12      Q    Sure.  So that's a different question.  But if
13  citizens of Knox County had made complaints against you,
14  they would have been maintained as part of your
15  personnel file, correct?
16      A    Yes.
17      Q    Okay.  And the same holds true for any other
18  of the employees at the Knox County Sheriff's Department
19  while you were sheriff, right?
20      A    Yes.
21      Q    Okay.  At the time that you left the sheriff's
22  department in March of 2015, did your personnel file
23  still exist?
24      A    I left in January --
25      Q    In January.

Page 47

1      A    -- of '15.
2      Q    I'm sorry.  When you left the Knox County
3  Sheriff's Department in January of 2015, did your
4  personnel file still exist there?
5      A    Yes.
6      Q    And where was it maintained at within the Knox
7  County Sheriff's Department?
8      A    I think it was in a filing cabinet.
9      Q    Okay.
10      A    As far as I -- best I can remember it was.
11      Q    Do you remember a deputy by the name of Mikey
12  Ashers (phonetic)?
13      A    He wasn't a deputy for me.
14      Q    Was he employed there --
15      A    No.
16      Q    -- when you were there?
17      A    No.
18      Q    Did you hire him at all?
19      A    No.
20      Q    Okay.  Would you have hired him?
21      A    No.
22      Q    Why not?
23      A    I hear too many things about him, I didn't
24  like what I heard so
25      Q    What type of -- did you hear that he was

Page 48

1  involved in police misconduct in other agencies?
2      A    No.
3      Q    What did you hear about him?
4           MR. WILLIAMS:  Again, if what you heard
5      involves confidential information, just keep that
6      in mind, but you can answer the question.
7      A    I heard like, you know, he had problems
8  dealing with people maybe, or something like that, but I
9  wasn't impressed with him.
10  BY MR. SLOSAR:
11      Q    Did you ever hear that Mikey Ashers, you know,
12  let me, actually, strike the question.
13           Prior to you leaving in January of 2015, did
14  you learn that Mikey Ashers had anger management issues?
15           MR. WILLIAMS:  Object to the form, but you can
16      answer.
17      A    I wouldn't say that, no.
18      Q    Well, prior to you leaving in January of 2015,
19  did you learn that Mikey Ashers had difficulty dealing
20  with people?
21      A    I had heard that.
22      Q    And what type of difficulty have you heard
23  that he had, dealing with people?
24      A    I just heard he had problem dealing with
25  people and that's all I ever heard.

Page 49

1      Q    Did you ever hear any incidents, prior to
2  leaving in 2015, that involved Mikey Ashers using
3  excessive force on people when he was employed at a
4  different agency?
5      A    I hadn't heard that.
6      Q    No.  Are you aware, sitting here today, that
7  Mikey Ashers killed somebody while he was employed at
8  the Knox County Sheriff's Department after you left?
9      A    Yes.
10      Q    Okay.  What have you heard about that
11  incident?
12      A    I just heard they got in a fight and he got --
13  the boy got killed.  That's all I know.
14      Q    Was there any investigation done into that, to
15  the best of your knowledge?
16      A    I have no idea.
17      Q    Okay.  So is it fair to say that you wouldn't
18  have hired -- based upon the knowledge that you have of
19  Mikey Ashers' and his background, is it fair to say that
20  you would not have hired him to be a deputy at the Knox
21  County Sheriff's Department?
22      A    He applied one time.  I didn't -- I didn't
23  hire him.
24      Q    Why is it that you didn't hire him?
25      A    I just didn't want to take a chance.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 50

1    Q    And as sheriff, were you -- you realize that
2  people working under your supervision had the -- an
3  enormous amount of power to affect citizens' lives in
4  Knox County, right?
5    A    Yes.
6        MR. WILLIAMS:  Object to the form of the
7  question.
8        MR. WRIGHT:  I join that.
9  BY MR. SLOSAR:
10   Q    And were you worried that Mikey Ashers might
11 abuse that power if he was hired at the Knox County
12 Sheriff's Department?
13   A    Yes.
14   Q    I'm going to ask you a little bit about when
15 you were a -- when you were the sheriff and how you
16 interacted with some of your employees, okay?
17   A    Okay.
18   Q    Do you remember, generally, how many deputies
19 worked under your supervision around the time of the
20 Mills' homicide in December of 2010?
21   A    Probably seven or eight.
22   Q    Okay.  And how did you interact with those
23 deputies during the normal course of operating there in
24 2010?
25   A    Well, we had to answer 911 calls, that was the

Page 51

1  main thing, but we also did paper service, and they --
2  each day, they worked on them when they had time, if
3  they had time.
4    Q    What's paper service, like, subpoenas or
5  something?
6    A    Yes.
7    Q    Okay.  So you guys -- so the sheriff's
8  department was responsible for securing the courthouse,
9  right?
10   A    Yes.
11   Q    Okay.  And how many people did you have
12 assigned over to the Knox County Courthouse back in
13 2010?
14   A    Two.
15   Q    Okay.  And you remember their names?
16   A    In 2010, I -- I'm not sure.
17   Q    Okay.
18   A    They --
19   Q    That's fine.  I know it was a long time ago.
20   A    We replaced them a lot there.
21   Q    Okay.  And then other people under your
22 supervision were responsible for investigations --
23   A    No.
24   Q    -- out here?  No.
25   A    We didn't -- well, certain types of

Page 52

1  investigations, burglaries, or something like that, yes.
2    Q    What type of investigations in December of
3  2010, would your agency re -- be responsible for
4  investigating?
5        MR. WILLIAMS:  I made -- already made a
6  continuing objection to the word "responsibility,"
7  but that continues.  Thank you.  You can answer.
8    A    We -- they would investigate burglaries or car
9  wrecks, things like that.
10   Q    Okay.  So smaller investigations --
11   A    Yes.
12   Q    -- is that fair to say?  Okay.  So -- and
13 we're going to get into the Mills' homicide
14 investigation in a little bit, but was it -- would you
15 agree that by December 20, 2010, it was pretty rare for
16 your agency to be involved in a homicide investigation?
17   A    Yes, it -- we didn't do it.
18   Q    Okay.  And what would happen then with the
19 homicide investigations?  Would they get referred
20 elsewhere?
21   A    Yes.
22   Q    What agencies would they get referred to?
23   A    Kentucky State Police.
24   Q    Okay.  Did you have any sort of method for
25 checking in with your officers about investigations that

Page 53

1  they were conducting?
2    A    I would look over paperwork from time to time.
3    Q    Okay.  Fair to say there wasn't a daily check-
4  in process to see how investigations were coming along?
5    A    No, I didn't do it daily.
6    Q    Probably had a lot of things on your plate,
7  right?
8    A    Yes.
9    Q    Did you ever check in with them at the
10 beginning of their shifts to see how investigations were
11 coming along?
12   A    I have before, yes.
13   Q    Did you do that daily?
14   A    No, I wouldn't say daily.
15   Q    Okay.  And how were police reports submitted
16 in the investigations that were being conducted at the
17 Knox County Sheriff's Department in 2010?
18   A    We had a -- everything was filed and they --
19 they kind of -- each person kept up with their own, and
20 when it was -- I guess when it was finished, we -- we --
21 well, we kept the file, you know.
22   Q    Okay.  Where -- what -- like, did you look
23 over every police report?
24   A    No, I didn't.
25   Q    Okay.  That would have been a lot of police

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 54

1  reports, right?
2      A     (No verbal response.)
3      Q     Were officers under your command required to
4  give you their police reports to review?
5      A     They wasn't required to, no.
6      Q     Where were the investigation files maintained
7  at the Knox County Sheriff's Department in 2010?
8      A     We kept -- we kept some of the -- when we
9  would file them away, we kept some in the office, and
10  then after a certain period of time, we stored them in
11  an outbuilding --
12      Q     Okay.
13      A     -- to keep up with them.  We had -- I mean, we
14  had to keep them, so we store them out there.
15      Q     Is there any sort of retention policy on how
16  long you -- the Knox County Sheriff's Department was
17  required to keep investigation files back in 2010?
18      A     There is, but I -- I'm not aware of how long.
19  Everyone's different.
20      Q     Probably been a long time, right?
21      A     Yeah, it has.
22      Q     I'm going to show you what we'll mark as
23  Exhibit number 4.  These are the policies and procedures
24  that were produced to us in this litigation. Mr.
25  Pickard, if you could take a look at this.

Page 55

1            (EXHIBIT 4 MARKED FOR IDENTIFICATION)
2            MR. WILLIAMS:  I've got a copy of it.
3            MR. SLOSAR:  You sure?  Well, I got an extra
4      copy.  That's for everybody.
5            MR. WILLIAMS:  Oh, I've got one.  I'm good,
6      thanks.
7  BY MR. SLOSAR:
8      Q     Mr. Pickard, do you recognize these?
9      A     Yes.
10      Q     Okay.  And what is this document?
11      A     It's policy and procedure.
12      Q     Okay.  And I know on the front of this
13  document, it looks like your signature is on there; is
14  that right?
15      A     Yes.
16      Q     Okay.  And when did you sign this?
17      A     Looks like 01/17/14.
18      Q     Okay.  Now, is -- still during the course of
19  the Mills' homicide investigation, correct?
20      A     Yes.
21      Q     Okay.  Before the case was dismissed, right?
22      A     Yes.
23      Q     Okay.  Now, my understanding is that although
24  these policies were revised in 2014, that these were the
25  actual policies and procedures that were in place from

Page 56

1  the beginning of the Mills' homicide investigation on
2  December 20, 2010, until the case was dismissed in 2016.
3  Is that your understanding, sir?
4            MR. WILLIAMS:  Object to the form.
5            MR. WRIGHT:  I'll object to form.
6      A     Yes.
7      Q     Okay.  Sitting here today, do you recall any
8  other policies or procedures from the Knox County
9  Sheriff's Department having been in effect during the
10  course of the Mills' homicide investigation?
11      A     No.
12      Q     Okay.  And if you can, you know, just briefly
13  look through these policies or -- let me know when
14  you're done.  I just want to make sure that this is a
15  complete set of policies and procedures that were in
16  effect, and that no policies and procedures are missing
17  from this collection of documents.
18      A     I think that would be everything.
19      Q     So nothing's missing, from what you can tell,
20  correct?
21      A     Not that I can tell, no.
22      Q     Okay.
23            MR. WILLIAMS:  Oh, Elliot, in the copy that
24      I've got, I didn't see a section six, seven, or
25      eight.

Page 57

1            MR. SLOSAR:  I've got six.
2            MR. WILLIAMS:  Mine jumps from five to eight.
3            MR. SLOSAR:  That might be a copying issue.
4  What does yours have?
5            MR. FARAH:  Six is on the back of five.
6            MR. SLOSAR:  Six is just one line.
7            MS. STAPLES:  No, it looks like some have them
8  and some don't.  Am I --
9            MR. SLOSAR:  Does -- is yours complete?
10            MS. STAPLES:  Yeah.
11            MR. WILLIAMS:  Oh, I see six now.  Seven's
12  blank.
13            MR. SLOSAR:  Yeah, I don't see -- oh, seven --
14  but seven's blank on here, too, on your table of
15  contents.
16            MR. WILLIAMS:  You're right.
17            MR. SLOSAR:  And then it looks like 15 and 16
18  and 20 are blank, too.  And six is just one line.
19  Okay.
20            MR. WILLIAMS:  I don't see -- well, it's just
21  --
22            MR. SLOSAR:  Which one?
23            MR. WILLIAMS:  Go ahead.  Sorry.
24            MR. SLOSAR:  Is it complete to the table of
25  contents?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 58

1     MR. WILLIAMS:  Well, there's --
2     MS. STAPLES:  I think it's confusing because
3  it doesn't list it at the top of the page, like,
4  what's...
5     MR. WILLIAMS:  Yeah.  I don't see traffic
6  checkpoints.
7     MR. SLOSAR:  Which --
8     MR. WILLIAMS:  Looks like ten.
9     MS. STAPLES:  I think it's --
10    MR. SLOSAR:  Oh, yeah.  Ten doesn't have a
11 number of pages.
12    MR. WILLIAMS:  Yeah.  Maybe there isn't
13 anything for that.  11, uh-huh.  Yeah, it doesn't
14 identify any pages for that section, so
15 BY MR. SLOSAR:
16    Q    All right.  So what's before you is what you
17 believe to be the complete policies and procedures that
18 were in effect at the time that the Katherine Mills'
19 homicide investigation began, and throughout the
20 investigation, correct?
21    MR. WILLIAMS:  Object to the form.
22    Q    You can answer.
23    A    Yeah, this -- I think was revised, you know,
24 since that -- some, I don't know particularly which
25 ones.

Page 59

1     Q    Okay.  How are these policies physically
2  stored at the Knox County Sheriff's Department?
3     A    They would have been in a cabinet file.
4     Q    And you know what cabinet -- do you know what
5  cabinet that would be in?
6     A    No, I don't right off.
7     Q    Okay.  Who has access to the cabinet at the
8  Knox County Sheriff's -- well, let me strike that
9  question.
10          In 2010, who had access to the cabinet that
11 the Knox County Sheriff's Department's policies and
12 procedures would be kept in?
13    A    Probably, I'm thinking just the -- office
14 manager.  I think we kept it in her office and it was
15 locked at night, so
16    Q    Who was the office manager back then, do you
17 remember?
18    A    My wife.
19    Q    Oh, your wife.  What was her name?
20    A    Libby.
21    Q    Libby?
22    A    Yes.
23    Q    Libby Pickard?
24    A    Yes.
25    Q    Okay.  It's a good name.  And are the policies

Page 60

1  and procedures provided to employees when they're hired
2  at the Knox County Sheriff's Department?
3     A    I -- I'm not sure on that.
4     Q    When you were sheriff, were there any sort of
5  requirements that you that -- that each of the employees be
6  provided with a copy of the policies and procedures in
7  effect at the time?
8     A    Not that I recall.
9     Q    Okay.  When you were sheriff, and during the
10 course of the Mills' homicide investigation, were
11 officers required to be apprised of any revisions to the
12 policies and procedures?
13    MR. WILLIAMS:  Object to the form.
14    A    Not that I recall.
15    Q    When you were sheriff, were officers at the
16 Knox County Sheriff's Department required to review the
17 Knox County Sheriff's Department's policies and
18 procedures?
19    A    I -- I -- I just don't recall what we did or
20 not.  I don't remember.
21    Q    You don't recall any specific requirement that
22 would make officers to review the policies and
23 procedures that were --
24    A    No.
25    Q    And likewise, was there any sort of mandatory

Page 61

1  training to employees of the Knox County Sheriff's
2  Department on how to comply or follow the policies and
3  procedures in effect?
4     A    Not that I recall.
5     Q    You never conducted one of those trainings,
6  right?
7     A    Not that I remember, no.
8     Q    Sitting here today, you don't recall ever
9  training any deputy or employee of the Knox County
10 Sheriff's Department on the policies or procedures in
11 effect, correct?
12    A    No, not that I remember.
13    Q    And you don't have any notes or anything at
14 home that would help refresh your memory as to whether
15 any such training occurred, correct?
16    A    No.
17    Q    When you were first hired -- well, let me
18 strike that question.
19          When you were elected, did anybody re -- sit
20 you down and say that you were required to review the
21 policies and procedures?
22    A    No.
23    Q    So sitting here today, you can't recall any
24 training having taken place at the Knox County Sheriff's
25 Department on the policies or procedures that were --



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 62

1   that are before you, correct?
2       A    Correct.
3       Q    Sitting here today, can you think of any
4   formal mechanisms that exist at the Knox County
5   Sheriff's Department prior to 2010, for communicating
6   the official policies and procedures of the Knox County
7   Sheriff's Department to its employees?
8       A    No.
9       Q    Fair to say that these policies and procedures
10  that are before you aren't mandatory to its employees?
11          MR. WILLIAMS:  Object to the form.
12      A    No, I wouldn't think so.
13      Q    Okay.  Fair to say, sitting here today, that
14  the policies and procedures that were in effect -- here,
15  let me strike that question.
16          At the time of the Katherine Mills' homicide
17  investigation, is it fair to say that Knox County
18  employees weren't required to review the policies and
19  procedures of the department?
20          MR. WILLIAMS:  Object to the form.
21      A    I don't -- they wasn't required to, no.
22      Q    And is it fair to say that by the time of the
23  Katherine Mills' homicide investigation, that employees
24  of Knox County weren't even required to follow the
25  policies and procedures of the Knox County Sheriff's

Page 63

1   Department?
2           MR. WILLIAMS:  Object to the form.
3       A    They was required to go by them.
4       Q    But there was no requirement -- well, let me
5   strike that question.
6           Sitting here today, you can't recall any
7   training having taken place prior to the Katherine
8   Mills' homicide investigation on the policies and
9   procedures, correct?
10      A    I don't recall it, no.
11      Q    And sitting here today -- well, you testified
12  a few minutes ago, that employees of Knox County weren't
13  even required to review the policies and procedures when
14  they were hired, right?
15      A    Not when they was hired, no.
16      Q    By the time that the Katherine Mills' homicide
17  investigation started in December 20, 2010, were you
18  aware of any unwritten policies or procedures that
19  existed at the Knox County Sheriff's Department?
20      A    No.
21      Q    Prior to December 20, 2010, do you recall any
22  of the written policies or procedures at the Knox County
23  Sheriff's Department having ever been audited for their
24  effectiveness?
25      A    Not that I recall.

Page 64

1       Q    Do you recall how often the policies and
2   procedures of the Knox County Sheriff's Department were
3   revised?
4       A    No.  Derek Eubanks did that and he done all --
5   and we went over them, but it was from time to time.  I
6   can't -- no, second time.
7       Q    Fair to say that by the time that the Knox --
8   the Katherine Mills' homicide investigation began in
9   December 20, 2010, that there were no unwritten policies
10  or procedures on how to conduct witness interviews?
11          MR. WILLIAMS:  Object to the form.
12      A    None I know of.
13      Q    Fair to say that at the time that the
14  Katherine Mills' homicide investigation be -- began on
15  December 20, 2010, that there were no unwritten policies
16  or procedures on the documentation of witness interviews
17  and police reports?
18          MR. WILLIAMS:  Object to the form.
19      A    Not that I know of.
20      Q    Fair to say that by the time that the
21  Katherine Mills' homicide investigation began, there
22  were no unwritten policies or procedures on documenting
23  promises of leniency to witnesses?
24      A    No.
25      Q    Fair to say that by the time the Katherine

Page 65

1   Mills' homicide investigation began, that there were no
2   unwritten policies or procedures on interview techniques
3   with witnesses in a homicide investigation?
4       A    No.
5       Q    Fair to say that by the time that the
6   Katherine Mills' homicide investigation began in
7   December of 2010, that there were no unwritten policies
8   or procedures on how to avoid suggestive lineups or
9   photo arrays?
10      A    Not --
11          MR. WILLIAMS:  Object to the form.
12      A    Not that I recall.
13      Q    Fair to say that by the time the Katherine
14  Mills' homicide investigation began, that there were no
15  unwritten policies or procedures on how to conduct a
16  lineup or a photo array?
17      A    Not that I recall.
18      Q    Fair to say that by the time the Katherine
19  Mills' homicide investigation began in December of 2010,
20  that there were no unwritten policies or procedures
21  which instructed police officers not to fabricate
22  evidence?
23          MR. WILLIAMS:  Object to the form.
24      A    Not that I recall.
25      Q    Why did you sign the front page of the



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 66

1  policies and procedures?
2      A    I -- I have no idea.
3      Q    Somebody tell you to sign it?
4      A    I guess, I don't know.  Might have been me.
5      Q    All right.  When you signed it, were you
6  signing it as part of your reveal -- review process?
7      A    I re -- looked through it before I signed it,
8  but --
9      Q    I got a quick question.  You know, earlier you
10 asked -- I have a lot of questions, I'm sorry, but this
11 one is quick.  Earlier you said that Mikey Ashers, that
12 you did not hire him, right?
13     A    Yes.
14     Q    Okay.  And that was based upon concerns that
15 you had about him being an officer in your department,
16 correct?
17     A    Yes.
18     Q    Okay.  And Sheriff Mike Smith eventually took
19 over for you in 2015, right?
20     A    Yes.
21     Q    Okay.  When Sheriff Smith took over to you,
22 would he have had access to -- would he have had access
23 or knowledge of the fact that Mikey Ashers had applied
24 at the Knox County Sheriff's department previously and
25 was rejected?

Page 67

1          MR. WILLIAMS:  Requires him to speculate.
2      Q    You can answer.
3      A    That -- where he put in for it was there
4  somewhere --
5      Q    Yeah.
6      A    -- filed somewhere.  But he really wasn't
7  rejected, I just never interviewed him ever.
8      Q    Okay.  And you purposely never interviewed him
9  because you had concerns about his -- about whether he
10 would be a good police officer or not for your
11 department, right?
12     A    I guess you could say that, yes.
13     Q    Okay.  And why, again, did you have those
14 concerns?
15         MR. WILLIAMS:  Asked and answered.
16     Q    You can answer.
17     A    Well, I just -- I mean, I had heard he was
18 hard -- he had problem dealing with people, and I didn't
19 want -- I didn't want that.
20     Q    Do you remember where you heard that from?
21     A    No, I don't.  Word travels, I don't -- I don't
22 remember.
23     Q    Could it have been from another law
24 enforcement agency?
25     A    It could have been.  I don't -- I don't

Page 68

1  remember.
2      Q    Sir, I'm going to just -- let's -- Mr.
3  Pickard, let's go through these policies real quick,
4  okay?  It looks like the first policy and procedure is -
5  - and I'm looking at page 2.  The first policy and
6  procedure deals with personnel records, right?  It's on
7  page 2.
8      A    Yes.
9      Q    Okay.
10     Q    This policy requires a personnel file to be
11 maintained by the bookkeeper or appropriate designee for
12 each employee; is that right?
13     A    Yes.
14     Q    And it's your understanding that that would
15 include the sheriff himself, right --
16     A    Uh-huh.  Yes.
17     Q    -- or herself, if Knox County had a female
18 sheriff --
19     A    Yes.
20     Q    -- right?  And that when you were employed
21 there at the Knox County Sheriff's Department in 2015,
22 at the time that you left them in 2015, that you
23 yourself had a personnel file that existed, correct?
24     A    Yes.
25     Q    Okay.  And that was in conformance with the

Page 69

1  first policy and procedure of Knox County which requires
2  a personnel file to be kept for each employee, right?
3      A    Yes.
4      Q    Okay.  Now, let's -- the next policy and
5  procedure deals with false credentials; is that right?
6      A    Yes.
7      Q    Okay.  And it's fair to say that that sort of
8  -- if somebody lies during the application process this,
9  you know, gives the sheriff's department a way to
10 terminate that person?
11     A    Yes.
12     Q    Okay.  And I'm going to try to skip through
13 some of this stuff, but looking at the first seven
14 pages, Mr. Pickard, is it fair to say -- well, actually,
15 I'm going to ask that you look through the first nine
16 pages, which is the first policy and procedure.  And
17 when you look through there, the question that I'm going
18 to ask is:  Would you agree that none of these policies
19 and procedures relate to criminal investigations being
20 conducted by the Knox County Sheriff's Department?
21     A    I don't see anything to that.
22     Q    Okay.  And it looks like the next policy and
23 procedure, which it goes back to change 1 -- page 1, it
24 says, Chain of command, so you're on there.  You're on
25 that same page, yep.  But you agree that the second

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 70

1  policy and procedure just relates to chain of command;
2  is that right?
3      A    Yes.
4      Q    Okay.  And again, nothing in this policy or
5  procedure provides any guidance or instruction for
6  officers on how to conduct a criminal investigation; is
7  that right?
8      A    Not that I recall, no.
9      Q    Okay.  The next policy and procedure on the
10  following page relates to discipline; is that right?
11  Sorry, it's on the back side.
12      A    Yes.
13      Q    Okay.  Did you ever discipline any officer
14  under your command, when you were sheriff, for
15  fabricating evidence?
16      A    Not that I remember, no.
17      Q    When you were sheriff, did you ever discipline
18  any officer for withholding exculpatory evidence?
19      A    No.
20      Q    When you were sheriff, did you ever discipline
21  any officer for coercing witnesses?
22      A    No.
23      Q    When you were sheriff, did you ever discipline
24  any officer for conducting a suggestive lineup or a
25  photo array?

Page 71

1      A    No, not that I recall.
2      Q    When you were sheriff, did you ever discipline
3  any officer for initiating charges against an innocent
4  person?
5      A    No.
6      Q    Do you recall discipline -- disciplining
7  anyone under your command between 2005 and December 20,
8  2010?
9      A    Not that I recall, no.
10      Q    Do you recall disciplining anyone under your
11  command between December 20, 2010 and January of 2015
12  when you left?
13      A    Not that I recall.
14      Q    Okay.  So the next -- looks like the next
15  policy and procedure relates to the use of vehicles,
16  that's policy and procedure number 4.  Are you there?
17  Oh, you're there.  This page.
18      A    Number 4?
19      Q    Yeah.
20      A    Okay.  Yeah.
21      Q    Would you, you know, browse through
22  this section real quick and, you know, the question that
23  I pose to you is:  Is it fair to say that nothing in
24  this policy and procedure provides any guidance or
25  instruction to officers on how to conduct a criminal

Page 72

1  investigation?
2      A    I don't see anything, no.
3      Q    Okay.  I'm going to ask that you turn to the
4  next policy and procedure number 5.
5      A    Okay.
6      Q    It looks like it's the use of -- really, into
7  the use of firearms.  Are you there?
8      A    Yes.
9      Q    Okay.  At the bottom, it has some instructions
10  on the use of firearms.  Do you see that?
11      A    Uh-huh.  Yes.
12      Q    Okay.  And it says, "Officers or employees --
13  and employees authorized to handle firearms are
14  prohibited from recklessly handling any firearm, dry
15  snapping any weapon, except on the firing range, and
16  holstering or carrying a weapon in a cock position," do
17  you see that?
18      A    Yes.
19      Q    Okay.  At the time that you -- well, would you
20  agree with me that none of these policies or procedures
21  provide any guidance or instruction to officers on how
22  to conduct a criminal investigation?
23      A    Yes.
24      Q    Okay.  Mr. Pickard, we just went over some
25  pretty specific instructions with firearms.  At the time

Page 73

1  that you declined to interview and hire Mikey Ashers,
2  did you trust that he would be able to use a firearm at
3  the Knox County Sheriff's Department in conformance with
4  this policy?
5      MR. WILLIAMS:  Let me just enter an objection.
6      I'm having trouble understanding how this line of
7      questioning regarding Mr. Asher relates to this
8      lawsuit?
9  BY MR. SLOSAR:
10      Q    You can answer the question, sir.
11      MR. WILLIAMS:  Or anything discoverable about
12      it.  Just make a continuing objection to it.
13      A    I have no idea.  I didn't know him personally.
14      Q    Okay.  But you worried about how he would
15  interact with people, right?
16      A    That was my main concern, yes.
17      Q    Did you ever fear that Mr. Ashers would abuse
18  his firearm if he was hired at the Knox County Sheriff's
19  Department?
20      A    I have no idea.
21      Q    I'm going to refer you to the next policy
22  that's on use of force.  Are you there?  It's one line.
23      A    Yes.
24      Q    Okay.  Now, this policy says, "Use only force
25  necessary to effect arrest as trained," is that right?



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 74

1    A    Yes.
2    Q    Okay.  What -- by the time you left the Knox
3  County Sheriff's Department in 2015, what training was
4  provided to deputies on use of force?
5    A    They did 40 hours a week at -- you know, each
6  year, and I'm sure they've had that, but --
7    Q    Did the Knox County Sheriff's Department
8  directly train any of its employees by the time you left
9  in 2015, on use of force?
10   A    No.
11   MR. WILLIAMS:  Object to the form.
12   Q    Was there any method by which you as sheriff
13 would assess or monitor whether officers under your
14 command understood the use of force policy properly?
15   A    I think they all understood it, yes.
16   Q    Did you ever test them on it?
17   A    No, I can't say that I did.
18   Q    Were there -- was there ever any guidance
19 provided to officers under your command on escalation
20 techniques?
21   A    Not that I recall.
22   MR. WILLIAMS:  You're asking by his
23 department.
24   Q    By your department, yes.
25   A    Not that I recall.

Page 75

1    Q    Okay.  You would agree that nothing in this
2  policy and procedure provides any instruction or
3  guidance to officers at the Knox County Sheriff's
4  Department on how to conduct a criminal investigation,
5  right?
6    A    Not that I know of, I'm aware of, no.
7    Q    Okay.  Let's look at the next policy and
8  procedure, which is number 8.  This deals with domestic
9  violence, correct?
10   A    Yes.
11   Q    Is it fair to say that this policy and
12 procedure only relates to domestic violence calls?
13   A    I don't know.  I'd have to read it.
14   Q    Okay.  Look it over real quick.
15   A    Looks like it's all to do with domestic
16 violence.
17   Q    Okay.  So this policy or procedure wouldn't
18 provide any guidance or instruction to officers on how
19 to handle an investigation which is unrelated to
20 domestic violence.  Is that fair to say?
21   A    Yes.
22   Q    There's no guidance or instructions in this
23 policy or procedure on how to conduct a homicide
24 investigation, right?
25   A    Yes.

Page 76

1    Q    Okay.  All right.  Let's go to the next policy
2  and procedure, number 9.  This relates to evidence on
3  lost property.  Sheriff Pickard, would you agree that
4  this policy and procedure provides instructions to
5  officers on how to handle evidence?
6    A    Yes.
7    Q    Okay.  And would you agree that the main focus
8  of this policy and procedure is to assure that evidence
9  is handled in a proper way, and that chain of custody is
10 appropriately maintained?
11   A    Yes.
12   Q    Okay.  Again, this policy or procedure doesn't
13 provide any instruction to officers on how to conduct a
14 homicide investigation, correct?
15   A    Yes.
16   Q    Let's look at the next policy or procedure,
17 number 11.  This relates to citations.  Please look over
18 this.  Let me know when you're finished, Mr. Pickard.
19   A    Okay.  I think I've got it now.
20   Q    Okay.  So what's the purpose of this policy or
21 procedure?
22   A    To how to -- I guess, how to do a citation
23 correctly and all the information you need to put on it.
24   Q    Okay.  So fair to say that this is -- the
25 purpose of this policy or procedure is to assure that

Page 77

1  officers at the Knox County Sheriff's Department are
2  filling out citations completely?
3    A    Yes.
4    Q    Okay.  And that in addition, that this policy
5  or procedure provides direction to officers at the Knox
6  County Sheriff's Department on the order that citations
7  should be stapled and handed in?
8    MR. WILLIAMS:  Object to the form.
9    A    Yes.
10   Q    Okay.  Fair to say that this policy or
11 procedure does not provide any guidance or instruction
12 to officers on how to conduct a homicide investigation?
13   A    Yes.
14   Q    Okay.  Let's turn to the next policy or
15 procedure.  This is a policy or procedure named,
16 Collision Reports.  Do you see that?
17   A    Yes.
18   Q    Okay.  Again, is it fair to say that this
19 policy or procedure provides instructions to officers on
20 how to handle a car accident investigation?
21   A    Yes.
22   Q    Okay.  Fair to say that this policy or
23 procedure doesn't provide any guidance or instruction on
24 how to handle a homicide investigation?
25   A    Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 78

1    Q   Okay.  Let's look at the next policy or
2   procedure, number 13, dealing with case, incident, car
3   reports.  Are you there?
4    A   Yes, I'm there.
5    Q   Again, is it fair to say that this policy and
6   procedure relates to filling out a police report in a
7   car accident case?
8    A   Yes.
9    Q   Okay.  Fair to say, again, this policy or
10  procedure doesn't provide any instruction or guidance to
11  officers conducting a homicide investigation?
12   A   Yes.
13   Q   Okay.  Go to the next policy or procedure. The
14  vehicle holder, wrecker list.  Would you agree that this
15  policy or procedure does not provide any guidance or
16  instructions on how to handle a homicide investigation?
17   A   Yes.
18   Q   Okay.  Let's look at number 17, Appearance and
19  Dress Code.  Would you agree that this policy and
20  procedure doesn't provide any instruction or guidance to
21  officers on how to handle a homicide investigation?
22   A   Yes.
23   Q   Okay.  And in fact, it doesn't provide any
24  instruction or guidance to officers on how to conduct an
25  investigation at all, right?

Page 79

1    A   Yes.
2    Q   Okay.  Let's look at the next one, number 18,
3   that deals with social networking and internet postings.
4   Would you agree that this policy or procedure does not
5   provide any guidance or instruction to officers of the
6   Knox County Sheriff's Department on how to conduct a
7   criminal investigation?
8    A   Yes.
9    Q   Okay.  Number 19, this policy or procedure,
10  would you agree that it does not provide any instruction
11  or guidance to officers at the Knox County Sheriff's
12  Department, on how to conduct a criminal investigation?
13   A   Yes. Yes.
14   Q   Okay.  Looking at the last one, number 21,
15  would you agree that this policy or procedure relating
16  to cell phones and computers, doesn't provide any
17  guidance or instruction to officers of the Knox County
18  Sheriff's Department on how to conduct a criminal
19  investigation?
20   A   Yes.
21   Q   Okay.
22           MR. WILLIAMS:  Elliot, can we take a break?
23           MR. SLOSAR:  For sure.  Yeah.
24           VIDEOGRAPHER:  Off the record.
25               (OFF THE RECORD)

Page 80

1           VIDEOGRAPHER:  Back on the record.
2   BY MR. SLOSAR:
3    Q   All right.  Mr. Pickard, we went through a
4   little bit of this earlier, and I'm just going to do it
5   in a more specific fashion.  In 2007, was there a policy
6   or procedure in place at the Knox County Sheriff's
7   Department that informed officers that they should not
8   fabricate evidence?
9    A   I wouldn't know that for sure.
10   Q   Okay.  Sitting here today, do you recall a
11  single policy or procedure in place that informed the
12  officers that they should not fabricate evidence?
13   A   I don't recall anything like that.
14   Q   Okay.  And obviously we just went through the
15  written policies and procedures, and there wasn't a
16  single written policy or procedure in place, at least by
17  2010, that informed officers that they should not
18  fabricate evidence, correct?
19   A   Yes.
20   Q   Okay.  Well, what does it mean to fabricate
21  evidence?
22           MR. WRIGHT:  Object to form.
23           MR. WILLIAMS:  I'll join.
24   A   It means you're breaking the law.  I mean --
25   Q   Did you ever have any training sessions for

Page 81

1   your employees when you were sheriff, where you gave
2   them instructions on how to not fabricate evidence?
3    A   I'm sure they had that training in Richmond.
4   No, I didn't.
5    Q   Okay.  And are you aware of any training by
6   the Knox County Sheriff's Department that instructed
7   officers not to fabricate evidence?
8    A   Not that I recall.
9    Q   Okay.  Fair to say that the Knox County
10  Sheriff's Department never instructed their officers
11  that fabricating evidence is a violation of a criminal
12  defendant's constitutional right?
13   A   I don't recall.
14   Q   Can't recall that type of training ever had
15  been done at Knox County, right?
16   A   No.
17   Q   Fair to say that by the beginning of the
18  Mills' homicide investigation, that there was no
19  mechanism in place to assure that officers did not
20  fabricate evidence?
21   A   Not -- not -- I don't recall anything.
22   Q   You testified earlier that you never penalized
23  or disciplined an officer for fabricating evidence,
24  right?
25           MR. WILLIAMS:  Object to the form of the

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 82

1    question.  Assumes facts not in evidence.
2        Q    You can answer.
3        A    I don't recall anything like that.
4        Q    In 2007, were you aware of any written policy
5    or procedure that informed officers at the Knox County
6    Sheriff's Department, that they were required to
7    preserve any material or information that tended to
8    negate the guilt of the accused or reduce his or her
9    punishment for a crime?
10            MR. WILLIAMS:  Object to the form.
11            MR. WRIGHT:  Join.
12       A    I don't recall anything.
13       Q    Okay.  And again, we went through the written
14   policies or procedures a few moments ago, and there's
15   nothing in those written policies or procedures that
16   provides any instructions to officers, that would guide
17   them and inform them that they're required to preserve
18   exculpatory evidence and disclose that evidence to the
19   prosecution or defense, correct?
20            MR. WILLIAMS:  Object to the form.
21            MR. WRIGHT:  Join.
22       A    Correct.
23       Q    And you don't ever recall the Knox County
24   Sheriff's Department providing any training to employees
25   on this issue, correct?

Page 83

1        A    Not the sheriff's department, no.
2        Q    And you personally, as the Knox County
3    sheriff, prior to leaving in 2015, and since being hired
4    in 2003, you never provided any training to your
5    employees on the preservation and disclosure of
6    exculpatory evidence, correct?
7            MR. WILLIAMS:  Your question is stated -- is
8    asking internally at his department?
9            MR. SLOSAR:  Yes.
10           MR. WILLIAMS:  Because there's a difference
11   between --
12           MR. SLOSAR:  I understand.
13           MR. WILLIAMS:  -- requiring your officers to
14   attend the required training.
15           MR. SLOSAR:  I -- yes.  Different question.
16           MR. WILLIAMS:  Uh-huh.
17   BY MR. SLOSAR:
18       Q    You can answer.
19           MR. WILLIAMS:  Go ahead.
20       A    Not at the -- not through the sheriff's
21   department, no.
22       Q    Yep.  And again, you've never personally
23   provided this instruction to any of the deputies under
24   your command, correct?
25       A    Correct.

Page 84

1        Q    And there was no mechanism in place to assure
2    that police officers were documenting and disclosing as
3    exculpatory evidence, while you were sheriff between
4    2003 and 2015, correct?
5        A    Correct.
6        Q    And by the time of the Mills' homicide
7    investigation in 2010, is it fair to say that there was
8    no policy or procedure in place at the Knox County
9    Sheriff's Department, that required officers to document
10   interviews with witnesses during the course of a
11   criminal investigation?
12       A    Not that I'm aware of.
13       Q    And again, we went through the written
14   policies and procedures earlier.  There's nothing in
15   there that provides guidance or instruction on this
16   topic, correct?
17       A    Yes.
18       Q    And you personally, but between the years of
19   2003 and 2015, never informed or instructed your
20   officers on how to document witness interviews, during
21   the course of a criminal investigation, correct?
22       A    Correct.
23       Q    And there was no mechanism in place at the
24   Knox County Sheriff's Department between 2003 and 2015
25   to assure that officers were documenting witness

Page 85

1    interviews in an appropriate fashion, correct?
2            MR. WILLIAMS:  Object to the form.
3        A    Yes.
4        Q    By 2010, were you aware of any written policy
5    or procedure that existed at the Knox County Sheriff's
6    Department, instructing officers not to coerce witnesses
7    in a criminal investigation?
8        A    Not that I'm aware of.
9        Q    And again, you never personally trained or
10   instructed any of your officers not to coerce witnesses
11   in a criminal investigation, correct?
12       A    Correct.
13       Q    And there was no mechanism in place at the
14   Knox County Sheriff's Department that audited or -- let
15   me withdraw that question.
16           There was no mechanism in place between 2003
17   and 2015 at the Knox County Sheriff's Department,
18   assuring that officers did not coerce witnesses in a
19   criminal investigation, correct?
20           MR. WILLIAMS:  Object to the form.
21       A    Correct.
22       Q    And again, between 2003 and 2015, you never
23   disciplined a single officer for coercing a witness,
24   correct?
25       A    Not that I recall, no.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 86

1    Q    Between 2003 and 2015, was there a policy or
2    procedure in place at the Knox County Sheriff's
3    Department that required officers to document any
4    promises of consideration made to a witness in a
5    criminal investigation?
6        A    Not that I'm aware of.
7        Q    And again, you didn't provide, as sheriff,
8    between 2003 and 2015, you didn't provide any direct
9    training or give instructions to officers, that they
10   need to document promises of consideration to a witness
11   in a criminal investigation, correct?
12       A    Correct.
13       Q    Between 2003 and 2015, who was tasked with the
14   responsibility and had the authority at the Knox County
15   Sheriff's Department, to maintain discipline of
16   officers?
17           MR. WILLIAMS: Object to the words
18       "responsibility" and "authority." They may have a
19       legal connotation and continuing with that
20       objection made, you can answer the question.
21       A    Myself and Derek Eubanks.
22   BY MR. SLOSAR:
23       Q    What was Derek Eubanks' position in December
24   2010 at the Knox County Sheriff's Department?
25       A    Chief deputy.

Page 87

1        Q    Okay.  What efforts were made between 2003 and
2    2015 when you left, to investigate officers who were
3    accused of withholding exculpatory evidence?
4            MR. WILLIAMS: Object to the form.  Assumes
5        facts not in evidence.
6        A    None I know of.
7        Q    Between 2003 and 2015 when you were sheriff,
8    what efforts were made to investigate officers who were
9    accused of fabricating evidence?
10           MR. WILLIAMS: Same objection.
11       A    None I know of.
12       Q    What efforts were made between 2003 and 2015
13   to investigate officers who were accused of coercing
14   witnesses?
15           MR. WILLIAMS: Same objection.
16       A    None I know of.
17       Q    What efforts were made between 2003 and 2015
18   to identify officers who were withholding exculpatory
19   evidence?
20           MR. WILLIAMS: Object to the form.  Assumes
21       facts not in evidence.
22       A    None I know of.
23       Q    Between 2003 and 2015, what efforts were made
24   to identify officers who were fabricating evidence?
25           MR. WILLIAMS: Object to the form.  Assumes

Page 88

1    facts not in evidence.
2        A    None I know of.
3        Q    Between 2003 and 2015, what efforts were made
4    to identify officers who were coercing witnesses?
5            MR. WILLIAMS: Same objection.
6        A    None I know of.
7        Q    What efforts were made between 2003 and 2015
8    to prevent police officers from withholding exculpatory
9    evidence?
10       A    None I know of.
11           MR. WILLIAMS: Same objection.
12       Q    Between 2003 and 2015, what efforts were made
13   to prevent police officers from fabricating evidence?
14           MR. WILLIAMS: Same objection.
15       A    None I know of.
16       Q    Between 2003 and 2015, what efforts were made
17   to prevent police officers from coercing witnesses?
18           MR. WILLIAMS: Same objection.
19       A    None I know of.
20       Q    Between 2003 and 2015, what efforts were made
21   to discipline officers for withholding exculpatory
22   evidence?
23           MR. WILLIAMS: Same objection.
24       A    None I know of.
25       Q    Between 2003 and 2015, what efforts were made

Page 89

1    to discipline officers for fabricating evidence?
2            MR. WILLIAMS: Same objection.
3        A    None I know of.
4        Q    Between 2003 and 2015, what efforts were made
5    to discipline officers who were accused of coercing
6    witnesses?
7            MR. WILLIAMS: Same objection.
8        A    None I know of.
9        Q    Mr. Pickard, did you know Amanda Hoskins prior
10   to December 20, 2010, when the Mills' investigation
11   began?
12       A    Yes.
13       Q    How did you know Amanda?
14       A    I knowed [sic] of her on -- where she was
15   charged with a hit-and-run.
16       Q    Okay.
17       A    That's the first that I remember.
18       Q    What do you remember about the hit-and-run
19   incident?
20       A    I didn't -- I don't remember a lot about it.  I
21   just remember a kid was hit with a car and was
22   hospitalized.  I don't -- I don't know nothing about the
23   case because I didn't work it.  I didn't
24       Q    Sitting here today, do you even remember who
25   was driving the car?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 90

1    A    I doubt she was.  I don't know that to be a
2  fact, though.
3    Q    Okay.  Aside from the hit-and-run incident,
4  did you have any other run-ins with Amanda Hoskins prior
5  to December of 2010?
6         MR. WILLIAMS:  Object to the form of the
7  question.  You can answer.
8    A    Just on a couple of arrest, but you mean prior
9  to December 20th?
10   Q    Yeah.
11   A    None that I remember, no.
12   Q    Okay.  Did you know Jonathan Taylor prior to
13  December 20, 2010?
14   A    No.
15   Q    Did you know William Lester prior to December
16  20, 2010?
17   A    I knowed of him, but I didn't -- I didn't know
18  him personally.
19   Q    Okay.  What'd you know of him, do you
20  remember?
21   A    Just the name.
22   Q    Did you know Mike Simpson prior to December
23  20, 2010?
24   A    Not that I remember, no.
25   Q    Did you know Allen Helton prior to December

Page 91

1  20, 2010?
2    A    Yes.
3    Q    How did you know Mr. Helton?
4    A    Where he was arrested on different things.
5    Q    Was Mr. Helton in trouble often?
6         MR. WRIGHT:  Object to form.
7         MR. WILLIAMS:  I'll join.
8    Q    Sorry, I'm just getting a highlighter.
9         MR. WILLIAMS:  Did you understand that
10  question, Mr. Pickard?
11   A    Yeah.  He was -- he was in trouble pretty
12  regular.
13   Q    What kind of criminal cases you recall Mr.
14  Helton getting caught up in prior to the murder of Ms.
15  Mills?
16   A    Theft, mostly.
17   Q    Okay.  Fair to say that he was usually trying
18  to find ways to make money?
19   A    I guess.
20         MR. WILLIAMS:  Requires him to speculate.
21   A    I -- I don't know what his reason was.
22   Q    Okay.  Were you aware of whether Mr. Helton
23  had a pill addiction prior to Ms. Mills' death?
24         MR. WRIGHT:  Object to form.
25   A    I -- I don't really -- I don't know.  I don't

Page 92

1  -- don't know what his problem was.
2    Q    Did you know a person by the name of Robert
3  Beach prior to December 20, 2010?
4    A    No.
5    Q    Did you know Amber Simpson prior to December
6  20, 2010?
7    A    Not her, no.
8    Q    Did you now Christy Branson prior to December
9  20, 2010?
10   A    Yes.
11   Q    How did you know Christy?
12   A    She had been in trouble a few times.
13   Q    Do you remember what kind of trouble?
14   A    Not right off, I don't.
15   Q    Prior to December 20, 2010 -- well, let me
16  strike that. At some point during the course of the
17  Mills' homicide investigation, were you aware that Allen
18  Helton was working as an informant?
19         MR. WRIGHT:  Object to form and foundation.
20   A    Not to my knowledge.
21         MR. WILLIAMS:  Join.
22   Q    What is UNITE?
23   A    Just a program through Hal Rogers.
24   Q    And who is Hal Rogers?
25   A    He's a congressman.

Page 93

1    Q    Okay.  Is UNITE -- does UNITE use informants -
2  -
3         MR. WRIGHT:  Object to form and foundation.
4    Q    -- do you know?
5    A    I'm -- I'm sure they do.
6    Q    Did you know a person by the name of Michael
7  Crump prior to December of 2010?
8    A    No.
9    Q    Did you know Jessie Lawson prior to December
10  of 2010?
11   A    No.
12   Q    Did you have any opinions of Ms. Hoskins prior
13  to December 20, 2010?
14         MR. WILLIAMS:  Object to the form.
15         MR. WRIGHT:  Object and I join.
16   A    No.
17   Q    Did you know Mikey Bruner prior to December
18  20, 2010?
19   A    No.
20   Q    Did you know Joe King prior to December 20,
21  2010?
22   A    No.
23   Q    Did you know Caleb Mills prior to December 20,
24  2010?
25   A    No.  I knowed of her, but I didn't know her

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 94

1  personally.

2  Q    Do you know her mom, Donna Mills?

3  A    Yes.

4  Q    Do you call her by her nickname or her real

5  name?

6  A    Whatever hits me. Cookie most of the time, or

7  what's -- what everybody called her.

8  Q    Cricket?

9  A    Cricket, I mean, not Cookie.

10  Q    You don't think she's crooked, right?

11  A    Do what?

12  Q    You don't think she's crooked, right?

13       MS. STAPLES: He said, "Cookie."

14  A    No.

15       MR. WILLIAMS: I'm sorry, did you say Cricket

16  or Cookie?

17  A    Cricket.

18       MR. SLOSAR: Oh, I thought he said crooked

19  first.

20       MS. STAPLES: No, he said Cookie.

21       MR. WILLIAMS: I'm pretty sure he said Cookie.

22  A    I said, "Cookie."

23  Q    Cookie. Oh. All right. I got it mixed up.

24  Cricket, I think, is her nickname for the record.

25  A    I thought I was wrong, but that's right.

Page 95

1  Q    I'm going to show you what we'll mark as

2  Exhibit number 5. This is your request for production

3  in this case. Please take a look at that. Have you

4  seen this document before, Mr. Pickard?

5       (EXHIBIT 5 MARKED FOR IDENTIFICATION)

6  A    I think so.

7  Q    I know lawyers typically do these responses.

8  I'm going to ask for you to turn to page 2 and look at

9  request number 3. Are you there?

10  A    Yes.

11  Q    So request number 3 asks for any and all

12  documents prepared in connection with the Mills' murder

13  investigation, and the investigation arrest,

14  interrogation, and charging of plaintiffs for the murder

15  of Katherine Mills, including, but not limited to, any

16  and all police reports, collected evidence, lab reports,

17  handwritten notes, crime scene photographs, photo

18  arrays, and photographs of the plaintiffs or other

19  witnesses. The request specifically includes, but is

20  not limited to, the complete investigative file or other

21  files with respect to the Mills' murder investigation.

22  Do you see that question, sir?

23  A    Yes.

24  Q    Okay. In response you said that you have no

25  documents regarding the investigation of the murder of

Page 96

1  Katherine Mills; is that right?

2  A    That's true.

3  Q    Okay. The next request asks for all documents

4  relating to Allen Helton, Mike Simpson, Jessie Lawson,

5  William Lester, Bob Smith, Michael Crump, Christy

6  Branson, Joe King, Dr. Warren, Amber Simpson, Daniel

7  Wilson, Robert Beach, Kayla Mills, Donna Mills, and

8  Margaret Polly. Do you see that request, sir?

9  A    Yes.

10  Q    And do you see the response that you have

11  where it says, "I have no documents regarding the

12  investigation of Katherine Mills"?

13  A    Yes.

14  Q    Is that true, sir?

15  A    Yes.

16  Q    Okay. Looking at the next page, number 3,

17  it's request number 7. Do you see where it says, "Any

18  documents relating to any confidential informants that

19  were used by the department during the Mills' murder

20  investigation," and you responded by saying that, "I

21  have no documents regarding the investigation and murder

22  of Katherine Mills." Is that true?

23  A    Yes.

24  Q    Okay. Mr. Pickard, you participated in the

25  investigation into the death of Katherine Mills,

Page 97

1  correct?

2       MR. WILLIAMS: Object to the form.

3  Q    You can answer, sir.

4  A    I didn't -- I didn't really do any

5  investigating, I -- I just helped locate people, I mean,

6  that was Mr. York's case and he worked it.

7  Q    You joined in the questioning of Allen Helton,

8  right?

9       MR. WRIGHT: Object to form.

10  A    I did sit in on that, yeah.

11  Q    Okay. And you joined in questioning Jonathan

12  Taylor at the Barbourville Police Department, right?

13  A    I sat in on it, yes.

14  Q    And you were present when photographs were

15  taken of Mr. Taylor, correct?

16  A    I don't remember that, but I mean, I don't

17  recall any pictures being made.

18  Q    Well, when you participate in questioning at

19  the Barbourville Police Department of Jonathan Taylor,

20  do you recall Detective Mike Broughton and Detective

21  Jason York being present for that?

22  A    Yes.

23       MR. WRIGHT: I'll object to form.

24       MR. FARAH: Object to form.

25       MR. WILLIAMS: Join.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 98

1  BY MR. SLOSAR:
2      Q    And in fact, during that time, all three of
3  you questioned Mr. Taylor at the Barbourville Police
4  Department, correct?
5      A    I don't remember questioning him.  I was
6  there, but I don't remember asking anything.
7      Q    Okay.  Well, you were present when Mr. Taylor
8  was being questioning by those other officers, right?
9      A    Yes.
10     Q    Okay.  And whose idea was it to put
11  photographs of the crime scene on the table when Mr.
12  Taylor was being questioned?
13     A    I don't know.
14     Q    You don't recall whose idea that was?
15     A    No, I don't.  I don't recall that.
16     Q    Do you -- did you tell Detective Broughton or
17  Detective York to not put photographs on the table?
18     A    No.
19     Q    Mr. Pickard, do you know Dr. Larry Warren?
20     A    Yes.
21     Q    Yeah.  Do you have -- have you -- are you
22  aware of any evidence that exists that would corroborate
23  any allegation that Amanda Hoskins had a relationship
24  with Dr. Larry Warren?
25     A    I have no idea.

Page 99

1      Q    You've never seen Amanda Hoskins with Dr.
2  Warren in Knox County, right?
3      A    No.
4      Q    Okay.  And you don't have any -- you're
5  unaware of any evidence that would indicate that they
6  had anything other than a professional physician/patient
7  relationship, correct?
8      A    Yes.
9      Q    Okay.  So, Mr. Pickard, I know that you said
10  you joined and you were present when some of these
11  people were questioned.  Why are you reluctant to admit
12  that you participated in the investigation into
13  Katherine Mills' death?
14         MR. WILLIAMS:  Objection to the form.
15         MR. WRIGHT:  I'll join.
16     A    I'm not -- I'm not being reluctant, I just,
17  you know, it was Detective York's call.  And the main
18  thing I did was try to help him in any way, and most of
19  that was dealing with people he didn't know.
20     Q    Fair to say you were just doing what Detective
21  York told you to do?
22     A    No.
23     Q    No.  Why not?
24     A    I was just being nice and helping, you know,
25  just trying to help him, whatever he needed.

Page 100

1      Q    Well, he asked you to talk to Kayla Mills,
2  right?
3         MR. WILLIAMS:  Object to form, foundation.  Go
4  ahead.
5         MR. WRIGHT:  I'll join.
6      A    I don't remember that.
7  BY MR. SLOSAR:
8      Q    Well, you did talk to Kayla Mills, though,
9  during the investigation into Katherine Mills' death,
10  correct?
11     A    I was with Detective York when we went to her
12  house one time.
13     Q    Do you remember talking to Kayla during a drug
14  sting in February of 2012, where Jonathan Taylor was
15  arrested?
16         MR. WRIGHT:  Object to form.
17     Q    And Kayla Mills was arrested, and a couple of
18  other people were arrested.  Do you remember being there
19  for that?
20         MR. WILLIAMS:  I'll join.
21     A    Was that at a meth lab?
22     Q    Well, it allegedly was.
23     A    Yes, I remember that.
24     Q    Okay.  And in fact, you were there with Mr.
25  Eubanks, right?

Page 101

1      A    Yes.
2      Q    All right.  During the Katherine Mills'
3  investigation, you spoke to -- you were present and/or
4  participated in the questioning of a number of witnesses
5  and suspects in the homicide; is that right?
6         MR. WRIGHT:  Object to the form.
7         MR. WILLIAMS:  Object to the form.
8      A    You would have to -- it would have to be --
9      Q    Okay.
10     A    -- somebody specific.
11     Q    Okay.
12     A    I can't --
13     Q    During the investigation into Katherine Mills'
14  death, did you speak to Allen Helton?
15     A    Yes.
16     Q    During the investigation into Katherine Mills'
17  death, did you speak to Mike Simpson?
18     A    Yes, one time.
19     Q    During the investigation into Katherine Mills'
20  death, did you speak to Jonathan Taylor?
21     A    Yes.
22     Q    During the investigation into Katherine Mills'
23  death, did you speak to Kayla Mills?
24     A    Yes.
25     Q    During the investigation into Katherine Mills'

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 102

1  death, did you speak to a witness by the name of Bob
2  Smith?
3      A    Yes.
4      Q    Mr. Pickard, just looking back at this Exhibit
5  number 5 and request number 3 where it says that you
6  have no documents regarding the investigation into the
7  murder of Katherine Mills.  Is that truthful?
8      A    Yes.
9      Q    Fair to say that you did not create a single
10 document based upon your interactions with Allen Helton,
11 during the Mills' homicide investigation?
12     A    Yes.
13     Q    Okay.  You never memorialized your
14 conversations with Mr. Helton in a police report, right?
15     A    No.
16     Q    You never took notes during any of your
17 conversations with Mr. Helton, right?
18     A    No.
19     Q    You understood at the time of your meetings
20 with Mr. Helton in 2011 and 2012, that he was a suspect
21 in the homicide of Katherine Mills, correct?
22     A    I don't recall that being so.
23     Q    Well, were you ever informed at any time
24 during your meetings of Mr. Helton in 2011 and 2012,
25 that he was a person of interest in the homicide of

Page 103

1  Katherine Mills?
2          MR. WRIGHT:  Object to the form.
3      A    You're saying in 2011, 2012?  No, I didn't
4  know that.
5      Q    You didn't know that?
6      A    Not that I recall.  I mean
7      Q    Okay.  Well, I'll show you some stuff later.
8  Mr. Pickard, is it fair to say that you did not create a
9  single police report regarding any of the activities you
10 took in assisting Jason York in the Mills' homicide
11 investigation?
12         MR. WRIGHT:  Object to the form.
13     A    That's true.
14     Q    Likewise, fair to say that you never created a
15 single note regarding any of the activities you
16 participated in during the underlying Mills' homicide
17 investigation?
18     A    Yes.
19         MR. WRIGHT:  Object to the form.
20     Q    And was that consistent with the training that
21 you received prior to that time?
22     A    I didn't -- I can't say I ever had training on
23 it.
24     Q    Okay.  Well, was that consistent with your
25 understanding of the policies and procedures in place at

Page 104

1  the Knox County Sheriff's Department, that you weren't
2  required to create a police report or notes about
3  investigative activities you were taking in a homicide
4  investigation?
5          MR. WRIGHT:  Object to the form.
6          MR. WILLIAMS:  Object to the form.  Asked and
7      answered.  Mr. Pickard has stated on numerous times
8      that this was not his investigation.
9  BY MR. SLOSAR:
10     Q    You can answer.
11     A    We didn't investigate murders.  Had I been
12 investigating myself, yes, I -- there would have been a
13 lot different, but I just assisted Detective York.
14     Q    Well, did this -- Detective York ever tell you
15 that he was going to be creating police reports based on
16 the conversations you were having with people?
17     A    Well, I just assumed he did.  That was his
18 job.
19     Q    Okay.  So it would have been -- in your
20 opinion, it's Detective York's responsibility to
21 document the interactions that you both had with
22 witnesses?
23     A    Yes.
24         MR. WRIGHT:  Object to form.
25     Q    What about when Detective York's not present?

Page 105

1  Whose responsibility would it be, then, to document
2  interactions that you have with witnesses?
3          MR. WILLIAMS:  I've made a continuing
4      objection to the use of the word "responsibility,"
5      but you may answer.
6      A    I didn't investigate the murder myself.
7  BY MR. SLOSAR:
8      Q    All right.  I understand that.  Detective York
9  was the lead, right?
10     A    Yes.
11         MR. WILLIAMS:  Object to the form.
12     Q    But you -- during the investigation, you spoke
13 to Kayla Mills without Detective York, right?
14     A    I remember speaking to her one time.
15     Q    Yeah.  And Detective York wasn't there, right?
16     A    Yes, but that was on a -- that was on another
17 --
18     Q    The meth lab.
19     A    -- call that I went on.
20     Q    Sure.  The meth lab thing, right?
21     A    No, it wasn't that.
22     Q    A different one?
23     A    Different one.
24     Q    Okay.  Well, when you talked to Kayla on that
25 occasion, was the -- Detective York present?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 106

1        MR. WRIGHT:  Which occasion, the meth lab or
2    the separate one, sorry?
3        MR. SLOSAR:  The separate time.
4        MR. WRIGHT:  Okay.  Sorry.
5    A   I don't recall taking to her about the murder
6    --
7    BY MR. SLOSAR:
8    Q   **No?**
9    A   -- at the meth lab.  No.  I don't even know
10   would I even talked to her.
11   Q   **Well --**
12   A   I don't -- I don't remember it, if I did.
13   Q   **Let me see if I can refresh your memory.  You**
14   **know what, let me just -- let me get there a little bit**
15   **later.  I'm going to ask for you to turn to your written**
16   **interrogatories.  I think it should be Exhibit 23,**
17   **maybe.**
18       MR. WRIGHT:  It's -- I've got it as 13.
19   Q   **13, I apologize.  I couldn't find them.  Sorry.**
20   **Do you have your interrogatory responses in front of you**
21   **--**
22   A   Yeah.
23   Q   **-- Mr. Pickard?  Okay.  Now, looking at your**
24   **interrogatory response number 4, do you have that in**
25   **front of you?**

Page 107

1    A   Yes.
2    Q   **Okay.  Do you see where it says that you sat**
3    **in on at least one interview with Jonathan Taylor?  Oh,**
4    **you know what, you're going to need to go to the next**
5    **page there.**
6    A   Okay.
7    Q   **Yes, I'm going to ask you about your answer --**
8    **there you go.  It's going to be soon.**
9    A   Okay.
10   Q   **Do you see where it says you sat in on at**
11   **least one interview of Jonathan Taylor?**
12   A   Yes.
13   Q   **Okay.  Is it possible that you sat in on more**
14   **than one with Mr. Taylor?**
15   A   Not that I recall, no.
16   Q   **Did you create any police report based on the**
17   **questioning of Mr. Taylor?**
18   A   No.
19   Q   **Okay.  And fair to say that Mr. Taylor was a**
20   **suspect in the homicide by that point?**
21   A   Yes.
22   Q   **Okay.  And in fact, you and Mr. Broughton and**
23   **Mr. York were interrogating Mr. Taylor about the murder,**
24   **correct?**
25       MR. FARAH:  Object to form.

Page 108

1        MR. WRIGHT:  Object to form.
2        MR. WILLIAMS:  Object to form.  Join.
3        MR. SLOSAR:  It's a good question.
4    A   Mr. Broughton and Mr. York did.  I think I
5    just -- I don't think I said a word in the whole thing
6    that I remember.
7    BY MR. SLOSAR:
8    Q   **Just sat there.  Okay.  Don't remember saying**
9    **anything?**
10   A   I don't remember anything I said.
11   Q   **Well, what were Mr. Broughton and Mr. York**
12   **telling Mr. Taylor in that interrogation?**
13   A   I can't remember.
14   Q   **Fair to say that they were trying to get Mr.**
15   **Taylor to confess?**
16       MR. WILLIAMS:  Asked and answered.  He said he
17       didn't remember.
18   A   I don't remember.  I really don't.  I don't
19   know what they --
20   Q   **You don't know what they said?**
21   A   They just -- you know, they interviewed him.  I
22   mean, I don't know what their intentions were.
23   Q   **Well, isn't it true that Detective York and**
24   **Detective Broughton threatened to charge Jonathan Taylor**
25   **with murder during that questioning?**

Page 109

1        MR. FARAH:  Object to form.
2        MR. WILLIAMS:  Object to form.
3        MR. WRIGHT:  Join.
4    A   I don't recall that statement.
5    Q   **You don't recall that?**
6    A   No.
7    Q   **Could have happened, but you don't remember,**
8    **right?**
9    A   I don't remember.
10       MR. FARAH:  Object to form.
11   Q   **How -- what was the interrogation room like at**
12   **the Barbourville Police Department when Mr. Taylor was**
13   **being questioned that day?**
14       MR. WRIGHT:  Objection to form and foundation.
15       Go ahead.
16   A   It's just a small room with a table in it,
17   that's about it.
18   Q   **Now, prior to the questioning of Jonathan**
19   **Taylor, were you aware that he had a limited mental**
20   **capacity?**
21       MR. WRIGHT:  Object to form and foundation.
22       MR. WILLIAMS:  Join.
23   A   Not that I recall, no.
24   Q   **Did you think he was slow at all?**
25       MR. WRIGHT:  Object to form and foundation.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

---

Page 110

```
 1    A    No.
 2         MR. WILLIAMS:  Same.
 3    A    I didn't see that.
 4    Q    Mr. Taylor, during this questioning, said that
 5  he was innocent, right?
 6    A    I can't recall.
 7         MR. WILLIAMS:  Object to the form.  Asked and
 8  answered.
 9    Q    So you don't recall anything that happened
10  during the questioning of Jonathan Taylor in this case?
11    A    The only thing I can really say I remember is
12  I was there.  I don't remember what was said.
13    Q    Okay.  Now, you said -- you say that there
14  should be a record of that interview, either written or
15  recorded, that would reflect what was said; is that
16  right?
17    A    Yes.
18    Q    Okay.  Did you create a record of that
19  interview?
20    A    No.
21    Q    Did you have a conversation with Detective
22  Broughton about whether he was going to record that
23  interview?
24    A    No.
25    Q    Okay.  And it was his police department,
```

---

Page 111

```
 1  right?
 2    A    Yes.
 3    Q    Was he chief of police back in 2012?
 4    A    I'm not sure.
 5    Q    Okay.  Did you have a conversation with
 6  Detective York about whether he was going to record that
 7  interview?
 8    A    No.
 9    Q    Was there an agreement between you and
10  Detective York and Detective Broughton as to who was
11  going to take notes?
12    A    No.
13    Q    And the next sentence of your interrogatory,
14  you state that you spoke with Detective York about
15  locating potential witnesses in the community and try to
16  answer Detective York's question as he began his
17  investigation.  Do you see that?  Should be --
18    A    Yeah.
19    Q    Okay.  What witnesses did Detective York ask
20  you -- for you to assist in locating?
21    A    I can't remember everybody, but I remember a
22  couple, maybe.  I remember him asking me about Lynn
23  Brown, he wanted to talk to, and maybe Cleo Brown.
24    Q    And is it -- and in fact, you actually
25  assisted Mr. York in talking to one of the Browns,
```

---

Page 112

```
 1  right?
 2         MR. WILLIAMS:  Object to the form.
 3         MR. WRIGHT:  I'll join.
 4    A    I can't -- I can't remember who we actually
 5  talked to.
 6    Q    Do you remember on January 4, 2011, pulling
 7  Allen Helton over for a DUI stop?
 8    A    Me pulling him over?
 9    Q    Yeah.
10    A    No, I don't remember that.
11    Q    Do you remember being with Detective York and
12  talking to one of the Browns as Allen Helton drove past
13  in his Ford Ranger?
14    A    I don't recall that, no.
15    Q    Aside from the Browns, who else do you recall
16  Detective York asking you to help him locate?
17    A    I can't -- I can't recall right off.
18    Q    Did Detective York ask for your assistance in
19  locating Bob Smith?
20    A    No.
21    Q    Whose idea was it to talk to Bob Smith?
22    A    It was his, Detective York's.
23    Q    Okay.  Did Detective York as for your help in
24  locating Kayla Mills?
25    A    No.
```

---

Page 113

```
 1    Q    Did Detective York ask for your assistance in
 2  locating Mike Simpson?
 3    A    No.
 4    Q    Did Detective York ask for your assistance in
 5  locating Allen Helton?
 6    A    Not that I recall.
 7    Q    Now, you say in this interrogatory response
 8  that you tried to answer Detective York's questions as
 9  he began his investigation.  Do you see that, sir?
10    A    That I what?
11    Q    That you tried to answer Detective York's
12  questions as he began his investigation; is that right?
13    A    Yes.
14    Q    What questions do you recall Detective York
15  asking you?
16    A    I don't have any idea.
17    Q    Okay.
18    A    It's been too long.
19    Q    Do you have any notes or anything that would
20  help refresh your recollection in that regard?
21    A    No.
22    Q    Fair to say that you communicated with
23  Detective York even after Ms. Hoskins, Mr. Taylor, and
24  Mr. Lester were charged with murder?
25    A    I'm sure I seen him from time to time.  I
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 114

```
1    don't recall any of it, but --
2    Q    And you like Jason York, right?
3    A    Yeah.
4    Q    Think he's a good guy --
5    A    I think --
6    Q    -- right?
7    A    Yes, I think he's all right.
8    Q    You think he was a good police officer?
9    A    I don't have no idea.  I don't -- as far as
10   working with him, I never worked -- just around him
11   some.
12   Q    Well, you saw some of the stuff that he did in
13   this case, right?
14   A    I heard it here the other day, yes.
15   Q    You remember when Detective York came in here
16   the other day and said that he's threatened witnesses.
17   Do you remember him saying that?
18        MR. WRIGHT:  Object to form.
19   A    I don't recall that right off.
20   Q    Well --
21   A    I'm remembering -- no, I don't remember him
22   actually saying that.
23   Q    But you remember hearing him actually threaten
24   a witness during that -- an interview that took place in
25   the investigation, in a different homicide
```

Page 115

```
1    investigation, right?
2         MR. WRIGHT:  Object to form.
3         MR. WILLIAMS:  Join.
4    A    I remember him talking about using it as a
5    tactic.  I remember that, but --
6    Q    Yeah.  I think Detective York said that
7    threatening witnesses was a tactic.  You remember him
8    saying that?
9         MR. WRIGHT:  Object to form.
10        MR. WILLIAMS:  Join.
11   A    Not in them words, maybe.
12   Q    Okay.  But do you ever threaten a witness as
13   part of a tactic?
14        MR. WRIGHT:  Object to form.
15        MR. WILLIAMS:  Join.
16   A    I don't ever remember doing it.
17   Q    Well, let me ask it a different way:  Do you
18   think it's appropriate to threaten a witness?  Do you
19   think that that's an appropriate law enforcement tactic?
20        MR. WRIGHT:  Object to form and foundation.
21        MR. WILLIAMS:  Join.
22   A    Repeat that one more time.
23   Q    Sure.  Mr. Pickard, do you believe that it's
24   an appropriate investigative tactic for a law
25   enforcement officer to threaten a witness?
```

Page 116

```
1         MR. WRIGHT:  Same objection.
2    A    Not in some cases, no.
3    Q    But in some cases, yes?
4    A    Some -- every case is different.
5    Q    Well, in your opinion, is it fair to say that
6    in some cases, you believe it is appropriate to threaten
7    a witness and that that's a legitimate law enforcement
8    tactic?
9         MR. WILLIAMS:  Objection and requires him to
10        speculate.
11        MR. WRIGHT:  Object to form and foundation.
12   A    No.
13        MR. WILLIAMS:  Join.
14   Q    Okay.  And in this case, would it have been
15   appropriate for a police officer to threaten a witness?
16        MR. WRIGHT:  Object to form and foundation.
17        MR. WILLIAMS:  Join.
18   A    I don't -- I don't have no comment on that.
19   Q    Well, it's -- I'm not trying to be rude, but I
20   need an answer out of you that's not a "no comment."  I'm
21   going to ask it to you again.  In the investigation into
22   the death of Katherine Mills, would it have been an
23   appropriate law enforcement tactic for a police officer
24   to threaten a witness?
25        MR. WRIGHT:  Same objection.
```

Page 117

```
1         MR. WILLIAMS:  Object to the form, foundation.
2    A    I just don't know.
3    Q    Why don't you know?
4         MR. WRIGHT:  Object to form and foundation.
5         MR. WILLIAMS:  Objection and argumentative.
6    A    I don't -- I just don't know.  I mean,
7    different agents works different cases.  I mean, I don't
8    -- I don't understand really what -- what you're saying,
9    "threatened," I mean --
10   Q    Okay.  Let me give you an example.  That --
11   that's fair.  So you're saying on January 4, 2011, you
12   don't have any recollection of participating in a pull
13   over of Allen Helton with Detective York that day?
14        MR. WILLIAMS:  Asked and answered.
15   A    I don't recall pulling him over, but Detective
16   York might.
17   Q    I'm going to show you what we'll mark as
18   Exhibit number 14.  This is PL Bates 18940 through
19   18943.  And I do have a copying issue with this one, so
20   I'm going to hand a copy to counsel for review, I only
21   have two copies, and then I'll show a copy to Mr.
22   Pickard.  Actually, let me mark this first.  Sorry.  Can
23   we go off the record?  I just --
24        (EXHIBIT 14 MARKED FOR IDENTIFICATION)
25        VIDEOGRAPHER:  Off the record.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 118

```
1                    (OFF THE RECORD)
2            VIDEOGRAPHER:  Back on the record.
3   BY MR. SLOSAR:
4        Q    Okay.  Now, Mr. Pickard, we just had a short
5   break, right?
6        A    Yes.
7        Q    Let me get my -- I'm sorry.  I forgot to put
8   this thing on.  And over that break, you had a moment to
9   consult with your attorney; is that right?
10       A    Yes.
11       Q    Okay.  I'm not going to ask you anything about
12  the substance of those conversations.  Did you also have
13  a moment to consult with Mike Broughton as well?
14       A    We talked just a second, yeah.
15       Q    Yeah.  And you had a chance to communicate
16  with Mr. Broughton's attorney, Mr. Farah, down there at
17  the end of this table; is that right?
18       A    Yes.
19       Q    Okay.  And before we went on a break, you had
20  provided some testimony about how you were present when
21  Detective York and Detective Broughton were questioning
22  Jonathan Taylor about the Mills' homicide investigation.
23  Do you test -- do you recall testifying to that effect
24  earlier today?
25            MR. FARAH:  Object to the form.
```

Page 119

```
1        A    Yes.
2            MR. WRIGHT:  Same.
3            MR. WILLIAMS:  Object to the form.
4        Q    All right.  Looking at Exhibit 14, do you
5   recognize this document, Mr. Pickard?
6        A    I don't know it, really.
7        Q    Okay.  Well, looking at the second page of
8   this document, do you see where it has some charges that
9   were initiated against Allen Helton on January 4, 2011?
10       A    Yes, I see that.
11       Q    Okay.  Okay.  And it seems, from looking at
12  this document, that Allen Helton was charged on that day
13  with operating a motor vehicle under the influence,
14  failure to wear seat belts, failure to register transfer
15  of motor vehicle, and failure of owner to maintain
16  required insurance.  Does that seem right, sir?
17       A    Yes.
18       Q    Okay.  I'm going to ask you to turn to the
19  last page.  Let me know when you're there.
20       A    I'm there.
21       Q    Okay.  And this is for that same case number,
22  11-T-136 against James Allen Helton, correct?
23       A    Yes.
24       Q    Okay.  And do you see where it says, "The
25  complaining witness.'  Do you see that?  And it's right
```

Page 120

```
1   under James Allen Helton.
2            MR. WILLIAMS:  I think he's actually wanting
3        you to look at this other page, Mr. Pickard.
4        A    Oh.
5            MR. WILLIAMS:  Yeah.  If you turn to the last
6        page, which is actually --
7            MR. SLOSAR:  I'm sorry.  That was --
8            MR. WILLIAMS:  -- the one you're looking at.
9        Right here.
10       A    Yes.
11  BY MR. SLOSAR:
12       Q    Okay.  Who is the complaining witness in this
13  citation?
14       A    Jason York.
15       Q    From KSP, right?
16       A    Yes.
17       Q    All right.  Does that refresh your memory in
18  any regard as to participating in a traffic stop of Mr.
19  Helton on January 4, 2011 with Detective York?
20       A    I -- I just don't remember --
21       Q    Okay.
22       A    -- being with him when he was charged with
23  that.
24       Q    Okay.  So is it fair to say that you don't
25  remember anything that happened after Mr. Helton was
```

Page 121

```
1   pulled over on January 4, 2011?
2        A    I -- I guess.  I mean, I don't -- I just don't
3   --
4            MR. WILLIAMS:  Don't guess.  If you know, tell
5        him.
6        A    I don't remember that happening.
7        Q    Okay.  You don't remember being there for that
8   traffic stop, right?
9        A    No.
10       Q    You don't remember -- and if you don't
11  remember being there for the traffic stop, is it fair to
12  say that you don't remember anything that happened
13  between Mr. Helton and Mr. York, which would have
14  occurred at that traffic stop?
15            MR. WRIGHT:  I'll object to the form.
16       A    No, I don't.
17       Q    Okay.  Have you ever seen Detective York grab
18  Allen Helton's face and tell him that he should go down
19  the street and let the victim's family beat the fuck out
20  of him?
21            MR. WRIGHT:  Object to form.
22       A    No.
23            MR. WILLIAMS:  Object to form.  Lack of
24       foundation.
25       A    I don't remember.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 122

1     MR. WILLIAMS:  Assumes facts not in evidence.
2     Q     So you don't remember that happening?
3     A     I've never seen nothing like that.
4     Q     Never seen anything like that?
5     A     No.
6     Q     You ever seen Detective York grab Allen
7  Helton's face?
8     A     No.
9     Q     How many times have you been in the presence
10 of Detective York and Allen Helton?
11    A     Just -- all I can remember right off is the
12 one time where he interviewed him.
13    Q     And that was in your office, right?
14    A     Yes.
15    Q     And you were present for that entire --
16    A     Yes.
17    Q     -- interview, right?
18    A     Yes.
19    Q     All right.  I'm going to point you back to the
20 interrogatory, which is Exhibit number --
21    MR. WILLIAMS:  I'm sorry.  Elliot, what number
22 did you make that citation?
23    Q     This is 14.  And I'm pointing now to the
24 interrogatory that we were talking about earlier.  I
25 believe it's number 4, where you went through the

Page 123

1  different activities that you participated in during
2  this investigation.  Are you there?
3     A     Yes.
4     Q     Okay.  Now, it said that you tried to answer
5  Detective York's questions as he began his
6  investigation.  This is on page 4.
7     A     Okay.
8     Q     The middle of that paragraph.  Let me know if
9  you see that.
10    A     Yes.
11    Q     Okay.  Did you do your best to answer
12 Detective York's questions during the investigation into
13 the death of Katherine Mills?
14    A     Just whatever he asked me, I would have did my
15 best.
16    Q     Do you remember any questions that Mr. York
17 asked you?
18    A     Other than knowing somebody, where they lived
19 or something, no.
20    Q     Okay.  The next sentence in your interrogatory
21 responses, you spoke with Defendant Broughton at the
22 time of Plaintiff, Jonathan Taylor's, questioning, but
23 that you cannot recall any statements made at the time.
24 Do you see that?
25    A     That's true.

Page 124

1     Q     Okay.  And that goes back to what you were
2  testifying to earlier where you said that you were
3  present with Mr. Broughton -- Mr. York is -- Jonathan
4  Taylor was being questioned at the Barbourville Police
5  Department, right?
6     MR. FARAH:  Object to the form.
7     MR. WRIGHT:  Join.
8     MR. WILLIAMS:  Join.
9     A     I -- I was there.  I don't -- I didn't
10 participate.  I mean, I remember being there, yes.
11 BY MR. SLOSAR:
12    Q     You were actually in the interrogation room as
13 Jonathan Taylor was being questioned, correct?
14    MR. FARAH:  Object to form.
15    A     I was in the -- I was in there when it
16 started, I could have got up and left.  I don't
17 remember.
18    Q     Okay.  You don't remember anything that you
19 said, right?
20    A     I didn't say anything.
21    Q     Okay.  Well, you don't remember anything that
22 any --
23    A     I don't remember saying.
24    Q     -- other officers said, right?
25    A     No.

Page 125

1     Q     You don't remember anything that Jonathan
2  Taylor said back, right?
3     A     I don't remember.
4     Q     Okay.  Do you know who got the photographs, to
5  put them on the table --
6     A     No.
7     Q     -- in that room?  Was it you?
8     A     No.
9     Q     On December 20, 2010, did you go to the scene
10 where Ms. Mills' body was found?
11    A     Yes.
12    Q     And how did you first find out about the --
13 about Ms. Mills' passing away?
14    A     Originally, I think it come through 911 and my
15 deputy responded.
16    Q     Did -- was Derek Eubanks at the scene as well?
17    A     I don't think so.  Not that I remember, no.
18    Q     What did you do after you responded to the
19 scene?
20    A     I just -- I guess -- we -- they called for the
21 state police to come because we didn't work murders, and
22 they got there and did their -- started their
23 investigation.
24    Q     Did you talk to any of the witnesses at the
25 crime scene?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 126

1    A   I probably did at some point.  I don't
2  remember what was said.
3    Q   Do you recall the names of any witnesses that
4  you would have spoken to at the crime scene?
5    A   I mean, I -- I could have spoke to any of them
6  that was there, I just don't remember.  I don't
7  remember.  I mean, I kind of let them do their thing.  I
8  just was there.
9    Q   In this interrogatory response, you say that
10  at some point, you spoke to Mark Mefford, Dallas
11  Eubanks, Jason Bunch, and Brian Johnson; was that true?
12    A   That's probably -- yeah, it's true.
13    Q   Okay.  Did you talk to each of those officers
14  at the crime scene?
15    A   Just -- I have no idea what we talked about.
16  It might not have had nothing to do with this, I don't
17  know.  I can't remember.
18    Q   But you remember you talked to each of them at
19  the scene of the crime; is that right?
20    A   I probably did.  I mean, I don't --
21    Q   Well, you have these names written down here
22  in your interrogatory response, right?
23    A   Yeah.  I mean, they was there.
24    MR. WILLIAMS:  Excuse me.  The answer says,
25    "At some point."

Page 127

1    Q   Okay.  All right.  That's fair.  So at some
2  point in the Katherine Mills' homicide investigation,
3  you had an opportunity to speak with Mark Mefford,
4  Dallas Eubanks, Jason Bunch, and Brian Johnson; is that
5  right?
6    A   Yeah, probably.
7    Q   Okay.  But you're not saying here today that
8  you had the conversations with them necessarily at the
9  crime scene, but that it was at some point throughout
10  the investigation; is that right?
11    A   True.
12    Q   Okay.  Do you recall the substance of any
13  conversation you had with Mark Mefford about the
14  investigation into Katherine Mills' death?
15    A   No.
16    Q   Do you recall the substance of any
17  conversation you had with Dallas Eubanks regarding the
18  investigation into Katherine Mills' death?
19    A   No.
20    Q   Do you recall the substance of any
21  conversation you had with Jason Bunch regarding the
22  investigation into Katherine Mills' death?
23    A   No.
24    Q   Do you recall the substance of any
25  conversation you had with Brian Johnson regarding the

Page 128

1  investigation into Katherine Mills' death?
2    A   No.
3    Q   Do you have any notes or documents at home
4  that would refresh your recollection as to the substance
5  of any conversation you had with these officers?
6    A   No.
7    Q   How often did you communicate with Detective
8  York in the investigation into Katherine Mills' death?
9    MR. WILLIAMS:  Object to the form.
10    A   Just -- I mean, it wasn't an everyday thing,
11  just when he needed help with something, I would help
12  him if he need me.
13    Q   When did you just -- when did you first find
14  out that Detective York was going to initiate charges
15  against Amanda Hoskins, Jonathan Taylor, and William
16  Lester?
17    A   I just don't -- I don't recall.
18    Q   Did Jason tell you?
19    A   I don't remember him telling me, he could
20  have.  I don't know.
21    Q   I'm going to ask that you turn to your
22  response to interrogatory number 10.  It's on page 7.
23    A   Page 10?
24    Q   Yes.
25    MR. WILLIAMS:  Interrogatory number 10?

Page 129

1    Q   Oh, sorry.  Page 7, interrogatory 10.  Yes,
2  Jason.  Sorry.
3    MR. WILLIAMS:  103.
4    THE WITNESS:  I have that, too, all of this.
5    MR. WILLIAMS:  All right.  Okay.  He's looking
6    for page 7.
7    A   Page 7, 10.
8  BY MR. SLOSAR:
9    Q   Okay.  You have that in front of you, sir?
10    A   Yes.
11    Q   Okay.  In your response to this interrogatory
12  which requests each specific investigative task that you
13  participated in during the Mills' murder investigation,
14  you state that you assisted KSP Officer Jason York, you
15  were familiar with the area than people who lived there,
16  and helped him, being Jason York, locate persons of
17  interest, and that you were present for the interview of
18  Jonathan Taylor, and you were present when Mr. Taylor
19  was arrested by Mike Broughton; is that true?
20    A   I don't -- I don't recall an interview.  I
21  don't recall him being arrested.  I'm not saying he
22  wasn't, I don't remember that.
23    Q   Do you see where it says that you helped
24  Detective York locate persons of interest?
25    A   Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 130

1    Q    What persons of interest did you help
2 Detective York locate?
3    A    A while ago, I give some names that's -- and
4 there was more than that, I just don't recall them right
5 off.
6    Q    Was Allen Helton a person of interest that you
7 helped Mr. York locate?
8         MR. WILLIAMS:  Object to the form.
9    A    I don't remember talking to Allen other than
10 in my office.
11   Q    My question's a little bit different.  Did you
12 help Detective York locate Allen?
13   A    No.
14   Q    Did you assist Detective York in locating Mike
15 Simpson?
16   A    I think him and I both knowed where he lived.
17   Q    Did you assist Detective York in locating
18 Jessie Lawson?
19   A    I don't know Jessie Lawson.
20   Q    Did you assist Detective York in locating Bob
21 Smith?
22   A    We both knowed where he lived.
23   Q    Okay.  What do you recall about you and
24 Detective York meeting with -- well, let me strike that.
25 Do you now Vernon Bennett?

Page 131

1    A    No.
2    Q    No.  Have you ever talked to Vernon Bennett
3 during the investigation into the death of Katherine
4 Mills?
5    A    Not that I'm aware of.
6    Q    How many times did you and Detective York talk
7 to Cleo Brown during the underlying investigation?
8    A    I don't -- I don't remember me and him talking
9 to her, period.  With -- I mean, seemed like we -- we
10 tried to find her one time and couldn't, but I'm not
11 going to -- I don't remember her talking to both of us,
12 no.
13   Q    Is Cleo related to your wife?
14   A    Well, probably to a -- it's according to how
15 far back you want to go.
16   Q    You know where Cleo Brown lives, though,
17 right, or you -- you know what, let me strike that.
18 In December of 2010 and early 2011, January, would you
19 have known where Cleo Brown lived?
20   A    I probably would have at the time, but I can't
21 remember.  She moves around a lot.
22   Q    Were you -- what do you recall about the
23 arrest of Jonathan Taylor by Mike Broughton?
24   A    I can't remember him being arrested by Mike
25 Broughton.

Page 132

1    Q    Okay.  But in your interrogatory responses, do
2 you see where it says, "I was present for the interview
3 of Jonathan Taylor and was present when he was arrested
4 by Mike Broughton."  Do you see that?
5    A    Well, I see that, but --
6    Q    Saying you just don't remember any of the
7 details --
8    A    I just don't.
9    Q    -- of that arrest now?
10   A    I don't remember him being arrested, no.
11   Q    Do you remember Mike Broughton and yourself
12 picking Jonathan Taylor up to bring him to the
13 Barbourville Police Department before he was questioned?
14        MR. WRIGHT:  Object to form, foundation.
15        MR. FARAH:  Objection to form.
16   A    I -- I just don't remember that.
17   Q    Mr. Pickard, I'm going to fast forward to
18 interrogatory number 14.  It has a list of names and you
19 gave some responses in response to those names.  Are you
20 on page 9 and do you see interrogatory number 14?
21   A    Yes.
22   Q    Okay.  Mr. Pickard, on interrogatory number 14
23 you state that you and Detective York went to speak with
24 Mike Simpson during the underlying investigation into
25 the death of Katherine Mills; is that true?

Page 133

1    A    Could you repeat that question?
2    Q    Sure.  So the -- specifically, the number 2
3 has Mike Simpson?
4    A    Yes.
5    Q    So if you go to Mike Simpson, your answer to
6 number 2, it says that, "I was with Jason -- KSP Jason
7 York -- and went to his home to speak with him in
8 relation to Mike Simpson."  Is that truthful?
9    A    Yes.
10   Q    Okay.  Did you and Detective York go to Mike
11 Simpson's home shortly after the murder was -- or let me
12 strike that question. Did you and Detective York first
13 go to Mr. Simpson's home within a week or two of Ms.
14 Mills being found dead?
15   A    I couldn't tell you when we went.  I remember
16 going, but I don't remember when.
17   Q    Okay.  When you went to Mr. Simpson's home,
18 did you see Mr. Simpson hand Detective York a post-it
19 note with the names of alibi witnesses?
20   A    I don't recall that.
21   Q    Okay.  I'm going to show you what we'll mark
22 as Exhibit number 6.  Mr. Pickard, please take a look at
23 this document.
24        (EXHIBIT 6 MARKED FOR IDENTIFICATION)
25        MR. WILLIAMS:  Oh, you got one for me?  Thank



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 134

1    you.
2          MR. WRIGHT:  Sorry, Elliot, which exhibit did
3    you --
4          MR. SLOSAR:  6.
5          MR. WRIGHT:  6.
6    BY MR. SLOSAR:
7       Q    I think we're going in chronological order,
8    hopefully, moving forward.  That's my goal.  Mr. Pickard,
9    is this the post-it note that Mike Simpson handed to
10   Detective York when you and him went to go speak?
11         MR. WILLIAMS:  Object to the form.  Go ahead.
12         MR. WRIGHT:  Object to form and foundation.
13      A    I don't remember him giving him a sticky note.
14      Q    You don't?  What do you recall about your
15   meeting with Mike Simpson in the presence of Detective
16   York?
17      A    I remember -- I don't remember who got the
18   information, but he had a stolen four-wheeler there and
19   I remember checking it, and I don't remember what was
20   said between them.
21      Q    Did Detective York ever give you a copy of the
22   sticky note that you have before you?
23      A    Not that I'm aware of.
24      Q    Did Detective York tell you at any point
25   during the investigation, that Mike Simpson gave him a

Page 135

1    sticky note with alibi witnesses without Detective York
2    even asking for it?
3       A    I don't recall that.
4       Q    Did Detective York ever -- well, let me strike
5    that. When you -- in the meeting with Mike Simpson that
6    you recall having with Detective York and this four-
7    wheeler issue, do you recall searching Mike Simp- son's
8    home at all?
9       A    No.
10      Q    Do you recall searching any of his vehicles
11   for evidence that could have been related to the Mills'
12   homicide?
13         MR. WRIGHT:  Object to form, foundation.
14         MR. WILLIAMS:  Join.
15      A    I don't even remember a vehicle being there
16   that day.
17      Q    What did Mike Simpson tell you when you met
18   with him that day?
19      A    I don't recall what -- what was said.  I don't
20   even remember talking to Mike.  I remember being there.
21      Q    Was Detective York taking the lead on talking
22   to Mike Simpson?
23      A    He was talking to him.
24      Q    Was he talking to him about the murder of
25   Katherine Mills?

Page 136

1       A    I have no idea what he's talking about.  I
2    don't remember.  I wasn't -- I might have been over
3    there running the four-wheeler or something, but I just
4    remember being there.
5       Q    So you don't have any recollection as to what
6    was said to Mike Simpson when you and Detective York met
7    with him; is that right?
8       A    No, I can't recall anything.
9       Q    And do you have any recollection as to any
10   statements that Mike Simpson made to you or Detective
11   York during that meeting?
12      A    No.
13      Q    Do you have any notes that would refresh your
14   recollection?
15      A    Don't have any notes.
16      Q    Was the interview recorded?
17      A    I don't think so.  I don't know, but I don't
18   remember it being recorded.
19      Q    Prior to going to speak with Mike Simpson, did
20   you learn that he was a person of interest in the
21   homicide?
22      A    I just don't recall.
23      Q    Prior to speaking with Mike Simpson, had you
24   learned that Mike Simpson, Allen Helton had gone on a
25   trip to Florida to get pills after the death of

Page 137

1    Katherine Mills?
2       A    I remember that they was gone.
3       Q    Yeah.  And did Detective York tell you about
4    that?
5       A    Yes.
6       Q    Okay.  And was that one of the reasons why you
7    and Detective York were going to speak to Mr. Simpson
8    that day?
9          MR. WILLIAMS:  Requires him to speculate as to
10         why York went, but you can answer the question if
11         you know.
12      A    I -- I don't know.
13   BY MR. SLOSAR:
14      Q    And I'll show you what we'll mark as Exhibit
15   number 7.  Mr. Pickard, when was the first time that you
16   saw --
17            (EXHIBIT 7 MARKED FOR IDENTIFICATION)
18         MR. WILLIAMS:  Take a look at it before you
19         answer any questions, okay?
20   BY MR. SLOSAR:
21      Q    When was the first time that you saw car
22   rental records relating to Mike Simpson?
23      A    I don't remember seeing any records on Mike
24   Simpson.
25      Q    Are you saying that today is the first day

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 138

1  that you learned that car rental records exist from a
2  car that Mike Simpson rented on the day that Katherine
3  Mills was found dead?
4      A   I had heard he did, I don't ever remember
5  seeing a record of it.
6      Q   Okay.  Did Detective York tell you about these
7  records during the investigation?
8      A   I think so.
9      Q   And is it your recollection that Detective
10 York told you about this rental car issue and Mike
11 Simpson renting a car with cash after Ms. Mills was
12 killed?  Did he tell you about this information prior to
13 you two going over to Mike Simpson's house to speak with
14 him?
15         MR. WILLIAMS:  Objection to the form.
16     A   I don't remember when he told me, I remember
17 him telling me about it.
18     Q   He told you about these records before Amanda
19 Hoskins and Jonathan Taylor were charged with murder in
20 2012, right?
21     A   I don't remember the time.
22     Q   Did you ever search one of Mr. Simpson's
23 vehicles?
24     A   Not that I'm aware of.
25     Q   Did you ever question Mr. Simpson about his

Page 139

1  whereabouts on December 20, 2010?
2      A   No, I didn't.
3      Q   Were you ever present when Mr. Simpson was
4  questioned about his whereabouts on December 20, 2010?
5      A   Not that I remember.
6      Q   I'm going to show you what we'll mark as
7  Exhibit number 8.  Mr. Pickard, are these -- who do
8  these photographs depict?
9         (EXHIBIT 8 MARKED FOR IDENTIFICATION)
10     A   Michael Simpson.
11     Q   And did you and Detective York take these
12 photographs of Mike Simpson when you were at his home?
13     A   I can't remember that, but it could have been.
14 I just don't remember him taking picture of him.
15     Q   Well, is these -- are these photographs of
16 Mike Simpson, is this an accurate reflection of what he
17 looked like around the time of Katherine Mills death?
18     A   Yeah, he's looked like that ever since I ever
19 saw him.
20     Q   Okay.
21     A   I guess.
22     Q   You don't recall exactly who took these
23 photographs?
24     A   No.
25     Q   Okay.  Well, what -- at the time -- well, did

Page 140

1  you learn, prior to seeing Mr. Simpson with Detective
2  York, did you learn that there was an eye witness in
3  this case by the name of Michael Crump?
4      A   Yes.
5      Q   Okay.
6         MR. WRIGHT:  Object to the form.  Go ahead.
7      Q   And was it your understanding that Mr. Crump
8  says that he saw a man walk into a blue vehicle around
9  the time that Ms. Mills was found dead?
10     A   I remember him -- something like that, to that
11 effect, yeah.
12     Q   Okay.  Is it fair to say that the purpose of
13 taking the photographs of Mike Simpson was to show these
14 photographs to Mr. Crump?
15     A   I don't know.
16     Q   Okay.
17     A   I don't know what his reason was.
18     Q   Did you ever make a request that Mike Simpson
19 take a polygraph examination?
20     A   No.
21     Q   Did you ever request that Mike Simpson come
22 down to the Knox County Sheriff's Department for
23 questioning about the Mills' homicide?
24     A   No.
25     Q   Did you ever make a request that Mike

Page 141

1  Simpson's phone records be subpoenaed to determine
2  whether he had conversations with Allen Helton or Jessie
3  Lawson around the time of the murder?
4      A   No.
5      Q   Did you ever request to have Mike Simpson's
6  DNA taken to compare to physical evidence obtained at
7  the scene?
8      A   No.
9      Q   Did you ever request that fingerprints be
10 taken from Mike Simpson to be compared to physical
11 evidence recovered at the scene?
12     A   No.
13     Q   Was it your understanding during the Mills'
14 homicide investigation, that approximately five $100
15 bills were left at the scene next to the victim's purse?
16     A   Yes.
17     Q   Okay.  And was it your understanding that
18 during the Mills' homicide investigation, that
19 fingerprints were actually found on those bills?
20     A   I don't know anything about the fingerprints.
21     Q   Mr. Pickard, who is Vernon Bennett?
22     A   I don't know.  I don't know a Vernon Bennett.
23     Q   Are you -- is it your testimony here today
24 that you did not interview Vernon Bennett during the
25 Mills' homicide investigation?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 142

1    A   No, I didn't.
2        MR. WILLIAMS:  Object to the form.
3    Q   Well, were you -- did you participate in any
4  interview of Vernon Bennett during the Mills' homicide
5  investigation?
6    A   Not that I know of.  I don't know him.
7    Q   Did Vernon Bennett ever tell you that Mike
8  Simpson called in the early morning hours of December
9  20, 2010 and wanted to borrow $50?
10   A   No.
11   Q   Did Vernon Bennett ever tell you that when Mr.
12 Simpson arrived later that afternoon, he had a brand-new
13 car and didn't need to borrow money?
14   A   No.
15   Q   Now, was it your understanding that Mr. Crump
16 described the suspect as wearing a camouflage coat?
17   A   I can't remember what he -- what he said.
18   Q   Okay.  Did Vernon Bennett tell you that Mike
19 Simpson had a camouflage coat like the one being
20 described by Mr. Crump?
21       MR. WRIGHT:  Object to form and foundation. Go
22 ahead.
23       MR. WILLIAMS:  Join.
24   A   I don't -- like I said, I don't know a Vernon
25 Bennett.

Page 143

1    Q   Did Vernon Bennett tell you that he hadn't
2  seen Mike Simpson in a -- in that camouflage coat since
3  Katherine Mills' was found dead?
4    A   No.
5        MR. WRIGHT:  Same objection.
6    Q   Did Vernon Bennett tell you that Mike Simpson
7  was driving a blue car on December 20, 2010?
8        MR. WRIGHT:  Same objection.
9        MR. WILLIAMS:  Asked and answered.  This
10 witness has already testified --
11   A   No.
12       MR. WILLIAMS:  -- repeatedly that he's not
13 familiar with a Vernon Bennett.
14       MR. SLOSAR:  I understand.  I'm just perfect-
15 ing the impeachment.
16 BY MR. SLOSAR:
17   Q   Is it fair to say that you never drafted a
18 police report in the Mills' homicide investigation
19 regarding any conversation with Vernon Bennett?
20   A   No.
21   Q   How many times did you speak with Mike Simpson
22 during the Mills' homicide investigation?
23       MR. WILLIAMS:  Object to the form.
24   A   As far as I remember, just that one time is
25 all I was there.

Page 144

1    Q   That was at his house?
2    A   Yes.
3    Q   You recall where he was living back then?
4    A   At Moore's Creek.
5    Q   Moore's Creek.  Was anyone else --
6        MR. WRIGHT:  It was in Morris Creek?
7        THE WITNESS:  Moore's, M-O-O-R-E-S.
8        MR. WRIGHT:  Thank you.
9  BY MR. SLOSAR:
10   Q   Was anyone else present outside from yourself,
11 Mike Simpson, and Detective York?
12   A   Not that I remember, no.
13   Q   Do you consider Mike Simpson to be a person of
14 interest today in the homicide of Katherine Mills?
15   A   No.
16   Q   Why not?
17   A   I don't know, I don't know nothing about it.
18   Q   Okay.  So you don't have any information one
19 way or the other as to whether he was involved?
20   A   No.
21   Q   Was it suspicious to you back in 2011 when you
22 found out that he went on a pill run immediately after
23 the death of Katherine Mills?
24       MR. WRIGHT:  Object to form, foundation.
25       MR. WILLIAMS:  Object to the form.  Lack of

Page 145

1  foundation.
2  BY MR. SLOSAR:
3    Q   You can answer.
4    A   It did look odd, I agree.  But I -- I don't
5  know the situation.
6    Q   Who is Bob Smith?
7    A   He's a drug dealer in Moore's Creek.
8    Q   All right.  How many times did you meet with
9  Bob Smith during the Mills' investigation?
10   A   One time, as far as I remember.
11   Q   And who else was present with you?
12   A   Detective York.
13   Q   Okay.  Whose idea was it to go meet with Bob
14 Smith?
15   A   Detective York.
16   Q   All right.  And did you and Detective York
17 meet with Bob Smith down at his home?
18   A   Yes.
19   Q   What part of Knox County was that in?
20   A   Moore's Creek.
21   Q   All right.  Why did you and Mr. York meet with
22 Bob Smith that day?
23   A   Detective York wanted -- asked to talk to him
24 about some things.
25   Q   In the conversation that you and Detective

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 146

1  York had with Bob Smith, did you tell Mr. Smith that
2  you'd sweetened his drug trafficking charges -- that you
3  would sweep his drug trafficking charges under the rug
4  if he told you how much money Ms. Hoskins and Mr. Lester
5  had been spending with him?
6          MR. WRIGHT:  Object to form, foundation.  Go
7      ahead.
8      A    I didn't hear the comment made.
9      Q    Did you make that comment?
10     A    No, I don't think I said a word.
11     Q    Well, did anybody in your presence tell Bob
12  Smith that they would help him out on his drug charges
13  if he gave a statement against Ms. Hoskins?
14     A    No.
15     Q    No.  How long did you and Mr. York speak to
16  Bob Smith that day?
17     A    Probably seven or eight minutes, max.
18     Q    What did you say to him?
19     A    I don't remember saying anything to him.
20     Q    What did Detective York say to him?
21     A    He told him when we first went in -- he told
22  him we was there, we wasn't there to talk to him about
23  his drug dealing, he wanted to talk to him about
24  something else.
25     Q    And why weren't you guys there to talk to him

Page 147

1  about his drug dealing?
2      A    I did not know it.  Well, I knowed he done it.
3  He just --
4      Q    Got away with it?
5      A    No, he didn't get away.
6          MR. WRIGHT:  Object to form, foundation.
7          MR. WILLIAMS:  Join.
8      Q    You're saying you didn't have any evidence
9  implicating Bob Smith in drug trafficking back then?
10     A    Yeah, we had plenty evidence.
11     Q    Did you arrest him that day?
12     A    No.
13     Q    Did Mr. Smith tell you and Detective York, in
14  this conversation, that Amanda Hoskins had never
15  purchased drugs from him?
16     A    He told Jason York that.
17     Q    And did Mr. Smith tell Detective York, in your
18  presence, that he had actually never even seen or met
19  Amanda Hoskins?
20          MR. WILLIAMS:  Did you say see or met?
21          MR. SLOSAR:  Seen or met.
22          MR. WILLIAMS:  Thank you.
23     A    I'm not sure about that.
24  BY MR. SLOSAR:
25     Q    But you did hear Bob Smith tell Detective York

Page 148

1  that Amanda Hoskins wasn't buying drugs from him, right?
2      A    Yes, I remember him saying that.
3      Q    And isn't it true that Bob Smith also told
4  Detective York that William Lester wasn't buying drugs
5  from him either?
6      A    Yes, he told him that.
7      Q    Now, did Detective York write that stuff down
8  in your presence?
9      A    No, I don't remember --
10     Q    Okay.
11     A    -- whether he did or not.
12     Q    You didn't take any notes, right?
13     A    No.
14     Q    Okay.  You weren't recording it, right?
15     A    No.
16     Q    Do you know whether Detective York was
17  recording that?
18     A    I don't think so.
19     Q    Who's Frank Edward?
20     A    Who?
21     Q    Frank Edward.  Do you know him?
22     A    No.
23     Q    Okay.  Now, Bob Smith was later arrested for
24  drug trafficking.  Do you recall that?  After your
25  conversation with him?

Page 149

1          MR. WRIGHT:  I'm going to object to the form
2      and foundation.
3          MR. WILLIAMS:  I'll join.
4      A    I think I remember hearing about it.
5  BY MR. SLOSAR:
6      Q    Okay.  Were you involved in that arrest at
7  all?
8      A    No.
9      Q    Do you recall what else Bob Smith told
10  Detective York while you were there?
11     A    I don't recall anything.
12     Q    Mr. Pickard, who is Kayla Mills?
13     A    Donna Mills' daughter.
14     Q    On how many occasions during the investigation
15  into Katherine Mills' death, did you speak with Kayla?
16     A    Probably two or three times.  I can't remember
17  for sure.
18     Q    On February 12, 2012, did you participate in a
19  search at 43 Full Moon Court [sic], Barbourville,
20  Kentucky?
21     A    I was there, yes.
22     Q    I'll show you what we'll mark as Exhibit
23  number 9.  Here you go, Mr. Pickard.
24          (EXHIBIT 9 MARKED FOR IDENTIFICATION)
25     A    Thank you.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 150

1    Q    Mr. Pickard, do you recognize this document?
2    A    Yeah, I mean, it's -- I think it's the first
3  time I ever saw it, but I know what -- I know what it's
4  about.
5    Q    Okay.  What's this document about?
6    A    It's where the meth lab was found.
7    Q    Okay.  And this is from a search that happened
8  on February 12, 2012 in the early morning hours; is that
9  right?
10   A    Yes.
11   Q    According to -- and you participated in that
12 search, correct, sir?
13   A    Yes.
14   Q    Okay.  According to this report, did officers
15 from the Barbourville Police Department and Kentucky
16 State Police assist your office in conducting a search?
17   A    To the best of my memory, there was some of
18 them there, yes.
19   Q    And I'm going to ask for you to go to page 4.
20 I think it will list some of those officers.  It should
21 look like this.  Yeah.  It's going to be in that
22 paragraph right there.
23   A    Yes.
24   Q    Okay.  Mr. Pickard, can you review that
25 paragraph and let me know if officers from the Kentucky

Page 151

1  State Police and Barbourville Police Department assisted
2  your department in the search?
3    A    Yes, I remember.
4    Q    Okay.  Now, when this search happened, did the
5  officers involved wear any sort of mask to cover their
6  face?
7    A    Not that I'm aware of.
8    Q    From looking at this report, are you able to
9  determine which -- and I think on that first page, if
10 you turn to the first page of this report, can you
11 determine which officer initiated charges against the
12 five people inside that residence?
13   A    Derek Eubanks.
14   Q    Okay.  And going back to page 4 of that
15 paragraph, did Dallas Eubanks and Detective Randy Hunter
16 assist your department in conducting the search?
17   A    I don't know a Randy Hunter.  No, that was --
18 yeah, for the cleanup, yes.
19   Q    Okay.  And aside from yourself, did Derek
20 Hoskins -- or Derek Eubanks assist in conducting this
21 search on behalf of the Knox County Sheriff's
22 Department?
23   A    Yes.
24   Q    Okay.  And is it fair to say that on behalf of
25 the Barbourville Police Department, that Josh Lawson,

Page 152

1  Clay Helton, and Jacob Knuckles assisted in the search
2  on behalf of that department?
3    A    Yes.
4    Q    Okay.  Now, why was this search of the
5  residence conducted; do you recall?
6    A    I can't say for sure.
7    Q    Okay.  I believe that this report references
8  something about a 911 call.  Do you have any
9  recollection of the information provided in that call?
10   A    No, I remember.  I thought somebody called it
11 in, but I wasn't positive, so
12   Q    And Jonathan Taylor was one of the people
13 inside the residence at the time, correct?
14   A    Yes.
15   Q    Okay.  Did you have any conversations with Mr.
16 Taylor while you were at the residence with him?
17   A    No, not that I can remember, no.
18   Q    All right.  And Kayla Mills was also one of
19 the individuals inside the home at the time of the
20 search, correct?
21   A    Yes.
22   Q    Okay.  And a number of other individuals were
23 arrested during the search, right?
24   A    I think so.
25   Q    Kim Helton was arrested, correct?

Page 153

1    A    Yes.
2    Q    Michael Bailey was arrested, correct?
3    A    I think so.  I'm not --
4    Q    And Josh Garland was arrested as well,
5  correct?
6    A    (No verbal response.)
7    Q    Now, looking at the 4th page, staying on the
8  4th page, do you see at the top where it says, "Date and
9  time of occurrence, February 11, 2012 at 1922 hours, to
10 February 12, 2012 at 724 hours"?
11   A    Yes.
12   Q    Is it fair to say that the officers did not
13 completely leave the scene until 7:24 a.m. on February
14 12, 2012?
15        MR. WRIGHT:  Object to form and foundation.
16        MR. WILLIAMS:  Join.
17   A    That's probably true.
18        MR. WILLIAMS:  Don't guess.  If you know, Mr.
19 Pickard, tell him, but don't guess.
20   Q    Do you have any independent recollection?
21   A    No.
22   Q    Now, you stayed at the residence and had a
23 conversation with Kayla Mills on the couch; isn't that
24 right?
25        MR. WRIGHT:  Object to form and foundation.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

154..157

Page 154

1    A    I don't remember talking to Kayla that night.
2    Q    Well, is it true, sir, that you had a
3  conversation with Kayla Mills that lasted about an hour
4  or two --
5         MR. WRIGHT:  Objection.
6    Q    -- on the couch in that residence before she
7  was arrested?
8    A    No.
9         MR. WRIGHT:  Object to form and foundation.
10        MR. WILLIAMS:  Join.
11   Q    Do you have any recollection?
12   A    No.
13   Q    Have you ever told Kayla to say that she was
14 passed out in the car and woke up when she saw Jonathan
15 Taylor and Amanda Hoskins coming out of the house --
16   A    No.
17   Q    -- Katherine Mills' house?
18   A    No, I've never told her that.
19   Q    Never told her that?
20   A    No.
21   Q    Do you ever tell Kayla that you believe that
22 she fell asleep in the car when Jonathan Taylor and
23 Amanda Hoskins were inside Katherine Mills' home?
24   A    No.
25   Q    Never said anything like that?

Page 155

1    A    No.
2    Q    Did you ever tell Kayla Mills that you knew
3  that she wasn't involved in the murder of Katherine
4  Mills?
5    A    No.
6    Q    You never told her that?
7    A    I don't remember telling her that, no.
8    Q    Did you believe that Kayla Mills was involved
9  in the murder --
10   A    Yes.
11   Q    -- of Katherine Mills?
12   A    To a point.
13   Q    Based on what?
14   A    Just -- I guess, you could say, just -- I
15 mean, I don't know, I just felt like she was involved
16 some way.  She did a lot of talking.
17   Q    To who?
18   A    To other people.
19   Q    Who?
20   A    Just people in the neighborhood told you
21 things, I can't tell you a name.
22   Q    What did Kayla allegedly tell those people?
23   A    I -- I can't recall right off.  I mean --
24   Q    You have any notes at home that would refresh
25 your recollection?

Page 156

1    A    I don't have no notes.
2    Q    So you had a gut feeling that Kayla was
3  involved, is that what you're saying?
4    A    Yes.
5    Q    Okay.  But you didn't have any evidence that
6  actually directly implicated Kayla in murder, correct?
7    A    No.
8    Q    You ever tell Kayla that she'd spend the rest
9  of her life in jail if she didn't give a statement?
10   A    No.
11   Q    Did you ever tell Kayla that you didn't want
12 her to spend the rest of her life in jail?
13   A    I don't remember saying anything.
14   Q    When you saw Kayla Mills on February 12, 2012
15 during the search, did she tell you that she was not
16 involved in the homicide of Katherine Mills?
17   A    I don't even remember talking to Kayla Mills
18 that night.
19   Q    You said earlier you had two or three
20 conversations with Kayla throughout the investigation,
21 right?
22   A    Yes.
23   Q    Did Kayla Mills, in those conversations, al-
24 ways maintain her innocence?
25   A    Two of the times I talked to Kayla Mills, it

Page 157

1  wasn't nothing to do with the murder.
2    Q    What was it to do with?
3    A    We was -- she about run over me in another
4  part of the county.  I was walking, she about run over
5  me.
6    Q    So you went to go talk to her about that?
7    A    No.  By the time I got to my car, she was too
8  far gone, she was moving on.  I went -- when I got back
9  in my car, I went to Brown Springs, she almost hit me
10 head on coming out of Brown Springs.
11   Q    Did you think it was on purpose?
12   A    No.
13   Q    What did you think she did that for?
14        MR. WRIGHT:  Object to form, foundation.
15   A    I just think she just --
16        MR. WILLIAMS:  Requires him to speculate.
17 Objection.
18   A    She just drove crazy, I guess.
19   Q    Did you talk to her about that?
20   A    I told her she needed to slow down before she
21 kills somebody.
22   Q    What did she say back?
23   A    I don't recall what she said.  She was crying,
24 she didn't say much.
25   Q    Well, you spoke to her at least one time about

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 158

1   the actual homicide, right?
2       A    Yes.
3       Q    Okay.  In that conversation with Kayla, did
4   she maintain her innocence to you?
5       A    Yes.
6       Q    Kayla Mills told you, in fact, that she didn't
7   have anything to do with the murder, correct?
8       A    Yes, she told me that.
9       Q    And she told you, in fact, that she didn't
10  have any information about who did the murder, right?
11      A    I think so.
12      Q    In the conversation that you had with her,
13  Kayla never told you anything about anyone ever
14  confessing to her, correct?
15      A    Yes.
16      Q    And in fact, in your opinion, did she seem
17  cooperative --
18           MR. WRIGHT:  Object to the --
19      Q    -- with your questions about the homicide?
20           MR. WRIGHT:  Object to form and foundation.
21           MR. WILLIAMS:  I'll join.
22      Q    You can answer.
23      A    I remember.  Yeah, she was always cooperative,
24  it seemed like.
25      Q    Just -- she was a pretty young girl back then,

Page 159

1   right?
2       A    Yeah.
3       Q    When you had this conversation with Kayla
4   about the actual homicide investigation, not when she
5   was driving her car recklessly, but when you spoke to
6   her about the actual homicide investigation, do you
7   recall where that conversation happened at?
8       A    I remember going to her house and Jason
9   talking to her.  I might have said a couple of things, I
10  didn't say much.
11      Q    Okay.  So during that time at Kayla's house,
12  she was actually talking to you and Detective York?
13      A    Yes.
14      Q    Okay.  Were any other officers there?
15      A    No.
16      Q    Do you remember if there were any other --
17  like, was her mother or father there at the house?
18      A    I don't -- no, I don't think there was anybody
19  there.
20      Q    Okay.  So in this conversation that Kayla had
21  with you and Detective York at her home, she informed
22  both of you that she didn't have any involvement in the
23  murder, correct?
24      A    Yes.
25      Q    And during this conversation at Kayla's home,

Page 160

1   she informed both you and Detective York that she didn't
2   have any information about who actually committed the
3   murder of Katherine Mills, correct?
4       A    Yes.
5       Q    During this conversation with you and
6   Detective York, Kayla Mills informed you that she didn't
7   have any knowledge of anyone confessing to have done
8   that murder, correct?
9       A    Yes.
10      Q    Okay.  And you believed her, right?
11           MR. WRIGHT:  Object to form and foundation.
12           MR. WILLIAMS:  I'll join.
13      Q    You can answer.
14      A    To a point.
15      Q    Now --
16           MR. WILLIAMS:  Is this a good time to take a
17  break for lunch?
18           MR. SLOSAR:  Just a couple more minutes, if
19  that's okay?
20           MR. WILLIAMS:  Okay.
21  BY MR. SLOSAR:
22      Q    Is that okay, Mr. Pickard?
23      A    That's fine.
24      Q    Okay.  And did you record that conversation
25  that you had with Kayla Mills in the house with

Page 161

1   Detective York?
2       A    I didn't.
3       Q    Okay.  Did Detective York?
4       A    I don't think he did.
5       Q    Okay.  Did you take any notes during that
6   conversation?
7       A    No, sir.
8       Q    Did you ever document the information that you
9   learned from Kayla Mills that day in a police report?
10      A    No.
11      Q    Did Detective York make any threats to Kayla
12  Mills during that conversation?
13      A    Not that I remember, no.
14      Q    Okay.  Did he ever -- did Detective York, in
15  that conversation, ever tell Kayla that he was going to
16  charge her with murder?
17           MR. WRIGHT:  Object to form and foundation.
18      A    I don't recall.
19           MR. WILLIAMS:  I'll join.
20      Q    Did Detective York tell her that -- did
21  Detective York, in that conversation, tell Kayla that he
22  would charge her with murder unless she gave a statement
23  against somebody?
24           MR. WRIGHT:  Object to form, foundation.
25      A    I don't recall that.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 162

1    Q    Not saying it didn't happen, just saying you
2  don't remember, right?
3    A    I don't remember.
4        MR. WRIGHT:  Object to form and foundation.
5  Misstates it.
6    Q    After you spoke with Kayla that day, you
7  didn't believe that she was involved in the murder of
8  Katherine Mills, right?
9        MR. WRIGHT:  Object to form, foundation.
10       MR. WILLIAMS:  I'll join.
11   Q    Is that right?
12   A    At that time, I don't -- I don't remember what
13 I thought.
14   Q    Well, if you thought that she was involved in
15 the murder, you would have -- well, if you believed that
16 Kayla Mills was involved in the murder, would you have
17 given her her Miranda warning before interviewing her?
18   A    No.  I would have had to have evidence.  I
19 didn't have nothing.  I wouldn't have done that no way,
20 that's up to Jason York.
21   Q    That's right.  Okay.  By the time you spoke to
22 Kayla Mills, you weren't aware of any evidence that
23 implicated her in the murder, correct?
24   A    Not that I recall, no.
25   Q    How often did you try to speak with Kayla

Page 163

1  Mills during the investigation?
2    A    I don't know.
3        MR. WILLIAMS:  Object to the form of the
4  question.
5    A    I don't know.  I even tell her -- a couple of
6  time's all I remember ever talking to her.
7        MR. SLOSAR:  You want to take a break?  That's
8  fine.  Can we agree to do just, like, 40 minutes;
9  is that okay?
10       MR. WILLIAMS:  40 minutes.  That's fine.
11       VIDEOGRAPHER:  Off the record.
12            (OFF THE RECORD)
13       VIDEOGRAPHER:  Back on the record.
14 BY MR. SLOSAR:
15   Q    Mr. Pickard, before we went on a break, I was
16 asking you some questions about a girl by the name of
17 Kayla Mills.  Do you remember that?
18   A    Yes.
19   Q    Okay.  Now, at some point, you said that you
20 had one conversation with her about a homicide
21 investigation into Katherine Mills' death; is that
22 right?
23   A    I was present.
24   Q    So you were present for one conversation with
25 Kayla Mills --

Page 164

1    A    Yes.
2    Q    -- about Katherine Mills' death, right?
3    A    Yes.
4    Q    Okay.  Detective York was also present, right?
5    A    Yes.
6    Q    Okay.  In that conversation, did Kayla tell
7  you and Detective York that she was not dating Jonathan
8  Taylor at the time of the murder?
9    A    I'm pretty sure, yes.
10   Q    Okay.  And in that conversation, did Kayla
11 Mills tell you and Detective York that -- let me strike
12 that.  Sorry.
13       Did you create any police report about the
14 conversation that yourself and Detective York had with
15 Kayla about the Mills' homicide?
16   A    No.
17   Q    And that's because you didn't believe you were
18 required to, right?
19   A    I didn't think anything, any kind of reports
20 or anything.
21   Q    And that was consistent with your
22 understanding of the Knox County policies and
23 procedures, right?  Not documenting an interview?
24   A    I wasn't -- I wasn't taken anything, any --
25 any kind of notes, anything.

Page 165

1    Q    Okay.  But that's -- that was -- you didn't
2  have -- at the time that you met with Kayla Mills, you
3  weren't aware of any policy or procedure of Knox County
4  that would have required you to take notes or draft a
5  police report based on the information you learned from
6  her, correct?
7    A    I wasn't aware of it, no.
8    Q    Okay.  Now, between December 20, 2010 and
9  April of 2012, you knew where Kayla Mills was living in
10 Barbourville, right?
11   A    Yes.
12   Q    Okay.  And isn't it true that you actually
13 helped Detective York locate her in Barbourville?
14   A    I can't say for sure.
15   Q    Do you recall that Kayla Mills, between --
16 well, let me strike that.  Between December 20, 2010 and
17 April of 2012, did Kayla Mills live across the street
18 from Escoe's Market in Barbourville, Kentucky?
19   A    I don't know the dates, but that's where I
20 know she lived.
21   Q    Okay.  Sometime during that -- and at some
22 point during that range of December 20, 2010 and April
23 1, 2012, Kayla Mills live across from Escoe's, correct?
24   A    As far as I know, yes.
25   Q    Did you ever park your police vehicle in the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 166

1    Escoe's Market parking lot do surveillance on Kayla
2    Mills?
3        A    No.
4        Q    Did you ever park your vehicle over at the
5    Escoe's parking lot and watch -- or wait for Kayla Mills
6    to come home?
7        A    No.
8        Q    No?  Did you ever park your police vehicle
9    over at Escoe's Market and do surveillance on any other
10   residents that was in close proximity to it?
11       A    Not in his parking lot, I didn't.
12       Q    Did you park next to Escoe's and do
13   surveillance?
14       A    Across the road, I did.
15       Q    Okay.  And was that close to Kayla's house?
16       A    Yes.
17       Q    Okay.  And when you say, "across the road,"
18   can you describe where, approximately, you parked your
19   police cruiser?
20       A    There was a apartment building across the
21   road, I sit there a lot.  It had nothing to do with
22   Kayla Mills, though.
23       Q    What did it have to do with?
24       A    Just -- I just sit there and rest and watch
25   traffic.  We have a lot of things going on there.

Page 167

1        Q    And did you do that -- were you known to do
2    that between December 20, 2010 and April 1, 2012?
3        A    I'm sure I did, yes.
4        Q    But it's your testimony that it didn't have
5    anything to do with Kayla Mills; is that right?
6        A    No.  It didn't have anything to do with her.
7        Q    If you saw Kayla Mills come home, would you go
8    talk to her sometimes?
9        A    No.
10       Q    No?
11       A    No.
12       Q    But when you were doing this, you know, when
13   you were sitting in this parking lot, you were aware
14   that Kayla Mills was a -- let me strike that.  Between
15   two -- December 20, 2010 and April 1, 2012, you were
16   aware that Detective York wanted to interview Kayla
17   Mills for the investigation into Katherine Mills' death,
18   correct?
19            MR. WRIGHT:  Object to form and foundation.
20            MR. WILLIAMS:  Requires him to speculate.
21       A    I -- I can't say that, no.
22       Q    Okay.  Okay.  Have you ever followed Kayla
23   Mills?
24       A    No.
25       Q    Who is Kayla's grandmother, do you know?

Page 168

1        A    I -- I think I know who her grandma was.
2        Q    Did you ever talk to Kayla Mills' grandmother
3    about this case?
4        A    No.
5        Q    Did you ever talk to Kayla Mills' grandmother
6    about Kayla giving a statement to you or Detective York
7    in this case?
8        A    No.
9        Q    You know who Stella Smith is, right?
10       A    Yeah, I know Stella.
11       Q    And you know that -- you knew that Stella
12   Smith was Kayla's aunt --
13       A    Yes.
14       Q    -- right?
15       A    Yes.
16       Q    I know that Stella has since passed away,
17   right?
18       A    Yes.
19       Q    Yeah.  Why did you and Detective York talk to
20   Stella Smith about Kayla giving a statement?
21            MR. WRIGHT:  Object to form and foundation.
22            MR. WILLIAMS:  Join.
23       A    I don't remember me and Detective York ever
24   talking to her.
25       Q    Did you talk to Stella Smith about Kayla

Page 169

1    giving a statement?
2        A    Not that I can recall, no.
3        Q    Did you ever tell Stella Smith that you wanted
4    Kayla to say that she was in the car asleep and saw
5    Jonathan and Amanda walk out of the house?
6        A    No.
7        Q    Did you ever tell Stella Smith that you wanted
8    Kayla to tell a story that implicated Jonathan Taylor
9    and Amanda Hoskins in the murder?
10       A    No.
11            MR. WILLIAMS:  Object to the form.
12       Q    Did you ever tell Stella Smith that you
13   believe that Kayla was innocent and didn't have anything
14   to do with the murder?
15       A    No.
16       Q    Mr. Pickard, I'm going to ask that you look at
17   Exhibit number 10.  It's a copy of an arrest warrant for
18   Kayla Mills for the murder of Katherine Mills.  When did
19   Detective York first tell you that he was going to
20   initiate charges against Kayla Mills for the murder of
21   Katherine?
22            (EXHIBIT 10 MARKED FOR IDENTIFICATION)
23       A    I don't remember him ever telling me that.
24       Q    When was the first time that you ever saw the
25   criminal complaint that was filed on March 14, 2012

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 170

1 against Kayla Mills for the homicide of Katherine Mills?

2 MR. WILLIAMS: I'll object to form.

3 MR. WRIGHT: I'll join.

4 A This is the first time I ever saw it.

5 Q Okay. Was the first time you ever learned

6 about this, during Detective York's deposition a couple

7 of weeks ago?

8 A I mean, I -- I know we arrested her, but I

9 don't -- I mean, I don't -- that's all I know.

10 Q Did you ever -- did Detective York ever tell

11 you that he charged Kayla Mills with murder?

12 A Not that I recall.

13 Q That's something that you probably would

14 recall, right?

15 A I would think so, yeah --

16 Q Yeah.

17 A -- but I don't. I don't remember that.

18 Q Sitting here today, do you -- are you aware of

19 any evidence that implicates Kayla Mills in the homicide

20 of Katherine?

21 A Not that I'm aware of.

22 Q And in March of 2012, were you aware of any

23 information that implicated Kayla Mills in the murder of

24 Katherine Mills?

25 A No.

Page 171

1 Q Are you surprised that Detective York didn't

2 tell you that he was able to secure an arrest warrant

3 against Kayla for the murder of Katherine Mills?

4 MR. WRIGHT: Object to form.

5 A It's not surprising to me, but there would be

6 long periods of time I didn't see Detective York. He

7 worked on his own.

8 Q Well, you were -- you took a statement with

9 Detective York on March 8, 2012 from Allen Helton,

10 right?

11 A I don't remember the date, but we did do that.

12 Q Okay. And I'll show you this statement later

13 on. I'll represent to you it was March 8, 2012.

14 According to this arrest warrant, this was signed March

15 14, 2012, this arrest warrant against Kayla Mills. Do

16 you see that?

17 A Yes.

18 Q Okay. So -- and you know what sir, I'll show

19 you what we'll mark as Exhibit 15, which is a statement

20 that you and Detective York obtained from Allen Helton

21 on March 8, 2012. Here you go, Mr. Pickard.

22 (EXHIBIT 15 MARKED FOR IDENTIFICATION)

23 MR. WILLIAMS: Take your time to look that

24 over before you answer any questions on it, Mr.

25 Pickard.

Page 172

1 Q I'm only going to -- no need to read it right

2 now, I'm only going to ask you a question about the

3 date. In looking at that document, can you tell the

4 date that you and Detective York obtained the statement

5 from Mr. Helton?

6 A 03/08/12.

7 Q Okay. And going back to the criminal

8 complaint of -- against Kayla Mills, the other exhibit,

9 which was done March 14, 2012, would you agree with me

10 that you then -- you would, at least, participated in an

11 interview, within six days of Mr. York initiating

12 charges against Kayla?

13 A Repeat that question again.

14 Q Okay. Would you agree with me that you

15 participated in the interview of Allen Helton within six

16 days of Mr. York initiating charges against Kayla --

17 A Yes.

18 Q -- for the murder of Katherine Mills?

19 MR. WRIGHT: I'll object to form.

20 Q And --

21 MR. WILLIAMS: I'll join.

22 Q -- either before or after you and Detective

23 York interviewed Mr. Helton, did Detective York ever

24 tell you that he was going to initiate charges against

25 Kayla Mills --

Page 173

1 A Not --

2 Q -- for the murder of Katherine?

3 A Not that I recall.

4 Q On March 8, 2012, at any point in time, did

5 Detective York tell you that he had evidence implicating

6 Kayla Mills in the homicide of Katherine Mills?

7 A Not that I recall.

8 Q At any point in time on March 8, 2012, did

9 Detective York tell you that he had probably cause to

10 initiate charges against Kayla for the murder of

11 Katherine Mills?

12 A Not that I recall.

13 Q Either before or after your interview with Mr.

14 Helton, did Detective York tell you that he was going to

15 initiate charges against Amanda Hoskins and Jonathan

16 Taylor for the murder of Ms. Mills?

17 MR. WILLIAMS: Object to the form.

18 A Not that I recall.

19 Q On March 8, 2012, did Detective York tell you

20 whether he had probable cause to initiate charges

21 against Amanda Hoskins and Jonathan Taylor for the

22 murder of Katherine Mills?

23 A Not that I recall, no.

24 Q Aside from taking the statement from -- well,

25 let me withdraw that question. Mr. Pickard, did

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 174

1  Detective York tell you that he agreed to not pursue
2  charges against Kayla Mills, so long as she gave a
3  statement implicating Jonathan Taylor?
4        MR. WILLIAMS:  Object to form.
5     A   No.
6     Q   Did Detective York ever tell you whether he
7  made any promises to Kayla in exchange for her statement
8  against John [sic]?
9     A   No.
10    Q   What did Detective York tell you about the
11 statement he obtained from Kayla Mills?
12    A   I don't remember anything he told me.
13    Q   Did you ever ask him how he got that
14 statement?
15    A   No.
16    Q   Did you ever ask him what that statement said?
17    A   No, not that I recall, no.
18    Q   Mr. Pickard, in your career as the sheriff of
19 Knox County for 12 years, have you ever obtained an
20 arrest warrant against a witness in order to coerce that
21 witness into giving a statement against a suspect --
22    A   No.
23    Q   -- in an investigation?
24        MR. WILLIAMS:  Object to form.
25    A   No.

Page 175

1     Q   Would that be a legitimate investigative
2  action if someone were to do that?
3        MR. WRIGHT:  Object to form and foundation.
4        MR. WILLIAMS:  I'll join.  You can answer.
5     A   I would think so, yes.
6     Q   You would think that that would be a
7  legitimate thing to do?
8     A   Oh, no.  I think it wouldn't be legitimate.  I
9  misunderstood you.
10        MR. WRIGHT:  I'll reiterate the objection to
11        the follow-up.
12    Q   And you know, in your opinion, would it be
13 inappropriate for a police officer to charge someone
14 with a crime for the purpose of pressuring that witness
15 into giving a statement against someone else?  Would
16 that be an inappropriate law enforcement activity?
17        MR. WRIGHT:  Object to form and foundation.
18        MR. WILLIAMS:  Join.  You can answer.
19    A   In my opinion, yes.
20    Q   And that's based upon your career in law
21 enforcement; is that right?
22    A   Yes.
23        MR. WRIGHT:  Object to form and foundation.
24    Q   You were present here a few weeks ago when
25 Detective York testified in his deposition; is that

Page 176

1  right?
2     A   Yes.
3     Q   And in that deposition, Detective York said
4  that he agreed to not pursue the murder charges against
5  Kayla because she gave a statement against Jonathan
6  Taylor.  Do you recall him testifying to that effect?
7        MR. WRIGHT:  I'll object to form.
8        MR. WILLIAMS:  Counsel, I think if you want
9        him to review Mr. York's testimony and ask him
10        whether he recalls it as it's been stated, that's
11        fine, but I don't -- I think it's inappropriate to
12        just pick out statements that counsel recalls being
13        said and then asking about it.
14        MR. SLOSAR:  All right.  Let's go off.
15        MR. WILLIAMS:  I think he should be given the
16        statement and the context.
17        MR. SLOSAR:  Let's go off the record.
18        VIDEOGRAPHER:  Off the record.
19            (OFF THE RECORD)
20        VIDEOGRAPHER:  We're back on the record.
21 BY MR. SLOSAR:
22    Q   Sir, I'm going to read this to you that you
23 can follow along.  This is from the deposition
24 transcript of Jason York on February 13, 2018. Beginning
25 at 1:62, line 4.  Question, "So was your understanding

Page 177

1  that Kayla Mills implicated Jonathan Taylor in the
2  murder of Katherine Mills, that you would not proceed
3  forward with the charges against her for the murder,
4  correct?"  Answer, "Say that very first part again."
5  "Okay.  So there was an understanding between you and
6  Kayla Mills and her counsel, that if she gave a
7  statement implicating Jonathan Taylor in the murder of
8  Katherine Mills but not implicating herself, that you
9  would not proceed forward with the arrest warrant and a
10 citation against her for the murder of Ms. Mills,
11 correct?"  Objection by Mr. Wright.  Answer, "Yeah.
12 That's what the understanding of myself and her attorney
13 had."  Question, "Okay.  Did you document that
14 understanding in any police report?"  Answer, "No."  See
15 those questions and answers, Mr. Pickard?
16    A   Yeah.
17    Q   Okay.  You were present for Detective York's
18 deposition, right?
19    A   Yes.
20    Q   It was a long day, right?
21    A   Oh, it was.
22    Q   And at that deposition, as we just went over,
23 Detective York testified that he had an agreement with
24 Kayla Mills and her attorney that if she gave a
25 statement implicating Jonathan Taylor in the murder of

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 178

1  Katherine Mills, that he would not proceed forward with
2  the arrest warrant that he had initiated against her for
3  the murder.  Okay?
4      A   Uh-huh.  Yes.
5      Q   Was that your recollection of Mr. York's
6  testimony?
7          MR. WRIGHT:  I'll object to form.
8      A   I read it there, I couldn't remember.
9      Q   Speaks for itself, right?
10     A   Yes.
11     Q   Okay.  Did Detective York ever tell you that
12  he had reached that agreement with Kayla Mills?
13         MR. WRIGHT:  I'll object to form.
14     A   Not that I recall, no.
15     Q   Do you believe that it was appropriate for
16  Detective York to charge Kayla Mills with murder in
17  order to elicit a statement from her implicating
18  Jonathan Taylor?
19         MR. WRIGHT:  Object to form and foundation.
20         MR. WILLIAMS:  I'll join the objection.  You
21  can answer.
22     A   I don't really know.  I don't know why he
23  arrested her.  I mean, that was -- I don't know what
24  evidence he had or anything.
25     Q   And is it in your experience, do police

Page 179

1  officers who initiate charges against somebody for a
2  crime, are they usually supposed to make a factual basis
3  for probable cause in the warrant for an arrest?
4          MR. WRIGHT:  Object to form.
5      A   As far as I understand it, yeah.
6      Q   Can you look at the Exhibit number 10, which
7  is the arrest warrant against Kayla Mills?
8      A   Yes.
9      Q   Looking at this arrest warrant, and there is
10  an opening where normally there would be a factual
11  predicate to the charges, right, Mr. Pickard?
12     A   Yes.
13         MR. WRIGHT:  Object to form.
14     Q   Looking in the part of this form where there
15  would normally be a factual predicate to the charges, is
16  there any factual basis listed there by Detective York
17  as to how he formed probable cause against Kayla for the
18  murder of Katherine Mills?
19         MR. WRIGHT:  Object to form.
20         MR. WILLIAMS:  I have to object to the form of
21  the question, but you can answer.
22     A   I don't see it on this form, no.
23     Q   I'm going to now ask for you to -- well, did
24  Detective York ever tell you about his plan to arrest
25  Kayla Mills for murder unless she came to the police

Page 180

1  station on March 16, 2012 to give a statement?
2          MR. WRIGHT:  Object to form.
3      A   I don't recall that, no.
4      Q   Did Detective York ever tell you that he
5  received a statement from Kayla Mills on March 16, 2012?
6      A   I don't remember that.
7      Q   Did he ever tell you any of the details of the
8  statement he received from Ms. Mills on March 16, 2012?
9      A   Not that I recall.
10     Q   Sir, I'm going to ask you to look at Exhibit
11  number 11.  It's the March 16, 2012 police report of
12  Kayla Mills.  Do you have that in front of you?
13         (EXHIBIT 11 MARKED FOR IDENTIFICATION)
14     A   Yes.
15     Q   You ever seen this police report before today?
16     A   No.
17     Q   Okay.  Now, you testified earlier that between
18  the time Katherine Mills was found dead and the
19  time when Kayla gave a statement in March of 2012, that
20  you had a few run-ins with her; is that right?
21     A   Yes.
22     Q   Okay.  And that in fact, you and Detective
23  York actually interviewed Kayla at her home on one
24  occasion about the murder of Katherine Mills, correct?
25     A   Yes.

Page 181

1      Q   Okay.  Sir, I'm going to ask for you to look
2  at this report.  Have you ever seen this report prior to
3  today?
4      A   No.
5      Q   Did you ever review this report during the
6  underlying homicide investigation?
7      A   No.
8          MR. WILLIAMS:  Object to the form.
9      Q   Did Detective York ever provide you with this
10  report during the homicide investigation?
11     A   No.
12     Q   Looking at the second paragraph, do you see
13  where it says, "Kayla Mills stated that she dated
14  Jonathan Taylor.  I asked Kayla to tell me about all the
15  times Jonathan talked about killing Katherine Mills."
16  You see that?
17     A   Yes.
18     Q   Okay.  Now, prior to March 16, 2012, Kayla had
19  actually told you and Detective York, in a separate
20  interview, that she was not dating Jonathan Taylor
21  around the time of the murder, correct?
22         MR. WRIGHT:  I'll object to the form.
23     A   I can't remember her saying that.
24     Q   Okay.  Well, when you and Detective York --
25  I'll -- here's something I'm going to ask that you do.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 182

1  Can you read to yourself the second paragraph of this
2  report and let me know when you're finished?
3      A    Okay.  Okay.
4      Q    Now, you had a moment to read through this.
5      A    (Coughs.)
6      Q    You okay?
7      A    I'm fine.
8      Q    Okay.  You interviewed Kayla Mills prior to
9  March 16, 2012 when Detective York took this statement,
10  correct?
11      A    I talked to her.  I can't remember the dates.
12      Q    Sure.  Sure.  But it was sometime before
13  Detective York got this statement, right?
14      A    Yeah.  I'm about pretty sure it was.
15      Q    Yeah.  And in your conversation with you, and
16  Detective York, and Kayla, she never told you that she
17  knew that Jonathan Taylor had it in him to kill
18  somebody, correct?
19      A    I don't recall her saying that, no.
20      Q    Kayla never told you that she broke up with
21  Jonathan Taylor because he had it in him to kill
22  somebody, correct?
23      A    I don't recall.
24      MR. WRIGHT:  I'll object to form.
25      Q    Kayla Mills never told you that Jonathan

Page 183

1  Taylor confessed to her that he killed Katherine,
2  correct?
3      A    Not that I recall, no.
4      Q    Kayla Mills never told you that Jonathan
5  Taylor said he left one lying up on the creek and didn't
6  care to leave another, correct?
7      A    Correct.
8      Q    Kayla never told you that Jonathan brought up
9  Amanda Hoskins and William Lester, and money being taken
10  from Ms. Mills, correct?
11      A    I don't recall that.
12      Q    Yeah.  In fact, earlier here, you testified
13  that Kayla told you and Detective York when she met with
14  you-all, that she didn't have any knowledge or
15  participation in the murder of Katherine Mills, correct?
16      A    Yes.
17      Q    Would you agree that the information that
18  Kayla -- that is attributed to Kayla in this statement
19  is the opposite of what she told you and Detective York
20  when you interviewed here -- her before?
21      MR. WRIGHT:  Object to form.
22      MR. WILLIAMS:  Object to the form.
23      Q    You can answer.
24      MR. WILLIAMS:  You can answer.
25      A    Yes.

Page 184

1      Q    Now, Mr. Pickard, have you ever, as the
2  sheriff in Knox County, have you ever recorded
3  interviews with a witness?
4      A    No.
5      Q    No.  Okay.  You never have?
6      A    Not that I can remember, no.
7      Q    You ever trained any of your officers on
8  recording interviews?
9      A    No.
10      Q    In your opinion, would it be appropriate for a
11  law enforcement officer to stop a recorded interview for
12  the purpose of telling that witness what to say?
13      MR. WRIGHT:  Object to form and foundation.
14      A    No.
15      Q    Would that be against the training that you
16  received?
17      MR. WRIGHT:  Object to form and foundation.
18      Q    Well, let me strike the question.  I'm going
19  to hand you what we'll mark as Exhibit number 12, Mr.
20  Pickard.  Actually, I've already handed it to you.  I
21  apologize.  This is the -- it's a transcription of the
22  statement that Kayla gave.
23      (EXHIBIT 12 MARKED FOR IDENTIFICATION)
24      A    Oh.
25      Q    So it's this last one.  Mr. Pickard, you

Page 185

1  weren't present when Detective York obtained a statement
2  from Kayla Mills on March 16, 2012, correct?
3      MR. WILLIAMS:  Take as much time as you need
4  to read it over before you answer questions.
5      A    No, I wasn't there.
6      Q    Prior to today, have you ever seen the
7  transcribed statement from Kayla Mills from
8  March 16, 2012?
9      A    No.
10      Q    Did Detective York ever talk to you about the
11  transcribed statement he got from Kayla Mills?
12      A    No.
13      Q    Okay.  Sir, how many times did you meet with
14  Michael Crump during the underlying investigation into
15  Katherine Mills death?
16      A    I don't ever remember talking to him but one
17  time.  And I didn't talk to him, I was there.
18      Q    Who else was there?
19      A    Detective York --
20      Q    Okay.
21      A    -- was talking to him.
22      Q    And do you recall where that conversation took
23  place?
24      A    At Ms. Mills' residence.
25      Q    Was -- how close in time to the murder was it

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 186

1  that Detective York was interviewing Mr. Crump in your
2  presence?
3       A   I'm not sure, it was a -- I'm not sure.
4       Q   Do you vaguely remember when Amanda Hoskins,
5  and Jonathan Taylor, and William Lester were charged
6  with murder in March of 2012?
7       A   Yes.
8       Q   Okay.  Was the conversation that Detective
9  York had in your presence with Mr. Crump prior to the
10  plaintiffs being charged with murder?
11       A   Yes.
12       Q   Okay.  What do you remember about this
13  conversation with Mr. Crump that took place at Katherine
14  Mills' residence?
15       A   I just -- I don't remember a lot, I just
16  remember he was talking about he saw a guy with a coat
17  on and walking toward the car.  And he said something
18  about a female, but I couldn't tell you.  I don't
19  remember what that was.
20       Q   Was anybody else there aside from you
21  yourself, Detective York, and Mr. Crump?
22       A   I don't remember.
23       Q   Do you recall how long that conversation
24  lasted?
25       A   It wasn't very long.

Page 187

1       Q   Did Mister -- did Detective York show Mr.
2  Crump photographs of Jonathan Taylor in that
3  conversation?
4       A   Not that I remember.
5       Q   I'm going to show you what we'll mark as
6  Exhibit number 19.
7            (EXHIBIT 19 MARKED FOR IDENTIFICATION)
8       MR. WILLIAMS:  You made Kayla Mills' statement
9  number 12; is that right?
10       MR. SLOSAR:  Yeah.  I'm bouncing.  Sorry.
11       MR. WILLIAMS:  That's all right.  Just trying
12  to keep up.
13  BY MR. SLOSAR:
14       Q   Mr. Pickard, here's Exhibit number 19.  Please,
15  take a look at this.  When was the first time you saw
16  this sketch?
17       A   I don't remember.  I remember seeing it, but I
18  don't remember when.
19       Q   Well, when you saw it, was it your
20  understanding that this was a sketch based upon the
21  description that Michael Crump gave to officers in this
22  case?
23       A   Yes.
24       Q   Is it fair to say that you and Detective York
25  were looking for suspects in this investigation based --

Page 188

1  that would have matched the physical description of this
2  sketch?
3       MR. WILLIAMS:  Object to the form.
4       A   Not that I recall.
5       Q   Well, let me ask it a different way.  Did he
6  use this sketch in the investigation to try to find the
7  real killer?
8       MR. WILLIAMS:  Object to the form.
9       MR. WRIGHT:  Yeah.  I'll object to the form of
10  that, too.
11       A   I don't -- don't recall that.
12  BY MR. SLOSAR:
13       Q   Well, did Detective York use this sketch to
14  try to identify a suspect?
15       A   I don't -- I don't know.
16       Q   But you saw the sketch and you were aware that
17  it came from Michael Crump's description, right?
18       A   Yes.
19       Q   Did you request that a polygraph examination
20  be conducted of Allen Helton in January of 2011?
21       A   No.
22       Q   Do you know who did that?
23       A   No, I don't.
24       Q   Did Detective York ever tell you that he
25  requested a polygraph examination of Allen Helton in

Page 189

1  January of 2011?
2       A   Not that I recall.
3       Q   When did you first learn that Allen Helton
4  failed the polygraph examination in this case?
5       MR. WILLIAMS:  Objection.  Lack of foundation.
6       A   I have no idea, date wise.
7       Q   Okay.  But prior -- sorry.  Prior to Ms.
8  Hoskins and Mr. Taylor being charged with murder, did
9  you learn that Allen Helton and Jessie Lawson had failed
10  polygraph examinations?
11       A   I heard at some point in time that they did,
12  but I can't tell you when -- when I was told that.
13       Q   And was it your understanding that Allen
14  Helton, Jessie Lawson, failed polygraph examinations
15  directly about whether they were involved in killing Ms.
16  Mills?
17       MR. WRIGHT:  Object to form.
18       A   I don't remember being told what it was about.
19       Q   You just knew that they failed their
20  polygraphs, right?
21       A   Yes.
22       Q   Do you know who told you?
23       A   Detective York.
24       Q   Did you ever conduct any follow-up
25  investigation into Allen Helton, Jessie Lawson, or Mike

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 190

1  Simpson, after you found out about the failed polygraph
2  examinations?
3      A    No.
4      Q    Did Detective York ever request your
5  assistance in follow-up investigations into Allen
6  Helton, Jessie Lawson, or Mike Simpson, after you
7  learned of the failed polygraph examinations?
8           MR. WRIGHT:  Object to form.
9      A    Not that I recall.
10          MR. WILLIAMS:  Join.
11     Q    Now, Mr. Pickard, how did you come into
12  contact with Allen Helton on March 7, 2012?
13     A    I -- I don't remember that date.
14     Q    Did I give you -- do you have an Exhibit
15  number 15, the statement from Allen Helton?  Yeah, it's
16  right there.  Did I not put a sticker on it?  I should
17  have.
18     A    There ain't no sticker on it.
19     Q    Oh, wait, here it is.
20     A    Oh, at the top.  Yeah, okay.  I got you.
21     Q    Okay.
22          MR. WILLIAMS:  Make sure you've had time to
23     review it before you answer any questions about it.
24     Q    So this is a statement that you and Detective
25  York obtained from Allen Helton on March 8, 2012; is

Page 191

1  that right?
2      A    Yes.
3      Q    Okay.  And you came into contact with Allen
4  Helton the day before he gave this statement to you and
5  Detective York, correct?
6      A    This -- no.  This was all the same day.
7      Q    It was all the same day?
8      A    Yes.
9      Q    How did you come into contact with Mr. Helton
10  that day?
11     A    The jail contacted me and said he wanted to
12  talk to me about the murder.
13     Q    Do you recall what jail it was?
14     A    Knox County Jail, but I don't recall who
15  called me.
16     Q    What did you do after you got the phone call?
17     A    I had somebody go over and bring him over to
18  the sheriff's office.
19     Q    Do you remember who that was?
20     A    No, I don't.
21     Q    And prior to that day, have you talked to
22  Allen Helton previously about the Mills' homicide
23  investigation?
24     A    Not that I remember, no.
25     Q    Have you been present when any other officer

Page 192

1  talked to Allen Helton previously about the Katherine
2  Mills' homicide investigation?
3      A    Not that I remember, no.
4      Q    Okay.  You don't have any notes or reports at
5  home that would refresh your recollection, right?
6      A    No.
7      Q    That's because you didn't take any notes or
8  recorded statements during this case, right?
9      A    That's right.
10     Q    So what happens when Mister -- well, I believe
11  you said you got a phone call from the jail saying that
12  Mr. Helton wanted to talk about the murder, right?
13     A    Yes.
14     Q    Okay.  And at that point, you made a request
15  to retrieve Mr. Helton, correct?
16     A    Yes.
17     Q    Did he make any phone calls to any other
18  officers to join you in the interview of Mr. Helton that
19  day?
20     A    Not that I recall.
21     Q    Okay.  Well, how did Jason York end up in your
22  office on March 8, 2012?
23     A    I called him.
24     Q    Okay.  And how did you get ahold of Mr. York?
25     A    I'm sure I called his cell phone.

Page 193

1      Q    Okay.  So you had his cell phone number at the
2  time?
3      A    Yes.
4      Q    Did you tell him that Mr. Helton wanted to
5  talk?
6      A    I told him what Mr. Helton told me and he
7  wanted to tell him.
8      Q    So you had a conversation with Mr. Helton
9  prior to calling Detective York?
10     A    Yes.  I mean, I didn't -- I just let him tell
11  me what he had on his mind.
12     Q    All right.  Was anybody else present when you
13  spoke to Mr. Helton?
14     A    There was somebody with me, but I can't tell
15  you who he was, I don't remember.
16     Q    Was it Derek Eubanks?
17     A    No.
18     Q    Do you know who else it could have been?
19     A    It just -- probably one of the deputies, I
20  don't remember.
21     Q    Mr. Helton was incarcerated at the time,
22  right?
23     A    Yes.
24     Q    He was charged with crimes; is that right?
25     A    Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 194

1    Q    You remember what crimes he was charged with?
2    A    Theft.
3    Q    Now, did you talk to Mr. Helton about the trip
4  he took to Florida?
5    A    No.
6    Q    Did you talk to Mr. Helton about Mike Simpson
7  having money after Katherine Mills was found dead?
8    A    No.
9    Q    Did you talk to Mr. Helton about the rental
10 car that was paid for with cash on the day of Ms. Mills'
11 death?
12   A    No.
13   Q    Did you talk to Mr. Helton about how he got
14 money to go on a pill run to Florida?
15   A    No.
16   Q    Did you talk to Mr. Helton about how Mike
17 Simpson got money to go on a pill run to Florida?
18   A    No.
19   Q    Did you ask him about any of that stuff?
20   A    No.
21   Q    All right.  Now, prior to March 8, 2012, Allen
22 Helton never told you that he saw Amanda Hoskins and
23 William Lester at Escoe's Market the day before
24 Katherine Mills was found dead, right?
25   A    He did tell me that, but I don't know on the

Page 195

1  dates.
2    Q    Well -- and I'm asking, prior to the -- well,
3  the statement that you have in front of you, the
4  statement that you and Detective York got from Allen
5  Helton, he had never provided you with any of that
6  information prior to March 8, 2012, correct?
7    A    No.
8    Q    Okay.
9    A    So prior to March 8, 2012, Mr. Helton never
10 told you that Amanda Hoskins informed him that she was
11 going to tie up an old woman when she came out of the
12 bathroom, right?
13   A    Right.
14   Q    Prior to March 8, 2012, Allen Helton never
15 told you that he saw Amanda Hoskins after Ms. Mills'
16 death, and that she had thousands of dollars folded up
17 in a big wad, right?
18   A    Prior to 8th?
19   Q    Yes.
20   A    No.
21   Q    Prior to March 8, 2012, Allen Helton never
22 told you that Mike Simpson knew that Mr. Lester and Ms.
23 Hoskins were going to rob Katherine Mills, correct?
24   A    Correct.
25   Q    Now, this conversation that you had with Mr.

Page 196

1  Helton on March 8, 2012, where did that conversation
2  take place?
3    A    At the sheriff's office.
4    Q    And when Mr. Helton came into the room, was he
5  wearing handcuffs?
6    A    I can't remember, but I'm sure he was, we
7  always did cuff them.
8    Q    Did any of the jail guards stay with him?
9    A    I'm sure they waited outside, but I'm not
10 positive.  I can't remember.
11   Q    Do you recall whether your door was open or
12 closed?
13   A    Closed.
14   Q    And who else was present when you first talked
15 to Mr. Helton that day?
16   A    I don't remember who was in there with me.
17   Q    Now, the report that you have in front of you,
18 who drafted that report?  Was it you or Detective York?
19   A    Detective York.  It wasn't me.
20   Q    Okay.  Did you ever review that report to make
21 sure it was accurate?
22   A    I never looked at it before.  I just kind of
23 glanced through it now.
24   Q    Before today, have you ever seen this report?
25   A    No.

Page 197

1    Q    Okay.  Did you and Detective York have a
2  conversation about who was going to draft this report?
3    A    No.
4    Q    How long did you speak to Allen Helton prior
5  to calling Detective York?
6    A    Probably six or seven minutes.
7    Q    And in the six or seven minutes, what promises
8  did you make to Mr. Helton?
9        MR. WRIGHT:  Object to form.
10   A    I didn't make no promise.  I did tell him I
11 would try to help him on these other charges if he was
12 telling the truth.
13   Q    Well, what were the charges that you were
14 referring to?
15   A    He was charged with stealing metal and it had
16 like -- I know one of them was a felony, but it worked
17 itself out.
18   Q    Allen Helton was in jail at the time, right?
19   A    Yes.
20   Q    And you promised that if he gave a statement,
21 that he would get out of jail that day on a bond, right?
22       MR. WRIGHT:  Object to form.
23       MR. WILLIAMS:  Object to the form.  Asked and
24 answered.
25   A    I didn't promise that.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 198

1  BY MR. SLOSAR:
2      Q   Well, did you tell him you would see what you
3  could do?
4      A   I told him I can see what I do about the
5  charges.
6      Q   After Allen Helton gave a statement to
7  yourself and Detective York on March 8, 2012, was he
8  released that same day from the Knox County Jail?
9      A   I couldn't say.  I don't remember that.
10     Q   Do you have any reason to dispute that?
11         MR. WRIGHT:  Object to form.
12     A   No, I don't.
13     Q   Did you contact anybody to see if Allen Helton
14  could get bonded out that day after he gave a statement
15  to you and Detective York?
16     A   No.  Not that I remember, no.
17     Q   Did Detective York tell you that he was going
18  to contact somebody to see if Allen Helton could get
19  bonded out that day?
20     A   I don't recall that.
21     Q   Do you recall having a conversation with Allen
22  Helton about getting him released?
23         MR. WRIGHT:  Object to form.
24         MR. WILLIAMS:  I'll join.
25     A   I don't recall that.

Page 199

1      Q   So you're not saying it didn't happen, you're
2  saying you don't remember, right?
3         MR. WRIGHT:  Object.
4      A   I'm saying I don't remember it happening, no.
5      Q   You told him you could see what you could do
6  on the charges, but you don't remember anything about
7  trying to get him released that day --
8      A   No.
9      Q   -- is that your testimony?
10     A   No.  Yes, I don't remember.
11     Q   What did you tell Allen Helton when he came
12  into the room with his handcuffs?
13         MR. WILLIAMS:  I'm sorry, what?  Who did --
14  who are you speaking about?  I'm sorry.
15     Q   Well, did -- Mr. Pickard, when Allen Helton
16  was brought over from the jail in handcuffs, the door
17  was closed, and the jail guard was outside.  What did
18  you first say to Mr. Helton?
19         MR. WRIGHT:  I'll object to form.
20     A   I just asked him what he wanted, to start
21  with.
22     Q   And did Allen Helton tell you that he wanted
23  help out on his criminal charges?
24     A   No.  Not in the beginning, no.
25     Q   Well, who first brought that up, you or him?

Page 200

1      A   He did.
2      Q   What did he say?
3      A   He told him that if I would help him on the
4  charges he had against him, that he would tell about the
5  murder.  He knowed some -- had some information on it.
6      Q   And you didn't have any -- you said that you
7  made that agreement as long as Allen was telling the
8  truth, is that what you said?
9      A   Yes.
10         MR. WRIGHT:  Object to the form.
11         MR. WILLIAMS:  Object to the form.  Go ahead.
12     Q   What investigation did you do to determine
13  whether the statement that you and Detective York got
14  from Allen Helton on March 8, 2012, what investigation
15  did you do to determine whether it was truthful or not?
16     A   I didn't do anything.
17     Q   Part of your agreement with him was that you
18  would see what you could do on his criminal charges as
19  long and he told you the truth, right?
20     A   Yes.
21         MR. WRIGHT:  Object to form.
22     Q   But you didn't do any --
23         MR. WILLIAMS:  Join.
24     Q   -- investigation to determine whether he told
25  you the truth; is that right?

Page 201

1      A   No, I didn't.
2      Q   Was it you or did Detective York, who told Mr.
3  Helton that he would be released on bond if he gave a
4  statement implicating Ms. Hoskins and Mr. Taylor?
5         MR. WRIGHT:  Object to form and foundation.
6         MR. WILLIAMS:  Object to formation and
7  foundation.
8      A   That wasn't me.
9      Q   Did Detective York make that promise to him?
10     A   I don't remember that.
11     Q   Was it you or Detective York who told Mr.
12  Helton that he would not be charged with murder, so long
13  as he gave a statement against Mr. Taylor and Ms.
14  Hoskins?
15         MR. WILLIAMS:  Object to the form.  Assumes
16  facts not in evidence.
17         MR. WRIGHT:  And I'll join.
18     A   It wasn't me.
19  BY MR. SLOSAR:
20     Q   Do you recall whether Detective York made that
21  statement to Mr. Helton?
22     A   I don't --
23         MR. WRIGHT:  Same objection.
24     A   I don't remember him making that statement.
25     Q   Not saying it didn't happen, you just don't

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 202

1  remember, right?
2      A    Right.
3          MR. WRIGHT:  Object to the form of that.
4      Q    What did Mr. Helton tell you in the six or
5  seven minutes that you talked to him before you called
6  Detective York?
7      A    He just -- he told me, you know, to -- who
8  killed Katherine Mills.  And he wanted to give a
9  statement on it and I'm -- I told him that anyone that'd
10  help on them -- those charges, I told him that was
11  Detective York's case, I would contact him, and if he
12  wanted to tell him, you know, I said as long as you're
13  telling me the truth.  If you want to tell Jason -- Mr.
14  York that, you can.  And I called Jason and it seemed
15  like it was a short time thereafter, he came down and --
16  and talked to him.
17     Q    Mr. York did?
18     A    Yes.
19     Q    And when Detective York came down there, did
20  he come into your sheriff's office?
21     A    Yes.
22     Q    Okay.  And was that at the Knox County
23  Sheriff's Department?
24     A    Yes.
25     Q    What floor was that on?

Page 203

1      A    It ain't but one floor.
2      Q    One floor?  I'm sorry.  That how you know I'm
3  not from here.  Did you talk to Detective York outside
4  of Mr. Helton's presence at all?
5      A    I don't think so, I talked to him in there
6  when he come in.  I just told him what he had.
7      Q    And by that time, is it fair to say that Mr.
8  Helton didn't give you any of the specifics that he
9  knew?
10         MR. WRIGHT:  Object to form.
11     A    No.
12     Q    He just told you generally that he was ready
13  to give a statement, right?
14     A    That -- concerning the --
15     Q    The murder.
16     A    -- the murder of her.
17     Q    Yeah.  But he didn't give you any of the
18  details of what he knew prior to Detective York getting
19  there?
20     A    Not that I recall, no.
21     Q    Okay.  So he said that he wanted to give a
22  statement on the murder, he wanted some help with his
23  pending charges, is that fair to say?
24     A    Yes.
25     Q    And you said, "I'm not the lead guy on this

Page 204

1  case, I got to get Detective York over here," right?
2      A    Yes.
3      Q    Did you do any further questioning of Mr.
4  Helton after you called Detective York, but before
5  Detective York got there?
6      A    No.
7      Q    That's because you were waiting for the lead
8  investigator to come into that room, right?
9      A    Yes, I let him do it.
10     Q    Let him do his thing?
11     A    Yes.
12     Q    All right.  Did you record any of the first
13  part of that interview?
14     A    No.
15     Q    Okay.  Now, when Mr. York -- when Detective
16  York came into the room, did he have a conversation with
17  Mr. Helton in your presence?
18     A    Yes.
19     Q    How long was that?
20     A    I don't recall.  It wasn't very long --
21     Q    Okay.
22     A    -- but I can't recall exactly.
23     Q    Did Mr. Helton tell Detective York that he
24  would give a statement as long as he got some help out
25  on those pending charges?

Page 205

1          MR. WRIGHT:  Object to form.
2      A    I don't recall.
3      Q    Did Mr. Helton make any requests of Detective
4  York that he wanted help on his pending cases?
5      A    I don't recall how that was brought about.
6      Q    But at some point prior to taking this
7  statement, or finishing the statement from Allen Helton,
8  Detective York knew that Allen Helton wanted help on his
9  pending charges in exchange for giving a statement; is
10  that right?
11         MR. WRIGHT:  Object to form and foundation.
12         MR. WILLIAMS:  Object to form.
13     A    Yes.
14     Q    And in fact, wouldn't you have told Detective
15  York about the request that Allen Helton made to have
16  help on his pending cases in exchange for giving a
17  statement?
18         MR. WRIGHT:  Object to form.
19         MR. WILLIAMS:  Object to the form.
20     A    I'm pretty sure I told him what he wanted.
21     Q    That's not something that you would have
22  hidden from Detective York, right?
23     A    No.
24     Q    That's an important fact in the case, right?
25     A    Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 206

1    Q    Is it fair to say that Detective York led
2   Allen Helton's questioning during his recorded
3   statement?
4    A    Yes.
5        MR. WRIGHT:  Now, object to form on that.
6    Q    Well, was Detective York asking questions to
7   Allen Helton on March 8, 2012, in your office?
8    A    Yes.
9    Q    Were you present when Detective York was
10  asking those questions?
11   A    Yes.
12   Q    Did you ever leave the room when Detective
13  York asked those questions?
14   A    No.
15   Q    You were present the whole time, right?
16   A    Yes.
17   Q    Okay.  Did you ever make any attempts to stop
18  Detective York's questioning of Allen Helton on March 8,
19  2012 in your office?
20   A    No.
21   Q    So Exhibit 16 is an audio file.  The Bates
22  number is PL25962.  It's the audio recorded statement of
23  Allen Helton.  I'm going to hand Mr. Pickard Exhibit 17,
24  which is the transcript of the Allen Helton recording,
25  PL15840 through 15854.  Is that what you were going to

Page 207

1   get?
2            (EXHIBIT 16 MARKED FOR IDENTIFICATION)
3            (EXHIBIT 17 MARKED FOR IDENTIFICATION)
4        MR. SLOSAR:  Is that what you were going to
5    get?
6        MR. WRIGHT:  Yeah.  Do you have an extra one?
7        MR. SLOSAR:  Yeah.
8        MR. WRIGHT:  Okay.
9        MR. SLOSAR:  I figured that's --
10       MR. WILLIAMS:  Take the time to read that over
11   before you answer questions on it.
12  BY MR. SLOSAR:
13   Q    I'm not going to -- we're going to go through
14  this bit by bit, Mr. Pickard.  Mr. Pickard, have you
15  ever seen this transcribed statement from Allen Helton
16  besides today?
17   A    No.
18   Q    First time you've seen this?
19   A    First time I've saw it.
20   Q    Okay.  Mr. Pickard, is it fair to say that the
21  March 8, 2012 statement from Mr. Helton implicates
22  Amanda Hoskins and Jonathan Taylor in the murder of
23  Katherine Mills?
24   A    I need to read some of it first.
25   Q    If you want, the police report is -- you can

Page 208

1   certainly read through this, but the police report,
2   also, Exhibit 15, is a summary of the transcript.
3        MR. WRIGHT:  Why don't we take a minute to go
4    off the record --
5        MR. SLOSAR:  Sure.
6        MR. WRIGHT:  -- to let him read it.
7        MR. SLOSAR:  That's fine.
8        MR. WRIGHT:  Okay?
9        MR. WILLIAMS:  Thank you.
10       MR. SLOSAR:  Yep.
11       VIDEOGRAPHER:  Off the record.
12           (OFF THE RECORD)
13       VIDEOGRAPHER:  Back on the record.
14  BY MR. SLOSAR:
15   Q    Mr. Pickard, do you have Exhibit number 15 in
16  front of you?
17   A    Yes.
18   Q    Okay.  Now, would you agree that -- so this is
19  the police report that Detective York drafted based upon
20  the conversation that you and he had with Allen Helton
21  on March 8, 2012, right?
22   A    Yes.
23   Q    Okay.  Fair to say that the statement from
24  Mister -- obtained from Mr. Helton on March 8, 2012,
25  implicates Amanda Hoskins and Jonathan Taylor in the

Page 209

1   murder of Katherine Mills?
2    A    Yes.
3    Q    Mr. Pickard, would you agree that Mister --
4   Detective York provided information to Allen Helton
5   during his recorded statement on March 8, 2012?
6        MR. WRIGHT:  Object to form --
7        MR. WILLIAMS:  Object to form.
8        MR. SLOSAR:  -- and foundation.
9   BY MR. SLOSAR:
10   Q    You can answer.
11   A    Yes.
12   Q    And I'm going to go through these paragraphs
13  with you real quick, okay?  So I'm going to start at the
14  second paragraph of the police report.  Yep.  Do you see
15  where it says in the second paragraph that, "Allen
16  stated."  So this would be the second -- "Allen stated
17  Amanda asked him if he wanted to make some money, and
18  told him how."  Do you see that?
19   A    Yes.
20   Q    Prior to that sentence, it says that this
21  conversation happened on Sunday, December 19, 2010 when
22  Allen Helton was pumping gas at Escoe's Market, Dewitt,
23  right?
24   A    Yes.
25   Q    Okay.  Now, according to the report Allen

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 210

1    Helton, provided that information to yourself and
2    Detective York on March 8, 2012, right?
3         A    Yes.
4         Q    Now, did Detective York provide that
5    information to Mr. Helton on March 8, 2012?
6              MR. WRIGHT:  Object to form.
7              MR. WILLIAMS:  Requires him to speculate.
8         A    Not that I recall, no.
9         Q    Okay.  Do you see in the report where it says,
10   "Amanda told him about tying an old woman up when she
11   came out to tie her in the bathroom --
12        A    Yes.
13        Q    -- when she came out to the bathroom."  Do you
14   see that?
15        A    Yes.
16        Q    It's the third sentence in that second
17   paragraph, right?
18        A    Yes.
19        Q    Okay.  And according to this report -- well,
20   let me ask you it this way:  Did Detective York tell
21   Allen Helton this information --
22             MR. WRIGHT:  Object to form.
23        Q    -- during the March 8, 2012 interview?
24        A    I don't recall that, no.
25        Q    So you're not saying it didn't happen, you're

Page 211

1    saying you don't recall, right?
2         A    I just don't -- no, I don't recall.
3         Q    Okay.  But according to this report, Allen
4    Helton is the one that's supposedly is providing this
5    information, right?
6         A    Yes.
7         Q    All right.  Now, I'm going to go a little bit
8    farther in this paragraph.  Do you see where it says, "I
9    asked Allen if he wanted to be a part of it, he said no.
10   Allen also stated Amanda told him that Katherine had
11   $15,000."
12        A    Yes.
13        Q    Do you see that?
14        A    Yes.
15        Q    Okay.  Did Detective York provide that
16   information to Allen Helton on March 8, 2012?
17        A    I'm not aware of that.
18        Q    Not saying it didn't happen, just saying you
19   don't recall, right?
20        A    I don't recall.
21        Q    Okay.  Would you agree that according to this
22   report, it's supposed to be Allen Helton providing this
23   information.  That's the way it reads, right?
24             MR. WRIGHT:  Object to form.
25        A    Yes.

Page 212

1         Q    Okay.  I'm going to go to the last paragraph
2    on this first page.  It says -- about half way down, and
3    it says, "I asked Allen if they have the money that they
4    had stolen from Katherine?  He stated, 'Yes.'  Allen
5    then stated -- or Allen stated Amanda had approximately
6    $4,000 on her.  Allen stated Amanda Hoskins had the
7    money folded up, like, he would put a rubber band on
8    it."  Do you see that, sir?
9         A    Yes.
10        Q    Okay.  Did Detective York provide that
11   information to Allen Helton on March 8, 2012?
12             MR. WRIGHT:  Object to form.
13        A    Not that I'm aware of.
14        Q    Do you recall one way or the other?
15        A    No.
16        Q    According to this report, though, this is
17   supposed to be Allen Helton providing the information to
18   York, not the other way around, right?
19        A    Yes.
20        Q    Now, turning to the second page, do you see
21   where it says, "Allen stated it was true that Mike
22   Simpson knew William and Amanda was going to rob
23   Katherine, but did not -- they were going to kill her."
24   I think it's supposed to say, but they did not know --
25   but did not know they were going to kill her.  You see

Page 213

1    that, sir?
2         A    Yes.
3         Q    Okay.  And then it says, "Then Mike found out
4    and started crying when Jessie called and told him they
5    were in Florida."  Do you see that?
6         A    Yes.
7         Q    Okay.  Did Detective York provide that
8    information to Allen Helton in the March 8, 2012
9    interview?
10        A    Not that I'm aware of.
11        Q    Do you recall one way or the other?
12        A    No.
13        Q    Okay.  According to this report, though, this
14   is Allen Helton volunteering this information, right?
15        A    Yes.
16             MR. WRIGHT:  Object to the form.
17        Q    Okay.  And again, after you spoke to -- when
18   you spoke to Allen Helton, he didn't give you any
19   substantive information about the knowledge that he was
20   going -- well, let me withdraw that question.  Prior to
21   calling Detective York, Allen Helton basically told you
22   that he had information about the Mills' homicide and
23   that he wanted a deal; is that right?
24        A    Yes.
25        Q    Okay.  You didn't have any substantive

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 214

1  conversations with him about the specific details that
2  he was going to say, right?
3         MR. WRIGHT: Object to the form.
4         MR. WILLIAMS: Join. You can answer.
5    A    No.
6    Q    Okay. And in fact, you waited for Detective
7  York to get there for the questioning to really begin,
8  right?
9    A    Yes.
10   Q    Okay. And I believe you testified earlier,
11 that Detective York spoke very briefly to Allen Helton
12 prior to turning on the recorder, right?
13        MR. WRIGHT: Object to form, foundation.
14   A    I don't recall how -- it wasn't very long.
15   Q    Okay. Fair to say that Allen Helton didn't
16 get into all the details with Jason York before the
17 recorder was turned on?
18   A    Yes.
19   Q    Okay. So when the recorder was turned on,
20 that was the first time that Mr. Helton was able to tell
21 whatever information he knew about the murder of
22 Katherine Mills, right?
23   A    Yes.
24   Q    Okay.
25        MR. WILLIAMS: To Mr. Pickard?

Page 215

1         MR. SLOSAR: To Mr. Pickard -- well, let me --
2  I'll go into that.
3         MR. WILLIAMS: Okay.
4  BY MR. SLOSAR:
5    Q    Prior to the recorder being turned on, Mr.
6  Helton didn't give you any specific details that he knew
7  about the homicide of Katherine Mills, correct?
8    A    No.
9    Q    Okay. Prior to the recorder being turned on,
10 Mr. Helton didn't give you any specific details about the
11 murder of Katherine Mills to Detective York, correct?
12   A    Correct.
13        MR. WILLIAMS: At the time of the interview.
14        MR. SLOSAR: On March 8, 2012.
15        MR. WILLIAMS: Thank you.
16 BY MR. SLOSAR:
17   Q    Okay. And at no time prior to March 8, 2012
18 did you and Detective York question Allen Helton about
19 the homicide of Katherine Mills together, right?
20   A    Not that I'm aware of.
21   Q    Okay. So the first time on March 8, 2012, in
22 your office, that Allen Helton would have provided
23 information in specific details about the murder of
24 Katherine Mills, would have been when the recorder was
25 turned on; is that right?

Page 216

1    A    Yes.
2    Q    And was the recorder ever turned off during
3  the middle of the interview that Detective York and
4  yourself were conducting of Allen Helton in your office?
5    A    Not that I recall, no.
6    Q    Okay. You don't have any notes to refresh
7  your memory, right?
8    A    No.
9    Q    All right. Sir, I am going to play some Audio
10 and I'm just going to ask for you to listen. I'm going
11 to ask you some questions after each audio clip, okay?
12   A    Okay.
13   Q    This is all from -- this is Exhibit number --
14 I want to say 16, and this is from the audio recorded
15 March 8, 2012 interview of Allen Helton. It's PL25962.
16        MR. WILLIAMS: There's a transcript right
17 there.
18        MR. SLOSAR: This time stamp is one minute 25
19 seconds through one minute 48 seconds. And, Mr.
20 Pickard, I don't have a page number for you to
21 follow along. You certainly are welcome to. I'll
22 represent to you that this is going to be on page
23 2, this first one. But I want you more to listen
24 than read, okay?
25        MR. WILLIAMS: We can locate it after you

Page 217

1  listen to it.
2    Q    Sure. All right. So listen to this clip and
3  I'm going to ask you some questions after, all right?
4         (AUDIO PLAYED)
5    Q    Sir, is that audio from the March 8, 2012
6  recorded statement that yourself and Detective York took
7  of Allen Helton?
8    A    Yes.
9    Q    And would you agree -- well, was the person
10 doing most of the talking in that recording, in that
11 clip, Detective York?
12   A    Yes.
13   Q    Okay. And the other voice was Allen Helton,
14 right?
15   A    Yes.
16   Q    Do you agree that in the recording we just
17 listened to, that Detective York told Mr. Helton that he
18 saw Ms. Hoskins and Mr. Lester at Escoe's Market while
19 he was pumping gas, the day before Katherine was dead?
20   A    Yes.
21   Q    In that recorded statement, Mr. Helton did not
22 provide that information to yourself and Detective York,
23 correct?
24   A    Correct.
25   Q    Mr. Helton just agreed with the information

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 218

```
1   that Detective York provided to him, correct?
2            MR. WRIGHT:  Object to form.
3        A   Yes.
4        Q   And, Mr. Pickard, did you take any steps to
5   stop that process from happening?
6        A   No.
7            MR. WRIGHT:  Object to form.
8            MR. WILLIAMS:  Object to the form.  Lack of
9        foundation.
10       Q   All right.  I'm going to play the next clip.
11  It's from three minutes and six seconds to three minutes
12  and 55 seconds.  The same interview.
13           MR. WRIGHT:  Do you know what page this is on?
14       Q   Please listen to this, I may ask you some
15  questions.
16           MR. SLOSAR:  I don't.
17           (AUDIO PLAYED)
18       Q   One moment.  Okay.  Sir, is that audio from
19  the recorded statement that yourself and Detective York
20  took of Allen Helton on March 8, 2012?
21           MR. WRIGHT:  Object to the form.
22       A   (No verbal response.)
23       Q   Would you agree that in the recording that we
24  just listened to, that Detective York told Mr. Helton
25  that Mr. Lester heard everything that was said by Ms.
```

Page 219

```
1   Hoskins?
2            MR. WRIGHT:  Object.
3        A   Yes.
4        Q   Would you agree that in the recording we just
5   listed to, that Detective York told Mr. Helton that Ms.
6   Hoskins said, "Do you want to make some money?  Williams
7   ex-mother-in-law has 15,000."
8        A   Yes.
9        Q   Would you agree that in the recording we just
10  listened to, that Detective York told Mr. Helton that
11  she goes out every morning to use the bathroom?
12       Q   Will you agree that in the recording we just
13  listened to, that Detective York told Mr. Helton that
14  they were either going to tie her up or just lock her
15  in?
16       A   Yes.
17           MR. WRIGHT:  Object to form.
18       Q   Would you agree that in the recording we just
19  listened to, that Detective York told Mr. Helton that he
20  didn't want to talk to them no more that day?
21           MR. WRIGHT:  Object to form.
22       A   Could you repeat that question?
23       Q   Sure.  Would you agree that in the recording
24  we just listened to, that Detective York told Allen
```

Page 220

```
1   Helton that Helton didn't want to talk to them no more
2   that day?
3        A   Yes.
4            MR. WRIGHT:  Same objection.
5        Q   And there were -- in the recorded statement
6   and the part of the recording that we just listened to,
7   is it fair to say that Mr. Helton did not provide that
8   information to you and Detective York?
9            MR. WRIGHT:  I'll object to the form.
10           MR. WILLIAMS:  Object to the form of the
11       question.
12           MR. WRIGHT:  Foundation.
13           MR. WILLIAMS:  He can only answer as to what
14       information that Mr. Helton provided to him.
15       Requires him to speculate in what he provided to
16       Mr. York.
17  BY MR. SLOSAR:
18       Q   You can answer.
19       A   Yes.
20       Q   Fair to say that Mr. Helton just agreed with
21  the information that Detective York was providing to him
22  in your office on March 8, 2012?
23           MR. WRIGHT:  Object to form.  Foundation.
24           MR. WILLIAMS:  Join.
25       A   Yes.
```

Page 221

```
1        Q   All right.  I'm going to play another clip.
2   This is six minutes and 20 seconds through six minutes
3   and 52 seconds.  Please listen and I'm going to ask a
4   question, okay?
5            (AUDIO PLAYED)
6        Q   Sir, is that audio from the recorded statement
7   that yourself and Detective York took from Allen Helton
8   on March 8, 2012?
9        A   Yes.
10       Q   Would you agree that in the recording we just
11  listened to, that Detective York told Allen Helton that
12  Amanda Hoskins had a big wad of money?
13           MR. WRIGHT:  Object to form.
14       A   Yes.
15       Q   Would you agree --
16           MR. WILLIAMS:  I'll join.
17       Q   -- that in the recording we just listened to,
18  that Detective York told Allen Helton that Amanda
19  Hoskins' wad of money was either flat or folded over?
20           MR. WRIGHT:  I'm going to object to the form
21       of that, too.
22       A   Yes.
23       Q   Would you agree that the recording we just
24  listened to, that Detective York told Allen Helton that
25  Amanda Hoskins told him that the money was from the job?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 222

```
 1    A   Yes
 2    Q   In that recorded statement, Mr. Helton did not
 3  provide that information to yourself and Detective York,
 4  correct?
 5         MR. WRIGHT:  Object to form.
 6         MR. WILLIAMS:  Same objection I made
 7  previously.  He can testify as to what Mr. Helton
 8  said to him.
 9    A   Yes.
10    Q   And in fact, Mr. Helton, on March 8, 2012 in
11  your office, which was agreeing with the information
12  that Detective York was providing to him, correct?
13         MR. WRIGHT:  Object to form.
14         MR. WILLIAMS:  Object.  I'll join.
15    A   (No verbal response.)
16    Q   I'm going to play eight minutes and 20 seconds
17  through nine minute [sic], three seconds.  Please
18  listen.  I'm going to ask you some questions.
19         (AUDIO PLAYED)
20    Q   Sir, is that audio from the recorded statement
21  that you and Detective York took from Allen Helton on
22  May 8 -- or March 8, 2012?
23    A   Yes.
24    Q   Okay.  Would you agree then that in the
25  recording we just listened to, that Detective York told
```

Page 223

```
 1  Allen Helton, "Jessie's testified that Mike started
 2  crying about Katherine, and you were in the car with him
 3  when he started crying about Katherine, right?"
 4         MR. WRIGHT:  Object to the form.
 5         MR. WILLIAMS:  Object to the form, too.
 6         MR. WRIGHT:  Join.
 7    Q   Would you agree that Detective York told Mr.
 8  Helton, "He knew that they were going to rob her
 9  beforehand, but he didn't know they was going to.  They
10  weren't supposed to kill her, right?"
11         MR. WILLIAMS:  Same objection.
12         MR. WRIGHT:  Same objection.  Join.
13    A   Yes.
14    Q   In that recorded statement, Mr. Helton did not
15  provide that information to yourself and Detective York,
16  correct?
17         MR. WILLIAMS:  Same objection.
18         MR. WRIGHT:  Join.
19         MR. WILLIAMS:  He can testify as to what Mr.
20  Helton said to him.
21    A   (No verbal response.)
22  BY MR. SLOSAR:
23    Q   And Mr. Helton just agreed with the
24  information on March 8, 2012 in your office that
25  Detective York was providing to him, correct?
```

Page 224

```
 1    A   Correct.
 2         MR. WRIGHT:  Object to form.
 3    Q   I'm going to play nine minutes and 37 seconds
 4  through nine minutes and 53 seconds.  Please listen.
 5  I'll ask you some questions.
 6         (AUDIO PLAYED)
 7    Q   Sir, is that audio from the recorded statement
 8  that yourself and Detective York took of Allen Helton on
 9  March 8, 2012?
10    A   Yes.
11    Q   Would you agree that in the recording we just
12  listened to, Detective York told Mr. Helton that Mike
13  started crying and he asked Mike what's up, and Mike
14  turned to him and said, "They killed her"?
15    A   Yes.
16         MR. WRIGHT:  Object to form.
17         MR. WILLIAMS:  I'll join.
18    Q   On March 8, 2012 in your office, Mr. Helton
19  did not provide that information to yourself and to
20  Detective York, correct?
21         MR. WRIGHT:  Object to form.
22         MR. WILLIAMS:  Same objection.  He can testify
23  as to what Mr. Helton said to him.
24  BY MR. SLOSAR:
25    Q   You can answer.
```

Page 225

```
 1    A   Correct.
 2    Q   And in fact, Mr. Helton was just agreeing with
 3  the information that Detective York was providing to
 4  him, correct?
 5         MR. WRIGHT:  Object to form.
 6         MR. WILLIAMS:  Requires him to speculate of
 7  what Helton was doing.
 8    A   Correct.
 9    Q   And you were present when that was happening,
10  correct?
11    A   Correct.
12    Q   You didn't take any steps to stop that from
13  happening, correct?
14         MR. WRIGHT:  Object to form.
15         MR. WILLIAMS:  Objection.  Lack of foundation.
16  Assumes facts not in evidence.
17  BY MR. SLOSAR:
18    Q   Is that correct, sir?
19    A   Correct.
20    Q   After listening to the recording, would you
21  agree that Detective York provided information for Allen
22  Helton to repeat during his March 8, 2012 statement?
23         MR. WRIGHT:  Object to form.
24         MR. WILLIAMS:  Requires him to speculate.
25    Q   You can answer.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 226

1    A   Yes.
2    Q   And in fact, Detective York provided
3  information to Allen Helton on March 8, 2012 that
4  implicated Amanda Hoskins and Jonathan Taylor in the
5  murder of Katherine Mills, correct?
6        MR. WRIGHT:  Object to form.
7    A   Correct.
8    Q   And when Detective York's report states that
9  Mr. Helton provided that information to him first,
10 that's not correct, right?
11       MR. WRIGHT:  Object to form.
12       MR. WILLIAMS:  Requires him to speculate.
13   A   Could you repeat that?
14   Q   Sure.  When Detective York says in his police
15 report that Allen Helton provided that information to
16 Detective York and yourself, when he says that in his
17 report, that's not accurate, right?
18       MR. WRIGHT:  Same objection.
19       MR. WILLIAMS:  Requires him to speculate.  He
20   can testify as to what Mr. Helton told him.
21   A   Correct.
22 BY MR. SLOSAR:
23   Q   Now, I know you -- we talked earlier about the
24 discussion with Mr. Helton about helping him out on his
25 pending charges.  Do you remember that?

Page 227

1    A   Yes.
2    Q   Okay.  Did you ever take any steps to help Mr.
3  Helton with those charges?
4    A   No.
5    Q   Do you remember whether Jason York took any
6  steps -- did -- well, let me ask it a different way.  Did
7  Jason York ever tell you that he took any steps to help
8  Mr. Helton with those charges?
9    A   No.
10   Q   Okay.  And you know, earlier we talked at
11 length about the conversations that happened before the
12 recorder got turned on on March 8, 2012; is that right?
13   A   Yes.
14   Q   Okay.  Is it fair to say that none of the
15 specific facts that are in this report, none of those
16 facts were revealed by Allen Helton, Detective York
17 [sic], in your presence prior to the recorder being
18 turned on on March 8, 2012, right?
19       MR. WRIGHT:  Object to form.
20   A   Yes.
21   Q   Mr. Pickard, you never made any threats to
22 Allen Helton before that statement was recorded, right?
23   A   No.
24   Q   And after that statement was recorded, you
25 didn't make any threats to Allen Helton, right?

Page 228

1    A   No.
2    Q   Did Detective York ever tell Allen Helton in
3  your presence on March 8, 2012, that he didn't need to
4  talk to any members of the defense team?
5        MR. WRIGHT:  Object to form, foundation.
6    A   Not that I'm aware of.
7    Q   Sir, I'm going to show you what we'll mark as
8        Exhibit number 18.  We're almost done.  Before
9  we get there, Mr. Pickard, let me ask you a couple of
10 questions.  The first one is:  Do you know Jackie
11 Steele?
12       (EXHIBIT 18 MARKED FOR IDENTIFICATION)
13   A   Yes.
14   Q   Okay.  Did you now Jackie Steele back in April
15 of 2012?
16   A   Yes.
17   Q   Okay.  Did you ever tell Jackie Steele that
18 Detective York was feeding Allen Helton information
19 during his March 8, 2012 statement?
20       MR. WRIGHT:  Object to form, foundation.
21   A   No.
22   Q   Did you ever tell Jackie Steele that --
23       MR. WILLIAMS:  I'll join in that objection.
24   Q   -- Detective York -- well, sorry.  Today was
25 the first time -- is -- was today the first time you saw

Page 229

1  Detective York's report relating to the March 8, 2012
2  interview of Allen Helton?
3    A   Yes.
4    Q   Okay.  So you weren't then -- if you read the
5  report and noticed that things were false inside of it -
6  - well, let me strike that question.
7        You wouldn't have had an opportunity to inform
8  Jackie Steele that parts of the police report were false
9  because you didn't have an opportunity to review it
10 while the case -- the criminal case was still pending;
11 is that right?
12       MR. WRIGHT:  I'm going to object to the form
13   and foundation.
14       MR. WILLIAMS:  Assumes facts not in evidence.
15   A   Yes, I never seen the form before.
16 BY MR. SLOSAR:
17   Q   You were there when the statement was taken,
18 but you didn't see what Detective York wrote up after
19 that; is that right?
20   A   Right.
21   Q   Okay.  Sir, do you recognize this document?
22   A   I've never seen it before, but I'm familiar
23 with it.
24   Q   All right.  Well, you wrote this letter,
25 right?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 230

1    A    That's just -- that's when he brought him over
2  to talk to me.
3    Q    And I know it says March 27, 2012.  Is that --
4  that's probably a wrong date, right?
5    A    Yeah.
6         MR. WRIGHT:  Object to form.
7    A    It would have to be.
8    Q    Because you remember talking to Allen Helton
9  on the same day that he was -- that he gave a statement,
10  right?
11    A    Yes.
12    Q    Is it possible that you talked to Allen Helton
13  on March 7, 2012, and not March 8th?
14    A    It's possible, but I don't know.
15    Q    Okay.  I know it's been a long time.  I
16  thought that maybe the two in here might have been a
17  typo and that maybe you talked to him the day before.
18    A    No.
19         MR. WRIGHT:  I'm going to object to the form,
20  foundation.
21    Q    You don't recall, though, right?
22    A    No, I don't recall.
23    Q    Okay.  So it says that Deputy Gambrel,
24  according to your letter, that Deputy Gambrel arrested
25  Mr. Helton on a warrant for receiving stolen property;

Page 231

1  is that right?
2    A    Yes.
3    Q    Okay.  And then Deputy Gambrel brought Mr.
4  Helton to the sheriff's office to speak with you; is
5  that right?
6    A    Yes.
7    Q    And when Mr. Helton got there, he told you
8  that he would help -- if you had helped him with the
9  receiving stolen property charges, that he would get a
10  lot of information on the Mills' murder; is that right?
11    A    Yes.
12    Q    And you told Mr. Helton that if this was true,
13  that you would see what you could be done with getting
14  him a deal on the stolen property charges; is that
15  right?
16    A    Yes.
17         MR. WILLIAMS:  Object to the form of the
18  question.
19         MR. WRIGHT:  I join that.
20  BY MR. SLOSAR:
21    Q    And after that, you contacted Detective York
22  to come and interview Mr. Helton; is that right?
23    A    Yes.
24    Q    All right.  Now, according to this letter, you
25  didn't actually assist Mr. Helton with his charges like

Page 232

1  you had told him that you would, right?
2         MR. WRIGHT:  Object to form.
3    A    I didn't have to.
4    Q    And why was that?
5    A    It took care of itself.
6    Q    Took care -- what do you mean by that?
7         MR. WRIGHT:  Object to form.
8    A    The very next day or two, he went to court on
9  it and they settled it in court that morning.
10    Q    Okay.  So you didn't have a chance to even
11  help him?
12    A    Right.
13    Q    I understand.  Okay.  Looking at the following
14  page, it's going to be the back side because I got these
15  double-sided, again.
16         MR. WILLIAMS:  Did you mark this, Mr. Slosar?
17         MR. SLOSAR:  Yeah.  This is marked as 18.
18         MR. WILLIAMS:  Number 18.
19  BY MR. SLOSAR:
20    Q    According to the back side of this, was Allen
21  Helton a confidential informant for the Cumberland Tax
22  Force, UNITE?
23    A    I have no idea.
24    Q    Okay.  Well, will you review these documents
25  and let me know if he was or not?

Page 233

1         MR. WILLIAMS:  Counsel, I will let him answer
2  these questions to the best of his ability, but can
3  we agree that as far as it relates to confidential
4  informants and how they're handled, that we'll keep
5  that portion of the transcript sealed to the
6  public?
7         MR. SLOSAR:  I think, you know, I wouldn't --
8  I don't have an objection to putting this under the
9  protective order, but we actually -- our complaint
10  alleges that he was an informant --
11         MR. WILLIAMS:  Okay.
12         MR. SLOSAR:  -- so I don't -- I don't have an
13  objection to putting this under seal.  I can't, you
14  know, I think it's pretty public that he was.
15         MR. WILLIAMS:  Well, if Mr. Helton's disclosed
16  the fact of it to you himself, then I guess the
17  confidentiality is waived.
18         MR. SLOSAR:  Sure.  Sure.  He has.
19    A    Pretty obvious that he was.
20  BY MR. SLOSAR:
21    Q    All right.  Well, let me ask you the question
22  and we'll move forward, okay?
23    A    Okay.
24    Q    All right.  So based upon your review of these
25  documents, prior to Allen Helton -- prior to March 8,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 234

1  2012 when yourself and Mr. York got a statement from
2  Allen Helton, was he a confidential informant for the
3  Cumberland Task Force UNITE unit?
4          MR. WRIGHT:  Object to form, foundation.
5      A   I don't -- I wouldn't have no way of knowing
6  that.
7      Q   All right.  Well, based upon these documents,
8  was it -- is it your belief that Allen Helton was a
9  confidential informant?
10         MR. WRIGHT:  Object to form, foundation.
11     A   Yes.
12     Q   Okay.  All right.  And, Mr. Pickard, you
13 participated in questioning Jonathan Taylor during the
14 underlying investigation into Katherine Mills' death; is
15 that right?
16     A   I think I was there, I didn't question him.
17     Q   I appreciate the distinction.  But that
18 questioning that you were present for happened at the
19 Barbourville Police Department, right?
20     A   Yes.
21         MR. WRIGHT:  I'm going to the form,
22 foundation.
23     Q   And was Detective Broughton and Detective York
24 present for Jonathan Taylor's questioning?
25         MR. FARAH:  Object to the form.

Page 235

1          MR. WRIGHT:  Join.
2      A   Yes.
3      Q   Okay.  And were they the ones primarily
4  responsible for questioning Mr. Taylor at the
5  Barbourville Police Department sometime in 2011 or 2012?
6          MR. FARAH:  Object to form.
7          MR. WRIGHT:  Join.
8      A   I'm not familiar with that.
9      Q   You just don't recall exactly who was doing
10 the questioning?
11         MR. WRIGHT:  Object to form, foundation.
12     A   I don't remember dates.
13     Q   Okay.
14     A   I remember being there.
15     Q   Okay.  And you were there with Detectives
16 Broughton and York, too, right?
17     A   Yes.
18     Q   And they were questioning Mr. Taylor, right?
19         MR. FARAH:  Object.
20         MR. WRIGHT:  Object to form, foundation.
21     A   I remember us being there and I remember them
22 asking some questions, but --
23     Q   And during that time, Jonathan Taylor is being
24 questioned about the murder of Katherine Mills, correct?
25         MR. WRIGHT:  Object to form and foundation.

Page 236

1          Asked and answered.
2      A   Yes.
3      Q   And I know that you don't recall any of the
4  specific questions that were posed to Mr. Taylor.  Is
5  that fair?
6      A   No.
7      Q   Was the interview or questioning recorded?
8      A   I have no idea.
9      Q   Were you taking notes?
10     A   No.
11     Q   Were any of your colleagues taking notes?
12     A   Not that I'm aware of.
13     Q   And by "colleagues," I'm referring to Mr.
14 Broughton and Mr. York.  Were they taking notes that you
15 can recall?
16     A   Not that I know of.
17     Q   Do you remember whose idea it was to put
18 photographs of the crime scene on the table during the
19 questioning of Jonathan Taylor?
20         MR. WILLIAMS:  Asked and answered.
21         MR. WRIGHT:  Objection to form and foundation.
22     Q   You can answer.
23     A   No, I don't.
24     Q   Do you recall who the first person was during
25 that interview to threaten Mr. Taylor that he would be

Page 237

1  charged with murder?
2          MR. WILLIAMS:  Object to the form.
3          MR. WRIGHT:  Objection.  Join.
4      A   I don't --
5          MR. WILLIAMS:  Assumes facts not in evidence.
6  BY MR. SLOSAR:
7      Q   Did Mr. Taylor continue maintaining his
8  innocence throughout that questioning?
9          MR. WRIGHT:  Object to form, foundation.
10     A   I don't recall.
11     Q   Now, prior to participating in the -- well,
12 let me withdraw the question.  Prior to being present at
13 the questioning of Jonathan Taylor at the Barbourville
14 Police Department, you were familiar with the sketch by
15 Michael Crump, it's Exhibit 19 --
16     A   Yes.
17     Q   -- is that right?
18         MR. WRIGHT:  Objection to form, foundation.
19     Q   Okay.  And sometime after this questioning,
20 yourself and Detectives York and Broughton participated
21 in taking photographs of Mr. Taylor; is that right?
22         MR. WRIGHT:  Object to the form.
23     A   I don't remember that.
24     Q   But you were present when photographs of Mr.
25 Taylor were done, right?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 238

1     A    I was -- I was there, but I don't remember
2  anybody taking any pictures.
3     Q    You don't?
4     A    I just don't, no.
5     Q    Okay.
6     A    I very well could have been outside at that
7  time, I don't know, I don't remember.
8     Q    I'm going to show you what we'll mark as
9  Exhibit number 20.  Okay.  Please take a look at this,
10  Mr. Pickard.
11        MR. SLOSAR:  Can you pass that back?
12     Q    Now, will you take a look at these
13  photographs, Mr. Pickard?  Do you recall -- well, whose
14  idea was it to give Jonathan Taylor a hoodie to put on
15  for these photographs?
16        (EXHIBIT 20 MARKED FOR IDENTIFICATION)
17     A    I can't answer that, I don't know.
18     Q    Were you there when Mr. Taylor was instructed
19  to put a hoodie on?
20     A    I don't remember that, no.
21     Q    Were you present when Mr. Taylor was
22  instructed to put the hoodie over his head?
23     A    No, I don't remember that.
24        MR. WRIGHT:  Object to form, foundation.
25     Q    And it's your testimony that you don't recall

Page 239

1  anything about these photographs being taken; is that
2  right?
3     A    Right.
4     Q    Did you have a conversation with Detectives
5  Broughton and York where someone said something to the
6  effect of, "Wait till these pictures make it so that we
7  can charge him with murder"?
8        MR. WRIGHT:  Objection to form and foundation.
9        MR. FARAH:  Form.
10     A    No.
11     Q    Did you have any conversation with Detectives
12  York and Broughton about sending photographs of Jonathan
13  Taylor to Michael Crump in Oklahoma?
14     A    No.
15     Q    No.  Anybody ever tell you that photographs
16  were sent of Jonathan Taylor to Oklahoma for Michael
17  Crump to view?
18     A    No, not that I recall.
19     Q    When was the first time you learned that
20  Michael Crump looked at photographs of Jonathan Taylor
21  and did not identify him?
22        MR. WRIGHT:  Object to form and foundation.
23     A    I don't know that I've ever heard that, I
24  don't.
25     Q    Will you look at Exhibit number 19 which is

Page 240

1  the sketch of Michael Crump?  And will you pull out the
2  Exhibit number 8, which are the photographs of Mike
3  Simpson?  Not Jonathan Taylor, I'm sorry.  Mr. Pickard,
4  does the photographs before you of Exhibit number 8, the
5  picture of Mike Simpson, does he look similar to the
6  sketch from Michael Crump?
7        MR. WRIGHT:  Object to form.
8        MR. WILLIAMS:  I'll join.
9     A    There might be some similarity there.
10     Q    Okay.
11     A    I don't know.
12     Q    His -- the front of his hair looks similar,
13  right?
14        MR. WRIGHT:  Object to form.
15     Q    The sketch, how it's sticking out of the
16  hoodie, he's got -- Mike Simpson has a male version of
17  bangs; is that right?
18     A    Yes.
19     Q    And the sketch has a mustache, which is
20  similar to the one that appears on Mike Simpson's face;
21  is that right?
22        MR. WRIGHT:  Object to form.
23     A    Yes.
24     Q    And the profile of their -- of Mike Simpson's
25  face looks similar to that in the sketch, which stems

Page 241

1  from Michael Crump's description; is that right?
2        MR. WRIGHT:  Object to form.
3        MR. WILLIAMS:  I'll join.
4     A    Yes.
5     Q    Sheriff Pickard, I'm going to ask you some
6  general questions, okay?  Have you ever lied to a
7  witness in a criminal investigation?
8     A    No.
9     Q    Based upon the -- your knowledge of what a law
10  enforcement officer is supposed to do, would it be
11  appropriate for an officer to lie to a witness during a
12  criminal investigation?
13        MR. WRIGHT:  Object to form and foundation.
14        MR. WILLIAMS:  I'll join.
15     A    I think sometimes you can do that if you're --
16  you're working an investigation and I've -- I've let
17  people -- I've led them to believe I knowed something I
18  didn't.  I don't know whether you call that lying or
19  not, but --
20     Q    Well, would you ever tell a witness that you
21  would do something for them when you had no intention of
22  doing so?
23     A    No.
24        MR. WRIGHT:  Object to form and foundation.
25     Q    Would you ever tell a witness that you were

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 242

1  going to charge them with a crime knowing that you
2  didn't have probable cause to do so?
3      MR. WRIGHT:  Object to form, foundation.
4  A   No.
5      Q   Mr. Pickard, have you ever yelled at a witness
6  while questioning them in a criminal investigation?
7  A   No.
8      MR. WRIGHT:  Object to form, foundation.
9      Q   Is that something that you would have accepted
10  your deputies at the Knox County Sheriff's Department to
11  do?
12      MR. WRIGHT:  Object to form.
13      MR. WILLIAMS:  Requires him to speculate, but
14  he can answer.
15  A   I don't have a problem with yelling, as long
16  as that's as far as it goes.
17      Q   Have you ever threatened a witness in a
18  criminal investigation while questioning them?
19  A   No.
20      Q   Would that be acceptable of law enforcement
21  activity?
22      MR. WRIGHT:  Object to form, foundation.
23  A   To an extent, yeah.
24      Q   You think that that is acceptable for police
25  officers to yell at witnesses while they're

Page 243

1  investigating?
2      MR. WRIGHT:  Object to form, foundation.
3      MR. WILLIAMS:  Object to the form.
4  A   No.
5      Q   Have you ever swore at a witness while
6  interviewing them in a criminal investigation?
7  A   No.
8      Q   Is that acceptable behavior from law
9  enforcement officers?
10      MR. WRIGHT:  Object to form, foundation.
11  A   I'm really not sure.
12      Q   Have you ever told a witness that you were
13  going to put them in prison unless they told you the
14  story that you wanted them to tell?
15  A   Not that I recall.
16      Q   Is that acceptable behavior in 2010 of a law
17  enforcement officer?
18      MR. WRIGHT:  Object to form, foundation.
19  A   I'm not sure.
20      Q   Have you ever told the witness, "Fuck you,
21  fuck you, fuck you," while questioning them?
22  A   No.
23      MR. WILLIAMS:  Asked and answered.
24      Q   Would that be appropriate investigation
25  technique in 2012?

Page 244

1      MR. WRIGHT:  Object to form, foundation.
2  A   Not to me.
3      Q   Have you ever physically assaulted a witness
4  while questioning them?
5  A   No.
6      Q   Would that be acceptable behavior in 2012?
7  A   No.
8      Q   Have you ever thrown a chair while questioning
9  a witness in a criminal investigation?
10  A   No.
11      Q   Would that be acceptable behavior?
12  A   No.
13      MR. WRIGHT:  Object to form, foundation.
14      Q   Mr. Pickard, I'm going to play what's Exhibit
15  number 21.  It's at PL27706.  It's a clip.  Please listen.
16  I'm going to ask you some questions.
17      (EXHIBIT 21 IS MARKED FOR
18      IDENTIFICATION)
19      (AUDIO PLAYED)
20      Q   Mr. Pickard, that was an audio recording of
21  Detective York and Detective -- Deputy Derek Eubanks
22  interviewing Dave Fox in December 3, 2011 during an
23  investigation that your department was conducting with
24  the Kentucky State Police into the death of Bobby
25  Wiggins.  Was that the first time you heard that

Page 245

1  recording?
2  A   No.
3      Q   You heard that recording at Detective York's
4  deposition as well, right?
5  A   Yes.
6      Q   Had you heard that recording before then?
7  A   No.
8      Q   At the time that Deputy Eubanks was
9  questioning Dave Fox, were you his supervisor?
10  A   Yes.
11      Q   And you heard Detective York's voice in there,
12  right?
13  A   Yes.
14      Q   You believe that Detective York is a good law
15  enforcement officer?
16      MR. WRIGHT:  Object to form, foundation.
17  A   Yes.
18      Q   The conduct that you just heard in that clip,
19  is that something that you would have accepted to happen
20  under your supervision at Knox County Sheriff's
21  Department?
22      MR. WILLIAMS:  Are you talking --
23      MR. WRIGHT:  Object to form and foundation.
24      MR. WILLIAMS:  -- about Detective York's
25  conduct?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 246

1        MR. SLOSAR:  Yes.
2        MR. WILLIAMS:  Thank you.
3        MR. WRIGHT:  Same objection.
4    A   I wouldn't allow that personally, but
5 BY MR. SLOSAR:
6    Q   Why not?
7        MR. WRIGHT:  Objection.
8    A   I'm just not that way.
9    Q   So you don't coerce witnesses, right?
10       MR. WRIGHT:  Object to form, foundation.
11   A   Well, I don't -- I just don't use foul
12 language.
13   Q   Well, did you hear Detective York throw a
14 chair in there?
15       MR. WRIGHT:  Object to form, foundation.
16       MR. WILLIAMS:  Requires him to speculate.
17 Wasn't present.
18 BY MR. SLOSAR:
19   Q   Detective -- were you here a couple weeks ago
20 when Detective York claims that the noise you heard in
21 there was not him actually hitting a witness, but
22 instead him throwing a chair?  Were you here when you
23 testified to that Effect?
24       MR. WRIGHT:  Object to form --
25   A   Yes.

Page 247

1        MR. WRIGHT:  -- and foundation.
2    Q   Is that a credible explanation to you?
3        MR. WRIGHT:  Object to form, foundation.
4    A   I -- I wouldn't do that, but everybody's
5 different.
6    Q   What would you have done if you were in a room
7 with Detective York?  Would you have stopped him there?
8        MR. WRIGHT:  Object to form.
9    A   I'm not sure what I'd have done.
10   Q   Did you ever stop Detective York at any point
11 in the investigation into the death of Katherine Mills?
12   A   No.
13       MR. SLOSAR:  Let's take a break.
14       VIDEOGRAPHER:  Off the record.
15            (OFF THE RECORD)
16       VIDEOGRAPHER:  Back on the record.
17       MR. SLOSAR:  Plaintiff has no further
18 questions.  Thank you, Mr. Pickard.
19       THE WITNESS:  Thank you.
20            CROSS EXAMINATION
21 BY MR. FARAH:
22   Q   Sheriff Pickard, I represent Mike Broughton
23 and the City of Barbourville.  I just have a couple
24 follow-up clarification questions.  Do you have your
25 discovery answers in front of you, Exhibit number 13?

Page 248

1        MR. WILLIAMS:  I'll help you get them here.
2    Q   I'll direct you to page 7.  Interrogatory
3 number 10.  You there?
4    A   Yes.
5    Q   And I think you clarified this earlier, but I
6 just want to make sure we're clear on this.  At the end
7 of that answer, you indicated you were present for the
8 interview of Jonathan Taylor.  And then when Mr. Slosar
9 asked you were you -- in the discovery answer it says
10 you were present when Mr. Taylor was arrested by Mike
11 Broughton, but you testified earlier you don't believe
12 that's true; is that correct?
13       MR. SLOSAR:  Objection to form.  Misstates his
14 testimony.
15   Q   Go ahead.
16   A   I didn't have any knowledge that Mike arrested
17 him.
18   Q   Okay.  And I think you're right.  Let me show
19 you PL5132.  And I don't have copies.  Elliot, you're
20 welcome to give that back to him, to the witness.
21       MR. SLOSAR:  Sure.  Is this going to be an
22 exhibit?
23   Q   Yeah.  We'll make it Exhibit --
24       MR. SLOSAR:  24.
25   Q   -- 24.  Sir, I would just ask you, would you

Page 249

1 identify what this document is?  Thank you, Elliot.
2            (EXHIBIT 24 MARKED FOR IDENTIFICATION)
3    A   It's an arrest warrant.
4    Q   Okay.  And this -- is this the arrest warrant
5 issued to Jonathan Taylor for murder and robbery in the
6 Katherine Mills' investigation?
7    A   Yes.
8    Q   Okay.  And is that -- is this a Kentucky State
9 Police as the agency on this citation?  At the very top.
10   A   Yes.
11   Q   And at the bottom, was this executed by
12 Detective Jason York?
13   A   Yes.
14   Q   Okay.  Did that help refresh your recollection
15 that it was actually Detective York that arrested
16 Jonathan Taylor?
17   A   Yes.
18   Q   Okay.  And likewise, I'm going to mark this
19 next one as Exhibit 25, just to make sure we're clear on
20 this.  I know that Mr. Taylor was also arrested on the -
21 - for manufacturing meth about a month earlier.  I'm
22 going to hand you what we'll mark -- sorry, this is
23 PL3221.
24       MR. SLOSAR:  Isn't that part of the group
25 exhibit that I --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 250

1    Q    It might be.  I'm not sure if you had
2  introduced it or not.  But let me go on and introduce as
3  Exhibit 25.  Can you take a look at that and tell me if
4  you recognize what this document is?
5          (EXHIBIT 25 MARKED FOR IDENTIFICATION)
6    A    Yes.
7    Q    And tell -- will you tell the jury what that
8  is.
9          MR. SLOSAR:  Objection to form.
10   Q    Go ahead.
11         MR. SLOSAR:  There's no jury.
12   Q    Go ahead.
13   A    It's an arrest warrant on Jonathan Taylor.
14   Q    And this is for what charge?
15   A    Manufacturing.
16   Q    And was this issued by the Knox County
17  Sheriff's Department?
18   A    Yes.
19   Q    And who was the arresting officer who arrested
20  Mr. Taylor on this charge?
21   A    Derek Eubanks.
22   Q    Okay.  Thank you.  We'll mark that as Exhibit
23  25.  Thank you, Elliot.  So clearly, your discovery
24  answer was incorrect, Mike Broughton was not involved in
25  the arrest of Jonathan Taylor; is that correct?

Page 251

1          (EXHIBIT 25 IS MARKED FOR IDENTIFICATION)
2          MR. SLOSAR:  objection to form.
3    A    To my knowledge.
4    Q    Okay.  Thank you.  Now, go to interrogatory --
5  on that same Exhibit 13, number 4.
6    A    Yes.
7    Q    You got that number on page 4?
8    A    Yes.
9    Q    This is the part of the deposition where you
10  explained or talked about that Detective -- or
11  Defendant, Broughton may have been present during
12  questioning of Jonathan Taylor at the Barbourville
13  Police Department.
14   A    Yes.
15   Q    Okay.  Now, let me go through this with you.
16  My understanding was, is that Jonathan Taylor was
17  brought to the Barbourville Police Department that day,
18  correct?  Whatever date it was for questioning.
19   A    The best I remember, yes.
20   Q    Okay.  And I understand that Detective
21  Broughton may have been present at the police department
22  that day.  Were you actually in the room when questions
23  were asked of Mr. Taylor?
24         MR. SLOSAR:  Objection to form.  Asked and
25  answered.

Page 252

1    Q    Go ahead.  I'm unclear what your testimony was
2  earlier.  Were you actually present when questions were
3  asked?
4          MR. SLOSAR:  Objection to form.  Asked and
5  answered.
6    Q    You can answer.
7    A    I was present, but I don't know about the
8  whole time.  I could have got up and went out, I don't
9  know.  I did that a lot.
10   Q    Okay.  Do you know for certain if Detective
11  Broughton asked any questions of Mr. Taylor on that day?
12         MR. SLOSAR:  Objection to form.  Asked and
13  answered.
14   Q    Go ahead.
15   A    I don't recall.
16   Q    And you've been asked today a lot of questions
17  about different people that you participated in
18  interviews with along with Detective York, you know,
19  you've mentioned Allen Helton, Mike Simpson, Jessie
20  Lawson, I think Bob Smith, Michael Crump, Kayla Mills.
21  When those interviews were conducted, Detective
22  Broughton wasn't present on any of those, was he?
23         MR. SLOSAR:  objection to form.
24   Q    Go ahead.
25         MR. SLOSAR:  Misstates his prior testimony.

Page 253

1    A    I wasn't in interviews with all of them.
2    Q    Okay.  But Detective Broughton certainly
3  wasn't present, was he?
4    A    No.
5          MR. SLOSAR:  Objection to form.
6    Q    Are you aware of any other interviews of any
7  witnesses, of any witnesses, other than Amanda Hoskins,
8  who I think you recall from a prior deposition, that
9  Detective Broughton was present or participated in.  Are
10  you aware of any interviews of any witness, suspect,
11  anybody involved in the investigation into the Katherine
12  Mills' murder, that Detective Broughton was involved in?
13   A    Not to my knowledge.
14   Q    Did you ever have any discussions with
15  Detective Broughton about the investigation or about any
16  witnesses or anything concerning the investigation into
17  the murder of Katherine Mills?
18   A    Not that I recall.
19   Q    Do you recall ever sending Detective Broughton
20  out or asking him to go interview any witnesses or
21  examine any crime scenes or collect any evidence into
22  the investigation into the murder of Katherine Mills?
23   A    No.
24   Q    Now, I think you testified to this earlier.  In
25  your mind, in your understanding, this was a Kentucky

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 254

1  State Police investigation into the murder of Katherine
2  Mills, correct?
3          MR. SLOSAR:  Objection to form.
4      Q   And the lead investigator in this was Jason
5  York, correct?
6      A   Yes.
7          MR. FARAH:  That's all the questions I have.
8  Thank you, sir.
9              EXAMINATION
10 BY MS. KINCER:
11     Q   Mr. Pickard, I'm Shawna Kincer, and I
12 represent the bulk of the KSP defendants that are
13 charged today.  My questions are basically the same as
14 his, except that, do you know Mark Mefford?
15     A   Yes.
16     Q   Do you work with him often?
17     A   No.
18     Q   Okay.  Have you worked with him closely on any
19 case?
20     A   One -- one case.
21     Q   Which case was that?
22     A   It was a -- where a body was missing --
23     Q   Okay.
24     A   -- for like 11 months, I worked with him a
25 couple of days on that.

Page 255

1      Q   Just assisting?
2      A   We was actually all just searching for a body
3  in a creek, He was there.
4      Q   Okay.  Was that before this Katherine Mills
5  murder or after, do you know?
6      A   I'm pretty sure it was before.
7      Q   In this investigation Of Katherine Mills, did
8  you work at all with Mark Mefford on this case?  Assist,
9  help?
10     A   Not that I recall.  We was just both there at
11 the house.
12     Q   At Katherine Mills' house?
13     A   Yes.
14     Q   On the night of?
15     A   Yes.
16     Q   Okay.  Were you present with him during any
17 interviews?
18     A   Not that I recall, no.
19     Q   Okay.  Let's move on to Brian Johnson.  Do you
20 know him?
21     A   Yes.
22     Q   Okay.  Have you worked with him before?
23     A   Very little, if any.  I just don't -- don't
24 remember anything working with him.
25     Q   Okay.  Specifically, anything on this case

Page 256

1  with Katherine Mills?
2      A   No.
3      Q   Was he present the night of -- when you went
4  to the crime, the scene of the crime?
5      A   Best I recall, he was.
6      Q   He was.  Okay.
7      A   He was there.
8      Q   And Jackie Joseph, do you know her?
9      A   Yes.
10     Q   Okay.  Do you work with her very often?
11     A   No.
12     Q   Okay.  Did you work with her on this
13 particular case?
14     A   She was just up there.  I didn't work -- at
15 the house.
16     Q   She was at the house?
17     A   Yes.
18     Q   Okay.  And Kelly Farris, you know him?
19     A   Yes.
20     Q   Okay.  How often do you work with him?
21     A   He actually worked for me for a while.
22     Q   All right.  As a deputy in Knox County?
23     A   Yes.
24     Q   After he retired from KSP?
25     A   Yes.

Page 257

1      Q   Okay.  And was he involved in any way in this
2  case with you?
3      A   No.
4      Q   Okay.  Was he at the scene?
5      A   He was there.  That's all I remember.
6      Q   Okay.  And Dallas Eubanks, do you know him?
7      A   Yes.
8      Q   Okay.  Do you work with him often?
9      A   No.
10     Q   Okay.  Did you work with him in any way,
11 shape, form, or fashion in this particular case?
12     A   He was there at the house.
13     Q   So the people that I've named, your memory is
14 them just being present at the house initially?
15     A   Yes.
16     Q   Okay.  Did you have any involvement at all
17 with any of them after, that you can remember?
18     A   There was another case that Johnson was on
19 that I was involved with us some, somewhat.
20     Q   Anderson?
21     A   Yes.
22     Q   Okay.
23     A   Other than that, no.
24         MS. KINSER:  Okay.  That's all I have.
25             EXAMINATION

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 258

BY MR. WRIGHT:

Q    Sheriff Pickard, my name is Derek Wright. I'm the counsel for Defendant, Jason York and Defendant, Jason Bunch. I'll start with Jason Bunch. Do you know Trooper Jason Bunch?

A    Yes.

Q    Did you work with him at all in the investigation into the murder of Katherine Mills?

A    Not with him, no.

Q    Okay.

A    That I remember.

Q    You mentioned earlier in your testimony, that day, you spoke to Lisa Evans. Do you recall testifying to that?

A    Yes.

Q    When was that?

A    I'm not sure.

Q    Was it before or after the charges against the plaintiffs in this case were dismissed; do you know?

A    I think it was in October of '15, but I'm not really sure.

Q    Okay. How did she identify herself to you?

A    To be honest, I don't even remember.

Q    Did she tell you she was an investigator for one of the -- for either Ms. Hoskins or Mr. Taylor?

Page 259

A    She said that, but I don't remember saying that.

Q    You don't remember whether she said that or not?

A    I can't remember her saying that, no. She could have. I'm not -- excuse me, but I don't remember.

Q    Okay. Did she identify if she worked for any sort of agency?

A    I -- I remember something like her saying about public defender. That's all I remember.

Q    Was anybody with her?

A    Yeah.

Q    Do you know who that was?

A    I don't know her name.

Q    Did you ask who it was at the time?

A    She told me who she was, but I can't remember.

Q    And to your knowledge, was that conversation recorded?

A    It was, I didn't know it at the time.

Q    When did you find out it was recorded?

A    Right before we went to trial.

Q    Right before what went to trial?

A    On the Anderson case.

Q    Was that some of the questioning about the Anderson case?

Page 260

A    Yes.

Q    Did she indicate she was an investigator for one of the defendants in that case, criminal defendants, that is?

A    I don't remember.

MR. SLOSAR: There's only one defendant.

MR. WRIGHT: Okay. I'm sorry.

Q    Your interrogatories, Exhibit number 13, interrogatory number 6 on page 5; do you see that?

A    Yes.

Q    You indicate you have no direct knowledge about either plaintiff acting in the killing of Ms. Mills; do you see that?

A    Yes.

Q    Are you referring to the personal knowledge? What do you mean by direct knowledge?

A    I have no personal knowledge, no.

Q    When you filled out this interrogatory, had you read the criminal investigation file that Detective York had compiled?

A    I don't think so.

Q    Okay. There was some testimony about whether you went to a children's home, do you recall that testimony?

A    Yes.

Page 261

Q    And there was reference to receipts, I believe --

A    Yeah.

Q    -- do you recall that? Do you remember what the dates of those receipts were?

A    No, I don't.

Q    You mentioned you knew Ms. Hoskins through a prior hit-and-run investigation; is that true?

A    Yes.

Q    But were you the sheriff at the time?

A    Yes.

Q    Do you recall whether there was any evidence that the driver was under the influence when that happened, under the influence, being controlled substances or alcohol?

A    I'm not really sure.

Q    Okay. There was testimony regarding Dr. Larry Warren. Do you recall that?

A    Yes.

Q    Do you know of Dr. Larry Warren?

A    I know him.

Q    All right. You were asked whether you had any knowledge of a relationship between him and Ms. Hoskins. Do you recall that?

A    Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 262

1    Q    Were you present with any interviews of Joe
2 King when he advised that Ms. Hoskins was having an
3 affair with Dr. Warren?
4         MR. SLOSAR:  Objection to form.  You can
5 answer.
6    A    No.
7    Q    Were you ever in an interview of Joe King with
8 Detective York?
9    A    No.
10    Q    There was testimony earlier, questions asked
11 about you being present when Jonathan Taylor was with
12 you, Detective Broughton of the Barbourville Police
13 Department, and Detective York.  Do you recall that
14 testimony?
15    A    Yes.
16    Q    Okay.  And am I correct, that you don't recall
17 what questions, if any, were asked?
18    A    No, I don't.
19    Q    Okay.  If Jonathan Taylor -- do you recall if
20 Jonathan Taylor declined to answer any questions?
21    A    I don't remember.
22    Q    Okay.  You talked about an encounter with
23 Kayla Mills when she was driving recklessly.  Is that --
24 do you recall that testimony?
25    A    Yes.

Page 263

1    Q    Do you remember what -- when that was?
2    A    It was after the murder sometime.  I don't
3 know how long.
4    Q    Do you remember what car she was driving?
5    A    She was driving a little blue, just a small
6 blue car.  I can't remember.
7    Q    Can't remember the make and model?
8    A    Not really.
9    Q    But you recall it being blue?
10    A    Yeah.
11    Q    Do you recall any information from Michael
12 Crump, that he saw a blue car at the house of Katherine
13 Mills on the day she was found dead?
14         MR. SLOSAR:  Objection to form, foundation.
15    A    I've heard that statement before.
16    Q    Do you know whether Kayla Mills was driving
17 that same blue car in the December 2010 time period?
18         MR. SLOSAR:  Objection to form.  Calls for
19 speculation.
20    A    I don't know.
21    Q    Don't know?
22    A    No.
23    Q    There was testimony about Kayla Mills'
24 grandmother.  Do you recall that?
25    A    Yes.

Page 264

1    Q    I don't believe there was ever a name
2 mentioned.  Who is her grandmother?  And I know she
3 would have more than one, but --
4    A    She was a Bingham.  I'm trying to think of her
5 first name.  Sylvia.
6    Q    And was that who you were referring to in your
7 testimony, Sylvia Bingham?
8    A    Yeah.  That's her grandma.  The only grandma I
9 know.
10    Q    Okay.  That's what I was getting at.  Could
11 you look at Exhibit number 19?
12    A    It's here somewhere.  Yeah.  There it is.
13 Thank you.
14    Q    Exhibit number 19, to your understanding, is
15 that the sketch based on the information provided by
16 Michael Crump?
17    A    To my understanding, yeah.
18    Q    And I believe you testified that you saw some
19 similarity between him and Michael Simpson.  Is that how
20 you testified earlier?
21    A    Some, yes.
22    Q    Would you also agree that there's some
23 similarity between him and Jonathan Taylor?
24    A    Yes.
25         MR. SLOSAR:  Objection to form.

Page 265

1    Q    Could you turn to Exhibit number 15.
2    A    What is that?
3    Q    That's the report.
4    A    Allen Helton report?
5    Q    Allen Helton report.  He's got it.  Before I
6 ask that, let me clarify my last question.  Do you find
7 any similarity between the sketch on Exhibit 19 and
8 Jonathan Taylor?
9         MR. SLOSAR:  Objection to form, foundation.
10 Thank you.
11    Q    The sketch, going back to -- I'm sorry, I
12 wanted to go back to that one question.
13    A    They -- they both could --
14    Q    Fit the --
15    A    -- resemble that to a point.
16    Q    Okay.  Now, going to Exhibit number 15, at the
17 end of that, does it say that the report is a summary of
18 Allen Helton's statement that -- on the back page?
19         MR. SLOSAR:  It's the last line of the last
20 paragraph.
21    A    Yes.
22    Q    And isn't it true that it also says that
23 there's a CD for the entire statement?
24    A    Yes.
25    Q    Okay.  So if somebody wanted to confirm what

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 266

1   was in this report, there was a CD of it, correct?
2           MR. SLOSAR:  Objection to form.  Calls for
3   speculation.
4       A   I'm sure, yeah.  Detective York would have
5   that.
6       Q   And you were in on that interview -- you were
7   present for the interview, correct?
8       A   Yes.
9       Q   And to your memory, was it recorded?
10      A   Yes.
11      Q   So the reference in this report to, "A CD of
12  entire statement," is that consistent with your memory
13  that the interview was recorded?
14      A   Yes.
15          MR. SLOSAR:  Objection to form.
16      Q   Now, Exhibit number 17 on page 2, marked line
17  25.  It has Detective York referencing, "Earlier, you
18  stated to me."  Do you see that?
19      A   Yes.
20      Q   Was there statements by Allen Helton to
21  Detective York prior to the recording?
22          MR. SLOSAR:  Objection to form.  Asked and
23  answered.
24      A   Not that I recall.
25      Q   You don't remember any discussion between

Page 267

1   Detective York and Allen Helton before the recording was
2   turned on?
3           MR. SLOSAR:  Objection to form.  Asked and
4   answered.
5       A   They talked just a little bit before he
6   actually started recording, but I don't remember.
7       Q   The details.
8       A   I don't remember the details or how much of it
9   there was.
10      Q   So that question where he makes that reference
11  he says, "You were pumping gas at Escoe's Market."  Do
12  you see that?
13      A   What number you on?
14      Q   Line 26 of page 2.
15      A   Yes, I see it now.
16      Q   So you don't have a memory if that was
17  something Allen Helton told Detective York before the
18  recorder came on?
19          MR. SLOSAR:  Objection.
20      A   No.
21          MR. SLOSAR:  Objection to form.  Asked and
22  answered.
23      Q   It may have been asked.  You just -- it may
24  have been something spoken, you just don't remember it?
25          MR. SLOSAR:  Objection to form.  It misstates

Page 268

1   his testimony.  He just answered that question.
2       Q   You can go ahead.
3           MR. SLOSAR:  He just answered it earlier.
4       A   I don't recall it, but --
5       Q   Okay.  On that same page, do you see in line
6   30 and 31 -- on line 30 where Detective York's -- York
7   asks what the conversation that says curtailed -- I
8   think it was meant to be entailed -- do you see that on
9   line 30?
10      A   Yes.
11      Q   And what does Helton answer?
12      A   "She asked me did I want to make money and --
13  I -- and told me how."
14      Q   And then what did Detective York do?
15      A   He said, "And how was what [sic]."
16      Q   How was that?
17      A   Yeah.
18      Q   And then isn't it true that according to the
19  transcript, Allen Helton says, "By tying this old lady
20  up," is that what the next line says?
21      A   Yes.
22      Q   And isn't it true that Detective York did not
23  provide that information to Allen Helton beforehand?
24          MR. SLOSAR:  Objection to form.
25      A   Not that I'm aware of.

Page 269

1           MR. WRIGHT:  Let's go off the record for just
2   one second.  I'm almost done.
3           VIDEOGRAPHER:  Off the record.
4               (OFF THE RECORD)
5           VIDEOGRAPHER:  Back on the record.
6   BY MR. WRIGHT:
7       Q   Yeah.  I have a few more questions.  We're
8   back on the record.  Looking -- continuing to look at
9   this Exhibit number 17.  Do you see on -- if you turn to
10  page 4, line 65.  Detective York, the transcript,
11  reflects him saying, "She said, do you want to make some
12  money."  Do you see that?
13      A   Yes.
14      Q   If you flip back to page 2 of the transcript
15  on line 31, isn't it true that Helton is saying that she
16  said, "I want to make some money," do you see that?
17      A   Yes.
18          MR. SLOSAR:  Objection to form.
19      Q   So by the time that Detective York makes that
20  statement on page 4, that information had already been
21  provided to him by Allen Helton, hadn't it?
22          MR. SLOSAR:  Objection to form.
23      A   Yes.
24          MR. SLOSAR:  Calls for speculation.
25      Q   According to the transcript?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 270

1    A    Yes.
2    Q    On page 4, line 73, Detective York says,
3  "Because earlier you said, 'tie her up.'"  You see that?
4    A    Yes.
5    Q    If you flip back to page 2, line 33, the
6  transcript reflects Allen Helton explaining, By going in
7  and tying this old lady up, do you see that on line 33?
8    A    Yes.
9    Q    So by the time that Detective York said that
10  on page 4, isn't it true that Allen Helton had already
11  provided that information to him, correct?
12    MR. SLOSAR:  Objection to form.
13    A    Yes.
14    Q    If you go to page 8 of the transcript, line
15  45, Detective York asks Mr. Helton if it was a big wad
16  of money.  Do you see that?
17    A    Yes.
18    Q    Line 47 he asks, "Was it flat or folded over?"
19  Do you see that?
20    A    Yes
21    Q    Prior to those questionings -- questions on
22  the same page, isn't it true that Allen Helton said,
23  "She had money on her."  Do you see that on line 42?
24    A    Yes.
25    Q    And Detective York then asks, How much, on

Page 271

1  line 43.  Do you see that?
2    A    Yes.
3    Q    Allen Helton describes four-, three-, 35-,
4  four grand.  Do you see that on line 44?
5    A    Yes.
6    Q    So before he asked if he saw a big wad of
7  money or if it was flat or folded over, isn't it true
8  that Allen Helton had already told Detective York that
9  he had seen 35- to four grand, correct?
10    MR. SLOSAR:  Objection to form.
11    A    Yes.
12    Q    And were you present for any other interviews
13  between Detective York and Allen Helton?
14    A    No.
15    Q    When you testified earlier that Detective York
16  was leaving the interview, were you meaning he was
17  leaving the interview as between you and him?
18    A    Yes.
19    Q    That he was the one asking the questions?
20    A    Yes.
21    MR. WRIGHT:  Okay.  That's all I have.
22    EXAMINATION
23  BY MR. WILLIAMS.
24    Q    Mr. Pickard, I just have a few questions I
25  want to talk with you about.  It's been a long

Page 272

1  deposition and I don't want to keep you any longer than
2  need be, but you were asked some questions about your
3  training and deputy sheriff's training.  To your
4  knowledge, are the qualifications for a sheriff in
5  Kentucky found within the Constitution of Kentucky?
6    A    Yes.
7    Q    And it sets out the qualifications for a
8  sheriff?
9    A    Yes.
10    Q    As it relates to deputy sheriffs, are you
11  familiar with Kentucky having laws which require that
12  sheriff's deputies undergo training?
13    A    Each year, yes.
14    Q    And is that training conducted at the
15  Department of Criminal Justice Training in Richmond,
16  Kentucky?
17    A    Yes.
18    Q    And deputy sheriffs, after they've worked over
19  a certain period of time, have to go through that
20  training and complete it, correct?
21    A    Yes.
22    Q    And become certified?
23    A    Yes.
24    Q    And in fact, even before they are sent to
25  Richmond for training, they have to undergo a background

Page 273

1  check and what's called POP certification --
2    A    Yes.
3    Q    -- is that fair?
4    A    Yes.
5    Q    Now, to your knowledge, does the State of
6  Kentucky or the Commonwealth of Kentucky, also require
7  that deputy sheriffs undergo yearly freshening or
8  continuing education?
9    A    Yes.
10    Q    And while you were sheriff, did your deputies
11  complete that training as required by the Commonwealth?
12    A    Yes.
13    Q    In fact, one of the questions you were asked
14  relating to your own training had an attachment of the
15  record of training of Derek Eubanks, would you agree
16  with that?
17    A    Yes.
18    Q    In one of the recordings that you were asked
19  to comment about or statement that you made, and I'm
20  just going to paraphrase because I can't remember the
21  exact statement, but you reference someone hanging if
22  they're guilty, or if they're found to be guilty.  Did
23  you literally mean hang from the gallows?
24    A    No.
25    Q    Were you referring to if they're guilty, they

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

274..277

Page 274

1   need to face justice?
2       A    Yes.
3       Q    Mr. Pickard, you were asked some questions
4   about your encounter with Allen Helton at your office, I
5   think, on March 8th --
6       A    Yes.
7       Q    -- of 2012.  And you've been asked some
8   questions about this, but as I understood your
9   testimony, after -- after Mr. York arrived at the
10  sheriff's department, there was a period of time that he
11  spoke with Mr. Helton before the recording began.  Is
12  that fair?
13          MR. SLOSAR:  Objection to form.
14      A    He talked to him.  I don't remember how long,
15  but he did talk to him.
16      Q    As we sit here today, do you remember for how
17  long and what was said in that conversation?
18      A    No.
19          MR. SLOSAR:  Objection to form.
20      A    I don't remember.
21      Q    Do you know whether Detective York would have
22  spoke with Allen Helton before March 8th of 2012?
23      A    Not that I know of.
24      Q    Okay.  You don't know whether he did or
25  didn't?

Page 275

1       A    No, I don't.
2       Q    And you were asked by counsel -- and again,
3   I'm paraphrasing questions best as I can recall -- as it
4   relates to the interview of Detective York by -- I'm
5   sorry, the interview of Mr. Helton by Detective York,
6   why you didn't stop it, or you didn't stop it.  Did you
7   see any reason to stop Detective York's interview of Mr.
8   Helton?
9       A    No.
10          MR. WILLIAMS:  Thank you.
11          REDIRECT EXAMINATION
12  BY MR. SLOSAR:
13      Q    Mr. Pickard, just a couple questions.  During
14  the time of the Katherine Mills' homicide, December of
15  2010 through your retirement in 2015, did the Knox
16  County Sheriff's Department monitor outside training for
17  their employees?
18      A    From what date now?  From the time I retired?
19      Q    2010 to the time you retired.
20      A    I have no idea what they did.
21      Q    Okay.  You didn't take any actions as
22  sheriff to monitor any outside training that your
23  employees were receiving, correct?
24      A    No.
25      Q    And would that be the same prior, between 2003

Page 276

1   and 2010 as well, that you weren't doing any monitoring
2   of outside training that your deputies or employees were
3   receiving?
4       A    Derek Eubanks took care of that.
5       Q    Okay.
6       A    I didn't, he did.
7       Q    Did -- were you aware of any evaluations done
8   at the Knox County Sheriff's Department as to outside
9   training that employees received?
10      A    No.
11      Q    Okay.  Mr. Pickard, I know it's been a long
12  day.  You participated in an interview of Allen Helton
13  on March 8, 2012, right?
14      A    Yes.
15      Q    Testified about that a lot today, right?
16      A    Yes.
17      Q    Now, Allen Helton had been arrested a number
18  of times before March 8, 2012, right?
19      A    Yes.
20          MR. WRIGHT:  Object to form, foundation.
21      Q    You had experiences with Allen Helton being
22  arrested prior to that date, right?
23      A    Yes.
24      Q    You knew that he was a thief, right?
25      A    Yes.

Page 277

1       Q    You knew that he wasn't a very credible
2   person, right?
3           MR. WRIGHT:  Object to form, foundation.
4       A    Yes.
5       Q    Do you know that prior to March 8, 2012, did
6   you know that Allen Helton was addicted to pills?
7           MR. WRIGHT:  Object to form, foundation.
8       A    Yes.
9       Q    Prior to March 8, 2012, did you know that
10  Allen Helton was dealing pills in the Knox County area?
11          MR. WRIGHT:  Object to form, foundation.
12      A    I don't know that he was dealing.
13      Q    Well, by the time you took his statement on
14  March 8, 2012, you knew that Allen Helton and Mike
15  Simpson were going on runs to Florida to go buy massive
16  amounts of pills, right?
17      A    Yes.
18      Q    Okay.
19          MR. WILLIAMS:  Object to the form.
20          MR. WRIGHT:  I agree, yeah.  I join that.
21      Q    At the time that Detective York took Mr.
22  Helton's statement on March 8, 2012, did you believe
23  that Allen Helton was a very credible person?
24          MR. WRIGHT:  Object to form, foundation.
25      A    No.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 278

1    Q    Did you believe what came out of his mouth
2  that day?
3         MR. WRIGHT:  Object to form, foundation.
4    A    I'm not sure.
5    Q    Did you do any investigation after March 8,
6  2012, to see whether anything that Allen Helton told
7  Detective York was actually true?
8    A    No, I didn't.
9    Q    Did -- to your knowledge, did Detective York
10  do any investigation into the statements that Allen
11  Helton provided, to determine whether they were true or
12  not?
13   A    I'm not aware of anything.
14   Q    Sitting here today, are you aware of any
15  evidence that implicates Amanda Hoskins and Jonathan
16  Taylor in the murder of Katherine Mills?
17        MR. WRIGHT:  Object to form.
18   A    No.
19        MR. SLOSAR:  I don't have anything further.
20  Thank you, Mr. Pickard.
21        THE WITNESS:  Thank you.
22        VIDEOGRAPHER:  Off the record.
23             (DEPOSITION CONCLUDED AT 4:43 P.M.)
24
25

Page 279

1                CERTIFICATE OF REPORTER
2              COMMONWEALTH OF KENTUCKY AT LARGE
3
4  I do hereby certify that the witness in the foregoing
5  transcript was taken on the date, and at the time and
6  place set out on the Title page here of by me after
7  first being duly sworn to testify the truth, the whole
8  truth, and nothing but the truth; and that the said
9  matter was recorded stenographically and mechanically by
10  me and then reduced to typwritten form under my
11  direction, and constitutes a true record of the
12  transcript as taken, all to the best of my skill and
13  ability.  I certify that I am not a relative or employee
14  of either counsel, and that I am in no way interested
15  financially, directly or indirectly, in this action.
16
17
18
19
20
21
22  JESSICA VAN-TILBURG,
23  COURT REPORTER/NOTARY
24  COMMISSION EXPIRES:  06/28/2020
25  SUBMITTED ON:  05/09/2018

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibits**

**EXHIBIT 1**
40:6,12 42:9

**EXHIBIT 2**
42:9,10,16

**EXHIBIT 3**
43:25 44:2

**EXHIBIT 4**
54:23 55:1

**EXHIBIT 5**
95:2,5 102:4,5

**EXHIBIT 6**
133:22,24

**EXHIBIT 7**
137:14,15,17

**EXHIBIT 8**
139:7,9 240:2,4

**EXHIBIT 9**
149:22,23,24

**EXHIBIT 10**
169:17,22
179:6

**EXHIBIT 11**
180:10,11,13

**EXHIBIT 12**
184:19,23

**EXHIBIT 13**
15:4,11 247:25
251:5 260:8

**EXHIBIT 14**
117:18,24
119:4

**EXHIBIT 15**
171:19,22
190:14,15
208:2,15 265:1,
16

**EXHIBIT 17**
206:23 207:3
266:16 269:9

**EXHIBIT 18**
228:8,12

**EXHIBIT 19**
187:6,7,14
237:15 239:25

264:11,14
265:7

**EXHIBIT 20**
238:9,16

**EXHIBIT 23**
28:21,25
106:16

**EXHIBIT 24**
249:2

**EXHIBIT 25**
249:19 250:3,5,
22,23 251:1

**$**

**$100**  141:14

**$15,000**  211:11

**$4,000**  212:6

**$50**  142:9

**0**

**01/17/14**  55:17

**03/08/12**  172:6

**04-CV-278**
42:11

**1**

**1**  40:6,12 41:24,
25 42:9 69:23
165:23 167:2,
15

**10**  128:22,23,25
129:1,7 169:17,
22 179:6 248:3

**103**  129:3

**11**  58:13 76:17
153:9 180:11,
13 254:24

**11-T-136**
119:22

**12**  149:18 150:8
153:10,14
156:14 174:19
184:19,23

187:9

**13**  15:4,6,11
28:14,15 78:2
106:18,19
176:24 247:25
251:5 260:8

**14**  117:18,24
119:4 122:23
132:18,20,22
169:25 171:15
172:9

**15**  47:1 57:17
171:19,22
190:15 208:2,
15 258:20
265:1,16

**15,000**  219:7

**15854**  206:25

**16**  57:17 180:1,
5,8,11 181:18
182:9 185:2,8
206:21 207:2
216:14

**17**  78:18 206:23
207:3 266:16
269:9

**17-cv-84**  8:10

**18**  32:17 79:2
228:8,12
232:17,18

**18940**  117:18

**18943**  117:19

**19**  79:9 187:6,7,
14 209:21
237:15 239:25
264:11,14
265:7

**1922**  153:9

**1971**  27:14

**1:62**  176:25

**2**

**2**  41:24 42:10,
16 68:5,7 95:8
133:2,6 216:23
266:16 267:14

269:14 270:5

**20**  13:17 23:7
24:8 52:15 56:2
57:18 63:17,21
64:9,15 71:7,11
89:10 90:13,16,
23 91:1 92:3,6,
9,15 93:13,18,
20,23 125:9
139:1,4 142:9
143:7 165:8,16,
22 167:2,15
221:2 222:16
238:9,16

**2003**  32:2,6
37:13 83:4
84:4,19,24
85:16,22 86:1,
8,13 87:1,7,12,
17,23 88:3,7,
12,16,20,25
89:4 275:25

**2004**  30:21
31:7 40:9 42:14

**2005**  30:11,18
71:7

**2007**  9:19
28:10 30:6 80:5
82:4

**2008**  28:10
30:1

**2009**  28:10
29:16,19

**2010**  13:9,17,
20 23:7 24:8
38:12,13 39:6,
10 45:24 50:20,
24 51:13,16
52:3,15 53:17
54:7,17 56:2
59:10 62:5
63:17,21 64:9,
15 65:7,19
71:8,11 80:17
84:7 85:4 86:24
89:10 90:5,13,
16,23 91:1
92:3,6,9,15
93:7,10,13,18,
21,24 125:9
131:18 139:1,4
142:9 143:7

165:8,16,22
167:2,15
209:21 243:16
263:17 275:15,
19 276:1

**2011**  102:20,24
103:3 112:6
117:11 119:9
120:19 121:1
131:18 144:21
188:20 189:1
235:5 244:22

**2012**  16:25
18:1,19,22
20:2,17,20
100:14 102:20,
24 103:3 111:3
138:20 149:18
150:8 153:9,10,
14 156:14
165:9,17,23
167:2,15
169:25 170:22
171:9,13,15,21
172:9 173:4,8,
19 180:1,5,8,
11,19 181:18
182:9 185:2,8
186:6 190:12,
25 192:22
194:21 195:6,9,
14,21 196:1
198:7 200:14
206:7,19
207:21 208:21,
24 209:5 210:2,
5,23 211:16
212:11 213:8
215:14,17,21
216:15 217:5
218:20 220:22
221:8 222:10,
22 223:24
224:9,18
225:22 226:3
227:12,18
228:3,15,19
229:1 230:3,13
234:1 235:5
243:25 244:6
274:7,22
276:13,18
277:5,9,14,22
278:6



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**2013** 28:17,18

**2014** 37:25 55:24

**2015** 44:10 46:5,22 47:3 48:13,18 49:2 66:19 68:21,22 71:11 74:3,9 83:3 84:4,19,24 85:17,22 86:1, 8,13 87:2,7,12, 17,23 88:3,7, 12,16,20,25 89:4 275:15

**2016** 56:2

**2018** 8:5 176:24

**20th** 90:9

**21** 79:14 244:15,17

**21st** 8:4

**22** 12:6,8

**23** 28:21,25 106:16

**24** 248:24,25 249:2

**25** 216:18 249:19 250:3,5, 23 251:1 266:17

**26** 40:9 267:14

**27** 230:3

**3**

**3** 29:9 43:25 44:2 95:9,11 96:16 102:5 244:22

**30** 268:6,9

**31** 268:6 269:15

**33** 270:5,7

**35-** 271:3,9

**37** 224:3

---

**4**

**4** 54:23 55:1 71:16,18 106:24 112:6 117:11 119:9 120:19 121:1 122:25 123:6 150:19 151:14 176:25 251:5,7 269:10,20 270:2,10

**40** 74:5 163:8, 10

**42** 270:23

**43** 149:19 271:1

**44** 271:4

**45** 270:15

**47** 270:18

**48** 216:19

**4:43** 278:23

**4th** 153:7,8

---

**5**

**5** 16:1 44:9 72:4 95:2,5 102:5 260:9

**52** 221:3

**53** 224:4

**55** 218:12

---

**6**

**6** 16:1 133:22, 24 134:4,5 260:9

**65** 269:10

---

**7**

**7** 96:17 128:22 129:1,6,7 137:15,17 190:12 230:13

248:2

**724** 153:10

**73** 270:2

**7:24** 153:13

---

**8**

**8** 9:19 20:2,17, 20 75:8 139:7,9 171:9,13,21 173:4,8,19 190:25 192:22 194:21 195:6,9, 14,21 196:1 198:7 200:14 206:7,18 207:21 208:21, 24 209:5 210:2, 5,23 211:16 212:11 213:8 215:14,17,21 216:15 217:5 218:20 220:22 221:8 222:10, 22 223:24 224:9,18 225:22 226:3 227:12,18 228:3,19 229:1 233:25 240:2,4 270:14 276:13, 18 277:5,9,14, 22 278:5

**8th** 195:18 230:13 274:5, 22

---

**9**

**9** 76:2 132:20 149:23,24

**911** 50:25 125:14 152:8

---

**A**

**a.m.** 153:13

**ability** 233:2

**abuse** 50:11 73:17

---

**acceptable** 242:20,24 243:8,16 244:6, 11

**accepted** 242:9 245:19

**access** 22:13, 22 59:7,10 66:22

**accident** 77:20 78:7

**accordance** 45:4

**accurate** 139:16 196:21 226:17

**accused** 82:8 87:3,9,13 89:5

**act** 16:7

**acted** 16:11

**acting** 260:12

**action** 175:2

**actions** 275:21

**activities** 103:9,15 104:3 123:1

**activity** 175:16 242:21

**actual** 55:25 158:1 159:4,6

**addicted** 277:6

**addiction** 91:23

**addition** 77:4

**additional** 27:18 31:11

**admit** 99:11

**advised** 262:2

**affair** 262:3

**affect** 50:3

**affirm** 9:2

**Affirmative** 11:13

---

**afternoon** 142:12

**agencies** 48:1 52:22

**agency** 13:9 14:11 49:4 52:3,16 67:24 249:9 259:8

**agents** 117:7

**agree** 11:16 13:3 52:15 69:18,25 72:20 75:1 76:3,7 78:14,19 79:4, 10,15 145:4 163:8 172:9,14 183:17 208:18 209:3 211:21 217:9,16 218:23 219:4,9, 13,19,24 221:10,15,23 222:24 223:7 224:11 225:21 233:3 264:22 273:15 277:20

**agreed** 174:1 176:4 217:25 220:20 223:23

**agreeing** 222:11 225:2

**agreement** 111:9 177:23 178:12 200:7, 17

**ahead** 24:3 57:23 83:19 100:4 109:15 134:11 140:6 142:22 146:7 200:11 248:15 250:10,12 252:1,14,24 268:2

**ahold** 192:24

**al-** 156:23

**alcohol** 261:15

**alibi** 133:19 135:1

---

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

**allegation** 98:23

**allegations** 41:12 43:2,18

**allegedly** 100:22 155:22

**alleges** 233:10

**Allen** 14:22 19:14 20:2,8, 14,15,19 25:24 90:25 92:17 96:4 97:7 101:14 102:10 112:7,12 113:5 117:13 119:9, 12,22 120:1 121:18 122:6, 10 130:6,9,12 136:24 141:2 171:9,20 172:15 188:20, 25 189:3,9,13, 25 190:5,12,15, 25 191:3,22 192:1 194:21 195:4,14,21 197:4,18 198:6, 13,18,21 199:11,15,22 200:7,14 205:7, 8,15 206:2,7, 18,23,24 207:15 208:20 209:4,15,16,22, 25 210:21 211:3,9,10,16, 22 212:3,4,5,6, 11,17,21 213:8, 14,18,21 214:11,15 215:18,22 216:4,15 217:7, 13 218:20 219:25 221:7, 11,18,24 222:21 223:1 224:8 225:21 226:3,15 227:16,22,25 228:2,18 229:2 230:8,12 232:20 233:25 234:2,8 252:19 265:4,5,18

**allowed** 34:5

**Amanda** 8:7 16:15 17:23 18:2,24 19:8 20:23 21:4,8,15 22:13 89:9,13 90:4 98:23 99:1 128:15 138:18 147:14,19 148:1 154:15, 23 169:5,9 173:15,21 183:9 186:4 194:22 195:10, 15 207:22 208:25 209:17 210:10 211:10 212:5,6,22 221:12,18,25 226:4 253:7 278:15

**Amber** 92:5 96:6

**amount** 41:3,9 50:3

**amounts** 277:16

**Amy** 8:12

**and/or** 44:9 101:3

**Anderson** 257:20 259:23, 25

**Anderson's** 11:25

**anger** 48:14

**answering** 11:10

**answers** 11:13 15:20 30:5 177:15 247:25

**apartment** 166:20

**apologize** 106:19 184:21

**Appalachian** 21:18 25:13

**apparently** 29:4

**Appearance** 78:18

**appears** 240:20

**application** 69:8

**applied** 49:22 66:23

**apprised** 60:11

**appropriately** 76:10

**approximately** 141:14 166:18 212:5

**April** 165:9,17, 22 167:2,15 228:14

**area** 129:15 277:10

**argumentative** 117:5

**array** 65:16 70:25

**arrays** 34:24 35:3 65:9 95:18

**arrest** 73:25 90:8 95:13 131:23 132:9 147:11 149:6 169:17 171:2, 14,15 174:20 177:9 178:2 179:3,7,9,24 249:3,4 250:13, 25

**arrested** 91:4 100:15,17,18 129:19,21

**266:20 267:1, 17 268:19,23 269:21 270:6, 10,22 271:3,8, 13 274:4,22 276:12,17,21 277:6,10,14,23 278:6,10**

131:24 132:3, 10 148:23 152:23,25 153:2,4 154:7 170:8 178:23 230:24 248:10, 16 249:15,20 250:19 276:17, 22

**arresting** 250:19

**arrived** 142:12 274:9

**Asher** 73:7

**Ashers** 47:12 48:11,14,19 49:2,7 50:10 66:11,23 73:1, 17

**Ashers'** 49:19

**asks** 16:4 95:11 96:3 268:7 270:15, 18,25

**asleep** 154:22 169:4

**assaulted** 244:3

**assess** 74:13

**assigned** 51:12

**assist** 14:15 111:20 130:14, 17,20 150:16 151:16,20 231:25 255:8

**assistance** 112:18 113:1,4 190:5

**assisted** 14:5, 12 104:13 111:25 129:14 151:1 152:1

**assisting** 103:10 255:1

**assume** 10:23

**assumed**

26:17 104:17

**Assumes** 82:1 87:4,20,25 122:1 201:15 225:16 229:14 237:5

**assure** 76:8,25 81:19 84:1,25

**assuring** 85:18

**attachment** 273:14

**attempts** 206:17

**attend** 83:14

**attended** 31:15,19

**attorney** 118:9,16 177:12,24

**attributed** 183:18

**audio** 12:25 36:15 206:21, 22 216:9,11,14 217:4,5 218:17, 18 221:5,6 222:19,20 224:6,7 244:19, 20

**audited** 63:23 85:14

**aunt** 168:12

**authority** 86:14,18

**authorized** 72:13

**avoid** 65:8

**aware** 49:6 54:18 63:18 75:6 81:5 82:4 84:12 85:4,8 86:6 91:22 92:17 98:22 109:19 131:5 134:23 138:24 151:7 162:22

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

165:3,7 167:13, 16 170:18,21, 22 188:16 211:17 212:13 213:10 215:20 228:6 236:12 253:6,10 268:25 276:7 278:13,14

**B**

**back** 15:14,18 30:9 37:19 38:13 40:3 51:12 54:17 57:5 59:16 69:23 70:11 80:1 102:4 111:3 118:2 122:19 124:1 125:2 131:15 144:3,21 147:9 151:14 157:8, 22 158:25 163:13 172:7 176:20 208:13 228:14 232:14, 20 238:11 247:16 248:20 265:11,12,18 269:5,8,14 270:5

**background** 49:19 272:25

**bad** 16:5

**Bailey** 153:2

**bailiff** 38:25

**bailiffs** 39:1

**band** 212:7

**bangs** 240:17

**Barbourville** 8:23 13:17,20 97:12,19 98:3 109:12 124:4 132:13 149:19 150:15 151:1, 25 165:10,13, 18 234:19 235:5 237:13 247:23 251:12,

17 262:12

**based** 19:6 23:23 24:18 49:18 66:14 102:10 104:15 107:16 155:13 165:5 175:20 187:20,25 208:19 233:24 234:7 241:9 264:15

**basically** 213:21 254:13

**basis** 179:2,16

**Bates** 39:18 117:18 206:21

**bathroom** 195:12 210:11, 13 219:11

**Beach** 92:3 96:7

**beat** 38:3,4 121:19

**began** 38:13 58:19 64:8,14, 21 65:1,6,14,19 89:11 111:16 113:9,12 123:5 274:11

**begin** 214:7

**beginning** 53:10 56:1 81:17 176:24 199:24

**behalf** 8:14,17, 19,22 151:21, 24 152:2

**behavior** 243:8,16 244:6, 11

**belief** 234:8

**believed** 20:23 160:10 162:15

**belts** 119:14

**Bennett** 130:25 131:2 141:21,22,24

142:4,7,11,18, 25 143:1,6,13, 19

**big** 195:17 221:12 270:15 271:6

**bills** 141:15,19

**Bingham** 37:20,22 264:4, 7

**bit** 19:23 36:6, 25 50:14 52:14 80:4 106:14 130:11 207:14 211:7 267:5

**blank** 57:12,14, 18

**Bledsoe** 42:11

**blue** 22:3,13, 18,22 24:7 140:8 143:7 263:5,6,9,12,17

**Bob** 15:1 25:24 96:5 102:1 112:19,21 130:20 145:6,9, 13,17,22 146:1, 11,16 147:9,25 148:3,23 149:9 252:20

**Bobby** 244:24

**body** 125:10 254:22 255:2

**bond** 197:21 201:3

**bonded** 198:14,19

**bookkeeper** 68:11

**borrow** 142:9, 13

**bottom** 16:1 42:23 44:5,6 72:9 249:11

**bouncing** 187:10

**Bowling** 28:6

**boy** 49:13

**Brady** 35:10,17

**brand-new** 142:12

**Branson** 92:8 96:6

**break** 11:2,7 79:22 118:5,8, 19 160:17 163:7,15 247:13

**breaking** 80:24

**Brian** 8:21 126:11 127:4, 25 255:19

**briefly** 56:12 214:11

**bring** 132:12 191:17

**broke** 182:20

**brought** 183:8 199:16,25 205:5 230:1 231:3 251:17

**Broughton** 8:23 97:20 98:16 107:22 108:4,11,24 110:22 111:10 118:13,21 123:21 124:3 129:19 131:23, 25 132:4,11 234:23 235:16 236:14 237:20 239:5,12 247:22 248:11 250:24 251:11, 21 252:11,22 253:2,9,12,15, 19 262:12

**Broughton's** 118:16

**Brown** 111:23 131:7,16,19 157:9,10

**Browns** 111:25 112:12,15

**browse** 71:21

**Bruner** 93:17

**building** 166:20

**bulk** 254:12

**Bunch** 8:18 126:11 127:4, 21 258:4,5

**burglaries** 52:1,8

**buy** 277:15

**buying** 148:1,4

**C**

**cabinet** 47:8 59:3,4,5,7,10

**Caleb** 93:23

**call** 94:4 99:17 105:19 152:8,9 191:16 192:11 241:18

**called** 94:7 125:20 142:8 152:10 191:15 192:23,25 202:5,14 204:4 213:4 273:1

**calling** 193:9 197:5 213:21

**calls** 50:25 75:12 192:17 263:18 266:2 269:24

**camouflage** 142:16,19 143:2

**candidate** 38:7

**capacity** 43:3 109:20

**caption** 42:23

**car** 22:3,22 23:7 24:7 52:8 77:20 78:2,7



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

89:21,25
137:21 138:1,2,
10,11 142:13
143:7 154:14,
22 157:7,9
159:5 169:4
186:17 194:10
223:2 263:4,6,
12,17

**care** 10:2 183:6
232:5,6 276:4

**career** 27:20
32:9 174:18
175:20

**carrying** 72:16

**case** 9:24 15:8
18:9,17 19:4
24:20 35:10
41:4 42:20
55:21 56:2
78:2,7 89:23
95:3 97:6
110:10 114:13
116:4,14
119:21 140:3
168:3,7 187:22
189:4 192:8
202:11 204:1
205:24 229:10
254:19,20,21
255:8,25
256:13 257:2,
11,18 258:19
259:23,25
260:3

**cases** 17:5
91:13 116:2,3,6
117:7 205:4,16

**cash** 138:11
194:10

**caught** 91:14

**CD** 265:23
266:1,11

**cell** 79:16
192:25 193:1

**Central** 27:16

**certification**
273:1

**certified**

272:22

**chain** 69:24
70:1 76:9

**chair** 244:8
246:14,22

**chance** 49:25
118:15 232:10

**change** 37:15
69:23

**charge** 17:23
25:3 39:3
108:24 161:16,
22 175:13
178:16 239:7
242:1 250:14,
20

**charged** 11:17
89:15 113:24
119:12 120:22
138:19 170:11
186:5,10 189:8
193:24 194:1
197:15 201:12
237:1 254:13

**charges** 18:15,
24 19:8 21:4
71:3 119:8
128:14 146:2,3,
12 151:11
169:20 172:12,
16,24 173:10,
15,20 174:2
176:4 177:3
179:1,11,15
197:11,13
198:5 199:6,23
200:4,18
202:10 203:23
204:25 205:9
226:25 227:3,8
231:9,14,25
258:18

**charging**
18:12 95:14

**Charles** 42:12

**check** 53:9
273:1

**check-** 53:3

**checking**

52:25 134:19

**checkpoints**
58:6

**chief** 86:25
111:3

**children's**
21:19,24 22:3,
17,22 23:14
24:8 25:13
260:23

**Christy** 92:8,
11 96:5

**chronological**
134:7

**citation** 76:22
120:13 122:22
177:10 249:9

**citations** 76:17
77:2,6

**citizens** 45:14,
24 46:13

**citizens'** 50:3

**City** 8:23 13:17,
20 247:23

**claims** 246:20

**clarification**
247:24

**clarified** 248:5

**clarify** 265:6

**class** 26:10
30:20

**classes** 26:5,7
29:20 33:16

**Clay** 152:1

**cleanup**
151:18

**clear** 248:6
249:19

**Cleo** 111:23
131:7,13,16,19

**clip** 216:11
217:2,11
218:10 221:1
244:15 245:18

**close** 38:4,5,6
166:10,15
185:25

**closed** 196:12,
13 199:17

**closely** 254:18

**co-defendants**
43:9

**coat** 142:16,19
143:2 186:16

**cock** 72:16

**Code** 78:19

**coerce** 85:6,
10,18 174:20
246:9

**coercing**
70:21 85:23
87:13 88:4,17
89:5

**colleagues**
236:11,13

**collect** 38:19,
22 253:21

**collected**
95:16

**collection**
56:17

**Collision**
77:16

**command**
54:3 69:24
70:1,14 71:7,11
74:14,19 83:24

**comment**
116:18,20
146:8,9 273:19

**commit** 11:18
20:24

**committed**
16:7 160:2

**Commonwealth**
273:6,11

**communicate**
118:15 128:7

**communicated** 113:22

**communicating** 62:5

**community**
111:15

**compare**
141:6

**compared**
141:10

**compiled**
260:20

**complaining**
119:25 120:12

**complaint**
16:8 40:10 43:2
169:25 172:8
233:9

**complaints**
45:15,16,24,25
46:1,6,11,13

**complete**
56:15 57:9,24
58:17 95:20
272:20 273:11

**completed**
30:17

**completely**
77:2 153:13

**comply** 61:2

**computers**
79:16

**concern** 73:16

**concerns**
66:14 67:9,14

**CONCLUDED**
278:23

**conduct** 27:3
34:21,24 35:2
64:10 65:15
70:6 71:25
72:22 75:4,23
76:13 77:12
78:24 79:6,12,
18 189:24
245:18,25



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

conducted 27:8 53:16 61:5 69:20 152:5 188:20 252:21 272:14

conducting 24:6 53:1 70:24 78:11 150:16 151:16,20 216:4 244:23

conference 29:15,19 30:1,6

confess 108:15

confessed 183:1

confessing 158:14 160:7

confidential 40:25 48:5 96:18 232:21 233:3 234:2,9

confidentiality 233:17

confirm 265:25

conformance 68:25 73:3

confusing 58:2

congressman 92:25

connection 95:12

connotation 24:3 38:17 86:19

consideration 86:4,10

consistent 24:15,23 25:9, 14 26:2 103:20, 24 164:21 266:12

Constitution 272:5

constitutional 81:12

consult 11:2 118:9,13

contact 190:12 191:3,9 198:13, 18 202:11

contacted 191:11 231:21

contained 46:7

contend 16:4,6

contents 57:15,25

context 12:13, 15 176:16

continue 21:4 237:7

continues 52:7

continuing 11:10 12:10 38:15,18 52:6 73:12 86:19 105:3 269:8 273:8

control 18:11

controlled 261:14

convention 28:8,10 33:6

conventions 28:16 33:9

conversation 11:24 12:3,6 16:24 17:7,12 22:11,15,16 23:22 110:21 111:5 127:13, 17,21,25 128:5 143:19 145:25 147:14 148:25 153:23 154:3 158:3,12 159:3, 7,20,25 160:5, 24 161:6,12,15, 21 163:20,24 164:6,10,14 182:15 185:22 186:8,13,23

187:3 193:8 195:25 196:1 197:2 198:21 204:16 208:20 209:21 239:4, 11 259:17 268:7 274:17

conversations 21:13 35:24 37:8 102:14,17 104:16 118:12 127:8 141:2 152:15 156:20, 23 214:1 227:11

Cookie 94:6,9, 13,16,20,21,22, 23

cooperative 158:17,23

cop 32:25

copies 117:21 248:19

copy 15:9 42:4 45:16 46:1 55:2,4 56:23 60:6 117:20,21 134:21 169:17

copying 57:3 117:19

Cornett 40:7

correct 15:6 18:12,13 20:3, 20 26:19 45:6, 20 46:2,15 55:19 56:20 58:20 61:11,15 62:1,2 63:9 66:16 68:23 75:9 76:14 80:18 82:19,22, 25 83:6,24,25 84:4,5,16,21,22 85:1,11,12,19, 21,24 86:11,12 97:1,15 98:4 99:7 100:10 102:21 107:24 119:22 124:13 150:12 152:13, 20,25 153:2,5

156:6 158:7,14 159:23 160:3,8 162:23 165:6, 23 167:18 177:4,11 180:24 181:21 182:10,18,22 183:2,6,7,10,15 185:2 191:5 192:15 195:6, 23,24 215:7,11, 12 217:23,24 218:1 222:4,12 223:16,25 224:1,20 225:1, 4,8,10,11,13, 18,19 226:5,7, 10,21 235:24 248:12 250:25 251:18 254:2,5 262:16 266:1,7 270:11 271:9 272:20 275:23

correctly 76:23

corroborate 98:22

couch 153:23 154:6

Coughs 182:5

counsel 8:10 15:9 29:6 35:23 117:20 176:8, 12 177:6 233:1 258:3 275:2

county 8:8,16 10:1,6 13:11, 13,21 14:11 24:24 25:10,15 26:3,14,22 31:25 32:6 33:3,19,22,25 34:4,10,13,17, 20,23 35:1,5,12 38:9,12 39:7 40:8,9 42:13 44:10,21 45:1, 5,9,15 46:5,13, 18 47:2,7 49:8, 21 50:4,11 51:12 53:17 54:7,16 56:8 59:2,8,11 60:2,

16,17 61:1,9,24 62:4,6,17,24,25 63:12,19,22 64:2 66:24 68:17,21 69:1, 20 73:3,18 74:3,7 75:3 77:1,6 79:6,11, 17 80:6 81:6,9, 15 82:5,23 83:2 84:8,24 85:5, 14,17 86:2,14, 24 99:2 104:1 140:22 145:19 151:21 157:4 164:22 165:3 174:19 184:2 191:14 198:8 202:22 242:10 245:20 250:16 256:22 275:16 276:8 277:10

couple 10:12 90:8 100:17 111:22 159:9 160:18 163:5 170:6 228:9 246:19 247:23 254:25 275:13

courses 27:23

court 8:4,9 9:1, 6 11:14 15:7 35:10 38:25 40:9 42:5 149:19 232:8,9

courthouse 51:8,12

courtroom 16:25 17:4

courts 38:20, 22,24

cover 151:5

crazy 157:18

create 102:9 103:8 104:2 107:16 110:18 164:13

created 25:25 103:14



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**creating** 104:15

**credentials** 69:5

**credible** 247:2 277:1,23

**creek** 144:4,5,6 145:7,20 183:5 255:3

**Cricket** 94:8,9, 15,17,24

**crime** 82:9 95:17 98:11 125:25 126:4, 14,19 127:9 175:14 179:2 236:18 242:1 253:21 256:4

**crimes** 11:17 193:24 194:1

**criminal** 17:5 29:5 69:19 70:6 71:25 72:22 75:4 79:7,12,18 81:11 84:11,21 85:7,11,19 86:5,11 91:13 169:25 172:7 199:23 200:18 229:10 241:7, 12 242:6,18 243:6 244:9 260:3,19 272:15

**crooked** 94:10, 12,18

**CROSS** 247:20

**cruiser** 166:19

**Crump** 93:7 96:5 140:3,7,14 142:15,20 185:14 186:1,9, 13,21 187:2,21 237:15 239:13, 17,20 240:1,6 252:20 263:12 264:16

**Crump's** 188:17 241:1

**crying** 157:23 213:4 223:2,3 224:13

**cuff** 196:7

**Cumberland** 232:21 234:3

**curtailed** 268:7

**custody** 76:9

**customer** 32:14,15

_____

**D**

**daily** 53:3,5,13, 14

**Dallas** 8:20 126:10 127:4, 17 151:15 257:6

**Daniel** 96:6

**date** 153:8 171:11 172:3,4 189:6 190:13 230:4 251:18 275:18 276:22

**dated** 181:13

**dates** 165:19 182:11 195:1 235:12 261:5

**dating** 164:7 181:20

**daughter** 149:13

**Dave** 244:22 245:9

**David** 40:6

**day** 8:4 20:8 22:18,23 23:24 36:23 51:2 109:13 114:14, 16 117:13 119:12 135:16, 18 137:8,25 138:2 145:22 146:16 147:11 161:9 162:6

177:20 191:4,6, 7,10,21 192:19 194:10,23 196:15 197:21 198:8,14,19 199:7 217:19 219:21 220:2 230:9,17 232:8 251:17,22 252:11 258:13 263:13 276:12 278:2

**days** 172:11,16 254:25

**dead** 13:16 133:14 138:3 140:9 143:3 180:18 194:7, 24 217:19 263:13

**deal** 213:23 231:14

**dealer** 145:7

**dealing** 17:4 48:8,19,23,24 67:18 78:2 99:19 146:23 147:1 277:10, 12

**deals** 68:6 69:5 75:8 79:3

**death** 13:9 14:2,14 22:2 31:12 45:23 91:23 96:25 99:13 100:9 101:14,17,20, 23 102:1 116:22 123:13 127:14,18,22 128:1,8 131:3 132:25 136:25 139:17 144:23 149:15 163:21 164:2 167:17 185:15 194:11 195:16 234:14 244:24 247:11

**December** 13:9,17 23:7 24:8 38:13 39:6 45:24 50:20

52:2,15 56:2 63:17,21 64:9, 15 65:7,19 71:7,11 86:23 89:10 90:5,9, 13,15,22,25 92:3,5,8,15 93:7,9,13,17, 20,23 125:9 131:18 139:1,4 142:8 143:7 165:8,16,22 167:2,15 209:21 244:22 263:17 275:14

**declined** 73:1 262:20

**deeply** 43:2

**defendant** 8:15 12:15 40:19 41:6 42:20 123:21 251:11 258:3 260:6

**defendant's** 81:12

**defendants** 8:18,20 254:12 260:3

**defender** 259:10

**defense** 35:15 82:19 228:4

**Delta** 32:10

**democratic** 38:6

**department** 10:6 14:12 24:25 25:10,15 26:3,5,14 29:5 32:1 39:7 40:8 42:13 44:10,22 45:1,6,10,16 46:5,18,22 47:3,7 49:8,21 50:12 51:8 53:17 54:7,16 56:9 59:2 60:2, 16 61:2,10,25 62:5,7,19 63:1,

19,23 64:2 66:15,24 67:11 68:21 69:9,20 73:3,19 74:3,7, 23,24 75:4 77:1,6 79:6,12, 18 80:7 81:6,10 82:6,24 83:1,8, 21 84:9,24 85:6,14,17 86:3,15,24 96:19 97:12,19 98:4 104:1 109:12 110:25 124:5 132:13 140:22 150:15 151:1,2,16,22, 25 152:2 202:23 234:19 235:5 237:14 242:10 244:23 245:21 250:17 251:13,17,21 262:13 272:15 274:10 275:16 276:8

**department's** 13:24 59:11 60:17

**depict** 139:8

**deposition** 8:6 9:15 35:21 36:3,18 37:11 170:6 175:25 176:3,23 177:18,22 245:4 251:9 253:8 272:1 278:23

**depositions** 10:13

**deputies** 39:4, 11,12,17 50:18, 23 74:4 83:23 193:19 242:10 272:12 273:10 276:2

**deputy** 47:11, 13 49:20 61:9 86:25 125:15 230:23,24 231:3 244:21 245:8 256:22

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

272:3,10,18
273:7

**Derek** 8:15
39:12 64:4
86:21,23
125:16 151:13,
19,20 193:16
244:21 250:21
258:2 273:15
276:4

**Derrick** 8:17

**describe**
166:18

**describes**
271:3

**description**
187:21 188:1,
17 241:1

**designee**
68:11

**details** 132:7
180:7 203:18
214:1,16 215:6,
10,23 267:7,8

**Detective** 18:9
20:16,22 21:3
22:3,7,12,16,20
23:16,19,21
24:9 97:20
98:16,17 99:17,
20 100:11
104:13,14,20,
25 105:8,13,15,
25 108:23,24
110:21 111:6,
10,14,16,19
112:11,16,18,
22,23 113:1,4,
8,11,14,23
114:15 115:6
117:13,15
118:21 120:19
121:17 122:6,
10 123:5,12
128:7,14
129:24 130:2,
12,14,17,20,24
131:6 132:23
133:10,12,18
134:10,15,21,
24 135:1,4,6,21
136:6,10 137:3,

7 138:6,9
139:11 140:1
144:11 145:12,
15,16,23,25
146:20 147:13,
17,25 148:4,7,
16 149:10
151:15 159:12,
21 160:1,6
161:1,3,11,14,
20,21 164:4,7,
11,14 165:13
167:16 168:6,
19,23 169:19
170:6,10 171:1,
6,9,20 172:4,
22,23 173:5,9,
14,19 174:1,6,
10 175:25
176:3 177:17,
23 178:11,16
179:16,24
180:4,22 181:9,
19,24 182:9,13,
16 183:13,19
185:1,10,19
186:1,8,21
187:1,24
188:13,24
189:23 190:4,
24 191:5 193:9
195:4 196:18,
19 197:1,5
198:7,15,17
200:13 201:2,9,
11,20 202:6,11,
19 203:3,18
204:1,4,5,15,23
205:3,8,14,22
206:1,6,9,12,18
208:19 209:4
210:2,4,20
211:15 212:10
213:7,21 214:6,
11 215:11,18
216:3 217:6,11,
17,22 218:1,19,
24 219:5,10,14,
20,25 220:8,21
221:7,11,18,24
222:3,12,21,25
223:7,15,25
224:8,12,20
225:3,21 226:2,
8,14,16 227:16
228:2,18,24

229:1,18
231:21 234:23
244:21 245:3,
11,14,24
246:13,19,20
247:7,10
249:12,15
251:10,20
252:10,18,21
253:2,9,12,15,
19 260:19
262:8,12,13
266:4,17,21
267:1,17 268:6,
14,22 269:10,
19 270:2,9,15,
25 271:8,13,15
274:21 275:4,5,
7 277:21 278:7,
9

**Detectives**
235:15 237:20
239:4,11

**determine**
141:1 151:9,11
200:12,15,24
278:11

**Dewitt** 209:22

**difference**
83:10

**difficulty**
48:19,22

**direct** 9:7
16:10,15,18
86:8 248:2
260:11,16

**direction** 77:5

**directly** 74:8
156:6 189:15

**discipline**
70:10,13,17,20,
23 71:2,6 86:15
88:21 89:1,5

**disciplined**
81:23 85:23

**disciplining**
71:6,10

**disclose** 35:14
82:18

**disclosed**
40:16 233:15

**disclosing**
84:2

**disclosure**
83:5

**discoverable**
73:11

**discovery**
247:25 248:9
250:23

**discussion**
24:9 226:24
266:25

**discussions**
253:14

**dismissed**
55:21 56:2
258:19

**dispute** 198:10

**distinction**
234:17

**District** 8:9

**Divine** 37:16

**DNA** 141:6

**Doan** 42:12

**document**
15:10,13 26:9,
23 27:8 28:24
33:23 40:11
42:15 44:1,5,8
55:10,13 84:9,
20 86:3,10 95:4
102:10 104:21
105:1 119:5,8,
12 133:23
150:1,5 161:8
172:3 177:13
229:21 249:1
250:4

**documentatio
n** 64:16

**documented**
34:15

**documenting**
64:22 84:2,25
164:23

**disclosed**
40:16 233:15

**documents**
29:3 41:22
44:17 56:17
95:12,25 96:3,
11,18,21 102:6
128:3 232:24
233:25 234:7

**dollars** 195:16

**domestic** 75:8,
12,15,20

**Donna** 94:2
96:7 149:13

**door** 196:11
199:16

**dose** 30:25

**double-side**
15:18

**double-sided**
15:15 232:15

**doubt** 90:1

**draft** 165:4
197:2

**drafted** 143:17
196:18 208:19

**drafting** 23:23

**Dress** 78:19

**driver** 10:11
261:13

**driving** 89:25
143:7 159:5
262:23 263:4,5,
16

**drove** 112:12
157:18

**drug** 100:13
145:7 146:2,3,
12,23 147:1,9
148:24

**drugs** 147:15
148:1,4

**dry** 72:14

**DUI** 112:7

**duties** 38:14,
16

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**E**

earlier 66:9,11
80:4 81:22
84:14 118:24
122:24 124:2
156:19 180:17
183:12 214:10
226:23 227:10
248:5,11
249:21 252:2
253:24 258:12
262:10 264:20
266:17 268:3
270:3 271:15

early 131:18
142:8 150:8

Eastern 8:9
26:6

education
27:18 273:8

Edward
148:19,21

effect 17:14
56:9,16 58:18
60:7 61:3,11
62:14 73:25
118:23 140:11
176:6 239:6
246:23

effective 44:9

effectiveness
63:24

efforts 87:1,8,
12,17,23 88:3,
7,12,16,20,25
89:4

EKU 27:21

elected 13:14
32:3,4,5 33:3
37:14 61:19

election 38:1
44:14

electronically
42:1

elicit 178:17

Elliot 8:12 12:9

41:21 56:23
79:22 122:21
134:2 248:19
249:1 250:23

employed 13:9
47:14 49:3,7
68:20

employee
44:21 45:1 61:9
68:12 69:2

employees
46:18 50:16
60:1,5 61:1
62:7,10,18,23
63:12 72:12,13
74:8 81:1 82:24
83:5 275:17,23
276:2,9

encounter
262:22 274:4

end 33:17
118:17 192:21
248:6 265:17

ended 28:1

enforcement
27:24 28:5
32:7,22 67:24
115:19,25
116:7,23
175:16,21
184:11 241:10
242:20 243:9,
17 245:15

enormous
50:3

entailed 268:8

enter 40:23
73:5

entire 122:15
265:23 266:12

Erie 21:22

escalation
74:19

Escoe's
165:18,23
166:1,5,9,12
194:23 209:22
217:18 267:11

et al 8:8

Eubanks 8:15,
20 38:10 39:12
64:4 86:21
100:25 125:16
126:11 127:4,
17 151:13,15,
20 193:16
244:21 245:8
250:21 257:6
273:15 276:4

Eubanks'
86:23

evaluations
276:7

Evans 11:24
258:13

eventually
66:18

everybody's
247:4

everyday
128:10

Everyone's
54:19

evidence 35:6,
14 65:22 70:15,
18 76:2,5,8
80:8,12,18,21
81:2,7,11,20,23
82:1,18 83:6
84:3 87:3,5,9,
19,21,24 88:1,
9,13,22 89:1
95:16 98:22
99:5 122:1
135:11 141:6,
11 147:8,10
156:5 162:18,
22 170:19
173:5 178:24
201:16 225:16
229:14 237:5
253:21 261:12
278:15

ex-mother-in-
law 219:7

exact 273:21

examination

9:7 140:19
188:19,25
189:4 247:20
254:9 257:25
271:22 275:11

examinations
189:10,14
190:2,7

examine
253:21

excessive
49:3

exchange
174:7 205:9,16

exculpatory
35:14 70:18
82:18 83:6 84:3
87:3,18 88:8,21

excuse 126:24
259:6

executed
249:11

exhibit 12:6,8
15:4,11 28:21,
25 40:6,12
42:9,16 43:25
44:2 54:23 55:1
95:2,5 102:4
106:16 117:18,
24 119:4
122:20 133:22,
24 134:2
137:14,17
139:7,9 149:22,
24 169:17,22
171:19,22
172:8 179:6
180:10,13
184:19,23
187:6,7,14
190:14 206:21,
23 207:2,3
208:2,15
216:13 228:8,
12 237:15
238:9,16
239:25 240:2,4
244:14,17
247:25 248:22,
23 249:2,19,25
250:3,5,22
251:1,5 260:8

264:11,14
265:1,7,16
266:16 269:9

Exhibits 41:24

exist 46:23
47:4 62:4 138:1

existed 21:4
63:19 68:23
85:5

exists 98:22

experience
32:7 178:25

experiences
276:21

explained
251:10

explaining
270:6

explanation
247:2

Express 8:5

extent 12:11
38:11 40:24
242:23

extra 55:3
207:6

extras 41:23

eye 140:2

**F**

fabricate
65:21 80:8,12,
18,20 81:2,7,20

fabricating
70:15 81:11,23
87:9,24 88:13
89:1

face 121:18
122:7 151:6
240:20,25
274:1

fact 11:23
18:18 24:22
25:7 66:23
78:23 90:2 98:2



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

100:24 107:22
111:24 158:6,9,
16 180:22
183:12 205:14,
24 214:6
222:10 225:2
226:2 233:16
272:24 273:13

**facts** 82:1 87:5,
21 88:1 122:1
201:16 225:16
227:15,16
229:14 237:5

**factual** 179:2,
10,15,16

**failed** 189:4,9,
14,19 190:1,7

**failure** 119:14,
15

**fair** 10:24 14:5,
8,11 17:22
18:22 26:21
46:5 49:17,19
52:12 53:3
62:9,13,17,22
64:7,13,20,25
65:5,13,18
69:7,14 71:23
75:11,20 76:24
77:10,18,22
78:5,9 81:9,17
84:7 91:17
99:20 102:9
103:8,14
107:19 108:14
113:22 116:5
117:11 120:24
121:11 127:1
140:12 143:17
151:24 153:12
187:24 203:7,
23 206:1
207:20 208:23
214:15 220:7,
20 227:14
236:5 273:3
274:12

**fairness** 12:14

**false** 69:5
229:5,8

**familiar** 129:15
143:13 229:22

235:8 237:14
272:11

**family** 121:19

**Farah** 8:22
57:5 97:24
107:25 109:1,
10 118:16,25
124:6,14
132:15 234:25
235:6,19 239:9
247:21 254:7

**Farris** 8:21
256:18

**farther** 30:8
211:8

**fashion** 80:5
85:1 257:11

**fast** 132:17

**father** 159:17

**fear** 73:17

**February**
16:25 100:14
149:18 150:8
153:9,10,13
156:14 176:24

**feeding** 228:18

**feeling** 156:2

**fell** 154:22

**felony** 197:16

**felt** 155:15

**female** 68:17
186:18

**fight** 49:12

**figured** 207:9

**file** 24:13 44:23
45:2,8,12,17
46:2,8,15,22
47:4 53:21 54:9
59:3 68:10,23
69:2 95:20
206:21 260:19

**filed** 10:3,8
40:9 42:14
53:18 67:6
169:25

**files** 29:6 54:6,
17 95:21

**filing** 47:8

**filled** 260:18

**filling** 77:2
78:6

**find** 14:19
91:18 106:19
125:12 128:13
131:10 188:6
259:20 265:6

**fine** 9:14 11:8
51:19 160:23
163:8,10
176:11 182:7
208:7

**fingerprints**
141:9,19,20

**finished** 53:20
76:18 182:2

**finishing** 205:7

**firearm** 72:14
73:2,18

**firearms** 72:7,
10,13,25

**firing** 72:15

**Fiscal** 40:9

**Fit** 265:14

**flat** 221:19
270:18 271:7

**flip** 269:14
270:5

**floor** 202:25
203:1,2

**Florida** 136:25
194:4,14,17
213:5 277:15

**focus** 76:7

**folded** 195:16
212:7 221:19
270:18 271:7

**follow** 61:2
62:24 176:23
216:21

**follow-up**
175:11 189:24
190:5 247:24

**force** 49:3
73:22,24 74:4,
9,14 232:22
234:3

**Ford** 112:13

**forgot** 42:19
118:7

**form** 11:19
17:20 18:4
19:1,11,19 20:9
21:10,16 22:24
23:9 24:1 39:22
44:1 46:9 48:15
50:6 56:4,5
58:21 60:13
62:11,20 63:2
64:11,18 65:11,
23 74:11 77:8
80:22 81:25
82:10,20 85:2,
20 87:4,20,25
90:6 91:6,24
92:19 93:3,14
97:2,9,23,24
99:14 100:3,16
101:6,7 103:2,
12,19 104:5,6,
24 105:11
107:25 108:1,2
109:1,2,10,14,
21,25 110:7
112:2 114:18
115:2,9,14,20
116:11,16
117:1,4 118:25
119:3 121:15,
21,23 124:6,14
128:9 130:8
132:14,15
134:11,12
135:13 138:15
140:6 142:2,21
143:23 144:24,
25 146:6 147:6
149:1 153:15,
25 154:9
157:14 158:20
160:11 161:17,
24 162:4,9
163:3 167:19
168:21 169:11

170:2 171:4
172:19 173:17
174:4,24 175:3,
17,23 176:7
178:7,13,19
179:4,13,14,19,
20,22 180:2
181:8,22
182:24 183:21,
22 184:13,17
188:3,8,9
189:17 190:8
197:9,22,23
198:11,23
199:19 200:10,
11,21 201:5,15
202:3 203:10
205:1,11,12,18,
19 206:5 209:6,
7 210:6,22
211:24 212:12
213:16 214:3,
13 218:2,7,8,21
219:18,22
220:9,10,23
221:13,20
222:5,13 223:4,
5 224:2,16,21
225:5,14,23
226:6,11
227:19 228:5,
20 229:12,15
230:6,19
231:17 232:2,7
234:4,10,21,25
235:6,11,20,25
236:21 237:2,9,
18,22 238:24
239:8,9,22
240:7,14,22
241:2,13,24
242:3,8,12,22
243:2,3,10,18
244:1,13
245:16,23
246:10,15,24
247:3,8 248:13
250:9 251:2,24
252:4,12,23
253:5 254:3
257:11 262:4
263:14,18
264:25 265:9
266:2,15,22
267:3,21,25
268:24 269:18,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

22 270:12
271:10 274:13,
19 276:20
277:3,7,11,19,
24 278:3,17

**formal** 62:4

**formation**
201:6

**formed** 179:17

**forward** 132:17
134:8 177:3,9
178:1 233:22

**foul** 246:11

**found** 13:16
125:10 133:14
138:3 140:9
141:19 143:3
144:22 150:6
180:18 190:1
194:7,24 213:3
263:13 272:5
273:22

**foundation**
19:19 22:25
23:9 46:10
92:19 93:3
100:3 109:14,
21,25 115:20
116:11,16
117:1,4 121:24
132:14 134:12
135:13 142:21
144:24 145:1
146:6 147:6
149:2 153:15,
25 154:9
157:14 158:20
160:11 161:17,
24 162:4,9
167:19 168:21
175:3,17,23
178:19 184:13,
17 189:5 201:5,
7 205:11 209:8
214:13 218:9
220:12,23
225:15 228:5,
20 229:13
230:20 234:4,
10,22 235:11,
20,25 236:21
237:9,18

238:24 239:8,
22 241:13,24
242:3,8,22
243:2,10,18
244:1,13
245:16,23
246:10,15
247:1,3 263:14
265:9 276:20
277:3,7,11,24
278:3

**four-** 135:6
271:3

**four-wheeler**
134:18 136:3

**Fox** 244:22
245:9

**Frank** 148:19,
21

**freshening**
273:7

**front** 55:12
65:25 106:20,
25 129:9
180:12 195:3
196:17 208:16
240:12 247:25

**fuck** 121:19
243:20,21

**Full** 149:19

**G**

**gallows**
273:23

**Gambrel**
230:23,24
231:3

**Garland** 153:4

**Gary** 39:18

**gas** 32:10
209:22 217:19
267:11

**gave** 20:8
43:23 81:1
132:19 134:25
146:13 161:22
174:2 176:5

177:6,24
180:19 184:22
187:21 191:4
197:20 198:6,
14 201:3,13
230:9

**general** 43:18
241:6

**generally**
41:12,15 50:18
203:12

**girl** 158:25
163:16

**give** 9:2 15:8
30:5 33:16 54:4
86:9 117:10
130:3 134:21
156:9 180:1
190:14 202:8
203:8,13,17,21
204:24 213:18
215:6,10
238:14 248:20

**giving** 134:13
168:6,20 169:1
174:21 175:15
205:9,16

**glanced**
196:23

**goal** 134:8

**good** 9:9,10
55:5 59:25
67:10 108:3
114:4,8 160:16
245:14

**grab** 121:17
122:6

**graduate**
27:12

**grand** 271:4,9

**grandma**
168:1 264:8

**grandmother**
167:25 168:2,5
263:24 264:2

**great** 11:9

**Green** 28:6

**group** 249:24

**guard** 199:17

**guards** 196:8

**guess** 25:6
30:19 37:15,17
53:20 66:4
67:12 76:22
91:19 121:2,4
125:20 139:21
153:18,19
155:14 157:18
233:16

**guidance** 70:5
71:24 72:21
74:18 75:3,18,
22 77:11,23
78:10,15,20,24
79:5,11,17
84:15

**guide** 82:16

**guilt** 82:8

**guilty** 13:4
273:22,25

**gut** 156:2

**guy** 10:4,5 22:8
114:4 186:16
203:25

**guys** 51:7
146:25

**H**

**hair** 240:12

**Hal** 92:23,24

**half** 212:2

**hand** 8:25 40:5
41:11 42:10
117:20 133:18
184:19 206:23
249:22

**handcuffs**
196:5 199:12,
16

**handed** 29:3
77:7 134:9
184:20

**handle** 72:13
75:19 76:5
77:20,24 78:16,
21

**handled** 76:9
233:4

**handling** 72:14

**handwritten**
95:17

**hang** 13:5
273:23

**hanging**
273:21

**happen** 52:18
162:1 199:1
201:25 210:25
211:18 245:19

**happened**
109:7 110:9
120:25 121:12
150:7 151:4
159:7 209:21
227:11 234:18
261:14

**happening**
121:6 122:2
199:4 218:5
225:9,13

**happy** 42:1

**hard** 67:18

**head** 11:11
21:23 157:10
238:22

**hear** 47:23,25
48:3,11 49:1
146:8 147:25
246:13

**heard** 31:21
35:9 47:24
48:4,7,21,22,
24,25 49:5,10,
12 67:17,20
114:14 138:4
189:11 218:25
239:23 244:25
245:3,6,11,18
246:20 263:15

**hearing** 114:23



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

149:4

**hearings**
38:25

**helped** 14:7,18
18:8 31:3 97:5
129:16,23
130:7 165:13
231:8

**helpful** 11:13

**helping** 99:24
226:24

**Helton** 14:22
19:18 20:2,8,
14,15,19 25:24
90:25 91:3,5,
14,22 92:18
96:4 97:7
101:14 102:10,
14,17,20,24
112:7,12 113:5
117:13 119:9,
12,22 120:1,19,
25 121:13
122:10 130:6
136:24 141:2
152:1,25 171:9,
20 172:5,15,23
173:14 188:20,
25 189:3,9,14,
25 190:6,12,15,
25 191:4,9,22
192:1,12,15,18
193:4,6,8,13,21
194:3,6,9,13,
16,22 195:5,9,
14,21 196:1,4,
15 197:4,8,18
198:6,13,18,22
199:11,15,18,
22 200:14
201:3,12,21
202:4 203:8
204:4,17,23
205:3,7,8,15
206:7,18,23,24
207:15,21
208:20,24
209:4,22 210:1,
5,21 211:4,16,
22 212:11,17
213:8,14,18,21
214:11,15,20
215:6,10,18,22

216:4,15 217:7,
13,17,21,25
218:20,24
219:5,10,14,20
220:1,7,14,20
221:7,11,18,24
222:2,7,10,21
223:1,8,14,20,
23 224:8,12,18,
23 225:2,7,22
226:3,9,15,20,
24 227:3,8,16,
22,25 228:2,18
229:2 230:8,12,
25 231:4,7,12,
22,25 232:21
233:25 234:2,8
252:19 265:4,5
266:20 267:1,
17 268:11,19,
23 269:15,21
270:6,10,15,22
271:3,8,13
274:4,11,22
275:5,8 276:12,
17,21 277:6,10,
14,23 278:6,11

**Helton's** 19:15
121:18 122:7
203:4 206:2
233:15 265:18
277:22

**hidden** 205:22

**high** 27:13,15,
17

**highlighter**
91:8

**hire** 47:18
49:23,24 66:12
73:1

**hired** 32:3
47:20 49:18,20
50:11 60:1
61:17 63:14,15
73:18 83:3

**history** 29:14

**hit** 89:21 157:9

**hit-and-run**
89:15,18 90:3
261:8

**hits** 94:6

**hitting** 246:21

**hold** 45:19

**holder** 78:14

**holds** 46:17

**Holiday** 8:5

**holstering**
72:16

**home** 13:17
21:19,24 22:3,
17,22 23:14
24:8 25:13
61:14 128:3
133:7,11,13,17
135:8 139:12
145:17 152:19
154:23 155:24
159:21,25
166:6 167:7
180:23 192:5
260:23

**homicide**
17:11 26:9,23
27:3,8 34:6
35:7 38:12
39:13,20 50:20
52:13,16,19
55:19 56:1,10
58:19 60:10
62:16,23 63:8,
16 64:8,14,21
65:1,3,6,14,19
75:23 76:14
77:12,24 78:11,
16,21 81:18
84:6 92:17
101:5 102:11,
21,25 103:10,
16 104:3
107:20 114:25
118:22 127:2
135:12 136:21
140:23 141:14,
18,25 142:4
143:18,22
144:14 156:16
158:1,19 159:4,
6 163:20
164:15 170:1,
19 173:6 181:6,
10 191:22
192:2 213:22

215:7,19
275:14

**honest** 258:23

**hoodie** 238:14,
19,22 240:16

**hope** 37:4

**horse** 41:17

**horses** 9:25
10:1,4 41:16

**Hoskins** 8:7
16:15 17:3,9,
14,23 18:2,12,
15,24 19:9
20:23 21:5,8,15
22:13 89:9 90:4
93:12 98:23
99:1 113:23
128:15 138:19
146:4,13
147:14,19
148:1 151:20
154:15,23
169:9 173:15,
21 183:9 186:4
189:8 194:22
195:10,15,23
201:4,14
207:22 208:25
212:6 217:18
219:1,6 221:12,
25 226:4 253:7
258:25 261:7,
23 262:2
278:15

**Hoskins'**
16:22 221:19

**hospitalized**
89:22

**hour** 154:3

**hours** 74:5
142:8 150:8
153:9,10

**house** 100:12
138:13 144:1
154:15,17
159:8,11,17
160:25 166:15
169:5 255:11,
12 256:15,16
257:12,14

263:12

**Hunter** 151:15,
17

---

**I**

**idea** 49:16 66:2
73:13,20 98:10,
14,25 112:21
113:16 114:9
126:15 136:1
145:13 189:6
232:23 236:8,
17 238:14
275:20

**IDENTIFICATI
ON** 12:8 15:11
28:25 40:12
42:16 44:2 55:1
95:5 117:24
133:24 137:17
139:9 149:24
169:22 171:22
180:13 184:23
187:7 207:2,3
228:12 238:16
244:18 249:2
250:5 251:1

**identify** 8:11
58:14 87:18,24
88:4 188:14
239:21 249:1
258:22 259:7

**illegal** 16:7

**immediately**
144:22

**impeachment**
143:15

**implicated**
156:6 162:23
169:8 170:23
177:1 226:4

**implicates**
170:19 207:21
208:25 278:15

**implicating**
147:9 173:5
174:3 177:7,8,
25 178:17
201:4

---

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**important**
205:24

**impressed**
48:9

**inappropriate**
175:13,16
176:11

**incarcerated**
193:21

**incident** 49:11
78:2 89:19 90:3

**incidents** 16:8
49:1

**include** 68:15

**includes** 95:19

**including**
95:15

**incorrect**
250:24

**independent**
153:20

**indicating**
22:21

**individually**
43:6

**individuals**
23:14 152:19,
22

**influence**
119:13 261:13,
14

**inform** 82:17
229:7

**informant**
92:18 232:21
233:10 234:2,9

**informants**
93:1 96:18
233:4

**information**
19:4 23:23
26:23 34:14
48:5 76:23 82:7
134:18 138:12
144:18 152:9
158:10 160:2

161:8 165:5
170:23 183:17
195:6 200:5
209:4 210:1,5,
21 211:5,16,23
212:11,17
213:8,14,19,22
214:21 215:23
217:22,25
220:8,14,21
222:3,11
223:15,24
224:19 225:3,
21 226:3,9,15
228:18 231:10
263:11 264:15
268:23 269:20
270:11

**informed** 80:7,
11,17 82:5
84:19 102:23
159:21 160:1,6
195:10

**ing** 143:15

**initially** 257:14

**initiate** 18:23
19:8 21:4
128:14 169:20
172:24 173:10,
15,20 179:1

**initiated** 119:9
151:11 178:2

**initiating** 18:15
71:3 172:11,16

**lnn** 8:5

**innocence**
156:24 158:4
237:8

**innocent** 11:17
17:10 71:3
110:5 169:13

**inside** 17:4
151:12 152:13,
19 154:23
229:5

**instance** 31:18

**instructed**
26:8 65:21
81:6,10 84:19

85:10 238:18,
22

**instructing**
85:6

**instruction**
70:5 71:25
72:21 75:2,18
76:13 77:11,23
78:10,20,24
79:5,10,17
83:23 84:15

**instructions**
27:3,7 72:9,25
75:22 76:4
77:19 78:16
81:2 82:16 86:9

**insurance**
119:16

**intend** 12:11

**intention**
241:21

**intentions**
108:22

**interact** 50:22
73:15

**interacted**
50:16

**interactions**
25:23 102:10
104:21 105:2

**interest** 102:25
129:17,24
130:1,6 136:20
144:14

**interested**
32:22,24

**internally** 83:8

**internet** 79:3

**interrogate**
34:1

**interrogating**
107:23

**interrogation**
31:19 34:18
95:14 108:12
109:11 124:12

**interrogatorie
s** 106:16 260:8

**interrogatory**
15:5 16:1 40:16
106:20,24
111:13 113:7
122:20,24
123:20 126:9,
22 128:22,25
129:1,11 132:1,
18,20,22 248:2
251:4 260:9,18

**intervention**
37:16

**interview** 14:9
19:17 20:2
24:6,10,13,19
25:8,13 33:20
34:1 65:2 73:1
107:3,11
110:14,19,23
111:7 114:24
122:17 129:17,
20 132:2
136:16 141:24
142:4 164:23
167:16 172:11,
15 173:13
181:20 184:11
192:18 204:13
210:23 213:9
215:13 216:3,
15 218:12
229:2 231:22
236:7,25 248:8
253:20 262:7
266:6,7,13
271:16,17
275:4,5,7
276:12

**interviewed**
67:7,8 108:21
122:12 172:23
180:23 182:8
183:20

**interviewing**
162:17 186:1
243:6 244:22

**interviews**
25:20 26:9 27:8
33:23 64:10,16
84:10,20 85:1

184:3,8 252:18,
21 253:1,6,10
255:17 262:1
271:12

**introduce**
250:2

**introduced**
250:2

**invade** 35:22

**investigate**
52:8 87:2,8,13
104:11 105:6

**investigating**
52:4 97:5
104:12 243:1

**investigation**
14:2,6,13,15
22:1 24:7 25:4
26:9,24 27:4,9
31:12,16 34:7
35:7 38:13
39:14,20 45:23
49:14 52:14,16
54:6,17 55:19
56:1,10 58:19,
20 60:10 62:17,
23 63:8,17
64:8,14,21
65:1,3,6,14,19
70:6 72:1,22
75:4,19,24
76:14 77:12,20,
24 78:11,16,21,
25 79:7,12,19
81:18 84:7,11,
21 85:7,11,19
86:5,11 89:10
92:17 95:13,21,
25 96:12,20,21,
25 99:12 100:9
101:3,13,16,19,
22,25 102:6,11
103:11,17
104:4,8 105:12
111:17 113:9,
12 114:25
115:1 116:21
118:22 123:2,6,
12 125:23
127:2,10,14,18,
22 128:1,8
129:13 131:3,7
132:24 134:25



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

138:7 141:14,
18,25 142:5
143:18,22
145:9 149:14
156:20 159:4,6
163:1,21
167:17 174:23
181:6,10
185:14 187:25
188:6 189:25
191:23 192:2
200:12,14,24
234:14 241:7,
12,16 242:6,18
243:6,24 244:9,
23 247:11
249:6 253:11,
15,16,22 254:1
255:7 258:8
260:19 261:8
278:5,10

**investigations**
51:22 52:1,2,
10,19,25 53:4,
10,16 69:19
190:5

**investigative**
95:20 104:3
115:24 129:12
175:1

**investigator**
14:1 204:8
254:4 258:24
260:2

**involved** 48:1
49:2 52:16
144:19 149:6
151:5 155:3,8,
15 156:3,16
162:7,14,16
189:15 250:24
253:11,12
257:1,19

**involvement**
159:22 257:16

**involves** 48:5

**issue** 57:3
82:25 117:19
135:7 138:10

**issued** 249:5
250:16

**issues** 48:14

_____

**J**

_____

**Jackie** 8:21
21:14 228:10,
14,17,22 229:8
256:8

**Jacob** 152:1

**jail** 17:9 156:9,
12 191:11,13,
14 192:11
196:8 197:18,
21 198:8
199:16,17

**James** 42:11
43:13 119:22
120:1

**January** 32:2,6
37:25 44:9
46:24,25 47:3
48:13,18 71:11
112:6 117:11
119:9 120:19
121:1 131:18
188:20 189:1

**Jason** 8:14,18
14:4,5,12 18:8,
11,14 19:3,17
20:2,8 25:18
97:21 103:10
114:2 120:14
126:11 127:4,
21 128:18
129:2,14,16
133:6 147:16
159:8 162:20
176:24 192:21
202:13,14
214:16 227:5,7
249:12 254:4
258:3,4,5

**Jed** 39:18

**Jessica** 8:3

**Jessie** 93:9
96:4 130:18,19
141:2 189:9,14,
25 190:6 213:4
252:19

**Jessie's** 223:1

**job** 11:9 104:18
221:25

**Joe** 93:20 96:6
262:1,7

**John** 8:7 29:12
42:13 174:8

**Johnson** 8:21
126:11 127:4,
25 255:19
257:18

**join** 11:20
12:19 17:21
18:5 19:2,12,20
20:10 23:1,12
24:4 31:25 50:8
80:23 82:11,21
91:7 92:21
93:15 97:25
99:15 100:5,20
108:2 109:3,22
112:3 115:3,10,
15,21 116:13,
17 124:7,8
135:14 142:23
147:7 149:3
153:16 154:10
158:21 160:12
161:19 162:10
168:22 170:3
172:21 175:4,
18 178:20
190:10 192:18
198:24 200:23
201:17 214:4
220:24 221:16
222:14 223:6,
12,18 224:17
228:23 231:19
235:1,7 237:3
240:8 241:3,14
277:20

**joined** 97:7,11
99:10

**Jonathan**
14:24 16:15
17:23 18:2,24
19:9 20:23
21:5,8,15 25:24
90:12 97:11,19
100:14 101:20
107:3,11
108:24 109:18
110:10 118:22

**Joseph** 8:21
256:8

**Josh** 151:25
153:4

**jumps** 57:2

**June** 42:14

**jurisdiction**
13:24

**jury** 250:7,11

**justice** 29:5
272:15 274:1

_____

**K**

_____

**Katherine** 13:8
14:2,14 16:7,
11,16 17:11,15,
24 18:3,25 19:9
20:24 21:9 22:2
31:13 45:23
58:18 62:16,23
63:7,16 64:8,
14,21,25 65:6,
13,18 95:15
96:1,12,22,25

**job** 123:22 124:3,
13 125:1
128:15 129:18
131:23 132:3,
12 138:19
152:12 154:14,
22 164:7 169:5,
8 173:15,21
174:3 176:5
177:1,7,25
178:18 181:14,
15,20 182:17,
21,25 183:4,8
186:5 187:2
207:22 208:25
226:4 234:13,
24 235:23
236:19 237:13
238:14 239:12,
16,20 240:3
248:8 249:5,16
250:13,25
251:12,16
262:11,19,20
264:23 265:8
278:15

**Joseph** 8:21
256:8

**Josh** 151:25
153:4

99:13 100:9
101:2,13,16,19,
22,25 102:7,21
103:1 116:22
123:13 127:2,
14,18,22 128:1,
8 131:3 132:25
135:25 137:1
138:2 139:17
143:3 144:14,
23 149:15
154:17,23
155:3,11
156:16 160:3
162:8 163:21
164:2 167:17
169:18,21
170:1,20,24
171:3 172:18
173:2,6,11,22
177:2,8 178:1
179:18 180:18,
24 181:15
183:1,15
185:15 186:13
192:1 194:7,24
195:23 202:8
207:23 209:1
211:10 212:4,
23 214:22
215:7,11,19,24
217:19 223:2,3
226:5 234:14
235:24 247:11
249:6 253:11,
17,22 254:1
255:4,7,12
256:1 258:8
263:12 275:14
278:16

**Kayla** 14:20
25:23 96:7
100:1,8,13,17
101:23 105:13,
24 112:24
149:12,15
152:18 153:23
154:1,3,13,21
155:2,8,22
156:2,6,8,11,
14,17,20,23,25
158:3,6,13
159:3,20 160:6,
25 161:9,11,15,
21 162:6,16,22,



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

25 163:17,25
164:6,10,15
165:2,9,15,17,
23 166:1,5,22
167:5,7,14,16,
22 168:2,5,6,
20,25 169:4,8,
13,18,20 170:1,
11,19,23 171:3,
15 172:8,12,16,
25 173:6,10
174:2,7,11
176:5 177:1,6,
24 178:12,16
179:7,17,25
180:5,12,19,23
181:13,14,18
182:8,16,20,25
183:4,8,13,18
184:22 185:2,7,
11 187:8
252:20 262:23
263:16,23

**Kayla's**
159:11,25
166:15 167:25
168:12

**Kelley** 35:23

**Kelly** 8:20
256:18

**Kentucky** 8:6,
10 14:13 52:23
149:20 150:15,
25 165:18
244:24 249:8
253:25 272:5,
11,16 273:6

**kid** 32:23 89:21

**kill** 182:17,21
212:23,25
223:10

**killed** 18:3,7
49:7,13 138:12
183:1 202:8
224:14

**killer** 188:7

**killing** 16:6,11,
16 181:15
189:15 260:12

**kills** 157:21

**Kim** 152:25

**kin** 43:15

**Kincer** 8:19
254:10,11

**kind** 9:24 36:4,
5,21 53:19
91:13 92:13
126:7 164:19,
25 196:22

**King** 93:20
96:6 262:2,7

**KINSER**
257:24

**knew** 19:6
155:2 165:9
168:11 182:17
189:19 195:22
203:9,18 205:8
212:22 214:21
215:6 223:8
261:7 276:24
277:1,14

**knowed** 89:14
90:17 93:25
130:16,22
147:2 200:5
241:17

**knowing**
123:18 234:5
242:1

**knowledge**
14:3 16:10,15,
18 49:15,18
66:23 92:20
160:7 183:14
213:19 241:9
248:16 251:3
253:13 259:17
260:11,15,16,
17 261:23
272:4 273:5
278:9

**Knox** 8:8,15
10:6 13:11,13,
21 14:11 24:24
25:10,15 26:3,
14,22 27:16
31:25 32:5
33:3,19,22,25
34:4,10,13,17,

20,23 35:1,5,12
38:9,12 39:7
40:8 42:12
44:10,21 45:1,
5,9,15 46:4,13,
18 47:2,6 49:8,
20 50:4,11
51:12 53:17
54:7,16 56:8
59:2,8,11 60:2,
16,17 61:1,9,24
62:4,6,17,24,25
63:12,19,22
64:2,7 66:24
68:17,21 69:1,
20 73:3,18
74:2,7 75:3
77:1,5 79:6,11,
17 80:6 81:6,9,
15 82:5,23 83:2
84:8,24 85:5,
14,17 86:2,14,
24 99:2 104:1
140:22 145:19
151:21 164:22
165:3 174:19
184:2 191:14
198:8 202:22
242:10 245:20
250:16 256:22
275:15 276:8
277:10

**Knuckles**
152:1

**KSP** 120:15
129:14 133:6
254:12 256:24

---

## L

**lab** 95:16
100:21 105:18,
20 106:1,9
150:6

**Lacee** 8:2

**Lack** 121:23
144:25 189:5
218:8 225:15

**lady** 268:19
270:7

**language**
246:12

**Larry** 98:19,24
261:17,20

**lasted** 154:3
186:24

**law** 27:23 28:5
32:7,22 67:23
80:24 115:19,
24 116:7,23
175:16,20
184:11 241:9
242:20 243:8,
16 245:14

**laws** 272:11

**Lawson** 93:9
96:4 130:18,19
141:3 151:25
189:9,14,25
190:6 252:20

**lawsuit** 9:20,22
10:3,9 40:6,19,
22 41:13 42:11
43:7,19 73:8

**lawsuits** 40:16

**lawyer** 11:3
37:5,10

**lawyers** 95:7

**lead** 14:1 105:9
135:21 203:25
204:7 254:4

**learn** 30:15
48:14,19
136:20 140:1,2
189:3,9

**learned** 23:24
26:23 29:18
30:6 31:1,8
33:8 136:24
138:1 161:9
165:5 170:5
190:7 239:19

**learning** 23:6

**leave** 153:13
183:6 206:12

**leaving** 48:13,
18 49:2 83:3
271:16,17

**led** 206:1
241:17

**left** 46:4,21,24
47:2 49:8 68:22
71:12 74:2,8
87:2 124:16
141:15 183:5

**legal** 24:3
38:16 86:19

**legitimate**
116:7 175:1,7,8

**length** 227:11

**leniency** 34:6
64:23

**Lester** 90:15
96:5 113:24
128:16 146:4
148:4 183:9
186:5 194:23
195:22 217:18
218:25

**letter** 229:24
230:24 231:24

**Libby** 59:20,
21,23

**Licha** 8:22

**lie** 241:11

**lied** 241:6

**lies** 69:8

**life** 156:9,12

**likewise** 60:25
103:14 249:18

**limited** 95:15,
20 109:19

**Linda** 16:19,24

**lineup** 65:16
70:24

**lineups** 34:21
35:2 65:8

**Lisa** 11:24
258:13

**list** 58:3 78:14
132:18 150:20

**listed** 31:10
179:16 219:5

**listen** 12:21
19:23 36:15



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

216:10,23
217:1,2 218:14
221:3 222:18
224:4 244:15

**listened**
217:17 218:24
219:10,14,20,
25 220:6
221:11,17,24
222:25 224:12

**listening**
225:20

**literally** 273:23

**litigation** 29:4
54:24

**live** 165:17,23

**lived** 10:1
123:18 129:15
130:16,22
131:19 165:20

**lives** 50:3
131:16

**living** 144:3
165:9

**locate** 97:5
112:16 129:16,
24 130:2,7,12
165:13 216:25

**located** 8:6

**locating** 14:7
111:15,20
112:19,24
113:2,5 130:14,
17,20

**lock** 219:15

**locked** 59:15

**London** 8:6

**long** 9:18
32:15,18,19
36:23,24 51:19
54:16,18,20
113:18 146:15
171:6 174:2
177:20 186:23,
25 197:4 200:7,
19 201:12
202:12 204:19,
20,24 214:14

230:15 242:15
263:3 271:25
274:14,17
276:11

**longer** 272:1

**looked** 36:4,7,
21 43:2 66:7
139:17,18
196:22 239:20

**lose** 42:7

**lost** 76:3

**lot** 19:4 39:10
51:20 53:6,25
66:10 89:20
104:13 131:21
155:16 166:1,5,
11,21,25
167:13 186:15
231:10 252:9,
16 276:15

**Louisville** 28:7

**lucky** 37:17

**lunch** 160:17

**lying** 183:5
241:18

**Lynn** 111:22

————————

**M**
————————

**M-O-O-R-E-S**
144:7

**made** 32:20
38:17 45:15,24,
25 46:6,13 52:5
86:4,20 87:1,8,
12,17,23 88:3,
7,12,16,20,25
89:4 97:17
105:3 123:23
136:10 146:8
174:7 187:8
192:14 200:7
201:20 205:15
222:6 227:21
273:19

**main** 32:12
51:1 73:16 76:7
99:17

**maintain** 86:15
119:15 156:24
158:4

**maintained**
46:2,14 47:6
54:6 68:11
76:10

**maintaining**
237:7

**maintenance**
22:21 23:6

**make** 12:9
24:12 34:5
38:15 43:23
56:14 60:22
73:12 91:18
122:22 140:18,
25 146:9
161:11 179:2
190:22 192:17
196:20 197:8,
10 201:9 205:3
206:17 209:17
219:6 227:25
239:6 248:6,23
249:19 263:7
268:12 269:11,
16

**makes** 267:10
269:19

**making** 201:24

**male** 240:16

**man** 140:8

**manage** 30:23
31:3

**management**
30:21 48:14

**manager**
59:14,16

**mandatory**
30:12 31:6
60:25 62:10

**manner** 35:3

**manufacturing**
249:21 250:15

**March** 8:5
18:1,19,22
20:1,17,20 40:9

46:5,22 169:25
170:22 171:9,
13,14,21 172:9
173:4,8,19
180:1,5,8,11,19
181:18 182:9
185:2,8 186:6
190:12,25
192:22 194:21
195:6,9,14,21
196:1 198:7
200:14 206:7,
18 207:21
208:21,24
209:5 210:2,5,
23 211:16
212:11 213:8
215:14,17,21
216:15 217:5
218:20 220:22
221:8 222:10,
22 223:24
224:9,18
225:22 226:3
227:12,18
228:3,19 229:1
230:3,13
233:25 274:5,
22 276:13,18
277:5,9,14,22
278:5

**Margaret** 96:8

**mark** 8:20 15:4
28:21 40:6
41:11 54:22
95:1 117:17,22
126:10 127:3,
13 133:21
137:14 139:6
149:22 171:19
184:19 187:5
228:7 232:16
238:8 249:18,
22 250:22
254:14 255:8

**marked** 12:8
15:11 28:25
40:12 42:16
43:25 44:2 55:1
95:5 117:24
133:24 137:17
139:9 149:24
169:22 171:22
180:13 184:23

187:7 207:2,3
228:12 232:17
238:16 244:17
249:2 250:5
251:1 266:16

**Market** 165:18
166:1,9 194:23
209:22 217:18
267:11

**Maryland**
35:10,17

**mask** 151:5

**massive**
277:15

**matched** 188:1

**material** 82:7

**matter** 8:7

**max** 146:17

**meaning**
271:16

**means** 80:24

**meant** 268:8

**mechanism**
81:19 84:1,23
85:13,16

**mechanisms**
62:4

**meet** 37:5,10
145:8,13,17,21
185:13

**meeting**
130:24 134:15
135:5 136:11

**meetings**
102:19,24

**Mefford** 8:20
126:10 127:3,
13 254:14
255:8

**members**
228:4

**memorialized**
102:13

**memory** 61:14
106:13 120:17

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

150:17 216:7
257:13 266:9,
12 267:16

**Memory's** 30:8

**men** 22:21 23:6

**mental** 109:19

**mentioned**
252:19 258:12
261:7 264:2

**met** 135:17
136:6 147:18,
20,21 165:2
183:13

**metal** 197:15

**meth** 100:21
105:18,20
106:1,9 150:6
249:21

**method** 52:24
74:12

**Meyer** 42:12

**Michael** 93:6
96:5 139:10
140:3 153:2
185:14 187:21
188:17 237:15
239:13,16,20
240:1,6 241:1
252:20 263:11
264:16,19

**middle** 123:8
216:3

**Mike** 8:22 44:4
66:18 90:22
96:4 97:20
101:17 113:2
118:13 129:19
130:14 131:23,
24 132:4,11,24
133:3,5,8,10
134:9,15,25
135:5,7,17,20,
22 136:6,10,19,
23,24 137:22,
23 138:2,10,13
139:12,16
140:13,18,21,
25 141:5,10
142:7,18 143:2,

6,21 144:11,13
189:25 190:6
194:6,16
195:22 212:21
213:3 223:1
224:12,13
240:2,5,16,20,
24 247:22
248:10,16
250:24 252:19
277:14

**Mikey** 47:11
48:11,14,19
49:2,7,19 50:10
66:11,23 73:1
93:17

**military** 31:23

**Mills** 13:8,16
14:20 16:7,11,
17 17:15,24
18:3,25 19:10
20:24 21:9
25:24 31:13
38:12 39:13
45:23 91:15
93:23 94:2
95:15 96:1,7,
12,22,25 100:1,
8,17 101:23
102:7,21 103:1
105:13 112:24
116:22 123:13
131:4 132:25
133:14 135:25
137:1 138:3,11
139:17 140:9
144:14,23
149:12 152:18
153:23 154:3
155:2,4,8,11
156:14,16,17,
23,25 158:6
160:3,6,25
161:9,12 162:8,
16,22 163:1,17,
25 164:11
165:2,9,15,17,
23 166:2,5,22
167:5,7,14,17,
23 169:18,20
170:1,11,19,23,
24 171:3,15
172:8,18,25
173:6,11,16,22

174:2,11 177:1,
2,6,8,10,24
178:1,12,16
179:7,18,25
180:5,8,12,18,
24 181:13,15
182:8,25 183:4,
10,15 185:2,7,
11,15 189:16
194:7,24
195:23 202:8
207:23 209:1
214:22 215:7,
11,19,24 226:5
235:24 247:11
252:20 253:17,
22 254:2 255:4,
7 256:1 258:8
260:13 262:23
263:13,16
278:16

**Mills'** 13:23
14:2,14 17:11
22:2 39:19
50:20 52:13
55:19 56:1,10
58:18 60:10
62:16,23 63:8,
16 64:8,14,21
65:1,6,14,19
81:18 84:6
89:10 91:23
92:17 95:12,21
96:19 99:13
100:9 101:2,13,
16,19,22,25
102:11 103:10,
16 118:22
125:10,13
127:2,14,18,22
128:1,8 129:13
135:11 140:23
141:13,18,25
142:4 143:3,18,
22 145:9
149:13,15
154:17,23
163:21 164:2,
15 167:17
168:2,5 185:24
186:14 187:8
191:22 192:2
194:10 195:15
213:22 231:10
234:14 249:6

253:12 255:12
263:23 275:14

**mind** 48:6
193:11 253:25

**Mine** 57:2

**minute** 208:3
216:18,19
222:17

**minutes** 63:12
146:17 160:18
163:8,10 197:6,
7 202:5 218:11
221:2 222:16
224:3,4

**Miranda**
162:17

**misconduct**
48:1

**missing** 56:16,
19 254:22

**misstates**
162:5 248:13
252:25 267:25

**Mister** 187:1
192:10 208:24
209:3

**misunderstood** 175:9

**mixed** 94:23

**model** 263:7

**mom** 16:22
94:2

**moment** 118:8,
13 182:4
218:18

**moments**
18:18 82:14

**money** 91:18
142:13 146:4
183:9 194:7,14,
17 209:17
212:3,7 219:6
221:12,19,25
268:12 269:12,
16 270:16,23
271:7

**monitor** 74:13
275:16,22

**monitoring**
276:1

**month** 249:21

**months** 254:24

**Moon** 149:19

**Moore's** 144:4,
5,7 145:7,20

**morning** 9:9,
10 142:8 150:8
219:11 232:9

**Morris** 144:6

**mother** 159:17

**motor** 119:13,
15

**mouth** 278:1

**move** 41:21
233:22 255:19

**moves** 131:21

**moving** 134:8
157:8

**MR.WILLIAMS**
19:12

**murder** 17:15,
24 18:20,25
19:9 20:24 21:8
91:14 95:12,14,
21,25 96:19,21
102:7 105:6
106:5 107:23
108:25 113:24
129:13 133:11
135:24 138:19
141:3 155:3,9
156:6 157:1
158:7,10
159:23 160:3,8
161:16,22
162:7,15,16,23
164:8 169:9,14,
18,20 170:11,
23 171:3
172:18 173:2,
10,16,22 176:4
177:2,3,7,10,25
178:3,16
179:18,25

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

180:24 181:21
183:15 185:25
186:6,10 189:8
191:12 192:12
200:5 201:12
203:15,16,22
207:22 209:1
214:21 215:11,
23 226:5
231:10 235:24
237:1 239:7
249:5 253:12,
17,22 254:1
255:5 258:8
263:2 278:16

**murders**
104:11 125:21

**mustache**
240:19

**N**

**named** 35:10
77:15 257:13

**names** 14:17
39:16 51:15
126:3,21 130:3
132:18,19
133:19

**Natural** 32:10

**necessarily**
127:8

**needed** 14:17
99:25 128:11
157:20

**negate** 82:8

**neighborhood**
155:20

**networking**
79:3

**nice** 99:24

**nicer** 36:25
37:2

**nickname**
94:4,24

**night** 59:15
154:1 156:18
255:14 256:3

**nod** 11:11

**noise** 246:20

**normal** 50:23

**note** 25:21
41:23 103:15
133:19 134:9,
13,22 135:1

**notes** 23:5,19
24:12,19,21,22
25:4,8,12,17
36:11,12 61:13
95:17 102:16
104:2 111:11
113:19 128:3
136:13,15
148:12 155:24
156:1 161:5
164:25 165:4
192:4,7 216:6
236:9,11,14

**nothing's**
56:19

**noticed** 229:5

**number** 8:10
12:6 15:4 16:1
20:15 28:21
40:6 43:25
54:23 58:11
71:16,18 72:4
75:8 76:2,17
78:2,18 79:2,9,
14 95:2,9,11
96:16,17 101:4
102:5 106:24
117:18 119:21
122:20,21,25
128:22,25
132:18,20,22
133:2,6,22
137:15 139:7
149:23 152:22
169:17 179:6
180:11 184:19
187:6,9,14
190:15 193:1
206:22 208:15
216:13,20
228:8 232:18
238:9 239:25
240:2,4 244:15
247:25 248:3
251:5,7 260:8,9

264:11,14
265:1,16
266:16 267:13
269:9 276:17

**numerous**
104:7

**O**

**oath** 15:20,22

**object** 11:19
17:20 18:4
19:1,11,19 20:9
21:10,16 22:24
23:9 24:1 39:22
46:9 48:15 50:6
56:4,5 58:21
60:13 62:11,20
63:2 64:11,18
65:11,23 74:11
77:8 80:22
81:25 82:10,20
85:2,20 86:17
87:4,20,25 90:6
91:6,24 92:19
93:3,14,15
97:2,9,23,24
100:3,16 101:6,
7 103:2,12,19
104:5,6,24
105:11 107:25
108:1,2 109:1,
2,10,21,25
110:7 112:2
114:18 115:2,9,
14,20 116:11,
16 117:1,4
118:25 119:3
121:15,21,23
124:6,14 128:9
130:8 132:14
134:11,12
135:13 140:6
142:2,21
143:23 144:24,
25 146:6 147:6
149:1 153:15,
25 154:9
157:14 158:18,
20 160:11
161:17,24
162:4,9 163:3
167:19 168:21
169:11 170:2

171:4 172:19
173:17 174:4,
24 175:3,17,23
176:7 178:7,13,
19 179:4,13,19,
20 180:2 181:8,
22 182:24
183:21,22
184:13,17
188:3,8,9
189:17 190:8
197:9,22,23
198:11,23
199:3,19
200:10,11,21
201:5,6,15
202:3 203:10
205:1,11,12,18,
19 206:5 209:6,
7 210:6,22
211:24 212:12
213:16 214:3,
13 218:2,7,8,21
219:2,18,22
220:9,10,23
221:13,20
222:5,13,14
223:4,5 224:2,
16,21 225:5,14,
23 226:6,11
227:19 228:5,
20 229:12
230:6,19
231:17 232:2,7
234:4,10,25
235:6,11,19,20,
25 237:2,9,22
238:24 239:22
240:7,14,22
241:2,13,24
242:3,8,12,22
243:2,3,10,18
244:1,13
245:16,23
246:10,15,24
247:3,8 276:20
277:3,7,11,19,
24 278:3,17

**objection**
12:10,19 38:16,
17 40:24 52:6
73:5,12 86:20
87:10,15 88:5,
11,14,18,23
89:2,7 99:14

105:4 109:14
116:1,9,25
117:5 132:15
138:15 143:5,8
154:5 157:17
175:10 177:11
178:20 189:5
201:23 220:4
222:6 223:11,
12,17 224:22
225:15 226:18
228:23 233:8,
13 236:21
237:3,18 239:8
246:3,7 248:13
250:9 251:2,24
252:4,12,23
253:5 254:3
262:4 263:14,
18 264:25
265:9 266:2,15,
22 267:3,19,21,
25 268:24
269:18,22
270:12 271:10
274:13,19

**obtained** 141:6
171:20 172:4
174:11,19
185:1 190:25
208:24

**obvious**
233:19

**occasion**
105:25 106:1
180:24

**occasions**
149:14

**occurred**
61:15 121:14

**occurrence**
153:9

**October**
258:20

**odd** 145:4

**office** 13:11
20:5 32:12
44:18 54:9
59:13,14,16
122:13 130:10
150:16 191:18

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

192:22 196:3
202:20 206:7,
19 215:22
216:4 220:22
222:11 223:24
224:18 231:4
274:4

**officer** 10:5
66:15 67:10
70:13,18,21,24
71:3 81:23
85:23 114:8
115:25 116:15,
23 129:14
151:11 175:13
184:11 191:25
241:10,11
243:17 245:15
250:19

**officers** 35:14,
18 39:19 45:15
52:25 54:3
60:11,15,22
65:21 70:6
71:25 72:12,21
74:13,19 75:3,
18 76:5,13
77:1,5,12,19
78:11,21,24
79:5,11,17
80:7,12,17
81:7,10,19
82:5,16 83:13
84:2,9,20,25
85:6,10,18
86:3,9,16 87:2,
8,13,18,24
88:4,8,13,17,21
89:1,5 98:8
124:24 126:13
128:5 150:14,
20,25 151:5
153:12 159:14
179:1 184:7
187:21 192:18
242:25 243:9

**official** 43:3
62:6

**Oklahoma**
239:13,16

**one-page**
33:17

**open** 196:11

**opening**
179:10

**operating**
50:23 119:13

**opinion** 104:20
116:5 158:16
175:12,19
184:10

**opinions** 93:12

**opportunity**
127:3 229:7,9

**opposite**
183:19

**order** 12:14
77:6 134:7
174:20 178:17
233:9

**Originally**
125:14

**Otis** 43:13

**outbuilding**
54:11

**owned** 10:4

**owner** 21:24
119:15

———————

**P**

**P.M.** 278:23

**pages** 58:11,14
69:14,16

**paid** 194:10

**paper** 51:1,4

**papers** 36:5,7

**paperwork**
53:2

**paragraph**
123:8 150:22,
25 151:15
181:12 182:1
209:14,15
210:17 211:8
212:1 265:20

**paragraphs**

209:12

**paraphrase**
273:20

**paraphrasing**
275:3

**park** 165:25
166:4,8,12

**parked** 166:18

**parking** 166:1,
5,11 167:13

**part** 12:5 13:21
16:9 36:22
46:2,14 66:6
115:13 145:19
157:4 177:4
179:14 200:17
204:13 211:9
220:6 249:24
251:9

**participate**
97:18 124:10
142:3 149:18

**participated**
16:16 19:7 25:7
96:24 99:12
101:4 103:16
123:1 129:13
150:11 172:10,
15 234:13
237:20 252:17
253:9 276:12

**participating**
16:5,6 117:12
120:18 237:11

**participation**
183:15

**parts** 36:20
229:8

**party** 9:22

**pass** 238:11

**passed** 154:14
168:16

**passing**
125:13

**past** 112:12

**penalized**
81:22

**pending** 8:8
11:6 203:23
204:25 205:4,9,
16 226:25
229:10

**people** 11:17
14:7,9,18,20,
22,24 15:1
37:15 48:8,20,
23,25 49:3 50:2
51:11,21 67:18
73:15 97:5
99:11,19
100:18 104:16
129:15 151:12
152:12 155:18,
20,22 241:17
252:17 257:13

**perfect-** 143:14

**perfectly**
10:18

**period** 25:17
54:10 131:9
263:17 272:19
274:10

**periods** 171:6

**person** 21:21
43:10 53:19
69:10 71:4 92:2
93:6 102:25
130:6 136:20
144:13 217:9
236:24 277:2,
23

**person's** 10:8

**personal**
260:15,17

**personally**
17:23 73:13
83:2,22 84:18
85:9 90:18 94:1
246:4

**personnel**
44:22 45:2,8,17
46:2,7,15,22
47:4 68:6,10,23
69:2

**persons**
129:16,24
130:1

**phone** 141:1
191:16 192:11,
17,25 193:1

**phones** 79:16

**phonetic** 21:22
47:12

**photo** 34:24
35:2 65:9,16
70:25 95:17

**photographs**
95:17,18 97:14
98:11,17 125:4
139:8,12,15,23
140:13,14
187:2 236:18
237:21,24
238:13,15
239:1,12,15,20
240:2,4

**physical** 35:6
141:6,10 188:1

**physically**
59:1 244:3

**physician/
patient** 99:6

**pick** 176:12

**Pickard** 8:7,15
9:9 11:16 14:1
15:3 16:19
17:22 21:18
27:12 28:22
29:12 31:11,15
35:9,21 40:5,
17,25 42:10,13,
14 43:19 54:25
55:8 59:23 68:3
69:14 72:24
76:3,18 80:3
89:9 91:10 95:4
96:24 98:19
99:9 102:4
103:8 104:7
106:23 115:23
117:22 118:4
119:5 120:3
132:17,22
133:22 134:8
137:15 139:7
141:21 149:12,
23 150:1,24
153:19 160:22

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

163:15 169:16
171:21,25
173:25 174:18
177:15 179:11
184:1,20,25
187:14 190:11
199:15 206:23
207:14,20
208:15 209:3
214:25 215:1
216:20 218:4
227:21 228:9
234:12 238:10,
13 240:3 241:5
242:5 244:14,
20 247:18,22
254:11 258:2
271:24 274:3
275:13 276:11
278:20

**picking** 132:12

**picture** 139:14
240:5

**pictures** 97:17
238:2 239:6

**pill** 91:23
144:22 194:14,
17

**pills** 136:25
277:6,10,16

**PL** 117:18

**PL15840**
206:25

**PL25962**
206:22 216:15

**PL27706**
244:15

**PL29737** 12:7

**PL3221** 249:23

**PL5132** 248:19

**place** 20:5
55:25 61:24
63:7 80:6,11,16
81:19 84:1,8,23
85:13,16 86:2
103:25 114:24
185:23 186:13
196:2

**plaintiff** 16:11
123:22 247:17
260:12

**plaintiffs** 8:13
95:14,18
186:10 258:19

**Plaintiffs'**
16:5,6,8

**plan** 179:24

**plate** 53:6

**play** 12:5,11
19:22 216:9
218:10 221:1
222:16 224:3
244:14

**played** 12:14,
25 217:4
218:17 221:5
222:19 224:6
244:19

**plenty** 147:10

**point** 11:1 21:2
27:20 92:16
107:20 122:19
126:1,10,25
127:2,9 134:24
155:12 160:14
163:19 165:22
173:4,8 189:11
192:14 205:6
247:10 265:15

**pointing**
122:23

**police** 14:13
23:23 24:13
25:25 34:11,15
35:13,18 36:9
48:1 52:23
53:15,23,25
54:4 64:17
65:21 67:10
78:6 84:2 88:8,
13,17 95:16
97:12,19 98:3
102:14 103:9
104:2,15
107:16 109:12
110:25 111:3
114:8 116:15,
23 124:4

125:21 132:13
143:18 150:15,
16 151:1,25
161:9 164:13
165:5,25 166:8,
19 175:13
177:14 178:25
179:25 180:11,
15 207:25
208:1,19
209:14 226:14
229:8 234:19
235:5 237:14
242:24 244:24
249:9 251:13,
17,21 254:1
262:12

**policies** 25:9,
14 26:13,18
45:5 54:23
55:24,25 56:8,
13,15,16 58:17
59:1,11,25
60:6,12,17,22
61:2,10,21,25
62:6,9,14,18,25
63:8,13,18,22
64:1,9,15,22
65:2,7,15,20
66:1 68:3 69:18
72:20 80:15
82:14,15 84:14
103:25 164:22

**policy** 26:22
27:2,7 54:15
55:11 68:4,5,10
69:1,4,16,22
70:1,4,9 71:15,
16,24 72:4
73:4,21,24
74:14 75:2,7,
11,17,23 76:1,
4,8,12,16,20,25
77:4,10,14,15,
19,22 78:1,5,9,
13,15,19 79:4,
9,15 80:5,11,16
82:4 84:8 85:4
86:1 165:3

**politics** 38:10

**Polly** 96:8

**polygraph**
140:19 188:19,

25 189:4,10,14
190:1,7

**polygraphs**
189:20

**POP** 273:1

**portion** 233:5

**portions**
12:12,13

**pose** 71:23

**posed** 236:4

**position** 13:12,
14 72:16 86:23

**positive**
152:11 196:10

**possession**
22:17 23:6

**post-it** 133:18
134:9

**postings** 79:3

**potential**
111:15

**power** 18:14
50:3,11

**predicate**
179:11,15

**prepare** 34:10
36:2 37:5,11

**prepared**
95:12

**preparing**
35:21

**presence**
122:9 134:15
146:11 147:18
148:8 186:2,9
203:4 204:17
227:17 228:3

**present** 19:14
20:1 97:14,21
98:7 99:10
101:3 104:25
105:25 118:20
122:15 124:3
129:17,18
132:2,3 139:3
144:10 145:11

163:23,24
164:4 175:24
177:17 185:1
191:25 193:12
196:14 206:9,
15 225:9
234:18,24
237:12,24
238:21 246:17
248:7,10
251:11,21
252:2,7,22
253:3,9 255:16
256:3 257:14
262:1,11 266:7
271:12

**preservation**
83:5

**preserve** 82:7,
17

**pressuring**
175:14

**pretty** 52:15
72:25 91:11
94:21 158:25
164:9 182:14
205:20 233:14,
19 255:6

**prevent** 88:8,
13,17

**previous** 15:7

**previously**
66:24 191:22
192:1 222:7

**primarily**
235:3

**prior** 24:6
31:12 32:5,9
48:13,18 49:1
62:5 63:7,21
83:3 89:9 90:4,
8,12,15,22,25
91:14,23 92:3,
5,8,15 93:7,9,
12,17,20,23
103:21 109:18
136:19,23
138:12 140:1
181:2,18 182:8
185:6 186:9
189:7 191:21



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

193:9 194:21
195:2,6,9,14,
18,21 197:4
203:18 205:6
209:20 213:20
214:12 215:5,9,
17 227:17
233:25 237:11,
12 252:25
253:8 261:8
266:21 270:21
275:25 276:22
277:5,9

**prison** 243:13

**probable**
18:23 19:8 21:3
173:20 179:3,
17 242:2

**problem** 48:24
67:18 92:1
242:15

**problems** 48:7

**procedure**
26:22 27:2,7
55:11 68:4,6
69:1,5,16,23
70:1,5,9 71:15,
16,24 72:4
75:2,8,12,17,23
76:2,4,8,12,16,
21,25 77:5,11,
15,19,23 78:2,
6,10,13,15,20
79:4,9,15 80:6,
11,16 82:5 84:8
85:5 86:2 165:3

**procedures**
25:10,15 26:13,
19 45:5 54:23
55:25 56:8,15,
16 58:17 59:12
60:1,6,12,18,23
61:3,10,21,25
62:6,9,14,19,25
63:9,13,18,22
64:2,10,16,22
65:2,8,15,20
66:1 69:19
72:20 80:15
82:14,15 84:14
103:25 164:23

**proceed** 177:2,

9 178:1

**PROCEEDING
S** 8:1

**process** 53:4
66:6 69:8 218:5

**produced** 29:5
54:24

**production**
95:2

**professional**
99:6

**profile** 240:24

**program** 92:23

**prohibited**
72:14

**promise**
197:10,25
201:9

**promised**
197:20

**promises** 34:5
64:23 86:4,10
174:7 197:7

**proper** 76:9

**properly** 74:14

**property** 76:3
230:25 231:9,
14

**prosecution**
21:7,15 35:15
82:19

**prosecutor**
21:14

**protective**
233:9

**provide** 72:21
75:18 76:13
77:11,23 78:10,
15,20,23 79:5,
10,16 86:7,8
181:9 210:4
211:15 212:10
213:7 217:22
220:7 222:3
223:15 224:19
268:23

**provided** 34:9,
14 60:1,6 74:4,
19 83:4,23
118:20 152:9
195:5 209:4
210:1 215:22
218:1 220:14,
15 225:21
226:2,9,15
264:15 269:21
270:11 278:11

**providing**
82:24 211:4,22
212:17 220:21
222:12 223:25
225:3

**proximity**
166:10

**public** 233:6,
14 259:10

**publicly** 41:9

**pull** 117:12
240:1

**pulled** 121:1

**pulling** 112:6,8
117:15

**pumping**
209:22 217:19
267:11

**punishment**
82:9

**purchased**
147:15

**purpose**
76:20,25
140:12 157:11
175:14 184:12

**purposely**
67:8

**purse** 141:15

**pursue** 174:1
176:4

**put** 17:9 45:17
67:3 76:23
98:10,17 118:7
125:5 190:16
212:7 236:17
238:14,19,22

243:13

**putting** 233:8,
13

---

**Q**

**qualifications**
272:4,7

**question**
10:18,22 11:6
12:16 16:4,5,9
21:11 22:18,23
24:2 36:13
38:18 39:23
44:16 46:12
48:6,12 50:7
59:9 61:18
62:15 63:5 66:9
69:17 71:22
73:10 82:1
83:7,15 85:15
86:20 90:7
91:10 95:22
108:3 111:16
133:1,12
137:10 138:25
163:4 172:2,13
173:25 176:25
177:13 179:21
184:18 213:20
215:18 219:23
220:11 221:4
229:6 231:18
233:21 234:16
237:12 265:6,
12 267:10
268:1

**question's**
130:11

**questioned**
98:3,12 99:11
109:13 124:4,
13 132:13
139:4 235:24

**questioning**
73:7 97:7,11,18
98:5,8 101:4
107:17 108:25
109:18 110:4,
10 118:21
123:22 140:23
204:3 206:2,18

214:7 234:13,
18,24 235:4,10,
18 236:7,19
237:8,13,19
242:6,18
243:21 244:4,8
245:9 251:12,
18 259:24

**questionings**
270:21

**questions**
10:18 11:10
12:22 26:12,18
29:25 35:20
66:10 113:8,12,
14 123:5,12,16
137:19 158:19
163:16 171:24
177:15 185:4
190:23 206:6,
10,13 207:11
216:11 217:3
218:15 222:18
224:5 228:10
233:2 235:22
236:4 241:6
244:16 247:18,
24 251:22
252:2,11,16
254:7,13
262:10,17,20
269:7 270:21
271:19,24
272:2 273:13
274:3,8 275:3,
13

**quick** 39:25
66:9,11 68:3
71:22 75:14
209:13

---

**R**

**race** 38:4

**raise** 8:24

**Randy** 151:15,
17

**range** 72:15
165:22

**Ranger** 112:13



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

rare 52:15

Raven 40:7

reached 178:12

read 36:9,17,19
75:13 172:1
176:22 178:8
182:1,4 185:4
207:10,24
208:1,6 216:24
229:4 260:19

reads 211:23

ready 203:12

real 38:5,6
39:24 68:3
71:22 75:14
94:4 188:7
209:13

realize 50:1

reason 91:21
140:17 198:10
275:7

reasons 137:6

recall 11:23
17:18,19 22:2
23:17 27:2,6,10
29:18,20,22
30:16 31:1,3,7,
11,17 33:4,14
34:3,16,19
35:4,8,11,16
36:7 39:16
40:13,21 41:12
43:6,18,21
44:3,19 45:13
56:7 60:8,14,
19,21 61:4,8,23
63:6,10,21,25
64:1 65:12,17,
24 70:8 71:1,6,
9,10,13 74:21,
25 80:10,13
81:8,13,14,21
82:3,12,23
85:25 91:13
97:17,20 98:14,
15 102:22
103:6 106:5
107:15 109:4,5,
23 110:6,9

112:14,15,17
113:6,14 114:1,
19 117:15
118:23 123:23
126:3 127:12,
16,20,24
128:17 129:20,
21 130:4,23
131:22 133:20
134:14 135:3,6,
7,10,19 136:8,
22 139:22
144:3 148:24
149:9,11 152:5
155:23 157:23
159:7 161:18,
25 162:24
165:15 169:2
170:12,14
173:3,7,12,18,
23 174:17
176:6 178:14
180:3,9 182:19,
23 183:3,11
185:22 186:23
188:4,11 189:2
190:9 191:13,
14 192:20
196:11 198:20,
21,25 201:20
203:20 204:20,
22 205:2,5
210:8,24 211:1,
2,19,20 212:14
213:11 214:14
216:5 230:21,
22 235:9 236:3,
15,24 237:10
238:13,25
239:18 243:15
252:15 253:8,
18,19 255:10,
18 256:5
258:13 260:23
261:4,12,18,24
262:13,16,19,
24 263:9,11,24
266:24 268:4
275:3

recalls 176:10,
12

receipts 22:21
23:13 261:1,5

receive 27:17

33:2 34:18,21,
24 35:2

received
24:16,18,24
26:3 31:12
103:21 180:5,8
184:16 276:9

receiving
230:25 231:9
275:23 276:3

recklessly
72:14 159:5
262:23

recognize 15:9
42:15 55:8
119:5 150:1
229:21 250:4

recollection
38:19 113:20
117:12 128:4
136:5,9,14
138:9 152:9
153:20 154:11
155:25 178:5
192:5 249:14

record 8:11
39:24 40:1,2,3
79:24,25 80:1
94:24 110:14,
18,22 111:6
117:23,25
118:1,2 138:5
160:24 163:11,
12,13 176:17,
18,19,20
204:12 208:4,
11,12,13
247:14,15,16
269:1,3,4,5,8
273:15 278:22

recorded 12:3
24:10 110:15
136:16,18
184:2,11 192:8
206:2,22 209:5
216:14 217:6,
21 218:19
220:5 221:6
222:2,20
223:14 224:7
227:22,24
236:7 259:18,

20 266:9,13

recorder
214:12,17,19
215:5,9,24
216:2 227:12,
17 267:18

recording
19:23 148:14,
17 184:8
206:24 217:10,
16 218:23
219:4,9,13,19,
24 220:6
221:10,17,23
222:25 224:11
225:20 244:20
245:1,3,6
266:21 267:1,6
274:11

recordings
12:12 36:15,16
273:18

records 28:1
68:6 137:22,23
138:1,7,18
141:1

recovered
141:11

REDIRECT
275:11

reduce 82:8

refer 73:21

reference
261:1 266:11
267:10 273:21

references
152:7

referencing
266:17

referred 52:19,
22

referring
197:14 236:13
260:15 264:6
273:25

reflect 110:15

reflection
139:16

reflects 269:11
270:6

refresh 61:14
106:13 113:20
120:17 128:4
136:13 155:24
192:5 216:6
249:14

regard 113:20
120:18

register
119:14

regular 91:12

Reid 31:19,21

reiterate
175:10

rejected 66:25
67:7

relate 69:19

related 38:1
131:13 135:11

relates 70:1,10
71:15 73:7
75:12 76:2,17
78:6 233:3
272:10 275:4

relating 16:8
27:23 79:15
96:4,18 137:22
229:1 273:14

relation 43:12
133:8

relationship
98:23 99:7
261:23

released
198:8,22 199:7
201:3

reluctant
99:11,16

remember
10:10,11 17:2,
12,16 19:21
20:25 22:5,6,9,
10,11 23:2,3,20
24:5,11 26:10
33:8,11 39:8,11

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

46:11 47:10,11
50:18 51:15
59:17 60:20
61:7,12 67:20,
22 68:1 70:16
89:17,18,20,21,
24 90:11,20,24
92:13 97:16
98:5,6 100:6,
13,18,23
105:14 106:12
108:6,8,10,13,
17,18 109:7,9
110:11,12
111:21,22
112:4,6,10,11
114:15,17,21,
23 115:4,5,7,16
120:20,25
121:6,7,10,11,
12,25 122:2,11
123:16 124:10,
17,18,21,23
125:1,3,17
126:2,6,7,17,18
128:19 129:22
130:9 131:8,11,
21,24 132:6,10,
11,16 133:15,
16 134:13,17,
19 135:15,20
136:2,4,18
137:2,23 138:4,
16,21 139:5,13,
14 140:10
142:17 143:24
144:12 145:10
146:19 148:2,9
149:4,16 151:3
152:10,17
154:1 155:7
156:13,17
158:23 159:8,
16 161:13
162:2,3,12
163:6,17
168:23 169:23
170:17 171:11
174:12 178:8
180:6 181:23
182:11 184:6
185:16 186:4,
12,15,16,19,22
187:4,17,18
189:18 190:13
191:19,24

192:3 193:15,
20 194:1 196:6,
10,16 198:9,16
199:2,4,6,10
201:10,24
202:1 226:25
227:5 230:8
235:12,14,21
236:17 237:23
238:1,7,20,23
251:19 255:24
257:5,17
258:11,23
259:1,3,5,6,9,
10,16 260:5
261:4 262:21
263:1,4,6,7
266:25 267:6,8,
24 273:20
274:14,16,20

**remembering**
114:21

**rental** 137:22
138:1,10 194:9

**rented** 138:2

**renting** 138:11

**Reona** 42:11

**repeat** 25:11
115:22 133:1
172:13 219:23
225:22 226:13

**repeatedly**
143:12

**replaced** 51:20

**report** 23:23
25:25 34:15
53:23 78:6
102:14 103:9
104:2 107:16
143:18 150:14
151:8,10 152:7
161:9 164:13
165:5 177:14
180:11,15
181:2,5,10
182:2 196:17,
18,20,24 197:2
207:25 208:1,
19 209:14,25
210:9,19 211:3,
22 212:16

213:13 226:8,
15,17 227:15
229:1,5,8
265:3,4,5,17
266:1,11

**reporter** 8:4,25
9:1,6 11:14
15:7 42:5

**reports** 34:11
36:9 53:15
54:1,4 64:17
77:16 78:3
95:16 104:15
164:19 192:4

**represent**
171:13 216:22
247:22 254:12

**representative**
32:14,16

**republican**
38:7,8

**request** 95:2,9,
11,19 96:3,8,17
102:5 140:18,
21,25 141:5,9
188:19 190:4
192:14 205:15

**requested**
29:6 188:25

**requests**
129:12 205:3

**require** 272:11
273:6

**required** 25:4
26:8,22 44:22
54:3,5,17
60:11,16 61:20
62:18,21,24
63:3,13 82:6,17
83:14 84:9 86:3
104:2 119:16
164:18 165:4
273:11

**requirement**
60:21 63:4

**requirements**
35:13 60:5

**requires** 35:17
67:1 68:10 69:1

91:20 116:9
137:9 157:16
167:20 210:7
220:15 225:6,
24 226:12,19
242:13 246:16

**requiring**
83:13

**resemble**
265:15

**residence**
13:23 151:12
152:5,13,16
153:22 154:6
185:24 186:14

**residents**
166:10

**resigned** 44:9

**resolution**
40:22 43:7

**resolve** 41:4

**resolved** 41:7
43:21

**respect** 95:21

**responded**
96:20 125:15,
18

**response**
40:17 54:2
95:24 96:10
106:24 113:7
126:9,22
128:22 129:11
132:19 153:6
218:22 222:15
223:21

**responses**
15:5 95:7
106:20 123:21
132:1,19

**responsibility**
24:2 52:6
86:14,18
104:20 105:1,4

**responsible**
23:22 51:8,22
52:3 235:4

**rest** 156:8,12
166:24

**restroom** 11:2

**retention** 35:6
54:15

**rethought** 36:4

**retired** 256:24
275:18,19

**retirement**
275:15

**retiring** 38:2

**retrieve** 192:15

**reveal** 66:6

**revealed**
227:16

**review** 36:11
54:4 60:16,22
61:20 62:18
63:13 66:6
117:20 150:24
176:9 181:5
190:23 196:20
229:9 232:24
233:24

**revised** 55:24
58:23 64:3

**revisions**
60:11

**Richmond**
81:3 272:15,25

**road** 10:11
166:14,17,21

**rob** 195:23
212:22 223:8

**robbery** 249:5

**Robert** 92:2
96:7

**Robinson** 8:12

**rode** 14:18

**Rogers** 92:23,
24

**Ronnie** 40:7
42:12 43:10,12

**room** 109:11,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

16 124:12
125:7 196:4
199:12 204:8,
16 206:12
247:6 251:22

**rubber** 212:7

**rude** 116:19

**rug** 146:3

**rules** 9:11

**run** 37:19
144:22 157:3,4
194:14,17

**run-ins** 90:4
180:20

**running** 38:10
136:3

**runs** 277:15

_____

_____
S
_____

**sacred** 35:22

**sat** 14:10 97:3
107:2,10,13
108:8

**save** 15:18

**scene** 95:17
98:11 125:9,16,
19,25 126:4,14,
19 127:9 141:7,
11,15 153:13
236:18 256:4
257:4

**scenes** 253:21

**school** 27:13,
15,17 31:19

**schools** 31:16
33:5

**seal** 233:13

**sealed** 233:5

**search** 138:22
149:19 150:7,
12,16 151:2,4,
16,21 152:1,4,
20,23 156:15

**searching**
135:7,10 255:2

**seat** 119:14

**seconds**
216:19 218:11,
12 221:2,3
222:16,17
224:3,4

**section** 56:24
58:14 71:22

**secure** 171:2

**securing** 51:8

**send** 42:1

**sending**
239:12 253:19

**sentence**
111:13 123:20
209:20 210:16

**separate**
106:2,3 181:19

**served** 31:23

**service** 32:14,
16 51:1,4

**sessions**
80:25

**set** 56:15

**sets** 272:7

**settled** 41:15
232:9

**settlement**
40:25 41:4,7,9

**seven's** 57:11,
14

**shape** 257:11

**Shawna** 8:19
254:11

**she'd** 156:8

**sheriff** 13:13
32:6,20 33:3,
19,22,25 34:4,
10,13,17,20,23
35:1,5,12
37:13,24 38:11,
14 42:13 43:4
44:4,18,20,25
45:9 46:19
50:1,15 60:4,9,

15 66:18,21
68:15,18 70:14,
17,20,23 71:2
74:12 76:3 81:1
83:3 84:3 86:7
87:7 174:18
184:2 241:5
247:22 258:2
261:10 272:4,8
273:10 275:22

**sheriff's** 10:6
13:11,23 14:12
24:24 25:10,15
26:3,4,14 28:8,
10 29:15,19
30:1,6 32:1
33:6 39:7 40:8
42:13 44:10,22
45:1,6,9,16
46:5,18,21
47:3,7 49:8,21
50:12 51:7
53:17 54:7,16
56:9 59:2,8,11
60:2,16,17
61:1,10,24
62:5,7,25
63:19,23 64:2
66:24 68:21
69:9,20 73:3,18
74:3,7 75:3
77:1,6 79:6,11,
18 80:6 81:6,10
82:6,24 83:1,20
84:9,24 85:5,
14,17 86:2,15,
24 104:1
140:22 151:21
191:18 196:3
202:20,23
231:4 242:10
245:20 250:17
272:3,12
274:10 275:16
276:8

**sheriffs** 39:4,7
272:10,18
273:7

**shifts** 53:10

**short** 118:4
202:15

**shortly** 133:11

**show** 15:3
23:13 28:20
43:24 54:22
95:1 103:7
117:17,21
133:21 137:14
139:6 140:13
149:22 171:12,
18 187:1,5
228:7 238:8
248:18

**shown** 22:20

**sic** 8:4 40:7
42:12 89:14
149:19 174:8
222:17 227:17

**sic]** 268:15

**side** 70:11
232:14,20

**sign** 15:13
44:17 55:16
65:25 66:3

**signature**
15:16 26:16
55:13

**signed** 15:19
44:4 66:5,7
171:14

**signing** 66:6

**similar** 240:5,
12,20,25

**similarity**
240:9 264:19,
23 265:7

**Simp-** 135:7

**Simpson**
90:22 92:5
96:4,6 101:17
113:2 130:15
132:24 133:3,5,
8,18 134:9,15,
25 135:5,17,22
136:6,10,19,23,
24 137:7,22,24
138:2,11,25
139:3,10,12,16
140:1,13,18,21
141:10 142:8,
12,19 143:2,6,

21 144:11,13
190:1,6 194:6,
17 195:22
212:22 240:3,5,
16 252:19
264:19 277:15

**Simpson's**
133:11,13,17
138:13,22
141:1,5 240:20,
24

**single** 25:21,25
27:2,7 80:11,16
85:23 102:9
103:9,15

**sir** 8:24 15:9
16:12 20:22
32:8 40:10
42:21 56:3 68:2
73:10 95:22
96:8,14 97:3
113:9 119:16
129:9 150:12
154:2 161:7
171:18 176:22
180:10 181:1
185:13 212:8
213:1 216:9
217:5 218:18
221:6 222:20
224:7 225:18
228:7 229:21
248:25 254:8

**sit** 61:19 97:10
166:21,24
274:16

**sitting** 16:14
27:1,6 49:6
56:7 61:8,23
62:3,13 63:6,11
80:10 89:24
167:13 170:18
278:14

**situation** 145:5

**Sizemore** 40:7
42:12 43:10,12,
13

**sketch** 187:16,
20 188:2,6,13,
16 237:14
240:1,6,15,19,
25 264:15



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

265:7,11

skip 69:12

Slosar 8:13 9:8
12:17,20 38:21
39:24 40:4
41:2,25 42:3,6,
8 48:10 50:9
55:3,7 57:1,3,6,
9,13,17,22,24
58:7,10,15 73:9
79:23 80:2
83:9,12,15,17
86:22 94:18
98:1 100:7
104:9 105:7
106:3,7 108:3,7
118:3 120:7,11
124:11 129:8
134:4,6 137:13,
20 143:14,16
144:9 145:2
147:21,24
149:5 160:18,
21 163:7,14
176:14,17,21
187:10,13
188:12 198:1
201:19 207:4,7,
9,12 208:5,7,
10,14 209:9
215:1,4,14,16
216:18 218:16
220:17 223:22
224:24 225:17
226:22 229:16
231:20 232:16,
17,19 233:7,12,
18,20 237:6
238:11 246:1,5,
18 247:13,17
248:8,13,21,24
249:24 250:9,
11 251:2,24
252:4,12,23,25
253:5 254:3
260:6 262:4
263:14,18
264:25 265:9,
19 266:2,15,22
267:3,19,21,25
268:3,24
269:18,22,24
270:12 271:10
274:13,19
275:12 278:19

slow 109:24
157:20

small 109:16
263:5

smaller 52:10

Smith 15:1
25:24 40:7
44:4,18 66:18,
21 96:5 102:2
112:19,21
130:21 145:6,9,
14,17,22 146:1,
12,16 147:9,13,
17,25 148:3,23
149:9 168:9,12,
20,25 169:3,7,
12 252:20

snapping
72:15

snippets 12:11

social 79:3

solemnly 9:1

son's 135:7

sort 33:2 52:24
54:15 60:4,25
69:7 151:5
259:8

sound 9:12

space 35:22

speak 101:14,
17,20,23 102:1
127:3 132:23
133:7 134:10
136:19 137:7
138:13 143:21
146:15 149:15
162:25 197:4
231:4

speaking
105:14 136:23
199:14

Speaks 178:9

specific 60:21
72:25 80:5
101:10 129:12
214:1 215:6,10,
23 227:15
236:4

specifically
95:19 133:2
255:25

specifics 23:3
203:8

speculate 67:1
91:20 116:10
137:9 157:16
167:20 210:7
220:15 225:6,
24 226:12,19
242:13 246:16

speculation
263:19 266:3
269:24

spend 156:8,
12

spending
146:5

spoke 101:3
105:12 111:14
123:21 126:5,
10 157:25
159:5 162:6,21
193:13 213:17,
18 214:11
258:13 274:11,
22

spoken 126:4
267:24

Springs 157:9,
10

stamp 216:18

stapled 77:7

Staples 8:12
15:6 57:7,10
58:2,9 94:13,20

start 12:10
199:20 209:13
258:4

started 9:12
63:17 124:16
125:22 213:4
223:1,3 224:13
267:6

state 14:13
52:23 111:14
125:21 129:14

132:23 150:16
151:1 244:24
249:8 254:1
273:5

stated 83:7
104:7 176:10
181:13 209:16
211:10 212:4,5,
6,21 266:18

statement
13:3 19:15
20:7,16 109:4
146:13 156:9
161:22 168:6,
20 169:1 171:8,
12,19 172:4
173:24 174:3,7,
11,14,16,21
175:15 176:5,
16 177:7,25
178:17 180:1,5,
8,19 182:9,13
183:18 184:22
185:1,7,11
187:8 190:15,
24 191:4 195:3,
4 197:20 198:6,
14 200:13
201:4,13,21,24
202:9 203:13,
22 204:24
205:7,9,17
206:3,22
207:15,21
208:23 209:5
217:6,21
218:19 220:5
221:6 222:2,20
223:14 224:7
225:22 227:22,
24 228:19
229:17 230:9
234:1 263:15
265:18,23
266:12 269:20
273:19,21
277:13,22

statements
123:23 136:10
176:12 192:8
266:20 278:10

states 8:9
226:8

station 180:1

status 43:25

stay 37:4 196:8

stayed 153:22

staying 153:7

stealing
197:15

Steele 21:14
228:11,14,17,
22 229:8

Stella 168:9,
10,11,16,20,25
169:3,7,12

stems 240:25

steps 21:7
218:4 225:12
227:2,6,7

Steve 21:22

sticker 190:16,
18

sticking
240:15

sticky 134:13,
22 135:1

sting 100:14

stolen 134:18
212:4 230:25
231:9,14

stop 18:14 21:7
37:23 112:7
120:18 121:8,
11,14 184:11
206:17 218:5
225:12 247:10
275:6,7

stopped 247:7

stopping
21:14

store 54:14

stored 54:10
59:2

story 169:8
243:14

street 121:19

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

165:17

**stress** 30:21, 24 31:4

**strike** 48:12 59:8 61:18 62:15 63:5 92:16 130:24 131:17 133:12 135:4 164:11 165:16 167:14 184:18 229:6

**stuff** 69:13 103:7 114:12 148:7 194:19

**subjects** 33:10

**submitted** 53:15

**subpoenaed** 141:1

**subpoenas** 51:4

**substance** 118:12 127:12, 16,20,24 128:4

**substances** 261:15

**substantive** 213:19,25

**sued** 43:3

**suggestive** 35:3 65:8 70:24

**summary** 208:2 265:17

**Sunday** 209:21

**supervised** 39:13

**supervising** 39:3,8

**supervision** 50:2,19 51:22 245:20

**supervisor** 245:9

**supposed** 179:2 211:22 212:17,24

223:10 241:10

**supposedly** 211:4

**Supreme** 35:9

**surprised** 171:1

**surprising** 171:5

**surrendered** 44:17

**surveillance** 166:1,9,13

**suspect** 102:20 107:20 142:16 174:21 188:14 253:10

**suspects** 34:2, 6 101:5 187:25

**suspicious** 144:21

**swear** 9:1

**sweep** 146:3

**sweetened** 146:2

**swore** 243:5

**sworn** 8:25

**Sylvia** 264:5,7

———————

**T**

**table** 57:14,24 98:11,17 109:16 118:17 125:5 236:18

**tactic** 115:5,7, 13,19,24 116:8, 23

**taking** 11:7 20:15 23:19 25:12 26:10 104:3 106:5 135:21 139:14 140:13 173:24 205:6 236:9,11, 14 237:21 238:2

**talk** 14:17 22:10 100:1,8 111:23 112:21 125:24 126:13 131:6 145:23 146:22,23,25 157:6,19 167:8 168:2,5,19,25 185:10,17 191:12 192:12 193:5 194:3,6, 9,13,16 203:3 219:21 220:1 228:4 230:2 271:25 274:15

**talked** 20:14,18 22:8 105:24 106:10 112:5 118:14 126:15, 18 131:2 156:25 181:15 182:11 191:21 192:1 196:14 202:5,16 203:5 226:23 227:10 230:12,17 251:10 262:22 267:5 274:14

**talking** 26:20 41:16,17 100:13 111:25 112:12 115:4 122:24 130:9 131:8,11 135:20,21,23, 24 136:1 154:1 155:16 156:17 159:9,12 163:6 168:24 185:16, 21 186:16 217:10 230:8 245:22

**task** 129:12 234:3

**tasked** 86:13

**Tax** 232:21

**taxes** 38:19,22

**Taylor** 14:24 16:15,19,25 17:7,13,23 18:2,12,16,24 19:9 20:24

21:5,8,15 25:24 90:12 97:12,15, 19 98:3,7,12 100:14 101:20 107:3,11,14,17, 19,23 108:12, 15,24 109:12, 19 110:4,10 113:23 118:22 124:4,13 125:2 128:15 129:18 131:23 132:3, 12 138:19 152:12,16 154:15,22 164:8 169:8 173:16,21 174:3 176:6 177:1,7,25 178:18 181:14, 20 182:17,21 183:1,5 186:5 187:2 189:8 201:4,13 207:22 208:25 226:4 234:13 235:4,18,23 236:4,19,25 237:7,13,21,25 238:14,18,21 239:13,16,20 240:3 248:8,10 249:5,16,20 250:13,20,25 251:12,16,23 252:11 258:25 262:11,19,20 264:23 265:8 278:16

**Taylor's** 123:22 234:24

**teach** 30:23

**team** 228:4

**technician** 8:3

**technique** 31:21 243:25

**techniques** 34:18 65:2 74:20

**telling** 19:18, 21 108:12 128:19 138:17

155:7 169:23 184:12 197:12 200:7 202:13

**ten** 58:8,10

**tend** 10:12,17

**tended** 82:7

**terminate** 69:10

**terminated** 44:9

**test** 33:17 74:16 118:23

**testified** 18:19 63:11 81:22 143:10 175:25 177:23 180:17 183:12 214:10 223:1 246:23 248:11 253:24 264:18,20 271:15 276:15

**testify** 222:7 223:19 224:22 226:20

**testifying** 118:23 124:2 176:6 258:13

**testimony** 9:2 25:5 118:20 141:23 167:4 176:9 178:6 199:9 238:25 248:14 252:1, 25 258:12 260:22,24 261:17 262:10, 14,24 263:23 264:7 268:1 274:9

**tests** 33:12,13, 14,15

**that'd** 202:9

**Theft** 91:16 194:2

**thief** 276:24

**thing** 11:5 25:18 41:17 51:1 99:18



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

105:20 108:5 110:11 118:8 126:7 128:10 175:7 204:10

**things** 15:18 41:24 47:23 52:9 53:6 91:4 145:24 155:21 159:9 166:25 229:5

**thinking** 59:13

**thought** 94:18, 25 152:10 162:13,14 230:16

**thousands** 195:16

**threaten** 114:23 115:12, 18,25 116:6,15, 24 236:25

**threatened** 108:24 114:16 117:9 242:17

**threatening** 115:7

**threats** 161:11 227:21,25

**three-** 271:3

**throw** 246:13

**throwing** 246:22

**thrown** 244:8

**tie** 195:11 210:11 219:15 270:3

**Tilburg** 8:3

**till** 239:6

**time** 9:17 11:1 13:8,12 17:3,5, 9 18:6 19:7 20:11,18,23 21:2 28:6 32:18,19 39:13 41:6 44:17 45:22 46:4,21 49:22 50:19

51:2,3,19 53:2 54:10,20 58:18 60:7 62:16,22 63:16 64:5,6,7, 13,20,25 65:5, 13,18 68:22 72:19,25 74:2,8 84:6 94:6 98:2 100:12 101:18 102:19,23 103:21 105:14 106:3 113:25 115:22 122:12 123:22,23 131:10,20 137:15,21 138:21 139:17, 25 140:9 141:3 143:24 145:10 150:3 152:13, 19 153:9 157:7, 25 159:11 160:16 162:12, 21 164:8 165:2 169:24 170:4,5 171:6,23 173:4, 8 180:18,19 181:21 185:3, 17,25 187:15 189:11 190:22 193:2,21 197:18 202:15 203:7 206:15 207:10,18,19 214:20 215:13, 17,21 216:18 228:25 230:15 235:23 238:7 239:19 244:25 245:8 252:8 259:15,19 261:10 263:17 269:19 270:9 272:19 274:10 275:14,18,19 277:13,21

**time's** 163:6

**times** 20:15 37:10 92:12 104:7 122:9 131:6 143:21 145:8 149:16 156:25 181:15 185:13 276:18

**today** 8:3,4 15:22 16:14 27:2,6 44:1 49:6 56:7 61:8, 23 62:3,13 63:6,11 80:10 89:24 118:24 127:7 137:25 141:23 144:14 170:18 180:15 181:3 185:6 196:24 207:16 228:24,25 252:16 254:13 274:16 276:15 278:14

**today's** 35:21 36:2

**told** 17:8 20:19 99:21 138:10, 16,18 146:4,21 147:16 148:3,6 149:9 154:13, 18,19 155:6,20 157:20 158:6,8, 9,13 174:12 181:19 182:16, 20,25 183:4,8, 13,19 189:12, 18,22 193:6 194:22 195:10, 15,22 198:4 199:5 200:3,19, 24 201:2,11 202:7,9,10 203:6,12 205:14,20 209:18 210:10 211:10 213:4, 21 217:17 218:24 219:5, 10,14,20,25 221:11,18,24, 25 222:25 223:7 224:12 226:20 231:7, 12 232:1 243:12,13,20 259:16 267:17 268:13 271:8 278:6

**top** 21:23 26:16 29:11 58:3 153:8 190:20

249:9

**topic** 84:16

**topics** 29:22

**totally** 18:17

**Townsend** 8:2

**track** 41:24 42:7

**traffic** 58:5 120:18 121:8, 11,14 166:25

**trafficking** 146:2,3 147:9 148:24

**train** 74:8

**trained** 29:23 33:20,21,23 34:1,5 73:25 85:9 184:7

**training** 24:15, 18,24 26:2,4 28:5 29:5,6,14 30:12 31:7,10, 11 33:2,5 34:9, 14,18,21,24 35:2,6,13 61:1, 9,15,24 63:7 74:3 80:25 81:3,5,14 82:24 83:4,14 86:9 103:20,22 184:15 272:3, 12,14,15,20,25 273:11,14,15 275:16,22 276:2,9

**trainings** 61:5

**transcribed** 185:7,11 207:15

**transcript** 176:24 206:24 208:2 216:16 233:5 268:19 269:10,14,25 270:6,14

**transcription** 184:21

**transfer** 119:14

**travel** 15:17

**travels** 67:21

**trial** 11:25 259:21,22

**trials** 38:25

**trick** 36:13 44:16

**trip** 136:25 194:3

**Trooper** 258:5

**trouble** 13:6 73:6 91:5,11 92:12,13

**truck** 10:11

**true** 17:8 45:19 46:17 96:2,14, 22 103:13 108:23 123:25 126:11,12 127:11 129:19 132:25 148:3 153:17 154:2 165:12 212:21 231:12 248:12 261:8 265:22 268:18,22 269:15 270:10, 22 271:7 278:7, 11

**trust** 73:2

**truth** 9:3,4 197:12 200:8, 19,25 202:13

**truthful** 102:7 133:8 200:15

**turn** 15:25 29:8 72:3 77:14 95:8 106:15 119:18 120:5 128:21 151:10 265:1 269:9

**turned** 214:17, 19 215:5,9,25 216:2 224:14 227:12,18 267:2



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

turning 212:20 214:12

tying 210:10 268:19 270:7

type 47:25 48:22 52:2 81:14

types 51:25

typically 95:7

typo 230:17

**U**

uh-huh 11:11 20:19 27:11 58:13 68:16 72:11 83:16 178:4

uh-uh 11:11

ultimate 40:21

unaware 99:5

unclear 252:1

undergo 272:12,25 273:7

underlying 22:1 103:16 131:7 132:24 181:6 185:14 234:14

understand 10:19 12:15 15:19 26:19,20 43:1 83:12 91:9 105:8 117:8 143:14 179:5 232:13 251:20

understanding 12:2 24:23 25:9,14 44:21 45:14 55:23 56:3 68:14 73:6 103:25 140:7 141:13,17 142:15 164:22 176:25 177:5, 12,14 187:20 189:13 251:16

253:25 264:14, 17

understood 10:23 74:14,15 102:19 274:8

unduly 35:3

unit 234:3

UNITE 92:22 93:1 232:22 234:3

United 8:8

unrelated 75:19

unwritten 63:18 64:9,15, 22 65:2,7,15,20

up.' 270:3

update 43:25

**V**

vaguely 23:2 186:4

Van 8:3

vehicle 22:13, 18 78:14 119:13,15 135:15 140:8 165:25 166:4,8

vehicles 71:15 135:10 138:23

verbal 54:2 153:6 218:22 222:15 223:21

verbally 11:10

Vernon 130:25 131:2 141:21, 22,24 142:4,7, 11,18,24 143:1, 6,13,19

version 240:16

victim's 121:19 141:15

video 8:3

videotape

30:12,15 31:7

view 239:17

violation 81:11

violence 75:9, 12,16,20

voice 13:1 217:13 245:11

volunteering 213:14

**W**

wad 195:17 221:12,19 270:15 271:6

Wagner 39:18

wait 166:5 190:19 239:6

waited 196:9 214:6

waiting 204:7

waived 233:17

walk 140:8 169:5

walking 157:4 186:17

wanted 32:21 37:15 111:23 142:9 145:23 146:23 167:16 169:3,7 191:11 192:12 193:4,7 199:20,22 202:8,12 203:21,22 205:4,8,20 209:17 211:9 213:23 243:14 265:12,25

wanting 120:2

warning 162:17

warrant 169:17 171:2,14,15 174:20 177:9 178:2 179:3,7,9 230:25 249:3,4

250:13

Warren 96:6 98:19,24 99:2 261:18,20 262:3

watch 166:5,24

watched 10:15

ways 91:18 156:24

weapon 72:15, 16

wear 119:14 151:5

wearing 142:16 196:5

week 74:5 133:13

weeks 170:7 175:24 246:19

What'd 90:19

wheeler 135:7

whereabouts 139:1,4

wife 59:18,19 131:13

Wiggins 244:25

Wilbur 37:20, 22,23

William 11:25 90:15 96:5 128:15 148:4 183:9 186:5 194:23 212:22

Williams 8:14 11:20 12:9,18 17:21 18:5 19:2,20 20:9 21:10,16 23:1, 12 24:1 35:23 38:15 39:22 40:23 46:9 48:4,15 50:6 52:5 55:2,5 56:4,23 57:2, 11,16,20,23 58:1,5,8,12,21

60:13 62:11,20 63:2 64:11,18 65:11,23 67:1, 15 73:5,11 74:11,22 77:8 79:22 80:23 81:25 82:10,20 83:7,10,13,16, 19 85:2,20 86:17 87:4,10, 15,20,25 88:5, 11,14,18,23 89:2,7 90:6 91:7,9,20 92:21 93:14 94:15,21 97:2,25 99:14 100:3,20 101:7 104:6 105:3,11 108:2,16 109:2, 22 110:2,7 112:2 115:3,10, 15,21 116:9,13, 17 117:1,5,14 119:3 120:2,5,8 121:4,23 122:1, 21 124:8 126:24 128:9, 25 129:3,5 130:8 133:25 134:11 135:14 137:9,18 138:15 142:2, 23 143:9,12,23 144:25 147:7, 20,22 149:3 153:16,18 154:10 157:16 158:21 160:12, 16,20 161:19 162:10 163:3, 10 167:20 168:22 169:11 170:2 171:23 172:21 173:17 174:4,24 175:4, 18 176:8,15 178:20 179:20 181:8 183:22, 24 185:3 187:8, 11 188:3,8 189:5 190:10, 22 197:23 198:24 199:13 200:11,23 201:6,15 205:12,19

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

308

207:10 208:9
209:7 210:7
214:4,25 215:3,
13,15 216:16,
25 218:8 219:6
220:10,13,24
221:16 222:6,
14 223:5,11,17,
19 224:17,22
225:6,15,24
226:12,19
228:23 229:14
231:17 232:16,
18 233:1,11,15
236:20 237:2,5
240:8 241:3,14
242:13 243:3,
23 245:22,24
246:2,16 248:1
271:23 275:10
277:19

**Wilson** 96:7

**Winchester**
32:12

**wise** 189:6

**withdraw**
85:15 173:25
213:20 237:12

**withholding**
70:18 87:3,18
88:8,21

**witness.'**
119:25

**witnesses**
33:20 34:6
64:23 65:3
70:21 84:10
85:6,10,18
87:14 88:4,17
89:6 95:19
101:4 104:22
105:2 111:15,
19 114:16
115:7 125:24
126:3 133:19
135:1 242:25
246:9 253:7,16,
20

**woke** 154:14

**woman** 11:24
195:11 210:10

**word** 24:2 52:6
67:21 105:4
108:5 146:10

**words** 86:17
115:11

**work** 32:15
38:19,22,24
39:19 89:23
125:21 254:16
255:8 256:10,
12,14,20 257:8,
10 258:7

**worked** 18:9
19:3 32:10
50:19 51:2 97:6
114:10 171:7
197:16 254:18,
24 255:22
256:21 259:7
272:18

**working** 50:2
92:18 114:10
241:16 255:24

**works** 117:7

**worried** 50:10
73:14

**worse** 30:10

**wrecker** 78:14

**wrecks** 52:9

**Wright** 8:17
11:19 12:19
17:20 18:4
19:1,11,19
20:10 22:24
23:9 24:4 41:21
42:2,4,7 50:8
56:5 80:22
82:11,21 91:6,
24 92:19 93:3,
15 97:9,23
99:15 100:5,16
101:6 103:2,12,
19 104:5,24
106:1,4,18
108:1 109:3,14,
21,25 112:3
114:18 115:2,9,
14,20 116:1,11,
16,25 117:4
119:2 121:15,

21 124:7
132:14 134:2,5,
12 135:13
140:6 142:21
143:5,8 144:6,
8,24 146:6
147:6 149:1
153:15,25
154:5,9 157:14
158:18,20
160:11 161:17,
24 162:4,9
167:19 168:21
170:3 171:4
172:19 175:3,
10,17,23 176:7
177:11 178:7,
13,19 179:4,13,
19 180:2
181:22 182:24
183:21 184:13,
17 188:9
189:17 190:8
197:9,22
198:11,23
199:3,19
200:10,21
201:5,17,23
202:3 203:10
205:1,11,18
206:5 207:6,8
208:3,6,8
209:6,8 210:6,
22 211:24
212:12 213:16
214:3,13 218:2,
7,13,21 219:2,
18,22 220:4,9,
12,23 221:13,
20 222:5,13
223:4,6,12,18
224:2,16,21
225:5,14,23
226:6,11,18
227:19 228:5,
20 229:12
230:6,19
231:19 232:2,7
234:4,10,21
235:1,7,11,20,
25 236:21
237:3,9,18,22
238:24 239:8,
22 240:7,14,22
241:2,13,24
242:3,8,12,22

243:2,10,18
244:1,13
245:16,23
246:3,7,10,15,
24 247:1,3,8
258:1,2 260:7
269:1,6 271:21
276:20 277:3,7,
11,20,24 278:3,
17

**write** 148:7

**written** 63:22
80:15,16 82:4,
13,15 84:13
85:4 106:15
110:14 126:21

**wrong** 94:25
230:4

**wrote** 229:18,
24

———————
**Y**
———————

**year** 74:6
272:13

**yearly** 273:7

**years** 17:8 28:9
32:17 84:18
174:19

**yell** 242:25

**yelled** 242:5

**yelling** 242:15

**York** 8:18 14:4,
5,8,12 18:9,11,
15 19:17 20:2,
8,16,22 21:3
22:3,7,12,16,20
23:16,19,21
24:9 97:21
98:17 99:21
100:11 103:10
104:13,14
105:8,13,15,25
107:23 108:4,
11,23 111:6,10,
14,19,25
112:11,16,18,
23 113:1,4,14,
23 114:2,15
115:6 117:13,

16 118:21
120:14,19
121:13,17
122:6,10
123:16 124:3
128:8,14
129:14,16,24
130:2,7,12,14,
17,20,24 131:6
132:23 133:7,
10,12,18
134:10,16,21,
24 135:1,4,6,21
136:6,11 137:3,
7,10 138:6,10
139:11 140:2
144:11 145:12,
15,16,21,23
146:1,15,20
147:13,16,17,
25 148:4,7,16
149:10 159:12,
21 160:1,6
161:1,3,11,14,
20,21 162:20
164:4,7,11,14
165:13 167:16
168:6,19,23
169:19 170:10
171:1,6,9,20
172:4,11,16,23
173:5,9,14,19
174:1,6,10
175:25 176:3,
24 177:23
178:11,16
179:16,24
180:4,23 181:9,
19,24 182:9,13,
16 183:13,19
185:1,10,19
186:1,9,21
187:1,24
188:13,24
189:23 190:4,
25 191:5
192:21,24
193:9 195:4
196:18,19
197:1,5 198:7,
15,17 200:13
201:2,9,11,20
202:6,14,17,19
203:3,18 204:1,
4,5,15,16,23
205:4,8,15,22

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

Kentuckiana
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

206:1,6,9,13
208:19 209:4
210:2,4,20
211:15 212:10,
18 213:7,21
214:7,11,16
215:11,18
216:3 217:6,11,
17,22 218:1,19,
24 219:5,10,14,
20,25 220:8,16,
21 221:7,11,18,
24 222:3,12,21,
25 223:7,15,25
224:8,12,20
225:3,21 226:2,
14,16 227:5,7,
16 228:2,18,24
229:18 231:21
234:1,23
235:16 236:14
237:20 239:5,
12 244:21
245:14 246:13,
20 247:7,10
249:12,15
252:18 254:5
258:3 260:20
262:8,13 266:4,
17,21 267:1,17
268:6,14,22
269:10,19
270:2,9,15,25
271:8,13,15
274:9,21 275:4,
5 277:21 278:7,
9

**York's** 36:17
97:6 99:17
104:20,25
111:16 112:22
113:8,11 123:5,
12 170:6 176:9
177:17 178:5
202:11 206:18
226:8 229:1
245:3,11,24
268:6 275:7

**you-all** 183:14

**young** 158:25

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com