

# NO. 17-CV-84

## AMANDA HOSKINS, ET AL.

## V.

## KNOX COUNTY, ET AL.

**DEPONENT:**

**DEREK EUBANKS**

**DATE:**

**June 06, 2018**



schedule@kentuckianareporters.com

877.808.5856 | 502.589.2273

www.kentuckianareporters.com

LOUISVILLE LEXINGTON LONDON FLORENCE CINCINNATI INDIANAPOLIS ORLANDO JACKSONVILLE TAMPA

1      IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN

2                    DISTRICT OF KENTUCKY

3                        NO. 17-CV-84

4                    HON. DAVID L. BUNNING

5                    HON. CANDACE J. SMITH

6

7

8

9

10               AMANDA HOSKINS, ET AL.,

11                      PLAINTIFFS

12

13                          V.

14

15               KNOX COUNTY, ET AL.,

16                      DEFENDANTS

17

18

19

20

21

22

23   DEPONENT:   DEREK EUBANKS

24   DATE:       JUNE 6, 2018

25   REPORTER:   LACEE TOWNSEND



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 2

1                    APPEARANCES
2
3    ON BEHALF OF THE PLAINTIFFS, AMANDA HOSKINS, ET AL.:
4    AMY ROBINSON STAPLES
5    LOEVY & LOEVY
6    311 NORTH ABERDEEN STREET
7    THIRD FLOOR
8    CHICAGO, ILLINOIS 60607
9    TELEPHONE NO.: (312) 243-5900
10   E-MAIL: ELLIOT@LOEVY.COM
11
12   ON BEHALF OF THE DEFENDANTS, BRIAN JOHNSON, MARK
13   MEFFORD, JACKIE JOSEPH AND DALLAS EUBANKS:
14   CODY WEBER
15   KENTUCKY STATE POLICE GENERAL COUNSEL
16   919 VERSAILLES ROAD
17   FRANKFORT, KENTUCKY 40601
18   TELEPHONE NO.: (502) 573-1636
19   E-MAIL: SHAWNA.KINCER@KY.GOV
20
21
22
23
24
25

Page 4

1            APPEARANCES (CONTINUED)
2
3    ON BEHALF OF THE DEFENDANTS, JOHN PICKARD AND DEREK
4    EUBANKS:
5    JASON WILLIAMS
6    WILLIAMS FARMER & TOWE
7    303 SOUTH MAIN STREET
8    P.O. BOX 3199
9    LONDON, KENTUCKY 40743
10   TELEPHONE NO.: (606) 877-5291
11   E-MAIL: JASON@WFTLAW.COM
12
13   ALSO PRESENT:  AMANDA HARRIS, VIDEOGRAPHER; JOHN
14   PICKARD, DEFENDANT
15
16
17
18
19
20
21
22
23
24
25

Page 3

1            APPEARANCES (CONTINUED)
2
3    ON BEHALF OF THE DEFENDANTS, JASON YORK AND JASON BUNCH:
4    DERRICK T. WRIGHT
5    STURGILL, TURNER, BARKER & MOLONEY, PLLC
6    333 WEST VINE STREET
7    SUITE 1500
8    LEXINGTON, KENTUCKY 40507
9    TELEPHONE NO.: (859) 255-8581
10   E-MAIL: DWRIGHT@STURGILLTURNER.COM
11
12   ON BEHALF OF THE DEFENDANTS, MIKE BROUGHTON AND CITY OF
13   BARBOURVILLE:
14   LICHA H. FARAH, JR.
15   WARD HOCKER THORNTON
16   333 WEST VINE STREET
17   SUITE 1100
18   LEXINGTON, KENTUCKY 40507
19   TELEPHONE NO.: (859) 422-6000
20   E-MAIL: LFARAH@WHTLAW.COM
21
22
23
24
25

Page 5

1                    INDEX
2                                           Page
3    PROCEEDINGS                              7
4    DIRECT EXAMINATION BY MS. STAPLES        8
5    CROSS EXAMINATION BY MR. FARAH          65
6    EXAMINATION BY MR. WEBER                68
7    EXAMINATION BY MR. WRIGHT               71
8    EXAMINATION BY MR. WILLIAMS             73
9    REDIRECT EXAMINATION BY MS. STAPLES     74
10
11                  EXHIBITS
12                                           Page
13   1     AUDIO RECORDING                   48
14   2     EUBANKS CASE REPORT               58
15
16
17
18
19
20
21
22
23
24
25

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 6

STIPULATION

The deposition of DEREK EUBANKS taken at the HOLIDAY INN
EXPRESS & SUITES, 506 MINTON DRIVE, LONDON, KENTUCKY
40741 on WEDNESDAY, the 6TH day of JUNE, 2018 at
approximately 9:27 a.m.; said deposition was taken
pursuant to the KENTUCKY Rules of Civil Procedure.

It is agreed that LACEE TOWNSEND, being a Notary Public
and Court Reporter for the State of INDIANA, may swear
the witness and that the reading and signing of the
completed transcript by the witness is not waived.

<!-- Page 7 -->

Page 7

PROCEEDINGS

VIDEOGRAPHER:  We are now on the record.  My
name is Amanda Harris.  I'm the video technician
today, and Lacee Townsend is the court reporter.
Today is the 6th day of June, 2018, and the time is
9:27 a.m.  We are at the Holiday Inn Express &
Suites located in London, Kentucky to take the
deposition of Derek Eubanks in the matter of Amanda
Hoskins, et al. v. Knox County, et al., pending in
the United States District Court for the Eastern
District of Kentucky, Number 17-CV-84.  Will Counsel
please identify themselves and whom they represent
for the record?

MS. STAPLES:  Amy Robinson Staples for the
plaintiffs, Amanda Hoskins and Jonathan Taylor.

MR. WILLIAMS:  I'm Jason Williams.  I'm here on
behalf Defendant Derek Eubanks, John Pickard, and
Knox County.

MR. WRIGHT:  Derek Wright on behalf of
Defendants Jason York and Jason Bunch.

MR. WEBER:  Cody Weber on behalf of Defendants
Mark Mefford, Brian Johnson, Jackie Joseph, Dallas
Eubanks, and Kelly Farris.

MR. FARAH:  Licha Farah on behalf of Michael
Broughton and the City of Barbourville.

<!-- Page 8 -->

Page 8

VIDEOGRAPHER:  Thank you.  Mr. Eubanks, will
you please raise your right hand to be sworn in by
the court reporter.

COURT REPORTER:  Do you solemnly swear and
affirm that the testimony that you're about to give
will be the truth, the whole truth, and nothing but
the truth?

THE WITNESS:  Yes.

COURT REPORTER:  Thank you.

DIRECT EXAMINATION

BY MS. STAPLES:

Q   Good morning, Mr. Eubanks.

A   Good morning.

Q   You warmed up any?

A   Yeah, we're getting there.

Q   Good.

A   Thanks for getting the air turned off.

Q   You're welcome.  All right, sir.  Have you
ever been deposed before?

A   Yes.

Q   And when was that?

A   Oh, it's been years ago.

Q   Were you a party in that case?

A   I was a witness.

Q   Just a witness?

<!-- Page 9 -->

Page 9

A   Uh-huh.

Q   Was it a result of your employment?

A   Not with the Sheriff's office, no.

Q   Okay.  What -- so what was the case that you
were deposed in?

A   It was a radio station.  I managed a radio
station and the station got sued.

Q   Okay.  And you were just a witness in that
case?

A   Yeah.

Q   Okay.  So it's been a little bit since you did
that?

A   Yeah, two or three years.

Q   Okay.  Well, let me go over just some of the
rules really quickly.  I'm going to ask you some
questions, first on behalf of Jonathan Taylor and
Amanda Hoskins.

A.   Uh-huh.

Q.   While I'm asking you questions, some of the
gentleman over here may have objections, if you'll let
them state their objections, you'll then be able to
continue with your answer, because we don't have a judge
here to say whether it's preferable or not.

A   Right.

Q.   If you can answer verbally instead of shaking

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 10

1  your head, say yes, no --
2     A.   Yes.
3     Q.   -- whatever the answer is, that will help the
   court reporter.  If I ask a question that is unclear,
   please just let me know that, and I'll be happy to
   rephrase the question.
7     A    Okay.
8     Q    We can take any breaks that you need to take.
9  We just ask that you finish answering the question
10 before we do so.
11    A    Okay.
12    Q    Okay.  All right. Are you a high school
13 graduate, sir?
14    A    Yes.
15    Q    Where did you go to high school?
16    A    Corbin High School.
17    Q    Did you take any post high school education?
18    A    Uh-uh.  No.
19    Q    Okay.  Do you have any experience with any
20 other type of training, not necessarily college?  Did
21 you take any, like, vocational training?
22    A    I took welding when I was in high school.
23    Q    Okay.  Have you ever been in the military?
24    A    No.
25    Q    Okay.  I asked you just a second ago, I think,

Page 11

1  but have you ever been a party to a lawsuit or just a
2  witness in a lawsuit?
3     A    Just a witness.
4     Q    Okay.  Are you currently employed?
5     A    Yes.
6     Q    Where are you currently employed, sir?
7     A    With Eubanks Broadcasting, Eubanks Electrical
8  Supply, and with the County Sheriff's Department.
9     Q    And which Sheriff's Department?
10    A    Whitley.
11    Q    Whitley County, okay.  What's your position
12 there, sir?
13    A    Deputy.
14    Q    And who is the sheriff there?
15    A    Colan Harrell.
16    Q    I know Mr. Harrell.  Were you employed at one
17 time with the Knox County Sheriff's Department?
18    A    Yes.
19    Q    When was that, sir?
20    A    2004 to '14, '15.
21    Q    Okay.  And I want you think back to when you
22 first were hired for -- with the Knox County Sheriff's
23 Department.  First of all, what was your position when
24 you were first hired?
25    A    Just deputy.

Page 12

1     Q    Deputy.  Were you interviewed for that
2  position?
3     A    Yes.
4     Q    Do you recall who interviewed you?
5     A    It would have been the sheriff.
6     Q    And who was the sheriff at the time?
7     A    John Pickard.
8     Q    Did you have to take any type of written test?
9     A    No.
10    Q    Okay.  Had you ever worked in law enforcement
11 prior to that?
12    A    I was a volunteer for 15 years.
13    Q    A volunteer with who?
14    A    Knox County Sheriff's Office.
15    Q    Okay.  What did you do as a volunteer?
16    A    I assisted other deputies and rode with the
17 State Police and assisted them.
18    Q    And when you say, "you assisted", what were
19 some of the duties that you assisted with?
20    A    I would go on complaints with them and things.
21    Q    Did you interview witnesses?
22    A    I didn't do any interviews.  I may have sit in
23 on some, but I never done any interviews then.
24    Q    Okay.  As a volunteer, like, did you have the
25 power to pull someone over?

Page 13

1     A    I didn't have a car.
2     Q    Okay.  Did you have the power to arrest
3  someone as a volunteer?
4     A    Yes.  Yes, it's called a special deputy in
5  Kentucky.
6     Q    Special Deputy, okay.
7     A    It's unpaid service.
8     Q    So for 15 years you were special deputy, and
9  then in 2004, is when you became an official deputy? I'm
10 not sure what the correct termination is, but a paid
11 deputy, how about that?
12    A    Yeah, I went from free to paid.
13    Q    Okay.  I think I would have done that a little
14 bit quicker, but okay.  So either as a special deputy or
15 as a deputy with the Knox County Sheriff's Office, did
16 you receive any training on interviewing witnesses?
17    A    I mean, we go to the in-service.  I mean,
18 that started in '99.
19    Q    Okay.
20    A    I mean, you go to that.  I mean, as far as me
21 going to the academy or full-blown academy, no, I've
22 never done that, but I've done all the in-services once
23 they enacted that, I think that was in '99, maybe.
24    Q    Okay.  So what is the in-service?
25    A    It's training, different topics, different

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 14

1  things.
2      Q      Who was in charge of the training?
3      A      Department of Criminal Justice.
4      Q      And where did that training occur?
5      A      Well, most of time it's at Richmond, but it
6  could be, you know, have remote locations.
7      Q      Like at the College of Justice or Criminal --
8      A      Yeah, Department of Criminal Justice, yes,
9  ma'am.
10     Q      At EKU?
11     A      Yes.
12     Q      Okay.  So that started, you think, in '99, did
13 that -- were those just, like, one course at a time --
14     A      Forty hours a year --
15     Q      -- were you there for two or three?
16     A      -- is what you have to have.
17     Q      Forty hours.  Okay.  Can you recall if you
18 received any specific training at that in-service on
19 interviewing witnesses?
20     A      I'd have to look at the training schedule, I
21 mean --
22     Q      Okay.  But off the top of your head you can't
23 recall that?
24     A      No.
25     Q      Can you recall if you had any training with or

Page 15

1  from the Knox County Sheriff's Office on interviewing
2  witnesses?
3      A      As far as in-house training?
4      Q      Yes, sir.
5      A      No.
6      Q      Okay.  Can you recall if you had any specific
7  training on interviewing suspects?
8      A      No, not -- not specific.
9      Q      Okay.  And that would be true of the Knox
10 County Sheriff's Office?
11     A      Right.
12     Q      Okay.  Can you recall any training you had
13 specifically from the Sheriff's Office?
14     A      The whole training was done by the Department
15 of Criminal Justice.
16     Q      Okay.  In that training with the Department of
17 Criminal Justice, were you taught how to properly write
18 reports?
19     A      I don't know.  Once again, I need to look at
20 the -- my training list.
21     Q      When you first started working for the
22 Sheriff's Office, did you know what was required to be
23 in a report?
24            MR. WILLIAMS:  Are you saying as a special
25        deputy or as a paid deputy?

