IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF KENTUCKY, LONDON DIVISION

|  |  |  |
|---|---|---|
| AMANDA HOSKINS and JONATHAN TAYLOR, | ) | |
| | ) | |
| | ) | Case No. 17-CV-84 |
| Plaintiffs, | ) | |
| | ) | Hon. ROBERT E. WEIR |
| v. | ) | |
| | ) | Mag. HANLY A. INGRAM |
| KNOX COUNTY, ET AL., | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendants. | | |

**<u>PLAINTIFFS' CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS – STATEMENT OF FACTS

I.   PLAINTIFFS ARE INNOCENT .........................................................................5

    A.  Plaintiff Amanda Hoskins Did Not Know Katherine Mills and Is Completely Innocent ................................................................................................5

    B.  Plaintiff Jonathan Taylor, too, Did Not Know The Victim and Is Completely Innocent.................................................................................................6

    C.  Due to the Absence of Probable Cause, the Knox County Commonwealth Attorney Dismissed Plaintiffs' Criminal Charges.................................................8

    D.  The Physical Evidence at the Crime Scene Corroborates the Plaintiffs' Innocence, Yet Defendant York Did Nothing to Stop Their Wrongful Prosecution ............................9

II.  THE MURDER OF KATHERINE MILLS........................................................10

    A.  Katherine Mills Was Discovered Dead In The Early Evening Hours of December 20, 2010 ...........................................................................10

    B.  Defendants' Roles in Investigation..........................................................10

III. DEFENDANTS' ILLEGAL INVESTIGATION INTO THE MILLS' HOMICIDE........12

    A.  The Immediate Investigation of Mills' Homicide Reveals a Possible Eyewitness .....12

    B.  Mike Simpson and Allen Helton Are Obvious Suspects in Mills' Death....................12

    C.  Defendants' Incomplete and Failed Investigation of Mike Simpson, Allen Helton, and Jesse Lawson Transforms into a Conspiracy to Frame Plaintiffs ........................14

        i.   Defendants Learn that Helton and Simpson Were Broke Prior to Mills' Death, Possessed a Blue Vehicle, Paid Bills with Cash, and Fled to Florida After Murder......................................................................................14

        ii.  Defendant York Questioned Helton On December 23, 2010 After His Return to Kentucky ....................................................................................15

        iii. Defendants York, Mefford, and Broughton Question Helton Regarding Mills' Homicide on January 4, 2011 ...........................................................16

        iv.  Defendant York Initiates Charges Against Helton on January 4, 2011 After Questioning Him for Mills' Murder .................................................17

        v.   Defendant York Threatens Jesse Lawson During Investigation........................17

i

vi.   Helton and Lawson's Failed Polygraph Examinations Lead to Defendants' Plot to Frame Plaintiffs for Mills' Murder......................................................18

vii.  Defendant York Feeds Information to Helton After Polygraph Examination In Attempt to Fabricate Statement ......................................................20

viii. Targeting His Then Suspects, Defendant York Falsifies Information in Multiple Search Warrant Affidavits..................................................21

ix.   After Helton and Lawson Fail Polygraph Examinations, Defendants Decline to Conduct any Further Investigation and Use Lawson as a Confidential Informant in Ongoing Investigations..........................................22

IV.   DEFENDANT BROUGHTON FAILS TO INTERVENE AS DEFENDANT YORK THREATENS TO FRAME PLAINTIFF ON FEBRUARY 15, 2011 .............................23

V.    DEFENDANTS MAKE PROMISES OF CONSIDERATION AND THREATS OF COERCION TO FABRICATE FALSE EVIDENCE IMPLICATING PLAINTIFFS IN MILLS' DEATH...........................................................................................25

A. Defendants York and Pickard Switch Suspects, Make Promises of Consideration, and Fabricate Helton's March 2012 Statement ................................................25

B. Detective York Tampers with Ms. Hoskins' Medical Records to Support Fabricated Statement from Allen Helton ...................................................28

C. Detective York Fabricates Christy Branson's May 16, 2011 Statement ...................30

D. Detective York Fabricates Joe King's June 24, 2011 Statement................................31

E. Detective York Fabricates Amber Simpson's March 13, 2012 Statement .................33

F. Sheriff Pickard and Detective York Fabricate Kayla Mills' Statement......................36

    i.   Defendants Pickard and York Coerce and Feed Information To Kayla To Fabricate Her False Statement Against Plaintiffs ................................................36

    ii.  Defendant York Initiates Charges Against Kayla Mills For Murder Without Notifying the Commonwealth Attorney's Office ................................................38

    iii. Defendant York Sets Deadline For Kayla Mills To Regurgitate Defendants' Fabricated Statement..............................................................39

    iv.  Defendant York Strikes Undisclosed Deal With Kayla Mills In Exchange For Fabricated Statement..............................................................40

G.  Detectives York and Mefford Fabricate Daniel Wilson's July 18, 2012 Statement....42

    i.    Defendant Mefford Was Present During the Fabrication of Wilson's Statement, Did Nothing to Intervene, and Failed to Document the Fabrication and Promises of Consideration ................................................................................................43

VI.  DEFENDANTS YORK, BROUGHTON, AND PICKARD FACILITATE UNDULY SUGGESTIVE IDENTIFICATION PROCEDURE TO FRAME PLAINTIFFS.............45

A.  Defendant York is Present When Sketch is Made .......................................................45

B.  Defendants York, Pickard, and Broughton Interrogate Plaintiff Taylor for the Mills' Murder.........................................................................................................................45

C.  Defendants York, Pickard, and Broughton Facilitate Unduly Suggestive Show-up of Plaintiff Jonathan Taylor.............................................................................................46

D.  Defendant Broughton Admits to Assisting Defendant York by Photographing Plaintiff Taylor.............................................................................................................48

E.  Defendants York, Pickard, and Broughton Discuss Conspiracy to Frame Plaintiff....49

F.  Defendant York Reveals for the First Time in this Case That He Conducted Photographic Show-Up of Plaintiff Taylor and Declined To Document The Failed Identification Attempt....................................................................................................50

G.  The Commonwealth's Attorney Was Never Informed of Defendants' Plan To Conduct Suggestive Photo-Identification Procedure ....................................................51

H.  PLAINTIFFS' EYEWITNESS IDENTIFICATION EXPERT...................................51

VII.  BASED ON FALSE AND FABRICATED EVIDENCE, DEFENDANT YORK INITIATES CHARGES AGAINST PLAINTIFFS THROUGH CRIMINAL COMPLAINTS .................................................................................................................52

A.  Defendant York Initiates Charges Against Plaintiff Hoskins While Admitting That He Knew She Was Not Involved in Crime.........................................................................52

B.  Defendant York Initiates Charges Against Plaintiff Taylor, Then Threatens Him .....53

VIII.  DEFENDANT YORK PRESENTS FABRICATED EVIDENCE AT PRELIMINARY HEARING.......................................................................................................................53

A.  Defendants' Fabricated Statements Introduced at Preliminary Hearing.....................54

IX.    DEFENDANT YORK TESTIFIES FALSELY WHILE PRESENTING DEFENDANTS' FABRICATED EVIDENCE TO GRAND JURY ............................................................55

       A. Defendants' Fabricated Statements Introduced to Grand Jury ....................................56

       B. Defendant York Testifies Falsely Before Grand-Jury ..................................................57

            i.     Defendant York Falsely Testified that Hoskins and Taylor Knew Victim.........57

            ii.    Defendant York Falsely Testified that Lester Was on Run ...............................58

            iii.   Defendant York Falsely Testified That Ms. Hoskins Claimed to be at Doctor Earlier in the Morning.......................................................................................58

            iv.    Defendant York Falsely Informed the Grand Jury that Allen Helton Did Not Fail The Polygraph Examination on Questions Relating to Murder of Ms. Mills .........................................................................................................59

            v.     Defendant York Falsely Informed Grand Jury that Hoskins Engaged in Affair with Dr. Warren ...................................................................................60

            vi.    Defendant York Falsely Testified that Jonathan and Kayla Dated in December 2010 and that Kayla's Car Was Hidden.................................................60

            vii.   Defendant York Falsely Presents Motive Theory to Grand Jury Knowing it Was False ................................................................................................61

            viii.  Defendant York Falsely Testified that Ms. Hoskins' Mother Was Driving Blue Car Around Time of Murder................................................................62

            ix.    Defendant York Falsely Testified Before Grand Jury That Crump Identified Jonathan Taylor....................................................................................63

X.     DEFENDANT YORK FABRICATES TWO ADDITIONAL STATEMENTS AFTER THE INITIATION OF CHARGES THAT DEFENDANT YORK AND THE COMMONWEALTH ATTORNEY AGREE WERE NOT MATERIAL TO PROBABLE CAUSE.........................................................................................................64

       A. Defendant York Fabricates Robert Beach's February 26, 2014 Statement .................64

       B. Detective York Fabricates Mikey Bruner's April 29, 2015 Statement........................67

XI.    DEFENDANTS HID THEIR EGREGIOUS MISCONDUCT FROM THE PROSECUTOR THROUGHOUT CRIMINAL PROSECUTION ...................................69

A. The Knox County Commonwealth Attorney Did Not Initiate Criminal Charges Against Plaintiffs and Relied Upon Truthful Reports In Continuing Initiation of Charges ...............................................................................................................69

B. The Defendants Hid The Egregious Misconduct Outlined Above From the Knox County Commonwealth Attorneys' Office ..................................................................69

C. If Defendants' Misconduct was Disclosed, Knox County Commonwealth Attorney would have Taken Steps to Stop Plaintiffs' Criminal Prosecution .............................72

XII. DEFENDANT KNOX COUNTY FAILED TO ADOPT POLICIES THAT WERE OBVIOUSLY NEEDED .....................................................................................................72

XIII. DEFENDANT KNOX COUNTY FAILED TO TRAIN OFFICERS REGARDING CRITICAL POLICE FUNCTIONS....................................................................................75

XIV. DEFENDANT KNOX COUNTY'S FINAL POLICYMAKERS HAD NOTICE OF THE NEED TO ADOPT POLICIES AND TRAINING AND CHOSE NOT TO ADOPT ANY.......................................................................................................................76

A. Knox County Policymakers Were on Notice as the Kentucky State Police Defendants and Knox County Defendants Framed Another Innocent Person For Murder Using the Same Unconstitutional Tactics Due to the Lack of Training, Policies, and Procedures77

B. Defendants Pickard and Derek Eubanks Led Initial Investigation Into Wiggins' Death ....................................................................................................78

C. Defendant Pickard and Deputy Eubanks Interrogate James Otis Sizemore for Wiggins' Murder on December 2, 2011 ....................................................................80

D. In His Quest to Frame Mr. Anderson, Defendant York Assaults Dave Fox in the Presence of Jackie Joseph and Derek Eubanks, Who Decline to Intervene ...............82

E. Defendant York's Penchant for Threatening Witnesses and Feeding Information in the Wiggins Homicide is Directly Relevant to the Mills' Investigation.....................84

F. Defendants York and Pickard Protect Mr. Sizemore's Accomplice in Wiggins' Homicide Due to Payoffs and Familial Relationship ..................................................85

G. After Defendants' Misconduct, William Anderson Was Tried and Acquitted of Capital Murder .............................................................................................87

XV.  KENTUCKY STATE POLICE DEFENDANT JACKIE JOSEPH FAILED TO SUPERVISE OFFICERS UNDER HER COMMAND, INCLUDING DEFENDANT YORK ........................................................................................................ 87

A.  Defendant Joseph Was Unaware of Significant Aspects of Defendant York's Investigation Into Mills Because She Declined to Actually Supervise Him ...............89

B.  Defendant Joseph Not Only Failed to Supervise Defendant York, but She Actively Encouraged His Misconduct by Participating, Failing to Intervene, and Failing to Discipline Him Afterwards ...........................................................................................93

C.  Given Defendant Joseph's Failure to Supervise, Defendant York Believed he Could Violate Plaintiffs' Constitutional Rights With Impunity ............................................96

XVI.  PLAINTIFFS' POLICE PRACTICES EXPERT .............................................................97

# **TABLE OF CONTENTS – ARGUMENT**

ARGUMENT .................................................................................................................99

XVII.   A TRIAL IS NECESSARY ON PLAINTIFFS' FABRICATION CLAIMS............100

  A. Defendants York's Motion for Reconsideration of this Court's Prior Ruling is Without Merit and Conflicts with Binding Sixth Circuit Precedent.........................101

  B. There is sufficient evidence for a reasonable jury to conclude that Defendants York, Pickard, Mefford, and Broughton fabricated evidence against Plaintiffs.................106

    i.   Defendants York and Pickard Do Not Contest That A Reasonable Jury Could Conclude That They Fabricated Kayla Mills' Statement .................................106

    ii.  A Reasonable Jury Could Conclude That Defendants York and Pickard Fabricated Allen Helton's Statement.  That Same Jury Could Likewise Conclude that Defendants Broughton and Mefford Assisted and Failed to Intervene in the Fabrication of Helton's Statement ..........................................111

      a.   Defendant York's Comingling of Unrelated Constitutional Torts is Similarly Without Merit...............................................................................118

    iii. A Reasonable Jury Could Conclude That Defendant York Fabricated Amber Simpson's Statement.........................................................................................119

      a.   Defendant York's Representation of His Interaction with Amber Simpson is Contrary to the Actual Record ...................................................................121

      b.   The Cases Relied Upon by Defendant York Illustrate that Ms. Simpson's Testimony is for a Jury to Decide and Inappropriate for This Court to Resolve at Summary Judgment...................................................................126

    iv.  A Reasonable Jury Could Conclude That Defendant York Fabricated Joe King's Statement.............................................................................................126

    v.   A Reasonable Jury Could Conclude That Defendants York and Mefford Fabricated Daniel Wilson's Statement.............................................................129

      a.   Defendant York's Cursory Arguments Should be Rejected.......................129

      b.   Defendant Mefford's Argument Should Be Rejected as Well...................130

    vi.  A Reasonable Jury Could Conclude That Defendant York Fabricated Ms. Hoskins' Medical Records...............................................................................131

      a.  The Record Illustrates that Defendant York Tampered With And Fabricated Ms. Hoskins' Medical Records ..................................................................131

      b.  Defendant York's Arguments Regarding the Medical Records are Without Merit and For a Jury to Decide ....................................................................133

  vii.  A Reasonable Jury Could Conclude that Defendant York Fabricated Two Additional Statements After the Initiation of Charges as His Case Against Plaintiffs was Falling Apart ..............................................................................134

      a.  A Reasonable Jury Could Conclude that Defendant York Fabricated Robert Beach's February 26, 2014 Statement ........................................................134

      b.  A Reasonable Jury Could Conclude that Defendant York Fabricated Mikey Bruner's April 29, 2015 Statement ...........................................................137

  viii.  A Summary of Different Evidence Supporting Plaintiffs' Fabrication Claim...............................................................................................................139

XVIII. A TRIAL IS NECESSARY ON PLAINTIFFS' MALICIOUS PROSECUTION CLAIMS ....................................................................................................................140

  A.  A Reasonable Jury Could Conclude that Defendants' Made, Influenced, or Participated in the Initiation of Charges and/or the Continued Detention of Plaintiffs ........................................................................................................141

    i.  Defendant York's Misconduct Led to Both the Initiation of Charges Against and Continued Detention of Defendants ............................................................142

    ii.  A Reasonable Jury Could Conclude that Defendant Pickard Made, Influenced and/or Participated in the Decision to Prosecute and in Plaintiffs' Continued Detention .........................................................................145

    iii.  A Reasonable Jury Could Conclude that Defendant Mefford Made, Influenced, and/or Participated in the Decision to Prosecute and to Continue the Prosecution of the Plaintiffs ..............................................149

    iv.  A Reasonable Jury Could Conclude that Defendant Broughton Made, Influenced, and/or Participated in the Decision to Prosecute and to Continue Plaintiffs' Detention.................................................152

    v.  The Defendants are Liable for the Actions of Their Co-Conspirators.............156

  B.  A Reasonable Jury Could Conclude There Was No Probable Cause to Prosecute Plaintiffs......................................................................................................157

i.  The Finding of Probable Cause at the Preliminary Hearing and the Grand Jury
    Proceedings is Rebuttable ...................................................................................158

    a.  A Reasonable Jury Could Conclude that Defendant York Presented False
        Testimony in the Preliminary Hearing and at the Grand Jury, Rebutting the
        Presumption of Probable Cause ..................................................................158

    b.  A Reasonable Jury Could Conclude Defendant Broughton's Nontestimonial
        Acts That Were Material to the Prosecution Rebuts the Probable Cause
        Presumption ................................................................................................162

    c.  A Reasonable Jury Could Conclude that Probable Cause did Not Exist
        Outside the False Evidence Defendants Fabricated.....................................162

    d.  Defendant Mefford's General Argument that there Was Probable Cause
        for Plaintiffs' Arrest, Based on a Multitude of Offenses For which
        They Were Not Charged is Irrelevant ........................................................165

C.  Plaintiffs Suffered a Deprivation of Liberty ............................................................165

D.  A Reasonable Jury Could Conclude That the Criminal Proceedings Were Terminated
    in Plaintiffs' Favor and Without Compromise...........................................................166

    i.  The Dismissal of Plaintiffs' Criminal Case Without Prejudice is of Little
        Significance..................................................................................................167

    ii.  A Reasonable Jury Could Conclude The Prosecutor Dismissed the Plaintiffs'
         Criminal Charges on the Merits Due to a Lack of Probable Cause ...................169

XIX.  A TRIAL IS NECESSARY ON PLAINTIFFS CONSPIRACY CLAIM AGAINST
      DEFENDANTS YORK, PICKARD, BROUGHTON AND MEFFORD......................172

A.  A Reasonable Jury Could Find that Defendants York and Pickard Were Part of a
    Conspiracy to Frame Plaintiffs .................................................................................173

B.  A Reasonable Jury Could Find that Defendant Broughton Joined Defendants York
    and Pickard in the Conspiracy to Frame Plaintiffs ....................................................176

C.  A Reasonable Jury Could Find that Defendant Mefford Joined the Conspiracy to
    Frame Plaintiffs........................................................................................................177

XX.   A TRIAL IS NECESSARY ON PLAINTIFFS' FAILURE TO INTERVENE
      CLAIM.................................................................................................................177

XXI.  DEFENDANTS ARE NOT ENTITLED TO ABSOLUTE IMMUNITY......................180

ix

a.  Defendant York is Not Shielded by Absolute Immunity for Violating Plaintiffs'
    Constitutional Rights by Submitting Fabricated Evidence to Grand-Jury,
    Withholding Exculpatory Evidence from Grand-Jury, and Recklessly Testifying
    before Grand-Jury ........................................................................................................180

b.  Defendant Knox County is Not Shielded by Absolute Immunity from Plaintiff's
    Federal Claims ............................................................................................................180

XXII.  DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY .....................180

a.  It Was Clearly Established Long Before 2010 that Defendants' Misconduct Violated
    the Constitution ...........................................................................................................180

b.  For All Reasons Discussed Above, Defendants Violated Plaintiffs' Clearly
    Established Constitutional Rights ...............................................................................182

c.  Defendant Pickard is Not Entitled to State-Law Qualified Immunity .......................182

XXIII.  A TRIAL IS NECESSARY ON PLAINTIFFS' SUPERVISOR LIABILITY CLAIM
        AGAINT JACKIE PICKRELL JOSEPH .......................................................................183

A.  A Reasonable Jury Could Conclude that Defendant Joseph Is Liable for the
    Misconduct of Defendants York and Mefford Because she Knowingly Acquiesced to
    the Misconduct ............................................................................................................183

B.  A Reasonable Jury Could Conclude that Plaintiffs' Wrongful Continued Detention
    was Caused by the Deliberate Indifference and Recklessness of Defendant
    Joseph When she Failed to Adequately Train and Supervise Defendants
    York and Mefford ........................................................................................................188

    i.   Defendant Joseph's Deliberate Indifference and Recklessness Caused Plaintiffs'
         Wrongful Detention ............................................................................................188

    ii.  A Reasonable Jury Could Conclude that Given Defendant Joseph's Failure to
         Supervise, Defendant York believed He Could Violate Plaintiffs' Constitutional
         Rights with Impunity ..........................................................................................190

C.  The Plaintiffs Properly Brought Claims of Negligence, Gross Negligence and
    Malicious Prosecution Claims ....................................................................................192

XXIV.  A TRIAL IS NECESSARY ON PLAINTIFFS' *MONELL* THEORIES AGAINST
       DEFENDANT KNOX COUNTY .....................................................................................192

A.  Defendant Knox County's Conclusory Arguments Are Insufficient to Shift the
    Summary Judgment Burden .........................................................................................194

B.  The County's Conscious Choice Not to Have Policies on *Brady,* Fabrication, and Other Crucial Issues Amounts to Deliberate Indifference ........................................195

C.  The County's Failure to Train and Supervise Amounts to Deliberate Indifference ..................................................................................................................200

D.  Defendant Knox County Engaged in a Custom of Misconduct Which Resulted in the Violation of Plaintiffs' Constitutional Rights ............................................................203

E.  The County's Policy, Training, Customs, and Supervision Failures Caused the Violation of Plaintiffs' Constitutional Rights ............................................................209

XXV.  A TRIAL IS NECESSARY ON PLAINTIFFS' STATE-LAW MALICIOUS PROSECUTION CLAIM ........................................................................210

CONCLUSION........................................................................................................................211

## **TABLE OF AUTHORITIES**

*Albright v. Oliver,* 510 U.S. 266 (1994) ................................................................... 160

*Alcorn v. Gordon,* 762 S.W.2d 809 (Ky.Ct.App. 1988) ...........................................171

*Alexander v. CareSource*, 576 F.3d 551 (6th Cir. 2009) .....................................99, 195

*Alman v. Reed,* 703 F.3d 887 (6th Cir.2013) ..........................................................157

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................................100

*Armstrong v. Squadrito*, 152 F.3d 564 (7th Cir. 1998)...........................................196

*Ash v. Ash,* 72 Ohio St.3d 520 (1995)...........................................................166, 170

*Avery v. Burke Cnty.*, 660 F.2d 111 (4th Cir. 1981) ...............................................196

*Barber v. City of Salem*, 953 F.2d 232 (6th Cir. 1992).............................................193

*Barnes v. Wright,* 449 F.3d 709 (6th Cir. 2006) ....................................................140

*Bass v. Robinson*, 167 F.3d 1041 (6th Cir. 1999) ...................................................185

*Bazzi v. City of Dearborn*, 658 F.3d 598 (6th Cir. 2011) .........................................172

*Bd. of the Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 396 (1997)..................200

*Braddy v. Florida Dep't of Labor & Employment Sec.,* 133 F.3d 797 (11th Cir. 1998)..............185

*Broaddus v. Campbell,* 911 S.W.2d 281 (Ky.Ct.App. 1995) .....................................167

*Bruner v. Dunaway*, 684 F.2d 422 (6th Cir. 1982)........................................ 171-172

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) ...........................................99, 135, 195

*Chapman v. UAW Local 1005,* 670 F.3d 677 (6th Cir. 2012) ..................................100

*Chavez v. Illinois State Police*, 251 F.3d 612 (7th Cir. 2001) ...................................185

*Chelios v. Heavener*, 520 F.3d 678 (7th Cir. 2008)................................................157

*Cherry v. Howie,* 191 F.Supp.3d 707 (W.D. Ky 2016) ...........................................167

*Ciminillo v. Streicher*, 434 F.3d 461 (6th Cir. 2006)...............................................200

*City of Canton v. Harris*, 489 U.S. 378 (1989)................................................................193, 195

*City of Oklahoma City v. Tuttle*, 471 U.S. 808 (1985)................................................197

*City of Roseville,* 296 F.3d at 440 (6th Cir. 2002) ............................................. 185-186

*City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988)................................................193

*Coble v. City of White House, Tenn.*, 634 F.3d 865 (6th Cir. 2011)............................125

*Connick v. Thompson*, 131 S. Ct. 1350 (2011) ...............................................200, 201

*Crowder v. Lash*, 687 F.2d 996 (7th Cir. 1982)................................................117

*Darrah v. City of Oak Park*, 255 F.3d 301 (6th Cir. 2001) ......................................140

*Davidson v. Castner-Knott Dry Good Co.,* 202 S.W.3d 597
    (Ky.Ct.App. 2006) ...............................................................168, 170, 171, 172

*District of Columbia v. Wesby,* 138 S.Ct. 577 (2018)......................................162, 165

*Doe v. City of Roseville,* 296 F.3d 431 (6th Cir. 2002)........................... 185, 187, 188

*Doe v. Sullivan Cnty.*, 956 F.2d 545 (6th Cir. 1992) ..............................................194

*Dubbs v. GCA Servs. Grp. of N. Carolina, Inc.*, No. 1:16-CV-498, 2018 WL 3371054
    (E.D. Tenn. July 9, 2018)......................................................................131

*Everidge v. Rice,* 2011 WL 6014407 (E.D. Ky. 2011) ..............................................166

*F.T.C. v. E.M.A. Nationwide, Inc.,* 767 F.3d 611 (6th Cir. 2014)................................99

*Feinberg v. Townsend,* 107 S.W.3d. 910 (Ky.Ct.App. 2003)........................................167

*Fields v. Wharrie*, 740 F.3d 1107 (7th Cir. 2014) ................................................105

*Fillmore v. Page*, 358 F.3d 496 (7th Cir. 2004) ................................................117

*Fox v. DeSoto*, 489 F.3d 227 (6th Cir. 2007)................................................140, 141

*France v. Lucas,* 836 F.3d 612 (6th Cir. 2016)................................................162

*Garner v. Memphis Police Department*, 8 F.3d 358 (6th Cir. 1993).............................. 193-194

*Garnett v. Undercover Officer C0039*, 848 F.3d 265 (2nd Cir. 2016) ..........................104

*Gregory v. City of Louisville*, 444 F.3d 725 (6th Cir. 2006)................................................... passim

*Grove Press, Inc. v. Angleton*, 649 F.2d 121 (2d. Cir. 1981) ......................................................156

*Hale v. Kart,* 396 F.3d 721 (6th Cir.2005)...................................................................................157

*Haley v. City of Boston*, 2013 WL 4936840 (D. Mass. Sept. 12, 2013)......................................197

*Halsey v. Pfeiffer*, 750 F.3d 273 (3d Cir. 2014)...........................................................................101

*Harden v. Hillman,* 2017 WL 3668437 (W.D.Ky. 2017) ..............................................................171

*Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) ...........................183

*Heck v. Humphrey*, 512 U.S. 477, 114 S.Ct. 2361, 129 L.Ed.2d 383 (1994).............................141

*Hill v. McIntyre*, 884 F.2d 271 (6th Cir. 1989)...................................................................160, 181

*Hinchman v. Moore*, 312 F.3d 198 (6th Cir. 2002) ....................................................................181

*Hooks v. Hooks*, 771 F.2d 935 (6th Cir. 1985) ...........................................................................156

*Horn v. City of Convington,* 2015 WL 4042154 (E.D.Ky. July 1, 2015) ....................................178

*Hoskins v. Knox Cty., Kentucky*, No. CV 17-84-DLB-HAI, 2018 WL 1352163
    (E.D. Ky. Mar. 15, 2018) .....................................................................................................181

*Illinois v. Gates,* 462 U.S. 213 (1983) ........................................................................................157

*Jackson v. City of Cleveland*, 925 F.3d 793 (6th Cir. 2019)................................................200, 202

*Jackson v. City of Cleveland*, No. 17-3840, 2019 WL 2171462
    (6th Cir. May 20, 2019) .......................................................................................101, 103, 105

*Johnson v. Knorr*, 477 F.3d 75 (3d Cir. 2007)............................................................................140

*Johnson v. Moseley,* 790 F.3d 649 (6th Cir. 2015) .....................................................................149

*Johnson v. Vill. of Ottawa Hills*, 5 Fed.Appx. 390 (6th Cir. 2001) ............................................178

*Jones v. City of Chicago*, 787 F.2d 200 (7th Cir. 1986) .....................................................173, 196

*Jones v. Clark Co., Kentucky,* 5:15-CV-337, 2019 WL 637769 (E.D. Ky. Feb. 14, 2019)........168

*King v. Harwood,* 852 F.3d 568 (6th Cir. 2017).........................................................141, 143, 166

*Kinzer v. Jackson*, 316 F.3d 139 (2d Cir. 2003) ........................................................148, 150, 157

*Martin v. O'Daniel*, 507 S.W.3d 1 (Ky. 2016) ........................................................................183

*Matsushita Elec. Indus Co. v. Zenith Radio Corp.,* 475 U.S. 574,
   106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).........................................................................100

*McDonough v. Smith*, No. 18-485, 2019 WL 2527474 (U.S. June 20, 2019) ....................102, 103

*McKinley v. City of Mansfield*, 404 F.3d 418 (6th Cir. 2005) ......................................................140

*McQueen v. Beecher Cmty. Schs.,* 433 F.3d 460 (6th Cir. 2006) ................................................184

*Miller v. Calhoun Cnty.*, 408 F.3d 803 (6th Cir. 2005) ..............................................................196

*Miller v. Maddox*, 866 F.3d 386 (6th Cir. 2017).............................................................141, 166

*Mills v. Barnard,* 869 F.3d 473 (6th Cir. 2017)........................................................................142

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).................................................................193

*Mooney v. Holohan*, 294 U.S. 103 (1935) ..............................................................................181

*Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.,* 276 F.3d 845
   (6th Cir.2002)........................................................................................................195, 99

*Napue v. Illinois*, 360 U.S. 264 (1959) ...................................................................................181

*Novosteel SA v. United States*, 284 F.3d at 1261 (Fed. Cir. 2002) ....................................... passim

*Oakley v. Ballard Cty.,* 2013 WL 275641 (Ky. Ct. App. Jan. 25, 2013)....................................210

*Ohnemus v. Thompson,* 594 F.App'x 864 (6th Cir. 2014)..........................................................166

*Ontha v. Rutherford Cty., Tenn.*, 222 Fed.Appx. 498 (6th Cir. 2007).........................................178

*Owen v. City of Independence*, 445 U.S. 622 (1980).................................................................193

*Paige v. Coyner*, 614 F.3d 273 (6th Cir. 2010)........................................................................193

*Peatross v. City of Memphis,* 818 F.3d 233 (6th Cir. 2016) ........................................ 184-185, 188

*Pembaur v. City of Cincinnati,* 475 U.S. 469 (1986).................................................................193

*Phat's Bar & Grill v. Louisville Jefferson Cty. Metro Gov't*, 918 F. Supp. 2d 654
   (W.D. Ky. 2013) ...........................................................................................157

*Proffitt v. Ridgeway,* 279 F.3d 503 (7th Cir. 2002) ......................................156

*Pyle v. Kansas*, 317 U.S. 213 (1942) ...........................................................181

*Rehberg v. Paulk,* 566 U.S. 356 (2012) .......................................................143

*Revis v. Meldrum*, 489 F.3d 273 (6th Cir. 2007) ........................................172

*Richko v. Wayne Cnty.*, 819 F.3d 907 (6th Cir. 2016) ................................194

*Rudisill v. Ford Motor Co.,* 709 F.3d 595 (6th Cir. 2013).............................100

*Russell v. Smith,* 68 F.3d 33 (2d Cir. 1995) ................................................169

*Russo v. City of Cincinnati*, 953 F.2d 1036 (6th Cir. 1992) ........................202

*Sampson v. Vill. Of Mackinaw City,* 685 F.App'x 407 (6th Cir. 2017).......141

*Sanders v. Jones,* 845 F.3d 721 (6th Cir. 2017).........................................142, 148, 150

*Schertz v. Waupaca County*, 875 F.2d 578 (7th Cir. 1989) ........................158

*Schlueter v. Southern Energy Homes, Inc.,* 252 Fed.Appx. 7 (6th Cir. 2007)...........170

*Scott v. Harris,* 550 U.S. 372 (2007) ...........................................................178

*Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546 (6th Cir. 2008)............................ passim

*Shadrick v. Hopkins Cnty.*, 805 F.3d 724 (6th Cir. 2015) ...........................200, 210

*Sheffey v. City of Covington*, 564 Fed.Appx. 783 (6th Cir. 2014) ..............178

*Shehee v. Luttrell*, 199 F.3d 295 (6th Cir. 1999) .......................................184, 190

*Skousen v. Brighton High Sch.*, 305 F.3d 520 (6th Cir. 2002).....................140

*Smith v. Heath*, 691 F.2d 220 (6th Cir. 1982)..............................................178

*Smith v. Ross*, 482 F.2d 33 (6th Cir. 1973)..................................................177

*Sornberger v. City of Knoxville*, 434 F.3d 1006 (7th Cir. 2006) ................158

xvi

*Spurlock v. Satterfield*, 167 F.3d 995 (6th Cir. 1999) .................................................100, 105, 181

*Stearns Coal Co. v. Johnson,* 238 Ky. 247, 37 S.W.2d 38 (1931) ...............................................210

*Stemler v. City of Florence*, 126 F.3d 856 (6th Cir. 1997) ........................................................103

*Stillwagon v. City of Delaware, Ohio*, 747 F. App'x 361 (6th Cir. 2018) ...................................175

*Stovall v. Denno*, 388 U.S. 293 (1967) ....................................................................................181

*Sykes v. Anderson,* 625 F.3d. 294 (6th Cir. 2010) .............................................................. passim

*Thomas v. City of Chattanooga*, 398 F.3d 426 (6th Cir. 2005) ...........................................203, 209

*Tsao v. Desert Palace, Inc*., 698 F.3d 1128 (9th Cir. 2012) ......................................................196

*Turner v. Scott*, 119 F.3d 425 (6th Cir. 1997) ..........................................................................178

*United States v. Frost,* 914 F.2d 756 (6th Cir. 1990) .................................................................156

*United States v. Garcia*, 897 F.2d 1413 (7th Cir. 1990) ............................................................108

*United States v. Green,* 680 F.2d 520 (7th Cir.) ........................................................................108

*Virgil v. City of Newport,* 2018 WL 344986 (E.D.Ky., January 9, 2018) ...................................156

*Virgil v. City of Newport*, No. CV 16-224-DLB-CJS, 2018 WL 344986
    (E.D. Ky. Jan. 9, 2018) .................................................................................155, 178, 192

*Webb v. United States*, 789 F.3d 647 (6th Cir. 2015) ........................................................ passim

*Weberg v. Franks,* 229 F.3d 514 (6th Cir.2000) ........................................................................173

*Wells v. City of Dearborn Heights*, 538 Fed.Appx. 631 (6th Cir. 2013) ....................................178

*White v. Rockafellow,* 181 F.3d. 106 (6th Cir. 1999) .................................................................171

*Williams v. Crosby,* 43 F. Supp.3d 794, 805-806 (N.D. Ohio 2014 ........................... 166, 170-171

*Windswor v. Tennessean*, 719 F.2d 155 (6th Cir. 1983 ............................................................181

*Yancey v. Carroll County,* 876 F.2d 1238 (6th Cir.1989)..........................................................160

*Yanero v. Davis*, 65 S.W.3d 510 (Ky.2001) .....................................................................182, 183

## STATUTES AND OTHER AUTHORITIES

Fed. R. Civ. P. 56(e) .................................................................131

Fed. R. Evid. 804(b)(3) ..............................................................108

Fed.R.Civ.P. 56(c)(1)(A) ......................................................99, 195

FRE 803(1),(2), and (3) .............................................................108

*Restatement (Second) of Torts* § 660 .........................................166

# INTRODUCTION

This is not a summary judgment case.  Plaintiffs Amanda Hoskins and Jonathan Taylor are innocent cousins framed by Defendant police officers from the Kentucky State Police, Knox County Sheriff's Department, and Barbourville Police Department.  Plaintiffs' devastating experience was not an accident.  Before this Court is an unprecedented record of police misconduct that nearly ruined Plaintiffs' lives.  As is thoroughly described below, Defendants Jason York, John Pickard, Mike Broughton, and Mark Mefford framed Plaintiffs for a murder they did not commit. As a result of Defendants' misconduct, Ms. Hoskins and Mr. Taylor were wrongfully prosecuted and spent more than eight combined years incarcerated for a crime they did not commit.  During that time, Mr. Taylor was charged with the penalty of death, while Ms. Hoskins was tragically torn from her children while facing life imprisonment for a crime she did not commit.  During the course of this litigation, the severity of the Defendants' misconduct has finally unraveled.  As this Court will see, Plaintiffs are entitled to a trial.

Due to Defendants' egregious misdeeds, the true killer(s) of Katherine Mills were never charged nor convicted.  Yet Defendants' misconduct did not just victimize the lives of three families: (1) the victim's; (2) Ms. Hoskins'; (3) and Mr. Taylor's.  Rather, Defendants' quest to frame Plaintiffs tore apart the lives of nearly a dozen witnesses who were coerced into submitting to Defendants' desires - the closure of a homicide case regardless of the Constitution or the truth.  At their depositions, Plaintiffs testified at length regarding Defendant York's threats to frame them for a crime they did not commit. But Plaintiffs were not alone in their experiences with the Defendants in this case.  Indeed, more than a dozen witnesses testified that Defendant York and his cohorts used coercive methods to fabricate statements and frame Plaintiffs for a crime they did not commit.

On many scores, Defendants do not challenge the record in this case. Nor could they. Defendants' uncontested admissions in this case are striking and underscore the significant misconduct that took place. Defendant York, like many of the other Defendants, freely admits to much of the misconduct. For instance, when asked if he "ever threatened a witness in a homicide investigation while questioning them," Defendant York revealed "[y]eah, and that was – is a tactic that we do use in -- in all—in a majority of criminal investigations." *Ex.* 2, York Dep. Tr. at 24-25. Defendant York then agreed that "there could be times that that tactic [was] used" in the Mills' homicide investigation. The record establishes that Defendant York, as well as the other Defendants, frequently engaged in these unconstitutional tactics.

Both tragically and predictably, Plaintiffs were not alone in being framed by these Defendants for a crime they did not commit. A year prior, the majority of these Defendants framed another person, William Anderson, for murder using many of the same methods. Fortunately for Mr. Anderson, a jury of his peers acquitted him on capital murder. Defendant York's penchant for misconduct is perhaps best captured in a December 3, 2011 audio-recorded interview of a witness in the Anderson investigation. There, Defendant York was captured throwing a chair at the wall, hitting a hat off Mr. Fox's head, and proclaiming "Fuck you, fuck you, fuck you" as he threatened to charge the witness with criminal offenses for refusing to change his story. According to Defendant York, "that was a tactic I – I was using" because he "felt like [the witness] was lying. As a tactic, I was trying to get him to understand that this was not a joke and take it serious." As Defendant York used coercive tactics with Mr. Fox, other Defendants in this case joined, including his own supervisor, Defendant Jackie Joseph. Given that Defendant York engaged in this behavior when a recorder was turned on, one can only imagine what type of misconduct he engaged in when the recorder was turned off or worse yet –

when no one was watching.

This Court need not wonder what Defendant York and the remaining Defendants did when the recorder was off because their misconduct has now been exposed through discovery. Indeed, Defendant York's audio-recorded misconduct with Mr. Fox corroborates the allegations raised by more than a dozen witnesses in this case. As is discussed below, an uncontested record establishes that Defendants York and Pickard fabricated a false statement for Kayla Mills that implicating Plaintiffs in the murder. This litigation has unearthed the egregious misconduct that led to the manufacturing of that false statement. Here, Defendant York revealed for the first-time that he charged Kayla Mills with murder to leverage her into implicating Plaintiff. Although he obtained a $1,000,000 bond against Kayla for the murder, he never disclosed the charging documents to the Commonwealth nor the defense. Yet, Defendant York's misconduct did not end there. In fact, Defendant York revealed at his deposition that he reached an agreement with Kayla to not pursue the murder charges so long as she gave a statement implicating Plaintiffs. He then fabricated Kayla's statement in front of her own parents before allowing her to freely leave the police station in spite of the arrest warrant and judicially ordered $1,000,000 bail. The misconduct that led to the fabrication of Kayla's false statement, one that was used to initiate charges no less, entitles Plaintiffs to a trial on its' own volition. However, Plaintiffs present this Court with far more evidence demonstrating how their constitutional rights were violated. Indeed, more than a dozen other witnesses have testified that Defendants' fabricated statements and otherwise conspired to frame Plaintiffs for the murder of Ms. Mills.

The robust record discussed below demonstrates exactly how the Defendants fabricated evidence and framed Plaintiffs for a crime they did not commit. Plaintiffs have developed a record that, taken in the light most favorable to them, requires that summary judgment be denied.

There is ample evidence that Plaintiffs' wrongful prosecution was caused by the unconstitutional misconduct of Defendants Jason York, John Pickard, Mike Broughton, and Mark Mefford. These Defendants fabricated an entire criminal case against Plaintiffs, concealed material exculpatory evidence from state prosecutors and defense attorneys, fabricated false statements from witnesses, and caused Plaintiffs to be prosecuted without probable cause. As it relates to Defendant Pickard, the record establishes more than sufficient grounds from which a reasonable jury can conclude that the constitutional violations were caused by the absence of training, supervision, and policies and procedures of Defendant Knox County.  Finally, Plaintiffs present this Court with a clear record of how Defendant Joseph failed to supervise Kentucky State Police detectives under her command.  A trial is warranted.

## STATEMENT OF DISPUTED MATERIAL FACTS

I.    **PLAINTIFFS ARE INNOCENT**

A.  **Plaintiff Amanda Hoskins Did Not Know Katherine Mills and Is Completely Innocent**

1.      Amanda Hoskins did not know Katherine Mills and had nothing to do with her murder. *Ex*. 1, Hoskins Dep. Tr. at 20, 84.  On the morning of December 20, 2010, Ms. Hoskins was home with her two children, mother, and cousin. *Id*. at 52. She remained home until she left for her 11:30 a.m. doctor's appointment at Hope Medical Clinic. *Id*. at 45-46, 54. After her appointment, Ms. Hoskins accompanied her daughter and William Lester to McDonalds before going to Walgreens to get her prescription filled. *Id*. at 45, 48.

2.      During the underlying investigation, Defendant Jason York obtained medical records corroborating that on December 20, 2010, Ms. Hoskins both attended her appointment and subsequently had her prescription filled. *Ex*. 2, York Dep. Tr. at 305-306; *see also Ex*. 3, Confidential Hoskins' Medical Records at PL4165.

3.      After obtaining her medication, Ms. Hoskins returned home. *Ex*. 1, Hoskins Dep. Tr. at 10-12. Later that day, Mr. Lester returned to Ms. Hoskins' home and revealed the terrible news he just received about his ex-mother-in-law passing away. *Id*. at 11-12. Ms. Hoskins described the tragic conversation as follows: "his face got red. He was speechless. Looked like he wanted to cry." *Id*. at 13. Ms. Hoskins ultimately went to Mr. Lester's daughter's home to assist in caring for his grandchildren.  *Id*. at 13-15.

4.      Prior to being charged with the murder of Ms. Mills, Ms. Hoskins cooperated in every way possible with the investigation conducted by law enforcement. She voluntarily met with the Defendants, never requested counsel, and provided them with the limited knowledge she

had relating to the underlying investigation. *Ex*. 1, Hoskins Dep. Tr. at 31-42; *Ex*. 2, York Dep. Tr. at 294-296.

5.        Ms. Hoskins never confessed to a single person to having involvement in a crime she knew nothing about. *Ex*. 1, Hoskins Dep. Tr. at 148, 222.  Nevertheless, the Defendants fabricated statements falsely claiming that Ms. Hoskins confessed, and they fabricated other evidence in their attempt to negate her innocence. *See* Sections III-V. As described fully below, Defendants' misconduct resulted in Ms. Hoskins being wrongfully prosecuted for the murder of Katherine Mills.

6.        Ms. Hoskins and her family have been traumatized as a result of her being framed for a murder she did not commit. *Ex*. 1, Hoskins Dep. Tr. at 183. "I live my life every day on camera because the fear of someone lying on me. In my house, camera. I walk out the door, camera. In my car, camera. I'm constantly taking pictures. I'm constantly looking out my window. I have a 9-year-old little girl, she's 10 now, that brings me her phone because Kentucky State Police is sitting in front of my house constantly." *Id*.  Defendants' egregious misconduct discussed below nearly ruined Ms. Hoskins' life.

## B.  Plaintiff Jonathan Taylor, too, Did Not Know The Victim and Is Completely Innocent

7.        Like Ms. Hoskins, Jonathan Taylor did not know Katherine Mills and had nothing to do with her murder. *Ex*. 4, Taylor Dep. Tr. I at 115; *Ex*. 5, Taylor Dep. Tr. II at 57.

8.        On December 20, 2010, Mr. Taylor woke up at the home of his Aunt Linda Taylor– the same residence where Ms. Hoskins stayed. *Ex*. 4, Taylor Dep. Tr. I at 125. Ms. Hoskins, Ms. Taylor, and his cousin, Jerry Wayne were home when Mr. Taylor awoke. *Id*. at 127-128. To Mr. Taylor, the day was relatively unremarkable.  *Id*. at 130. He does not remember exactly what he did that day other than possibly "go get [ta]bacco." *Id*. at 130. Since he did not

6

have a car at the time, "where am I going to go?  My Nikes ain't going to take me too far." *Id*. at 130. Mr. Taylor's birthday was the following day and his focus was on having a simple get together with family. *Id*. at 134-135.

9.      Mr. Taylor, too, cooperated in every way possible with the investigation conducted by law enforcement. *Id*. at 147-150.  He voluntarily met with the Defendants, never requested counsel, and provided them with all knowledge he had relating to the underlying investigation. Id.

10.      Notably, Mr. Taylor never confessed to a single person to having involvement in a crime he knew nothing about. *Ex*. 4, Taylor Dep. Tr. I at 143, 177-178, 181.  Nevertheless, the Defendants fabricated statements falsely claiming that Mr. Taylor confessed, and they fabricated other evidence in their attempt to negate his innocence. *See* Sections III-V. As described fully below, Defendants' misconduct resulted in Mr. Taylor being wrongfully prosecuted for the murder of Katherine Mills.

11.      Being wrongfully charged and facing the death penalty has traumatized Mr. Taylor. *Ex*. 4, Taylor Dep. Tr. I at 253. It "destroyed my life." *Ex*. 5, Taylor Dep. Tr. II at 35. It changed him: he does not like being around many people; he does not like anyone getting close to him; he does not like confined spaces; he now suffers from anxiety and depression. *Ex*. 4, Taylor Dep. Tr. I at 253. People in the community also look at him differently; when they see him in town, they talk about the fact that he was charged with murder. *Id*. at 260-261. Mr. Taylor constantly looks over his back and records all his actions with cameras so that he will not be framed a second time for crimes he did not commit. *Ex*. 5, Taylor Dep. Tr. II at 35.

### C. Due to the Absence of Probable Cause, the Knox County Commonwealth Attorney Dismissed Plaintiffs' Criminal Charges

12.     After five years of wrongful prosecution and incarceration, the Commonwealth moved to dismiss murder charges against Plaintiff Jonathan Taylor on June 29, 2016, due to the absence of probable cause. *Ex.* 6, MTD Taylor at PL 24828-24831.  In doing so, the Knox County Commonwealth Attorney informed the court of its' ethical obligation to be "vigilant in the pursuit of justice not just to gain a conviction[,] but…not pursuing charges or moving forward in matters in which probable cause of guilt is not present." *Id*. at PL 24831.

13.     After three years of wrongful incarceration and five years of wrongful prosecution, due to the absence of probable cause, the Commonwealth of Kentucky also moved to dismiss murder charges against Plaintiff Amanda Hoskins on July 29, 2016. *Ex.* 7, MTD Hoskins at PL 24839-24842.  The Commonwealth's Motion to Dismiss lists several bases for the lack of probable cause, including that witnesses denied making statements to law enforcement. Id.  Specifically, the Knox County Commonwealth Attorney informed the Court that:

> The Commonwealth must ever be vigilant in the pursuit of justice not just to gain a conviction[,] but to be mindful of the duty of the prosecutor for the people in not pursuing charges or moving forward in matters in which probabl[e] cause of guilt is not present.  Based on the changes in the testimony of the above witnesses and the unavailability of others the Commonwealth does not feel as though probable cause of guilt is present anymore.  Moreover, SCR 3.130 (3.8) requires a prosecutor in a criminal case to refrain from prosecuting a charge once the prosecutor knows it is not supported by probabl[e] cause.

Id.

14.     The Commonwealth's request to dismiss Ms. Hoskins' criminal charges was granted on August 22, 2016, while Mr. Taylor's criminal charges were dismissed on June 30, 2016.

**D. The Physical Evidence at the Crime Scene Corroborates the Plaintiffs' Innocence, Yet Defendant York Did Nothing to Stop Their Wrongful Prosecution**

15.    As the elected Knox County Commonwealth Attorney testified to at his deposition, the Commonwealth did not list every basis he considered for the dismissal of charges against Plaintiffs in the motion to dismiss. *Ex*. 8, Steele Dep. Tr. at 154-155 (considered the exclusion of Plaintiffs from contributing latent prints found at the crime-scene), 153 (kept apprised of other scientific testing in the case). For instance, by the time Mr. Steele drafted his motion to dismiss, he was aware that latent prints recovered from currency left at the crime scene excluded Plaintiffs from having any involvement in the murder, yet Mr. Steele did not reference this exculpatory evidence in his motion to dismiss. *Id*. at 154-155; *Ex*. 7, MTD Hoskins at PL 24839-24842.

16.    This exclusion of Plaintiffs was critical, as from the onset of his investigation, Defendant York believed that the true killer(s) of Katherine Mills placed five $100 bills on the floor next to her purse at the scene. *Ex*. 2, York Dep. Tr. at 139-40. Despite the value Defendant York placed on this evidence, and despite recovering the evidence on December 21, 2010, Defendant York did not request that it be examined for latent prints – and those prints compared to Plaintiffs' standards – until November 1, 2012. *Id*. at 143, 145-146; Ex. 9, Request at KSP413; *Ex*. 10, AFIS Report at KSP382.

17.    By December 6, 2012, Defendant York learned that Plaintiffs were excluded as contributors of the latent prints recovered from the currency left at the crime scene. *Ex*. 2, York Dep. Tr. at 151. Even at that point, however, Defendant York declined to take any steps to stop Plaintiffs' criminal prosecution. *Id*. at 151-152. Notably, Defendant York did not request that the prints be compared to Mike Simpson, Allen Helton, or Jesse Lawson even though within the first

9

year of his investigation Defendant York investigated all three men for Ms. Mills' murder. *Id*. at 144-47.

18.    Additional scientific evidence establishes Plaintiffs' innocence in Ms. Mills' homicide.  Specifically, DNA was obtained from the victims' fingernail clippings. By February 3, 2013, a Kentucky State Police laboratory analyst reported that the DNA found on multiple fingernail clippings excluded Plaintiffs as contributors.  *Ex*. 11, KSP Forensic Report at KSP385-386. Although Defendant York learned that Plaintiffs were excluded as contributors to the DNA in 2013, he again did nothing to halt their wrongful prosecution. *Ex*. 2, York Dep. Tr. at 153-154.

## II.    THE MURDER OF KATHERINE MILLS

### A.  Katherine Mills Was Discovered Dead In The Early Evening Hours of December 20, 2010

19.    Jessie Lawson is married to Jennifer Lawson, the granddaughter of Katherine Mills. *Ex*. 12, Lawson Dep. Tr. I, 9-10.  Sometime in the early evening of December 20, 2010, Jessie, Jennifer and their kids went to Ms. Mills' residence. *Ex*. 12, Lawson Dep. Tr. I. at 10-11.

20.    Mrs. Lawson went to Ms. Mills' back door and noticed some of Ms. Mills' possessions on the floor. *Id*. at 11-12. Mr. Lawson got out of the car, looked through the back door and saw that Ms. Mills' coat rack and purse had fallen over. *Id*. at 12, 14.  As Mr. Lawson walked toward the front porch of the home, he discovered Ms. Mills laying on the ground deceased. *Id*. at 14-15.  Mr. Lawson did not see anyone or any footprints in the snow around Ms. Mills' body. *Id*. at 17. Law enforcement was immediately contacted.

### B.  Defendants' Roles in Investigation

21.    Defendant Jason York was an investigator for the Kentucky State Police at the time of his assignment to the Katherine Mills' investigation. *Ex*. 2, York Dep. Tr. at 97. Defendant York was the lead investigator into Ms. Mills' death. *Id*. As the lead detective,

Defendant York was responsible for providing discovery to the Commonwealth Attorneys' Office for the investigation. *Id*. at 326.

22.    Defendant John Pickard was the Sheriff of Knox County during the Mills' investigation. *Ex*. 13, Pickard Dep. Tr. at 13. Defendant Pickard assisted Detective York in the Mills' homicide investigation.  *Id*. at 14.   According to Defendant York, "Sheriff Pickard would help me through the investigation just like any other police officer would." *Ex*. 2, York Dep. Tr. at 239.

23.    At the time of Mrs. Mills' death, Defendant Broughton was a lieutenant detective at the Barbourville Police Department ("BPD"). *Ex*. 14, Broughton Dep. Tr. at 12; 86; 91.

24.    Defendant Mark Mefford was an officer for the Kentucky State Police at the time of the underlying investigation. *Ex*. 15, Mefford Dep. Tr. at 3. Defendant Mefford processed the crime scene, attended the autopsy, and participated in numerous witness interviews, including those with Allen Helton and Daniel Wilson.  *Id*. at 42; *Ex*. 16, Mefford Written Discovery Responses at 6-7; *Ex*. 17, Helton Dep. Tr. at 39, 163; *Ex*. 2, York Dep. Tr. at 201-202.

25.    Defendant Jackie Joseph (formerly Pickrell) was a Detective Sergeant at the Kentucky State Police at the time of the underlying investigation. Ex. 18, Joseph Dep Tr. at 15-16.  Defendant Joseph was the supervisor of Defendants York and Mefford during their investigation into the Mills' homicide.  *Id*. at 26. Defendant Joseph was involved in this investigation as well, in addition to assisting on a separate contemporaneous investigation into the death of Bobby Wiggins that involved many of the same KSP and Knox County Defendants. *Id*. at 33-42, 114-134; *see also Ex*. 19, KSP Cornett Report at KSP 288.

## III.    DEFENDANTS' ILLEGAL INVESTIGATION INTO THE MILLS' HOMICIDE

### A.  The Immediate Investigation of Mills' Homicide Reveals a Possible Eyewitness

26.     On December 22, 2010, Mr. Michael Crump approached law enforcement at the Mills' crime scene. *Ex*. 20, Crump Dep. Tr. at 33; *Ex*. 21, Cornett Report at KSP 289-290. In that initial interview, Crump informed Officer Cornett that he observed a blue car near the front of Mills' home on December 20, 2010. *Id*. at KSP 289. He also revealed that he saw a "white male wearing a hooded camouflage coat" walking from the rear of the residence. *Id*. According to Crump's description, the man had tattoos on at least one hand. *Id*. Although the report notes that Crump's interview was audio-recorded, that recording has never been disclosed. *Ex*. 22, Mefford Report at KSP 296; *Ex*. 15, Mefford Dep. Tr. at 69-72.

### B.  Mike Simpson and Allen Helton Are Obvious Suspects in Mills' Death

27.     From May 2, 1991 through January 19, 2015, Mike Simpson took pills every day that he was not in prison. *Ex*. 23, M. Simpson Dep. Tr. at 23. By December 2010, Mr. Simpson was addicted to OxyContin and other pain pills. *Id*. at 24.

28.     On December 19, 2010 – the day prior to Ms. Mills' death – Simpson "was broke" but informed his friend, Allen Helton, that "he'd have the money to go [to Florida] the next day." *Ex*. 17, Helton Dep. Tr. at 24-25.  Notably, Simpson did not reveal to his friend how he would obtain the money. *Id*. at 24-25. At the time, Simpson and Helton had arranged a Florida trip to acquire a significant quantity of pills to feed their addictions. *Ex*. 23, M. Simpson Dep. Tr. at 28-29.

29.     As promised, by the afternoon of December 20, 2010, Mr. Simpson suddenly had acquired a significant amount of cash. With more than $400 in cash, Simpson rented a blue vehicle in Middlesboro, Kentucky on December 20, 2010. *Ex*. 23, M. Simpson Dep. Tr. at 33-36;

*see also Ex*. 24, Rental Car Receipt, PL 15643-15648; *Ex*. 12, Lawson Dep. Tr. I, at 37-38; *Ex*. 23, Photo, PL 10474.

30.     Thereafter, Helton accompanied Simpson as he paid for several bills with cash, including his water and electric. *Ex*. 17, Helton Dep. Tr. at 19-20; *Ex*. 23, M. Simpson Dep. Tr. at 64.  He also bought a bike from Dickie Brown for which he paid between $600 and $830. *Ex*. 23, M. Simpson Dep. Tr. at 68-69. Although Simpson was admittedly broke on December 19, 2010, he was, thus, somehow able to pay more than $2,000 worth of expenses with cash by the following afternoon before he and Helton left for Florida.

31.     After leaving for Florida, Simpson and Helton frequently ate out at restaurants and purchased hotel rooms – again, all with cash.  *Ex*. 23, M. Simpson Dep. Tr. at 49.  As Helton revealed at his deposition, the sole purpose of the trip was to purchase "Roxi" pills. *Ex*. 17, Helton Dep. Tr. at 17, 26. Helton purchased approximately 180 Roxicet pills on this trip that cost between $700-800.  *Id*. at 127-28.  Mr. Simpson went on the trip to purchase Roxi pills as well. Id. at 26.  After obtaining pills, the duo returned to Kentucky which took "a while" because both "were doing pills together." *Id*. at 27, 30.

32.     At some point during their return, Simpson received a phone call where he began "just crying."  *Id*. at 26. Helton eventually asked Simpson "what was wrong." *Id*. at 27. Simpson revealed that Jesse Lawson informed him in the phone conversation that "somebody had killed his – killed William's ex-mother-in-law." *Id*. at 27.

13

**C. Defendants' Incomplete and Failed Investigation of Mike Simpson, Allen Helton, and Jesse Lawson Transforms into a Conspiracy to Frame Plaintiffs**

    **i.    Defendants Learn that Helton and Simpson Were Broke Prior to Mills' Death, Possessed a Blue Vehicle, Paid Bills with Cash, and Fled to Florida After Murder**

33.    By January 21, 2011, Allen Helton and Mike Simpson were persons of interests in the Mills' murder. *Ex*. 2, York Dep. Tr. at 186.  Early in the investigation, Defendant York learned that Simpson was broke prior to Ms. Mills' death and about the trip that Simpson and Helton took to Florida to purchase pills – while flush with cash - after she died. *Id*. at 147, 186-87. Because of this, the Defendants began investigating the two men.

34.    Defendant York retrieved the rental car records from Enterprise establishing that Mr. Simpson rented the blue vehicle – via a cash payment - on December 20, 2010 at 2:06 p.m. *Id*. at 195-196, 201; *Ex*. 24, Simpson Rental Car Records at PL 15643-15648, PL 18545. Later, Defendant York learned that the car was returned on December 24, 2010 at 2:00 p.m.  *Ex*. 2, York Dep. Tr. at 198.

35.    On December 24, 2010, Defendant York went to question Simpson about his potential involvement in the crime. *Id*. at 199. Without any prompting, Simpson provided Defendant York with a post-it note containing a handwritten list of purported alibi witnesses. *Id*. at 148.  Defendant York admits that he found Simpson's actions to be alarming and "peculiar." *Id*. at 193.

36.    Shortly thereafter, Defendant York conducted a search of Simpson's residence and took photographs of the blue rental car. *Id*. at 194. Defendant York also took photographs of Mike Simpson because his physical appearance was consistent with Mr. Crump's description. *Id*. at 268.  In his view, "Michael Simpson, yes, I would say that he could have matched the description, yes."  *Id*. at 268.  Defendant York also unsuccessfully requested that Simpson

participate in a polygraph examination. *Id*. at 268. Notably, Defendant York did not document any of his interactions with Simpson between December 20, 2010 and January 21, 2011. *Id*. at 194.

37.    Defendant York eventually went to speak to one of Simpson's alleged alibi witnesses, Vernon Bennett, contained on Simpson's post-it. At his deposition, Defendant York revealed for the first time that: (1) Bennett denied being an alibi witness for Simpson; (2) Simpson sought to borrow money from Bennett prior to Ms. Mills' death; (3) Bennett saw Simpson driving a blue vehicle after Ms. Mills' death; and (4) Helton and Simpson were in Eastern Kentucky during the afternoon of December 20, 2010, and thus, had not departed prior to Mills' death. *Id*. at 148-149, 188. Despite the probative nature of this evidence, Defendant York admits that he did not document any of this information in a police report, nor did he testify to the substance of it before the court at Plaintiffs' preliminary hearing or before the grand jury that was charged with the task of issuing charges.  *Id*. at 149.

## ii.    Defendant York Questioned Helton On December 23, 2010 After His Return to Kentucky

38.    After returning to Kentucky, Allen Helton was questioned by Defendant York and another KSP officer on December 23, 2010.  *Ex*. 17, Helton Dep. Tr. at 31. In this meeting, Defendant York questioned Helton about "where'd the money and stuff was and about that old woman's death ..." *Id*. at 32. In response, Helton informed the officers of the details of his Florida trip with Simpson and maintained he did not have any knowledge relating to the death of Ms. Mills. *Id*. at 34-35.  Before leaving, the Detectives also searched Helton's house and asked him if he had a list of alibi witnesses. *Id*. at 32-33. Again, Defendant York did not create a single report regarding any information learned from Helton on December 23, 2010.  *Ex*. 26, KSP Investigative File e.g.

15

### iii. Defendants York, Mefford, and Broughton Question Helton Regarding Mills' Homicide on January 4, 2011

39.     Nearly two weeks later, Defendant Pickard stopped Helton's vehicle. *Ex*. 17, Helton Dep. Tr. at 36; *Ex*. 27, Citation at PL18949-52.  Shortly thereafter, Defendant York appeared on scene, grabbed Helton by his face, and said, "I ought to take you down there and let this family beat the fuck out of you for killing this old woman." *Ex*. 17, Helton Dep. Tr. at 37. After conducting a search of Helton's vehicle, Defendant Pickard found "a wet coat in the floorboard" and said "it's probably the coat [Helton] killed her in." *Id*. at 38, 114. Sheriff Pickard was so close to Helton during this interaction with Defendant York that he could reach out and touch Helton. *Id*. at 38, 107.

40.     Helton was eventually brought to the Barbourville Police Department, where he was read his Miranda rights and questioned extensively about his potential involvement in the Mills' homicide. *Id*. at 38-40; *Ex*. 28, Helton Waiver at KSP341. There, Defendants York, Mefford, and Broughton all participated in the questioning and remained present for the entire interrogation. *Ex*. 17, Helton Dep. Tr. at 39-44, 163; *Ex*. 2, York Dep. Tr. at 201-204.

41.     In Defendants' Broughton and Mefford's presence, Defendant York fed details of the crime to Helton. *Ex*. 17, Helton Dep. Tr. at 41, 42. Even still, Helton informed the Defendants that he "didn't know nothing" about the Mills' homicide. *Id*. at 42.  Defendant York does not deny that this occurred, but rather, claims he has no recollection of anything said to Helton during this conversation. *Ex*. 2, York Dep. Tr. at 203-204.  No documentation was created by Defendants York, Broughton, or Mefford memorializing any information obtained from nor provided to Helton during this interrogation. *Ex*. 2, York Dep. Tr. at 203-205.

### iv. Defendant York Initiates Charges Against Helton on January 4, 2011 After Questioning Him for Mills' Murder

42.　After feeding details of the crime to Helton, Defendant York charged Helton with various unrelated crimes and incarcerated him. *Ex*. 17, Helton Dep. Tr. at 44, 116; *Ex*. 27, Citation at PL18949-52. Once released on home incarceration, Defendants York and Pickard approached Helton and asked him to take a polygraph examination. *Ex*. 17, Helton Dep. Tr. at 45-46; *Ex*. 2, York Dep. Tr. at 205-206.

### v. Defendant York Threatens Jesse Lawson During Investigation

43.　Around this same period of time, Defendant York arrived unannounced at Jessie Lawson's home. *Ex*. 12, Lawson Dep. Tr. I at 22; 34.  Defendant York beat on Mr. Lawson's door until Lawson could answer it. *Id*. Once Lawson opened the door, Defendant York said, "What the fuck are you doing fucking up my investigation?" and then pushed his way into Mr. Lawson's home. *Id*. Once inside, Defendant York told Lawson to "get [his] shit and get [his] clothes" and come with him. *Id*. at 23.

44.　At the station, Defendant York physically slammed Mr. Lawson into a "tiny" room and asked him questions about his whereabouts on the previous day, what he had done, and with whom he had talked. *Id*. at 24-25; 27-28; 34; 63-64. Defendant York stood behind Lawson, yelling "Don't lie to me, son of a bitch. Don't lie. You fucking lie to me, you'll – we'll fucking kill you. I'll fucking kill you. You'll be dead. They won't find you." *Id*. at 31. Defendant York threatened to charge Lawson with conspiracy to commit murder if he did not cooperate. *Ex*. 29, Lawson Dep. Tr. II, at 69, 76.  Although he was scared and uncomfortable, Lawson answered the questions asked of him by Defendant York and two other KSP officers who were present. *Id*. at 31-32. If he did not answer the officers' questions quickly enough, Defendant York would give Lawson a "hard nudge" in the back of his chair or hit him in the head. *Ex*. 29, Lawson Dep. Tr. II

at 66-68.  Lawson was not free to leave the room, was not Mirandized, and felt like "a prisoner of theirs." *Ex*. 12, Lawson Dep. Tr. Part I at 32-33; 34.  It was "psychological warfare." *Ex*. 29, Lawson Dep. Tr. Part II at 67.

45.    Defendant York also questioned Mr. Lawson about Cleo Brown. *Ex*. 12, Lawson Dep. Tr. Part I at 33. Lawson informed Defendant York that Ms. Brown told Lawson the day after Ms. Mills' death that she had seen Mr. Simpson and Mr. Helton in Ms. Mills' yard. *Id*. at 33-34. As such, Defendant York forced Lawson to wear a wire and go to Brown's home in an attempt to get Ms. Brown to state again what and who she had seen. *Id*. at 36-37. Lawson was unsuccessful in speaking with Brown.  *Id*. at 39.

46.    Mr. Lawson went back to the station after his failed recording attempt. *Id*. at 39. There, Defendant Pickard joined Defendant York in another round of questioning. *Ex*. 29, Lawson Dep. Tr. Part II at 65-66, 69. When Lawson requested permission to leave the station, he was told to "shut the fuck up and sit back down." *Ex*. 12, Lawson Dep. Tr. Part I at 39; *Ex*. 29, Lawson Dep. Part II at 63. Thereafter, Defendant York threatened that the police could "set him up," "put [him] in jail for nothing," and that they "could bury [him]." *Ex*. 12, Lawson Dep. Tr. Part I at 78-79. Defendant York told Lawson that no one would believe "a drughead" like him over the word of the police. *Id*. at 79. Defendant York finally permitted Lawson to leave after 10 hours.  *Id*.; *Ex*. 29, Lawson Dep. Tr.  Part II at 42.

### vi.    Helton and Lawson's Failed Polygraph Examinations Lead to Defendants' Plot to Frame Plaintiffs for Mills' Murder

47.    On the morning of January 21, 2011, KSP Officer Jay Sowders arrived at Jesse Lawson's home and told Lawson that "Detective York sent me here to pick you up and take you to get a polygraph." *Ex*. 12, Lawson Dep. Tr., Part I at 50; *Ex*. 29, Lawson Dep. Tr. Part II at 78; *Ex*. 30, York Supplement at KSP 270.

18

48.     Officer Sowders drove Lawson to the test while Defendant York followed with Allen Helton. *Ex*. 12, Lawson Dep. Tr., Part 1 at 51.  At the conclusion of Lawson's polygraph test, Defendant York told Lawson he had failed the test "miserably." *Id*. at 53; *Ex*. 31, Polygraph Report at PL 13695. Defendant York was "screaming. Irate. Yelling. Just loud," telling Lawson to give him a name, to just give him "anybody." *Ex*. 12, Lawson Dep. Tr. Part I at 55-56. Mr. Lawson had no names to give him, as he did not know who killed Ms. Mills. *Id*. at 56.

49.     So, Defendant York provided Lawson with names of his suspects, pushing Lawson to agree with the information he was feeding him. Defendant York initially told Lawson that William Lester was involved. *Id*. at 58; *Ex*. 32, Lawson audio recording, at PL 9773, 26:26-26:42. But, Lawson had no such knowledge. *Ex*. 12, Lawson Dep. Tr. Part I at 58.

50.     Eventually, Defendant York told Lawson to say that Amanda Hoskins was involved. *Ex*. 12, Lawson Dep. Part 1 at 61; *Ex*. 32, Lawson audio recording, PL 9773 at 29:50-30:27. Mr. Lawson, who had been "beat down" by Defendant York agreed to whatever Defendant York told him. *Ex*. 12, Lawson Dep. Tr. Part I at 61. Lawson, who was scared because Defendant York had already threatened to kill him, "would have done anything to get out of that room then." *Id*. at 64-65.

51.     On January 21, 2011, Defendant York documented Lawson's polygraph examination and results in a report.  *Ex*. 30, KSP Report at 270-271; *Ex*. 2, York Dep. Tr. at 274. According to Kentucky State Police examiner John Fyffe, Lawson was deceptive when he denied participating in the murder of Katherine Mills. *Id*. at 274.  Lawson was also allegedly deceptive when he denied hitting Katherine Mills in the head. *Id*. at 275. Defendant York was aware of this information and documented it in his report.  *Id*. at 274-276.

### vii.    Defendant York Feeds Information to Helton After Polygraph Examination In Attempt to Fabricate Statement

52.    Allen Helton was also given a polygraph examination on January 21, 2011. *Ex.* 33, Helton Polygraph Results at KSP 270-271. Like Mr. Lawson, the Kentucky State Police examiner determined that "deception was indicated" when Mr. Helton denied the following three questions:

- Did you participate in any way in the death of that woman?
- Did you hit that woman in the head?
- Did you steal any of that money from that woman?

Id.

53.    Defendant York questioned Helton after the failed polygraph examination.  *Ex.* 17, Helton Dep. Tr. at 54.  There, Defendant York first pressured Helton into saying things about Mr. Simpson of which he had no knowledge. *Id*. at 54-55.  Defendant York also told Helton to say that: (1) "Mike Simpson received that money from the death of Katherine Mills"; and (2) the money was split between Simpson, Helton, and at least one other person. *Id*. at 56-57, 59. Through Defendant York's actions, Mr. Helton believed that York wanted him to agree with whatever he was saying regardless of whether it was true or not. *Id*. at 59.

54.    Defendant York also told Helton to say that William Lester was one of the people who committed the murder with Simpson and that he had the other "wad" of money, even though Helton repeatedly stated that he had no direct knowledge of the Mills' homicide. *Id*. at 60-61. By the end of this questioning, Defendant York made it clear that he wanted Helton to implicate Mr. Lester in the Mills' murder and attempted to get him to repeat whatever information he provided to him. *Id*. at 61-62.

55.    In the face of all this, Helton continued telling Defendant York that he did not have any independent knowledge of the murder and did not want to lie and send innocent people to prison. *Id*. at 57, 66.  In the end, Helton maintained his innocence and provided Defendant York with information regarding his Florida trip. *Id*. at 67.

### viii.  Targeting His Then Suspects, Defendant York Falsifies Information in Multiple Search Warrant Affidavits

56.    Defendant York filled out a probable cause affidavit for a search warrant for Mr. Lawson's telephone records on the same date that Lawson failed his polygraph examination.  *Ex*. 34, Lawson Search Warrant Affidavit at KSP 337-338.  In that affidavit, "being first duly sworn," Defendant York averred that telephone records relating to Lawson were "used as means of committing a crime." *Id*. at KSP 337. Defendant York claimed to have received information that: "Jessie Lawson stated he called Mike Simpson to advise him Katherine Mills had died. Jesse Lawson stated Mike Simpson started crying. This call took place on 12-22-10.  Mike Simpson has been identified to being at Katherine Mills residence the day she was robbed and found dead."  *Id*. at KSP 338.  On February 15, 2011, a Knox County judge approved Defendant York's request for a search warrant. *Id*.

57.    Two weeks later, on February 4, 2011, "being first duly sworn" Defendant York averred that he had probable cause to believe that the phone records for Mr. Simpson were "used as means of committing a crime." *Ex*. 35, Affidavit for Search Warrant at KSP 339-340.  In support of obtaining a search warrant, Defendant York revealed that "Mr. Simpson had been identified by Michael Crump t[o] being at Katherine Mill's residence the morning she was robbed and found dead. Also[,] Jessie Lawson and Allen Helton both stated to this unit that Mr. Simpson started crying the when Jesse told him about Katherine via a telephone call Jesse made

to him the day after Katherine was found dead." *Id*. at KSP 340. A Knox County judge approved this request on February 15, 2011. *Id*.

58.     The representations made by Defendant York in his search warrant affidavits are false. *Ex*. 20, Crump Dep. Tr. at 11-12. Michael Crump denies ever making an identification of anyone during the investigation into Ms. Mills' death. *Id*.  At his deposition, Mr. Crump testified that "[n]o, I never did, because I told him I couldn't." *Id*. at 11. When asked specifically whether he ever identified Mike Simpson, Mr. Crump revealed, "No, I don't even know who he is…I didn't identify no one." *Id*. at 16. For his part, Defendant York likewise acknowledges that he was aware Mr. Crump never identified anyone.  *Ex*. 2, York Dep. Tr. at 355.

### ix.    After Helton and Lawson Fail Polygraph Examinations, Defendants Decline to Conduct any Further Investigation and Use Lawson as a Confidential Informant in Ongoing Investigations

59.     In spite of his failed polygraph results in January 2011, Defendant York began using Mr. Lawson as a confidential informant on six cases beginning on April 11, 2011.  *Ex*. 36, Lawson Informant Report at PL4850-51; *Ex*. 2, York Dep. Tr. at 276-277.  Defendant York concedes that it would have damaged Lawson's credibility – and affected the viability of the other criminal investigations – by charging him with the murder of Ms. Mills. *Id*. at 277.

60.     Outside of falsifying information in two search warrant affidavits, not a single investigative step was taken to investigate Mr. Helton or Mr. Simpson after the January 2011 polygraph examinations. *Ex*. 2, York Dep. Tr. at 219. When asked what investigation he conducted into Helton after learning he failed his polygraph examination on questions that directly implicate him in the murder, Defendant York responded: "Off the top of my head, I do not..."  *Id*. at 219.

61.     As discussed below, not a single investigatory step was taken to investigate Mr. Helton, Mr. Simpson, or Mr. Lawson after January 21, 2011 because Defendant York and the other Defendants had already set about to frame Plaintiffs.

## IV.   DEFENDANT BROUGHTON FAILS TO INTERVENE AS DEFENDANT YORK THREATENS TO FRAME PLAINTIFF ON FEBRUARY 15, 2011

62.     On February 15, 2011, Defendants York and Broughton interrogated Ms. Hoskins. *Ex.* 2, York Dep. Tr. at 292-294; *Ex.* 1, Hoskins Dep. Tr. at 31; *Ex.* 37, KSP Report at PL15071-72. Neither Defendant York nor Defendant Broughton read Ms. Hoskins her rights after placing her inside an interrogation room, yet, when they first sat down, Defendant York placed a citation for murder and robbery bearing Ms. Hoskins' name on the table. *Ex.* 1, Hoskins Dep. Tr. at 36-37. To this day, this citation has never been disclosed in discovery nor is it contained in the Commonwealth Attorneys' casefile.

63.     While in the interrogation room, Defendants York and Broughton questioned Ms. Hoskins extensively prior to turning on a recorder. *Ex.* 38, Hoskins Aff. at ¶2-9. Defendant York admits that he does not know how long he spoke to Ms. Hoskins or what he said prior to a recorder being turned on.  *Ex.* 2, York Dep. Tr. 295-296.  Defendant Broughton likewise agrees that Defendant York questioned Ms. Hoskins when the recorder was stopped.  *Ex.* 14, Broughton Dep. Tr. at 164.

64.     During this unrecorded session, Defendant York threatened to frame Ms. Hoskins for the murder of Katherine Mills. *Ex.* 38, Hoskins Aff. at ¶6. Specifically, Defendant York told Ms. Hoskins that he "has the tail and just needed for the donkey to pin it on." *Id.* at ¶7. Defendant York does not deny threatening Ms. Hoskins in this manner: "I don't remember saying.  I cannot tell you who I said it to and who I did not.  I'm not denying saying it, but I don't remember no particulars."  *Ex.* 2, York Dep. Tr. at 44.

65.     During another unrecorded portion of this same interrogation, Defendant York threatened Ms. Hoskins that if she did not speak with him and did not call William Lester, acting as if she was in a panic and hysterical, that he would charge her with murder and robbery of Ms. Mills. *Ex*. 1, Hoskins Dep. Tr. at 37; 40. As he made these threats, Defendant York was in Ms. Hoskins' face, banging on the table, causing Ms. Hoskins to feel "awful [and] scared." *Id*. at 291-292.

66.     Defendant Broughton was present when Defendant York threatened to frame Ms. Hoskins for murder and did nothing to intervene. *Ex*. 38, Hoskins Affidavit at ¶7.  In fact, at some point before starting the recording, Defendant Broughton asked Defendant York to step outside the room. *Ex*. 1, Hoskins Dep. Tr. at 275. As they were getting up to step outside, Defendant Broughton said, "I feel something fishy about this." Id. The Defendants were out of the room for about 10 minutes and once they re-entered, Defendant Broughton actively questioned Ms. Hoskins regarding the Mills' homicide. *Id*. at 276. As Ms. Hoskins testified to at her deposition, "If I didn't answer it the way, I guess, what they wanted to hear, [Broughton] would ask me the same question. It might be once, it might be twice. And then I think, at one point, he was asking me the questions, and York backed off." *Id*. at 277. This occurred before the recorder was turned on. *Id*. at 278.

67.     Ms. Hoskins cooperated with law-enforcement and informed them of comments that she heard Mr. Lester make to Mike Simpson prior to Ms. Mills' passing.  *Id*. at 29-30. Specifically, Ms. Hoskins relayed to Defendants York and Broughton that she heard Lester joke that when Ms. Mills was using her outhouse, he should "lock her in there, take her money, not hurt her." *Id*. at 30, 238-239.

68.     At Defendants' request, Ms. Hoskins eventually made the recorded phone call to Mr. Lester. Once Ms. Hoskins hung up the phone, Defendant York "was really mad." *Id*. at 286. He stopped the recording of the interrogation and then continued to berate Ms. Hoskins. *Id*. at 42. He grabbed the phone out of Ms. Hoskins' hands, "started hitting the table harder and harder," and told her that it should have been her that was taking her "last breath" and not Ms. Mills. *Id*. at 42. As Defendant York was screaming in her face, Defendant Broughton did nothing to stop Defendant York, and in fact, was encouraging Defendant York's actions. *Id*. at 286; 292. Defendant Broughton admits as much.  *Ex*. 14, Broughton Dep. Tr. at 166, 169, 170.

## V.     DEFENDANTS MAKE PROMISES OF CONSIDERATION AND THREATS OF COERCION TO FABRICATE FALSE EVIDENCE IMPLICATING PLAINTIFFS IN MILLS' DEATH

### A. Defendants York and Pickard Switch Suspects, Make Promises of Consideration, and Fabricate Helton's March 2012 Statement

69.     In 2011, Mr. Helton appeared at the Knox County Courthouse due to the charges initiated against him by Defendant York on January 4, 2011. *Ex*. 17, Helton Dep. Tr. at 68; *See also Ex*. 39, Docket 11-T-00136, Knox District Court (arrest on January 4, 2011; Arraignment on January 6, 2011; Pre-trial Conference on February 1, 2011; Jury Trial scheduled for March 3, 2011 and April 14, 2011).  There, Defendant York approached Helton after court and stated, "if you tell me what I need to hear, I'll get it took care of for you."  *Ex*. 17, Helton Dep. Tr. at 68. By this time, Helton knew what Defendant York wanted him to say regarding the Mills' homicide based on his previous interactions with Defendants York, Mefford, Pickard, and Broughton.  *Id*. at 69; see *supra,* Section III(C)(iii).

70.     Thereafter, Defendant Pickard came to Helton's home on March 7, 2012 to arrest him. *Ex*. 17, Helton Dep. Tr. at 70.  While driving Helton to the Knox County Jail, Defendant Pickard promised "he'd get me a bond to get me out and there wouldn't be no more charges

brought up on me" if Helton told "[them] what [they] need to hear about the murder case." *Id*. at 70-71. Helton knew exactly what Defendant Pickard wanted to hear –the same story Defendant York wanted him to repeat. *Id*. at 69, 71.

71.     The following day, Helton was incarcerated after being charged with third degree burglary and first-degree criminal mischief. *Id*. at 70. While incarcerated, a "police officer [came] over and got [Helton] at the jail."  *Id*. at 72. Helton was then taken to the Sheriff's Office to speak with Defendants Pickard and York. *Id*. at 72.  Each Defendant remained present for the entirety of Helton's questioning. *Id*. at 72; *Ex*. 2, York Dep. Tr. at 236-237.

72.     Defendants Pickard and York spoke with Helton extensively prior to turning on a recorder.  *Ex*. 17, Helton Dep. Tr. at 73.  During this unrecorded discussion, Defendant "Pickard told me that he would get me a bond and there wouldn't be no more charges brought upon me" in exchange for "tell[ing] them what they wanted to hear about the murder." *Id*. at 73. Defendants York and Pickard also told Helton what to say prior to the recorder being turned on. *Id*. at 87. While recording, Helton understood that he had to either repeat the information provided to him by the Defendants or agree with whatever they told him.  *Id*. at 86-87, 249-250, 255, 257.  In his words, they "told me what to say, I just agreed with it."  *Id*. at 154.

73.     Specifically, Helton understood that he needed to falsely implicate Plaintiffs and William Lester in the murder of Katherine Mills in order to get the deal that was promised to him – his release from jail and the dismissal of his charges. *Id*. at 81-82, 85; 87-88.  Helton did not want to go along with the false statement, but he "was looking out for [his] best interest, you know."  *Id*. at 193.

74.     Defendant York does not deny feeding information to Mr. Helton prior to the recorder being turned on; he likewise concedes that Helton was promised consideration in

exchange for a statement. *Ex.* 2, York Dep. Tr. at 253, 255. When Defendant York was asked

what he and Defendant Pickard discussed with Helton prior to turning on a recorder, Defendant

York admitted:

> No, like I previously stated, I don't remember any of the particulars of what the
> conversation took place.  I don't remember any specific tactics that I may or may
> not have used.  I do not remember the specific time that it may or may not have
> started.

Id. at 240.

75.     As Helton testified, and as the recording illustrates, Defendant Pickard was

involved in the misconduct and did nothing to stop it. *Ex.* 17, Helton Dep. Tr. at 90, 250, 255;

*Ex.* 40, Helton Audio Recording e.g.

76.     Defendant York ultimately created a police report regarding the March 8, 2012

questioning of Allen Helton.  *Ex.* 2, York Dep. Tr. at 236; *Ex.* 41, Helton Report at KSP 282-

283. That report – and the accompanying recorded statement - implicates Jonathan Taylor,

Amanda Hoskins, and William Lester in the murder of Katherine Mills.  *Id.*  According to the

report:

> -     Allen Helton was pumping gas on December 19, 2010 at Escoe's Market in
>       Dewitt, Kentucky when Ms. Hoskins and Mr. Lester approached him. In this
>       conversation, Ms. Hoskins asked Helton if "he wanted to make some money and
>       told him how."  Ms. Hoskins then told Helton "about tying an old woman up
>       when she came out to the bathroom."  The woman was named Katherine, Lester's
>       ex-mother-in-law.
>
> -     During this conversation, Ms. Hoskins told Mr. Helton that Katherine had
>       $15,000 dollars and that the plan was to lock her in the outhouse.
>
> -     Helton saw Mr. Lester's Chevrolet Camaro the next morning less than a half-mile
>       from the victim's home.
>
> -     On December 20, 2010, "around 1200 hrs he saw William Lester and Amanda
>       Hoskins at Mike Simpson's residence at Moore's Creek."  There, Ms. Hoskins
>       "got the job done."

- Allen stated that Ms. Hoskins had approximately four thousand dollars that was "folded up" like a rubber band was on it. Ms. Hoskins revealed that the money came from robbing Ms. Mills and that she put in an order to buy drugs from Florida.

Id.

77.    Notably, Defendant York's report does not document that Defendants Pickard and York provided information for Mr. Helton to repeat and that they made promises of consideration. *Id*.

78.    According to Mr. Helton, every bit of information that implicated Plaintiffs in Defendant York's report was false and fabricated. *Ex*. 17, Helton Dep. Tr. at 73-81. Importantly, the false information contained in the false report was provided to Mr. Helton by Defendant York – and again, in Defendant Pickard's presence and previously in the presence of Defendants Mefford and Broughton. *Id*. at 81, 90, 250, 255. Prior to giving into Defendants' plan, Mr. Helton repeatedly informed Defendants York and Pickard that he did not have any direct knowledge regarding the murder of Katherine Mills. *Id*. at 82. As promised, Helton was ultimately released after going along with Defendants' plan. *Id*. at 84:22-25.

**B. Detective York Tampers with Ms. Hoskins' Medical Records to Support Fabricated Statement from Allen Helton**

79.    To support the fabricated statement that he and other Defendants manufactured for Allen Helton, Defendant York obtained - and altered - Ms. Hoskins' medical records. He obtained the records improperly - without a court order, subpoena, HIPPA release, or search warrant - through Shannon Cobb-Bunch, the wife of his colleague, Jason Bunch. *Ex*. 2, York Dep. Tr. at 315-317.

80.    The verified medical records from Ms. Hoskins visit to Dr. Warrens' office at the Hope Medical Center on December 20, 2010, illustrate that Ms. Hoskins arrived at the office at 11:54 a.m. *Ex*. 42, Hoskins Confidential Medical Record at PL4165. *See* below:



*Id.*

81. The medical records- in their original condition, free of markings – prove that Ms. Hoskins was at the doctor at noon on December 20, 2010, and likewise could not have confessed to Helton at Simpson's home "around 1200 hrs," as Defendant York's fabricated Helton report claims. *Id.*; see also Ex. 43, Evans Dep. Tr. at 224.

82. The medical records that Defendant York (and separately, Ms. Hoskins' defense team) obtained look dramatically different, however, than those he provided to the Knox County Commonwealth Attorney. *See* below:



*Ex.* 44, Hoskins Confidential Fabricated Medical Record at PL 14301.

83. Of significance is the time that Ms. Hoskins appeared at Dr. Warren's office on December 20, 2010. The records that Defendant York provided to the Commonwealth's Attorney, Jackie Steele, appear as if the time that Ms. Hoskins arrived at the doctor's appointment was "12:54" a.m. *Id.* When confronted with the doctored time, Defendant York hypothesized that 11:54 a.m. was changed to 12:54 because "this is a fax copy…[and] a little bit more smudged…" *Id.* at 326. A comparison of the two medical records illustrates that the remaining numbers are not distorted in any way.

84. Defendant York admits to writing on the medical records prior to sending them to the Commonwealth for disclosure in the underlying case. *Ex.* 2, York Dep. Tr. at 323 (testifying that "that appears to be my handwriting" at the bottom of the page). When asked whether he

underlined the times of the appointment, circled the CC, and drew a star next to the altered

arrival time – Defendant York retorted "I don't remember doing it. I'm not saying I didn't." *Id*.

at 324.

### C. Detective York Fabricates Christy Branson's May 16, 2011 Statement

85.     The Defendants' misconduct did not end with the fabrication of medical records

to conform with Mr. Helton's fabricated statement.  On May 16, 2011, Defendant Pickard

informed Defendant York that Christy Branson was present to speak with him regarding the

Mills' investigation. *Ex*. 2, York Dep. Tr. at 329-330. Defendant York spoke to Ms. Branson off

the record prior to turning on a recording device. *Id*. at 330. Defendant York did not document

what he told Ms. Branson prior to turning on the recorder. *Id*. at 330-331. He likewise does not

recall how long that unrecorded – and undocumented – conversation lasted.  *Id*. at 331.

86.     Defendant York created a report based on his interactions with Ms. Branson that

claimed Ms. Hoskins confessed to her to involvement in the murder during their incarceration in

the Knox County and Harlan County Jails. *Ex*. 45, Branson KSP Report at PL20498.  Defendant

York's report is false, as Ms. Hoskins never made any admissions to Ms. Branson – or anyone

else - regarding the Mills' homicide. *Ex*. 1, Hoskins Dep. Tr. at 85, 148.  Interestingly, Ms.

Branson's false statement claims that Joe King was the alleged killer, something that no other

witness corroborated. *Ex*. 2, York Dep. Tr. at 331.  Importantly, Ms. Branson has no recollection

of Ms. Hoskins ever confessing to her – nor does she remember providing Defendant York with

any of the details contained in his report. *Ex*. 46, Branson Dep. Tr. at 12-12, 14-15, 18.

87.     Ms. Branson was in a car accident in 2012 and claims that, as a result, she has

memory loss. *Id*. at 9-10.  Defendant York learned of Ms. Branson's memory issues during the

underlying investigation "and that she had some type of amnesia and didn't remember giving me a statement." *Ex*. 2, York Dep. Tr. at 332.

88.    Notably, although Ms. Branson has not formally recanted her original statement – as she has no memory of making it – Defendant York has testified that he only initiated charges when he believed he had probable cause. *Id*. at 129-130.  Considering that Defendant York did not initiate charges until March 14, 2012, nearly a year after obtaining Ms. Branson's statement, it is clear that even he recognized that Ms. Branson's statement was not enough to initiate charges against Plaintiffs.

### D.  Detective York Fabricates Joe King's June 24, 2011 Statement

89.    After obtaining Ms. Branson's alleged statement, Defendant York questioned Joe King twice.  *Ex*. 47, King Dep. Tr. at 12.  On June 23, 2011, Defendant York appeared at the Bell County Courthouse to question Mr. King about the murder of Katherine Mills.  *Id*.  at 12-13. At the onset, King informed Defendant York that he did not have any knowledge regarding the Mills' homicide. *Id*. at 16.  Nevertheless, Defendant York told King that "he had some tapes that he – that he wanted me to hear and brought me and started the, you know, started playing them." *Id*. at 12-13.

90.    Defendant York then began playing a tape recording from "a female inmate that was locked up with Amanda. And the conversation started out, like, if this will help me get time off my sentence from whoever the judge is, then that's what they was going to say…" *Id*. at 14. As Defendant York began playing a second recording, King stated, "man, I don't…want to hear this because it's – it's—that's just crazy." *Id*. at 16. Defendant York then told Mr. King, "I'll come back – I'll put you on ice for 24 hours and come back…". *Id*. at 16.

91.     Making good on his promise, Defendant York returned the following day and brought Mr. King to the Bell County Courthouse for questioning. *Id*. at 19-20; *Ex*. 48, King Report at KSP 277-278. In that meeting, King informed Defendant York that he was not "here to give a statement" as he did not know "anything that would be…helpful to [York's] investigation." *Ex*. 47, King Dep. Tr. at 21.

92.     Ignoring this, Defendant York set out to fabricate Mr. King's statement by providing him with all the information he wanted him to repeat – as he had done with Mr. Helton. *Id*. at 22-31. According to King, Defendant York "started telling me this stuff that he'd got from other – from other witnesses in the case. And then…after he'd finish… each little thing, he would say, now, you…know this, or do you agree with me... [a]nd I'm like, I didn't say that, you know, you're putting words in my mouth here, because I didn't say that…" *Id*. at 22.

93.     Defendant York created a report based on his interactions with Mr. King on June 24, 2011.[1] *Ex*. 48, King Report at KSP 277-278.  According to Defendant York's report, King informed him that:

-   On December 19, 2010, King was in Pineville when Ms. Hoskins and Mr. Lester approached him looking for money to get a Suboxone prescription filled. *Ex*. 48, King Report at 277. King provided Ms. Hoskins with enough money to get the prescription filled and the four went to Walgreens in Pineville to pick it up.  *Id*.

-   At the time the prescription was being filled, Ms. Hoskins and Mr. Lester informed King "about robbing an old lady, that was William's ex-mother-in-law." *Id*.  The report reveals that "Joe stated that he remembered William talking about locking her in the outhouse while they robbed her" of money she came into from selling timber and "Amanda told him she was going to dress up like a home health nurse and use that as her way in to rob her." *Id*.

-   On December 20, 2010, King unsuccessfully attempted to call Ms. Hoskins after seeing that Ms. Mills was found dead on the news.

---

[1] Defendant York's report is dated June 27, 2010.  Given that the murder had not yet taken place by that time, it is clear that Defendant York's report has a typographical error and was instead created on June 27, 2011, approximately three days after his interviews of Mr. King.

- A few days later, King spoke to Ms. Hoskins who revealed that she had come into
$10,000 from a settlement and was purchasing items at the County Gun and Pawn.

- Ms. Hoskins was having an affair with Dr. Warren.

*Id*.

94.    At his deposition, King was presented with the report and denied providing
Defendant York with any of the information that implicated Plaintiffs in the murder of Katherine
Mills. *Ex*. 47, King Dep. Tr. at 22-29, 41, 150. Instead, King reveals that the report reflects "what
York provided to me and was trying to get me to agree with – with this stuff…and then put it
down like – like I'd said it.  And that's what –that's what was outrageous to me, so." *Id*. at 30.
Later, King recalled that Defendant York was "telling me this stuff right here, and then he's
trying to get me to agree with it…"  *Id*. at 112.  Indeed, the "first time ever [heard] the name
Katherine Mills was when York come to the jail and talked about it." *Id*. at 136-37.  The
information attributed to Mr. King in the report was false and fabricated by Defendant York. *Id*.
at 30, 136-137.

**E.  Detective York Fabricates Amber Simpson's March 13, 2012 Statement**

95.    Defendant York's quest to falsely initiate charges against Plaintiffs continued
through additional fabricated statements. Next, Defendant York set his sights on Amber
Simpson, a teenage neighbor of Jonathan Taylor's in 2010. *Ex*. 49, A. Simpson Dep. Tr. at 9. Ms.
Simpson considered Taylor to be a friend. Id. at 10.  Ms. Simpson used to spend time with
Taylor, and often "help[ed] him with his health problems" prior to 2012. *Id*. at 10. At her recent
deposition, Ms. Simpson explained that Mr. Taylor never confessed to her about the death of Ms.
Mills. *Id*. at 11.

96.    Defendant York appeared at Ms. Simpson's home in March 2012. *Id*. at 11.  After
arriving, Defendant York informed Ms. Simpson's mother that he would charge Amber Simpson

with "withholding evidence" unless Amber gave a statement against Mr. Taylor; he also revealed that a reward was available in exchange for her daughter's cooperation. *Id*. at 11-12. Defendant York does not deny informing Simpson's family about a reward. *Ex*. 2, York Dep. Tr. at 110.

97.     Thereafter, Defendant York interviewed Ms. Simpson at her high school on March 13, 2012 - without any request or notification that she had information to provide in the underlying investigation. *Id*. at 108-109; *Ex*. 50, A. Simpson Report at PL 15049-50; *Ex*. 49, A. Simpson Dep. Tr. at 12.

98.     Prior to turning on a recorder, Defendant York told Ms. Simpson that she "could be charged…that he could get my brother out on the manufacturing charge that he had caught…and was telling me about a  reward being offered by the family that he could get –that he could get to me." *Id*. at 51. Specifically, Defendant York made it clear that Ms. Simpson would be given a $10,000 reward in exchange for telling Defendant York what he wanted her to hear. *Id*. at 16. Although Ms. Simpson admits that the promise regarding her brother had little effect, the threat of criminal charges and the promise of reward money proved dispositive. *Id*. at 14.

99.     Defendant York informed Ms. Simpson that he "would not be able to sleep until he prosecuted" Plaintiffs and that he needed her help because he "didn't have all the evidence he needed to prosecute [them]." *Id*. at 15. As such, while the recorder was turned off, Defendant York fed information to Ms. Simpson that implicated Plaintiffs in the murder. *Id*. at 15. As Ms. Simpson recalled:

> [H]e was telling me about a car that had first been hid at the children's home and then was moved to Stinking Creek, that it was a Cavalier.  He pretty much told me what kind it was, what color, where it was hid at. Told me that the purse was left [sitting] beside of her with money spread out, I think, like this (indicating) in front of it.

*Id*. at 15.

100.    Thereafter, Defendant York "then turn[ed] the recorder" on so that she would repeat the story he had just fed her. Id. According to Ms. Simpson, Defendant York would "stop the recorder, turn it on and off, and I do remember he's the one, while the recorder was off, would give me certain details to say and pretty much tell me to say it in my own words when the recorder was turned back on."  Ex. 49, A. Simpson Dep. Tr. at 54.

101.    Prior to meeting with Defendant York, Ms. Simpson "had no clue" of any information that implicated Plaintiffs – or anyone for that matter – in the murder of Ms. Mills. *Id*. at 15-16. In fact, the only details Ms. Simpson knew of the murder were ones that came from Defendant York. Id. at 46.

102.    Several pieces of evidence corroborate Ms. Simpson's recollection of events. First, although Defendant York documents the time that the recording begins, there is nothing documenting the end time. *Ex*. 51, Amber Simpson Recording at PL-9652; *Ex*. 2, York Dep. Tr. at 119, 121. Further, Defendant York admits to speaking with Ms. Simpson before turning on the recorder. *Ex*. 2, York Dep. Tr. at 115, 117. "Yes, I had talked to her when she first came into the room…" *Id*. Additionally, Defendant York could not remember how many times he stopped the recorder, but he did not deny doing so when asked specifically if he had done so. *Id*. at 121; 122.

103.    Although Defendant York claims to not recall how long Ms. Simpson was with him before he turned the recorder on, and cannot remember what he said to Ms. Simpson prior to turning on the recorder, he did recall a conversation with Ms. Simpson, or her family, about a reward prior to obtaining her statement: "I – some – one of them asked me about a reward .…" *Id*. at 115, 117.

104.    When asked whether he promised to assist Ms. Simpson's brother in getting released from jail in exchange from a statement, Defendant York readily conceded that he "would try to help and relay that message." *Id*. at 118; 119 ("I did not promise her anything, but I said I would tell – I would mention it").

105.    Defendant York ultimately created a police report regarding the statement obtained from Ms. Simpson on March 13, 2012. *Ex*. 2, York Dep. Tr. at 108-109; Ex. 50 Amber Simpson Report at PL 15049-50.  That report implicates Plaintiffs in the murder of Katherine Mills. *Id*. Yet, according to Ms. Simpson, all the information in Defendant York's report that implicates Plaintiffs in the murder is false and was fabricated by York. *Ex*. 49, A. Simpson Dep. Tr. at 17-22, 25. As long as she went along with Defendant York's plan, it was Ms. Simpson's understanding that she would receive the $10,000 reward, her brother would be released from jail, and she would not be criminally charged. *Id*. at 21-22. Notably, that report does not document that Defendant York provided information, threatened, and made promises of consideration to Ms. Simpson. *Ex*. 50, Amber Simpson Report at PL 15049-50.

**F.  Sheriff Pickard and Detective York Fabricate Kayla Mills' Statement**

106.    Defendants' pursuit to frame Plaintiffs continued. By March 2012, Kayla Mills was just 19 years old. *Ex*. 52, Donna Mills Dep. Tr. at 15, 26. According to Kayla's mother, Donna Mills, Jonathan Taylor and Kayla dated but broke up in 2009. *Id*. at 15. As discussed below, Defendants Pickard and York had extensive contact with Kayla Mills, as well as her family, prior to obtaining Kayla's false and fabricated statement on March 16, 2012.

**i.    Defendants Pickard and York Coerce and Feed Information To Kayla To Fabricate Her False Statement Against Plaintiffs**

107.    Defendants Pickard and York harassed Kayla Mills repeatedly prior to obtaining her statement on March 16, 2012. *Ex*. 52, Donna Mills Dep. Tr. at 18.  Defendant Pickard

36

approached Kayla "at different places…told her what he thought happened and was telling her that if she didn't cooperate with the police that she was going to be arrested and put in jail forever." *Id*. at 19. He told her further "that if she would just cooperate and tell them that Jonathan and Amanda and William Lester had killed Ms. Mills that he would make sure that she would not get in trouble." *Id*. at 20. If Kayla refused to cooperate, Defendant Pickard threatened that "she was going to get in trouble." *Id*. at 20.

108.    After Defendant Pickard made these threats, Kayla immediately called her mother while "really upset." *Id*. at 19. These threats made Kayla "very afraid. Very afraid…she cried, and it was just hard for her…" *Id*. at 20. According to Donna Mills, "it just became more and more and more harassing." *Id*. at 19.

109.    Defendant Pickard's tactics became more aggressive as time went on. On one occasion, he followed Kayla to her grandmother's home to question her "again about Katherine…" *Id*. at 22. At other times, Defendant Pickard would sit across the street from Kayla's home "just waiting for her to come out of the house." *Id*. at 25. Another time, Defendant Pickard questioned Kayla about the Mills' homicide after showing up at a residence with numerous other offices on an alleged drug sting. *Id*. at 23.

110.    In the end, Kayla repeatedly revealed to her mother that she "felt really harassed and threatened. She told me this herself. That she felt they were harassing, and she felt threatened, and she was scared." *Id*. at 25. Kayla always maintained to her mother that she "don't know anything" and that "Jonathan has never said anything to me about this. Nothing. He don't know anything at all." *Id*. at 21; 27.

111.    Defendant Pickard admits to having several interactions with Kayla throughout the investigation. *Ex*. 13, Pickard Dep. Tr. at 14, 149. Defendant Pickard does not dispute that he

spoke to Kayla Mills outside the presence of Defendant York. *Id*. at 105-106. In at least one of

his conversations, Kayla maintained her innocence to Sheriff Pickard and revealed that she did

not have any knowledge about who was involved in the Mills' homicide. *Id*. at 158-160.

Defendant Pickard never created a single police report documenting his interactions with Kayla

Mills. *Id*. at 25-26, 160-161.

112.    Defendant York also admits to speaking with Kayla prior to that March 16, 2012.

*Ex*. 2, York Dep. Tr. at 156. Defendant York instructed Kayla on numerous occasions that she

needed to tell him that "Jonathan, William Lester and Amanda Hoskins had robbed

Katherine…[a]nd if she didn't tell him this, that she was going to jail." *Ex*. 52, Donna Mills Dep.

Tr. at 45. Defendant York does not deny these allegations, and instead testified:

> Q: Did you threaten to charge – prior to actually getting an arrest warrant with regard to
> Kayla Mills, did you ever threaten to charge her with murder unless she gave you a
> statement?
>
> A: That might have been a tactic that I used.  I don't remember the time or day.

*Ex*. 2, York Dep. Tr. at 158.

### ii.    Defendant York Initiates Charges Against Kayla Mills For Murder Without Notifying the Commonwealth Attorney's Office

113.    The Defendants eventually made good on their threats against Kayla.  On March

14, 2012, Defendant York initiated charges against Kayla for the murder of Katherine Mills. *Ex*.

2, York Dep. Tr. at 159-160; Ex. 53, Kayla Mills Arrest Warrant at KSP362, 364. Jackie Steele,

the elected Commonwealth's Attorney, was never informed that Defendant York initiated these

charges. *Ex*. 8, Jackie Steele Dep. Tr. at 110-111. Likewise, although it was Defendant York's

responsibility to place the charging document against Kayla in the Mills' investigative file, the

file is void of Defendant York's criminal complaint against her. *Ex*. 2, York Dep. Tr. at 22.

114.     Defendant York openly admits that charges were initiated against Kayla Mills prior to having probable cause. "There was a point in the investigation that it was – we was beginning to get probable cause – or, not probable cause, yet, but information that would indicate that she would be involved." *Id*. at 28. When asked what evidence supported the initiation of charges against Kayla Mills for murder, Defendant York stated "Again, I don't know. I would need to look at the case and see which witness statements. I don't know remember which ones in order." *Id*. at 32.

### iii.    Defendant York Sets Deadline For Kayla Mills To Regurgitate Defendants' Fabricated Statement

115.     On March 15, 2012, one day after initiating charges against her for murder, Defendant York arrived at Donna Mills' residence, "walked in like looking around, went halfway down the hallway and looking for Kayla." *Ex*. 52, Donna Mills Dep. Tr. at 35, 38. After Donna Mills explained that Kayla was not home, she informed Defendant York of Kayla's whereabouts during the day that Ms. Mills was killed. *Id*. at 39.  In response, Defendant York informed Donna that:

> I don't give a shit where she was that day…I need to talk to Kayla.  She knows what I need her to say. And if she doesn't come by at 2:00 today to the City police station and tell me what she knows, I want her to say specifically…and she knows what that is, she is going to jail because I have a warrant for her arrest and she is going to jail. And I don't even need her statement anyway because I already have enough evidence to arrest her.

*Id*. at 39.

116.     Donna Mills then informed Defendant York that Kayla was not dating Mr. Taylor at the time of the murder, had not dated him after the murder, and had not seen him for more than a year. *Id*. at 40.  She also provided Defendant York with information with which he could verify

Kayla's whereabouts at the time of Ms. Mills' death. *Id*. at 40. But, Defendant York did not care

about the information and instead retorted:

> I don't give a shit what you're saying. I don't care. She's going to come in here
> today and tell me what she – I want her to say. And she knows what that is
> because I've talked to her several times. And if she doesn't, she's going to go to
> jail today.

*Id*. at 40.

117.    Donna frantically searched for her daughter after Defendant York left. *Id*. at 42.

After finding Kayla, Donna retained a lawyer who could represent Kayla at the impending

interrogation. *Id*. at 43. That lawyer, Kenneth Boggs, had a conflict that prevented him from

appearing on March 14, 2012. *Id*. at 43. So, Ms. Mills informed Defendant York that she would

appear with her daughter, lawyer, and husband the following day for questioning.

### iv.    Defendant York Strikes Undisclosed Deal With Kayla Mills In Exchange For Fabricated Statement

118.    On March 16, 2012, Donna Mills appeared at the Barbourville Police Department

with Kayla for questioning. *Ex*. 52, Donna Mills Dep Tr. at 44.  Defendant York told Kayla prior

to her statement that "we've discussed this several times. You know what you have to say. If you

don't tell me this, you're going to jail today." *Id*. at 44. Although Kayla knew what Defendant

York wanted her to say, she continued to maintain that "she didn't know anything." *Id*. at 64. In

response, Defendant York continued to tell her that "you know. You know. You know this. You

know [what] you're going to have to tell me." *Id*. at 48.

119.    Defendant York got "more angry" each time Kayla denied having knowledge. *Id*.

at 48. Defendant York threatened Kayla more than before by telling her she would go to prison

for murder and robbery. *Id*. at 48-49. He began "hitting his desk and just acting irate." *Id*. at 49.

As Kayla continued to say "I don't know. I don't know. I don't know," Defendant York used

more coercive techniques that became so aggressive that Donna got so "ill [she] had to leave the room and literally go out in the parking lot and throw up. It was so bad. Really, it was that bad." *Id*. at 57.

120.     Defendant York ultimately threatened Kayla that she was going to tell his story or go to jail. *Ex*. 2, York Dep. Tr. at 49. Defendant York does not deny this and instead readily admits to informing Kayla that he charged her with murder prior to taking her statement. *Id*. at 29, 157,162.

121.     When asked whether there was an understanding between himself and Kayla that if she gave a statement implicating Mr. Taylor in the murder of Ms. Mills, that Defendant York would not proceed forward with the arrest warrant against Kayla for murder, Defendant York admitted: "Yeah, that's what the understanding of myself and her attorney had." *Id*. at 162.

122.     When asked whether he ever documented this agreement to abandon murder charges against Kayla Mills, and a $1,000,000 bail that was signed by a judge, in exchange for a statement implicating Mr. Taylor in the murder, Defendant York retorted, "No." *Id*. Of course, Defendant York did not document that he and Defendant Pickard provided information to Kayla, threatened her, and then made significant promises of consideration to her. *Ex*. 54, Kayla Mills Recording at e.g.; *Ex*. 55, Report of Kayla Mills' Statement at 286.

123.     Although Defendant York recorded portions of his interactions with Kayla on March 16, 2012, he readily acknowledges that he spoke to her off the record prior to taking a statement. *Ex*. 2, York Dep. Tr. at 156. Even when Defendant York began recording, he often stopped the recorder to tell Kayla what to say. *Ex*. 52, Donna Mills Dep. Tr. at 51-53. In those gaps, Defendant York rehearsed Kayla's story. *Id*. at 51-52. Throughout the marathon

questioning, Defendant York repeatedly informed Kayla as to what he wanted her to say. Id. at 56, 64. "He continued and continued and continued." *Id*. at 56.

124.    Defendant York ultimately drafted a summary of the statement he obtained from Kayla Mills on March 16, 2012. *Ex*. 2, York Dep. Tr. at 154.  Defendant York's report claims that Mr. Taylor confessed to Kayla Mills that he killed Ms. Mills, with assistance from Ms. Hoskins and Mr. Lester. *Id*. at 163; *Ex*. 55, Kayla Mills Report at KSP 286. The statement manufactured by Defendant York for Kayla Mills was false and fabricated. *Ex*. 52, Donna Mills Dep. Tr. at 45, 48-53, 56, 61-64.

125.    As noted above, at the time she gave her statement, Kayla Mills was charged with the murder of Katherine Mills and was facing a $1,000,000 bond. *Ex*. 2, York Dep. Tr. at 162. Nonetheless, consistent with Defendant York's undocumented promises of consideration, Kayla Mills was allowed to freely leave the police department after implicating Plaintiffs in the murder of Ms. Mills.  *Ex*. 2, York Dep. Tr. at 31.

**G.  Detectives York and Mefford Fabricate Daniel Wilson's July 18, 2012 Statement**

126.    Defendants' quest to frame Plaintiffs did not end with Kayla's March 16, 2012 statement. Daniel Wilson was incarcerated in the Whitley County Jail with Mr. Taylor in 2012. *Ex*. 57, Wilson Dep. Tr. at 10-11. For a little more than a month, Wilson and Mr. Taylor were incarcerated in the same pod. *Id*. at 11. During that time, Mr. Taylor never confessed any involvement relating to the murder of Katherine Mills. *Id*. at 12. Nonetheless, without any request or prompting, Defendant York went to the Roederer Correctional Complex in La Grange, Kentucky to meet with Wilson. *Id*. at 12-13. Defendant Mefford accompanied Defendant York on the visit. *Id*. at 13; *Ex*. 15, Mefford Dep. Tr. at 42.

127.    Defendant York admits that prior to obtaining a statement from Mr. Wilson, he promised to discuss with the prosecutor whether Wilson could be moved to a prison closer to home. *Ex.* 2, York Dep. Tr. at 369. At his deposition, Wilson likewise recalled that Defendant York promised to "talk to them and get back with me" about being released from prison. *Ex.* 57, Wilson Dep. Tr. at 15.

128.    Defendant York eventually drafted a July 21, 2012 report regarding his interview with Daniel Wilson. *Ex.* 2, York Dep. Tr. at 365. Defendant York's report claims that Mr. Wilson told the officers that:

- While in a cell with Jonathan Taylor, Mr. Taylor talked about killing an old woman over money.

- Mr. Taylor revealed it was arranged by his cousin Amanda.

- Mr. Taylor would move his arms and hands when he described beating the lady, "the motion would be if he had something like a club or hammer in his hands."

*Ex.* 58, Wilson Report at PL 15055

129.    At his deposition, Wilson testified that the statements attributed to him which implicated Plaintiffs in the murder were false. *Ex.* 57, Wilson Dep. Tr. at 18-20. Wilson further testified that the substance of Defendant York's report was fabricated:

Q: Your testimony is you didn't give any statement at all?

A: No sir.

*Id.* at 35-36.

130.    In fact, Wilson made it clear that he "didn't have nothing to tell them, so I didn't think I would be involved. I didn't think they would pull me this far into Jonathan Taylor's case." *Id.* at 36.

**i.    Defendant Mefford Was Present During the Fabrication of Wilson's Statement, Did Nothing to Intervene, and Failed to Document the Fabrication and Promises of Consideration**

131.    Defendant Mefford admits to participating in the interview of Daniel Wilson. *Ex*. 15, Mefford Dep. Tr. at 42. In fact, Defendant Mefford not only participated in the interview, but he drove Defendant York to it. *Id*. at 43. Although the prison was more than 3 hours from Post 10, Defendant Mefford claims to not recall the substance of any conversations with Defendant York on the drive there. *Id*. at 43-44. Defendant Mefford readily concedes that he knew the goal of the meeting was to obtain a statement from Wilson that would be used in the Mills' homicide investigation. *Id*. at 63-64.

132.    Defendant Mefford does not deny the fabrication allegations by Mr. Wilson, rather, he claims to not recall what Defendant York told Wilson nor what Wilson told the Defendants. *Id*. at 47-48. Defendant Mefford never left the room while Defendant York spoke to Wilson. *Ex*. 57, Wilson Dep. Tr. at 76-77; *Ex*. 15, Mefford Dep. Tr. at 48. During this entire interview, Defendant Mefford admits that there was nothing Defendant York did with which he disagreed. *Id*. at 63-64. From Wilson's perspective, Defendant Mefford "just sat there" while Defendant York did his thing. *Ex*. 57, Wilson Dep. Tr. at 71.

133.    Defendant Mefford assumed that Defendant York would have drafted a report documenting Wilson's statement and assumed that it would be used in the criminal prosecution. *Ex*. 15, Mefford Dep. Tr. at 61, 64. At no point in time did Defendant Mefford take any steps to stop the initiation of charges against Plaintiffs. *Id*. at 64.

134.    In any event, Defendant Mefford ultimately created a report on April 6, 2013 that documents his participation in the Wilson interview on July 18, 2012. *Id*. at 58; *Ex*. 59, Mefford Wilson Report at KSP 300. Defendant Mefford's report did not document the promises of

44

consideration nor the fabrication of Mr. Wilson's statement. *Ex*. 59, Mefford Wilson Report at

KSP 300.

## VI. DEFENDANTS YORK, BROUGHTON, AND PICKARD FACILITATE UNDULY SUGGESTIVE IDENTIFICATION PROCEDURE TO FRAME PLAINTIFFS

### A. Defendant York is Present When Sketch is Made

135.    On February 2, 2011, Defendant York met with Michael Crump and KSP Officer

Joshua Bunch. *Ex*. 2, York Dep. Tr. at 343-344. There, Defendant York learned that Crump saw

a white male coming from Ms. Mills' residence around the time of her death. *Id*. at 344. The

male had a hood on his head and was wearing a hunting jacket with a mossy pattern. *Id*. at 344.

At Defendant York's direction, and in his presence, Detective Bunch created a composite sketch

based upon Mr. Crump's description. *Id*. at 344, 346; *Ex*. 60, Crump Sketch at PL2660.

Defendant York admits he used the sketch to search for suspects during the underlying

investigation. *Ex*. 2, York Dep. Tr. at 347; *Ex*. 60, Crump Sketch at PL2660.

### B. Defendants York, Pickard, and Broughton Interrogate Plaintiff Taylor for the Mills' Murder

136.    In 2011, Defendants Pickard, York, and other officers from the Kentucky State

Police arrested Mr. Taylor and Ms. Hoskins and transported them to the Barbourville Police

Department and the Knox County Detention Center, respectively. *Ex*. 4, Taylor Dep. I, at 145-

147. Thereafter, Defendants Pickard, York, and Broughton questioned Mr. Taylor about the

murder of Katherine Mills. *Id*. at 147; *see also Ex*. 5, Taylor Dep. II, at 9.

137.    Defendant York initiated the interrogation by placing 10-12 photos of the crime

scene in front of Mr. Taylor, telling him to "see what you've done, realize what you've done."

*Ex*. 4, Taylor Dep. I, at 148. The officers then left Mr. Taylor in the interrogation room alone to

review the photos. Id. Once the officers went back into the room, Mr. Taylor told them that he

knew nothing about Ms. Mills' death as Defendants York, Pickard and Broughton questioned him jointly and individually. *Id*. at 149-150; 229; *see also Ex*. 5, Taylor Dep. II at 11; *Ex*. 13, Pickard Dep. Tr. at 97-98.

138.    When Defendant Broughton questioned Mr. Taylor, he sat as close as he could to Mr. Taylor and told him that he knew he had something to tell him. *Ex*. 5, Taylor Dep. II at 12-13. Mr. Taylor told him that he had nothing to tell him because the only thing he knew about the case was what he had seen on the news. *Id*. at 13; 15.

### C. Defendants York, Pickard, and Broughton Facilitate Unduly Suggestive Show-up of Plaintiff Jonathan Taylor

139.    During their questioning of Mr. Taylor, Defendants York, Pickard, and Broughton told Mr. Taylor to step out into the hallway, put on a coat, and to pull the hood on his head, leaving some of his hair out it. *Ex*. 5, Taylor Dep. II at 150; *see also Ex*. 5, Taylor Dep. Tr. II at 22. In Defendant Pickard's presence, Defendants York and Broughton then ordered Mr. Taylor to stand in multiple positions while photographs were taken. *Ex*. 4, Taylor Dep. Tr. I at 230; *see also Ex*. 5, Taylor Dep. II, at 17. Mr. Taylor cooperated because he "didn't have [anything] to hide." *Ex*. 4, Taylor Dep. Tr. I at 230.

140.    Defendant York does not dispute Mr. Taylor's recollection of events. Instead, Defendant York claims to have no recollection of the photo-taking process. *Ex*. 2, York Dep. Tr. at 350. When asked if he was the person who instructed Mr. Taylor to put on a hoodie and have the hood placed over his head for the photographs, Defendant York admitted, "probably so, yes." *Id*. at 349.

46





Ex. 60, Crump Sketch at PL 2660          Ex. 61, Taylor Photograph at PL 5070

Defendant York's intent was to conduct an unduly suggestive identification procedure:

Q: Okay.  Well, you told Jonathan Taylor to put on this hoodie and have the hood over his head when you took the photographs, right?

A: Probably so, yes.

Q: Yeah.  And that's because you knew that Mr. Crump's sketch had a hood over the suspect, right?

A: Yes.

Q: So you wanted the photographs of Jonathan Taylor to look like the sketch that was done by Michael Crump, correct?

[Objection]

A: Is –as long as – all the pictures I took of different people.  Yes.

*Ex*. 2, York Dep. Tr. at 350.

*       *       *       *       *       *       *       *       *       *       *       *       *

Q: Okay. Is it fair to say that you wanted the photographs that you sent of Jonathan Taylor to look as close to the February 2, 2011 sketch as possible?

[objection]

A: Yes. Are you referring to the hood? Yes, yes.

Q: Okay.

A: Yes. As far as the hood, yes.

*Id*. at 360.

141.    Importantly, Defendants Broughton and Pickard never told Defendant York that it was inappropriate to order Mr. Taylor to put on the hoodie before requesting the photos be taken and never stopped the photos from being taken. *Ex*. 5, Taylor Dep. II, at 58-59; *Ex*. 14, Broughton Dep. Tr. at 130-131.

### D. Defendant Broughton Admits to Assisting Defendant York by Photographing Plaintiff Taylor

142.    In fact, Defendant Broughton admits to taking photographs of Mr. Taylor at multiple angles, with a digital camera belonging to the Barbourville Police Department, at Defendant York's request. *Ex*. 14, Broughton Dep. at 14-15; 17; 121; 128-129. According to Defendant Broughton, it was Defendant York's idea to have Mr. Taylor put on the jacket with a hoodie for the photographs. *Id*. at 127; 130; *see also Ex*. 61, Taylor Photos. The photographs were taken in a way to replicate the sketch of the suspect. *Ex*. 14, Broughton Dep. at 132. Defendant Broughton admits that he wanted to help Defendant York and knew the photos were going to be used in some capacity in the Mills' investigation. *Id*. at 19; 126.

143.    Defendant Broughton did not create any reports or notes documenting the steps that led to the photographs, nor did he inform the prosecutor of any of the events or discussions that took place while photographing Mr. Taylor. *Id*. at 129; 172-173.

144.    In his 20 years as a law enforcement official, prior to taking the photos of Mr. Taylor, Defendant Broughton never dressed up a suspect to look like a sketch. *Ex*. 14, Broughton Dep. Tr. at 142. He had never requested that a suspect put on a hoodie to match the hoodie on the sketch. *Id*. In his experience, doing so would be unduly suggestive and even more so if the photographs of the suspect were the only photographs presented to the eyewitness. *Id*. at 142-143. He would never conduct a photographic array that consisted only of photos of the same person because he acknowledges that it would be unduly suggestive. *Id*. at 144-145.

145.    Even still, Defendant Broughton never informed Defendant York that it would be suggestive to take photographs of Mr. Taylor with a hood on his head. *Id*. at 130-131. Further, Defendant Broughton never told Defendant York or Defendant Pickard not to adjust Mr. Taylor's hair to make it visible in the photos he took. *Id*. at 132. In fact, Defendant Broughton would have complied with Defendant York's request to dress Mr. Taylor like the sketch - even if he knew they were being sent to an eyewitness - because he "was there to assist [Detective York] to the best of [his] ability." *Id*. at 147-148. He would have complied even if Defendant York told him that he was only going to send the photographs of Mr. Taylor to the eyewitness. *Id*. at 148.

### E.  Defendants York, Pickard, and Broughton Discuss Conspiracy to Frame Plaintiff

146.    Defendant York, Defendant Broughton and Mr. Taylor stood in the hallway after taking photographs of Mr. Taylor. *Ex*. 4, Taylor Dep. 1, at 152. Defendant Pickard was also present. *Ex*. 4, Taylor Dep. Tr. I at 230.There, Defendant York spoke to Defendant Broughton - loudly enough for Mr. Taylor to overhear them - about sending the photographs that they had just taken of Mr. Taylor and a sketch of the suspect to "someplace", saying, "We got him. We're charging him with murder. It's him…We're sending him down." *Id*. at 152; 157; *see also Ex*. 5, Taylor Dep. Tr. II at 16-17.

**F.  Defendant York Reveals for the First Time in this Case That He Conducted Photographic Show-Up of Plaintiff Taylor and Declined To Document The Failed Identification Attempt**

147.    During this litigation, Defendant York revealed for the first time that Mr. Crump was shown the photographs of Jonathan Taylor during the underlying investigation. *Ex.* 62, York Response to Pl. First Set of Interrogatories at 10-11; *Ex.* 2, York Dep. Tr. at 16. Those are the same photographs taken by Defendant Broughton.

148.    Notably, Defendant York only sent photographs of Mr. Taylor to Oklahoma for Mr. Crump to make an identification. *Id*. at 69, 80. According to Defendant York, a "police officer in Oklahoma" showed Crump these photographs. *Id*. at 16-17.  Defendant York learned from Crump after he viewed the photographic lineup that "he could not positively identify him…" *Id*. at 70, 73, 348.

149.    On this score, Mr. Crump readily agrees.  At his deposition, Crump testified that he repeatedly told Defendant York, "I told him I couldn't.  All I seen was a tattoo on a hand, and only reason I knew it because it was a big blue one…but I did not see a face and I didn't see a face in the car…" *Ex*. 20, Crump Dep. Tr. at 11:22-23. Crump repeatedly informed Defendant York that he "can't 100 percent identify somebody." *Id*. at 12.

150.    Defendant York never documented any of this information in an investigative report, nor did he reveal the substance of such information to the grand jury, prosecutor, or defense. *Ex*. 2, York Dep. Tr. at 70, 73 (never documented in report); 357-358 (never informed the GJ that Crump did not identify Taylor). When asked whether he documented this information in any manner, Defendant York revealed: "I don't remember doing that." *Id*. at 356.

### G. The Commonwealth's Attorney Was Never Informed of Defendants' Plan To Conduct Suggestive Photo-Identification Procedure

151.    The elected Knox County Commonwealth Attorney, Jackie Steele, testified at his deposition that law-enforcement officers never informed him that they instructed Mr. Taylor to dress up like the sketch. *Ex*. 8, Steele Dep. Tr. at 93. Defendants York, Pickard, and Broughton also never disclosed to the Commonwealth that Mr. Taylor's photographs were sent to Oklahoma for Mr. Crump to view – and that no identification was made. *Id*. at 92-93; 98. Mr. Steele further testified that "all information's important for me to have, so yeah, I think – yeah. Obviously, any information would've been important to have." *Id*. at 102. Mr. Steele revealed that he "would want them to … document it and make sure I have it…" *Id*. at 103.

152.    If Mr. Steele had learned of Defendants' plan, he would have "advised them first in the difference of a photo array or a photo show-up, and then I would –I would've cautioned them not to use a photo show-up, and that if they're going to put one person in the hoodie, coat, whatever they were using, to put them all in that." *Id*. at 126. According to Mr. Steele, when a photographic show-up occurs, the "likelihood…[is] that [it] will be suppressed." *Id*. at 91. In his view, the showing of a single photograph to a witness without exigent circumstances would be unduly suggestive. *Id*. at 92. Mr. Steele considered the tactics employed by Defendant York to be "a photo show-up by the courts…in my opinion." *Id*. at 98.

### H. PLAINTIFFS' EYEWITNESS IDENTIFICATION EXPERT

153.    Dr. Neushatz is an eyewitness identification expert who has reviewed the evidence in this case and detailed the various ways in which Defendants' actions constituted a suggestive identification procedure. His opinions are expressed in his report, attached here as *Ex*. 63. Dr. Neushatz determined that the identification procedures administered by Defendants York, Pickard, and Broughton were biased against Mr. Taylor in several ways. *Id*. at 8-23. First,

the Defendants actions of having Mr. Taylor wear clothing similar to the sketch, placing the hood over his head, and adjusting his hair increased the bias in the procedure. *Id*. at 20. Dr. Neushatz next opines that this "suggestiveness was further enhanced by the manner in which the identification process was administered" based on Defendant York only sending photographs of Mr. Taylor for the witness to view. *Id*. at 20. Finally, Dr. Neushatz concluded that "the identification procedures utilized by the Defendants in this case are unquestionably suggestive…" *Id*. at 23.

## VII.    BASED ON FALSE AND FABRICATED EVIDENCE, DEFENDANT YORK INITIATES CHARGES AGAINST PLAINTIFFS THROUGH CRIMINAL COMPLAINTS

### A. Defendant York Initiates Charges Against Plaintiff Hoskins While Admitting That He Knew She Was Not Involved in Crime

154.    In March 2012, although no warrant was issued and no charges filed, Ms. Hoskins was told by her probation officer to turn herself in to the jail for allegedly absconding from probation. *Ex*. 1, Hoskins Dep. Tr. at 127-128. Ms. Hoskins complied and was then taken to a small room where Defendant York interrogated her again about the Mills' murder. *Id*. at 128. Defendant York told her, "I know you wasn't [sic] there. I know you didn't do it. Matter of fact, I know you didn't have any involvement. Now, tell me what you know." *Id*. at 128.

155.    When Ms. Hoskins told him that she did not know about what he was talking, Defendant York stated that "you will tell me – you will talk to me by the time you go to court." *Id*. at 128. Thereafter, Defendant York told Ms. Hoskins that he was going to Whitely County to charge Mr. Taylor and walked out of the room without informing her that he had likewise charged her with the murder of Katherine Mills. *Id*.

156.    On March 14, 2012, Defendant York initiated charges against Ms. Hoskins for the murder and robbery of Katherine Mills. *Ex*. 64, Hoskins Charging Docs at KSP 361, 365.

Defendant York did so by completing a criminal complaint and accompanying arrest warrant, which he presented to a Knox County Judge. *Id.*; *Ex.* 8, Steele Dep. Tr. at 18. Notably, the criminal complaint is completely devoid of any factual basis for the initiation of charges. *Ex.* 64, Hoskins Charging Docs at KSP 361, 365.

### B. Defendant York Initiates Charges Against Plaintiff Taylor, Then Threatens Him

157.    On March 14, 2012, Defendant York also charged Mr. Taylor for the murder and robbery of Katherine Mills. *Ex.* 65, Taylor Charging Docs at KSP 358, 363; *Ex.* 4, Taylor Dep. I at 168. Defendant York did so by completing a criminal complaint and accompanying arrest warrant, which he presented to a Knox County Judge. *Ex.* 65, Taylor Charging Docs at KSP 358, 363; *Ex.* 8, Steele Dep. Tr. at 18, 60.  Notably, the criminal complaint is completely devoid of any factual basis for the initiation of charges. *Ex.* 65, Taylor Charging Docs at KSP 358, 363.

158.    After initiating charges, Defendant York met with Mr. Taylor, threw the arrest warrant at him, and threatened "…I'm going to do everything in me for you to rot in the penitentiary on this…if you get out, if you make bond, if you beat the case, if it gets dismissed…, then I'll have you done away with." *Ex.* 4, Taylor Dep. Tr. I. at 168-169. Put simply, Defendant York threatened to have Mr. Taylor killed if he successfully met his $1,000,000 bail. *Id.*

### VIII.  DEFENDANT YORK PRESENTS FABRICATED EVIDENCE AT PRELIMINARY HEARING

159.    On March 27, 2012, Defendant York testified at a preliminary hearing in Knox County District Court. *Ex.* 2, York Dep. Tr. at 138; *Ex.* 66, Preliminary Hearing Tr. at PL 25665-25683. There, Defendant York introduced the same fabricated statements that he would later present to the grand jury, while repeating many of the same falsehoods.

### A.  Defendants' Fabricated Statements Introduced at Preliminary Hearing

160.    In seeking to charge Plaintiffs for murder, Defendant York once again introduced the statement he obtained from Amber Simpson. *Ex.* 66, Preliminary Hearing Tr. at PL 25668, 25681-82. As discussed, *supra* in Section V(E), Defendant York fabricated Ms. Simpson's statement during the underlying investigation. Notably, Defendant York did not inform the Court as to any promises of consideration made to Ms. Simpson prior to obtaining her statement. *Ex.* 66, Preliminary Hearing Tr. at PL 25665-25683.

161.    Defendant York also introduced the statement he obtained from Joe King that implicated Plaintiffs in the murder. *Ex.* 66, Preliminary Hearing at PL 25667-68, 25671. As discussed, *supra*, in Section V(D), Defendant York likewise fabricated Mr. King's statement during the underlying investigation.

162.    Defendant York also introduced the statement that he, Defendant Pickard, Defendant Mefford, and Defendant Broughton manufactured for Allen Helton that implicated Plaintiffs in the murder. *Ex.* 66, Preliminary Hearing Tr. at PL 25668-69, 25673-74.  As discussed, *supra* in Sections III(C)(iii) and V(A), Defendants York, Pickard, Mefford, and Broughton fabricated Mr. Helton's statement during the underlying investigation.  Notably, Defendant York did not inform the Court as to any coercion or promises of consideration made to Mr. Helton prior to obtaining his statement.

163.    Defendant York also introduced the statement that he and Defendant Pickard created for Kayla Mills that implicated Plaintiffs in the murder.  *Ex.* 66, Preliminary Hearing Tr. at PL 25668, 25681-82.  Notably, Defendant York did not inform the Court as to any promises of consideration made to Ms. Mills prior to obtaining her statement. *Ex.* 2, York Dep. Tr. at 162-

163. As discussed, *supra,* in Section V(F), Defendants York and Pickard fabricated Ms. Mills' statement during the underlying investigation.

164.    Defendant York also introduced the statement that he created for Christy Branson that implicated Plaintiff Hoskins in the murder. *Ex.* 66, Preliminary Hearing Tr. at PL 25668. As discussed, *supra*, in Section V(C), Defendant York fabricated Ms. Branson's statement during the underlying investigation. Even Defendant York conceded that Ms. Branson's statement conflicted with his theory of the case, as she claimed Ms. Hoskins confessed to her that Mr. King was involved. *Id.* at PL 25676-77.

## IX.    DEFENDANT YORK TESTIFIES FALSELY WHILE PRESENTING DEFENDANTS' FABRICATED EVIDENCE TO GRAND JURY

165.    On April 27, 2012, Defendant York testified before the Knox County, Kentucky grand jury for the purpose of obtaining indictments against Amanda Hoskins, Jonathan Taylor, and William Lester for the murder of Katherine Mills.  *Ex.* 2, York Dep. Tr. at 146; *Ex.* 67, York GJ Tr. at PL 36660-36678. Defendant York did not have any conversations with the Commonwealth Attorney's Office regarding the prosecution of Amanda Hoskins and Jonathan Taylor prior to his testimony before a grand jury. *Ex.* 2, York Dep. Tr. at 96.

166.    At his deposition, Defendant York unapologetically revealed that his goal when testifying before the grand jury was to obtain an indictment against Plaintiffs. *Id.* at 279, 281. Because of this, Defendant York admits he did not provide any statements to the grand jury that implicated Allen Helton, Mike Simpson, or Jesse Lawson in the murder of Katherine Mills. *Id.* at 268-272, 280. In addition to withholding critical material exculpatory evidence from the grand jury, Defendant York likewise testified falsely and presented fabricated evidence to the grand jury.

### A.  Defendants' Fabricated Statements Introduced to Grand Jury

167.    In seeking to charge Plaintiffs for murder, Defendant York informed the grand jury that "Jonathan Taylor, he bragged to a girl named Amber Simpson about doing it and he said he used a hammer, hit her head twice…"  *Ex*. 67, Grand Jury Tr. at PL 36636-37. As discussed, *supra,* in Section V(E), Ms. Simpson's statement was false and fabricated by Defendant York during the underlying investigation. Notably, Defendant York did not inform the grand jury as to any promises of consideration made to Ms. Simpson prior to obtaining her statement.  Ex. 67, Grand Jury Tr. at e.g. Defendant York informed the grand jury that Ms. Simpson's statement "sealed the deal." *Id*. at PL 36659.

168.    Defendant York also introduced Joe King's statement that implicated Plaintiffs in the murder to the grand jury. *Ex*. 67, Grand Jury Tr. at PL 36644-46.  As discussed, *supra*, in Section V(D), Mr. King's statement was false and fabricated by Defendant York during the underlying investigation.

169.    Defendant York also introduced the statement that he, Defendant Pickard, Defendant Mefford, and Defendant Broughton created for Allen Helton that implicated Plaintiffs in the murder. *Ex*. 67, Grand Jury Tr. at PL 36649-56. As discussed, *supra*, in Section III(C)(iii); V(A), Mr. Helton's statement was false and fabricated by Defendants York, Pickard, Mefford, and Broughton during the underlying investigation. Notably, Defendant York did not inform the grand jury as to any coercion or promises of consideration made to Mr. Helton prior to obtaining his statement.

170.    Defendant York also introduced the statement that he and Defendant Pickard created for Kayla Mills that implicated Plaintiffs in the murder.  *Ex*. 67, Grand Jury Tr. at PL 36664, 36668. Notably, Defendant York did not inform the grand jury as to any promises of

consideration made to Ms. Mills prior to obtaining her statement. *Ex*. 2, York Dep. Tr. at 162-163. As discussed, *supra*, in Section V(F), Ms. Mills' statement was false and fabricated by Defendants York and Pickard during the underlying investigation.

171.    Defendant York also introduced the statement that he created for Christy Branson that implicated Plaintiff Hoskins in the murder. *Ex*. 67, Grand Jury Tr. at PL 36649. As discussed, *supra*, in Section V(C), Ms. Branson's statement was fabricated by Defendants York during the underlying investigation. Even Defendant York conceded to the Grand Jury that Ms. Branson's statement conflicted with his theory of the case, as she claimed Ms. Hoskins confessed to her that "Joe King instead of Jonathan Taylor…is the one that actually did the killing." *Id*. at PL 36648-49.

### B.  Defendant York Testifies Falsely Before Grand-Jury

172.    Defendant York repeatedly provided false information to the grand jury. At his deposition, Defendant York admitted to testifying falsely in several respects, some of which are discussed below.

### i.    Defendant York Falsely Testified that Hoskins and Taylor Knew Victim

173.    First, Defendant York informed the grand jury that Ms. Hoskins and Mr. Taylor knew Katherine Mills prior to her death. *Ex*. 2, York Dep. Tr. at 101-102; *Ex*. 68, Grand Jury Audio at 2:06-2:36. At his deposition, Defendant York admitted that at the time of his grand-jury testimony, not a single witness informed him that Mr. Taylor knew the victim prior to her death. *Ex*. 2, York Dep. Tr. at 103. When directly asked to name a single witness who informed him that Mr. Taylor knew Katherine Mills prior to her death, Defendant York revealed, "Again, as far as knowing on an individual, like, a personal level? No." *Id*. at 103.

174.     After conceding that his testimony was false, Defendant York attempted to clarify what he meant, stating that he intended to testify that each of the three suspects "knew of" Ms. Mills – not that they actually each knew her. *Id*. at 104-105.  Regardless, when asked if he explained the definition of "know" – or informed the grand jury of what he intended to testify to – Defendant York revealed, "no, I did not." *Id*. at 105.

**ii.     Defendant York Falsely Testified that Lester Was on Run**

175.     Next, Defendant York also falsely informed the grand jury that William Lester was on the run at the time of charging. *Id*. at 106; *Ex*. 68, Grand-Jury Audio at 3:03-3:20.  When confronted, Defendant York admitted that he informed the grand jury of this because he "could not find him. Yeah, to me, that's on the run."  *Ex*. 2, York Dep. Tr. at 106. Defendant York admitted at his deposition that he did "not have a witness that stated that, no." *Id*. at 108. Instead of being on the run, Mr. Lester was out of town working, as Defendant York later learned. Id. at 108.  Nonetheless, Defendant York gave the misimpression to the grand jurors that Lester had fled town to avoid criminal charges knowing that Lester was instead working out of state. *Id*. at 106-108.

**iii.     Defendant York Falsely Testified That Ms. Hoskins Claimed to be at Doctor Earlier in the Morning**

176.     Defendant York falsely testified to the grand jury that Ms. Hoskins informed him that she was at a doctor's appointment at 9:30 a.m. on December 20, 2010. *Ex*. 68, Grand Jury Audio at 14:04-14:45; *Ex*. 2, York Dep. Tr. at 302. At his deposition, Defendant York admits there is not a single report or recording that supports his testimony before the grand jury. *Id*. at 303.

177.     Defendant York also falsely told the grand jury that Ms. Hoskins did not appear at her doctor's appointment on December 20, 2010 until noon. *Id*. at 303-304.  At his deposition,

Defendant York acknowledged that he reviewed records prior to testifying before the grand jury demonstrating that Ms. Hoskins showed up before noon on December 20, 2010 to her doctor's appointment. *Id*. at 303-307.

178.    Defendant York also acknowledged that the medical records he reviewed established that Ms. Hoskins' appointment on December 20, 2010 was at 11:30 a.m., not 9:30 a.m. as he informed the grand jury. *Id*. at 308-309, 312. Defendant York's testimony to the grand jury gave the misimpression that Ms. Hoskins was 2.5 hours late to her doctor's appointment on December 20, 2010, during the same time frame that he claimed Ms. Mills was killed.

> **iv.    Defendant York Falsely Informed the Grand Jury that Allen Helton Did Not Fail The Polygraph Examination on Questions Relating to Murder of Ms. Mills**

179.    Defendant York testified before the grand jury that Mr. Helton did not pass his polygraph examination pertaining to questions solely about money. *Ex*. 68, Grand-Jury Audio at 16:41-17:45.  Specifically, Defendant York falsely told the grand jury that Mr. Helton "didn't pass it...but he –talking to the polygraphers, he wasn't lying about if he killed her or not, he was lying about when he was asked about the money." *Ex*. 67, Grand Jury Tr. at PL 36650; *Ex*. 2, York Dep. Tr. at 234. Defendant York now admits that his testimony was false based on the report that he reviewed prior to testifying. *Id*. at 236.

180.    According to Defendant York's report and deposition testimony, Defendant York traveled to Frankfort, Kentucky with Mr. Helton on January 21, 2011 and received the KSP Polygraph Report prior to testifying to the grand jury on April 27, 2012. *Ex*. 2, York Dep. Tr. at 214-215. Defendant York admits to reviewing the report prior to testifying before the grand jury. *Id*. at 215. The following questions and answers are indicative of Defendant York knowingly testifying falsely:

Q: You knew when you testified at the Grand Jury in April 27, 2012, you knew at the time you testified that deception was indicated when Allen Helton denied participating in any way in the death of Katherine Mills, correct?

A: Yes, on the polygraph.  Yes.

Q: Yes.  And you knew by the time you testified at the April 27, 2012 Grand Jury that deception was indicated when Allen Helton denied hitting Katherine Mills in the head, correct?

A: Yes.

Q: And you knew when you testified before the Grand Jury on April 27, 2012 that deception was indicated when Allen Helton denied stealing any money from Katherine Mills, correct?

A: Yes.

Q: Would you consider that Allen Helton failed the polygraph examination based on the results before you?

A: Yes.

*Id*. at 215-216.

Given this, it is uncontested that Defendant York knowingly lied to the grand jury on this score as well.

### v.    Defendant York Falsely Informed Grand Jury that Hoskins Engaged in Affair with Dr. Warren

181.    Defendant York also falsely informed the grand jury that Ms. Hoskins "was having an affair with Dr. Warren…" *Ex*. 67, Grand Jury Tr. at PL 36647.  Although Dr. Warren was interviewed denied having an affair, Defendant York still falsely claimed in his report that they had one. *Ex*. 2, York Dep. Tr. at 313-314.

### vi.    Defendant York Falsely Testified that Jonathan and Kayla Dated in December 2010 and that Kayla's Car Was Hidden

182.    Defendant York testified at the grand jury that Kayla Mills and Mr. Taylor were dating at the time of the murder and that Kayla's parents attempted to hide Kayla's car. *Ex*. 2,

York Dep. Tr. at 175; *Ex.* 67, Grand Jury Tr. at PL 36659. Defendant York interviewed Kayla

Mills' mother, Donna Mills, prior to testifying at grand jury. *Id*. at 174. In that meeting, Ms.

Mills informed Defendant York that Kayla did not have access to the car at the time of the

homicide, that the car was inoperable, and that Kayla and Mr. Taylor had not dated for more than

a year prior to Mills' death. Ex. 52, Donna Mills Dep. Tr. at 14, 30-31.

183.    At his deposition, Defendant York acknowledged that Ms. Mills informed him

that Kayla did not have access to the car during the time of the Mills' homicide. *Ex*. 2, York Dep.

Tr. at 175.  Defendant York did not document anything relating to the information Donna Mills

provided to him and instead affirmatively testified falsely to the grand jury that Kayla and Mr.

Taylor were dating and had access to Kayla's car. *Id*. at 175; *Ex*. 67, Grand Jury Tr. at PL 36659.

**vii.    Defendant York Falsely Presents Motive Theory to Grand Jury Knowing it Was False**

184.    Next, Defendant York testified before the grand jury that Joe King informed him

that Ms. Hoskins and Mr. Lester were too broke on December 19, 2010 to fill Hoskins' suboxone

prescription. *Ex*. 67, Grand Jury Tr. at PL 36645; *Ex*. 2, York Dep. Tr. at 283-284. At his

deposition, however, Defendant York admitted that he knew that the statement from Mr. King

was false prior to testifying before the grand jury. *Id*. at 284-285; see also 287 ("I knew that he

was incorrect on that day…").

185.    Defendant York knew that King's statement was false because he vetted the

information to determine whether it was accurate or not. *Id*. at 285. According to Defendant

York, "the part about her trying to fill a prescription on 12-19 at the Pineville Walgreens was

inaccurate and actually it was on 12-20." *Id*. at 286. In fact, Defendant York obtained Ms.

Hoskins' medical records which established that she was able to pay for her prescription

medication on December 20, 2010. *Id*. at 284. Even though he knew that the statement from King was false, Defendant York did not inform the grand jury as such. *Id*. at 287-290.

> ### viii.    Defendant York Falsely Testified that Ms. Hoskins' Mother Was Driving Blue Car Around Time of Murder

186.    Defendant York also falsely informed the grand jury that Ms. Hoskins' mother, Linda Taylor, was driving a blue Cavalier owned by her place of employment, the Appalachian Children's Home, at the time of the murder. *Ex*. 67, Grand Jury Tr. at PL 36659; *Ex*. 2, York Dep. Tr. at 176. Defendant York's testimony that Ms. Hoskins would "sneak up there and ste[a]l a Cavalier that belonged to the orphanage and take and drive it…" gave the grand jury the impression that the blue car that Mr. Crump saw at the victim's residence was obtained by Ms. Hoskins due to her mother's employment. *Ex*. 67, Grand Jury Tr. at PL 36659.

187.    Defendant York admitted at his deposition that his testimony before the grand jury was not truthful on this score. *Ex*. 2, York Dep. Tr. at 177-178. Even more, Defendant York readily concedes that he was aware prior to testifying before the grand jury that Ms. Hoskins and her mother did not own a blue car nor that he had any evidence supporting his testimony that Ms. Hoskins was in possession of the orphanage vehicle on the day in question. *Id*. at 178.

188.    Not only did Defendant York provide false information to the grand jury in his attempt to link Ms. Hoskins to the blue vehicle, but he likewise withheld significant information establishing that Ms. Hoskins did not have access to that car on the day of Katherine Mills' death. At his deposition, Defendant York revealed that he went to the orphanage to speak with the person responsible for running it, Steven Yeary. *Id*. at 179.

189.    In this meeting, Mr. Yeary informed Defendant York and Sheriff Pickard that his employee – not Ms. Taylor or Ms. Hoskins - was in possession of the blue car on December 20,

2010. *Id*. at 181. In support, Mr. Yeary provided the Defendants with a gas receipt from his employees documenting that they filled up the car with gas on that date. *Id*. at 181. Not only did these Defendants decline to copy the receipt for the investigative file, but they never documented the information provided by Mr. Yeary in any report. *Id*. at 180, 182. Defendant York likewise never testified to any of this information before the grand jury or at the preliminary hearing.  *Id*. at 180-181.

### ix.    Defendant York Falsely Testified Before Grand Jury That Crump Identified Jonathan Taylor

190.    Defendant York failed to inform the grand jury that Mr. Crump did not identify Jonathan Taylor after viewing numerous photographs. *Ex. 67*, Grand Jury Tr. e.g.  Not only did Defendant York decline to inform the jury that Mr. Taylor was not identified by Crump, but he likewise misled the jury into believing that Crump identified Mr. Taylor as the individual who he saw with the hood. *Ex*. 68, Grand Jury Recording at 23:30 to 24:09; *Ex*. 67, Grand Jury Tr. at PL 36656-57.  The following inquiry is instructive:

> **Detective York**: Crump, C-R-U-M-P, and…they're coming out that morning and they see a blue car at Katherine's house, and he –there is a – he describes a male with a hood coming around the corner with tattoos on his hands, coming around the corner where Katherine was found around 8:15 that morning.
>
> **Unidentified Speaker**:  And who is that?
>
> **Detective York**: That is Jonathan Taylor.  That would be Amanda Hoskins' cousin…

*Id*. at PL 36657.

As discussed, *supra,* in Section III(A), Mr. Crump never identified Jonathan Taylor as the person he saw at Ms. Mills' residence.

**X.    DEFENDANT YORK FABRICATES TWO ADDITIONAL STATEMENTS AFTER THE INITIATION OF CHARGES THAT DEFENDANT YORK AND THE COMMONWEALTH ATTORNEY AGREE WERE NOT MATERIAL TO PROBABLE CAUSE**

### A.  Defendant York Fabricates Robert Beach's February 26, 2014 Statement

191.    As his case was falling apart, Defendant York also obtained a statement from Robert Beach on February 26, 2014.  *Ex*. 69, Beach Recording at PL 9640.  Mr. Beach's recorded statement lasts all of two minutes and fifty-four seconds.  *Id*.  Several pieces of evidence illustrate that Defendant York fabricated Beach's false statement.

192.    First, the recording itself demonstrates that a majority of the limited information in Beach's statement came from Defendant York's mouth and not Beach's.  *Id*.  Defendant York told Beach that the supposed conversation with Mr. Taylor occurred at the Whitley County Jail, when "you was in a jail cell with Jonathan Taylor…and in reference [to] a woman dying, Katherine Mills, what did he say about that to you…"  *Id*. at 0:35-57.  After prompting, Beach claims that Mr. Taylor's "niece or cousin, or whatever that was to him" told Taylor that the lady had "some money or maybe some drugs or whatever" and that it would be an easy robbery.  *Id*. at 0:58-1:24. Beach claims he did not get any details other than it did not go very well and that he did not even know whether it was a man or a woman that died.  Id. at 1:41-2:01.  After some prompting, Beach agreed that it was an old person who died.  *Id*. at 1:58 – 2:06.

193.    Second, although the recorded statement from Mr. Beach lasted a total of two minutes and fifty-four seconds, multiple witnesses have testified in discovery that Defendant York was with Beach for approximately 30-45 minutes.  *Ex*. 8, Steele Dep. Tr. at 84.  According to Prosecutor Steele, "it was just the statement that [was] recorded.  The entire meeting was not recorded."  *Id*. at 85.

194.    Although Detective Bryan Johnson, who accompanied Defendant York during the Beach interview, did not recall any specific discussions between Beach and York (and testified that he did not participate in the conversation in any manner), he claimed that the interview of Beach lasted, "38 minutes, to the best of my recollection, but I'd have to review to know for sure." *Ex. 70*, Johnson Dep. Tr. at 82, 84-85.

195.    Third, the record outside of that brief two-minute recording illustrates that Defendant York fabricated Beach's statement.  Two days prior to meeting with Defendant York, Mr. Beach had a recorded telephone conversation with his sister, Margaret Polly, on February 24, 2014 that revealed the falsity of his eventual statement.  *Ex. 71*, February 24, 2014 Beach Recording Labeled 1393287338_102 at PL 25986; *Ex.* 72, Beach Call Log at 2.  In that February 24, 2014 recording, Ms. Polly asks Beach if "anybody been up there to talk to you…like detectives…or U.S. Marshalls?"  *Id*. at 3:31-3:50. In response, Beach pondered aloud, "what would they want to talk to me for?"  *Id*. at 3:50-55.  Ms. Polly then informed Beach that the detectives wanted to talk about "something about when you was in another county you had wrote them and told them you know about this man that's fixin to come up to trial and he killed an 80 year-old woman and robbed her and killed her."  *Id*. at 3:55-4:10. In response, Beach confessed, "Oh I don't nothing about that.  They come and asked me about that before.  They asked everybody that was in the cell with that guy about that stuff."  *Id*. at 4:10-4:17.  The conversation continued as Ms. Polly informed Beach that the detectives spoke to her and asked if he "wanted some help to get back closer to home or something…" *Id*. at 4:21-4:30. Beach revealed that the Detectives had "come and offered stuff like that and was trying to get some people to say something about something and I don't even know nothing about the case.  It's just

people that was in the cell with this guy…that guy is getting ready to go to trial and stuff and they are trying to [inaudible]." *Id*. at 4:30-4:59.

196.    Fourth, Beach called his sister on March 1, 2014, after he gave his two-minute statement to Defendant York. *Ex*. 73, March 1, 2014 Beach Recording Labeled 1393706424_102 at PL25987. This conversation reveals that promises of consideration were made prior to Defendant York obtaining Beach's cooperation. The recording also demonstrates that Beach believed he would be temporarily moved closer to Knox County and anticipated other benefits in the future in exchange for helping Defendant York out. In this call, Mr. Beach revealed that the detectives "come up here and talked to me." *Ex*. 73, March 1, 2014 Beach Recording at PL 25987 (2:15-2:20). Beach then told his sister that he would be close to her soon, in "Knox County," because he told them "he would help them out." *Id*. at 3:41-3:55. In exchange, Beach stated that "I believe they will, later on, they [will] probably help me…" *Id*. 5:10-5:14.

197.    Finally, Mr. Steele had a conversation with Beach on June 23, 2016 where he recanted the statement provided to Defendant York. *Ex*. 7 Motion to Dismiss at PL 24840. Mr. Steele characterized this recantation as Beach's "version of the events had changed." *Id*. Importantly, although Mr. Steele was present for Beach's statement, he was never informed that Defendant York approached Ms. Polly previously or that Defendant York had prior contacts with Beach in an attempt to get him to provide a statement. *Ex*. 8, Steele Dep. Tr. at 86, 195-196. As discussed below, Defendants withheld all their misconduct from the Commonwealth in an effort to frame Plaintiffs.

## B. Detective York Fabricates Mikey Bruner's April 29, 2015 Statement

198.    Defendant York also obtained a statement from Mikey Bruner on April 29, 2015. *Ex*. 74, Bruner Dep. Tr. at 11.  In that statement, Mr. Bruner claims that Mr. Taylor confessed involvement to him in "2010, 2011."  *Ex*. 75, Bruner Statement at KSP 305-306; *Ex*. 74, Bruner Dep. Tr. at 30.  Mr. Taylor denies making any such statement to Mr. Bruner.  *Ex*. 4, Taylor Dep. Tr. I at 143.  With the reasonable inference in Plaintiffs' favor, several pieces of evidence indicate that Bruner's statement was false and fabricated.

199.    First, like with other witnesses, Bruner did not come to law-enforcement with information.  Instead, Defendant York sought him out after repeatedly approaching Bruner's mother "several times" and "discussed that [Bruner] didn't really have a choice in the matter, you know, that any – any objection on [his] party could possibly cause [him] to get in trouble if [he] didn't cooperate, so."  *Ex*. 74, Bruner Dep. Tr. at 17.  Defendant York also harassed Bruner at his job before approaching his mother.  *Id*. at 18.

200.    Yet again, Defendant York declined to record his entire meeting with Bruner and according to Bruner, "hadn't recorded our entire conversation in the car."  *Id*. at 86.

201.    Third, Mr. Bruner admitted at his deposition that he was shocked Defendant York even considered taking a statement from him because he was a "a drug addict at the time."  *Id*. at 13.  According to Bruner, Defendant York learned that Bruner was high and had "illicit substances in" his body at the time of his supposed conversation with Mr. Taylor.  *Id*. at 12.  Although Mr. Bruner told Defendant York that he was high at the time of the alleged conversation with Mr. Taylor, Defendant York declined to document that information in his report.  Id. at 13; *Ex*. 75, Bruner Statement at KSP 305-306.  He likewise never informed the Prosecutor, Jackie Steele, about Bruner's state of mind.  *Ex*. 8, Steele Dep. Tr. at 144.

Importantly, if Steele had learned that Bruner admitted to being intoxicated at the time of the alleged conversation with Taylor, he would have disclosed that to the defense and reevaluated the continuation of charges against Plaintiff Taylor. *Id*. at 145.

202.    Fourth, according to Bruner, he never wanted to "be involved in this whole Jonathan and Amanda situation. [He] never did from the very beginning." *Ex*. 74, Bruner Dep. Tr. at 15. In his meeting with Defendant York, he repeatedly informed York that he couldn't "remember all the details from that night." *Id*. at 16. Again, Defendant York declined to document any of this information in his report. *Ex*. 75, Bruner Statement at KSP 305-306.

203.    Fifth, Bruner's statement conflicts with all of the physical evidence uncovered in the investigation. *Id*. For instance, Bruner claims that Mr. Taylor confessed that he knocked on the door and "rushed in and tried to take her purse" and that when the "old lady tried to fight back and he hit on the head, took the purse and left her laying." *Id*. at 305. Fatal to Bruner's statement is that Ms. Mills was found deceased on her back porch, not inside her home (and certainly not near her front door) where her purse and money were ultimately recovered. Next, Mr. Bruner claims that Mr. Taylor told him "they got away with a couple hundred dollars." *Id*. Again, Defendants' investigation proved that approximately twelve-thousand dollars being stolen from Ms. Mills, not a few hundred. Further, Mr. Bruner claims that "Jonathan told him they did it at night." *Id*. Again, Defendants' theory of the investigation was that Ms. Mills was killed in the morning hours of December 20, 2010. Almost every aspect of Bruner's statement is in conflict with the Defendants' theory of the investigation and the physical evidence that exists in the case.

204.    Finally, the Commonwealth believed Bruner's statement was not credible enough to form probable cause against Plaintiffs as Jackie Steele dismissed the charges without Bruner recanting.  *Ex.* 7, Motion to Dismiss at PL 24839-42.

## XI.    DEFENDANTS HID THEIR EGREGIOUS MISCONDUCT FROM THE PROSECUTOR THROUGHOUT CRIMINAL PROSECUTION

### A.    The Knox County Commonwealth Attorney Did Not Initiate Criminal Charges Against Plaintiffs and Relied Upon Truthful Reports In Continuing Initiation of Charges

205.    According to Commonwealth's Attorney Steele, Defendant York decided to initiate charges through a criminal complaint. *Ex.* 8, Steele Dep. Tr. at 26-27.  Mr. Steele was not consulted and did not have a role in Defendant York's initiation of charges against Plaintiffs. *Id.* at 16-17, 60. Equally as important, Mr. Steele's office did not independently investigate the murder of Katherine Mills prior to the initiation of charges. *Id.* at 56. Rather, the Commonwealth Attorney's Office relies upon information brought by law-enforcement to present to a grand jury; and relies upon the information presented by law enforcement to be complete and accurate. *Id.* at 57-58.

### B.    The Defendants Hid The Egregious Misconduct Outlined Above From the Knox County Commonwealth Attorneys' Office

206.    The criminal prosecution of Plaintiffs was initiated due to evidence gathered by the Defendant law-enforcement officers. *Id.* at 58, 75.  If probable cause did not exist at any point after the initiation of charges, Mr. Steele testified that his office would have stopped the prosecution.  *Id.* at 76.

207.    Although he was the prosecutor on the underlying criminal case, Mr. Steele was not aware of any efforts by the Defendants to coerce witnesses into giving false statements that

implicated Plaintiffs in the murder. *Id*. at 88-89. He was likewise never informed by law enforcement that the statements created for Kayla Mills were false and fabricated. *I*d. at 109-110.

208.    Prior to his June 2018 deposition, Mr. Steele was never informed that criminal charges were initiated against Kayla Mills for the murder of Katherine Mills.  *Id*. at 110. Defendant York had neither informed Mr. Steele nor provided him with the documents memorializing the criminal charges. *Id*. at 110.  Defendant York likewise never informed Mr. Steele that he reached an agreement with Kayla to provide a statement implicating Plaintiffs in the murder. *Id*. at 111-112. As a prosecutor, he expected Defendant York – and other law-enforcement personnel – to disclose this type of information to him.  *Id*. at 112.

209.    If Mr. Steele learned that Kayla Mills' statement was false or fabricated, he would have not used that to continue charges against Plaintiffs.  *Id*. at 113.  Likewise, if Mr. Steele learned that Kayla was threatened by police or promised consideration, he likewise would not have used that evidence to continue charges against Plaintiffs.  *Id*. at 113-114.  If any of this was known, Mr. Steele would not have allowed any prosecutor to present such evidence to the grand jury. *Id*. at 114.  If such misconduct had been disclosed, Mr. Steele would have taken steps to reevaluate the criminal charges pending against Plaintiffs. *Id*. at 123-4.

210.    Likewise, Mr. Steele was never informed that a search warrant affidavit documented that Mr. Crump identified Mike Simpson as the male he saw at Katherine Mills' residence on December 20, 2010. *Id*. at 120. Not only did Mr. Steele testify that this information should have been disclosed to his office, but it also should have been provided to the grand jury prior to charging Plaintiffs. *Id*. at 121.  The Defendants never provided the Commonwealth with this search warrant affidavit. *Id*. at 120-122.

211.    Defendants also never informed Mr. Steele that the statement from Joe King was false or fabricated. *Id*. at 127. The Defendants likewise never informed him that Mr. King was threatened or promised consideration. *Id*. at 128. If he had learned such information, Mr. Steele would not have used such evidence and would have reevaluated the continuation of criminal charges against Plaintiffs. *Id*. at 128.

212.    Defendants never informed Mr. Steele that the statement from Amber Simpson was false or fabricated. *Id*. at 128-129. He likewise was never informed that Ms. Simpson was threatened or promised consideration. *Id*. at 129.  If he had learned such information, Mr. Steele would not have used such evidence and would have reevaluated the continuation of criminal charges against Plaintiffs.  *Id*. at 128-129.

213.    Defendants never informed Mr. Steele that the statement from Allen Helton was false or fabricated. *Id*. at 130. The Defendants likewise never informed him that Mr. Helton was threatened or promised consideration. *Id*. at 130. If he had learned such information, Mr. Steele would not have used such evidence and would have reevaluated the continuation of criminal charges against Plaintiffs. *Id*. at 131.

214.    Defendants never informed Mr. Steele that the statement from Daniel Wilson was false or fabricated. *Id*. at 135. He likewise was never informed that Mr. Wilson was threatened or promised consideration. *Id*. at 136. If he had learned such information, Mr. Steele would not have used such evidence and would have reevaluated the continuation of criminal charges against Plaintiffs.  *Id*. at 136.

215.    Defendants never informed Mr. Steele that the statement from Robert Beach was false or fabricated. *Id*. at 139. He likewise was never informed that Mr. Beach was promised consideration. *Id*. at 140-141. If he had learned such information, Mr. Steele would not have used

such evidence and would have reevaluated the continuation of criminal charges against

Plaintiffs.  Id. at 139.

216.    Defendants never informed Mr. Steele that the statement from Mikey Bruner was

false or fabricated. *Id*. at 158-159. He likewise was never informed that Mr. Bruner was

intoxicated at the time of the alleged conversation with Mr. Taylor.  *Id*. at 143-145.  If he had

learned such information, Mr. Steele would not have used such evidence and would have

reevaluated the continuation of criminal charges against Plaintiffs.  *Id*. at 145, 158-159.

### C.  If Defendants' Misconduct was Disclosed, Knox County Commonwealth Attorney would have Taken Steps to Stop Plaintiffs' Criminal Prosecution

217.    Mr. Steele was unaware of any efforts by officers to hide police reports, lie to the

grand jury, fabricate statements, or hide witness recantations. *Id*. at 107-108. If such misconduct

had been disclosed, Mr. Steele would have disclosed such evidence to the defense. *Id*. at 89. He

would not have tolerated nor approved such conduct. Id. at 104. And most importantly, if the

Defendants had informed Mr. Steel that "they helped fabricate the statement," then Mr. Steele

would have stopped the criminal prosecution of Plaintiffs.  *Id*. at 158.

## XII.    DEFENDANT KNOX COUNTY FAILED TO ADOPT POLICIES THAT WERE OBVIOUSLY NEEDED

218.    By 2010, the Knox County Sheriff's Department had one source for written

policies and procedures:  The Knox County Sheriff's Office Policy and Procedures Manual.[2]  *See*

*generally, Ex. 76*, Knox County Policies and Procedures; *Ex*. 13, Pickard Dep. Tr. at 55-56

(testifying that the 2014 policies were the actual policies and procedures in place throughout the

Mills' homicide investigation).

---

[2] Notably, current Knox County Sheriff Michael Smith openly questioned whether the written policies and procedures produced in this case were ever in effect.  Ex. 77, Michael Smith Dep. Tr. at 10. According to Mr. Smith, when he took office in 2015, he had "no knowledge of these policies and procedures."  *Id*. at 10.

219.    There were major problems with these policies. In December 2010, the policies and procedures did not provide any guidance to officers on how to conduct a criminal investigation. Equally as concerning, of the written policies and procedures that did exist, officers were not required review them and were not apprised of revisions. *Ex*. 13, Pickard Dep. at 60-61. When asked if Knox County officers were required to review the policies and procedures of the department, Sheriff Pickard admitted "I don't – they wasn't required to, no." *Id*. at 62.

220.    Most importantly, by 2010, the Knox County Sheriff's Department did not have any policies or procedures that required officers to document information gathered during a homicide investigation.[3] *Id*. at 26-27.  In fact, Knox County did not have any policies or procedures that provided guidance to officers on how to conduct a criminal investigation at all. *Id*. at 27, 72.  Given this, there were no policies nor procedures that informed officers that they were required to preserve or disclose evidence that tended to negate the guilt of the accused or reduce his or punishment for a crime. *Id*. at 82. Similarly, there were no policies or procedures that required officers to document witness interviews in a criminal investigation.  *Id*. at 84. There were likewise no policies or procedures that instructed officers not to fabricate evidence or coerce witnesses. *Id*. at 81, 85. Although there were clear policy gaps, there were no unwritten policies or procedures that filled such gaps. *Id*. at 63-65.

221.    Indeed, in this case, Defendant Pickard was not familiar with *Brady* and testified that he did not take a single note or create a single report regarding any investigation in which he

---

[3] Former Knox County Sheriff John Pickard provided binding Fed. R. Civ. P. 30(B)(6) testimony on behalf of Defendant Knox County. *Ex*. 78, Slosar Correspondence; *Ex*. 79, Knox County Correspondence. Defendant Pickard was designated by Defendant Knox County to testify about the County's policies, practices, and training in the 2000s, and was likewise the final policymaker. *Ex*. 80, Plaintiff's Notice of 30(B)(6) Depositions; *Ex*. 81, PL Correspondence to Knox County; Ex. 82, Knox County Correspondence Re: 30(B)(6).

participated. *Ex*. 13, Pickard Dep. Tr. at 23-26. Defendant Pickard readily concedes that he never had a conversation with Defendant York about documenting information learned; he just "assumed" that Defendant York would document such details. *Id*. at 104. When asked if his lack of documentation of activities conducted in a murder investigation was consistent with the training he received, Defendant Pickard aptly revealed "I didn't – I can't say I ever had training on it." *Id*. at 103. None of this is surprising given that Knox County had no policies, procedures, or training that informed its' officers that such documentation was required. *Id*. at 27, 72, 82-85; *Ex*. 76, Knox County Policies and Procedures e.g.

222.    Not only were there no policies relating to documenting investigatory steps in a criminal investigation, but there was no practice requiring officers to document or turn this information over to prosecutors. Although Defendant Pickard was involved in critical aspects of the underlying criminal investigation, learned of significant material evidence during that investigation that exculpated Plaintiffs – and implicated alternate suspects, he readily admits that he did not create a single note or report documenting any of the information he learned. *Id*. at 103. Specifically, Defendant Pickard declined to document that he:

-    Participated in the investigation into whether the blue car at the Appalachian Children's home was used on December 20, 2010. *Id*. at 21-22. In that conversation, Defendant Pickard learned that the employees possessed the car on the day in question and was provided with receipts indicating as much. *Id*. at 22-23.

-    Communicated with Allen Helton on several occasions, as discussed, *supra,* in Section III(C)(iii)-V(A), was present when Mr. Helton's statement was obtained, and made promises of consideration prior to obtaining that statement alongside Defendant York. *Id*. at 19-20. Again, Defendant Pickard did not document this information. *Ex*. 13, Pickard Dep. Tr. at 102.

-    Questioned Mike Simpson at home, searched the residence and found "a stolen four-wheeler there." *Id*. at 134. Defendant Pickard did not document any of the information learned as a result of this questioning or search. *Id*. at 102.

- Participated in several conversations with Kayla Mills, as described, *supra,* in Section V(F), where she denied having any knowledge relating to the Katherine Mills' homicide and did not document this information in any report. *Id*. at 102, 133-136, 159-161.

- Participated in the unduly suggestive identification process of Plaintiff Taylor, as described, *supra,* in Section IX, and did not document this process in any report. *Ex*. 13, Pickard Dep. Tr. at 102.

223.    As demonstrated, Defendant Pickard's practice, as the policymaker for the Knox County Sheriff's Department, was to not document investigatory steps taken during a criminal investigation.

224.    The lack of Knox County's policies and procedures was endemic to numerous crucial areas of policing: no policies guided police on areas including preservation or documentation of exculpatory evidence, conducting interrogations and interviews, eyewitness identification, avoiding suggestive lineups or photo arrays, or training or supervision of officers. *Ex*. 76, Knox County Policies and Procedures e.g.; *Ex*. 13, Pickard Dep. Tr. at 64-65, 70, 82-84. As police-practices expert Charles Drago explains, the Knox County Sheriff's Department lacked reasonable and appropriate policies in these areas. *Ex*. 83, Drago Report at 26-28.

## XIII.   DEFENDANT KNOX COUNTY FAILED TO TRAIN OFFICERS REGARDING CRITICAL POLICE FUNCTIONS

225.    In addition to lacking basic and necessary policies, Knox County failed to provide adequate training to its officers.  The only training that officers received as of 2010 was at the police academy – an academy that the policymaker and Knox County Sheriff was not required and did not personally attend. *Ex*. 13, Pickard Dep. Tr. at 27-28.

226.    By 2015, no training occurred at the Knox County Sheriff's Department on the written policies and procedures in place. *Id*. at 61-62, 63. There were no formal mechanisms in place for communicating the written policies and procedures in place. Id. at 62. Defendant

Pickard readily concedes that he never trained officers that they needed to document information learned in witness interviews, nor preserve and disclose exculpatory evidence. *Id*. at 83-84. There was likewise no training to Knox County officers informing them that they should not coerce witnesses in a criminal investigation. *Id*. at 85.

227.    Whatever training Defendant Pickard received was reflected in his Department of Criminal Justice Training records. *Id*. at 29; *Ex. 79,* Pickard Training Records. According to Defendant Pickard, "I didn't get any training at the sheriff's department. I – I went – I went through some classes, you know, through Eastern, but that's it." *Id*. at 26. According to his file, Defendant Pickard attended a few Sheriff's conference between 2004 and 2009. *Id*. at 28-29; *Ex.* 79, Pickard Training History at 3-4. After becoming the Knox County Sheriff, Defendant Pickard was not trained on how to: (1) interview witnesses; (2) document witness interviews; (3) interview or interrogate suspects; (4) make promises of leniency or consideration; (5) prepare police reports; (6) document information in a police report; (7) conduct lineups; (8) conduct photo identification procedures; (9) conduct lineups or photo-arrays without being unduly suggestive; and (10) retain physical evidence. *Ex.* 13, Pickard Dep. Tr. at 33-35.

## XIV.    DEFENDANT KNOX COUNTY'S FINAL POLICYMAKERS HAD NOTICE OF THE NEED TO ADOPT POLICIES AND TRAINING AND CHOSE NOT TO ADOPT ANY

228.    There is no legitimate dispute that the Knox County Sheriff's Department had notice of the need to adopt policies and training of how to conduct and document information learned in criminal investigations prior to Defendant Pickard's involvement in the Mills' homicide investigation. As Defendant Pickard - the elected Knox County Sheriff and policymaker during the time period in question - even acknowledges, by 2010, the Knox County

Sheriff's Department handled criminal investigations, including "burglaries, or something like that, yes." *Ex*. 13, Pickard Dep. Tr. at 51-52.

229.    As is described below, the Knox County Sheriff's Department not only conducted criminal investigations into "burglaries, or something like that," but they likewise conducted homicide investigations without the assistance of the Kentucky State Police prior to engaging in significant misconduct during the Mills' investigation in 2012.[4]  Indeed, Defendant Pickard and Deputy Eubanks not only conducted the investigation into the death of Bobby Wiggins in 2011, but they actually interrogated a suspect into a confession.  Only after receiving that confession did Defendant Pickard request assistance from Defendant York and the Kentucky State Police.

**A. Knox County Policymakers Were on Notice as the Kentucky State Police Defendants and Knox County Defendants Framed Another Innocent Person For Murder Using the Same Unconstitutional Tactics Due to the Lack of Training, Policies, and Procedures**

230.    Bobby Wiggins was brutally murdered on November 23, 2011 in Bell County, Kentucky.  *Ex*. 85, Anderson May 12, 2016 Trial Tr. at PL 28245.  Prior to his death, Mr. Wiggins left Kimberly York's residence with a man named James Otis Sizemore.  *Ex*. 86, Anderson May 16, 2016 Trial Tr. at PL 28684-85.  Mr. Sizemore lured Wiggins away by falsely informing him that he someone wanted to purchase pills from him on Red Bird Mountain.  *Ex*. 87, Anderson Police Reports at PL 27609.  Together, Wiggins and Sizemore drove to the top of the mountain in Wiggins' Toyota Camry.  There, Mr. Wiggins was brutally murdered by James Otis Sizemore.  *Ex*. 88, Sizemore Guilty Plea at PL 29707-29710; Ex. *89*, May 19, 2016 Trial

---

[4] Although Plaintiffs have presented this Court with extensive evidence of Defendants' misconduct that occurred in 2011, but the majority of statements that were fabricated against Plaintiffs occurred in March of 2012.  As is discussed below, Defendant Pickard and the Knox County Sheriff's Department were involved in criminal investigations – including homicides – and were well on notice of the need to establish policies and procedures for guidance in. how to conduct and document criminal investigations.

Tr. at PL 29342 (Mr. Anderson denying involvement in murder); Ex. *90*, May 25, 2016 Trial Tr. at PL 29671 (Mr. Anderson's acquittal).

231.     After fleeing the scene, James Otis Sizemore drove Mr. Wiggins' black Toyota Camry to Jeremy Ferrell's residence, where he arrived around 3:00 p.m.  *Ex*. 86, Anderson May 16, 2016 Trial Tr. at PL 28751-52.  Notably, Mr. Ferrell recalls that Mr. Sizemore was alone and asked to clean himself off before retrieving new clothing.  *Id*. at PL 28753-54.  Shortly thereafter, Mr. Sizemore and Mr. Ferrell went to the local grocery store in the black Toyota Camry, where they encountered William Anderson and Dave Fox, who were in the process of purchasing some cigarettes and soda.  *Ex*. 86, Anderson May 16, 2016 Trial Tr. at PL 28754-56; Ex. *91*, Anderson May 18, 2016 Trial Tr. at 29169-170.

**B.  Defendants Pickard and Derek Eubanks Led Initial Investigation Into Wiggins' Death**

232.     On December 1, 2011, Mr. Wiggins' sister, Faye Scott, filed a missing person's report at the Knox County Sheriff's Department.  *Ex*. 92, Anderson May 9, 2016 Trial. Tr. at PL 27784.  Because the missing person's report was filed at their office, Defendants Pickard and Eubanks led the initial investigation into Wiggins' death.  *Id*.

233.     Defendant Pickard and Derek Eubanks interviewed Kimberly York on December 1, 2011.  *Ex*. 92, Anderson May 9, 2016 Trial Tr. at PL 27809; *Ex*. 86, Anderson May 16, 2016 Trial Tr. at PL 28694.  In that interview, Ms. York informed Defendant Pickard that the last time she saw Wiggins was at her home on November 23, 2011 around noon.  *Ex*. 86, Anderson May 16, 2016 Trial Tr. at PL 28685-86, PL 28694.According to Ms. York, Wiggins was driving his black Toyota Camry and was in the presence of James Otis Sizemore.  *Id*.

234.     On that same date, Defendant Pickard and Deputy Eubanks located William Anderson.  *Ex*. 92, Anderson May 9, 2016 Trial. Tr. at PL 27785.  In that interview, Mr.

Anderson informed Defendant Pickard and Deputy Eubanks of the following: (1) that he and Dave Fox cared for Elijah Messer, a handicapped individual, on November 23, 2011 prior to leaving for the local grocery store; (2) he arrived at the store around 5:30 p.m. and accompanied Dave Fox inside to purchase cigarettes and sodas; (3) that he and Mr. Fox encountered Sizemore and Ferrell at the store; (4) shortly thereafter, Mr. Sizemore told Anderson and Fox to "[g]o ahead get what you want, I'll take care of what you ain't got the money for." Mr. Sizemore then paid for these items; (5) Sizemore asked Anderson to accompany him to Ferrell's residence after leaving the store; (6) Mr. Anderson asked Sizemore where he got the car after leaving for Ferrell's house, to which Sizemore responded that his wife "took over payments from somebody"; (7) that Mr. Sizemore took papers out of the glovebox while at Ferrell's residence and burnt them; and that (8) when Sizemore returned Anderson to his home, Sizemore gave Anderson a black coat and hat for him to have. *Id*. at PL 27785-27800. Importantly, Mr. Anderson voluntarily provided the coat and hat given to him by Sizemore to Defendant Pickard and Deputy Eubanks during their questioning of him. *Id*. at PL 27801-27802.

235.    After interviewing Mr. Anderson, Defendant Pickard and Deputy Eubanks proceeded to question Dave Fox. *Id*. at PL 27809. In that interview, Mr. Fox confirmed that he was with Mr. Anderson during the day on November 23, 2011 and that they encountered Sizemore and Ferrell at the store. *Id*.; *Ex. 91*, Anderson May 18, 2016 Trial Tr. at PL 29142. Finally, Mr. Fox confirmed that Mr. Anderson left briefly with Sizemore and Ferrell after the grocery store but returned home a short-time later. *Id*. at PL 29144.

236.    Defendant Pickard and Deputy Eubanks then interviewed Jeremy Ferrell, who also corroborated Mr. Anderson's version of events – namely, that he was not with James Otis Sizemore on November 23, 2011 prior to encountering him at the grocery store. *Ex*. 92,

Anderson May 9, 2016 Trial Tr. at PL 27809, PL 27801.  Mr. Ferrell provided these officers with the information that he later testified to at trial, namely, that Sizemore was alone in the black Toyota Camry when he arrived at his home around 3:00 p.m. on November 23, 2011.  *Ex.* 86, Anderson May 16, 2016 Trial. Tr. at PL 28753-54. Mr. Ferrell also revealed that Mr. Sizemore asked to change his shirt and clean himself off.  *Id.*  According to Mr. Ferrell, Sizemore was high on pills when he arrived, was noticeably paranoid, and acting very strange.  *Id.* at PL 28754-57.

### C.  Defendant Pickard and Deputy Eubanks Interrogate James Otis Sizemore for Wiggins' Murder on December 2, 2011

237.    On December 2, 2011, Defendant Pickard and Deputy Eubanks interrogated James Otis Sizemore at the Knox County Sheriff's Department.  *Ex.* 92, Anderson May 9, 2016 Trial Tr. at PL 27802; *Ex.* 93, December 2, 2011 Sizemore Audio-Recorded Interview at PL 29734, PL 29735.  There, James Otis Sizemore gave more than a dozen different stories.  *Id.*; *Ex.* 92, Anderson May 9, 2016 Trial Tr. at 27836.  During that December 2, 2011 questioning session, Deputy Eubanks confronted Sizemore, stating, "Yeah, well, you're not tellin it [the truth] now…cause we know – and – and we don't only know it, we can prove it…we've got evidence that proves different than what you're saying."  *Ex.* 93, December 2, 2011 Sizemore Audio-Recorded Interview at PL 29734 (18:59-19:11)

238.    Defendant Pickard and Deputy Eubanks ultimately began fabricating statement for Sizemore to repeat that falsely implicated Mr. Anderson.  *Ex.* 93, December 2, 2011 Sizemore Audio-Recorded Interview at PL 29734, 29735.  After repeatedly mentioning that Mr. Anderson turned in Mr. Wiggins' clothing, Defendant Pickard and Deputy Eubanks urged Mr. Sizemore to implicate someone else to help himself out of the charges: "[t]he thing is, all my evidence points at you right now, James.  That's the problem.  Now, if it's somebody else, the problem is everything I got points at you. So you've got to point me at someone else, and not just

telling me.  You've got to be able to show me – give me something hard.  You see what I'm saying?"  *Ex.* 93, December 2, 2011 Sizemore Audio Recorded Interview at PL 29734 (time 1:06:41-1:07:01.

239.    When Mr. Sizemore didn't understand the instructions, Deputy Eubanks told him, "If you take me and show me and give me evidence that points at somebody else, I'm gonna turn left and go down that road."  *Ex.* 93, December 2, 2011 Sizemore Audio-Recorded Interview at PL 29734 (1:16:00-16:15).  Still not understanding the plan to frame Mr. Anderson, Sizemore begged Defendant Pickard and Deputy Eubanks for more clarification – "I wish you would just tell me so I can at least tell you something."  *Id.* at 55:30-55:35. To clear things up for Sizemore, Deputy Eubanks eventually told him that "Bill Bill couldn't tell the truth if his hind end was on fire."  *Id.* at 1:11:23-28.  In response, Mr. Sizemore repeated that, "well, that's the man you'll be wantin right there."  *Id.*

240.    As the recordings illustrate, Defendant Pickard and Deputy Eubanks fabricated a false statement for Sizemore that implicated Mr. Anderson in the murder.  *Ex.* 93, December 2, 2011 Sizemore Audio-Recorded Interview at PL 29734, PL 29735.   While doing so, Defendant Pickard and Deputy Eubanks offered praise and words of encouragement for Mr. Sizemore after he agreed to go along with the plan, stating, "That'll help you…that'll help."   Ex. 93, December 2, 2011 Sizemore Audio-Recorded Interview at PL 29734 (time: 1:16:25-30)

241.    Defendant Pickard and Deputy Eubanks also made significant promises of consideration and informed Sizemore that if he gave a statement implicating Mr. Anderson, he was not going to spend much time behind bars: "Okay.  Eight years.  Let's do eight times twelve, equals – that's 96 months.  96 times one five.  You'd pull 4 months in the house.  That's a long

way from eight." *Id*. at 1:13:10-30. According to their promise, Sizemore would only spend "14 months in the house." *Id*.

242. Defendant Pickard knew Sizemore's statement was false. In fact, Defendant Pickard later revealed that he was aware that at the time he interrogated Sizemore, he "knew the truth wasn't in him." *Ex*. 94, Pickard Recording at PL 29737; *Ex*. 92, Anderson May 9, 2016 Trial Tr. at PL 27826. Importantly, after obtaining Mr. Sizemore's confession to murder – and false statement implicating Mr. Anderson - Defendant Pickard requested assistance from Defendant York and the Kentucky State Police. *Ex*. 92, Anderson May 9, 2016 Trial Tr. at PL 27815, 27820, 27854 (Defendant York testifying about receiving a call from Pickard for assistance); PL 27919.

### D. In His Quest to Frame Mr. Anderson, Defendant York Assaults Dave Fox in the Presence of Jackie Joseph and Derek Eubanks, Who Decline to Intervene

243. By December 2, 2011, Defendants York and Pickard were aware that Mr. Anderson had an ironclad alibi for the time that Mr. Wiggins was killed. By then, Dave Fox, Jeremy Ferrell, and Kimberly York had each confirmed that Mr. Anderson was not with Mr. Sizemore at the time Wiggins was last seen alive – and had not encountered Sizemore until seeing him at the store (after Wiggins' death).

244. Thus, on December 3, 2011, Defendant Jason York, Defendant Jackie Joseph and Derek Eubanks questioned Dave Fox again about Mr. Anderson's alibi. *Ex*. 2, York Dep. Tr. at 19-20; 35-36; *Ex*. 18, Jackie Joseph Dep. Tr. at 126-136. Over the course of several hours, York, Joseph, and Eubanks attempted to fabricate a statement for Dave Fox that would have nullified Mr. Anderson's alibi. *Ex*. 2, York Dep. Tr. at 41-42, 133-134, 172-173; *Ex*. 18, Jackie Joseph Dep. Tr. at 126-136. Their clear objective was to get Dave Fox to state that Mr. Anderson was with Sizemore and Wiggins earlier on November 23, 2011 than when they saw Sizemore at the

store.  *Ex*. 95, December 3, 2011 Fox Audio Recording at PL 27706.  In doing so, Defendant York and Eubanks made dozens of threats.  *Id*.

245.    After several hours, Defendant York again attempted to fabricate Mr. Fox's statement by telling him, "You know that that car and Bobby was at Bill-Bill's house before he got killed.  You know that.  And I know you know that."  *Ex*. 95, December 3, 2011 Fox Audio Recording at PL 27706 (2:09:20-34).  Mr. Fox replied by stating that he didn't know what Defendant York was talking about, "I never seen the car there during the day.  I seriously did not…".  *Id*. at 2:09:47-53.

246.    Frustrated that Mr. Fox continued to verify Mr. Anderson's story and alibi, Defendant York upped his verbal assault by threatening: "I'm going to put you in fucking prison because you God damn lied to me.  I'm so fucking sick of this God damn bullshit.  You fucking lied…Fuck you, fuck you, fuck you.  Let's put his ass in the fucking jail."  *Ex*. 2, York Dep. Tr. at 35; *Ex*. 95, Dave Fox Audio Clip at PL 27706 (2:10:06-2:10:21).  Immediately after, Eubanks chimed in and threatened to charge Mr. Fox with complicity in the murder of Bobby Wiggins – even though no evidence implicating him in any crime.  *Id*. at 2:20:21-43.

247.    At this same juncture, the recording captures Defendant York resorting to physical violence as part of his plan to coerce Mr. Fox into a fabricated and false statement.  *Ex*. 95, December 3, 2011 Fox Audio Recording at PL 27706 (2:10:06-2:10:43).

248.    Dave Fox testified on May 18, 2016 at Mr. Anderson's criminal trial.  *Ex*. 91, Anderson May 18, 2016 Trial Tr. at PL 29162.  There, Mr. Fox revealed that Defendant York "smacked my hat off my head like this…[a]nd, you know, was right in my face and cursing me and accusing me of doing something I hadn't done, you know, being involved in Mr. Wiggins' murder.  I didn't have nothing to do with it."  *Id*.

249.    Defendant York's version of events is that he "kicked a chair, slapped a table" when interviewing Mr. Fox. *Ex*. 2, York Dep. Tr. at 38. According to Defendant York, "that was a tactic I – I was using." *Id*. at 39. Defendant York resorted to that "tactic" because he "felt like he was lying. As a tactic, I was trying to get him to understand that this was not a joke and take it serious." *Id*. at 39. From his standpoint, Defendant York claims that he kicked a chair and slammed the table "to try to get his attention because [he] felt like he was lying." Id. at 40.

250.    From Defendant Joseph's perspective, "at some point during the interview he—he threw a chair. And I believe, I don't know if it's during that segment or not, be he did knock Mr. Fox's hat off his head." *Ex*. 18, Jackie Joseph Dep. Tr. at 125. According to Defendant Joseph, "yeah, he flipped the bill of it" as she watched. *Id*. at 132. At that time, Defendant York was "calling him a liar." *Id*. at 133. Still, to Defendant Joseph, "it didn't appear to [her] that he was being aggressive at all." *Id*. at 133.

251.    The following day, based solely on the statements from Mr. Sizemore, Defendant Mefford signed a criminal complaint initiating charges against Mr. Anderson for the murder of Bobby Wiggins. *Ex*. 87, Anderson Reports at PL 27611.

**E.  Defendant York's Penchant for Threatening Witnesses and Feeding Information in the Wiggins Homicide is Directly Relevant to the Mills' Investigation**

252.    Defendant York's actions with Mr. Fox – who is a witness on Plaintiffs' 26(a)(1) disclosures in this case – are critical to the allegations raised by more than a dozen witnesses in this case. At his deposition, Defendant York explained that he became more aggressive, and told Mr. Fox to say certain things because he "had reason to believe that he knew that and was keeping that from us, and I was trying to get the truth out of him." *Ex*. 2, York Dep. Tr. at 134. The following inquiry is instructive:

Q: So is it proper – is it – is one of your investigatory tactics if you have reason to believe that something happened, is one of your investigation tactics to tell that witness what you believed happened?

A: That could be used as a – as a tactic.

Q: Okay.  And that's a tactic that you used during the Wiggins' homicide investigation, correct?

A: Well, yes, that's just one of them, yes.

*Id*. at 135

\*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*

Q: Okay. So if you had a reason to believe that somebody knew something, you would confront them with that information, correct?

A: Yes

Q: That's a tactic that you –

A: Yes

Q: -- would use, right?

A: Yes.

Q: That's a tactic that you were trained to use by KSP, correct?

A: I don't remember the exact training on that, but yes, I've –I've seen that happen.

Q: That's a tactic that you've used during the Mills' investigation, too, right?

A: It's a possibility.  I don't remember the exact details.

Id. at 136.

### F.  Defendants York and Pickard Protect Mr. Sizemore's Accomplice in Wiggins' Homicide Due to Payoffs and Familial Relationship

253.     By January 14, 2012, Detective Johnson obtained a number of video-recordings

and a receipt from the Lowe's in Corbin, Kentucky.  *Ex*. 85, Anderson May 12, 2016 Trial Tr. at

PL 28239-40 (video); 28243-45 (receipt and video).  The video-footage and receipts were from the evening hours of November 25, 2011, approximately two days after Wiggins' murder.  Id.

254.    Detective Johnson reviewed the footage and recognized the two individuals purchasing the materials as Jeffrey Gray and James Otis Sizemore.  *Ex*. 85, Anderson May 12, 2016 Trial Tr. at PL 28267.  According to Johnson, a review of the receipt and video footage showed Gray and Sizemore purchasing "six bags of pulverized lime, a Maglite 3D LED flashlight, a Cobalt digging shovel, 40-pound bag salt crystals, water, and 8-pack of D Duracell batteries."  *Ex*. 85, Anderson May 12, 2016 Trial Tr. at PL 28244-45.  The items purchased was "of interest because we know that lime was recovered from the body of Bobby Wiggins."  *Id*. at PL 28268.

255.    In spite of this, Jeffrey Gray was never charged with any crime relating to the murder of Bobby Wiggins.  *Ex*. 85, Anderson May 12, 2016 Trial Tr. at PL 28270.  At the time of the investigation, Defendant York had an incentive to protect Jeff Gray as York was married to Gray's first cousin – Kayla Gray.  *Ex. 2*, York Dep. Tr. at 52, 54-55; *Ex*. 96, Jeffrey Gray Recording at PL 13696 (9:31-9:45).

256.    Defendant York, however, was not the only officer with a motivation to protect Gray.  Defendant Pickard, too, had a personal motivation for framing Anderson and protecting Gray.  In a recorded interview, Mr. Gray admitted to making monthly payments to Defendant Pickard for the right to conduct criminal activity in Eastern Kentucky without fear of prosecution.  *Ex*. 96, Jeffrey Gray Recording at PL 13696 (12:00-14:24).  Defendant Pickard would have his deputies collect the fees, which shifted from $1,000 per month to $5,000, for the pay-to-play scheme he operated.  *Id*.  According to Mr. Gray: "If you are asking me if it's true, I'm telling you yes. I'm in a case right now over trafficking drugs.  And yes, I paid officers that

came to my house to collect their money.  This went on for years." *Id*. at 14:08-14:27. "I paid

them $1,000 per month for a long time, for about five years." *Id*. at 14:38-14:45. Once Mr. Gray

refused to pay the monthly $5,000 fee, he was arrested by the Kentucky State Police for drug

trafficking[5].

### G. After Defendants' Misconduct, William Anderson Was Tried and Acquitted of Capital Murder

257.    The recording of the December 3, 2011 questioning of Dave Fox was not

disclosed to Mr. Anderson prior to trial.  Defendant York was asked during his May 9, 2016 trial

testimony whether he recorded the interview with Dave Fox. *Ex*. 92, Anderson May 9, 2016

Trial Tr. at 27931.  In response, Defendant York stated, "I don't know.  I assisted.  I didn't start

the interview." *Id*. at PL 27931.  When asked whether Sgt. Joseph recorded the interview,

Defendant York responded, "You would have to ask her." *Id*.  At trial, Defendant Joseph

revealed for the first-time that: (1) the December 3, 2011 interview took place and (2) that a

recording existed. *Ex*. 18, Jackie Joseph Dep. Tr. at 123-124.

258.    On May 25, 2016, a Kentucky jury found Mr. Anderson not guilty. *Ex*. 90, May

25, 2016 Trial Tr. at PL 29671 (Mr. Anderson's acquittal).

## XV.    KENTUCKY STATE POLICE DEFENDANT JACKIE JOSEPH FAILED TO SUPERVISE OFFICERS UNDER HER COMMAND, INCLUDING DEFENDANT YORK

259.    In 2010, Defendant Joseph was a Sergeant in Post 10. *Ex*. 18, Jackie Joseph Dep.

Tr. at 15.  In that capacity, Defendant Joseph was the supervisor of Defendants York and

Mefford throughout the investigation into the death of Katherine Mills. *Id*. at 26-28.

---

[5] A number of witnesses in the Wiggins' homicide have been disclosed as witnesses and are anticipated to testify consistently with the allegations contained in Plaintiffs' brief, including but not limited to: (1) Jeffrey Gray; (2) James Otis Sizemore; (3) Dave Fox; and (4) Jeremy Ferrell. *Ex*. 97, Plaintiffs' Rule 26(a)(1) Disclosures.

260.    Crucially, prior to December 20, 2010, Defendant Joseph had never received training on how to conduct a homicide investigation.  *Id*. at 16.  Given this, Defendant Joseph clearly did not feel comfortable supervising homicide investigations.  When asked if she would ever review reports by Detectives and provide suggestions on further investigative actions, Defendant Joseph admitted:

> Rarely…because I was never a homicide investigator.  If it was a case about child pornography, you know, I've got experience in that.  So I could make suggestions on, you know, a way to investigate that, or a different route to take, or a next step.  You know, I've got experience with interviews, with kids, and preserving evidence in those cases.  I've got lots and lots of training on preserving electronic evidence, how – what to look for in those cases as far as computers, and thumb drives, and hard drives, and all that kind of stuff.  But as far as, like, a homicide goes, I've never worked one in my career, so it would be, I feel, very inappropriate for me to tell somebody who's been doing homicide investigations for ten years how they should be doing their job.

*Id*. at 53.

261.    Later, Defendant Joseph revealed, "You know, detectives like Jason and Mark have forgotten more about homicide investigations probably than what I'm ever going to be able to learn.  So as far as telling them how to do their investigations, that's not –it's not appropriate.  Like, that's not what my job is.  I don't give them a play-by-play on "This is what you need to do." That's what their job is.  Their job is to conduct those investigations." *Id*. at 55.  Defendant Joseph later confessed that, "[s]o I'm not just going to just make a blanket statement that I would never give a advice on a homicide case. I'm just saying, specifically, I think that it would be inappropriate for me to dictate how any of my detectives would conduct a case.  They have the discretion and the freedom to do their investigations the way that they see appropriate." *Id*. at 58.

262.    Not only did Defendant Joseph not feel adequately experienced to supervise homicides, but she likewise did not have law-enforcement training on how other issues relating to homicides like conducting identification procedures that was not unduly suggestive.  *Id*. at

149-150.  She likewise never received any training by the Kentucky State Police on how to

conduct photo identification procedures of people with similar characteristics.  *Id.* at 150.

263.    Not only was her training lacking in how to investigate a homicide, nevertheless

supervise one, Defendant Joseph also openly admits that she likely didn't review the policies and

procedures of the Kentucky State Police that were in effect in 2011.  *Id.* at 153.  According to

Defendant Joseph, "I don't sit around and read policy normally, so I mean, I can't – I'm not

going to say "Yes, I read every one of these policies while I was a supervisor at Post 10,"

because the chances are that I did not."  *Id.* at 153.

### A.  Defendant Joseph Was Unaware of Significant Aspects of Defendant York's Investigation Into Mills Because She Declined to Actually Supervise Him

264.    Defendant Joseph's supervision of Defendant York's investigation into the Mills'

homicide was non-existent.  Although Kentucky State Police policies and procedures required a

quality control checklist, Defendant Joseph never required Defendant York to complete one.  *Id.*

at 158.  When asked if she reviewed Defendant York's investigative file into Ms. Mills' death

every 120 days – as KSP policies require – Defendant Joseph claimed to not "recall."  *Id.* at 161.

265.    Defendant Joseph could not recall having a single conversation with Defendant

York about the Mills' homicide investigation.  *Id.* at 33.  On one occasion, she recalls Defendant

York approaching her about getting a supplement from an interview that Detective Cornett had.

Id. at 33.

266.    Out of the approximately 30 investigative reports that Defendant York completed

in the Mills' investigation, not a single one was documented as being reviewed by Defendant

Joseph.  *Id.* at 163.  Defendant Joseph admitted that she did not sign a single report nor indicate

in any way that she had ever reviewed any.  Id. at 163-164.  When pointedly asked if there was

any documentation proving that any supervisor ever reviewed a single report by Defendant York

in the Mills' homicide investigation, Defendant Joseph admitted, "Right, yeah. There's no – there's nobody's unit number on there." *Id*. at 164.

267.    Predictably, during the six to seven years of supervising Defendant York, Defendant Joseph did not discipline York on a single occasion. *Id*. at 56. In her words, "But as far as, like, a disciplinary action, he's never had, to my knowledge, not from me, I have never required him to have remedial training in any area." *Id*. at 56.

268.    Regarding the Mills' investigation, Defendant Joseph acknowledged that she was unaware of significant aspects of the Mills' investigation. She did not "recall any meetings with any detective in reference to this investigation." *Id*. at 69. Defendant Joseph did not "micromanage any investigation," especially the Mills one. *Id*. at 72. When asked how she was keep apprised of which witnesses were being spoken to in the Mills' case, Defendant Joseph revealed: "I don't keep track of that." *Id*. at 72.

269.    According to Defendant Joseph, the information that she learned was based on what she "read in the case jacket. So if – if there are units out there doing interviews, they don't call me to get approval for that…I don't keep track of that…If they do a supplement and put it into the case, then I'll read or listen to a statement. But other than that, there's not – there's no process for me keeping track of my units or micromanaging them in that fashion." *Id*. at 73. Again, there is no documentation confirming that Defendant Joseph ever read any documents in the Mills' investigation.

270.    Defendant Joseph readily acknowledges that she did not take any steps to make sure that Defendant York, or any other Detective under her supervision, was documenting exculpatory evidence in the Mills' investigation. *Id*. at 75. She confessed, "that's not something that I would have any way of knowing even existed if they weren't already documented." *Id*. at

75.  When asked if she took steps to see if exculpatory evidence was being documented, Defendant Joseph retorted, "I don't recall."  *Id.* at 76.  The following is instructive:

> Q: You don't recall taking any steps to determine whether exculpatory evidence was being document in the Katherine Mills homicide investigation; is that right?
>
> A: That's correct. I don't recall. I'm sorry.

*Id.* at 77.

271.    For instance, Defendant Joseph did not know that Defendant York initiated murder charges against Kayla Mills.  *Id.* at 141.  She likewise did not know that Defendant York struck a deal with Kayla to not pursue charges if she gave a statement against Mr. Taylor.  *Id.* at 142.  Not only was Defendant Joseph unaware of significant aspects of the investigation, but she likewise had no idea whether Defendant York failed to document witness interviews in the Mills' homicide: "there is absolutely no way for me to know, or have knowledge of, an interview that wasn't documented."  *Id.* at 142.  And as is discussed above, there is no documentation indicating that Defendant Joseph reviewed a single report.  *Id.* at 164.

272.    However, Defendant Joseph made clear that even if she learned that Defendant York was making promises of consideration to witnesses that were not documented – she would not have done a single thing about it:

> Q: Detective York testified at his deposition that he made promises to witnesses that were not documented during the Mills homicide investigation; were you aware of that conduct?
>
> A: I didn't take any steps to stop him from lying to a witness because, I mean, that's not – that's not a violation of our conduct.  It's not a violation of policy or anything like that.  So even if he was, I'm not aware of it, but even if he was, I wouldn't take any steps to tell him not to do that.

Id. at 108.

273.     Defendant Joseph was on notice during the investigation that significant missteps were taken by detectives under her command.  *Ex*. 18, Joseph Dep. Tr. at 44.   For instance, although the initial 2010 interview of Michael Crump was recorded by Detective Cornett[6], that recording was never disclosed.  *Ex*. 19, Missing Cornett Recording at KSP 288.   Defendant York became aware early in the investigation that such a recording existed as he documented this in his February 2, 2011 investigative report, stating "Mr. Crump gave a recorded statement to Det. Mike Cornet concerning Katherine Mills."  *Ex*. 98, York Crump Report at KSP 272; *Ex*. 2, York Dep. Tr. at 339, 341, 343-344.

274.     Defendant York also informed Sgt. Joseph that he needed a report from Detective Cornett regarding his interview with Mr. Crump.  *Ex*. 19, Missing Cornett Recording at KSP 288.  Four days later, Defendant York requested that Defendant Mefford review his records to locate "an audio interview by Detective Mike Cornett of Michael [Crump.]"  *Ex*. 22, Mefford Cornett Report at KSP 296.

275.     Defendant Joseph requested that Detective Cornett create a supplement at Defendant York's request.  *Ex*. 18, Joseph Dep. Tr. at 34.  Yet, even after learning that the recording was missing, Defendant Joseph had no idea as to whether Detective Cornett actually created a supplemental report.[7]  *Ex*. 18, Joseph Dep. Tr. at 36.  Further, she could not recall having a single conversation with Cornett about the substance of his interview with the eyewitness – an interview where the recording was missing and no contemporaneous report drafted.  *Id*. at 41.

---

[6] Defendant Joseph admits Detective Cornett was under her command during the underlying investigation.  *Ex*. 18, Joseph Dep. Tr. at 35.

[7] Detective Cornett ultimately created a supplemental report recounting his initial conversation with a supposed eyewitness three years after the fact, the underlying recording was never recovered.  *Ex*. 99, Cornett Supplement at PL 14435; *Ex*. 21, Cornett Supplement Version 2 at KSP 289-290.

276.    Outside of asking Defendant York if there was anything else that he needed, Defendant Joseph did not conduct any other action to assure that the investigative file was complete.  *Id*. at 47.  She also could not recall taking a single affirmative step to ensure that detectives under her command documented information learned in witness interviews.  *Id*. at 171.

277.    Finally, although Defendant Joseph claims that she conducted quarterly reviews of the investigative file, no such documents were ever tendered to Plaintiffs indicating that such a review was conduct.  *Id*. at 47.  In any event, as Defendant Joseph acknowledges, a quarterly review didn't provide the detectives with any actual supervision on the investigation.  *Id*. at 70-72.  In her words:

> But there's no point where, in a quarterly review where I would ever say " I think that you need to find a different witness" or "I think that you need to pursue a different suspect" or "I think that." – like, there's no room in a quarterly review for your opinions or how you feel a case should go forward.  You know, that's what the detective does, is they investigate it.  They follow the leads.  They document stuff.  They – like, that's what the detective's job is.  As a supervisor, mine's very much administrative stuff, and the quarterly review is exactly that.  There's—there's like, checklists of what's in the case.  If there's evidence, has the evidence been cleared?  If there's property, has the property been entered into NCIC?  Like, there's very – it's just very clinical as far as, like, check certain boxes and make sure certain forms are included.  Like, that's what the quarterly review is.  There's nowhere in there where I read a case and make suggestions on how I feel that they should pursue a case.  Does that make sense?

*Id*. at 70-71.

**B. Defendant Joseph Not Only Failed to Supervise Defendant York, but She Actively Encouraged His Misconduct by Participating, Failing to Intervene, and Failing to Discipline Him Afterwards**

278.    Although the above admissions are dispositive as to whether Defendant Joseph failed to supervise Defendant York in the underlying investigation, she also actively encouraged the exact misconduct that Defendant York comitted in the Mills' investigation by allowing him to assault Dave Fox in her presence in December of 2011.

93

279.    At her deposition, Defendant Joseph revealed that Defendant York's style of questioning with Mr. Fox did not violate any of the Kentucky State Police rules or procedures. Id. at 122.  When questioned at her deposition, Defendant Joseph revealed that there was nothing Defendant Yor k did during his questioning of Dave Fox that she disagreed with.  *Id*. at 121. Defendant Joseph likewise never issued any sort of reprimand of Defendant York based on his questioning of Mr. Fox.  *Id*. at 121.

280.    Although Defendant Joseph was present for the questioning of Dave Fox, she never tried to intervene.  *Id*. at 122.  In her view, "[n]o, I never saw anything that made me feel like I needed to intervene in the interview."  *Id*. at 122.  In her view, "techniques are what they are.  I mean there's good-cop/bad-cop has been talked about.  It's been on TV shows and everything…and if you listen to the interview, I think it's pretty was to pick out who was the good one and who was – who was supposed to be playing the part of the bad one."  *Id*. at 127.

281.    Defendant Joseph openly discussed the plan going into Mr. Fox's questioning – she was to play the "buddy-buddy to him and try to help him out to get him to come around and give the statement, like, give us what information that we felt like he absolutely knew."  Id. at 129.  When that failed, "then Detective York was like, 'Well, I'm going to try to be, you know, a little more aggressive with him and see – and see if that will get him to talk.' So that was – that was the technique that we decided we were going to use."  *Id*. at 129.

282.    At some point, Defendant Joseph "was tired, and I felt like we weren't getting anywhere, and so I came out of room and I was like, 'My style of questioning is not working with this guy.'"  *Id*. at 130.  In her view, Mr. Fox was more interested in taking her on a date than changing his story.  Id.  Defendant Joseph explains, "[s]o that's why Detective York

decided that – or that he and I decided that he would go in there and attempt to interview him."

*Id.* at 131.

283.    The following line of questioning is instructive as to Defendant Joseph's failure to supervise Defendant York:

> Q: If you learned that Detective York was questioning witnesses in the Mills homicide investigation using the same tactics that he used with Dave Fox, would you have approved of that?
>
> A: As long as Detective York isn't violating policy, he can conduct his interviews however he feels
>
> Q: As a supervisor of detectives, if you learned that Detective York was swearing at witnesses during interviews in the Mills investigation, would you have done anything to stop him?
>
> A: No.
>
> Q: If Detective York told witnesses during the Mills homicide investigation that he would charge them unless they said what he wanted them to say, would you have done anything to stop that?
>
> A: I don't think that Detective York would have ever said anything like that
>
> Q: My question to you is different, which is: If you had learned that he had threatened to charge people unless they told him the information that he wanted to hear and you had learned…
>
> A: Yeah, just like in the David Fox interview, that's what he told David Fox interview, that's what he told David Fox. He said, "Either tell me the truth or I'm going to put you in prison, and I'm going to charge you just like the rest of these people." That is appropriate. There's nothing wrong with that. That's the reality of it. IF somebody is concealing evidence of a crime, they can absolutely be charged with that. So I would not –I would not step in. I would not intervene. If somebody told me, "He threatened to put me in prison if I didn't tell him the truth," I would say, "Well, then you should probably tell him the truth." So I mean that's the way that I would deal with that as a supervisor.

*Id.* at 139-140.

## C. Given Defendant Joseph's Failure to Supervise, Defendant York Believed he Could Violate Plaintiffs' Constitutional Rights With Impunity

284.    With this backdrop, it is no wonder that Defendant York believed he could violation Plaintiffs' constitutional rights with impunity.  First, Defendant York openly concedes that he yells and threatens witnesses while questioning them in homicide investigations, including in this case.  *Ex*. 2, York Dep. Tr. at 23-25.  On this score, Defendant York openly admits to yelling at witnesses while questioning them in a homicide investigation.  *Id*. at 23.  Defendant York testified that he was not provided with "any particular training at the academy [on] whether to yell or not."  *Id*. at 23.  When asked if he "ever threatened a witness in a homicide investigation while questioning them," Defendant York revealed "Yeah, and that was – is a tactic that we do use in -- in all—in a majority of criminal investigations."  *Id.* at 24-25.  Defendant York admits that "there could be times that that tactic [was] used" in the Mills' homicide investigation.  *Id*. at 25.  Later, Defendant York revealed "Again that's a tactic that I did use.  I can't – I don't remember every time I used it, but yes."  *Id*. at 27.  Defendant York claims to have learned this tactic "on the job."  *Id*. at 25. Defendant York maintains this "tactic" was not against his training and understanding of the policies and procedures of the Kentucky State Police.  *Id*. at 27.

285.    Defendant York also openly concedes that he makes promises of consideration to witnesses and suspects in homicide investigations.  For instance, Defendant York admits that he promised James Otis Sizemore that he would never go to prison if he gave a statement implicating himself and William Anderson in the Wiggins' murder.  *Id*. at 42-43 (need implicating Bill).  In his words, "I don't remember the particulars of that, but that is a tactic that I use. If I was promising something that I could not deliver on because there was nothing to promise."  *Id*. at 43.  As is detailed above, Defendant York admits to making a number of

promises to witnesses in the Mills' investigation, none of which were ever documented in an investigative report.

286.    Relatedly, Defendant York admits that at the time he began his investigation into the death of Katherine Mills, Defendant York had not reviewed any Kentucky State Police policies or procedures on how to question witnesses or interrogate suspects. *Id*. at 86-87.

287.    Defendant York was likewise never provided with any training on how to conduct an identification procedure that is not unduly suggestive. *Id*. at 88.  The only training Defendant York received from the Kentucky State Police on how to conduct a lineup was that he should go to "AFIS and get photographs of similar people." *Id*. at 74.

288.    Defendant York was also never provided with any training on what type of information should be documented in a police report. *Id*. at 68.  According to York, "I don't remember no – no – no particular details on, you know, a specific thing.  Id. at 68.  As it relates to those reports, Defendant York revealed that he did not submit his police reports to Sgt. Joseph after completing them. *Id*. at 123.  In his words, "I hit enter" and then is unaware of what happens. *Id*.

## XVI.    PLAINTIFFS' POLICE PRACTICES EXPERT

289.    Charles Drago is a police practices expert.  He has the reviewed the evidence in this case and detailed the various ways in which the Defendants handling of the Katherine Mills murder investigation did not meet the generally accepted standards of investigative behavior in a murder investigation. *Ex*. 83, Drago Report at e.g.   Mr. Drago's opinions are expressed in his report, which is attached as *Ex*. 83.

290.    Mr. Drago determined that: (1) Defendants York, Pickard, Mefford, and Broughton failed to act in accordance with accepted police practices when conducting interviews

of witnesses and suspects; *Id*. at 6-18; (2) Defendants York and Pickard used improper threats and promises of consideration to obtain statement Ms. Mills; *Id*. at 18-19; (3) Defendant York failed to follow generally accepted police practices when he failed to disclose exculpatory evidence to Commonwealth; *Id*. at 19-23; (4) Defendant York misled the grand jury with fabricated misinformation which was unsupported by evidence; *Id*. at 23-26 (5) Knox County, through Defendant Pickard, failed to provide policies, procedures, training, and adequate supervision of law-enforcement officers in criminal investigations, interrogations, and the production of exculpatory evidence; *Id*. at 26-28; (6) Defendant York acted contrary to accepted police practices when he conducted a "Show Up" with Mr. Crump; *Id*. at 29-31 (7) Defendant Jackie Joseph acted contrary to standard and generally accepted police practices by failing to properly supervise officers under her command, including Defendant Jason York; *Id*. at 28-29; and (8) from a police perspective, the information reviewed would not have formed probable cause; *Id*. at 31-34.

## ARGUMENT

There is ample evidence supporting Plaintiffs' claims that Defendants York, Pickard, Broughton, and Mefford[1]: (a) maliciously prosecuted Plaintiffs, violating their right to be free from continued detention without probable cause under the Fourth Amendment; (b) illegally fabricated evidence resulting in a deprivation of liberty; (c) engaged in a conspiracy amongst themselves to deprive Plaintiffs of their constitutional rights; (d) failed to intervene to prevent the violation of Plaintiffs' constitutional rights; and (e) with regard to Defendant Pickard, committed these constitutional violations pursuant to the policies and practices of the Knox County Sheriff's Department.  Further, the record also demonstrates that Plaintiffs are deserving of a trial against Defendant Joseph for her: (f) failure to supervise; and (g) negligent supervision.[2]

Summary judgment should not be granted unless Defendants are able to demonstrate the absence of a genuine dispute of material fact for trial. Fed.R.Civ.P. 56(a); *F.T.C. v. E.M.A. Nationwide, Inc.,* 767 F.3d 611, 629 (6th Cir. 2014). In ruling on a motion for summary

---

[1] Defendants' motions for Summary Judgment are frivolous. In contravention of Fed.R.Civ.P. 56(1)(c) and Sixth Circuit precedent, the briefs are littered with factual assertions that are wholly unsupported by citation.  The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.,* 276 F.3d 845, 848 (6th Cir.2002); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986) (requiring the moving party to set forth "the basis for its motion, and identify[ ] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate an absence of a genuine issue of material fact"). The moving party must support his or her "assert[ion] that a fact cannot be ... disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials[.]" Fed.R.Civ.P. 56(c)(1)(A).  As such, the unsupported factual assertions made by the Defendants must not be given credence.  *Id.*

[2] These are the claims and parties that should proceed. Plaintiffs hereby voluntarily dismiss Defendants Brian Johnson, Dallas Eubanks, Kelly Farris, and Jason Bunch as parties in this matter.  Plaintiffs further voluntarily dismiss their *Monell* claim against Defendant City of Barbourville, their Intentional Infliction of Emotional Distress claim against all Defendants, and their Respondeat Superior claims against Defendants Knox County and City of Barbourville. Finally, Plaintiffs only pursue their claims of failure to supervise and negligent supervision against Defendant Joseph.  *See* Dckt. No. 1 at Counts III and IX.

judgment, the Court must view the evidence in the light most favorable to the non-moving party and afford the non-moving party all reasonable inferences to be drawn from that record. *Chapman v. UAW Local 1005,* 670 F.3d 677, 680 (6th Cir. 2012)(*en banc*); *Matsushita Elec. Indus Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Because summary judgment is such an extreme remedy, it should not be granted "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Rudisill v. Ford Motor Co.,* 709 F.3d 595, 600-01 (6th Cir. 2013). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Properly construed, the record unambiguously supports each of Plaintiffs' claims. The disputed facts cannot be resolved by this Court. A jury trial is necessary.

## XVII.  A TRIAL IS NECESSARY ON PLAINTIFFS' FABRICATION CLAIMS

Plaintiffs present this Court with a robust record demonstrating how Defendants' fabrication of evidence caused a deprivation of their liberty.  In this Circuit, as others, "[i]t is well established that a person's constitutional rights are violated when evidence is knowingly fabricated and a reasonable likelihood exists that the false evidence would have affected the decision of the jury." *Gregory v. City of Louisville*, 444 F.3d 725, 737 (6th Cir. 2006); *see also Id.* at 744–45 (denying qualified immunity to police crime lab analyst for fabricating notes); *Spurlock v. Satterfield*, 167 F.3d 995, 998–99, 1005–06 (6th Cir. 1999) (police fabrication of witness testimony violates due process and is not entitled to qualified immunity); *Webb v. United States*, 789 F.3d 647, 667–72 (6th Cir. 2015) (false statements in police reports give rise to a due process fabrication of evidence claim irrespective of probable cause). Just weeks ago in *Jackson, et al v. City of Cleveland, et al.*, the Sixth Circuit reaffirmed its' earlier opinions and held that

"fabricated evidence that is used as [the] basis for a criminal charge can form the basis for a § 1983 claim because, absent that evidence, there would have been no jury." *Jackson v. City of Cleveland*, No. 17-3840, 2019 WL 2171462, at *13–14 (6th Cir. May 20, 2019); *see also Halsey v. Pfeiffer*, 750 F.3d 273, 294 n.19 (3d Cir. 2014). Given this binding precedent, and as this Court has previously ruled, Plaintiffs must be able to "pursue their malicious prosecution and fabrication-of-evidence claims, both of which are predicated on the Fourth Amendment."[3] *See* Dckt. No. 119 at 21. For the following reasons, Plaintiffs' fabrication of evidence claim is clearly triable.

### A. Defendants York's Motion for Reconsideration of this Court's Prior Ruling is Without Merit and Conflicts with Binding Sixth Circuit Precedent

In spite of this Court's prior ruling and binding Sixth Circuit precedent, Defendant York dedicates a significant portion of his brief to challenging the viability Plaintiffs' fabrication claim. *See* Dckt. No. 180-23 at 14-22. First, Defendant York attempts to reserve any (re)argument relating to whether Plaintiffs' fabrication claim accrued outside the statute of limitations. *See* Dckt. No. 180-23 at 15. Next, Defendant York argues that this Court should transform Plaintiffs' fabrication claim into one of malicious prosecution while adding the elements of probable cause and favorable termination to a fabrication of evidence claim. *See* Dckt. 180-23 at 17. As is discussed below, Defendant York's conflation of constitutional torts is patently without merit and stands in direct contrast to binding Sixth Circuit and United States Supreme Court precedent – which has time and again held that fabrication claims do not include the elements of probable cause or favorable termination.

---

[3] The joint brief on behalf of Defendants York and Bunch curiously address Plaintiffs' fabrication claim under the Fourth and Fourteenth Amendments. *See* Dckt. No. 180-23 at 14. As this Court has previously held, Plaintiffs have a viable fabrication of evidence claim under the Fourth Amendment and not the Fourteenth. *See* Dckt. No. 119 at 21.

First, although Defendant York raises the issue of accrual, he declines to present any substantive argument that Plaintiffs' fabrication claim accrued outside the statute of limitations. *See* Dckt. No. 180-23 at 15. It would be too late for Defendant York to make any arguments in his reply brief. *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008); *see also Novosteel SA v. United States*, 284 F.3d at 1261, 1274 (Fed. Cir. 2002)(finding that plaintiff failed to preserve an issue for review by not presenting it in its principal summary judgment brief and raising it for the first time in its reply brief). In any event, the United States Supreme Court has definitively held that "the statute of limitations for … [a] § 1983 claim alleging that he was prosecuted using fabricated evidence began to run when the criminal proceedings against him terminated in his favor." *See McDonough v. Smith*, No. 18-485, 2019 WL 2527474, at *8 (U.S. June 20, 2019). Given this, Plaintiffs' claims are timely as they were filed less than a year after the termination of their criminal cases.

In his next at bat, Defendant York takes several failed swings at transforming Plaintiffs' fabrication of evidence claim into one for malicious prosecution. *See* Dckt. No. 180-23 at 16-22. In his view, fabrication of evidence claims should be transformed into a malicious prosecution claim that includes the elements of probable cause and favorable termination. Of course, Defendant York's interpretation of Plaintiffs' fabrication claim has been resoundingly rejected by every court that has considered it. The Sixth Circuit made clear in *Webb v. United States* – a case that did not go to trial – that "even if independent evidence establishes probable cause against a suspect, it would still be unlawful for law-enforcement officers to fabricate evidence in order to strengthen the case against that suspect." *Webb v. United States*, 789 F.3d 647, 670 (6th Cir. 2015). Contrary to Defendant York's suggestion, *Webb v. United States* is not an outlier nor did it invent a new constitutional tort. The Sixth Circuit in *Webb* merely reaffirmed existing

precedent: "a claim of fabrication of evidence does not require a conclusion that the state did not have probable cause to prosecute the claimant." *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997).

While at the plate, Defendant York completely ignores the March 28, 2019 Sixth Circuit opinion in *Jackson, et al. v. City of Cleveland, et. al* (later amended on unrelated issues on May 20, 2019), holding that "fabricated evidence that 'is used as [the] basis for a criminal charge' can form the basis for a § 1983 claim because, absent that evidence, there would have been no jury." *Jackson v. City of Cleveland*, No. 17-3840, 2019 WL 2171462, at *13 (6th Cir. May 20, 2019); *see also Halsey v. Pfeiffer*, 750 F.3d 273, 294 n.19 (3d Cir. 2014). Considering that the fabricated evidence here *was* presented to a jury – the grand jury – and resulted in the deprivation of Plaintiffs' liberty for nearly a combined decade of their lives, there is no legitimate argument that Plaintiffs' fabrication claim cannot survive. Indeed, binding Sixth Circuit precedent easily establishes that Plaintiffs' fabrication claim is triable.

In the last few weeks, the Supreme Court recognized the exact type of fabrication claim that exists here. *McDonough v. Smith*, No. 18-485, 2019 WL 2527474, at *4 (U.S. June 20, 2019). In *McDonough v. Smith*, allegedly fabricated evidence was presented to a grand jury, caused a deprivation of that plaintiff's liberty, and did not result in a conviction. *Id.* Although the crux of *McDonough* centered on accrual of fabrication claims, the Supreme Court did recognize that "[h]is claim requires him to show that the criminal proceedings against him – and consequent deprivations of his liberty – were caused by Smith's malfeasance in fabricating evidence." *Id.* Going further, the Supreme Court adopted the Second Circuit's analysis that a fabrication of evidence claim exists even if there was probable cause so long as there was a deprivation of liberty, stating "As for Smith's suggestion that he fabricated evidence could not

have caused any liberty deprivation where, as here, there could have been probable cause and there was in fact an acquittal, it suffices to reiterate that we assume the contours of the claim as defined by the Second Circuit…and thus accept its undisputed conclusion that there was a sufficient liberty deprivation here." *Id.* at *9; *see also Garnett v. Undercover Officer C0039*, 848 F.3d 265, 277 (2nd Cir. 2016)(explaining that "a further deprivation of liberty can resulted from the fabrication of evidence even if the initial arrest is lawful.")

In his attempt to get around and ignore this binding precedent, Defendant York misrepresents the various constitutional claims litigated in *Stemler v. City of Florence* and argues that "Stemler confirmed how the existence of probable cause would negate Fourth Amendment liability." *See* Dckt. No. 180-23. What Defendant York declined to inform this Court is that *Stemler* merely held that: "[a] plaintiff bringing a constitutional claim of false arrest under the Fourth Amendment must show that there was not probable cause for the arrest. Likewise, the existence of probable cause would negate the possibility of liability under a state-law malicious prosecution theory, and therefore under a federal constitutional theory as well…" *Stemler v. City of Florence*, 126 F.3d at 871 (6th Cir. 1997). As shown, the *Stemler* Court merely held that the existence of probable cause would negate liability for false arrest and malicious prosecution claims, and in fact, found the exact opposite with regard to fabrication claims: "[a] claim of fabrication of evidence does not require a conclusion that the state did not have probable cause to prosecute the claimant." *Id.* at 871-872.

As Defendant York even concedes, the standard in *Stemler* has been widely used in a litany of Sixth Circuit decisions – each confirming that probable cause is not an element of fabrication claims and that such a claim exists without trial or conviction. As is illustrated below, each of those decisions support the viability of claim: "[i]t is well established that a

person's constitutional rights are violated when evidence is knowingly fabricated and a reasonable likelihood exists that the false evidence would have affected the decision of the jury." *Gregory v. City of Louisville*, 444 F.3d 725, 737 (6th Cir. 2006); *Spurlock v. Satterfield*, 167 F.3d 995, 998-99, 1005-06 (1999); *Webb v. United States*, 789 F.3d 647, 667-70 (6th Cir. 2015). When police fabricate evidence, they are liable if that fabrication causes any deprivation of liberty, whatever form the fabrication takes, and whether it is presented at trial or used to charge or indict. In *Gregory v. City of Louisville*, the Sixth Circuit found that a forensic expert's report "exist[ed] independently of her subsequent testimony," and was "a piece of documentary evidence upon which Plaintiff argues that the prosecutors justifiably relied to continue their prosecution of Plaintiff." 444 F.3d at 741. The report "affected the course of the criminal proceedings independent of [the expert's] testimony as to its contents." *Id.* Further, the Sixth Circuit found that officers' fabricated notes: "comprise[d] part of the documentary record before the prosecution and defense and affected the course of the criminal proceedings independent of any testimony to the notes' contents.…Their very existence, even if not introduced as evidence at trial, affected Plaintiff's criminal prosecution independent of the officers' testimony." *Id*; *see also Halsey v. Pfeiffer*, 750 F.3d 273, 289, 294 n.19 (defendant suffered injury when fabricated evidence is used to initiate prosecution or obtain criminal charges); *Fields v. Wharrie*, 740 F.3d 1107, 1112 (7th Cir. 2014) ("*Fields II*") (same).

If there was any question as to whether Plaintiffs' fabrication claim is viable without trial - and without Defendant York's additional elements - the Sixth Circuit's opinion in *Jackson, et al v. City of Cleveland, et al* is dispositive. *Jackson v. City of Cleveland*, No. 17-3840, 2019 WL 2171462, at *13–14 (6th Cir. May 20, 2019). Here, considering that Defendants' fabricated evidence was presented to a jury - the grand jury - and resulted in Plaintiffs' deprivation of

liberty for nearly a combined decade of their lives, Sixth Circuit precedent clearly requires that their fabrication claim survives.  PSOF ¶¶39-41, 52-55, 69-134, 154-190.

   **B.  There is sufficient evidence for a reasonable jury to conclude that Defendants York, Pickard, Mefford, and Broughton fabricated evidence against Plaintiffs.**

Viewing the evidence and inferences in Plaintiffs' favor, a reasonable jury could easily conclude that Defendants York, Pickard, Mefford, and Broughton fabricated evidence that not only could have affected the jury, but actually did affect the grand jury.

   **i.   Defendants York and Pickard Do Not Contest That A Reasonable Jury Could Conclude That They Fabricated Kayla Mills' Statement**

Plaintiffs have built an uncontested record documenting how Defendants York and Pickard fabricated a statement for Kayla Mills through extreme coercion and harassment.  PSOF ¶¶ 106- 125.  During their depositions, Defendants York and Pickard admitted to egregious misconduct and Ms. Mills' mother detailed how her daughter's statement was fabricated in her presence.  PSOF ¶¶  111-114, 120-125.  In the face of this, neither Defendant moves for summary judgment as it relates to their fabrication of Kayla Mills' statement.  *See* Dckt. No. 180-23; *see also* Dckt. No. 179-1.  Defendants York and Pickard's silence on what is arguably Plaintiffs' most outrageous fabrication claim is telling.  This Court's inquiry into whether Plaintiffs are deserving of a trial against Defendants York and Pickard for the fabrication of evidence can candidly end here. As the Sixth Circuit has repeatedly held, issues are "waived when they are raised for the first time in motions requesting reconsideration or in replies to responses."  *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008); *see also Novosteel SA v. United States*, 284 F.3d at 1261, 1274 (Fed. Cir. 2002)(finding that plaintiff failed to preserve an issue for review by not presenting it in its principal summary judgment brief and raising it for the first time in its reply brief).  Considering that Defendants York and Pickard have

not moved for summary judgment on Plaintiffs' claim that Kayla Mills' statement was fabricated, a trial is warranted.

Although Defendants Pickard and York have not moved for summary judgment as to their fabrication of Kayla Mills' statement, Plaintiffs provide this Court with a brief recitation of the outrageous misconduct that led to the manufacturing of Kayla's fabricated statement. Defendants Pickard and York approached Kayla repeatedly prior to obtaining her statement on March 16, 2012.  PSOF ¶¶ 107-118.  Defendant Pickard often located Kayla "at different places…told her what he thought happened and was telling her that if she didn't cooperate with the police that she was going to be arrested and put in jail forever." PSOF ¶107.  Defendant Pickard told Kayla "that if she would just cooperate and tell them that Jonathan and Amanda and William Lester had killed Ms. Mills that he would make sure that she would not get in trouble." PSOF ¶107.  If Kayla refused to cooperate, Defendant Pickard threatened that "she was going to get in trouble." PSOF ¶107.  Defendant Pickard's tactics became more aggressive as time went on. PSOF ¶¶108-109.  In the end, Kayla "felt really harassed and threatened. She told me this herself. That she felt they were harassing, and she felt threatened, and she was scared." PSOF ¶110.  Kayla always maintained that she "don't know anything" and that "Jonathan has never said anything to me about this. Nothing. He don't know anything at all." PSOF ¶110.

Defendant York also pressured Kayla and instructed her on numerous occasions that she needed to tell him that "Jonathan, William Lester and Amanda Hoskins had robbed Katherine…[a]nd if she didn't tell him this, that she was going to jail." PSOF ¶112.  Defendant York does not deny this.  *Id.*  The Defendants ultimately made good on their threats against Kayla on March 14, 2012.  PSOF ¶113.  Then, Defendant York initiated charges against Kayla for the murder of Katherine Mills. *Id.*  The Commonwealth was never informed that Defendant

York initiated these charges against Kayla until his deposition in this lawsuit. *Id.* Although it was his responsibility to place the charging document against Kayla in the Mills' investigative file, the file is void of Defendant York's criminal complaint against Kayla. *Id.* The record demonstrates – and Defendant York admits - that Kayla Mills was charged with murder as leverage. PSOF ¶¶114, 118-122.

On March 15, 2012, Donna Mills, Kayla's mother, told Defendant York that her daughter did not have any knowledge regarding the crime, did not date Mr. Taylor around the time of the murder, and had an alibi for the day in question. PSOF ¶¶115-117. In response, Defendant York informed Donna that:

> I don't give a shit what you're saying. I don't care. She's going to come in here today and tell me what she – I want her to say. And she knows what that is because I've talked to her several times. And if she doesn't, she's going to go to jail today.

PSOF ¶115.

On March 16, 2012, Donna Mills appeared at the Barbourville Police Department for her daughter's questioning. Defendant York told Kayla[4] prior to her statement that "we've discussed

---

[4] Kayla Mills died after giving a statement to Defendant York in March of 2012. The statements from Kayla Mills to her mother, Donna Mills, are admissible at trial through a variety of hearsay exceptions. First, Kayla's admissions to her mother that she had no direct knowledge of any information implicating Mr. Taylor in the homicide, is a statement against interest. *See* Fed. R. Ev*Id.* 804(b)(3). This rule requires: (1) the declarant must be unavailable to testify at trial, (2) the statement must be against the declarant's penal interest, and (3) the statement must be supported by corroborating circumstances indicating the trustworthiness of the statement. *United States v. Garcia*, 897 F.2d 1413, 1420 (7th Cir. 1990). All three elements are met. Given that Kayla is now deceased, and thus unavailable, the admissions go directly against the ultimate statement she gave and there are significant corroborating circumstances. The statements also satisfy the elements of FRE 803(1),(2), and (3) – as Kayla made these admissions to her mother directly after her confrontational interactions with Defendants York and Pickard, in which she was threatened and promised significant consideration in exchange for falsely implicating Plaintiffs in a murder. Donna Mills has described in detail the emotional reactions that Kayla had after being threatened and harassed by the Defendants at issue, further meeting the requirement of the hearsay exceptions listed above. And of course, Defendants' statements in the presence of Donna Mills are admissions of a party opponent, and thus, admissible at trial. Finally, Kayla's conversations with her mother prove a requisite element of plaintiffs' fabrication claim, namely, defendants' intent to fabricate. *United States v. Green,* 680 F.2d 520, 523 (7th Cir.), *cert. denied,* 459 U.S. 1072 (1982) (kidnapping

this several times. You know what you have to say. If you don't tell me this, you're going to jail today." PSOF ¶118.  Although Kayla knew what Defendant York wanted her to say, she continued to maintain that "she didn't know anything." *Id.*  In response, Defendant York told her that "You know. You know. You know this. You know [what] you're going to have to tell me." *Id.*

Each time Kayla denied knowledge, Defendant York got "more angry." PSOF ¶119. Defendant York threatened Kayla more than before by telling her she would go to prison for murder and robbery.  *Id.*  He began "hitting his desk and just acting irate."  *Id.*  As Kayla continued to say "I don't know. I don't know. I don't know," Defendant York then used more coercive techniques that became so aggressive that Donna got so "ill [she] had to leave the room and literally go out in the parking lot and throw up. It was so bad. Really, it was that bad." *Id.* Defendant York ultimately threatened Kayla that she was going to tell his story or go to jail. PSOF ¶120.  Defendant York does not deny this and instead readily admits to informing Kayla that he charged her with murder prior to taking her statement.  *Id.*

Defendant York's actual fabrication of Kayla's statement was similar to the other witnesses.  Although Defendant York recorded portions of his interactions with Kayla on March 16, 2012, he readily acknowledges that he spoke to her off the record prior to taking a statement. PSOF ¶123.  Even when Defendant York began recording, he often stopped the recorder to tell

---

victim's statement that the defendant "is still bothering me" admitted to show victim's dislike of defendant and thus held against her will).  Although Plaintiffs maintain that Kayla's statements to her mother and the conversations made in her mother's presence are admissible at trial through a variety of ways, Defendants do not raise such objections in their brief, and thus, any arguments to the contrary are waived. *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008); *see also Novosteel SA v. United States*, 284 F.3d at 1261, 1274 (Fed. Cir. 2002)(finding that plaintiff failed to preserve an issue for review by not presenting it in its principal summary judgment brief and raising it for the first time in its reply brief).

Kayla what to say. *Id.* In those gaps, Defendant York rehearsed Kayla's story. *Id.* Throughout the marathon questioning, Defendant York repeatedly informed Kayla as to what he wanted her to say. "He continued and continued and continued." *Id.*

When asked whether there was an understanding between himself and Kayla that if she gave a statement implicating Mr. Taylor in the murder of Ms. Mills, that Defendant York would not proceed forward with the arrest warrant against Kayla for murder, Defendant York admitted: "Yeah, that's what the understanding of myself and her attorney had." When asked whether he ever documented this agreement to abandon murder charges against Kayla Mills, and a $1,000,000 bail that was signed by a judge, in exchange for a statement implicating Mr. Taylor in the murder, Defendant York retorted, "No." PSOF ¶¶120-122.

Defendant York ultimately drafted a summary of the statement he obtained from Kayla Mills on March 16, 2012. PSOF ¶124. Defendant York's report claims that Mr. Taylor confessed to Kayla Mills that he killed Ms. Mills, with assistance from Ms. Hoskins and Mr. Lester. *Id.* The statement manufactured by Defendant York for Kayla Mills was false and fabricated. *Id.*

As noted above, at the time she gave her statement, Kayla Mills was charged with the murder of Katherine Mills and was facing a $1,000,000 bond. PSOF ¶125. Nonetheless, consistent with Defendant York's undocumented promises of consideration, Kayla was allowed to freely leave the police department after implicating Plaintiffs in the murder of Katherine Mills. *Id.* Given this robust (and uncontested record), a reasonable jury could easily infer that Defendants Pickard and York fabricated Kayla's statement using information that was already in the investigative file. Further, a reasonable jury could easily find that Defendants York and Pickard either knew the statement was false or acted with a reckless disregard for the truth when

obtaining it.  With the reasonable inferences in Plaintiffs' favor, a jury could easily find this as

these Defendants either knew the statement was false or acted with a reckless disregard for the

truth when obtaining it, as the Defendants: (1) were on notice that Kayla was not dating Mr.

Taylor at the time of the murder; (2) were on notice that Kayla had an alibi for the day in

question; (3) employed extensive coercive techniques t to manufacture the statement (like

charging Kayla with murder to reach a deal); (4) repeatedly told Kayla that she would get

charged unless she repeated what they "needed to hear" and "wanted to hear" instead of

requesting that Kayla tell the truth (5) fed all of the information for Kayla to repeat.  Again, since

Defendants York and Pickard have not moved for summary judgment on this claim, they have

waived any argument to the contrary.

> **ii.    A Reasonable Jury Could Conclude That Defendants York and Pickard
> Fabricated Allen Helton's Statement.  That Same Jury Could Likewise
> Conclude that Defendants Broughton and Mefford Assisted and Failed to
> Intervene in the Fabrication of Helton's Statement**

Next, a reasonable jury could conclude that Defendants Pickard and York fabricated

Allen Helton's false statement.  That same jury could likewise conclude that Defendants

Broughton and Mefford assisted and failed to intervene in stopping the fabrication of Helton's

statement.  Here, as elsewhere, Defendant York readily concedes that disputes of material fact

exist with regarding to whether he: (1) told Helton what to say[5] and (2) promised consideration

to Helton in exchange for the statement.   *See* Dckt. No. 180-23 at 29-30.   Yet, Defendant York

---

[5] Defendant York's brief concedes there is a dispute of material fact regarding the feeding of information
to Helton when the recorder was turned on: "York disagrees with Plaintiffs' characterization of the March
2012 Helton interview as leading and feeding him information…Although the interview features some
leading questions, they are primarily to confirm previous interactions and information exchanged between
them."  *See* Dckt. No. 180-23 at 29-30.  Defendant York's brief repeatedly highlights that a trial is
warranted.

improperly asks this Court to resolve such disputes instead of leaving them to the jury, as binding precedent requires.

As is discussed at length above, Defendants' fabrication of Helton's statement occurred over a period of time. PSOF ¶¶39-42, 47-55, 69-78. In 2011, after Defendant Pickard pulled over Helton, Defendant York appeared on scene, grabbed Helton by his face, and said, "I ought to take you down there and let this family beat the fuck out of you for killing this old woman." PSOF ¶39. Law enforcement eventually brought Helton to the Barbourville Police Department, where he was read his Miranda rights and questioned extensively about the Mills' homicide. PSOF ¶¶39-42. There, Defendants York, Mefford, and Broughton participated in the questioning and remained present for the entire interrogation. *Id.* Critically, in Defendants' Broughton and Mefford's presence, Defendant York fed details of the crime to Helton that were later used to fabricate his statement even though he informed the Defendants that he "didn't know nothing" about the Mills' homicide. PSOF ¶¶41. Defendant York does not deny that this occurred, but rather, claims he has no recollection of anything said to Helton during this conversation. *Id.* No documentation was created by Defendants York, Broughton, or Mefford memorializing any information obtained from, or provided to, Helton during this interrogation. *Id.*

Defendants York and Pickard continued laying the foundation for Helton's fabrication statement after leaving the interrogation room in 2011. PSOF ¶¶42, 52-55, 69-78. On a separate occasion, and although Mr. Helton did not have any direct knowledge of the Mills' homicide, Defendant York later approached Helton after court and stated, "if you tell me what I need to hear, I'll get it took care of for you." PSOF ¶69. Ultimately, on March 8 2012, Pickard and York spoke with Helton extensively prior to turning on a recorder. PSOF ¶¶71-72. During this

unrecorded discussion, Defendant "Pickard told me that he would get me a bond and there wouldn't be no more charges brought upon me" in exchange for "tell[ing] them what they wanted to hear about the murder."[6] PSOF ¶72.  Defendants York and Pickard then proceeded to again tell Helton exactly what they wanted to hear – and what he had to repeat - prior to the recorder being turned on. PSOF ¶¶72-73.

While recording, Helton understood that he had to either repeat the information previously provided to him by Defendants York and Pickard – and earlier, in the presence of Defendants Broughton and Mefford - or agree with whatever they told him.  PSOF ¶¶ 39-42, 72-74.  In his words, they "told me what to say, I just agreed with it."  PSOF ¶72.  Specifically, Helton understood that he needed to falsely implicate Plaintiffs and William Lester in the murder of Katherine Mills in order to get the deal that was promised to him – his release from jail and the dismissal of his charges. PSOF ¶73.  Helton did not want to go along with the false statement, but he "was looking out for [his] best interest, you know."  *Id.*

Notably, at his deposition, Defendant York did not deny feeding information to Mr. Helton prior to the recorder being turned on; he likewise concedes that Helton was promised consideration in exchange for a statement. PSOF ¶74.  Importantly, as Helton testified, and as the recording illustrates, Defendant Pickard was involved in the misconduct and did nothing to stop it.[78]   PSOF ¶75.

---

[6] Although Defendant Pickard argues that he "he did not make Helton any promises; however, he told him he would try to help him on his charges if he told the truth," Mr. Helton's testimony claims something entirely different.  *See* Dckt. No. 179-1 at 23.  Again, this is a genuine issue of material fact left for a jury to resolve.

[7] In citing to a single page of Helton's deposition, Defendant Pickard falsely informs this Court that Helton "denies that Pickard told him what to say in his statement."  *See* Dckt. No. 179-1 at 30.  A close inspection of that page reveals something different altogether.  There, Helton testified that he was agreeing with whatever information Defendant York told him during the recorded interview due to the promises of consideration made earlier by both Defendants.  Ex. 17, Helton Dep. Tr. at 90.  Notably,

Defendant York ultimately created a police report regarding the March 8, 2012 questioning of Allen Helton. PSOF ¶76. That report – and the accompanying recorded statement - implicates Jonathan Taylor, Amanda Hoskins, and William Lester in the murder of Katherine Mills. *Id.* According to Mr. Helton, every bit of information that implicated Plaintiffs in Defendant York's report was false and fabricated. PSOF ¶78. Importantly, the false information contained in the false report was provided to Mr. Helton by Defendant York in Defendant Pickard's presence. *Id.* Prior to giving into Defendants' plan, Mr. Helton repeatedly informed Defendants York and Pickard that he did not have any direct knowledge regarding the murder of Katherine Mills. *Id.* And of course, Helton was ultimately released from custody after going along with Defendants' plan. *Id.*

There is no dispute as to whether Helton's false and fabricated statement was introduced to initiate criminal charges against Plaintiffs before the grand-jury and at the preliminary hearing. PSOF ¶¶162, 169. As a result of those charges, Plaintiffs were deprived of their liberty. PSOF ¶¶12-14.

A reasonable jury could easily infer that Defendants Pickard and York fabricated the statement for Helton using information that was already in the investigative file. Further, a

---

Helton revealed that Defendant Pickard was present for the recorded and fabricated statement and did nothing to stop it. *Id.* Nowhere on this page does Helton deny that Pickard told him what to say, and as is discussed above, Defendant Pickard repeatedly informs Helton that he would receive consideration in exchange for repeating what the Defendants needed and wanted to hear.

[8] Defendant Pickard, among other Defendants not named York, claim that they had no obligation to document information learned in the homicide investigation as they were not the lead investigator. See Dckt. No. 179-1 at 2. In making this argument, Defendant Pickard apparently ignores the fact that in 2014, he did ultimately write a letter to the Commonwealth Attorney informing Mr. Steele that "he could see what could be done on the receiving stolen property charges." Ex. 99, March 14, 2014 Pickard Letter at PL 4844. In that letter, Defendant Pickard did not inform Mr. Steele that Mr. Helton was made additional promises or that his statement was fabricated. That Defendant Pickard felt he had an obligation to disclose a promise he made to Helton, but not the underlying circumstances of Helton's fabricated statement, or promises of consideration and threats made to other witnesses is something only Defendants can square away. As established, Defendants' strawman argument is not only contrary to binding caselaw, but it stands in conflict to Defendant Pickard's own correspondence.

reasonable jury could likewise find that Defendants Broughton and Mefford were present for part of the fabrication and failed to intervene to stop it from taking place. A reasonable inference exists that Defendants York and Pickard either knew the statement was false or fabricated or had a reckless disregard for the truth when obtaining it for several reasons. First, the false March 8, 2012 statement by Helton claims that on December 20, 2010, "around 1200 hrs he saw William Lester and Amanda Hoskins at Mike Simpson's residence at Moore's Creek" and while there, Ms. Hoskins confessed that she "got the job done" and showed Helton approximately four-thousand dollars in cash that was "folded up." PSOF ¶76. As Defendant York's own report demonstrates, he already received Ms. Hoskins medical records by June 29, 2011 and determined that she was at Dr. Warrens office on December 20, 2010 beginning at 11:54 a.m – and not at Mike Simpson's house confessing to Helton that she successfully committed a murder. *Ex.* 26, KSP Investigative File at KSP279-280. Defendant York further corroborated that Ms. Hoskins had her prescription filled that afternoon after leaving Dr. Warren's office. *Id.* Given that Defendant York obtained Ms. Hoskins' records nine months prior to fabricating the March 8, 2012 statement, a reasonable jury could readily infer that he knew Helton's statement was false when he manufactured it.

Several additional inferences illustrate that the Defendants knew the statement was false or fabricated because: (1) Helton was not giving his version of events, but instead, denied any knowledge of the Mills' homicide; (2) these Defendants kept telling Helton that he would get a deal if he repeated what they "needed to hear" and "wanted to hear" instead of requesting that Helton tell the truth; (3) these Defendants had to make significant promises of consideration to Helton in exchange for him repeating the statement they scripted; (4) these Defendants "told [Helton] what to say, [he] just agreed with it" after repeatedly informing these Defendants that he

had no actual knowledge; and (5) as the recorded statement itself demonstrates, Helton merely agreed with the Defendants' assertions during the recorded interview or parroted back the information fed to him prior to the recorder being turned on.

Although Defendant York's brief "denies any wrongdoing regarding Helton," that certainly wasn't the case at his deposition when he made several dispositive admissions under oath.[9] There, Defendant York did not deny feeding information to Helton prior to turning on a recorder and readily concedes – as he must – that Helton was promised consideration in exchange for his statement against Plaintiffs.

Defendant York also claims that "while Plaintiffs and York may differ in their interpretations whether the interview was too leading, there is no genuine dispute of fact because the audio recording is available for review, which enables the Court to review the recording and issuing summary judgment." *See* Dckt. No. 180-23 at 30. This argument is without merit and completely sidesteps the factual record in this case. As the record demonstrates, Defendants Pickard and York spoke with Helton extensively prior to turning on the recorder. PSOF ¶¶ 39-

---

[9] Defendant York's brief dedicates a paragraph to whether he knowingly fabricated Helton's false statement. There, Defendant York claims that a 2015 telephonic conversation "confirms York did not knowingly fabricate Helton's statement because it was Helton [in 2015] who informed York the statement was untrue. Helton would not have needed to explain his statement was false if it were known to be untrue from its inception" *See* Dckt. No. 180-23 at 27. Defendant York's vague assertions are not only contrary to what actually occurred, but instead highlight his failed attempts to cover his misdeeds. Mr. Helton testified that he called Defendant York in 2015 to advise that he was on his way to the courthouse but was running late. Ex. 7, Helton Dep. Tr. at 94. When Helton informed Defendant York that he was going to testify truthfully – and reveal that his March 8, 2012 was false – Defendant York told Helton "[n]ot to worry about it" and to not come to Court. *Id.* at 96-98. Not only did Defendant York inform Helton to not come to Court – which ultimately delayed Plaintiffs' trial and continued the deprivation of their liberty - Defendant York proceeded to double down on his fabrication by falsely writing in a police report that: "On May 18, 2015 this unit talked to Allen Helton via telephone from a Knox County courthouse phone. He stated he was at UK Hospital. He stated he had an infection around metal plates in his head." Ex. 26, KSP Investigative File at KSP 1000. According to Helton, Defendant York's 2015 report was false and that he specifically informed Defendant York that he "was coming." Ex. 17, Helton Dep. Tr. at 98. A jury could easily find that Defendant York falsified his 2015 report in a quest to cover-up his 2012 fabricated statement, namely, he did noDfet want a jury to learn not just that Helton's statement was false, but that it was a product of fabrication in the first place.

42, 52-55, 69-78.  In that time, Defendants York and Pickard told Helton exactly what they wanted him to repeat, namely, that he needed to falsely implicate Plaintiffs in the murder. *Id.* Further, when Defendant York was asked what he and Defendant Pickard discussed with Helton prior to turning on a recorder, he admitted:

> No, like I previously stated, I don't remember any of the particulars of what the conversation took place.  I don't remember any specific tactics that I may or may not have used.  I do not remember the specific time that it may or may not have started.

PSOF ¶74.  Even more, Defendant York's argument also ignores the unrecorded – and undocumented – interactions that Defendants York, Pickard, Mefford, and Broughton had with Helton prior to March 8, 2012 in a quest to fabricate his statement.  PSOF ¶¶ 39-42, 52-55, 69-78.  Thus, Defendant York's position that this Court can determine summary judgment by listening to a recording is simply not the case, as the recorded interview was only a small portion of the Defendants' efforts to fabricate Helton's statement.

While Defendant Pickard denies Helton's allegations of fabrication, falsification, and promises of consideration, those disputes are simply not appropriate to resolve at the summary judgment phase.  *See* Dckt. No. 179-1 at 30.  Indeed, Defendants' denials are up to the jury to decide.  Finally, Defendant Pickard's attempt to minimize his involvement in the underlying investigation or creating Helton's fabricated statement is likewise without merit.  As is discussed *supra*, Defendant Pickard's involvement in the Mills' investigation was extensive – as was his involvement in fabricating Mr. Helton's statement.  Given that an "official satisfies the personal responsibility requirement of § 1983 if she acts or fails to act with a deliberate or reckless disregard of plaintiff's constitutional rights," *Fillmore v. Page*, 358 F.3d 496, 506 (7th Cir. 2004), "or if the conduct causing the constitutional deprivation occurs at her direction or with her knowledge and consent," *Crowder v. Lash*, 687 F.2d 996, 1005 (7th Cir. 1982).  Defendant

Pickard's attempts to minimize his role in th4e investigation fail. Viewing the evidence and inferences in Plaintiffs' favor, a reasonable jury could conclude that is exactly what happened here.

### a. Defendant York's Comingling of Unrelated Constitutional Torts is Similarly Without Merit

Defendant York next attempts to interject a voluntariness standard into this Court's analysis of Plaintiffs' fabrication claim. *See* Dckt. No. 180-23 at 28. In doing so, Defendant York argues "Section 1983 precedent generally appears to borrow from the due process voluntariness standard to evaluate whether witness statements were sufficiently induced or coerced to support liability." *Id.* Here, Defendant York confuses Plaintiffs' fabrication claim with unrelated constitutional torts. In doing so, Defendant York relies on a litany of cases addressing Fifth Amendment due process violations in situations where individuals allege that coercive interrogation tactics caused false confessions. *Id.* at 28-29. Put simply, these cases are completely inapplicable to Plaintiffs' claims in this case. *Id.* As is demonstrated above, no Sixth Circuit case has interjected a Fifth Amendment voluntariness standard into a fabrication claim, which is perhaps why Defendant York does not cite a single case from this Circuit when discussing these issues.

In this litigation, Plaintiffs have not alleged substantive due process claims. Rather, Plaintiffs' fabrication of evidence claims merely alleges – and the record aptly demonstrates – that the Defendants knowingly or with reckless disregard manufactured false or fabricated statements that could have affected the jury. While Defendants methods of fabrication included coercive questioning and various inducements, that evidence is simply for a jury to consider when determining whether Plaintiffs meet the first element of their fabrication claim. Plaintiffs have not lodged – nor could they – separate due process claims for the interrogation practices

used with third-party witnesses. As a result, Defendant York's interjection of law relating to false confession cases is wholly inapplicable.

### iii.    A Reasonable Jury Could Conclude That Defendant York Fabricated Amber Simpson's Statement

A reasonable jury could easily conclude that Defendant York fabricated Amber Simpson's statement. See Dckt. No. 180-23 at 30. Even Defendant York acknowledges there are genuine disputes of material fact as Amber Simpson testified at her deposition that her statement was false, fabricated, and manufactured by Defendant York in exchange for promises of consideration. PSOF ¶¶ 95-105. Defendant York readily admits that he made promises of consideration, spoke to Ms. Simpson prior to turning on a recorder, and did not recall if he stopped the recording. PSOF ¶¶ 96, 102-103. Yet, as with Helton, Defendant York's brief: (1) declines to discuss the fabrication that occurred prior to the recorder being turned on; (2) ignores the allegations of fabrication when the recorder is turned off; (3) and then asks this Court to resolve the material disputes of fact in his favor – and against Plaintiffs, the non-moving parties – due to his interpretation of an incomplete audio recording. *See* Dckt. No. 180-23 at 30-32. As the Court will see, Defendant York's argument is patently without merit and should be rejected.

Prior to addressing Defendant York's sensational view of a six-minute audio-recording, Plaintiffs present this Court with the fulsome record of Ms. Simpson's fabricated statement. At her recent deposition, Ms. Simpson explained that Mr. Taylor never confessed to her about the death of Ms. Mills. PSOF ¶ 95. Yet, Defendant York appeared at Ms. Simpson's home in March 2012. PSOF ¶ 96. After arriving, Defendant York informed Ms. Simpson's mother that he would charge Amber Simpson with "withholding evidence" unless Amber gave a statement against Mr. Taylor; he also revealed that a reward was available in exchange for her daughter's cooperation. *Id.* Defendant York does not deny informing Simpson's family about a reward. *Id.*

Thereafter, Defendant York met Ms. Simpson at her high school on March 13, 2012 - without any request or notification that she had information relating to the underlying investigation. PSOF ¶ 97. Prior to turning on a recorder, Defendant York told Ms. Simpson that she "could be charged…that he could get my brother out on the manufacturing charge that he had caught…and was telling me about a reward being offered by the family that he could get – that he could get to me." PSOF ¶ 98. Specifically, Defendant York made it clear that Ms. Simpson would be given a $10,000 reward in exchange for telling Defendant York what he wanted to hear. *Id.* Although Ms. Simpson admits that the promise regarding her brother had little effect, the threat of criminal charges and the promise of reward money proved dispositive. *Id.*

While the recorder was turned off, Defendant York fed information to Ms. Simpson that implicated Plaintiffs in the murder. PSOF ¶ 99. Thereafter, Defendant York "then turn[ed] the recorder" on so that she would repeat the story he had just fed her. PSOF ¶¶ 99-100. Ms. Simpson further claimed that Defendant York would "stop the recorder, turn it on and off, and I do remember he's the one, while the recorder was off, would give me certain details to say and pretty much tell me to say it in my own words when the recorder was turned back on." PSOF ¶ 100. Prior to meeting with Defendant York, Ms. Simpson "had no clue" of any information that implicated Plaintiffs – or anyone for that matter – in the murder of Ms. Mills. PSOF ¶ 101. In fact, the only details Ms. Simpson knew of the murder were ones that came from Defendant York. *Id.*

A reasonable jury could easily infer that Defendant York fabricated the statement for Simpson using information that was already in the investigative file and that he did so knowing the statement was false or had a reckless disregard for the truth when obtaining it. In fact,

Defendant York does not argue either of these points, and as such, they are waived. *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008); *see also Novosteel SA v. United States*, 284 F.3d at 1261, 1274 (Fed. Cir. 2002)(finding that plaintiff failed to preserve an issue for review by not presenting it in its principal summary judgment brief and raising it for the first time in its reply brief).

### a. Defendant York's Representation of His Interaction with Amber Simpson is Contrary to the Actual Record

Because a genuine dispute of material fact exists, Defendant York ignores his entire deposition testimony, only addresses a portion of Ms. Simpson's testimony, and inaccurately describes the six-minute audio recording. *See* Dckt. No. 180-23 at 30-31. While doing so, Defendant York casually claims that "there is no genuine dispute of fact for summary judgment purposes, however because Simpson's conflicting version of events is blatantly contracted[10] by the recording itself and demonstrably false." *See* Dckt. No. 180-23 at 30. Finally, the cases relied upon by Defendant York actually prove that a jury is left to resolved whether Defendant York fabricated Ms. Simpson's statement.

First, Defendant York's argument completely ignores that he confessed to speaking to Ms. Simpson prior to turning on the recorder and did not recall what he told her. *Ex.* 2, York Dep. Tr. at 115. Defendant York likewise ignores the portion of Ms. Simpson's deposition where she testified that she was provided information by Defendant York prior to the recorder being turned on. PSOF ¶¶ 99-101. Given this, a reasonable jury could easily find that Defendant York fabricated Ms. Simpson's statement by telling her what to repeat before the recorder was ever turned on.

---

[10] Plaintiffs assume Defendant York meant to write contradicted.

Ignoring this, Defendant York's brief spends an inordinate amount of time attempting to establish that the audio recorder was never stopped until the completion of the interview. *See* Dckt. No. 180-23 at 30-32. Fatal to Defendant York's legal argument is his actual deposition testimony on this exact issue. The following inquiry illustrates just how frivolous his argument is:

Q: How many times did you stop the recorder when you took Ms. Simpson's statement?

A: I do not remember.

Q: Okay. You do not deny stopping the recorder, correct?

A: No

Q: Okay. And you also don't have an end time at the end of that statement, correct?

A: Yes.

Q: So you have no idea the quantity of times that you stopped the recorder while you were interviewing her, correct?

A: I don't remember any, but no.

Q: Okay. Do you remember what was said to Ms. Simpson by you when you stopped the recorder?

A: It's the same answer I said before. I don't remember exactly what was sa*Id.*

Q: From the time that you began that statement, after beginning the statement before ending it, you stopped the recorder and had conversations with Amber Simpson, correct?

A: Oh, during? I do not remember ever stopping. I don't remember that.

Q: You have no recollection, right?

A: No

Q: You're not denying that it happened, just don't remember, correct?

A: That – that is correct.

*Ex.* 2, York Dep. Tr. at 121-123.

Given Defendant York's own admissions, a reasonable jury could easily find that Ms. Simpson's version of events is true.  And, as indicated above, Defendant York has already testified under oath that he does not deny stopping the recorder to have conversations with Ms. Simpson. Thus, he could not change his testimony to deny Ms. Simpson's allegations at trial without significantly impeaching himself, or worse yet, committing perjury.

Several additional pieces of evidence corroborate Ms. Simpson's recollection of events and fill in the gaps for Defendant York's alleged memory failures.  First, although Defendant York documents the time that the recording begins, there is nothing documenting the end. *Ex.* 51, Amber Simpson Recording at PL-9652; *Ex.* 2, York Dep. Tr. at 119, 121.  Second, while Ms. Simpson testified that she was with Defendant York for around an hour, the audio-recording itself is incredibly short – just six minutes – corroborating Ms. Simpson's position that Defendant York fed her information when the recorder was stopped.  *Ex.* 49, Simpson Dep. Tr. at 50.  Third, the recording repeatedly includes moments of dead space where Defendant York could have been stopped and started the recording without any apparent distortion.  *Ex.* 51, Amber Simpson Recording at PL-9652.  Fourth, as is discussed *supra*, at least one other witness, Donna Mills, claims that Defendant York used the same tactic – of stopping and starting the recording device - when fabricating her daughter's statement.  PSOF ¶¶ 118-123.  And finally, instead of stopping and starting the recording – a reasonable jury could find that when Ms. Simpson testified that Defendant York turned the recorder on and off – and then would provide her the information to repeat – Defendant York could have instead deleted the recording and started all over.  Thus, the produced recording may in fact have just been the last segment of a much longer interaction.  This, too, would be consistent with Ms. Simpson's memory that her

interactions with Defendant York lasted "maybe an hour" contrasted with the disclosed recorded statement that is a mere six minutes. These inferences, all of which must be taken in Plaintiffs' favor at this stage of the litigation, prove fatal to Defendant York's argument that the recording itself is uncontested proof that dissolves a genuine issue of material fact. Ms. Simpson's version of events is for a jury to decide and not for this Court to resolve at summary judgment.

> **b. The Cases Relied Upon by Defendant York Illustrate that Ms. Simpson's Testimony is for a Jury to Decide and Inappropriate for This Court to Resolve at Summary Judgment**

The cases cited by Defendant York only prove that Plaintiffs are (again) entitled to a jury trial on their fabrication claim. *See* Dckt. No. 180-23 at 31-32. First, Defendant York points to *Scott v. Harris* as an example of an instance where summary judgment was appropriate if a different story was blatantly contradicted by objective evidence. *See* Dckt. No. 180-23 at 31. In *Scott*, the Supreme Court was presented with a case where a high-speed pursuit between law enforcement and an evader resulted in a claim of excessive force. *Scott v. Harris,* 550 U.S. 372, 379 (2007). The Court recognized in *Scott* that the "existence in the record of a videotape capturing the events in question" was significant at the summary judgment phase as "[t]here are no allegations or indications that this videotape was doctored or altered in any way, nor any contention that what it depicts differs from what actually happened." *Id.* at 379. After viewing the entire unaltered videotape, the Supreme Court concluded that "when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts..." *Id.* at 380. Given the record discussed above, *Scott* is completely distinguishable.

Unlike *Scott*, in this case there are "allegations or indications that this [tape] was doctored or altered in any way" and that "what it depicts differs from what actually happened." Amber

Simpson testified under oath that Defendant York fabricated her statement and that he began doing so prior to a recorder ever being turned on.  PSOF ¶¶ 95-103. Simpson, however, further testified that Defendant York was touching the recording device during the meeting and she assumed that he was pausing it.  PSOF ¶ 100. Defendant York readily admits to speaking with Simpson prior to turning on a recorder and does not deny turning the recorder off and on during the interview.  PSOF ¶¶ 102-103.  This Court's inquiry can frankly end here.  Given this, a reasonable jury could easily determine that Defendant York: (1) fabricated Simpson's statement prior to turning on a recorder; (2) paused the recorded device to feed information to Simpson as she testified to at her deposition and as Defendant York claimed to not remember at his; or (3) destroyed the prior audio-recordings when he fiddled with his device, and thus, only produced the final segment.  Each of these theories warrants a trial under *Scott*.

Curiously, Defendant York next cites to *Coble v. City of White House, Tenn.*, a Sixth Circuit case that actually reversed the grant of summary judgment when the district court ruled that an audio-recording blatantly contradicted plaintiff's version of events.  Contrary to Defendant York's protestation – namely, that you cannot hear him pause the device – the Sixth Circuit ruled in *Coble* that "[t]he lack of sound on an audio recording cannot be reliably used to discount Coble's testimony. Many factors could affect what sounds are recorded, including the volume of the sound, the nature of the activity at issue, the location of the microphone, whether the microphone was on or off, and whether the microphone was covered."  *Coble v. City of White House, Tenn.*, 634 F.3d 865, 869 (6th Cir. 2011).  Like *Coble*, Plaintiffs do "not merely characterize the recording differently" instead, Simpson "insists that the facts differed from what was recorded."  *Id.*  Again, Simpson testified that Defendant York stopped the recording and fed her information and began fabricating her statement before turning on the recorder.  PSOF ¶ 100.

And further, a reasonable jury could clearly find that Defendant York was not stopping and starting the recorder, as Simpson recalls, but rather, deleting the prior recording and starting anew.  Of course, Defendant York does not deny nor recall whether he turned the recorder on and off while speaking to Simpson, and in addition, readily acknowledges to speaking to Simpson prior to turning the recorder on.  PSOF ¶¶ 102-103.  Finally, the audio recording itself reveals several pauses where the recording could have paused and started without any discernable notification.[11]

Given all of this, Defendant York has completely failed to demonstrate how this record could meet the incredibly high bar set forth in *Scott* that entitles him to summary judgment only when a witness's version of events is so "blatantly contradicted by the record, so that no reasonable jury could believe it…"  That surely is not the case here with regard to Amber Simpson, whose statement Defendant York began fabricating before a recording device was ever turned on.  Plaintiffs are entitled to a trial against Defendant York regarding his fabrication of Simpson's statement.

### iv.    A Reasonable Jury Could Conclude That Defendant York Fabricated Joe King's Statement

A reasonable jury could likewise conclude that Defendant York fabricated Joe King's statement.  PSOF ¶¶ 89-94.  Defendant York dedicates a single paragraph of his brief to the fabrication of Joe King's statement.  *See* Dckt. No. 180-23 at 27.  Defendant York's decision to avoid Mr. King's deposition testimony is telling.  As is discussed *supra* in Section XVII(iv), Defendant York had two interactions with Mr. King that resulted in a fabricated statement implicating Plaintiffs in the Mills' homicide.  PSOF ¶¶ 89-94.  At his deposition, Mr. King

---

[11] Defendant York's cites two cases, one unreported out of district and another in a completely different circuit, for the proposition that continuous and uninterrupted audio is sufficient to reject witness testimony.  *See* Dckt. No. 180-23 at 32.  As demonstrated *supra*, neither case is applicable given the record in this case.  And of course, neither case controls.

revealed how Defendant York fabricated that statement. *Id.* For his part, Defendant York admits at his own deposition that his investigation proved that critical portions of King's statement were false. PSOF ¶¶ 184-185. Of course, although Mr. King's statement was presented to the grand jury, those jurors never heard that the statement was fabricated or that Defendant York's own investigation proved the statement was false. *Id.* Given these admissions, Defendant York apparently tries to side-step the issue altogether through a cursory one-paragraph response.

The fabrication of Mr. King's statement took place over the course of two-days. PSOF ¶¶ 89-94. On the second day, June 23, 2011, Defendant York appeared at the Courthouse to question Mr. King about the murder of Katherine Mills. PSOF ¶ 91. At the onset, King informed Defendant York that he did not have any knowledge regarding the Mills' homicide. *Id.* Ignoring this, Defendant York set out to fabricate Mr. King's statement by providing him with all the information he wanted him to repeat – as he had done with Mr. Helton. PSOF ¶ 92. At his deposition, King was presented with Defendant York's report and denied providing any of the information that implicated Plaintiffs in the murder of Katherine Mills. PSOF ¶ 94. Instead, King revealed that the report reflects "what York provided to me and was trying to get me to agree with – with this stuff…and then put it down like – like I'd said it. And that's what –that's what was outrageous to me, so." *Id.* The information attributed to Mr. King in the report was false and fabricated by Defendant York. PSOF ¶¶ 89-94.

Ignoring this, Defendant York argues in his brief that he "denies either fabricating the information from King or knowing it was untrue." See Dckt. No. 180-23 at 27. Defendant York's own deposition testimony demonstrates the opposite.[12] There, Defendant York repeatedly admitted that he knew portions of Mr. King's statement were false because he vetted

---

[12] Defendant York's own brief establishes why a trial is necessary – again, a genuine dispute of material facts entitles Plaintiffs to a trial, not Defendants to summary judgment.

the information. *Ex.* 2, York Dep. Tr. at 284-285; *see also* 287 ("I knew that he was incorrect on

that day…").  According to Defendant York, "the part about her trying to fill a prescription on

12-19 at the Pineville Walgreen's was inaccurate and actually it was on 12-20."  PSOF ¶ 185.

Even though Defendant York knew that the statement from Mr. King was false, he did not

inform the Grand Jury that his own investigation revealed the falsity of such information.  *Id.*

Further, Defendant York begs this Court to ignore the "potential dispute," claiming that

"the additional information attributed to King is not material to probable cause…"  *See* Dckt. No.

180-23 at 27.  Here, Defendant York conveniently avoids the summary judgment standard and

the devastating effect of  King's fabricated statement.  To be clear, Defendant York's fabricated

report claims that:  (1) on December 19, 2010, Ms. Hoskins and Mr. Lester informed King

"about robbing an old lady, that was William's ex-mother-in-law" and that "Amanda told him

she was going to dress up like a home health nurse and use that as her way in to rob her."; (2) on

December 20, 2010, King unsuccessfully attempted to call Ms. Hoskins after seeing that Ms.

Mills was found dead on the news; (3) Mr. King spoke to Ms. Hoskins who revealed that she had

come into $10,000 from a settlement and was purchasing items at the County Gun and Pawn;

and (4) Ms. Hoskins was having an affair with Dr. Warren. PSOF ¶ 93.

As demonstrated, the fabricated statement attributed to Joe King was material to the

deprivation of Plaintiffs' liberty as it provided an alleged motive for Plaintiffs to commit the

murder; a plan to commit the crime (which Plaintiff denies ever having made any comments);

and a supposed admission from Plaintiff Hoskins that she came into the same amount of money

that was allegedly stolen from Ms. Mills during her murder.  It also attempts to impeach Ms.

Hoskins' alibi by falsely representing that she was having an affair with Doctor Warren – an

otherwise unimpeachable witness.  There is no legitimate dispute that this evidence was

presented to the grand jury and was used to deprive Plaintiffs of their liberty. Defendant York's refusal to meaningfully address this evidence in his summary judgment motion – and instead encourage this Court to resolve genuine disputes of material facts – is an implicit admission that a trial is warranted. Given the record above, a reasonable jury could easily find that Defendant York knew the statement was false at the time he manufactured it or acted with reckless disregard for the truth. Again, a trial is warranted on Plaintiffs' fabrication claim.

> **v.  A Reasonable Jury Could Conclude That Defendants York and Mefford Fabricated Daniel Wilson's Statement**

A reasonable jury could likewise conclude that Defendants York and Mefford fabricated a statement for Daniel Wilson on July 18, 2012 that continued the deprivation of Plaintiffs' liberty.

### a. Defendant York's Cursory Arguments Should be Rejected

Yet again, Defendant York dedicates a single paragraph to the fabrication of Wilson's statement. *See* Dckt. No. 180-23 at 32. There, Defendant York claims that "Plaintiffs presume Wilson's statement was false and allege York fabricated it." *Id.* However, Plaintiffs do not presume that Mr. Wilson's statement was false and fabricated, instead Plaintiffs appropriately rely upon what Mr. Wilson testified to at his deposition. At his deposition, Wilson testified that the statements attributed to him that implicated Plaintiffs in the murder were false and fabricated. PSOF ¶ 129. Given this, Plaintiffs are again entitled to a jury trial on their fabrication of evidence claim against Defendant York.

Next, Defendant York argues that any "potential dispute, however, is immaterial because the information from Wilson was after the preliminary hearing and grand jury probable cause determination." *See* Dckt. No. 180-23 at 32. Defendant York's sole argument is easily refuted by binding precedent. Although Mr. Wilson's statement was fabricated after the initiation of

charges, the Sixth Circuit has repeatedly held that fabricated evidence can form the basis of a

constitutional tort if such evidence was material to the continued deprivation of a plaintiff's

liberty. *Gregory v. City of Louisville*, 444 F.3d 725, 749 (6th Cir. 2006). Here, it is undisputed

that Mr. Wilson's statement was maintained as part of the Commonwealth Attorney's file, and

thus, a triable issue exists as to whether this fabrication was material to the continued deprivation

of Plaintiffs' liberty. *Id.*

### b. Defendant Mefford's Argument Should Be Rejected as Well

Given the record, Plaintiffs are likewise entitled to a jury trial against Defendant Mefford

for fabrication. In his brief, Defendant Mefford argues that he did not review Mr. Wilson's

statement until the lawsuit was filed and because he was not the lead investigator had no

obligation to document exculpatory or impeachment information in a report. *See* Dckt. No. 178

at 17. What Defendant Mefford fails to discuss was that he did ultimately create a report on

April 6, 2013 that documents his participation in the Wilson interview on July 18, 2012. PSOF ¶

134. Defendant Mefford's report does not document the promises of consideration nor the

fabrication of Mr. Wilson's statement. *Id.* Given this, whether Defendant Mefford had an

affirmative obligation to document the Wilson interview is irrelevant. He did document his

meeting with Mr. Wilson – he just failed to disclose that Wilson was promised consideration

during that meeting and that a statement was fabricated from it. PSOF ¶ 134.

Even more, Defendant Mefford does not deny the fabrication allegations by Mr. Wilson,

rather, he claims to not recall what Defendant York told Wilson nor what Wilson told the

Defendants. PSOF ¶ 132. Importantly, Defendant Mefford never left the room while Defendant

York spoke to Wilson and admits that there was nothing Defendant York did with which he

disagreed. *Id.* Finally, Defendant Mefford assumed that Defendant York drafted a report

documenting Wilson's statement that would be used in the criminal prosecution and never took any steps to stop the initiation of charges against Plaintiffs. PSOF ¶ 133.  As established, although Defendant York drafted the fabricated report, Defendant Mefford was present for the fabrication of the statement, failed to intervene, and then declined to document the misconduct that happened in his presence when later drafting his own report.  PSOF ¶¶ 126-134.  For these reasons, Plaintiffs fabrication claim against Defendants Mefford and York must likewise be presented to a jury.

### vi.    A Reasonable Jury Could Conclude That Defendant York Fabricated Ms. Hoskins' Medical Records

Next, Plaintiffs have compiled a record demonstrating that Defendant York fabricated and tampered with Ms. Hoskins' medical records.   PSOF ¶¶ 79-84.  Although Defendant York dedicates three paragraphs to this issue – only two sentences are supported by citation to the factual record.  See Dckt. No. 180-23 at 23-24.  As this Court is well-aware, factual assertions unsupported by citation must be given no weight.  *Fed. R. Civ. P. 56(e); see also Dubbs v. GCA Servs. Grp. of N. Carolina, Inc.*, No. 1:16-CV-498, 2018 WL 3371054, at *3 (E.D. Tenn. July 9, 2018).  As is discussed below, Defendant York's remaining assertions are not only unsupported by citation, but they are in fact flatly contradicted by the actual record in this case.

### a.  The Record Illustrates that Defendant York Tampered With And Fabricated Ms. Hoskins' Medical Records

In order to support the fabricated statement he obtained from Allen Helton, Defendant York obtained - and altered - Ms. Hoskins' medical records. PSOF ¶¶ 79-84.  The verified medical records from Ms. Hoskins visit to Dr. Warrens' office at the Hope Medical Center on December 20, 2010, illustrate that Ms. Hoskins arrived at the office at 11:54 a.m.

CC (Appt time: 11:30 AM) (Arrival time: 11:54 AM) pulse ox:98%  Suboxone check up

The medical records- in their original condition, free of markings – prove that Ms. Hoskins was at the doctor at noon on December 20, 2010, and likewise could not have confessed to Helton at Simpson's home "around 1200 hrs," as Defendant York's fabricated Helton report claims.   PSOF ¶ 76.

The medical records that Defendant York (and separately, Ms. Hoskins' defense team) obtained look dramatically different, however, than those he provided to the Knox County Commonwealth Attorney on November 28, 2012.



*Ex.* 44, Hoskins Confidential Fabricated Medical Record at PL 14301.

Of significance is the time that Ms. Hoskins appeared at Dr. Warren's office on December 20, 2010.  The records that Defendant York provided to the Commonwealth's Attorney, Jackie Steele, appear as if the time that Ms. Hoskins arrived at the doctor's appointment was "12:54" a.m. When confronted with the doctored time, Defendant York hypothesized that 11:54 a.m. was changed to 12:54 because "this is a fax copy…[and] a little bit more smudged…" PSOF ¶ 83.  A comparison of the two medical records illustrates that the remaining numbers are not distorted in any way.  In any event, Defendant York admits to writing on them prior to sending them to the Commonwealth for disclosure in the underlying case. PSOF ¶ 84.  When asked whether he underlined the times of the appointment, circled the CC, and drew a star next to the altered arrival time – Defendant York retorted "I don't remember doing it. I'm

not saying I didn't."  PSOF ¶ 83.  As demonstrated, this is a factual dispute that only a jury can decide.

### b.  Defendant York's Arguments Regarding the Medical Records are Without Merit and For a Jury to Decide

Next, Defendant York's brief makes a number of factual claims without any reference to the record whatsoever.  For instance, Defendant York asserts that "[a] clean copy of the doctor's office documentation reflecting the 11:54 arrival time was made part of the KSP investigation file…"  *See* Dckt. No. 180-23 at 23.  On this score, Defendant York is correct - a clean copy of Ms. Hoskins' medical records was made part of the KSP investigative file.  *Ex.* 26, KSP Investigative File at KSP 500.  On that clean copy, "10-10-1058" and "4/856" is written towards the bottom of the page in handwriting.  *Id.*  Importantly, the clean copy does not include any writing near the time that Ms. Hoskins at her doctor's appointment.  *Id.*  Defendant York, however, next argues:

> Once the prosecution of Plaintiffs was underway, the KSP investigation file was made available to the office of the Commonwealth Attorney Steele, and Steele's office disclosed the KSP investigation file to Plaintiffs' criminal defense attorneys.  Document production in discovery for this case confirms the initial disclosures produced by Steele and received by Plaintiffs' criminal defense attorneys included both a clean copy of the doctor's office documentation…and York's separately prepared report referencing her 11:54 arrival time.  The disclosures were made at the beginning of the prosecution.

*See* Dckt. No. 180-23 at 23.

Once again, Defendant York fails to cite to the record for this proposition because no such citation exists.  In any event, Defendant York's argument is for trial and not to be resolved at summary judgment.  A reasonable jury could easily conclude that Defendant York tampered with Ms. Hoskins' medical records to bolster his fabricated statement from Allen Helton.  If Defendant York wishes to blame the fax machine for the so-called distortion on this particular

record – and curiously, none of the others – that is simply a genuine issue of material of fact for a jury to decide.

      **vii.**   **A Reasonable Jury Could Conclude that Defendant York Fabricated Two Additional Statements After the Initiation of Charges as His Case Against Plaintiffs was Falling Apart**

As is discussed below, a reasonable jury could also conclude that Defendant York fabricated statements for Robert Beach and Mikey Bruner when his case against Plaintiffs was falling apart. Admittedly, these fabricated statements are not as critical to this Court's analysis as the fabricated statements discussed above. Neither of these statements were used to initiate charges nor formed the basis of probable cause. *Ex.* 2, York Dep. Tr. at 373, 377-378. On this score, even Defendant York's own brief concedes that statements obtained after "the preliminary hearing and grand jury probable cause determination" are "immaterial" for this Court's analysis of the Plaintiffs' claims.[13] *See* Dckt. No. 180-23 at 32. Regardless, because these statements are potentially relevant to the *continuation* of Plaintiffs' deprivation of liberty, Plaintiffs briefly address the false and fabricated statements that Defendant York manufactured for Mikey Bruner and Robert Beach in 2014 and 2015 respectively.

      **a.**   **A Reasonable Jury Could Conclude that Defendant York Fabricated Robert Beach's February 26, 2014 Statement**

As his case was falling apart, Defendant York obtained a statement from Robert Beach on February 26, 2014. PSOF ¶ 191. Mr. Beach's recorded statement lasts all of two minutes and fifty-four seconds. *Id.* Although Mr. Beach avoided his deposition, significant evidence demonstrates that his statement, like the others, was false and fabricated. Importantly, both Beach and his sister Margaret Polly are witnesses on Plaintiffs' Rule 26(a)(1) disclosures, and as

---

[13] Defendant York makes this argument in relation to the fabricated statement obtained from Daniel Wilson on July 18, 2012. Under Defendant York's argument, the April 29, 2015 statement from Bruner and Beach would be likewise irrelevant for the determination of Plaintiffs' claims.

such, a jury will be able to easily find that the two-minute statement described below was fabricated. *Ex.* 97, Plaintiffs Rule 26(a)(1) Disclosures.

First, the recording itself demonstrates that a majority of the limited information in Beach's statement came from Defendant York's mouth and not Beach's. PSOF ¶ 192. Second, although the recorded statement from Mr. Beach lasted a total of two minutes and fifty-four seconds, multiple witnesses have testified that Defendant York was with Beach for approximately 30-45 minutes. PSOF ¶¶ 193-194. Further, Defendant Johnson does not remember any specific details of the conversation that occurred with Beach prior to a recorder being turned on. PSOF ¶ 194. With reasonable inferences in Plaintiffs' favor, a jury could easily come to the conclusion that Defendant York fabricated Beach's statement in that unaccounted for period of time.

Third, the record outside of that brief two-minute recording illustrates that Defendant York fabricated Beach's statement. Two days prior to meeting with Defendant York, Mr. Beach had a recorded telephone conversation with his sister, Margaret Polly, on February 24, 2014 that revealed: (1) his lack of knowledge regarding Mr. Taylor and any of the information contained in his ultimate statement; (2) that detectives had previously gone to the jail in an attempt to obtain statements against Mr. Taylor, though they declined to document such actions in any investigative reports; and (3) that the detectives drove to the residence of Margaret Polly first to try to curry Mr. Beach's cooperation.[14] PSOF ¶ 195.

---

[14] Defendant York's brief asserts that "[a]s Beach was never deposed, admissible evidence on summary judgment is lacking to create a dispute of fact based on Plaintiffs' version of events." *See* Dckt. No. 190-23 at 33. As is demonstrated above and below, a wealth of evidence exists demonstrating that Beach's statement was false and fabricated – especially given that all reasonable inferences must be given in favor of the non-movant at this stage. Next, although Rule 56 requires the non-moving party to demonstrate genuine material facts, that does "not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). On the merits, given that Robert Beach, Margaret Polly, and Jeff Henderson (the

In that February 24, 2014 recording, Ms. Polly asks Beach if "anybody been up there to talk to you…like detectives…or U.S. Marshalls?" PSOF ¶ 195. In response, Beach pondered aloud, "what would they want to talk to me for?" *Id.* Ms. Polly then informed Beach that the detectives wanted to talk about "something about when you was in another county you had wrote them and told them you know about this man that's fixin to come up to trial and he killed an 80 year-old woman and robbed her and killed her." *Id.* In response, Beach confessed, "Oh I don't nothing about that. They come and asked me about that before. They asked everybody that was in the cell with that guy about that stuff." *Id.* Beach revealed that the Detectives had "come and offered stuff like that and was trying to get some people to say something about something and I don't even know nothing about the case. It's just people that was in the cell with this guy…that guy is getting ready to go to trial and stuff and they are trying to [inaudible]." *Id.* This recorded conversation proves the falsity of the February 26, 2014 statement obtained by Defendant York.

Fourth, Beach called his sister on March 1, 2014 after he gave his two-minute statement to Defendant York and revealed that promises of consideration were made prior to Defendant York obtaining Beach's cooperation. PSOF ¶ 196. Finally, Mr. Steele had a conversation with Beach on June 23, 2016 where he recanted the statement provided to Defendant York. PSOF ¶ 197. Mr. Steele characterized this recantation as Beach's "version of the events had changed." *Id.* As is discussed below, Defendants withheld all their misconduct from the Commonwealth in an effort to frame Plaintiffs. With the reasonable inferences in Plaintiffs' favor, as they must be at this stage, a reasonable jury could easily conclude that Defendant York fabricated Beach's statement in the unrecorded portions of the interview and that the fabrication continued the

---

records custodian for Branchville Correctional Center) are all listed as witnesses on Plaintiffs' Rule 26(a)(1) disclosure, Plaintiffs will be able to easily prove up the record discussed above. Ex. 97, Plaintiffs' Rule 26(a)(1) Disclosures. Finally, the telephone recordings between Beach and Polly are easily authenticated through records retrieved from Branchville Correctional Center. Ex. 72, Beach Call Log at 2.

deprivation of Plaintiffs' liberty.  Given the above, a reasonable jury could likewise easily

conclude that Defendant York fabricated Beach's statement knowing that it was false or acting

with a reckless disregard for the truth when doing so.

### b.  A Reasonable Jury Could Conclude that Defendant York Fabricated Mikey Bruner's April 29, 2015 Statement

Plaintiffs also present this Court with an uncontested record relating to the fabrication of

Mikey Bruner's statement. [15]  Defendant York obtained a statement from Mikey Bruner on April

29, 2015. PSOF ¶ 198.  In that statement, Mr. Bruner claims that Mr. Taylor confessed

involvement to him in "2010, 2011."  *Id.*  Mr. Taylor denies knowing Mr. Bruner and ever

having made such a statement.  *Id.*

Significant evidence indicates that Bruner's statement was false and fabricated.  PSOF ¶¶

198-204. First, like other witnesses, Bruner did not come to law-enforcement with information.

Instead, Defendant York sought him out after repeatedly approaching Bruner's mother "several

times" and "discussed that [Bruner] didn't really have a choice in the matter, you know, that any

– any objection on [his] party could possibly cause [him] to get in trouble if [he] didn't

cooperate, so."  PSOF ¶ 199.  Second, Defendant York declined to record his entire meeting with

Bruner and according to Bruner, "hadn't recorded our entire conversation in the car."  PSOF ¶

200.  Third, Defendant York declined to document any details that would corroborate that

Bruner's statement was false.  PSOF ¶ 201.  For instance, according to Bruner, Defendant York

learned that Bruner was high and had "illicit substances in" his body at the time of his supposed

conversation with Mr. Taylor.  *Id.* Although Mr. Bruner told Defendant York that he was high at

---

[15] Defendant York makes no argument regarding Bruner in relation to any of Plaintiffs' claims.  As such, *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008); *see also Novosteel SA v. United States*, 284 F.3d at 1261, 1274 (Fed. Cir. 2002)(finding that plaintiff failed to preserve an issue for review by not presenting it in its principal summary judgment brief and raising it for the first time in its reply brief).

the time of the alleged conversation with Mr. Taylor, Defendant York declined to document that information in his report. *Id.* He likewise never informed the Prosecutor, Jackie Steele. *Id.* If Steele had learned that Bruner admitted to being intoxicated at the time of the alleged conversation with Taylor, he would have disclosed that to the defense and reevaluated the continuation of charges against Plaintiff Taylor. *Id.*

Fourth, Bruner testified at his deposition that he repeatedly informed York that he couldn't "remember all the details from that night." PSOF ¶ 202. Again, Defendant York declined to document any of this information in his report. *Id.* Finally, Bruner's statement conflicts with all of the physical evidence uncovered in the investigation. PSOF ¶ 203. For instance, Bruner claims that Mr. Taylor confessed that he knocked on the door and "rushed in and tried to take her purse" and that when the "old lady tried to fight back and he hit on the head, took the purse and left her laying." *Id.* Fatal to Bruner's statement is that Ms. Mills was found deceased on her back porch, not inside her home (and certainly not near her front door) where her purse and money were ultimately recovered. Next, Mr. Bruner claims that Mr. Taylor told him "they got away with a couple hundred dollars." *Id.* Again, Defendant York's investigation proved that approximately twelve-thousand dollars being stolen from Ms. Mills, not a few hundred. Further, Mr. Bruner claims that "Jonathan told him they did it at night." *Id.* Again, Defendants' theory of the investigation was that Ms. Mills was killed in the morning hours of December 20, 2010. *Id.* Almost every aspect of Bruner's statement is in conflict with the Defendants' theory of the investigation and the physical evidence that exists in the case. *Id.* Given the above, the Commonwealth Attorney believed Bruner's statement was not credible enough to form probable cause against Plaintiffs as Jackie Steele dismissed the charges without Bruner recanting. PSOF ¶ 204.

With the inferences in Plaintiffs' favor, a reasonable jury could easily conclude that Defendant York fabricated Bruner's statement: (1) Defendant York declined to record the entire conversation with Bruner; (2) Bruner's statement was obtained in 2015, more than four to five years after the conversation took place; (3) Taylor denies ever having made such a statement; (4) Bruner claims that Mr. Taylor confessed to killing the old woman whose granddaughter is Amanda Hoskins (Amanda Hoskins is not related to Ms. Mills) .  Further, a reasonable jury could easily conclude that Defendant York knew the statement was false at the time he gave it, as Bruner's recitation was that Taylor committed the murder at the front door of Ms. Mills' home, a completely different theory than Defendant York was working under.

### viii.    A Summary of Different Evidence Supporting Plaintiffs' Fabrication Claim

Given the above, viewing the evidence and inference is Plaintiffs' favor, there is more than enough evidence for a reasonable jury could conclude that:

- Defendants York and Pickard fabricated a statement for Kayla Mills.  See Section XVII(B)(i).

- Defendants York, Pickard, Broughton, and Mefford fabricated a statement for Allen Helton.  See Section XVII(B)(ii).

- Defendants York and Mefford fabricated a statement for Daniel Wilson.  See Section XVII(B)(v).

- Defendant York fabricated statements for Amber Simpson, Christy Branson,[16] Joe King, Robert Beach and Mikey Bruner. See Section XVII(B)(iii).

- Defendant York fabricated Ms. Hoskins' medical records.  See Section XVII(B)(vi).

---

[16] A reasonable jury could likewise conclude that Defendant York also fabricated Christy Branson's statement. PSOF ¶¶85-88. Before interviewing Christy Branson, Defendant York spoke with her off the record. PSOF ¶85. He did not document what he told her prior to turning on the recorder. *Id.* Defendant York subsequently drafted a report stating that Branson told him that Hoskins had confessed to her. *Id.* Interestingly, Ms. Branson's false statement claims that Joe King was the alleged killer, something that no other witness corroborated. PSOF ¶86. Importantly, Ms. Branson has no recollection of Ms. Hoskins ever confessing to her – nor does she remember providing York with any of the details contained in the report he drafted. *Id.*

Because fabricated evidence can form the basis of a constitutional tort if such evidence was material to the initiation of charges and/or the continued deprivation of a plaintiffs' liberty, Plaintiffs are deserving of a trial on this claim. *Gregory v. City of Louisville*, 444 F.3d 725, 749 (6th Cir. 2006).

## XVIII. A TRIAL IS NECESSARY ON PLAINTIFFS' MALICIOUS PROSECUTION CLAIMS

Plaintiffs likewise present this Court with a robust record entitling them to a trial against Defendants York, Pickard, Broughton and Mefford for malicious prosecution. "The Sixth Circuit 'recognize[s] a separate constitutionally cognizable claim of malicious prosecution under the Fourth Amendment,' which 'encompasses wrongful investigation, prosecution, conviction, and incarceration.'" *Sykes v. Anderson*, 625 F.3d. 294, 308 (6th Cir. 2010) *quoting, Barnes v. Wright*, 449 F.3d 709, 715-16 (6th Cir. 2006). To succeed on a malicious-prosecution claim under Section 1983 when the claim is premised on a violation of the Fourth Amendment, Plaintiffs must prove the following elements: First, Plaintiffs must show that a criminal prosecution was initiated and that the Defendants "ma[d]e, influence[d], or participate[d] in the decision to prosecute." *Sykes*, at 308 *quoting Fox v. DeSoto*, 489 F.3d 227, 237 (6th Cir. 2007); *see also McKinley v. City of Mansfield*, 404 F.3d 418, 444 (6th Cir. 2005); *Darrah v. City of Oak Park*, 255 F.3d 301, 312 (6th Cir. 2001); *Skousen v. Brighton High Sch.*, 305 F.3d 520, 529 (6th Cir. 2002). Second, because a § 1983 claim is premised on the violation of a constitutional right, Plaintiffs must show that there was a lack of probable cause for the criminal prosecution. *Id., quoting Fox*, 489 F.3d at 237; *Voyticky*, 412 F.3d at 675. Third, Plaintiffs must show that, "as a consequence of a legal proceeding," Plaintiffs suffered a "deprivation of liberty." *Id., quoting, Johnson v. Knorr*, 477 F.3d 75, 81 (3d Cir. 2007); *See Gregory v. City of Louisville*, 444 F.3d

725, 748-750 (6th Cir. 2006)(discussing the scope of "Fourth Amendment protections…beyond an initial seizure,"  including "continued detention without probable cause"); *cf. Heck v. Humphrey*, 512 U.S. 477, 484, 114 S.Ct. 2361, 129 L.Ed.2d 383 (1994)("[U]nlike the related cause of action for false arrest or imprisonment, [an action for malicious prosecution] permits damages for confinement imposed pursuant to legal process.").  Fourth, the criminal proceeding must have been resolved in the Plaintiffs' favor.  *Id., see also, King v. Harwood,* 852 F.3d 568, at 580 (6th Cir. 2017); *Miller v. Maddox*, 866 F.3d 386, 389 (6th Cir. 2017); *Webb v. United States*, 789 F.3d 647, 659 (6th Cir. 2015).

The Sixth Circuit makes clear that the term "malicious prosecution" is a misnomer because unlike the common-law tort of malicious prosecution, the constitutional tort of malicious prosecution in this Circuit does not require a showing of malice – so it may be more aptly titled "unreasonable prosecutorial seizure." *King,* 852 F.3d at 580; *Sykes,* 625 F.3d at 309-310. Regardless of its title, the Defendants violated Plaintiffs' constitutional rights by contributing and/or continuing the initiation of charges against Plaintiffs without probable cause. Despite the Defendants' arguments otherwise, the record firmly supports each element. As a result, the Plaintiffs are entitled to a trial on their malicious prosecution claim against Defendants York, Pickard, Broughton and Mefford.

### A.  A Reasonable Jury Could Conclude that Defendants' Made, Influenced, or Participated in the Initiation of Charges and/or the Continued Detention of Plaintiffs

The Sixth Circuit holds that "an officer may be responsible for commencing a criminal proceeding against a plaintiff, where the officer made, influenced, or participated in the decision to prosecute." *Sykes,* 625 F.3d 294 at 311, *quoting, Fox,* 489 F.3d at 237; *see also, Sampson v. Vill. Of Mackinaw City,* 685 F.App'x 407, 417 (6th Cir. 2017). Such "influence" can

be based on misstatements…to the prosecutor" or "pressure or influence" over an individual who either made the decision to prosecute or testified at the preliminary hearing. *Sykes,* 625 F.3d at 316. That is satisfied whether the officer's investigatory materials, which were in the prosecutor's file, contained "knowing misstatements," and the prosecutor relied on them in filing criminal charges. *Id.* at 316-17. Plaintiffs do not have to show that the officer spoke to the prosecutor. *Id.*

Additionally, a malicious- prosecution claim is not limited to the "institution of proceedings;" it can also support a claim for 'continued detention without probable cause.'" *Mills v. Barnard,* 869 F.3d 473, 480 (6th Cir. 2017) *quoting, Sanders v. Jones,* 845 F.3d 721, 728 n.4 (6th Cir. 2017), *as amended on denial of rehearing* (March 20, 2017); *see also, Gregory v. City of Louisville,* 444 F.3d 725, 749-50 (6th Cir. 2006). Specifically, a viable malicious prosecution claim exists when Plaintiffs present "some evidence" that the impact of the Defendants' "misstatements and falsehoods in his investigatory materials extended beyond the Plaintiffs' initial arrest and ultimately influenced Plaintiffs' continued detention." *Sykes,* 625 F.3d at 316. Plaintiffs well exceed the standard outlined in *Sykes.*

### i.    Defendant York's Misconduct Led to Both the Initiation of Charges Against and Continued Detention of Defendants

As described throughout, Defendant's York misconduct in the present case is extensive. It includes:

- learning of evidence implicating other suspects, namely Mike Simpson and Allen Helton and ignoring such evidence, PSOF ¶¶ 26-61;

- reaching an agreement to protect Simpson and Helton and frame the Plaintiffs, PSOF ¶¶ 39-42, 59-78;

- coercing and/or threatening numerous witnesses, including, but not limited to: Allen Helton, Kayla Mills, Christy Branson, Amber Simpson, Daniel Wilson, and Jessie Lawson, PSOF ¶¶ 39-42, 59-134;

- fabricating witness statements, such as Joe King among the others described above, *see, Id.;*

- manipulating evidence, including medical records, search warrant affidavits, and the eyewitness identification, PSOF ¶¶ 39-42, 59-152;

- ignoring forensic evidence left on evidence at the scene establishing Plaintiff's innocence, PSOF ¶¶ 15-18;

- destroying and withholding exculpatory evidence; PSOF ¶¶ 39-42, 59-152; 273-276;

- presenting fabricated evidence at the preliminary hearing and grand-jury proceeding, PSOF ¶¶ 159-171;

- concealing all those actions from Prosecutor Steele, PSOF ¶¶ 205-217;

Ignoring the extent of Defendant York's liability, Defendant York states simply that "application of this element to York must comport with his absolute immunity for testimony, which filters the analysis through the above-referenced specialized test form [sic] *Hardwood* [sic]." Dckt. No. 180-23 at 46. Defendant York then "reserve[s] for reply whether Plaintiff can satisfy their burden under that precedent" – refraining from making any argument regarding Defendant York's misconduct and liability for initiating the charges against Plaintiffs. *Id.*

The 2017 opinion in *King v. Harwood* establishes that Defendant York is not entitled to absolute immunity. 852 F.3d at 584. There, the Sixth Circuit compared malicious-prosecution claims based *solely* on an officer's grand-jury testimony, as in *Rehberg v. Paulk,* 566 U.S. 356 (2012), verses malicious-prosecution claims based on an officer's actions "that are prior to, and independent of, his grand-jury testimony" and held that an officer is not afforded absolute immunity for the latter. *King,* 852 F.3d at 586 ("Because King has alleged that Harwood set her prosecution in motion – and that Harwood both sought warrants despite the absence of probable cause *and* made knowing or reckless statements implicating King in his investigative report- King may properly base her malicious-prosecution claim on those by Harwood without

triggering the absolute immunity established by *Rehberg.*")(emphasis added). Here, Defendant York not only testified falsely at the preliminary hearing and grand jury proceedings, but he also made knowing and/or reckless statements in search warrants, altered records, and fabricated witness statements – depriving him of the cloak of absolute immunity.  PSOF ¶¶ 39-190.

Further, there is no question that Defendant York, as the lead investigator in the Mills' homicide, made, influenced, and participated in the decision to initiate charges against the Plaintiffs and to withhold information leading to their continued detention. In *Sykes,* the Sixth Circuit found that this element was met where an officer made misrepresentations and omissions in his application for arrest warrant and investigative report, which were relied on by prosecutors. 625 F.3d at 314-17. In *Miller,* the Sixth Circuit found that an officer influenced the prosecution decision even though the officer "never directly spoke with the prosecutor regarding the case," because the officer swore out the warrant affidavit and was the only witness to testify at the preliminary hearing. 866 F.3d at 390-91. The officer's false statements caused the prosecution to be set in motion.

Here, Defendant York's actions went well beyond the misconduct leading to the decisions to prosecute in *Sykes* and *Miller.* York not only testified falsely at the preliminary hearing and grand jury, but also fabricated statements that were presented to the grand-jury, falsified and made material omissions in warrants, withheld exculpatory evidence from the grand-jury, manipulated physical evidence, ignored viable suspects in the murder, and withheld/concealed all these actions from the prosecutor (and the grand-jury) – much of which Defendant York conceded during his deposition. PSOF ¶¶ 39-190; *see also, Ex*. 2, York Dep. Tr. at 148-149 (admitting he did not document any of the information about Vernon Bennett denying being an alibi witness for Simpson and seeing Simpson driving a blue car in Eastern Ky. on the

date of Mills' death); *Id.* at 47 (admitting he did not document information he gathered from Helton on December 23, 2010 regarding his trip to Florida with Simpson); *Id.* at 203-204 (simply failing to recall whether he fed Helton facts about the crime during his interview with him); *Id.* at 274-276 (documenting the fact that Jessie Lawson failed a polygraph examination in regard to participation in the Mills' homicide); *Id.* at 355 (acknowledging that Crump never identified a specific individual as being who he saw at Ms. Mills' home on the morning of her death – despite York stating specifically in a search warrant affidavit that Crump had identified Simpson); *Ex.* 2, York Dep.Tr. at 219 (failing to recall any investigation he conducted into Helton after learning Helton had failed a polygraph); *Id.* at 323 (admitting to writing on (altering) Hoskins' medical records prior to sending them to the Commonwealth); *Id.* at 330-31; *Id.* at 161-162 (admitting to charging Kayla Mills with murder and reaching an agreement to resolve the case if she provided a statement implicating Taylor); *see also* Section IX.

Even more, Defendant York personally initiated the charging process by signing the criminal complaints against each Plaintiff. PSOF ¶¶ 156-157. Defendant York did not consult Mr. Steele before initiating charges against Plaintiffs. As such, Steele had no role in Defendant York's initiation of charges. PSOF ¶ 205. And, Commonwealth's Attorney Steele did no independent investigation into the murder of Ms. Mills but instead relied upon the information given to him by Defendant York when making his decision to continue the prosecution of Plaintiffs. *Id.* As such, Plaintiffs have satisfied this element regarding Defendant York.

### ii. A Reasonable Jury Could Conclude that Defendant Pickard Made, Influenced and/or Participated in the Decision to Prosecute and in Plaintiffs' Continued Detention

Defendant Pickard argues that Plaintiffs' malicious prosecution claim against him fails because "Pickard did not make, influence, or participate in the decision to prosecute…" Dckt.

No. 179-1 at 25. As noted throughout, Defendant Pickard actively participated in the investigation that led to the decision to maliciously prosecute Plaintiffs and in their continued detention. Defendant York agrees and testified that "Sheriff Pickard would help me through the investigation just like any other police officer would." PSOF ¶ 22.  As such, his argument too fails.

Defendant Pickard's argument that "Pickard's involvement in the investigation was limited to occasionally sitting in on interviews and locating witnesses" simply ignores and/or distorts the facts and Defendant Pickard's active participation and misconduct. Dckt. No. 179-1 at 27. As illustrated throughout, Defendant Pickard is much more than a passive party in the investigation.

Specifically, Defendant Pickard actively participated in coercing and fabricating Allen Helton's March 2012 statement implicating Plaintiffs and William Lester in Ms. Mills' murder. PSOF ¶¶ 22, 39-42, 69-78.  He did so by promising to get Helton out on bond and to prevent any further charges from being brought against Helton if he told them what they wanted to hear about the Plaintiffs– even though Defendant Pickard had stated as early as January of 2011 that Helton was the killer. PSOF ¶¶ 70, 72, 78.  When Helton repeatedly denied knowing anything about the murder, Defendants Pickard and York told him what to say about the Plaintiffs prior to taking his recorded statement; he only had to repeat what was told to him. PSOF ¶¶ 69-78.  Defendant Pickard was not only directly involved in this misconduct, he also did nothing to stop York's misconduct involving Helton's coerced and fabricated statement. *Id.* Subsequently, Defendant York introduced this fabricated statement to the Grand Jury – failing to inform them of the coercion and promises of consideration made to Mr. Helton by Defendant Pickard prior to obtaining his statement. PSOF ¶¶ 168.

Further, Defendant Pickard facilitated an unduly suggestive identification procedure to frame the Plaintiffs. In 2011, Defendants Pickard, York and other KSP officers arrested Mr. Taylor and Ms. Hoskins. PSOF ¶¶ 135-152.  Thereafter, Defendant Pickard actively participated in an interrogation of Plaintiff Taylor, wherein he questioned Plaintiff Taylor and watched as Defendants York and Broughton photographed Taylor after dressing him up to resemble a sketch of the suspect in the murder.  *Id.* It was these photos, and these photos alone, that were subsequently sent to the eyewitness for identification. *Id.*

Defendant Pickard did nothing to stop Defendants Broughton and York from taking the suggestive photos, and never informed Prosecutor Steele about the photos or the procedure used to obtain them. *Id.* Later, Defendant York misled the grand jurors into believing that Mr. Crump had identified Mr. Taylor as being seen at Ms. Mills' home on the morning of her murder, failing to inform them that Crump did not make a positive identification of Mr. Taylor after viewing the photographs of him. PSOF ¶ 190.

Additionally, Defendant Pickard assisted Defendant York in coercing Kayla Mills into a fabricated and false statement against Plaintiffs. PSOF ¶¶ 106-125.  Defendants Pickard and York approached Kayla on multiple occasions prior to obtaining her statement on March 16, 2012 – two days after Defendant York initiated charges against the Plaintiffs. PSOF ¶¶ 107-112. Although Kayla knew nothing about the murder, Defendant Pickard approached Kayla "at different places…told her what he thought happened and was telling her that if she didn't cooperate with the police, that she was going to be arrested and put in jail forever." PSOF ¶ 107. Defendant Pickard told her "if she would just cooperate and tell them that Jonathan and Amanda and William Lester had killed Ms. Mills that he would make sure that she would not get in trouble." *Id.* Defendant Pickard threatened that Kayla "was going to get in trouble" if she refused

to cooperate. *Id.* Defendant Pickard's tactics became more aggressive as time went on; "it just became more and more and more harassing." PSOF ¶ 109.

Defendant Pickard admits to having several interactions with Kayla throughout the investigation. PSOF ¶ 111.  He does not dispute that he spoke to Kayla Mills outside the presence of Defendant York. *Id.* And in at least one of his conversations, Kayla maintained her innocence to Sheriff Pickard and revealed that she did not have any knowledge about who was involved in the Mills' homicide. *Id.* Even still, Defendant Pickard never created a single police report documenting his interactions with Kayla Mills. *Id. See also,* Fabrication of Evidence Argument, Section XVII(B)(i). Defendant York introduced the statement to the grand jury that he and Defendant Pickard fabricated for Kayla Mills implicating Plaintiffs in the murder. PSOF ¶ 170.

A reasonable jury could conclude that Pickard influenced the decision to prosecute and/or continue the detention of the Plaintiffs because he actively participated in: (1) coercing and fabricating statements against Plaintiffs; and (2) the unduly suggestive identification procedure to obtain a positive identification of Plaintiff Taylor. The Sixth Circuit has repeatedly held that malicious prosecution takes account of whether there was probable cause to commence *or to continue* criminal proceedings. *Mills,* 869 F.3d at 480; *quoting, Sanders,* 845 F.3d at 728 n.4; *see also, Gregory,* 444 F.3d at 749-50; *see also, Kinzer v. Jackson*, 316 F.3d 139, 143-44 (2d Cir. 2003) ("A malicious prosecution claim can rest on a prosecution that is continued notwithstanding the discovery of information that exculpates the defendant."). Specifically, a viable malicious-prosecution claim exists when Plaintiffs present "some evidence" that the impact of the Defendants' "misstatements and falsehoods in his investigatory materials extended

beyond the Plaintiffs' initial arrest and ultimately influenced the Plaintiffs' continued detention." *Sykes,* 625 F.3d at 316.

Even more, Defendant Pickard withheld his knowledge of the coercive circumstances of Helton and Kayla Mills' fabricated statements and of the unduly suggestive photos from Prosecutor Steele and allowed the prosecution of the Plaintiffs to proceed. *Ex.* 8, Steele Dep. Tr., at 88-89, 92-93, 98, 109-110. Had Prosecutor Steele known the statements were fabricated, he would have stopped the criminal prosecution of Plaintiffs.  PSOF ¶¶ 206-216.

 Additionally, Defendant Pickard's argument that he "did not make the decision to prosecute Plaintiffs" fails. Dckt. No. 179-1 at 27. "An investigating officer does not escape liability just because someone else (e.g. the prosecutor) made the actual decision to prosecute, so long as the plaintiff can show that the officer 'influenced or participated in the decision to prosecute.'" *Sampson v. Vill. Of Mackinaw City,* 685 Fed. Appx, 407 417 (6th Cir. 2017)(*quoting, Sykes,* 625 F.3d at 311-12).  Defendant Pickard's active participation in manufacturing evidence that falsely implicated the Plaintiffs, leading to the initiation of charges against Plaintiffs and to their continued detention is "marked by some kind of blameworthiness, something beyond mere negligence or innocent mistake." *See, Johnson v. Moseley,* 790 F.3d 649, 655 (6th Cir. 2015). As such, Plaintiffs have met this element regarding Defendant Pickard and are entitled to a trial against him for their malicious prosecution.

### iii.  A Reasonable Jury Could Conclude that Defendant Mefford Made, Influenced, and/or Participated in the Decision to Prosecute and to Continue the Prosecution of the Plaintiffs

Defendant Mefford also argues that Plaintiffs' malicious prosecution claim fails because "there is no evidence that any of the KSP Defendants 'made, influenced, or participated in the decision to prosecute.'" Dckt. No. 178 at 36. As noted above, because

malicious prosecution takes account of whether there was probable cause to commence *or to continue* criminal proceedings, Defendant Mefford's argument fails. *Mills,* 869 F.3d at 480; *quoting, Sanders,* 845 F.3d at 728 n.4; *see also, Gregory,* 444 F.3d at 749-50; *see also, Kinzer v. Jackson*, 316 F.3d 139, 143-44 (2d Cir. 2003); *Sykes,* 625 F.3d at 316.

Attempting to downplay his active participation and influence in the decision to initiate charges and continue Plaintiffs' detention, Defendant Mefford generally mentions that he "took measurements and photos at the crime scene, attended the autopsy, observed one witness interview and participated in another interview of a suspect…" Dckt. No. 178 at 36.  The two interviews that Defendant Mefford declined to discuss – Allen Helton and Daniel Wilson – resulted in fabricated statements that initiated and then continued charges against Plaintiffs and resulted in a deprivation of their liberty.

First, Defendant Defendant Mefford actively participated in coercing and fabricating a statement from Allen Helton.  PSOF ¶¶ 39-42.  In January 2011, Mefford was present and involved in the extensive questioning of Helton at the Barbourville Police Department. PSOF ¶¶ 40-41.  In Defendant Mefford's presence, Defendant York fed Helton details of Ms. Mills' murder – even after Helton told the Defendants he knew nothing about it. *Id.*  Helton later repeated these details when fabricating a statement against the Plaintiffs. Defendant Mefford created no documentation memorializing the information obtained from nor provided to Helton during this interrogation. PSOF ¶¶ 76-78; *see also,* Fabrication of Evidence argument, Section XVII(B)(ii). Subsequently, Defendant York introduced this fabricated statement to the Grand Jury – failing to inform them of the coercion and promises of consideration made to Mr. Helton by Defendant Pickard prior to obtaining his statement. PSOF ¶ 169.  Defendant Mefford never informed Prosecutor Steele that the statement from Mr. Helton,

150

used to initiate the charges against Plaintiffs and continue their detention, was false and fabricated and the result of threats and promises of consideration. PSOF ¶ 213.  Had Defendant Mefford informed Mr. Steele of such, Mr. Steele would not have used the evidence and would have re-evaluated the continuation of charges against the Plaintiffs. *Id.*

Additionally, on July 18, 2012, four months after Defendant York obtained a criminal complaint against the Plaintiffs for Ms. Mills' murder, Defendant Mefford accompanied Defendant York to the Roederer Correctional Complex in LaGrange, Ky. for an interview of Daniel Wilson, who had previously been incarcerated with Plaintiff Taylor. PSOF ¶ 126. (During their incarceration, Taylor never confessed to Wilson; nonetheless, without any request or prompting, Defendants York and Mefford went to speak with Wilson. *Id.*). There, Defendant Mefford participated in the interview. *Id.*  Mefford readily concedes that he knew the goal of the meeting was to obtain a statement from Wilson that would be used in the Mills' homicide investigation. PSOF ¶ 131.

Prior to obtaining a statement from Wilson, Defendant York admits that he promised to discuss with the prosecutor whether Wilson could be moved to a prison closer to home. PSOF ¶ 127.  Thereafter, Defendant York drafted a July 21, 2012 report regarding his interview with Wilson, claiming that Wilson told he and Defendant Mefford that Plaintiff Taylor talked about killing an old woman over money and that it had been arranged by Plaintiff Hoskins. PSOF ¶ 128.  At his deposition, Wilson insisted the statements attributed to him were false. PSOF ¶ 129. In fact, Wilson testified that he "didn't give any statement at all" because he "didn't have nothing to tell them." PSOF ¶ 130.  Nine months after Wilson's interview, Mefford ultimately created a report of his participating in the interview. PSOF ¶ 134.  The report makes no mention of the promises of consideration nor the fabrication of Wilson's statement. *Id.*

Defendant Mefford does not deny the allegations of fabrication by Wilson, rather, he simply claims not to recall what he or Defendant York told Wilson nor what Wilson told them. PSOF ¶ 132.  But, Mefford assumed Defendant York would have drafted a report documenting Wilson's statement to be used in the criminal prosecution. PSOF ¶ 133. Importantly, Defendant Mefford never informed Prosecutor Steele that the statement from Daniel Wilson was false and fabricated and that Wilson was threatened or promised consideration. PSOF ¶ 214.  Had Steele learned such information, he would not have used the evidence and would have reevaluated the continuation of criminal charges against the Plaintiffs. PSOF ¶ 169. Mefford admits he did nothing himself to stop the initiation of charges or continued detention of Plaintiffs. PSOF ¶ 133.   Because a reasonable jury could infer that Defendant Mefford actively participated in or influenced the continued detention of Plaintiffs as noted above by his involvement in the fabrication of Helton and Wilson's statements, Plaintiffs have met this element in relation to him. *See also* Plaintiffs' conspiracy argument below regarding Defendant Mefford's liability as a co-conspirator.

### iv.   A Reasonable Jury Could Conclude that Defendant Broughton Made, Influenced, and/or Participated in the Decision to Prosecute and to Continue Plaintiffs' Detention

Defendant Broughton's argument that Plaintiffs cannot establish that he "made, influenced, or participated in the decision to prosecute the plaintiff" also fails. Dckt. No. 117-1 at 17. Like Defendants Pickard and Mefford, Defendant Broughton attempts to escape liability by arguing that he was not the lead detective in the case, did not testify, and did not speak with the prosecutor. *Id.* at 17-18. Because a reasonable jury could conclude that Defendant Broughton participated in and influenced the decision to prosecute and in the decision to continue the detention of the Plaintiffs by obtaining false statements and creating an unduly-

suggestive photo lineup  - and need not have testified or spoken with the prosecutor in doing so - Plaintiffs have met this element in relation to Defendant Broughton. *See, Sykes,* 625 F.3d 294 at 316-17.

Like Defendant Mefford, Defendant Broughton actively participated in coercing and fabricating a statement from Allen Helton, later used to initiate charges against the Plaintiffs. Broughton was present during the entirety of the January 2011 interrogation of Helton, actively participating in the extensive questioning of Helton at the Barbourville Police Department. PSOF ¶¶ 39-42.  While there, in Defendant Broughton's presence, Defendant York fed Helton details of Ms. Mill's murder – even after Helton told the Defendants he knew nothing about it. And, Broughton did nothing to stop it. *Id.*  As a result, Helton later repeated these details when fabricating a statement against the Plaintiffs. PSOF ¶¶ 76-78.  Defendant Broughton created no documentation memorializing the information obtained from nor provided to Helton during this interrogation. *See also,* Fabrication of Evidence argument, Section XVII(B)(ii). Subsequently, Defendant York introduced this fabricated statement to the Grand Jury – failing to inform them of the coercion and promises of consideration made to Mr. Helton by Defendants Broughton, York and Pickard prior to obtaining his statement. PSOF ¶ 169.

Further, Defendant Broughton failed to intervene as Defendant York threatened to frame Plaintiff Hoskins. On February 15, 2011, Defendants York and Broughton interrogated Ms. Hoskins. PSOF ¶¶ 62-68.  Despite never reading her rights, York placed a citation for murder and robbery bearing Ms. Hoskins' name on the table in front of her. PSOF ¶ 62.  As both York and Broughton agree, Defendant York questioned Ms. Hoskins prior to the recorder being turned on and during periods in which York would stop the recorder. PSOF ¶ 63. During this unrecorded session, Defendant York threatened - on multiple occasions - to frame

Ms. Hoskins for Ms. Mills' murder. PSOF ¶ 64. He also screamed at Ms. Hoskins, berating her and beating the table while telling her that it should have been her taking her "last breath." PSOF ¶¶ 65, 68.  Defendant Broughton actively participated in questioning Ms. Hoskins and admits he did nothing to stop these threats.  PSOF ¶ 66.  In fact, Defendant Broughton was encouraging Defendant York's behavior. PSOF ¶ 68.

Three weeks later, Defendant Broughton also actively participated in the interrogation of Plaintiff Taylor with Defendants York and Pickard, wherein each Defendant questioned Plaintiff Taylor individually and jointly at the Barbourville Police Department. Ex. 4, Taylor Dep. I at 149-150; *see also,* Taylor Dep. II at 11; *Ex.* 13, Pickard Dep. Tr. at 97-98. Thereafter, Defendant Broughton, at Defendant York's request, photographed Taylor – with a camera belonging to the Barbourville Police Department - after dressing him up to resemble a sketch of the suspect in the murder, while Defendant Pickard watched. PSOF ¶¶ 135-152. Defendant Broughton took the photos in a way to replicate the sketch of the suspect, knowing the photos were going to be used in some capacity in the Mills' investigation. *Id.* Although Defendant Broughton had never before dressed up a suspect to look like a sketch and believed doing so would be unduly suggestive – even more so if the photographs were the only photographs presented to the eyewitness, as happened here - he never informed Defendant York that it would be suggestive to take the photos of Taylor. PSOF ¶144.

Defendant Broughton attempts to downplay his role in this unduly-suggestive photo identification procedure and investigation, arguing he had "limited knowledge of the investigation," and that "he was unaware how the photographs would be used in the criminal investigation." Dckt. No 177-1 at 21. A review of Defendant Broughton's deposition testimony illustrates otherwise. There, he conceded that he was aware of Defendant York's intention of

sending only the photos of Mr. Taylor to the eyewitness, Mr. Crump – to secure an identification leading to Mr. Taylor's arrest - because York told him so; yet, Defendant Broughton did nothing to stop it. *See,* Dckt. No 177-1 at 20; *Ex.* 4, Taylor Dep. 1 at 152; 157; *Ex.* 14, Broughton Dep. Tr. at 148; *Ex.* 2, York Dep. Tr. at 69, 80. (Said Defendant York to Defendant Broughton when discussing sending off the photos and sketch to the eyewitness, "We got him. We're charging him with murder. It's him…We're sending him down." *Id.* at 152; *see also, Ex.* 5, Taylor Dep. Tr. II at 16-17.)  Defendant Broughton did what he could to further this effort. As he testified, he "was there to assist [Detective York] to the best of [his] ability." *Id.* at 147-148. Later, Defendant York misled the grand jurors into believing that Mr. Crump had identified Mr. Taylor as being seen at Ms. Mills' home on the morning of her murder, failing to inform them that Crump did not make a positive identification of Mr. Taylor after viewing the photographs of him. PSOF ¶ 190.

In a further attempt to downplay his role in the prosecution of the Plaintiffs, Defendant Broughton cites to *Virgil v. City of Newport,* 2018 WL 344986 (E.D.Ky., January 9, 2018). Dckt. No. 177-1 at 18. There, the Court found that *Virgil* failed to state a malicious-prosecution claim against Officer Daniels, because the allegations established that Daniels "participated in the 'joint investigation'" into the "murder of [the victim] and other similar homicide[s] in the area,'" and "not that Officer Daniels 'influenced or participated' in the *prosecution." Id.* at \*10 (internal citations omitted). Here, Defendant Broughton did more than just participate in the investigation into Ms. Mill's death, he influenced the decision to prosecute by assisting in the fabrication of Helton's statement – used to initiate the prosecution- and withholding from the prosecution the circumstances leading to the fabrication, by participating and encouraging Defendant York's threats to frame Ms. Hoskins, and by withholding the facts surrounding the

unduly-suggestive photo array and Defendant York's desire to use it to frame Mr. Taylor. As such, *Virgil* is distinguishable.

Because Defendant Broughton was an active participant in and influenced the decision to prosecute and to continue the detention of the Plaintiffs, Plaintiffs have met this element in relation to Defendant Broughton. Further, because a reasonable jury could conclude that Defendant Broughton joined Defendant York – among the other Defendants – in a conspiracy to frame Plaintiffs, he is liable for the misconduct they committed in furtherance of that conspiracy. *Hooks v. Hooks*, 771 F.2d 935, 943-44 (6th Cir. 1985); *see also,* Argument I(A)(v) below regarding Defendant Broughton's liability as a co-conspirator.

### v. The Defendants are Liable for the Actions of Their Co-Conspirators

Finally, because it is well established that a conspirator is liable for actions of their co-conspirators in furtherance of that conspiracy, *Hooks v. Hooks*, 771 F.2d 935, 943-44 (6th Cir. 1985), the Defendants are liable for malicious prosecution through the false and fabricated statements manufactured by the other Defendants with whom they entered the conspiracy. *See also, United States v. Frost,* 914 F.2d 756, 762 (6th Cir. 1990) (noting that "each member of a conspiracy becomes responsible for acts in furtherance of the conspiracy committed by his co-conspirators."); *cf. Proffitt v. Ridgeway,* 279 F.3d 503, 507(7th Cir. 2002)(noting that, "in civil as in criminal law" a conspirator is liable "for the wrongful acts of the other conspirators committed within the scope of the conspiracy."): *Grove Press, Inc. v. Angleton*, 649 F.2d 121, 122 (2d. Cir. 1981) ("A conspiracy is alleged for the purpose of showing that a wrong was committed jointly by the conspirators and that, because of their common purpose and interest, the acts of one may be imputed to the others."). As mentioned above, the conspiracy into which the Defendant Officers entered resulted in false and fabricated statements that were used to initiate false charges

against and continue the illegitimate detention of Plaintiffs for a murder they did not commit. As such, the Plaintiffs have met this element regarding each individual Defendant.

### B.  A Reasonable Jury Could Conclude There Was No Probable Cause to Prosecute Plaintiffs

Given the robust record that exists, a reasonable jury could easily conclude that probable cause was not present to prosecute Plaintiffs.  PSOF ¶ 1-217.  Indeed, "[i]n a § 1983 action, the existence of probable cause is a question of fact." *Gregory,* 444 F.3d at 743; *Webb*, 789 F.3d at 665. "Probable cause to initiate a criminal prosecution exists 'where facts and circumstances are sufficient to lead an ordinarily prudent person to believe the accused was guilty of the crime charged.'" *Webb,* 789 F.3d at 666; *see also, Phat's Bar & Grill v. Louisville Jefferson Cty. Metro Gov't*, 918 F. Supp. 2d 654, 662 (W.D. Ky. 2013). Probable cause is an objective standard based on facts known to the officer. Whether probable cause exists is determined by the totality of the circumstances." *Illinois v. Gates,* 462 U.S. 213, 238 (1983). Additionally, malicious prosecution takes account of whether there was probable cause to commence *or to continue* criminal proceedings. *See Kinzer v. Jackson*, 316 F.3d 139, 143-44 (2d Cir. 2003) ("A malicious prosecution claim can rest on a prosecution that is continued notwithstanding the discovery of information that exculpates the defendant.").

Further, when facts underlying a probable cause analysis are disputed, a jury must decide the probable cause question and not the court at summary judgment.  Specifically, "[i]f disputed factual issues underlying probable cause exist, those issues must be submitted to a jury for the jury to determine the appropriate facts." *Alman v. Reed,* 703 F.3d 887, 896 (6th Cir.2013); *Hale v. Kart,* 396 F.3d 721, 728 (6th Cir.2005); *Chelios v. Heavener*, 520 F.3d 678, 686 (7th Cir. 2008) ("The probable cause determination must be made by a jury if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them.");

157

*Sornberger v. City of Knoxville*, 434 F.3d 1006, 1013-14 (7th Cir. 2006); *Schertz v. Waupaca County*, 875 F.2d 578, 582 (7th Cir. 1989). The Sixth Circuit has reversed grants of summary judgment where defendants failed to establish conclusively that there was no fact issue on probable cause. *Gregory*, 444 F.3d at 750. Because the parties have significant factual disputes as to whether probable cause ever existed in the present case, the proper remedy is for a jury to resolve the dispute.

### i. The Finding of Probable Cause at the Preliminary Hearing and the Grand Jury Proceedings is Rebuttable

Ignoring binding precedent, Defendant York and Defendant Broughton improperly argue that the finding of probable cause at the preliminary hearing and the return of an indictment by the grand jurors establishes probable cause. *See,* Dckt. No. 180-23 at 38-39; Dckt. No. 177-1 at 22.[17] Further, Defendant York again argues – erroneously - that he is entitled to absolute immunity for his false testimony at the preliminary hearing and grand jury proceeding. Dckt. No. 180-23 at 39, 43. Finally, Defendant Broughton argues that he cannot be held liable for a malicious prosecution claim because he did not testify during either proceeding. Dckt. No. 177-1 at 22. Defendants' arguments fail on each score.

### a. A Reasonable Jury Could Conclude that Defendant York Presented False Testimony in the Preliminary Hearing and at the Grand Jury, Rebutting the Presumption of Probable Cause

A reasonable jury could conclude that Defendant York testified falsely at the preliminary hearing and before the grand-jury, thus rebutting the presumption of probable cause. The Sixth Circuit holds, "[w]hen the defendant knowingly or recklessly presented false testimony to, or omitted critical information from, the grand jury in order to obtain that indictment," the presumption of probable cause is rebuttable. *Jones v. Clark Cty.,* 690 F.App'x 334, 335 (6th Cir.

---

[17] Defendants Pickard and Knox County do not dispute that probable cause was lacking. *See,* Dckt. No. 179-1 at 25 (making no mention of this element of Plaintiffs' malicious prosecution claim).

2017) (*citing Sykes,* 625 F.3d at 312). As the Sixth Circuit recently held in *King,* the probable

cause presumption is rebuttable and not conclusive when:

> (1) A law-enforcement officer, in the course of setting a prosecution in motion either knowingly or recklessly makes false statements (such as affidavits or investigative reports) or falsifies or fabricates evidence; (2) the false statements and evidence, together with any concomitant misleading omissions, are material to the ultimate prosecution of the plaintiff; and (3) the false statements, evidence, and omission do not consist solely of grand-jury testimony or preparation for that testimony (where preparation has a meaning broad enough to encompass conspiring to commit perjury before the grand jury).

*King,* 852 F.3d at 587-88.

Here, as noted above, in Section XVIII(A)(i) and *supra*, a reasonable jury could *easily*

conclude that Defendant York knowingly and/or recklessly presented false testimony to, or

omitted critical information at, the preliminary hearing and grand jury proceedings (e.g.

presenting the false and fabricated statements of: Amber Simpson, Joe King, Allen Helton,

Kayla Mills, and Christy Branson – without telling the jury of the threats against and promises

made to each witness, and testifying falsely that: (1) Plaintiffs Hoskins and Taylor knew Ms.

Mills, that Mr. Lester was on the run; (2) Ms. Hoskins claimed to be at the doctor earlier than she

actually was there; (3) Helton did not fail the polygraph examination on questions relating to the

murder of Ms. Mills, (4) Plaintiff Hoskins had engaged in an affair with Dr. Warren; (5) that

Plaintiff Taylor and Kayla Mills had dated in December 2010 and that they had hidden Kayla's

car; and (6) that Mr. Crump had made a positive identification of Plaintiff Taylor, etc.)  PSOF ¶

159-190.  Indeed, Defendant York repeatedly admitted to testifying false before the grand-jury

and at his deposition.  PSOF ¶¶ 173-174, 177, 179-180, 183, 185, 187. There is no dispute that

Defendant York presented this false testimony "in the course of setting a prosecution in motion."

Defendant York's knowingly false statements cannot support probable cause. Police officers cannot, in good faith, rely on a judicial determination of probable cause when that determination was premised on an officer's own material misrepresentations to the court. *Yancey v. Carroll County,* 876 F.2d 1238, 1243 (6th Cir.1989). Such reliance is unreasonable, and detention of an individual pursuant to such deceptive practices violates the Fourth Amendment. *Hill v. McIntyre,* 884 F.2d 271, 275 (6th Cir.1989). The Sixth Circuit has held investigators subject to suit for making materially false statements either knowingly or in reckless disregard for the truth to establish probable cause for an arrest. *Id.* Because Fourth Amendment rights are implicated by ongoing, pretrial detention, deliberate obfuscation or omission of material facts by an investigator at the preliminary hearing, the investigator's subsequent reliance on the hearing's conclusions are unreasonable. *See Albright v. Oliver,* 510 U.S. 266, 280(1994)(Ginsburg, J., concurring); *Gregory v. City of Louisville*, 444 F.3d 725, 758 (6th Cir. 2006) ("[A] reasonable police officer would be on notice that unlawfully detaining a suspect, despite the fact that the evidence used to detain the individual was fabricated, would also be unlawful.").

Second, the false statements and evidence, together with the misleading omissions noted above, were material to Plaintiffs' prosecution. As in *Miller,* without York's misconduct (and that of his co-defendants) and testimony, there was no case. 866 F.3d at 392. Defendant York's attempt to downplay the false, fabricated and material sworn testimony he gave at the preliminary hearing and grand jury proceedings by pointing to testimony by Defendant York "that appears to be undisputed and not fabricated or false" fails.[18] Dckt. No. 180-23. No evidence existed of Plaintiffs participation in Ms. Mills' death – except that manufactured by the Defendants, and the testimony that York contends is "undisputed and not false or fabricated"

---

[18]  It must again be noted that Defendant York's Motion for Summary Judgment makes no citations to the record to support the "factual allegations" he is referencing, in violation of Fed.R.Civ.P. 56(1)(c) and Sixth Circuit precedent. As such, these allegations should be given no credence.

does nothing more than suggest that Ms. Mills was murdered – not that Ms. Hoskins or Mr. Taylor participated in the murder.

No evidence exists indicating Plaintiffs Hoskins and Taylor personally knew Ms. Mills or that they "likely knew exactly where the victim kept her cash in her purse" as Defendant York now appears to contend. *See,* Dckt. No. 180-23 at 41; PSOF ¶¶ 173-174.  No one places Ms. Hoskins nor Mr. Taylor in the blue vehicle seen in Ms. Mills' driveway. *See,* Dckt. No, 180-23 at 41; PSOF ¶ 190. In fact, prior to obtaining an indictment against the Plaintiffs, Defendant York obtained medical records and prescription receipts proving Ms. Hoskins was at a medical appointment on the morning of Ms. Mills' death – just as she stated. PSOF ¶¶ 178, 185.  Further, neither Ms. Hoskins' nor Mr. Taylor's DNA was found on the physical evidence recovered from the scene or from the victim's fingernails. PSOF ¶¶ 18.  And Plaintiffs never discussed stealing Ms. Mills' money.  PSOF ¶¶ 5, 10.

Further, Defendant York's representation that "the evidence is insufficient to establish on summary judgment that York knew or acted with reckless disregard for the true [sic] as to the Branson, Simpson and Helton statements" is wholly unsupported by the record developed in discovery. Dckt. No. 180-23 at 41; s*ee* Section XVII.

Finally, Defendant York's false statements do not consist solely of grand-jury testimony: he made false statements in numerous written reports and in multiple search and arrest warrants, fabricated statements for witnesses, and altered Plaintiff Hoskins' medical records, etc. as discussed, *supra*. "Evidence of an officer's actions prior to and independent of his grand-jury testimony may call into question the presumption of probable cause created by an indictment even if a malicious-prosecution plaintiff may not bring in evidence of the grand-jury testimony itself to do so." *King,* 852 F.3d. at 590.  As such, a reasonable jury could conclude that the

presumption of probable cause created by the indictment has been rebutted. Defendant York and

Broughton's arguments to the contrary fail. Further, as argued in Section XVIII(A)(i), and

established in *King,* Defendant York is not entitled to absolute immunity because his misconduct

extended beyond the false testimony he presented at the preliminary hearing and grand jury

proceeding. 852 F.3d at 584; Dckt. 180-23 at 43.

### b. A Reasonable Jury Could Conclude Defendant Broughton's Nontestimonial Acts That Were Material to the Prosecution Rebuts the Probable Cause Presumption

Defendant Broughton argues the exception to the presumption of probable cause after a

grand-jury indictment – "when the indictment was obtained wrongfully by police officers who

knowingly presented false testimony with a reckless disregard for the truth – is inapplicable

because "there is no evidence that Broughton testified before the grand jury." Dckt. No. 177-1 at

22, *citing France v. Lucas,* 836 F.3d 612, 626 (6th Cir. 2016). However, "pre-indictment

nontestimonial acts that were material to the prosecution of a plaintiff [can] rebut the

presumption of probable cause established by the grand-jury indictment." *See* Section

XVIII(A)(iv), *supra,* regarding Broughton's bad acts. *Mills,* 869 F.3d at 180 (*citing King,* 852

F.3d at 587-90).  Because of this, Defendant Broughton's argument also fails.

### c. A Reasonable Jury Could Conclude that Probable Cause did Not Exist Outside the False Evidence Defendants Fabricated

Defendant York spends multiple pages of his motion arguing that "probable cause, if

established independent of any alleged false evidence, will negate Section 1983 Fourth

Amendment liability."  Dckt. No. 180-23 at 43-45, *citing Darah,* 225 F.3d at 312. Likewise,

Defendant Mefford argues that "probable cause 'requires only a probability or substantial chance

of criminal activity, not an actual showing of such activity.'" Dckt. No. 178 at 41, *citing, District

of Columbia,* 138 S.Ct. 577, 586 (2018). Mefford further states that "considering the totality of

the circumstances, there was probable cause for the Plaintiffs' arrests on March 15, 2012," and like, Defendant York, argues that "probable cause exists even if omitting the allegedly-fabricated evidence." Dckt. No. 178 at 42.

Unfortunately for Defendants York and Medford, their arguments have a fatal flaw: *all* evidence implicating Plaintiffs in the Mills' homicide was fabricated, rebutting the presumption of probable cause as established in *King,* 852 F.3d at 587-88.

Defendant Mefford argues that "there is no evidence that the statements for Christy Branson or Michael Crump were fabricated or suspicious." Dckt. No. 178 at 43. But a reasonable jury could easily infer that Branson's statement was fabricated: Christy Branson has no recollection of ever making a statement against Ms. Hoskins, there is no other evidence that Ms. Hoskins ever confessed to the crime, Defendant York admits he spoke with Branson before turning on the recorder, and even York concedes that Branson's statement was inconsistent with any of the other "evidence" he had developed in the case (since Branson stated Joe King was the real killer). PSOF ¶¶ 85-88. Further, Defendant York admitted he did not initiate charges against the Plaintiffs until he believed he had probable cause; considering that Defendant York did not initiate charges until a year after obtaining Ms. Branson's statement indicates that even he recognized her statement was not enough to support probable cause. PSOF ¶¶ 88.

Next, the so-called "evidence" that Defendants Mefford and York allege creates "a sufficient cause foundation in this case" simply supports the fact that Ms. Mills may have been murdered – not that Plaintiffs killed her. Dckt. No. 180-23 at 44; Dckt.No. 178 at 43-44; *see also,* Section XVII(B)(i)(a).  The majority of Defendant York's argument relates to William Lester – a person who is not a party to this case, and whose criminal case was also dismissed due to the absence of probable cause.  No evidence exists indicating Ms. Hoskins or Mr. Taylor knew

that the victim kept money in her purse (although it is not uncommon for a female to do so – a fact the majority of the population would likely surmise); in fact, neither of the Plaintiffs personally knew Ms. Mills. *Ex.* 1, Hoskins Dep. Tr. at 20, 84; *Ex.* 4, Taylor Dep. I at 115; *Ex.* 5, Taylor Dep. II at 57. Mr. Crump could not make an identification of Plaintiff Taylor; in fact, he denied Mr. Taylor being the person he saw at Ms. Mills' home that day. *Ex.* 18, Crump Dep. Tr. at 11-12; *Ex.* 2, York Dep. Tr. at 70, 73, 348. No one disputed Ms. Hoskins nor Mr. Taylor's alibis for the day in question, and no one places Ms. Hoskins nor Mr. Taylor in the blue vehicle seen in Ms. Mills' driveway. *See,* Dckt. No, 180-23 at 43.  No reasonable police officer would believe that probable cause existed based upon the evidence cited by Defendant York in his brief. See Dckt. No. 180-23 at 44-45.  Given the robust record in this case, it is clear that Defendant York, himself, did not believe that probable cause existed based on the evidence referenced in his brief because: (1) he declined to initiate charges against Plaintiffs for the murder of Ms. Mills until nearly a year after he first questioned Mr. Lester and Ms. Hoskins; and (2) he resorted to fabricating evidence to falsely implicate Plaintiffs in the murder prior to initiating charges.  Put simply, if probable cause existed, then why would Defendants resort to fabricating evidence and testifying falsely to initiate charges?  Again, that is a question for a jury to answer at trial and not for this Court to resolve at summary judgment.

In short, none of the "evidence" upon which Defendants York and Mefford rely to support their claims of probable cause stands because it was all knowingly false, improperly suggestive, and would not have led a reasonable officer to believe that Plaintiffs committed a crime, *supra. See also,* Argument XVII(B)(i)(a).  Without the Defendants' misconduct, there was no case. *Miller,* 866 F.3d. at 392.  Accordingly, the Defendants are precluded from arguing that probable cause existed.

### d. Defendant Mefford's General Argument that there Was Probable Cause for Plaintiffs' Arrest, Based on a Multitude of Offenses For which They Were Not Charged is Irrelevant

Defendant Mefford further makes a curious argument spanning a multitude of pages that Defendant York had probable cause to arrest Plaintiffs for a multitude of offenses for which they were not charged: including, "complicity in committing murder, manslaughter, or robbery, or for committing or for complicity in tampering with physical evidence, or for committing conspiracy or facilitation of those crimes." Dckt. No. 178 at 45-47. In support of this argument, Defendant Mefford cites to *District of Columbia v. Wesby,* 138 S.Ct. 577, 586 (2018), a case involving probable cause for a warrantless arrest of partygoers who had illegally entered an unoccupied home. This case, and Defendant's Mefford's arguments about a host of other "potential" charges that were never initiated against Plaintiffs is completely irrelevant to the claims at issue.

### C. Plaintiffs Suffered a Deprivation of Liberty

The third element of a malicious prosecution claim is satisfied if the Plaintiffs show "that as a consequence of a legal proceeding, the plaintiff[s] suffered a deprivation of liberty, as understood in our Fourth Amendment jurisprudence, apart from the initial seizure." *Sykes*, 625 F.3d at 308-09 (internal citations omitted). As this Court noted in its previous ruling on this element, the Defendants do not dispute that the Plaintiffs suffered a deprivation of liberty as a result of the charges brought against them in the underlying case. *See* Dckt. No. 119 at 14; *see also,* Dckt. No. 177-1 at 17-23 (void of any argument by Defendants Barbourville and Broughton on this element); Dckt. No. 178 at 33 (stating that the KSP Defendants "do not dispute the deprivation of liberty element."); Dckt. No. 179 at 25 (Defendants Knox County and Pickard stating that "it is not disputed that Plaintiffs suffered a deprivation of liberty while they were

incarcerated pending trial"); Dckt.180-23 at 33-46 (void of any argument by Defendants York and Bunch regarding this element). As such, Plaintiffs satisfy this element as well.

### D. A Reasonable Jury Could Conclude That the Criminal Proceedings Were Terminated in Plaintiffs' Favor and Without Compromise

Finally, Plaintiffs have easily established that the criminal proceedings were resolved in their favor when the prosecutor moved to dismiss the charges against them in a manner indicative of their innocence. *See Sykes,* 625 F.3d at 309; *Restatement (Second) of Torts* § 660; *Harwood,* 852 F.3d 568, at 580; *Miller v. Maddox*, 866 F.3d 386, 389 (6th Cir. 2017); *Webb v. United States*, 789 F.3d 647, 659 (6th Cir. 2015).  Specifically, both the motions dismissing the charges filed by Knox County Commonwealth's Attorney Jackie Steele and Mr. Steele's deposition testimony establish that he moved to dismiss both cases on the merits because "the Commonwealth does not feel as though probable cause of guilt is present anymore." *See, Ex.* 6, Taylor MTD, PL 24828-24831; *Ex.* 7, Hoskins MTD, PL 24839-24842; *Ex.* 8, Steele Deposition at 160.

Both state and federal law affirm that a favorable termination is met with the underlying proceedings have been "dismissed for reasons reflecting on the merits of the case." *Everidge v. Rice,* 2011 WL 6014407, *4 (E.D. Ky. 2011). Further, "an unconditional, unilateral dismissal of criminal charges or an abandonment of a prosecution by the prosecutor or the complaining witness that results in the discharge of the accused generally constitutes a termination in favor of the accused." *Ash v. Ash,* 72 Ohio St.3d 520, 522 (1995); *see also, Williams v. Crosby,* 43 F.Supp. 3d 794, 805-06 (N.D. Ohio 2014).

Here, prosecutor Steele moved for the dismissal of charges against the Plaintiffs unilaterally, without any conditions, and not as a result "of any settlement or compromise" on the part of the Plaintiffs. *See, Ohnemus v. Thompson,* 594 F.App'x 864, 886 (6th Cir. 2014) (a

166

Plaintiff can satisfy the favorable-termination element when the dismissal is "one-sided" and "not the result of any settlement or compromise."); *Feinberg v. Townsend,* 107 S.W.3d. 910, 912 (Ky.Ct.App. 2003); *Cf. Broaddus v. Campbell,* 911 S.W.2d 281, 284 (Ky.Ct.App. 1995) (If the dismissal is "not the unilateral act of the prosecutor," and the accused "[gives] up something to secure dismissal of the charges," the termination of the proceedings is not favorable to the accused."); *Cherry v. Howie,* 191 F.Supp.3d 707, 715 (W.D. Ky 2016) (not favorable termination when Plaintiff accepted plea offer in which prosecutor agreed to dismiss all charges in exchange for Plaintiff's agreement to resign from city council.); *Evridge,* 2011 WL 6014407 at 5 (dismissing malicious-prosecution claim where plaintiff participated in an informal pre-trial diversion program.).

Despite the extensive reasoning cited in the four-page Motions to Dismiss filed by the Commonwealth in state court, and the case law cited above, the Defendants argue that the Plaintiffs cannot establish that criminal proceedings were resolved in their favor. *See,* Dckt. No. 180-23 at 34-38; Dckt. 177-1 at 23; Dckt. 178 at 36-40; Dckt.179-1 at 27-28. First, Defendant York claims that "dismissal without prejudice is not a favorable termination." *Id.* at 34. Next, the Defendants argue that the grounds upon which Plaintiffs' charges were dismissed "do not indicate that Plaintiffs were innocent." Dckt. 180-23 at 35; Dckt.178 at 36. As is discussed below, the Defendants' arguments on this point are without merit.

### i. The Dismissal of Plaintiffs' Criminal Case Without Prejudice is of Little Significance

In a previous ruling on this exact argument, this Court noted that "the dismissal of Plaintiffs' criminal case was without prejudice is of little significance." Dkt. No. 119 at 20.  In reaching this conclusion, this Court found that "Kentucky courts have held that a 'dismissal of a case – whether it be with or without prejudice – constitutes a 'final termination'

for purposes of malicious-prosecution claims." *Id. citing Davidson v. Castner-Knott Dry Goods Co., Inc.,* 2020 S.W.3d 597, 604 (Ky.Ct.App. 2006).

Despite this, Defendant York argues that "dismissal without prejudice is not a favorable termination because it neither adjudicates the guilt or innocence of Plaintiffs nor precludes the Commonwealth from renewing its prosecution against them for the crime." Dckt. No. 180-23 at 34.  In support, the Defendants rely upon *Jones v. Clark Co., Kentucky,* 5:15-CV-337, 2019 WL 637769 (E.D. Ky. Feb. 14, 2019); *see,* Dckt. 180-23 at 34-35; Dckt. 177-1 at 23. *Jones,* however, is not binding on this Court for several reasons. First, the case is currently on appeal – and not yet decided - at the Sixth Circuit. *See,* Case No. 19-5143, 6th Cir. As such, it is improper and premature for this Court to rely upon it. Second, the *Jones* court specifically stated that it was not issuing a decision in the case based on the favorable termination element. *Jones,* 2019 WL 637769 at *7. Finally, as discussed below, *Jones* is factually inconsistent with the case at hand.

In *Jones,* the criminal defendant was charged with promoting a minor in a sexual performance after "police tracked a 39-second video of child pornography to an IP address and tracked that IP address to subscriber David Jones." *Jones,* 2019 WL 637769 at *1. Mr. Jones was released over a year later once an expert conducted a search of seized devices (a tablet computer, cellphone, modem, etc.) from his home, finding no evidence of child pornography. *Id.* Jones' malicious prosecution argument failed because the Court found that "law enforcement had…probable cause to arrest and prosecute the subscriber of an IP address based, in context, on the subject IP address being used to transmit child pornography – a predicate fact that Jones himself admitted, *see* DE #21 at ¶ 1 (acknowledging that 'his IP address was used to download a 39-second video of child pornography.')." *Id.* at 4.

Here, no "evidence" like the IP address in *Jones* exists - nor ever existed - linking Plaintiffs to Ms. Mills' murder: forensic testing of the currency at the crime scene excluded the Plaintiffs and the witness statements allegedly tying the Plaintiffs to the murder were fabricated by the Defendants. *See* Argument I(b) above for further discussion regarding the lack of probable cause. As such, *Jones* is not persuasive, and the Court's previous ruling on this matter should stand.

### ii.   A Reasonable Jury Could Conclude The Prosecutor Dismissed the Plaintiffs' Criminal Charges on the Merits Due to a Lack of Probable Cause

Commonwealth's Attorney Steele made clear in his Motion to Dismiss that he was moving to dismiss the charges against the Plaintiffs, in a manner indicative of their innocence, because probable cause of guilt did not exist. Said Steele:

> The Commonwealth must ever be vigilant in the pursuit of justice not just to gain a conviction[,] but to be mindful of the duty of the prosecutor for the people i*n not pursuing charges or moving forward in matters in which probabl[e] cause of guilt is not present.* Based on the changes in the testimony of the above witnesses and the unavailability of others the Commonwealth *does not feel as though probable cause of guilt is present anymore.*  Moreover, SCR 3.130 (3.8) requires a prosecutor in a criminal case to refrain from prosecuting a charge once the prosecutor knows *it is not supported by probabl[e] cause.*

PSOF ¶ 13.

Prosecutor Steele specifically noted that one of the factors no longer supporting probable cause was that key witnesses denied making statements and were anticipated to change their testimony. *Id.* Put simply, the Commonwealth knew that witnesses intended to testify in a way that supported Plaintiff's innocence – because their original statements were coached and fabricated.  *See* Section I(C) and Section XI.

Arguing that witness recantation does not support a favorable termination, the Defendants rely upon *Russell v. Smith,* 68 F.3d 33 (2d Cir. 1995). *See,* Dckt. 178 at 37; Dckt. 180-23 at 36-

37. *Russell,* however, is readily distinguishable and not dispositive to the facts at hand. There, the Second Circuit noted that suspicion of the witness recantation in that case was "particularly well justified." *Id.* at 36. The Court held as such because Viust's [the witness] recantation:

> is more suspect than most because the testimony he recanted implicated his own brother. Viust's grand jury testimony was consistent with statements he had previously given to Smith and other police detectives investigating the Clay Avenue murders. It was, furthermore, substantially corroborated by Castaing, by the subsequent discovery of the murder weapon at the scene of another similar robbery where Russell and another of the Clay Avenue murder defendants had been placed, as well as by other circumstances. Viust, furthermore, refused to testify in support of Russell in this proceeding.

*Id.*

No such corroboration exists here, and the witnesses have already testified that their original statements were false and fabricated by the Defendants – eliminating the suspicion of witness recantation. *See,* Fabrication of Evidence argument, Section XVII(A), (B).

Further, this is not a case in which the charges were dismissed due to a technicality. *See, Schlueter v. Southern Energy Homes, Inc.,* 252 Fed.Appx. 7, 11 (6th Cir. 2007) (state court's finding that guilty verdict was supported by the evidence and last event before the dismissal was filing of motion to dismiss on speedy trial grounds, indicate dismissal was not a favorable termination). Nor, is this a situation that is the result of a compromise; in fact, as noted by Defendant York, the Plaintiffs argued for a dismissal *with* prejudice – just as the Plaintiff did in *Davidson. See, Davidson v. Castner-Knott Dry Good Co.,* 202 S.W.3d 597, 606 (Ky.Ct.App. 2006) (rejecting Defendant's argument that Plaintiff compromised the criminal charge against her by agreeing to a dismissal without prejudice because Plaintiff "made no efforts to bargain with the Commonwealth in exchange for a dismissal and instead strenuously argued for dismissal *with* prejudice.") And this is not a case in which the charges were dismissed with conditions. *See, Ash v. Ash,* 72 Ohio St.3d 520, 522 (1995); *see also, Williams v. Crosby,* 43 F.

Supp.3d 794, 805-806 (N.D. Ohio 2014)(holding that "an unconditional, unilateral dismissal of criminal charges or an abandonment of a prosecution by the prosecutor or the complaining witness that results in the discharge of the accused generally constitutes a termination in favor of the accused."); *White v. Rockafellow,* 181 F.3d. 106, *1 (6th Cir. 1999). Finally, this is not a situation in which the charges were dismissed wholly due to the failure of a witness to appear for trial. *See, Harden v. Hillman,* 2017 WL 3668437 at *4 (W.D.Ky. 2017) *comparing, Davidson,* 202 S.W.3d at 605 ("finding that charges were dismissed due to belief that accused was innocent when, *in addition to witness no longer being available,* Commonwealth learned prior to trial that checks at issue had been stolen from accused two months before alleged writing of checks, indicating innocence.")(emphasis added).

Instead, this is a case where the prosecutor moved to dismiss the case, due to a variety of factors based on the same premise: no probable cause of guilt existed – supporting Plaintiffs' innocence. *Ex.* 7, Hoskins' MTD; *Ex.* 6, Taylor MTD; Because a reasonable jury could conclude the termination at hand related to the merits - reflecting on innocence and the lack of responsibility for the charges – the termination is favorable and supports a malicious prosecution claim. *See, Alcorn v. Gordon,* 762 S.W.2d 809, 812 (Ky.Ct.App. 1988); *see also, Evridge,* 2011 WL 6014407 at *4. As a result, the Defendants' argument to the contrary fail.

To the extent that this Court finds a factual dispute of the underlying reasons for dismissal of the charges, the proper remedy is not to dismiss the claim, as Defendants argue, but to allow the claim to go to trial. *See, Davidson v. Castner-Knott Dry Good Co.,* 202 S.W.3d 597 (Ky.Ct.App. 2006). In *Davidson,* the defendants argued, as they do here, that the dismissal of charges did not occur because the plaintiff was innocent, but rather, was "dismissed because attainment of evidence necessary to fully prosecute her was not readily available." *Id.*, 202

171

S.W.3d at 605. The plaintiff, however, maintained that favorable termination was motivated by the prosecutor's discovery of other evidence that indicated her innocence. *Id.* The *Davidson* Court ultimately held that the plaintiff was entitled to a trial on the malicious prosecution claim because a factual dispute existed at to the underlying reasons for dismissal. *Id.* at 606.  Here, the record is even stronger than that in *Davidson* as the dismissal of the Plaintiffs' charges were unconditional, ordered as a result of the prosecutor's motion, and done because probable cause did not exist. As such, Plaintiffs Hoskins and Taylor are entitled to a trial on the malicious prosecution claims.

## XIX.    A TRIAL IS NECESSARY ON PLAINTIFFS CONSPIRACY CLAIM AGAINST DEFENDANTS YORK, PICKARD, BROUGHTON AND MEFFORD

In addition, Defendants move for summary judgment on Plaintiffs' conspiracy claim. *See* Dckt. No. 180-23 at 48 (Defendants' York[19] and Bunch Brief); Dckt. No. 179-1 at 35-37 (Defendant Pickard's Brief); and Dckt. No. 177-1 at 28-30 (Defendant Broughton's Brief); Dckt. No. 178 at 7 (Remaining KSP Defendants' Brief).  Defendants' argument on this score is nonsensical and devoid of any legal citation apart from the standard required to prove a conspiracy.

Under Section 1983, a civil conspiracy is "an agreement between two or more persons to injure another by unlawful action."  *Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011)(*quoting Revis v. Meldrum*, 489 F.3d 273, 290 (6th Cir. 2007)).  To prevail on a claim, plaintiff must show that: (1) a single plan existed; (2) the defendant officer shared in the general conspiratorial objective to deprive the plaintiff of his or her constitutional rights; and (3) an over act was committed in furtherance of the conspiracy that caused injury.  *Id.*  Importantly, "[r]arely

---

[19] Defendant York's entire argument is premised on there being no underlying constitutional violation and notably opts not to address the extensive record in this case supporting Plaintiffs' conspiracy claims.  See Dckt. No. 180-23 at 48-49.  As is extensively detailed above, Plaintiffs have easily established the violation of their constitutional rights.

in a conspiracy case will there be direct evidence of an express agreement among all the
conspirators to conspire, ... [and] circumstantial evidence may provide adequate proof of
conspiracy." *Weberg v. Franks,* 229 F.3d 514, 528 (6th Cir.2000); *Webb v. United States*, 789
F.3d 647, 671 (6th Cir. 2015). Here there is a wealth of summary judgment evidence from
which a jury can find that Defendants York, Pickard, Broughton and Mefford were "voluntary
participants in a common venture to railroad" Plaintiffs, *supra* Sections XVII-XIX. *Jones v. City
of Chicago*, 856 F.2d 985, 992 (7th Cir 2002).

### A. A Reasonable Jury Could Find that Defendants York and Pickard Were Part of a Conspiracy to Frame Plaintiffs

A reasonable jury could easily find that Defendants York and Pickard conspired together
to frame Plaintiffs for the Mills' homicide by deep-sixing exculpatory evidence and fabricating
inculpatory evidence. PSOF ¶¶ 1-217. To begin, Defendant Pickard assisted Detective York in
the Mills' homicide investigation, and according to Defendant York, "Sheriff Pickard would help
me through the investigation just like any other police officer would." PSOF ¶ 22. The record
reveals that Defendant Pickard did not just help with the investigation, but rather, assisted
Defendant York in framing Plaintiffs for a crime they did not commit. PSOF ¶¶ 1-217.

First, the record demonstrates that Defendant Pickard joined Defendant York in
fabricating Mr. Helton's statement over the course of a lengthy period of time. For starters,
Defendant Pickard was present when Mr. Helton was questioned and provided the details of the
Mills' homicide by Defendant York. PSOF ¶¶ 39-42, 69-78. Later, Defendant Pickard arrested
Mr. Helton on March 7, 2012 and while driving him to the Knox County Jail, promised to "get
[Helton] a bond…and there wouldn't be no more charges brought up" if he told "[them] what
[they] need to hear about the murder case." PSOF ¶ 70. Helton knew exactly what Defendant

Pickard wanted to hear –the same story that Defendant York and the other Defendants wanted him to repeat. PSOF ¶¶ 39-42, 69-78.

According to Mr. Helton, Defendants Pickard and York later spoke to him extensively off the record, notably, in Defendant Pickard's office, prior to turning on a recorder.  PSOF ¶¶ 70-72.  During this portion, Defendant Pickard promised Helton another deal in exchange for telling them what they wanted to hear.  PSOF ¶¶ 70-72.  In the end, Defendants Pickard and York "told [Helton] what to say, [he] just agreed with it."  PSOF ¶ 72.  This evidence is more than enough for a reasonable jury to conclude that Defendant Pickard joined Defendant York in his quest to frame Plaintiffs.  But there is more.

Second, Plaintiffs also present this Court with an unrebutted and robust record demonstrating how Defendants Pickard and York fabricated a statement for Kayla Mills.  PSOF ¶¶ 106-125.  The record reveals that Defendants Pickard and York coerced Ms. Mills over the course of several months into going along with the false and fabricated statement that implicated Plaintiffs in the murder.  *Id.*  For his part, Defendant Pickard told Kayla "that if she would just cooperate and tell them that Jonathan and Amanda and William Lester had killed Ms. Mills that he would make sure that she would not get in trouble." PSOF ¶ 107. If Kayla refused to cooperate, Defendant Pickard threatened that "she was going to get in trouble." *Id.*  After Defendant Pickard made these threats, Kayla immediately called her mother while "really upset." PSOF ¶ 108.  These threats made Kayla "very afraid. Very afraid…she cried, and it was just hard for her…" *Id.*  According to Donna Mills, "it just became more and more and more harassing." *Id.*

Defendant Pickard admits to having several interactions with Kayla throughout the investigation some of which were outside the presence of Defendant York. PSOF ¶ 111.  In at

least one of his conversations, Kayla maintained her innocence to Sheriff Pickard and revealed that she did not have any knowledge about who was involved in the Mills' homicide. *Id.* Defendant Pickard never created a single police report documenting his interactions with Kayla Mills. *Id.* And of course, as is detailed above, Defendant York readily concedes that he charged Kayla Mills with murder and agreed to dismiss such charges so long as she provided a statement implicating Plaintiffs. PSOF ¶¶ 107-123. As Mr. Steele testified, those charges were initiating without knowledge of the Commonwealth Attorney's Office and were never made part of the prosecutor's file. PSOF ¶208.

Third, undocumented investigatory steps taken by Defendants York and Pickard's not only exculpated Plaintiffs from the murder – like when they learned that the blue car from the orphanage was in the care of employees on the day of the murder and not Plaintiffs – but implicated others, like when they spoke to Bob Smith and Vernon Bennett and learned information that implicated Mr. Helton and Mr. Simpson. PSOF ¶¶ 37,188-189. On each score, Defendants York and Pickard declined to document such investigatory steps. *Id.* Further, and as is discussed more fully below, Defendant Pickard actively participated in an unduly suggestive lineup procedure with Defendants York and Broughton in an effort to frame Plaintiffs. PSOF ¶¶ 135-152. Again, this circumstantial evidence is more than sufficient for a reasonable jury to conclude that a conspiracy existed to frame Plaintiffs. *Stillwagon v. City of Delaware, Ohio*, 747 F. App'x 361, 374 (6th Cir. 2018)(finding that the "[t]he officers' knowledge of the evidence in this case, which does not establish probable cause to arrest or prosecute Stillwagon, indicates that the officers entered into an agreement to unlawfully injure Stillwagon). Moreover, a finding of conspiracy is particularly appropriate here where the Defendants fabricated statements, withheld exculpatory evidence, and conducted unduly suggestive identification procedures – amongst

themselves over a period of time.  That evidence, as described in detail above, shows that the Defendants conspired with one another to frame Plaintiffs for a crime they did not commit. *Webb v. United States*, 789 F.3d 647, 671 (6th Cir. 2015).

### B.  A Reasonable Jury Could Find that Defendant Broughton Joined Defendants York and Pickard in the Conspiracy to Frame Plaintiffs

Viewing the evidence and inference is Plaintiffs' favor, there is more than enough evidence for a jury to conclude that Defendant Broughton joined the conspiracy to frame Plaintiffs by participating in the interrogations of both Plaintiffs – including one where Defendant York threatened to frame Ms. Hoskins and by facilitating an unduly suggestive identification procedure that was designed to elicit an identification of Plaintiff Taylor by Michael Crump.  PSOF ¶¶ 62-68, 135-152.  Nonetheless, without a single citation, Defendant Broughton casually claims that he "did not participate in the investigation, identification, or subsequent prosecution of Plaintiffs."  *See* Dckt. No. 177-1 at 29.  As is discussed above and below, Defendant Broughton's assertions are contrary to the robust record.

Defendant Broughton assisted in the underlying investigation and evidence indicates he joined the conspiracy to frame Plaintiffs along the way.  As is described more fully above in Section VI, in 2011 Defendant Broughton joined Defendants York and Pickard in questioning Plaintiff Taylor for the murder of Katherine Mills.  PSOF ¶¶136-150.  He likewise participated in the interrogation of Ms. Hoskins for the murder and was present when Defendant York threatened to frame her for a crime she did not commit.  PSOF ¶¶ 62-68.  Defendant Broughton was likewise present when Mr. Helton was provided all the details of the homicide by Defendant York – details later used to fabricate his false statement against Plaintiffs. PSOF ¶¶ 39-42.  And finally, Defendant Broughton was not only present for the unduly suggestive identification

procedure of Plaintiff Taylor – but was one of the Defendants who boasted about that procedure resulting in Plaintiff being charged with murder.  PSOF ¶¶ 135-152.

Key to Plaintiffs' conspiracy allegations, after conducting this unduly suggestive identification procedure, Defendants York and Broughton stood in the hallway.  PSOF ¶ 146. There, Defendant York spoke to Defendant Broughton - loudly enough for Mr. Taylor to overhear them - about sending the photographs that they had just taken of Mr. Taylor and a sketch of the suspect to "someplace", saying, "We got him. We're charging him with murder. It's him…We're sending him down." *Id.*  With this record, a reasonable jury could easily conclude with this record that Defendant Broughton conspired to frame Plaintiffs for a crime they did not commit. *Webb v. United States*, 789 F.3d 647, 671 (6th Cir. 2015).

### C.  A Reasonable Jury Could Find that Defendant Mefford Joined the Conspiracy to Frame Plaintiffs

Finally, a reasonable jury could likewise conclude that Defendant Mefford joined the conspiracy to frame Plaintiffs by joining Defendant York for the fabricated statements of Allen Helton and Daniel Wilson.  As is described more fully above in Section III(iii) and Section V(a) , both Wilson and Helton claim that Mefford was present when their statements were fabricated by Defendant York.  Again, a jury could easily conclude with this record that Defendant Mefford joined the conspiracy to frame Plaintiffs with this conduct.

## XX.    A TRIAL IS NECESSARY ON PLAINTIFFS' FAILURE TO INTERVENE CLAIM

Plaintiffs also present this Court with a failure to intervene claim.  Although most failure-to-intervene claims involve allegations of excessive force, the Sixth Circuit has extended the failure-to-intervene theory of liability beyond the excessive-force context. *See Smith v. Ross*, 482 F.2d 33, 36-37 (6th Cir. 1973); *see also Bruner v. Dunaway*, 684 F.2d 422, 426 (6th Cir.

1982); *Johnson v. Vill. of Ottawa Hills*, 5 Fed.Appx. 390, 395 (6th Cir. 2001); *Virgil v. City of Newport*, No. CV 16-224-DLB-CJS, 2018 WL 344986, at *12 (E.D. Ky. Jan. 9, 2018), *aff'd*, 745 F. App'x 618 (6th Cir. 2018). Thus, a reasonable jury could find the Defendants liable under § 1983 when they failed to intervene to prevent constitutional violations. Plaintiffs must merely show that the defendants "(1) observed or had reason to know that [constitutional harm] would be or was [taking place], and (2) had both the opportunity and the means to prevent the harm from occurring." *Sheffey v. City of Covington*, 564 Fed.Appx. 783, 793 (6th Cir. 2014) (quoting *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)). This is true regardless of whether the individual violating the plaintiff's constitutional rights is a fellow officer or a supervisor. *Smith v. Heath*, 691 F.2d 220, 224-25 (6th Cir. 1982). Defendants cannot be held liable, however, unless there was "a realistic opportunity to intervene and prevent harm." *Wells v. City of Dearborn Heights*, 538 Fed.Appx. 631, 640 (6th Cir. 2013) (citing *Ontha v. Rutherford Cty., Tenn.*, 222 Fed.Appx. 498, 507 (6th Cir. 2007)).

Here, Defendant Pickard[20] had a number of opportunities to intervene and stop Defendant York's violation of Plaintiffs' constitutional rights, some of those include: (1) the coercion and fabrication of Allen Helton's false and fabricated statement; (2) the coercion and fabrication of Kayla Mills' false and fabricated statement; and (3) the unduly suggestive identification procedure with Mr. Taylor. Defendant Pickard declined to intervene on any of these occasions

---

[20] Defendant York does not raise any specific arguments relating to Plaintiffs' failure to intervene claim other than acknowledging that most witnesses implicated him directly in the misconduct. To the extent that Defendant York argues that any other Defendant is responsible for the fabrication of false evidence, or the withholding of exculpatory evidence, the record is sufficient for Plaintiffs' failure to intervene claim to survive for trial against him as well. For instance, Defendant York had the opportunity to intervene when Defendant Pickard made promises of consideration to Mr. Helton in his presence in exchange for "tell[ing] them what they wanted to hear about the murder." This testimony, alone, is deserving of a trial against Defendant York for his failure to intervene.

to stop the violation of Plaintiffs' constitutional rights.  As a result, Plaintiffs' failure to intervene claim is triable.

Next, Defendant Broughton likewise had a number of opportunities to intervene and stop Defendant York's violation of Plaintiffs' constitutional rights.  As discussed more fully in Sections III-V, Defendant Broughton was present and declined to intervene when: (1) Defendant York provided details of the murder to Allen Helton; (2) Defendant York threatened to frame Ms. Hoskins for the murder; (3) Defendant York instructed Mr. Taylor to be dressed up like the sketch in order to conduct an unduly suggestive identification procedure; and (4) Defendant York admitted to Defendant Broughton his desire to concoct an unduly suggestive procedure to close the case against Mr. Taylor.  Again, a reasonable jury could easily conclude that Defendant Broughton failed to intervene to stop the violation of Plaintiffs' constitutional rights.

Finally, a reasonable jury could also conclude that Defendant Mefford failed to intervene when he was present when: (1) Defendant York fed information to Allen Helton; and (2) Defendant York made promises of consideration to Daniel Wilson in exchange for a fabricated statement.  At that meeting, Mr. Wilson claims that Defendant York made promises of consideration prior to fabricating a false statement for him that implicated Plaintiffs in the underlying murder.  Defendant Mefford does not deny the fabrication allegations by Mr. Wilson, rather, he claims to not recall what Defendant York told Wilson nor what Wilson told the Defendants. During this entire interview, Defendant Mefford admits that there was nothing Defendant York did with which he disagreed. Again, a jury could easily conclude with this record that Defendant Mefford failed to intervene on Plaintiffs' behalf to prevent the fabrication of both statements, and thus, the deprivation of Plaintiffs' liberty.

## XXI.  DEFENDANTS ARE NOT ENTITLED TO ABSOLUTE IMMUNITY

### a.  Defendant York is Not Shielded by Absolute Immunity for Violating Plaintiffs' Constitutional Rights by Submitting Fabricated Evidence to Grand-Jury, Withholding Exculpatory Evidence from Grand-Jury, and Recklessly Testifying before Grand-Jury

Plaintiff herein incorporates the arguments made *supra* in Section XVIII(A)(i), for how Defendant York is not absolutely immune for the egregious misconduct he committed.

### b.  Defendant Knox County is Not Shielded by Absolute Immunity from Plaintiff's Federal Claims

Defendant Knox County also argues that absolute immunity in the Commonwealth of Kentucky shields itself from Plaintiffs' state-law claims.  *See* Dckt. No. 179-1 at 47.  The only state-law claim that Plaintiffs allege against Defendant Knox County is one of Respondeat Superior.  *See* Dckt. No. 1 at 38.  Plaintiffs hereby voluntarily dismiss that claim against Defendant Knox County. Given that state-law sovereign immunity only shields against state-law torts for Defendant Knox County, it provides no protection against Plaintiffs' federal *Monell* claim.

## XXII.  DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY

### a.    It Was Clearly Established Long Before 2010 that Defendants' Misconduct Violated the Constitution

As even Defendant York acknowledges, many "of the issues in this case involve clearly established law," and as a result, qualified immunity is simply not applicable.  *See* Dckt. No. 180-23.  Ignoring this, Defendant Broughton argues that it was not clearly established by 2011 that a police officer could be personally liable for malicious prosecution, fabrication of evidence, failure to intervene, and conspiracy based upon the particularized facts of this case.  *See* Dckt. No. 177-1 at 31-33.  Defendants' qualified immunity argument is without merit.  As this Court has already ruled:

At the time of Plaintiffs' arrest and pretrial detention, they had a clearly established right to be free from malicious prosecution and fabricated evidence under the Fourth Amendment. *Spurlock v. Satterfield*, 167 F.3d 995, 1005 (6th Cir. 1999) ("[P]laintiffs sufficiently raised claims that allege violations of their constitutional rights ... Namely, that Satterfield and other defendants wrongfully investigated, prosecuted, convicted, and incarcerated them; that Satterfield fabricated evidence and manufactured probable cause; that they were held in custody, despite a lack of probable cause to do so; and that Satterfield and others conspired to maliciously prosecute and convict them. Satterfield cannot seriously contend that a reasonable police officer would not know that such actions were inappropriate and performed in violation of an individual's constitutional ... rights.").

*Hoskins v. Knox Cty., Kentucky*, No. CV 17-84-DLB-HAI, 2018 WL 1352163, at *20 (E.D. Ky. Mar. 15, 2018)

Nothing has changed since this Court's earlier ruling that the Defendants are not entitled to qualified immunity for the type of misconduct that exists in this case.  It was clearly established law that Defendants could not violate Plaintiffs' constitutional rights well before the events at issue. *See Gregory, 644 F.3d, 725,* at 760; *Mooney v. Holohan*, 294 U.S. 103 (1935), *Pyle v. Kansas*, 317 U.S. 213 (1942), and *Napue v. Illinois*, 360 U.S. 264 (1959), for the proposition that it has been clearly established for nearly 100 years that fabricating evidence for use against a criminal defendant violates due process. Furthermore, each of the remaining constitutional violations that Plaintiffs allege violated their clearly established rights at the time of the Mills homicide. *See, e.g., Hinchman v. Moore*, 312 F.3d 198, 205–06 (6th Cir. 2002) ("[f]alsifying facts to establish probable cause to arrest and prosecute an innocent person is of course patently unconstitutional") (citing *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989)); *Spurlock*, 167 F.3d at1004-06 (the right to be free from malicious prosecution is clearly established law for purposes of qualified immunity); *Windswor v. Tennessean*, 719 F.2d 155, 165 (6th Cir. 1983) (recognizing "freedom from a governmental conspiracy to violate one's civil rights is a clearly established right); *Stovall v. Denno*, 388 U.S. 293, 302 (1967)(holding that suspects have a constitutional right to be free from identification procedures "so unnecessarily

suggestive and conducive to irreparable mistaken identification" that the identification's use violates due process of law).  For these reasons, the Defendants qualified immunity arguments must be rejected.

> **b.     For All Reasons Discussed Above, Defendants Violated Plaintiffs' Clearly Established Constitutional Rights**

Completing the qualified immunity analysis, there is sufficient evidence for a reasonable jury to conclude that Plaintiffs' constitutional rights were violated.  As described above, the Defendants accomplished their task of framing Plaintiffs through the manipulation of witnesses, coercion of witnesses, fabrication of witness statements, and a host of other misconduct.  See PSOF ¶ 1-219.  At multiple stages, these Defendants had opportunities to intervene and stop the violation of Plaintiffs' constitutional rights but declined to do so.  Taking this evidence and all reasonable inferences in the light most favorable to Plaintiffs, these acts unquestionably constitute violations of Plaintiffs' clearly established constitutional rights. *Gregory*, 444 F.3d at 737. As such, the Defendants' qualified immunity argument must be rejected.

> **c.    Defendant Pickard is Not Entitled to State-Law Qualified Immunity**

Defendant Pickard argues that he is entitled to state-law qualified immunity.  See Dckt. No. 179-1 at 40.  As is amply demonstrated above, Defendant Pickard's argument fails.[21]  The Kentucky Supreme Court has long held that the qualified immunity defense "is available only to officials acting in good faith. *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky.2001) ("[W]hen sued in their individual capacities, public officers and employees enjoy only qualified official immunity, which affords protection from damages liability for good faith judgment calls made in a legally

---

[21] Defendant Pickard argues that his acts were discretionary rather than ministerial.  See Dckt. No. 179-1 at 42.  This argument is a non-sequitur, as police officers do not have discretion to intentionally violate the constitutional rights of citizens.  As stated *supra*, the Defendants actions were performed in bad-faith, and as such, qualified immunity does not attach.

uncertain environment."). Acting with malice and acting in good faith are mutually exclusive. *Martin v. O'Daniel*, 507 S.W.3d 1, 5–6 (Ky. 2016), as corrected (Sept. 22, 2016).

Given the lengthy record described more fully above, a jury could reasonably find that Defendant Pickard coerced witnesses, fabricated false evidence, withheld exculpatory evidence, and participated in an unduly suggestive identification procedure. This evidence is sufficient to meet the standard of malice, which defeats Defendant Pickard's assertion of state-law qualified immunity. *Id.* Indeed, official immunity is unavailable to public officers who acted "with the malicious intention to cause a deprivation of constitutional rights or other injury ...." *Yanero*, 65 S.W.3d at 523 (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 815, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). As has been repeatedly held, summary judgment is inappropriate on the grounds of qualified immunity as Defendant Pickard cannot show that Plaintiffs "could not satisfy [their] burden of proving malice, which is an issue of fact to be decided by the jury and may be inferred, or not, from the absence of probable cause. *Martin v. O'Daniel*, 507 S.W.3d 1, 5–6 (Ky. 2016), as corrected (Sept. 22, 2016)

## XXIII. A TRIAL IS NECESSARY ON PLAINTIFFS' SUPERVISOR LIABILITY CLAIM AGAINST JACKIE PICKRELL JOSEPH

### A. A Reasonable Jury Could Conclude that Defendant Joseph Is Liable for the Misconduct of Defendants York and Mefford Because she Knowingly Acquiesced to the Misconduct

Plaintiffs have raised a supervisor liability claim based on Defendant Joseph's personal participation in and knowing acquiescence of the unconstitutional conduct of detectives under her supervision, including Defendants York and Mefford. Defendant Joseph, who was a Sergeant at Post 10 in 2010, claims that no supervisory liability exists because of her purported lack of personal involvement, and as a result, "Plaintiffs' claims that Sgt. Joseph is vicariously liable for the case officer's alleged fabrication of evidence, conspiracy, and malicious

prosecution because she was his supervisor fails to state a claim as a matter of law." Dckt. No. 178 at 26; PSOF ¶ 259. Specifically, Sgt. Joseph argues that "she was not required to participate in the investigation, conduct her own investigation, or micromanage how the investigation was performed," and that her "supervision of the investigation was limited to case reviews to check for technical compliance and look for internal consistencies [sic]." Dckt. No. 178 at 20. According to Defendant Joseph, there "was no indication of witness coercion in the investigative materials for supervisory review," and "she had no duty to conduct a separate investigation or double-check witness statements." *Id.* at 21. Defendant Joseph's arguments fail for several reasons.

First, Plaintiffs have never claimed that Defendant Joseph is liable because she merely supervised – or failed to supervise - Defendants York and Mefford. Rather, Defendant Joseph "at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). As argued throughout, Sgt. Joseph was well aware of the coercive "tactics" Defendant York used to secure [fabricated] witness statements.  PSOF ¶ ¶ 259-288.  As such, her arguments fail.

Plaintiffs concede that supervisory liability under § 1983 cannot attach where the allegation of liability is based "solely on the right to control employees" or "simple awareness of employees' misconduct." *McQueen v. Beecher Cmty. Schs.,* 433 F.3d 460, 470 (6th Cir. 2006) (internal citations omitted); *see also, Horn v. City of Convington,* 2015 WL 4042154 at *7 (E.D.Ky. July 1, 2015). For liability to attach to Defendant Joseph, Plaintiffs must prove that she did more than play a passive role in the alleged violations or show mere tacit approval of the goings on; they must prove that she "either encouraged the specific incident of [alleged] misconduct or in some other way directly participated in it."  *Peatross v. City of Memphis,* 818

F.3d 233, 241-242 (6th Cir. 2016). Plaintiffs must show "some active constitutional behavior" on the part of the supervisor. *Id.* at 241; *See also Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999); *Chavez v. Illinois State Police,* 251 F.3d 612, 651 (7th Cir. 2001) ("to be liable for the conduct of subordinates, a supervisor must be personally involved in that conduct," and "supervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see."). Plaintiffs easily meet this burden.

Attempting to downplay her liability, Defendant Joseph argues that "nowhere in the Complaint or in the discovery developed since is there any evidence that Sgt. Joseph was present during the alleged events, knew of the events beforehand, approved of them, participated in the investigation, or in the arrests or prosecution of the Plaintiffs." Dckt. No. 177 at 28. Again, Defendant Joseph ignores the actual record in this case.  PSOF ¶¶ 259-288.  Further, the Sixth Circuit has cautioned, however, that "active behavior does not mean active in the sense that the supervisor must have physically put his hands on the injured party or even physically been present at the time of the constitutional violation." *Peatross,* 818 F.3d at 242; *See, e.g., Campbell v. City of Springboro, Ohio,* 700 F.3d 779, 790 (holding that a police chief was not entitled to qualified immunity although he was not "actively involved in the incidents" at issue); *Braddy v. Florida Dep't of Labor & Employment Sec.,* 133 F.3d 797, 802 (11th Cir. 1998) (explaining supervisor liability occurs either when the supervisor personally participates in the constitutional violation or when there is a causal connection between actions of the supervising official and the constitutional deprivation; "the causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and she fails to do so.") *cf. Doe v. City of Roseville,* 296 F.3d 431, 440 (6th Cir.

2002) (noting that encouragement, authorization, approval, and knowing acquiescence are all sufficient to confer liability).

Here, Defendant Joseph was on notice of Defendant York's "technique" of securing fabricated statements- like those he secured throughout the Mills' homicide investigation- because she had actively participated in an interview in another homicide investigation with Defendant York on December 3, 2011where they used the same tactics. PSOF ¶ ¶ 264-288. Specifically, Defendant Joseph and Defendant York devised a plan on how they were going to question Dave Fox, an individual they believed may have information into the murder of Bobby Wiggins. *Ex.* 18, Joseph Dep. Tr. at 129. Her role was to play "good cop," and York's was to play "bad cop." *Id.* (As Defendant Joseph testified at her deposition, she was to play the "buddy-buddy to him and try to get him to come around and give the statement"…and when that failed, "Defendant York was like, 'Well, I'm going to try to be...a little more aggressive with him and see – and see if that will get him to talk." *Id.* at 129).

After several hours of Defendant Joseph questioning Mr. Fox and failing to force him to give them the fabricated statement for which they hoped, Defendant York lived up to his role – at Defendant Joseph's encouragement. PSOF ¶ ¶ 243-251.  As Defendant Joseph watched, Defendant York physically and verbally assaulted Mr. Fox, screaming at him, threw a chair at the wall, and knocked Mr. Fox's hat off his head. *Id.* at 250. As the recording demonstrates, Defendant York repeatedly threatened and cursed Mr. Fox, saying: "I'm going to put you in fucking prison because you God damn lied to me. I'm so fucking sick of this God damn bullshit. You fucking lied…Fuck you, fuck you, fuck you. Let's put his ass in the fucking jail."  PSOF ¶ 246.   Defendant Joseph did nothing to stop Defendant York because, incredulously, to her, "it didn't appear that he was being aggressive at all." PSOF ¶ 250.

The fact that Defendant York subsequently used some of these same techniques when forcing fabricated statements from the witnesses after December 2011 in the Mills' homicide investigation comes as no surprise. *See,* PSOF ¶ ¶ 69-152. Defendant Joseph did not discipline Defendant York for his misconduct during the Dave Fox interview nor did she require him to take any remedial training. PSOF ¶ 267. Instead, she encouraged, authorized and knowingly acquiesced Defendant York's misconduct – behavior that he continued throughout his investigation in the present case. *See, City of Roseville,* 296 F.3d at 440 (6th Cir. 2002) (noting that encouragement, authorization, approval, and knowing acquiescence are all sufficient to confer liability).

Defendant Joseph's claim that "there was no indication of witness coercion in the investigation materials for supervisory review" is without merit. Dckt. No. 178 at 21. Because Joseph had personally witnessed and participated in Defendant York's coercive techniques, Defendant Joseph cannot now claim she had no knowledge of Defendant York's misconduct by "turning a blind eye for fear of what [she] might see." *Chavez,* 251 F.3d at 651. In fact, Defendant Joseph testified that had she learned that Detective York was questioning witnesses in the Mills' homicide investigation using the same tactics that he had used with Mr. Fox, she would not have disapproved: she would not have stopped him if she had learned that he was swearing at witnesses in the Mills' investigation, and she would not have stopped him if she had learned that he had threatened to charge witnesses with crimes unless they told him the information he wanted to hear from them. PSOF ¶ ¶ 280-284. As such, a reasonable jury could conclude that Defendant Joseph is liable for Defendant York's misconduct in the Mills' investigation.

**B. A Reasonable Jury Could Conclude that Plaintiffs' Wrongful Continued Detention was Caused by the Deliberate Indifference and Recklessness of Defendant Joseph When she Failed to Adequately Train and Supervise Defendants York and Mefford**

**i. Defendant Joseph's Deliberate Indifference and Recklessness Caused Plaintiffs' Wrongful Detention**

Defendant Joseph failed to supervise officers under her command, including Defendant York. A supervisory official's failure to supervise, control or train the offending individual is actionable when the supervisor either encouraged the specific incident of misconduct or in some other way directly participated in it. *Peatross,* 818 F.3d at 242. As part of this inquiry, this Court also "considers whether there is a causal connection between the defendant's wrongful conduct and the violation alleged." *Id.*; s*ee, e.g., City of Roseville,* 296 F.3d at 441. Plaintiff has satisfied this standard regarding Defendant Joseph.

As noted above, Defendant Joseph was personally aware of coercive techniques Defendant York employed to obtain fabricated statements. PSOF ¶¶ 259-288.  Despite this knowledge, Defendant Joseph failed to adequately supervise Defendant York, turning a blind eye to his unconstitutional conduct. *See, Peatross,* 818 F.3d at 242; *Chavez,* 251 F.3d at 651. Her refusal to supervise, train, and correct Defendant York's misconduct "is a causal connection between Defendant York's wrongful conduct and the violations alleged" in the present case. *City of Roseville,* 296 F.3d at 441.

Specifically, the record illustrates that Sgt. Joseph's supervision of Defendant York's investigation in the Mills' murder was non-existent. Although the Kentucky State Police Policies and Procedures required a quality control checklist in every case, Defendant Joseph never required Defendant York to complete one. PSOF ¶ 264.  Likewise, Defendant Joseph could not recall having a single conversation with Defendant York about the Mills' investigation and did

not document having reviewed even one of the approximate 30 investigative reports that Defendant York completed in the case. PSOF ¶ 265.  She did not keep apprised of which witnesses were being interviewed because she did not "micromanage any investigation" – even after personally participating in and witnessing the misconduct in the Dave Fox interview. PSOF ¶ 268.  Likewise, Defendant Joseph did not take any steps to ensure that Defendant York was documenting exculpatory evidence in the Mills' investigation. PSOF ¶¶ 270-272.  She did not know that Defendant York initiated murder charges against Kayla Mills or that he had struck a deal with Kayla to not pursue those charges if she gave a statement implicating Plaintiff Taylor. *Id.* And even if Defendant Joseph learned that Defendant York was making promises of consideration to witnesses that were not documented, she would not have done anything about it. *Id.* Instead, Defendant Joseph would have turned a blind eye to it; just as she did the other unconstitutional conduct committed by Defendants York and Mefford.

With recklessness and deliberate indifference, Defendant Joseph ignored the significant missteps taken by the detectives under her command in the Mills' investigation. For example, although Detective Cornett, who Defendant Joseph admitted was under her command, audio recorded the initial interview of Michael Crump at the crime scene, that recording was never disclosed, and a contemporaneous report was not drafted. PSOF ¶¶ 273-277. Despite this being brought to Defendant Joseph's attention, she never followed through with Detective Cornett to determine whether he had completed a supplemental report on the interview with Crump and can not recall ever speaking with him about the substance of the interview with the eyewitness - despite the missing audio and no contemporaneous report. *Id.*

In fact, Defendant Joseph could not recall taking a single affirmative step to ensure that detectives under her command documented information learned in witness interviews. PSOF ¶¶

269-270.  And, she admitted that she did not actually provide supervision during the required quarterly file reviews: "there's no room in a quarterly review for your opinions or how you feel a case should go forward. You know, that's what the detective does...there's nowhere in there where I read a case and make suggestions on how I feel that they should pursue a case." PSOF ¶ 277.

Defendant Joseph never received training herself on how to conduct a homicide investigation or how to conduct a proper photo identification. PSOF ¶¶ 260-262.As a result, she felt it was "inappropriate for [her] to tell somebody who's been doing homicide investigations for ten years how they should be doing their job." PSOF ¶ 260.  In fact, she testified it was not "her job" to "give advice on a homicide case," and that the officers "have the discretion and the freedom to do their investigations the way that they see appropriate." PSOF ¶ 261.  Here, that resulted in Defendant York committing egregious misconduct – acquiesced to and approved by his supervisor Joseph.  Under these circumstances, a reasonable jury could conclude that Defendant Joseph is liable because sufficient evidence exists for the jury to infer that with indifference and reckless disregard she "at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers."  *Shehee,* 199 F.3d at 300.

### ii. A Reasonable Jury Could Conclude that Given Defendant Joseph's Failure to Supervise, Defendant York believed He Could Violate Plaintiffs' Constitutional Rights with Impunity

Because his supervisor not only participated in but also encouraged Defendant York's misconduct and because he was not trained differently, Defendant York believed he could violate Plaintiffs' constitutional rights with impunity. PSOF ¶¶ 1-219, 284-288.  Defendant York openly concedes that he yells and threatens witnesses while questioning them in homicide investigations, including in this case, because that was "a tactic that we do use

– in all – in a majority of criminal investigations." PSOF ¶ 284. According to Defendant York, he was not provided with "any particular training at the academy [on] whether to yell or not." *Id.* In fact, Defendant York claims to have learned this tactic "on the job." *Id.*

Additionally, Defendant York also openly concedes that he makes promises of consideration to witnesses and suspects in homicide investigations. PSOF ¶ 285. For instance, Defendant York admits that he promised James Otis Sizemore that he would never go to prison if he gave a statement implicating himself and William Anderson in the Wiggins' murder. *Id.* In his words, "I don't remember the particulars of that, but that is a tactic that I use. If I was promising something that I could not deliver on because there was nothing to promise." *Id.* As detailed above, Defendant York admits to making a number of promises to witnesses in the Mills' investigation, none of which were ever documented in an investigative report.

Relatedly, Defendant York admits that at the time he began his investigation into the death of Katherine Mills, Defendant York had not reviewed any Kentucky State Police policies or procedures on how to question witnesses or interrogate suspects. PSOF ¶ 286. Likewise, supervisors never provided Defendant York with any training on how to conduct an identification procedure that is not unduly suggestive; the only training Defendant York received from the Kentucky State Police on how to conduct a lineup was that he should go to "AFIS and get photographs of similar people." PSOF ¶ 287. The Kentucky State Police also failed to provide Defendant York with any training on what type of information should be documented in a police report. PSOF ¶ 288. As it relates to those reports, Defendant York revealed that he did not submit his police reports to Defendant Joseph after completing them. *Id.* He simply "hit enter" and then did not know what happened with them thereafter. *Id.* Given this, a reasonable jury could conclude that Defendant Joseph's failure to supervise allowed detectives under her

command – including the Defendants in this case – to believe they could act with impunity in violating citizens' constitutional rights.

### C. The Plaintiffs Properly Brought Claims of Negligence, Gross Negligence and Malicious Prosecution Claims

Defendant Joseph next argues that "there is no evidence that Sgt. Joseph was negligent regarding promulgating policies, training, or supervising." Dckt. No. 177 at 28. Plaintiffs, however, have illustrated Defendant Joseph's negligent supervision above. *See supra.* Defendant Joseph next argues that "Plaintiffs are barred from asserting claims of negligence and gross negligence in addition to malicious prosecution claims based on the same conduct." Dckt. No. 178 at 31. However, because "the situs of the alleged injuries are distinct," this argument is without merit. *See, Virgil v. City of Newport,* 2018 WL 344986 at 3 (E.D.Ky., January 9, 2018) *citing, Gregory v. City of Louisville,* 444 F.3d 725, 750 (6th Cir. 2006). In any event, Plaintiffs only move forward on their failure to supervise (Count III) and negligent supervision (IX) claims against Defendant Joseph, while dismissing the remaining counts against her. As a result, Defendant Joseph's argument on this score is moot.

## XXIV. A TRIAL IS NECESSARY ON PLAINTIFFS' *MONELL* THEORIES AGAINST DEFENDANT KNOX COUNTY

Defendant Knox County also moves for summary judgment on Plaintiffs' *Monell* claim. *See* Dckt. No. 179-1 at 37-40. Again, summary judgment should be denied. Whether the County is liable here is to be decided by a jury. Plaintiffs begin with the basic principles regarding municipal liability that govern here (including that a County can be liable even if individual officers have been dismissed from the case), and then discuss the three independent claims against the City that require a trial.

Defendant Knox County can be directly liable under § 1983 for constitutional violations caused by (1) enforcement of a municipal policy, *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); (2) a widespread, though unwritten, custom or practice, *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988); or (3) action of a municipal final policymaker, *Pembaur*, 475 U.S. at 483. Municipalities can also be liable for failure to train, where the need for more or better training is sufficiently obvious, and where the lack of training causes injury. *City of Canton v. Harris*, 489 U.S. 378, 388–89 (1989). Failure to train is a subset of a municipal policy claim. *Id.* at 390. Furthermore, "policy or custom does not have to be written law; it can be created 'by those whose edits or acts may fairly be said to represent official policy.'" *Paige v. Coyner*, 614 F.3d 273, 284 (6th Cir. 2010) (quoting *Monell*, 436 U.S. at 694).  For the reasons discussed below, Plaintiffs are deserving of a trial under each theory.

Further, the defense of qualified immunity is unavailable to municipalities. *Owen v. City of Independence*, 445 U.S. 622, 657 (1980). Even if officers had qualified immunity because the law was not clearly established at the time of their actions (disputed in this case in any event), "a municipality may nevertheless be liable if the actions complained of rise to the level of constitutional violations in light of present law." *Barber v. City of Salem*, 953 F.2d 232, 237 (6th Cir. 1992) (citing *Owen*, 445 U.S. at 657–58). Given that the City's liability is evaluated in light of present law, the City's suggestion that its policies were acceptable in light of "generally accepted practices" in 1975 (which, in any event, is unsupported any evidence), must be rejected.

Finally, contrary to the County's argument otherwise, Dckt. No. 179-1 at 40, the County may be liable even if no individual defendant is liable. Though, of course, the record discussed above well exceeds the standards at this stage against Defendant Pickard for malicious prosecution, fabrication, conspiracy, and failure to intervene.  In any event, in *Garner v.*

*Memphis Police Department*, the Sixth Circuit rejected the city's argument that because the only defendant officer in the case had been dismissed by the district court, the city should also be dismissed. 8 F.3d 358, 365 (6th Cir. 1993). While Plaintiffs may need to prove an underlying constitutional violation committed by a city employee, plaintiffs do not have to prove actual liability on the part of a named defendant officer. *Id.* For instance, a court could find that defendant officers in a case are entitled to dismissal, and yet, if a constitutional violation has been committed, the plaintiff could still prevail on a *Monell* claim. *Id.*; *Richko v. Wayne Cnty.*, 819 F.3d 907, 920 (6th Cir. 2016); *Doe v. Sullivan Cnty.*, 956 F.2d 545, 553–54 (6th Cir. 1992). Thus, even if the Court were to find that Defendant Pickard was entitled to summary judgment, Plaintiff can still prevail against the County if there is enough for a reasonable jury to find a constitutional violation was committed.

There are multiple independent claims establishing Plaintiffs right to a jury trial against Knox County here: (1) the County's lack of any policy regarding *Brady* obligations, fabrication of evidence, or how to conduct a criminal investigation; (2) the County's widespread custom of practice of violating the constitutional rights of citizens; (3) the actions of the County's policymaker, in this case, Defendant Pickard, and (4) the County's failure to train and supervise its officers in light of the obvious need. Taking the evidence in the light most favorable to the nn-movant, summary judgment is improper here, and each theory of Plaintiffs' *Monell* claim should proceed to trial.

### A.  Defendant Knox County's Conclusory Arguments Are Insufficient to Shift the Summary Judgment Burden

As an initial matter, Defendant Knox County makes only the most conclusory arguments related to Plaintiffs' *Monell* theories of liability in support of its motion. *See* Dckt. No. 179-1 at 38-40.  Defendant Knox County makes no substantive argument at all; instead, it sets out generic

*Monell* case law and then states without elaboration that Plaintiffs were not prosecuted pursuant to any of its policies or practices. *Id.* This statement is nothing more than a legal conclusion devoid of any factual discussion. Defendant Knox County's entirely conclusory assertions do not shift the summary judgment burden to Plaintiffs. *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.,* 276 F.3d 845, 848 (6th Cir.2002); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986) (requiring the moving party to set forth "the basis for its motion, and identify[ ] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate an absence of a genuine issue of material fact"). The moving party must support his or her "assert[ion] that a fact cannot be ... disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials[.]" Fed.R.Civ.P. 56(c)(1)(A). Defendant Knox County has completely failed to meet this standard, and Plaintiffs should be allowed to proceed to trial on his *Monell* theories of liability on that basis alone.

### B. The County's Conscious Choice Not to Have Policies on *Brady,* Fabrication, and Other Crucial Issues Amounts to Deliberate Indifference.

A municipality may be held liable under § 1983 for its *deliberate choice not to have a policy* when one is called for. In *Canton*, the Supreme Court "distinguished between a city's deliberate or conscious choice not to have a policy, which can fairly be characterized as a municipal policy, and the city's occasional negligent administration of an otherwise sound program." 489 U.S. at 391 (internal citations and quotation marks omitted). Liability occurs in "a situation that demands a policy," where the failure to implement a policy "ignored a plainly

obvious danger." *Armstrong v. Squadrito*, 152 F.3d 564, 577–78 (7th Cir. 1998); *Jones v. City of Chicago*, 787 F.2d 200, 204 (7th Cir. 1986) ("In situations that call for procedures, rules or regulations, the failure to make policy itself may be actionable."); *Avery v. Burke Cnty.*, 660 F.2d 111, 114 (4th Cir. 1981) ("Official policy may be established by the omissions of supervisory officials as well as from their affirmative acts."); *Tsao v. Desert Palace, Inc*., 698 F.3d 1128, 1143–44 (9th Cir. 2012).

Thus, it means little that the County argues that it had no express policies instructing officers to withhold exculpatory evidence, fabricate evidence, threaten witnesses, or to conduct homicide investigations. Dckt. No. 179-1 at 39-40. The County can be liable for its deliberate choice not to have policy in these areas.

Moreover, Plaintiffs need not prove a pattern of unconstitutional conduct to prevail on this type of claim regarding the failure to adopt a policy where the need for policy is obvious. "If the decision to adopt [a] particular course of action is properly made by that government's authorized decision makers, it surely represents an act of official government 'policy' as that term is commonly understood." *Pembaur*, 475 U.S. at 481. "More importantly, where action is directed by those who establish government policy, *the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly*." *Id.* (emphasis added); *see also Gregory*, 444 F.3d at 755 (plaintiff can show the municipality's inaction had the "obvious consequence" of leading to a constitutional violation of the sort experienced by the plaintiff); *Miller v. Calhoun Cnty.*, 408 F.3d 803, 816–17 (6th Cir. 2005) (if the violation is a "known and obvious" or "highly predictable consequence" of an ongoing course of action or inaction, knowledge of past violations is unnecessary and deliberate indifference will be assumed).

For example, in a case involving similar claims as here, the court denied summary judgment to a city where the plaintiff's *Monell* claim alleged that the city failed to adopt any *Brady* policies or training in 1971. *Haley v. City of Boston*, 2013 WL 4936840, at *5 n.12 (D. Mass. Sept. 12, 2013.  There, the court explained that "the lack of pattern evidence is not necessarily fatal to a municipal liability claim" where it was foreseeable that a constitutional violation would result without a policy. *Id.* (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 832 (1985) (Brennan, J., concurring)). This Court should deny summary judgment here, as Knox County similarly made the deliberate choice not to have policies regarding obligations with respect to *Brady*, interviewing witnesses, fabricating evidence, and other critical police functions.

By 2010, The Knox County Sheriff's Department had one source for written policies and procedures:  The Knox County Sheriff's Office Policy and Procedures Manual.  PSOF ¶ 218. There were major problems with these policies. PSOF ¶ 219. In December 2010, the policies and procedures did not provide any guidance to officers on how to conduct a criminal investigation. *Id.*  Equally as concerning, of the written policies and procedures that did exist, officers were not required review them and were not apprised of revisions. *Id.* When asked if Knox County officers were required to review the policies and procedures of the department, Sheriff Pickard admitted "I don't – they wasn't required to, no."

Most importantly, by 2010, the Knox County Sheriff's Department did not have any policies or procedures that required officers to document information gathered during a homicide investigation.  PSOF ¶ 220. In fact, Knox County did not have any policies or procedures that provided guidance to officers on how to conduct a criminal investigation at all.  *Id.* Given this, there were no policies nor procedures that informed officers that they were required to preserve

or disclose evidence that tended to negate the guilt of the accused or reduce his or punishment for a crime. *Id.* Similarly, there were no policies or procedures that required officers to document witness interviews in a criminal investigation. *Id.* There were likewise no policies or procedures that instructed officers not to fabricate evidence or coerce witnesses. *Id.* Although there were clear policy gaps, there were no unwritten policies or procedures that filled such gaps. *Id.*

Indeed, in this case, Defendant Pickard was not familiar with *Brady* and testified that he did not take a single note or create a single report regarding any investigation in which he participated. PSOF ¶ 221. Defendant Pickard readily concedes that he never had a conversation with Defendant York about documenting information learned; he just "assumed" that Defendant York would document such details. *Id.* When asked if his lack of documentation of activities conducted in a murder investigation was consistent with the training he received, Defendant Pickard aptly revealed "I didn't – I can't say I ever had training on it." *Id.* None of this is surprising given that Knox County had no policies, procedures, or training that informed its' officers that such documentation was required. And, by 2010, *Brady* was not new: it had been the law of the land for nearly fifty years. As expert Drago explains, "to have effective constitutional policing, every law enforcement agency must have the three critical pillars which link the operational standards of the department: policy, training, and supervision." *Ex.* 83, Drago Report at 26.

Not only were there no policies relating to documenting investigatory steps in a criminal investigation, but there was no practice requiring officers to document or turn this information over to prosecutors. PSOF ¶ 222. Although Defendant Pickard was involved in critical aspects of the underlying criminal investigation, learned of significant material evidence during that investigation that exculpated Plaintiffs – and implicated alternate suspects, he readily admits that

198

he did not create a single note or report documenting any of the information he learned. *Id.* As demonstrated, Defendant Pickard's practice, as the policymaker for the Knox County Sheriff's Department, was to not document investigatory steps taken during a criminal investigation. *Id.*

These failures ignored the plainly obvious danger that citizens' constitutional rights would be violated in the absence of such policies. In sum, there is ample evidence in the record to permit a jury to conclude that it was the Knox County Sheriff Department's policy and practice not to require the disclosure of exculpatory evidence.

The lack of Knox County's policies and procedures was endemic to numerous crucial areas of policing; no policies guided police on areas including preservation or documentation of exculpatory evidence; conducting interrogations and interviews; eyewitness identification; or training or supervision of officers. PSOF ¶ 224. As police-practices expert Drago explains, the Knox County Sheriff's Department lacked reasonable and appropriate policies in these areas. *Id.* There, Mr. Drago opines that "Because of their refusal to implement policies, procedures, and training on such vital areas, the Knox County Sheriff's Office has given tacit approval to the members of the agency to violate citizen's constitutional rights as it relates to criminal investigations, interrogations, interviews, production of exculpatory evidence, preservation of evidence, etc…" *Ex.* 83, Drago Report at 28.

Given this, a jury could readily conclude that the County's deliberate choice not to have policies regarding officers' obligations played a direct role in Plaintiffs' wrongful incarceration. Policies regarding *Brady*, fabrication of evidence, and guidance for officers conducting criminal investigations would have required documentation of: (1) the information he learned about the blue car at the Appalachian Children's Home being used by employees on December 20, 2010; (2) his communication with Allen Helton, including promises of consideration and the

199

manufacturing of Helton's false statement; (3) his interactions with Kayla Mills and the manufacturing of her false statement; and (4) the unduly suggestive identification procedures that he participated in.  Of course, Defendant Pickard failed to document a host of other material, as is described more fully above, each of which is fully attributable to the lack of policies, procedures, and training by Defendant Knox County.

### C. The County's Failure to Train and Supervise Amounts to Deliberate Indifference

To prevail on his *Monell* claim for Defendant Knox County's failure to train or supervise, Plaintiffs must show that (1) the County's training or supervision was inadequate for the tasks that officers must perform; (2) the inadequacy was the result of the County's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury. *Ciminillo v. Streicher*, 434 F.3d 461, 469 (6th Cir. 2006). There is sufficient evidence for a reasonable jury to find in favor of Plaintiff on this claim.

As with Plaintiffs' claim regarding the County's failure to adopt necessary policy, single-incident liability is available where the need for more or different training is so obvious that a plaintiff's injury is a "highly predictable consequence" of deficient training. *Jackson v. City of Cleveland*, 925 F.3d 793, 836 (6th Cir. 2019); *Connick v. Thompson*, 131 S. Ct. 1350, 1361 (2011); *Canton*, 489 U.S. at 390; *Bd. of the Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 396, 409 (1997); *Shadrick v. Hopkins Cnty.*, 805 F.3d 724, 739 (6th Cir. 2015). "Liability under this theory depends on the 'likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights." *Brown*, 520 U.S. at 409–10.

The Supreme Court in *Connick* contemplated the situation presented here: The failure to train officers regarding *Brady* obligations presents a highly predictable danger of constitutional

violations. In *Connick*, the Court concluded that there was no single-incident liability for failure to train *prosecutors* about *Brady* because prosecutors are legally trained and familiar with *Brady*. 131 S. Ct. at 1361–65. The Court expressly distinguished attorneys from police officers: "legal '[t]raining is what differentiates attorneys from average public employees.'" *Id.* at 1361; *see also Id.* 1363 ("A licensed attorney making legal judgments, in his capacity as a prosecutor, about *Brady* material simply does not present the same 'highly predictable' constitutional danger as *Canton*'s untrained officer."). In fact, the Court expressly stated that police officers are not equipped with the tools to find, interpret, and apply *Brady*: "The reason why the *Canton* hypothetical is inapplicable is that attorneys, ***unlike police officers***, are equipped with the tools to find, interpret, and apply legal principles." *Id.* at 1364 (emphasis added).

The Sixth Circuit's decisions in *Gregory* and *Jackson* are directly on point and controlling. In *Gregory*, a plaintiff who had been wrongfully convicted due to a *Brady* violation alleged that the City of Louisville failed to train its officers in the requirement to disclose exculpatory material. The district court granted summary judgment to the city. The Sixth Circuit reversed. The court examined the evidence presented by plaintiff, which was (1) expert testimony that the police department's training on handling of exculpatory materials was nonexistent, and (2) "deposition and inferential evidence" that officers generally did not receive any instruction in the handling of exculpatory materials. 444 F.3d at 753–54. The city countered with testimony from a former chief of police that "officers are trained to document and turn over to the prosecutor all evidence in their possession." *Id.* at 754. The Court explained that, at "a minimum, Plaintiff has presented sufficient evidence to survive summary judgment on his failure to train allegations regarding exculpatory materials." *Id.* "The obligation to turn over exculpatory materials," the court continued, "is a significant constitutional component of police duties with

obvious consequences for criminal defendants." *Id.* In sum, the Court held that "the district court

erred when it failed to consider that evidence of failure to train on the proper handling of

exculpatory materials has the 'highly predictable consequence' of constitutional violations." *Id.*

*See also Moldowan*, 578 F.3d at 393 (affirming denial of summary judgment on failure-to-train

claim regarding *Brady*).   Likewise, in *Jackson v. City of Cleveland*, the Sixth Circuit reversed a

district court's granting of summary judgment and held that "Plaintiffs have provided testimony

sufficient for a jury to find that Cleveland did not in fact train its officers in their disclosure

obligations. *Gregory* therefore controls, and there is sufficient evidence for a reasonable jury to

find that Cleveland was deliberately indifferent to the risk of *Brady* violations."  *Jackson v. City*

*of Cleveland*, 925 F.3d 793, 837 (6th Cir. 2019).

Plaintiffs' evidence here is indistinguishable from that in *Gregory* and *Jackson*. The

County deliberately chose to provide no training on the documentation of exculpatory evidence,

the fabrication of evidence, or how to conduct a criminal investigation, even though the need for

such training was obvious to prevent the violation of a criminal defendant's constitutional rights.

There are no written policies, training bulletins, or any other documentation whatsoever

indicating that officers or detectives were taught anything on these topics. And Drago's expert

opinions on the County's deficiencies regarding their failures to train are the sort that the Sixth

Circuit has recognized as particularly valuable. *Ex.* 83, Drago Report at 27-32.  *See Russo v. City*

*of Cincinnati*, 953 F.2d 1036, 1047 (6th Cir. 1992) (reliance on expert testimony regarding a

city's failure to train under *Monell* is "particularly appropriate where, as here, the conclusions

rest directly upon the expert's review of the materials provided by the City itself").

Just as in *Gregory*, *Jackson*, and *Moldowan*, a jury must assess whether the County's

failure to train contributed to the constitutional violations here. Not only was there no polices

202

regarding *Brady* obligations, the fabrication of evidence, or how to conduct a criminal

investigation, but there was no training or supervision regarding these obligations. Thus, when

Allen Helton and Kayla Mills informed Defendant Pickard that he did not have any information

of Plaintiffs' involvement in the crime, that information was never disclosed to prosecutors or

the grand jury. Defendant Pickard similarly never disclosed that he and other Defendants fed

Kayla Mills and Allen Helton all the information about the crime.

### D. Defendant Knox County Engaged in a Custom of Misconduct Which Resulted in the Violation of Plaintiffs' Constitutional Rights

Plaintiffs also present this Court with a robust record demonstrating that a trial is

warranted on their *Monell* claim as a result of actions taken by Defendant Pickard, an official

with final policy-making authority and through a custom of tolerance or acquiescence in the

violation of federal rights that existed in Knox County. [22]   *Thomas v. City of Chattanooga*, 398

F.3d 426 (6th Cir. 2005); *Pembaur v. City of Cincinnati, 475 U.S. 469, 580 (1986).*  Under an

inaction theory, Plaintiffs must merely show that : (1) the existence of a clear and persistent

pattern of illegal activity; (2) notice or constructive notice on the part of the defendant; (3) the

defendant's tacit approval of the unconstitutional conduct, such that their deliberate indifference

in their failure to act can be said to amount to an official policy of inaction; and (4) that the

defendant's custom was the moving force or direct causal link in the constitutional deprivation.

*Thomas v. City of Chattanooga*, 398 F.3d at 429. As is discussed below, Defendant Pickard and

Deputy Eubanks violation of William Anderson's constitutional rights is clearly sufficient to

---

[22] Given that Defendant Pickard as Sheriff is a policymaker for Knox County and was personally involved in violating Plaintiffs' constitutional rights, Plaintiffs are likewise entitled to a trial through the theory that a custom or illegal policy existed due to the "actions taken by officials with final decision-making authority." *Thomas v. City of Chattanooga*, 398 F.3d 426 (6th Cir. 2005); Ex. 13, Pickard Dep. Tr. at 39, 65, 66 (for proposition that Pickard signed policies and procedures, was responsible for promulgating them); *see also* Ex. 78, 79, and 80 (for designation of Pickard's testimony as Rule 30(B)(6).

establish a clear and persistent pattern of coercing witnesses, fabricating evidence, and ultimately

maliciously prosecuting individuals for crimes they did not commit.  Given Defendants'

misconduct in this case, as with Mr. Anderson, a jury reasonable could easily conclude that

Defendant Knox County had a custom of violating citizens' constitutional rights by fabricating

evidence, coercing witnesses, and making undisclosed promises of consideration.  As such,

Plaintiffs present this Court with an uncontested[23] record establishing that such a custom existed

in Knox County prior to the initiation of charges against Plaintiffs in March of 2012. As a result,

a trial is again warranted on Plaintiffs' *Monell* claim.

The actions of Defendant Pickard and Deputy Eubanks easily establishes that a custom of

framing innocent people existed in Knox County, Kentucky prior to the initiation of charges

against Plaintiffs in March of 2012.  As is discussed in PSOF ¶¶ 228-258, Bobby Wiggins was

brutally murdered on November 23, 2011 in Bell County, Kentucky.  PSOF ¶ 230.  Prior to his

death, Mr. Wiggins left Kimberly York's residence with a man named James Otis Sizemore.  *Id.*

Mr. Sizemore ultimately lured Wiggins away by falsely informing him that he someone wanted

to purchase pills from him on Red Bird Mountain.  *Id.*  Together, Wiggins and Sizemore drove to

the top of the mountain in Wiggins' Toyota Camry.  *Id.*  There, Mr. Wiggins was brutally

murdered by James Otis Sizemore  Because Mr. Wiggins' sister filed a missing person's report at

the Knox County Sheriff's Department on December 1, 2011, Defendant Pickard and Deputy

Eubanks led the initial investigation into Wiggins' death.  *Id.*

---

[23] What is noticeably absent from every Defendants brief is any mention of Mr. Anderson's case and the significant misconduct that has been unearthed through this lawsuit.  Defendants' omissions are telling. Yet again, because Defendants fail to address the Anderson case in any respect, they have waived any arguments in their reply. *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008); *see also Novosteel SA v. United States*, 284 F.3d at 1261, 1274 (Fed. Cir. 2002)(finding that plaintiff failed to preserve an issue for review by not presenting it in its principal summary judgment brief and raising it for the first time in its reply brief).

On December 1, 2011, Defendant Pickard and Deputy Eubanks interviewed a number of witnesses, including William Anderson, all of whom revealed that Mr. Sizemore was involved in the murder and that Mr. Anderson had a solid alibi for the time-period that Wiggins was killed. PSOF ¶¶ 232-236.  In spite of this, Defendant Pickard and Deputy Eubanks set about to frame Mr. Anderson in a parallel way to how fabricated statements were conducted in this case.

On December 2, 2011, Defendant Pickard and Deputy Eubanks interrogated Mr. Sizemore at the Knox County Sheriff's Department.  PSOF ¶¶ 237-242.  There, Defendant Pickard and Deputy Eubanks fabricated Sizemore's statement by feeding information and theories of the crime, all while making considerable promises of consideration in exchange for a statement implicating Mr. Anderson.  *Id.*  When Sizemore ultimately agreed to implicate Mr. Anderson, Defendant Pickard and Deputy Eubanks offered praise and words of encouragement, stating, "That'll help you…that'll help."   PSOF ¶ 240.  Defendant Pickard and Deputy Eubanks also made significant promises of consideration and informed Sizemore that if he gave a statement implicating Mr. Anderson, he was not going to spend much time in prison. PSOF ¶ 241.  Further, although he declined to document this in any report, Defendant Pickard knew Sizemore's statement implicating Mr. Anderson was false.  PSOF ¶ 242.  In fact, Defendant Pickard later revealed that he was aware that at the time he interrogated Sizemore, he "knew the truth wasn't in him."  *Id.*  Third, after obtaining Mr. Sizemore's confession to murder – and false statement implicating Mr. Anderson - Defendant Pickard requested assistance from Defendant York and the Kentucky State Police – the same agency that assisted in violating Plaintiffs' constitutional rights.  *Id.*

Importantly, by December 2, 2011, Defendants York and Pickard were aware that Mr. Anderson had an ironclad alibi for the time that Mr. Wiggins was killed.  PSOF ¶ 243.  By then,

Dave Fox, Jeremy Ferrell, and Kimberly York had each confirmed that Mr. Anderson was not with Mr. Sizemore at the time Wiggins was last seen alive – and had not encountered Sizemore until seeing him at the store (after Wiggins' death). PSOF ¶¶ 232-236, 243. Thus, on December 3, 2011, Defendant Jason York, Defendant Jackie Joseph and Knox County Deputy Eubanks questioned Dave Fox again about Mr. Anderson's alibi. PSOF ¶ 244. Over the course of several hours, York, Joseph, and Eubanks attempted to fabricate a statement for Dave Fox that would have nullified Mr. Anderson's alibi. *Id.* Their clear objective was to get Dave Fox to state that Mr. Anderson was with Sizemore and Wiggins earlier on November 23, 2011 than when they saw Sizemore at the store. *Id.* In doing so, Defendant York and Eubanks made dozens of threats before York upped his verbal assault by threatening: "I'm going to put you in fucking prison because you God damn lied to me. I'm so fucking sick of this God damn bullshit. You fucking lied…Fuck you, fuck you, fuck you. Let's put his ass in the fucking jail." PSOF ¶¶ 244-246. Immediately after, Eubanks chimed in and threatened to charge Mr. Fox with complicity in the murder of Bobby Wiggins – even though no evidence implicating him in any crime. PSOF ¶ 246. At this same juncture, the recording captures Defendant York resorting to physical violence as part of his plan to coerce Mr. Fox into a fabricated and false statement. PSOF ¶ 247.

Dave Fox later revealed that Defendant York "smacked my hat off my head like this…[a]nd, you know, was right in my face and cursing me and accusing me of doing something I hadn't done, you know, being involved in Mr. Wiggins' murder. I didn't have nothing to do with it." PSOF ¶ 248. Defendant York's version of events is that he "kicked a chair, slapped a table" when interviewing Mr. Fox. PSOF ¶ 249. According to Defendant York, "that was a tactic I – I was using." *Id.* From Defendant Joseph's perspective, "at some point during the interview he—he threw a chair. And I believe, I don't know if it's during that segment or not, be

he did knock Mr. Fox's hat off his head."  PSOF ¶ 250.  According to Defendant Joseph, "yeah, he flipped the bill of it" as she watched.  *Id.*  Under either scenario, Defendant York resorted to both verbal and physical assaults of a witness in the presence of Defendant Eubanks, who not only did nothing to intervene but ultimately threatened to charge the witness with murder. Again, this conduct is analogous to the experience suffered by a number of witnesses in Plaintiffs' case, including: Ms. Hoskins (in her 2011 questioning), Kayla Mills, Jessie Lawson, Amber Simpson, and Allen Helton.  PSOF ¶¶ 39-42, 62-134.

Similar to Plaintiffs' experience, the fabricated statement from Sizemore resulted in murder charges for Mr. Anderson.  PSOF ¶ 251.  Further, and also like Plaintiffs' case, significant evidence implicated other individuals in the crime.  PSOF ¶¶ 253-256.  Yet again, the evidence implicating others never resulted in charges.  *Id.*  In this way, by January 14, 2012, Detective Johnson obtained a number of video-recordings and a receipt from the Lowe's in Corbin, Kentucky.  PSOF ¶ 253.  The video-footage and receipts were from the evening hours of November 25, 2011, approximately two days after Wiggins' murder.  *Id.*  Detective Johnson reviewed the footage and recognized the two individuals purchasing the materials as Jeffrey Gray and James Otis Sizemore.  PSOF ¶ 254.  According to Johnson, a review of the receipt and video footage showed Gray and Sizemore purchasing "six bags of pulverized lime, a Maglite 3D LED flashlight, a Cobalt digging shovel, 40-pound bag salt crystals, water, and 8-pack of D Duracell batteries."  The items purchased was "of interest because we know that lime was recovered from the body of Bobby Wiggins."  *Id.*  In spite of this, Jeffrey Gray was never charged with any crime relating to the murder of Bobby Wiggins.  *Id.*

Like Plaintiffs' case, the Knox County Defendants had a reason to protect the uncharged individual(s).  PSOF ¶ 255-256.  Defendant Pickard had a personal motivation for framing

Anderson and protecting Gray.  PSOF ¶ 256.  In a recorded interview, Mr. Gray admitted to making monthly payments to Defendant Pickard for the right to conduct criminal activity in Eastern Kentucky without fear of prosecution.  *Id.*  Defendant Pickard would have his deputies collect the fees, which shifted from $1,000 per month to $5,000, for the pay-to-play scheme he operated.  *Id.*  According to Mr. Gray: "If you are asking me if it's true, I'm telling you yes. I'm in a case right now over trafficking drugs.  And yes, I paid officers that came to my house to collect their money.  This went on for years…I paid them $1,000 per month for a long time, for about five years."  *Id.*  Once Mr. Gray refused to pay the monthly $5,000 fee, he was arrested by the Kentucky State Police for drug trafficking. *Id.*

Conveniently, like many of the interviews in the Mills' case, the recording of the December 3, 2011 questioning of Dave Fox was not disclosed to Mr. Anderson prior to trial.  PSOF ¶ 257.  On May 25, 2016, a Kentucky jury found Mr. Anderson not guilty.   PSOF ¶ 258.

Given the above, a reasonable jury could easily conclude that Defendant Knox County had a custom of maliciously prosecuting individuals for crimes they did not commit through the coercion of witnesses, fabricating false statements, and failing to document promises of consideration.  A reasonable jury could likewise conclude that Defendant Pickard's penchant for misconduct – such as allowing deputies to accept bribes on his behalf for the decision to not charge people for criminal offenses – was of itself a custom that allowed officers to act with impunity to the constitutional rights of citizens in Knox County.  Put simply, because the Knox County Defendants got away with this misconduct in 2011, they committed those same misdeeds to frame Plaintiffs in 2012.  The record above, coupled with the serious constitutional violations that occurred in Plaintiffs' case, well exceeds the Sixth Circuit standard requiring "(1) a clear and persistent pattern of illegal activity, (2) which the Department knew or should have known about,

(3) yet remained deliberately indifferent about, and (4) that the Department's custom was the cause of the [incident] here." *Thomas v. City of Chattanooga*, 398 F.3d 433 (6th Cir. 2005). A trial on this theory is warranted.

### E. The County's Policy, Training, Customs, and Supervision Failures Caused the Violation of Plaintiffs' Constitutional Rights.

There is an extensive amount of exculpatory evidence which a jury could find was withheld in this case. Allen Helton testified that Defendant Pickard promised him consideration in exchange for repeating what the Defendants wanted and needed to hear. Plaintiffs have presented this Court with a robust record of how Kayla Mills was coerced by Defendants Pickard and York into a false and fabricated statement. As set forth above, Defendant Pickard learned of exculpatory evidence during the underlying investigation and declined, on all occasions, to issue a report regarding what he learned. Further, Defendant Pickard participated in the unduly suggestive identification procedure or Mr. Taylor. None of these facts were written in a report or disclosed. If there had been policies or training on the importance of *Brady* (or the other investigation topics discussed above), then Defendant Pickard (like the others) likely would not have committed the constitutional violations that a reasonable jury could find they committed in this case. Significantly, the County has admitted that the individual Defendants acted consistently with the policies of the County. *Ex.* 101, Knox County Response to Plaintiffs' First Set of Interrogatories at 7.

If there had been policies on disclosure of exculpatory evidence or any of the other topics discussed above, then it is likely that the detectives would have understood the parameters of the law and expectations for their conduct. As Drago explained, "First, the department must have current written policies, secondly the department has to have proper training on those policies, and lastly the department must hold the police officers accountable to follow those policies." *Ex.*

83, Drago Report at 26. All of this, at the very least, presents a jury question. "'The high degree of predictability may … support an inference of causation—that the municipality's indifference led directly to the very consequence that was so predictable.'" *Shadrick*, 805 F.3d at 739 (quoting *Bryan Cnty.*, 520 U.S. at 409–10). Moreover, causation is a jury question. *Matulin*, 862 F.2d at 613. Just as in *Gregory*, Plaintiff is entitled to a jury trial on his *Monell* claim: "A custom of failing to train its officers on the handling of exculpatory materials is sufficient to establish the requisite fault on the part of the City and the causal connection to the constitutional violations experienced by Plaintiff." 444 F.3d at 754; *see also Moldowan*, 578 F.3d at 393. The Sixth Circuit in *Gregory, Jackson,* and *Moldowan* considered the same causation issue and held that it is a jury question.

## XXV. A TRIAL IS NECESSARY ON PLAINTIFFS' STATE-LAW MALICIOUS PROSECUTION CLAIM

Plaintiffs have presented sufficient evidence of Defendants York, Pickard, Broughton, and Mefford influencing or continuing the prosecution and a lack of probable cause, as discussed above.  Under Kentucky law, Plaintiffs also have to show malice.  Malice is defined as "the intentional doing of a wrongful act to the injury of another, with an evil or unlawful motive or purpose." *Stearns Coal Co. v. Johnson,* 238 Ky. 247, 37 S.W.2d 38, 40 (1931). In Kentucky, the law permits an inference of malice from a lack of probable cause.  *Oakley v. Ballard Cty.,* 2013 WL 275641, at *2 (Ky. Ct. App. Jan. 25, 2013).  As is established above, a reasonable jury could easily conclude that probable cause was absent in this case, and that Defendants fabricated evidence, coerced witnesses, threats to frame Plaintiffs for crimes they did not commit, and withheld exculpatory evidence to initiate charges against the Plaintiffs.  Given this, Plaintiffs' state-law malicious prosecution claim is ripe for a jury to decide.

**CONCLUSION**

Concrete evidence requires a trial against Defendants York, Pickard, Broughton, Mefford, Joseph and Knox County on Plaintiffs' claims. This case is one in which all material facts are disputed, and as a result, the pending motions for summary judgment should be denied.

Respectfully submitted,


/s/ Elliot Slosar


Arthur Loevy
Jon Loevy
Michael Kanovitz
Elliot Slosar
Amy Robinson Staples
Loevy & Loevy
311 N. Aberdeen, 3rd Floor
Chicago, Illinois  60607
(312) 243-5900
(312) 243-5902


**CERTIFICATE OF SERVICE**

I, Elliot Slosar, hereby certify that on July 9, 2019, I filed the foregoing Response via the Court's CM/ECF filing system, thereby causing a copy of the Response to be served on all Counsel of Record.

/s/ Elliot Slosar