IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF KENTUCKY, LONDON DIVISION

AMANDA HOSKINS and JONATHAN TAYLOR,

        Plaintiffs,

v.

KNOX COUNTY, ET AL.,

        Defendants.

)
)
)
)
)
)
)
)
)
)

Case No. 17-CV-84

Hon. ROBERT E. WEIR

Mag. HANLY A. INGRAM

JURY TRIAL DEMANDED

# <u>EXHIBIT 2</u>



LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA

# KENTUCKIANA
## — COURT REPORTERS —

NO. 17-cv-84

AMANDA HOSKINS, ET AL.

V.

KNOX COUNTY, ET AL.

DEPONENT:

JASON YORK

DATE:

February 13, 2018



✉ schedule@kentuckianareporters.com

☎ 877.808.5856 | 502.589.2273

www.kentuckianareporters.com

1            IN THE UNITED STATES DISTRICT COURT FOR THE

2                  EASTERN DISTRICT OF KENTUCKY

3                        NO. 17-cv-84

4                    HON. DAVID L. BUNNING

5                    HON. CANDACE J. SMITH

6

7                  AMANDA HOSKINS, et al.,

8                        PLAINTIFFS

9

10                          V.

11

12                  KNOX COUNTY, et al.,

13                        DEFENDANTS

14

15

16

17

18

19

20

21

22

23   DEPONENT:  JASON YORK

24   DATE:        FEBRUARY 13, 2018

25   REPORTER:  JESSICA VAN TILBURG

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
                                               Page 2
1                       APPEARANCES
2
3    ON BEHALF OF THE PLAINTIFFS, AMANDA HOSKINS, et al.:
4    ELLIOT SLOSAR
5    AMY ROBINSON STAPLES
6    LOEVY & LOEVY
7    311 NORTH ABERDEEN STREET
8    THIRD FLOOR
9    CHICAGO, ILLINOIS 60607
10   TELEPHONE NO.: (312) 243-5900
11   E-MAIL: ELLIOT@LOEVY.COM
12
13   ON BEHALF OF THE DEFENDANTS, BRIAN JOHNSON, MARK
14   MEFFORD, JACKIE JOSEPH AND DALLAS EUBANKS:
15   SHAWNA VIRGIN KINCER
16   CODY WEBER
17   KENTUCKY STATE POLICE GENERAL COUNSEL
18   919 VERSAILLES ROAD
19   FRANKFORT, KENTUCKY 40601
20   TELEPHONE NO.: (502) 573-1636
21   E-MAIL: SHAWNA.KINCER@KY.GOV
22
23
24
25
```

```
                                               Page 4
1                  APPEARANCES CONTINUED
2
3    ON BEHALF OF THE DEFENDANTS, JOHN PICKARD AND DEREK
4    EUBANKS:
5    JOHN F. KELLEY
6    JASON WILLIAMS
7    WILLIAMS, FARMER & TOWE
8    303 SOUTH MAIN STREET
9    LONDON, KENTUCKY 40741
10   TELEPHONE NO.: (606) 877-5291
11   E-MAIL: JOHN@WFTLAW.COM
12
13
14
15
16
17
18
19
20   ALSO PRESENT:  LACEE TOWNSEND - VIDEOGRAPHER; AMANDA
21   HOSKINS, PLAINTIFF; JONATHAN TAYLOR, PLAINTIFF; TRAVIS
22   TAYLOR, FAMILY MEMBER; KARLA COLLINS, FAMILY MEMBER;
23   JASON BUNCH, KENTUCKY STATE POLICE; KELLY FARRIS,
24   KENTUCKY STATE POLICE; DEREK EUBANKS, KNOX COUNTY DEPUTY
25   SHERIFF; JOHN PICKARD, FORMER SHERIFF
```

```
                                               Page 3
1                  APPEARANCES CONTINUED
2
3    ON BEHALF OF THE DEFENDANTS, JASON YORK AND TROOPER
4    BUNCH:
5    DERRICK T. WRIGHT
6    STURGILL, TURNER, BARKER & MOLONEY, PLLC
7    333 WEST VINE STREET
8    SUITE 1500
9    LEXINGTON, KENTUCKY 40507
10   TELEPHONE NO.: (859) 255-8581
11   E-MAIL: DWRIGHT@STURGILLTURNER.COM
12
13   ON BEHALF OF THE DEFENDANTS, MIKE BROUGHTON AND CITY OF
14   BARBOURVILLE:
15   LICHA H. FARAH, JR.
16   WARD, HOCKER & THORNTON, PLLC
17   333 WEST VINE STREET
18   SUITE 1100
19   LEXINGTON, KENTUCKY 40507
20   TELEPHONE NO.: (859) 422-6000
21   E-MAIL: LFARAH@WHTLAW.COM
22
23
24
25
```

```
                                               Page 5
1                          INDEX
2                                              Page
3    DIRECT EXAMINATION BY MR. SLOSAR              12
4
5
6                         EXHIBITS
7                                              Page
8
9    EXHIBIT 1- AUDIO CLIP FROM INTERVIEW WITH    34
10       DAVID FOX
11   EXHIBIT 2- PL 014450-014456 BLACK AND WHITE  44
12       PICTURES
13   EXHIBIT 3- ANSWERS TO PLAINTIFF'S            74
14       INTERROGATORIES
15   EXHIBIT 4- GRAND JURY AUDIO                  99
16   EXHIBIT 5- KSP 284-285 CRIME SUPPLEMENT     107
17       REPORT
18   EXHIBIT 6- AUDIO RECORDING OF AMBER SIMPSON 124
19       STATEMENT
20   EXHIBIT 7- PL 025665-025683 TRANSCRIPT OF   124
21       SGT. YORK'S PRELIMINARY HEARING
22   EXHIBIT 8- KSP 413 EVIDENCE/RECOVERED       136
23       PROPERTY
24   EXHIBIT 9- KSP 382-383 FORENSIC LATENT      144
25       PRINT LABORATORY REPORT
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 6

EXHIBITS CONTINUED

| | Page |
|---|---|
| EXHIBIT 10- KSP 385-386 REPORT OF FORENSIC LABORATORY EXAMINATION | 151 |
| EXHIBIT 11- PL 286 CRIME SUPPLEMENT REPORT | 153 |
| EXHIBIT 12- KSP 362 and 364 ARREST WARRANT | 157 |
| EXHIBIT 13- AUDIO INTERVIEW KAYLA MILLS | 163 |
| EXHIBIT 14- PL 014718-014719 CRIME SUPPLEMENT REPORT | 183 |
| EXHIBIT 15- PL 001308-001309 E-MAIL FROM JASON YORK TO LISA EVANS | 188 |
| EXHIBIT 16- PL 015643-015648 and PL 018545 RENTAL CAR RECORDS | 194 |
| EXHIBIT 17- KSP 341 WAIVER OF RIGHTS | 200 |
| EXHIBIT 18- PL001791-01792 POLYGRAPH REPORT FOR JAMES HELTON | 205 |
| EXHIBIT 19- PL 015103-015104 REPORT OF ADAM HELTON | 234 |
| EXHIBIT 20- PL 0158840-015854 WRITTEN STATEMENT OF ADAM HELTON | 242 |
| EXHIBIT 21- KSP 018073 CRIME SUPPLEMENT REPORT | 255 |

Page 7

EXHIBITS CONTINUED

| | Page |
|---|---|
| EXHIBIT 22- PL 004844- 004855 LETTER FROM JOHN PICKARD | 260 |
| EXHIBIT 23- KSP 487-488 AREA DRUG DEALERS | 220 |
| EXHIBIT 24- PL 015063-015064 CRIME SUPPLEMENT REPORT | 263 |
| EXHIBIT 25- PL 015317-015318 PICTURES | 265 |
| EXHIBIT 26-PL 004850-004851 JESSIE LAWSON'S INFORMANT CASES | 270 |
| EXHIBIT 27- KSP 270-271 CRIME SUPPLEMENT REPORT | 271 |
| EXHIBIT 28- PL 05786-05787 CRIME SUPPLEMENT REPORT | 383 |
| EXHIBIT 29- KSP 279 CRIME SUPPLEMENT REPORT | 316 |
| EXHIBIT 30- PL 277255 PRESCRIPTION | 286 |
| EXHIBIT 31- PL 015071-01572 CRIME SUPPLEMENT REPORT | 290 |
| EXHIBIT 32- RECORDED STATEMENT OF AMANDA HOKSINS (SUPPLEMENTED TO RECORD) | 297 |
| EXHIBIT 33- PL 004164-004172 ELIGIBILITY VERIFICATION | 305 |
| EXHIBIT 34- PL 002291-002294 APPLICATION | 320 |

Page 8

EXHIBITS CONTINUED

| | Page |
|---|---|
| EXHIBIT 35- PL 014301 HOPE MEDICAL CENTER (MEDICAL RECORD) | 320 |
| EXHIBIT 36- PL 020498 CRIME SUPPLEMENT REPORT | 327 |
| EXHIBIT 37- PL014435-014436 CASE SUPPLEMENT | 333 |
| EXHIBIT 38- KSP 289-290 CASE SUPPLEMENT | 334 |
| EXHIBIT 39- PL 025460 CRIME SUPPLEMENT REPORT | 337 |
| EXHIBIT 40- PL 015065 CRIME SUPPLEMENT REPORT | 339 |
| EXHIBIT 41- PL 002660 SKETCH | 344 |
| EXHIBIT 42- PL 005067-005074 PHOTOGRAPHS | 346 |
| EXHIBIT 43- KSP 370-371 POLYGRAPH REPORT FOR JESSIE LAWSON | 356 |
| EXHIBIT 44- KSP 287 CRIME SUPPLEMENT REPORT | 363 |
| EXHIBIT 45- PL 000243 JAIL HOUSE CORRESPONDENCE | 371 |
| EXHIBIT 46- PL 281 CRIME SUPPLEMENT REPORT | 372 |
| EXHIBIT 47- KSP 305-306 CRIME SUPPLEMENT REPORT | 376 |

Page 9

CERTIFIED QUESTIONS

| | Page |
|---|---|
| 1 - How many times did you meet with your counsel, though? | 81 |
| 2 - Mr. York, what documents did you review to prepare for today's deposition? | 83 |
| 3 - Mr. York, what testimony did you review in preparation for today's deposition? | 84 |
| 4 - On how many occasions did you meet with your counsel to prepare for today's deposition? | 84 |
| 5 - Who was present during your preparation for this deposition? | 85 |

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

---

Page 10

STIPULATION

The VIDEO deposition of JASON YORK taken at the LAUREL
COUNTY HEALTH DEPARTMENT, 525 WHITLEY STREET, LONDON,
KENTUCKY 40741 on TUESDAY, the 13th day of FEBRUARY,
2018 at approximately 8:45 a.m.; said VIDEO deposition
was taken pursuant to the KENTUCKY Rules of Civil
Procedure. It is agreed that JESSICA VAN TILBURG, being
a Notary Public and Court Reporter for the State of
KENTUCKY, may swear the witness and that the reading and
signing of the completed transcript by the witness is
not waived.

---

Page 11

PROCEEDINGS

VIDEOGRAPHER: My name is Lacee Townsend. I'm the
video technician today, and Jessica Van Tilburg is the
court reporter. Today's the 13th day of February, 2018.
The time is 8:45 a.m. We're here at the Laurel County
Health Department located at 525 Whitley Street in
London, Kentucky, 40741 to take the deposition of Jason
York in the matter of Amanda Hoskins, et al. v. Knox
County, et al., pending in the U.S. District Court for
the Eastern District of Kentucky, number 17-CV-84. Will
Counsel please identify themselves for the record?

MR. SLOSAR: Elliot Slosar on behalf of Plaintiffs
Jonathan Taylor and Amanda Hoskins.

MR. WRIGHT: Derrick Wright on behalf of Detective
York and Trooper Bunch.

MS. KINCER: Shawna Kincer on behalf of Jackie
Joseph, Kelly Farris, Dallas Eubanks, and Mark Mefford.

MR. WILLIAMS: Jason Williams. I'm here on behalf
of Defendants Sheriff Pickard, Derrick Eubanks, Knox
County.

MR. KELLY: My name's John Kelly. I also am here
on behalf of Sheriff Pickard and Derrick Eubanks.

MR. FARAH: Licha Farah on behalf of Michael
Broughton and Cecilia Barbourville.

MS. STAPLES: Amy Robinson Staples on behalf of

---

Page 12

Plaintiffs Amanda Hoskins and Jonathan Taylor.

VIDEOGRAPHER: Sir, will you please raise your
right hand to be sworn in by the reporter?

COURT REPORTER: Do you solemnly swear or affirm
the testimony you're about to give will be the truth,
the whole truth and nothing but the truth?

THE WITNESS: I do.

COURT REPORTER: Thank you.

DIRECT EXAMINATION

BY MR. SLOSAR:

Q   Good morning, Mr. York. How are you doing?

A   Good. How are you?

Q   Good. Have you ever lied to a witness in a
homicide investigation while questioning them?

A   I've used that as a tactic. I would not say
lie to them. It was a tactic that I used.

Q   Where did you learn that tactic?

A   Through prior investigations and other units
or police officers, observing them.

Q   Which police officers did you observe lying to
witnesses during a homicide investigation?

A   Again, as a tactic, I've seen one of my
previous detectives that I worked with, KY Pusin
(phonetic), for example, but, again, it wasn't a lie. It
was a tactic being used.

---

Page 13

Q   So in your -- what's the difference between a
lie and a tactic?

A   Well, a tactic is something that we use. For
example, we might promise them something that they
already had is, essentially, it's not lying to them.
They believe that we have something, or we're going to
give them something when, in fact, we don't. They
already have it.

Q   Now, did you use those -- that tactic of lying
or making promises to witnesses during your
investigation into the death of Katherine Mills?

A   There were times I used that tactic, yes.

Q   Did you always document when you used those
tactics?

A   Everything that I did, it should be in the
case file or recorded.

Q   Well, in your -- do you recall doing written
interrogatories responses in this case?

A   Yes.

Q   And those were under oath, correct?

A   Yes.

Q   You understand you're under oath today?

A   Yes, sir.

Q   Okay. Do --

MR. WRIGHT: I'm going to object to the extent that

---

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 14

1  some of those objections -- or some of those
2  interrogatories were subject to objections.
3  BY MR. SLOSAR:
4      Q   All of your written interrogatories responses
5  you signed as under oath, correct?
6      A   Yes, sir.
7      MR. WRIGHT:  And I will object subject to
8  objections therein as well.
9      Q   And in your interrogatory responses, do you
10 recall stating, under oath, that you did not document
11 witness interviews in this case?
12     MR. WRIGHT:  Object to form. Go ahead. Answer best
13 you can.
14     A   Repeat the question.
15     Q   Did you document in your written interrogatory
16 responses, did you say in there, under oath, that you
17 did not document every witness interview that you
18 conducted in this case?
19     A   Witness interview, I will go -- I need to
20 define a witness. Now, a witness to me is somebody that
21 had firsthand knowledge. For example, if a witness or a
22 person said -- I heard, you know, Amanda Hoskins say
23 this about the crime that occurred, yes, I documented
24 it. Now, if there was a situation where it was third or
25 fourth hand information, I don't consider that as a

Page 15

1  witness, and I did not document that.
2      Q   Did you document every contact or interview
3  you with Allen Helton during the underlying
4  investigation in the case?
5      A   No.
6      Q   Did you document every interview or contact
7  you had with Michael Crump during the underlying
8  investigation of this case?
9      A   No.
10     Q   Did you document every interview or contact
11 that you had with Amber Simpson during the underlying
12 investigation in the case?
13     A   No.
14     Q   Did you document any interview or contact, or
15 every interview or contact that you had with Kayla Mills
16 during the underlying investigation of this case?
17     A   No.
18     Q   Did you document every contact or interview
19 that you had with Joe King during your underlying
20 investigation into this case?
21     A   I believe I did on that one to the best of my
22 recollection.
23     Q   Well, sir, fair to say that you did not
24 document every contact or interview that you had with
25 witnesses during the investigation of Katherine Mills,

Page 16

1  correct?
2      A   To -- again, I go back. If a witness who told
3  me something on a -- they heard from firsthand knowledge
4  about anything that related to this case, I documented.
5  If -- during -- if there was a contact where they did
6  not advise me of anything pertaining to this case, no, I
7  -- I did not document it.
8      Q   Well, Mr. York, I'm not asking you a trick
9  question. Let's -- you remember who Michael Crump is,
10 right?
11     A   Yes.
12     Q   The only eye witness in this case, correct?
13     A   Yeah.
14     MR. WRIGHT:  Object to the form, but go ahead.
15     A   I know who Michael Crump is.
16     Q   The only person who is even close to being an
17 eye witness to the Mills homicide; would you agree with
18 that?
19     A   I'll agree he's the only person I saw anybody
20 at the residence, that one, yes.
21     Q   Okay. And during the underlying investigation
22 to this case, you showed Mr. Crump photographs of
23 Jonathan Taylor, correct?
24     A   I didn't. There was a police officer in
25 Oklahoma that did.

Page 17

1      Q   Okay. So you're saying that you never once
2  personally showed any photograph of Jonathan Taylor to
3  Mr. Crump during the investigation into Katherine Mills'
4  death?
5      A   Not that I recollect as far as personally. It
6  was, like, any -- sort of like a photo lineup or
7  anything like that, that I did. Like I said, he was
8  shown pictures, but he moved around. He was Oklahoma.
9      Q   Okay. Sure. And I -- and we're going to get
10 there. What I'm asking is a little bit different. Not
11 whether you showed him a photo ray, whether you did a
12 live lineup. What I'm asking you is: Did you
13 personally ever show a single photograph of a suspect to
14 Michael Crump during the underlying investigation of
15 Katherine Mills' death?
16     A   I don't remember doing it. I'm not saying it
17 couldn't happen. You know, this has been almost a
18 decade ago. I don't remember.
19     Q   Well, this happened sometime in the last --
20 this investigation -- well, let me ask you this: Is
21 this investigation still ongoing?
22     A   I'm not the case officer. You would have to
23 talk to them.
24     Q   When did you stop being the case officer on
25 this case?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 18

1    A    When I promoted to sergeant in 2015.
2    Q    When were you promoted to the sergeant in
3  2015?
4    A    2015.
5    Q    What month or day?
6    A    I think the personnel orders came out in
7  November.
8    Q    So you're saying that after November of 2015,
9  you did not talk to a single witness relating to the
10 investigation of Katherine Mills' death?
11   A    I was -- I'm saying that I was not a case
12 officer.  Now, it could be -- this case was continued,
13 you know, several times as you're well aware.  There
14 might have been times that I talked to somebody at one
15 of the many hearings or something like that, but I don't
16 remember taking anymore witness statements that I can
17 remember.
18   Q    Do you know whether the investigation is still
19 ongoing?
20   A    No.  You need to -- I do not know.  You have
21 to contact the case officer.
22   Q    And that's because you were assigned away the
23 Katherine Mills' homicide investigation after November
24 2015; is that right?
25   MR. WRIGHT:  Object to form.  Answer best you can.

Page 19

1    A    I was promoted and went to a different post.
2    Q    And now you're back at Post 10, correct?
3    A    Yes.
4    Q    Okay.  And that's the post that's assigned to
5  the Katherine Mills' homicide?
6    A    Yes.
7    Q    Okay.  Are you back on this case?
8    A    No.
9    Q    Why not?
10   A    Because supervisors don't work cases.
11   Q    And you're a supervisor now?
12   A    Yes.
13   Q    Was Sergeant Pickerel a supervisor when you
14 conducted the underlying investigation between 2010 and
15 November 2015?
16   A    She was a -- one of the supervisors.
17   Q    Yeah.  And she was one of the supervisors
18 involved in your investigation of Bobby Wiggins' death,
19 too, right?
20   A    Well, there's -- it's not my investigation.
21 I'm not the case officer on that case, but I believe she
22 was the detective squad sergeant at that time.
23   Q    And you question with witnesses in the
24 Wiggins' investigation, right?
25   A    I was sent on -- yes, and -- and to parts of

Page 20

1  the interviews.
2    Q    Yeah.  And the interview with Dave Fox, you
3  participated in, correct?
4    A    That name sounds familiar.  I believe so.
5    Q    Okay.  You also participated in an interview
6  with James Otis Sizemore, right?
7    A    I believe so, yes.
8    Q    And your interview with Dave Fox, Sergeant
9  Pickerel also participated in that interview, correct?
10   A    I do not remember.
11   Q    You don't remember?
12   A    No.  I don't know who all sat in.
13   Q    So a few moments ago you testified that you
14 used tactics such as lying to witnesses or making
15 promises to them during the underlying investigation; is
16 that right?
17   MR. WRIGHT:  I'll object to form, but go ahead.
18   A    There is -- that is a tactic that I -- I used,
19 yes.
20   Q    And you used that tactic in this case,
21 correct?
22   A    On some of them, yes.
23   Q    And you didn't document each time you used
24 that tactic, correct?
25   A    Anytime that I used that, it was -- I usually

Page 21

1  recorded -- all my witness statements are recorded.
2    Q    Okay.  Well, are you -- before you pressed the
3  recorder -- well, let me specify one of these witness
4  statements.  Before you took a recorded statement from
5  Kayla Mills in this case -- you know who Kayla Mills is,
6  right?
7    A    Kayla Mills?
8    Q    Yeah.
9    A    Yes.
10   Q    She killed herself after talking to you,
11 correct?
12   MR. WRIGHT:  I object to form.
13   Q    You can answer.
14   A    I don't know the details around her death.  I
15 don't -- I don't know nothing about -- I know -- last
16 thing -- the only thing I remember is somebody's telling
17 me she's in Louisville.
18   Q    Did you ever --
19   A    And her attorney was present during -- when I
20 recorded her.
21   Q    Yeah.  Did you show Kayla Mills' attorney the
22 warrant that you had for her arrest for the murder of
23 Katherine Mills during that interview?
24   A    He was aware of it, yes.
25   Q    Yeah?  Was Jackie Steele aware of it?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Page 22**

1   A   I'm not for sure. I'm -- I'm assuming he is.
2   I don't -- I can't speculate on what he knows or doesn't
3   know.
4   Q   Who was -- why wasn't the warrant for Kayla
5   Mills' arrest in Jackie -- in the Commonwealth
6   attorney's files in this case?
7   A   I can't answer that.
8   Q   You're responsible for handing over your
9   investigation file to Jackie Steele, weren't you?
10  A   It was in a case Peak file and that was my
11  responsibility. I put it in my case file. What Jackie
12  or the Commonwealth attorney has or has not in his file,
13  I can't, like, speculate on why something is in his case
14  file or is not.
15  Q   Why didn't Mirandize Kayla Mills because
16  questioning her?
17  A   Do what?
18  Q   Do you what a Miranda is?
19  A   Yes.
20  Q   What is it?
21  A   It's when you advise a subject their Miranda
22  warnings, rights and with her attorney there.
23  Q   So you're saying if an attorney is present,
24  you don't need to provide a Miranda warning?
25  A   He advised me that she was prepared to give a

**Page 23**

1   statement.
2   Q   What's probable cause mean?
3   A   Reasonable belief that a crime is committed.
4   Q   What is Brady verse Maryland?
5   MR. WRIGHT: Object. This is legal conclusions,
6   but answer the best you can.
7   A   I don't know off the top of my head.
8   Q   Sir, have you ever yelled at a witness in a
9   homicide investigation while questioning them?
10  A   Yes.
11  Q   Is that another tactic that you use?
12  A   Yes.
13  Q   Is that how you were trained at KSP to use
14  that tactic?
15  A   I don't remember going through any particular
16  training at the academy whether to yell or not.
17  Q   Did -- when you were saying that one of your
18  tactics and questioning witnesses in a homicide
19  investigation is to lie to them and make promises to
20  them, was that consistent with the training that you
21  received at KSP?
22  MR. WRIGHT: Object to form, but answer best you
23  can.
24  A   Again, you -- you keep going back to this lie.
25  I was -- it was a tactic that was used, and it wasn't --

**Page 24**

1   I didn't use it in every interview. It was just a
2   tactic. There's a few that I did use that tactic, but
3   there's hundreds that I did not use that tactic.
4   Q   Okay. And sitting here today, can you recall
5   any witness in the Katherine Mills' homicide
6   investigation that you did not use the tactic of lying
7   or making promises?
8   MR. WRIGHT: Object to form. Go ahead. Answer best
9   you can.
10  A   Michael Crump, I -- I don't think I used that
11  tactic. I mean, we could sit there and -- and listen to
12  each on them. I can't remember the details on each one
13  of them and whether or not I raised my voice, so I'm not
14  going to sit here and -- and say for 110 percent sure
15  that I didn't raise my voice, and I don't want to on
16  each individual, but there were -- were interviews that
17  I did -- that I did not yell.
18  Q   But you used that tactic -- well, are you a
19  sergeant today?
20  A   Yes.
21  Q   Okay. Sergeant York, have you ever threatened
22  a witness in a homicide investigation while questioning
23  them?
24  A   Yeah, and that was -- is a tactic that we do
25  use in -- in all -- in a majority of criminal

**Page 25**

1   investigations.
2   Q   Did you use that tactic with witnesses in the
3   Katherine Mills' investigation?
4   A   I can't tell you every exact time, but there
5   could be times that that tactic is used.
6   Q   Fair to say you used that tactic so often you
7   can't exactly recall which witness you might have done
8   it with?
9   A   Well, you're -- you're putting words in my
10  mouth. I did not say that. I said, "I don't remember
11  every exact time I used it."
12  Q   Was that tactic consistent with the training
13  that you received at KSP?
14  A   It was a tactic that I learned on the job. I
15  can't say particularly what classroom at what date and
16  what time that I -- I saw that.
17  Q   I understand that and my question's a little
18  bit different. We're going to get to the rules in a
19  little bit, so that I can better frame all this for you,
20  but what I'm asking is a little bit different, okay? You
21  were trained when you were originally hired at KSP in
22  2000, correct?
23  A   Yes.
24  Q   Okay. And so these questions that I'm asking
25  you about, whether it was consistent with your training,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 26

1   what I'm really trying to ask you, and I'll tell you
2   later, if I ask you questions you don't understand, just
3   let me know, and it's -- I'll rephrase it a better way,
4   okay?  Is that okay?  Yes or no?
5       A   Yes.
6
7       Q   Okay.  Sorry.  Just helps the court reporter
8   when you answer.  My question to you is:  When you're
9   lying to witnesses or making promises to witnesses
10  during the underlying investigation of Katherine Mills'
11  death, was that against any of the rules that you were
12  aware of from KSP?
13      A   Again, that was a tactic.  I do not call it
14  lying because, obviously, there's a policy troopers are
15  not supposed to lie.  That was a tactic I use.  For
16  example, as -- you know, I had to explain in a -- the
17  Circuit Court trial of Bobby Wiggins, and I'll -- I'll
18  explain in here.  For example, if I interview somebody
19  that has been charged with a rape in a 7- or 8-year-old
20  girl, as a tactic, I will tell them that I understand
21  why they done that.  Now, essentially, you can say
22  that's lying.  I say it's a tactic I use to further my
23  investigation to get information on -- on a crime that
24  happened.  Now, obviously, do I understand and condone
25  somebody raping a 7-year-old girl, absolutely not, but

Page 27

1   that person that I'm interviewing will perceive that.
2       Q   Sergeant York, I appreciate that, but that is
3   -- that's not the question I asked you, and
4   we're going to be here for a very long time today, and I
5   have a lot of questions for you, so if you can just try
6   to respond to the question, I'd appreciate it, okay?
7   What I'm asking you is:  When you lie to a witness
8   during the Katherine Mills' homicide investigation, was
9   that against any of the training or rules, as you
10  understood them to be, from the Kentucky State Police?
11      A   That tactic to my understanding is not.
12      Q   Okay.  Thank you.  And when you yell at a
13  witness during the Katherine Mills' homicide
14  investigation, was that against any of the rules or
15  training that you received from KSP?
16      A   Again, that tactic that I'm not aware of
17  that's against it.
18      Q   Because you're not using -- you wouldn't use
19  tactics that KSP didn't allow, right?
20      A   The ones that I'm aware of, no.
21      Q   Okay.  So have you ever threatened a witness
22  during the Katherine Mills' homicide investigation?
23      A   There could be times.  Again, that's a tactic
24  that I did use.  I can't -- I don't remember every time
25  I used it, but yes.

Page 28

1       Q   Not sure which witnesses you used it with in
2   this case, correct?
3       A   Yes.
4       Q   Okay.  And you also used that tactic during
5   the Bobby Wiggins' homicide investigation, correct?
6       MR. WRIGHT:  I'm going to object to form.  I don't
7   what you're meaning by "threaten," but answer it best
8   you can.
9       A   I go back to a tactic that I use raising my
10  voice, yes, on both of them.
11      Q   Okay.  Let's -- and, well, let's turn -- you
12  know, with threats, you threatened to charge Kayla Mills
13  with murder unless she gave you a statement, correct?
14      A   I don't know if I used a threat.  There was a
15  point in the investigation that it was -- we was
16  beginning to get probable cause -- or, not probable
17  cause, yet, but information that would indicate that she
18  would be involved.
19      Q   You got an arrest warrant for Kayla Mills 36
20  hours before you took her recorded statement in this
21  case, correct?
22      A   I don't know exactly how many hours.
23      Q   But you remember getting an arrest warrant
24  before you got a recorded statement from her, right?
25      A   Yes.

Page 29

1       Q   Yeah.  And you told her about the arrest
2   warrant that you had against her for the murder of
3   Katherine Mills prior to taking her statement, correct?
4       A   Yes.
5       Q   Okay.  And how did Kayla Mills respond to you
6   know -- to you telling her that you charged her with
7   murder?
8       A   She responded by telling me that she wasn't a
9   part of it, that it was Jonathan who killed her.
10      Q   And, in fact, at the time that you initiated
11  charges against Kayla Mills, what evidence did you have
12  that she was actually involved in that crime?
13      A   I need to go back.  I would have to look at
14  the case file because there is several witness
15  statements saying that Kayla was involved.  Now, as far
16  as chronological, I'm not saying, but one top of my
17  head, Heather Warren was one of them that said that
18  Kayla had stated that is was her, but, again, I don't --
19  chronologically, I'm --
20      Q   Yeah.
21      A   -- not sure.
22      Q   And let me help you with that chronological
23  order.  You didn't take a statement from Heather Warren
24  until 2013, approximately eight months after you got an
25  arrest for Kayla Mills; do that sound right?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 30

1    MR. WRIGHT: I'll object to form. Answer best you
2  can.
3        A    I-- I don't remember the exact dates.
4        Q    I'll show it to you soon, but Kayla Mills
5  knew, at the time she gave you a recorded statement,
6  that you initiated charges against her for murder and
7  that you successfully received a $1 million cash bail
8  for her, correct?
9        MR. WRIGHT: I'll object to form and foundation,
10 but answer best you can.
11       A    Can you repeat about this million dollar? I'm
12 not aware of, what now?
13       Q    Did you go to court and initiate charges
14 against Kayla Mills for the murder of Katherine Mills?
15       A    Yes, I did --
16       Q    Okay.
17       A    -- get a warrant.
18       Q    And you're in court when the judge actually
19 said that there would be a $1 million cash bail?
20       A    If that's what's on the warrant. I'm not
21 familiar -- I don't remember what was on the warrant.
22       Q    Okay. Well, you would've told Kayla Mills
23 about the $1 million cash bill prior to her taking a
24 recorded statement, right?
25       MR. WRIGHT: Object to form and foundation. Go

Page 31

1  ahead.
2        A    I'm sure her attorney was aware of it.
3        Q    Do you have any specific recollection whether
4  her attorney was aware of it?
5        A    No. You would have to ask him.
6        Q    After Kayla Mills gave her recorded statement,
7  she was allowed to leave the police department freely,
8  correct?
9        A    Yes.
10       Q    Okay. Did you ever have a conversation with
11 Jackie Steele about dismissing Kayla Mills' murder
12 charge in this case after she gave her statement?
13       A    It never got to that point because when she
14 gave her statement, at that point, we did not feel like
15 that she was involved in it.
16       Q    So before she gave a statement, you had
17 probable cause, or did you have probable for -- to
18 initiate charges against Kayla Mills for murder?
19       A    I would need to go back --
20       MR. WRIGHT: Object to calling for a legal
21 conclusion, but answer best you can.
22       A    I feel like we had probable cause, yes.
23       Q    Based on what evidence?
24       A    Again, I don't know. I would need to look at
25 the case and see which witness statements. I don't know

Page 32

1  remember which ones in order.
2        Q    Sitting here today, aside from Heather Warren,
3  can you name a single individual that implicated Kayla
4  Mills in the murder of Katherine Mills prior to you
5  initiating charges against her?
6        A    As far as -- again, if we want to -- I need to
7  start back, starting with Michael Crump. When we found
8  out from Michael Crump that as he drove by the house
9  that morning, that he saw a blue car with a blond female
10 in it, and a male subject coming around. Now, could he
11 positively identify the female? No, but given the other
12 aspects of the investigation, as far as the statements
13 that Amanda Hoskins had made that -- that would -- and
14 Christy Branson and all the other ones that indicated
15 that Amanda was involved, that Jonathan was involved,
16 and Jonathan was dating Kayla at the time was all that
17 information felt like there was probable cause.
18       Q    Sir, are you saying here under oath that you
19 believe that you could form probable cause against Kayla
20 Mills as being the woman in the blue car that Michael
21 Crump saw?
22       MR. WRIGHT: Object to form. Calling for legal
23 conclusion. Answer best you can.
24       Q    Is that part of what you based your probable
25 cause on was Michael Crump seeing a woman in a car?

Page 33

1        A    That wasn't all of it. That's just one part
2  of the puzzle.
3        Q    Okay. And that's also Michael Crump -- seeing
4  the woman in the car is also what you used to form
5  probable cause against Amanda Hoskins, right?
6        A    No.
7        Q    Yes or no?
8        A    That was just one part of it.
9        Q    So which -- when you initiated charges against
10 Amanda Hoskins and Kayla Mills, on the same day, in
11 2012, which person did you believe was the woman in the
12 blue car?
13       A    Obviously, there is no video of it. We had
14 probable cause to believe that they were both in the
15 vicinity.
16       Q    Who told you that there was more than one
17 woman in a blue car at Katherine Mills' residence on
18 December 20, 2010?
19       A    I seen -- seen -- I didn't see a blue car.
20 What I do recollect from the witness statements is that
21 Allen Helton stated that he saw William Lester's car
22 close to the vicinity and then Amber Simpson also stated
23 that Jonathan Taylor had told her that Amanda was a
24 lookout close to the area.
25       Q    You took those statements, right, Mr. York?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 34

1    A    Yes.
2    Q    Yeah.  Have you ever swore at a witness in a
3  homicide investigation while questioning them?
4    A    I swore?  Can you define swore?
5    Q    You ever said, "Fuck you, fuck you, fuck you,"
6  to a witness in a homicide investigation while
7  questioning them?
8    A    Yes.
9    Q    Yeah.  Is that one of the tactics that you use
10  during your investigation of the homicide of Katherine
11  Mills?
12    A    That's one of the tactics.
13    Q    Yeah.  That's also one of the tactics that you
14  used during your investigation into the murder of Bobby
15  Wiggins, too, right?
16    A    There was a couple of interviews, a few, that
17  that tactic was used, but, again, I'm not a case officer
18  in that case.
19    Q    Well, you used that tactic in that case,
20  right?
21    A    Yes.
22    Q    Was that consistent with your understanding of
23  the rules and training that you received from the
24  Kentucky State Police?
25    A    It's my understanding that tactic is not

Page 35

1  against anything.
2    Q    Have you ever assaulted a witness in a
3  homicide investigation while questioning them?
4    A    No.
5    Q    Have you ever hit a witness in a homicide
6  investigation while questioning them?
7    A    No.
8    Q    Have you thrown any objects at a witness in a
9  homicide investigation while questioning them?
10    A    Thrown?  No.
11    Q    Well, what have you done that is similar to
12  throwing objects to a witness in a homicide
13  investigation while questioning them?
14    MR. WRIGHT:  Object to form.  Answer best you can.
15    A    That calls me to speculate.  If you'll give me
16  an example, I -- I will answer it.
17    Q    This will be Exhibit 1, an audio clip labeled
18  PL-27706.  Listen to this.  I'm going to ask you some
19  questions.
20        (EXHIBIT 1 MARKED FOR IDENTIFICATION)
21    (AUDIO CLIP PLAYED FROM INTERVIEW WITH DAVID FOX)
22    Q    Sergeant York, is that your voice on there
23  saying, "Fuck you, fuck you, fuck you"?
24    A    Yes.
25    Q    Yeah.  And that was an interview that you did

Page 36

1  with a witness in the Bobby Wiggins' investigation,
2  correct?
3    A    I believe so.  I don't remember.  Who is that?
4    Q    Dave Fox.
5    A    Dave Fox?  Yeah, David Fox --
6    Q    My question to you was:  Was that a witness in
7  the Bobby Wiggins' investigation?
8    MR. WRIGHT:  Object.  Let the witness answer the
9  question.
10    A    Yes.
11    Q    Yes or no?
12    A    Yes, that was a witness that was in the Bobby
13  Wiggins' case who testified in Bell Circuit Court that
14  nobody touched him.
15    Q    Did I ask you whether -- what he testified to?
16  So today -- here let me go through some of the rules,
17  okay?  So have you ever given a deposition before?
18    A    No.
19    Q    No?  Okay.  So here's how this is going to
20  work.  I'm going to ask you questions, okay?
21    A    Yes.
22    Q    And you're going to answer under oath, all
23  right?
24    A    Yes.
25    Q    Okay.  And you've got to just answer

Page 37

1  affirmatively, no head nods because that'll help the
2  court reporter down there even though she's got this on
3  video, all right?
4    A    Yes, sir.
5    Q    Your nice attorney over here is going to make
6  objections, okay?  Yes?  You understand that?
7    A    Yes.
8    Q    Sorry.  I need an affirmative response each
9  time.  And there's no judge here today to determine
10  whether those objections are valid or not, okay?
11    A    Yes.
12    Q    And sometimes I tend not to ask questions
13  perfectly, so if I don't ask a question that you
14  understand, please let me know, okay?
15    A    Yes.
16    Q    And I'd be happy to rephrase it a better way
17  if you don't understand it, okay?
18    A    Yes.
19    Q    Okay.  Now, if you answer a question that I
20  ask you, I'm going to assume that you understood what
21  you're being asked; is that fair?
22    A    Yes.
23    Q    Okay.  At any point in time, you can take a
24  restroom today or speak to your counsel.  You just let
25  me know, okay?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 38

1    A    Yes.
2    Q    The only thing that I'm going to ask is that
3  if there's a question pending, you've got to answer that
4  question before you go take a break, all right?
5    A    Yes.
6    Q    Okay.  Do you have any questions about those
7  rules?
8    A    No.
9    Q    All right.  So it's a little bit different
10  than when you're interviewing witnesses and you're
11  asking questions, right?
12    A    Yes.
13    Q    Okay.  Today you're the witness, right?
14    A    Yes.
15    Q    Okay.  Did you hear that after -- during the
16  questioning that you had with Dave Fox in the Wiggins'
17  investigation, what was that noise that sounded like
18  somebody being hit or an object being thrown?  What was
19  that?
20    MR. WRIGHT:  Object to form.
21    A    I believe I kicked a chair, slapped a table.
22    Q    What chair did you kick?
23    A    The one I was sitting in.
24    Q    So you kicked your own chair?
25    A    I stood up, yes.

Page 39

1    Q    Why did you do that?
2    A    That was a tactic I -- I was using.
3    Q    Were you using those tactics, too, during the
4  investigation in the Katherine Mills' death?
5    A    I don't know -- I don't recollect -- remember
6  using that particular tactic.
7    Q    Not saying that you didn't.  You just don't
8  remember it, right?
9    A    I don't --
10    MR. WRIGHT:  Object to form.  Go ahead.
11    Q    You can --
12    A    I don't remember kicking my chair.
13    Q    Okay.  Why did you get aggressive with Dave
14  Fox?
15    MR. WRIGHT:  Object to form.
16    A    I felt like he was lying.  As a tactic, I was
17  trying to get him to understand that this was not a joke
18  and take it serious.
19    Q    And you were trying to scare him, right?
20    A    I'm trained and use tactics to try to get
21  information to solve a crime.
22    Q    Okay.  And one of those tactics is trying to
23  put fear into witnesses, right?
24    MR. WRIGHT:  Object to form, but answer best you
25  can.

Page 40

1    A    I can't speculate what they -- they feel or
2  don't feel.
3    Q    Well, why did you kick a chair?
4    A    To try to get his attention.
5    Q    Okay.  Slammed on the table, too, right?
6    A    Yes.
7    Q    Slammed on it pretty hard, right?
8    MR. WRIGHT:  Object to form.  Go ahead.
9    A    Yes.  I -- you know, yes.
10    Q    Yeah.  And that's because you want to scare
11  Dave Fox a little bit, right?
12    A    I want to get his attention.
13    Q    Shake him up, right?
14    MR. WRIGHT:  Object to form.
15    Q    Right?
16    MR. WRIGHT:  Go ahead.  Answer best you can.
17    A    I was try -- I've answered this before.  I was
18  trying to get his attention because I felt like he was
19  lying.
20    Q    You were trying to get Dave Fox to say what
21  you wanted him to say, correct?
22    MR. WRIGHT:  I object to form.  You're arguing with
23  the witness.  This is asked and answered.
24    MR. SLOSAR:  Sir?
25    MR. WRIGHT:  He's already answered.

Page 41

1    MR. SLOSAR:  Sir, if you will let me finish my
2  question before you interject, I'd appreciate it.  I
3  will give you time, and maybe we can instruct your
4  client to pause and give you time to object, but do not
5  interfere with my questioning.
6    MR. WRIGHT:  I object to your repeated questioning,
7  asking and answering the same question.
8    MR. SLOSAR:  All right.
9    MR. WRIGHT:  And harassing the witness.
10    MR. SLOSAR:  Your objection's on the record.
11  BY MR. SLOSAR:
12    Q    Mr. York, you can answer the question.
13    A    No.  I was not trying to get him to say
14  anything, I wouldn't say.  I want him to tell the truth.
15    Q    Well, when you said, "you know, you know, you
16  know."  After that, you proceeded to tell Dave Fox what
17  you wanted him to say, right?
18    A    No.  It -- it might sound like that in that
19  one little bit of audio clip, but this was an ongoing
20  investigation.  If we had anything -- any knowledge of
21  anything, it's because of what we've developed, not what
22  I wanted him to say.
23    Q    So your testimony, under oath, here today is
24  that you were not telling Dave Fox what to say in that
25  interview?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 42

```
 1      A    I'm telling you anything that I said was a
 2  part of the investigation that we had discovered.  It's
 3  not something that I made up out of my head to try to
 4  get him to say.
 5      Q    So you're saying, based on your investigation,
 6  you knew what you wanted Dave Fox to say, right?
 7      A    No.  I said exactly what I said.  I said
 8  throughout the course of the investigation, we were --
 9  we were learning more stuff.  Again, I don't remember
10  the particulars of that case you're talking about that
11  or that witness statement.  I would have to read the
12  entire statement because I -- I don't remember, but I
13  was not trying to get him to say stuff off the top of my
14  head.
15      Q    Oh, sure.  You knew -- you had it planned out
16  what you needed him to say, right?
17      MR. WRIGHT:  Object to form.
18      A    No.  I was trying to get him to tell the
19  truth.
20      Q    Tell the truth, and the truth is what you
21  believed happened, right?
22      MR. WRIGHT:  Object to form.
23      A    Not what I believed to happen.  It's whatever
24  it is.  Whatever we find out.
25      Q    Oh, before you got a statement from James Otis
```

Page 43

```
 1  Sizemore, you promised him that he was going to never go
 2  to prison; is that right?
 3      MR. WRIGHT:  Object to form and foundation.  Go
 4  ahead.
 5      A    Again, I'm not the case officer on that, and I
 6  -- I don't remember the particulars of that, but that is
 7  a tactic that I use.  If I was promising something that
 8  I could not deliver on because there was nothing to
 9  promise.
10      Q    Okay.  So to you, it's sort of like because
11  you don't have the power to make those promises come
12  true, it's okay, right?
13      MR. WRIGHT:  I'll object to form of that.
14      Q    Is that what you're saying?  You're trying to
15  say the prosecutor has that ability, but you don't, so
16  when you make that promise to a witness, it's -- you
17  don't consider it to be a real promise; is that right?
18      A    Now, when I use that tactic, I'm -- I'm not
19  promising them something that the Commonwealth attorney
20  can give him or not give him.
21      Q    You're just making a promise from yourself,
22  right?
23      MR. WRIGHT:  Object to form.
24      A    It's a tactic.
25      Q    A tactic.
```

Page 44

```
 1      A    It's not --
 2      Q    And that tactic is not against any of the
 3  rules or training from KSP as you can recall, correct?
 4      A    Yes.
 5      Q    Okay.  Why did you tell Amanda Hoskins when
 6  you interviewed her in February of 2011 that you have a
 7  tail and you just want the donkey to pin it on?
 8      A    Again, I would have to go back and -- and look
 9  at that statement.  That particular phrase I would have
10  to see it in the statement.
11      Q    Well, you've said that phrase in your life.
12  You don't deny that, right?
13      A    Probably have.
14      Q    Okay.
15      A    I don't remember each -- each time.
16      Q    You told other people in the Katherine Mills'
17  investigation that you have the tail, and you're looking
18  for the donkey to pin it on, correct?
19      MR. WRIGHT:  Object to form and foundation, but
20  answer best you can.
21      A    I don't remember saying it.  I cannot tell you
22  who I said it to and who I did not.  I'm not denying
23  saying it, but I don't remember no particulars.
24      Q    Is that phrase consistent with your
25  understanding of the training you received at Kentucky
```

Page 45

```
 1  State Police?
 2      A    It's not -- that tactic being used is -- is
 3  not against anything that I'm -- I'm aware.
 4      Q    Who is Rueben York?
 5      A    That is my biological father.
 6      Q    Okay.  And did you ever communicate with
 7  Rueben about your investigation into the Katherine
 8  Mills' homicide?
 9      A    No.
10      Q    Never spoke to him about it even a single
11  time?
12      A    No.
13      Q    Okay.  Did Rueben York used to be in law
14  enforcement?
15      A    No.
16      Q    We are now going to Exhibit 2.  This is PL-
17  11450 through 11 -- or, I'm sorry, PL-14450 through
18  14456.  And for the record, Jonathan Taylor is also
19  present.  Sir, I'm handing you mark -- what's marked
20  Exhibit number 2.  Give a copy to your counsel.
21      MR. SLOSAR:  Here you go.  Let you-all pass this
22  around.
23           (EXHIBIT 2 MARKED FOR IDENTIFICATION)
24      MR. WRIGHT:  What was the Bates number for the
25  first Exhibit?  I didn't get that LM.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 46

1    MS. STAPLES:  27706.
2    MR. SLOSAR:  PL?
3    MS. STAPLES:  PL-27706.
4  BY MR. SLOSAR:
5    Q    Sir, who's car is that?
6    A    It appears to be Rueben York's.
7    Q    Yeah.  Okay.  That's the car that Mr. York
8  had in 2015, correct?
9    A    As best I can remember, yes.
10   Q    That's your dad's car, right?
11   A    Yes.
12   Q    Okay.  What was your dad doing following
13 Amanda Hoskins from the courthouse in 2015?
14   MR. WRIGHT:  Object to form.  Answer best you can.
15   A    I have no idea.
16   Q    You never spoke to him about it a single time?
17   A    No.
18   Q    Prior to coming in here today -- well, why
19 don't you go to page 3 of that Exhibit, sir, up there?
20   A    I talked to him when I became aware of this a
21 few weeks ago, yes.
22   Q    Oh, a few weeks ago?  So you're saying in 2018
23 was the first time that you learned that a police report
24 from the Bell County Sheriff's Department was filed
25 against your father?

Page 47

1    A    Absolutely.
2    Q    Before a few weeks ago, you had no idea that
3  your father had a report filed against him for
4  harassment?
5    A    Not a clue.
6    Q    Did you tell your father about Amanda Hoskins
7  prior to that date?
8    A    No.
9    Q    So does your father just go around and follow
10 young women around for no reason?
11   MR. WRIGHT:  Object to form.
12   A    I cannot speculate anything he did, but I had
13 no knowledge of this until a -- two or three weeks ago
14 when you produced this.
15   Q    You talked to your dad about this since then?
16   A    I called and asked him about it, yes --
17   Q    What --
18   A    -- what was the deal?
19   Q    What did he say?
20   A    He advised -- this is what he told me that he
21 was in Pineville and saw a girl coming out of the bank,
22 I believe, and he stopped and hit on her, to try to take
23 her out on a date.
24   Q    That's what your dad told you?
25   A    Yes.

Page 48

1    Q    How old is your dad?
2    A    I believe he's in his 60s.
3    Q    So your dad just coincidently hit on a woman
4  in her 20s who just so happens to be charged with a
5  murder in one of your investigations; is that your
6  testimony, sir?
7    MR. WRIGHT:  Object to form.  Answer best you can.
8    A    I had no knowledge of this, and we did not
9  talk about this, and, like I said, until a few weeks
10 ago.
11   Q    So you're saying if we got cell phone records
12 between you and your dad from August 31, 2015 through
13 September 3, 2015, it wouldn't show that you and your
14 dad had phone calls after this report was filed against
15 him?
16   MR. WRIGHT:  I'll object to foundation.  You were
17 asking him whether he was talking about this, not
18 whether he ever spoke to his father during the time
19 period.
20   MR. SLOSAR:  Can you please tell me a federal rule
21 that that objection would be proper under, objection for
22 --
23   MR. WRIGHT:  I think you are -- you're
24 misrepresenting the record there by making that
25 question.

Page 49

1    MR. SLOSAR:  Well, the speaking objections are
2  inappropriate.  If they continue to happen, we will call
3  the Magistrate.
4    MR. WRIGHT:  That's fine.  I think that objection
5  was appropriate.  Your question had a faulty foundation
6  on it.
7    MR. SLOSAR:  And you're saying that that's an
8  objection under federal rules?
9    MR. WRIGHT:  I believe it is.  It's objection to
10 form and foundation, yes.
11   MR. SLOSAR:  If these speaking objections continue,
12 we will petition the Court for additional time based
13 upon the inappropriate speaking objections that are
14 being made.  I'm just letting you know, counsel.
15   MR. SLOSAR:  I will be happy to show them the
16 record --
17   MR. SLOSAR:  Thank you.
18   MR. WRIGHT:  -- on that.
19 BY MR. SLOSAR:
20   Q    You can answer the question.
21   A    If you could repeat it again, please?
22   Q    Sure.  After a report was filed against your
23 father on September 3, 2015, did he call you to talk to
24 you about what he did with regard to Ms. Hoskins?
25   A    No.  He did not.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

50..53

Page 50

1    Q    And did you talk to your father on September
2   3, 2015?
3    A    I have no idea.
4    Q    What's your cell phone number, Mr. York?
5    A    I do not remember what it was in 2015.
6    Q    Did you have a different cell phone in 2015
7   than you do today?
8    A    I can't remember when I -- I switched the
9   number.
10   Q    What's your number today?
11   A    Well, I, obviously, don't want everybody in
12  the room to have it.  Can I write it down?
13   Q    Yes.  And will you also write down, I'll put
14  in here, father's cell phone or write down whatever
15  numbers you have for your father as well, okay?
16   A    I do not remember it off the top of my head,
17  but I can provide you mine.
18   MR. SLOSAR:  And just to assure, Counsel, I will
19  not give these phone numbers to my clients.  It'll be
20  for attorneys' eyes only.
21  BY MR. SLOSAR:
22   Q    What's that area code, though?  Sorry.  I'm a
23  Chicago guy.  And what's your father's phone number?
24   A    I don't know off the top of my head.
25   Q    You got a cell phone on you?

Page 51

1    A    Yes.
2    Q    You got contacts in there?
3    A    Yes.
4    MR. SLOSAR:  Let's take a break, and you can find
5   your father's phone number.  Five minutes?
6    MR. WRIGHT:  Do you want to use the bathroom?
7    THE WITNESS:  Sure.
8    VIDEOGRAPHER:  Off the record at 9:32.
9          (OFF THE RECORD)
10   VIDEOGRAPHER:  Back on the record at 9:42.
11   MR. WRIGHT:  Before we begin with questioning, just
12  to note that the deponent has provided a phone number
13  for himself and Rueben York and plaintiffs' counsel has
14  agreed to keep that as attorneys' eye only; is that
15  correct?
16   MR. SLOSAR:  Uh-huh.
17   MR. WRIGHT:  Yes?
18   MR. SLOSAR:  Yes.  Yes.
19   MR. WRIGHT:  Thank you.
20   MR. SLOSAR:  I anticipated that correction, yes.
21  BY MR. SLOSAR:
22   Q    Sergeant York, are you currently married?
23   A    Yes.
24   Q    To whom?
25   A    Virgie York.

Page 52

1    Q    When did you marry Virgie York?
2    A    It was March of last year.
3    Q    March of 2017?
4    A    No, March of 2016.
5    Q    Okay.  When did you start dating -- and
6   Virgie's maiden name is Mills; is that right?
7    A    Yes.
8    Q    Okay.  When did you start dating Virgie Mills?
9    A    I believe somewhere around 2012.
10   Q    This is the second marriage between you and
11  Ms. Mills, correct?
12   A    No.
13   Q    No?  Were you ever -- who were you married to
14  before Ms. Mills?
15   A    I've been married twice before.
16   Q    Okay.  Who was the person that you were
17  married to before Virgie?
18   A    Kayla Gray.
19   Q    When did you marry Kayla Gray?
20   A    2008.
21   Q    When did you and Ms. Gray complete your
22  divorce?
23   A    I want to say October 2011.  I'm not -- I
24  mean, I don't know the exact day.  I believe it was
25  around October 2011.

Page 53

1    Q    Did you meet Virgie prior to divorcing Ms.
2   Gray?
3    A    I've known Virgie for 20 years.
4    Q    You still talk to Kayla Gray?
5    A    I've not had any personal contact with her,
6   no.
7    Q    When's the last time you talked to her?
8    A    Probably 2011.
9    Q    You haven't talked to her by phone or social
10  media or e-mail since 2011?
11   A    Not to Kayla, no.
12   Q    To anybody associated with Kayla?
13   A    Her mother reached out to me.
14   Q    When did her mother reach out to you?
15   A    I believe sometime late last year.
16   Q    Do you recall why she reached out?
17   A    Yes.
18   Q    Why was it?
19   A    She wanted to let me know that there was some
20  attorney, she wasn't for sure, that was harassing her
21  and Kayla that Melinda Patterson had fed her a bunch --
22  fed somebody a bunch of lies about the Wiggins' murder,
23  and she wanted to let me know that, that she had
24  threatened to get an attorney for her.
25   Q    When was -- what's the name of Kayla's mother?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 54

```
 1    A    Debbie.
 2    Q    Debbie who?
 3    A    Gray.
 4    Q    You were a police officer at the time that
 5  Debbie called you, right?
 6    A    She didn't call me.
 7    Q    How did she reach out to you?
 8    A    She went through another trooper.
 9    Q    Who was that?
10    A    I believe his name is Scott Bunch.  He's
11  somehow related to the family.  I don't know how.  Or
12  his wife is.
13    Q    Did you get in contact with Debbie after that?
14    A    No.
15    Q    Why not?
16    A    There was no need.  I didn't see no need in
17  it.
18    Q    Who's Melinda Patterson?  Is that the name
19  that you brought up?  Did I get that right?
20    A    That was the name that she told me, yes.
21    Q    Do you know who she is?
22    A    Yes.
23    Q    Who is she?
24    A    She's Kayla Gray's aunt.
25    Q    How is Jeff Gray related to Kayla?
```

Page 55

```
 1    A    I believe they're cousins.
 2    Q    You know who Jeff Gray is, right?
 3    A    I know several Jeff Grays, but she has a
 4  cousin named Jeff Gray, yes.
 5    Q    All right.  And that cousin's a drug dealer,
 6  right?
 7    A    That's the way I understand it, yes.
 8    Q    Okay.  You know that Jeff Gray is a dope
 9  dealer from your capacity as an investigating officer at
10  Post 10, right?
11    MR. WRIGHT:  Object to form and foundation.  Go
12  ahead.
13    A    I've never investigated.  Again, that's
14  knowledge that's been passed around, yes.
15    Q    And in January of 2011, you knew that Jeff
16  Gray was related to your wife, Kayla, correct?
17    A    Yes, sir.
18    Q    Yeah.  You seen him at family occasions?
19    A    No.
20    Q    No?  How often did you see Jeff Gray?
21    A    I think the only time that I ever saw Jeff
22  Gray while I was married to Kayla at any type event, it
23  was when -- I don't remember her name.  It was somebody
24  that was kin to them that was in the hospital and died.
25  I can't remember their name, so being at -- at a
```

Page 56

```
 1  hospital and then at the funeral.
 2    Q    Detective -- or Sergeant York, did you have a
 3  stepson who passed away in a car accident?
 4    A    He wasn't my stepson at the time.
 5    Q    Okay.
 6    A    I was not married.
 7    Q    But you know who I'm talking about, right?
 8    A    Yes.
 9    Q    Yeah.  And was that a stepson of Virgie's or
10  Kayla's?
11    A    Virgie's.
12    Q    I'm sorry, was that a son of Virgie's or
13  Kayla's?
14    A    Virgie's.
15    Q    Virgie's, okay.  And where were you at -- and
16  what's his name?  The boy that passed away?
17    A    His name was Jathan.
18    Q    Jathan?  Okay.  Where were you at when Jathan
19  passed away?
20    A    I was at home.
21    Q    You were at home?  So you and Virgie weren't
22  out in Richmond?
23    A    No.
24    Q    Okay.  Do you remember going to the
25  investigation site after the accident?
```

Page 57

```
 1    A    And if I have to relive it, yes, I do.  They
 2  called me, the city police did, and told me that
 3  Virgie's son was dead, and he had just wrecked from her
 4  house, so yes, I did go to it.  They called me.  I went,
 5  and I had to ID the body.  Then I had to go to Virgie's
 6  house and tell her that her son was killed.
 7    Q    And, sorry -- and, sir, I'm sorry.  I know
 8  this is emotional.  I'm not going to through the whole
 9  incident, so I'm --
10    A    Well, you have.
11    Q    -- going to ask you a few limited questions on
12  this.  Do you recall eventually recovering some property
13  from Jathan prior to leaving the investigation scene?
14  And specifically, do you recall recovering Jathan's cell
15  phone?
16    A    I don't remember.  I -- I know I did not
17  recover anything because the only thing I did was go and
18  lift the sheet up and -- and identify it.  I didn't take
19  nothing from the scene.
20    Q    What about -- do you remember going inside of
21  the car at some impound lot?
22    A    I think later I did, yes.
23    Q    Okay.  Did you recover his cell phone?
24    A    I recovered some things.  I don't remember
25  exactly what I recovered.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 58

1      Q     Have you ever spoken to -- you know who
2  Sheriff Pickard is, right?
3      A     Yes.
4      Q     Is he in the room?
5      A     Yes.
6      Q     He's wearing the green shirt?
7      A     Yes.
8      MR. SLOSAR:  Okay.  Sorry, Sheriff, that's it.  I
9  won't do an in-room identification, I promise.
10     MR. WRIGHT:  Should we put the camera on him?
11     MR. SLOSAR:  No, no.  That's a perfectly fine shirt
12 you're wearing over there.
13 BY MR. SLOSAR:
14     Q     You ever talk to Sheriff Pickard about Jeff
15 Gray's involvement in Bobby Wiggins' homicide
16 investigation?
17     A     I don't remember any -- talking any
18 particulars about it, no.
19     Q     Well, during the Wiggins' homicide
20 investigation, do you recall going to a Lowes and
21 recovering a video surveillance of Jeff Gray and James
22 Otis Sizemore buying tools to bury a body?
23     A     I didn't do that.
24     Q     Did you ever see that video?
25     A     Nope.

Page 59

1      Q     Until this day, have you ever seen video
2  surveillance of James Otis Sizemore and Jeff Gray buying
3  shovels, lime and a flashlight at a Lowes in Corbin,
4  Kentucky?
5      A     I've not seen it, but I heard that it existed.
6      Q     Who did you hear that it existed from?
7      A     From the case officer?
8      Q     Who is that?
9      A     Brian Johnson.
10     Q     Did Detective Johnson talk you about that?
11     A     He didn't talk to me.  I just got the
12 particulars of it, but I think, you know, he -- that's
13 where it came from.  I can't remember the specific date
14 and time that I became aware of it.
15     Q     So you knew, and you became aware of this
16 video surveillance while you're investigating the
17 Wiggins' homicide, correct?
18     MR. WRIGHT:  Object to form and foundation.
19     A     No.  Again, I'm not the case officer, and, but
20 I became aware of when Detective -- sorry, Detective
21 Johnson was.
22     Q     Okay.  And at that time, you, obvious -- I
23 mean, you obviously, knew that Jeff Gray was related to
24 Kayla, correct?
25     A     Yes, sir.

Page 60

1      Q     Okay.  Now, did you ever talk to Kayla about
2  why her uncle was buying those tools with James Otis
3  Sizemore in the late evening hours?
4      A     No, and what uncle are you talking about?
5      Q     I'm sorry.  Was it a cousin?
6      A     I believe they are cousins.
7      Q     I'm sorry.
8      A     You're -- you're referring to Jeff Gray?
9      Q     Yeah, yeah, sorry about that.  Sorry.  You
10 never talked to Kayla about it?
11     A     Not that I -- I remember because I believe
12 when -- during that course of that investigation, that
13 was in 2011, if I remember, we were -- we had separated
14 back in May or June, if I remember correctly.  And then
15 we divorced -- the divorce became final either in
16 October or maybe the very first of December, if I
17 remember correctly.
18     Q     So you separated from Kayla Gray in May of
19 2011; is that fair to say?
20     A     Approximately somewhere around --
21     Q     Sure.
22     A     -- there.
23     Q     Okay.  And you questioned -- you participated
24 in the questioning of Dave Fox in January of 2011,
25 right?

Page 61

1      A     I don't know the particular date, but I did
2  participate in that interview --
3      Q     Did --
4      A     -- at the --
5      Q     I know.  It's been a while.  You're a
6  defendant in that case, though, too, right?  Bill
7  Anderson's?
8      A     Yes.
9      Q     Yeah.  He sued you in that case, right?
10     A     Yes.  You-all did, yes.
11     Q     Yeah.  And did you ever talk to Sheriff
12 Pickard about Jeff Gray during the Wiggins' homicide
13 investigation?
14     A     I don't remember because I believe, if I
15 remember correctly, when that video was -- was
16 discovered, I -- I didn't have nothing to do with the
17 case, if I remember correctly, as far as -- my
18 involvement was fairly limited to the very beginning of
19 it.  Anything after the -- after the body was found, a
20 few interviews around that, I didn't have nothing to do
21 with it, so I don't remember.
22     Q     When is the first time you learned that
23 Sheriff Pickard was taking bribes from Jeff Gray?
24     MR. WRIGHT:  Object to form and foundation.
25     Q     You can answer.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 62

1    A    Okay.  I don't have no knowledge of him taking
2  bribes from Jeff Gray.
3    Q    Okay.  When is the first time that you learned
4  about those allegations?
5    MR. WRIGHT:  Object to form and foundation.
6    A    I don't -- I've never heard that to my
7  knowledge.
8    Q    Have you ever heard a recording of Jeff Gray
9  stating that he paid off Sheriff Pickard and deputies
10 working under his command?
11   A    I've never heard no statement from Jeff Gray
12 like that.
13   Q    Have you ever confiscated money or pills in an
14 investigation and given it to a witness?
15   A    A witness, you're referring somebody that I
16 arrested?  Absolutely not.
17   Q    Well, no, no, no.  So what I'm saying is you
18 confiscated money and pills as your capacity as an
19 officer for the Kentucky State Police, right?
20   A    Yes.
21   Q    Okay.  Have you ever confiscated money or
22 pills and then instead of putting that evidence in
23 property, you go and give it to another person who's not
24 law enforcement?
25   A    No.

Page 63

1    Q    Okay.  Never done that?
2    A    No.
3    Q    Have you ever taken -- well, let me withdraw
4  that question.  You served in the military, right, sir?
5    A    Yes.
6    Q    Never been deployed, right?
7    A    No.
8    Q    Why not?
9    A    Well, the National Guard unit I was with
10 wasn't deployed.
11   Q    Was there some sort of medical or other reason
12 for why you were never deployed?
13   A    I have two vertebrae that's a genetic defect
14 in my back.
15   Q    So how long were you in the military, sir?
16   A    Approximately six years.
17   Q    And did you receive a medical discharge?
18   A    I -- you know, I don't know what the discharge
19 was.  When I was -- we did a pre-deployment thing.  I
20 had a -- I had found out about my back through the State
21 Police.  I went to an Army doctor to confirm that, and
22 they gave me the choice of changing MO -- MOSs or job
23 description and not -- and then I told them I wanted
24 out.
25   Q    What investigation schools did you attend

Page 64

1  prior to being hired by the Kentucky State Police?
2    A    Investigation?  None.
3    Q    Okay.
4    A    I was a -- prior police officer.
5    Q    Okay.  What, and you got hired around 2000,
6  correct?
7    A    Yes.
8    Q    Okay.  What investigation schools did you
9  attend after being hired by KSP?
10   A    Just the -- the academy training.  I can't
11 tell you the dates or times or exact course titles.
12   Q    Did you attend any outside courses or schools
13 in relation to your employment as a KSP officer?
14   A    Outside, as far as law enforcement, no.
15   Q    Okay.  Have you ever attended the Reid School
16 of Interrogation?
17   A    Yes.
18   Q    Okay.  When did you attend there?
19   A    I don't know the particular year, 2009, 2010
20 maybe.
21   Q    How long was that course?
22   A    I believe it was 40 hours.
23   Q    Did you attend the second Reid Interrogation
24 School?
25   A    I'm not sure, but I believe so.  I'm not -- I

Page 65

1  can't -- they're -- they're all running together.  I
2  believe I did.  I believe I went two different ones.
3    Q    Two interrogation courses from Reid?
4    A    They wasn't back to back.
5    Q    Sure.  Do you remember what city that was in?
6    A    I want to say Frankfort.
7    Q    Aside from Reid -- and do you have any
8  certificates from that?
9    A    Not on me, no.  I don't.  I'm assuming they'd
10 be in my training records.  I -- I don't have it with
11 me.
12   MR. SLOSAR:  And to my knowledge, we haven't been
13 produced any certificates related to any retraining, so
14 I would just ask that you guys, you know, supplement his
15 personnel file with any additional training that he's
16 received aside from what we found so far.
17   MR. WRIGHT:  If we have it, we ask for the
18 personnel file and gave everything they gave to us.  I
19 mean, I'll make the same objection I made when we
20 produced it that -- I mean, we're going through an
21 intermediary to get that.
22   MR. SLOSAR:  Sure, but that -- well, we can deal
23 with this after.  I mean, you're a party in the lawsuit,
24 and you have an obligation to turn that stuff over, but
25 we'll --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    MR. WRIGHT: Well, we've discussed before, so I'm
2 just going to reiterate my objection I put on the
3 supplemental production.
4    MR. SLOSAR: Well, we'll reserve the right to
5 compel these documents to the extent that you're not
6 able to produce them.
7 BY MR. SLOSAR:
8    Q    What other outside training did you receive
9 aside from the basic training from KSP?
10   A    None.
11   Q    Okay. So you went to two Reid Interrogation
12 schools, potentially, and you received the basic
13 training at the KSP Academy; is that right, sir?
14   A    Yes. I went to an Internet Crimes Against
15 Kids training. I don't remember what year.
16   Q    What was the hiring process like at KSP in
17 2000?
18   A    It was very hard. It was a reading test, a
19 physical test and then we did, like, an oral board.
20   Q    A what?
21   A    Oral board.
22   Q    What does that mean? Oh, I'm sorry. Like, an
23 oral examination?
24   A    You go in front of three different people, and
25 they ask you questions.

1    Q    Okay. How long was your training at the
2 Kentucky State Police?
3    A    22 weeks.
4    Q    22 weeks? Where did that take place at?
5    A    Frankfort.
6    Q    Did you have courses during that training?
7    A    Yes.
8    Q    Okay. What courses did you take as part of
9 this basic academy?
10   A    I don't remember the exact details. They was
11 -- you know, we get firearms training, defensive driving
12 training, just along the lines of police work.
13   Q    Did you take a course on how to prepare police
14 reports?
15   A    I don't remember the exact title. They went
16 over the initial, but when I went through it and -- and
17 now, it's totally different. We were handwriting
18 everything when I went through it. Now, it's all
19 computerized.
20   Q    Sure. Were you trained on what information
21 you're required to put in a police report?
22   A    Required other than, you know, the basic who,
23 where, why, what, when, where, stuff like that.
24   Q    Okay. But did anybody ever train you that
25 you're obligated to insert specific information in a

1 police report other than the basics of who you're
2 interviewing, when you interview them, where the
3 interview took place?
4    A    I don't remember no -- no -- no particular
5 details on, you know, a specific thing.
6    Q    Okay. So and I'll give you a couple of
7 specifics, and you just tell me whether you recall being
8 trained on this or not, okay? So did anyone ever train
9 you that you're required to document promises made to a
10 witness during questioning?
11   A    No.
12   Q    Okay. Did anyone ever train you that you're
13 required to document threats made to a witness during
14 questioning.
15   A    No.
16   MR. WRIGHT: I'll object to the form --
17   Q    Did --
18   MR. WRIGHT: -- on that, but go ahead.
19   Q    Did -- and by threats, I'm saying, threats to
20 somebody would go to prison if they don't tell you
21 something. Threats of --
22   (RADIO CALL NOISE)
23   Q    Let me ask that question again. By threats, I
24 mean, threats of physical harm or threats to charge
25 anybody with a crime during your questioning of them?

1 Did anybody ever train you that you were required to
2 document that type of information in a police report?
3    A    Not -- not -- not that I remember.
4    MR. WRIGHT: Object to form, but go ahead.
5    Q    And you don't have any notes or documents at
6 home that would help refresh your memory if you actually
7 were trained on that, correct?
8    A    No. I do not.
9    Q    Okay. Did anyone ever train you that you're
10 required to document if a witness looks at photographs
11 and is unable to make an identification?
12   MR. WRIGHT: Object to form, but go ahead.
13   A    I don't -- can you say that --
14   Q    Sure. Let me ask it a better way.
15 Specifically, this case, you sent photographs of
16 Jonathan Taylor to a police department in Oklahoma,
17 correct?
18   A    Yes. I don't remember which department.
19   Q    Okay. And you learned -- and the purpose of
20 you sending the photographs to Oklahoma was to see
21 whether Michael Crump could identify Jonathan Taylor,
22 correct?
23   A    I believe, yes.
24   Q    Okay. And you learned from Michael Crump that
25 he did not, in fact, make an identification of Jonathan

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 70

1   Taylor, correct?
2       MR. WRIGHT: Object to form and foundation.
3       Q    You can answer.
4       A    Yes.
5       Q    Okay.  And you also never documented which
6   photographs -- well, let me back up.  You never
7   documented anywhere in a police report that you had sent
8   photographs to Oklahoma, correct?
9       A    That is correct.
10      Q    Okay.  You also never documented which
11  photographs you sent to Oklahoma of Jonathan Taylor,
12  correct?
13      A    That is correct.
14      Q    Okay.  And you never documented it in a police
15  report that Michael Crump was unable to identify
16  Jonathan Taylor after looking at his photographs,
17  correct?
18      MR. WRIGHT: I'll object to the form on that. Go
19  ahead.
20      Q    Correct?
21      A    Can I answer?
22      Q    You can answer.
23      A    That is correct, but there's nothing -- there
24  was nothing new.  That's one thing that myself and --
25  and the defense agreed upon is that Michael Crump could

Page 71

1   never positively identify anybody from the photos.
2       Q    Okay.  But you only -- let me back up.  My
3   question to you is a little bit different.  You never
4   documented in a police report that Michael Crump was
5   unable to identify Jonathan Taylor, correct?
6       MR. WRIGHT: I'll object to the form again, but --
7       Q    Yes or no, sir?
8       MR. WRIGHT: -- you can answer the question.
9       A    Not that particular time.
10      Q    Okay.  And prior to that occurring, you had
11  never received any training from the Kentucky State
12  Police saying that you were required to document when
13  someone like Mr. Crump doesn't make an identification;
14  is that right?
15      MR. WRIGHT: I'm going to object to form again.
16      Q    And you know what?  I'll ask it a better way.
17  Let me ask a better question, which is you not
18  documenting the non-identification of Jonathan Taylor by
19  Michael Crump, that was consistent with the training
20  that you received from the Kentucky State Police,
21  correct?
22      MR. WRIGHT: I'll object to form again, but go
23  ahead as best you can.
24      Q    Is that correct?
25      A    Again, I did not document that particular

Page 72

1   time, but I did document it, and I've said it from the
2   get-go and to this end that Michael Crump could not
3   positively identify.  It was no big secret.
4       Q    Is that --
5       A    Like I said, that's something --
6       Q    Is -- by you not documenting those
7   interactions with Michael Crump where he did not
8   identify Jonathan Taylor, was that consistent with the
9   training you received from the Kentucky State Police,
10  yes or no?
11      MR. WRIGHT: Object to form.
12      A    I -- I'm not aware of any training that would
13  -- I would have to document what a police department in
14  Oklahoma did.
15      Q    Well, you spoke to Mr. Crump after he viewed
16  the photographs, right?
17
18
19
20      A    Yes.
21      Q    And you learned from Mr. Crump that he did not
22  identify Jonathan Taylor after looking at those
23  photographs?
24      MR. WRIGHT: Object to form and foundation. Answer
25  best you can.

Page 73

1       Q    Yes or no?
2       A    What he told he could not positively identify
3   him, said it could be.
4       Q    Okay.  You didn't document that, right?
5       A    No.
6       Q    Okay.  And that was consistent with the
7   training you received at KSP, correct?
8       A    I go back, I'm not aware of any training that
9   says I had to document from something like that when
10  it's already in the case file.
11      Q    So you're saying that there was a report that
12  you directed in the Katherine Mills' homicide
13  investigation file where you state that Michael Crump
14  looked at photographs of Jonathan Taylor and could not
15  identify him?
16      A    No.
17      MR. WRIGHT: I'll object to form and foundation,
18  again.
19      Q    That --
20      MR. WRIGHT: Answer the best you can.
21      Q    That report doesn't exist, right, sir?
22      A    Right.
23      Q    Okay.  So let me ask you a different question:
24  Did you ever receive any training at the Kentucky State
25  Police on how to conduct a photo array?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 74

1    A    A photo lineup?  Yes.
2    Q    You did?  What training did you receive on
3    that, sir?
4    A    It was very basic, I -- I believe.  If I
5    personally was going to do one, I would, you know, send
6    to AFIS and get photographs of similar people.
7    Q    Okay.  Well, AFIS is for latent prints; is
8    that right, sir?
9    A    For instance, driver's license, I'm sorry.
10   Q    Okay.  AFIS is for latent prints, right?
11   A    Yeah.
12   Q    Okay.  So KSP when they trained you said, you
13   know, Detective York and all the other recruits, you can
14   find photographs in the driver's license's database; is
15   that right?
16   A    Yes, and I forgot who we sent that to.  We
17   don't prepare it ourselves.  Yeah, but I also should say
18   that Jonathan was a double photograph that was sent out
19   either.
20   Q    Well, do you remember doing a written
21   interrogatory response in this case?
22   A    I -- I -- I believe, but yes.
23   Q    Do you -- you do?  Okay.  And you understand
24   that you were under oath in that written interrogatory
25   response, right?

Page 75

1    A    Yes.
2    Q    And you --
3    MR. WRIGHT:  And I'll object to the extent that
4    there was an answer subject to objection.
5    MR. SLOSAR:  All right.  Well, I'm not sure what
6    federal rule that falls under, but I appreciate the
7    commentary.
8    BY MR. SLOSAR:
9    Q    So I'm going to show what we'll mark as
10   Exhibit number 3.  Sir, these are your written
11   interrogatories, okay?  You went through these with your
12   lawyer, right?
13        (EXHIBIT 3 MARKED FOR IDENTIFICATION)
14   A    Yes.
15   Q    Okay.  Sorry, there's no Bates numbers,
16   obviously, on these.  I'll pass them around.  And you
17   understood that you were under oath when you answered
18   these, right?
19   A    Yes.
20   Q    Okay.  You're under oath today, right?
21   A    Yes.
22   Q    And you take that oath seriously, right?
23   A    Yes.
24   Q    You took an oath to be a KSP officer, right?
25   A    Yes.

Page 76

1    Q    So that you wouldn't lie, right?
2    A    Yes.
3    Q    So you wouldn't frame people for murder,
4    right?
5    A    Yes.
6    Q    Okay.  You did take an oath on that, right?
7    A    Yes.
8    Q    And I'm going to refer you, sir, to -- these
9    pages aren't numbered, but the answer that you provided
10   to number 10.  Can you go there?  Yep.  Flip right
11   there, and I appreciate that.  So we're going to look
12   right here at the bottom, and do you see at the bottom
13   where it starts with "Between," sir?  The second line
14   from the bottom?
15   A    "Between my two interviews" --
16   A    Yeah.
17   A    -- "I sent".
18   Q    So --
19   A    "One or more pictures of Jonathan Taylor to a
20   police department in Oklahoma where Crump was then
21   living for him to review," yes.
22   Q    Okay.  All right.  Now, that's truthful,
23   right, because you're under oath?
24   A    Yes.  That is true.
25   Q    Okay.  So according to your under oath

Page 77

1    interrogatory response you sent one or more pictures of
2    Jonathan Taylor to Oklahoma for Mr. Crump to review,
3    correct?
4    A    Yes.
5    Q    You said nothing in this interrogatory
6    response about sending photographs of other people
7    involved --
8    MR. WRIGHT:  I'm going to object --
9    Q    -- in the investigation.
10   MR. WRIGHT:  -- to form and foundation.
11   MR. SLOSAR:  Counsel --
12   MR. WRIGHT:  There's an objection before the
13   interrogatory answer about asking for specificity on
14   each activity and investigation.  I object to the form
15   and foundation of this question.
16   MR. SLOSAR:  Okay.  First of all, again, and I'm
17   going to say this as nice as I can.  Wait until I'm
18   finishing asking my question before you make an
19   objection, okay, because it's very hard for the court
20   reporter down there to start typing when we're both
21   talking at the same time; is that okay?
22   MR. WRIGHT:  Yeah, I'm good.
23   MR. SLOSAR:  And I won't talk over you when you're
24   making your objection, okay?  Do you understand that,
25   Counsel?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     MR. WRIGHT:  I understand it.

2     MR. SLOSAR:  Okay.  So if this -- and, next, if you

3  continue making speaking objections, I will call the

4  Magistrate in this case.  It is -- the objection that

5  you just made is not a proper objection at trial, and

6  today the rules are as if they were at trial.  I

7  understand there's an objection lodged in the response.

8  I'm not asking him about that.  The objection has

9  nothing to do with the information he provided.

10    MR. WRIGHT:  I respectfully disagree.  You're

11 asking him about his answer.  We objected to giving

12 specifics because he couldn't enumerate all of it.  We

13 indicated that he would answer best as he could giving

14 the principle activities, so I think that is pertinent

15 to the representation of his answer.  So I'm just noting

16 my objection.  We can continue on your question about

17 whether he indicated any photographs were given to Mr.

18 Crump.

19    MR. SLOSAR:  Counsel, just for the record, if you

20 continue telling your client how to respond to

21 questions, which is what you just did, you just told him

22 what to testify to, we will stop this deposition, and I

23 will seek sanctions for the cost that it took for us to

24 travel down here from Chicago in order to reconvene

25 this, okay?  So the speaking objections and telling your

1  client how to respond are absolutely inappropriate.

2     MR. WRIGHT:  We are not -- I'm not giving a

3  speaking objection.  I'm just objecting -- noting the

4  objection in the interrogatory answer.

5  BY MR. SLOSAR:

6     Q    Sir, did you understand that you were under

7  the oath when you wrote -- when you signed this?

8     A    Yes.

9     Q    Okay.  And according to this interrogatory

10 response, you only sent one or more pictures of Jonathan

11 Taylor to a police department in Oklahoma, correct?

12    MR. WRIGHT:  And I will object to the form of that

13 question.

14    Q    Correct?

15    A    Yes.

16    Q    Okay.  In this interrogatory response, you

17 don't say anything about showing or sending Mr. Crump

18 photographs of anyone other than Jonathan Taylor,

19 correct?

20    A    I thought this lawsuit was just about Taylor

21 and Amanda Hoskins.  I didn't realize it was about

22 anybody else.  I'm sorry.

23    Q    I'm confused.  Why are you -- what other

24 photographs relating to investigations other than

25 Katherine Mills would you have been asking Mr. Crump to

1  view?

2     A    I thought I was being sued by Jonathan Taylor

3  and Amanda Hoskins in this.

4     Q    You are.

5     A    So I was just responding to --

6     Q    To this case?

7     A    Yeah.

8     Q    So -- okay.  So let me make sure I have this

9  right, correct?  All right.  You sent photographs

10 relating to the Mills' homicide investigation to Michael

11 Crump, and those photographs were one or more pictures

12 of Jonathan Taylor, correct?

13    A    That is a true statement.

14    Q    Okay.  Other than the photographs you sent to

15 Jonathan Taylor to this Oklahoma police department

16 relating to this homicide investigation, you didn't send

17 any other photographs of suspects, correct?

18    A    That is not true.  I mean, I -- I just

19 answered in reference to Jonathan Taylor.  I believe, if

20 my memory serves me correct, like Michael Simpson, those

21 pictures were sent, but I did not know I was answering

22 for Michael Simpson, but I did -- this -- that is a true

23 and accurate statement that I sent pictures of Jonathan

24 Taylor.

25    Q    And you would agree that this interrogatory

1  response doesn't say anything about you sending

2  photographs of Mike Simpson to Oklahoma, correct?

3     MR. WRIGHT:  And I'll object to the form, but go

4  ahead.

5     Q    Correct?

6     A    Yes.

7     Q    Okay.  Sir, I'm going to ask you some very

8  limited questions about --

9     A    Are you done with this?

10    Q    For now.  For now.  Yeah.  Sorry.  About your

11 preparation for today's deposition, I don't want you to

12 discuss any conversations you had with your counsel,

13 okay?  Those are privileged.  All right?  You get that?

14    A    Yes.

15    Q    I'm sorry.  I'm not trying to be facetious.  I

16 --

17    A    Yes.

18    Q    -- just need to make sure it's on the record.

19 What did you do to prepare for today's deposition?

20    A    The only thing I did was meet with my

21 attorney, and we discussed stuff.

22         (CERTIFIED QUESTION)

23    Q    Yeah.  Perfect.  Okay.  I'm not going to ask

24 you any of the discussions that you had.  How many times

25 did you meet with your counsel, though?



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 82

```
 1        MR. WRIGHT:  I'm going to object.  I don't think
 2   this is relevant to the subject matter about how many
 3   times he's meeting with me.
 4        A    Two or three --
 5        MR. SLOSAR:  Well --
 6        THE WITNESS:  I'm sorry.
 7        MR. SLOSAR:  Are you going to obstruct -- or, I'm
 8   sorry.  Are you --
 9        MR. WRIGHT:  Can you articulate a basis why you
10   need to know how many --
11        MR. SLOSAR:  It --
12        MR. WRIGHT:  -- times he's talked with me?
13        MR. SLOSAR:  It absolutely is relevant because I'm
14   going to ask what documents he reviewed during each of
15   those conversations.
16        MR. WRIGHT:  See, I don't think -- I think that
17   shows attorney work product about -- you produced over
18   30,000 documents in our selection and certain ones in
19   there reveal our strategy on what we think is most
20   important or not, so I believe that's improper to talk
21   about what documents I've sorted out and we went over.  I
22   don't believe that's appropriate.
23        MR. SLOSAR:  These are --
24        MR. WRIGHT:  You can ask him what he's maybe done
25   independently, but the stuff we've done, I think that's
```

Page 83

```
 1   off limits.
 2        MR. SLOSAR:  Are you going to instruct your client
 3   to assert the attorney-client privilege as to documents
 4   he reviewed --
 5        MR. WRIGHT:  At my direction?  Yes, I will.
 6        MR. SLOSAR:  Okay.
 7        MR. WRIGHT:  I think we can certify that and move
 8   onto the next question.
 9   BY MR. SLOSAR:
10        Q    Sir, I'm going to ask you a series of
11   questions relating to this.
12        MR. SLOSAR:       You can instruct your client of
13   what to do, and we'll certify these questions for the
14   Court and come back another day.
15   BY MR. SLOSAR:
16        Q    And you'll answer them after a court order,
17   okay?
18        A    I'm totally confused.  Now, what's fixing to
19   happen here?
20        Q    Yeah.  I'm just going to ask you some
21   questions.  He's going to instruct you what to do.  It's
22   just for the record so that we can put forth these --
23   this issue to the Court, and a judge will rule later on
24   whether you should have to answer them.
25        A    So I'm not answering them right now?
```

Page 84

```
 1        (CERTIFIED QUESTION)
 2        Q    You're going to do whatever your lawyer says -
 3   -
 4        A    Yes.
 5        Q    -- all right?  Mr. York, what documents did
 6   you review to prepare for today's deposition?
 7        MR. WRIGHT:  I instruct not to answer.
 8        Q    Are you going to take your attorney's advice
 9   and refuse to answer that question?
10        A    Yes, sir.
11        (CERTIFIED QUESTION)
12        Q    Mr. York, what testimony did you review in
13   preparation for today's deposition?
14        MR. WRIGHT:  Are you referring to his testimony or
15   any testimony?
16        MR. SLOSAR:  Any testimony at any point in the
17   preparation.
18        MR. WRIGHT:  I'm going to instruct not to answer.
19   BY MR. SLOSAR:
20        Q    Are you going to take you counsel's advice?
21        A    Yes, sir.
22        (CERTIFIED QUESTION)
23        Q    On how many occasions did you meet with your
24   counsel to prepare for today's deposition?
25        MR. WRIGHT:  I'm going to instruct not to answer.
```

Page 85

```
 1        Q    Are you going to take your counsel's advice?
 2        A    Yes, sir.
 3        (CERTIFIED QUESTION)
 4        Q    Okay.  Sir, I have a -- who was present during
 5   your preparation for this deposition?
 6        MR. WRIGHT:  Instruct not to answer.
 7        Q    Are you going to follow your counsel's advice?
 8        A    Yes.
 9        Q    Okay.  I have a series of questions, just for
10   the record, about preparation that Mr. York did to
11   prepare for today's deposition.  Sir, is it fair to say
12   that you are going to take your counsel's advice and
13   refuse to answer those questions under the attorney-
14   client privilege?
15        A    Yes.
16        MR. SLOSAR:  We'll certify those for the record.
17        MR. WRIGHT:  All right.
18   BY MR. SLOSAR:
19        Q    Sir, what training did -- well --
20        A    Right here are we still doing this?
21        Q    No, no.
22        MR. WRIGHT:  No.  We're moving on.
23        Q    We're going to move on.  Okay.  I appreciate
24   it, though.  What -- and let me tell you, if there ever
25   --
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 86

1  (BRIEF INTERRUPTION)
2      Q    We're apparently in a doctor's office. If
3  there ever comes a point in today's deposition where you
4  need to confer with your counsel about whether you can
5  answer a question, please let me know, okay?
6      A    Yes, sir.
7      Q    Okay. I imagine your attorney won't be shy
8  that either, but I want to put that on the record in
9  case we have any concerns, okay?
10     A    Yes.
11     Q    Okay. Sir, prior to the homicide --
12              (BRIEF INTERRUPTION)
13  MR. SLOSAR: All right. We're going to need to
14  find a different location, although, I appreciate the --
15  this place, Ms. Kincer.
16  BY MR. SLOSAR:
17     Q    Sir, prior to the beginning of the Katherine
18  Mills' homicide investigation, December 20, 2010, have
19  you ever reviewed any policies or procedures on how to
20  question witnesses?
21     A    Not that I remember, no.
22     Q    Prior to you beginning with your investigation
23  into the death of Katherine Mills, have you ever
24  reviewed any KSP polices or procedures on how to
25  interrogate suspects?

Page 87

1      A    No. I did not.
2      Q    Prior to beginning your investigation into the
3  death of Katherine Mills, have you ever reviewed any KSP
4  policies or procedures on how to conduct lineups?
5      A    I -- like I said before, we had some basic
6  training before that, but not just prior. I mean, I
7  didn't say, oh, we got this murder. I went back and --
8  and did that.
9      Q    Okay. And I --
10     A    Does that answer your question?
11     Q    Yeah. Let me -- I just want to be clear. What
12  I'm saying is any time before December 20, 2010.
13     A    So anytime?
14     Q    That's what I mean. Anytime. So any time
15  prior to your investigation into Katherine Mills' death,
16  did you review KSP policies or procedures on how to
17  compile, how to put together a photo lineup?
18     A    Yes.
19     Q    Okay. And what policies or procedures did you
20  review relating to how to create a photo lineup?
21     A    Not that I reviewed it. It was just, like,
22  basic training. We received like I had stated earlier.
23     Q    What basic -- okay, so earlier you said that
24  you were trained on how to locate photographs, right?
25     A    Yes.

Page 88

1      Q    Okay. And those were the driver's license
2  photos?
3      A    The same answer.
4      Q    Okay. Were there any policies or procedures
5  that you reviewed on how you were to actually put
6  together a photo lineup?
7      A    I'm not familiar with any policies that they
8  went over with that basic training.
9      Q    And you didn't have any training on how to
10  compile and put together a photo array either, correct?
11  MR. WRIGHT: Object to form and foundation. Answer
12  best you can.
13     Q    Other than what you testified earlier?
14     A    Yes.
15     Q    Okay. So do you know what a double blind
16  photo lineup is?
17     A    No. I do not.
18     Q    Okay. Do you what a blind -- conducting a
19  blind photo lineup is?
20     A    No. Off the top of my head, no, I do not.
21     Q    Okay. I promise you it does not involve a
22  blind police officer. It's just a phrase that's used.
23  Has anybody ever trained you on how to conduct a photo
24  lineup or a live lineup based on characteristics?
25     A    Not that I'm -- I'm familiar -- familiar.

Page 89

1      Q    Okay.
2      A    I'll just go back to my previous answer.
3      Q    Okay. And prior to the Katherine Mills'
4  homicide investigation, did you ever review any KSP
5  policies or procedures on how to create a police report?
6      A    I had an initial training, yes. Basic
7  training, yes.
8      Q    Okay.
9      A    Well, it all --
10     Q    And that's what you testified to earlier?
11     A    Yes.
12     Q    Okay. But those policies or procedures are
13  training that you received did not inform you as to
14  specific content that needed to be included; is that
15  right? Other than the basics of who you're
16  interviewing, when it happened, where it happened; is
17  that right?
18     A    Yes. I remember that's to the best of my
19  knowledge, yes.
20     Q    Okay. And that's consistent with the
21  testimony you testified to earlier, right? Yes?
22     A    Yes.
23     Q    Okay. Sorry. Did you know Amanda Hoskins
24  prior to the Katherine Mills' homicide investigation?
25     A    No. No, I mean, I heard her name before.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 90

1    Q    Never investigated her before, though, right?
2    A    No.
3    Q    All right.  Did you have any opinions of
4 Amanda Hoskins prior to investigating her in the
5 Katherine Mills' homicide?
6    A    Preconceived opinions? No.
7    Q    Okay.  Did you know Jonathan Taylor prior to
8 the Katherine Mills' homicide investigation?
9    A    No, sir.
10    Q    Have any opinions of him prior to that
11 investigation beginning?
12    A    No.
13    Q    Did you know William Lester prior to the
14 Katherine Mills' homicide investigation?
15    A    No.
16    Q    Have any opinions of him prior to it
17 beginning?
18    A    No.
19    Q    Did you know Christy Branson prior to the
20 Katherine Mills' homicide investigation?
21    A    No.
22    Q    Have any opinions of her prior to the
23 investigation beginning?
24    A    No.
25    Q    Did you know Amber Simpson prior to the

Page 91

1 Katherine Mills' homicide investigation?
2    A    No.  I did not know her.
3    Q    Okay.  Now, when I say "to the beginning of
4 the Katherine Mills' homicide investigation," I'm
5 referring specifically to December 20, 2010 when you
6 began investigating, okay?
7    A    Yes.
8    Q    Okay.  That doesn't change any of the answers
9 you just provided, right?
10    A    No.
11    Q    Okay.  You understood that that's what I was
12 referring to, right?
13    A    Yes.
14    Q    Okay.
15    A    If I had any preconceived opinions of him --
16    Q    Yeah.  Do you have --
17    A    -- prior to --
18    Q    Do you have any preconceived opinions of Ms.
19 Simpson prior to beginning your investigation in this
20 case?
21    A    No.
22    Q    Okay.  Did you know Robert Beech prior to
23 beginning the Katherine Mills' homicide investigation?
24    A    No.
25    Q    Have any preconceived opinions of him prior to

Page 92

1 beginning this?
2    A    No.
3    Q    Did you Mike Simpson prior to the Katherine
4 Mills' homicide investigation?
5    A    No.
6    Q    Have any preconceived opinions about him?
7    A    No.
8    Q    Okay.  Did you know Allen Helton prior to the
9 Katherine Mills' homicide investigation?
10    A    No.
11    Q    Do you have any preconceived opinions of Allan
12 Mills -- or Allen Helton prior to this investigation?
13    A    Prior?  No.
14    Q    Did you know Michael Crump prior to the
15 Katherine Mills' homicide investigation?
16    A    I did not know him, but as the defense pointed
17 out in one of the many hearings, I've written him a
18 seatbelt ticket or something, but I did not know him or
19 have any preconceived ideas.
20    Q    Okay.  So aside from the seatbelt ticket that
21 I'm sure you -- well, did he remember that when you
22 began this investigation?
23    A    Did not have a clue when Jim Cox produced it.
24    Q    Okay.  No opinions of Mr. Crump before that?
25    A    No.

Page 93

1    Q    Okay.  Was Mr. Crump's seatbelt violation
2 pending during the course of this case?
3    A    I believe so.  I believe, if I remember
4 correctly, he didn't pay his fine, and we had an FTA on
5 him.
6    Q    Did you help him out with that?
7    A    No.
8    Q    Did you ask anyone to help him out with that?
9    A    No.  I did not.
10    Q    Did you know Jesse Lawson prior to the
11 Katherine Mills' homicide investigation beginning?
12    A    I did not know him, no.
13    Q    Any preconceived notions of him prior to this
14 investigation?
15    A    No.
16    Q    Did you know Michael Bruner prior to the
17 Katherine Mills' homicide investigation --
18    A    Yes.
19    Q    -- in the beginning?  How did you know Mr.
20 Bruner?
21    A    I knew his family.
22    Q    Did you know Mr. Bruner himself?
23    A    I knew -- I knew who he was, and -- and last
24 time I had saw him before that, he was like a little
25 kid.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 94

1    Q    So you knew Mr. Bruner since he was a little
2 kid?
3    MR. WRIGHT:  I object to form, foundation.  Go
4 ahead.
5    Q    Did you know Mr. Bruner since he was a little
6 kid?
7    A    Yes.  Be careful.  I mean, I want to clarify
8 no.  I knew of him.  Did I know him on an intimate and
9 personal good friend level?  No.  But --
10    Q    How did you know him since he was a little
11 child?
12    MR. WRIGHT:  Object to form.
13    A    I was friends with his family.
14    Q    Okay.  Who in Mr. Bruner's family were you
15 friends with?
16    A    His mother, his -- his father, his stepmother.
17    Q    Are they friends of yours?
18    A    They're acquaintances, yes.
19    Q    All right.
20    A    But they're not people that I hang out with or
21 have dinner with, but I -- I know them.
22    Q    Do you know their names?
23    A    Yes.
24    Q    What are their names?
25    A    Thomas Bruner.  His mother's name, Angie.  I

Page 95

1 know exactly who -- who she's -- what exactly her -- she
2 was a Mills-Bruner.  I don't know what it is now.  And
3 then Mr. Bruner, the father's wife now, I know her,
4 Jennifer Bruner.
5    Q    Okay.  Do you consider any of Mr. Bruner's
6 parents to be friends of your anytime?
7    A    Yes.  I mean, they are friends.  I went to
8 school with them, but they're not -- I'm not -- we don't
9 hang out today or any time before that or have lunch
10 together or anything like that, but we were friends.
11    Q    Did you know Joe King prior to beginning the
12 Katherine Mills' homicide investigation?
13    A    No, sir.
14    Q    Have any preconceived opinions of Mr. King?
15    A    No.
16    Q    Prior to this case?
17    A    No.
18    Q    Is that a "no," sir?
19    A    No.
20    Q    I know you were drinking water, I apologize.
21 Did you know Kayla Mills prior to the Katherine Mills'
22 homicide investigation?
23    A    No.
24    Q    Have any preconceived opinions of her?
25    A    No.

Page 96

1    MR. SLOSAR:  Can we take a short break?  I got to
2 use the restroom?
3    MR. WRIGHT:  Sure.
4    MR. SLOSAR:  Okay.
5    VIDEOGRAPHER:  Off the record at 10:29.
6         (OFF THE RECORD)
7    VIDEOGRAPHER:  Back on the record at 10:39.
8 BY MR. SLOSAR:
9    Q    Mr. York, did you testify before a Grand Jury
10 relating to the Katherine Mills' homicide investigation
11 on April 27, 2012?
12    A    Yes.
13    Q    All right.  Did you have conversations with
14 the Commonwealth Attorney's Office prior to testifying
15 at the Grand Jury proceedings?
16    A    In reference to this case?
17    Q    Yeah, sorry.  Yes.
18    A    Not -- I don't remember any conversations we
19 had going into the Grand Jury --
20    Q    Well --
21    A    -- or prior to that.
22    Q    -- did you have conversations with -- let me
23 put it -- let me withdraw the question.  At a certain
24 point in your investigation, April of 2012, did you
25 approach Jackie Steele or any other Commonwealth

Page 97

1 attorney about the initiation of charges against Amanda
2 Hoskins, Jonathan Taylor and William Lester for the
3 murder of Katherine Mills?
4    A    I don't remember a specific date.  I'm sure
5 that it was discussed.  I -- I don't know particulars of
6 it or a particular date.
7    Q    You were the lead investigator in this
8 investigation, correct?
9    A    At that point.
10    Q    Yeah.  At the time the charges were initiated
11 --
12    A    Yes.
13    Q    -- you were the lead investigator?
14    A    Yes.
15    Q    Okay.  And you were the person who provided --
16 well, let me strike that question.  Were you the person
17 who provided reports from the underlying investigation
18 to the Commonwealth attorney's office?
19    A    Yes.  During my time, I was the investigator.
20    Q    Okay.  So at the time the charges were
21 initiated against the plaintiffs in this case, you were
22 the officer who provided reports that were created
23 during the underlying investigation, correct?
24    A    Yes.
25    Q    Okay.  And specifically, I'm going to ask you

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 98

1  whether you provided certain witness -- certain reports
2  and interviews to the prosecutor's office. I'm just
3  going to down through the list of witnesses, okay? So
4  prior to the Grand Jury, did you provide the
5  Commonwealth Attorney's Office with reports and
6  statements that you obtained from Joe King?
7      A   Yes.
8      Q   Prior to the Grand Jury proceeding, did you
9  provide reports and statements that you obtained from
10 William Lester?
11     A   I believe so. I -- I don't know exactly when
12 -- I cannot remember when I interviewed with his
13 attorney, but whether it was before or right after, but
14 yes, I did.
15     Q   Okay. Prior to the initiation of charges
16 against the plaintiffs, did you provide a report and
17 statement that you took from Amanda Hoskins?
18     A   Yes.
19     Q   All right. Prior to the initiation of
20 charges, did you provide the Commonwealth Attorney's
21 Office with a report and statement that you took from
22 Christy Branson?
23     A   Yes.
24     Q   Prior to the initiation of charges, did you
25 provide the Commonwealth Attorney's Office with a report

Page 99

1  and statement that you took from Allen Helton?
2      A   Yes.
3      Q   Prior to the initiation of charges, did you
4  provide the Commonwealth Attorney's Office with reports
5  and statements that you obtained from Amber Simpson?
6      A   Yes.
7      Q   Prior to the initiation of charges, did you
8  provide the Commonwealth Attorney's Office with reports
9  and a statement that you took from Kayla Mills?
10     A   I believe that was prior. I'm not exactly
11 sure on the date, but yes, I did provide it. I'm -- I
12 can't say the exact date.
13     Q   Okay. Prior to the initiation of charges, did
14 you provide the Commonwealth Attorney's Office with any
15 reports that were drafted relating to Michael Crump?
16     A   Yes.
17     Q   And I understand that you had a number of
18 interviews and contacts of Michael Crump that were not
19 documented in the report, correct?
20     A   Yes.
21     Q   Okay. So, obviously, you only provided the
22 Commonwealth Attorney's Office with whatever
23 documentation you actually had related to contacts with
24 Michael Crump, correct?
25     A   Yes.

Page 100

1      Q   Okay. Couldn't provide them with reports that
2  were never generated, right?
3      A   Right.
4      Q   Okay. Was the purpose of you testifying
5  before a Grand Jury on April 27, 2012 to initiate
6  charges against Amanda Hoskins and Jonathan Taylor for
7  the murder and robbery of Katherine Mills?
8      A   Yes. And William Lester.
9      Q   Yes. Sir, I'm going to mark the following
10 Exhibit as number 4. This is the Grand Jury audio at
11 PL-9684.
12     MR. SLOSAR: For the court reporter, we have a
13 flash drive that we'll give you after this deposition
14 with this audio on it.
15 BY MR. SLOSAR:
16     Q   Sir, please listen to this audio, and I'm
17 going to ask you a couple of questions after. This is
18 from zero to 20 seconds of the Grand Jury recording.
19         (EXHIBIT 4 MARKED FOR IDENTIFICATION)
20         (AUDIO CLIP PLAYED FROM THE GRAND JURY)
21     Q   Sir, is that your voice?
22     A   Yes.
23     Q   Okay. And is that from you testifying before
24 the Grand Jury on April 27, 2012?
25     A   It sounds like it, yes.

Page 101

1      Q   Okay. Sir, we're going to play you another
2  clip another clip from that same Exhibit PL-9684
3  beginning at 2:06 to 2:36. Please listen to this. I'm
4  going to ask you a couple of questions.
5         (AUDIO CLIP PLAYED FROM THE GRAND JURY)
6      Q   Sir, that was your voice, correct?
7      A   Yes.
8      Q   And that was from your testimony at the April
9  27, 2012 Grand Jury?
10     A   Sounds like it, yes.
11     Q   Okay. And, sir, did you testify before the
12 Grand Jury that all three suspects knew Katherine Mills
13 before her murder?
14     A   I don't remember saying individual -- I didn't
15 -- from just that audio clip, I don't remember hearing
16 me saying individual names.
17     Q   Can you play that back? Mr. York, I'm just
18 going to ask you to listen very clearly to it, okay?
19     A   Now, who are you asking about?
20     Q   Did -- my question is: Did you testify before
21 the Grand Jury that all three suspects, Amanda Hoskins,
22 William Lester and Jonathan Taylor, knew Katherine Mills
23 before her murder? That's my question to you. We're
24 going to play this audio, and you let me know.
25     A   Yes. I can say that -- I didn't hear it on

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 102

1  that one, but I will say, yes, I -- I conveyed that.
2      Q    Okay.  Okay.  And the three suspects you're
3  referring to when you testified to that before the Grand
4  Jury were Amanda Hoskins, Jonathan Taylor and William
5  Lester, correct?
6      A    Yes.
7      Q    What was the basis of your testimony that
8  Jonathan Taylor knew Katherine Mills prior to her dying
9  on December 20, 2010?
10     A    Through Amanda Hoskins and William Lester.
11     Q    You're saying that the statements that you
12  took from Amanda Hoskins and William Lester --
13     A    No.  What I'm saying is that's how he was
14  aware of -- of her.
15     Q    Prior to -- and that's an assumption that
16  you're making, correct?
17     A    No.  I'm -- I'm not saying an assumption.  I
18  had a reason to believe that, yes.
19     Q    Did you have -- prior to testifying at the
20  Grand Jury, did a single witness tell you that Jonathan
21  Taylor knew Katherine Mills prior to December 20, 2010?
22     A    Yeah.  Well, let's define "no."  As far as an
23  intimate personal level?  No.  But yes, know of her,
24  like, who she is, yes.
25     Q    Who told you prior to April 17, 2012 that

Page 103

1  Jonathan Taylor knew of Katherine Mills prior to her
2  death on December 20, 2010?
3      A    I believe, if I remember, that Amber Simpson
4  said that Amanda had talked to him about it and that the
5  mother -- that William talked about the timber or
6  something like that, if I remember correctly.  Again, I
7  would need to look at the individual statements.
8      Q    Sir --
9      A    I'm not sure, but I'm sorry.
10     Q    -- sitting here, can you think of a single
11  witness who informed you in the investigation that
12  Jonathan Taylor knew Katherine Mills prior to her death?
13     MR. WRIGHT:  Object to form.
14     Q    You can answer.
15     MR. WRIGHT:  Do the best you can.
16     Q    You can answer.
17     A    Again, as far as knowing on an individual,
18  like, a personal level?  No.
19     Q    Okay.  And you testified to the Grand Jury
20  that all three suspects knew Katherine Mills prior to
21  her death, right?
22     A    Who she was, yes.
23     Q    Okay.  Well, did he say who she was, or did
24  you tell the grand --
25     A    William Lester -- Amanda Hoskins knew who she

Page 104

1  was because of William Lester.
2      Q    Please play the clip again.  Sir, I want you
3  to listen very closely to this. and I'm going to ask you
4  some pointed questions, okay, Mr. York?
5      A    Yes, sir.
6          (AUDIO CLIP PLAYED FROM GRAND JURY)
7      Q    Okay.  So you testified before the Grand Jury
8  that all three suspects knew her prior to her death,
9  correct?
10     A    Yes.
11     MR. WRIGHT:  Object to form.
12     Q    Okay.  You didn't testify that all three
13  suspects knew of Katherine Mills prior to her death,
14  right?
15     A    I didn't hear, but I went into start
16  explaining that just like I did you, but --
17     Q    But you --
18     A    -- yes, you're right.
19     Q    Okay.  And you would agree, here today, that
20  not a single witness told you, prior to April 27, 2012,
21  that Jonathan Taylor or Amanda Hoskins actually knew
22  Katherine Mills prior to her death?
23     MR. WRIGHT:  Object --
24     Q    Correct?
25     MR. WRIGHT:  Object to form.  Go ahead.

Page 105

1      A    Again, we're getting bogged down with this
2  word "no," and I've stated that as far as knowing who
3  she was, yes, they did.  As far as a personal intimate
4  level?  No.
5      Q    Did you explain that to the Grand Jury,
6  though?
7      A    I don't recall, but I -- I -- I believe that
8  my testimony showed that.  I don't ever remember saying
9  in the Grand Jury testimony that they had dinner
10  together and were close friends.
11     Q    Okay.  You told the Grand Jury that the
12  suspects -- each suspect, knew Katherine Mills, right?
13     MR. WRIGHT:  Object to form.
14     Q    Right?
15     A    Yes.  Yes.
16     Q    Okay.  You didn't explain to the Grand Jury
17  what you meant by "knew," correct?
18     A    I did not go -- I did not explain the
19  definition of "know," no, I did not.
20     Q    And you would agree with me, sitting here
21  today, that it was not accurate as of April 27, 2012,
22  that Jonathan Taylor or Amanda Hoskins actually knew
23  Katherine Mills, correct?
24     MR. WRIGHT:  Object to form.  Go ahead.
25     Q    Correct?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A    I'm not -- no, I'm not going to agree with
2 that because you're trying to put words in my mouth.  I
3 said, no.  Again, we're getting bogged on the -- the
4 definition of "know."  I've answered your question that
5 they did not know her personally, like, on a very close
6 relation.  They knew of her.  That's -- that -- I'm not
7 going to change my answer.  That's it.
8    Q    And you never testified to that before the
9 Grand Jury, right, to that difference?
10   A    Not in those precise words, no.
11   Q    Okay.
12   MR. SLOSAR:    Can you play 3:03 to 3:20?  Same
13 Exhibit beginning at 3:03 to 3:20.
14            (AUDIO CLIP PLAYED FROM GRAND JURY)
15   Q    Okay.  That's your voice, right?
16   A    Yes.
17   Q    Okay.  Testified to the Grand Jury that
18 William Lester was on the run, right?
19   A    Yes.
20   Q    Okay.  Can you think of a single witness that
21 told you that William Lester was on the run from law
22 enforcement prior to your testimony in April 27, 2012?
23   A    I could not find him.  Yeah, to me, that's on
24 the run.
25   Q    You assumed he was on the run, right?

1    A    Yes.
2    Q    Not a single witness told you he was running
3 from you, right?
4    A    No.
5    MR. WRIGHT: Object to form.  Answer best you can.
6    A    I had reason to believe because I couldn't
7 find him, he was, yes.
8    Q    Do you ever document in a single report that
9 William Lester was running from you or other law
10 enforcement officials prior to testifying before the
11 Grand Jury?
12   A    Not that I remember.
13   Q    Okay.  And would you agree as the lead
14 investigator of homicide investigations that somebody
15 running from law enforcement would be a pretty big piece
16 of information as part of a criminal investigation; is
17 that right?
18   MR. WRIGHT: Object to form.  Answer best you can.
19   A    Well, obviously, if he's got a warrant, yes.
20   Q    Okay.  Yeah.  Was there a warrant issued?
21   A    Yes, on William Lester.
22   Q    Yeah.  Did William Lester know that there was
23 a warrant issued prior to you testifying before his
24 Grand Jury?
25   A    I can't speculate what William Lester knows or

1 did know.
2    Q    Okay.  William Lester was actually out of town
3 working prior to you testifying at the Grand Jury,
4 correct?
5    A    I believe that's what I said, yes.
6    Q    Yeah.  He wasn't on the run from you, right?
7    A    I don't know that.
8    Q    Okay.  You had no pieces of evidence that ever
9 indicated to you -- let me withdraw that.  Not a single
10 witness told you that William Lester was running from
11 you prior to you testifying, correct?
12   A    I do not have a witness that stated that, no.
13   Q    Okay.  Sergeant York, did you take a statement
14 from Amber Simpson on March 13, 2012?
15   A    Again, yes, I did.  I'm not sure of the exact
16 date, but yes, I did take a statement.  That sounds
17 right.
18   Q    Sir, we're going to mark this as Exhibit
19 number 5.  This is KSP-284, 285.  I'm going to hand it
20 to you.  I'm giving a copy to your counsel, sir.  I'm
21 sorry.  Sir, did you take this statement?
22            (EXHIBIT 5 MARKED FOR IDENTIFICATION)
23   A    Yes.
24   Q    Type this up?
25   A    I believe I did on this one, yes.

1    Q    Okay.  When did you take the statement from
2 Amber Simpson?
3    A    The report says March 13, 2012.
4    Q    Okay.  How did you come into contact with Ms.
5 Simpson on March 13, 2012?
6    A    I went to the alternative school in Knox
7 County.
8    Q    Why did you go to the alternative school in
9 Knox County?
10   A    That's where she went to school at.
11   Q    Sorry.  That's a good answer.  It's a bad
12 question.  What made you want to go speak to Amber
13 Simpson on that date?
14   A    I'd -- I cannot remember.  I had information
15 that Jonathan had bragged about some things to her.
16   Q    Who gave you that information?
17   A    I'm not for sure because I talked to all the
18 family.  I -- I believe -- I believe her mother's name
19 is Tammy, but don't quote me on that.  I -- I think it's
20 Tammy.
21   Q    Okay.  And, in fact, when you spoke to Tammy -
22 - or you spoke to Ms. Simpson's mother the night before
23 you went to go meet with Amber at the school, right?
24   A    Possibly, but I -- I mean, I don't know
25 exactly when, but yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 110

1    I talked to her, but prior to that.
2    Q    And when you talked to her and you told -- and
3  when you talked Amber Simpson's mother prior to meeting
4  with Ms. Simpson on March 13th, you told her about an
5  reward in the case, correct?
6    MR. WRIGHT: Object to form and foundation.
7    A    I don't remember telling her about no reward.
8  The state police never had no reward for her.
9    Q    I didn't say whether the state police had one.
10   My question to you is: Did you tell Amber
11  Simpson's mother about a reward?
12   A    I don't -- I don't remember if I did or not. I
13  think at the time the family was off, and I don't
14  remember.
15   Q    So you're not saying that you did. You're
16  just saying you don't recall?
17   A    Yes.
18   Q    All right. And you said you took Ms.
19  Simpson's statement on March 13, 2012 at the school; is
20  that right?
21   A    Yes.
22   Q    Who was present for that interview?
23   A    I see -- some -- Rhonda Abner.
24   Q    Okay. Do you know Ms. Abner?
25   A    I mean, again, I don't want to get bogged down

Page 111

1  with the word, "know," but yes, I know who she is --
2    Q    Did you --
3    A    -- but I'm not --
4    Q    -- ever date you?
5    A    -- close with her. No.
6    Q    No? That's a pretty strong no. How come you
7  said it that way?
8    A    That's speculation.
9    Q    Speculation. All right. Well, I won't ask
10  you why you wouldn't date her, but we're -- now, you
11  spoke to Amber Simpson outside the presence of Ms. Abner
12  for a little bit, right?
13   A    No.
14   Q    No? She was present the whole time?
15   A    Yes. I mean, Ms. -- Rhonda Abner was, yes.
16   Q    Okay. Amber -- when you spoke to Amber's mom
17  prior to March 13, 2002, Amber was present, correct?
18   A    I don't remember if she was in the room or
19  not. I -- again, I've had so many interactions with
20  Tammy over the years, I don't remember.
21   Q    How come you had some many interactions with
22  Tammy?
23   A    They are originally from the area. I was --
24  grew up in, and she was involved in a lot of
25  investigations and been charged with crimes.

Page 112

1    Q    Tammy?
2    A    Yes.
3    Q    Okay. Was Tammy was an informant for you
4  prior to the Mills' investigation?
5    A    No.
6    Q    You ever promise her any deals prior to the
7  investigation?
8    A    Did I promise her deals? No.
9    Q    Did anybody promise her deals in your presence
10  prior to the Mills' investigation?
11   A    No. Not I remember, no.
12   Q    Do you ever investigate her for any crimes?
13   A    After this, I believe I -- she -- about -- if
14  it's -- I believe. I don't know the dates, but I
15  stopped her because I didn't know who she was because
16  she -- on the side of the road, and I called a uniform
17  trooper to come to check her out.
18   Q    Is that Amber or Tammy?
19   A    Tammy.
20   Q    Tammy? Okay. Now, I'm going to ask you to
21  set that report real quick, okay? So I'm going to ask
22  you some questions just based on your memory, if not
23  based on what you wrote in a report, all right? When
24  you met with Amber Simpson on March 13, 2012, what did
25  you say to her?

Page 113

1    A    I asked her what she knew about the Katherine
2  Mills -- Mills' incident.
3    Q    And who first told you that Amber Simpson had
4  any knowledge about the Mills' incident?
5    A    I think her mother did. I mean, I'm not for
6  sure how it got to me, but I think it was her mother.
7    Q    How -- did you ever -- why didn't you ever
8  document why -- the reason why you originally came to
9  speak to Amber Simpson's mother prior to the March 13,
10  2012 interview?
11   A    Can you say that one more time?
12   Q    Sure. So you never documented anything about
13  your contact with Amber Simpson's mother prior to March
14  13, 2012, right?
15   A    That's -- that's true.
16   Q    Okay. You also never documented why you came
17  to speak with Tammy Simpson in the first place, correct?
18   A    That is correct.
19   Q    Okay. Why not?
20   A    There wasn't -- there was -- to me, there was
21  no need because Tammy did not have firsthand knowledge
22  of anything about the case.
23   Q    So pursuant to your training, you weren't
24  required to document why you reached out to witnesses in
25  a homicide investigation; is that fair to say?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 114

```
 1      A    That's not fair to say if they're a witness,
 2  but Tammy wasn't a witness.
 3      Q    Was Amber?
 4      A    Yes.
 5      Q    You didn't document why you contacted Amber,
 6  right?
 7      A    I documented her statement.
 8      Q    Sure.  You documented her recorded statement,
 9  right?
10      A    Yes.
11      Q    Yeah?  And it's your practice to speak with
12  witnesses prior to actually recording them, right?
13      MR. WRIGHT:  Objection to form and foundation. Go
14  ahead.
15      A    Every situation's different.  With her, that's
16  -- you know, the reason why I had the guidance counselor
17  in there, she's a juvenile.  I wanted a juvenile -- or
18  somebody else present with a juvenile.
19      Q    That's not what I asked you, sir.  What I --
20      A    How's that?
21      Q    With Amber Simpson, you spoke to her off the
22  record prior to turning on a recorder, correct?
23      MR. WRIGHT:  Object to form and foundation. Answer
24  best you can.
25      A    I don't remember -- I was never alone with
```

Page 115

```
 1  her. I don't remember how long she was in a room before
 2  I turned a recorder on. I don't know what was
 3  discussed.
 4      Q    Yeah.  You're not sure what you said to her or
 5  what she said to you prior to a recorder being turned
 6  on, correct?
 7      A    No.
 8      Q    That's correct, right?
 9      A    Yes.
10      Q    Okay.  So when this says approximately in the
11  first line, "On March 13, 2012, at approximately 12:55
12  hours, I took a recorded statement from Amber Simpson,"
13  what that means is that you turned on the recorder at
14  12:55 p.m., right?
15      A    Yes.
16      Q    Okay.  You had interviewed and spoken to Ms.
17  Simpson prior to turning on the recorder, correct?
18      MR. WRIGHT:  Object to form and foundation.
19      A    Yes, I had talked to her when she first came
20  into the room, but I wasn't by myself.
21      Q    I get it, and I didn't ask you that question,
22  but I get it.  Why -- and you say you can't recall what
23  you said to her prior to the recording being turned on?
24      A    I -- I -- no.  I can't give you a word for
25  word, no.
```

Page 116

```
 1      Q    Sure.  Why did you -- so let me withdraw that.
 2  Since you can't recall what you said her and what she
 3  said to you, is that fair to say that you don't recall
 4  whether you discussed a reward with her prior to the
 5  recorded statement had taken place?
 6      MR. WRIGHT:  What was the question?  I didn't hear
 7  that Elliot.  Can you rephrase that?
 8      MR. SLOSAR:  Sure.  Can you re-read that?
 9      COURT REPORTER:  Yes.  Just give me one second.
10  I'm going to start it up just a little bit so it doesn't
11  cut off your question.
12      MR. SLOSAR:  That's fair.
13      COURT REPORTER:  Can you hear it?  Okay?
14          (REPORTER PLAYSBACK RECORDED PORTION)
15      MR. SLOSAR:  You know what?  It's pretty low. It's
16  fine.
17      COURT REPORTER:  Yeah, I'm sorry.
18      MR. SLOSAR:  If you --
19      COURT REPORTER:  Yeah, I'm sorry.
20      MR. SLOSAR:  -- type, I'll reask it, okay?
21      COURT REPORTER:  Okay.
22      MR. SLOSAR:  Okay.  All right.  So let me just
23  frame this a little bit.  You're good?
24      COURT REPORTER:  Yeah, I'm good.
25  BY MR. SLOSAR:
```

Page 117

```
 1      Q    Okay.  You spoke to Amber Simpson prior to
 2  recording her statement, correct?
 3      A    Yes.
 4      Q    You don't recall what you said to her,
 5  correct?
 6      A    Not exactly, no.
 7      Q    Okay.  You don't recall what she said to you,
 8  correct?
 9      A    No.
10      Q    Okay.
11      A    No.  I cannot give you a word for word
12  knowledge.
13      Q    Sure.  You don't recall how long you spoke to
14  her before the recording took place, right?
15      A    No.
16      Q    Okay.  So is that fair to say that you don't
17  recall whether you talked to Amber Simpson about a
18  reward prior to taking her recorded statement on March
19  13, 2012?
20      A    Again, I don't -- I -- I remember I -- some --
21  one of them asked me about a reward, again.  I told them
22  that state police wasn't offering an award.  I think the
23  family was, but I didn't have nothing to do with that.
24      Q    So you may have discussed that with Amber
25  Simpson, you just don't recall, right?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A    Right. It was one of the two, I remember
2  somebody asking me about that, yes.
3    Q    And one of those two was Amber Simpson, right?
4    A    Could've been or her mother.
5    Q    Okay. Now, do you recall that Amber Simpson
6  had a brother --
7    A    Yes.
8    Q    -- who was in jail during the time that you
9  spoke to her?
10    A    I knew her brother was in trouble. I don't
11  know if he was incarcerated at the time, or -- or what,
12  but he was in trouble.
13    Q    Why did you tell Amber Simpson that her
14  brother would get out of jail that evening if she gave a
15  statement?
16    MR. WRIGHT: Object to form and foundation.
17    Q    You can answer.
18    A    I don't remember telling her that, and I
19  didn't make her no promises. I said I would try to help
20  and relay that message. I didn't promise her or
21  anything like that. And -- if my memory serves me
22  correct, is that her brother and Jonathan Taylor were
23  maybe charged together, and -- and it was a meth lab,
24  but the meth was outside, and they couldn't -- I don't
25  think there was enough evidence, but like I said, I

1  wasn't the case officer on that.
2    Q    Okay. But you talked to Amber Simpson about
3  her brother getting out if she gave a statement, right?
4    A    No. I said --
5    MR. WRIGHT: Object to form and foundation.
6    Q    You can answer.
7    A    All right. I -- I did not promise her
8  anything, but I said I would tell -- I would mention it.
9    Q    To -- and you told me --- you mentioned it to
10  the Commonwealth Attorney, right?
11    A    I don't think I told her who exactly I would -
12  -
13    Q    Just mention it to someone?
14    A    Right.
15    Q    Okay. That -- and that was before the
16  recording turned on, right?
17    A    It was before or right after, I don't remember
18  or --
19    Q    Yeah.
20    A    -- I don't even know if it was during.
21    Q    Now, sir, the beginning of your report says
22  that the recording began at 12:55 p.m., right, first
23  line?
24    A    Yes.
25    Q    Okay. Now, does it say anywhere on this

1  report when your recorded statement from Amber Simpson
2  stopped or was finished?
3    A    Not that I see it doesn't.
4    Q    Okay. And I'll represent to you, and for
5  counsel's benefit this is PL-9652, the recorded
6  statement from Amber Simpson, which let me play this,
7  likewise, at the end does not have a time that the
8  statement stops. If I can enter my password correct.
9        (AUDIO CLIP PLAYED OF AMBER SIMPSON
10        STATEMENT)
11    Q    That's your voice?
12    A    Yes.
13    Q    Okay.
14    (AUDIO CLIP PLAYED AGAIN OF AMBER SIMPSON STATEMENT)
15    Q    This is audio from the recorded statement you
16  took from Amber Simpson, correct?
17    A    Sounds like it, yes.
18    Q    And that's the Robin [sic] Abner that you
19  wouldn't date, right?
20    A    Well --
21    Q    I'm joking with you.
22    A    Okay.
23    Q    Now, I'm going to fast forward this. This
24  statement is -- all right. It's going to a different
25  one. This statement is six minutes and 46 seconds,

1  okay?
2    A    This is -- this is the same statement?
3    Q    Same statement of Amber Simpson, okay?
4    A    Okay.
5    Q    Okay. Now, at the end of this statement, I'm
6  going to fast forward to 6:23, and it's going to play
7  all the way until the end, okay?
8    A    Okay.
9    (AUDIO CLIP PLAYED OF AMBER SIMPSON STATEMENT)
10    Q    Okay. So that's the statement -- the end of
11  the statement that you took from Ms. Simpson; is that
12  right?
13    A    Yes.
14    Q    Okay. And you would agree with me that you
15  did not give a time that the statement finished at at
16  the end of that recording, correct?
17    A    Yes.
18    Q    Okay. Sir, why did you stop the -- well, let
19  me withdraw that question. How many times did you stop
20  the recorder when you took Ms. Simpson's statement?
21    A    I do not remember.
22    Q    Okay. You do not deny stopping the recorder,
23  correct?
24    A    No.
25    MR. WRIGHT: Object to form.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 122

1    Q    Okay.  And you also don't have an end time at
2  the end of that statement, correct?
3    A    Yes.
4    Q    So you have no idea the quantity of times that
5  you stopped the recorder while you were interviewing
6  her, correct?
7    A    I don't remember any, but no.
8    Q    Okay.  Do you remember what was said to Ms.
9  Simpson by you when you stopped the recorder?
10   MR. WRIGHT: Object to form and foundation, but
11 answer best you can.
12   A    It's the same answer as I said before.  I
13 don't remember exactly what was said.
14   Q    You're not denying that it happened.  You just
15 don't recall, right?
16   MR. WRIGHT: Are you implying that --
17   MR. SLOSAR: I'm --
18   MR. WRIGHT: -- before the end?  I'm unsure what
19 you're saying by, "when he stopped."  Are you saying the
20 very end or --
21   MR. SLOSAR: No.  I'm saying --
22   MR. WRIGHT: -- you're saying when it stopped?
23   MR. SLOSAR: -- during the process.
24 BY MR. SLOSAR:
25   Q    From the time that you began that statement,

Page 123

1  after beginning the statement before ending it, you
2  stopped the recorder and had conversations with Amber
3  Simpson, correct?
4    A    Oh, during?  I do not remember ever stopping.
5  I don't remember that.
6    Q    You have no recollection, right?
7    A    No.
8    Q    You're not denying that it happened, just
9  don't remember, correct?
10   A    That -- that is correct.
11   Q    Okay.  Now, I want you to look at this report.
12 You drafted this report, right?
13   A    This one?  Yes.
14   Q    Yeah.  Amber Simpson's report.  After drafting
15 a report, did you pass it along to your supervisor,
16 Sergeant Pickerel?
17   A    I did not.
18   Q    What did you do with it?
19   A    I transmitted it.
20   Q    How did you transmit it?
21   A    I hit enter.
22   Q    And when did it go when you transmitted it?
23   A    I cannot answer that.
24   Q    Okay.  Well, is there some process at Post 10
25 during the Mills' investigation for your supervisor

Page 124

1  reviewing these reports?
2    A    On a supplement, I believe so.  Or not when a
3  supplement is transmitted, I do not believe that it gets
4  checked until, like, a case review.
5    Q    Okay.  Well, case reviews took place in this
6  investigation prior to you testifying before a Grand
7  Jury, correct?
8    A    I cannot remember the particular day, so I
9  assume they would.
10   Q    Yeah.  And when a case review takes place, can
11 you generally describe what happens?
12   A    Whoever the particular supervisor, whoever it
13 may be, will look at the case and ask for -- or instruct
14 if there's anything that they need or update.
15   Q    Sorry.  Okay.  And your supervisor on this
16 investigation was with Sergeant Jackie Pickerel; is that
17 right?
18   A    She was one of them.
19   Q    Okay.  The other one was Lieutenant Hatmaker?
20   A    Yes, but I'm -- I'm not sure when he left, and
21 there was -- there was more.
22   Q    Is it fair that Jackie Pickerel was your main
23 supervisor on this investigation?
24   A    The main one?  She was one of them, yes.  She
25 was the detective sergeant.

Page 125

1    Q    Okay.  And you were a detective at the time,
2  right?
3    A    Yes.
4    Q    Okay.
5    MR. SLOSAR:    And I apologize, for the record,
6  Exhibit 6 is that audio recording from Amber Simpson,
7  that PL-9652, so now we're on Exhibit 7.
8    (EXHIBIT 6 MARKED FOR IDENTIFICATION)
9    MR. WRIGHT: What was that number again?
10   MR. SLOSAR: 9652.
11 BY MR. SLOSAR:
12   Q    Sir, would you generally agree that your
13 report for Amber Simpson documents a confession from
14 Jonathan Taylor to Ms. Simpson about the Mills'
15 homicide?
16   A    Yes.  I would agree with you.
17   Q    Okay.  And this is one of the statements that
18 you used to initiate charges against Mr. Taylor, Ms.
19 Hoskins and Mr. Lester for the homicide of Katherine
20 Mills, correct?
21   A    One of them, yes.
22   Q    Okay.  And after taking the statement, you
23 move forward with initiating charges against those three
24 suspects, correct?
25   A    Yes.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 126

1    Q    Okay.  Sir, we're going to go back to the
2  Grand Jury, beginning at 6:08.  This is back to the
3  Grand Jury audio.  Please listen to this.  I'm going to
4  ask you some questions, all right, sir?
5    A    Yes.
6    Q    6:08 to 6:38.
7             (AUDIO CLIP PLAYED FROM THE GRAND JURY)
8    Q    Sir, did you testify before the Grand Jury
9  that the victim sustained a blunt head injury?
10   A    I believe I did, yes.
11   Q    Okay.  And that's the audio you just heard,
12 right?
13   A    Yes.
14   Q    Okay.  And the prosecutor asked you whether
15 you retained or knew of the weapon that was used to
16 cause the blunt injury of Ms. Mills', correct?
17   A    Yes.
18   Q    Okay.  In response, you informed the Grand
19 Jury that a hammer was used to cause those injuries,
20 correct?
21   A    Yes.
22   Q    All right.  And did you testify to the Grand
23 Jury that you knew that a hammer was used because
24 Jonathan Taylor confessed to Amber Simpson that he hit
25 Ms. Mills over the head twice with a hammer?

Page 127

1    A    I believe that sounded correct, yes, sir.
2    Q    All right.  Fair to say that you informed the
3  Grand Jury that Mr. Taylor used a hammer to kill Ms.
4  Mills based upon the statement -- the March 13, 2012
5  statement, you took from Amber Simpson?
6    A    Yes.
7    Q    And that was the statement that you took from
8  Ms. Simpson on March 13, 2012, correct?
9    A    Yes.
10   Q    All right.  Sir, you never informed the Grand
11 Jury that you had any discussions with Ms. Simpson or
12 mother about a reward in this case prior to taking the
13 statement, correct?
14   A    That is correct.
15   Q    Okay.  You never informed the Grand Jury that
16 you had a discussion with Amber Simpson about her
17 brother getting released from custody prior to taking
18 her recorded statement, correct?
19   A    That is correct.
20   Q    Sir, we're going to play for you some more
21 Grand Jury audio at -- well, let me ask you
22 this question:  You just acknowledged that you didn't
23 inform the Grand Jury about the discussion with Ms.
24 Simpson or her mother about the reward, and you didn't
25 inform the Grand Jury about a discussion you had with

Page 128

1  Ms. Simpson prior to taking her statement about her
2  brother getting released from jail.  Why didn't you
3  reveal that information to the Grand Jury when you
4  testified on April 27, 2012?
5    MR. WRIGHT:  Object to form, but answer best you
6  can.
7    Q    I did not think where it wasn't related to
8  what she heard was pertinent.
9    Q    Okay.  So you didn't believe that it was
10 relevant or pertinent for the Grand Jury to learn that
11 you had a discussion with Ms. Simpson about a reward,
12 and her brother getting freed prior to taking her
13 statement; is that right?
14   MR. WRIGHT:  I object to form.
15   Q    You can answer.
16   MR. WRIGHT:  Answer best you can.
17   A    No, not at the time, no.
18   Q    Okay.  Sir, we're going to play the Grand Jury
19 25:57 through 27:29.  I want you to listen to this.  I'm
20 going to ask you some questions after it, okay?
21   A    Yes.
22   Q    Okay.
23             (AUDIO CLIP PLAYED FROM THE GRAND JURY)
24   Q    Sir, that's your voice, correct?
25   A    Yes.

Page 129

1    Q    Testifying at the April 27, 2012, Grand Jury,
2  correct?
3    A    Yes.
4    Q    Okay.  Sir, you testified before the Grand
5  Jury that the interview and statement you took from
6  Amber Simpson "sealed the deal"; is that right?
7    A    Yes, that's what I said.
8    Q    Okay.  And by "sealed the deal," did you
9  believe at the time you testified to the Grand Jury that
10 after you obtained Ms. Simpson's statement on March 13,
11 2012, that you had probable cause to initiate charges
12 against Amanda Hoskins and Jonathan Taylor for the
13 murder of Katherine Mills?
14   MR. WRIGHT:  Object to the extent it calls for a
15 legal conclusion, but go ahead, answer best you can.
16   A    Yes.  I thought I had probable cause.
17   Q    And that was -- and you believed that you had
18 probable cause after you took Ms. Simpson's statement,
19 correct?
20   A    Yes.
21   Q    Okay.  Fair to say that prior to taking Ms.
22 Simpson's statement, you didn't believe you had probable
23 cause or else you would've initiated charges prior to
24 taking her statement; is that right?
25   MR. WRIGHT:  Object to form.  Go ahead and answer.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 130

```
1    A    Well, that's -- that's not totally accurate.
2  This case was -- it was, like, a big puzzle, and there
3  was pieces of it.  You know, we -- we started, you know,
4  going from the very beginning of Michael Crump
5  described, determined that there was amount of money
6  missing and then going through all the different
7  statements from Amanda saying that she overheard William
8  Lester talk about robbing her and went into detail about
9  it was in the morning because she didn't have a bathroom
10 and only William Lester would have that knowledge.
11   Q    Sergeant York, I'm sorry.  Respectively, I
12 asked you a pretty pointed question.  It's, you know,
13 really a "yes" or "no" answer.  If you had -- you said -
14 - you told the Grand Jury that Amber Simpson's statement
15 sealed the deal, right?
16   A    I said that, yes.
17   Q    Yes.  By, "seal the deal" you meant that after
18 Amber Simpson's statement, you believed you had probable
19 cause to initiate charges against Ms. Hoskins and Mr.
20 Taylor, correct?
21   A    I do not deny it.
22   MR. WRIGHT:  I object to the form and foundation.
23 Go ahead.
24   Q    Is that correct?
25   A    That's not just from this one statement, no,
```

Page 131

```
1  but --
2    Q    Okay.
3    A    -- yes.
4    Q    And you testified before the Grand Jury that
5  Jonathan confessed to Amber Simpson that he hit her
6  twice in the head with a hammer and killed her; is that
7  right?
8    A    Yes.
9    Q    And you told the Grand Jury that Jonathan
10 confessed to Ms. Simpson that Ms. Hoskins was also
11 involved in the murder, including to help clean it,
12 correct?
13   A    I believe that's what in there, yes.
14   Q    That's what you just testified to, right?
15   A    Yes.
16   Q    Okay.  Why didn't you tell the Grand Jury that
17 you provided information to Amber Simpson prior to
18 taking her recorded statement?
19   MR. WRIGHT:  Object to form and foundation.
20   A    What -- I don't what information you're
21 talking about.
22   Q    Well, you're not denying that you provided
23 information to Ms. Simpson, correct?
24   MR. WRIGHT:  Object to form and foundation.
25   A    I'm not going to say I provided her with
```

Page 132

```
1  anything unless you tell me exactly what I was allegedly
2  supposed to say.
3    Q    Well, prior to taking Ms. Simpson's recorded
4  statement on March 13, 2012, did you provide her with
5  information relating to the homicide of Katherine Mills?
6    A    Not the investigation, no.
7    Q    You're saying that you did not provide Amber
8  Simpson with any information from Mr. Johnson.
9    A    I'm not saying any, but I did not sit with
10 her, "I need you to say this, this and this," if that's
11 what you're trying to insinuate.  No.  I did not do
12 that.
13   Q    You also don't recall what you spoke to her
14 about, correct?
15   A    Exactly, that's what I'm saying.
16   MR. WRIGHT:  Object to form and foundation.
17   Q    So you can't say that you didn't provide, just
18 that you don't recall if you provided it, correct?
19   MR. WRIGHT:  Object to form and foundation.  Answer
20 best you can on that.
21   A    Again, I've -- I've -- I've already answered
22 it.  I don't remember exactly what was said.  I did not
23 coach her or anything like that on what to say.
24   Q    Well, was one of your tactics to coach
25 witnesses?
```

Page 133

```
1    A    No.
2    Q    Okay.  How do you explain what you were doing
3  with Dave Fox then when you were telling him what to say
4  --
5    A    I wasn't telling --
6    Q    -- about the murder --
7    A    -- him what to say.  I was trying to get him
8  to tell me what I didn't know --
9    Q    Can we --
10   A    -- and -- and the truth.
11   Q    Okay.  And that's the truth that you believe
12 your investigation revealed, right?
13   MR. WRIGHT:  Object to form and foundation.
14   Q    You can answer.
15   A    Again, I'm not the case officer.
16   Q    All right.  Listen to this again.  This is
17 going back to the Dave Fox clip, Exhibit 1.
18   (AUDIO CLIP PLAYED FROM THE DAVE FOX INTERVIEW)
19   Q    That was you on that tape, right?
20   A    Yes, as we previously discussed.
21   Q    Yeah, you and one of the Eubanks officers,
22 correct?
23   A    Yes.
24   Q    Is that officer in the room?
25   A    Yes.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 134

1    Q    Which one?

2    A    Derek.

3    Q    Okay.  And he's in this room, too, right?

4    A    Yes.

5    Q    Okay.  And when you told Dave Fox to say that

6  the car was there, do you consider that to be coaching a

7  witness?

8    A    No.  I do not.  I don't -- I don't remember

9  exactly, but I had reason to believe that he knew that

10 and was keeping that from us, and I was trying to get

11 the truth out of him.

12   Q    So is it a proper investigatory tactic if you

13 believe that evidence indicates that somebody knows

14 something to tell that witness what they should say?

15   MR. WRIGHT:  Object to form and foundation.  Go

16 ahead.  Answer best you can.

17   A    Can you repeat that?

18   Q    Yeah.  So what you're basically saying is that

19 your theory in the case was that Dave Fox saw that car

20 in the afternoon, correct?

21   A    For me to say that, like I said, I don't

22 remember the -- I would have to reason to believe that

23 he knew that, yes.

24   Q    Okay.  So is it proper -- is it -- is one of

25 your investigatory tactics if you have reason to believe

Page 135

1  that something happened, is one of your investigation

2  tactics to tell that witness what you believed happened?

3    MR. WRIGHT:  Object to form and foundation.  Answer

4  best you can.

5    A    That could be used as a -- as a tactic.

6    Q    Okay.  And that's a tactic that you used

7  during the Wiggins' homicide investigation, correct?

8    A    Well, yes that's just one of them, yes.

9    Q    Yeah, and that's one of the same tactics that

10 you were using during the Mills' investigation, too,

11 correct?

12   MR. WRIGHT:  Object to form and foundation.

13   A    I don't never remember doing that in the

14 Mills' investigation as far as like kicking a chair.

15   Q    No, no, no, but telling a witness what you

16 believe the investigation shows, that tactic; is that --

17 that's one that you used during the Mills'

18 investigation, right?

19   A    No, no, this is -- no.  If I believed that a

20 particular person that I'm interviewing knows something

21 because I have probable -- or reason to believe that

22 they knew something, that is one thing, but --

23   Q    And you were --

24   A    -- trying to get him to say something that I

25 know they didn't have no knowledge of, I didn't have

Page 136

1  reason to believe that they believed that, then, no.

2    Q    Okay.  So if you had a reason to believe that

3  somebody knew something, you would confront them with

4  that information, correct?

5    A    Yes.

6    Q    That's a tactic that you --

7    A    Yes.

8    Q    -- would use, right?

9    A    Yes.

10   Q    That's a tactic that you were trained to use

11 by KSP, correct?

12   A    I don't remember the exact training on that,

13 but yes, I've -- I've seen that happen.

14   Q    That's a tactic that you've used during the

15 Mills' investigation, too, right?

16   MR. WRIGHT:  Object to form and foundation.

17   Q    You can answer.

18   MR. WRIGHT:  Answer best you can.

19   A    It's a possibility.  I don't remember the

20 exact details, but I can -- will say this since you were

21 on Amber, that I did not tell her to use -- say that she

22 had a hammer -- or that Jonathan used a hammer.

23   Q    So now you have an independent recollection of

24 your conversation with Amber Simpson, sir?

25   A    No, for a general thing.  I don't tell people

Page 137

1  stuff that I don't think they knew.  I didn't know what

2  she said.  They wanted to talk to me.

3    Q    Well, you never documented that they wanted to

4  talk to you, right?  We went over this before.

5    A    Yes.

6    Q    Yeah.  Sir, I'm going to show you what we'll

7  mark as Exhibit 7.  This is your preliminary hearing --

8  a transcript of your preliminary hearing testimony, PL-

9  25665 through 25683.  And I'll give a copy to -- this is

10 Exhibit 8.  Give a copy to you, sir.  Give a copy to

11 counsel.

12   MR. FARAH:  What Exhibit?

13   MR. SLOSAR:  8.  8.

14   MR. WRIGHT:  Was 7 the Grand Jury?

15   MS. KINCER:  7.

16   MR. SLOSAR:  Wait.  7?  All right.  You know what?

17 You're right.  Thank you.  It is 7.  My apologies.  Let

18 me put the sticker on it.  Sorry about that.  If I was

19 better at numbers, I would have been a doctor.  Speaking

20 of which, sir, when's the last time you talked to Dr.

21 Warren?

22       (EXHIBIT 7 MARKED FOR IDENTIFICATION)

23   A    I have no -- I -- I can't tell you that exact

24 day when -- the last time I talked to -- you're talking

25 about Larry Warren?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 138

1   BY MR. SLOSAR:
2       Q    Yeah, Larry Warren.  You know him, right?
3       A    No.  Again, I don't know him.
4       Q    You don't know him?
5       A    I know who he is.
6       Q    Have you ever been a friend of Dr. Warren's?
7       A    A friend?  No.
8       Q    No?  Personal thoughts.  All right, sir.  This
9   is a transcript of your testimony before the preliminary
10  hearing.  It's been disclosed in this case.  I'm just
11  going to ask you a general question about page 17 of
12  this.  Mr. York, do you recall testifying at the
13  preliminary hearing that Jonathan Taylor confessed to
14  Amber Simpson that he killed Ms. Mills?
15      A    If it's in there, I did.  I -- I would imagine
16  I would have.
17      Q    Middle of the page.  "Apparently the counsel
18  forgot that Jonathan told both of his ex-girlfriends
19  that he killed her.  Okay.  Who did he tell that to?
20  Amber Simpson, Kayla Mills."  Do you recall providing
21  that testimony?
22      A    Yes.
23      Q    And the testimony that you provided at the
24  preliminary hearing, that was based upon the statement
25  that you obtained from Ms. Simpson on March 13, 2012,

Page 139

1   correct?
2       A    Yes.  Yes.
3       Q    We're going to go back to the Grand Jury
4   recording.  This is at 6:43.  We're going to play this
5   until 7:25.  Mr. York, please listen to this, and I'm
6   going to ask you some questions right after it.
7            (AUDIO CLIP PLAYED FROM GRAND JURY)
8            MR. SLOSAR:  Okay.  You know what?  I cut it off
9   too soon.
10           (AUDIO CLIP PLAYED FROM GRAND JURY)
11      Q    Sir, was that your testimony from the Grand
12  Jury?
13      A    Well, that's my voice, yes.
14      Q    Sounds like it, right?  Sir, you testified
15  before the Grand Jury that when you went into Ms. Mills'
16  home, that you found $500 placed on the floor by her
17  purse; is that right?
18      A    Yes.
19      Q    Okay.  And you specifically testified that the
20  money was placed on the floor, correct?
21      A    That was my belief.
22      Q    You believe that the suspect or suspects
23  purposely put those $500 bills on the floor next to the
24  purse, correct?
25      A    Yes. I believe that.

Page 140

1       Q    All right.  And you believe that they put that
2   -- the suspect or suspects, put the money on the floor
3   during the commission of the crime, right?
4       A    Yes.
5       Q    Okay.  And fair to say that you believe during
6   your investigation that the money on the floor was a
7   significant piece of physical evidence?
8            MR. WRIGHT:  Object to form and foundation. Answer
9   best you can.
10      A    I don't know if it was significant.  This --
11  this case was -- there was no physical evidence.  It was
12  circumstantial, but that was -- you know, even though,
13  it's physical, it wasn't determined on who -- didn't --
14  didn't use to develop probable cause on who was charged.
15      Q    Oh, we're going to get to that, but you never
16  found a weapon that was used to kill Katherine Mills,
17  correct?
18      A    No.
19      Q    Okay.  And you believed from the moment that
20  you went to that crime scene on December 20, 2010, that
21  the perpetrator or perpetrators purposely placed and
22  left the currency on the floor next to the purse,
23  correct?
24      A    Yes.
25      Q    Okay.  And you wanted to have that evidence

Page 141

1   tested to see whether you could get fingerprints or DNA
2   that would lead you to who committed this crime,
3   correct?
4       A    Yes.
5       Q    Okay.  So this was pretty important evidence,
6   would you agree?
7            MR. WRIGHT:  Object to form.  Answer best you can.
8       A    Yes.
9       Q    I mean, you believe that it could lead you to
10  who really killed Katherine Mills, correct?
11      A    Well, it could possibly.  I mean, again, I --
12  I didn't think it was like a video, like a smoking gun,
13  but yes, it possibly could have played a role if I can
14  determine what was the motive behind it, you know --
15      Q    Yeah.
16      A    -- for -- or testimony.
17      Q    Let me ask you this:  Early in your
18  investigation Allen Mills [sic], Mike Simpson, Jesse
19  Lawson were all suspects, right?
20      A    Yes.
21      Q    Okay.  So --
22           MR. WRIGHT:  I'll interrupt.
23      A    Persons of interest.  I'm sorry.
24           MR. WRIGHT:  Did you say Allen Mills?
25           MR. SLOSAR:  Allen Helton, Jesse Lawson and Mike

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 142

1  Simpson.
2       MR. WRIGHT:  Okay.
3       MR. SLOSAR:  Sorry.
4  BY MR. SLOSAR:
5       Q    We'll get to the difference between a suspect
6  and a person of interest later on, okay, but they were
7  people that you were looking at --
8       A    Yes.
9       Q    -- to figure out whether they killed Katherine
10  Mills, right?
11      A    Yes.
12      Q    Okay.  If the fingerprints on -- and you
13  eventually made request to KSP to have the prints
14  tested, correct?  Compared?
15      A    Yes.
16      Q    Compared; is that right?
17      A    Yes.
18      Q    Okay.  I'm going to show what we'll mark as 8;
19  is that right?  Okay.  Sorry.  I'm telling you I'm not a
20  numbers guy.  Shoot, of course, I'm giving you my copy.
21  Let me mark your copy.  I'm going to get this right
22  pretty soon.  Here's Exhibit number 8, Mr. York.  Here,
23  this is for your counsel, for many counsel as well.  This
24  is KSP-413 for the record.  Sir, do you recognize this
25  evidence property form?

Page 143

1       (EXHIBIT 8 MARKED FOR IDENTIFICATION)
2       A    Yes.
3       Q    Okay.  Is that your handwriting on this?
4       A    It appears so, yes.
5       Q    Okay.  And tell me, you know, generally, when
6  you would fill out a report like this?
7       A    Excuse me, when I -- well, when I fill out --
8       Q    Well, tell me when you -- when did you fill
9  out this form?
10      A    Well, it says -- this particular one was 12-
11  21-2010.
12      Q    How about 12-20-2010; does that sound right?
13      A    I'm -- I'm sorry.  I -- I -- I didn't see the
14  --
15      Q    Oh, you know what?  I'm sorry about that.  Let
16  me -- do you see the top where it says, "Date, time
17  recovered unit, 12-20-2010, 2300 hours"?
18      A    Yes.  I see that.
19      Q    Okay.  That's your handwriting?
20      A    Yes.
21      Q    Is that when you recovered this physical
22  evidence listed on this form?
23      A    Yes.
24      Q    Okay.  And then later on you documented this
25  information in a report on 12-21-2010; is that right?

Page 144

1       A    Yes.
2       Q    Okay.  And the money -- the evidence that's
3  listed on here, is that the currency that was located
4  next to Ms. Mills' purse?
5       A    I believe so, yes.
6       Q    Okay.  And you recovered that during your
7  initial investigation into the crime, right?
8       A    Yes.
9       Q    And after receiving that evidence, what did
10  you do with it?
11      A    I started a post team.
12      Q    Okay.  And that's something that you would
13  regularly do in the -- your investigation of different
14  crimes, correct?
15      A    Do what?
16      Q    You would store the evidence at the post.
17      A    Yes.
18      Q    You wouldn't take it home, right?
19      A    No.
20      Q    Okay.  I know that's a crazy question, but
21  there are some officers that do that.  Now, at some
22  point, you sent that currency off to KSP to be tested,
23  correct?
24      A    Yes.
25      Q    Okay.  Fair to say that within the first year

Page 145

1  of your investigation, that Mike Simpson, Allen Helton
2  and Jesse Lawson were being investigated for the murder
3  of Katherine Mills?
4       A    Yes.
5       Q    Okay.  I'm going to show you what we'll mark
6  as Exhibit 9.  I'm going to get this one right.  Here
7  you go, sir, and I'll give a copy to your counsel,
8  opposing counsel.  Do you see this document, sir?
9       (EXHIBIT 9 MARKED FOR IDENTIFICATION)
10      A    Yes.
11      Q    Okay.  And according to this document, you
12  sent the currency off to be tested at the KSP forensic
13  laboratory on November 1, 2012; does that sound right?
14      A    This --
15      Q    That points you to right here where it says,
16  "Received from"?
17      A    Yes, that's what it says.
18      Q    Does that sound right?
19      A    Yes.
20      Q    Do you recall sending the currency off to be
21  examined in 2012?
22      A    I don't remember the exact date or details,
23  but I'm not arguing that's -- that's not the date.
24      Q    Okay.  And in this request, you were -- who
25  did you request that the currency be compared to?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 146

1    A    Jonathan Taylor, Amanda Hoskins and William
2  Lester.
3    Q    Okay.  And at that point, you had already
4  initiated charges against those three, right?
5    A    I'm not for sure if I -- on the particular
6  dates the charges, but --
7    Q    I'll represent to you that you testified
8  before the Grand Jury April 27, 2012.
9    A    Yes.
10   Q    So with that understanding, this was after you
11 initiated charges --
12   A    Yes.
13   Q    -- against the three suspects, correct?
14   A    Yes.
15   Q    Okay.  Prior to November 1, 2012, did you ever
16 request that the KSP laboratory compare the prints on
17 this currency to Allen Helton, Mike Simpson or Jesse
18 Lawson?
19   A    No.
20   Q    Why not?
21   A    Because I hadn't developed probable cause on
22 those three as I did William Lester, Amanda Hoskins and
23 Jonathan Taylor.
24   Q    So -- well, it -- to this day, you've never
25 requested that these prints be examined against Mike

Page 147

1  Simpson, Allen Helton or Jesse Lawson?
2    A    I have not.  That is.
3    Q    Okay.  And prior to November 1, 2012, Jesse
4  Lawson failed a polygraph relating to the homicide of
5  Katherine Mills, correct?
6    A    Yes.
7    Q    Prior to November 1, 2012, Allen Helton failed
8  a polygraph relating to his involvement in the murder of
9  Katherine Mills, correct?
10   A    Yes.
11   Q    Prior to November 1, 2012, you learned that
12 Mike Simpson was broke prior to Katherine Mills' death
13 on December 20, 2012, correct?
14   MR. WRIGHT:  Object to form and foundation, but
15 answer best you can.
16   A    Yes.  We were told that.
17   Q    Okay.  Prior to November 1, 2012, you learned
18 that after Ms. Mills died, that Mike Simpson and Allen
19 Helton took a trip to Florida in a rental car that was
20 paid with cash, correct?
21   A    Yes.
22   Q    Prior to November 1, 2012, you learned that
23 Mike Simpson was actually seen at Katherine Mills'
24 residence on December 20, 2012, correct?
25   MR. WRIGHT:  Object to form and foundation.

Page 148

1    A    Now, right there, I'm not -- I don't remember
2  no witness statement saying that they saw Mike Simpson
3  at Katherine Mills' residence.
4    Q    Okay.  We'll get there a little bit later on
5  today, Mr. York, to see if we can refresh your memory.
6  Prior to November 1, 2012, you knew that Mike Simpson
7  gave you a Post-it note of purported alibi witnesses
8  immediately upon his return from the Florida trip,
9  correct?
10   A    Yes.
11   Q    And when he gave you that Post-it note, it was
12 prior to you asking Mr. Simpson any questions about the
13 homicide of Katherine Mills, correct?
14   A    Yes.
15   Q    He gave you that Post-it note unprompted,
16 correct?
17   A    Yes.
18   Q    And you thought that was strange that he would
19 do so, correct?
20   A    Yes.
21   Q    And then you went to go talk to one of those
22 witnesses named Vernon Bennett, correct?
23   A    Yes.
24   Q    Yeah?  And Mr. Bennett told you that he
25 actually was not an alibi witness for Mike Simpson,

Page 149

1  correct?
2    A    Yes.
3    Q    And Vernon Bennett also told you that Mike
4  Simpson was seeking to borrow money prior to the
5  homicide of Katherine Mills, correct?
6    A    I believe he did, yes.
7    Q    Yeah.  And Mr. Bennett also told you that
8  after the homicide of Katherine Mills on December 20,
9  2010, that he saw Mr. Simpson in a blue vehicle,
10 correct?
11   MR. WRIGHT:  Object to form and foundation. Answer
12 best you can.
13   A    I -- I -- I believe so, yes.
14   Q    Yeah.  And you didn't document any information
15 you learned from Vernon Bennett in a police report,
16 correct?
17   A    No.
18   Q    Yeah.  And you didn't testify to any of the
19 information you learned from Vernon Bennett before the
20 Grand Jury, correct?
21   A    That is correct.
22   Q    And you didn't testify about any of the
23 information you learned from Vernon Bennett before -- at
24 the preliminary hearing, correct?
25   A    That is correct.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 150

1    Q    Now, if you had requested a comparison of the
2  currency to Allen Helton, Mike Simpson and Jesse Lawson
3  and one of those individual's prints had formed a match,
4  would that have formed probable cause for you to
5  initiate charges against them for the murder of
6  Katherine Mills?
7    A    No.
8    MR. WRIGHT:  Object to form.  Answer best you can.
9    A    No.
10   Q    No?  Why not?
11   A    Because to say who handled that money before
12  or after -- and, again, they're not the ones that were
13  bragging about and talking about robbing and killing the
14  victim.
15   Q    Sir, is it your testimony here today that
16  Allen Helton -- well, withdraw that question.  Sir, is
17  it your testimony here today that, during the course of
18  your investigation, that not a single witness informed
19  you that Mike Simpson or Allen Helton confessed
20  involvement in the murder of Katherine Mills?
21   A    What I can say is that I had nobody come to me
22  and was going to give me a statement saying that they
23  heard Michael Simpson or Allen Helton confess to it.
24   Q    That's your testimony under oath, sir?
25   A    That I remember, yes.

Page 151

1    Q    Okay.  You learned -- after December 6, 2012
2  when this report was conducted, you learned the results
3  of the comparison of the money found at Katherine Mills'
4  residence, correct?
5    A    Yes.  When they tested it, yes.
6    Q    Yep.  And you learned that Ms. Hoskins, Mr.
7  Taylor, Mr. Lester's fingerprints were excluded as the
8  ones that were left on the currency, correct?
9    MR. WRIGHT:  I'll object to form and foundation.
10  Answer best you can.
11   Q    Is that right?
12   A    Yes.
13   Q    Okay.  Did you ever go back to the Grand Jury
14  to inform them of this new information?
15   A    No.
16   Q    Did you ever stop the initiation of charges
17  against Ms. Hoskins or Mr. Taylor or Mr. Lester after
18  you learned that they were excluded from the currency?
19   A    No, but that's my call.  That's the
20  Commonwealth attorney's.
21   Q    Well, did you ever tell Jackie Steele after
22  you got these results that he should stop prosecuting
23  Ms. Hoskins, Mr. Taylor and Mr. Lester?
24   A    No.
25   MR. WRIGHT:  Object to form and foundation.  Answer

Page 152

1  best you can.
2    A    No.  I didn't, but he was aware of it.
3    Q    He was aware of the results, right?
4    A    Yes.
5    Q    Yeah.  Sir, I'm going to show you what we'll
6  mark as Exhibit number 10, KSP-3536.  I'm going to give
7  you.
8              (EXHIBIT 10 MARKED FOR IDENTIFICATION)
9    THE WITNESS:  When you --
10   MR. SLOSAR:  Hand a copy to your counsel.
11   THE WITNESS:  When you get to a good stopping
12  point, can we stop for a break.  Just --
13   MR. SLOSAR:  Let's take a little break right now.
14   THE WITNESS:  Sure.
15   MR. SLOSAR:  Okay.  Yeah.  Let's go off the record.
16   VIDEOGRAPHER:  Off the record at 10:48 -- or
17  11:48.
18              (OFF THE RECORD)
19   VIDEOGRAPHER:  Back on the record at 12:00.
20  BY MR. SLOSAR:
21   Q    All right, sir.  I've handed you what's marked
22  as Exhibit number 10.  Do you recognize this document?
23   A    Yes.
24   Q    Okay.  And what is this document?
25   A    It's KSP-385.

Page 153

1    Q    Okay.  Generally, is this document a report
2  that was drafted after DNA testing was done?
3    A    Yes.
4    Q    Okay.  I'm looking at the second page, do you
5  see -- this report looks like it was completed February
6  5, 2013; is that right?
7    A    Yes.
8    Q    And, generally, the evidence submitted was
9  fingernail clippings from Katherine Mills and some other
10  standards from the individuals who were charged in this
11  case, correct?
12   A    Yes.
13   Q    Okay.  Now, you didn't submit any standards
14  from Kayla Mills; is that right?
15   A    I do not believe so.  I -- I -- I don't see
16  any.
17   Q    Looking at the top, it just says --
18   A    Jonathan Taylor.
19   Q    -- Jonathan Taylor, William Lester and Amanda
20  Hoskins, right?
21   A    Yes.
22   Q    Okay.  And, sir, generally, would you agree
23  that these results actually exclude Ms. Hoskins, Mr.
24  Taylor and Mr. Lester as contributing any DNA from the
25  victim's fingernails?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 154

1    A    Yes.
2    Q    And you learned that during the course of your
3  investigation, correct?
4    A    Yes.
5    Q    Fair to say that you learned that pretty close
6  in time to -- when the report -- after the report was
7  completed?
8    A    Yes.
9    Q    That's because you were the lead investigator,
10  right?
11    A    At that time, yes.
12    Q    Sir, I'm going to show you what we'll mark as
13  Exhibit number 11.  This is Bates-stamped KSP-286.  Do
14  you recognize this document?
15              (EXHIBIT 11 MARKED FOR IDENTIFICATION)
16    A    Yes.
17    Q    What is this document?
18    A    It's a summary of the statement taken from
19  Kayla Mills.
20    Q    Did you draft this summary?
21    A    Yes.
22    Q    When did you draft it?
23    A    3-16-2012.
24    Q    After drafting this report, did you forward
25  this onto the prosecution when you initiated charges

Page 155

1  against Ms. Hoskins and Mr. Taylor?
2    A    Yes.
3    Q    All right.  Is this one of the statements you
4  considered when you determined whether probable cause
5  was met?
6    A    Yes.  I -- yes.
7    Q    Okay.  And let me say that a better way.  Is
8  this one of the statements that you considered when you
9  initiated charges against Ms. Hoskins, Mr. Taylor for
10  the murder of Katherine Mills?
11    A    I don't want to get tied down to dates, but
12  yeah -- yes, I would agree with that.
13    Q    Okay.
14    A    That was prior.  All these --
15    Q    Prior to the Grand Jury, right?
16    A    Yeah.
17    Q    About five weeks prior to your testimony --
18    You said the Grand Jury --
19    Q    -- to the Grand Jury?
20    A    -- was actually in April?
21    Q    April 27th.
22    A    Okay.  Yes.
23    Q    Okay.  From looking at this document, do you
24  remember who was present for the statement that you took
25  from Kayla Mills on March 16, 2012?

Page 156

1    A    It was Ken Boggs, Kirk Mills and -- and Scott
2  Mills.
3    Q    Now, do you have any independent recollection
4  of what time Kayla Mills arrived at the police
5  department that day?
6    A    No.
7    Q    Okay.  It's fair to say that your report only
8  documents that you begin taking a recorded statement
9  from Kayla at 2:49 p.m. on March 16, 2012?
10    A    That is correct.
11    Q    All right.  So you spoke with Kayla prior to
12  taking her recorded statement, correct?
13    MR. WRIGHT:  Object to form and foundation. Answer
14  best you can remember.
15    A    Yes, with all these people.  Well, actually, I
16  did the majority of my consulting with her attorney, Ken
17  Boggs.
18    Q    Okay.  And you had spoken to Kayla Mills prior
19  to March 16, 2012, right?
20    A    Yes.
21    Q    Okay.  When was the first time that you recall
22  speaking to Kayla prior to March 16th?
23    A    I don't remember the exact date.
24    Q    Do you recall approximately how many times you
25  spoke to Kayla from the beginning of your investigation

Page 157

1  on December 20, 2010 to the time you took her recorded
2  statement on March 16, 2012?
3    A    I only remember once.
4    Q    Okay.
5    A    That's the only time I recall is once.
6    Q    It could've been more, though, right?
7    MR. WRIGHT:  Object to form and foundation. Answer
8  best you can.
9    A    I don't remember more than one.
10    Q    Okay.  What did you and Kayla talk about in
11  the occasion that you remember, which preceded her
12  statement on March 16th?
13    A    About possibly her involvement and what
14  information she had with this incident.
15    Q    During that conversation, did you inform Kayla
16  that you initiated charges against her for murder?
17    A    I don't remember if that was prior.  I don't
18  remember the exact date.
19    Q    Okay.  Well, after you initiated charges
20  against Kayla Mills, did you tell her about it before
21  taking her recorded statement?
22    MR. WRIGHT:  I'll object to form.
23    Q    You can answer.
24    A    She knew that, yes, sir.
25    Q    How did she react when you told that you

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 158

1  charged her with murder?

2      A    Well, I didn't charge her with murder.

3      Q    Okay.  Let me withdraw the question.  How did
4  Kayla react when she learned that you got an arrest
5  warrant against her for the murder of Katherine Mills?

6      A    I don't know.  Her -- her attorney was there.

7      Q    How did she react?

8      A    I didn't -- when her attorney told her, I
9  don't know how she reacted.  I wasn't --

10     Q    So you're saying that you didn't tell her?

11     A    I -- I -- if I remember correctly, it was the
12  -- they were all there together and the attorney because
13  I was -- I was -- he was the main one I was dealing with
14  until she started talking.

15     Q    Did you threaten to charge -- prior to
16  actually getting an arrest warrant with regard to Kayla
17  Mills, did you ever threaten to charge her with murder
18  unless she gave you a statement?

19     A    That might have been a tactic that I used.  I
20  don't remember the time or day.

21     Q    Okay.  Do you remember who might have been
22  there aside from Kayla when you told her that?

23     A    No.

24     Q    I'm going to show you what we'll mark as
25  Exhibit number 12.  It's PL-15867 through PL-15875.  You

Page 159

1  know what?  I apologize.  I messed up.  Exhibit 12 is
2  KSP-362 and 364.

3              (EXHIBIT 12 MARKED FOR IDENTIFICATION)

4      A    Do you need this stuff back?

5      Q    No, not at all.  You're going to hold onto
6  that.  Sorry, sir.  Here you go.  Detective -- or,
7  Sergeant York, what is this?

8      MR. WRIGHT:  Just for the record, did you say 62
9  through 64 or...?

10     MR. SLOSAR:  Nope.  I said 362 and 364.  363 was
11  unrelated.

12     MR. WRIGHT:  Okay.

13  BY MR. SLOSAR:

14     Q    Sergeant York, what is this?

15     A    The -- the arrest warrant?

16     Q    Yeah.

17     A    The arrest warrant.

18     Q    Okay.  Who drafted out this arrest warrant?

19     A    I did.

20     Q    Signature on it?

21     A    Yes.

22     Q    When did you sign this?

23     A    2012.

24     Q    What day?

25     A    The 14th of March, or, yeah, that's right.

Page 160

1      Q    Who's Donna Smith?

2      A    I believe she worked at the courthouse, I -- I
3  think for the county attorney.

4      Q    Where did you get this arrest warrant signed
5  at?

6      A    I don't remember what building.  I don't know
7  if it was at the courthouse or at the judge's house.  I
8  don't remember.

9      Q    But you were the one that initiated the
10  charges against Kayla Mills for the murder of Katherine;
11  is that correct?

12     A    Yes.

13     MR. WRIGHT:  I'll object to the form of that.  Go
14  ahead.

15     Q    Yeah, well, did you initiate charges against
16  Kayla Mills for Katherine Mills' murder?

17     A    I got this, yes.

18     Q    Okay.  You got a judge to sign it, right?

19     A    Yes.

20     Q    Do you see where it says, "Defendant may give
21  a bail in the amount of $1 million secured by cash," on
22  the second page?

23     A    Yes.

24     Q    Okay.  Did you tell Kayla Mills about this
25  arrest warrant prior to taking her recorded statement on

Page 161

1  March 16, 2012, two days later?

2      A    I believe so, yes.

3      Q    Okay.  She knew about this?  She knew at the
4  time she gave her recorded statement that she was
5  charged with murder; isn't that right, sir?

6      A    She wasn't charged yet.

7      Q    What did you say?

8      A    I had not officially charged her, yet.

9      Q    Well, how did you not officially charge her if
10  you had a warrant issued for her arrest?

11     A    When I said, "officially," I hadn't filled out
12  a citation launch during -- to holding facility.

13     Q    Why not?

14     A    Because her attorney advised me that she was
15  going to tell the truth and that she really wasn't
16  there, but she had information about it.

17     Q    Okay.  So you didn't want to officially --
18  well, let me say this one right.  Was he understanding -
19  - was it your understanding that if Kayla Mills gave a
20  statement against Jonathan Taylor that you would not
21  proceed forward with a citation against her for the
22  murder of Katherine Mills?

23     MR. WRIGHT:  Object to form.

24     Q    You can answer.

25     MR. WRIGHT:  Answer best you can.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 162

1    A    Obviously, if she confessed to the -- being --
2  partaking in it, that would've been no, but if she just
3  had knowledge of it, then, yes.
4    Q    Okay.  So it was your understanding that if
5  Kayla Mills implicated Jonathan Taylor in the murder of
6  Katherine Mills, that you would not proceed forward with
7  charges against her for the murder, correct?
8    A    Say that very first part again.
9    Q    Okay.  So there was an understanding between
10 you and Kayla Mills and her counsel that if she gave a
11 statement implicating Jonathan Taylor in the murder of
12 Katherine Mills, but not implicated herself, that you
13 would not proceed forward with the arrest warrant in a
14 citation against her for the murder of Ms. Mills,
15 correct?
16       MR. WRIGHT: Object to form.
17    A    Yeah, that's what the understanding of myself
18 and her attorney had.
19    Q    Okay.  Did you document that understanding in
20 any police report?
21    A    No.
22    Q    Okay.  And, likewise, you never told the Grand
23 Jury about that understanding that you had reached with
24 Kayla Mills prior to taking her recorded statement,
25 correct?

Page 163

1    A    No.  I -- I -- I don't remember doing that,
2  no.
3    Q    Yeah.  And you also never testified to that
4  understanding when you went before the preliminary
5  hearing, correct?
6    A    Yes.
7    Q    Okay.  In fact, before today, you've never
8  disclosed that understanding to anyone on the defense
9  team, correct?
10       MR. WRIGHT: Object to form.
11    A    I do not recall or remember.
12    Q    Now, going back to your report of your
13 interview with Kayla Mills.  It's the prior exhibit,
14 sir.  This one.  You wrote this report, right?
15    A    Yes.
16    Q    Okay.  And, generally, the report states that
17 Jonathan Taylor confessed to Kayla that he killed
18 Katherine Mills; is that right?
19    A    Yes.
20    Q    Okay.  In your report, you were specifically
21 saying the second paragraph, halfway through, that,
22 "Kayla Mills stated Jonathan Taylor confessed to killing
23 Katherine Mills a lot to her", correct?
24    A    Yes.
25    Q    Okay.  And you wrote this report, correct?

Page 164

1    A    Yes.
2    Q    All right.  And you testified to this before
3  the Grand Jury, correct?
4    A    I should have, yes.
5    Q    Yeah.  I'm now going to play you what'll be
6  Exhibit 13; is that right?
7          (EXHIBIT 13 MARKED FOR IDENTIFICATION)
8    A    Yes.
9    Q    Okay.  You guys got to keep me in line.  Now,
10 with these numbers.  It's PL-9650.  This is the
11 interview -- the audio interview you did of Kayla Mills,
12 all right?
13    A    Okay.
14    Q    Bear with me.  And we're specifically going to
15 time stamp 1:47 through 2:09 for counsel.  All right,
16 sir, please listen to this.  I'm going to ask you some
17 questions, all right?
18 (AUDIO CLIP PLAYED FROM KAYLA MILLS STATEMENT)
19    Q    Is that your voice, sir?
20    A    Yes.
21    Q    That's from your interview of Kayla Mills on
22 March 16, 2012, correct?
23    A    Yes.
24    Q    Okay.  And Kayla Mills told you within that
25 recording that Jonathan Taylor never confessed to

Page 165

1  killing Katherine Mills, correct?
2    A    Do what now?  She's --
3    Q    Kayla Mills told you in that recording that I
4  just played that Jonathan Taylor never specifically
5  confessed to killing a person named Katherine Mills,
6  correct?
7          MR. WRIGHT: Object to form and foundation. Go
8  ahead.
9    A    I had a reason to believe that she did and
10 that's the only reason why we was interviewing that.
11 That's who he was talking about and, in fact, that's the
12 whole reason why we took the statement.
13    Q    Sir, I --
14    A    But on that little audio clip, then, that is
15 correct.
16    Q    Okay.  Kayla Mills told you he never gave a
17 name, right?
18    A    On that audio clip, yes.
19    Q    Okay.  And sitting here today -- well, I'm
20 going to now play 2:22 through 2:32.
21          (AUDIO CLIP PLAYED FROM KAYLA MILLS
22          STATEMENT)
23    Q    So after Kayla Mills gave you that
24 information, you wanted to know whether Jonathan
25 specifically, request -- confessed to killing a person

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 166

1  named Katherine Mills, correct?

2      A    Yes.

3      Q    That's the statement you're making to Kayla,

4  correct?

5      A    Yes.

6      Q    And that's because you had concerns about

7  whether Jonathan was confessing to killing Kathryn or

8  similarly, right?

9      MR. WRIGHT: Object to form.

10     Q    Yes or no?

11     A    No.  I had no concerns of that whatsoever.

12     Q    Well, you had concerns that this confession

13  was vague, right?

14     MR. WRIGHT:  Object to form.

15     A    And the reason she was afraid of Jonathan.

16  That's the reason why she did not want to testify or use

17  names, and I knew that --

18     Q    Okay.

19     A    -- going into that.

20     Q    Okay.  Answer my --

21     A    And that's because she said --

22     Q    Answer --

23     A    -- that.

24     Q    Answer my question:  Did you ask Kayla Mills

25  specifically whether Jonathan Taylor named the victim

Page 167

1  that he killed?

2      A    Yes.

3      Q    Okay.  And Kayla Mills told you no, right?

4      A    On that -- on that audio clip, yes.

5      Q    Yeah.  And specifically, she told you that he

6  never named names, correct?

7      MR. WRIGHT: Object to form.

8      Q    Correct?

9      A    At -- at one point, yes, sir.

10     Q    And you can't think of another point in your

11  recorded statement with her where she actually came out

12  and said that he named Katherine Mills, correct?

13     A    I can tell you beforehand that I -- I was

14  under the assumption and that she said that, but, again,

15  she was afraid and that's the reason why I asked the

16  attorney -- was pushing her because you could tell, when

17  she hesitated, she was not wanting --

18     Q    Sir --

19     A    -- to say the name.

20     Q    -- your answer is not responsive.  I'm asking

21  a specific question, okay?  Kayla Mills --

22     A    I apologize.

23     Q    -- did not tell you that Jonathan specifically

24  confessed to killing Katherine, right?

25     A    She did say that on -- during the recording,

Page 168

1  yes.

2      Q    Yes.  And you wrote down in your report that,

3  "Kayla Mills stated Jonathan Taylor confessed to killing

4  Katherine Mills a lot to her," right?

5      A    Yes.

6      Q    That part of your report that says that,

7  "Jonathan confessed to killing Katherine a lot to her"

8  isn't accurate?

9      MR. WRIGHT:  I'll object to form.

10     Q    Right?

11     A    That is incorrect.

12     Q    Oh, that's incorrect?

13     A    She did --

14     Q    So --

15     A    -- say -- say that.

16     Q    So you're saying during your -- this is a

17  summary -- your report is a summary of the recorded

18  statement, correct?

19     A    Yes.

20     Q    Because you don't document the interviews that

21  you have with people prior to turning on that recorder,

22  correct?

23     A    That is -- not -- not with her, that is

24  correct.

25     Q    Yeah.  And not with Amber Simpson, correct?

Page 169

1      A    Correct.

2      Q    Yeah.  Not with Michael Crump, correct?

3      A    I don't think I did --

4      Q    Yeah.  I mean, you didn't document anything

5  with Michael Crump aside from a summary report, right?

6      A    Right.

7      MR. WRIGHT: Object to form.

8      Q    Yeah.  You didn't document that he did not

9  identify Jonathan Taylor, right?

10     MR. WRIGHT: Object to form.

11     Q    We went over to this, right?

12     MR. WRIGHT: Object to form.  Let him answer your

13  question.

14     MR. SLOSAR:  Then, you know, maybe you can stop

15  being an obstructionist.

16     A    Well --

17  BY MR. SLOSAR:

18     Q    Answer the question.

19     MR. WRIGHT: Yeah.  Ask one question at a time.

20     Q    Answer the question.

21     A    Which one?  You just spit off about four.

22     Q    You didn't document when Michael Crump when

23  did not identify Jonathan Taylor, correct?

24     MR. WRIGHT: Object to form.

25     A    That is correct.



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 170

1   Q   Okay. All right. So this report, again, is a
2   summary of your recorded statement, correct?
3   A   Summary of my -- this -- my interaction with
4   her and statement, yes.
5   Q   The first line of -- the last line of the
6   first paragraph, does it read, "This is a summary of
7   statement. See CV for entire statement"?
8   A   Yes.
9   Q   Okay.
10  A   Of the recorded statement, yes.
11  Q   Yeah. This report is a summary of the
12  recorded statement, correct?
13  A   Yes.
14  Q   Nowhere in that recorded statement, on March
15  16, 2012, did Kayla Mills tell you that Jonathan Taylor
16  specifically, confessed to killing a person named
17  Katherine Mills; isn't that right?
18  MR. WRIGHT: Object to form.
19  A   That is correct on the audio as far as I'm
20  saying, but she did say that with her attorney there,
21  and he's got records. Ask him.
22  Q   Just not on the audio, right? Not on the
23  audio, right?
24  A   That is correct.
25  MR. SLOSAR: Go to the Grand Jury 29:53 to

Page 171

1   30:16.
2         (AUDIO CLIP PLAYED FROM THE GRAND JURY)
3   MR. SLOSAR: Wait.
4   MS. STAPLES: 9661.
5   MR. SLOSAR: That's wrong.
6   BY MR. SLOSAR:
7   Q   You know what? Sorry about that. Sir,
8   Detective York, you testified to the Grand Jury that
9   Jonathan Taylor confessed involvement in the murder of
10  Katherine Mills to his girlfriend, Kayla, correct?
11  A   Yes.
12  Q   All right. And that was -- and you testified
13  the same way before the Court at the preliminary hearing
14  as well, right?
15  A   Yes, sir.
16  Q   The basis for you testimony was in March 16,
17  2012 recorded statement that you took from Kayla,
18  correct?
19  A   It was based on that event.
20  Q   Okay. And the report that you drafted from
21  that statement, correct?
22  A   Yes.
23  Q   Is it fair to say that when you wrote this
24  line in your report, that Kayla Mills stated that
25  Jonathan Taylor confessed to killing Katherine Mills a

Page 172

1   lot to her during her -- during your summary of the
2   recorded statement that that was not accurate?
3   MR. WRIGHT: Object to form.
4   A   When I wrote that, I had 110 percent
5   confidence that's what Kayla was saying to me.
6   Q   You are 100 percent confident that in your
7   belief that that's what she was implying, right?
8   A   Yes.
9   Q   Okay. It wasn't that Kayla actually told you
10  in that recorded statement that Jonathan specifically
11  confessed to killing Katherine, correct?
12  MR. WRIGHT: Object to form, and I think you're
13  getting borderline harassment. He's indicated that --
14  Q   You can answer the question.
15  MR. WRIGHT: -- the implication.
16  Q   Well, do --
17  MR. WRIGHT: Go ahead best you can.
18  Q   Restate it, please.
19  Q   All right. Sir, do you believe I'm harassing
20  you right now?
21  A   I believe it's borderline, yes.
22  Q   Okay. All right. When you were saying, "Fuck
23  you. Fuck you. Fuck you," to Dave Fox, was that
24  harassing?
25  MR. WRIGHT: Objection. That is --

Page 173

1   MR. SLOSAR: I'm asking --
2   MR. WRIGHT: You're comparing apples to oranges.
3   This is under the Civil Rules of Procedures. That's a
4   police investigation.
5   BY MR. SLOSAR:
6   Q   Oh, so, sir, was that harassment -- is that a
7   harassing tactic that you used with Dave Fox?
8   A   Yes.
9   MR. WRIGHT: Object to form.
10  Q   I'm sorry?
11  A   Yes.
12  Q   Well --
13  A   That's -- that's a police tactic I used to get
14  information. I'm -- I'm not saying that's harassment.
15  Q   To harass witnesses?
16  A   No.
17  Q   Sir, do you recall testifying before the Grand
18  Jury that Kayla Mills had a car that matched the
19  description involved in the crime?
20  A   I -- I don't recall, but she did, yes.
21  Q   Okay. Do you recall testifying to the Grand
22  Jury that Ms. Mills' parents attempted to hide the car
23  during the time of the homicide?
24  A   Probably, yes.
25  Q   All right. I can play it for you if you want



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 174

1  to hear it, but --
2      A    No.
3      Q    -- you testified that way; does that sound
4  right?
5      A    Yes.
6      Q    Now, Detective York, you, obviously,
7  interviewed Kayla Mills prior to testifying for the
8  Grand Jury, correct?        We've just been going over
9  that.
10     A    Yes.
11     Q    Yeah.  And more than once, correct?
12     A    Yes.
13     Q    Yeah.  Some -- first conversation wasn't
14  documented or recorded, correct?
15     A    That is correct.
16     Q    All right.  And you also interviewed Donna
17  Cricket Mills prior testifying before the Grand Jury; is
18  that right?
19     A    I don't never remember taking a statement from
20  her at all.
21     Q    No, no, no, no.  You interviewed her.  You
22  spoke with Donna Mills prior to taking her daughter's
23  statement on March 16, 2012, right?
24     A    Yes.
25     Q    Okay.  And prior to the Grand Jury, you

Page 175

1  learned from Donna Mills that the blue vehicle at her
2  home was inoperable; isn't that right?
3      MR. WRIGHT:  Object to form and foundation. Answer
4  best you can.
5      A    I don't remember her saying those words, no.
6      Q    Well, Donna Mills told you that the car wasn't
7  working at the time of the homicide, right?
8      MR. WRIGHT:  Object to form and foundation.
9      A    No, I think she told me that Kayla was
10  grounded from it.  I don't remember her saying it was
11  tore up as far as mechanical-wise.
12     Q    Did you document anything about your
13  conversation with Donna Mills about the blue car?
14     A    No.
15     Q    Okay.  Did you ever create a single police
16  report saying that the Mills' family informed you that
17  that they were hiding a blue car?
18     A    The Mills' family.  There's a lot of Mills.
19  Which particular --
20     Q    Donna Mills.
21     A    Donna Mills?
22     Q    Yeah.
23     A    No, I did not document it, no.
24     Q    Yeah.  There's no -- so when you testified
25  before the Grand Jury that that the Mills -- that

Page 176

1  Kayla's parents attempted to hide a car during the time
2  of the homicide, you had never created a report about
3  that prior to testifying on April 27, 2012, correct?
4      A    Not that I know.
5      Q    And you also testified that Amanda Hoskins'
6  mother, Linda Taylor, works at an orphanage and was
7  driving a blue Cavalier at the time of the murder; is
8  that right?  Testified that way at the Grand Jury?
9      MR. WRIGHT:  Object to form and foundation, but
10  answer best you can.
11     A    I don't remember saying that Linda owned a car
12  like that, but the orphanage had one that may possibly
13  be driven.  I -- I mean, as far as the ownership of it.
14     Q    Okay.  But you testified before the Grand Jury
15  that Ms. Hoskins's mother works at an orphanage and was
16  driving a blue Cavalier at the time of the murder,
17  correct?
18     MR. WRIGHT:  Object to form and foundation, if
19  you're quoting from something.
20     Q    Let's go to 25:47 if you need me to refresh
21  your recollection, Mr. York.  Do you want to hear this?
22     A    If -- if it's different from what I remember,
23  yes, but if not, we can go -- go on.
24     Q    All right.  Well, is what I said true that you
25  testified before the Grand Jury that Ms. Hoskins'

Page 177

1  mother, Linda Taylor, worked at an orphanage and was
2  driving a blue Cavalier at the time of the murder?
3      MR. WRIGHT:  I'll just object to form and
4  foundation.
5      Q    Did you testify that way?
6      A    I could, but if I -- like I said, I -- I don't
7  remember saying it if it was in her ownership.  The blue
8  car I was probably seeing if it was the one at the
9  orphanage.
10     Q    Yeah.  And well, you told --
11     A    That was -- that was, yeah.
12     Q    Well, let's just listen to it.  Maybe it'll
13  refresh your memory.  25:47 to -- 25:14, I'm sorry, to
14  25:47.
15         (AUDIO CLIP PLAYED FROM THE GRAND JURY)
16     Q    Okay.  So you testified, sir, to the Grand
17  Jury that Ms. Hoskins's mother works at the orphanage,
18  was driving a blue Cavalier at the time of the murder,
19  correct?
20     A    Yes.  I said that, but I think it's important
21  that you get all that that it was at the orphanage, and
22  she would sneak up there to get it.  That might have
23  just --
24     Q    And --
25     A    -- been an oversight that I was in --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 178

1  referring that that was her personal vehicle.
2      Q    Yeah, because that wouldn't be accurate,
3  right?
4      A    Right.
5      Q    Yeah.  It wasn't -- you didn't have any
6  evidence that Ms. Taylor, Linda Taylor, or Amanda
7  Hoskins had a personal vehicle that was a blue Caviler,
8  correct?
9      A    Yes.
10     Q    Okay.  And, in fact, prior to your Grand Jury
11  testimony, you knew that Ms. Hoskins and Ms. Taylor,
12  Linda Taylor, did not have a blue car; isn't that right?
13     A    Yes.
14     Q    Now, Detective York, you also test -- or,
15  sorry, Sergeant York, you testified that Ms. Hoskins
16  would sneak up there and steal a Caviler that belonged
17  to the orphanage and take it and drive it; do you recall
18  testifying to that?
19     A    Yes.
20     Q    Prior to April 27, 2012, did you have any
21  evidence indicating that Ms. Hoskins ever snuck up to
22  the orphanage and took a blue vehicle to drive on
23  December 20, 2010?
24     A    No.
25     Q    In fact, you investigated the car that was at

Page 179

1  the orphanage, correct?
2      A    If I recall, I went and looked at it.
3      Q    Yeah.  You spoke to Stevie Erie, right?
4      A    I can't remember if it was him or the other
5  guy charged, but I forgot who, but possibly it could've
6  been Stevie.
7      Q    Mr. Erie runs a children's orphanage, right?
8      A    Yeah, well, there's several people that I've -
9  - I've answered several complaints there, and I've
10  talked to several people, but yes, I did talk to him at
11  one point.
12     Q    And, you know, would you agree Mr. Erie's a
13  pretty standup fellow?
14     MR. WRIGHT:  Object to form, foundation.  Go ahead.
15     A    I'm not going to speculate on what type of guy
16  he is.
17     Q    He's not a criminal, right?
18     MR. WRIGHT:  Object to form.
19     A    I do not know.
20     Q    You don't know?  A guy who runs a children's
21  orphanage in town, you're saying could be a criminal?
22     MR. WRIGHT:  Object to form.
23     A    You're causing me -- you're asking to
24  speculate on somebody's --
25     Q    Have --

Page 180

1      A    -- personal life that I -- I don't know
2  nothing about.
3      Q    Okay.  Well, have you ever investigated Mr.
4  Erie for any crime?
5      A    No.
6      Q    Yeah.  Unaware of any criminal record, right?
7      A    Yes.
8      Q    Yeah.  Has he ever lied to you?
9      A    Not that I know of, that I remember.
10     Q    Sure.  Pickard was with you when you-all went
11  down to the orphanage to check out this blue car,
12  correct?
13     A    He could've been.  I -- I don't remember.
14     Q    Okay.  You --
15     A    I was there a lot.
16     Q    You didn't create any police reports in this
17  case about going down to the orphanage and learning
18  about who was in possession of the blue car in December
19  20, 2010, right?
20     A    No.  I've didn't -- no.
21     Q    Okay.  You didn't testify about any of that,
22  any information that you learned when you're before the
23  Grand Jury on that topic, right?
24     A    Not that I remember, no.
25     Q    Yeah.  Likewise, never testified at the

Page 181

1  preliminary hearing about the information that you
2  learned from people at the children's home who was
3  really in possession of the blue car on December 20,
4  2010, correct?
5      MR. WRIGHT:  Object to form and foundation.  Go
6  ahead and answer.
7      A    Not that I remember, no.
8      Q    Sir, isn't it true that Mr. Erie or one of his
9  associates showed you and Sheriff Pickard receipts that
10  stated who was in the possession of the blue car on
11  December 20, 2010, and specifically, I'm referring to
12  gas receipts about who had the car that day.
13     A    I believe he showed us some type of gas
14  receipt, yes.
15     Q    And isn't it true that you learned when you
16  were with Sheriff Pickard down there from either Mr.
17  Erie or one of his associates, that the maintenance men
18  were in possession of the blue car on December 20, 2010?
19     MR. WRIGHT:  Object to form and foundation.  Answer
20  best you can.
21     A    No.  No.  I don't remember learning that.
22     Q    You're saying that Mr. Erie or his associates
23  never told you or Sheriff Pickard that?
24     A    I'm not saying that he didn't, but I -- there
25  was no -- I don't remember nothing that was -- says that

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 182

1  they could've had it or anybody could've had it.  I
2  don't remember any specific details.
3      Q   Well, they showed you receipts, gas receipts,
4  about -- from December 20, 2010, about who had the car
5  that day, correct?
6      MR. WRIGHT:  Object to form and foundation. Answer
7  best you can.
8      A   I don't remember somebody's name being on it
9  off the top of my head.
10     Q   Did they show you receipts?
11     A   Yes.
12     Q   Okay.  Did you copy those receipts and make it
13  part of your investigation file?
14     A   I don't believe so, no.
15     Q   Yeah.  Did you make any report about the
16  information that you learned at the orphanage about who
17  had the blue car from there on December 20, 2010?
18     A   No, but as I stated at the Grand Jury, I
19  couldn't tell them if it was that car or something else
20  --
21     Q   Well --
22     A   -- another car.
23     Q   -- you told the Grand Jury that Ms. Hoskins
24  could've took the car that day from the orphanage,
25  correct?

Page 183

1      A   Possibly could.
2      Q   I mean, that's --
3      A   I can't tell you --
4      Q   -- what you testified to.
5      A   -- but I said I did not know for sure.
6      Q   Okay.  Well, you never told any of the grand
7  jurors about any of the information you learned from
8  people at the orphanage, correct?
9      A   That is correct.
10     Q   Never testified about it at the preliminary
11  hearing, correct?
12     A   Yes.
13     Q   Now, January 21, 2011, you requested that a
14  polygraph be conducted of Allen Helton, right?
15     A   Yes.
16     Q   Yeah.  Who's Mr. Helton?
17     A   He's William Lester's cousin.  He was a person
18  of interest.
19     Q   Let me ask it a better way:  Allen Helton's a
20  snitch for you, right?
21     MR. WRIGHT:  Object to form and foundation.
22     Q   I'm sorry.  I withdraw a question.  Allen
23  Helton is an informant for you, right?
24     MR. WRIGHT:  Object to form and foundation.
25     Q   You can answer it.

Page 184

1      A   That is incorrect.
2      Q   Well, Allen Helton's never worked as an
3  informant for you?
4      A   Not for me.
5      Q   Who?  Who?
6      A   Who what?
7      Q   Who did he work for?
8      A   I can't confirm this, but I think at one time
9  it was maybe U.N.I.T.E.
10     Q   Who?
11     A   U.N.I.T.E.
12     MR. WRIGHT:  Object to form.
13     Q   Who?  U.N.I.T.E.?  What is that?
14     A   I don't know how to explain it to you.  That's
15  what they call themselves.
16     Q   All right.  Okay.  You don't know who they
17  are?  All right.  All right.  I'm going to show what
18  we'll mark as Exhibit 14.  This is a PL-14718 through
19  19.  Sir, have you seen this report before today?
20         (EXHIBIT 14 MARKED FOR IDENTIFICATION)
21     A   Yes.
22     Q   Yeah.  You drafted this report, right?
23     A   Yes.
24     Q   When did you draft it?
25     A   It looks like January 21, 2011.

Page 185

1      Q   Yeah.  And on that same day you made a request
2  that Mr. Helton be polygraphed for the murder of
3  Katherine Mills, right?
4      A   Yes.
5      Q   Yeah.  And that's because he was a suspect at
6  the time, right?
7      A   He was a person of interest.
8      Q   Well, everybody's a person of interest, right?
9      MR. WRIGHT:  Object to form.
10     A   I mean, if you want -- I guess, until we
11  develop probable cause, yes.
12     Q   Yeah.  Everybody in the world is a person of
13  interest, right?
14     MR. WRIGHT:  Object to form.
15     Q   You testified that way at the preliminary
16  hearing, didn't you?
17     MR. WRIGHT:  Object to form and foundation.
18     A   No.
19     Q   Oh, you didn't?
20     A   What -- you're -- what are you saying?  What's
21  the question?
22     Q   Did you testify at the preliminary hearing
23  that everybody is a person of interest?
24     A   I don't remember if I said them exact words.
25     Q   So you're saying that Mr. Helton was not a

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 186

1  suspect at the time you requested a polygraph --
2      MR. WRIGHT: Object --
3      Q   -- of January 21, 2011?
4      MR. WRIGHT: Object to form.
5      A   He was a person of interest that we were
6  looking at. I don't know how else you want me to say
7  it.
8      Q   Okay. Well, on January 21, 2011, Amanda
9  Hoskins and Jonathan Taylor weren't yet persons of
10  interest in this investigation, correct?
11      A   Yes.
12      Q   Yeah. And at the time you requested a
13  polygraph, would you agree that you had information that
14  you felt implicated Mr. Helton in the murder of
15  Katherine Mills?
16      A   Implicated? I don't know about implicated,
17  but I had information that he could've been a part of
18  it.
19      Q   Yeah. Well --
20      A   -- but I'm not -- about specifically the
21  killing.
22      Q   You had information that he fled to Florida
23  right after the murder, correct?
24      A   Yes.
25      Q   You had information that he and Mr. Simpson

Page 187

1  were in large -- were in possession of large sums of
2  money after Ms. Mills was killed, correct?
3      A   Yes.
4      Q   He had information that Allen Helton and Mike
5  Simpson went down to Florida to go buy a bunch of pills
6  and bring them back, correct?
7      A   Yes.
8      Q   And from looking at this -- well, Mr. Helton
9  told you that he and Mike Simpson went to Florida the
10  day that Ms. Mills was killed, correct?
11      A   I believe that day or -- yeah, or -- yeah, I
12  believe so or I don't know what day -- what time they
13  exactly left. You know --
14      Q   Sure.
15      A   -- early morning hours, but yes.
16      Q   Okay. Well, you learned after speaking to
17  Vernon Bennett that Mr. Helton, Mr. Simpson left to
18  Florida in the -- or, at least, were present in
19  Kentucky, still, in the afternoon of December 20, 2010,
20  right?
21      MR. WRIGHT: Object to form and foundation. Go --
22  answer best you can.
23      A   What date was that?
24      Q   So on December -- so Vernon Bennett told you
25  during your investigation that Mike Simpson and Allen

Page 188

1  Helton were present in Kentucky. He saw them during the
2  afternoon of December 20, 2010, right?
3      A   Yeah.
4      MR. WRIGHT: Object to form and foundation. Answer
5  best you can.
6      A   Yes, I mean, but they was more people than
7  just him, but yes.
8      Q   Sure. I understand that. What I'm saying,
9  you didn't have any information that as of January 21,
10  2011, that Mike Simpson or Allen Helton had left prior
11  to Katherine Mills being killed, correct?
12      A   That's correct.
13      Q   All right. And according to Mr. Helton, prior
14  to Ms. Mills being killed, Mike Simpson had told him
15  that he was broke, correct?
16      A   Yes.
17      Q   Okay. And can you just generally tell me what
18  else Mr. Helton told you before you wrote this narrative
19  on January 21, 2011?
20      A   If it's not important, not off the top of my
21  head -- top of my head, no. I mean, if it's something
22  in here, then, yes.
23      Q   We'll go through your report. What is --
24  according to your narrative, what did Allen Helton tell
25  you on December 21st?

Page 189

1      A   Do you want me to read the report? Okay.
2      Q   Yeah.
3      MR. WRIGHT: Take your time to read the report.
4      A   All right.
5      Q   Sure.
6      A   "On January 21st --
7      MR. WRIGHT: Do you want him to read it into the
8  record or read it to --
9      Q   Oh, you know what --
10      MR. WRIGHT: -- himself?
11      Q   You don't have to read it into the record. Why
12  don't you read it to yourself and tell me whether
13  everything in there is truthful to the best of your
14  recollection.
15      A   Okay.
16      Q   Let me know when you're done.
17      MR. WRIGHT: This will be Exhibit 15?
18      MR. SLOSAR: It will.
19      MR. WRIGHT: Yeah.
20  BY MR. SLOSAR:
21      A   Yes.
22      Q   Okay. Everything in there is truthful and
23  accurate to the best you can recall?
24      A   Yes.
25      Q   Okay. So prior to writing this report, you

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

190..193

Page 190

1   also met with Mike Simpson, correct?

2      A    Yes.

3      Q    Okay.  And that -- you testified a little bit
4   about that earlier.  That's when Mr. Simpson gave you a
5   Post-it note; is that right?

6      A    Yes.

7      Q    Okay.  I'm going to hand you what's been
8   marked as Exhibit 15.  This is an e-mail from yourself
9   to Lisa Evans over at TPA and then on the back side is
10  an attachment to that e-mail of Mr. Simpson's Post-it
11  note.  First question, and flip it back over, did you
12  send that e-mail?

13                (EXHIBIT 15 MARKED FOR IDENTIFICATION)

14     A    It would appear that I did.

15     Q    Okay.  And the attachment on the back side, is
16  that the Post-it note you received from Mike Simpson?

17     A    It appears, but I -- I'm having trouble --

18     Q    Pretty faded --

19     A    -- reading it.

20     Q    -- right?

21     A    Yes.

22     Q    Does it look like it, though?

23     A    Yes.

24     Q    If I had a better -- you didn't put a Post-it
25  note -- you didn't put that Post-it note inside of your

Page 191

1   investigative file, correct?

2      A    I do not remember if it was a copy or -- or --
3   or what.

4      Q    Well, I'll represent to you that I've gone
5   through the KSP file, and I haven't seen that in there
6   but --

7      A    Oh, you've not seen this?

8      Q    I have not.  Obviously, you gave it to Ms.
9   Evans.  I just haven't seen a better version of it, so
10  if it appears, we'll deal with it, but when Mike Simpson
11  -- when you had this interaction with Mike Simpson, when
12  him and Allen got back from Florida on January 24, 2010,
13  is what you wrote in your report --

14     MR. WRIGHT:  I'm going to object.

15     Q    -- although, it says --

16     MR. WRIGHT:  It was January or December.

17     MR. SLOSAR:      I'm sorry.  You're right. December

18  24, 2010.  You're right, Counsel.

19  BY MR. SLOSAR:

20     Q    You had this interaction with Mike Simpson,
21  Allen Helton when they got back from Florida.  Where did
22  you have that interaction with him at?

23     A    With Mike Simpson?  At his residence.

24     Q    Okay.  How did you know he got back in town?

25     A    I want to say from probably Jesse Lawson.

Page 192

1      Q    Okay.  And do you remember were any other
2   officers with you?

3      A    I -- I believe so.

4      Q    Do you recall who they were?

5      A    Not off the top of my head, no --

6      Q    Okay.

7      A    -- but they was -- I believe other troopers
8   there.

9      Q    Okay.  Okay.  Now, did you talk to Mike
10  Simpson about the murder of Katherine Mills?

11     A    Did I interview him?  I did not record
12  anything that I remember.

13     Q    I understand that, so you questioned him about
14  the homicide?

15     A    I -- I probably mentioned it to him and asked
16  him -- asked him, yes.

17     Q    Yeah.  There would be no reason why you
18  wouldn't ask him questions, correct?

19     A    Yes.

20     Q    Okay.  That point you were suspicious of him?

21     A    Yeah.

22     Q    Yeah.  Now, you testified earlier, Mike
23  Simpson actually gave you this Post-it note reported
24  alibi witnesses before you ever mentioned any reason why
25  you were there, correct?

Page 193

1      A    That is correct.

2      Q    Okay.  How did that make you feel?

3      A    I thought -- I thought that was peculiar.

4      Q    Yeah.  A little bit alarming, right?

5      A    Yes.

6      Q    Yeah.  Now, how long did your questioning of
7   Mr. Simpson last that day?

8      A    I don't remember how long we were there.

9      Q    All right.  Did you ask him to come down to
10  the police station?

11     A    I cannot remember if I did or not that day.

12     Q    Did you go inside his residence?

13     A    I believe so, yes.

14     Q    Right.

15     A    I -- I believe so that day, yes.

16     Q    Were you looking for any evidence when you
17  were in there?

18     A    Oh, possibly, I -- anything that would --
19  would relate to that, yes.

20     Q    Yeah.  Now, you didn't document any -- you
21  didn't document this interaction you had with Mike
22  Simpson on December 24, correct?  And, you know what?

23         Let me ask it better way:  After you met with
24  Mike Simpson on December 24, questioned him about the
25  murder, he gave you this Post-it note, you didn't go

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 194

```
 1  back to the police department and draft up a report,
 2  right?
 3      A   No.  I don't believe so, no.
 4      Q   Okay.  And, in fact, you didn't document
 5  anything relating to this interaction until nearly a
 6  month later; is that right?
 7      A   Possibly.
 8      MR. WRIGHT:  I'll object to form.
 9      Q   This January 21, 2011 report's the first time
10  you'd documented anything about your interaction with
11  Mike Simpson on December 24, 2010, correct?
12
13
14
15      MR. WRIGHT:  I'll object to form and foundation.
16  Answer best you can.
17      Q   You can answer.
18      A   I believe so, yes.  It's after 12:45.  Do we
19  want to break for lunch?
20      Q   I'm make -- I've got maybe about ten more
21  minutes until a natural stopping point.  Can you allow -
22  -
23      A   Yes, sir.
24      Q   -- a little bit?  Sorry.  If that's okay.  Ten
25  more minutes, I've got to have to be right.  If you want
```

Page 195

```
 1  to leave, we can leave.  Now, after meeting with Mike
 2  Simpson and learning this information from Allen Helton,
 3  by December 24, 2010, you felt that Jesse Lawson, Mike
 4  Simpson, Allen Helton could be responsible for the
 5  murder of Katherine Mills, correct?
 6      MR. WRIGHT:  Object to form and foundation. Answer
 7  best you can.
 8      A   They were definitely person of interest, yes.
 9      Q   And that's because you knew that Jesse Lawson
10  had knowledge -- was one of the few people that had
11  knowledge about the amount of money that Katherine Mills
12  had on her at the time she was killed, correct?
13      A   That is correct.
14      Q   Yeah.  Now, I'm going to show you what we'll
15  mark as Exhibit number 16.  These are the rental car
16  records, Bates-stamped, 15643 through 15648 and then
17  we've got 18545.  Sir, I'm going to hand you these
18  records.  Can you this one to your counsel?
19  I'm sorry.  Okay.  Sergeant York, you received these
20  records during the course of your investigation in this
21  homicide, correct?
22            (EXHIBIT 16 MARKED FOR IDENTIFICATION)
23      A   Yes.
24      Q   And you received these records relating to Mr.
25  Simpson well before he requested that Allen Helton and
```

Page 196

```
 1  Jesse Lawson be given a polygraph exam on January 21,
 2  2011, correct?
 3      A   Are you -- what was the question again?
 4      Q   After Allen Helton -- after you learned that
 5  Mike Simpson had got this rental car, went to Florida
 6  with Allen Helton, you immediately went to go to
 7  Enterprise to get these records, correct?
 8      A   I don't remember if I went to Enterprise, or
 9  if these were in the vehicle, but okay.  I -- yes.
10      Q   You got these pretty shortly --
11      A   Yes.
12      Q   -- after you learned that information --
13      A   Yes.
14      Q   -- right?  Well before you initiated charges
15  against Ms. Hoskins, Mr. Taylor, correct?
16      A   Yes.
17      Q   Okay.  All right.  And you reviewed these
18  records, correct?
19      A   Yes.  If you want to ask me specific questions
20  from them, then --
21      Q   Well --
22      A   -- I'll have to read it again, but yes.
23      Q   I understand.  I'm just going to ask you
24  general questions.  You looked through these records to
25  see when Mike Simpson rented that car, correct?
```

Page 197

```
 1      A   I believe so, yes.
 2      Q   Okay.  And on the third page, where it says
 3  15645, you would've learned that Mike Simpson rented
 4  this car on December 20, 2010 at 2:06 p.m., correct?
 5      A   Where are you seeing that?  I -- I -- you're -
 6  -
 7      Q   Right here.   I'm sorry.  You know what?
 8  You're right.  I apologize.  I'm talking about the --
 9  it's double-sided, so it's a little bit tricky.  So you
10  learned when you reviewed that Mike Simpson rented this
11  car on December 20th at 2:06 p.m., correct?
12      A   Yes.
13      Q   Okay.  And sometime after that, that's when he
14  and Allen Helton fled to Florida; is that right?
15      MR. WRIGHT:  Object to form.
16      A   Yes.
17      Q   And so you knew that Mike Simpson, Allen
18  Helton were, at least, in the Knox County area on
19  December 20, 2010 prior to 2:06 p.m., right?
20      A   Yes.
21      Q   Yeah.  Because they had to be there to rent
22  the car, correct?
23      A   Yes.
24      Q   Okay.  Sorry.  Not a trick question, I
25  promise.  And you learned from looking at these
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 198

1  documents, that they returned the car on December 24,
2  2010 at 2:00 p.m., right?
3      A    That's what it says, yes.
4      Q    Okay.  And that's the same day that you
5  actually met with Mr. Simpson --
6      MR. WRIGHT: Object to form.  Hold on a second.
7  Where did you -- what were you pointing to on that?
8      MR. SLOSAR:  It's just right next to it.  The
9  return date's right next to the checkout date.
10      MR. WRIGHT:  Well, I'll object to whether that same
11  time it came back or the time it was due back.  I don't
12  know if it's --
13  BY MR. SLOSAR:
14      Q    Okay.  It says --
15      MR. WRIGHT: -- I'm not clear.
16      Q    -- return date/time, which I think is pretty
17  clear, but you learned that, according to this record,
18  that it was returned on December 24, 2010 at 2:00 p.m.,
19  correct?
20      MR. WRIGHT:  Just note my objection on that.
21      Q    Sure.
22      A    I -- I -- again, I'm not disagreeing that he -
23  - he's back in, but as far as that time because I know
24  he still had the car when I went there, so I don't know
25  --

Page 199

1      Q    Okay.
2      A    -- as far as the exact time, but yes.
3      Q    So maybe -- so Mike Simpson actually had this
4  car when you went to go question him on the 24th; is
5  that right?
6      A    Yes.
7      Q    And that's when he gave you that Post-it note,
8  right?
9      A    Yes.
10      Q    Okay.  And you knew, at that point, that this
11  person, Mike Simpson, could've been involved in the
12  murder of Katherine Mills, correct?
13      A    Yes.
14      Q    Okay.  Did you call any evidence technicians
15  at that time to search the car?
16      A    No.
17      Q    Did you physically search the car for any
18  physical evidence --
19      A    We briefly --
20      Q    -- at that time?
21      A    -- went through it, yes.
22      Q    At that time, you searched the car?
23      A    We took pictures of it, yes.
24      Q    Did you go inside the car and take photographs
25  of what the inside of the car looked like when you were

Page 200

1  there on the 24th?
2      A    Did I take pictures inside?  I don't remember
3  taking any pictures inside the car.
4      Q    Did you call any evidence technicians at KSP
5  to have the car analyzed for blood or DNA?
6      A    No.
7      Q    Okay.  And, at this point, again, Mike Simpson
8  is, at the very least, somebody that you're suspicious
9  of in the homicide investigation, correct?
10      A    Yes.
11      Q    Okay.  And after you leave and stop
12  interviewing Mr. Simpson, he goes and returns this car,
13  right, according to this document?
14      A    Yes.
15      Q    Okay.  Does that make you more suspicious that
16  he just got rid of a car that could've been used in the
17  murder right after the police go to speak to him about
18  it?
19      MR. WRIGHT:  Object to form and foundation.
20      Q    You can answer.
21      A    No, because I -- I never -- I had no reason to
22  believe that Ms. Mills was transported or -- in a
23  vehicle --
24      Q    Now, your theory --
25      A    -- or was even in a vehicle.

Page 201

1      Q    Your theory -- and, well, you learned from
2  looking at these documents, that Mr. Simpson paid for
3  cash for the car, right?
4      A    Yes.
5      Q    Okay.  Now, how many times did you interview
6  Allen Helton between December 20, 2010 and the time that
7  you requested that a polygraph exam be conducted?  The
8  answer won't be on here.
9      A    Well, I don't remember how many.
10      Q    Okay.  More than a couple?
11      A    It's -- it's possible.
12      MR. SLOSAR:  Okay.  I think that we're at a
13  breaking point.  Let's go off the record.
14      VIDEOGRAPHER:  Off the record at 12:53.
15          (OFF THE RECORD)
16      VIDEOGRAPHER:  Back on the record at 1:52 p.m.
17  BY MR. SLOSAR:
18      Q    All right.  Sir, I'm going to hand you what
19  we'll mark as Exhibit number 17.  Please take a look at
20  this document.  I'll hand a copy to your counsel.  It's
21  Bates-stamped 341.  Do you recognize this document?
22          (EXHIBIT 17 MARKED FOR IDENTIFICATION)
23      A    Yeah, it's KSP 341.
24      Q    What is this document?
25      A    It's a Statement to Rights and Waiver of

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 202

1  Rights.
2      Q    For whom?
3      A    Excuse me?
4      Q    For whom?
5      A    Oh, James Helton.
6      Q    Okay.  And were any officers present when Mr.
7  Helton signed this Waiver of Rights?
8      A    Mark Mefford.
9      Q    How do you know that?
10     A    His name is on it.
11     Q    And were you also present?
12     A    Yes.
13     Q    Okay.  And your signature is on there; is that
14  right?
15     A    Yes.
16     Q    Date of this is January 4, 2011; is that
17  right?
18     A    Yes.
19     Q    Okay.  And pursuant to your training at
20  Kentucky State Police, were you required to give a
21  statement of rights and a waiver of rights to a suspect
22  in a homicide investigation prior to questioning them?
23     MR. WRIGHT:  Object to form.  Answer best you can.
24     A    If the -- my understanding is if they was not
25  into custody, and I can't remember if he was in custody

Page 203

1  for something else at that -- on this particular day.
2      Q    Did you have Mr. Helton sign this document on
3  January 4, 2011 because he was a suspect in the homicide
4  of Katherine Mills?
5      A    He was a person of interest, yes.
6      Q    Well, aside from Alan Helton, did you have a
7  single other witness sign a statement of rights form
8  before you questioned them in the Mills homicide
9  investigation?
10     MR. WRIGHT:  Object to form.  Go ahead and answer
11  as best you can.
12     A    I don't believe -- I can't remember if the
13  Hoskins did or did not.  Johnson didn't give a statement
14  and I can't remember if William Lester's attorney had
15  one or not.
16     Q    You never had Caleb Mills sign one of these,
17  right?
18     A    Not -- I don't remember if I did.  If it's not
19  there, then no.
20     Q    Okay.  Now, you questioned Alan Helton on
21  January 4, 2011 with Mr. Mefford; is that right?
22     A    Yes.
23     Q    Okay.  You questioned him after he signed this
24  document, correct?
25     A    Yes.

Page 204

1      Q    Okay.  What did you tell Mr. Helton?
2      A    I would have to read the transcripts or listen
3  to the audio statement.  I don't remember what the
4  entire interview was about.
5      Q    So you don't remember anything you told Mr.
6  Helton when you questioned him on January 4, 2011,
7  correct?
8      A    Without reading it to refresh my memory
9  because I talked to him several times, but that's
10  correct.
11     Q    Okay.  You have no independent recollection of
12  anything you told Alan Helton on January 4, 2011, right?
13     A    Not off the top of my head, no.
14     Q    Okay.  You don't have any notes at home that
15  would refresh your memory, correct?
16     A    No.
17     Q    Okay.  If I represented to you that no report
18  exists relating to your January 4, 2011 conversation
19  with Alan Helton, would that surprise you?
20     A    No, because I talked to him several times. No,
21  it does not surprise me if it's not there.
22     Q    Okay.  So because no report exists and you
23  don't have any notes at home about this conversation, is
24  it fair to say that there's no documents that you can
25  rely on to refresh your memory as to anything you told

Page 205

1  Alan Helton during your January 4, 2011 conversation?
2      A    If it's not in the case, no.
3      Q    Okay.  And sitting here today likewise, do you
4  have any recollection of any statements that Mr. Mefford
5  made to Alan Helton during this January 4, 2011
6  conversation?
7      A    No, I do not.
8      Q    Was Mr. Mefford present with you and Mr.
9  Helton during the entire conversation that day?
10     A    I don't remember the exact conversation.
11  Obviously, he was there for a part of it.  I don't know
12  if he stepped out to use the bathroom or something of
13  that nature the entire time.
14     Q    Okay.  Do you recall where this conversation
15  with Mr. Helton took place on January 4, 2011?
16     A    No, I do not.
17     Q    Do you recall how long this conversation
18  lasted?
19     A    No, sir.
20     Q    Fair to say you don't recall any of the
21  information that Mr. Helton provided to you on January
22  4, 2011?
23     A    Not that particular day, no.
24     Q    Now, I'm going to show you -- well, after
25  speaking with Mr. Helton on January 4, 2011, you

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 206

1  facilitated a polygraph examination to be conducted of
2  Mr. Helton; is that right?
3      A    Yes, he was taken for a polygraph.
4      Q    Okay.  I show you Exhibit 18, sir.  PL1791 to
5  1792.  Do you recognize that document?
6               (EXHIBIT 18 MARKED FOR IDENTIFICATION)
7      A    Yes, KSP 218.
8      Q    Well, what -- what type of document is this,
9  sorry?
10     A    Polygraph report.
11     Q    Okay.  And do you see at the top where it says
12  "Date of Request: January 3, 2011"?
13     A    That's at the far right?  Yes.
14     Q    Okay.  Would that have been when you requested
15  that Mr. Helton take a polygraph exam?
16     A    Excuse me?  What was that?
17     Q    Would that have been -- January 3, 2011, is
18  that the date that you requested that a polygraph be
19  conducted of Mr. Helton?
20     A    You know, I'm not sure what these dates
21  represent.  I'd be somewhere -- I'm not saying it is
22  not, but I don't remember if that's the specific day.  It
23  says the "Date of Request" so I'm assuming that the
24  person generating this report would have put that date
25  when they got the request or certainly thereafter.

Page 207

1      Q    And do you recall being the officer that made
2  the request to Kentucky State Police to have Mr. Helton
3  polygraphed?
4      A    Yes.
5      Q    And it looks like, wouldn't you agree with me,
6  that there was a gap between the date that you made the
7  request and when KSP was actually able to facilitate the
8  request and do a polygraph of Mr. Helton?
9      A    It looks like, you know, 18 days.
10     Q    Yeah.
11     A    Or 19 -- somewhere around that.
12     Q    And is that generally what you recall how --
13  what you recall happening that there was a period of a
14  couple of weeks that passed by before you were able to
15  get Mr. Helton in there for a polygraph?
16     A    If I remember correctly, I don't make the
17  dates.  They tell me when they're available --
18     Q    Yeah.
19     A    -- and so they told me that day and we went
20  with it.
21     Q    Sure.  So they had -- I'm sure they had other
22  scheduling conflicts that prevented Mr. Helton from
23  going right in; is that fair to say?
24     A    Yes, that would be fair to say.
25     Q    Okay.  And between January 3, 2011 and January

Page 208

1  21, 2011 when the examination took place, you were
2  questioning Alan Helton during that 18 day period,
3  correct?
4      A    Well, that would be -- yes.  I would indicate,
5  yes.
6      Q    Yeah.  So we just talked about the January 4th
7  report -- or not report, but the waiver of rights that
8  Mr. Helton signed on January 4th, right?
9      A    Yes.
10     Q    Okay.  And you had other contacts and meetings
11  with Mr. Helton between January 3rd and January 21st
12  when he went in for the polygraph, correct?
13     A    Yes.
14     Q    Okay.  And you didn't document any of those
15  contacts in any police report; is that right?
16     MR. WRIGHT:  I'll object to form and foundation.
17  Answer best you can.
18     A    If it's not in the case, then I -- no.
19     Q    Okay.  You also didn't document the --
20  anything about the conversation you had with Mr. Helton
21  on January 4, 2011, correct?
22     MR. WRIGHT:  I'll object to form and foundation.
23  Answer best you can.
24     A    Yes, I think we've agreed on that.  Yes.
25     Q    Okay.  So fair to say that by the date of

Page 209

1  January 3, 2011, approximately 14 days after Ms. Mills'
2  death, that you believed that Jessie Lawson, Alan
3  Helton, and Mike Simpson could have been involved in the
4  murder of Katherine Mills?
5      A    Well, I'm not going to trust in your days
6  since you've said you got numbers, but I'm not
7  disagreeing that they were persons of interest.
8      Q    And I'm just -- I'm basing it on the fact that
9  there's 31 days in December, right?
10     A    We agree on that.
11     Q    Yeah.  And she was found dead on the 20th,
12  correct?
13     A    Of when?
14     Q    Of December, 2010?
15     A    Of December, yes.
16     Q    Yeah.  And you made the request for Mr. Helton
17  to be polygraphed on the 3rd of January, correct?
18     A    Yes.
19     Q    So approximately within 14 days of Ms. Mills'
20  death, you suspected that Allen Helton, Mike Simpson and
21  Jessie Lawson were involved in the murder of Katherine
22  Mills, correct?
23     MR. WRIGHT:  I'll object to the form.  Answer best
24  you can.
25     A    You can answer.  I had reasons to believe



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 210

```
1   that.  Yes, they were involved in some sort of fashion.
2       Q    That's why you requested --
3       A    Yes.
4       Q    -- that Mr. Lawson and Mr. Helton take a
5   polygraph exam, correct?
6       A    Yes.
7       Q    Okay.  Now, looking at this document, you
8   include, on the first page, information about Allen
9   Helton and Mike Simpson leaving to Florida, being found
10  with money after the victim's death and some other
11  evidence about money being taken from the crime scene.
12  Is that generally consistent with the summary you
13  provided on this page?
14      A    I would like to be able to read it first.
15      Q    Sure.  Please do, sir.
16      A    I'm not for sure what this -- the examinee
17  lives just down the road from the examinee.  I didn't
18  prepare this report and I'm not exactly sure what that's
19  indicating.
20      Q    Okay.
21      A    Just for the record.
22      Q    So we're -- it's basically implying that Mr.
23  Helton lived down the road from the -- I think what he's
24  meaning to say is that Mr. Helton, the examinee, lived
25  just down the road from the victim.  I'm assuming is
```

Page 211

```
1   what Mr. Hader wrote; is that fair?
2       A    I'm not speculating that.
3       Q    Okay.
4       A    I'm not disagreeing with you.
5       Q    Well, did -- during your investigation, prior
6   to the Grand Jury testimony in April of 2012, did you
7   learn that Allen Helton lived down the road from
8   Katherine Mills at the time of the homicide?
9       A    I cannot remember.  I thought he lived on
10  Morris Creek.  I'm not for sure.  He at -- could have at
11  one time moved there.
12      Q    Okay.  Aside from that, do you generally agree
13  with the other information provided here?
14      A    Oh, I've not read the back but the front --
15      Q    On the first page?
16      A    -- for this page, yes.
17      Q    Okay.
18      A    I'll read the back.
19      Q    Well, hold on.  Let me ask you about the back
20  in a second.  Is it fair to say, sir, that as the
21  investigating officer, that you would have provided this
22  information, aside from that one last sentence in the
23  second paragraph that -- but would you have been the
24  person responsible for providing this information to the
25  polygrapher?
```

Page 212

```
1       A    Yes.
2       Q    Okay.  So -- and you don't -- aside from the
3   last sentence of the second paragraph, you don't dispute
4   any of the information in here, correct?
5       A    Yes, on what I've read on the first page.
6       Q    Okay.  And this is some of the information
7   that caused you to initiate a polygraph exam, not only
8   for Allen Helton, but for Jessie Lawson as well,
9   correct?
10      A    Yes.
11      Q    Okay.  So earlier you testified that Allen
12  Helton was a person of interest in the Mills
13  investigation and was never a suspect.  Do you recall
14  testifying to that effect?
15      A    I remember saying that he was a person of
16  interest, yes.
17      Q    Okay.  Do you see the first sentence of the
18  second paragraph where it says "The examinee is
19  suspected in this investigation because he was known to
20  leave for Florida on the same day of the victim's death
21  and traveling with a Mike Simpson."  Do you see that,
22  sir?
23      A    Let's see -- yes.
24      Q    Okay.  And you told Mr. Hayden that
25  information prior to him conducting a polygraph exam,
```

Page 213

```
1   correct?
2       A    Summarized.  I didn't say those exact words.
3   Like I say, I didn't prepare this report.
4       Q    Sir, are you testifying here under oath today
5   that you did not, at any time, tell the KSP polygraph
6   examiner that James Allen Helton was a suspect in the
7   investigation?
8       A    Well, this says suspected.  I'm not going to
9   argue with that.  But all I'm saying for the record, I
10  didn't prepare this report.  I don't remember exactly
11  what I told the polygraph examiner, but I don't disagree
12  with anything in here.
13      Q    So you don't disagree that you suspected that
14  James Allen Helton killed Katherine Mills at least as of
15  January 21, 2011?
16      MR. WRIGHT:  Object to form.  Answer best you can.
17      A    I had reason to believe that he could possibly
18  be involved in this investigation.  I did not have
19  anything that said he killed Ms. -- or Ms. Mills, or
20  Katherine.
21      Q    Okay.  Now, did you meet with the KSP
22  polygrapher prior to     tests being -- or examinations
23  being conducted of Allen Helton and Jessie Lawson on
24  January 21, 2011?
25      A    Prior to the 21st?  No, I don't believe I did.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 214

1    Q    Sorry, did -- I'm sorry.  It was a bad
2  question.  Prior to -- on January 21, 2011, that's when
3  Mr. Lawson and Mr. Helton had their polygraphs
4  conducted, correct?
5    A    Yes.
6    Q    Okay.  And did you drive Mr. Lawson and Mr.
7  Helton down to Frankfort to have the examinations done?
8    A    I believe so, yes.
9    Q    Okay.  Were they in the same car with you or
10  different cars?
11    A    I don't remember.  They possibly -- I don't
12  remember how the sitting arrangements were.
13    Q    Were they handcuffed?
14    A    I don't believe so, no.  I don't remember.
15    Q    Okay.  Now, looking at the backside of your
16  report, sir.  Or not your report but looking at the
17  backside of this report, do you see where it says,
18  second paragraph, "Based on series 1 of a polygraph
19  examination conducted on January 21, 2011, it was
20  concluded that deception was indicated when the examinee
21  was answering the relevant questions.  The relevant
22  questions utilized during series 1 were as follows:"  Do
23  you see that, sir?
24    A    Yes.
25    Q    Okay.  And you were provided with this report

Page 215

1  prior to testifying to the Grand Jury in April 27, 2012,
2  correct?
3    A    Yes.
4    Q    Okay.  And you reviewed this report after
5  being provided with it, correct?
6    A    Yes.
7    Q    Yeah. And those questions are: "Did you
8  participate in any way in the death of that woman?"
9        Answer: "No."   "Did you hit that woman in the
10  head?"
11        Answer: "No."   "Did you steal any of the
12  money from that woman?"  Answer: "No."  Do you see those
13  questions and answers?
14    A    Yes.
15    Q    Did you review those questions and answers
16  prior to testifying at the Grand Jury on April 27, 2012?
17    A    Yes.
18    Q    Okay.  So you knew that deception was
19  indicated when Allen Helton denied participating in the
20  death of Katherine Mills, correct?
21    MR. WRIGHT: Object to form.  Answer best you can.
22    A    Restate the question, please.
23    Q    You knew when you testified at the Grand Jury
24  in April 27, 2012, you knew at the time you testified
25  that deception was indicated when Allen Helton denied

Page 216

1  participating in any way in the death of Katherine
2  Mills, correct?
3    A    Yes, on the polygraph.  Yes.
4    Q    Yes.  And you knew by the time you testified
5  at the April 27, 2012 Grand Jury that deception was
6  indicated when Allen Helton denied hitting Katherine
7  Mills in the head, correct?
8    A    Yes.
9    Q    And you knew when you testified before the
10  Grand Jury April 27, 2012 that deception was indicated
11  when Allen Helton denied stealing any money from
12  Katherine Mills, correct?
13    A    Yes.
14    Q    Okay.  After Allen Helton failed -- well, let
15  me withdraw that question.  Would you consider that
16  Allen Helton failed the polygraph examination based on
17  the results before you?
18    A    Yes.
19    MR. WRIGHT: Objection to form.  Answer best you
20  can.
21    A    Yes.  And later in the investigation, he did
22  state the reason why he failed it is because of the
23  knowledge that he did have, but that he did not
24  participate but he felt like because he knew at the time
25  who he thought who had done it and the money that was

Page 217

1  spent in Florida.
2    Q    He never documented that in a police report,
3  correct?
4    A    If it's not in the case then, no.
5    Q    Okay.  Now, and you never informed the Grand
6  jury of that, correct?
7    MR. WRIGHT: Object to form.
8    Q    You can answer.
9    A    Not that I remember, no.
10    Q    Yeah. So after Allen Helton failed the
11  polygraph, what investigation did you do to determine
12  whether he was involved in Katherine Mills' death?
13    A    Well, you know, after this point we knew that,
14  or we suspected -- obviously a polygraph is not
15  admissible in Court and it's just another tool or a
16  tactic that we use.  So with him still being a person of
17  interest, having deception -- (intercom interruption)
18  sorry.
19    Q    Go ahead.
20    A    I keep thinking I have to stop for her.
21    Q    Investigative tool.  Polygraph results are an
22  investigative tool that you use.
23    A    Okay.  I just totally lost my train of
24  thought.  So anyway, if we were continuing to look at
25  those and it wasn't like I woke up one day and decided



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 218

1 that Allen Helton was no longer a person of interest,
2 but we started getting other information from witness
3 statements without me going through all of them that led
4 other places.
5 Q Let me ask it another way. Okay, Mr. York?
6 A okay.
7 Q Let me as it a better way. Okay?
8 A Okay.
9 Q Bad question. Did you draft a single police
10 report after Allen Helton failed his polygraph on
11 January 21, 2011? Did you -- between that date and the
12 time you testified at the Grand Jury, April 27, 2012,
13 did you draft a single police report in that timeframe
14 about any investigation you conducted to determine
15 whether Allen Helton or Mike Simpson were responsible
16 for the death of Katherine Mills?
17 A Other than the statement that I -- I think I
18 had another statement between that time. I'm not sure
19 on the exact date of Allen Simpson when he stated to me
20 --
21 Q Allen Helton.
22 A Allen Helton. What did I say?
23 Q Simpson.
24 A I apologize.
25 Q Sure. I get it.

Page 219

1 A Allen Helton, other than he gave the statement
2 saying what he had heard Amanda and William Lester talk
3 about that, but other than that, no.
4 Q Okay. So you took a statement from Allen
5 Helton, we're going to get into that, right? Sometime
6 in 2012 you took Mr. Helton's statement, right?
7 A Yes.
8 Q His statement implicated plaintiffs in this
9 murder, correct?
10 A Yes.
11 Q Okay. Aside from the statement that you took
12 from Allen Helton, was there a single police report that
13 you drafted or interview that you conducted into whether
14 Allen Helton or Mike Simpson or Jessie Lawson were
15 responsible for the murder of Katherine Mills?
16 A Off the top of my head, I do not. At least I
17 don't remember no witnesses coming forward saying that
18 they bragged about doing it or anything like that, no.
19 Q Between the time you took Allen Helton's
20 statement and the time that he failed the polygraph, you
21 did not speak to a single witness about whether Allen
22 Helton or Mike Simpson or Jessie Lawson were responsible
23 for the murder of Katherine Mills, correct?
24 A I don't remember talking to anybody who said
25 that they saw or heard -- make sure I back up. I don't

Page 220

1 remember talking to any witnesses that said that they
2 saw them at Katherine's house or that they bragged about
3 robbing her or killing her like the rest of them had.
4 Q Yeah. In fact, you got this Post-it note from
5 Mike Simpson that you saw earlier on December 24, 2010,
6 correct?
7 A Yes, the one you showed her earlier.
8 Q Yep. And you did not draft a single police
9 report about making contact with any witness on that
10 Post-it note to determine whether they were, in fact, an
11 accurate alibi for Mike Simpson or Allen Helton during
12 the time of the Mills' homicide, correct?
13 A That is -- that is correct but regardless of
14 what was on the alibi note, would not suggest if they
15 did or did not do it. I mean, if I had it -- some --
16 first of all, if I had somebody who, a witness that
17 stated that they was with them during the time then
18 obviously I would have put that in the case or that they
19 saw him do that, but to my -- best I remember, there was
20 nothing like that.
21 Q Aside from Vernon Bennett, you didn't talk to
22 a single person on that Post-it note to determine
23 whether they were an alibi for Mike Simpson and Allen
24 Helton, correct?
25 MR. WRIGHT: Object to form and foundation. Answer

Page 221

1 best you can.
2 Q Correct?
3 A I don't remember. I believe that I did check
4 with the East Knox.
5 Q Who?
6 A East Knox Water District. I think he said he
7 paid the water bill and going by recollection, I'd have
8 to look at it but --
9 Q Yeah.
10 A -- as far as taking any statements, no.
11 Q And when you talked to the water district, you
12 actually learned that Mike Simpson paid cash for his
13 water bill after the time of the Mills homicide, right?
14 A Possibly. That seems correct.
15 Q Yeah. He didn't document that in any police
16 report, correct?
17 A No.
18 Q Never before the Grand Jury about that,
19 correct?
20 A No, because I was not appearing before Mike
21 Simpson, but yes, that's correct.
22 Q Okay. So I'm going to show you what we're
23 going to mark as out of order as Exhibit number 23. This
24 is KSP 47488. Sir, take a look at this. Mr. York,
25 that's your handwriting, correct?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 222

(EXHIBIT 23 MARKED FOR IDENTIFICATION)

1
2    A    Yes.
3    Q    Okay.  You wrote these notes, right?
4    A    Yes.
5    Q    Yep.
6    A    I did not write the back page.
7    Q    Okay.  You wrote the front page, 487, correct?
8    A    Yes.
9    Q    Okay.
10   A    Is this page here what you're talking about?
11   Q    Yep.
12   A    Not this one.
13   Q    Front page, 48 -- KSP 487 at the bottom,
14   right?
15   A    Yes.
16   Q    Ad if you flip it over, see right where it
17   says KSP 487?  I'm sorry, you're right.  Go back and
18   then look at the KSP 487 at the bottom, turn it around
19   like a clock.  See that fax?  See it?
20   A    It's been cut off.
21   Q    Yeah.
22   A    I think it says the 23rd of '10, Cumberland
23   Valley Electric.  Can't really tell the numbers.
24   Q    On December 23, 2010 at 10:45 a.m. you faxed
25   this -- these notes to somebody from the phone number

Page 223

1    606-523-2698; is that right?
2    MR. WRIGHT: I'll object to form and foundation.
3    Answer as best you can.
4    A    Is that the sending number or receiving
5    number?  I'm not sure.
6    Q    You probably wouldn't be receiving your own
7    notes, right?  Nobody is faxing you your own notes?
8    MR. WRIGHT:  I'll object to form.
9    A    Well, you know, it's also speculate -- the
10   only thing I'm trying to point out I don't know if that
11   was the receiving number or the sending number.  That's
12   it.
13   Q    All right.  Well, you've got a number of area
14   drug dealers written on here, right?
15   A    Yes.
16   Q    These are people that you suspected could have
17   been involved in the murder very early on in the
18   investigation; is that right?
19   A    No.
20   Q    No?  Then what is this on here for?
21   A    These -- I believe these were possibly the
22   names that we got from the saw mill and possible drug
23   dealers in the area.
24   Q    Okay.  Allen Helton was on there, right?
25   A    Yes.

Page 224

1    Q    Number 7?
2    A    Yes, sir.
3    Q    Okay.  You wrote Allen Helton, correct?
4    A    Yes.
5    Q    Bob Smith is on there, right?
6    A    Yes.
7    Q    Okay.  Persons of interest at the bottom.  Do
8    you see that?
9    A    Yes.
10   Q    Okay.  Sir, did you write the names of these
11   persons of interest?
12   A    Yes.
13   Q    Okay.  Mike Simpson is on there, right?  Number
14   4?
15   A    Mine is cut off, but I'm not -- it looks -- it
16   appears that way.
17   Q    Yeah.  It says "Mike Simpson left December 21,
18   2010 for Florida.  Pills to --"
19   A    Mine says --
20   Q    What does that say after?
21   A    Mine's been like cut off.
22   Q    Okay.
23   A    I can't --
24   Q    "Bob Smith" -- well, it looks --
25   A    I'm not arguing with you.

Page 225

1    Q    Okay.  But it looks like you wrote that Mike
2    Simpson left on December 21, 2010 for Florida.  Something
3    relating to pills.  And then it looks like your -- you
4    may have implied that "something Bob Smith drug dealers
5    this month for 5,000."  Were you implying that Mike
6    Smith owes drug dealers $5,000 that month?
7    MR. WRIGHT:  Object to form.  Answer best you can.
8    A    First of all, as far at that line that you
9    were having trouble reading, I have no idea what it says
10   and I'm not going to assume you're correct or incorrect
11   on that.  As far as Bob Smith goes, I believe through
12   the course of the investigation, and I -- I don't
13   remember exactly what this thing, as far as this month
14   for 5,000, but it seems like that Mike Simpson might
15   have owed or took or stole money from Bob Smith, best I
16   can remember.
17   Q    Now, sir, did you ever -- well, strike that.
18   Why didn't you ever document that information in a
19   police report?
20   A    I'm assuming this was given in the police
21   report as far as I know.
22   Q    Well, this document was not turned over to the
23   Commonwealth Attorney's Office.  Why not?
24   MR. WRIGHT:  Object to form and foundation. Answer
25   best you can.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 226

1    A    Well, I'm assuming I turned this over. I'm
2  not trying to hide it. I mean, I gave it -- you-all got
3  it somehow.
4    Q    You should have -- sure. And we found this in
5  the KSP file. It says KSP 487, so this is in the
6  homicide file at KSP, but this was not -- I'll represent
7  to you that this was not located in Jackie Steele's file
8  at the Commonwealth Attorney's Office. My question to
9  you is: why didn't you turn this note over to Mr.
10  Steele's office?
11    A    I'm not saying I didn't. I cannot speculate
12  why this was in one file and not in the other.
13  Obviously, I'm not trying to hide it or anything that
14  you're trying to assume -- assuming like that. But I
15  can't speculate on why it's not.
16    Q    Okay. Now, I'm going to ask you some
17  questions about those persons of interest at the bottom.
18  Okay? Or I'm sorry -- yes, at the bottom. 1 through 6.
19  See it?
20    A    Yes.
21    Q    Yes. Did you ever draft a single police
22  report as to why Hank Smith was a person of interest in
23  the Mills' homicide?
24    A    No.
25    Q    Did you ever draft a single police report

Page 227

1  about why Bradley Broughton was a person of interest in
2  the Mills homicide?
3    A    No.
4    Q    Did you ever draft a single police report
5  about why the Blankenship brothers were persons of
6  interest and then excluded apparently through you
7  crossing them out, in the Mills' homicide?
8    A    No.
9    Q    Did you ever draft a single police report
10  about Davey Houghton being a person of interest in the
11  Mills' homicide?
12    A    I'm not trying to correct you but --
13    Q    Daffey.
14    A    -- it's Daffey.
15    Q    Okay. Sorry. What about Daffey? Never
16  drafted one, right?
17    A    No.
18    Q    Okay.
19    A    That's Allen's father.
20    Q    So Allen's father was a person of interest for
21  you in the Mills homicide investigation as of December
22  23, 2010; is that right?
23    MR. WRIGHT: I'll object to the form of the
24  question. Foundation.
25    Q    You can answer.

Page 228

1    A    This list was attained -- I got these names
2  from when I talked to the saw mill. And I believe there
3  is a supplement in the case where I went to a saw mill
4  that was in close proximity to the -- or the victim's
5  house.
6    Q    Sure.
7    A    And I think these names came from that as far
8  as people throwing out names. Now, as far as a specific
9  thing that Hank Smith did, I don't recollect anybody at
10  the saw mill telling me a specific thing. Number 2,
11  Bradley Broughton, do I need to hang on?
12    Q    No, you keep going, sir.
13    A    I don't remember any specific thing that
14  anybody told me about Bradley Broughton other than, you
15  know, like suspected drug dealers or people of interest.
16  You know, Mike Simpson, Daffey Helton, Dustin Abner, and
17  so on.
18    Q    Is Mr. Broughton related in any way to Chief
19  Mike Broughton from the Barbourville Police Department?
20    A    I do not know.
21    Q    Okay. Now, sir, in the report that you
22  discussed, do you recall actually writing the names of
23  these persons of interest in that report?
24    A    I don't recollect. I can look at it if you
25  have it.

Page 229

1    Q    I'll give it to you later on. I'll represent
2  to you that I have not seen these neither.
3    MR. WRIGHT: Object to form.
4    Q    But I will show you that report later on. What
5  -- you didn't draft a single police report about any
6  investigation that you did into the people labeled
7  "persons of interest" on this note, correct?
8    MR. WRIGHT: I'll object to the form and
9  foundation. Answer best you can.
10    Q    You can answer.
11    A    Okay. There -- not to my knowledge there's
12  not a police report on Ernie Hammonds, Wendell Smith,
13  Randy Burnett on that list or on down or where it says
14  "Person of interest: Hank Smith, Bradley
15  Martin, Dustin Abner or Daffey Helton" because I never
16  did have witnesses or somebody that came to me and said,
17  you know, again, they bragged about doing it or anybody
18  to say that I seen them there.
19    Q    Let me make this more simple. Is it fair to
20  say that you didn't do any investigation into any
21  persons of interest listed on that sheet, sir?
22    MR. WRIGHT: Object to form and foundation.
23    A    I did not have any more information on these
24  individuals that would suggest that they were involved
25  in this incident.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 230

1    Q   That's a little bit different answer.  What

2    I'm asking you is:  did you do -- after you

3 wrote down these persons of interest, what investigation

4 did you do into each of these people to determine

5 whether they were involved in Katherine Mills' homicide?

6    A   On each individual?  I believe Ernie Hammonds,

7 I went to his house but he denied knowing anything as

8 far as -- he denied selling drugs.

9    Q   Sorry.  We're down here.  I'm talking about

10 the persons of interest in that homicide of Katherine

11 Mills, not the drug dealers.

12    A   Oh, I'm sorry.

13    Q   With regard to these people, did you do any

14 investigation to determine whether they were involved in

15 the murder?

16    A   Well, you know, I interviewed Mike Simpson,

17 and then obviously James Helton.  You know, Bob Smith, I

18 talked to him about whether or not Michael -- or Mike

19 Simpson was involved in that in any way.

20    Q   Now, with regard to Bob Smith, you never

21 created a police report based on your conversation with

22 him, correct?

23    A   On this particular incident, no.

24    Q   Well, what other incident would you have done

25 a report from Bob Smith on?

Page 231

1    A   He's been arrested a lot over the course of

2 the years.

3    Q   Okay.  Yeah.  So with regard to your contacts

4 with him relating to the Katherine Mills homicide

5 investigation, you did not create a single police report

6 relating to those contacts, correct?

7    A   That is correct.

8    Q   All right.  We're going to play 16:41

9 to 17:45 of your Grand Jury testimony, sir.  Please

10 listen to this because I'm going to ask you some

11 specific questions about this recording.  Okay?

12    A   Yes.

13    Q   Thank you.

14    (AUDIO CLIP PLAYED FROM THE GRAND JURY)

15    Q   Sir, is that the way you testified before the

16 Grand Jury on April 27, 2012?

17    A   Yes.

18    Q   And you told the Grand Jury, in fact, that

19 Allen Helton didn't pass the polygraph, correct?

20    A   Yes.

21    Q   And then you told the Grand Jury that Allen

22 Helton didn't pass the polygraph exam pertaining to

23 questions about money, correct?

24    A   They was --

25    Q   Answer it, sir.

Page 232

1    MR. WRIGHT:  I'll object.

2    MR. SLOSAR:  No.

3    MR. WRIGHT:  You asked him a question.  Let him

4 explain it.

5    MR. SLOSAR:  This is a -- this is a yes or no

6 question.

7 BY MR. SLOSAR:

8    Q   Did you tell the Grand Jury that Allen Helton

9 did not pass a polygraph exam but only about certain

10 questions about money?

11    MR. WRIGHT:  Object to form.

12    Q   Yes or no?

13    A   I believe that is correct based on, if I

14 remember, at the polygraph, the examiner told me certain

15 questions.  For some reason, I thought that -- and I

16 know what the report says but I can only tell you that

17 what I remember him telling me about that.

18    Q   Okay.  Well, you reviewed this report -- you

19 testified earlier under oath that you reviewed this

20 report prior to going into the Grand Jury on April 27,

21 2012, correct?

22    A   Yes.

23    Q   Okay.  And I don't mean to be rude but you can

24 read and comprehend, right?

25    A   Yes, sir.  I'm not -- I'm not saying that this

Page 233

1 form doesn't say exactly what it says.

2    Q   And you read this form prior to testifying

3 before the Grand Jury, right?

4    A   Yes, but what I'm telling you is that at the

5 polygraph of -- the way I understood the polygraph

6 examiner, that was because of that.

7    Q   Mr. York, I'm sorry.  Prior to April 27, 2012,

8 did you understand the meaning of "Did you hit that

9 woman in the head?"  Answer:  "No."  Did you understand

10 what that meant before testifying at the Grand Jury?

11    MR. WRIGHT:  Object to form.

12    Q   Yes or no?

13    A   Yes, I -- I know what it meant.

14    Q   Okay.  And did you understand, prior to

15 testifying at the Grand Jury on April 27, 2012, the

16 question:  "Did you participate in any way in the death

17 of that woman?"  Answer:  "No."  Did you understand that

18 question, sir?

19    A   Yes.

20    Q   Okay.  And sir, you testified to the Grand Jury

21 that Mr. Helton didn't lie to the polygrapher about

22 whether he killed Ms. Mills or not, correct?

23    MR. WRIGHT:  Object to form.

24    A   Yes, I did do that.

25    Q   Okay.  And you told the Grand Jury that Mr.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 234

1  Helton did not lie when he was questioned about whether
2  he was involved in the murder of Ms. Mills, correct?
3      A   Yes, that's what I was told from the
4  polygrapher examiner.
5      Q   Okay.  And -- but you agree with me that that
6  testimony was not accurate based upon the information
7  you learned in this polygraph report?
8      MR. WRIGHT: Object to form.
9      A   I will say that it is easy to read this and
10 come to that terms, but when I was saying that in the
11 Grand Jury, I was -- wasn't misleading to what I
12 understood the polygraph examiner telling me.
13     Q   So what you're saying is that the polygraph
14 examiner from the Kentucky State -- State Police, a
15 person named Marvin Hayden, that that examiner told you
16 information that was the opposite of what you learned
17 when you read this report?
18     MR. WRIGHT: Object to form.  Answer best you can.
19     A   No, I'm not saying that.  What I'm saying is
20 that I understood it differently and that -- about the
21 polygraph.
22     Q   The information that you provided to the Grand
23 Jury about Mr. Helton not lying when questioned about
24 his involvement in the murder of Ms. Mills, that was not
25 accurate, right?

Page 235

1      MR. WRIGHT: Object to form.
2      A   It was accurate based on my belief at the
3  time, yes.
4      Q   Well, it was not accurate based upon the
5  report that you reviewed prior to going into the Grand
6  Jury?
7      A   I agree, it isn't.  It would tend to look
8  different by this report.
9      MR. WRIGHT: Object to form on that.
10     Q   Okay.  Now, on -- I'm going to show you what
11 is Exhibit number 19.  The report you did with Mr.
12 Helton.  Did you draft that report Mr. York?
13             (EXHIBIT 19 MARKED FOR IDENTIFICATION)
14     A   Yes, it appears that on March 8, 2012 is when
15 the report was prepared.
16     Q   Yeah, you prepared that report, right?
17     A   It would appear that way, yes.
18     Q   And that's based upon a recorded statement
19 that you took with Allen Helton on that date, correct?
20     A   Yes.
21     Q   And present for the interview and the recorded
22 statement was Sheriff Pickard; is that right?
23     A   Yes.
24     Q   Okay.  And did Sheriff Pickard ever leave the
25 room when you met with Allen Helton on March 8, 2012?

Page 236

1      A   I do not remember if he left the room or not.
2      Q   But he was present for the interview that took
3  place between yourself and Mr. Helton prior to you
4  turning on a recorder; isn't that right?
5      A   Yes.
6      Q   And did you draft this report based on your
7  March 8, 2012 interview with Mr. Helton?
8      A   Yes.
9      Q   And this is fair to say that this report
10 summarizes the recorded statement that you took from Mr.
11 Helton on that date?
12     A   Yes.
13     Q   Okay.  This report does not summarize the
14 conversation that you and Sheriff Pickard had with Mr.
15 Helton prior to the recorder being turned on, correct?
16     MR. WRIGHT: Object to form.  Foundation. Answer
17 best you can.
18     A   I don't remember what we discussed beforehand.
19 I'm sorry.  I can't answer that.
20     Q   Is it fair to say you don't have any
21 recollection of what you told Allen Helton on March 8,
22 2012 before the recorder was turned on?
23     A   No.  Not off the top of my head, no.
24     Q   You don't have any notes at home that would
25 refresh your memory, right?

Page 237

1      A   No.
2      Q   Okay.  And fair to say that you don't recall
3  what Sheriff Pickard would have told Allen Helton before
4  that recorder was turned on on March 8, 2012 with Allen
5  Helton?
6      A   No, I don't remember anything in particular.
7      Q   Is it fair to say that you don't recall what
8  Allen Helton was telling you and Sheriff Pickard before
9  the recorder was turned on?
10     A   Not -- again, I don't remember no particulars.
11     Q   Yeah.  And you don't have anything at home
12 that would refresh your memory, right?
13     A   Yes.
14     Q   Okay.  Now, you drafted this report on March
15 8, 2012; is that right?
16     A   Yes.
17     Q   Okay.  Did you give a copy of this report to
18 Mr. Pickard at some point in your investigation?
19     A   I don't believe so.  There would be no need
20 for me to give this report to Mr. Pickard.  I don't
21 remember giving it to him, no.
22     Q   Okay.  Well, did you talk to Mr. Pickard after
23 interviewing Mr. Helton on March 8, 2012?
24     A   Did I talk to him?  I probably did.
25     Q   Why was Mr. Pickard present for Mr. Helton's

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 238

1  questioning on March 8, 2012?

2      A    Sheriff Pickard would help me through the
3  investigation just like any other police officer would.
4  I don't remember the particulars why he was there on
5  that particular date and time.

6      Q    So Mr. -- Sheriff Pickard was assisting you in
7  the investigation; is that right?

8      A    He would help on various people if I didn't
9  know where they would live or stuff like that.  One, you
10  know, was Wesley Row Arkansas.  You don't want me to go
11  on with that, do you?

12      Q    No, no.  And Sheriff Pickard, he was working
13  with you in the investigation into Katherine Mills'
14  death, correct?

15      A    I would not say working.  He helped me if I --
16  if I asked him a question where somebody was at or
17  something like that.  But as an active role in
18  investigating, I think that would be incorrect to say,
19  in so many words of that nature, if that makes sense.

20      Q    Sure.  How long did the questioning between
21  you and Mr. Pickard and Mr. Helton -- how long did that
22  questioning last before you decided to take a recorded
23  statement from Allen Helton on March 8, 2012?

24      A    Again, I would go back to what I previously
25  answered, which is when I said that, I don't know the

Page 239

1  particulars on what exactly was said.  I apologize.  I
2  should have reiterated I don't know the exact times that
3  we got together for anything like that.  Does that
4  answer your question?

5      Q    Sure.  And is it fair to say that you don't
6  recall the tactics you used with Allen Helton prior to
7  turning on the recorder on March 8, 2012?

8      A    No, but if you want to listen to it, I'll try
9  to help you out.

10      Q    My question is a little bit different.  Prior
11  to turning on the recorder, is it fair to say that you
12  don't recall which questioning tactics you used with Mr.
13  Helton that day?

14      A    No, like I previously stated I don't remember
15  any of the particulars of what the conversation took
16  place.  I don't remember any specific tactics that I may
17  or may not have used.  I do not remember the specific
18  time that it may or may not started or ended.

19      Q    Okay.  Sir, isn't it true that at some point
20  prior to April 27, 2012, when you testified before the
21  Grand Jury, that Sheriff Pickard, sitting right over
22  there, told you that he believed that Amanda Hoskins and
23  Jonathan Taylor didn't have anything to do with the
24  murder of Katherine Mills?

25      MR. WRIGHT:  Object to form and foundation.

Page 240

1      A    If it -- I don't remember that particulars or
2  if it's in the case.  If it's in the case then he did.
3  But if it's not in the case, I don't remember him saying
4  that.

5      Q    Sheriff Pickard told you prior to you seeking
6  charges against Amanda Hoskins and Jonathan Taylor, that
7  he believed that they were innocent of this crime; isn't
8  that true, sir?

9      MR. WRIGHT:  I object to form and foundation.

10      A    I don't remember him telling me that.

11      Q    So if Sheriff Pickard told you that in front
12  of some witnesses who are going to come in here and
13  testify in this case, would you be saying that they're
14  lying or are you saying that you don't remember?

15      MR. WRIGHT:  Object to form and foundation. Answer
16  it best you can.

17      A    I can tell you, I don't remember saying that.
18  I don't know why they would lie about that, but I don't
19  remember seeing that document and what -- when he told
20  me that or what the details was behind it.

21      Q    You're not saying it didn't happen.  You're
22  saying you don't remember, right?

23      A    I can tell you that if Sheriff Pickard had
24  information that was pertinent to this case that would
25  result, or that would indicate that Amanda or Jonathan

Page 241

1  was not guilty, either from some type of piece of
2  physical evidence or some sort of witness statement,
3  then I would have put it into the case.  I don't
4  remember no opinions given or what ifs or anything like
5  that.

6      Q    You agree that there's a lot of information
7  that you did not document in this case, right?

8      MR. WRIGHT:  Object to the form.  Go ahead.

9      Q    Okay.

10      A    No, I disagree with that.  If they was a
11  person that my views was a witness.  And when I consider
12  that they are a witness, that is somebody who can
13  testify that they saw a potential, or they saw a person
14  at Katherine Mills' house or that a person bragged to
15  them that they could testify, hey, such and such person
16  bragged to me about doing it or being involved in it,
17  then that -- I would have put that in --

18      Q    You should have documented that type of
19  information, right?

20      A    Yes.

21      Q    All right.  We're going to get there later.
22  Now, in the first paragraph of this report, you state
23  that in an earlier conversation with Allen, he stated he
24  knew who was involved with the murder of Katherine Mills
25  and saw some of the money the individuals have stolen.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 242

1  Do you see that? It's the last sentence of the first
2  paragraph?
3      A   Is it something I need to read the entire or
4  just the last?
5      Q   No, just that last sentence. That's all I'm
6  asking you.
7      A   Yeah, that sentence is in this.
8      Q   Okay. You wrote that sentence down, right?
9      A   Yes.
10     Q   Okay. And sitting here today, would you agree
11 that you -- well, prior to March 8, 2012, when did Allen
12 Helton inform you that he knew who was involved with the
13 Mills' homicide? What date?
14     A   I do not recall what particular date.
15     Q   That's because you never drafted a report when
16 Allen Helton supposedly told you that, correct?
17     A   No, see. This date report dates 3-8-2012. I
18 don't remember being another one drafted.
19     Q   Yeah, so in your report you say "Allen Helton
20 told me he knew was -- who was involved with the murder
21 of Katherine Mills" prior to the conversation you were
22 having with him on March 8, 2012. That's what this
23 sentence says, right?
24     A   Yes.
25     Q   Okay.

Page 243

1      A   The thing about Allen Helton was every time we
2  talked to him, or I talked to him, I should say, that he
3  would tell a little bit more. And I mean, and it was
4  every time it was something different, he added
5  something more or would take away something more. He
6  said -- at one time, I think he said, "I think," but he
7  said, "I don't know." Then he said, "I know." And it
8  was always going -- it was always a, you know, an
9  ongoing thing with him.
10     Q   Okay. You know what sir?
11     A   And then -- I'm sorry. Go ahead.
12     Q   No, no. I'm sorry. I'm not meaning to cut
13 you off. But let me hand you, this is the recorded
14 statement that you took from Allen Helton at some point
15 on March 8, 2012, Exhibit number 20. I'll give a copy
16 to your counsel. Now, focusing in on this report,
17 though, Exhibit 19, is it fair to say that the statement
18 you drafted and the interview and recording that you
19 conducted with Sheriff Pickard on March 8, 2012 with
20 Allen Helton, that his statement implicates Ms. Hoskins
21 and Mr. Taylor in the murder of Ms. Mills?
22          (EXHIBIT 20 MARKED FOR IDENTIFICATION)
23     A   I would need to take time to read this before
24 I made any suggestions.
25     Q   This is a summary -- this is a narrative of

Page 244

1  your statement, right?
2      A   This is, yes.
3      Q   Okay. Sitting here today, do you recall that
4  the statement that you took from Allen Helton on March
5  8, 2012 implicated the plaintiffs in this case?
6      A   Let me read this.
7      MR. SLOSAR:    Okay. Let's go off the record
8  while he reads this.
9      VIDEOGRAPHER: Off the record at 2:44.
10          (OFF THE RECORD)
11     VIDEOGRAPHER: Back on the record at 2:55.
12 BY MR. SLOSAR:
13     Q   Sergeant York, taking a look at the report
14 that's before you, and I know over the break you
15 reviewed the transcript relating to the recording from
16 Mr. Helton, to some respect, is it fair to say that the
17 statement that you and Sheriff Pickard took from Mr.
18 Helton on March 8, 2012, implicated Amanda Hoskins and
19 Jonathan Taylor in the murder of Katherine Mills?
20     A   I would -- definitely Amanda Hoskins. I'm not
21 seeing over here where it says Jonathan at. He said he
22 heard that Jonathan Taylor helped Amanda -- the very
23 last sentence. Yes.
24     Q   Okay. And actually, Mr. Helton's statement
25 implicated Jonathan Taylor, Amanda Hoskins and William

Page 245

1  Lester in the murder of Katherine Mills, correct?
2      A   Yes. I think on this -- this sentence here
3  where it says he heard, I don't think it implied that he
4  heard Jonathan person-to-person.
5      Q   Sure. Like he heard -- he allegedly heard
6  somebody else put Jonathan's name in it?
7      A   Yes.
8      Q   Okay. Now, I know you said earlier you
9  couldn't recall what you or Sheriff Pickard said to Mr.
10 Helton before the recorder turned on, right?
11     A   That is correct. I said that.
12     Q   Okay. Did you provide any information to Mr.
13 Helton about the homicide before the recorder was turned
14 on?
15     A   I do not remember if -- what we -- exactly we
16 talked about. AS far -- I know one thing I wouldn't
17 have done is, if you're trying to insinuate I would try
18 to get him to say what I wanted to, that's not correct.
19     Q   Okay. Well, one of your tactics was to
20 confront witnesses with information that you believed
21 they knew, right?
22     A   Yes.
23     Q   Okay. Do you recall one way or the other
24 about whether you used that tactic with Mr. Helton
25 before the recorder turned on?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 246

1    A    I don't think I used anything prior to this
2    one. I don't remember using any tactics about that on
3    this particular date.
4    Q    You don't recall -- well, so you don't recall
5    whether you used that tactic with Mr. Helton on a
6    different day?
7    A    No, I do not.
8    Q    Okay.
9    A    Which tactic?
10   Q    Any of your investigation tactics?
11   A    I could have very well. Possible.
12   Q    Yeah.
13   A    Like I said, I don't remember on this specific
14   day.
15   Q    And you don't recall what, if any, tactics
16   Sheriff Pickard, used with Allen Helton prior to the
17   recorded statement on March 8, 2012; is that right?
18   A    That is correct.
19   Q    Detective York, having reviewed the narrative
20   of your -- well, let me ask you a couple specific
21   questions. Do you see where it says, first paragraph --
22   or second paragraph, first sentence. Do you see where
23   it says "Allen stated that on Sunday, December 19, 2010
24   he was pumping gas at Escoes Market in Dewitt when
25   Amanda Hoskins and William Lester approached him"?

Page 247

1    A    Yes, I see that.
2    Q    Okay. And -- and so from reading this
3    statement, would you agree with me that the implications
4    that Allen Helton told you and volunteered that on
5    December 19, 2010, he was pumping gas at Escoes Market
6    in Dewitt when Amanda Hoskins and William Lester
7    approached him, correct?
8    A    He stated that, yes.
9    Q    He provided that information to you is what
10   the report says, right?
11   A    Yes.
12   Q    The report does not say that you provided that
13   information to him, correct?
14   A    No. That is correct.
15   Q    And do you see --
16   A    I'm sorry. What?
17   Q    Sorry. Do you see where it says, in two
18   sentences later, do you see where it says you asked him
19   to explain how Amanda -- "I then asked him to explain
20   how. Amanda told him about tying an old woman up when
21   she came out to the bathroom." Do you see that, sir?
22   A    Yes, I see that sentence.
23   Q    Okay. So according to your report, Mr. Helton
24   told you and Sheriff Pickard that Amanda told him about
25   tying an old woman up when she came out to tie -- when

Page 248

1    she came out to the bathroom; is that right?
2    A    Yes.
3    Q    Okay. So according to your report, Mr. Helton
4    provided that information to you; is that right?
5    A    Yeah, at some point, he provided that
6    information.
7    Q    Okay. And according to your report, you and
8    Sheriff Pickard did not provide that information to Mr.
9    Helton, right?
10   A    About Amanda saying those things?
11   Q    Yes.
12   A    To him, no.
13   Q    Okay. If we go through this report, is it fair
14   to say that Allen Helton told you and Sheriff Pickard
15   all of the information contained here?
16   A    The majority of it. Again, without the
17   particulars, what you said I have agreed on.
18   Q    I mean --
19   A    I don't want you to throw something in that
20   I'm --
21   Q    You and Sheriff Pickard didn't feed this
22   information to Allen Helton during the recorded
23   interview, did you?
24   A    I did not feed him information about -- now,
25   what I may have done, having previous knowledge of that,

Page 249

1    I may have stated something to the effect "Now, isn't it
2    true that you said earlier that this happened, and this
3    happened," he would have said something to the effect of
4    yes.
5    Q    Okay. So you would agree that during your
6    interview with Mr. Helton on March 8, 2012, that you
7    were actually telling Mr. Helton information that you
8    wanted him to agree with relating to the homicide of
9    Katherine Mills; is that right?
10   MR. WRIGHT: Object to form. Answer best you can.
11   A    What I'm telling you is that -- (intercom
12   interruption) -- messes me up. I think I have to be
13   quiet. What I'm telling you is that if I said anything
14   like that, it's information that Allen Helton had
15   already told me.
16   Q    But you don't -- you didn't document what
17   Allen Helton told you before the recorder turned on,
18   right?
19   A    That is correct.
20   Q    Okay. And you didn't document any
21   conversations you had with Allen Helton before January
22   24, 2011, correct?
23   A    January 22 --
24   MR. WRIGHT: I object. Form and foundation.
25   Q    January 24, 2011. I read that you got him to

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 250

1  waive his rights on the 4th.

2      A    If it's in the case, yes.

3      Q    Okay.

4      A    That would be it.

5      Q    This is the only narrative that you ever wrote

6  about information that Allen Helton provided to you

7  during the course of the homicide investigation,

8  correct?

9      A    Yes, other than that other one you talked

10 about.

11     Q    Yep.  Okay.  Detective York -- I'm sorry about

12 that.  Sergeant York, I'm sorry about that.  Sergeant

13 York --

14     A    No, no.  You call me whatever you want to.

15 Let's just get through this.

16     Q    -- I don't mean to be disrespectful.  You're a

17 detective here so I've got it written out.

18     A    It doesn't matter.  Don't apologize.  Let's

19 just roll.

20     Q    Sergeant York, did you or Sheriff Pickard make

21 any promises to Allen Helton prior to his statement

22 being taken on March 8, 2012?

23     A    I know I didn't make him no promises that I

24 can remember.  I can't remember anything else.  What

25 kind of promises are you talking about?  I'm not -- I

Page 251

1  don't remember nothing.

2      Q    Allen Helton had pending cases going on when

3  you met with him on March 8, 2012, right?

4      A    I'm sure he --

5      MR. WRIGHT:  Object to form and foundation.  Just

6  answer best you can.

7      A    I'm sure he has.  I mean, every person

8  involved in this case was -- had skeletons in their

9  closet and definitely not denying that.  But probably,

10 yes.

11     Q    Did you ever tell Allen Helton that you would

12 try to get him out of jail prior to taking his statement

13 on March 8, 2012?

14     A    I don't remember the particulars.  I'm not

15 saying that -- because Allen Helton has -- was always

16 getting in trouble and always wanting something.  Like I

17 said, he was a criminal, skeletons in his closet, he

18 never tried to hide that.  I don't remember which

19 particular case or what he got in trouble for or

20 anything like that.  Because there was times that he did

21 ask me if I would put a good word in for him.  But as

22 far as promising anything like that, I can't deter -- I

23 can't make those promises and I didn't make to him.  But

24 it's something that I would put in a good word for him

25 on something.  And like I said, I don't remember the

Page 252

1  specific charge or anything or the specific date and

2  time.  Because you understand what I'm trying to say?

3      Q    Yeah.  So like -- so Allen Helton at some

4  point prior to you taking his statement on March 8,

5  2012, he asked you to put a good word in for him about

6  some pending case that he had, right?

7      A    That would be fair to say, yes.

8      Q    Okay.

9      A    But as far as the particulars or dates, I --

10     Q    Sure.  You didn't -- you didn't say "No,

11 Allen, I'm not going to do that for you," right?

12     A    As --

13     Q    Here let me -- let me ask a better question.

14 Remember earlier I said I ask bad questions.  Let me --

15     A    I'm glad you agree with that.

16     Q    Yeah.  Yep.  So when Allen said, "Hey,

17 Detective York," at that time you were a detective.

18     A    Just go with it.

19     Q    You know, "I'm helping you-all out and why

20 don't you put in a good word for me because I'm

21 cooperating with you in this investigation."  You didn't

22 say "Allen, I'm not going to do that."  You didn't --

23 you didn't say that to him, right?

24     A    I don't remember saying that, no.

25     Q    Yeah.  Fair to say that you led Allen Helton

Page 253

1  to believe prior to the time he gave you this statement

2  that you would see what you could do about helping out

3  with his pending criminal case?

4      MR. WRIGHT:  Object to form.

5      A    And I'm not trying to be difficult here, but

6  you said earlier I said I would get him out of jail.  And

7  I'm assuming we're referring to one particular charge.

8  I just don't want to get -- I don't want you to tie me

9  up.  You can understand what I'm saying.

10     Q    I get it.

11     A    But if you're saying --

12     Q    Do you recall generally making a promise to

13 Allen Helton that you would seek some sort of relief on

14 his behalf prior to him giving his statement?

15     A    What I would tell Allen Helton is that -- and

16 you know, as I would any other criminal investigation

17 because there's a more than not that's how a lot of

18 criminal cases go is somebody gets in trouble and wants

19 to help themselves and we would put in a good word for

20 that.  Now as far as saying, "Hey, Allen Helton.  I will

21 -- if you say this, this and this and you would be out

22 of jail today."  I didn't say that.  And never would say

23 that.  What I could say, and I don't know the specific

24 dates and times.  I don't want you to try to twist my

25 words.  You say, "If I help you out, would you put in a

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 254

1 good word for me?" And I don't know if this was on this
2 day or day before or any particular days if that's what
3 you're trying to go on.
4    Q    Sure. No, no, no. Just sometime in the
5 investigation you were in contact with Allen Helton. You
6 told him that you would see what you could do for him,
7 right?
8    A    That would be a fair statement. Yes, sir.
9    Q    And would you agree that you never documented
10 that in any of your police reports?
11    A    That is correct.
12    Q    Okay. Now, you later testified before the
13 Grand Jury about the statement that Allen Helton gave
14 you that implicated the plaintiffs in this murder. Do
15 you recall testifying about Allen Helton's statement at
16 the Grand Jury?
17    A    You know, do I recall everything I said in the
18 Grand Jury. But I'm sure I did. I'm sure you wouldn't
19 be lying about it.
20    Q    Okay. And you know, the information that you
21 provided to the Grand Jury about the knowledge that
22 Allen Helton had, is it fair to say that the testimony
23 that you provided about him stemmed from the March 8,
24 2012 police report that you created?
25    A    Absolutely. This would be a part of it.

Page 255

1    Q    And the recorded statement that you took from
2 him as well, right?
3    A    Yeah, that would have been obviously a part of
4 it too.
5    Q    Okay.
6    A    And then, like I say, without knowing
7 apparently exactly what I said, could there have been
8 something else that he might have said. But I would
9 assume and agree that I definitely would have went on
10 with that.
11    Q    Well, you testified at the Grand Jury that a
12 large sum of money was taking from Ms. Mills during her
13 killing, correct?
14    A    Yes, we determined that by -- after it
15 initially happened. Do you want me to go into that?
16    Q    No, no, no. Here, let me ask you a more
17 specific question relating to just Allen Helton. You
18 testified before the Grand Jury that your investigation
19 revealed that one of them, a suspect, showed the money
20 and said, "This is from the job that we had done"; is
21 that right?
22    A    Yes, I remember Allen Helton stating to me
23 that -- I believe that it was on the day of or -- yes,
24 the day of -- when I said day of, the day of the
25 incident with Kathy.

Page 256

1    Q    December 20th, yes.
2    A    That I believe he said that Amanda showed him
3 part of the money and said that, yes.
4    Q    And that information came from the report that
5 you drafted on March 18, 2012 and the recorded statement
6 that you and Sheriff Pickard took of Allen Helton on
7 that same day, correct?
8    A    I'm not saying the same day. If it's in
9 there, it's in there. If it's not, I'm not arguing if
10 it's in there or not.
11    Q    Okay, sure.
12    A    Yes, it came from him.
13    Q    Yeah.
14    A    Either that day or some other day.
15    Q    The statement that you took from him, right?
16    A    Or one of them. I mean, in talking to him.
17    Q    Well, you only took one statement from him,
18 correct?
19    A    Well, I want to say I'm not arguing with you.
20 If it's in there, it's in there.
21    Q    Okay. All right. I'm going to show you
22 what's marked as Exhibit 21, sir. It's K -- wait. You
23 know, I don't think this is --
24         (EXHIBIT 21 MARKED FOR IDENTIFICATION)
25    A    I'm sorry, I didn't follow that.

Page 257

1    Q    Look at this report. I'm not sure that this
2 is actually accurate. But it says KSP Bates number of
3 18073. I don't remember those -- that many documents
4 being produced but anyways. Did you draft this report?
5    A    Yes, sir. I did.
6    Q    When did you draft this report?
7    A    The report date says May 18, 2015.
8    Q    Okay. And what caused you to draft this
9 report, sir?
10    A    I said I talked to Allen Helton on the
11 telephone from Moss County Courthouse. He stated that
12 he was at UK Hospital. He stated that he had infections
13 from all the plates in his head. I didn't put in there
14 he had a car wreck and metal plates. He also
15 advised me that he had lied when he gave his statement
16 about Amanda Hoskins and William Lester at Escoes and I
17 didn't -- he was referring to -- that was the 19th, I
18 believe.
19    Q    Okay.
20    A    On that day and he stated that incident never
21 happened.
22    Q    Okay. So Allen Helton called you on -- prior
23 to you drafting this report on May 18, 2015, correct?
24    A    I don't think he called me if I remember
25 correctly. On that particular day, like I said, there

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 258

1  was so many times that we were supposed to go to trial
2  and it got continued for one thing or the other.  On
3  this particular day, they was a whole bunch of witnesses
4  that was not there.  I think Allen Helton was one of
5  them.  Maybe Michael Crump.  And again, I mean, there
6  was so many I don't remember the specific dates.
7       Q    Sure.
8       A    Maybe one of the --
9       Q    Let me start --
10      A    I'm sorry.
11      Q    I'm sorry, Sergeant York, I'm just going to
12  try to speed this up a little bit.  You had a telephone
13  conversation with Mr. Helton on May 18, 2015, correct?
14      A    Yes, sir.
15      Q    Okay.  In that conversation, Mr. Helton told
16  you in his March 8, 2012 statement that he gave to you
17  was false, correct?
18      A    The -- yes, the statement about the --
19      Q    The statement that implicated the plaintiffs?
20      A    Yes.
21      Q    He said -- he told you it was false, right?
22      A    Yes.
23      Q    Okay.  And it's your testimony that Mr. Helton
24  told you he had an infection around metal plates in his
25  head?

Page 259

1       A    Yes, that's what I remember.  Yes.
2       Q    Okay.
3       A    From a car wreck he had prior to that.
4       Q    Now, did Mr. Helton tell you on that phone
5  call that if he got up there on the stand and testified
6  under oath, that he was going to tell the truth?
7       A    I don't remember him saying those exact words.
8  He told me he lied.  And I can tell you this, I said,
9  "Well, I always just wanted you to tell the truth.  If
10  you lied, tell me."  And he said he lied about it.  And
11  I supplemented and turned it in.
12      Q    Did Mr. Helton tell you in that phone call
13  that if he testified that he was going to say that you
14  fed him all the information that was contained in his
15  March 8, 2012 statement?
16      A    Not at all, no.
17      Q    Did he tell you --
18      A    Absolutely not.
19      Q    -- that he was going to say that the statement
20  you took from him was false?
21      A    Yeah.  I mean, yes, that's what I put in
22  there.  Yes.
23      Q    Did he tell you that he was going to inform
24  the Court that you promised -- that you made promises to
25  him prior to taking his statement?

Page 260

1       A    No, he never did say that.
2       Q    Did he tell you in that phone call that he was
3  actually coming to court and was going to tell the truth
4  about what happened prior to you taking his March 8,
5  2012 statement?
6       A    I don't remember him saying that in those
7  exact words.
8       Q    Sir, have you ever seen medical record showing
9  that Allen Helton wasn't actually at the hospital?
10      A    No, I have not.
11      Q    Prior to today, did anybody ever tell you that
12  Allen Helton was not in the hospital on the day that you
13  talked to him in 2015?
14      A    No, but again, this is getting really close
15  where I was no longer the case officer.  I can't speak
16  on -- because for example, there was times, I believe --
17  and again, there was so many times these were continued.
18  I don't remember if the Commonwealth Attorney said --
19  because they was people not showing up and I think they
20  was wanting to get a warrants out for him for failure to
21  appear or something along those lines.  So on this one,
22  I don't remember exactly.
23      Q    Sergeant York, you understand you're under
24  oath?
25      A    Yes.

Page 261

1       Q    Did you make up the part of this report where
2  it says that Mr. Helton couldn't appear because he was
3  in UK Hospital?
4       A    No, I did not.
5       Q    Okay.  Do you understand what cell phone tower
6  records are?
7       A    Yes.
8       Q    Okay.  And do you understand that there are
9  cell phone tower records that indicate that Mr. Helton
10  was not in a hospital and was actually close to the
11  courthouse at the time that you had a communication with
12  him in May of 2015?
13      MR. WRIGHT:  Object to form and foundation.
14      A    I did not know that.
15      Q    Have you ever seen those records?
16      A    No.  I'm not saying they don't exist.  I'm
17  saying I've never seen them or not aware of anything
18  like that.
19      Q    Sergeant York, was Allen Helton an informant
20  for the Kentucky State Police prior to you taking a
21  statement on March 8, 2012?
22      A    No.  Not that I'm aware of.
23      Q    Okay.  I'm going to show you what is Exhibit
24  22.  Pass it around to your counsel.  PL 4844 through
25  45.  Have you ever seen these documents prior to today?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 262

(EXHIBIT 22 MARKED FOR IDENTIFICATION)

2  A  No, I have not.

3  Q  Okay. Were you aware, prior to taking Allen

4 Helton's statement on -- in this case that he was an

5 informant for Sheriff Pickard and the Knox County

6 Sheriff's Department?

7  A  Was I aware that he was a paid informant? No,

8 I was not aware he was a paid informant.

9  Q  Will you read through this letter from Sheriff

10 Pickard and let me know when you are finished?

11  A  Do you want me to read it out loud?

12  Q  To yourself, sir. To yourself.

13  A  Okay. Do I need to go on and read the rest of

14 it or just this front page?

15  Q  Well, does this refresh your recollection?

16  A  I've never seen this before.

17  Q  You've never seen this before?

18  A  No.

19  Q  Sheriff Pickard ever -- well, do you see where

20 it says that Sheriff Pickard contacted you to come to

21 the sheriff's office to interview Allen Helton?

22  A  Yes.

23  Q  Okay. And is that true that Sheriff Pickard

24 contacted you to interview him?

25  A  I mean, I'm sure he did at times. I don't

Page 263

1 remember if this is the exact day, but yeah. Yes.

2  Q  Did Sheriff Pickard tell you that he had this

3 conversation with Allen Helton about helping him out on

4 his charges?

5  A  Again, I think I told this before. Allen

6 Helton was always wanting help with something because he

7 was always in trouble and never denied that or anything

8 like that. So I don't know what else you are wanting me

9 to say because I'm not going to say no more than what I

10 know.

11  Q  Sure. You knew that Allen Helton was an

12 informant for U.N.I.T.E. prior to testifying before the

13 Grand Jury in April of 2012, right?

14  A  I think he was. I've never --

15  Q  Okay.

16  A  -- this -- that was from what Allen Helton

17 said. I never talked to anybody from U.N.I.T.E to

18 confirm that.

19  Q  Well, Kelly Farris is involved with U.N.I.T.E,

20 right?

21  A  No.

22  Q  He's not?

23  A  Not to my knowledge. He might have been at

24 some time.

25  Q  Go to the page marked 4853.

Page 264

1  A  4853. Okay.

2  Q  All right. Is this an informant agreement

3 with Allen Helton and U.N.I.T.E that was signed in 2009?

4 Do you know?

5  A  What question are you asking me about this?

6  Q  Is this --

7  A  I've never seen this before.

8  Q  Is this an informant agreement between Allen

9 Helton and U.N.I.T.E that was signed in 2009?

10  MR. WRIGHT: I'll object to form. I don't -- he

11 said he's never seen this before.

12  Q  You can answer the question.

13  A  I mean, I'm not saying it's not. I've never

14 seen this form before.

15  Q  Okay.

16  A  But you know, like we talked about earlier, I

17 told you that I thought he was going with U.N.I.T.E.

18  Q  I'll hand you what we'll mark as Exhibit 24.

19 It says -- I can't actually read the Bates stamp 15063

20 to 64, sir.

21  (EXHIBIT 24 MARKED FOR IDENTIFICATION)

22  A  Did you say I need to -- do you want me to

23 read all this?

24  Q  No, no, no. Did you draft this report?

25  A  Yes, I did.

Page 265

1  Q  You drafted this report on when?

2  A  As soon as I -- I transmitted it on April 3,

3 2013.

4  Q  Okay. Now --

5  A  I'm confused. Do you want me to go ahead --

6 are we still on this one or on this one?

7  Q  No, we're moving on. We're on the new report.

8  A  So put this up. Okay.

9  Q  Yep. Now, at the bottom of this statement, do

10 you see where it says "I asked Mr. Simpson about the

11 first time I saw him. He gave me a list of things he

12 did the day Katherine Mills died. I asked why he

13 thought he needed that. He stated his neighbors told

14 him he was a suspect in the case." Do you see that,

15 sir?

16  A  Yes.

17  Q  Did you believe Mr. Simpson when he told you

18 that?

19  A  I had no other reason not to believe him. You

20 see, this is in 2013. I believe, by this time, that I

21 had witness statements stating that Amanda and Jonathan

22 were involved with that.

23  Q  Okay. So because you had information that

24 implicated the plaintiffs, that needed more -- well, you

25 tended to find Mr. Simpson to be more credible?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 266

1    MR. WRIGHT: Object to form. Answer best you can.
2    A    Credible might be a far fetch. But if I had
3  witness statements that said that Michael Simpson had
4  bragged about killing and robbing the lady, obviously it
5  would have been approached different.
6    Q    Okay. Take a look at this exhibit, which is
7  Plaintiff's Exhibit 25.
8    A    Are we moving on past this one?
9    Q    Moving on. Moving on. This is PL 15317
10  through --
11          (EXHIBIT 25 MARKED FOR IDENTIFICATION)
12    A    So I need to look through all these or just --
13    Q    -- PL 15322.
14    A    -- one particular page?
15    Q    No, turn to the second page. Who is that?
16    A    My -- it's 318 PL 15318.
17    Q    Is that --
18    A    Is that right? Michael Simpson.
19    Q    That's Mike Simpson, right? Did you take that
20  photograph?
21    A    I believe I did. Or one of the units there. I
22  can't remember.
23    Q    Did you take that photograph on December 24,
24  2010 when he gave you the Post-it note?
25    A    Yes, I believe so.

Page 267

1    Q    Okay. Did you take that photograph because
2  you believe he was a suspect at that time?
3    A    He was definitely a person of interest.
4    Q    Okay. By this time, you were aware that
5  Michael Crump had been -- had come forward as a witness
6  in the case, correct?
7    A    I don't know particular dates, but I'm
8  assuming yes.
9    Q    Yeah. And fair to say that Mike Simpson
10  matched the description provided by Michael Crump?
11    MR. WRIGHT: Object to form. Answer best you can.
12    A    Michael Simpson, yes, I would say that he
13  could have matched the description, yes.
14    Q    Okay. Did you ever request Mike Simpson to
15  take a polygraph exam?
16    A    I asked.
17    Q    You did?
18    A    And he said he didn't' want to.
19    Q    Why didn't you document that in the police
20  report?
21    A    Because polygraphs are inadmissible in court.
22  And in the course of my investigation, I did not find
23  nothing else -- like I said before, I never did get no
24  witness statements from other people stating that he
25  talked about, bragged about killing the subject like I

Page 268

1  did the others. And I never did get a witness statement
2  that said they saw him there.
3    Q    Well, you didn't tell the Grand Jury about Mr.
4  Simpson providing a Post-it note to you of alibi
5  witnesses unprovoked, correct?
6    A    No, because I was not appearing at the Grand
7  Jury on Mike Simpson.
8    Q    Well, you were appearing at the Grand Jury to
9  initiate charges related to Katherine Mills, correct?
10    A    Yes, I was at the Grand Jury to establish that
11  I had probable cause to bring charges reason to believe
12  from witness statements -- well, if we're going to go
13  back. I had probable cause to bring charges. Number 1
14  starting with I knew that she was killed in the morning.
15    Q    And sir, I'm sorry. I'm asking you a pretty
16  pointed question. You were at the Grand Jury as an
17  officer of the Kentucky State Police to testify as to
18  your investigation into the death of Katherine Mills in
19  order to initiate charges; is that right? Yes or no?
20    A    Yes.
21    Q    Okay. And you did not tell the Grand Jury
22  about the fact that Mike Simpson was broke prior to
23  Katherine Mills' murder, correct?
24    MR. WRIGHT: Object to form. Answer best you can.
25    A    I do not remember if I did or did not. Again,

Page 269

1  I was not appearing before the Grand Jury against Mike
2  Simpson.
3    Q    Okay. I'm going to try to ask you some yes or
4  no questions, all right? You did not tell the Grand
5  Jury about the rental car that Mr. Simpson paid with
6  cash after Ms. Mills was killed, correct?
7    MR. WRIGHT: Object to form.
8    Q    Correct?
9    A    Yes.
10    Q    You did not tell the Grand Jury that you spoke
11  to Vernon Bennett, one of the names on Mr. Simpson's
12  Post-it note, who refuted the fact that he was an alibi
13  for Mr. Simpson on the date of Ms. Mills' murder,
14  correct?
15    MR. WRIGHT: Object to the form. Foundation. Go
16  ahead.
17    A    No.
18    Q    And in fact, Vernon Bennett told you that Mr.
19  Simpson had a camouflage coat like the one that was
20  described by Michael Crump; isn't that right?
21    A    I'm not saying he did.
22    MR. WRIGHT: Object to form and foundation. Go
23  ahead.
24    A    I don't remember exactly him saying that. I'm
25  not saying he didn't. I don't remember that.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 270

1    Q    Okay.  Well, Mr. Bennett also told you that he
2   hadn't seen Mr. Simpson in that camouflage coat since
3   Katherine Mills was killed, correct?
4    MR. WRIGHT:  Objection to form and foundation.
5    A    Did you say had not seen?
6    Q    Had not, yeah.
7    A    I don't remember him saying one way or the
8   other.
9    Q    Okay.  Just don't recall, right?
10   A    Right.
11   Q    And again, you didn't draft a report after you
12  met with Vernon Bennett, correct?
13   A    No, I did not.
14   Q    Okay.  And in fact, Vernon Bennett told you
15  when he met with you that Mr. Simpson was driving in a
16  blue car on the day of Ms. Mills' murder; isn't that
17  right?
18   MR. WRIGHT:  Object to form and foundation.  Go
19  ahead.
20   A    No, I did not report to the Grand Jury.  I was
21  trying to think --
22   Q    Did he tell you that?
23   A    I don't remember him telling me -- I remember
24  him telling me that I think he saw him.  I can't
25  remember the particular color of the coat or something

Page 271

1   like that.
2    Q    Okay.  You're not saying it didn't happen.
3   Just don't recall it?
4    A    That is correct.
5    Q    Okay.
6    A    But I will say this.  If Vernon Bennett had
7   told me that he saw Michael Simpson at the victim's or
8   heard Michael Simpson say he killed the victim or spent
9   the money from the victim or had the money, I would have
10  put that in there.  But go ahead.  I'm sorry.
11   Q    Well, you didn't draft any report so there was
12  nothing to put in there, right?
13   MR. WRIGHT:  Object to form.  Foundation.
14   Q    There was no report to put that information in
15  because you didn't document any of it, correct?
16   MR. WRIGHT:  That's not what he said.  Object to
17  form.  Foundation.
18   Q    Did you document any information you learned
19  from Vernon Bennett?
20   A    No.
21   Q    Okay.  Now, I'm going to show you what we'll
22  mark as -- well, here we go again.
23   COURT REPORTER:  It's 26.
24   Q    26.
25   A    Are we moving on from this one?

Page 272

1    Q    Moving on.  This is Exhibit 26, PL 4850
2   through 51.  Sir, do you recognize this document?
3        (EXHIBIT 26 MARKED FOR IDENTIFICATION)
4    A    I don't believe I have ever seen this.  I
5   don't think I prepared this.  I've seen --
6    Q    Okay.  Well, let me ask you a different
7   question, sir.
8    A    Well, I assume the back of it it was prepared
9   by Lieutenant Ryan Catron.  Okay.
10   Q    Let me hand you what we'll mark as Exhibit 27.
11  This is KSP 270 to 271.
12       (EXHIBIT 27 MARKED FOR IDENTIFICATION)
13   A    Would it be possible that we turn the heat
14  down.  It is roasting.
15   THE WITNESS:  I mean, does everybody agree with
16  that?
17   MS. KINCER:     Yes.
18  BY MR. SLOSAR:
19   Q    Okay.  That's not the question, though, right?
20  Just the weather.
21   A    It's hot in here.  You agree with that?
22   Q    I promise, it is not a read technique.
23  Although I didn't go there.
24   A    You did.
25   Q    So this KSP report from January 21, 2011 --

Page 273

1    A    Which one are we -- are we moving past this
2   one already?
3    Q    Well, just keep them both in front of you.
4    A    Okay.
5    Q    So looking at 27, we went over this report a
6   little bit earlier but I'm giving you another one.  This
7   is a report that you drafted relating to Jessie Lawson
8   being taken in January 2011 before a polygraph exam,
9   right?
10   A    Yes, yes, yes.
11   Q    Okay.  And on the back page you discuss the
12  polygraph questions that Jessie Lawson failed on, right?
13   A    Yes.
14   Q    Okay.  And you wrote this report January 21,
15  2011, right?
16   A    Yes.
17   Q    Okay.  According to John Fyffe, KSP, Jessie
18  Lawson was deceptive when he answered the
19  question: Did you participate in any way in the death of
20  that woman, correct?  On the back page?
21   A    Yes.  That's what he said yes.  I'm not --
22  yes.
23   Q    You don't dispute that?
24   A    No.
25   Q    No?  And in fact, you wrote that in your

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 274

1   report, right?

2       A   Yes.

3       Q   This is your report?

4       A   Yes.

5       Q   Okay.  And the next question and it says that
6   Mr. Fyffe told you that Jessie Lawson was deceptive when
7   he said that he did not hit the woman in the head,
8   correct?

9       A   Where is that at?  Just point it out to me.

10      Q   I'm just going through these questions on the
11  back right here.  Number 2.

12      A   That was one of the questions that was used.

13      Q   Yep.  "Did you hit that woman in the head?"
14  Jessie Lawson said, "No."  John Fyffe said, "That Jessie
15  Lawson was being deceptive, right?

16      A   Okay.  I understand what you're saying, yes.

17      Q   Okay.

18      A   You were saying that he failed all these
19  questions, right?

20      Q   Yeah.

21      A   Okay.

22      Q   And he did.  You don't dispute that, right?

23      A   No.

24      Q   Okay.  Jessie Lawson failed his polygraph exam
25  when he was asked about whether he actually physically

Page 275

1   participated in the murder of Katherine Mills.  Do you
2   agree with that?  Yes or no?

3       A   If it's on the polygraph report.  I'm not
4   looking at it but I'm not disagreeing with it if it's on
5   there.

6       Q   Okay.  And that was in January of 2011,
7   correct?

8       A   Yes.

9       Q   Yep.  Okay.  Looking at the next exhibit, you
10  have it next to you.  Mr. Lieutenant Ryan Catron, I'm
11  going to assume is a boss of yours at KSP back in 2014;
12  is that right?

13      A   It's pronounced Catron.

14      Q   Catron?  He's the boss, right?

15      A   Yes.

16      Q   Okay.  And according to Mr. Catron, you used
17  Jessie Lawson as a confidential informant on six of your
18  cases between April, 2011 and June of 2011; is that
19  right?

20      A   That would appear, yes.  Where do you get
21  these dates at?  Oh, right here.  Just from here to
22  here.  Yes.

23      Q   April.  Yeah?  Okay.  So after Jessie Lawson
24  failed a polygraph exam about being personally involved
25  in the murder of Katherine Mills, you decided to use him

Page 276

1   a confidential informant in six of your cases, correct?

2       MR. WRIGHT:  I'll object to form and foundation.
3   Answer best you can.

4       A   Did you want a yes or no or did you want me to
5   give you the reason why?

6       Q   Yes or no.  Yes or no.

7       MR. WRIGHT:  Object to form and foundation.

8       Q   Did you use him --

9       A   Yes.

10      Q   Yes.

11      A   Yes.

12      Q   Okay.  And would it have assisted you in these
13  investigations that he was buying drugs on -- would it
14  have assisted you if Jessie Lawson was charged with
15  murder?

16      A   Can you say that again?

17      Q   Sure.  Would it have hurt Jessie Lawson's
18  credibility to testify in any of these cases that he was
19  doing buys in if you had charged him with the murder of
20  Katherine Mills?

21      A   Yes, but it's not fair to say that the only
22  reason he was an informant was to try to gain the
23  information on this.

24      Q   Uh-huh.

25      A   And it's also -- he kept telling us, and we

Page 277

1   have no reason to doubt it, that the reason why he did
2   fail it is because he had heard William Lester talk
3   about it.  In fact, William Lester confirmed that he
4   talked about robbing her and went into great detail
5   about how he was going to do it.  And the crime scene
6   would indicate that's exactly what happened, but go
7   ahead.

8       Q   Jason -- Jason, Jessie Lawson was deceptive
9   according to KSP polygrapher Fyffe when he denied
10  actually hitting Katherine Mills in the head, correct?

11      A   Yes.

12      MR. WRIGHT:  I object to the form of that.

13      Q   And after he failed that polygraph exam, you
14  decided to use him as a confidential informant; is that
15  right?

16      MR. WRIGHT:  Object to form and foundation.  Go
17  ahead.

18      Q   Yes or no?

19      A   Yes.

20      Q   Why didn't you tell the Grand Jury that Jessie
21  Lawson failed his polygraph examination on questions
22  about whether he was personally involved in killing
23  Katherine Mills?

24      MR. WRIGHT:  Object to form.  Go ahead.

25      A   What was that?  Why I did or did I not?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 278

1   Q    Why did you not?

2   A    Again, I'm not -- wasn't appearing on Jessie

3  Lawson at the Grand Jury.

4   Q    But is it -- would you agree with me that your

5  goal before -- when you testified at the April 27, 2012

6  Grand Jury was to obtain indictments against Amanda

7  Hoskins, Jonathan Taylor and William Lester?

8       MR. WRIGHT:  Object to form.

9   Q    Is that your goal?

10   A    Yes.

11   Q    Okay.  So fair to say that you were not going

12  before the Grand Jury to testify about information that

13  would have hurt you obtaining an indictment against Ms.

14  Hoskins, Mr. Taylor and Mr. Lester?

15      MR. WRIGHT:  Objection to form.

16   A    That is totally incorrect.  Can I explain that

17  one now?

18   Q    Well, hold on.  Let me -- let me ask -- let me

19  ask --

20   A    You asked me.  Let me -- because I took -- you

21  asked me.  What was the question again?

22   Q    You're saying that -- every time I ask you

23  whether you provided testimony to the Grand Jury about

24  people who could have killed Katherine Mills, you say "I

25  wasn't there to provide testimony against them.  I was

Page 279

1  there to provide testimony against Ms. Hoskins, Mr.

2  Taylor and Mr. Lester."

3   A    Yes, it would be unfair to not point out that

4  there's several statements.  For example, let's take

5  Amanda.  There's several statements in there that --

6  from people who said Amanda had nothing to do with it.

7  So whether a particular statement helped one of them or

8  hurt one of them, I didn't keep it out.  It wasn't like

9  I was trying to pin anything on anybody or I wouldn't

10  have put those statements in there.  So, again, there is

11  statements in there that helps and hurt each individual.

12  I didn't change anything.  I took what I had and gave it

13  to establish the probable cause.

14   Q    You did not provide any statements to the

15  Grand Jury that implicated Allen Helton, Mike Simpson or

16  Jessie Lawson in the murder of Katherine Mills; isn't

17  that true?

18      MR. WRIGHT:  I'm going to object to the form and

19  foundation.

20   A    Yes.

21   Q    And that's because you were trying to obtain

22  an indictment against Ms. Hoskins, Mr. Taylor and Mr.

23  Lester, correct?

24      MR. WRIGHT:  Object to form and foundation.  Go

25  ahead best you can.

Page 280

1   A    Yes, because I had probable cause on them.

2      MR. SOLSAR:    All right.  Let's take a short

3  break.

4      VIDEOGRAPHER:  Off the record at 3:36.

5           (OFF THE RECORD)

6      VIDEOGRAPHER:  Back on the record at 3:50.

7  BY MR. SLOSAR:

8   Q    Sir, you testified before the Grand Jury

9  regarding the June 24, 2011 statement you took from Joe

10  King, correct?

11   A    Yes, I believe so.

12   Q    Okay.  Is it fair to say that the statement

13  you took from Joe King on that date was the first time

14  that anyone directly implicated Amanda Hoskins or

15  Jonathan Taylor in the homicide of Katherine Mills?

16      MR. WRIGHT:  Object to form and foundation.  Answer

17  best you can.

18   A    To my knowledge, I don't know the

19  chronological dates.  Obviously, it's been a very long

20  day and it's been a long time, but I'm not -- there is

21  other statements.  I don't know if they was before or

22  after.

23   Q    Okay.  Well, you testified before the Grand

24  Jury that you learned from Mr. King that Amanda Hoskins

25  was going to dress up like a home health nurse to gain

Page 281

1  entry into the Mills residence in order to lure the door

2  open and take her money; is that right?

3   A    That's one of the things they talked about,

4  yes.

5   Q    Okay.  And the basis of that testimony was the

6  report that you took from Joe King on June 27, 2011,

7  correct?

8   A    Yes.  But Amanda did advise me and so did

9  William Lester that Joe King had been talked to by

10  William Lester about robbing her because she had -- she

11  had come into contact with a lot of money and one of the

12  ways that they -- I think they all three agreed on was

13  that William said she has an outhouse which she don't

14  have no indoor plumbing and that if they do it in the

15  morning, which go along with what happened when she was

16  killed in the morning between her outhouse and the back

17  door of her residence.  I'm sorry.  Go ahead.

18   Q    Sergeant, I'm sorry.  I was asking you

19  something different.  I wasn't asking about the

20  statement that Amanda told you about William Lester.

21  What I was asking you was Joe King, your June 27, 2011

22  report, which you have in front of you.

23   A    Yes.

24   Q    You document in there that Joe King told you

25  that Amanda told him that she was going to dress up like

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

282..285

Page 282

1 a home health nurse to enter Katherine Mills'
2 residence, correct?
3    A    That is correct, yes.
4    Q    Okay.  And you testified to that effect before
5 the April, 2012 Grand Jury, right?
6    A    I believe I covered it.  If not, that
7 statement was in there.
8    Q    Okay.  And you likewise testified to that
9 effect at the preliminary hearing too, right?
10   A    Yes, I testified about this statement.  Yes.
11   Q    Okay.  Now, you informed the Grand Jury that
12 Joe King told you that on December 19, 2010 Ms. Hoskins,
13 Mr. Lester were too broke to fill a prescription for Ms.
14 Hoskins' Suboxone; is that right?
15   A    Yes.  12-19, yes.
16   Q    Okay.  And --
17   A    Not the date that I talked to him but yeah.
18   Q    Sure.  Your statement reflects that Joe King
19 told you that --
20   A    Yes, that on 12-19.  He didn't tell me on
21 12-19 but he said that they were broke.
22   Q    Sure.  That's what happened?
23   A    Yes.
24   Q    Okay.  Okay.  And you testified to the Grand
25 Jury that Joe King had told you that on December 19th

Page 283

1 Ms. Hoskins and Mr. Lester were too broke to fill a
2 prescription of Suboxone, correct?
3    A    Yes, that's what Joe King told me.
4    Q    Okay.  Well, by the time that you testified to
5 the Grand Jury you knew that Joe King's story about
6 Amanda needing to fill a Suboxone prescription on 12-19
7 you knew that story was false, right?
8    MR. WRIGHT:  Object to form and foundation.
9    A    Just the Walgreen's Pharmacy I knew that he
10 said that on 12-19 that they filled a prescription when
11 the only records I remember finding was that on 12-20
12 she had filled that prescription, I believe.  Now,
13 again, I'm pretty sure that's what it says.  Not 110.
14   Q    Yeah.  And you've got that --
15   A    That's what that says?
16   Q    You've got that document in your report,
17 right?
18   A    So you're agreeing with me?
19   Q    Do you know the -- yeah, I'm agreeing with
20 you.
21   A    Okay.
22   Q    And the second paragraph of this report that
23 you drafted on 6-29-2011 you documented that Ms. Hoskins
24 actually filled the prescription on 12-20 and not 12-19,
25 right?

Page 284

1    A    Yes.
2    Q    And then your report then states that also the
3 prescription was not written until 12-20 which would
4 indicate Mr. King was inaccurate about his description
5 of the Suboxone being filled on 12-19-11 and it being
6 after dark.  Is that what you wrote in your report?
7    A    Yes, I'm assuming you're reading directly from
8 it.  Yes.
9    Q    I am.  I'm reading right from this report that
10 you wrote.
11   A    Oh, okay.
12   Q    Right.
13   A    You -- Joe King, I was looking at this.  Oh,
14 it was inaccurate.  Yes, yes.
15   Q    Yeah.  Yeah.  Mr. King gave you a statement
16 and then you went to go vet the information in that
17 statement; isn't that right?
18   A    Yes.
19   Q    Okay.  You wanted to see whether Mr. King was
20 telling you the truth or not, right?
21   A    Yes.
22   Q    You wanted to verify whether the report that
23 you documented was accurate or not with regard to Joe
24 King, correct?
25   MR. WRIGHT:  Object to form and foundation but

Page 285

1 answer best you can.
2    Q    Correct?
3    A    I went there to corroborate and see if that
4 was correct, yes.
5    Q    Okay.  And you determined that it was actually
6 incorrect, right?
7    MR. WRIGHT:  Object to form and foundation. Answer
8 best you can.
9    Q    Right?
10   A    The part about her trying to fill a
11 prescription on 12-19 at the Pineville Walgreen's was
12 inaccurate and actually it was on 12-20.
13   Q    And that's -- with you, Sergeant York, would
14 you agree that when you originally took Joe King's
15 statement that you believed that motivation for Ms.
16 Hoskins participating in this crime was her desperation
17 to obtain money in order to fill or fulfill her Suboxone
18 prescription and whatever else, you know, she wanted to
19 do with that money; is that fair to say?
20   MR. WRIGHT:  Object to form and foundation. Answer
21 best you can.
22   A    I'm not going to speculate on what was going
23 through Ms. Hoskins' head because obviously I'm not
24 there.
25   Q    Was that a motive that you were --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 286

1    A    Can you state that question again?  I'm not
2  trying to be difficult.
3    Q    Yeah, let me ask it a better way. Was the
4  motive that you were investigating, was that motive with
5  regard to Ms. Hoskins related to her need to have money
6  so that she could fulfill her pill prescription?
7    A    No, not entirely.  The motivation was I knew
8  that there were money missing.  I know that they had
9  knowledge of it.  They talked about a plan and talked
10  about going through with robbing and taking money and
11  going about it as far as what they was going to do with
12  every dime of it, you know, I -- possibly, you know,
13  some of it was to buy drugs I would assume.  And
14  probably I'd say that throughout the investigation.
15    Q    Well, when you testified about Joe King's
16  statement to the Grand Jury on April 27, 2012, you knew
17  by that point that Mr. King's statement about the 19th,
18  you knew that was false, right?
19    MR. WRIGHT:  Objection.  Form and foundation.
20    A    I knew that he was incorrect on that day.  I'm
21  not saying the whole thing was false.
22    Q    And you never informed the Grand Jury that Mr.
23  King was incorrect about what he said happened on the
24  19th, did you?
25    MR. WRIGHT:  Object to form and foundation.

Page 287

1    A    No, but there was more than enough probable
2  cause.
3    Q    That's not what I'm asking.  You felt that it
4  was important to tell the Grand Jury that Ms. Hoskins
5  was broke on the 19th but was able to fill her
6  prescription on the 20th, correct?
7    A    Yeah, did I say the 20th?
8    Q    Yeah.
9    A    Yes.  Okay, yes.
10    Q    And you were trying to inform the Grand Jury
11  that you believed that the money that was used for Ms.
12  Hoskins' Suboxone prescription on the 20th was taken
13  from the robbery and murder of Katherine Mills, correct?
14    MR. WRIGHT:  Object to form and foundation.
15    A    We had probable cause to believe that, yes.
16    Q    That's what you testified to to the Grand
17  Jury, correct?
18    A    I guess. I don't know how exactly I put it but
19  I'm not arguing with you.
20    Q    Sir, I'm going to show you what we'll mark as
21  Exhibit 30.  This is PL 27725.
22    (EXHIBIT 30 MARKED FOR IDENTIFICATION)
23    A    Do I still need to keep these out or are we
24  moving on?
25    Q    You can put them in the stack.  Moving on.

Page 288

1  Like the Jefferson's.  You recognize the prescription,
2  sir?
3    A    I believe this is the one that was attached to
4  the case file, isn't it?
5    Q    Yep.  That's a record that you obtained prior
6  to testifying to the Grand Jury, correct?
7    A    I believe so, yes.
8    Q    Okay.  And this is a prescription for Amanda
9  Hoskins that was dated 12-20-2010, correct?
10    A    Yes.
11    Q    Okay.  That's the date of Ms. Mills' death,
12  correct?
13    A    Yes.
14    Q    Okay.  Did you have this before you testified
15  at the Grand Jury, correct?
16    A    I believe so, yes.
17    Q    Yep.  You reviewed that document before you
18  testified at the Grand Jury, correct?
19    A    Yes.
20    Q    Now, this document shows that Mr. King's
21  statement about Ms. -- about Ms. Hoskins needing to fill
22  a prescription on December 19, 2010 this prescription
23  shows that that's not true, correct?
24    MR. WRIGHT:  Object to form and foundation. Answer
25  best you can.

Page 289

1    A    Yes, we've already agreed on that.
2    Q    You didn't tell the Grand Jury about this
3  prescription dated 12-20, did you?
4    A    I don't remember mentioning it, no.  I was
5  using all the other probable cause we had.
6    Q    Now, going back to your report about the
7  interview with Joe King that you did on June 27, 2010.
8    Are we done with this one?
9    Q    Yes.  In that report, Joe King told you in his
10  statement to you on June 24, 2011 that he arranged for
11  Ms. Hoskins to get money to fill her prescription; isn't
12  that right?
13    A    I believe so, yes.
14    Q    Okay.  And in fact, Mr. King told you that he
15  went to Walgreen's to fill the prescription with Ms.
16  Hoskins, correct?
17    A    I believe so.
18    Q    Yeah.  And you did not testify to the Grand
19  Jury that Mr. King told you that he gave money to Ms.
20  Hoskins so that she could get her --
21    A    Let's back up one second.  I believe this
22  thing stated that Joe stated that Amanda went in.  Did
23  you say that Joe went in with them?
24    Q    Oh, no.  I said that Joe went with her to
25  Walgreen's, right?



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 290

```
 1    A    That is correct.
 2    Q    Okay.  And Joe had told you during your
 3  interview with him in June of 2011 -- June of 2011.
 4    A    2011.  Okay.
 5    Q    Yeah.  That he gave Amanda Hoskins money so
 6  that she could get her Suboxone prescription filled,
 7  correct?
 8    A    Joe stated he arranged for Amanda to get it,
 9  yes.
10    Q    Yeah.  Okay.  And you did not tell the Grand
11  Jurors that Ms. Hoskins filled her prescription on 12-20
12  through money received from Joe King, correct?
13    A    I might have -- I don't remember telling them
14  but I think this was attached with it, with the case.
15    Q    But you don't recall, right?
16    A    No.
17    Q    And, in fact, you implied to the jurors during
18  the Grand Jury that Ms. Hoskins filled her prescription
19  on 12-20 after she killed Katherine Mills, correct?
20    MR. WRIGHT:  Object to form and foundation.
21    A    I mean, we've already went over that.  I'm
22  agreeing with you on that.
23    Q    You agree?
24    A    She filled the prescription on 12-20.
25    Q    Yeah.  And you told the Grand Jurors that you
```

Page 291

```
 1  believe that she filled that prescription through the
 2  robbery and murder of Katherine Mills, right?
 3    A    Yes, we've already went over that.  Yes.
 4    Q    Okay.
 5    A    I had reasonable belief to believe that.
 6    Q    Now, you also interviewed Ms. Hoskins on
 7  February 15, 2011, correct?
 8    A    I interviewed her.  That's on the case too.
 9    Q    Yeah.  You drafted a report from that
10  interview, right?
11    A    Yes.
12    Q    Okay.  This is 31.  You drafted that report on
13  February 15, 2011, right?
14        (EXHIBIT 31 MARKED FOR IDENTIFICATION)
15    A    Do I need to keep this one out?
16    Q    Just put it in the stack.  You created this
17  report on February 15, 2011, right?
18    A    Yes.
19    Q    Okay. And you questioned Ms. Hoskins on that
20  date in the presence of Detective Mike Brown from the
21  Barbourville Police Department, correct?
22    A    Yes.
23    Q    Okay.  You didn't read Ms. Hoskins her Miranda
24  rights prior to questioning her, right?
25    A    I do not remember if I did or not.
```

Page 292

```
 1    Q    Well, if you had read Ms. Hoskins her Miranda
 2  rights and she had waived them, she would have had to
 3  sign a form like the one that you gave to Allen Helton,
 4  correct?
 5    A    Okay.
 6    MR. WRIGHT:  Object to form and foundation.
 7    Q    Is that right?
 8    A    Yes, if there was one in there.  It would be
 9  in there, yes.
10    Q    Okay.  And since there is no form in your file
11  is it fair to say that you didn't read her her Miranda
12  rights?
13    MR. WRIGHT:  Object to form and foundation.
14    A    I don't remember if I did or not.  If it's not
15  in there then no.  Like I said, I -- it's been a long
16  time ago and I don't remember.
17    Q    Okay.  Well, you did not arrest or initiate
18  charges against Amanda Hoskins after her February 15,
19  2011 interview, correct?
20    A    No, I believe that was -- she got charged way
21  after that; is that correct?
22    Q    Yeah.  And so prior to April 27, 2012,
23  prior to the time you initiated charges.
24    A    So that's --
25    Q    Yeah.  April 27, 2012.  Prior to April 27,
```

Page 293

```
 1  2012, is it fair to say that you did not have probable
 2  cause to initiate charges against Amanda Hoskins and
 3  Jonathan Taylor for the murder of Katherine Mills?
 4    MS. WRIGHT:  Object to the extent it calls for a
 5  legal conclusion but answer the best you can.
 6    A    You know, we -- I don't want to get into
 7  particular dates or what I knew before then or didn't.
 8  Obviously it's in the case file.  If it's in the case
 9  file, it's there.  I can tell you when we brought
10  charges, I felt that we had more than enough probable
11  cause to arrest them on that.
12    Q    Okay. Well, prior to the initiation of
13  charges, you did not have probable cause, right?
14    MR. WRIGHT:  Object to form and foundation. Answer
15  the best you can.
16    A    Again, I don't know.  I think, given some of
17  them statements, I don't know exactly what date -- what
18  particular date on what particular year, again, given
19  the time, that we had what you would consider sufficient
20  probable cause.  I don't remember that.  Obviously, by
21  the date that we arrested them, obviously, we did.
22    Q    Sure.  In your mind, right?
23    A    Huh?
24    Q    In your mind?  In your opinion, as of April
25  27, 2012, you felt that you had probable cause, right?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 294

1    A    Yes.

2    Q    Okay.  All right.  During your interview with
3  Ms. Hoskins, do you recall Detective Broughton ever
4  leaving the room?

5    A    I don't know if he -- he could have.  I don't
6  remember.

7    Q    How long did you interview Ms. Hoskins before
8  taking a recorded statement?

9    A    I do not remember.

10    Q    What did you say to her prior to recording a
11  statement?

12    A    I don't recollect what was said before or
13  after.

14    Q    What did she say to you prior to recording a
15  statement?

16    A    I believe she -- again, I don't remember
17  exactly what she said.  So I'm not going to speculate
18  what she could or did not say.

19    Q    And I understand that.  I just have to ask you
20  these questions.  Do you recall what Detective
21  Broughton told Amanda Hoskins before the recording
22  began?

23    A    Can you like -- go ahead and ask me like -- go
24  ahead and get this out of the way?  All of it.  I mean,
25  I don't remember before or after.  So --

Page 295

1    Q    You have no recollection of anything that any
2  officer told Detective --

3    A    Not no specifics.

4    Q    -- that told Amanda Hoskins on February 15,
5  2011, correct?

6    A    No specifics, no.

7    Q    Okay.  Nothing to refresh your recollection
8  about what was said before you started recording,
9  correct?

10    A    Are you asking me again if I have any notes or
11  anything?

12    Q    Yeah.

13    A    No.

14    Q    No?  Okay.  Ms. Hoskins maintained her
15  innocence to you, correct?

16    A    Actually, I don't know what you would call
17  knowing about a robbery and murder and not telling the
18  people that are totally innocent.  But she did state
19  that she wasn't involved in killing Amanda --

20    Q    Yeah.

21    A    -- not Amanda, Katherine.

22    Q    Yeah.  And in fact, Ms. Hoskins told you the
23  statement that William Lester had made in her presence,
24  correct?

25    A    Yes.

Page 296

1    Q    Yeah.  She didn't -- Ms. Hoskins didn't ask
2  for a lawyer when she met with you, did she?

3    A    I don't remember her doing it.

4    Q    She didn't assert her Fifth Amendment right
5  and refuse to answer your questions, did she?

6    A    I don't -- I don't recollect, no.

7    Q    Well, you wouldn't have taken a statement from
8  her if she did, right?

9    A    No.

10    Q    Yeah.  All right.  Now, why did you tell
11  Amanda Hoskins that you had the tail but are looking for
12  the donkey to pin it on when you met with her on
13  February 15, 2011?

14    A    Again, as we talked about before on that
15  particular statement, could I have said it?  Maybe so.  I
16  don't remember saying it in those exact words.  Could
17  have been.  By this time, again, if it's in the case,
18  it's in the case.  If it's not as far as the
19  chronological dates.  I don't know exactly -- I don't
20  remember exactly what information we had at this point.

21    Q    Sergeant York, looking through this statement,
22  this narrative, the recorded statement that you took
23  from Amanda Hoskins on February 15, 2011, anywhere in
24  that report do you document information that Amanda
25  Hoskins told you about what she was doing on December

Page 297

1  20, 2010.  Please review that and let me know when
2  you're finished.

3    A    Do you want me to read it?

4    Q    To yourself?

5    A    Okay.  Now, what was the question so I can
6  be looking for it.

7    Q    Did you document anywhere in this report what
8  Amanda Hoskins told you she was doing on December 20,
9  2010?

10    A    Okay.

11    Q    While he is reading that, we're going to go to
12  14:04 of the Grand Jury transcript through 14:45.

13    A    Okay.  It -- as far as the particulars on that
14  day no, I didn't see it in there.

15    Q    Okay.  So according to this report, you did
16  not question Amanda Hoskins about what she was doing on
17  December 20, 2010, correct?

18    A    I'm not saying that.  I said it's not in this
19  report.  This is just a summary.

20    Q    According to the narrative of your recorded
21  statement with Ms. Hoskins --

22    A    I would have to listen to the recorded
23  statement before I would say, in depth.  I mean, this is
24  just a summary.  It's not word for word.  But if you've
25  got her statement, we'll listen to it.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 298

1    Q    We will supplement the record with the
2  recorded statement of Amanda Hoskins and we'll label it
3  as Exhibit 32.  Sir, I do not have a copy to listen to
4  the whole thing right now, but
5              (EXHIBIT 32 MARKED FOR IDENTIFICATION)
6    A    I mean, as long as we agree --
7    Q    -- I'll put it in the record and it will speak
8  for itself.
9    A    -- on what it says.
10   Q    If the recorded statement correlates to the
11 report, and you did not ask her about what she was doing
12 on December 20, 2010, would you dispute the fact that
13 you apparently did not ask her?  If the recorded
14 statement matches this, would you agree with me that you
15 did not question Ms. Hoskins about what she did on the
16 date of Ms. Mills' murder?
17   A    I'm not going to dispute it but that's not the
18 only time I talked to her and I believe you are aware of
19 that.
20   Q    Okay.  But on that day, you did not, correct?
21 MR. WRIGHT:  Object to form.  Foundation.
22   Q    On --
23   A    This?  Yes.  Yes.
24   Q    Okay.  And fair to say that you did not create
25 a police report or take a recorded statement from Amanda

Page 299

1  Hoskins other than the one that is before you during the
2  underlying investigation to Katherine Mills' homicide.
3  MR. WRIGHT:  I'm objecting to the form of that.  I
4  didn't -- I think he said there was a recorded statement
5  from -- that this is a summary of.
6    Q    There is.  From this date.  Other than taking
7  a recorded statement from Amanda Hoskins on February 15,
8  2011 and drafting a narrative of that recorded
9  statement, did you ever document or record any other
10 statements or questioning that you did of Amanda Hoskins
11 during the underlying investigation?
12   A    I'm not sure if Ms. Evans did or not when we
13 met.  That was a later date.  I don't know that -- the
14 date that I met with Ms. Hoskins with Ms. Evans present.
15 I don't know if Ms. Evans recorded that or not.
16   Q    I am asking whether you recorded any other
17 statements with Ms. Hoskins or drafted a police report
18 based on any conversations you had with her other than
19 the report that is before you and the recorded statement
20 that you took with that report?  Yes or no?
21   A    Again, I think somewhere in the case report or
22 in part of my testimony, I said that Amanda and William
23 told me they were at a doctor's appointment at 9:30 or
24 something.  I don't know if that was -- where that is
25 documented or if it was just said in the case.

Page 300

1    Q    So you have -- you have no idea.  Like you
2  can't -- sitting here today, you can't point to a single
3  police report where you wrote --
4  MR. WRIGHT:  Well, I object.  You haven't given him
5  all the police reports.
6  MR. SLOSAR:  Counsel, if you are implying that a
7  report exists of questioning of my client other than the
8  one that is before your client right now, then I would
9  be shocked because you've never disclosed it.  So if you
10 have such a report, I want --
11 MR. WRIGHT:  I am objecting.  I am objecting that
12 you're talking about a whole police report and you've
13 only given him the things out of it that you want him to
14 see.  That's all I'm objecting to.
15 MR. SLOSAR:  You're saying that this is not a
16 police report?
17 MR. WRIGHT:  I'm saying this is part of the case
18 file.  But you're saying there was no police report ever
19 done and you've only given him parts of the case file.
20 So I'm just objecting.
21 MR. SLOSAR:  Counsel, the speaking objection is
22 improper and it's wasting the time.
23 MR. WRIGHT:  That's not a speaking objection.
24 That's not improper.  You're -- you had a lack of
25 foundation.

Page 301

1  BY MR. SLOSAR:
2    Q    Sir, can you -- can you think of any other
3  report that you drafted relating to conversations with
4  Ms. Hoskins other than the one is before you?
5  MR. WRIGHT:  Object to form and foundation.
6    Q    Yes or no?
7  MR. WRIGHT:  Answer best you can.
8    A    Best I can.  I remember stating, and I don't
9  remember if I wrote it in a police report that I found
10 out from them that they had a doctor's appointment.
11   Q    Well, you testified to that effect before the
12 Grand Jury on April 27, 2012, correct?
13   A    Yes, sir.
14   Q    Okay.  You testified that -- well, let's play
15 this.  Listen to this, please.
16              (AUDIO CLIP PLAYED FROM THE GRAND JURY)
17   Q    Okay.  So you testified before the Grand Jury
18 on February 15, 2011, Amanda Hoskins told you that she
19 was at her doctor's appointment on December 20, 2010 at
20 9:30 a.m.; is that correct?
21   A    That's what would go along with that, yes.
22   Q    That's what you just testified -- that's what
23 you testified to at the Grand Jury, correct?
24   A    Yes.
25   Q    Okay.  And the report before you doesn't



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 302

1  discuss what you testified -- well, let me strike that
2  question.  Is the information that you just -- that you
3  testified to before the Grand Jury on April 27, 2012
4  about Amanda Hoskins telling you that she was at her
5  doctor's office on December 20, 2010, is that
6  information contained anywhere in your narrative of the
7  recorded interview that you took with Amanda Hoskins on
8  February 15, 2011?
9      A   Not with this one, no.
10     Q   No?  Okay.
11     A   But I would say I believe there is a form or
12  something there that shows that she did have an
13  appointment at that time.
14     Q   You -- okay.  You also testified before the
15  Grand Jury that you pulled Ms. Hoskins' medical records
16  and it showed that she was late, correct?
17     A   Yes. I don't know if --
18     MR. WRIGHT:  Object to the form and foundation.
19  But answer best you can.
20     A   Again, I don't think it's in medical records.
21  But yes, I had that documentation.
22     Q   You testified to the Grand Jury that on April
23  27, 2012, that Ms. Hoskins did not show up to her
24  doctor's appointment until noon on December 20, 2010; is
25  that right?

Page 303

1      A   Approximately.  It was 11:00 something, but
2  yes.
3      MR. SLOSAR:      Can you play it?
4      A   Or noon.
5          (AUDIO CLIP PLAYED FROM THE GRAND JURY)
6      Q   Okay.  So you testified to the Grand Jury that
7  Ms. Hoskins didn't show up until noon to Dr. Warren's
8  office, correct?
9      A   Yes.
10     Q   You didn't say about noon, did you?
11     A   No, that was -- no.  It was around noon, yes.
12     Q   But you didn't tell the jury it was around
13  noon.  You said that it was at noon, correct?
14     MR. WRIGHT:  I object to form.  But answer best you
15  can.
16     Q   You can answer.
17     A   It was -- it was a close proximity of the
18  time.
19     Q   Okay.  But you didn't tell the Grand Jury that
20  it was a close proximity.  You told them that she showed
21  up at noon, right?
22     A   Yeah, I did not tell them that it was -- it
23  showed like five or six minutes before.
24     Q   Yeah.  And that wasn't true, correct?
25     MR. WRIGHT:  Object to form.

Page 304

1      A   What wasn't true?
2      Q   Well, let me say it this way.  Because of
3  these inconsistencies that you were testifying to the
4  Grand Jury about that Ms. Hoskins allegedly told you
5  that she showed up at her doctor's appointment at 9:30
6  a.m.  You found out that she didn't show up until noon.
7  You were informing the Grand Jury that Ms. Hoskins
8  actually lied to you about her alibi; isn't that right?
9      A   She was lying, yes.  As far as -- yes.
10     Q   Yes.  And you -- prior to going to the Grand
11  Jury, you drafted a report and you recorded a statement
12  from Ms. Hoskins on February 15, 2011, correct?
13     A   Yes.
14     Q   Yeah.  And again, according to your police
15  report, you didn't ask Ms. Hoskins any questions on
16  February 15, 2011 about what she was doing on the day of
17  the murder, correct?
18     A   I'm not saying that.  It's not in this report.
19  I don't know what we discussed before or after.
20     Q   Now, Mr. York, at some point in your
21  investigation, you obtained medical records from Dr.
22  Warren's office, correct?
23     A   No, not from his office.  I think from the
24  Hope Medical Center maybe.
25     Q   Okay.  And you obtained those records from

Page 305

1  Shannon Bunch-Cobb; is that right?
2      A   Yes.
3      Q   Okay.  And Ms. Bunch-Cobb was the wife --
4      A   I think it's Cobb-Bunch.
5      Q   Cobb-Bunch.  She was the wife of Jason Bunch,
6  right?
7      A   Yes.
8      Q   He was another officer working on this
9  investigation, right?
10     MR. WRIGHT:  Object to form and foundation. Answer
11  best you can.
12     Q   Right?
13     A   He was there the initial day but as far as
14  starting to describe it as assisting in the
15  investigation, no.  He was there and helped out, you
16  know, on the very first day but after that first couple
17  of days, I don't think he was involved that I recollect.
18     Q   All right.  Well, you obtained medical records
19  relating to Ms. Hoskins from Ms. Cobb-Bunch, correct?
20     A   Yes.
21     Q   Okay.  And you obtained those medical records
22  after you took the March 8, 2012 statement from Allen
23  Helton; isn't that right?
24     A   I'm not disagreeing.
25     MR. WRIGHT:  Object to form and foundation. Answer



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 306

1  best you can.
2      A    I don't remember the dates but if that's it,
3  yeah, sure.
4      Q    Okay.  And now, you obtained those medical
5  records before testifying to the Grand Jury, right?
6      A    Yes.
7      Q    Okay.  I'm going to show you what we'll mark
8  as Exhibit 33.  PL 4164 through 72.  Here you go, sir.
9           (EXHIBIT 33 MARKED FOR IDENTIFICATION)
10     A    You done with this one now?
11     Q    Yeah.  Sir, are the -- are these some of the
12 medical records that you obtained from Ms. Cobb-Bunch
13 prior to testifying at the Grand Jury?
14     A    It appears the first page is.  I'll have to
15 look at the second one.  This copy is so smeared it's
16 hard to tell.
17     Q    I understand.  Looking at the second page, is
18 this one of the records that you obtained from Ms. Cobb-
19 Bunch relating to Amanda Hoskins?
20     A    This one?
21     Q    Yep.
22     A    Wait a minute.
23     MR. WRIGHT:  What number are you on?
24     A    No.
25     MR. SLOSAR:    4165.

Page 307

1      A    This is --
2      Q    4165.  Right here.
3      A    Oh, okay.  Yes, it would appear so.
4      Q    Okay.  And --
5      A    This one we already looked at, right?
6      Q    Yeah, yeah.  We did.  It was part of another
7  exhibit.
8      A    Are we going through the rest of them?
9      Q    No, no, no.  Let me just ask you some
10 questions.  So looking at this medical record, PL 4165 -
11 -
12     A    65?
13     Q    Yep.  This is a medical record from December
14 20, 2010; is that right?
15     A    Quickly, where do you see this data at?
16     Q    At the top right-hand corner.
17     A    Top right corner.  Oh, right here.
18     Q    Yep.
19     A    And this 22nd --
20     Q    Well, it was signed on the 22nd, but it was --
21 she saw Dr. Warren on the 20th, correct?
22     A    I'm not arguing.  I'm just trying to figure
23 out where you -- oh, Monday.
24     Q    Look at Monday.
25     A    20.  Okay, yes.

Page 308

1      Q    Yeah.  Okay.  And according to this medical
2  record, going down here, her appointment time was 11:30
3  a.m. on December 20, 2010; is that right?
4      A    That's what that says.
5      Q    And she arrived at 11:54 a.m.; is that right?
6      A    Yes, that's what that says.
7      Q    Okay.  And there are a number of notes
8  relating to the examination with her doctor on that day;
9  is that right?
10     A    You're not wanting me to like --
11     Q    No, it's just --
12     A    -- to summarize and explain this stuff?
13     Q    -- you know, it's the doctor -- Dr. Warren or
14 somebody typed on her whatever examination he did of
15 Amanda Hoskins on that date.  Would you agree with that?
16     A    Yes.
17     Q    Okay.  We've already gone through the
18 prescription.  I'm going to ask for you to turn to page
19 -- it's marked PL 4167.  You're right on it.  It's this
20 one.  This is another document that you obtained during
21 your investigation, correct?
22     A    I really -- I mean, as I've said.  This is a
23 horrible copy.  I'm not arguing with you.  I can't
24 hardly read anything on it.
25     Q    You can read --

Page 309

1      A    I can't even make out the name on it.
2      Q    All right.
3      A    It looks like it says Hoskins.
4      Q    Yeah, it says Amanda Hoskins on the second
5  line down, right?  The local patient profile.  I don't
6  dispute -- I don't dispute with you that it's not great,
7  but this says Amanda Hoskins, right?
8      A    It appears, yeah.
9      Q    Okay.  And you received a better copy of this
10 during your investigation, didn't you?
11     A    I think so, yes.
12     Q    Yeah, and this says that Ms. Hoskins filled up
13 a prescription for Suboxone on December 20, 2010 at 3:22
14 p.m. at this Walgreen's; is that right?
15     A    I don't see where it says Walgreen's on here.
16     Q    You know what, you're right.  You're right.  I
17 don't see that on here either.  But this says that she
18 filled the prescription on December 20, 2010 at 3:22
19 p.m., correct?
20     A    I can tell you that it says there's a date and
21 it says "Refill new RX."  I don't know what -- I'm
22 assuming that means cash payment.  Customer price was --
23 is that $168?
24     Q    $168.75.
25     A    And it says sold that day.  Yes, we agree on

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 310

1  that.
2      Q   Yes.  3:22 p.m., right?  15:22:08 is the time?
3      A   Yeah, I think so.  Yeah.
4      Q   You're a military guy so you understand
5  military time as 3:22, correct?
6      A   Yes.
7      Q   Okay.  And now, the fact that she paid with
8  cash, that's consistent with what Joe King told you
9  about when he said that he gave her money to make the
10 payment for the Suboxone prescription, correct?
11     A   Well, if I remember correctly, I think Joe
12 King said that he gave it to her on the 19th, right?
13     Q   Well, he had the day mixed up.  Yes.  But he
14 told you that he had given her -- he had arranged for
15 her to have money so that she could fill this
16 prescription, correct?
17     A   On the 19th, yes.
18 MR. WRIGHT:  Object to form and foundation.
19     Q   Now, did you have a --
20     A   Wait a minute.  Wait a minute.  You know, I
21 don't think this is the same one we looked at earlier.  I
22 don't want to say I've looked at this one.  This is
23 dated on the 27th.  The one you showed me before, what
24 date?
25     Q   So there is a -- this is a different -- this

Page 311

1  is a different prescription.  So she got one the
2  following week.  This is January 27th.
3      A   Right.
4      Q   So she got her -- it's a different
5  prescription than earlier.
6      A   But you said I already looked at this one and
7  I don't think I looked at this one.
8      Q   I was talking about this one.  12-20.  There's
9  the one that we went over.
10     A   Okay.  Okay.
11     Q   I'm not trying to trick you.  But the other
12 one is not super relevant.  So --
13             (KNOCK AT DOOR)
14 THE WITNESS:  Are we supposed to wait until they
15 answer the door or what?
16 MR. SLOSAR:     Let's take a break.
17 VIDEOGRAPHER:  Off the record at 4:28.
18             (OFF THE RECORD)
19 VIDEOGRAPHER:  Back on the record at 4:37.
20 BY MR. SLOSAR:
21     Q   Sergeant York, at the time you testified to
22 the Grand Jury, April 27, 2012, you knew that Ms.
23 Hoskins appeared for her appointment with Dr. Warren on
24 December 20, 2010, correct?
25     A   Yes.

Page 312

1      Q   The time you testified at the Grand Jury, you
2  knew that Ms. Hoskins was just 24 minutes late for her
3  appointment on that date, correct?
4      A   Yeah, but I believe somewhere in there they
5  told me they was supposed to be there at 9:30.  But yes,
6  that time.  I'm not arguing that time on that piece of
7  paper.
8      Q   And prior to you testifying at the Grand Jury,
9  you received the medical records from Dr. Warren and saw
10 that Ms. Hoskins' appointment was not until 11:30 a.m.
11 on December 20, 2010, correct?
12     A   That was on the form, yes.
13     Q   Yes.  And you knew the time that you testified
14 at the Grand Jury that Ms. Hoskins did not have a
15 prescription for Suboxone from Dr. Warren until December
16 20, 2010; isn't that right?
17     A   I knew she had one on that day but I mean,
18 previous, I don't know how many times she got it.  I'm
19 assuming this wasn't her first one.
20     Q   You didn't have any records indicating that
21 Ms. Hoskins had a new prescription from Dr. Warren on
22 December 19, 2010, correct?
23     A   Yes, that is correct.
24     Q   Okay.  And sir, do you recall testifying
25 before the Grand Jury that Ms. Hoskins was having an

Page 313

1  affair with Dr. Warren?
2  MR. WRIGHT:  Object to form and foundation but
3  testify best you can.
4      A   Yes, I believe Joe King advised me of that.
5  Yes.
6      Q   Did you do any investigation to determine
7  whether Ms. Hoskins and Dr. Warren were having an affair
8  prior to testifying before the Grand Jury?
9      A   I did go and ask him but he refused.  He was
10 supposed to write me a letter and I don't think he ever
11 did.  Also, I believe I got documentation.  I'm sure
12 it's in there somewhere, where he was doing things that
13 I was under the understanding he wasn't supposed to like
14 giving her Suboxone prescriptions when she had track
15 marks on her arm.
16     Q   Sir, I understand that.
17     A   That would indicate an inappropriate
18 relationship or I had a reasonable belief -- a
19 reasonable belief to believe that.
20     Q   Aside from Joe King, after Joe King said
21 Amanda Hoskins is having an affair with Dr. Warren, who
22 did you talk to to determine whether that was true?
23     A   The only person I asked was Mr. Warren.
24     Q   You asked Dr. Warren?  And he denied having an
25 affair with Ms. Hoskins, correct?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 314

1      A    Yes.  Yes.

2      Q    Did you talk to any of his staff members about

3  whether they had an affair?

4      A    I don't believe I did, no.  Not that I

5  remember.

6      Q    Definitely didn't document any such

7  investigation in your police report, correct?

8      A    No.

9      Q    Yeah.  Now, at the time you interviewed Joe

10  King, you knew that he was an ex-boyfriend of Amanda

11  Hoskins, correct?

12     A    Joe King?  I don't -- that was a very weird

13  relationship.  I don't know if they was on again or off

14  again because throughout the investigation -- for

15  example, there was one time when Amanda and Joe were

16  living in the house that William Lester had provided and

17  stuff so I can't tell you when exactly when they were on

18  again or off again.

19     Q    All right.  You testified earlier you received

20  medical records including some of the ones that are

21  before you right now from Ms. Cobb-Bunch during your

22  investigation, correct?

23     A    Yes, we went over that, yes.

24     Q    Yes.  Did you have a subpoena for those

25  medical records?

Page 315

1      A    No.

2      Q    Did you have a Court Order for those medical

3  records?

4      A    No.

5      Q    Did you have a signed HIPAA release from Ms.

6  Hoskins to get these medical records?

7      A    No.

8      Q    Did you have a search warrant that would allow

9  you to get those records?

10     A    No.  My understanding is that HIPAA doesn't

11  apply to a criminal investigation.  That was my

12  understanding of it.

13     Q    Were your actions in getting these records

14  without a subpoena, a warrant, court order or a HIPAA

15  waiver, were those -- was that action consistent with

16  the training that you received from KSP?

17  MR. WRIGHT:  Objection to form and foundation but

18  answer best you can.

19     A    The best I remember, that HIPAA does not apply

20  to criminal investigations.

21     Q    Let me ask you a different way.  Did anything

22  that you did with regard to getting these records

23  without a Court order or a subpoena or a search warrant,

24  did any of those actions violate any policy, procedure

25  or training from KSP as you understood it?

Page 316

1      A    Not that I remember.  Again, I was under the

2  understanding that HIPAA doesn't apply to rules for a

3  criminal investigation.

4      Q    Okay.  Well, there are rules for how you are

5  supposed to obtain evidence in a homicide investigation,

6  right?  Is that right?

7      A    I remember going over that.

8      Q    Okay.

9      A    Do I have to tell you that?

10     Q    No.  You know what?  Let me ask you a

11  different way.  Are you supposed to get a search warrant

12  to retrieve evidence in a homicide investigation?

13  MR. WRIGHT:  Objet to form and foundation.  Answer

14  the best you can.

15     Q    Yes or no?

16     A    Obviously, that is a very -- how would you

17  say, an open-ended question.  You -- I would have to go

18  from a piece by piece.  Obviously, there is some things

19  that would -- you would have to have a search warrant

20  for.  For example, phone records.  But it is my

21  understanding with medical records in a criminal

22  investigation that HIPAA doesn't apply and if HIPAA

23  didn't apply, I wouldn't need a search warrant.

24     Q    So you have to get a search warrant to get

25  phone records but not medical records?  Is that your

Page 317

1  testimony, sir?

2      A    On an ongoing criminal investigation that's

3  right.

4      Q    Did you ever get permission from Ms. Hoskins

5  on February 15, 2011, to go get her medical records?

6  MR. WRIGHT:  Objection.  Form and foundation.

7  Answer best you can.

8      A    No.

9      Q    All right.  Let me ask you this.  You say in

10  your report, which is 279 to 280.  I'm sorry, sir.  Let

11  me look through here real quick.  We've got a lot of

12  exhibits.  You say in your report that Dr. Warren

13  refused to give you a statement but promised to give you

14  a letter.  Do you recall writing that in one of your

15  reports in this case?

16     A    I believe that's correct.

17  MS. STAPLES:  29, I think.

18  MR. SLOSAR:  29.

19  MS. STAPLES:  It think it's at 279.

20  MR. SLOSAR:    Okay.  Now -- yeah, you're right.

21  Thank you.

22          (EXHIBIT 29 MARKED FOR IDENTIFICATION)

23  BY MR. SLOSAR:

24     Q    All right.  Here's the report.  Here is the

25  last paragraph.  Will you read this to yourself, sir, of

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 318

1  280.  Let me know when you're finished.
2      A    Just this one?
3      Q    Yeah.
4      MR. WRIGHT: What exhibit are we on?  29?
5      COURT REPORTER:  29.
6      THE WITNESS:     It says 000280.
7      MR. WRIGHT:  Okay.  Go ahead.
8      MR. SLOSAR:  If you need another one, I can give
9  you a copy.
10     MR. WRIGHT:  No, I have it.
11 BY MR. SLOSAR:
12     Q    Okay.
13     A    Okay.  So I've read it.
14     Q    And you wrote this, correct?
15     A    I believe so, yes.
16     Q    And according to your statement on June 30,
17 2011, you went to the Faith Medical Center and talked to
18 Dr. Larry Warren, correct?
19     A    June 30, 2008 [sic].  Yes, that would be what
20 it says.
21     Q    June 2011, right?
22     A    Yes, that's what it says there.
23     Q    Okay.  And you asked Mr. -- Dr. Warren to give
24 a recorded statement, correct?
25     A    Yes.

Page 319

1      Q    And he refused, correct?
2      A    Yes.
3      Q    And that was all on June 30, correct?
4      A    Yes.
5      Q    And then he told you that he would write you a
6  letter, right?
7      A    Yes.
8      Q    Okay.  Well, sir, are you fabricating this
9  portion of your report about the June 30, 2011 interview
10 that you had with Dr. Warren?
11     MR. WRIGHT:  Object to form.  Foundation. Answer
12 best you can.
13     A    It could be a typo, but I'm thinking this is -
14 - I knew I talked to him.  I would have to look at the
15 case file.
16     Q    Are you lying about having a conversation with
17 Dr. Warren on June 30, 2011?  Yes or no?
18     A    No, I'm not lying.  Could there have been a
19 typo of one of the year or dates maybe, but I'm not
20 lying about having a conversation with him.
21     Q    Why would you say that there would be a typo?
22 Aren't you accurate when you document your reports?
23     MR. WRIGHT:  Object to form.  Foundation. Go ahead
24 and answer best you can.
25     A    Okay.  Obviously mistakes happen.  I'm not

Page 320

1  saying that there is one, but obviously you are trying
2  to make a point and get me pinned in on something that
3  I'm not doing.  Or trying to insinuate that I'm lying or
4  something like that which is not true.
5      Q    I'm asking you: did you fabricate this
6  conversation?  Yes or no?
7      A    I did not fabricate me talking to Dr. Warren.
8      Q    You had a conversation with Dr. Warren on June
9  30, 2011, correct?
10     A    I've already answered that.
11     Q    Yes.
12     A    I said I believe so, but I'm not -- the exact
13 date could be wrong.
14     Q    Sir, how did -- turn to the first page of this
15 report.  What day did you draft your report?
16     A    6-29-2011.
17     Q    Okay.  So you drafted this report a day before
18 you supposedly had a conversation with Dr. Warren,
19 right?
20     A    That's what it shows.
21     Q    Yeah.  So you knew that when you drafted this
22 report on June 29, 2011, that you did not have a
23 conversation with Dr. Warren the following day, correct?
24     MR. WRIGHT:  Object to form and foundation. Go
25 ahead.

Page 321

1      A    Say that again.
2      Q    You will agree with me that when you draft a
3  report on the 29th that you cannot document information
4  that you learned from an interview that happened with
5  Dr. Warren the following day because it had not yet
6  happened.  Would you agree with that?
7      A    Yes, that's the reason I said it could be a
8  typo.
9      Q    Okay.  Just a typo in a murder investigation,
10 right?
11     MR. WRIGHT:  Objection.  That's not a question.
12     Q    If Dr. Warren denied your accusation that he
13 refused an interview with you on June 30, 2011 or on any
14 other date, would he be lying?
15     MR. WRIGHT:  Object to form.  Answer best you can.
16     A    Absolutely.
17     Q    Okay.  Well, I'm going to show you what we'll
18 mark as Exhibit number 35.  PL 221 to 2294.  Shoot.  I'm
19 sorry.  It's 34. That's my fault.  Sir, you applied to
20 KSP in June of 2000, right?  Right?  You may wish you
21 didn't apply there right now.
22         (EXHIBIT 34 MARKED FOR IDENTIFICATION)
23     MR. WRIGHT:  Objection.
24     Q    You applied there in June of 2000, right?
25     A    That's what the date says on this, but this

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 322

1  has been so long, I don't remember this.  I don't even
2  know what this is.
3      Q   Do you -- why don't you turn to the last page
4  and tell me whether you remember whether Dr. Larry
5  Warren was a character reference for you when you
6  applied to KSP in June of 2000?
7      A   Oh, this would be -- I would love to.  Because
8  this Larry Warren is my former superintendent at my high
9  school, not the Dr. Larry Warren.
10     Q   Not Dr. Warren.  Okay.
11     A   Anymore questions?
12     Q   I have a lot more questions, Mr. York.  Yes.  I
13 do have some more questions.  Let's go to the next
14 exhibit.  This is PL 14301 through -- well, just 14301.
15     A   Let's back up.  He was a superintendent at
16 that time, but when I was in high school, he was the
17 principal.  I just don't want nobody to construe my
18 words.
19     Q   We don't want that happening.
20     MR. SLOSAR:        This is -- what exhibit are we on?
21     COURT REPORTER:    35.
22 BY MR. SLOSAR:
23     Q   35.  All right, sir.  Sir, I am going to ask
24 you to look at this document.  It's PL 14301.  Okay?
25 Counsel, I apologize.  The copy that he has is one-sided

Page 323

1  which was intentionally done.  This one has two
2  different documents on it, but I'm just asking him about
3  one with the handwriting on it.  PL 14301.
4      (EXHIBIT 35 MARKED FOR IDENTIFICATION)
5      MR. WRIGHT:  Exhibit 35?
6      MR. SLOSAR:     It is.
7      Q   Sir, that's your handwriting at the bottom of
8  this page, correct?
9      A   That appears to be my handwriting.
10     Q   10-10-1058, Katherine Mills murder, right?
11     A   Yes.
12     Q   Okay.  And you faxed this document to the
13 Commonwealth Attorney's Office looking at the top of
14 this page on November 28, 2012; is that right?
15     A   I know there's a date but that middle line is
16 out.  I can't tell where -- what dates it came from.  You
17 see what I'm saying right here?
18     Q   Sure.  Well, do you see on the left
19 where it says 11-28-2002?
20     A   Yes.
21     Q   Okay.  And I'll represent to you that Mr.
22 Steele has records in his file saying that you faxed to
23 him 19 pages of discovery on November 28, 2002.  It
24 should have been here but it's not my file.  Sir, you
25 also were the person who circled this "CO", right?

Page 324

1      A   I'm not saying I'm not.  I don't remember.  I'm
2  not saying I didn't.
3      Q   Well, you were the person who underlined the
4  appointment time and the arrival time, right?
5      MR. WRIGHT:  Objection to form and foundation.
6      A   It looks like 11:30 to 11:54.
7      Q   Did you underline the appointment time and the
8  arrival time?
9      A   I don't remember doing it.  I'm not saying I
10 didn't.
11     Q   Is that your star next to it?
12     A   I said I don't remember.  I'm not saying I
13 didn't do it, but I don't remember underlining it and
14 putting the star by it.
15     Q   So you're not saying that you -- I mean, you
16 acknowledge that you wrote on this document?
17     A   Yeah, I said that appears to be my
18 handwriting.
19     Q   Yeah.  And you don't -- you're not saying that
20 you did not write on this document by circling it and
21 underlining the time and putting a star next to the
22 time, right?
23     A   Yes.
24     Q   Okay.  And this was the document that was
25 found in Jackie Steele's file.  Okay?

Page 325

1      MR. WRIGHT:  Object to form and foundation.
2      A   Yes.
3      Q   And earlier I showed you Exhibit --
4      MR. SLOSAR:     Can you give me the exhibit number
5  of the first medical record?
6      MS. STAPLES:  30.
7      MR. SLOSAR:     I'm sorry?
8      MS. STAPLES:  33.  It's the packet.  334162.
9  BY MR. SLOSAR:
10     Q   Sergeant York, do you know where that packet
11 is of medical information?  I don't see that exhibit.
12     A   I'm not taking nothing out.  I pushed
13 everything right here.
14     MS. STAPLES:  Look at the bottom.  It looks like
15 yours.
16     MR. SLOSAR:     Oh, you're right.  All the way at
17 the bottom.  Sorry about that.  I'm not going to touch
18 that either.
19 BY MR. SLOSAR:
20     Q   You were responsible for providing the
21 discovery to Jackie Steele's office as the lead case
22 officer, correct?
23     A   Yes.
24     Q   Okay.  And you acknowledge that your
25 handwriting is at the bottom of this medical record,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 326

1  correct?
2      A    That would appear it is.
3      Q    And you don't discount the fact that it may be
4  your handwriting next to this information at the top,
5  correct?
6      A    Yes.
7      Q    Okay.  So Sergeant York, can you explain to me
8  why the time on the medical record, Bates stamp PL 14165
9  says that Ms. Hoskins arrived at 11:54 and why the
10  document that you sent to Jackie Steele at PL 14301 says
11  that Ms. Hoskins arrived at 12:54?
12      MR. WRIGHT:  I'm going to object here.
13  Characterization of what that second form says.  But
14  answer the best you can.
15      Q    Can you explain how that happened, Sergeant
16  York?
17      A    Well, it didn't happen.  That says 11:54.  I'm
18  assuming by it being a fax, it got smudged.  Obviously,
19  you can tell this is a fax copy.  Not only on that one
20  but other ones is a little bit more smudged.  I mean,
21  for example, look at the lines.  This is a good point.
22  See how the lines here are straight?
23      Q    Sure.
24      A    These lines here are up and down and not even.
25  Do you see that?

Page 327

1      Q    No, I do.  But can you tell me, would you at
2  least agree with me, that these are both supposed to be
3  11s.  11:30 a.m. and 11:54 a.m., right?  That's what
4  it's supposed to be?
5      A    That's what it is.
6      Q    Okay.  Now, the second digit in the 11:30 does
7  not look like the number 2 where the second digit and
8  the 11:54 does look like the number 2.  Would you agree
9  with that?
10      MR. WRIGHT:  Object to form.
11      A    Again, I want to go back and say this.  I did
12  not change anything and again, it is more than obvious
13  if you look at the two different ones how this one is
14  smudged.  The lines are not even straight on this one.
15  Do you see that?  Do you agree with that?  How that
16  lines are not even and smudged?
17      Q    I get that but that's not my question to you.
18      A    Do you agree with me on that on the lines?
19      Q    I agree with you that the lines are --
20      A    Uneven and smudged compared to the lines on
21  this one?
22      Q    Sure, sir.
23      A    Okay.
24      Q    My question to you is different.  Which his,
25  did you change the second digit in 11:54 to read 12:54

Page 328

1  a.m.?
2      A    No.
3      Q    And at the time that you sent these medical
4  records to Jackie Steele's office, by that point in
5  time, did you or have you taken the statement from Allen
6  Helton in this case that implicated Ms. Hoskins in the
7  homicide?
8      A    You asked if Allen Helton was before the Grand
9  Jury?
10      Q    Yes.
11      A    Yes.
12      Q    Okay.  So let's move on.  We're off with the
13  medical records, okay?  I'm going to show you what's
14  marked -- what we'll mark as 36.  This is PL 20498.  Do
15  you remember Christy Branson, right, sir?  Do you
16  remember her?
17          (EXHIBIT 36 MARKED FOR IDENTIFICATION)
18      A    I remember taking a statement from her, yes.
19      Q    Okay.  That statement.
20      A    Do you want me to put these any particular
21  place?  I don't want them to get lost again.
22      Q    Just keep them in that pile.  And I'm going to
23  try to keep my pile away from it so I don't mess up
24  something.  Okay.  So you took a statement from Ms.
25  Branson, right?  Right?

Page 329

1      A    Yes, do you want me to read through this?
2      Q    No.
3      MR. WRIGHT:  What's the Bates number on that?
4      A    It's PL 020498.
5      Q    Yep.
6      A    It's only got one page.
7      Q    Yep.  One page.  You took this statement,
8  correct?
9      A    Yes, I interviewed Christy Branson.
10      Q    You took this statement on May 16, 2011,
11  right?
12      A    Yes, sir.
13      Q    Okay.  Who was with you when you took this
14  statement from Ms. Branson?
15      A    I don't remember if anybody was with me.  I
16  remember Sheriff Pickard telling me that she came into
17  our office, I think, wanting to talk to me.
18      Q    Okay.
19      A    I don't know.  I don't remember who -- I don't
20  think nobody else was in the room.
21      Q    Did Sheriff Pickard tell you that Christy
22  Branson wanted to make a statement in this case against
23  Ms. Hoskins, Mr. Taylor and Mr. Lester for the murder of
24  Katherine Mills?
25      A    I don't think he went into all that.  I

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 330

1  believe he stated that Christy Branson wanted to talk to
2  me.
3      Q    And did Sheriff Pickard tell you that she
4  wanted to talk to you about the homicide of Katherine
5  Mills?
6      A    Yeah, it had something to do with that. Like
7  I said, I don't know the exact words.
8      Q    You don't recall who was with you during the
9  statement, correct?
10     A    No, if there was anybody in there other than
11 the Sheriff, I would imagine I would have put that. I
12 don't see it. Did you listen to it, I'm assuming?
13     Q    I have, yes.
14     A    Anybody else that I mention?
15     Q    I don't recall. No, I don't recall anybody.
16     A    You don't recall? Okay.
17     Q    Your -- that's fair. You were asking all the
18 questions from my recollection. Okay. Now, fair to say
19 that you spoke to Ms. Branson prior to turning on the
20 recorder?
21     A    That would be fair to say, yes.
22     Q    Okay. And the conversation that you had with
23 Ms. Branson prior to turning on the recorder, that
24 conversation is not reflected in the narrative that you
25 drafted, correct?

Page 331

1      A    That is correct.
2      Q    Okay. Do you have any idea what time your
3  interview with Ms. Branson actually began on May 16,
4  2011?
5      A    Other than -- you mean, how much time before?
6      Q    Yeah.
7      A    No.
8      Q    Okay. So I know that -- from looking at your
9  report, the recorded statements are at 11:00 a.m., but
10 it's fair to say that you're not sure how long you spoke
11 to her before that recording took place, correct?
12     A    Yes, sir.
13     Q    Okay. Now, according to your report, Ms.
14 Branson told you that Amanda Hoskins confessed
15 involvement to her in the murder of Katherine Mills,
16 correct?
17     A    Yes, if I remember without reading. But if
18 you want me to take time to read it, I will. But I
19 believe that she would tell you. But I believe this
20 one, she implicated that maybe Joe King done it and not
21 Jonathan Taylor. If I remember, if you'll give me a
22 second, I'll read it or if you want to agree with me if
23 you're familiar with it.
24     Q    No, I -- I'm not going to ask you a time. I
25 don't think you need to read it yet.

Page 332

1      A    Okay.
2      Q    Now, did -- Sergeant York, what promises did
3  you make to Ms. Branson before turning on the recorder?
4      MR. WRIGHT: Objection to form and foundation.
5  Answer best you can.
6      A    I don't believe she asked me for anything. I
7  don't remember anything she -- wanted anything.
8      Q    Do you have an independent recollection of
9  having a conversation with her about promises?
10     A    No, I do not remember.
11     Q    So if Ms. Branson says that you promised her
12 things in exchange for giving a statement, you wouldn't
13 deny that, right?
14     A    I don't remember --
15     MR. WRIGHT: Objection. Form and foundation.
16 Answer best you can.
17     A    I don't remember her asking for anything. I
18 know I didn't help her with anything. The only thing I
19 remember from the time that this happened is when -- I
20 want to say I believe her attorney was Sam Castle maybe.
21 I'm not for sure on that. But I believe he came forward
22 and said that she was in a car wreck and I believe that
23 I was under the understanding that he had documentation
24 and that she had some type of amnesia and didn't
25 remember giving me a statement.

Page 333

1      Q    So Ms. Branson later denied any knowledge of
2  Ms. Hoskins confessing to her, correct?
3      MR. WRIGHT: Objection to form and foundation.
4  Answer best you can.
5      A    No, that's not what happened. What happened
6  was that she was in a car wreck and -- like I said, I
7  did not look at the medical records. That's something
8  that I think the Commonwealth Attorney did because
9  I don't want to, as far as medical. But I -- my
10 understanding is that she was in a car wreck and her
11 attorneys said that she didn't remember because of the
12 brain injury. That's the best of my understanding. Now,
13 exactly what date that happened or month or anything
14 like that, I'm not familiar. And like I said, I'm not
15 saying that I read through each of her medical records
16 concerning the car wreck. Okay?
17     Q    Okay. You later testified to the Grand Jury
18 on April 27, 2012 about the substance of the information
19 contained in your report relating to Christy Branson; is
20 that right?
21     A    Yeah, I think that would be -- yes.
22     Q    And you testified similarly at the preliminary
23 hearing, too; is that right?
24     A    I should have, yes.
25     Q    And generally you told the Court at the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 334

1  preliminary hearing, you told the Grand Jurors that Ms.
2  Hoskins confessed to Christy Branson when she was
3  incarcerated, correct?
4      A   Yes, that -- yes.
5      Q   Okay.  All right.  Moving on.
6      A   From this one?
7      Q   Yeah.  Sir, how many times did you speak with
8  a witness by the name of Michael Crump during your
9  investigation?
10     A   I don't remember exactly how many.
11     Q   Okay.
12     A   I mean, obviously the ones that we've already
13 discussed.
14     Q   Okay.  Well, you acknowledged earlier that you
15 did not document each of your conversations or contacts
16 with Michael Crump throughout this investigation; is
17 that right?
18     A   Yes.
19     Q   Sir, I am going to show you what we'll mark as
20 Exhibit number 37.  This is KSP -- wait.  I'm sorry.  It's
21 PL 144435 to 36.  Take a look at that, sir.
22             (EXHIBIT 37 MARKED FOR IDENTIFICATION)
23     A   Go ahead and read it?  Okay.
24     Q   Do you recognize this report?
25     A   I'll review it.

Page 335

1      Q   Okay.
2      A   I read it and I don't remember making this
3  star.
4      Q   Okay.  Does that similar -- that star looks
5  similar to the one on the medical record that we
6  discussed a few minutes ago; is that right?
7      MR. WRIGHT:  Object to form and foundation.
8      A   I don't remember that.
9      Q   Does this look similar?
10     MR. WRIGHT:  Objection.  But do the best you can.
11     A   Not really.
12     Q   No?  All right.
13     A   No, because -- I mean, look.  You see her the
14 point on the, I guess, the first angle is below the line
15 here and here obviously, see here?  It's way above.
16     Q   Okay.  All right.  I'm going to show you what
17 we'll mark as Plaintiff's Exhibit number 38.  I don't
18 have extra copies of this file.  I apologize.  It's KSP 288 to
19 -- 289 to 290.  It's a different version of this report.
20 Sir, can you look at this two page report?  It's the
21 same text but it looks like this is -- if you flip over
22 to the backside of 37.  You flip this over.
23             (EXHIBIT 38 MARKED FOR IDENTIFICATION)
24     A   That's 36.
25     Q   36.  Okay.  So this is -- what is this?  This

Page 336

1  is 30 --
2      A   This is 290.
3      Q   Oh, no.  Sorry.  This is Exhibit 37.
4      A   You're confusing me now.  What numbers am I
5  trying to tell?
6      Q   If you flip over Exhibit 37, which I've done.
7      A   Okay.  You want me to look at this page?
8      Q   Yes.
9      A   Okay.
10     Q   You go to the second page of Exhibit 38.  You
11 agree with me that this is a different version of the
12 report because there's two lines on this second page and
13 there's three lines on this second page.
14     MR. WRIGHT:  I'm going to object based on the
15 foundation of these two reports.  But go on ahead and
16 review them.
17     A   Okay.  Let me -- I'm reading --
18     Q   And I'm just asking about the -- I'm asking
19 about the --
20     A   You're not asking me about the content?
21     Q   No.  Just is the second page of this report,
22 does it have a different number of lines than the second
23 page of this report?
24     A   Yes, this one has like one and a half and this
25 one has like two and a half, would you agree with that?

Page 337

1      Q   Okay.  Yeah.
2      A   And then there's no -- this page doesn't have
3  that line here.
4      Q   Yeah, Officer Cornett signed one of these
5  reports, correct?
6      A   He signed it, yes.
7      Q   Exhibit number 38.  And Exhibit number 37, he
8  typed out his name, correct?
9      A   Yeah, that is typed.  But I would point out
10 that, again, I don't want to -- I'm not trying to argue
11 with you but I mean, how this happened, I do not know.
12 It's the same content and there's nothing different.  I
13 don't know how that happened or remember anything about
14 it.
15     MR. WRIGHT:  I'm also going to object to the
16 foundation of where these reports came from.
17     Q   Did you ever review -- well, one of these
18 reports came from the KSP file, correct?
19     A   I don't know where you got them.
20     Q   I'm sorry.  You're right.  One of these
21 reports came from KSP.  That's fine.
22     MR. WRIGHT:  Well, I don't -- I object to that
23 representation.
24     MR. SLOSAR:  You know what, it's fine.
25     MR. WRIGHT:  There is --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 338

1    MR. SLOSAR: All right. Well, there's a KSP - -
2 there's a KSP 290 Bates stamp. So if --
3    MR. WRIGHT: Okay.
4    MR. SLOSAR: -- you're objecting that Kentucky
5 State --
6    MR. WRIGHT: I'm just objecting to the foundation.
7 BY MR. SLOSAR:
8    Q    Sir, I'm going to show you what we'll mark as
9 Exhibit 39. This is a report that you -- that Officer
10 Mefford drafted apparently. Please look over this and
11 review it.
12         (EXHIBIT 39 MARKED FOR IDENTIFICATION)
13    A    Okay. I read these two items.
14    Q    Okay. So based on your -- based on this 20 --
15 March 23, 2013 report, is it -- did you contact
16 Detective Mefford to look for an audio interview done by
17 Mike Cornett of Michael Crump early on in the
18 investigation?
19    A    Yes, it says on the March 23rd he contacted
20 me, yes.
21    Q    Okay. And you know, is it your recollection
22 that Mr. Crump was interviewed by Mr. Cornett on
23 December 22, 2010 about what he saw on the date of the
24 homicide? Was that generally what you recall?
25    A    Yes, sir.

Page 339

1    Q    Okay. And to your understanding, and I believe
2 you said as much in your interrogatory responses, there
3 was actually a recorded statement done by Mr. Cornett of
4 Mr. Crump during that December 22, 2010 interview,
5 right?
6    A    That's what -- yeah, Detective Cornett stated,
7 yes.
8    Q    And when you learned about that, you contacted
9 -- well, you learned about that audio statement after
10 Mr. Cornett took it, correct?
11    A    Was that a question or were you just --
12    Q    Yes, that's a question.
13    A    If I knew about the statement? Yes.
14    Q    Yeah. After he took that statement, Mr.
15 Cornett talked to you about what he learned from Michael
16 Crump; is that right?
17    A    Yes.
18    Q    Okay. And I'm going to show what we'll --
19 well, let me ask you this. Why weren't -- were you
20 present for the interview between Mr. -- Detective
21 Cornett and Mr. Crump on December 22, 2010?
22    A    No, sir.
23    Q    Why not?
24    A    We spread out to do neighborhood canvases and
25 went in different directions.

Page 340

1    Q    I mean, Mr. Crump was the only person who was
2 even -- let me rephrase it. Mr. Crump was the closest
3 person to an eyewitness in this investigation, would you
4 agree with that?
5    MR. WRIGHT: Object to form and foundation. Answer
6 best you can.
7    A    I mean, again, I'm not saying -- I don't want
8 you to put words in my mouth. He did not say I can
9 positively identify somebody. What he did say was that
10 he saw people there.
11    Q    Sure. Sure.
12    A    We agree on that?
13    Q    Yeah.
14    A    Okay.
15    Q    And there was nobody else in the investigation
16 aside from Cleo Brown that came forward and said that
17 they saw people at the Mills' residence on December 20,
18 2010. Do you agree with that?
19    A    Cleo Brown never gave me a statement saying
20 that.
21    Q    We'll get into it a little bit later. Aside
22 from Mr. Crump, can you think of another person who said
23 that they saw people at Ms. Mills' residence on the date
24 of her death?
25    A    No.

Page 341

1    Q    Okay. And I'm going to show you what we'll
2 mark as Exhibit 40. This is PL 15065. This is a report
3 that you drafted; is that right, Sergeant York?
4         (EXHIBIT 40 MARKED FOR IDENTIFICATION)
5    A    Yes, on February 2, 2011, this unit along with
6 Detective Bunch interviewed Michael Crump. Mr. Crump
7 gave a recorded statement to Detective Mike Cornett,
8 which I'm referring to this one.
9    Q    Yeah. So let me --
10    A    -- connected -- I'm sorry.
11    Q    I'm sorry. So let me stop you right there. So
12 you knew by February 2, 2011, that Mr. Crump had given a
13 recorded statement to Mr. Cornett, correct?
14    A    Yes, sir.
15    Q    Okay. And the following details that you put
16 in here, and you don't need to read it out loud. But
17 did that come from your interview with Michael Crump on
18 February 2, 2011 or did that come from you listening to
19 the recorded statement that Detective Cornett took from
20 Michael Crump on December 22nd?
21    A    I never listened to the recording. Detective
22 Cornett told me what was -- what he had said and so when
23 I interviewed Michael Crump, it wasn't recorded because
24 he didn't say nothing different than what Michael
25 Cornett had told me.



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 342

1    Q    Okay.  So -- but how did you know at the
2  beginning of the interview with Michael Crump that he
3  wasn't going to say anything that was different?  Well,
4  let me ask it a different way.  Is it fair to say that
5  before you talked to Michael Crump on February 2, 2011
6  with Detective Bunch, you had no idea what information
7  he was going to provide to you?
8       MR. WRIGHT: Object to form and foundation. Answer
9  best you can.
10   A    Say that one more time.
11   Q    So when you and Detective Bunch talked to
12 Michael Crump on February 2, 2011 --
13   A    You're talking about this page.  Okay.
14   Q    Yeah.
15   A    Okay.
16   Q    During that interview, you didn't know whether
17 Michael Crump was going to tell you something different
18 or similar to what he told Detective Cornett the day
19 before, right?
20      MR. WRIGHT:  Object to form.  Foundation.  Go
21 ahead.
22   Q    It's not a trick question.  You couldn't read
23 his mind, right?
24   A    I want to make sure.  As I am driving up there
25 before I get there, I had no idea.  You're right.  But

Page 343

1  once I got there and talked to him, there was nothing no
2  different.
3    Q    Okay.  And Michael Crump told you when he met
4  with you on February 2nd that he saw a white male coming
5  from Katherine's residence where she was found dead,
6  correct?
7    A    That -- yes.  That's one of the things.
8    Q    He told you the male had a hood in his head,
9  was wearing a hunting jacket with a camo pattern similar
10 to a popular hunting camo pattern called Mossy Oak,
11 correct?
12   A    That is correct.
13   Q    And then Detective Bunch did a sketch with you
14 and Michael Crump, correct?
15   A    That was the main reason why we went there was
16 to do a sketch of the male he saw.
17   Q    Okay.  And how long do you recall it taking
18 Detective Bunch to do that sketch?
19   A    I don't remember how long.  I don't -- I
20 couldn't even begin to give you an estimate on how long
21 it took him to draw.
22   Q    But you knew by February 2, 2011 that there
23 was a recording from Michael Crump that existed from his
24 December 22nd interview with Mr. Cornett.  Would you
25 agree with that?

Page 344

1    A    Yes.
2    Q    And on December 22, 2011 you were in charge of
3  the investigation file in this case, correct?
4    A    Yes.
5    Q    Okay.  And on February 2, 2011, you were in
6  charge of the investigation filed in this case, correct?
7    A    I'm sorry, is that just a sentence you asked
8  me?
9    Q    No, no, no.  So the time you wrote this
10 report, approximately a month later, in February you
11 were still in charge of the investigation file, correct?
12   A    Yes.  I was -- if you're asking me if I was
13 doing both of them, yes.
14   Q    And that's because you were the lead case
15 officer from KSP on this investigation, right?
16   A    Yes.  At that time.
17 COURT REPORTER:  We are at 40 minutes.
18 MR. SLOSAR:  Okay.  Thank you.
19   Q    At the time of the Grand Jury, you were -- on
20 April 27, 2012, you were in charge of that investigation
21 file, correct?
22   A    Yes, sir.
23   Q    Okay.  Now, who requested that a sketch be
24 done on February 2nd?
25   A    I believe I did.

Page 345

1    Q    Okay.  And why was it that you wanted a
2  request to be done?
3    A    Our intentions was to put that drawing out
4  there to hopefully get information on the case.
5    Q    Wanted to solve the murder of Katherine Mills,
6  right?  It's not a trick question.  Is that right?
7    A    We was trying to solve it, yes.
8    Q    Okay.  Sorry.  Exhibit 41, PL 2660.  Sir, is
9  this the sketch that Detective Bunch made in your
10 presence on February 2, 2011?
11        (EXHIBIT 41 MARKED FOR IDENTIFICATION)
12   A    This appears to be a copy but it appears to be
13 that.
14   Q    This is substantially similar to the sketch
15 that he did in your presence, correct?
16   A    Yes, but this is not that.
17   Q    It may have been.  The sketch, the original
18 sketch may have been larger, right?
19   A    I mean, all I'm saying is a print off.
20   Q    Okay.
21   A    It's not the original.  I don't want nobody
22 trying to say I'm saying this is it.
23   Q    But you're not saying this is a different
24 sketch than what was done.  You're just saying this is a
25 copy, right?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

346..349

Page 346

1    A    Yes.

2    Q    Okay.  And did you use this sketch during your
3 investigation of the Mills homicide to look for
4 potential    suspects?

5    A    Yes, I -- yes.  We used that sketch that
6 Trooper Bunch done.

7    Q    Now, sir, I am going to show you your
8 interrogatory response.  Actually, it is already an
9 exhibit.

10    MR. SLOSAR:    What is it?

11    COURT REPORTER:  3.

12    Q    Here it is.  Exhibit number 3.  I'll refer you
13 to your second interrogatory response.  Now, in your
14 second interrogatory response --

15    A    Are you talking about you want me to read
16 this?

17    Q    Actually, you know what?  Let's go to number -
18 - sorry.  Let me refer you to number 10.  I apologize.
19 Your 10th interrogatory response, you state that eluding
20 to Michael Crump, that "Crump consistently described the
21 persons he saw at the victim's residence on the day of
22 the murder but could not positively identify any
23 suspect"; is that right, sir?

24    A    Yes.

25    Q    Okay.  And earlier you testified, in fact,

Page 347

1 that you had sent some photographs to an Oklahoma Police
2 Department of Jonathan Taylor that Mr. Crump did not
3 identify -- did not positively identify Mr. Taylor's
4 photographs, correct?

5    A    But he didn't positively say it wasn't either.

6    Q    That's not what I asked you.

7    A    I said yes.

8    Q    When you sent the photographs -- when you sent
9 the photographs to Oklahoma, did Mr. Crump positively
10 identify Jonathan Taylor's photograph?

11    MR. WRIGHT:  I'll object to form and foundation.
12 Go ahead and answer.

13    Q    Yes or no?

14    A    Yes, that is correct.  He could not positively
15 identify whether it was or was not.

16    Q    Okay.  And sir, I'm going to show you what we
17 will mark as Exhibit number 42.

18    (EXHIBIT 42 MARKED FOR IDENTIFICATION)

19    A    Can we move past this one?

20    Q    Not yet, not yet.  Now, these aren't a great
21 copy but here -- they get better after the first page.
22 Are these, can you tell me, which of these photographs
23 you sent to Oklahoma for Mr. Crump to review?

24    A    I can't tell you one -- which ones, no.

25    Q    Okay.

Page 348

1    A    It could have been all of them.  It could have
2 been one of them. I don't remember.

3    Q    Okay.  But you sent at least one of these
4 photographs of Jonathan Taylor for Mr. Crump to look at,
5 correct?

6    A    Yes.

7    Q    And at the time --

8    A    I believe so.  I don't know which ones so I
9 don't want you to --

10    Q    Okay.  Well, I'm going to look at -- I'm going
11 to focus on -- why don't we look at PL 5070 now.  I've
12 got PL 5070 in front of you and your sketch in front of
13 you, correct? The sketch in Exhibit 41 that Detective
14 Bunch did in your presence?

15    A    Okay.

16    Q    Is that right?

17    A    Yes.  A copy of it.

18    Q    Okay. All right.  Tell me whose idea it was to
19 take photographs of Jonathan Taylor, those photographs
20 that are in front of you.

21    A    I don't remember.  I probably took them.  I
22 don't know or remember what was behind it.  I'm not
23 denying that I took them.  I don't remember exactly the
24 date or time.

25    Q    Do you remember you and Detective Broughton

Page 349

1 taking these photographs together of Jonathan Taylor
2 after Court one day?

3    A    After Court one day?  I don't remember.  I'm
4 not saying that we did not take the pictures, but what
5 I'm saying, I don't remember where or when the exact
6 dates were.

7    Q    Okay.    Well, you told Jonathan Taylor to put
8 on this hoodie and have the hood over his head when you
9 took the photographs, right?

10    A    Probably so, yes.

11    Q    Yeah.  And that's because you knew that Mr.
12 Crump's sketch had a hood over the suspect, right?

13    A    Yes.

14    Q    So you wanted the photographs of Jonathan
15 Taylor to look like the sketch that was done by Michael
16 Crump, correct?

17    MR. WRIGHT:  Object to form and foundation. Answer
18 best you can.

19    Q    Is that right?

20    A    Is -- as long as -- all the pictures I took of
21 different people.  Yes.

22    Q    Okay.  And you also told Jonathan Taylor to
23 turn to the side, correct?

24    MR. WRIGHT:  Object to form and foundation. Answer
25 best you can.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

350..353

Page 350

1      A    I'm not saying I didn't.  I don't remember
2  exactly.  I'm sure I did.
3      Q    Okay.  Well, you knew that Detective -- or
4  that Mr. Crump's sketch had the hair of the individual
5  that he saw out of his hoodie a little bit, right?
6      A    Yes, yes, yes.
7      Q    And so when you told Jonathan Taylor to take
8  these photographs, you told him to leave some of his
9  hair out of the hoodie so it would look like the sketch.
10     MR. WRIGHT:  Object to form and foundation.
11     Q    Isn't that right?
12     A    I'm not saying I told him those in exact
13  words, but okay.
14     Q    Okay.  Well, you don't disagree with that, do
15  you?
16     MR. WRIGHT:  Object.  Answer best you can.
17     A    I -- I -- I'm agreeing that I took these
18  photographs and told him to turn sideways.  But exactly
19  -- exactly the language I used verbatim, I'm not saying
20  yes or no.  I don't remember.
21     Q    So you gave Mr. Taylor instructions on what to
22  do when you took these photos.  Do you agree with that?
23     MR. WRIGHT:  Objection. Answer best you can.
24     A    Yes, I told him that I was going to take
25  pictures of him.  Yes.

Page 351

1      Q    Okay.  And you told him to put on a hoodie,
2  correct?
3      A    Yes, probably I did.  As I did with all of
4  them --
5      Q    Told him to --
6      A    -- that I took pictures of.
7      Q    -- you told Mr. Taylor to put the hood on his
8  head, right?
9      A    I think the same way I did William Lester,
10  yes.
11     Q    And now, you -- you're saying today under oath
12  that you think that you took photographs of William
13  Lester in this case?
14     A    I believe so.  I can't remember when or where.
15  And then, obviously, I took pictures of Mike Simpson,
16  but you already saw those.
17     Q    Yeah.  And the photographs of Mike Simpson
18  that you took, would you agree that he is actually
19  wearing a hoodie?
20     A    Yes.
21     Q    Okay.  And I'm looking at PL 15318.  Now, Mr.
22  Simpson's pictures, you did not tell him to put the
23  hoodie on top of his head, correct?
24     MR. WRIGHT:  I'll object to form and foundation.
25  Answer to the best of your memory.

Page 352

1      A    What's the date on that?
2      Q    Well, you told me earlier under oath that you
3  took this photograph the same day that you got the Post-
4  it note, which was December 24, 2010, right?
5      A    What date was this?
6      Q    You're right.  So this was done in February 2,
7  2011, right?
8      A    Yeah.
9      Q    Okay.  So at the time that you -- but you
10  testified earlier that Mr. Cornett did this interview
11  with Michael Crump on December 22, 2010, right?
12     A    Yes.
13     Q    That was two days before you went to go talk
14  to Mike Simpson, right?
15     A    It should -- yes.  I guess.
16     Q    This happened on the 24th, this happened on
17  the 22nd, right?  Cornett's interview with Crump was
18  December 22nd.
19     A    Was the 22nd.  Then he came back to -- okay,
20  yes.
21     Q    Yeah.  Okay.  And would you agree that Mike
22  Simpson actually has hair that is similar to the sketch
23  drawn up for Michael Crump?  Would you agree with that?
24     MR. WRIGHT:  Object to form and foundation but do
25  the best you can.

Page 353

1      A    I can tell you they both have hair.
2      Q    Well, he's got what looks like to be sort of
3  bangs over his forehead, correct?
4      MR. WRIGHT:  I'll object to the characterization.
5  But go ahead, the best you can.
6      A    Yes, but this is more of a fuzzy beard.  Not
7  really -- I mean, he might have a fuzzy beard, but, you
8  know.
9      Q    Okay.  Well, he's got a mustache, right?
10     A    Yeah, I was talking about, you know, like this
11  right here.  You see here?
12     Q    Yeah.
13     A    This part right here, and where it comes down
14  and I -- that looked like to be a beard or something.  I
15  don't really see that there, do you?
16     Q    I do.
17     A    I mean, where at?
18     Q    He's got some -- he's got some facial hair --
19  he's got facial hair.
20     A    I mean, I'm talking about -- if you come back
21  from the nose.  See here?
22     Q    Well, what about --
23     A    Then you come here and go straight like that.
24  See that?
25     Q    All right.  Sir, do you agree that the sketch

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 354

1  drawn by Michael Crump on February 2, 2011 looks similar
2  to Mike Simpson?
3      MR. WRIGHT: Object to the form but answer the best
4  you can.
5      A   I will agree that there are similarities like
6  with Jonathan's, yes.
7      Q   Now, you -- you spoke to Michael Crump prior
8  to going to the Grand Jury on a number of occasions,
9  correct?
10     A   Yes, sir.  That would be correct.
11     Q   And Michael Crump told you in one of those
12 conversations that he was not going to identify Jonathan
13 Taylor; isn't that right?
14     MR. WRIGHT:  Object to form and foundation. Answer
15 best your memory.
16     A   Yes, he said he positively could not identify
17 Jonathan Taylor or positively could either.
18     Q   And you didn't document that in a report,
19 correct?
20     A   I don't -- I don't remember.  I don't think --
21 like I said, that was something that me and the defense
22 actually agreed on.  I don't think there was never --
23     Q   Sir.
24     A   -- that was ever called into question.
25     Q   Sir, I'm asking you.  Did you ever document

Page 355

1  that Michael Crump looked at photographs of Jonathan
2  Taylor and did not make a positive identification?  Yes
3  or no?
4      MR. WRIGHT:  Object to form.
5      Q   Did you document that?
6      A   I don't remember doing that.
7      Q   Okay.
8      A   I never did document saying it was a positive
9  I.D. either.
10     Q   Okay.  In fact, Michael Crump told you during
11 the investigation that he was not going to make up junk;
12 isn't that right?
13     MR. WRIGHT:  I'm going to object to the foundation
14 of that as well.  Answer best you can.
15     A   To my remember Michael Crump never did use
16 those words.  He said that he did not feel comfortable
17 positively ID'ing somebody because, like I said, he
18 didn't get a great look, I mean, to positively I.D.
19         somebody because he was driving by the front
20 of the residence as this -- the person was coming around
21 the corner of the residence.  And obviously, he wasn't
22 thinking anything out of the ordinary and, you know, he
23 just kind of saw a subject walking around.  And from the
24 best of his recollection, he gave what we had.  But he
25 went on to say that he could not positively identify

Page 356

1  Jonathan.
2      Q   Okay.
3      A   If that is the question, right?
4      Q   Well, the question I asked you was different
5  but I appreciate your testimony.
6      MR. SLOSAR:    Can you let me know when there's 25
7  minutes left?
8      Q   Sir, you didn't testify to the Grand Jury that
9  Michael Crump did not make an identification of Jonathan
10 Taylor after being shown photographs; isn't that right?
11     A   Say that again?
12     Q   You did not testify to the Grand Jury that
13 Michael Crump looked at photographs of Jonathan Taylor
14 and did not make a positive identification?
15     A   I don't remember saying that, no.
16     Q   Yeah.  Never told the Grand Jurors that,
17 right?
18     A   No, no.  I wasn't --
19     Q   Okay.
20     A   -- appearing for Mike Simpson at the Grand
21 Jury.
22     Q   No, no, no.  I'm saying with --
23     A   I'm agreeing with you.
24     Q   No, no.  I'm saying Jonathan Taylor.  You
25 never told the Grand Jurors that Mr. Crump did not make

Page 357

1  an identification of Jonathan Taylor.
2      A   Oh, okay.  Right, right.  Yes.
3      MR. SLOSAR:    Okay.  Let's take a short break
4  off the record.
5      VIDEOGRAPHER: Off the record at 5:31.
6          (OFF THE RECORD)
7      VIDEOGRAPHER:  Back on the record at 5:44.
8  BY MR. SLOSAR:
9      Q   Sir, I'm handing you what's marked Exhibit
10 number 43.  This is KSP 370 and 371.  It's a polygraph
11 report of Jessie Lawson.  I know that you testified
12 earlier about the results of the polygraph because you
13 had it contained in a report that you yourself drafted;
14 is that right?
15         (EXHIBIT 43 MARKED FOR IDENTIFICATION)
16     A   Yes.  I said, yes, this is accurate.
17     Q   Okay.  And you -- but this actual polygraph
18 report, you received the results of this report after it
19 was completed by KSP, correct?
20     A   Yes.
21     Q   And this is -- the information contained in
22 this report is what you included in your investigative
23 report that's part of the file, right?
24     A   I thought you was asking for it back.
25     Q   No, no.  But this is where you got the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 358

1  information that was contained in your report. It was
2  from this actual polygraph results report, correct?
3       MR. WRIGHT: Object to form and foundation. Answer
4  best you can.
5       Q   So in your -- let me ask it a little bit
6  better. Earlier, I showed you a report where you
7  included questions and answers that Jessie Lawson failed
8  during his polygraph exam, right?
9       A   Yes.
10      Q   Okay. The questions and answers that Mr.
11 Lawson failed, you knew about those because one, you
12 were present when he did his polygraph; and two, you
13 received the report that is before you prior to that?
14      A   Yes, I thought that -- I'm sorry. I thought
15 that was what we was looking at earlier.
16      Q   Okay. This is a different one. But you
17 received this prior to testifying at the Grand Jury,
18 correct?
19      A   Yes, I'm not arguing with that. Yes.
20      Q   Okay. Yep. And you did not tell the Grand
21 Jury that Jessie Lawson had failed his polygraph exam,
22 correct?
23      A   No, I was not appearing for Jessie Lawson.
24 That is correct.
25      Q   Sir, a few minutes ago, you were testifying at

Page 359

1  length about the photographs of Jonathan Taylor that
2  were sent to Oklahoma. You know, one or more of these
3  photographs that's contained in this group exhibit, and
4  the sketch that was done in your presence by Detective
5  Bunch and Michael Crump. Do you recall testifying about
6  the process of Jonathan Taylor's photographs being taken
7  in comparison to the sketch that was done?
8       A   I don't understand the question. What's the
9  question?
10      Q   Do you recall testifying about his photographs
11 being similar to the sketch? And you know what, let me
12 withdraw the question. Earlier, you testified that you
13 told Jonathan Taylor to put a hood on himself because
14 that was similar to the description provided by Michael
15 Crump in his sketch, correct?
16      A   Yes, I believe I said that. Yes.
17      Q   Okay. Is it fair to say that you wanted the
18 photographs that you sent of Jonathan Taylor to look as
19 close to the February 2, 2011 sketch as possible?
20      MR. WRIGHT: Object to form and foundation. Answer
21 best you can.
22      A   Yes. Are you referring to the hood? Yes,
23 yes.
24      Q   Okay.
25      A   Yes. As far as the hood, yes.

Page 360

1       Q   Yeah. Okay. And that's because you wanted
2  Mr. Crump to be able to make an identification of
3  Jonathan Taylor, correct?
4       MR. WRIGHT: Object to form and foundation, but go
5  ahead best you can.
6       A   Again, you're just saying did I want him to
7  make it the same? No, I just wanted to see possibly if
8  that was it. But again, I'm not saying -- nowhere in my
9  case is it documented that Michael Crump said this
10 photograph was --
11      Q   Okay.
12      A   -- was the person that he saw. He could not
13 positively I.D. Jonathan and I don't think -- I don't
14 remember anywhere in the case or any -- testifying
15 anywhere that I said that.
16      Q   Okay. We're going to play your Grand Jury
17 testimony. Listen to this please. 23:30 to 24:09.
18      (AUDIO CLIP PLAYED FROM THE GRAND JURY)
19      Q   So, sir, you testified that -- to the Grand
20 Jury, that Michael Crump identified the male with a hood
21 coming around the corner with tattoos on his hands
22 coming around the corner as Jonathan Taylor --
23      MR. WRIGHT: I'll object to form and foundation.
24 Go ahead.
25      Q   -- isn't that right?

Page 361

1       A   I don't remember saying those exact words, but
2  I did say that the person that Michael Crump described,
3  given with the probable cause I had with all the witness
4  statements, I had reasonable belief that that was
5  Jonathan Taylor given the fact of the description that
6  Michael Crump gave on top of the statements that I had
7  taken like from Amber Simpson and Kayla Mills and those.
8  Given all that together, I had reasonable belief to
9  believe that was Jonathan Taylor.
10      Q   And that's not how you described it to the
11 Grand Jury though, right?
12      A   Whether if they interpreted wrong, that's what
13 I meant.
14      Q   Okay. But you didn't say -- instead of saying
15 what you meant, which you're clarifying here today and I
16 appreciate the distinction. It's an important one. The
17 way you described it to the Grand Jury was that Michael
18 Crump identified the person with the hood on as Jonathan
19 Taylor. That's what you just testified to, what you
20 just listened to; isn't that right?
21      A   I didn't --
22      MR. WRIGHT: I'll object to the form of that.
23 Describe as best you can.
24      A   Can I listen again because I didn't take that
25 from that? And I'm not arguing with you.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 362

1    MR. SLOSAR:    Go to 23:30, please.
2         (AUDIO CLIP PLAYED FROM THE GRAND JURY)
3    A    Okay.  Again, when I said that, I said that he
4  described a male.  I never did say there that he's --
5  can I finish, please?  I never did say that Michael
6  Crump said positively ID'd Jonathan Taylor.  I said he
7  described a male and then if you notice, I apologized at
8  the end of the sentence.  And I said that was Jonathan
9  Taylor given the fact of the description and of the
10  other statements.
11    Q    Sir, you did not tell the Grand Jury that you
12  took the inference in the description from Michael Crump
13  and built an inference from his description from the
14  other statements he took.  Would you agree with me that
15  you did not explain that to the Grand Jury?
16    MR. WRIGHT:  Object to form and foundation. Answer
17  best you can.
18    A    I'm not sure what inference means.  Can you
19  explain that better, please?  Put it in simple terms.
20    Q    You -- you -- you told the Grand Jury that Mr.
21  Crump provided the description --
22    A    Got you.
23    Q    -- and that that person was Jonathan Taylor,
24  correct?
25    MR. WRIGHT:  Object to the form.  Foundation.

Page 363

1    A    I'll go back.  If you listen to it, I said he
2  described a white male and then I paused.  I did not say
3  that Michael Crump positively ID'd Jonathan Taylor.  I
4  mean, unless my hearing is bad, I did not say that and
5  then I paused and then I said, and that was Michael
6  Crump and I -- the reason why I said that is -- what I
7  went into before is because of that and the other
8  witness statements.
9    Q    All right.  Well, but you didn't tell the
10  Grand Jurors that the reason why -- you didn't tell --
11  when you told the -- when you told the Grand Jurors that
12  Michael Crump's description was Jonathan Taylor, you
13  didn't tell them that you were providing that testimony
14  based on Crump's description plus witness statements.
15  Would you agree with me?
16    MR. WRIGHT:  I'm going to object to the form and
17  foundation.  We just listened to a snippet of that but
18  describe best you can.
19    A    Again, I am not trying to be difficult and
20  argue with you but I did not say that Michael Crump
21  positively ID'd -- it says what it says.
22    Q    You said Michael Crump's description is
23  Jonathan Taylor?
24    MR. WRIGHT:  I object to that characterization.
25  That is wrong.

Page 364

1    Q    I appreciate -- well, you should listen to the
2  Grand Jury again.
3    MR. WRIGHT:  I did listen to it and he didn't say
4  that at all.
5    MR. SLOSAR:  All right. Thanks for your speaking
6  objection.  I appreciate it.
7    A    I don't think I said it.  I said he described
8  a white male.
9  BY MR. SLOSAR:
10    Q    All right.  Sir, let's move on.  The record
11  audio speaks for itself.  You've got an exhibit before
12  you, 44, right?  This is a report that you drafted on
13  July 31, 2012; is that right, Sergeant York?
14         (EXHIBIT 44 MARKED FOR IDENTIFICATION)
15    A    July --
16    Q    July 18 -- well, July 21, 2012 you drafted
17  this report, correct?
18    A    Yes.
19    Q    Okay.  The Grand Jury indictment was April 27,
20  2012, correct?
21    A    Yes.
22    Q    Okay.  According to this report, you and
23  Detective Mefford met with Daniel Wilson on July 18,
24  2012, correct?
25    A    Yes, that's what it says.

Page 365

1    Q    Okay.  Would you agree -- prior to July 18,
2  2012, did you or Detective Mefford or any other officer
3  to your knowledge receive information from Daniel Wilson
4  relating to the investigation of Katherine Mills?
5    A    I can't remember exactly because, I'm sorry,
6  I'm not saying that anything on this is incorrect.  But
7  as far as when I first became aware of it, I get to him
8  and the other one, I believe, it was Broughton Beach.
9    Q    Broughton Beach.
10    A    Yeah.  As far as how I became aware of that, I
11  know one of them, I think, prison --
12    Q    Robert Beach has the sister, Margaret, who you
13  talked to.
14    A    What I'm saying is I believe the prison
15  reached out to us and said he might want to talk to us.
16  But now I'm not saying -- I'm not saying it happened on
17  this specific date or time.
18    Q    Let me ask you it this way.  You did not have
19  a statement or receive information from Daniel Wilson
20  that implicated the plaintiffs in this case prior to
21  testifying at the Grand Jury on April 27, 2012, correct?
22    A    I don't remember the original date. Obviously,
23  he is far away at Rotary Correction Complex.  I don't
24  know the specific date.  I'm not saying it was before or
25  after it.  It could have been either.  I don't remember.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

366..369

Page 366

1   Q   Sir, if you had learned -- if you had learned
2  information from Daniel Wilson that implicated the
3  plaintiffs, you would have testified to that information
4  before the Grand Jury when you sought to initiate
5  charges; is that right?
6   A   If it's not in there, then I probably wasn't
7  aware of it.
8   Q   Okay.  And it's not in there, sir.  So then
9  according to your report, Daniel Wilson told you that he
10 did not want to be recorded; is that true?
11   A   Yes, if that's the way he answered.
12   Q   Did Detective Mefford ever leave the room when
13 you spoke with Daniel Wilson on July 18, 2012?
14   A   I don't remember if Detective Mefford left or
15 not.  Like I said, we was in a room for quite a while
16 before they brought Mr. Wilson to our room and I don't -
17 - but as far as if he got up during while he was talking
18 to us, I can't recollect.
19   Q   Sitting here today, do you recall how you
20 first learned about Daniel Wilson?
21   A   I already stated that.  I mean, I can't
22 remember.  The -- one of the prisons reached out to
23 post and said that this guy wanted to talk to us, I
24 believe.
25   Q   You never documented that in a police report

Page 367

1  though, correct?
2   A   No.
3   Q   Okay.  And you never documented which person
4  from the prison reached out to you, correct?
5   A   No, I do not remember.  And again, with him,
6  in regards to him and Robert Beach, I think one of them
7  reached out to the Commonwealth.  I'm not for sure.  Or
8  maybe both.
9   Q   We're going to get there, Mr. York.  With
10 regard to Mr. Wilson, is it fair to say you don't recall
11 what you told him during this interview?
12   A   What I told him?
13   Q   Yeah.  What did --
14   A   I was there to listen to what he had to say.  I
15 wasn't there to, you know, tell him stuff.
16   Q   What did you say to him?
17   A   Tell me what you know.  I mean, I know that's
18 one of the things I would say to him.
19   Q   Okay.  Well, did you tell Mr. Wilson that you
20 would speak to a prosecutor on his case if he helped you
21 out and gave you a statement?
22   A   No, I think that's inaccurate.  Now, I know he
23 wanted something but what I think he wanted was to be
24 moved closer because -- let's see, Robert Beach was in -
25 - he was in Indiana.

Page 368

1   Q   Yes.
2   A   But I knew one of them wanted to be moved
3  closer to home so it was probably Wilson and, obviously,
4  I can't promise anything.
5   Q   Well, Beach was in -- Beach was in Indiana.
6   A   Yeah, that's what I'm saying.  Beach was the
7  one in Indiana and also he is at LaGrange.  So I knew --
8  my point being I knew one of them wanted to be moved to
9  a different location in Kentucky.  Obviously, that's
10 going to be Wilson, not Beach.  That's my point.
11   Q   Did you document that in this report?
12   A   No, I don't think I did.
13   Q   Did --
14   A   I did not promise him because obviously I am
15 not over the Department of Corrections or anything like
16 that.
17   Q   Well, did you tell him that you would look
18 into it?
19   A   I told him that I would mention it to the
20 Commonwealth Attorney.
21   Q   Okay.  All right.  I'm going to ask you some
22 questions about Robert Beach now, sir.
23   A   So we're moving on from this?
24   Q   Moving on, moving on.  This is PL 243 through
25 245.  And sir, while I'm looking for this document.

Page 369

1  Earlier we talked about the February 15, 2011 statement
2  you took from Amanda Hoskins.  Do you recall that?
3   A   Yes.
4   Q   Yeah.  We went over the report, right?
5   A   Yes.
6   Q   You made a recording of it too?
7   A   Yeah.
8   Q   Okay.
9   A   I don't believe we listened to it, did we?
10   Q   No, we didn't.  Now, during that February,
11 2011 questioning of Ms. Hoskins, do you remember having
12 her call William Lester?
13   A   Yes, I believe she did to try to get him to
14 talk about what he had previously told her.  But if I
15 remember correctly, he would not say anything about what
16 he said about as far as him talking about robbing
17 Katherine Mills because of him having knowledge of
18 selling timber or not meaning to talking to, I believe,
19 Wesley Rowe or Jonathan or Joe King.
20   Q   All right.  Well, let's -- let me ask some
21 questions.  Okay.  I appreciate the volunteering of
22 information.  You told Ms. Hoskins to call William
23 Lester, correct?
24   A   Yes.
25   MR. WRIGHT:  Object to form and foundation.  But



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 370

1   answer best you can.
2       Q    And isn't it true that at the time you told
3   Ms. Hoskins to call William Lester that Mr. Broughton
4   was in the room?
5       A    He could have been. I'm not saying no. I
6   know he was present during most of the interviewing. I
7   don't remember if he got up or walked out but it's
8   possible.
9       Q    And isn't it true that you poured --
10      A    I poured?
11      Q    -- you put, sorry, an arrest warrant on the
12  table prior to telling Ms. Hoskins to call William
13  Lester?
14      MR. WRIGHT: Object to form and foundation. Answer
15  best you can.
16      A    I don't think I charged her with murder until
17  after this.
18      Q    No, I'm not saying what you charged --
19      COURT REPORTER:    Ten minutes.
20      A    What? I'm sorry.
21      MR. SLOSAR:    What?
22      COURT REPORTER: You have ten minutes.
23      Q    All right. I'm not saying whether you charged
24  her with murder. I'm saying did you put a piece of
25  paper on the table and say that you were going to charge

Page 371

1   her unless she called William Lester?
2       MR. WRIGHT: Object to form and foundation. Answer
3   best you can.
4       A    I don't remember saying those exact words. She
5   was picked up, if I remember, on other charges. Excuse
6   me, because I don't remember what them particular
7   charges are. But I think she had bench warrants or
8   probation violation or something of that nature. If you
9   already know, go ahead and stop me. Because I don't
10  know.
11      Q    So she -- so she -- so you may have threatened
12  to arrest her with another warrant but it would have
13  been not for -- a warrant for the murder investigation,
14  is that what you're saying?
15      MR. WRIGHT: Object to form and foundation. Answer
16  best you can.
17      A    I'm not -- I think I agree with you but yeah.
18      Q    Okay. Okay. So you don't disagree with that?
19      A    I agree that she was being arrested on other
20  charges. What I'm saying is she was not being arrested
21  on a murder warrant that day. Is that -- is that -- is
22  that what we're agreeing on?
23      Q    Okay. I get it. Yes. Yeah. But what I'm
24  asking you is: did you threaten to arrest Amanda unless
25  she called William Lester? That's my question to you.

Page 372

1       A    I know she was already arrested.
2       Q    Okay. So you didn't need to threaten to
3   arrest her?
4       A    She had bench warrants on unrelated charges. I
5   did not say if you -- it's not -- I don't remember saying "If you
6   don't call her that" --
7       Q    Call him.
8       A    -- "I'm going to go get a murder warrant for
9   you right at this moment."
10      Q    Okay. Exhibit 45. This is a letter from
11  Robert Beach. You saw this letter during your
12  investigation, correct?
13          (EXHIBIT 45 MARKED FOR IDENTIFICATION)
14      A    I'm totally confused. Are we moving on from
15  what we just got done talking about?
16      Q    Yes, we're moving on.
17      A    I'm sorry.
18      Q    You saw this letter during your investigation,
19  correct?
20      A    Again, it's -- this copy is hard to see. Let's
21  see.
22      Q    Okay. Well, the first -- looking at the
23  first page, would you agree with me that according to
24  this correspondence, Allen Trimble, the Commonwealth
25  Attorney, did not send this to Jackie Steele until May

Page 373

1   18, 2012. Would you agree with that?
2       A    Where are you getting that?
3       MR. WRIGHT: I'll object to the foundation.
4       Q    First page.
5       A    I'm sorry. I was looking at the --
6       MR. SLOSAR:    Will you give me a five-minute?
7   Hello?
8       COURT REPORTER:    Yes.
9       A    That says --
10  BY MR. SLOSAR:
11      Q    May 18 --
12      A    May 18, 2012.
13      Q    Yeah. Okay. So Allen, according to this
14  document, Jackie Steele didn't even receive information
15  about -- about Mr. Beach until after you testified at
16  the Grand Jury; is that right?
17      A    Yes. Yes.
18      Q    Okay. And so fair to say the time you
19  initiated charges against the plaintiffs that you didn't
20  yet speak to Robert Beach; is that right?
21      A    Yes, that is correct.
22      Q    Okay. All right. We're going to turn to
23  another exhibit now.
24      A    We're not going over the letter or anything?
25      Q    Nope. This is going to be Exhibit 46. Sir,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 374

1  during your investigation of this case on December 7,
2  2011 -- I'm sorry.  This is 46.  I've got to remark it.
3          (EXHIBIT 46 MARKED FOR IDENTIFICATION)
4      A   You need to mark this one?
5      Q   Yeah.  Did you draft this report?
6      MR. WRIGHT:  What are we looking at?
7      Q   Did you draft this, sir?
8      A   Yes.  Yes, I did.
9      Q   Okay.
10     A   Yes, sir.
11     Q   Why did you not disclose this to Jackie Steele
12 prior to -- well, let me rephrase that question.  Why
13 didn't you give this report to Jackie Steele at any time
14 during your investigation?
15     MR. WRIGHT:  I'll object to form and foundation.
16 Answer best you can.
17     Q   I'll represent to you that this is not in
18 Jackie Steele's file.
19     A   Again, I don't know why this -- obviously, I
20 generated it, I put it in the KSP file.  When I transmit
21 it, it should have went into the -- a file -- the KSP
22 file.  Are we agreeing to this point?
23     Q   It should have been in there, right?  But it
24 wasn't.
25     A   It wasn't in the KSP file?

Page 375

1      Q   It is in the -- it's in the KSP file.  It is
2  not in the --
3      A   That's what I said.  Can we agree on the KSP
4  file?
5      Q   -- it's not in -- yes.  It's in the KSP file.
6          It's Bates-stamped KSP 281.  What I'm saying
7  is this was not in Jackie Steele's file.  My question to
8  you is: why did you not give this to him during the
9  underlying investigation?
10     MR. WRIGHT:  And I'm going to object to the form
11 and foundation.  Answer best you can.
12     A   I don't --
13     COURT REPORTER:  Five minutes.
14     A   I don't remember why this -- he shouldn't have
15 had this.
16     Q   Okay.  On December 7, 2011, according to this
17 report, you had a conversation with Shawn Kinningham at
18 the Laurel County Detention Center; is that right?
19     A   Yes, sir.
20     Q   Mr. Kinningham told you that Brian Mills
21 confessed to himself, Shawn Kinningham and his friends,
22 that he hit Katherine Mills over the head and took her
23 money that she had got from selling timber; is that
24 right?
25     A   Yes, it's what this report says.

Page 376

1      Q   Okay.
2      A   And then -- that's the reason why Trooper
3  Ferris told me that he wasn't in the state --
4      Q   Did you ever --
5      A   -- when this -- when the incident happened
6  with Katherine Mills.
7      Q   Did you ever speak to Brian Mills about this
8  supposed confession?
9      A   No, I don't think I did personally.  I don't
10 remember doing it, no.
11     Q   And there's no police reports that you've seen
12 about -- from any Trooper about any questioning of Brian
13 Mills about this confession, correct?
14     A   Again, whether it was a police --
15     Q   Yes -- yes or no?
16     A   -- or testimony.  And I don't remember doing
17 it myself or saying -- but I believe it was common
18 knowledge that -- and obviously it was since Trooper
19 Ferris is involved in this lawsuit, that he told me that
20 he found out, and I'm not putting words in his mouth,
21 that this -- Brian Mills was, I think, in Indiana or
22 Illinois maybe at the time this happened.
23     Q   Sir, my question to you is: what investigation
24 did you independently do into Brian Mills and did you
25 ever question him about this confession?

Page 377

1      MR. WRIGHT:  And I'll just object.  I think the
2  prior question was about other Troopers but go ahead and
3  answer this question.
4      Q   Did you -- okay.  Did you ever question Brian
5  Mills?  Yes or no?
6      A   I did not.
7      Q   Did you ever personally do any investigation
8  into the statement by Brian Mills?  Yes or no?
9      A   Yes, I did.  And I explained -- just what I
10 said earlier about asking Trooper Ferris and he -- about
11 it and he said that he was in -- now, I don't know -- I
12 don't know.  I'm not putting words in Trooper Ferris'
13 mouth and -- about exactly where or when he came across
14 that information.
15     Q   All right.  Let me ask you this question.  And
16 I'm showing you what's marked as Exhibit 47, I believe.
17     A   So we're moving on from this one?
18     Q   Yeah.  47.  Two questions:  did you take that
19 report of Mikey Bruner?
20         (EXHIBIT 47 MARKED FOR IDENTIFICATION)
21     A   Yes, sir, I did.
22     Q   And you took that report on April 29, 2015,
23 correct?
24     A   Yes, sir.  I did.
25     Q   Okay.  That's after you initiated charges

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 378

1  against the plaintiffs on April 27, 2012, correct?
2      A    Yes, and I think this is a good statement
3  saying as far as we're going back --
4      Q    Look, look.  It's a yes or -- it's a yes or
5  no?
6          MR. WRIGHT;  That's all right.  Just let him
7  continue.
8      Q    Is that correct?
9      A    Yes.
10     Q    Okay.  Okay.  Sir, you spoke to Bob Smith
11 during the underlying investigation at his home on May
12 1, 2012 with Sheriff Pickard, correct?
13     A    I don't know what particular day I talked to
14 Bob but I did talk to Bob.
15     Q    Sheriff Pickard was there, right?
16     A    You know, I don't remember that particular
17 day.  He could have very well been.  Again, I -- I
18 talked to him a lot through the course, but you're just
19 referring to this investigation, right?
20     Q    Yes.
21     A    And I talked to him more than once in this
22 investigation.
23     Q    Did you -- you didn't create any reports about
24 your contacts with Bob Smith in this investigation,
25 correct?

Page 379

1      A    We're not talking -- I don't think -- not
2  particularly with this case, no.
3      Q    Okay.  Did you tell Bob Smith that you would
4  sweeten his drug trafficking charges under the rug --
5  that you -- sorry.  Let me rephrase that.  Did you tell
6  Bob Smith that you would sweep his drug trafficking
7  charges under the rug if he told you how much Amanda
8  Hoskins and William Lesters -- and William Lester had
9  spent with him?
10     A    I don't remember saying those words.  And in
11 fact, he pled guilty.  I did charge him.  I don't
12 remember.
13     Q    Did you promise to give him a deal if he gave
14 you information in this case?
15     A    Again, me promising somebody something, I
16 can't promise nothing.  I said I would mention it if I
17 said anything to the effect.
18     Q    Okay.
19     A    Along those lines.
20     Q    Did -- did Bob Smith tell you that Ms. Hoskins
21 had never purchased drugs from him during this
22 investigation?
23     A    I believe so.  I think during -- like right
24 after Katherine Mills.
25     Q    Yeah.  You asked him that and he told you that

Page 380

1  she had never purchased drugs from him, correct?
2          MR. WRIGHT:  Object to form and foundation.
3      A    I -- I -- I'm not disagreeing.  Like I said, I
4  don't recollect right off the top of my head.
5      Q    Well, he told you -- Bob Smith told you, in
6  fact, that William Lester hadn't spent any money there
7  with him either buying drugs, correct?
8          MR. WRIGHT:  Object to form and foundation.
9      A    Yeah, I believe that is true about William
10 Lester.  I don't remember at all about William Lester.
11     Q    Okay.  And you never documented any of the
12 information you learned from Bob Smith about Ms. Hoskins
13 or Mr. Lester in an investigative report in this case,
14 correct?
15     A    Not that I recollect, no.
16         MR. SLOSAR:    Just for the record, I'm done with
17 questioning for right now.  We have an agreement to
18 reserve questions relating to punitive damages, right?
19         MR. WRIGHT:  Subject to what we put in writing on
20 that, yeah.
21         MR. SLOSAR:  Yes, until after summary judgment.
22 Just want to make sure that's on the record because I'm
23 preserving that for later.  We are going to seek
24 additional time with the Court relating to not only the
25 questions that were certified but some limited

Page 381

1  questioning that we were unable to get today in light of
2  Sergeant York's extensive investigation in this case.  I
3  appreciate all counsel being here.
4          MR. WRIGHT:  I will allow one question about you to
5  ask who he met with me, just to establish that
6  everything was privileged, that there was no third
7  parties, if you want to ask him whether he's met with
8  anybody with me who wasn't an attorney or a part of my
9  staff.  You can.  All I'm just saying is whenever I met
10 with him in preparation for this, it was privileged
11 discussions.
12         MR. SLOSAR:  I understand that, Counsel.  I
13 appreciate that clarification.
14 BY MR. SLOSAR:
15     Q    I have one more question for you, Sergeant --
16         MR. WRIGHT:  I'm moving to terminate unless that's
17 what the question is going to be.
18         MR. SLOSAR:  Well, it relates to that question,
19 which is that -- what you've said is that he has not
20 communicated or prepared with any other defendant here,
21 that his preparation was solely with you, right?
22         MR. WRIGHT:  You asked who he had met with with
23 counsel, was my recollection.
24         MR. SLOSAR:  Sure.
25 BY MR. SLOSAR:

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 382

1     Q    Well, during today's deposition, Sergeant

2 York, have you been exchanging text messages with the

3 defendants who are here today?

4     A    Uh --

5     Q    Yes or no?

6     A    Yes, because I work with them.

7     MR. SLOSAR:  Okay.  All right.  No further

8 questions.  We'll seek relief from the Court.  I would

9 instruct everyone here not to destroy any text messages.

10 Thank you.  We can go off the record.

11     VIDEOGRAPHER:  Off the record at 6:12, and that

12 concludes the deposition.

13            (OFF THE RECORD)

14     VIDEOGRAPHER:  Back on the record at 6:13.

15     MR. WRIGHT:  Derrick Wright on behalf of Jason

16 York.  I'm moving to terminate the deposition in

17 accordance with the Rules providing for a seven-hour

18 limit to the extent that any other defense counsel want

19 to reserve the right to examine him under the Rules. I'm

20 going to object to any redirect by Mr. -- by plaintiff's

21 counsel because they have exhausted their time.  But at

22 this time, I am moving to terminate based on the Rules.

23     MR. FARAH:  Licha Farah on behalf of Mike Broughton

24 and the City of Barbourville.  I do want to reserve my

25 right to question, limited questioning, but I have some

Page 383

1 questions for this witness regarding my clients and

2 their involvement in this and I respect the right of

3 counsel to terminate the deposition after seven hours,

4 but given the fact that plaintiff's counsel exhausted

5 the entire seven hours, I think that the defendants,

6 including myself, have a right to ask some questions of

7 this witness in discovery so I reserve that right.

8     MR. KELLEY:  Likewise.  I'm John Kelley, and I'm

9 here representing Sheriff Pickard and Deputy Eubanks.

10 And we too would ask to reserve an opportunity to ask

11 questions of this witness concerning my clients' alleged

12 involvement in this matter.

13     MS. KINSER:  Shawna Kincer on behalf of KSP

14 defendants Eubanks, Mark Mefford, Brian Johnson, Jackie

15 Joseph and Kelly Ferris that we also reserve the right

16 to ask any questions.

17     MR. SLOSAR:  And just so the record is clear, I do

18 believe that if defense counsel has the ability to ask

19 Mr. York questioning, that we would be afforded an

20 opportunity to provide some limited re-direct.  We will

21 obviously file a motion with the Court asking for a

22 short amount of additional time for questioning in this

23 case of Defendant York.  That's all.

24     MR. WRIGHT:  And we object to that because they

25 have exhausted their seven hours.  That's all.

Page 384

1     VIDEOGRAPHER:  Off the record at 6:15, and that

2 concludes the deposition.

3            (EXHIBIT 28 MARKED FOR IDENTIFICATION)

4            (DEPOSITION CONCLUDED AT 6:15 P.M.)

Page 385

1 CERTIFICATE OF REPORTER

2 COMMONWEALTH OF KENTUCKY AT LARGE

3

4     I do hereby certify that the witness in the foregoing

5 transcript was taken on the date, and at the time and

6 place set out on the Title page hereof by me after first

7 being duly sworn to testify the truth, the whole truth,

8 and nothing but the truth; and that the said matter was

9 recorded by me and then reduced to typewritten form

10 under my direction, and constitutes a true record of the

11 transcript as taken, all to the best of my skills and

12 ability. I certify that I am not a relative or employee

13 of either counsel, and that I am in no way interested

14 financially, directly or indirectly, in this action.

15

16

17

18     *Jessica Van Tilburg*

19

20

21

22 JESSICA VAN-TILBURG,

23 COURT REPORTER / NOTARY

24 COMMISSION EXPIRES ON: 06/28/2020

25 SUBMITTED ON:  02/23/2018

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

## Exhibits

**EXHIBIT 2**
45:16,20,23

**EXHIBIT 3**
75:10,13
346:12

**EXHIBIT 5**
108:18,19,22

**EXHIBIT 7**
125:7 137:7,22

**EXHIBIT 8**
137:10 142:22
143:1

**EXHIBIT 9**
145:6,9

**EXHIBIT 10**
152:6,8,22

**EXHIBIT 11**
154:13,15

**EXHIBIT 12**
158:25 159:1,3

**EXHIBIT 14**
184:18,20

**EXHIBIT 15**
189:17 190:8,
13

**EXHIBIT 16**
195:15,22

**EXHIBIT 17**
201:19,22

**EXHIBIT 18**
206:4,6

**EXHIBIT 19**
235:11,13
243:17

**EXHIBIT 20**
243:15,22

**EXHIBIT 21**
256:22

**EXHIBIT 22**
261:23,24
262:1

**EXHIBIT 23**
221:23 222:1

**EXHIBIT 24**
264:18,21

**EXHIBIT 25**
266:7,11

**EXHIBIT 26**
272:1,3

**EXHIBIT 27**
272:10,12

**EXHIBIT 28**
384:3

**EXHIBIT 29**
317:22

**EXHIBIT 30**
287:21,22

**EXHIBIT 31**
291:14

**EXHIBIT 33**
306:8,9

**EXHIBIT 34**
321:22

**EXHIBIT 35**
321:18 323:4,5

**EXHIBIT 36**
328:17

**EXHIBIT 37**
334:20,22
336:3,6 337:7

**EXHIBIT 38**
335:17,23
336:10 337:7

**EXHIBIT 39**
338:9,12

**EXHIBIT 40**
341:2,4

**EXHIBIT 41**
345:8,11
348:13

**EXHIBIT 42**
347:17,18

**EXHIBIT 43**
357:9,10,15

**EXHIBIT 44**
364:14

**EXHIBIT 45**
372:10,13

**EXHIBIT 46**
373:25 374:3

**EXHIBIT 47**
377:16,20

---

## $

**$1** 30:7,19,23
160:21

**$168** 309:23

**$168.75** 309:24

**$5,000** 225:6

**$500** 139:16,23

---

## 0

**000280** 318:6

**020498** 329:4

---

## 1

**1** 35:17,20
133:17 145:13
146:15 147:3,7,
11,17,22 148:6
214:18,22
226:18 268:13
378:12

**10** 19:2 55:10
76:10 123:24
152:6,8,22
222:22 346:18

**10-10-1058**
323:10

**100** 172:6

**10:29** 96:5

**10:39** 96:7

**10:45** 222:24

**10:48** 152:16

**10th** 346:19

**11** 45:17
154:13,15

**11-28-2002**
323:19

**110** 24:14
172:4 283:13

**11450** 45:17

**11:00** 303:1
331:9

**11:30** 308:2
312:10 324:6
327:3,6

**11:48** 152:17

**11:54** 308:5
324:6 326:9,17
327:3,8,25

**11s** 327:3

**12** 158:25
159:1,3

**12-** 143:10

**12-19** 282:15,
20,21 283:6,10,
24 285:11

**12-19-11** 284:5

**12-20** 283:11,
24 284:3
285:12 289:3
290:11,19,24
311:8

**12-20-2010**
143:12,17
288:9

**12-21-2010**
143:25

**12:00** 152:19

**12:45** 194:18

**12:53** 201:14

**12:54** 326:11
327:25

**12:55** 115:11,
14 119:22

**13** 108:14
109:3,5 110:19
111:17 112:24
113:9,14
115:11 117:19
127:4,8 129:10
132:4 138:25
164:6,7

**13th** 11:4 110:4

**14** 184:18,20
209:1,19

**14165** 326:8

**14301** 322:14,
24 323:3
326:10

**144435** 334:21

**14456** 45:18

**14:04** 297:12

**14:45** 297:12

**14th** 159:25

**15** 189:17
190:8,13 291:7,
13,17 292:18
295:4 296:13,
23 299:7
301:18 302:8
304:12,16
317:5 369:1

**15063** 264:19

**15065** 341:2

**15317** 266:9

**15318** 266:16
351:21

**15322** 266:13

**15643** 195:16

**15645** 197:3

**15648** 195:16

**15:22:08** 310:2

**16** 155:25
156:9,19 157:2
161:1 164:22
170:15 171:16
174:23 195:15,
22 329:10
331:3

**16:41** 231:8

**16th** 156:22
157:12

**17** 102:25
138:11 201:19,
22

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

Kentuckiana
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**17-CV-84**
11:10

**1792** 206:5

**17:45** 231:9

**18** 206:4,6
207:9 208:2
256:5 257:7,23
258:13 364:16,
23 365:1
366:13 373:1,
11,12

**18073** 257:3

**18545** 195:17

**19** 184:19
207:11 235:11,
13 243:17
246:23 247:5
282:12 288:22
312:22 323:23

**19th** 257:17
282:25 286:17,
24 287:5
310:12,17

**1:47** 164:15

**1:52** 201:16

---

**2**

**2** 45:16,20,23
228:10 274:11
327:7,8 341:5,
12,18 342:5,12
343:22 344:5
345:10 352:6
354:1 359:19

**20** 33:18 53:3
86:18 87:12
91:5 100:18
102:9,21 103:2
140:20 147:13,
24 149:8 157:1
178:23 180:19
181:3,11,18
182:4,17
187:19 188:2
197:4,19 201:6
243:15,22
297:1,8,17
298:12 301:19
302:5,24

307:14,25
308:3 309:13,
18 311:24
312:11,16
338:14 340:17

**2000** 25:22
64:5 66:17
321:20,24
322:6

**2002** 111:17
323:23

**2008** 52:20
318:19

**2009** 64:19
264:3,9

**2010** 19:14
33:18 64:19
86:18 87:12
91:5 102:9,21
103:2 140:20
149:9 157:1
178:23 180:19
181:4,11,18
182:4,17
187:19 188:2
191:12,18
194:11 195:3
197:4,19 198:2,
18 201:6
209:14 220:5
222:24 224:18
225:2 227:22
246:23 247:5
266:24 282:12
288:22 289:7
297:1,9,17
298:12 301:19
302:5,24
307:14 308:3
309:13,18
311:24 312:11,
16,22 338:23
339:4,21
340:18 352:4,
11

**2011** 44:6
52:23,25 53:8,
10 55:15 60:13,
19,24 183:13
184:25 186:3,8
188:10,19
194:9 196:2
202:16 203:3,

21 204:6,12,18
205:1,5,15,22,
25 206:12,17
207:25 208:1,
21 209:1
213:15,24
214:2,19
218:11 249:22,
25 272:25
273:8,15 275:6,
18 280:9 281:6,
21 289:10
290:3,4 291:7,
13,17 292:19
295:5 296:13,
23 299:8
301:18 302:8
304:12,16
317:5 318:17,
21 319:9,17
320:9,22
321:13 329:10
331:4 341:5,12,
18 342:5,12
343:22 344:2,5
345:10 352:7
354:1 359:19
369:1,11 374:2
375:16

**2012** 33:11
52:9 96:11,24
100:5,24 101:9
102:25 104:20
105:21 106:22
108:14 109:3,5
110:19 112:24
113:10,14
115:11 117:19
127:4,8 128:4
129:1,11 132:4
138:25 145:13,
21 146:8,15
147:3,7,11,13,
17,22,24 148:6
151:1 155:25
156:9,19 157:2
159:23 161:1
164:22 170:15
171:17 174:23
176:3 178:20
211:6 215:1,16,
24 216:5,10
218:12 219:6
231:16 232:21
233:7,15

235:14,25
236:7,22 237:4,
15,23 238:1,23
239:7,20
242:11,22
243:15,19
244:5,18
246:17 249:6
250:22 251:3,
13 252:5
254:24 256:5
258:16 259:15
260:5 261:21
263:13 278:5
282:5 286:16
292:22,25
293:1,25
301:12 302:3,
23 305:22
311:22 323:14
333:18 344:20
364:13,16,20,
24 365:2,21
366:13 373:1,
12 378:1,12

**2013** 29:24
153:6 265:3,20
338:15

**2014** 275:11

**2015** 18:1,3,4,
8,24 19:15
46:8,13 48:12,
13 49:23 50:2,
5,6 257:7,23
258:13 260:13
261:12 377:22

**2016** 52:4

**2017** 52:3

**2018** 11:4
46:22

**20498** 328:14

**20s** 48:4

**20th** 197:11
209:11 256:1
287:6,7,12
307:21

**21** 183:13
184:25 186:3,8
188:9,19 194:9
196:1 208:1

213:15,24
214:2,19
218:11 224:17
225:2 256:22,
24 272:25
273:14 364:16

**21-2010**
143:11

**218** 206:7

**21st** 188:25
189:6 208:11
213:25

**22** 67:3,4
249:23 261:24
262:1 338:23
339:4,21 344:2
352:11

**221** 321:18

**2294** 321:18

**22nd** 307:19,20
341:20 343:24
352:17,18,19

**23** 221:23
222:1,24
227:22 338:15

**2300** 143:17

**23:30** 360:17
362:1

**23rd** 222:22
338:19

**24** 191:12,18
193:22,24
194:11 195:3
198:1,18 220:5
249:22,25
264:18,21
266:23 280:9
289:10 312:2
352:4

**243** 368:24

**245** 368:25

**24:09** 360:17

**24th** 199:4
200:1 352:16

**25** 266:7,11
356:6

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

| | | | | |
|---|---|---|---|---|
| **25665** 137:9 | **289** 335:19 | **318** 266:16 | 4 344:17 | ────── |
| **25683** 137:9 | **29** 317:17,18,22 318:4,5 320:22 377:22 | **32** 298:3,5 | **40741** 11:7 | **6** |
| **25:14** 177:13 | | **33** 306:8,9 325:8 | **41** 345:8,11 348:13 | ────── |
| **25:47** 176:20 177:13,14 | **290** 335:19 336:2 338:2 | **334162** 325:8 | **4164** 306:8 | **6** 125:6,8 151:1 226:18 |
| **25:57** 128:19 | **29:53** 170:25 | **34** 321:19,22 | **4165** 306:25 307:2,10 | **6-29-2011** 283:23 320:16 |
| **26** 271:23,24 272:1,3 | **29th** 321:3 | **341** 201:21,23 | **4167** 308:19 | **606-523-2698** 223:1 |
| **2660** 345:8 | **2:00** 198:2,18 | **35** 321:18 322:21,23 323:4,5 | **42** 347:17,18 | **60s** 48:2 |
| **27** 96:11 100:5, 24 101:9 104:20 105:21 106:22 128:4 129:1 146:8 176:3 178:20 215:1,16,24 216:5,10 218:12 231:16 232:20 233:7, 15 239:20 272:10,12 273:5 278:5 281:6,21 286:16 289:7 292:22,25 293:25 301:12 302:3,23 311:22 333:18 344:20 364:19 365:21 378:1 | **2:06** 101:3 197:4,11,19 | **36** 28:19 328:14,17 334:21 335:24, 25 | **43** 357:10,15 | **62** 159:8 |
| | **2:09** 164:15 | | **44** 364:12,14 | **64** 159:9 264:20 |
| | **2:22** 165:20 | **362** 159:10 | **45** 261:25 372:10,13 | **65** 307:12 |
| | **2:32** 165:20 | **363** 159:10 | **46** 120:25 373:25 374:2,3 | **6:08** 126:2,6 |
| | **2:36** 101:3 | **364** 159:2,10 | **47** 377:16,18,20 | **6:12** 382:11 |
| | **2:44** 244:9 | **37** 334:20,22 335:22 336:3,6 337:7 | **47488** 221:24 | **6:13** 382:14 |
| | **2:49** 156:9 | | **48** 222:13 | **6:15** 384:1,4 |
| | **2:55** 244:11 | **370** 357:10 | **4844** 261:24 | **6:23** 121:6 |
| | **2nd** 343:4 344:24 | **371** 357:10 | **4850** 272:1 | **6:38** 126:6 |
| | | **38** 335:17,23 336:10 337:7 | **4853** 263:25 264:1 | **6:43** 139:4 |
| | ────── | **39** 338:9,12 | **487** 222:7,13, 17,18 226:5 | ────── |
| | **3** | **3:03** 106:12,13 | **4:28** 311:17 | **7** |
| **270** 272:11 | | **3:20** 106:12,13 | **4:37** 311:19 | ────── |
| **271** 272:11 | **3** 46:19 48:13 49:23 50:2 75:10,13 206:12,17 207:25 209:1 265:2 346:11, 12 | **3:22** 309:13,18 310:2,5 | **4th** 208:6,8 250:1 | **7** 125:7 137:7, 14,15,16,17,22 224:1 374:1 375:16 |
| **27706** 46:1 | | **3:36** 280:4 | | **7-** 26:19 |
| **27725** 287:21 | | **3:50** 280:6 | ────── | **7-year-old** 26:25 |
| **279** 317:10,19 | **3-16-2012** 154:23 | **3rd** 208:11 209:17 | **5** | **72** 306:8 |
| **27:29** 128:19 | **3-8-2012** 242:17 | | ────── | **7:25** 139:5 |
| **27th** 155:21 310:23 311:2 | **30** 287:21,22 318:16,19 319:3,9,17 320:9 321:13 325:6 336:1 | ────── | **5** 108:19,22 153:6 | ────── |
| **28** 323:14,23 384:3 | | **4** | **5,000** 225:5,14 | **8** |
| **280** 317:10 318:1 | **30,000** 82:18 | **4** 100:10,19 202:16 203:3, 21 204:6,12,18 205:1,5,15,22, 25 208:21 224:14 | **5070** 348:11,12 | ────── |
| **281** 375:6 | **30:16** 171:1 | | **51** 272:2 | **8** 137:10,13 142:18,22 143:1 235:14, 25 236:7,21 237:4,15,23 238:1,23 239:7 242:11,22 243:15,19 244:5,18 246:17 249:6 |
| **285** 108:19 | **31** 48:12 209:9 291:12,14 364:13 | | **525** 11:6 | |
| **288** 335:18 | | **40** 64:22 341:2, | **5:31** 357:5 | |
| | | | **5:44** 357:7 | |

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

389

250:22 251:3,
13 252:4
254:23 258:16
259:15 260:4
261:21 305:22

**8-year-old**
26:19

**8:45** 11:5

**9**

**9** 145:6,9

**9652** 125:10

**9661** 171:4

**9:30** 299:23
301:20 304:5
312:5

**9:32** 51:8

**9:42** 51:10

**A**

**a.m.** 11:5
222:24 301:20
304:6 308:3,5
312:10 327:3
328:1 331:9

**ability** 43:15
383:18

**Abner** 110:23,
24 111:11,15
120:18 228:16
229:15

**absolutely**
26:25 47:1
62:16 79:1
82:13 254:25
259:18 321:16

**academy**
23:16 64:10
66:13 67:9

**accident** 56:3,
25

**accordance**
382:17

**accurate** 80:23
105:21 130:1

168:8 172:2
178:2 189:23
220:11 234:6,
25 235:2,4
257:2 284:23
319:22 357:16

**accusation**
321:12

**acknowledge**
324:16 325:24

**acknowledged**
127:22 334:14

**acquaintances**
94:18

**action** 315:15

**actions**
315:13,24

**active** 238:17

**activities**
78:14

**activity** 77:14

**actual** 357:17
358:2

**Ad** 222:16

**added** 243:4

**additional**
49:12 65:15
380:24 383:22

**admissible**
217:15

**advice** 84:8,20
85:1,7,12

**advise** 16:6
22:21 281:8

**advised** 22:25
47:20 161:14
257:15 313:4

**affair** 313:1,7,
21,25 314:3

**affirm** 12:4

**affirmative**
37:8

**affirmatively**
37:1

**afforded**
383:19

**AFIS** 74:6,7,10

**afraid** 166:15
167:15

**afternoon**
134:20 187:19
188:2

**aggressive**
39:13

**agree** 16:17,19
80:25 104:19
105:20 106:1
107:13 121:14
125:12,16
141:6 153:22
155:12 179:12
186:13 207:5
209:10 211:12
234:5 235:7
241:6 242:10
247:3 249:5,8
252:15 254:9
255:9 272:15,
21 275:2 278:4
285:14 290:23
298:6,14
308:15 309:25
321:2,6 327:2,
8,15,18,19
331:22 336:11,
25 340:4,12,18
343:25 350:22
351:18 352:21,
23 353:25
354:5 362:14
363:15 365:1
371:17,19
372:23 373:1
375:3

**agreed** 51:14
70:25 208:24
248:17 281:12
289:1 354:22

**agreeing**
283:18,19
290:22 350:17
356:23 371:22
374:22

**agreement**
264:2,8 380:17

**ahead** 14:12
16:14 20:17
24:8 31:1 39:10
40:8,16 43:4
55:12 68:18
69:4,12 70:19
71:23 81:4 94:4
104:25 105:24
114:14 129:15,
25 130:23
134:16 160:14
165:8 172:17
179:14 181:6
203:10 217:19
241:8 243:11
265:5 269:16,
23 270:19
271:10 277:7,
17,24 279:25
281:17 294:23,
24 318:7
319:23 320:25
334:23 336:15
342:21 347:12
353:5 360:5,24
371:9 377:2

**Alan** 203:6,20
204:12,19
205:1,5 208:2
209:2

**alarming**
193:4

**alibi** 148:7,25
192:24 220:11,
14,23 268:4
269:12 304:8

**Allan** 92:11

**allegations**
62:4

**alleged** 383:11

**allegedly**
132:1 245:5
304:4

**Allen** 15:3
33:21 92:8,12
99:1 141:18,24,
25 145:1
146:17 147:1,7,
18 150:2,16,19,
23 183:14,19,
22 184:2 187:4,
25 188:10,24

191:12,21
195:2,4,25
196:4,6 197:14,
17 201:6
209:20 210:8
211:7 212:8,11
213:6,14,23
215:19,25
216:6,11,14,16
217:10 218:1,
10,15,19,21,22
219:1,4,12,14,
19,21 220:11,
23 223:24
224:3 231:19,
21 232:8
235:19,25
236:21 237:3,4,
8 238:23 239:6
241:23 242:11,
16,19 243:1,14,
20 244:4
246:16,23
247:4 248:14,
22 249:14,17,
21 250:6,21
251:2,11,15
252:3,11,16,22,
25 253:13,15,
20 254:5,13,15,
22 255:17,22
256:6 257:10,
22 258:4 260:9,
12 261:19
262:3,21 263:3,
5,11,16 264:3,8
279:15 292:3
305:22 328:5,8
372:24 373:13

**Allen's** 227:19,
20

**allowed** 31:7

**alternative**
109:6,8

**Amanda** 11:8,
13 12:1 14:22
32:13,15 33:5,
10,23 44:5
46:13 47:6
79:21 80:3
89:23 90:4 97:1
98:17 100:6
101:21 102:4,
10,12 103:4,25

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

390

104:21 105:22
129:12 130:7
146:1,22
153:19 176:5
178:6 186:8
219:2 239:22
240:6,25
244:18,20,22,
25 246:25
247:6,19,20,24
248:10 256:2
257:16 265:21
278:6 279:5,6
280:14,24
281:8,20,25
283:6 288:8
289:22 290:5,8
292:18 293:2
294:21 295:4,
19,21 296:11,
23,24 297:8,16
298:2,25 299:7,
10,22 301:18
302:4,7 306:19
308:15 309:4,7
313:21 314:10,
15 331:14
369:2 371:24
379:7

**Amber** 15:11
33:22 90:25
99:5 103:3
108:14 109:2,
12,23 110:3,10
111:11,16,17
112:18,24
113:3,9,13
114:3,5,21
115:12 117:1,
17,24 118:3,5,
13 119:2 120:1,
6,9,14,16
121:3,9 123:2,
14 125:6,13
126:24 127:5,
16 129:6
130:14,18
131:5,17 132:7
136:21,24
138:14,20
168:25 361:7

**Amber's**
111:16

**Amendment**

296:4

**amnesia**
332:24

**amount** 130:5
160:21 195:11
383:22

**Amy** 11:25

**analyzed**
200:5

**Anderson's**
61:7

**Angie** 94:25

**angle** 335:14

**answering**
41:7 80:21
83:25 214:21

**answers** 91:8
215:13,15
358:7,10

**anticipated**
51:20

**anymore**
18:16 322:11

**anytime** 20:25
87:13,14 95:6

**apologies**
137:17

**apologize**
95:20 125:5
159:1 167:22
197:8 218:24
239:1 250:18
322:25 335:18
346:18

**apologized**
362:7

**apparently**
86:2 138:17
227:6 255:7
298:13 338:10

**appeared**
311:23

**appearing**
221:20 268:6,8
269:1 278:2
356:20 358:23

**appears** 46:6
143:4 190:17
191:10 224:16
235:14 306:14
309:8 323:9
324:17 345:12

**apples** 173:2

**applied**
321:19,24
322:6

**apply** 315:11,
19 316:2,22,23
321:21

**appointment**
299:23 301:10,
19 302:13,24
304:5 308:2
311:23 312:3,
10 324:4,7

**approach**
96:25

**approached**
246:25 247:7
266:5

**approximately**
29:24 60:20
63:16 115:10,
11 156:24
209:1,19 303:1
344:10

**April** 96:11,24
100:5,24 101:8
102:25 104:20
105:21 106:22
128:4 129:1
146:8 155:20,
21 176:3
178:20 211:6
215:1,16,24
216:5,10
218:12 231:16
232:20 233:7,
15 239:20
263:13 265:2
275:18,23
278:5 282:5
286:16 292:22,
25 293:24
301:12 302:3,
22 311:22
333:18 344:20
364:19 365:21

**area** 33:24
50:22 111:23
197:18 223:13,
23

**argue** 213:9
337:10 363:20

**arguing** 40:22
145:23 224:25
256:9,19
287:19 307:22
308:23 312:6
358:19 361:25

**Arkansas**
238:10

**arm** 313:15

**Army** 63:21

**arranged**
289:10 290:8
310:14

**arrangements**
214:12

**array** 73:25
88:10

**arrest** 21:22
22:5 28:19,23
29:1,25 158:4,
16 159:15,17,
18 160:4,25
161:10 162:13
292:17 293:11
370:11 371:12,
24 372:3

**arrested** 62:16
231:1 293:21
371:19,20
372:1

**arrival** 324:4,8

**arrived** 156:4
308:5 326:9,11

**articulate** 82:9

**aspects** 32:12

**assaulted** 35:2

**assert** 83:3
296:4

**assigned**

18:22 19:4

**assisted**
276:12,14

**assisting**
238:6 305:14

**associates**
181:9,17,22

**assume** 37:20
124:9 225:10
226:14 255:9
272:8 275:11
286:13

**assumed**
106:25

**assuming** 22:1
65:9 206:23
210:25 225:20
226:1,14 253:7
267:8 284:7
309:22 312:19
326:18 330:12

**assumption**
102:15,17
167:14

**assure** 50:18

**attached** 288:3
290:14

**attachment**
190:10,15

**attained** 228:1

**attempted**
173:22 176:1

**attend** 63:25
64:9,12,18,23

**attended** 64:15

**attention** 40:4,
12,18

**attorney**
21:19,21 22:12,
22,23 31:2,4
37:5 43:19
53:20,24 81:21
82:17 86:7 97:1
98:13 119:10
156:16 158:6,8,
12 160:3
161:14 162:18

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

167:16 170:20
203:14 260:18
332:20 333:8
368:20 372:25
381:8

**attorney's**
22:6 84:8 96:14
97:18 98:5,20,
25 99:4,8,14,22
151:20 225:23
226:8 323:13

**attorney-**
85:13

**attorney-client**
83:3

**attorneys**
333:11

**attorneys'**
50:20 51:14

**audio** 35:17,21
41:19 100:10,
14,16,20 101:5,
15,24 104:6
106:14 120:9,
14,15 121:9
125:6 126:3,7,
11 127:21
128:23 133:18
139:7,10
164:11,18
165:14,18,21
167:4 170:19,
22,23 171:2
177:15 204:3
231:14 301:16
303:5 338:16
339:9 360:18
362:2 364:11

**August** 48:12

**aunt** 54:24

**award** 117:22

**aware** 18:13
21:24,25 26:12
27:16,20 30:12
31:2,4 45:3
46:20 59:14,15,
20 72:12 73:8
102:14 152:2,3
261:17,22
262:3,7,8 267:4

298:18 365:7,
10 366:7

_____

**B**

**back** 16:2 19:2,
7 23:24 28:9
29:13 31:19
32:7 44:8 51:10
60:14 63:14,20
65:4 70:6 71:2
73:8 83:14 87:7
89:2 96:7
101:17 126:1,2
133:17 139:3
151:13 152:19
159:4 163:12
187:6 190:9,11,
15 191:12,21,
24 194:1
198:11,23
201:16 211:14,
18,19 219:25
222:6,17
238:24 244:11
268:13 272:8
273:11,20
274:11 275:11
280:6 281:16
289:6,21
311:19 322:15
327:11 352:19
353:20 357:7,
24 363:1 378:3
382:14

**backside**
214:15,17
335:22

**bad** 109:11
214:1 218:9
252:14 363:4

**bail** 30:7,19
160:21

**bangs** 353:3

**bank** 47:21

**Barbourville**
11:24 228:19
291:21 382:24

**based** 31:23
32:24 42:5
49:12 88:24

112:22,23
127:4 138:24
171:19 214:18
216:16 230:21
232:13 234:6
235:2,4,18
236:6 299:18
336:14 338:14
363:14 382:22

**basic** 66:9,12
67:9,22 74:4
87:5,22,23 88:8
89:6

**basically**
134:18 210:22

**basics** 68:1
89:15

**basing** 209:8

**basis** 82:9
102:7 171:16
281:5

**Bates** 45:24
75:15 257:2
264:19 326:8
329:3 338:2

**Bates-
stamped**
154:13 195:16
201:21 375:6

**bathroom** 51:6
130:9 205:12
247:21 248:1

**Beach** 365:8,9,
12 367:6,24
368:5,6,10,22
372:11 373:15,
20

**Bear** 164:14

**beard** 353:6,7,
14

**Beech** 91:22

**began** 91:6
92:22 119:22
122:25 294:22
331:3

**begin** 51:11
156:8 343:20

**beginning**
28:16 61:18
86:17,22 87:2
90:11,17,23
91:3,19,23 92:1
93:11,19 95:11
101:3 106:13
119:21 123:1
126:2 130:4
156:25 342:2

**behalf** 11:12,
14,16,18,22,23,
25 253:14
382:15,23
383:13

**belief** 23:3
139:21 172:7
235:2 291:5
313:18,19
361:4,8

**believed**
42:21,23
129:17 130:18
135:2,19 136:1
140:19 209:2
239:22 240:7
245:20 285:15
287:11

**Bell** 36:13
46:24

**belonged**
178:16

**bench** 371:7
372:4

**benefit** 120:5

**Bennett**
148:22,24
149:3,7,15,19,
23 187:17,24
220:21 269:11,
18 270:1,12,14
271:6,19

**big** 72:3 107:15
130:2

**bill** 30:23 61:6
221:7,13

**bills** 139:23

**biological** 45:5

**bit** 17:10 25:18,
19,20 38:9
40:11 41:19
71:3 111:12
116:10,23
148:4 190:3
193:4 194:24
197:9 230:1
239:10 243:3
258:12 273:6
326:20 340:21
350:5 358:5

**Blankenship**
227:5

**blind** 88:15,18,
19,22

**blond** 32:9

**blood** 200:5

**blue** 32:9,20
33:12,17,19
149:9 175:1,13,
17 176:7,16
177:2,7,18
178:7,12,22
180:11,18
181:3,10,18
182:17 270:16

**blunt** 126:9,16

**board** 66:19,21

**Bob** 224:5,24
225:4,11,15
230:17,20,25
378:10,14,24
379:3,6,20
380:5,12

**Bobby** 19:18
26:17 28:5
34:14 36:1,7,12
58:15

**body** 57:5
58:22 61:19

**bogged** 105:1
106:3 110:25

**Boggs** 156:1,
17

**borderline**
172:13,21

**borrow** 149:4

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

boss 275:11,14

bottom 76:12, 14 222:13,18 224:7 226:17, 18 265:9 323:7 325:14,17,25

boy 56:16

Bradley 227:1 228:11,14 229:14

Brady 23:4

bragged 109:15 219:18 220:2 229:17 241:14,16 266:4 267:25

bragging 150:13

brain 333:12

Branson 32:14 90:19 98:22 328:15,25 329:9,14,22 330:1,19,23 331:3,14 332:3, 11 333:1,19 334:2

break 38:4 51:4 96:1 152:12,13 194:19 244:14 280:3 311:16 357:3

breaking 201:13

Brian 59:9 375:20 376:7, 12,21,24 377:4, 8 383:14

bribes 61:23 62:2

briefly 199:19

bring 187:6 268:11,13

broke 147:12 188:15 268:22 282:13,21 283:1 287:5

brother 118:6, 10,14,22 119:3 127:17 128:2, 12

brothers 227:5

brought 54:19 293:9 366:16

Broughton 11:24 227:1 228:11,14,18, 19 294:3,21 348:25 365:8,9 370:3 382:23

Brown 291:20 340:16,19

Bruner 93:16, 20,22 94:1,5,25 95:3,4 377:19

Bruner's 94:14 95:5

building 160:6

built 362:13

bunch 11:15 53:21,22 54:10 187:5 258:3 305:5 306:19 341:6 342:6,11 343:13,18 345:9 346:6 348:14 359:5

Bunch-cobb 305:1,3

Burnett 229:13

bury 58:22

buy 187:5 286:13

buying 58:22 59:2 60:2 276:13 380:7

buys 276:19

_____

C

Caleb 203:16

call 26:13 49:2, 23 54:6 68:22 78:3 151:19

184:15 199:14 200:4 250:14 259:5,12 260:2 295:16 369:12, 22 370:3,12 372:6,7

called 47:16 54:5 57:2,4 112:16 257:22, 24 343:10 354:24 371:1, 25

calling 31:20 32:22

calls 35:15 48:14 129:14 293:4

camera 58:10

camo 343:9,10

camouflage 269:19 270:2

canvases 339:24

capacity 55:9 62:18

car 32:9,20,25 33:4,12,17,19, 21 46:5,7,10 56:3 57:21 134:6,19 147:19 173:18, 22 175:6,13,17 176:1,11 177:8 178:12,25 180:11,18 181:3,10,12,18 182:4,17,19,22, 24 195:15 196:5,25 197:4, 11,22 198:1,24 199:4,15,17,22, 24,25 200:3,5, 12,16 201:3 214:9 257:14 259:3 269:5 270:16 332:22 333:6,10,16

careful 94:7

cars 214:10

case 13:16,18 14:11,18 15:4, 8,12,16,20 16:4,6,12,22 17:22,24,25 18:11,12,21 19:7,21 20:20 21:5 22:6,10, 11,13 28:2,21 29:14 31:12,25 34:17,18,19 36:13 42:10 43:5 59:7,19 61:6,9,17 69:15 73:10 74:21 78:4 80:6 86:9 91:20 93:2 95:16 96:16 97:21 110:5 113:22 119:1 124:4,5,10,13 127:12 130:2 133:15 134:19 138:10 140:11 153:11 180:17 205:2 208:18 217:4 220:18 228:3 240:2,3, 13,24 241:3,7 244:5 250:2 251:8,19 252:6 253:3 260:15 262:4 265:14 267:6 288:4 290:14 291:8 293:8 296:17, 18 299:21,25 300:17,19 317:15 319:15 325:21 328:6 329:22 344:3,6, 14 345:4 351:13 360:9, 14 365:20 367:20 374:1 379:2,14 380:13 381:2 383:23

cases 19:10 251:2 253:18 275:18 276:1, 18

cash 30:7,19, 23 147:20 160:21 201:3

221:12 269:6 309:22 310:8

Castle 332:20

Catron 272:9 275:10,13,14, 16

caused 212:7 257:8

causing 179:23

Caviler 176:7, 16 177:2,18 178:7,16

Cecilia 11:24

cell 48:11 50:4, 6,14,25 57:14, 23 261:5,9

Center 304:24 318:17 375:18

certificates 65:8,13

certified 81:22 84:1,11,22 85:3 380:25

certify 83:7,13 85:16

chair 38:21,22, 24 39:12 40:3 135:14

change 91:8 106:7 279:12 327:12,25

changing 63:22

character 322:5

characteristic s 88:24

characterizati on 326:13 353:4 363:24

charge 28:12 31:12 68:24 158:2,15,17 161:9 252:1 253:7 344:2,6,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianacourtreporters.com
www.kentuckianacourtreporters.com

11,20 370:25
379:11

**charged** 26:19
29:6 48:4
111:25 118:23
140:14 153:10
158:1 161:5,6,8
179:5 276:14,
19 292:20
370:16,18,23

**charges** 29:11
30:6,13 31:18
32:5 33:9 97:1,
10,20 98:15,20,
24 99:3,7,13
100:6 125:18,
23 129:11,23
130:19 146:4,6,
11 150:5
151:16 154:25
155:9 157:16,
19 160:10,15
162:7 196:14
240:6 263:4
268:9,11,13,19
292:18,23
293:2,10,13
366:5 371:5,7,
20 372:4
373:19 377:25
379:4,7

**check** 112:17
180:11 221:3

**checked** 124:4

**checkout**
198:9

**Chicago** 50:23
78:24

**Chief** 228:18

**child** 94:11

**children's**
179:7,20 181:2

**choice** 63:22

**Christy** 32:14
90:19 98:22
328:15 329:9,
21 330:1
333:19 334:2

**chronological**

29:16,22
280:19 296:19

**chronologically** 29:19

**circled** 323:25

**circling** 324:20

**Circuit** 26:17
36:13

**circumstantial**
140:12

**citation**
161:12,21
162:14

**city** 57:2 65:5
382:24

**Civil** 173:3

**clarification**
381:13

**clarify** 94:7

**clarifying**
361:15

**classroom**
25:15

**clean** 131:11

**clear** 87:11
198:15,17
383:17

**Cleo** 340:16,19

**client** 41:4
78:20 79:1
83:2,12 85:14
300:7,8

**clients** 50:19
383:1

**clients'** 383:11

**clip** 35:17,21
41:19 100:20
101:2,5,15
104:2,6 106:14
120:9,14 121:9
126:7 128:23
133:17,18
139:7,10
164:18 165:14,
18,21 167:4
171:2 177:15

231:14 301:16
303:5 360:18
362:2

**clippings**
153:9

**clock** 222:19

**close** 16:16
33:22,24
105:10 106:5
111:5 154:5
228:4 260:14
261:10 303:17,
20 359:19

**closely** 104:3

**closer** 367:24
368:3

**closest** 340:2

**closet** 251:9,17

**clue** 47:5 92:23

**coach** 132:23,
24

**coaching**
134:6

**coat** 269:19
270:2,25

**Cobb-** 306:18

**Cobb-bunch**
305:4,5,19
306:12 314:21

**code** 50:22

**coincidently**
48:3

**color** 270:25

**comfortable**
355:16

**command**
62:10

**commentary**
75:7

**commission**
140:3

**committed**
23:3 141:2

**common**

376:17

**Commonwealth** 22:5,12 43:19
96:14,25 97:18
98:5,20,25
99:4,8,14,22
119:10 151:20
225:23 226:8
260:18 323:13
333:8 367:7
368:20 372:24

**communicate**
45:6

**communicated** 381:20

**communication** 261:11

**compare**
146:16

**compared**
142:14,16
145:25 327:20

**comparing**
173:2

**comparison**
150:1 151:3
359:7

**compel** 66:5

**compile** 87:17
88:10

**complaints**
179:9

**complete**
52:21

**completed**
153:5 154:7
357:19

**Complex**
365:23

**comprehend**
232:24

**computerized**
67:19

**concerns** 86:9
166:6,11,12

**concluded**

214:20 384:4

**concludes**
382:12 384:2

**conclusion**
31:21 32:23
129:15 293:5

**conclusions**
23:5

**condone** 26:24

**conduct** 73:25
87:4 88:23

**conducted**
14:18 19:14
151:2 183:14
201:7 206:1,19
213:23 214:4,
19 218:14
219:13 243:19

**conducting**
88:18 212:25

**confer** 86:4

**confess**
150:23

**confessed**
126:24 131:5,
10 138:13
150:19 162:1
163:17,22
164:25 165:5,
25 167:24
168:3,7 170:16
171:9,25
172:11 331:14
334:2 375:21

**confessing**
166:7 333:2

**confession**
125:13 166:12
376:8,13,25

**confidence**
172:5

**confident**
172:6

**confidential**
275:17 276:1
277:14

**confirm** 63:21

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

184:8 263:18

**confirmed**
277:3

**confiscated**
62:13,18,21

**conflicts**
207:22

**confront** 136:3
245:20

**confused**
79:23 83:18
265:5 372:14

**confusing**
336:4

**connected**
341:10

**considered**
155:4,8

**consistent**
23:20 25:12,25
34:22 44:24
71:19 72:8 73:6
89:20 210:12
310:8 315:15

**consistently**
346:20

**construe**
322:17

**consulting**
156:16

**contact** 15:2,6,
10,14,15,18,24
16:5 18:21 53:5
54:13 109:4
113:13 220:9
254:5 281:11
338:15

**contacted**
114:5 262:20,
24 338:19
339:8

**contacts** 51:2
99:18,23
208:10,15
231:3,6 334:15
378:24

**contained**

248:15 259:14
302:6 333:19
357:13,21
358:1 359:3

**content** 89:14
336:20 337:12

**continue** 49:2,
11 78:3,16,20
378:7

**continued**
18:12 258:2
260:17

**continuing**
217:24

**contributing**
153:24

**conversation**
31:10 136:24
157:15 174:13
175:13 204:18,
23 205:1,6,9,
10,14,17
208:20 230:21
236:14 239:15
241:23 242:21
258:13,15
263:3 319:16,
20 320:6,8,18,
23 330:22,24
332:9 375:17

**conversations**
81:12 82:15
96:13,18,22
123:2 249:21
299:18 301:3
334:15 354:12

**conveyed**
102:1

**cooperating**
252:21

**copies** 335:18

**copy** 45:20
108:20 137:9,
10 142:20,21
145:7 152:10
182:12 191:2
201:20 237:17
243:15 298:3
306:15 308:23
309:9 318:9

322:25 326:19
345:12,25
347:21 348:17
372:20

**Corbin** 59:3

**corner** 307:16,
17 355:21
360:21,22

**Cornett** 337:4
338:17,22
339:3,6,10,15,
21 341:7,13,19,
22,25 342:18
343:24 352:10

**Cornett's**
352:17

**correct** 13:20
14:5 16:1,12,23
19:2 20:3,9,21,
24 21:11 25:22
28:2,5,13,21
29:3 30:8 31:8
36:2 40:21
44:3,18 46:8
51:15 52:11
55:16 59:17,24
64:6 69:7,17,22
70:1,8,9,12,13,
17,20,23 71:5,
21,24 73:7 77:3
79:11,14,19
80:9,12,17,20
81:2,5 88:10
97:8,23 99:19,
24 101:6 102:5,
16 104:9,24
105:17,23,25
108:4,11 110:5
111:17 113:17,
18 114:22
115:6,8,17
117:2,5,8
118:22 120:8,
16 121:16,23
122:2,6 123:3,
9,10 124:7
125:20,24
126:16,20
127:1,8,13,14,
18,19 128:24
129:2,19
130:20,24
131:12,23

132:14,18
133:22 134:20
135:7,11 136:4,
11 139:1,20,24
140:17,23
141:3,10
142:14 144:14,
23 146:13
147:5,9,13,20,
24 148:9,13,16,
19,22 149:1,5,
10,16,20,21,24,
25 151:4,8
153:11 154:3
156:10,12
160:11 162:7,
15,25 163:5,9,
23,25 164:3,22
165:1,6,15
166:1,4 167:6,
8,12 168:18,22,
24,25 169:1,2,
23,25 170:2,12,
19,24 171:10,
18,21 172:11
174:8,11,14,15
176:3,17
177:19 178:8
179:1 180:12
181:4 182:5,25
183:8,9,11
186:10,23
187:2,6,10
188:11,12,15
190:1 191:1
192:18,25
193:1,22
194:11 195:5,
12,13,21 196:2,
7,15,18,25
197:4,11,22
198:19 199:12
200:9 203:24
204:7,10,15
208:3,12,21
209:12,17,22
210:5 212:4,9
213:1 214:4
215:2,5,20
216:2,7,12
217:3,6 219:9,
23 220:6,12,13,
24 221:2,14,16,
19,21,25 222:7
224:3 225:10
227:12 229:7

230:22 231:6,7,
19,23 232:13,
21 233:22
234:2 235:19
236:15 238:14
242:16 245:1,
11,18 246:18
247:7,13,14
249:19,22
250:8 254:11
255:13 256:7,
18 257:23
258:13,17
267:6 268:5,9,
23 269:6,8,14
270:3,12 271:4,
15 273:20
274:8 275:7
276:1 277:10
279:23 280:10
281:7 282:2,3
283:2 284:24
285:2,4 287:6,
13,17 288:6,9,
12,15,18,23
289:16 290:1,7,
12,19 291:7,21
292:4,19,21
295:5,9,15,24
297:17 298:20
301:12,20,23
302:16 303:8,
13,24 304:12,
17,22 305:19
307:21 308:21
309:19 310:5,
10,16 311:24
312:3,11,22,23
313:25 314:7,
11,22 317:16
318:14,18,24
319:1,3 320:9,
23 323:8
325:22 326:1,5
329:8 330:9,25
331:1,11,16
333:2 334:3
337:5,8,18
339:10 341:13
343:6,11,12,14
344:3,6,11,21
345:15 347:4,
14 348:5,13
349:16,23
351:2,23 353:3
354:9,10,19

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

357:19 358:2, 18,22,24 359:15 360:3 362:24 364:17, 20,24 365:21 367:1,4 369:23 372:12,19 373:21 376:13 377:23 378:1,8, 12,25 380:1,7, 14

**correction** 51:20 365:23

**Corrections** 368:15

**correctly** 60:14,17 61:15, 17 93:4 103:6 158:11 207:16 257:25 310:11 369:15

**correlates** 298:10

**corresponden ce** 372:24

**corroborate** 285:3

**cost** 78:23

**could've** 118:4 157:6 179:5 180:13 182:1, 24 186:17 199:11 200:16

**counsel** 11:11 37:24 45:20 49:14 50:18 51:13 77:11,25 78:19 81:12,25 84:24 86:4 108:20 137:11 138:17 142:23 145:7,8 152:10 162:10 164:15 191:18 195:18 201:20 243:16 261:24 300:6, 21 322:25 381:3,12,23 382:18,21 383:3,4,18

**counsel's** 84:20 85:1,7,12 120:5

**counselor** 114:16

**county** 11:5,9, 20 46:24 109:7, 9 160:3 197:18 257:11 262:5 375:18

**couple** 34:16 68:6 100:17 101:4 201:10 207:14 246:20 305:16

**courses** 64:12 65:3 67:6,8

**court** 11:4,9 12:4,8 26:7,17 30:13,18 36:13 37:2 49:12 77:19 83:14,16, 23 100:12 116:9,13,17,19, 21,24 171:13 217:15 259:24 260:3 267:21 271:23 315:2, 14,23 318:5 322:21 333:25 344:17 346:11 349:2,3 370:19, 22 373:8 375:13 380:24 382:8 383:21

**courthouse** 46:13 160:2,7 257:11 261:11

**cousin** 55:4 60:5 183:17

**cousin's** 55:5

**cousins** 55:1 60:6

**covered** 282:6

**Cox** 92:23

**crazy** 144:20

**create** 87:20 89:5 175:15 180:16 231:5

298:24 378:23

**created** 97:22 176:2 230:21 254:24 291:16

**credibility** 276:18

**credible** 265:25 266:2

**Creek** 211:10

**Cricket** 174:17

**crime** 14:23 23:3 26:23 29:12 39:21 68:25 140:3,20 141:2 144:7 173:19 180:4 210:11 240:7 277:5 285:16

**crimes** 66:14 111:25 112:12 144:14

**criminal** 24:25 107:16 179:17, 21 180:6 251:17 253:3, 16,18 315:11, 20 316:3,21 317:2

**crossing** 227:7

**Crump** 15:7 16:9,15,22 17:3,14 24:10 32:7,8,21,25 33:3 69:21,24 70:15,25 71:4, 13,19 72:2,7, 15,21 73:13 76:20 77:2 78:18 79:17,25 80:11 92:14,24 99:15,18,24 130:4 169:2,5, 22 258:5 267:5, 10 269:20 334:8,16 338:17,22 339:4,16,21 340:1,2,22 341:6,12,17,20,

23 342:2,5,12, 17 343:3,14,23 346:20 347:2,9, 23 348:4 349:16 352:11, 17,23 354:1,7, 11 355:1,10,15 356:9,13,25 359:5,15 360:2, 9,20 361:2,6,18 362:6,12,21 363:3,6,20

**Crump's** 93:1 349:12 350:4 363:12,14,22

**Cumberland** 222:22

**currency** 140:22 144:3, 22 145:12,20, 25 146:17 150:2 151:8,18

**custody** 127:17 202:25

**Customer** 309:22

**cut** 116:11 139:8 222:20 224:15,21 243:12

**CV** 170:7

---

**D**

**dad** 46:12 47:15,24 48:1, 3,12,14

**dad's** 46:10

**Daffey** 227:13, 14,15 228:16 229:15

**Dallas** 11:17

**damages** 380:18

**Daniel** 364:23 365:3,19 366:2, 9,13,20

**dark** 284:6

**data** 307:15

**database** 74:14

**date** 25:15 47:7,23 59:13 61:1 97:4,6 99:11,12 108:16 109:13 111:4,10 120:19 143:16 145:22,23 156:23 157:18 187:23 198:9 202:16 206:12, 18,23,24 207:6 208:25 218:11, 19 235:19 236:11 238:5 242:13,14,17 246:3 252:1 257:7 269:13 280:13 282:17 288:11 291:20 293:17,18,21 298:16 299:6, 13,14 308:15 309:20 310:24 312:3 320:13 321:14,25 323:15 333:13 338:23 340:23 348:24 352:1,5 365:17,22,24

**date's** 198:9

**date/time** 198:16

**dated** 288:9 289:3 310:23

**dates** 30:3 64:11 112:14 146:6 155:11 206:20 207:17 242:17 252:9 253:24 258:6 267:7 275:21 280:19 293:7 296:19 306:2 319:19 323:16 349:6

**dating** 32:16 52:5,8

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

396

**daughter's** 174:22

**Dave** 20:2,8 36:4,5 38:16 39:13 40:11,20 41:16,24 42:6 60:24 133:3,17, 18 134:5,19 172:23 173:7

**Davey** 227:10

**David** 35:21 36:5

**day** 11:4 18:5 33:10 52:24 59:1 83:14 124:8 137:24 146:24 156:5 158:20 159:24 181:12 182:5, 24 185:1 187:10,11,12 193:7,11,15 198:4 203:1 205:9,23 206:22 207:19 208:2 212:20 217:25 239:13 246:6,14 254:2 255:23,24 256:7,8,14 257:20,25 258:3 260:12 263:1 265:12 270:16 280:20 286:20 297:14 298:20 304:16 305:13,16 308:8 309:25 310:13 312:17 320:15,17,23 321:5 342:18 346:21 349:2,3 352:3 371:21 378:13,17

**days** 161:1 207:9 209:1,5, 9,19 254:2 305:17 352:13

**dead** 57:3 209:11 343:5

**deal** 47:18 65:22 129:6,8

130:15,17 191:10 379:13

**dealer** 55:5,9

**dealers** 223:14,23 225:4,6 228:15 230:11

**dealing** 158:13

**deals** 112:6,8,9

**death** 13:11 17:4,15 18:10 19:18 21:14 26:11 39:4 86:23 87:3,15 103:2,12,21 104:8,13,22 147:12 209:2, 20 210:10 212:20 215:8, 20 216:1 217:12 218:16 233:16 238:14 268:18 273:19 288:11 340:24

**Debbie** 54:1,2, 5,13

**decade** 17:18

**December** 33:18 60:16 86:18 87:12 91:5 102:9,21 103:2 140:20 147:13,24 149:8 151:1 157:1 178:23 180:18 181:3, 11,18 182:4,17 187:19,24 188:2,25 191:16,17 193:22,24 194:11 195:3 197:4,11,19 198:1,18 201:6 209:9,14,15 220:5 222:24 224:17 225:2 227:21 246:23 247:5 256:1 266:23 282:12, 25 288:22 296:25 297:8,

17 298:12 301:19 302:5, 24 307:13 308:3 309:13, 18 311:24 312:11,15,22 338:23 339:4, 21 340:17 341:20 343:24 344:2 352:4,11, 18 374:1 375:16

**deception** 214:20 215:18, 25 216:5,10 217:17

**deceptive** 273:18 274:6, 15 277:8

**decided** 217:25 238:22 275:25 277:14

**defect** 63:13

**defendant** 61:6 160:20 381:20 383:23

**defendants** 11:19 382:3 383:5,14

**defense** 70:25 92:16 163:8 354:21 382:18 383:18

**defensive** 67:11

**define** 14:20 34:4 102:22

**definition** 105:19 106:4

**deliver** 43:8

**denied** 215:19, 25 216:6,11 230:7,8 263:7 277:9 313:24 321:12 333:1

**deny** 44:12 121:22 130:21 332:13

**denying** 44:22 122:14 123:8 131:22 251:9 348:23

**department** 11:6 31:7 46:24 69:16,18 72:13 76:20 79:11 80:15 156:5 194:1 228:19 262:6 291:21 347:2 368:15

**deployed** 63:6, 10,12

**deponent** 51:12

**deposition** 11:7 36:17 78:22 81:11,19 84:6,13,24 85:5,11 86:3 100:13 382:1, 12,16 383:3 384:2,4

**depth** 297:23

**deputies** 62:9

**Deputy** 383:9

**Derek** 134:2

**Derrick** 11:14, 19,22 382:15

**describe** 124:11 305:14 361:23 363:18

**description** 63:23 173:19 267:10,13 284:4 359:14 361:5 362:9,12, 13,21 363:12, 14,22

**desperation** 285:16

**destroy** 382:9

**detail** 130:8 277:4

**details** 21:14 24:12 67:10 68:5 136:20

145:22 182:2 240:20 341:15

**detective** 11:14 19:22 56:2 59:10,20 74:13 124:25 125:1 159:6 171:8 174:6 178:14 246:19 250:11,17 252:17 291:20 294:3,20 295:2 338:16 339:6, 20 341:6,7,19, 21 342:6,11,18 343:13,18 345:9 348:13, 25 350:3 359:4 364:23 365:2 366:12,14

**detectives** 12:23

**Detention** 375:18

**deter** 251:22

**determine** 37:9 141:14 217:11 218:14 220:10,22 230:4,14 313:6, 22

**determined** 130:5 140:13 155:4 255:14 285:5

**develop** 140:14 185:11

**developed** 41:21 146:21

**Dewitt** 246:24 247:6

**didn't'** 267:18

**died** 55:24 147:18 265:12

**difference** 13:1 106:9 142:5

**differently** 234:20

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

397

difficult 253:5
286:2 363:19

digit 327:6,7,25

dime 286:12

dinner 94:21
105:9

DIRECT 12:9

directed 73:12

direction 83:5

directions
339:25

directly 280:14
284:7

disagree 78:10
213:11,13
241:10 350:14
371:18

disagreeing
198:22 209:7
211:4 275:4
305:24 380:3

discharge
63:17,18

disclose
374:11

disclosed
138:10 163:8
300:9

discount 326:3

discovered
42:2 61:16

discovery
323:23 325:21
383:7

discuss 81:12
273:11 302:1

discussed
66:1 81:21 97:5
115:3 116:4
117:24 133:20
228:22 236:18
304:19 334:13
335:6

discussion
127:16,23,25
128:11

discussions
81:24 127:11
381:11

dismissing
31:11

dispute 212:3
273:23 274:22
298:12,17
309:6

disrespectful
250:16

distinction
361:16

district 11:9,10
221:6,11

divorce 52:22
60:15

divorced
60:15

divorcing 53:1

DNA 141:1
153:2,24 200:5

doctor 63:21
137:19 308:8,
13

doctor's 86:2
299:23 301:10,
19 302:5,24
304:5

document
13:13 14:10,15,
17 15:1,2,6,10,
14,18,24 16:7
20:23 68:9,13
69:2,10 71:12,
25 72:1,13
73:4,9 107:8
113:8,24 114:5
145:8,11
149:14 152:22,
24 153:1
154:14,17
155:23 162:19
168:20 169:4,8,
22 175:12,23
193:20,21
194:4 200:13
201:20,21,24
203:2,24 206:5,

8 208:14,19
210:7 221:15
225:18,22
240:19 241:7
249:16,20
267:19 271:15,
18 272:2
281:24 283:16
288:17,20
296:24 297:7
299:9 308:20
314:6 319:22
321:3 322:24
323:12 324:16,
20,24 326:10
334:15 354:18,
25 355:5,8
368:11,25
373:14

documentatio
n 99:23 302:21
313:11 332:23
333:9

documented
14:23 16:4
70:5,7,10,14
71:4 99:19
113:12,16
114:7,8 137:3
143:24 174:14
194:10 217:2
241:18 254:9
283:23 284:23
299:25 360:9
366:25 367:3
380:11

documenting
71:18 72:6

documents
66:5 69:5
82:14,18,21
83:3 84:5
125:13 156:8
198:1 201:2
204:24 257:3
261:25 323:2

dollar 30:11

donkey 44:7,
18 296:12

Donna 160:1
174:16,22
175:1,6,13,20,

21

door 281:1,17
311:13,15

dope 55:8

double 74:18
88:15

double-sided
197:9

doubt 277:1

draft 154:20,22
184:24 194:1
218:9,13 220:8
226:21,25
227:4,9 229:5
235:12 236:6
257:4,6,8
264:24 270:11
271:11 320:15
321:2 374:5,7

drafted 99:15
123:12 153:2
159:18 171:20
184:22 219:13
227:16 237:14
242:15,18
243:18 256:5
265:1 273:7
283:23 291:9,
12 299:17
301:3 304:11
320:17,21
330:25 338:10
341:3 357:13
364:12,16

drafting
123:14 154:24
257:23 299:8

draw 343:21

drawing 345:3

drawn 352:23
354:1

dress 280:25
281:25

drinking 95:20

drive 100:13
178:17,22
214:6

driven 176:13

driver's 74:9,
14 88:1

driving 67:11
176:7,16 177:2,
18 270:15
342:24 355:19

drove 32:8

drug 55:5
223:14,22
225:4,6 228:15
230:11 379:4,6

drugs 230:8
276:13 286:13
379:21 380:1,7

due 198:11

Dustin 228:16
229:15

dying 102:8

E

e-mail 53:10
190:8,10,12

earlier 87:22,
23 88:13 89:10,
21 190:4
192:22 212:11
220:5,7 232:19
241:23 245:8
249:2 252:14
253:6 264:16
273:6 310:21
311:5 314:19
325:3 334:14
346:25 352:2,
10 357:12
358:6,15
359:12 369:1
377:10

early 141:17
187:15 223:17
338:17

East 221:4,6

Eastern 11:10

easy 234:9

effect 212:14
249:1,3 282:4,9



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

301:11 379:17

**Electric** 222:23

**Elliot** 11:12
116:7

**eluding** 346:19

**emotional**
57:8

**employment**
64:13

**end** 72:2 120:7
121:5,7,10,16
122:1,2,18,20
362:8

**ended** 239:18

**ending** 123:1

**enforcement**
45:14 62:24
64:14 106:22
107:10,15

**enter** 120:8
123:21 282:1

**Enterprise**
196:7,8

**entire** 42:12
170:7 204:4
205:9,13 242:3
383:5

**entry** 281:1

**enumerate**
78:12

**Erie** 179:3,7
180:4 181:8,17,
22

**Erie's** 179:12

**Ernie** 229:12
230:6

**Escoes** 246:24
247:5 257:16

**essentially**
13:5 26:21

**establish**
268:10 279:13
381:5

**estimate**
343:20

**et al** 11:8,9

**Eubanks**
11:17,19,22
133:21 383:9,
14

**Evans** 190:9
191:9 299:12,
14,15

**evening** 60:3
118:14

**event** 55:22
171:19

**eventually**
57:12 142:13

**everybody's**
185:8

**evidence**
29:11 31:23
62:22 108:8
118:25 134:13
140:7,11,25
141:5 142:25
143:22 144:2,9,
16 153:8 178:6,
21 193:16
199:14,18
200:4 210:11
241:2 316:5,12

**ex-boyfriend**
314:10

**ex-girlfriends**
138:18

**exact** 25:4,11
30:3 52:24
64:11 67:10,15
99:12 108:15
136:12,20
137:23 145:22
156:23 157:18
185:24 199:2
205:10 213:2
218:19 239:2
259:7 260:7
263:1 296:16
320:12 330:7
349:5 350:12
361:1 371:4

**exam** 196:1
201:7 206:15
210:5 212:7,25

231:22 232:9
267:15 273:8
274:24 275:24
277:13 358:8,
21

**examination**
12:9 66:23
206:1 208:1
214:19 216:16
277:21 308:8,
14

**examinations**
213:22 214:7

**examine**
382:19

**examined**
145:21 146:25

**examinee**
210:16,17,24
212:18 214:20

**examiner**
213:6,11
232:14 233:6
234:4,12,14,15

**exchange**
332:12

**exchanging**
382:2

**exclude**
153:23

**excluded**
151:7,18 227:6

**Excuse** 143:7
202:3 206:16
371:5

**exhausted**
382:21 383:4,
25

**EXHBIIT**
256:24

**exhibit** 35:17,
20 45:16,20,23,
25 46:19 75:10,
13 100:10,19
101:2 106:13
108:18,22
125:6,7,8
133:17 137:7,

10,12,22
142:22 143:1
145:6,9 152:6,
8,22 154:13,15
158:25 159:1,3
163:13 164:6,7
184:18,20
189:17 190:8,
13 195:15,22
201:19,22
206:4,6 221:23
222:1 235:11,
13 243:15,17,
22 256:22
261:23 262:1
264:18,21
266:6,7,11
272:1,3,10,12
275:9 287:21,
22 291:14
298:3,5 306:8,9
307:7 317:22
318:4 321:18,
22 322:14,20
323:4,5 325:3,
4,11 328:17
334:20,22
335:17,23
336:3,6,10
337:7 338:9,12
341:2,4 345:8,
11 346:9,12
347:17,18
348:13 357:9,
15 359:3
364:11,14
372:10,13
373:23,25
374:3 377:16,
20 384:3

**exhibits**
317:12

**exist** 73:21
261:16

**existed** 59:5,6
343:23

**exists** 204:18,
22 300:7

**explain** 26:16,
18 105:5,16,18
133:2 184:14
232:4 247:19
278:16 308:12

326:7,15
362:15,19

**explained**
377:9

**explaining**
104:16

**extensive**
381:2

**extent** 13:25
66:5 75:3
129:14 293:4
382:18

**extra** 335:18

**eye** 16:12,17
51:14

**eyes** 50:20

**eyewitness**
340:3

---

**F**

**fabricate**
320:5,7

**fabricating**
319:8

**facetious**
81:15

**facial** 353:18,
19

**facilitate** 207:7

**facilitated**
206:1

**facility** 161:12

**fact** 13:7 29:10
69:25 109:21
163:7 165:11
178:10,25
194:4 209:8
220:4,10
231:18 268:22
269:12,18
270:14 273:25
277:3 289:14
290:17 295:22
298:12 310:7
326:3 346:25
355:10 361:5

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

362:9 379:11
380:6 383:4

**faded** 190:18

**fail** 277:2

**failed** 147:4,7
216:14,16,22
217:10 218:10
219:20 273:12
274:18,24
275:24 277:13,
21 358:7,11,21

**failure** 260:20

**fair** 15:23 25:6
37:21 60:19
85:11 113:25
114:1 116:3,12
117:16 124:22
127:2 129:21
140:5 144:25
154:5 156:7
171:23 204:24
205:20 207:23,
24 208:25
211:1,20
229:19 236:9,
20 237:2,7
239:5,11
243:17 244:16
248:13 252:7,
25 254:8,22
267:9 276:21
278:11 280:12
285:19 292:11
293:1 298:24
330:17,18,21
331:10 342:4
359:17 367:10
373:18

**fairly** 61:18

**Faith** 318:17

**falls** 75:6

**false** 258:17,21
259:20 283:7
286:18,21

**familiar** 20:4
30:21 88:7,25
331:23 333:14

**family** 54:11
55:18 93:21
94:13,14

109:18 110:13
117:23 175:16,
18

**Farah** 11:23
137:12 382:23

**Farris** 11:17
263:19

**fashion** 210:1

**fast** 120:23
121:6

**father** 45:5
46:25 47:3,6,9
48:18 49:23
50:1,15 94:16
227:19,20

**father's** 50:14,
23 51:5 95:3

**fault** 321:19

**faulty** 49:5

**fax** 222:19
326:18,19

**faxed** 222:24
323:12,22

**faxing** 223:7

**fear** 39:23

**February** 11:4
44:6 153:5
291:7,13,17
292:18 295:4
296:13,23
299:7 301:18
302:8 304:12,
16 317:5 341:5,
12,18 342:5,12
343:4,22 344:5,
10,24 345:10
352:6 354:1
359:19 369:1,
10

**fed** 53:21,22
259:14

**federal** 48:20
49:8 75:6

**feed** 248:21,24

**feel** 31:14,22
40:1,2 193:2
355:16

**fellow** 179:13

**felt** 32:17 39:16
40:18 186:14
195:3 216:24
287:3 293:10,
25

**female** 32:9,11

**Ferris** 376:3,19
377:10 383:15

**Ferris'** 377:12

**fetch** 266:2

**figure** 142:9
307:22

**file** 13:16 22:9,
10,11,12,14
29:14 65:15,18
73:10,13
182:13 191:1,5
226:5,6,7,12
288:4 292:10
293:8,9 300:18,
19 319:15
323:22,24
324:25 337:18
344:3,11,21
357:23 374:18,
20,21,22,25
375:1,4,5,7
383:21

**filed** 46:24 47:3
48:14 49:22
344:6

**files** 22:6

**fill** 143:6,7,8
282:13 283:1,6
285:10,17
287:5 288:21
289:11,15
310:15

**filled** 161:11
283:10,12,24
284:5 290:6,11,
18,24 291:1
309:12,18

**final** 60:15

**find** 42:24 51:4
74:14 86:14
106:23 107:7
265:25 267:22

**finding** 283:11

**fine** 49:4 58:11
93:4 116:16
337:21,24

**fingernail**
153:9

**fingernails**
153:25

**fingerprints**
141:1 142:12
151:7

**finish** 41:1
362:5

**finished** 120:2
121:15 262:10
297:2 318:1

**finishing** 77:18

**firearms** 67:11

**firsthand**
14:21 16:3
113:21

**five-minute**
373:6

**fixing** 83:18

**flash** 100:13

**flashlight** 59:3

**fled** 186:22
197:14

**flip** 76:10
190:11 222:16
335:21,22
336:6

**floor** 139:16,
20,23 140:2,6,
22

**Florida** 147:19
148:8 186:22
187:5,9,18
191:12,21
196:5 197:14
210:9 212:20
217:1 224:18
225:2

**focus** 348:11

**focusing**
243:16

**follow** 47:9
85:7 256:25

**forehead**
353:3

**forensic**
145:12

**forgot** 74:16
138:18 179:5

**form** 14:12
16:14 18:25
20:17 21:12
23:22 24:8 28:6
30:1,9,25
32:19,22 33:4
35:14 38:20
39:10,15,24
40:8,14,22
42:17,22 43:3,
13,23 44:19
46:14 47:11
48:7 49:10
55:11 59:18
61:24 62:5
68:16 69:4,12
70:2,18 71:6,
15,22 72:11,24
73:17 77:10,14
79:12 81:3
88:11 94:3,12
103:13 104:11,
25 105:13,24
107:5,18 110:6
114:13,23
115:18 118:16
119:5 121:25
122:10 128:5,
14 129:25
130:22 131:19,
24 132:16,19
133:13 134:15
135:3,12
136:16 140:8
141:7 142:25
143:9,22
147:14,25
149:11 150:8
151:9,25
156:13 157:7,
22 160:13
161:23 162:16
163:10 165:7
166:9,14 167:7
168:9 169:7,10,
12,24 170:18

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

172:3,12 173:9
175:3,8 176:9,
18 177:3
179:14,18,22
181:5,19 182:6
183:21,24
184:12 185:9,
14,17 186:4
187:21 188:4
194:8,15 195:6
197:15 198:6
200:19 202:23
203:7,10
208:16,22
209:23 213:16
215:21 216:19
217:7 220:25
223:2,8 225:7,
24 227:23
229:3,8,22
232:11 233:1,2,
11,23 234:8,18
235:1,9 236:16
239:25 240:9,
15 241:8
249:10,24
251:5 253:4
261:13 264:10,
14 266:1
267:11 268:24
269:7,15,22
270:4,18
271:13,17
276:2,7 277:12,
16,24 278:8,15
279:18,24
280:16 283:8
284:25 285:7,
20 286:19,25
287:14 288:24
290:20 292:3,6,
10,13 293:14
298:21 299:3
301:5 302:11,
18 303:14,25
305:10,25
310:18 312:12
313:2 315:17
316:13 317:6
319:11,23
320:24 321:15
324:5 325:1
326:13 327:10
332:4,15 333:3
335:7 340:5
342:8,20

347:11 349:17,
24 350:10
351:24 352:24
354:3,14 355:4
358:3 359:20
360:4,23
361:22 362:16,
25 363:16
369:25 370:14
371:2,15
374:15 375:10
380:2,8

**formed** 150:3,4

**forward** 120:23
121:6 125:23
154:24 161:21
162:6,13
219:17 267:5
332:21 340:16

**found** 32:7
61:19 63:20
65:16 139:16
140:16 151:3
209:11 210:9
226:4 301:9
304:6 324:25
343:5 376:20

**foundation**
30:9,25 43:3
44:19 48:16
49:5,10 55:11
59:18 61:24
62:5 70:2 72:24
73:17 77:10,15
88:11 94:3
110:6 114:13,
23 115:18
118:16 119:5
122:10 130:22
131:19,24
132:16,19
133:13 134:15
135:3,12
136:16 140:8
147:14,25
149:11 151:9,
25 156:13
157:7 165:7
175:3,8 176:9,
18 177:4
179:14 181:5,
19 182:6
183:21,24
185:17 187:21

188:4 194:15
195:6 200:19
208:16,22
220:25 223:2
225:24 227:24
229:9,22
236:16 239:25
240:9,15
249:24 251:5
261:13 269:15,
22 270:4,18
271:13,17
276:2,7 277:16
279:19,24
280:16 283:8
284:25 285:7,
20 286:19,25
287:14 288:24
290:20 292:6,
13 293:14
298:21 300:25
301:5 302:18
305:10,25
310:18 313:2
315:17 316:13
317:6 319:11,
23 320:24
324:5 325:1
332:4,15 333:3
335:7 336:15
337:16 338:6
340:5 342:8,20
347:11 349:17,
24 350:10
351:24 352:24
354:14 355:13
358:3 359:20
360:4,23
362:16,25
363:17 369:25
370:14 371:2,
15 373:3
374:15 375:11
380:2,8

**fourth** 14:25

**Fox** 20:2,8
35:21 36:4,5
38:16 39:14
40:11,20 41:16,
24 42:6 60:24
133:3,17,18
134:5,19
172:23 173:7

**frame** 25:19

76:3 116:23

**Frankfort** 65:6
67:5 214:7

**freed** 128:12

**freely** 31:7

**friend** 94:9
138:6,7

**friends** 94:13,
15,17 95:6,7,10
105:10 375:21

**front** 66:24
211:14 222:7,
13 240:11
262:14 273:3
281:22 348:12,
20 355:19

**FTA** 93:4

**fuck** 34:5 35:23
172:22,23

**fulfill** 285:17
286:6

**funeral** 56:1

**fuzzy** 353:6,7

**Fyffe** 273:17
274:6,14 277:9

———————

**G**

———————

**gain** 276:22
280:25

**gap** 207:6

**gas** 181:12,13
182:3 246:24
247:5

**gave** 28:13
30:5 31:6,12,
14,16 63:22
65:18 109:16
118:14 119:3
148:7,11,15
158:18 161:4,
19 162:10
165:16,23
190:4 191:8
192:23 193:25
199:7 219:1
226:2 253:1

254:13 257:15
258:16 265:11
266:24 279:12
284:15 289:19
290:5 292:3
310:9,12
340:19 341:7
350:21 355:24
361:6 367:21
379:13

**general** 136:25
138:11 196:24

**generally**
124:11 125:12
143:5 153:1,8,
22 163:16
188:17 207:12
210:12 211:12
253:12 333:25
338:24

**generated**
100:2 374:20

**generating**
206:24

**genetic** 63:13

**get all** 177:21

**get-go** 72:2

**girl** 26:20,25
47:21

**girlfriend**
171:10

**give** 12:5 13:7
22:25 35:15
41:3,4 43:20
45:20 50:19
62:23 68:6
100:13 115:24
116:9 117:11
121:15 137:9,
10 145:7
150:22 152:6
160:20 202:20
203:13 229:1
237:17,20
243:15 276:5
317:13 318:8,
23 325:4
331:21 343:20
373:6 374:13
375:8 379:13

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

**giving** 78:11,
13 79:2 108:20
142:20 237:21
253:14 273:6
313:14 332:12,
25

**glad** 252:15

**goal** 278:5,9

**good** 12:11,12,
13 77:22 94:9
109:11 116:23,
24 152:11
251:21,24
252:5,20
253:19 254:1
326:21 378:2

**grand** 96:9,15,
19 98:4,8
100:5,10,18,20,
24 101:5,9,12,
21 102:3,20
103:19,24
104:6,7 105:5,
9,11,16 106:9,
14,17 107:11,
24 108:3 124:6
126:2,3,7,8,18,
22 127:3,10,15,
21,23,25 128:3,
10,18,23 129:1,
4,9 130:14
131:4,9,16
137:14 139:3,7,
10,11,15 146:8
149:20 151:13
155:15,18,19
162:22 164:3
170:25 171:2,8
173:17,21
174:8,17,25
175:25 176:8,
14,25 177:15,
16 178:10
180:23 182:18,
23 183:6 211:6
215:1,16,23
216:5,10 217:5
218:12 221:18
231:9,14,16,18,
21 232:8,20
233:3,10,15,20,
25 234:11,22
235:5 239:21
254:13,16,18,

21 255:11,18
263:13 268:3,6,
8,10,16,21
269:1,4,10
270:20 277:20
278:3,6,12,23
279:15 280:8,
23 282:5,11,24
283:5 286:16,
22 287:4,10,16
288:6,15,18
289:2,18
290:10,18,25
297:12 301:12,
16,17,23 302:3,
15,22 303:5,6,
19 304:4,7,10
306:5,13
311:22 312:1,8,
14,25 313:8
328:8 333:17
334:1 344:19
354:8 356:8,12,
16,20,25
358:17,20
360:16,18,19
361:11,17
362:2,11,15,20
363:10,11
364:2,19
365:21 366:4
373:16

**Gray** 52:18,19,
21 53:2,4 54:3,
25 55:2,4,8,16,
20,22 58:21
59:2,23 60:8,18
61:12,23 62:2,
8,11

**Gray's** 54:24
58:15

**Grays** 55:3

**great** 277:4
309:6 347:20
355:18

**green** 58:6

**grew** 111:24

**grounded**
175:10

**group** 359:3

**Guard** 63:9

**guess** 185:10
287:18 335:14
352:15

**guidance**
114:16

**guilty** 241:1
379:11

**gun** 141:12

**guy** 50:23
142:20 179:5,
15,20 310:4
366:23

**guys** 65:14
164:9

―――――――

**H**

**Hader** 211:1

**hair** 350:4,9
352:22 353:1,
18,19

**half** 336:24,25

**halfway**
163:21

**hammer**
126:19,23,25
127:3 131:6
136:22

**Hammonds**
229:12 230:6

**hand** 12:3
14:25 108:19
152:10 190:7
195:17 201:18,
20 243:13
264:18 272:10

**handcuffed**
214:13

**handed** 152:21

**handing** 22:8
45:19 357:9

**handled**
150:11

**hands** 360:21

**handwriting**
67:17 143:3,19

221:25 323:3,7,
9 324:18
325:25 326:4

**hang** 94:20
95:9 228:11

**Hank** 226:22
228:9 229:14

**happen** 17:17
42:23 49:2
83:19 136:13
240:21 271:2
319:25 326:17

**happened**
17:19 26:24
42:21 89:16
122:14 123:8
135:1,2 249:2,3
255:15 257:21
260:4 277:6
281:15 282:22
286:23 321:4,6
326:15 332:19
333:5,13
337:11,13
352:16 365:16
376:5,22

**happening**
207:13 322:19

**happy** 37:16
49:15

**harass** 173:15

**harassing**
41:9 53:20
172:19,24
173:7

**harassment**
47:4 172:13
173:6,14

**hard** 40:7
66:18 77:19
306:16 372:20

**harm** 68:24

**Hatmaker**
124:19

**Hayden** 212:24
234:15

**head** 23:7
29:17 37:1

42:3,14 50:16,
24 88:20 126:9,
25 131:6 182:9
188:21 192:5
204:13 215:10
216:7 219:16
233:9 236:23
257:13 258:25
274:7,13
277:10 285:23
343:8 349:8
351:8,23
375:22 380:4

**health** 11:6
280:25 282:1

**hear** 38:15 59:6
101:25 104:15
116:6,13 174:1
176:21

**heard** 14:22
16:3 59:5 62:6,
8,11 89:25
126:11 128:8
150:23 219:2,
25 244:22
245:3,4,5 271:8
277:2

**hearing** 101:15
137:7,8 138:10,
13,24 149:24
163:5 171:13
181:1 183:11
185:16,22
282:9 333:23
334:1 363:4

**hearings**
18:15 92:17

**heat** 272:13

**Heather** 29:17,
23 32:2

**helped** 238:15
244:22 279:7
305:15 367:20

**helping** 252:19
253:2 263:3

**helps** 26:7
279:11

**Helton** 15:3
33:21 92:8,12
99:1 141:25

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

145:1 146:17
147:1,7,19
150:2,16,19,23
183:14,16,23
185:2,25
186:14 187:4,8,
17 188:1,10,13,
18,24 191:21
195:2,4,25
196:4,6 197:14,
18 201:6 202:5,
7 203:2,6,20
204:1,6,12,19
205:1,5,9,15,
21,25 206:2,15,
19 207:2,8,15,
22 208:2,8,11,
20 209:3,16,20
210:4,9,23,24
211:7 212:8,12
213:6,14,23
214:3,7 215:19,
25 216:6,11,14,
16 217:10
218:1,10,15,21,
22 219:1,5,12,
14,22 220:11,
24 223:24
224:3 228:16
229:15 230:17
231:19,22
232:8 233:21
234:1,23
235:12,19,25
236:3,7,11,15,
21 237:3,5,8,23
238:21,23
239:6,13
242:12,16,19
243:1,14,20
244:4,16,18
245:10,13,24
246:5,16 247:4,
23 248:3,9,14,
22 249:6,7,14,
17,21 250:6,21
251:2,11,15
252:3,25
253:13,15,20
254:5,13,22
255:17,22
256:6 257:10,
22 258:4,13,15,
23 259:4,12
260:9,12 261:2,
9,19 262:21

263:3,6,11,16
264:3,9 279:15
292:3 305:23
328:6,8

**Helton's**
183:19 184:2
219:6,19
237:25 244:24
254:15 262:4

**hesitated**
167:17

**hey** 241:15
252:16 253:20

**hide** 173:22
176:1 226:2,13
251:18

**hiding** 175:17

**high** 322:8,16

**HIPAA** 315:5,
10,14,19 316:2,
22

**hired** 25:21
64:1,5,9

**hiring** 66:16

**hit** 35:5 38:18
47:22 48:3
123:21 126:24
131:5 215:9
233:8 274:7,13
375:22

**hitting** 216:6
277:10

**hold** 159:5
198:6 211:19
278:18

**holding** 161:12

**home** 56:20,21
69:6 139:16
144:18 175:2
181:2 204:14,
23 236:24
237:11 280:25
282:1 368:3
378:11

**homicide**
12:14,21 16:17
18:23 19:5
23:9,18 24:5,22

27:8,13,22 28:5
34:3,6,10 35:3,
5,9,12 45:8
58:15,19 59:17
61:12 73:12
80:10,16 86:11,
18 89:4,24
90:5,8,14,20
91:1,4,23 92:4,
9,15 93:11,17
95:12,22 96:10
107:14 113:25
125:15,19
132:5 135:7
147:4 148:13
149:5,8 173:23
175:7 176:2
192:14 195:21
200:9 202:22
203:3,8 211:8
220:12 221:13
226:6,23 227:2,
7,11,21 230:5,
10 231:4
242:13 245:13
249:8 250:7
280:15 299:2
316:5,12 328:7
330:4 338:24
346:3

**hood** 343:8
349:8,12 351:7
359:13,22,25
360:20 361:18

**hoodie** 349:8
350:5,9 351:1,
19,23

**Hope** 304:24

**horrible**
308:23

**Hoskins** 11:8,
13 12:1 14:22
32:13 33:5,10
44:5 46:13 47:6
49:24 79:21
80:3 89:23 90:4
97:2 98:17
100:6 101:21
102:4,10,12
103:25 104:21
105:22 125:19
129:12 130:19
131:10 146:1,

22 151:6,17,23
153:20,23
155:1,9 178:7,
11,15,21
182:23 186:9
196:15 203:13
239:22 240:6
243:20 244:18,
20,25 246:25
247:6 257:16
278:7,14 279:1,
22 280:14,24
282:12 283:1,
23 285:16
286:5 287:4
288:9,21
289:11,16,20
290:5,11,18
291:6,19,23
292:1,18 293:2
294:3,7,21
295:4,14,22
296:1,11,23,25
297:8,16,21
298:2,15 299:1,
7,10,14,17
301:4,18 302:4,
7,23 303:7
304:4,7,12,15
305:19 306:19
308:15 309:3,4,
7,12 311:23
312:2,14,21,25
313:7,21,25
314:11 315:6
317:4 326:9,11
328:6 329:23
331:14 333:2
334:2 369:2,11,
22 370:3,12
379:8,20
380:12

**Hoskins'**
176:5,25
282:14 285:23
287:12 302:15
312:10

**Hoskins's**
176:15 177:17

**hospital** 55:24
56:1 257:12
260:9,12 261:3,
10

**hot** 272:21

**Houghton**
227:10

**hours** 28:20,22
60:3 64:22
115:12 143:17
187:15 383:3,5,
25

**house** 32:8
57:4,6 160:7
220:2 228:5
230:7 241:14
314:16

**How's** 114:20

**hundreds** 24:3

**hunting** 343:9,
10

**hurt** 276:17
278:13 279:8,
11

---

**I**

---

**I--** 30:3

**I.D.** 355:9,18
360:13

**ID** 57:5

**ID'D** 362:6
363:3,21

**ID'ING** 355:17

**idea** 46:15 47:2
50:3 122:4
225:9 300:1
331:2 342:6,25
348:18

**ideas** 92:19

**identification**
35:20 45:23
58:9 69:11,25
71:13 75:13
100:19 108:22
125:8 137:22
143:1 145:9
152:8 154:15
159:3 164:7
184:20 190:13
195:22 201:22
206:6 222:1



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

235:13 243:22
256:24 262:1
264:21 266:11
272:3,12
287:22 291:14
298:5 306:9
317:22 321:22
323:4 328:17
334:22 335:23
338:12 341:4
345:11 347:18
355:2 356:9,14
357:1,15 360:2
364:14 372:13
374:3 377:20
384:3

**identified**
360:20 361:18

**identify** 11:11
32:11 57:18
69:21 70:15
71:1,5 72:3,8,
22 73:2,15
169:9,23 340:9
346:22 347:3,
10,15 354:12,
16 355:25

**ifs** 241:4

**Illinois** 376:22

**imagine** 86:7
138:15 330:11

**immediately**
148:8 196:6

**implicated**
32:3 162:5,12
186:14,16
219:8 244:5,18,
25 254:14
258:19 265:24
279:15 280:14
328:6 331:20
365:20 366:2

**implicates**
243:20

**implicating**
162:11

**implication**
172:15

**implications**
247:3

**implied** 225:4
245:3 290:17

**implying**
122:16 172:7
210:22 225:5
300:6

**important**
82:20 141:5
177:20 188:20
287:4 361:16

**impound**
57:21

**improper**
82:20 300:22,
24

**in-room** 58:9

**inaccurate**
284:4,14
285:12 367:22

**inadmissible**
267:21

**inappropriate**
49:2,13 79:1
313:17

**incarcerated**
118:11 334:3

**incident** 57:9
113:2 157:14
229:25 230:23,
24 255:25
257:20 376:5

**include** 210:8

**included** 89:14
357:22 358:7

**including**
131:11 314:20
383:6

**inconsistencie
s** 304:3

**incorrect**
168:11,12
184:1 225:10
238:18 278:16
285:6 286:20,
23 365:6

**independent**
136:23 156:3

204:11 332:8

**independently**
82:25 376:24

**Indiana** 367:25
368:5,7 376:21

**indicating**
178:21 210:19
312:20

**indictment**
278:13 279:22
364:19

**indictments**
278:6

**individual**
24:16 32:3
101:14,16
103:7,17 230:6
279:11 350:4

**individual's**
150:3

**individuals**
153:10 229:24
241:25

**indoor** 281:14

**infection**
258:24

**infections**
257:12

**inference**
362:12,13,18

**inform** 89:13
127:23,25
151:14 157:15
242:12 259:23
287:10

**informant**
112:3 183:23
184:3 261:19
262:5,7,8
263:12 264:2,8
275:17 276:1,
22 277:14

**information**
14:25 26:23
28:17 32:17
39:21 67:20,25
69:2 78:9
107:16 109:14,

16 128:3
131:17,20,23
132:5,8 136:4
143:25 149:14,
19,23 151:14
157:14 161:16
165:24 173:14
180:22 181:1
182:16 183:7
186:13,17,22,
25 187:4 188:9
195:2 196:12
205:21 210:8
211:13,22,24
212:4,6,25
218:2 225:18
229:23 234:6,
16,22 240:24
241:6,19
245:12,20
247:9,13 248:4,
6,8,15,22,24
249:7,14 250:6
254:20 256:4
259:14 265:23
271:14,18
276:23 278:12
284:16 296:20,
24 302:2,6
321:3 325:11
326:4 333:18
342:6 345:4
357:21 358:1
365:3,19 366:2,
3 369:22
373:14 377:14
379:14 380:12

**informed**
103:11 126:18
127:2,10,15
150:18 175:16
217:5 282:11
286:22

**informing**
304:7

**initial** 67:16
89:6 144:7
305:13

**initially** 255:15

**initiate** 30:13
31:18 100:5
125:18 129:11
130:19 150:5

160:15 212:7
268:9,19
292:17 293:2
366:4

**initiated** 29:10
30:6 33:9
97:10,21
129:23 146:4,
11 154:25
155:9 157:16,
19 160:9
196:14 292:23
373:19 377:25

**initiating** 32:5
125:23

**initiation** 97:1
98:15,19,24
99:3,7,13
151:16 293:12

**injuries** 126:19

**injury** 126:9,16
333:12

**innocence**
295:15

**innocent** 240:7
295:18

**inoperable**
175:2

**insert** 67:25

**inside** 57:20
190:25 193:12
199:24,25
200:2,3

**insinuate**
132:11 245:17
320:3

**instance** 74:9

**instruct** 41:3
83:2,12,21
84:7,18,25 85:6
124:13 382:9

**instructions**
350:21

**intentionally**
323:1

**intentions**
345:3



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**interaction**
170:3 191:11,
20,22 193:21
194:5,10

**interactions**
72:7 111:19,21

**intercom**
217:17 249:11

**interest** 141:23
142:6 183:18
185:7,8,13,23
186:5,10 195:8
203:5 209:7
212:12,16
217:17 218:1
224:7,11
226:17,22
227:1,6,10,20
228:15,23
229:7,14,21
230:3,10 267:3

**interfere** 41:5

**interject** 41:2

**intermediary**
65:21

**Internet** 66:14

**interpreted**
361:12

**interrogate**
86:25

**interrogation**
64:16,23 65:3
66:11

**interrogatorie
s** 13:18 14:2,4
75:11

**interrogatory**
14:9,15 74:21,
24 77:1,5,13
79:4,9,16 80:25
339:2 346:8,13,
14,19

**interrupt**
141:22

**interruption**
86:12 217:17
249:12

**INTERRUTION**
86:1

**interview**
14:17,19 15:2,
6,10,14,15,18,
24 20:2,5,8,9
21:23 24:1
26:18 35:21,25
41:25 61:2
68:2,3 110:22
113:10 129:5
133:18 163:13
164:11,21
192:11 201:5
204:4 219:13
235:21 236:2,7
243:18 248:23
249:6 262:21,
24 289:7 290:3
291:10 292:19
294:2,7 302:7
319:9 321:4,13
331:3 338:16
339:4,20
341:17 342:2,
16 343:24
352:10,17
367:11

**interviewed**
44:6 98:12
115:16 174:7,
16,21 230:16
291:6,8 314:9
329:9 338:22
341:6,23

**interviewing**
27:1 38:10 68:2
89:16 122:5
135:20 165:10
200:12 237:23
370:6

**interviews**
14:11 20:1
24:16 34:16
61:20 76:15
98:2 99:18
168:20

**intimate** 94:8
102:23 105:3

**investigate**
112:12

**investigated**

55:13 90:1
145:2 178:25
180:3

**investigating**
55:9 59:16 90:4
91:6 211:21
238:18 286:4

**investigation**
12:14,21 13:11
15:4,8,12,16,
20,25 16:21
17:3,14,20,21
18:10,18,23
19:14,18,20,24
20:15 22:9
23:9,19 24:6,22
25:3 26:10,23
27:8,14,22
28:5,15 32:12
34:3,6,10,14
35:3,6,9,13
36:1,7 38:17
39:4 41:20
42:2,5,8 44:17
45:7 56:25
57:13 58:16,20
60:12 61:13
62:14 63:25
64:2,8 73:13
77:9,14 80:10,
16 86:18,22
87:2,15 89:4,24
90:8,11,14,20,
23 91:1,4,19,23
92:4,9,12,15,22
93:11,14,17
95:12,22 96:10,
24 97:8,17,23
103:11 107:16
112:4,7,10
113:4,25
123:25 124:6,
16,23 132:6
133:12 135:1,7,
10,14,16,18
136:15 140:6
141:18 144:7,
13 145:1
150:18 154:3
156:25 173:4
182:13 186:10
187:25 195:20
200:9 202:22
203:9 211:5
212:13,19

213:7,18
216:21 217:11
218:14 223:18
225:12 227:21
229:6,20 230:3,
14 231:5
237:18 238:3,7,
13 246:10
250:7 252:21
253:16 254:5
255:18 267:22
268:18 286:14
299:2,11
304:21 305:9,
15 308:21
309:10 313:6
314:7,14,22
315:11 316:3,5,
12,22 317:2
321:9 334:9,16
338:18 340:3,
15 344:3,6,11,
15,20 346:3
355:11 365:4
371:13 372:12,
18 374:1,14
375:9 376:23
377:7 378:11,
19,22,24
379:22 381:2

**investigations**
12:18 25:1 48:5
79:24 107:14
111:25 276:13
315:20

**investigative**
191:1 217:21,
22 357:22
380:13

**investigator**
97:7,13,19
107:14 154:9

**investigatory**
134:12,25

**involve** 88:21

**involved** 19:18
28:18 29:12,15
31:15 32:15
77:7 111:24
131:11 173:19
199:11 209:3,
21 210:1
213:18 217:12

223:17 229:24
230:5,14,19
234:2 241:16,
24 242:12,20
251:8 263:19
265:22 275:24
277:22 295:19
305:17 376:19

**involvement**
58:15 61:18
147:8 150:20
157:13 171:9
234:24 331:15
383:2,12

**issue** 83:23

**issued** 107:20,
23 161:10

**items** 338:13

_____
J

**jacket** 343:9

**Jackie** 11:16
21:25 22:5,9,11
31:11 96:25
124:16,22
151:21 226:7
324:25 325:21
326:10 328:4
372:25 373:14
374:11,13,18
375:7 383:14

**jail** 118:8,14
128:2 251:12
253:6,22

**James** 20:6
42:25 58:21
59:2 60:2 202:5
213:6,14
230:17

**January** 55:15
60:24 183:13
184:25 186:3,8
188:9,19 189:6
191:12,16
194:9 196:1
202:16 203:3,
21 204:6,12,18
205:1,5,15,21,
25 206:12,17
207:25 208:6,8,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

11,21 209:1,17 213:15,24 214:2,19 218:11 249:21, 23,25 272:25 273:8,14 275:6 311:2

**Jason** 11:7,18 277:8 305:5 382:15

**Jathan** 56:17, 18 57:13

**Jathan's** 57:14

**Jeff** 54:25 55:2, 3,4,8,15,20,21 58:14,21 59:2, 23 60:8 61:12, 23 62:2,8,11

**Jefferson's** 288:1

**Jennifer** 95:4

**Jesse** 93:10 141:18,25 145:2 146:17 147:1,3 150:2 191:25 195:3,9 196:1

**Jessica** 11:3

**Jessie** 209:2, 21 212:8 213:23 219:14, 22 273:7,12,17 274:6,14,24 275:17,23 276:14,17 277:8,20 278:2 279:16 357:11 358:7,21,23

**Jim** 92:23

**job** 25:14 63:22 255:20

**Joe** 15:19 95:11 98:6 280:9,13 281:6, 9,21,24 282:12, 18,25 283:3,5 284:13,23 285:14 286:15 289:7,9,22,23,

24 290:2,8,12 310:8,11 313:4, 20 314:9,12,15 331:20 369:19

**John** 11:21 273:17 274:14 383:8

**Johnson** 59:9, 10,21 132:8 203:13 383:14

**joke** 39:17

**joking** 120:21

**Jonathan** 11:13 12:1 16:23 17:2 29:9 32:15,16 33:23 45:18 69:16,21, 25 70:11,16 71:5,18 72:8,22 73:14 74:18 76:19 77:2 79:10,18 80:2, 12,15,19,23 90:7 97:2 100:6 101:22 102:4,8, 20 103:1,12 104:21 105:22 109:15 118:22 125:14 126:24 129:12 131:5,9 136:22 138:13, 18 146:1,23 153:18,19 161:20 162:5, 11 163:17,22 164:25 165:4, 24 166:7,15,25 167:23 168:3,7 169:9,23 170:15 171:9, 25 172:10 186:9 239:23 240:6,25 244:19,21,22, 25 245:4 265:21 278:7 280:15 293:3 331:21 347:2, 10 348:4,19 349:1,7,14,22 350:7 354:12, 17 355:1 356:1, 9,13,24 357:1

359:1,6,13,18 360:3,13,22 361:5,9,18 362:6,8,23 363:3,12,23 369:19

**Jonathan's** 245:6 354:6

**Joseph** 11:17 383:15

**judge** 30:18 37:9 83:23 160:18

**judge's** 160:7

**judgment** 380:21

**July** 364:13,15, 16,23 365:1 366:13

**June** 60:14 275:18 280:9 281:6,21 289:7, 10 290:3 318:16,19,21 319:3,9,17 320:8,22 321:13,20,24 322:6

**junk** 355:11

**jurors** 183:7 290:11,17,25 334:1 356:16, 25 363:10,11

**jury** 96:9,15,19 98:4,8 100:5, 10,18,20,24 101:5,9,12,21 102:4,20 103:19 104:6,7 105:5,9,11,16 106:9,14,17 107:11,24 108:3 124:7 126:2,3,7,8,19, 23 127:3,11,15, 21,23,25 128:3, 10,18,23 129:1, 5,9 130:14 131:4,9,16 137:14 139:3,7,

10,12,15 146:8 149:20 151:13 155:15,18,19 162:23 164:3 170:25 171:2,8 173:18,22 174:8,17,25 175:25 176:8, 14,25 177:15, 17 178:10 180:23 182:18, 23 211:6 215:1, 16,23 216:5,10 217:6 218:12 221:18 231:9, 14,16,18,21 232:8,20 233:3, 10,15,20,25 234:11,23 235:6 239:21 254:13,16,18, 21 255:11,18 263:13 268:3,7, 8,10,16,21 269:1,5,10 270:20 277:20 278:3,6,12,23 279:15 280:8, 24 282:5,11,25 283:5 286:16, 22 287:4,10,17 288:6,15,18 289:2,19 290:18 297:12 301:12,16,17, 23 302:3,15,22 303:5,6,12,19 304:4,7,11 306:5,13 311:22 312:1,8, 14,25 313:8 328:9 333:17 344:19 354:8 356:8,12,21 358:17,21 360:16,18,20 361:11,17 362:2,11,15,20 364:2,19 365:21 366:4 373:16

**juvenile** 114:17,18

————————

**K**

**Katherine** 13:11 15:25 17:3,15 18:10, 23 19:5 21:23 24:5 25:3 26:10 27:8,13,22 29:3 30:14 32:4 33:17 34:10 39:4 44:16 45:7 73:12 79:25 86:17,23 87:3, 15 89:3,24 90:5,8,14,20 91:1,4,23 92:3, 9,15 93:11,17 95:12,21 96:10 97:3 100:7 101:12,22 102:8,21 103:1, 12,20 104:13, 22 105:12,23 113:1 125:19 129:13 132:5 140:16 141:10 142:9 145:3 147:5,9,12,23 148:3,13 149:5, 8 150:6,20 151:3 153:9 155:10 158:5 160:10,16 161:22 162:6, 12 163:18,23 165:1,5 166:1 167:12,24 168:4,7 170:17 171:10,25 172:11 185:3 186:15 188:11 192:10 195:5, 11 199:12 203:4 209:4,21 211:8 213:14, 20 215:20 216:1,6,12 217:12 218:16 219:15,23 230:5,10 231:4 238:13 239:24 241:14,24 242:21 244:19 245:1 249:9

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

Kentuckiana
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

265:12 268:9,
18,23 270:3
275:1,25
276:20 277:10,
23 278:24
279:16 280:15
282:1 287:13
290:19 291:2
293:3 295:21
299:2 323:10
329:24 330:4
331:15 345:5
365:4 369:17
375:22 376:6
379:24

**Katherine's**
220:2 343:5

**Kathryn** 166:7

**Kathy** 255:25

**Kayla** 15:15
21:5,7,21 22:4,
15 28:12,19
29:5,11,15,18,
25 30:4,14,22
31:6,11,18
32:3,16,19
33:10 52:18,19
53:4,11,12,21
54:24,25 55:16,
22 59:24 60:1,
10,18 95:21
99:9 138:20
153:14 154:19
155:25 156:4,9,
11,18,22,25
157:10,15,20
158:4,16,22
160:10,16,24
161:19 162:5,
10,24 163:13,
17,22 164:11,
18,21,24 165:3,
16,21,23 166:3,
24 167:3,21
168:3 170:15
171:10,17,24
172:5,9 173:18
174:7 175:9
361:7

**Kayla's** 53:25
56:10,13 176:1

**keeping**
134:10

**Kelley** 383:8

**Kelly** 11:17,21
263:19 383:15

**Ken** 156:1,16

**Kentucky**
11:7,10 27:10
34:24 44:25
59:4 62:19 64:1
67:2 71:11,20
72:9 73:24
187:19 188:1
202:20 207:2
234:14 261:20
268:17 338:4
368:9

**kick** 38:22 40:3

**kicked** 38:21,
24

**kicking** 39:12
135:14

**kid** 93:25 94:2,
6

**Kids** 66:15

**kill** 127:3
140:16

**killed** 21:10
29:9 57:6 131:6
138:14,19
141:10 142:9
163:17 167:1
187:2,10
188:11,14
195:12 213:14,
19 233:22
268:14 269:6
270:3 271:8
278:24 281:16
290:19

**killing** 150:13
163:22 165:1,5,
25 166:7
167:24 168:3,7
170:16 171:25
172:11 186:21
220:3 255:13
266:4 267:25
277:22 295:19

**kin** 55:24

**Kincer** 11:16
86:15 137:15
272:17 383:13

**kind** 250:25
355:23

**King** 15:19
95:11,14 98:6
280:10,13,24
281:6,9,21,24
282:12,18,25
283:3 284:4,13,
15,19,24
286:23 289:7,9,
14,19 290:12
310:8,12 313:4,
20 314:10,12
331:20 369:19

**King's** 283:5
285:14 286:15,
17 288:20

**Kinningham**
375:17,20,21

**KINSER**
383:13

**Kirk** 156:1

**knew** 30:5
42:6,15 55:15
59:15,23 93:21,
23 94:1,8
101:12,22
102:8,21 103:1,
12,20,25 104:8,
13,21 105:12,
17,22 106:6
113:1 118:10
126:15,23
134:9,23
135:22 136:3
137:1 148:6
157:24 161:3
166:17 178:11
195:9 197:17
199:10 215:18,
23,24 216:4,9,
24 217:13
241:24 242:12,
20 245:21
263:11 268:14
283:5,7,9
286:7,16,18,20
293:7 311:22
312:2,13,17

314:10 319:14
320:21 339:13
341:12 343:22
349:11 350:3
358:11 368:2,7,
8

**KNOCK** 311:13

**knowing**
103:17 105:2
230:7 255:6
295:17

**knowledge**
14:21 16:3
41:20 47:13
48:8 55:14
62:1,7 65:12
89:19 113:4,21
117:12 130:10
135:25 162:3
195:10,11
216:23 229:11
248:25 254:21
263:23 280:18
286:9 333:1
365:3 369:17
376:18

**Knox** 11:8,19
109:6,9 197:18
221:4,6 262:5

**KSP** 23:13,21
25:13,21 26:12
27:15,19 44:3
64:9,13 66:9,
13,16 73:7
74:12 75:24
86:24 87:3,16
89:4 136:11
142:13 144:22
145:12 146:16
191:5 200:4
201:23 206:7
207:7 213:5,21
221:24 222:13,
17,18 226:5,6
257:2 272:11,
25 273:17
275:11 277:9
315:16,25
321:20 322:6
334:20 335:18
337:18,21
338:1,2 344:15
357:10,19

374:20,21,25
375:1,3,5,6
383:13

**KSP-284**
108:19

**KSP-286**
154:13

**KSP-3536**
152:6

**KSP-362** 159:2

**KSP-385**
152:25

**KSP-413**
142:24

**KY** 12:23

---

**L**

**lab** 118:23

**label** 298:2

**labeled** 35:17
229:6

**laboratory**
145:13 146:16

**Lacee** 11:2

**lack** 300:24

**lady** 266:4

**Lagrange**
368:7

**language**
350:19

**large** 187:1
255:12

**larger** 345:18

**Larry** 137:25
138:2 318:18
322:4,8,9

**lasted** 205:18

**late** 53:15 60:3
302:16 312:2

**latent** 74:7,10

**launch** 161:12

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

**Laurel** 11:5 375:18

**law** 45:13 62:24 64:14 106:21 107:9,15

**Lawson** 93:10 141:19,25 145:2 146:18 147:1,4 150:2 191:25 195:3,9 196:1 209:2,21 210:4 212:8 213:23 214:3,6 219:14,22 273:7,12,18 274:6,14,15,24 275:17,23 276:14 277:8, 21 278:3 279:16 357:11 358:7,11,21,23

**Lawson's** 276:17

**lawsuit** 65:23 79:20 376:19

**lawyer** 75:12 84:2 296:2

**lead** 97:7,13 107:13 141:2,9 154:9 325:21 344:14

**learn** 12:17 128:10 211:7

**learned** 25:14 46:23 61:22 62:3 69:19,24 72:21 147:11, 17,22 149:15, 19,23 151:1,2, 6,18 154:2,5 158:4 175:1 180:22 181:2, 15 182:16 183:7 187:16 196:4,12 197:3, 10,25 198:17 201:1 221:12 234:7,16 271:18 280:24 321:4 339:8,9, 15 366:1,20 380:12

**learning** 42:9 180:17 181:21 195:2

**leave** 31:7 195:1 200:11 212:20 235:24 350:8 366:12

**leaving** 57:13 210:9 294:4

**led** 218:3 252:25

**left** 124:20 140:22 151:8 187:13,17 188:10 224:17 225:2 236:1 323:18 356:7 366:14

**legal** 23:5 31:20 32:22 129:15 293:5

**length** 359:1

**Lester** 90:13 97:2 98:10 100:8 101:22 102:5,10,12 103:25 104:1 106:18,21 107:9,21,22,25 108:2,10 125:19 130:8, 10 146:2,22 151:17,23 153:19,24 219:2 245:1 246:25 247:6 257:16 277:2,3 278:7,14 279:2, 23 281:9,10,20 282:13 283:1 295:23 314:16 329:23 351:9, 13 369:12,23 370:3,13 371:1, 25 379:8 380:6, 10,13

**Lester's** 33:21 151:7 183:17 203:14

**Lesters** 379:8

**letter** 262:9 313:10 317:14 319:6 372:10, 11,18 373:24

**letting** 49:14

**level** 94:9 102:23 103:18 105:4

**license** 74:9 88:1

**license's** 74:14

**Licha** 11:23 382:23

**lie** 12:16,24 13:2 23:19,24 26:15 27:7 76:1 233:21 234:1 240:18

**lied** 12:13 180:8 257:15 259:8,10 304:8

**lies** 53:22

**Lieutenant** 124:19 272:9 275:10

**life** 44:11 180:1

**lift** 57:18

**light** 381:1

**likewise** 120:7 162:22 180:25 205:3 282:8 383:8

**lime** 59:3

**limit** 382:18

**limited** 57:11 61:18 81:8 380:25 382:25 383:20

**limits** 83:1

**Linda** 176:6,11 177:1 178:6,12

**lines** 67:12 260:21 326:21, 22,24 327:14, 16,18,19,20

336:12,13,22 379:19

**lineup** 17:6,12 74:1 87:17,20 88:6,16,19,24

**lineups** 87:4

**Lisa** 190:9

**list** 98:3 228:1 229:13 265:11

**listed** 143:22 144:3 229:21

**listen** 24:11 35:18 100:16 101:3,18 104:3 126:3 128:19 133:16 139:5 164:16 177:12 204:2 231:10 239:8 297:22, 25 298:3 301:15 330:12 360:17 361:24 363:1 364:1,3 367:14

**listened** 341:21 361:20 363:17 369:9

**listening** 341:18

**live** 17:12 88:24 238:9

**lived** 210:23,24 211:7,9

**lives** 210:17

**living** 76:21 314:16

**LM** 45:25

**local** 309:5

**locate** 87:24

**located** 11:6 144:3 226:7

**location** 86:14 368:9

**lodged** 78:7

**London** 11:7

**long** 27:4 63:15 64:21 67:1 115:1 117:13 193:6,8 205:17 238:20,21 280:19,20 292:15 294:7 298:6 322:1 331:10 343:17, 19,20 349:20

**longer** 218:1 260:15

**looked** 73:14 179:2 196:24 199:25 307:5 310:21,22 311:6,7 353:14 355:1 356:13

**lookout** 33:24

**lost** 217:23 328:21

**lot** 27:5 57:21 111:24 163:23 168:4,7 172:1 175:18 180:15 231:1 241:6 253:17 281:11 317:11 322:12 378:18

**loud** 262:11 341:16

**Louisville** 21:17

**love** 322:7

**low** 116:15

**Lowes** 58:20 59:3

**lunch** 95:9 194:19

**lure** 281:1

**lying** 12:20 13:5,9 20:14 24:6 26:9,14,22 39:16 40:19 234:23 240:14 254:19 304:9 319:16,18,20 320:3 321:14

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

Kentuckiana COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

# M

**made** 32:13
42:3 49:14
65:19 68:9,13
78:5 109:12
142:13 185:1
205:5 207:1,6
209:16 243:24
259:24 295:23
345:9 369:6

**Magistrate**
49:3 78:4

**maiden** 52:6

**main** 124:22,24
158:13 343:15

**maintained**
295:14

**maintenance**
181:17

**majority** 24:25
156:16 248:16

**make** 23:19
37:5 43:11,16
65:19 69:11,25
71:13 77:18
80:8 81:18
118:19 182:12,
15 193:2
194:20 200:15
207:16 219:25
229:19 250:20,
23 251:23
261:1 309:1
310:9 320:2
329:22 332:3
342:24 355:2,
11 356:9,14,25
360:2,7 380:22

**makes** 238:19

**making** 13:10
20:14 24:7 26:9
43:21 48:24
77:24 78:3
102:16 166:3
220:9 253:12
335:2

**male** 32:10
343:4,8,16

360:20 362:4,7
363:2 364:8

**March** 52:2,3,4
108:14 109:3,5
110:4,19
111:17 112:24
113:9,13
115:11 117:18
127:4,8 129:10
132:4 138:25
155:25 156:9,
19,22 157:2,12
159:25 161:1
164:22 170:14
171:16 174:23
235:14,25
236:7,21 237:4,
14,23 238:1,23
239:7 242:11,
22 243:15,19
244:4,18
246:17 249:6
250:22 251:3,
13 252:4
254:23 256:5
258:16 259:15
260:4 261:21
305:22 338:15,
19

**Margaret**
365:12

**mark** 11:17
45:19 75:9
100:9 108:18
137:7 142:18,
21 145:5 152:6
154:12 158:24
184:18 195:15
201:19 202:8
221:23 264:18
271:22 272:10
287:20 306:7
321:18 328:14
334:19 335:17
338:8 341:2
347:17 374:4
383:14

**marked** 35:20
45:19,23 75:13
100:19 108:22
125:8 137:22
143:1 145:9
152:8,21
154:15 159:3

164:7 184:20
190:8,13
195:22 201:22
206:6 222:1
235:13 243:22
256:22,24
262:1 263:25
264:21 266:11
272:3,12
287:22 291:14
298:5 306:9
308:19 317:22
321:22 323:4
328:14,17
334:22 335:23
338:12 341:4
345:11 347:18
357:9,15
364:14 372:13
374:3 377:16,
20 384:3

**Market** 246:24
247:5

**marks** 313:15

**marriage**
52:10

**married** 51:22
52:13,15,17
55:22 56:6

**marry** 52:1,19

**Martin** 229:15

**Marvin** 234:15

**Maryland** 23:4

**match** 150:3

**matched**
173:18 267:10,
13

**matches**
298:14

**matter** 11:8
82:2 250:18
383:12

**meaning** 28:7
210:24 233:8
243:12 369:18

**means** 115:13
309:22 362:18

**meant** 105:17
130:17 233:10,
13 361:13,15

**mechanical-
wise** 175:11

**media** 53:10

**medical** 63:11,
17 260:8
302:15,20
304:21,24
305:18,21
306:4,12
307:10,13
308:1 312:9
314:20,25
315:2,6 316:21,
25 317:5
318:17 325:5,
11,25 326:8
328:3,13 333:7,
15 335:5

**meet** 53:1
81:20,25 84:23
109:23 213:21

**meeting** 82:3
110:3 195:1

**meetings**
208:10

**Mefford** 11:17
202:8 203:21
205:4,8 338:10,
16 364:23
365:2 366:12,
14 383:14

**Melinda** 53:21
54:18

**members**
314:2

**memory** 69:6
80:20 112:22
118:21 148:5
177:13 204:8,
15,25 236:25
237:12 351:25
354:15

**men** 181:17

**mention** 119:8,
13 330:14
368:19 379:16

**mentioned**
119:9 192:15,
24

**mentioning**
289:4

**mess** 328:23

**message**
118:20

**messages**
382:2,9

**messed** 159:1

**messes**
249:12

**met** 112:24
155:5 190:1
193:23 198:5
235:25 251:3
270:12,15
296:2,12
299:13,14
343:3 364:23
381:5,7,9,22

**metal** 257:14
258:24

**meth** 118:23,24

**Michael** 11:23
15:7 16:9,15
17:14 24:10
32:7,8,20,25
33:3 69:21,24
70:15,25 71:4,
19 72:2,7 73:13
80:10,20,22
92:14 93:16
99:15,18,24
130:4 150:23
169:2,5,22
230:18 258:5
266:3,18 267:5,
10,12 269:20
271:7,8 334:8,
16 338:17
339:15 341:6,
17,20,23,24
342:2,5,12,17
343:3,14,23
346:20 349:15
352:11,23
354:1,7,11
355:1,10,15

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

356:9,13 359:5, 14 360:9,20 361:2,6,17 362:5,12 363:3, 5,12,20,22

**middle** 138:17 323:15

**Mike** 81:2 92:3 141:18,25 145:1 146:17, 25 147:12,18, 23 148:2,6,25 149:3 150:2,19 187:4,9,25 188:10,14 190:1,16 191:10,11,20, 23 192:9,22 193:21,24 194:11 195:1,3 196:5,25 197:3, 10,17 199:3,11 200:7 209:3,20 210:9 212:21 218:15 219:14, 22 220:5,11,23 221:12,20 224:13,17 225:1,5,14 228:16,19 230:16,18 266:19 267:9, 14 268:7,22 269:1 279:15 291:20 338:17 341:7 351:15, 17 352:14,21 354:2 356:20 382:23

**Mikey** 377:19

**military** 63:4, 15 310:4,5

**mill** 223:22 228:2,3,10

**million** 30:7, 11,19,23 160:21

**Mills** 13:11 15:15,25 16:17 21:5,7,23 22:15 28:12,19 29:3, 5,11,25 30:4,

14,22 31:6,18 32:4,20 33:10 34:11 52:6,8, 11,14 79:25 86:23 87:3 92:12 95:21 97:3 99:9 100:7 101:12,22 102:8,21 103:1, 12,20 104:13, 22 105:12,23 113:2 125:20 126:25 127:4 129:13 132:5 138:14,20 140:16 141:10, 18,24 142:10 145:3 147:5,9, 18 148:13 149:5,8 150:6, 20 153:9,14 154:19 155:10, 25 156:1,2,4,18 157:20 158:5, 17 160:10,16, 24 161:19,22 162:5,6,10,12, 14,24 163:13, 18,22,23 164:11,18,21, 24 165:1,3,5, 16,21,23 166:1, 24 167:3,12,21 168:3,4 170:15, 17 171:10,24, 25 173:18 174:7,17,22 175:1,6,13,18, 20,21,25 185:3 186:15 187:2, 10 188:11,14 192:10 195:5, 11 199:12 200:22 203:4,8, 16 209:4,22 211:8 212:12 213:14,19 215:20 216:2,7, 12 218:16 219:15,23 221:13 227:2, 21 230:11 231:4 233:22 234:2,24 239:24 241:24 242:21 243:21

244:19 245:1 249:9 255:12 265:12 268:9, 18 269:6 270:3 275:1,25 276:20 277:10, 23 278:24 279:16 280:15 281:1 287:13 290:19 291:2 293:3 323:10 329:24 330:5 331:15 345:5 346:3 361:7 365:4 369:17 375:20,22 376:6,7,13,21, 24 377:5,8 379:24

**Mills'** 17:3,15 18:10,23 19:5 21:21 22:5 24:5 25:3 26:10 27:8,13,22 31:11 33:17 39:4 44:16 45:8 73:12 80:10 86:18 87:15 89:3,24 90:5,8, 14,20 91:1,4,23 92:4,9,15 93:11,17 95:12, 21 96:10 112:4, 10 113:2 123:25 125:14 126:16 135:10, 14,17 136:15 139:15 144:4 147:12,23 148:3 151:3 160:16 173:22 175:16,18 209:1,19 217:12 220:12 226:23 227:7, 11 230:5 238:13 241:14 242:13 268:23 269:13 270:16 282:1 288:11 298:16 299:2 340:17,23

**Mills-bruner** 95:2

**mind** 293:22,24 342:23

**mine** 50:17 224:15,19

**Mine's** 224:21

**minute** 306:22 310:20

**minutes** 51:5 120:25 194:21, 25 303:23 312:2 335:6 344:17 356:7 358:25 370:19, 22 375:13

**Miranda** 22:18, 21,24 291:23 292:1,11

**Mirandize** 22:15

**misleading** 234:11

**misrepresenting** 48:24

**missing** 130:6 286:8

**mistakes** 319:25

**mixed** 310:13

**MO** 63:22

**mom** 111:16

**moment** 140:19 372:9

**moments** 20:13

**Monday** 307:23,24

**money** 62:13, 18,21 130:5 139:20 140:2,6 144:2 149:4 150:11 151:3 187:2 195:11 210:10,11 215:12 216:11, 25 225:15 231:23 232:10 241:25 255:12,

19 256:3 271:9 281:2,11 285:17,19 286:5,8,10 287:11 289:11, 19 290:5,12 310:9,15 375:23 380:6

**month** 18:5 194:6 225:5,6, 13 333:13 344:10

**months** 29:24

**morning** 12:11 32:9 130:9 187:15 268:14 281:15,16

**Morris** 211:10

**Moss** 63:22 257:11

**Mossy** 343:10

**mother** 53:13, 14,25 94:16 103:5 109:22 110:3,11 113:5, 6,9,13 118:4 127:12,24 176:6,15 177:1, 17

**mother's** 94:25 109:18

**motion** 383:21

**motivation** 285:15 286:7

**motive** 141:14 285:25 286:4

**mouth** 25:10 106:2 340:8 376:20 377:13

**move** 83:7 85:23 125:23 328:12 347:19 364:10

**moved** 17:8 211:11 367:24 368:2,8

**moving** 85:22 265:7 266:8,9

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

271:25 272:1
273:1 287:24,
25 334:5
368:23,24
372:14,16
377:17 381:16
382:16,22

**murder** 21:22
28:13 29:2,7
30:6,14 31:11,
18 32:4 34:14
48:5 53:22 76:3
87:7 97:3 100:7
101:13,23
129:13 131:11
133:6 145:2
147:8 150:5,20
155:10 157:16
158:1,2,5,17
160:10,16
161:5,22 162:5,
7,11,14 171:9
176:7,16 177:2,
18 185:2
186:14,23
192:10 193:25
195:5 199:12
200:17 209:4,
21 219:9,15,23
223:17 230:15
234:2,24
239:24 241:24
242:20 243:21
244:19 245:1
254:14 268:23
269:13 270:16
275:1,25
276:15,19
279:16 287:13
291:2 293:3
295:17 298:16
304:17 321:9
323:10 329:23
331:15 345:5
346:22 370:16,
24 371:13,21
372:8

**mustache**
353:9

---

**N**

**name's** 11:21

---

**named** 55:4
148:22 165:5
166:1,25 167:6,
12 170:16
234:15

**names** 94:22,
24 101:16
166:17 167:6
223:22 224:10
228:1,7,8,22
269:11

**narrative**
188:18,24
243:25 246:19
250:5 296:22
297:20 299:8
302:6 330:24

**National** 63:9

**natural** 194:21

**nature** 205:13
238:19 371:8

**needed** 42:16
89:14 265:13,
24

**needing** 283:6
288:21

**neighborhood**
339:24

**neighbors**
265:13

**nice** 37:5 77:17

**night** 109:22

**nods** 37:1

**noise** 38:17
68:22

**non-identification**
71:18

**noon** 302:24
303:4,7,10,11,
13,21 304:6

**nose** 353:21

**note** 51:12
148:7,11,15
190:5,11,16,25
192:23 193:25
198:20 199:7

---

220:4,10,14,22
226:9 229:7
266:24 268:4
269:12 352:4

**notes** 69:5
204:14,23
222:3,25 223:7
236:24 295:10
308:7

**notice** 362:7

**noting** 78:15
79:3

**notions** 93:13

**November**
18:7,8,23 19:15
145:13 146:15
147:3,7,11,17,
22 148:6
323:14,23

**number** 11:10
45:20,24 50:4,
9,10,23 51:5,12
75:10 76:10
99:17 100:10
108:19 125:9
142:22 152:6,
22 154:13
158:25 195:15
201:19 221:23
222:25 223:4,5,
11,13 224:1,13
228:10 235:11
243:15 257:2
268:13 274:11
306:23 308:7
321:18 325:4
327:7,8 329:3
334:20 335:17
336:22 337:7
346:12,17,18
347:17 354:8
357:10

**numbered**
76:9

**numbers**
50:15,19 75:15
137:19 142:20
164:10 209:6
222:23 336:4

**nurse** 280:25
282:1

---

**O**

**Oak** 343:10

**oath** 13:20,22
14:5,10,16
32:18 36:22
41:23 74:24
75:17,20,22,24
76:6,23,25 79:7
150:24 213:4
232:19 259:6
260:24 351:11
352:2

**object** 13:25
14:7,12 16:14
18:25 20:17
21:12 23:5,22
24:8 28:6 30:1,
9,25 31:20
32:22 35:14
36:8 38:18,20
39:10,15,24
40:8,14,22
41:4,6 42:17,22
43:3,13,23
44:19 46:14
47:11 48:7,16
55:11 59:18
61:24 62:5
68:16 69:4,12
70:2,18 71:6,
15,22 72:11,24
73:17 75:3
77:8,14 79:12
81:3 82:1 88:11
94:3,12 103:13
104:11,23,25
105:13,24
107:5,18 110:6
114:23 115:18
118:16 119:5
121:25 122:10
128:5,14
129:14,25
130:22 131:19,
24 132:16,19
133:13 134:15
135:3,12
136:16 140:8
141:7 147:14,
25 149:11
150:8 151:9,25
156:13 157:7,

---

22 160:13
161:23 162:16
163:10 165:7
166:9,14 167:7
168:9 169:7,10,
12,24 170:18
172:3,12 173:9
175:3,8 176:9,
18 177:3
179:14,18,22
181:5,19 182:6
183:21,24
184:12 185:9,
14,17 186:2,4
187:21 188:4
191:14 194:8,
15 195:6
197:15 198:6,
10 200:19
202:23 203:10
208:16,22
209:23 213:16
215:21 217:7
220:25 223:2,8
225:7,24
227:23 229:3,8,
22 232:1,11
233:11,23
234:8,18 235:1,
9 236:16
239:25 240:9,
15 241:8
249:10,24
251:5 253:4
261:13 264:10
266:1 267:11
268:24 269:7,
15,22 270:18
271:13,16
276:2,7 277:12,
16,24 278:8
279:18,24
280:16 283:8
284:25 285:7,
20 286:25
287:14 288:24
290:20 292:6,
13 293:4,14
298:21 300:4
301:5 302:18
303:14,25
305:10,25
310:18 313:2
319:11,23
320:24 321:15
325:1 326:12



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

327:10 335:7
336:14 337:15,
22 340:5 342:8,
20 347:11
349:17,24
350:10,16
351:24 352:24
353:4 354:3,14
355:4,13 358:3
359:20 360:4,
23 361:22
362:16,25
363:16,24
369:25 370:14
371:2,15 373:3
374:15 375:10
377:1 380:2,8
382:20 383:24

**objected** 78:11

**objecting** 79:3
299:3 300:11,
14,20 338:4,6

**objection**
48:21 49:4,8,9
65:19 66:2 75:4
77:12,19,24
78:4,5,7,8,16
79:3,4 114:13
172:25 198:20
216:19 270:4
278:15 286:19
300:21,23
315:17 317:6
321:11,23
324:5 332:4,15
333:3 335:10
350:23 364:6

**objection's**
41:10

**objections**
14:1,2,8 37:6,
10 49:1,11,13
78:3,25

**objects** 35:8,
12

**Objet** 316:13

**obligated**
67:25

**obligation**
65:24

**observe** 12:20

**observing**
12:19

**obstruct** 82:7

**obstructionist**
169:15

**obtain** 278:6
279:21 285:17
316:5

**obtained** 98:6,
9 99:5 129:10
138:25 288:5
304:21,25
305:18,21
306:4,12,18
308:20

**obtaining**
278:13

**obvious** 59:22
327:12

**occasion**
157:11

**occasions**
55:18 84:23
354:8

**occurred**
14:23

**occurring**
71:10

**October** 52:23,
25 60:16

**offering**
117:22

**office** 86:2
96:14 97:18
98:2,5,21,25
99:4,8,14,22
225:23 226:8,
10 262:21
302:5 303:8
304:22,23
323:13 325:21
328:4 329:17

**officer** 16:24
17:22,24 18:12,
21 19:21 34:17
43:5 54:4 55:9
59:7,19 62:19

64:4,13 75:24
88:22 97:22
119:1 133:15,
24 207:1
211:21 238:3
260:15 268:17
295:2 305:8
325:22 337:4
338:9 344:15
365:2

**officers** 12:19,
20 133:21
144:21 192:2
202:6

**officially**
161:8,9,11,17

**officials**
107:10

**Oklahoma**
16:25 17:8
69:16,20 70:8,
11 72:14 76:20
77:2 79:11
80:15 81:2
347:1,9,23
359:2

**one-sided**
322:25

**ongoing** 17:21
18:19 41:19
243:9 317:2

**open** 281:2

**open-ended**
316:17

**opinion** 293:24

**opinions** 90:3,
6,10,16,22
91:15,18,25
92:6,11,24
95:14,24 241:4

**opportunity**
383:10,20

**opposing**
145:8

**opposite**
234:16

**oral** 66:19,21,
23

**oranges** 173:2

**order** 29:23
32:1 78:24
83:16 221:23
268:19 281:1
285:17 315:2,
14,23

**orders** 18:6

**ordinary**
355:22

**original**
345:17,21
365:22

**originally**
25:21 111:23
113:8 285:14

**orphanage**
176:6,12,15
177:1,9,17,21
178:17,22
179:1,7,21
180:11,17
182:16,24
183:8

**Otis** 20:6 42:25
58:22 59:2 60:2

**outhouse**
281:13,16

**overheard**
130:7

**oversight**
177:25

**owed** 225:15

**owes** 225:6

**owned** 176:11

**ownership**
176:13 177:7

_____

**P**

**p.m.** 115:14
119:22 156:9
197:4,11,19
198:2,18
201:16 309:14,
19 310:2 384:4

**packet** 325:8,

10

**pages** 76:9
323:23

**paid** 62:9
147:20 201:2
221:7,12 262:7,
8 269:5 310:7

**paper** 312:7
370:25

**paragraph**
163:21 170:6
211:23 212:3,
18 214:18
241:22 242:2
246:21,22
283:22 317:25

**parents** 95:6
173:22 176:1

**part** 29:9 32:24
33:1,8 42:2
67:8 107:16
162:8 168:6
182:13 186:17
205:11 254:25
255:3 256:3
261:1 285:10
299:22 300:17
307:6 353:13
357:23 381:8

**partaking**
162:2

**participate**
61:2 215:8
216:24 233:16
273:19

**participated**
20:3,5,9 60:23
275:1

**participating**
215:19 216:1
285:16

**particulars**
42:10 43:6
44:23 58:18
59:12 97:5
237:10 238:4
239:1,15 240:1
248:17 251:14
252:9 297:13

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

parties 381:7

parts 19:25 300:19

party 65:23

pass 45:21 75:16 123:15 231:19,22 232:9 261:24

passed 55:14 56:3,16,19 207:14

password 120:8

past 266:8 273:1 347:19

patient 309:5

pattern 343:9, 10

Patterson 53:21 54:18

pause 41:4

paused 363:2, 5

pay 93:4

payment 309:22 310:10

Peak 22:10

peculiar 193:3

pending 11:9 38:3 93:2 251:2 252:6 253:3

people 44:16 66:24 74:6 76:3 77:6 94:20 136:25 142:7 156:15 168:21 179:8,10 181:2 183:8 188:6 195:10 223:16 228:8,15 229:6 230:4,13 238:8 260:19 267:24 278:24 279:6 295:18 340:10, 17,23 349:21

perceive 27:1

percent 24:14 172:4,6

Perfect 81:23

perfectly 37:13 58:11

period 48:19 207:13 208:2

permission 317:4

perpetrator 140:21

perpetrators 140:21

person 14:22 16:16,19 27:1 33:11 52:16 62:23 97:15,16 135:20 142:6 165:5,25 170:16 183:17 185:7,8,12,23 186:5 195:8 199:11 203:5 206:24 211:24 212:12,15 217:16 218:1 220:22 226:22 227:1,10,20 229:14 234:15 241:11,13,14, 15 251:7 267:3 313:23 323:25 324:3 340:1,3, 22 355:20 360:12 361:2, 18 362:23 367:3

person-to-person 245:4

personal 53:5 94:9 102:23 103:18 105:3 138:8 178:1,7 180:1

personally 17:2,5,13 74:5 106:5 275:24 277:22 376:9 377:7

personnel 18:6 65:15,18

persons 141:23 186:9 209:7 224:7,11 226:17 227:5 228:23 229:7, 21 230:3,10 346:21

pertaining 16:6 231:22

pertinent 78:14 128:8,10 240:24

petition 49:12

Pharmacy 283:9

phone 48:11, 14 50:4,6,14, 19,23,25 51:5, 12 53:9 57:15, 23 222:25 259:4,12 260:2 261:5,9 316:20, 25

phonetic 12:24

photo 17:6,11 73:25 74:1 87:17,20 88:6, 10,16,19,23

photograph 17:2,13 74:18 266:20,23 267:1 347:10 352:3 360:10

photographs 16:22 69:10,15, 20 70:6,8,11,16 72:16,23 73:14 74:6,14 77:6 78:17 79:18,24 80:9,11,14,17 81:2 87:24 199:24 347:1,4, 8,9,22 348:4,19 349:1,9,14 350:8,18 351:12,17 355:1 356:10, 13 359:1,3,6,

10,18

photos 71:1 88:2 350:22

phrase 44:9, 11,24 88:22

physical 66:19 68:24 140:7,11, 13 143:21 199:18 241:2

physically 199:17 274:25

Pickard 11:19, 22 58:2,14 61:12,23 62:9 180:10 181:9, 16,23 235:22, 24 236:14 237:3,8,18,20, 22,25 238:2,6, 12,21 239:21 240:5,11,23 243:19 244:17 245:9 246:16 247:24 248:8, 14,21 250:20 256:6 262:5,10, 19,20,23 263:2 329:16,21 330:3 378:12, 15 383:9

picked 371:5

Pickerel 19:13 20:9 123:16 124:16,22

pictures 17:8 76:19 77:1 79:10 80:11,21, 23 199:23 200:2,3 349:4, 20 350:25 351:6,15,22

piece 107:15 140:7 241:1 312:6 316:18 370:24

pieces 108:8 130:3

pile 328:22,23

pill 286:6

pills 62:13,18, 22 187:5 224:18 225:3

pin 44:7,18 279:9 296:12

Pineville 47:21 285:11

pinned 320:2

PL 46:2 261:24 266:9,13,16 272:1 287:21 306:8 307:10 308:19 321:18 322:14,24 323:3 326:8,10 328:14 329:4 334:21 341:2 345:8 348:11, 12 351:21 368:24

PL- 45:16 137:8

PL-14450 45:17

PL-14718 184:18

PL-15867 158:25

PL-15875 158:25

PL-27706 35:18 46:3

PL-9650 164:10

PL-9652 120:5 125:7

PL-9684 100:11 101:2

PL1791 206:4

place 67:4 68:3 86:15 113:17 116:5 117:14 124:5,10 205:15 208:1 236:3 239:16 328:21 331:11

places 218:4

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**plaintiff's** 266:7 335:17 382:20 383:4

**plaintiffs** 11:12 12:1 97:21 98:16 219:8 244:5 254:14 258:19 265:24 365:20 366:3 373:19 378:1

**plaintiffs'** 51:13

**plan** 286:9

**planned** 42:15

**plates** 257:13, 14 258:24

**play** 101:1,17, 24 104:2 106:12 120:6 121:6 127:20 128:18 139:4 164:5 165:20 173:25 231:8 301:14 303:3 360:16

**played** 35:21 100:20 101:5 104:6 106:14 120:9,14 121:9 126:7 128:23 133:18 139:7, 10 141:13 164:18 165:4, 21 171:2 177:15 231:14 301:16 303:5 360:18 362:2

**PLAYSBACK** 116:14

**pled** 379:11

**plumbing** 281:14

**point** 28:15 31:13,14 37:23 84:16 86:3 96:24 97:9 144:22 146:3 152:12 167:9, 10 179:11 192:20 194:21

199:10 200:7 201:13 217:13 223:10 237:18 239:19 243:14 248:5 252:4 274:9 279:3 286:17 296:20 300:2 304:20 320:2 326:21 328:4 335:14 337:9 368:8,10 374:22

**pointed** 92:16 104:4 130:12 268:16

**pointing** 198:7

**points** 145:15

**police** 12:19,20 16:24 27:10 31:7 34:24 45:1 46:23 54:4 57:2 62:19 63:21 64:1,4 67:2,12, 13,21 68:1 69:2,16 70:7,14 71:4,12,20 72:9,13 73:25 76:20 79:11 80:15 88:22 89:5 110:8,9 117:22 149:15 156:4 162:20 173:4,13 175:15 180:16 193:10 194:1 200:17 202:20 207:2 208:15 217:2 218:9,13 219:12 220:8 221:15 225:19, 20 226:21,25 227:4,9 228:19 229:5,12 230:21 231:5 234:14 238:3 254:10,24 261:20 267:19 268:17 291:21 298:25 299:17 300:3,5,12,16, 18 301:9 304:14 314:7 347:1 366:25 376:11,14

**polices** 86:24

**policies** 86:19 87:4,16,19 88:4,7 89:5,12

**policy** 26:14 315:24

**polygraph** 147:4,8 183:14 186:1,13 196:1 201:7 206:1,3, 10,15,18 207:8, 15 208:12 210:5 212:7,25 213:5,11 214:18 216:3, 16 217:11,14, 21 218:10 219:20 231:19, 22 232:9,14 233:5 234:7,12, 13,21 267:15 273:8,12 274:24 275:3, 24 277:13,21 357:10,12,17 358:2,8,12,21

**polygraphed** 185:2 207:3 209:17

**polygrapher** 211:25 213:22 233:21 234:4 277:9

**polygraphs** 214:3 267:21

**popular** 343:10

**portion** 116:14 319:9

**positive** 355:2, 8 356:14

**positively** 32:11 71:1 72:3 73:2 340:9 346:22 347:3,5, 9,14 354:16,17 355:17,18,25 360:13 362:6 363:3,21

**possession** 180:18 181:3,

10,18 187:1

**possibility** 136:19

**possibly** 109:24 141:11, 13 157:13 176:12 179:5 183:1 193:18 194:7 213:17 214:11 221:14 223:21 286:12 360:7

**post** 19:1,2,4 55:10 123:24 144:11,16 366:23

**Post-** 352:3

**Post-it** 148:7, 11,15 190:5,10, 16,24,25 192:23 193:25 199:7 220:4,10, 22 266:24 268:4 269:12

**potential** 241:13 346:4

**potentially** 66:12

**poured** 370:9, 10

**power** 43:11

**practice** 114:11

**pre-deployment** 63:19

**preceded** 157:11

**precise** 106:10

**preconceived** 90:6 91:15,18, 25 92:6,11,19 93:13 95:14,24

**preliminary** 137:7,8 138:9, 13,24 149:24 163:4 171:13 181:1 183:10

185:15,22 282:9 333:22 334:1

**preparation** 81:11 84:13,17 85:5,10 381:10, 21

**prepare** 67:13 74:17 81:19 84:6,24 85:11 210:18 213:3, 10

**prepared** 22:25 235:15, 16 272:5,8 381:20

**prescription** 282:13 283:2,6, 10,12,24 284:3 285:11,18 286:6 287:6,12 288:1,8,22 289:3,11,15 290:6,11,18,24 291:1 308:18 309:13,18 310:10,16 311:1,5 312:15, 21

**prescriptions** 313:14

**presence** 111:11 112:9 291:20 295:23 345:10,15 348:14 359:4

**present** 21:19 22:23 45:19 85:4 110:22 111:14,17 114:18 155:24 187:18 188:1 202:6,11 205:8 235:21 236:2 237:25 299:14 339:20 358:12 370:6

**preserving** 380:23

**pressed** 21:2

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**pretty** 40:7 107:15 111:6 116:15 130:12 141:5 142:22 154:5 179:13 190:18 196:10 198:16 268:15 283:13

**prevented** 207:22

**previous** 12:23 89:2 248:25 312:18

**previously** 133:20 238:24 239:14 369:14

**price** 309:22

**principal** 322:17

**principle** 78:14

**print** 345:19

**prints** 74:7,10 142:13 146:16, 25 150:3

**prior** 12:18 29:3 30:23 32:4 46:18 47:7 53:1 57:13 64:1,4 71:10 86:11,17, 22 87:2,6,15 89:3,24 90:4,7, 10,13,16,19,22, 25 91:17,19,22, 25 92:3,8,12, 13,14 93:10,13, 16 95:11,16,21 96:14,21 98:4, 8,15,19,24 99:3,7,10,13 102:8,15,19,21, 25 103:1,12,20 104:8,13,20,22 106:22 107:10, 23 108:3,11 110:1,3 111:17 112:4,6,10 113:9,13 114:12,22 115:5,17,23 116:4 117:1,18

**pretty** 124:6 127:12, 17 128:1,12 129:21,23 131:17 132:3 146:15 147:3,7, 11,12,17,22 148:6,12 149:4 155:14,15,17 156:11,18,22 157:17 158:15 160:25 162:24 163:13 168:21 174:7,17,22,25 176:3 178:10, 20 188:10,13 189:25 197:19 202:22 211:5 212:25 213:22, 25 214:2 215:1, 16 232:20 233:2,7,14 235:5 236:3,15 239:6,10,20 240:5 242:11, 21 246:1,16 250:21 251:12 252:4 253:1,14 257:22 259:3, 25 260:4,11 261:20,25 262:3 263:12 268:22 288:5 291:24 292:22, 23,25 293:12 294:10,14 304:10 306:13 312:8 313:8 330:19,23 354:7 358:13, 17 365:1,20 370:12 374:12 377:2

**prison** 43:2 68:20 365:11, 14 367:4

**prisons** 366:22

**privilege** 83:3 85:14

**privileged** 81:13 381:6,10

**probable** 23:2 28:16 31:17,22 32:17,19,24

**pretty** 33:5,14 129:11, 16,18,22 130:18 135:21 140:14 146:21 150:4 155:4 185:11 268:11, 13 279:13 280:1 287:1,15 289:5 293:1,10, 13,20,25 361:3

**probation** 371:8

**procedure** 315:24

**procedures** 86:19,24 87:4, 16,19 88:4 89:5,12 173:3

**proceed** 161:21 162:6, 13

**proceeded** 41:16

**proceeding** 98:8

**proceedings** 11:1 96:15

**process** 66:16 122:23 123:24 359:6

**produce** 66:6

**produced** 47:14 65:13,20 82:17 92:23 257:4

**product** 82:17

**production** 66:3

**profile** 309:5

**promise** 13:4 43:9,16,17,21 58:9 88:21 112:6,8,9 118:20 119:7 197:25 253:12 272:22 368:4, 14 379:13,16

**promised** 43:1 259:24 317:13 332:11

**promises** 13:10 20:15 23:19 24:7 26:9 43:11 68:9 118:19 250:21, 23,25 251:23 259:24 332:2,9

**promising** 43:7,19 251:22 379:15

**promoted** 18:1,2 19:1

**pronounced** 275:13

**proper** 48:21 78:5 134:12,24

**property** 57:12 62:23 142:25

**prosecuting** 151:22

**prosecution** 154:25

**prosecutor** 43:15 126:14 367:20

**prosecutor's** 98:2

**provide** 22:24 50:17 98:4,9, 16,20,25 99:4, 8,11,14 100:1 132:4,7,17 245:12 248:8 278:25 279:1, 14 342:7 383:20

**provided** 51:12 76:9 78:9 91:9 97:15,17, 22 98:1 99:21 131:17,22,25 132:18 138:23 205:21 210:13 211:13,21 214:25 215:5 234:22 247:9,

**pretty** 12 248:4,5 250:6 254:21, 23 267:10 278:23 314:16 359:14 362:21

**providing** 138:20 211:24 268:4 325:20 363:13 382:17

**proximity** 228:4 303:17, 20

**pulled** 302:15

**pumping** 246:24 247:5

**punitive** 380:18

**purchased** 379:21 380:1

**purported** 148:7

**purpose** 69:19 100:4

**purposely** 139:23 140:21

**purse** 139:17, 24 140:22 144:4

**pursuant** 113:23 202:19

**pushed** 325:12

**pushing** 167:16

**Pusin** 12:23

**put** 22:11 39:23 50:13 58:10 66:2 67:21 83:22 86:8 87:17 88:5,10 96:23 106:2 137:18 139:23 140:1,2 190:24, 25 206:24 220:18 241:3, 17 245:6 251:21,24 252:5,20 253:19,25

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

257:13 259:21
265:8 271:10,
12,14 279:10
287:18,25
291:16 298:7
328:20 330:11
340:8 341:15
345:3 349:7
351:1,7,22
359:13 362:19
370:11,24
374:20 380:19

**putting** 25:9
62:22 324:14,
21 376:20
377:12

**puzzle** 33:2
130:2

———————

**Q**

———————

**quantity** 122:4

**question** 14:14
16:9 19:23 26:8
27:3,6 36:6,9
37:13,19 38:3,4
41:2,7,12 48:25
49:5,20 63:4
68:23 71:3,8,17
73:23 77:15,18
78:16 79:13
81:22 83:8
84:1,9,11,22
85:3 86:5,20
87:10 96:23
97:16 101:20,
23 106:4
109:12 110:10
115:21 116:6,
11 121:19
127:22 130:12
138:11 144:20
150:16 158:3
166:24 167:21
169:13,18,19,
20 172:14
183:22 185:21
190:11 196:3
197:24 199:4
214:2 215:22
216:15 218:9
226:8 227:24
232:3,6 233:16,

18 238:16
239:4,10
252:13 255:17
264:5,12
268:16 272:7,
19 273:19
274:5 278:21
286:1 297:5,16
298:15 302:2
316:17 321:11
327:17,24
339:11,12
342:22 345:6
354:24 356:3,4
359:8,9,12
371:25 374:12
375:7 376:23,
25 377:2,3,4,15
381:4,15,17,18
382:25

**question's**
25:17

**questioned**
60:23 192:13
193:24 203:8,
20,23 204:6
234:1,23
291:19

**questioning**
12:14 22:16
23:9,18 24:22
34:3,7 35:3,6,9,
13 38:16 41:5,6
51:11 60:24
68:10,14,25
193:6 202:22
208:2 238:1,20,
22 239:12
291:24 299:10
300:7 369:11
376:12 380:17
381:1 382:25
383:19,22

**questions**
25:24 26:2 27:5
35:19 36:20
37:12 38:6,11
57:11 66:25
78:21 81:8
83:11,13,21
85:9,13 100:17
101:4 104:4
112:22 126:4
128:20 139:6

148:12 164:17
192:18 196:19,
24 214:21,22
215:7,13,15
226:17 231:11,
23 232:10,15
246:21 252:14
269:4 273:12
274:10,12,19
277:21 294:20
296:5 304:15
307:10 322:11,
12,13 330:18
358:7,10
368:22 369:21
377:18 380:18,
25 382:8 383:1,
6,11,16

**quick** 112:21
317:11

**Quickly** 307:15

**quiet** 249:13

**quote** 109:19

**quoting** 176:19

———————

**R**

———————

**RADIO** 68:22

**raise** 12:2
24:15

**raised** 24:13

**raising** 28:9

**Randy** 229:13

**rape** 26:19

**raping** 26:25

**ray** 17:11

**re-direct**
383:20

**re-read** 116:8

**reach** 53:14
54:7

**reached** 53:13,
16 113:24
162:23 365:15
366:22 367:4,7

**react** 157:25

158:4,7

**reacted** 158:9

**read** 42:11
170:6 189:1,3,
7,8,11,12
196:22 204:2
210:14 211:14,
18 212:5
232:24 233:2
234:9,17 242:3
243:23 244:6
249:25 262:9,
11,13 264:19,
23 272:22
291:23 292:1,
11 297:3
308:24,25
317:25 318:13
327:25 329:1
331:18,22,25
333:15 334:23
335:2 338:13
341:16 342:22
346:15

**reading** 66:18
190:19 204:8
225:9 247:2
284:7,9 297:11
331:17 336:17

**reads** 244:8

**real** 43:17
112:21 317:11

**realize** 79:21

**reask** 116:20

**reason** 47:10
63:11 102:18
107:6 113:8
114:16 134:9,
22,25 135:21
136:1,2 165:9,
10,12 166:15,
16 167:15
192:17,24
200:21 213:17
216:22 232:15
265:19 268:11
276:5,22 277:1
321:7 343:15
363:6,10 376:2

**reasonable**
23:3 291:5

313:18,19
361:4,8

**reasons**
209:25

**recall** 13:17
14:10 24:4 25:7
44:3 53:16
57:12,14 58:20
68:7 105:7
110:16 115:22
116:2,3 117:4,
7,13,17,25
118:5 122:15
132:13,18
138:12,20
145:20 156:21,
24 157:5
163:11 173:17,
20,21 178:17
179:2 189:23
192:4 205:14,
17,20 207:1,12,
13 212:13
228:22 237:2,7
239:6,12
242:14 244:3
245:9,23 246:4,
15 253:12
254:15,17
270:9 271:3
290:15 294:3,
20 312:24
317:14 330:8,
15,16 338:24
343:17 359:5,
10 366:19
367:10 369:2

**receipt** 181:14

**receipts** 181:9,
12 182:3,10,12

**receive** 63:17
66:8 73:24 74:2
365:3,19
373:14

**received** 23:21
25:13 27:15
30:7 34:23
44:25 65:16
66:12 71:11,20
72:9 73:7 87:22
89:13 145:16
190:16 195:19,
24 290:12



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

309:9 312:9
314:19 315:16
357:18 358:13,
17

**receiving**
144:9 223:4,6,
11

**recognize**
142:24 152:22
154:14 201:21
206:5 272:2
288:1 334:24

**recollect** 17:5
33:20 39:5
228:9,24
294:12 296:6
305:17 366:18
380:4,15

**recollection**
15:22 31:3
123:6 136:23
156:3 176:21
189:14 204:11
205:4 221:7
236:21 262:15
295:1,7 330:18
332:8 338:21
355:24 381:23

**reconvene**
78:24

**record** 11:11
41:10 45:18
48:24 49:16
51:8,9,10 78:19
81:18 83:22
85:10,16 86:8
96:5,6,7 114:22
125:5 142:24
152:15,16,18,
19 159:8 180:6
189:8,11
192:11 198:17
201:13,14,15,
16 210:21
213:9 244:7,9,
10,11 260:8
280:4,5,6 288:5
298:1,7 299:9
307:10,13
308:2 311:17,
18,19 325:5,25
326:8 335:5
357:4,5,6,7

364:10 380:16,
22 382:10,11,
13,14 383:17
384:1

**recorded**
13:16 21:1,4,20
28:20,24 30:5,
24 31:6 114:8
115:12 116:5,
14 117:18
120:1,5,15
127:18 131:18
132:3 156:8,12
157:1,21
160:25 161:4
162:24 167:11
168:17 170:2,
10,12,14
171:17 172:2,
10 174:14
235:18,21
236:10 238:22
243:13 246:17
248:22 255:1
256:5 294:8
296:22 297:20,
22 298:2,10,13,
25 299:4,7,8,
15,16,19 302:7
304:11 318:24
331:9 339:3
341:7,13,19,23
366:10

**recorder** 21:3
114:22 115:2,5,
13,17 121:20,
22 122:5,9
123:2 168:21
236:4,15,22
237:4,9 239:7,
11 245:10,13,
25 249:17
330:20,23
332:3

**recording** 62:8
100:18 114:12
115:23 117:2,
14 119:16,22
121:16 125:6
139:4 164:25
165:3 167:25
231:11 243:18
244:15 294:10,
14,21 295:8

331:11 341:21
343:23 369:6

**records** 48:11
65:10 170:21
195:16,18,20,
24 196:7,18,24
261:6,9,15
283:11 302:15,
20 304:21,25
305:18,21
306:5,12,18
312:9,20
314:20,25
315:3,6,9,13,22
316:20,21,25
317:5 323:22
328:4,13 333:7,
15

**recover** 57:17,
23

**recovered**
57:24,25
143:17,21
144:6

**recovering**
57:12,14 58:21

**recruits** 74:13

**redirect**
382:20

**refer** 76:8
346:12,18

**reference**
80:19 96:16
322:5

**referring** 60:8
62:15 84:14
91:5,12 102:3
178:1 181:11
253:7 257:17
341:8 359:22
378:19

**Refill** 309:21

**reflected**
330:24

**reflects** 282:18

**refresh** 69:6
148:5 176:20
177:13 204:8,
15,25 236:25

237:12 262:15
295:7

**refuse** 84:9
85:13 296:5

**refused** 313:9
317:13 319:1
321:13

**refuted** 269:12

**regard** 49:24
158:16 230:13,
20 231:3
284:23 286:5
315:22 367:10

**regularly**
144:13

**Reid** 64:15,23
65:3,7 66:11

**reiterate** 66:2

**reiterated**
239:2

**relate** 193:19

**related** 16:4
54:11,25 55:16
59:23 65:13
99:23 128:7
228:18 268:9
286:5

**relates** 381:18

**relating** 18:9
79:24 80:10,16
83:11 87:20
96:10 99:15
132:5 147:4,8
194:5 195:24
204:18 225:3
231:4,6 244:15
249:8 255:17
273:7 301:3
305:19 306:19
308:8 333:19
365:4 380:18,
24

**relation** 64:13
106:6

**relationship**
313:18 314:13

**relay** 118:20

**release** 315:5

**released**
127:17 128:2

**relevant** 82:2,
13 128:10
214:21 311:12

**relief** 253:13
382:8

**relive** 57:1

**rely** 204:25

**remark** 374:2

**remember**
16:9 17:16,18
18:16,17 20:10,
11 21:16 23:15
24:12 25:10
27:24 28:23
30:3,21 32:1
36:3 39:5,8,12
42:9,12 43:6
44:15,21,23
46:9 50:5,8,16
55:23,25 56:24
57:16,20,24
58:17 59:13
60:11,13,14,17
61:14,15,17,21
65:5 66:15
67:10,15 68:4
69:3,18 74:20
86:21 89:18
92:21 93:3
96:18 97:4
98:12 101:14,
15 103:3,6
105:8 107:12
109:14 110:7,
12,14 111:18,
20 112:11
114:25 115:1
117:20 118:1,
18 119:17
121:21 122:7,8,
13 123:4,5,9
124:8 132:22
134:8,22
135:13 136:12,
19 145:22
148:1 150:25
155:24 156:14,
23 157:3,9,11,
17,18 158:11,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

20,21 160:6,8
163:1,11
174:19 175:5,
10 176:11,22
177:7 179:4
180:9,13,24
181:7,21,25
182:2,8 185:24
191:2 192:1,12
193:8,11 196:8
200:2 201:9
202:25 203:12,
14,18 204:3,5
205:10 206:22
207:16 211:9
212:15 213:10
214:11,12,14
217:9 219:17,
24 220:1,19
221:3 225:13,
16 228:13
232:14,17
236:1,18 237:6,
10,21 238:4
239:14,16,17
240:1,3,10,14,
17,19,22 241:4
242:18 245:15
246:2,13
250:24 251:1,
14,18,25
252:14,24
255:22 257:3,
24 258:6 259:1,
7 260:6,18,22
263:1 266:22
268:25 269:24,
25 270:7,23,25
283:11 289:4
290:13 291:25
292:14,16
293:20 294:6,9,
16,25 296:3,16,
20 301:8,9
306:2 310:11
314:5 315:19
316:1,7 322:1,4
324:1,9,12,13
328:15,16,18
329:15,16,19
331:17,21
332:7,10,14,17,
19,25 333:11
334:10 335:2,8
337:13 343:19
348:2,21,22,23,

25 349:3,5
350:1,20
351:14 354:20
355:6,15
356:15 360:14
361:1 365:5,22,
25 366:14,22
367:5 369:11,
15 370:7 371:4,
5,6 372:5
375:14 376:10,
16 378:16
379:10,12
380:10

rent 197:21

rental 147:19
195:15 196:5
269:5

rented 196:25
197:3,10

repeat 14:14
30:11 49:21
134:17

repeated 41:6

rephrase 26:3
37:16 116:7
340:2 374:12
379:5

report 46:23
47:3 48:14
49:22 67:21
68:1 69:2 70:7,
15 71:4 73:11,
21 89:5 98:16,
21,25 99:19
107:8 109:3
112:21,23
119:21 120:1
123:11,12,14,
15 125:13
143:6,25
149:15 151:2
153:1,5 154:6,
24 156:7
162:20 163:12,
14,16,20,25
168:2,6,17
169:5 170:1,11
171:20,24
175:16 176:2
182:15 184:19,
22 188:23

189:1,3,25
191:13 194:1
204:17,22
206:10,24
208:7,15
210:18 213:3,
10 214:16,17,
25 215:4 217:2
218:10,13
219:12 220:9
221:16 225:19,
21 226:22,25
227:4,9 228:21,
23 229:4,5,12
230:21,25
231:5 232:16,
18,20 234:7,17
235:5,8,11,12,
15,16 236:6,9,
13 237:14,17,
20 241:22
242:15,17,19
243:16 244:13
247:10,12,23
248:3,7,13
254:24 256:4
257:1,4,6,7,9,
23 261:1
264:24 265:1,7
267:20 270:11,
20 271:11,14
272:25 273:5,7,
14 274:1,3
275:3 281:6,22
283:16,22
284:2,6,9,22
289:6,9 291:9,
12,17 296:24
297:7,15,19
298:11,25
299:17,19,20,
21 300:3,7,10,
12,16,18 301:3,
9,25 304:11,15,
18 314:7
317:10,12,24
319:9 320:15,
17,22 321:3
331:9,13
333:19 334:24
335:19,20
336:12,21,23
338:9,15 341:2
344:10 354:18
357:11,13,18,
22,23 358:1,2,

6,13 364:12,17,
22 366:9,25
368:11 369:4
374:5,13
375:17,25
377:19,22
380:13

report's 194:9

reported
192:23

reporter 11:4
12:3,4,8 26:7
37:2 77:20
100:12 116:9,
13,14,17,19,21,
24 271:23
318:5 322:21
344:17 346:11
370:19,22
373:8 375:13

reports 67:14
97:17,22 98:1,
5,9 99:4,8,15
100:1 124:1
180:16 254:10
300:5 317:15
319:22 336:15
337:5,16,18,21
376:11 378:23

represent
120:4 146:7
191:4 206:21
226:6 229:1
323:21 374:17

representation
78:15 337:23

represented
204:17

representing
383:9

request 142:13
145:24,25
146:16 165:25
185:1 206:12,
23,25 207:2,7,8
209:16 267:14
345:2

requested
146:25 150:1
183:13 186:1,

12 195:25
201:7 206:14,
18 210:2
344:23

required
67:21,22 68:9,
13 69:1,10
71:12 113:24
202:20

reserve 66:4
380:18 382:19,
24 383:7,10,15

residence
16:20 33:17
147:24 148:3
151:4 191:23
193:12 281:1,
17 282:1
340:17,23
343:5 346:21
355:20,21

respect 244:16
383:2

respond 27:6
29:5 78:20 79:1

responded
29:8

responding
80:5

response 37:8
74:21,25 77:1,6
78:7 79:10,16
81:1 126:18
346:8,13,14,19

responses
13:18 14:4,9,16
339:2

responsibility
22:11

responsible
22:8 195:4
211:24 218:15
219:15,22
325:20

responsive
167:20

rest 220:3
262:13 307:8

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Restate** 172:18
215:22

**restroom**
37:24 96:2

**result** 240:25

**results** 151:2,
22 152:3
153:23 216:17
217:21 357:12,
18 358:2

**retained**
126:15

**retraining**
65:13

**retrieve** 316:12

**return** 148:8
198:9,16

**returned**
198:1,18

**returns** 200:12

**reveal** 82:19
128:3

**revealed**
133:12 255:19

**review** 76:21
77:2 84:6,12
87:16,20 89:4
124:4,10
215:15 297:1
334:25 336:16
337:17 338:11
347:23

**reviewed**
82:14 83:4
86:19,24 87:3,
21 88:5 196:17
197:10 215:4
232:18,19
235:5 244:15
246:19 288:17

**reviewing**
124:1

**reviews** 124:5

**reward** 110:5,
7,8,11 116:4
117:18,21
127:12,24

128:11

**Rhonda**
110:23 111:15

**Richmond**
56:22

**rid** 200:16

**right-hand**
307:16

**rights** 22:22
201:25 202:1,7,
21 203:7 208:7
250:1 291:24
292:2,12

**road** 112:16
210:17,23,25
211:7

**roasting**
272:14

**robbery** 100:7
287:13 291:2
295:17

**robbing** 130:8
150:13 220:3
266:4 277:4
281:10 286:10
369:16

**Robert** 91:22
365:12 367:6,
24 368:22
372:11 373:20

**Robin** 120:18

**Robinson**
11:25

**role** 141:13
238:17

**roll** 250:19

**room** 50:12
58:4 111:18
115:1,20
133:24 134:3
235:25 236:1
294:4 329:20
366:12,15,16
370:4

**Rotary** 365:23

**Row** 238:10

**Rowe** 369:19

**rude** 232:23

**Rueben** 45:4,7,
13 46:6 51:13

**rug** 379:4,7

**rule** 48:20 75:6
83:23

**rules** 25:18
26:11 27:9,14
34:23 36:16
38:7 44:3 49:8
78:6 173:3
316:2,4 382:17,
19,22

**run** 106:18,21,
24,25 108:6

**running** 65:1
107:2,9,15
108:10

**runs** 179:7,20

**RX** 309:21

**Ryan** 272:9
275:10

———

**S**

**Sam** 332:20

**sanctions**
78:23

**sat** 20:12

**scare** 39:19
40:10

**scene** 57:13,19
140:20 210:11
277:5

**scheduling**
207:22

**school** 64:15,
24 95:8 109:6,
8,10,23 110:19
322:9,16

**schools** 63:25
64:8,12 66:12

**Scott** 54:10
156:1

**seal** 130:17

**sealed** 129:6,8
130:15

**search** 199:15,
17 315:8,23
316:11,19,23,
24

**searched**
199:22

**seatbelt** 92:18,
20 93:1

**seconds**
100:18 120:25

**secret** 72:3

**secured**
160:21

**seek** 78:23
253:13 380:23
382:8

**seeking** 149:4
240:5

**selection**
82:18

**selling** 230:8
369:18 375:23

**send** 74:5
80:16 190:12
372:25

**sending** 69:20
77:6 79:17 81:1
145:20 223:4,
11

**sense** 238:19

**sentence**
211:22 212:3,
17 242:1,5,7,8,
23 244:23
245:2 246:22
247:22 344:7
362:8

**sentences**
247:18

**separated**
60:13,18

**September**
48:13 49:23

50:1

**sergeant** 18:1,
2 19:13,22 20:8
24:19,21 27:2
35:22 51:22
56:2 108:13
123:16 124:16,
25 130:11
159:7,14
178:15 195:19
244:13 250:12,
20 258:11
260:23 261:19
281:18 285:13
296:21 311:21
325:10 326:7,
15 332:2 341:3
364:13 381:2,
15 382:1

**series** 83:10
85:9 214:18,22

**served** 63:4

**serves** 80:20
118:21

**set** 112:21

**seven-hour**
382:17

**Shake** 40:13

**Shannon**
305:1

**Shawn** 375:17,
21

**Shawna** 11:16
383:13

**sheet** 57:18
229:21

**Sheriff** 11:19,
22 58:2,8,14
61:11,23 62:9
181:9,16,23
235:22,24
236:14 237:3,8
238:2,6,12
239:21 240:5,
11,23 243:19
244:17 245:9
246:16 247:24
248:8,14,21
250:20 256:6



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

262:5,9,19,20,
23 263:2
329:16,21
330:3,11
378:12,15
383:9

**sheriff's** 46:24
262:6,21

**shirt** 58:6,11

**shocked** 300:9

**Shoot** 142:20
321:18

**short** 96:1
280:2 357:3
383:22

**shortly** 196:10

**shovels** 59:3

**show** 17:13
21:21 30:4
48:13 49:15
75:9 137:6
142:18 145:5
152:5 154:12
158:24 182:10
184:17 195:14
205:24 206:4
221:22 229:4
235:10 256:21
261:23 271:21
287:20 302:23
303:7 304:6
306:7 321:17
328:13 334:19
335:16 338:8
339:18 341:1
346:7 347:16

**showed** 16:22
17:2,11 105:8
181:9,13 182:3
220:7 255:19
256:2 302:16
303:20,23
304:5 310:23
325:3 358:6

**showing** 79:17
260:8,19
377:16

**shown** 17:8
356:10

**shows** 82:17
135:16 288:20,
23 302:12
320:20

**shy** 86:7

**sic** 120:18
141:18 318:19

**side** 112:16
190:9,15
349:23

**sideways**
350:18

**sign** 159:22
160:18 203:2,7,
16 292:3

**signature**
159:20 202:13

**signed** 14:5
79:7 160:4
202:7 203:23
208:8 264:3,9
307:20 315:5
337:4,6

**significant**
140:7,10

**similar** 35:11
74:6 335:4,5,9
342:18 343:9
345:14 352:22
354:1 359:11,
14

**similarities**
354:5

**similarly** 166:8
333:22

**simple** 229:19
362:19

**Simpson**
15:11 33:22
80:20,22 81:2
90:25 91:19
92:3 99:5 103:3
108:14 109:2,5,
13 110:4
111:11 112:24
113:3,17
114:21 115:12,
17 117:1,17,25
118:3,5,13

119:2 120:1,6,
9,14,16 121:3,
9,11 122:9
123:3 125:6,13,
14 126:24
127:5,8,11,16,
24 128:1,11
129:6 131:5,10,
17,23 132:8
136:24 138:14,
20,25 141:18
142:1 145:1
146:17 147:1,
12,18,23 148:2,
6,12,25 149:4,9
150:2,19,23
168:25 186:25
187:5,9,17,25
188:10,14
190:1,4,16
191:10,11,20,
23 192:10,23
193:7,22,24
194:11 195:2,4,
25 196:5,25
197:3,10,17
198:5 199:3,11
200:7,12 201:2
209:3,20 210:9
212:21 218:15,
19,23 219:14,
22 220:5,11,23
221:12,21
224:13,17
225:2,14
228:16 230:16,
19 265:10,17,
25 266:3,18,19
267:9,12,14
268:4,7,22
269:2,5,13,19
270:2,15 271:7,
8 279:15
351:15,17
352:14,22
354:2 356:20
361:7

**Simpson's**
109:22 110:3,
11,19 113:9,13
121:20 123:14
129:10,18,22
130:14,18
132:3 190:10
269:11 351:22

**single** 17:13
18:9 32:3 45:10
46:16 102:20
103:10 104:20
106:20 107:2,8
108:9 150:18
175:15 203:7
218:9,13
219:12,21
220:8,22
226:21,25
227:4,9 229:5
231:5 300:2

**sir** 12:2 13:23
14:6 15:23 23:8
32:18 37:4
40:24 41:1
45:19 46:5,19
48:6 55:17 57:7
59:25 63:4,15
66:13 71:7
73:21 74:3,8
75:10 76:8,13
79:6 81:7 83:10
84:10,21 85:2,
4,11,19 86:6,
11,17 90:9
95:13,18 100:9,
16,21 101:1,6,
11 103:8 104:2,
5 108:18,20,21
114:19 119:21
121:18 125:12
126:1,4,8
127:1,10,20
128:18,24
129:4 136:24
137:6,10,20
138:8 139:11,
14 142:24
145:7,8 150:15,
16,24 152:5,21
153:22 154:12
157:24 159:6
161:5 163:14
164:16,19
165:13 167:9,
18 171:7,15
172:19 173:6,
17 177:16
181:8 184:19
194:23 195:17
201:18 205:19
206:4 210:15
211:20 212:22

213:4 214:16,
23 221:24
224:2,10
225:17 228:12,
21 229:21
231:9,15,25
232:25 233:18,
20 239:19
240:8 243:10
247:21 254:8
256:22 257:5,9
258:14 260:8
262:12 264:20
265:15 268:15
272:2,7 280:8
287:20 288:2
298:3 301:2,13
306:8,11
312:24 313:16
317:1,10,25
319:8 320:14
321:19 322:23
323:7,24
327:22 328:15
329:12 331:12
334:7,19,21
335:20 338:8,
25 339:22
341:14 344:22
345:8 346:7,23
347:16 353:25
354:10,23,25
356:8 357:9
358:25 360:19
362:11 364:10
366:1,8 368:22,
25 373:25
374:7,10
375:19 376:23
377:21,24
378:10

**sister** 365:12

**sit** 24:11,14
132:9

**site** 56:25

**sitting** 24:4
32:2 38:23
103:10 105:20
165:19 205:3
214:12 239:21
242:10 244:3
300:2 366:19

**situation** 14:24

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**situation's** 114:15

**Sizemore** 20:6 43:1 58:22 59:2 60:3

**skeletons** 251:8,17

**sketch** 343:13, 16,18 344:23 345:9,14,17,18, 24 346:2,5 348:12,13 349:12,15 350:4,9 352:22 353:25 359:4,7, 11,15,19

**Slammed** 40:5,7

**slapped** 38:21

**Slosar** 11:12 12:10 14:3 40:24 41:1,8, 10,11 45:21 46:2,4 48:20 49:1,7,11,17,19 50:18,21 51:4, 16,18,20,21 58:8,11,13 65:12,22 66:4,7 75:5,8 77:11, 16,23 78:2,19 79:5 82:5,7,11, 13,23 83:2,6,9, 12,15 84:16,19 85:16,18 86:13, 16 96:1,4,8 100:12,15 106:12 116:8, 12,15,18,20,22, 25 122:17,21, 23,24 125:5,10, 11 137:13,16 138:1 139:8 141:25 142:3,4 152:10,13,15, 20 159:10,13 169:14,17 170:25 171:3,5, 6 173:1,5 189:18,20 191:17,19 198:8,13 201:12,17

232:2,5,7 244:7,12 272:18 280:7 300:6,15,21 301:1 303:3 306:25 311:16, 20 317:18,20, 23 318:8,11 322:20,22 323:6 325:4,7, 9,16,19 337:24 338:1,4,7 344:18 346:10 356:6 357:3,8 362:1 364:5,9 370:21 373:6, 10 380:16,21 381:12,14,18, 24,25 382:7 383:17

**smeared** 306:15

**Smith** 160:1 224:5,24 225:4, 6,11,15 226:22 228:9 229:12, 14 230:17,20, 25 378:10,24 379:3,6,20 380:5,12

**smoking** 141:12

**smudged** 326:18,20 327:14,16,20

**sneak** 177:22 178:16

**snippet** 363:17

**snitch** 183:20

**snuck** 178:21

**social** 53:9

**sold** 309:25

**solely** 381:21

**solemnly** 12:4

**SOLSAR** 280:2

**solve** 39:21 345:5,7

**somebody's** 21:16 179:24 182:8

**son** 56:12 57:3, 6

**sort** 17:6 43:10 63:11 210:1 241:2 253:13 353:2

**sorted** 82:21

**sought** 366:4

**sound** 29:25 41:18 143:12 145:13,18 174:3

**sounded** 38:17 127:1

**sounds** 20:4 100:25 101:10 108:16 120:17 139:14

**speak** 37:24 109:12 113:9, 17 114:11 200:17 219:21 260:15 298:7 334:7 367:20 373:20 376:7

**speaking** 49:1, 11,13 78:3,25 79:3 137:19 156:22 187:16 205:25 300:21, 23 364:5

**speaks** 364:11

**specific** 31:3 59:13 67:25 68:5 89:14 97:4 167:21 182:2 196:19 206:22 228:8,10,13 231:11 239:16, 17 246:13,20 252:1 253:23 255:17 258:6 365:17,24

**specifically** 57:14 69:15 91:5 97:25

139:19 163:20 164:14 165:4, 25 166:25 167:5,23 170:16 172:10 181:11 186:20

**specificity** 77:13

**specifics** 68:7 78:12 295:3,6

**speculate** 22:2,13 35:15 40:1 47:12 107:25 179:15, 24 223:9 226:11,15 285:22 294:17

**speculating** 211:2

**speculation** 111:8,9

**speed** 258:12

**spent** 217:1 271:8 379:9 380:6

**spit** 169:21

**spoke** 45:10 46:16 48:18 72:15 109:21, 22 111:11,16 114:21 117:1, 13 118:9 132:13 156:11, 25 174:22 179:3 269:10 330:19 331:10 354:7 366:13 378:10

**spoken** 58:1 115:16 156:18

**spread** 339:24

**squad** 19:22

**stack** 287:25 291:16

**staff** 314:2 381:9

**stamp** 164:15 264:19 326:8

338:2

**stand** 259:5

**standards** 153:10,13

**standup** 179:13

**Staples** 11:25 46:1,3 171:4 317:17,19 325:6,8,14

**star** 324:11,14, 21 335:3,4

**start** 32:7 52:5, 8 77:20 104:15 116:10 258:9

**started** 130:3 144:11 158:14 218:2 239:18 295:8

**starting** 32:7 268:14 305:14

**starts** 76:13

**state** 27:10 34:24 45:1 62:19 63:20 64:1 67:2 71:11,20 72:9 73:13,24 110:8, 9 117:22 202:20 207:2 216:22 234:14 241:22 261:20 268:17 286:1 295:18 338:5 346:19 376:3

**stated** 29:18 33:21,22 87:22 105:2 108:12 163:22 168:3 171:24 181:10 182:18 218:19 220:17 239:14 241:23 246:23 247:8 249:1 257:11,12,20 265:13 289:22 290:8 330:1 339:6 366:21

**statement**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

421

21:4 23:1
28:13,20,24
29:3,23 30:5,24
31:6,12,14,16
42:11,12,25
44:9,10 62:11
80:13,23 98:17,
21 99:1,9
108:13,16,21
109:1 110:19
114:7,8 115:12
116:5 117:2,18
118:15 119:3
120:1,6,8,10,
14,15,24,25
121:2,3,5,9,10,
11,15,20 122:2,
25 123:1
125:22 127:4,5,
7,13,18 128:1,
13 129:5,10,18,
22,24 130:14,
18,25 131:18
132:4 138:24
148:2 150:22
154:18 155:24
156:8,12 157:2,
12,21 158:18
160:25 161:4,
20 162:11,24
164:18 165:12,
22 166:3
167:11 168:18
170:2,4,7,10,
12,14 171:17,
21 172:2,10
174:19,23
201:25 202:21
203:7,13 204:3
218:17,18
219:1,4,6,8,11,
20 235:18,22
236:10 238:23
241:2 243:14,
17,20 244:1,4,
17,24 246:17
247:3 250:21
251:12 252:4
253:1,14 254:8,
13,15 255:1
256:5,15,17
257:15 258:16,
18,19 259:15,
19,25 260:5
261:21 262:4
265:9 268:1

279:7 280:9,12
281:20 282:7,
10,18 284:15,
17 285:15
286:16,17
288:21 289:10
294:8,11,15
295:23 296:7,
15,21,22
297:21,23,25
298:2,10,14,25
299:4,7,9,19
304:11 305:22
317:13 318:16,
24 328:5,18,19,
24 329:7,10,14,
22 330:9
332:12,25
339:3,9,13,14
340:19 341:7,
13,19 365:19
367:21 369:1
377:8 378:2

**statements**
18:16 21:1,4
29:15 31:25
32:12 33:20,25
98:6,9 99:5
102:11 103:7
125:17 130:7
155:3,8 205:4
218:3 221:10
265:21 266:3
267:24 268:12
279:4,5,10,11,
14 280:21
293:17 299:10,
17 331:9 361:4,
6 362:10,14
363:8,14

**states** 163:16
284:2

**stating** 14:10
62:9 255:22
265:21 267:24
301:8

**station** 193:10

**steal** 178:16
215:11

**stealing**
216:11

**Steele** 21:25

22:9 31:11
96:25 151:21
323:22 326:10
372:25 373:14
374:11,13

**Steele's** 226:7,
10 324:25
325:21 328:4
374:18 375:7

**stemmed**
254:23

**stepmother**
94:16

**stepped**
205:12

**stepson** 56:3,
4,9

**Stevie** 179:3,6

**sticker** 137:18

**stole** 225:15

**stolen** 241:25

**stood** 38:25

**stop** 17:24
78:22 121:18,
19 151:16,22
152:12 169:14
200:11 217:20
341:11 371:9

**stopped** 47:22
112:15 120:2
122:5,9,19,22
123:2

**stopping**
121:22 123:4
152:11 194:21

**stops** 120:8

**store** 144:16

**story** 283:5,7

**straight** 326:22
327:14 353:23

**strange** 148:18

**strategy** 82:19

**Street** 11:6

**strike** 97:16
225:17 302:1

**strong** 111:6

**stuff** 42:9,13
65:24 67:23
81:21 82:25
137:1 159:4
238:9 308:12
314:17 367:15

**subject** 14:2,7
22:21 32:10
75:4 82:2
267:25 355:23
380:19

**submit** 153:13

**submitted**
153:8

**Suboxone**
282:14 283:2,6
284:5 285:17
287:12 290:6
309:13 310:10
312:15 313:14

**subpoena**
314:24 315:14,
23

**substance**
333:18

**substantially**
345:14

**successfully**
30:7

**sued** 61:9 80:2

**sufficient**
293:19

**suggest**
220:14 229:24

**suggestions**
243:24

**sum** 255:12

**summarize**
236:13 308:12

**Summarized**
213:2

**summarizes**
236:10

**summary**
154:18,20

168:17 169:5
170:2,3,6,11
172:1 210:12
243:25 297:19,
24 299:5
380:21

**sums** 187:1

**Sunday** 246:23

**super** 311:12

**superintenden
t** 322:8,15

**supervisor**
19:11,13
123:15,25
124:12,15,23

**supervisors**
19:10,16,17

**supplement**
65:14 124:2,3
228:3 298:1

**supplemental**
66:3

**supplemented**
259:11

**supposed**
26:15 132:2
258:1 311:14
312:5 313:10,
13 316:5,11
327:2,4 376:8

**supposedly**
242:16 320:18

**surprise**
204:19,21

**surveillance**
58:21 59:2,16

**suspect** 17:13
105:12 139:22
140:2 142:5
185:5 186:1
202:21 203:3
212:13 213:6
255:19 265:14
267:2 346:23
349:12

**suspected**
209:20 212:19
213:8,13

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

217:14 223:16
228:15

**suspects**
80:17 86:25
101:12,21
102:2 103:20
104:8,13
105:12 125:24
139:22 140:2
141:19 146:13
346:4

**suspicious**
192:20 200:8,
15

**sustained**
126:9

**swear** 12:4

**sweep** 379:6

**sweeten** 379:4

**switched** 50:8

**swore** 34:2,4

**sworn** 12:3

---

**T**

**table** 38:21
40:5 370:12,25

**tactic** 12:15,16,
17,22,25 13:2,
3,9,12 20:18,
20,24 23:11,14,
25 24:2,3,6,11,
18,24 25:2,5,6,
12,14 26:13,15,
20,22 27:11,16,
23 28:4,9
34:17,19,25
39:2,6,16 43:7,
18,24,25 44:2
45:2 134:12
135:5,6,16
136:6,10,14
158:19 173:7,
13 217:16
245:24 246:5,9

**tactics** 13:14
20:14 23:18
27:19 34:9,12,
13 39:3,20,22

132:24 134:25
135:2,9 239:6,
12,16 245:19
246:2,10,15

**tail** 44:7,17
296:11

**takes** 124:10

**taking** 18:16
29:3 30:23
61:23 62:1
117:18 125:22
127:12,17
128:1,12
129:21,24
131:18 132:3
156:8,12
157:21 160:25
162:24 174:19,
22 200:3
221:10 244:13
251:12 252:4
255:12 259:25
260:4 261:20
262:3 286:10
294:8 299:6
325:12 328:18
343:17 349:1

**talk** 17:23 18:9
48:9 49:23 50:1
53:4 58:14
59:10,11 60:1
61:11 77:23
82:20 130:8
137:2,4 148:21
157:10 179:10
192:9 219:2
220:21 237:22,
24 277:2
313:22 314:2
329:17 330:1,4
352:13 365:15
366:23 369:14
378:14

**talked** 18:14
46:20 47:15
53:7,9 60:10
82:12 103:4,5
109:17 110:1,2,
3 115:19
117:17 119:2
137:20,24
179:10 204:9,
20 208:6

221:11 228:2
230:18 243:2
245:16 250:9
257:10 260:13
263:17 264:16
267:25 277:4
281:3,9 282:17
286:9 296:14
298:18 318:17
319:14 339:15
342:5,11 343:1
365:13 369:1
378:13,18,21

**talking** 21:10
42:10 48:17
56:7 58:17 60:4
77:21 131:21
137:24 150:13
158:14 165:11
197:8 219:24
220:1 222:10
230:9 250:25
256:16 300:12
311:8 320:7
342:13 346:15
353:10,20
366:17 369:16,
18 372:15
379:1

**Tammy**
109:19,20,21
111:20,22
112:1,3,18,19,
20 113:17,21
114:2

**tape** 133:19

**tattoos** 360:21

**Taylor** 11:13
12:1 16:23 17:2
33:23 45:18
69:16,21 70:1,
11,16 71:5,18
72:8,22 73:14
76:19 77:2
79:11,18,20
80:2,12,15,19,
24 90:7 97:2
100:6 101:22
102:4,8,21
103:1,12
104:21 105:22
118:22 125:14,
18 126:24

127:3 129:12
130:20 138:13
146:1,23 151:7,
17,23 153:18,
19,24 155:1,9
161:20 162:5,
11 163:17,22
164:25 165:4
166:25 168:3
169:9,23
170:15 171:9,
25 176:6 177:1
178:6,11,12
186:9 196:15
239:23 240:6
243:21 244:19,
22,25 278:7,14
279:2,22
280:15 293:3
329:23 331:21
347:2 348:4,19
349:1,7,15,22
350:7,21 351:7
354:13,17
355:2 356:10,
13,24 357:1
359:1,13,18
360:3,22 361:5,
9,19 362:6,9,23
363:3,12,23

**Taylor's** 347:3,
10 359:6

**team** 144:11
163:9

**technician**
11:3

**technicians**
199:14 200:4

**technique**
272:22

**telephone**
257:11 258:12

**telling** 21:16
29:6,8 41:24
42:1 78:20,25
110:7 118:18
133:3,5 135:15
142:19 228:10
232:17 233:4
234:12 237:8
240:10 249:7,
11,13 270:23,

24 276:25
284:20 290:13
295:17 302:4
329:16 370:12

**ten** 194:20,24
370:19,22

**tend** 37:12
235:7

**tended** 265:25

**terminate**
381:16 382:16,
22 383:3

**terms** 234:10
362:19

**test** 66:18,19
178:14

**tested** 141:1
142:14 144:22
145:12 151:5

**testified** 20:13
36:13,15 88:13
89:10,21 102:3
103:19 104:7
106:8,17 128:4
129:4,9 131:4,
14 139:14,19
146:7 163:3
164:2 171:8,15
174:3 175:24
176:5,8,14,25
177:16 178:15
180:25 183:4,
10 185:15
190:3 192:22
212:11 215:23,
24 216:4,9
218:12 231:15
232:19 233:20
239:20 254:12
255:11,18
259:5,13 278:5
280:8,23 282:4,
8,10,24 283:4
286:15 287:16
288:14,18
301:11,14,17,
22,23 302:1,3,
14,22 303:6
311:21 312:1,
13 314:19
333:17,22
346:25 352:10

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

that'll 37:1

theory 134:19
200:24 201:1

thing 21:16
38:2 57:17
63:19 68:5
70:24 81:20
135:22 136:25
223:10 225:13
228:9,10,13
243:1,9 245:16
258:2 286:21
289:22 298:4
332:18

things 57:24
109:15 248:10
265:11 281:3
300:13 313:12
316:18 332:12
343:7 367:18

thinking
217:20 319:13
355:22

Thomas 94:25

thought 79:20
80:2 129:16
148:18 193:3
211:9 216:25
217:24 232:15
264:17 265:13
357:24 358:14

thoughts
138:8

threat 28:14

threaten 28:7
158:15,17
371:24 372:2

threatened
24:21 27:21
28:12 53:24
371:11

threats 28:12
68:13,19,21,23,
24

throw 248:19

throwing
35:12 228:8

thrown 35:8,10

---

357:11 359:12
360:19 361:19
366:3 373:15

testify 78:22
96:9 101:11,20
104:12 126:8,
22 149:18,22
166:16 177:5
180:21 185:22
240:13 241:13,
15 268:17
276:18 278:12
289:18 313:3
356:8,12

testifying
96:14 100:4,23
102:19 107:10,
23 108:3,11
124:6 129:1
138:12 173:17,
21 174:7,17
176:3 178:18
212:14 213:4
215:1,16 233:2,
10,15 254:15
263:12 288:6
304:3 306:5,13
312:8,24 313:8
358:17,25
359:5,10
360:14 365:21

testimony
12:5 41:23 48:6
84:12,14,15,16
89:21 101:8
102:7 105:8,9
106:22 137:8
138:9,21,23
139:11 141:16
150:15,17,24
155:17 171:16
178:11 211:6
231:9 234:6
254:22 258:23
278:23,25
279:1 281:5
299:22 317:1
356:5 360:17
363:13 376:16

testing 153:2

tests 213:22

text 335:21
382:2,9

---

38:18

ticket 92:18,20

tie 247:25
253:8

tied 155:11

Tilburg 11:3

timber 103:5
369:18 375:23

time 11:5 19:22
20:23 25:4,11,
16 27:4,24
29:10 30:5
32:16 37:9,23
41:3,4 44:15
45:11 46:16,23
48:18 49:12
53:7 54:4 55:21
56:4 59:14,22
61:22 62:3 71:9
72:1 77:21
87:12,14 93:24
95:9 97:10,19,
20 110:13
111:14 113:11
118:8,11 120:7
121:15 122:1,
25 125:1
128:17 129:9
137:20,24
143:16 154:6,
11 156:4,21
157:1,5 158:20
161:4 164:15
169:19 173:23
175:7 176:1,7,
16 177:2,18
184:8 185:6
186:1,12
187:12 189:3
194:9 195:12
198:11,23
199:2,15,20,22
201:6 205:13
211:8,11 213:5
215:24 216:4,
24 218:12,18
219:19,20
220:12,17
221:13 235:3
238:5 239:18
243:1,4,6,23
252:2,17 253:1
261:11 263:24

---

265:11,20
267:2,4 278:22
280:13,20
283:4 292:16,
23 293:19
296:17 298:18
300:22 302:13
303:18 308:2
310:2,5 311:21
312:1,6,13
314:9,15
322:16 324:4,7,
8,21,22 326:8
328:3,5 331:2,
5,18,24 332:19
342:10 344:9,
16,19 348:7,24
352:9 365:17
370:2 373:18
374:13 376:22
380:24 382:21,
22 383:22

timeframe
218:13

times 13:12
18:13,14 25:5
27:23 64:11
81:24 82:3,12
121:19 122:4
156:24 201:5
204:9,20 239:2
251:20 253:24
258:1 260:16,
17 262:25
312:18 334:7

title 67:15

titles 64:11

today 11:3
13:22 24:4,19
27:4 32:2 36:16
37:9,24 38:13
41:23 46:18
50:7,10 75:20
78:6 95:9
104:19 105:21
148:5 150:15,
17 163:7
165:19 184:19
205:3 213:4
242:10 244:3
253:22 260:11
261:25 300:2
351:11 361:15

---

366:19 381:1
382:3

today's 11:4
81:11,19 84:6,
13,24 85:11
86:3 382:1

told 16:2 29:1
30:22 33:16,23
44:16 47:20,24
54:20 57:2
63:23 73:2
78:21 102:25
104:20 105:11
106:21 107:2
108:10 110:2,4
113:3 117:21
119:9,11
130:14 131:9
134:5 138:18
147:16 148:24
149:3,7 157:25
158:8,22
162:22 164:24
165:3,16 167:3,
5 172:9 175:6,9
177:10 181:23
182:23 183:6
187:9,24
188:14,18
204:5,12,25
207:19 212:24
213:11 228:14
231:18,21
232:14 233:25
234:3,15
236:21 237:3
239:22 240:5,
11,19 242:16,
20 247:4,20,24
248:14 249:15,
17 254:6
258:15,21,24
259:8 263:5
264:17 265:13,
17 269:18
270:1,14 271:7
274:6 281:20,
24,25 282:12,
19,25 283:3
289:9,14,19
290:2,25
294:21 295:2,4,
22 296:25
297:8 299:23
301:18 303:20

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

Kentuckiana
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

304:4 310:8,14
312:5 319:5
331:14 333:25
334:1 341:22,
25 342:18
343:3,8 349:7,
22 350:7,8,12,
18,24 351:1,5,7
352:2 354:11
355:10 356:16,
25 359:13
362:20 363:11
366:9 367:11,
12 368:19
369:14,22
370:2 375:20
376:3,19 379:7,
25 380:5

**tool** 217:15,21,
22

**tools** 58:22
60:2

**top** 23:7 29:16
42:13 50:16,24
88:20 143:16
153:17 182:9
188:20,21
192:5 204:13
206:11 219:16
236:23 307:16,
17 323:13
326:4 351:23
361:6 380:4

**topic** 180:23

**tore** 175:11

**totally** 67:17
83:18 130:1
217:23 278:16
295:18 372:14

**touch** 325:17

**touched** 36:14

**tower** 261:5,9

**town** 108:2
179:21 191:24

**Townsend**
11:2

**TPA** 190:9

**track** 313:14

**trafficking**
379:4,6

**train** 67:24
68:8,12 69:1,9
217:23

**trained** 23:13
25:21 39:20
67:20 68:8 69:7
74:12 87:24
88:23 136:10

**training** 23:16,
20 25:12,25
27:9,15 34:23
44:3,25 64:10
65:10,15 66:8,
9,13,15 67:1,6,
11,12 71:11,19
72:9,12 73:7,8,
24 74:2 85:19
87:6,22 88:8,9
89:6,7,13
113:23 136:12
202:19 315:16,
25

**transcript**
137:8 138:9
244:15 297:12

**transcripts**
204:2

**transmit**
123:20 374:20

**transmitted**
123:19,22
124:3 265:2

**transported**
200:22

**travel** 78:24

**traveling**
212:21

**trial** 26:17 78:5,
6 258:1

**trick** 16:8
197:24 311:11
342:22 345:6

**tricky** 197:9

**Trimble** 372:24

**trip** 147:19
148:8

**trooper** 11:15
54:8 112:17
346:6 376:2,12,
18 377:10,12

**troopers** 26:14
192:7 377:2

**trouble** 118:10,
12 190:17
225:9 251:16,
19 253:18
263:7

**true** 43:12
76:24 80:13,18,
22 113:15
176:24 181:8,
15 239:19
240:8 249:2
262:23 279:17
288:23 303:24
304:1 313:22
320:4 366:10
370:2,9 380:9

**trust** 209:5

**truth** 12:5,6
41:14 42:19,20
133:10,11
134:11 161:15
259:6,9 260:3
284:20

**truthful** 76:22
189:13,22

**turn** 28:11
65:24 222:18
226:9 266:15
272:13 308:18
320:14 322:3
349:23 350:18
373:22

**turned** 115:2,5,
13,23 119:16
225:22 226:1
236:15,22
237:4,9 245:10,
13,25 249:17
259:11

**turning** 114:22
115:17 168:21
236:4 239:7,11
330:19,23
332:3

**twist** 253:24

**tying** 247:20,25

**type** 55:22 69:2
108:24 116:20
179:15 181:13
206:8 241:1,18
332:24

**typed** 308:14
337:8,9

**typing** 77:20

**typo** 319:13,19,
21 321:8,9

___

**U**

**U.n.i.t.e**
263:12,17,19
264:3,9

**U.N.I.T.E.**
184:9,11,13
264:17

**U.S.** 11:9

**Uh-huh** 51:16
276:24

**UK** 257:12
261:3

**unable** 69:11
70:15 71:5
381:1

**Unaware**
180:6

**uncle** 60:2,4

**underline**
324:7

**underlined**
324:3

**underlining**
324:13,21

**underlying**
15:3,7,11,16,19
16:21 17:14
19:14 20:15
26:10 97:17,23
299:2,11 375:9
378:11

**understand**

13:22 25:17
26:2,20,24
37:6,14,17
39:17 55:7
74:23 77:24
78:1,7 79:6
99:17 188:8
192:13 196:23
233:8,9,14,17
252:2 253:9
260:23 261:5,8
274:16 294:19
306:17 310:4
313:16 359:8
381:12

**understanding**
27:11 34:22,25
44:25 146:10
161:18,19
162:4,9,17,19,
23 163:4,8
202:24 313:13
315:10,12
316:2,21
332:23 333:10,
12 339:1

**understood**
27:10 37:20
75:17 91:11
233:5 234:12,
20 315:25

**Uneven** 327:20

**unfair** 279:3

**uniform**
112:16

**unit** 63:9
143:17 341:5

**units** 12:18
266:21

**unprompted**
148:15

**unprovoked**
268:5

**unrelated**
159:11 372:4

**unsure** 122:18

**update** 124:14

**utilized** 214:22

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

## V

**vague** 166:13

**valid** 37:10

**Valley** 222:23

**Van** 11:3

**vehicle** 149:9 175:1 178:1,7, 22 196:9 200:23,25

**verbatim** 350:19

**verify** 284:22

**Vernon** 148:22 149:3,15,19,23 187:17,24 220:21 269:11, 18 270:12,14 271:6,19

**verse** 23:4

**version** 191:9 335:19 336:11

**vertebrae** 63:13

**vet** 284:16

**vicinity** 33:15, 22

**victim** 126:9 150:14 166:25 210:25 271:8,9

**victim's** 153:25 210:10 212:20 228:4 271:7 346:21

**video** 11:3 33:13 37:3 58:21,24 59:1, 16 61:15 141:12

**view** 80:1

**viewed** 72:15

**views** 241:11

**violate** 315:24

**violation** 93:1

371:8

**Virgie** 51:25 52:1,8,17 53:1, 3 56:21

**Virgie's** 52:6 56:9,11,12,14, 15 57:3,5

**voice** 24:13,15 28:10 35:22 100:21 101:6 106:15 120:11 128:24 139:13 164:19

**volunteered** 247:4

**volunteering** 369:21

## W

**wait** 77:17 137:16 171:3 256:22 306:22 310:20 311:14 334:20

**waive** 250:1

**waived** 292:2

**waiver** 201:25 202:7,21 208:7 315:15

**Walgreen's** 283:9 285:11 289:15,25 309:14,15

**walked** 370:7

**walking** 355:23

**wanted** 40:21 41:17,22 42:6 53:19,23 63:23 114:17 137:2,3 140:25 165:24 245:18 249:8 259:9 284:19, 22 285:18 329:22 330:1,4 332:7 345:1,5 349:14 359:17 360:1,7 366:23

367:23 368:2,8

**wanting** 167:17 251:16 260:20 263:6,8 308:10 329:17

**warning** 22:24

**warnings** 22:22

**warrant** 21:22 22:4 28:19,23 29:2 30:17,20, 21 107:19,20, 23 158:5,16 159:15,17,18 160:4,25 161:10 162:13 315:8,14,23 316:11,19,23, 24 370:11 371:12,13,21 372:8

**warrants** 260:20 371:7 372:4

**Warren** 29:17, 23 32:2 137:21, 25 138:2 307:21 308:13 311:23 312:9, 15,21 313:1,7, 21,23,24 317:12 318:18, 23 319:10,17 320:7,8,18,23 321:5,12 322:5, 8,9,10

**Warren's** 138:6 303:7 304:22

**wasting** 300:22

**water** 95:20 221:6,7,11,13

**ways** 281:12

**weapon** 126:15 140:16

**wearing** 58:6, 12 343:9 351:19

**weather** 272:20

**week** 311:2

**weeks** 46:21, 22 47:2,13 48:9 67:3,4 155:17 207:14

**weird** 314:12

**Wendell** 229:12

**Wesley** 238:10 369:19

**what'll** 164:5

**whatsoever** 166:11

**when's** 53:7 137:20

**white** 343:4 363:2 364:8

**Whitley** 11:6

**wife** 54:12 55:16 95:3 305:3,5

**Wiggins** 26:17 34:15

**Wiggins'** 19:18,24 28:5 36:1,7,13 38:16 53:22 58:15,19 59:17 61:12 135:7

**William** 33:21 90:13 97:2 98:10 100:8 101:22 102:4, 10,12 103:5,25 104:1 106:18, 21 107:9,21,22, 25 108:2,10 130:7,10 146:1, 22 153:19 183:17 203:14 219:2 244:25 246:25 247:6 257:16 277:2,3 278:7 281:9,10, 13,20 295:23 299:22 314:16

351:9,12 369:12,22 370:3,12 371:1, 25 379:8 380:6, 9,10

**Williams** 11:18

**Wilson** 364:23 365:3,19 366:2, 9,13,16,20 367:10,19 368:3,10

**withdraw** 63:3 96:23 108:9 116:1 121:19 150:16 158:3 183:22 216:15 359:12

**witnesses** 12:21 13:10 15:25 19:23 20:14 23:18 25:2 26:9 28:1 38:10 39:23 86:20 98:3 113:24 114:12 132:25 148:7, 22 173:15 192:24 219:17 220:1 229:16 240:12 245:20 258:3 268:5

**woke** 217:25

**woman** 32:20, 25 33:4,11,17 48:3 215:8,9,12 233:9,17 247:20,25 273:20 274:7, 13

**women** 47:10

**word** 105:2 111:1 115:24, 25 117:11 251:21,24 252:5,20 253:19 254:1 297:24

**words** 25:9 106:2,10 175:5 185:24 213:2 238:19 253:25

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

259:7 260:7
296:16 322:18
330:7 340:8
350:13 355:16
361:1 371:4
376:20 377:12
379:10

**work** 19:10
36:20 67:12
82:17 184:7
382:6

**worked** 12:23
160:2 177:1
184:2

**working** 62:10
108:3 175:7
238:12,15
305:8

**works** 176:6,15
177:17

**world** 185:12

**would've**
30:22 129:23
162:2 197:3

**wreck** 257:14
259:3 332:22
333:6,10,16

**wrecked** 57:3

**Wright** 11:14
13:25 14:7,12
16:14 18:25
20:17 21:12
23:5,22 24:8
28:6 30:1,9,25
31:20 32:22
35:14 36:8
38:20 39:10,15,
24 40:8,14,16,
22,25 41:6,9
42:17,22 43:3,
13,23 44:19
45:24 46:14
47:11 48:7,16,
23 49:4,9,15,18
51:6,11,17,19
55:11 58:10
59:18 61:24
62:5 65:17 66:1
68:16,18 69:4,
12 70:2,18
71:6,8,15,22

72:11,24 73:17,
20 75:3 77:8,
10,12,22 78:1,
10 79:2,12 81:3
82:1,9,12,16,24
83:5,7 84:7,14,
18,25 85:6,17,
22 88:11 94:3,
12 96:3 103:13,
15 104:11,23,
25 105:13,24
107:5,18 110:6
114:13,23
115:18 116:6
118:16 119:5
121:25 122:10,
16,18,22 125:9
128:5,14,16
129:14,25
130:22 131:19,
24 132:16,19
133:13 134:15
135:3,12
136:16,18
137:14 140:8
141:7,22,24
142:2 147:14,
25 149:11
150:8 151:9,25
156:13 157:7,
22 159:8,12
160:13 161:23,
25 162:16
163:10 165:7
166:9,14 167:7
168:9 169:7,10,
12,19,24
170:18 172:3,
12,15,17,25
173:2,9 175:3,8
176:9,18 177:3
179:14,18,22
181:5,19 182:6
183:21,24
184:12 185:9,
14,17 186:2,4
187:21 188:4
189:3,7,10,17,
19 191:14,16
194:8,15 195:6
197:15 198:6,
10,15,20
200:19 202:23
203:10 208:16,
22 209:23
213:16 215:21

216:19 217:7
220:25 223:2,8
225:7,24
227:23 229:3,8,
22 232:1,3,11
233:11,23
234:8,18 235:1,
9 236:16
239:25 240:9,
15 241:8
249:10,24
251:5 253:4
261:13 264:10
266:1 267:11
268:24 269:7,
15,22 270:4,18
271:13,16
276:2,7 277:12,
16,24 278:8,15
279:18,24
280:16 283:8
284:25 285:7,
20 286:19,25
287:14 288:24
290:20 292:6,
13 293:4,14
298:21 299:3
300:4,11,17,23
301:5,7 302:18
303:14,25
305:10,25
306:23 310:18
313:2 315:17
316:13 317:6
318:4,7,10
319:11,23
320:24 321:11,
15,23 323:5
324:5 325:1
326:12 327:10
329:3 332:4,15
333:3 335:7,10
336:14 337:15,
22,25 338:3,6
340:5 342:8,20
347:11 349:17,
24 350:10,16,
23 351:24
352:24 353:4
354:3,14 355:4,
13 358:3
359:20 360:4,
23 361:22
362:16,25
363:16,24
364:3 369:25

370:14 371:2,
15 373:3 374:6,
15 375:10
377:1 378:6
380:2,8,19
381:4,16,22
382:15 383:24

**write** 50:12,13,
14 222:6
224:10 313:10
319:5 324:20

**writing** 189:25
228:22 317:14
380:19

**written** 13:17
14:4,15 74:20,
24 75:10 92:17
223:14 250:17
284:3

**wrong** 171:5
320:13 361:12
363:25

**wrote** 79:7
112:23 163:14,
25 168:2
171:23 172:4
188:18 191:13
211:1 222:3,7
224:3 225:1
230:3 242:8
250:5 273:14,
25 284:6,10
300:3 301:9
318:14 324:16
344:9

———— Y ————

**year** 52:2 53:15
64:19 66:15
144:25 293:18
319:19

**years** 53:3
63:16 111:20
231:2

**yell** 23:16
24:17 27:12

**yelled** 23:8

**York** 11:8,15
12:11 16:8

24:21 27:2
33:25 35:22
41:12 45:4,13
46:7 50:4
51:13,22,25
52:1 56:2 74:13
84:5,12 85:10
96:9 101:17
104:4 108:13
130:11 138:12
139:5 142:22
148:5 159:7,14
171:8 174:6
176:21 178:14,
15 195:19
218:5 221:24
233:7 235:12
244:13 246:19
250:11,12,13,
20 252:17
258:11 260:23
261:19 285:13
296:21 304:20
311:21 322:12
325:10 326:7,
16 332:2 341:3
364:13 367:9
382:2,16
383:19,23

**York's** 46:6
381:2

**you-all** 45:21
61:10 180:10
226:2 252:19

**young** 47:10

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS