IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF KENTUCKY, LONDON DIVISION

| | | |
|---|---|---|
| AMANDA HOSKINS and JONATHAN TAYLOR, | ) ) ) | |
| | ) | Case No. 17-CV-84 |
| Plaintiffs, | ) | |
| | ) | Hon. ROBERT E. WEIR |
| v. | ) | |
| | ) | Mag. HANLY A. INGRAM |
| KNOX COUNTY, ET AL., | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendants. | | |

# **EXHIBIT 8**

NO. 17-CV-84

# AMANDA HOSKINS, ET AL.

V.

# KNOX COUNTY, ET AL.

## DEPONENT:

## JACKIE STEELE

## DATE:

## June 18, 2018

1    IN THE UNITED STATES DISTRICT COURT FOR THE

2          EASTERN DISTRICT OF KENTUCKY

3                NO. 17-CV-84

4            HON. DAVID L. BUNNING

5            HON. CANDACE J. SMITH

6

7        AMANDA HOSKINS, ET AL.,

8              PLAINTIFFS

9

10                   V.

11

12          KNOX COUNTY, ET AL.,

13              DEFENDANTS

14

15

16

17

18

19

20

21

22

23   DEPONENT:   JACKIE STEELE

24   DATE:      JUNE 18, 2018

25   REPORTER:   LACEE TOWNSEND

Page 2

```
1                APPEARANCES
2
3  ON BEHALF OF THE PLAINTIFFS, AMANDA HOSKINS, ET AL.:
4  ELLIOT SLOSAR
5  AMY ROBINSON STAPLES
6  LOEVY & LOEVY
7  311 NORTH ABERDEEN STREET
8  THIRD FLOOR
9  CHICAGO, ILLINOIS 60607
10 TELEPHONE NO.: (312) 243-5900
11 E-MAIL: ELLIOT@LOEVY.COM
12
13 ON BEHALF OF THE DEFENDANTS, BRIAN JOHNSON, MARK
14 MEFFORD, JACKIE JOSEPH AND DALLAS EUBANKS:
15 SHAWNA KINCER
16 KENTUCKY STATE POLICE GENERAL COUNSEL
17 919 VERSAILLES ROAD
18 FRANKFORT, KENTUCKY 40601
19 TELEPHONE NO.: (502) 573-1636
20 E-MAIL: SHAWNA.KINCER@KY.GOV
21
22
23
24
25
```

Page 3

```
1             APPEARANCES CONTINUED
2
3  ON BEHALF OF THE DEFENDANTS, JASON YORK AND TROOPER
4  BUNCH:
5  DERRICK T. WRIGHT
6  STURGILL, TURNER, BARKER & MOLONEY, PLLC
7  333 WEST VINE STREET
8  SUITE 1500
9  LEXINGTON, KENTUCKY 40507
10 TELEPHONE NO.: (859) 255-8581
11 E-MAIL: DWRIGHT@STURGILLTURNER.COM
12
13 ON BEHALF OF THE DEFENDANTS, MIKE BROUGHTON AND CITY OF
14 BARBOURVILLE:
15 LICHA H. FARAH, JR.
16 WARD HOCKER & THORNTON, PLLC
17 333 WEST VINE STREET
18 SUITE 1100
19 LEXINGTON, KENTUCKY 40507
20 TELEPHONE NO.: (859) 422-6000
21 E-MAIL: LFARAH@WHTLAW.COM
22
23
24
25
```

Page 4

```
1           APPEARANCES CONTINUED
2
3  ON BEHALF OF THE DEFENDANTS, JOHN PICKARD AND DEREK
4  EUBANKS:
5  JOHN KELLEY
6  JASON WILLIAMS
7  WILLIAMS FARMER & TOWE
8  303 SOUTH MAIN STREET
9  P.O. BOX 3199
10 LONDON, KENTUCKY 40743
11 TELEPHONE NO.: (606) 877-5291
12 E-MAIL: JASON@WFTLAW.COM
13
14 ALSO PRESENT:  AMANDA HOSKINS, PLAINTIFF
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
1                  INDEX
2                            Page
3  DIRECT EXAMINATION BY MR. SLOSAR            8
4  CROSS EXAMINATION BY MR. WRIGHT           168
5  EXAMINATION BY MR. KELLEY          214
6  EXAMINATION BY MS. KINCER          220
7  EXAMINATION BY MR. FARAH          229
8  REDIRECT EXAMINATION BY MS. STAPLES      235
9  RECROSS EXAMINATION BY MR. WRIGHT        237
10 RE-EXAMINATION BY MR. KELLEY          241
11
12                EXHIBITS
13                            Page
14  1  ARREST WARRANT FOR AMANDA HOSKINS      14
15  2  ARREST WARRANT FOR JOHNATHAN TAYLOR    16
16  3  ARREST WARRANT FOR WILLIAM LESTER      18
17  4  INDICTMENT                19
18  5  GRAND JURY CHECKLIST          21
19  6  MOTION FOR DISCOVERY PL24490-PL24492    32
20  7  MOTION FOR SPECIFIC DISCOVER
21     PL24455-PL24458          35
22  8  MOTION FOR SPECIFIC DISCOVER
23     PL026183-PL026185              36
24  9  MOTION PL024494-PL024501          38
25 10  MOTION PL24511-PL24540          42
```

Page 6

EXHIBITS CONTINUED

|  |  | Page |
| --- | --- | --- |
| 11 | MOTION PL024553- PL024558 | 44 |
| 12 | CASE REPORT PL25395-PL25516 | 48 |
| 13 | ELECTRONIC FILE DISCOVERY |  |
|  | PL25239-PL25296 | 50 |
| 14 | MOTION TO DISMISS | 51 |
| 15 | KAYLA MILLS ARREST WARRANT | 95 |
| 16 | YORK TRANSCRIPT | 94 |
| 17 | SKETCH | 94 |
| 18 | PHOTOS OF JOHNATHAN TAYLOR | 95 |
| 19 | AFFIDAVIT KSP000337 | 118 |
| 20 | AFFIDAVIT KSP000339 | 118 |
| 21 | LETTER | 132 |
| 22 | MOTION TO DISMISS | 141 |
| 23 | SUPPLEMENTAL REPORT | 152 |
| 24 | PL024722-PL024728 | 241 |

Page 7

1        STIPULATION

3   The deposition of JACKIE STEELE taken at the HOLIDAY INN

4   EXPRESS & SUITES, 506 MINTON DRIVE, LONDON, KENTUCKY

5   40741 on MONDAY, the 18TH day of JUNE, 2018 at

6   approximately 9:30 a.m.; said deposition was taken

7   pursuant to the FEDERAL Rules of Civil Procedure.

8   It is agreed that LACEE TOWNSEND, being a Notary Public

9   and Court Reporter for the State of INDIANA, may swear

10   the witness and that the reading and signing of the

11   completed transcript by the witness is not waived.

Page 8

PROCEEDINGS

3        COURT REPORTER:  Will you raise your right

4   hand?  Do you solemnly swear or affirm that the

5   testimony you are about to give will be the truth,

6   the whole truth, and nothing but the truth?

7        THE WITNESS:  I do.

8        VIDEOGRAPHER:  Thank you.

9             DIRECT EXAMINATION

10   BY MR. SLOSAR:

11        Q   Good afternoon, Mr. Steele.

12        A   Good afternoon.

13        Q   Have you given a deposition before?

14        A   Not to my recollection, no.

15        Q   Okay.  I'm going to go over some of the rules

16   real quick before we plow forward, okay?

17        A   Okay.

18        Q   As you know, there are a lot of attorneys

19   here, and one of them has a very nice tie on, and they

20   may make objections.

21        MR. WRIGHT:  So you don't like my tie.

22        MR. KELLEY:  It could be me.  I don't know.

23        MR. SLOSAR:  You're right.  There – they –

24   I'm sorry about that.  The purple caught my eye.

25        MR. FARAH:  So two of you don't have very nice

Page 9

1   ties.

2        MR. KELLEY:  I know.  Nonverbal LAUGHTER

3        MR. WRIGHT:  Well, that's the implication.

4        MS. STAPLES:  Great start.

5        MR. KELLEY:  Don't like my tie.

6   BY MR. SLOSAR:

7        Q   They're nice, as well, I was telling Jason.

8   They may make objections.  There's no judge here today,

9   so if you'll allow for them to make their record, I'd

10   appreciate it.  If you want to use the restroom, take a

11   break, just let any of us know, okay?

12        A   Okay.

13        Q   You know verbal answers are better than non-

14   verbal, so if you're able to do that, that'd be great.

15        A   Yes, sir.

16        Q   I also tend not to ask questions perfectly, so

17   if there's a question I ask you, you don't understand

18   it, please let me know and I will ask it a better way;

19   is that fair?

20        A   Fair enough.

21        Q   If you answer the question, I'm going to

22   assume that you understood what was being asked; is that

23   fair?

24        A   Yes, sir.

25        Q   All right.  Mr. Steele, prior to coming in

Page 10

1  here today, did you hear about the allegations in this
2  lawsuit?
3      A   I have read the complaint filed in the
4  lawsuit.
5      Q   Okay.  And I believe – well, several months
6  ago, your office tendered the complete files that you
7  possessed relating to the criminal prosecution against
8  Amanda Hoskins, Jonathan Taylor, and William Lester; is
9  that right?
10     A   That is correct.
11     Q   Okay.  I remember, in reviewing those files, I
12  think I actually saw a copy of the complaint; does that
13  seem right to you?
14     A   It does.  Yes, sir.
15     Q   Okay.  How did you first find out about the
16  lawsuit?
17     A   In all honesty, I can't answer that.  I
18  honestly can't remember.
19     Q   Prior to – right now, what is your – what is
20  your title?
21     A   I'm the Commonwealth Attorney for the 27th
22  Judicial Circuit, which includes Knox and Laurel
23  Counties here in Kentucky.
24     Q   How long have you held that title?
25     A   I've been the Commonwealth Attorney for in

Page 11

1  excess of ten years and was an assistant for five years
2  prior.
3      Q   Where were you an Assistant Commonwealth
4  Attorney at?
5      A   Here in the same office.
6      Q   Where did you go to law school?
7      A   Salmon P. Chase College of Law, Northern
8  Kentucky University.
9      Q   When'd you graduate from there?
10     A   2001.
11     Q   Prior to going to law school, where'd you go
12  to college?
13     A   Graduate college or go to college?
14     A   Graduate.
15     A   Graduated college University of the
16  Cumberlands, Cumberland College at the time, in
17  Williamsburg, Kentucky.
18     Q   What was your major?
19     A   I had a double major in accounting and
20  finance.
21     Q   Were you born and raised in Kentucky?
22     A   I was born in Knoxville, Tennessee, but all of
23  my life that I know of I was raised here in Kentucky.
24  Yes.
25     Q   What are your day-to-day responsibilities as

Page 12

1  the elected Commonwealth Attorney for Knox and Laurel
2  County?
3      A   Oversee the prosecution of indicted felony
4  cases to be a day-to-day responsibility, to include
5  Grand Jury preparation, review of files.  Now I've
6  trimmed back my trial workload, so I just try murder
7  cases.  I don't do all cases.
8      Q   In 2011, do you recall how many criminal cases
9  your office handled?
10     A   Specifically, no.  I could tell you, on
11  average, we would've handled in the course of year
12  somewhere around 600 or more.
13     Q   And approximately in 2011, how many of those
14  600 would've been felonies?
15     A   That would've been all felonies.  My – my –
16     Q   All felonies?
17     A   – my office does not handle any misdemeanor
18  cases.
19     Q   In 2011, can you give an estimate as to how
20  many murder cases your office would've been handling?
21     A   Again, I can't give a specific number.  I can
22  tell you, on average, I probably have anywhere from 8 to
23  12 pending at any point in time.
24     Q   And in 2011, was it the practice of your
25  office to initiate charges in felony murder cases by way

Page 13

1  of indictment or preliminary hearing?
2      A   My office, it would have to come through an
3  indictment.  We don't initiate – my office will not
4  self-initiate a felony charge.  There's two – two
5  manners in which it could come through, one from a
6  preliminary hearing at a district court, and the second
7  is just by the recent indictment of the Grand Jury.
8      Q   What sort of process, in 2011, existed for
9  police officers to initiate charges in a felony case; so
10  before there's a Grand Jury indictment, what would a
11  police officer need to do in order to begin the
12  initiation of charges?
13     A   We'll make sure we're talking about the same
14  thing.  When you say "initiate charges," do you mean
15  begin an investigation or do you mean go and arrest
16  somebody?
17     Q   Go and arrest someone.
18     A   At that point in time, they'd have to –
19  before Grand Jury, it would have to be through an arrest
20  warrant, which they would have to lay out before a
21  judge.
22     Q   And from your experience, is the arrest
23  warrant – is that the same thing as a criminal
24  complaint or is that different?
25         MR. WRIGHT:  Object to form.  Answer best you

Page 14

1  can.
2   A  I – I don't understand the – I'm...
3   Q  Sure.  I'm –
4   A  I don't – I don't understand the question
5  then.
6   Q  Show you what we'll mark as Exhibit 1.  So,
7  Exhibit 1 will be the arrest warrant and criminal
8  complaint against Amanda Hoskins; do you recognize this
9  document?
10      (EXHIBIT 1 MARKED FOR IDENTIFICATION)
11   A  I do.  Yes.
12   Q  Okay.  And what does this document appear to
13  be?
14   A  It appears to be the – what I would call an
15  arrest warrant for Amanda Hoskins on the charge of
16  murder and robbery.
17   Q  From looking at this document, are you able to
18  determine who initiated the arrest warrant against Ms.
19  Hoskins for the murder and robbery of Katherine Mills?
20   A  Yes.  On the bottom of page 1, it's got
21  "Affiant's Name."  It would be Detective Jason York.  It
22  also appears to be Detective Jason York's signature and
23  badge number as the final signature.
24   Q  Okay.  Do you recognize Detective York's
25  signature from your years of working with him?

Page 15

1   A  Yes.  That appears to be the signature I would
2  associate with Detective York.
3   Q  Okay.  And on the second page, do you see
4  where it says "Warrant of Arrest" with a check mark next
5  to it?
6   A  I do.  Yes, sir.
7   Q  Okay.  What does that mean, sir?
8   A  This would be – it actually serves a – as –
9  just as it says, a warrant of arrest for law enforcement
10  officers to – to serve the warrant with – and this was
11  notated as a main or a cash bail.
12   Q  From looking at this document, does it appear
13  that this was issued on March 14, 2012?
14   A  March 14.  Yes, sir.
15   Q  Okay.  And can you explain to me the process
16  of how an arrest warrant against Ms. Hoskins would've
17  been issued back in 2012?
18   A  I – I – I can't personally.
19   Q  Well, would a detective, if they had an arrest
20  warrant that was filled out, where would that detective,
21  in 2012, need to submit the arrest warrant in order for
22  someone to sign off on it?
23   A  In this – (coughs).  Excuse me.  In this
24  case, it appears to be a handwritten signature, so we've
25  had a e-warrants process come in, so I'm assuming this

Page 16

1  was before the e-warrants.  I can't remember when that
2  was initiated.  The officer or detective in this matter
3  would've had to submit it to the judge.
4   Q  Okay.  Is it fair to say that you would not
5  have had any role in the filling out of the arrest
6  warrant on March 14, 2012?
7   A  Yes.
8      MR. WRIGHT:  Object to form.
9   Q  You can answer.
10   A  That is correct.  I – I had no personal
11  involvement in this arrest warrant.
12   Q  Okay.  I'm going to show you what we'll mark
13  as Exhibit number 2.  It's the arrest warrant and
14  criminal complaint against Jonathan Taylor, with the
15  same date, March 14, 2012, and do you recognize this
16  document, Mr. Steele?
17      (EXHIBIT 2 MARKED FOR IDENTIFICATION)
18   A  I do.
19   Q  Okay.  What does this document appear to be?
20   A  Oh, you've got it.  I'm sorry.
21      MR. WRIGHT:  No, I don't.
22   A  And you don't have that.  Okay.  This appears
23  to be a – the arrest warrant – what I'd call an arrest
24  warrant for Jonathan Taylor, again for the murder and
25  robbery in the first degree.

Page 17

1   Q  Did you have any role in completing the arrest
2  warrant against Jonathan Taylor for the murder and
3  robbery of Katherine Mills?
4   A  Personally, no.
5   Q  And according to your review of this document,
6  who initiated the arrest warrant against Mr. Taylor on
7  March 14, 2012?
8   A  Detective Jason York.
9   Q  I'm going to show you what we'll mark as
10  Exhibit number 3, Mr. Steele.  Again, is this a document
11  that you're familiar with?
12      (EXHIBIT 3 MARKED FOR IDENTIFICATION)
13   A  Yes, it is.
14   Q  What does this appear to be?
15   A  This is a – what I would call, again, an
16  arrest warrant for William Lester on the murder and
17  robbery in the first degree charges.
18   Q  Did you have any role in completing the arrest
19  warrant and criminal complaint against William Lester on
20  March 14, 2012?
21   A  Personally, no.
22   Q  Okay.  And according to your review of this
23  document, who initiated that process?
24   A  It'd be Detective Jason York.
25   Q  Okay.  Thank you, sir.  Can you tell me

Page 18

1  generally, in 2012, the process by which Knox County
2  Commonwealth Attorney's office proceeds forward with
3  charges after an arrest warrant or criminal complaint
4  has been issued by a law enforcement officer?
5      A  We'd proceed based upon the manner in which
6  the – the law enforcement officer's the one that would
7  direct the manner in which it'd proceed at this point in
8  time.
9      Q  Sure.  So after Detective York fills out a
10  criminal complaint and arrest warrant, gets a judge to
11  sign off on it against Ms. Hoskins or Mr. Taylor, at
12  what point in the process would your office step into
13  that initiation of criminal charges?
14      A  Once a preliminary hearing – I'm sorry.  I
15  cut you off.  Once a preliminary hearing's been held in
16  district court and probable cause had been found, the –
17  then the district judge waives it over, bounds it over
18  to the Grand Jury, my office becomes involved.  Or the
19  officer decides to go ahead and present it to the Grand
20  Jury prior to the preliminary hearing, at which point in
21  time we would get involved.
22      Q  Okay.  And when you – is it fair to say –
23  well, do you recall the names of Commonwealth Attorneys
24  that were working for your office in April of 2012?
25      A  I – I think I can.  If I leave one out, I

Page 19

1  will apologize.  We just had some turnover.  Terry
2  Beckner, Mike Pratt, Harold Dyche, Brandon Jones, Danny
3  Evans.
4      Q  In this case, it's my recollection that Danny
5  Evans was the Assistant Commonwealth Attorney who
6  presented the case to the Grand Jury; do you recall
7  having any involvement in presenting evidence in the
8  criminal prosecution against Amanda Hoskins, Jonathan
9  Taylor, or William Lester in April of 2012?
10          MR. WRIGHT:  Object to form.
11      A  You can answer.
12      A  I do not recall.
13      Q  I'm going to show you – did you have any –
14  do you recall, sitting here today, having any
15  conversations with Danny Evans or any Assistant
16  Commonwealth Attorney prior to the presentation of
17  evidence before a Knox County Grand Jury in April of
18  2012?
19      A  I don't recall.
20      Q  I'm going to show you what we'll mark as
21  Exhibit 4.  It's a copy of the indictment.  I'm going to
22  – I'm looking for it.  Looks like I only have three
23  extras.  I'm sorry.  This is PL25392 to PL25393.  Mr.
24  Steele, do you recognize this document?
25      A  The one you handed me, –

Page 20

1      Q  Yes.
2      A  – Exhibit number 4?
3      Q  Yes.
4      A  Yes, I do.
5      Q  Okay.  And what is this document?
6      A  This is the indictment returned by the Knox
7  County Grand Jury against Jonathan Taylor, Amanda
8  Hoskins, and William Lester.
9      Q  And looking at this document, are you able to
10  determine the Assistant Commonwealth Attorney who
11  presented evidence to the Grand Jury on April 27, 2012?
12      A  No.
13      Q  Sitting here today, do you have any
14  recollection of personally presenting any evidence to
15  the Knox County Grand Jury on that day?
16      A  I have no personal recollection, sitting here.
17      Q  Can you explain the process, in 2012, for how
18  an Assistant Commonwealth Attorney would receive a
19  criminal complaint and arrest warrant from law
20  enforcement officials in March or April of 2012?
21      A  The same way in which I described earlier, be
22  to bound it over by a district judge after finding
23  probable cause, then bound it over to the Grand Jury or
24  the officer bringing it straight to the Grand Jury.
25      Q  If an officer in 2012 wanted to bring a matter

Page 21

1  straight to a Grand Jury, would that officer need to
2  reach out to an Assistant Commonwealth Attorney first?
3      A  No.
4          MR. WRIGHT:  Object to form.
5      Q  What process would the officer be able to go
6  through in the spring of 2012 to initiate charges by way
7  of a Grand Jury indictment?
8      A  So the Grand Jury meets on – typically meets
9  on Monday to hear evidence.  We return indictments on
10  Friday.  That Monday morning, if they showed up with a
11  case and wanted to present it to the Grand Jury, we
12  would've made a – I'd say a precursory look of the file
13  to make sure they had everything in there that they
14  needed, you know, speaking in general.  I don't know how
15  this one came in or have any recollection, but that's the
16  manner in which they would come.  They would show up
17  that Monday morning.
18      Q  Let me show you what we'll mark as – is that
19  4?
20      A  Yeah.  This one.  The previous one you gave me
21  was number 4.
22      Q  Thank you.  Sorry.  Going to show you what
23  we'll mark as Exhibit number 5.  Mr. Steele, please let
24  me know if you recognize this document.  Sorry.  And I
25  think I might be one of a lot of these are mixed up.

Page 22

1  This is PL26180 through PL26182. It's a Grand Jury
2  checklist.
3     (EXHIBIT 5 MARKED FOR IDENTIFICATION)
4     A  Okay.
5     Q  Mr. Steele, do you recognize this document?
6     A  I do.  Yes.
7     Q  And what is this?
8     A  This is what we refer to in my office as a
9  Dinkins form, and we -- we use this form basically as a
10  cheat sheet for the prosecutors when we may be thrown a
11  file in the middle of a court proceeding so that we can
12  quickly look and assess for what we're looking at
13  without going through a -- a massive file.
14     Q  Would this document have been created prior to
15  the Grand Jury session or is this something that gets
16  created after an indictment has been issued?
17     A  This is prepared before Grand Jury, before
18  they go into the Grand Jury room.
19     Q  Okay.  Now, looking at the second page in this
20  document, are you able to determine who the charges were
21  being initiated against?
22     A  By looking on the second page?
23     Q  Or on the first page.  I'm sorry.
24     A  Yeah.  On the first page, it's -- "Accused"
25  has all three, Jonathan Taylor, Amanda Hoskins, and

Page 23

1  William Lester listed.
2     Q  And was that for that death of Katherine Mills
3  in December of 2010?
4     A  Yes.
5     Q  Okay.  Do you see on the second page where it
6  has a list of witnesses?
7     A  I do.
8     Q  Okay.  In this case, we've been produced a
9  Grand Jury audio recording of Detective York testifying
10  before the Grand Jury, but I had -- I have never seen
11  any audio recordings of third-party witnesses or other
12  detectives testifying before the Grand Jury.  Can you
13  explain to me what it means in the witness column that
14  all of these people are listed there; does that
15  necessarily mean that they testified or does it
16  represent that their statements to the police were
17  submitted to the Grand Jury?
18     A  It does just represent that they are witnesses
19  in the case, not witnesses at Grand Jury.
20     Q  Okay.  So would it be accurate if -- to assume
21  that if Allen Helton's name is listed as a witness that
22  his statement was either testified to by Detective York
23  or submitted directly to the Grand Jury for
24  consideration prior to the issuance of an indictment?
25     A  No.

Page 24

1     MR. WRIGHT:  Object to form.
2     A  No.
3     Q  Okay.  Then why would Mr. Helton be listed
4  here?
5     A  He may be a witness, but your question asked
6  would his -- would his statement have been read -- read
7  to the Grand Jury or testified to by.  I cannot say that
8  it was.  I can tell you that when the officer comes in
9  the Grand Jury, he will bring his case file for the
10  Grand Jury to consider after his testimony ends.
11     Q  Okay.  So that's helpful.  So was it the
12  practice in 2012 for the officer who testified at the
13  Grand Jury to present their investigative file to the
14  grand jurors for review prior to the issuance of an
15  indictment?
16     MR. WRIGHT:  Object to form.
17     A  What are you calling an investigative file?
18  What would your definition of "investigative file" be?
19     Q  I'm not sure.  What file were you talking
20  about?
21     A  It's -- it -- it may have just been as
22  simple as his police -- as his investigative report.  It
23  may not be the -- you know, many of the times, these
24  things are -- discovery's an ongoing process, so the
25  transcripts or a lot of those things may not have been

Page 25

1  included at that point in time in a case.  The -- the
2  autopsy may not have been included with the case file at
3  that point in time, so if -- and I don't know what was
4  presented actually at Grand Jury in this case, but the -
5  the officer's case report is included.
6     Q  And officer -- would the lead detective's case
7  reports be included to the Grand Jury for submission?
8     MR. WRIGHT:  Objection to form.
9     Q  Like in this case, since Detective York was
10  the lead detective and the person who testified before
11  the grand jurors, would it have been his case report
12  that was presented for their review?
13     A  Yes.
14     MR. WRIGHT:  Object to form.
15     A  His case report would have been in that he had
16  prepared it at the time of the Grand Jury presentation.
17     Q  Okay.  And then on the third page, where it
18  says "Murder Case Checklist," is this a summary of the
19  documents that would've been submitted to the Grand Jury
20  for review or does this relate to another part of this
21  process?
22     A  This would've been another part of the
23  process.  This would not have been completed or done by
24  the Grand Jury.  This would've been done by a lady in my
25  office that goes through and makes sure all discoverable

Page 26

1  items are – are done and just a checklist for us to
2  keep up with things.
3      Q   Okay.  So this is something that would be
4  updated throughout the prosecution?
5      A   That's correct.
6      Q   Okay.  Earlier I asked you some questions
7  relating to the criminal complaint that was issued in
8  this case against Ms. Hoskins, and you testified that
9  Detective York's signature was on that; is that right?
10     A   Yes, sir.
11     Q   Okay.  And I believe you testified earlier
12  that you didn't have any role in the process of
13  Detective York filling out the criminal complaint and
14  initiating charges against Ms. Hoskins; is that right?
15     A   Yes, sir.
16     Q   Okay.  And would the same be true for other
17  individuals that were working under your supervision in
18  March of 2012?
19         MR. WRIGHT:  Object to form.  Foundation.
20     Q   You can answer.
21     A   I have no idea if – if Detective York
22  would've called an assistant in my office at that point
23  in time.
24     Q   Okay.  Is it fair to say that the decision on
25  whether to fill out a criminal complaint in this case

Page 27

1  would've rested with the lead law enforcement officer?
2         MR. WRIGHT:  Object to form.
3      A   Yes.
4      Q   And is it fair to say that that person, based
5  upon the documents that you reviewed and your knowledge
6  of this case, would've been Detective York?
7      A   Yes.
8         MR. WRIGHT:  Object to form.
9         THE WITNESS:  (Phone vibrates.)  I'm sorry.  My
10  – can you –
11         MR. WRIGHT:  No.  You go ahead.
12         THE WITNESS:  I apologize.
13         MR. WRIGHT:  You're fine.
14  BY MR. SLOSAR:
15     Q   I'm going to ask you a lot of boring questions
16  now about training, okay?  After law school and apart
17  from on-the-job training and your general continuing
18  legal education requirements, have you had any training
19  or education relevant to your duties?
20     A   Did you say other than our continuing legal
21  education?
22     Q   Yes.
23     A   I have had other courses that I've taken.  Yes.
24     Q   And what sort of – well, what position did
25  you first hold at the Knox County Commonwealth

Page 28

1  Attorney's office?
2      A   I would've been an assistant.
3      Q   Were you trained after becoming an assistant
4  Knox County Commonwealth Attorney?
5      A   Yes, sir.
6      Q   What sort of training did you receive?
7      A   I began volunteering as an Assistant
8  Commonwealth Attorney under Tom Handy as the
9  Commonwealth Attorney in 2002.  My first Kentucky
10  Prosecutors Conference I went to would've been in the
11  fall of 2002.  I've attended those annually since 2002.
12  I have had trainings – other trainings in regards to
13  drug court, alternative sentencing plans.  I've had
14  others in regards to evidence collection, accident
15  reconstruction, DUI, expertise trial and training.  And
16  I may be missing some.  I apologize.  I didn't realize
17  how long I've been doing this and I'm trying to think
18  back.
19     Q   After being hired as an assistant Knox County
20  Commonwealth Attorney, did you have any training on your
21  ethical obligations as a prosecutor?
22     A   Yes.
23     Q   And after being elected as the Commonwealth
24  Attorney, have you had any training on your ethical
25  obligations as a prosecutor?

Page 29

1      A   Yes.
2      Q   One of the things we're going to talk about
3  today is Brady vs. Maryland, as I'm sure you've guessed;
4  are you familiar with that case?
5      A   I am.
6      Q   And I apologize for having to ask you these
7  questions.  Try and go as quickly as I can.  Are you
8  familiar with a prosecutor's obligation to turn over
9  exculpatory evidence to the accused?
10     A   Yes.
11     Q   Are you familiar with a prosecutor's
12  obligation to turn over evidence that may be used to
13  impeach a state's witnesses?
14     A   Yes.
15         MR. WRIGHT:  Object to form.
16     Q   Are you familiar with a prosecutor's
17  obligation not to destroy material evidence in a case?
18     A   Yes.
19     Q   Are you – were you familiar with those duties
20  for the entire time that the prosecution against Amanda
21  Hoskins and Jonathan Taylor was going on from March of
22  2012 until the dismissal of charges in the summer of
23  2016?
24     A   Yes.
25     Q   Were you familiar during your time as the

Page 30

1   prosecutor with Kentucky Supreme Court Rule 3.8, which
2   outlines the special responsibilities of prosecutors?
3       A   Yes.
4       Q   Are you familiar with the part of the rule
5   that requires prosecutors to make timely disclosures to
6   the defense of all evidence or information known to the
7   prosecutor that tends to negate the guilt of the accused
8   or mitigates the offense?
9       A   Yes.
10          MR. WRIGHT:  Object to form.
11      Q   Does Kentucky have a criminal rule that
12  requires –
13      A   Let me – let me interrupt you.  Can you –
14  the statement you just asked me, in regards to
15  exculpatory evidence, and what was the other part?
16      Q   Well, the question that I just asked was –
17  says: Were you familiar with the part of the rule of 3.8
18  – Supreme Court Rule – that requires prosecutors to
19  make timely disclosure to the defense of all evidence or
20  information known to the prosecutor that tends to negate
21  the guilt of the accused or mitigates the offense?
22      A   Yes.
23      Q   So you're obviously aware that a failure to
24  follow the rules about disclosing exculpatory evidence
25  as a prosecutor in Kentucky can lead to violations of

Page 31

1   the rules of professional conduct, correct?
2          MR. WRIGHT:  Object to form.
3       A   Yes.
4       Q   And are you aware, or were you aware between
5   2012 and 2017, that police and prosecutors are sued –
6   well, I'll withdraw that question.  Did you receive
7   training in criminal law when you were in law school?
8       A   Yes.
9       Q   Were you familiar with the Brady obligation
10  since you've been in law school?
11      A   Since I've been in law school?
12      Q   Like, since you were in law school, have you
13  been familiar with what Brady requires?
14      A   I would hope, but I can't say I found that out
15  in law school.
16      Q   Okay.  All right.  But since you've been a
17  Knox Count Commonwealth Attorney, you have understood
18  and complied with your obligations under Brady, –
19      A   Yes, sir.
20      Q   – right?
21      A   Yes, sir.
22      Q   All right.  In your experience in the Knox
23  County Commonwealth Attorney's office, were lawyers in
24  that office aware of their Brady obligations?
25      A   Yes.

Page 32

1       Q   I'm going to show you a series of motions. I'm
2   going to show you what we'll mark as Exhibit number 6.
3   It's a motion for discovery by Ms. Hoskins, Bates
4   stamped PL24490 through PL24492. Mr. Steele, having
5   reviewed this motion, are you able to determine what
6   this appears to be?
7          (EXHIBIT 6 MARKED FOR IDENTIFICATION)
8       A   If you'll give me just one second to finish
9   reading it.
10      Q   Yes.
11      A   Yes.  This appears to be a motion filed by
12  James Cox in Knox Circuit Court, Bates number  40070 –
13      Q   And what –
14      A   – through 72.
15      Q   – what's the motion requesting, generally,
16  Mr. Steele?
17      A   It – it's a request – he gave it a heading,
18  "Request for Exculpatory Evidence."
19      Q   So, and is this something that you were
20  tendered with while you were prosecuting a criminal case
21  against Ms. Hoskins and Mr. Taylor?
22      A   I don't have any independent recollection of
23  – of – of this one at this point in time.  I can tell
24  you – and one of the reasons I wanted to read it,
25  because all the things listed on here are things that I

Page 33

1   – I remember discussing and going through in discovery
2   process, but I don't have any independent recollection
3   of this motion.
4       Q   Do you have any reason to dispute that this
5   was a motion that was tendered in May of 2013 in the
6   criminal prosecution against Amanda Hoskins?
7       A   Other than it's not file – has a – doesn't
8   have a file stamp on it, which I would expect to be on a
9   tender document that's been filed in the court.  It –
10  it may have just been a copy that he had.  I – I don't
11  know. But obviously, if it's a – it was a tendered
12  document, it would be file stamped in the clerk's
13  office.
14      Q   And I'll represent to you that, at least the
15  Bates range that we're looking at now, these documents
16  were all pulled from the prosecution files that –
17      A   Okay.
18      Q   – you turned over in this case.  So is – if
19  this is something that would've been maintained as part
20  of the files that you turned over in this case, is it
21  fair to assume that this is something that you would've
22  been tendered in discovery?
23      A   Yeah.  He probably e-mailed it to me.  My
24  guess would be he emailed it to me when – before he
25  filed it.

Page 34

1    Q.  Okay. And after receiving a motion for
2    discovery, would you have taken steps to assure that
3    your office was complying with your disclosure
4    obligations, both under the rules of the Kentucky
5    Supreme Court and under Brady vs. Maryland?
6    A.  Yes.
7    Q.  Okay. I'm going to show you what we're
8    marking as Exhibit number 7. That's another motion for
9    a specific discovery filed by Barbara Carnes. It's
10   PL24455 through 24458; Mr. Steele, do you recognize this
11   document?
12        (EXHIBIT 7 MARKED FOR IDENTIFICATION)
13   A.  I do.
14   Q.  What does this document appear to be?
15   A.  It appears to be a motion for specific
16   discovery in Amanda Hoskins' file filed by, as you said,
17   Ms. Barbara Carnes.
18   Q.  Okay. And looking at this document, would you
19   agree that, according to the certificate of service, it
20   was filed December 6, 2012?
21   A.  That is correct.
22   Q.  And on the first page of this document, do you
23   see where it requests "all reports, field notes, case
24   supplements, and lab requests for any law enforcement
25   officer, coroner, or emergency personnel who were

Page 35

1    involved in the investigation of this case, including
2    but not limited to," and then it goes on to name a
3    number of law enforcement officials?
4    A.  I do.
5    Q.  Okay. Would you have complied with that
6    request pursuant to Kentucky Supreme Court rules and
7    your ethical obligations under Brady vs. Maryland?
8        MR. WRIGHT:  Object to form.
9    Q.  You can answer.
10   A.  I would not have complied with this request.
11   If I'm not mistaken, we had a hearing on this issue.
12   Specifically, they – there were requesting things that
13   were not included or had to be included in discovery.
14   Q.  I'm going to hand you what we'll mark as
15   Exhibit 8. This is a court order for the compliance of
16   Ms. Hoskins' discovery request. Mr. Steele, can you
17   look at this document? Do you recognize this court
18   order?
19        (EXHIBIT 8 MARKED FOR IDENTIFICATION)
20   A.  (No verbal response.)
21   Q.  Okay. And is it fair to say – well, is this
22   order signed by a judge?
23   A.  It is.
24   Q.  Okay. When was it signed by a judge?
25   A.  It appears to be signed on the 5th day of

Page 36

1    February, 2013.
2    Q.  Okay. And you're copied on this order, right?
3    A.  I am.
4    Q.  Okay. And this order instructs your office to
5    disclose all of the requests made in the motion for
6    specific discovery by Barbara Carnes that was filed in
7    December of 2012; is that right?
8        MR. WRIGHT:  Object to form.
9    A.  That is correct.
10   Q.  Would you have complied with this court order
11   and disclosed all of the materials that your office
12   possessed relating to each of the discovery requests
13   outlined in the February 7, 2013 court order?
14   A.  If I did not file a motion to alter, amend, or
15   vacate this order, I would have complied with it. Yes.
16   Q.  Sitting here today, do you have any
17   recollection of filing a motion to alter, amend, or
18   vacate the court order that was issued by the Honorable
19   Thomas Jensen on February 5, 2013?
20   A.  I – I – I do have a memory of the issue, and
21   as you can see on Exhibit number 7, as you said, this
22   was taken from my file, on the – on page 1, paragraph
23   1, you'll notice "Field Notes" is highlighted, and then
24   on the bottom of page 4, the notes are on top of –
25   number 4, there are notes of summaries of interviews,

Page 37

1    and also a copy of their taped statement recorded in –
2    in parentheses. These are notes that I remember making
3    on this. One is that field notes were not required to
4    be turned over under criminal rules in discovery, so I
5    would've objected to that. "A copy of their taped
6    statement" is in parentheticals because I would've
7    agreed to that under criminal rule 7.24 as being a
8    verbatim statement or – either a verbatim recorded
9    statement or a statement similar to – of which is their
10   statement initialed or signed. I would've turned that
11   over, but I – I – I remember us having discussions
12   regarding field notes, but what – ultimately, whatever
13   the court would've decided, we would have complied with
14   entirely. Yes, sir.
15   Q.  And you would've – looking at page 2 of
16   Exhibit 7, the – we're actually – you know, why don't
17   we just stick with the order?
18   A.  Okay.
19   Q.  Exhibit 8.
20   A.  Exhibit 8?
21   Q.  Looking at paragraph 2, it requests a copy of
22   the recorded statement of witness Michael Crump,
23   referred to in the investigative report of Detective
24   York; do you see that?
25   A.  I do.

Page 38

1  Q  Okay. And if your office was ever provided
2  with a copy or a recorded statement of Michael Crump,
3  would you have disclosed that pursuant to this court
4  order?
5  A  Yes.
6  Q  Paragraph 3 requests the copy of any
7  investigative reports and taped statements of additional
8  witnesses, including jail informants; if your office
9  possessed copies of such reports or recorded interviews,
10  would you disclose that pursuant to this court order in
11  your ethical obligations under the Kentucky Supreme
12  Court rules?
13  A  Yes.
14  Q  I'm going to hand you what we'll mark as
15  Exhibit number 9. This is one of the objections that
16  you recalled. This is PL24494 through 501. It's an
17  objection to defendant's request for exculpatory
18  evidence; Mr. Steele, do you recognize this document?
19      (EXHIBIT 9 MARKED FOR IDENTIFICATION)
20  A  I do.
21  Q  Did you draft this motion?
22  A  I'd say my office – this may be a collective
23  effort on my office.
24  Q  Okay. Did you sign the last page of this
25  motion?

Page 39

1  A  I did. Yes.
2  Q  Okay. On the second page of this motion, do
3  you see where it says "recorded interviews of Mr. Crump"
4  in the first paragraph, the first numbered paragraph?
5  A  Yes.
6  Q  Okay. And according to this document, is it
7  fair to say that the Commonwealth produced all recorded
8  statements relating to Mr. Crump that it either was
9  aware of or had in its possession?
10     MR. WRIGHT: Object to form.
11  A  Can you restate the question?
12  Q  Well, according to this paragraph, what did
13  your office produce relating to Mr. Crump?
14  A  We informed the court that we obviously had
15  provided any and all statements that we had received at
16  that point in time. If any of them were – were located
17  afterwards, we would provide those.
18  Q  Okay. And to the best of your knowledge and
19  recollection sitting here today, did your office produce
20  the recorded statements or police reports relating to
21  the recorded statements relating to Mr. Crump?
22  A  In regard to Mr. Crump, a recorded statement
23  was never identified, found. I believe Mr. – Detective
24  Corner, if I'm not mistaken, was the officer that took
25  Mr. Crump's statement. Mr. Corner – and I – and I

Page 40

1  believe it's in a supplement to the file, stated that he
2  would – stated that he had recorded it on a digital
3  recorder and left it with the detectives, but then when
4  he gave his supplement in regards to his conversation
5  with Mr. Crump.
6  Q  Were you ever made aware that Detective York
7  only requested that Detective Mefford search his own
8  computer for the recorded conversation of Mr. Crump and
9  not any other law enforcement computer or file –
10     MR. WRIGHT: Object to form.
11  Q  – at the Kentucky State Police?
12  A  I wasn't aware of any methodology they used in
13  searching for the – the recording, other than to say
14  that they could not find it.
15  Q  Did you ever request that Detective York only
16  ask Detective Mefford to search his office computer for
17  the missing Crump recording?
18     MR. WRIGHT: Object to form.
19  A  No.
20  Q  So if that – if those are the steps that
21  Detective York took to attempt to locate a recorded
22  conversation of Michael Crump, is it fair to say that he
23  did that on his own volition?
24     MR. WRIGHT: Object to form.
25  A  Yes.

Page 41

1  Q  Looking at the paragraph that's numbered 3,
2  where it says, "Deals, incentives, or any favorable
3  treatment given to prosecution witnesses," according to
4  this document, were there – were you aware, was your
5  office aware of any deals, incentives, or favorable
6  treatment given to prosecution witnesses at the time
7  that you filed this motion?
8  A  Obviously, my annex says that we're aware of
9  none at this time.
10  Q  And if you were aware of any promises of
11  consideration made to witnesses, would you have
12  disclosed such promises to defense counsel in the
13  underlying criminal case?
14  A  Yes.
15  Q  And would you have done that pursuant to your
16  ethical obligations under the Kentucky Supreme Court
17  rules and Brady v. Maryland?
18  A  Yes.
19  Q  Looking at page 4, paragraph 8, do you see
20  where it says "inconsistent statements"?
21  A  Yes.
22  Q  Is it fair to say that, according to this
23  response, that your office disclosed any inconsistent
24  statements of witnesses in the underlying criminal
25  proceeding that your office was aware of?

Page 42

1    A   Yes.
2    Q   Show you some -- exhibit that we'll label
3  number 10. So this is a motion that was filed on behalf
4  of Jonathan Taylor in the underlying criminal
5  proceeding. It's Bates stamped PL24511 through 24540;
6  do you see this, sir?
7        (EXHIBIT 10 MARKED FOR IDENTIFICATION)
8    A   I do. Yes.
9    Q   And from looking at this document, does it
10  purport to be a motion to produce all potentially
11  exculpatory evidence on behalf of Jonathan Taylor?
12   A   That is the heading of the motion. Yes.
13   Q   From looking at this document, when was it
14  filed?
15   A   It was file stamped in the clerk's office
16  July 2, 2013.
17   Q   In the upper right-hand corner, do you
18  recognize that handwriting?
19   A   I think I do. Yes.
20   Q   Is that your handwriting?
21   A   It is not.
22   Q   Whose handwriting do you believe that to be?
23   A   Terry Beckner's.
24   Q   Was that one of the Assistant Commonwealth
25  Attorneys assisting you in the criminal prosecution

Page 43

1  against Amanda Hoskins and Jonathan Taylor?
2    A   It is. Yes.
3    Q   And would you generally agree with me that
4  this motion filed on behalf of Mr. Taylor requests
5  additional exculpatory information in the underlying
6  criminal proceeding?
7        MR. WRIGHT: Object to form.
8    Q   Well, let me -- I'll withdraw the question.
9  What type of information does this motion request of
10  your office, generally?
11   A   Generally, any deals, rewards, incentives,
12  favorable treatment, or agreements not to prosecute any
13  accountable witnesses, time-date stamp photographs,
14  recordings of Mr. Crump's statements or information what
15  happened to the recording, detective's notes from his
16  interview with Mr. Crump, confirmed contents of certain
17  photographs, explanation of notes, signatures on a
18  suspects sketch, full reports, recordings, and notes of
19  the polygraph tests administered by Allen Helton and
20  Jessie Lawson, all recordings and notes of Jesse
21  Lawson's conversation with police, recordings and notes
22  from Detective York's conversations, in quotations,
23  "every drug dealer in Stinking Creek", all recordings
24  and notes of Allen Helton's conversations with the
25  police, recordings and notes of interviews with Wesley

Page 44

1  Roark, juvenile records of Amber Simpson, and I believe
2  that is everything in the request.
3    Q   And if a court ordered you to disclose this
4  information, would you have complied with such an order?
5    A   Yes.
6    Q   Okay. And throughout the criminal prosecution
7  of Amanda Hoskins and Jonathan Taylor, did you and your
8  office comply with the ethical obligations under the
9  Kentucky Supreme Court rule 3.8 and your obligations
10  under Brady vs. Maryland in tendering exculpatory and/or
11  impeachment evidence to defense counsel for Ms. Hoskins
12  and Mr. Taylor?
13   A   Yes, sir.
14   Q   Going to show what we'll mark as Exhibit
15  number 11; is this another motion filed on behalf of
16  Jonathan Taylor and Amanda Hoskins in the underlying
17  criminal case?
18       (EXHIBIT 11 MARKED FOR IDENTIFICATION)
19   A   Yes, sir.
20   Q   And generally, what does this motion request
21  of your office?
22   A   Give me one second.
23   Q   Sure.
24   A   And generally, they're just asking for
25  exculpatory evidence and this is a memorandum in regards

Page 45

1  to officers. But reading this, we'd already had some
2  discussions in court regarding the criminal rules and
3  the officer's notes not discoverable under 7.24. They
4  cite that and the reasons why they should be report.
5  Also, confidential records and I can't -- just from
6  review real quick, I think there was juvenile records
7  and possibly some mental health records that were issues
8  in this that we also argued about in here. Ms.
9  Simpson's juvenile record is one of the issues they're
10  talking about in this.
11   Q   Mr. Steele, is it fair to say that a defense
12  attorney practicing in Knox County would expect that
13  your office would produce all exculpatory evidence in a
14  case in response to a discovery order from the court?
15       MR. WRIGHT: And I'll object to form.
16   Q   You can answer.
17   A   Can you say that again for me?
18   Q   All right. Is it fair to say that, in 2012, a
19  defense attorney practicing in Knox County would expect
20  to receive any exculpatory or impeachment evidence
21  maintained by your office?
22   A   Yes.
23   Q   Are you aware of any instance in which you
24  have withheld exculpatory or impeachment evidence from a
25  defense in a criminal case?

Page 46

1    A  No.
2    Q   Are you aware of any instance where any
3  prosecutor you've supervised has withheld any
4  exculpatory or impeachment evidence from the defense?
5    A  No.
6    Q   Are you aware of any instance where any
7  prosecutor you have ever worked with -- well, I'm going
8  to withdraw that question.  In your own words, can you
9  describe for us your personal practice when it came to
10  disclosing evidence to the defense in a felony or
11  capital murder case while you were at the Knox County
12  Commonwealth Attorney's office?
13    A  Our position then and it is today is that we
14  practice with -- with an open file discovery, in that if
15  we have it, they have it, good, bad, or indifferent, to
16  the point that the offer's always extended to defense
17  attorneys in preparation for trial in a case we know
18  going to trial, they can come to my office and review my
19  file.
20    Q   And aside from reviewing your file, if
21  additional documents are made available to your office,
22  would you take steps to affirmatively supplement the
23  discovery that you tendered in a criminal case?
24    A  Yes.  We --
25      MR. WRIGHT:  Object to form.  Go ahead.

Page 47

1    A  Sorry.  Yes, and we do do supplemental
2  discoveries affirmatively..
3    Q   Let's talk a little bit about the file system
4  in your office; how were the criminal files maintained
5  at the Knox County Commonwealth Attorney's office in
6  2012?
7    A  They are maintained -- since we have two
8  courts, we keep those in two separate filing systems,
9  one for Laurel County and one for Knox County.  At that
10  point in time, they're -- they're filed in numerical
11  sequence.
12    Q   And is there a certain area of your office
13  where those files are kept?
14    A  In 2012, yes, there -- we -- we just recently
15  moved, but in 2012, yeah, we had a file room that housed
16  some of the older files, but some of the ongoing files
17  that were continually in court were maintained in the
18  secretary's office that is responsible for that county.
19    Q   All right.  Do you recall producing documents
20  in this litigation in response to a subpoena?
21    A  In this litigation, the one we're on today?
22    Q   In this civil case, yes.
23    A  Civil case.  Yes, I did.
24    Q   Okay.  And to the best of your knowledge and
25  recollection, did you produce an electronic copy of all

Page 48

1  of the files that were maintained by your office in
2  regards to the criminal prosecution against Amanda
3  Hoskins, Jonathan Taylor, and William Lester for the
4  murder of Katherine Mills?
5    A  To the best of my knowledge, everything we
6  have, you all have.
7    Q   Okay.  Going to hand you what we'll mark as
8  Exhibit 12.  In the electronic files that you gave us,
9  Mr. Steele, this was titled "Case Report 12-CR-70" and
10  the Bates range is PL25395 through 25516.  Mr. Steele,
11  can you describe what the case report consists of and
12  your findings presented in this case?
13      (EXHIBIT 12 MARKED FOR IDENTIFICATION)
14    A  Yeah.  (Coughs.)  Excuse me.  Generally, this
15  is the case report that was prepared by the officer --
16  detective in this matter, Jason York.  It has a front
17  sheet on it, which is a cover system that the state
18  police use.  From there, it goes into the actual
19  reporting system as far as witnesses and what they've
20  done and when they did it.  Any other officers that were
21  involved may include their information in here.  I
22  believe there are some supplementals by other officers
23  in the -- in the case report.
24    Q   Would you expect the case report maintained by
25  your office to include all of the police reports

Page 49

1  tendered to you by the law enforcement agency
2  investigative team?
3    A  It would.  Yes.
4    Q   Having reviewed the document before you, does
5  this seem to be an accurate representation of the
6  reports that law enforcement officers produced to your
7  office relating to the criminal investigation into the
8  death of Katherine Mills?
9      MR. WRIGHT:  Object to form.
10    Q   You can answer.
11    A  Well, obviously this is a several pages
12  document.  It appears to be, but if there's a sheet
13  missing, I wouldn't be able to tell you right off the
14  top of my head, but it appears to be the -- the police
15  report as -- as I know it to be.
16    Q   When you reviewed your case files, did you
17  take steps to ensure that those files were complete and
18  accurate to the best of your recollection?
19    A  In response to your subpoena or just in
20  general?
21    Q   In general.
22    A  Yes.
23    Q   Okay.  And in response to our subpoena, as
24  well?
25    A  Yes.  In the initial phase criminal --

Page 50

1  obviously, I would've made -- there are several safety
2  guards and checks to make sure that everything is turned
3  over to defendants in criminal cases. Not that your
4  subpoena wasn't any more important, but there -- the
5  multiple reviews of it wasn't done like it would've been
6  done in a criminal case.
7      Q   Sure. To the best of your knowledge and
8  recollection, have all the documents retained by your
9  office relating to the criminal investigation into the
10 death of Katherine Mills been turned over?
11     A   As far as my -- as far as I know, yes.
12     Q   I'm going to hand you what we'll mark as
13 Exhibit 13. In the electronic files, this was titled
14 "Discovery Knox 12-CR-070" and the Bates range is
15 PL25239 through 25296. Mr. Steele, if there was a file
16 labeled "Discovery" with that case number, what would
17 you expect to be maintained in that file?
18     (EXHIBIT 13 MARKED FOR IDENTIFICATION)
19     MR. WRIGHT:  Object to form. Go ahead.
20     A   In this file, the way we do discovery is, for
21 our convenience and also for the court, this would've
22 been filed in the court's file also. The top file --
23 the top sheet, anyway, the supplemental discovery
24 request for a civil discovery and it lays out exactly
25 what we were -- what we were turning over.

Page 51

1      Q   Is it fair to say that the electronic file
2  labeled "Discovery" which you now hold in your hand as
3  Exhibit 14 would be a set of --
4      A   Exhibit 13.
5      Q   -- supplemental discovery produced to the
6  defense counsel in the underlying criminal prosecution?
7      MR. WRIGHT:  Object to form.
8      A   Is it Exhibit 13?
9      Q   13. You're right. Yes.
10     A   This would've been turned over to defense
11 counsel, yes.
12     Q   Okay. And does this group exhibit accurately
13 reflect, to the best of your knowledge and recollection,
14 all of the supplemental discovery that your office
15 tendered to the defense during the criminal prosecution
16 against Ms. Hoskins, Mr. Taylor, and Mr. Lester?
17     MR. WRIGHT:  Object to form.
18     A   I honestly don't recall all the supplemental
19 discovery we did in this case. I can tell you that if
20 it's in my file it was made as discovery to -- to
21 defense counsel.
22     Q   Are there situations where you tender evidence
23 to the defense and would not create a supplemental
24 response?
25     A   There are on limited occasions and it's done

Page 52

1  without the supplemental discovery form, and I can't say
2  it was done in this case, but we have tendered something
3  in a courtroom because we got it that day. An officer
4  brought it to us, we'd go ahead and tender it and it's
5  put on the record -- "Judge, for the record, we have
6  tendered this to defense counsel today. It is
7  reciprocal discovery."
8      Q   Do you have any independent recollection of
9  that happening in this case?
10     A   I do not.
11     Q   Is it fair to say that the receipt is a way to
12 keep track of what has been tendered by your office to
13 the defense in a criminal prosecution?
14     A   I would say it's the best way for us to keep
15 up with it. Yes. Unfortunately, we don't always follow
16 that.
17     Q   And in the -- well, generally, between 2002 --
18 '12 -- between 2012 and 2017, is it fair to say that the
19 files maintained in your office for ongoing criminal
20 prosecution was a separate set of files than those
21 maintained at the law enforcement agencies that
22 investigated the case?
23     A   Yes.
24     Q   Okay. And as relates to the criminal
25 prosecution against Amanda Hoskins and Jonathan Taylor,

Page 53

1  is it fair to say that between 2012 and 2017, your
2  office maintained a separate set of files than that of
3  the law enforcement agencies involved in the criminal
4  investigation?
5      A   Yes.
6      Q   Is it fair -- well, the case file that is
7  before you is Exhibit 12 with the various police
8  reports; whose responsibility would it have been during
9  the criminal investigation and prosecution into
10 Katherine Mills' death to provide you with whatever law
11 enforcement reports exist?
12     MR. WRIGHT:  Object to form.
13     MR. WILLIAMS:  Join.
14     A   It would be -- it would be the individual
15 officer's responsibility to provide that to me, most
16 times, and a lot of times the lead detective is the one
17 that tracks them down, but I think each officer has a --
18 has an independent responsibility to make sure that if
19 the -- they have a supplement or if they've done
20 something in the case that it gets to the proper people.
21     Q   During your role as a prosecutor in the
22 criminal prosecution against Amanda Hoskins, Jonathan
23 Taylor, and William Lester, did you expect that the
24 police officers investigating the case would provide you
25 with any documents, notes, recordings, or other evidence

Page 54

1  that they created or obtained during the underlying
2  criminal investigation?
3      MR. WRIGHT: Object to form. Foundation.
4      MR. WILLIAMS: Join.
5      Q  You can answer.
6      A  That is my expectation. Yes.
7      Q  And pursuant to your office filing practice,
8  would you have maintained possession of whatever reports
9  or evidence was tendered to you by law enforcement
10  officials in the file that was maintained internally at
11  the Knox County Commonwealth Attorney's office?
12      A  I didn't understand your question. I didn't
13  hear a question there, I guess.
14      Q  No. Any of the documents or evidence
15  submitted to your office by law enforcement officials --
16      A  Uh-huh.
17      Q  -- in this case, would you have maintained
18  those documents and that evidence as part of your file?
19      A  Yes.
20      Q  Is it fair to say that anything that might
21  become evidence that was tendered to you by law
22  enforcement officers would go into the file, with the
23  exception of things that couldn't actually physically
24  fit inside of it?
25      A  That is correct.

Page 55

1      MR. WRIGHT: Object to form.
2      Q  Once the information or documents were placed
3  into your office's file, other than by use of other
4  prosecutors, is there any reason that you can think of
5  why it would've been removed or destroyed?
6      MR. WRIGHT: Object to form.
7      A  While in my office, can I think of any reason?
8  No. It would not be removed.
9      Q  And was there a retention policy for -- was
10  there any sort of retention policy for files at your
11  office between 2012 and 2017?
12      A  There is.
13      Q  What was that policy?
14      A  Any active cases, no matter what, would remain
15  in the office. Inactive cases would remain in the
16  office two, sometimes three years before they would be
17  sent to the state archives.
18      Q  In this case, are you aware of any files being
19  removed or destroyed prior to responding to the subpoena
20  that was issued?
21      A  No.
22      Q  All right. I want to talk to you generally
23  about the investigative activities of Knox County
24  prosecutors, okay?
25      A  Okay.

Page 56

1      Q  And I want to be completely clear by what I
2  mean by "investigation"; I am talking about prosecutors
3  leaving the prosecutorial role, going out on the street,
4  and investigating crimes, okay?
5      A  Okay.
6      Q  During the pendency of the criminal charges
7  against plaintiffs from 2012 to 2017, were prosecutors
8  at the Knox County Commonwealth Attorney's office known
9  to investigate crimes independently of the police agency
10  who brought the crimes to the prosecutor's office?
11      A  No.
12      Q  Did you ever investigate Katherine Mills'
13  homicide independent of the Kentucky State Police, Knox
14  County Sheriff's Department, or Barbourville Police
15  Department?
16      A  No.
17      MR. WILLIAMS: Object to the form.
18      MR. FARAH: Objection to the form.
19      MR. WRIGHT: Join.
20      THE WITNESS: Sorry.
21  BY MR. SLOSAR:
22      Q  Has that, to your knowledge, always been the
23  practice of the Knox County Commonwealth Attorney's
24  office to not investigate crimes independently of the
25  law enforcement agencies?

Page 57

1      A  Yes.
2      Q  While you were employed -- you're still
3  employed -- while you have still been employed at the
4  Knox County Commonwealth Attorney's office, have you
5  ever known Knox County prosecutors to independently
6  investigate crimes?
7      A  No.
8      Q  Did you ever assign any prosecutor to
9  independently investigate crimes?
10      A  No.
11      Q  Is it fair to say that the Knox County
12  Commonwealth Attorney's office relies upon the
13  information that police agencies bring to you about
14  criminal cases?
15      MR. WRIGHT: Object to form.
16      MR. Williams: Join.
17      A  Solely rely, do -- or just rely upon?
18      Q  Well, let me withdraw the question. I'll ask
19  it a better way. Does the Knox County Commonwealth
20  Attorney's office rely upon information brought to your
21  office by law enforcement agencies?
22      A  Yes.
23      Q  Is it fair to say that your office typically
24  relies on information from law enforcement agencies
25  about criminal cases?

Page 58

1    A   Yes.
2    Q   Other than -- let me withdraw that.  Is it
3  fair to say that the Knox County Commonwealth Attorney's
4  office relies upon the information provided by law
5  enforcement agencies to be complete and accurate?
6    A   Yes.
7    Q   Is it fair to say that the prosecution of
8  Amanda Hoskins was based on evidence brought to your
9  office by law enforcement officials?
10    A   Yes.
11        MR. WRIGHT:  Object to form.
12    Q   Is it fair to say that the prosecution of
13  William Lester was based upon evidence brought to your
14  office by law enforcement officials?
15        MR. WRIGHT:  Object to form.
16    A   Yes.
17    Q   Is it fair to say that the prosecution of
18  Jonathan Taylor was based on evidence brought to your
19  office by law enforcement officials?
20        MR. WRIGHT:  Object to form.
21    A   Yes.
22    Q   Is it fair to say that your prosecution as a
23  Knox County Commonwealth Attorney regarding the
24  Katherine Mills homicide was based on evidence developed
25  by local law enforcement agencies and not by the Knox

Page 59

1  County Commonwealth Attorney's office?
2        MR. WRIGHT:  Object to form.
3        MR. WILLIAMS:  Objection.
4    Q   You can answer.
5    A   Yes.
6    Q   Is it fair to say that your prosecution as the
7  Knox County Commonwealth Attorney regarding the
8  Katherine Mills homicide was based on evidence developed
9  by the Kentucky State Police, Knox County Sheriff's
10  Department, and Barbourville Police Department, and not
11  by an independent investigation by the Knox County
12  Commonwealth Attorney's office?
13        MR. WRIGHT:  Object to form.
14        MR. KELLEY:  Object to form.
15        MR. FARAH:  Object to form.
16  BY MR. SLOSAR:
17    Q   You can answer.
18    A   I don't know which agencies you would say
19  developed evidence or investigated.  I will say that
20  none of it was developed or acquired by my office.
21    Q   For instance, the criminal complaint that you
22  reviewed earlier today was prepared by Detective York of
23  the Kentucky State Police; is that right?
24        MR. WRIGHT:  Object to form.  Foundation.
25    A   Yes.

Page 60

1    Q   The three criminal complaints and arrest
2  warrants that were issued all on March 14, 2012 against
3  Amanda Hoskins, Jonathan Taylor, and William Lester, is
4  it your recollection that each of those were initiated
5  by Detective Jason York of the Kentucky State Police?
6        MR. WRIGHT:  Object to form.  Foundation.
7    A   Detective York signed all of the arrest
8  warrants and presented them to the court.  Yes.
9    Q   And is it fair to say that your office did not
10  have any role in filling out the arrest warrant and
11  criminal complaint against Amanda Hoskins and Jonathan
12  Taylor in March of 2012?
13    A   That --
14        MR. WRIGHT:  Object to form.  Foundation.
15    A   -- that is correct.
16    Q   In this case, who made the decision on whether
17  to charge Mr. Taylor with capital murder?
18        MR. WRIGHT:  Object to form.  Foundation.
19    A   I would've made that decision.
20    Q   And was that -- would that have been based
21  upon the case file presented to you from law enforcement
22  agencies?
23    A   At --
24        MR. WRIGHT:  Object to form.
25        MR. WILLIAMS:  Object to the form.

Page 61

1    A   -- at the time I made the -- yes, at the time
2  I made the filing.
3    Q   And at the time that you made the filing
4  charging Jonathan Taylor with capital murder, was it
5  your expectation that the reports and statements
6  obtained in the case file were truthful and accurate?
7        MR. WRIGHT:  Object to form.  Foundation.
8    A   Can you rephrase that question for me?
9    Q   Sure.
10    A   Because --
11    Q   So at the time that you charged or proceeded
12  forward with the charges against Jonathan Taylor for
13  capital murder, was it your expectation and
14  understanding that the case file presented to you, which
15  included written statements, audio recorded statements,
16  that the evidence presented to you was true?
17    A   Yes.
18        MR. WRIGHT:  Object to -- same objection.
19    Q   Aside from -- well, let me ask you this
20  question:  Is it -- do the arrest warrant and criminal
21  complaints as indicated in Exhibit number 1, does this
22  usually include the factual predicate for the underlying
23  charges?
24    A   I don't know.  The -- the county attorneys in
25  both our respective counties handle those.  I may -- I

Page 62

1  – I've seen more today than I've probably seen in the
2  last year.
3      Q   Okay.  Is it fair to say that in Exhibit
4  number 1 that the information listed in the criminal
5  complaint is minimal?
6      MR. WRIGHT:  Object to form.
7      MR. WILLIAMS:  Join.
8      A   I can't say that's minimal.  I don't know what
9  is typically included in those.
10     Q   Have you ever seen a criminal complaint that
11  actually names the witnesses or the exact evidence that
12  implicates the person being charged with a crime?
13     A   In state court I cannot say that I have.  No.
14     Q   In another court have you?
15     A   Federal court I have seen them, which they go
16  into great detail.
17     Q   In 2012, would the Knox County Commonwealth
18  Attorney's office have any written or unwritten policy
19  about the promises – promising incentives to witnesses
20  who might testify in a criminal case?
21     A   Could you say that again; in the Commonwealth
22  Attorney's office?
23     Q   Yeah.  So in 2012, did the Knox County
24  Commonwealth Attorney's office have any policies, be it
25  written or unwritten, about promising incentives to

Page 63

1  witnesses who might testify in a criminal case?
2      A   Our office, yes.  We don't make promises to
3  anybody, any witnesses, in my office.  No.
4      Q   So – and by "promises," I just want to make
5  sure we're talking about the same thing here.
6      A   Okay.
7      Q   If your office was to – have you ever reached
8  an agreement with an individual to plead guilty to a
9  crime in exchange for testimony against another
10  individual?
11     A   Yes.
12     Q   Okay.  In an instance like that, does your
13  office have any policy requiring the disclosure of the
14  consideration promise to the individual who pled guilty
15  in exchange for testifying?
16     A   Sure.  Those are included in the
17  Commonwealth's offers on pleas of guilty, then there's a
18  motion or a guilty plea, then there's a judgment or an
19  order.  All it is in the public record, but even in
20  those type cases, we will make sure the defense
21  attorney, who's probably sitting right there and watches
22  the plea, is aware and has a copy of – of the
23  Commonwealth's offer.
24     Q   So between 2012 and 2017, would it have been
25  your practice – your personal practice to disclose any

Page 64

1  such offers of consideration to a witness in a pending
2  criminal case?
3      A   Yes.
4      Q   And same question, but about your office
5  policy, not your personal –
6      A   Okay.
7      Q   – practice or policy:  Between 2012 and 2017,
8  would it have been the office policy of the Knox County
9  Commonwealth Attorney to disclose any promises of
10  consideration made to a witness in a pending criminal
11  case?
12     A   If we would have made such a promise, yes.
13     Q   Sure.  Can you think of any circumstance where
14  a prosecutor from your office would have made such a
15  promise to a witness and not disclose such evidence to a
16  defendant in a pending criminal case?
17     A   No.
18     Q   To your knowledge, has the Knox County
19  Commonwealth Attorney's office ever paid money to any
20  witness to testify in a criminal case?
21     A   Personally, no.  Obviously there are
22  reimbursements that – that our office is required to
23  assist.  I mean, I'm just making sure we're clear.
24     Q   For, like, expenses or subpoenas –
25     A   Expenses and travel.  We – we will – we

Page 65

1  assist in those and prepare orders, so just for
2  clarification, we have not made any personal
3  expenditures from my office or personally to any
4  witness.  No.
5      Q   Yeah.  The example that I'll give you is, you
6  know, we have got a case somewhere where a witness was
7  promised a monetary, you know – a sum of money, a lump
8  of money in exchange for testifying; are you –
9      A   No.
10     Q   – aware of that ever happening in your
11  office?
12     A   No.
13     Q   Okay.  Are you aware of, in this case, any
14  Knox County Commonwealth Attorney making a promise of
15  consideration to a witness in exchange for a statement
16  against Ms. Hoskins, Mr. Taylor, or Mr. Lester?
17     A   I made an offer to Mr. Lester through his
18  attorney, Mr. Hoskins, in regards to a statement in
19  contemplation of a plea agreement.
20     Q   And what was your offer, as best you can
21  recall, to Mr. Lester?
22     A   I cannot recall.  I – I'm – I can tell you
23  one reason I don't recall.  It was a very short, quick
24  conversation because Mr. Hoskins said he's not – best
25  of my knowledge, wasn't going to entertain any type of

Page 66

1 felony plea, so it wasn't – we didn't get much farther
2 than that.
3    Q   Okay.  In terms of non-defendants, but
4 witnesses, do you have any recollection of promising
5 consideration to any witness involved in the criminal
6 investigation or prosecution of Ms. Hoskins and Mr.
7 Taylor?
8    A   No.
9    Q   Have yourself or any other prosecutor, to your
10 knowledge, made any promises to assist a witness with
11 bond conditions in exchange for a statement or testimony
12 in the underlying criminal investigation and prosecution
13 of Amanda Hoskins and Jonathan Taylor?
14    A   Has – have myself or my office made –
15    Q   Yes.
16    A   No.
17    Q   Do you recall when you were first brought the
18 criminal prosecution file relating to Amanda Hoskins and
19 Jonathan Taylor?
20    A   I do not, as far as the day.  No, I do not.
21    Q   Do you recall what year you got involved in
22 the prosecution?
23    A   It would've been in 2012.
24    Q   At the time that you first became involved in
25 the criminal prosecution against Amanda Hoskins and

Page 67

1 Jonathan Taylor, did you expect that law enforcement
2 officers would provide your office with any statements
3 or evidence obtained from witnesses in the underlying
4 criminal investigation?
5    A   Yes.
6    Q   Did you independently investigate the
7 Katherine Mills homicide independent of what the law
8 enforcement agencies provided to you?
9       MR. WRIGHT:  Object to form.
10       MR. WILLIAMS:  Object to form.
11    Q   You can answer.
12    A   Can you rephrase the question for me?
13    Q   Sure.  Between 2012 and 2017, did you
14 independently investigate the Katherine Mills homicide
15 independent of law enforcement agencies?
16       MR. WRIGHT:  Object to form.
17    A   I know this – not trying to be petty, but
18 what – when you're saying "investigate" can you – can
19 you tell me what you mean by "investigate"?
20    Q   Sure.  Did you go talk to witnesses without
21 police officers present?
22    A   Yes.
23    Q   What witnesses did you speak with without law
24 enforcement officers present?
25    A   I specifically remember talking to Joe King

Page 68

1 outside of law enforcement presence.
2    Q   Did you talk to Joe King at the county jail?
3    A   I did.  We were in a parking lot at the Laurel
4 County Detention Center.
5    Q   How did you discover that Mr. King was at the
6 Laurel County Detention Center?
7    A   Obviously, he'd given a statement that was
8 included in the case file regarding Mr. Lester and
9 Amanda.  We were trying to get in touch with him,
10 couldn't find him.  Well, one of the problems is he had
11 an address in Tennessee.  We knew he frequented Bell
12 County and Pineville, but nobody'd seen him in a while.
13 Come to find he was on federal parole, I believe it was
14 – probation or parole, and the – their federal
15 probation and parole officer helped us come make contact
16 with him.  Help – my first recollection of talking to
17 Mr. King was on the telephone and I just told him who I
18 was and I wanted to talk to him and to get some things
19 straightened out and ironed out.  And then he told me
20 that he was coming to visit, I believe, a family member
21 – his dad, if I'm not mistaken, who was in the Laurel
22 County Detention Center that Sunday, so I – I was
23 there on Sunday afternoon to meet him.
24    Q   When you said, "We were having trouble getting
25 ahold of him," who's the "we" that you're referring to?

Page 69

1    A   That would've been myself, law enforcement
2 officers who had to subpoena.  Typically, law – the
3 Knox County Sheriff's Department in this case would be
4 given the subpoenas to issue.  They couldn't – they
5 were having a hard time locating him.  Bell County
6 wasn't of any assistance, in my recollection, because he
7 had a – a Bell County address at one point in
8 time.  Nobody could – could find him and – and locate
9 him, so our next step would be to call the Kentucky
10 State Police to see if they could assist us in locating
11 him, and I'm not sure how we found out he was on federal
12 probation and parole.
13    Q   Was Detective York one of the officers
14 assisting in the finding of Joe King?
15    A   I honestly can't speak to that.  I don't know.
16    Q   How long did your conversation  with Mr. King
17 last at the Laurel County Detention Center?
18    A   I don't recall.  I really don't.
19    Q   Fair to say, it's been a long time?
20    A   It has been a long time.  Yes.
21    Q   Do you recall the statements that you made to
22 Mr. King during that conversation?
23    A   I do remember the general context of our
24 conversation.  I mean, I can remember the – it was a
25 nice day.  It was sunny.  It wasn't like we were running

Page 70

1  trying to race to get out. We actually stood in the
2  parking lot and you, know, had a pleasant conversation
3  and – and the fact that, you know, he wasn't upset and
4  – or short with me and he answered all my questions. I
5  – I served him a subpoena that day because of we had a
6  trial date coming up, so I made sure he was served. The
7  context of the conversation was I went through his
8  statement with him and at the end of his – end of his
9  statement, he basically just said he – he just didn't
10  remember any of that. Of course, I'm sure I asked him a
11  couple different ways and he – "Man, I just – I don't
12  remember any of that." And it wasn't that he didn't
13  remember the – the conversation with York. He was just
14  saying he didn't remember anything in the conversations
15  with Amanda and William up there.
16     Q  So is that fair to say that Mr. King told you
17  that the statement that was attributed to him in the
18  police report, that that wasn't truthful?
19     MR. WRIGHT:  Object to form.
20     MR. WILLIAMS:  Join.
21     A  He never told me it wasn't truthful.
22     Q  Well, let me ask you a different way. You're
23  saying Joe – Mr. King represented to you that he didn't
24  recall any of the stuff listed in Detective York's
25  report, actually included, right?

Page 71

1     MR. WRIGHT:  Object to form.
2     MR. WILLIAMS:  Join.
3     A  He didn't remember anything, the – the –
4  talking to Detective York or talking about this or
5  anything. He didn't remember anything at the Pineville
6  Walgreens, I believe, was where his conversation with
7  Amanda and William took place. He just said he didn't
8  remember anything, and that's – he just – every time I
9  remember asking him a question, it was, "I don't
10  remember. I don't remember."
11     Q  Did he tell you that he was going to testify
12  to that effect at trial?
13     A  He told me he just couldn't remember is what
14  he'd tell – tell the jury.
15     Q  How come you wanted to subpoena him for a
16  trial still?
17     A  I served him a subpoena because at that point
18  in time I needed to – time to digest it and look at Mr.
19  King's statement again, see if there was any independent
20  verification that I could use in regards to this
21  statement that – one of these I do remember was that
22  Amanda's statement kind of verified what he said about
23  this Walgreens meeting in – I'm going to say Walgreens
24  Pineville. They met in Pineville somewhere. So I – I
25  did – I'd already served him a subpoena. I just wanted

Page 72

1  him to be there. Many times witnesses, when they don't
2  want to testify until they get there and they're like,
3  "Man, just – fine. I'll – I'll – I'll testify just
4  to get this thing over with." So I did have him
5  subpoenaed to be there at trial.
6     Q  Did you ever talk to Joe King again after that
7  day?
8     A  If I – if I – I don't have any recollection
9  of speaking to him again. I – I may have, but I don't
10  – I just don't remember.
11     Q  Showing you what we'll mark as Exhibit 14, the
12  motion to dismiss that you filed against Amanda Hoskins,
13  July 29, 2016; do you recognize the document, sir?
14     (EXHIBIT 14 MARKED FOR IDENTIFICATION)
15     A  I do.
16     Q  What is this document?
17     A  This is the Commonwealth's motion to dismiss
18  in regards to Amanda Hoskins and William Lester that was
19  filed by myself.
20     Q  Did you draft this document?
21     A  I did.
22     Q  Looking on the second page, paragraph 5.
23     A  Uh-huh. Yes, sir.
24     Q  Is it fair to say that the first three to four
25  sentences of that paragraph are basically a summary of

Page 73

1  the case report that was provided to you from Detective
2  York?
3     MR. WRIGHT:  Object to form.
4     Q  All right. Sir, can you also take that
5  Exhibit 12. I'm going to point you to page number at
6  the bottom, 25418.
7     A  25418?
8     Q  Yeah.
9     A  Okay.
10     Q  Okay. All right. Is this a police report
11  that was provided to you during the criminal prosecution
12  against Amanda Hoskins and Jonathan Taylor?
13     A  Yes.
14     Q  And sitting here today, is this the only
15  report that you're aware of that exists relating to any
16  statements from Joe King in the criminal prosecution
17  relating to the death of Katherine Mills?
18     A  Yes.
19     Q  Okay. Now, having looked at Exhibit 12, this
20  case report, –
21     A  Uh-huh.
22     Q  – is it fair to say that the first three
23  sentences of paragraph 5 of the motion to dismiss is a
24  summary of the narrative that was drafted by Detective
25  York on June 27, 2011?

Page 74

1        MR. WRIGHT:  Object to form.
2        Q    I'm sorry?
3        MR. WRIGHT:  I said, "Object to form."
4        It -- it -- it appears that the first -- I'm
5  trying to count -- the first three sentences are, in a
6  very concise statement, a brief summary of Mr. King's
7  statement to law enforcement.  Yes.
8        Q    Were you with Detective York on June 24, 2011
9  when he originally interviewed Joe King and subsequently
10  created this report?
11       A    No, I was not.
12       Q    Okay.  Looking at the fourth sentence, do you
13  see where it says, "Joe King has since changed his story
14  in that he never heard anyone talking about robbing an
15  elderly lady and that he did not see or know of Amanda
16  spending money"?
17       A    I do.
18       Q    Is that information that you learned from Joe
19  King?
20       A    It is.
21       Q    Is that information that he personally told
22  you?
23       A    It was.
24       Q    Is that information that he told you when you
25  met with him at the Laurel County Detention Center?

Page 75

1        A    It is.
2        Q    Is it fair to say that in your summary of the
3  conversation you had with Joe King that's contained in
4  this motion to dismiss, that it does not say anywhere in
5  here that Joe King forgot or doesn't remember?
6        A    It does not.
7        Q    Okay.  And in fact, your -- the summary in --
8  contained in your motion to dismiss says that Joe King
9  affirmatively denied to you the statements contained in
10  this paragraph; is that right?
11       MR. WRIGHT:  Object to form.
12       A    I think -- I think the sentence speaks for
13  itself and that it -- he's changed his story.  I don't
14  -- I -- I think it speaks for itself, yes.
15       Q    All right.  Let's go back to some questions.
16       A    Thank you.
17       Q    Would it be fair to say that with respect to
18  Amanda Hoskins and Jonathan Taylor, you relied on
19  information that law enforcement officers brought to you
20  to prosecute the case?
21       MR. WRIGHT:  Object to the form.
22       MR. WILLIAMS:  Join.
23       A    Yes.
24       Q    And would it be fair to say that during the
25  time you were a prosecutor at the Knox County

Page 76

1  Commonwealth Attorney's office, you only prosecuted
2  criminal cases where probable cause was present?
3        A    Yes.
4        Q    If at any time during the prosecution of a
5  criminal case you learned facts which negated probable
6  cause, would you have taken steps to immediately stop
7  the prosecution?
8        MR. WRIGHT:  Object to form.
9        A    Yes.
10       Q    Could you have reviewed the criminal complaint
11  at some point during your prosecution of Ms. Hoskins and
12  Mr. Taylor?
13       A    No.
14       Q    We saw earlier today that there wasn't really
15  any information contained in the criminal complaint to
16  review; is that right?
17       MR. WRIGHT:  Object to form.
18       MR. WILLIAMS:  Object to the form.
19       A    Again, I -- I don't deal with those.
20  Obviously, that's an issue for the court to decide.
21  There must have been enough information for the judge to
22  sign it for an arrest warrant, but...
23       Q    Did you rely upon evidence generated by law
24  enforcement officers and testimony from those officers
25  to the Grand Jury to begin your prosecution against

Page 77

1  Amanda Hoskins and Jonathan Taylor in the death of
2  Katherine Mills?
3        MR. WRIGHT:  Object to form.
4        MR. WILLIAMS:  Object to the form.
5        Q    You can answer.
6        A    Yes.
7        Q    Aside from Joe King, do you recall meeting
8  with any other witnesses during the criminal prosecution
9  against Ms. Hoskins and Mr. Taylor?
10       A    Yes.
11       Q    Who else?
12       A    Christy Branson.  Well, I would've spoke to
13  her without law enforcement.
14       Q    Can you give an estimate of when,
15  approximately, you met with Joe King?
16       A    No, but I -- I can't as I sit here today, but
17  if you look through the court records, the first time he
18  would've been subpoenaed would've been by me and he
19  would've -- he would've been -- it would've been before
20  that subpoena was issued.  That would be the best I can
21  provide.  I really don't know.
22       Q    As best you can recall, when did you meet with
23  Ms. Branson?
24       A    I -- honestly, I -- this -- this case seemed
25  like drug on forever, and it would've been before a --

Page 78

1 if I'm not mistaken, she was in court for something and
2 I – I spoke to her in a witness room in the back of the
3 Knox County Courthouse, but it'd been after I'd been
4 notified that she had had a vehicle accident, I believe,
5 or some type of head trauma and was claiming she didn't
6 remember anything, and – and I was – I remember
7 speaking to her attorney first to – to her civil
8 attorney at the time and verified because it'd been –
9 she'd had a lawsuit and Sam Castle was – I had talked
10 to Sam Castle – Sam Castle, who did confirm with me she
11 had been in a wreck. So then I went to speak to her
12 just to see what her competency level would be or what
13 she'd be willing – what she could remember.
14     Q   When you spoke to Ms. Branson, what do you
15 recall her saying?
16     A   I remember her just being real fidgety and
17 talking a – a mile a minute, but in essence is that she
18 – you know, she just can't remember anything. She'd
19 been in a – can't – I can't remember if it was a car
20 wreck or motorcycle wreck or something, but she'd had
21 head injury and she just couldn't remember anything.
22     Q   Did Ms. Branson tell you in that conversation
23 that she didn't recall Ms. Hoskins making any statements
24 to her in the county jail?
25     A   Yeah.  Yes, she said she didn't recall

Page 79

1 anything.  I mean, she didn't recall anything during
2 that period of time.
3     Q   Well, did you ask her – did you ask Ms.
4 Branson in that conversation if Amanda Hoskins made any
5 statements to her while they were incarcerated together?
6     A   I don't specifically remember that question. I
7 do remember the general framework of the question was
8 her remember to give me a statement to law enforcement,
9 her remember the contents of that statement, and her
10 remembering anything regarding the murder of Katherine
11 Mills, and she just repeat – kept saying, "I can't
12 remember anything.  I don't remember any of that."
13     Q   I'm going to – aside from Christy Branson and
14 Joe King, did you meet with any other witnesses during
15 the criminal prosecution of –
16     A   Personally meet with, no. I did have
17 conversations with Daniel Wilson and Robert Beach.  I'm
18 trying to think if there was somebody else.  I can't
19 remember if I talked to Mr. Crump or not.  I want to
20 think I did have a phone conversation with Mr. Crump at
21 some point in time.
22     Q   Do you remember the contents of that
23 conversation?
24     A   Knew that he was not coming back to testify.
25     Q   Anything subsequently about the case?

Page 80

1     A   No.
2     Q   With Daniel Wilson and Robert Beach, did you
3 speak with them over the phone or in person?
4     A   Been over the phone.
5     Q   Do you recall, sitting here today, when you
6 spoke to Daniel Wilson over the phone?
7     A   Daniel Wilson, if I'm not mistaken, was being
8 held in Campbell County, Kentucky, northern Kentucky,
9 somewhere in there.  Campbell – Campbell or Kenton, but
10 he was – he would've been the last person I spoke to
11 right before I filed my motion to dismiss the...
12     Q   So would that have been close in time to
13 the –
14     A   It –
15     Q   – moment when you filed the motion to
16 dismiss in June of 2016 for Mr. Taylor and in July of
17 2016 for Ms. Hoskins?
18     A   It would've been before the June –
19     Q   Sure.
20     A   You kind of threw me – I –
21     Q   Yeah.
22     A   – I don't – did I file them on the same day?
23 I honestly don't remember.
24     Q   No.  So they were filed apart.  Let me
25 withdraw the question.  I'll ask it a better way.

Page 81

1     A   Okay.
2     Q   Would you have spoken to Daniel Wilson close
3 in time to the first motion to dismiss you filed in June
4 of 2016?
5     A   Yes.  It would've been in – I would put it a
6 couple to a few days at the most.
7     Q   And in the conversation that you had with
8 Daniel Smith, what do you recall him telling you?
9         MR. WILLIAMS:  Daniel Wilson.
10     Q   I'm sorry.  Let me withdraw the question.
11 You're right.  In the conversation – it'll be a rare
12 thing where we're on the same page.  In the conversation
13 that you had with Daniel Wilson close in time to June of
14 2016, what do you recall Mr. Wilson telling you?
15     A   I'm – I'm going to look at my motion to –
16 motion to dismiss –
17     Q   Sure.
18     A   – which is – think we've marked as Exhibit
19 number 14, and under paragraph number 1, I actually put
20 on there the date that I spoke to him, on June 23, 2016
21 in preparation for trial, and I state that he – and I
22 contacted him at the Campbell County jail and it – Mr.
23 Wilson had changed his story.  He did not remember Mr.
24 Taylor making any statements about the death of an
25 elderly lady where he mentioned his cousin, Amanda

Page 82

1 Hoskins, in a robbery. I asked about his previous
2 statements and he restated that he didn't know anything
3 about those statements, did not remember making them.
4     Q   Do you recall anything independently about the
5 conversation you had with him, other than what's written
6 in your motion?
7     A   No. I mean, obviously I read that in about
8 ten seconds, but it was – we were on the phone for a
9 few minutes, but it was a – and he just didn't remember
10 anything about his conversation with the officer in this
11 case.
12     Q   Did you ask Daniel Wilson about any of his
13 interactions with Detective York?
14     A   I did ask him about his previous statement to
15 Detective York, and I believe it's reflected in here
16 that he did not remember making any of it. Other than
17 that, no, I don't remember him making any other
18 statements.
19     Q   And Robert Beach – what do you recall about
20 your interaction with Mr. Beach?
21     A   In general, or just my independent talking to
22 him – talking on the phone?
23     Q   Your independent.
24     A   Independently on the phone, again, it was just
25 much like Mr. Wilson. He was an inmate in Indiana.

Page 83

1 There was a – there is an out-of-state process we had
2 to go through to get him before the court. If I'm not
3 mistaken, we were calling to verify that he was still in
4 the same prison or trying to figure out where he was at.
5 He had been transported a couple times already, if I'm
6 not mistaken, to court. I was – I don't remember
7 making him – talking to him at all in court. If I did,
8 it would just be to say, "Sorry. It's been continued
9 again. We'll bring you back the next time." Nothing of
10 any substance. The phone conversation I remember having
11 with him was telling him that I think we were finally
12 going to get this thing over with and that I hoped this
13 would be the last time we have to transport him and
14 bring him back and forth, because it was a – a rather
15 lengthy drive and at that – that point in time I
16 believe is when he told me.
17     Q   It's paragraph 2.
18     A   Yeah, paragraph 2. I go into what he – what
19 he tells me at that point in time.
20     Q   Aside from the phone conversation you had with
21 Robert Beach in June of 2016, do you have any
22 recollection of any other conversations that you had
23 with him?
24     A   Again, I – I don't have any recollection of
25 anything of substance to the case, other than just,

Page 84

1 like, scheduling when he was in court and didn't have to
2 be there because of transporters had already been in.
3     Q   Do you have any independent recollection of
4 ever meeting with Robert Beach in person?
5     A   Yes.
6     Q   When – what do you recall about meeting with
7 Mr. Beach in person?
8     A   Myself, Detective York, and I believe he was a
9 detective at the time – Brian Johnson, left here,
10 London. I want to say they picked me up in the London
11 office and we drove to the Indiana penitentiary or
12 prison system he's being housed in. Came in and they
13 had – I can't remember if somebody called ahead and
14 told them we were coming, but they gave us an area to
15 which we could speak to Mr. Beach about any information
16 we had in regards to this case.
17     Q   And how long were you all in that prison with
18 Mr. Beach?
19     A   I – I wouldn't guess no more than – and
20 again, I'm – I'm guessing, but the prison record would
21 show when we checked in and when we checked out, but I
22 would – I – I can't imagine it's more than 30, 45
23 minutes.
24     Q   How big was the room?
25     A   Maybe 15 by 15. It was a – it was an office

Page 85

1 area. There was an office desk in there and – and
2 chairs to sit around the office desk.
3     Q   Was Mr. Beach handcuffed?
4     A   I don't recall.
5     Q   Did Detective Johnson or Detective York have a
6 recorder with them during the interview?
7     A   Yeah, somebody did, because it was recorded,
8 but I don't – I'm not sure who – who brought that.
9     Q   Is it your – do you have any recollection of
10 whether the entire meeting was recorded or whether it
11 was just a statement that was recorded to him – from
12 him at the end of the meeting?
13     A   It was just a statement that recorded. The
14 entire meeting was not recorded.
15     Q   Do you recall ever leaving the room at any
16 point during the meeting with Mr. Beach?
17     A   No, I did not. I – I did not leave the room.
18 I was in the room the entire time, best of my relection
19 – best of my recollection.
20     Q   Who took the lead in questioning Mr. Beach?
21     A   I don't know that I would say "lead" in
22 regards to – I don't know if I'd call it a lead. I
23 think me and – me and Detective York just talked to
24 him. It was a – just same as you'd throw three people
25 in a room. We were just having a conversation to begin

Page 86

1  with. I don't remember Detective Johnson ever – of
2  course, he didn't know anything about the case other
3  than that he was a new detective and I think he got
4  thrown into driving us and – and possibly just see how
5  this – these things are done, but I don't remember – I
6  don't remember him asking any questions about the case,
7  because his knowledge of it would've been very limited.
8      Q   Do you know whether Detective York spoke to
9  Mr. Beach prior to the meeting that you all had with him
10  at that prison?
11     A   I do not know.
12     Q   Did Detective York ever tell you whether he
13  had any telephone conversations with Mr. Beach prior to
14  you joining in that prison visit?
15     A   Not that I can recall. No.
16     Q   Did Detective York ever tell you whether he
17  made any promises to Mr. Beach prior to you meeting with
18  him in that prison visit?
19     A   No.
20     Q   All right. Aside from the four witnesses that
21  you just testified to interacting with personally, Joe
22  King, Christy Branson, Daniel Wilson, Robert Beach, do
23  you have any independent recollection of speaking to any
24  other witness involved in the criminal prosecution?
25     A   I think you said four, but I believe I

Page 87

1  identified five.
2      Q   Oh, you're right. And –
3      A   Mr. Crump.
4      Q   – a phone call with Mr. Crump that was mainly
5  about scheduling, correct?
6      A   Other than those five, I do not have any
7  independent recollection as I sit here today of any
8  conversation.
9      Q   Is it fair to say that most of your
10  interactions with these witnesses were towards the end
11  of the prosecution?
12     A   I think it's fair to say that it was after the
13  initiation of the indictment. Danny Wilson and Robert
14  Beach was obviously at the end – end – end of the
15  prosecution. I – I can't recall on Christy Branson,
16  Joe King, and Michael Crump. I'm not – honestly can't
17  remember.
18     Q   Okay. All right. A few questions that I have
19  to ask and then we're going to start getting into some
20  specifics.
21     MR. WRIGHT: Can we take a break, Elliot?
22     MR. SLOSAR: Yeah. Let me just get through
23     these few first.
24     MR. WILLIAMS: It's been two hours.
25  BY MR. SLOSAR:

Page 88

1      Q   Sure. Just give me a minute. Did you make
2  any promises to witnesses in the underlying criminal
3  prosecution against Jonathan Taylor and Amanda Hoskins?
4      A   No.
5      Q   Did you offer any money to witnesses in the
6  underlying criminal prosecution against Amanda Hoskins
7  and Jonathan Taylor?
8      A   No.
9      Q   Did you coerce any witnesses in the underlying
10  prosecution against Amanda Hoskins and Jonathan Taylor?
11     A   No.
12     Q   Did you assist in fabricating any statements
13  from witnesses in the underlying criminal prosecution
14  against Amanda Hoskins and Jonathan Taylor?
15     A   No.
16     MR. SLOSAR: Okay. Let's take a break.
17         (OFF THE RECORD)
18  BY MR. SLOSAR:
19     Q   All right. Mr. Steele, I think these are some
20  of the easy questions for you. I'm going to show you
21  some more exhibits, okay?
22     A   It's about time. Okay.
23     Q   In Ms. Hoskins' and Mr. Taylor's criminal
24  case, were you aware of any efforts by police officers
25  to coerce witnesses into giving false statements against

Page 89

1  Mr. – Ms. Hoskins or Mr. Taylor?
2      A   No.
3      Q   In Ms. Hoskins' and Mr. Taylor's criminal
4  case, were you aware of any efforts by police officers
5  to threaten witnesses into giving false statements
6  against Ms. Hoskins or Mr. Taylor?
7      A   No.
8      Q   If you had been aware of any efforts by police
9  officers to threaten witnesses into giving false
10  statements against Ms. Hoskins and Mr. Taylor, would you
11  have disclosed that information to the defense?
12     A   Yes.
13     Q   Would you have taken other actions with
14  respect to the police officers if you had learned that
15  type of conduct was taking place?
16     A   Yes.
17     Q   That is not conduct that you would have
18  tolerated, correct?
19     A   That is correct.
20     Q   That is not conduct that you would've approved
21  of, correct?
22     A   Correct.
23     Q   In Mr. Taylor's criminal case, were you aware
24  of any efforts by police officers to conduct a photo
25  show-up for Michael Crump?

Page 90

1      MR. WILLIAMS: Object to the form.
2      A   Can you state that one more time for me?
3      Q   In Mr. Taylor's criminal case, were you aware
4   of any efforts by police officers to conduct a photo
5   show-up for Michael Crump?
6      MR. WRIGHT: Objection.
7      MR. WILLIAMS: Same objection.
8      A   I don't have any independent recollection of
9   – of that one way or the other if they did or did not.
10     Q   And sitting here today, do you – maybe let me
11  define what a photo show-up is. Are you aware of what a
12  photo array would be?
13     A   Yes.
14     Q   Okay. Sorry.
15     A   That's okay.
16     Q   And is it – in your general experience, does
17  a photo array include six photographs of similarly
18  depicted individuals?
19     MR. WRIGHT: Object to form.
20     A   Yes. I believe the Supreme Court spoke on
21  that issue and I think six is the minimum number.
22     Q   Okay. And is it your understanding that a
23  photo show-up would generally just be a single
24  photograph?
25     A   No.

Page 91

1      Q   What do you – what does a photo show-up –
2      A   Well, let me – let me rephrase that. A photo
3   show-up would – could be one individual. Of course, if
4   you do that, you do have a very high likelihood of it
5   being suppressed for a photo show-up, unless there's
6   some very limited instances in which it would not be
7   suppressed. So I believe the best course of action is
8   six, to get around the suppression issues. There can be
9   a photo show-up with one, but again, your likelihood of
10  suppression of that will be suppressed.
11     Q   In your experience, is a photo show-up – or
12  let me withdraw that question. In your experience, why
13  would a single photograph being shown to a witness be
14  likely to get suppressed at a court hearing?
15     MR. WRIGHT: Objection to form.
16     MR. WILLIAMS: Object to the form. Objection.
17     Q   You can answer.
18     A   Again, it's very specific circumstances, but
19  if I was to say – giving you an example, if I was to
20  say, "Elliot Slosar hit my vehicle out in the parking
21  lot as we left this hotel," and the officer said,
22  "Elliot Slosar" and they pull a photo of you up and
23  said, "Is that who you're talking about?" and I said,
24  "Yup, that's him. That's Elliot Slosar," I have
25  independent knowledge of who Elliot Slosar is. It's not

Page 92

1   somebody that I did not know, whereas if it's somebody
2   who says, "Hey, you know, I – I came home and it was
3   dark and – and I saw somebody run across the back, you
4   know, back of the kitchen on the way out the back door
5   and then they show a photo lineup, they don't know who
6   it is, but, "Yeah, that looks like the same person,"
7   that's a very high likelihood of being suppressed.
8      Q   Okay. And the photo lineup that you just
9   talked about, would that be just the showing of a single
10  photograph?
11     MR. WRIGHT: Object to form.
12     Q   Well, I think –
13     A   In my – in my example?
14     Q   Yes. In your example.
15     A   Yes. The single photo. Yes.
16     Q   And is that because, in your experience,
17  courts have found that the showing of a single
18  photograph of an unknown suspect is unduly suggestive?
19     MR. WRIGHT: Object to form.
20     A   I think that's the – the language that the
21  courts would use. Yes.
22     Q   Sitting here today, were you aware that
23  Detective York, Sheriff Pickard, and Chief Broughton
24  staged photographs of Jonathan Taylor at the
25  Barbourville Police Department and requested that Mr.

Page 93

1   Taylor put a hood on his head?
2      MR. WRIGHT: Objection to the form. Foundation.
3      MR. WILLIAMS: Objection to form.
4      MR. FARAH: Objection to form.
5      A   I remember this issue coming up talking to
6   defense attorneys for Mr. Taylor, but I don't – I don't
7   have any knowledge of that through the officers of that
8   ever happening. No.
9      Q   Did Detective York, Chief Broughton, or
10  Sheriff Pickard ever inform you that they were going to
11  request that Jonathan Taylor put a hoodie on – put a
12  hood on his head prior to taking photographs of him at
13  the Barbourville Police Department?
14     MR. WRIGHT: Objection to the form.
15     MR. KELLEY: Objection to the form. Foundation.
16     MR. FARAH: Objection. Form.
17  BY MR. SLOSAR:
18     Q   You can answer.
19     A   No. They did not call me beforehand, but let
20  me go back to your last question: Was I aware of that
21  being done? I believe there's some photos in this
22  matter – this is why I think this is the manner in
23  which we were talking, discussing with defense
24  attorneys. They would not file a motion to suppress or
25  quash the use of photos with a hoodie on and something

Page 94

1  – I can't remember.  There was something other issue
2  early on in the – in this court proceeding, if I'm not
3  mistaken.  So the – the last question is: Was I aware
4  of that?  Yes.  Was I notified by law enforcement that
5  – no, I was not.
6       Q   Is it fair to say that you were aware that –
7  that photographs had been taken of Jonathan Taylor?
8       A   Yes.  That is correct.
9       Q   Were you aware that officers took certain
10  actions prior to taking those photographs?
11      MR. WRIGHT:  Object to the form.  Foundation.
12      MR. WILLIAMS:  Object to form.
13      A   Certain actions such as putting on a hoodie as
14  you were talking about before?
15      Q   Yes.  So I guess let me make it more specific.
16  Let me show you what we'll mark as Exhibit – this will
17  be 17.
18      A   Skipped – the last exhibit I've got is 15.
19  We've not –
20      Q   I know.  Yeah.  I'm going to give you –
21  sorry.  I'm going to hand you what is marked as Exhibit
22  16.  It's the deposition of Jason York.  And then I will
23  hand you what we'll mark as Exhibit 17, which is a
24  sketch that's done by Trooper Bunch for – based on
25  Michael Crump's description.

Page 95

1       (EXHIBIT 16 MARKED FOR IDENTIFICATION)
2       (EXHIBIT 17 MARKED FOR IDENTIFICAITON)
3       A   Okay.
4       Q   Okay?  So ignore Jason York's transcript for
5  now.
6       A   Okay.
7       Q   I'm going to ask you some questions about
8  this –
9       MR. FARAH:  What's Exhibit 15?
10      MR. SLOSAR:  15 is an arrest warrant and
11  criminal complaint.
12      MR. FARAH:  Oh, okay.
13      MR. SLOSAR:  It's Kayla Mills.
14      MR. FARAH:  Okay.  Thank you.
15  BY MR. SLOSAR:
16      Q   Okay.  I'm going to hand you what we'll mark
17  as Exhibit 18, which are photographs of Jonathan Taylor.
18  All right.  Sir, looking at Exhibit 18, do you see the
19  photographs of Jonathan Taylor?
20      (EXHIBTI 18 MARKED FOR IDENTIFICATION)
21      A   I do.  Yes.
22      Q   Okay.  During the criminal prosecution of Mr.
23  Taylor, did you learn that those photographs were taken
24  of him?
25      A   I believe these were the ones that was given

Page 96

1  to you by my office, correct?
2       Q   Sure.
3       A   Yeah.  I did.
4       Q   Actually, I don't know if this exact Bates
5  range was, but similar ones were –
6       A   Okay.
7       Q   – reproduced by your –
8       A   Yes.
9       Q   – office.  Yes.  Okay.  So having Exhibit 18
10  in front of you and 17 in front of you, which should be
11  the sketch.
12      A   Yes sir.
13      Q   Did any law enforcement officer tell you,
14  prior to the photographs taken of Jonathan Taylor at the
15  Barbourville Police Department, that they were going to
16  request that Mr. Taylor put a hoodie on his head in
17  order to take photographs for Michael Crump to view?
18      MR. WRIGHT:  Object to the form.
19      MR. WILLIAMS:  Object to the form.
20      Q   You can answer.
21      A   I don't recall that.  No.
22      Q   All right.  So you can put those down for
23  right now.  Thank you, sir.  Prior to today, were you
24  ever made aware that Detective York sent a photograph of
25  Jonathan Taylor with a hood on his head and the sketch

Page 97

1  done by Michael Crump to Oklahoma for Mr. Crump to make
2  an identification?
3       MR. WRIGHT:  Object to form.
4       A   I think you said a sketch done by Mr. Crump.
5  It was a sketch done by Mr. Bunch –
6       Q   Mr. Bunch, on behalf –
7       A   – based upon Mr. Crump's –
8       Q   Yes.  Description.
9       A   – identification – descriptions.
10      Q   Yeah.
11      A   I don't recall that I was aware of him sending
12  it to Oklahoma, no.
13      Q   Okay.  Prior to today, did Detective York ever
14  inform you that Mr. Crump viewed the photograph of Mr.
15  Taylor with a hood on his head and the sketch that was
16  done based on his description and informed Detective
17  York that he could not make an identification of Mr.
18  Taylor?
19      MR. WRIGHT:  Object to form and foundation.
20      MR. WILLIAMS:  Object to hearsay.
21      A   I – I believe I've always known that Mr.
22  Crump could not make an identification as to who it was,
23  Mr. Taylor, or if it wasn't Mr. Taylor, even the
24  individual that it was the – the person that – am I
25  answering your question?

Page 98

1   Q   My question's a little bit different.  Did –
2   A   Okay.
3   Q   – Detective York ever tell you that he sent a
4   photograph or photographs of Jonathan Taylor to
5   Oklahoma, along with a sketch, and then Mr. Crump looked
6   at Mr. Taylor's photograph and informed Detective York
7   that he could not make an identification of Mr. Taylor?
8       MR. WRIGHT:  Object to form.
9   A   Yeah.  I – I'm going to – I've answered the
10  fact that I didn't know he sent it to Oklahoma, so based
11  upon that response, I have to beg no on this response,
12  but I will say that Mr. York, even in his report, I
13  believe, says that Mr. Crump couldn't make an
14  identification of him, but I did not know of this
15  sequence of events in which you said that – Oklahoma,
16  could not make an identification.
17  Q   Okay.  Would you agree that sending a
18  photograph or photographs of Mr. Taylor by himself along
19  with a sketch to Mr. Crump would constitute a photo
20  show-up?
21      MR. WRIGHT:  Object to form.
22  A   That would be considered a photo show-up by
23  the courts, –
24  Q   And in your experience –
25  A   – in my opinion.

Page 99

1   Q   – with this type of – if an identification
2   had been made, would this type of investigative tactic
3   have likely been suppressed?
4       MR. WRIGHT:  Objection to form.
5       MR. WILLIAMS:  Trying to speculate.
6   Q   You can answer it.
7   A   I – I think it would've been brought to the
8   court's attention for the court to decide.
9   Q   If you had known that Detective York send a
10  photograph with Jonathan Taylor to Oklahoma and that an
11  identification was not made, would you have disclosed
12  that information to the defense?
13      MR. WRIGHT:  Object to form.  Foundation.
14  A   I'm not trying to split hairs here, but I
15  believe that had – that was made – I believe that
16  disclosure that he could not identify the individual was
17  made in the police report.  In his – if I'm not
18  mistaken, in the original police report Detective York
19  provided us was that he could not get an identification
20  of the – kind of gave a description that he had tattoos
21  on his hands, but didn't know the individual, couldn't
22  identify the individual.
23  Q   But you agree that there's not a – do you
24  recall there being a single police report that says that
25  Michael Crump looked at photographs and could not make

Page 100

1   an identification?
2       MR. WRIGHT:  Object to form.
3   A   No.  That is not included.
4   Q   Okay.
5   A   I'm sorry.  I interrupted.
6   Q   Is there any police report that you're aware
7   of that documents that the – some law enforcement
8   officers at the Barbourville Police Department attempted
9   to dress Jonathan Taylor up like the sketch?
10      MR. FARAH:      Object to the form.
11      MR. WRIGHT:  Object to form.
12      MR. WILLIAMS:  Join.
13  BY MR. SLOSAR:
14  Q   Do you recall seeing a report like that, Mr.
15  Steele?
16  A   I do not remember seeing a report that they
17  dressed him up.
18  Q   Okay.  And I'm looking at page 25414 of the
19  police reports, which is an interview from
20  February 2, 2011 with Josh Bunch, Detective York, and
21  Michael Crump; are you there?
22  A   What was that number again?
23  Q   25414.
24  A   Okay.  I am.
25  Q   Will you review that and let me know when

Page 101

1   you're finished?
2   A   I reviewed it.
3   Q   Does that report document – let me withdraw
4   that.  Does that report that you just reviewed indicate
5   whether Mr. Crump could or could not make an
6   identification of the male who he saw at Katherine
7   Mills' residence on December 20, 2010?
8   A   It does not.
9   Q   Turning to page 25461, the case supplement
10  from Mike Cornett.
11  A   Uh-huh.
12  Q   Would you please review that document, as
13  well?
14      MR. WRIGHT:  What number is that one?
15  Q   25461.
16  A   I have reviewed it.
17  Q   Does this report by Detective Cornett give any
18  indication as to whether Mr. Crump could or could not
19  make an identification of the male he saw at Katherine
20  Mills' residence on December 20, 2010?
21  A   It does not.
22  Q   Are you aware of any other reports that were
23  created during the course of the Katherine Mills
24  investigation that give any indication as to whether Mr.
25  Crump is or is unable to make an identification of the

Page 102

1  male subject he saw at Katherine Mills' residence on
2  December 20, 2010?
3      A   There's none other that I'm aware of.  No.
4      Q   Okay.  So, would it have been important for
5  you, as a prosecutor, to know that Mr. Crump looked at a
6  photograph of Jonathan Taylor and declined to make an
7  identification of him as the person who he saw at
8  Katherine Mills' residence on December 20, 2010?
9          MR. WRIGHT:  Object to form.
10         MR. WILLIAMS:  Foundation.
11     A   I think all information's important for me to
12  have, so yeah, I think -- yeah.  Obviously, any
13  information would've been important to have.
14     Q   Should the law enforcement officer or officers
15  involved in that attempt to make an identification have
16  documented their efforts?
17         MR. WRIGHT:  Object to form.
18         MR. WILLIAMS:  Objection to the form.
19     A   I don't know that I'm qualified to answer that
20  from what they should or should not do from a job
21  perspective, in that I don't set the policy for state
22  police in -- in what they should and should not
23  document.
24     Q   Well, would you have -- in a capital murder
25  case, would you have expected the law enforcement agency

Page 103

1  that's conducting the criminal investigation to document
2  any efforts to obtain an identification from Michael
3  Crump?
4          MR. WRIGHT:  Objection to the form.
5          MR. KELLEY:  Object to form.
6          MR. WILLIAMS:  Join.
7      A   My expectation would be the same in a capital
8  murder case or a class D felony case.  I'm -- what I
9  would want them to do would be to document it and make
10  sure I have it.  Yes.
11     Q   All right.  In the underlying criminal case,
12  were you aware of any efforts by police officers to
13  provide facts about the crime to witnesses so that they
14  could construct a false statement implicating Amanda
15  Hoskins or Jonathan Taylor?
16         MR. WRIGHT:  Object to form.
17         MR. KELLEY:  Objection to the form.
18         MR. WILLIAMS:  Object to form.
19  BY MR. SLOSAR:
20     Q   You can answer.
21     A   No.
22     Q   If you had been aware of any efforts by police
23  officers to provide facts about the crime to witnesses
24  so that they could falsely implicate Amanda Hoskins or
25  Johnathan Taylor, would you have disclosed that

Page 104

1  information to the defense?
2      A   Yes.
3      Q   Would you have taken other actions with
4  respect to the police officers if you had learned that
5  type of conduct was taking place?
6      A   Yes.
7      Q   That is not conduct that you would have
8  tolerated, correct?
9      A   That is correct.
10     Q   That is not conduct that you would've approved
11  of, correct?
12     A   Correct.
13     Q   In the underlying criminal case, would -- were
14  you aware of any efforts by police officers to fabricate
15  statements implicating Amanda Hoskins or Jonathan
16  Taylor?
17     A   No.
18     Q   If you had been aware of efforts like this,
19  would you have disclosed that information to the
20  defense?
21     A   Yes.
22     Q   Would you have taken other actions with
23  respect to the law enforcement officers if you had
24  learned that type of conduct was taking place?
25     A   Yes.

Page 105

1      Q   That is not conduct that you would have
2  tolerated, correct?
3      A   Correct.
4      Q   That is not conduct that you would've approved
5  of, correct?
6      A   Correct.
7      Q   In Ms. Hoskins and Ms. Taylor -- and Mr.
8  Taylor's criminal case, were you aware of any efforts by
9  police officers to destroy evidence?
10     A   No.
11     Q   If you had been aware of any efforts by police
12  officers to destroy evidence, would you have disclosed
13  that information to the defense?
14     A   Yes.
15     Q   Would you have taken other actions with
16  respect to the law enforcement officers if you had
17  learned that was taking place?
18     A   Yes.
19     Q   That is not conduct that you would've
20  tolerated, correct?
21     A   Correct.
22     Q   That is not conduct that you would've approved
23  of, correct?
24     A   Correct.
25     Q   In Ms. Hoskins' or Mr. Taylor's criminal case,

Page 106

1  were you aware of any efforts by police officers to hide
2  police interviews or statements obtained from witnesses?
3     A  No.
4     Q  If you had been aware of that type of conduct,
5  would you have disclosed that information to the
6  defense?
7     A  Yes.
8     Q  Would you have taken other actions with
9  respect to the police officers if you had learned that
10 was taking place?
11    A  Yes.
12    Q  That is not conduct that you would've
13 tolerated, correct?
14    A  Correct.
15    Q  That is not conduct that you would've approved
16 of, correct?
17    A  Correct.
18    Q  In Ms. Hoskins' or Mr. Taylor's criminal case,
19 were you aware of any efforts by police officers to hide
20 recorded interviews from witnesses?
21    A  No.
22    Q  If you had been aware of any efforts by
23 officers to hide police recordings from witnesses, would
24 you have disclosed that information to the defense?
25    A  Yes.

Page 107

1     Q  Would you have taken other actions with
2  respect to the police officers if you had known that was
3  taking place?
4     A  Yes.
5     Q  That is not conduct that you would've
6  tolerated, correct?
7     A  Correct.
8     Q  That is not conduct that you would've approved
9  of, correct?
10    A  Correct.
11    Q  In Ms. Hoskins' or Mr. Taylor's criminal case,
12 were you aware of any efforts by police officers to hide
13 police reports?
14    A  No.
15    Q  If you had been aware of any efforts by
16 officers to hide police reports, would you have
17 disclosed that information to the defense?
18    A  Yes.
19    Q  Would you have taken other actions with
20 respect to the officers if you had learned that was
21 taking place?
22    A  Yes.
23    Q  That is not conduct that you would've
24 tolerated, correct?
25    A  Correct.

Page 108

1     Q  That is not conduct that you would've approved
2  of, correct?
3     A  Correct.
4     Q  In Ms. Hoskins' or Mr. Taylor's criminal case,
5  were you aware of any efforts by Detective York to
6  testify falsely at the Grand Jury?
7     A  No.
8     Q  If you had been aware of efforts by Detective
9  York to testify falsely at the Grand Jury, would you
10 have disclosed that information to the defense?
11    A  Yes.
12    Q  Would you have taken other actions with
13 respect to Detective York?
14    A  Yes.
15    Q  That is not conduct that you would've
16 tolerated, correct?
17    A  Correct.
18    Q  That is not conduct that you would've approved
19 of, correct?
20    A  Correct.
21    Q  In Ms. Hoskins' or Mr. Taylor's criminal case,
22 were you aware of any efforts by police officers to hide
23 witness recantations?
24    A  No.
25    Q  If you had been aware of any efforts by police

Page 109

1  officers to hide witness recantations, would you have
2  disclosed that information to the defense?
3     A  Yes.
4     Q  Would you have taken other actions with
5  respect to the law enforcement officers if you had
6  learned that was taking place?
7     A  Yes.
8     Q  That is not conduct that you would've
9  tolerated or approved, correct?
10    A  Correct.
11    Q  Up through the time -- well, up through the
12 time that you filed a motion to dismiss in July of 2016,
13 were you ever made aware that the March 16, 2012
14 statement from Kayla Mills was false?
15    A  No.
16    MR. WILLIAMS:  Object to the form.
17    Q  Up through the time that you filed a motion to
18 dismiss in July of 2016, were you ever made aware that
19 the March 16, 2012 statement of Kayla Mills was
20 fabricated by law enforcement officials?
21    MR. WILLIAMS:  Objection to the form.
22    MR. KELLEY:  Objection to form.
23    MR. WRIGHT:  Join.
24    A  No.
25 BY MR. SLOSAR:

Page 110

1    Q   Up through the time the charges were dismissed
2 against Amanda Hoskins and Jonathan Taylor in the summer
3 of 2016, were you ever made aware that Detective York
4 initiated criminal charges against Kayla Mills on
5 March 14, 2012 for the murder of Katherine Mills?
6       MR. WRIGHT:  Object to form.
7    A   No.
8    Q   Going to show you what's marked as Exhibit 15
9 and ask for you to take a look at this document, sir.
10       (EXHIBIT 15 MARKED FOR IDENTIFICATION)
11    A   Okay.
12    Q   Prior to coming in here today, have you ever
13 seen the criminal complaint and arrest warrant that was
14 signed by Detective York on March 14, 2012, initiating
15 charges against Kayla Mills for the murder of Katherine
16 Mills?
17       MR. WRIGHT:  Object to form.
18    A   No.  Not that I can recall ever seeing this
19 before.
20    Q   Is this something that, as a prosecutor in the
21 criminal felony murder case against Amanda Hoskins and
22 Jonathan Taylor, that you would've wanted to know about
23 during the pending prosecution?
24       MR. WRIGHT:  Object to form.
25    A   Yes.

Page 111

1    Q   Up through the time that you dismissed the
2 criminal charges against Ms. Hoskins and Mr. Taylor in
3 the summer of 2016, were you ever made aware that Kayla
4 Mills was promised consideration prior to giving a
5 statement against Jonathan Taylor on March 16, 2012?
6       MR. WRIGHT:  Objection to form.
7       MR. KELLEY:  Object to the form.
8    A   No.
9    Q   Sir, I'm going to ask for you to look at a
10 deposition transcript.  It's Exhibit 16.  And turn to
11 page 158.  Actually, I'm sorry, 162.  When you get
12 there, I'm going to ask that you read lines 9 through 18
13 and tell me when you're done.
14       MR. WRIGHT:  What page is he on?  I'm sorry.
15       MR. SLOSAR:  162.
16       THE WITNESS:  162.
17 BY MR. SLOSAR:
18    Q   I'd actually ask you to read up until line 21,
19 so 9 through 21.
20    A   Okay.
21    Q   And tell me when you're done.
22    A   Okay.
23    Q   Prior to today's deposition, were you ever
24 made aware that Detective York reached an agreement with
25 Kayla Mills that if she gave a statement implicating

Page 112

1 Jonathan Taylor in the murder of Katherine Mills that
2 Detective York would not proceed forward with the arrest
3 warrant criminal complaint filed against her for the
4 murder of Katherine Mills?
5       MR. WRIGHT:  Object to form.
6    A   No.  I don't recall ever being notified of
7 that.
8    Q   Is that information, as a prosecutor, that you
9 would've expected a law enforcement agency to provide to
10 you during the course of the criminal prosecution?
11       MR. WRIGHT:  Object to form.
12       MR. KELLEY:  Objection to form.
13    A   Yes.
14    Q   Is that information that, if you had known it,
15 you would've disclosed it to the defense?
16       MR. WRIGHT:  Object to form.
17    A   Yes.
18    Q   And would you have disclosed such information
19 to the defense because you would believe it to be either
20 defined as exculpatory evidence under Brady vs. Maryland
21 or impeachment under -- evidence under Giglio that you
22 would be required to turn over?
23    A   Yes.
24       MR. WRIGHT:  Object to form.
25    A   Yes.

Page 113

1    Q   If you learned that Kayla Mills'
2 March 16, 2002 statement against Jonathan Taylor and
3 Amanda Hoskins was either false or fabricated by law
4 enforcement officers, would you have used that evidence
5 to continue charges against Ms. Hoskins and Mr. Taylor?
6       MR. WRIGHT:  Object to form.
7       MR. KELLEY:  Objection.  Form.
8    A   Can you repeat that for me again?  I'm sorry.
9    Q   Sure.  If you learned that Kayla Mills'
10 statement was false and fabricated by law enforcement
11 officers, would you have used that evidence to continue
12 the initiation of charges against Amanda Hoskins and
13 Jonathan Taylor?
14       MR. WRIGHT:  Object to form.
15    A   No.
16    Q   If you learned that Kayla Mills was threatened
17 by police or promised consideration for giving a false
18 and fabricated statement, would you have used that
19 evidence to continue the initiation of charges against
20 Amanda Hoskins and Jonathan Taylor?
21       MR. WRIGHT:  Object to form.
22       MR. KELLEY:  Objection.
23    A   No.
24    Q   If you learned that Kayla Mills' statement was
25 fabricated and false, would you have allowed any

Page 114

1  prosecutor in your office to use that evidence to
2  initiate charges against Amanda Hoskins or Jonathan
3  Taylor?
4      MR. WRIGHT: Object to form.
5      A  I think I know what you're getting at, but we
6  don't initiate charges out of my office, regardless.
7      Q  I guess, let me withdraw the question. If you
8  learned that Kayla Mills' statement was false and
9  fabricated, would you have allowed any prosecutor in
10  your office to have that evidence presented before a
11  Grand Jury?
12      MR. WRIGHT: Object to form.
13      A  No.
14      Q  If you had learned that law enforcement
15  officers threatened Kayla Mills into repeating a false
16  and fabricated statement, would you have taken steps to
17  immediately stop the criminal charges against Amanda
18  Hoskins and Jonathan Taylor?
19      MR. WILLIAMS: Objection to form.
20      MR. KELLEY: Objection.
21      MR. WRIGHT: Object to form.
22      A  No.
23  BY MR. SLOSAR:
24      Q  So it's your testimony here today that if you
25  learned that evidence was false and fabricated, that you

Page 115

1  would've still continued the charges against the
2  defendants?
3      A  If that was the only evidence, I would have
4  stopped the prosecution, obviously, under my
5  responsibilities and duties, and in this case, Kayla
6  Mills' – Kayla Mills' statement wasn't the only
7  statement we had. Even – even after Kayla Mills died,
8  I knew we weren't going to use her statement and we
9  proceeded on with the prosecution.
10      Q  We're going to get to these other witness
11  statements –
12      A  Okay.
13      Q  – in short order. Sitting here today, can
14  you recall a single other case where a detective signed
15  a criminal complaint and arrest warrant against a
16  witness in your prosecution for murder and then released
17  that person from a police station in exchange for giving
18  a statement?
19      MR. WRIGHT: Object to form.
20      A  I don't recall.
21      Q  Can you recall a single other case where a
22  detectives signed a criminal complaint and arrest
23  warrant against a witness for murder charges and did not
24  inform you during the pending prosecution that was
25  ongoing against other defendants in that case?

Page 116

1      A  I don't recall.
2      MR. WRIGHT: Object to form.
3      Q  Does this type of conduct shock you?
4      MR. WRIGHT: Object to form.
5      A  No.
6      Q  Is this the type of conduct that you would
7  expect Detective York to use in criminal investigations?
8      MR. WRIGHT: Object to form.
9      A  No.
10      Q  How come you're not shocked by Detective
11  York's initiation of charges against Kayla Mills in the
12  murder of Katherine Mills without ever disclosing that
13  to your office; why doesn't that shock you?
14      MR. WRIGHT: Object to form.
15      A  I guess – I guess you could say that if
16  you've done this so long, the things you've seen, the –
17  the level that requires you to shock value increases,
18  unfortunate. Is this the type of investigative work I'd
19  like to see? No. But does it shock me? No. So, you
20  know, I – unfortunately, officers make mistakes and
21  some of them make a lot worse mistakes than this and –
22  some of them are in federal prison now. Those are the
23  things that shock me, I guess you could say.
24      Q  It's your understanding prior to today that
25  Michael Crump has never made an identification in this

Page 117

1  case, correct?
2      A  It's my understanding. Yes.
3      Q  Have you ever referred law enforcement
4  officers to an outside agency for prosecution?
5      A  I have. Yes, sir.
6      Q  And do you believe that when law enforcement
7  officers lie under oath that they should be held
8  criminally responsible?
9      A  I do.
10      Q  Do you believe that when law enforcement
11  officers lie under oath in a capital murder case, that
12  should – that they should be held criminally
13  responsible?
14      A  I believe if they lie under oath regarding a
15  capital murder case or a possession of methamphetamine
16  case they should be held responsible.
17      Q  Mr. Steele, I am going to assume that you
18  would never want to be put in the position where you
19  wrongfully convict somebody as a prosecutor; is that
20  right?
21      A  Absolutely.
22      Q  And I'm going to assume that you would never
23  want to be in a position where you could wrongfully
24  convict somebody and send them to death row as a
25  prosecutor?

Page 118

1    A   That's correct.
2    Q   Is that one of your worst fears?
3    A   Absolutely.
4    Q   Going to show you what we'll mark as Exhibit
5   number 19, which is Bates stamped KSP337, an affidavit
6   for a search warrant.  Going to show you what we'll mark
7   as Exhibit number 20, KSP339, another application for a
8   search warrant.  Mr. Steele, looking at Exhibit 19, --
9    A   Okay.
10    Q   -- do you recognize this type of document?
11       (EXHIBIT 19 MARKED FOR IDENTIFICATION)
12       (EXHIBIT 20 MARKED FOR IDENTIFICATION)
13    A   Yeah.  This is an affidavit for a search
14   warrant.
15    Q   Okay.  Are you familiar with these in your
16   capacity as a prosecutor?
17    A   I am.
18    Q   And can you generally explain to me the
19   process for what a law enforcement officer has to go
20   through to get a search warrant?
21    A   Yeah.  They have to have probable cause for
22   the issuance of a search warrant.  They would also
23   document, you know, what they want to search, place or
24   person they want to search for the court, and then
25   they'd attach an affidavit to the search warrant given

Page 119

1   the court guides and background as to why -- why
2   probably cause had been met.
3    Q   Is it your understanding that affidavits for
4   search warrants are signed and sworn under oath?
5    A   Yes.
6    Q   Okay.  And from looking at KSP337, can you
7   determine who the affiant is on this search warrant --
8   affidavit for a search warrant?
9    A   You're still looking at KSP3 --
10    Q   Oh, yes.
11    A   -- oh, I'm sorry.  I didn't see it-- different
12   numbering system.  All right.  So on the back of K -- on
13   the back page of that, it's KSP338 and it appears to be
14   Detective Jason York's signature as the officer.
15    Q   Okay.  And from looking at this document, are
16   you able to determine when this was -- when Detective
17   York's sworn -- the statements that are made in this
18   affidavit?
19    A   Appears to be it was sworn between district
20   judges.  It appears that signature is Wendell Skip
21   Hammons' on February 15, 2011 at 11:02 a.m.
22    Q   Would you agree with me that this is a little
23   bit more than a year prior to the initiation of charges
24   against Amanda Hoskins and Jonathan Taylor in March of
25   2012?

Page 120

1    A   Yes.
2    Q   Okay.  According to this affidavit, do you see
3   where it says, at the -- 338 in the first paragraph,
4   "Jessie Lawson stated he called Mike Simpson to advise
5   him that Katherine Mills had died.  Jessie Lawson stated
6   Mike Simpson started crying.  This call took place on
7   12-22-2010.  Mike Simpson has been identified to be near
8   Katherine Mills' residence the day she was robbed and
9   found dead"; do you see that, sir?
10    A   I do.
11    Q   Prior to today's date, did Detective York ever
12   tell you that Mike Simpson had been identified as the
13   male individual at Katherine Mills' residence on
14   December 20, 2010?
15    A   No.
16    Q   Is that information that you would've expected
17   a law enforcement officer to inform you during the
18   ongoing criminal charges against Amanda Hoskins and
19   Jonathan Taylor?
20       MR. WRIGHT:  Object to form.
21    A   (Coughs.)  Excuse me.  I would think if -- if
22   an individual had been identified in the -- just looking
23   at the affidavit, reading from the -- identified at the
24   residence, that they -- they would be included in the
25   case report as -- as such.

Page 121

1    Q   Is that information that you would've expected
2   a law enforcement officer to tell you yourself or a
3   member of your office prior to testifying at the Grand
4   Jury proceeding to initiate charges against Amanda
5   Hoskins, Jonathan Taylor, and William Lester?
6       MR. WRIGHT:  Object to form.
7    A   I -- I -- again, like I said, I think it would
8   -- should've been included in their case report, which
9   we would've had at the Grand Jury, so I guess the answer
10   to all that's "yes," since they're -- they're providing
11   their report at Grand Jury, we would all be notified.
12    Q   And asking you to turn to Exhibit 20, which is
13   KSP339.  Again, this looks like an affidavit that was
14   signed on February 15, 2011; is that right, sir?
15    A   February 15, 2011.  Yes.
16    Q   And according to the paragraph -- do you see
17   where it says that, "This affiant has learned
18   information on February 4, 2011, approximately 9:30
19   a.m.," and then it says, "The following information, do
20   you see that, sir"?
21    A   I do.  Yes.
22    Q   Okay.  Do you see where it says, "Mike Simpson
23   gave this unit a number of 606-622-1780 as a contact
24   number for him.  Mr. Simpson has been identified by
25   Michael Crump being at Katherine Mills' residence the

Page 122

1  morning she was robbed and found dead"; do you see that,
2  sir?
3     A   I do.
4     Q   Prior to today's date, have you ever seen this
5  search warrant affidavit signed by Detective York on
6  February 15, 2011?
7     A   I don't recall ever seeing this, sir.
8     Q   Prior to today's date, did Detective York ever
9  inform you that Michael Crump identified Mike Simpson as
10  the male seen at Katherine Mills' residence on
11  December 20, 2010?
12     A   No.
13     Q   Between the time that charges were initiated
14  against Amanda Hoskins and Jonathan Taylor and the time
15  that you filed the motion to dismiss their case in the
16  summer of 2016, were you ever made aware that Michael
17  Crump identified Mike Simpson as the male individual he
18  saw leaving Katherine Mills' residence on
19  December 20, 2010?
20        MR. WRIGHT:  Object to form.
21     A   Not that I recall.  No.
22     Q   In any of your conversations with Mr. Crump,
23  did he ever inform you that he identified Mike Simpson
24  as the male individual he saw leaving Katherine Mills'
25  residence on December 20, 2010?

Page 123

1     A   No.
2     Q   If you had been made aware of the information
3  contained in Detective York's affidavit, namely that
4  Michael Crump identified Mike Simpson, would you have
5  disclosed that information to the defense?
6     A   Yes.
7        MR. WRIGHT:  Object to form.
8     A   Yes.
9     Q   And is that because you would consider that
10  the three – Kentucky Supreme Court rule 3.8 and your
11  ethical obligations under Brady would require you to
12  disclose such evidence?
13        MR. WRIGHT:  Object to form.
14     A   I think under Giglio, also, I think it'd be
15  impeachment evidence, so yes.  I – under – several
16  different reasons, I believe that should be discovered.
17     Q   If you learned that Mr. Crump identified Mike
18  Simpson, would you have taken steps to reevaluate the
19  pending criminal charges you had against Amanda Hoskins
20  and Jonathan Taylor?
21        MR. WRIGHT:  Object to form.
22     A   Yes.
23     Q   And earlier, if you had learned that Kayla
24  Mills' statement was false and fabricated, would you
25  have taken steps to reevaluate the pending charges that

Page 124

1  you had against Amanda Hoskins and Jonathan Taylor?
2        MR. WRIGHT:  Object to form.
3     A   Yes.
4     Q   Sir, as Detective York informed the Grand Jury
5  that Michael Crump described Jonathan Taylor as the male
6  that he saw at Katherine Mills' residence, are you aware
7  of Mr. Crump ever identifying Jonathan Taylor as the
8  male individual that he saw walking around Katherine
9  Mills' residence on December 20, 2010?
10        MR. WRIGHT:  Object to the form of the
11  question.
12     Q   You can answer.
13     A   No.  I am not.
14     Q   In your conversations with Mr. Crump, did he
15  ever tell you that he identified Mr. Taylor as the male
16  that he saw walking around Katherine Mills' residence?
17     A   No, he did not.
18     Q   Sir, Detective York has testified in this case
19  that he sent photographs of Jonathan Taylor to Oklahoma
20  so that Mr. Crump could make an identification.  Were
21  you ever informed about that at any point prior to the
22  dismissal of charges in the summer of 2016?
23     A   I don't recall ever being informed of anything
24  about Oklahoma in this case.
25     Q   Were you made aware that Sheriff Pickard,

Page 125

1  Chief Broughton, and Detective York dressed Mr. Taylor
2  up at the Barbourville Police Department to have him
3  appear similar to the sketch that was created by Mr.
4  Bunch?
5        MR. WRIGHT:  Objection to the form of the
6  question.
7        MR. KELLEY:  Objection.  Foundation.
8        MR. WILLIAMS:  Object to form.
9        MR. FARAH:  Objection.
10     A   Yes.
11     Q   And is it fair to say that you were only made
12  aware of that after receiving the photographs?
13        MR. WRIGHT:  Object to form.
14     A   I don't know if it was – it was after we –
15  in my – my recollection is it was after it was done,
16  but I don't know if it was after I received the
17  photographs or before I received the photographs, but it
18  was already done.  That was my recollection of that.
19     Q   Did any of those law enforcement officers ever
20  tell you that they dressed Mr. Taylor up to look like
21  the sketch?
22        MR. WRIGHT:  Objection to form.
23        MR. WILLIAMS:  Object to the form of the
24  question.  Lack of foundation.
25        MR. FARAH:  Object to the form.

Page 126

1    A   I don't remember – no, I don't remember
2  officers ever telling me they dressed him like the
3  sketch.  I believe I was – the defense attorneys were
4  the ones who brought it up in the court proceeding, and
5  I want to say that's when I became aware of it.
6    Q   If law enforcement officers had told you,
7  prior to taking photographs of Mr. Taylor, that they
8  were going to ask that he put on a hoodie, put a hood on
9  his head, take some of his hair off so that he could
10 appear as similar as possible to the sketch for the
11 purpose of having Michael Crump look at it, what would
12 you have advised them to do?
13     MR. WRIGHT:  Object to form.
14    A   I would've advised them first in the
15 difference of a photo array or a photo show-up, and then
16 I would – I would've cautioned them not to use a photo
17 show-up, and that if they're going to put one person in
18 the hoodie, coat, whatever they were using, to put them
19 all in that.  That would've been the advice I gave them.
20    Q   And why would you want to assure that it was
21 done in the manner that you just described?
22    A   Again, going back to the guides that we've
23 been given by the federal courts and supreme courts in
24 regards to show-ups and lineups, that's the guide –
25 that's – my deciphering of those cases would've been

Page 127

1  the reason why I gave them that guidance.
2    Q   Up through the time that you dismissed the
3  charges against Ms. Hoskins and Mr. Taylor in the summer
4  of 2016, were you ever made aware that the June 24, 2011
5  statement of Joe King was false and fabricated by law
6  enforcement officials?
7    A   No.
8      MR. WRIGHT:  Objection to form.
9      MR. KELLEY:  Object to form.
10     MR. WILLIAMS:  Join.
11 BY MR. SLOSAR:
12    Q   If you had been made aware of that
13 information, would you have disclosed that to the
14 defense?
15    A   Yes.
16    Q   And is that because you would consider this
17 evidence to be material and required to be turned over?
18    A   Yes.
19    Q   If you learned that Mr. King's statement was
20 false, fabricated by law enforcement officers, would you
21 have continued using that evidence to continue charges
22 against Ms. Hoskins and Mr. Taylor?
23     MR. WRIGHT:  Object to form.
24     MR. WILLIAMS:  Join.
25    A   No.

Page 128

1    Q   And if you learned that Mr. King's statement
2  was false and fabricated by law enforcement officers,
3  would you have reevaluated the continuation of criminal
4  charges against Amanda Hoskins and Jonathan Taylor?
5      MR. WRIGHT:  Object to form.
6    A   Yes.
7    Q   If you learned that Mr. King was threatened by
8  law enforcement into giving a false statement, would
9  have used that evidence to continue the initiation of
10 charges against Amanda Hoskins and Jonathan Taylor?
11     MR. WRIGHT:  Object to form.
12     MR. KELLEY:  Objection to form.
13    A   No.
14    Q   Up through the time that charges were
15 dismissed – well, let me withdraw that question.  Up to
16 the time that you moved to dismiss charges against
17 Amanda Hoskins and Jonathan Taylor in the summer of
18 2016, were you ever made aware that the March 13, 2012
19 statement of Amber Simpson was false?
20    A   No.
21    Q   Up through the time that you moved to dismiss
22 criminal charges against Amanda Hoskins and Jonathan
23 Taylor in the summer of 2016, were you ever made aware
24 that the March 13, 2012 statement of Amber Simpson was
25 fabricated by law enforcement officials?

Page 129

1      MR. WRIGHT:  Object to the form.
2    A   No.
3    Q   If you had been made aware of that
4  information, would you have disclosed that to the
5  defense?
6    A   Yes.
7    Q   Would you have disclosed that to the defense
8  because you would believe that this evidence is material
9  and required to be turned over?
10    A   Yes.
11    Q   If you learned that Ms. Simpson's statement
12 was false or fabricated by the police, would you have
13 used that evidence to continue charges against Amanda
14 Hoskins and Jonathan Taylor?
15    A   No.
16     MR. WRIGHT:  Object to form.
17    Q   If you learned that Ms. Simpson was threatened
18 by police or promised consideration for giving her false
19 and fabricated statement, would you have used that
20 evidence to initiate or continue charges against Ms.
21 Hoskins and Mr. Taylor?
22     MR. WRIGHT:  Object to form.
23    A   No.
24    Q   If you learned that the police threatened Ms.
25 Simpson into a false and fabricated statement, would you

Page 130

1  have reevaluated the continuation of charges against
2  Amanda Hoskins and Jonathan Taylor?
3       MR. WRIGHT:  Object to form.
4    A   Yes.
5    Q   Up until the summer of 2016 when you filed
6  motions to dismiss criminal charges against Amanda
7  Hoskins and Jonathan Taylor, were you ever made aware
8  that the March 8, 2012 statement of Allen Helton was
9  false and fabricated by law enforcement officials?
10       MR. WRIGHT:  Objection to form.
11       MR. KELLEY:  Objection to form.
12       MR. WILLIAMS:  Lack of foundation.
13  BY MR. SLOSAR:
14    Q   Up through the time that you moved to dismiss
15  the criminal cases against Amanda Hoskins and Jonathan
16  Taylor in the summer of 2016, were you ever made aware
17  that Allen Helton was promised consideration from law
18  enforcement officials in exchange for giving his false
19  March 8, 2012 statement?
20       MR. WRIGHT:  Object to form.
21       MR. KELLEY:  Objection to form.
22       MR. WILLIAMS:  Objection.
23    A   No.
24    Q   If you had been made aware of that
25  information, would you have disclosed that to the

Page 131

1  defense?
2       MR. WRIGHT:  Object to form.
3    A   Yes.
4    Q   And is that because you would consider this
5  evidence to be material and thus required to be turned
6  over under your ethical obligations?
7    A   Yes.
8    Q   If you learned that Mr. Helton's March 8, 2012
9  statement was false and fabricated by law enforcement,
10  would you have used that evidence to continue criminal
11  charges against Amanda Hoskins and Jonathan Taylor?
12       MR. WRIGHT:  Object to form.
13       MR. KELLEY:  Object to form
14       MR. WILLIAMS:  Objection to form.
15    A   No.
16    Q   If you learned that Mr. Helton was threatened
17  by police or promised consideration in exchange for
18  giving a false and fabricated statement, would you have
19  used that evidence to initiate or continue charges
20  against Amanda Hoskins and Jonathan Taylor?
21    A   No.
22       MR. WILLIAMS:  Same objection.
23       MR. WRIGHT:  Join.
24    Q   If you learned that law enforcement made
25  promises of consideration to Allen Helton in exchange

Page 132

1  for a false and fabricated statement, would you have
2  reevaluated the continuation of criminal charges against
3  Amanda Hoskins and Jonathan Taylor?
4       MR. WRIGHT:  Object to form.
5       MR. WILLIAMS:  Same objection.
6    A   Sorry.  Yes.
7    Q   Now, I'm going to hand you Exhibit 21.  Sir,
8  this is a letter Bates stamped PL4844; do you recognize
9  this letter?
10       (EXHIBIT 21 MARKED FOR IDENTIFICATION)
11    A   Yes.
12    Q   Okay.  Now, I asked you some questions earlier
13  relating to promises of consideration in exchange for
14  giving a false and fabricated statement.
15    A   Uh-huh.
16    Q   Would you agree that nothing in this document
17  indicates that Sheriff Pickard promised Mr. Helton
18  consideration in exchange for giving a false and
19  fabricated statement against Amanda Hoskins and Jonathan
20  Taylor?
21    A   I would agree with that.
22    Q   Okay.  According to this document, Sheriff
23  Pickard reveals that he made some promises to Mr. Helton
24  in exchange for "a lot of information on the Mills
25  lady's murder"; is that right?

Page 133

1       MR. WRIGHT:  I'll object to form on that.
2    Q   Quoting from the statement.
3    A   That's what the statement says.  Yes.
4    Q   Okay.  So is it fair to say that Sheriff
5  Pickard never told you that he promised Mr. Helton
6  consideration or assistance in his criminal cases in
7  exchange for a false and fabricated statement against
8  Amanda Hoskins and Jonathan Taylor?
9       MR. KELLEY:  Objection as to form.
10    A   That's true.
11    Q   Okay.  Did Sheriff Pickard ever ask you to
12  help Mr. Helton on his criminal cases after sending you
13  this letter?
14    A   No, he did not.
15    Q   Okay.  Did you ever provide any assistance for
16  Mr. Helton on his criminal cases?
17    A   I did not.
18    Q   Okay.  All right.  Up until the time that you
19  moved to dismiss the criminal charges against Amanda
20  Hoskins and Jonathan Taylor in the summer of 2016, were
21  you ever informed by law enforcement officials that
22  Christy Branson's statement was false?
23       MR. WRIGHT:  Objection as to form.
24       MR. KELLEY:  Object to form, as well.
25    A   No.

Page 134

1    Q   Up through the time that you moved to dismiss
2  criminal charges against Amanda Hoskins and Jonathan
3  Taylor in the summer of 2016, were you ever informed by
4  law enforcement officials that Christy Branson's
5  statement was fabricated?
6        MR. WRIGHT:  Objection as to form.
7        MR. KELLEY:  Join.
8    A   No.
9    Q   If you had been made aware of that
10  information, would you have disclosed that to the
11  defense?
12   A   Yes.
13   Q   Would you have done so because of your ethical
14  obligations as a prosecutor?
15       MR. WRIGHT:  Object to form.
16   A   Yes.
17   Q   If you learned that Ms. Branson's statement
18  was declared false or fabricated, would you have used
19  that evidence to continue charges against Amanda Hoskins
20  and Jonathan Taylor?
21       MR. WRIGHT:  Object to form.
22   A   No.
23   Q   If you learned that Ms. Branson's statement
24  was either false or fabricated, would you have
25  reevaluated the pending charges against Amanda Hoskins

Page 135

1  and Jonathan Taylor?
2        MR. WRIGHT:  Object to form.
3    A   Yes.
4    Q   Almost there.  Up through the time of --
5    A   Only four more to go.
6    Q   -- the dismissal against -- in the summer of
7  2016, were you ever informed by law enforcement
8  officials that Daniel Wilson's July 18, 2012 statement
9  was false?
10       MR. WRIGHT:  Object to form.
11   A   No.
12   Q   Up until the time that you moved to dismiss
13  charges against Ms. Hoskins in July of 2016, were you
14  ever informed by law enforcement officials that Daniel
15  Wilson's July 18, 2012 statement was fabricated by law
16  enforcement?
17       MR. WRIGHT:  Object to form.
18       MR. KELLEY:  Objection.
19   A   No.
20   Q   If you had been made aware of that
21  information, would you have disclosed that to the
22  defense?
23   A   Yes.
24   Q   And is that because of your ethical
25  obligations as a prosecutor?

Page 136

1    A   Yes.
2    Q   If you learned that Mr. Wilson's statement was
3  either false or fabricated by the police, would you have
4  used that evidence to continue charges against Ms.
5  Hoskins and Mr. Taylor?
6        MR. WRIGHT:  Object to form.
7        MR. KELLEY:  Objection as to form.
8    A   No.
9    Q   If you learned that Mr. Wilson was threatened
10  by a police or promised consideration in exchange for
11  giving a false and fabricated statement, would you have
12  used that evidence to initiate or continue charges
13  against Ms. Hoskins and Mr. Taylor?
14   A   No.
15       MR. WRIGHT:  Object to form.
16   Q   If you learned that law enforcement officers
17  fabricated Mr. Wilson's false statement, would you have
18  taken steps to immediately reevaluate the pending
19  criminal charges against Amanda Hoskins and Jonathan
20  Taylor?
21   A   Yes.
22   Q   Sir, I'm going to ask for you to take out the
23  case report.  This is Exhibit number 12.  You know what?
24  Sorry about this.  Mr. Steele, do you recall
25  participating in an interview with Robert Beach,

Page 137

1  Detective York, and Detective Johnson on
2  February 26, 2014?
3    A   I do.
4    Q   That seem right to you?
5    A   I wouldn't -- just seems -- if I remember, it
6  was -- it was the winter months and it was cool outside,
7  but I -- the exact date I couldn't tell you.
8    Q   Is it fair --
9    A   I wasn't involved on interviews.
10   Q   Is it your recollection that the interview and
11  statement from Robert Beach was after the initiation of
12  charges against Amanda Hoskins and Jonathan Taylor?
13   A   That is correct.
14   Q   In fact, is it your recollection that the
15  statement obtained from Robert Beach was taken more than
16  two years after the initiation of charges against Amanda
17  Hoskins and Jonathan Taylor, --
18       MR. WRIGHT:  Object to form.
19   Q   -- which would've been March of 2012?
20   A   Yes.
21   Q   Okay.
22   A   Been -- been around the two-year mark.
23   Q   Okay.  So is it fair to say that the statement
24  obtained from Robert Beach was not used to initiate
25  criminal charges against Amanda Hoskins and Jonathan

Page 138

1  Taylor for the murder of Katherine Mills?
2      A   That's correct.
3      Q   Is it fair to say that for the first two years
4  and -- that the statement from Robert Beach was not used
5  to continue the charges against Amanda Hoskins and
6  Jonathan Taylor, because it had not yet been obtained?
7      A   For -- yeah, the time period before it was
8  obtained, obviously it was not used.
9      Q   You testified earlier here today that you were
10  unaware of any conversations that may have taken place
11  between any law enforcement officer with Robert Beach
12  prior to your meeting with him at the prison in February
13  of 2014; is that right?
14      A   No.  I believe your question earlier was if I
15  -- I was aware if Jason York had any conversations with
16  him prior to.  There -- there was obviously at some
17  point in time law enforcement of some nature that had
18  talked to him and then forwarded the information to us,
19  but I -- the question earlier was if Jason York had any
20  conversations with him.  I'm not aware of any
21  conversation Jason York had with Mr. Beach beforehand.
22      Q   Are you aware, sitting here today, of any
23  conversation that any other law enforcement officer
24  other than Jason York had with Robert Beach prior to
25  your meeting with him?

Page 139

1      A   Again, some -- somebody -- he talked to
2  somebody in law enforcement that would've contacted -- I
3  believe it was Allen Trimble's office, the Commonwealth
4  Attorney of Whitley County, and Mr. Trimble wrote me a
5  letter advising me of -- of -- that Mr. Beach wanted to
6  make a statement, but I don't know who he -- I -- I
7  don't think -- you know, I don't know who he spoke to or
8  what initiated that conversation.  I don't know.
9      Q   Prior to the motions to dismiss that you filed
10  in the summer of 2016, were you ever informed by law
11  enforcement officials that Robert Beach's 2014 statement
12  was false and fabricated?
13      MR. WRIGHT:  Object to form.
14      A   No.
15      Q   If you had been made aware of that
16  information, would you have disclosed it to the defense?
17      A   Yes.
18      Q   And is that because of your ethical
19  obligations as a prosecutor?
20      A   Yes.
21      Q   If you had learned that Mr. Beach's statement
22  was either false or fabricated by the police, would you
23  have used that evidence to continue charges against Ms.
24  Hoskins or Mr. Taylor?
25      A   No.

Page 140

1      Q   If you learned that Mr. Beach's statement was
2  either false or fabricated, would you have reevaluated
3  the continuation of charges against Ms. Hoskins and Mr.
4  Taylor?
5      A   Yes.
6      Q   If you learned that law enforcement officers
7  promised consideration to Mr. Beach in exchange for his
8  statement, would you have disclosed that information to
9  the defense?
10      MR. WRIGHT:  Object to form.
11      MR. KELLEY:  Objection to form.
12      A   Yes.
13      Q   And is that because of your ethical
14  obligations as a prosecutor and your belief that this
15  evidence would be material under Brady and Giglio?
16      A   Yes.
17      Q   If you learned that Mr. Beach was promised
18  consideration in exchange for his statement, would you
19  have reevaluated the continuation of charges against Ms.
20  Hoskins and Mr. Taylor?
21      MR. WRIGHT:  Object to form.
22      A   I lost you there.  I'm sorry, Mr. Slosar.  Can
23  you say that one again?
24      Q   Sure.  If you learned that Mr. Beach was
25  promised consideration in exchange for his statement,

Page 141

1  would you have reevaluated the continuation of charges
2  against Ms. Hoskins and Mr. Taylor?
3      A   Yes.
4      Q   Prior to -- well, I'm going to show you what
5  we'll mark as Exhibit 22, the motion to dismiss you
6  filed in Jonathan Taylor's case.  To the best of your
7  knowledge and recollection, what is -- the evidence that
8  you outlined in your motion to dismiss, is that the
9  evidence that you believed, at some point in time,
10  supported the probable cause determination against
11  Amanda Hoskins and Jonathan Taylor?
12      (EXHIBIT 22 MARKED FOR IDENTIFICATION)
13      MR. WRIGHT:  Objection to form.  Answer the
14  best you can.
15      A   I believe (clears throat) -- excuse me.  I
16  believe that at the time the Grand Jury met, all of the
17  individuals and their statements would've been provided
18  for the Grand Jury's consideration, other than Robert
19  Beach.
20      Q   Okay.  Sorry.  Let me -- I'm going to ask it a
21  little bit differently.  There's -- in your motion to
22  dismiss, there's no mention of this person by the name
23  of Mikey Bruner; would you agree with that?
24      A   Who?
25      Q   Mikey Bruner?

Page 142

1    A    No. I'll agree that that's not included in
2  the motion to dismiss.
3    Q    Okay. And is that because you believe that
4  Mr. Bruner's statement wasn't credible?
5        MR. WRIGHT: Object to form.
6    A    I'm drawing a blank on Mikey Bruner.
7    Q    Okay. Let me ask you some basic questions.
8  Mikey Bruner's statement that Jason York -- in 2015,
9  April of 2015.
10    A    Okay.
11    Q    And Mr. Bruner claims that Mr. Taylor
12  confessed to him four years before about the Mills
13  homicide. Between -- up until the time that you moved
14  to dismiss charges against Jonathan Taylor in the summer
15  of 2016, were you ever informed that Mikey Bruner was
16  intoxicated -- actually, let me withdraw that question.
17  Up until the time that you moved to dismiss charges
18  against Jonathan Taylor in the summer of 2016, did any
19  law enforcement officer inform you that Mikey Bruner
20  admitted that he was intoxicated during the supposed
21  confession that he had years before with Jonathan
22  Taylor?
23        MR. WRIGHT: Object to form.
24    A    Can you -- (coughs.) Excuse me. Can you
25  point me to Mikey Bruner's supplement or statement or

Page 143

1  help me refresh my memory? I don't --
2    Q    Yeah.
3    A    -- I'm just drawing a complete blank on Mikey
4  Bruner right now.
5    Q    Sure. I'm not sure if it's -- let me try to
6  find it in here. I'm not sure if it's going to be in
7  here because it was done so late in the investigation.
8  It might be in the supplements file. Oh, yeah. Here it
9  is. It's in the supplements, Exhibit 3 at 25251. Yeah.
10  Figured that's where it was..
11    A    Is that Exhibit...
12    Q    That's the statement that Mr. York claims to
13  have gotten from Mr. Bruner in 2015. Does that refresh
14  your recollection?
15    A    It -- it does. Yes, sir. Thank you.
16    Q    Okay. So, at any time prior to the dismissal
17  of charges against Mr. Taylor in June of 2016, did any
18  law enforcement officer inform you that they learned
19  from Mikey Bruner that he was intoxicated at the time of
20  his conversation with Mr. Taylor many years earlier?
21        MR. KELLEY: Objection as to form.
22        MR. WRIGHT: I'll join.
23    Q    You can answer.
24    A    Just for clarification, when you say that he
25  was intoxicated, are you talking about Mr. Bruner being

Page 144

1  intoxicated or Mr. -- Jonathan being?
2    Q    Mr. Bruner.
3    A    No.
4    Q    I know that the report does document that Mr.
5  Taylor was --
6    A    Yes.
7    Q    -- intoxicated. I'm asking you a different
8  question. If you had been made aware of that
9  information, would you have disclosed it to the defense?
10        MR. WRIGHT: Object to form.
11    Q    That Mr. Bruner was intoxicated during a
12  conversation where he claimed somebody confessed to him?
13    A    If I'd been made aware of, yeah, I would.
14    Q    And would you have disclosed that to the
15  defense because of your obligations under Brady and
16  Giglio?
17        MR. WRIGHT: Object to form.
18    A    I don't know that it goes to Brady and Giglio
19  just as much as I just have an open-file policy and that
20  it would've been a, you know -- I don't know that I'd
21  have made a formal filing of it other than just tell
22  defense attorneys in talking about these statements,
23  "Well, you know, they were drunk. Couple of drunks
24  having some drinks and -- and he made his statements." I
25  would've made sure they were aware of it. I don't -- I

Page 145

1  just don't know that that rises to the level of Brady
2  and Giglio.
3    Q    Well, if somebody's intoxicated and they claim
4  that somebody made a statement to them, would you agree
5  with me that that would be a form of impeachment?
6        MR. WRIGHT: Object to form.
7    Q    From a defense perspective?
8    A    We can agree to disagree on this. I would
9  still turn it over regardless.
10    Q    Okay. If you learned that Mikey Bruner was
11  intoxicated, either through drugs or alcohol, at the
12  time of this supposed statement by Mr. Taylor, would you
13  have reevaluated the continuation of criminal charges
14  against Mr. Taylor for the murder of Katherine Mills?
15        MR. WRIGHT: Object to form.
16    A    Yes.
17    Q    All right. Almost done. Then if you could
18  take out your motion to dismiss.
19    A    I've heard that before.
20    Q    If you could take out your motion to dismiss
21  -- I'm running out of exhibits.
22    A    Go ahead. Let me give you this back. That
23  was yours you handed me.
24    Q    Oh, thank you. So I'm just going to -- would
25  you agree with me that the motion to dismiss that you

Page 146

1 filed in Jonathan Taylor appears to be, except for the
2 caption, the same one that you filed in Amanda Hoskins'
3 and William Lester's case?
4    A  It – it is. Yes, sir.
5    Q  Okay. From looking at the motion to dismiss,
6 is it fair to say that at some point in the prosecution
7 you learned that a number of witnesses denied making
8 statements to the police?
9      MR. WRIGHT: Object to form.
10    Q  Joe King, for instance?
11    A  I – I don't think he ever denied making
12 statements to the police to me, he just did not –
13 didn't remember.
14    Q  All right. Well, let's go to paragraph 5,
15 page 2. Do you see where it says, "Joe King has since
16 changed his story and that he never heard anyone talking
17 about robbing an elderly lady and that he did not see or
18 know of Amanda spending money"; do you see that?
19    A  Uh-huh. I do.
20    Q  Okay. But you agree with me that he is
21 denying having any knowledge of the information
22 contained in Detective York's June 24, 2011 statement?
23      MR. WRIGHT: Object to form.
24    Q  You can answer.
25      MR. WRIGHT: That's – this motion is not Joe

Page 147

1 King's writing.
2      MR. SLOSAR: Is that on objection or –
3      MR. WRIGHT: Yes. It is an objection. Object
4 to form.
5      MR. SLOSAR: If you want to testify, I'd be
6 happy to...
7      MR. WRIGHT: Do you want to call for that one
8 question?
9 BY MR. SLOSAR:
10    Q  You can answer.
11    A  The – the –
12      MR. WRIGHT: His testimony would be limited
13 then.
14    A  The – okay. The – can you restate the
15 question for me?
16    Q  Sure. Earlier, a few moments ago, you said
17 something to the effect that Joe King told you that he
18 didn't remember something and my question to you was:
19 Did he deny making a statement? So I'm trying to get
20 past that.
21    A  Okay. Yeah. He –
22    Q  The last –
23    A  – he never denied making a statement, though.
24    Q  He – but he told you when he spoke with you
25 – he told you that he denied any of the knowledge that

Page 148

1 was attributed to him in that earlier statement drafted
2 by Detective York?
3    A  Correct.
4      MR. WRIGHT: Object to form. Asked and
5 answered. That's not his testimony. Answer best
6 you can.
7    Q  He already did. Is that correct?
8    A  That – that is correct. What I have in my –
9 in my motion is the – that he had changed his story,
10 not that he had not given a statement but that he had
11 changed his story and then never heard anyone talking
12 about robbing an elderly lady. That's correct.
13    Q  So he told you that the information contained
14 in the statement –
15    A  Uh-huh.
16    Q  – wasn't true, right?
17      MR. WRIGHT: Object to form.
18    A  In essence, without saying those words, yes.
19 In – based upon his statements, yes.
20    Q  And according to paragraph two, it says you
21 contacted Robert Beach on June 23, 2016, and his version
22 of events had changed from what was recorded in the
23 statement, correct?
24    A  Correct.
25    Q  Okay. So Robert Beach gave you information in

Page 149

1 that phone call that was different than the two-minute
2 and 40 second recording that yourself and Detective
3 Johnson and Detective York obtained from him in an
4 Indiana prison, correct?
5      MR. WRIGHT: Object to form.
6    A  That would be correct.
7    Q  Okay. And Daniel Wilson, in paragraph 1, told
8 you that he could not recall Jonathan Taylor ever making
9 any statements about the murder of Katherine Mills or an
10 old lady; is that right?
11      MR. WRIGHT: Object to form.
12    A  Specifically, he stated that, when I asked
13 about his previous statements, he didn't know anything
14 about those statements and he didn't remember making
15 them.
16    Q  Okay. So, you had spoke to witnesses close in
17 time to June of 2016 when you filed this motion to
18 dismiss; is that right?
19    A  Yes.
20    Q  Okay. And those witnesses told you that the
21 statements attributed to them earlier in the
22 investigation were not true, correct?
23      MR. WRIGHT: Object to form.
24    Q  You can answer.
25    A  Again, I'm not going to – for instance, Mr.

Page 150

1  Wilson didn't say they weren't true, he said he just
2  didn't remember making them.  Mr. King didn't change his
3  statement in regards to what he saw and heard.  One of
4  them's not true.  That's – that's for somebody to else
5  to decide which one's not true.
6      Q   Well, yeah.  Not – I'm not asking you to sit
7  here and say whether somebody is – whether the police
8  report is true or whether their, you know, telephone
9  conversation with you is true.  That's going to be for a
10 jury to decide later on.  All I'm asking you is: Did
11 these people, when you spoke to them around the time you
12 filed the motion to dismiss, say that their knowledge in
13 the criminal investigation was not what was reported to
14 be their knowledge in earlier investigative reports?
15      MR. WRIGHT:  Object.  Asked and answered.
16      A   Again, I – it – it had changed.
17      Q   Okay.  Now we're past that hurdle.  Once you
18 learned that witness statements were not as they were
19 reported to be in the earlier police report, did you
20 take affirmative steps to reevaluate the criminal
21 charges against Amanda Hoskins, Jonathan Taylor, and
22 William Lester?
23      A   Yes, I did, and I – let me just say, I took
24 them as they came in.  So Joe King was the first one I
25 can remember.  Well, Kayla Mills obviously died before

Page 151

1  anybody else, and at that point in time, we would look
2  as we would in any case as any discovery issue comes in,
3  discovery item comes in, we reevaluate that case as they
4  come in.  I specifically remember Joe King because I
5  spoke to him on a Sunday, if I'm not mistaken.  Amanda
6  and William were scheduled for trial earlier that week
7  and I immediately, that Sunday afternoon, contacted Mr.
8  Hoskins, who is Mr. Lester's attorney.  I cannot
9  remember who was representing Amanda at the time –
10 contacted them on Sunday afternoon and then we got a
11 phone call with the judge to make sure they were aware
12 immediately of – under my prosecutorial duties and –
13 and Giglio and Brady, of the change in Mr. King's
14 testimony.  So it's something I – I take care –
15      Q   Seriously?
16      A   – take very serious and I take care of
17 immediately once those issues come up.
18      Q   I'm going to show you – and I have a copy of
19 this that I will get to you all.  This is KSP382 and
20 383.  I've got to find it in my file folder down here.
21 It's a – just the affixed  supplemental report from
22 December 6, 2012.  Mr. Steele, will you review that
23 document for a moment?
24      A   I'm familiar with this document.
25      Q   You're familiar with it?

Page 152

1      A   I am.
2      Q   And what is that document?  Did you receive
3  that document during the criminal prosecution?
4      A   I did.  Yes.
5      Q   Okay.  And is it fair to say that you believed
6  during the underlying investigation that – I have it.
7  Sorry.  Here it is.  Sorry.
8      A   Want to mark these as an exhibit?
9      Q   Yeah.  You're right.  This will be 23.  And
10 that number is 23.
11      MR. KELLEY:  Well, for some reason, I don't
12 know what I have written down.
13      MR. SLOSAR:  Here.  Here.
14      MR. KELLEY:  What is John Pickard's statement
15 number?
16      THE WITNESS:  Let's see.  His last exhibit was
17 21.
18      MR. SLOSAR:  Yeah.
19      THE WITNESS:  It was John Pickard's letter, and
20 22 was my motion to dismiss.
21 BY MR. SLOSAR:
22      Q   Okay.  So Exhibit 23 – so, is it fair to say
23 that the criminal – in – during the criminal
24 investigation, the theory was that the perpetrator or
25 perpetrators left five $100 bills at the crime scene?

Page 153

1      (EXHIBIT 23 MARKED FOR IDENTIFICATION)
2      A   There were five $100 bills left at the crime
3  scene.  Yes.
4      Q   Okay.  And did – was it your understanding
5  that law enforcement officers believed that this
6  physical evidence could help solve who really was
7  responsible for Katherine Mills' death?
8      MR. WRIGHT:  Object to the form.
9      MR. WILLIAMS:  Join.
10     A   Can you – I think any physical evidence, your
11 hope when you send it to the lab for testing, is that it
12 will help either include or exclude a potential
13 defendant.
14     Q   And during the criminal prosecution against
15 Amanda Hoskins and Jonathan Taylor, which was initiated
16 in March of 2012 by Detective York, did you as a
17 prosecutor keep close attention to the results of
18 scientific testing in this case?
19     A   Yes, as good as – as well as we could, and
20 that's one of the reasons we have what we referred to
21 earlier as a Dinkins form on the Grand Jury forms.  They
22 bring it to the Grand Jury so we have a checklist of
23 what has been provided and what's outstanding.  And the
24 state police crime lab, it has instituted a – a new
25 system – I'm going to call it a new system, the B

Page 154

1  system, which allows prosecutors access to that system
2  to check reports instead of waiting on officers to check
3  and bring them to us, so we try to keep up with that.
4  And I'm – I'm not sure when that system was initiated,
5  but we obviously would've known fingerprints were
6  outstanding and waited for that analysis.
7      Q   And at some point in or around December of
8  2012, were you made aware that latent print comparisons
9  were conducted between Amanda Hoskins, Jonathan Taylor,
10 and William Lester and the currency found at the Mills
11 crime scene?
12     A   I was – I was made aware of sometime after
13 the date of the report of December 6, 2012.  Yes.
14     Q   And did you learn sometime after
15 December 6, 2012 that the latent prints excluded Amanda
16 Hoskins, Jonathan Taylor, and William Lester from
17 contributing any prints on the currency at issue?
18     A   That is correct.
19     Q   Okay.  Now, at the time that you received this
20 report, did you reevaluate the pending criminal charges
21 against Amanda Hoskins, Jonathan Taylor for the murder
22 of Katherine Mills?
23     A   Yes.
24     Q   Is it fair to say that you continued with the
25 pending criminal charges due to the statements obtained

Page 155

1  from law enforcement officers during the underlying
2  criminal investigation?
3          MR. WILLIAMS:  Object to the form.
4          MR. WRIGHT:  Join.
5      Q   You can answer.
6      A   It – looking at the case as a whole, it's
7  fair to say we were seeing not just statements, but –
8  but – and that's a lot of what this case is, but not
9  just statements that – that we went through today, but
10 of – of Ms. Hoskins' statement, all those going forward
11 is what we considered to go forward on.  Yes.
12     Q   Well, is it fair to say that prior to the
13 dismissal of charges in 2016, no law enforcement
14 official ever made you aware of any confession that
15 Amanda Hoskins made to the police?
16     A   That's fair.
17         MR. WRIGHT:  Object to form.
18     Q   Prior to the dismissal of charge against
19 Jonathan Taylor in the summer of 2016, had any law
20 enforcement officer ever informed you as to whether Mr.
21 Taylor ever made a confession to police?
22     A   No.  Nobody ever did.
23     Q   Prior to the initiation of charges against –
24 well, let me withdraw that question.  At the time when
25 you first got the criminal case against Amanda Hoskins

Page 156

1  and Jonathan Taylor for the murder of Katherine Mills,
2  had any law enforcement official ever told you that
3  Amanda Hoskins or Jonathan Taylor confessed –
4      A   No.
5      Q   – to the police?
6      A   No.
7      Q   At any point between the initiation of charges
8  in March of 2012 and you sitting here today, has any law
9  enforcement officer ever told you that Jonathan Taylor
10 confessed to the police?
11     A   No.
12     Q   Between the initiation of charges in March of
13 2012 and today, has any law enforcement officer ever
14 told you that Amanda Hoskins confessed to the police?
15     A   No.
16     Q   Is it fair to say that the initiation and
17 continuation of the criminal charges against Jonathan
18 Taylor was never based on any confession that he gave to
19 police?
20     A   That is true.
21     Q   Is it fair to say that the initiation and
22 continuation of charges against Amanda Hoskins for the
23 murder of Katherine Mills was never based on any
24 confession that she gave to police?
25     A   That is true.

Page 157

1      Q   All right.  Is it fair to say that at the time
2  you filed the motion to dismiss against Jonathan Taylor
3  on June 29, 2016 that you no longer believed that
4  probable cause existed to continue the criminal
5  prosecution against him?
6      A   That is correct.  It's noted so in my motion.
7      Q   Is it fair to say that at the time that you
8  filed a motion to dismiss against Ms. Hoskins that you
9  no longer believed that you had probable cause to
10 continue the criminal prosecution against her for the
11 murder of Katherine Mills?
12     A   Again, same as Mr. Taylor, it's notated in –
13 in my motion.
14     Q   Is it fair to say that at the time you filed
15 the motion to dismiss in William Lester's case in July
16 of 2016 that you no longer believed you had probable
17 cause to continue the criminal prosecution against him?
18     A   That is correct and also noted in the motion.
19     Q   If law enforcement officials had informed you
20 earlier in the prosecution that witness statements were
21 false, would you have taken steps to stop the criminal
22 prosecution against Amanda Hoskins and Jonathan Taylor
23 at that time?
24         MR. WRIGHT:  Object to form.
25         MR. KELLEY:  Object to form.

Page 158

1    A   Yes.
2    Q   If law enforcement officials had informed you
3   that statements obtained from witnesses against Ms.
4   Hoskins and Mr. Taylor were fabricated, is it fair to
5   say that you would have stopped the criminal prosecution
6   of them at that time?
7        MR. WRIGHT:  Object to form.
8        MR. KELLEY:  Join.
9        MR. WILLIAMS:  Join.
10    A   Make sure I understand your question.  If all
11   the statements – if – if they told me – informed me
12   that all the statements had been fabricated or that a
13   statement had been fabricated and – I guess I'm asking
14   if – if – we – we routinely have witnesses that come
15   in and say, "Hey, look.  I – I've lied," you know, "It
16   – it's a false statement."  I'm made aware of it, I
17   reevaluate the case based on that being a false
18   statement.  If the questions was, and I'm sorry if I
19   zoned out of – the statement – the question was that
20   law enforcement has helped fabricate the statement, then
21   the answer would be yes.
22   BY MR. SLOSAR:
23    Q   Yes.  Okay.  That is my question.  I'll ask it
24   a better way.  If law enforcement officers had informed
25   you earlier in the prosecution that they had fabricated

Page 159

1   statements against Amanda Hoskins and Jonathan Taylor,
2   would you have stopped the criminal prosecution?
3        MR. WRIGHT:  Objection to form.
4        MR. KELLEY:  Objection.
5        MR. WILLIAMS:  Objection.
6    A   Yes.
7   BY MR. SLOSAR:
8    Q   Did you ultimately dismiss the criminal
9   charges against Amanda Hoskins because there was no
10   longer any credible evidence indicating that she was
11   responsible for the death of Katherine Mills?
12        MR. WRIGHT:  Object to form.
13    A   No.  I think the reason the – the – it's
14   laid out in my motion to dismiss that probably cause
15   could not be – I do not think probable cause could be
16   met at that point in time.
17    Q   In your motion to dismiss, did you write that,
18   "The Commonwealth must be ever vigilant in the pursuit
19   of justice, not just to get – gain a conviction, but to
20   be ever mindful of the duty of the prosecutor for the
21   people and not pursuing charges or moving forward in
22   matters in which probable cause of guilt is not
23   present"?
24    A   Yes, I did.
25    Q   At the time you filed this, did you believe

Page 160

1   that probable cause existed to continue the charges
2   against Amanda Hoskins or Jonathan Taylor?
3    A   I did not.
4    Q   Mr. Steele, sitting here today, do you have
5   any opinions as to whether Amanda Hoskins or Jonathan
6   Taylor were involved in the murder of Katherine Mills?
7        MR. WRIGHT:  Object to form.
8    A   I'm going to – I'm going to decline to answer
9   that question for this reason: this is a case that was
10   dismissed without prejudice, which means that it could
11   be brought back up at a – at another point in time.  My
12   opinions are not – are not at issue in a criminal
13   prosecution.  My – my thoughts are not at issue in a
14   criminal prosecution, only what I can prove.  And I'm
15   not trying to be crass with you, but – and I'm not –
16   my opinion doesn't – doesn't matter in a criminal
17   prosecution, and if I was to make an opinion as to a
18   criminal prosecution, it could have myself and my office
19   removed from the case for prosecution, so that's the
20   reason I'm going to – I'm going to not answer that
21   unless I have a federal judge that tells me to answer
22   it.
23    Q   So is it your testimony here today that you
24   don't have a personal opinion one way or the other as to
25   whether Amanda Hoskins or Jonathan Taylor were involved

Page 161

1   in the death of Katherine Mills?
2    A   No.  No.  I think we all have our personal
3   opinions, I'm just not going to voice mine.
4    Q   Since the dismissal of charges against Ms.
5   Hoskins and Mr. Taylor in the summer of 2016, are you
6   aware of any investigation taking place by any law
7   enforcement agency into the death of Katherine Mills?
8    A   I know – I believe I have referred a couple
9   – from the family of Ms. Mills, I have referred them to
10   law enforcement when they contacted me, and – and
11   unfortunately for the victim's families, especially in
12   small communities, people are always talking about it
13   and there's always speculation by the community and –
14   and as they hear these and they hear somebody's name
15   repeated over and over and over again, they want
16   somebody to look into it, so I don't know – to answer
17   your question, I don't know if law enforcement's done
18   any independent investigation or if they had enough
19   information to answer the questions before them at that
20   point in time regarding the individuals, but I know
21   Diane, the victim's daughter, I've talked to her, I
22   think, two or three times, and maybe even the son once.
23    Q   Has Diane ever asked you to investigate Mike
24   Simpson?
25    A   I don't have any independent recollection

Page 162

1  other than to say that she, as most victims' families,
2  wants everybody investigated, wants everybody.
3     Q   What law enforcement agency did you refer her
4  to?
5     A   I would've referred her on the state police to
6  contact, because they're – they were the original
7  investigating agency, so...
8     Q   Have you referred any of the victim's family
9  to the state police since this lawsuit has been filed?
10    A   I don't – no, I don't think so.  When did you
11  file the lawsuit in – last fall, summer?
12        MS. STAPLES:  It was April or – April of last
13  year.
14    Q   April of 2017.
15    A   April – I – I don't – I don't think so.  It
16  was – I want to say it was fairly close to, you know,
17  when the – when the – when the case were dismissed and
18  – yeah, I – I've talked to – I've talked to Diane
19  since the suit has been filed and we – we've discussed
20  at issues in – in Pulaski Circuit Court in regards to
21  the –
22    Q   Sure.
23    A   – release of evidence, so, but it wasn't –
24  at that point in time, there wasn't any new suspects or
25  issues she had.  It was – it was prior to that.

Page 163

1     Q   If you were to testify at trial, would you
2  decline to give your opinion on whether or not Ms.
3  Hoskins or Mr. Taylor were in any way responsible for
4  the death of Katherine Mills under the same basis that
5  you gave here today?
6     A   Yes.  I would.
7     Q   Okay.  You understand why I asked that
8  question?  I don't want a surprise in front of a jury.
9     A   Oh, that's – I completely understand.  And
10  like I said, if I have a federal judge tells me to
11  answer the question, I'll answer the question.
12    Q   Let me ask you a few more questions and then
13  I'm going to be done, and I'm sorry I have to ask this.
14    A   Okay.
15    Q   Did you conspire with any police officer
16  deprive Amanda Hoskins of her constitutional rights?
17    A   No.
18    Q   Did you conspire with any police officer to
19  deprive Jonathan Taylor of his constitutional rights?
20    A   No.
21    Q   Did you withhold any exculpatory evidence for
22  Ms. Hoskins or Mr. Taylor?
23    A   No.
24    Q   Did Detective York present any exculpatory
25  evidence to you which you then withheld?

Page 164

1     A   No.
2     Q   Did Sheriff Pickard present any exculpatory
3  evidence to you which you then withheld?
4     A   No.
5     Q   Did Detective Mefford present any exculpatory
6  evidence to you which you then withheld?
7     A   No.
8     Q   Did Detective Johnson present any exculpatory
9  evidence to you which you then withheld?
10    A   No.
11    Q   Did Chief Mike Broughton from the Barbourville
12  Police Department present any exculpatory evidence to
13  you which you then withheld?
14    A   No.
15    Q   Did any Kentucky State Police officer present
16  any exculpatory evidence to you which you then withheld?
17    A   No.
18    Q   Did any Knox County deputy present any
19  exculpatory evidence to you which you then withheld?
20    A   No.
21    Q   How – or do you consider Detective York to be
22  a friend of yours?
23    A   An acquaintance.  I – I don't know that I'd
24  call him, I guess, a friend in that I guess if you
25  needed something, call and I'd help him and I'd hope

Page 165

1  vice versa, but he's never been to my house that I –
2  I'm aware of, never been to his house or socialized
3  together.  Working – I guess working acquaintance is
4  the best way to put it.
5     Q   Do you have any opinion one way or the other
6  as to Detective York's investigative abilities?
7     A   My – my impression of Detective York in –
8  with the cases I've worked with him on was that he was a
9  good detective.
10    Q   Do you still have that same opinion after
11  reviewing some of the evidence here today that he never
12  disclosed to you?
13    A   I would agree that Detective York may have
14  made mistakes.  There may have been some things even he
15  probably wished he'd done different now, but no.  My –
16  my general opinion of Detective York would be the same.
17    Q   After discovering that the lawsuit had been
18  filed, do you recall having a conversation with
19  Detective York?
20    A   I'm sure I did, but I don't have any – I
21  don't remember.
22    Q   Did you help Detective York obtain a lawyer in
23  this civil lawsuit?
24    A   Help him obtain a lawyer?  I may have referred
25  him to some lawyers.  I don't know – I think – do

Page 166

1 you –
2     MR. WRIGHT: I'm his attorney. I don't know
3 that I talked to you about representing him, though.
4     A   Yeah. I – I'm sure I haven't talked to Mr.
5 Wright about representing him. I – I do know Mr.
6 Wright. He's presented at a couple conferences, but I
7 know I never had any conversation with Mr. Wright about
8 representing Mr. York. No.
9     Q   Do you remember having a text message
10 communication with Detective York where you gave him the
11 phone number for an attorney named Matt?
12     A   I don't remember. Matt Feltner was – oh,
13 wait a minute. Hang on. If I'm not mistaken – oh,
14 this could be speculation. If I'm not mistaken, we did
15 – we did converse and he had – he just asked me about
16 some attorneys. Matt Feltner was a retired state police
17 post commander, if I'm not mistaken – captain, and I
18 advised him – Matt Feltner had worked with the KSP
19 legal team who does a lot of – obviously they do a lot
20 of – of representation of officers and I may have given
21 him Matt Feltner's number and contact information.
22     Q   Is something that you had ever done before for
23 an officer involved in a criminal investigation who was
24 in a suit?
25     MR. WRIGHT: Object to form.

Page 167

1     A   To be – I – I'm sure I have, but then again,
2 I guess as a small-town, you know, prosecuting attorney,
3 I get phone calls all the time about who – you know,
4 "Who should I contact for a property dispute? Who
5 should I contact for this?" And – and I typically
6 refer them several – several names.
7     Q   Did any law enforcement officer during the
8 time that you were handling the prosecution ever provide
9 evidence to you that implicated Mike Simpson or Allen
10 Helton in the murder of Katherine Mills?
11     A   Mike Simpson and Allen Helton were – were
12 suspects that were discussed and reviewed, but did they
13 ever hand me what?
14     Q   Any evidence implicating Mr. Helton or Mr.
15 Simpson?
16     A   No.
17     MR. SLOSAR: I don't think I have any further
18 questions. Thank you for your time.
19     THE WITNESS: You're welcome. All right. We're
20 done, right?
21     MR. KELLEY: No.
22     MR. WRIGHT: We can take a break before we get
23 going again.
24     MR. SLOSAR: Okay.
25         (OFF THE RECORD)

Page 168

1             CROSS EXAMINATION
2 BY MR. WRIGHT:
3     Q   Mr. Steele, my name is Derrick Wright. I'm an
4 attorney for defendant Jason York and defendant Jason
5 Bunch. I appreciate you being here and we'll just go
6 through some questions. I'm sorry I'm going to jump
7 around –
8     A   Oh, you're fine.
9     Q   – because you've already went through a lot
10 of it. I want to go first to Exhibit number 22. It's
11 one of the motions to dismiss.
12     A   Okay.
13     Q   You see that?
14     A   Yes, sir.
15     Q   We'll just go through it. The first paragraph
16 refers to Daniel Wilson; do you see that?
17     A   Yes, sir.
18     Q   About – it begins by mentioning a statement
19 that he told KSP detectives based on what Taylor told
20 him while in jail. That's the first couple of sentence;
21 do you see that?
22     A   Yes, sir.
23     Q   And then about halfway through it starts,
24 "This statement was confirmed by the Commonwealth
25 Attorney several months after the statement was made in

Page 169

1 person at the Knox County jail"; do you see that?
2     A   I do.
3     Q   Did you talk to Daniel Wilson?
4     A   I did.
5     Q   Did he – tell me what he told you.
6     MR. SLOSAR: Objection to form. Foundation.
7     A   It would've been a general conversation
8 between just, you know, talking to an individual, not
9 as formal as a KSP interview. If I'm not mistaken, they
10 put us in the – the law library there at the Knox
11 County Detention Center. We were alone and I just spoke
12 to him again, I think it was in regards to some court
13 dates, where he was going to be at, what his – you're
14 always playing where – where are they locating them at
15 now, what his – where he was going to be going, what
16 his charges were, not from the meat and bones of the
17 charges he's in there on, but what's he anticipating,
18 does he have a sentencing date, where's he at, just so
19 we can get him back for court, at which point in time we
20 just had a – just – just a general conversation
21 regarding his statement, and – and that's – my
22 statement says he confirmed what he told.
23     Q   So had you seen Detective York's report of
24 what Daniel Wilson had said defendant Taylor had said?
25     MR. SLOSAR: Objection to form.

Page 170

1   A   I – again, I can't say if I'd seen the report
2   at that point in time or I had knowledge of the contents
3   of what – of what he said. I honestly can't tell you.
4        Q   To your memory, when you met with him, what he
5   told you was with consistent with what he had told
6   Detective York?
7        A   That is correct.
8        MR. SLOSAR: Objection to form.
9        THE WITNESS: Sorry.
10       MR. SLOSAR: No, you're fine.
11   BY MR. WRIGHT:
12       Q   Now, did you speak to him again in phone; is
13   that correct?
14       A   Yes, sir.
15       Q   All right. And then, was anyone else on the
16   line with you?
17       A   No. Not – I – I believe – I don't know if
18   anybody was on the line with me at this point in time.
19   Yes. Mr. Jones, Brandon Jones in my office. We were
20   sitting in the conference room where I typically get
21   prepared for trial at – (coughs) excuse me – and I had
22   him on speaker phone. Mr. Jones was present in the
23   room, also. He was going to sit second chair with me on
24   this case.
25       Q   Did you ask him about – well, tell me what he

Page 171

1   told you on the phone.
2        A   Okay. Like I say in the statement, it was
3   just that he didn't remember: "I don't remember making a
4   – making any statements." He just – "I don't
5   remember" and that he was not going to testify as to his
6   previous statements.
7        Q   Okay. Did you talk with him the prior
8   statement that he'd had with you in person?
9        A   I did.
10       MR. SLOSAR: Objection to form.
11       Q   And what did he say about that?
12       A   Did I confront him – I'm sorry.
13       Q   Yeah.
14       A   Did I confront him about his previous
15   statement? Yes. I – and again, I – there's probably
16   a jail recording of it in Campbell County that would –
17   that would be specific to the content, but if my
18   memory's not – I don't know if I – I don't know if I
19   confronted him about making the prior statement to me,
20   but I – I would think I would have, and he just stated
21   he didn't remember.
22       Q   Do you know how long it would've been between
23   the time that you saw him in person and the time you saw
24   him – talked to him on the phone?
25       A   I do not, other than to say it would not have

Page 172

1   been a couple weeks or even a couple months. It
2   would've been a lengthy amount of time.
3        Q   Did he affirmatively deny what he had said to
4   Detective York and you again in person, or did he just
5   say he couldn't remember?
6        MR. SLOSAR: Objection to form.
7        A   He just said he didn't remember Mr. Taylor
8   making any statements of an elderly – of any elderly
9   lady or any mention of his cousin and that he didn't
10   know anything about those statements. And – and I used
11   the – the – you know, as I'm looking at my statement
12   and I'm looking at my motion to dismiss, I'm reading –
13   I used "statements" in the plural, which would indicate
14   his statement to the law enforcement officers and then
15   his statement to me, and – and he didn't remember
16   making them.
17       Q   Okay. Do witnesses to prosecutions, when
18   you're preparing for trial, do they tell you they don't
19   remember the statements they made? Is that something
20   that comes up?
21       MR. SLOSAR: Objection to form. Foundation.
22       A   Quite frequently. Yes.
23       Q   How long have you been a prosecutor?
24       A   15 plus years.
25       Q   Okay. And do you follow up with witnesses

Page 173

1   identified by police prior to trial?
2        A   Yes.
3        Q   And do they sometimes claim to have no memory
4   of the statements they gave to police?
5        MR. SLOSAR: Objection to form. Calls for
6   speculation. Foundation.
7        A   They do.
8        Q   Okay. All right. Let's move to Robert Beach.
9   He was interviewed in February 2014 it says; do you see
10   that, paragraph two?
11       A   Yes, sir.
12       Q   And you were present for that interview?
13       A   I was.
14       Q   And I believe you were asked how long – to
15   estimate how long you were in – in the prison; do you
16   recall that questioning?
17       A   I do.
18       Q   And how long did you estimate?
19       A   I think I estimated 30 to 45 minutes, and as
20   you say that, the time we were in the prison from the
21   time we checked in and checked out would probably –
22   would be a lot longer. I would say we were – we talked
23   to Mr. Beach for 30 to 45 minutes, and the way this
24   prison was laid out, we actually went through – we
25   checked in and went through, like, a – a yard area. It

Page 174

1  was a – not a mile walk or anything, but it was a – it
2  was a pretty decent walk to the facility which they took
3  us – the building they took us to and sat us three in,
4  and I want to say they brought Mr. Beach to us.  I don't
5  think he was present when we first came in, so we waited
6  some period of time for Mr. Beach to us.
7      Q   Now the recording isn't very long.  Do you
8  recall what was discussed before his recorded statement?
9      A   Yeah.  Just in general, we – we told him why
10  we were there, what we were there for.  He understood,
11  gave us just general what he knew.  We – you know, we
12  were just talking to him, what he was in there for, how
13  long – you know, what kind of sentence he got, how long
14  we – he was going to be there, just a very general
15  conversation, not anything pointed and got – you know,
16  we was just making him feel comfortable with us.  We was
17  – again, we spoke for a period of time and then he –
18  we kind of got down to exactly what – you know, where
19  they were at, where they may have – where they were
20  housed at, tried to get him to pinpoint specifics.  If
21  I'm not mistaken, Detective York or somebody had already
22  verified with the Whitley County Detention Center that
23  they had – were in the same area of – of – same area
24  while incarcerated so that they could've actually had a
25  conversation, so we knew we weren't wasting our time

Page 175

1  driving up there, and then it was just getting specifics
2  about that.  I remember us having a conversation about
3  – he was – he was upset that an elderly lady died
4  because of drugs.  He was upset that it was all over
5  drugs.  He'd had a drug problem.  If I'm not mistaken,
6  his brother had a drug problem.  He told us a story
7  about his brother and – had died while on drugs, and
8  think him and his brother would – were on drugs
9  together one night and had a – had a bad experience
10  with methamphetamine and his brother got tangled in some
11  – some barbed wire and got cut and – and – and that
12  he died.  I remember him telling us that story, also.
13      Q   Did he – was there any discussion about any
14  promises being made to him for his testimony in this
15  case?
16      A   No.  He had – he had asked – he did ask me,
17  I suppose asked us about getting him moved to Kentucky
18  because I think he had a – some prison time left in
19  Kentucky and Indiana both and wanted to go and get moved
20  to Kentucky and pull his time there, and I told him
21  there that day that, you know, he's a inmate of Indiana.
22  He's basically their property and – and once they got
23  him released, then it – the Kentucky Department of
24  Corrections would pick him up at that point in time, but
25  at this point in time there was nothing myself or

Page 176

1  anybody could do for him in regards to where he's being
2  housed.
3      Q   Did you tell him that you would see what could
4  be done once he got into Kentucky, into the Kentucky
5  prison system?
6      A   I – I'm – I don't specifically recall, but
7  yeah, I – I mean, it wouldn't be uncommon for me to
8  say, "You know, you get to Kentucky, call me and we'll
9  – we'll see if we can get you" – because I think his
10  family's from Warren County or Pulaski County area, and
11  he wanted – just wanted to be in a general closer area
12  to them.
13      Q   Did you consider that any kind of promise or
14  consideration or incentive that you would need to
15  disclose under Brady or Giglio?
16      A   No.  I'd made him no promises that – that I
17  would move him, could move him, or would try to move
18  him.  Just, "Call me when, you know – make contact with
19  us when you get back to Kentucky."
20      Q   Okay.  Anything else you remember about the
21  conversation with Beach at the prison system?
22      MR. SLOSAR:  At the prison system?
23      Q   I'm sorry.  At the Indiana prison?
24      A   Not that I can recall off the top of my head.
25  No.

Page 177

1      Q   Okay.  Did you have any phone calls with him;
2  to your memory?
3      A   Not until the – the date that I was listed on
4  my motion to dismiss when I contacted him on
5  June 23, 2016 in preparation for trial.
6      Q   And that was by phone call?
7      A   That was.
8      Q   Okay.  Did you ever talk to him in person
9  again?
10      A   No, sir.
11      Q   Okay.  What did he tell you on the phone call
12  – well, let me strike that.
13      A   The – let – let me go back and answer that
14  question again.  I believe I testified earlier that I do
15  believe I did talk to him in person once, maybe twice,
16  because he'd already been transported for a trial date
17  that got continued and it was – it wasn't anything
18  about the case other than, "Sorry you had to be brought
19  down here," because it was – if my memory serves, it's
20  about a four- or five-hour drive from the prison
21  facility in Indiana down here, so it was a – you know,
22  it was a – it was a long drive him down and back, so –
23  let me rephrase that.  I – I'm pretty sure I did talk
24  to him in person again after this statement.
25      Q   Did he – that was before your phone call,

Page 178

1  though, right?
2      A   That was – yes, sir.
3      Q   Did he – did you talk about his statement at
4  that time?
5      A   No, sir.
6      Q   Did he indicate to you that his statement was
7  false?
8      A   No, sir.
9      Q   That he couldn't remember what had happened?
10         MR. SLOSAR:  Objection to form.
11     A   No, sir.
12     Q   So what prompted you to call him then on
13  June 23, 2016?
14     A   If I'm not mistaken, we had a trial date
15  coming up probably within a week, and I'd have to go
16  back and check the – the court records, but I believe
17  we had a trial date probably within a week of that, you
18  know, a – towards the end of June.  I – I know I have
19  a family vacation around the 4th, so it may have been
20  before that or after that and I was just doing some prep
21  work prior to trial just to make contact with him again,
22  go through his statement, make sure everything was same
23  as we discussed before.
24     Q   Okay.  And do you remember if anybody was on
25  the line with you that time?

Page 179

1      A   I can't remember if Mr. Jones was on the line
2  with me that time or not, and – and I – I'm thinking
3  he wasn't and that's why I had him come in when I –
4  when I was talking to Mr. Wilson, is because of the
5  conversation I had with Mr. Beach, and then I wanted
6  somebody eels in the room with me with – during Mr.
7  Wilson's conversation.
8      Q   So it looks like you called them on the same
9  day; is that right?
10     A   I did.  That's correct.
11     Q   Okay.  And just tell me what he told you on
12  the phone.
13         MR. SLOSAR:  Objection.  Asked and answered.
14  He's testified to this earlier here today, Derrick.
15         MR. WRIGHT:  Well, you don't – you're not the
16  only one that gets to ask question about it.
17         MR. SLOSAR:  But that – no, that's – but
18  that's not the rule.  I mean, he – if he's –
19  asked –
20         MR. WRIGHT:  If you're –
21         MR. SLOSAR:  If you have a different question
22  about his testimony from earlier, then ask it, but
23  to ask him the same exact question that I asked him
24  earlier is –
25         MR. WRIGHT:  You can make your objection.  I'm

Page 180

1  asking him what he remembers him saying.
2         THE WITNESS:  Can I go ahead?
3  BY MR. WRIGHT:
4      Q   Yeah.  Go ahead.
5      A   Okay.  And I state that on that – on that
6  June 23 date that his version of events had changed and
7  he stated Mr. Taylor was contacted after the robbery and
8  murder of Ms. Mills.
9      Q   Did you confront him with the statement that
10  he told you and Detective York while you visited him in
11  prison in Indiana?
12         MR. SLOSAR:  Objection to form.
13     A   Yes.  I – I would've obviously said, "You –
14  you know, you – you told us this when we were in
15  Indiana at – at the – and you just" – he was –
16  change – didn't want to change his testimony.
17     Q   Did he say he didn't remember talking to you
18  all?
19         MR. SLOSAR:  Objection to form.
20     A   No, he did not.
21     Q   Did he say that he had made it up?
22         MR. SLOSAR:  Objection to form.
23     A   No, he did not.
24     Q   Did he give you any explanation why his story
25  had changed?

Page 181

1      A   I remember him telling me that it had been
2  going on long enough and that he was done, and that's
3  the best explanation I – but that's all he told me.  I
4  don't know if you would call it a explanation of not,
5  but he'd been – and like I said, he'd been brought back
6  and forth to court a couple times and he just said it'd
7  been going on long enough and he was done.
8      Q   Anything else in that phone call that you
9  recall?
10     A   Not that I can recall.
11     Q   Kayla Mills is the third witness you list in
12  the motion to dismiss; do you see that?
13     A   Yes, sir.
14     Q   Do you know who she was with when she gave
15  that statement to Detective York?
16         MR. SLOSAR:  Objection to form.  Foundation.
17     Q   Were you there when she gave the statement to
18  Detective York?
19     A   No, I was not.
20     Q   Did you listen to the recording?
21     A   I have listened to the recording.  Yes.
22     Q   Do you recall whether it identifies who was
23  present for the statement?
24     A   I think it – I think it does, but I can't
25  recall off the top of my head trying.  It's probably in

Page 182

1 the police report as far as Kayla's statement as to who
2 was there present – like, took it. You want me to look
3 real quick?
4 Q Sure.
5 MR. SLOSAR: Here. Oh, I've got the page in
6 front of me. Not sure how it's relevant. It's
7 25426. Derrick, do you have a question for him?
8 Q I was letting him read it, if that's okay.
9 MR. SLOSAR: Yes, sir.
10 A Yeah. And to answer your question, Mr. Boggs
11 which is an attorney in Knox County who is – who's now
12 deceased, individual name is Cricket Mills, Scott Mills
13 was present during the interview.
14 Q Who's her – who's Cricket Mills; do you know?
15 A I do not know.
16 Q Okay. Did you ever talk to Kayla Mills
17 yourself?
18 A No. Kayla Mills passed away, if I'm not
19 mistaken, just a matter of a few months after she made
20 this statement. And that – I believe if you look at
21 the discovery we have, the – that black mark across
22 that is mine that I made indicating that she is no
23 longer available.
24 Q No longer available?
25 A That is correct.

Page 183

1 Q All right. Do you know whether her statement
2 was false?
3 A I do not know.
4 Q Okay. Same question with Daniel Wilson; do
5 you know which of his statements were false, the one
6 that he gave to Detective York or the – afterwards when
7 he filed a statement in June of –
8 MR. SLOSAR: Objection to form.
9 Q – 2016?
10 MR. SLOSAR: Objection to form. Asked and
11 answered. He has testified previously that he is
12 not here to testify as to the truth or falsity and
13 it's also not admissible evidence to illicit from
14 this witness as to what is true or false. That's a
15 determination for a jury.
16 MR. WRIGHT: I'm just asking him if he knows.
17 MR. SLOSAR: Well, I'm – I mean, I'm telling
18 you that this line of questioning is inappropriate.
19 MR. WRIGHT: Well, your questions assumed it.
20 You kept adding the "false and fabricated" in the
21 question, so I'm going to ask him –
22 MR. SLOSAR: I say that –
23 MR. WRIGHT: I objected to the form, so I'm
24 going to ask him if he knows whether this – which
25 one is false?

Page 184

1 MR. SLOSAR: I mean, he's already testified
2 that he doesn't know which is true and which is
3 false as to anything.
4 MR. WRIGHT: Well, I just want to get it on the
5 record.
6 MR. SLOSAR: Even though it's on the record.
7 I think you're just –
8 MR. WRIGHT: I don't know that it's been asked
9 that way. I'm just asking a question to make a
10 record. Do you want to – do we need to call a
11 magistrate?
12 MR. SLOSAR: No. I'm just trying to speed this
13 up, Derrick, because I think you're – I think you
14 could do this more efficiently and speak quicker and
15 that this could all go more quickly.
16 MS. KINCER: Well, if Derrick doesn't ask it,
17 I'm asking it, so...
18 BY MR. WRIGHT:
19 Q All right. Let's go back. Do you know which
20 of the statements – the statements that you heard from
21 Daniel Wilson were inconsistent, right?
22 A They – they were. Yes.
23 Q Do you know which of them was false?
24 A No, I do not.
25 Q Same with Robert Beach; he gave you different

Page 185

1 statements, correct?
2 A Yes.
3 Q Do you know which of them was false?
4 A No, I do not.
5 Q All right. Christy Branson – did you speak
6 to her in person?
7 A I did.
8 Q And she indicated to you she had no memory of
9 her statement to Detective York?
10 A That is – Detective York or the events of
11 that timeframe. Yes, sir.
12 Q So does that make her unavailable to testify
13 at trial?
14 A I – I believe under – under the rules of
15 evidence, she would be unavailable, and if not
16 unavailable, competency of a witness unable to recall
17 the time and events as they occurred would also be
18 challenged.
19 Q Did you also speak with her attorney?
20 A I spoke to her civil attorney who handled her
21 – I still say I can't remember if it was a car wreck,
22 but it was – he was a civil attorney so I'm going to
23 assume it was some type of civil litigation for a car
24 wreck. That was –
25 MR. KELLEY: Sam Castle?

Page 186

1  A  Sam – thank you. It was – which – Sam
2  Castle. I did confirm them after I spoke with her
3  that she had in fact had a head trauma and memory loss
4  was one of the issues she dealt with in the civil action.
5  Q  And you mentioned that Kayla Mills' attorney,
6  Ken Boggs has deceased. Is Matt Castle – is he still
7  alive and practicing?
8  A  Sam. Yes, he is.
9  Q  He is. Now the – Joe King is the witness
10  listed in paragraph 5; do you see that?
11  A  Yes, sir.
12  Q  And I believe your testimony was you met with
13  him outside of the Laurel County Detention Center?
14  A  That is correct.
15  Q  Did you have your whole file with you?
16  A  No, sir.
17  Q  What did you have with you that day?
18  A  I don't think I had anything with me. I don't
19  believe I – I had a – a notepad or anything, other
20  than the subpoena that I served him. You know, I just
21  went there to – to discuss – same as I was with Mr.
22  Wilson and Mr. Beach, discuss their prior testimony in
23  anticipation of trial, which was – in his case, was a
24  – was a trial with Amanda and William was coming up in
25  close proximity, so I got him served, wanted to go over

Page 187

1  his statement again, so I don't think I had anything in
2  my hands.
3  Q  And I know we talked about this before, but
4  I'm – I want to make sure I understand it: Was his
5  statement to you that he could not remember what
6  happened or did he change his story; which was it?
7  MR. SLOSAR: Objection to form. Asked and
8  answered.
9  A  Based on my – and – and of course, this
10  motion was drafted several years ago, close in proximity
11  to my – my statement with Mr. King and – and it says
12  that he changed his story and that he had never heard
13  anyone talk about robbery of an elderly lady and he did
14  not see or know of Amanda spending money and that he had
15  since moved to a location unknown, so his...
16  Q  Did he recall having talked to Detective York
17  in your discussions with him?
18  MR. SLOSAR: Objection to form. Foundation.
19  Q  Did you ask him that?
20  MR. SLOSAR: Same objection.
21  A  I did, and he – my memory was that he did not
22  recall. He did tell me that he – he went to federal
23  prison, him and his – several family members for drugs.
24  He indicated to me that he was in – into some drug use
25  at the time is the reason – what I can remember him

Page 188

1  telling me the reason he just didn't remember the
2  conversation with Detective York.
3  Q  Did he ever tell you that – did he see the
4  police report that Detective York had drafted; did you
5  show that to him?
6  A  I did not. No.
7  Q  Okay. And then the sixth witness on the next
8  page is Michael Crump; do you see that?
9  A  I do.
10  Q  And you believe you may have but you're not
11  for sure if you may have spoken to him directly?
12  MR. SLOSAR: Objection to form. Foundation.
13  A  That is correct.
14  Q  Okay. Your memory is that you may have talked
15  to him on the phone; is that right?
16  A  Yeah. I – if I'm not mistaken, we found him
17  at one – some point in time in Mount Sterling and had
18  him served and that – I think that's how I got in
19  contact with him. The subpoena would've had my name
20  and number at the bottom right-hand corner. I believe
21  he contacted – I – I can't remember if he contacted me
22  or the – the – I think KSP's the one that served him,
23  got a phone number, and somehow we made contact. If I'm
24  not mistaken, we made contact. That's when he told me
25  he – he – you know, he wasn't going to appear.

Page 189

1  Q  Did he say any reason why he wouldn't appear?
2  A  Not – not that I can remember. He just told
3  me he wasn't coming.
4  Q  Did you consider him unavailable?
5  A  I – well, we go to court that day and he
6  wasn't available, the – the trial was continued, but if
7  I'm not mistaken, we were there anyway to notice – to
8  notice some witnesses. Mr. Crump was not available, he
9  was not present, and if I'm not mistaken I had a
10  material witness warrant issued for him.
11  Q  Okay. Was it ever your understanding that
12  Michael Crump had positively identified who he saw at
13  Katherine Mills' home?
14  A  No. It was – it was my understanding that he
15  was unable to identify. As a person, you know, he knew
16  it was a – a white male in – in camo, but he did not
17  positively identify it as a certain individual.
18  Q  So you were going to call him as a witness,
19  correct?
20  A  That's correct.
21  Q  And you were going – was it your intention to
22  let him give a description of what he saw?
23  MR. SLOSAR: Objection to form. Calls for
24  speculation.
25  Q  Have him give a description of what he saw

Page 190

1 that day?

2 A That –

3 MR. SLOSAR: Same objection.

4 A – that's what I would've asked him at the

5 stand, yes.

6 Q Even though he couldn't point at Jason – or,

7 I mean at Jonathan Taylor and say he saw him?

8 MR. SLOSAR: Objection.

9 A From my standpoint, the fact that he couldn't

10 identify who it was wasn't as important to me, one,

11 because he didn't know any of these individuals, that

12 I'm aware of – that I was aware of, –

13 Q Sure.

14 A – but that he could identify the individual

15 having tattoos up and down their arms. And Mr. Taylor

16 – because as we had argued as we had in court was that

17 they wanted the – they wanted to suppress the photos of

18 – which I agreed to, and I think some of the photos

19 actually show his hand like this with tattoos, but I

20 made a statement that I would be having him stand up and

21 show his hands to the jury and arms to the jury because

22 of the tattoos.

23 Q So you agreed, then, to not use the photos

24 that were taken of him at trial; that's your memory?

25 A That's my memory. Yes, sir.

Page 191

1 Q You were still going to call Mr. Crump to

2 testify as to give a description of what he saw that

3 day?

4 A I was. Yes.

5 Q Okay. Do you know whether Mr. Crump ever saw

6 any of the photos that were taken of Jonathan Taylor?

7 A I did not show him any photos.

8 Q Okay. Did you ever get the chance to ask him

9 if he'd seen the photos?

10 A I did not. Not that I can recall.

11 Q You mentioned this motion to dismiss; were the

12 charges dismissed without prejudice?

13 A They were.

14 Q Does that mean that the criminal defendants

15 could be re-prosecuted, potentially?

16 A They could. Yes.

17 Q Okay. Have you ever dismissed criminal

18 charges with prejudice?

19 A I have not. Judges have ordered to dismiss

20 with prejudice, but no, I don't know that – I don't

21 know that I have ever wanted to dismiss with – I mean,

22 short of a defendant dying during the proceedings,

23 obviously then would dismiss with prejudice, but – as

24 to that defendant, but I don't ever – I don't recall

25 right now ever dismissing with prejudice.

Page 192

1 Q Okay. Can you go to Exhibit 21.

2 A The letter from the – Sheriff Pickard?

3 Q Correct.

4 A Yes, sir.

5 Q Do you see in the middle of that where it

6 says, "I told James Helton that if this information was

7 true, I would see what could be done on the receiving

8 stolen property charges"; –

9 A Yes.

10 Q – do you see that?

11 A I do.

12 Q Is Sheriff Pickard's indication that he could

13 see what could be done – is that a promise, an

14 incentive, or a consideration that would, in your

15 opinion, be under Brady or Giglio?

16 A No.

17 Q Okay. Did you disclose that as part of your

18 open-file policy?

19 A Yes. This letter was provided to defense in

20 the – in the discovery. And – and I know that because

21 of we had many discussion and – and one of the – also,

22 as part of that exhibit I have stapled, from PL4844 to

23 PL4855, it also – where he was working for U.N.I.T.E.

24 back in 2009.

25 Q Did you have any other information whether he

Page 193

1 was an informant for police?

2 A No, and I – and I do remember having

3 conversations with him about this and – and – because

4 there was only one day of him actively working as a –

5 December 3, 2009, just one entry and they said it's the

6 only time he ever worked.

7 Q Would you have been the prosecutor in that

8 case; do you know?

9 A I don't – I don't know. U.N.I.T.E. worked

10 20-something counties, so Tim – Tim Jordan doesn't ring

11 a bell to me. He could've been a Bell County or Leslie

12 County or anybody. I don't know.

13 Q Okay. Going to Exhibit number 15.

14 A Yes, sir.

15 Q This is the Kayla Mills arrest warrant.

16 A Yes, sir.

17 Q You don't know how this – you have no

18 knowledge of whether Detective York showed this to

19 Kayla, what he said about this to Ms. Mills, do you?

20 A I have no knowledge. No, sir.

21 Q Okay. Do you have any knowledge whether he –

22 what he may have told her attorney, Ken Boggs, about

23 this?

24 MR. SLOSAR: Other than what he reviewed today?

25 A No. I – I –

Page 194

1   Q   Were you ever –
2   A   – I – I have no knowledge of – of what he
3   may have told Mr. Boggs either.
4   Q   If this case had went to trial, would you have
5   argued that Jonathan Taylor could've fit the description
6   given by Michael Crump?
7       MR. SLOSAR:  Objection to form.
8   A   Yes.
9   Q   But he could not positively identify him,
10  correct?
11  A   That is correct.
12  Q   Is it possible that other people may have also
13  fit the description?
14      MR. SLOSAR:  Objection to form.
15  A   Yes.
16  Q   Could Mike Simpson have fit that description?
17  A   I really – I can't recall.  I don't know what
18  Mr. Simpson looks like, so I don't know.
19  Q   Was Mike Simpson a suspect in the case, to
20  your memory, at one point in time?
21  A   Yes.
22  Q   To your memory, do you remember if your office
23  had any follow-up communications with Detective York
24  about getting materials for you to disclose to defense
25  counsel?

Page 195

1   A   Yes, we did.
2   Q   Did he follow up and confirm or provide
3   additional info as that process went along?
4   A   He did.
5       MR. SLOSAR:  Objection to form.
6   A   I'm sorry.  He did.
7   Q   Okay.  Do you recall having any issues with
8   Detective York's responsiveness to your requests?
9       MR. SLOSAR:  Objection to form.
10  A   Other than attorneys want it done today, but
11  if you ask us to do something it means in the next 30
12  days.  It's – I always wanted it done quicker than when
13  I received it, but he always responded.
14  Q   Okay.  To the best of your memory?
15  A   Yeah.  To the best of my memory, he always
16  responded in a timely manner.
17  Q   Did you ever remember a – did you ever meet
18  with Robert Beach's sister, Margaret Polly?
19  A   I did not.
20  Q   Do you have any knowledge whether anybody did
21  talk to her from law enforcement or anybody else from
22  your office?
23  A   From my office, I can tell you no.
24  Q   You don't have any memory –
25  A   I don't, but I want to say somebody may – I

Page 196

1   know it's alleged in his complaint because I reviewed
2   the day before I came in here that they did, but I want
3   to – I think she may have given a location of where he
4   could be found in Indiana, where he was being housed.  I
5   – I think that – so I think somebody did, but I don't
6   know who – who it may have been.
7   Q   Okay.  You weren't there to witness –
8   A   I was not there.  No, sir.
9   Q   All right.  Do you know who Margaret Polly is;
10  if you saw her, would you –
11  A   No.
12  Q   – know who she is?
13  A   I do not.
14  Q   Just recognize the name?
15  A   Other than it's Allen – Mr. Beach's sister.
16  That's – and I had to remember that after I reviewed
17  the file today.
18  Q   Do you know Allen Helton, who he is; have you
19  prosecuted him in other cases, to your memory?
20      MR. SLOSAR:  Objection to form.
21  A   I honestly don't know.
22  Q   You wouldn't recognize him –
23  A   I – I wouldn't recognize him, no.  Whether or
24  not I've prosecuted him before, I – I have no – I – I
25  couldn't tell you.

Page 197

1   Q   That's fair enough, and I guess it's the same
2   with Mike Simpson; is that what you –
3   A   That's correct.
4   Q   Going back to the motion to dismiss, Exhibit
5   22.
6   A   Yes, sir.
7   Q   You talked that Tommy – or, I'm sorry.  I
8   think – believe it's Mikey Bruner was not listed in
9   there; do you recall that testimony?
10  A   I do.
11  Q   Is it also true that Amber Simpson also was
12  not listed in there?
13  A   That is correct.
14  Q   Did you consider both those witnesses
15  potentially available?  Were you –
16  A   I –
17  Q   – I'm sorry.  I guess what I was meaning was:
18      were you only listing the witnesses that were
19  no longer available to you?
20      MR. SLOSAR:  Objection to form.
21  A   I – I was.  I was laying out to the court the
22  witnesses that were no longer available or their
23  statements had changed.
24  Q   Okay.  Had you ever talked to Amber Simpson?
25  A   I'm sure I have.  I don't – it wasn't one of

Page 198

1  the – I'm sure I have, but I don't have any independent
2  memory of it.
3     Q   Okay.  Do you know if anybody in your office,
4  any assistants would've contacted her?
5     A   No.  I – Mr. Jones, he – he may have, but I
6  – I doubt it, as he was sitting second chair on this
7  matter.
8     Q   And what was his full name?
9     A   Brandon Jones.  He's an assistant in the
10  office.  I – I seriously doubt he would talk to a
11  witness, one, without me being there since I was going
12  to sit first chair, but I'll – I'm not – I – I don't
13  have any independent memory of talking to her, but I can
14  tell you my regular practice.  I'm not going to start a
15  murder trial without talking to the witnesses going to
16  say, "This is what I was told."
17     Q   Sure.  To your memory, did she ever deny any
18  recollection or deny what she had told the police?
19     A   Not to my recollection.  If she would have, I
20  would've included it in this motion to dismiss.
21     Q   All right.  It had been your practice to
22  follow up with witnesses before going to trial?
23     A   That is correct.
24     Q   All right.  Do you know whether there had been
25  any contact with any members of her family?

Page 199

1     A   I have not.  No.  I had no contact with any
2  members of her family that I'm aware of.  Is there
3  anyone in particular?
4     Q   I believe her father's name is Larry Simpson.
5     A   Not that I know of.  No.
6     Q   Okay.  Was this case – was the trial date
7  continued on occasion in this case?
8     A   It was.  Yes.
9     Q   And were some of those by the Commonwealth on
10  your motion?
11     A   Yes.
12     Q   Do you remember how many?
13     A   Remember – I remember one.  I had a – we had
14  a bad snowstorm.  I was president of the Commonwealth
15  Attorneys' Association and we had our winter meeting
16  which I was responsible for running and getting
17  together.  Judge Jensen allowed a continuance on that
18  issue, because it actually – the only time we could the
19  hotel in was during the week the trial was set on, so –
20     Q   The weather?
21     A   – weather was one of them that I – I just –
22  for rescheduling issues, Judge Jensen allowed.  There
23  was another continuance –
24     Q   When Crump didn't show up and Helton?
25     A   – when Crump and Helton didn't show up.  I

Page 200

1  believe that was on my motion to continue.  I believe
2  when Mr. King changed his testimony, I don't think that
3  was my motion to continue.  That may have been Mr.
4  Hoskins' motion to continue.
5     Q   Okay.  And that was going to be my next
6  question: Do you recall the defendants moving to
7  continue the trial?
8     A   Yes.  A multitude of times.  And – and when I
9  say "a multitude," not as much her attorney – I don't
10  want to say "her" – Amanda's attorney.  Mr. Taylor's
11  attorney moved to continue repeatedly.
12     Q   Who were their attorneys?
13     A   Excuse me?
14     Q   Who was his attorney?
15     A   Mr. Cox and Heather Gatnarek were his
16  attorneys.  We had continuances for competency
17  evaluations.  Expert reports were being done, mitigating
18  evidence.  It was – it – there was some lengthy
19  continuances.  I – I – I remember Mr. Taylor filed
20  several continuances.
21     Q   I want to talk a little bit about one of the
22  continuances with Allen Helton not appearing; do you
23  have a memory of that?
24     A   Limited.  If I'm not mistaken, that was one of
25  the earlier trial dates, I think.

Page 201

1     Q   Do you recall whether Detective York contacted
2  Allen Helton?  How did that come up; do you know or
3  remember why Allen Helton could not be there?
4     A   Oh, wait a minute.  Yeah.  Allen Helton had a
5  – believe a medical condition.
6     Q   I don't know.  Just whatever you can remember.
7     A   I've had so many of these cases.  I think he
8  was coming from Lexington, had a medical issue arise,
9  had to go to the hospital.
10     Q   Do you recall whether they – you were in
11  contact with Allen Helton or his family the day before
12  trial about this, or the day of trial; do you have any
13  memory?
14     A   The day of trial, yeah, because – I do know
15  the day of trial because, if I'm not mistaken, Detective
16  York wasn't able to make contact with his wife,
17  girlfriend.  We had been – we've had a location that he
18  was residing in – I can't remember.  I might be getting
19  this confused with another murder case.
20     Q   All right.  Do you have any memory whether
21  Detective York – were you in – present at the
22  courthouse when he was making those phone calls, or is
23  it –
24     A   Yeah, I was getting two cases confused.  We
25  did have one in – in Lexington where we had a residence

Page 202

1  and they went to Lake Cumberland and we were searching
2  for them on a different case. Mr. Helton, if I'm not
3  mistaken, had a medical issue. Detective York was
4  contacting him. I think he may have got – gotten in
5  touch with, actually, Mr. Helton who was – told us he
6  may have been on his way to the hospital or having to go
7  to the hospital for some medical condition. Then, you
8  know, of course I let the court know at that point in
9  time that Mr. Helton had a medical – if I'm not
10  mistaken, Mr. Helton had a medical issue and wasn't
11  going to be present. Mr. Cox objected regarding –
12  didn't know how long he'd be in the hospital and also
13  didn't know the extent of it – of the medical –
14      Q   Excuse?
15      A   – treatment. I believe Mr. Helton had a
16  documented issue that had had to be dealt with before by
17  a hospitalization stay. Those issues were taken to
18  Judge Jensen, I believe, this time and he continued the
19  trial.
20      Q   Did he end up doing a show cause for Allen
21  Helton; do you have any memory of that?
22      A   I don't know if it was a show cause or as much
23  as a – just for him to bring medical – medical records
24  for his –
25      Q   Excuse?

Page 203

1      A   – excuse. Yes. And that would've probably
2  been agreed to and asked for by both parties, myself and
3  them, because obviously we both spent a lot of time
4  getting ready for trial.
5      Q   Now you mentioned Lester – you had made a –
6  talked to his attorney, but Lester would not take
7  anything less – would not take a felony –
8      A   That is –
9      Q   – plea; is that right?
10      A   – that is correct.
11      Q   Did they indicate that they would make an
12  agreement if he was offered a misdemeanor?
13      A   I don't know that we got that far in a
14  conversation. (Clears throat.) Excuse me. I don't
15  know if we got that far in a conversation. Based on my
16  belief at the time, with the information that I had, I
17  would not have been willing to offer a misdemeanor. I
18  believe it was – I believe, if I'm not mistaken, it was
19  a – a felony on facilitation of murder, which would've
20  been a one to five range, if I'm not mistaken.
21      Q   And if that'd been the offer, do you know
22  whether his attorney would've made a counteroffer?
23          MS. STAPLES: Objection. Speculation.
24      Q   Do you have any memory of that?
25      A   I – I don't have a memory. I remember him

Page 204

1  saying he's going to talk to his client, but he – he'd
2  indicated to me before we got off the phone that he just
3  didn't think he do it – he wouldn't take it to his
4  client.
5      Q   And do you know – I don't do the criminal
6  side, but criminal defendants have the right to not
7  testify, their Fifth Amendment right, correct?
8      A   Yes, sir.
9      Q   As a prosecutor, just generally, how does that
10  right get exercised; how do you get notice of it? Can
11  you call a witness in trial and them say the Fifth in
12  front of a jury; how does all that work out?
13      A   No. If – if I have – if I have reason to
14  believe or have any indication that somebody's going to
15  assert their Fifth Amendment right, I have to bring it
16  before the court and the judge outside the presence of a
17  jury so that the judge can make a determination whether
18  or not their Fifth Amendment right does apply, because
19  it's very specific to somebody who could be charged with
20  a crime based upon their statement. So if it's somebody
21  who just doesn't want to testify and they say, "I assert
22  my Fifth," the judge says, "What's the basis of your
23  Fifth Amendment?" and they say, "Well, Judge, I don't
24  want to be here," well, that's not an assertion of your
25  Fifth – that's just not wanting to be there, because

Page 205

1  the judge can hold you in contempt, but it all has to be
2  done outside the presence of a jury.
3      Q   Okay. Is that done at the trial?
4      A   Yeah. I've seen it done both ways. I've seen
5  – I've – you know, I've witnesses subpoenaed for a –
6  a – what we call a final pretrial, usually a couple
7  weeks before the trial date for the court to address the
8  issue, and then I've also had – on the morning of
9  trial, I've – I've had witnesses come up and say, "I'm
10  not going to testify. I'm asserting my Fifth," and, you
11  know, at that point in time it's a scramble. You let
12  the court know. They have to be given counsel to advise
13  them. Most of the time, that alleviates any hearing
14  when the – their public defender talks to them, they
15  say, "You have to testify. You don't have a choice,
16  because you're going to go to jail if you don't. You
17  don't have a Fifth Amendment right here."
18      Q   Did you get far enough at all in the
19  prosecution of Ms. Hoskins, Mr. Taylor, and Mr. Lester
20  whether they would plan to assert their Fifth Amendment
21  rights and not testify?
22      A   No. I wouldn't be notified of a defendant
23  that is charged with a crime during their trial until,
24  one, they take the stand, or two, they rest their case
25  and at that point in time, they – they've asserted

Page 206

1 their right to remain silent. There's no – there's no
2 notification by them of them asserting their right.
3     MR. WRIGHT: Okay. I might be about done if we
4 just go off just one second and let me check off
5 what we've covered already.
6     MS. STAPLES: Can we have, like, a two-minute
7 break?
8     (OFF THE RECORD)
9 BY MR. WRIGHT:
10   Q All right. I'm about finished. I know you've
11 heard that a bunch today, but I think I'm being honest
12 here, so I'm going to run you through a few quick-
13 hitters to finish up, Mr. Steele.
14   A Okay.
15   Q You mentioned that you were not personally
16 involved in assisting Detective York before he appeared
17 before the Grand Jury; is that correct?
18   A To my knowledge, no.
19   Q Is it possible that he could've coordinated
20 with any assistant prosecutors in your office?
21   A It is possible.
22   Q Okay. As far as the criminal complaint, your
23 office generally does not get involved with those, the
24 arrest warrant criminal complaint?
25   A That is correct.

Page 207

1   Q Is that something, though, that police
2 officers may consult at county attorney's office with?
3   A He'd frequently consult the county attorney's
4 office.
5   Q Do you have any personal knowledge whether
6 that was done in this case?
7   A I do not. No. And let me go back. I think
8 you said – two questions ago, you said that he
9 contacted you – I don't – I don't – before these – I
10 don't have any recollection of if – if he did, I'm –
11 they will call me frequently and say, "Hey, this is what
12 I've got going on," just for some general guidance. But
13 I don't – I don't have any recollection. I hate to
14 say, "No, it did not happen," when – when I just may
15 not remember.
16   Q When something is bound over from a
17 preliminary hearing to the Grand Jury, is that how it
18 works?
19   A Yes, sir.
20   Q How does your office become aware of that?
21   A First, there's a – generated docket out of
22 the clerk's office, the circuit clerk's office, they
23 will give us as the Grand Jury meets for cases to
24 consider by the Grand Jury. The officers – usually no
25 other case has been bound over to the Grand Jury, so

Page 208

1 they'll come to the next Grand Jury session or,
2 depending on the kind of case it is, it may be, you know
3 60, 90 days before they come out after waiting for the
4 lab to come back.
5   Q Okay. Do you know who the prosecutor will be
6 who will be presenting the cases that day?
7   A At this point in time in 2012, Danny Evans was
8 – was handling Grand Jury matters for the office in
9 Laurel and Knox County, so at that point in time they
10 would've been very familiar. Recently in the last few
11 years, I'm the one handling all the Grand Jury matters,
12 except for today because I had this scheduled along with
13 these , so Brandon Jones handled it today, but typically
14 they know it's going to be – at that point in time it
15 was Danny Evans.
16   Q You indicated that your office maintains this
17 file when it gets it from the case officer; is that
18 correct?
19   A That is correct.
20   Q Do you know whether that's physically handed
21 over by the case officer or does your office coordinate
22 with the KSP administrative staff; do you know exactly
23 how that happens?
24   A Those are typically handed over by the case
25 officer. Knox County's a little different because the

Page 209

1 – the post is in Harlan where the evidence is stored,
2 so that's a considerable trip from Harlan to London
3 sometimes, so occasionally we'll e-mail from Harlan post
4 to our office. Now more so, we probably take advantage
5 of e-mail and electronic communications more so, then
6 it's e-mailed to us.
7   Q Okay. You were asked questions about whether
8 you rely on the information for police in making your
9 decisions on prosecution; do you recall that testimony?
10   A Yes, sir.
11   Q It is true in this case you did follow up with
12 witnesses to prepare for trial, correct?
13   A That is correct.
14   Q Okay. You were asked questions about whether
15 you would expect a truth – a report by a police officer
16 to be truthful and accurate; do you remember that
17 questioning?
18   A I do.
19   Q Did you consider the report regarding the
20 statement by Wilson to be truthful and accurate?
21     MS. STAPLES: Objection to form.
22   Q You did confirm it, correct?
23   A I did.
24   Q Yeah.
25   A So yes, I – to answer your – I did consider

Page 210

1  it to be truthful.
2      MS. STAPLES:  What was your answer?  I'm sorry.
3      A   I did consider it to be truthful.
4      Q   Do you know whether there was a report done
5  for the Beach interview, or since you were in attendance
6  you were already aware of it?
7      A   I don't know that there was a report done.  I
8  know there was an audio recording done that would've
9  been provided in discovery.  I don't know that there was
10  a supplemental report done for it.
11      Q   So when you -- did you disclose that
12  statement, recorded statement by Mr. Beach to defense
13  counsel?
14      A   We did.  Yes, sir.
15      Q   And did you consider that to be truthful and
16  accurate when you disclosed it?
17      MS. STAPLES:  Objection.
18      A   I did.
19      Q   Because you sat there and heard it yourself?
20      A   I heard it on there.
21      Q   If there are any promises made or incentives,
22  consideration that you were asked about that you believe
23  would implicate Brady or Giglio, would that be put in a
24  writing or a plea agreement of some sort?
25      A   Yes.  There -- okay.  So, yes, there's

Page 211

1  obviously -- any type of information would be handed to
2  defense counsel in some form or fashion, by a written
3  statement, just a notice of filing, could just be a
4  general letter to counsel notifying them of this, not in
5  a court filing.  On a plea agreement, they're notified
6  and in the plea agreement itself is a document which
7  serves as notification.
8      Q   And what I was getting at is you were asked
9  questions about Allen Helton; do you recall that name
10  coming up --
11      A   I do.
12      Q   -- from plaintiff's counsel?
13      A   Yes, sir.
14      Q   And I believe that you referenced assistance
15  with other charges or bond on other charges; do you
16  recall that testimony?
17      A   Yes.
18      Q   Okay.  If he was facing other charges, would
19  that be in a -- if he pled guilty, would that be
20  memorialized in a plea agreement that he was helping in
21  consideration for help on his pending charges in another
22  case?
23      MS. STAPLES:  Objection to form.
24      A   Yes.  Typically, it is, and it's done for
25  protection of the Commonwealth.  So on a plea -- just

Page 212

1  throw a number out there -- on a plea of -- of five
2  years, probate five years on the condition the defendant
3  truthful -- truth --
4      Q   Testified truthfully.
5      A   -- testified truthfully -- thank you -- in the
6  matter of Commonwealth vs. Jane Doe, John Doe.  So it's
7  put in there so if they violate that term, we can go
8  back and reopen their case and possibly give them a
9  larger sentence.
10      Q   So if any promises, incentives, or that
11  consideration is made, the Commonwealth has an incentive
12  to document it, right?
13      A   Yes.
14      Q   We talked about the evidence listed in the
15  motion to dismiss, and I believe your testimony was
16  that's the evidence that was no longer available or the
17  statements had changed, correct?
18      A   Say it again.
19      Q   In your motion to dismiss, the itemized
20  evidence you listed were statements or expected
21  testimony from witnesses which was no longer available
22  or you expected their testimony to change?
23      A   You lost me there again.
24      Q   I'm sorry.
25      A   That's okay.

Page 213

1      Q   We talked earlier about the motion to dismiss
2  and you itemized several witnesses in your motion to
3  dismiss, correct?
4      A   Yes.
5      Q   And there were some witnesses that were not
6  listed on there, like Amber Simpson, correct?
7      A   Correct.
8      Q   And Mikey Bruner, correct?
9      A   Yes, sir.
10      Q   Was there other evidence in the case besides
11  just witnesses that could've went to the probable cause
12  or the guilt of the criminal defendants?
13      A   Yes.
14      Q   So for instance, did -- to your understanding
15  of the case, did William Lester have knowledge that the
16  victim had money --
17      MS. STAPLES:  Objection to form.
18      Q   -- on her from selling timber?
19      A   Yes.
20      Q   Did he have knowledge of where she kept that
21  money?
22      A   Yes.
23      Q   Did your understanding of the case, did you
24  have reason to believe that Ms. Hoskins had that same
25  knowledge?

Page 214

1    MS. STAPLES: Objection. Speculation.
2    A   Yes.
3    Q   Okay. Did you have any evidence of a motive
4    to steal that money, whether it's debts, drug use?
5    A   Yes.
6       MR. WRIGHT: Okay. That's all the questions I
7    have.
8             EXAMINATION
9  BY MR. KELLEY:
10   Q   Mr. Steele, Mr. Wright took most of my
11   questions, but I do have a few.
12   A   Okay.
13   Q   I'm John Kelley. I'm here today representing
14   Knox County. I also represent Sheriff John Pickard
15   who's no longer sheriff, of course, and I also represent
16   Deputy Derrick Eubanks, who now is a deputy I think at
17   Whitley County, still. From what I understand, having
18   15 years' experience as a prosecutor, much of that --
19   for much of that time, Sheriff Pickard was the sheriff
20   of Knox County during much of your term as the
21   prosecutor.
22   A   He was. Yes.
23   Q   All right. Have you ever known Sheriff
24   Pickard to be either the lead investigator or the case
25   officer for any murder cases during the time that you

Page 215

1    served as prosecutor?
2    A   Not to my recollection.
3    Q   Okay. Would I say a great majority and
4    perhaps all have been -- all of the investigations into
5    -- all murder investigations have been conducted by
6    Kentucky State Police?
7    A   No. I -- majority, yes. Barbourville Police
8    Department may have -- may have had a couple and even
9    the sheriff's department's carried a couple murder
10   cases, but primarily, yes, it would be the state police.
11   I think it was Sheriff Pickard's practice on murder
12   cases to get the state police involved quickly.
13   Q   All right. Would he -- would the Knox County
14   Sheriff's Department assist other law enforcement
15   agencies in murder investigations?
16   A   Yes.
17   Q   So there's was a corollary or secondary role
18   in most instances; is that fair?
19   A   That'd be correct.
20   Q   All right. Do you know what role, if any,
21   Deputy Eubanks played in the investigation of this
22   murder case, that is, Katherine Mills' death?
23   A   I don't know of any role.
24   Q   All right. Did you ever hear his name come up
25   during any of your preparation or review of the file?

Page 216

1    A   No. In my review of the file, he was not --
2    he was not considered a witness that I was going to call
3    to trial.
4    Q   All right.
5    A   If his name's in there, it would've been
6    because it's common practice in it to have two people in
7    a room during an interview. The sheriff's department
8    detective -- you know, Derek Eubanks and Sheriff Pickard
9    were really good at tracking people down. They just
10   knew the community better than state police, so I -- I
11   wouldn't be surprised if Deputy Eubanks and Sheriff
12   Pickard found people and brought them to the police
13   department, which is typically what they did in a lot of
14   the investigations.
15   Q   All right. Setting Sheriff Pickard aside for
16   just a second, do you know the involvement of any other
17   Knox County deputies or members of the sheriff's
18   department in the investigation of Katherine Mills'
19   death?
20   A   Not off the top of my head, no.
21   Q   Talking about Sheriff Pickard, I -- a lot of
22   the questions being asked of you by Mr. Slosar were if
23   law enforcement people fabricated or if law enforcement
24   or if the police did; I want to -- I only saw -- heard
25   Mr. -- Sheriff Pickard's name mentioned twice, or in two

Page 217

1    regards. First of all, with regard to Michael Crump,
2    and in particular the photos that were prepared for the
3    -- or that were sent to Mr. Crump; do you know what, if
4    any, involvement Sheriff Pickard had in that?
5    A   I do not know.
6    Q   Okay. As I understand it, as far as you knew,
7    Michael Crump never identified Jonathan Taylor or anyone
8    as being the person he saw at the -- at Ms. Mills'
9    house?
10   A   That is correct.
11   Q   In your evaluation of probable cause for
12   pursuing a -- this prosecution, obviously, you could not
13   and would not have relied upon Michael Crump's
14   observations alone?
15       MS. STAPLES: Objection to form.
16   A   That would be correct.
17   Q   With regard to Allen Helton and, in
18   particular, Exhibit 21, and I think Mr. Wright asked you
19   about this, and since Mr. Slosar's not here, I might get
20   away with a repetitive question, but --
21   THE WITNESS: Maybe not.
22   MR. KELLEY: I don't know. She's very --
23   MS. STAPLES: You got on me last time for
24   getting on you about that.
25   BY MR. KELLEY:

Page 218

1    Q   I know.  But again, I'll read the – what I
2  consider a pertinent part of that letter from Sheriff
3  Pickard.  It says, "James Allen Helton told me that if I
4  could – if I would help him with the receiving property
5  charges that he could give me a lot of information on
6  the Mills lady's murder.  I told James Allen Helton that
7  if this information were true, I would see what could be
8  done on the receiving stolen property charges."  Did
9  Sheriff Pickard do anything inappropriate or unethical
10  or do anything that you consider to be less than
11  professional –
12     MS. STAPLES:  Objection to form.
13    Q   – in relaying that –
14     MS. STAPLES:  I'm sorry.
15    Q   – information?
16    A   No.
17    Q   Or having that conversation with Mr. Helton?
18    A   No, I do not.
19    Q   Okay.  You've already – believe I – think
20  you already said that this particular exhibit, number
21  21, was provided to the defense once sent to you?
22    A   Yes, sir.
23    Q   All right.  You did talk to James Allen Helton
24  at some point concerning his statements?
25    A   Again, I don't – I don't have any independent

Page 219

1  recollection of – of a statement from him.  I'm sure I
2  did, but I don't have any independent recollection of
3  that.
4    Q   Well, he was not mentioned in your motion to
5  dismiss; –
6    A   Correct.
7    Q   – is that fair?
8    A   That is fair.
9    Q   If he had come to you and said, "They coerced
10  me into making a statement," would you have considered
11  that to be grounds for a motion to dismiss?
12    A   Yes.
13     MS. STAPLES:  Objection to form.
14    A   I'm sorry.  Yes, I would.
15    Q   All right.  Likewise, if he had recanted his
16  statement at some point, would you have included that in
17  your motion to dismiss?
18    A   Yes.
19     MS. STAPLES:  Objection to form.
20    Q   It's my understanding that you believed you
21  had probable cause to prosecute Amanda Hoskins and
22  Jonathan Taylor for the murder of Ms. Mills until the
23  events that ultimately led to you filing the motion to
24  dismiss; is that fair?
25    A   That is fair.

Page 220

1    Q   Okay.  And did you have plans to call Sheriff
2  Pickard at the trial in this case?
3     MS. STAPLES:  I'm going to object on
4  speculation.  He hadn't got to that point.
5    A   I had not had intentions to call him in my
6  case in chief, no.
7    Q   Okay.  Likewise, any other Knox County deputy
8  or member of the sheriff's department?
9     MS. STAPLES:  Same objection.
10    A   No.
11     MR. KELLEY:  Okay.  That's all I have.  Thank
12  you.
13     MS. KINCER:  Finally have you under oath.
14     MS. STAPLES:  You going to ask him questions
15  about the prosecutor's conference?  I've heard what
16  goes on there.
17     MS. KINCER:  Nothing like the Kool-Aid drinking
18  DTA was.
19     MS. STAPLES:  Right.
20     EXAMINATION
21  BY MS. KINCER:
22    Q   Mr. Steele, to my understanding, you've been a
23  Commonwealth Attorney for 15 years; do you also teach?
24    A   I've been the Commonwealth Attorney for 10
25  years, was an assistant for five-ish , but yes, I have

Page 221

1  taught classes, also.  Yes, ma'am.
2    Q   Well, do you teach young prosecutors?
3    A   I do.
4    Q   Okay.  Do you also teach sometimes the police?
5    A   Yes, I do.
6    Q   On the rights and wrongs and how to document
7  things?
8    A   Yes, ma'am.
9    Q   Okay.  I want to turn your attention to
10  Exhibit 5, which is your cheat sheet.
11    A   Yes, ma'am.
12    Q   On there, you said one of the admin people, I
13  think, are the ones that fill this out for you all; is
14  this a documentation that you put in the front of the
15  file so that when you're in court you can refer to it
16  quickly and know what the case – kind of a brief
17  synopsis of the case is?
18    A   Yes.
19     MS. STAPLES:  Objection to form.
20    A   So the – let me look it over to – so I can
21  – just looking at the same thing.  So, if you're
22  looking at that form, you'll see number 13 circled at
23  the top of that.  That would've been written by us.  That
24  indicates the recorder number for the Grand Jury
25  testimony.  When we go back to that day, it's going to

Page 222

1  be number 13 on that docket list. Obviously, the "yes,
2  no, continue," that's the yesses initialed by the four
3  parts of the Grand Jury. Detective York would've filled
4  out everything that would've been typed. The -- the
5  notation there beside "murder," "striking Katherine
6  Mills in the head with a hammer," and the notation
7  beside "Robert took 20 -- $12,280 from Katherine Mills,"
8  that appears to be the writing of a lady in my office
9  who would've been preparing in -- the indictment, so
10  that she knew the wording to put in the indictment."
11  Then the PFO second degree also would've been done by my
12  office because we will do the criminal record search
13  after the -- presenting it to the Grand Jury. On the
14  second page, which isn't uncommon for the officers to
15  leave out the witness -- witnesses, that appears also to
16  be the writing of a lady in my office. Again,
17  everything typed on that page would've been prepared by
18  Detective York.
19      Q.   Okay.  When it talks about the witnesses, you
20  have Mark Mefford listed second --
21      A.   Uh-huh.
22      Q.   -- not you, but the lady; does that -- is
23  there any significance to the order of this or the
24  importance of the witness?
25      A.   No, ma'am.

Page 223

1      Q.   Okay.  From my understanding, Mark Mefford
2  accompanied Sergeant York to the Daniel Wilson
3  interview; does that sound right to you?
4      A.   That does.  Yes.
5      Q.   Okay.  And you testified just a second ago
6  that when detectives will -- oftentimes will have two
7  people to an interview; why is that?
8      A.   If something was -- God forbid something
9  happened to Detective York from this to the -- pending
10  to the action, getting that statement in could be
11  problematic.  Even -- even if it's a recording, without
12  somebody to say it's a true and accurate depiction --
13  description of the -- of the recording, you can't get it
14  in if the witness has recanted, so that's what they said
15  too, and also I think that they probably do it out of
16  abundance of caution, also, to say, you know, there --
17  people don't allege things that they were saying or
18  doing so that there's another witness present.
19      Q.   Yeah.  With Mark Mefford attending that with
20  Daniel Wilson, --
21      A.   Uh-huh.
22      Q.   -- but would the hears of -- the rules of
23  hearsay, Daniel Wilson would've had to say what he said
24  on the stand, correct?
25      A.   Yes, ma'am.

Page 224

1      Q.   And if he had said something different, he
2  could've been impeached by either Mefford or Sergeant
3  York?
4      A.   That is correct.
5      Q.   Okay.  Would you -- do you -- did you plan on
6  calling Mark Mefford?  Because that's the only
7  involvement that we had of -- with him.
8      A.   No.  I take the -- the only individual that I
9  had planned to call in my case in chief would've been
10  Jason York -- Detective York.
11      Q.   All right.  So then is --
12      A.   And -- and again, as the lead officer, he
13  can't testify what anybody else says, --
14      Q.   Correct.
15      A.   -- but more about the collection of evidence
16  and the procession of the investigation.
17      Q.   Okay.  Well, I think you've already answered
18  my question, then: Did you have any intent of calling
19  Jackie Joseph who would have -- just have been a
20  supervisor?
21      A.   No.
22      Q.   How about Brian Johnson who happened to be the
23  unlucky new kid on the block who drove up there to
24  Robert Beach?
25      A.   No.  No.  Not Brian Johnson, no.

Page 225

1      Q.   Okay.  Kelley Farris, who apparently served a
2  subpoena for somebody so that somebody else would come
3  to -- potentially come to the -- one of the trials?
4      A.   No.
5      Q.   Okay.  Dallas Eubanks, who put up crime scene
6  tape at the night of?
7      A.   No.
8      Q.   Okay.  All right.  I should probably stop
9  there.  How common -- I think Derrick Wright touched on
10  this a minute, but -- ago, but how common is it for
11  witnesses to have troubled pasts when you're dealing
12  with criminal defendants and witnesses?
13      A.   That is very common, especially in -- in
14  murder -- murder cases.  That -- naturally, the -- that
15  -- especially in this type of -- of murder case in which
16  a home invasion, robbery, when you talk about the
17  witnesses in this matter, the drug addiction, the drug
18  use.  They're not pillars of the community and their
19  testimony changes frequently.  That's why we like to get
20  them recorded if at all possible, as soon as possible,
21  but I've never had any -- I don't remember a murder case
22  that I've ever had in which somebody didn't change
23  something.
24      Q.   Okay.  So often then they have criminal histories?
25      A.   Yes.

Page 226

1      MS. STAPLES:  Objection to form.
2      Q   Convicted felons?
3      A   Yes.
4      Q   Okay.  So, do you find a lot of what they have
5  to say untrustworthy; is that one of the reasons you
6  record -- try to record the --
7      MS. STAPLES:  Objection to form.
8      A   Partially, yes.
9      Q   Okay.  Do you find in a criminal prosecution
10 that oftentimes somebody's inconsistency can just be as
11 important piece of evidence as a fingerprint or
12 something like that; if you can prove that they are not
13 telling the truth, they -- as an alibi?
14     A   Yes.
15     Q   Okay.  And is that an important factor in
16 probable cause?
17     A   It can be, yes.  It -- of course, that's
18 always case specific, but it absolutely can be.
19     Q   Okay.  In this particular case, it looks like
20 the arrest warrant was March 14 of 2012 and the Grand
21 Jury was April 27 of 2012; do you know if this case was
22 bound or held or waived?
23     A   If they filled it out.
24     Q   Would it be on your cheat sheet?
25     A   It should be on the cheat sheet.  On the top

Page 227

1  of PL26181, "Did this case start in district court?
2  Circle yes or no."  They didn't circle, but it gives a
3  date of March 27, 2012, action taken, Grand Jury, which
4  indicates to me that's the day it was bound over,
5  possibly.
6      Q   So there was a hearing in -- a preliminary
7  hearing, or waived?
8      A   When -- when was -- I don't -- now, that I
9  don't know.  That wouldn't have been on the cheat sheet
10 whether it was a preliminary hearing or a waiver of --
11 of a hearing.
12     Q   If it was bound over, would a judge have had
13 to make a determination of probable cause to bound it to
14 the Grand Jury?
15     A   For a judge to do it, yes, or there could've
16 been a stipulation of probable cause by the defendant
17 and it bound up about the hearing.
18     Q   Would they waive that?
19     A   They'd waive it.  Yes, ma'am.
20     Q   Okay.  But you don't know which one happened
21 in this --
22     A   I do --
23     Q   -- particular case?
24     A   -- I do not.  There was either a stipulation
25 to probable cause by the defendant and they waived up to

Page 228

1  Grand Jury, or there was a preliminary hearing and the
2  court found probable cause.
3      Q   Okay.  All right.  I'm going to ask you some
4  silly questions, but have you ever had a perfect case?
5      A   No.
6      Q   Have you ever had a smoking gun?
7      A   No.  I -- I've had -- I've had them confess
8  before, which I guess is as close to smoking gun as you
9  can get, but...
10     Q   Okay.  Have you ever had a perfect
11 investigation?
12     A   No.
13     Q   Okay.  Do you do absolutely your best to do
14 what is right in every single case?
15     A   Yes, ma'am.
16     Q   Okay.  Do you find the same true with the
17 Kentucky State Police troopers that you've worked with?
18     A   Yes.
19     Q   Okay.  Have you ever known any of the troopers
20 that are named in this lawsuit to ever have conspire or
21 frame or fabricate anything?
22     A   No.
23     MS. KINCER:  Okay.  That's all the questions I
24 have for you.
25     MR. FARAH:  Sir, I'm going to be very specific.

Page 229

1  I represent -- need a break?
2      THE WITNESS:  Five minutes.
3      MR. FARAH:  Five minutes.
4      THE WITNESS:  All right.
5      MR. FARAH:  Let's go with that one.
6      MS. KINCER:  All right.  Wait.  Wait. Wait.
7  Wait.
8              EXAMINATION
9  BY MR. FARAH:
10     Q   I represent Mike Broughton and the
11 Barbourville Police Department.
12     A   Okay.
13     Q   I'm going to ask very specific questions about
14 them.
15     A   Okay.
16     Q   Are you familiar with Mike Broughton's role in
17 the murder investigation and the prosecution in this
18 case?
19     A   If I'm not mistaken, I believe Mr. Broughton
20 was in an interview, and I can't even tell you which
21 interview it was, but I think he was in a -- in an
22 interview.
23     Q   I'll represent to you that he was present on
24 one day when Detective York brought in Amanda Hoskins
25 and Jonathan Taylor to the Barbourville Police

Page 230

1 Department to be interviewed.
2    A   Okay.
3    Q   And I think some photographs were taken, as
4 well; that -- you -- that was discussed earlier today.
5    A   Correct.
6    Q   From your experience, when KSP's investigating
7 something in Knox County, is it common for them to
8 utilize either the Barbourville Police Department or the
9 Knox County Sheriff's office to bring witnesses or
10 suspects in to be interviewed?
11   A   Yes.  Typically, they will -- because like I
12 said, the -- the Harlan post is the post for the state
13 police, which is 45 minutes to an hour drive in -- from
14 Barbourville area.  There is a -- a location that the
15 KSP will use down there, but it is a public place.  It's
16 the RECC building in Letcher County.  They have a little
17 office in there for them to type and do everything.  It's
18 not conducive to bringing individuals in for interviews,
19 long interviews, with the public coming in and out.  So
20 they will -- majority of the time, they will use the
21 Barbourville PD.  It's just a better facility for the
22 interview process, recording, and it's just a nicer
23 facility, too.
24   Q   And in your experience, is it common for
25 either Mike Broughton or other members of the

Page 231

1 Barbourville Police Department to sit in on interviews?
2    A   About 50-50.  I mean, sometimes they are,
3 sometimes they're not.  They just give them a room.  It
4 just -- it's 50-50.  I can't say if they always do or
5 they always don't.  Sometimes they do, sometimes they
6 don't.
7    Q   And in this case, again, you said earlier
8 Detective York was the lead officer, correct?
9    A   Yes, sir.
10   Q   And the KSP was the lead agency with regard to
11 this investigation, correct?
12   A   Yes, sir.
13   Q   Did you have any intention of calling Mike
14 Broughton as a witness if this matter had gotten to
15 trial?
16   A   No, sir.
17   Q   Did you present Mike Broughton to the Grand
18 Jury?
19   A   No, sir.
20   Q   Did you ever meet with Mike Broughton -- and
21 let me -- I think Mike -- I mean Mike Broughton and
22 anybody else in the Barbourville Police Department.
23   A   Okay.
24   Q   Did you ever meet with any of them in this
25 investigation?

Page 232

1    A   No.
2    Q   Did you ever meet with Mike Broughton or any
3 of the officers in the prosecution?
4    A   Not that I can recall.
5    Q   There were some exhibits earlier in the case
6 report that was submitted by, I think, Detective York
7 that contained, per your testimony, all the different
8 statements and reports from different law enforcement
9 officers; did that report contain any documents or
10 information from Mike Broughton or the Barbourville
11 Police Department?
12   A   Not that I can recall.  No.
13   Q   Mike Broughton didn't prepare any arrest
14 warrant applications, correct?
15   A   Not to my knowledge, no.
16   Q   And we got -- you know, obviously we got a
17 copy of your file from -- in discovery; there's no notes
18 or reports in that file from Barbourville or Mike
19 Broughton, are there?
20   A   No.  To my recollection, no.
21   Q   You weren't pressed to pursue an indictment
22 against either Ms. Hoskins or Mr. Taylor by Mike
23 Broughton or the Barbourville Police Department,
24 correct?
25   A   No.

Page 233

1    Q   There were -- I know there were a lot of --
2 what?  I'm not going to make it.  I know there were a
3 lot of hearings in the criminal case, different
4 motions --
5    A   Yes.
6    Q   -- and so forth; did Mike Brought -- was he
7 ever called as a witness at any of those hearings?
8    A   Not that I recall.  No.
9    Q   I'm getting there.  Are you aware of any
10 evidence or allegations that Mike Broughton withheld any
11 exculpatory evidence from you or from the counsel for
12 Ms. Hoskins and Mr. Taylor?
13   A   No.
14   Q   Are you aware of any evidence or allegations
15 that Mike Broughton or Barbourville fabricated any
16 evidence or fabricated any statements?
17   A   No.
18   Q   Did you consult with Mike Broughton or
19 Barbourville at all in this investigation or prosecution
20 at any level from the day you got the case referred to
21 you until you dismissed the case?
22   A   I don't -- I -- I can say no, I would not have
23 consulted with them on it.  I may have discussed --
24 discussed it with them you -- just in regards to where
25 it's going or what -- you know, what's going on, but as

Page 234

1  far as consulting them, no.
2      Q    As far as officially in the investigation and
3  prosecution, would you have?
4      A    No.  More of just an inquiry as to, "Hey,
5  what's going on in this case?" or -- that -- that would
6  be the nature of it.
7      Q    And obviously when the indictment was issued
8  against -- and the Grand Jury returned the indictment
9  for Ms. Hoskins and Mr. Taylor, there was probable cause
10  established at that level, correct?
11      A    Yes.
12      Q    Okay.  And obviously, you -- I'm sure you
13  agreed with what the Grand Jury did in that case,
14  correct; at that level, you agreed?
15      MS. STAPLES:  Objection to form.
16      Q    Your office presented the case to the Grand
17  Jury, they returned an indictment; I'm assuming you
18  agreed with their finding?
19      A    I -- I -- I will -- well, let me put it this
20  way: Even if a Grand Jury returns an indictment and I do
21  not think probable cause can be sustained, I have a duty
22  to dismiss the indictment.  I did not do that once a
23  Grand Jury returned it, so I think probable cause, which
24  is what the Grand Jury's there for -- probable cause had
25  been established at the time of the Grand Jury heard it.

Page 235

1      MR. FARAH:  I made it, didn't I?
2      MS. KINCER:  You're done.
3      MR. FARAH:  I'm done.  That's all I got.
4          REDIRECT EXAMINATION
5  BY MS. STAPLES:
6      Q    I have just have a few follow-up questions.  It
7  won't take long.  Mr. Wright touched on the number of
8  continuances that occurred in this case.
9      A    Uh-huh.
10      Q    Can you recall specifically how many times
11  this case was continued?
12      A    Specifically, I cannot.
13      Q    Can you recall how many times specifically Ms.
14  Hoskins' counsel requested continuances?
15      A    Specifically, I cannot.
16      Q    Can you recall Ms. Hoskins' counsel ever
17  requesting a continuance?
18      A    I can't remember if they did or did not,
19  specifically.
20      Q    Can you recall Ms. Hoskins' counsel filing a
21  motion for a fast and speedy trial?
22      A    Somebody filed a motion.  I can't remember
23  which party filed a motion.  I'm -- I'm sorry I can't,
24  but somebody did file a motion for a fast and speedy
25  trial.

Page 236

1      Q    Okay.  Do you recall Ms. Hoskins being let out
2  on bond because the trial had not yet occurred?
3      A    She was, and I'd --
4      MR. WRIGHT:  Object to form.
5      A    I'd forgot about that until Mr. Slosar was
6  talking about the difference in timeframes when we filed
7  a motion to dismiss, and I -- as I was sitting here
8  thinking, "Why did I wait?"  And I -- it dawned on me
9  that she was not being held at the time because she was
10  out on bond.  Mr. Taylor was not out on bond, so I filed
11  his a -- just a matter of a few days, I think, after my
12  conversation with Mr. Beach and Mr. Wilson, and then
13  since she was out, I had a little more time, and they
14  had also separated the trial, so I filed hers later, but
15  I do remember her being out on bond.  Yes.
16      Q    Okay.  So speaking of the motion to dismiss,
17  you were asked if there was other evidence other than
18  what's mentioned in your motion to dismiss that you --
19      A    Uh-huh.
20      Q    -- considered, and I think you were asked
21  specifically about Amber Simpson, Mikey Bruner, --
22      A    Uh-huh.
23      Q    -- and the defendants having knowledge of
24  money that Ms. Mills had; is that correct?
25      A    That's correct.

Page 237

1      MR. WRIGHT:  Object to form.
2      Q    And you considered all that evidence when you
3  filed this motion to dismiss?
4      A    Yes.
5      Q    And despite having that evidence, you felt
6  like probable cause could not be found -- that probable
7  cause no longer existed?
8      A    Yes.  I -- do you want me to explain or
9  just --
10      Q    No.  You can just give me the answer, yes or
11  no.
12      A    Yes.
13      MS. STAPLES:  Okay.  That's all I need.
14      THE WITNESS:  Okay.
15          RECROSS EXAMINATION
16  BY MR. WRIGHT:
17      Q    Why don't you go on ahead and explain?
18      A    I had a feeling that was coming.  So, when I
19  looked at the -- the case in its entirety at this -- at
20  this juncture, and I knew that a multitude of witnesses
21  were not available or their testimony changed, the
22  remaining evidence taken in consideration, I thought
23  that there was so much evidence and testimony that
24  changed by witnesses, the Commonwealth would not be --
25  be successful at trial, to the point that I -- I just

Page 238

1  thought probable – that probable cause was no longer –
2  no longer available. There was still evidence, but I
3  just didn't think it was going to overcome all the
4  changing of testimony that was out there.
5    Q   Did you – was there ever a point when the
6  defense identified who their witnesses would be for
7  trial?
8    A   No. And in the Commonwealth of Kentucky,
9  there's no requirement for a witness list in criminal
10 cases, either by the prosecution or the defense.
11   Q   Okay. When you prepared for trial, you said
12 you'd follow up with witnesses and this trial was
13 continued a couple different times. Did you follow up
14 multiple times or did you just follow up one time; do
15 you have any memory?
16   A   I don't – I don't have any memory. No, and
17 – and part – part of that is that once you've talked
18 to them once, like Mr. Beach, after I talked to him
19 there in the prison and I'd saw him a couple times at
20 court just about the transport issues, I didn't discuss
21 with him – you know, I figured if – if it's an issue
22 that comes up, he'll call me and say, "I'm not
23 testifying," or, "They made me say this," you know,
24 something of that nature and that never happened from
25 when I – you know, I did follow up because it had been

Page 239

1  a – a year more since I'd taken a statement from him, I
2  did follow up with him.
3    Q   All right. Just have one other document to
4  look at. This was in your file that was produced by
5  plaintiffs to us after the subpoena.
6    A   Okay.
7    Q   PL24722 through -728; did your office prepare
8  that? Let you –
9    A   Give me – let me –
10   Q   Sure.
11   A   – give me one second. I'm sorry.
12   Q   Take a second.
13   MS. STAPLES: Are you getting a copy for us,
14 Derrick?
15   MR. WRIGHT: Yeah.
16   MS. STAPLES: Okay. Thank you.
17   MR. FARAH: Derrick, what is this document?
18   MR. WRIGHT: It is a response that was filed by
19 their office to some of the motions that we talked
20 about.
21   MR. FARAH: All right.
22 BY MR. WRIGHT:
23   Q   Let me get the – I'll get the number again.
24 I'm sorry.
25   A   It is – number's PL24722 to PL24728, and yes,

Page 240

1  this was – this was prepared by my office.
2    Q   I believe – I gave my copy over there – on
3  page 3, there's a paragraph there about Danny Wilson; do
4  you see that?
5    A   Yeah. It'd be paragraph 2 under the heading
6  of "Additional Discovery Information."
7    Q   Right. Page 3, paragraph 2. You're right.
8    A   Yes, sir.
9    Q   And it indicates that Jason York relayed a
10 request to the Commonwealth Attorney about him wanting
11 to relocate from one part of a prison to another; do you
12 see that?
13   A   I do.
14   Q   Would that be some sort of promise, incentive,
15 or consideration that would implicate Brady or Giglio,
16 in your opinion?
17   A   No, it would not.
18   Q   Okay. You can turn to the next page, the
19 paragraph at the top relating to Amber Simpson, do you
20 see that?
21   A   I do.
22   Q   And that paragraph indicates that her mother
23 had inquired about help for Amber's brother and that
24 Detective York would relay the request to the
25 Commonwealth Attorney; do you see that?

Page 241

1    A   I do.
2    Q   Would that implicate Brady or Giglio as a
3  incentive, promise, consideration, in your opinion?
4    MS. STAPLES: Objection to form.
5    A   No.
6    MR. WRIGHT: Okay. That's all the – I'll make
7  this Exhibit – what are we on?
8    COURT REPORTER: 24.
9    MR. WRIGHT: All right. Exhibit 25.
10   (EXHIBIT 24 MARKED FOR IDENTIFICATION)
11   COURT REPORTER: Here's – I've got it written
12 out there if you want it.
13   MR. WRIGHT: Okay. Thanks.
14   THE WITNESS: I think I kept all these in
15 order. I try my best.
16   COURT REPORTER: Thank you.
17   MR. WRIGHT: Anything else?
18   RE-EXAMINATION
19 BY MR. KELLEY:
20   Q   Have one. Just – Danny Evans, how long has
21 he been a prosecutor?
22   A   Oh, Danny Evans was a prosecutor from 1978, I
23 believe, until 2008, which would've been 30 years. He
24 was an assistant under Tom Handy for most of those years
25 and in 2003 he became the Commonwealth Attorney until

Page 242

1  2008 when he retired. He came back in 2010, maybe –
2  either 2009 or 2010, came back to an assistant, was an
3  assistant in the office for me until he took an
4  appointment to the bench as a circuit judge.
5      Q   He was appointed to the –
6      A   He was –
7      Q   – Circuit Court, Division 2, I believe.
8      A   That is correct.
9      Q   All right. And am I correct – did you have a
10 discussion with him at any point concerning this case;
11 would he have collaborated with you during that time?
12     A   During the time he was an assistant in my
13 office?
14     Q   During – yes, during the time he was an
15 assistant in your office?
16     A   I mean, he would've talked to me about it
17 probably after the indictment. If he would want to –
18 heard the – heard the case in the Grand Jury, he
19 would've talked to me about it, about what kind of case
20 it was coming up.
21     Q   Did he ever indicate to you that he had any
22 doubts about probable cause being established at the
23 time the Grand Jury indicted?
24     A   He never indicated that to me, no.
25     Q   All right. Did he ever indicate to you that

Page 243

1  probable cause didn't exist at any time during the
2  course of the proceedings?
3      A   No, and that's one thing he would've done or
4  any assistant in my office would've done if probable
5  cause did not exist.
6          MR. KELLEY: That's all I have. Thanks.
7          THE WITNESS: Can I follow up with one issue?
8  You had mentioned he's in Division 2. When he
9  became a circuit judge in Division 2, that was an –
10     another reason for a continuance and delays in this
11     matter because we had to get special judges. I
12     completely forgot about that issue until you
13     mentioned him as Division 2. I just wanted to
14     follow up on that.
15         (DEPOSITION CONCLUDED AT 5:55 P.M.)
16
17
18
19
20
21
22
23
24
25

Page 244

1  CERTIFICATE OF REPORTER
2  STATE OF INDIANA
3
4  I do hereby certify that the witness in the foregoing
5  transcript was taken on the date, and at the time and
6  place set out on the Title page hereof by me after first
7  being duly sworn to testify the truth, the whole truth,
8  and nothing but the truth; and that the said matter was
9  recorded by me and then reduced to typewritten form
10 under my direction, and constitutes a true record of the
11 transcript as taken, all to the best of my skills and
12 ability. I certify that I am not a relative or employee
13 of either counsel, and that I am in no way interested
14 financially, directly or indirectly, in this action.
15
16
17
18
19
20
21
22 LACEE TOWNSEND,
23 COURT REPORTER / NOTARY
24 COMMISSION EXPIRES ON: 06/19/2024
25 SUBMITTED ON: 06/29/2018

## Exhibits

**exhibit 1** 14:6,
7,10 61:21
62:3,4

**exhibit 2**
16:13,17

**exhibit 3**
17:10,12 143:9

**exhibit 4** 19:21
20:2

**exhibit 5** 21:23
22:3 221:10

**exhibit 6** 32:2,
7

**exhibit 7** 34:8,
12 36:21 37:16

**exhibit 8**
35:15,19 37:19,
20

**exhibit 9**
38:15,19

**exhibit 10** 42:7

**exhibit 11**
44:14,15,18

**exhibit 12**
48:8,13 53:7
73:5,19 136:23

**exhibit 13**
50:13,18 51:4,8

**exhibit 14** 51:3
72:11,14 81:18,
19

**exhibit 15** 95:9
110:8,10
193:13

**exhibit 16**
94:21,22 95:1
111:10

**exhibit 17**
94:23 95:2

**exhibit 18**
95:17,18 96:9

**exhibit 19**
118:4,5,8,11

**exhibit 20**
118:7,12
121:12

**exhibit 21**
132:7,10 192:1
217:18

**exhibit 22**
141:5,12
168:10 197:4,5

**exhibit 23**
152:22 153:1

**exhibit 24**
241:10

## $

**$100** 152:25
153:2

**$12,280** 222:7

## -

**-728** 239:7

## 1

**1** 14:6,7,10,20
36:22,23 61:21
62:4 81:19
149:7

**10** 42:3,7
220:24

**11** 44:15,18

**11:02** 119:21

**12** 12:23 48:8,
13 52:18 53:7
73:5,19 136:23

**12-22-2010**
120:7

**12-CR-070**
50:14

**12-CR-70** 48:9

**13** 50:13,18
51:4,8,9
128:18,24
221:22 222:1

**14** 15:13,14
16:6,15 17:7,20
51:3 60:2
72:11,14 81:19
110:5,14
226:20

**15** 84:25 94:18
95:9,10 110:8,
10 119:21
121:14,15
122:6 172:24
193:13 214:18
220:23

**158** 111:11

**16** 94:22 95:1
109:13,19
111:5,10 113:2

**162** 111:11,15,
16

**17** 94:17,23
95:2 96:10

**18** 95:17,18,20
96:9 111:12
135:8,15

**19** 118:5,8,11

**1978** 241:22

## 2

**2** 16:13,17
37:15,21 42:16
83:17,18
100:20 146:15
240:5,7 242:7
243:8,9,13

**20** 101:7,20
102:2,8 118:7,
12 120:14
121:12 122:11,
19,25 124:9
222:7

**20-something**
193:10

**2001** 11:10

**2002** 28:9,11
52:17 113:2

**2003** 241:25

**2008** 241:23
242:1

**2009** 192:24
193:5 242:2

**2010** 23:3
101:7,20 102:2,
8 120:14
122:11,19,25
124:9 242:1,2

**2011** 12:8,13,
19,24 13:8
73:25 74:8
100:20 119:21
121:14,15,18
122:6 127:4
146:22

**2012** 15:13,17,
21 16:6,15
17:7,20 18:1,24
19:9,18 20:11,
17,20,25 21:6
24:12 26:18
29:22 31:5
34:20 36:7
45:18 47:6,14,
15 52:18 53:1
55:11 56:7
60:2,12 62:17,
23 63:24 64:7
66:23 67:13
109:13,19
110:5,14 111:5
119:25 128:18,
24 130:8,19
131:8 135:8,15
137:19 151:22
153:16 154:8,
13,15 156:8,13
208:7 226:20,
21 227:3

**2013** 33:5 36:1,
13,19 42:16

**2014** 137:2
138:13 139:11
173:9

**2015** 142:8,9
143:13

**2016** 29:23
72:13 80:16,17
81:4,14,20
83:21 109:12,
18 110:3 111:3

**122:16 124:22**
127:4 128:18,
23 130:5,16
133:20 134:3
135:7,13
139:10 142:15,
18 143:17
148:21 149:17
155:13,19
157:3,16 161:5
177:5 178:13
183:9

**2017** 31:5
52:18 53:1
55:11 56:7
63:24 64:7
67:13 162:14

**21** 111:18,19
132:7,10
152:17 192:1
217:18 218:21

**22** 141:5,12
152:20 168:10
197:5

**23** 81:20 148:21
152:9,10,22
153:1 177:5
178:13 180:6

**24** 74:8 127:4
146:22 241:8,
10

**24458** 34:10

**24540** 42:5

**25** 241:9

**25251** 143:9

**25296** 50:15

**25414** 100:18,
23

**25418** 73:6,7

**25426** 182:7

**25461** 101:9,15

**25516** 48:10

**26** 137:2

**27** 20:11 73:25
226:21 227:3

**27th** 10:21

**29** 72:13 157:3

---

**3**

**3** 17:10,12 38:6
41:1 143:9
193:5 240:3,7

**3.8** 30:1,17 44:9
123:10

**30** 84:22
173:19,23
195:11 241:23

**338** 120:3

**383** 151:20

---

**4**

**4** 19:21 20:2
21:19,21 36:24,
25 41:19
121:18

**40** 149:2

**40070** 32:12

**45** 84:22
173:19,23
230:13

**4th** 178:19

---

**5**

**5** 21:23 22:3
36:19 72:22
73:23 146:14
186:10 221:10

**50-50** 231:2,4

**501** 38:16

**5:55** 243:15

**5th** 35:25

---

**6**

**6** 32:2,7 34:20
151:22 154:13,
15

**60** 208:3

**600** 12:12,14

**606-622-1780**
121:23

---

**7**

**7** 34:8,12 36:13,
21 37:16

**7.24** 37:7 45:3

**72** 32:14

---

**8**

**8** 12:22 35:15,
19 37:19,20
41:19 130:8,19
131:8

---

**9**

**9** 38:15,19
111:12,19

**90** 208:3

**9:30** 121:18

---

**A**

**a.m** 121:19

**a.m.** 119:21

**abilities** 165:6

**absolutely**
117:21 118:3
226:18 228:13

**abundance**
223:16

**access** 154:1

**accident** 28:14
78:4

**accompanied**
223:2

**accountable**
43:13

**accounting**
11:19

**accurate** 23:20
49:5,18 58:5
61:6 209:16,20
210:16 223:12

**accurately**
51:12

**accused** 22:24
29:9 30:7,21

**acquaintance**
164:23 165:3

**acquired**
59:20

**action** 91:7
186:4 223:10
227:3

**actions** 89:13
94:10,13 104:3,
22 105:15
106:8 107:1,19
108:12 109:4

**active** 55:14

**actively** 193:4

**activities**
55:23

**actual** 48:18

**addiction**
225:17

**adding** 183:20

**additional**
38:7 43:5 46:21
195:3 240:6

**address** 68:11
69:7 205:7

**admin** 221:12

**administered**
43:19

**administrative**
208:22

**admissible**
183:13

**admitted**
142:20

**advantage**
209:4

**advice** 126:19

**advise** 120:4
205:12

**advised**
126:12,14
166:18

**advising** 139:5

**affiant** 119:7
121:17

**Affiant's** 14:21

**affidavit** 118:5,
13,25 119:8,18
120:2,23
121:13 122:5
123:3

**affidavits**
119:3

**affirm** 8:4

**affirmative**
150:20

**affirmatively**
46:22 47:2 75:9
172:3

**affixed** 151:21

**afternoon**
8:11,12 68:23
151:7,10

**agencies**
52:21 53:3
56:25 57:13,21,
24 58:5,25
59:18 60:22
67:8,15 215:15

**agency** 49:1
56:9 102:25
112:9 117:4
161:7 162:3,7
231:10

**agree** 34:19
43:3 98:17
99:23 119:22
132:16,21
141:23 142:1
145:4,8,25
146:20 165:13

**agreed** 37:7
190:18,23

**advice** 126:19

191:21 203:2
234:13,14,18

**agreement**
63:8 65:19
111:24 203:12
210:24 211:5,6,
20

**agreements**
43:12

**ahead** 18:19
27:11 46:25
50:19 52:4
84:13 145:22
180:2,4 237:17

**ahold** 68:25

**alcohol** 145:11

**alibi** 226:13

**alive** 186:7

**allegations**
10:1 233:10,14

**allege** 223:17

**alleged** 196:1

**Allen** 23:21
43:19,24 130:8,
17 131:25
139:3 167:9,11
196:15,18
200:22 201:2,3,
4,11 202:20
211:9 217:17
218:3,6,23

**alleviates**
205:13

**allowed**
113:25 114:9
199:17,22

**alter** 36:14,17

**alternative**
28:13

**Amanda** 10:8
14:8,15 19:8
20:7 22:25
29:20 33:6
34:16 43:1
44:7,16 48:2
52:25 53:22
58:8 60:3,11

66:13,18,25
68:9 70:15 71:7
72:12,18 73:12
74:15 75:18
77:1 79:4 81:25
88:3,6,10,14
103:14,24
104:15 110:2,
21 113:3,12,20
114:2,17
119:24 120:18
121:4 122:14
123:19 124:1
128:4,10,17,22
129:13 130:2,6,
15 131:11,20
132:3,19 133:8,
19 134:2,19,25
136:19 137:12,
16,25 138:5
141:11 146:2,
18 150:21
151:5,9 153:15
154:9,15,21
155:15,25
156:3,14,22
157:22 159:1,9
160:2,5,25
163:16 186:24
187:14 219:21
229:24

**Amanda's**
71:22 200:10

**Amber** 44:1
128:19,24
197:11,24
213:6 236:21
240:19

**Amber's**
240:23

**amend** 36:14,
17

**Amendment**
204:7,15,18,23
205:17,20

**amount** 172:2

**analysis** 154:6

**and/or** 44:10

**annex** 41:8

**annually** 28:11

**answering**
97:25

**answers** 9:13

**anticipating**
169:17

**anticipation**
186:23

**apologize** 19:1
27:12 28:16
29:6

**apparently**
225:1

**appeared**
206:16

**appearing**
200:22

**appears** 14:14,
22 15:1,24
16:22 32:6,11
34:15 35:25
49:12,14 74:4
119:13,19,20
146:1 222:8,15

**application**
118:7

**applications**
232:14

**apply** 204:18

**appointed**
242:5

**appointment**
242:4

**approved**
89:20 104:10
105:4,22
106:15 107:8
108:1,18 109:9

**approximately**
12:13 77:15
121:18

**April** 18:24
19:9,17 20:11,
20 142:9
162:12,14,15
226:21

**archives** 55:17

**area** 47:12
84:14 85:1
173:25 174:23
176:10,11
230:14

**argued** 45:8
190:16 194:5

**arise** 201:8

**arms** 190:15,21

**array** 90:12,17
126:15

**arrest** 13:15,
17,19,22 14:7,
15,18 15:4,9,
16,19,21 16:5,
11,13,23 17:1,
6,16,18 18:3,10
20:19 60:1,7,10
61:20 76:22
95:10 110:13
112:2 115:15,
22 193:15
206:24 226:20
232:13

**assert** 204:15,
21 205:20

**asserted**
205:25

**asserting**
205:10 206:2

**assertion**
204:24

**assess** 22:12

**assign** 57:8

**assist** 64:23
65:1 66:10
69:10 88:12
215:14

**assistance**
69:6 133:6,15
211:14

**assistant** 11:1,
3 19:5,15
20:10,18 21:2
26:22 28:2,3,7,
19 42:24 198:9
206:20 220:25
241:24 242:2,3,

12,15 243:4

**assistants**
198:4

**assisting**
42:25 69:14
206:16

**associate** 15:2

**Association**
199:15

**assume** 9:22
23:20 33:21
117:17,22
185:23

**assumed**
183:19

**assuming**
15:25 234:17

**assure** 34:2
126:20

**attach** 118:25

**attempt** 40:21
102:15

**attempted**
100:8

**attendance**
210:5

**attended** 28:11

**attending**
223:19

**attention** 99:8
153:17 221:9

**attorney**
10:21,25 11:4
12:1 19:5,16
20:10,18 21:2
28:4,8,9,20,24
31:17 45:12,19
58:23 59:7
63:21 64:9
65:14,18 78:7,8
139:4 151:8
166:2,11 167:2
168:4,25
182:11 185:19,
20,22 186:5
193:22 200:9,
10,11,14 203:6,

22 220:23,24
240:10,25
241:25

**attorney's**
18:2 28:1 31:23
46:12 47:5
54:11 56:8,23
57:4,12,20 58:3
59:1,12 62:18,
22,24 64:19
76:1 207:2,3

**attorneys** 8:18
18:23 42:25
46:17 61:24
93:6,24 126:3
144:22 166:16
195:10 200:12,
16

**Attorneys'**
199:15

**attributed**
70:17 148:1
149:21

**audio** 23:9,11
61:15 210:8

**autopsy** 25:2

**average** 12:11,
22

**aware** 30:23
31:4,24 39:9
40:6,12 41:4,5,
8,10,25 45:23
46:2,6 55:18
63:22 65:10,13
73:15 88:24
89:4,8,23 90:3,
11 92:22 93:20
94:3,6,9 96:24
97:11 100:6
101:22 102:3
103:12,22
104:14,18
105:8,11 106:1,
4,19,22 107:12,
15 108:5,8,22,
25 109:13,18
110:3 111:3,24
122:16 123:2
124:6,25
125:12 126:5
127:4,12
128:18,23

248

129:3 130:7,16,
24 134:9
135:20 138:15,
20,22 139:15
144:8,13,25
151:11 154:8,
12 155:14
158:16 161:6
165:2 190:12
199:2 207:20
210:6 233:9,14

**B**

**back** 12:6
15:17 28:18
75:15 78:2
79:24 83:9,14
92:3,4 93:20
119:12,13
126:22 145:22
160:11 169:19
176:19 177:13,
22 178:16
181:5 184:19
192:24 197:4
207:7 208:4
212:8 221:25
242:1,2

**background**
119:1

**bad** 46:15
175:9 199:14

**badge** 14:23

**bail** 15:11

**Barbara** 34:9,
17 36:6

**barbed** 175:11

**Barbourville**
56:14 59:10
92:25 93:13
96:15 100:8
125:2 164:11
215:7 229:11,
25 230:8,14,21
231:1,22
232:10,18,23
233:15,19

**based** 18:5
27:4 58:8,13,
18,24 59:8

60:20 94:24
97:7,16 98:10
148:19 156:18,
23 158:17
168:19 187:9
203:15 204:20

**basic** 142:7

**basically** 22:9
70:9 72:25
175:22

**basis** 163:4
204:22

**Bates** 32:3,12
33:15 42:5
48:10 50:14
96:4 118:5
132:8

**Beach** 79:17
80:2 82:19,20
83:21 84:4,7,
15,18 85:3,16,
20 86:9,13,17,
22 87:14
136:25 137:11,
15,24 138:4,11,
21,24 139:5
140:7,17,24
141:19 148:21,
25 173:8,23
174:4,6 176:21
179:5 184:25
186:22 210:5,
12 224:24
236:12 238:18

**Beach's**
139:11,21
140:1 195:18
196:15

**Beckner** 19:2

**Beckner's**
42:23

**beg** 98:11

**began** 28:7

**begin** 13:11,15
76:25 85:25

**begins** 168:18

**behalf** 42:3,11
43:4 44:15 97:6

**belief** 140:14
203:16

**believed** 141:9
152:5 153:5
157:3,9,16
219:20

**bell** 68:11 69:5,
7 193:11

**bench** 242:4

**big** 84:24

**bills** 152:25
153:2

**bit** 47:3 98:1
119:23 141:21
200:21

**black** 182:21

**blank** 142:6
143:3

**block** 224:23

**Boggs** 182:10
186:6 193:22
194:3

**bond** 66:11
211:15 236:2,
10,15

**bones** 169:16

**boring** 27:15

**born** 11:21,22

**bottom** 14:20
36:24 73:6
188:20

**bound** 20:22,
23 207:16,25
226:22 227:4,
12,13,17

**bounds** 18:17

**Brady** 29:3
31:9,13,18,24
34:5 35:7 41:11
44:10 112:20
123:11 140:15
144:15,18
145:1 151:13
176:15 192:15
210:23 240:15
241:2

**Brandon** 19:2
170:19 198:9
208:13

**Branson**
77:12,23 78:14,
22 79:4,13
86:22 87:15
185:5

**Branson's**
133:22 134:4,
17,23

**break** 9:11
87:21 88:16
167:22 206:7
229:1

**Brian** 84:9
224:22,25

**bring** 20:25
24:9 57:13
83:9,14 153:22
154:3 202:23
204:15 230:9

**bringing** 20:24
230:18

**brother** 175:6,
7,8,10 240:23

**brought** 52:4
56:10 57:20
58:8,13,18
66:17 75:19
85:8 99:7 126:4
160:11 174:4
177:18 181:5
216:12 229:24
233:6

**Broughton**
92:23 93:9
125:1 164:11
229:10,19
230:25 231:14,
17,20,21 232:2,
10,13,19,23
233:10,15,18

**Broughton's**
229:16

**Bruner** 141:23,
25 142:6,11,15,
19 143:4,13,19,
25 144:2,11
145:10 197:8

213:8 236:21

**Bruner's**
142:4,8,25

**building** 174:3
230:16

**bunch** 94:24
97:5,6 100:20
125:4 168:5
206:11

**C**

**call** 14:14
16:23 17:15
69:9 85:22 87:4
93:19 120:6
147:7 149:1
151:11 153:25
164:24,25
176:8,18 177:6,
11,25 178:12
181:4,8 184:10
189:18 191:1
204:11 205:6
207:11 216:2
220:1,5 224:9
238:22

**called** 26:22
84:13 120:4
179:8 233:7

**calling** 24:17
83:3 224:6,18
231:13

**calls** 167:3
173:5 177:1
189:23 201:22

**camo** 189:16

**Campbell**
80:8,9 81:22
171:16

**capacity**
118:16

**capital** 46:11
60:17 61:4,13
102:24 103:7
117:11,15

**captain** 166:17

**caption** 146:2

car 78:19
185:21,23

care 151:14,16

Carnes 34:9,17
36:6

carried 215:9

case 13:9
15:24 19:4,6
21:11 23:8,19
24:9 25:1,2,4,5,
6,9,11,15,18
26:8,25 27:6
29:4,17 32:20
33:18,20 34:23
35:1 41:13
44:17 45:14,25
46:11,17,23
47:22,23 48:9,
11,12,15,23,24
49:16 50:6,16
51:19 52:2,9,22
53:6,20,24
54:17 55:18
60:16,21 61:6,
14 62:20 63:1
64:2,11,16,20
65:6,13 68:8
69:3 73:1,20
75:20 76:5
77:24 79:25
82:11 83:25
84:16 86:2,6
88:24 89:4,23
90:3 101:9
102:25 103:8,
11 104:13
105:8,25
106:18 107:11
108:4,21
110:21 115:5,
14,21,25 117:1,
11,15,16
120:25 121:8
122:15 124:18,
24 136:23
141:6 146:3
151:2,3 153:18
155:6,8,25
157:15 158:17
160:9,19
162:17 170:24
175:15 177:18
186:23 193:8
194:4,19 199:6,

7 201:19 202:2
205:24 207:6,
25 208:2,17,21,
24 209:11
211:22 212:8
213:10,15,23
214:24 215:22
220:2,6 221:16,
17 224:9
225:15,21
226:18,19,21
227:1,23 228:4,
14 229:18
231:7 232:5
233:3,20,21
234:5,13,16
235:8,11
237:19 242:10,
18,19

cases 12:4,7,8,
18,20,25 50:3
55:14,15 57:14,
25 63:20 76:2
126:25 130:15
133:6,12,16
165:8 196:19
201:7,24
207:23 208:6
214:25 215:10,
12 225:14
238:10

cash 15:11

Castle 78:9,10
185:25 186:2,6

caught 8:24

caution 223:16

cautioned
126:16

Center 68:4,6,
22 69:17 74:25
169:11 174:22
186:13

certificate
34:19

chair 170:23
198:6,12

chairs 85:2

challenged
185:18

chance 191:8

change 150:2
151:13 180:16
187:6 212:22
225:22

changed 74:13
75:13 81:23
146:16 148:9,
11,22 150:16
180:6,25
187:12 197:23
200:2 212:17
237:21,24

changing
238:4

charge 13:4
14:15 60:17
155:18

charged 61:11
62:12 204:19
205:23

charges 12:25
13:9,12,14
17:17 18:3,13
21:6 22:20
26:14 29:22
56:6 61:12,23
110:1,4,15
111:2 113:5,12,
19 114:2,6,17
115:1,23
116:11 119:23
120:18 121:4
122:13 123:19,
25 124:22
127:3,21 128:4,
10,14,16,22
129:13,20
130:1,6 131:11,
19 132:2
133:19 134:2,
19,25 135:13
136:4,12,19
137:12,16,25
138:5 139:23
140:3,19 141:1
142:14,17
143:17 145:13
150:21 154:20,
25 155:13,23
156:7,12,17,22
159:9,21 160:1
161:4 169:16,

17 191:12,18
192:8 211:15,
18,21 218:5,8

charging 61:4

Chase 11:7

cheat 22:10
221:10 226:24,
25 227:9

check 15:4
154:2 178:16
206:4

checked 84:21
173:21,25

checklist 22:2
25:18 26:1
153:22

checks 50:2

chief 92:23
93:9 125:1
164:11 220:6
224:9

choice 205:15

Christy 77:12
79:13 86:22
87:15 133:22
134:4 185:5

circle 227:2

circled 221:22

circuit 10:22
32:12 162:20
207:22 242:4,7
243:9

circumstance
64:13

circumstance
s 91:18

cite 45:4

civil 47:22,23
50:24 78:7
165:23 185:20,
22,23 186:4

claim 145:3
173:3

claimed
144:12

claiming 78:5

claims 142:11
143:12

clarification
65:2 143:24

class 103:8

classes 221:1

clear 56:1
64:23

clears 141:15
203:14

clerk's 33:12
42:15 207:22

client 204:1,4

close 80:12
81:2,13 149:16
153:17 162:16
186:25 187:10
228:8

closer 176:11

coat 126:18

coerce 88:9,25

coerced 219:9

collaborated
242:11

collection
28:14 224:15

collective
38:22

college 11:7,
12,13,15,16

column 23:13

comfortable
174:16

commander
166:17

common 216:6
225:9,10,13
230:7,24

Commonwealt
h 10:21,25 11:3
12:1 18:2,23
19:5,16 20:10,
18 21:2 27:25

28:4,8,9,20,23 31:17,23 39:7 42:24 46:12 47:5 54:11 56:8,23 57:4, 12,19 58:3,23 59:1,7,12 62:17,21,24 64:9,19 65:14 76:1 139:3 159:18 168:24 199:9,14 211:25 212:6, 11 220:23,24 237:24 238:8 240:10,25 241:25

**Commonwealth's** 63:17,23 72:17

**communication** 166:10

**communications** 194:23 209:5

**communities** 161:12

**community** 161:13 216:10 225:18

**comparisons** 154:8

**competency** 78:12 185:16 200:16

**complaint** 10:3,12 13:24 14:8 16:14 17:19 18:3,10 20:19 26:7,13, 25 59:21 60:11 62:5,10 76:10, 15 95:11 110:13 112:3 115:15,22 196:1 206:22, 24

**complaints** 60:1 61:21

**complete** 10:6

49:17 58:5 143:3

**completed** 25:23

**completely** 56:1 163:9 243:12

**completing** 17:1,18

**compliance** 35:15

**complied** 31:18 35:5,10 36:10,15 37:13 44:4

**comply** 44:8

**complying** 34:3

**computer** 40:8,9,16

**concise** 74:6

**CONCLUDED** 243:15

**condition** 201:5 202:7 212:2

**conditions** 66:11

**conducive** 230:18

**conduct** 31:1 89:15,17,20,24 90:4 104:5,7, 10,24 105:1,4, 19,22 106:4,12, 15 107:5,8,23 108:1,15,18 109:8 116:3,6

**conducted** 154:9 215:5

**conducting** 103:1

**conference** 28:10 170:20 220:15

**conferences**

166:6

**confess** 228:7

**confessed** 142:12 144:12 156:3,10,14

**confession** 142:21 155:14, 21 156:18,24

**confidential** 45:5

**confirm** 78:10 186:2 195:2 209:22

**confirmed** 43:16 168:24 169:22

**confront** 171:12,14 180:9

**confronted** 171:19

**confused** 201:19,24

**considerable** 209:2

**consideration** 23:24 41:11 63:14 64:1,10 65:15 66:5 111:4 113:17 129:18 130:17 131:17,25 132:13,18 133:6 136:10 140:7,18,25 141:18 176:14 192:14 210:22 211:21 212:11 237:22 240:15 241:3

**considered** 98:22 155:11 216:2 219:10 236:20 237:2

**consistent** 170:5

**consists** 48:11

**conspire** 163:15,18 228:20

**constitute** 98:19

**constitutional** 163:16,19

**construct** 103:14

**consult** 207:2, 3 233:18

**consulted** 233:23

**consulting** 234:1

**contact** 68:15 121:23 162:6 166:21 167:4,5 176:18 178:21 188:19,23,24 198:25 199:1 201:11,16

**contacted** 81:22 139:2 148:21 151:7, 10 161:10 177:4 180:7 188:21 198:4 201:1 207:9

**contacting** 202:4

**contained** 75:3,8,9 76:15 123:3 146:22 148:13 232:7

**contemplation** 65:19

**contempt** 205:1

**content** 171:17

**contents** 43:16 79:9,22 170:2

**context** 69:23 70:7

**continually** 47:17

**continuance** 199:17,23 235:17 243:10

**continuances** 200:16,19,20, 22 235:8,14

**continuation** 128:3 130:1 132:2 140:3,19 141:1 145:13 156:17,22

**continue** 113:5,11,19 127:21 128:9 129:13,20 131:10,19 134:19 136:4, 12 138:5 139:23 157:4, 10,17 160:1 200:1,3,4,7,11 222:2

**continued** 83:8 115:1 127:21 154:24 177:17 189:6 199:7 202:18 235:11 238:13

**continuing** 27:17,20

**contributing** 154:17

**convenience** 50:21

**conversation** 40:4,8,22 43:21 65:24 69:16,22, 24 70:2,7,13 71:6 75:3 78:22 79:4,20,23 81:7,11,12 82:5,10 83:10, 20 85:25 87:8 138:21,23 139:8 143:20 144:12 150:9 165:18 166:7 169:7,20 174:15,25 175:2 176:21 179:5,7 188:2 203:14,15

218:17 236:12

**conversations**
19:15 43:22,24
70:14 79:17
83:22 86:13
122:22 124:14
138:10,15,20
193:3

**converse**
166:15

**convict**
117:19,24

**Convicted**
226:2

**conviction**
159:19

**cool** 137:6

**coordinate**
208:21

**coordinated**
206:19

**copied** 36:2

**copies** 38:9

**copy** 10:12
19:21 33:10
37:1,5,21 38:2,
6 47:25 63:22
151:18 232:17
239:13 240:2

**corner** 39:24,
25 42:17
188:20

**Cornett**
101:10,17

**corollary**
215:17

**coroner** 34:25

**correct** 10:10
13:7 16:10 26:5
31:1 34:21 36:9
54:25 60:15
87:5 89:18,19,
21,22 94:8 96:1
104:8,9,11,12
105:2,3,5,6,20,
21,23,24
106:13,14,16,

17 107:6,7,9,
10,24,25 108:2,
3,16,17,19,20
109:9,10 117:1
118:1 137:13
138:2 148:3,7,
8,12,23,24
149:4,6,22
154:18 157:6,
18 170:7,13
179:10 182:25
185:1 186:14
188:13 189:19,
20 192:3
194:10,11
197:3,13
198:23 203:10
204:7 206:17,
25 208:18,19
209:12,13,22
212:17 213:3,6,
7,8 215:19
217:10,16
219:6 223:24
224:4,14 230:5
231:8,11
232:14,24
234:10,14
236:24,25
242:8,9

**Corrections**
175:24

**coughs** 15:23
48:14 120:21
142:24 170:21

**could've**
174:24 193:11
194:5 206:19
213:11 224:2
227:15

**counsel** 41:12
44:11 51:6,11,
21 52:6 194:25
205:12 210:13
211:2,4,12
233:11 235:14,
16,20

**count** 31:17
74:5

**counteroffer**
203:22

**counties** 10:23

61:25 193:10

**county** 12:2
18:1 19:17
20:7,15 27:25
28:4,19 31:23
45:12,19 46:11
47:5,9,18 54:11
55:23 56:8,14,
23 57:4,5,11,19
58:3,23 59:1,7,
9,11 61:24
62:17,23 64:8,
18 65:14 68:2,
4,6,12,22 69:3,
5,7,17 74:25
75:25 78:3,24
80:8 81:22
139:4 164:18
169:1,11
171:16 174:22
176:10 182:11
186:13 193:11,
12 207:2,3
208:9 214:14,
17,20 215:13
216:17 220:7
230:7,9,16

**County's**
208:25

**couple** 70:11
81:6 83:5
144:23 161:8
166:6 168:20
172:1 181:6
205:6 215:8,9
238:13,19

**courses** 27:23

**court** 8:3 13:6
18:16 22:11
28:13 30:1,18
32:12 33:9 34:5
35:6,15,17
36:10,13,18
37:13 38:3,10,
12 39:14 41:16
44:3,9 45:2,14
47:17 50:21
60:8 62:13,14,
15 76:20 77:17
78:1 83:2,6,7
84:1 90:20
91:14 94:2 99:8
118:24 119:1

123:10 126:4
162:20 169:12,
19 178:16
181:6 189:5
190:16 197:21
202:8 204:16
205:7,12 211:5
221:15 227:1
228:2 238:20
241:8,11,16
242:7

**court's** 50:22
99:8

**courthouse**
78:3 201:22

**courtroom**
52:3

**courts** 47:8
92:17,21 98:23
126:23

**cousin** 81:25
172:9

**cover** 48:17

**covered** 206:5

**Cox** 32:12
200:15 202:11

**crass** 160:15

**create** 51:23

**created** 22:14,
16 54:1 74:10
101:23 125:3

**credible** 142:4
159:10

**Creek** 43:23

**Cricket** 182:12,
14

**crime** 62:12
63:9 103:13,23
152:25 153:2,
24 154:11
204:20 205:23
225:5

**crimes** 56:4,9,
10,24 57:6,9

**criminal** 10:7
12:8 13:23 14:7
16:14 17:19

18:3,10,13 19:8
20:19 26:7,13,
25 30:11 31:7
32:20 33:6
37:4,7 41:13,24
42:4,25 43:6
44:6,17 45:2,25
46:23 47:4 48:2
49:7,25 50:3,6,
9 51:6,15
52:13,19,24
53:3,9,22 54:2
56:6 57:14,25
59:21 60:1,11
61:20 62:4,10,
20 63:1 64:2,
10,16,20 66:5,
12,18,25 67:4
73:11,16 76:2,
5,10,15 77:8
79:15 86:24
88:2,6,13,23
89:3,23 90:3
95:11,22 103:1,
11 104:13
105:8,25
106:18 107:11
108:4,21 110:4,
13,21 111:2
112:3,10
114:17 115:15,
22 116:7
120:18 123:19
128:3,22 130:6,
15 131:10
132:2 133:6,12,
16,19 134:2
136:19 137:25
145:13 150:13,
20 152:3,23
153:14 154:20,
25 155:2,25
156:17 157:4,
10,17,21 158:5
159:2,8 160:12,
14,16,18
166:23 191:14,
17 204:5,6
206:22,24
213:12 222:12
225:12,24
226:9 233:3
238:9

**criminally**
117:8,12

**CROSS** 168:1

**Crump** 37:22
38:2 39:3,8,13,
21,22 40:5,8,
17,22 43:16
79:19,20 87:3,
4,16 89:25 90:5
96:17 97:1,4,
14,22 98:5,13,
19 99:25
100:21 101:5,
18,25 102:5
103:3 116:25
121:25 122:9,
17,22 123:4,17
124:5,7,14,20
126:11 188:8
189:8,12 191:1,
5 194:6 199:24,
25 217:1,3,7

**Crump's** 39:25
43:14 94:25
97:7 217:13

**crying** 120:6

**Cumberland**
11:16 202:1

**Cumberlands**
11:16

**currency**
154:10,17

**cut** 18:15
175:11

— **D** —

**dad** 68:21

**Dallas** 225:5

**Daniel** 79:17
80:2,6,7 81:2,8,
9,13 82:12
86:22 135:8,14
149:7 168:16
169:3,24 183:4
184:21 223:2,
20,23

**Danny** 19:2,4,
15 87:13 208:7,
15 240:3
241:20,22

**dark** 92:3

**date** 16:15 70:6
81:20 120:11
122:4,8 137:7
154:13 169:18
177:3,16
178:14,17
180:6 199:6
205:7 227:3

**dates** 169:13
200:25

**daughter**
161:21

**dawned** 236:8

**day** 20:15
35:25 52:3
66:20 69:25
70:5 72:7 80:22
120:8 175:21
179:9 186:17
189:5 190:1
191:3 193:4
196:2 201:11,
12,14,15 208:6
221:25 227:4
229:24 233:20

**day-to-day**
11:25 12:4

**days** 81:6
195:12 208:3
236:11

**dead** 120:9
122:1

**deal** 76:19

**dealer** 43:23

**dealing** 225:11

**deals** 41:2,5
43:11

**dealt** 186:4
202:16

**death** 23:2
49:8 50:10
53:10 73:17
77:1 81:24
117:24 153:7
159:11 161:1,7
163:4 215:22
216:19

**debts** 214:4

**deceased**
182:12 186:6

**December**
23:3 34:20 36:7
101:7,20 102:2,
8 120:14
122:11,19,25
124:9 151:22
154:7,13,15
193:5

**decent** 174:2

**decide** 76:20
99:8 150:5,10

**decided** 37:13

**decides** 18:19

**deciphering**
126:25

**decision** 26:24
60:16,19

**decisions**
209:9

**declared**
134:18

**decline** 160:8
163:2

**declined** 102:6

**defendant**
64:16 153:13
168:4 169:24
191:22,24
205:22 212:2
227:16,25

**defendant's**
38:17

**defendants**
50:3 115:2,25
191:14 200:6
204:6 213:12
225:12 236:23

**defender**
205:14

**defense** 30:6,
19 41:12 44:11
45:11,19,25
46:4,10,16
51:6,10,15,21,

23 52:6,13
63:20 89:11
93:6,23 99:12
104:1,20
105:13 106:6,
24 107:17
108:10 109:2
112:15,19
123:5 126:3
127:14 129:5,7
131:1 134:11
135:22 139:16
140:9 144:9,15,
22 145:7
192:19 194:24
210:12 211:2
218:21 238:6,
10

**define** 90:11

**defined** 112:20

**definition**
24:18

**degree** 16:25
17:17 222:11

**delays** 243:10

**denied** 75:9
146:7,11
147:23,25

**deny** 147:19
172:3 198:17,
18

**denying**
146:21

**department**
56:14,15 59:10
69:3 92:25
93:13 96:15
100:8 125:2
164:12 175:23
215:8,14 216:7,
13,18 220:8
229:11 230:1,8
231:1,22
232:11,23

**department's**
215:9

**depending**
208:2

**depicted** 90:18

**depiction**
223:12

**deposition**
8:13 94:22
111:10,23
243:15

**deprive**
163:16,19

**deputies**
216:17

**deputy** 164:18
214:16 215:21
216:11 220:7

**Derek** 216:8

**Derrick** 168:3
179:14 182:7
184:13,16
214:16 225:9
239:14,17

**describe** 46:9
48:11

**description**
94:25 97:8,16
99:20 189:22,
25 191:2 194:5,
13,16 223:13

**descriptions**
97:9

**desk** 85:1,2

**destroy** 29:17
105:9,12

**destroyed**
55:5,19

**detail** 62:16

**detective**
14:21,22,24
15:2,19,20 16:2
17:8,24 18:9
23:9,22 25:9,10
26:9,13,21 27:6
37:23 39:23
40:6,7,15,16,21
43:22 48:16
53:16 59:22
60:5,7 69:13
70:24 71:4
73:1,24 74:8
82:13,15 84:8,9

85:5,23 86:1,3,
8,12,16 92:23
93:9 96:24
97:13,16 98:3,6
99:9,18 100:20
101:17 108:5,8,
13 110:3,14
111:24 112:2
115:14 116:7,
10 119:14,16
120:11 122:5,8
123:3 124:4,18
125:1 137:1
146:22 148:2
149:2,3 153:16
163:24 164:5,8,
21 165:6,7,9,
13,16,19,22
166:10 169:23
170:6 172:4
174:21 180:10
181:15,18
183:6 185:9,10
187:16 188:2,4
193:18 194:23
195:8 201:1,15,
21 202:3
206:16 216:8
222:3,18 223:9
224:10 229:24
231:8 232:6
240:24

**detective's**
25:6 43:15

**detectives**
23:12 40:3
115:22 168:19
223:6

**Detention**
68:4,6,22 69:17
74:25 169:11
174:22 186:13

**determination**
141:10 183:15
204:17 227:13

**determine**
14:18 20:10
22:20 32:5
119:7,16

**developed**
58:24 59:8,19,
20

**Diane** 161:21,
23 162:18

**died** 115:7
120:5 150:25
175:3,7,12

**difference**
126:15 236:6

**differently**
141:21

**digest** 71:18

**digital** 40:2

**Dinkins** 22:9
153:21

**direct** 8:9 18:7

**directly** 23:23
188:11

**disagree** 145:8

**disclose** 36:5
38:10 44:3
63:25 64:9,15
123:12 176:15
192:17 194:24
210:11

**disclosed**
36:11 38:3
41:12,23 89:11
99:11 103:25
104:19 105:12
106:5,24
107:17 108:10
109:2 112:15,
18 123:5
127:13 129:4,7
130:25 134:10
135:21 139:16
140:8 144:9,14
165:12 210:16

**disclosing**
30:24 46:10
116:12

**disclosure**
30:19 34:3
63:13 99:16

**disclosures**
30:5

**discover** 68:5

**discoverable**

25:25 45:3

**discovered**
123:16

**discoveries**
47:2

**discovering**
165:17

**discovery**
32:3 33:1,22
34:2,9,16
35:13,16 36:6,
12 37:4 45:14
46:14,23 50:14,
16,20,23,24
51:2,5,14,19,20
52:1,7 151:2,3
182:21 192:20
210:9 232:17
240:6

**discovery's**
24:24

**discuss**
186:21,22
238:20

**discussed**
162:19 167:12
174:8 178:23
230:4 233:23,
24

**discussing**
33:1 93:23

**discussion**
175:13 192:21
242:10

**discussions**
37:11 45:2
187:17

**dismiss** 72:12,
17 73:23 75:4,8
80:11,16 81:3,
16 109:12,18
122:15 128:16,
21 130:6,14
133:19 134:1
135:12 139:9
141:5,8,22
142:2,14,17
145:18,20,25
146:5 149:18
150:12 152:20

157:2,8,15
159:8,14,17
168:11 172:12
177:4 181:12
191:11,19,21,
23 197:4
198:20 212:15,
19 213:1,3
219:5,11,17,24
234:22 236:7,
16,18 237:3

**dismissal**
29:22 124:22
135:6 143:16
155:13,18
161:4

**dismissed**
110:1 111:1
127:2 128:15
160:10 162:17
191:12,17
233:21

**dismissing**
191:25

**dispute** 33:4
167:4

**district** 13:6
18:16,17 20:22
119:19 227:1

**Division** 242:7
243:8,9,13

**docket** 207:21
222:1

**document**
14:9,12,17
15:12 16:16,19
17:5,10,23
19:24 20:5,9
21:24 22:5,14,
20 33:9,12
34:11,14,18,22
35:17 38:18
39:6 41:4 42:9,
13 49:4,12
72:13,16,20
101:3,12
102:23 103:1,9
110:9 118:10,
23 119:15
132:16,22
144:4 151:23,
24 152:2,3

211:6 212:12
221:6 239:3,17

**documentatio
n** 221:14

**documented**
102:16 202:16

**documents**
25:19 27:5
33:15 46:21
47:19 50:8
53:25 54:14,18
55:2 100:7
232:9

**Doe** 212:6

**door** 92:4

**double** 11:19

**doubt** 198:6,10

**doubts** 242:22

**draft** 38:21
72:20

**drafted** 73:24
148:1 187:10
188:4

**drawing** 142:6
143:3

**dress** 100:9

**dressed**
100:17 125:1,
20 126:2

**drinking**
220:17

**drinks** 144:24

**drive** 83:15
177:20,22
230:13

**driving** 86:4
175:1

**drove** 84:11
224:23

**drug** 28:13
43:23 77:25
175:5,6 187:24
214:4 225:17

**drugs** 145:11
175:4,5,7,8

254

**drunk** 144:23

**drunks** 144:23

**DTA** 220:18

**due** 154:25

**DUI** 28:15

**duties** 27:19
29:19 115:5
151:12

**duty** 159:20
234:21

**Dyche** 19:2

**dying** 191:22

—————

**E**

—————

**e-mail** 209:3,5

**e-mailed** 33:23
209:6

**e-warrants**
15:25 16:1

**earlier** 20:21
26:6,11 59:22
76:14 123:23
132:12 138:9,
14,19 143:20
147:16 148:1
149:21 150:14,
19 151:6
153:21 157:20
158:25 177:14
179:14,22,24
200:25 213:1
230:4 231:7
232:5

**early** 94:2

**easy** 88:20

**education**
27:18,19,21

**eels** 179:6

**effect** 71:12
147:17

**efficiently**
184:14

**effort** 38:23

187:23

**efforts** 88:24
89:4,8,24 90:4
102:16 103:2,
12,22 104:14,
18 105:8,11
106:1,19,22
107:12,15
108:5,8,22,25

**elderly** 74:15
81:25 146:17
148:12 172:8
175:3 187:13

**elected** 12:1
28:23

**electronic**
47:25 48:8
50:13 51:1
209:5

**Elliot** 87:21
91:20,22,24,25

**emailed** 33:24

**emergency**
34:25

**employed**
57:2,3

**end** 70:8 85:12
87:10,14
178:18 202:20

**ends** 24:10

**enforcement**
15:9 18:4,6
20:20 27:1
34:24 35:3 40:9
49:1,6 52:21
53:3,11 54:9,
15,22 56:25
57:21,24 58:5,
9,14,19,25
60:21 67:1,8,
15,24 68:1 69:1
74:7 75:19
76:24 77:13
79:8 94:4 96:13
100:7 102:14,
25 104:23
105:16 109:5,
20 112:9 113:4,
10 114:14
117:3,6,10
118:19 120:17

121:2 125:19
126:6 127:6,20
128:2,8,25
130:9,18 131:9,
24 133:21
134:4 135:7,14,
16 136:16
138:11,17,23
139:2,11 140:6
142:19 143:18
153:5 155:1,13,
20 156:2,9,13
157:19 158:2,
20,24 161:7,10
162:3 167:7
172:14 195:21
215:14 216:23
232:8

**enforcement's**
161:17

**ensure** 49:17

**entertain**
65:25

**entire** 29:20
85:10,14,18

**entirety** 237:19

**entry** 193:5

**essence** 78:17
148:18

**established**
234:10,25
242:22

**estimate** 12:19
77:14 173:15,
18

**estimated**
173:19

**ethical** 28:21,
24 35:7 38:11
41:16 44:8
123:11 131:6
134:13 135:24
139:18 140:13

**Eubanks**
214:16 215:21
216:8,11 225:5

**evaluation**
217:11

**evaluations**
200:17

**Evans** 19:3,5,
15 208:7,15
241:20,22

**events** 98:15
148:22 180:6
185:10,17
219:23

**evidence** 19:7,
17 20:11,14
21:9 28:14
29:9,12,17
30:6,15,19,24
32:18 38:18
42:11 44:11,25
45:13,20,24
46:4,10 51:22
53:25 54:9,14,
18,21 58:8,13,
18,24 59:8,19
61:16 62:11
64:15 67:3
76:23 105:9,12
112:20,21
113:4,11,19
114:1,10,25
115:3 123:12,
15 127:17,21
128:9 129:8,13,
20 131:5,10,19
134:19 136:4,
12 139:23
140:15 141:7,9
153:6,10
159:10 162:23
163:21,25
164:3,6,9,12,
16,19 165:11
167:9,14
183:13 185:15
200:18 209:1
212:14,16,20
213:10 214:3
224:15 226:11
233:10,11,14,
16 236:17
237:2,5,22,23
238:2

**exact** 62:11
96:4 137:7
179:23

**evaluations**
200:17

**Evans** 19:3,5,
15 208:7,15
241:20,22

**events** 98:15
148:22 180:6
185:10,17
219:23

**EXAMINATIO
N** 8:9 168:1
214:8 220:20
229:8 235:4
237:15

**exception**
54:23

**excess** 11:1

**exchange**
63:9,15 65:8,15
66:11 115:17
130:18 131:17,
25 132:13,18,
24 133:7
136:10 140:7,
18,25

**exclude**
153:12

**excluded**
154:15

**exculpatory**
29:9 30:15,24
32:18 38:17
42:11 43:5
44:10,25 45:13,
20,24 46:4
112:20 163:21,
24 164:2,5,8,
12,16,19
233:11

**excuse** 15:23
48:14 120:21
141:15 142:24
170:21 200:13
202:14,25
203:1,14

**exercised**
204:10

**exhibit** 14:6,7,
10 16:13,17
17:10,12 19:21
20:2 21:23 22:3
32:2,7 34:8,12
35:15,19 36:21
37:16,19,20
38:15,19 42:2,7
44:14,18 48:8,
13 50:13,18
51:3,4,8,12
53:7 61:21 62:3
72:11,14 73:5,

19 81:18 94:16,
18,21,23 95:1,
2,9,17,18 96:9
110:8,10
111:10 118:4,7,
8,11,12 121:12
132:7,10
136:23 141:5,
12 143:9,11
152:8,16,22
153:1 168:10
192:1,22
193:13 197:4
217:18 218:20
221:10 241:7,9,
10

**exhibits** 88:21
145:21 232:5

**EXHIBTI** 95:20

**exist** 53:11
243:1,5

**existed** 13:8
157:4 160:1
237:7

**exists** 73:15

**expect** 33:8
45:12,19 48:24
50:17 53:23
67:1 116:7
209:15

**expectation**
54:6 61:5,13
103:7

**expected**
102:25 112:9
120:16 121:1
212:20,22

**expenditures**
65:3

**expenses**
64:24,25

**experience**
13:22 31:22
90:16 91:11,12
92:16 98:24
175:9 214:18
230:6,24

**Expert** 200:17

**expertise**
28:15

**explain** 15:15
20:17 23:13
118:18 237:8,
17

**explanation**
43:17 180:24
181:3,4

**extended**
46:16

**extent** 202:13

**extras** 19:23

**eye** 8:24

———

**F**

———

**fabricate**
104:14 158:20
228:21

**fabricated**
109:20 113:3,
10,18,25 114:9,
16,25 123:24
127:5,20 128:2,
25 129:12,19,
25 130:9 131:9,
18 132:1,14,19
133:7 134:5,18,
24 135:15
136:3,11,17
139:12,22
140:2 158:4,12,
13,25 183:20
216:23 233:15,
16

**fabricating**
88:12

**facilitation**
203:19

**facility** 174:2
177:21 230:21,
23

**facing** 211:18

**fact** 70:3 75:7
98:10 137:14
186:3 190:9

**factor** 226:15

**facts** 76:5
103:13,23

**factual** 61:22

**failure** 30:23

**fair** 9:19,20,23
16:4 18:22
26:24 27:4
33:21 35:21
39:7 40:22
41:22 45:11,18
51:1 52:11,18
53:1,6 54:20
57:11,23 58:3,
7,12,17,22 59:6
60:9 62:3 69:19
70:16 72:24
73:22 75:2,17,
24 87:9,12 94:6
125:11 133:4
137:8,23 138:3
146:6 152:5,22
154:24 155:7,
12,16 156:16,
21 157:1,7,14
158:4 197:1
215:18 219:7,8,
24,25

**fairly** 162:16

**fall** 28:11
162:11

**false** 88:25
89:5,9 103:14
109:14 113:3,
10,17,25 114:8,
15,25 123:24
127:5,20 128:2,
8,19 129:12,18,
25 130:9,18
131:9,18 132:1,
14,18 133:7,22
134:18,24
135:9 136:3,11,
17 139:12,22
140:2 157:21
158:16,17
178:7 183:2,5,
14,20,25 184:3,
23 185:3

**falsely** 103:24
108:6,9

**falsity** 183:12

**familiar** 17:11
29:4,8,11,16,
19,25 30:4,17
31:9,13 118:15
151:24,25
208:10 229:16

**families**
161:11 162:1

**family** 68:20
161:9 162:8
178:19 187:23
198:25 199:2
201:11

**family's**
176:10

**FARAH** 8:25
56:18 59:15
93:4,16 95:9,
12,14 100:10
125:9,25
228:25 229:3,5,
9 235:1,3
239:17,21

**Farris** 225:1

**farther** 66:1

**fashion** 211:2

**fast** 235:21,24

**father's** 199:4

**favorable**
41:2,5 43:12

**fears** 118:2

**February** 36:1,
13,19 100:20
119:21 121:14,
15,18 122:6
137:2 138:12
173:9

**federal** 62:15
68:13,14 69:11
116:22 126:23
160:21 163:10
187:22

**feel** 174:16

**feeling** 237:18

**felonies** 12:14,
15,16

**felons** 226:2

**felony** 12:3,25
13:4,9 46:10
66:1 103:8
110:21 203:7,
19

**felt** 237:5

**Feltner** 166:12,
16,18

**Feltner's**
166:21

**fidgety** 78:16

**field** 34:23
36:23 37:3,12

**figure** 83:4

**figured** 143:10
238:21

**file** 21:12
22:11,13 24:9,
13,17,18,19
25:2 33:7,8,12
34:16 36:14,22
40:1,9 42:15
46:14,19,20
47:3,15 50:15,
17,20,22 51:1,
20 53:6 54:10,
18,22 55:3
60:21 61:6,14
66:18 68:8
80:22 93:24
143:8 151:20
162:11 186:15
196:17 208:17
215:25 216:1
221:15 232:17,
18 235:24
239:4

**filed** 10:3 32:11
33:9,25 34:9,
16,20 36:6 41:7
42:3,14 43:4
44:15 47:10
50:22 72:12,19
80:11,15,24
81:3 109:12,17
112:3 122:15
130:5 139:9
141:6 146:1,2
149:17 150:12

157:2,8,14
159:25 162:9,
19 165:18
183:7 200:19
235:22,23
236:6,10,14
237:3 239:18

**files** 10:6,11
12:5 33:16,20
47:4,13,16
48:1,8 49:16,17
50:13 52:19,20
53:2 55:10,18

**filing** 36:17
47:8 54:7 61:2,
3 144:21 211:3,
5 219:23
235:20

**fill** 26:25
221:13

**filled** 15:20
222:3 226:23

**filling** 16:5
26:13 60:10

**fills** 18:9

**final** 14:23
205:6

**finally** 83:11
220:13

**finance** 11:20

**find** 10:15
40:14 68:10,13
69:8 143:6
151:20 226:4,9
228:16

**finding** 20:22
69:14 234:18

**findings** 48:12

**fine** 27:13 72:3
168:8 170:10

**fingerprint**
226:11

**fingerprints**
154:5

**finish** 32:8
206:13

**finished** 101:1
206:10

**fit** 54:24 194:5,
13,16

**five-hour**
177:20

**five-ish** 220:25

**folder** 151:20

**follow** 30:24
52:15 172:25
195:2 198:22
209:11 238:12,
13,14,25 239:2
243:7,14

**follow-up**
194:23 235:6

**forbid** 223:8

**forever** 77:25

**forgot** 75:5
236:5 243:12

**form** 13:25
16:8 19:10 21:4
22:9 24:1,16
25:8,14 26:19
27:2,8 29:15
30:10 31:2 35:8
36:8 39:10
40:10,18,24
43:7 45:15
46:25 49:9
50:19 51:7,17
52:1 53:12 54:3
55:1,6 56:17,18
57:15 58:11,15,
20 59:2,13,14,
15,24 60:6,14,
18,24,25 61:7
62:6 67:9,10,16
70:19 71:1 73:3
74:1,3 75:11,21
76:8,17,18
77:3,4 90:1,19
91:15,16 92:11,
19 93:2,3,4,14,
15,16 94:11,12
96:18,19 97:3,
19 98:8,21
99:4,13 100:2,
10,11 102:9,17,
18 103:4,5,16,

17,18 109:16,
21,22 110:6,17,
24 111:6,7
112:5,11,12,16,
24 113:6,7,14,
21 114:4,12,19,
21 115:19
116:2,4,8,14
120:20 121:6
122:20 123:7,
13,21 124:2,10
125:5,8,13,22,
23,25 126:13
127:8,9,23
128:5,11,12
129:1,16,22
130:3,10,11,20,
21 131:2,12,13,
14 132:4 133:1,
9,23,24 134:6,
15,21 135:2,10,
17 136:6,7,15
137:18 139:13
140:10,11,21
141:13 142:5,
23 143:21
144:10,17
145:5,6,15
146:9,23 147:4
148:4,17 149:5,
11,23 153:8,21
155:3,17
157:24,25
158:7 159:3,12
160:7 166:25
169:6,25 170:8
171:10 172:6,
21 173:5
178:10 180:12,
19,22 181:16
183:8,10,23
187:7,18
188:12 189:23
194:7,14 195:5,
9 196:20
197:20 209:21
211:2,23
213:17 217:15
218:12 219:13,
19 221:19,22
226:1,7 234:15
236:4 237:1
241:4

**formal** 144:21
169:9

**forms** 153:21

**forward** 8:16
18:2 61:12
112:2 155:10,
11 159:21

**forwarded**
138:18

**found** 18:16
31:14 39:23
69:11 92:17
120:9 122:1
154:10 188:16
196:4 216:12
228:2 237:6

**foundation**
26:19 54:3
59:24 60:6,14,
18 61:7 93:2,15
94:11 97:19
99:13 102:10
125:7,24
130:12 169:6
172:21 173:6
181:16 187:18
188:12

**four-** 177:20

**fourth** 74:12

**frame** 228:21

**framework**
79:7

**frequented**
68:11

**frequently**
172:22 207:3,
11 225:19

**Friday** 21:10

**friend** 164:22,
24

**front** 48:16
96:10 163:8
182:6 204:12
221:14

**full** 43:18 198:8

———

**G**

**gain** 159:19

**Gatnarek**
200:15

**gave** 21:20
32:17 40:4 48:8
84:14 99:20
111:25 121:23
126:19 127:1
148:25 156:18,
24 163:5
166:10 173:4
174:11 181:14,
17 183:6
184:25 240:2

**general** 21:14
27:17 49:20,21
69:23 79:7
82:21 90:16
165:16 169:7,
20 174:9,11,14
176:11 207:12
211:4

**generally** 18:1
32:15 43:3,10,
11 44:20,24
48:14 52:17
55:22 90:23
118:18 204:9
206:23

**generated**
76:23 207:21

**Giglio** 112:21
123:14 140:15
144:16,18
145:2 151:13
176:15 192:15
210:23 240:15
241:2

**girlfriend**
201:17

**give** 8:5 12:19,
21 32:8 44:22
65:5 77:14 79:8
88:1 94:20
101:17,24
145:22 163:2
180:24 189:22,
25 191:2
207:23 212:8
218:5 231:3
237:10 239:9,
11

giving 88:25 89:5,9 91:19 111:4 113:17 115:17 128:8 129:18 130:18 131:18 132:14, 18 136:11

God 223:8

good 8:11,12 46:15 153:19 165:9 216:9

graduate 11:9, 13,14

Graduated 11:15

grand 12:5 13:7,10,19 18:18,19 19:6, 17 20:7,11,15, 23,24 21:1,7,8, 11 22:1,15,17, 18 23:9,10,12, 17,19,23 24:7, 9,10,13,14 25:4,7,11,16, 19,24 76:25 108:6,9 114:11 121:3,9,11 124:4 141:16, 18 153:21,22 206:17 207:17, 23,24,25 208:1, 8,11 221:24 222:3,13 226:20 227:3, 14 228:1 231:17 234:8, 13,16,20,23,24, 25 242:18,23

great 9:4,14 62:16 215:3

grounds 219:11

group 51:12

guards 50:2

guess 33:24 54:13 84:19 94:15 114:7 116:15,23 121:9 158:13

164:24 165:3 167:2 197:1,17 228:8

guessed 29:3

guessing 84:20

guidance 127:1 207:12

guide 126:24

guides 119:1 126:22

guilt 30:7,21 159:22 213:12

guilty 63:8,14, 17,18 211:19

gun 228:6,8

―――――

H

hair 126:9

hairs 99:14

halfway 168:23

hammer 222:6

Hammons' 119:21

hand 8:4 35:14 38:14 48:7 50:12 51:2 94:21,23 95:16 132:7 167:13 190:19

handcuffed 85:3

handed 19:25 145:23 208:20, 24 211:1

handle 12:17 61:25

handled 12:9, 11 185:20 208:13

handling 12:20 167:8 208:8,11

hands 99:21

187:2 190:21

handwriting 42:18,20,22

handwritten 15:24

Handy 28:8 241:24

Hang 166:13

happen 207:14

happened 43:15 178:9 187:6 223:9 224:22 227:20 238:24

happening 52:9 65:10 93:8

happy 147:6

hard 69:5

Harlan 209:1,2, 3 230:12

Harold 19:2

hate 207:13

he'll 238:22

head 49:14 78:5,21 93:1,12 96:16,25 97:15 126:9 176:24 181:25 186:3 216:20 222:6

heading 32:17 42:12 240:5

health 45:7

hear 10:1 21:9 54:13 161:14 215:24

heard 74:14 145:19 146:16 148:11 150:3 184:20 187:12 206:11 210:19, 20 216:24 220:15 234:25 242:18

hearing 13:1,6 18:14,20 35:11 91:14 205:13

207:17 227:6,7, 10,11,17 228:1

hearing's 18:15

hearings 233:3,7

hears 223:22

hearsay 97:20 223:23

Heather 200:15

held 10:24 18:15 80:8 117:7,12,16 226:22 236:9

helped 68:15 158:20

helpful 24:11

helping 211:20

Helton 24:3 43:19 130:8,17 131:16,25 132:17,23 133:5,12,16 167:10,11,14 192:6 196:18 199:24,25 200:22 201:2,3, 4,11 202:2,5,9, 10,15,21 211:9 217:17 218:3,6, 17,23

Helton's 23:21 43:24 131:8

Hey 92:2 158:15 207:11 234:4

hide 106:1,19, 23 107:12,16 108:22 109:1

high 91:4 92:7

highlighted 36:23

hired 28:19

histories 225:24

hit 91:20

hitters 206:13

hold 27:25 51:2 205:1

home 92:2 189:13 225:16

homicide 56:13 58:24 59:8 67:7,14 142:13

honest 206:11

honestly 10:18 51:18 69:15 77:24 80:23 87:16 170:3 196:21

honesty 10:17

Honorable 36:18

hood 93:1,12 96:25 97:15 126:8

hoodie 93:11, 25 94:13 96:16 126:8,18

hope 31:14 153:11 164:25

hoped 83:12

Hoskins 10:8 14:8,15,19 15:16 18:11 19:8 20:8 22:25 26:8,14 29:21 32:3,21 33:6 43:1 44:7,11,16 48:3 51:16 52:25 53:22 58:8 60:3,11 65:16,18,24 66:6,13,18,25 72:12,18 73:12 75:18 76:11 77:1,9 78:23 79:4 80:17 82:1 88:3,6,10,14 89:1,6,10 103:15,24 104:15 105:7 110:2,21 111:2

113:3,5,12,20
114:2,18
119:24 120:18
121:5 122:14
123:19 124:1
127:3,22 128:4,
10,17,22
129:14,21
130:2,7,15
131:11,20
132:3,19 133:8,
20 134:2,19,25
135:13 136:5,
13,19 137:12,
17,25 138:5
139:24 140:3,
20 141:2,11
150:21 151:8
153:15 154:9,
16,21 155:15,
25 156:3,14,22
157:8,22 158:4
159:1,9 160:2,
5,25 161:5
163:3,16,22
205:19 213:24
219:21 229:24
232:22 233:12
234:9 236:1

**Hoskins'**
34:16 35:16
88:23 89:3
105:25 106:18
107:11 108:4,
21 146:2
155:10 200:4
235:14,16,20

**hospital** 201:9
202:6,7,12

**hospitalizatio
n** 202:17

**hotel** 91:21
199:19

**hour** 230:13

**hours** 87:24

**house** 165:1,2
217:9

**housed** 47:15
84:12 174:20
176:2 196:4

**hurdle** 150:17

_____

**I**

_____

**idea** 26:21

**IDENTIFICAIT
ON** 95:2

**identification**
14:10 16:17
17:12 22:3 32:7
34:12 35:19
38:19 42:7
44:18 48:13
50:18 72:14
95:1,20 97:2,9,
17,22 98:7,14,
16 99:1,11,19
100:1 101:6,19,
25 102:7,15
103:2 110:10
116:25 118:11,
12 124:20
132:10 141:12
153:1 241:10

**identified**
39:23 87:1
120:7,12,22,23
121:24 122:9,
17,23 123:4,17
124:15 173:1
189:12 217:7
238:6

**identifies**
181:22

**identify** 99:16,
22 189:15,17
190:10,14
194:9

**identifying**
124:7

**ignore** 95:4

**illicit** 183:13

**imagine** 84:22

**immediately**
76:6 114:17
136:18 151:7,
12,17

**impeach** 29:13

**impeached**
224:2

**impeachment**
44:11 45:20,24
46:4 112:21
123:15 145:5

**implicate**
103:24 210:23
240:15 241:2

**implicated**
167:9

**implicates**
62:12

**implicating**
103:14 104:15
111:25 167:14

**implication**
9:3

**importance**
222:24

**important** 50:4
102:4,11,13
190:10 226:11,
15

**impression**
165:7

**Inactive** 55:15

**inappropriate**
183:18 218:9

**incarcerated**
79:5 174:24

**incentive**
176:14 192:14
212:11 240:14
241:3

**incentives**
41:2,5 43:11
62:19,25
210:21 212:10

**include** 12:4
48:21,25 61:22
90:17 153:12

**included** 25:1,
2,5,7 35:13
61:15 62:9
63:16 68:8
70:25 100:3

**includes** 10:22

**including** 35:1
38:8

**inconsistency**
226:10

**inconsistent**
41:20,23
184:21

**increases**
116:17

**independent**
32:22 33:2 52:8
53:18 56:13
59:11 67:7,15
71:19 82:21,23
84:3 86:23 87:7
90:8 91:25
161:18,25
198:1,13
218:25 219:2

**independently**
56:9,24 57:5,9
67:6,14 82:4,24

**Indiana** 82:25
84:11 149:4
175:19,21
176:23 177:21
180:11,15
196:4

**indicating**
159:10 182:22

**indication**
101:18,24
192:12 204:14

**indicted** 12:3
242:23

**indictment**
13:1,3,7,10
19:21 20:6 21:7
22:16 23:24
24:15 87:13
222:9,10
232:21 234:7,8,
17,20,22
242:17

**indictments**
21:9

**indifferent**
46:15

**individual**
53:14 63:8,10,
14 91:3 97:24
99:16,21,22
120:13,22
122:17,24
124:8 169:8
182:12 189:17
190:14 224:8

**individuals**
26:17 90:18
141:17 161:20
190:11 230:18

**info** 195:3

**inform** 93:10
97:14 115:24
120:17 122:9,
23 142:19
143:18

**informant**
193:1

**informants**
38:8

**information**
30:6,20 43:5,9,
14 44:4 48:21
55:2 57:13,20,
24 58:4 62:4
74:18,21,24
75:19 76:15,21
84:15 89:11
99:12 102:13
104:1,19
105:13 106:5,
24 107:17
108:10 109:2
112:8,14,18
120:16 121:1,
18,19 123:2,5
127:13 129:4
130:25 132:24
134:10 135:21
138:18 139:16
140:8 144:9
146:21 148:13,
25 161:19
166:21 192:6,
25 203:16

209:8 211:1
218:5,7,15
232:10 240:6

**information's**
102:11

**informed**
39:14 97:16
98:6 124:4,21,
23 133:21
134:3 135:7,14
139:10 142:15
155:20 157:19
158:2,11,24

**initial** 49:25

**initialed** 37:10
222:2

**initiate** 12:25
13:3,9,14 21:6
114:2,6 121:4
129:20 131:19
136:12 137:24

**initiated** 14:18
16:2 17:6,23
22:21 60:4
110:4 122:13
139:8 153:15
154:4

**initiating** 26:14
110:14

**initiation** 13:12
18:13 87:13
113:12,19
116:11 119:23
128:9 137:11,
16 155:23
156:7,12,16,21

**injury** 78:21

**inmate** 82:25
175:21

**inquired**
240:23

**inquiry** 234:4

**inside** 54:24

**instance** 45:23
46:2,6 59:21
63:12 146:10
149:25 213:14

**instances** 91:6
215:18

**instituted**
153:24

**instructs** 36:4

**intent** 224:18

**intention**
189:21 231:13

**intentions**
220:5

**interacting**
86:21

**interaction**
82:20

**interactions**
82:13 87:10

**internally**
54:10

**interrupt** 30:13

**interrupted**
100:5

**interview**
43:16 85:6
100:19 136:25
137:10 169:9
173:12 182:13
210:5 216:7
223:3,7 229:20,
21,22 230:22

**interviewed**
74:9 173:9
230:1,10

**interviews**
36:25 38:9 39:3
43:25 106:2,20
137:9 230:18,
19 231:1

**intoxicated**
142:16,20
143:19,25
144:1,7,11
145:3,11

**invasion**
225:16

**investigate**
56:9,12,24
57:6,9 67:6,14,

18,19 161:23

**investigated**
52:22 59:19
162:2

**investigating**
53:24 56:4
162:7 230:6

**investigation**
13:15 35:1 49:7
50:9 53:4,9
54:2 56:2 59:11
66:6,12 67:4
101:24 103:1
143:7 149:22
150:13 152:6,
24 155:2 161:6,
18 166:23
215:21 216:18
224:16 228:11
229:17 231:11,
25 233:19
234:2

**investigations**
116:7 215:4,5,
15 216:14

**investigative**
24:13,17,18,22
37:23 38:7 49:2
55:23 99:2
116:18 150:14
165:6

**investigator**
214:24

**involved**
18:18,21 35:1
48:21 53:3
66:5,21,24
86:24 102:15
137:9 160:6,25
166:23 206:16,
23 215:12

**involvement**
16:11 19:7
216:16 217:4
224:7

**ironed** 68:19

**issuance**
23:24 24:14
118:22

**issue** 35:11
36:20 69:4
76:20 90:21
93:5 94:1 151:2
154:17 160:12,
13 199:18
201:8 202:3,10,
16 205:8
238:21 243:7,
12

**issued** 15:13,
17 18:4 22:16
26:7 36:18
55:20 60:2
77:20 189:10
234:7

**issues** 45:7,9
91:8 151:17
162:20,25
186:4 195:7
199:22 202:17
238:20

**it--** 119:11

**item** 151:3

**itemized**
212:19 213:2

**items** 26:1

———————

**J**

**Jackie** 224:19

**jail** 38:8 68:2
78:24 81:22
168:20 169:1
171:16 205:16

**James** 32:12
192:6 218:3,6,
23

**Jane** 212:6

**Jason** 9:7
14:21,22 17:8,
24 48:16 60:5
94:22 95:4
119:14 138:15,
19,21,24 142:8
168:4 190:6
224:10 240:9

**Jensen** 36:19
199:17,22

202:18

**Jesse** 43:20

**Jessie** 43:20
120:4,5

**job** 102:20

**Joe** 67:25 68:2
69:14 70:23
72:6 73:16
74:9,13,18
75:3,5,8 77:7,
15 79:14 86:21
87:16 127:5
146:10,15,25
147:17 150:24
151:4 186:9

**John** 152:14,19
212:6 214:13,
14

**Johnathan**
103:25

**Johnson** 84:9
85:6 86:1 137:1
149:3 164:8
224:22,25

**join** 53:13 54:4
56:19 57:16
62:7 70:20 71:2
75:22 100:12
103:6 109:23
127:10,24
131:23 134:7
143:22 153:9
155:4 158:8,9

**joining** 86:14

**Jonathan** 10:8
16:14,24 17:2
19:8 20:7 22:25
29:21 42:4,11
43:1 44:7,16
48:3 52:25
53:22 58:18
60:3,11 61:4,12
66:13,19 67:1
73:12 75:18
77:1 88:3,7,10,
14 92:24 93:11
94:7 95:17,19
96:14,25 98:4
99:10 100:9
102:6 103:15

104:15 110:2, 22 111:5 112:1 113:2,13,20 114:2,18 119:24 120:19 121:5 122:14 123:20 124:1,5, 7,19 128:4,10, 17,22 129:14 130:2,7,15 131:11,20 132:3,19 133:8, 20 134:2,20 135:1 136:19 137:12,17,25 138:6 141:6,11 142:14,18,21 144:1 146:1 149:8 150:21 153:15 154:9, 16,21 155:19 156:1,3,9,17 157:2,22 159:1 160:2,5,25 163:19 190:7 191:6 194:5 217:7 219:22 229:25

**Jones** 19:2 170:19,22 179:1 198:5,9 208:13

**Jordan** 193:10

**Joseph** 224:19

**Josh** 100:20

**judge** 9:8 13:21 16:3 18:10,17 20:22 35:22,24 52:5 76:21 151:11 160:21 163:10 199:17,22 202:18 204:16, 17,22,23 205:1 227:12,15 242:4 243:9

**judges** 119:20 191:19 243:11

**judgment** 63:18

**Judicial** 10:22

**July** 42:16 72:13 80:16 109:12,18 135:8,13,15 157:15

**jump** 168:6

**juncture** 237:20

**June** 73:25 74:8 80:16,18 81:3,13,20 83:21 127:4 143:17 146:22 148:21 149:17 157:3 177:5 178:13,18 180:6 183:7

**jurors** 24:14 25:11

**jury** 12:5 13:7, 10,19 18:18,20 19:6,17 20:7, 11,15,23,24 21:1,7,8,11 22:1,15,17,18 23:9,10,12,17, 19,23 24:7,9, 10,13 25:4,7, 16,19,24 71:14 76:25 108:6,9 114:11 121:4,9, 11 124:4 141:16 150:10 153:21,22 163:8 183:15 190:21 204:12, 17 205:2 206:17 207:17, 23,24,25 208:1, 8,11 221:24 222:3,13 226:21 227:3, 14 228:1 231:18 234:8, 13,17,20,23,25 242:18,23

**Jury's** 141:18 234:24

**justice** 159:19

**juvenile** 44:1 45:6,9

---

**K**

**Katherine** 14:19 17:3 23:2 48:4 49:8 50:10 53:10 56:12 58:24 59:8 67:7,14 73:17 77:2 79:10 101:6,19,23 102:1,8 110:5, 15 112:1,4 116:12 120:5,8, 13 121:25 122:10,18,24 124:6,8,16 138:1 145:14 149:9 153:7 154:22 156:1, 23 157:11 159:11 160:6 161:1,7 163:4 167:10 189:13 215:22 216:18 222:5,7

**Kayla** 95:13 109:14,19 110:4,15 111:3, 25 113:1,9,16, 24 114:8,15 115:5,6,7 116:11 123:23 150:25 181:11 182:16,18 186:5 193:15, 19

**Kayla's** 182:1

**Kelley** 8:22 9:2,5 59:14 93:15 103:5,17 109:22 111:7 112:12 113:7, 22 114:20 125:7 127:9 128:12 130:11, 21 131:13 133:9,24 134:7 135:18 136:7 140:11 143:21 152:11,14 157:25 158:8 159:4 167:21 185:25 214:9,

13 217:22,25 220:11 225:1 241:19 243:6

**Ken** 186:6 193:22

**Kenton** 80:9

**Kentucky** 10:23 11:8,17, 21,23 28:9 30:1,11,25 34:4 35:6 38:11 40:11 41:16 44:9 56:13 59:9,23 60:5 69:9 80:8 123:10 164:15 175:17,19,20, 23 176:4,8,19 215:6 228:17 238:8

**kid** 224:23

**KINCER** 184:16 220:13, 17,21 228:23 229:6 235:2

**kind** 71:22 80:20 99:20 174:13,18 176:13 208:2 221:16 242:19

**King** 67:22 68:2,5,17 69:14,16,22 70:16,23 72:6 73:16 74:9,13, 19 75:3,5,8 77:7,15 79:14 86:22 87:16 127:5 128:7 146:10,15 147:17 150:2, 24 151:4 186:9 187:11 200:2

**King's** 71:19 74:6 127:19 128:1 147:1 151:13

**kitchen** 92:4

**knew** 68:11 79:24 115:8

174:11,25 189:15 216:10 217:6 222:10 237:20

**knowledge** 27:5 39:18 47:24 48:5 50:7 51:13 56:22 64:18 65:25 66:10 86:7 91:25 93:7 141:7 146:21 147:25 150:12, 14 170:2 193:18,20,21 194:2 195:20 206:18 207:5 213:15,20,25 232:15 236:23

**Knox** 10:22 12:1 18:1 19:17 20:6,15 27:25 28:4,19 31:17, 22 32:12 45:12, 19 46:11 47:5,9 50:14 54:11 55:23 56:8,13, 23 57:4,5,11,19 58:3,23,25 59:7,9,11 62:17,23 64:8, 18 65:14 69:3 75:25 78:3 164:18 169:1, 10 182:11 208:9,25 214:14,20 215:13 216:17 220:7 230:7,9

**Knoxville** 11:22

**Kool-aid** 220:17

**KSP** 166:18 168:19 169:9 208:22 230:15 231:10

**KSP's** 188:22 230:6

**KSP3** 119:9

**KSP337** 118:5 119:6

**KSP338** 119:13

**KSP339** 118:7 121:13

**KSP382** 151:19

———————

**L**

**lab** 34:24 153:11,24 208:4

**label** 42:2

**labeled** 50:16 51:2

**Lack** 125:24 130:12

**lady** 25:24 74:15 81:25 146:17 148:12 149:10 172:9 175:3 187:13 222:8,16,22

**lady's** 132:25 218:6

**laid** 159:14 173:24

**Lake** 202:1

**language** 92:20

**larger** 212:9

**Larry** 199:4

**late** 143:7

**latent** 154:8,15

**LAUGHTER** 9:2

**Laurel** 10:22 12:1 47:9 68:3, 6,21 69:17 74:25 186:13 208:9

**law** 11:6,7,11 15:9 18:4,6 20:19 27:1,16 31:7,10,11,12, 15 34:24 35:3

40:9 49:1,6 52:21 53:3,10 54:9,15,21 56:25 57:21,24 58:4,9,14,19,25 60:21 67:1,7, 15,23 68:1 69:1,2 74:7 75:19 76:23 77:13 79:8 94:4 96:13 100:7 102:14,25 104:23 105:16 109:5,20 112:9 113:3,10 114:14 117:3,6, 10 118:19 120:17 121:2 125:19 126:6 127:5,20 128:2, 8,25 130:9,17 131:9,24 133:21 134:4 135:7,14,15 136:16 138:11, 17,23 139:2,10 140:6 142:19 143:18 153:5 155:1,13,19 156:2,8,13 157:19 158:2, 20,24 161:6,10, 17 162:3 167:7 169:10 172:14 195:21 215:14 216:23 232:8

**Lawson** 43:20 120:4,5

**Lawson's** 43:21

**lawsuit** 10:2,4, 16 78:9 162:9, 11 165:17,23 228:20

**lawyer** 165:22, 24

**lawyers** 31:23 165:25

**lay** 13:20

**laying** 197:21

**lays** 50:24

**lead** 25:6,10 27:1 30:25 53:16 85:20,21, 22 214:24 224:12 231:8, 10

**learn** 95:23 154:14

**learned** 74:18 76:5 89:14 104:4,24 105:17 106:9 107:20 109:6 113:1,9,16,24 114:8,14,25 121:17 123:17, 23 127:19 128:1,7 129:11, 17,24 131:8,16, 24 134:17,23 136:2,9,16 139:21 140:1,6, 17,24 143:18 145:10 146:7 150:18

**leave** 18:25 85:17 222:15

**leaving** 56:3 85:15 122:18, 24

**led** 219:23

**left** 40:3 84:9 91:21 152:25 153:2 175:18

**legal** 27:18,20 166:19

**lengthy** 83:15 172:2 200:18

**Leslie** 193:11

**Lester** 10:8 17:16,19 19:9 20:8 23:1 48:3 51:16 53:23 58:13 60:3 65:16,17,21 68:8 72:18 121:5 150:22 154:10,16 203:5,6 205:19 213:15

**Lester's** 146:3 151:8 157:15

**Letcher** 230:16

**letter** 132:8,9 133:13 139:5 152:19 192:2, 19 211:4 218:2

**letting** 182:8

**level** 78:12 116:17 145:1 233:20 234:10, 14

**Lexington** 201:8,25

**library** 169:10

**lie** 117:7,11,14

**lied** 158:15

**life** 11:23

**likelihood** 91:4,9 92:7

**Likewise** 219:15 220:7

**limited** 35:2 51:25 86:7 91:6 147:12 200:24

**lines** 111:12

**lineup** 92:5,8

**lineups** 126:24

**list** 23:6 181:11 222:1 238:9

**listed** 23:1,14, 21 24:3 32:25 62:4 70:24 177:3 186:10 197:8,12 212:14,20 213:6 222:20

**listen** 181:20

**listened** 181:21

**listing** 197:18

**litigation** 47:20,21 185:23

**local** 58:25

**locate** 40:21 69:8

**located** 39:16

**locating** 69:5, 10 169:14

**location** 187:15 196:3 201:17 230:14

**London** 84:10 209:2

**long** 10:24 28:17 69:16,19, 20 84:17 116:16 171:22 172:23 173:14, 15,18 174:7,13 177:22 181:2,7 202:12 230:19 235:7 241:20

**longer** 157:3,9, 16 159:10 173:22 182:23, 24 197:19,22 212:16,21 214:15 237:7 238:1,2

**looked** 73:19 98:5 99:25 102:5 237:19

**loss** 186:3

**lost** 140:22 212:23

**lot** 8:18 21:25 24:25 27:15 53:16 68:3 70:2 91:21 116:21 132:24 155:8 166:19 168:9 173:22 203:3 216:13,21 218:5 226:4 233:1,3

**lump** 65:7

———————

**M**

**made** 21:12 36:5 40:6 41:11

46:21 50:1 51:20 60:16,19 61:1,2,3 64:10, 12,14 65:2,17 66:10,14 69:21 70:6 79:4 86:17 96:24 99:2,11, 15,17 109:13, 18 110:3 111:3, 24 116:25 119:17 122:16 123:2 124:25 125:11 127:4, 12 128:18,23 129:3 130:7,16, 24 131:24 132:23 134:9 135:20 139:15 144:8,13,21,24, 25 145:4 154:8, 12 155:14,15, 21 158:16 165:14 168:25 172:19 175:14 176:16 180:21 182:19,22 188:23,24 190:20 203:5, 22 210:21 212:11 235:1 238:23

**magistrate** 184:11

**main** 15:11

**maintained** 33:19 45:21 47:4,7,17 48:1, 24 50:17 52:19, 21 53:2 54:8, 10,17

**maintains** 208:16

**major** 11:18,19

**majority** 215:3, 7 230:20

**make** 8:20 9:8, 9 13:13 21:13 30:5,19 50:2 53:18 63:2,4,20 68:15 88:1 94:15 97:1,17, 22 98:7,13,16

99:25 101:5,19, 25 102:6,15 103:9 116:20, 21 124:20 139:6 151:11 158:10 160:17 176:18 178:21, 22 179:25 184:9 185:12 187:4 201:16 203:11 204:17 227:13 233:2 241:6

**makes** 25:25

**making** 37:2 64:23 65:14 78:23 81:24 82:3,16,17 83:7 146:7,11 147:19,23 149:8,14 150:2 171:3,4,19 172:8,16 174:16 201:22 209:8 219:10

**male** 101:6,19 102:1 120:13 122:10,17,24 124:5,8,15 189:16

**Man** 70:11 72:3

**manner** 18:5,7 21:16 93:22 126:21 195:16

**manners** 13:5

**March** 15:13, 14 16:6,15 17:7,20 20:20 26:18 29:21 60:2,12 109:13, 19 110:5,14 111:5 113:2 119:24 128:18, 24 130:8,19 131:8 137:19 153:16 156:8, 12 226:20 227:3

**Margaret** 195:18 196:9

**mark** 14:6 15:4

16:12 17:9 19:20 21:18,23 32:2 35:14 38:14 44:14 48:7 50:12 72:11 94:16,23 95:16 118:4,6 137:22 141:5 152:8 182:21 222:20 223:1, 19 224:6

**marked** 14:10 16:17 17:12 22:3 32:7 34:12 35:19 38:19 42:7 44:18 48:13 50:18 72:14 81:18 94:21 95:1,2,20 110:8,10 118:11,12 132:10 141:12 153:1 241:10

**marking** 34:8

**Maryland** 29:3 34:5 35:7 41:17 44:10 112:20

**massive** 22:13

**material** 29:17 127:17 129:8 131:5 140:15 189:10

**materials** 36:11 194:24

**Matt** 166:11,12, 16,18,21 186:6

**matter** 16:2 20:25 48:16 55:14 93:22 160:16 182:19 198:7 212:6 225:17 231:14 236:11 243:11

**matters** 159:22 208:8,11

**meaning** 197:17

**means** 23:13 160:10 195:11

**meat** 169:16

**medical** 201:5, 8 202:3,7,9,10, 13,23

**meet** 68:23 77:22 79:14,16 195:17 231:20, 24 232:2

**meeting** 71:23 77:7 84:4,6 85:10,12,14,16 86:9,17 138:12, 25 199:15

**meets** 21:8 207:23

**Mefford** 40:7, 16 164:5 222:20 223:1, 19 224:2,6

**member** 68:20 121:3 220:8

**members** 187:23 198:25 199:2 216:17 230:25

**memorandum** 44:25

**memorialized** 211:20

**memory** 36:20 143:1 170:4 173:3 177:2,19 185:8 186:3 187:21 188:14 190:24,25 194:20,22 195:14,15,24 196:19 198:2, 13,17 200:23 201:13,20 202:21 203:24, 25 238:15,16

**memory's** 171:18

**mental** 45:7

**mention** 141:22 172:9

**mentioned**

**meat** 169:16

**mentioning** 168:18

**message** 166:9

**met** 71:24 74:25 77:15 119:2 141:16 159:16 170:4 186:12

**methamphetamine** 117:15 175:10

**methodology** 40:12

**Michael** 37:22 38:2 40:22 87:16 89:25 90:5 94:25 96:17 97:1 99:25 100:21 103:2 116:25 121:25 122:9, 16 123:4 124:5 126:11 188:8 189:12 194:6 217:1,7,13

**middle** 22:11 192:5

**Mike** 19:2 101:10 120:4,6, 7,12 121:22 122:9,17,23 123:4,17 161:23 164:11 167:9,11 194:16,19 197:2 229:10, 16 230:25 231:13,17,20, 21 232:2,10,13, 18,22 233:6,10, 15,18

**Mikey** 141:23, 25 142:6,8,15, 19,25 143:3,19 145:10 197:8

213:8 236:21

**mile** 78:17 174:1

**Mills** 14:19 17:3 23:2 48:4 49:8 50:10 58:24 59:8 67:7,14 73:17 77:2 79:11 95:13 101:23 109:14,19 110:4,5,15,16 111:4,25 112:1, 4 113:16 114:15 115:7 116:11,12 120:5 132:24 138:1 142:12 145:14 149:9 150:25 154:10, 22 156:1,23 157:11 159:11 160:6 161:1,7,9 163:4 167:10 180:8 181:11 182:12,14,16, 18 193:15,19 218:6 219:22 222:6,7 236:24

**Mills'** 53:10 56:12 101:7,20 102:1,8 113:1, 9,24 114:8 115:6 120:8,13 121:25 122:10, 18,24 123:24 124:6,9,16 153:7 186:5 189:13 215:22 216:18 217:8

**mindful** 159:20

**mine** 161:3 182:22

**minimal** 62:5,8

**minimum** 90:21

**minute** 78:17 88:1 166:13 201:4 225:10

**minutes** 82:9 84:23 173:19,

23 229:2,3 230:13

**misdemeanor** 12:17 203:12, 17

**missing** 28:16 40:17 49:13

**mistaken** 35:11 39:24 68:21 78:1 80:7 83:3,6 94:3 99:18 151:5 166:13,14,17 169:9 174:21 175:5 178:14 182:19 188:16, 24 189:7,9 200:24 201:15 202:3,10 203:18,20 229:19

**mistakes** 116:20,21 165:14

**mitigates** 30:8, 21

**mitigating** 200:17

**mixed** 21:25

**moment** 80:15 151:23

**moments** 147:16

**Monday** 21:9, 10,17

**monetary** 65:7

**money** 64:19 65:7,8 74:16 88:5 146:18 187:14 213:16, 21 214:4 236:24

**months** 10:5 137:6 168:25 172:1 182:19

**morning** 21:10,17 122:1 205:8

**mother** 240:22

**motion** 32:3,5, 11,15 33:3,5 34:1,8,15 36:5, 14,17 38:21,25 39:2 41:7 42:3, 10,12 43:4,9 44:15,20 63:18 72:12,17 73:23 75:4,8 80:11,15 81:3,15,16 82:6 93:24 109:12, 17 122:15 141:5,8,21 142:2 145:18, 20,25 146:5,25 148:9 149:17 150:12 152:20 157:2,6,8,13, 15,18 159:14, 17 172:12 177:4 181:12 187:10 191:11 197:4 198:20 199:10 200:1,3, 4 212:15,19 213:1,2 219:4, 11,17,23 235:21,22,23, 24 236:7,16,18 237:3

**motions** 32:1 130:6 139:9 168:11 233:4 239:19

**motive** 214:3

**motorcycle** 78:20

**Mount** 188:17

**move** 173:8 176:17

**moved** 47:15 128:16,21 130:14 133:19 134:1 135:12 142:13,17 175:17,19 187:15 200:11

**moving** 159:21 200:6

**multiple** 50:5

238:14

**multitude** 200:8,9 237:20

**murder** 12:6, 20,25 14:16,19 16:24 17:2,16 25:18 46:11 48:4 60:17 61:4,13 79:10 102:24 103:8 110:5,15,21 112:1,4 115:16, 23 116:12 117:11,15 132:25 138:1 145:14 149:9 154:21 156:1, 23 157:11 160:6 167:10 180:8 198:15 201:19 203:19 214:25 215:5,9, 11,15,22 218:6 219:22 222:5 225:14,15,21 229:17

————————

**N**

**name's** 216:5

**named** 166:11 228:20

**names** 18:23 62:11 167:6

**narrative** 73:24

**naturally** 225:14

**nature** 138:17 234:6 238:24

**necessarily** 23:15

**needed** 21:14 71:18 164:25

**negate** 30:7,20

**negated** 76:5

**nice** 8:19,25 9:7 69:25

**nicer** 230:22

**night** 175:9 225:6

**nobody'd** 68:12

**non-** 9:13

**non-defendants** 66:3

**Nonverbal** 9:2

**northern** 11:7 80:8

**notated** 15:11 157:12

**notation** 222:5,6

**noted** 157:6,18

**notepad** 186:19

**notes** 34:23 36:23,24,25 37:2,3,12 43:15,17,18,20, 21,24,25 45:3 53:25 232:17

**notice** 36:23 189:7,8 204:10 211:3

**notification** 206:2 211:7

**notified** 78:4 94:4 112:6 121:11 205:22 211:5

**notifying** 211:4

**number** 12:21 14:23 16:13 17:10 20:2 21:21,23 32:2, 12 34:8 35:3 36:21,25 38:15 42:3 44:15 50:16 61:21 62:4 73:5 81:19 90:21 100:22 101:14 118:5,7

121:23,24
136:23 146:7
152:10,15
166:11,21
168:10 188:20,
23 193:13
212:1 218:20
221:22,24
222:1 235:7
239:23

**number's**
239:25

**numbered**
39:4 41:1

**numbering**
119:12

**numerical**
47:10

———————

**O**

**oath** 117:7,11,
14 119:4
220:13

**object** 13:25
16:8 19:10 21:4
24:1,16 25:14
26:19 27:2,8
29:15 30:10
31:2 35:8 36:8
39:10 40:10,18,
24 43:7 45:15
46:25 49:9
50:19 51:7,17
53:12 54:3
55:1,6 56:17
57:15 58:11,15,
20 59:2,13,14,
15,24 60:6,14,
18,24,25 61:7,
18 62:6 67:9,
10,16 70:19
71:1 73:3 74:1,
3 75:11,21
76:8,17,18
77:3,4 90:1,19
91:16 92:11,19
94:11,12 96:18,
19 97:3,19,20
98:8,21 99:13
100:2,10,11
102:9,17 103:5,

16,18 109:16
110:6,17,24
111:7 112:5,11,
16,24 113:6,14,
21 114:4,12,21
115:19 116:2,4,
8,14 120:20
121:6 122:20
123:7,13,21
124:2,10 125:8,
13,23,25
126:13 127:9,
23 128:5,11
129:1,16,22
130:3,11,20
131:2,12,13
132:4 133:1,24
134:15,21
135:2,10,17
136:6,15
137:18 139:13
140:10,21
142:5,23
144:10,17
145:6,15 146:9,
23 147:3 148:4,
17 149:5,11,23
150:15 153:8
155:3,17
157:24,25
158:7 159:12
160:7 166:25
220:3 236:4
237:1

**objected** 37:5
183:23 202:11

**objection** 25:8
38:17 56:18
59:3 61:18
90:6,7 91:15,16
93:2,3,4,14,15,
16 99:4 102:18
103:4,17
109:21,22
111:6 112:12
113:7,22
114:19,20
125:5,7,9,22
127:8 128:12
130:10,21,22
131:14,22
132:5 133:9,23
134:6 135:18
136:7 140:11
141:13 143:21

147:2,3 159:3,
4,5 169:6,25
170:8 171:10
172:6,21 173:5
178:10 179:13,
25 180:12,19,
22 181:16
183:8,10 187:7,
18,20 188:12
189:23 190:3,8
194:7,14 195:5,
9 196:20
197:20 203:23
209:21 210:17
211:23 213:17
214:1 217:15
218:12 219:13,
19 220:9
221:19 226:1,7
234:15 241:4

**objections**
8:20 9:8 38:15

**obligation**
29:8,12,17 31:9

**obligations**
28:21,25 31:18,
24 34:4 35:7
38:11 41:16
44:8,9 123:11
131:6 134:14
135:25 139:19
140:14 144:15

**observations**
217:14

**obtain** 103:2
165:22,24

**obtained** 54:1
61:6 67:3 106:2
137:15,24
138:6,8 149:3
154:25 158:3

**occasion**
199:7

**occasionally**
209:3

**occasions**
51:25

**occurred**
185:17 235:8
236:2

**offense** 30:8,
21

**offer** 63:23
65:17,20 88:5
203:17,21

**offer's** 46:16

**offered** 203:12

**offers** 63:17
64:1

**office** 10:6
11:5 12:9,17,
20,25 13:2,3
18:2,12,18,24
22:8 25:25
26:22 28:1
31:23,24 33:13
34:3 36:4,11
38:1,8,22,23
39:13,19 40:16
41:5,23,25
42:15 43:10
44:8,21 45:13,
21 46:12,18,21
47:4,5,12,18
48:1,25 49:7
50:9 51:14
52:12,19 53:2
54:7,11,15
55:7,11,15,16
56:8,10,24
57:4,12,20,21,
23 58:4,9,14,19
59:1,12,20 60:9
62:18,22,24
63:2,3,7,13
64:4,8,14,19,22
65:3,11 66:14
67:2 76:1
84:11,25 85:1,2
96:1,9 114:1,6,
10 116:13
121:3 139:3
160:18 170:19
194:22 195:22,
23 198:3,10
206:20,23
207:2,4,20,22
208:8,16,21
209:4 222:8,12,
16 230:9,17
234:16 239:7,
19 240:1 242:3,
13,15 243:4

**office's** 55:3

**officer** 13:11
16:2 18:4,19
20:24,25 21:1,5
24:8,12 25:6
27:1 34:25
39:24 48:15
52:3 53:17
68:15 82:10
91:21 96:13
102:14 118:19
119:14 120:17
121:2 138:11,
23 142:19
143:18 155:20
156:9,13
163:15,18
164:15 166:23
167:7 208:17,
21,25 209:15
214:25 224:12
231:8

**officer's** 18:6
25:5 45:3 53:15

**officers** 13:9
15:10 45:1
48:20,22 49:6
53:24 54:22
67:2,21,24
69:2,13 75:19
76:24 88:24
89:4,9,14,24
90:4 93:7 94:9
100:8 102:14
103:12,23
104:4,14,23
105:9,12,16
106:1,9,19,23
107:2,12,16,20
108:22 109:1,5
113:4,11
114:15 116:20
117:4,7,11
125:19 126:2,6
127:20 128:2
136:16 140:6
153:5 154:2
155:1 158:24
166:20 172:14
207:2,24
222:14 232:3,9

**official** 155:14
156:2

265

**officially** 234:2

**officials** 20:20 35:3 54:10,15 58:9,14,19 109:20 127:6 128:25 130:9, 18 133:21 134:4 135:8,14 139:11 157:19 158:2

**oftentimes** 223:6 226:10

**Oklahoma** 97:1,12 98:5, 10,15 99:10 124:19,24

**older** 47:16

**on-the-job** 27:17

**one's** 150:5

**ongoing** 24:24 47:16 52:19 115:25 120:18

**open** 46:14

**open-file** 144:19 192:18

**opinion** 98:25 160:16,17,24 163:2 165:5,10, 16 192:15 240:16 241:3

**opinions** 160:5,12 161:3

**order** 13:11 15:21 35:15,18, 22 36:2,4,10, 13,15,18 37:17 38:4,10 44:4 45:14 63:19 96:17 115:13 222:23 241:15

**ordered** 44:3 191:19

**orders** 65:1

**original** 99:18 162:6

**originally** 74:9

**out-of-state** 83:1

**outlined** 36:13 141:8

**outlines** 30:2

**outstanding** 153:23 154:6

**overcome** 238:3

**Oversee** 12:3

---

**P**

---

**P.M.** 243:15

**pages** 49:11

**paid** 64:19

**paragraph** 36:22 37:21 38:6 39:4,12 41:1,19 72:22, 25 73:23 75:10 81:19 83:17,18 120:3 121:16 146:14 148:20 149:7 168:15 173:10 186:10 240:3,5,7,19,22

**parentheses** 37:2

**parentheticals** 37:6

**parking** 68:3 70:2 91:20

**parole** 68:13, 14,15 69:12

**part** 25:20,22 30:4,15,17 33:19 54:18 192:17,22 218:2 238:17 240:11

**Partially** 226:8

**participating** 136:25

**parties** 203:2

**parts** 222:3

**party** 235:23

**passed** 182:18

**past** 147:20 150:17

**pasts** 225:11

**PD** 230:21

**pendency** 56:6

**pending** 12:23 64:1,10,16 110:23 115:24 123:19,25 134:25 136:18 154:20,25 211:21 223:9

**penitentiary** 84:11

**people** 23:14 53:20 85:24 150:11 159:21 161:12 194:12 216:6,9,12,23 221:12 223:7, 17

**perfect** 228:4, 10

**perfectly** 9:16

**period** 79:2 138:7 174:6,17

**perpetrator** 152:24

**perpetrators** 152:25

**person** 25:10 27:4 62:12 80:3,10 84:4,7 92:6 97:24 102:7 115:17 118:24 126:17 141:22 169:1 171:8,23 172:4 177:8,15,24 185:6 189:15 217:8

**personal** 16:10 20:16 46:9 63:25 64:5 65:2 160:24 161:2 207:5

**personally** 15:18 17:4,21 20:14 64:21 65:3 74:21 79:16 86:21 206:15

**personnel** 34:25

**perspective** 102:21 145:7

**pertinent** 218:2

**petty** 67:17

**PFO** 222:11

**phase** 49:25

**phone** 27:9 79:20 80:3,4,6 82:8,22,24 83:10,20 87:4 149:1 151:11 166:11 167:3 170:12,22 171:1,24 177:1, 6,11,25 179:12 181:8 188:15, 23 201:22 204:2

**photo** 89:24 90:4,11,12,17, 23 91:1,2,5,9, 11,22 92:5,8,15 98:19,22 126:15,16

**photograph** 90:24 91:13 92:10,18 96:24 97:14 98:4,6,18 99:10 102:6

**photographs** 43:13,17 90:17 92:24 93:12 94:7,10 95:17, 19,23 96:14,17 98:4,18 99:25 124:19 125:12, 17 126:7 230:3

**photos** 93:21, 25 190:17,18, 23 191:6,7,9 217:2

**physical** 153:6,10

**physically** 54:23 208:20

**pick** 175:24

**Pickard** 92:23 93:10 124:25 132:17,23 133:5,11 164:2 192:2 214:14, 19,24 216:8,12, 15,21 217:4 218:3,9 220:2

**Pickard's** 152:14,19 192:12 215:11 216:25

**picked** 84:10

**piece** 226:11

**pillars** 225:18

**Pineville** 68:12 71:5,24

**pinpoint** 174:20

**PL24455** 34:10

**PL24490** 32:4

**PL24492** 32:4

**PL24494** 38:16

**PL24511** 42:5

**PL24722** 239:7,25

**PL24728** 239:25

**PL25239** 50:15

**PL25392** 19:23

**PL25393** 19:23

**PL25395** 48:10

**PL26180** 22:1

**PL26181** 227:1

**PL26182** 22:1

**PL4844** 132:8 192:22

PL4855 192:23

**place** 71:7
89:15 104:5,24
105:17 106:10
107:3,21 109:6
118:23 120:6
138:10 161:6
230:15

**plaintiff's**
211:12

**plaintiffs** 56:7
239:5

**plan** 205:20
224:5

**planned** 224:9

**plans** 28:13
220:1

**played** 215:21

**playing** 169:14

**plea** 63:18,22
65:19 66:1
203:9 210:24
211:5,6,20,25
212:1

**plead** 63:8

**pleas** 63:17

**pleasant** 70:2

**pled** 63:14
211:19

**plow** 8:16

**plural** 172:13

**point** 12:23
13:18 18:7,12,
20 25:1,3 26:22
32:23 39:16
46:16 47:10
69:7 71:17 73:5
76:11 79:21
83:15,19 85:16
124:21 138:17
141:9 142:25
146:6 151:1
154:7 156:7
159:16 160:11
161:20 162:24
169:19 170:2,
18 175:24,25

188:17 190:6
194:20 202:8
205:11,25
208:7,9,14
218:24 219:16
220:4 237:25
238:5 242:10

**pointed** 174:15

**police** 13:9,11
23:16 24:22
31:5 39:20
40:11 43:21,25
48:18,25 49:14
53:7,24 56:9,
13,14 57:13
59:9,10,23 60:5
67:21 69:10
70:18 73:10
88:24 89:4,8,
14,24 90:4
92:25 93:13
96:15 99:17,18,
24 100:6,8,19
102:22 103:12,
22 104:4,14
105:9,11 106:1,
2,9,19,23
107:2,12,13,16
108:22,25
113:17 115:17
125:2 129:12,
18,24 131:17
136:3,10
139:22 146:8,
12 150:7,19
153:24 155:15,
21 156:5,10,14,
19,24 162:5,9
163:15,18
164:12,15
166:16 173:1,4
182:1 188:4
193:1 198:18
207:1 209:8,15
215:6,7,10,12
216:10,12,24
221:4 228:17
229:11,25
230:8,13 231:1,
22 232:11,23

**policies** 62:24

**policy** 55:9,10,
13 62:18 63:13
64:5,7,8 102:21

144:19 192:18

**Polly** 195:18
196:9

**polygraph**
43:19

**position** 27:24
46:13 117:18,
23

**positively**
189:12,17
194:9

**possessed**
10:7 36:12 38:9

**possession**
39:9 54:8
117:15

**possibly** 45:7
86:4 212:8
227:5

**post** 166:17
209:1,3 230:12

**potential**
153:12

**potentially**
42:10 191:15
197:15 225:3

**practice** 12:24
24:12 46:9,14
54:7 56:23
63:25 64:7
198:14,21
215:11 216:6

**practicing**
45:12,19 186:7

**Pratt** 19:2

**precursory**
21:12

**predicate**
61:22

**prejudice**
160:10 191:12,
18,20,23,25

**preliminary**
13:1,6 18:14,
15,20 207:17
227:6,10 228:1

**prep** 178:20

**preparation**
12:5 46:17
81:21 177:5
215:25

**prepare** 65:1
209:12 232:13
239:7

**prepared**
22:17 25:16
48:15 59:22
170:21 217:2
222:17 238:11
240:1

**preparing**
172:18 222:9

**presence** 68:1
204:16 205:2

**present** 18:19
21:11 24:13
67:21,24 76:2
159:23 163:24
164:2,5,8,12,
15,18 170:22
173:12 174:5
181:23 182:2,
13 189:9
201:21 202:11
223:18 229:23
231:17

**presentation**
19:16 25:16

**presented**
19:6 20:11
25:4,12 48:12
60:8,21 61:14,
16 114:10
166:6 234:16

**presenting**
19:7 20:14
208:6 222:13

**president**
199:14

**pressed**
232:21

**pretrial** 205:6

**pretty** 174:2
177:23

**prep** 178:20

**previous**
21:20 82:1,14
149:13 171:6,
14

**previously**
183:11

**primarily**
215:10

**print** 154:8

**prints** 154:15,
17

**prior** 9:25
10:19 11:2,11
18:20 19:16
22:14 23:24
24:14 55:19
86:9,13,17
93:12 94:10
96:14,23 97:13
110:12 111:4,
23 116:24
119:23 120:11
121:3 122:4,8
124:21 126:7
138:12,16,24
139:9 141:4
143:16 155:12,
18,23 162:25
171:7,19 173:1
178:21 186:22

**prison** 83:4
84:12,17,20
86:10,14,18
116:22 138:12
149:4 173:15,
20,24 175:18
176:5,21,22,23
177:20 180:11
187:23 238:19
240:11

**probable**
18:16 20:23
76:2,5 118:21
141:10 157:4,9,
16 159:15,22
160:1 213:11
217:11 219:21
226:16 227:13,
16,25 228:2
234:9,21,23,24
237:6 238:1
242:22 243:1,4

probate 212:2

probation 68:14,15 69:12

problem 175:5,6

problematic 223:11

problems 68:10

proceed 18:5,7 112:2

proceeded 61:11 115:9

proceeding 22:11 41:25 42:5 43:6 94:2 121:4 126:4

proceedings 8:1 191:22 243:2

proceeds 18:2

process 13:8 15:15,25 17:23 18:1,12 20:17 21:5 24:24 25:21,23 26:12 33:2 83:1 118:19 195:3 230:22

procession 224:16

produce 39:13,19 42:10 45:13 47:25

produced 23:8 39:7 49:6 51:5 239:4

producing 47:19

professional 31:1 218:11

promise 63:14 64:12,15 65:14 176:13 192:13 240:14 241:3

promised 65:7 111:4 113:17

129:18 130:17 131:17 132:17 133:5 136:10 140:7,17,25

promises 41:10,12 62:19 63:2,4 64:9 66:10 86:17 88:2 131:25 132:13,23 175:14 176:16 210:21 212:10

promising 62:19,25 66:4

prompted 178:12

proper 53:20

property 167:4 175:22 192:8 218:4,8

prosecute 43:12 75:20 219:21

prosecuted 76:1 196:19,24

prosecuting 32:20 167:2

prosecution 10:7 12:3 19:8 26:4 29:20 33:6,16 41:3,6 42:25 44:6 48:2 51:6,15 52:13, 20,25 53:9,22 58:7,12,17,22 59:6 66:6,12, 18,22,25 73:11, 16 76:4,7,11,25 77:8 79:15 86:24 87:11,15 88:3,6,10,13 95:22 110:23 112:10 115:4,9, 16,24 117:4 146:6 152:3 153:14 157:5, 10,17,20,22 158:5,25 159:2 160:13,14,17, 18,19 167:8 205:19 209:9

217:12 226:9 229:17 232:3 233:19 234:3 238:10

prosecutions 172:17

prosecutor 28:21,25 30:1, 7,20,25 46:3,7 53:21 57:8 64:14 66:9 75:25 102:5 110:20 112:8 114:1,9 117:19, 25 118:16 134:14 135:25 139:19 140:14 153:17 159:20 172:23 193:7 204:9 208:5 214:18,21 215:1 241:21, 22

prosecutor's 29:8,11,16 56:10 220:15

prosecutorial 56:3 151:12

prosecutors 22:10 28:10 30:2,5,18 31:5 55:4,24 56:2,7 57:5 154:1 206:20 221:2

protection 211:25

prove 160:14 226:12

provide 39:17 53:10,15,24 67:2 77:21 103:13,23 112:9 133:15 167:8 195:2

provided 38:1 39:15 58:4 67:8 73:1,11 99:19 141:17 153:23 192:19 210:9 218:21

providing 121:10

proximity 186:25 187:10

public 63:19 205:14 230:15, 19

Pulaski 162:20 176:10

pull 91:22 175:20

pulled 33:16

purple 8:24

purport 42:10

purpose 126:11

pursuant 35:6 38:3,10 41:15 54:7

pursue 232:21

pursuing 159:21 217:12

pursuit 159:18

put 52:5 81:5, 19 93:1,11 96:16,22 117:18 126:8, 17,18 165:4 169:10 210:23 212:7 221:14 222:10 225:5 234:19

putting 94:13

**Q**

qualified 102:19

quash 93:25

question 9:17, 21 14:4 24:5 30:16 31:6 39:11 43:8 46:8 54:12,13 57:18 61:8,20 64:4 67:12 71:9 79:6,7 80:25

81:10 91:12 93:20 94:3 97:25 114:7 124:11 125:6, 24 128:15 138:14,19 142:16 144:8 147:8,15,18 155:24 158:10, 19,23 160:9 161:17 163:8, 11 177:14 179:16,21,23 182:7,10 183:4, 21 184:9 200:6 217:20 224:18

question's 98:1

questioning 85:20 173:16 183:18 209:17

questions 9:16 26:6 27:15 29:7 70:4 75:15 86:6 87:18 88:20 95:7 132:12 142:7 158:18 161:19 163:12 167:18 168:6 183:19 207:8 209:7,14 211:9 214:6,11 216:22 220:14 228:4,23 229:13 235:6

quick 8:16 45:6 65:23 182:3

quick- 206:12

quicker 184:14 195:12

quickly 22:12 29:7 184:15 215:12 221:16

quotations 43:22

Quoting 133:2

**R**

race 70:1

**raise** 8:3

**raised** 11:21, 23

**range** 33:15 48:10 50:14 96:5 203:20

**rare** 81:11

**RE-EXAMINATION** 241:18

**re-prosecuted** 191:15

**reach** 21:2

**reached** 63:7 111:24

**read** 10:3 24:6 32:24 82:7 111:12,18 182:8 218:1

**reading** 32:9 45:1 120:23 172:12

**ready** 203:4

**real** 8:16 45:6 78:16 182:3

**realize** 28:16

**reason** 33:4 55:4,7 65:23 127:1 152:11 159:13 160:9, 20 187:25 188:1 189:1 204:13 213:24 243:10

**reasons** 32:24 45:4 123:16 153:20 226:5

**recall** 12:8 18:23 19:6,12, 14,19 47:19 51:18 65:21,22, 23 66:17,21 69:18,21 70:24 77:7,22 78:15, 23,25 79:1 80:5 81:8,14 82:4,19 84:6 85:4,15 86:15 87:15

96:21 97:11 99:24 100:14 110:18 112:6 115:14,20,21 116:1 122:7,21 124:23 136:24 149:8 165:18 173:16 174:8 176:6,24 181:9, 10,22,25 185:16 187:16, 22 191:10,24 194:17 195:7 197:9 200:6 201:1,10 209:9 211:9,16 232:4, 12 233:8 235:10,13,16, 20 236:1

**recalled** 38:16

**recantations** 108:23 109:1

**recanted** 219:15 223:14

**RECC** 230:16

**receipt** 52:11

**receive** 20:18 28:6 31:6 45:20 152:2

**received** 39:15 125:16,17 154:19 195:13

**receiving** 34:1 125:12 192:7 218:4,8

**recently** 47:14 208:10

**reciprocal** 52:7

**recognize** 14:8,24 16:15 19:24 21:24 22:5 34:10 35:17 38:18 42:18 72:13 118:10 132:8 196:14,22,23

**recollection** 8:14 19:4

20:14,16 21:15 32:22 33:2 36:17 39:19 47:25 49:18 50:8 51:13 52:8 60:4 66:4 68:16 69:6 72:8 83:22,24 84:3 85:9,19 86:23 87:7 90:8 125:15,18 137:10,14 141:7 143:14 161:25 198:18, 19 207:10,13 215:2 219:1,2 232:20

**reconstruction** 28:15

**record** 9:9 45:9 52:5 63:19 84:20 88:17 167:25 184:5,6, 10 206:8 222:12 226:6

**recorded** 37:1, 8,22 38:2,9 39:3,7,20,21,22 40:2,8,21 61:15 85:7,10,11,13, 14 106:20 148:22 174:8 210:12 225:20

**recorder** 40:3 85:6 221:24

**recording** 23:9 40:13,17 43:15 149:2 171:16 174:7 181:20, 21 210:8 223:11,13 230:22

**recordings** 23:11 43:14,18, 20,21,23,25 53:25 106:23

**records** 44:1 45:5,6,7 77:17 178:16 202:23

**RECROSS** 237:15

**REDIRECT** 235:4

**reevaluate** 123:18,25 136:18 150:20 151:3 154:20 158:17

**reevaluated** 128:3 130:1 132:2 134:25 140:2,19 141:1 145:13

**refer** 22:8 162:3 167:6 221:15

**referenced** 211:14

**referred** 37:23 117:3 153:20 161:8,9 162:5,8 165:24 233:20

**referring** 68:25

**refers** 168:16

**reflect** 51:13

**reflected** 82:15

**refresh** 143:1, 13

**regard** 39:22 217:1,17 231:10

**regular** 198:14

**reimbursements** 64:22

**relate** 25:20

**relates** 52:24

**relating** 10:7 26:7 36:12 39:8,13,20,21 49:7 50:9 66:18 73:15,17 132:13 240:19

**relay** 240:24

**relayed** 240:9

**relaying** 218:13

**release** 162:23

**released** 115:16 175:23

**relection** 85:18

**relevant** 27:19 182:6

**relied** 75:18 217:13

**relies** 57:12,24 58:4

**relocate** 240:11

**rely** 57:17,20 76:23 209:8

**remain** 55:14, 15 206:1

**remaining** 237:22

**remember** 10:11,18 16:1 33:1 37:2,11 67:25 69:23,24 70:10,12,13,14 71:3,5,8,9,10, 13,21 72:10 75:5 78:6,13, 16,18,19,21 79:6,7,8,9,12, 19,22 80:23 81:23 82:3,9, 16,17 83:6,10 84:13 86:1,5,6 87:17 93:5 94:1 100:16 126:1 137:5 146:13 147:18 149:14 150:2,25 151:4, 9 165:21 166:9, 12 171:3,5,21 172:5,7,15,19 175:2,12 176:20 178:9, 24 179:1 180:17 181:1 185:21 187:5, 25 188:1,21 189:2 193:2 194:22 195:17 196:16 199:12,

13 200:19 201:3,6,18 203:25 207:15 209:16 225:21 235:18,22 236:15

**remembering** 79:10

**remembers** 180:1

**removed** 55:5, 8,19 160:19

**reopen** 212:8

**repeat** 79:11 113:8

**repeated** 161:15

**repeatedly** 200:11

**repeating** 114:15

**repetitive** 217:20

**rephrase** 61:8 67:12 91:2 177:23

**report** 24:22 25:5,11,15 37:23 48:9,11, 15,23,24 49:15 70:18,25 73:1, 10,15,20 74:10 98:12 99:17,18, 24 100:6,14,16 101:3,4,17 120:25 121:8, 11 136:23 144:4 150:8,19 151:21 154:13, 20 169:23 170:1 182:1 188:4 209:15, 19 210:4,7,10 232:6,9

**reported** 150:13,19

**REPORTER** 8:3 241:8,11,16

**reporting** 48:19

**reports** 25:7 34:23 38:7,9 39:20 43:18 48:25 49:6 53:8,11 54:8 61:5 100:19 101:22 107:13, 16 150:14 154:2 200:17 232:8,18

**represent** 23:16,18 33:14 214:14,15 229:1,10,23

**representation** 49:5 166:20

**represented** 70:23

**representing** 151:9 166:3,5,8 214:13

**reproduced** 96:7

**request** 32:17, 18 35:6,10,16 38:17 40:15 43:9 44:2,20 50:24 93:11 96:16 240:10, 24

**requested** 40:7 92:25 235:14

**requesting** 32:15 35:12 235:17

**requests** 34:23,24 36:5, 12 37:21 38:6 43:4 195:8

**require** 123:11

**required** 37:3 45:4 64:22 112:22 127:17 129:9 131:5

**requirement** 238:9

**requirements** 27:18

**requires** 30:5, 12,18 31:13 116:17

**requiring** 63:13

**rescheduling** 199:22

**residence** 101:7,20 102:1, 8 120:8,13,24 121:25 122:10, 18,25 124:6,9, 16 201:25

**residing** 201:18

**respect** 75:17 89:14 104:4,23 105:16 106:9 107:2,20 108:13 109:5

**respective** 61:25

**responded** 195:13,16

**responding** 55:19

**response** 35:20 41:23 45:14 47:20 49:19,23 51:24 98:11 239:18

**responsibilitie s** 11:25 30:2 115:5

**responsibility** 12:4 53:8,15,18

**responsible** 47:18 117:8,13, 16 153:7 159:11 163:3 199:16

**responsivene ss** 195:8

**rest** 205:24

**restate** 39:11

147:14

**restated** 82:2

**rested** 27:1

**restroom** 9:10

**results** 153:17

**retained** 50:8

**retention** 55:9, 10

**retired** 166:16 242:1

**return** 21:9

**returned** 20:6 234:8,17,23

**returns** 234:20

**reveals** 132:23

**review** 12:5 17:5,22 24:14 25:12,20 45:6 46:18 76:16 100:25 101:12 151:22 215:25 216:1

**reviewed** 27:5 32:5 49:4,16 59:22 76:10 101:2,4,16 167:12 193:24 196:1,16

**reviewing** 10:11 46:20 165:11

**reviews** 50:5

**rewards** 43:11

**right-hand** 42:17 188:20

**rights** 163:16, 19 205:21 221:6

**ring** 193:10

**rises** 145:1

**Roark** 44:1

**robbed** 120:8 122:1

**robbery** 14:16, 19 16:25 17:3, 17 82:1 180:7 187:13 225:16

**robbing** 74:14 146:17 148:12

**Robert** 79:17 80:2 82:19 83:21 84:4 86:22 87:13 136:25 137:11, 15,24 138:4,11, 24 139:11 141:18 148:21, 25 173:8 184:25 195:18 222:7 224:24

**role** 16:5 17:1, 18 26:12 53:21 56:3 60:10 215:17,20,23 229:16

**room** 22:18 47:15 78:2 84:24 85:15,17, 18,25 170:20, 23 179:6 216:7 231:3

**routinely** 158:14

**row** 117:24

**rule** 30:1,4,11, 17,18 37:7 44:9 123:10 179:18

**rules** 8:15 30:24 31:1 34:4 35:6 37:4 38:12 41:17 45:2 185:14 223:22

**run** 92:3 206:12

**running** 69:25 145:21 199:16

S

**safety** 50:1

**Salmon** 11:7

**Sam** 78:9,10 185:25 186:1,8

sat 174:3 210:19

scene 152:25 153:3 154:11 225:5

scheduled 151:6 208:12

scheduling 84:1 87:5

school 11:6,11 27:16 31:7,10, 11,12,15

scientific 153:18

Scott 182:12

scramble 205:11

search 40:7,16 118:6,8,13,20, 22,23,24,25 119:4,7,8 122:5 222:12

searching 40:13 202:1

secondary 215:17

seconds 82:8

secretary's 47:18

self-initiate 13:4

selling 213:18

send 99:9 117:24 153:11

sending 97:11 98:17 133:12

sentence 74:12 75:12 168:20 174:13 212:9

sentences 72:25 73:23 74:5

sentencing 28:13 169:18

separate 47:8 52:20 53:2

separated 236:14

sequence 47:11 98:15

Sergeant 223:2 224:2

series 32:1

serve 15:10

served 70:5,6 71:17,25 186:20,25 188:18,22 215:1 225:1

serves 15:8 177:19 211:7

service 34:19

session 22:15 208:1

set 51:3 52:20 53:2 102:21 199:19

Setting 216:15

she'd 78:9,13, 18,20

sheet 22:10 48:17 49:12 50:23 221:10 226:24,25 227:9

sheriff 92:23 93:10 124:25 132:17,22 133:4,11 164:2 192:2,12 214:14,15,19, 23 215:11 216:8,11,15,21, 25 217:4 218:2, 9 220:1

sheriff's 56:14 59:9 69:3 215:9,14 216:7, 17 220:8 230:9

shock 116:3, 13,17,19,23

shocked 116:10

short 65:23 70:4 115:13 191:22

should've 121:8

show 14:6 16:12 17:9 19:13,20 21:16, 18,22 32:1,2 34:7 42:2 44:14 84:21 88:20 92:5 94:16 110:8 118:4,6 141:4 151:18 188:5 190:19, 21 191:7 199:24,25 202:20,22

show-up 89:25 90:5,11,23 91:1,3,5,9,11 98:20,22 126:15,17

show-ups 126:24

showed 21:10 193:18

showing 72:11 92:9,17

shown 91:13

side 204:6

sign 15:22 18:11 38:24 76:22

signature 14:22,23,25 15:1,24 26:9 119:14,20

signatures 43:17

signed 35:22, 24,25 37:10 60:7 110:14 115:14,22 119:4 121:14 122:5

significance 222:23

silent 206:1

silly 228:4

similar 37:9 96:5 125:3 126:10

similarly 90:17

simple 24:22

Simpson 44:1 120:4,6,7,12 121:22,24 122:9,17,23 123:4,18 128:19,24 129:17,25 161:24 167:9, 11,15 194:16, 18,19 197:2,11, 24 199:4 213:6 236:21 240:19

Simpson's 45:9 129:11

single 90:23 91:13 92:9,15, 17 99:24 115:14,21 228:14

sir 9:15,24 10:14 15:6,7,14 17:25 26:10,15 28:5 31:19,21 37:14 42:6 44:13,19 72:13, 23 73:4 95:18 96:12,23 110:9 111:9 117:5 120:9 121:14, 20 122:2,7 124:4,18 132:7 136:22 143:15 146:4 168:14, 17,22 170:14 173:11 177:10 178:2,5,8,11 181:13 182:9 185:11 186:11, 16 190:25 192:4 193:14, 16,20 196:8 197:6 204:8

207:19 209:10 210:14 211:13 213:9 218:22 228:25 231:9, 12,16,19 240:8

sister 195:18 196:15

sit 77:16 85:2 87:7 150:6 170:23 198:12 231:1

sitting 19:14 20:13,16 36:16 39:19 63:21 73:14 80:5 90:10 92:22 115:13 138:22 156:8 160:4 170:20 198:6 236:7

situations 51:22

sixth 188:7

sketch 43:18 94:24 96:11,25 97:4,5,15 98:5, 19 100:9 125:3, 21 126:3,10

Skip 119:20

Skipped 94:18

Slosar 8:10,23 9:6 27:14 56:21 59:16 87:22,25 88:16,18 91:20, 22,24,25 93:17 95:10,13,15 100:13 103:19 109:25 111:15, 17 114:23 127:11 130:13 140:22 147:2,5, 9 152:13,18,21 158:22 159:7 167:17,24 169:6,25 170:8, 10 171:10 172:6,21 173:5 176:22 178:10 179:13,17,21 180:12,19,22 181:16 182:5,9

183:8,10,17,22
184:1,6,12
187:7,18,20
188:12 189:23
190:3,8 193:24
194:7,14 195:5,
9 196:20
197:20 216:22
236:5

**Slosar's**
217:19

**small** 161:12

**small-town**
167:2

**Smith** 81:8

**smoking**
228:6,8

**snowstorm**
199:14

**socialized**
165:2

**Solely** 57:17

**solemnly** 8:4

**solve** 153:6

**somebody's**
145:3 161:14
204:14 226:10

**son** 161:22

**sort** 13:8 27:24
28:6 55:10
210:24 240:14

**sound** 223:3

**speak** 67:23
69:15 78:11
80:3 84:15
170:12 184:14
185:5,19

**speaker**
170:22

**speaking**
21:14 72:9 78:7
86:23 236:16

**speaks** 75:12,
14

**special** 30:2
243:11

**specific** 12:21
34:9,15 36:6
91:18 94:15
171:17 204:19
226:18 228:25
229:13

**specifically**
12:10 35:12
67:25 79:6
149:12 151:4
176:6 235:10,
12,13,15,19
236:21

**specifics**
87:20 174:20
175:1

**speculate** 99:5

**speculation**
161:13 166:14
173:6 189:24
203:23 214:1
220:4

**speed** 184:12

**speedy**
235:21,24

**spending**
74:16 146:18
187:14

**spent** 203:3

**split** 99:14

**spoke** 77:12
78:2,14 80:6,10
81:20 86:8
90:20 139:7
147:24 149:16
150:11 151:5
169:11 174:17
185:20 186:2

**spoken** 81:2
188:11

**spring** 21:6

**staff** 208:22

**staged** 92:24

**stamp** 33:8
43:13

**stamped** 32:4
33:12 42:5,15

118:5 132:8

**stand** 190:5,20
205:24 223:24

**standpoint**
190:9

**stapled** 192:22

**STAPLES** 9:4
162:12 203:23
206:6 209:21
210:2,17
211:23 213:17
214:1 217:15,
23 218:12,14
219:13,19
220:3,9,14,19
221:19 226:1,7
234:15 235:5
237:13 239:13,
16 241:4

**start** 9:4 87:19
198:14 227:1

**started** 120:6

**starts** 168:23

**state** 40:11
48:17 55:17
56:13 59:9,23
60:5 62:13
69:10 81:21
90:2 102:21
153:24 162:5,9
164:15 166:16
180:5 215:6,10,
12 216:10
228:17 230:12

**state's** 29:13

**stated** 40:1,2
120:4,5 149:12
171:20 180:7

**statement**
23:22 24:6
30:14 37:1,6,8,
9,10,22 38:2
39:22,25 65:15,
18 66:11 68:7
70:8,9,17
71:19,21,22
74:6,7 79:8,9
82:14 85:11,13
103:14 109:14,
19 111:5,25

113:2,10,18,24
114:8,16 115:6,
7,8,18 123:24
127:5,19 128:1,
8,19,24 129:11,
19,25 130:8,19
131:9,18 132:1,
14,19 133:2,3,
7,22 134:5,17,
23 135:8,15
136:2,11,17
137:11,15,23
138:4 139:6,11,
21 140:1,8,18,
25 142:4,8,25
143:12 145:4,
12 146:22
147:19,23
148:1,10,14,23
150:3 152:14
155:10 158:13,
16,18,19,20
168:18,24,25
169:21,22
171:2,8,15,19
172:11,14,15
174:8 177:24
178:3,6,22
180:9 181:15,
17,23 182:1,20
183:1,7 185:9
187:1,5,11
190:20 204:20
209:20 210:12
211:3 219:1,10,
16 223:10
239:1

**statements**
23:16 38:7
39:8,15,20,21
41:20,24 43:14
61:5,15 67:2
69:21 73:16
75:9 78:23 79:5
81:24 82:2,3,18
88:12,25 89:5,
10 104:15
106:2 115:11
119:17 141:17
144:22,24
146:8,12
148:19 149:9,
13,14,21
150:18 154:25
155:7,9 157:20

158:3,11,12
159:1 171:4,6
172:8,10,13,19
173:4 183:5
184:20 185:1
197:23 212:17,
20 218:24
232:8 233:16

**station** 115:17

**stay** 202:17

**steal** 214:4

**Steele** 8:11
9:25 16:16
17:10 19:24
21:23 22:5
32:4,16 34:10
35:16 38:18
45:11 48:9,10
50:15 88:19
100:15 117:17
118:8 136:24
151:22 160:4
168:3 206:13
214:10 220:22

**step** 18:12 69:9

**steps** 34:2
40:20 46:22
49:17 76:6
114:16 123:18,
25 136:18
150:20 157:21

**Sterling**
188:17

**stick** 37:17

**Stinking** 43:23

**stipulation**
227:16,24

**stolen** 192:8
218:8

**stood** 70:1

**stop** 76:6
114:17 157:21
225:8

**stopped** 115:4
158:5 159:2

**stored** 209:1

**story** 74:13

75:13 81:23
146:16 148:9,
11 175:6,12
180:24 187:6,
12

**straight** 20:24
21:1

**straightened**
68:19

**street** 56:3

**strike** 177:12

**striking** 222:5

**stuff** 70:24

**subject** 102:1

**submission**
25:7

**submit** 15:21
16:3

**submitted**
23:17,23 25:19
54:15 232:6

**subpoena**
47:20 49:19,23
50:4 55:19 69:2
70:5 71:15,17,
25 77:20
186:20 188:19
225:2 239:5

**subpoenaed**
72:5 77:18
205:5

**subpoenas**
64:24 69:4

**subsequently**
74:9 79:25

**substance**
83:10,25

**successful**
237:25

**sued** 31:5

**suggestive**
92:18

**suit** 162:19
166:24

**sum** 65:7

**summaries**
36:25

**summary**
25:18 72:25
73:24 74:6
75:2,7

**summer** 29:22
110:2 111:3
122:16 124:22
127:3 128:17,
23 130:5,16
133:20 134:3
135:6 139:10
142:14,18
155:19 161:5
162:11

**Sunday** 68:22,
23 151:5,7,10

**sunny** 69:25

**supervised**
46:3

**supervision**
26:17

**supervisor**
224:20

**supplement**
40:1,4 46:22
53:19 101:9
142:25

**supplemental**
47:1 50:23
51:5,14,18,23
52:1 151:21
210:10

**supplemental
s** 48:22

**supplements**
34:24 143:8,9

**supported**
141:10

**suppose**
175:17

**supposed**
142:20 145:12

**suppress**
93:24 190:17

**suppressed**

91:5,7,10,14
92:7 99:3

**suppression**
91:8,10

**supreme** 30:1,
18 34:5 35:6
38:11 41:16
44:9 90:20
123:10 126:23

**surprise** 163:8

**surprised**
216:11

**suspect** 92:18
194:19

**suspects**
43:18 162:24
167:12 230:10

**sustained**
234:21

**swear** 8:4

**sworn** 119:4,
17,19

**synopsis**
221:17

**system** 47:3
48:17,19 84:12
119:12 153:25
154:1,4 176:5,
21,22

**systems** 47:8

———

**T**

———

**tactic** 99:2

**taking** 89:15
93:12 94:10
104:5,24
105:17 106:10
107:3,21 109:6
126:7 161:6

**talk** 29:2 47:3
55:22 67:20
68:2,18 72:6
169:3 171:7
177:8,15,23
178:3 182:16
187:13 195:21
198:10 200:21

204:1 218:23
225:16

**talked** 78:9
79:19 85:23
92:9 138:18
139:1 161:21
162:18 166:3,4
171:24 173:22
187:3,16
188:14 197:7,
24 203:6
212:14 213:1
238:17,18
239:19 242:16,
19

**talking** 13:13
24:19 45:10
56:2 63:5 67:25
68:16 71:4
74:14 78:17
82:21,22 83:7
91:23 93:5,23
94:14 143:25
144:22 146:16
148:11 161:12
169:8 174:12
179:4 180:17
198:13,15
216:21 236:6

**talks** 205:14
222:19

**tangled** 175:10

**tape** 225:6

**taped** 37:1,5
38:7

**tattoos** 99:20
190:15,19,22

**taught** 221:1

**Taylor** 10:8
16:14,24 17:2,6
18:11 19:9 20:7
22:25 29:21
32:21 42:4,11
43:1,4 44:7,12,
16 48:3 51:16
52:25 53:23
58:18 60:3,12,
17 61:4,12
65:16 66:7,13,
19 67:1 73:12
75:18 76:12

77:1,9 80:16
81:24 88:3,7,
10,14 89:1,6,10
92:24 93:1,6,11
94:7 95:17,19,
23 96:14,16,25
97:15,18,23
98:4,7,18 99:10
100:9 102:6
103:15,25
104:16 105:7
110:2,22 111:2,
5 112:1 113:2,
5,13,20 114:3,
18 119:24
120:19 121:5
122:14 123:20
124:1,5,7,15,19
125:1,20 126:7
127:3,22 128:4,
10,17,23
129:14,21
130:2,7,16
131:11,20
132:3,20 133:8,
20 134:3,20
135:1 136:5,13,
20 137:12,17
138:1,6 139:24
140:4,20 141:2,
11 142:11,14,
18,22 143:17,
20 144:5
145:12,14
146:1 149:8
150:21 153:15
154:9,16,21
155:19,21
156:1,3,9,18
157:2,12,22
158:4 159:1
160:2,6,25
161:5 163:3,19,
22 168:19
169:24 172:7
180:7 190:7,15
191:6 194:5
200:19 205:19
217:7 219:22
229:25 232:22
233:12 234:9
236:10

**Taylor's** 88:23
89:3,23 90:3
98:6 105:8,25

106:18 107:11 108:4,21 141:6 200:10

**teach** 220:23 221:2,4

**team** 49:2 166:19

**telephone** 68:17 86:13 150:8

**telling** 9:7 81:8,14 83:11 126:2 175:12 181:1 183:17 188:1 226:13

**tells** 83:19 160:21 163:10

**ten** 11:1 82:8

**tend** 9:16

**tender** 33:9 51:22 52:4

**tendered** 10:6 32:20 33:5,11, 22 46:23 49:1 51:15 52:2,6,12 54:9,21

**tendering** 44:10

**Tennessee** 11:22 68:11

**term** 212:7 214:20

**terms** 66:3

**Terry** 19:1 42:23

**testified** 23:15, 22 24:7,12 25:10 26:8,11 86:21 124:18 138:9 177:14 179:14 183:11 184:1 212:4,5 223:5

**testify** 62:20 63:1 64:20 71:11 72:2,3 79:24 108:6,9

147:5 163:1 171:5 183:12 185:12 191:2 204:7,21 205:10,15,21 224:13

**testifying** 23:9,12 63:15 65:8 121:3 238:23

**testimony** 8:5 24:10 63:9 66:11 76:24 114:24 147:12 148:5 151:14 160:23 175:14 179:22 180:16 186:12,22 197:9 200:2 209:9 211:16 212:15,21,22 221:25 225:19 232:7 237:21, 23 238:4

**testing** 153:11, 18

**tests** 43:19

**text** 166:9

**that'd** 9:14 203:21 215:19

**them's** 150:4

**theory** 152:24

**thing** 13:14,23 63:5 72:4 81:12 83:12 221:21 243:3

**things** 24:24, 25 26:2 29:2 32:25 35:12 54:23 68:18 86:5 116:16,23 165:14 221:7 223:17

**thinking** 179:2 236:8

**third-party** 23:11

**Thomas** 36:19

**thought** 237:22 238:1

**thoughts** 160:13

**threaten** 89:5, 9

**threatened** 113:16 114:15 128:7 129:17, 24 131:16 136:9

**threw** 80:20

**throat** 141:15 203:14

**throw** 85:24 212:1

**thrown** 22:10 86:4

**tie** 8:19,21 9:5

**ties** 9:1

**Tim** 193:10

**timber** 213:18

**time** 11:16 12:23 13:18 18:8,21 25:1,3, 16 26:23 29:20, 25 32:23 39:16 41:6,9 47:10 61:1,3,11 66:24 69:5,8,19,20 71:8,18 75:25 76:4 77:17 78:8 79:2,21 80:12 81:3,13 83:9, 13,15,19 84:9 85:18 88:22 90:2 109:11,12, 17 110:1 111:1 122:13,14 127:2 128:14, 16,21 130:14 133:18 134:1 135:4,12 138:7, 17 141:9,16 142:13,17 143:16,19 145:12 149:17 150:11 151:1,9 154:19 155:24

157:1,7,14,23 158:6 159:16, 25 160:11 161:20 162:24 167:3,8,18 169:19 170:2, 18 171:23 172:2 173:20, 21 174:6,17,25 175:18,20,24, 25 178:4,25 179:2 185:17 187:25 188:17 193:6 194:20 199:18 202:9, 18 203:3,16 205:11,13,25 208:7,9,14 214:19,25 217:23 230:20 234:25 236:9, 13 238:14 242:11,12,14, 23 243:1

**time-date** 43:13

**timeframe** 185:11

**timeframes** 236:6

**timely** 30:5,19 195:16

**times** 24:23 53:16 72:1 83:5 161:22 181:6 200:8 235:10, 13 238:13,14, 19

**title** 10:20,24

**titled** 48:9 50:13

**today** 9:8 10:1 19:14 20:13 29:3 36:16 39:19 46:13 47:21 52:6 59:22 62:1 73:14 76:14 77:16 80:5 87:7 90:10 92:22 96:23 97:13 110:12 114:24

115:13 116:24 138:9,22 155:9 156:8,13 160:4, 23 163:5 165:11 179:14 193:24 195:10 196:17 206:11 208:12,13 214:13 230:4

**today's** 111:23 120:11 122:4,8

**told** 68:17,19 70:16,21 71:13 74:21,24 83:16 84:14 126:6 133:5 147:17, 24,25 148:13 149:7,20 156:2, 9,14 158:11 168:19 169:5, 22 170:5 171:1 174:9 175:6,20 179:11 180:10, 14 181:3 188:24 189:2 192:6 193:22 194:3 198:16, 18 202:5 218:3, 6

**tolerated** 89:18 104:8 105:2,20 106:13 107:6, 24 108:16 109:9

**Tom** 28:8 241:24

**Tommy** 197:7

**top** 36:24 49:14 50:22,23 176:24 181:25 216:20 221:23 226:25 240:19

**touch** 68:9 202:5

**touched** 225:9 235:7

**track** 52:12

**tracking** 216:9

tracks 53:17

trained 28:3

training 27:16, 17,18 28:6,15, 20,24 31:7

trainings 28:12

transcript 95:4 111:10

transcripts 24:25

transport 83:13 238:20

transported 83:5 177:16

transporters 84:2

trauma 78:5 186:3

travel 64:25

treatment 41:3,6 43:12 202:15

trial 12:6 28:15 46:17,18 70:6 71:12,16 72:5 81:21 151:6 163:1 170:21 172:18 173:1 177:5,16 178:14,17,21 185:13 186:23, 24 189:6 190:24 194:4 198:15,22 199:6,19 200:7, 25 201:12,14, 15 202:19 203:4 204:11 205:3,7,9,23 209:12 216:3 220:2 231:15 235:21,25 236:2,14 237:25 238:7, 11,12

trials 225:3

Trimble 139:4

Trimble's 139:3

trimmed 12:6

trip 209:2

Trooper 94:24

troopers 228:17,19

trouble 68:24

troubled 225:11

true 26:16 61:16 133:10 148:16 149:22 150:1,4,5,8,9 156:20,25 183:14 184:2 192:7 197:11 209:11 218:7 223:12 228:16

truth 8:5,6 183:12 209:15 212:3 226:13

truthful 61:6 70:18,21 209:16,20 210:1,3,15 212:3

truthfully 212:4,5

turn 29:8,12 111:10 112:22 121:12 145:9 221:9 240:18

turned 33:18, 20 37:4,10 50:2,10 51:10 127:17 129:9 131:5

turning 50:25 101:9

turnover 19:1

two-minute 149:1 206:6

two-year 137:22

type 43:9 63:20 65:25 78:5

89:15 99:1,2 104:5,24 106:4 116:3,6,18 118:10 185:23 211:1 225:15 230:17

typed 222:4,17

typically 21:8 57:23 62:9 69:2 167:5 170:20 208:13,24 211:24 216:13 230:11

——— U ———

U.N.I.T.E. 192:23 193:9

Uh-huh 54:16 72:23 73:21 101:11 132:15 146:19 148:15 222:21 223:21 235:9 236:19, 22

ultimately 37:12 159:8 219:23

unable 101:25 185:16 189:15

unavailable 185:12,15,16 189:4

unaware 138:10

uncommon 176:7 222:14

underlying 41:13,24 42:4 43:5 44:16 51:6 54:1 61:22 66:12 67:3 88:2,6,9,13 103:11 104:13 152:6 155:1

understand 9:17 14:2,4 54:12 158:10 163:7,9 187:4 214:17 217:6

understanding 61:14 90:22 116:24 117:2 119:3 153:4 189:11,14 213:14,23 219:20 220:22 223:1

understood 9:22 31:17 174:10

unduly 92:18

unethical 218:9

unfortunate 116:18

unit 121:23

University 11:8,15

unknown 92:18 187:15

unlucky 224:23

untrustworthy 226:5

unwritten 62:18,25

updated 26:4

upper 42:17

upset 70:3 175:3,4

utilize 230:8

——— V ———

vacate 36:15, 18

vacation 178:19

vehicle 78:4 91:20

verbal 9:13,14 35:20

verbatim 37:8

verification

71:20

verified 71:22 78:8 174:22

verify 83:3

versa 165:1

version 148:21 180:6

vibrates 27:9

vice 165:1

victim 213:16

victim's 161:11,21 162:8

victims' 162:1

view 96:17

viewed 97:14

vigilant 159:18

violate 212:7

violations 30:25

visit 68:20 86:14,18

visited 180:10

voice 161:3

volition 40:23

volunteering 28:7

——— W ———

wait 166:13 201:4 229:6,7 236:8

waited 154:6 174:5

waiting 154:2 208:3

waive 227:18, 19

waived 226:22 227:7,25

waiver 227:10

waives 18:17

**Walgreens** 71:6,23

walk 174:1,2

walking 124:8, 16

wanted 20:25 21:11 32:24 68:18 71:15,25 110:22 139:5 175:19 176:11 179:5 186:25 190:17 195:12 243:13

wanting 204:25 240:10

warrant 13:20, 23 14:7,15,18 15:4,9,10,16, 20,21 16:6,11, 13,23,24 17:2, 6,16,19 18:3,10 20:19 60:10 61:20 76:22 95:10 110:13 112:3 115:15, 23 118:6,8,14, 20,22,25 119:7, 8 122:5 189:10 193:15 206:24 226:20 232:14

warrants 60:2, 8 119:4

**Warren** 176:10

wasting 174:25

watches 63:21

ways 70:11 205:4

weather 199:20,21

week 151:6 178:15,17 199:19

weeks 172:1 205:7

**Wendell** 119:20

**Wesley** 43:25

**When'd** 11:9

**where'd** 11:11

white 189:16

**Whitley** 139:4 174:22 214:17

wife 201:16

**William** 10:8 17:16,19 19:9 20:8 23:1 48:3 53:23 58:13 60:3 70:15 71:7 72:18 121:5 146:3 150:22 151:6 154:10, 16 157:15 186:24 213:15

**Williams** 53:13 54:4 56:17 57:16 59:3 60:25 62:7 67:10 70:20 71:2 75:22 76:18 77:4 81:9 87:24 90:1,7 91:16 93:3 94:12 96:19 97:20 99:5 100:12 102:10, 18 103:6,18 109:16,21 114:19 125:8, 23 127:10,24 130:12,22 131:14,22 132:5 153:9 155:3 158:9 159:5

**Williamsburg** 11:17

**Wilson** 79:17 80:2,6,7 81:2,9, 13,14,23 82:12, 25 86:22 87:13 136:9 149:7 150:1 168:16 169:3,24 179:4 183:4 184:21 186:22 209:20 223:2,20,23 236:12 240:3

**Wilson's** 135:8,15 136:2, 17 179:7

winter 137:6 199:15

wire 175:11

wished 165:15

withdraw 31:6 43:8 46:8 57:18 58:2 80:25 81:10 91:12 101:3 114:7 128:15 142:16 155:24

withheld 45:24 46:3 163:25 164:3,6,9,13, 16,19 233:10

withhold 163:21

witnesses 23:6,11,18,19 29:13 38:8 41:3,6,11,24 43:13 48:19 62:11,19 63:1,3 66:4 67:3,20,23 72:1 77:8 79:14 86:20 87:10 88:2,5,9,13,25 89:5,9 103:13, 23 106:2,20,23 146:7 149:16, 20 158:3,14 172:17,25 189:8 197:14, 18,22 198:15, 22 205:5,9 209:12 212:21 213:2,5,11 222:15,19 225:11,12,17 230:9 237:20, 24 238:6,12

wording 222:10

words 46:8 148:18

work 116:18 178:21 204:12

worked 46:7 165:8 166:18 193:6,9 228:17

working 14:25 18:24 26:17 165:3 192:23 193:4

workload 12:6

works 207:18

worse 116:21

worst 118:2

would've 12:11,14,15,20 15:16 16:3 21:12 25:19,22, 24 26:22 27:1,6 28:2,10 33:19, 21 37:5,6,10, 13,15 50:1,5,21 51:10 55:5 60:19 66:23 69:1 77:12,18, 19,25 80:10,18 81:5 86:7 89:20 99:7 102:13 104:10 105:4, 19,22 106:12, 15 107:5,8,23 108:1,15,18 109:8 110:22 112:9,15 115:1 120:16 121:1,9 126:14,16,19, 25 137:19 139:2 141:17 144:20,25 154:5 162:5 169:7 171:22 172:2 180:13 188:19 190:4 198:4,20 203:1, 19,22 208:10 210:8 216:5 221:23 222:3,4, 9,11,17 223:23 224:9 241:23 242:16,19 243:3,4

wreck 78:11,20 185:21,24

**Wright** 8:21 9:3 13:25 16:8,21

19:10 21:4 24:1,16 25:8,14 26:19 27:2,8, 11,13 29:15 30:10 31:2 35:8 36:8 39:10 40:10,18,24 43:7 45:15 46:25 49:9 50:19 51:7,17 53:12 54:3 55:1,6 56:19 57:15 58:11,15, 20 59:2,13,24 60:6,14,18,24 61:7,18 62:6 67:9,16 70:19 71:1 73:3 74:1, 3 75:11,21 76:8,17 77:3 87:21 90:6,19 91:15 92:11,19 93:2,14 94:11 96:18 97:3,19 98:8,21 99:4,13 100:2,11 101:14 102:9, 17 103:4,16 109:23 110:6, 17,24 111:6,14 112:5,11,16,24 113:6,14,21 114:4,12,21 115:19 116:2,4, 8,14 120:20 121:6 122:20 123:7,13,21 124:2,10 125:5, 13,22 126:13 127:8,23 128:5, 11 129:1,16,22 130:3,10,20 131:2,12,23 132:4 133:1,23 134:6,15,21 135:2,10,17 136:6,15 137:18 139:13 140:10,21 141:13 142:5, 23 143:22 144:10,17 145:6,15 146:9, 23,25 147:3,7, 12 148:4,17 149:5,11,23

150:15 153:8
155:4,17
157:24 158:7
159:3,12 160:7
166:2,5,6,7,25
167:22 168:2,3
170:11 179:15,
20,25 180:3
183:16,19,23
184:4,8,18
206:3,9 214:6,
10 217:18
225:9 235:7
236:4 237:1,16
239:15,18,22
241:6,9,13,17

**write** 159:17

**writing** 147:1
210:24 222:8,
16

**written** 61:15
62:18,25 82:5
152:12 211:2
221:23 241:11

**wrongfully**
117:19,23

**wrongs** 221:6

**wrote** 139:4

———————
**Y**
———————

**yard** 173:25

**year** 12:11 62:2
66:21 119:23
162:13 239:1

**years** 11:1
14:25 55:16
137:16 138:3
142:12,21
143:20 172:24
187:10 208:11
212:2 220:23,
25 241:23,24

**years'** 214:18

**yesses** 222:2

**York** 14:21
15:2 17:8,24
18:9 23:9,22
25:9 26:13,21

27:6 37:24
40:6,15,21
48:16 59:22
60:5,7 69:13
70:13 71:4
73:2,25 74:8
82:13,15 84:8
85:5,23 86:8,
12,16 92:23
93:9 94:22
96:24 97:13,17
98:3,6,12 99:9,
18 100:20
108:5,9,13
110:3,14
111:24 112:2
116:7 120:11
122:5,8 124:4,
18 125:1 137:1
138:15,19,21,
24 142:8
143:12 148:2
149:3 153:16
163:24 164:21
165:7,13,16,19,
22 166:8,10
168:4 170:6
172:4 174:21
180:10 181:15,
18 183:6 185:9,
10 187:16
188:2,4 193:18
194:23 201:1,
16,21 202:3
206:16 222:3,
18 223:2,9
224:3,10
229:24 231:8
232:6 240:9,24

**York's** 14:22,
24 26:9 43:22
70:24 95:4
116:11 119:14,
17 123:3
146:22 165:6
169:23 195:8

**young** 221:2

**Yup** 91:24

———————
**Z**
———————

**zoned** 158:19