IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF KENTUCKY, LONDON DIVISION

| | | |
|---|---|---|
| AMANDA HOSKINS and JONATHAN TAYLOR, | ) ) | |
| | ) | Case No. 17-CV-84 |
| Plaintiffs, | ) | |
| | ) | Hon. ROBERT E. WEIR |
| v. | ) | |
| | ) | Mag. HANLY A. INGRAM |
| KNOX COUNTY, ET AL., | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendants. | | |

# **<u>EXHIBIT 18</u>**

NO. 17-CV-84

# AMANDA HOSKINS, ET AL.

V.

# KNOX COUNTY, ET AL.

**DEPONENT:**

**JACKIE JOSEPH**

**DATE:**

**July 24, 2018**

IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN

DISTRICT OF KENTUCKY

NO. 17-CV-84

HON. DAVID L. BUNNING

HON. CANDACE J. SMITH


AMANDA HOSKINS, ET AL.,

PLAINTIFFS


V.


KNOX COUNTY, ET AL.,

DEFENDANTS


DEPONENT:   JACKIE JOSEPH

DATE:       JULY 24, 2018

REPORTER:   LACEE TOWNSEND

Page 2

```
1              APPEARANCES
2
3   ON BEHALF OF THE PLAINTIFFS, AMANDA HOSKINS, ET AL.:
4   ELLIOT SLOSAR
5   AMY ROBINSON STAPLES
6   LOEVY & LOEVY
7   311 NORTH ABERDEEN STREET, THIRD FLOOR
8   CHICAGO, ILLINOIS 60607
9   TELEPHONE NO.: (312) 243-5900
10  (VIA TELEPHONE)
11
12  ON BEHALF OF THE DEFENDANTS, BRIAN JOHNSON, MARK
13  MEFFORD, JACKIE JOSEPH, AND DALLAS EUBANKS:
14  SHAWNA KINCER
15  CODY WEBER
16  KENTUCKY STATE POLICE GENERAL COUNSEL
17  919 VERSAILLES ROAD
18  FRANKFORT, KENTUCKY 40601
19  TELEPHONE NO.: (502) 573-1636
20
21
22
23
24
25
```

Page 3

```
1         APPEARANCES CONTINUED
2
3   ON BEHALF OF THE DEFENDANTS, JASON YORK AND TROOPER
4   BUNCH:
5   DERRICK WRIGHT
6   STURGILL, TURNER, BARKER & MOLONEY, PLLC.
7   333 WEST VINE STREET, SUITE 1500
8   LEXINGTON, KENTUCKY 40507
9   TELEPHONE NO.: (859) 255-8581
10
11  ON BEHALF OF THE DEFENDANTS, MIKE BROUGHTON AND CITY OF
12  BARBOURVILLE:
13  ALEXANDRA DEMOSS-CAMPBELL
14  WARD HOCKER THORNTON
15  333 WEST VINE STREET, SUITE 1100
16  LEXINGTON, KENTUCKY 40507
17  TELEPHONE NO.: (859) 422-6000
18
19  ON BEHALF OF THE DEFENDANTS, JOHN PICKARD AND DEREK
20  EUBANKS:
21  JASON WILLIAMS
22  WILLIAMS FARMER & TOWE
23  303 SOUTH MAIN STREET
24  LONDON, KENTUCKY 40741
25  TELEPHONE NO.: (606) 877-5291
```

