IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF KENTUCKY, LONDON DIVISION

| | | |
|---|---|---|
| AMANDA HOSKINS and JONATHAN TAYLOR, | ) ) ) | |
| | ) | Case No. 17-CV-84 |
| Plaintiffs, | ) ) | |
| | ) | Hon. ROBERT E. WEIR |
| v. | ) ) | |
| | ) | Mag. HANLY A. INGRAM |
| KNOX COUNTY, ET AL., | ) ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendants. | | |

# <u>EXHIBIT 1</u>

# CASE NO. 17-cv-84

## AMANDA HOSKINS, ET AL.,

## V.

## KNOX COUNTY, ET AL.

## DEPONENT:

## AMANDA HOSKINS

## DATE:

## March 16, 2018

1  IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN

2          DISTRICT OF KENTUCKY

3            NO. 17-cv-84

4          HON. DAVID L. BUNNING

5          HON. CANDACE J. SMITH

6

7       AMANDA HOSKINS, et al.,

8          PLAINTIFFS

9

10            V.

11

12        KNOX COUNTY, et al.,

13          DEFENDANTS

14

15

16

17

18

19

20

21

22

23  DEPONENT:  AMANDA HOSKINS

24  DATE:     MARCH 16, 2018

25  REPORTER:  JESSICA VAN TILBURG

Page 2

1                      APPEARANCES
2
3    ON BEHALF OF THE PLAINTIFFS, AMANDA HOSKINS, et al.:
4    ELLIOT SLOSAR
5    AMY ROBINSON-STAPLES
6    LOEVY & LOEVY
7    311 NORTH ABERDEEN STREET
8    THIRD FLOOR
9    CHICAGO, ILLINOIS 60607
10   TELEPHONE NUMBER: (312) 243-5900
11   E-MAIL: ELLIOT@LOEVY.COM
12
13   ON BEHALF OF THE DEFENDANTS, BRIAN JOHNSON, MARK
14   MEFFORD, JACKIE JOSEPH, DALLAS EUBANKS, AND KELLY
15   FARRIS:
16   SHAWNA VIRGIN KINCER
17   CODY WEBER
18   KENTUCKY STATE POLICE GENERAL COUNSEL
19   919 VERSAILLES ROAD
20   FRANKFORT, KENTUCKY 40601
21   TELEPHONE NUMBER: (502) 573-1636
22   E-MAIL: SHAWNA.KINCER@KY.GOV
23
24
25

Page 3

1                   APPEARANCES (CONTINUED)
2
3    ON BEHALF OF THE DEFENDANTS, JASON YORK AND TROOPER
4    JASON BUNCH:
5    DERRICK T. WRIGHT
6    STURGILL, TURNER, BARKER & MOLONEY, PLLC
7    333 WEST VINE STREET
8    SUITE 1500
9    LEXINGTON, KENTUCKY 40507
10   TELEPHONE NUMBER: (859) 255-8581
11   E-MAIL: DWRIGHT@STURGILLTURNER.COM
12
13   ON BEHALF OF THE DEFENDANTS, MIKE BROUGHTON AND THE CITY
14   OF BARBOURVILLE:
15   LICHA H. FARAH, JR.
16   WARD HOCKER THORNTON
17   333 WEST VINE STREET
18   SUITE 1100
19   LEXINGTON, KENTUCKY 40507
20   TELEPHONE NUMBER: (859) 422-6000
21   E-MAIL: LFARAH@WHTLAW.COM
22
23
24
25

Page 4

1                   APPEARANCES (CONTINUED)
2
3    ON BEHALF OF THE DEFENDANTS, KNOX COUNTY, JOHN PICKARD,
4    AND DEREK EUBANKS:
5    JOHN F. KELLEY
6    JASON WILLIAMS
7    WILLIAMS FARMER & TOWE
8    303 SOUTH MAIN STREET
9    P.O. BOX 3199
10   LONDON, KENTUCKY 40743
11   TELEPHONE NUMBER: (606) 877-5291
12   E-MAIL: JOHN@WFTLAW.COM
13
14   ALSO PRESENT:  JASON YORK, KENTUCKY STATE POLICE; DEREK
15   EUBANKS, WHITLEY COUNTY DEPUTY SHERIFF; JOHN PICKARD,
16   FORMER SHERIFF; LACEE TOWNSEND, VIDEOGRAPHER
17
18
19
20
21
22
23
24
25

Page 5

1                        INDEX
2                                      Page
3    PROCEEDINGS                        7
4    DIRECT EXAMINATION BY MR. WRIGHT            8
5    EXAMINATION BY MR. KELLEY           190
6    EXAMINATION BY MS. KINCER           268
7    EXAMINATION BY MR. FARAH            272
8    CROSS EXAMINATION BY MR. SLOSAR          290
9    RE-EXAMINATION BY MR. FARAH         293
10
11                      EXHIBITS
12                                      Page
13   1 - RULE 26 DISCLOSURE             71
14   2 - INTERROGATORIES                93
15   3 - PL 018938-018939 RX
16      GUARDIAN RESULTS REPORT         149
17   4 - PL 018934-018935 RX
18      GUARDIAN RESULTS REPORT         152
19
20
21
22
23
24
25

THE DEPOSITION OF AMANDA HOSKINS, taken on MARCH 16, 2018                    6..9

Page 6

```
1              STIPULATION
2
3    The videotaped deposition of AMANDA HOSKINS taken at the
4    HOLIDAY INN EXPRESS & SUITES, 506 MINTON DRIVE, LONDON,
5    KENTUCKY 40741 on TUESDAY, the 16th day of MARCH, 2018
6    at approximately 9:02 a.m.; said videotaped deposition
7    was taken pursuant to the FEDERAL Rules of Civil
8    Procedure.
9
10   It is agreed that JESSICA VAN TILBURG, being a Notary
11   Public and Court Reporter for the State of KENTUCKY, may
12   swear the witness and that the reading and signing of
13   the completed transcript by the witness is not waived.
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 7

```
1           PROCEEDINGS
2       VIDEOGRAPHER:  My name is Lacee Townsend, and
3    I'm the video technician today, and Jessica Van
4    Tilburg is the court reporter.  Today is the 16th
5    day of March, 2018.  Time is 9:02.  We are at the
6    Holiday Inn located in London, Kentucky to take the
7    deposition of Amanda Hoskins in the matter of Amanda
8    Hoskins, et al. versus Knox County, et al., pending
9    in the United States District Court of the Eastern
10   Kentucky – Eastern District of Kentucky, number
11   17-CV-84.  Will counsel please identify themselves
12   for the record?
13      MR. SLOSAR:  Elliott Slosar for the plaintiffs,
14   Amanda Hoskins and Jonathan Taylor.
15      MS. STAPLES:  Amy Robinson-Staples on behalf of
16   the plaintiffs.
17      MR. WRIGHT:  Derrick Wright on behalf of
18   Defendants Jason York and Jason Bunch.
19      MS. KINCER:  Shawna Kincer and Cody Weber on
20   behalf of Defendants Mark Mefford, Brian Johnson,
21   Josie – Jackie Joseph, Dallas Eubanks, and Kelly
22   Farris.
23      MR. WEBER:  Cody Weber on behalf of Mark
24   Mefford, Brian Johnson, Jackie Joseph Pickrell,
25   Dallas Eubanks, and Kelly Farris.
```

Page 8

```
1       MR. KELLEY:  John Kelley.  I'm here on behalf
2    of the defendants Knox County, John Pickard, and
3    Derek Eubanks.
4       MR. FARAH:  Licha Farah on behalf of Mike
5    Broughton and the City of Barbourville.
6       VIDEOGRAPHER:  Ma'am, will you raise your right
7    hand to be sworn in?
8       COURT REPORTER:  Do you solemnly swear or
9    affirm the testimony you are about to give will be
10   the truth, the whole truth, and nothing but the
11   truth?
12      THE WITNESS:  I do.
13      COURT REPORTER:  Thank you.
14           DIRECT EXAMINATION
15   BY MR. WRIGHT:
16      Q    Will you state your name for the record,
17   please?
18      A    Amanda Hoskins.
19      Q    Have you given a deposition before?
20      A    No.
21      Q    Okay.  Just a couple ground rules.  I'll ask
22   questions, and let you answer.  We'll try not to talk
23   over each other, okay?
24      A    Okay.
25      Q    And if you could just verbalize your answer,
```

Page 9

```
1    that easier for them to take that down.  You understand?
2       A    Yes.
3       Q    Okay.  If you don't understand a question,
4    feel free to ask me to rephrase it.  But if you don't,
5    I'm going to assume you understood what I asked; is that
6    fair?
7       A    Yes.
8       Q    This isn't a marathon.  If you need a break,
9    just let me know.  But I would ask that if I have a
10   question pending, that you finish that before we take a
11   break.
12      A    Okay.
13      Q    Okay?
14      A    Okay.
15      Q    All right.  Do you have a memory of when you
16   first heard that Katherine Mills had been found dead?
17      A    I was babysitting her great-grandkids at the
18   time.
19      Q    So where were you at?
20      A    When I first heard it?
21      Q    Yes.
22      A    I was in Barbourville.  That's where I lived
23   at.
24      Q    And where at in Barbourville?
25      A    Topaz Court.
```

Page 10

1   Q   And what was the address there?
2   A   I'm not sure.
3   Q   Whose home was it?
4   A   It was mine.  My mom's house.
5   Q   Your mom's house?  Who's your mom?
6   A   Linda Taylor.
7   Q   Who else lived at that house at that time?
8   A   My two kids, and my cousin.
9   Q   Who's your cousin?
10  A   Jerry-Wayne Smith.
11  Q   How old were your kids at the time?
12  A   At the time, probably – let's see.  That year
13  would be what?
14  Q   2010.
15  A   2010.  My little boy was 7, and my little girl
16  was 3.
17  Q   And you said you were babysitting kids?
18  A   When we first got – like when I got the news,
19  I went and babysat William Lester's grandkids, which
20  would have been that Mills' lady's great-grandkids.
21  Q   So you babysat them after you heard –
22  A   Yeah.
23  Q   – the news, right?
24  A   Uh-huh.
25  Q   Yes?

Page 11

1   A   Yes.
2   Q   Was Jerry-Wayne at the house when the news
3   came?
4   A   I'm not sure.
5   Q   What about Linda Taylor?
6   A   I'm not sure.
7   Q   Are you sure you were in Linda Taylor's house
8   when that news came in?
9   A   Yes.
10  Q   Who told you?
11  A   William Lester.
12  Q   Was he there with you?
13  A   No.
14  Q   Where was he?
15  A   I'm not sure.
16  Q   So how did he tell you?
17  A   I was on the phone with him.
18  Q   And did – how did that – were you talking to
19  him, and then he had a call and it was interrupted; what
20  happened?
21  A   No.  He –
22       MR. SLOSAR:  Objection to form.  You can answer
23  the question.
24  A   Can you repeat it?
25  Q   Sure.  So you said you were talking to William

Page 12

1   Lester on the phone when you found out.  Did he call you
2   to tell you that for that purpose?
3       MR. SLOSAR:  Objection to form and calls for
4   speculation.  You can answer the question.
5   A   No.  He was actually on his way to get me.  He
6   got a beep, clicked it – like when he clicked over, I
7   walked out.  He was talking on the phone.  When I got in
8   the car, he told me when he got off the phone what just
9   happened.
10  Q   So he was already at your house then when –
11  A   He was picking me up.
12  Q   Okay.  Was there any reason why he was picking
13  you up?
14  A   No.
15  Q   Where does – where did William Lester live at
16  the time?
17  A   Stinking Creek.
18  Q   Who lived with him?
19  A   Hisself.
20  Q   No one else lived with him?
21  A   No.
22  Q   Did you ever stay with him?
23  A   I stayed with him before.
24  Q   What time was it?
25  A   I'm not sure.

Page 13

1   Q   So he had already heard it on the phone before
2   he told you?
3   A   He had – I was on the phone with him.  He
4   answered a beep, and by the time – he was just to tell
5   me he was outside.  I walk out.  He was on the phone.
6   Q   Okay.  So did you see him talking on the phone
7   when he got the news?
8   A   Yes.
9   Q   How did he react?
10  A   His face got red.  He was speechless.  Looked
11  like he wanted to cry.
12  Q   Did he hang up the phone before he talked to
13  you?
14  A   I'm not sure.
15  Q   What was your reaction?
16  A   I felt sorry for everyone.
17  Q   So were you going to go to his house, you
18  said?  Is that why he was picking you up?
19  A   I'm not sure where we were going.  That's been
20  a long time ago.
21  Q   You don't remember?
22  A   I'm not sure.  No.  I don't remember where we
23  were going.
24  Q   So where did you end up going after he picked
25  you up after that news?

THE DEPOSITION OF AMANDA GOSKINS, taken as of 2016

Page 14

1    A   We went to his daughter's house, and he told
2  her the news.  And then I got her two kids, drove them
3  to William Lester's house.
4    Q   Which daughter did he go to?
5    A   Michelle.
6    Q   What's her last name?
7    A   I'm not sure.
8    Q   Is it Edwards; does that sound right?
9    A   Probably with one of them.  I don't know if
10  she still goes by that.
11    Q   Did he have a second daughter?
12    A   Yes.
13    Q   What was her name?
14    A   Jennifer.
15    Q   Do you know what her last name was?
16    A   Lawson.
17    Q   Is it still Lawson?
18    A   That I know of.
19    Q   Did he have any other daughters?
20    A   No.
21    Q   Did he have any sons?
22    A   No.
23    Q   So you went to Michelle's house; is that
24  right?
25    A   Yes.

Page 15

1    Q   So then what happens?
2    A   I got -- he told her the news.  I was still
3  sitting in the truck at the time.  He -- she goes with
4  him.  I get her two kids, and we go to William Lester's
5  house, and I keep those kids until they come back.
6    Q   So when you find out about Katherine, did he
7  say how she had died?
8    A   No.
9    Q   What did he say?
10    A   That they found Michelle's mamaw outside.
11    Q   Did he say that she was dead?
12    A   They just said that they had found her
13  outside.
14    Q   So you go to William Lester's house.  What --
15  do you remember what time that was?
16    A   No.
17    Q   Was it dark out?
18    A   I know it was close to dark.
19    Q   Did you say who called William; was it
20  Jennifer?  Do you know?
21    A   I'm not sure.
22    Q   How long did you keep the kids; do you
23  remember?
24    A   Hours.  But I don't have the how many hours.  I
25  just know it was hours.

Page 16

1    Q   Did Michelle come back that night?
2    A   Yes.
3    Q   Did you keep Jennifer's kids?
4    A   I'm not sure if they came back, if I kept all
5  four of them or if they came as she came.  I'm not sure.
6    Q   Do you remember seeing Jennifer that night?
7    A   Yes.
8    Q   Was it at Michelle's house?
9    A   No.
10    Q   Where did you see her?
11    A   William Lester's.
12    Q   You kept the kids at Michelle's house?
13    A   No.
14    Q   Or you kept the kids at William Lester's?
15    A   Yes.
16    Q   So you picked them up at Michelle's house?
17    A   Yes.
18    Q   And then took them back?
19    A   To William Lester's house.
20    Q   What were you driving?
21    A   A silver -- I think it's a Ford Ranger truck.
22    Q   Was that yours?
23    A   No.
24    Q   Whose was it?
25    A   It's the one that William Lester drove.

Page 17

1    Q   Did you have a car at the time?
2    A   No.
3    Q   How old were you in 2010?
4    A   Goodness.  Let's see.  I can't --
5    Q   What year were you born?
6    A   1985.
7    Q   Now, I won't ask for a date, but just the
8  month?
9    A   January.
10    Q   This happened 2010 in December.  Is that your
11  memory?
12    A   Yes.
13    Q   That would be 25 years old?
14    A   Yes.
15    Q   Sound right?
16    A   Yes.
17    Q   And you didn't have a car at the time?
18    A   No.
19    Q   Didn't have a home?
20    A   No.
21    Q   Lived with your mother?
22    A   I did.
23    Q   Did you ever own a car?
24    A   Yes.
25    Q   Before that?

Page 18

1   A   Yes.
2   Q   What was it?
3   A   I had a – let's see, a 1999 Firebird.
4   Q   When did you own that?
5   A   I'm not sure when.  I had a 2000 Grand Am.
6   Q   How long were you – in December 2010, how
7   long had you been going without a car?
8   A   Probably months.
9   Q   How come you didn't have a car?
10  A   I had a car accident.
11  Q   When did you get it replaced; did you buy a
12  new one?
13  A   No.
14  Q   So you were in a Ford Ranger and that belongs
15  to William Lester?
16  A   I don't know if it belonged to him or not.  I'm
17  not sure.
18  Q   You don't know whose vehicle it was?
19  A   No.
20  Q   Had you ever seen it before?
21  A   Yes.
22  Q   Where had you seen it?
23  A   He drove it.
24  Q   But you don't know if he owned it?
25  A   No.

Page 19

1   Q   And what other vehicles did William Lester
2   have at that time?
3   A   A Camaro.
4   Q   Did you drive those vehicles?
5   A   I've drove the Camaro.
6   Q   Was that the only one you had driven of his?
7   A   First time I ever drove that truck, and the
8   only time is when I got those kids and went to William
9   Lester's house.
10  Q   And you picked them up from Michelle's house?
11  A   Yes.
12  Q   Do you know where she lived?
13  A   Where William Lester lived.  All I know is you
14  take a right at the store.  Not for sure what it's
15  called.
16  Q   What store?
17  A   Escoe's Market.
18  Q   Did you grow up in this community?
19  A   No.
20  Q   Where did you grow up?
21  A   Bell County.
22  Q   And is that Pineville?
23  A   Yes.
24  Q   But your – did Linda Taylor live in Knox
25  County, your mother, or did she live in Bell County?

Page 20

1   A   At the time of this?
2   Q   Yes.
3   A   Or like my entire life?
4   Q   At the time of this.
5   A   Knox County.
6   Q   How far did she live from William Lester?
7   A   I'm not sure.  Eight minutes, maybe, ten.
8   Q   Do you know where the – Katherine Mills was
9   the victim, right?
10  A   Yes.
11  Q   Do you know where she lived?
12  A   No.
13  Q   So you don't know how far away that was
14  from – how far Katherine Mills' home was from William
15  Lester's?
16  A   No.
17  MR. SLOSAR:  Objection to form.  Calls for
18  speculation.
19  Q   You pick up Michelle's kids and you go to
20  William Lester's with them and babysit, right?
21  A   Yes.
22  Q   Do you recall Jennifer Lawson – do you
23  recall – is she married to a Jesse Lawson at the time?
24  A   Yes.
25  Q   And did they have kids?

Page 21

1   A   Yes.
2   Q   They have.  How many?
3   A   Two.
4   Q   Michelle had two?
5   A   Yes.
6   Q   Do you recall babysitting four kids that
7   night?
8   A   I'm not sure.
9   Q   Is it true that when Jennifer Lawson came to
10  pick up her kids, you asked if police had found
11  anything?
12  A   No.
13  Q   What did you – how – what did you say to
14  her?
15  A   I didn't talk to her.  She was crying.
16  Q   What about Michelle Edwards; did you say
17  anything to her?
18  A   No.
19  Q   Did you stay at William Lester's house that
20  night?
21  A   No.
22  Q   Where did you go?
23  A   To my mom's.
24  Q   How did you get back?
25  A   William Lester took me.

Page 22

1    Q   Do you remember what time that was?
2    A   No.
3    Q   Did William Lester stay with you that night?
4    A   No.
5    Q   He went back to his house?
6    A   I'm not sure where he went.
7    Q   Did William Lester ever stay with you at your
8  mom's house, Linda Taylor's?
9    A   No.
10    Q   Did you get any more information about what
11  had happened when they came back to pick up the kids?
12    A   No.
13    Q   No one talked about it?
14    A   No.
15    Q   What about when William Lester took you to
16  your – back to your house; he didn't talk any more
17  about it?
18    A   No.
19    Q   You didn't ask him?
20    A   He was on the phone.
21    Q   Who was he talking to; do you know?
22    A   I have no idea.  Not sure.
23    Q   And all you knew when you went back to your
24  mom's house was that they found her in the yard?
25    A   Yes.

Page 23

1    Q   Now, isn't it true that before that happened,
2  you knew that she had money from selling timber?
3    A   No.
4    Q   You didn't know that?
5    A   I heard that.
6    Q   Okay.
7    A   I didn't know that.
8    Q   Didn't know it?  And you heard it from Lester,
9  right?
10    A   Yes.
11    Q   And he told you $15,000?
12    A   No.
13    Q   What did he tell you?
14    A   He didn't tell me anything.  I heard it in a
15  conversation.
16    Q   All right.  Well, how much did you hear?
17    A   I never heard an amount.
18    Q   When did you first hear William Lester talking
19  about the – Katherine Mills having money from selling
20  timber?
21    A   I was sitting in a driveway in that silver
22  truck, and I was smoking a cigarette.  The window was
23  cracked.  Heard him talking about it.
24    Q   What silver truck?
25    A   The one that William Lester drove.

Page 24

1    Q   Well, a minute ago you said that you'd never
2  been in that before?
3    A   No.
4       MR. SLOSAR:  Objection.  It misstates her
5  earlier testimony.
6    A   No.  I told you I had never drove that before.
7    Q   Okay.  So you've been in it before, but you've
8  never driven it?
9    A   Yes.
10    Q   All right.  So you heard him – the first time
11  you heard him say that was when again?
12    A   When I was sitting in the passenger seat of
13  the silver truck smoking a cigarette.
14    Q   That's the first time you heard about the
15  money?
16    A   Yes.
17    Q   Or is that the first time you heard about the
18  plan to tie her up and steal it?
19    A   I've never heard –
20       MR. SLOSAR:  Objection.  Argumentative.
21    A   – that.
22       MR. SLOSAR:  You can answer.
23    A   I never heard that.
24    Q   You never heard what?
25    A   What you just said.

Page 25

1    Q   You never heard that there was a – that
2  William Lester had suggested that they steal the money;
3  tie her up in an outhouse or a smokehouse?
4    A   That's not how I heard it.
5    Q   Well, how did you hear it?
6    A   I was sitting in the truck, and William Lester
7  was having a conversation with someone.  He – how he
8  was talking – he just said, "Buddy, what I should do is
9  catch my ex-mother-in-law in the outhouse, and like lock
10  her in, but not hurt her."
11    Q   He said that?
12    A   Yes.
13    Q   Lock her in where?
14    A   The outhouse.
15    Q   So you knew then she had an outhouse from
16  that –
17    A   Yes.
18    Q   – conversation?
19    A   Yes.
20    Q   He never said how much money she had?
21    A   No.
22    Q   Who was he talking to?
23    A   Mike Simpson.
24    Q   Do you know Mike Simpson?
25    A   No.

Page 26

1  Q  Did you know his face?
2  A  Yes.
3  Q  Did he sell drugs to your understanding?
4  A  I heard that.
5  Q  Did you ever buy from him?
6  A  No.
7  Q  Did William Lester buy from him?
8  A  I'm not sure.
9  Q  Did he go there to pick up drugs for you?
10  A  He's went there before, like I've not ever
11  seen anything handed to him.
12  Q  You didn't see anything handed to him.  Did he
13  ever go there and then come back with illegal drugs?
14  A  Yes.
15  Q  Did you use those?
16  A  Yes.
17  Q  With William?
18  A  No.
19  Q  He didn't use drugs?
20  A  No.
21  Q  But he would give them to you?
22  A  Yes.
23  Q  He'd buy them for you?
24  A  Yes.
25  Q  How long was that going on?

Page 27

1  A  I'm not sure.
2  Q  How long did you know William Lester before
3  Katherine Mills was found dead?
4  A  I met William Lester probably in 2004.
5  Q  Would you say you dated him?
6  A  No.
7  Q  Not off and on?
8  A  No.
9  Q  Did you sleep with him?
10  A  I have.
11  Q  Were you sleeping with him in 2010; the later
12  part of that year?
13  A  I'm not sure of the dates.
14  Q  To your knowledge, though, he didn't use
15  drugs?
16  A  No.
17  Q  How many times had you seen Mike Simpson
18  before this conversation he had with William Lester?
19  A  I'm not sure.
20  Q  How far did Mike Simpson live from William
21  Lester?
22  A  Maybe five minutes.
23  Q  Isn't it true that you also heard William
24  Lester discuss this with Joe King?
25  A  Yes.

Page 28

1  Q  When was that?
2  A  I'm not sure of the date.
3  Q  Can you ballpark it; was it within a week?
4  MR. SLOSAR:  Objection to form.
5  A  That's a guess.
6  MR. SLOSAR:  Asked and answered.
7  A  I'm not sure.
8  Q  You're not sure?
9  A  No.
10  Q  Would you know was it within a month?
11  A  I'm not sure.
12  Q  What about Mike Simpson; how close in time was
13  the conversation you overheard with Mike Simpson and
14  William Lester?
15  A  I'm not sure.
16  Q  Do you remember giving a statement to Jason
17  York in February of 2011?
18  A  I've gave several to Jason York.
19  Q  Were you being honest when you talked to Jason
20  York?
21  MR. SLOSAR:  Objection to form and foundation.
22  You can answer the question.
23  Q  Were you being honest when you talked to him?
24  A  Yes.
25  Q  Didn't you tell him that it had been within a

Page 29

1  week, week-and-a-half that you'd heard these statements?
2  A  I'm not sure.  This is how many years ago. I'm
3  not sure.
4  Q  Do you have any reason to doubt the accuracy
5  of what you told him back then?
6  MR. SLOSAR:  Objection to form.  Asked and
7  answered.
8  A  I'm not sure.
9  Q  Well, you said you were being honest, right?
10  A  Yeah.
11  Q  So that's probably as accurate as you can
12  remember at the time, right?
13  A  Yes.
14  Q  And that was February 2011.  Was that the
15  first time you spoke to Jason York?
16  A  I'm not sure with the dates.  I talked to him
17  several times.
18  Q  Okay.  February 2011; you've been with him
19  about two months of the incident, right?
20  A  Yes.
21  Q  Okay.  Who else did you hear William Lester
22  talk about Katherine Mills having money?
23  A  No one.
24  Q  No one else?  Now, do you know that the
25  statements by Lester to Simpson and King were before

Page 30

1 Katherine Mills was found dead, right?

2     A   Yes.

3     Q   So before she was found dead, you knew about

4   she had money, right?

5       MR. SLOSAR: Objection. Asked and answered.

6   This is the third time you've asked her this

7   question. Ms. Hoskins, you can answer again if he

8   asks one more time. It's fine.

9     A   Can you repeat it?

10 BY MR. WRIGHT:

11     Q   Yeah. Before she was found dead, you knew

12   about the money. You'd overheard that from William

13   Lester, right?

14     A   I didn't know about it personally, but I did

15   hear that.

16     Q   And you'd heard William Lester tell two people

17   about locking her in an outhouse and taking it, correct?

18     A   Yes.

19     Q   Did you also hear that the money was kept in

20   the victim's purse?

21     A   No.

22     Q   You didn't hear that?

23     A   Not -- I'm not sure.

24     Q   So this is a document that was produced by

25   you-all, a transcript of your statement given on

Page 31

1 February 15, 2011. PL8 is the beginning. On PL11, the

2 transcript says that, "I was told that he was going

3 through some (Inaudible). He's been out of work.

4 Everybody knows he's been out of work since last

5 November. I was told that he should go up, and put her

6 in the -- lock her in the outhouse when she was using

7 the bathroom. Lock her in there, and just take her

8 purse." And so didn't you know that the money was kept

9 in the purse?

10     A   I didn't know. I may have heard, but I didn't

11 know.

12     Q   So you'd heard that the money was kept in a

13 purse, right?

14       MR. SLOSAR: Objection. Asked and answered.

15     Q   Yes?

16     A   I may have heard that. I'm not sure.

17     Q   That's what you told Detective York; wasn't

18 it?

19     A   It could have been after Detective York told

20 me what to say. It could have been after that.

21     Q   Told you what to say. When did that happen?

22     A   Before the recording started on that audio.

23     Q   So what's your memory of that February 15,

24 2011 interview; where were you at?

25     A   I was at my house when they came and got me.

Page 32

1     Q   Who got you?

2     A   At that time, the first time I was picked up

3 then, I'm thinking Detective York came, and he may have

4 called -- it was either KSP or Knox County Sheriff's

5 Department.

6     Q   Did they pick you up on charges; what was the

7 reason?

8     A   He told me he had a few questions to ask me,

9 and I had an FTA, I think, for failure to show proof of

10 community service in 12 step program out of Bell County.

11 So I had to go with him because I had that warrant is

12 what he told me.

13     Q   Was that like a probation violation?

14     A   No. It was actually I just didn't show proof

15 of a 12 step program.

16     Q   Were you on probation at that time?

17     A   I'm not sure.

18     Q   Well, why were -- why did you have to show

19 proof of a 12 step program?

20     A   I'm not even sure what the charge was -- what

21 I had. It was on some kind of conditions from the judge

22 in Bell County.

23     Q   In what case?

24     A   I'm not sure. I'm not sure.

25     Q   Who else was with him when he picked you up?

Page 33

1     A   It's either the Sheriff's Department or KSP.

2 There were several times he picked me up, so I'm not for

3 sure which time that was.

4     Q   Who was -- where did they take you when they

5 picked you up?

6     A   To the Barbourville Police Department.

7     Q   Were you at your mother's house when they

8 picked you up?

9     A   Yes.

10     Q   And did your mom live in Barbourville or

11 outside of Barbourville?

12     A   She didn't live in town. She lived -- it

13 would be Knox County.

14     Q   So how long of a trip was it from your mom's

15 house to the Barbourville Police Department?

16     A   Seven minutes, maybe.

17     Q   Were you handcuffed?

18     A   No.

19     Q   Were you in the back of a cruiser?

20     A   If I wasn't in the cruiser, then at that time,

21 then I was in the back of a Sheriff's Department

22 vehicle. I was taken more than once, so I'm not sure

23 which vehicle I was in.

24     Q   But you don't remember who else was there

25 other than York?

Page 34

1    A  I know Mike Broughton was present when I got
2  there.  I just can't remember if he came to my house.
3    Q  Did you know Broughton before this?
4    A  No.
5    Q  Did you know Detective York before this?
6    A  Yes.
7    Q  How did you know him?
8    A  I guess I was about 18.  Me and one of my
9  friends at the time, we had met two cops -- State
10  Police, at the Shell in Barbourville, and he happened to
11  be one of them.  And we were talking to them.
12    Q  So that would have been about seven years
13  before this?
14    A  It would have been in 2003.
15    Q  Well, you said you're 25 when the incident
16  happened.  You'd been 26, I guess, when you were -- in
17  February 2011, right?
18    A  Yes.
19    Q  So you said you had met York when you were 18
20  years old; is that right?
21    A  It would have been in 2003.
22    Q  How does it -- why does that stick out in your
23  mind?
24    A  Because my little boy -- I had him when I was
25  18, and that's how I just remember 18.

Page 35

1    Q  So you met him at a Shell station?
2    A  Yes.
3    Q  And what did you talk about?
4    A  It was actually the girl I was with was
5  talking to another trooper at the time, and I guess we
6  were -- I'm not sure of the conversations, but we were
7  just standing there talking.  He was sitting in his
8  cruiser, and so was the other KSP.
9    Q  And he told you his name?
10    A  Yeah.
11    Q  But you don't remember anything else you
12  talked about?
13    A  No.  That's been a very long time ago.
14    Q  I'm surprised you even remember meeting him.
15  Did you recognize his face then when he came to pick you
16  up?
17    A  I knew of him, like I knew his name.
18    Q  How's that?
19    A  Because I had met with him and that girl that
20  was talking to that other state police.  I was there at
21  the Shell station when they were talking.
22    Q  So you had met him one time when you were 18,
23  and you didn't meet him again until this incident?
24    A  Yes.
25    Q  So you go to the station.  What happens when

Page 36

1  you get there?
2    A  I'm not sure.
3    Q  You're not sure?
4    A  No.  I just know at that time we were just
5  seeing them -- she was talking to the other cop, the
6  state police.  She was standing there talking to him.
7    Q  Now, I'm talking -- I'm sorry.  I didn't mean
8  to confuse you.
9    A  Oh.
10    Q  I'm talking about when you were picked up at
11  your mom's house in February 2011.  They take you to the
12  police department; what happens when you get to the
13  police department?
14    A  They take -- they ask me if I wanted something
15  to drink.  They take me in this room, and I sat down.
16    Q  Did they read you your rights?
17    A  No.
18    Q  Did you -- did they ask about this Katherine
19  Mills?
20    A  Yes.
21    Q  And they -- did they ask you if you knew
22  anything about the case?
23    A  Actually, when we sat down, Detective York
24  placed the citation on the table, and it has my name on
25  it.  It has murder, and underneath murder, it has

Page 37

1  robbery.  And he tells me if I didn't talk to him, and
2  make a phone call, that he wanted me to call William
3  Lester that he was charging me.
4    Q  Anything else said?
5    A  Do you have a question, like --
6    Q  No.  I'm just asking.  You said that he
7  presented this citation with a murder charge, and
8  robbery; is that right?
9    A  Yes.  He laid it down and told me if I didn't
10  make a phone call to William Lester, that he was
11  charging me with it.
12    Q  Did you-all -- did -- was that recorded, to
13  your memory?
14    A  No.
15    Q  Was any part of your conversation with him
16  recorded?
17    A  After -- when -- sometime after.
18    Q  What was talked about before the recording
19  started?
20    A  That I was a piece of crap.  I was a druggie,
21  and there was a woman that had been killed.  And he told
22  me the woman's name, and that -- let's see.  That I
23  didn't have no family, and that this could have easily
24  been me that did it.
25    Q  What did you say?

Page 38

1    A   I just looked at him like he was crazy.
2    Q   Did he tell you anything else?
3    A   Before the recording started?
4    Q   Yes.
5    A   Just he – we had talked about my papers to
6  send to Bell County, and he also told me if I talked to
7  him, that he would send my papers that I had for that
8  warrant in Bell County.  He would send them to the judge
9  to make sure I didn't get arrested.
10    Q   Did you get arrested?
11    A   Yes.
12    Q   When?
13    A   Right after.
14    Q   Did he talk about the case to you at all?
15    A   Yes.
16    Q   What did he tell you?
17    A   That there was a woman that was murdered on
18  Stinking Creek, and that it could very easily have been
19  me that did it.
20    Q   And that's all you remember?
21    A   Yeah.  He also laid out several different
22  pictures of me.  When I – like, one picture I might
23  have more highlights in my hair.  One picture I could
24  have had dark hair.  One picture I could have had
25  blonde.  And he told me that during that time period, I

Page 39

1  had changed my hair color, so
2    Q   Is that true?
3    A   Not that I know of.
4    Q   What is your natural hair color?
5    A   I'm not even sure.  It's probably – it's been
6  so long since I've been getting it dyed.  I'm not sure.
7    Q   All right.  What color was it in December
8  2010; was it blonde?
9    A   It's – I – it's no telling how many colors I
10  had in 2010.  I'm not sure.
11    Q   Do you color it yourself?
12    A   I have.
13    Q   Did you ever pay for somebody to color it for
14  you?
15    A   Yeah.
16    Q   Did you – were you able to pay for that
17  service in 2010, December?
18    A   I'm not sure.  I think I had just like one
19  color hair then, so I'm not sure if I would have done it
20  myself in 2010 or had it done.
21    Q   So he lays out pictures.  Anything else?  Any
22  other exchanges before the recording starts?
23    MR. SLOSAR:  Objection to form as to the
24    definition of exchange.  You can answer the
25    question.

Page 40

1    Q   Any other – did you – what else did he speak
2  to you about before the recording started?
3    A   He actually –  he told me about the phone
4  call that he wanted me to make, and he told me to act
5  like I was in a panic, and that I was hysterical to
6  William Lester.
7    Q   What else did he tell you –
8    A   He told –
9    Q   – before the recording started?
10    A   This is before the recording started.  He told
11  me not to call him.  Just not – to say that I was in
12  questioning and just to pump him for information.
13    Q   Anything else he told you before the recording
14  started?
15    A   I'm not sure what else.
16    Q   Anything –
17    A   Try to forget all of that.
18    Q   You tried to forget it?
19    A   I try to.  It's not something I want to play
20  back and listen to.
21    Q   You filed the lawsuit though?
22    A   I did.
23    Q   And you still tried to forget it despite
24  filing a lawsuit?
25    MR. SLOSAR:  Objection to form.  That's

Page 41

1  harassing her.  You understand that.  You can answer
2  the question to the extent that there is one.
3    A   Can you ask the question again?
4  BY MR. WRIGHT:
5    Q   I said you filed a lawsuit about the case, but
6  your testimony is you're trying to forget the facts?
7    A   Just some of the facts that –
8    MR. SLOSAR:  Objection to form.  That's not
9    what she testified to, Derrick.
10    Q   Okay.  Well, you can still answer the
11    question.
12    MR. SLOSAR:  This is – this line of
13    questioning is absolutely harassing.  You can answer
14    the question, Amanda.  But you continue this, and
15    we'll call the magistrate.
16    MR. WRIGHT:  That's fine.  I think it's a fair
17    question if she's going to file a lawsuit.  I just
18    want to know if she said that she was trying to
19    forget –
20    MR. SLOSAR:  Her –
21    MR. WRIGHT:  – the facts.
22  BY MR. WRIGHT:
23    Q   Are you trying to forget the facts or what are
24  you trying to forget?
25    A   Actually how Jason York talked to me.

Page 42

1  Q  You have sued Jason York, correct?
2  A  I have.  Yes.
3  Q  But you want to forget how he treated you?
4  A  Maybe his voice, how he talked to me.
5  Q  Anything else?
6  A  Before the recording?  No.  After.  Yes.
7  Q  All right.  What happened after the recording?
8  A  After the recording, he – first, let's begin
9  by he snatched the phone out of my hand.  Snatched the
10  phone.  He started hitting the table harder and harder,
11  telling me I was showing no emotions.  That a woman had
12  took her last breath, and it should have been me taking
13  my last breath.  That she deserved air.  I didn't.  I
14  was a druggie.  I had no family.  No one cared, and he
15  also talked about what kind of cigarettes I smoked.
16  Q  Is this after the recording starts?
17  A  This is after it was – after the phone call
18  was made.
19  Q  After the phone call was made?
20  A  He snatched the phone, and turned it off.
21  Q  Well, isn't it true that before you made the
22  phone call, you talked to him about your knowledge of
23  what William Lester had said to Joe King, and Mike
24  Simpson, correct?
25  A  Before the phone call?  I mean, before the

Page 43

1  recording was on?
2  Q  While the recording was on.
3  A  And what's the question again?
4  Q  Didn't you do that?
5  A  What's the question?
6  Q  Didn't you speak on the recording to Detective
7  York about your knowledge of overhearing William Lester
8  talk about the money, and the tying up to Joe King and
9  Mike Simpson?
10  A  Yes.
11  Q  Do you remember the phone number that you
12  called for William Lester?
13  A  No.
14  Q  Do you remember William Lester's phone numbers
15  from that time period?
16  A  No.
17  Q  So he told you dial 546-3441; does that ring a
18  bell?
19  A  No.
20  Q  No?  How many phones did William Lester have?
21  A  I just –
22  MR. SLOSAR:  Objection to form.  Foundation.
23  You can answer the question to the extent you
24  understand it, Ms. Hoskins.
25  A  I just knew one cell phone.

Page 44

1  BY MR. WRIGHT:
2  Q  One cell phone.  Did he have a home phone?
3  A  I'm not sure.
4  Q  You went to – you'd been at his house at that
5  time, right?
6  A  Yes.
7  Q  But you don't remember whether he had a
8  landline?
9  A  I'm not sure if they had a landline, if they
10  had Internet.  I'm not sure.
11  Q  All you remember seeing is one cell phone?
12  A  Yes.
13  Q  Before you said that you were at your mom's
14  house when you – when Lester come to pick you up and
15  found out about Katherine Mills being found dead, right?
16  A  What's the question again?
17  Q  Your memory is that you were at your mom's
18  house when William Lester picked you up the evening that
19  Katherine Mills was found dead, right?
20  A  Yes.
21  Q  How long had you been at the house before he
22  came by?
23  A  I'm not sure.  I went home after I had a
24  doctor's appointment that day.  I went home, and stayed
25  home.

Page 45

1  Q  So you had a doctor's appointment on the day
2  that Katherine Mills was found dead, right?
3  A  Yes.
4  Q  And what time was the doctor's appointment
5  over; do you remember?
6  A  I'm not sure.
7  Q  Where did you go after the doctor's
8  appointment?
9  A  McDonald's.
10  Q  With who?
11  A  William Lester.
12  Q  Anybody else?
13  A  My little girl.
14  Q  Where was your son?
15  A  He was with my mom.
16  Q  Was this a Monday to your memory?
17  A  Yes.
18  Q  Did you go straight home from McDonald's?
19  A  Yes.
20  Q  William Lester took you there?
21  A  Yes.
22  Q  Did you stop at William Lester's house so he
23  could drop off drugs to Jennifer Lawson?
24  A  No.
25  Q  Well, if William Lester said that, that would

Page 46

1  not be consistent with your memory?
2     A   No.
3     Q   What time did you get at the doctor's office;
4  arrive there?
5     A   I think my appointment was at 11:00, so
6     Q   Did you get there on time?
7     A   It seems like I might have been 15 minutes
8  late.
9     Q   If the form from the doctor's office said your
10 appointment time was 11:30, would you dispute that?
11    A   If what?
12    Q   If the form from the doctor's office -- let me
13 back up.  What was the name of the doctor's office?
14    A   It was Dr. Larry Warren's office.  I'm not
15 even for sure what the name was.
16    Q   So Hope Medical Clinic sound right?
17    A   Yes.  It does.
18    Q   Is that in Barbourville?
19    A   Yes.
20    Q   How far away was that from your mom's house?
21    A   Five minutes.
22    Q   How far away was it from Lester's house?
23    A   I'm not sure like minute-wise.  I'm not sure.
24 I don't want to guess.
25    Q   So if a form from the Hope Medical Center on

Page 47

1  December 20, 2010 says that your appointment time was
2  11:30, would you dispute that?
3     A   No.
4     Q   It said you arrived there at 11:54.  Would you
5  dispute that?
6     A   It's according who typed that out.
7     Q   You said you might have been 15 minutes
8  late --
9     A   Yes.
10    Q   -- right?  So your memory is you were running
11 late that day?
12    A   Yes.
13    Q   Did you usually run late?
14    A   I'm always late.
15    Q   Do you remember why you were late that day?
16    A   No.
17    Q   So you said you went from the doctor's office
18 to McDonald's, and then straight to your mom's house?
19    A   Yes.
20    Q   Isn't it true that you got a prescription?
21    A   Yes.
22    Q   Didn't you go fill that first?
23    A   No.
24    Q   You didn't fill a prescription on December 20,
25 2011?

Page 48

1     A   I didn't do that first.
2     Q   When did you do that?
3     A   I'm not sure when.
4     Q   Was it that day?
5     A   Not sure.
6     Q   If records subpoenaed from Walgreen's show
7  that you did it on December 20, 2011, would you dispute
8  that?
9     A   No.
10    Q   But you don't have any memory of stopping
11 there?
12    A   I actually got a prescription filled every
13 Monday, so
14    Q   So how would that work; would you go straight
15 there from McDonald's or straight there from the
16 doctor's office?
17    A   No.
18    Q   But you don't remember going to Walgreen's on
19 the 20th?
20    A   I'm just not sure what time it would have
21 been.
22    Q   So the appointment time on the form would have
23 said 11:30, but you were late.  Do you have any memory
24 how long you were there?
25    A   No.

Page 49

1     Q   If William Lester said that you left the
2  doctor between 12:30 and 1:00, would that sound right?
3     A   Yes.
4     Q   You said you got a prescription filled at
5  2:00; would that sound right?
6     A   Could be.
7     Q   You don't know?
8     A   Not sure.
9     Q   Did you say why you were late that day; do you
10 have a memory?
11    A   No.  I always run late.
12    Q   You said you left your son with your mom?
13    A   Yes.
14    Q   What's your mom do or what did your mom do at
15 that time?
16    A   She works at the Appalachian Children's Home.
17    Q   What were her hours back then in 2010?
18    A   I'm not sure of the hours.
19    Q   Well, your appointment was on a Monday.  Did
20 she work Mondays?
21    A   Yes.
22    Q   To your memory, did she take that off to watch
23 your kid?
24    A   No.
25    Q   So then how was she watching your kid; did she

Page 50

1  work in the -- before noon?
2      A   Sometimes my -- if my kid wanted to, they
3  could go to work with her.
4      Q   Is that what you remember happening?
5      A   I'm not sure.
6      Q   What time does she go to work back then?
7          MR. SLOSAR:  Objection to form.  And asked and
8  answered.  You can answer it to the extent --
9          MR. WRIGHT:  I don't think she's -- it's not
10  been asked what time did she go into work.
11      A   I'm not sure.
12          MR. SLOSAR:  You asked her what her hours were,
13  which is the same question.
14  BY MR. WRIGHT:
15      Q   Were they standard every day of the week or
16  did they vary?
17      A   I can't remember.
18      Q   Was she gone before you left to the doctor?
19      A   No.  I don't -- I'm not sure.
20      Q   You don't remember if anybody was there when
21  you left?
22      A   My cousin was -- he's always at the house.  He
23  was.
24      Q   And that's Jerry-Wayne, right?
25      A   Yes.

Page 51

1      Q   How old was he in 2010; do you know?
2      A   No.
3      Q   Was he in his 20s, 30s?
4      A   No.  He's 24 now.
5      Q   So he'd have been a teenager?
6      A   Yes.
7      Q   Did he go to school?
8      A   Yes.
9      Q   Do you remember if he was at home that day?
10      A   I'm thinking he was 18.  He had already
11  finished school.  I'm not sure.
12      Q   Well, I mean, he would have been -- in the
13  morning of -- the day that Katherine Mills was found
14  dead, December 20, 2010; that's your understanding the
15  day it happened, right?
16      A   That's my understanding.
17      Q   And I believe the investigation, the theory of
18  it was it happened in the morning; is that your
19  understanding?
20          MR. SLOSAR:  Objection.  Calls for speculation.
21      Q   Well, do you have a reason to believe it
22  happened at some other time?
23          MR. SLOSAR:  Objection.  Calls for speculation.
24      Q   You can answer the best you can.
25      A   No.

Page 52

1      Q   No?  Who saw you in the morning of December
2  20, 2010?
3      A   My mother, and both of my kids, Jerry-Wayne.
4      Q   Is Jerry-Wayne still alive?
5      A   Yes.
6      Q   Where does he live now?
7      A   He still lives with me and my mother.
8      Q   Do you-all still live in the same place or has
9  she moved?
10      A   No.  We don't live in the same place.
11      Q   When did she move?
12      A   Before I got out of jail.
13      Q   You know what year?
14      A   No.
15      Q   When Lester went to the doctor's office with
16  you, did he stay there or did he drop you off?
17          MR. SLOSAR:  Objection to form.  Foundation as
18  to the date that you're speaking of.
19          MR. WRIGHT:  All right.  Well, let me clarify.
20  BY MR. WRIGHT:
21      Q   When you went to the doctor's office on
22  December 20, 2010, did William Lester drop you off or
23  stay there?
24      A   I can't remember.
25      Q   And you said the doctor's office is five

Page 53

1  minutes from your home?
2      A   Yes.
3      Q   Do you remember any detours?  Anything you did
4  that may have made the trip longer that day, December
5  20, 2010?
6      A   No.
7      Q   I think you mentioned it's about five minutes
8  from your mom's house to the doctor's office; is that
9  right?
10      A   Yes.
11      Q   Did you tell Detective York that you were at
12  the doctor's office at 9:30?
13          MR. SLOSAR:  Objection to form.  Foundation.
14  You can answer the question.
15      Q   Did you ever tell him that?
16      A   I'm not sure.
17      Q   You're not sure that you -- so you may have
18  told him that you were at the doctor's office on
19  December 20, 2010 at 9:30?
20          MR. SLOSAR:  Objection.  Asked and answered.
21      A   Like I said, I went every Monday to the
22  doctor.  I'm not sure every appointment time.
23      Q   So what time would you have gotten up that
24  morning; do you remember?
25      A   No.

The Deposition of AMANDA HOSKINS, taken on March 26, 2013     54..57

Page 54

1    Q   Are you a late riser generally?
2    A   If my kids don't have school, I could have
3   been at the time.
4    Q   You don't have any memory if the – Hope
5   Medical records says you arrived at 11:54.  You don't
6   have any memory of why – what you were doing that
7   morning?
8    A   No.
9    Q   Before you left to the doctor's office on that
10  day, did you go anywhere else outside of the house that
11  morning on December 20, 2010?
12   A   After I went to the doctor?
13   Q   Before.
14   A   No.
15   Q   So you – your alibi then is on the morning of
16  December 20, 2010 you were at your mom's house that
17  whole morning?
18   A   Yes.
19   Q   And to your memory, was your mother there when
20  you left that whole time?
21   A   When I went to the doctor, was my mom –
22   That morning.
23   A   My mom was there that morning.
24   Q   Jerry-Wayne was there that morning?
25   A   Yes.

Page 55

1    Q   Your kids were there?
2    A   Yes.
3    Q   To your memory you left before Linda left?
4    A   I'm not sure.
5    Q   Do you have any memory of Jerry-Wayne leaving
6   the house before you did?
7    A   No.
8    Q   Did – what time did William Lester show up to
9   pick you up?
10   A   I don't remember the time.
11   Q   Is it true that he showed up – that he came
12  to wake you up between 9:30 and 10:00?
13   A   I'm not sure.
14   Q   Don't know?  Do you know whether he showed up
15  and came back?
16   A   I'm not sure.
17   Q   You have no idea when he got there?
18   A   I don't know the time.  I don't remember it.
19   Q   You said your doctor that you were seeing was
20  Larry Warren; is that right?
21   A   Yes.
22   Q   How long had you been seeing him before
23  December 20, 2010?
24   A   I don't remember when I first started going to
25  him.  I don't remember the date.

Page 56

1    Q   Six months?
2    A   I'm not sure.  I would have to go back and
3   look at medical records or something.  I'm not sure.
4    Q   To your memory had you just started seeing him
5   recently or had he been your doctor for a while; do you
6   have any memory at all?
7    A   No.
8    Q   Isn't it true that he got into trouble and was
9   no longer work at the Hope Medical Center?
10       MR. SLOSAR:  Objection to form.  Foundation.
11  Calls for speculation.  You can answer to the extent
12  you understand.
13   A   I have no idea if he got in trouble or not.
14  BY MR. WRIGHT:
15   Q   You don't know anything about that?
16   A   About him getting in trouble?
17   Q   Right.
18   A   I don't know if he got in trouble.
19   Q   Do you have a memory that he stopped working
20  at the Hope Medical Center?
21   A   I do know that he don't work there today.
22   Q   Do you know why?
23   A   I'm not sure.
24   Q   Did he ever have – did you ever hear that he
25  had been involved in an inappropriate relationship?

Page 57

1    A   No.
2    Q   Never heard that?
3    A   No.
4    Q   Is it true that you were in a relationship
5   with Dr. Warren?
6    A   No.
7    Q   So if Joe King told Detective York that you
8   were in a relationship with Dr. Warren, that would be
9   untrue?
10   A   Yes.
11   Q   If Lester told – William Lester told
12  Detective York that Dr. Warren had gotten into trouble,
13  you don't – you can't confirm or deny that, right?
14   A   I don't know.  I couldn't.
15   Q   Is it true you visited the Knox County
16  Hospital on February 7, 2011?
17   A   I'm not sure of the dates.
18   Q   ███████████████████████████████
    ████████████████████████████████████
21       MR. SLOSAR:  Objection to form.  Asked and
22  answered.  You can answer to the extent you
23  understand it.
24   A   Can you repeat it?
25   Q   ███████████████████████



Page 58

1
2       MR. SLOSAR:  Same objection.
3    A
4    Q
5    A
6    Q

15      MR. SLOSAR:  I would object to this line of
16   questioning on relevance grounds.  You can answer
17   the question, Ms. Hoskins.
18   A   Can you repeat it?
19   BY MR. WRIGHT:
20   Q

Page 59

1

12   Q   Were you seeing any other doctors at that
13   time?
14   A   No.
15   Q   Were you on any other prescriptions at that
16   time?
17   A   No.
18

24      MR. SLOSAR:  Mr. Wright, just for the record,
25   I'm going to request that any questions relating to

Page 60

1    Ms. Hoskins' prior use of pills or drugs be placed
2    under the protective order.
3       MR. WRIGHT:  Let's take that up with the other
4    protective order issue with medical records, and I
5    think we can work that out.
6       MR. SLOSAR:  Sure.
7       MR. WRIGHT:  Okay.
8       MR. SLOSAR:  And the same thing with the line
9    of questioning relating to her interactions with Dr.
10   Warren and her treatment at the hospital.  I think
11   all of that should be under the protective order.
12   I'll work it out with you after, but I just want to
13   put it on the record.
14      MR. WRIGHT:  I understand that you want to do
15   that.  Noted.
16   BY MR. WRIGHT:
17   Q   If William Lester told Detective York that he
18   saw you on the morning of December 20, 2010 and you told
19   him that you felt like you were dying, would that be
20   true?
21   A   If that's what he said, I'm not sure if that's
22   true or not.
23   Q   And you can't deny it?
24   A   I'm not sure if it's true or not.
25   Q   You can account for where William Lester was

Page 61

1    that morning, can't you, on December 20, 2010 before he
2    came to pick you up?
3    A   Can I what?
4    Q   Do you know where he was?
5    A   No.
6    Q   What about Jonathan Taylor; do you know where
7    he was that morning?
8    A   I'm not sure.  I'm not sure.
9    Q   Let's talk about him for a minute.  Where did
10   he live at that time?
11   A   At that time, I think he stayed mostly with --
12   at my mom's, but I'm not sure if he stayed with his mom
13   some.  Because my mom keeps anyone of the family that
14   needed a place to live.
15   Q   So he stayed with Linda Taylor on occasion?
16   A   Yes.
17   Q   Okay.  You didn't list him before; is there a
18   reason why?
19   A   I was never asked.
20   Q   I asked you who lived there.
21   A   He didn't live there.
22   Q   But he stayed there on occasion?
23   A   If he needed a place to stay, yes.
24   Q   Did anybody else just stay there on occasion?
25   A   No.

Page 62

1    Q   And where did you say he would stay if he
2  didn't – if he wasn't at your mother's house?
3    A   Maybe his mom's.
4    Q   Who was his mom?
5    A   Donna Taylor.
6    Q   And where does she live?
7    A   Pineville.
8    Q   Was he dating Kayla Mills in 2000 – December
9  2010?
10   A   I'm not sure when they started dating, when
11 they stopped dating.
12   Q   Do you know whether he was dating anybody else
13 at that time?
14   A   I don't remember.
15   Q   Do you recall if William Lester saw you that
16 morning, December 20, 2010; said that he would be going
17 to Mike Simpson's and would come back to pick you up?
18   A   I don't remember.
19   Q   Do you – let's talk about the date prior to
20 December 19, 2010.  That would have been a Sunday?
21       MR. SLOSAR:  Sorry.  Answer the question, and
22     then –
23   A   Yes.
24   Q   Yes.
25       MR. SLOSAR:  Can we take a break real quick?

Page 63

1        MR. WRIGHT:  Yeah.
2        MR. SLOSAR:  I'm just
3        VIDEOGRAPHER:  Off the record at 10:04.
4     (OFF THE RECORD)
5        VIDEOGRAPHER:  Back on the record at 10:15.
6  BY MR. WRIGHT:
7    Q   All right.  Thank you, Ms. Hoskins.  We're
8  back on the record, and you're still under oath.  I want
9  to go back to Dr. Warren for a minute, and I believe I
10 asked if you were in a relationship with him, and let me
11 make sure I don't miss anything, I'm not being specific
12 enough.  Did you ever have sex with Dr. Warren?
13   A   No.
14   Q   Did you have oral sex with him?
15   A   No.
16   Q   Kiss him?
17   A   No.  I never kissed him.
18   Q   Did you touch him?
19   A   No.
20   Q   Now, you had mentioned that you had sex on and
21 off with William Lester from 2004 for about six years;
22 is that about right?
23   A   No.  I never said that we started in 2004
24 having sex.
25       MR. SLOSAR:  Sorry.  Finish answering the

Page 64

1    question.
2    Q   You knew him in 2004?
3    A   Yes.
4    Q   At – but at times, it was sexual with him,
5  right?
6        MR. SLOSAR:  Counsel, at this point, I am going
7    to object to a line of questioning about who the
8    plaintiff in this case was having sex with six years
9    prior to the murder of Katherine Mills.  It's
10   absolutely harassing.  It is not relevant to the
11   claims.  I gave you a little bit of a leash to ask
12   questions about Dr. Warren, but at this point,
13   you're absolutely harassing the plaintiff.  And if
14   you continue down this path, we'll call the judge.
15       MR. WRIGHT:  Well, we can call the judge if you
16   want.  I'm just asking her relationship because I
17   don't want to be caught up in a trap of what do you
18   mean by relationship.  I don't intend to harass, but
19   I think it's relevant inquiry who she's – has
20   relationships with.  It goes to bias, credibility, a
21   whole host of issues.
22       MR. SLOSAR:  She's already admitted that Mr.
23   Lester and her had relationships at some point, were
24   together around the time of the murder.  You know,
25   he picked her up and took her to the doctor's

Page 65

1    office. Asking Amanda who she had sex with six years
2    prior to the incident is absolutely harassing.  So
3    please continue your questioning.  If this happens,
4    we'll call Judge Ingram.
5        MR. WRIGHT:  All right.
6  BY MR. WRIGHT:
7    Q   In 2010, do you have a memory of having a
8    sexual relationship with any other men at that time
9    frame?
10   A   No.
11   Q   How about Joe King?
12   A   Joe King.  We were on and off – I'm not
13 sure the dates that we had sexual relationships.
14   Q   And I don't need dates of actual times that
15 that happened.  I'm just – the time frame.  Was that in
16 2010; to your memory?
17   A   I'm not sure of the date.  The time frame, I'm
18 not sure.
19   Q   Okay.  And again, I don't want to go back six
20 years with William Lester, but as of 2010, were you in a
21 sexual relationship with him?
22   A   I'm not sure if we were in a sexual
23 relationship at that time or not.
24   Q   Okay.  But to your memory, you had been prior
25 to that, at some point in time, right?

Page 66

1     A   I had sex with William Lester, but I don't
2  know –
3     Q   When.
4     A   – when.
5     Q   And Joe King was the father of both children
6  or one children?
7     A   My son.
8     Q   And the son was – was the son 7 years old at
9  that time?
10    A   In 2010?
11    Q   Yes.
12    A   Was he how old did you –
13    Q   7, I think you told me.
14    A   That sounds right.
15    Q   And your daughter was 3?
16    A   Yeah.
17    Q   Who is the father of your daughter?
18    A   Do I have to give that name?
19    Q   I mean, that's –
20    A   Okay.  We've never had DNA, so I'm not sure.
21    Q   You're unsure.  Okay.  Is there a range of
22  people who you believe it may be?
23        MR. SLOSAR:  Counsel –
24        MR. WRIGHT:  This is jury pool information, I
25  mean.

Page 67

1         MR. SLOSAR:  Jury pool information?
2         MR. WRIGHT:  Yes.  I mean, I asked –
3         MR. SLOSAR:  You want to know –
4         MR. WRIGHT:  – her relatives, her people she's
5  – I usually ask for marriage.  I don't believe
6  she's married, but she has kids with people.  All I
7  just want to know is –
8         MR. SLOSAR:  You just asked her two minutes ago
9  whether she gave oral sex to her doctor.  And I gave
10  you some leeway with that.  You then went into a
11  long line of inquiry as to how many years she had
12  sex with William Lester, who is a witness in this
13  case.  Obviously, if she has a kid with Joe King, it
14  wasn't an immaculate conception.  So you can imagine
15  how that happened.  And now you're asking her if
16  there's a range of people that she had sexual
17  relationships with.  Please –
18        MR. WRIGHT:  No.  No.  I did not ask that.  I
19  asked the father of her daughter if she just knows
20  the individual –
21        MR. SLOSAR:  She said no.
22        MR. WRIGHT:  – and what would that name be.
23        MR. SLOSAR:  She said no.
24        MR. WRIGHT:  She has –
25  BY MR. WRIGHT:

Page 68

1     Q   Is that your testimony; you have no idea?
2         MR. SLOSAR:  It's not that she has no idea.  She
3  said it's whose – Amanda, who's crying now.  If she
4  told you that she did not have a DNA test done,
5  please tell me how this is relevant to whether your
6  client framed Ms. Hoskins for murder.
7         MR. WRIGHT:  That is –
8         MR. SLOSAR:  Please tell me how the DNA test of
9  her –
10        MR. WRIGHT:  I don't have to answer that
11  question that way.
12        MR. SLOSAR:  Let's go on a break.  We're going
13  to call Judge Ingram with my crying plaintiff.
14        VIDEOGRAPHER:  Off the record at 10:20.
15  (OFF THE RECORD)
16        VIDEOGRAPHER:  Back on the record at 10:32.
17        MR. SLOSAR:  Over the past 15 minutes of this
18  deposition, there's been a lengthy line of
19  questioning relating to Ms. Hoskins, and her
20  intimate relationships she may have had in her life,
21  both with Mr. King, Mr. Lester, and allegations that
22  Mr. Wright has raised with regard to Dr. Warren.  So
23  that the record is clear, the father – the person
24  who Ms. Hoskins believes to be the father of her
25  daughter, Lexi, is not a witness in this case.

Page 69

1  Second, the – while plaintiffs' counsel allowed
2  some leeway to Mr. Wright to ask questions of Ms.
3  Hoskins relating to allegations with regard to Dr.
4  Warren, the record will reflect that the line of
5  questioning that was done to delve into that area
6  was absolutely inappropriate.  Those questions I
7  think many attorneys would ask if Ms. Hoskins had an
8  intimate relationship with her doctor; not whether
9  she had sex with him, gave him oral sex, or the very
10  specific descriptions given, which could have been
11  done in a much more tasteful manner.  With that
12  being said, we are going to seek a protective order
13  over any further questioning of Ms. Hoskins relating
14  to sexual activity.  We believe that these questions
15  are harassing.  They are absolutely not relevant.
16  She's acknowledged relationships with Mr. Lester and
17  Mr. King, and she's denied the allegations with
18  regard to Dr. Warren.  And we are also going to
19  consider sanctions for the line of questioning posed
20  to Ms. Hoskins about the father of Lexi, and the
21  manner in which that was done.  With that being
22  said, my understanding is that defense counsel does
23  not intend to go into this inquiry any further based
24  upon Ms. Hoskins' representation that the person who
25  she believes to be the father of Lexi is not a

Page 70

1  witness in this case.  That's all I have.
2     MR. WRIGHT:  I'll remark that their objections
3  were not made during that questioning that I recall,
4  but I will ask if you're going to instruct her not
5  to answer, I'm going to submit to her the Rule 26
6  disclosures, and just ask if she has had a sexual
7  relationship with any witness on there.  I believe
8  that's relevant to bias.  Are you going to instruct
9  her not to answer that question?  I'm willing – I
10  will try – I will do that to minimize the privacy
11  to your client, but I think that is a valid
12  question.  And I'm just going to hand her the list,
13  and ask her if that is the case.
14     MR. SLOSAR:  Mr. Wright, respectfully, I
15  believe that you lost that right when you asked my
16  client whether there was a general realm of people
17  who could have produced the DNA that produced her
18  daughter.  I think that over the past 15 minutes, and
19  Ms. Hoskins crying in a room because of the sexual
20  questions that you posed to her were over the past
21  15 minutes have been troubling.  I have never had
22  questions poised like that to a client before.  I
23  will tell you that I have consulted with my client.
24  She obviously acknowledges a relationship with Mr.
25  King and Mr. Lester.  I am seeking a protective

Page 71

1  order over any further inquiry by you into people
2  that Ms. Hoskins had a sexual relationship with.  If
3  you want to produce the 26(a)(1)s, mark it as an
4  exhibit, I would be happy to talk to my client about
5  whether she will answer your question or not.  But I
6  believe that you have completely abandoned the
7  normal decorum that takes place in these types of
8  depositions, with the sensitive issues that we're
9  talking about.
10     MR. WRIGHT:  I'm going to ask her if she's had
11  a sexual relationship with anybody on these Rule 21.
12  We've already talked about William Lester.  I don't
13  intend to talk about that.  Joe King.  Dr. Warren.
14  Are you going to instruct your client not to answer?
15     MR. SLOSAR:  Give her the exhibit and mark it,
16  and please give me one so I can see it.  Thank you.
17  Is this the only copy?  Look through here and see if
18  you have had an intimate relationship with any of
19  the people named, Ms. Hoskins.
20     THE WITNESS:  Do I read through up here?  That's
21  it?  Is that where it stops or read the whole thing?
22      (EXHIBIT 1 MARKED FOR IDENTIFICATION)
23     MR. SLOSAR:  No.  You can stop there.  Those
24  are
25     MR. WRIGHT:  So, just for the record, no one on

Page 72

1  that list other than the ones we've already talked
2  about; William Lester, Joe King, no intimate
3  relationship with any of those witnesses on that
4  Exhibit 1, correct?
5     MR. SLOSAR:     Well, she has denied the Dr.
6  Warren allegations, which is what I think you were
7  implying.  All the other ones on that list except
8  for Joe King and William Lester, she has not had an
9  intimate relationship with; is that right?
10     THE WITNESS:  Right.
11     MR. SLOSAR:  All right.  We can move on.  Are
12  you okay to move on now?
13     MR. WRIGHT:  Sure.
14     THE WITNESS:  Yeah.
15     MR. SLOSAR:  Okay.
16  BY MR. WRIGHT:
17     Q   So the day prior to the day that Katherine
18  Mills was found dead on December 20, 2010, would have
19  been December 19th, a Sunday.  Does that sound correct?
20     A   Yes.
21     Q   Do you remember what you did that day?
22     A   No.
23     Q   Did you go to church?
24     A   I'm not sure if I went that Sunday or not.
25     Q   Do you usually go to church?

Page 73

1     A   Now?
2     Q   Back then.
3     A   Back then.  Every now and then.
4     Q   Which church was it?
5     A   Victory Baptist.
6     Q   Is anybody on that Rule 26 disclosure a church
7  member; do you remember?
8     A   That goes to that church?
9     Q   Yeah.
10     A   Can I look again at it?
11     Q   Sure.  Take a look.
12     A   Jerry-Wayne Smith goes.  He had to go to that
13  church.
14     Q   And that's your cousin?
15     A   Yes.
16     Q   Lived with Linda Taylor?
17     A   Yes.
18     Q   Okay.  Is that all?
19     A   Myself.  I would go when – when I wanted to.
20  Both of my kids go.  Linda Taylor goes.
21     Q   Does your mom go regularly?
22     A   Yes.
23     Q   Back then?
24     A   Back then.
25     Q   Now, William Lester gave a statement to

Page 74

1  Detective York, and indicated that you had to get high
2  before you went to church; is that true?
3      A   I took my medicine before.
4      Q   The – and that was what was prescribed by Dr.
5  Warren?
6      A   No.
7      Q   What medicine did you have?
8      A   Roxi.
9      Q   So that was not prescribed to you, right?
10     A   No.
11     Q   The days after the – when you found out that
12  Katherine Mills had been found dead on December 20,
13  2010, you indicated that after that William Lester took
14  you back to your mom's house on that night, correct?
15         MR. SLOSAR:  Objection.
16     Q   December 20, 2010.
17     A   Did I go back to my house that night?
18     Q   Yes.
19     A   Yes.
20     Q   What's your memory of what happened the next
21  day?
22     A   I don't remember anything at all.  I can't
23     Q   We've talked about when in February 2011 the
24  police came and picked you up at your mom's house, and
25  you went to Barbourville Police Department for an

Page 75

1  interview; is that right?
2      A   If that's what the paper had the date of one
3  of the interviews, that's right.
4      Q   Do you remember the Barbourville – the
5  interview at the Barbourville Police Department,
6  correct?
7      A   Yes.
8      Q   Did you have another interview at that police
9  station?
10     A   I was took there, again, to that police
11  station.
12     Q   Do you know what time that was?
13     A   No.
14     Q   Do you have a memory of being questioned by a
15  police before that February 2015 – or I'm sorry,
16  February 15, 2011 interview at the Barbourville Police
17  Department?
18     A   I'm not sure.
19     Q   You don't remember.  Do you recall William
20  Lester being approached or interviewed by police?
21     A   No.
22     Q   Did he ever tell you that he was being – had
23  been approached or interviewed by police?
24     A   Not that I remember.
25     Q   Did anybody tell you that they were being

Page 76

1  approached or interviewed by police about the Katherine
2  Mills' murder?
3      A   No.
4      Q   What do you remember – I believe your
5  testimony was the first thing you found out is that
6  she'd been found in the yard; is that correct?
7      A   Yes.
8      Q   What do you remember the details as you
9  learned them; was it from the news, word of mouth?
10  What's your memory?
11     A   What's my memory of?
12     Q   How you found out the details.  Was William
13  Lester telling you his daughters
14     A   I just heard that she was found in the yard.
15     Q   And that was it?
16     A   I think I had watched a news thing of it.  I'm
17  just not sure what news, what day.
18     Q   Did you – at what point did you consider
19  yourself a suspect in the murder at any point?
20     A   I never considered myself as a suspect.
21     Q   Not even after they interviewed you in that
22  February 2011 at the Barbourville Police Department?
23     A   No.
24     Q   You'd heard William Lester talk about stealing
25  Katherine Mills' money before it happened.  I believe

Page 77

1  you mentioned you heard that was Mike Simpson, Joe King,
2  correct?
3      A   Yes.
4      Q   Once you found out that Katherine Mills had
5  been found dead, what was your reaction after having
6  heard that beforehand?
7      A   I didn't have a reaction.
8      Q   Did you suspect William Lester may have had
9  something to do with it?
10     A   No.
11     Q   Why not?
12     A   Because Will was actually a good person.
13     Q   Did you suspect Joe King might have had
14  something to do with it?
15     A   No.
16     Q   Why not?
17     A   Just never would think either one of them
18  would do that.
19     Q   Did you think Mike Simpson was a suspect or he
20  could have been a perpetrator?
21     A   No.
22     Q   Do you think he is now?
23         MR. SLOSAR:  Objection.  Calls for speculation.
24     A   I'm not sure.
25     Q   Did you read your complaint before you filed

Page 78

1  the lawsuit?
2     A  Yes.
3     Q  Was there anything in there that you don't
4  stand by; you believe to be inaccurate?
5     A  No.
6     Q  Well, your complaint says that the persons
7  likely responsible for this are Mike Simpson, and Allen
8  Helton; do you believe that?
9     A  Yes.
10    Q  A minute ago you weren't for sure.  What –
11  why are you changing?
12       MR. SLOSAR:  Objection to form.  The record
13    speaks for itself.  To the extent that there's a
14    question that you understand, Ms. Hoskins, you can
15    answer it.
16  BY MR. WRIGHT:
17    Q  Do you believe Mike Simpson is likely
18  responsible for committing that murder and robbery?
19       MR. SLOSAR:  Objection to form.  Asked and
20    answered.
21    A  With what I read in my file like when I've
22  been throughout the years that I sat in jail, everything
23  my investigators found, it looks like it.
24    Q  And what is that based on?
25       MR. SLOSAR:  I'm going to object to the extent

Page 79

1  that you're asking her for a communication that she
2  had with her legal team during the underlying case.
3  And I would request that those types of questions be
4  subject to attorney-client privilege.
5  BY MR. WRIGHT:
6     Q  Well, you – the complaint alleges that Mike
7  Simpson and Allen Helton are most likely responsible for
8  the crime.  What is your reason for believing that?
9        MR. SLOSAR:  I mean, again, I'm going to object
10    to the extent that her knowledge is based upon
11    information provided to her by her attorneys.
12       MR. WRIGHT:  Are you instructing her not to
13    answer the question?
14       MR. SLOSAR:  I'm saying ask the question in a
15    way that doesn't invoke the attorney-client
16    privilege.
17  BY MR. WRIGHT:
18    Q  Well, I don't want you to talk about anything
19  that you've discussed with your attorneys, but as we sit
20  here today, to your understanding, why do you believe
21  Mike Simpson and Allen Helton are the ones who are
22  likely responsible for the crime?
23    A  Just what I've went over with my attorneys
24  that I had in my criminal case, and the investigator
25  thinks that they had found.  Just –

Page 80

1        MR. SLOSAR:  And you can stop there, Ms.
2  Hoskins.  I'm going to ask that obviously – I'm
3  going to ask that follow-up inquiry – if you do
4  follow-up inquiry, I'm going to maintain the
5  attorney-client privilege on what they told her when
6  she learned it since she has said that the
7  information – the allegations in her complaint are
8  based upon information provided to her by her
9  attorneys and investigator.
10  BY MR. WRIGHT:
11    Q  Well, let me ask it this way.  What facts do
12  you believe make – what facts do you base your belief
13  on that Mike Simpson and Allen Helton are the ones who
14  are likely responsible for the crime; what facts?
15    A  I'm not sure.  I'm not sure.
16    Q  Is there anybody else in your mind who could
17  be a likely suspect?
18       MR. SLOSAR:  I'm going to object to form.  Calls
19    for speculation.  You can answer the question, Ms.
20    Hoskins.
21    A  Is there what?
22    Q  is anybody else in your mind a suspect in
23  committing that crime?
24    A  No.
25    Q  Just Mike Simpson and Allen Helton?

Page 81

1     A  I'm not sure.
2     Q  Well, were you ever – do you recall receiving
3  information about how the victim died?
4        MR. SLOSAR:  And again if you could preface it
5    with instruction not to delve into conversations
6    with her counsel.  I don't want to be an
7    obstructionist.  So if you stay away from
8    conversations that she had with her attorneys as an
9    investigator.
10  BY MR. WRIGHT:
11    Q  And we can lay that out up front.  I don't
12  want you to talk about your communications with your
13  attorneys or their legal team, their paralegals and
14  staff.  I just want to know the facts.  Did you – what
15  facts did you receive about how the victim died?  What
16  was your understanding factually?  I know you said that
17  she was found in the yard, but did you ever come across
18  facts as to whether she was struck, whether she was
19  shot, whether she was cut; like that?
20    A  I never knew what happened to her until I
21  talked to my lawyers.  That would be the only facts.
22    Q  Did you ever remember seeing through the news
23  any description of the suspects?
24    A  I seen a sketch, but that wasn't through the
25  news.  I'm not sure where I seen it.

Page 82

1   Q   Was that after you had been charged or –
2   A   Yes.
3   Q   – before?
4   A   After.
5   Q   Did you ever hear through the news how the
6   victim had died?
7   A   No.
8   Q   Did you ever hear that a blue car was seen at
9   the victim's house on the morning of the – of her
10  death?
11  A   Did I ever hear?
12  Q   Yes.
13  A   Only reason I heard is two of the cops went to
14  my mom's work.
15  Q   Who told you that?
16  A   My mother.
17  Q   Do you know when she told you that?
18  A   No.
19  Q   Do you have a just a general – was it weeks,
20  months, years after the Katherine Mills was found dead?
21  A   I'm not sure.
22  Q   Did you hear from anywhere else; news,
23  anywhere else that they were looking for a blue car?
24  A   No.
25  Q   Within days of the incident on December 20,

Page 83

1   2011, did you have any information that police were
2   stopping people driving blue cars?
3   A   No.
4   Q   Do you have any information to believe that
5   Allen Helton had a blue car?
6   A   No.
7   Q   How about Mike Simpson; do you have
8   information to believe he had a blue car?
9   A   No.
10  Q   Are you aware that he went to Florida on the
11  day that Katherine Mills was found dead?
12  A   Just from what I've learned in my case from my
13  lawyers.  The civil, like the – not the civil, but the
14  criminal lawyers, the defense team I have.
15  Q   You mentioned that – well, your complaint
16  identifies that Mike Simpson is one of the people likely
17  responsible for the crime; is that your understanding?
18  A   Yes.
19  Q   And you knew before this – before Katherine
20  Mills was found dead, that William Lester had mentioned
21  Katherine Mills having money, tying her up, and stealing
22  it before it happened to Mike Simpson, right?
23       MR. SLOSAR:  Objection to form.  It misstates
24  her prior testimony as to what she testified to
25  about that conversation.

Page 84

1   BY MR. WRIGHT:
2   Q   You overheard William Lester talk to Mike
3   Simpson about the victim having money before she was
4   found dead, correct?
5   A   I don't know how long before.  But, yes, I
6   heard that.
7   Q   Why didn't you report that to police after she
8   was found dead?
9   A   Well, I'm not sure.  I wouldn't never think
10  that William Lester would ever hurt anyone.
11  Q   I'm talking about Mike Simpson; why wouldn't
12  you report that Mike Simpson had been told about the
13  money?
14  A   I'm not sure.
15  Q   Have you ever been on the victim's property?
16  A   No.
17  Q   So you didn't witness who struck her?
18  A   No.
19  Q   You didn't strike her?
20  A   No.
21  Q   Amber Simpson gave a statement to Detective
22  York that Jonathan Taylor had told you – told him that
23  you were the look-out driving the car; is that true?
24       MR. SLOSAR:  Objection to form.  Foundation.
25  Are you asking whether Amber Simpson gave York that

Page 85

1   statement or whether that information that Ms.
2   Hoskins was the driver of the car?  It's vague.  If
3   you can –
4       MR. WRIGHT:  Okay.
5   BY MR. WRIGHT:
6   Q   Were you the driver of the car on the day that
7   Katherine Mills was found dead?
8   A   No.
9   Q   Did you help plan it?
10  A   No.
11  Q   Did you have money?  Allen Helton said he saw
12  you at Escoe's Market that day with a lot of money; is
13  that true?
14  A   No.
15  Q   Christy Branson, was she a cellmate of yours
16  at one point?
17  A   Yes.
18  Q   She says you told her that you spent the money
19  from the robbery on dope; is that true?
20  A   No.
21  Q   Let's talk about you said that you were 25
22  when Katherine Mills was found dead, right, 2010?
23  A   Yes.
24  Q   You were living at your mom's house, Linda
25  Taylor, correct?

**Page 86**

1   A   Yes.
2   Q   Do you remember how long you'd been living
3  there prior to December 20, 2010?
4   A   No.
5   Q   Had you been living elsewhere before that or
6  had you always lived with your mom?
7   A   I've always lived with my mom, but, I mean,
8  I've moved out maybe with a boyfriend, came back home.
9   Q   Okay.  You've never owned a place?
10  A   No.
11  Q   Never rented one yourself?
12  A   Not by myself.  No.
13  Q   Did you -- on this Rule 26 disclosures, you
14 can take your time to look at it.  Just if you could
15 identify whether you -- you mentioned that you may have
16 moved out of or lived outside of your mom's house, if
17 you could just identify.  We talked about William
18 Lester, obviously.  If there's anybody else on this list
19 who you may have stayed with or lived at prior to the
20 December 2010 incident?
21      MR. SLOSAR:  Other than the people she already
22  identified.
23      MR. WRIGHT:  Yeah.  We've talked about William
24 Lester.  I don't know that we've --
25      MR. SLOSAR:  Her mom.

**Page 87**

1      MR. WRIGHT:  And her mom.  Yes.
2      MR. SLOSAR:  Her kids.
3      MR. WRIGHT:  Yes.
4      MR. SLOSAR:  Jerry-Wayne.
5      MR. WRIGHT:  Yes.  That's true.
6      MR. SLOSAR:  Okay.
7      MR. WRIGHT:  I might follow up on Joe King.  I
8      don't know that I -- we've talked in-depth about
9      whether they lived together or not.
10 BY MR. WRIGHT:
11  Q   Just Joe King would be the other one.
12  Q   And just the best you can remember; do you
13 remember a time frame when you were living with him?
14  A   No.
15  Q   No?  Would it have even been in that 2010 time
16 period?
17  A   No.
18  Q   Probably before that?
19  A   Yes.
20  Q   Okay.  And you mentioned you didn't have a
21 vehicle in December 2010, right?
22  A   No.
23  Q   Did you graduate high school?
24  A   Yes.
25  Q   What year?

**Page 88**

1   A   2003.
2   Q   Did you go to college?
3   A   I took phlebotomy classes.  Got my phlebotomy
4  certificate.  I also did dental assistant and --
5   A   All right.  When did you get the phlebotomy
6  certificate?
7   A   I'm not sure the date.
8   Q   Was after December 2010?
9   A   I'm not sure.
10  Q   Where did you get it?
11  A   In Corbin, Kentucky.
12  Q   And you can't remember whether that was before
13 or after the Katherine Mills found dead?
14  A   It would have been before.
15  Q   It was before.  What happened to jog your
16 memory on that?
17  A   I was thinking of my little girl's age.
18  Q   Okay.  The dental assistant, did that require
19 any certificate training, anything?
20  A   Yes.
21  Q   Was that before December 2010?
22  A   It was right after high school.
23  Q   Where did you get that certificate from?
24  A   Pineville, Kentucky, Dr. Wollum & Dixon.
25  Q   Do you know how long it took you to get that?

**Page 89**

1  You mentioned after high school.  You graduate in 2003.
2   A   I'm not sure how long the program was.
3   Q   When we were talking about your phlebotomy
4  certificate, you mentioned that you were able to
5  remember that was before Katherine Mills.  Do you know
6  how long before that was?
7   A   I was pregnant with my little girl is how I
8  remember that.  I was thinking about how old she would
9  be.  So I was pregnant with her and I'm still not sure -
10 - I had her in 2007.  So it would be in that time frame.
11  Q   All right.  Did you use those to -- in any
12 employment?  Did you hold any jobs as a dental
13 assistant?
14  A   The dental assistant I didn't.  The
15 phlebotomy, I did my clinicals through Dr. Mohan's
16 office in Pineville, Kentucky.
17  Q   Would that have been, like, 2006?
18  A   No.  Because I didn't have them until 2007, so
19 sometime after that.
20  Q   So clinicals come after you get the
21 certificate?
22  A   Yes.
23  Q   Are clinicals paid or unpaid?
24  A   Unpaid.
25  Q   Did you ever have a paid position with that

Page 90

1  certificate?

2    A   Nope.

3    Q   Did you have -- prior to December 2010, what

4  was your employment history?

5    A   Prior to 2010?

6    Q   Uh-huh.

7    A   I had worked at a little pizza place.  Not

8  sure of the dates.

9    Q   Can you ballpark it?  Was it close after you

10  graduated?

11    A   I'm not sure.

12    Q   Was it within a year of the December 2010?

13    A   It would -- I'm -- I'm not sure.

14    Q   What was the name of it?

15    A   Pineville Pizza Palace.  I worked at a Little

16  Caesars.  I'm not even sure if I was -- if it was after

17  high school, while high school.

18    Q   Any other jobs that you can remember before

19  2010?

20    A   No.

21    Q   I think I saw somewhere in the record where --

22  did Joe King provide child support?

23    A   Yes.

24    Q   Do you remember how much that was?

25    A   I'm thinking 150.

Page 91

1    Q   A what, week, month?

2    A   Monthly.

3    Q   And that would have been something you were

4  receiving before December 2010, right?

5    A   Yes.

6    Q   Did he pay that regularly or was he

7  delinquent?  Do you recall?

8    A   No.  I don't recall.

9    Q   Any other income that you can remember before

10  December 2010?

11    A   I did a K-TAP program.  I'm not sure any of

12  the dates of when that would have been.

13    Q   What's K-TAP?

14    A   It's a Kentucky -- it's like for single

15  mothers.

16    Q   Did you work through that?

17    A   At the -- like, now, you have to have so many

18  hours of community service, like, work credits, but I'm

19  not sure at the time if I had to have them or not.

20    Q   Okay.

21    A   It's been a long time ago.

22    Q   Do you recall having any income from that K-

23  TAP program?

24    A   Yes.

25    Q   Okay.  But you -- do you know whether that was

Page 92

1  before the December 2010 incident?

2    A   I'm not sure when it was.

3    Q   Did your mom support you, give you money?

4    A   Yes.

5    Q   Did William Lester support you, give you

6  money?

7    A   When I was with him, yes.

8    Q   Okay.  We talked about Joe King's child

9  support.  Did he provide any other support to you?

10    A   If I was dating him at the time, yes.

11    Q   Okay.  Was there anybody -- again, we'll go

12  back to the Rule 26 disclosures.  We've talked about

13  Lester, your mom, Joe King.  Is there anybody on that

14  list who was providing support to you?  And we'll just

15  ask that before or after.

16    A   Before or after what?

17    Q   The Katherine Mills incident in December 2010.

18    A   Joe King.

19    Q   Joe King and William Lester are on that list,

20  your mom is on that list.  Nobody else that you can say

21  was providing any financial support to you before or

22  after the -- Katherine Mills was found dead, right?

23    A   Right.

24    Q   Okay.  Did your mom provide like money or was

25  it support in the sense that you could eat out of the

Page 93

1  refrigerator or did she pay bills for you?  What type of

2  support did you get?

3    A   If I needed money, I could ask her for money.

4    MR. WRIGHT:  And we'll take a quick break.

5    VIDEOGRAPHER:  Off the record at 11:10.

6  (OFF THE RECORD)

7    VIDEOGRAPHER:  Back on the record at 11:21.

8  BY MR. WRIGHT:

9    Q   All right.  We're back on, Ms. Hoskins.  I'm

10  going to hand you what is your interrogatories.  We can

11  make them Exhibit No. 2.

12    (EXHIBIT 2 MARKED FOR IDENTIFICATION)

13    MR. WRIGHT:  I don't see a verification with

14  these, Elliot.  Did -- was one provided?

15    MR. SLOSAR:  We may not have -- there may not

16  be a verification.

17    MR. WRIGHT:  Well, I tell you what, I'm sorry

18  we're taking another break, but can I let her review

19  that, off the record, and we'll just verify it here?

20  Would that be suitable?

21    MR. SLOSAR:  I mean, you can give it to her

22  now.  I don't know.  She can --

23    MR. WRIGHT:  I mean, by rule, they're supposed

24  to be verified.

25    MR. SLOSAR:  Sure.  I get that.

Page 94

1    MR. WRIGHT:  So I just would ask that she
2    review it and verify that this is true and accurate
3    to the –
4        MR. SLOSAR:  Why don't we –
5        MR. WRIGHT:  – best of her knowledge and
6    belief.
7        MR. SLOSAR:  Can you go to her next line of
8    questioning?  Maybe she could review it over the
9    lunch break so that we're not wasting 20 minutes of
10   her reading through it.  I mean, if you want to ask
11   her if she had reviewed it before coming in here.
12       MR. WRIGHT:  All right.  Well, let's try that.
13   BY MR. WRIGHT:
14       Q    Would you take a moment to see if you
15   recognize that document, Ms. Hoskins?  I'm sorry to
16   interrupt.  We'll have to do this over lunch break.  This
17   is eating up too much time.
18       MR. SLOSAR:  Sure.  I'll have her review it
19   again over the lunch break and you could –
20       MR. WRIGHT:  Do you have a copy in your file?
21       THE WITNESS:  Yes.
22       MR. WRIGHT:  You do?
23       MR. SLOSAR:  Yes.
24       MR. WRIGHT:  All right.  I should have had
25   three, but I can't find my third one.

Page 95

1    BY MR. WRIGHT:
2        Q    All right.  Ms. Hoskins, have you ever been
3    convicted of a crime for theft?
4        A    Like can you explain it?
5        Q    Shoplifting, any type of theft?
6        A    I had a shoplifting charge when I was younger.
7    I'm not sure of the dates.
8        Q    Do you know how many times you were charged?
9        A    No.
10       Q    Do you know how many times you've been
11   convicted?
12       A    No.
13       Q    What crimes have you been – had you been
14   convicted of prior to December 2010, to your memory?
15       A    Before 2010?
16       Q    Yes.
17       A    Let's see.  I know there is shoplifting.  I'm
18   not for sure what all I've been convicted of, like, that
19   I can remember.  I know I have been convicted of things
20   back – like, as far as sitting here naming them all to
21   you, I can't.
22       Q    I'm going to show you interrogatory number 19.
23   Just see if that looks correct to you.  Take a second to
24   review that question and answer, please.
25       A    Yes.

Page 96

1        Q    Does that look complete to you?
2        A    Yes.
3        Q    Is there any inaccuracies in that, to your
4    knowledge?
5        A    No.
6        Q    Do you have a memory of – let's go in reverse
7    order since it'll be more recent.  The number 6, the
8    third-degree burglary, do you recall that charge and
9    conviction?
10       A    Very well.
11       Q    Okay.  So what was the circumstances of that?
12       A    This happened.  I was actually charged after I
13   was questioned about Ms. Mills from Detective York.  He
14   came to my mother's house and I was actually in the car
15   with her.  So he calls my mom's work, contacts my
16   mom, and she talks to Detective York and he was wanting
17   in her house to question my mom's nephew, which is my
18   cousin, Jonathan Taylor.  I tell her – she's going to
19   unlock the door, I tell her I can go, too, because I've
20   done no wrong.  I'm not going to jail.  We get there,
21   Sheriff Pickard is there, Detective York is at my mom's
22   house.  She unlocks the door.  As I was getting out of
23   her car, Detective York looks at me and tells me not to
24   go too far, because I was going to jail, too.  I looked
25   at him and ask him, "What for?"  He says, "For that gun

Page 97

1    you stole."  I said, "What are you talking about?"  He
2    said, "You know, that gun you stole."  So I end up going
3    to jail for that.  Never seen a gun.  First time I'd
4    ever heard about it was from Detective York.
5        Q    So was that 2011?
6        A    Yes.
7        Q    And do you know, was that after the February
8    2011 interview at the Barbourville Police Department?
9        A    I'm not sure which interview, but it was after
10   an interview.
11       Q    Who was with Detective York when you were
12   arrested?
13       A    Sheriff Pickard was there, but it seems like
14   Detective York called KSP.  Let me think of the man's
15   name.  KSP sends someone to pick me up at my mom's.  I'm
16   not for sure of the man's name.  I can't think of what
17   cop it was, but I do know it was KSP.
18       Q    And it was at your mom's house that you were
19   picked up; is that right?
20       A    Yes.  They were actually there to question
21   Jonathan.
22       Q    And was he there alone?
23       A    Was Jonathan there alone?
24       Q    Yes.
25       A    I'm not sure about that.

Page 98

1    Q    You weren't there when they arrived, right?
2    A    Right.
3    Q    Where were you at?
4    A    With my mom.
5    Q    Where was you and your mom at?
6    A    I – for some reason, I think it was on her
7  lunch.  We were going to get something to eat.
8    Q    She was on a lunch break from her job?
9    A    Yeah.
10   Q    And did you get a call from Jonathan?  Is
11  that –
12   A    No.
13   Q    How did you find out that they were there?
14   A    My mom's work had called her and said that
15  Detective York was at her house wanting to talk to her.
16   Q    And did you ever find out how her work knew
17  that Detective York was there?
18   A    Detective York called her work.
19   Q    So then you arrived with your mom?
20   A    Yes.
21   Q    And did you say that Detective York wanted to
22  interview Jonathan?
23   A    He was wanting in the house to talk to
24  Jonathan.
25   Q    Did he go in the house?

Page 99

1    A    Yes.
2    Q    Did anybody let him in?
3    A    My mom unlocked the door.
4    Q    Okay.  Did he end up talking to Jonathan at
5  that time?
6    A    I'm not for sure if they talked there.  I know
7  he took Jonathan with him.
8    Q    With him where?
9    A    I'm not sure.
10   Q    Was he arrested that day?
11   A    I'm not sure if he was kept that day.  I'm not
12  sure.
13   Q    Did you go in the house?
14   A    It seems – yes, I did.  I stood in the
15  kitchen at the stove and Sheriff Pickard was standing
16  there, and Detective York was in the kitchen, and my mom
17  was standing there.
18   Q    Did anybody talk to your mother?  You said she
19  unlocked the door.  Did anybody, like, interview her or
20  anything?
21   A    I'm not sure.
22   Q    Don't know?  So you were in the kitchen and
23  you saw some activity, right?
24   A    I just made it to the kitchen, like, as soon
25  as you step in is where I made it to?

Page 100

1    Q    And then what happened?
2    A    He told me not to go too far, so –
3    Q    Stayed there?
4    A    – I never went too far.
5    Q    And then did you interact with anybody in the
6  kitchen?
7    A    No.
8    Q    Did you, were you put under arrest in the
9  kitchen?
10   A    No.
11   Q    So how – what – how did you get out of the
12  kitchen, what happened?
13   A    He – Detective York called KSP.  I don't
14  know – I couldn't ride with him and I couldn't ride
15  with Sheriff Pickard, for some reason.
16   Q    When you were first there, it was just
17  Detective York and Sheriff Pickard, to your memory?
18   A    Yes.
19   Q    And then you believe KSP, other troopers, came
20  afterwards?
21   A    Yes.
22   Q    And then were you taken – arrested at that
23  point?
24   A    Yes.
25   Q    And do you know who the arresting officer was?

Page 101

1    A    I know he's no longer with KSP.  I do know
2  that.  I don't know if he's quit.  Can't – I'm not sure
3  what his name is.
4    Q    And you said you were informed that the charge
5  involved a stolen firearm; is that right?
6    A    That's – Detective York told me when I asked
7  him, "What for?  Why couldn't I go too far?"  And he
8  told me I was going to jail.  He said, "For that gun you
9  stole."
10   Q    And what information do you have about a gun?
11   A    I have no information about a gun.
12   Q    Did you end up pleading guilty?
13   A    I did.
14   Q    Was York the complaining officer, to your
15  memory, on the citation?
16   A    No.  Actually, I was – he showed up every
17  time.  I was arrested, like, four times over the same
18  charge – on the same charge.  He kept showing up.  The
19  first incident he showed up and told me I was charged
20  with a gun.  I ended up making bond.  I got charged with
21  an – I got indicted, so that broke my bond.  He shows
22  up at another place that I'm at.  I answered the door
23  with my little girl in my arms.
24   Q    Well, that –
25   A    And he has a gun pointed between my eyes.

**Page 102**

1   Q   Well, let me break this down. We'll go
2 chronologically. So this burglary charge, you said he
3 was there for four arrests, to your memory; is that
4 right?
5   A   He was what?
6   Q   That Detective York was around for four
7 arrests. He showed up at four arrests, I think is what
8 you said; does that sound right?
9   A   Can I just name them off to you to see if it
10 is the four that –
11   Q   Yeah. You can try your best.
12   A   Okay.
13   Q   But I will try to take the facts down one at a
14 time, okay?
15   A   Okay
16   Q   All right. So the first one was this burglary
17 charge for the gun, right?
18   A   Yeah. For – I guess it just shows what you
19 plead out to. It was different. Like, that's what I
20 plead to is the burglary third.
21   Q   Okay. So then after that charge, which one is
22 the next arrest that you recall?
23      MR. SLOSAR: Sorry. So the – I think the
24 confusion might be in the interrogatory question.
25      MR. WRIGHT: It asks for convictions.

**Page 103**

1      MR. SLOSAR: Yes. So that's different than the
2 initial charges. So I think –
3      MR. WRIGHT: I understand.
4      MR. SLOSAR: – that's – okay.
5      MR. WRIGHT: I understand. So I – but I think
6 we worked that.
7 BY MR. WRIGHT:
8   Q   So the – and I – this 2011 arrest is the
9 last one on your interrogatory list, right?
10   A   Yes.
11   Q   But you seem to recall after that, three more
12 arrests when –
13   A   The – oh, yeah, the first one is when they
14 showed up and told me that I was going to jail for the
15 gun I stole is what – how he said it.
16   Q   Now, after an –
17      MR. KELLEY: (Phone ringing.) Sorry. I'm
18 sorry. I left it on, because my wife had surgery
19 and I just –
20      MR. SLOSAR: Oh, no.
21      MR. KELLEY: I brought her and I don't know –
22 so I'll check her at lunch. It's a minor surgery.
23 It's not a big deal, that's why. I apologize.
24 BY MR. WRIGHT:
25   Q   So I've got here, this is not an official

**Page 104**

1 record, but I'll just ask if this sounds correct. I've
2 got a February 2011 date for the firearm charge that was
3 amended to a burglary charge. Does that date sound
4 about right?
5   A   Yes.
6   Q   And it looks like that was resolved in March
7 of 2011. Does that sound right to you? That it would
8 have been resolved in about a month's time?
9   A   No.
10   Q   How long do you think it took to resolve that
11 charge? Just based on your memory, best you can.
12   A   Well, when I got charged with murder, I was
13 actually, at that time, doing the fourth time I had been
14 arrested on it, which would have been – they had
15 charged me with a probation violation.
16   Q   All right. So we've – this lists
17 convictions. After this conviction for the burglary in
18 2011, you said you were arrested again. I know that
19 this is only listing convictions, but you'd mentioned
20 times where you were arrested or charged where Detective
21 York was present. So what was the next incident that
22 you recall after the firearm issue?
23   A   Okay. It all – well, I was arrested that
24 many times on the same – on number 6.
25   Q   Okay.

**Page 105**

1   A   Is that –
2   Q   I see. Okay.
3   A   Okay.
4   Q   So you were arrested multiple times on the
5 same issue?
6   A   On the same issue.
7   Q   To your understanding?
8   A   On the one that I plead third degree burglary,
9 I was arrested multiple times on it. I can go –
10   Q   All right. So let's talk about the – do you
11 recall anything else happening on the first incident
12 where you went back to your mom's house and she let
13 Detective York in the house, right?
14   A   Uh-huh.
15   Q   And –
16   A   Yes.
17   Q   – you were in the kitchen for a time period?
18   A   Yes.
19   Q   And then he ended up calling other troopers to
20 the scene, correct?
21   A   To transport me, yes.
22   Q   Yes. Okay. When was the next time that you
23 believe you were arrested on that charge?
24   A   The second time I'm not for sure the date. I
25 got out on bond. I made bond after the first arrest

The Deposition of AMANDA HOSKINS, taken on March 26, 2019
106..109

Page 106

1  when I was actually charged with the receiving stolen
2  property or the firearm charge, right. The second time
3  I got indicated, which that put me an indictment warrant
4  on me. He shows up to a house that I'm at. It's
5  Detective York. I opened the door, as I'm holding my
6  little girl, he has a – a long black gun and he sticks
7  it between my eyes with my little girl in my arms.
8      Q   Do you know the time when this incident
9  occurred?
10     A   No.
11     Q   Was it 2011?
12     A   Yes.
13     Q   Summer, spring, you have any memory?
14     A   Spring or – probably spring.
15     Q   And he shows up – was it your mom's house?
16  What house was it?
17     A   No. It was – a house that William Lester
18  stayed, like, did all the work for.
19     Q   It wasn't a house that he owned, to your
20  knowledge?
21     A   No. He was just the caretaker of it.
22     Q   Was he there?
23     A   No.
24     Q   Was anybody else there?
25     A   Yes.

Page 107

1      Q   Who else was there?
2      A   Joe King.
3      Q   Were you living in that house at the time?
4      A   No.
5      Q   Was Joe King living in the house at that time?
6      A   No.
7      Q   Do you know if anybody was living in it?
8      A   No.
9      Q   You mentioned Lester took care of it, but you
10  don't know that anybody was living in it?
11     A   No.
12     Q   What were you doing there?
13     A   We – we were just staying there. He – we
14  could go stay a few days at a time if we wanted.
15     Q   So you were staying there, but just not on a
16  permanent basis, I guess?
17     A   It was – Joe wasn't allowed at my house at
18  the time. So we – we stayed a few days there. I
19  stayed with him.
20     Q   And when you say he wasn't allowed at your
21  house, was that a court order or was that your mom?
22     A   No. That was just my mom.
23         MR. SLOSAR: Different kind of court.
24         MR. WRIGHT: Yeah.
25     Q   Why was she separating you from Joe, do you

Page 108

1  remember?
2      A   No. She just – she really didn't like his
3  ways. If my mom – if you stayed there at her house, no
4  matter if you were of age, over age, the rule is, you're
5  there – say if you stay there on Saturday, on Sunday,
6  you – you go to church.
7      Q   You go to church?
8      A   Yep. So –
9      Q   Did you go to church regularly with your mom?
10     A   If I was there on Saturday night, I had to go
11  on Sunday.
12     Q   Okay. Anything else that she didn't like
13  about his ways? Was it just this church-going or other
14  issues?
15     A   I'm not sure what all she didn't like about
16  him. He just wasn't her favorite.
17     Q   You mentioned that you did, was it Roxette –
18  what did you say it was?
19     A   Roxicet.
20     Q   Roxicet, okay, I'm sorry. Did you do that at
21  your mom's house?
22     A   No.
23     Q   No? Did Joe do any drugs at your mom's house?
24     A   No.
25     Q   Would anybody do drugs at your mom's house?

Page 109

1      A   No.
2      Q   Not to your knowledge?
3      A   Uh-uh. No.
4      Q   Not Jonathan?
5      A   No.
6      Q   So how long had you been staying at this house
7  of William Lester's before Detective York showed up?
8      A   Two – two to three days.
9      Q   Do you know how he knew you were there?
10     A   No.
11     Q   And you said – you mentioned your daughter, I
12  believe. Were both kids with you?
13     A   No. Just one.
14     Q   Was that your daughter?
15     A   Yes.
16     Q   And Joe is the father of your son, though,
17  right?
18     A   Yes.
19     Q   But he wasn't with you then?
20     A   My son wasn't with me.
21     Q   Do you know where he was at?
22     A   He was in school.
23     Q   Okay. What time of day did they show up?
24     A   I'm not for sure of the time. I just know it
25  was early after Landon had went to school.

Page 110

1    Q   And then who was with him?  Who was with
2  Detective York?
3    A   I know Buster Liford was with him.
4    Q   Who is that?
5    A   He's – I'm not sure if he's a county cop,
6  city cop, what he is, but he's a cop.
7    Q   So a local cop, but not KSP to your knowledge?
8    A   No.
9    Q   And what was his name again?
10    A   There was an – there was one KSP, Curtis
11  Pingleton.
12    Q   And what was the name of the local cop?
13    A   Buster Liford.
14    Q   Anybody else you remember?
15    A   It seems like Sheriff John Pickard showed up.
16  I'm – after, like, after the – after the incident with
17  York.  He wasn't the – Pickard was not the first one on
18  the scene.
19    Q   Anybody else show up later on?
20    A   Not that I remember?
21    Q   And I believe you mentioned that York had an
22  indictment warrant?
23    A   I did.  I had an indictment warrant.
24    Q   Did he knock on the door?
25    A   No.

Page 111

1    Q   Was the door locked?
2    A   Yes.
3    Q   So how did you-all meet?
4    A   I was going toward the door and there was a
5  spare key outside.  Detective York had the spare key in
6  his hand with Buster Liford and the door opened.
7    Q   Was the spare key, like, that had been used to
8  unlock the door, to your belief?
9    A   Yes.
10    Q   And no one had knocked?
11    A   No.
12    Q   Did you know anybody was there?
13    A   No.
14    Q   Where was the spare key kept?
15    A   There was a window in – like, the window
16  sill.  It was in a cup on the window sill.
17    Q   Do you know how he would have known to find
18  the key there?
19    A   No.
20    Q   No?  Did he have his gun drawn?  Is that your
21  testimony?
22    A   He had it – am I allowed to show how?
23    Q   Sure.
24    A   He had it up – it was a longer black gun.  He
25  had it up and I was standing with my little girl and it

Page 112

1  was right here.
2    Q   When you opened the door, did he put it down?
3    A   It – let's see – when he – when I – I
4  didn't open the door.  He had it opened, like, we met.  I
5  was coming – he had already unlocked it and was coming.
6  We met and when I stopped, the gun stopped.
7    Q   Was it a – you said you didn't know anybody
8  was there, right?
9    A   Right.
10    Q   So you coming to the door was a coincidence
11  then?  You weren't going there purposely to meet him,
12  right?
13    A   Actually, I didn't even have time to change my
14  little girl's diaper.  I was going to get a bottle.
15    Q   Okay.  Did he drop the – did he lower the
16  weapon after the door came open?
17    A   No.
18    Q   Did you put your hands up?  Did he tell you to
19  put your hands up?
20    A   No.
21    Q   So what happens after the door opens?
22    A   We look at each – when the gun stops against
23  my forehead, we look at each other, and I said, "Can you
24  please put that down?  I'm holding my little girl."  And
25  then he drops the gun.

Page 113

1    Q   And then what happens?
2    A   That – he told me I was going to jail.  I had
3  an indictment warrant and I was running.  He also asked
4  me who else was in the house.
5    Q   Did he arrest Joe?
6    A   He didn't.  He had another KSP to take Joe.
7    Q   Okay.  Do you know whether Joe was arrested
8  for anything or just taken?
9    A   He was arrested.
10    Q   He was?  Do you know what he was arrested for?
11    A   I'm not for sure.
12    Q   So were you handcuffed?
13    A   Like right then that second?
14    Q   On the scene?
15    A   No.
16    Q   And where did they take you from there?
17    A   Knox County Jail.
18    Q   And to your memory, how long were you in the
19  Knox County Jail?
20    A   I actually got transported to Harlan County.
21  This is where I was in the cell with Christy Branson.
22  And this is in the same time frame as Joe King's
23  statement.  When – because he got arrested, we just
24  went to two different jails.
25    Q   And I'm sorry, I was writing down, I don't

Page 114

1   know if I caught it.  Do you know where Joe went?
2       A   Bell County Jail.
3       Q   And it's your understanding that that – he
4   was in custody following that arrest when he gave his
5   statement to York – Detective York?
6       A   This is the same time frame and he didn't get
7   out after that.  It's the same – same time that Joe
8   King gave a statement and Christy Branson would be
9   around the same time that they were both in jail after
10  this indictment.
11      Q   After the – after Joe King was arrested in
12  this episode, to your knowledge, he's never been out of
13  jail since then?
14      A   Now, he has.  I'm just – in the time frame
15  that he gave a statement, it was in that time that he
16  stayed.
17      Q   I understand.  So you're arrested some time in
18  2011 and so is Joe King, but you're taken to different
19  facilities, right?
20      A   Yes.
21      Q   And it's your understanding that while Joe
22  King was in custody, that's when he gave his statement?
23      A   From the dates that I can look at, like, on my
24  papers, yes.
25      Q   All right.  When did you – you said you were

Page 115

1   transported from Knox County to Harlan County, correct?
2       A   Yes.
3       Q   When did you get out of custody?
4       A   Not sure how long I stayed or when I got out
5   or even when they transported me.
6       Q   Did you get out on this charge?  Because
7   you've indicated you were arrested multiple times.
8       A   Yes.
9       Q   So you must –
10      A   That's the second arrest on the same charge.
11      Q   Do you just remember accumulatively?  I know
12  you were transferred from one to the other, but do you
13  just remember approximately how long you were in – in
14  custody either just total on that second arrest?
15      A   I know it's part of the plea agreement that I
16  gave them.  I stayed a few – quite a few days, that it
17  added up, that one of the reasons I took a plea
18  agreement.
19      Q   Because you – was your sentence to time
20  served, to some degree?
21      A   It's – it was kind of wrote up like a
22  probation with those days, like, it was taken off.
23      Q   So now there was a third charge?  A third
24  arrest, I'm sorry, a third arrest on the gun charge, to
25  your memory?

Page 116

1       A   Yes.
2       Q   Okay.  When was that arrest?
3       A   The third arrest, I got out, again, made –
4   made bond, after the indictment warrant –
5       Q   And can I just interrupt you to say –
6       A   Yes.
7       Q   – do you know when that would have been?
8       A   No.
9       Q   2011?
10      A   It would have been 2011.  I'm just not for
11  sure.
12      Q   Okay.  So 2011, you – you get out within that
13  same year.  Okay.  Go ahead.
14      A   I got out on a property bond and the property
15  bond, I can't remember the man or woman's name that it
16  was under.  I got out on property bond.  Not even a
17  month later, the woman said she had talked to someone
18  and she needed to withdraw her property bond.  That she
19  couldn't – she could no longer have that up for me.
20      Q   So somebody posted a property bond for you,
21  but they withdrew it about a month later; that's your
22  memory?
23      A   Yes.
24      Q   Do you – and you don't remember who it was?
25      A   Her name is somewhere in one of my papers, but

Page 117

1   I can't – I'm not sure what it is.
2       Q   Do you know who it was who arranged to – for
3   that person – was it a husband and wife or an
4   individual?  Do you remember?
5       A   I'm not sure.
6       Q   Do you know who arranged for them to do that
7   for you?
8       A   William Lester.
9       Q   To your understanding is, I guess, William
10  Lester, was he an acquaintance of these people who made
11  that bond?  You don't know?
12      A   I'm not sure.
13      Q   When the – have we crossed into 2012 when
14  your bond was withdrawn?
15      A   Not yet.  I don't –
16      Q   Still in 2011, you believe?
17      A   Yeah.
18      Q   How did that work when they did that?  Did law
19  enforcement inform you of it?  Did William Lester?  Who
20  told you that that was happening?
21      A   That?
22      Q   They were going to withdraw their bond.
23      A   I just got arrested again.  They came to my
24  mom's house.
25      Q   You didn't know it until you got arrested?

Page 118

1    A   No.
2    Q   So is that the third arrest?
3    A   That's the third arrest.
4    Q   Now, this is a discovery deposition, not a
5    trial.  So is it – any information, whether it's direct
6    or hearsay, about why those people withdrew the bond?
7    A   Nope.
8    Q   You have no idea?
9    A   No.
10   Q   Lester never told you?
11   A   The only thing I had ever heard was they had
12   talked to someone and they couldn't keep – keep me out.
13   Like they couldn't have my bond up anymore.
14   Q   Who told you that?
15   A   William Lester.
16   Q   That's all he – to your memory, that's all he
17   said?
18   A   Yes.
19   Q   So I think you said the third arrest was at
20   your mom's house?  They picked you up again?
21   A   That was the third arrest, yes.  That was at
22   my mom's house.
23   Q   And was that 2012 or are we still in 2011?
24   A   I'm not sure.  I –
25   Q   And I understand.  I know you don't have

Page 119

1    perfect memory, but do you remember the time of the
2    year?  Like, was it cold out, warm?  Do you have any
3    memory of that?
4    A   No.
5    Q   No?  Do you remember who was there when they
6    came?
7    A   No.
8    Q   Was Detective York there?
9    A   He was on the scene.
10   Q   Were there others?
11   A   Yes.  I don't know if it was Barbourville City
12   at the time or the sheriff's department.  It wasn't
13   Sheriff Pickard.  I didn't go with him that time.
14   Q   Did Detective York transport you?
15   A   No.
16   Q   So it was – you have a memory that was
17   somebody with the city?
18   A   I don't know if it was the city or the county,
19   but it was one of the two.
20   Q   Okay.  Where did they take you, Knox County
21   Jail?
22   A   Yes.
23   Q   Did – when you were arrested, did you give an
24   interview, any statements about the Katherine Mills'
25   investigation on that third arrest, to your memory?

Page 120

1    A   No.
2    Q   And I'm sorry to back up, but on the second
3    arrest, where they came to the home that William Lester
4    had where you with Joe King, when you were arrested on
5    that occasion, did you – were you interviewed or give
6    any statements about the Katherine Mills' investigation.
7    A   I wasn't interviewed and I wasn't questioned,
8    but I rode in the back of the cop car with Buster Liford
9    and how I remember that, he always plays Christian music
10   and I don't know if he was talking about something on
11   the song or if it was something toward me, I'm not
12   really sure, but he said, "You know, everyone is
13   considered a murderer."  That's how it ended and that
14   was it.
15   Q   That's all that was said?
16   A   Uh-huh.
17   Q   And that was by the local police officer, to
18   your memory?
19   A   He – I think sheriff's department, maybe.
20   Q   Okay.  Did you see Detective York on that
21   second occasion at the jail?
22   A   On the second occasion, did I see York at the
23   jail?
24   Q   Yeah.  After you had been transported.
25   A   No.

Page 121

1    Q   No.  And it sounds like on the third arrest,
2    you didn't have any interactions with law enforcement
3    about the Katherine Mills' investigation?
4    A   No.
5    Q   No?  So they take you to Knox County.  How
6    long were you there that time, do you remember?
7    A   No.  No.  I'm not sure.
8    Q   And do you remember how you got out?
9    A   I went back to court.  Luckily, I got another
10   court date, Judge Mills ended up giving me, I'm
11   thinking, a surety bond, because he, I guess, understood
12   the situation, that I was on property bond, and then it
13   got pulled and they didn't give a good reason.  So he –
14   he let me out on a surety bond.
15   Q   And how does that work?
16   A   Someone signs their name and you go back to
17   court.
18   Q   Do you know who signed your surety bond?
19   A   No.
20   Q   No?  I don't think you remember exactly how
21   long that took, right?
22   A   Right.
23   Q   So then you – is this 2012 now?  Do you have
24   memory?  Or are we still in 2011?
25   A   I'm not sure.

Page 122

1   Q   That's okay.  All right.  So after you get
2 out, I think you said there were four arrests on this
3 charge.
4   A   Yes.
5   Q   So then when is the next –
6   A   The next –
7   Q   – arrest?
8   A   – one is – actually, it was still – after I
9 plead to it, I got arrested after I plead to it, because
10 they ended up getting me on my – on a probation
11 violation within not even one month after I plead.
12   Q   So then the fourth arrest you plead guilty to
13 a charge and it – it changed, right?  You were
14 originally charged with a stolen firearm?
15   A   The morning that my trial was supposed to
16 begin, I was going to trial, I didn't do it.  I wanted a
17 trial.  Me and my mom, on our way to court, Knox Circuit
18 Court, we get there, Sheriff Pickard is standing at the
19 door.  As I remember, the jurors were getting sent home
20 and I had to go in the court room by myself, my mom
21 stands back in the hallway with Sheriff Pickard.  I
22 wasn't allowed to have no one in there with me, for some
23 reason, I'm not sure why.
24   Q   And this is at the courtroom?
25   A   Yeah.

Page 123

1   Q   And it was the day of your trial?
2   A   Yes.
3   Q   Were you represented by anybody?
4   A   I was.
5   Q   Who was your attorney?
6   A   Johnnie Turner.
7   Q   Did he go in the courtroom with you?
8   A   He was already in there sitting.
9   Q   Okay.  Was the commonwealth's attorney in
10 there or an assistant attorney, prosecutor, of some
11 sort?
12   A   Yes.
13   Q   And the judge was in there?
14   A   I didn't see the judge when I first went in. I
15 had to go to a room to the side, in the back.
16   Q   Was the judge in there?
17   A   No.
18   Q   Okay.  So then what happens?  Does your
19 criminal defense attorney and the prosecutor work out a
20 deal?
21   A   They already had it worked out before I got
22 there, like, to give – it was just me and my attorney
23 in that room and he tells me, "Hey, look, if you don't
24 go to trial this morning, they are offering you two
25 years' probation with the time you've got in and going

Page 124

1 to amend a gun charge to burglary third."  At the time,
2 I was on medication, so I took the plea to go home.
3 [redacted]
[redacted]
[redacted]
7   Q   So you do – you say you took that plea then,
8 and that was the resolution of that gun charge, right,
9 that started this, the firearm's charge?
10   A   It wasn't – it wasn't the resolution, because
11 I still got picked back up within a month after I took
12 that plea.
13   Q   And what were you picked up on the –
14   A   It wasn't – I didn't get picked up.  I turned
15 myself in.  I got probation and not even a month after,
16 the probation officer said I absconded.
17   Q   All right.  Well, what – were you on
18 probation from a prior charge?
19   A   No.  This was probation on the –
20   Q   Okay.  I –
21   A   – this charge.
22   Q   I think I follow then.  So when you plea to
23 this charge, you get time served and two years'
24 probation; is that your memory?
25   A   Uh-huh.  Yep.  I don't even think it was a

Page 125

1 full two years' probation.  It – my – that time
2 counted, so – so much, that I still got probation, I'm
3 just not for sure how long.
4   Q   So within a month after this, you – you
5 were –
6   A   This should be around March 2012 now.  We
7 should be there.
8   Q   And your probation officer had said you
9 absconded; is that your understanding?
10   A   Yes.
11   Q   Do you know who your probation officer was?
12   A   Matthew Armstrong.  Same one that absconded my
13 cousin that was – ended up being my codefendant in this
14 case.
15   Q   When did that happen with Jonathan Taylor?
16   A   The same – his was a month – he got
17 absconded the month before that I got absconded.  So
18 February and March of 2012.
19   Q   He was in February and you were in March?
20   A   Yes.  I actually turned myself in.
21   Q   Well, let me go on.  How did you find out
22 about that?
23   A   About?
24   Q   You said you turned yourself in.  So how did
25 you know to do that?

Page 126

1  A  There was a card on my door and I called
2  Matthew Armstrong, which was the probation parole
3  officer and I said can – "What have I done?  Do I need
4  to turn myself in or what?"  This was on a Friday and I
5  actually went to Knox County Jail and tried to turn
6  myself in and they wouldn't keep me.  So I sat on the
7  sidewalk for three hours trying to get – go to jail.  I
8  hadn't done anything wrong.  So a guard named Thomas was
9  actually working and they had called everywhere trying
10  to find that warrant.  So on – they told me just to go
11  on home.  There was no warrant, they couldn't find
12  anything on –
13  Q  The jail told you that?
14  A  Yeah.  On Monday morning, I called Matthew
15  Armstrong and I said, "Look.  I've ran around trying to
16  turn myself into jail all weekend it feels like."  I
17  even got pulled over by KSP on the Sunday before and
18  told them, said, "Hey – hey, look, I think I have a
19  warrant, can you run my name?"
20  Q  Who pulled you over?
21  A  I'm not for sure of the name.  It was – I'm
22  not sure.
23  Q  What was the reason, did they say?
24  A  Said that I had swerved.  And at the time,
25  William Lester was actually the one driving and me in

Page 127

1  the passenger seat.
2  Q  What were you driving?
3  A  That silver truck.
4  Q  So did KSP let you go then, because there was
5  no warrant in the system?
6  A  Yes.  I even handed my ID, because I didn't
7  want to have to stay a full time of what my probation
8  was and I thought if I turned myself in, it would help
9  me.  They couldn't find a warrant.  So on Monday
10  morning, I called probation and parole and I talked to
11  him.  I said, "Look.  I'm tired of running around trying
12  to turn myself in while they won't keep me."  He told
13  me, "Honey, all I can tell you is you bring you some
14  jail clothes and turn yourself in in London."  I turned
15  myself in and two days later, Detective York comes and
16  charges me with murder.
17  Q  Did the probation officer tell you what – the
18  absconding, what the basis for that was?
19  A  He said I failed to report.
20  Q  To what?
21  A  To report to him.
22  Q  Was there, to your memory, some obligation to
23  call him, stop by his office?
24  A  Maybe to call him.  I'm not even for sure how
25  that went.  I thought I'd call him within the month and

Page 128

1  I was fine, so I went ahead and turned myself in.
2  Q  Did the absconding, did that result in a
3  separate criminal charge or did that just result in your
4  probation being revoked?
5  A  Just my probation being revoked.
6  Q  And so while you were in custody on that is
7  when you were charged with the Katherine Mills' murder?
8  A  They took me downstairs and I thought it was
9  that Matthew Armstrong at probation and parole and sat
10  me in this room.  Detective York walks in.  He said,
11  "Tell me what you know."  I said, "I don't know what
12  you're talking about."  He said, "Look.  I know you
13  wasn't there.  I know you didn't do it.  Matter of fact,
14  I know you didn't have any involvement.  Now, tell me
15  what you know."  Before he sets down on the stool, I
16  say, again, "I don't know what you're talking about."
17  Before his butt hit – hits the stool, he gets up and he
18  says "you will talk – you will talk to me by the
19  time you go to court".  He gets to the door and says,
20  "Now, I'm going to Whitley Count to charge your cousin."
21  He still never handed me the citation or anything like
22  that.  They come and get me, walk me out and, that woman
23  said, "Re-fingerprint Hoskins," and I said, "Re-
24  fingerprint me for what?"  She said, "Honey, he didn't
25  tell you what he charged you with?"  I said, "No.  He

Page 129

1  told me what he was going to charge me with if I didn't
2  talk to him."  We go over, re-fingerprint me, they take
3  a mug shot and my eyes is closed and I said, "Do you
4  think you could take another mug shot, because I'm
5  probably about to be on the news?"  And they take me up
6  and it was embarrassing, I'll never forget that, I went
7  from a regular cell to – I wasn't allowed in there.
8  They'd already put my stuff out to go into a max cell.
9  Q  So you went into the jail on the absconding
10  issue on a Monday?
11  A  Yes.
12  Q  Okay.  You okay?  Do you need to take a break?
13  A  I'm good.
14  Q  Okay.  And I think you said it was a day or
15  two later, they led you to another – it wasn't the same
16  day, was it, that you saw Detective York, it was a day
17  or two later?
18  A  It was two days later, because I thought it
19  was that probation officer.
20  Q  Okay.  Okay.  You all right?
21  Who all was in the room with Detective York
22  when he was talking to you about the Katherine Mills'
23  investigation?
24  Q  At the jail?
25  A  Yes.

Page 130

1    Q   Just him.  Did you have any more interaction
2   with York after that?  I think you may have had an
3   interview with Lisa Evans at some point in time.  Does
4   that sound right?
5    A   Yes.
6        MR. SLOSAR:  And, you know, we are -- I see
7   what you're saying.  With York and Lisa Evans?
8        MR. WRIGHT:  Yeah.  I'm just asking, generally,
9   after this March 2012, after the arrest, other
10   interactions with York and --
11        MR. SLOSAR:  Anyone else?
12        MR. WRIGHT:  -- just to refresh.
13        MR. SLOSAR:  Okay.
14   BY MR. WRIGHT:
15    Q   I believe there was an interview with -- I
16   believe you had an interview with him and Lisa Evans
17   attended that; is that true?
18    A   Yes.  He came to get my DNA and she wanted --
19   she had to be there.  She wanted to be there.
20    Q   Okay.  Was any statement given at that time?
21   Did you talk to him or did -- was that just a --
22    A   No.  That -- no statement was given.  It was
23   for him to swab my mouth, and that's the last that I'd
24   ever been in a room or talked to Detective York.
25    Q   Do you remember when that was?

Page 131

1    A   No.
2    Q   All right.  And I know we've -- we've covered
3   a lot of ground.  So I just want to try to get the
4   universe of your interactions with my client, Jason York
5   with the Lisa Evans, DNA sample, right, was the last
6   one?
7    A   Yes.
8    Q   And then in March 2012, while after you had
9   turned yourself in on the absconding, he met you at the
10   jail, right?
11    A   When I turned myself in on the absconding, it
12   was two days later.
13    Q   Right.  Two days later.  So I think I'm going
14   in reverse order here and correct me if I'm wrong, okay?
15   The last meeting that you had with Detective York was
16   with Lisa Evans when they got the DNA sample?
17    A   Yes.
18    Q   After you turned yourself in on the probation
19   violation for absconding, you saw him two days later at
20   the jail; is that approximately?  Does that sound right?
21    A   Yes.
22    Q   It sounds like the third one was when your
23   bond was withdrawn and you were picked up, but I don't
24   believe you had much -- he showed up, but you didn't
25   interact with him; is that right?

Page 132

1    A   Yes.
2    Q   And the time before that was where he showed
3   up at the home, that Lester was taking care of, that you
4   were with Joe King, right?
5    A   Yes.
6    Q   And then there was the initial arrest on the
7   stolen firearm at your mom's house, right?
8    A   Yes.
9    Q   There was also the interview at the
10   Barbourville Police Department when you called William
11   Lester, right?
12    A   Yes.
13    Q   Is there any other interactions that you had
14   with Detective York that you can remember?
15    A   I'm not sure.  It seems like I was taken to
16   the police department twice, but I don't -- I'm not
17   sure.
18    Q   Well, when you were -- the first one that we
19   talked about or what I -- as far as I know, is the first
20   one, the February 2011 interview, that was at the PD,
21   the Barbourville PD, right?
22    A   Yes.
23    Q   The gun arrest at your mom's house, or the
24   stolen firearm arrest, were you taken to the PD or the
25   Knox County Jail?

Page 133

1    A   Knox County Jail.
2    Q   And you were later transferred to Harlan
3   County on that one?
4    A   Yes.
5    Q   And then when you were picked up at the house
6   that Lester took care of with Joe King, where were you
7   taken after that one?
8    A   Knox County.
9    Q   Then when they picked you up after your
10   bond -- after the bond had been withdrawn, they picked
11   you up at your mom's house, right?
12    A   Yes.
13    Q   And where did they take you after that?
14    A   Knox County.
15    Q   You turned yourself in to Knox County Jail?
16    A   On the probation violation?
17    Q   Yes.
18    A   No.  I -- that's the one that they wouldn't
19   keep me and I had to end up turning myself in in Laurel
20   County.
21    Q   Laurel County.  And you're meeting with York
22   two days later was also at Laurel County?
23    A   Yes.
24    Q   And the last meeting with the DNA sample, do
25   you know what jail or where you were in custody at?

Page 134

1    A   Laurel County.
2    Q   So the only PD, police department interaction
3   I have is the February 2011 where you tried to call
4   William Lester, but you think there may have been a
5   second?
6    A   I'm thinking there was a second one. I'm –
7   I'm not – I'm not sure.
8    Q   Do you – I know it's a longtime frame, but do
9   you know where that would have fallen in?
10    A   That would be before my gun charge that I got.
11    Q   Okay. Does anybody else stick out in your
12   mind? I know the time when you called William Lester at
13   the police department, I believe the city police officer
14   was there, who you've sued, a Broughton; does that sound
15   right?
16    A   Yes.
17    Q   As far as any other interaction with Detective
18   York at the police department, are – does anybody stick
19   out in your mind who may have been there for that?
20    A   No.
21    Q   No?
22        MR. WRIGHT: I might be at a stopping point. Do
23   you want to keep on going or you want to break for
24   lunch?
25        MR. SLOSAR: Whatever is convenient for you

Page 135

1   guys. I don't know how you-all have this split up.
2        MR. WRIGHT: Yeah. Are you ready for a break?
3   We can take a break now and come back here about
4   1:15. Would that be okay?
5        MR. SLOSAR: That's fine. But before we go off
6   the record, just very quickly, you know, 30(d)(1)
7   allows for a total of seven hours. We're going to
8   stop it at seven hours. So I'm anticipating that
9   you-all have spoken before this and have an
10    agreement as to the time split. I just want to put
11   it on the record, I think we're somewhere around
12    three hours now, so that you guys can figure out
13   where you're at.
14        MR. WRIGHT: What is the time?
15        VIDEOGRAPHER: You're at two hours and 42
16   minutes.
17        MR. WRIGHT: All right. We can go off the
18   record then.
19        MR. SLOSAR: Okay. Thank you.
20        MR. WRIGHT: Thank you.
21        VIDEOGRAPHER: Off the record at 12:18.
22        (OFF THE RECORD)
23        VIDEOGRAPHER: Back on the record at 1:11.
24   BY MR. WRIGHT:
25    Q   All right. We're back on the record, Ms.

Page 136

1   Hoskins and still under oath. Have you had a chance to
2   read this document with interrogatory answers and
3   request for production of documents during lunch?
4    A   Yes.
5    Q   And based on your review, is it true and
6   accurate to the best of your knowledge and belief?
7    A   Yes.
8    Q   Okay. Can we make that Exhibit 2? If you
9   could flip to page – Interrogatory number 19. You see
10   that –
11    A   Yes.
12    Q   – Ms. Hoskins?
13    A   Yes.
14    Q   We covered the number 6, I believe, everything
15   related to that conviction. I don't want to talk about
16   five. Number 4, do you see that listed?
17    A   Yes.
18    Q   Was that originally a stolen identity charge?
19    A   I'm not sure what had happened. I went
20   through a road block and I was driving on suspended, so
21   I gave my sister's birthdate.
22    Q   You gave them the birthdate?
23    A   Yeah.
24    Q   Okay.
25    A   And then two weeks later, he pulls me over,

Page 137

1   said someone told on me. Took me to jail for giving
2   false.
3    Q   Do you remember who that officer was?
4    A   No.
5    Q   No. And that was 2010; is that right? That's
6   the 10 dash – yeah, I'm guessing that's correct. Does
7   that sound right to your memory?
8    A   Yeah.
9    Q   Now, one other one. There's a theft by
10   unlawful taking, would that be a shoplifting charge?
11    A   I'm not sure.
12    Q   Okay. Number 3, the second-degree assault,
13   wanton endangerment, do you know what the circumstances
14   of that charge and conviction were?
15    A   I do. So that was in Knox County. I was a
16   passenger in the car and the guy – it was night time,
17   one lane road, no street lights. He hit something,
18   didn't expect someone would be in the road. He thought
19   it was a tree branch. And that's – I ended up taking
20   the plea on that one. I hired a lawyer out of Knox
21   County and he said that was my best option would be to
22   take the plea.
23    Q   Who was the driver? Do you remember?
24    A   Let's – John Battingfield, I think is his
25   name.

Page 138

1    Q    Was he charged?

2    A    He was.

3    Q    Was he also convicted?

4    A    Yes.

5    Q    Did he have the same attorney or a different

6  one?

7    A    Different one.

8    Q    Do you remember who your attorney was?

9    A    Yes.

10    Q    Do you know – so somebody was hit.  Do you

11  remember who it was?

12    A    It was 11 or 12-year-old.  It was dark, no

13  lights.  He said that's what he thought he hit was a

14  tree branch.

15    Q    And I won't dig into this too much, but

16  just – you thought – your testimony is you both – did

17  you think you hit a tree branch too?

18    A    I didn't even know we had hit anything.  The

19  way that road is, constantly branches are hitting your

20  windows at the time.

21    Q    I'm from a small county too, not here.  Was it

22  in Knox County, you said?

23    A    It was in Knox County.  It – it wasn't like

24  the front of the car hit.  It was the side mirror.

25    Q    On your side or his side?

Page 139

1    A    Goodness.  I don't – I'm not sure.

2    Q    Do you remember the road?

3    A    Yes.

4    Q    What was the road name or number?

5    A    It was at Steven Trace.  I'm not for sure the

6  side road, what it was called.

7    Q    And did – how did you – how were you

8  connected with that incident if you-all drove on without

9  knowing that you hit anything?

10    A    Because we didn't talk to the law until the

11  next day.

12    Q    Did the law come after – come to your home?

13    A    I met a cop and talked to him.

14    Q    Okay.  Were you living with your mother at the

15  time?

16    A    I was.

17    Q    And was that the same house that you were

18  living with her in 2010?

19    A    No.

20    Q    A different one?

21    A    Yes.

22    Q    Was it in Barbourville?

23    A    Yes.

24    Q    And the police showed up at her house?

25    A    I'm not sure how that went.  I – I was

Page 140

1  contacted by a cop and he asked me to come talk to him

2  and I did.

3    Q    Okay.  Do you remember who that cop was?

4    A    No.  Not sure.

5    Q    Do you remember the agency?

6    A    Sheriff's Department.

7    Q    Did they ever – did you ever come across any

8  information of how they determined it was the person's

9  car that you were in?

10    A    It was my car, is what it was.

11    Q    It was in your car?

12    A    Uh-huh.

13    Q    Did you ever figure out how they determined it

14  was your car that was involved?

15    A    No.

16    Q    You never found that out?

17    A    No.

18    Q    Was the – was it a boy; is that what you

19  said?

20    A    A girl.

21    Q    Girl.  Okay.  Do you – and this will – I

22  think this will be the last.  Do you remember, was it

23  just an injury, was it a death, was it – do you

24  remember was –

25    A    It was a injury.

Page 141

1    Q    Okay.  Now, let's turn to Interrogatory number

2  8 – or I'm sorry, 9.  And Interrogatory number 9 is

3  asking for any income or financial support received by

4  you from January 1, 2007 to December 20, 2010; do you

5  see that?

6    A    Yes.

7    Q    And you had listed there some amounts.  And we

8  talked about this earlier.  Is there anything to add on

9  this information or does it seem to be complete and

10  accurate to the best of your knowledge?

11    A    To the best of my knowledge, it's – it's

12  complete.

13    Q    So it identifies 100 to 150 per month for Mr.

14  King for child support?

15    A    And the –

16    Q    Number 9.  The answer's on the next page.  I'm

17  sorry.

18    A    Yes.

19    Q    And it says, "From K-TAP of 262 per month with

20  a gas check of 200 per month."  Do you see that?

21    A    Yes.

22    Q    When we talked earlier you weren't for sure if

23  that K-TAP was before or after the December 2010.  Are

24  you sure it was that time period?

25    A    As – to the best of my knowledge, it was

Page 142

1  before and after.
2    Q   Both?
3    A   Yeah.
4    Q   It also says you receive food stamps of 350
5  per month?
6    A   Yes.
7    Q   And then, I think, you also identified that
8  your mother supported you to some degree, right?
9    A   Yes.
10    Q   And William Lester?
11    A   When I was with him.
12    Q   Yes.  And Joe King in addition to the child
13  support, right?
14    A   Yes.  And when I was with him.
15    Q   But you didn't have any other job related
16  income, right?
17    A   No.
18    Q   So did you have any savings in 2010?
19    A   No.
20    Q   Allen Helton gave a statement to police that
21  he saw you with a wad of cash on December 20, 2010.
22  Would you have a wad of cash?
23    A   No.
24    Q   No.  Did you – do you recall coming into any
25  money at Christmas because it was the holidays, coming

Page 143

1  into any money at that time that you weren't expecting?
2    A   No.
3    Q   No.  Now, I mentioned earlier that Christy
4  Branson had given a statement to police that you were –
5  let me pull that up.  This is, for the record, PL010110
6  and this is a transcript of a statement by Christy
7  Branson to Detective York on May 16, 2011.  And on that
8  page, she said that you went and bought 30s, about 300
9  or 400 worth of 30s a day.  What are – what is she
10  referring to when she says, "30s."  Do you know?
11    A   I know what Roxicet 30s is.
12    Q   Okay.  What is that?
13    A   It's a pain pill.
14    Q   Okay.  Is the 30 referring to the cost, the
15  weight.  And what's the 30, do you know?
16    A   That's the milligram.
17    Q   Milligram.  Best you know?
18    A   Yes.  Yes.
19    Q   How much does a 30 cost?
20    MR. SLOSAR:  Objection to form foundation.
21    Q   Have you ever bought a Roxicet?  Is that what
22  it's called?
23    MR. SLOSAR:  And again, just for the record is
24  clear.  We are requesting that any testimony
25  relating to Ms. Hoskins' past use of medication or

Page 144

1  narcotics be placed under the protective order in
2  addition to the entire line of questioning that you
3  had to her earlier about her intimate relationships
4  with people or denials of intimate relationships
5  with people.  You can answer the question, Ms.
6  Hoskins.
7    A   Can you ask it again?
8  BY MR. WRIGHT:
9    Q   Yeah.  Was it one pill, two pills, how many
10  was it if you purchased a Roxicet 30?  What was that
11  referring to, one pill?
12    A   Yes.
13    Q   And then how much, to your understanding,
14  would that have cost?
15    A   Different prices.  I never had to go and buy
16  it so...
17    Q   Did anybody tell you what they cost?
18    A   I've heard.
19    Q   Okay.  Well, what have you heard?
20    A   $15.
21    Q   Thereabout.
22    A   $20.
23    Q   So $400 worth of 30 a day – of 30s a day
24  would be 20?
25    A   What is it again?

Page 145

1    Q   $400 worth.  That's what Christy Branson said
2  you were doing.  $300 or $400 worth of 30s a day.
3    MR. SLOSAR:  Objection to form.  Foundation.
4  You can answer to the extent there's a question.
5  I'm not sure there was.
6  BY MR. WRIGHT:
7    Q   $400 worth of 30s, how many would that buy?
8    MR. SLOSAR:  Objection to form.  Foundation.
9  You can answer the question.
10    Q   Answer the best you can.
11    A   I guess where it's according to where the
12  person is buying them.
13    Q   Okay.  And to your understanding it was like
14  $15 a pill; is that right?
15    A   Yes.
16    Q   And you're saying you never bought them?
17    A   I never had to.
18    Q   Why is that?
19    A   Because the person I was with always bought
20  them.
21    Q   And that would be William Lester on occasion?
22    A   Yes.
23    Q   Joe King on occasion?
24    A   Yes.
25    Q   Who else would buy them for you?

Page 146

1    A    That's it.
2    Q    That's all.  In December of 2010, who was
3  buying?  Were either of those individual buying those
4  for you?
5    A    I'm not sure.
6    Q    You don't remember?
7    A    No.
8    Q    But you never bought them yourself?
9    A    No.
10    Q    Would you go with William Lester or Joe King
11  to buy these and wait in the car or would you just be at
12  the house and they would bring them to you?
13    A    Both.
14    Q    Both.  When William Lester was going to Mike
15  Simpson's and you overheard the conversation about
16  Katherine Mills, was he going there to buy drugs?
17    A    Yes.
18    Q    You mentioned that William Lester didn't use
19  drugs to your knowledge; is that right?
20    A    Yes.
21    Q    Did Joe King?
22    A    Yes.
23    Q    He did?
24    A    Yes.
25    Q    Did he sell drugs?

Page 147

1    A    I'm – I'm not sure.
2    Q    What about William Lester?  Did he sell drugs?
3    A    Yes.
4    Q    What kind of drugs did he sell?
5    A    I'm not sure.
6    Q    Was he selling drugs in 2010?
7    A    I'm not sure.
8    Q    Now, she had mentioned in her statement that
9  it was – you're buying $400 worth a day.  You said that
10  depends on how much they're selling for.
11        MR. SLOSAR:  Objection to form.  And misstates
12    her earlier testimony.  That's not what –
13        MR. WRIGHT:    Okay.  We'll refrain.
14  BY MR. WRIGHT:
15    Q    To your memory, how many 30s would you – were
16  you using a day in December 2010?
17    A    I'm not sure.
18    Q    Do you use them now?
19    A    No.
20    Q    Are you on any medication?
21    A    No.
22    Q    Were you using them in 2010?
23    A    I'm not sure if I was using those or not in
24  2010.
25    Q    Do you know whether William Lester or Joe King

Page 148

1  would have been buying $400 worth of 30s for you in that
2  time period?
3    A    No.
4    Q    That sounds like too much?
5    A    Yes.
6    Q    So you believe that statement by Christy
7  Branson that she attributes to you, that's not true?
8    A    It's not true.
9    Q    You wouldn't have told her that you were in
10  possession of $300 to $400 worth of 30s a day?
11    A    No.
12    Q    Do you remember being in – I asked earlier
13  whether you had come into any extra cash in December
14  2010.  You said "no," right?
15    A    Right.
16    Q    Do you remember whether your drug habit picked
17  up at that time?
18    A    No.
19    Q    What about in January of 2011?
20    A    No.
21    Q    And to your knowledge, there was no one other
22  than Lester King who had been supplying you with 30s in
23  December 2010?
24    A    No.
25    Q    ██████████████████████████

Page 149

1  ██████████████
   ██████████
3    Q    And that would have been in the 2010 time
4  period?
5    A    Yes.
6    Q    Did they screen you for drugs when you were
7  seeing him in that time?
8    A    No.
9    Q    They didn't?
10    A    No.
11    Q    I'm going to pass you a document.  This was
12  produced to us labeled PL018938 and 018939.
13        MR. SCOLAR:  It's Exhibit 3?
14        MR. WRIGHT:    Yeah.  We can make it Exhibit
15    3.
16    Q    That document was produced to us in the case.
17  Do you recognize that?
18        (EXHIBIT 3 MARKED FOR IDENTIFICATION)
19    A    Yes.
20    Q    What is it?
21    A    That is a drug test.
22    Q    Who would have performed that on you?
23    A    Maybe my first visit, but you asked me "Did
24  they screen me?"  And screen me should have been weekly.
25  I didn't receive that every week.

The Deposition of AMANDA HOSKINS, taken on March 6, 2018

150..153

**Page 150**

1    Q   Didn't receive it every week?
2    A   No.
3    Q   When would they screen you?
4    A   I'm not sure when, but they – not every week
5   to check my levels.
6    Q   Okay.
7

9    Q   Do you know what any of the numbers on there
10  mean?
11   A   Like on this side?
12   Q   On any of the columns.
13   A   No.
14   Q

20   Q   Would that have been your 30s that you were
21  taking?
22   A   Yes.
23   Q   Okay.  And it gives three values there, 498,
24  5884, 2828.  Do you see that?
25   A   Oh, right here it is.

**Page 151**

1    Q   You see that?
2    A   Yes.
3    Q   Do those values mean anything to you?
4    A   I'm not sure what you're asking.
5    Q   Well, I mean, do you know – I know that you
6   may not be an expert in the field.  Do you know how much
7   that is saying is in your system or what that means?
8    A   No.
9    Q   No.
10       MR. WRIGHT:    Can we have a clip?
11       MR. KELLEY:  I've got a paperclip, but that's
12  it.
13       MR. WRIGHT:  Thanks.
14       MR. SLOSAR:  When the protective order is in
15  place, we're going to request that this exhibit be
16  placed under it as well.
17  BY MR. WRIGHT:
18   Q   Is there a date on the Exhibit 3 form?  You
19  see that at the top?
20   A   Yes.
21   Q   It's June of 2010?
22   A   Yes.
23   Q   What was your – was your drug habit in that
24  time period any different than December 2010?
25   A   I'm not sure.

**Page 152**

1    Q   No.  I'm going to have – give you a document.
2   And for the record, it's PL018934 and 018935.  You see
3   the date of that exhibit?
4        (EXHIBIT 4 MARKED FOR IDENTIFICATION)
5    A   Yes.
6    Q   And it's January of 2011?
7    A   Yes.
8    Q   So that would have been after Katherine Mills
9   was found dead, right?
10   A   Yes.
11   Q   And this is, I know the printing is on the
12  left side, a little smudged, right?
13   A   Yes.
14   Q   But does it appear to be the same type of drug
15  screen form as Exhibit 3?
16   A   It looks like it.
17   Q

?

**Page 153**

1

10       MR. SLOSAR:  And I object to form.  It's a
11  compound question.  She's also already answered your
12  question.
13   Q   Can you go ahead and answer, please?
14

19   Q   So you weren't, in fact, then using more 30s
20  prior to that January 2011 drug screen?
21   A   I'm not sure.
22       MR. WRIGHT:    Can we have a clip?  We've got
23  one.  Thanks.
24       COURT REPORTER:  Okay.
25  BY MR. WRIGHT:



Case: 6:17-cv-00084-REW-HAI Doc #: 200-1 Filed: 07/31/19 Page: 42 of 107 - Page
ID#: 9018
The Deposition of AMANDA HOSKINS, taken on March 26, 2019
154..157

Page 154

1    Q   Now, in your interview with Detective York in
2 February 2011, isn't it true that you told him that
3 William Lester was behind on bills?
4    A   That's what I told him.
5    Q   Yes. Was that true?
6    A   That's what I was told by William Lester.
7 Maybe it was because he didn't want to give me money.
8 I'm not sure.
9    Q   You didn't see any extra money from him
10 though, right?
11    A   I never seen his money period. He never just
12 had his money laying out.
13    Q   Did they cut off his electricity at that time?
14    A   I was told that. I didn't see that. I was
15 told that.
16    Q   Let me just run down some people -- some names
17 in this case. Is it true that you stole toys from
18 Michelle Edwards?
19    A   No.
20    Q   So if she told that to police, that would not
21 be true?
22    A   No.
23    Q   Did you steal anything from William Lester's
24 family?
25    A   No. Not that I remember, no.

Page 155

1    Q   Now, is it true that you did tell Detective
2 York in your February 2011 interview with him that you
3 had stolen before, correct?
4    A   I'm not sure.
5     MR. SLOSAR: While Derrick's looking for that,
6 we are going to make the same request that Exhibit 4
7 be placed under the protective order as a medical
8 record.
9     MR. WRIGHT:   Sure.
10 BY MR. WRIGHT:
11    Q   So you're statement in the transcript PL24.
12 "Have you ever stolen anything in your life?" Answer,
13 "Yes." And were you telling the truth?
14    A   If that's what it says, yes.
15    Q   Okay. Were you stealing at the time of 2010?
16     MR. SLOSAR: Objection to form. Foundation.
17 You can answer to the extent you understand the
18 question.
19    Q   Were you stealing from others in 2010?
20    A   If what I meant by stealing, I wouldn't go
21 steal off a person. If I stole something out of a
22 store, that -- I consider that was -- I didn't steal off
23 someone. And I'm sure I told Detective York that, it's
24 just not -- it's -- I don't know where it's at.
25    Q   So your testimony is you've stolen from

Page 156

1 stores, but not individuals?
2    A   Not stores. I'm not -- I -- I've stolen from
3 a store before?
4    Q   Just once?
5    A   I'm not sure.
6    Q   But you deny stealing from any person; is that
7 what you're saying?
8    A   Yes.
9    Q   Kayla Mills gave a statement to Detective York
10 and she said that she never talked to you; is that true?
11     MR. SLOSAR: Objection to form. Again,
12 Derrick, if you can clarify as to -- the way you've
13 asked it, it -- it's unclear as to whether you're
14 asking her whether Kayla Mills give that statement
15 to York or whether Kayla Mills had a conversation or
16 interaction with Ms. Hoskins about the underlying --
17     MR. WRIGHT: I understand.
18     MR. SLOSAR: -- substance.
19     MR. WRIGHT: I'll refrain -- I'll rephrase.
20 BY MR. WRIGHT:
21    Q   Kayla Mills told Detective York that she
22 didn't talk to you. Is it true that Kayla Mills did not
23 talk to you?
24    A   Do you mean like she had never spoke to me
25 before?

Page 157

1    Q   I mean, did you-all speak?
2    A   I've spoke to her.
3    Q   Was that regularly?
4    A   When I would see her.
5    Q   Did you have her phone number?
6    A   No.
7    Q   Did Jonathan date her at a point in time?
8    A   Yes.
9    Q   Do you know when that was?
10    A   No.
11    Q   Did you talk to her very regularly when they
12 dated?
13    A   Just when I would see them.
14    Q   And I think you said though you had never --
15 do you know whether she had a cell phone in 2010?
16    A   I'm not sure.
17    Q   Would you ever -- do you know where Kayla
18 Mills lived?
19    A   Yes.
20    Q   Where did she live?
21    A   Really close to Will in front of Escoe's
22 Market.
23    Q   Was that her own place or was that her
24 mother's place; do you know?
25    A   Her mother.

Case: 6:17-cv-00084-REW-HAI Doc #: 200-1 Filed: 07/31/19 Page: 43 of 107 - Page
The Deposition of AMANDA HOSKINS, taken on March 26, 2013
ID#: 9019

158..161

Page 158

1   Q   Who is her mother?
2   A   Donna.
3   Q   Did you know Donna Mills?
4   A   I've talked to her.
5   Q   Would you call her on the phone?
6   A   No.
7   Q   Did you know her phone number?
8   A   No.
9   Q   Were – William Lester and Donna, did they
10  know each other?
11  A   Yes.
12  Q   How well?
13  A   I'm not sure how well.
14  Q   Did he know Kayla Mills?
15  A   Yes.
16  Q   Would they call each other?
17  A   No.
18  Q   Would he call Donna Mills?
19  A   I'm not sure who he called.
20  Q   Do you ever have a memory of him calling Donna
21  Mills?
22  A   No.
23  Q   No?  Do you know who Bob Smith is?
24  A   Know of him.
25  Q   What do you know of him?

Page 159

1   A   That he sells pills.
2   Q   Is he still alive or is he dead?
3   A   I was told he died.
4   Q   Was he a – to your understanding, was he a
5   drug dealer in 2010?
6   A   Sounds right.
7   Q   Did you ever – did William Lester ever buy
8   drugs from Bob Smith?
9   A   Yes.
10  Q   Joe King buy drugs from Bob Smith?
11  A   Yes.
12  Q   Did they buy drugs from Bob Smith for you?
13  A   William Lester, yes.  Joe King, I'm not sure.
14  He could have bought them for himself too.
15  Q   Was that before or after December 2010?
16  A   Probably both.
17  Q   Both.
18  A   I would –
19  Q   Did Bob Smith deny selling any drugs to you,
20  to your knowledge?
21      MR. SLOSAR:  Objection to form.  Calls for
22  speculation.
23  Q   Did you – do you have any knowledge that he
24  ever denied that?  Did he ever give that statement to
25  anybody?

Page 160

1   A   No.
2   Q   Okay.  So William Lester had an interview with
3   Detective York that's recorded and there's a transcript
4   beginning at PL010183.  And he asked William Lester to
5   give a list of drug dealers that Amanda goes to.  And he
6   says, "Bob Smith."  Did you go to Bob Smith for drugs?
7       MR. SLOSAR:  Objection to form.  You can
8   answer.
9   A   I've never bought off Bob Smith.
10  Q   He may have been talking about himself buying
11  for you?
12  A   Yes.
13      MR. SLOSAR:  Objection to form.  Calls for
14  speculation.
15  Q   He says you used to go to Cleo Brown.  Was
16  that – did you ever buy drugs off of Cleo Brown?
17  A   I have.
18  Q   You have personally?
19  A   Yes.
20  Q   When was that?
21  A   I'm not sure.
22  Q   Was it after Katherine Mills was found dead or
23  before?
24  A   I'm not sure.
25  Q   He says there's a guy named Jason Messer.  Did

Page 161

1   you buy drugs off a person by the name of Jason Messer?
2   A   No.
3   Q   Do you know the name Jason Messer?
4   A   I do.
5   Q   To your understanding, is he a drug dealer?
6   A   I've heard that.
7   Q   There's another name, S-Y-M-M-E-S Ford.  I
8   don't know, is that Symmes?  Does that ring a bell?
9   A   No.
10  Q   You never bought off a person by the name of
11  Ford?
12  A   No.
13  Q   Rick Neighbor?
14  A   No.
15  Q   A person by the name of Red Bones?
16  A   No.
17  Q   Did William Lester or Joe King ever buy drugs
18  off Red Bones for you?
19  A   Not that I know of.
20  Q   Is there a drug dealer named Red Bones that
21  you're aware of?
22  A   No.
23  Q   What about Rick Neighbor?  Are you aware of a
24  drug dealer by that name?
25  A   No.

Page 162

1   Q   Danny Jackson?
2   A   No.
3   Q   You never bought drugs off somebody by the
4   name of Danny Jackson?
5   A   No.
6   Q   You know if William Lester or Joe King bought
7   off those people for you?
8   A   I'm not sure.
9   Q   Did you know Allen Helton before January -
10  December 2010?
11  A   I don't know him.
12  Q   You don't know him at all?
13  A   What I've seen in this case.
14  Q   Had you ever seen him face to face?
15  A   No.
16  Q   Had you heard William Lester talk about him?
17  A   I've heard his name.
18  Q   Was that before that Katherine Mills was found
19  dead or was it afterwards in the case?
20  A   I'm not sure when.
21  Q   Do you have any information that he's an
22  informant for law enforcement?
23  A   Do I have information?
24  Q   Yes.
25      MR. SLOSAR:  I can - other than through -

Page 163

1      MR. WRIGHT:    Just factual information.
2   Not -
3      MR. SLOSAR:  - communication - but factual
4   information learned through communication with
5   counsel, obviously remains privileged.  So you
6   can't -
7      MR. WRIGHT:  But you can't hide the facts
8   behind privilege though.  She knows facts that he
9   was an informant.
10     MR. SLOSAR:  Well, I mean, Derrick
11  respectfully, you wouldn't even let me ask your
12  client what documents he reviewed prior to being
13  deposed.  And you're asking her information that she
14  learned during the course of conversations with her
15  counsel.  It seems -
16     MR. WRIGHT:  I didn't ask that.  I just asked
17  if she had information.  Do you have any facts that
18  he was an informant?
19     MR. SLOSAR:  And I am telling you that you
20  should only answer that question based upon
21  information that you learned outside of
22  conversations with your counsel.  So if you know
23  outside of conversations with any of your attorneys
24  or investigators that Allen Helton was an informant,
25  you may answer.

Page 164

1   A   No.
2   BY MR. WRIGHT:
3   Q   You don't know.  Have you read your complaint?
4   A   That's something with my lawyer that I've
5   done.
6   Q   Well, it says that Allen Helton was an
7   informant, but you don't know anything about that?
8      MR. SLOSAR:  Mr. Wright, respectfully
9   instructing your client not to answer your question if
10  it delves into communication that she had with
11  your - her counsel.  She's told you that she
12  doesn't have independent knowledge of Helton being
13  an informant outside of conversations with her
14  counsel.  You're continuing to go - to inquire as
15  to where she learned that information in the
16  complaint.  It's clear that that is protected by the
17  attorney-client privilege.  Please move forward.
18  Q   So you've never seen any documents,
19  independent documents, not that were created by your
20  attorneys from a law enforcement agency from anywhere
21  that Helton was an informant?
22     MR. SLOSAR:  Or shown to her by her attorneys,
23  which would get back into privilege, right?
24     MR. WRIGHT:  I didn't ask them if it was shown
25  to you?

Page 165

1      MR. SLOSAR:  It doesn't -
2      MR. WRIGHT:  Are you going to instruct her not
3   to answer on that?  That's fine if that's what
4   you're going to do.
5      MR. SLOSAR:  Answer - Amanda, you can answer
6   the question as to whether you've seen confidential
7   informant documents relating to Allen Helton.
8   A   No.
9   BY MR. WRIGHT:
10  Q   No?  Can you turn to Interrogatory number 11?
11  Have you read that?
12  A   Yes.
13  Q   All right.  So I've asked for any - if Jason
14  York has coerced any witness in his investigation of
15  you.  Do you see that in Interrogatory number 11?
16  A   Yes.
17  Q   So there begins - the answer begins on the
18  next page but carries on.  And the first full paragraph
19  of the next page where it says, "To begin."
20  A   Yes.
21  Q   Do you see that?
22  A   Yes.
23  Q   It says, "Defendants York and Pickard met with
24  Bob Smith to promise to sweep his drug cases under the
25  rug so long as he deviated from prior allegations

Page 166

1 against Mr. Simpson and Helton." Do you see that?
2    A. Yes.
3    Q. Now, you've never spoken to Bob Smith
4 directly, correct?
5    A. Right.
6    Q. Do you know who Bob Smith gave that
7 information to?
8    A. No.
9    Q. Did this information come from anywhere other
10 than your counsel?
11    A. My counsel -- like right here? My -- her?
12    MR. SLOSAR: So you have the attorney-client
13    privilege with regard to us, with regard to the
14    representation your underlying criminal case and
15    that would include not only the attorneys but
16    investigators and whatnot working for them. So I
17    think what he's trying to ask you is, do you have
18    any independent knowledge other than from anyone on
19    your legal team that these defendants did this to
20    Bob Smith. Is that right, Derrick?
21    MR. WRIGHT: Yeah.
22 BY MR. WRIGHT:
23    Q. Do you have any independent knowledge of this
24 information about Bob Smith?
25    A. No.

Page 167

1    Q. Do you know who Bob Smith spoke to on your
2 legal team?
3    A. I'm not sure.
4    Q. Okay. The next paragraph says, "On May 16,
5 2011 Defendant York fabricated a statement attributed to
6 Christy Branson." Do you see that?
7    A. Yes.
8    Q. Now, she was a cell mate of yours, right?
9    A. I was in the same cell with her.
10    Q. What -- how was that set up? Did you just
11 have one cell mate or were you in a room with a bunch of
12 cell mates?
13    A. It was a cell. It was a really big cell, lots
14 of beds.
15    Q. Do you remember anybody else who was cell
16 mates with you that overlapped with Christy Branson?
17    A. Her -- I know there was a group of co-
18 defendants in there. Mills is all. I'm not -- Sue
19 Mills and Jenny -- Jennifer Mills.
20    Q. Is it true that Branson was a cell mate of
21 your in both Knox County and Harlan County?
22    A. Yes.
23    Q. Did you tell her any facts about the Katherine
24 Mills' murder?
25    A. No.

Page 168

1    Q. Did you speak to her -- in May of 16, 2011,
2 were you still cell mates with Christy Branson at that
3 time?
4    A. What is it again?
5    Q. May 16, 2011 is when your answer says she gave
6 her statement to Branson. Do you know whether you were
7 still her cell mate at that time?
8    A. I'm not sure of the dates. At Knox County, it
9 was a holding cell, so they were all called in waiting
10 to get transported to Harlan. And I was one of them.
11 But to the best of my knowledge, she was passed out the
12 entire time. They had to wake her up to ship her out.
13    Q. In Knox County?
14    A. Yes.
15    Q. What about Harlan County?
16    A. I'm not sure. I'm not sure of the dates when
17 we were up there.
18    Q. Have you ever spoken to Christy Branson
19 regarding her interview with Detective York?
20    A. No.
21    Q. Do you have any independent knowledge of the
22 circumstances of the interview between defendant York
23 and Christy Branson?
24    A. No.
25    Q. No. Do you know who on your legal team has

Page 169

1 talked to Christy Branson?
2    MR. SLOSAR: I am going to assert the attorney-
3    client privilege and tell you not to answer that
4    question.
5    Q. Are you going to take the advice of counsel
6 and not answer that question?
7    A. Yes.
8    Q. Now, the next paragraph says, "On June 24,
9 2011 that defendant York fabricated a report on behalf
10 of Joe King that falsely implicated plaintiffs in the
11 murder of Ms. Mills." Do you see that?
12    A. Yes.
13    Q. Did you -- you weren't present for the
14 interview between defendant York and Joe King, correct?
15    A. Correct.
16    Q. And you weren't present for the interview
17 between defendant York and Christy Branson, right?
18    A. Right.
19    Q. Going back to the Joe King statement, did you
20 have any independent discussions with Joe King about
21 what he told defendant York?
22    A. No.
23    Q. No. Do you have a memory of what the false
24 statement was from Joe King about you to defendant York?
25    A. I'm not sure.

Page 170

1    Q   It is true, though, that you did – or you
2  overheard William Lester speak to Joe King about
3  Katherine Mills having money prior to her being found
4  dead, correct?
5    A   Can you ask it again?
6    Q   Sure.  You've allege that his statement was
7  false, but it is true that you overheard William Lester
8  talk to Joe King about Katherine Mills having money
9  before she was found dead.  That is true, right?
10      MR. SLOSAR:  Objection to form.
11   Q   Isn't that true?
12   A   Can you ask it again?
13   Q   Sure.  You've alleged that Joe King gave false
14  statements to Detective York.  That's what this
15  paragraph is saying, right?
16   A   That's what it says.
17   Q   Yeah.  But it is true that you overheard
18  William Lester talking to Joe King about Katherine Mills
19  having money before she was found dead?
20   A   I overheard William Lester telling Joe that he
21  should lock his ex mother-in-law in the outhouse and
22  take her money and not hurt her.
23   Q   So if Joe King said that to Detective York,
24  that part of the statement would be true, right?
25      MR. SLOSAR:  Objection to form.  Calls for

Page 171

1  speculation.  You can answer to the extent you
2  understand the question.  Or if you want to show her
3  the statement, maybe that would help.
4    A   You want to ask it again?
5    Q   No, I think I've got enough from you on that.
6      MR. WRIGHT:     We've been going for an hour.
7  Let's take a little break and I'll see if I can
8  finish up so we can pass to the other defendants.
9  All right.
10      VIDEOGRAPHER:  Off the record at 2:03.
11   (OFF THE RECORD)
12      VIDEOGRAPHER:  Back on the record at 2:13.
13  BY MR. WRIGHT:
14   Q   All right.  Ms. Hoskins, we're back on.  You're
15  still under oath.  I'm just going to run through some of
16  the people who were witnesses in the criminal matter.
17  And just find out – let's start with Robert Beach.  Do
18  you have any firsthand knowledge of the circumstances
19  between Detective York and his interview of Robert
20  Beach?
21   A   No.
22   Q   Do you have any second hand information aside
23  from what may have – you spoken to your attorneys or
24  their investigators, their team, do you have any second
25  hand information about Robert Beach?

Page 172

1    A   I've had conversations with my attorneys.
2    Q   Well, I don't want to get into your
3  conversations with your attorneys.  Just people other
4  than your attorneys, have you had any information
5  relating to Robert Beach?
6    A   No.
7    Q   How about Daniel Wilson?  Do you have any
8  first hand interactions with Daniel Wilson?
9    A   No.
10   Q   And you don't have any firsthand knowledge of
11  the circumstances of the statement by Daniel Wilson to
12  Detective York?
13   A   No.
14   Q   Have you gotten any second hand information
15  about his statement to Detective York from sources other
16  than your attorneys or their team?
17   A   No.
18   Q   Kayla Mills, she gave a statement to Detective
19  York.  Do you have any firsthand knowledge of the
20  circumstance of her statement to Detective York?
21   A   No.
22   Q   Do you have – have you gotten any second hand
23  information from sources other than your attorneys or
24  their –
25   A   No.

Page 173

1    Q   – teams?  No.  The statement by Allen Helton
2  to Detective York of March 2012, I believe, do you have
3  any firsthand knowledge of that statement?
4    A   No.
5    Q   Do you have any second hand knowledge of
6  sources other than your attorneys?
7    A   No.
8    Q   Have you had any discussions with Jessie
9  Lawson about the Katherine Mills murder?
10   A   No.
11   Q   None at all?
12   A   No.
13   Q   Have you had any discussions with Jennifer
14  Lawson about the murder?
15   A   No.
16   Q   None?
17   A   No.
18   Q   Michelle Edwards, did you have any discussions
19  with her about Katherine Mills' murder?
20   A   No.
21   Q   And when I say "murder," I'm going to include
22  the investigation of her murder –
23   A   No.
24   Q   – in that, so Jessie Lawson, Jennifer Lawson,
25  Michelle Edwards, you had no discussions about the

Page 174

1  investigation with them?

2    A  No.

3    Q  William Lester, did you have any discussions

4  with him about the Katherine Mills murder or the

5  investigation?

6    A  No.

7    Q  None?

8    A  None.

9    Q  Well, I mean, obviously he told you about when

10  it first happened, right?

11    A  No.

12    Q  He picked you up and he said Katherine had

13  been found outside, I think was your words?

14    A  In the yard.

15    Q  Did you understand that she was dead?

16    A  No.

17    Q  Who told you that she had died?

18    A  When they came back and they were crying, I

19  just figured that's what had happened.

20    Q  And they came back later that night?

21    A  To get their kids.

22    Q  And you figured that's what happened, then you

23  heard reports on the news?

24    A  I did hear it on the news.

25    Q  Did you – and after that night, you didn't

Page 175

1  have any discussions with William Lester about the

2  Katherine Mills' murder investigation?

3    A  No.

4    Q  What about Johnathan Taylor?  Have you spoken

5  to him about the Katherine Mills' murder?

6    A  No.

7    Q  None at all?

8    A  None.

9    Q  Did you correspond with him while you were in

10  jail?

11    A  We went to court together.  That's it.

12    Q  And it never came up?

13    A  No.

14    Q  Did you ever offer to take a polygraph?

15    A  Yes.

16    Q  When?

17    A  I begged Detective York for one.

18    Q  When did you do that?

19    A  When Detective Broughton – I guess

20  Detective – when Mike Broughton and Detective York had

21  me at the City Hall.

22    Q  So that was in February.

23    A  That was the first time I asked for one.

24    Q  February 2011, I believe, is the date of that.

25    A  I think so.

Page 176

1    Q  And you asked for a polygraph at that time?

2    A  Yes.

3    Q  What did they tell you?

4    A  Ignored it.

5    Q  And you – I think you may have said that that

6  was the first time.  Did you do it again as –

7    A  I – I've asked several times.

8    Q  When else did you ask for a polygraph?

9    A  When I had my DNA.  I asked that time.  And –

10    Q  And was that Detective York?

11    A  Yes.  And the time before that would have been

12  when I was charged at Laurel County Jail.

13    Q  Detective York was there for that?

14    A  Yes.

15    Q  Anybody else?

16    A  No.

17    Q  Did your defense team ever – let me ask it

18  this way.  Did you ever look into an independent

19  polygraph?

20       MS. STAPLES:  I object.  Privilege.

21       MR. WRIGHT:  Are you going to not – are you

22    instructing her –

23       MS. STAPLES:  Yes.  I am instructing her not to

24    answer.

25  BY MR. WRIGHT:

Page 177

1    Q  Are you going to follow your advice of counsel

2  and not answer?

3    A  Yes.

4    Q  Okay.

5       MR. WRIGHT:  We'll reserve certifying those

6    questions.  That one and the others for which we've

7    had instructions, okay counsel?

8       MS. STAPLES:  Yes.

9  BY MR. WRIGHT:

10    Q  Was your criminal trial for this murder charge

11  continued on occasion?

12    A  Many – many times.

13    Q  Did you ever agree to any of those?

14    A  No.

15    Q  Was there one occasion where Jonathan Taylor's

16  attorney requested a continuance?

17       MS. STAPLES:  Objection.  Calls for speculation

18    on her part.

19    Q  In open court did that happen?  Do you have

20  any memory of it?

21    A  I'm not sure.

22    Q  You don't remember that?

23    A  No.

24    Q  Who's Ruben York; do you know?

25    A  I think I heard that is Mr. – or Detective

Page 178

1    York's father.
2        Q    When did you learn he was Detective York's
3    father?
4        A    I'm not for sure.  I was working at the Public
5    Defender's Office in Bell County.
6        Q    So you were in custody on your murder charges.
7    Do you know when you got out of custody on those?
8        A    The end of February and I'm not even for sure
9    the year.
10       Q    They were just -- the charges were dismissed I
11   want to say in -- is it 2015?
12       A    I'm not sure.
13       Q    Maybe 2016.
14       A    No.  I know it wasn't 2016.
15       Q    So you were out of jail, but you were still
16   under the charges when --
17       A    Yes.
18       Q    How did you come to meet him?
19       A    Meet who?
20       Q    Ruben York?
21       A    I never met him.  Like myself go to meet him,
22   I never did that.
23       Q    When did you encounter him?
24       A    I -- there's a back door that goes from the
25   office, the Public Defender's Office, and one time I got

Page 179

1    my nerve up to walk by myself to the Dollar Store
2    because I still have that fear.  I don't go anywhere by
3    myself.  It's got better now, but I walked from the
4    Dollar -- or from the office to the Dollar Store and on
5    the way back there was this black SUV, Ford Explorer to
6    be exact, dark windows.  And it was right behind me in
7    the alley.  I walked on down.  I made it to the back
8    door, walked a little faster.  Before I got to the back
9    door, and he pulls up beside me, rolls his window down.
10   And he asked me what I was doing.  I said, "Going back
11   to work."  It startled me.  Never seen this man before
12   in my life.  He said, "Don't you remember me?  No, don't
13   remember you."  And somewhere in there he told me he had
14   took me to the park this time last year.  And I knew
15   that wasn't true because I was in jail.
16       Q    What city was this in?
17       A    Pineville.  Bell County.
18       Q    Did you have any more encounters with him
19   after that?
20       A    I -- I did.  I went to Knox County Court, not
21   for sure when.  Just sometime after on the murder
22   charges.  And as we came out I said, "There's that
23   vehicle."  And he had his window half way down.  And not
24   for sure who I was with.  Someone from the office got --
25   she said, "Are you sure?"  And my mom was actually with

Page 180

1    us and my mom followed him to Pineville as I road back
2    with the other woman.  And he went to the bank and then
3    he came back to the office and turned in the back
4    alleyway again.
5        Q    Was that the last encounter you had with him?
6        A    Yes.
7        Q    Do you -- I think I missed one here.  Do you
8    have any direct knowledge of the circumstances of the
9    statement by Amber Simpson to Detective York?
10       A    No.
11       Q    Do you have any second hand information of
12   those circumstances from sources other than your
13   attorneys or their staff?
14       A    No.
15       Q    Do you have any knowledge of a falsified
16   medical record?
17           MR. SLOSAR:  Other than through --
18       A    No.  Like, not other -- other than my
19   attorney, no.
20       Q    So you didn't review that document and say it
21   was falsified?
22           MR. SLOSAR:  I would instruct you, Amanda, to
23       answer that question only to the extent if you
24       reviewed that document outside the presence of your
25       attorneys or investigators.

Page 181

1    BY MR. WRIGHT:
2        Q    Have you ever reviewed that document
3    independently?
4        A    No.
5        Q    So prior to meeting your attorneys, did you
6    have any independent basis to believe that that -- any
7    record had been falsified?
8        A    Before what?
9        Q    Before meeting with your attorneys, if you
10   reviewed that with them or not, did you have any
11   independent basis to believe that a medical record had
12   been falsified?
13       A    I've never looked at a medical record without
14   them.
15       Q    Can you turn to Interrogatory number 5?  Do
16   you see that question?
17       A    Yes.
18       Q    And then your answer gives a description.  I
19   had asked for an amount of damages, but there's no
20   amount in there; is that correct?
21       A    Correct.
22       Q    Is that correct, there's no amount in there?
23       A    That's correct.
24       Q    So do you have any independent way of valuing
25   the damages you've suffered, putting a number figure on

Page 182

1  it?

2      MR. SLOSAR:  I would instruct my client not to

3  answer that question based upon conversations that

4  she's had with her counsel, so...

5  BY MR. WRIGHT:

6      Q   Well, do you have any independent way to put a

7  number on the damages you claim?

8      MR. SLOSAR:  He's asking you the value -- the

9  value of what you lost essentially?

10     A   I'm still losing today so...

11     Q   Read your interrogatory answer.  Take a

12  moment.  And let me know if there's anything you want to

13  add to that.

14     MR. SLOSAR:  And this is 6, correct?

15     MR. WRIGHT:  Number 5, I believe.

16     MR. SLOSAR:  Oh, 5.  The second page.  Thank

17  you.  Sorry.

18     MR. WRIGHT:  We can go off the record for a

19  minute while she reviews this since she's --

20     MR. SLOSAR:  That's fine.

21         (OFF THE RECORD)

22     THE WITNESS:  I still -- I'm still dealing with

23  this daily like I'm still going through it.

24  BY MR. WRIGHT:

25     Q   And I understand.  Is there anything you want

Page 183

1  to add to that statement?  And what I'm getting at is

2  there anything more you're going to tell a jury?

3      A   I mean, I live my life every day on a camera

4  because the fear of someone lying on me.  In my house,

5  camera.  I walk out my door, camera.  In my car, camera.

6  I'm constantly taking pictures.  I'm constantly looking

7  out my window.  I have a 9-year-old little girl.  She's

8  10 now.  That brings me her phone because Kentucky State

9  Police is sitting in front of my house constantly.

10     Q   You need a tissue?

11     A   So it's every day something new.  My little

12  boy, he's not allowed over to a friend's house now.

13  Friend's not allowed over there to my house because they

14  pulled his mom up on jail tracker.  It's just something

15  every day.

16     Q   And you said you live with your -- still live

17  with your mother, right?

18     A   Right.

19     Q   And it's a new location since 2010, right?

20     A   Right.

21     Q   What is the current address?

22     MR. SLOSAR:  I can -- we will provide that

23  information to you under protective order so that --

24  the few defendants that may not know will not know,

25  and we'll do it for attorneys' eyes only.

Page 184

1  BY MR. WRIGHT:

2      Q   And you say KSP is around?

3      A   Yes.

4      Q   How often?

5      A   At least three nights, two nights a week.

6      Q   Are they like parked, driving by?

7      A   Parked.

8      Q   And I don't know the location, so is it like

9  parked in a driveway, parked in a store parking lot?

10     A   Just parked pointed right toward my house

11  across the street.

12     Q   What's across -- is it a house across the

13  street, a vacant lot, a business?

14     MR. SLOSAR:  I think that gets into the -- I'm

15  happy to provide you the address for attorneys' eyes

16  only.  And you can do a search and see what's across

17  the street.  It's a public area to park across the

18  street.

19     MR. WRIGHT:  So you're going to instruct her

20  not to answer what's across the street?

21     MR. SLOSAR:  What she's testifying is that she

22  feels threatened by people from the agency that she

23  is suing.  And to the extent that there are

24  defendants in the room, I would prefer to disclose

25  her address to you under attorneys' eyes only, so

Page 185

1  that these threats don't worsen.  That's all I'm

2  saying.  You'll see when you get the address what is

3  across the street.  And if I -- and if you learned

4  it here, you would know exactly where her house is.

5  BY MR. WRIGHT:

6      Q   So you're not going to answer the question

7  about what's across the street.  You take your counsel's

8  advice on that?

9      MR. SLOSAR:  Yes.

10     A   Yes.

11     Q   As of the date of these interrogatory answers

12  number -- your answer to Interrogatory number 6

13  indicated that you hadn't received any professional

14  treatment for any of your injuries; is that still true?

15     A   Yes.

16     Q   All right.  I think I'm just about finished.

17  Has -- I asked if Jon -- if you had talked to Jonathan

18  Taylor about the case, but I want to be clear, has

19  Jonathan Taylor talked to you about the Katherine Mills'

20  murder investigation?

21     A   No.

22     Q   Okay.  Do you recall what Jonathan Taylor

23  looked like in December of 2010?

24     A   Just what I said in the discovery.  I can't go

25  back and say he looked like this day.

Page 186

1    Q   Did he have any tattoos?
2    A   I'm – I'm not sure where.
3    Q   Did he have any tattoos on his arm?
4    A   I don't remember.
5    Q   Does he have any tattoos on his arm now?
6    A   I'm – I'm not sure.
7    Q   Did he get any tattoos while he was in jail?
8    A   I'm not sure.
9    Q   Do you know – have you seen Jonathan Taylor
10   since you-all have been out of custody?
11   A   Yes.
12   Q   Where's he live now?
13       MR. SLOSAR:  I mean, I will – again, I'll
14   provide Mr. Taylor's address to you under an
15   attorneys' eyes only protective order.
16   BY MR. WRIGHT:
17   Q   Can – are you going to follow your attorney's
18   instruction not to answer that question?
19   A   Yes.
20   Q   Does Jonathan Taylor live in Knox County?
21       MR. SLOSAR:  You can answer.
22   A   No.
23   Q   No.  Okay.  All I want to know is, does he
24   live within an hour of where you live?
25       MR. SLOSAR:  Don't – you'll have the address

Page 187

1    under a protective order.  I'm going to instruct you
2    not to answer that question.  And if they continue,
3    I'll just seek a protective order on this entirety.
4    BY MR. WRIGHT:
5    Q   So you don't – do you call him on the phone?
6    A   I – I see him when he stops to see my mom.
7    Q   How often do you see each other?
8    A   I'm not sure.
9    Q   Did he ever get a teardrop tattoo?
10   A   (NO VERBAL RESPONSE.)
11   Q   No?
12   A   Not – I'm not sure.  Not that I know of.
13   Q   Okay.  Has he been arrested since he's been
14   out of custody, to your knowledge?
15   A   Yes.
16   Q   When was that?
17   A   I'm not sure.
18   Q   How many times has he been arrested since
19   you've been out of custody?
20   A   I'm not sure.
21   Q   More than once?
22   A   I don't know.  I'm not sure.
23   Q   Do you know if he's been convicted of any
24   crime since you've been out of custody?
25   A   Not that I know of.

Page 188

1    Q   During his arrest, do you know whether – how
2    long he was in custody?
3    A   When he got arrested –
4    Q   Yes.
5    A   – like for the murder charge?
6    Q   No.  After you-all had been released from
7    that, has he been arrested since then?
8    A   Is that the question you just asked me a
9    minute ago?
10   Q   Yes.  Yeah.
11   A   Yes.
12   Q   He has.  And you didn't know how many times,
13   right?
14   A   No.
15   Q   And you don't know how long he may have been
16   in custody for those subsequent arrest, right?
17   A   No.
18   Q   Do you know what the arrest was for?
19   A   I don't remember.
20   Q   Did William Lester have any relationships to
21   your knowledge to any other women during this time
22   period, 2010?
23   A   (NO VERBAL RESPONSE.)
24   Q   No?
25   A   I don't remember.

Page 189

1    Q   That's all I have.  Oh, that's okay.  Well,
2    one last question.  Do you know who Jason Bunch is?
3    A   He did introduce his self last time we were
4    all here at the other place.
5    Q   As far as the investigate – the Katherine
6    Mills' investigation, did you have any interaction with
7    him to your memory?
8    A   With Jason Bunch, right?
9    Q   Right.  Yes.
10   A   No.
11   Q   No.  Do you have any knowledge of his
12   involvement in this from sources other than your
13   attorneys about what role he had in the Katherine Mills'
14   investigation?
15   A   No.
16       MR. WRIGHT:  That's all I have.
17       MR. KELLEY:  I think I'm next.  Do you want me
18   up there or –
19       COURT REPORTER:  No.
20       MR. KELLEY:  – can you get me from here?
21       COURT REPORTER:  I can hear you.  You're good.
22       MR. KELLEY:  We're good.  Okay.  It's all right
23   with you if we proceed?  I assume it is.
24       MR. SLOSAR:  Yeah.  Of course.  You've got that
25   booming voice.

Case: 6:17-cv-00084-REW-HAI   Doc #: 200-1   Filed: 07/31/19   Page: 51 of 107 - Page
ID#: 9027
The Deposition of AMANDA HOSKINS, taken on March 26, 2019
190..193

Page 190

1      MR. KELLEY:  Thank you.
2                    EXAMINATION
3  BY MR. KELLEY:
4      Q   All right.  Again, Ms. Hoskins, my name is
5  John Kelley.  I'm here today representing Knox County
6  including the Sheriff's Department.  I'm also here
7  representing John Pickard, who was sheriff at the time
8  that Ms. Mills was killed.  I'm also here representing
9  Derek -- (clears throat) excuse me -- Derek Eubanks,
10  who's a deputy with the Knox County Sheriff's Department
11  at the time that Ms. Mills was killed.  Let me start
12  first with Ms. -- with Deputy Eubanks.  And he's the
13  gentleman -- handsome gentleman in the far corner of the
14  room.  Okay.  Do you know Deputy Eubanks?
15     A   No.
16     Q   All right.  I take it then you've never
17  been -- do you -- and I mean that not only do you know
18  him, have you ever had any contact with him?
19     A   No.
20     Q   Okay.  Do you remember any instances where
21  you've been stopped by him as a deputy?
22     A   No.
23     Q   Okay.  Likewise, do you know -- other than
24  what your attorney has told you, can you tell me what
25  role Deputy Eubanks had in the investigation of Ms.

Page 191

1  Mills' murder, if any?
2      A   I've never heard of anything besides what I've
3  talked with my attorneys about.
4      Q   Okay.  I have to admit, I'm very confused on
5  that point because I see him in the caption, I see him
6  in the introductory paragraph, I see him identified as a
7  deputy sheriff, but I don't see anything that
8  specifically says he did anything wrong or did anything
9  to harm you.  Do you know of anything he did to harm
10  you?
11      MR. SLOSAR:  Aside from communication you had
12      with your counsel.
13     A   No.
14     Q   Okay.  Do you know of any animosity he bears
15  you or any grudge or anything that you may have heard of
16  as scuttlebutt or on publics or topics or whatever it is
17  that people use these days?
18      MR. SLOSAR:  I'm going to object to the form.
19      She's answered.
20     Q   Okay.  Before Ms. Mills' murder, do you know
21  how many times you may have been stopped, arrested,
22  interviewed or had any contact with members of the Knox
23  County Sheriff's Department?
24     A   I'm not sure of any.  I'm not sure.
25     Q   Okay.  You mentioned Deputy Liford; is that

Page 192

1  correct?
2      A   Yes.
3      Q   Okay.  And he apparently had some role in your
4  arrest, I think, at times after Ms. Mills' murder; is
5  that correct?
6      A   After -- yes, he showed up when I got arrested
7  the second time -- the second -- on that gun charge.
8      Q   Okay.  Did he say anything in your presence?
9      A   Just in the car on the way back.
10     Q   Okay.  You told me about the -- he said
11  something about all of us are murderers; is that
12  correct?
13     A   Yes.
14     Q   All right.  First of all, did you know Deputy
15  Liford before that incident?
16     A   No.
17     Q   Okay.  Do you know -- if I were to tell you he
18  was a preacher would you -- did you know that?
19     A   I would believe that, because the music I
20  heard, like he played his good, like Christian music.
21     Q   All right.  Did you consider his comment to be
22  threatening.
23     A   I didn't know -- I don't know how to take that
24  comment.  That's the only thing he said to me.  And that
25  was it.  I -- I -- I don't feel threatened by Buster.

Page 193

1      Q   Did you feel intimidated or somehow that he
2  was wanting you to say something back?
3      A   I felt like that at the time that he might of
4  wanted me to say something, but then again, I
5  couldn't -- I wasn't sure.
6      Q   All right.  Did you say anything back?
7      A   No.
8      Q   Okay.  Do you -- I think you also said there
9  was another incident and maybe there were more where
10  Deputy Liford was present.  I thought you said he was
11  there when you were with Joe at that house that Mr.
12  Lester was taking care of, was that -- did I
13  misunderstand you?
14     A   That is what we're talking about where he's
15  at, right, at that house?
16     Q   I'm sorry.  Was that the only time you saw
17  Deputy Liford?
18     A   Yes.
19     Q   I misunderstood.  I thought you had seen him
20  before.  Okay.  Was he present -- I think you told me
21  that Detective York threatened you, had a gun in your
22  face?
23     A   Yes.
24     Q   Was he present?
25     A   I'm not sure if he was in there right behind

Page 194

1  him. He wasn't beside him. I don't know if he came in
2  behind him or how the order went. I just know Detective
3  York was first.
4      Q  Did you observe where he was at the time that
5  Deputy York had the gun in your face?
6      A  I – no, I don't remember.
7      Q  All right. Are you in a position to tell me
8  that he would have seen that?
9      A  No.
10     Q  Okay. After that, what contact did you have
11  with Deputy Liford at that house?
12     A  I don't remember if I had any contact with him
13  at the house.
14     Q  All right. Did anyone say that they were
15  there to make an arrest for criminal trespass?
16     A  No, I – just the indictment warrant was
17  mentioned and I actually didn't know I was getting that
18  criminal trespass that I got until I was already booked
19  in on my indictment warrant at the jail.
20     Q  all right. Do you know who owned the home?
21     A  Someone that Will knew. Is – that's all I
22  know.
23     Q  All right. Likewise, did Will say that he had
24  the right to be in the house?
25     A  Yes.

Page 195

1      Q  He told you that?
2      A  Yes.
3      Q  All right. Did you have any other information
4  to indicate that Will was telling the truth?
5      A  No.
6      Q  Okay. In other words, is it – it was your
7  understanding that Will had the consent of the landowner
8  to be there and that the fact that the lights were on
9  shouldn't have been suspicious to anybody?
10     A  Can you ask it again?
11     Q  Sure. I think that there – I'm going to tell
12  you and I think – I would ask you to presume that there
13  had been a report from the homeowner of a concern that
14  somebody was in the house.
15         MR. SLOSAR: I'm going to object to form.
16  Although there's no question.
17         MR. KELLEY: Well, I haven't finished.
18         MR. SLOSAR: Okay.
19  BY MR. KELLEY:
20     Q  I asked her to presume it. Do you have any
21  basis and that he sent the police out there to find out
22  if somebody was on their property without them knowing
23  it and with that – in their house? Do you have
24  anything to dispute that?
25         MR. SLOSAR: Objection to form. Incomplete

Page 196

1  hypothetical. Calls for speculation. You can
2  answer to the extent you understand his
3  hypothetical.
4      A  I've never heard that.
5  BY MR. KELLEY:
6      Q  All right. So nobody expressed that to you as
7  they were coming to the house that they had no idea who
8  was in that house?
9      A  I never heard that.
10     Q  Okay. It was not mentioned at the scene?
11     A  No.
12     Q  Okay. Were – on that occasion, were there
13  any other members of the Knox County Sheriff's
14  Department present?
15     A  I don't remember if Sheriff Pickard came at
16  the time. I'm – I'm not for sure. I don't remember if
17  he did.
18     Q  All right. So I take it from your answer, you
19  can't tell me whether he saw what you allege that it is
20  that you had a gun in your face at some point?
21     A  Correct.
22     Q  You don't know whether he would have seen
23  it –
24     A  I'm not sure.
25     Q  – or it hadn't been there even?

Page 197

1      A  I really wasn't worried about who was behind
2  who when that gun was right in my face. I was more
3  concerned about my little girl I was holding.
4      Q  Okay. Well, you were taken – am I correct,
5  you were taken into custody at the house?
6      A  Yes.
7      Q  All right. And you were transported to, I may
8  have this wrong, but Knox County Jail?
9      A  That's where they booked me in at was Knox
10  County Jail.
11     Q  All right. How did you get there?
12     A  Buster.
13     Q  Okay. So Mr. Liford?
14     A  Yes.
15     Q  Okay. Was anybody else in the car with him?
16     A  No. Not that I remember.
17     Q  Okay. Do you remember how many cars were out
18  there – I mean, law enforcement vehicles?
19     A  No.
20     Q  Okay. All right. Again, and I'm sorry if
21  I've asked this or making you repeat it. Do you know of
22  any other times – do you know of any other Knox County
23  deputies or members of the sheriff's department that
24  were present during any of the events in the
25  investigation of Ms. Mills' murder where you were the

Page 198

1  subject?

2       MR. SLOSAR:  I'm going to object to form and

3  he's asking you about outside knowledge from your

4  attorneys and investigators, right?

5       MR. KELLEY:  I'm asking her if she knew people

6  there.  I mean, did she see any other.

7       MR. SLOSAR:  I thought you asked her --

8       MR. KELLEY:  If I said -- if I screwed up the

9  question --

10       MR. SLOSAR:  I thought it was, do you have any

11  knowledge of Knox County's participation in the

12  investigation?  That's how I took the question.

13       MR. KELLEY:  Well, let me rephrase it.

14       MR. SLOSAR:  Sorry.

15  BY MR. KELLEY:

16       Q   Did you -- on those occasions, you've told me

17  that, you know, that Detective -- Deputy Liford is

18  there.  You've also told me that the sheriff was there

19  on occasion on these instances where you were part of

20  the investigation where you were apprehended?

21       A   Right.

22       Q   All right.  Did you know -- did you see any

23  other Knox County law enforcement?

24       A   I'm not sure.  I -- I can't remember who took

25  me to jail.  The -- it was the third time that I was

Page 199

1  arrested on that same gun charge.  I think that's the

2  one that we couldn't figure out who picked me up or if

3  that was the case.  But I'm not sure.

4       Q   All right.  Beyond that instance, do you know

5  of any other officers that would have been present, but

6  you've named?

7       A   Not that I'm aware of.

8       Q   Okay.  In your answers to interrogatories, and

9  you may have them open, it's where you're answering

10  questions that were posed by Detective York's attorney.

11  I'm sorry, it's number 19.

12       A   Number what?

13       Q   Interrogatory number 19 has to do with the

14  prior criminal history.  This is -- number 3 is a, I

15  believe a conviction for second-degree assault and

16  first-degree wanton endangerment.  I think that was the

17  instance where involving a motor vehicle and the mirror

18  hitting the little girl?

19       A   Yes.

20       Q   Okay.  That occurred in Knox County?

21       A   Yes.

22       Q   All right.  Was the sheriff's department

23  involved in the investigation of that case?

24       A   Yes.

25       Q   All right.  Can you tell me what members of

Page 200

1  the sheriff's department were involved?

2       A   Thomas -- and I'm not for sure his last name.

3  He actually worked there, then he moved onto the jail.

4       Q   All right.  Was he a member of the sheriff's

5  department at the time of Ms. Mills' murder; to your

6  knowledge?

7       A   Oh, I don't know.

8       Q   Was he ever -- did you ever see him at any of

9  the instances where you were with?

10       A   No.

11       Q   Okay.  Likewise, the Knox County charge and, I

12  guess, 2002, it's a traffic charge leaving the scene of

13  an accident?

14       A   Number 1?

15       Q   Yes.  Number 1.

16       A   Okay.

17       Q   Do you remember the member of the Knox County

18  Sheriff's Department that was involved in the

19  investigation of that accident?

20       A   That's a long time ago.  I was actually a

21  juvenile right here.  I just -- I won't -- Barbourville

22  City would have been that.

23       Q   Okay.  All right.  So the ones I know you've

24  had contact with are Deputy Liford, Deputy Thomas,

25  whatever his last name may be.  And Sheriff Pickard; is

Page 201

1  that correct?

2       A   Yes.  That I can remember, yes.

3       Q   Okay.  Had you had other instances where you

4  would have had contact with members of the sheriff's

5  department where you weren't the subject of the

6  investigation?

7       A   Not that I can remember.

8       Q   All right.  Do you have any instances where

9  you may have been stopped, but they let you go?  And

10  again, I'm talking about Knox County.

11       A   That they had let me go?

12       Q   Yeah.

13       A   No.

14       Q   You were never fortunate enough to be --

15       A   No.

16       Q   They always gave you a ticket.  Okay.  All

17  right.  Do you know any -- again, any animus, any kind

18  of grudge that anybody at the sheriff's department had?

19  And we'll talk about Sheriff Pickard in a second, but

20  other than Sheriff Pickard, do you know of anybody that

21  bore you any animus there?

22       MR. SLOSAR:  Objection to form.  You can

23  answer.

24       A   Not that I know of.

25       Q   Okay.  Let's talk about Sheriff Pickard.  Did

Page 202

1   you know Sheriff Pickard before he became sheriff?
2       A.  No.
3       Q.  Know of him at all?
4       A.  No.
5       Q.  Okay.  Did you know Sheriff Pickard outside of
6   his job?
7       A.  No.
8       Q.  Okay.  In other words, did you have -- see him
9   in church or go on any picnics or anything like that?
10      A.  No.
11      Q.  Before Katherine Mills' murder and did Sheriff
12  Pickard ever stop you or arrest you, question you?
13      A.  No.
14      Q.  All right.  With regard to the incident
15  involving the little girl and the -- being hit by the
16  automobile mirror, was he involved in that
17  investigation?
18      A.  It -- I'm not -- I don't remember if he was or
19  not.
20      Q.  Okay.  Let's talk about subsequent to it.  And
21  you told us of -- I wrote down six different instances
22  where you may have been stopped or arrested after Ms.
23  Mills' murder.  There's an incident, I believe, that
24  occurred in February of 2011.  I don't know that you
25  remember the date.  But it was one where you were taken

Page 203

1   to the city police department.  That would be the first
2   incident, I believe.
3       A.  Yes.
4       Q.  Detective York was involved in that; is that
5   correct?
6       A.  Yes.
7       Q.  All right.  And I thought you told me that --
8   or you told -- you testified that Sheriff Pickard was
9   with him that day.  Did I misunderstand?
10      A.  That he was with him?
11      Q.  Yes.
12          MR. SLOSAR:  I'm going to make an objection to
13  form, foundation.  You can answer to the extent you
14  understand.
15  BY MR. KELLEY:
16      Q.  Do you remember --
17      A.  I don't remember if he came to the house.  I
18  know he wasn't at the police department in the room.
19      Q.  Okay.  Tell me again what happened at your
20  mother's house.  Is that where this occurred?
21      A.  Yes.
22      Q.  All right.  What happened?
23          MR. SLOSAR:  I'm going to object.  This has
24  been asked and answered numerous times.  You can
25  answer.

Page 204

1       Q.  I want some more specifics.  Detective York
2   came; is that correct?
3       A.  Yes.
4       Q.  And you think -- and as I understand it, you
5   think Sheriff Pickard could have been there as well?
6       A.  He might have came, but he didn't -- he
7   wasn't -- he wasn't with us when I got questioned --
8       Q.  Okay.
9       A.  -- at the police department --
10      Q.  Okay.
11      A.  -- City Hall.
12      Q.  All right.  Do you remember him saying
13  anything at your -- while you were there at your
14  mother's house?
15      A.  He talked to my mother.
16      Q.  All right.
17      A.  I do know that.
18      Q.  Did you overhear it?
19      A.  No.
20      Q.  Did your mother later tell you what they
21  talked about?
22      A.  Not on that occasion.
23      Q.  When -- did she ever talk to about what was
24  said at any time?
25      A.  Yes.

Page 205

1       Q.  What did she tell you?
2       A.  When they came to work, he told her he was
3   going out of town and told her to go visit me and see if
4   I would tell her what had happened to Ms. Mills.
5       Q.  I'm not quite understanding.  He -- you're
6   saying that Sheriff Pickard told your mother to ask you
7   what happened to Ms. Mills; is that --
8       A.  He went to my mom's work and he told -- he
9   told her he was going -- that Sheriff Pickard was going
10  out of town.  Would my mom talk to me to see if I would
11  tell her what had happened to Ms. Mills.
12      Q.  Okay.  Did that occur that day when Deputy --
13  when, excuse me, Detective York was there?
14      A.  No.
15      Q.  Okay.  Do you know -- I'm trying to figure out
16  when in this series of events that may have occurred.
17  Did it occur before the first time you -- before this
18  incident at your house where --
19      A.  It would have been --
20      Q.  -- you were arrested there?
21      A.  I -- I was already charged.
22      Q.  Okay.  So it occurred sometime in between?
23      A.  Sometime after I was charged.
24      Q.  All right.  Do you remember -- did your mother
25  tell you how she responded?

Page 206

1    A   I don't remember. I just know –
2    Q   Did she –
3    A   – that –
4    Q   Did she tell you any greater details as to
5  where they were when this conversation occurred?  You
6  said it was at her work?
7    A   Yes.  It was at her work.
8    Q   And you're talking about the Appalachian
9  Children's Home?
10    A   Yes.  And Detective York was there, also.
11    Q   Okay.  So they came together.  Anybody else
12  be – was there?
13    A   No.  Not that I heard.
14    Q   All right.  She attributed these statements,
15  though, to Sheriff Pickard as opposed to Detective York?
16    A   I just know he was there, and Sheriff Pickard
17  was talking to my mom.
18    Q   So you believe it was Sheriff Pickard that
19  said, "Please have your daughter" –
20    A   Yes.
21    Q   It was?
22    A   Yes.  Yes.
23    Q   But she knows about the Mills' murder; is that
24  correct?
25    A   Yes.

Page 207

1    Q   All right.  When you heard that, did you –
2  were you alarmed that he had asked your mother that
3  question?
4    A   Actually, I didn't even know that until I got
5  out of jail.  Uh-uh.
6    Q   Okay.
7    A   Just after all this stuff.
8    Q   In other words, the charge has been dismissed
9  before you learned about it?
10    A   Yeah.
11    Q   Okay.  Going back again to this, what I
12  believe is in February 2011, where you're ultimately
13  taken down to the city police station.  While Sheriff
14  Pickard was at your house, do you remember him talking
15  to your mother there?
16    A   I don't know what was said.  I have no idea.
17    Q   Okay.  During that time, did he say anything
18  to you?
19    A   No.
20    Q   All right.  Did he touch you, puts cuffs on
21  you, grab you by the arm?
22    A   I don't even remember if I was cuffed, or who
23  cuffed me, or who took me –
24    Q   All right.
25    A   – to the jail.

Page 208

1    Q   So can you tell me who took you down to the
2  city police department?
3    A   I know on one occasion, I – those get mixed
4  up because they were four different times I was arrested
5  right there in the same close amount of time.  Once – I
6  don't know if they were coming to question me or
7  Jonathan.  It was Sheriff Pickard, Detective York.  They
8  acted like we couldn't get in the same backseat of
9  Sheriff Pickard's – was – might have been a Tahoe –
10  whatever it was – the gold four-door ride.  I'm not
11  sure why, but I had to ride with – I think it might
12  have been KSP or the county.  That's the only ones that
13  came – would come and get you.  I think that Jonathan
14  ended up riding with Sheriff Pickard.
15    Q   Okay.  Jonathan rode with Sheriff Pickard?
16    A   Yeah.
17    Q   But on this first occasion we're talking
18  about, Jonathan wasn't there, was he?
19    A   On the first one?
20    Q   Yes.
21    A   Not – not the first one.  This – so this
22  would've been the second one.
23    Q   Okay.
24    A   Yeah.
25    Q   As I understood – well, let's get down to the

Page 209

1  city police department.  Was Sheriff Pickard at the city
2  police department?
3    A   I don't remember.  No.
4    Q   All right.  You said something that, before
5  you made a statement, that you were addressed by
6  Detective York, and you said that you were told what to
7  say?
8    A   Yes.
9    Q   Was Sheriff Pickard present when that
10  happened?
11    A   No.
12    Q   Okay.  Had Sheriff Pickard ever told you what
13  to say?
14    A   No, not that I can recall.
15    Q   At the time the actual statement was taken,
16  had Sheriff Pickard – was he there?
17    A   No.
18    Q   All right.  Do you know how long you were at
19  the police department?  Can you – I know you weren't
20  sitting there with a stopwatch.
21    A   Right.
22    Q   Were you there hours?  Were you there an hour?
23    A   I'm not sure how long.
24    Q   All right.  How did you get back home; do you
25  remember that?  Or I assume you went back home.  I don't

Page 210

1 know.
2     A   I went to jail after.
3     Q   Okay.
4     A   Yeah.
5     Q   Okay.
6     A   Then I had to walk to -- all the way through
7 town and get a ride. My mom met me as she was coming to
8 pick me up. I wasn't about to hang around and wait at
9 the jail, so I walked.
10    Q   Let me ask on all of these occasions at any --
11 all of these instances where you're arrested and put in
12 jail, has Sheriff Pickard come to see you in the jail?
13    A   Not that I remember. No.
14    Q   Okay. All right. The second instance I have
15 down involves the stolen firearm. This is where you're,
16 again, stopped, arrested, and that's -- Deputy Liford's
17 there. Was Sheriff Pickard there?
18        MR. SLOSAR: I object to form.
19    A   Which occasion?
20        MR. SLOSAR: You can answer.
21    A   Which -- which time?
22    Q   Where they arrested you for possession of a
23 firearm. I think they first arrested you for being a
24 felon with a firearm.
25    A   Possession of?

Page 211

1     Q   I could be wrong.
2         MR. SLOSAR: I object to form.
3         MR. KELLEY: Sure.
4     A   So this was on the first one, right? On --
5     Q   No. I'm talking about the one after you --
6 the city police department -- the next opportunity where
7 you were stopped by.
8     A   Oh, the second one would've been on my
9 indictment warrant, and I'm not sure if he was or not.
10    Q   Okay. Well, let me put it this way. Do you
11 remember any other instances where you were arrested
12 that Sheriff Pickard was there? I think you told me
13 about one instance where both Jonathan and you are
14 there?
15    A   Yeah.
16    Q   Okay.
17    A   That's -- would've been the time that he came
18 to get -- question Jonathan, and I got arrested over the
19 gun that Detective York said I stole. I didn't know I
20 was going to jail. I thought it was okay to go back and
21 talk to him and be at my own house, until he told me I
22 was going to jail, too. So that was --
23    Q   Sheriff Pickard was there?
24    A   That -- yes, he was there. That was --
25 because he was actually standing in the kitchen with my

Page 212

1 mom, Detective York, and I was where you walk into the
2 kitchen, but that would have been -- first time, second
3 time -- third time, probably.
4     Q   Okay. On that occasion, that happens at your
5 mother's home?
6     A   Uh-huh. Yes.
7     Q   All right. And I'm trying to understand, what
8 did Sheriff Pickard do on that occasion? Did he talk to
9 your mother?
10    A   I don't remember who talked to who. I know we
11 were all in the kitchen, and I walk -- I go to walk back
12 down the steps because I smoked a cigarette because I
13 was waiting to go to jail.
14    Q   Okay. Did Sheriff Pickard talk to you?
15    A   Not that I remember.
16    Q   All right. Do you remember overhearing any
17 statements he made?
18    A   No.
19    Q   All right. Was he present when Detective York
20 was there where you felt that Detective York was acting
21 outside of his role as a -- where you --
22    A   Which --
23    Q   -- where you felt intimidated by --
24        MR. WRIGHT: I'll object to form.
25    Q   -- Detective York?

Page 213

1         MR. SLOSAR: I'll object to form, too.
2     Q   Where you felt intimidated. I'm not saying
3 anybody was intimidated.
4     A   Which time was this?
5     Q   On this occasion where you're at the house. I
6 think they're coming to serve you with a warrant for the
7 stolen firearm.
8     A   They were actually coming to get Jonathan to
9 question him.
10    Q   Okay.
11    A   Detective York and Sheriff Pickard, they were
12 coming to get him.
13    Q   All right.
14    A   We turned around. I remember my mom's work
15 called her, said Detective York's at her house, and then
16 she goes back. I said, "Hey, I can go, too. I've not
17 done anything." When we pull in, I start walking.
18 Detective York says, "Hey, don't you go too far." "Uh,
19 why?"
20    Q   What I want to know: Right then, was Sheriff
21 Pickard present?
22    A   Yes.
23    Q   Okay.
24    A   He was present.
25    Q   He would've heard it? He was close enough?

Page 214

1    A   I don't know. I'm not sure about that. He
2   was there. He was there.
3    Q   All right. Do you remember him being present
4   any other times during that arrest?
5    A   I'm not sure.
6    Q   Again, and I -- if I've asked this, I
7   apologize. It's because I'm too old to be doing this.
8   Did he -- did Sheriff Pickard put his hands on you to
9   restrain you or to put you in a car or to --
10   A   No.
11   Q   Okay. And I think you told me 100 times now
12  that he would -- actually drove Jonathan, as you
13  remember?
14   A   That I remember.
15   Q   Yeah. Okay. All right. And where were you
16  taken on that day?
17   A   I was taken on to the jail. I know that the
18  Knox sheriff's department -- Mike T. Smith was the one
19  that signed my -- was the complaining officer, or
20  whatever, on my citation of that gun, but for some
21  reason, Detective York and Sheriff Pickard was at the
22  same -- he wasn't there. But I went and got booked in
23  at Knox County Jail and, after that, that's when I ended
24  up making bond. Don't know how long after.
25   Q   Do you know Detective Mike Smith?

Page 215

1    A   Who is --
2       MR. SLOSAR:  The sheriff?
3       MR. KELLEY:  No, he's not. He's actually
4   another Mike Smith, as I understand it.
5       MR. SLOSAR:  From which agency?
6       MR. EUBANKS:  Deputy.
7       MR. KELLEY:  He's listed as the arresting --
8       MR. EUBANKS:  Not detective. Deputy.
9       MR. KELLEY:  Deputy.
10      MR. EUBANKS:  Michael T. Smith was --
11      MR. KELLEY:  He's listed on a couple --
12      MR. EUBANKS:  -- complaining witness.
13      MR. KELLEY:  -- of these as being the
14  complaining witness.
15      MR. SLOSAR:  Okay. Sorry.
16  BY MR. KELLEY:
17   Q   I'm not talking about the present sheriff. I'm
18  talking about another Mike Smith. Do you know a Deputy
19  Mike Smith different from the present sheriff?
20   A   I know him that he signed that warrant for my
21  arrest for that -- and he was the complaining officer
22  for that gun charge.
23   Q   Uh-huh.
24   A   I do know that because I never heard of his
25  name, and I thought, "My goodness, who's this big Mike

Page 216

1   T. Smith?" And then, when they showed him that that was
2   him, it was some little skinny guy, and I thought,
3   "wow," so that's how I know his name. But now that I
4   worked at -- in Bell County at the Public Defender's
5   Office, I -- he's -- I guess, he's in that county now,
6   so I -- I do know who he is.
7    Q   He's not in --
8    A   No.
9    Q   -- Knox County anymore.
10   A   Uh-uh.
11   Q   I think he -- is he in Middlesboro; is that
12  correct? He's in Middlesboro PD, but, all right. Did -
13  - in other words, did you have any interaction with him
14  during any of these encounters with Sheriff Pickard or
15  Detective York?
16   A   No. When I went to court, I can -- can't
17  remember if it was the arraignment of the -- of the
18  murder charge or -- it would've been the arraignment --
19  the first time you go to court, or if it was on that gun
20  charge because I -- where all that was in the same time
21  frame, I, kind of, get it mixed up. He said, "Send her
22  upstairs to the big dogs where she belongs." That was -
23  - that Mike teased me after.
24   Q   Who was he talking to?
25   A   He said it just loud enough -- I guess, it was

Page 217

1   supposed to intimidate me in court. I'm not sure.
2    Q   Meant to intim -- did it intimidate you in
3   court?
4    A   Did it?
5    Q   Yeah.
6    A   I -- not sure what --
7    Q   Doesn't sound like --
8    A   -- it did.
9    Q   -- he was an intimidating figure --
10   A   He's --
11   Q   -- to you.
12   A   He, kind of, said it so my mom would hear it,
13  too, so...
14   Q   Okay. Again, my question is did you feel
15  intimidated by Detective [sic] Mike T. Smith?
16   A   I -- I did because I never seen a gun, never
17  stole a gun, and I wondered how in the world this guy
18  has got me charged -- or a complaining witness saying I
19  had a gun.
20   Q   Okay. Now that is a charge you ultimately
21  pled guilty to, isn't it?
22   A   Actually they amended it to a burglary-third.
23   Q   Well, what was the burglary of?
24   A   I couldn't even tell you. I can --
25   Q   Was it the gun?

Page 218

1    A    I – I couldn't even tell you. I'm not sure.
2    Q    Okay.
3    A    I just know I got to go home that day, and I
4    didn't have to go on any farther with it, so –
5    Q    Okay.
6    A    – I did plea.
7    Q    All right. Do you know if Mike T. Smith is
8    involved in anything else in the – subsequent to
9    Katherine Mills' death?
10    A    No.
11    Q    All right. There is an instance where the
12    property bond was withdrawn, and you were again arrested
13    after that. Was Sheriff Pickard there during that
14    arrest?
15    A    I don't remember.
16    Q    There was a time you actually pulled – turned
17    yourself in to Laurel County jail because you thought
18    you were guilty of a probation violation. Was Sheriff
19    Pickard there?
20        MR. SLOSAR:  Objection to form. It misstates
21    her testimony.
22    Q    I might – have I got that wrong? Okay. Tell
23    me how I've got it – I thought you ultimately went to
24    Laurel County to get arrested.
25    A    I turned myself in, not because I thought I

Page 219

1    was guilty, just because I had a warrant, and that was
2    the right thing to do.
3    Q    I'm sorry if I'm – if I phrased that question
4    wrong. What I meant is, ultimately, you went to Laurel
5    County to do that; is that correct?
6    A    Yes.
7    Q    And you were put into a Laurel County jail?
8    A    I went to the probation officer first – to
9    the probation-parole, and, therefore, they transported
10    me. Laurel County Probation & Parole to Laurel –
11    Q    Where did they –
12    A    – County Jail.
13    Q    – put you? All right.
14    A    Laurel County.
15    Q    Okay. Again, did Sheriff Pickard come to the
16    Laurel County jail?
17    A    No.
18    Q    Okay. There was a meeting that you had with
19    Lisa Evans, when Lisa Evans was present, where, I think,
20    they took swabs from your mouth and under your
21    fingernails for a DNA testing?
22    A    I did get the DNA testing done. Yes.
23    Q    Yeah. Was Sheriff Pickard or any member of
24    the Knox County Sheriff's Department present then?
25    A    No.

Page 220

1    Q    Okay. Again, the interrogatories are in front
2    of you. And this is an answer to Interrogatory number
3    11, and my pages aren't numbered, but after you see
4    Interrogatory number 11, turn two more pages.
5        MR. SLOSAR:  Here. I got it. That's the page.
6    The Bob Smith one?
7        MR. KELLEY:    Yes.
8    BY MR. KELLEY:
9    Q    And to show you that I'm not too over the
10    hill, I do know that you've answered questions from
11    Deputy York's counsel, the counsel concerning this, but
12    I    simply want to know what knowledge you might
13    have concerning Sheriff Pickard. The first allegation
14    being: "To begin, defendant's York and Pickard met with
15    Bob Smith on May 1, 2012." Do you, yourself,
16    independent of what your attorney may have told you,
17    have any knowledge of Sheriff Pickard ever meeting with
18    Bob Smith?
19    A    No.
20    Q    Okay. Within that paragraph, it says,
21    "Defendant's York and Pickard instructed Mr. Smith to
22    state that Ms. Hoskins and Mr. Lester were spending
23    significant amounts of money on drug purchases." Do you
24    have any independent knowledge, except for from your
25    attorney, that Sheriff Pickard was trying to manufacture

Page 221

1    or create – fabricate an allegation that you were
2    spending significant sums of money on drug purchases?
3    A    No.
4    Q    The next allegation has to do with Defendant
5    York. It says, "On May 16, 2011, Defendant York
6    fabricated a statement that he attributed to Christy
7    Branson." Are you aware of any contact that Sheriff
8    Pickard may have had with Christy Branson?
9    A    Outside of conversations with –
10    Q    Yeah. I'm sorry –
11    A    – my lawyer?
12    Q    – the – let me tell you that the same
13    proviso applies each time. I don't want to know what
14    your attorney may have told you. I want to know what
15    you may know independent of that.
16    A    No.
17    Q    Okay. The next one has to do with Joe York,
18    as – talks about "Defendant York fabricated a report
19    of – on behalf of Joe King." First of all, has Joe
20    King talked to you about any encounters he's had with
21    either?
22    A    No.
23    Q    No. Has Joe King told you of any problems he
24    has with anybody on the Knox County Sheriff's
25    Department?

Page 222

1    A  No.
2    Q  Okay.  The next one has to do with Allen
3  Helton, and, again, I think you didn't know who Allen
4  Helton was.  It says, "Defendants York and Pickard also
5  fabricated a report on behalf of Allen Helton."  Am I
6  correct you don't know who Allen Helton is, do you?
7    A  Before all this?
8    Q  Right.
9    A  No.
10    Q  Okay.  You have never had any occasion to talk
11  to him in your life?
12    A  No.  I would've never talked to him.  I didn't
13  know him.
14    Q  All right.
15    A  But you have heard through others, people
16  other than your attorney, about what Allen Helton may
17  have said or -- concerning the murder of Ms. Mills?
18      MR. SLOSAR:  Objection to form.
19    A  Can you ask it again?
20    Q  Sure.  Have you heard from others -- you heard
21  from Mr. Lester, Mr. King, anybody, your mother, that
22  Allen Helton was making accusations --
23    A  No.
24    Q  -- concerning the murder of Ms. Mills?  Okay.
25  There's an allegation here concerning falsification of

Page 223

1  medical records and manipulation of medical records.  Do
2  you know of any involvement by Sheriff Pickard in any
3  change to your medical records, other than what your
4  attorney may have told you?
5    A  No.
6    Q  Okay.  The next has to do with the statement
7  taken from Amber Simpson on March 13, 2012.  Do you know
8  of any contact that Sheriff Pickard had or anybody with
9  the Knox County Sheriff's Department may have had with
10  Amber Simpson?
11    A  No.
12    Q  Okay.  Likewise, the same kind of questions
13  concerning Robert Beach.  Do you know of any contact
14  that my client had?
15    A  No.
16    Q  All right.  Do you know of any grudge, animus,
17  any reason that Sheriff Pickard wanted to do you harm;
18  have you thrown in jail; have you charged with murder?
19    A  Not that I've ever heard.
20    Q  Okay.  Couple more times on 19 --
21  Interrogatory number 19.  It has to do with the criminal
22  charges.  I couldn't remember, way back to this 2002
23  traffic charge in Knox County, leaving the scene of an
24  accident, were you guilty of that, in your own mind, at
25  least?

Page 224

1    A  Yeah.
2      MR. SLOSAR:  Hold on.
3    Q  I'm sorry to make you --
4    A  That's okay.
5      MR. SLOSAR:  What was your question, John?
6      MR. KELLEY:    Interrogatory number 19, and
7    the answer to it, and I don't have a numbered page.
8    I'm sorry.
9      MR. SLOSAR:  What's the question?
10  BY MR. KELLEY:
11    Q  The question is did you leave the scene of an
12  accident?  Were you guilty of that --
13    A  Where are we at?
14    Q  -- charge.
15    A  Number 1?
16    Q  Number 1.
17      MR. SLOSAR:  Number 1.  I'm going to object to
18    the form of that question.
19    A  Okay.
20    Q  Did you plead guilty because you felt you
21  were?
22    A  I was a juvenile.  I'm not -- I couldn't -- I
23  guess I did plead guilty because it shows on my
24  convictions, so I'm not for sure even --
25    Q  All right.

Page 225

1    A  -- what it was.
2    Q  I understand you were a juvenile, but I won't
3  ask you any more about it.
4    A  It's a long time ago.  Yeah.
5    Q  Okay.  Let's talk about the Bell County
6  charge.  You would have been --
7    A  Theft by unlawful taking?
8    Q  Yeah.  When you been -- admittedly, I don't
9  know when the charges -- I know when the charge was
10  brought; I don't know when the crime occurred.  But the
11  theft by unlawful taking, is that one you were guilty
12  of?
13    A  I'm not even sure what it was.
14    Q  Have you taken things --
15      MR. SLOSAR:  Object.
16    Q  -- unlawfully?
17      MR. SLOSAR:  Objection.  Asked and answered.
18    A  I have from stores.  Yes, I have.
19    Q  Okay.  All right.  The next one, I believe,
20  the 2007 charge in Knox County: the second degree
21  assault and first degree wanton endangerment.  As I
22  understand it, you do not think you were guilty of
23  that --
24    A  No.
25    Q  -- of those charges?  But you pled guilty?

Page 226

1  A  I do.
2  Q  All right.  Did you stand in court and take an
3  oath?
4      MR. SLOSAR:  Object to form.
5  A  I'm not sure.
6      MR. SLOSAR:  Compound question.  You can
7  answer.
8  A  I'm not sure how I took the plea, but I took
9  the plea upon -- my lawyer was there, and --
10  Q  Did the judge ask you questions and ask you if
11  you really were guilty?
12  A  I don't remember.  I'm not sure.
13  Q  Okay.  In other words, this is a -- one -- am
14  I correct you were sentenced to time in jail?
15  A  When?
16  Q  For the -- this charge.
17  A  Number 3?
18  Q  Yes.
19  A  Yes.
20  Q  All right.  You're about to go to jail.
21  They --
22  A  I'd already been in jail.  I -- actually on
23  that charge, why I plead guilty -- I stayed 76 days.  I
24  got out on house arrest.  I had my little girl, and in
25  September while I was still pregnant, I pled to it on

Page 227

1  conditions that instead of going to trial or anything
2  like that, I could -- I could stay out, have my little
3  girl, wouldn't have to turn myself in until the first of
4  the year, and I would only have to go back to jail for
5  104 days, and the rest probated, so, yes, I took the
6  guilty plea.  I pled guilty to that, and I went back;
7  turned myself in.  I got to pick where I turned myself
8  in at, and it was easy time.  I got to hold my little
9  girl, and my little boy every weekend, contact visit.
10  After that, I completed three years of supervised
11  probation.
12  Q  Okay.  None of that would have occurred if you
13  were -- had been found not guilty; you agree there?
14      MR. SLOSAR:  Object to form.  This has been
15  asked and answered.
16      MR. KELLEY:  Well, okay.
17      MR. SLOSAR:  She just --
18      MR. KELLEY:  Well, are you asking her --
19  telling her not to answer?
20      MR. SLOSAR:  Well, I -- she just told you she
21  pled guilty.  You're asking her the same question a
22  different way.
23      MR. KELLEY:  Yeah, but she pled guilty rather
24  than stand trial for something she says she didn't
25  do, and I'm trying to understand that she waited --

Page 228

1  that she'd rather go to jail than be tried.
2      MR. SLOSAR:  She just told you she wanted to be
3  with her daughter.  I mean, you're, literally,
4  harassing the witness at this point, John.  I don't
5  understand --
6      MR. KELLEY:  Really?
7      MR. SLOSAR:  Yeah.
8      MR. KELLEY:  You don't think being away from
9  your daughter in jail is time spent away from your
10  daughter?  I don't understand, counsel.  I'm
11  saying --
12      MR. SLOSAR:  She was fix --
13      MR. KELLEY:  She has a choice to stay with her
14  daughter if she's not guilty of this crime.
15      MR. SLOSAR:  Do you have an actual, legitimate
16  question for the witness?
17      MR. KELLEY:  No, I won't -- I'm done.
18      MR. SLOSAR:  Thank you.
19      MR. KELLEY:  I'm done.  Thank you.
20  BY MR. KELLEY:
21  Q  The Bell County charge, it's number 4.  As I
22  understand it, you're saying you gave your right name to
23  the officer who stopped you; is that correct?  You were
24  stopped because you didn't have a license?
25  A  No.  I went through a roadblock, and I was

Page 229

1  on -- driving on suspended; gave them my sister's name
2  or birthday, maybe both.  I'm -- can't remember.
3  Q  All right.  That one was a probated one; is
4  that correct?  And you were actually unsupervised as I
5  remember.
6  A  I don't even know.  I don't know what I got
7  out on that.
8  Q  All right.
9  A  I just know I did do that.  I did give them my
10  sister's name and birthday.
11  Q  All right.  The operating -- but you were also
12  convicted of -- or pled guilty to operating a vehicle
13  with a suspended or revoked license?
14  A  Yes.
15  Q  Do you think you were represented by counsel
16  in both of those instances?  Certainly, the felony one
17  you were?
18      MR. SLOSAR:  Objection to form.
19  A  What is it now?
20  Q  Never mind.  Okay.  I want to understand
21  this -- you mentioned that Sheriff Pickard was
22  present -- I'm talking about number 6, the burglary --
23  the third degree burglary one, which I think has to do
24  with the firearm to begin with and turned into a
25  burglary.

Page 230

1    A  Yeah.
2    Q  All right. You told me that, I think, in part
3 of your answer that Sheriff Pickard was present in the
4 courtroom or at the courthouse on the day that you went
5 to plead guilty?
6    A  Yes.
7    Q  Or you didn't know you were going to plead
8 guilty, but...?
9    A  Right.
10    Q  All right. What encounter did you have with
11 him, if any, other than seeing him there?
12    A  My mom and I was walking up the steps. We got
13 to the Circuit Court. He was actually sit – the one
14 telling the jurors they could go on back. He's actually
15 the one that told my mom she couldn't go in the
16 courtroom with me. He stood there and talked to her. I
17 had to go in by myself and take a plea that I was crazy
18 for even taking. He did tell her that he believes her
19 daughter didn't commit murder, that he believes that her
20 daughter –
21    Q  That you didn't commit murder; is that –
22 that's who you're referencing, right?
23    MR. SLOSAR:  He – she's saying what Sheriff
24 Pickard told her mom, which was why –
25    MR. KELLEY:  Third person. Got you.

Page 231

1    MR. SLOSAR:  If you want exactly what she's
2 saying, she's trying to recount it back to you.
3    MR. KELLEY:  Thank you.
4    A  That –
5 BY MR. KELLEY:
6    Q  Go ahead.
7    A  Her daughter didn't have nothing to do with
8 that murder. That two years ago, whatever that meant –
9 two years ago, he'd have put her under the jail, but he
10 thinks she was a key witness to closing the case. That's
11 what was said.
12    Q  Okay. You overheard this; any of it?
13    A  No.
14    Q  Your mother heard it?
15    A  Yes.
16    Q  Anybody else present when she was there?
17    A  I'm not sure.
18    Q  Okay. This was said outside of the courtroom?
19    A  Yes.
20    Q  All right. Did he send you into the courtroom
21 before talking to your mother?
22    A  Yes.
23    Q  Okay. As you went – before you went into the
24 courtroom, did you notice people milling around?
25 Where – in the courthouse we're talking about, where –

Page 232

1 are you upstairs?
2    A  Yes.
3    Q  Okay. And you're about to go into the – the
4 door. Does it face the bench?
5    A  Yes.
6    Q  Okay. That area to me is fairly small; would
7 you agree?
8    MR. SLOSAR:  I object to form. You can answer
9 it to the extent you understand it.
10    A  Is that area before you go into the courtroom
11 small?
12    Q  Right. It's a tile floor right there.
13    A  It is a tile floor.
14    Q  Uh-huh.
15    A  I mean, quite a few people can fit there.
16    Q  Okay. And so you – what you're saying
17 well, what I'm trying to understand, you'd see a lot –
18 if there were a lot of people on that landing, you'd see
19 them?
20    A  They were being sent home. The jurors were
21 leaving.
22    Q  Are you saying the jurors were standing there?
23    A  No. They were leaving, like, walking – he
24 was telling them there was no trial today. Go on home.
25    Q  What I'm trying to understand is whether there

Page 233

1 were people milling around that could've overheard
2 Sheriff Pickard talking to your mother and telling
3 him – telling you about...?
4    A  I doubt it because I was the only one that
5 scheduled for a trial that day. I'm not sure, so I
6 don't know how to answer that.
7    Q  Okay. Did you happen to know anybody on the
8 jury that was walking out?
9    A  No. I'm not sure.
10    Q  Not to ask you what your attorney talked to
11 you about, but had you gone over the jury list with him?
12    A  I don't remember.
13    Q  Okay. All right. I'm just trying to find out
14 is there anybody other than your mother that I need to
15 talk to corroborate what she said Sheriff Pickard
16 said?
17    MR. SLOSAR:  Well, I mean, that – I think
18 she's told you all she knows.
19    MR. KELLEY:  That's what I'm trying to get to.
20 BY MR. KELLEY:
21    Q  Is that all you know?
22    A  Yes.
23    Q  Thank you. All right.
24    MR. SLOSAR:  If we find someone, we'll disclose
25 it.

Page 234

1    Q   You went – did you – you don't have to tell
2  me what you said, but you did talk to Johnny Turner at
3  some point?
4    A   When I went to –
5    Q   And I think you described –
6    A   – the courtroom?
7    Q   – what he said –
8    A   Yeah.
9    Q   – to you?  Okay.  All right.  It's coming.
10  Did you protest that?
11       MR. SLOSAR:   Protest.
12    Q   Did you say, "I don't want to do that"?
13    A   No.  I was ready to get home.  He also told me
14  if I spit on the sidewalk the wrong way that they were
15  going to get me, whatever he meant by that.  I guess,
16  looking back now, I – I see.
17    Q   Okay.  So Johnny Turner told you that?
18    A   Yes.
19    Q   All right.
20       MR. KELLEY:      So I guess I can ask Johnny
21  Turner, at least that far, whether he said that.  Is
22  that fair, counsel?
23       MR. SLOSAR:  Yeah.  Just not about the actual
24  advice that he gave her.  It's obvious he told her
25  to plead guilty, right?  She pled guilty.

Page 235

1        MR. KELLEY:  Well, I hope he told her not to
2  commit any more crimes, but that would –
3        MR. SLOSAR:  She didn't.  That's why we're
4  here.  Continue.
5  BY MR. KELLEY:
6    Q   But again, on that occasion, you get up in
7  front of a judge.  Do you remember whether it was Judge
8  Mills or Judge Lay, or do you know?
9    A   I don't remember.
10    Q   Do you remember taking an oath?
11    A   I don't remember.
12    Q   All right.  Do you remember being asked or was
13  anybody coercing you to do this?  Do you really believe
14  you were guilty?
15    A   I don't remember.
16    Q   Okay.  I'm not certain as to the time period,
17  but this is before Ms. Mills' death, and it's my
18  understanding you were present when Mr. Lester was
19  talking – and I'm confused as – with Joe King
20  concerning information he had gotten that Ms. Mills had
21  a large amount of money.
22       MR. SLOSAR:  Object to form.  You can answer if
23  you understand.
24    A   I'm not sure –
25    Q   Well, if I'm cutting it –

Page 236

1    A   – of the question.
2    Q   – if I've described it wrong, please correct
3  me.
4    A   I'm not sure what the question even was.
5    Q   It's my understanding that there was some time
6  where you overheard a conversation where Mr. Lester was
7  telling someone else, and I believe it was Joe King – I
8  could be wrong on that, or maybe it was Mike – that Ms.
9  Mills had a lot of money; had come into a lot of money?
10       MR. SLOSAR:  I object to form and misstates her
11  testimony.  You can answer the question.
12    A   That's how I said it was.  I overheard him
13  saying that what he should do is lock Ms. Mills in her
14  outhouse, take her money, and not hurt her.
15    Q   Okay.  And who was he telling that to?
16    A   Mike Simpson.
17    Q   Okay.  Was that the first instance you had
18  heard Mr. Lester talking about Ms. Mills –
19    A   I don't know which one.
20    Q   – newfound wealth?
21       MR. SLOSAR:  I object to the form of the
22  question.  That actually misstates what she just
23  told you.  It did – nowhere in her testimony did
24  she say, "newfound wealth" or "a lot of wealth."
25  She just explicitly described –

Page 237

1        MR. KELLEY:  I beg your pardon.  I was being
2  flippant with my question.  I apologize.
3        MR. SLOSAR:  I know, but it means something for
4  the record.
5        MR. KELLEY:  Okay.
6  BY MR. KELLEY:
7    Q   That she had money.  That she'd come into a –
8  some large sum of money.  I don't know whether you
9  consider it wealth or not.
10    A   I'm not sure.  I don't – I'm not sure what
11  you're even asking right now.
12    Q   Before that – before you overheard the
13  conversation he had, had you ever – had Mike – excuse
14  me – had Mr. Lester revealed that to you?
15    A   No.
16    Q   So – all right.  Did you have any discussion
17  after that conversation, you and Mr. Lester, about it?
18    A   No.
19    Q   All right.  Were you shocked that he was
20  urging someone else – conspiring with someone else to
21  commit a robbery?
22       MR. SLOSAR:  Object to form.  Continue.
23    A   Can you ask it again?
24    Q   Sure.  You overheard somebody saying that they
25  were going to lock Ms. – or somehow keep Ms. Mills in

Page 238

1  the outhouse while they took her money.  Did that shock
2  or surprise you?
3      A   That I heard that?
4      Q   Well, that he was suggesting that to someone
5  else?
6      A   I never said he suggested that.  I – I never
7  said that.
8      Q   I thought you did.
9      A   I didn't say he suggested that.
10     Q   What did he say again?  I'm having trouble
11 understanding what exactly you overheard.
12     A   He said what he should do –
13     Q   Who should do?
14     A   William Lester.  What – he's talking his
15 self.  William Lester said what William Lester should do
16 is catch Ms. Mills in her outhouse, lock her in there,
17 take her money, not hurt her.
18     Q   Okay.
19     A   That's it.
20     Q   Were you shocked that he was contemplating
21 robbing Ms. Mills?
22     A   He wasn't contemplating?
23     Q   He's thinking about.
24     A   He was saying that as, like, "Hey, buddy, I'm
25 broke," something like that.  I'm not sure what –

Page 239

1      Q   So you considered –
2      A   – you're trying to ask me.
3      Q   You considered it as a joke?
4      A   This – I'm not sure what you're trying to
5  ask.  Can you ask me the question again?
6      Q   Okay.  As I understand it, Mr. Lester said
7  something to the effect that, "What I should do is lock
8  Ms. Mills in the outhouse and take her money"?
9          MR. SLOSAR:  And –
10         MR. KELLEY:    Have I misstate – once again,
11 got –
12         MR. SLOSAR:  Not – it –
13         MR. KELLEY:  – it wrong?
14         MR. SLOSAR:  – and not hurt her.
15         MR. KELLEY:  And not hurt her.  Okay.
16 BY MR. KELLEY:
17     Q   Sounds like a robbery to me.
18         MR. SLOSAR:  Object –
19     A   I –
20         MR. SLOSAR:  Objection to form.  Let's take –
21         MR. KELLEY:  That's not a real question,
22 really, counsel?
23         MR. SLOSAR:  All right.  Well, let's take a
24 break.
25         MR. KELLEY:  Okay.

Page 240

1          VIDEOGRAPHER:  Off the record at 3:40.
2          (OFF THE RECORD)
3          VIDEOGRAPHER:  Back on the record at 3:51.
4  BY MR. KELLEY:
5      Q   I'm going to be changing subjects on you, Ms.
6  Hoskins.  When did you go to work with the Public
7  Defender's Office in Pineville?
8      A   Yes.
9      Q   All right.  When did you go to work with them?
10     A   A month after – maybe two months after I got
11 out of jail.
12     Q   Okay.  You listed some people here that I
13 think work for their office.  Lisa Evans is listed on
14 your disclosure, so I'm sorry that I can't remember what
15 exhibit the disclosures were in, but –
16         MR. SLOSAR:  I think it's 1.
17         MS. STAPLES:  1.
18         MR. SLOSAR:  Do you have –
19         THE WITNESS:  This one?
20         MR. SLOSAR:  It's the first one.
21         MR. WRIGHT:  This one.
22         THE WITNESS:  This?
23         MR. SLOSAR:  Yeah.
24 BY MR. KELLEY:
25     Q   Lisa Evans is somebody who works with the

Page 241

1  Public Defender's Office; is that correct?
2      A   Yes.
3      Q   All right.  Anybody else on that list is
4  Heather Gatnarek or Joshua Powell involved with the
5  Public Defender's Office?
6      A   This – have involved – the names that's on
7  here?
8      Q   Yes.
9      A   Is that about –
10     Q   Are there any others that are – work at that
11 office?
12         MR. SLOSAR:  Are you talking about the DPA or
13 Bell County DPA?  Because they're –
14         MR. KELLEY:  Did she work for both?
15         MR. SLOSAR:  Oh, no, but I'm saying she worked
16 with –
17         MR. KELLEY:  People she would've worked with is
18 what I'm asking.
19         MR. SLOSAR:  In Bell County?
20         MS. STAPLES:  At the local office?
21         MR. SLOSAR:  Yeah.  I assume that.
22         MS. STAPLES:  Okay.
23         MR. SLOSAR:  Okay.  I just want to make sure
24 you weren't saying the entire agency because
25 there's –

Page 242

1      MR. KELLEY: No.
2      MR. SLOSAR: Okay.
3 BY MR. KELLEY:
4      Q    The ones I'm asking about are on page 6, if
5 that helps.
6      MR. SLOSAR: He just wants to know which of
7 those worked at Bell County with you.
8      A    Just Bell County, right?
9      MR. SLOSAR: Yeah.
10     Q    Yeah.
11     A    Lisa Evans.
12     Q    All right. Is that the only one that you've
13 come in contact with?
14     A    On this page that works at Bell County Public
15 Defender's Office.
16     Q    Tell me who you work for down at the Bell
17 County Public Defender's Office, or who you work with?
18 What are their names? Whether they be on there or not,
19 tell me their names.
20     A    Linda West.
21     Q    Okay. Anybody else?
22     A    Sereda Brewer.
23     Q    All right. Mr. Cox work there still?
24     A    Not at the Bell County one.
25     Q    Okay. Go ahead. Anybody else working at the

Page 243

1 Bell County one?
2      A    Bonnie. Not sure her last name.
3      Q    Okay. How much contact do you have with any
4 other offices for the public defenders?
5      A    None.
6      Q    None? So those are the only persons you work
7 with, then, at the Public Defender's Office?
8      A    First, I'm not working there right now. I had
9 a little boy a little over a year ago, and I've just
10 been spending time with him.
11     Q    Okay. When did you last work for them?
12     A    September 2016.
13     Q    Okay. Of course, this is time after you were
14 dismissed from them; is that correct?
15     A    What is it?
16     Q    After your charges were dismissed, this was
17 all time after that; is that correct?
18     A    Yes.
19     Q    All right. Did you discuss your case with any
20 of the people at the Public Defender's Office after the
21 charges were dismissed?
22     A    After my charges was dismissed, what –
23     Q    Yes.
24     A    Did I what?
25     Q    Discuss your case with anybody working at the

Page 244

1 Public Defender's Office?
2      `    MR. SLOSAR: We would continue to assert
3 the privilege as the conversations that she's had
4 with Lisa Evans as –
5      MR. KELLEY: You're saying the privilege
6 extends beyond the time that she was actually being
7 represented?
8      MR. SLOSAR: Well, you haven't laid a proper
9 foundation for that type of question.
10     MR. KELLEY: Well, first of all, I'm asking
11 simply if she did discuss it. I'm not asking for
12 the content of it.
13     MR. SLOSAR: Okay. The privilege would extend,
14 but you can answer the question, if you understand
15 it.
16     A    After this was dismissed, did I talk to
17 anybody about my case that was dismissed? Is that what
18 you're saying?
19 BY MR. KELLEY:
20     Q    Yes.
21     A    Now, I got a lot of congratulations from
22 attorneys there and from attorneys around the
23 surrounding counties. I got a handshake from judge in
24 Bell County.
25     Q    Okay. Did you talk to them about the civil

Page 245

1 suit you're now involved in?
2      A    No.
3      Q    You've not said one word to them about
4 bringing a lawsuit against Detective York or Sheriff
5 Pickard –
6      MR. SLOSAR: And –
7      Q    – Deputy Eubanks?
8      MR. SLOSAR: We're going to continue to
9 instruct her to assert the privilege as to
10 conversations with Lisa Evans, who was a member of
11 her defense team to which the privilege would
12 extend.
13     MR. KELLEY: You're telling me that Lisa
14 Evans's involvement subsequent to the charges being
15 dismissed remain privileged?
16     MR. SLOSAR: Conversations that she has with
17 her former attorneys about the case that they
18 represented her on, or investigators in that case, I
19 believe would extend.
20 BY MR. KELLEY:
21     Q    Well, let me ask it this way. Has Lisa
22 Evans – don't answer this question until your attorney
23 gets a chance to object. Did Lisa Evans give you
24 information that is now being used in this lawsuit?
25     MR. SLOSAR: I'm – because that question

Page 246

1  delves into communication that Ms. Hoskins had with
2  Lisa Evans during their representation of her, I'm
3  going to inform my client to assert the attorney-
4  client privilege –
5  BY MR. KELLEY:
6     Q  Okay.  And are you –
7        MR. SLOSAR:  – and not answer that question.
8     Q  All right.  I assume you're going to follow
9  your attorney's advice?
10    A  Yes.
11    Q  Okay.  Again, same – I'm going to ask you
12 another question.
13       MR. KELLEY:  You want to take a break?
14       MR. SLOSAR:  John, can we take a quick break? I
15 got to – it's a judge calling me.  I've got to take
16 this.
17       MR. KELLEY:  Sure.
18       VIDEOGRAPHER:  Off the record at 3:58.
19          (OFF THE RECORD)
20       VIDEOGRAPHER:  Back on the record at 4:00.
21 BY MR. KELLEY:
22    Q  Again, I'm going to ask you the same question,
23 basically, concerning anybody else in the Public
24 Defender's Office, whether they have told you things
25 that they learned that are now being used in this

Page 247

1  lawsuit, and I assume counsel will issue the same
2  objection.
3        MR. SLOSAR:  John, I – I don't want to be
4  overbroad in the privilege assertion, so if you were
5  to narrow that question to people outside of your
6  legal team that were at the Public Defender's
7  Office, I actually wouldn't maintain the –
8        MR. KELLEY:  Well, let me tell you my
9  immediate –
10       MR. SLOSAR:  – privilege.
11       MR. KELLEY:  – goal is to find out what the
12 basis is for Deputy Eubanks being in this lawsuit.
13       MR. SLOSAR:  Okay.  And –
14       MR. KELLEY:  It's never been ex – and I guess
15 I'm going to have to send written discovery to get
16 it, but –
17       MR. SLOSAR:  That'd be helpful.  Yeah.
18       MR. KELLEY:  – but I sure would like to find
19 out now.  We're –
20       MR. SLOSAR:  I mean, but –
21       MR. KELLEY:  – kind of, we're all perplexed -
22       MR. SLOSAR:  But she –
23       MR. KELLEY:  – by it.
24       MR. SLOSAR:  She's already testified, you know,
25 about her independent knowledge.  I think we – it's

Page 248

1  been a long day.  I want you to get the information
2  that you can get.  If you can narrow your request, I
3  think that she'll tell you what is a very easy
4  answer, and you can move forward.  So –
5        MR. KELLEY:  Okay.
6        MR. SLOSAR:  – I'm sorry.
7  BY MR. KELLEY:
8     Q  Has anybody at the Public Defender's Office,
9  other than those who assisted in representing you with
10 regard to the murder trial, told you anything that
11 you're using in this civil lawsuit?
12       MR. SLOSAR:  You can answer.
13    A  No.
14    Q  Okay.  I kind of figured that'd be the answer
15 then, but all right.  Let me start out this by saying –
16 I'll do a Deputy Liford and tell you we're all sinners
17 in this room.  This is not to be reflected on you.  It
18 is important to me to understand the damages you're
19 claiming, the questions I'm about to ask.  You, of
20 course, have said that – you've given us some idea both
21 in answer to written questions and here today the
22 psychological effect that these charges have had on you.
23 I want to know about other stressors in your life.  And,
24 again, this is one your attorney will probably object
25 to.  But I consider the fact that you ran – not ran –

Page 249

1  that you left the room pretty upset when he asked who
2  was the father of your daughter, that to be a stressor
3  in your life that might have a psychological effect, and
4  that's something we need to know about when weighing
5  your condition prior to these charges.
6        MR. SLOSAR:  I am going to – first of all,
7  seek a protective order into any further questioning
8  about the father of Lexi Hoskins.  There was a
9  lengthy series of questions earlier.  We have
10 addressed this. It has absolutely no relevance in
11 this litigation.  I am shocked that you would go
12 down this road in light of what happened earlier.
13 If you want to go further, that's fine.  We'll talk
14 to a judge.
15       MR. KELLEY:  Well, I don't understand why you
16 cannot perceive the fact that if we are talking
17 about the psychological condition of a party, which
18 you have put into dispute, that I should know the
19 entirety of those things that are stressful in her
20 life and the degree to which they affect her present
21 condition.
22       MR. SLOSAR:  You know, the things that affect
23 her condition that relate to this lawsuit are the
24 facts that she was ripped from her kids for years of
25 her life, the fact that she was ripped from the

Page 250

1  family for years of her life, which are the damages
2  that we've claimed here.  She said in a written
3  interrogatory response that she wasn't getting
4  psychological treatment prior to this incident
5  taking place –
6      MR. KELLEY:  Well, I know –
7      MR. SLOSAR:  – under oath, so
8      MR. KELLEY:  I appreciate that you want to
9  tunnel –
10     MR. SLOSAR:  John.
11     MR. KELLEY:  I appreciate that you want to
12  tunnel how the evidence goes in and how discovery
13  goes, but if you're going to put these issues into
14  dispute, I think we have a right to know about it,
15  and, obviously, that's something that has a major
16  effect upon her life, as we've seen here today.  And
17  do I want her – drag her through this?  No.  I
18  don't.
19     MR. SLOSAR:  Look at her.  Look.
20     MR. KELLEY:  Well –
21     MR. SLOSAR:  Look.
22     MR. KELLEY:  – I want to know about everything
23  that is psychologically impairing her now.
24     MR. SLOSAR:  I think – you know what?  Let's
25  call the judge.  This is unethical.  Let's call the

Page 251

1  judge.
2      MR. KELLEY:  Sure.
3      MR. SLOSAR:  I've got my phone.  We'll make an
4  emergency call to the Court, and you can explain how
5  the person who helped create Lexi Hoskins prior to
6  this lawsuit is relevant in light of the fact that
7  she's testified under oath that it is not a single
8  witness in this case.  The psychological harm, the
9  crying is because an attorney asked her whether she
10  gave oral sex to someone, whether she had sex with
11  someone, and then said, well, give me the general
12  realm of people that could have produced the DNA
13  that gave you your daughter.  So that –
14     MR. KELLEY:  I didn't ask that.
15     MR. SLOSAR:  Oh, no.  But you're continuing it.
16  You're –
17     MR. KELLEY:  I'm trying to find out what are
18  stressors in her life.  Are you saying that that's
19  not a stressor?
20     MR. SLOSAR:  I'm saying a stressor in her life
21  is Sheriff Pickard, Jason York, who's no longer
22  here, you, asking her questions about who helped
23  bear the father of her trial (sic) prior to getting
24  framed for murder.  How is that relevant?  It's not.
25     MR. KELLEY:  Well, let me also tell you I'm

Page 252

1  going to ask her if she's been in any abusive
2  relationships.  Is that going to draw the same call?
3      MR. SLOSAR:  How is this relevant?
4      MR. KELLEY:  Because you put her psychological
5  condition into dispute.  You're saying we're
6  responsible for her present mental condition.
7  Aren't you saying that?
8      MR. SLOSAR:  We have not sought damages for –
9  you know what?  Let's call the Court.
10     MR. KELLEY:  No.  I want to get it on the
11  record.  What are you saying, then as – what are
12  damages you're seeking then if it has nothing to do
13  with her present mental status?
14     MR. SLOSAR:  Her present mental status, before
15  she came in here, related absolutely to the
16  litigation. To ask her questions about who she had
17  sex with –
18     MR. KELLEY:  I haven't done that.
19     MR. SLOSAR:  – who helped – who bore your
20  child.  I'm not sure.  I haven't had a DNA test.
21  Well, tell me – the next question:  Tell me all the
22  guys that you had sex with.  That was the question
23  asked earlier.
24     MR. KELLEY:  I have not asked –
25     MR. SLOSAR:  And then, you know what?  Why

Page 253

1  don't you tell me what sexual acts you performed
2  with those guys, because that was actually asked
3  earlier about Dr. Warren.
4      MR. KELLEY:  That –
5      MR. SLOSAR:  Or did you have oral sex?
6      MR. WRIGHT:  We had –
7      MR. SLOSAR:  We addressed this.  I thought
8  we –
9      MR. WRIGHT:  I don't know whether you – how
10  she was defining that, and we moved on.  I think we
11  came to an agreement.  We just had her identify that
12  on the Rule 26 disclosure.
13     MR. SLOSAR:  Derrick, I thought we –
14     MR. KELLEY:  Why don't we do this simply, to
15  make it easier so we can get done today?  I'd like
16  to certify the questions.  I don't know that we have
17  to make an emergency call to the magistrate to bring
18  up things that came up that I may want to question.
19  And we can – if I want to pursue it, I'll do it
20  with the magistrate as a motion to compel.
21     MR. SLOSAR:  You know what?  Why don't you
22  certify those questions without Ms. Hoskins in the
23  room. I'm going to instruct her not to answer it.  I
24  think these questions are intentionally harassing
25  and causing her emotional harm as you can see.

Page 254

1     MR. KELLEY:  Well, I resent that a whole lot,
2  but I'll get over that to say let's get what we've
3  got to get done.  I think I'm representing my client
4  in trying to determine exactly --
5     MR. SLOSAR:  Who bore her children?
6     MR. KELLEY:  Well, that's not so much a concern
7  to me as why she had that reaction to answering a
8  simple question of:  Who's the father of your child?
9     MR. SLOSAR:  She said she didn't --
10    MR. KELLEY:  And, you know, I don't know why
11  that would cause that kind of reaction.
12    MR. SLOSAR:  She told you that --
13    THE WITNESS:  Can I speak?  Can I say
14  something?
15    MR. SLOSAR:  Sure.
16    THE WITNESS:  It's because you mentioned my
17  child.  You didn't have to go through what I went
18  through this morning when I left my kid at home that
19  wouldn't go to school because she knew I was coming
20  to see attorneys.
21    MR. KELLEY:  Well --
22    THE WITNESS:  She thinks I'm not coming home.
23  You didn't do that, did you?  You didn't go through
24  that.
25    MR. KELLEY:  No.  I've had something worse

Page 255

1  happen to me, but I won't talk about that.
2     THE WITNESS:  It's nothing to do with the
3  daddy.
4     MR. SLOSAR:  Worse?
5     MR. KELLEY:  Yes.  Worse.
6     THE WITNESS:  Nothing to do with the daddy.
7     MR. SLOSAR:  Worse --
8     MR. KELLEY:  Yes.  I don't have a son because
9  he's six feet under, but okay.
10    MR. SLOSAR:  Look, John.
11    MR. KELLEY:  I don't -- well, you've just
12  questioned my ethics, and I'm really on my
13  borderline with you.
14    MR. SLOSAR:  I did, because look at what you're
15  putting her through for a question that's not
16  relevant.
17    MR. KELLEY:  Well, I've been through a lot,
18  too.  I've not brought it into a court of law for
19  somebody else to decide so You know, I don't bring
20  it to the world to talk about.  I don't hire some --
21  I'm sorry.
22    MR. SLOSAR:  Some what?  Some what?
23    MR. KELLEY:  I stopped.  I stopped.  I'm not
24  going to say anything more.
25    MR. SLOSAR:  Why don't we take a break?  You

Page 256

1  can regroup with your questions.
2     MR. KELLEY:  I'll ask my questions, and we'll
3  certify them, and that'll be it.  That's as easy as
4  can be.
5     MR. SLOSAR:  And what I'm saying is that I
6  would respectfully ask for my client not to be in
7  the room and --
8     MR. KELLEY:  That's fine.
9     MR. SLOSAR:  -- I will go on the record.
10    MR. KELLEY:  That's your choice.
11    MR. SLOSAR:  Okay.  You should leave the room
12  with Amy.  Let's go off the record real quick.
13    VIDEOGRAPHER:  Off the record at 4:09.
14        (OFF THE RECORD)
15    MR. KELLEY:  After consultation with counsel,
16  it is my understanding that I can at least discuss
17  the areas I intended to cover and certify them to
18  the Court for the purposes of determining whether
19  they have relevance and whether Ms. Hoskins should
20  be compelled to testify as to these matters.  I
21  would ask the witness, number one, who is the father
22  of her daughter, because of the reaction she had to
23  it and why it was so objectionable.  Number two, I
24  would ask questions concerning whether she's ever
25  been involved in an abusive relationship and whether

Page 257

1  she's was ever abused or frightened of Mr. Lester or
2  Mr. King or others who were involved in this case,
3  whether she ever felt intimidated by them.
4     MR. SLOSAR:  You can ask those questions.
5     MR. KELLEY:  All right.  I would ask her --
6     MR. SLOSAR:  Not the -- we would object to the
7  first, the abusive relationship.
8     MR. KELLEY:  Okay.
9     MR. SLOSAR:  We would not.
10    MR. KELLEY:  I would ask her whether she had
11  ever sought or obtained either a domestic violence
12  order or other restraining orders for Mr. Lester,
13  Mr. King, others -- whether -- I would extend it
14  also to include Jonathan as far as whether she was
15  intimidated by him.
16    MR. SLOSAR:  We will not object to those
17  questions.
18    MR. KELLEY:  Didn't ask her if she's ever been
19  treated.  I was going to ask her what effect and
20  whether she felt that her addiction took her away
21  from her children and whether she ever wrote a
22  letter to that effect.
23    MR. SLOSAR:  We would not object to that
24  question.
25    MR. KELLEY:  Okay.  I intend to ask her

Page 258

1 questions as to whether she's ever sought
2 psychological treatment or ever sought counseling
3 through comprehensive care, through her pastor,
4 through – any treatment like that.
5     MR. SLOSAR:  She answered that interrogatory
6 under oath negatively.  We would not object to that
7 question.
8     MR. KELLEY:  Okay.  Those are the areas I'd
9 cover.
10     MR. SLOSAR:  So, it seems like the question
11 that you want to ask to Ms. Hoskins, which is:
12 Earlier when you testified that you did not know who
13 the father of your daughter, Lexi Hoskins, is, why
14 did you leave the room and have such an emotional
15 reaction when that question was posed?
16     MR. KELLEY:  Yes.
17     MR. SLOSAR:  We would object to that and seek a
18 protective order on that, because I think the answer
19 is very obvious to most people.  Let me go consult
20 with my client, get her back in here, and you can
21 ask these other issues.
22     MR. WRIGHT:  All right.  Let's go off the
23 record then.
24     MR. KELLEY:  Okay.
25         (OFF THE RECORD)

Page 259

1         VIDEOGRAPHER:  Back on the record at 4:22.
2 BY MR. KELLEY:
3     Q   Okay.  Let me ask you about your present
4 medical – are you taking any prescription medication at
5 the present time?
6     A   No.
7     Q   Okay.  I have to ask this:  Are you taking any
8 illicit medications at the present time?
9     A   No.
10    Q   [REDACTED]
[REDACTED]
[REDACTED]
15    Q   Okay.  And so did you enter a program while
16 you were in jail or how did it resolve?
17    A   I guess just because I was put in jail.  I
18 wasn't going nowhere.  I just – I – I got involved –
19 there was a program at Laurel County.  I just can't
20 think of the name.  It was church women that came maybe
21 every Tuesday.
22    Q   Kind of counseling then?
23    A   It's where they – we could hear other
24 people's stories.
25    Q   Okay.

Page 260

1     A   But what really changed my life in jail was I
2 got to – they brought a 16-year-old girl in the jail.
3 Her mom had been in and out of jail.  And I got to hear
4 her side of the story about how it was having a parent
5 that was on drugs.
6     Q   Okay.
7     A   I got to hear her side, so from that point on,
8 that really had an impact on my life.
9     Q   [REDACTED]
[REDACTED]
[REDACTED]
14    Q   Okay.  How long had you been an addict before
15 2012?
16    A   I was in a car wreck in 2003, and the doctor I
17 had, he started writing me pain pills.  I started taking
18 them, and eventually, they quit working.  So, from that
19 point – that would have been in 2003 – stayed on pain
20 pills for quite a few years, and when they quit working,
21 I moved to the Roxie 30s.
22    Q   Okay.  [REDACTED]
[REDACTED]
[REDACTED]

Page 261

1     Q   All right.  When did you buy – start buying
2 drugs on the street, let's say, for lack of a better
3 term.
4     MR. SLOSAR:  Object to form.  You can answer.
5     A   I don't think it was that I was buying them.  I
6 was just with people that had them, so
7     Q   You recognize that you developed a physical
8 need for them; is that fair?
9     A   Yes.  It wasn't that I did them to get high,
10 not at all.  I actually – when I was taking medication,
11 it was just I did it to just be able to sit here and
12 talk.
13    Q   All right.
14    A   If that makes any sense.  It wasn't that I was
15 doing it to get high.  It was just to do it to feel
16 normal.
17    Q   Did you seek counseling during this period of
18 time for your addiction?
19    A   I tried the 12-step program.
20    Q   What was the name of the – can you tell me
21 the name of the agency or the program you were enrolled
22 in?
23    A   It was in Knox County.  I don't remember the
24 church, what it was called.
25    Q   Usually, I associate AA with 12-step programs.

Page 262

1   Is that a Knox County AA?
2       A   Yes.
3       Q   Okay.
4       A   AAN.
5       Q   All right.  Again, did you abuse any other
6   substances or drink?  Were you drinking, too?
7       A   No.
8       Q   Okay.  It was simply the -- either the pills,
9   or it became an intravenous issue; is that fair?
10      A   Yes.  It started out taking them.  Then it led
11  to snorting them.  Then shooting them in the end.
12      Q   All right.  And I would take it, at this time,
13  2010, 2011, when this murder occurred, that this was
14  probably the lowest point in your life as far as your
15  drug abuse?
16          MR. SLOSAR:  Objection to form.  You can
17      answer.
18      A   Can you ask it again?
19      Q   Sure.  I take it you were an intravenous drug
20  user in 2010 and 2011 when this murder occurred?
21      A   I'm not for sure when I started using the
22  needle.  I actually got my phlebotomy, did my clinicals,
23  learned how to take my blood from that point on.  So I'm
24  not for sure where I started or when.
25      Q   Okay.  I guess I'm not asking this right.  Can

Page 263

1   you tell us how many times you were injecting yourself,
2   say, in December of 2010, January of 2011?
3       A   I'm not sure.
4       Q   Okay.  Was it daily?
5       A   Yes.
6       Q   Okay.  Would it be more than once a day?
7       A   No.  A lot of times, it could be just once a
8   day.
9       Q   Okay.  Do you believe that your addiction,
10  particularly at this time in your life, affected your
11  family life?
12          MR. SLOSAR:  Objection to form.
13      A   Do I believe it what, affected
14      Q   Well, I'll probably draw an objection, but do
15  you think you were a good mother while you were under
16  the influence of these drugs?
17      A   I -- I do think I was a good mother.  I
18  actually know I was a good mother.  It -- like I said, I
19  didn't do it to get high.  I did it to not have the pain
20  that I had from that car wreck.  Say -- I would always
21  make sure that my kids had money to the side.  I would
22  not take from them.  I would not take their money.  If I
23  thought they could want something to eat, I was right
24  there.  I probably wasn't -- I -- my mom helped probably
25  a lot.  She had a big impact on mine and my kids' life.

Page 264

1   She helped us a lot.
2       Q   Would you drive during this period of time?
3       A   My -- I would have a car sometimes; sometimes
4   I wouldn't have a car.
5       Q   Sure.  But you would --
6       A   If I could get a car --
7       Q   Would you drive while taking drugs?
8          MR. SLOSAR:  Objection to form.  Foundation.
9      You can answer.
10      A   If I did, I didn't take my kids with me.
11      Q   That was my next question.  Okay.  I'm the bad
12  guy in this whole thing, you realize, but okay.  All
13  right.  I take it then you think that your drug abuse
14  did not have much effect upon your family during this
15  period of time?  They wouldn't know?
16      A   They wouldn't have known.
17      Q   They wouldn't know it?
18      A   If it -- if -- this explains it better.  My
19  mom had no idea that I took medication.  She had no
20  idea.
21      Q   Okay.
22      A   And I lived with her and saw her all the time.
23      Q   All right.  Were you ever afraid of William
24  Lester?
25      A   No.

Page 265

1       Q   All right.  Ever have any reason -- did he
2   ever abuse you, have any reason to get a domestic
3   violence order or any kind of protective order?
4       A   No.
5       Q   Okay.  Likewise, Joe King?
6       A   Mine and Joe King's relationship, it was for
7   so long on and off.  I guess right out of high school,
8   maybe during high school.  He was always a jealous kind.
9   I was, too, especially in high school.  But he -- we
10  kind of grew apart and separated ourself for a couple of
11  years.  Then we'd get back together.  But his
12  relationship was just different.  He -- he got to where
13  he wanted to start hanging with the wrong people, doing
14  medicine, and he would start cussing me, and other than
15  that, we had to get an EPO on each other.  I think he
16  got one on me.  I know I got one on him.
17      Q   Yeah.
18      A   But other than that, he -- he busted my mouth
19  once before, and other than that, we were -- we just had
20  to separate ourself.
21      Q   All right.  I know you didn't have any
22  relationship with Mike Simpson, did you?
23      A   No.
24      Q   Okay.  But you knew him.  Were you scared of
25  him?

Page 266

1    A   I didn't know him like, to be -- I didn't know
2   him good enough to be scared of him.
3    Q   Okay.  I'll ask this in a general way.  Well,
4   let me ask:  Did you ever write a letter saying to your
5   children that you regretted the time that you spent
6   addicted, and that you thought it took away from your
7   relationship with them?
8    A   I'm not sure how it was worded, but I'm sure
9   it took time away, because, remember, I told you if I
10  drove, they didn't go with me.  So, whenever I was
11  driving, therefore, I was away from them.
12   Q   All right.  I'm particularly interested in the
13  time -- the instance where you heard William Lester
14  having this conversation about Ms. Mills.  Were you high
15  that day?
16   A   Like I told you, I didn't -- I couldn't tell
17  you the last time I ever was high.
18   Q   Okay.
19   A   I only took that medicine and got prescribed
20  for medicine --
21   Q   To keep it from hurting you?
22   A   -- was to not hurt.
23   Q   Yeah.  Keep it from hurting you.  I got you.
24  So you were pretty clear about what you heard?
25   A   Oh, yeah.

Page 267

1    Q   Okay.  Is there a reason after you heard about
2   the murder and the robbery that you didn't go to the
3   police immediately and say, "hey, this is what I know
4   about what Mr. Lester said, I can't live with myself,
5   I've got to tell you this"?
6    A   If, at one second -- if one second I would
7   have thought William Lester meant what he said, I would
8   have went straight to the law.  As you can see from my
9   past, I don't care one bit to talk to them.  So, I would
10  have went as fast as I could if I would have took
11  William Lester serious.
12   Q   Well, don't you think it was worthy to tell --
13  I think you talked -- I think you've already told me you
14  weren't scared of Sheriff Pickard to go and tell him, I
15  don't know if this has importance or not, but this is
16  what he said?
17      MR. SLOSAR:  Objection to form.  Asked and
18  answered.  She just answered that.
19   Q   You didn't think of doing that?
20   A   Well, if I would have took it -- him serious,
21  if I thought he would have ever done something like
22  that, I would have been the first one to run and tell
23  the law.
24   Q   Okay.  So, you
25      MR. KELLEY:  All right.  If we can go off the

Page 268

1   record for a second, I want to talk to my clients,
2   and then I'll come back.  I may be done.
3      VIDEOGRAPHER:  Off the record at 4:34.
4        (OFF THE RECORD)
5      VIDEOGRAPHER:  Back on the record at 4:37.
6      MR. KELLEY:  Thank you, Ms. Hoskins.  That's
7   all the questions I have.  Want to trade seats?
8      MR. FARAH:  She's going to go next.
9      MR. KELLEY:  Okay.
10     MS. KINCER:  Just because I have more.
11     MR. KELLEY:  Beg your pardon.
12     MS. KINCER:  That's all right.
13     MR. KELLEY:  Beg your pardon.
14        EXAMINATION
15  BY MS. KINCER:
16   Q   Ms. Hoskins, my name's Shawna Kincer, and I
17  represent a bunch of the KSP people.  So, it's even hard
18  for me to keep all of their names straight, but kind of
19  the ground rules of what I want to say is a lot of my
20  questions are going to be like Mr. Kelley's as far --
21  and Mr. Wright's as far as I'm asking you independent --
22  your independent knowledge and not conversations or what
23  your attorney's told you.
24   A   Okay.
25   Q   So, when I ask, let's just assume every one of

Page 269

1   those questions have that preface, that it's any
2   independent knowledge that you would possess outside of
3   what your attorney has said, okay?
4    A   Okay.
5    Q   All right.  So, I'm going to start with Mark
6   Mefford, Trooper Mark Mefford.  Do you know him?
7    A   No.
8    Q   Okay.  Never dealt with him in the past, any
9   other charges, speeding tickets?
10   A   That, I'm not sure about because I can't
11  remember who all has wrote me a ticket, so I'm -- I'm
12  not sure.
13   Q   Okay.  Do you have any independent knowledge
14  of an interview that he was present on that involved
15  Robert Beach?
16   A   No.
17   Q   Okay.  Do you know Brian Johnson -- Trooper
18  Brian Johnson?
19   A   No.
20   Q   Okay.  Did he -- in any of these encounters,
21  was he ever part of, you know, showing up at your house,
22  the time that Jonathan Taylor was there, or
23   A   No.
24   Q   Okay.  So no independent knowledge of him?
25  Okay.  What about Dallas Eubanks -- Trooper Dallas

Page 270

1  Eubanks?
2      A   No.
3      Q   And that happens to be Derek's brother.
4      A   I don't know him.
5      Q   You don't know him as well?
6      A   No.
7      Q   Okay.  Trooper Kelly Farris?
8      A   No.
9      Q   Do not know him, no knowledge?
10     A   Never had any run-ins, never been told
11  anything other than conversation with attorneys.
12     Q   Okay.  And Jackie Joseph, Trooper Jackie
13  Joseph?
14     A   I saw her in court before.  I – I know she
15  came to one of our court – the dates on the murder
16  charge.
17     Q   On the murder charge?  Did you have any
18  knowledge of her while the investigation was going on?
19     A   No.
20     Q   Okay.  Do you have any independent knowledge
21  that she somehow led this investigation or that she
22  directed the investigation, because she's a supervisor?
23     A   No.
24     Q   Okay  Any – you know, that she somehow told
25  Detective York what questions to ask or led how this

Page 271

1  interrogation would go?
2      A   No.
3      Q   Okay.  And do you have any knowledge that any
4  of those five troopers conspired to frame you?
5      A   No.
6      Q   Okay.  That they falsified any evidence?
7      A   No.
8      Q   Okay.  That they manipulated any evidence?
9      A   No.
10     Q   Okay.  Do you know these five troopers, any
11  reason that they would have somehow held a grudge
12  against you or animosity?
13     A   No.
14     Q   Okay.  I'm sorry.  With Mark Mefford –
15  Trooper Mark Mefford, apparently, he was present for the
16  interview of Daniel Wilson.  Do you have any independent
17  knowledge of that interview?
18     A   No.
19     Q   Okay.  And then Brian Johnson is the one who
20  sat in on Robert Beach, if I'm not mistaken.
21     A   No.
22     Q   Do you have independent knowledge of that?
23     A   No.
24     Q   Okay.
25         MS. KINCER:  Anything else?  That's all I have.

Page 272

1             EXAMINATION
2  BY MR. FARAH:
3      Q   All right.  I get to close.  I'm going to be
4  very, very brief, Ms. Hoskins.  I represent Mike
5  Broughton and the Barbourville Police Department. You've
6  testified a lot today about Detective York and Sheriff
7  Pickard and the other officers and so forth. I'm going
8  to ask some very specific and narrow questions about my
9  officer, Detective Broughton, and anybody else with the
10  Barbourville Police Department, okay?
11     A   Okay.
12     Q   I'm going to get to the interview on February
13  15, 2011 in a minute.  I understand that Detective
14  Broughton was present at that interview, correct?
15     A   Yes.
16     Q   Okay.  And that was at the Barbourville Police
17  Department, correct?
18     A   Yes.
19     Q   Okay.  Prior to that date, had you ever had
20  any interaction, ever met, any involvement whatsoever
21  with Mike Broughton?
22     A   Never.
23     Q   Had you ever had – prior to that date,
24  February 15, 2011 had you ever had any interaction,
25  involvement, or dealings with anybody else – any other

Page 273

1  officers with the Barbourville Police Department?
2      A   No.  On that – let me take that back.  On one
3  of the, I think the juvenile hit-and-run case, that was
4  just Barbourville City that showed up at my house.
5      Q   Okay.  And that was when you were how old?
6      A   I was a juvenile.
7      Q   Okay.  Do you know if it was Mike Broughton?
8  I'm not sure he was even around then.
9      A   No.  Not that I remember.
10     Q   Okay.  Do you have any reason to believe that
11  anything arising out of that juvenile incident had
12  anything to do with this case here?
13     A   No.
14     Q   Okay.  Now, let's go to the interview at the
15  police department.  You testified earlier that you were
16  picked up at your house and brought to the police
17  department, correct?
18     A   Correct.
19     Q   Was either Detective Broughton or any other
20  member of the Barbourville Police Department involved in
21  picking you up at your house and bringing you to the
22  Department?
23     A   I'm – I'm not sure.  When I said – the
24  County or the City took me on one of those times I was
25  arrested.  I'm still not for sure.

Page 274

1    Q   If I mention Mike Broughton to you, does that
2  help refresh your recollection?  Was he in the car with
3  you when you were transported?
4    A   I just remember when I got there, he was
5  standing, waiting.  So, I don't know if he was in a cop
6  car.  I don't know that.  And we went into a small room
7  in the Barbourville City Police Department.
8    Q   Okay.  And Detective York was there, correct?
9    A   Yes.
10   Q   Okay.
11   A   Detective York and Mike Broughton.
12   Q   Okay.  Now, Exhibit 1, which is that
13  transcript.
14      MR. FARAH:  Do you have it handy, by any
15  chance?  It's the very first – it should – yes.
16  No.
17      MR. SLOSAR:  The 26(a)(1) disclosure?
18      MR. KELLEY:  No.  I don't think it's 1.
19      MR. FARAH:  No.  I'm sorry.  It's not Exhibit
20  1.
21      MR. SLOSAR:  Yeah.  He didn't mark it.
22      MR. FARAH:  Do you have PL –
23      MR. KELLEY:  She has it, I think.
24      MR. FARAH:  It was out earlier.
25      MR. SLOSAR:  He didn't – I don't think he

Page 275

1  marked it.
2      MR. FARAH:  It was not – okay.  That's fine.
3      MR. WRIGHT:  I just identified them for the
4  record –
5      MR. FARAH:  That's fine.
6      MR. WRIGHT:  – by the Bates number.
7      MR. FARAH:  That's fine.
8  BY MR. FARAH:
9    Q   During the interview – and there's a
10  transcript of the interview; it was recorded, and
11  someone transcribed it, Detective York starts off by
12  stating that – he identifies himself, he says that I'm
13  here to take a statement from you, and then he mentions
14  that Detective Broughton is also present.  That sound
15  familiar to you?
16   A   Yes.
17   Q   During the interview, was it clear to you that
18  Detective York was primarily leading the interview of
19  you?
20   A   Up until de – or Mike Broughton asked – this
21  was before they turned on the recorder.  Mike Broughton
22  asked Detective York would he step outside.  They
23  stepped out in the hallway, but as he was getting up, he
24  said, "I feel something fishy about this" –
25   Q   Who –

Page 276

1    A   – and they walk out.
2    Q   Who said that?
3    A   That was Mike Broughton told York.
4    Q   Okay.
5    A   At that point, they walk out in the hallway,
6  and I guess they – they're out there probably over 10
7  minutes, and they come back in.
8    Q   Okay.  Do you have any information about what
9  they discussed in the hallway for those ten minutes?
10   A   No.
11   Q   Okay.  Now, this is before the recording
12  started, correct?
13   A   Before.
14   Q   Okay.  Tell me anything that Mike Broughton
15  said in your presence in that room before the recording
16  started other than what you just said, can we go out in
17  the hallway for a second.
18   A   Other than that, Detective York was leading
19  it, and he was just going along with what Detective York
20  said.
21   Q   Yeah.
22   A   If Detective York asked me something, and I
23  didn't answer it, then Mike Broughton would try to ask
24  me the same thing and see if I would answer it then.
25   Q   That's the take that I got as well when I read

Page 277

1  it, that Mike might have a couple of follow-up
2  questions, but then York would ask five or six questions
3  in a row, and Mike might say, well, what vehicle was
4  that, who owned that vehicle, something like that?
5      MR. SLOSAR:  Objection.
6    Q   Is that fair?
7      MR. SLOSAR:  Objection to form.  You can
8  answer.
9    Q   Go ahead.
10   A   He would – say, if I – I guess if I didn't
11  answer it the way, I guess, what they wanted to hear, he
12  would just ask me the same question.  It might be once,
13  it might be twice.  And then I think, at one point, he
14  was asking me the questions, and York backed off.
15   Q   Okay.  And when the – and during the
16  recording part of the interview, I think it's the –
17  call to Mr. Lester was made, correct?
18   A   Yes.
19   Q   Okay.  Now, you indicated earlier in your
20  testimony that at some point after the recording, that
21  Detective York also said some things to you; is that
22  correct?
23   A   Yes.
24   Q   Okay.  Let's go to that part.  Did Detective
25  Broughton – did Mike Broughton say anything to you

Page 278

1 during that time?
2     A   Not – I can't remember exactly if he would
3 have said anything, what it would have been.
4     Q   Was he still in the room?
5     A   Yes.  He was still in the room.
6     Q   Okay.  So, is it fair to say, from what you've
7 just testified to, that other than what was on the
8 recording, whatever Mike Broughton said on the
9 recording, the only other things he said to you either
10 before the recording or after, the only thing he
11 actually said was, he asked Detective York to step out,
12 that something smelled fishy?
13        MR. SLOSAR:  Objection to form.  You can
14     answer.
15     A   Before – remember, I told you at one point
16 York backed off and Broughton started asking the
17 questions, I guess to see – play a different role to
18 see if – who I was more comfortable with maybe?  I
19 don't know.  At that point, York was actually quiet
20 and –
21     Q   I took that to mean that was during the
22 interview?
23     A   That was before – not the recorded part.
24     Q   Okay.
25     A   That was before the recorder was even on.

Page 279

1 After the recorder went off is when the phone got
2 snatched.  It seems like Mike Broughton got mad about
3 it, but York's the one that snatched the phone.  They
4 had put a piece in my phone, like, on the back of it or
5 in it to record them, and that was – both of them did
6 that to the phone.  I'm not sure which one did more or
7 anything like that.
8     Q   What, exactly, are you talking about?
9     A   I don't know.
10     Q   Like, some device?
11     A   It was something that recorded the
12 conversation.
13     Q   Okay.  Again, I want to know exactly what Mike
14 Broughton said – you know, if he asked you questions
15 that aren't in this recorded statement, I need you, to
16 the best of your ability, tell me what he was asking
17 about.
18     A   I'm not sure what all he could have – what
19 all he asked.
20     Q   Okay.  Were they just questions about the
21 investigations, about what you knew?
22     A   Just questions.
23     Q   For example, earlier, you mentioned Detective
24 York, I'm not sure if you called it a threat or
25 whatever, he said – you know, referred to you as a

Page 280

1 piece of crap, a druggie, mentioned a woman was killed,
2 that you had no family, and that it could have been you.
3 Do you recall saying that earlier about Detective York?
4     A   Yes.
5        MR. SLOSAR:  Object to form.
6     Q   Did Detective Broughton say anything to you
7 like that?
8     A   I don't know exactly the questions he asked.
9 I'm – I'm not for sure.
10     Q   Now, after the interview – I'm sorry.  Were
11 you going to add something?
12     A   No.  Go ahead.
13     Q   After the interview was over, from that point
14 forward, did you have any other interaction with
15 Detective Broughton with regard to the investigation and
16 prosecution for the Mills' murder?
17     A   After the interview –
18     Q   Yes.
19     A   – York told Broughton to get me out of there.
20 And he's actually the one that took me over to the jail.
21     Q   Okay.  So, Detective Broughton took you over
22 to the Knox County Jail?
23     A   Yes.
24     Q   Okay.  Did he take you in a cruiser?
25     A   I'm not for sure.

Page 281

1     Q   Okay.  Did you have any conversation with him
2 in the car or whatever you were driving on the way over
3 there?
4     A   Not that I remember.
5     Q   Okay.  Once he deposited you at the jail, did
6 you have any other interaction or involvement with him,
7 anything else that you're aware of from that point
8 forward in the investigation and prosecution for the
9 Mills' murder?
10     A   Not that I remember.
11     Q   You mentioned also that you think there may
12 have been a second visit at some point in time that you
13 made to the Barbourville Police Department, at some
14 point in time, correct?
15     A   Correct.
16     Q   Was Mike Broughton present during that second
17 visit?
18     A   Not that I remember.
19     Q   Do you recall interacting or being interviewed
20 or speaking to any other members of the Barbourville
21 Police Department at that second visit?
22     A   I – not that I remember.
23     Q   Now, I think you said earlier that you were
24 asked – I can't remember by whom, but that you asked
25 or, your word, begged, to take a polygraph on a number

Page 282

1  of occasions.
2      A   Yes.
3      Q   Is that correct?  And I think you mentioned
4  the first time was at that first interview; is that
5  correct?
6      A   Yes.
7      Q   Okay.  Was Mike Broughton in the room when you
8  made this request?
9      A   Yes.
10     Q   And what was the response from either
11  Detective Broughton or Detective York?
12     A   They -- it was like they ignored me.  They
13  didn't -- they didn't acknowledge that I wanted it.
14     Q   They didn't respond --
15     A   No.
16     Q   -- anything?  They just didn't respond?
17     A   Yeah.
18     Q   Now, how about the others?  You mentioned
19  maybe three or four times that you asked -- that was the
20  first time.  Then there were several times in the, you
21  know, time after -- oh, I'm sorry.  It's been a long
22  day.  I'm surprised it hasn't come off before.  You
23  mentioned there were several other times after that that
24  you made a request for polygraph, correct?
25     A   Yes.

Page 283

1      Q   Okay.  What was the response when you made
2  those subsequent requests to take the polygraph?
3      A   At the -- the hearing -- or the DNA thing,
4  I -- I'm not for sure why he -- I didn't get a response
5  out of that.  I actually had some of my defense team
6  there, I guess --
7      Q   Who was that person?
8      A   Lisa Evans and Jessica -- I'm not for sure of
9  her last name.  She's with the DPA also.
10     Q   Okay.  But who from the, I guess, prosecutor's
11  office or the law enforcement, who was present then?
12     A   Just Detective York.
13     Q   Okay.  And were you given a reason as to why
14  or a rejection or just did they ignore you again?
15     A   No.  I -- I know, on one occasion, that
16  Detective York told me that lie detector tests, that it
17  didn't stand up in court.  I didn't know that, that it
18  doesn't count in court.
19     Q   But that wasn't the -- was that the first
20  time -- that wasn't the first time there with Broughton;
21  that was a subsequent time, correct?
22     A   Yeah.  That was a different time.
23     Q   Okay.  And I'm going to jump around a little
24  bit because you've been asked a lot today.  You
25  mentioned later in your deposition that even currently

Page 284

1  or in recent times that you have concerns because you
2  will see the KSP -- a KSP cruiser parked out near your
3  house or in front of your house, correct?
4      A   Correct.
5      Q   Okay.  Have you ever seen a Barbourville
6  Police Department cruiser or car or vehicle parked out
7  in a similar fashion?
8      A   No.
9      Q   I asked you about prior to the interview had
10  you ever dealt with Detective Broughton or the
11  Barbourville Police Department.  Since you were first
12  brought in there, have you had any other interactions
13  with anybody on behalf of the Barbourville Police
14  Department in any -- whether it's this investigation or
15  anything else?
16     A   I've ran into Mike Broughton once after I had
17  got out.  He just -- and it wasn't no conversation.  I
18  don't -- I don't even know if he knew who I was.  He
19  just told me where the place that you go get your
20  license in Knox Court was, where that office was.
21     Q   Okay.  I'm assuming you just ran into him in
22  downtown Barbourville?
23     A   No.  We were in the courthouse, and he had to
24  tell us where -- where to go to.
25     Q   Okay.  Other than that --

Page 285

1      A   No.
2      Q   -- anything else?
3      A   No.
4      Q   Okay.  Now, do you have any -- other than,
5  obviously, Mr. Broughton -- or Detective Broughton's
6  involvement in the interview with you -- and I've read
7  the transcript and seen the questions he asked.  Do you
8  have any knowledge or information that Detective
9  Broughton or any other member of the Barbourville Police
10  Department either created or fabricated any evidence or
11  witness statements?
12         MR. SLOSAR:  And I would -- I don't what you
13     prefaced this with.  I'm sorry.
14         MR. FARAH:  I'll go with the same preface.
15         MR. SLOSAR:  Okay.
16  BY MR. FARAH:
17     Q   I don't want you to tell me anything your
18  attorneys or investigators have told you.  Do you have
19  any information, personal knowledge that you've not
20  received or ascertained from your counsel, that
21  Detective Broughton or any other member of the
22  Barbourville Police Department have created or
23  fabricated any evidence or witness statements in this
24  case?
25     A   No.

Page 286

1   Q   Do you have any personal knowledge, and with
2   the same admonition, that Detective Broughton or any
3   other member of the Barbourville Police Department
4   conspired to frame you, to fabricate evidence, or to
5   manipulate or create evidence against you in this
6   matter?
7   A   No.
8   Q   Do you have any personal knowledge that
9   Detective Broughton or any members of the Barbourville
10  Police Department either withheld or concealed any
11  exculpatory evidence, or evidence that might have
12  cleared you?
13  A   No.  Only problem on that -- I mean, I felt
14  like Mike Broughton should have asked York to stop
15  during that -- the way he was acting when -- in that
16  questioning, if that is how you -- how -- part of the
17  question.
18  Q   No.  That's fair.  So, what do you think Mike
19  Broughton should have done?
20  A   Instead of telling him he felt something fishy
21  going on, just at least calm him down.  Like, Detective
22  York was really mad after the phone call, when he
23  snatched the phone.  It actually was scary.  He just
24  kept hitting the table over and over and over and just
25  screaming right here in my face.

Page 287

1   Q   Okay.  But Detective Broughton wasn't doing
2   this.  You're saying you felt that he should have
3   intervened or said something to Detective York?
4   A   Yeah.
5   Q   Okay.  Anything else that you believe he
6   should have done or did do or didn't do at that time?
7   A   Not that I remember.
8   Q   You would agree that, in that room -- I'm
9   sorry.
10  A   Go ahead.
11  Q   I know it's not easy.  You would agree that in
12  that room, though, that Detective York was running the
13  show?
14      MR. SLOSAR:  Objection to form.
15      MR. WRIGHT:  Object to form.
16      MR. SLOSAR:  Calls for speculation.
17  BY MR. FARAH:
18  Q   Take your time.
19  A   Go ahead.
20  Q   We're almost done.  No.  You would agree with
21  me that Detective York was running the show in that
22  interview on February 15, 2011?
23      MR. SLOSAR:  Objection to form.  Calls for
24  speculation.
25      MR. WRIGHT:  Objection.

Page 288

1   BY MR. FARAH:
2   Q   Go ahead.
3       MR. WRIGHT:  Join.
4       MR. SLOSAR:  Go ahead and answer.
5   Q   You can answer.
6   A   Yes.
7   Q   Okay.
8   A   But I felt like Mike Broughton could have at
9   least calmed him down or stopped it at some point.
10  Q   Is that the most you have to say about
11  Detective Broughton is that, at worst, he should have
12  said something to Detective York or told him to calm
13  down or take it easy?
14  A   He -- he sure didn't -- he -- he wasn't
15  saying -- it's like he was pumping him.  He -- he was
16  more than less telling him he felt something fishy about
17  it, taking him out in the hallway.  Then when York came
18  back, he was really aggravated after that.
19  Q   Well, he told Detective York -- he took him
20  out in the hallway.  You have no idea what they
21  discussed in the hallway?
22  A   I just know he came back a different attitude,
23  York did.
24  Q   Okay.  Okay.  But Detective Broughton didn't
25  exhibit any different attitude toward you when he came

Page 289

1   back in, correct?
2   A   I don't remember.
3   Q   And, again -- I'm almost finished here --
4   Interrogatory number 11, which you've been asked about
5   repeatedly today, in your answers to Detective York's
6   interrogatories, you went through a long list of things
7   that defendant York or defendant Pickard or defendant
8   Mefford, or a bunch of different people that they --
9   where they allegedly fabricated statements or fabricated
10  reports.  There's no mention whatsoever of Detective
11  Broughton in any of these?
12      MR. SLOSAR:  I would object to form and --
13      MR. FARAH:  Okay.  Anyway
14      MR. SLOSAR:  I think the interrogatory isn't
15  framed, as you know, toward Detective Broughton.
16      MR. FARAH:  I don't think it's framed toward
17  Detective Pickard or Mefford or anyone else, but it
18  is what it is.
19  BY MR. FARAH:
20  Q   But you would agree that there's no -- you
21  don't mention anything about Detective Broughton
22  specifically in this discovery answer?  And you can read
23  it if you want to.  I'll represent to you you don't, but
24      MR. SLOSAR:  We would stipulate to it.  In your
25  discovery answer, you'll get some stuff.

Page 290

1        MR. FARAH: I'm looking forward to it.
2  BY MR. FARAH:
3        Q    In fact, in the complaint, it's a 198-
4  paragraph complaint, very, very de-factually detailed.
5  Would you agree with me that there's not one factual
6  allegation or assertion that references Mike Broughton
7  by name in that entire 198-page complaint? Would you
8  agree with me?
9        MR. SLOSAR: Objection to form. That actually
10  misstates the complaint, itself, which speaks for
11  itself.
12       Q    Would you agree with me?
13       A    Can I –
14       MR. SLOSAR: Object to form. Calls for
15  speculation. Can you show her the complaint?
16       MR. FARAH: Sure. Let's go off the record and
17  let her do that.
18       VIDEOGRAPHER: Off the record at 5:00.
19            (OFF THE RECORD)
20       VIDEOGRAPHER: Back on the record at 5:01.
21  BY MR. FARAH:
22       Q    Ms. Hoskins
23       MR. FARAH: You know, I'll withdraw that last
24  question. That's all I have.
25            CROSS EXAMINATION

Page 291

1  BY MR. SLOSAR:
2       Q    I have very, very short follow-up, Amanda.
3       A    Okay.
4       Q    A few moments ago, you were just being asked
5  questions about Detective Broughton during the February
6  2011 interrogation with defendant York. Do you recall
7  being asked questions about that?
8       A    Yes.
9       Q    Okay. And I believe you testified earlier
10  that Detective York, at some points in that interview,
11  was telling you what to say; is that right?
12       MR. WRIGHT: Object to form.
13       Q    You can answer.
14       A    Yes.
15       Q    And was defendant Broughton present when
16  Detective York was doing that?
17       A    Yes.
18       MR. WRIGHT: Object to form.
19       Q    Did Detective Broughton ever tell Detective
20  York to stop doing that?
21       A    No.
22       Q    At some point in that interview, I believe you
23  testified earlier that Detective York was banging on the
24  table; is that right?
25       A    Yes.

Page 292

1       Q    Okay. Was Detective Broughton present when
2  that was happening?
3       A    Yes.
4       Q    Did Detective York make any threats to you as
5  he was banging on the table?
6       A    Threatened to charge me with murder.
7       Q    And how close to you was Detective York when
8  he was banging on the table and threatening to charge
9  you with murder?
10       A    About right here.
11       Q    How did that make you feel?
12       A    Awful. Scared.
13       Q    Did Detective Broughton ever tell Detective
14  York to stop doing this stuff to you?
15       A    No.
16       Q    And, in fact, was it your belief that
17  Detective Broughton, during the course of that
18  interview, was encouraging the type of actions that
19  Detective York was taking?
20       MR. FARAH: Object to the form.
21       MR. WRIGHT: I object, too.
22       A    Yes.
23       MR. SLOSAR: We don't have anything further.
24       MR. WRIGHT: Could I just ask – it was
25  mentioned that she's recently had a child, if she

Page 293

1  could just identify whether the father is on the
2  Rule 26 disclosures as we've done before?
3       MR. SLOSAR: He's not. He's not.
4       MR. WRIGHT: Can you represent that?
5       MR. SLOSAR: Sure.
6       THE WITNESS: Yes. He's not.
7       MR. WRIGHT: That's all I have.
8       MR. SLOSAR: We done?
9       MR. FARAH: No, no. I do want to ask one
10  follow-up.
11            RE-EXAMINATION
12  BY MR. FARAH:
13       Q    In response to that last question, tell me –
14  we went through just earlier exactly what Detective
15  Broughton did or didn't do in the interview, what he
16  said. Tell me who you believe he was encouraging
17  Detective York's actions or his words or, as you alluded
18  to, where he was in your face threatening you?
19       A    It wasn't that he was in my face. He would
20  repeat the same question. York couldn't get it out of
21  me; he would repeat it. He didn't get down like this
22  right here like Detective York did, right in my ears.
23       Q    Broughton didn't? For example, where was
24  Broughton – if you were sitting there, during the
25  interview, where was Detective Broughton at the time?

Page 294

1    A   They both were right in front of me, both of
2   them sitting side by side, say, at just a regular table.
3   I don't know which side was which, but both of them was
4   right in front of me.
5    Q   Okay.  And you realize we have a recorded
6   statement and we have a transcription of the interview
7   and the questions that were asked concerning who asked
8   you what and in what order they asked you and so forth,
9   correct?
10   A   Yes.
11   Q   Okay.  When you say that Mike would keep
12  repeating the same question, I see a couple of occasions
13  like that, but I don't see a long pattern of that
14  throughout the interview.
15       MR. SLOSAR:  Objection to form.
16   A   That's -- that's not -- the entire time we
17  talked is definitely not on that recording that you
18  have.
19   Q   Okay.  How much time -- tell me how much time
20  you believe was off the record or off the recording?
21   A   I've already answered that.  I'm not sure.
22   Q   Okay.  And you also answered that -- you told
23  me exactly what Detective Broughton said during that
24  time.
25   A   I said I wasn't for sure what all he said.

Page 295

1   I -- I don't remember what exactly -- everything he
2   said.
3    Q   Well, you said that he asked Detective York to
4   step out, that something smelled fishy?
5    A   Yeah.
6    Q   Okay.  And then that was it for before the
7   recording, and then after the recording, you said he
8   just was in the room?
9        MR. SLOSAR:  Objection to form.  Misstates her
10  testimony.
11   Q   Well, tell me -- to the best of your
12  recollection, tell me what you recall Detective
13  Broughton asking you or saying to you that you believe
14  was not recorded.
15   A   He kept repeating the question.  Whatever
16  question it was that York would say five or six times,
17  here Broughton would say it, just maybe not the same way
18  York was saying it, right in my face.
19   Q   Okay.  And did --
20   A   After it was cut off, when Detective York was
21  in my face screaming, I -- Detective Broughton sure
22  wasn't poking him on the shoulder and saying come on,
23  come one.  I mean, this detective really wanted to hit
24  me, honestly.
25   Q   What detective wanted to hit you?

Page 296

1    A   Detective York.  He -- he was that mad.
2    Q   Now, you're not alleging that anyone struck
3   you in the interview room, are you?
4    A   No.  No.
5    Q   Okay.
6        MR. FARAH:  All right.  That's all.
7        MR. SLOSAR:  Done.
8        VIDEOGRAPHER:  Off the record at 5:06.
9        (DEPOSITION CONCLUDED AT 5:06 P.M.)

Page 297

1        CERTIFICATE OF REPORTER
2        COMMONWEALTH OF KENTUCKY AT LARGE
3
4   I do hereby certify that the witness in the foregoing
5   transcript was taken on the date, and at the time and
6   place set out on the Title page here of by me after
7   first being duly sworn to testify the truth, the whole
8   truth, and nothing but the truth; and that the said
9   matter was recorded stenographically and mechanically by
10  me and then reduced to type written form under my
11  direction, and constitutes a true record of the
12  transcript as taken, all to the best of my skill and
13  ability. I certify that I am not a relative or employee
14  of either counsel, and that I am in no way interested
15  financially, directly or indirectly, in this action.
16
17
18
19
20
21
22
23  JESSICA VAN-TILBURG, COURT REPORTER / NOTARY
24  MY COMMISSION EXPIRES ON: 06/28/2020
25  SUBMITTED ON: 03/22/2018

**Exhibits**

EX 1 71:22 72:4 274:12,19, 20

EX 2 93:11,12 136:8

EX 3 149:13, 14,15,18 151:18 152:15 153:9

EX 4 152:4,20 153:9 155:6

**$**

$15 144:20 145:14

$15,000 23:11

$20 144:22

$300 145:2 148:10

$400 144:23 145:1,2,7 147:9 148:1,10

**-**

--I 216:6

**0**

018935 152:2

018939 149:12

**1**

1 71:22 72:4 141:4 200:14, 15 220:15 224:15,16,17 240:16,17 274:12,18,20

10 137:6 183:8 276:6

100 141:13

214:11

104 227:5

10:00 55:12

10:04 63:3

10:15 63:5

10:20 68:14

10:32 68:16

11 138:12 165:10,15 220:3,4 289:4

11:00 46:5

11:10 93:5

11:21 93:7

11:30 46:10 47:2 48:23

11:54 47:4 54:5

12 32:10,15,19

12-step 261:19,25

12-year-old 138:12

12:18 135:21

12:30 49:2

13 223:7

15 31:1,23 46:7 47:7 68:17 70:18,21 75:16 272:13,24 287:22

150 90:25 141:13

16 143:7 167:4 168:1,5 221:5

16-year-old 260:2

16th 7:4

17-CV-84 7:11

18 34:8,19,25 35:22 51:10

19 62:20 95:22 136:9 199:11, 13 223:20,21

224:6

198- 290:3

198-page 290:7

1985 17:6

1999 18:3

19th 72:19

1:00 49:2

1:11 135:23

1:15 135:4

**2**

2 93:11,12 136:8

20 47:1,24 48:7 51:14 52:2,22 53:5,19 54:11, 16 55:23 60:18 61:1 62:16 72:18 74:12,16 82:25 86:3 94:9 141:4 142:21 144:24

200 141:20

2000 18:5 62:8

2002 200:12 223:22

2003 34:14,21 88:1 89:1 260:16,19

2004 27:4 63:21,23 64:2

2006 89:17

2007 89:10,18 141:4 225:20

2010 10:14,15 17:3,10 18:6 27:11 39:8,10, 17,20 47:1 49:17 51:1,14 52:2,22 53:5,19 54:11,16 55:23 59:6,21 60:18 61:1 62:9,16,20 65:7,16,20

66:10 72:18 74:13,16 85:22 86:3,20 87:15, 21 88:8,21 90:3,5,12,19 91:4,10 92:1,17 95:14,15 137:5 139:18 141:4, 23 142:18,21 146:2 147:6,16, 22,24 148:14, 23 149:3 151:21,24 155:15,19 157:15 159:5, 15 162:10 183:19 185:23 188:22 262:13, 20 263:2

2011 28:17 29:14,18 31:1, 24 34:17 36:11 47:25 48:7 57:16 58:7 74:23 75:16 76:22 83:1 97:5,8 103:8 104:2,7,18 106:11 114:18 116:9,10,12 117:16 118:23 121:24 132:20 134:3 143:7 148:19 152:6 153:20 154:2 155:2 167:5 168:1,5 169:9 175:24 202:24 207:12 221:5 262:13,20 263:2 272:13, 24 287:22 291:6

2012 117:13 118:23 121:23 125:6,18 130:9 131:8 173:2 220:15 223:7 259:14 260:12, 15

2015 75:15 178:11

2016 178:13,14 243:12

2018 7:5

20s 51:3

20th 48:19

21 71:11

24 51:4 169:8

25 17:13 34:15 85:21

26 34:16 70:5 73:6 86:13 92:12 253:12 293:2

26(a)(1) 274:17

26(a)(1)s 71:3

262 141:19

2828 150:24

2:00 49:5

2:03 171:10

2:13 171:12

**3**

3 10:16 66:15 137:12 149:13, 15,18 151:18 152:15 153:9 199:14 226:17

3,000 153:3

30 143:14,15,19 144:10,23

30(d)(1) 135:6

300 143:8

30s 51:3 143:8, 9,10,11 144:23 145:2,7 147:15 148:1,10,22 150:20 153:19 260:21

350 142:4

3:40 240:1

3:51 240:3

3:58 246:18

The Deposition of AMANDA HOSKINS, taken on March 16, 2018

299

**4**

**4** 136:16 152:4, 20 153:9 155:6 228:21

**400** 143:9

**42** 135:15

**498** 150:23

**4:00** 246:20

**4:09** 256:13

**4:22** 259:1

**4:34** 268:3

**4:37** 268:5

**5**

**5** 181:15 182:15,16

**500** 153:2

**546-3441** 43:17

**5884** 150:24

**5:00** 290:18

**5:01** 290:20

**5:06** 296:8,9

**6**

**6** 96:7 104:24 136:14 182:14 185:12 229:22 242:4

**7**

**7** 10:15 57:16 66:8,13

**7.5** 260:25

**76** 226:23

**8**

**8** 141:2

**9**

**9** 141:2,16

**9-year-old** 183:7

**9:02** 7:5

**9:30** 53:12,19 55:12

**A**

**AA** 261:25 262:1

**AAN** 262:4

**abandoned** 71:6

**ability** 279:16

**absconded** 124:16 125:9, 12,17

**absconding** 127:18 128:2 129:9 131:9,11, 19

**absolutely** 41:13 64:10,13 65:2 69:6,15 249:10 252:15

**abuse** 262:5,15 264:13 265:2

**abused** 257:1

**abusive** 252:1 256:25 257:7

**accident** 18:10 200:13,19 223:24 224:12

**account** 60:25

**accumulatively** 115:11

**accuracy** 29:4

**accurate** 29:11 58:10 94:2 136:6 141:10

**accusations** 222:22

**acknowledge** 282:13

**acknowledged** 69:16

**acknowledges** 70:24

**acquaintance** 117:10

**act** 40:4

**acted** 208:8

**acting** 212:20 286:15

**actions** 292:18 293:17

**activity** 69:14 99:23

**acts** 253:1

**actual** 65:14 209:15 228:15 234:23

**add** 141:8 182:13 183:1 280:11

**added** 115:17

**addict** 260:14

**addicted** 266:6

**addiction** 257:20 261:18 263:9

**addition** 142:12 144:2

**address** 10:1 183:21 184:15, 25 185:2 186:14,25

**addressed** 209:5 249:10 253:7

**admit** 191:4

**admitted** 64:22

**admittedly** 225:8

**admonition** 286:2

**advice** 169:5 177:1 185:8 234:24 246:9

**affect** 249:20, 22

**affected** 263:10,13

**affirm** 8:9

**afraid** 264:23

**age** 88:17 108:4

**agency** 140:5 164:20 184:22 215:5 241:24 261:21

**aggravated** 288:18

**agree** 177:13 227:13 232:7 287:8,11,20 289:20 290:5,8, 12

**agreement** 115:15,18 135:10 253:11

**ahead** 116:13 128:1 153:13 231:6 242:25 277:9 280:12 287:10,19 288:2,4

**air** 42:13

**alarmed** 207:2

**alibi** 54:15

**alive** 52:4 159:2

**allegation** 220:13 221:1,4 222:25 290:6

**allegations** 68:21 69:3,17 72:6 80:7 165:25

**allege** 170:6

**alleged** 170:13

**allegedly** 289:9

**alleges** 79:6

**alleging** 296:2

**Allen** 78:7 79:7,21 80:13, 25 83:5 85:11 142:20 162:9 163:24 164:6 165:7 173:1 222:2,3,5,6,16, 22

**alley** 179:7

**alleyway** 180:4

**allowed** 69:1 107:17,20 111:22 122:22 129:7 183:12, 13

**alluded** 293:17

**Amanda** 7:14 8:18 41:14 65:1 68:3 160:5 165:5 180:22 291:2

**Amber** 84:21, 25 180:9 223:7, 10

**amend** 124:1

**amended** 104:3 217:22

**amount** 23:17 181:19,20,22 208:5 235:21

**amounts** 141:7 220:23

**Amy** 7:15 256:12

**animosity** 191:14 271:12

**animus** 201:17,21 223:16

196:19

**answer's** 141:16

**answering** 63:25 199:9 254:7

**answers** 136:2 185:11 199:8 289:5

**anticipating** 135:8

**anymore** 118:13 216:9

**apologize** 103:23 214:7 237:2

**Appalachian** 49:16 206:8

**apparently** 192:3 271:15

**applies** 221:13

**appointment** 44:24 45:1,4,8 46:5,10 47:1 48:22 49:19 53:22

**apprehended** 198:20

**approached** 75:20,23 76:1

**approximately** 115:13 131:20

**area** 69:5 184:17 232:6, 10

**areas** 256:17 258:8

**Argumentativ e** 24:20

**arising** 273:11

**arm** 186:3,5 207:21

**arms** 101:23 106:7

**Armstrong** 125:12 126:2, 15 128:9

**arraignment** 216:17,18

**arranged** 117:2,6

**arrest** 100:8 102:22 103:8 105:25 113:5 114:4 115:10, 14,24 116:2,3 118:2,3,19,21 119:25 120:3 121:1 122:7,12 130:9 132:6,23, 24 188:1,16,18 192:4 194:15 202:12 214:4 215:21 218:14 226:24

**arrested** 38:9, 10 97:12 99:10 100:22 101:17 104:14,18,20, 23 105:4,9,23 113:7,9,10,23 114:11,17 115:7 117:23, 25 119:23 120:4 122:9 187:13,18 188:3,7 191:21 192:6 199:1 202:22 205:20 208:4 210:11, 16,22,23 211:11,18 218:12,24 273:25

**arresting** 100:25 215:7

**arrests** 102:3,7 103:12 122:2

**arrive** 46:4

**arrived** 47:4 54:5 98:1,19

**ascertained** 285:20

**asks** 30:8 102:25

**assault** 137:12 199:15 225:21

**assert** 169:2 244:2 245:9 246:3

**assertion** 247:4 290:6

**assistant** 88:4, 18 89:13,14 123:10

**assisted** 248:9

**associate** 261:25

**assume** 9:5 189:23 209:25 241:21 246:8 247:1 268:25

**assuming** 284:21

**attended** 130:17

**attitude** 288:22,25

**attorney** 123:5,9,10,19, 22 138:5,8 177:16 180:19 190:24 199:10 220:16,25 221:14 222:16 223:4 233:10 245:22 248:24 251:9 269:3

**attorney's** 186:17 246:9 268:23

**attorney-** 169:2 246:3

**attorney-client** 79:4,15 80:5 164:17 166:12

**attorneys** 69:7 79:11,19,23 80:9 81:8,13 163:23 164:20, 22 166:15 171:23 172:1,3, 4,16,23 173:6 180:13,25 181:5,9 189:13 191:3 198:4

244:22 245:17 254:20 270:11 285:18

**attorneys'** 183:25 184:15, 25 186:15

**attributed** 167:5 206:14 221:6

**attributes** 148:7

**audio** 31:22

**automobile** 202:16

**aware** 83:10 161:21,23 199:7 221:7 281:7

**Awful** 292:12

———

**B**

**babysat** 10:19, 21

**babysit** 20:20

**babysitting** 9:17 10:17 21:6

**back** 15:5 16:1, 4,18 21:24 22:5,11,16,23 26:13 29:5 33:19,21 40:20 46:13 49:17 50:6 55:15 56:2 62:17 63:5,8,9 65:19 68:16 73:2,3,23,24 74:14,17 86:8 92:12 93:7,9 95:20 105:12 120:2,8 121:9, 16 122:21 123:15 124:11 135:3,23,25 164:23 169:19 171:12,14 174:18,20 178:24 179:5,7, 8,10 180:1,3 185:25 192:9

193:2,6 207:11 209:24,25 211:20 212:11 213:16 223:22 227:4,6 230:14 231:2 234:16 240:3 246:20 258:20 259:1 265:11 268:2,5 273:2 276:7 279:4 288:18, 22 289:1 290:20

**backed** 277:14 278:16

**backseat** 208:8

**bad** 264:11

**ballpark** 28:3 90:9

**banging** 291:23 292:5,8

**bank** 180:2

**Baptist** 73:5

**Barbourville** 8:5 9:22,24 33:6,10,11,15 34:10 46:18 74:25 75:4,5,16 76:22 97:8 119:11 132:10, 21 139:22 200:21 272:5, 10,16 273:1,4, 20 274:7 281:13,20 284:5,11,13,22 285:9,22 286:3, 9

**base** 80:12

**based** 69:23 78:24 79:10 80:8 104:11 136:5 163:20 182:3

**basically** 246:23

**basis** 107:16 127:18 181:6,

The Deposition of AMANDA WOSKINS, taken on March 16, 2018

301

11 195:21
247:12

**Bates** 275:6

**bathroom** 31:7

**Battingfield**
137:24

**Beach** 171:17,
20,25 172:5
223:13 269:15
271:20

**bear** 251:23

**bears** 191:14

**beds** 167:14

**beep** 12:6 13:4

**beg** 237:1
268:11,13

**begged** 175:17
281:25

**begin** 42:8
122:16 165:19
220:14 229:24

**beginning**
31:1 160:4

**begins** 165:17

**behalf** 7:15,17,
20,23 8:1,4
169:9 221:19
222:5 284:13

**belief** 80:12
94:6 111:8
136:6 292:16

**believes** 68:24
69:25 230:18,
19

**believing** 79:8

**bell** 19:21,25
32:10,22 38:6,8
43:18 59:8
114:2 161:8
178:5 179:17
216:4 225:5
228:21 241:13,
19 242:7,8,14,
16,24 243:1
244:24

**belonged**
18:16

**belongs** 18:14
216:22

**bench** 232:4

**bias** 64:20 70:8

**big** 103:23
167:13 215:25
216:22 263:25

**bills** 93:1 154:3

**birthdate**
136:21,22

**birthday**
229:2,10

**bit** 64:11 267:9
283:24

**black** 106:6
111:24 179:5

**block** 136:20

**blonde** 38:25
39:8

**blood** 262:23

**blue** 82:8,23
83:2,5,8

**Bob** 158:23
159:8,10,12,19
160:6,9 165:24
166:3,6,20,24
167:1 220:6,15,
18

**bond** 101:20,
21 105:25
116:4,14,15,16,
18,20 117:11,
14,22 118:6,13
121:11,12,14,
18 131:23
133:10 214:24
218:12

**Bones** 161:15,
18,20

**Bonnie** 243:2

**booked** 194:18
197:9 214:22

**booming**
189:25

**borderline**
255:13

**bore** 201:21
252:19 254:5

**born** 17:5

**bottle** 112:14

**bought** 143:8,
21 145:16,19
146:8 159:14
160:9 161:10
162:3,6

**boy** 10:15
34:24 140:18
183:12 227:9
243:9 259:12

**boyfriend** 86:8

**branch** 137:19
138:14,17

**branches**
138:19

**Branson** 85:15
113:21 114:8
143:4,7 145:1
148:7 167:6,16,
20 168:2,6,18,
23 169:1,17
221:7,8

**Branson's**
153:7

**break** 9:8,11
62:25 68:12
93:4,18 94:9,
16,19 98:8
102:1 129:12
134:23 135:2,3
171:7 239:24
246:13,14
255:25

**breath** 42:12,
13

**Brewer** 242:22

**Brian** 7:20,24
269:17,18
271:19

**bring** 127:13
146:12 253:17
255:19

**bringing** 245:4
273:21

**brings** 183:8

**broke** 101:21
238:25

**brother** 270:3

**brought**
103:21 225:10
255:18 260:2
273:16 284:12

**Broughton** 8:5
34:1,3 134:14
175:19,20
272:5,9,14,21
273:7,19 274:1,
11 275:14,20,
21 276:3,14,23
277:25 278:8,
16 279:2,14
280:6,15,19,21
281:16 282:7,
11 283:20
284:10,16
285:5,9,21
286:2,9,14,19
287:1 288:8,11,
24 289:11,15,
21 290:6 291:5,
15,19 292:1,13,
17 293:15,23,
24,25 294:23
295:13,17,21

**Broughton's**
285:5

**Brown** 160:15,
16

**buddy** 25:8
238:24

**bunch** 7:18
167:11 189:2,8
268:17 289:8

**burglary** 96:8
102:2,16,20
104:3,17 105:8
124:1 217:23
229:22,23,25

**burglary-third**
217:22

**business**

184:13

**busted** 265:18

**Buster** 110:3,
13 111:6 120:8
192:25 197:12

**butt** 128:17

**buy** 18:11 26:5,
7,23 144:15
145:7,25
146:11,16
159:7,10,12
160:16 161:1,
17 261:1

**buying** 145:12
146:3 147:9
148:1 160:10
261:1,5

———

**C**

**Caesars** 90:16

**call** 11:19 12:1
37:2,10 40:4,11
41:15 42:17,19,
22,25 64:14,15
65:4 68:13
98:10 127:23,
24,25 134:3
158:5,16,18
187:5 250:25
251:4 252:2,9
253:17 277:17
286:22

**called** 15:19
19:15 32:4
43:12 97:14
98:14,18
100:13 126:1,9,
14 127:10
132:10 134:12
139:6 143:22
158:19 168:9
213:15 261:24
279:24

**calling** 105:19
158:20 246:15

**calls** 12:3
20:17 51:20,23
56:11 77:23
80:18 96:15

159:21 160:13
170:25 177:17
196:1 287:16,
23 290:14

**calm** 286:21
288:12

**calmed** 288:9

**Camaro** 19:3,5

**camera** 183:3,
5

**caption** 191:5

**car** 12:8 17:1,
17,23 18:7,9,10
82:8,23 83:5,8
84:23 85:2,6
96:14,23 120:8
137:16 138:24
140:9,10,11,14
146:11 183:5
192:9 197:15
214:9 260:16
263:20 264:3,4,
6 274:2,6 281:2
284:6

**card** 126:1

**care** 107:9
132:3 133:6
193:12 258:3
267:9

**cared** 42:14

**caretaker**
106:21

**carries** 165:18

**cars** 83:2
197:17

**case** 32:23
36:22 38:14
41:5 64:8 67:13
68:25 70:1,13
79:2,24 83:12
125:14 149:16
154:17 162:13,
19 166:14
185:18 199:3,
23 231:10
243:19,25
244:17 245:17,
18 251:8 257:2
273:3,12

285:24

**cases** 165:24

**cash** 142:21,22
148:13

**catch** 25:9
238:16

**caught** 64:17
114:1

**causing**
253:25

**cell** 43:25 44:2,
11 113:21
129:7,8 157:15
167:8,9,11,12,
13,15,20 168:2,
7,9

**cellmate** 85:15

**Center** 46:25
56:9,20

**certificate**
88:4,6,19,23
89:4,21 90:1

**certify** 253:16,
22 256:3,17

**certifying**
177:5

**chance** 136:1
245:23 274:15

**change** 112:13
223:3

**changed** 39:1
122:13 260:1

**changing**
78:11 240:5

**charge** 32:20
37:7 95:6 96:8
101:4,18 102:2,
17,21 104:2,3,
11 105:23
106:2 115:6,10,
23,24 122:3,13
124:1,8,9,18,
21,23 128:3,20
129:1 134:10
136:18 137:10,
14 177:10
188:5 192:7

199:1 200:11,
12 207:8
215:22 216:18,
20 217:20
223:23 224:14
225:6,9,20
226:16,23
228:21 270:16,
17 292:6,8

**charged** 82:1
95:8 96:12
101:19,20
104:12,15,20
106:1 122:14
128:7,25 138:1
176:12 205:21,
23 217:18
223:18

**charges** 32:6
103:2 127:16
178:6,10,16
179:22 223:22
225:9,25
243:16,21,22
245:14 248:22
249:5 269:9

**charging** 37:3,
11

**check** 103:22
141:20 150:5

**child** 90:22
92:8 141:14
142:12 252:20
254:8,17
292:25

**children** 66:5,6
254:5 257:21
266:5

**Children's**
49:16 206:9

**choice** 228:13
256:10

**Christian**
120:9 192:20

**Christmas**
142:25

**Christy** 85:15
113:21 114:8
143:3,6 145:1
148:6 153:7

167:6,16 168:2,
18,23 169:1,17
221:6,8

**chronologicall
y** 102:2

**church** 72:23,
25 73:4,6,8,13
74:2 108:6,7,9
202:9 259:20
261:24

**church-going**
108:13

**cigarette**
23:22 24:13
212:12

**cigarettes**
42:15

**Circuit** 122:17
230:13

**circumstance**
172:20

**circumstance
s** 96:11 137:13
168:22 171:18
172:11 180:8,
12

**citation** 36:24
37:7 101:15
128:21 214:20

**city** 8:5 110:6
119:11,17,18
134:13 175:21
179:16 200:22
203:1 204:11
207:13 208:2
209:1 211:6
273:4,24 274:7

**civil** 83:13
244:25 248:11

**claim** 182:7

**claimed** 250:2

**claiming**
248:19

**claims** 64:11

**clarify** 52:19
156:12

**classes** 88:3

**clear** 68:23
143:24 164:16
185:18 266:24
275:17

**cleared** 286:12

**clears** 190:9

**Cleo** 160:15,16

**clicked** 12:6

**client** 68:6
70:11,16,22,23
71:4,14 131:4
163:12 164:9
169:3 182:2
223:14 246:3,4
254:3 256:6
258:20

**clients** 268:1

**Clinic** 46:16

**clinicals**
89:15,20,23
262:22

**clip** 151:10
153:22

**close** 15:18
28:12 90:9
157:21 208:5
213:25 272:3
292:7

**closed** 129:3

**closing** 231:10

**clothes** 127:14

**co-** 167:17

**codefendant**
125:13

**Cody** 7:19,23

**coerced**
165:14

**coercing**
235:13

**coincidence**
112:10

**cold** 119:2

**college** 88:2

303

color 39:1,4,7, 11,13,19

colors 39:9

columns 150:12

comfortable 278:18

comment 192:21,24

commit 230:19,21 235:2 237:21

committing 78:18 80:23

commonwealth's 123:9

communication 79:1 163:3,4 164:10 191:11 246:1

communications 81:12

community 19:18 32:10 91:18

compel 253:20

compelled 256:20

complaining 101:14 214:19 215:12,14,21 217:18

complaint 77:25 78:6 79:6 80:7 83:15 164:3,16 290:3, 4,7,10,15

complete 96:1 141:9,12

completed 227:10

completely 71:6

compound 153:11 226:6

comprehensive 258:3

concealed 286:10

conception 67:14

concern 195:13 254:6

concerned 197:3

concerns 284:1

CONCLUDED 296:9

condition 249:5,17,21,23 252:5,6

conditions 32:21 227:1

confidential 165:6

confirm 57:13

confuse 36:8

confused 191:4 235:19

confusion 102:24

congratulations 244:21

connected 139:8

consent 195:7

considered 76:20 120:13 239:1,3

consistent 46:1

conspired 271:4 286:4

conspiring 237:20

constantly 138:19 183:6,9

consult 258:19

consultation 256:15

consulted 70:23

contact 190:18 191:22 194:10, 12 200:24 201:4 221:7 223:8,13 227:9 242:13 243:3

contacted 140:1

contacts 96:15

contemplating 238:20,22

content 244:12

continuance 177:16

continue 41:14 64:14 65:3 187:2 235:4 237:22 244:2 245:8

continued 150:7 177:11

continuing 164:14 251:15

convenient 134:25

conversation 23:15 25:7,18 27:18 28:13 37:15 83:25 146:15 156:15 206:5 236:6 237:13,17 266:14 270:11 279:12 281:1 284:17

conversations 35:6 81:5,8 163:14,22,23 164:13 172:1,3 182:3 221:9 244:3 245:10, 16 268:22

convicted 95:3,11,14,18,

19 138:3 187:23 229:12

conviction 96:9 104:17 136:15 137:14 199:15

convictions 102:25 104:17, 19 224:24

cop 36:5 97:17 110:5,6,7,12 120:8 139:13 140:1,3 274:5

cops 34:9 82:13

copy 71:17 94:20

Corbin 88:11

corner 190:13

correct 30:17 42:1,24 72:4,19 74:14 75:6 76:6 77:2 84:4 85:25 95:23 104:1 105:20 115:1 131:14 137:6 149:1,2 152:18 155:3 166:4 169:14,15 170:4 181:20, 21,22,23 182:14 192:1,5, 12 196:21 197:4 201:1 203:5 204:2 206:24 216:12 219:5 222:6 226:14 228:23 229:4 236:2 241:1 243:14, 17 272:14,17 273:17,18 274:8 276:12 277:17,22 281:14,15 282:3,5,24 283:21 284:3,4 289:1 294:9

correspond 175:9

corroborate 233:15

cost 143:14,19 144:14,17

could've 233:1

counsel 7:11 64:6 66:23 69:1,22 81:6 163:5,15,22 164:11,14 166:10,11 169:5 177:1,7 182:4 191:12 220:11 228:10 229:15 234:22 239:22 247:1 256:15 285:20

counsel's 185:7

counseling 258:2 259:22 261:17

count 128:20 283:18

counted 125:2

counties 244:23

county 7:8 8:2 19:21,25 20:5 32:4,10,22 33:13 38:6,8 57:15 58:7 110:5 113:17, 19,20 114:2 115:1 119:18, 20 121:5 126:5 132:25 133:1,3, 8,14,15,20,21, 22 134:1 137:15,21 138:21,22,23 167:21 168:8, 13,15 176:12 178:5 179:17, 20 186:20 190:5,10 191:23 196:13 197:8,10,22 198:23 199:20 200:11,17 201:10 208:12

214:23 216:4,5, 9 218:17,24 219:5,7,10,12, 14,16,24 221:24 223:9, 23 225:5,20 228:21 241:13, 19 242:7,8,14, 17,24 243:1 244:24 259:19 261:23 262:1 273:24 280:22

County's 198:11

couple 8:21 215:11 223:20 265:10 277:1 294:12

court 7:4,9 8:8, 13 9:25 107:21, 23 121:9,10,17 122:17,18,20 128:19 153:24 175:11 177:19 179:20 189:19, 21 216:16,19 217:1,3 226:2 230:13 251:4 252:9 255:18 256:18 270:14, 15 283:17,18 284:20

courthouse 230:4 231:25 284:23

courtroom 122:24 123:7 230:4,16 231:18,20,24 232:10 234:6

cousin 10:8,9 50:22 73:14 96:18 125:13 128:20

cover 256:17 258:9

covered 131:2 136:14

Cox 242:23

cracked 23:23

crap 37:20 280:1

crazy 38:1 230:17

create 221:1 251:5 286:5

created 164:19 285:10,22

credibility 64:20

credits 91:18

Creek 12:17 38:18

crime 79:8,22 80:14,23 83:17 95:3 187:24 225:10 228:14

crimes 95:13 235:2

criminal 79:24 83:14 123:19 128:3 166:14 171:16 177:10 194:15,18 199:14 223:21

CROSS 290:25

crossed 117:13

cruiser 33:19, 20 35:8 280:24 284:2,6

cry 13:11

crying 21:15 68:3,13 70:19 174:18 251:9

cuffed 207:22, 23

cuffs 207:20

cup 111:16

current 183:21

Curtis 110:10

cussing 265:14

custody 114:4, 22 115:3,14

128:6 133:25 178:6,7 186:10 187:14,19,24 188:2,16 197:5

cut 81:19 154:13 295:20

cutting 235:25

———————

D

daddy 255:3,6

daily 182:23 263:4

Dallas 7:21,25 269:25

damages 181:19,25 182:7 248:18 250:1 252:8,12

Daniel 172:7,8, 11 271:16

Danny 162:1,4

dark 15:17,18 38:24 138:12 179:6

dash 137:6

date 17:7 28:2 52:18 55:25 57:18 58:8 62:19 65:17 75:2 88:7 104:2,3 105:24 121:10 151:18 152:3 157:7 175:24 185:11 202:25 272:19, 23

dated 27:5 157:12

dates 27:13 29:16 57:17 65:13,14 90:8 91:12 95:7 114:23 168:8, 16 270:15

dating 62:8,10, 11,12 92:10

daughter 14:4, 11 66:15,17 67:19 68:25 70:18 109:11, 14 206:19 228:3,9,10,14 230:19,20 231:7 249:2 251:13 256:22 258:13

daughter's 14:1

daughters 14:19 76:13

day 7:5 44:24 45:1 47:11,15 48:4 49:9 50:15 51:9,13,15 53:4 54:10 72:17,21 74:21 76:17 83:11 85:6,12 99:10,11 109:23 123:1 129:14,16 139:11 143:9 144:23 145:2 147:9,16 148:10 183:3, 11,15 185:25 203:9 205:12 214:16 218:3 230:4 233:5 248:1 263:6,8 266:15 282:22

days 74:11 82:25 107:14, 18 109:8 115:16,22 127:15 129:18 131:12,13,19 133:22 191:17 226:23 227:5

de 275:20

de-factually 290:4

dead 9:16 15:11 27:3 30:1,3,11 44:15,19 45:2 51:14 72:18 74:12 77:5 82:20 83:11,20

84:4,8 85:7,22 88:13 92:22 152:9 159:2 160:22 162:19 170:4,9,19 174:15

deal 103:23 123:20

dealer 159:5 161:5,20,24

dealers 160:5

dealing 182:22

dealings 272:25

dealt 269:8 284:10

death 82:10 140:23 218:9 235:17

December 17:10 18:6 39:7,17 47:1,24 48:7 51:14 52:1,22 53:4,19 54:11,16 55:23 59:6 60:18 61:1 62:8,16,20 72:18,19 74:12, 16 82:25 86:3, 20 87:21 88:8, 21 90:3,12 91:4,10 92:1,17 95:14 141:4,23 142:21 146:2 147:16 148:13, 23 151:24 159:15 162:10 185:23 263:2

decide 255:19

decorum 71:7

defendant 167:5 168:22 169:9,14,17,21, 24 221:4,5,18 289:7 291:6,15

defendant's 220:14,21

defendants 7:18,20 8:2

165:23 166:19
167:18 171:8
183:24 184:24
222:4

**Defender's**
178:5,25 216:4
240:7 241:1,5
242:15,17
243:7,20 244:1
246:24 247:6
248:8

**defenders**
243:4

**defense** 69:22
83:14 123:19
176:17 245:11
283:5

**defining**
253:10

**definition**
39:24

**degree** 105:8
115:20 142:8
225:20,21
229:23 249:20

**delinquent**
91:7

**delve** 69:5 81:5

**delves** 164:10
246:1

**denials** 144:4

**denied** 69:17
72:5 159:24

**dental** 88:4,18
89:12,14

**deny** 57:13
60:23 153:6
156:6 159:19

**department**
32:5 33:1,6,15,
21 36:12,13
74:25 75:5,17
76:22 97:8
119:12 120:19
132:10,16
134:2,13,18
140:6 190:6,10
191:23 196:14

197:23 199:22
200:1,5,18
201:5,18 203:1,
18 204:9 208:2
209:1,2,19
211:6 214:18
219:24 221:25
223:9 272:5,10,
17 273:1,15,17,
20,22 274:7
281:13,21
284:6,11,14
285:10,22
286:3,10

**depends**
147:10

**deposed**
163:13

**deposited**
281:5

**deposition** 7:7
8:19 68:18
118:4 283:25
296:9

**depositions**
71:8

**deputies**
197:23

**deputy** 190:10,
12,14,21,25
191:7,25
192:14 193:10,
17 194:5,11
198:17 200:24
205:12 210:16
215:6,8,9,18
220:11 245:7
247:12 248:16

**Derek** 8:3
190:9

**Derek's** 270:3

**Derrick** 7:17
41:9 156:12
163:10 166:20
253:13

**Derrick's**
155:5

**description**
81:23 181:18

**descriptions**
69:10

**deserved**
42:13

**detailed** 290:4

**details** 76:8,12
206:4

**detective**
31:17,19 32:3
34:5 36:23 43:6
53:11 57:7,12
60:17 74:1
84:21 96:13,16,
21,23 97:4,11,
14 98:15,17,18,
21 99:16
100:13,17
101:6 102:6
104:20 105:13
106:5 109:7
110:2 111:5
114:5 119:8,14
120:20 127:15
128:10 129:16,
21 130:24
131:15 132:14
134:17 143:7
154:1 155:1,23
156:9,21 160:3
168:19 170:14,
23 171:19
172:12,15,18,
20 173:2
175:17,19,20
176:10,13
177:25 178:2
180:9 193:21
194:2 198:17
199:10 203:4
204:1 205:13
206:10,15
208:7 209:6
211:19 212:1,
19,20,25
213:11,15,18
214:21,25
215:8 216:15
217:15 245:4
270:25 272:6,9,
13 273:19
274:8,11
275:11,14,18,
22 276:18,19,
22 277:21,24

278:11 279:23
280:3,6,15,21
282:11 283:12,
16 284:10
285:5,8,21
286:2,9,21
287:1,3,12,21
288:11,12,19,
24 289:5,10,15,
17,21 291:5,10,
16,19,23 292:1,
4,7,13,17,19
293:14,17,22,
25 294:23
295:3,12,20,21,
23,25 296:1

**detector**
283:16

**determine**
254:4

**determined**
140:8,13

**determining**
256:18

**detours** 53:3

**developed**
261:7

**deviated**
165:25

**device** 279:10

**dial** 43:17

**diaper** 112:14

**died** 15:7 81:3,
15 82:6 159:3
174:17

**dig** 138:15

**direct** 8:14
118:5 180:8

**directed**
270:22

**directly** 166:4

**disclose**
184:24 233:24

**disclosure**
73:6 240:14
253:12 274:17

**disclosures**
70:6 86:13
92:12 240:15
293:2

**discovery**
118:4 185:24
247:15 250:12
289:22,25

**discuss** 27:24
243:19,25
244:11 256:16

**discussed**
79:19 276:9
288:21

**discussion**
237:16

**discussions**
169:20 173:8,
13,18,25 174:3
175:1

**dismissed**
178:10 207:8
243:14,16,21,
22 244:16,17
245:15

**dispute** 46:10
47:2,5 48:7
195:24 249:18
250:14 252:5

**District** 7:9,10

**Dixon** 88:24

**DNA** 66:20
68:4,8 70:17
130:18 131:5,
16 133:24
176:9 219:21,
22 251:12
252:20 283:3

**doctor** 49:2
50:18 53:22
54:12,21 55:19
56:5 67:9 69:8
260:16

**doctor's** 44:24
45:1,4,7 46:3,9,
12,13 47:17
48:16 52:15,21,
25 53:8,12,18
54:9 64:25

doctors 59:12

document 30:24 94:15 136:2 149:11, 16 152:1 180:20,24 181:2

documents 136:3 163:12 164:18,19 165:7

dogs 216:22

Dollar 179:1,4

domestic 257:11 265:2

Donna 62:5 158:2,3,9,18,20

door 96:19,22 99:3,19 101:22 106:5 110:24 111:1,4,6,8 112:2,4,10,16, 21 122:19 126:1 128:19 178:24 179:8,9 183:5 232:4

dope 85:19

doubt 29:4 233:4

downstairs 128:8

downtown 284:22

DPA 241:12,13 283:9

drag 250:17

draw 252:2 263:14

drawn 111:20

drink 36:15 262:6

drinking 262:6

drive 19:4 264:2,7

driven 19:6 24:8

driver 85:2,6 137:23

driveway 23:21 184:9

driving 16:20 83:2 84:23 126:25 127:2 136:20 184:6 229:1 266:11 281:2

drop 45:23 52:16,22 112:15

drops 112:25

drove 14:2 16:25 18:23 19:5,7 23:25 24:6 139:8 214:12 266:10

drug 58:14,25 148:16 149:21 151:23 152:14 153:20 159:5 160:5 161:5,20, 24 165:24 220:23 221:2 262:15,19 264:13

druggie 37:20 42:14 280:1

drugs 26:3,9, 13,19 27:15 45:23 60:1 108:23,25 146:16,19,25 147:2,4,6 149:6 153:6 159:8,10, 12,19 160:6,16 161:1,17 162:3 260:5 261:2 263:16 264:7

dyed 39:6

dying 60:19

———

E

earlier 24:5 141:8,22 143:3 144:3 147:12 148:12 249:9,

12 252:23 253:3 258:12 273:15 274:24 277:19 279:23 280:3 281:23 291:9,23 293:14

early 109:25

ears 293:22

easier 9:1 253:15

easily 37:23 38:18

Eastern 7:9,10

easy 227:8 248:3 256:3 287:11 288:13

eat 92:25 98:7 263:23

eating 94:17

Edwards 14:8 21:16 154:18 173:18,25

effect 239:7 248:22 249:3 250:16 257:19, 22 264:14

electricity 154:13

Elliot 93:14

Elliott 7:13

embarrassing 129:6

emergency 251:4 253:17

emotional 253:25 258:14

emotions 42:11

employment 89:12 90:4

encounter 178:23 180:5 230:10

encounters

179:18 216:14 221:20 269:20

encouraging 292:18 293:16

end 13:24 97:2 99:4 101:12 133:19 178:8 262:11

endangerment 137:13 199:16 225:21

ended 101:20 105:19 120:13 121:10 122:10 125:13 137:19 208:14 214:23

enforcement 117:19 121:2 162:22 164:20 197:18 198:23 283:11

enrolled 261:21

enter 259:15

entire 20:3 144:2 168:12 241:24 290:7 294:16

entirety 187:3 249:19

episode 114:12

EPO 265:15

Escoe's 19:17 85:12 157:21

essentially 182:9

et al 7:8

ethics 255:12

Eubanks 7:21, 25 8:3 190:9, 12,14,25 215:6, 8,10,12 245:7 247:12 269:25 270:1

Evans 130:3,7, 16 131:5,16

219:19 240:13, 25 242:11 244:4 245:10, 22,23 246:2 283:8

Evans's 245:14

evening 44:18

events 197:24 205:16

eventually 260:18

evidence 250:12 271:6,8 285:10,23 286:4,5,11

ex-mother-in-law 25:9

exact 179:6

EXAMINATIO N 8:14 190:2 268:14 272:1 290:25

exchange 39:24

exchanges 39:22

exculpatory 286:11

excuse 190:9 205:13 237:13

exhibit 71:4, 15,22 72:4 93:11,12 136:8 149:13,14,18 151:15,18 152:3,4,15,20 153:9 155:6 240:15 274:12, 19 288:25

expect 137:18

expecting 143:1

expert 151:6

explain 95:4 251:4

**explains** 264:18

**explanation** 153:8

**explicitly** 236:25

**Explorer** 179:5

**expressed** 196:6

**extend** 244:13 245:12,19 257:13

**extends** 244:6

**extent** 41:2 43:23 50:8 56:11 57:22 78:13,25 79:10 145:4 155:17 171:1 180:23 184:23 196:2 203:13 232:9

**extra** 148:13 153:5,6 154:9

**eyes** 101:25 106:7 129:3 183:25 184:15, 25 186:15

---

**F**

**fabricate** 221:1 286:4

**fabricated** 167:5 169:9 221:6,18 222:5 285:10,23 289:9

**face** 13:10 26:1 35:15 162:14 193:22 194:5 196:20 197:2 232:4 286:25 293:18,19 295:18,21

**facilities** 114:19

**fact** 128:13 153:19 195:8

**248:25 249:16, 25 251:6 290:3 292:16**

**facts** 41:6,7,21, 23 80:11,12,14 81:14,15,18,21 102:13 163:7,8, 17 167:23 249:24

**factual** 163:1,3 290:5

**factually** 81:16

**failed** 127:19

**failure** 32:9

**fair** 9:6 41:16 234:22 261:8 262:9 277:6 278:6 286:18

**fairly** 232:6

**fallen** 134:9

**false** 137:2 169:23 170:7, 13

**falsely** 169:10

**falsification** 222:25

**falsified** 180:15,21 181:7,12 271:6

**familiar** 275:15

**family** 37:23 42:14 61:13 154:24 250:1 263:11 264:14 280:2

**Farah** 8:4 268:8 272:2 274:14,19,22, 24 275:2,5,7,8 285:14,16 287:17 288:1 289:13,16,19 290:1,2,16,21, 23 292:20 293:9,12 296:6

**Farris** 7:22,25 270:7

**farther** 218:4

**fashion** 284:7

**fast** 267:10

**faster** 179:8

**father** 66:5,17 67:19 68:23,24 69:20,25 109:16 178:1,3 249:2,8 251:23 254:8 256:21 258:13 293:1

**favorite** 108:16

**fear** 179:2 183:4

**February** 28:17 29:14,18 31:1,23 34:17 36:11 57:16 58:7 74:23 75:15,16 76:22 97:7 104:2 125:18,19 132:20 134:3 154:2 155:2 175:22,24 178:8 202:24 207:12 272:12, 24 287:22 291:5

**feel** 9:4 192:25 193:1 217:14 261:15 275:24 292:11

**feels** 126:16 184:22

**feet** 255:9

**felon** 210:24

**felony** 229:16

**felt** 13:16 60:19 193:3 212:20, 23 213:2 224:20 257:3, 20 286:13,20 287:2 288:8,16

**field** 151:6

**figure** 135:12 140:13 181:25 199:2 205:15

**217:9**

**figured** 174:19, 22 248:14

**file** 41:17 78:21 94:20

**filed** 40:21 41:5 77:25

**filing** 40:24

**fill** 47:22,24

**filled** 48:12 49:4

**financial** 92:21 141:3

**find** 15:6 94:25 98:13,16 111:17 125:21 126:10,11 127:9 171:17 195:21 233:13, 24 247:11,18 251:17

**fine** 30:8 41:16 128:1 135:5 165:3 182:20 249:13 256:8 275:2,5,7

**fingernails** 219:21

**fingerprint** 128:24

**finish** 9:10 63:25 171:8

**finished** 51:11 185:16 195:17 289:3

**firearm** 101:5 104:2,22 106:2 122:14 132:7, 24 210:15,23, 24 213:7 229:24

**firearm's** 124:9

**Firebird** 18:3

**first-degree** 199:16

**firsthand** 171:18 172:10, 19 173:3

**fishy** 275:24 278:12 286:20 288:16 295:4

**fit** 232:15

**fix** 228:12

**flip** 136:9

**flippant** 237:2

**floor** 232:12,13

**Florida** 83:10

**follow** 87:7 124:22 177:1 186:17 246:8

**follow-up** 80:3,4 277:1 291:2 293:10

**food** 142:4

**Ford** 16:21 18:14 161:7,11 179:5

**forehead** 112:23

**forget** 40:18,23 41:6,19,23,24 42:3 129:6

**forget all** 40:17

**form** 11:22 12:3 20:17 28:4,21 29:6 39:23 40:25 41:8 43:22 46:9,12,25 48:22 50:7 52:17 53:13 56:10 57:21 78:12,19 80:18 83:23 84:24 143:20 145:3,8 147:11 151:18 152:15,17 153:10 155:16 156:11 159:21 160:7,13 170:10,25 191:18 195:15,

25 198:2
201:22 203:13
210:18 211:2
212:24 213:1
218:20 222:18
224:18 226:4
227:14 229:18
232:8 235:22
236:10,21
237:22 239:20
261:4 262:16
263:12 264:8
267:17 277:7
278:13 280:5
287:14,15,23
289:12 290:9,
14 291:12,18
292:20 294:15
295:9

**fortunate**
201:14

**forward** 164:17
248:4 280:14
281:8 290:1

**found** 9:16
12:1 15:10,12
21:10 22:24
27:3 30:1,3,11
44:15,19 45:2
51:13 72:18
74:11,12 76:5,
6,12,14 77:4,5
78:23 79:25
81:17 82:20
83:11,20 84:4,8
85:7,22 88:13
92:22 140:16
152:9 160:22
162:18 170:3,9,
19 174:13
227:13

**foundation**
28:21 43:22
52:17 53:13
56:10 84:24
143:20 145:3,8
155:16 203:13
244:9 264:8

**four-door**
208:10

**fourth** 104:13
122:12

**frame** 65:9,15,
17 87:13 89:10
113:22 114:6,
14 134:8
216:21 271:4
286:4

**framed** 68:6
251:24 289:15,
16

**free** 9:4

**Friday** 126:4

**friend's**
183:12,13

**friends** 34:9

**frightened**
257:1

**front** 81:11
138:24 157:21
183:9 220:1
235:7 284:3
294:1,4

**FTA** 32:9

**full** 125:1 127:7
165:18

_____

**G**

**gas** 141:20

**Gatnarek**
241:4

**gave** 28:18
64:11 67:9 69:9
73:25 84:21,25
114:4,8,15,22
115:16 136:21,
22 142:20
156:9 166:6
168:5 170:13
172:18 201:16
228:22 229:1
234:24 251:10,
13 259:13

**general** 70:16
82:19 251:11
266:3

**generally** 54:1
130:8

**gentleman**
190:13

**girl** 10:15 35:4,
19 45:13 89:7
101:23 106:6,7
111:25 112:24
140:20,21
183:7 197:3
199:18 202:15
226:24 227:3,9
260:2

**girl's** 88:17
112:14

**give** 8:9 26:21
66:18 71:15,16
92:3,5 93:21
119:23 120:5
121:13 123:22
152:1 154:7
156:14 159:24
160:5 229:9
245:23 251:11

**giving** 28:16
121:10 137:1

**goal** 247:11

**gold** 208:10

**good** 77:12
121:13 129:13
189:21,22
192:20 263:15,
17,18 266:2

**goodness**
17:4 139:1
215:25

**grab** 207:21

**graduate**
87:23 89:1

**graduated**
90:10

**Grand** 18:5

**grandkids**
10:19

**great-
grandkids**
9:17 10:20

**greater** 152:25
153:9 206:4

**grew** 265:10

**ground** 8:21
131:3 268:19

**grounds** 58:16

**group** 167:17

**grow** 19:18,20

**grudge** 191:15
201:18 223:16
271:11

**guard** 126:8

**guess** 28:5
34:8,16 35:5
46:24 102:18
107:16 117:9
121:11 145:11
152:23 175:19
200:12 216:5,
25 224:23
234:15,20
247:14 259:17
262:25 265:7
276:6 277:10,
11 278:17
283:6,10

**guessing**
137:6

**guilty** 101:12
122:12 217:21
218:18 219:1
223:24 224:12,
20,23 225:11,
22,25 226:11,
23 227:6,13,21,
23 228:14
229:12 230:5,8
234:25 235:14

**gun** 96:25 97:2,
3 101:8,10,11,
20,25 102:17
103:15 106:6
111:20,24
112:6,22,25
115:24 124:1,8
132:23 134:10
192:7 193:21
194:5 196:20
197:2 199:1
211:19 214:20
215:22 216:19
217:16,17,19,

25

**guy** 137:16
160:25 216:2
217:17 264:12

**guys** 135:1,12
252:22 253:2

_____

**H**

**habit** 148:16
151:23

**hair** 38:23,24
39:1,4,19

**half** 179:23

**Hall** 175:21
204:11

**hallway** 122:21
275:23 276:5,9,
17 288:17,20,
21

**hand** 8:7 42:9
70:12 93:10
111:6 171:22,
25 172:8,14,22
173:5 180:11

**handcuffed**
33:17 113:12

**handed** 26:11,
12 127:6
128:21

**hands** 112:18,
19 214:8

**handshake**
244:23

**handsome**
190:13

**handy** 274:14

**hang** 13:12
210:8

**hanging**
265:13

**happen** 31:21
125:15 177:19
233:7 255:1

**happened**
11:20 12:9

17:10 22:11
23:1 34:10,16
42:7 51:15,18,
22 65:15 67:15
74:20 76:25
81:20 83:22
88:15 96:12
100:1,12
136:19 174:10,
19,22 203:19,
22 205:4,7,11
209:10 249:12

**happening**
50:4 105:11
117:20 292:2

**happy** 71:4
184:15

**harass** 64:18

**harassing**
41:1,13 64:10,
13 65:2 69:15
228:4 253:24

**hard** 268:17

**harder** 42:10

**Harlan** 113:20
115:1 133:2
167:21 168:10,
15

**harm** 191:9
223:17 251:8
253:25

**hear** 23:16,18
25:5 29:21
30:15,19,22
56:24 82:5,8,
11,22 174:24
189:21 217:12
259:23 260:3,7
277:11

**heard** 9:16,20
10:21 13:1
23:5,8,14,17,23
24:10,11,14,17,
19,23,24 25:1,4
26:4 27:23 29:1
30:16 31:10,12,
16 57:2 76:14,
24 77:1,6 82:13
84:6 97:4
118:11 144:18,

19 161:6
162:16,17
174:23 177:25
191:2,15
192:20 196:4,9
206:13 207:1
213:25 215:24
222:15,20
223:19 231:14
236:18 238:3
266:13,24
267:1

**hearing** 283:3

**hearsay** 118:6

**Heather** 241:4

**held** 271:11

**helped** 251:5,
22 252:19
263:24 264:1

**helpful** 247:17

**helps** 242:5

**Helton** 78:8
79:7,21 80:13,
25 83:5 85:11
142:20 162:9
163:24 164:6,
12,21 165:7
166:1 173:1
222:3,4,5,6,16,
22

**hey** 123:23
126:18 213:16,
18 238:24
267:3

**hide** 163:7

**high** 74:1 87:23
88:22 89:1
90:17 261:9,15
263:19 265:7,8,
9 266:14,17

**highlights**
38:23

**hill** 220:10

**hire** 255:20

**hired** 137:20

**Hisself** 12:19

**history** 90:4
199:14

**hit** 128:17
137:17 138:10,
13,17,18,24
139:9 202:15
295:23,25

**hit-and-run**
273:3

**hits** 128:17

**hitting** 42:10
138:19 199:18
286:24

**hold** 89:12
224:2 227:8

**holding** 106:5
112:24 168:9
197:3

**Holiday** 7:6

**holidays**
142:25

**home** 10:3
17:19 20:14
44:2,23,24,25
45:18 49:16
51:9 53:1 86:8
120:3 122:19
124:2 126:11
132:3 139:12
194:20 206:9
209:24,25
212:5 218:3
232:20,24
234:13 254:18,
22

**homeowner**
195:13

**honest** 28:19,
23 29:9

**honestly**
295:24

**Honey** 127:13
128:24

**hope** 46:16,25
54:4 56:9,20
235:1

**Hoskins** 7:7,8,
14 8:18 30:7

43:24 58:17
63:7 68:6,19,24
69:3,7,13,20
70:19 71:2,19
78:14 80:2,20
85:2 93:9 94:15
95:2 128:23
136:1,12 144:6
156:16 171:14
190:4 220:22
240:6 246:1
249:8 251:5
253:22 256:19
258:11,13
268:6,16 272:4
290:22

**Hoskins'** 60:1
69:24 143:25

**hospital** 57:16
58:7 60:10

**host** 64:21

**hour** 171:9
186:24 209:22

**hours** 15:24,25
49:17,18 50:12
91:18 126:7
135:7,8,12,15
209:22

**house** 10:4,5,7
11:2,7 12:10
13:17 14:1,3,23
15:5,14 16:8,
12,16,19 19:9,
10 21:19 22:5,
8,16,24 31:25
33:7,15 34:2
36:11 44:4,14,
18,21 45:22
46:20,22 47:18
50:22 53:8
54:10,16 55:6
62:2 74:14,17,
24 82:9 85:24
86:16 96:14,17,
22 97:18 98:15,
23,25 99:13
105:12,13
106:4,15,16,17,
19 107:3,5,17,
21 108:3,21,23,
25 109:6 113:4
117:24 118:20,
22 132:7,23

133:5,11
139:17,24
146:12 183:4,9,
12,13 184:10,
12 185:4
193:11,15
194:11,13,24
195:14,23
196:7,8 197:5
203:17,20
204:14 205:18
207:14 211:21
213:5,15
226:24 269:21
273:4,16,21
284:3

**How's** 35:18

**hurt** 25:10
84:10 170:22
236:14 238:17
239:14,15
266:22

**hurting**
266:21,23

**husband** 117:3

**hypothetical**
196:1,3

**hysterical**
40:5

————————

**I**

**ID** 127:6

**idea** 22:22
55:17 56:13
68:1,2 118:8
196:7 207:16
248:20 264:19,
20 288:20

**IDENTIFICATI
ON** 71:22 93:12
149:18 152:4

**identified**
86:22 142:7
191:6 275:3

**identifies**
83:16 141:13
275:12

**identify** 7:11

86:15,17
253:11 293:1

**identity** 136:18

**ignore** 283:14

**illegal** 26:13

**illicit** 259:8

**illicitly** 259:11

**imagine** 67:14

**immaculate**
67:14

**immediately**
267:3

**impact** 260:8
263:25

**impairing**
250:23

**implicated**
169:10

**implying** 72:7

**importance**
267:15

**important**
248:18

**in-depth** 87:8

**inaccuracies**
96:3

**inaccurate**
78:4

**inappropriate**
56:25 69:6

**Inaudible** 31:3

**incident** 29:19
34:15 35:23
65:2 82:25
86:20 92:1,17
101:19 104:21
105:11 106:8
110:16 139:8
192:15 193:9
202:14,23
203:2 205:18
250:4 273:11

**include** 166:15
173:21 257:14

**including**
190:6

**income** 91:9,
22 141:3
142:16

**Incomplete**
195:25

**independent**
164:12,19
166:18,23
168:21 169:20
176:18 181:6,
11,24 182:6
220:16,24
221:15 247:25
268:21,22
269:2,13,24
270:20 271:16,
22

**independently**
181:3

**indicted**
101:21

**indictment**
106:3 110:22,
23 113:3
114:10 116:4
194:16,19
211:9

**individual**
67:20 117:4
146:3

**individuals**
156:1

**influence**
263:16

**inform** 117:19
246:3

**informant**
162:22 163:9,
18,24 164:7,13,
21 165:7

**information**
22:10 40:12
66:24 67:1
79:11 80:7,8
81:3 83:1,4,8
85:1 101:10,11
118:5 140:8

141:9 162:21,
23 163:1,4,13,
17,21 164:15
166:7,9,24
171:22,25
172:4,14,23
180:11 183:23
195:3 235:20
245:24 248:1
276:8 285:8,19

**informed**
101:4

**ingesting**
58:22

**Ingram** 65:4
68:13

**initial** 103:2
132:6

**injecting** 263:1

**injuries** 185:14

**injury** 140:23,
25

**Inn** 7:6

**inquire** 164:14

**inquiry** 64:19
67:11 69:23
71:1 80:3,4

**instance**
199:4,17
210:14 211:13
218:11 236:17
266:13

**instances**
190:20 198:19
200:9 201:3,8
202:21 210:11
211:11 229:16

**instruct** 70:4,8
71:14 165:2
180:22 182:2
184:19 187:1
245:9 253:23

**instructed**
220:21

**instructing**
79:12 164:9
176:22,23

**instruction**
81:5 186:18

**instructions**
177:7

**intend** 64:18
69:23 71:13
257:25

**intended**
256:17

**intentionally**
253:24

**interact** 100:5
131:25

**interacting**
281:19

**interaction**
130:1 134:2,17
156:16 189:6
216:13 272:20,
24 280:14
281:6

**interactions**
60:9 121:2
130:10 131:4
132:13 172:8
284:12

**interested**
266:12

**Internet** 44:10

**interrogation**
271:1 291:6

**interrogatorie
s** 93:10 199:8
220:1 289:6

**interrogatory**
95:22 102:24
103:9 136:2,9
141:1,2 165:10,
15 181:15
182:11 185:11,
12 199:13
220:2,4 223:21
224:6 250:3
258:5 289:4,14

**interrupt** 94:16
116:5

**interrupted**
11:19

**intervened**
287:3

**interview**
31:24 75:1,5,8,
16 97:8,9,10
98:22 99:19
119:24 130:3,
15,16 132:9,20
154:1 155:2
160:2 168:19,
22 169:14,16
171:19 269:14
271:16,17
272:12,14
273:14 275:9,
10,17,18
277:16 278:22
280:10,13,17
282:4 284:9
285:6 287:22
291:10,22
292:18 293:15,
25 294:6,14
296:3

**interviewed**
75:20,23 76:1,
21 120:5,7
191:22 281:19

**interviews**
75:3

**intim** 217:2

**intimate** 68:20
69:8 71:18
72:2,9 144:3,4

**intimidate**
217:1,2

**intimidated**
193:1 212:23
213:2,3 217:15
257:3,15

**intimidating**
217:9

**intravenous**
262:9,19

**introduce**
189:3

**introductory**
191:6

**investigate**

**investigation**
51:17 119:25
120:6 121:3
129:23 165:14
173:22 174:1,5
175:2 185:20
189:6,14
190:25 197:25
198:12,20
199:23 200:19
201:6 202:17
270:18,21,22
280:15 281:8
284:14

**investigations**
279:21

**investigator**
79:24 80:9 81:9

**investigators**
78:23 163:24
166:16 171:24
180:25 198:4
245:18 285:18

**invoke** 79:15

**involved** 56:25
101:5 140:14
199:23 200:1,
18 202:16
203:4 218:8
241:4,6 245:1
256:25 257:2
259:18 269:14
273:20

**involvement**
128:14 189:12
223:2 245:14
272:20,25
281:6 285:6

**involves**
210:15

**involving**
199:17 202:15

**issue** 60:4
104:22 105:5,6
129:10 247:1
262:9

**issues** 64:21
71:8 108:14
250:13 258:21

---

**J**

**Jackie** 7:21,24
270:12

**Jackson**
162:1,4

**jail** 52:12 78:22
96:20,24 97:3
101:8 103:14
113:2,17,19
114:2,9,13
119:21 120:21,
23 126:5,7,13,
16 127:14
129:9,24
131:10,20
132:25 133:1,
15,25 137:1
175:10 176:12
178:15 179:15
183:14 186:7
194:19 197:8,
10 198:25
200:3 207:5,25
210:2,9,12
211:20,22
212:13 214:17,
23 218:17
219:7,12,16
223:18 226:14,
20,22 227:4
228:1,9 231:9
240:11 259:14,
16,17 260:1,2,3
280:20,22
281:5

**jails** 113:24

**January** 17:9
141:4 148:19
152:6 153:20
162:9 263:2

**Jason** 7:18
28:16,18,19
29:15 41:25
42:1 131:4
160:25 161:1,3
165:13 189:2,8
251:21

**jealous** 265:8

**Jennifer** 14:14
15:20 16:6

---

20:22 21:9
45:23 167:19
173:13,24

**Jennifer's**
16:3

**Jenny** 167:19

**Jerry-wayne**
10:10 11:2
50:24 52:3,4
54:24 55:5
73:12 87:4

**Jesse** 20:23

**Jessica** 7:3
283:8

**Jessie** 173:8,
24

**job** 98:8 142:15
202:6

**jobs** 89:12
90:18

**Joe** 27:24
42:23 43:8 57:7
65:11,12 66:5
67:13 71:13
72:2,8 77:1,13
87:7,11 90:22
92:8,13,18,19
107:2,5,17,25
108:23 109:16
113:5,6,7,22
114:1,7,11,18,
21 120:4 132:4
133:6 142:12
145:23 146:10,
21 147:25
159:10,13
161:17 162:6
169:10,14,19,
20,24 170:2,8,
13,18,20,23
193:11 221:17,
19,23 235:19
236:7 265:5,6

**jog** 88:15

**John** 8:1,2
110:15 137:24
190:5,7 224:5
228:4 246:14
247:3 250:10
255:10

---

**Johnathan**
175:4

**Johnnie** 123:6

**Johnny** 234:2,
17,20

**Johnson** 7:20,
24 269:17,18
271:19

**Join** 288:3

**joke** 239:3

**Jon** 185:17

**Jonathan** 7:14
61:6 84:22
96:18 97:21,23
98:10,22,24
99:4,7 109:4
125:15 157:7
177:15 185:17,
19,22 186:9,20
208:7,13,15,18
211:13,18
213:8 214:12
257:14 269:22

**Joseph** 7:21,
24 270:12,13

**Joshua** 241:4

**Josie** 7:21

**judge** 32:21
38:8 64:14,15
65:4 68:13
121:10 123:13,
14,16 226:10
235:7,8 244:23
246:15 249:14
250:25 251:1

**jump** 283:23

**June** 151:21
169:8

**jurors** 122:19
230:14 232:20,
22

**jury** 66:24 67:1
183:2 233:8,11

**juvenile**
200:21 224:22
225:2 273:3,6,
11

---

**K**

**K-** 91:22

**K-TAP** 91:11,
13 141:19,23

**Katherine** 9:16
15:6 20:8,14
23:19 27:3
29:22 30:1
36:18 44:15,19
45:2 51:13 64:9
72:17 74:12
76:1,25 77:4
82:20 83:11,19,
21 85:7,22
88:13 89:5
92:17,22
119:24 120:6
121:3 128:7
129:22 146:16
152:8 160:22
162:18 167:23
170:3,8,18
173:9,19 174:4,
12 175:2,5
185:19 189:5,
13 202:11
218:9

**Kayla** 62:8
156:9,14,15,21,
22 157:17
158:14 172:18

**Kelley** 8:1
103:17,21
151:11 189:17,
20,22 190:1,3,5
195:17,19
196:5 198:5,8,
13,15 203:15
211:3 215:3,7,
9,11,13,16
220:7,8 224:6,
10 227:16,18,
23 228:6,8,13,
17,19,20
230:25 231:3,5
233:19,20
234:20 235:1,5
237:1,5,6
239:10,13,15,
16,21,25 240:4,
24 241:14,17,

21 242:1,3
244:5,10,19
245:13,20
246:5,13,17,21
247:8,11,14,18,
21,23 248:5,7
249:15 250:6,8,
11,20,22 251:2,
14,17,25 252:4,
10,18,24 253:4,
14 254:1,6,10,
21,25 255:5,8,
11,17,23 256:2,
8,10,15 257:5,
8,10,18,25
258:8,16,24
259:2 267:25
268:6,9,11,13
274:18,23

**Kelley's**
268:20

**Kelly** 7:21,25
270:7

**Kentucky** 7:6,
10 88:11,24
89:16 91:14
183:8

**key** 111:5,7,14,
18 231:10

**kid** 49:23,25
50:2 67:13
254:18

**kids** 10:8,11,17
14:2 15:4,5,22
16:3,12,14 19:8
20:19,25 21:6,
10 22:11 52:3
54:2 55:1 67:6
73:20 87:2
109:12 174:21
249:24 263:21
264:10

**kids'** 263:25

**killed** 37:21
190:8,11 280:1

**Kincer** 7:19
268:10,12,15,
16 271:25

**kind** 32:21
42:15 58:25

107:23 115:21
147:4 201:17
216:21 217:12
223:12 247:21
248:14 254:11
259:22 265:3,8,
10 268:18

**King** 27:24
29:25 42:23
43:8 57:7
65:11,12 66:5
67:13 68:21
69:17 70:25
71:13 72:2,8
77:1,13 87:7,11
90:22 92:13,18,
19 107:2,5
114:8,11,18,22
120:4 132:4
133:6 141:14
142:12 145:23
146:10,21
147:25 148:22
159:10,13
161:17 162:6
169:10,14,19,
20,24 170:2,8,
13,18,23
221:19,20,23
222:21 235:19
236:7 257:2,13
265:5

**King's** 92:8
113:22 265:6

**Kiss** 63:16

**kissed** 63:17

**kitchen** 99:15,
16,22,24 100:6,
9,12 105:17
211:25 212:2,
11

**knew** 22:23
23:2 25:15
30:3,11 35:17
36:21 43:25
64:2 81:20
83:19 98:16
109:9 179:14
194:21 198:5
254:19 265:24
279:21 284:18

**knock** 110:24

**knocked**
111:10

**knowing** 139:9
195:22

**knowledge**
27:14 42:22
43:7 58:4 79:10
94:5 96:4
106:20 109:2
110:7 114:12
136:6 141:10,
11,25 146:19
148:21 159:20,
23 164:12
166:18,23
168:11,21
171:18 172:10,
19 173:3,5
180:8,15
187:14 188:21
189:11 198:3,
11 200:6
220:12,17,24
247:25 268:22
269:2,13,24
270:9,18,20
271:3,17,22
285:8,19 286:1,
8

**Knox** 7:8 8:2
19:24 20:5 32:4
33:13 57:15
58:6 113:17,19
115:1 119:20
121:5 122:17
126:5 132:25
133:1,8,14,15
137:15,20
138:22,23
167:21 168:8,
13 179:20
186:20 190:5,
10 191:22
196:13 197:8,9,
22 198:11,23
199:20 200:11,
17 201:10
214:18,23
216:9 219:24
221:24 223:9,
23 225:20
261:23 262:1
280:22 284:20

**KSP** 32:4 33:1
35:8 97:14,15,
17 100:13,19
101:1 110:7,10
113:6 126:17
127:4 184:2
208:12 268:17
284:2

**L**

**labeled** 149:12

**Lacee** 7:2

**lack** 261:2

**lady's** 10:20

**laid** 37:9 38:21
244:8

**landing** 232:18

**landline** 44:8,9

**Landon** 109:25

**landowner**
195:7

**lane** 137:17

**large** 235:21
237:8

**Larry** 46:14
55:20 148:25

**late** 46:8 47:8,
11,13,14,15
48:23 49:9,11
54:1

**Laurel** 133:19,
21,22 134:1
176:12 218:17,
24 219:4,7,10,
14,16 259:19

**law** 117:18
121:2 139:10,
12 162:22
164:20 197:18
198:23 255:18
267:8,23
283:11

**Lawson** 14:16,
17 20:22,23
21:9 45:23
173:9,14,24

**lawsuit** 40:21,
24 41:5,17 78:1
245:4,24 247:1,
12 248:11
249:23 251:6

**lawyer** 137:20
164:4 221:11
226:9

**lawyers** 81:21
83:13,14

**lay** 81:11 235:8

**laying** 154:12

**lays** 39:21

**leading** 275:18
276:18

**learn** 178:2

**learned** 76:9
80:6 83:12
163:4,14,21
164:15 185:3
207:9 246:25
262:23

**leash** 64:11

**leave** 224:11
256:11 258:14

**leaving** 55:5
200:12 223:23
232:21,23

**led** 129:15
262:10 270:21,
25

**leeway** 67:10
69:2

**left** 49:1,12
50:18,21 54:9,
20 55:3 103:18
152:12 249:1
254:18

**legal** 79:2
81:13 166:19
167:2 168:25
247:6

**legitimate**
228:15

**lengthy** 68:18
249:9

The Deposition of AMANDA WOSKINS, taken on March 16, 2018

313

**Lester** 11:11
12:1,15 16:25
18:15 19:1,13
20:6 21:25
22:3,7,15 23:8,
18,25 25:2,6
26:7 27:2,4,18,
21,24 28:14
29:21,25 30:13,
16 37:3,10 40:6
42:23 43:7,12,
20 44:14,18
45:11,20,25
49:1 52:15,22
55:8 57:11
60:17,25 62:15
63:21 64:23
65:20 66:1
67:12 68:21
69:16 70:25
71:12 72:2,8
73:25 74:13
75:20 76:13,24
77:8 83:20
84:2,10 86:18,
24 92:5,13,19
106:17 107:9
117:8,10,19
118:10,15
120:3 126:25
132:3,11 133:6
134:4,12
142:10 145:21
146:10,14,18
147:2,25
148:22 154:3,6
158:9 159:7,13
160:2,4 161:17
162:6,16 170:2,
7,18,20 174:3
175:1 188:20
193:12 220:22
222:21 235:18
236:6,18
237:14,17
238:14,15
239:6 257:1,12
264:24 266:13
267:4,7,11
277:17

**Lester's** 10:19
14:3 15:4,14
16:11,14,19
19:9 20:15,20
21:19 43:14

45:22 46:22
109:7 154:23

**letter** 257:22
266:4

**levels** 150:5

**Lexi** 68:25
69:20,25 249:8
251:5 258:13

**license** 228:24
229:13 284:20

**Licha** 8:4

**lie** 283:16

**life** 20:3 68:20
155:12 179:12
183:3 222:11
248:23 249:3,
20,25 250:1,16
251:18,20
260:1,8 262:14
263:10,11,25

**Liford** 110:3,13
111:6 120:8
191:25 192:15
193:10,17
194:11 197:13
198:17 200:24
248:16

**Liford's** 210:16

**light** 249:12
251:6

**lights** 137:17
138:13 195:8

**Likewise**
190:23 194:23
200:11 223:12
265:5

**Linda** 10:6
11:5,7 19:24
22:8 55:3 61:15
73:16,20 85:24
242:20

**Lisa** 130:3,7,16
131:5,16
219:19 240:13,
25 242:11
244:4 245:10,
13,21,23 246:2
283:8

**list** 61:17 70:12
72:1,7 86:18
92:14,19,20
103:9 160:5
233:11 241:3
289:6

**listed** 136:16
141:7 215:7,11
240:12,13

**listen** 40:20

**listing** 104:19

**lists** 104:16

**literally** 228:3

**litigation**
249:11 252:16

**live** 12:15
19:24,25 20:6
27:20 33:10,12
52:6,8,10
61:10,14,21
62:6 157:20
183:3,16
186:12,20,24
267:4

**lived** 9:22 10:7
12:18,20 17:21
19:12,13 20:11
33:12 61:20
73:16 86:6,7,
16,19 87:9
157:18 264:22

**lives** 52:7

**living** 85:24
86:2,5 87:13
107:3,5,7,10
139:14,18

**local** 110:7,12
120:17 241:20

**located** 7:6

**location**
183:19 184:8

**lock** 25:9,13
31:6,7 170:21
236:13 237:25
238:16 239:7

**locked** 111:1

**locking** 30:17

**London** 7:6
127:14

**long** 13:20
15:22 18:6,7
26:25 27:2
33:14 35:13
39:6 44:21
48:24 55:22
67:11 84:5 86:2
88:25 89:2,6
91:21 104:10
106:6 109:6
113:18 115:4,
13 121:6,21
125:3 165:25
188:2,15
200:20 209:18,
23 214:24
225:4 248:1
260:14 265:7
282:21 289:6
294:13

**longer** 53:4
56:9 101:1
111:24 116:19
251:21

**longtime** 134:8

**look-out** 84:23

**looked** 13:10
38:1 96:24
181:13 185:23,
25

**Lorcet** 260:25

**losing** 182:10

**lost** 70:15
182:9

**lot** 85:12 131:3
184:9,13
232:17,18
236:9,24
244:21 254:1
255:17 263:7,
25 264:1
268:19 272:6
283:24

**lots** 167:13

**loud** 216:25

**lower** 112:15

**lowest** 262:14

**Luckily** 121:9

**lunch** 94:9,16,
19 98:7,8
103:22 134:24
136:3

**lying** 183:4

**M**

**mad** 279:2
286:22 296:1

**made** 42:18,19,
21 53:4 70:3
99:24,25
105:25 116:3,4
117:10 179:7
209:5 212:17
277:17 281:13
282:8,24 283:1

**magistrate**
41:15 253:17,
20

**maintain** 80:4
247:7

**major** 250:15

**make** 37:2,10
38:9 40:4 63:11
80:12 93:11
136:8 149:14
155:6 194:15
203:12 224:3
241:23 251:3
253:15,17
260:10 263:21
292:4,11

**makes** 261:14

**making** 101:20
197:21 214:24
222:22

**mamaw** 15:10

**man** 116:15
179:11

**man's** 97:14,16

**manipulate**
286:5

**manipulated**

271:8

**manipulation**
223:1

**manner** 69:11,
21

**manufacture**
220:25

**marathon** 9:8

**March** 7:5
104:6 125:6,18,
19 130:9 131:8
173:2 223:7
259:14

**mark** 7:20,23
71:3,15 269:5,6
271:14,15
274:21

**marked** 71:22
93:12 149:18
152:4 275:1

**Market** 19:17
85:12 157:22

**marks** 58:10,
12,20

**marriage** 67:5

**married** 20:23
67:6

**mate** 167:8,11,
20 168:7

**mates** 167:12,
16 168:2

**matter** 7:7
108:4 128:13
171:16 286:6

**matters** 256:20

**Matthew**
125:12 126:2,
14 128:9

**max** 129:8

**Mcdonald's**
45:9,18 47:18
48:15

**means** 151:7
237:3

**meant** 155:20

217:2 219:4
231:8 234:15
267:7

**medical** 46:16,
25 54:5 56:3,9,
20 60:4 155:7
180:16 181:11,
13 223:1,3
259:4

**medication**
124:2,3 143:25
147:20 259:4
260:23 261:10
264:19

**medications**
259:8

**medicine** 74:3,
7 265:14
266:19,20

**meet** 35:23
111:3 112:11
178:18,19,21

**meeting** 35:14
131:15 133:21,
24 181:5,9
219:18 220:17

**Mefford** 7:20,
24 269:6
271:14,15
289:8,17

**member** 73:7
200:4,17
219:23 245:10
273:20 285:9,
21 286:3

**members**
191:22 196:13
197:23 199:25
201:4 281:20
286:9

**memory** 9:15
17:11 31:23
37:13 44:17
45:16 46:1
47:10 48:10,23
49:10,22 54:4,
6,19 55:3,5
56:4,6,19 58:6
65:7,16,24
74:20 75:14

76:10,11 88:16
95:14 96:6
100:17 101:15
102:3 104:11
106:13 113:18
115:25 116:22
118:16 119:1,3,
16,25 120:18
121:24 124:24
127:22 137:7
147:15 158:20
169:23 177:20
189:7

**men** 65:8

**mental** 252:6,
13,14

**mention** 274:1
289:10,21

**mentioned**
53:7 63:20 77:1
83:15,20 86:15
87:20 89:1,4
104:19 107:9
108:17 109:11
110:21 143:3
146:18 147:8
191:25 194:17
196:10 229:21
254:16 279:23
280:1 281:11
282:3,18,23
283:25 292:25

**mentions**
275:13

**Messer** 160:25
161:1,3

**met** 27:4 34:9,
19 35:1,19,22
112:4,6 131:9
139:13 165:23
178:21 210:7
220:14 272:20

**Michael**
215:10

**Michelle** 14:5
16:1 21:4,16
154:18 173:18,
25

**Michelle's**
14:23 15:10

16:8,12,16
19:10 20:19

**Middlesboro**
216:11,12

**Mike** 8:4 25:23,
24 27:17,20
28:12,13 34:1
42:23 43:9
62:17 77:1,19
78:7,17 79:6,21
80:13,25 83:7,
16,22 84:2,11,
12 146:14
175:20 214:18,
25 215:4,18,19,
25 216:23
217:15 218:7
236:8,16
237:13 265:22
272:4,21 273:7
274:1,11
275:20,21
276:3,14,23
277:1,3,25
278:8 279:2,13
281:16 282:7
284:16 286:14,
18 288:8 290:6
294:11

**milligram**
143:16,17

**milling** 231:24
233:1

**Mills** 9:16 20:8
23:19 27:3
29:22 30:1
36:19 44:15,19
45:2 51:13 62:8
64:9 72:18
74:12 77:4
82:20 83:11,20,
21 85:7,22
88:13 89:5
92:17,22 96:13
121:10 146:16
152:8 156:9,14,
15,21,22
157:18 158:3,
14,18,21
160:22 162:18
167:18,19
169:11 170:3,8,
18 172:18

173:9 174:4
190:8,11 205:4,
7,11 222:17,24
235:8,20 236:9,
13,18 237:25
238:16,21
239:8 266:14

**Mills'** 10:20
20:14 76:2,25
119:24 120:6
121:3 128:7
129:22 167:24
173:19 175:2,5
185:19 189:6,
13 191:1,20
192:4 197:25
200:5 202:11,
23 206:23
218:9 235:17
280:16 281:9

**mind** 34:23
80:16,22
134:12,19
223:24 229:20

**mine** 10:4
263:25 265:6

**minimize**
70:10

**minor** 103:22

**minute** 24:1
61:9 63:9 78:10
182:19 188:9
272:13

**minute-wise**
46:23

**minutes** 20:7
27:22 33:16
46:7,21 47:7
53:1,7 67:8
68:17 70:18,21
94:9 135:16
276:7,9

**mirror** 138:24
199:17 202:16

**missed** 180:7

**misstate**
239:10

**misstates** 24:4
83:23 147:11

218:20 236:10,
22 290:10
295:9

**mistaken**
153:14 271:20

**misunderstand**
d 193:13 203:9

**misunderstood**
d 193:19

**mixed** 208:3
216:21

**Mohan's** 89:15

**mom** 10:5
33:10 45:15
49:12,14 54:21,
23 61:12,13
62:4 73:21
86:6,7,25 87:1
92:3,13,20,24
96:16 98:4,5,19
99:3,16 107:21,
22 108:3,9
122:17,20
179:25 180:1
183:14 187:6
205:10 206:17
210:7 212:1
217:12 230:12,
15,24 260:3
263:24 264:19

**mom's** 10:4,5
21:23 22:8,24
33:14 36:11
44:13,17 46:20
47:18 53:8
54:16 61:12
62:3 74:14,24
82:14 85:24
86:16 96:15,17,
21 97:15,18
98:14 105:12
106:15 108:21,
23,25 117:24
118:20,22
132:7,23
133:11 205:8
213:14

**moment** 94:14
182:12

**moments**
291:4

**Monday** 45:16
48:13 49:19
53:21 126:14
127:9 129:10

**Mondays**
49:20

**money** 23:2,19
24:15 25:2,20
29:22 30:4,12,
19 31:8,12 43:8
76:25 83:21
84:3,13 85:11,
12,18 92:3,6,24
93:3 142:25
143:1 153:6
154:7,9,11,12
170:3,8,19,22
220:23 221:2
235:21 236:9,
14 237:7,8
238:1,17 239:8
263:21,22

**month** 17:8
28:10 91:1
116:17,21
122:11 124:11,
15 125:4,16,17
127:25 141:13,
19,20 142:5
240:10

**month's** 104:8

**Monthly** 91:2

**months** 18:8
29:19 56:1
82:20 240:10

**morning**
51:13,18 52:1
53:24 54:7,11,
15,17,22,23,24
60:18 61:1,7
62:16 82:9
122:15 123:24
126:14 127:10
254:18

**mother** 17:21
19:25 52:3,7
54:19 82:16
99:18 139:14
142:8 157:25
158:1 183:17
204:15,20
205:6,24 207:2,

15 212:9
222:21 231:14,
21 233:2,14
263:15,17,18

**mother's** 33:7
62:2 96:14
157:24 203:20
204:14 212:5

**mother-in-law**
170:21

**mothers** 91:15

**motion** 253:20

**motor** 199:17

**mouth** 76:9
130:23 219:20
265:18

**move** 52:11
72:11,12
164:17 248:4

**moved** 52:9
86:8,16 200:3
253:10 260:21,
25

**mug** 129:3,4

**multiple** 105:4,
9 115:7

**murder** 36:25
37:7 64:9,24
68:6 76:2,19
78:18 104:12
127:16 128:7
167:24 169:11
173:9,14,19,21,
22 174:4 175:2,
5 177:10 178:6
179:21 185:20
188:5 191:1,20
192:4 197:25
200:5 202:11,
23 206:23
216:18 222:17,
24 223:18
230:19,21
231:8 248:10
251:24 262:13,
20 267:2
270:15,17
280:16 281:9
292:6,9

**murdered**
38:17

**murderer**
120:13

**murderers**
192:11

**music** 120:9
192:19,20

_____

**N**

**name's** 268:16

**named** 71:19
126:8 160:25
161:20 199:6

**names** 154:16
241:6 242:18,
19 268:18

**naming** 95:20

**narcotics**
144:1

**narrow** 247:5
248:2 272:8

**natural** 39:4

**needed** 61:14,
23 93:3 116:18

**needle** 58:13,
14,21,22
262:22

**negatively**
258:6

**Neighbor**
161:13,23

**nephew** 96:17

**nerve** 179:1

**newfound**
236:20,24

**news** 10:18,23
11:2,8 13:7,25
14:2 15:2 76:9,
16,17 81:22,25
82:5,22 129:5
174:23,24

**night** 16:1,6
21:7,20 22:3
74:14,17

108:10 137:16
174:20,25

**nights** 184:5

**noon** 50:1

**normal** 71:7
261:16

**notations** 58:9

**Noted** 60:15

**notice** 231:24

**November**
31:5

**number** 7:10
43:11 93:11
95:22 96:7
104:24 136:9,
14,16 137:12
139:4 141:1,2,
16 157:5 158:7
165:10,15
181:15,25
182:7,15
185:12 199:11,
12,13,14
200:14,15
220:2,4 223:21
224:6,15,16,17
226:17 228:21
229:22 256:21,
23 275:6
281:25 289:4

**numbered**
220:3 224:7

**numbers**
43:14 150:9

**numerous**
203:24

_____

**O**

**oath** 63:8 136:1
171:15 226:3
235:10 250:7
251:7 258:6

**object** 58:15
64:7 78:25 79:9
80:18 153:10
176:20 191:18
195:15 198:2
203:23 210:18

211:2 212:24
213:1 224:17
225:15 226:4
227:14 232:8
235:22 236:10,
21 237:22
239:18 245:23
248:24 257:6,
16,23 258:6,17
261:4 280:5
287:15 289:12
290:14 291:12,
18 292:20,21

**objection**
11:22 12:3
20:17 24:4,20
28:4,21 29:6
30:5 31:14
39:23 40:25
41:8 43:22 50:7
51:20,23 52:17
53:13,20 56:10
57:21 58:2
74:15 77:23
78:12,19 83:23
84:24 143:20
145:3,8 147:11
155:16 156:11
159:21 160:7,
13 170:10,25
177:17 195:25
201:22 203:12
218:20 222:18
225:17 229:18
239:20 247:2
262:16 263:12,
14 264:8
267:17 277:5,7
278:13 287:14,
23,25 290:9
294:15 295:9

**objectionable**
256:23

**objections**
70:2

**obligation**
127:22

**observe** 194:4

**obstructionist**
81:7

**obtained**
257:11

**obvious**
234:24 258:19

**occasion**
57:18 61:15,22,
24 120:5,21,22
145:21,23
177:11,15
196:12 198:19
204:22 208:3,
17 210:19
212:4,8 213:5
222:10 235:6
283:15

**occasions**
198:16 210:10
282:1 294:12

**occur** 205:12,
17

**occurred**
106:9 199:20
202:24 203:20
205:16,22
206:5 225:10
227:12 262:13,
20

**offer** 175:14

**offering**
123:24

**office** 46:3,9,
12,13,14 47:17
48:16 52:15,21,
25 53:8,12,18
54:9 65:1 89:16
127:23 178:5,
25 179:4,24
180:3 216:5
240:7,13 241:1,
5,11,20 242:15,
17 243:7,20
244:1 246:24
247:7 248:8
283:11 284:20

**officer** 100:25
101:14 120:17
124:16 125:8,
11 126:3
127:17 129:19
134:13 137:3
214:19 215:21
219:8 228:23
272:9

**officers** 199:5
272:7 273:1

**offices** 243:4

**official** 103:25

**open** 112:4,16
177:19 199:9

**opened** 106:5
111:6 112:2,4

**opens** 112:21

**operating**
229:11,12

**opioid** 259:11

**opportunity**
211:6

**opposed**
206:15

**option** 137:21

**oral** 63:14 67:9
69:9 251:10
253:5

**order** 60:2,4,11
69:12 71:1 96:7
107:21 131:14
144:1 151:14
155:7 183:23
186:15 187:1,3
194:2 249:7
257:12 258:18
265:3 294:8

**orders** 257:12

**originally**
122:14 136:18
260:22

**ourself** 265:10,
20

**outhouse**
25:3,9,14,15
30:17 31:6
170:21 236:14
238:1,16 239:8

**overbroad**
247:4

**overhear**
204:18

**overheard**
28:13 30:12

84:2 146:15
170:2,7,17,20
231:12 233:1
236:6,12
237:12,24
238:11

**overhearing**
43:7 212:16

**overlapped**
167:16

**owned** 18:24
86:9 106:19
194:20 277:4

**oxycodone**
150:15,18
152:18,22
153:8

**Oxycontin**
59:3,19 150:17

**oxymorphone**
153:15

———

**P**

**P.M.** 296:9

**pages** 220:3,4

**paid** 89:23,25

**pain** 59:2
143:13 260:17,
19 263:19

**Palace** 90:15

**panic** 40:5

**paper** 75:2

**paperclip**
151:11

**papers** 38:5,7
114:24 116:25

**paragraph**
165:18 167:4
169:8 170:15
191:6 220:20
290:4

**paralegals**
81:13

**pardon** 237:1
268:11,13

**parent** 260:4

**park** 179:14
184:17

**parked** 184:6,
7,9,10 284:2,6

**parking** 184:9

**parole** 126:2
127:10 128:9
219:10

**part** 27:12
37:15 115:15
170:24 177:18
198:19 230:2
269:21 277:16,
24 278:23
286:16

**participation**
198:11

**party** 249:17

**pass** 149:11
171:8

**passed** 168:11

**passenger**
24:12 127:1
137:16

**past** 68:17
70:18,20
143:25 267:9
269:8

**pastor** 258:3

**path** 64:14

**pattern** 294:13

**pay** 39:13,16
91:6 93:1

**PD** 132:20,21,
24 134:2
216:12

**pending** 7:8
9:10

**people** 30:16
66:22 67:4,6,16
70:16 71:1,19
83:2,16 86:21
117:10 118:6
144:4,5 154:16
162:7 171:16

172:3 184:22
191:17 198:5
222:15 231:24
232:15,18
233:1 240:12
241:17 243:20
247:5 251:12
258:19 261:6
265:13 268:17
289:8

**people's**
259:24

**perceive**
249:16

**perfect** 119:1

**performed**
149:22 253:1

**period** 38:25
43:15 87:16
105:17 141:24
148:2 149:4
151:24 154:11
188:22 235:16
261:17 264:2,
15

**permanent**
107:16

**perpetrator**
77:20

**perplexed**
247:21

**person** 68:23
69:24 77:12
117:3 145:12,
19 155:21
156:6 161:1,10,
15 230:25
251:5 283:7

**person's**
140:8

**personal**
285:19 286:1,8

**personally**
30:14 160:18

**persons** 78:6
243:6

**phlebotomy**
88:3,5 89:3,15

262:22

**phone** 11:17
12:1,7,8 13:1,3,
5,6,12 22:20
37:2,10 40:3
42:9,10,17,19,
20,22,25 43:11,
14,25 44:2,11
103:17 157:5,
15 158:5,7
183:8 187:5
251:3 279:1,3,
4,6 286:22,23

**phones** 43:20

**phrased** 219:3

**physical** 261:7

**pick** 20:19
21:10 22:11
26:9 32:6 35:15
44:14 55:9 61:2
62:17 97:15
210:8 227:7

**Pickard** 8:2
96:21 97:13
99:15 100:15,
17 110:15,17
119:13 122:18,
21 165:23
190:7 196:15
200:25 201:19,
20,25 202:1,5,
12 203:8 204:5
205:6,9 206:15,
16,18 207:14
208:7,14,15
209:1,9,12,16
210:12,17
211:12,23
212:8,14
213:11,21
214:8,21
216:14 218:13,
19 219:15,23
220:13,14,17,
21,25 221:8
222:4 223:2,8,
17 229:21
230:3,24 233:2,
15 245:5
251:21 267:14
272:7 289:7,17

**Pickard's**

208:9

**picked** 13:24
16:16 19:10
32:2,25 33:2,5,
8 36:10 44:18
64:25 74:24
97:19 118:20
124:11,13,14
131:23 133:5,9,
10 148:16
174:12 199:2
273:16

**picking** 12:11,
12 13:18
273:21

**Pickrell** 7:24

**picnics** 202:9

**picture** 38:22,
23,24

**pictures** 38:22
39:21 183:6

**piece** 37:20
279:4 280:1

**pill** 59:2 143:13
144:9,11
145:14

**pills** 60:1 144:9
159:1 260:17,
20 262:8

**Pineville** 19:22
62:7 88:24
89:16 90:15
179:17 180:1
240:7

**Pingleton**
110:11

**pizza** 90:7,15

**PL** 274:22

**PL010110**
143:5

**PL010183**
160:4

**PL018934**
152:2

**PL018938**
149:12

**PL11** 31:1

**PL24** 155:11

**PL8** 31:1

**place** 52:8,10
61:14,23 71:7
86:9 90:7
101:22 151:15
157:23,24
189:4 250:5
284:19

**plaintiff** 64:8,
13 68:13

**plaintiffs** 7:13,
16 169:10

**plaintiffs'** 69:1

**plan** 24:18 85:9

**play** 40:19
278:17

**played** 192:20

**plays** 120:9

**plea** 115:15,17
124:2,7,12,22
137:20,22
218:6 226:8,9
227:6 230:17

**plead** 102:19,
20 105:8 122:9,
11,12 224:20,
23 226:23
230:5,7 234:25

**pleading**
101:12

**pled** 217:21
225:25 226:25
227:6,21,23
229:12 234:25

**point** 64:6,12,
23 65:25 76:18,
19 85:16
100:23 130:3
134:22 157:7
191:5 196:20
228:4 234:3
260:7,19
262:14,23
276:5 277:13,
20 278:15,19
280:13 281:7,

12,14 288:9
291:22

**pointed** 101:25
184:10

**points** 291:10

**poised** 70:22

**poking** 295:22

**police** 21:10
33:6,15 34:10
35:20 36:6,12,
13 74:24,25
75:5,8,10,15,
16,20,23 76:1,
22 83:1 84:7
97:8 120:17
132:10,16
134:2,13,18
139:24 142:20
143:4 154:20
183:9 195:21
203:1,18 204:9
207:13 208:2
209:1,2,19
211:6 267:3
272:5,10,16
273:1,15,16,20
274:7 281:13,
21 284:6,11,13
285:9,22 286:3,
10

**polygraph**
175:14 176:1,8,
19 281:25
282:24 283:2

**pool** 66:24 67:1

**posed** 69:19
70:20 199:10
258:15

**position** 89:25
194:7

**positive**
150:14 152:18,
22

**possess** 269:2

**possession**
148:10 210:22,
25

**posted** 116:20

The Deposition of AMANDA WOSKING - Taken on March 16, 2018

318

Powell 241:4

preacher 192:18

preface 81:4 269:1 285:14

prefaced 285:13

prefer 184:24

pregnant 89:7, 9 226:25

prescribed 59:18 74:4,9 148:25 150:17 259:11,12 260:22 266:19

prescribing 59:10

prescription 47:20,24 48:12 49:4 57:19,25 124:5 259:4

prescriptions 59:5,15

presence 180:24 192:8 276:15

present 34:1 104:21 169:13, 16 193:10,20, 24 196:14 197:24 199:5 209:9 212:19 213:21,24 214:3 215:17, 19 219:19,24 229:22 230:3 231:16 235:18 249:20 252:6, 13,14 259:3,5,8 269:14 271:15 272:14 275:14 281:16 283:11 291:15 292:1

presented 37:7

presume 195:12,20

pretty 249:1

266:24

prices 144:15

primarily 275:18

printing 152:11

prior 60:1 62:19 64:9 65:2,24 72:17 83:24 86:3,19 90:3,5 95:14 124:18 153:20 163:12 165:25 170:3 181:5 199:14 249:5 250:4 251:5,23 272:19,23 284:9

privacy 70:10

privilege 79:4, 16 80:5 163:8 164:17,23 166:13 169:3 176:20 244:3,5, 13 245:9,11 246:4 247:4,10

privileged 163:5 245:15

probated 227:5 229:3

probation 32:13,16 104:15 115:22 122:10 123:25 124:15,16,18, 19,24 125:1,2, 8,11 126:2 127:7,10,17 128:4,5,9 129:19 131:18 133:16 218:18 219:8,10 227:11

probation-parole 219:9

problem 286:13

problems 221:23

proceed 189:23

PROCEEDINGS 7:1

produce 71:3

produced 30:24 70:17 149:12,16 251:12

production 136:3

professional 185:13

program 32:10,15,19 89:2 91:11,23 259:15,19 261:19,21

programs 261:25

promise 165:24

proof 32:9,14, 19

proper 244:8

property 84:15 106:2 116:14, 16,18,20 121:12 195:22 218:12

prosecution 280:16 281:8

prosecutor 123:10,19

prosecutor's 283:10

protected 164:16

protective 60:2,4,11 69:12 70:25 144:1 151:14 155:7 183:23 186:15 187:1,3 249:7 258:18 265:3

protest 234:10, 11

provide 90:22 92:9,24 183:22 184:15 186:14

provided 79:11 80:8 93:14

providing 92:14,21

proviso 221:13

psychological 248:22 249:3, 17 250:4 251:8 252:4 258:2

psychologically 250:23

public 178:4, 25 184:17 216:4 240:6 241:1,5 242:14, 17 243:4,7,20 244:1 246:23 247:6 248:8

publics 191:16

pull 143:5 213:17

pulled 121:13 126:17,20 183:14 218:16

pulls 136:25 179:9

pump 40:12

pumping 288:15

purchased 144:10

purchases 220:23 221:2

purpose 12:2

purposely 112:11

purposes 256:18

purse 30:20 31:8,9,13

pursue 253:19

put 31:5 60:13 100:8 106:3 112:2,18,19,24 129:8 135:10 182:6 210:11 211:10 214:8,9 219:7,13 231:9 249:18 250:13 252:4 259:17 279:4

puts 207:20

putting 181:25 255:15

---

Q

question 9:3, 10 11:23 12:4 28:22 30:7 37:5 39:25 41:2,3, 11,14,17 43:3, 5,23 44:16 50:13 53:14 58:17 62:21 64:1 68:11 70:9,12 71:5 78:14 79:13,14 80:19 95:24 96:17 97:20 102:24 144:5 145:4,9 153:11, 12 155:18 163:20 164:9 165:6 169:4,6 171:2 180:23 181:16 182:3 185:6 186:18 187:2 188:8 189:2 195:16 198:9,12 202:12 207:3 208:6 211:18 213:9 217:14 219:3 224:5,9, 11,18 226:6 227:21 228:16 236:1,4,11,22 237:2 239:5,21 244:9,14 245:22,25 246:7,12,22 247:5 252:21, 22 253:18 254:8 255:15

257:24 258:7,
10,15 260:10
264:11 277:12
286:17 290:24
293:13,20
294:12 295:15,
16

**questioned**
75:14 96:13
120:7 204:7
255:12

**questioning**
40:12 41:13
58:16 60:9 64:7
65:3 68:19
69:5,13,19 70:3
94:8 144:2
249:7 286:16

**questions**
8:22 32:8 59:25
64:12 69:2,6,14
70:20,22 79:3
177:6 199:10
220:10 223:12
226:10 248:19,
21 249:9
251:22 252:16
253:16,22,24
256:1,2,24
257:4,17 258:1
268:7,20 269:1
270:25 272:8
277:2,14
278:17 279:14,
20,22 280:8
285:7 291:5,7
294:7

**quick** 62:25
93:4 246:14
256:12

**quickly** 135:6

**quiet** 278:19

**quit** 101:2
260:18,20

————

**R**

————

**raise** 8:6

**raised** 68:22

**ran** 126:15

248:25 284:16,
21

**range** 66:21
67:16

**Ranger** 16:21
18:14

**Re-** 128:23

**RE-
EXAMINATIO
N** 293:11

**re-fingerprint**
128:23 129:2

**react** 13:9

**reaction** 13:15
77:5,7 254:7,11
256:22 258:15

**read** 36:16
71:20,21 77:25
78:21 136:2
164:3 165:11
182:11 276:25
285:6 289:22

**reading** 94:10

**ready** 135:2
234:13

**real** 62:25
239:21 256:12

**realize** 264:12
294:5

**realm** 70:16
251:12

**reason** 12:12
29:4 32:7 51:21
61:18 79:8
82:13 98:6
100:15 121:13
122:23 126:23
214:21 223:17
265:1,2 267:1
271:11 273:10
283:13

**reasons**
115:17

**recall** 20:22,23
21:6 62:15 70:3
75:19 81:2
91:7,8,22 96:8

102:22 103:11
104:22 105:11
142:24 185:22
209:14 280:3
281:19 291:6
295:12

**receive** 81:15
142:4 149:25
150:1

**received** 141:3
185:13 285:20

**receiving** 81:2
91:4 106:1

**recent** 96:7
284:1

**recently** 56:5
292:25

**recognize**
35:15 94:15
149:17 261:7

**recollection**
274:2 295:12

**record** 7:12
8:16 59:24
60:13 63:3,4,5,
8 68:14,15,16,
23 69:4 71:25
78:12 90:21
93:5,6,7,19
104:1 135:6,11,
18,21,22,23,25
143:5,23 152:2
155:8 171:10,
11,12 180:16
181:7,11,13
182:18,21
237:4 240:1,2,3
246:18,19,20
252:11 256:9,
12,13,14
258:23,25
259:1 268:1,3,
4,5 275:4 279:5
290:16,18,19,
20 294:20
296:8

**recorded**
37:12,16 160:3
275:10 278:23
279:11,15
294:5 295:14

**recorder**
275:21 278:25
279:1

**recording**
31:22 37:18
38:3 39:22
40:2,9,10,13
42:6,7,8,16
43:1,2,6
276:11,15
277:16,20
278:8,9,10
294:17,20
295:7

**records** 48:6
54:5 56:3 60:4
223:1,3

**recount** 231:2

**red** 13:10
161:15,18,20

**references**
290:6

**referencing**
230:22

**referred**
279:25

**referring**
143:10,14
144:11

**reflect** 69:4

**reflected**
248:17

**refrain** 147:13
156:19

**refresh** 130:12
274:2

**refrigerator**
93:1

**regard** 68:22
69:3,18 166:13
202:14 248:10
280:15

**regretted**
266:5

**regroup** 256:1

**regular** 129:7
294:2

**regularly**
73:21 91:6
108:9 157:3,11

**rejection**
283:14

**relate** 249:23

**related** 136:15
142:15 252:15

**relating** 59:25
60:9 68:19
69:3,13 143:25
165:7 172:5

**relationship**
56:25 57:4,8
63:10 64:16,18
65:8,21,23 69:8
70:7,24 71:2,
11,18 72:3,9
256:25 257:7
265:6,12,22
266:7

**relationships**
64:20,23 65:13
67:17 68:20
69:16 144:3,4
188:20 252:2

**relatives** 67:4

**released** 188:6

**relevance**
58:16 249:10
256:19

**relevant** 64:10,
19 68:5 69:15
70:8 251:6,24
252:3 255:16

**remain** 245:15

**remains** 163:5

**remark** 70:2

**remember**
13:21,22 15:15,
23 16:6 22:1
28:16 29:12
33:24 34:2,25
35:11,14 38:20
43:11,14 44:7,
11 45:5 47:15
48:18 50:4,17,
20 51:9 52:24

53:3,24 55:10, 18,24,25 59:7 62:14,18 72:21 73:7 74:22 75:4,19,24 76:4,8 81:22 86:2 87:12,13 88:12 89:5,8 90:18,24 91:9 95:19 108:1 110:14,20 115:11,13 116:15,24 117:4 119:1,5 120:9 121:6,8, 20 122:19 130:25 132:14 137:3,23 138:8, 11 139:2 140:3, 5,22,24 146:6 148:12,16 154:25 167:15 177:22 179:12, 13 186:4 188:19,25 190:20 194:6, 12 196:15,16 197:16,17 198:24 200:17 201:2,7 202:18, 25 203:16,17 204:12 205:24 206:1 207:14, 22 209:3,25 210:13 211:11 212:10,15,16 213:14 214:3, 13,14 216:17 218:15 223:22 226:12 229:2,5 233:12 235:7,9, 10,11,12,15 240:14 260:23 261:23 266:9 269:11 273:9 274:4 278:2,15 281:4,10,18,22, 24 287:7 289:2 295:1

**rented** 86:11

**repeat** 11:24 30:9 57:24 58:18 197:21 293:20,21

**repeatedly** 289:5

**repeating** 294:12 295:15

**rephrase** 9:4 156:19 198:13

**replaced** 18:11

**report** 84:7,12 127:19,21 169:9 195:13 221:18 222:5

**reporter** 7:4 8:8,13 153:24 189:19,21

**reports** 174:23 289:10

**represent** 268:17 272:4 289:23 293:4

**representation** 69:24 166:14 246:2

**represented** 123:3 229:15 244:7 245:18

**representing** 190:5,7,8 248:9 254:3

**request** 59:25 79:3 136:3 151:15 155:6 248:2 282:8,24

**requested** 177:16

**requesting** 143:24

**requests** 283:2

**require** 88:18

**resent** 254:1

**reserve** 177:5

**resolution** 124:8,10

**resolve** 104:10 259:16

**resolved** 104:6,8

**respectfully** 70:14 163:11 164:8 256:6

**respond** 282:14,16

**responded** 205:25

**response** 187:10 188:23 250:3 282:10 283:1,4 293:13

**responsible** 78:7,18 79:7,22 80:14 83:17 252:6

**rest** 227:5

**restrain** 214:9

**restraining** 257:12

**result** 128:2,3

**revealed** 237:14

**reverse** 96:6 131:14

**review** 93:18 94:2,8,18 95:24 136:5 180:20

**reviewed** 94:11 163:12 180:24 181:2, 10

**reviews** 182:19

**revoked** 128:4, 5 229:13

**Rick** 161:13,23

**ride** 100:14 208:10,11 210:7

**riding** 208:14

**rights** 36:16

**ring** 43:17 59:8 161:8

**ringing** 103:17

**ripped** 249:24, 25

**riser** 54:1

**road** 136:20 137:17,18 138:19 139:2,4, 6 180:1 249:12

**roadblock** 228:25

**robbery** 37:1,8 78:18 85:19 237:21 239:17 267:2

**robbing** 238:21

**Robert** 171:17, 19,25 172:5 223:13 269:15 271:20

**Robinson-staples** 7:15

**rode** 120:8 208:15

**role** 189:13 190:25 192:3 212:21 278:17

**rolls** 179:9

**room** 36:15 70:19 122:20 123:15,23 128:10 129:21 130:24 167:11 184:24 190:14 203:18 248:17 249:1 253:23 256:7,11 258:14 274:6 276:15 278:4,5 282:7 287:8,12 295:8 296:3

**row** 277:3

**Roxette** 108:17

**Roxi** 74:8

**Roxicet** 108:19,20 124:4 143:11,

21 144:10

**Roxicets** 58:23,25

**Roxie** 260:21

**Ruben** 177:24 178:20

**rug** 165:25

**rule** 70:5 71:11 73:6 86:13 92:12 93:23 108:4 253:12 293:2

**rules** 8:21 268:19

**run** 47:13 49:11 126:19 154:16 171:15 267:22

**run-ins** 270:10

**running** 47:10 113:3 127:11 287:12,21

———————

**S**

**S-Y-M-M-E-S** 161:7

**sample** 131:5, 16 133:24

**sanctions** 69:19

**sat** 36:15,23 78:22 126:6 128:9 271:20

**Saturday** 108:5,10

**savings** 142:18

**scared** 265:24 266:2 267:14 292:12

**scary** 286:23

**scene** 105:20 110:18 113:14 119:9 196:10 200:12 223:23 224:11

scheduled 233:5

school 51:7,11 54:2 87:23 88:22 89:1 90:17 109:22, 25 254:19 265:7,8,9

SCOLAR 149:13

screaming 286:25 295:21

screen 149:6, 24 150:3 152:15 153:20

screwed 198:8

scuttlebutt 191:16

search 184:16

seat 24:12 127:1

seats 268:7

second-degree 137:12 199:15

seek 69:12 187:3 249:7 258:17 261:17

seeking 70:25 252:12

sell 26:3 146:25 147:2,4

selling 23:2,19 147:6,10 159:19

sells 159:1

send 38:6,7,8 216:21 231:20 247:15

sends 97:15

sense 92:25 261:14

sensitive 71:8

sentence 115:19

sentenced 226:14

separate 128:3 265:20

separated 265:10

separating 107:25

September 226:25 243:12

Sereda 242:22

series 205:16 249:9

serve 213:6

served 115:20 124:23

service 32:10 39:17 91:18

set 167:10

sets 128:15

sex 63:12,14, 20,24 64:8 65:1 66:1 67:9,12 69:9 251:10 252:17,22 253:5

sexual 64:4 65:8,13,21,22 67:16 69:14 70:6,19 71:2,11 253:1

Shawna 7:19 268:16

she'd 76:6 228:1 237:7

she'll 248:3

Shell 34:10 35:1,21

sheriff 96:21 97:13 99:15 100:15,17 110:15 119:13 122:18,21 190:7 191:7 196:15 198:18 200:25 201:19,

20,25 202:1,5, 11 203:8 204:5 205:6,9 206:15, 16,18 207:13 208:7,9,14,15 209:1,9,12,16 210:12,17 211:12,23 212:8,14 213:11,20 214:8,21 215:2, 17,19 216:14 218:13,18 219:15,23 220:13,17,25 221:7 223:2,8, 17 229:21 230:3,23 233:2, 15 245:4 251:21 267:14 272:6

sheriff's 32:4 33:1,21 119:12 120:19 140:6 190:6,10 191:23 196:13 197:23 199:22 200:1,4,18 201:4,18 214:18 219:24 221:24 223:9

ship 168:12

shock 238:1

shocked 237:19 238:20 249:11

shooting 262:11

shoplifting 95:5,6,17 137:10

short 291:2

shot 81:19 129:3,4

shoulder 295:22

show 32:9,14, 18 48:6 55:8 95:22 109:23 110:19 111:22

171:2 220:9 287:13,21 290:15

showed 55:11, 14 101:16,19 102:7 103:14 109:7 110:15 131:24 132:2 139:24 192:6 216:1 273:4

showing 42:11 101:18 269:21

shown 164:22, 24

shows 101:21 102:18 106:4, 15 153:4 224:23

sic 217:15 251:23

side 123:15 138:24,25 139:6 150:11 152:12 260:4,7 263:21 294:2,3

sidewalk 126:7 234:14

signed 121:18 214:19 215:20

significant 220:23 221:2

signs 121:16

sill 111:16

silver 16:21 23:21,24 24:13 127:3

similar 284:7

simple 254:8

simply 220:12 244:11 253:14 262:8

Simpson 25:23,24 27:17, 20 28:12,13 29:25 42:24 43:9 77:1,19 78:7,17 79:7,21

80:13,25 83:7, 16,22 84:3,11, 12,21,25 166:1 180:9 223:7,10 236:16 265:22

Simpson's 62:17 146:15

single 91:14 251:7

sinners 248:16

sister's 136:21 229:1,10

sit 79:19 230:13 261:11

sitting 15:3 23:21 24:12 25:6 35:7 95:20 123:8 183:9 209:20 293:24 294:2

situation 121:12

sketch 81:24

skinny 216:2

sleep 27:9

sleeping 27:11

Slosar 7:13 11:22 12:3 20:17 24:4,20, 22 28:4,6,21 29:6 30:5 31:14 39:23 40:25 41:8,12,20 43:22 50:7,12 51:20,23 52:17 53:13,20 56:10 57:21 58:2,15 59:24 60:6,8 62:21,25 63:2, 25 64:6,22 66:23 67:1,3,8, 21,23 68:2,8, 12,17 70:14 71:15,23 72:5, 11,15 74:15 77:23 78:12,19, 25 79:9,14 80:1,18 81:4 83:23 84:24

Case: 6:17-cv-00084-REW-HAI Doc #: 200-1 Filed: 07/31/19 Page: 102 of 107 - Page
ID#: 9078
The Deposition of AMANDA HOSKINS, taken on March 16, 2018          322

86:21,25 87:2,
4,6 93:15,21,25
94:4,7,18,23
102:23 103:1,4,
20 107:23
130:6,11,13
134:25 135:5,
19 143:20,23
145:3,8 147:11
151:14 153:10
155:5,16
156:11,18
159:21 160:7,
13 162:25
163:3,10,19
164:8,22 165:1,
5 166:12 169:2
170:10,25
180:17,22
182:2,8,14,16,
20 183:22
184:14,21
185:9 186:13,
21,25 189:24
191:11,18
195:15,18,25
198:2,7,10,14
201:22 203:12,
23 210:18,20
211:2 213:1
215:2,5,15
218:20 220:5
222:18 224:2,5,
9,17 225:15,17
226:4,6 227:14,
17,20 228:2,7,
12,15,18
229:18 230:23
231:1 232:8
233:17,24
234:11,23
235:3,22
236:10,21
237:3,22 239:9,
12,14,18,20,23
240:16,18,20,
23 241:12,15,
19,23 242:2,6,9
244:2,8,13
245:6,8,16,25
246:7,14 247:3,
10,13,17,20,22,
24 248:6,12
249:6,22 250:7,
10,19,21,24
251:3,15,20

252:3,8,14,19,
25 253:5,7,13,
21 254:5,9,12,
15 255:4,7,10,
14,22,25 256:5,
9,11 257:4,6,9,
16,23 258:5,10,
17 261:4
262:16 263:12
264:8 267:17
274:17,21,25
277:5,7 278:13
280:5 285:12,
15 287:14,16,
23 288:4
289:12,14,24
290:9,14 291:1
292:23 293:3,5,
8 294:15 295:9
296:7

**small** 138:21
232:6,11 274:6

**smelled**
278:12 295:4

**Smith** 10:10
73:12 158:23
159:8,10,12,19
160:6,9 165:24
166:3,6,20,24
167:1 214:18,
25 215:4,10,18,
19 216:1
217:15 218:7
220:6,15,18,21

**smoked** 42:15
212:12

**smokehouse**
25:3

**smoking** 23:22
24:13

**smudged**
152:12

**snatched** 42:9,
20 279:2,3
286:23

**snorting**
262:11

**solemnly** 8:8

**son** 45:14
49:12 66:7,8

109:16,20
255:8

**song** 120:11

**sons** 14:21

**sort** 123:11

**sought** 252:8
257:11 258:1,2

**sound** 14:8
17:15 46:16
49:2,5 72:19
102:8 104:3,7
130:4 131:20
134:14 137:7
217:7 275:14

**sounds** 66:14
104:1 121:1
131:22 148:4
159:6 239:17

**sources**
172:15,23
173:6 180:12
189:12

**spare** 111:5,7,
14

**speak** 40:1
43:6 157:1
168:1 170:2
254:13

**speaking**
52:18 281:20

**speaks** 78:13
290:10

**specific** 63:11
69:10 272:8

**specifically**
191:8 289:22

**specifics**
204:1

**speculation**
12:4 20:18
51:20,23 56:11
77:23 80:19
159:22 160:14
171:1 177:17
196:1 287:16,
24 290:15

**speechless**

13:10

**speeding**
269:9

**spending**
220:22 221:2
243:10

**spent** 85:18
228:9 266:5

**spit** 234:14

**split** 135:1,10

**spoke** 29:15
156:24 157:2
167:1

**spoken** 135:9
166:3 168:18
171:23 175:4

**spring** 106:13,
14

**staff** 81:14
180:13

**stamps** 142:4

**stand** 78:4
226:2 227:24
283:17

**standard**
50:15

**standing** 35:7
36:6 99:15,17
111:25 122:18
211:25 232:22
274:5

**stands** 122:21

**STAPLES** 7:15
176:20,23
177:8,17
240:17 241:20,
22

**start** 171:17
190:11 213:17
248:15 261:1
265:13,14
269:5

**started** 31:22
37:19 38:3
40:2,9,10,14
42:10 55:24
56:4 62:10

63:23 124:9
260:17,24
262:10,21,24
276:12,16
278:16

**startled** 179:11

**starts** 39:22
42:16 275:11

**state** 8:16 34:9
35:20 36:6
183:8 220:22

**statement**
28:16 30:25
73:25 84:21
85:1 113:23
114:5,8,15,22
130:20,22
142:20 143:4,6
147:8 148:6
153:7 155:11
156:9,14
159:24 167:5
168:6 169:19,
24 170:6,24
171:3 172:11,
15,18,20 173:1,
3 180:9 183:1
209:5,15 221:6
223:6 275:13
279:15 294:6

**statements**
29:1,25 119:24
120:6 170:14
206:14 212:17
285:11,23
289:9

**States** 7:9

**stating** 275:12

**station** 35:1,
21,25 75:9,11
207:13

**status** 252:13,
14

**stay** 12:22
21:19 22:3,7
52:16,23 61:23,
24 62:1 81:7
107:14 108:5
127:7 227:2
228:13

The Deposition of AMANDA HOSKINS, taken on March 16, 2018

323

**stayed** 12:23
44:24 61:11,12,
15,22 86:19
100:3 106:18
107:18,19
108:3 114:16
115:4,16
226:23 260:19

**staying**
107:13,15
109:6

**steal** 24:18
25:2 154:23
155:21,22

**stealing** 76:24
83:21 155:15,
19,20 156:6

**step** 32:10,15,
19 99:25
275:22 278:11
295:4

**stepped**
275:23

**steps** 212:12
230:12

**Steven** 139:5

**stick** 34:22
134:11,18

**sticks** 106:6

**Stinking** 12:17
38:18

**stipulate**
289:24

**stole** 97:1,2
101:9 103:15
154:17 155:21
211:19 217:17

**stolen** 101:5
106:1 122:14
132:7,24
136:18 155:3,
12,25 156:2
210:15 213:7

**stood** 99:14
230:16

**stool** 128:15,17

**stop** 45:22

71:23 80:1
127:23 135:8
202:12 286:14
291:20 292:14

**stopped** 56:19
62:11 112:6
190:21 191:21
201:9 202:22
210:16 211:7
228:23,24
255:23 288:9

**stopping**
48:10 83:2
134:22

**stops** 71:21
112:22 187:6

**stopwatch**
209:20

**store** 19:14,16
155:22 156:3
179:1,4 184:9

**stores** 156:1,2
225:18

**stories** 259:24

**story** 260:4

**stove** 99:15

**straight** 45:18
47:18 48:14,15
267:8 268:18

**street** 137:17
184:11,13,17,
18,20 185:3,7
261:2

**stressful**
249:19

**stressor** 249:2
251:19,20

**stressors**
248:23 251:18

**strike** 84:19

**stronger**
260:25

**struck** 81:18
84:17 296:2

**stuff** 129:8
207:7 289:25

292:14

**subject** 79:4
198:1 201:5

**subjects** 240:5

**submit** 70:5

**Suboxone**
57:19 59:8
148:25 150:8
153:14,17
260:11

**subpoenaed**
48:6

**subsequent**
188:16 202:20
218:8 245:14
283:2,21

**substance**
156:18

**substances**
262:6

**Sue** 167:18

**sued** 42:1
134:14

**suffered**
181:25

**suggested**
25:2 238:6,9

**suggesting**
238:4

**suing** 184:23

**suit** 245:1

**suitable** 93:20

**sum** 237:8

**Summer**
106:13

**sums** 221:2

**Sunday** 62:20
72:19,24 108:5,
11 126:17

**supervised**
227:10

**supervisor**
270:22

**supplying**
148:22

**support** 90:22
92:3,5,9,14,21,
25 93:2 141:3,
14 142:13

**supported**
142:8

**supposed**
93:23 122:15
217:1

**surety** 121:11,
14,18

**surgery**
103:18,22

**surprise** 238:2

**surprised**
35:14 282:22

**surrounding**
244:23

**suspect** 76:19,
20 77:8,13,19
80:17,22

**suspects**
81:23

**suspended**
136:20 229:1,
13

**suspicious**
195:9

**SUV** 179:5

**swab** 130:23

**swabs** 219:20

**swear** 8:8

**sweep** 165:24

**swerved**
126:24

**sworn** 8:7

**Symmes** 161:8

**system** 127:5
151:7

---

**T**

**table** 36:24
42:10 286:24
291:24 292:5,8
294:2

**Tahoe** 208:9

**takes** 71:7

**taking** 30:17
42:12 93:18
132:3 137:10,
19 150:21
183:6 193:12
225:7,11
230:18 235:10
250:5 259:4,7
260:17 261:10
262:10 264:7
288:17 292:19

**talk** 8:22 21:15
22:16 29:22
35:3 37:1 38:14
43:8 61:9 62:19
71:4,13 76:24
79:18 81:12
84:2 85:21
98:15,23 99:18
105:10 128:18
129:2 130:21
136:15 139:10
140:1 156:22,
23 157:11
162:16 170:8
201:19,25
202:20 204:23
205:10 211:21
212:8,14
222:10 225:5
233:15 234:2
244:16,25
249:13 255:1,
20 261:12
267:9 268:1

**talked** 13:12
22:13 28:19,23
29:16 35:12
37:18 38:5,6
41:25 42:4,15,
22 71:12 72:1
74:23 81:21
86:17,23 87:8
92:8,12 99:6

116:17 118:12
127:10 130:24
132:19 139:13
141:8,22
156:10 158:4
169:1 185:17,
19 191:3
204:15,21
212:10 221:20
222:12 230:16
233:10 267:13
294:17

talking 11:18,
25 12:7 13:6
22:21 23:18,23
25:8,22 34:11
35:5,7,20,21
36:5,6,7,10
59:21 71:9
84:11 89:3 97:1
99:4 120:10
128:12,16
129:22 160:10
170:18 193:14
201:10 206:8,
17 207:14
208:17 211:5
215:17,18
216:24 229:22
231:21,25
233:2 235:19
236:18 238:14
241:12 249:16
279:8

talks 96:16
221:18

TAP 91:23

tasteful 69:11

tattoo 187:9

tattoos 186:1,
3,5,7

Taylor 7:14
10:6 11:5 19:24
61:6,15 62:5
73:16,20 84:22
85:25 96:18
125:15 175:4
185:18,19,22
186:9,20
269:22

Taylor's 11:7
22:8 177:15

186:14

team 79:2
81:13 83:14
166:19 167:2
168:25 171:24
172:16 176:17
245:11 247:6
283:5

teams 173:1

teardrop 187:9

teased 216:23

technician 7:3

teenager 51:5

telling 39:9
42:11 76:13
155:13 163:19
170:20 195:4
227:19 230:14
232:24 233:2,3
236:7,15
245:13 286:20
288:16 291:11

tells 37:1 96:23
123:23

ten 20:7 276:9

term 261:3

test 68:4,8
149:21 153:15
252:20

tested 152:17

testified 41:9
83:24 203:8
247:24 251:7
258:12 272:6
273:15 278:7
291:9,23

testify 256:20

testifying
184:21

testimony 8:9
24:5 41:6 68:1
76:5 83:24
111:21 138:16
143:24 147:12
155:25 218:21
236:11,23
277:20 295:10

testing 219:21,
22

tests 283:16

that'd 247:17
248:14

that'll 256:3

theft 95:3,5
137:9 225:7,11

theory 51:17

Thereabout
144:21

thing 60:8
71:21 76:5,16
118:11 192:24
219:2 264:12
276:24 278:10
283:3

things 95:19
225:14 246:24
249:19,22
253:18 277:21
278:9 289:6

thinking 32:3
51:10 88:17
89:8 90:25
121:11 134:6
238:23

thinks 79:25
231:10 254:22

third-degree
96:8

Thomas 126:8
200:2,24

thought 127:8,
25 128:8
129:18 137:18
138:13,16
193:10,19
198:7,10 203:7
211:20 215:25
216:2 218:17,
23,25 238:8
253:7,13
263:23 266:6
267:7,21

threat 279:24

threatened
184:22 192:25

193:21 292:6

threatening
192:22 292:8
293:18

threats 185:1
292:4

throat 190:9

thrown 223:18

ticket 201:16
269:11

tickets 269:9

tie 24:18 25:3

Tilburg 7:4

tile 232:12,13

timber 23:2,20

time 7:5 9:18
10:7,11,12
12:16,24 13:4,
20 15:3,15
17:1,17 19:2,7,
8 20:1,4,23
22:1 24:10,14,
17 28:12 29:12,
15 30:6,8 32:2,
16 33:3,20 34:9
35:5,13,22 36:4
38:25 43:15
44:5 45:4 46:3,
6,10 47:1
48:20,22 49:15
50:6,10 51:22
53:22,23 54:3,
20 55:8,10,18
59:13,16 61:10,
11 62:13 64:24
65:8,15,17,23,
25 66:9 75:12
86:14 87:13,15
89:10 91:19,21
92:10 94:17
97:3 99:5
101:17 102:14
104:8,13
105:17,22,24
106:2,8 107:3,
5,14,18 109:23,
24 112:13
113:22 114:6,7,
9,14,15,17
115:19 119:1,

12,13 121:6
123:25 124:1,
23 125:1
126:24 127:7
128:19 130:3,
20 132:2
134:12 135:10,
14 137:16
138:20 139:15
141:24 143:1
148:2,17 149:3,
7 151:24
154:13 155:15
157:7 168:3,7,
12 175:23
176:1,6,9,11
178:25 179:14
188:21 189:3
190:7,11 192:7
193:3,16 194:4
196:16 198:25
200:5,20
204:24 205:17
207:17 208:5
209:15 210:21
211:17 212:2,3
213:4 216:19,
20 218:16
221:13 225:4
226:14 227:8
228:9 235:16
236:5 243:10,
13,17 244:6
259:5,8,10,13
260:11 261:18
262:12 263:10
264:2,15,22
266:5,9,13,17
269:22 278:1
281:12,14
282:4,20,21
283:20,21,22
287:6,18
293:25 294:16,
19,24

times 27:17
29:17 33:2 64:4
65:14 95:8,10
101:17 104:20,
24 105:4,9
115:7 152:25
153:8 176:7
177:12 187:18
188:12 191:21
192:4 197:22

The Deposition of AMANDA HOSKINS, taken on March 16, 2018 325

203:24 208:4 214:4,11 223:20 263:1,7 273:24 282:19, 20,23 284:1 295:16

**tired** 127:11

**tissue** 183:10

**today** 7:3,4 56:21 79:20 182:10 190:5 232:24 248:21 250:16 253:15 272:6 283:24 289:5

**told** 11:10 12:8 13:2 14:1 15:2 23:11 24:6 29:5 31:2,5,17,19,21 32:8,12 35:9 37:9,21 38:6,25 40:3,4,8,10,13 43:17 53:18 57:7,11 60:17, 18 66:13 68:4 80:5 82:15,17 84:12,22 85:18 100:2 101:6,8, 19 103:14 113:2 117:20 118:10,14 126:10,13,18 127:12 129:1 137:1 148:9 153:5 154:2,4, 6,14,15,20 155:23 156:21 159:3 164:11 169:21 174:9, 17 179:13 190:24 192:10 193:20 195:1 198:16,18 202:21 203:7,8 205:2,3,6,8,9 209:6,12 211:12,21 214:11 220:16 221:14,23 223:4 227:20 228:2 230:2,15, 24 233:18 234:13,17,24 235:1 236:23

246:24 248:10 254:12 266:9, 16 267:13 268:23 270:10, 24 276:3 278:15 280:19 283:16 284:19 285:18 288:12, 19 294:22

**top** 151:19

**Topaz** 9:25

**topics** 191:16

**total** 115:14 135:7

**touch** 63:18 207:20

**town** 33:12 205:3,10 210:7

**Townsend** 7:2

**toys** 154:17

**Trace** 139:5

**track** 58:10,12, 20

**tracker** 183:14

**trade** 268:7

**traffic** 200:12 223:23

**training** 88:19

**transcribed** 275:11

**transcript** 30:25 31:2 143:6 155:11 160:3 274:13 275:10 285:7

**transcription** 294:6

**transferred** 115:12 133:2

**transport** 105:21 119:14

**transported** 113:20 115:1,5 120:24 168:10 197:7 219:9

274:3

**trap** 64:17

**treated** 42:3 257:19

**treatment** 60:10 185:14 250:4 258:2,4

**tree** 137:19 138:14,17

**trespass** 194:15,18

**trial** 118:5 122:15,16,17 123:1,24 177:10 227:1, 24 232:24 233:5 248:10 251:23

**trip** 33:14 53:4

**trooper** 35:5 269:6,17,25 270:7,12 271:15

**troopers** 100:19 105:19 271:4,10

**trouble** 56:8, 13,16,18 57:12 238:10

**troubling** 70:21

**truck** 15:3 16:21 19:7 23:22,24 24:13 25:6 127:3

**true** 21:9 23:1 27:23 39:2 42:21 47:20 55:11 56:8 57:4,15 60:20, 22,24 74:2 84:23 85:13,19 87:5 94:2 130:17 136:5 148:7,8 152:24 153:3 154:2,5, 17,21 155:1 156:10,22 167:20 170:1,7,

9,11,17,24 179:15 185:14

**truth** 8:10,11 155:13 195:4

**Tuesday** 259:21

**tunnel** 250:9, 12

**turn** 126:4,5,16 127:12,14 141:1 165:10 181:15 220:4 227:3

**turned** 42:20 124:14 125:20, 24 127:8,14 128:1 131:9,11, 18 133:15 180:3 213:14 218:16,25 227:7 229:24 275:21

**Turner** 123:6 234:2,17,21

**turning** 133:19

**tying** 43:8 83:21

**type** 93:1 95:5 124:3 152:14 244:9 292:18

**typed** 47:6

**types** 71:7 79:3

──────

**U**

**Uh-huh** 10:24 90:6 105:14 120:16 124:25 140:12 212:6 215:23 232:14

**Uh-uh** 109:3 207:5 216:10

**ultimately** 207:12 217:20 218:23 219:4

**unclear** 156:13

**underlying**

79:2 156:16 166:14

**underneath** 36:25 152:24

**understand** 9:1,3 41:1 43:24 56:12 57:23 60:14 78:14 103:3,5 114:17 118:25 155:17 156:17 171:2 174:15 182:25 196:2 203:14 204:4 212:7 215:4 225:2,22 227:25 228:5, 10,22 229:20 232:9,17,25 235:23 239:6 244:14 248:18 249:15 272:13

**understanding** 26:3 51:14,16, 19 69:22 79:20 81:16 83:17 105:7 114:3,21 117:9 125:9 144:13 145:13 159:4 161:5 195:7 205:5 235:18 236:5 238:11 256:16

**understood** 9:5 121:11 208:25

**unethical** 250:25

**United** 7:9

**universe** 131:4

**unlawful** 137:10 225:7, 11

**unlawfully** 225:16

**unlock** 96:19 111:8

**unlocked** 99:3, 19 112:5

**unlocks** 96:22

**unpaid** 89:23, 24

**unsupervised** 229:4

**unsure** 66:21

**untrue** 57:9

**upset** 249:1

**upstairs** 216:22 232:1

**urging** 237:20

**user** 262:20

---

**V**

---

**vacant** 184:13

**vague** 85:2

**valid** 70:11

**values** 150:23 151:3 152:24

**valuing** 181:24

**Van** 7:3

**vehicle** 18:18 33:22,23 87:21 179:23 199:17 229:12 277:3,4 284:6

**vehicles** 19:1, 4 197:18

**VERBAL** 187:10 188:23

**verbalize** 8:25

**verification** 93:13,16

**verified** 93:24

**verify** 93:19 94:2

**versus** 7:8

**victim** 20:9 81:3,15 82:6 84:3

**victim's** 30:20 82:9 84:15

**Victory** 73:5

**video** 7:3

**violation** 32:13 104:15 122:11 131:19 133:16 218:18

**violence** 257:11 265:3

**visit** 149:23 205:3 227:9 281:12,17,21

**visited** 57:15

**voice** 42:4 189:25

---

**W**

---

**wad** 142:21,22

**wait** 146:11 210:8

**waited** 227:25

**waiting** 168:9 212:13 274:5

**wake** 55:12 168:12

**Walgreen's** 48:6,18

**walk** 13:5 128:22 179:1 183:5 210:6 212:1,11 276:1, 5

**walked** 12:7 179:3,7,8 210:9

**walking** 213:17 230:12 232:23 233:8

**walks** 128:10

**wanted** 13:11 36:14 37:2 40:4 50:2 73:19 98:21 107:14 122:16 130:18, 19 193:4 223:17 228:2 265:13 277:11 282:13 295:23,

25

**wanting** 96:16 98:15,23 193:2

**wanton** 137:13 199:16 225:21

**warm** 119:2

**warrant** 32:11 38:8 106:3 110:22,23 113:3 116:4 126:10,11,19 127:5,9 194:16, 19 211:9 213:6 215:20 219:1

**Warren** 55:20 57:5,8,12 59:10 60:10 63:9,12 64:12 68:22 69:4,18 71:13 72:6 74:5 149:1 253:3

**Warren's** 46:14

**wasting** 94:9

**watch** 49:22

**watched** 76:16

**watching** 49:25

**ways** 108:3,13

**wealth** 236:20, 24 237:9

**weapon** 112:16

**Weber** 7:19,23

**week** 28:3 29:1 50:15 91:1 149:25 150:1,4 184:5

**week-and-a-half** 29:1

**weekend** 126:16 227:9

**weekly** 149:24

**weeks** 82:19 136:25

**weighing** 249:4

**weight** 143:15

**West** 242:20

**whatnot** 166:16

**whatsoever** 272:20 289:10

**Whitley** 128:20

**wife** 103:18 117:3

**William** 10:19 11:11,25 12:15 14:3 15:4,14,19 16:11,14,19,25 18:15 19:1,8,13 20:6,14,20 21:19,25 22:3, 7,15 23:18,25 25:2,6 26:7,17 27:2,4,18,20,23 28:14 29:21 30:12,16 37:2, 10 40:6 42:23 43:7,12,14,20 44:18 45:11,20, 22,25 49:1 52:22 55:8 57:11 60:17,25 62:15 63:21 65:20 66:1 67:12 71:12 72:2,8 73:25 74:13 75:19 76:12,24 77:8 83:20 84:2,10 86:17,23 92:5, 19 106:17 109:7 117:8,9, 19 118:15 120:3 126:25 132:10 134:4, 12 142:10 145:21 146:10, 14,18 147:2,25 154:3,6,23 158:9 159:7,13 160:2,4 161:17 162:6,16 170:2, 7,18,20 174:3 175:1 188:20 238:14,15

264:23 266:13 267:7,11

**Wilson** 172:7, 8,11 271:16

**window** 23:22 111:15,16 179:9,23 183:7

**windows** 138:20 179:6

**withdraw** 116:18 117:22 290:23

**withdrawn** 117:14 131:23 133:10 218:12

**withdrew** 116:21 118:6

**withheld** 286:10

**witnesses** 72:3 171:16

**Wollum** 88:24

**woman** 37:21 38:17 42:11 116:17 128:22 180:2 280:1

**woman's** 37:22 116:15

**women** 188:21 259:20

**wondered** 217:17

**word** 76:9 245:3 281:25

**worded** 266:8

**words** 174:13 195:6 202:8 207:8 216:13 226:13 293:17

**work** 31:3,4 48:14 49:20 50:1,3,6,10 56:9,21 60:5,12 82:14 91:16,18 96:15 98:14,16, 18 106:18 117:18 121:15

123:19 179:11 205:2,8 206:6,7 213:14 240:6,9, 13 241:10,14 242:16,17,23 243:6,11

**worked** 90:7, 15 103:6 123:21 200:3 216:4 241:15, 17 242:7

**working** 56:19 126:9 166:16 178:4 242:25 243:8,25 260:18,20

**works** 49:16 240:25 242:14

**world** 217:17 255:20

**worried** 197:1

**worse** 254:25 255:4,5,7

**worsen** 185:1

**worst** 288:11

**worth** 143:9 144:23 145:1,2, 7 147:9 148:1, 10

**worthy** 267:12

**would've** 208:22 211:8, 17 213:25 216:18 222:12 241:17

**wow** 216:3

**wreck** 260:16 263:20

**Wright** 7:17 8:15 30:10 41:4,16,21,22 44:1 50:9,14 52:19,20 56:14 58:19 59:24 60:3,7,14,16 63:1,6 64:15 65:5,6 66:24 67:2,4,18,22,

24,25 68:7,10, 22 69:2 70:2,14 71:10,25 72:13, 16 78:16 79:5, 12,17 80:10 81:10 84:1 85:4,5 86:23 87:1,3,5,7,10 93:4,8,13,17,23 94:1,5,12,13, 20,22,24 95:1 102:25 103:3,5, 7,24 107:24 130:8,12,14 134:22 135:2, 14,17,20,24 144:8 145:6 147:13,14 149:14 151:10, 13,17 153:22, 25 155:9,10 156:17,19,20 163:1,7,16 164:2,8,24 165:2,9 166:21, 22 171:6,13 176:21,25 177:5,9 181:1 182:5,15,18,24 184:1,19 185:5 186:16 187:4 189:16 212:24 240:21 253:6,9 258:22 275:3,6 287:15,25 288:3 291:12, 18 292:21,24 293:4,7

**Wright's** 268:21

**write** 57:25 266:4

**writing** 113:25 260:17

**written** 247:15 248:21 250:2

**wrong** 96:20 126:8 131:14 191:8 197:8 211:1 218:22 219:4 234:14 236:2,8 239:13 265:13

**wrote** 115:21 202:21 257:21 269:11

— Y —

**yard** 22:24 76:6,14 81:17 174:14

**year** 10:12 17:5 27:12 52:13 87:25 90:12 116:13 119:2 178:9 179:14 227:4 243:9

**years** 17:13 29:2 34:12,20 63:21 64:8 65:1,20 66:8 67:11 78:22 82:20 227:10 231:8,9 249:24 250:1 260:20 265:11

**years'** 123:25 124:23 125:1

**York** 7:18 28:17,18,20 29:15 31:17,19 32:3 33:25 34:5,19 36:23 41:25 42:1 43:7 53:11 57:7,12 60:17 74:1 84:22,25 96:13, 16,21,23 97:4, 11,14 98:15,17, 18,21 99:16 100:13,17 101:6,14 102:6 104:21 105:13 106:5 109:7 110:2,17,21 111:5 114:5 119:8,14 120:20,22 127:15 128:10 129:16,21 130:2,7,10,24 131:4,15 132:14 133:21 134:18 143:7 154:1 155:2,23

156:9,15,21 160:3 165:14, 23 167:5 168:19,22 169:9,14,17,21, 24 170:14,23 171:19 172:12, 15,19,20 173:2 175:17,20 176:10,13 177:24 178:20 180:9 193:21 194:3,5 203:4 204:1 205:13 206:10,15 208:7 209:6 211:19 212:1, 19,20,25 213:11,18 214:21 216:15 220:14,21 221:5,17,18 222:4 245:4 251:21 270:25 272:6 274:8,11 275:11,18,22 276:3,18,19,22 277:2,14,21 278:11,16,19 279:24 280:3, 19 282:11 283:12,16 286:14,22 287:3,12,21 288:12,17,19, 23 289:7 291:6, 10,16,20,23 292:4,7,14,19 293:20,22 295:3,16,18,20 296:1

**York's** 178:1,2 199:10 213:15 220:11 279:3 289:5 293:17

**you-all** 30:25 37:12 52:8 111:3 135:1,9 139:8 157:1 186:10 188:6

**younger** 95:6