Page 16

1            MS. STAPLES:  Oh, I'm sorry.
2  BY MS. STAPLES:
3      Q      Well, as a special deputy, did you write
4  police reports?
5      A      No.
6      Q      Or case reports?
7      A      No.
8      Q      As a paid deputy, did you write reports?
9      A      Yes.
10     Q      When you first began as a paid deputy, were
11 you given any training on how to write a report?
12     A      No.
13     Q      Were you given any training on what the
14 contents should be in that report?
15     A      No, not -- I mean, unless I had something at
16 the Department of Criminal Justice.  I mean, I'd have
17 to, like I said, I'd have to look at the training
18 schedule.
19     Q      Okay.  Did the Knox County Sheriff's Office
20 give you any training on interrogation techniques?
21     A      As far as in the office?
22     Q      Yes, sir.
23     A      No, the -- like I said, all the training was
24 done at the Department of Criminal Justice in Richmond.
25     Q      Okay.

Page 17

1      A      Over at one of their remote sites.
2      Q      Sure.  So did you have any training from the
3  Department of Criminal Justice on evidence retention?
4      A      Shoot, I wish I had that list.  I had last
5  year or a year before.
6      Q      Okay.
7      A      Something on evidence, but I can't remember
8  the title of it.
9      Q      Okay.  I understand.  But thinking about to,
10 like, 2003, can you recall then if you had any
11 training --
12     A      No.
13     Q      -- on evidence retention?  Sir, are you
14 familiar with the case Maryland v. Brady and what that
15 requires police officers to do?
16            MR. WRIGHT:  Object to form.
17            MR. WILLIAMS:  I'll join.
18     A      I've heard it.  I mean, you can tell me there
19 and I'm probably going to know what it is.
20     Q      Okay.  But just off the top of the head
21 you're not --
22     A      No.
23     Q      -- sure?  Okay.  That's fine.  Can you tell me
24 what you did today to prepare for this deposition?
25     A      I looked over my information that my attorney

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 18

1 had given me.
2   Q   Okay.  And can you recall what type of
3 information that was?
4   A   It was my answers to some of the questions
5 that had been given to me.
6   Q   Your interrogatories?
7   A   Yes.
8   Q   Did you review any deposition testimony?
9   A   I looked at some of Sheriff Pickard's.
10   Q   You did?
11   A   Yes.
12   Q   Okay.  Were there just specific parts of
13 Sheriff Pickard's deposition testimony that you
14 reviewed?
15   A   I just skimmed through it here and there and
16 read different parts.  I think it's about that thick.
17   Q   okay.  Did you choose which parts to read or
18 were you asked to read specific parts?
19   A   No, I just -- I mean, he give me the whole
20 stack and I just skimmed through.
21   Q   Skimmed through it.  Did you review anyone
22 else's deposition testimony?
23   A   No.
24   Q   Do you know why you were asked to look at
25 Sheriff Pickard's deposition testimony?

Page 19

1       MR. WILLIAMS:  Any conversations he's had with
2   counsel are not discoverable.  Requires him to
3   speculate.
4   A   I wasn't told anything.
5 BY MS. STAPLES:
6   Q   Okay.  Other than your attorneys, did you
7 speak with anyone else about your testimony today?
8   A   No.
9   Q   Okay.  You didn't speak with Sheriff Pickard
10 about it?
11       MR. WILLIAMS:  Are you saying outside of
12   meetings with counsel?
13       MS. STAPLES:  Yes, sir.
14       MR. WILLIAMS:  Okay.
15       THE WITNESS:  No.
16       MR. WILLIAMS:  You can answer if you know.
17 BY MS. STAPLES:
18   Q   Okay.  So on your way here today, you-all
19 didn't have a discussion about what was going on?
20   A   No.
21   Q   Okay.  How about your brother, have you spoken
22 to him about the depositions in this case?
23   A   No.
24   Q   Did you speak with him about the deposition
25 testimony that he gave?

Page 20

1   A   No.
2   Q   Okay.  And you didn't discuss the fact that
3 you were going to be given a deposition today?
4   A   No.
5   Q   Okay.  So you said that you started as a paid
6 deputy with --
7   A   No, volunteer.
8   Q   I'm sorry.
9   A   Special deputy, unpaid.
10   Q   Yes, sir, but you started as a paid deputy
11 with the Knox County Sheriff's Office in 2003; is that
12 correct?
13   A   I'm thinking four.
14   Q   Oh, 2004, is that what you told me?  I'm
15 sorry.
16   A   Once again I --
17   Q   You did say 2004.  I apologize.
18   A   It's two or three.  I can't remember exactly.
19   Q   I understand.  How long were you a deputy with
20 the Knox County Sheriff's Office, a paid deputy?
21   A   From -- if I'm correct on my date, 2004 'til
22 the end of his term, which was end of '14?
23       MR. WILLIAMS:  You can't ask him.
24   A   It's the end of '14, I think.
25   Q   That's fine.  At some point, did you become

Page 21

1 chief deputy --
2   A   Yes.
3   Q   -- of the Knox County Sheriff's office?  When
4 did you become chief deputy?
5   A   I couldn't tell you.
6   Q   You don't know?
7   A   I don't know the date.
8   Q   Were you chief deputy for just a couple of
9 years or was it more like five or six years, ten years,
10 can you give me an estimation?
11   A   It was probably ten.
12   Q   Okay.  And were you chief deputy when ended
13 your employment with the Knox County Sheriff's Office?
14   A   Yes.
15   Q   And why did that employment end?
16   A   Sheriff lost.
17   Q   Okay.  As chief deputy, what were your duties
18 with the Knox County Sheriff's office?
19       MR. WILLIAMS:  Object to form and make a
20   continuing objection to duties, it may have legal
21   connotation, but that objection continued and made.
22   You can answer the question.
23   A   Say it again.
24 BY MS. STAPLES:
25   Q   What were some of your responsibilities as

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 22

1  chief deputy with the Knox County Sheriff's Office?
2      A   I made the schedule for the other deputies,
3  scheduled their training, pretty much let them pick it,
4  and then I would do the paperwork and submit it to
5  Richmond.  Review the crash reports and accidents to
6  make sure that everything should be in there was there.
7  Help with policy.  Help with budget.
8      Q   What do you mean by helping with policy?
9      A   As far as getting things that we put in it.
10     Q   Did you determine what was to be in the
11  policies?
12     A   Not solely myself, no.
13     Q   Okay.  But you assisted in determining --
14     A   Yes.
15     Q   -- what policies should be within Knox County
16  Sheriff's Office?
17     A   Yes.
18     Q   Okay.  We'll talk some more about that.  So
19  while you were with the Knox County Sheriff's Office, I
20  think you said that you worked under Sheriff John
21  Pickard; is that correct?
22     A   Paid.
23     Q   Yes, sir.
24     A   Yes.
25     Q   I'm sorry.  From here on out, let's just

Page 23

1  assume I'm asking about your paid time --
2      A   Okay.
3      Q   -- is that okay?
4      A   So we're done with special, okay.
5      Q   Okay.  Because I'm going to forget to ask that
6  every single time.  So as a paid deputy, Sheriff Pickard
7  was the --
8      A   Yes, ma'am.
9      Q   -- sheriff at the time; is that correct?
10     A   Yes.
11     Q   And was that true throughout your entire -
12     A   Paid time, yes.
13     Q   -- paid career?
14     A   Yes, yes.
15     Q   Okay.  Did you have any -- I assume that you
16  had to answer to Sheriff Pickard, for a lack of a better
17  term.
18     A   Yes.
19     Q   Is that true? He was --
20     A   Yes.
21     Q   -- your supervisor?
22     A   Yes.
23     Q   Did you have any other supervisors at the Knox
24  County Sheriff's Office?
25     A   No, nobody that --

Page 24

1      Q   Okay.  Were you kind of next in line from
2  Sheriff Pickard --
3      A   I guess --
4      Q   -- as a chief deputy?
5      A   -- I guess you could say that, yes.
6      Q   Okay.
7      A   As far as the deputies go.
8      Q   Would you talk with Sheriff Pickard about the
9  specific cases on which you were working?
10     A   No.
11     Q   Not at all?
12     A   I mean, he manned the work days, and I worked
13  the nights.
14     Q   Okay.
15     A   So I mean, unless I was going to court, I
16  mean, most of the time I wasn't there during the day.  I
17  mean, we'd talk about some, but nothing -- nothing big.
18     Q   If you had a problem with a case and you
19  wanted to discuss that with someone, who would you
20  discuss that with?
21     A   If I had a problem with a case, like, what do
22  you mean?
23     Q   If you ran into a roadblock in your
24  investigation and wanted some further ideas on what to
25  do on the case, who would you discuss that with?  Would

Page 25

1  you discuss it with anyone?
2      A   I might discuss it with a sheriff.  I might
3  discuss with another deputy.
4      Q   Okay.  So was Sheriff Pickard aware of the
5  cases on which you were working?
6          MR. WILLIAMS:  Requires him to speculate.  He
7  can answer.
8      A   Every one that I worked?  I would say no.
9      Q   Okay.  But he was aware of some of the cases,
10  to your knowledge?
11     A   I'm sure he -- I'm sure.
12     Q   Did you ever have to check in with Sheriff
13  Pickard?
14     A   I spoke with him about every day.
15     Q   Okay.  Would that be, like, at the beginning
16  of the shift or --
17     A   It could be through during the day, anytime.  I
18  mean --
19     Q   Okay.  Did you prepare written reports of the
20  cases on which you were working?
21     A   Did I do --
22     Q   Did you prepare written reports?
23     A   Yes, if I'd done a case, yes.  If it's my
24  case, yes.
25     Q   Okay.  And did you turn those written reports

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 26

1   into anyone?

2       A    Yes.

3       Q    Who did you turn those into?

4       A    I went into the office.

5       Q    Was there a specific person at the office?

6       A    No.  We just had a place that they were put

7   in.

8       Q    Just had, like, a bin that you put them in

9   or --

10      A    Uh-huh.

11      Q    Okay.  And what happened to those reports

12  after they were placed in that bin?

13      A    Most of the time, I got them and reviewed

14  them.  I mean, as far as reading them in detail, no, I

15  didn't do that, but just looked over them, make sure,

16  you know, if it's supposed to have pictures or

17  attachments, if all the papers were there.

18      Q    Okay.  So one of your responsibilities was to

19  review the case reports written by other deputies?

20      A    Right.

21      Q    Did anyone review the case reports that you,

22  yourself, authored?

23      A    No.  I think my review was basically, are all

24  the parts there, like, if you got auto accident, did

25  they turn the CD in with the pictures.

Page 27

1       Q    Did you ever take audio recordings of

2   witnesses?

3       A    Yes.

4       Q    Did you take audio recordings of suspects?

5       A    Yes.

6       Q    What was your standard mode of operation

7   regarding those audio recordings?  Did you turn those

8   in --

9       A    Yeah, I returned --

10      Q    -- with your reports?

11      A    Yes.

12      Q    And then, so you would put those in the bin as

13  well; is that correct?

14      A    Yeah.

15      Q    Your reports in the bin?

16      A    And then I get them back out.

17      Q    And then you get them back out, okay.  So you

18  were kind of reviewing your own --

19      A    Yeah.

20      Q    -- your own work?

21      A    Like I said, I'm not reviewing it as far as

22  the details of the investigation, it's just, are the

23  components there.

24      Q    Okay.

25      A    Should there been recordings, should there

Page 28

1   have been pictures, should there have been 41s, you

2   know, different things like that.

3       Q    Yes, sir.  And, to your knowledge, did Sheriff

4   Pickard ever review your written reports?

5       A    I don't know if he did or not.

6       Q    Okay.  You mentioned earlier about assisting

7   with the policy making --

8       A    Uh-huh.

9       Q    -- as the chief deputy, so when you first

10  became a paid deputy --

11      A.   Uh-huh.

12      Q.   -- with the Knox County Sheriff's Office, were

13  there procedures and policies in place, written

14  procedures and policies in place?

15      A    No, not that I can remember.

16      Q    Okay.  You don't ever remember being provided

17  with any written --

18      A    To start with --

19      Q    -- policies?

20      A    -- this, no.

21      Q    Okay.  At some point, during your career with

22  the Knox County Sheriff's Office, were written policies

23  then drafted?

24      A    They were -- we started on some.

25      Q    Okay.  Can you recall when you started on

Page 29

1   those policies?

2       A    No, ma'am.

3       Q    So the policies of what you're describing,

4   that was first time the Knox County Sheriff Office had

5   policies while you were employed there?

6       A    They may have before I was there.  They may

7   have had -- you could -- we could adopt the county's

8   policy.

9       Q    Okay.  But as far as you --

10      A    In whole or parts.

11      Q    As far as you're aware, when you first started

12  with the Knox County Sheriff's Office as a paid deputy,

13  there were not policies and procedures in place?

14      A    We didn't have our own, no.

15      Q    Okay.  And I'm assuming that would be true

16  when you started as a volunteer deputy as well?

17      A    I couldn't tell you what they had then.

18      Q    Okay.  But you, yourself, did not review any

19  written policies and procedures?

20      A    Are you saying prior to --

21      Q    Prior to when you first enacted them after

22  you'd been employed with the Sheriff's Office.

23      A    I think there was some -- some things when I'd

24  become a paid deputy.  There were some things that I

25  signed in the beginning.  I can't remember.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 30

1    Q    Can't remember what those would be?

2    A    Right.  Other than normal employment
3    paperwork.

4    Q    Yes, sir.

5    A    Something about policies and --

6    Q    Do you have any estimation of when it was that
7    you helped draft the policies that you're speaking of,
8    the initial policies?