Page 4

```
1                INDEX
2                     Page
3   DIRECT EXAMINATION BY MR. SLOSAR         6
4   CROSS EXAMINATION BY MR. KELLY         172
5   EXAMINATION BY MS. DEMOSS-CAMPBELL       176
6
7               EXHIBITS
8                     Page
9   1 TRAINING RECORDS              14
10  2 JURY TRIAL TRANSCRIPT          179
11  3 YORK CRIME SUPPLEMENT REPORT      29
12  4 KSP CRIMINAL FILE            78
13  5 PICKRELL REPORT             66
14  6 DAVE FOX AUDIO INTERVIEW        118
15  7 2011 POLICIES AND PROCEDURES     152
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
1                STIPULATION
2
3   The deposition of JACKIE JOSEPH taken at the HOLIDAY INN
4   EXPRESS & SUITES, 506 MINTON DRIVE, LONDON, KENTUCKY
5   40741 on TUESDAY, the 24TH day of JULY 2018 at
6   approximately 10:00 a.m.; said deposition was taken
7   pursuant to the FEDERAL Rules of Civil Procedure.
8
9   It is agreed that LACEE TOWNSEND, being a Notary Public
10  and Court Reporter for the State of INDIANA, may swear
11  the witness.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

1    PROCEEDINGS
2       COURT REPORTER: Will you raise your right
3    hand? Do you solemnly swear or affirm that the
4    testimony you're about to give will be the truth,
5    the whole truth, and nothing but the truth?
6       THE WITNESS: I do.
7       COURT REPORTER: Thank you.
8          DIRECT EXAMINATION
9    BY MR. SLOSAR:
10      Q    Good morning, Ms. Joseph.
11      A    Good morning.
12      Q    Have you ever given a deposition before?
13      A    Yes.
14      Q    Okay. When was the last time you gave a
15   deposition?
16      A    I don't know. It's been years. Probably nine
17   or ten years.
18      Q    Do you know what kind of case that was in?
19      A    It was an accident, whenever I worked in Perry
20   county. Not long –
21      Q    Were you a witness?
22      A    I was the trooper that investigated an
23   accident, and it ended up being a civil suit. So I
24   testified, or I gave a deposition, for the civil suit.
25      Q    Okay. I'm going to go over some of the rules

Page 7

1    before we get started. Is that okay with you?
2       A    Yes.
3       Q    And I know that things are going to be a bit
4    challenging because I'm doing this over the phone. So I
5    apologize in advance. But if, I don't ask questions
6    perfectly, so if I ask you a question and you don't
7    understand it, please just let me know and I'll ask it a
8    better way; is that all right?
9       A    Yes, sir.
10      Q    Okay. And in the same respect, if there is a
11   question that I ask you and you answer it I'm going to
12   assume that you understood what was being asked; is that
13   fair?
14      A    Yes, sir.
15      Q    There are a number of lawyers today,
16   including, I'm assuming, two of them who are there in
17   your behalf, Ms. Kincer and Mr. Weber. You know the
18   attorneys have the ability to make objections, including
19   your counsel. I'm just going to ask that you allow for
20   them to make their record before you answer the
21   question; is that okay?
22      A    Yes, sir.
23      Q    Okay. There's no judge here today to
24   determine whether those objections are valid, so in
25   almost every instance you'll still answer the question

Page 8

1    unless your attorneys instruct you not to; is that all
2    right?
3       A    Yes, sir.
4       Q    Okay. At any point in time you want to leave
5    to go speak to your counsel or use the restroom or get
6    something to eat, please let me know and I'd be happy to
7    take a break, okay?
8       A    Okay.
9       Q    The only thing that I'll ask is that if
10   there's a question pending, that you answer the question
11   before you take your break; is that fair?
12      A    Yes, sir.
13      Q    Okay. All right. What is your full name?
14      A    Jacqueline Joseph.
15      Q    And Ms. Joseph where did you go to high
16   school?
17      A    Whitesburg.
18      Q    Where is that at?
19      A    It's in the city of Whitesburg.
20      Q    Is that in Kentucky or Tennessee?
21      A    Oh, no, it's in Kentucky. It's in Letcher
22   County.
23      Q    Okay. All right. Sorry about that. After –
24   well, what year did you graduate high school?
25      A    1998.

Page 9

1       Q    After graduating high school in 1998, did you
2    receive any additional education?
3       A    Yes, I went to college.
4       Q    Where did you go to college at?
5       A    I went to Southeast Community College.
6       Q    And did you graduate from there?
7       A    I did not go through a graduation exercise.
8       Q    Okay. After leaving college what did you do
9    next?
10      A    I went to the state police academy.
11      Q    What year did you start at the state police
12   academy?
13      A    2002.
14      Q    What made you want to be a police officer?
15      A    Well, it's kind of a goofy answer, but when I
16   was in high school a lady came and spoke to my class and
17   she said that when you're picking your career you should
18   pick something that you would be willing to do for free.
19   She said, so imagine yourself working in, like, an old
20   western town, or living in a western town where the
21   doctor got paid with eggs and you traded cows for
22   services and stuff like that. And she said you should
23   pick something that you'd be willing to do and not get
24   money for. And so I felt like being a police officer
25   would be the thing that, it was the right thing to do.

Page 10

1  I'm a peacemaker. I feel like I'm a civil servant at
2  heart and I spend pretty much most of my life and most
3  of my time serving people, so it just felt like a
4  natural fit. Of course, if I want to go into law
5  enforcement I want to be the best, so I become a
6  Kentucky State trooper.
7     Q   Have you ever applied to be a law enforcement
8  officer at any other agency?
9     A   Absolutely not.
10    Q   Sounds like you love being a Kentucky State
11 police officer; is that fair?
12    A   That's correct.
13    Q   Now, I believe you talked about a few minutes
14 ago that you went to the academy in 2002; is that right?
15    A   That's correct.
16    Q   How long was the academy at that time?
17    A   I started March the 3rd, 2002. I graduated
18 August the 2nd, 2002.
19    Q   I'm not great with math, but what's the
20 academy, approximately four months long? Does that
21 sound right?
22    A   No, it was six months.
23    Q   Six months. I am terrible at math. Were you
24 going to the academy every week during that six-month
25 time period, or where three weeks that you did not have

Page 11

1  to attend?
2     A   You live at the academy.
3     Q   And where was the academy at?
4     A   It was on – well, it's at the – where the
5  Kentucky State Police headquarters is currently located.
6  It's on Versailles Road.
7     Q   Is that in Frankfort?
8     A   Yes, sir, it is.
9     Q   Now, after graduating the academy, what did
10 you do in your law enforcement career?
11    A   I was assigned to the Morehead post.
12    Q   And would you have been assigned to the
13 Morehead post sometime in the summer of 2002?
14    A   I graduated the academy on August the 2nd and
15 I became a trooper at that point. I was no longer a
16 cadet, so, and then my assignment was officially made to
17 Morehead. So I would begin working for Morehead
18 immediately from leaving the academy. So that would
19 have been August of 2002.
20    Q   What was your original position at Morehead?
21    A   Trooper.
22    Q   And how long were you – did Morehead have a
23 post number assigned to it?
24    A   8.
25    Q   Okay. How long were you a trooper at Post 8?

Page 12

1     A   For approximately two years.
2     Q   In 2004, what happened next in your career
3  with KSP?
4     A   I was interviewed for a position at the
5  Electronic Crime Branch in Frankfort, and I was
6  accepted.
7     Q   Do you recall who interviewed you?
8     A   I do not.
9     Q   And what type of crimes did you investigate in
10 that position of KSP?
11    A   I investigated electronic crime, and most – I
12 was on a federal task force for Internet crimes against
13 children.
14    Q   How long did you do that assignment for?
15    A   Until I was – until I went back to Hazard.
16    Q   When did you go to Hazard County?
17    A   It's not Hazard County. It's Perry County.
18 But it's the Hazard post.
19    Q   Okay. Sorry. When did you go to the Hazard
20 post?
21    A   I'm not positive on the year.
22    Q   Do you have an approximate year that you would
23 have gone to Hazard?
24    A   Well, I don't want to tell you something
25 that's wrong, but it would have been probably around

Page 13

1  2005, without looking at my transfer stuff.
2     Q   In 2005 what position would you have had at
3  the Kentucky State Police?
4     A   At Hazard, or Electronic Crimes?
5     Q   Hazard.
6     A   Whenever I went to Hazard I was a road
7  trooper.
8     Q   What post is Hazard affiliated with?
9     A   Hazard. Oh, are you asking for a number?
10    Q   Yeah, the number, yeah.
11    A   Okay. I'm sorry. Post 13.
12    Q   Okay. How long were you at Post 13 for?
13    A   Until 2009.
14    Q   What happened in 2009?
15    A   I promoted to sergeant.
16    Q   When you were promoted to sergeant, did you
17 receive any additional training from the Kentucky State
18 Police?
19    A   In addition to my 40 hours of required in-
20 service?
21    Q   Yes.
22    A   Yeah. Yeah. I always took more than what was
23 required.
24    Q   So I guess I'm asking a little bit of a
25 different question, which is, when you got promoted to

Page 14

1 become a sergeant, aside from doing your annual
2 additional training that all law enforcement are
3 required to do in Kentucky, did you receive any specific
4 training on how to be a sergeant?
5    A  Yeah.  Yeah, the first –
6    Q  What training?
7    A  In 2009 I went to a training at DOCJT, which
8 is a leadership class.  And then in 2010 I went through
9 the State Police Sergeant Academy.
10    Q  Is that called the Leadership Academy?  Ms.
11 Joseph, do you know if the 2010 course that you took, is
12 that called the Leadership Academy?
13    A  Yeah, I was trying to look to see what the
14 official name of it was.  In 2009, right after I was
15 promoted, I went to situational leadership for
16 supervisors and managers and that was in Richmond at the
17 DOCJT.  And then in 2010 I went to the State Police
18 Sergeants Academy and on here it's called Leadership
19 Academy.
20    Q  Okay.  And are you getting that information
21 from Exhibit 1, Bates stamped KSP574?
22    A  Is that it?  Yes, Exhibit 1.
23       (EXHIBIT 1 MARKED FOR IDENTIFICATION)
24    Q  Okay.  Now when you were promoted to sergeant,
25 what post were you assigned to?

Page 15

1    A  I wasn't assigned to a post.
2    Q  How did the sergeant – well, over – since
3 you weren't assigned to a post, what sort of –
4    A  I was –
5    Q  What were your responsibilities?
6    A  I was assigned to the Criminal Identification
7 and Records Branch, which is located in Frankfort.
8    Q  And how long were you assigned to that branch?
9    A  For one year.
10    Q  So is it fair to say that sometime in 2010 you
11 transferred out of that role?
12    A  Yes.  I – yeah.  It would have been around
13 August of 2010 I transferred from the Criminal
14 Identification and Records Branch and I went to the
15 Harlan post.
16    Q  What post number is associated with Harlan?
17    A  10.
18    Q  When you transferred to the Harlan post in
19 August of 2010, what was your title?
20    A  Sergeant.
21    Q  And as a sergeant did you have people in Post
22 10 that were under your supervision?
23    A  Yes, sir.
24    Q  And were you a detective sergeant at Post 10
25 in August of 2010?

Page 16

1    A  Yes, I was assigned to the investigations
2 squad.
3    Q  Okay.  What responsibilities did you have in
4 that capacity at Post 10?
5    A  I just supervised the detectives.  I think
6 that was – I think that's the only people that I
7 supervised.
8    Q  Okay.  So is it fair to say that by December
9 20, 2010 that your responsibility as a detective
10 sergeant was to supervise the detectives in that post?
11    A  Yes, that's correct.
12    Q  Okay.  Now, I'm looking over Exhibit number 1,
13 which is an unofficial transcript of your training as a
14 detective with KSP.  Prior to December 20th of 2010, had
15 you ever received outside training on how to conduct a
16 homicide investigation?
17    A  No.
18    Q  Prior to December 20, 2010 had you ever
19 received outside training on how to interrogate suspects
20 or witnesses in a homicide investigation?
21    A  I've had – I've had training that's not on
22 this list.
23    Q  What training do you recall having that's not
24 on this list?
25    A  I had two courses of Reid's [sic] Techniques

Page 17

1 of Interrogations and Interviews.  I've had forensic
2 interviews of children.  I've had – I mean just from
3 memory those are – those are three classes I know right
4 off the top that I've had.
5    Q  When did you take the first Reid School of
6 Interrogation course?
7    A  I had all of interview courses while I was at
8 Electronic Crime.  Those are outside trainings that were
9 paid for by grant money on that federal tax course
10 though, so it wasn't – I mean it was through – of
11 course, I was employed by the state police, but it was
12 paid for through grant money on a federal tax course.  So
13 I guess that's why our county doesn't have record of it
14 or whatever.
15    Q  So this would have meant – so you would have
16 gone to both Reid Schools for Interrogation Techniques
17 prior to 2005 when you were assigned to Post 13; is that
18 fair?
19    A  To the best of my memory, yeah.  I mean it's
20 not right in front of me so I can't tell you the exact
21 date, but I'm positive that I went through Reid's and
22 I'm positive that I went through the forensic interview
23 course.
24    Q  Okay.  What did you learn at Reid?
25    A  Reid's was a lot about reading body language,

Page 18

1  and a line of questioning, how to detect possible
2  deception during interviews, things along that line.
3      Q   Did you apply any of the techniques that you
4  used or learned from the Reid School of Interrogation as
5  a officer for the Kentucky State Police?
6      A   When I was a detective I used them a lot.  And
7  even as a road trooper I've become a drug recognition
8  expert where I had some additional training on, on like,
9  roadside interviews for drug detection.  So I used – I
10  used most of it then, just on the side of the road.
11      Q   In the academy were you – did you receive any
12  training there on how to conduct a homicide
13  investigation?
14      A   We received basic crime scene investigation
15  training.  So, you know, in the academy I learned how to
16  look for fingerprints.  They talked a little bit about
17  blood spatter and processing evidence.  And I mean you
18  work – you work most cases pretty much the same.  You
19  know, sometimes there's a body in them and sometimes
20  there's not, but we still operate the same way as far as
21  collecting evidence, and taking statements, and stuff
22  like that.
23      Q   Did you receive any training at the Kentucky
24  State Police Academy on how to conduct a line-up?
25      A   I don't recall any training like that.

Page 19

1      Q   Did you receive any training at the Kentucky
2  State Police Academy on how to conduct a photo
3  identification?
4      A   I don't – I don't recall anything like that.
5  Not specifically.
6      Q   Did you receive any training at the Kentucky
7  State Police Academy on how to interrogate suspects or
8  witnesses?
9      A   I do not recall any.  I don't recall that,
10  either.
11      Q   Did you have any or receive any training at
12  the Kentucky State Police Academy on what information
13  should be included in a police report?
14      A   We would have reviewed the policy because we
15  had a block every day of policy.  So we would have went
16  over the policy that was in effect at that time, as far
17  as case files and stuff.  But I mean that's been 17
18  years ago, so most I don't – I don't recall exactly
19  what the policy was then.
20      Q   Okay.
21      A   Back then we wrote – we handwrote cases, so
22  thing have changed.
23      Q   Yeah, things have –
24      A   Things have changed a lot.
25      Q   Yeah.  Now have you been a party to a lawsuit

Page 20

1  prior to this litigation?
2      A   Can you clarify?
3      Q   Sure.  Have you ever been, and I'm not talking
4  – I know that there were some documents disclosed in
5  this case relating to, you know, your personal
6  relationship, and so I'm not asking you about that.
7      A   Okay.
8      Q   But have you ever been a plaintiff or a
9  defendant in a lawsuit aside from the case that you're
10  testifying in today?
11      MS. KINCER:  Besides Anderson, have you been
12  named in any type of lawsuit?
13      A   Well, there's the one pending.
14      MS. KINCER:  Anderson.
15      A   Okay.  So besides the two that's right now
16  pending, is that what you're asking?
17      Q   Yes.
18      A   Okay.  No.
19      Q   Okay.
20      A   I've had a few divorces.
21      Q   Have you ever been in the military?
22      A   No, sir.
23      Q   What training did you receive at the Kentucky
24  State Police Academy on interviewing witnesses in a
25  homicide investigation?

Page 21

1      A   I don't recall.  I don't recall if we had
2  anything like that.  I mean that's – I remember things
3  like the day we got our fingerprint kit.  Like, I
4  remember that.  And I remember the day we got our
5  cameras where we practiced taking pictures with old
6  roll, like film, we had, like, actual rolls of film that
7  we practiced taking pictures with.  So I mean, like, I
8  can remember stuff like that, but I don't remember
9  specific – we had a class called "verbal judo" which
10  was how to talk to people that are in an elevated state,
11  like they're in crisis or they're upset, how to talk to
12  people like that.  But as far as anything specific about
13  interviews, I don't – I don't recall anything like that
14  from the academy.
15      Q   Okay.  Is it fair to say that the courses you
16  took at the academy dealt with basic law enforcement
17  procedures?
18      A   Yes, I'll agree with that.
19      Q   Okay.  Do you recall any training at the
20  academy that specifically related to conducting a
21  homicide investigation?
22      A   Is that a different question?
23      Q   Yes.
24      A   Well, can you repeat it again?
25      Q   Sure.  Do you recall any training at the

Page 22

1 police academy that was specifically related to
2 conducting a homicide investigation?
3    A    I don't recall anything that was specific to
4 homicides. I only remember basic crime scene
5 investigation.
6    Q    Did you receive any training at the Kentucky
7 State Police Academy relating to the Supreme Court case
8 called Brady versus Maryland?
9    A    I don't recall if that was taught in the
10 academy.
11    Q    Sitting here today, do you know what Brady
12 versus Maryland requires police officers to do?
13    A    Brady versus Maryland requires prosecutors to
14 turn over exculpatory evidence to the defense, I think.
15 I'm not positive.
16    Q    Sure. Does Brady versus Maryland, in your
17 understanding, does Brady versus Maryland require police
18 officers to turn over exculpatory, or impeachment
19 evidence, to the prosecutors?
20        MR. WRIGHT: Object to form. Foundation. Go
21    ahead, best you can.
22    Q    You can answer.
23    A    Okay. I still answer it, okay. No, my
24 understanding, just – I mean, of course, I'm not an
25 attorney, because I've never been to law school. My

Page 23

1 basic understanding of it is that it requires
2 prosecutors to turn over exculpatory evidence to the
3 defense.
4    Q    And Ms. Joseph, what is your current position
5 at the Kentucky State Police?
6    A    I'm a lieutenant.
7    Q    When were you promoted to a lieutenant?
8    A    In 2016.
9    Q    Between 2010 and 2016 were you a detective
10 sergeant at Post 10?
11    A    What were the dates again?
12    Q    December 2010 – well, actually, I'm sorry.
13 Let me withdraw that.
14    A    Okay.
15    Q    Between August of 2010 and 2016 were you a
16 detective sergeant in Post 10?
17    A    Not for that entire time, no.
18    Q    Okay. When in your career did you stop being
19 a detective sergeant in Post 10?
20    A    I went to driver testing and I – I don't
21 recall the dates that I went to driver testing.
22    Q    What's driver testing?
23    A    It's the section in our agency that gives
24 driving tests to teenagers or people who've lost their -
25 - lost their license.

Page 24

1    Q    Do you recall what year you would have went
2 there?
3    A    I'm not positive. I don't know for sure
4 without looking at a transfer log.
5    Q    After – how long were you in driver testing
6 for?
7    A    A year.
8    Q    And after driver testing what did you do next
9 at KSP?
10    A    I got promoted while I was at driver testing.
11    Q    And what did you get promoted to?
12    A    Lieutenant.
13    Q    Okay. And that was in 2016; is that right?
14    A    Yes.
15    Q    Okay. And prior to 2016 you were in driver
16 testing for approximately a year; is that right?
17    A    That's correct, yeah. I just can't remember
18 the date.
19    Q    Okay. Is it fair to say that sometime in 2015
20 you were in the driver testing unit of the Kentucky
21 State Police?
22    A    Yes.
23    Q    Prior to being transferred to the driver
24 testing unit at the Kentucky State Police, where were
25 you at?

Page 25

1    A    I was a sergeant at Post 10.
2    Q    Is it fair to say that you were a sergeant at
3 Post 10 beginning in 2010 and ending either in 2014 or
4 2015?
5    A    To the best of my memory. I don't have a
6 transfer log in front of me, so – but, yeah, that's
7 approximately how long I was there as a detective
8 sergeant.
9    Q    Okay. Between December 20, 2010 and March 8,
10 2012, did your role as a detective sergeant in Post 10
11 change?
12    A    No.
13    Q    Between December 20, 2010 and March of 2012
14 were you a supervisor in Post 10?
15    A    Yes. The only time that I didn't – I need to
16 clarify that. The only time that I wasn't there as a
17 supervisor was whenever I attended SPI.
18    Q    And what is that?
19    A    The Southern Police Institute. It's located
20 in Louisville and it's an executive-level leadership
21 course, and it last like four months or something.
22    Q    Is that the – is that course held at U of L?
23    A    It is, yes, sir.
24    Q    Have you ever taught at that course?
25    A    No. I was not an instructor, no.

Page 26

1    Q. Okay. Is it fair to say that between December
2  20, 2010 and the time that you were transferred out of
3  Post 10 in approximately 2014 or 2015, that you were a
4  supervisor of detectives at that post?
5    A. Yes. That was the only assignment that I held
6  in the state police during that time period, with the
7  exception of the time that I was gone to SPI.
8    Q. Okay. Between December 20, 2010 and March 8,
9  2012 did you supervise Detective Jason York?
10   A. I did, yes, sir.
11   Q. Between December 20, 2010 and March 8, 2012
12  did you supervise Detective Mark Mefford?
13   A. Yes, I did. Yes, sir.
14   Q. Between December 20, 2010 and March 8, 2012
15  did you supervise Detective Brian Johnson?
16   A. I'm not sure what dates that Brian Johnson
17  started as a detective. But once he was made detective
18  I did supervise him.
19   Q. Okay. Between December 20, 2010 and March 8,
20  2012 did you supervise Kelly Ferris?
21   A. Yes, I did.
22   Q. Between December 20, 2010 and March 8, 2012
23  did you supervise Detective Jason Bunch?
24     MR. WRIGHT: Object to form. Foundation.
25   A. I've never supervised Jason Bunch.

Page 27

1    Q. Why is that, Ms. Joseph?
2    A. Because he – he wasn't in my – in my chain.
3  He wasn't in my squad.
4    Q. Do you know what squad he was in in –
5    A. He's a trooper.
6    Q. – 2012? Okay. So Jason Bunch, to your
7  knowledge, has never been a detective?
8    A. Jason Bunch has not ever been a trooper – I
9  mean, a detective.
10   Q. Okay. To your knowledge has Dallas Eubanks
11  ever been a detective at KSP?
12   A. Dallas Eubanks has never been a detective.
13   Q. Okay.
14   A. Unless that's what his current title is. He's
15  a K-9 handler and sometimes when they go to special ops
16  they change their title. But as far as while I was
17  there as a sergeant at Post 10, Dallas Eubanks was never
18  assigned to me as a detective.
19   Q. Okay. Now, between December 20, 2010 and the
20  time that you left Post 10 in 2014 or 2015 to go to the
21  driver and testing academy, were you the supervisor of
22  Detective Jason York?
23   A. Can you repeat that?
24   Q. Sure. Between December 20, 2010 and the time
25  that you left Post 10 in 2014 or 2015, were you

Page 28

1  Detective York's supervisor?
2    A. Yes.
3    Q. Between December 20, 2010 and the time that
4  you left Post 10 in 2014 or 2015, were you Detective
5  Mefford's supervisor?
6    A. Jason York promoted around that time and I
7  don't know the exact date. I don't know if it was
8  before I left or about the same time that I transferred
9  out, and so did Mark Mefford. So I don't – as far as
10  their dates I – I can't say what their dates were,
11  because they were no longer there at Post 10. But while
12  they were at Post 10 as a detective, I was their
13  supervisor, unless they continued to be a detective
14  after I left and then they would have had somebody
15  different, or if they left before I did. I just don't –
16  - I don't remember.
17   Q. Between December 20, 2010 and the time that
18  you left in 2014 or 2015, were you the supervisor for
19  Detective Brian Johnson?
20   A. While he was assigned to Post 10 as a
21  detective. But I think during that time he was also a
22  trooper and he ultimately went to Electronic Crime. And
23  so there's possibly time periods in there where he was
24  not assigned to me.
25   Q. Okay. Is it fair to say that between December

Page 29

1  20, 2010 and the time that you were transferred to
2  Electronic – oh, wait. I'm sorry. Let me withdraw
3  that question. Is it fair to say that between December
4  20, 2010 and the time that you were transferred to the
5  driver testing school in 2014 or 2015, that you were the
6  supervisor of all detectives at Post 10 the Kentucky
7  State Police Department?
8    A. Just to clarify, I was not ever transferred to
9  a school. I was the supervisor over a region.
10   Q. Okay. I appreciate that distinction. I'm
11  sorry.
12   A. Okay.
13   Q. But between December 20, 2010 and the time
14  that you were transferred to a different section in 2014
15  or 2015, were you the supervisor of all detectives at
16  Post 10?
17   A. Yes, sir, I was.
18   Q. Okay. Now, Ms. Joseph, I'm going to ask that
19  you look at Exhibit number 3. It's a Kentucky State
20  Police report that was drafted by Detective York on
21  March 19, 2013. Do you have that before you?
22     (EXHIBIT 3 MARKED FOR IDENTIFICATION)
23   A. I do.
24   Q. Okay. Have you seen this document before
25  today?

Page 30

1     A   I don't recall.

2     Q   Okay.  Did you -- I'm going to ask you a

3   couple of questions about what you did to prepare for

4   today's deposition.  I don't want you to tell me any

5   information about conversations that you may or may not

6   have had with your counsel.  Did you review any

7   documents prior to today's deposition?

8     A   Yes.

9     Q   Okay.  What documents do you recall reviewing?

10    A   Okay.  The answers to interrogatories.

11    Q   Okay.  Aside from your interrogatory

12   responses, what else did you review?

13        MS. KINCER:  Did you review anything else?

14        THE WITNESS:  Not really.

15        MS. KINCER:  Your personnel file?

16        THE WITNESS:  Not really.

17        MS. KINCER:  Your training records?

18        THE WITNESS:  No, not really.

19        MS. KINCER:  Policies?

20        THE WITNESS:  I looked at my training record.

21        MS. KINCER:  Okay.

22        THE WITNESS:  I did look at that.  And I read--

23   BY MR. SLOSAR:

24    Q   All right.

25    A   Yeah, I read over policy.

Page 31

1     Q   So besides your training records and the

2   interrogatories, do you recall reviewing any other

3   documents to prepare for today's deposition?

4     A   I read through a couple of policies last

5   night.

6     Q   Do you recall the names of those policies?

7     A   I read the case review policy because it

8   changed in 2017.  It was a new -- a new policy and so I

9   was just re- --

10    Q   And which policy was that?

11    A   The case review.

12    Q   Case review.  Okay.  So it changed in 2017,

13   you said?

14    A   Yes, sir.

15    Q   The case review policy that you're talking

16   about, is that --

17    A   OMC1.

18    Q   -- the policy that's stamped Criminal

19   Investigations and Reports?

20    A   It's OMC1.

21    Q   OMC1.  Okay.  OMCC1 [sic], right?

22    A   Yeah, OMC1.

23    Q   Okay.

24    A   I think.

25    Q   I just wanted to make sure we're talking about

Page 32

1   the same thing.  All right.  So looking at Exhibit

2   number 3, prior to today's deposition, have you ever

3   seen this document?

4     A   I don't recall.

5     Q   Okay.  Will you take a moment to review the

6   narrative and then let me know when you're finished?

7     A   I read it.

8     Q   Okay.  All right.  So according to this

9   report, Detective York states that he approached you and

10   requested assistance in the underlying investigation

11   into Katherine Mills' death; is that correct?

12    A   That is correct, he did.

13    Q   Okay.  And do you recall having a conversation

14   with Detective York about the investigation into

15   Katherine Mills' death?

16    A   About the investigation or about this issue

17   here?

18    Q   Well, let's start with the investigation check

19   line.

20    A   Okay.

21    Q   Did you ever have conversations with Detective

22   York about the investigation into Ms. Mills' death?

23    A   I do not recall specific conversations with

24   him.

25    Q   Do you recall having conversations with any

Page 33

1   other officers relating to the investigation into the

2   death of Katherine Mills?

3     A   I don't -- I don't recall specific

4   conversations.  Like, this narrative here that I read, I

5   do remember having this conversation with Detective

6   York, so, obviously, we've discussed the case.  But as

7   far as recalling from memory of having conversations, I

8   don't recall any of them.

9     Q   What do you recall about the conversation in

10   March of 2013 between yourself and Detective York

11   relating to the investigation of Katherine Mills' death?

12    A   Are you asking specifically about the

13   narrative on this supplement?

14    Q   Yes, ma'am.

15    A   Okay.  He, Detective York came to me and was

16   frustrated because he was trying to get a supplement

17   about an interview that Detective Mike Cornett had

18   conducted, and he was not able to get a copy of it.  And

19   he was wanting me to try to get Mike to either do a

20   supplement about it, or do something to add to the case

21   with it.

22    Q   Was Detective Cornett under your supervision

23   at Post 10 prior to March 19, 2013?

24    A   Yes, he was.

25    Q   Okay.  And I believe you just expressed that

Page 34

1  Detective York shared some frustration relating to a
2  report from Mr. Cornett that he did not yet have; is
3  that right?
4      A   That is correct.
5      Q   Okay.  Did Detective York tell you why he
6  needed that report?
7      A   I don't recall that.  I just -- I recall that
8  he wanted a supplement from Detective Cornett, and he
9  wanted me to talk to Detective Cornett about having it
10 added to the case.
11     Q   What did you do after Detective York made this
12 request?
13     A   I brought Detective Cornett in and asked him
14 where the supplement was, and told him he needed to get
15 one done.  And then I followed up a few weeks later,
16 because it still hadn't made it into the case jacket,
17 and I counseled him on it.  I gave him a verbal
18 counseling.
19     Q   What does that mean, Mr. -- I'm sorry, I'm
20 sorry.  What does that mean, Ms. Joseph?  Sorry about
21 that.
22     A   That means that he hadn't -- he hadn't done
23 something that I asked him to and I counseled him about
24 it.
25     Q   Is that some form of discipline?

Page 35

1      A   Yes.
2      Q   Now did Mr. Cornett tell you why he did not
3  create a report?
4      A   I don't recall what his explanation was.  I
5  just recall telling him that he needed to get it done,
6  and then it didn't get done, and then I brought him in
7  and counseled him for not doing it.  And then, at that
8  time Detective Cornett had been a detective for many
9  years, and he was, I don't want to say that he was burnt
10 out, but I would -- I would say that this quality of
11 cases was starting to diminish, and he wasn't the
12 statement detective that he was in the beginning.  And
13 ultimately what ended up happening was, we put him back
14 into uniform and back on the road.  He -- he started
15 having some problems, like some medical problems, like
16 some health issues and stuff like that.  In one
17 conversation, whenever I brought him into counseling, he
18 told me that he had seen all the dead babies that he
19 could stand.  And he just wasn't comfortable being a
20 detective anymore.  So there was -- there was some
21 issues there that we addressed.  And he ultimately was
22 no longer a detective, and worked the remaining years of
23 his career as a road trooper and he is now retired.
24     Q   Do you recall approximately what year it was
25 that Mr. Cornett was demoted?

Page 36

1      MR. WRIGHT:  Object to form.  Foundation.
2      A   I do not recall.
3      Q   Now what steps did you take to make sure that
4  Detective Cornett drafted a report?
5      A   Well, he didn't get demoted, because being a
6  detective is not a promotion.  It's just an assignment.
7  So he was just reassigned to a different squad.  But as
8  a supervisor, whenever he didn't turn in the supplement,
9  I counseled him for it.
10     Q   Sure.  But after the -- did you take any steps
11 to make sure that he actually created the supplement?
12     A   I don't recall.  I don't recall what happened
13 after that.
14     Q   Did you ever review the supplement?
15     A   I don't recall.
16     Q   How, sitting here today, do you know whether
17 Detective Cornett ever actually completed a supplement?
18     A   I do not know.
19     Q   I know earlier you testified that going from a
20 detective back to patrol wasn't a demotion; is there a
21 pay increase at the Kentucky State Police for becoming a
22 detective?
23     A   No, there's not.
24     Q   Okay.  So is it fair to say that patrol
25 troopers could make the same amount of money as

Page 37

1  detectives?
2      A   Could you ask it again?
3      Q   Sure.  So is it your testimony that patrol
4  officers make the same, could make the same amount of
5  money as detectives?
6      A   Well, we all make different pay.  Mike
7  Cornett's been on, he probably worked 25 years, if not
8  longer.  So even as a road trooper he was making more
9  than what detectives would have.  So I mean depending on
10 what year you came on, and how -- where you were at, if
11 we ever got a pay raise or anything like that, you know,
12 your pay would be different.  But going from trooper to
13 detective, or detective to trooper, there's no pay
14 difference.  Your pay stays the same.  The only -- the
15 only difference is the title before your name.
16     Q   Why did you take steps to assist Detective
17 York in obtaining a supplement from Detective Cornett?
18     A   Excuse me?
19     Q   Why did you assist Detective York in obtaining
20 a supplement from Detective Cornett about his
21 conversation with Michael Crump in 2010?
22     A   Did you say why did I assist Detective York?
23     Q   Yes, yes.
24     A   Because I'm his supervisor and he asked for my
25 help.

Page 38

1    Q.  Okay.  Is it fair to say that in your capacity
2   as a detective sergeant at Post 10 that it was your
3   responsibility to verify the contents of Detective
4   York's case file and make sure that it was complete?
5    A   Are you – I'm not sure exactly what you're
6   asking.  Can you repeat it again?
7    Q   Sure.  As the detective sergeant at Post 10,
8   was it your responsibility to verify the content of
9   Detective York's investigation file to make sure that it
10  was complete?
11   A   Well, by policy I'm required to do case
12  reviews.  So I review the cases.  But I mean, I don't
13  know what – what you're asking, as far as, like, "make
14  sure it's complete," because what I think is a complete
15  case isn't necessarily what other people would consider
16  a complete case.
17   Q   Well, was it your responsibility, while you
18  were the supervisor of Detective York at Post 10, to
19  make sure that the investigation file into the death of
20  Katherine Mills was complete?
21   A   Are you asking specifically about Mike
22  Cornett's supplement?
23   Q   Well, I'm asking generally about the
24  investigation file.
25   A   Yeah.  I mean, I review the case to make sure

Page 39

1   that the detective is doing what he's supposed to be
2   doing, and that he's – he's doing an investigation
3   that's proper.
4    Q   Well, and part of the case review process is,
5   requires you to take steps to ensure that the quality
6   control of case reports and investigation files are
7   complete, right?
8        MR. WRIGHT:  Object to form, foundation.
9    A   That – I reviewed Jason York's case, and I
10  feel like Jason did everything that he was supposed to
11  in his investigation, if that's what you're asking.  I
12  feel like Jason added everything to his case that he
13  needed to add to his case.
14   Q   Okay.  And I'm asking a little bit different
15  question which is, as a detective sergeant, was it your
16  responsibility to verify the contents of Detective
17  York's case file to make sure that nothing was missing?
18       MR. WRIGHT:  Object to form, foundation.
19   A   I don't – like I – I don't know where you're
20  going with that.  I reviewed the case, and Jason had put
21  everything in there that Jason was required to put in
22  his investigation.  When there was something that he
23  recognized that was not in the case, he brought it to
24  me, and I went to the other detective and told him to do
25  a supplement.  When he did not do the supplement, he was

Page 40

1   punished for it.  So –
2    Q   Sure.
3    A   I mean –
4    Q   I guess –
5    A   – as far as like what –
6    Q   – that's what I'm asking.
7    A   – your – what your question is is, you know,
8   did I take it and ensure that everything was in there,
9   well, we checked it and everything was not in there, and
10  we made – Jason York, first off, made a significant
11  step by coming in and telling me on one of his buddies,
12  really, which is, you know, a pretty big deal saying
13  somebody's not doing something they're supposed to.  He
14  brought it to my attention because I would not have
15  caught that, probably, without him bringing it to my
16  attention.  And then, you know, I took steps as a
17  supervisor to get that put in there.  And whenever it
18  did not get put in there, we addressed it.
19   Q   And is it fair to say that you went to
20  Detective Cornett and assisted Detective York in
21  obtaining this supplemental report, because as a
22  supervisor you're required to assure that the
23  investigation file was complete?
24   A   Will you repeat that?
25   Q   Sure.  Did you go to Detective Cornett and

Page 41

1   instruct him to create a supplemental report because the
2   Kentucky State Police required you, as a sergeant at