9    A    Through the whole time when I was a paid
10   deputy.

11   Q    So when you first began in 2004 as a paid
12   deputy?

13   A    Yeah, I mean, it would have started somewhere
14   in there, yes.

15   Q    But you're not sure when?

16   A    I don't have a date, no, ma'am.

17   Q    Do you think there were written policies and
18   proceed -- in place in 2010?

19   A    Yes.

20   Q    Okay.  And you, yourself, helped draft those
21   written policies?

22   A    Yes.

23   Q    Can you tell me what any of those policies
24   pertained to?

25   A    Shoo, not off the bat.  Basically, reports,

Page 31

1    what needed to be in them, citations, employment, your
2    records, where they was kept.  And maybe some other
3    things, I don't --

4    Q    Can you recall if you helped enact any
5    policies regarding interviewing witnesses?

6    A    No.

7    Q    Can -- no, you don't recall that, or no?

8    A    No.  All that would have been under your
9    training.

10   Q    Okay.  Would that be true, also, of
11   interviewing suspects, there would not be a policy --

12   A    No.

13   Q    -- enacted on that?

14   A    That would fall under their training.

15   Q    Okay.  So once you did enact the policies that
16   you were speaking of, were those ever revised during
17   your employment with the Knox County Sheriff's Office?

18   A    I'm sure some of them -- some of the sections
19   were revised and some were added.  It was basically a
20   work-in-progress.

21   Q    Okay.

22   A    It's kind of hard to -- it's a seven-man --
23   seven-deputy sheriff department, so it's tough to do
24   everything.

25   Q    Yes, sir.  I understand that.  Would you help

Page 32

1    with the revisions of the policies?

2    A    Yes, I would have helped.

3    Q    Okay.  When a policy was revised, were those
4    revisions communicated to the employees of the Knox
5    County Sheriff's Office?

6    A    Yeah, they were handed -- we'd give everybody
7    a copy.

8    Q    okay.  Would you -- you would hand deliver a
9    copy to everyone?

10   A    Uh-huh.  Yeah.

11   Q    Was there any formal requirement that they
12   actually read those policies that you handed to them?

13   A    If they did, I didn't have a list or nothing
14   that they said they -- no, I mean, as far as a formal
15   written -- no.

16   Q    Okay.  You just assumed that if you handed it
17   to them that they would --

18   A    Yeah, you would think.

19   Q    -- read that?  Did you ever have, like, staff
20   meetings where you discussed some of the revisions?

21   A    Well, we would have staff meetings every now
22   and then.

23   Q    Okay.  And would you talk about policies as
24   they were revised in those staff meetings?

25   A    Yes, if we added or removed anything or added

Page 33

1    a new section or something, yes.

2    Q    How did you determine when a new section
3    should be added?

4    A    Know that I had no certain way, I mean, I
5    don't know if you've seen it or not, it wasn't that big,
6    I mean, it was a -- there's plenty of sections that
7    could have been added, just time and resources to do it
8    was the issue there.  I mean, as far as what determined
9    when a new section got added, I couldn't.

10   Q    Okay.  And so, because of time and resource
11   constraints, you did not add all the policies that you
12   would want to add?

13        MR. WILLIAMS:  Object to the form.

14   A    I'm sure we would have added some more.

15   Q    Would that be true about revising policies?  If
16   you had more time and resources, would you have wanted
17   to revise policies?

18        MR. WILLIAMS:  Requires him to speculate.

19   A    I don't know.  I would have to look at them
20   and, I mean, I couldn't tell you now if --

21   Q    Okay.  Sir, have you ever lied to a witness in
22   a case?

23        MR. WILLIAMS:  Object to form.

24        MR. WRIGHT:  Object to the form.

25   A    I would say to a certain degree, yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 34

1    Q    What degree is that?
2    A    Well, like, if I've told you I know this,
3 this, and this and I know, man I know more, but I'm not
4 telling you.  I really don't know no more, okay?
5    Q    Okay.
6    A    That would be --
7    Q    And was that something that you did regularly?
8         MR. WILLIAMS:  Object to the form.
9         MR. WRIGHT:  Object to the form.
10   A    I don't -- I couldn't tell you if it was a
11 regular thing, I mean.
12   Q    Was it a common procedure that you used when
13 interviewing witnesses?
14        MR. WILLIAMS:  Object to the form.
15   A    I always tried to stick with something that
16 was true, that I prove because if you don't, then
17 they're going to know it, and you're basically done with
18 an interview.
19   Q    Okay.  Did you use that technique when you
20 were interviewing witnesses in the Mills homicide case?
21   A    I didn't interview no witnesses in the Mills
22 homicide.
23   Q    You didn't interview any witnesses?
24   A    No.
25   Q    Okay.  How about during your investigation of

Page 35

1 the Bobby Wiggins death?
2         MR. WILLIAMS:  We're going to object to any
3    discovery being conducted in the Anderson case under
4    Federal Rule of Civil Procedure procedure 26(d).
5    Direct him not to answer any questions related to
6    the Anderson civil suit that has been filed.
7         MS. STAPLES:  Well, and I'm asking these
8    questions based on the fact that both investigations
9    were going on at the same time and I'm just trying
10   to determine whether or not this was a common --
11        MR. WILLIAMS:  Well, it's also an attempt to
12   try to gather discovery in the Anderson case, and
13   for that reason, I'll direct him not to answer based
14   upon the civil rule.
15 BY MS. STAPLES:
16   Q    Are you going to take your attorney's advice
17 on that, sir?
18   A    Well, probably be the smart thing to do.
19   Q    Okay.  So that's yes?
20   A    Yes.
21   Q    Sir, have you ever yelled at a witness in a
22 homicide investigation while you were questioning them?
23   A    I'm sure I've raised my voice, ma'am.
24   Q    Okay.  And why would you do that?
25        MR. WILLIAMS:  Requires him to speculate.

Page 36

1    A    To rattle them.
2    Q    Okay.  And was that something that you did
3 regularly with witnesses?
4    A    No, I wouldn't say that.
5    Q    Was that something that was consistent with
6 the training that you we received?
7    A    I have seen that technique used before, yes.
8    Q    Okay.  Did you do that with any witnesses in
9 the Mills homicide investigation?
10   A    I didn't interview nobody in the Mills
11 homicide.
12   Q    Okay.  And, I'm going to ask you the same
13 question and your attorney is going to object.
14   A    Okay.
15   Q    But did you do that in your investigation of
16 the Bobby Wiggins death?
17        MR. WILLIAMS:  Let's just make it a continuing
18   objection and direction on that basis.  I mean, you
19   can continue to ask him that way, but I'm going to
20   give him the same direction on anything involving
21   the Anderson civil case.
22   Q    Are you going to take your attorney's advice
23 and --
24   A    Yes, ma'am.
25   Q    -- not answer the questions, sir?  Have you

Page 37

1 ever threatened a witness when you were investigating
2 or -- I'm sorry, when you're interviewing them in a
3 homicide case?
4         MR. WILLIAMS:  Object to the form of the
5    question.
6    A    No.  I mean, as far as, I'm going to put in
7 you in the penitentiary; are you considering that a
8 threat?
9    Q    Sure.
10   A    Well, yeah, that's --
11        MR. WILLIAMS:  I'll object to the form of
12   question as well.
13   A    I mean, that's -- if I had the evidence, yes.
14   Q    Okay.
15   A    I mean, I would have made that statement
16 before.
17   Q    Did you make any other types of threats with
18 witnesses?
19   A    No.
20   Q    Okay.
21   A    Ain't much else I can do if I -- if, unless I
22 have evidence.  I mean, that's -- that's police
23 officer's job, do the investigation and present to the
24 grand jury.
25   Q    Would you ever make threats against witnesses

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 38

1 where you did not have evidence?  In other words, would
2 you use threats to try to elicit information from
3 witnesses?
4          MR. WILLIAMS:  Object to form.
5          MR. WRIGHT:  Object to form.
6     A    I can't think of anything right off, ma'am.
7     Q    Were you ever trained on the use of threats
8 against witnesses to elicit information?
9          MR. WILLIAMS:  Object to form.
10          MR. WRIGHT:  Join.
11     A    Ma'am, once again, I'd have to look at my
12 training.  I can't remember nothing specific right off.
13     Q    So off the top of your head, you don't
14 recall --
15     A    I can't, no.
16     Q    -- if that was something you were trained on
17 doing?
18     A    No, I can't remember.
19     Q    Did you witness other law enforcement officers
20 using that technique?
21          MR. WILLIAMS:  Object to the form.
22          MR. WRIGHT:  Join.
23     A    I can't recall that, I mean.
24     Q    Okay.  You can't recall sitting in any
25 interviews where a law enforcement officer threatened a

Page 39

1 witness?
2          MR. WILLIAMS:  Object to form.
3     A    Threatened him of what?  I mean, there's --
4     Q    Well, you said earlier a threat that you had
5 used was that you were going to send someone to the
6 penitentiary.
7     A    And that would be about the biggest threat
8 that I would ever --
9     Q    Did you ever witness anyone threaten to take
10 someone's kids away?
11     A    Not that I recall, no.
12     Q    Did you ever witness an officer threaten a
13 witness with bodily harm?
14     A    No.
15     Q    When -- during the Mills investigation, in
16 this case, did you ever threaten any witnesses?
17     A    I've never talked to nobody --
18          MR. WILLIAMS:  Asked and answered.
19     A    -- in the Mills investigation, ma'am.
20     Q    During your investigation of the death of
21 Bobby Wiggins, did you ever threaten any witnesses?
22          MR. WILLIAMS:  Same objection claiming to the
23 Anderson civil case.
24     Q    Are you going to take your attorney's advice?
25     A    Yes.

Page 40

1     Q    Okay.  Can -- or have you ever cursed at a
2 witness or a suspect while you were interviewing them?
3     A    I'm going to say that's a possibility.  I
4 can't remember nothing right off.
5     Q    Was that something that you would do
6 routinely?
7     A    I mean, I don't know.  I mean, I may have
8 cussed in an interview.  I don't know, ma'am.
9     Q    Okay.  Can you recall if you received training
10 on using curse words against witnesses or --
11     A    Not that I can, no.  I mean, I don't think --
12 I don't remember anything.
13     Q    Okay.  Did you cuss at anyone when you were
14 investigating the Mills case?
15     A    I didn't interview anybody --
16          MR. WILLIAMS:  Same objection.  Asked and
17 answered.
18     A    -- in the Mills case.
19     Q    Did you do that during your investigation into
20 the death of Bobby Wiggins?
21          MR. WILLIAMS:  Objection.  Same directions to
22 the client.
23     Q    Are you going --
24     A    Yes.
25     Q    You're going to take your attorney's advice.

Page 41

1 So you stated earlier, that you recalled telling a
2 witness that you were going to put him in the
3 penitentiary.  Can you recall telling a witness that you
4 were going to put him in the penitentiary if they did
5 not tell you what you wanted to hear?
6     A    No.
7     Q    You never did that?
8     A    No.
9     Q    Okay.  Would that have been something you
10 would have been trained on?
11     A    To tell them if they don't --
12          MR. WRIGHT:  Object to form and foundation.
13          MR. WILLIAMS:  I'll join.
14     A    -- no, I don't recall that.
15     Q    As someone who has been in law enforcement for
16 several years, would you consider that a proper
17 technique to use?
18          MR. WILLIAMS:  Object to the form and
19 foundation.
20          MR. WRIGHT:  Object to the form.
21     A    Restate your first statement first, you've got
22 me totally confused --
23     Q    Sure.  I'm sorry.
24     A    -- with objections going flying everywhere.
25     Q    Sure.  As someone who has been a law



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 42

1  enforcement officer for several years --
2      A    Uh-huh.
3      Q    -- would you think threatening to send someone
4  to the penitentiary just to get information from them
5  was a proper technique to use?
6          MR. WILLIAMS:  Object to the form.
7          MR. WRIGHT:  Objection.
8      A    Say it one more time.
9      Q    Sure.
10     A    I'm driving you insane here.
11     Q    It's okay.  No, that's fine.  So you would
12  agree that you've been in law enforcement for several
13  years?
14     A    Yes.
15     Q    Okay.  From the experience that you have
16  gained during those years of employment --
17     A    Uh-huh.
18     Q    -- would you believe that it is a proper
19  technique to use, when you're interviewing a witness, to
20  threaten them with a penitentiary if they did not give
21  you the information that you were looking for?
22          MR. WRIGHT:  Object to form and foundation.
23          MR. WILLIAMS:  Join.
24     A    I don't -- I don't just want information, I
25  want -- I want the truth, that's what I want.  I'm not

Page 43

1  wanting --
2      Q    So if an officer asked a suspect or a witness
3  to give them specific information and they did not do
4  that -- strike that.  If an officer was looking for
5  specific information and told the witness what he/she
6  was looking for, would you think it was a proper
7  technique to threaten that witness with going to prison
8  if he or she did not give you that information?
9          MR. WRIGHT:  Object to form.
10         MR. WILLIAMS:  Object to the form and
11     foundation.
12         MR. WRIGHT:  Requires speculation.
13     A    I've never questioned or interviewed anybody
14  to -- I would ask them what they know about something
15  or, you know, where was you at this day.  As far as, I
16  want you to tell me this, this, and this, I don't --
17  BY MS. STAPLES:
18     Q    Yes, sir.  So what I'm asking you now, is not
19  necessarily what you have done specifically.
20     A    Oh, okay.
21     Q    But I'm asking you if you believe it's proper
22  for other law enforcement personal to threaten to send
23  someone to prison if they -- the witness did not give
24  him the information for which he was trying to gather?
25     A    I don't know how -

Page 44

1          MR. WRIGHT:  Object to the form and foundation.
2      A    -- they would have been trained, ma'am.  I
3  don't know.
4      Q    Okay.  So you don't know whether or not that's
5  proper or not?
6          MR. WRIGHT:  Same objection.
7      A    I wouldn't think it would be.
8      Q    You would not think so?  Okay.
9          MR. WILLIAMS:  Requires him to speculate.
10     A    I mean, I'm assuming.
11     Q    Have you ever physically assaulted a witness
12  during an interview?
13     A    No.
14     Q    Have you ever physically assaulted a suspect
15  during an interview?
16     A    No.
17     Q    Have you ever been trained on using physical
18  assault as a technique in interviewing a witness or
19  suspect?
20     A    No.
21     Q    If an officer was to use physical contact with
22  a witness or was to physically assault a witness, would
23  you believe that would be a proper law enforcement
24  technique.
25     A    No.