3   Post 10, to assure – to take steps to assure that your
4   detective's file was complete?
5    A   Yes.
6    Q   Okay.  And I believe you testified a few
7   moments ago that when Detective Cornett ignored your
8   request for a supplement, that you actually disciplined
9   him; is that right?
10   A   Yes, I gave him a verbal counseling.
11   Q   Okay.  Did you document that anywhere?
12   A   No, it's a verbal.
13   Q   Okay.  Did you have any conversation with
14  Detective Cornett about the substance of the interview
15  that he took that was not yet documented?
16   A   No, I did not.
17   Q   Did Detective York tell you that the interview
18  that Detective Cornett failed to document related to a
19  potential eyewitness in the underlying homicide
20  investigation?
21   A   I don't recall a conversation like that.
22   Q   Did Detective York tell you that Detective
23  Cornett audio recorded his interview with the
24  eyewitness?
25   A   I don't recall any more of the conversation

Page 42

1  with Detective York other than he needed a supplement
2  from Detective Cornett, and he asked me to help him
3  obtain that.
4      Q   Did Detective York tell you that there was a
5  missing audio recording from Detective Cornett's
6  interview with Michael Crump?
7      A   I don't recall if it was in that conversation,
8  but I am aware of that.
9      Q   How did you – how do you recall first
10  becoming aware of that?
11     A   I'm not sure.
12     Q   Was it during the underlying investigation?
13     A   It was at some point during the investigation
14  I was made aware of it.  And I don't recall who I had
15  the conversation with, but I – I do know that Detective
16  Cornett borrowed somebody's digital recorder, and for
17  some reason batteries were dead, he didn't understand
18  how to turn it on.  There was something along those
19  lines that there was an interview that was conducted and
20  the recorder, there was some kind of failure or
21  something with it.  I don't –
22     Q   Did you make any attempt to locate that
23  recording?
24     A   Well, I don't recall what the circumstances
25  was.  Like, if it wasn't turned on or the batteries were

Page 43

1  dead, there would be no – there would be nothing to
2  look for.
3      Q   Do you recall who told you that the batteries
4  were dead?
5      A   No, I don't.  I don't recall specific details
6  about it.  I know that I'm – I know that at some point
7  during the investigation, I don't know if it was cited
8  in the case, in an area somewhere, or if it was a
9  conversation, but I at some point was made aware that
10  there was a recording that wasn't – that didn't get
11  recorded, or an interview that didn't get recorded.
12     Q   Is it fair to say that at the time Detective
13  York wrote this report on March 19, 2013, that you were
14  aware that the investigation file into Katherine Mills'
15  death was incomplete?
16     A   What do you mean by "incomplete?"
17         MR. WRIGHT:  Object to form.
18     A   Well, that there were interviews with
19  witnesses, at least one witness, that had not yet been
20  documented and placed inside the case file.
21         MR. WRIGHT:  Object to form.
22     Q   You can answer.
23     A   I don't recall.  I don't recall if, like, on
24  this day I was aware that something was missing.
25     Q   Well, you don't dispute that you had a

Page 44

1  conversation with Detective York at some time in 2013
2  where he requested that a report be created by another
3  officer under your command, right?
4      A   That's correct, yes.
5      Q   Okay.  And at least at the time of the
6  conversation that you had with Detective York, you were
7  aware at that time that the investigation file into the
8  death of Katherine Mills was not complete, correct?
9          MR. WRIGHT:  Object to form.
10     Q   You can answer.
11     A   Whatever Jason York – just repeat the
12  question, if you don't care.
13     Q   Sure.  At the time that Detective York came to
14  you in 2013 and revealed to you that another detective
15  under your command had not documented a witness
16  interview in a report, you were aware during that
17  conversation, or at least by the conclusion of that
18  conversation, that the investigation file into the death
19  of Katherine Mills was incomplete, correct?
20         MR. WRIGHT:  Same objection.
21     A   Yes, that's correct.  Once he brought it to my
22  attention, then I was aware that there was something
23  that was not in the case.
24     Q   Okay.  After your conversation with Detective
25  York, what steps did you take to make sure that no other

Page 45

1  documents or interviews were left out of the
2  investigation file relating to the death of Katherine
3  Mills?
4      A   Can you repeat that?
5      Q   Sure.  So at the time of your conversation
6  with Detective York, you learned that at least one other
7  interview with a witness of the case was not included in
8  the case file, correct?
9      A   That's correct.
10     Q   Okay.  After that conversation that you had
11  with Detective York in 2013, what steps did you take to
12  make sure that no other documents or interviews were
13  missing in the Katherine Mills investigation file?
14     A   Well, during the conversation I asked
15  Detective York if there was anything else that he was
16  needing.
17     Q   And what did Detective York tell you?
18     A   I think he made a request that if anybody had
19  field notes, that they be submitted to the case.
20     Q   And what are field notes?
21     A   Field notes are notes that investigators would
22  keep during an investigation, like if they kept, I don't
23  know, I guess if they made notes during an interview or
24  something like that or, I don't know, I guess it's just
25  whatever an individual person would see as relevant to

Page 46

1 keep up with, or something.
2    Q   And in 2012 were officers at the Kentucky
3 State Police required to disclose or place field notes
4 inside of a investigation file?
5        MR. WRIGHT:  Object to form.  Foundation.
6    A   Can you repeat it?
7    Q   Sure.  Prior to March 8, 2012, so between
8 December 20, 2010 to March 8, 2012, were officers at the
9 Kentucky State Police required to turn over their field
10 notes to the lead investigator so that they could be
11 placed within the investigation file?
12    A   No.
13    Q   Okay.  Are you aware of any policy or
14 procedure at the Kentucky State Police which requires
15 Kentucky State police officers, between December 20,
16 2010 and the time that you left Post 10 in 2014 or 2015,
17 to disclose field notes to the prosecutor handling a
18 criminal prosecution?
19    A   No.
20    Q   Now you said that Detective York also
21 requested that you turn over, or, I'm sorry.  Let me
22 withdraw that.  You said that in this conversation that
23 you had with Detective York in 2013, that he requested
24 that field notes be obtained from other officers; is
25 that right?

Page 47

1    A   That's correct.
2    Q   Okay.  What steps did you take to assist
3 Detective York in gathering those field notes?
4    A   I would – I told – I told the unit, the
5 detectives that were there that if they had field notes
6 that Jason York needed to see them.,
7    Q   Do you recall what detectives you spoke to?
8    A   I don't recall if I spoke to them individually
9 or if I sent an email.  But to the best of my memory
10 there was – nobody had field notes.
11    Q   Aside from speaking to Detective York and
12 requesting from other officers any field notes that were
13 done during the underlying investigation, did you take
14 any further action to gather documents for the
15 investigation file into Katherine Mills' death?
16    A   Not that I recall.
17    Q   Did you take any steps, as a supervisor, to
18 make sure that the investigation file into the death of
19 Katherine Mills was complete?
20    A   Yes, I did my quarterly review as is required
21 by policy.
22    Q   All right.  Do you have an independent
23 recollection, sitting here today, as to how many times
24 you conducted a quarterly review into the investigation
25 of Katherine Mills' death?

Page 48

1    A   No, I don't.
2    Q   Do you have any documents that were generated
3 as part of the quarterly review process as it relates to
4 the investigation into Katherine Mills' death?
5    A   Yes, we have a KSP that we fill out whenever
6 we do a case review, and it's kept in a file with the
7 cases, in the front of the case drawer, and that is
8 maintained for three years, or the most, the three most
9 recent KSP3s.  So I guess –
10    Q   Do you know, sitting here today, whether any
11 of those documents exist relating to your reviews of the
12 investigation into Katherine Mills' death?
13    A   I have no knowledge of that.  I know by policy
14 they're only maintained – you only maintain the three
15 most recent ones.  But I have no knowledge of it.
16    Q   And where are those stored?
17    A   With the case file.
18    Q   And what do these KSP3 forms look like?
19    A   It's a spreadsheet that has all the open cases
20 for a detective on it, and then in one column it has a
21 list of all the cases, and then there's another column
22 that the supervisor goes through and makes suggestions
23 on what needs to be added to the case, what, you know,
24 like, there's certain things that are required in order
25 to close a case.  Our KSP41 come in three different

Page 49

1 colors, they're pink, white and yellow.  So if the wrong
2 copy is in the case, we make a note in there to – to
3 correct stuff like that.  So it's just a quarterly
4 review, like if you – like all the supervisors go
5 through the cases and they just, if there's something in
6 there that they see that's not – that's not supposed to
7 be in there, or there's something missing, you make
8 notes on it and you submit it to the unit, and then they
9 make corrections to it and turn it back into you.  They
10 have 30 days to fix their cases.
11    Q   Do you have any independent recollection,
12 sitting here today, on any recommendations that you made
13 to Detective York as it relates to the investigation
14 into the death of Katherine Mills?
15    A   I do not recall.
16    Q   Did Detective York consult with you in any way
17 prior to the initiation of charges against Amanda
18 Hoskins, Jonathan Taylor, and William Lester in March of
19 2012?
20    A   Can you repeat that?.
21    Q   Did Detective York consult with you prior to
22 the initiation of charges against Amanda Hoskins and
23 Jonathan Taylor in March of 2012?
24    A   No, that would be out of ordinary for a
25 detective to do that.

Page 50

1    Q   Why would that be out of the ordinary?

2    A   Because they just don't typically consult me

3 before they file charges against somebody, or before

4 they seek a grand jury indictment, or anything along

5 those lines.

6    Q   Well, as part of the quarterly review process

7 -- well, what were you looking for in Detective York's

8 cases as part of the quarterly review process?

9    A   Well, if he -- just in general for all of his

10 cases, if I read his case and there was a suspect and

11 there was witnesses and there was evidence and he sought

12 an indictment and was given an indictment by the courts,

13 then there would have to be a document in the case

14 reflecting that.  And so if for some reason a copy of

15 the warrant or the indictment was not included in a

16 case, that's what would be in the comment section of his

17 case review.  It would say that it's missing the

18 citation, or that whenever -- and sometimes they're just

19 not available yet.  You know, if you get an indictment

20 on one day and I do your case review the very next day,

21 those court documents may not be available yet.  And on

22 other cases we have to do a 30-day victim contact.

23 Within 30 days of a case we have to follow up with the

24 victim and make contact with them again.  Sometimes, you

25 know, if it's past 30 days and I don't see anything in

Page 51

1 the case where they supplemented that they've made

2 contact with the victim, that's what will be in that

3 comment section that, you know, they've not done that

4 victim contact yet.  And other times it's time -- some

5 cases can be closed after a certain amount of time and,

6 you know, if they're unsolvable or if there's no

7 evidence.  Of course, with detectives that's rare.  They

8 get moved to a cold case file after six months, couple

9 of years, that policy changed, too, so -- but, you know,

10 I look for stuff like that.  Like, it's time -- time to

11 close the case.  That's what I'll put in there is "The

12 time has passed for this case and it needs to be closed"

13 or "Something needs to be entered, NCIC" and there's not

14 documentation in the case to reflect that, then I just

15 ask them where that documentation is or something.

16    Q   As a detective sergeant when you reviewed the

17 case files, would you have read through the reports that

18 were generated by officers under your command?

19    A   No, the reports that get submitted are

20 electronically and they go to the admin sergeant.

21    Q   And who was the acting [sic] sergeant in Post

22 10 between December 20, 2010 and March of 2012?

23    A   I don't -- I don't recall who that would have

24 been.

25    Q   So even though you were the detectives'

Page 52

1 supervisor during that time period, you're saying that

2 it would have been somebody else's responsibility to

3 review reports generated by detectives under your

4 supervision?

5    A   On, no, I'm sorry.  No.  It's, I would review

6 it once it got added to the case file.  But whenever

7 they submit it, it doesn't go to me, or it doesn't go to

8 me now anyhow.  But it would go to the admin sergeant

9 and the clerk, and they get printed out, and serialized,

10 and placed in the case, and stuff like that.  So I

11 wouldn't -- I wouldn't see that stuff until the next

12 quarterly review.

13    Q   And when you reviewed police reports that were

14 generated by detectives under your command, did you ever

15 give those detectives suggestions on what they should do

16 in their investigation?

17    A   Rarely.

18    Q   How come?

19    A   Because I was never a homicide investigator.

20 If it was a case about child pornography, you know, I've

21 got experience in that.  So I could make suggestions on,

22 you know, a way to investigate that, or a different

23 route to take, or a next step.  You know, I've got

24 experience with interviews, with kids, and preserving

25 evidence in those cases.  I've got lots and lots of

Page 53

1 training on preserving electronic evidence, how to --

2 what to look for in those cases as far as computers, and

3 thumb drives, and hard drives, and all that kind of

4 stuff.  But as far as, like, a homicide goes, I've never

5 worked one in my career, so it would be, I feel, very

6 inappropriate for me to tell somebody who's been doing

7 homicide investigations for ten years how they should be

8 doing their job.

9    Q   Is it fair to say that you didn't feel

10 comfortable supervising homicide investigations due to

11 your inexperience in having personally investigated

12 those types of cases?

13        MR. WRIGHT:  Object to form.

14    A   Can you repeat that?

15        MR. SLOSAR:  Can you read that back for me,

16 Lacee.

17        COURT REPORTER:  Give me one second.

18        (REPORTER PLAYS BACK REQUESTED TESTIMONY)

19        MS. KINCER:  Object to form.  Can you repeat

20 the question?  Do you want it repeated?

21        THE WITNESS:  Yes.

22        (REPORTER PLAYS BACK REQUESTED TESTIMONY)

23        THE WITNESS:  Okay, that's not correct at all.

24 That's not what I said.

25 BY MR. SLOSAR:

Page 54

1    Q  Okay. Then help me understand what you were
2  trying to say.
3    A  Well, what you asked was do I not feel
4  comfortable supervising detectives that are conducting
5  homicide investigations. And that's not true at all. I
6  feel comfortable supervising any unit, because the main
7  thing that they ask of me is, "Can I get somebody to go
8  to an autopsy for me?" or, "I've been up for 24 hours,
9  can you get somebody else to go execute this search
10  warrant?" Like, that's the main thing that supervisors
11  do is, you know, I would go on most of the call-outs
12  with my guys because if I've been up since 5:00 in the
13  morning, and we've already worked our shift for the day
14  and then we get called out at 10:00 at night and we're
15  up all night and all the next day, I can gauge how tired
16  they are, and I can see what they need. Do they need
17  the crime scene truck? If it's at nighttime and it's
18  starting to rain, do we need to find a canopy somewhere?
19  And so my main job is to facilitate the needs of those
20  detectives. The detectives are detectives for a reason.
21  And it's because they are qualified, and they're highly
22  trained, and they're very good at what they do. And if
23  I didn't trust them to do their job, they would not be
24  in that position, which is evident by the detectives
25  over the years that I have put back in uniform that I

Page 55

1  did not want in my squad, because they were no longer
2  producing the way they were supposed to, or they were no
3  longer investigating the way they were supposed to. But
4  now as far as, you know, Mark Mefford calling me and
5  asking me how to exhume a bone, I'm not going to go
6  there and pretend like I'm some kind of expert on it,
7  because I've never done that. I've never had training
8  on that. So therefore, I cannot tell him this is how
9  we're going to do that. You know, detectives like Jason
10  and Mark have forgotten more about homicide
11  investigations probably than what I'm ever going to be
12  able to learn. So as far as telling them how to do
13  their investigations, that's not -- it's not
14  appropriate. Like, that's not what my job is. I don't
15  give them a play-by-play on "This is what you need to
16  do." That's what their job is. Their job is to conduct
17  those investigations.
18    Q  Okay. Sitting here today, do you believe that
19  Detective York is a highly qualified detective?
20    A  Absolutely.
21    Q  Sitting here today, do you have any reason to
22  believe that Detective York did not understand the
23  policies and procedures of the Kentucky State Police,
24  based on your years of supervising him?
25    A  I -- I don't feel comfortable answering a

Page 56

1  question on what Detective York understands.
2    Q  Well, how long -- how many -- approximately
3  how many years did you supervise Detective York?
4    A  Six, seven years, maybe.
5    Q  During the six or seven years that you
6  supervised Detective York, did you ever discipline him?
7    A  No.
8    Q  During the six or seven years that you
9  supervised Detective York, did you ever require
10  Detective York to receive additional training relating
11  to homicide investigations?
12    A  He's required to have training every year. I
13  don't know what -- what training he would have selected,
14  but I did not mandate that he attend any training. But
15  now I require all the detectives, they have to take some
16  kind of photograph course, or something related to
17  investigations, if it's available. But as far as, like,
18  a disciplinary action, he's never had, to my knowledge,
19  not from me, I have never required him to have remedial
20  training in any area.
21    Q  And during the time that you supervised
22  Detective York in Post 10, was there ever any conduct
23  done by Detective York that you disagreed with?
24    A  I don't recall any misconduct. If I observed
25  any misconduct by any of my units I would have drafted a

Page 57

1  letter myself to internal affairs and requested an
2  investigation.
3    Q  I just want to make sure I have the testimony
4  that you gave a few minutes ago correct, Ms. Joseph. I'm
5  sorry to go back to that area, but is it fair to say
6  that you did not feel comfortable giving advice to
7  detectives under your command relating to ongoing
8  homicide investigations?
9      MR. WRIGHT: Object to form.
10    A  Can you repeat that?
11    Q  Sure. Is it fair to say that you did not feel
12  comfortable giving advice to detectives under your
13  command relating to homicide investigations?
14    A  No, that's not correct.
15    Q  That's not correct?
16    A  No.
17    Q  What is incorrect about that?
18    A  I'm not -- I'm not going to say just a blanket
19  statement that says I don't feel comfortable giving them
20  any advice at all. You know, I mean, that's -- if I see
21  something that maybe they don't see, you know, if we're
22  standing in a house and they can't find a spent round or
23  a spent shell case or something, you know, I might say,
24  "Did we think to check here?" So I'm not just going to
25  just make a blanket statement that I would never give

Page 58

1 advice on a homicide case. I'm just saying,
2 specifically, I think that it would be inappropriate for
3 me to dictate how any of my detectives would conduct a
4 case. They have the discretion and the freedom to do
5 their investigations the way that they see appropriate.
6 Q Okay. And did you, sitting here today, do you
7 recall ever interfering with a homicide investigation
8 that was being conducted by detectives under your
9 command?
10 A What do you mean by "interfere?"
11 Q Sure. If they had -- if detectives under your
12 command had generated evidence indicating that two
13 people were suspects and you believed, based on the
14 documents that you reviewed, that other people should
15 have been suspects, do you recall ever interjecting
16 yourself into a homicide investigation to direct your
17 detectives to investigate suspects other than the ones
18 that they were currently investigating?
19 A No.
20 Q Okay. What is a case review?
21 A It's the same thing that I was talking about a
22 few minutes ago. It's a quarterly review that we do.
23 Well now the policy's changed, because I read it last
24 night. It's every 120 days. But it used to be
25 quarterly, and it's a spreadsheet. It has all their

Page 59

1 open cases listed on it in one column and in the other
2 column is notes about what still needs to be done in a
3 case.
4 Q And is this an electronic spreadsheet, or
5 something in writing?
6 A It can be done either way. Policy doesn't
7 dictate that. Policy actually just says that we have to
8 do them, now, it says, every 120 days. And it tells
9 which month that we are allowed to do them in, and that
10 we have to maintain copies of it for them, I think the
11 three most recent ones. But I don't think that it
12 dictates that it has to be electronic or not, because
13 I've done them both ways. I've done them -- and, of
14 course, before 2017, they were different anyhow. It was
15 a different policy. But, yeah, you can, I do most of
16 mine by hand.
17 Q Did you -- do you remember, and I believe you
18 testified that there was the policy that used to be in
19 effect required that the last three quarterly reviews be
20 maintained in the same cabinet as the case files that,
21 do I have that right?
22 A That's correct.
23 Q Okay. And where would that cabinet be?
24 A For what case?
25 Q Okay. So like in the Katherine Mills homicide

Page 60

1 investigation, my understanding was that Detective York
2 had possession of the investigative file; is that your
3 understanding?
4 MR. WRIGHT: Object to form.
5 A I have no knowledge of where that case is now.
6 Q Okay. Do you have any knowledge, sitting here
7 today, as to whether the case is continuing to be
8 investigated by KSP?
9 A I have no knowledge.
10 Q Okay. Do you have any knowledge of where the
11 file was maintained during the underlying investigation?
12 A During the initial investigation?
13 Q Yes.
14 A During the initial investigation it would have
15 been maintained in Detective York's file cabinet.
16 Q Okay. Is that where the case reviews would
17 have been maintained as well?
18 A Yes, in the front of that drawer, or drawers,
19 depending on how many cases that a unit has.
20 Q And back between December of 2010 and 2015
21 when you left Post 10, or 2014, 2015 when you left Post
22 10, do you recall what information would be contained as
23 part of a case review?
24 A Could you repeat that?
25 Q Yeah, sure. What were you documenting during

Page 61

1 your case review process between December 2010 and the
2 time you left Post 10?
3 A I don't understand what that question is.
4 Q Well, I'm trying to figure out, earlier you
5 testified that there would be some sort of sheets,
6 either in electronic form now, or a paper form back
7 then, that you would document information as part of
8 your case review, your quarterly case review. And my
9 question to you is, what information would you be
10 documenting as part of your case review?
11 A It's the same stuff that I was talking about
12 in the remarks column. If there's was a citation
13 missing, or if somebody had been indicted and the
14 indictment wasn't included. Like, those are things that
15 are required in order to close a case. And so that's
16 what we look for, is correct copies of forms, you know,
17 anything that -- that I see in there that is not
18 accurate, or it's missing or something like that, I
19 would put it in there.
20 Q To your knowledge, has any supervisor at Post
21 10 performed a case review of the Katherine Mills
22 homicide investigation?
23 A I did.
24 Q Okay. On how many occasions did you perform a
25 case review of the Katherine Mills homicide

Page 62

1  investigation?
2      A   I have no way of knowing that.
3      Q   And is that because you don't have the
4  documents available for you to review?
5      A   Yeah, that's just not something that -- that I
6  would keep track of on my own.
7      MR. SLOSAR:  Shawna, we don't have any of these
8  documents, and I believe that our discovery request
9  would include that type of information.  Would you --
10 all mind taking -- doing a -- conducting a review to
11 see if these documents continue to exist today?
12     MS. KINCER:  We will, but from what I'm
13 understanding of her testimony, I'll definitely
14 look, but it sounds like that 2015 would have been
15 the last, would have been the last probably review,
16 and this is three years past that.
17     THE WITNESS:  Not even three -- I mean just
18 looking at the date, like, the case review that I
19 would have been done during 2013 absolutely does not
20 exist.
21     MS. KINCER:  Okay.
22     THE WITNESS:  Because it's like a revolving
23 folder.  There's three in there.  So whenever I
24 print one out I hand it to the detective, or if I
25 handwrite it, I hand it to the detective.  They go

Page 63

1  down through it and they highlight it, or they'll
2  make notes on it and say "This is what I put in the
3  case," or "This, you know, this has been
4  reassigned," or whatever.  They'll give reasons if
5  they can't do what I've asked them to do, and then
6  we put it in there, but it's revolving. And so the
7  last one comes out, and the new one comes in the
8  front.  And so then when we do the next case review,
9  same thing; a new one goes in the front, the last
10 one comes out.  And so we only maintain the three
11 most current ones.
12     MS. KINCER:  So if you do it three times a
13 year, it would only be like, 2000 --
14     THE WITNESS:  One year.  They're only
15 maintained for one year.
16     MS. KINCER:  Because there's three times --
17     THE WITNESS:  Yeah.  So if I did one in
18 January, by December it's gone.
19     MS. KINCER:  Because there's three reviews --
20     THE WITNESS:  Because --
21     MS. KINCER:  -- that year.
22     THE WITNESS:  -- there's three -- yeah, there's
23 three reviews that year.  So by the time next
24 January rolls around, last year's has already gone
25 out.

Page 64

1      MS. KINCER:  Okay.  Does that makes sense,
2  Elliot?
3      MR. SLOSAR:  Yeah.
4  BY MR. SOLSAR:
5      Q   So it sounds like the last year's worth of
6  case reviews might be available?
7      A   No.  I mean, I don't know for sure.  I'm sure
8  that the agency can check on that, but if -- if the case
9  -- I don't know what the status of the case is.  I don't
10 know who it's assigned to or anything like that. But,
11 just based on the age of the case, it is classified a
12 cold case now, which means it does not get a case
13 review.
14     Q   But I think, is it -- I just want to make sure
15 I have this right.  Your testimony is that the case
16 reviews would be basically destroyed after a year,
17 because they would be effectively replaced three times
18 and you're only required to keep the last three in the
19 file; is that right?
20     A   That -- that's correct, yes.
21     Q   Okay.
22     A   And that's just --
23     Q   And --
24     A   And that's just in cases like, you know, we --
25 supervisors change.  They retire, they promote, they

Page 65

1  move around, stuff like that.  I mean you can just see,
2  like, based on my career, how much we move around.  So
3  there's two previous, or three previous case reviews, to
4  refer back to in case one sergeant has already told
5  somebody to do something twice and here it is on the
6  third case, where you're being told again.  You can --
7  you can refer back to those.  Or, you know, it's just
8  really for reference in case you need to go back and see
9  what you put on the last page for you, like, "Did I tell
10 this guy last time he needed a citation?  He still
11 doesn't have it."  Maybe the citation's not available.
12 Maybe another agency wrote the citation that we don't
13 have access to, or something like that.  And so we only
14 maintain it for reasons like that.  And we only maintain
15 three at a time.
16     Q   Okay.  All right.
17     MR. SLOSAR:  Shawna, I'd at least ask for you
18 guys to take a look and just let us know whether any
19 case reviews exist.
20     MS. KINCER:  Sure, we will.
21     Q   Now, Ms. Joseph, I'm going to ask you -- well,
22 I'm going to ask for you to look at Exhibit number 5,
23 which should be a report that you had drafted during the
24 underlying investigation.  Can you let me know when
25 you've had a chance to take a look at that document and

Page 66

1  review the narrative?
2        (EXHIBIT 5 MARKED FOR IDENTIFICATION)
3        MS. KINCER:  Tell me when you need a bathroom
4  break.
5        THE WITNESS:  Okay.
6        MS. KINCER:  Do you need one?
7    A   Can I take a bathroom break?
8    Q   For sure, yes.  Do you guys want to take like
9  five or ten minutes?
10   A   Yeah, that's fine.
11   Q   Okay.  All right.  Just let me know when
12 you're ready.
13       (OFF THE RECORD)
14 BY MR. SLOSAR:
15   Q   Ms. Joseph, before we took a break I think I
16 was about to ask you some questions about Exhibit 5; do
17 you have that in front of you?
18   A   About what?
19       MS. KINCER:  Exhibit 5.
20   A   Oh –
21   Q   Exhibit 5.
22   A   – Exhibit 5.  Yes, Exhibit 5.  Yes, I've got
23 it.
24   Q   Okay.  Have you had an opportunity to review
25 that document?

Page 67

1    A   I did.  I read it.
2    Q   Okay.  Did you draft this report?
3    A   It appears I did.
4    Q   Okay.  And is your name on the document?
5    A   It is.  Yes, it is.
6    Q   Okay.  When did you draft this document?
7    A   The report date is February the 24th  of 2014.
8    Q   And according to the document what happened on
9  February 24, 2014?
10   A   It says that at approximately 10:00 hours I
11 received – I arrived at post and received a fax from
12 Knox Circuit Court.  The fax was a court order which
13 instructed me to forward the fingernail – fingernail
14 clippings from Katherine Mills after autopsy to
15 Mitotyping Technologies for analysis.  The nail
16 clippings were signed out of evidence by me and placed
17 in a mailing envelope by me.  The package was shipped
18 overnight to Mitotyping Technologies as directed in the
19 court order.  The KSP41 was filled out to reflect the
20 fingernail clippings being removed from KSP evidence.
21   Q   Now, after sending the fingernail clippings
22 off, did you have any conversations with Detective York
23 about the steps that you had taken to assist in the
24 investigation?
25   A   I do not recall doing this, and I do not

Page 68

1  recall having any conversations with Detective York
2  about it.
3    Q   Do you know, did you ever learn what the
4  results of the testing yield?
5    A   No, I have no recollection of this.
6    Q   How often did you meet with investigators
7  under your command regarding the Mills homicide
8  investigation?
9    A   I don't recall ever having a meeting.
10   Q   While you were the detective sergeant at Post
11 10, do you recall having any meeting – well, let me
12 withdraw that question.  While you were the detective
13 sergeant at Post 10, did you have any meetings with
14 Detective Jason York regarding his investigation into
15 the death of Katherine Mills?
16   A   What type of meeting are you referring to?
17   Q   Any meeting about the underlying investigation
18 that you remember?
19   A   Well, there's the supplement that – that
20 documents Detective York approaching me in reference to
21 a supplement that he wanted added to the case.
22   Q   Fair enough.  Aside from the report that was
23 generated by Detective York in 2013 about the missing
24 summary from Detective Cornett, aside from that one
25 meeting that you had with Detective York, do you recall

Page 69

1  having any other meetings with Detective York regarding
2  the underlying investigation into Katherine Mills'
3  death?
4    A   I do not.
5    Q   Did you have any meeting with Detective
6  Mefford regarding the underlying investigation into
7  Katherine Mills' death while you were a detective
8  sergeant at Post 10?
9    A   I do not recall.  I do not recall any meetings
10 with any detective in reference to this investigation.
11   Q   What steps did you take to keep aware of what
12 was going on during KSP's investigation into the
13 Katherine Mills homicide?
14   A   I did the quarterly review of the case
15 investigation that's required by policy.
16   Q   Aside from the – sitting here today, you
17 don't recall substantively any of the information
18 learned in your quarterly review; is that right?
19   A   Can you repeat that?
20   Q   Sitting here today, can you recall any
21 information that you learned from conducting a quarterly
22 review of the Katherine Mills homicide investigation?
23   A   No.  I don't – I don't think that that was
24 clear about what I do with the case reviews.  Like, all
25 the case review stuff is administrative.  Like, it's not

Page 70

1  I read a case, and then I make a judgment on "I think
2  that you need to track somebody down and do an interview
3  with them" or something like that. It's not – that's
4  not what a case review is. A case review is very
5  clinical administrative stuff. Is this box checked? Is
6  this form filled out? Is this form the correct color?
7  Is it the correct form number? Are there enough copies
8  of something in a case? Like, it's very administrative.
9  It's not my opinion on how I feel an investigation
10  should be conducted. It's a very clinical kind of down
11  the list, is this included, or is this not included.
12      Q   Okay. So, is it fair to say that your – the
13  quarterly review doesn't provide any substantive
14  instruction to detectives under your command regarding
15  the Katherine Mills homicide investigation?
16      A   It doesn't – a quarterly review doesn't – it
17  doesn't do that for any case. Not just this one
18  specifically, we don't do that for any case. But
19  there's no point where, in a quarterly review where I
20  would ever say "I think that you need to find a
21  different witness" or "I think that you need to pursue a
22  different suspect" or "I think that" – like, there's no
23  room in a quarterly review for your opinions or how you
24  feel a case should go forward. You know, that's what
25  the detective does, is they investigate it. They follow

Page 71

1  the leads. They document stuff. They – like, that's
2  what the detective's job is. As a supervisor, mine's
3  very much administrative stuff, and the quarterly review
4  is exactly that. There's – there's, like, checklists
5  of what's in the case. If there's evidence, has the
6  evidence been cleared? If there's property, has the
7  property been entered into NCIC? Like, there's very –
8  it's just very clinical as far as, like, check certain
9  boxes and make sure certain forms are included. Like,
10  that's what the quarterly review is. There's nowhere in
11  there where I read a case and make suggestions on how I
12  feel that they should pursue a case. Does that make
13  sense?
14      Q   Okay. Sure.
15      A   Okay.
16      Q   I understand that that's not part of the
17  quarterly review process, but as a detective sergeant,
18  did you have the ability to review case files and
19  provide guidance during your time at Post 10?
20      A   I review case files as required by policy and
21  do their quarterly reviews. But I don't micromanage
22  anybody that works for me. I don't have the time or the
23  resources to be able to do that. So, no, I do not read
24  through hundreds of cases and then contact detectives
25  individually and say, "You need to be doing this

Page 72

1  different in your cases. I don't want you to – to use
2  this type of recorder," or "I don't want you to" – I
3  just don't micromanage them in that fashion. There's
4  not really – there's no time or resources for a
5  sergeant to be able to do that.
6      Q   Did you have any time or resources that
7  allowed for some sort of micromanagement of homicide
8  investigations that were conducted on your supervision
9  of Post 10?
10      A   No, I do not micromanage any investigation.
11      Q   Okay. Now, I'm going to ask you – let me ask
12  you something else. This is just pertaining to the
13  Mills investigation, okay, these questions.
14      A   Okay.
15      Q   How did you keep aware of what was going on
16  into the investigation to Katherine Mills' death
17  regarding the witnesses that were being spoken to?
18      A   Can you repeat that?
19      Q   Sure. As a detective sergeant of Post 10, how
20  did you keep aware of what witnesses were being spoken
21  to during the Mills homicide investigation?
22      A   I would – I don't keep track of that.
23      Q   All right. As a detective sergeant at Post
24  10, how did you keep aware of what suspects existed in
25  the Mills homicide investigation?

Page 73

1      A   The information that I know about any case is
2  what I read in the case jacket. So if – if there are
3  units out there doing interviews, they don't call me to
4  get approval for that. They don't call me and make me
5  aware that they've done an interview, or anything like
6  that. That's not something that they have to run by me
7  or to get authority to do. So there's no –
8      Q   Okay.
9      A   There's no way – I don't keep track of that.
10  There's no form, or spreadsheets, or anything like that
11  that I use to keep track of interviews, or witnesses, or
12  anything that any of my units are talking to. If they
13  do a supplement and put it into the case, then I'll read
14  or listen to a statement. But other than that, there's
15  not – there's no process for me keeping track of my
16  units, or micromanaging them in that fashion.
17      Q   Between December 20, 2010 and the time that
18  you left Post 10 in 2014 or 2015, what steps did you
19  take as a detective sergeant to make sure that officers
20  in the Mills homicide investigation were documenting
21  exculpatory evidence?
22          MR. WRIGHT: Object to form.
23      A   Can you repeat that?
24      Q   Sure. Between 2010 and the time that you left
25  Post 10 in 2014 or 2015, what steps did you take to make

Page 74

1  sure that officers in the Mills homicide investigation
2  were documenting exculpatory evidence?
3       MR. WRIGHT:  Same objection.
4    A  I don't -- can you clarify what you mean by
5  that?
6    Q  Sure.  What part of it is confusing?
7  Exculpatory evidence?
8    A  Well, I know what exculpatory evidence is.  I