Page 45

1          MR. WRIGHT:  Object to form and foundation.
2          MR. WILLIAMS:  Join.
3      Q    Have you ever thrown objects at a witness
4  during an interrogation?
5      A    No.
6      Q    Were you ever trained on the use of throwing
7  objects?
8      A    Not that I know of.
9      Q    If a law enforcement officer was to throw an
10  object at a witness during an interview, would you
11  believe that to be proper law enforcement technique?
12          MR. WRIGHT:  Object to form and foundation.
13          MR. WILLIAMS:  Join.
14     A    No.
15     Q    Okay.
16     A    You're talking about throwing something to
17  physically harm?
18     Q    Yes, sir.
19     A    Like, pick up that tape recorder and throw it
20  at you?
21     Q    That's correct.
22     A    No.
23     Q    How about throwing a chair at somebody?
24     A    No.
25     Q    Okay.  You do not believe that would be

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 46

1 proper?

2 A No, ma'am.

3 MR. WRIGHT: Object to form and foundation.

4 Q Okay. I am just going to play just a very

5 small clip. Give me just a second.

6 MR. WILLIAMS: Is it an interview from the

7 Anderson case?

8 MS. STAPLES: Yes, sir, it is.

9 MR. WILLIAMS: I'll direct the witness not to

10 answer the questions based upon Rule 26(d).

11 MS. STAPLES: Okay. For the record, I'm going

12 to play this.

13 THE WITNESS: Okay.

14 MS. STAPLES: If you'll just listen to it

15 regardless. Let me make sure I have the volume up.

16 (VIDEO PLAYING)

17 BY MS. STAPLES:

18 Q Mr. Eubanks, are you firm -- Deputy Eubanks,

19 are you familiar with that recording?

20 MR. WILLIAMS: Same objection. Same direction.

21 Q Are you going to follow your --

22 A Yes.

23 Q -- attorney's advice?

24 MS. STAPLES: Are you going to direct him not

25 to answer any questions whatsoever about that

Page 47

1 recording?

2 MR. WILLIAMS: As I believe it to be a

3 recording of a witness relating to the Anderson

4 civil case, which has been filed against Mr.

5 Eubanks, based upon Rule 26(d), yes.

6 BY MS. STAPLES:

7 Q Deputy Eubanks, do you know in what year the

8 Mills investigation was going on?

9 A No. I mean, I'm sure I've seen the date on

10 the list, but I don't know.

11 Q Okay. If I told you that the investigation

12 started in December of 2010, would that reflect your

13 recollection?

14 A If you're saying that's what it is, I don't

15 know. I believe that.

16 Q Okay. Are you familiar with the date of the

17 Bobby Wiggins death investigation?

18 MR. WILLIAMS: Again, this is an objection I

19 made earlier, the continuing objection --

20 A I can't recall.

21 MR. WILLIAMS: --relating to the Anderson civil

22 case which has been filed, based upon 26(d).

23 MS. STAPLES: Again, the reason for these

24 questions is because the investigation was going on

25 at the same time. We will reserve those objections

Page 48

1 for later or those questions for later.

2 BY MS. STAPLES:

3 Q Deputy Eubanks, are you familiar with

4 Amanda Hoskins?

5 A I met her here.

6 MS. STAPLES: Can we hold on for just two

7 seconds, please.

8 (OFF THE RECORD)

9 MS. STAPLES: Okay. Before I start with that

10 line of questioning, I did want to admit that

11 exhibit, or the audio, as Exhibit 1. It was

12 PL27706.

13 (EXHIBIT 1 MARKED FOR IDENTIFICATION)

14 MR. WILLIAMS: Just -- I've already objected to

15 it, but renew the objection.

16 MS. STAPLES: Yeah, you don't have to say

17 anything to that.

18 THE WITNESS: Okay. Lost the question there.

19 MR. WILLIAMS: Don't answer unless she asks you

20 a question.

21 MS. STAPLES: Unless you want to disagree, then

22 go right ahead. Okay.

23 BY MS. STAPLES:

24 Q Deputy Eubanks, do you know Amanda Hoskins?

25 A No.

Page 49

1 Q Do you know who Amanda Hoskins is?

2 A I do now.

3 Q Okay. Did you know her prior to

4 December 20th, 2010?

5 A No.

6 Q Did you know anything about Amanda Hoskins --

7 A No.

8 Q -- prior to that date?

9 MR. WILLIAMS: I'm sorry, Derek. Let her get

10 her whole question out, okay?

11 THE WITNESS: Okay.

12 MR. WILLIAMS: I know you're anticipating what

13 she's asking, but let her get the whole question

14 out.

15 BY MS. STAPLES:

16 Q And maybe I asked this, because I'm not sure.

17 Did you have any opinion of Amanda Hoskins prior to

18 December 20th of 2010?

19 A No.

20 Q You did not know of her --

21 A No.

22 Q -- prior to that time? Okay. Did you know

23 William Lester prior to December 20th of 2010?

24 A No.

25 Q Do you know if you'd ever arrested Mr. Lester



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 50

1 before?
2   A   Not that I know of.  I mean, I may have, but I
3 don't --
4   Q   Do you know who William Lester is today?
5   A   No.
6   Q   And so, you don't think you've arrested him
7 since December 20th of 2010, either?
8   A   Not that I know of, ma'am.  I mean --
9   Q   Okay.  Does that mean that you had no opinion
10 of William Lester in December of 2010?
11   A   I don't.
12   Q   How about Jonathan Taylor?  Did you know
13 Mr. Taylor prior to December 20th of 2010?
14   A   I arrested Jonathan in a meth lab, whatever
15 date that was.
16   Q   Okay.  Do you think that was --
17   A   I don't know about the 2010 deal there.
18   Q   I'm sorry.  You're not sure if that was 2010?
19   A   I don't know what the date of the meth lab
20 arrest was.
21   Q   Okay.  I believe that was February of 2012;
22 would that sound correct?
23   A   Yes.
24   Q   Okay.  We're going to go over that.
25   A   Then no, I didn't know anything.

Page 51

1   Q   So you did not know Jonathan Taylor in 2010?
2   A   No --
3   Q   And you don't think --
4   A   -- not that -- not that I recall.
5   Q   So was that February 2012 arrest the first
6 time that you'd ever arrested him?
7   A   As far as I can remember.
8   Q   Okay.  Have you arrested --
9   A   I mean, I'm not researched and gone back and
10 looked to see if --
11   Q   Sure.  Have you arrested him any time since
12 that 2012 arrest?
13   A   Not that I know of.
14   Q   So in 2010, did you have any opinion of
15 Jonathan Taylor whatsoever?
16   A   Didn't know him.
17   Q   Okay.  So let's talk about that February 2012
18 arrest.  I'm going to give you this document to review,
19 please.  And it is PL025647.
20       MR. WILLIAMS:  Thank you.
21   Q   Sir, do you recognize that document?
22   A   Yes, it looks like my case report on the meth
23 lab I was telling you about earlier.
24   Q   Okay.  That's your case report?
25   A   Yes, ma'am.

Page 52

1   Q   It has you listed as the submitting officer;
2 is that correct?
3   A   Yes.
4   Q   Okay.  So what is this report in regard to?
5   A   A meth lab.
6   Q   Okay.  Is it a search that you did of a meth
7 lab?
8   A   Yes, we received a complaint of a meth lab.
9   Q   Okay.  And that was on February 11th, 2012?  I
10 guess, really late February 11th, 2012, to early
11 February 12th of 2012?
12   A   I got the call on 2/12/2012 around 1:26 in the
13 morning.
14   Q   Okay.
15   A   But it looks --
16   Q   Were there other officers --
17   A   Yes.
18   Q   -- involved in this search of the meth lab?
19   A   Yes.
20   Q   From what department were those officers?
21   A   Knox County Sheriff's Office, myself, and
22 Sheriff Pickard, and Barbourville P.D. was Jack
23 Knuckles, and Josh Lawson, and Clay Hilton, and State
24 police was my brother Trooper Dallas Eubanks, and then
25 the cleanup crew was DESI, with the State Police, KSP

Page 53

1 DESI.  Tom Underwood and Randy Hunter.
2   Q   Okay.  So we had Knox County Sheriff's
3 officers, Barbourville Police Department officers,
4 Kentucky State Police officers --
5   A   Yes.
6   Q   -- all present at this scene?
7   A   Yes.
8   Q   Okay.  At any time during this search for this
9 meth lab, or alleged meth lab, did you wear a mask to
10 cover your face?
11   A   No.  I would have had a beanie on.
12   Q   What's a beanie?
13   A   It's like a toboggan, but it don't have the --
14 it just sits down --
15   Q   Okay.
16   A   -- it just comes down to here.
17   Q   Would you have pulled that down over your
18 face?
19   A   You can't get it over your face.
20   Q   Okay.  Did you see any other officers with
21 masks on their faces?
22   A   No.
23   Q   No.  Okay.  So I think you said that you
24 received a call about an alleged meth lab, that's what
25 prompted this search; is that correct?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 54

1     MR. WILLIAMS: Object to the form. You can
2 answer.
3     A    The report come in smelling meth cooking is
4 what they --
5     Q    Okay. How many individuals were present at
6 this location when you arrived?
7     MR. WILLIAMS: I'm sorry.
8     A    This is an apartment complex, ma'am. This is
9 not a single house.
10    Q    Okay. Did you go into a specific apartment?
11    A    In the end, yes, we did.
12    Q    How many individuals, non-law enforcement
13 individuals, were present in the apartment?
14    A    Golly. I'm going to assume here. I don't
15 like to, but I arrested one, two, three, four, five
16 people, is what I'm assuming.
17    Q    Five people. Was Jonathan Taylor one of those
18 people?
19    A    Yes.
20    Q    Did you speak with Mr. Taylor at the scene?
21    A    Nobody wanted to talk to me. They didn't know
22 nothing.
23    Q    Okay. So you did not speak with Mr. Taylor?
24    A    No.
25    Q    Did you speak --

Page 55

1     A    I mean, I probably spoke to him.
2     Q    But you didn't get any information from
3 Mr. Taylor.
4     A    I got information as far as his personal
5 information for the arrest citation.
6     Q    Okay. Can you recall Kayla Mills being
7 present at that apartment?
8     A    Yes, she was there.
9     Q    Okay. Did you speak with her?
10    A    Same thing.
11    Q    When you first -- okay, let me ask this first,
12 it says you got, you were dispatched to the residence,
13 were you one of the first arriving officers on the
14 scene?
15    A    I was, yes.
16    Q    Okay. How did you enter the apartment?
17    A    We got the call -- let me go back here and
18 read this, now.
19    Q    Sure.
20    A    I got the call when Sheriff Pickard was out,
21 and me and him both went to the call. I'm trying to
22 read here.
23    Q    Can you recall if the door was open or closed
24 when you first arrived?
25    A    It was closed.

Page 56

1     Q    Okay. Did you knock?
2     A    Yes.
3     Q    Did you announce yourself --
4     A    Yes.
5     Q    -- as a sheriff's officer?
6     A    Yes.
7     Q    Did you have your gun drawn when you went into
8 the apartment?
9     A    I would assume, yes.
10    Q    Okay.
11    MR. WILLIAMS: Don't assume. If you know,
12 testify what you know. Don't guess.
13    A    I don't know. I don't recall.
14    Q    Do you not know? Do you recall other officers
15 arriving at the scene?
16    A    Yes, there was other officers there.
17    Q    Okay. Can you recall if they had their guns
18 drawn?
19    A    I can't recall.
20    Q    Do you know if -- well, did you hold your gun
21 on any of the suspects?
22    A    I don't remember having any incident.
23    Q    Okay. Do you remember of any other officer
24 held any of the suspects at gunpoint?
25    A    No.

Page 57

1     Q    Okay. So it says you just -- you just stated
2 that you arrested five individuals from that scene. Can
3 you tell me who those five individuals were?
4     A    Jonathan Taylor, a Josh Garland, Kayla Mills,
5 Michael Bailey, and a Kim Help.
6     Q    Okay. Can you recall what evidence you had
7 against Jonathan Taylor to arrest him at that time?
8     A    Had the meth lab.
9     Q    Okay. Did you speak with the county attorney
10 about this meth lab?
11    A    Later, yes.
12    Q    Okay. And did the county attorney proceed
13 with prosecuting these individuals?
14    A    No, he told me that I had a bad uphill battle,
15 which I pretty much knew that. Nobody would talk to me,
16 couldn't -- didn't get any other information that was
17 helpful.
18    Q    Okay. Did you have a similar conversation
19 with the Commonwealth's attorney about the case?
20    A    Yes, because I think -- I'm not to assume;
21 right?
22    Q    That's correct.
23    A    Then yes, I had a conversation with the
24 Commonwealth's attorney also.
25    Q    Okay. And ultimately, the case was not

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 58

1 prosecuted; is that correct?
2    A    No.
3    Q    Were you aware that a meth check was ran on
4 the five individuals that you just talked about?
5    A    Yes.
6    Q    Can you explain to me what a meth check is?
7    A    Not real sure. Barbourville P.D. -- well, I
8 understand it is, is how often they buy the Sudafed that
9 you use to make the one-step meth labs with.
10   Q    Okay. And how often had Mr. Taylor bought the
11 ingredients or the Sudafed --
12   A    None.
13   Q    -- for a meth lab? None?
14   A    Uh-huh.
15   Q    Okay. So even though he had not bought any
16 ingredients, and no one would speak to you, you still
17 proceeded to arrest Mr. Taylor?
18   A    I didn't know all this until after, ma'am.
19   Q    Okay. I'd like to mark that as Plaintiff's
20 Exhibit 2. You don't mind, if you'll hand that back to
21 me, I'm going to put this sticker on there somewhere.
22 Okay.
23        (EXHIBIT 2 MARKED FOR IDENTIFICATION)
24   Q    Okay. Deputy Eubanks, I'm going to ask you
25 about some of the witnesses in the Mills death

Page 59

1 investigation, Okay.
2    A    Okay.
3    Q    Did you know Kristy Branson prior to December
4 of 2010?
5    A    Nope. I don't know her now.
6    Q    Don't know her now, so to your knowledge
7 you've never arrested Ms. Branson?
8    A    Not that, I mean, not that I know of.
9    Q    Did you know Amber Simpson prior to
10 December 20th of 2010?
11   A    Not that I know of.
12   Q    Do you know if you ever arrested Ms. Simpson?
13   A    Not without doing some research, no.
14   Q    Okay. Are you familiar with Robert Beech?
15   A    No.
16   Q    So you don't believe you knew him in December
17 of 2010?
18   A    No. No.
19   Q    Do you know if you have arrested him before or
20 after December 2010?
21   A    Not that I know of.
22   Q    Okay. Did you know Mike Simpson prior to
23 December of 2010?
24   A    No.
25   Q    So you've never arrested Mr. Simpson?