9  mean, is there something specific that you're talking
10  about?
11    A  No.  These are just general questions to you.
12  So let me ask it again.
13    A  Okay.
14    Q  Between December 20, 2010 and the time that
15  you left Post 10 in 2014 or 2015, what steps did you
16  take to make sure that officers in the Mills homicide
17  investigation were documenting exculpatory evidence?
18    A  To my knowledge all investigators provided all
19  relevant evidence to the case.  So if there's something
20  exculpatory it would have -- to my knowledge, would have
21  already been included.
22    Q  All right.  My question's a little bit
23  different, okay.  So let me ask it a better way:  Between
24  December 20, 2010 and the time that you left Post 10,
25  did you take any steps in the Katherine Mills homicide

Page 75

1  investigation to make sure that officers were
2  documenting exculpatory evidence?
3       MR. WRIGHT:  Object to form.
4    A  I still -- I'm sorry.  I'm just not following
5  what you're saying.  Are you asking if I, like, polled
6  the unit to see, "Hey guys, do you know of some type of
7  exculpatory evidence that exists?" like, is that what
8  you're saying?
9    Q  Did you do anything?  Did you take any steps
10  to make sure that detectives under your command were
11  documenting exculpatory evidence in the underlying Mills
12  investigation?
13       MR. WRIGHT:  Object to form.
14    A  That's not something that I would have any way
15  of knowing even existed if they weren't already
16  documented.
17    Q  So did you take any steps to determine whether
18  exculpatory evidence was being documented in the Mills
19  investigation?
20       MR. WRIGHT:  Objection to form.
21    A  I don't know -- I don't know what other answer
22  to give you.  As a supervisor if -- if there was
23  anything like that, it would have been documented, and
24  there was no -- there's no way for me to check for
25  information that I'm not aware of, if that makes sense.

Page 76

1    Q  Well, you could have -- okay.  All right.
2  Sitting here today, can you name a single person that
3  you spoke to at the Kentucky State Police regarding the
4  Katherine Mills homicide investigation?
5    A  I can tell you a specific conversation that I
6  had with Detective Jason York, because it's documented
7  in the case.
8    Q  In that conversation did you ask Detective
9  York whether he was documenting exculpatory evidence of
10  the underlying investigation?
11    A  I do not recall ever asking him that.
12    Q  And sitting here today, is it fair to say that
13  you cannot recall having a conversation with any other
14  detective under your command relating to the
15  investigation of Katherine Mills' death?
16    A  That's correct.
17    Q  Okay.  So, between December 20, 2010 and the
18  time that you left Post 10, do you recall taking any
19  steps to determine whether exculpatory evidence was
20  being documented by detectives under your command?
21       MR. WRIGHT:  Object to form.
22    A  I don't recall.
23    Q  You don't recall taking any steps to determine
24  whether exculpatory evidence was being documented in the
25  Katherine Mills homicide investigation; is that right?

Page 77

1    A  That's correct.  I don't recall.  I'm sorry.
2    Q  Okay.  Do you have any notes or other
3  documents that would refresh your recollection in this
4  regard?
5    A  No, sir, not that I'm aware of.
6    Q  Between December 20, 2010 and the time that
7  you left Post 10 in 2014 or 2015, what steps did you
8  take to make sure that officers in the Katherine Mills
9  homicide investigation were not fabricating evidence?
10       MR. WRIGHT:  Object to form.
11    A  Can you repeat that?
12    Q  Sure.  While you were at Post 10 as the
13  detective sergeant between December 20, 2010 and the
14  time you left 2014 or 2015, what steps did you take to
15  make sure that officers in the Mills homicide
16  investigation were not fabricating evidence?
17       MR. WRIGHT:  Object to form.
18    A  There was absolutely no evidence that any part
19  of an investigation had ever been fabricated, any
20  witnesses, any statements, or anything along those
21  lines.  And at no point during that investigation was
22  anything ever suspicious or brought to my attention.  No
23  one ever -- no one ever mentioned anything to me, that I
24  can recall, that they felt something was suspicious, or
25  wasn't correct, or anything along those lines.

Page 78

1    Q   All right. I'm going to ask for you to look
2  at Exhibit 4, which should be a very large file of the
3  KSP criminal case file; do you have that in front of
4  you?
5    (EXHIBIT 4 MARKED FOR IDENTIFICATION)
6    A   Okay.
7    Q   Would you turn to page 307, please? That's
8  KSP 307 at the bottom. It should only be about page 54
9  of the actual printout.
10   A   Okay, I found it.
11   Q   Okay. Can you review this document, please?
12   A   Okay.
13   Q   Okay. So according to this report -- well, do
14 you see in this report where it says, "He also advised
15 me that he lied when he gave me a statement about Amanda
16 Hoskins and William Lester at S-Go's market?"
17   A   I see that, yes.
18   Q   Okay. So according to this report that
19 Detective York made on May 18, 2015, this witness, Allen
20 Helton, told him that his first statement was a lie; is
21 that fair?
22   A   That's what his supplement says.
23   Q   Okay. All right. Did you ever make any
24 attempts to reach out to any witness in the underlying
25 investigation of Katherine Mills' death to determine

Page 79

1  whether their statements were true or false?
2    A   No, I did not. That's not --
3    Q   Did you ever make any -- I'm sorry.
4    A   That's not something that I would typically
5  do. That's not what my job is.
6    Q   Did you ever -- what steps did you take as the
7  detective sergeant to make sure that officers in the
8  underlying investigation into Katherine Mills' death
9  were not fabricating statements?
10     MR. WRIGHT: Object to form.
11   A   There is nothing that I can ever recall that
12 made me think that anything had been fabricated. So
13 there is no reason for me to -- feel like I needed to
14 take any steps to investigate my own detectives.
15   Q   So is it fair to say that, sitting here today,
16 you did not take any steps to make sure that officers
17 were not fabricating evidence?
18   A   No, that's not fair.
19   Q   Well, you just testified that -- well, tell
20 me, what steps did you take to determine whether
21 statements were being fabricated in the underlying
22 investigation.
23     MR. WRIGHT: Object to form.
24   A   I reviewed the case the way that I'm supposed
25 to. And I field complaints that people have against the

Page 80

1  detectives. And to my knowledge, at no point did anyone
2  ever make a complaint to me, or did I ever see anything
3  that I felt like was fabricated. So those are steps as
4  a supervisor that -- that I have. I mean I field
5  complaints and I -- I read through the case and stuff.
6  But I mean, reading this supplement, there's nothing in
7  this that suggests that Detective York fabricated a
8  statement. It suggests that Allen Helton lied in a
9  statement. But that's not a fabrication by one of my
10 detectives.
11   Q   Sure. Have you ever reviewed a police report
12 of one of your detectives where they admitted to
13 fabricating a statement?
14   A   No, I've not.
15   Q   Okay. That would be pretty shocking if you
16 reviewed such a report, right?
17   A   Yes, because that would not be --
18   Q   Have you ever had any --
19   A   Go ahead.
20   Q   Have you ever had a detective tell you that he
21 or she fabricated evidence?
22   A   Absolutely not.
23   Q   Okay. All right. How many times have you
24 seen a police report that documents a witness lying?
25   A   Pretty regular.

Page 81

1    Q   And on any of those occasions, have you ever
2  reached out to any of the witnesses to determine whether
3  they voluntarily lied to the police, or whether the
4  police assisted them in lying during this?
5    A   To my knowledge, I have never reached out to
6  anybody to ask them if the police assisted them in
7  lying, because there's absolutely nothing that would
8  ever make me believe that one of my detectives would do
9  that. There's -- to my knowledge, in all of my years,
10 I've never had anybody approach me and even suggest such
11 a thing.
12   Q   Do you remember interviewing Dave Fox in
13 December of 2011?
14     MS. KINCER: I object to this line of
15 questioning. We're not going to talk about the
16 Anderson case today. She's not prepared.
17     MR. SLOSAR: Well, Shawna, we've disclosed
18 evidence during this lawsuit relating to officers,
19 including Ms. Joseph, their participation involved
20 in the investigation. It is absolutely relevant to
21 this litigation. And we have a number of questions
22 that we intend to ask Ms. Joseph relating to her
23 participation and interrogation and questioning of
24 witnesses alongside Detective York, who's a
25 defendant in this case. Are you saying that you're

Page 82

1 not going to allow Ms. Joseph to answer any of those
2 questions?
3     MS. KINCER:  That is correct.  She can answer
4 those when it comes to the Anderson case.  We are
5 here today to talk about Hoskins and Taylor.  She
6 has not reviewed that material, and we are not
7 prepared to answer those questions.  It's not
8 relevant for today's proceeding.
9     MR. SLOSAR:  Are you instructing her – well,
10 let me – let's get there in a little bit, and then
11 we'll figure out what to do.
12 BY MR. SLOSAR:
13     Q   Ms. Joseph, is it fair to say that you did not
14 take any steps during the underlying investigation to
15 Katherine Mills' death to determine whether witness
16 statements were coerced?
17     A   There was no point during the investigation
18 that I ever felt like any statement was fabricated or
19 coerced.
20     Q   And I'm not asking you whether you personally
21 felt that the evidence was legitimate.  I trust that if
22 you knew the evidence was fabricated or coerced, that
23 you would not have approved of that.  What I'm asking
24 you is something different, which is, did you take any
25 steps to determine whether detectives at the Kentucky

Page 83

1 State Police had fabricated or coerced evidence during
2 the underlying investigation?
3     A   Well, I did my job duties, which are reviewing
4 cases and fielding complaints.  And so by doing just
5 what my job is, those are the steps that I take that
6 would hopefully capture something like that if it ever
7 did occur.
8     Q   So I just want to make sure I have this right;
9 if somebody had reached out directly to you and
10 complained that they were coerced into making a false
11 statement, would you have done something with that?
12     A   Yes, sir, I would have.
13     Q   Okay.  What would you have done?
14     A   Well, I would have made – I would have made
15 an attempt to get a copy of the statement, and I would
16 have done an interview with the person who was making
17 the complaint, and then I would have asked the officer
18 involved for, you know, what their – their side of it
19 was.  And then I would write a complaint letter to
20 internal affairs and request an investigation.
21     Q   During the Katherine Mills homicide
22 investigation, do you recall getting any direct calls
23 about police misconduct?
24     A   I do not recall ever receiving any type of
25 communication about police misconduct during this

Page 84

1 investigation.
2     Q   Okay.  With that premise as such, what steps
3 did you take to make sure that officers were not
4 fabricating evidence?
5     MR. WRIGHT:  Object to form.
6     A   I feel like I've answered that numerous times.
7 I mean I do my job.  I supervise the detectives to the
8 best of my ability.  I feel like, by doing my job, I'm
9 taking those steps to ensure that no statements are
10 being fabricated.
11     Q   Did you ever – let me ask it to you a
12 different way.  Did you ever reach out to any witness,
13 in the Katherine Mills homicide investigation, and ask
14 them whether officers under your command had engaged in
15 police misconduct?
16     A   No, because that would be completely
17 unreasonable.
18     Q   Did you ever reach out to the Knox County
19 Commonwealth attorney, Jackie Steele, and ask him if any
20 witnesses had informed him that officers were committing
21 police misconduct?
22     A   No.  I do not communicate with prosecutors
23 about cases on the detectives.  Unless for some reason a
24 detective is going to be out of town and they need me to
25 – to transport something to the Commonwealth attorney's

Page 85

1 office, or just out of convenience if they need me to
2 relay something, I do not normally communicate with
3 prosecutors about cases that are not my own.
4     Q   Did you take any independent steps in the
5 Katherine Mills homicide investigation to investigate
6 whether officers at the Kentucky State Police were
7 committing misconduct?
8     MR. WRIGHT:  Object to form.
9     A   There is absolutely no part of me that ever
10 suspected that anybody under my command was acting
11 inappropriately, or doing anything inappropriate during
12 this investigation, for me to even think that I needed
13 to reach out and try to dig up dirt on somebody.
14     Q   So is it fair to say that because no witness
15 came directly to you and accused a police officer of
16 misconduct, that you in turn did not take steps to
17 investigate officers under your command for fabricating
18 evidence or coercing witnesses?
19     MR. WRIGHT:  Object to form.
20     A   I mean, it's – I'm trying to answer your
21 question the best I can, but it's really ridiculous to
22 assume that I would ever just start investigating one of
23 my detectives for no reason at all.  I mean, I – at
24 that time I was probably supervising 13 or 14
25 detectives.  We have hundreds and hundreds of cases.

Page 86

1  Like, there would be no reason for me ever to select one
2  case and one detective and just reach out to hundreds of
3  witnesses and say, "Was your statement coerced by one of
4  my detectives?" or "Did you feel – feel like you needed
5  to" – "that this was fabricated, that you didn't say
6  this?  That they just – they gave you a script and made
7  you read?"  Like, there is – there is no reason for me
8  to ever feel like that is something that I need to do as
9  part of my job.  Unless there is some type of complaint,
10  or there is something that looks suspicious about a
11  case, or a statement, or there's something that leads me
12  to believe that there's something not right about it,
13  there would be no time that I would ever just randomly
14  select a witness, or a detective, or a case, and try to
15  go create some type of a complaint against them.  Like
16  it's not – to me it's not reasonable.  It's not
17  something that would ever be appropriate as a
18  supervisor.  Actually, we call that head hunting.  Like
19  whenever you go out and you try to find something that -
20  - that's not there, and you try to force some type of an
21  issue.  So, no, I can tell you with all certainty that
22  I've never just randomly selected a case, a detective,
23  and a witness and just went out and said, "Is this
24  statement fabricated?"
25     Q    I'm going to ask that you turn to, in Exhibit

Page 87

1  4, to page 338.  That's the second page of a search
2  warrant affidavit from January 2011.  And you know what,
3  I'm actually going to ask you to turn two pages after
4  that to KSP's report, which is the one that I want to
5  ask you about.  Are you there?
6     A    I am.  I'm trying to see what type of search
7  warrant it is.  I had to flip back a couple of pages to
8  see the front of the affidavit.  Okay, go ahead.
9     Q    Okay.  When you were a supervisor did you have
10  access to search warrants?  Did you have the ability to
11  review these?
12     A    It appears that – I'm not sure where this
13  document came from.  Every case has a serial number at
14  the bottom of it, and each page is labeled individually,
15  so I do not know if this was contained in the case
16  report or not.
17     Q    It looks like at the bottom of the page
18  there's actually some writing there that has been
19  redacted; do you see that?
20     A    I do see that.  That's a – that's normally
21  where a case file number would be written on it.
22     Q    Okay.  And so looking at this search warrant
23  it looks like it was drafted in February of 2011; would
24  you agree with that?
25     A    That's correct.

Page 88

1     Q    Okay.  Were you Detective York's supervisor at
2  that time?
3     A    Yes, I was.
4     Q    Okay.  Now according to the search warrant,
5  you see on page 2 where it says that Mr. Simpson, the
6  second sentence, has been identified by Michael Crump,
7  being at Katherine Mills' residence the morning she was
8  robbed and found dead; do you see that?
9     A    I see that.
10     Q    Okay.  And I believe that the "k" is a typo
11  and it's supposed to be an "o".  But, according to the
12  search warrant – well, are you able to determine who
13  signed it?
14        MR. WRIGHT:  Object to form.  Foundation.
15     A    It appears the district judge, but I can't
16  make out –
17     Q    All right.  Is –
18     A    – the name.
19     Q    – is there a law enforcement officer who
20  signed this?
21     A    Oh, yes.  Detective York.
22     Q    Okay.  Do you recognize Detective York's
23  signature from your years of supervising him at KSP?
24     A    It appears that that would be his signature.
25     Q    Okay.  Did Detective York – would you have

Page 89

1  expected a detective under your command to document an
2  identification of a suspect in a homicide investigation?
3        MR. WRIGHT:  Object to form.  Foundation.
4     A    Can you repeat that?
5     Q    Would you have expected a detective under your
6  command to document an identification by a suspect in a
7  homicide investigation?
8        MR. WRIGHT:  Same objection.
9     A    What do you mean "identification?"
10     Q    According to this search warrant, Detective
11  York represents that Michael Crump identified Mike
12  Simpson as being at the victim's residence the morning
13  she was robbed and found dead; is that right?
14        MR. WRIGHT:  Object to form.  Foundation.
15     A    That's what's –
16     Q    You can answer.
17     A    – in the affidavit, yes.
18     Q    Okay.  Would you have – if the eyewitness,
19  Michael Crump, makes an identification of a suspect, Mr.
20  Simpson, would you have expected Detective York, or any
21  other detective under your command, to document that in
22  a police report?
23        MR. WRIGHT:  Object to form.  Foundation.
24     A    From my understanding, what I'm reading is an
25  affidavit for a search warrant on a cell phone number.

Page 90

1 And so the only thing that he is providing in this is
2 the cell phone number that he wants the name, address
3 and billing information on.
4    Q   I'm asking you a completely different
5 question, Ms. Joseph. What I'm asking you is, would you
6 have expected a detective under your supervision to
7 document an identification made by an eyewitness in a
8 homicide investigation?
9       MR. WRIGHT: Object to form.
10   A   Well, I guess I'm just not following you. I
11 mean, you're asking me to read something that he wrote
12 in an affidavit to get information on a phone number
13 that he was provided. Mike Simpson gave him a phone
14 number. And he simply, in the affidavit, is saying that,
15 you know, this may or may not be involved in a murder
16 investigation. He wants the name, address and billing
17 information of -- of this phone number, that's
18 associated with the phone number. So I guess I'm just
19 not following, since I am just reading an affidavit.
20   Q   So I'm not -- so, I'm asking you a question
21 that is unrelated to the purpose of the affidavit, okay?
22   A   Okay.
23   Q   All right. Would you -- according to this
24 affidavit, Michael Crump, a witness in this case,
25 identified Mike Simpson as being in the victim's

Page 91

1 residence on the day that she was found dead; do you
2 agree with that general premise?
3       MR. WRIGHT: Object to form. Foundation.
4    A   Accord-- yeah, what has been typed in this
5 affidavit says that Mr. Simpson had been identified by
6 Michael Crump, being at Katherine Mill's residence.
7    Q   The morning she was found dead and robbed?
8    A   Right, yeah.
9    Q   Okay. Now, would you have expected Detective
10 York, or any other detective under your supervision, to
11 have generated a report revealing that Michael Crump
12 made an identification of Mike Simpson?
13      MR. WRIGHT: Object to form. Foundation.
14   A   Can you repeat that?
15      MR. SLOSAR: Can you play it back, Lacee.
16      COURT REPORTER: Yeah, hold on one second.
17      (REPORTER PLAYS BACK REQUESTED TESTIMONY)
18   A   So, I mean it's -- if we go back to Exhibit 3,
19 that's the supplement that Detective York wanted Mike
20 Cornett to include in the investigation. So --
21      (EXHIBIT 3 MARKED FOR IDENTIFICATION)
22   Q   Right. So let's turn --
23   A   So, obviously, I expected him to -- to
24 document that. That's why I went to Detective Cornett
25 and said, "I need you to document it and add it to the

Page 92

1 case." So I'm not sure what -- what you're saying.
2    Q   What I'm saying is, there's no police report
3 in this entire investigation file indicating that
4 Michael Crump made an identification of anyone ever
5 during the underlying investigation. My question to you
6 is, would you have expected a detective under your
7 command to generate a report when an eyewitness makes an
8 identification in a criminal investigation such as the
9 Katherine Mills one?
10   A   Yeah, and --
11      MR. WRIGHT: Object to form.
12   A   I'm sorry.
13      MR. WRIGHT: Go ahead.
14   A   He objected. Yeah, and so Detective York
15 approached me and said, "I need the supplement in the
16 case that has that information in it." I've never
17 listened to an interview, or I have no idea what the
18 interview would contain, but I know that, based on
19 Exhibit 3, that Detective Cornett is the one that
20 interviewed Michael Crump, and that's the supplement
21 that Detective York was trying to get attached to the
22 investigation. So, yes, obviously I expect that if
23 Michael Crump had made an identification of Mr. Simpson,
24 I mean it doesn't say that he's a suspect in the murder.
25 It just says that he was identified. So I'm not sure

Page 93

1 what -- what all this is about here. But I know that
2 Detective York came to me and wanted that statement, and
3 I took steps a few different times trying to get that
4 statement included. But now did I sit down and hold
5 Detective Cornett's hand and force him to write out a
6 supplement? No, I did not. But I told him that it
7 needed to be in there, and when he didn't do it I
8 counseled him over it, and so I'm not sure what the
9 status ever was. But, yes, obviously I expect that if
10 there was a statement like that, that it would be
11 included.
12   Q   Did Detective York tell you, when he was
13 talking to you about this interview that Mike Cornett
14 did, did he tell you that Michael Crump identified Mike
15 Simpson as being at Katherine Mills' residence the day
16 she was found dead?
17   A   No, I don't -- I don't recall any conversation
18 like that.
19   Q   I'm going to ask for you to turn to page KSP
20 289 in that same exhibit. It's the 36 total pages.
21   A   Okay.
22   Q   Okay. Will you review that?
23   A   Okay.
24   Q   Does the report that Mr. Cornett generated
25 indicate anything about Michael Crump being presented

Page 94

1  with photographs or making an identification?
2      A   No, it does not.
3      Q   Is it fair to say that the information that
4  you reviewed in the search warrant is different than
5  that that you just reviewed in Detective Cornett's
6  report?
7      MR. WRIGHT:  Object to form.  Foundation.
8      A   I don't know.  I'd have to turn back to the
9  affidavit to review it again, but I'm pretty sure that
10  it does not say that that statement was Mike Cornett's
11  statement.  So I don't know if Detective York used the
12  phone number to call him and get a different statement,
13  or if there was something that wasn't recorded that
14  wasn't written in the supplement.  Like, I have no
15  knowledge, and I don't feel comfortable testifying about
16  where Detective York got information on an affidavit.
17      Q   I appreciate that, and so that's why I'm
18  trying to ask you a very different question which is,
19  you know, if Detective York learned that Michael Crump
20  identified Mike Simpson as being at the victim's
21  residence on the day she was found dead, should he have
22  documented that in a police report that would be
23  maintained as part of the investigative file?
24      MR. WRIGHT:  Object to form.  Foundation.
25      A   Yeah, I really don't want to speculate what –

Page 95

1  what might have happened.
2      Q   I'm asking you to testify what officers under
3  your command should have done in an ongoing criminal
4  investigation; do you believe that you're able to
5  testify about what officers should have done under your
6  command?
7      A   I think that I can – I know that I can
8  testify about forms and administrative stuff that are
9  required to be in cases.  But I'm not going to sit here
10  and pretend like I know all the documents that are
11  contained in here.  I don't have them memorized.  Most
12  of this stuff I have absolutely no memory of, including
13  my own supplement that I submitted.  That affidavit does
14  not say that that information is based on a statement
15  that Detective Cornett wrote.  And it doesn't say that
16  it came from a recording that malfunctioned, or is
17  missing, or anything like that.  So I don't – I don't -
18  - I'm not going to make the leap from "Detective York
19  put this in an affidavit" and assume that it came from a
20  supplement that you've made the connection on, and I'm
21  not going to assume that there's nothing else in the
22  investigation where he got that information from,
23  because I'm not aware of that.  So I'm not – I'm not
24  comfortable with saying that that's where he got the
25  information from and that's why he put it in the

Page 96

1  affidavit.
2      Q   And I'm not trying to leap, I mean, what I'm,
3  when I originally asked you the question you assumed
4  that that information came from Detective Cornett's
5  supplemental report.  That's why I asked for you to
6  review the report, because it obviously does not come
7  from that.
8      A   No, I didn't assume it.
9      Q   My question to you – I'm sorry?
10      A   I didn't assume that.  Whenever you asked me
11  to read that affidavit I was confused as to why you're
12  asking me if it would be documented somewhere, and I
13  know that one of the interviews that was done was done
14  by Mike Cornett, and so I just said I felt like
15  Detective York had made an attempt to get the supplement
16  included, but the interview with Crump in there.  So I
17  know at least of one instance where someone spoke to Mr.
18  Crump and got information from him, and I know for
19  certainty that Detective York took steps to try to get
20  that into the case.  So I'm not – I wasn't assuming
21  that that's where the affidavit information came from,
22  and I'm not trying to make that leap.  I'm just pointing
23  out that there's information in there from that
24  interview, and I know that he did take steps to try to
25  get that included in the case.  So, yes, I – and even

Page 97

1  said this earlier, I absolutely expect information to be
2  documented and put into a case.  And I think that was
3  made obvious – or made – I made you aware of that
4  whenever we discussed when I thought that the supplement
5  had not been included.
6      Q   Okay.  So, all right, well then, let's start
7  there.  If a detective under your command, in the Mills
8  homicide investigation, learned of exculpatory evidence,
9  would you have expected that officer to document it and
10  make it a part of the investigative file?
11      MR. WRIGHT:  Object to form.  Foundation.
12      A   Can you repeat that?
13      MR. SLOSAR:  Can you play it back, Lacee.
14      COURT REPORTER:  Yeah, I will in a second.
15      (REPORTER PLAY BACK REQUESTED TESTIMONY)
16      A   I am not aware of any exculpatory evidence
17  that was not included in this case.
18      Q   Ma'am, you're not even answering the question.
19  I just asked you if, as a supervisor, would – did you
20  expect that officers under your supervision would have
21  been documenting exculpatory evidence that was learned
22  during the underlying investigation?
23      MR. WRIGHT:  Same objection.
24      A   To my knowledge anything that would be
25  exculpatory would be included.  But I can't – I can't

Page 98

1  give a statement or a testimony about some information
2  that – that may not even exist, or does not exist.
3  Because what we're reading is an affidavit on a search
4  warrant. To me, that doesn't – I'm not seeing anything
5  that's exculpatory.
6      Q   Okay. Well, do you know who the people are
7  who sued you, what their names are?
8      A   No.
9      Q   You don't even know who sued you in this case?
10     A   No, sir, I do not.
11     Q   Have you ever read the allegations in the
12 complaint?
13     A   Yes, sir, I have.
14     Q   When did you?
15     A   It's been several months. I'm not –
16     Q   I will represent to you that the people who
17 have sued you are Amanda Hoskins and Jonathan Taylor,
18 and that Mike Simpson is not a party to this lawsuit,
19 okay?
20     A   Okay.
21     Q   Does the affidavit that you've read in that
22 search warrant implicate Amanda Hoskins or Jonathan
23 Taylor in any way?
24     MR. WRIGHT:  Object to the form. Foundation.
25     A   Can you tell me what page it was on?

Page 99

1      Q   Sure. It is on 340.
2      A   Okay. Repeat the question.
3      Q   Do you agree that the information contained in
4  that affidavit does not implicate the plaintiffs in any
5  way?
6      A   Yes. Well – I mean it doesn't have their
7  names mentioned.
8      Q   Okay. Does it implicate them, yes or no?
9      A   No, it doesn't appear. But I don't know what
10 the results of the search warrant are, either. So I
11 mean the search warrant – but that statement right
12 there does not mention their names.
13     Q   That statement right there implicates somebody
14 by the name of Mike Simpson, correct?
15     A   This statement here says that Mr. Simpson was
16 identified my Michael Crump as being at the Katherine
17 Mills residence that morning.
18     Q   Okay. Do you, sitting here today, are you
19 aware that Katherine Mills was the person who was found
20 dead on December 20, 2010?
21     A   Yes, that's correct.
22     Q   Okay. So it's your understanding that
23 Katherine Mills is the victim in this case; is that
24 right?
25     A   Yes. Yes, I understand that.

Page 100

1      Q   Okay. Would you have expected detectives
2  under your command to document an identification that
3  was created during a homicide investigation?
4      MR. WRIGHT:  Object to form. Foundation.
5      A   Well, the affidavit is attached to the case.
6  So it's included in there.
7      Q   Would you have expected detectives under your
8  command to also create a supplemental report that
9  describes the identification process, and when it was
10 conducted, and what photographs were shown, or whether a
11 live line-up was conducted?
12     MR. WRIGHT:  Object to form. Foundation.
13     A   If that information is relevant, then, yes, I
14 would expect that – that at some point it would be
15 documented, which here it's not implicating that he
16 murdered anybody. This is an affidavit asking for
17 information about a cell phone number. He's asking for
18 the name, the date, and address of a cell phone number.
19 So I don't – I don't know what the results of the
20 search warrant are. I mean you're asking me to – to
21 give an answer to something that is very limited
22 information on an affidavit for a phone number.
23     Q   Ma'am, were you a supervisor on this murder
24 investigation?
25     A   Yes.

Page 101

1      Q   Okay. Would it have been important for you,
2  with your doing your quality control checks every
3  quarter for a number of years, to know whether
4  identifications were conducted in the underlying
5  investigation?
6      MR. WRIGHT:  Object to form. Foundation.
7      A   Can you repeat it? The question, please.
8      MR. SLOSAR:  Lacee, will you play it back?
9      COURT REPORTER:  Yeah, hold on one second.
10     (REPORTER PLAYS BACK REQUESTED TESTIMONY)
11     A   What type of identifications are you talking
12 about?
13     Q   Any.
14     A   Are you talk – I mean what kind – tell me
15 specifically what kind of identifications that you're
16 talking – identifications of what? People at the
17 scene? I mean, we did –
18     Q   A human being?
19     A   We identified people at the scene. I mean we
20 left somebody there that would have done, most likely, a
21 crime scene log of every person that was there. I think
22 there was at some point a UPS driver there. I mean, is
23 that the type of identifications that you're talking
24 about? Like, anybody that was ever present around the
25 house, or –

Page 102

1    Q   Ma'am, do you know what Michael Crump's
2  significance to the criminal investigation is?
3    A   No.
4    Q   Sitting here today?
5    A   No, I do not.
6    Q   Okay.  At any point in the investigation were
7  you aware of Michael Crump's significance?
8    A   I don't -- I have very limited memory of this
9  investigation.  It has been many years, and it's one of
10 hundreds of cases that I was a sergeant whenever they
11 happened, or that I reviewed.  So I mean, no, I don't.  I
12 don't remember names, I don't remember dates, I don't
13 remember a lot of this stuff.  I honestly do not even
14 remember the supplement that I wrote where I took
15 fingernail clippings from evidence and mailed them.  I
16 have absolutely no recollection of ever doing that.
17   Q   How many homicide investigations have you
18 supervised at Post 10?
19   A   I have no idea.
20   Q   Can you provide an estimate?
21   A   No.
22   Q   What was the last homicide investigation you
23 supervised?
24   A   Well, we have -- we currently have several,
25 so, that are open right now.

Page 103

1    Q   Are you back at Post 10 today?
2    A   Yes, I am.  I'm the investigative lieutenant.
3    Q   And as the investigative lieutenant, are you
4  aware of ongoing homicide investigations at Post 10?
5    A   Yes, sir.  I know that they're taking -- right
6  now I don't have a sergeant, so still five years later,
7  we're still understaffed.  So I don't have a sergeant
8  now.
9    Q   Where is Detective York at now?
10   A   He's a sergeant at Post 10.
11   Q   I thought you just said you don't have a
12 sergeant at Post 10?
13   A   I do not have an investigative sergeant at
14 Post 10.  The only sergeants that are at Post 10 are the
15 admin sergeant, and three squad sergeants.  But there is
16 no sergeant in the detective squad.
17   Q   Okay.  What kind of sergeant is Detective
18 York?
19   A   He's a squad sergeant.
20   Q   What responsibilities do squad sergeants have?
21   A   They supervise troopers.
22   Q   Why is -- is Detective York currently involved
23 in, as a sergeant, is he involved in any ongoing
24 investigations at Kentucky State Police?
25   A   He would supervise any investigation that his

Page 104

1  troopers are -- are conducting.
2    Q   Is it fair to say that troopers don't conduct
3  homicide investigations?
4      MR. WRIGHT:  Object to form.  Foundation.
5    A   Normally when a trooper receives a homicide
6  investigation, he gets reassigned to a detective.  But --
7    Q   Are you aware -- I'm sorry.  Keep going.
8    A   But usually a trooper is the first one to
9  respond to death investigations.
10   Q   Okay.  So aside from initially appearing at
11 the scene, is it fair to say that troopers are not
12 handling or leading a homicide investigation?
13   A   Not traditionally, no.
14   Q   Okay.  Are you aware of any homicide
15 investigation that Detective York has supervised as a
16 sergeant at Post 10?
17   A   I don't -- I don't know.
18   Q   Are you aware of any officers having been
19 assigned to the investigation into the death of
20 Katherine Mills?
21   A   Can you repeat that?
22   Q   Are any officers, to your knowledge, assigned
23 to the investigation into the death of Katherine Mills?
24   A   Are you referring to troopers?
25   Q   Anyone?

Page 105

1    A   I have no knowledge at all of the status of
2  the Katherine Mills case.  I do not know who it's
3  assigned to, if it's in a cold case drawer, I have
4  absolutely no knowledge of that case, or the current
5  status of it.
6    Q   Ma'am, have you reviewed Detective York's
7  deposition in this lawsuit?
8    A   No, I have not.
9    Q   Between December 20, 2010 and the time that
10 you left Post 10, what steps did you take to screen
11 police reports generated by detectives in the Mills
12 homicide?
13     MS. KINCER:  I'm going to object to asked and
14 answered at this point.  We're asking the same
15 questions over and over in a different way, but the
16 answers are still the same.
17   Q   You can answer.
18   A   Can you repeat that, please?
19     MR. SLOSAR:  Lacee, can you play back?
20     COURT REPORTER:  Yeah, hold on.
21     (REPORTER PLAYS BACK REQUESTED TESTIMONY)
22   A   Can you play it again?
23     (REPORTER PLAYS BACK REQUESTED TESTIMONY)
24   A   Can you explain what you mean by "screen?"
25   Q   I'm sorry, what's the word that you're having

Page 106

1  trouble with?
2    A  "Screen."
3    Q  "Screen," like review?
4    A  Okay.  Again, I mean, it's -- I do a quarterly
5  review of cases, so any reports that are generated by
6  the detectives, I would review those quarterly.
7    Q  Ms. Joseph, I'm going to ask you some specific
8  questions about Detective York and testimony he's
9  provided at his deposition, okay?
10    A  Okay.
11    Q  Detective York testified at his deposition
12  that he lied to witnesses during the homicide
13  investigation; were you aware of this while you were his
14  supervisor at Post 10?
15    MR. WRIGHT:  Object to form.  Foundation.
16    A  In what context is he lying to a witness?
17    Q  Well ma'am, there are --
18    A  No, I'm not aware of it.  I'll just -- I'm --
19  I'm not aware of it.
20    Q  All right.  What steps did you take during
21  your supervision of Detective York to prevent him from
22  lying to witnesses in the Mills investigation?
23    MR. WRIGHT:  Object to form.
24    A  I -- is there a problem that he lied to a
25  witness?  Is that what you're saying?

Page 107

1    Q  No, that's not what I'm saying.  I think
2  you're overthinking my question.  I'm asking you
3  something very basic, ma'am.
4    A  Okay.
5    Q  Which is, did you take any steps while you
6  supervised Detective York to instruct him that he
7  shouldn't be lying to witnesses?
8    A  No, I've never told him not to lie to
9  somebody.
10    Q  Detective York testified at his deposition
11  that he made promises to witnesses that were not
12  documented during the Mills homicide investigation; were
13  you aware of that conduct?
14    MR. WRIGHT:  Object to form.
15    A  I didn't take any steps to stop him from lying
16  to a witness because, I mean, that's not -- that's not a
17  violation of our conduct.  It's not a violation of
18  policy or anything like that.  So even if he was, I'm
19  not aware of it, but even if I was, I wouldn't take any
20  steps to tell him not to do that.
21    Q  I appreciate that Ms. Joseph, but that really
22  wasn't my question.  My question to you is about a
23  different topic entirely.  My question to you was,
24  Detective York testified at his deposition that he made
25  promises of consideration to witnesses that were not

Page 108

1  documented on police reports; were you aware of him