Page 60

1    A    Not that I know of, ma'am.
2    Q    Okay. Do you know who Mike Simpson is today?
3    A    No.
4    Q    How about James Allen Hilton. He goes by
5 Allen. Did you know him prior to December of 2010?
6    A    Not that I know of.
7    Q    Do you know if you've ever arrested Mr. Hilton
8 prior to December of 2010?
9    A    Not that I recall.
10   Q    Do you know if you've arrested him since?
11   A    Not that I recall.
12   Q    Okay. How about Michael Krump? Did you know
13 Mr. Krump in December of 2010?
14   A    No.
15   Q    Do you know if you've ever arrested Mr. Krump?
16   A    Not that I know of.
17   Q    And do you think that you've arrested
18 Mr. Krump since 2010?
19   A    Not that I know of.
20   Q    Okay. Jessie Lawson. Did you know
21 Mr. Lawson?
22   A    Not that --
23   Q    In the December of 2010?
24   A    No.
25   Q    Have you ever arrested Mr. Lawson?

Page 61

1    A    Not that I know of.
2    Q    Mikey Bruner. Do you know who Mikey Bruner
3 was in December of 2010?
4    A    Not that I know of.
5    Q    Had you ever arrested Mr. Bruner?
6    A    Not that I know of.
7    Q    Don't believe you've arrested him since that
8 day?
9    A    No.
10   Q    Okay. How about Joe King, did you know
11 Mr. King --
12   A    No.
13   Q    -- in December of 2010?
14   A    No, ma'am.
15   Q    Had you arrested him prior to that date?
16   A    Not that I know of.
17   Q    Have you arrested him since that date?
18   A    Not that I know of.
19   Q    Okay. Kayla Mills. We talked about Ms. Mills
20 a little bit ago. She was at the scene in 2012, and you
21 arrested her then; correct?
22   A    Yes.
23   Q    Okay. Did you know Ms. Mills in December of
24 2010?
25   A    Not -- not personally, and not that I had

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 62

1  dealt with her, that I can recall.
2    Q    Did you know of Ms. Mills --
3    A    I think --
4    Q    -- Kayla Mills?
5    A    -- I'd heard the name.
6    Q    Did you have any opinion of Kayla Mills?
7    A    No.
8    Q    Okay.  Do you know if you arrested her any
9  other time than the February 12th, 2012 date?
10   A    Not that I can recall.
11   Q    Sir, do you know KSP Detective, or Sergeant
12 now, I think, Detective Jason York?
13   A    Yes.
14   Q    Okay.  Would -- have you worked with him, sir?
15   A    Yes, I mean --
16   Q    You've worked cases together?
17        MR. WRIGHT:  Object to form.
18   A    No, I've never -- other than, which it wasn't
19 his case, the one we're not allowed to speak about.
20   Q    Okay.
21   A    I mean, I'm sure over the years I've been on
22 complaints with him, and I'm sure he's gone to some of
23 my complaints, but as far as working a case.
24   Q    What post does Detective York work out of?
25   A    Harlan.

Page 63

1    Q    Okay.  And do you know what counties that
2  covers?
3    A    Harlan, Bell, Knox.
4    Q    Okay.  So you would have worked with him
5  possibly on cases out of Knox County when you were --
6    A    Yes.
7    Q    -- a sheriff's deputy there?
8        MR. WRIGHT:  I'm object to form.
9    Q    Okay.  Do you consider Detective York to be a
10 friend of yours?
11   A    I guess, yes.
12   Q    Do you-all go out to dinner together?
13   A    Uh-uh.
14   Q    Ever had lunch together?
15   A    I'm not going to say that when we was working
16 that we didn't go out and to eat, you know, all of us, I
17 mean, we do that sometimes --
18   Q    Okay.  Sure.
19   A    -- if the calls are slow enough.
20   Q    Sure.  Have you and Detective York ever
21 discussed this case?
22   A    No.
23   Q    But you have done some interviews with
24 Detective York in other cases --
25   A    Yes.

Page 64

1    Q    -- is that correct?  Okay.  Are you aware of
2  Detective York ever being disciplined?
3    A    I don't --
4    Q    Professionally?
5    A    I don't know.
6    Q    Okay.  Do you know who the lead investigator
7  was into Katherine Mills' death?
8    A    From what I've learned here, Detective York.
9    Q    Okay.  At any time, did you and Detective York
10 discuss the case?
11   A    No.
12   Q    Were you aware that Detective York was
13 initiating charges against Amanda Hoskins and
14 Jonathan Taylor?
15        MR. WRIGHT:  Object to form.
16   A    No.
17   Q    So at any point, did you ever speak with the
18 Commonwealth's attorney, Jackie Steele, about this case?
19   A    No.
20   Q    At any point, did you speak with him about
21 Amanda Hoskins or Jonathan Taylor?
22   A    Not Amanda.  Jonathan on my case.
23   Q    Okay.  What about regards in this case, sir?
24   A    No, not this case.
25   Q    Okay.

Page 65

1        MS. STAPLES:  I think that's all the questions
2  that I have for you at this moment.  However, I do
3  want to put on the record that we have an agreement
4  regarding reserving questions for punitive damages
5  after that decision is made.
6        MR. WILLIAMS:  Yes, we discussed that earlier I
7  think either person or by letter, and I agree you
8  have the right to reserve those questions.
9        MS. STAPLES:  Thank you.
10       MR. WILLIAMS:  Thank you.
11       MS. STAPLES:  And so, with that, I'll pass the
12 witness.
13       THE WITNESS:  Thank you.
14       MR. WILLIAMS:  You may begin.
15       MR. FARAH:  All right.
16       VIDEOGRAPHER:  You want to pass the microphone
17 back and over here.  Thank you.
18       MR. FARAH:  I'm pretty loud.
19              CROSS EXAMINATION
20 BY MR. FARAH:
21   Q    Sir, as you know, I represent Mike Broughton
22 and City of Barbourville in this case.
23   A    Yes, sir.
24   Q    I'm just going to ask you some very specific
25 questions concerning my client as it relates to this

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 66

1   investigation.  Did you have any professional
2   interaction with Mike Broughton as it relates to the
3   investigation into the Katherine Mills murder?
4       A   No.
5       Q   Other than what you've learned in discovery in
6   this case, do you have any firsthand knowledge of what
7   Mr. Broughton's involvement was in the Katherine Mills
8   investigation?
9       A   No.
10      Q   Did you have any interaction or involvement or
11  knowledge of interaction or involvement of any other
12  members of the Barbourville Police Department in the
13  Katherine Mills investigation?
14      A   No.
15      Q   You mentioned that there was a separate arrest
16  for this drug arrest or drug bust in 2012 involving
17  Jonathan Taylor; correct?
18      A   Yes.
19      Q   And you mentioned that there were three
20  Barbourville police officers were part of your group
21  that night, Officers Knuckles -- that's with a K; right?
22          K-N-U-C-K-L-E-S?
23      A   Can I look at that again?
24          MS. STAPLES:  Oh, yes, I'm sorry.
25      Q   I'm sorry.  Officers Knuckles, Lawson, and

Page 67

1   Hilton; is that correct?
2       A   Yes. Yes.
3       Q   Why were Barbourville Police Officers involved
4   in this, whatever search warrant, or whatever?
5       A   They come to assist.
6       Q   Okay.  Was this a, that evening, was this a
7   Knox County investigation?
8       A   It'd been a Sheriff's office investigation,
9   yes.
10      Q   And were you the lead -- so Knox County was
11  the lead department, correct?
12      A   Yes.
13      Q   And were you the lead officer?
14      A   Yes.
15      Q   So my client's officers were just there to
16  assist?
17      A   Yes.  Here you go.
18      Q   Bear with me for a second here.  Were you the
19  officer who actually served the arrest warrant on
20  Jonathan Taylor, as it relates to the Katherine Mills
21  murder?
22      A   No.
23      Q   When you were working for Knox County, on
24  occasion, would, for example, the Kentucky State Police
25  bring in witnesses or suspects to the Knox County Police

Page 68

1   depart -- to the Knox County Sheriff's Office and use
2   your facilities for interviews, things of that nature?
3       A   Yes.
4       Q   That was -- is that a common occurrence?
5       A   Yes.
6       Q   Okay.  Would that mean you were necessarily
7   involved in their investigation if they brought someone
8   to your office to just use your facilities?
9       A   No.
10          MR. FARAH:  That's all the questions I have.
11      Thank you, sir.
12                  EXAMINATION
13  BY MR. WEBER:
14      Q   Deputy Eubanks?
15      A   Yes?
16      Q   My name is Cody Weber.  I represent some KSP
17  troopers in this case.  The first one is your brother,
18  Dallas Eubanks.  I also represent Mark Mefford,
19  Brian Johnson, Jackie Joseph, and Kelly Farris.  I just
20  have a few questions for you about those individuals.
21      A   Okay.
22      Q   First, I'll ask you about your brother,
23  Trooper Dallas Eubanks.  You mentioned that he was, at
24  the night of this meth arrest involving Jonathan Taylor,
25  that he was present that night.

Page 69

1       A   Yes.
2       Q   Did you see him --
3       A   Yes.
4       Q   -- at the arrest?  Did he have, I believe you
5   testified earlier, that no officers had a mask on his
6   face -- their face, down on their face.  Did Trooper
7   Eubanks have a mask down on his face that night?
8       A   No.
9       Q   No.  And also on that night, you testified,
10  and I may -- I want to make sure I heard you correctly,
11  that there were no other officers or officers that had
12  their guns pointed at any of the individuals; is that
13  what you testified to?
14      A   Not that I could recall.
15      Q   Not that you could recall?
16      A   Right.
17      Q   So you don't recall Dallas Eubanks ever having
18  his gun pointed at any individual that or anything?
19      A   No.
20      Q   Okay.  Also, with your -- with your brother,
21  Ms. Staples had asked you if you had spoken to him about
22  any of the depositions in this case and you said no; is
23  that correct --
24      A   That is correct.
25      Q   -- what you previously testified?  Have you

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 70

1 had any conversations with him about the Katherine Mills
2 murder investigation at any time?
3     A    No.
4     Q    Other than just what you've learned through
5 discovery or anything like that, do you have any
6 knowledge of how Trooper Eubanks -- Dallas Eubanks is
7 involved in the investigation of Katherine Mills'
8 murder?
9     A    I'm trying to figure out how I'm involved, no.
10     Q    All right.  And again, the same question, do
11 you have any ideas, and we'll move on to Trooper Mark
12 Mefford, how he is involved in any way in the
13 investigation of the Katherine Mills murder?
14     A    (NO VERBAL RESPONSE.)
15     Q    No?
16     A    No.
17     Q    What about Trooper Brian Johnson, do you have
18 any idea how he is involved in the investigation in the
19 Katherine Mills murder?
20     A    No.
21     Q    Sergeant Jackie Joseph, any knowledge of how
22 she is involved in this investigation of the Katherine
23 Mills murder?
24     A    No, other than she would be the Detective
25 Sergeant, or was at one time, would be the only thing

Page 71

1 that I would think.
2     Q    But nothing specific that --
3     A    Nothing specific --
4     Q    -- that she was involved?
5     A    -- that she'd done, no.
6     Q    Okay.  And Trooper Kelly Farris, any knowledge
7 of how he has been involved in the investigation of
8 Katherine Mills' murder?
9     A    No.
10     MR. WEBER:  I think that's all the questions I
11 have.  Thank you.
12               EXAMINATION
13 BY MR. WRIGHT:
14     Q    Good morning, Deputy Eubanks.  My name is
15 Derrick Wright, I represent Jason York and Jason Bunch.
16 I just got a few questions.  When you responded to that
17 complaint of smelling meth, the report indicates that
18 you went to apartment 28 because a one-step meth lab was
19 located on the porch of that property; is that right?
20 Let me look at the --
21     A    Yes.  This is an apartment complex, you got a
22 row of apartments, okay?  I can't remember how many,
23 five or six apartments down through there.  They all
24 have a concrete patio, not fenced off or anything, and
25 they have the grills -- I call them the KOA grills that

Page 72

1 are concreted in the ground, the big heavy ones.
2     Q    Yeah.
3     A    They -- each one of them, they have that down
4 there, and the one-step meth lab was found in the grill
5 of the patio of apartment 28.
6     Q    Did you know who lived in apartment 28 at the
7 time?
8     A    No.
9     Q    Do you recall what happened inside the
10 apartment?
11     A    Myself, and I think it was Sheriff Pickard,
12 cleared the downstairs and my brother, and I don't know
13 who all, went upstairs.
14     Q    Okay.  You didn't go upstairs?
15     A    I did later, but when we first entered, I went
16 downstairs and cleared it, and I think Kayla Mills was
17 down there.  I think she was the only down there, and
18 then when I went upstairs, that's where all the others
19 were found.
20     Q    Okay.  Had they already been found by the time
21 you got up there?
22     A    Yes.
23     Q    All right.  Do you know transported
24 Jonathan Taylor from the scene?
25     A    No, I couldn't.