2  doing that?
3    MR. WRIGHT:  Object to form.
4    A  I do not recall being made aware of -- of
5  anything like that, of any kind of considerations that
6  he made promises about.
7    Q  Okay.  While you were Detective York's
8  supervisor, did you ever tell him that he was not
9  allowed to make promises to witnesses without
10  documenting those promises in a police report?
11    A  No --
12    MR. WRIGHT:  Object to form.
13    A  -- I don't recall.  I'm sorry.
14    MR. WRIGHT:  Go ahead.
15    A  I don't recall ever telling him that.
16    Q  Detective York testified in his deposition
17  that he yelled at witnesses during the homicide
18  investigation of Katherine Mills' death.  Were you aware
19  that Detective York was yelling at witnesses during this
20  investigation?
21    MR. WRIGHT:  Object to form.
22    A  I don't recall ever listening to an interview
23  where he yelled.  He may have, but even if he had,
24  again, that's not a violation of conduct or policy, so
25  that's not something that I would have felt the need to

Page 109

1  even address.
2    Q  Okay.  So is it fair to say that you never
3  took any steps to instruct Detective York that he was
4  not allowed to yell at witnesses during the homicide
5  investigation?
6    MR. WRIGHT:  Object to form.
7    A  No, because, you know, we all interview in a
8  different way, and there's nothing that prohibits him
9  from -- from yelling, or raising his voice, or making
10  false statements, or lying to witnesses, or anything
11  else along those lines.
12    Q  Is there -- are you aware of any policy or
13  procedure that would instruct Detective York that he's
14  not allowed to threaten witnesses?
15    MR. WRIGHT:  Object to form.
16    A  I'm not aware of Detective York ever making a
17  threat towards a witness.
18    Q  Well, ma'am, you were present with Detective
19  York during the questioning of Dave Fox in December of
20  2011, were you not?
21    A  I don't -- I do not recall that interview, or
22  the date that it happened.
23    Q  When was the last time you listened to that
24  recording?
25    A  I have -- I have no memory of listening to it.

Page 110

1    Q   Do you recall testifying at a criminal capital
2 murder trial in Bell County?
3    A   Can you tell me which case it is?
4    Q   It's the case of the Commonwealth versus
5 William Anderson?
6    A   Okay.  Well, I've testified numerous times in
7 court in Bell County.  Yes, I do recall.
8    Q   Okay.
9    A   Yes, I remember the testimony in that case.
10   Q   Okay.  And at some point in that trial you
11 actually revealed that a second recording existed from
12 an interview that you participated in with Detective
13 York and Deputy Eubanks; do you recall testifying to
14 that effect?
15   A   No, I do not.
16       MS. KINCER:  We're objecting now because this
17 is getting into Anderson.
18       MR. WILLIAMS:  I'll join.  It's Rule 26(d).
19       MR. SLOSAR:  Are you going to instruct any --
20 are you going to instruct your client not to answer
21 any questions about the questioning or of the -- her
22 participation in questioning a witness with
23 Detective York in the Anderson case?
24       MS. KINCER:  I am.
25       MR. SLOSAR:  And what grounds is the objection?

Page 111

1        MS. KINCER:  That it's not relevant, that it's
2 not part of this lawsuit.  She's not prepared to
3 testify to that because this -- there's not even the
4 same named parties in that lawsuit and -- what's
5 Rule 26?
6        MR. WILLIAMS:  Rule 26(d)?
7        MS. KINCER:  Yes.
8        MR. WILLIAMS:  There hasn't been a scheduling
9 order entered in the court allowing discovery to
10 proceed.
11       MR. SLOSAR:  All right.  So, obviously, that's
12 not a -- Jason, I'm assuming that's you.  That's not
13 --
14       MR. WILLIAMS:  That's me, Jason.  I'm just
15 joining.
16       MR. SLOSAR:  -- not a civil rule that prevents
17 questioning on a topic.  You're saying that because
18 there's not a scheduling order in William Anderson's
19 case, that we're not allowed to ask questions about
20 Sergeant Pickrell's participation and investigations
21 with defendants in this case?
22       MR. WILLIAMS:  Well, I'm just joining an
23 objection made by KSP counsel, and it's certainly a
24 valid objection to make.  I can't direct this
25 witness not to testify, obviously.  I'm just making

Page 112

1 an objection.  But 26(d) says that discovery didn't
2 commence in an action until a scheduling order has
3 been issued, or the court orders that discovery can
4 proceed.  So I don't know that there's an exception
5 to it, but it's just a stated objection.
6        MR. SLOSAR:  Shawna, are you going to instruct
7 your client not to answer any questions about her
8 involvement in supervising or participating in the
9 criminal investigation that led to charges against
10 William Anderson as it relates to KSP officers that
11 are defendants in this case and in that case?
12       MS. KINCER:  With regard to William Anderson, I
13 am instructing her not to answer any questions about
14 her supervision or participation in that particular
15 case.  We're here to discuss Hoskins and Taylor.
16 BY MR. SLOSAR:
17   Q   Okay.  And you understand from our -- have you
18 reviewed our discovery responses, Sergeant Joseph, about
19 how this type of questioning is related to this suit?
20   A   I did.  I read how the investigation talked
21 about Anderson and all the case -- things of Anderson
22 and Dave Fox.  You're alleging a conspiracy and a cover-
23 up, but I don't see how the two are related.
24       MR. SLOSAR:  All right.  Well, I think under
25 Rule 26(c), because we do have a line of questioning

Page 113

1 that I believe is directly related to Ms. Joseph's
2 participation and supervision of the defendants that
3 were under her supervision in this case as were the
4 same ones in the other case being conducted at the
5 same time, I do believe that we have a good faith
6 basis for that being relevant.  But to the extent
7 you're going to prevent her from answering such
8 questions, I think 26(b) requires you to seek a
9 protective order and that we stop today's
10 deposition.
11       MS. KINCER:  Let's go off the record for a few
12 minutes.
13       MR. SLOSAR:  Sure.
14       (OFF THE RECORD)
15       MS. KINCER:  All right.  Elliot, we have
16 discussed this a little further.  We are
17 comfortable, just for getting this over with, any
18 questions about techniques, any supervision
19 questions, that's fine.  But if it gets into
20 litigation or the facts of the case, she is not
21 prepared to answer those, so we'll take it up at
22 that time, question-by-question objection.  But we
23 will go ahead and move forward as far as techniques
24 and her supervision.
25       MR. SLOSAR:  Sounds good.  And just to let you

Page 114

1    guys know, this is, you know, moving a lot slower
2    than I anticipated. So I'm only about halfway
3    through my outline. So at any point in time it
4    makes sense to take a lunch break you-all just let
5    me know. But I probably have a couple of hours
6    left.
7        MS. KINCER: Oh, dear, God. Okay. I have
8    childcare issues, so I'll have to start working on
9    that, but, we'll –
10       MR. SLOSAR: Sorry.
11       MS. KINCER: We'll go.
12       MR. SLOSAR: Okay. All right.
13   BY MR. SLOSAR:
14       Q   So, Ms. Joseph, were you – do you recall
15   participating in questioning of Dave Fox with Detective
16   York and a Knox County deputy in December of 2011?
17       A   Yes.
18       Q   Okay. And where did that questioning take
19   place at?
20       A   I don't recall where it was at.
21       Q   Okay. Do you remember questioning Mr. Fox
22   first?
23       A   I don't recall.
24       Q   Well, at some point did Detective York join
25   you in the interrogation room with the witness?

Page 115

1        A   I don't – without listening to the audio, I
2    really have a limited knowledge or memory of it. The
3    best I can remember, I was not in the room when
4    Detective York was interviewing him. Wherever we were
5    at, it was either at the PD or the sheriff's office,
6    there's a room with a view window in it, or it was on
7    video or something of that nature, like, there's a live
8    feed video where I could see it in another room and
9    observe the interview.
10       Q   Okay. So at the time that you left, it's your
11   recollection that Detective York came into the room and
12   you were not physically present there, but were able to
13   watch either through a window or through some sort of
14   video monitoring; is that your recollection?
15       A   That's correct. I don't recall like –
16   because the best I could remember, I provided the
17   transportation of Mr. Fox to the location. And I'm not
18   100 percent sure on that, but I believe I provided the
19   transportation so, yes, I was – I was possibly in the
20   room with him prior to Detective York coming in there. I
21   don't know if we spent any time in the room together,
22   but I think that I left the room and then Detective York
23   came in.
24       Q   Okay.
25       A   But I do remember standing outside watching

Page 116

1    it.
2        Q   Okay. Were you Detective York's supervisor at
3    that time?
4        A   Yes, I was.
5        Q   Okay. And do you recall how you came to pick
6    up that witness? Was that something that you did on
7    your own, or did Detective York request that you do
8    that?
9        A   We were at a residence somewhere on a
10   different case, and this gentleman was inside the
11   residence. I don't think it's where he lived, but I
12   think he was there. And at some point during the search
13   warrant, I don't know what – what made Detective York
14   or one of the other detectives, at some point somebody
15   decided that we probably should go back and speak to
16   this guy and get some kind of statement from him. I
17   guess the search warrant maybe revealed something that
18   maybe he would have information or something, but I
19   don't – I don't recall the exact details of it. But I
20   do recall that while we were doing the search warrant,
21   Mr. Fox did not want us there. And so he was making
22   numerous statements to us about he wanted us – that we
23   didn't have business there, or maybe he was saying
24   something that – he seemed to be irritated by us being
25   there, the best I could remember. But I was, of course,

Page 117

1    supervisor, so kind of my job was to smooth things over
2    with the family. Like, there was a little kid there,
3    that, she was kind of nervous about us being there and
4    so I spoke to her. I stayed in the living room. It
5    seemed like there was a guy who was crippled or
6    something like that. So we couldn't clear the house for
7    officer safety stuff so – or for officer safety, so
8    what happened was I stayed in that room with them just
9    to make sure that nobody pulled a weapon or anything
10   like that, or anybody was trying to conceal evidence or
11   anything. So – so I just stayed in the room. So I
12   remember talking to the little girl, and talking to the
13   family, and just trying to reassure everybody that, you
14   know, we were going to be gone in a few minutes, and all
15   that kind of stuff. So whenever it was decided that Mr.
16   Fox should be interviewed, then it – it made sense that
17   since I kind of had a rapport with the family, that I
18   would go back and give him a ride to the – to the
19   department. And, again, I don't remember if we were at
20   the city police department or if we were at the
21   sheriff's office using their facility. But it was – it
22   was a good distance from post, so we used somebody
23   else's facility. And to the best of my memory, I
24   transported Mr. Fox to the facility that we conducted
25   the interview. And that was just because –

Page 118

1  Q   Okay.

2  A   – I had a better rapport with him.

3  Q   Okay.

4      MR. SLOSAR:  And Lacee, I think that we have

5  the interview as Exhibit 6.  Do you have that?

6      ( EXHIBIT 6 MARKED FOR IDENTIFICATION )

7      COURT REPORTER:  I do.

8      MR. SLOSAR:  Do you have that available?  Okay.

9  So we're going to introduce the interview as Exhibit

10  6.  And it's Bates Number PL27706, the September 3,

11  2011 interview of Dave Fox.

12      MR. WILLIAMS:  Just please note my continuing

13  objection to this line of questioning.  Thank you.

14      MR. WRIGHT:  Join.

15      MR. SLOSAR:  Lacee, would you play the first,

16  well, will you go to the time stamp of an hour and

17  45 minutes, and let me know when you get it?

18      THE WITNESS:  Is it possible for us just to

19  play all of it?

20      MR. WILLIAMS:  Rules of evidence requires it.

21      MR. SLOSAR:  We would be here for a while if we

22  played the whole thing. It's a couple of hours long.

23      THE WITNESS:  Well, I mean if you're going to

24  ask me questions about it, I prefer to listen to it.

25      MR. SLOSAR:  You want – well, I am going to

Page 119

1  ask you a few questions that are just about certain

2  segments.  Certainly, if you want to stop the

3  deposition, Ms. Joseph, and review the entire thing,

4  I would be perfectly accommodating and willing to do

5  that. So if you want to do it that way we can do it

6  that way and have you review it, and come back a

7  different day and I can ask you questions about it,

8  if that's what you would feel more comfortable

9  doing.

10      THE WITNESS:  Well, I'll see what you ask me

11  about it.  I just don't want – I don't want you

12  asking me about something that I'm not going to be

13  able to have in the correct context, or something

14  like that.

15      MR. SLOSAR:  I understand.

16      COURT REPORTER:  Okay.  Now what time did you

17  want me to go to?

18      MR. SLOSAR:  Well, I guess the first 20 seconds

19  of it, and then let me know when that's done.

20      COURT REPORTER:  Okay.  So I'm going to play

21  this.  Let me know if you can't hear it, okay?

22      THE WITNESS:  Okay.

23      (REPORTER PLAYS RECORDING)

24      COURT REPORTER:  The first 20 seconds is over.

25      MR. SLOSAR:  Great.  Thank you.

Page 120

1  BY MR. SLOSAR:

2      Q   Ms. Pickrell, do you recognize that – or, I'm

3  sorry, Ms. Joseph, I apologize, ma'am.

4      A   That's okay.

5      Q   Do You recognize the voice in that recording?

6      A   Yeah, it sounds like me.

7      Q   Okay.  I know that – and you had a different

8  last name at that time; is that fair?

9      A   Yep, that was two names ago.

10      Q   Okay.  All right.  But based upon the

11  recording, do you have any reason to dispute that you

12  were questioning Dave Fox on September 3, 2011 at

13  approximately 10:00 p.m.?

14      A   No.

15      Q   Okay.  Now the recording that has been

16  disclosed to us in this lawsuit is two hours and 41

17  minutes.  And I will represent to you that for

18  approximately the first hour and 40 minutes, that you

19  were questioning Dave Fox relating to his knowledge of

20  that investigation; do you have any recollection of

21  that?

22      MR. WRIGHT:  Object to form.

23      A   I honestly do not have any recollection of

24  that, but I do recall speaking with him.

25      Q   Okay.

Page 121

1      A   I didn't realize it lasted that long, but I do

2  recall talking to him.

3      Q   Okay.  And earlier you testified that you not

4  only recall speaking to him, but that at some point you

5  recall leaving the room; is that right?

6      A   That's correct.

7      Q   Okay.  And I just want to make sure I have

8  this right; after you left the room, were you able to

9  watch and listen in on the questioning of Dave Fox by

10  Detective York and a Knox County deputy?

11      A   Yes, sir.

12      Q   Okay.  Was there anything that Detective York

13  did during the questioning, that you were watching, that

14  you disapproved of?

15      A   No, sir.

16      Q   Was there any conduct that Detective York

17  exhibited during his questioning of Dave Fox that you

18  ever disciplined him for?

19      A   No, absolutely not.

20      Q   Did you ever do any sort of verbal or

21  reprimand of Detective York, based upon the questioning

22  of Dave Fox on December 3, 2011?

23      A   No, sir, I did not.

24      Q   The questioning that Detective York did of

25  Dave Fox, that you were able to see and listen to, did

Page 122

1  that questioning violate any of the Kentucky State
2  Police policies or procedures that you're aware of?
3      A   No, sir.
4      Q   Was there any training, to your knowledge,
5  that you provided to Detective York, that instructed him
6  not to conduct an interview in the fashion that he
7  conducted Dave Fox's on December 3, 2011?
8      A   No.  As a matter of fact, I think that
9  training is – is probably where he learned his
10  techniques.
11     Q   Okay.  At any point in time did you stop
12  Detective York from questioning Dave Fox in the manner
13  that he was questioning him in on December 3, 2011?
14     A   No, sir.
15     Q   At any point in time did you intervene in
16  Detective York's questioning of Mr. Fox out of fear that
17  he had violated any policy, procedure, training of the
18  Kentucky State police?
19     A   No, I never –
20         MR. WRIGHT:  Objection.
21     A   I'm sorry.
22         MR. WRIGHT:  Go ahead.
23     A   No, I never saw anything that made me feel
24  like I needed to intervene in the interview.
25     Q   Now, at some point do you recall learning that

Page 123

1  the recorded questioning of Dave Fox had not been
2  disclosed in the criminal case?
3         MR. WRIGHT:  Object to form.
4      A   I don't – I don't know what you're – can you
5  repeat the question?  I don't think I understood it.
6      Q   Sure, sure.  I believe that at some point
7  during William Anderson's trial, you disclosed the audio
8  recording of the December 3, 2011 questioning of Dave
9  Fox; do you recall doing that?
10     A   Do I recall disclosing the interview?
11     Q   Yes.
12     A   I – I remember testifying about it.
13     Q   Okay.  And after you testified about it, do
14  you recall going back to the post to find the actual
15  recording?
16     A   Oh, yes.  I forgot about that, sorry about
17  that.  Yeah, it does seem – there was something,
18  whatever, the case was copied.  I don't know if the copy
19  wasn't a good copy, if it was a blank disk, or what had
20  happened, but the clerk, whenever she provided a copy to
21  the Commonwealth attorney's office, that specific
22  interview, for whatever reason, was not included.  But
23  as soon as we realized that it was not in the case, or
24  that they had not been made aware – as soon as I
25  figured out that the Commonwealth attorney did not have

Page 124

1  a copy of that, I immediately went to post and obtained
2  a copy and delivered it to the courthouse.
3      Q   Okay.  Did you ever do any investigation to
4  determine why that recording had not been made part of
5  the case file originally?
6      A   Well, it appeared that it was included in the
7  case.  The clerk that would have made a copy for the
8  Commonwealth attorney's office was no longer an employee
9  there, so I wasn't able to ask her what happened, but
10  there was – there was something whenever the case file
11  was provided to the Commonwealth attorney's office, that
12  it was not included in there.  But we made no attempt to
13  act like the interview never happened, or that it didn't
14  exist.  The second that I figured out that they didn't
15  have a copy of it, I went to post directly and got a
16  copy of it and made it available to them.
17     Q   Okay.
18         MR. SLOSAR:  I don't have the time stamp for
19  this part, Lacee, so I'm going to try to play it on
20  this end.
21     Q   Ms. Joseph, I want you to try to listen to
22  this clip, and I'm going to ask you some questions from
23  it once we're done, okay?
24     A   Okay.
25         (RECORDING PLAYED)

Page 125

1      Q   Ms. Joseph, could you hear that?
2      A   I did.  Yes, sir.
3      Q   Okay.  And was that the interview that you
4  participated in at one point, and then listened, and
5  then watched later on?
6      A   Yes, sir.
7      Q   Okay.  And did you watch and listen in during
8  that segment that I just played for you?
9      A   Yes, sir.
10     Q   Okay.  And is it fair to say that you were
11  aware that Detective York – what did you see Detective
12  York do?
13     A   I watched him do an interview.  Go ahead.
14     Q   I'm sorry.  With regard to Dave Fox, what did
15  you actually see Detective York do during that segment?
16     A   I don't recall exactly what he was doing
17  during that segment.  I know that at some point during
18  the interview he – he threw a chair.  And I believe, I
19  don't know if it's during that segment or not, but he
20  did knock Mr. Fox's hat off of his head.
21     Q   And did you ever issue any verbal or written
22  reprimand to Detective York based on those actions?
23     A   No, because those actions are not improper.
24     Q   Did you ever intervene to stop Detective York
25  from questioning Mr. Fox in that fashion?

Page 126

1  A  No, I did not, because at no point did I feel
2  like that he was violating any policy or any training
3  that he had received.  And as a matter of fact, Mr. Fox
4  testified in court during that trial that at no point
5  did he feel threatened or that Detective York was ever
6  going to injure him or that Detective York had ever
7  assaulted him, or come close to assaulting him.
8  Q  After -- your understanding was -- well, was
9  it appropriate for detectives under your supervision to
10  throw chairs, during questioning of witnesses in
11  criminal investigations?
12  MR. WRIGHT:  Object to form.
13  A  Well, I mean you're just listening to the
14  audio.  I was actually watching, watched the events take
15  place, and Mr. Fox was seated at a table next to a wall
16  and Detective York was standing on the other side of the
17  room when he's talking to him.  And the chair that he --
18  he didn't really throw it across the room, but he did
19  like throw it up against the wall, and it was closer to
20  him, across the room.  So he didn't -- at no point did I
21  think that even the chair could have come close to
22  striking anybody else in the room, or anything like
23  that.  He had been standing behind it I believe.  I
24  can't remember if he at one point was sitting in it, and
25  then he stood up out of it, but he just took his hand

Page 127

1  and hit the side of the chair and flipped it over, and
2  it bumped up against the wall.  So I mean I didn't --
3  whenever I saw that, at no point did I think that he was
4  being like -- like, trying to hurt anybody or anything
5  like that.  I mean, techniques are what they are.  I
6  mean there's good-cop/bad-cop has been talked about.
7  It's been on TV shows and everything.  I mean nobody --
8  I mean, it's no secret that good-cop/bad-cop is an
9  actual thing that police use.  And if you listen to the
10  interview, I think it's pretty easy to pick out who was
11  the good one and who was the -- who was supposed to be
12  playing the part of the bad one.
13  Q  Were you the good cop in that interview?
14  A  Yes.
15  Q  And was it your understanding Detective York
16  was going to serve as the bad cop?
17  A  The way that we were going to approach it was,
18  I had a rapport with Mr. Fox, and I felt like -- of
19  course, all of my training is in child sex abuse, so
20  most of the people that I've interviewed in my career
21  have been very passive.  They're not drug dealers or
22  involved in -- in the drug world.  They're not --
23  usually they have no criminal record.  You know, I
24  interview a lot of preachers, and Boy Scout leaders, and
25  things along those lines and so the people that I

Page 128

1  interview are usually more passive, and so whenever I
2  interview people I'm usually a lot more calm.  Sometimes
3  I play the dumb female, you know, I don't really know
4  what's going on here, like that kind of thing.  And
5  and that approach works for most of the interviews that
6  I've had to do in my career, whereas other people,
7  whenever they're talking to somebody that has been
8  raised in a much rougher home, or in a much rougher
9  life, you know, it's appropriate to use foul language,
10  or to be more aggressive in their approach and things
11  like that.  And so the first approach that we took was,
12  I already felt like I had a rapport with Mr. Fox, and so
13  I was going to go in there and be like, "If you know
14  anything, I want you to tell me what you know, because I
15  really want to help you out.  I don't want to see you
16  get in trouble, or I don't want to see you get blamed
17  for something that you didn't do."  And that approach
18  did not work.  And so then Detective York's approach was
19  going to be, "I'm going to go in there and I'm going to
20  tell him he's a liar, because I know he's lying, and
21  whenever he tries to deny that, I'm going to tell him
22  that I'm going to charge him along with everybody else,"
23  which is consistent with what I had been telling him,
24  you know, "I don't want to see you in trouble for
25  something that you didn't do," and that kind of thing.

Page 129

1  So, I mean, yeah, there was -- that was part of the plan
2  going into it, that one of us was going to be buddy-
3  buddy to him and try to help him out to get him to come
4  around and give the statement, like, give us what
5  information that we felt like he absolutely knew.  And
6  whenever that didn't work, then Detective York was like,
7  "Well, I'm going to try to be, you know, a little more
8  aggressive with him and see -- and see if that will get
9  him to talk."  So that was -- that was the technique
10  that we decided that we were going to use.
11  Q  Is it fair to say that Detective York resorted
12  to his techniques because Dave Fox was still maintaining
13  the same story that he never saw Mr. Anderson in a
14  vehicle with Mr. Wiggins?
15  MR. WRIGHT:  Object to form.
16  A  I'm not sure.  I'm not sure -- I'm not going
17  to testify about why Detective York went down a path of
18  questioning with him, because I don't know what he was
19  thinking, or why -- why he would go down a certain line
20  of questioning.
21  Q  Well, is it fair to say that the statement
22  that you and Detective York wanted to obtain from Dave
23  Fox did not -- was not done through your questioning?  Is
24  that fair to say?
25  A  Yes.

Page 130

1    MR. WRIGHT: Object to form.
2    A   I'm sorry.
3    MR. WRIGHT: Go ahead.
4    Q   But you didn't get the information that you
5  were looking to get from Dave Fox, which is why
6  Detective York came into the room and took on the role
7  of being the bad cop, is that right?
8    A   Yeah.  I interviewed him until I was tired,
9  and I felt like we weren't getting anywhere, and so I
10 came out of room and I was like, "My style of
11 questioning is not working with this guy."  I mean, he's
12 not – like, he was more interested in trying to get me
13 to go out and get a cup of coffee with him than he was
14 about having a serious interview.  I mean it – it was
15 almost like he didn't understand – like, he wasn't
16 comprehending that he was being interviewed about a
17 murder case.  So whenever I saw that I was getting
18 nowhere with him, I think he thought I was trying to
19 flirt with him or something like that.  So I came out of
20 the room.  I was like, "This is going nowhere.  Like,
21 he's even – he's not even on the spectrum with me
22 with this.  Like, he's not – he thinks that he's going
23 to be able to buffalo me," which is fine.  I mean he –
24 he comes from a different lifestyle than what I'm
25 accustomed to, and so, I mean, I – I kind of expected

Page 131

1  that he wasn't going to tell me the information that he
2  knew.  So that's why Detective York decided that – or
3  that he and I decided that he would go in there and
4  attempt to interview him.
5    Q   Now at some point you said Detective York was
6  on the other side of the table from Mr. Fox; is that
7  right?
8    A   No, he was not – there was a table in the
9  room and Mr. Fox was standing at the table.  He was –
10 had a chair and he was pushed up against the table.  And
11 that table was near the door.  So Detective Fox was
12 standing right beside the door to the interview room.
13 Detective York was on the other side of the other room,
14 and he had his chair back away from the table.  And I
15 don't know if he ever – because whenever I was talking
16 to Mr. Fox, I sat at the chair directly across the table
17 from him.  I was pushed all the way up against the table
18 because that's the way that I was interviewing.  I was a
19 lot more close.  Like, I closed in the personal space
20 and, you know, I was closer to him to where I didn't
21 have to raise my voice, that we could speak in low –
22 low voices and all that kind of stuff, and so whenever –
23 - whenever Detective York came in, he moved the chair
24 back away from the table.  And I don't recall if he ever
25 sat in the chair or not, but I know that he moved the

Page 132

1  chair back to the far end of the room, and it was almost
2  against the wall away from the table.
3    Q   Okay.  Now at the beginning of the questioning
4  you reviewed, or you went over, Mr. Fox's Miranda
5  warning with him; do you recall doing that?
6    A   No, but it wouldn't be uncommon for me to do
7  that.
8    Q   Okay.  I believe you said at some point that
9  Detective York hit the hat off of Mr. Fox; do you recall
10 that happening?
11   A   Yeah, he flipped the bill of it.
12   Q   And when that happened, were you watching?
13   A   Yes.
14   Q   Okay.  What was Detective York saying to Mr.
15 Fox as he hit the hat off his head?
16   A   Well –
17   Q   Let me ask –
18   A   I don't know.
19   Q   Let me ask you a – I could ask you a better
20 way: Did the hitting of the hat off of Mr. Fox's head,
21 did that occur during that short clip that I placed for
22 you a few minutes ago?
23   A   I don't recall.  I don't know if it was during
24 that point or not.  I know – I remember watching it.
25 Like, I was outside the room watching it, and whenever

Page 133

1  it happened Mr. Fox did not react to it at all.  Like,
2  he didn't raise his hands, like any kind of defensive
3  action or anything like that.  He didn't flinch.  The
4  best I can recall, Jason was calling him a liar and Mr.
5  Fox looked down at the ground and Jason took his hand
6  and flipped his hat back so – I don't know why he did
7  it, but I would assume so that he could see his face.
8  Like, it didn't appear to me that he was being
9  aggressive towards him at all.  He didn't – it didn't
10 look like he was attempting to hit him, or strike him,
11 or anything like that.  He wasn't trying to cause harm
12 to him.  There was nothing along those lines.  From my
13 standpoint, looking at it from the outside, Detective
14 York was removing the hat from his head so that he could
15 see his face, which is common.  Like, when we do
16 interviews we want to look people in the eye, and we
17 want, you know, to be able to read their facial
18 expressions and stuff.  And at no point did I see Mr.
19 Fox move, flinch, put up his arms in any kind of
20 defensive action.
21   Q   Did you ask Mr. Fox to remove his hat when you
22 questioned him during the first part of the questioning?
23   A   No, but whenever I was questioning him I was
24 sitting at the table directly across from him, and I was
25 leaned over the table so that I was very close to him.

Page 134

1  We were on –
2    Q  Did Detective York – I'm sorry.
3    A  Well, I was, of course I'm pretty short, so I
4  was at least eye level with Mr. Fox when I was talking
5  to him, if not a little bit below eye level, so – and
6  he didn't – I had no problem maintaining eye contact
7  with him during my interview with him.  So the hat was
8  never an issue for me, but...
9    Q  Did – well, can we take like a three or four-
10  minute break?  Is that okay?  I've got to get some water
11  real quick.
12    A  Sure.
13        (OFF THE RECORD)
14  BY MR. SLOSAR:
15    Q  Was there – did you ever have a conversation
16  with Detective York, after the questioning of Dave Fox,
17  where you told him that he needed to conduct his
18  questioning of witnesses or suspects in homicide
19  investigations in a different manner?
20    A  I don't recall.
21    Q  I believe you testified earlier that, based on
22  what you saw, Detective York didn't do anything to
23  violate the treaty, or policies, or procedures of the
24  Kentucky State Police during his December 3, 2011
25  questioning of Dave Fox; is that right?

Page 135

1    A  That's correct.
2    Q  So is it fair to say that if Detective York
3  had conducted questioning of witnesses in the Katherine
4  Mills homicide investigation in the same manner, and you
5  became aware of such tactics, that you would have done
6  nothing to stop Detective York?
7        MR. WRIGHT:  Object to the form.
8    A  Can you repeat that, please?
9    Q  Sure.  It was actually a bad question.  So let
10  me ask it a better way.
11    A  Okay.
12    Q  Is it fair to say that the tactics that
13  Detective York used against Dave Fox on December 3,
14  2011, that if he had used those same tactics with
15  witnesses or suspects in the Mills homicide
16  investigation, that you would have approved the use of
17  such tactics?
18        MR. WRIGHT:  Object to form.
19    A  Well, I don't want to speculate what my
20  reaction to something would have been that didn't occur,
21  so – I mean, to my knowledge, he didn't conduct an
22  interview like that.  Especially not one that I was
23  present for and witnessed, so I don't want to speculate
24  what I might have done if something might have happened.
25    Q  Well, you were present and witnessed the Dave

Page 136

1  Fox interview and you didn't stop it, correct?
2    A  That's correct.
3    Q  And after the questioning was done with Dave
4  Fox, you never did any sort of reprimand to Detective
5  York that would have provided instruction to him that
6  he's not allowed to do that type of stuff in
7  questioning, correct?
8    A  That's correct.  I mean there was – there
9  would have been no reason for me to reprimand him.  And
10  even Mr. Fox testified in court that he was not
11  assaulted, or that he didn't feel threatened.  So I
12  didn't perceive anything improper, and even Mr. Fox,
13  according to his testimony, didn't feel like it was
14  improper.
15    Q  Well, does Detective – would Dave Fox's
16  feelings matter as to whether Detective York was
17  violating the policies or procedures of KSP?
18    A  Oh, no, no.  He – I observed it, and I did
19  not see any violation of policy.  So, of course not.  I
20  mean, if – but now, if Mr. Fox had had a complaint
21  about it he had ample opportunity, because I gave him a
22  ride back home.  So at any point he could have been
23  like, "Man, that detective really scared me.  I thought
24  he is going to hit me," or "I felt threatened," or "I
25  don't feel safe around him," or, I mean, he had plenty

Page 137

1  of opportunity.  There was no reason for him to feel
2  like – as far as he knew, I wasn't in the room, and I
3  wasn't aware of anything that had happened, and I even
4  took him outside for a smoke break and everything.  So I
5  mean, he had plenty of opportunities that if he felt
6  like something was improper, inappropriate, that he
7  could have relayed that to me.  So even if I looked at
8  it, and in my own judgment I didn't see a problem with
9  it, he could have brought something to my attention that
10  maybe I didn't notice, or that I didn't pick up on, or
11  something like that.  But, you know, Mr. Fox, at no
12  point, even though he had numerous opportunities, he
13  never – he never mentioned to me that he felt like
14  anything was out of line or inappropriate.  And I felt
15  like I had a pretty good rapport with him.  I mean like
16  I said, afterwards he asked me to go get something to
17  drink with him.  So I mean, I feel like he felt
18  comfortable enough with me to ask me out, that he could
19  have at any moment said, "Oh yeah, by the way, your
20  detective, you know, I felt like he was kind of out of
21  line."
22    Q  What did you and Dave Fox talk about on the
23  ride home?
24    A  Nothing.
25    Q  Do you remember any specifics of the

Page 138

1  conversation?
2      A   No, I don't recall any conversation that we
3  had.  The last conversation that I remember having with
4  Mr. Fox was out behind the facility that we were using
5  while he was smoking, because I -- I think that was --
6  that's the only conversation that I remember still
7  having with him.
8      Q   Okay.  So if you learned in the Mills homicide
9  investigation that Detective York --
10          (phone beeps)
11     Q   Okay.  Sorry about that, Ms. Joseph.  If you
12  learned that Detective York was questioning witnesses in
13  the Mills homicide investigation using the same tactics
14  that he used with Dave Fox, would you have approved of
15  that?
16         MR. WRIGHT:  Object to form.
17     A   As long as Detective York isn't violating
18  policy, he can conduct his interviews however he feels
19  appropriate.
20     Q   As a supervisor of detectives, if you learned
21  that Detective York was swearing at witnesses during
22  interviews in the Mills investigation, would you have
23  done anything to stop him?
24     A   No.
25         MR. WRIGHT:  Object to form.

Page 139

1      A   I'm sorry.  I'm sorry.
2          MR. WRIGHT:  Go ahead.  You're fine.
3      A   No, I would not have.
4      Q   As a supervisor, if you had learned that
5  Detective York was threatening witnesses while
6  questioning them in the Mills investigation, would you
7  have done anything to stop them?
8          MR. WRIGHT:  Object to form.
9      A   Was it -- tell me what you feel is a "threat."
10  I mean like if he --
11     Q   If he --
12     A   If he tells somebody, "I'm going to burn your
13  house down and kill your kids if you don't tell me what
14  I want you to say," then, yeah, if I heard about that I
15  would go to him and be like, "Jason, are you threatening
16  to burn down people's houses if they don't give you a
17  statement?"  Yeah, I mean I would address that.  But now
18  if he -- if he's telling somebody, "Either tell me what
19  you know or I'm going to put you in prison," like he did
20  with David Fox, no, I would not say anything to him
21  about that.  But that's a reality, you know, if people
22  lie to us, then we can absolutely charge them,
23  criminally, in an investigation for lying, or covering
24  up evidence of a crime.
25     Q   If Detective York told witnesses during the

Page 140

1  Mills homicide investigation that he would charge them
2  unless they said what he wanted them to say, would you
3  have done anything to stop that?
4          MR. WRIGHT:  Object to form.
5      A   I don't think that Detective York would have
6  ever said anything like that.
7      Q   My question to you is different, which is:  If
8  you had learned that he had threatened to charge people
9  unless they told him the information that he wanted to
10  hear --
11     A   Well, just like --
12     Q   -- and you had learned --
13     A   Yeah, just like in the David Fox interview,
14  that's what he told David Fox.  He said, "Either tell me
15  the truth or I'm going to put you in prison, and I'm
16  going to charge you just like the rest of these people."
17  That is appropriate.  There's nothing wrong with that.
18  That's the reality of it.  If somebody is concealing
19  evidence of a crime, they can absolutely be charged with
20  that.  So I would not -- I would not step in.  I would
21  not intervene.  If somebody told me, "He threatened to
22  put me in prison if I didn't tell him the truth," I
23  would say, "Well, then you should probably tell him the
24  truth."  So I mean that's the way that I would deal with
25  that as a supervisor.

Page 141