Page 73

1     Q    Did you?
2     A    No.
3     Q    No.  Not to your knowledge?
4     A    I didn't transport nobody, I had to wait for
5 DESI to get there to do the cleanup, so I got to stay
6 all day and all.
7     Q    So you hung back at the scene for the cleanup
8 crew to come in?
9     A    Yes.
10     MR. WRIGHT:  All right.  That's all the
11 questions I have.
12               EXAMINATION
13 BY MR. WILLIAMS:
14     Q    Mr. Eubanks, I just have one follow-up
15 questions, similar question you were asked by counsel.
16 You were asked some questions about your training over
17 the years, and you testified about the training that you
18 would go and receive up at the Department of Criminal
19 Justice training; correct?
20     A    Yes.
21     Q    You had been a special deputy for a number of
22 years before becoming a paid deputy --
23     A    Yes.
24     Q    -- is that correct?
25     A    Yes.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 74

1    Q    Were there occasions, during those years that
2  you were a special deputy, where you able to observe
3  other officers in their duties?
4    A    During my special deputy time, I watched other
5  officers and learned that way.  And then, also, I had
6  the in-service starting, I think it was '99.  I started
7  as a special deputy in '89, I believe is the date.
8    Q    So did you actually start and go receive some
9  of the training at the Department of Criminal Justice
10 training?
11   A    When I was a special deputy, yes.
12   Q    That was my question.
13       MR. WILLIAMS:  Thank you.  That's all I have.
14            REDIRECT EXAMINATION
15 BY MS. STAPLES:
16   Q    I just have a couple, quick follow-up
17 questions.  You testified earlier that this incident
18 regarding this alleged meth lab was never prosecuted;
19 correct?
20   A    Yes.
21   Q    And, I think you said that the prosecutor told
22 you that you had an uphill battle.
23   A    Yes.
24   Q    Is that correct?
25   A    Yes, the county attorney did.

Page 75

1    Q    Okay.  And what did that --
2    A    Of course, I knew that, I mean.
3    Q    Okay.  How did you know that?  What did that
4  mean?
5    A    Well, when you go back and start looking at
6  everything, and after I got the CAD report, the call
7  come in on 2/11, at, like, seven something at night.
8    Q    Yes, sir.
9    A    Okay.  Oh, I didn't put it in here and I don't
10 know why, but the best of my memory, the call came in at
11 apartment 26.
12   Q    Okay.
13   A    Okay.  You got, like I said, five or six
14 apartments there.  They've all got these grills, who's
15 to say I don't stick it in yours and --
16   Q    Right.  Because you just testified that the
17 porch, or the patio on which the grill was found was
18 open.
19   A    Yeah, there -- I mean, when you -- when you
20 walk around back the apartments, you can see all the way
21 down.  There's no fence, nothing.
22   Q    Okay.  I think that you said, well, let me ask
23 you this question again.  Did you personally have any
24 conversations with Kayla Mills during this arrest?
25       MR. WILLIAMS:  Asked and answered, but you can

Page 76

1  answer.
2    A    Just her -- she didn't -- of course, she
3  didn't know anything.  I mean, her personal information,
4  that's -- that's basically what I got out of everybody.
5    Q    Did you talk with Ms. Mills about the
6  Katherine Mills investigation during this arrest?
7    A    No, ma'am, I don't -- I didn't know nothing
8  about the Katherine Mills invest --
9    Q    Did you hear anyone else have a conversation
10 with Ms. Mills about the Katherine Mills death during
11 this arrest?
12   A    No.
13       MS. STAPLES:  Okay.  That's all the questions I
14 have.
15       THE WITNESS:  Is anybody else going to get me?
16       VIDEOGRAPHER:  We are off the record at 10:49.
17       (DEPOSITION CONCLUDED AT 10:49 A.M.)
18
19
20
21
22
23
24
25

Page 77

1            CERTIFICATE OF REPORTER
2               STATE OF INDIANA
3  I do hereby certify that the witness in the foregoing
4  transcript was taken on the date, and at the time and
5  place set out on the Title page hereof by me after first
6  being duly sworn to testify the truth, the whole truth,
7  and nothing but the truth; and that the said matter was
8  recorded stenographically and mechanically by me and
9  then reduced to typewritten form under my direction, and
10 constitutes a true record of the transcript as taken,
11 all to the best of my skill and ability. I certify that
12 I am not a relative or employee of either counsel, and
13 that I am in no way interested financially, directly or
14 indirectly, in this action.
15
16
17
18
19
20
21
22 LACEE TOWNSEND,
23 COURT REPORTER / NOTARY
24 MY COMMISSION EXPIRES:  06/19/2024
25 SUBMITTED ON:  6/25/2018

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibits**

**EXHIBIT 2**

-

**--relating**
47:21

**1**

**1** 48:11,13

**10:49** 76:16,17

**11th** 52:9,10

**12th** 52:11 62:9

**14** 11:20 20:22,
24

**15** 11:20 12:12
13:8

**17-CV-84** 7:11

**1:26** 52:12

**2**

**2** 58:20,23

**2/11** 75:7

**2/12/2012**
52:12

**2003** 17:10
20:11

**2004** 11:20
13:9 20:14,17,
21 30:11

**2010** 30:18
47:12 49:4,18,
23 50:7,10,13,
17,18 51:1,14
59:4,10,17,20,
23 60:5,8,13,
18,23 61:3,13,
24

**2012** 50:21
51:5,12,17
52:9,10,11
61:20 62:9

66:16

**2018** 7:5

**20th** 49:4,18,23
50:7,13 59:10

**26** 75:11

**26(d)** 35:4
46:10 47:5,22

**28** 71:18 72:5,6

**4**

**41s** 28:1

**6**

**6th** 7:5

**8**

**89** 74:7

**9**

**99** 13:18,23
14:12 74:6

**9:27** 7:6

**A**

**a.m.** 7:6 76:17

**academy**
13:21

**accident** 26:24

**accidents** 22:5

**add** 33:11,12

**added** 31:19
32:25 33:3,7,9,
14

**admit** 48:10

**adopt** 29:7

**advice** 35:16
36:22 39:24
40:25 46:23

**affirm** 8:5

**agree** 42:12
65:7

**agreement**
65:3

**ahead** 48:22

**air** 8:17

**alleged** 53:9,
24 74:18

**Allen** 60:4,5

**allowed** 62:19

**Amanda** 7:3,8,
15 9:17 48:4,24
49:1,6,17
64:13,21,22

**Amber** 59:9

**Amy** 7:14

**Anderson**
35:3,6,12 36:21
39:23 46:7
47:3,21

**announce**
56:3

**answering**
10:9

**answers** 18:4

**anticipating**
49:12

**anytime** 25:17

**apartment**
54:8,10,13
55:7,16 56:8
71:18,21 72:5,
6,10 75:11

**apartments**
71:22,23 75:14,
20

**apologize**
20:17

**arrest** 13:2
50:20 51:5,12,
18 55:5 57:7
58:17 66:15,16
67:19 68:24
69:4 75:24
76:6,11

**arrested** 49:25
50:6,14 51:6,8,
11 54:15 57:2
59:7,12,19,25
60:7,10,15,17,
25 61:5,7,15,
17,21 62:8

**arrived** 54:6
55:24

**arriving** 55:13
56:15

**asks** 48:19

**assault** 44:18,
22

**assaulted**
44:11,14

**assist** 67:5,16

**assisted**
12:16,17,18,19
22:13

**assisting** 28:6

**assume** 23:1,
15 54:14 56:9,
11 57:20

**assumed**
32:16

**assuming**
29:15 44:10
54:16

**attachments**
26:17

**attempt** 35:11

**attorney** 17:25
36:13 57:9,12,
19,24 64:18
74:25

**attorney's**
35:16 36:22
39:24 40:25
46:23

**attorneys** 19:6

**audio** 27:1,4,7
48:11

**authored**
26:22

**auto** 26:24

**aware** 25:4,9
29:11 58:3
64:1,12

**B**

**back** 11:21
27:16,17 51:9
55:17 58:20
65:17 73:7
75:5,20

**bad** 57:14

**Bailey** 57:5

**Barbourville**
7:25 52:22 53:3
58:7 65:22
66:12,20 67:3

**based** 35:8,13
46:10 47:5,22

**basically**
26:23 30:25
31:19 34:17
76:4

**basis** 36:18

**bat** 30:25

**battle** 57:14
74:22

**beanie** 53:11,
12

**Bear** 67:18

**Beech** 59:14

**began** 16:10
30:11

**begin** 65:14

**beginning**
25:15 29:25

**behalf** 7:17,19,
21,24 9:16

**Bell** 63:3

**big** 24:17 33:5
72:1

**biggest** 39:7

**bin** 26:8,12



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

27:12,15

**bit** 9:11 13:14
61:20

**Bobby** 35:1
36:16 39:21
40:20 47:17

**bodily** 39:13

**bought** 58:10,
15

**Brady** 17:14

**Branson** 59:3,
7

**breaks** 10:8

**Brian** 7:22
68:19 70:17

**bring** 67:25

**Broadcasting**
11:7

**brother** 19:21
52:24 68:17,22
69:20 72:12

**brought** 68:7

**Broughton**
7:25 65:21 66:2

**Broughton's**
66:7

**Bruner** 61:2,5

**budget** 22:7

**Bunch** 7:20
71:15

**bust** 66:16

**buy** 58:8

—————

**C**

**CAD** 75:6

**call** 52:12
53:24 55:17,20,
21 71:25 75:6,
10

**called** 13:4

**calls** 63:19

**car** 13:1

**career** 23:13
28:21

**case** 8:23 9:4,9
16:6 17:14
19:22 24:18,21,
25 25:23,24
26:19,21 33:22
34:20 35:3,12
36:21 37:3
39:16,23 40:14,
18 46:7 47:4,22
51:22,24 57:19,
25 62:19,23
63:21 64:10,18,
22,23,24 65:22
66:6 68:17
69:22

**cases** 24:9
25:5,9,20 62:16
63:5,24

**CD** 26:25

**chair** 45:23

**charge** 14:2

**charges** 64:13

**check** 25:12
58:3,6

**chief** 21:1,4,8,
12,17 22:1 24:4
28:9

**choose** 18:17

**citation** 55:5

**citations** 31:1

**City** 7:25 65:22

**civil** 35:4,6,14
36:21 39:23
47:4,21

**claiming** 39:22

**Clay** 52:23

**cleanup** 52:25
73:5,7

**cleared** 72:12,
16

**client** 40:22
65:25

**client's** 67:15

**clip** 46:5

**closed** 55:23,
25

**Cody** 7:21
68:16

**Colan** 11:15

**college** 10:20
14:7

**common** 34:12
35:10 68:4

**Commonwealt
h's** 57:19,24
64:18

**communicate
d** 32:4

**complaint**
52:8 71:17

**complaints**
12:20 62:22,23

**complex** 54:8
71:21

**components**
27:23

**CONCLUDED**
76:17

**concrete**
71:24

**concreted**
72:1

**conducted**
35:3

**confused**
41:22

**connotation**
21:21

**consistent**
36:5

**constraints**
33:11

**contact** 44:21

**contents** 16:14

**continue** 9:22

36:19

**continued**
21:21

**continuing**
21:20 36:17
47:19

**conversation**
57:18,23 76:9

**conversations**
19:1 70:1 75:24

**cooking** 54:3

**copy** 32:7,9

**Corbin** 10:16

**correct** 13:10
20:12,21 22:21
23:9 27:13
45:21 50:22
52:2 53:25
57:22 58:1
61:21 64:1
66:17 67:1,11
69:23,24 73:19,
24 74:19,24

**correctly**
69:10

**counsel** 7:11
19:2,12 73:15

**counties** 63:1

**county** 7:9,18
11:8,11,17,22
12:14 13:15
15:1,10 16:19
20:11,20 21:3,
13,18 22:1,15,
19 23:24 28:12,
22 29:4,12
31:17 32:5
52:21 53:2
57:9,12 63:5
67:7,10,23,25
68:1 74:25

**county's** 29:7

**couple** 21:8
74:16

**court** 7:4,10
8:3,4,9 10:4
24:15

**cover** 53:10

**covers** 63:2

**crash** 22:5

**crew** 52:25
73:8

**Criminal** 14:3,
7,8 15:15,17
16:16,24 17:3
73:18 74:9

**CROSS** 65:19

**curse** 40:10

**cursed** 40:1

**cuss** 40:13

**cussed** 40:8

—————

**D**

**Dallas** 7:22
52:24 68:18,23
69:17 70:6

**damages** 65:4

**date** 20:21 21:7
30:16 47:9,16
49:8 50:15,19
61:15,17 62:9
74:7

**day** 7:5 24:16
25:14,17 43:15
61:8 73:6

**days** 24:12

**deal** 50:17

**dealt** 62:1

**death** 35:1
36:16 39:20
40:20 47:17
58:25 64:7
76:10

**December**
47:12 49:4,18,
23 50:7,10,13
59:3,10,16,20,
23 60:5,8,13,23
61:3,13,23

**decision** 65:5

**Defendant**



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

7:17

**Defendants** 7:20,21

**degree** 33:25 34:1

**deliver** 32:8

**depart** 68:1

**department** 11:8,9,17,23 14:3,8 15:14,16 16:16,24 17:3 31:23 52:20 53:3 66:12 67:11 73:18 74:9

**deposed** 8:19 9:5

**deposition** 7:8 17:24 18:8,13, 22,25 19:24 20:3 76:17

**depositions** 19:22 69:22

**deputies** 12:16 22:2 24:7 26:19

**deputy** 11:13, 25 12:1 13:4,6, 8,9,11,14,15 15:25 16:3,8,10 20:6,9,10,19,20 21:1,4,8,12,17 22:1 23:6 24:4 25:3 28:9,10 29:12,16,24 30:10,12 46:18 47:7 48:3,24 58:24 63:7 68:14 71:14 73:21,22 74:2, 4,7,11