1      Q   But you had no way of knowing what really the
2  truth was, right, when you questioned Dave Fox; is that
3  fair?
4          MR. WRIGHT:  Object to form.
5      A   Oh, no. I mean, we know what information that
6  we had to work off of, and that's why we do interviews,
7  is -- that's why we do investigations.  We take
8  statements from people, and we do interviews, and we try
9  to -- to compel people to tell us the truth.
10  Unfortunately, the reality of our job is most of the
11  people that we deal with are in the business of
12  manipulating and being dishonest.  So I mean, if you're
13  being accused of murder, you've got a lot to lose by
14  being honest with us.
15     Q   Were you aware that Detective York initiated
16  charges against a fourth person for the murder of
17  Katherine Mills?
18         MR. WRIGHT:  Object to form.
19     A   No.
20     Q   Prior to today's deposition, were you aware
21  that Detective York drafted an arrest warrant against a
22  woman named Kayla Mills for the murder of Katherine
23  Mills?
24     A   No.
25     Q   I'm going to try to refer you to the page, so

Page 142

1  bear with me. Were you ever made aware that Detective
2  York testified in his deposition that he reached an
3  agreement with Kayla Mills that he would not pursue the
4  charges against her for murder if she gave a statement
5  implicating John Taylor?
6      MR. WRIGHT: Object to form.
7      A  I do not recall.
8      Q  Have you ever been made aware of a detective
9  under your supervision signing an arrest warrant and
10  receiving a $1 million bail for a suspect in a homicide
11  investigation, and releasing that person from custody
12  without ever going to a Commonwealth attorney or judge
13  beforehand?
14      MR. WRIGHT: Object to form.
15      A  I don't – I don't recall anything like that.
16      Q  Ms. Joseph, Detective York testified in his
17  deposition that he failed to document witness interviews
18  during the Mills homicide investigation. Did you take
19  any steps during your supervision of him to make sure
20  that he documented all witness interviews in the
21  underlying investigation?
22      MR. WRIGHT: Object to form.
23      A  There is absolutely no way for me to know, or
24  have knowledge of, an interview that wasn't documented.
25      Q  Is that because you weren't actually actively

Page 143

1  conducting those interviews yourself?
2      A  That's correct.
3      Q  Okay. So is it fair to say that you're
4  relying on officers under your supervision to document
5  information relating to the ongoing criminal
6  investigation?
7      MR. WRIGHT: Object to form.
8      A  Can you repeat that?
9      Q  Yeah. It's not a trick question, I promise
10  you. It's the question is, is it fair to say that you
11  relied on officers under your supervision to document
12  information in their ongoing investigation?
13      A  Yes.
14      Q  And based upon the documentation they created,
15  your quarterly responsibility was to conduct a review of
16  those documents; is that right?
17      A  Yeah, that's correct. I mean I trust they're
18  – they're documenting anything that they feel is
19  relevant to the investigation. I mean, I don't – I'm
20  not one to say that I expect them to document, you know,
21  if they take – do a neighborhood canvas and they speak
22  to 800 people, I don't expect them to put 800 different
23  supplements in there that say, "I spoke to somebody and
24  they didn't see anything. I spoke to somebody else and
25  they didn't see anything." I mean, it's – sometimes

Page 144

1  that stuff is not relevant, and it doesn't add anything
2  to the investigation. So, but yeah, I trust that they
3  use their discretion, what they feel like is relevant to
4  an investigation and what's not, and that they are
5  documenting appropriately.
6      Q  Ms. Joseph, Detective York testified in his
7  deposition that he swore at witnesses during the Mills
8  investigation. Did you take any steps, as a supervisor,
9  to prevent him from engaging in that type of conduct?
10      A  I'm not aware of anybody that he swore at
11  during the Katherine Mills investigation. But I mean,
12  nobody ever complained to me about it. None of the
13  witnesses or anybody that they – that he interviewed or
14  spoke to ever made any type of complaint to me about
15  that. So I have no knowledge of him using any type of
16  foul language while talking to anybody during that
17  investigation.
18      Q  I understand that. My question is kind of, is
19  a little bit different. Maybe I didn't ask it right the
20  first time. During your supervision of Detective York
21  from 2010 to 2014 or '15, did you ever instruct him that
22  it was inappropriate to swear at witnesses during a
23  criminal investigation?
24      MR. WRIGHT: Object to form.
25      A  I don't recall ever having a counseling

Page 145

1  session or writing a specific contact or any type of
2  documentation where I felt the need to have a
3  conversation with him, whether it was an interview or
4  something that I had listened to in a case, or that
5  somebody had made a complaint on. I don't have any
6  knowledge of ever having a conversation with him like
7  that, or any recollection of it.
8      Q  Detective York testified at his deposition,
9  Ms. Joseph, that he's provided inaccurate information to
10  the grand jury. Before today's deposition, were you
11  ever made aware that Detective York testified falsely
12  before the grand jury?
13      MR. WRIGHT: Object to form.
14      MS. KINCER: Join.
15      MR. WILLIAMS: Join.
16      A  No. And I'm still not aware that he has
17  provided any false information.
18      Q  What steps did you take, as Detective York's
19  supervisor, to make sure that he testified truthfully
20  before grand juries?
21      MR. WRIGHT: Object to form.
22      A  Can you clarify that?
23      Q  Sure. Have you ever reviewed any of the
24  testimony that Detective York provided to grand juries,
25  and compared that to the investigative file to make sure

Page 146

1  that his testimony was accurate?
2      MS. KINCER: I object. Other investigators
3  aren't allowed to listen to grand jury, of the
4  recording.
5      MR. WILLIAMS: Join.
6    Q   You can answer, ma'am.
7    A   Well, I mean that's not something that I have
8  access to, so, no, I've obviously never done that.
9    Q   Have you ever communicated with any
10 Commonwealth attorneys to determine whether detectives
11 under your supervision testified truthfully before a
12 grand jury?
13   A   No prosecutor has ever contacted me and
14 relayed to me that they had concerns that Detective York
15 was being dishonest in grand jury testimony about this
16 case.
17   Q   My question to you is a little bit different,
18 which is: Have you ever proactively taken any steps to
19 reach out to prosecutors, in any counties, to determine
20 whether officers under your supervision testified
21 truthfully before a grand jury proceeding?
22   A   Can I speak to my attorney about that?
23   Q   Sure.
24       (OFF THE RECORD)
25   A   All right. If I understand the question

Page 147

1  correctly, you asked if I had ever reached out to any
2  prosecutor about any detective under my supervision that
3  I felt like was being dishonest during grand jury
4  testimony; is that correct?
5    Q   Not necessarily that specific. It was: Have
6  you ever reached out to any prosecuting attorney to see
7  whether detectives under your command were testifying
8  truthfully before a grand jury?
9    A   Okay. Well, the incident that – this does
10 not refer to Detective York. It was a different
11 detective. And I was concerned about his ability to
12 communicate in front of the grand jury, and I didn't –
13 I didn't know if the quality of his testimony was the
14 level that the prosecutor was going to need for him to
15 be able to testify effectively. I mean, basically, he
16 just had – he had a problem getting in front of people
17 and talking. And it was something that I kind of
18 suspected, so, yes, I proactively reached out to the
19 prosecutor in that county and, specifically, against
20 that guy. And it wasn't anything about dishonesty, or
21 anything like that. He just had a hard time
22 communicating in front of people. And so, you know,
23 after talking to the prosecutor, he ultimately – I
24 talked it over with him. He wasn't ever disciplined for
25 it. I just had to sit down, had a conversation with him

Page 148

1  of, "Maybe detective work really isn't for you. You do
2  a good job in uniform working the road, but maybe
3  detective work really isn't your cup of tea." So he
4  agreed with me. He felt like he was overwhelmed by it,
5  and was intimidated by it, and so he ended up going back
6  to being a road trooper. So it was never an issue of
7  his honesty. But I did see that there was potential
8  issues there, and I did actively seek out a conversation
9  with the prosecutor about that.
10   Q   Okay. Have you ever reached out to any
11 prosecutor to determine whether detectives under your
12 command testified truthfully in any court proceeding,
13 either the grand jury or a trial?
14   A   No, I've never been aware of anybody under my
15 command being dishonest during testimony.
16   Q   And that's a little bit different, and I just
17 want to make sure that we're on the same page. My
18 question wasn't "Are you aware of anybody testifying
19 falsely," my question was, "Did you reach out to any
20 prosecutor, or any Commonwealth attorneys, to learn or
21 to seek information about whether officers under your
22 command were testifying accurately or truthfully in
23 court proceedings?
24   A   No, I've – other than the instance that I
25 gave you, I did reach out to a prosecutor based on my

Page 149

1  own suspicion to find out if he was testifying
2  accurately. But it was not a dishonesty issue. It was,
3  I guess it's his fear of public speaking or his nerves,
4  or whatever – whatever the issue was. But other than
5  that, no, I've never – I've never had a reason for –
6  in any case, I've never had any reason to suspect that
7  any of my guys were – were being dishonest in their
8  testimony.
9    Q   Okay. Ms. Joseph, what steps did you take to
10 make sure that detectives under your supervision were
11 not conducting unduly and suggestive photo
12 identification procedures?
13       MR. WRIGHT: Object to the form.
14   A   I don't – I don't know what you mean by that.
15   Q   Did you ever receive any training on how to
16 conduct a photo array?
17   A   If I have, I don't recall it.
18   Q   Okay. Have you ever received any training on
19 whether show-up identifications are appropriate?
20   A   I'm not sure what that is, but no – I mean,
21 I'm not even aware of what that is. So, no, I can't
22 recall ever being – receiving any training on it.
23   Q   A show-up identification is when an officer
24 either shows a witness a live person who's a suspect, or
25 a single photograph of the suspect, to the eyewitness.

1 So there's not any fillers involved; either live or in
2 photo, okay?
3    A   Okay.
4       MR. WRIGHT:  Object.
5    Q   So have you ever received any training, prior
6 to today, on how to conduct an identification, be it
7 live or through photographs, that is not unduly
8 suggestive?
9    A   I don't – well, I don't – I don't think that
10 I'm receiving training today, but I also don't – I
11 don't recall having any type of training about that.
12    Q   Okay.  And I meant prior to today.  Obviously,
13 today is not a training session.  You might rather be at
14 a training session than at a deposition.  But do you
15 recall KSP ever training you in any way about how to
16 properly conduct photo identification procedures with
17 people with similar characteristics, or anything in that
18 regard?
19    A   No.
20    Q   Okay.  Do you recall providing any instruction
21 to detectives under your command regarding photo
22 identification procedures?
23    A   No.  I've never – I don't receive training in
24 that, because I'm not authorized to do that.  Like,
25 that's not something that I do.  AFIS is the one that –

1 that does our photo lineups for us.  And I'm not sure
2 what standard they use, or what kind of training they
3 receive, whenever they put those together.
4    Q   Did you say AFIS, like A-F-I-S?
5    A   Yes.
6    Q   My understanding was that AFIS is a system
7 that's used to do latent print comparisons; is that not
8 right?
9    A   There's a fingerprint system that we have in
10 Kentucky.  In Kentucky we have a central – a central
11 collection spot where we collect all the data for the
12 state, like, all the agencies report all their
13 information to the Kentucky State Police, which is the
14 Criminal Identification Records Branch, which is where I
15 was assigned as a supervisor.  It's the only reason I
16 know any of this.  But, old school, whenever we would
17 take somebody to jail and we would fingerprint them, we
18 would take a photograph of them also, and we would
19 forward the photograph, and the arrest data sheet, and
20 the fingerprints to AFIS, and they would maintain them
21 in the file room that is ridiculous.  And so whenever
22 you needed a photo lineup they would go in there and
23 actually pull hardcopy photos out and create a photo
24 lineup for you, based on your arrest data sheet for like
25 height, weight, and sex, and all that kind of stuff.  Now

1 we have an automated fingerprint system that is located
2 inside all of our jail facilities, detention centers,
3 and there's one at the records branch and there's, you
4 know, there's a couple of more located throughout the
5 state.  But mainly they're located inside the detention
6 facilities.  So whenever we go in and we do
7 fingerprints, they're supposed to do the automatic
8 fingerprint, and they're supposed to collect their
9 photos.  So now whenever I need a photo lineup, I
10 contact AFIS, because they are located at the Criminal
11 Identification Records Branch, and they maintain those
12 photographs along with the fingerprints.
13    Q   I see.  Okay.  Thank you for explaining that.
14 All right.  Ms. Joseph, I'm going to ask for you to look
15 at another exhibit, which is Exhibit 7, the policies and
16 procedures; do you have that before you?
17       ( EXHIBIT 7 MARKED FOR IDENTIFICATION )
18    A   I do.
19    Q   All right.  And these are a different set of
20 policies than you reviewed last night, or during the
21 past couple of weeks.  I believe you testified earlier
22 that you reviewed some of the 2017 policies; is that
23 right?
24    A   I – I just reviewed our current policies,
25 which is all that I have access to, is their current

1 policy.
2    Q   I see.  The policies that you have in front of
3 you now is a set of policies that was produced to us in
4 this litigation and they're supposed to be from 2011,
5 okay?
6    A   Okay.
7    Q   Would you have reviewed the 2011, the policies
8 that were in effect in 2011, would you have reviewed
9 those at some point during your supervision in Post 10?
10    A   I don't sit around and read policy normally,
11 so I mean, I can't – I'm not going to say "Yes, I read
12 every one of these policies while I was a supervisor at
13 Post 10," because the chances are that I did not.
14    Q   Fair enough.  But when you're hired at
15 Kentucky State Police, is one of your requirements, is
16 that to review the policies and procedures?
17    A   Yes.  In the academy every day they come in
18 and read policy to you.
19    Q   Okay.  Do you have a group exhibit that's
20 labeled KSP1894 through KSP2355 in front of you?  You're
21 going to look at the bottom right-hand corner.
22    A   I've got KSP1894 through KSP2552.
23    Q   2552.  Okay.  All right.
24       MR. SLOSAR:  And Shawna, I have an extra set
25    there for you.  Do you have those?

Page 154

1    MS. KINCER:  I do.
2    A    It's actually 2553.
3    MS. KINCER:  2553.
4    Q    Okay.  All right.  My understanding is that
5    these are policies that were in effect in 2011 at
6    Kentucky State Police.  Ms. Joseph, do you know how, in
7    2011, do you know how the policies and procedures were
8    stored at the Kentucky State Police?
9    A    No.
10   Q    When you were first hired, back in 2002, what
11   training did you receive on KSP's policies and
12   procedures?
13   A    We had a block of instruction every day where
14   someone would come to the classroom and read us
15   policies.  They would go through a few every day.
16   Q    Okay.  And are employees required to sign off
17   on learning these policies?
18   A    It does seem like that we had to sign
19   something.  Because used to, of course, that was back in
20   2002, we got a big three-ring binder, that I still have,
21   that you kept in the trunk of your car that you kept
22   your policy in.  But now it's on the desktop, if you
23   have a computer it's supposed to be on your desktop, or
24   it's on the public drive.
25   Q    Okay.  In 2011 was there a mechanism in place

Page 155

1    at KSP that you're aware of where employees would learn
2    about new or amended policies and procedures?
3    A    Yeah, it seems like, of course, I don't know
4    in 2011 what it is, but now our supervisors will send
5    out an email that will say a policy has been revised or
6    something.
7    Q    By March of 2012, were you aware of any
8    unwritten policies or procedures that governed criminal
9    investigation at Kentucky State Police?
10   A    I'm not aware of what an unwritten policy is.
11   Q    All right.  Well, that's fair.  So an
12   unwritten policy or procedure, you understand what a
13   written policy or procedure is, right?
14   A    Yes, sir.
15   Q    Okay.  And so an unwritten policy or procedure
16   would essentially be a policy or procedure promulgated,
17   or in effect, at the Kentucky State Police that is not
18   in written form.  So are you aware of any rules that
19   would consist of policies or procedures that were in
20   place in 2012 at KSP that are not in written form?
21   A    No.
22   Q    Okay.  All right.  I'm going to ask you some
23   questions about this policy and procedure that you
24   reviewed over the past couple of days of this CM – I'm
25   sorry, OMC1. And if you're looking at this exhibit, Ms.

Page 156

1    Joseph, you're going to want to turn to page 3104.  Just
2    let me know when you get there.  I know that you've got
3    a lot of documents.
4    Q    You want me to go to OMC1, or the page that
5    you told me?
6    Q    OMC1.  And it should be the page that I'm
7    telling you.  So if it's not –
8    A    My OMC1 is on 24, 25.
9    Q    Hold on one second.  I'm just pulling it up.
10   Okay.  All right.  I'm there.  All right.  Is this the -
11   - did you review an updated version of this policy prior
12   to today's deposition?
13   A    I read OMC1 last night.
14   Q    Okay.  Now what is – do you know what,
15   generally, what the purpose of this policy is?
16   A    To make sure that troopers – well, I mean, it
17   tells stuff like what Part 1 crimes are, which is
18   significant because, as a lieutenant, I only review Part
19   1 crimes.  So I mean, it makes units aware of what a
20   Part 1 crime is, so they know whenever they turn in the
21   case, who it actually goes to.  Stuff like solvability.
22   That's listed on there.  Doing –
23   Q    What's that?
24   A    It talks about, like, false investigation,
25   where it says you have to do the victim contact within

Page 157

1    30 days.  A lot about – it's not in this one, but the
2    new policy talks about how you serialize cases, and
3    stuff like that.  I don't – I don't think that – and
4    then, of course, this – this case review policy talks
5    about – or this criminal investigation report, it is –
6    the reason it got revised, is because it's terribly out
7    of date.  I mean, it talks about stuff like the Uniform
8    Offense Report, which we've not used in years, like,
9    since the '90s, probably.
10   Q    Okay.
11   A    So, but that's the significance of it.  I mean
12   the way it was supposed to be for is, like, it talks
13   about Link in this policy.  Link is not even a thing
14   anymore.  Like, that's something that we don't even have
15   now.
16   Q    Yeah.
17   A    And how to close a case, like things that are
18   required.  If all leads – like on here, that's still
19   the same.  If all leads have been exhausted, suspects
20   have been contacted, and, like, the evidence form has
21   been properly, there's a disposition on it that's
22   proper, so that's it.  I mean, it just tells, like, if
23   you have a case this is stuff that you're supposed to be
24   doing with it.
25   Q    And is one of the objectives for this policy

Page 158

1  to provide guidelines for opening, supplementing,
2  reviewing, and closing criminal cases?
3      MR. WRIGHT:  Object to form.
4      A  Yes, that's what it says.
5      Q  Okay.  All right.  And if you go to page 7, it
6  looks like there are a number of instructions or
7  guidance provided here related to reviews of cases; do
8  you see that Section B?
9      A  Yes.
10     Q  Okay.  And according to this policy procedure,
11 were case reviews to be conducted every 120 days?
12     A  Yes.
13     Q  And would you agree with me that this policy
14 procedure provides guidance to sergeants?
15     A  Yes, yes.  It specifically talks to sergeants.
16     Q  And, again, during the time of the underlying
17 investigation, the Katherine Mills investigation
18 beginning in December of 2010, you were a sergeant at
19 Post 10 all the way through 2014 or 2015 when you were
20 transferred out; is that right?
21     A  Correct.
22     Q  Did you ever require Detective York to
23 complete a quality control checklist?
24     A  I did not.  Not to my knowledge.  I think
25 there might be one in there, but I don't ever recall on

Page 159

1  any of his cases asking him to do one.
2      Q  Did you ever ensure that Detective York
3  completed the follow-up within 30 days of the case being
4  open?
5      A  Well, the victim in this case was dead, so
6  that only applies to cases where the victim is still
7  alive.
8      Q  Okay.  Did you ever request or receive
9  Detective York's evidence log?
10     A  By "evidence log" are you referring to a
11 KSP41?
12     Q  No.  I'm talking about a separate evidence
13 log.
14     A  To my knowledge, I would have to review the
15 case, but when we switched from UR1 to what we now use
16 as KyOPS, the crime scene log was no longer listed on
17 that form.  Without –
18     Q  Okay.
19     A  Without reviewing his actual case file, I
20 can't be certain of that.  But just based on my memory,
21 like back what we used the UR1, the uniform reporting
22 form, there was a section in there where you would put
23 the evidence log.  But the new KyOPS form that we fill
24 out online, which is what his case was typed on, and I
25 can tell that by looking at the supplement because all

Page 160

1  that's typed in KyOPS too, I do not know if the evidence
2  log is attached to that, that form any longer, or if
3  that's something that – that has been removed.  But I
4  would have received the KSP41, which is essentially the
5  same thing.  It's – it's a form that we use to list all
6  evidence that's been collected.
7      Q  Do you have any recollection, sitting here
8  today, as to whether you reviewed the KSP41 relating to
9  the Mills investigation?
10     A  Well, based on Exhibit number 5, I at least
11 reviewed it that day, because I documented on there that
12 I had removed fingernails.  So even though I don't
13 recall ever actually going and pulling the KSP41 from
14 his file, there's documentation that shows that I had at
15 least looked at it on that day.
16     Q  Fair enough.  It says that, under "Case
17 Reviews," that under V1, open cases, "Sergeants shall
18 review the officer's case file to determine the
19 appropriate action that should be taken on each case."
20 Did you ever personally review Detective York's case
21 file?
22     A  Yes, I would have.  Even though I don't have,
23 like, a specific memory of it, yes, it's part of my job
24 to review his case files, and I would have reviewed all
25 of them.

Page 161

1      Q  Did you ever give him – did you ever give
2  Detective York, during the Katherine Mills
3  investigation, any instruction into appropriate actions
4  that should be taken on the case?
5      A  I don't recall.
6      Q  Do you have any notes that would refresh your
7  memory?
8      A  No, I do not.
9      Q  Did you review Detective York's file every 120
10 days?
11     A  I don't recall.
12     Q  Do you have any notes that would refresh your
13 recollection?
14     A  Well, I don't have any disciplinary action
15 taken against me for failure to do it.  But I also do
16 not have any notes that documented exactly the date that
17 I reviewed them.
18     Q  Ms. Joseph, I'm going to ask you to turn back
19 to Exhibit 4.  It's the group exhibit of the KSP file;
20 do you have that there?
21     A  I do.
22     Q  I'm going to ask that you turn to, if you're
23 looking at the little numbers at the bottom, can you
24 turn to page KSP265 at the bottom right-hand corner? And
25 let me know when you're there.

Page 162

1   A   Okay.

2   Q   Was this the report drafted by Detective York

3   during the underlying investigation?

4   A   It has his name and his unit number on it.

5   Q   Okay.  Now, do you see beneath his name and

6   unit number where it says, "Reviewed By?"

7   A   Yes.

8   Q   Is there anything written in that box?

9   A   No.

10   Q   Did you sign or put your name on this report

11   as having reviewed it?

12   A   No, because as I testified earlier, whenever

13   they submit something to KyOPS, I do not physically

14   receive that on my computer.  Like, it doesn't come

15   through a program that I can open and view it to review

16   it.  So it would have been printed out, probably by a

17   clerk or the admin sergeant, and then it would have been

18   filed by a clerk into the case.  And then I would have

19   most likely seen it during the next case review.  I

20   don't think there's a name in any of them.  I never

21   actually noticed it.

22   Q   So if you look through KSP265 through KSP308,

23   just for these reports, if you focus on the review side

24   section, look through those and let me know if you see

25   any indication as to whether any of these reports have

Page 163

1   the "Reviewed By" section completed.

2   A   No.

3   Q   Let me know when you're finished.

4   A   No, I don't see it on any of them.  That's why

5   I don't – I've never actually noticed that, but it

6   doesn't appear that on any of that form, that section's

7   filled out.

8   Q   Okay.  And you just, I know you did it very

9   quickly, but is it fair to say that you just reviewed

10   approximately 30 case reports in the underlying

11   investigation, and none of them have the "Reviewed By"

12   box filled out; is that fair to say?

13   A   That's correct, yes.

14   Q   Okay.  And is it fair to say that each of

15   these reports, no supervisor signed or documented in any

16   way that they had been reviewed?

17   A   I'm not sure how the admin sergeant – like,

18   the admin sergeant has to go in and accept these

19   documents whenever – like, if I type it out in my KyOPS

20   and I hit Transmit, then it goes into a folder online

21   called Submitted Folders.  And in order to accept those,

22   a sergeant has to go in there and download those, and

23   then they have to go in there and individually select

24   all of them to accept them.  So I'm not going to say

25   that there's nothing – I mean, just because it's not

Page 164

1   printed on here I'm not going to say that nobody ever

2   accepted it, or that it didn't go through the proper

3   channels, or anything like that, because it's obviously

4   been serialized at the bottom because I can see that on

5   these, that it's been put in Volume 2-6.  So at some

6   point, these have been accepted.  But, you know, as far

7   as whenever I do a case review, I do not go through and

8   initial each individual page as I read it.  So I mean

9   I'm just not – I'm not familiar enough with the KyOPS

10   program to understand how you even would go in to type

11   in your name in the "Reviewed By" box.  I honestly never

12   even noticed that on there.  So I didn't know that it

13   was – that it was a part of the form.

14   Q   Okay.  But at least based upon the documents

15   that you just looked through, would you agree with me

16   that there's nothing on these reports that indicate that

17   they were actually reviewed by the supervisor?  There's

18   no notation confirming that a supervisor reviewed these

19   reports?

20   A   Right, yeah.  There's no – there's nobody's

21   unit number on there.

22   Q   Okay.  So you can put that exhibit away, Ms.

23   Joseph.  I've got some really boring questions for you

24   about policies and procedures, and then I'm going to be

25   done, okay?

Page 165

1   A   Okay.

2   Q   These questions are very specific, so you

3   know, let me know if there's something you don't

4   understand, but I think that they'll be fairly simple

5   for you to answer, okay?

6   A   Okay.

7   Q   In 2007, was there any policy or procedure in

8   place at the Kentucky State Police that informed

9   officers that they should not fabricate evidence?

10   A   In 2007?

11   Q   Yes.

12   A   I have no idea.

13   Q   Okay.  By 2012, were you aware of any policy

14   or procedure in place at the Kentucky State Police that

15   informed officers that they should not fabricate evidence?

16   A   I'm not aware of a policy that specifically

17   says that.  I'm not going to say that it doesn't exist,

18   but I'm, like, from memory I don't – I can't tell you

19   which policy it would be under.

20   Q   Sure.  Did you ever explain to any of the

21   officers or detectives under your supervision that they

22   should not fabricate evidence?

23   A   No, I've never felt the need to have to tell

24   someone not to fabricate evidence.

25   Q   To your knowledge, were officers at KSP

Page 166

1  provided any instructions that fabricating evidence is a
2  violation of a criminal defendant's constitutional
3  right?
4        MR. WRIGHT:  Object to form.
5     A  Can you repeat that, please?
6     Q  Sure.  To your knowledge, were officers in the
7  Kentucky State Police provided any instruction that
8  fabricating evidence is a violation of a defendant's
9  criminal constitutional rights?
10    A  I can't testify on what every member of our
11  agency received or did not receive.  I'm not aware of –
12  of anything like that.
13    Q  Okay.  Have you ever disciplined or penalized
14  any officer for fabricating evidence?
15    A  No, I've not.
16    Q  Okay.  What have you done to ensure that
17  officers under your supervision did not fabricate
18  evidence?
19        MR. WRIGHT:  Object to form.
20    A  Well, just coming to work and doing my job
21  every day.  I mean, like I said, I – I review cases and
22  if anybody were to contact me and make me aware of
23  something that was suspicious, or didn't sound right, it
24  would be something that I would look into.  But through
25  the course of my job I've never come across anything

Page 167

1  that made me feel like, or made me even suspect, that
2  someone was fabricating evidence.
3     Q  Well, in 2007 were you aware of any written
4  policy or procedure at the Kentucky State Police that
5  informed officers that they are required to preserve any
6  material, or information, that tended to negate the
7  guilt of the accused, or reduced his or her punishment
8  in criminal investigations?
9        MR. WRIGHT:  Object to the form.
10    A  I don't recall.
11    Q  And by 2012, were you aware of any such
12  policies existing at the Kentucky State Police?
13    A  I'm – yeah, I don't recall that.  Like, I
14  have no memory of what policy came out in 2007, what
15  policy would have come out in 2012, if there was a new
16  one, or anything like that.  I just don't – I'm sorry.
17  My mind just doesn't have the capacity to remember all
18  of the policies for that many years.
19    Q  I understand.  So my question, let me ask it a
20  different way: By the year 2012, were you aware of any
21  policy or procedure at the Kentucky State Police that
22  instructed officers to disclose exculpatory evidence?
23    A  I don't recall a policy like that.
24    Q  Okay.
25    A  But I think – I mean, I think common sense

Page 168

1  would – would tell us not to – I don't – I do not
2  personally need a policy to tell me not to fabricate
3  evidence, so...
4     Q  Sure.  Did you ever explain to any of the
5  detectives under your supervision at Post 10 that they
6  need to disclose, and should not withhold, exculpatory
7  evidence?
8     A  I don't recall ever having that conversation
9  with anybody under my command, because I never felt like
10  it was necessary.
11    Q  At Post 10, what was done between December 20,
12  2010 and the time you left there in 2014 or 2015, to
13  ensure the detectives under your command did not
14  withhold exculpatory evidence?
15    A  To my knowledge, there was no exculpatory
16  evidence that existed.  I was never made aware of it.  No
17  one ever brought any to my attention.  And based on, you
18  know, just my day-to-day business reviewing cases and
19  answering complaints and phone calls and stuff, nothing
20  like that was ever brought to my attention.
21    Q  So do you recall any actions being done at
22  Post 10 during that time frame to prevent the
23  withholding of exculpatory evidence?
24    A  Well, I think that's what the case review is
25  supposed to – to include to make sure that, you know,

Page 169

1  there's not stuff missing from the case.  But, again,
2  I'm not aware of any exculpatory evidence that existed
3  that was not included in the case, or presented to the
4  prosecutor.
5     Q  Have you ever penalized or disciplined an
6  officer for withholding exculpatory evidence?
7     A  No, I have not.
8     Q  While you were a supervisor detective at Post
9  10 did you take any action, or do anything to ensure
10  that officers under your command, did not withhold
11  exculpatory evidence?
12        MR. WRIGHT:  Object to form.
13    A  Again, just based on what my job was and still
14  is as a supervisor, you know, I come to work and do my
15  job duties.  I perform case reviews.  And I field any
16  complaints that someone has against one of my units, so
17  I feel by that, that I probably would have called if
18  there was something that – that didn't get turned in.
19    Q  In 2000 – well, by the year 2012, were you
20  aware of any policy or procedure in place at the
21  Kentucky State Police that informed officers that
22  they're required to document witness interviews in a
23  criminal investigation?
24    A  I don't recall.
25    Q  Have you ever personally explained to any of

Page 170

1  your detectives that they're required to document
2  witness interviews in a homicide investigation?
3       MR. WRIGHT:  Object to form.
4       A  I don't recall ever having a conversation like
5  that.
6       Q  Have you ever had to discipline an officer,
7  under your supervision, for not documenting information
8  learned in a homicide investigation?
9       A  Well, the one that we discussed earlier,
10  whenever I brought Mike Cornett in and gave him a
11  counseling session for – for not documenting.  But I
12  learned today that he eventually did document it.  But
13  to my knowledge, that's the only time that I ever had to
14  do that.  I don't recall any other instance.
15      Q  As a supervisor in Post 10, what did you do to
16  ensure that officers documented information learned in
17  witness interviews?
18      MR. WRIGHT:  Object to form.
19      A  Again, I mean I – I do case reviews, and
20  whenever Detective York brought it to my attention that
21  something was missing, I took action to – to try to get
22  that added to the case.
23      Q  Did you ever take any affirmative steps to
24  ensure that officers under your command documented
25  information learned in witness interviews, besides the

Page 171

1  previously discussed interaction with Detective Cornett?
2       MR. WRIGHT:  Object to form.
3       A  Can you repeat that?
4       Q  Sure.  So aside from your interaction with
5  Detective Cornett, did you ever take any additional
6  affirmative steps to ensure that detectives under your
7  command documented information learned in witness
8  interviews?
9       A  I don't recall.
10      Q  Have you ever penalized or disciplined an
11  officer – well, let me withdraw that.  By the year
12  2012, were you aware of any written policy or procedure
13  at the Kentucky State Police informing officers that
14  they were not allowed to coerce witnesses in a criminal
15  investigation?
16      A  I don't recall a policy from 2012.
17      Q  And is it fair to say that, sitting here
18  today, you're unaware of any policy that exists on this
19  report?
20      A  Yeah, I'm not – if it exists, I'm not
21  familiar with where it's located at.
22      Q  Okay.  Have you ever penalized or disciplined
23  an officer for coercing a witness?
24      A  No.
25      Q  Did you ever take any affirmative steps to

Page 172

1  inform officers, under your supervision, that they
2  should not coerce witnesses?
3       A  I've never been made aware of one of my units
4  coercing anyone, so I've never felt the need to have
5  that conversation with them.
6       Q  By the year 2012, were you aware of any policy
7  or procedure at the Kentucky State Police that informed
8  officers that they should not make undisclosed promises
9  of consideration to witnesses?
10      A  No, I don't recall that.
11      Q  Have you ever disciplined or penalized an
12  officer for making an undocumented promise of
13  consideration to a witness in a criminal investigation?
14      A  No, I've not.
15      MR. SLOSAR:  All right.  Ms. Joseph, I don't
16  think I have any further questions.  I appreciate
17  your time, and I'm sorry that I couldn't be there in
18  person.
19      THE WITNESS:  Okay.  That's fine.
20          CROSS EXAMINATION
21  BY MR. KELLY:
22      Q  Can I call you Ms. Joseph, or –
23      A  You can call me Jackie.
24      Q  Jackie, my name is John Kelly.  I'm here today
25  representing John Pickard and Knox County.

Page 173

1       A  Okay.
2       Q  My questions of you are few, but what
3  knowledge do you have of Sheriff Pickard's involvement,
4  or lack of involvement, in the Mills investigation?
5       A  None.
6       Q  I'd ask you to assume, for purposes of this
7  question at least, that Sheriff Pickard did assist
8  Detective York in finding witnesses, and was present
9  during some witness interviews.  Do you find that
10  unusual from your experience?
11      A  Absolutely not.  No.  We have always had a
12  very good working relationship, especially when Sheriff
13  Pickard was in office.
14      Q  All right.  Would you expect to receive
15  anything from Sheriff Pickard or from Detective York
16  informing you of Sheriff Pickard's involvement?
17      A  No.
18      Q  Okay.  In other words, there are two distinct
19  law enforcement authorities –
20      A  Absolutely –
21      Q  – going on here?
22      A  Sheriff absolutely does not work for me.
23      Q  Got you.  You've got enough on your plate.
24      A  Yeah.  He does not work for me, and he owes me
25  nothing.  If he's going to, you know, look into a crime

Page 174

1  or anything like that, he does not have to call and give
2  me notice, or ask for permission, or anything like that.
3      Q   Do you know my client?
4      A   Sheriff Pickard.
5      Q   Yes.
6      A   Yes.
7      Q   Have you been involved in other investigations
8  where he has either participated or assisted?
9      A   Yes.
10     Q   Okay.  What kind of -- are you aware of the
11  kind of investigation, or the kind of participation,
12  he's exhibited during those --
13     A   Well, he's from Knox County and --