**Derek** 7:8,17, 19 49:9

**Derrick** 71:15

**describing** 29:3

**DESI** 52:25 53:1 73:5

**detail** 26:14

**details** 27:22

**Detective** 62:11,12,24 63:9,20,24 64:2,8,9,12 70:24

**determine** 22:10 33:2 35:10

**determined** 33:8

**determining** 22:13

**dinner** 63:12

**direct** 8:10 35:5,13 46:9,24

**direction** 36:18,20 46:20

**directions** 40:21

**disagree** 48:21

**disciplined** 64:2

**discoverable** 19:2

**discovery** 35:3,12 66:5 70:5

**discuss** 20:2 24:19,20,25 25:1,2,3 64:10

**discussed** 32:20 63:21 65:6

**discussion** 19:19

**dispatched** 55:12

**District** 7:10, 11

**document** 51:18,21

**door** 55:23

**downstairs** 72:12,16

**draft** 30:7,20

**drafted** 28:23

**drawn** 56:7,18

**driving** 42:10

**drug** 66:16

**duties** 12:19 21:17,20 74:3

———————

**E**

**earlier** 28:6 39:4 41:1 47:19 51:23 65:6 69:5 74:17

**early** 52:10

**Eastern** 7:10

**eat** 63:16

**education** 10:17

**EKU** 14:10

**Electrical** 11:7

**elicit** 38:2,8

**else's** 18:22

**employed** 11:4,6,16 29:5, 22

**employees** 32:4

**employment** 9:2 21:13,15 30:2 31:1,17 42:16

**enact** 31:4,15

**enacted** 13:23 29:21 31:13

**end** 20:22,24 21:15 54:11

**ended** 21:12

**enforcement** 12:10 38:19,25 41:15 42:1,12

43:22 44:23 45:9,11 54:12

**enter** 55:16

**entered** 72:15

**entire** 23:11

**estimation** 21:10 30:6

**et al** 7:9

**Eubanks** 7:8, 17,23 8:1,12 11:7 46:18 47:5,7 48:3,24 52:24 58:24 68:14,18,23 69:7,17 70:6 71:14 73:14

**evening** 67:6

**evidence** 17:3, 7,13 37:13,22 38:1 57:6

**EXAMINATIO N** 8:10 65:19 68:12 71:12 73:12 74:14

**exhibit** 48:11, 13 58:20,23

**experience** 10:19 42:15

**explain** 58:6

**Express** 7:6

———————

**F**

**face** 53:10,18, 19 69:6,7

**faces** 53:21

**facilities** 68:2, 8

**fact** 20:2 35:8

**fall** 31:14

**familiar** 17:14 46:19 47:16 48:3 59:14

**Farah** 7:24 65:15,18,20

68:10

**Farris** 7:23 68:19 71:6

**February** 50:21 51:5,17 52:9,10,11 62:9

**Federal** 35:4

**fence** 75:21

**fenced** 71:24

**figure** 70:9

**filed** 35:6 47:4, 22

**fine** 17:23 20:25 42:11

**finish** 10:9

**firm** 46:18

**firsthand** 66:6

**flying** 41:24

**follow** 46:21

**follow-up** 73:14 74:16

**forget** 23:5

**form** 17:16 21:19 33:13,23, 24 34:8,9,14 37:4,11 38:4,5, 9,21 39:2 41:12,18,20 42:6,22 43:9,10 44:1 45:1,12 46:3 54:1 62:17 63:8 64:15

**formal** 32:11, 14

**Forty** 14:14,17

**found** 72:4,19, 20 75:17

**foundation** 41:12,19 42:22 43:11 44:1 45:1,12 46:3

**free** 13:12

**friend** 63:10



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**full-blown** 13:21

___

**G**

**gained** 42:16

**Garland** 57:4

**gather** 35:12 43:24

**gave** 19:25

**gentleman** 9:20

**give** 8:5 16:20 18:19 21:10 32:6 36:20 42:20 43:3,8,23 46:5 51:18

**Golly** 54:14

**Good** 8:12,13, 16 71:14

**graduate** 10:13

**grand** 37:24

**grill** 72:4 75:17

**grills** 71:25 75:14

**ground** 72:1

**group** 66:20

**guess** 24:3,5 52:10 56:12 63:11

**gun** 56:7,20 69:18

**gunpoint** 56:24

**guns** 56:17 69:12

___

**H**

**hand** 8:2 32:8 58:20

**handed** 32:6, 12,16

**happened** 26:11 72:9

**happy** 10:5

**hard** 31:22

**Harlan** 62:25 63:3

**harm** 39:13 45:17

**Harrell** 11:15, 16

**Harris** 7:3

**he/she** 43:5

**head** 10:1 14:22 17:20 38:13

**hear** 41:5 76:9

**heard** 17:18 62:5 69:10

**heavy** 72:1

**held** 56:24

**helped** 30:7,20 31:4 32:2

**helpful** 57:17

**helping** 22:8

**high** 10:12,15, 16,17,22

**Hilton** 52:23 60:4,7 67:1

**hired** 11:22,24

**hold** 48:6 56:20

**Holiday** 7:6

**homicide** 34:20,22 35:22 36:9,11 37:3

**Hoskins** 7:9,15 9:17 48:4,24 49:1,6,17 64:13,21

**hours** 14:14,17

**house** 54:9

**hung** 73:7

**Hunter** 53:1

___

**I**

**idea** 70:18

**ideas** 24:24 70:11

**IDENTIFICATION** 48:13 58:23

**identify** 7:12

**in-house** 15:3

**in-service** 13:17,24 14:18 74:6

**in-services** 13:22

**incident** 56:22 74:17

**individual** 69:18

**individuals** 54:5,12,13 57:2,3,13 58:4 68:20 69:12

**information** 17:25 18:3 38:2,8 42:4,21, 24 43:3,5,8,24 55:2,4,5 57:16 76:3

**ingredients** 58:11,16

**initial** 30:8

**initiating** 64:13

**Inn** 7:6

**insane** 42:10

**inside** 72:9

**interaction** 66:2,10,11

**interrogation** 16:20 45:4

**interrogatories** 18:6

**interview** 12:21 34:18,21, 23 36:10 40:8, 15 44:12,15 45:10 46:6

**interviewed** 12:1,4 43:13

**interviewing** 13:16 14:19 15:1,7 31:5,11 34:13,20 37:2 40:2 42:19 44:18

**interviews** 12:22,23 38:25 63:23 68:2

**invest** 76:8

**investigating** 37:1 40:14

**investigation** 24:24 27:22 34:25 35:22 36:9,15 37:23 39:15,19,20 40:19 47:8,11, 17,24 59:1 66:1,3,8,13 67:7,8 68:7 70:2,7,13,18,22 71:7 76:6

**investigations** 35:8

**investigator** 64:6

**involved** 52:18 67:3 68:7 70:7, 9,12,18,22 71:4,7

**involvement** 66:7,10,11

**involving** 36:20 66:16 68:24

**issue** 33:8

___

**J**

**Jack** 52:22

**Jackie** 7:22 64:18 68:19 70:21

**James** 60:4

**Jason** 7:16,20 62:12 71:15

**Jessie** 60:20

**job** 37:23

**Joe** 61:10

**John** 7:17 12:7 22:20

**Johnson** 7:22 68:19 70:17

**join** 17:17 38:10,22 41:13 42:23 45:2,13

**Jonathan** 7:15 9:16 50:12,14 51:1,15 54:17 57:4,7 64:14, 21,22 66:17 67:20 68:24 72:24

**Joseph** 7:22 68:19 70:21

**Josh** 52:23 57:4

**judge** 9:22

**June** 7:5

**jury** 37:24

**Justice** 14:3,7, 8 15:15,17 16:16,24 17:3 73:19 74:9

___

**K**

**K-N-U-C-K-L-E-S** 66:22

**Katherine** 64:7 66:3,7,13 67:20 70:1,7,13,19,22 71:8 76:6,8,10

**Kayla** 55:6 57:4 61:19 62:4,6 72:16 75:24

**Kelly** 7:23 68:19 71:6



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

**Kentucky** 7:7, 11 13:5 53:4 67:24

**kids** 39:10

**Kim** 57:5

**kind** 24:1 27:18 31:22

**King** 61:10,11

**knew** 57:15 59:16 75:2

**knock** 56:1

**knowledge** 25:10 28:3 59:6 66:6,11 70:6,21 71:6 73:3

**Knox** 7:9,18 11:17,22 12:14 13:15 15:1,9 16:19 20:11,20 21:3,13,18 22:1,15,19 23:23 28:12,22 29:4,12 31:17 32:4 52:21 53:2 63:3,5 67:7,10, 23,25 68:1

**Knuckles** 52:23 66:21,25

**KOA** 71:25

**Kristy** 59:3

**Krump** 60:12, 13,15,18

**KSP** 52:25 62:11 68:16

––––––– L –––––––

**lab** 50:14,19 51:23 52:5,7,8, 18 53:9,24 57:8,10 58:13 71:18 72:4 74:18

**labs** 58:9

**Lacee** 7:4

**lack** 23:16

**late** 52:10

**law** 12:10 38:19,25 41:15, 25 42:12 43:22 44:23 45:9,11

**Lawson** 52:23 60:20,21,25 66:25

**lawsuit** 11:1,2

**lead** 64:6 67:10,11,13

**learned** 64:8 66:5 70:4 74:5

**legal** 21:20

**Lester** 49:23, 25 50:4,10

**letter** 65:7

**Licha** 7:24

**lied** 33:21

**list** 15:20 17:4 32:13 47:10

**listed** 52:1

**listen** 46:14

**lived** 72:6

**located** 7:7 71:19

**location** 54:6

**locations** 14:6

**London** 7:7

**long** 20:19

**looked** 17:25 18:9 26:15 51:10

**lost** 21:16 48:18

**loud** 65:18

**lunch** 63:14

––––––– M –––––––

**made** 21:21 22:2 37:15 47:19 65:5

**make** 21:19 22:6 26:15 36:17 37:17,25 46:15 58:9 69:10

**making** 28:7

**man** 34:3

**managed** 9:6

**manned** 24:12

**mark** 7:22 58:19 68:18 70:11

**MARKED** 48:13 58:23

**Maryland** 17:14

**mask** 53:9 69:5,7

**masks** 53:21

**matter** 7:8

**meetings** 19:12 32:20,21, 24

**Mefford** 7:22 68:18 70:12

**members** 66:12

**memory** 75:10

**mentioned** 28:6 66:15,19 68:23

**met** 48:5

**meth** 50:14,19 51:22 52:5,6,8, 18 53:9,24 54:3 57:8,10 58:3,6, 9,13 68:24 71:17,18 72:4 74:18

**Michael** 7:24 57:5 60:12

**microphone** 65:16

**Mike** 59:22 60:2 65:21 66:2

**Mikey** 61:2

**military** 10:23

**Mills** 34:20,21 36:9,10 39:15, 19 40:14,18 47:8 55:6 57:4 58:25 61:19,23 62:2,4,6 66:3,7, 13 67:20 70:1, 13,19,23 72:16 75:24 76:5,6,8, 10

**Mills'** 64:7 70:7 71:8

**mind** 58:20

**mode** 27:6

**moment** 65:2

**morning** 8:12, 13 52:13 71:14

**move** 70:11

**murder** 66:3 67:21 70:2,8, 13,19,23 71:8

––––––– N –––––––

**nature** 68:2

**necessarily** 10:20 43:19 68:6

**needed** 31:1

**night** 66:21 68:24,25 69:7,9 73:6 75:7

**nights** 24:13

**non-law** 54:12

**normal** 30:2

**number** 7:11 73:21

––––––– O –––––––

**object** 17:16 21:19 33:13,23, 24 34:8,9,14 35:2 36:13

37:4,11 38:4,5, 9,21 39:2 41:12,18,20 42:6,22 43:9,10 44:1 45:1,10,12 46:3 54:1 62:17 63:8 64:15

**objected** 48:14

**objection** 21:20,21 36:18 39:22 40:16,21 42:7 44:6 46:20 47:18,19 48:15

**objections** 9:20,21 41:24 47:25

**objects** 45:3,7

**observe** 74:2

**occasion** 67:24

**occasions** 74:1

**occur** 14:4

**occurrence** 68:4

**office** 9:3 12:14 13:15 15:1,10,13,22 16:19,21 20:11, 20 21:3,13,18 22:1,16,19 23:24 26:4,5 28:12,22 29:4, 12,22 31:17 32:5 52:21 67:8 68:1,8