14     Q   Bless his heart.
15     A   Yeah.  And he's a politician, which means he
16  knows everybody.  So it is not uncommon for our agency
17  to reach out to the sheriff's office, because they are
18  from there.  Not all troopers are from the county they
19  work.  I, for one, have never worked my home county in
20  nearly 17 years.  So it's not uncommon for us to reach
21  out to the sheriff's office and say, "We're looking for
22  this guy.  Do you care to ride with me and show me where
23  he lives?"  Sometimes they have a better rapport and
24  things along those lines.  So it's not uncommon for us
25  to work with the sheriff or his deputies.

Page 175

1      Q   Have you ever had any qualms about Sheriff
2  Pickard working with your investigation?
3      A   Never.  There's not -- I do not recall any
4  instances where we had any kind of disagreement about
5  jurisdiction, or whose case it was, or stepped on
6  somebody's toes, or anything like that.  To my
7  knowledge, in my memory, we always worked well with the
8  sheriff.
9      Q   I'd ask you to assume for purposes of this
10  question alone, then, the sheriff has testified that
11  usually homicide, in fact, in 99 percent of the cases,
12  homicide investigations are the ones done by the KSP as
13  opposed to the local?
14     A   Yes, which is a very common thing in eastern
15  Kentucky.
16         MR. SLOSAR:  Objection to form.
17         MR. KELLY:  I was waiting for that.
18     Q   And I'm sorry if I'm repeating myself, because
19  I'm running out of questions that fast.  Again, do you
20  know of any specific witnesses that Sheriff Pickard
21  helped Jason York in finding, or any specific witnesses
22  where he may have been present during the interviews?
23     A   No.  I don't recall any of those.  Not
24  anything specific.
25         MR. KELLY:  That's all I have.  Thank you.

Page 176

1          EXAMINATION
2  BY MS. DEMOSS-CAMPBELL:
3      Q   Hi.  I'm Alexandra Demoss-Campbell.  I'm here
4  on behalf of Chief Mike Broughton at the Barbourville
5  Police Department.
6      A   Yes.
7      Q   Do you know who Mike Broughton is?
8      A   I do.
9      Q   All right.  And do you know any members of the
10  Barbourville Police Department?
11     A   No, not currently I don't.  I've been gone for
12  almost three years, so...
13     Q   Sure.  And do you have any personal knowledge
14  of any involvement they had in the Katherine Mills
15  investigation?
16     A   No.
17     Q   And did you have any interaction or
18  involvement with Mike Broughton or any member of the
19  Barbourville Police Department present?
20     A   No.
21     Q   Okay.  And earlier you had testified that you
22  believe you may have conducted an investigation -- or
23  not an investigation, I'm sorry -- an interview of a
24  witness at a city police department.  Is it common for
25  Kentucky State police officers to use city police

Page 177

1  department headquarters to conduct interviews?
2      A   Yes.
3      Q   All right.
4      A   Especially in Knox County.  Barbourville's
5  always been very helpful -- because we have limited
6  resources, and our post is an hour-and-a-half, maybe,
7  depending on traffic, from Barbourville.  So if we have
8  somebody we need to interview it makes sense to take
9  them there to the sheriff's office somewhere where, you
10  know, we can get in and just use the room real quick.
11     Q   Absolutely.  So that would be more of a law
12  enforcement, kind of a professional courtesy?
13     A   Absolutely, yes.
14     Q   And there's no distinction between which
15  department you're going to, just a nearby?
16     A   Yeah.  No, it doesn't matter.  Depending on if
17  another agency responds with us, because a lot of times
18  troopers are out there by their self, and so if they
19  have a relationship with somebody from that department
20  they may call them real quick on the cell phone and say
21  "Do you care to let me in the P.D. real quick," or "Do
22  you care to let me in the S.O. real quick just so I can
23  interview this guy," or something like that.  And so if
24  a key is not available to us, I think the P.D. down
25  there, the dispatch is attached to it, so there's

Page 178

1  usually somebody there they can let us in if we need to
2  use it.  But yeah, I mean, the agency has always
3  extended that professional courtesy to us and allowed us
4  to use their resources if we need them.
5      Q    Okay.  And that would be convenience?
6      A    It is absolutely out of convenience, yeah.
7  Because otherwise, we're trying to get a witness to
8  drive into Harlan, where the detective doesn't live up
9  there, and if the witness doesn't live up there, there's
10  really no sense in, you know, the detective driving out
11  of his county and taking a witness out of the county,
12  so...
13      MS. DEMOSS-CAMPBELL:  Well, thank you, and I
14  believe that concludes my questions.
15      THE WITNESS:  Okay.
16      MR. WRIGHT:  No questions.
17      THE WITNESS:  Okay.
18      MS. KINCER:  I don't have any.
19      THE WITNESS:  Okay.
20      MR. WRIGHT:  Any follow-up Elliot?  We're
21  finished here.
22      MR. SLOSAR:  No.  Derrick, are you not asking
23  any questions?
24      MR. WRIGHT:  No.
25      MR. SLOSAR:  Okay.  No, no.  And, Jackie, thank

Page 179

1  you for coming today, and I'm sorry about the mix up
2  with your last name.  I was reviewing some of the
3  reports and kept messing it up, so...
4      THE WITNESS:  No, that's fine.
5      (EXHIBIT 2 MARKED FOR IDENTIFICATION)
6      (DEPOSITION CONCLUDED AT 2:59 P.M.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 180

1  CERTIFICATE OF REPORTER
2  STATE OF INDIANA
3
4  I do hereby certify that the witness in the foregoing
5  transcript was taken on the date, and at the time and
6  place set out on the Title page hereof by me after first
7  being duly sworn to testify the truth, the whole truth,
8  and nothing but the truth; and that the said matter was
9  recorded by me and then reduced to typewritten form
10  under my direction, and constitutes a true record of the
11  transcript as taken, all to the best of my skills and
12  ability. I certify that I am not a relative or employee
13  of either counsel, and that I am in no way interested
14  financially, directly or indirectly, in this action.
15
16
17
18
19
20
21
22  LACEE TOWNSEND,
23  COURT REPORTER / NOTARY
24  COMMISSION EXPIRES ON: 06/19/2024
25  SUBMITTED ON:  08/03/2018

## Exhibits

**EXH 1** 14:21, 22,23 16:12

**EXH 2** 179:5

**EXH 3** 29:19,22 32:1,2 91:18,21 92:19

**EXH 4** 78:2,5 86:25 87:1 161:19

**EXH 5** 65:22 66:2,16,19,21, 22 160:10

**EXH 7** 152:15, 17

---

### $

**$1** 142:10

---

### 1

**1** 14:21,22,23 16:12 156:17, 19,20

**10** 15:17,22,24 16:4 23:10,16, 19 25:1,3,10,14 26:3 27:17,20, 25 28:4,11,12, 20 29:6,16 33:23 38:2,7,18 41:3 46:16 51:22 56:22 60:21,22 61:2, 21 68:11,13 69:8 71:19 72:9,19,24 73:18,25 74:15, 24 76:18 77:7, 12 102:18 103:1,4,10,12, 14 104:16 105:10 106:14 153:9,13 158:19 168:5, 11,22 169:9 170:15

**100** 115:18

**10:00** 54:14 67:10 120:13

**120** 58:24 59:8 158:11 161:9

**13** 13:11,12 17:17 85:24

**14** 85:24

**15** 144:21

**17** 19:17 174:20

**18** 78:19

**19** 29:21 33:23 43:13

**1998** 8:25 9:1

---

### 2

**2** 88:5 179:5

**2-6** 164:5

**20** 16:9,18 25:9, 13 26:2,8,11, 14,19,22 27:19, 24 28:3,17 29:1,4,13 46:8, 15 51:22 73:17 74:14,24 76:17 77:6,13 99:20 105:9 119:18, 24 168:11

**2000** 63:13 169:19

**2002** 9:13 10:14,17,18 11:13,19 154:10,20

**2004** 12:2

**2005** 13:1,2 17:17

**2007** 165:7,10 167:3,14

**2009** 13:13,14 14:7,14

**2010** 14:8,11, 17 15:10,13,19, 25 16:9,14,18 23:9,12,15

25:3,9,13 26:2, 8,11,14,19,22 27:19,24 28:3, 17 29:1,4,13 37:21 46:8,16 51:22 60:20 61:1 73:17,24 74:14,24 76:17 77:6,13 99:20 105:9 144:21 158:18 168:12

**2011** 81:13 87:2,23 109:20 114:16 118:11 120:12 121:22 122:7,13 123:8 134:24 135:14 153:4,7,8 154:5,7,25 155:4

**2012** 25:10,13 26:9,11,14,20, 22 27:6 46:2,7, 8 49:19,23 51:22 155:7,20 165:13 167:11, 15,20 169:19 171:12,16 172:6

**2013** 29:21 33:10,23 43:13 44:1,14 45:11 46:23 62:19 68:23

**2014** 25:3 26:3 27:20,25 28:4, 18 29:5,14 46:16 60:21 67:7,9 73:18,25 74:15 77:7,14 144:21 158:19 168:12

**2015** 24:19 25:4 26:3 27:20,25 28:4, 18 29:5,15 46:16 60:20,21 62:14 73:18,25 74:15 77:7,14 78:19 158:19 168:12

**2016** 23:8,9,15 24:13,15

**2017** 31:8,12 59:14 152:22

**20th** 16:14

**24** 54:8 67:9 156:8

**24th** 67:7

**25** 37:7 156:8

**2552** 153:23

**2553** 154:2,3

**26** 111:5

**26(b)** 113:8

**26(c)** 112:25

**26(d)** 110:18 111:6 112:1

**289** 93:20

**2:59** 179:6

**2nd** 10:18 11:14

---

### 3

**3** 29:19,22 32:2 91:18,21 92:19 118:10 120:12 121:22 122:7, 13 123:8 134:24 135:13

**30** 49:10 50:23, 25 157:1 159:3 163:10

**30-day** 50:22

**307** 78:7,8

**3104** 156:1

**338** 87:1

**340** 99:1

**36** 93:20

**3rd** 10:17

---

### 4

**4** 78:2,5 87:1 161:19

**40** 13:19 120:18

**41** 120:16

**45** 118:17

---

### 5

**5** 65:22 66:2,16, 19,21,22 160:10

**54** 78:8

**5:00** 54:12

---

### 6

**6** 118:5,6,10

---

### 7

**7** 152:15,17 158:5

---

### 8

**8** 11:24,25 25:9 26:8,11,14,19, 22 46:7,8

**800** 143:22

---

### 9

**90s** 157:9

**99** 175:11

---

### A

**A-F-I-S** 151:4

**ability** 7:18 71:18 84:8 87:10 147:11

**absolutely** 10:9 55:20 62:19 77:18 80:22 81:7,20 85:9 95:12 97:1 102:16 105:4 121:19 129:5 139:22 140:19

142:23 173:11, 20,22 177:11, 13 178:6

**abuse** 127:19

**academy** 9:10, 12 10:14,16,20, 24 11:2,3,9,14, 18 14:9,10,12, 18,19 18:11,15, 24 19:2,7,12 20:24 21:14,16, 20 22:1,7,10 27:21 153:17

**accept** 163:18, 21,24

**accepted** 12:6 164:2,6

**access** 65:13 87:10 146:8 152:25

**accident** 6:19, 23

**accommodating** 119:4

**Accord-** 91:4

**accurate** 61:18 146:1

**accurately** 148:22 149:2

**accused** 85:15 141:13 167:7

**accustomed** 130:25

**act** 124:13

**acting** 51:21 85:10

**action** 47:14 56:18 112:2 133:3,20 160:19 161:14 169:9 170:21

**actions** 125:22,23 161:3 168:21

**actively** 142:25 148:8

**actual** 21:6 78:9 123:14 127:9 159:19

**add** 33:20 39:13 91:25 144:1

**added** 34:10 39:12 48:23 52:6 68:21 170:22

**addition** 13:19

**additional** 9:2 13:17 14:2 18:8 56:10 171:5

**address** 90:2, 16 100:18 109:1 139:17

**addressed** 35:21 40:18

**admin** 51:20 52:8 103:15 162:17 163:17, 18

**administrative** 69:25 70:5,8 71:3 95:8

**admitted** 80:12

**advance** 7:5

**advice** 57:6,12, 20 58:1

**advised** 78:14

**affairs** 57:1 83:20

**affidavit** 87:2,8 89:17,25 90:12, 14,19,21,24 91:5 94:9,16 95:13,19 96:1, 11,21 98:3,21 99:4 100:5,16, 22

**affiliated** 13:8

**affirm** 6:3

**affirmative** 170:23 171:6, 25

**AFIS** 150:25 151:4,6,20 152:10

**age** 64:11

**agencies** 151:12

**agency** 10:8 23:23 64:8 65:12 166:11 174:16 177:17 178:2

**aggressive** 128:10 129:8 133:9

**agree** 21:18 87:24 91:2 99:3 158:13 164:15

**agreed** 148:4

**agreement** 142:3

**ahead** 22:21 80:19 87:8 92:13 108:14 113:23 122:22 125:13 130:3 139:2

**Alexandra** 176:3

**alive** 159:7

**allegations** 98:11

**alleging** 112:22

**Allen** 78:19 80:8

**allowed** 59:9 72:7 108:9 109:4,14 111:19 136:6 146:3 171:14 178:3

**allowing** 111:9

**alongside** 81:24

**Amanda** 49:17,22 78:15 98:17,22

**amended** 155:2

**amount** 36:25 37:4 51:5

**ample** 136:21

**analysis** 67:15

**Anderson** 20:11,14 81:16 82:4 110:5,17, 23 112:10,12, 21 129:13

**Anderson's** 111:18 123:7

**annual** 14:1

**answering** 55:25 97:18 113:7 168:19

**answers** 30:10 105:16

**anticipated** 114:2

**anymore** 35:20 157:14

**apologize** 7:5 120:3

**appeared** 124:6

**appearing** 104:10

**appears** 67:3 87:12 88:15,24

**applied** 10:7

**applies** 159:6

**apply** 18:3

**approach** 81:10 127:17 128:5,10,11,17, 18

**approached** 32:9 92:15

**approaching** 68:20

**appropriately** 144:5

**approval** 73:4

**approved** 82:23 135:16 138:14

**approximate** 12:22

**approximately** 10:20 12:1 24:16 25:7 26:3 35:24 56:2 67:10 120:13, 18 163:10

**area** 43:8 56:20 57:5

**arms** 133:19

**array** 149:16

**arrest** 141:21 142:9 151:19, 24

**arrived** 67:11

**assaulted** 126:7 136:11

**assaulting** 126:7

**assigned** 11:11,12,23 14:25 15:1,3,6, 8 16:1 17:17 27:18 28:20,24 64:10 104:19, 22 105:3 151:15

**assignment** 11:16 12:14 26:5 36:6

**assist** 37:16, 19,22 47:2 67:23 173:7

**assistance** 32:10

**assisted** 40:20 81:4,6 174:8

**assume** 7:12 85:22 95:19,21 96:8,10 133:7 173:6 175:9

assumed 96:3

assuming 7:16
96:20 111:12

assure 40:22
41:3

attached 92:21
100:5 160:2
177:25

attempt 42:22
83:15 96:15
124:12 131:4

attempting
133:10

attempts 78:24

attend 11:1
56:14

attended 25:17

attention
40:14,16 44:22
77:22 137:9
168:17,20
170:20

attorney 22:25
84:19 123:25
142:12 146:22
147:6

attorney's
84:25 123:21
124:8,11

attorneys 7:18
8:1 146:10
148:20

audio 41:23
42:5 115:1
123:7 126:14

August 10:18
11:14,19 15:13,
19,25 23:15

authorities
173:19

authority 73:7

authorized
150:24

automated
152:1

automatic
152:7

autopsy 54:8
67:14

aware 42:8,10,
14 43:9,14,24
44:7,16,22
46:13 69:11
72:15,20,24
73:5 75:25 77:5
95:23 97:3,16
99:19 102:7
103:4 104:7,14,
18 106:13,18,
19 107:13,19
108:1,4,18
109:12,16
122:2 123:24
125:11 135:5
137:3 141:15,
20 142:1,8
144:10 145:11,
16 148:14,18
149:21 155:1,7,
10,18 156:19
165:13,16
166:11,22
167:3,11,20
168:16 169:2,
20 171:12
172:3,6 174:10

B

babies 35:18

back 12:15
19:21 35:13,14
36:20 49:9
53:15,18,22
54:25 57:5
60:20 61:6
65:4,7,8 87:7
91:15,17,18
94:8 97:13,15
101:8,10 103:1
105:19,21,23
116:15 117:18
119:6 123:14
131:14,24
132:1 133:6
136:22 148:5
154:10,19
159:21 161:18

bad 127:12,16
130:7 135:9

bail 142:10

Barbourville
176:4,10,19
177:7

Barbourville's
177:4

based 55:24
58:13 64:11
65:2 92:18
95:14 120:10
121:21 125:22
134:21 143:14
148:25 151:24
159:20 160:10
164:14 168:17
169:13

basic 18:14
21:16 22:4 23:1
107:3

basically
64:16 147:15

basis 113:6

Bates 14:21
118:10

bathroom
66:3,7

batteries
42:17,25 43:3

bear 142:1

beeps 138:10

begin 11:17

beginning
25:3 35:12
132:3 158:18

behalf 7:17
176:4

believed 58:13

Bell 110:2,7

beneath 162:5

big 40:12
154:20

bill 132:11

billing 90:3,16

binder 154:20

bit 7:3 13:24
18:16 39:14
74:22 82:10
134:5 144:19
146:17 148:16

blamed 128:16

blank 123:19

blanket 57:18,
25

Bless 174:14

block 19:15
154:13

blood 18:17

body 17:25
18:19

bone 55:5

boring 164:23

borrowed
42:16

bottom 78:8
87:14,17
153:21 161:23,
24 164:4

box 70:5 162:8
163:12 164:11

boxes 71:9

Boy 127:24

Brady 22:8,11,
13,16,17

branch 12:5
15:7,8,14
151:14 152:3,
11

break 8:7,11
66:4,7,15 114:4
134:10 137:4

Brian 26:15,16
28:19

bringing 40:15

brought 34:13
35:6,17 39:23
40:14 44:21

77:22 137:9
168:17,20
170:10,20

Broughton
176:4,7,18

buddies 40:11

buddy 129:3

buddy- 129:2

buffalo 130:23

bumped 127:2

Bunch 26:23,
25 27:6,8

burn 139:12,16

burnt 35:9

business
116:23 141:11
168:18

C

cabinet 59:20,
23 60:15

cadet 11:16

call 73:3,4
86:18 94:12
172:22,23
174:1 177:20

call-outs 54:11

called 14:10,
12,18 21:9 22:8
54:14 163:21
169:17

calling 55:4
133:4

calls 83:22
168:19

calm 128:2

cameras 21:5

canopy 54:18

canvas 143:21

capacity 16:4
38:1 167:17

capital 110:1

capture 83:6

car 154:21

care 44:12
174:22 177:21,
22

career 9:17
11:10 12:2
23:18 35:23
53:5 65:2
127:20 128:6

case 6:18
19:17 20:5,9
22:7 31:7,11,
12,15 33:6,20
34:10,16 38:4,
11,15,16,25
39:4,6,9,12,13,
17,20,23 43:8,
20 44:23 45:7,
8,19 48:6,7,17,
23,25 49:2
50:10,13,16,17,
20,23 51:1,8,
11,12,14,17
52:6,10,20
57:23 58:1,4,20
59:3,20,24
60:5,7,16,23
61:1,8,10,15,
21,25 62:18
63:3,8 64:6,8,9,
11,12,15 65:3,
4,6,8,19 68:21
69:14,24,25
70:1,4,8,17,18,
24 71:5,11,12,
18,20 73:1,2,13
74:19 76:7 78:3
79:24 80:5
81:16,25 82:4
86:2,11,14,22
87:13,15,21
90:24 92:1,16
96:20,25 97:2,
17 98:9 99:23
100:5 105:2,3,4
110:3,4,9,23
111:19,21
112:11,15,21
113:3,4,20
116:10 123:2,
18,23 124:5,7,
10 130:17
145:4 146:16

149:6 156:21
157:4,17,23
158:11 159:3,5,
15,19,24
160:16,18,19,
20,24 161:4
162:18,19
163:10 164:7
168:24 169:1,3,
15 170:19,22
175:5

cases 18:18
19:21 35:11
38:12 48:7,19,
21 49:5,10
50:8,10,22 51:5
52:25 53:2,12
59:1 60:19
64:24 71:24
72:1 83:4 84:23
85:3,25 95:9
102:10 106:5
157:2 158:2,7
159:1,6 160:17
166:21 168:18
175:11

caught 40:15

cell 89:25 90:2
100:17,18
177:20

centers 152:2

central 151:10

certainty
86:21 96:19

chain 27:2

chair 125:18
126:17,21
127:1 131:10,
14,16,23,25
132:1

chairs 126:10

challenging
7:4

chance 65:25

chances
153:13

change 25:11
27:16 64:25

changed
19:22,24 31:8,
12 51:9 58:23

channels
164:3

characteristic
s 150:17

charge 128:22
139:22 140:1,8,
16

charged
140:19

charges 49:17,
22 50:3 112:9
141:16 142:4

check 32:18
57:24 64:8 71:8
75:24

checked 40:9
70:5

checklist
158:23

checklists
71:4

checks 101:2

Chief 176:4

child 52:20
127:19

childcare
114:8

children 12:13
17:2

Circuit 67:12

circumstance
s 42:24

citation 50:18
61:12 65:10,12

citation's
65:11

cited 43:7

city 8:19
117:20 176:24,
25

civil 6:23,24
10:1 111:16

clarify 20:2
25:16 29:8 74:4
145:22

class 9:16 14:8
21:9

classes 17:3

classified
64:11

classroom
154:14

clear 69:24
117:6

cleared 71:6

clerk 52:9
123:20 124:7
162:17,18

client 110:20
112:7 174:3

clinical 70:5,10
71:8

clip 124:22
132:21

clippings
67:14,16,20,21
102:15

close 48:25
51:11 61:15
126:7,21
131:19 133:25
157:17

closed 51:5,12
131:19

closer 126:19
131:20

closing 158:2

CM 155:24

coerce 171:14
172:2

coerced 82:16,
19,22 83:1,10
86:3

coercing
85:18 171:23
172:4

coffee 130:13

cold 51:8 64:12
105:3

collect 151:11
152:8

collected
160:6

collecting
18:21

collection
151:11

college 9:3,4,
5,8

color 70:6

colors 49:1

column 48:20,
21 59:1,2 61:12

comfortable
35:19 53:10
54:4,6 55:25
57:6,12,19
94:15 95:24
113:17 119:8
137:18

command
44:3,15 51:18
52:14 57:7,13
58:9,12 68:7
70:14 75:10
76:14,20 84:14
85:10,17 89:1,
6,21 92:7 95:3,
6 97:7 100:2,8
147:7 148:12,
15,22 150:21
168:9,13
169:10 170:24
171:7

commence
112:2

comment
50:16 51:3

committing
84:20 85:7

common
133:15 167:25
175:14 176:24

**Commonwealth** 84:19,25 110:4 123:21,25 124:8,11 142:12 146:10 148:20

**communicate** 84:22 85:2 147:12

**communicated** 146:9

**communicating** 147:22

**communication** 83:25

**Community** 9:5

**compared** 145:25

**comparisons** 151:7

**compel** 141:9

**complained** 83:10 144:12

**complaint** 80:2 83:17,19 86:9,15 98:12 136:20 144:14 145:5

**complaints** 79:25 80:5 83:4 168:19 169:16

**complete** 38:4, 10,14,16,20 39:7 40:23 41:4 44:8 47:19 158:23

**completed** 36:17 159:3 163:1

**completely** 84:16 90:4

**comprehending** 130:16

**computer** 154:23 162:14

**computers** 53:2

**conceal** 117:10

**concealing** 140:18

**concerned** 147:11

**concerns** 146:14

**CONCLUDED** 179:6

**concludes** 178:14

**conclusion** 44:17

**conduct** 16:15 18:12,24 19:2 55:16 56:22 58:3 104:2 107:13,17 108:24 121:16 122:6 134:17 135:21 138:18 143:15 144:9 149:16 150:6, 16 177:1

**conducted** 33:18 42:19 47:24 58:8 70:10 72:8 100:10,11 101:4 113:4 117:24 122:7 135:3 158:11 176:22

**conducting** 21:20 22:2 54:4 62:10 69:21 104:1 143:1 149:11

**confirming** 164:18

**confused** 96:11

**confusing** 74:6

**connection**

95:20

**consideration** 107:25 172:9, 13

**considerations** 108:5

**consist** 155:19

**consistent** 128:23

**conspiracy** 112:22

**constitutional** 166:2,9

**consult** 49:16, 21 50:2

**contact** 50:22, 24 51:2,4 71:24 134:6 145:1 152:10 156:25 166:22

**contacted** 146:13 157:20

**contained** 60:22 87:15 95:11 99:3

**content** 38:8

**contents** 38:3 39:16

**context** 106:16 119:13

**continue** 62:11

**continued** 28:13

**continuing** 60:7 118:12

**control** 39:6 101:2 158:23

**convenience** 85:1 178:5,6

**conversation** 32:13 33:5,9 35:17 37:21 41:13,21,25 42:7,15 43:9 44:1,6,17,18,24 45:5,10,14

46:22 76:5,8,13 93:17 134:15 138:1,2,3,6 145:3,6 147:25 148:8 168:8 170:4 172:5

**conversations** 30:5 32:21,23, 25 33:4,7 67:22 68:1

**cop** 127:13,16 130:7

**copied** 123:18

**copies** 59:10 61:16 70:7

**copy** 33:18 49:2 50:14 83:15 123:18, 19,20 124:1,2, 7,15,16

**corner** 153:21 161:24

**Cornett** 33:17, 22 34:2,8,9,13 35:2,8,25 36:4, 17 37:17,20 40:20,25 41:7, 14,18,23 42:2, 16 68:24 91:20, 24 92:19 93:13, 24 95:15 96:14 170:10 171:1,5

**Cornett's** 37:7 38:22 42:5 93:5 94:5,10 96:4

**correct** 10:12, 15 16:11 24:17 32:11,12 34:4 44:4,8,19,21 45:8,9 47:1 49:3 53:23 57:4,14,15 59:22 61:16 64:20 70:6,7 76:16 77:1,25 82:3 87:25 99:14,21 115:15 119:13 121:6 135:1 136:1,2,7,8 143:2,17 147:4

158:21 163:13

**corrections** 49:9

**correctly** 147:1

**counsel** 7:19 8:5 30:6 111:23

**counseled** 34:17,23 35:7 36:9 93:8

**counseling** 34:18 35:17 41:10 144:25 170:11

**counties** 146:19

**county** 6:20 8:22 12:16,17 17:13 84:18 110:2,7 114:16 121:10 147:19 172:25 174:13, 18,19 177:4 178:11

**couple** 30:3 31:4 51:8 87:7 114:5 118:22 152:4,21 155:24

**courses** 16:25 17:7 21:15

**court** 6:2,7 22:7 50:21 53:17 67:12,19 91:16 97:14 101:9 105:20 110:7 111:9 112:3 118:7 119:16,20,24 126:4 136:10 148:12,23

**courtesy** 177:12 178:3

**courthouse** 124:2

**courts** 50:12

**cover-** 112:22

**covering** 139:23

**cows** 9:21

**create** 35:3
41:1 86:15
100:8 151:23

**created** 36:11
44:2 100:3
143:14

**crime** 12:5,11
17:8 18:14 22:4
28:22 54:17
101:21 139:24
140:19 156:20
159:16 173:25

**crimes** 12:9,12
13:4 156:17,19

**criminal** 15:6,
13 31:18 46:18
78:3 92:8 95:3
102:2 110:1
112:9 123:2
126:11 127:23
143:5 144:23
151:14 152:10
155:8 157:5
158:2 166:2,9
167:8 169:23
171:14 172:13

**criminally** 139:23

**crippled** 117:5

**crisis** 21:11

**CROSS** 172:20

**Crump** 37:21
42:6 88:6
89:11,19 90:24
91:6,11 92:4,
20,23 93:14,25
94:19 96:16,18
99:16

**Crump's** 102:1,7

**cup** 130:13
148:3

**current** 23:4
27:14 63:11
105:4 152:24,

25

**custody** 142:11

---

**D**

**Dallas** 27:10,
12,17

**data** 151:11,19,
24

**date** 17:21
24:18 28:7
62:18 67:7
100:18 109:22
157:7 161:16

**dates** 23:11,21
26:16 28:10
102:12

**Dave** 81:12
109:19 112:22
114:15 118:11
120:12,19
121:9,17,22,25
122:7,12 123:1,
8 125:14
129:12,22
130:5 134:16,
25 135:13,25
136:3,15
137:22 138:14
141:2

**David** 139:20
140:13,14

**day** 19:15 21:3,
4 43:24 50:20
54:13,15 91:1
93:15 94:21
119:7 153:17
154:13,15
160:11,15
166:21

**day-to-day** 168:18

**days** 49:10
50:23,25 58:24
59:8 155:24
157:1 158:11
159:3 161:10

**dead** 35:18
42:17 43:1,4

88:8 89:13
91:1,7 93:16
94:21 99:20
159:5

**deal** 40:12
140:24 141:11

**dealers** 127:21

**dealt** 21:16

**dear** 114:7

**death** 32:11,
15,22 33:2,11
38:19 43:15
44:8,18 45:2
47:15,18,25
48:4,12 49:14
68:15 69:3,7
72:16 76:15
78:25 79:8
82:15 104:9,19,
23 108:18

**December**
16:8,14,18
23:12 25:9,13
26:1,8,11,14,
19,22 27:19,24
28:3,17,25
29:3,13 46:8,15
51:22 60:20
61:1 63:18
73:17 74:14,24
76:17 77:6,13
81:13 99:20
105:9 109:19
114:16 121:22
122:7,13 123:8
134:24 135:13
158:18 168:11

**deception** 18:2

**decided**
116:15 117:15
129:10 131:2,3

**defendant**
20:9 81:25

**defendant's**
166:2,8

**defendants**
111:21 112:11
113:2

**defense** 22:14
23:3

**defensive**
133:2,20

**delivered**
124:2

**Demoss-
campbell**
176:2,3 178:13

**demoted** 35:25
36:5

**demotion**
36:20

**deny** 128:21

**department**
29:7 117:19,20
176:5,10,19,24
177:1,15,19

**depending**
37:9 60:19
177:7,16

**deposition**
6:12,15,24
30:4,7 31:3
32:2 105:7
106:9,11
107:10,24
108:16 113:10
119:3 141:20
142:2,17 144:7
145:8,10
150:14 156:12
179:6

**deputies**
174:25

**deputy** 110:13
114:16 121:10

**Derrick** 178:22

**describes**
100:9

**desktop**
154:22,23

**destroyed**
64:16

**details** 43:5
116:19

**detect** 18:1

**detection** 18:9

**detective**
15:24 16:9,14
18:6 23:9,16,19
25:7,10 26:9,
12,15,17,23
27:7,9,11,12,
18,22 28:1,4,
12,13,19,21
29:20 32:9,14,
21 33:5,10,15,
17,22 34:1,5,8,
9,11,13 35:8,
12,20,22 36:4,
6,17,20,22
37:13,16,17,19,
20,22 38:2,3,7,
9,18 39:1,15,
16,24 40:20,25
41:7,14,17,18,
22 42:1,2,4,5,
15 43:12 44:1,
6,13,14,24
45:6,11,15,17
46:20,23 47:3,
11 48:20 49:13,
16,21,25 50:7
51:16 55:19,22
56:1,3,6,9,10,
22,23 60:1,15
62:24,25 67:22
68:1,10,12,14,
20,23,24,25
69:1,5,7,10
70:25 71:17
72:19,23 73:19
76:6,8,14 77:13
78:19 79:7
80:7,20 81:24
84:24 86:2,14,
22 88:1,21,22,
25 89:1,5,10,
20,21 90:6
91:9,10,19,24
92:6,14,19,21
93:2,5,12 94:5,
11,16,19 95:15,
18 96:4,15,19
97:7 103:9,16,
17,22 104:6,15
105:6 106:8,11,
21 107:6,10,24
108:7,16,19
109:3,13,16,18

110:12,23
114:15,24
115:4,11,20,22
116:2,7,13
121:10,12,16,
21,24 122:5,12,
16 125:11,15,
22,24 126:5,6,
16 127:15
128:18 129:6,
11,17,22 130:6
131:2,5,11,13,
23 132:9,14
133:13 134:2,
16,22 135:2,6,
13 136:4,15,16,
23 137:20
138:9,12,17,21
139:5,25 140:5
141:15,21
142:1,8,16
144:6,20 145:8,
11,18,24
146:14 147:2,
10,11 148:1,3
158:22 159:2,9
160:20 161:2,9
162:2 169:8
170:20 171:1,5
173:8,15 178:8,
10

**detective's**
41:4 71:2

**detectives**
16:5,10 26:4
29:6,15 37:1,5,
9 47:5,7 51:7
52:3,14,15
54:4,20,24 55:9
56:15 57:7,12
58:3,8,11,17
70:14 71:24
75:10 76:20
79:14 80:1,10,
12 81:8 82:25
84:7,23 85:23,
25 86:4 100:1,7
105:11 106:6
116:14 126:9
138:20 146:10
147:7 148:11
149:10 150:21
165:21 168:5,
13 170:1 171:6

**detectives'**
51:25

**detention**
152:2,5

**determine**
7:24 75:17
76:19,23 78:25
79:20 81:2
82:15,25 88:12
124:4 146:10,
19 148:11
160:18

**dictate** 58:3
59:7

**dictates** 59:12

**difference**
37:14,15

**dig** 85:13

**digital** 42:16

**diminish** 35:11

**direct** 6:8
58:16 83:22
111:24

**directed** 67:18

**directly** 83:9
85:15 113:1
124:15 131:16
133:24

**dirt** 85:13

**disagreed**
56:23

**disagreement**
175:4

**disapproved**
121:14

**disciplinary**
56:18 161:14

**discipline**
34:25 56:6
170:6

**disciplined**
41:8 121:18
147:24 166:13
169:5 171:10,
22 172:11

**disclose** 46:3,
17 167:22
168:6

**disclosed** 20:4
81:17 120:16
123:2,7

**disclosing**
123:10

**discovery**
62:8 111:9
112:1,3,18

**discretion**
58:4 144:3

**discuss**
112:15

**discussed**
33:6 97:4
113:16 170:9
171:1

**dishonest**
141:12 146:15
147:3 148:15
149:7

**dishonesty**
147:20 149:2

**disk** 123:19

**dispatch**
177:25

**disposition**
157:21

**dispute** 43:25
120:11

**distance**
117:22

**distinct** 173:18

**distinction**
29:10 177:14

**district** 88:15

**divorces** 20:20

**DOCJT** 14:7,17

**doctor** 9:21

**document**
29:24 32:3
41:11,18 50:13
61:7 65:25

66:25 67:4,6,8
71:1 78:11
87:13 89:1,6,21
90:7 91:24,25
97:9 100:2
142:17 143:4,
11,20 169:22
170:1,12

**documentatio
n** 51:14,15
143:14 145:2
160:14

**documented**
41:15 43:20
44:15 75:16,18,
23 76:6,20,24
94:22 96:12
97:2 100:15
107:12 108:1
142:20,24
160:11 161:16
163:15 170:16,
24 171:7

**documenting**
60:25 61:10
73:20 74:2,17
75:2,11 76:9
97:21 108:10
143:18 144:5
170:7,11

**documents**
20:4 30:7,9
31:3 45:1,12
47:14 48:2,11
50:21 58:14
62:4,8,11 68:20
77:3 80:24
95:10 143:16
156:3 163:19
164:14

**door** 131:11,12

**download**
163:22

**draft** 67:2,6

**drafted** 29:20
36:4 56:25
65:23 87:23
141:21 162:2

**drawer** 48:7
60:18 105:3

**drawers** 60:18

**drink** 137:17

**drive** 154:24
178:8

**driver** 23:20,
21,22 24:5,8,
10,15,20,23
27:21 29:5
101:22

**drives** 53:3

**driving** 23:24
178:10

**drug** 18:7,9
127:21,22

**due** 53:10

**dumb** 128:3

**duties** 83:3
169:15

**E**

**earlier** 36:19
61:4 97:1 121:3
134:21 152:21
162:12 170:9
176:21

**eastern** 175:14

**easy** 127:10

**eat** 8:6

**education** 9:2

**effect** 19:16
59:19 110:14
153:8 154:5
155:17

**effectively**
64:17 147:15

**eggs** 9:21

**electronic**
12:5,11 13:4
17:8 28:22 29:2
53:1 59:4,12
61:6

**electronically**
51:20

**elevated** 21:10

**Elliot** 64:2
113:15 178:20

**else's** 52:2
117:23

**email** 47:9
155:5

**employed**
17:11

**employee**
124:8

**employees**
154:16 155:1

**end** 124:20
132:1

**ended** 6:23
35:13 148:5

**ending** 25:3

**enforcement**
10:5,7 11:10
14:2 21:16
88:19 173:19
177:12

**engaged** 84:14

**engaging**
144:9

**ensure** 39:5
40:8 84:9 159:2
166:16 168:13
169:9 170:16,
24 171:6

**entered** 51:13
71:7 111:9

**entire** 23:17
92:3 119:3

**envelope**
67:17

**essentially**
155:16 160:4

**estimate**
102:20

**Eubanks**
27:10,12,17
110:13

**events** 126:14

**eventually**

170:12

**evidence**
18:17,21 22:14,
19 23:2 50:11
51:7 52:25 53:1
58:12 67:16,20
71:5,6 73:21
74:2,7,8,17,19
75:2,7,11,18
76:9,19,24
77:9,16,18
79:17 80:21
81:18 82:21,22
83:1 84:4 85:18
97:8,16,21
102:15 117:10
118:20 139:24
140:19 157:20
159:9,10,12,23
160:1,6 165:9,
15,22,24 166:1,
8,14,18 167:2,
22 168:3,7,14,
16,23 169:2,6,
11

**evident** 54:24

**exact** 17:20
28:7 116:19

**EXAMINATIO
N** 6:8 172:20
176:1

**exception** 26:7
112:4

**exculpatory**
22:14,18 23:2
73:21 74:2,7,8,
17,20 75:2,7,
11,18 76:9,19,
24 97:8,16,21,
25 98:5 167:22
168:6,14,15,23
169:2,6,11

**Excuse** 37:18

**execute** 54:9

**executive-
level** 25:20

**exercise** 9:7

**exhausted**
157:19

**exhibit** 14:21,
22,23 16:12
29:19,22 32:1
65:22 66:2,16,
19,21,22 78:2,5
86:25 91:18,21
92:19 93:20
118:5,6,9
152:15,17
153:19 155:25
160:10 161:19
164:22 179:5

**exhibited**
121:17 174:12

**exhume** 55:5

**exist** 48:11
62:11,20 65:19
98:2 124:14
165:17

**existed** 72:24
75:15 110:11
168:16 169:2

**existing**
167:12

**exists** 75:7
171:18,20

**expect** 92:22
93:9 97:1,20
100:14 143:20,
22 173:14

**expected** 89:1,
5,20 90:6 91:9,
23 92:6 97:9
100:1,7 130:25

**experience**
52:21,24
173:10

**expert** 18:8
55:6

**explain** 105:24
165:20 168:4

**explained**
169:25

**explaining**
152:13

**explanation**
35:4

**expressed**
33:25

**expressions**
133:18

**extended**
178:3

**extent** 113:6

**extra** 153:24

**eye** 133:16
134:4,5,6

**eyewitness**
41:19,24 89:18
90:7 92:7
149:25

**F**

**fabricate**
165:9,15,22,24
166:17 168:2

**fabricated**
77:19 79:12,21
80:3,7,21
82:18,22 83:1
84:10 86:5,24

**fabricating**
77:9,16 79:9,17
80:13 84:4
85:17 166:1,8,
14 167:2

**fabrication**
80:9

**face** 133:7,15

**facial** 133:17

**facilitate** 54:19

**facilities**
152:2,6

**facility** 117:21,
23,24 138:4

**fact** 122:8
126:3 175:11

**facts** 113:20

**failed** 41:18
142:17

**failure** 42:20
161:15

**fair** 7:13 8:11
10:11 15:10
16:8 17:18
21:15 24:19
25:2 26:1 28:25
29:3 36:24 38:1
40:19 43:12
53:9 57:5,11
68:22 70:12
76:12 78:21
79:15,18 82:13
85:14 94:3
104:2,11 109:2
120:8 125:10
129:11,21,24
135:2,12 141:3
143:3,10
153:14 155:11
160:16 163:9,
12,14 171:17

**fairly** 165:4

**faith** 113:5

**false** 79:1
83:10 109:10
145:17 156:24

**falsely** 145:11
148:19

**familiar** 164:9
171:21

**family** 117:2,
13,17

**fashion** 72:3
73:16 122:6
125:25

**fast** 175:19

**fax** 67:11,12

**fear** 122:16
149:3

**February** 67:7,
9 87:23

**federal** 12:12
17:9,12

**feed** 115:8

**feel** 10:1 39:10,
12 53:5,9 54:3,
6 55:25 57:6,
11,19 70:9,24
71:12 79:13

84:6,8 86:4,8
94:15 119:8
122:23 126:1,5
136:11,13,25
137:1,17 139:9
143:18 144:3
167:1 169:17

**feelings**
136:16

**feels** 138:18

**felt** 9:24 10:3
77:24 80:3
82:18,21 96:14
108:25 127:18
128:12 129:5
130:9 136:24
137:5,13,14,17,
20 145:2 147:3
148:4 165:23
168:9 172:4

**female** 128:3

**Ferris** 26:20

**field** 45:19,20,
21 46:3,9,17,24
47:3,5,10,12
79:25 80:4
169:15

**fielding** 83:4

**figure** 61:4
82:11

**figured** 123:25
124:14

**file** 30:15 38:4,
9,19,24 39:17
40:23 41:4
43:14,20 44:7,
18 45:2,8,13
46:4,11 47:15,
18 48:6,17 50:3
51:8 52:6 60:2,
11,15 64:19
78:2,3 87:21
92:3 94:23
97:10 124:5,10
145:25 151:21
159:19 160:14,
18,21 161:9,19

**filed** 162:18

**files** 19:17 39:6

**fill** 48:5 159:23

**filled** 67:19
70:6 163:7,12

**fillers** 150:1

**film** 21:6

**find** 54:18
57:22 70:20
86:19 123:14
149:1 173:9

**finding** 173:8
175:21

**fine** 66:10
113:19 130:23
139:2 172:19
179:4

**fingernail**
67:13,20,21
102:15

**fingernails**
160:12

**fingerprint**
21:3 151:9,17
152:1,8

**fingerprints**
18:16 151:20
152:7,12

**finished** 32:6
163:3 178:21

**fit** 10:4

**fix** 49:10

**flinch** 133:3,19

**flip** 87:7

**flipped** 127:1
132:11 133:6

**flirt** 130:19

**focus** 162:23

**folder** 62:23
163:20

**Folders** 163:21

**follow** 50:23
70:25

**follow-up**
159:3 178:20

**force** 12:12
86:20 93:5

**forensic** 17:1,
22

**forgot** 123:16

**forgotten**
55:10

**form** 22:20
26:24 34:25
36:1 39:8,18
43:17,21 44:9
46:5 53:13,19
57:9 60:4 61:6
70:6,7 73:10,22
75:3,13,20
76:21 77:10,17
79:10,23 84:5
85:8,19 88:14
89:3,14,23 90:9
91:3,13 92:11
94:7,24 97:11
98:24 100:4,12
101:6 104:4
106:15,23
107:14 108:3,
12,21 109:6,15
120:22 123:3
126:12 129:15
130:1 135:7,18
138:16,25
139:8 140:4
141:4,18 142:6,
14,22 143:7
144:24 145:13,
21 149:13
155:18,20
157:20 158:3
159:17,22,23
160:2,5 163:6
164:13 166:4,
19 167:9
169:12 170:3,
18 171:2
175:16

**forms** 48:18
61:16 71:9 95:8

**forward** 67:13
70:24 113:23
151:19

**foul** 128:9
144:16

**found** 78:10
88:8 89:13
91:1,7 93:16
94:21 99:19

**foundation**
22:20 26:24
36:1 39:8,18
46:5 88:14
89:3,14,23
91:3,13 94:7,24
97:11 98:24
100:4,12 101:6
104:4 106:15

**four-** 134:9

**fourth** 141:16

**Fox** 81:12
109:19 112:22
114:15,21
115:17 116:21
117:16,24
118:11 120:12,
19 121:9,17,22,
25 122:12,16
123:1,9 125:14,
25 126:3,15
127:18 128:12
129:12,23
130:5 131:6,9,
11,16 132:9,15
133:1,5,19,21
134:4,16,25
135:13 136:1,4,
10,12,20
137:11,22
138:4,14
139:20 140:13,
14 141:2

**Fox's** 122:7
125:20 132:4,
20 136:15

**frame** 168:22

**Frankfort** 11:7
12:5 15:7

**free** 9:18

**freedom** 58:4

**front** 17:20
25:6 48:7 60:18
63:8,9 66:17

78:3 87:8
147:12,16,22
153:2,20

**frustrated**
33:16

**frustration**
34:1

**full** 8:13

———————

**G**

**gather** 47:14

**gathering** 47:3

**gauge** 54:15

**gave** 6:14,24
34:17 41:10
57:4 78:15 86:6
90:13 136:21
142:4 148:25
170:10

**general** 50:9
74:11 91:2

**generally**
38:23 156:15

**generate** 92:7

**generated**
48:2 51:18
52:3,14 58:12
68:23 91:11
93:24 105:11
106:5

**gentleman**
116:10

**girl** 117:12

**give** 6:4 52:15
53:17 55:15
57:25 63:4
75:22 98:1
100:21 117:16
129:4 139:16
161:1 174:1

**giving** 57:6,12,
19

**God** 114:7

**good** 6:10,11
54:22 113:5,25
117:22 123:19

127:11,13
137:15 148:2
173:12

**good-cop/bad-cop** 127:6,8

**goofy** 9:15

**governed** 155:8

**graduate** 8:24
9:6

**graduated** 10:17 11:14

**graduating** 9:1
11:9

**graduation** 9:7

**grand** 50:4
145:10,12,20,
24 146:3,12,15,
21 147:3,8,12
148:13

**grant** 17:9,12

**great** 10:19
119:25

**ground** 133:5

**grounds** 110:25

**group** 153:19
161:19

**guess** 13:24
17:13 40:4
45:23,24 48:9
90:10,18
116:17 119:18
149:3

**guidance** 71:19 158:7,14

**guidelines** 158:1

**guilt** 167:7

**guy** 65:10
116:16 117:5
130:11 147:20
174:22 177:23

**guys** 54:12
65:18 66:8 75:6
114:1 149:7

---

**H**

**halfway** 114:2

**hand** 6:3 59:16
62:24,25 93:5
126:25 133:5

**handler** 27:15

**handling** 46:17
104:12

**hands** 133:2

**handwrite** 62:25

**handwrote** 19:21

**happened**
12:2 13:14
36:12 67:8 95:1
102:11 109:22
117:8 123:20
124:9,13
132:12 133:1
135:24 137:3

**happening** 35:13 132:10

**happy** 8:6

**hard** 53:3
147:21

**hardcopy** 151:23

**Harlan** 15:15,
16,18 178:8

**harm** 133:11

**hat** 125:20
132:9,15,20
133:6,14,21
134:7

**Hazard** 12:15,
16,17,18,19,23
13:4,5,6,8,9

**head** 86:18
125:20 132:15,
20 133:14

**headquarters** 11:5 177:1

**health** 35:16

---

**hear** 119:21
125:1 140:10

**heard** 139:14

**heart** 10:2
174:14

**height** 151:25

**held** 25:22 26:5

**helped** 175:21

**helpful** 177:5

**Helton** 78:20
80:8

**Hey** 75:6

**high** 8:15,24
9:1,16

**highlight** 63:1

**highly** 54:21
55:19

**hired** 153:14
154:10

**hit** 127:1 132:9,
15 133:10
136:24 163:20

**hitting** 132:20

**hold** 91:16 93:4
101:9 105:20
156:9

**home** 128:8
136:22 137:23
174:19

**homicide**
16:16,20 18:12
20:25 21:21
22:2 41:19
52:19 53:4,7,10
54:5 55:10
56:11 57:8,13
58:1,7,16 59:25
61:22,25 68:7
69:13,22 70:15
72:7,21,25
73:20 74:1,16,
25 76:4,25
77:9,15 83:21
84:13 85:5
89:2,7 90:8
97:8 100:3
102:17,22

---

**103:4 104:3,5,
12,14 105:12
106:12 107:12
108:17 109:4
134:18 135:4,
15 138:8,13
140:1 142:10,
18 170:2,8
175:11,12

**homicides**
22:4

**honest** 141:14

**honestly**
102:13 120:23
164:11

**honesty** 148:7

**Hoskins** 49:18,
22 78:16 82:5
98:17,22
112:15

**hour** 118:16
120:18

**hour-and-a-
half** 177:6

**hours** 13:19
54:8 67:10
114:5 118:22
120:16

**house** 57:22
101:25 117:6
139:13

**houses** 139:16

**human** 101:18

**hundreds**
71:24 85:25
86:2 102:10

**hunting** 86:18

**hurt** 127:4

---

**I**

**idea** 92:17
102:19 165:12

**identification**
14:23 15:6,14
19:3 29:22 66:2
78:5 89:2,6,9,

---

19 90:7 91:12,
21 92:4,8,23
94:1 100:2,9
118:6 149:12,
23 150:6,16,22
151:14 152:11,
17 179:5

**identifications**
101:4,11,15,16,
23 149:19

**identified** 88:6
89:11 90:25
91:5 92:25
93:14 94:20
99:16 101:19

**imagine** 9:19

**immediately**
11:18 124:1

**impeachment**
22:18

**implicate**
98:22 99:4,8

**implicates**
99:13

**implicating**
100:15 142:5

**important**
101:1

**improper**
125:23 136:12,
14 137:6

**in-** 13:19

**inaccurate**
145:9

**inappropriate**
53:6 58:2 85:11
137:6,14
144:22

**inappropriatel
y** 85:11

**incident** 147:9

**include** 62:9
91:20 168:25

**included** 19:13
45:7 50:15
61:14 70:11
71:9 74:21

93:4,11 96:16,
25 97:5,17,25
100:6 123:22
124:6,12 169:3

**including**
7:16,18 81:19
95:12

**incomplete**
43:15,16 44:19

**incorrect**
57:17

**increase** 36:21

**independent**
47:22 49:11
85:4

**indicating**
58:12 92:3

**indication**
162:25

**indicted** 61:13

**indictment**
50:4,12,15,19
61:14

**individual**
45:25 164:8

**individually**
47:8 71:25
87:14 163:23

**inexperience**
53:11

**inform** 172:1

**information**
14:20 19:12
30:5 60:22
61:7,9 62:9
69:17,21 73:1
75:25 90:3,12,
17 92:16 94:3,
16 95:14,22,25
96:4,18,21,23
97:1 98:1 99:3
100:13,17,22
116:18 129:5
130:4 131:1
140:9 141:5
143:5,12 145:9,
17 148:21
151:13 167:6

**informed**
84:20 165:8,15
167:5 169:21
172:7

**informing**
171:13 173:16

**initial** 60:12,14
164:8

**initially** 104:10

**initiated**
141:15

**initiation**
49:17,22

**injure** 126:6

**inside** 43:20
46:4 116:10
152:2,5

**instance** 7:25
96:17 148:24
170:14

**instances**
175:4

**Institute** 25:19

**instruct** 8:1
41:1 107:6
109:3,13
110:19,20
112:6 144:21

**instructed**
67:13 122:5
167:22

**instructing**
82:9 112:13

**instruction**
70:14 136:5
150:20 154:13
161:3 166:7

**instructions**
158:6 166:1

**instructor**
25:25

**intend** 81:22

**interaction**
171:1,4 176:17

**interested**
130:12

**interfere** 58:10

**interfering**
58:7

**interjecting**
58:15

**internal** 57:1
83:20

**Internet** 12:12

**interrogate**
16:19 19:7

**interrogation**
17:6,16 18:4
81:23 114:25

**Interrogations**
17:1

**interrogatorie
s** 30:10 31:2

**interrogatory**
30:11

**intervene**
122:15,24
125:24 140:21

**interview** 17:7,
22 33:17 41:14,
17,23 42:6,19
43:11 44:16
45:7,23 70:2
73:5 83:16
92:17,18 93:13
96:16,24
108:22 109:7,
21 110:12
115:9 117:25
118:5,9,11
122:6,24
123:10,22
124:13 125:3,
13,18 127:10,
13,24 128:1,2
130:14 131:4,
12 134:7
135:22 136:1
140:13 142:24
145:3 176:23
177:8,23

**interviewed**
12:4,7 92:20

117:16 127:20
130:8,16
144:13

**interviewing**
20:24 81:12
115:4 131:18

**interviews**
17:1,2 18:2,9
21:13 43:18
45:1,12 52:24
73:3,11 96:13
128:5 133:16
138:18,22
141:6,8 142:17,
20 143:1
169:22 170:2,
17,25 171:8
173:9 175:22
177:1

**intimidated**
148:5

**introduce**
118:9

**investigate**
12:9 52:22
58:17 70:25
79:14 85:5,17

**investigated**
6:22 12:11
53:11 60:8

**investigating**
55:3 58:18
85:22

**investigation**
16:16,20 18:13,
14 20:25 21:21
22:2,5 32:10,
14,16,18,22
33:1,11 38:9,
19,24 39:2,6,
11,22 40:23
41:20 42:12,13
43:7,14 44:7,18
45:2,13,22
46:4,11 47:13,
15,18,24 48:4,
12 49:13 52:16
57:2 58:7,16
60:1,11,12,14
61:22 62:1
65:24 67:24
68:8,14,17

69:2,6,10,12,
15,22 70:9,15
72:10,13,16,21,
25 73:20 74:1,
17 75:1,12,19
76:4,10,15,25
77:9,16,19,21
78:25 79:8,22
81:20 82:14,17
83:2,20,22
84:1,13 85:5,12
89:2,7 90:8,16
91:20 92:3,5,8,
22 95:4,22
97:8,22 100:3,
24 101:5 102:2,
6,9,22 103:25
104:6,12,15,19,
23 106:13,22
107:12 108:18,
20 109:5 112:9,
20 120:20
124:3 135:4,16
138:9,13,22
139:6,23 140:1
142:11,18,21
143:6,12,19
144:2,4,8,11,
17,23 155:9
156:24 157:5
158:17 160:9
161:3 162:3
163:11 169:23
170:2,8 171:15
172:13 173:4
174:11 175:2
176:15,22,23

**investigations**
16:1 31:19
53:7,10 54:5
55:11,13,17
56:11,17 57:8,
13 58:5 72:8
102:17 103:4,
24 104:3,9
111:20 126:11
134:19 141:7
167:8 174:7
175:12

**investigative**
60:2 94:23
97:10 103:2,3,
13 145:25

**investigator**

46:10 52:19

**investigators**
45:21 68:6
74:18 146:2

**involved** 81:19
83:18 90:15
103:22,23
127:22 150:1
174:7

**involvement**
112:8 173:3,4,
16 176:14,18