**officer** 38:25 39:12 42:1 43:2,4 44:21 45:9 52:1 56:5, 23 67:13,19

**officer's** 37:23

**officers** 17:15 38:19 52:16,20 53:3,4,20 55:13 56:14,16 66:20, 21,25 67:3,15 69:5,11 74:3,5



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

official 13:9

one-step 58:9
71:18 72:4

open 55:23
75:18

operation 27:6

opinion 49:17
50:9 51:14 62:6

_____

**P**

P.D. 52:22 58:7

paid 13:10,12
15:25 16:8,10
20:5,10,20
22:22 23:1,6,
12,13 28:10
29:12,24 30:9,
11 73:22

papers 26:17

paperwork
22:4 30:3

part 66:20

parts 18:12,16,
17,18 26:24
29:10

party 8:23 11:1

pass 65:11,16

patio 71:24
72:5 75:17

pending 7:9

penitentiary
37:7 39:6 41:3,
4 42:4,20

people 54:16,
17,18

person 26:5
65:7

personal
43:22 55:4 76:3

personally
61:25 75:23

pertained
30:24

physical
44:17,21

physically
44:11,14,22
45:17

pick 22:3 45:19

Pickard 7:17
12:7 19:9 22:21
23:6,16 24:2,8
25:4,13 28:4
52:22 55:20
72:11

Pickard's
18:9,13,25

pictures 26:16,
25 28:1

PL025647
51:19

PL27706 48:12

place 26:6
28:13,14 29:13
30:18

Plaintiff's
58:19

plaintiffs 7:15

play 46:4,12

PLAYING
46:16

plenty 33:6

point 20:25
28:21 64:17,20

pointed 69:12,
18

police 12:17
16:4 17:15
37:22 52:24,25
53:3,4 66:12,20
67:3,24,25

policies 22:11,
15 28:13,14,19,
22 29:1,3,5,13,
19 30:5,7,8,17,
21,23 31:5,15
32:1,12,23
33:11,15,17

policy 22:7,8

28:7 29:8 31:11
32:3

porch 71:19
75:17

position 11:11,
23 12:2

possibility
40:3

possibly 63:5

post 10:17
62:24

power 12:25
13:2

preferable
9:23

prepare 17:24
25:19,22

present 37:23
53:6 54:5,13
55:7 68:25

pretty 22:3
57:15 65:18

previously
69:25

prior 12:11
29:20,21 49:3,
8,17,22,23
50:13 59:3,9,22
60:5,8 61:15

prison 43:7,23

problem
24:18,21

procedure
34:12 35:4

procedures
28:13,14 29:13,
19

proceed 30:18
57:12

proceeded
58:17

PROCEEDING
S 7:1

professional
66:1

Professionally
64:4

prompted
53:25

proper 41:16
42:5,18 43:6,21
44:5,23 45:11
46:1

properly 15:17

property 71:19

prosecuted
58:1 74:18

prosecuting
57:13

prosecutor
74:21

prove 34:16

provided
28:16

pull 12:25

pulled 53:17

punitive 65:4

put 22:9 26:6,8
27:12 37:6
41:2,4 58:21
65:3 75:9

_____

**Q**

question 10:4,
6,9 21:22 36:13
37:5,12 48:18,
20 49:10,13
70:10 73:15
74:12 75:23

questioned
43:13

questioning
35:22 48:10

questions
9:16,19 18:4
35:5,8 36:25
46:10,25 47:24
48:1 65:1,4,8,
25 68:10,20
71:10,16 73:11,
15,16 74:17

76:13

quick 74:16

quicker 13:14

quickly 9:15

_____

**R**

radio 9:6

raise 8:2

raised 35:23

ran 24:23 58:3

Randy 53:1

rattle 36:1

read 18:16,17,
18 32:12,19
55:18,22

reading 26:14

real 58:7

reason 35:13
47:23

recall 12:4
14:17,23,25
15:6,12 17:10
18:2 28:25
31:4,7 38:14,
23,24 39:11
40:9 41:3,14
47:20 51:4
55:6,23 56:13,
14,17,19 57:6
60:9,11 62:1,10
69:14,15,17
72:9

recalled 41:1

receive 13:16
73:18 74:8

received 14:18
36:6 40:9 52:8
53:24

recognize
51:21

recollection
47:13

record 7:2,13
46:11 48:8 65:3

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

76:16

**recorder** 45:19

**recording** 46:19 47:1,3

**recordings** 27:1,4,7,25

**records** 31:2

**REDIRECT** 74:14

**reflect** 47:12

**regard** 52:4

**regular** 34:11

**regularly** 34:7 36:3

**related** 35:5

**relates** 65:25 66:2 67:20

**relating** 47:3

**remember** 17:7 20:18 28:15,16 29:25 30:1 38:12,18 40:4,12 51:7 56:22,23 71:22

**remote** 14:6 17:1

**removed** 32:25

**renew** 48:15

**rephrase** 10:6

**report** 15:23 16:11,14 51:22, 24 52:4 54:3 71:17 75:6

**reporter** 7:4 8:3,4,9 10:4

**reports** 15:18 16:4,6,8 22:5 25:19,22,25 26:11,19,21 27:10,15 28:4 30:25

**represent** 7:12 65:21 68:16,18 71:15

**required** 15:22

**requirement** 32:11

**requires** 17:15 19:2 25:6 33:18 35:25 43:12 44:9

**research** 59:13

**researched** 51:9

**reserve** 47:25 65:8

**reserving** 65:4

**residence** 55:12

**resource** 33:10

**resources** 33:7,16

**responded** 71:16

**RESPONSE** 70:14

**responsibilitie s** 21:25 26:18

**Restate** 41:21

**result** 9:2

**retention** 17:3, 13

**returned** 27:9

**review** 18:8,21 22:5 26:19,21, 23 28:4 29:18 51:18

**reviewed** 18:14 26:13

**reviewing** 27:18,21

**revise** 33:17

**revised** 31:16, 19 32:3,24

**revising** 33:15

**revisions** 32:1, 4,20

**Richmond** 14:5 16:24 22:5

**roadblock** 24:23

**Robert** 59:14

**Robinson** 7:14

**rode** 12:16

**routinely** 40:6

**row** 71:22

**rule** 35:4,14 46:10 47:5

**rules** 9:15

_____

**S**

**scene** 53:6 54:20 55:14 56:15 57:2 61:20 72:24 73:7

**schedule** 14:20 16:18 22:2

**scheduled** 22:3

**school** 10:12, 15,16,17,22

**search** 52:6,18 53:8,25 67:4

**seconds** 48:7

**section** 33:1,2, 9

**sections** 31:18 33:6

**send** 39:5 42:3 43:22

**separate** 66:15

**Sergeant** 62:11 70:21,25

**served** 67:19

**service** 13:7

**seven-deputy** 31:23

**seven-man** 31:22

**shaking** 9:25

**she'd** 71:5

**sheriff** 11:14 12:5,6 18:9,13, 25 19:9 21:16 22:20 23:6,9,16 24:2,8 25:2,4, 12 28:3 29:4 31:23 52:22 55:20 72:11

**sheriff's** 9:3 11:8,9,17,22 12:14 13:15 15:1,10,13,22 16:19 20:11,20 21:3,13,18 22:1,16,19 23:24 28:12,22 29:12,22 31:17 32:5 52:21 53:2 56:5 63:7 67:8 68:1

**shift** 25:16

**Shoo** 30:25

**Shoot** 17:4

**signed** 29:25

**similar** 57:18 73:15

**Simpson** 59:9, 12,22,25 60:2

**single** 23:6 54:9

**sir** 8:18 10:13 11:6,12,19 15:4 16:22 17:13 19:13 20:10 22:23 28:3 30:4 31:25 33:21 35:17,21 36:25 43:18 45:18 46:8 51:21 62:11,14 64:23 65:21,23 68:11 75:8

**sit** 12:22

**sites** 17:1

**sits** 53:14

**sitting** 38:24

**skimmed** 18:15,20,21

**slow** 63:19

**small** 46:5

**smart** 35:18

**smelling** 54:3 71:17

**solely** 22:12

**solemnly** 8:4

**someone's** 39:10

**sound** 50:22

**speak** 19:7,9, 24 54:20,23,25 55:9 57:9 58:16 62:19 64:17,20

**speaking** 30:7 31:16

**special** 13:4,6, 8,14 15:24 16:3 20:9 23:4 73:21 74:2,4,7,11

**specific** 14:18 15:6,8 18:12,18 24:9 26:5 38:12 43:3,5 54:10 65:24 71:2,3

**specifically** 15:13 43:19

**speculate** 19:3 25:6 33:33 35:25 44:9

**speculation** 43:12

**spoke** 25:14 55:1

**spoken** 19:21 69:21

**stack** 18:20

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

staff 32:19,21, 24

standard 27:6

Staples 7:14 8:11 16:1,2 19:5,13,17 21:24 35:7,15 43:17 46:8,11, 14,17,24 47:6, 23 48:2,6,9,16, 21,23 49:15 65:1,9,11 66:24 69:21 74:15 76:13

start 28:18 48:9 74:8 75:5

started 13:18 14:12 15:21 20:5,10 28:24, 25 29:11,16 30:13 47:12 74:6

starting 74:6

state 9:21 12:17 52:23,25 53:4 67:24

stated 41:1 57:1

statement 37:15 41:21

States 7:10

station 9:6,7

stay 73:5

Steele 64:18

stick 34:15 75:15

sticker 58:21

strike 43:4

submit 22:4

submitting 52:1

Sudafed 58:8, 11

sued 9:7

suit 35:6

Suites 7:7

supervisor 23:21

supervisors 23:23

Supply 11:8

supposed 26:16

suspect 40:2 43:2 44:14,19

suspects 15:7 27:4 31:11 56:21,24 67:25

swear 8:4

sworn 8:2

───────

T

talk 22:18 24:8, 17 32:23 51:17 54:21 57:15 76:5

talked 39:17 58:4 61:19

talking 45:16

tape 45:19

taught 15:17

Taylor 7:15 9:16 50:12,13 51:1,15 54:17, 20,23 55:3 57:4,7 58:10,17 64:14,21 66:17 67:20 68:24 72:24

technician 7:3

technique 34:19 36:7 38:20 41:17 42:5,19 43:7 44:18,24 45:11

techniques 16:20

telling 34:4 41:1,3 51:23

ten 21:9,11

term 20:22 23:17

termination 13:10

test 12:8

testified 69:5, 9,13,25 73:17 74:17 75:16

testify 56:12

testimony 8:5 18:8,13,22,25 19:7,25

thick 18:16

thing 34:11 35:18 55:10 70:25

things 12:20 14:1 22:9 28:2 29:23,24 31:3 68:2

thinking 17:9 20:13

threat 37:8 39:4,7

threaten 39:9, 12,16,21 42:20 43:7,22

threatened 37:1 38:25 39:3

threatening 42:3

threats 37:17, 25 38:2,7

throw 45:9,19

throwing 45:6, 16,23

thrown 45:3

til 20:21

time 7:5 11:17 12:6 14:5,13 23:1,6,9,12 24:16 26:13 29:4 30:9 33:7, 10,16 35:9 42:8

47:25 49:22 51:6,11 53:8 57:7 62:9 64:9 70:2,25 72:7,20 74:4

title 17:8

toboggan 53:13

today 7:4,5 17:24 19:7,18 20:3 50:4 60:2

told 19:4 20:14 34:2 43:5 47:11 57:14 74:21

Tom 53:1

top 14:22 17:20 38:13

topics 13:25

totally 41:22

tough 31:23

Townsend 7:4

trained 38:7,16 41:10 44:2,17 45:6

training 10:20, 21 13:16,25 14:2,4,18,20,25 15:3,7,12,14, 16,20 16:11,13, 17,20,23 17:2, 11 22:3 31:9,14 36:6 38:12 40:9 73:16,17,19 74:9,10

transport 73:4

transported 72:23

Trooper 52:24 68:23 69:6 70:6,11,17 71:6

troopers 68:17

true 15:9 23:11, 19 29:15 31:10 33:15 34:16

truth 8:6,7 42:25

turn 25:25 26:3,25 27:7

turned 8:17

type 10:20 12:8 18:2

types 37:17

───────

U

Uh-huh 9:1,18 26:10 28:8,11 32:10 42:2,17 58:14

Uh-uh 10:18 63:13

ultimately 57:25

unclear 10:4

understand 17:9 20:19 31:25 58:8

Underwood 53:1

United 7:10

unpaid 13:7 20:9

uphill 57:14 74:22

upstairs 72:13, 14,18

───────

V

VERBAL 70:14

verbally 9:25

video 7:3 46:16

vocational 10:21

voice 35:23

volume 46:15

volunteer 12:12,13,15,24 13:3 20:7 29:16

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

---

**W**

---

**wait** 73:4

**walk** 75:20

**wanted** 24:19, 24 33:16 41:5 54:21

**wanting** 43:1

**warmed** 8:14

**warrant** 67:4, 19

**watched** 74:4

**wear** 53:9

**Weber** 7:21 68:13,16 71:10

**welding** 10:22

**whatsoever** 46:25 51:15

**Whitley** 11:10, 11

**Wiggins** 35:1 36:16 39:21 40:20 47:17

**William** 49:23 50:4,10

**Williams** 7:16 15:24 17:17 19:1,11,14,16 20:23 21:19 25:6 33:13,18, 23 34:8,14 35:2,11,25 36:17 37:4,11 38:4,9,21 39:2, 18,22 40:16,21 41:13,18 42:6, 23 43:10 44:9 45:2,13 46:6,9, 20 47:2,18,21 48:14,19 49:9, 12 51:20 54:1,7 56:11 65:6,10, 14 73:13 74:13 75:25

**witnesses** 12:21 13:16 14:19 15:2 27:2

31:5 34:13,20, 21,23 36:3,8 37:18,25 38:3,8 39:16,21 40:10 58:25 67:25

**words** 38:1 40:10

**work** 24:12 27:20 62:24

**work-in-progress** 31:20

**worked** 12:10 22:20 24:12 25:8 62:14,16 63:4

**working** 15:21 24:9 25:5,20 62:23 63:15 67:23

**Wright** 7:19 17:16 33:24 34:9 38:5,10,22 41:12,20 42:7, 22 43:9,12 44:1,6 45:1,12 46:3 62:17 63:8 64:15 71:13,15 73:10

**write** 15:17 16:3,8,11

**written** 12:8 25:19,22,25 26:19 28:4,13, 17,22 29:19 30:17,21 32:15

---

**Y**

---

**year** 14:14 17:5 47:7

**years** 8:22 9:13 12:12 13:8 21:9 41:16 42:1,13, 16 62:21 73:17, 22 74:1

**yelled** 35:21

**York** 7:20 62:12,24 63:9,

20,24 64:2,8,9, 12 71:15

**you-all** 19:18 63:12

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com