**irritated**
116:24

**issue** 32:16
86:21 125:21
134:8 148:6
149:2,4

**issued** 112:3

**issues** 35:16,
21 114:8 148:8

---

**J**

**jacket** 34:16
73:2

**Jackie** 84:19
172:23,24
178:25

**Jacqueline**
8:14

**jail** 151:17
152:2

**January** 63:18,
24 87:2

**Jason** 26:9,23,
25 27:6,8,22
28:6 39:9,10,
12,20,21 40:10
44:11 47:6 55:9
68:14 76:6
111:12,14
133:4,5 139:15
175:21

**job** 53:8 54:19,
23 55:14,16
71:2 79:5 83:3,
5 84:7,8 86:9

117:1 141:10
148:2 160:23
166:20,25
169:13,15

**John** 142:5
172:24,25

**Johnson**
26:15,16 28:19

**join** 110:18
114:24 118:14
145:14,15
146:5

**joining** 111:15,
22

**Jonathan**
49:18,23 98:17,
22

**Joseph** 6:10
8:14,15 14:11
23:4 27:1 29:18
34:20 57:4
65:21 66:15
81:19,22 82:1,
13 90:5 106:7
107:21 112:18
114:14 119:3
120:3 124:21
125:1 138:11
142:16 144:6
145:9 149:9
152:14 154:6
156:1 161:18
164:23 172:15,
22

**Joseph's**
113:1

**judge** 7:23
88:15 142:12

**judgment** 70:1
137:8

**judo** 21:9

**juries** 145:20,
24

**jurisdiction**
175:5

**jury** 50:4
145:10,12
146:3,12,15,21
147:3,8,12

148:13

---

**K**

**K-9** 27:15

**Katherine**
32:11,15 33:2,
11 38:20 43:14
44:8,19 45:2,13
47:15,19,25
48:4,12 49:14
59:25 61:21,25
67:14 68:15
69:2,7,13,22
70:15 72:16
74:25 76:4,15,
25 77:8 78:25
79:8 82:15
83:21 84:13
85:5 88:7 91:6
92:9 93:15
99:16,19,23
104:20,23
105:2 108:18
135:3 141:17,
22 144:11
158:17 161:2
176:14

**Kayla** 141:22
142:3

**keeping** 73:15

**Kelly** 26:20
172:21,24
175:17,25

**Kentucky**
8:20,21 10:6,10
11:5 13:3,17
14:3 18:5,23
19:1,6,12 20:23
22:6 23:5
24:20,24 29:6,
19 36:21 41:2
46:2,9,14,15
55:23 76:3
82:25 85:6
103:24 122:1,
18 134:24
151:10,13
153:15 154:6,8
155:9,17 165:8,
14 166:7 167:4,
12,21 169:21

171:13 172:7
175:15 176:25

**key** 177:24

**kid** 117:2

**kids** 52:24
139:13

**kill** 139:13

**Kincer** 7:17
20:11,14 30:13,
15,17,19,21
53:19 62:12,21
63:12,16,19,21
64:1 65:20
66:3,6,19 81:14
82:3 105:13
110:16,24
111:1,7 112:12
113:11,15
114:7,11
145:14 146:2
154:1,3 178:18

**kind** 6:18 9:15
42:20 53:3 55:6
56:16 70:10
101:14,15
103:17 108:5
116:16 117:1,3,
15,17 128:4,25
130:25 131:22
133:2,19
137:20 144:18
147:17 151:2,
25 174:10,11
175:4 177:12

**kit** 21:3

**knew** 82:22
129:5 131:2
137:2

**knock** 125:20

**knowing** 62:2
75:15 141:1

**knowledge**
27:7,10 48:13,
15 56:18 60:5,
6,9,10 61:20
74:18,20 80:1
81:5,9 94:15
97:24 104:22
105:1,4 115:2
120:19 122:4

135:21 142:24
144:15 145:6
158:24 159:14
165:25 166:6
168:15 170:13
173:3 175:7
176:13

**Knox** 67:12
84:18 114:16
121:10 172:25
174:13 177:4

**KSP** 12:3,10
16:14 24:9
27:11 48:5 60:8
67:20 78:3,8
88:23 93:19
111:23 112:10
136:17 150:15
155:1,20
161:19 165:25
175:12

**KSP's** 69:12
87:4 154:11

**KSP1894**
153:20,22

**KSP2355**
153:20

**KSP2552**
153:22

**KSP265**
161:24 162:22

**KSP3** 48:18

**KSP308**
162:22

**KSP3S** 48:9

**KSP41** 48:25
67:19 159:11
160:4,8,13

**KSP574** 14:21

**Kyops** 159:16,
23 160:1
162:13 163:19
164:9

---

**L**

**labeled** 87:14
153:20

**Lacee** 53:16
91:15 97:13
101:8 105:19
118:4,15
124:19

**lack** 173:4

**lady** 9:16

**language**
17:25 128:9
144:16

**large** 78:2

**lasted** 121:1

**latent** 151:7

**law** 10:4,7
11:10 14:2
21:16 22:25
88:19 173:19
177:11

**lawsuit** 19:25
20:9,12 81:18
98:18 105:7
111:2,4 120:16

**lawyers** 7:15

**lead** 46:10

**leaders** 127:24

**leadership**
14:8,10,12,15,
18 25:20

**leading** 104:12

**leads** 71:1
86:11 157:18,
19

**leaned** 133:25

**leap** 95:18
96:2,22

**learn** 17:24
55:12 68:3
148:20 155:1

**learned** 18:4,
15 45:6 69:18,
21 94:19 97:8,
21 122:9 138:8,
12,20 139:4
140:8,12 170:8,
12,16,25 171:7

**learning**
122:25 154:17

**leave** 8:4

**leaving** 9:8
11:18 121:5

**led** 112:9

**left** 27:20,25
28:4,8,14,15,18
45:1 46:16
60:21 61:2
73:18,24 74:15,
24 76:18 77:7,
14 101:20
105:10 114:6
115:10,22
121:8 168:12

**legitimate**
82:21

**Lester** 49:18
78:16

**Letcher** 8:21

**letter** 57:1
83:19

**level** 134:4,5
147:14

**liar** 128:20
133:4

**license** 23:25

**lie** 78:20 107:8
139:22

**lied** 78:15 80:8
81:3 106:12,24

**lieutenant**
23:6,7 24:12
103:2,3 156:18

**life** 10:2 128:9

**lifestyle**
130:24

**limited** 100:21
102:8 115:2
177:5

**line-up** 18:24
100:11

**lines** 42:19
50:5 77:21,25
109:11 127:25

133:12 174:24

**lineup** 151:22,
24 152:9

**lineups** 151:1

**Link** 157:13

**list** 16:22,24
48:21 70:11
160:5

**listed** 59:1
156:22 159:16

**listen** 73:14
118:24 121:9,
25 124:21
125:7 127:9
146:3

**listened** 92:17
109:23 125:4
145:4

**listening**
108:22 109:25
115:1 126:13

**litigation** 20:1
81:21 113:20
153:4

**live** 11:2
100:11 115:7
149:24 150:1,7
178:8,9

**lived** 116:11

**lives** 174:23

**living** 9:20
117:4

**local** 175:13

**locate** 42:22

**located** 11:5
15:7 25:19
152:1,4,5,10
171:21

**location**
115:17

**log** 24:4 25:6
101:21 159:9,
10,13,16,23
160:2

**long** 6:20
10:16,20 11:22,

25 12:14 13:12
15:8 24:5 25:7
56:2 118:22
121:1 138:17

**longer** 11:15
28:11 35:22
37:8 55:1,3
124:8 159:16
160:2

**looked** 30:20
133:5 137:7
160:15 164:15

**lose** 141:13

**lost** 23:24,25

**lot** 17:25 18:6
19:24 102:13
114:1 127:24
128:2 131:19
141:13 156:3
157:1 177:17

**lots** 52:25

**Louisville**
25:20

**love** 10:10

**low** 131:21,22

**lunch** 114:4

**lying** 80:24
81:4,7 106:16,
22 107:7,15
109:10 128:20
139:23

———————

**M**

**made** 9:14
11:16 26:17
34:11,16 40:10
42:14 43:9
45:18,23 49:12
51:1 78:19
79:12 83:14
86:6 90:7 91:12
92:4,23 95:20
96:15 97:3
107:11,24
108:4,6 111:23
116:13 117:16
122:23 123:24
124:4,7,12,16

142:1,8 144:14
145:5,11 167:1
168:16 172:3

**mailed** 102:15

**mailing** 67:17

**main** 54:6,10,
19

**maintain** 48:14
59:10 63:10
65:14 151:20
152:11

**maintained**
48:8,14 59:20
60:11,15,17
63:15 94:23

**maintaining**
129:12 134:6

**make** 7:18,20
31:25 36:3,11,
25 37:4,6 38:4,
9,13,19,25
39:17 42:22
44:25 45:12
47:18 49:2,7,9
50:24 52:21
57:3,25 63:2
64:14 70:1
71:9,11,12
73:4,19,25
74:16 75:1,10
77:8,15 78:23
79:3,7,16 80:2
81:8 83:8 84:3
88:16 95:18
96:22 97:10
108:9 111:24
117:9 121:7
142:19 145:19,
25 148:17
149:10 156:16
166:22 168:25
172:8

**makes** 48:22
64:1 75:25
89:19 92:7
114:4 156:19
177:8

**making** 37:8
83:10,16 94:1
109:9,16
111:25 116:21

172:12

**malfunctioned**
95:16

**Man** 136:23

**managers**
14:16

**mandate** 56:14

**manipulating**
141:12

**manner** 122:12
134:19 135:4

**March** 10:17
25:9,13 26:8,
11,14,19,22
29:21 33:10,23
43:13 46:7,8
49:18,23 51:22
155:7

**Mark** 26:12
28:9 55:4,10

**MARKED**
14:23 29:22
66:2 78:5 91:21
118:6 152:17
179:5

**market** 78:16

**Maryland** 22:8,
12,13,16,17

**material** 82:6
167:6

**math** 10:19,23

**matter** 122:8
126:3 136:16
177:16

**means** 34:22
64:12 174:15

**meant** 17:15
150:12

**mechanism**
154:25

**medical** 35:15

**meet** 68:6

**meeting** 68:9,
11,16,17,25
69:5

**meetings**
68:13 69:1,9

**Mefford** 26:12
28:9 55:4 69:6

**Mefford's** 28:5

**member**
166:10 176:18

**members**
176:9

**memorized**
95:11

**memory** 17:3,
19 25:5 33:7
47:9 95:12
102:8 109:25
115:2 117:23
159:20 160:23
161:7 165:18
167:14 175:7

**mention** 99:12

**mentioned**
77:23 99:7
137:13

**messing** 179:3

**Michael** 37:21
42:6 88:6
89:11,19 90:24
91:6,11 92:4,
20,23 93:14,25
94:19 99:16
102:1,7

**micromanage**
71:21 72:3,10

**micromanage
ment** 72:7

**micromanagin
g** 73:16

**Mike** 33:17,19
37:6 38:21
89:11 90:13,25
91:12,19 93:13,
14 94:10,20
96:14 98:18
99:14 170:10
176:4,7,18

**military** 20:21

**Mill's** 91:6

**million** 142:10

**Mills** 33:2
38:20 44:8,19
45:3,13 47:19
49:14 59:25
61:21,25 67:14
68:7,15 69:13,
22 70:15 72:13,
21,25 73:20
74:1,16,25
75:11,18 76:4,
25 77:8,15
83:21 84:13
85:5 92:9 97:7
99:17,19,23
104:20,23
105:2,11
106:22 107:12
135:4,15 138:8,
13,22 139:6
140:1 141:17,
22,23 142:3,18
144:7,11
158:17 160:9
161:2 173:4
176:14

**Mills'** 32:11,15,
22 33:11 43:14
47:15,25 48:4,
12 69:2,7 72:16
76:15 78:25
79:8 82:15 88:7
93:15 108:18

**mind** 62:10
167:17

**mine** 59:16

**mine's** 71:2

**minute** 134:10

**minutes** 10:13
57:4 58:22 66:9
113:12 117:14
118:17 120:17,
18 132:22

**Miranda** 132:4

**misconduct**
56:24,25 83:23,
25 84:15,21
85:7,16

**missing** 39:17
42:5 43:24

45:13 49:7
50:17 61:13,18
68:23 95:17
169:1 170:21

**Mitotyping**
67:15,18

**mix** 179:1

**moment** 32:5
137:19

**moments** 41:7

**money** 9:24
17:9,12 36:25
37:5

**monitoring**
115:14

**month** 59:9

**months** 10:20,
22,23 25:21
51:8 98:15

**Morehead**
11:11,13,17,20,
22

**morning** 6:10,
11 54:13 88:7
89:12 91:7
99:17

**move** 65:1,2
113:23 133:19

**moved** 51:8
131:23,25

**moving** 114:1

**murder** 90:15
92:24 100:23
110:2 130:17
141:13,16,22
142:4

**murdered**
100:16

———————

**N**

**nail** 67:15

**named** 20:12
111:4 141:22

**names** 31:6
98:7 99:7,12

102:12 120:9

**narrative** 32:6
33:4,13 66:1

**natural** 10:4

**nature** 115:7

**NCIC** 51:13
71:7

**nearby** 177:15

**necessarily**
38:15 147:5

**needed** 34:6,
14 35:5 39:13
42:1 47:6 65:10
79:13 85:12
86:4 93:7
122:24 134:17
151:22

**needing** 45:16

**negate** 167:6

**neighborhood**
143:21

**nerves** 149:3

**nervous** 117:3

**night** 31:5
54:14,15 58:24
152:20 156:13

**nighttime**
54:17

**nobody's**
164:20

**notation**
164:18

**note** 49:2
118:12

**notes** 45:19,
20,21,23 46:3,
10,17,24 47:3,
5,10,12 49:8
59:2 63:2 77:2
161:6,12,16

**notice** 137:10
174:2

**noticed** 162:21
163:5 164:12

**number** 7:15
11:23 13:9,10
15:16 16:12
29:19 32:2
65:22 70:7
81:21 87:13,21
89:25 90:2,12,
14,17,18 94:12
100:17,18,22
101:3 118:10
158:6 160:10
162:4,6 164:21

**numbers**
161:23

**numerous**
84:6 110:6
116:22 137:12

─────────

**O**

**object** 22:20
26:24 36:1
39:8,18 43:17,
21 44:9 46:5
53:13,19 57:9
60:4 73:22
75:3,13 76:21
77:10,17 79:10,
23 81:14 84:5
85:8,19 88:14
89:3,14,23 90:9
91:3,13 92:11
94:7,24 97:11
98:24 100:4,12
101:6 104:4
105:13 106:15,
23 107:14
108:3,12,21
109:6,15
120:22 123:3
126:12 129:15
130:1 135:7,18
138:16,25
139:8 140:4
141:4,18 142:6,
14,22 143:7
144:24 145:13,
21 146:2
149:13 150:4
158:3 166:4,19
167:9 169:12
170:3,18 171:2

**objected** 92:14

**objecting**
110:16

**objection**
44:20 74:3
75:20 89:8
97:23 110:25
111:23,24
112:1,5 113:22
118:13 122:20
175:16

**objections**
7:18,24

**objectives**
157:25

**observe** 115:9

**observed**
56:24 136:18

**obtain** 42:3
129:22

**obtained** 46:24
124:1

**obtaining**
37:17,19 40:21

**obvious** 97:3

**occasions**
61:24 81:1

**occur** 83:7
132:21 135:20

**Offense** 157:8

**office** 85:1
115:5 117:21
123:21 124:8,
11 173:13
174:17,21
177:9

**officer** 9:14,24
10:8,11 18:5
44:3 83:17
85:15 88:19
97:9 117:7
149:23 166:14
169:6 170:6
171:11,23
172:12

**officer's**
160:18

**officers** 22:12,

18 33:1 37:4
46:2,8,15,24
47:12 51:18
73:19 74:1,16
75:1 77:8,15
79:7,16 81:18
84:3,14,20
85:6,17 95:2,5
97:20 104:18,
22 112:10
143:4,11
146:20 148:21
165:9,15,21,25
166:6,17 167:5,
22 169:10,21
170:16,24
171:13 172:1,8
176:25

**official** 14:14

**officially** 11:16

**OMC1** 31:17,
20,21,22
155:25 156:4,6,
8,13

**OMCC1** 31:21

**ongoing** 57:7
95:3 103:4,23
143:5,12

**online** 159:24
163:20

**open** 48:19
59:1 102:25
159:4 160:17
162:15

**opening** 158:1

**operate** 18:20

**opinion** 70:9

**opinions** 70:23

**opportunities**
137:5,12

**opportunity**
66:24 136:21
137:1

**opposed**
175:13

**ops** 27:15

**order** 48:24

61:15 67:12,19
111:9,18 112:2
113:9 163:21

**orders** 112:3

**ordinary** 49:24
50:1

**original** 11:20

**originally** 96:3
124:5

**outline** 114:3

**overnight**
67:18

**overthinking**
107:2

**overwhelmed**
148:4

**owes** 173:24

─────────

**P**

**P.D.** 177:21,24

**p.m.** 120:13
179:6

**package** 67:17

**pages** 87:3,7
93:20

**paid** 9:21 17:9,
12

**paper** 61:6

**part** 39:4 48:3
50:6,8 60:23
61:7,10 71:16
74:6 77:18 85:9
86:9 94:23
97:10 111:2
124:4,19
127:12 129:1
133:22 156:17,
18,20 160:23
164:13

**participated**
110:12 125:4
174:8

**participating**
112:8 114:15

**participation**
81:19,23
110:22 111:20
112:14 113:2
174:11

**parties** 111:4

**party** 19:25
98:18

**passed** 51:12

**passive**
127:21 128:1

**past** 50:25
62:16 152:21
155:24

**path** 129:17

**patrol** 36:20,24
37:3

**pay** 36:21 37:6,
11,12,13,14

**PD** 115:5

**peacemaker**
10:1

**penalized**
166:13 169:5
171:10,22
172:11

**pending** 8:10
20:13,16

**people** 10:3
15:21 16:6
21:10,12 23:24
38:15 58:13,14
79:25 98:6,16
101:16,19
127:20,25
128:2,6 133:16
139:21 140:8,
16 141:8,9,11
143:22 147:16,
22 150:17

**people's**
139:16

**perceive**
136:12

**percent** 115:18
175:11

**perfectly** 7:6
119:4

**perform** 61:24
169:15

**performed**
61:21

**period** 10:25
26:6 52:1

**periods** 28:23

**permission**
174:2

**Perry** 6:19
12:17

**person** 45:25
76:2 83:16
99:19 101:21
141:16 142:11
149:24 172:18

**personal** 20:5
131:19 176:13

**personally**
53:11 82:20
160:20 168:2
169:25

**personnel**
30:15

**pertaining**
72:12

**phone** 7:4
89:25 90:2,12,
13,17,18 94:12
100:17,18,22
138:10 168:19
177:20

**photo** 19:2
149:11,16
150:2,16,21
151:1,22,23
152:9

**photograph**
56:16 149:25
151:18,19

**photographs**
94:1 100:10
150:7 152:12

**photos** 151:23
152:9

**physically**
115:12 162:13

**pick** 9:18,23
116:5 127:10
137:10

**Pickard** 172:25
173:7,13,15
174:4 175:2,20

**Pickard's**
173:3,16

**picking** 9:17

**Pickrell** 120:2

**Pickrell's**
111:20

**pictures** 21:5,7

**pink** 49:1

**PL27706**
118:10

**place** 46:3
114:19 126:15
154:25 155:20
165:8,14
169:20

**plaintiff** 20:8

**plaintiffs** 99:4

**plan** 129:1

**plate** 173:23

**play** 91:15
97:13,15 101:8
105:19,22
118:15,19
119:20 124:19
128:3

**play-by-play**
55:15

**played** 118:22
124:25 125:8

**playing** 127:12

**PLAYS** 53:18,
22 91:17
101:10 105:21,
23 119:23

**plenty** 136:25
137:5

**point** 8:4 11:15
42:13 43:6,9
70:19 77:21
80:1 82:17
100:14 101:22
102:6 105:14
110:10 114:3,
24 116:12,14
121:4 122:11,
15,25 123:6
125:4,17 126:1,
4,20,24 127:3
131:5 132:8,24
133:18 136:22
137:12 153:9
164:6

**pointing** 96:22

**police** 9:10,11,
14,24 10:11
11:5 13:3,18
14:9,17 17:11
18:5,24 19:2,7,
12,13 20:24
22:1,7,12,17
23:5 24:21,24
25:19 26:6
29:7,20 36:21
41:2 46:3,9,14,
15 52:13 55:23
76:3 80:11,24
81:3,4,6 83:1,
23,25 84:15,21
85:6,15 89:22
92:2 94:22
103:24 105:11
108:1,10
117:20 122:2,
18 127:9
134:24 151:13
153:15 154:6,8
155:9,17 165:8,
14 166:7 167:4,
12,21 169:21
171:13 172:7
176:5,10,19,24,
25

**policies** 30:19
31:4,6 55:23
122:2 134:23
136:17 152:15,
20,22,24 153:2,
3,7,12,16
154:5,7,11,15,
17 155:2,8,19

164:24 167:12,
18

**policy** 19:14,
15,16,19 30:25
31:7,8,10,15,18
38:11 46:13
47:21 48:13
51:9 59:6,7,15,
18 69:15 71:20
107:18 108:24
109:12 122:17
126:2 136:19
138:18 153:1,
10,18 154:22
155:5,10,12,13,
15,16,23
156:11,15
157:2,4,13,25
158:10,13
165:7,13,16,19
167:4,14,15,21,
23 168:2
169:20 171:12,
16,18 172:6

**policy's** 58:23

**politician**
174:15

**polled** 75:5

**pornography**
52:20

**position** 11:20
12:4,10 13:2
23:4 54:24

**positive** 12:21
17:21,22 22:15
24:3

**possession**
60:2

**possibly** 28:23
115:19

**post** 11:11,13,
23,25 12:18,20
13:8,11,12
14:25 15:1,3,
15,16,18,21,24
16:4,10 17:17
23:10,16,19
25:1,3,10,14
26:3,4 27:17,
20,25 28:4,11,

12,20 29:6,16
33:23 38:2,7,18
41:3 46:16
51:21 56:22
60:21 61:2,20
67:11 68:10,13
69:8 71:19
72:9,19,23
73:18,25 74:15,
24 76:18 77:7,
12 102:18
103:1,4,10,12,
14 104:16
105:10 106:14
117:22 123:14
124:1,15 153:9,
13 158:19
168:5,11,22
169:8 170:15
177:6

**potential** 41:19
148:7

**practiced**
21:5,7

**preachers**
127:24

**prefer** 118:24

**premise** 84:2
91:2

**prepare** 30:3
31:3

**prepared**
81:16 82:7
111:2 113:21

**present** 101:24
109:18 115:12
135:23,25
173:8 175:22
176:19

**presented**
93:25 169:3

**preserve**
167:5

**preserving**
52:24 53:1

**pretend** 55:6
95:10

**pretty** 10:2
18:18 40:12

80:15,25 94:9
127:10 134:3
137:15

**prevent** 106:21
113:7 144:9
168:22

**prevents**
111:16

**previous** 65:3

**previously**
171:1

**print** 62:24
151:7

**printed** 52:9
162:16 164:1

**printout** 78:9

**prior** 16:14,18
17:17 20:1
24:15,23 30:7
32:2 33:23 46:7
49:17,21
115:20 141:20
150:5,12
156:11

**prison** 139:19
140:15,22

**proactively**
146:18 147:18

**problem**
106:24 134:6
137:8 147:16

**problems**
35:15

**procedure**
46:14 109:13
122:17 155:12,
13,15,16,23
158:10,14
165:7,14 167:4,
21 169:20
171:12 172:7

**procedures**
21:17 55:23
122:2 134:23
136:17 149:12
150:16,22
152:16 153:16
154:7,12 155:2,

8,19 164:24

**proceed**
111:10 112:4

**proceeding**
82:8 146:21
148:12

**proceedings**
6:1 148:23

**process** 39:4
48:3 50:6,8
61:1 71:17
73:15 100:9

**processing**
18:17

**produced**
153:3

**producing**
55:2

**professional**
177:12 178:3

**program**
162:15 164:10

**prohibits**
109:8

**promise** 143:9
172:12

**promises**
107:11,25
108:6,9,10
172:8

**promote** 64:25

**promoted**
13:15,16,25
14:15,24 23:7
24:10,11 28:6

**promotion**
36:6

**promulgated**
155:16

**proper** 39:3
157:22 164:2

**properly**
150:16 157:21

**property** 71:6,
7

**prosecuting**
147:6

**prosecution**
46:18

**prosecutor**
46:17 146:13
147:2,14,19,23
148:9,11,20,25
169:4

**prosecutors**
22:13,19 23:2
84:22 85:3
146:19

**protective**
113:9

**provide** 70:13
71:19 102:20
158:1

**provided**
74:18 90:13
106:9 115:16,
18 122:5
123:20 124:11
136:5 145:9,17,
24 158:7 166:1,
7

**providing** 90:1
150:20

**public** 149:3
154:24

**pull** 151:23

**pulled** 117:9

**pulling** 156:9
160:13

**punished** 40:1

**punishment**
167:7

**purpose** 90:21
156:15

**purposes**
173:6 175:9

**pursue** 70:21
71:12 142:3

**pushed**
131:10,17

**put** 35:13

39:20,21 40:17,
18 51:11 54:25
61:19 63:2,6
65:9 73:13
95:19,25 97:2
133:19 139:19
140:15,22
143:22 151:3
159:22 162:10
164:5,22

_____

**Q**

**qualified** 54:21
55:19

**quality** 35:10
39:5 101:2
147:13 158:23

**qualms** 175:1

**quarter** 101:3

**quarterly**
47:20,24 48:3
49:3 50:6,8
52:12 58:22,25
59:19 61:8
69:14,18,21
70:13,16,19,23
71:3,10,17,21
106:4,6 143:15

**question** 7:6,
11,21,25 8:10
13:25 21:22
29:3 39:15 40:7
44:12 53:20
56:1 61:3,9
68:12 85:21
90:5,20 92:5
94:18 96:3,9
97:18 99:2
101:7 107:2,22,
23 123:5 135:9
140:7 143:9,10
144:18 146:17,
25 148:18,19
167:19 173:7
175:10

**question's**
74:22

**question-by-
question**
113:22

**questioned**
133:22 141:2

**questioning**
18:1 81:15,23
109:19 110:21,
22 111:17
112:19,25
114:15,18,21
118:13 120:12,
19 121:9,13,17,
21,24 122:1,12,
13,16 123:1,8
125:25 126:10
129:18,20,23
130:11 132:3
133:22,23
134:16,18,25
135:3 136:3,7
138:12 139:6

**questions** 7:5
30:3 66:16
72:13 74:11
81:21 82:2,7
105:15 106:8
110:21 111:19
112:7,13 113:8,
18,19 118:24
119:1,7 124:22
155:23 164:23
165:2 172:16
173:2 175:19
178:14,16,23

**quick** 134:11
177:10,20,21,
22

**quickly** 163:9

_____

**R**

**rain** 54:18

**raise** 6:2 37:11
131:21 133:2

**raised** 128:8

**raising** 109:9

**randomly**
86:13,22

**rapport** 117:17
118:2 127:18
128:12 137:15
174:23

rare 51:7

Rarely 52:17

re- 31:9

reach 78:24 84:12,18 85:13 86:2 146:19 148:19,25 174:17,20

reached 81:2,5 83:9 142:2 147:1,6,18 148:10

react 133:1

reaction 135:20

read 30:25 31:4,7 32:7 33:4 50:10 51:17 53:15 58:23 67:1 70:1 71:11,23 73:2, 13 80:5 86:7 90:11 96:11 98:11,21 112:20 133:17 153:10,11,18 154:14 156:13 164:8

read-- 30:22

reading 17:25 80:6 89:24 90:19 98:3

ready 66:12

real 134:11 177:10,20,21, 22

reality 139:21 140:18 141:10

realize 121:1

realized 123:23

reason 42:17 50:14 54:20 55:21 79:13 84:23 85:23 86:1,7 120:11 123:22 136:9 137:1 149:5,6

151:15 157:6

reasonable 86:16

reasons 63:4 65:14

reassigned 36:7 63:4 104:6

reassure 117:13

recall 12:7 16:23 18:25 19:4,9,18 21:1, 13,19,25 22:3,9 23:21 24:1 30:1,9 31:2,6 32:4,13,23,25 33:3,8,9 34:7 35:4,5,24 36:2, 12,15 41:21,25 42:7,9,14,24 43:3,5,23 47:7, 8,16 49:15 51:23 56:24 58:7,15 60:22 67:25 68:1,9, 11,25 69:9,17, 20 76:11,13,18, 22,23 77:1,24 79:11 83:22,24 93:17 108:4,13, 15,22 109:21 110:1,7,13 114:14,20,23 115:15 116:5, 19,20 120:24 121:2,4,5 122:25 123:9, 10,14 125:16 131:24 132:5,9, 23 133:4 134:20 138:2 142:7,15 144:25 149:17, 22 150:11,15, 20 158:25 160:13 161:5, 11 167:10,13, 23 168:8,21 169:24 170:4, 14 171:9,16 172:10 175:3, 23

recalling 33:7

receive 9:2 13:17 14:3 18:11,23 19:1, 6,11 20:23 22:6 56:10 149:15 150:23 151:3 154:11 159:8 162:14 166:11 173:14

received 16:15,19 18:14 67:11 126:3 149:18 150:5 160:4 166:11

receives 104:5

receiving 83:24 142:10 149:22 150:10

recent 48:9,15 59:11

recognition 18:7

recognize 88:22 120:2,5

recognized 39:23

recollection 47:23 49:11 68:5 77:3 102:16 115:11, 14 120:20,23 145:7 160:7 161:13

recommendations 49:12

record 7:20 17:13 30:20 66:13 113:11, 14 127:23 134:13 146:24

recorded 41:23 43:11 94:13 123:1

recorder 42:16,20 72:2

recording 42:5,23 43:10

95:16 109:24 110:11 119:23 120:5,11,15 123:8,15 124:4, 25 146:4

records 15:7, 14 30:17 31:1 151:14 152:3, 11

redacted 87:19

reduced 167:7

refer 65:4,7 141:25 147:10

reference 65:8 68:20 69:10

referring 68:16 104:24 159:10

reflect 51:14 67:19

reflecting 50:14

refresh 77:3 161:6,12

regard 77:4 112:12 125:14 150:18

region 29:9

regular 80:25

Reid 17:5,16, 24 18:4

Reid's 16:25 17:21,25

related 21:20 22:1 41:18 56:16 112:19, 23 113:1 158:7

relates 48:3 49:13 112:10

relating 20:5 22:7 33:1,11 34:1 45:2 48:11 56:10 57:7,13 76:14 81:18,22 120:19 143:5 160:8

relationship 20:6 173:12 177:19

relay 85:2

relayed 137:7 146:14

releasing 142:11

relevant 45:25 74:19 81:20 82:8 100:13 111:1 113:6 143:19 144:1,3

relied 143:11

relying 143:4

remaining 35:22

remarks 61:12

remedial 56:19

remember 21:2,4,8 22:4 24:17 28:16 33:5 59:17 68:18 81:12 102:12,13,14 110:9 114:21 115:3,16,25 116:25 117:12, 19 123:12 126:24 132:24 137:25 138:3,6 167:17

remove 133:21

removed 67:20 160:3,12

removing 133:14

repeat 21:24 27:23 38:6 40:24 44:11 45:4 46:6 49:20 53:14,19 57:10 60:24 69:19 72:18 73:23 77:11 89:4 91:14 97:12 99:2 101:7 104:21 105:18

123:5 135:8 143:8 166:5 171:3

**repeated** 53:20

**repeating** 175:18

**replaced** 64:17

**report** 19:13 29:20 32:9 34:2,6 35:3 36:4 40:21 41:1 43:13 44:2,16 65:23 67:2,7 68:22 78:13,14, 18 80:11,16,24 87:4,16 89:22 91:11 92:2,7 93:24 94:6,22 96:5,6 100:8 108:10 151:12 157:5,8 162:2, 10 171:19

**REPORTER** 6:2,7 53:17,18, 22 91:16,17 97:14,15 101:9, 10 105:20,21, 23 118:7 119:16,20,23, 24

**reporting** 159:21

**reports** 31:19 39:6 51:17,19 52:3,13 105:11 106:5 108:1 162:23,25 163:10,15 164:16,19 179:3

**represent** 98:16 120:17

**representing** 172:25

**represents** 89:11

**reprimand** 121:21 125:22 136:4,9

**request** 34:12 41:8 45:18 62:8 83:20 116:7 159:8

**requested** 32:10 44:2 46:21,23 53:18, 22 57:1 91:17 97:15 101:10 105:21,23

**requesting** 47:12

**require** 22:17 56:9,15 158:22

**required** 13:19,23 14:3 38:11 39:21 40:22 41:2 46:3,9 47:20 48:24 56:12,19 59:19 61:15 64:18 69:15 71:20 95:9 154:16 157:18 167:5 169:22 170:1

**requirements** 153:15

**requires** 22:12,13 23:1 39:5 46:14 113:8 118:20

**residence** 88:7 89:12 91:1,6 93:15 94:21 99:17 116:9,11

**resorted** 129:11

**resources** 71:23 72:4,6 177:6 178:4

**respect** 7:10

**respond** 104:9

**responds** 177:17

**responses** 30:12 112:18

**responsibilities** 15:5 16:3 103:20

**responsibility** 16:9 38:3,8,17 39:16 52:2 143:15

**rest** 140:16

**restroom** 8:5

**results** 68:4 99:10 100:19

**retire** 64:25

**retired** 35:23

**revealed** 44:14 110:11 116:17

**revealing** 91:11

**review** 30:6,12, 13 31:7,11,12, 15 32:5 36:14 38:12,25 39:4 47:20,24 48:3,6 49:4 50:6,8,17, 20 52:3,5,12 58:20,22 60:23 61:1,8,10,21,25 62:4,10,15,18 63:8 64:13 66:1,24 69:14, 18,22,25 70:4, 13,16,19,23 71:3,10,17,18, 20 78:11 87:11 93:22 94:9 96:6 106:3,5,6 119:3,6 143:15 153:16 156:11, 18 157:4 159:14 160:18, 20,24 161:9 162:15,19,23 164:7 166:21 168:24

**reviewed** 19:14 39:9,20 51:16 52:13 58:14 79:24 80:11,16 82:6 94:4,5 102:11 105:6 112:18

132:4 145:23 152:20,22,24 153:7,8 155:24 160:8,11,24 161:17 162:6, 11 163:1,9,11, 16 164:11,17, 18

**reviewing** 30:9 31:2 83:3 158:2 159:19 168:18 179:2

**reviews** 38:12 48:11 59:19 60:16 63:19,23 64:6,16 65:3,19 69:24 71:21 158:7,11 160:17 169:15 170:19

**revised** 155:5 157:6

**revolving** 62:22 63:6

**Richmond** 14:16

**ride** 117:18 136:22 137:23 174:22

**ridiculous** 85:21 151:21

**right-hand** 153:21 161:24

**rights** 166:9

**road** 11:6 13:6 18:7,10 35:14, 23 37:8 148:2,6

**roadside** 18:9

**robbed** 88:8 89:13 91:7

**role** 15:11 25:10 130:6

**roll** 21:6

**rolls** 21:6 63:24

**room** 70:23 114:25 115:3,6, 8,11,20,21,22

117:4,8,11 121:5,8 126:17, 18,20,22 130:6, 10,20 131:9,12, 13 132:1,25 137:2 151:21 177:10

**rougher** 128:8

**round** 57:22

**route** 52:23

**rule** 110:18 111:5,6,16 112:25

**rules** 6:25 118:20 155:18

**run** 73:6

**running** 175:19

---

**S**

**S-Go's** 78:16

**S.O.** 177:22

**safe** 136:25

**safety** 117:7

**sat** 131:16,25

**scared** 136:23

**scene** 18:14 22:4 54:17 101:17,19,21 104:11 159:16

**scheduling** 111:8,18 112:2

**school** 8:16,24 9:1,16 17:5 18:4 22:25 29:5,9 151:16

**Schools** 17:16

**Scout** 127:24

**screen** 105:10, 24 106:2,3

**script** 86:6

**search** 54:9 87:1,6,10,22

88:4,12 89:10,
25 94:4 98:3,22
99:10,11
100:20 116:12,
17,20

**seated** 126:15

**seconds**
119:18,24

**secret** 127:8

**section** 23:23
29:14 50:16
51:3 158:8
159:22 162:24
163:1

**section's**
163:6

**seek** 50:4
113:8 148:8,21

**segment**
125:8,15,17,19

**segments**
119:2

**select** 86:1,14
163:23

**selected** 56:13
86:22

**send** 155:4

**sending** 67:21

**sense** 64:1
71:13 75:25
114:4 117:16
167:25 177:8
178:10

**sentence** 88:6

**separate**
159:12

**September**
118:10 120:12

**sergeant**
13:15,16 14:1,
4,9,24 15:2,20,
21,24 16:10
23:10,16,19
25:1,2,8,10
27:17 38:2,7
39:15 41:2
51:16,20,21

52:8 65:4
68:10,13 69:8
71:17 72:5,19,
23 73:19 77:13
79:7 102:10
103:6,7,10,12,
13,15,16,17,19,
23 104:16
111:20 112:18
158:18 162:17
163:17,18,22

**sergeants**
14:18 103:14,
15,20 158:14,
15 160:17

**serial** 87:13

**serialize** 157:2

**serialized** 52:9
164:4

**servant** 10:1

**serve** 127:16

**service** 13:20

**services** 9:22

**serving** 10:3

**session** 145:1
150:13,14
170:11

**set** 152:19
153:3,24

**sex** 127:19
151:25

**shared** 34:1

**Shawna** 62:7
65:17 81:17
112:6 153:24

**sheet** 151:19,
24

**sheets** 61:5

**shell** 57:23

**sheriff** 173:3,7,
12,15,16,22
174:4,25 175:1,
8,10,20

**sheriff's** 115:5
117:21 174:17,
21 177:9

**shift** 54:13

**shipped** 67:17

**shocking**
80:15

**short** 132:21
134:3

**show** 174:22

**show-up**
149:19,23

**shown** 100:10

**shows** 127:7
149:24 160:14

**sic** 16:25 31:21
51:21

**side** 18:10
83:18 126:16
127:1 131:6,13
162:23

**sign** 154:16,18
162:10

**signature**
88:23,24

**signed** 67:16
88:13,20
163:15

**significance**
102:2,7 157:11

**significant**
40:10 156:18

**signing** 142:9

**similar** 150:17

**simple** 165:4

**simply** 90:14

**Simpson** 88:5
89:12,20 90:13,
25 91:5,12
92:23 93:15
94:20 98:18
99:14,15

**single** 76:2
149:25

**sir** 7:9,14,22
8:3,12 11:8
15:23 20:22
25:23 26:10,13

29:17 31:14
77:5 83:12
98:10,13 103:5
121:11,15,23
122:3,14 125:2,
6,9 155:14

**sit** 93:4 95:9
147:25 153:10

**sitting** 22:11
36:16 47:23
48:10 49:12
55:18,21 58:6
60:6 69:16,20
76:2,12 79:15
99:18 102:4
126:24 133:24
160:7 171:17

**situational**
14:15

**six-month**
10:24

**SLOSAR** 6:9
30:23 53:15,25
62:7 64:3 65:17
66:14 81:17
82:9,12 91:15
97:13 101:8
105:19 110:19,
25 111:11,16
112:6,16,24
113:13,25
114:10,12,13
118:4,8,15,21,
25 119:15,18,
25 120:1
124:18 134:14
153:24 172:15
175:16 178:22,
25

**slower** 114:1

**smoke** 137:4

**smoking** 138:5

**smooth** 117:1

**solemnly** 6:3

**SOLSAR** 64:4

**solvability**
156:21

**somebody's**
40:13 42:16

175:6

**sort** 15:3 61:5
72:7 115:13
121:20 136:4

**sought** 50:11

**sound** 10:21
166:23

**sounds** 10:10
62:14 64:5
113:25 120:6

**Southeast** 9:5

**Southern**
25:19

**space** 131:19

**spatter** 18:17

**speak** 8:5
116:15 131:21
143:21 146:22

**speaking**
47:11 120:24
121:4 149:3

**special** 27:15

**specific** 14:3
21:9,12 22:3
32:23 33:3 43:5
74:9 76:5 106:7
123:21 145:1
147:5 160:23
165:2 175:20,
21,24

**specifically**
19:5 21:20 22:1
33:12 38:21
58:2 70:18
101:15 147:19
158:15 165:16

**specifics**
137:25

**spectrum**
130:21

**speculate**
94:25 135:19,
23

**spend** 10:2

**spent** 57:22,23
115:21

**SPI** 25:17 26:7

**spoke** 9:16 47:7,8 76:3 96:17 117:4 143:23,24 144:14

**spoken** 72:17, 20

**spot** 151:11

**spreadsheet** 48:19 58:25 59:4

**spreadsheets** 73:10

**squad** 16:2 27:3,4 36:7 55:1 103:15,16, 19,20

**stamp** 118:16 124:18

**stamped** 14:21 31:18

**stand** 35:19

**standard** 151:2

**standing** 57:22 115:25 126:16, 23 131:9,12

**standpoint** 133:13

**start** 9:11 32:18 85:22 97:6 114:8

**started** 7:1 10:17 26:17 35:14

**starting** 35:11 54:18

**state** 9:10,11 10:6,10 11:5 13:3,17 14:9,17 17:11 18:5,24 19:2,7,12 20:24 21:10 22:7 23:5 24:21,24 26:6 29:7,19 36:21 41:2 46:3,9,14,

15 55:23 76:3 83:1 85:6 103:24 122:1, 18 134:24 151:12,13 152:5 153:15 154:6,8 155:9, 17 165:8,14 166:7 167:4,12, 21 169:21 171:13 172:7 176:25

**stated** 112:5

**statement** 35:12 57:19,25 73:14 78:15,20 80:8,9,13 82:18 83:11,15 86:3, 11,24 93:2,4,10 94:10,11,12 95:14 98:1 99:11,13,15 116:16 129:4, 21 139:17 142:4

**statements** 18:21 77:20 79:1,9,21 82:16 84:9 109:10 116:22 141:8

**states** 32:9

**status** 64:9 93:9 105:1,5

**stayed** 117:4, 8,11

**stays** 37:14

**Steele** 84:19

**step** 40:11 52:23 140:20

**stepped** 175:5

**steps** 36:3,10 37:16 39:5 40:16 41:3 44:25 45:11 47:2,17 67:23 69:11 73:18,25 74:15,25 75:9, 17 76:19,23 77:7,14 79:6, 14,16,20 80:3

82:14,25 83:5 84:2,9 85:4,16 93:3 96:19,24 105:10 106:20 107:5,15,20 109:3 142:19 144:8 145:18 146:18 149:9 170:23 171:6, 25

**stood** 126:25

**stop** 23:18 107:15 113:9 119:2 122:11 125:24 135:6 136:1 138:23 139:7 140:3

**stored** 48:16 154:8

**story** 129:13

**strike** 133:10

**striking** 126:22

**stuff** 9:22 13:1 18:21 19:17 21:8 35:16 49:3 51:10 52:10,11 53:4 61:11 65:1 69:25 70:5 71:1,3 80:5 95:8,12 102:13 117:7,15 131:22 133:18 136:6 144:1 151:25 156:17, 21 157:3,7,23 168:19 169:1

**style** 130:10

**submit** 49:8 52:7 162:13

**submitted** 45:19 51:19 95:13 163:21

**substance** 41:14

**substantive** 70:13

**substantively** 69:17

**sued** 98:7,9,17

**suggest** 81:10

**suggestions** 48:22 52:15,21 71:11

**suggestive** 149:11 150:8

**suggests** 80:7, 8

**suit** 6:23,24 112:19

**summary** 68:24

**summer** 11:13

**supervise** 16:10 26:9,12, 15,18,20,23 56:3 84:7 103:21,25

**supervised** 16:5,7 26:25 56:6,9,21 102:18,23 104:15 107:6

**supervising** 53:10 54:4,6 55:24 85:24 88:23 112:8

**supervision** 15:22 33:22 52:4 72:8 90:6 91:10 97:20 106:21 112:14 113:2,3,18,24 126:9 142:9,19 143:4,11 144:20 146:11, 20 147:2 149:10 153:9 165:21 166:17 168:5 170:7 172:1

**supervisor** 25:14,17 26:4 27:21 28:1,5, 13,18 29:6,9,15 36:8 37:24 38:18 40:17,22 47:17 48:22

**supervisors** 14:16 49:4 54:10 64:25 155:4

**supplement** 33:13,16,20 34:8,14 36:8, 11,14,17 37:17, 20 38:22 39:25 41:8 42:1 68:19,21 73:13 78:22 80:6 91:19 92:15,20 93:6 94:14 95:13,20 96:15 97:4 102:14 159:25

**supplemental** 40:21 41:1 96:5 100:8

**supplemented** 51:1

**supplementing** 158:1

**supplements** 143:23

**supposed** 39:1,10 40:13 49:6 55:2,3 79:24 88:11 127:11 152:7,8 153:4 154:23 157:12,23 168:25

**Supreme** 22:7

**suspect** 50:10 70:22 89:2,6,19 92:24 142:10

52:1 61:20 71:2 75:22 80:4 86:18 87:9 88:1 97:19 100:23 106:14 108:8 116:2 117:1 138:20 139:4 140:25 144:8 145:19 151:15 153:12 163:15 164:17,18 169:8,14 170:15

149:6,24,25
167:1

**suspected**
85:10 147:18

**suspects**
16:19 19:7
58:13,15,17
72:24 134:18
135:15 157:19

**suspicion**
149:1

**suspicious**
77:22,24 86:10
166:23

**swear** 6:3
144:22

**swearing**
138:21

**switched**
159:15

**swore** 144:7,10

**system** 151:6,
9 152:1

---

**T**

**table** 126:15
131:6,8,9,10,
11,14,16,17,24
132:2 133:24,
25

**tactics** 135:5,
12,14,17
138:13

**taking** 18:21
21:5,7 62:10
76:18,23 84:9
103:5 178:11

**talk** 21:10,11
34:9 81:15 82:5
101:14 129:9
137:22

**talked** 10:13
18:16 112:20
127:6 147:24

**talking** 20:3
31:15,25 58:21
61:11 73:12

74:9 93:13
101:11,16,23
117:12 121:2
126:17 128:7
131:15 134:4
144:16 147:17,
23 159:12

**talks** 156:24
157:2,4,7,12
158:15

**task** 12:12

**taught** 22:9
25:24

**tax** 17:9,12

**Taylor** 49:18,
23 82:5 98:17,
23 112:15
142:5

**tea** 148:3

**technique**
129:9

**techniques**
16:25 17:16
18:3 113:18,23
122:10 127:5
129:12

**Technologies**
67:15,18

**teenagers**
23:24

**telling** 35:5
40:11 55:12
108:15 128:23
139:18 156:7

**tells** 59:8
139:12 156:17
157:22

**ten** 6:17 53:7
66:9

**tended** 167:6

**Tennessee**
8:20

**terrible** 10:23

**terribly** 157:6

**testified** 6:24
36:19 41:6

59:18 61:5
79:19 106:11
107:10,24
108:16 110:6
121:3 123:13
126:4 134:21
136:10 142:2,
16 144:6 145:8,
11,19 146:11,
20 148:12
152:21 162:12
175:10 176:21

**testify** 95:2,5,8
111:3,25
129:17 147:15
166:10

**testifying**
20:10 94:15
110:1,13
123:12 147:7
148:18,22
149:1

**testimony** 6:4
37:3 53:18,22
57:3 62:13
64:15 91:17
97:15 98:1
101:10 105:21,
23 106:8 110:9
136:13 145:24
146:1,15 147:4,
13 148:15
149:8

**testing** 23:20,
21,22 24:5,8,
10,16,20,24
27:21 29:5 68:4

**tests** 23:24

**thing** 8:9 9:25
19:22 32:1
54:7,10 58:21
63:9 81:11 90:1
118:22 119:3
127:9 128:4,25
157:13 160:5
175:14

**things** 7:3 18:2
19:23,24 21:2
48:24 61:14
112:21 117:1
127:25 128:10
157:17 174:24

**thinking**
129:19

**thinks** 130:22

**thought** 97:4
103:11 130:18
136:23

**threat** 109:17
139:9

**threaten**
109:14

**threatened**
126:5 136:11,
24 140:8,21

**threatening**
139:5,15

**three-ring**
154:20

**threw** 125:18

**throw** 126:10,
18,19

**thumb** 53:3

**time** 6:14 8:4
10:3,16,25
19:16 23:17
25:15,16 26:2,
6,7 27:20,24
28:3,6,8,17,21,
23 29:1,4,13
35:8 43:12
44:1,5,7,13
45:5 46:16
51:4,5,10,12
52:1 56:21 61:2
63:23 65:10,15
71:19,22 72:4,6
73:17,24 74:14,
24 76:18 77:6,
14 85:24 86:13
88:2 105:9
109:23 113:5,
22 114:3
115:10,21
116:3 118:16
119:16 120:8
122:11,15
124:18 144:20
147:21 158:16
168:12,22
170:13 172:17

**times** 47:23
51:4 63:12,16
64:17 80:23
84:6 93:3 110:6
177:17

**tired** 54:15
130:8

**title** 15:19
27:14,16 37:15

**today** 7:15,23
20:10 22:11
29:25 36:16
47:23 48:10
49:12 55:18,21
58:6 60:7 62:11
69:16,20 76:2,
12 79:15 81:16
82:5 99:18
102:4 103:1
150:6,10,12,13
160:8 170:12
171:18 172:24
179:1

**today's** 30:4,7
31:3 32:2 82:8
113:9 141:20
145:10 156:12

**toes** 175:6

**told** 34:14
35:18 39:24
43:3 47:4 65:4,
6 78:20 93:6
107:8 134:17
139:25 140:9,
14,21 156:5

**top** 17:4

**topic** 107:23
111:17

**total** 93:20

**town** 9:20
84:24

**track** 62:6 70:2
72:22 73:9,11,
15

**traded** 9:21

**traditionally**
104:13

**traffic** 177:7

**trained** 54:22

**training** 13:17 14:2,4,6,7 16:13,15,19,21, 23 18:8,12,15, 23,25 19:1,6,11 20:23 21:19,25 22:6 30:17,20 31:1 53:1 55:7 56:10,12,13,14, 20 122:4,9,17 126:2 127:19 149:15,18,22 150:5,10,11,13, 14,15,23 151:2 154:11

**trainings** 17:8

**transcript** 16:13

**transfer** 13:1 24:4 25:6

**transferred** 15:11,13,18 24:23 26:2 28:8 29:1,4,8,14 158:20

**Transmit** 163:20

**transport** 84:25

**transportation** 115:17,19

**transported** 117:24

**treaty** 134:23

**trial** 110:2,10 123:7 126:4 148:13

**trick** 143:9

**trooper** 6:22 10:6 11:15,21, 25 13:7 18:7 27:5,8 28:22 35:23 37:8,12, 13 104:5,8 148:6

**troopers** 36:25 103:21 104:1,2,

11,24 156:16 174:18 177:18

**trouble** 106:1 128:16,24

**truck** 54:17

**true** 54:5 79:1

**trunk** 154:21

**trust** 54:23 82:21 143:17 144:2

**truth** 6:4,5 140:15,22,24 141:2,9

**truthfully** 145:19 146:11, 21 147:8 148:12,22

**turn** 22:14,18 23:2 36:8 42:18 46:9,21 49:9 78:7 85:16 86:25 87:3 91:22 93:19 94:8 156:1,20 161:18,22,24

**turned** 42:25 169:18

**TV** 127:7

**type** 12:9 20:12 62:9 68:16 72:2 75:6 83:24 86:9,15,20 87:6 101:11,23 112:19 136:6 144:9,14,15 145:1 150:11 163:19 164:10

**typed** 91:4 159:24 160:1

**types** 53:12

**typically** 50:2 79:4

**typo** 88:10

———

**U**

**ultimately**

28:22 35:13,21 147:23

**unaware** 171:18

**uncommon** 132:6 174:16, 20,24

**underlying** 32:10 41:19 42:12 47:13 60:11 65:24 68:17 69:2,6 75:11 76:10 78:24 79:8,21 82:14 83:2 92:5 97:22 101:4 142:21 158:16 162:3 163:10

**understaffed** 103:7

**understand** 7:7 42:17 54:1 55:22 61:3 71:16 99:25 112:17 119:15 130:15 144:18 146:25 155:12 164:10 165:4 167:19

**understanding** 22:17,24 23:1 60:1,3 62:13 89:24 99:22 126:8 127:15 151:6 154:4

**understands** 56:1

**understood** 7:12 123:5

**undisclosed** 172:8

**undocumented** 172:12

**unduly** 149:11 150:7

**uniform** 35:14 54:25 148:2 157:7 159:21

**unit** 24:20,24 47:4 49:8 54:6 60:19 75:6 162:4,6 164:21

**units** 56:25 73:3,12,16 156:19 169:16 172:3

**unofficial** 16:13

**unreasonable** 84:17

**unrelated** 90:21

**unsolvable** 51:6

**unusual** 173:10

**unwritten** 155:8,10,12,15

**updated** 156:11

**UPS** 101:22

**upset** 21:11

**UR1** 159:15,21

———

**V**

**V1** 160:17

**valid** 7:24 111:24

**vehicle** 129:14

**verbal** 21:9 34:17 41:10,12 121:20 125:21

**verify** 38:3,8 39:16

**Versailles** 11:6

**version** 156:11

**versus** 22:8, 12,13,16,17 110:4

**victim** 50:22,24 51:2,4 99:23

156:25 159:5,6

**victim's** 89:12 90:25 94:20

**video** 115:7,8, 14

**view** 115:6 162:15

**violate** 122:1 134:23

**violated** 122:17

**violating** 126:2 136:17 138:17

**violation** 107:17 108:24 136:19 166:2,8

**voice** 109:9 120:5 131:21

**voices** 131:22

**Volume** 164:5

**voluntarily** 81:3

———

**W**

**wait** 29:2

**waiting** 175:17

**wall** 126:15,19 127:2 132:2

**wanted** 31:25 34:8,9 68:21 91:19 93:2 116:22 129:22 140:2,9

**wanting** 33:19

**warning** 132:5

**warrant** 50:15 54:10 87:2,7,22 88:4,12 89:10, 25 94:4 98:4,22 99:10,11 100:20 116:13, 17,20 141:21 142:9

**warrants** 87:10

watch 115:13
121:9 125:7

watched
125:5,13
126:14

watching
115:25 121:13
126:14 132:12,
24,25

water 134:10

ways 59:13

weapon 117:9

Weber 7:17

week 10:24

weeks 10:25
34:15 152:21

weight 151:25

western 9:20

white 49:1

Whitesburg
8:17,19

who've 23:24

Wiggins
129:14

William 49:18
78:16 110:5
111:18 112:10,
12 123:7

WILLIAMS
110:18 111:6,8,
14,22 118:12,
20 145:15
146:5

window 115:6,
13

withdraw
23:13 29:2
46:22 68:12
171:11

withhold
168:6,14
169:10

withholding
168:23 169:6

witnessed
135:23,25

witnesses
16:20 19:8
20:24 43:19
50:11 72:17,20
73:11 77:20
81:2,24 84:20
85:18 86:3
106:12,22
107:7,11,25
108:9,17,19
109:4,10,14
126:10 134:18
135:3,15
138:12,21
139:5,25 144:7,
13,22 171:14
172:2,9 173:8
175:20,21

woman 141:22

word 105:25

words 173:18

work 18:18
128:18 129:6
141:6 148:1,3
166:20 169:14
173:22,24
174:19,25

worked 6:19
35:22 37:7 53:5
54:13 174:19
175:7

working 9:19
11:17 114:8
130:11 148:2
173:12 175:2

works 71:22
128:5

world 127:22

worth 64:5

WRIGHT 22:20
26:24 36:1
39:8,18 43:17,
21 44:9,20 46:5
53:13 57:9 60:4
73:22 74:3
75:3,13,20
76:21 77:10,17
79:10,23 84:5

85:8,19 88:14
89:3,8,14,23
90:9 91:3,13
92:11,13 94:7,
24 97:11,23
98:24 100:4,12
101:6 104:4
106:15,23
107:14 108:3,
12,14,21 109:6,
15 118:14
120:22 122:20,
22 123:3
126:12 129:15
130:1,3 135:7,
18 138:16,25
139:2,8 140:4
141:4,18 142:6,
14,22 143:7
144:24 145:13,
21 149:13
150:4 158:3
166:4,19 167:9
169:12 170:3,
18 171:2
178:16,20,24

write 83:19
93:5

writing 59:5
87:18 145:1

written 87:21
94:14 125:21
155:13,18,20
162:8 167:3
171:12

wrong 12:25
49:1 140:17

wrote 19:21
43:13 65:12
90:11 95:15
102:14

_____

Y

_____

year 8:24 9:11
12:21,22 15:9
24:1,7,16 35:24
37:10 56:12
63:13,14,15,21,
23 64:16
167:20 169:19
171:11 172:6

year's 63:24
64:5

years 6:16,17
12:1 19:18
35:9,22 37:7
48:8 51:9 53:7
54:25 55:24
56:3,4,5,8
62:16 81:9
88:23 101:3
102:9 103:6
157:8 167:18
174:20 176:12

yell 109:4

yelled 108:17,
23

yelling 108:19
109:9

yellow 49:1

yield 68:4

York 26:9
27:22 28:6
29:20 32:9,14,
22 33:6,10,15
34:1,5,11
37:17,19,22
38:18 40:10,20
41:17,22 42:1,4
43:13 44:1,6,
11,13,25 45:6,
11,15,17 46:20,
23 47:3,6,11
49:13,16,21
55:19,22 56:1,
3,6,9,10,22,23
60:1 67:22
68:1,14,20,23,
25 69:1 76:6,9
78:19 80:7
81:24 88:21,25
89:11,20 91:10,
19 92:14,21
93:2,12 94:11,
16,19 95:18
96:15,19 103:9,
18,22 104:15
106:8,11,21
107:6,10,24
108:16,19
109:3,13,16,19
110:13,23
114:16,24

115:4,11,20,22
116:7,13
121:10,12,16,
21,24 122:5,12
125:11,12,15,
22,24 126:5,6,
16 127:15
129:6,11,17,22
130:6 131:2,5,
13,23 132:9,14
133:14 134:2,
16,22 135:2,6,
13 136:5,16
138:9,12,17,21
139:5,25 140:5
141:15,21
142:2,16 144:6,
20 145:8,11,24
146:14 147:10
158:22 159:2
161:2 162:2
170:20 173:8,
15 175:21

York's 28:1
38:4,9 39:9,17
50:7 60:15
88:1,22 105:6
108:7 116:2
122:16 128:18
145:18 159:9
160:20 161:9

you- 62:9

you-all 114:4