IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF KENTUCKY, LONDON DIVISION

| | | |
|---|---|---|
| AMANDA HOSKINS and JONATHAN TAYLOR, | ) | |
| | ) | |
| | ) | Case No. 17-CV-84 |
| Plaintiffs, | ) | |
| | ) | Hon. ROBERT E. WEIR |
| v. | ) | |
| | ) | Mag. HANLY A. INGRAM |
| KNOX COUNTY, ET AL., | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendants. | | |

# EXHIBIT 17

NO. 17-cv-84

# AMANDA HOSKINS, ET AL.

V.

# KNOX COUNTY, ET AL.

## DEPONENT:

## JAMES ALLEN HELTON

## DATE:

## April 09, 2018

IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN

DISTRICT OF KENTUCKY

NO. 17-cv-84

HON. DAVID L. BUNNING

HON. CANDACE J. SMITH


AMANDA HOSKINS, ET AL.,

PLAINTIFFS


V.


KNOX COUNTY, ET AL.

DEFENDANTS

DEPONENT:  JAMES ALLEN HELTON

DATE:     APRIL 9, 2018

REPORTER:  BETHANY BELLOFATTO

Page 2

1                    APPEARANCES

2

3    ON BEHALF OF THE PLAINTIFFS, AMANDA HOSKINS, ET AL.:

4    ELLIOT SLOSAR

5    AMY ROBINSON-STAPLES

6    LOEVY & LOEVY

7    311 NORTH ABERDEEN STREET

8    THIRD FLOOR

9    CHICAGO, ILLINOIS 60607

10   TELEPHONE NO.: (312) 243-5900

11   E-MAIL: ELLIOT@LOEVY.COM

12

13   ON BEHALF OF THE DEFENDANTS, BRIAN JOHNSON, MARK

14   MEFFORD, JACKIE JOSEPH, AND DALLAS EUBANKS:

15   CODY WEBER

16   SHAWNA VIRGIN KINCER

17   KENTUCKY STATE POLICE GENERAL COUNSEL

18   919 VERSAILLES ROAD

19   FRANKFORT, KENTUCKY 40601

20   TELEPHONE NO.: (502) 573-1636

21   E-MAIL: SHAWNA.KINCER@KY.GOV

22

23

24

25

Page 3

1    ON BEHALF OF THE DEFENDANTS, JASON YORK AND TROOPER

2    BUNCH:

3    DERRICK T. WRIGHT

4    STURGILL, TURNER, BARKER & MOLONEY, PLLC.

5    333 WEST VINE STREET

6    SUITE 1500

7    LEXINGTON, KENTUCKY 40507

8    TELEPHONE NO.: (859) 255-8581

9    E-MAIL: DWRIGHT@STURGILLTURNER.COM

10

11   ON BEHALF OF THE DEFENDANTS, MIKE BROUGHTON AND CITY OF

12   BARBOURVILLE:

13   LICHA H. FARAH, JR.

14   WARD HOCKER THORNTON

15   333 WEST VINE STREET

16   SUITE 1100

17   LEXINGTON, KENTUCKY 40507

18   TELEPHONE NO.: (859) 422-6000

19   E-MAIL: LFARAH@WHTLAW.COM

20

21

22

23

24

25

Page 4

1

2    ON BEHALF OF THE DEFENDANTS, JOHN PICKARD AND DEREK

3    EUBANKS:

4    JOHN F. KELLEY

5    JASON WILLIAMS

6    WILLIAMS FARMER & TOWE

7    303 SOUTH MAIN STREET

8    P.O. BOX 3199

9    LONDON, KENTUCKY 40743

10   TELEPHONE NO.: (606) 877-5291

11   E-MAIL: JOHN@WFTLAW.COM

12

13   ALSO PRESENT: NATALIA BASHAM, VIDEOGRAPHER.

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1                      INDEX

2                                              Page

3    PROCEEDINGS                                 8

4    DIRECT EXAMINATION BY MR. SLOSAR            9

5    CROSS EXAMINATION BY MR. KELLY              98

6    EXAMINATION BY MR. FARAH                    161

7    EXAMINATION BY MR. WEBER                    166

8    EXAMINATION BY MR. WRIGHT                   174

9    REDIRECT EXAMINATION BY MR. SLOSAR          247

10   RECROSS EXAMINATION BY MR. KELLY            255

11   RE-EXAMINATION BY MR. WRIGHT                257

12   FURTHER DIRECT EXAMINATION BY MR. SLOSAR    257

13   FURTHER EXAMINATION BY MR. WRIGHT           258

14

15

16                    EXHIBITS

17                                              Page

18   1  ENTERPRISE RENTAL AGREEMENT PL 015643    21

19   2  PL 9686 VTS 01  (AUDIO EXHIBIT)          27

20   3  PL 9688 VTS-01-3  (AUDIO EXHIBIT)        27

21   4  CHARGING CITATION BY JASON YORK 1-4-11   35

22       PL18949 AND 18952

23   5  KSP 341                                  39

24   6  PL 1791-1792                             50

25   7  PL9689 8:54 (AUDIO EXHIBIT)              55



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

## Page 6

EXHIBITS (CONTINUED)

3    8   POLICE REPORT 3-8-12                        69
4    9   PL 25962 (AUDIO EXHIBIT)                     86
5    10  SUBPOENA KSP 1873                            94
6    11  CUMBERLAND TASK FORCE DOCUMENTS             182
7    12  COPY OF COMPLAINT                           258

## Page 7

STIPULATION

The videotaped deposition of JAMES ALLEN HELTON taken at LITTLE SANDY CORRECTIONAL COMPLEX, 505 PRISON CONNECTOR, SANDY HOOK, KENTUCKY 41171 on MONDAY, the 9TH day of APRIL, 2018 at approximately 11:39 a.m.; said videotaped deposition was taken pursuant to the FEDERAL Rules of Civil Procedure. It is agreed that BETHANY BELLOFATTO, being a Notary Public and Court Reporter for the State of KENTUCKY, may swear the witness and that the reading and signing of the completed transcript by the witness is not waived.

## Page 8

PROCEEDINGS

VIDEOGRAPHER:  We are now on record.  My name is Natalia Basham.  I'm the video technician, and Bethany Bellofatto is the court report.  Today is the 9th day of April, 2018, and the time is 11:39 a.m. We're at the office of Little Sandy Correctional Center located at Sandy Hook, Kentucky to take the deposition of James Allen Helton in the matter of Amanda Hoskins, et al. v. Knox County, et al., pending in the United States District Court for the Eastern District of Kentucky, number 17-cv-84. Will Counsel please introduce themselves for the record?

MR. SLOSAR:  Elliot Slosar for the plaintiffs.

MS. STAPLES:  Amy Staples for the plaintiffs.

MR. WRIGHT:  Derrick Wright for defendants, Jason York and Jason Bunch.

MR. WEBER:  Cody Weber for defendants Mark Mefford, Jackie Joseph Pickerel, Brian Johnson, Dallas Eubanks, and Kelly Farris.

MR. KELLY:  My name is John Kelly; I'm here on behalf of the defendant, Knox County, John Pickard, and Derek Eubanks.

MR. FARAH:  Licha Farah on behalf of Mike

## Page 9

Broughton and the City of Barbourville.

VIDEOGRAPHER:  Thank you, counsel.  Sir, will you please raise your right hand and be sworn in by the court reporter?

COURT REPORTER:  Do you solemnly swear or affirm that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  I do.

COURT REPORTER:  Thank you.

DIRECT EXAMINATION

BY MR. SLOSAR:

Q    Good morning or afternoon, Mr. Helton.  How are you doing?

A    Pretty good.

Q    You all right?

A    Yeah.

Q    So, I know there's a lot of people here today. I want to go over some of the rules before we get started, okay?  So one of the things that would be really helpful for everyone, especially this court reporter down here is when you answer the questions that we ask you if just please answer them verbally, okay?

A    Okay.

Q    That way she can type down your answer; does



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 10

1 that sound all right?

2    A   Okay.

3    Q   All right. I tend not to ask perfect

4 questions but if I ask you a question and you don't

5 understand it just let me know and I'll ask it a better

6 way, okay?

7    A   Okay.

8    Q   Happens all the time, all right, so don't be

9 shy about that. If at any time you want to take a break

10 and go use the restroom or get some water or something,

11 just let us know, okay.

12    A   Okay.

13    Q   There are a lot of attorneys here and some of

14 these attorneys might make objections today; there's no

15 judge here and so, you know, I'm going to ask that you

16 wait for them to make their objection then you're going

17 to answer the question, okay?

18    A   Okay.

19    Q   Mr. Helton, how old are you?

20    A   38.

21    Q   38. And I know we're currently at the Little

22 Sandy Correctional Center; when did you get moved out to

23 Little Sandy?

24    A   About two weeks ago.

25    Q   And what kind of case are you in here on?

Page 11

1    A   Just receiving over $10,000.

2    Q   And what's your sentence on that?

3    A   Five years.

4    Q   All right. Who was the prosecutor in that

5 case?

6    A   Jackie Steele.

7    Q   Is that Mr. Steele up from Knox County?

8    A   Yes, sir.

9    Q   Okay. I'm going to be asking a lot of

10 questions today about December of 2010, all right?

11    A   Okay.

12    Q   Prior to December of 2010, did you personally

13 know Amanda Hoskins?

14    A   No.

15    Q   Prior to December of 2010, did you know

16 Jonathan Taylor?

17    A   No.

18    Q   Prior to December of 2010, did you know

19 William Lester?

20    A   Yeah.

21    Q   How did you know Mr. Lester?

22    A   He's a family friend.

23    Q   How long have you known Mr. Lester?

24    A   All my life.

25    Q   Have you ever been a friend of Amanda Hoskins?

Page 12

1    A   No.

2    Q   Have you ever been friends with Jonathan

3 Taylor?

4    A   No.

5    Q   Prior to December of 2010, did you know a

6 woman by the name of Katherine Mills?

7    A   Yeah.

8    Q   How did you know Ms. Mills?

9    A   Through William.

10    Q   And have you ever been over to Ms. Mills' home

11 before December of 2010?

12    A   I stopped by once.

13    Q   Do you remember who you were with?

14    A   I was with my wife.

15    Q   Who is your wife?

16    A   Sandy Helton.

17    Q   She still your wife?

18    A   Yeah.

19    Q   How long have you guys been together?

20    A   16 years.

21    Q   That's a long time.

22    A   Yeah.

23    Q   Now, do you know a detective by the name of

24 Jason York?

25    A   Yes, sir.

Page 13

1    Q   When did you first meet Jason York; do you

2 remember?

3    A   Not the exact day but he come to my house,

4 questioned me about the death of her.

5    Q   So prior to meeting with Detective York

6 relating to the death of Katherine Mills, have you ever

7 met with Detective York before that?

8    A   No, sir.

9    Q   Have you ever been a confidential informant

10 for Detective York?

11    A   No, sir.

12    Q   Do you know an officer by the name of Mark

13 Mefford?

14    A   Yeah.

15    Q   Okay. And did Detective Mefford ever question

16 you relating to the death of Katherine Mills?

17    A   Yeah.

18    Q   Do you recall who was with Detective Mefford

19 when he questioned you about Ms. Mills' death?

20    A   Jason York.

21    Q   And was that on the same day that you were

22 taken down to Frankfort for a polygraph exam?

23    A   No.

24    Q   Okay. It was a different day?

25    A   Yes.

Page 14

1    Q   Do you remember where Detectives York and
2  Mefford questioned you at?
3    A   Barbourville Police Station.
4    Q   Was -- do you know a person by the name of
5  Detective Mike Broughton?
6    A   Yes.
7    Q   I'm sorry.  It's Chief Mike Broughton; do you
8  know Chief Broughton?
9    A   Yes.
10   Q   Okay.  Was he present when Detectives Mefford
11  and York were questioning you --
12   A   Yes.
13   Q   -- at the Barbourville Police Department?  Did
14  Detectives York, Mefford, and Chief Broughton -- did
15  they question you together about Katherine Mills' death?
16   A   No.  Mark and Jason did and Mike stood at the
17  door.
18   Q   Was he watching it?
19   A   Yeah.
20   Q   Mr. Helton, do you know a police officer by
21  the name of Kelly Farris?
22   A   Yeah.
23   Q   How do you know Officer Farris?
24   A   I believe he brought me a summons or something
25  one time.

Page 15

1    Q   Okay.  And this -- did he -- do you remember
2  whether Officer Farris brought you a summons or
3  something similar to that during -- relating to the
4  Katherine Mills --
5    A   Yeah.
6    Q   -- homicide case?
7    A   Yeah.
8    Q   Did you ever know Detective, or Officer Farris
9  before that experience with him?
10   A   No.
11   Q   Mr. Helton, do you know former Sheriff John
12  Pickard?
13   A   Yes.
14   Q   And did you know Sheriff Pickard prior to the
15  investigation into Katherine Mills' death?
16   A   Yes.
17   Q   Had he ever arrested you before December of
18  2010?
19   A   I don't remember.
20   Q   Were you ever an informant for Sheriff
21  Pickard?
22   A   No.
23       MR. KELLY:  I'm sorry, but I can barely hear.
24  Maybe it's this in my ears.
25       MR. SLOSAR:  Sure.  I just asked if he was ever

Page 16

1  an informant for Sheriff Pickard.
2       MR. KELLY:  And I thought his answer was no.
3       MR. SLOSAR:  Yes.
4       MR. KELLY:  Thank you.
5  BY MR. SLOSAR:
6    Q   Now, earlier you testified that Chief
7  Broughton stood at a doorway when Detectives Mefford and
8  York were questioning you at the Barbourville Police
9  Department relating to the death of Katherine Mills; is
10  that right?
11   A   Right.
12   Q   Okay.  Prior to that interview, have you ever
13  interacted with Chief Broughton?
14   A   No.
15   Q   Do you recall ever being an informant for Mike
16  Broughton?
17   A   No.
18   Q   At any point -- well, we you an informant at
19  some point in your life for the U.N.I.T.E. Task Force?
20   A   Yes.
21   Q   Okay.  Approximately what years were you an
22  informant?
23   A   In 2010.  I don't really remember the days.
24   Q   Okay.  Do you remember any of the officers
25  that you worked with when you were an informant for the

Page 17

1  U.N.I.T.E. Task Force?
2    A   A Johnson.  I don't recall his first name.
3    Q   Would that be Ryan Johnson from the Kentucky
4  State Police?
5    A   No, he was from Pineville.  I don't know his
6  name.
7    Q   Do you remember the names of any of your --
8  any other officers that you worked with through
9  U.N.I.T.E.?
10   A   No, I don't.
11   Q   Mr. Helton, I'm going to ask you some
12  questions about December 20, 2010, okay.  Do you recall
13  going to Florida on December 20, 2010?
14   A   Yes, sir.
15   Q   And who did you go to Florida with on December
16  20, 2010?
17   A   Mike Simpson.
18   Q   Whose idea was it to go to Florida?
19   A   I mean, mine.  I had an appointment there.
20   Q   What type of appointment did you have?
21   A   Doctor's appointment.
22   Q   And by the time -- you know, in December of
23  2010, how long had you known Mike Simpson for by that
24  point?
25   A   Four or five years.

Page 18

1    Q   Is he a friend of yours?

2    A   Yeah.

3    Q   Prior to going to Florida on December 20,

4 2010, did you meet up with Mike Simpson earlier that

5 day?

6    A   Yes.

7    Q   Okay.  And at some point when you were with

8 Mr. Simpson, did he leave you to go meet someone?

9    A   No.

10   Q   You don't recall that?

11   A   No.

12   Q   Do you remember taking a polygraph examination

13 in Frankfort in January 2011?

14   A   Yes.

15   Q   And was your memory maybe a little bit fresher

16 back then as to what you did on December 20, 2010?

17   A   Oh, yeah.  Of course.

18   Q   And that was about seven years ago, right?

19   A   Yeah.

20   Q   Okay.  And to the best of your abilities, did

21 you tell the polygraph examiner the truth when you met

22 with him in December -- or on January 21, 2011?

23   A   Yes.

24   Q   Okay.  Sir, I'm going to play you part of the

25 video that they took when you met with the polygraph

Page 19

1 examiner to see if that refreshes your memory at all,

2 okay.  So I'm just going to ask you to listen to this

3 and then -- this little clip -- and then I'm going to

4 ask you some questions after, okay.  So this is PL9686,

5 it's ETS-01 at the minute mark 54:44 through 55:10.

6        (VIDEO PLAYING)

7    Q   All right, Mr. Helton, was that your voice?

8    A   Yeah.

9    Q   Okay.  And does that refresh your recollection

10 at all as to whether --

11   A   Yeah.

12   Q   -- whether Mr. Simpson left you that day?

13   A   Yeah.

14   Q   Okay.  So what do you recall happening the

15 morning of December 20, 2010?

16   A   I met Mike, I took him to pay his bills and

17 when we come back had -- I had waited at his house

18 and he went somewhere.

19   Q   Did he tell you where he was going?

20   A   No.

21   Q   And approximately what time do you recall

22 taking Mike to go pay his bills that day?

23   A   I don't remember that.

24   Q   Okay.  Do you recall how long Mike Simpson was

25 gone?

Page 20

1    A   Not long.  30 minutes tops.

2    Q   And where were you and Mr. Simpson when he

3 left you?

4    A   In Morris Creek.

5    Q   Morris Creek?

6    A   Yeah.

7    Q   What city is that?

8    A   Knox County.

9    Q   I'm sorry.

10   A   Barbourville.

11   Q   Okay.  Now, at some point that day you said

12 you took Mike Simpson to go pay his bills, right?

13   A   Yes.

14   Q   Did Mike Simpson have money on him?

15   A   Yes.

16   Q   What type of money did Mr. Simpson have on

17 him?

18   A   I don't really know.

19   Q   Did he have cash?

20   A   Yeah.  He had cash.

21   Q   On December 20 of 2010, did you see Mike

22 Simpson with cash on him?

23   A   Yeah.

24   Q   Approximately how much cash do you think Mike

25 Simpson had on him?

Page 21

1    A   I don't really know.

2    Q   At some point on December 20, 2010, did you go

3 with Mike Simpson to rent a vehicle?

4    A   Yes.

5    Q   And do you recall where you and Mr. Simpson

6 rented a vehicle at?

7    A   Middlesboro.

8    Q   Was it a rental car place or --

9    A   Yeah.

10   Q   Do you recall what kind of vehicle he rented?

11   A   A Volkswagen Beetle.

12   Q   And do you recall what color that Beetle was?

13   A   I can't remember.

14   Q   Was the --

15   A   Green.  Might have been green.

16   Q   Was the Volkswagen Beetle blue?

17       MR. WRIGHT:  Object to form.

18   Q   I'm going to show you what we'll mark as

19 Exhibit number 1.  It's PL15643 through 15646.  I have

20 no copies.  I'm kidding.

21       (EXHIBIT 1 MARKED FOR IDENTIFICATION)

22       MR. WRIGHT:  I was -- oh.  Okay.  I was going

23 to say I would just ask to look at it first.

24   Q   I'm going to show a copy of this to you, Mr.

25 Helton.  Can you just pass it down?  All right.  Will

Page 22

1  you take a look at the first page of this, Mr. Helton?
2  And do you see in the top left corner right here where
3  it says 12-20-2010?
4      A   Yeah.
5      Q   Okay.  And then, 2:06 p.m., do you see that
6  next to it?
7      A   Yeah.
8      Q   Does that – does 2:06 p.m. seem about the
9  time that you took Mr. Simpson to go get a rental
10  vehicle –
11      A   Yeah.
12      Q   – in Middlesboro?
13      A   Yeah.
14      Q   Okay.  And according to this document, it
15  looks like, at the bottom, do you see where it says when
16  the car is supposed to be returned by in the middle of
17  the first page there's a little box that says
18  12-23-2010?
19      A   Yeah.
20      Q   At 2:00 p.m. and it's $400.62; do you see
21  that?
22      A   Yeah.
23      Q   Were you actually with Mr. Simpson when he
24  went to pay for the vehicle in the Enterprise?
25      A   No, sir.  I mean, I just sat in the truck and

Page 23

1  waited on him.
2      Q   Okay.  So you sat outside while he went in?
3      A   Yeah.
4      Q   Okay.  So you weren't physically present when
5  he paid for it?
6      A   No, sir.
7      Q   Okay.  What – after leaving the rental car
8  place in Middlesboro, where did you and Mr. Simpson go?
9      A   We went back to his house.
10      Q   And is that over on Morris Creek?
11      A   Yes.
12      Q   What did you and Mr. Simpson do when you were
13  at his house on Morris Creek?
14      A   He left and went somewhere and I just waited
15  on him till he come back and
16      Q   And did Mr. Simpson, at that time, did he –
17  what vehicle did he take to go somewhere?
18      A   The Volkswagen.
19      Q   The Volkswagen.  Okay.  And that's the one
20  that you and him had rented that day?
21      A   Yeah.
22      Q   Okay.  When Mr. Simpson came back, was he with
23  anyone?
24      A   No.
25      Q   And what do you recall happening when Mr.

Page 24

1  Simpson came back?
2      A   We got ready and went.
3      Q   I know it's been a long time, almost eight
4  years, but do you recall what Mike Simpson was wearing
5  that day?
6      A   No, I don't.
7      Q   When you and Mr. Simpson left, where did you
8  all go?
9      A   We was headed to Florida.
10      Q   To Florida?
11      A   Yeah.
12      Q   Do you remember how you got down there?
13      A   In the Volkswagen.
14      Q   And that's the car that he rented?
15      A   Yes.
16      Q   Did Mike Simpson have a wad of money on
17  December 20, 2010?
18      A   He had some money.  I don't know how much but
19  he had money.
20      Q   And – now, on December 19th – so, the night
21  before, do you recall having a telephone conversation
22  with Mike Simpson?
23      A   I can't remember, really.
24      Q   Did Mike Simpson tell you the day before that
25  he, you know, was broke?

Page 25

1      A   Yes.
2      Q   What do you recall Mr. Simpson telling you the
3  day before when he spoke to you?
4      A   He just said that he'd have the money to go
5  the next day.
6      Q   So, were you and Mr. Simpson – on December
7  19th, were you and Mr. Simpson having a conversation
8  about going to Florida then, you say?
9      A   Yeah.
10      Q   And in that conversation did Mr. Simpson tell
11  you that he was broke at that time but that he would
12  have money the next day?
13      A   Yes.
14      Q   Did you ask Mr. Simpson how he was going to
15  get the money?
16      A   No.
17      Q   Did Mr. Simpson tell you how he was going to
18  get the money?
19      A   No.
20      Q   All you knew was that he said that he would
21  get – have it the –
22      A   Yes.
23      Q   – next day?  Now, is it fair to say that Mr.
24  Simpson ended up having money the next day to go on this
25  trip to Florida?

Page 26

1    A   Yes, sir.
2    Q   How long do you recall staying in Florida with
3  Mike Simpson?
4    A   A day or so.
5    Q   And what do you recall doing when you were in
6  Florida?
7    A   We just went to the doctor and went to fill my
8  pills.
9    Q   Was the purpose of the Florida trip to go get
10  pills?
11    A   Yes.
12    Q   And what type of pills was it?
13    A   Roxies.
14    Q   And did Mike Simpson go on that trip to go get
15  pills, too?
16    A   Yes.
17    Q   What type of pills was he trying to go get?
18    A   Roxy, same.
19    Q   Now, on the way back from Florida do you
20  recall a point where Mike Simpson had a telephone call
21  about Katherine Mills being found dead?
22    A   Yes.
23    Q   What do you recall about Mr. Simpson and that
24  phone call?
25    A   He was just crying and I asked him what was

Page 27

1  wrong and he said that Jesse had called and told him
2  that somebody had killed his – killed William's
3  ex-mother-in-law.
4    Q   Did – in that trip to Florida, did you ever
5  ask Mike how he got the money?
6    A   No.
7    Q   Now, the police eventually questioned you
8  after you got back from Florida, right?
9    A   Yes.
10    Q   Is it fair to say that in January of 2011 that
11  you believed that Mike Simpson got the money that he
12  used on the Florida trip from Katherine Mills?
13        MR. WRIGHT:  Object to form.
14    A   I don't know.  I mean, I don't know.
15    Q   Did you ever tell – well, do you recall
16  telling the polygraph examiner when you met with him on
17  – in January of 2011 that you believed that Mike
18  Simpson may have gotten the money from Katherine Mills?
19    A   I might have.  Yes.
20    Q   So this is I guess the first video, which was
21  PL9686, we'll make that Exhibit 2.  Exhibit 3 will be
22  PL9688, which is VTS-01-3.  I'm going to just play a
23  short clip for you, Mr. Helton, beginning at 2928.  I'm
24  going to ask you some questions after this, okay?
25        (EXHIBIT 2 MARKED FOR IDENTIFICATION)

Page 28

1        (EXHIBIT 3 MARKED FOR IDENTIFICATION)
2    A   Okay.
3        (VIDEO PLAYING)
4    Q   Mr. Helton, was that your voice?
5    A   Yes.
6    Q   Yeah.  And do you recall telling the polygraph
7  examiner –
8    A   Yeah.
9    Q   – at that time?
10    A   Yeah.
11    Q   Were you being truthful with him?
12    A   I mean – yeah.
13        MR. WRIGHT:  Object to form.
14    Q   To best you could, right?
15    A   Yes.
16    Q   So, do you remember asking – does that
17  refresh your recollection as to whether you asked Mike
18  Smith [sic] where he got the money?
19        MR. WRIGHT:  Object to form.
20    A   I don't remember asking him.
21    Q   Is it fair to say that Mike Simpson never told
22  you where he got the money?
23    A   Yeah.
24    Q   Now, for a period of time when you got back
25  from Florida, was there a period of time where you and

Page 29

1  Mike Smith [sic] stopped being friends?
2        MR. WRIGHT:  Object to form.  Do you mean Mike
3        Simpson or Mike Smith?
4        MR. SLOSAR:  I'm sorry.  You're right.  Let me
5        withdraw that question.  When you got back from
6        Florida, did there – was there a period of time
7        where you and Mike Simpson stopped being friends?
8    A   No.
9        MR. WRIGHT?  Object to form.  Misleading.
10    Q   You don't recall that?
11    A   No.
12    Q   Do you recall ever telling the polygraph
13  examiner that you and Mike stopped being friends when
14  you met with the polygraph examiner in January 2011?
15        MR. WRIGHT:  Object to form.
16    A   I don't remember.
17    Q   I'm going to play part of this clip from
18  Exhibit number 2; see if it refreshes your memory at
19  all, okay?  So this begins at 52.
20        (VIDEO PLAYING)
21    Q   Was that truthful the information –
22    A   Yeah.
23    Q   – by the polygraph examiner?
24    A   Yeah.
25    Q   When you and Mike Simpson got back from

Page 30

1 Florida, did he disappear for a little bit?
2     A   I was on house arrest so I never went around
3 him, you know.
4     Q   So you still considered him a friend --
5     A   Yeah.
6     Q   -- you just didn't see him as much?
7     A   Yeah.  He was my friend.
8     Q   Did -- when you and Mike were driving back
9 from Florida, do you recall how long it took you to get
10 back to Kentucky on that trip?
11     A   I can't really remember; it took us a while.
12     Q   Do you remember why it took you a while?
13     A   Because we were doing pills together.
14     Q   How many states did you drive through on the
15 way back; do you remember?
16     A   I can't really remember.
17     Q   Did you-all get lost at all?
18     A   Yes.
19     Q   During the -- after Mike Simpson got that
20 phone call from Jesse Lawson, did he ever talk to you
21 about alibi witnesses?
22     A   No.  He never said nothing to me about it.
23     Q   Did he ever tell you that he was going to
24 write a note about all the people that would be an alibi
25 for him?

Page 31

1     A   He didn't say nothing to me about it.
2     Q   Now, when you got back from Florida were you
3 questioned by police officers about Katherine Mills'
4 death?
5     A   Yes.
6     Q   And do you remember being questioned at home
7 on or about December 23, 2010 by Detectives York and
8 Sowders?
9     A   Yes.
10     Q   Did Detectives York and Sowders come to your
11 home on December 23, 2010?
12     A   Yes.
13     Q   Where were you living at the time?
14     A   Broughton Holler.
15     Q   Broughton Holler?
16     A   Yeah.
17     Q   And who were you living with at the time?
18     A   My wife.
19     Q   Is that Sandy?
20     A   Yeah.
21     Q   And what happened when Detectives York and
22 Sowders showed up to your house over on Broughton
23 Holler?
24     A   I was leaving and they was, like, pulled in my
25 driveway and then -- so I just pulled back up in the

Page 32

1 driveway and it was like -- told my wife and kids to sit
2 in the car and told me to get out.
3     Q   And when they told you to get out did they
4 tell you what they wanted to talk to you about?
5     A   Well, after I got out I invited them in my
6 house and then -- because it was cold outside and he had
7 said they wanted to know where'd the money and stuff was
8 and about that old woman's death and stuff.
9     Q   And who was doing the talking?  Was it
10 Detective York or Detective Sowders?
11     A   Both of them.
12     Q   And he told you they wanted to talk to you
13 about Ms. Mills' death?
14     A   Yeah.
15     Q   What did you tell Detectives York and Sowders?
16     A   I didn't know nothing about it.
17     Q   And did Detectives York or Sowders -- did they
18 do any searching of your residence when they were there?
19     A   Yeah.  They poked in my house.
20     Q   What were they doing when they were poking in
21 your house?
22     A   Just looking at things.
23     Q   Did either of those detectives ask you whether
24 you had a list of witnesses?
25     A   Yes.

Page 33

1     Q   Who asked you that?
2     A   York.
3     Q   And did he ask you -- did you know why he was
4 asking about that?
5     A   No.  He said that Mike had a list; where was
6 my list?  I said I didn't need one.
7     Q   And did either of those officers find -- well,
8 let me withdraw that question.  Did either of those
9 officers ask you about whether you had a blue car or
10 not?
11         MR. WRIGHT:  Object to form.
12     A   They just -- they probably did.  Or, I told
13 him a green one or
14     Q   Did you have a blue car back in December of
15 2010?
16     A   Me?
17     Q   Yeah.
18     A   No.
19     Q   Did Mike Simpson have a blue car back in
20 December of 2010, besides from the rental car that we
21 talked about --
22     A   No.
23         MR. WRIGHT:  Object to form.
24     Q   Did either of those officers search your
25 vehicle at all?

Page 34

1    A   No.  Not at that point.  No.
2    Q   Did any of those officers find any evidence or
3  make any comments as they were searching your home?
4    A   Yeah.
5    Q   What did they say?
6    A   My wife had brought home some computer boxes
7  and he was like, "There's where the money went."
8    Q   Who said that?
9    A   Sowders.
10   Q   Was York present?
11   A   Yes.
12   Q   Did York make any comments as he was searching
13  your house?
14   A   I can't remember.
15   Q   So you told – well, let me strike that.  Did
16  you tell Detective York in this conversation whatever
17  you knew about the death of Katherine Mills?
18   A   Yes.
19   Q   And what do you recall telling Detective York.
20   A   That I didn't know nothing about it.
21   Q   Did you tell Detective York about that trip
22  that you and Mike Simpson went on?
23   A   Yes.
24   Q   Were you as honest as you – well, let me
25  strike that.  Were you being truthful with Detective

Page 35

1  York when you told them back on December 23, 2010 that
2  you didn't know anything about Katherine Mills' death?
3    A   Yes.
4    Q   Now, after the police left your home did you
5  have another contact with Detective York about the death
6  of Katherine Mills?
7    A   Yes.
8    Q   Do you recall being pulled over for a DUI on
9  January 4, 2011?
10   A   Yes.
11   Q   And what kind of vehicle were you driving that
12  day?
13   A   Ford Ranger.
14   Q   Was that your car?
15   A   Yeah.
16   Q   All right.  On that – I've just got a lot of
17  paper.  So, this will be Exhibit number 4.  It's a
18  charging citation done by Jason York on January 4, 2011.
19  It's PL18949 and 18952; it's two pages.  Mr. Helton,
20  please take a look at this.  Have you seen in that
21  document before today, Mr. Helton?
22        (EXHIBIT 4 MARKED FOR IDENTIFICATION)
23   A   What?
24   Q   Have you seen that before?
25   A   Yeah.  Yeah.

Page 36

1    Q   Okay.  Back when you were charged did they
2  give you a copy of that?
3    A   Yeah.
4    Q   Okay.  And when you were pulled over on
5  January 4, 2011 who was the officer that pulled you over
6  that day, do you recall?
7    A   John Pickard.
8    Q   John Pickard.  And was he sheriff of Knox
9  County at the time?
10   A   Yes, sir.
11   Q   Okay.  Were you doing anything wrong when
12  Sheriff Pickard pulled you over?
13   A   No, sir.
14   Q   You were driving lawfully right then?
15   A   Huh?
16   Q   You were driving lawfully?
17   A   Yeah.
18   Q   Yeah.  As best you can recall?
19   A   Yeah.
20   Q   Okay.  What did – did Sheriff Pickard talk to
21  you after he pulled you over?
22   A   Yes.
23   Q   What'd he – did he tell you why he pulled you
24  over?
25   A   I don't really remember.

Page 37

1    Q   Did Sheriff Pickard ask you any questions
2  about the Mills death right after he pulled you over but
3  before you went to a police station?
4    A   No, sir.
5    Q   At some point, were any other officers
6  involved in your pull over?
7    A   Yes.
8    Q   Okay.  Who else came?
9    A   Jason York.
10   Q   Okay.  When Detective York appeared did he
11  make any comments to you?
12   A   Yes.
13   Q   What do you recall Detective York telling you?
14   A   He just tried to grab me by my face and said,
15  "I ought to take you down there and let this family beat
16  the fuck out of you for killing this old woman."
17   Q   How'd that make you feel?
18   A   Like an idiot, really.
19   Q   Were you scared?
20   A   Yeah.
21   Q   And was Sheriff Pickard there when Detective
22  York did that?
23   A   Yes.
24   Q   Now, did Sheriff Pickard or Detective York
25  search your truck at all?

Page 38

1    A   Jason York did.

2    Q   And when he searched your truck did he find

3 anything that -- did he find anything in it?

4    A   There was a wet coat in the floor board and he

5 said it's probably the coat I killed her in.

6    Q   That you killed her in?

7    A   Yeah.

8    Q   That's what he said?

9    A   Yeah.

10   Q   Was Sheriff Pickard present when Detective

11 York said that?

12   A   Yes.

13   Q   Did Detective York take the coat?

14   A   I don't remember.

15   Q   What happened after you got pulled over and

16 had these interactions with Detective York and Sheriff

17 Pickard?

18   A   I went to a hospital and took a blood test and

19 then I went to Barbourville PD.

20   Q   And were you questioned about the death of

21 Katherine Mills when you were at the Barbourville Police

22 Department?

23   A   Yes, sir.

24   Q   Okay.  And who was present when you were

25 questioned?

Page 39

1    A   Jason York, Mark Mefford, and Mike Broughton.

2       MR. KELLY:  I'm sorry, I didn't hear the last

3 name.

4    Q   Mike Broughton.  Sir, I'm going to show you

5 what we'll mark as Exhibit number -- what is that?

6       COURT REPORTER:  5.

7    Q   5.  This is KSP341.  There you go, Mr. Helton.

8 Do you recall signing this document on -- well, let me

9 withdraw that question.  Is that your signature at the

10 bottom of this document?

11      (EXHIBIT 5 MARKED FOR IDENTIFICATION)

12   A   Yes, sir.

13   Q   Okay.  Where it says James Helton; that's your

14 signature?

15   A   Yes.

16   Q   Did you sign this Waiver of Rights on January

17 4, 2011?

18   A   Yeah.

19   Q   And when you were present -- well, let me

20 strike that.  When you signed this Waiver of Rights was

21 Detective Mefford and York present?

22   A   Yeah.

23   Q   They also signed this document?

24   A   Yeah.

25   Q   Okay.  And did you sign this document when you

Page 40

1 were at the Barbourville Police Department?

2    A   Yes.

3    Q   Okay.  Was Chief Broughton in the room when

4 you were being questioned by Detective Mefford and York

5 on January 4, 2011?

6    A   Yes.

7    Q   And is it fair to say that on January 4, 2011

8 you were being questioned about the death of Katherine

9 Mills?

10   A   Yes.

11   Q   Did Detectives -- well, did any of the

12 officers who questioned you that day, did they tell you

13 that you were a suspect in the murder?

14   A   I don't remember.

15   Q   Did you believe you were a suspect?

16   A   Yeah.

17   Q   Now, what do you recall -- how long did the

18 questioning last; do you recall?

19   A   I don't remember.

20   Q   Was it less than a day?

21   A   Yeah.  It was probably an hour or so.

22   Q   Okay.  And I know that according to the

23 citation, which is Exhibit number 4 -- according to the

24 citation you were pulled over for DUI.

25   A   Yeah.

Page 41

1    Q   Is that right?

2    A   Yeah.

3    Q   Were you drunk on January 4, 2011?

4    A   No, sir.

5    Q   Were you high that day?

6    A   No.

7    Q   Okay.  So when you were being questioned by

8 Detectives Mefford, York, and Chief Broughton you were

9 sober; is that right?

10   A   Yes.

11   Q   Okay.  What do you recall Detective York

12 telling you when you were being questioned?

13   A   He just said if I went there and that old

14 woman fell that I will -- that murdered her, just stuff

15 like that.

16   Q   Was he telling you information about the

17 murder?

18      MR. WRIGHT:  Object to form.  Leading.

19   A   I don't really remember what all he said in

20 there.

21   Q   He -- from what you just said it sounds like -

22 - did Detective York tell you that the woman hit her

23 head?

24   A   Yeah.

25      MR. WRIGHT:  Object to form.

Page 42

1    Q   Was he giving you – during your – when he
2  was questioning you – when Detective York was
3  questioning you, was he giving you details relating to
4  the death of Katherine Mills?
5       MR. WRIGHT:  Object to form; asked and
6  answered.
7    Q   You can answer.
8    A   Yes.
9    Q   And was Detective Mefford present when
10 Detective York was doing that?
11   A   Yes.
12   Q   Was Chief Broughton present when Detective
13 York was doing that?
14   A   Yes.
15   Q   And did you tell Detective York and the other
16 officers the information that you knew relating to the
17 death of Katherine Mills?
18   A   I didn't know nothing.
19   Q   Did you tell them that?
20   A   Yes.
21   Q   Did they accept that and let you go home?
22   A   No.
23       MR. WRIGHT:  Object to form.
24   Q   What did they keep doing?
25   A   They kept asking me about it and I – they

Page 43

1  took me to jail for the DUI.
2    Q   Did they – did you tell the detectives and
3  Chief Broughton in this meeting about the trip that you
4  and Mike Simpson took to Florida?
5    A   Yeah.  I – yeah.
6    Q   They were questioning you about that?
7    A   Yeah.
8    Q   Did I – I know you said Chief Broughton
9  standing by the doorway; is that right?
10   A   Yes.
11   Q   Did he ever come in and ask you questions?
12   A   He just – he told them to let him have a
13 minute with me –
14   Q   Okay.  And did they –
15   A   – you know, during that time.
16   Q   Did they give Chief Broughton a minute with
17 you?
18   A   Yes.
19   Q   What do you recall Chief Broughton saying to
20 you?
21   A   He just said to try to – he just told me that
22 I needed to tell them the truth and stuff.
23   Q   And were you telling the officers the truth
24 when you –
25   A   Yeah.

Page 44

1    Q   – said that you didn't know who killed
2  Katherine Mills?
3    A   Yes, sir.
4    Q   Were they taking notes when they met with you
5  that day?
6    A   I don't really remember.
7    Q   Do you remember whether they recorded it at
8  all?
9    A   I don't remember.
10   Q   During that meeting did Detective York
11 threaten to charge you with murder?
12       MR. WRIGHT:  Object to form.  Leading.
13   A   I figured it.  I mean, he didn't – I don't
14 remember if he said it or not.  I mean, I can't
15 remember.
16   Q   Now the DUI that you got charged with that
17 day, were you ever convicted of that?
18   A   No.
19   Q   Did that case eventually get dismissed?
20   A   Yes.
21   Q   But after you were done being questioned by
22 Detectives York and Mefford and Chief Broughton, were
23 you let go?
24   A   No.  I went to jail for the DUI.
25   Q   Were you eventually let out on bond?

Page 45

1    A   Yes.
2    Q   Okay.  And when you were let out on bond did
3  you have any form of supervision or home incarceration?
4    A   Home incarceration.
5    Q   Did you have – did you ever have an ankle
6  monitor put on you?
7    A   Yes.
8    Q   And how long do you recall having an ankle
9  monitor on you?
10   A   For four months.
11   Q   Now, at some point – do you recall how long
12 it took you to get out of jail on the DUI?
13   A   I got out the next day.
14   Q   Who bonded you out?
15   A   My neighbor.
16   Q   Who is that?
17   A   Randy Merida.
18   Q   Okay.  And after Mr. Merida bonded you out did
19 you go back home to your place over on Broughton Holler?
20   A   Yes, sir.
21   Q   Okay.  Now, at some point after you were
22 released did Detective York and any other officer come
23 to your home to ask for you to take the polygraph exam?
24   A   Yes.
25   Q   Who came to your home to ask for you to take

Page 46

1  the polygraph exam?
2      A   Jason York and John Pickard.
3      Q   Okay.  And during this period of time were you
4  on home incarceration?
5      A   Yes.
6      Q   Did you have an ankle monitor on you?
7      A   Yes.
8      Q   And who – out of – was it Detective York or
9  was it Sheriff Pickard who asked for you to take a
10  polygraph?
11     A   York.
12     Q   Was Sheriff Pickard there?
13     A   Yeah.
14     Q   And what did you say to Detective York?
15     A   I told him yeah, I'll take one.
16     Q   Did Detective York or Sheriff Pickard ask you
17  any questions that day about the death of Katherine
18  Mills?
19     A   I don't really remember.
20     Q   Did Detective York or Sheriff Pickard that day
21  search your home at all?
22     A   They just ran through it.
23     Q   Did they make any promise –
24         MR. KELLY:  I'm sorry, I didn't hear the
25  answer.

Page 47

1      Q   I think – what'd you say again?
2      A   They ran through my house.  Ran through.
3      Q   So they searched your house that day, right?
4      A   Uh-huh.
5      Q   Did they make any comments to you as they were
6  searching it?
7      A   There was a sign from my holler – the sign of
8  my holler and he was like, "I could arrest you over
9  that."
10     Q   Who told you that?
11     A   Pickard.
12     Q   What did you say was in the holler?
13     A   It was a sign.  The holler name of the sign?
14     Q   Like a street sign or something?
15     A   Yeah.  Like a street sign.
16     Q   And Sheriff Pickard said that he could arrest
17  you for that?
18     A   Yes.
19     Q   Did they ask you again about whatever
20  information you knew about the murder?
21         MR. WRIGHT:  Objection.  Asked and answered.
22     A   I really don't remember.
23     Q   Did Sheriff Pickard charge you with anything
24  that day?
25     A   No.

Page 48

1      Q   Okay.  Did Detective York charge you with
2  anything that day?
3      A   No.
4      Q   Was it a pretty brief experience that you had
5  with them that day?
6      A   (NO VERBAL RESPONSE.)
7      Q   Were you with them for an hour or for the
8  whole day?
9      A   Just – they was there about 30 minutes.
10     Q   Pretty short period of time.
11     A   Yeah.
12     Q   Okay.  Was the next time that you saw
13  Detective York the day that you went to go take the
14  polygraph exam?
15     A   Yes.
16     Q   Okay.  Do you recall taking a polygraph exam?
17     A   Yes.
18     Q   Where did you take that examination?
19     A   Frankfort.
20     Q   How did you get down there?
21     A   Jason York.
22     Q   Was anyone else in the car with you?
23     A   No.
24     Q   Just you and Detective York?
25     A   Yeah.

Page 49

1      Q   Did you and Detective York talk on your way
2  down to the polygraph?
3      A   Yes.
4      Q   Did you and Detect – in that car ride, did
5  Detective York talk to you about the death of Katherine
6  Mills?
7      A   I mean.  I can't really remember.  I can't
8  remember what he said to me about the death of her.
9      Q   Was he talking to you about the case, though?
10         MR. WRIGHT:  Object to form.  Asked and
11  answered.
12     Q   You can answer.
13     A   He just said that him and Sowders had a bet
14  between which one was going to lose the polygraph test
15  between me and Jesse.
16     Q   And which – what did – who did Detective
17  York bet on?
18     A   He was betting on me.
19     Q   On you failing?
20     A   Yeah.  Not wanting me winning.  I think – I
21  don't really know, I didn't ask him.
22     Q   Yeah.  All right.  Do you remember being asked
23  or – let me withdraw the question.  Do you remember
24  when you took the polygraph examination?  Do you recall
25  the examiner testing you on some specific questions

Page 50

1 related to Katherine Mills' death?

2     A   Yeah.

3     Q   I'll show you what we'll mark as Exhibit

4 number 6.  KSP1791 to 1792.  There you go.  I don't have

5 copies of this.  I'm sorry.  You know what, I think –

6         (EXHIBIT 6 MARKED FOR IDENTIFICATION)

7     MR. FARAH:  I'm sorry, what number are we –

8     MR. SLOSAR:  Does yours have three pages?

9     MS. STAPLES:  Yes.

10    MR. SLOSAR:  Yeah.  Sorry.  It's 7 –

11    MR. KELLY:  7?

12    MR. SLOSAR:  No.  Here – let me –

13    MR. WRIGHT:  Is it 6 or 7?  I'm sorry.

14    MR. SLOSAR:  Yeah.  Let me – No, this is

15 Exhibit 6, sorry, but the one that Helton has only

16 has PL1791 and 1792.  That is what he is looking at.

17 I think the copy that I just handed out and these

18 are correct.

19    MR. KELLY:  There's –

20    MR. SLOSAR:  So yours is 414?

21    MR. WRIGHT:  And mine is 413 through 415.

22    MR. SLOSAR:  But it's his – is that his

23 examination and results?

24    MR. KELLY:  Yes.

25    MR. WRIGHT:  Where does it say the examinee?

Page 51

1     MR. SLOSAR:  It's like a fourth line –

2     MS. STAPLES:  It's there going –

3     MR. SLOSAR:  – fourth line down right below on

4 the on the first page.

5     MR. KELLY:  Lawsons is at the end of ours.

6     MR. SLOSAR:  Okay.  Yeah.  I think it's just a

7 copy if she – but the first two page is this.

8     MR. WRIGHT:  Okay.

9     MR. SLOSAR:  What he's looking at is just a

10 different page range.  Sorry about that.

11    MR. FARAH:  What did you say this range was,

12 I'm sorry?

13    MR. SLOSAR:  His is PL1791 to 1792.

14    MR. KELLY:  What'd you say?  PL or KSP?

15    MS. STAPLES:  Yeah.  You originally said KSP.

16    MR. SLOSAR:  Oh, okay.  It's a case – I'm

17 sorry.  Well.

18    MR. FARAH:  You started off KSP1791.

19    MR. SLOSAR:  No, this is PL1791, though –

20    MR. FARAH:  PL –

21 BY MR. SLOSAR:

22    Q   PL1792.  Mr. Helton, do you recall, you know,

23 being questioned by a polygraph examiner on January 21,

24 2011?

25    A   Yes.

Page 52

1     Q   Okay.  And that's the examination you took

2 down there in Frankfort, right?

3     A   Yes.

4     Q   Okay.  I'm going to ask for you to turn to the

5 second page, if you can.  Are you on the second page?

6     A   Yes.

7     Q   And they have three specific questions; I'm

8 going to be asking you about those.  Okay.

9     A   Yeah.

10    Q   So, do you recall the polygraph examiner

11 asking you if – the question:  "Did you participate in

12 any way in the death of that woman?"  And you responded,

13 "No."  Do you recall that question answer occurring?

14    A   Yes.

15    Q   Okay.  Were you being truthful when you denied

16 participating in any way in the death of Katherine

17 Mills?

18    A   Yes.

19    Q   Okay.  Do you see the next question?  It says,

20 "Did you hit that woman in the head?"  And you answered,

21 "No."  Do you see that, sir?

22    A   Yeah.

23    Q   Okay.  Do you recall that question and answer

24 being asked of you and you responding to it on January

25 21, 2011?

Page 53

1     A   Yes.

2     Q   Were you being truthful when you said that you

3 did not hit Katherine Mills in the head?

4     A   Yes.

5     Q   Okay.  And do you see the next question where

6 it says, "Did you steal any of that money from that

7 woman?"  And the answer says, "No."

8     A   Yes.

9     Q   Okay.  Do you recall being asked that question

10 and giving that answer to the polygraph examiner on

11 January 21, 2011?

12    A   Yes.

13    Q   And were you being truthful when you told the

14 examiner that you did not steal any of the money from

15 Katherine Mills?

16    A   Yes.

17    Q   Okay.  So you recall this polygraph

18 examination taking place, right, Mr. Helton?

19    A   Yes.

20    Q   And at some point after you gave your answers,

21 did anyone come into the room and inform you as to what

22 your results were?

23    A   No.  Not that I know of.

24    Q   Well, do you recall either Detective York or

25 the polygraph examiner telling you that you had failed

Page 54

1  the test?
2      A  No.
3      Q  No.
4      A  I mean, they didn't tell me I failed it but
5  they come in and started questioning me again.
6      Q  Okay.  And do you recall – well, was
7  Detective York one of the people who came in to start
8  questioning you again about Katherine Mills?
9      A  Do what, now?
10     Q  Did Detective York – after you took your
11 polygraph examination on January 21, 2011, did Detective
12 York come in the room and question you?
13     A  Yes.
14     Q  Okay.  And when you were questioned by
15 Detective York, did you tell him everything that you
16 knew about Mike Simpson and the Florida trip?
17     A  Yes.
18     Q  When you were questioned by Detective York
19 were you trying to cooperate the best you could?
20     A  Yes.
21     Q  Were you trying to be honest with him?
22     A  Yes.
23     Q  And, Mr. Helton, is it fair to say that
24 Detective York was trying to pressure you in this
25 interview to say things about Mike Simpson that you

Page 55

1  didn't know?
2      MR. WRIGHT:  Object to form.  Leading.
3      A  Yes.
4      Q  I'm going to play some audio clips, Mr.
5  Helton, of the polygraph interview for you and I'm going
6  to ask you to listen to the clips and I'm going to ask
7  you some questions about it, okay.  Okay.  I'm not
8  asking about that anymore.  You don't have to worry
9  about it.  During this – during the questioning by
10 Detective York after your polygraph, did Detective York
11 tell you to say that the money from Katherine Mills
12 death was split two ways?
13     A  No.
14     MR. WRIGHT:  Object to form.
15     Q  You don't recall that?
16     A  No.
17     Q  I'm going to play – this is – we'll make
18 this Exhibit –
19     COURT REPORTER:  7.
20     Q  – 7 and, Mr. Helton, I'm just going to ask
21 for you to listen to it and then I'm going to ask you
22 some questions, okay?
23     (EXHIBIT 7 MARKED FOR IDENTIFICATION)
24     A  Okay.
25     Q  This is PL9689 and it is Exhibit 7.  I'm

Page 56

1  playing starting at 854.
2      (VIDEO PLAYING)
3      Q  Mr. Helton, was that your voice on there?
4      A  Yeah.
5      Q  Okay.  And that was during your meeting with
6  Detective York after your polygraph exam, right?
7      A  Right.
8      Q  Okay.  And does that refresh your recollection
9  as to whether Detective York was telling you to say that
10 the money was split two ways?
11     MR. WRIGHT:  Object to form.
12     A  I mean, I felt like I was pressured into
13 saying it.  I mean, I was scared, you know.
14     Q  You didn't know how many ways the money was
15 split, right?
16     A  No.
17     Q  That's because you weren't there when
18 Katherine Mills was killed, right?
19     A  Yeah.
20     Q  But in the questioning that you had with
21 Detective York after your polygraph examination he was
22 trying to get you to say that it was split two ways,
23 correct?
24     MR. WRIGHT:  Object to form.  Leading.
25     A  Yeah.

Page 57

1      Q  And during your meeting with Detective York
2  that day, were you telling him that you didn't know how
3  many ways the money was split?
4      A  Yeah.
5      MR. WRIGHT:  Object to form.
6      Q  Did you tell Detective York that you weren't
7  there when Katherine Mills was killed?
8      A  Repeatedly.
9      Q  And is it fair to say that you were telling
10 Detective York during this January 21st meeting that you
11 didn't know how many ways the money was split because
12 you didn't have anything to do with Katherine Mills
13 death?
14     MR. WRIGHT:  Object to form.
15     A  Yes.
16     Q  But was it your understanding, after your
17 meeting with Detective York on January 21st that he
18 wanted you to say that the money taken from Katherine
19 Mills was split with Mike Simpson and at least one other
20 person?
21     MR. WRIGHT:  Object to form.
22     A  That's how I took it, yes.
23     Q  That's what you understood he wanted you to
24 say, right?
25     A  Yeah.

Page 58

1     MR. WRIGHT:  Object to form.

2     Q   And that was based on your conversations with

3 Detective York on January 21st and the previous meetings

4 you had with him, correct?

5     A   Correct.

6     MR. WRIGHT:  Object to form.

7     Q   Mr. Helton, I'm going to play – so this is

8 Exhibit 3 and I'm going to ask you to listen this and

9 I'm going to ask you some questions, okay.  This begins

10 at 5314.

11     (VIDEO PLAYING)

12     Q   Mr. Helton, was that part of your conversation

13 you had with Detective York on January 21, 2011?

14     A   Yeah.

15     Q   And in your meeting with Detective York on

16 January 21, 2011, did you tell Detective York that you

17 didn't know where Mike Simpson had got the money that he

18 possessed for your Florida trip?

19     A   Yeah.

20     Q   Did Detective York take your answer that you

21 didn't know where Mike Simpson got that money did he

22 accept your answer?

23     A   No.

24     Q   And in your meeting with Detective York on

25 January 21, 2011, was Detective York telling you to say

Page 59

1 that Mike Simpson received that money from the death of

2 Katherine Mills?

3     A   Yes.

4     MR. WRIGHT:  Object to form.

5     Q   Did you tell Detective York repeatedly in your

6 interactions with him that you didn't know where Mike

7 Simpson got the money from?

8     A   Yes.

9     Q   Was he accepting of that?

10     A   No.

11     Q   By the time you left the interview room with

12 Detective York on January 21, 2011, did you believe that

13 he wanted you to say that the money taken from Katherine

14 Mills, or actually – let me strike that question.  Was

15 it your belief in this interview with Detective York

16 that he just wanted you to agree with whatever he was

17 saying?

18     MR. WRIGHT:  Object to form.

19     A   Yes.

20     Q   Regardless of whether it was true or not?

21     A   Yes.

22     MR. WRIGHT:  Object to form.

23     Q   Mr. Helton, during your January 21, 2011

24 meeting with Detective York, did you believe that

25 Detective York wanted you to agree with whatever

Page 60

1 information he was providing?

2     MR. WRIGHT:  Object to form.

3     A   Yes.

4     Q   I'm going to play the same exhibit.  The time

5 stamp is 1 hour and 7 seconds. Mr. Helton, please

6 listen to this; I'm going to ask you some questions

7 after, okay.

8     (VIDEO PLAYING)

9     Q   All right.  Mr. Helton was that part of your

10 interview with Detective York after you took your

11 polygraph exam?

12     A   Yeah.

13     Q   And in that interview, did Detective York

14 bring up the name of William Lester?

15     A   Yeah.

16     MR. WRIGHT:  Object to form.

17     Q   Did Detective York bring up William Lester's

18 name as the other person who committed this murder with

19 Mike Simpson?

20     MR. WRIGHT:  Object to form.

21     A   I don't really remember how he said it but I

22 remember him bringing up his name, yeah.

23     Q   Well, is it fair to say that Detective York

24 brought up William Lester's name first and not you?

25     MR. WRIGHT:  Object to form.

Page 61

1     A   Yeah.

2     Q   And in that clip, Detective York was actually

3 telling you to say that William Lester had the other wad

4 of money; isn't that right?

5     A   Yeah.

6     MR. WRIGHT:  Object to form.

7     A   What I heard.

8     Q   And prior to this time were you telling

9 Detective York that you weren't sure where the money

10 from Katherine Mills went?

11     A   Yeah.

12     MR. WRIGHT:  Object to form.

13     Q   And were you telling Detective York prior to

14 this part of the interview that you didn't know who was

15 actually involved in the murder?

16     A   Yes.

17     Q   Prior to this point were you telling Detective

18 York that you weren't sure how many people were even

19 involved in Ms. Mills' death?

20     A   Yes.

21     Q   During this interview, did Detective York make

22 it clear to you that he wanted you to implicate William

23 Lester in the death of Katherine Mills?

24     A   Yes.

25     MR. WRIGHT:  Object to form.

Page 62

1    Q   And was it your understanding by the time you
2    left Frankfort that Detective York wanted you to
3    implicate William Lester in Katherine Mills' death?
4        MR. WRIGHT:  Object to form.
5    A   Yes.
6    Q   And did you believe that Detective York was
7    trying to get you to repeat whatever information he was
8    providing to you?
9        MR. WRIGHT:  Object to form.
10   A   Yes.
11   Q   And was that based upon the statements he was
12   making to you?
13   A   Yes.
14       MR. WRIGHT:  Object to form.
15   Q   I'm going to play Exhibit 7 beginning at 919.
16   Mr. Helton, can you please listen to this and I'm going
17   to ask you some questions just like the other time.
18       (VIDEO PLAYING)
19   Q   Was that your voice, Mr. Helton?
20   A   Yes.
21   Q   Were you being truthful there?
22   A   Yes.
23   Q   Prior to January 21, 2011, did anyone ever
24   tell you that they knew that Katherine Mills had money?
25   A   No.

Page 63

1    Q   Now, in this audio clip or in this interview
2    with Detective York on January 21, 2011, was he trying
3    to tell you that Mike Simpson killed Katherine Mills
4    with William Lester?
5        MR. WRIGHT:  Object to form.
6    A   Yes.
7    Q   Was that what he was trying to get you to say?
8        MR. WRIGHT:  Object to form.
9    A   Yeah.
10   Q   And was it your understanding when – was that
11   your understanding because of the statements that
12   Detective York was making to you during that interview?
13       MR. WRIGHT:  Object to form.
14   A   Tell me again.
15   Q   Sure.  So you – was Detective York saying
16   things to you during that interview that caused you to
17   believe that he wanted you to implicate William Lester
18   and Mike Simpson in the death of Katherine Mills?
19       MR. WRIGHT:  Object to form.
20   A   Yes.
21   Q   When you were meeting with Detective York and
22   during this interview, did he tell you to say that
23   William Lester was living large after Katherine Mills'
24   death?
25       MR. WRIGHT:  Object to form.

Page 64

1    A   I don't really remember.
2    Q   Now, in December of 2010, where you friends
3    with William Lester?
4    A   Not really.
5    Q   Is it fair to say that at the time and after
6    Katherine Mills' death – between the time of Katherine
7    Mills' death on December 20, 2010 and the time that you
8    were polygraphed on January 21, 2011 that you wouldn't
9    have known whether William Lester was living large?
10   A   (NO VERBAL RESPONSE.)
11   Q   During your questioning on January 21, 2011,
12   do you recall telling Detective York that you thought
13   that Jesse Lawson might have had something to do with
14   Katherine Mills' death?
15   A   Did I tell him that?
16   Q   Yeah.
17   A   I don't remember.
18   Q   In your – in this January 21, 2011 interview
19   with Detective York, did Detective York tell you to say
20   that William Lester or Mike Simpson told you that they
21   knew Katherine Mills had money on her before she was
22   dead?
23       MR. WRIGHT:  Object to form.
24   A   Yes.
25   Q   You recall Detective York telling that to you?

Page 65

1    A   Yes.
2        MR. WRIGHT:  Object to form.
3    Q   Did Detective York – was it your
4    understanding that Detective York wanted you to repeat
5    that information?
6        MR. WRIGHT:  Object to form.
7    A   (NO VERBAL RESPONSE.)
8    Q   Mr. Helton, when you met with Detective York
9    on January 21st and you told him that no one ever told
10   you that they knew Katherine had money on her before she
11   died, were you telling the truth?
12   A   Yes.
13   Q   Prior to your polygraph exam on January 21st,
14   had anyone ever told you that they knew that Katherine
15   Mills had money on her before she was killed?
16   A   No.
17   Q   Did Amanda Hoskins ever tell you that she knew
18   that Katherine Mills had money on her before she was
19   killed?
20   A   No.
21   Q   Did William Lester ever tell you that he knew
22   that Katherine Mills had money on her before she was
23   killed?
24   A   No.
25   Q   Do you recall telling Detective York when you

Page 66

1  met with him on this January 21, 2011 meeting that you
2  didn't want to lie?
3      A   Do what, now?
4      Q   Did you tell Detective York in this meeting
5  you had with him on January 21, 2011 that you didn't
6  want to lie?
7      A   Yeah.
8      Q   Did you tell Detective York during that
9  meeting that you didn't want to go along with repeating
10  the false information he wanted you to say?
11      MR. WRIGHT:  Object to form.
12      A   I don't remember.
13      Q   Well, do you remember telling Detective York
14  that you didn't want to make up information –
15      A   Yeah.
16      Q   – and send someone to prison who could be
17  innocent?
18      A   Yes, sir, I did do that.
19      Q   I'm going to play this Exhibit 7 beginning at
20  1108. Mr. Helton, just listen to this for a moment and
21  let me know and I'm going to ask you some questions.
22      (VIDEO PLAYING)
23      Q   Mr. Helton, were you being truthful to
24  Detective York then?
25      A   Yeah.

Page 67

1      Q   Had you heard anything about Katherine Mills'
2  death prior to meeting with Detective York on January
3  21, 2011?
4      MR. WRIGHT:  Object to form.
5      A   Just rumors on the street.
6      Q   Did you have any first-hand knowledge as to
7  who committed the murder?
8      A   No.
9      Q   And did you tell Detective York whatever you
10  had heard?
11      A   Yeah.  I can't remember what I told him just
12  to be honest with you.
13      Q   Well, is it fair to say that you were
14  cooperating with Detective York the best you could?
15      A   Yeah.
16      Q   Did you tell him whatever first-hand knowledge
17  you had about the Florida trip to the best of your
18  ability?
19      A   Yes.
20      Q   Did you tell him about your whereabouts on the
21  day that Katherine Mills was found dead to the best of
22  your ability?
23      A   Yes.
24      Q   After the polygraph exam was done, did you get
25  to go home?

Page 68

1      A   Yes.
2      Q   Who took you home?
3      A   Jay Sowders
4      Q   Did Mr. Sowders say anything to you on the way
5  home that day?
6      A   I don't think so.
7      Q   Now, do you remember seeing – well, did you
8  see Detective York again outside of the courthouse in
9  the spring of 2011?
10      A   Yes.
11      Q   And what courthouse was that?
12      A   Knox County.
13      Q   What were you there for?
14      A   Getting a DUI took care of.
15      Q   Is that the January 4th DUI that we talked
16  about a few moments ago?
17      A   Yes.
18      Q   Did Detective York speak with you when you saw
19  him outside the courthouse?
20      A   Yes.
21      Q   And what did he say?
22      A   He asked me what I was doing there and I told
23  him getting that took care of and he said, "If you tell
24  me what I need to hear, I'll get it took care of for
25  you."

Page 69

1      MR. KELLY:  I'm sorry.  I didn't hear him.
2      MR. SLOSAR:  "If you tell me what I need to
3  hear I'll get it taken care of for you."
4      MR. KELLY:  Okay.
5  BY MR. SLOSAR:
6      Q   And did you believe that Detective York was
7  talking about the Katherine Mills case?
8      A   Yeah.
9      MR. WRIGHT:  Object to form.
10      Q   And by that point did you know what Detective
11  York wanted you to say?
12      MR. WRIGHT:  Object to form.
13      A   Yeah.
14      Q   Mr. Helton, I'm going to show you what we'll
15  mark as Exhibit number 8.  It's a police report
16  regarding a statement that you made to Detective York on
17  March 8, 2012.  Mr. Helton, do you recall meeting with
18  Sheriff Pickard on March 8, 2012?
19      (EXHIBIT 8 MARKED FOR IDENTIFICATION)
20      A   Yes.
21      Q   And where did you meet with Sheriff Pickard
22  at?
23      A   At the Sheriff's office.
24      Q   And were you incarcerated at that time?
25      A   Yes.

Page 70

1   Q   What were you incarcerated on?
2   A   Third degree burglary and first degree
3   criminal mischief.
4   Q   Do you recall when you were charged when those
5   charges – do you recall when those charges were brought
6   against you?
7   A   I don't remember.
8   Q   Was it pretty close in time to when you met
9   with Sheriff Pickard?
10  A   Yeah.
11  Q   Now, how did you get in contact with Sheriff
12  Pickard on March 8?
13  A   They come to my house the day before that and
14  arrested me and I talked to him on the way to jail and
15  we met that next morning.
16  Q   Do you recall who you spoke with on the way to
17  jail?
18  A   Pickard.  John Pickard.
19  Q   And what did you and Sheriff Pickard talk
20  about on your way to the jail?
21  A   I just said I asked him what could I do to get
22  out of this.
23  Q   What did Sheriff Pickard say?
24  A   Tell us what we need to hear about the murder
25  case.

Page 71

1   Q   Did Sheriff Pickard make any promises to help
2   you out on your pending criminal case if you told him
3   what he wanted to hear?
4       MR. KELLY:  Objection.
5       MR. WRIGHT:  Join.
6   A   He offered to get – he said he'd get me a
7   bond to get me out and there wouldn't be no more charges
8   brought up on me.
9   Q   And was that exchange – were those promises
10  made in exchange for you telling –
11  A   Yeah.
12  Q   – Sheriff Pickard what he wanted to hear?
13      MR. WRIGHT:  Object to form.  Leading.
14  A   Yes.
15      MR. KELLY:  Join the objection.
16  Q   Well, a few moments ago you testified that
17  Sheriff Pickard told you that he would help you if you
18  said what he wanted to hear; is that right?
19  A   Yeah.
20      MR. KELLY:  Objection to form.
21  Q   Did you understand what Sheriff Pickard meant
22  when he told you what he wanted to hear?
23  A   Yes.
24      MR. KELLY:  Objection to form.
25      MR. WRIGHT:  Join.

Page 72

1   Q   So the next day how were you brought over to
2   Sheriff Pickard's office?
3   A   A police officer come over and got me at the
4   jail.
5   Q   And where were you taken?
6   A   The sheriff's office.
7   Q   And when you were brought over to the
8   sheriff's office do you remember who was in there?
9   A   John Pickard and Jason York.
10  Q   They were both there?
11  A   Yeah.
12  Q   And you eventually – do you recall eventually
13  giving a statement that day?
14  A   Yeah.
15  Q   Was Sheriff Pickard and Detective York present
16  for the entire time that you gave a statement?
17  A   Yeah.
18  Q   At any point in your meeting with Sheriff
19  Pickard and Detective York, did either of them leave any
20  point that day?
21  A   I don't remember.
22  Q   Now at some point do you recall Detective York
23  taking out a recorder?
24  A   Yeah.  Yeah.
25  Q   Do you recall approximately how long you spoke

Page 73

1   to Detective York and Sheriff Pickard before a recorder
2   was turned on?
3   A   I don't remember.
4   Q   Is it fair to say that the whole meeting
5   wasn't recorded between you and Sheriff Pickard and
6   Detective York?
7   A   Yes.
8   Q   Did Detective York or Sheriff Pickard make any
9   promises to you before the recorder was turned on?
10      MR. WRIGHT:  Object to form.
11  A   Pickard told me that he would get me a bond
12  and there wouldn't be no more charges brought upon me.
13  Q   What were those promises made in exchange for?
14  A   To tell them what they wanted to hear about
15  the murder?
16      MR. WRIGHT:  Object to form.
17  Q   Sir, you have Exhibit number 8 before you.
18  I'm going to go through this report with you step by
19  step, okay Mr. Helton?  Have you ever seen this police
20  report before today?
21  A   Yeah.
22  Q   You have?  Okay.  Looking at the second
23  paragraph – I'm going to ask you line by line, okay?  Do
24  you see where it says, "Allen stated that on Sunday,
25  December 19, 2010, he was pumping gas at Escoe's Market

Page 74

1   in Dewitt when Amanda Hoskins and William Lester
2   approached him.  Allen stated Amanda asked him if he
3   wanted to make some money and told him how."  Do you see
4   that, Mr. Helton?
5       A   Yeah.
6       Q   Was that true?
7       A   No.
8       Q   On December 19, 2010, were you pumping gas at
9   Escoe's Market when Amanda Hoskins and William Lester
10  approached you?
11      A   No.
12      Q   Did Amanda Hoskins ever ask you at any point
13  in time if you wanted to make some money and told you
14  how?
15      A   No.
16      Q   I'm going to go to the next sentence, okay.
17  Do you see where it says, "I then asked him to explain
18  how.  Amanda told him about tying an old woman up when
19  she came out to the bathroom.  I then asked them and she
20  stated which old woman he [sic] was and he replied,
21  Katherine.  He went on to state Amanda described her as
22  William Lester's ex-mother-in-law.  I asked Allen how
23  did they know Katherine came out to the bathroom every
24  morning and he stated William knew.  I asked Allen if he
25  wanted to be a part of it.  He stated he said no.  Allen

Page 75

1   also stated Amanda told him Katherine had $15,000.
2   Again, I asked him about the details of tying her up.  He
3   said the plan was to lock her in the outhouse, that was
4   what he meant by tying her up."  Do you see that Allen?
5       A   Yes.
6       Q   Is any of that true?
7       A   No.
8       Q   Did you – did Amanda ever tell you about
9   tying an old woman up when she came out to the bathroom?
10      A   No.
11      Q   Did Amanda ever tell you that Katherine Mills
12  was William Lester's ex-mother-in-law?
13      A   No.
14      Q   Did Amanda ever ask you if you wanted to be
15  part of a plan of robbing or killing Katherine Mills?
16      A   No.
17      Q   Did Amanda Hoskins ever tell you that
18  Katherine Mills had $15,000 on her?
19      A   No.
20      Q   Did Amanda Hoskins or William Lester ever give
21  you details about tying Katherine Mills up or locking
22  her in an outhouse?
23      A   No.
24      Q   Is all that false?
25      A   Yes.

Page 76

1       Q   Looking at the next paragraph, Mr. Helton, do
2   you see where it says, "Allen stated the next morning,
3   December 20, 2010, he was going to see his father at
4   Larry Smith's when he saw William Lester's car traveling
5   on Kentucky 223.  This would be less than one-half mile
6   from Katherine Mills' residence.  Allen stated that it
7   was between 8:15 hours and 8:30 hours.  I asked him how
8   he knew it was William Lester's car and he stated he
9   knew it because of the place on the hood.  He was
10  referring to William's Chevy Camaro.  Allen stated after
11  he left seeing his dad he went to Mike Simpson's house
12  on Morris Creek.  Allen stated he did not drive by
13  Katherine's house because he knew what was going on and
14  figured the law would be coming there.  I then asked him
15  he knew they was robbing lady Katherine and he stated
16  yes."  Do you see that, Mr. Helton?
17      A   Yes.
18      Q   Is any of that true?
19      A   No.
20      Q   On December 20, 2010, did you ever see William
21  Lester's car traveling on Kentucky 223 as you went to go
22  see your father Larry – at Larry Smith's house?
23      A   No.
24      Q   On December 20, 2010, between 8:15 and 8:30
25  did you see William's Chevy Camaro driving less than a

Page 77

1   half mile from Katherine Mills' residence?
2       A   No.
3       Q   And in fact, in December of 2010 was William
4   Lester's Camaro even working –
5           MR. WRIGHT:  Object to form.
6       Q   – at that time?
7       A   Not as I know of.
8       Q   And was it your understanding that Mr.
9   Lester's Camaro was actually not operating on –
10          MR. WRIGHT:  Object to form.
11      Q   – in December of 2010?
12      A   Yes.
13      Q   And how did you know that?
14          MR. WRIGHT:  Object to the form.  Leading
15  already.
16      A   I pass his house every day.
17      Q   You – Mr. Helton, according to this police
18  report, it says that you did not drive by Katherine's
19  house because you knew what was going on and figured the
20  law would be coming there; was that truthful?
21      A   No.
22      Q   Did you have any idea about Katherine Mills
23  being robbed or killed on December 20, 2010 prior to it
24  occurring?
25      A   No.

Page 78

1    Q   Now, looking at the next paragraph do you see
2  where it says, "Allen stated around 12:00 hours he saw
3  William Lester and Amanda Hoskins at Mike Simpson's
4  residence at Morris Creek."  Do you see that?
5    A   Yes.
6    Q   You ever see William Lester and Amanda Hoskins
7  on December 20, 2010 at Mike Simpson's residence?
8    A   No.
9    Q   The next sentence says, "I asked him if they
10  told him they had done it.  He stated Amanda Hoskins
11  told him they got the job done, referring to robbing
12  Katherine Mills."  Do you see that, sir?
13    A   Yes.
14    Q   Did Amanda Hoskins ever tell you that they got
15  the job done in reference to robbing and/or killing
16  Katherine Mills?
17    A   No.
18    Q   The next sentence says, "Allen stated at that
19  time he did not know where they had killed her.  He
20  thought they tied her up and took her money."  Do you
21  see that, sir?
22    A   Yeah.
23    Q   Is that truthful?
24    A   No.  I said it but it ain't true.
25    Q   The next sentence says, "I asked Allen if they

Page 79

1  had the money they had stolen from Katherine and he
2  stated yes.  Allen stated Amanda had approximately
3  $4,000 on her.  Allen stated Amanda Hoskins had the
4  money folded up like you would put a rubber band on it."
5  Do you see that, sir?
6    A   Yeah.
7    Q   Okay.  Did you ever see Amanda Hoskins with
8  $4,000 on her?
9    A   No.
10    Q   Did you ever see Amanda Hoskins with money on
11  her folded up like you would put a rubber band on it?
12    A   No.
13    Q   Looking at the second page it says, "Allen
14  stated Amanda told him the money came from the job
15  robbing Katherine Mills."  Did Amanda ever tell you
16  that?
17    A   No.
18    Q   Did Amanda ever tell you that she was involved
19  in robbing and/or killing Katherine Mills?
20    A   No.
21    Q   Did Amanda Hoskins ever tell you that she
22  received money from the death of Katherine Mills?
23    A   No.
24    Q   The next sentence says, "He stated Amanda put
25  an order to him and Mike to buy drugs in Florida."  Did

Page 80

1  Amanda Hoskins ever put in an order to you or Mike to
2  buy drugs in Florida in December of 2010?
3    A   No.
4    Q   The next sentence says, "Allen stated it was
5  true that Mike Simpson knew William and Amanda were
6  going to rob Katherine but did not know they were going
7  to kill her."  Do you have any knowledge as to whether
8  Mike Simpson knew that Katherine Mills was going to get
9  killed?
10    A   No.
11    Q   Do you have any knowledge, sitting here today
12  as to who actually killed Katherine Mills?
13    A   No.
14    Q   The last paragraph it says, "Allen stated he
15  heard Jonathan Taylor helped Amanda rob and kill
16  Katherine Mills but Amanda never told him that."  Do you
17  see that, sir?
18    A   Yes.
19    Q   Is that false, sir?
20    A   Yes.
21    Q   Now, during your March 8, 2012 meeting with
22  Sheriff Pickard and Detective York, was it your
23  understanding that if you agreed with whatever these
24  officers wanted you to say that you would get the
25  promises that you discussed?

Page 81

1    MR. KELLY:  Objection.
2    MR. WRIGHT:  Object to form.
3    Q   You can answer.
4    A   Yes.
5    Q   So it was your understanding that if you went
6  along with Sheriff York and Detective York's plan to
7  implicate William Lester, Amanda Hoskins, and Jonathan
8  Taylor that you would get out of jail that day and that
9  no additional charges would be brought against you; is
10  that right?
11    MR. WRIGHT:  Object to form.
12    MR. KELLY:  Objection.
13    Q   Allen, is it fair to say that the majority of
14  the false information that is contained in this report
15  – is it fair to say that that information was given to
16  you by Detective York?
17    MR. WRIGHT:  Object to form.
18    A   Yes.
19    Q   And did Detective York tell you that he would
20  assist you with your pending charges if you went along
21  and agreed with the false information that he provided?
22    MR. WRIGHT:  Object to form.
23    A   Yes.
24    Q   And did you take Detective York's statements
25  to mean that if you falsely implicated Amanda Hoskins,

Page 82

1   Jonathan Taylor, and William Lester in Katherine Mills'
2   death that you would get assistance with your pending
3   criminal cases.
4       MR. WRIGHT: Object to form.
5     A  Yes.
6       MR. KELLY: Objection. Leading.
7     Q  Now, prior to this March 8, 2012 meeting with
8   Detective York and Sheriff Pickard, did you tell those
9   officers that you didn't have any direct knowledge as to
10   who killed Katherine Mills?
11     A  Prior to that?
12     Q  Yeah.
13     A  Yeah.
14     Q  And, in fact, we talked –
15       MR. KELLY: Objection as to the form of the
16   question.
17     Q  – we talked about that earlier today and you
18   listened to some of that earlier today when you heard
19   your conversation after the polygraph exam, correct?
20     A  Yes.
21     Q  Do you recall earlier today when I played some
22   clips from your polygraph recording for you? I was
23   playing those audio clips for you to listen to; do you
24   recall some of that?
25     A  Yeah.

Page 83

1     Q  Okay. And in your January 21, 2011 interview
2   with Detective York do you recall him telling you to say
3   that William Lester or Mike Simpson told you that they
4   knew Katherine had money on her prior to her death?
5       MR. WRIGHT: Object to form.
6     A  Yeah.
7     Q  And on January 21, 2011 did you tell Detective
8   York that you'd never heard anything like that?
9       MR. WRIGHT: Object to form.
10     A  Yes.
11     Q  And in the January 21, 2011 interview with
12   Detective York after your polygraph examination did
13   Detective York try to get you to say that William Lester
14   did the murder with Mike Simpson?
15       MR. WRIGHT: Object to form.
16     A  Yes.
17     Q  And when Detective York was trying to get you
18   to say that did you tell him that you didn't know who
19   killed Katherine Mills?
20     A  Yes.
21       MR. WRIGHT: Object to form.
22     Q  And in that January 21, 2011 polygraph
23   interview with Detective York was he trying to get you
24   to say that William Lester had a wad of money from
25   Katherine Mills?

Page 84

1       MR. WRIGHT: Object to form.
2     A  Yes.
3     Q  Did you tell Detective York that you didn't
4   know who had any money from Katherine Mills' death?
5     A  Yes.
6       MR. WRIGHT: Object to form.
7     Q  At the end of that January 21, 2011 polygraph
8   interview with Detective York do you recall telling him
9   that you didn't want to lie and be responsible for
10   sending an innocent person to jail?
11     A  Yes.
12       MR. WRIGHT: Object to form.
13     Q  Mr. Helton, why did you eventually go along
14   and agree to repeat the information that Detective York
15   provided to you in this March 8, 2012 scene?
16       MR. WRIGHT: Object to form.
17     A  To get out of the trouble I was in.
18     Q  Was it because of the promises that Detective
19   York and Sheriff Pickard made to you?
20     A  Yes.
21       MR. WRIGHT: Object to form.
22     Q  After you gave a statement to Detective York
23   and Sheriff Pickard on March 8, 2012 when were you
24   released?
25     A  That same night.

Page 85

1     Q  So Detective York and Sheriff Pickard made
2   true on one of those promises?
3     A  Yeah.
4       MR. KELLY: Object to form.
5     Q  What happened with your criminal case after
6   you gave this March 8, 2012 statement?
7     A  Well, I still got convicted of criminal –
8   aggravated burglary and criminal trespassing.
9     Q  But you were out of jail on the bond –
10     A  Yeah.
11       MR. WRIGHT: Object to form.
12     Q  – immediately after?
13     A  Yes.
14     Q  Mr. Helton, I'm going to go through some of
15   the audio recorded statement that Sheriff Pickard and
16   Detective York did with you on March 8, 2012, okay. So
17   it's going to be just like earlier in that –
18     A  Can I use the restroom?
19     Q  Oh, sure. Yes.
20       MR. SLOSAR: Let's go off the record.
21     VIDEOGRAPHER: Off the record at 1:15 p.m.
22       (OFF THE RECORD)
23     VIDEOGRAPHER: Back on the record at 1:25 p.m.
24   BY MR. SLOSAR:
25     Q  So, Allen, I'm going to play you some audio,

Page 86

1  please listen to it; I'm going to ask you some
2  questions, okay?  This is Exhibit 9, PL25962, the
3  recorded statement from March 8, 2012.
4      (EXHIBIT 9 MARKED FOR IDENTIFICATION)
5      (AUDIO RECORDING PLAYING)
6      Q   Mr. Helton, was that your voice in that
7  conversation with Detective York?
8      A   Yeah.
9      Q   Now, is it your recollection that in your
10  March 8, 2012 meeting with Detective York and Sheriff
11  Pickard that you were just mostly agreeing with whatever
12  Detective York wanted you to say?
13      A   Yeah.
14      MR. WRIGHT:  Object to form.
15      Q   In your March 8, 2012 meeting were you mostly
16  just agreeing with whatever Detective York wanted you to
17  say?
18      MR. KELLY:  Objection to form.
19      A   Yes.
20      Q   And prior to -- earlier today you testified
21  that prior to your recorded statement, Sheriff Pickard
22  and Detective York had made promises to you in exchange
23  for telling them what they wanted to hear; is that
24  right?
25      MR. WRIGHT:  Object to form.

Page 87

1      MR. KELLY:  Objection.
2      A   Yes.
3      Q   And prior to the recording being turned on did
4  Detective York and Sheriff Pickard tell you what they
5  wanted you to say?
6      MR. WRIGHT:  Object to form.
7      MR. KELLY:  Join.
8      A   More or less, yes.
9      Q   By the time the recording turned on did you
10  know what Detective York and Sheriff Pickard wanted to
11  hear?
12      A   Yes.
13      MR. WRIGHT:  Object to form.
14      MR. KELLY:  Objection.
15      Q   Did Detective York and Sheriff Pickard --
16  well, let me check that question.  Was it your
17  understanding that Sheriff Pickard and Detective York
18  wanted you to falsely implicate Amanda Hoskins, Jonathan
19  Taylor, and William Lester in the murder of Katherine
20  Mills?
21      MR. WRIGHT:  Object to form.
22      MR. KELLY:  Objection.
23      A   Yeah.
24      Q   Was it your understanding that if you went
25  along and agreed with their story that you would get

Page 88

1  help on your criminal case?
2      A   Yes.
3      MR. WRIGHT:  Object to form.
4      MR. KELLY:  Objection.
5      Q   I'm going to play another part of the audio
6  beginning at 125.  Please listen, I'm going to ask you
7  some questions.
8      (AUDIO RECORDING PLAYING)
9      Q   Allen, why were you agreeing with the
10  information that Detective York was providing to you in
11  that audio?
12      MR. WRIGHT:  Object to form.
13      A   Because it was my way of getting out of
14  trouble.
15      Q   Were you agreeing because of the promises that
16  were made to you by Detective York and Sheriff Pickard
17  prior to the audio being turned on?
18      MR. KELLY:  Objection.
19      MR. WRIGHT:  Join.
20      A   Yes.
21      Q   And again, you said earlier here today that
22  you never saw Amanda Hoskins or William Lester at
23  Escoe's Market on December 19 or December 20, 2010; is
24  that right?
25      A   That's right.

Page 89

1      Q   I'm going to play beginning at 306.  Allen,
2  please listen; I'm going to ask you some questions.
3      (AUDIO RECORDING PLAYING)
4      Q   Mr. Helton, was Detective York providing the
5  information to you or were you providing the information
6  to him in that clip?
7      MR. WRIGHT:  Object to form; you skipped part
8  of the recording.  Go ahead.
9      A   He was providing it to me.
10      Q   And whatever information Detective York didn't
11  provide to you in the audio recording he would have
12  provided to you before the recorder was ever turned on
13  that day; is that right?
14      MR. WRIGHT:  Object to form.
15      A   Yeah.
16      Q   This wasn't the only day that Detective York
17  provided information to you, right?  You had other
18  interviews with him before this, right?
19      A   Right.
20      Q   And in those other interviews that you had
21  with Detective York did he make it clear to you what he
22  wanted you to say?
23      A   Yeah.
24      MR. WRIGHT:  Object to form.
25      A   I mean, yeah.

Page 90

1    Q   Is it fair to say that you were just agreeing
2  with this information to get the deal that was promised
3  to you by Detective York and Sheriff Pickard?
4    A   Yeah.
5        MR. WRIGHT:  Object to form.
6        MR. KELLY:  Join.
7    Q   I'm going to play another clip.  Mr. Helton,
8  please listen to this.  Beginning at 6:20.
9        (AUDIO RECORDING PLAYING)
10   Q   Mr. Helton, again in that audio clip were you
11 just agreeing with whatever Detective York wanted you to
12 say?
13   A   Yes.
14       MR. WRIGHT:  Object to form.
15   Q   Was Sheriff Pickard present when this was
16 happening?
17   A   Yes.
18   Q   Did he do anything to stop it?
19   A   No.
20   Q   And again, earlier today do you remember when
21 I played some recordings for you from the interview that
22 Detective York did with you after the polygraph
23 examination; do you remember that?
24   A   Yes.
25   Q   Remember listening to those recordings?

Page 91

1    A   Yeah.
2    Q   In those recordings do you remember when
3  Detective York told you that another person had a wad of
4  money that was folded over?
5    A   Yeah.
6        MR. WRIGHT:  Object to form.
7    Q   Now, Mr. Helton, in some portions of your –
8  well, let me withdraw that question.  Earlier today you
9  testified about a number of meetings you had with
10 Detective York and other officers before finally giving
11 a statement on March 8, 2012; do you recall that?
12   A   Yes.
13   Q   Okay.  And in conversations you had with
14 Detective York prior to March 8, 2012, did he give you
15 information about the death of Katherine Mills?
16       MR. WRIGHT:  Objection.  Asked and answered.
17 Form.
18   Q   And did Detective York make it clear in those
19 prior meetings about the story that he wanted you to
20 tell?
21       MR. WRIGHT:  Objection.
22   A   Yes.
23   Q   And was it your understanding on March 8, 2012
24 that if you repeated the story that Detective York
25 wanted you to tell that you would get the deals promised

Page 92

1  to you by Sheriff Pickard and Detective York?
2    A   Yes.
3        MR. WRIGHT:  Object to form.
4        MR. KELLY:  Objection.
5    Q   Was it your understanding on March 8, 2012
6  when you agreed to regurgitate the information provided
7  to you by Detective York that he and Sheriff Pickard
8  would get you out of jail and assist you on your pending
9  criminal charges?
10       MR. WRIGHT:  Object to form.
11       MR. KELLY:  Objection.
12   A   Yes.
13   Q   Just to be sure, you did not see Amanda
14 Hoskins the day before Katherine Mills died?
15   A   That's right.
16       MR. WRIGHT:  Objection.
17   A   Correct.
18       MR. WRIGHT:  Asked and answered.
19   Q   On December 19, 2010 did you see William
20 Lester?
21   A   No, sir.
22   Q   December 19, 2010 did you ever see Amanda
23 Hoskins or William Lester at Escoe's?
24   A   No.
25   Q   Were you ever told anything by Amanda Hoskins

Page 93

1  about a plan to rob or kill Katherine Mills?
2        MR. WRIGHT:  Objection.  Asked and answered.
3    A   No.
4    Q   And on December 21, 2010 did you ever see
5  Amanda Hoskins or William Lester?
6        MR. WRIGHT:  Objection.
7    A   No.
8    Q   Is it fair to say that you couldn't have seen
9  Amanda Hoskins or William Lester on December 21, 2010
10 because you were actually in Florida with Mike Simpson?
11   A   Yes.
12   Q   You were out of state the day after Katherine
13 Mills died, right?
14   A   Yes.
15   Q   You told Detective York prior to March 8, 2012
16 all about your Florida trip, correct?
17   A   Correct.
18   Q   You told Detective York that you were out of
19 state on December 21, 2010 for a couple of days,
20 correct?
21   A   Correct.
22       MR. WRIGHT:  Object to form.  Leading.
23   Q   So Detective York knew that you couldn't have
24 seen Amanda Hoskins and William Lester on December 21,
25 2010 because he knew that you were out of state, right?

Page 94

1       MR. WRIGHT:  Object to form.  Leading.
2   A   That's correct.
3   Q   Allen, do you remember being subpoenaed to
4   testify in 2015 at the criminal trial of Amanda Hoskins
5   and Jonathan Taylor?
6   A   Yes.
7   Q   I'm going to mark this as Exhibit number 10
8   and do you recall who served the subpoena on you to
9   testify?
10      (EXHIBIT 10 MARKED FOR EXHIBITION)
11  A   I think Kelly Farris.
12  Q   And what did -- did you say anything to Kelly
13  Farris when he served you with the subpoena?
14  A   I really don't remember what I said to him.
15  Q   Did you tell anything to Kelly Farris about
16  how you were going to testify at trial?
17  A   Yeah.
18  Q   What did you do?
19  A   I told him they wouldn't like what I had to
20  say.  Yeah.
21  Q   What'd you mean by that?
22  A   That none of it was true.
23      MR. WRIGHT:  Object to form.
24  Q   And did you later have a telephone
25  conversation about -- or with Jason York on May 18,

Page 95

1   2015?
2   A   Yeah.
3   Q   And who called who?  Did you call Detective
4   York or did he call you?
5   A   I called him.
6   Q   What'd you tell Detective York in that phone
7   call?
8   A   That I was going to be late.
9   Q   And do you recall where you were at at the
10  time?
11  A   I was coming from Lexington.
12  Q   Okay.  Where were you headed to?
13  A   To the courthouse.
14  Q   And what did Detective York say back to you
15  when you said that you were going to be late?
16  A   I really don't remember what he said.
17  Q   Did you tell Detective York that you were
18  going to testify truthfully?
19  A   Yeah.  Well, I told him that the things I had
20  said wasn't true.
21  Q   What did Detective York say when you told him
22  that the -- your statement was false?
23  A   Not to worry about it.
24  Q   Did he tell you to come to court?
25  A   No.

Page 96

1       MR. WRIGHT:  Object to form.  Leading.
2   Q   What did he tell you to do?
3   A   Don't worry about it.
4   Q   And did you take that to mean that you didn't
5   have to go to court that day?
6   A   Yeah.
7   Q   Now, looking at this police report do you see
8   -- do you have it in front of you, Exhibit number 10?
9   A   (NO VERBAL RESPONSE.)
10  Q   Do you see where it says -- and I'm just going
11  to read it to you, Mr. Helton.  "On May 18, 2015 this
12  unit talked to Allen Helton via telephone from a Knox
13  County courthouse phone.  He stated he was at UK
14  Hospital.  He stated he had an infection around metal
15  plates in his head."  Do you see that, sir?
16  A   Yeah.
17  Q   When you talked to Detective York on this May
18  18, 2015 phone call, were you at the University of
19  Kentucky Hospital?
20  A   No, I was at a -- I was in Berea, really,
21  headed to the courthouse.
22  Q   Did you tell Detective York in a phone call
23  that you had an infection around metal plates in your
24  head?
25  A   No, I had told him that I had surgery on a

Page 97

1   plate in my face and had it took out, that it had
2   infection behind it.
3   Q   Did you tell Detective York that you couldn't
4   make it to court that day?
5   A   No, I told him I was coming.
6   Q   And did you tell Detective York that you were
7   coming and that you intended to tell the truth when you
8   testified?
9   A   Yes.
10  Q   Did you tell Detective York that you intended
11  to testify that the statement that he took from you was
12  a lie?
13  A   Yes.
14      MR. WRIGHT:  Objection.  Leading.
15  Q   Did you tell Detective York that you intended
16  to testify about the deals that Detective York and
17  Sheriff Pickard promised you for making your statement?
18  A   No, I --
19      MR. KELLY:  Object to form.
20      MR. WRIGHT:  Objection.  Leading.
21  A   -- didn't say nothing like that.
22      MR. SLOSAR:  Can we just go off record for a
23  minute?  I think I'm done.
24      VIDEOGRAPHER:  Off the record at 1:42.
25      (OFF THE RECORD)

Page 98

1    VIDEOGRAPHER:  Back on the record at 1:43 p.m.
2  BY MR. SLOSAR:
3    Q  Mr. Helton, when you gave that March 8, 2012
4  statement that implicated Amanda Hoskins, Jonathan
5  Taylor, and William Lester -- I'll show it to you --
6  when you gave that statement -- on March 8, 2012, did you
7  want to lie against them that day?
8    MR. WRIGHT:  Object to form.
9    A  No.
10   Q  Was it something that you felt like you were
11  forced into?
12   MR. WRIGHT:  Object to form.  Leading.
13   A  I mean, I did it to get out of trouble.  Yeah.
14   Q  And is it fair to say that the idea for you to
15  give this false statement -- that that idea came from
16  Detective York and Sheriff Pickard?
17   MR. WRIGHT:  Object to form.
18   A  Yes, sir.
19   MR. SLOSAR:  I don't have anything further.
20  Thank you.
21   THE WITNESS:  Thank you.
22       CROSS EXAMINATION
23  BY MR. KELLY:
24   Q  Mr. Helton, my name is John Kelly.  I'm here
25  representing Knox County, and I represent Sheriff John

Page 99

1  Pickard, and I represent Deputy Sheriff Derek Eubanks.
2  First of all, do you know Derek Eubanks?
3    A  I know of him.
4    Q  Okay.  Was he ever in any meeting with you,
5  Sheriff Pickard and Trooper York?
6    A  Not as I know of.
7    Q  All right.  Do you know of his involvement in
8  any way with regard to this murder investigation
9  concerning Katherine Mills?
10   A  I don't know.
11   Q  Okay.  Has Derek Eubanks ever arrested you?
12   A  Not as I know of.
13   Q  Has he ever questioned or interviewed you?
14   A  No.
15   Q  I will tell you that he's a defendant in this
16  lawsuit.  Do you know any reason why he would be a
17  defendant in a lawsuit where it's being alleged that he
18  had something to do with incriminating falsely Ms.
19  Hoskins or Mr. Taylor?
20   MR. SLOSAR:  Objection to form.  Calls for
21  speculation; you can answer.
22   A  I don't know.
23   Q  Okay.  Do you know -- did you have any contact
24  with any other member of the Knox County Sheriff's
25  Department besides Sheriff Pickard with regard to the

Page 100

1  investigation into Katherine Mills' murder?
2    A  No.
3    Q  Okay.  Do you recall being arrested by any
4  other members of the Knox County Sheriff's Department?
5    A  Have I been?
6    Q  Yes.
7    A  Yes.
8    Q  Do you remember what officers in the past have
9  arrested you?
10   A  Claude Hudson.
11   Q  Okay.
12   A  Adam Townsley, which he works for Barbourville
13  PD now.
14   Q  Okay.
15   A  I can't -- I don't know.
16   Q  The date of the arrest while Sheriff Pickard
17  was still sheriff or is it since Sheriff Pickard's been
18  replaced?
19   A  Yeah.  While Pickard was sheriff.
20   Q  Okay.  Did you ever feel that you were being
21  accused falsely by those particular officers?
22   A  I mean, they always hounded me but, I mean,
23  they never did say nothing about that.
24   Q  All right.  Did it have anything to do with
25  Katherine Mills' -- the desiccation of Katherine Mills?

Page 101

1    A  No.
2    Q  So I want to understand and I have to admit
3  because of the machines I may have missed things that
4  you said and I simply want to go over what I thought
5  your testimony was but you should correct me if I get it
6  wrong.  I have down the first meeting that you had with
7  any kind of law enforcement after Ms. Mills' murder was
8  on December 23, 2011; is that correct?
9    A  Yeah.
10   Q  All right.  And that was when you came back
11  from Florida; is that correct?
12   MR. SLOSAR:  2010.
13   MR. KELLY:  I'm sorry.
14   MR. SLOSAR:  No no, you're okay.  I just want
15  to make sure the record's --
16  BY MR. KELLY:
17   Q  It's 2010.  I didn't mean to --
18   A  Yeah.
19   Q  All right.  I have you meeting with Detective
20  York and Detective Sowders at your house; is that
21  correct?
22   A  Yes.
23   Q  Do you remember any other law enforcement
24  officers being there?
25   A  No.

Page 102

1    Q   Were there –
2    A   Not at that time.
3    Q   Let me put it this way, were there any other
4  law enforcement officers –
5    A   Not at that time.
6    Q   Okay.  The next encounter I think you had you
7  said you were stopped for a DUI by Sheriff Pickard; is
8  that correct?
9    A   Correct.
10   Q   All right.  And I think you estimated that
11 occurred on January 4, 2011?
12   A   Yeah.
13   Q   All right.  Was – can you tell me where you
14 were stopped?
15   A   At Larry Smith's Auto Sales.
16   Q   Larry Smith's Auto Sales?
17   A   Yeah.
18   Q   What – where are you close to, then?  What
19 road were you on?
20   A   I was right above Katherine Mills' house.
21   Q   Okay.  All right.  And you said you were
22 stopped by Sheriff Pickard; is that correct?
23   A   Yes.
24   Q   Were there any other Knox County police
25 officers there?

Page 103

1    A   There was another cop with Pickard.  I don't
2  know – I don't remember who he was.
3    Q   All right.  Was he a Knox County deputy
4  sheriff?
5    A   Yes.
6    Q   Was he in the same vehicle with –
7    A   Yes.
8    Q   – Sheriff Pickard?  Did he get out of the
9  vehicle?
10   A   Yes.
11   Q   Was the deputy also there when Detective York
12 came on to the scene?
13   A   Yes.
14   Q   When Detective York came on to the scene was
15 he driving a cruiser – police cruiser?
16   A   Yes.
17   Q   Okay.  Was he with anyone?
18   A   No.
19   Q   How long were you there before Jason York
20 showed up?
21   A   Two or three minutes.
22   Q   When you were driving that night how long had
23 you been out before this accident – accident.  I'm
24 sorry – before the stop occurring?
25   A   How long I'd been out?

Page 104

1    Q   Yes, sir.
2    A   All day.
3    Q   Okay.  So where were you going when this stop
4  occurred?
5    A   To the salvage yard.
6    Q   I'm sorry.
7    A   Salvage yard.
8    Q   Okay.  What time of the day was it?
9    A   Probably 2:00 – 2:30.
10   Q   2:30 in the afternoon?
11   A   Yeah.
12   Q   I take it no one was with you at that point.
13   A   I mean, I really don't remember what time – I
14 believe it was around that time.
15   Q   All right.  It was in the afternoon?
16   A   Yeah.
17   Q   It was daylight?
18   A   Yeah, it was daylight.
19   Q   Okay.  As you were there on the road, did any
20 cars pass?
21   A   No.
22   Q   No cars passed?
23   A   No.
24   Q   So the only people that would have seen what
25 was going on was you, deputy sheriff – excuse me –

Page 105

1  Sheriff Pickard, the Knox County deputy and Jason York;
2  is that right?
3    A   Yeah.
4    Q   Now on that occasion – well – on that
5  occasion you said Deputy York grabbed you by the face;
6  is that correct?
7    A   He tried to grab me by the face.
8    Q   I'm sorry?
9    A   He tried to grab me by the face.
10   Q   All right.
11   A   He tried.
12   Q   He tried to grab –
13   A   He intended.  Yeah.
14   Q   Did he actually touch you?
15   A   No, I jerked away.  Yeah.
16   Q   So his hand came at you?
17   A   Yeah.
18   Q   All right.  And he was headed – how –
19   A   He was going to grab me by the face.
20   Q   How do you know that?
21   A   Because he come at me.
22   Q   And you just jerked your head away?
23   A   Right.
24   Q   Did he persist?
25   A   What do you mean in persist?

Page 106

1    Q   I mean continue to come at you.
2    A   No, I jerked away.
3    Q   Okay.  And he stopped?
4    A   He stopped.
5    Q   Okay.  So there was no face grabbing?
6    A   Right.
7    Q   No actual face grabbing?
8    A   He just tried to grab me by my face.
9    Q   Okay.  And what did he -- was he saying
10   something as he moved toward you?
11   A   He said, "I ought to take you down there and
12   let these people beat the fuck out of you for killing
13   that old woman."
14   Q   Okay.  Now, you were out in your vehicle at
15   this time?
16   A   Yes.
17   Q   All right.  And where were you in
18   relationship?  Were you standing next to your vehicle or
19   standing next to the cruiser or standing next the
20   sheriff --
21   A   John Pickard's vehicle.
22   Q   You were standing by John Pickard's vehicle?
23   A   Yes.
24   Q   All right.  Where was Sheriff Pickard?
25   A   Standing there, too.

Page 107

1    Q   All right.  Could he reach out and touch you
2    from where he was?
3    A   He probably could, yeah.
4    Q   Where was the other deputy sheriff?
5    A   In front of me, too.
6    Q   He was in front of you?
7    A   Yeah.  Standing in front of me.
8    Q   Okay.  And so they're all gathered around you
9    is --
10   A   Yeah.
11   Q   -- what I get.
12   A   Yeah.
13   Q   All would have heard what each other said?
14   A   Right.
15   Q   In the two to three -- when you -- who was the
16   one that actually -- did Sheriff Pickard come up to your
17   vehicle after stopping you?
18   A   Yeah.
19   Q   All right.  What did he say when he came up to
20   your vehicle?
21   A   "Step out of the vehicle."  I really don't
22   remember what all he said.
23   Q   Did you ask him why he was stopping you?
24   A   I really don't remember.  I'm sure I did.
25   Q   All right.  Do you remember him saying

Page 108

1    anything as to why he was stopping you?
2    A   I don't remember.
3    Q   Okay.  Did he ask you to get out of the car?
4    A   I'm sure he did.
5    Q   Okay.  Did he ask you to undergo any kind of
6    testing to determine your sobriety?
7    A   Yeah.  I'm sure he did.
8    Q   Did a field test; is that right?
9    A   Yeah.
10   Q   All right.  And did you do it?
11   A   I think I did, yes.
12   Q   All right.  And was Sheriff -- who else was
13   there while you were doing the field sobriety test?
14   A   I believe all three of them were.
15   Q   Okay.  Did they ask you to walk heel to toe?
16   A   I can't remember.  I ain't going to say yeah,
17   but I can't remember what all I did.
18   Q   All right.  Do you remember them using a
19   flashlight to look in your eyes?
20   A   Yeah.
21   Q   Did they look in your eyes?
22   A   Yeah.
23   Q   Now, sir, have you been -- had you had -- had
24   you taken any pills that day?
25   A   No.

Page 109

1    Q   Did not take any pills?
2    A   Uh-uh.  I might have, yeah.
3    Q   When did you take pills?
4    A   Earlier that day.
5    Q   Well, what time?  This occurred in the
6    afternoon; when did you take the pills?
7    A   I really don't remember.  I mean, I don't
8    remember.
9    Q   Did you take Roxicet that day?
10   A   Yeah.
11   Q   All right.  Do you remember what dosage of
12   Roxicet you took that day?
13   A   I don't remember.
14   Q   Were you high on Roxicet when you were
15   stopped?
16   A   No.
17       MR. SLOSAR:  Objection to form.
18   A   No, sir.
19   Q   Okay.  Were you driving erratically when you
20   were stopped, sir?
21   A   No, sir.
22   Q   Were you speeding?
23   A   No.
24   Q   So they had no reason to stop you, is that
25   what you're telling us?

Page 110

1    A   I mean, the only reason they had to stop me is
2   probably the tags bad, probably.
3    Q   Okay.  So you think there might have been a
4   reason to have to stop?
5    A   I mean, that would be my point of view, you
6   know.
7    Q   All right.  You're not saying this was a bad
8   arrest because -- a bad stop?
9    A   I not -- I mean, that would be the only reason
10  I would say they had any reason to stop me but he chased
11  me down to stop me over old-ass tags.
12   Q   How far did he have to chase you in terms of -
13  -
14   A   He was at somebody's house when I went by and
15  he seen me and he took off after me.
16   Q   Okay.  How long did you continue to drive
17  before you stopped?  How many miles?
18   A   Not far.  Probably a mile.
19   Q   Okay.  Did he have his lights on while he was
20  --
21   A   Yeah, when he come up on me he did.
22   Q   Did he have his siren on?
23   A   I don't believe.
24   Q   Why did you continue on for another mile
25  before you stopped?

Page 111

1    A   I mean, to a wide place.
2    Q   Okay.  Till you came to a wide place.  Were
3   you near anybody's house at that time?
4    A   Katherine Mills' house.
5    Q   Anybody else live near there?
6    A   My dad worked at a garage right where he
7   pulled me over at.
8    Q   So your dad was close by?
9    A   I mean, he wasn't there but he worked there.
10   Q   All right.  What's the name of the garage?
11  Does it have a name?
12   A   Larry Smith's Auto Sales.
13   Q   So your dad worked at Larry Smith's Auto
14  Sales?
15   A   Yeah.
16   Q   What's your dad's name?
17   A   James Helton.
18   Q   Was this a weekday or a weekend or do you
19  remember?
20   A   It was a weekday.
21   Q   Would Larry Smith's Auto be open?
22   A   Yeah.
23   Q   All right.  Was there a sales person working
24  there?
25   A   I mean, nobody -- nobody wasn't there.

Page 112

1    Q   All right.  Well, maybe I've got this all
2   crazy.  I thought you told me your dad worked at Larry
3   Smith's garage --
4    A   Yeah, but he wasn't there.  He pulled -- okay.
5   The auto sales is back off the road.  He pulled me over
6   at a wide place in front of it is what I'm saying.  You
7   see, we'll go -- you'd have to walk over to the auto
8   sales.
9    Q   How far is the auto sales from where you
10  stopped?
11   A   I'm going to say a football field.
12   Q   A hundred yards?
13   A   Yeah.
14   Q   You think there were -- well, do you know if
15  there were people working at Larry Smith's Auto Sales
16  that day?
17   A   Yeah, there was people working there but he's
18  dead now.
19   Q   All right.  Did they -- anybody come down?
20   A   No.
21   Q   Anything blocking your view between where you
22  were pulled over and Larry Smith's Auto Sale?
23   A   Trees.
24   Q   Okay.  Given what you know, especially -- I
25  assume you've been up to Larry Smith's Auto Sales when

Page 113

1   your dad was working there.
2    A   Right.
3    Q   Could you see where you were stopped from
4   Larry Smith's Auto Sales?
5    MR. SLOSAR:  Objection to form.  Calls for
6   speculation.
7    A   I probably could.  I mean, yeah.
8    Q   Yeah.
9    A   If you was looking.
10   Q   Sure.
11   A   Yeah.  You probably could.
12   Q   Are there any other houses nearby?
13   A   No.
14   Q   Any other businesses nearby?
15   A   No.
16   Q   Were there Roxicets in your vehicle at the
17  time that you were stopped?
18   A   No.
19   Q   Did you have any on your person?
20   A   No.
21   Q   Did you have any drugs in the car?
22   A   No.
23   Q   Did you have marijuana in the car?
24   A   No.
25   Q   You said a search was done of your vehicle;

Page 114

1  was that correct?

2  A  Yeah.

3  Q  I though you said that Detective York

4  performed the search; is that correct?

5  A  Yes.

6  Q  Did Sheriff Pickard do the search?

7  A  No.

8  Q  Participate?  All right.  And here's what I

9  had difficulty understanding.  Did Deputy York pull out

10  a coat is that –

11  A  Yes.

12  Q  Is that what was said?

13  A  Yeah.

14  Q  All right.  And again, what did he say?

15  A  He said this is probably the coat he killed

16  her in.

17  Q  Who's the he?

18  A  He was referring to me.

19  Q  So he –

20  A  That was my truck, yeah.

21  Q  He was accusing you of that?

22  A  Yeah.

23  Q  All right.  Everybody would have heard that?

24  A  I'm sure they would because I heard it.

25  Q  Okay.  And you were still standing over next

Page 115

1  to Sheriff Pickard?

2  A  Right.

3  Q  Yes?

4  A  Yes.

5  Q  All right.  Was Sheriff Pickard parked

6  directly behind your vehicle?

7  A  Yes.

8  Q  So the trunk would have been close to his

9  vehicle?

10  A  Yes

11  Q  All right.  Do you remember – I understand

12  there was an incident where you say that Jason York

13  tried to grab you by the face, also the coat – what

14  else happened out at that stop?

15  A  They just took me to the hospital and took

16  blood and took me to the Barbourville PD station.

17  Q  All right.  Who took you?

18  A  I can't remember who I rode with.  I can't

19  remember.

20  Q  I take it there were just the two vehicles,

21  Detective York's and Sheriff Pickard's.

22  A  Yes.

23  Q  Do you remember receiving a citation on that

24  occasion?

25  A  Yes.

Page 116

1  Q  Do you remember who was listed as the

2  arresting officer?

3  A  I don't remember.  Thank God I don't.

4  Q  I forgot the number of the exhibit.  I have it

5  as Exhibit 4; do you have that in front of you?

6  MR. SLOSAR:  What are you looking for?

7  MR. KELLY:  Exhibit 4 I believe it is.

8  MR. SLOSAR:  He has that.

9  THE WITNESS:  It's Jason York.

10  BY MR. KELLY:

11  Q  Okay.  You have that in front of you?

12  A  Yeah.

13  Q  Okay.  They indicate that it occurred on

14  January 4, 2011 at 13:00, which is 1:00 p.m.; would they

15  be right or you be right as far as the time?

16  A  Well, I guess they're right.

17  Q  Now, you were arrested for a DUI 3rd; had you

18  had two prior offenses?

19  A  If I was arrested on a 3rd I had to, I guess.

20  Q  Well, you remember at least either pleading

21  guilty or being convicted of DUI twice before this,

22  probably within five years during when this arrest was

23  made.

24  MR. SLOSAR:  Objection to form.

25  A  Yeah.

Page 117

1  Q  Is that true or do you know?

2  A  I probably was if that the 3rd.

3  Q  Okay.  They indicate that the exact location

4  of the arrest – and I have to admit I can't read it too

5  well.  Is that Route 223 or is it milepost 223?  Was it

6  route 223 you were on?

7  A  Yeah.

8  Q  Rural route 223.  Okay.  And they identified

9  as being near a road fork; is that where Larry Smith's

10  Auto is?

11  A  Yes.

12  Q  Okay.  All right.  It looks like they –

13  ultimately the charges were for operating a motor

14  vehicle under influence of alcohol 3rd offence, failure

15  to wear seatbelts, failure to register/transfer motor

16  vehicle, and failure of owner to maintain required

17  insurance; is that right?

18  A  Yeah.

19  Q  Okay.  Now, while you were out at the arrest,

20  did Detective York talk about the murder of Katherine

21  Mills other than to talk about the coat and to grab you

22  by the face?

23  A  No.

24  Q  All right.  Did he tell you anything about

25  what he wanted you to say while you were out there at

Page 118

1  that scene?
2      A   No.
3      Q   Did Sheriff Pickard ever say anything about
4  the murder of Katherine Mills while you were out there
5  at the scene?
6      A   No.
7      Q   Did you see which direction Detective York
8  came from?  Did he come from -- was he traveling in the
9  same direction you were when he came -- finally came on
10 the scene?
11     A   Yeah.
12     Q   So he would have been farther out 223?
13     A   Yeah.
14     Q   By the way, do you remember anything being
15 said by the other deputy sheriff there?
16     A   No.
17     Q   Now, did I get this right?  You were taken
18 from that scene to the city police department?
19     A   To the hospital, I believe.
20     Q   Hospital.  Okay.  And again, it was Detective
21 York that took you there or who?
22     A   I think I rode with -- I think -- I'm not for
23 sure; I believe I rode with Pickard to the --
24     Q   To the hospital.
25     A   Yeah.

Page 119

1      Q   Okay.  Anything said on that -- during the
2  drive from where you were to the hospital?
3      A   No.
4      Q   Went to the Knox County Hospital of
5  Barbourville?
6      A   Yeah.
7      Q   All right.  Were you in the back of trooper --
8  back of the vehicle?
9      A   Yeah.
10     Q   Were you handcuffed?
11     A   Yeah.
12     Q   I take it the other deputy would have been
13 with Sheriff Pickard; is that right?
14     A   Yeah.
15     Q   Okay.  So there are two men in the front and
16 you in the back?
17     A   Right.
18     Q   Remember any conversation that you may have
19 had?
20     A   No.
21     Q   Okay.  Who takes you to the hospital, Sheriff
22 Pickard or who?
23     A   I really can't remember.  I believe Sheriff --
24 I believe Pickard did.  I'm not for sure but I believe
25 he did.

Page 120

1      Q   All right.  You're aware of the routine they
2  go through with the implied consent where they read you
3  rights before you consent?  What may be the consequences
4  if you don't consent to a blood test?
5      A   Yeah.
6      Q   Okay.  That had happened to you before I take
7  it?
8      A   Yes.
9      Q   All right.  Do you remember whether Sheriff
10 Pickard did that or who?
11     A   Pickard.  I'll be honest with you, I don't
12 remember.
13     Q   Okay.
14     A   I don't remember.
15     Q   While I'm looking here at number 4 and, you
16 know, the report itself is filled out by Detective Jason
17 York and he talks about reading the implied consent; do
18 you think he could have done that?
19     A   He could have, yeah.  I'm not going to say he
20 didn't.
21     Q   He talks about blood being taken at the Knox
22 County --
23     A   I might have been with him, I can't remember.
24 I'm not going to say that I wasn't.  I can't remember.
25     Q   Right.  And that's

Page 121

1      A   I mean --
2      Q   That's what you have to tell me.  If you can't
3  remember just tell me.
4      A   I mean, I could have been with him; I don't
5  really remember who I was with.
6      Q   There's a statement in here that says,
7  "Subject was not wearing a seatbelt; subject failed
8  HGN," which is stimulant test.  It said that you failed
9  to walk and turn and then -- I can't even read that.
10 One leg standing test.  Remember doing all those things?
11     A   Yeah.
12     Q   Do you remember whether you passed or failed
13 them?
14     A   I mean, I'm sure I failed.  I believe it was
15 on gravel and I've already got a broke ankle and my
16 neck's been broke and you, know.
17     Q   Okay.
18     A   We were on gravel.  It wasn't like we was on
19 blacktop or nothing.
20     Q   Well, let me change the subject a little bit.
21     A   All right.
22     Q   Do you have metal -- did you have metal plates
23 in your face at one time?
24     A   Yes.
25     Q   How did you come to that?

Page 122

1    A   A car wreck.
2    Q   Okay. I take it you had a head injury; is
3  that correct?
4    A   On my eye socket and my face here was
5    Q   When was that -- was it a motor vehicle
6  accident?
7    A   Yeah.
8    Q   How long ago was that?
9    A   2009.
10   Q   Okay. And I would assume you were knocked
11 unconscious in that accident; is that fair?
12   A   Probably.
13   Q   Do you remember how long you were unconscious?
14 Was it --
15   A   No. I don't remember. I'm sorry.
16   Q   Did you suffer a brain injury in that
17 accident?
18       MR. SLOSAR: Objection to form.
19   Q   Or did a doctor ever tell you that?
20   A   He never did say -- tell me that I did.
21   Q   Okay. What kind of treatment were you
22 receiving for that accident? Did you have surgery?
23   A   Yeah, I had reconstructive surgery on my face.
24 Yeah.
25   Q   And you said that occurred in 2009? Did you -

Page 123

1  - were you still under a doctor's care in 2011 when this
2  -- stop?
3    A   No. No.
4    Q   Okay. When did you last visit -- how long
5  were you treated for this surgery and head injury?
6    A   I really don't know.
7    Q   Where was the -- where were you treated?
8    A   Lexington.
9    Q   UK?
10   A   Yeah.
11   Q   And did you have to go back there repeatedly?
12   A   Yeah.
13   Q   And I take it at some point where you talk
14 about a meeting you had in 2012 all -- excuse me. Around
15 I guess it would have been 2013 around the trial you had
16 a second surgery to have your face -- to have the metal
17 taken out of your face?
18   A   Yeah.
19       MR. SLOSAR: Objection to form. Misstates the
20       earlier testimony.
21   Q   When was that, do you remember?
22   A   I believe 2015. I can't really remember.
23 Yeah. I believe it was.
24   Q   Was that done at UK as well?
25   A   Yes.

Page 124

1    Q   All right. Did that accident impair your
2  thinking in any way?
3    A   No.
4    Q   Were you prescribed pain medication as a
5  result of that accident?
6    A   Yes.
7    Q   Were you addicted to Roxicets by the time of
8  this arrest in January of 2011?
9    A   Was I addicted to them?
10   Q   Yes. Did you have a habit?
11   A   Yeah.
12   Q   Were you still being prescribed pain
13 medication at that time?
14   A   Yes.
15   Q   The Roxicets that you -- well, I'd ask you to
16 say that apparently, according to this citation you told
17 the trooper that you had taken pills -- pain pills --
18 Roxicets also Xanax and others; is that true?
19   A   Yes.
20   Q   Okay. Had all those medications that you took
21 that day been prescribed?
22   A   Yes.
23   Q   Who was the doctor who prescribed those?
24   A   I forget.
25   Q   Where does the doctor practice?

Page 125

1    A   Florida.
2    Q   Okay. How long had you been making trips to
3  Florida?
4    A   Over a year.
5    Q   Why did you go to Florida for treatment?
6    A   To get pills.
7    Q   Had you been denied pills here in Kentucky?
8    A   Not really.
9    Q   Well, then why get in the car and go?
10   A   We got more --
11   Q   That's a long trip.
12   A   We got more and they were easy to get.
13   Q   Did you actually undergo an examination by --
14   A   Yeah.
15   Q   -- a physician while down there?
16   A   Oh yeah.
17   Q   What did they do?
18   A   Did an MRI on me.
19   Q   Okay. Do you remember where this -- what city
20 this was in?
21   A   I went to several in Jacksonville, Broward
22 County, Miami --
23   Q   Do you remember --
24   A   -- Miami Dade.
25   Q   Do you remember the name -- okay, that's on

Page 126

1 the way – that's a long, long trip.
2    A    It's a long trip.
3    Q    Okay.  Do you remember the names of any of the
4 physicians you went to?
5    A    I don't.
6    Q    Do you remember the names of the clinics you
7 went to?
8    A    Total Pain – I don't really remember the rest
9 of them.  No.
10    Q    In other words, could you sit down and tell me
11 – give me a list of I went to this clinic in this town?
12    A    I mean, Broward County, you know.
13    Q    Uh-huh.
14    A    I can't remember all of them, no.  I went to
15 several different ones.
16    Q    But the situation is you'd go down there,
17 they'd examine you, they'd give you a prescription and
18 you'd come back.
19    A    Right.
20    Q    Did you ever fill those prescriptions in
21 Kentucky?
22    A    A couple of times, yeah.
23    Q    Okay.  But all the medication you had on this
24 occasion you had got while you were in Florida under a
25 legal prescription?

Page 127

1    A    Yeah.
2    Q    All right.
3    MR. SLOSAR:  You're saying the January 4, 2011
4 –
5    MR. KELLY:  I am.
6    MR. SLOSAR:  I understand.  Just –
7 BY MR. KELLY:
8    Q    Yeah, I've talked to you about this citation.
9 I'm still stuck on that.
10    A    Yeah.
11    Q    And did you tell them?  Did the officers ask
12 you did you have a prescription?
13    A    He knew I did – Jason York did.
14    Q    How do you know he knew?
15    A    Because he was at my house before that asking
16 me where the pills and stuff were that I went to Florida
17 and got.
18    Q    Okay.  So, January 23rd and January 4th –
19 about 11 days.  So your prescriptions would have last
20 how long?  How long do the prescript – how many pills
21 did you bring back from Florida when you were down
22 there?
23    A    180.
24    Q    180?
25    A    Yeah.

Page 128

1    Q    Roxicets?
2    A    Yeah.
3    Q    What milligram?
4    A    30.
5    Q    Did you sell any of them?
6    A    No.
7    Q    You used them all yourself?
8    A    Yeah.
9    Q    How much did you have to pay in order to buy
10 those drugs?
11    A    I believe $7- $800 at that time.
12    Q    Where were you working at this time?
13    A    I wasn't.
14    Q    How did you get $700?
15    A    Just salvage yard and my neighbor loaned me
16 some money.
17    Q    I'm sorry, your neighbor?
18    A    Yeah.
19    Q    Your neighbor lends you money?
20    A    Yeah.
21    Q    Who is your neighbor?
22    A    Randy Merida.
23    Q    Randy Murry?
24    A    Merida.
25    Q    Merida.

Page 129

1    MR. SLOSAR:  M-E-R-I-D-A.  It's on the back of
2 that –
3    MR. KELLY:  Yeah.  I saw.  Well,
4    MR. SLOSAR:  Maybe not.  It's on one of the –
5 it's on one of those other bond documents.  Sorry.
6 BY MR. KELLY:
7    Q    Does Randy Merida still live where he was
8 living back in 2011?
9    A    Yes.
10    Q    Where is that?
11    A    Broughton Holler.
12    Q    Okay.  Do you know his exact address?
13    A    I don't – not at – he just lives in
14 Broughton Holler is all I know.
15    Q    All right.  Does he live with anybody?
16    A    Not now.
17    Q    Okay.  So he lives by himself in a house?
18    A    A trailer.
19    Q    Trailer.  Okay.  All right.  I'm sorry I got
20 off subject.  I want to go all the way back to the day
21 that you were arrested here, this January 4, '11 and you
22 were at the hospital and you got your blood test.  What
23 happened after that?
24    A    I went to the police station.
25    Q    All right.  Who took you there?

Page 130

1   A   I can't remember.
2   Q   Did Sheriff Pickard take you there?
3   A   I can't remember.
4   Q   When you got to the police station obviously
5   they took you in the police station; is that fair?
6   A   Yes.
7   Q   All right.  Do you remember was Sheriff
8   Pickard in the city police station?
9   A   No, sir.
10   Q   He was not there?  He took you there and
11   dropped you off.
12   A   Right.
13   Q   Likewise, the other Knox County officer, did
14   he go in?
15   A   No, sir.
16   Q   And again, as I understand it, Chief
17   Broughton, you, Detective York – who else was there?  I
18   think you mentioned somebody else in the police station.
19   A   Mark Mefford.
20   Q   Okay.  How long were you at the police
21   station?
22   A   I really don't remember.
23   Q   Don't know?
24   A   I don't.
25   Q   During that time is when Detective York asked

Page 131

1   you additional questions concerning the murder
2   investigation?
3   A   Yes, sir.
4   Q   And did he ask you some pointed questions
5   about Mr. Simpson – Mike Simpson?
6   A   Did he ask me what?
7   Q   Did he seem to be – did he want to know your
8   connections with Mr. Simpson?
9   A   Yes.
10   Q   Did he want to know your connections with
11   anybody else?  Did he happen to bring up Amanda Hoskins
12   or Jonathan Taylor?
13   A   Not at that time, no.
14   Q   Okay.  The only person he talked about was
15   Mike Simpson?
16   A   I don't really remember.
17   Q   Did he tell you anything about what he knew
18   about Mike Simpson?
19   A   No.
20   Q   Did he tell you anything about what he had
21   learned through his investigation by that point?
22   A   He just said if I went in to rob that old
23   woman if she fell down and hit her head I didn't murder
24   her is all he said.
25   Q   And that's all he said?

Page 132

1   A   Yes.  I'm just – he said more things but I
2   don't really recall all of what he said.
3   Q   Did you come away from that meeting feeling
4   that you were an object of that investigation; that you
5   were –
6   A   I'm sure I did.
7   Q   That you were a person of interest in that
8   murder investigation?
9   A   Sure, I did.
10   Q   One more time again.  As you were going there
11   did Sheriff Pickard ever say, "Hey, we think you're
12   involved in the murder."
13   A   He didn't say – I don't remember.  I don't
14   remember.
15   Q   Now the next time I believe you had contact
16   with – one of the things – on the back of 4 – will
17   you look on the back of this Exhibit 4?  The one I have
18   talks about what I think is a home incarceration
19   bracelet; is that right?
20   A   Yeah.
21   Q   And they marked it – although it's – up at
22   the top it mentions that it's related to the citation in
23   2011.  They have the date as being January 6, 2010.  What
24   I would think happened is that they just didn't – were
25   you on home incarceration at the –

Page 133

1   MR. SLOSAR:  Objection to form.
2   A   Was I on it?
3   Q   Were you on home – were you placed on home
4   incarceration as a result of this arrest –
5   A   Yes.
6   Q   – in January 2011?  And would you have
7   probably gotten it on the 6th of January, 2011?
8   A   It says on 2010.
9   Q   It does.  But it also says at the top of this
10   coming out of a case number 11-10.
11   MR. SLOSAR:  Objection to form.
12   A   I don't remember.
13   Q   Okay.
14   A   But I was on house arrest.
15   Q   All right.  By the way, how did you get home?
16   Were you taken anywhere else besides the city police
17   department the day of the arrest?
18   A   Yeah, to jail.
19   Q   To jail?  All right.  And then, I take it, you
20   went in front of Judge Chapel or Judge Hammonds the next
21   day?
22   A   No.  Yeah.  I probably did.  Yeah.
23   Q   Okay.  And it was then you were placed on home
24   – is it then you were placed on home –
25   A   No.

Page 134

1     Q  – incarceration?
2     A  No.
3     Q  No.
4     A  I was arrested and – no. I made bond and the
5 next day I went to court and they put me back in jail to
6 put me on home incarceration.
7     Q  Okay.
8     A  Yeah.
9     Q  While you were in jail was there anymore
10 contact between you and Detective – well, anymore
11 contact between you and Sheriff Pickard?
12     A  No.
13     Q  Anymore contact while you were in jail on that
14 occasion between you and Detective York?
15     A  No.
16     Q  As I understand the chronology, the next thing
17 that happens is that you're at home and Jason York and
18 John Pickard came to your house?
19     A  Yes.
20     Q  Who was at your house at that time?
21     A  Just me. Just me.
22     Q  Where was your wife?
23     A  At work.
24     Q  At work? Where does she work?
25     A  She worked at Dovie Thompson Early Head Start.

Page 135

1     Q  I'm sorry, I didn't hear.
2     A  Dovie Thompson Early Head Start.
3     Q  Head Start. She took care of little kids?
4     A  She was a cook. Yeah.
5     Q  Was that the same place you were living?
6     A  Yes.
7     Q  You lived at the same place ultimately when
8 you were –
9     A  The whole –
10     Q  – incarcerated this time – same address?
11     A  Not now. No.
12     Q  Okay. But it's the same Broughton Holler
13 address you were living in when you were arrested,
14 obviously?
15     A  Yeah.
16     Q  Okay. Did any other officers come with
17 Detective York and Sheriff Pickard on that occasion?
18     A  No. No.
19     Q  What was said in your home?
20     A  They just asked me would I go take a polygraph
21 test and I said yeah.
22     Q  Do you remember which – who asked that?
23     A  Jason York.
24     Q  Okay. What did Sheriff Pickard say while you
25 were there.

Page 136

1     A  He just said that he could arrest me over a
2 sign that was in my house.
3     Q  He was going to arrest you over a fine in your
4 house?
5     A  A sign.
6     Q  A sign in your house. Oh, that's right. I'm
7 sorry.
8     A  Yeah.
9     Q  Did you take the Broughton Holler sign off the
10 lamppost?
11     A  It was knocked down and my son –
12     Q  Okay.
13     A  – picked it up.
14     Q  Your son picked it up?
15     A  Yeah.
16     Q  By the way, was your son there?
17     A  No. He was at school.
18     Q  Okay. How old was your son back then – 2011?
19     A  I'm going to say 16 or 17.
20     Q  Okay. Who else would have been living at that
21 house back in 2011 – January of 2011?
22     A  Me, my wife, my son, my two girls and that's
23 it.
24     Q  Okay. What is your son's name?
25     A  Kevin.

Page 137

1     Q  All right. So he would be how old now?
2     A  He's 25.
3     Q  Okay. And your girls, how old were they back
4 then?
5     A  Back then?
6     Q  Yeah.
7     A  15 and 8.
8     Q  All right. But the girls weren't home that
9 day were they?
10     A  None of them – nobody was.
11     Q  Okay. I didn't – again, what are your girls'
12 names? Your girls' names.
13     A  Chelsea and Shelby.
14     Q  Chelsea and?
15     A  Shelby.
16     Q  Shelby. Okay. And so if that's seven years
17 ago I assume they're about 22 – 23 years old; is that
18 fair?
19     A  Well, Chelsea's 23 and Shelby is 16.
20     Q  Okay. Do they still live in Knox County?
21     A  Shelby does.
22     Q  All right. Where is your other daughter?
23     A  In Indiana.
24     Q  All right. So they ask you if you're going to
25 take a polygraph test and you agree; is that fair?

Page 138

1   A   Yes.
2   Q   Anything said about the murder investigation
3   at that time?
4   A   I can't recall.
5   Q   All right.  Did anybody tell you anything
6   about Amanda Hoskins then?
7   A   I can't recall.
8   Q   Anybody tell you about William Lester then?
9   A   (NO VERBAL RESPONSE.)
10  Q   Did anybody tell you about Jonathan Taylor
11  then?
12  A   No.
13  Q   Did anybody tell you a theory of – whatever
14  theory they might have had at that time as to who might
15  be involved in the murder?
16  A   No, not at that time.
17  Q   Did anybody tell you at that time what you
18  should – how you should handle the polygraph?  What you
19  should say or what you shouldn't say?
20  A   No.
21  Q   Okay.  How long do you think they were there?
22  A   30 minutes.
23  Q   All right.  Sheriff Pickard found – he's the
24  one to find the sign?
25  A   Yeah.

Page 139

1   Q   All right.  Was he in the room with you and
2   Detective York at all times?
3   A   Yeah.
4   Q   Okay.  Was he within earshot of everything
5   that was said?
6   A   Huh?
7   Q   Was he within earshot of everything that was
8   said?
9   A   Yeah.
10  Q   Now, if this visit was on the 6th of 2011 and
11  your – looks like your polygram was on – polygraph was
12  on the 21st of January.  So about 15 days apart.  Did you
13  – before you went to Frankfort to do the polygraph did
14  you have anymore meetings with Detective York or Sheriff
15  Pickard or any police officer?
16  A   No.
17  Q   And I think you told us before that it was
18  Detective York that took you to Frankfort; is that
19  right?
20  A   Yeah.
21  Q   Am I also correct, when you got to Frankfort
22  was Sheriff York – was Sheriff Pickard there?
23  A   No.
24  Q   Okay.  He had nothing to do with the
25  polygraph?

Page 140

1   A   No.
2   Q   Now, the next meeting I know about for sure is
3   March 8, 2012 when you were giving a statement in
4   Sheriff Pickard's office.  I take that back.  You did
5   tell me.  Is it March of 2012?  Did you have any
6   meetings with Sheriff Pickard between the time you gave
7   the polygraph and the time you were in his office giving
8   your statement?
9   A   No.
10  Q   Did you have any encounter with any Knox
11  County – any member of the Knox County Sheriff's
12  Department during that time?
13  MR. SLOSAR:  Objection.  Objection to form.
14  A   No.  Not as I know, no.
15  Q   As I understand it we're looking – this is a
16  – it's my understanding that you were indicted for
17  burglary in the 3rd degree, criminal mischief in the 1st
18  degree, fleeing or evading police and receiving stolen
19  property.  All of that occurred in March of 2012.
20  MR. SLOSAR:  Objection to form.
21  Q   All right.  Had you actually been arrested
22  before that indictment came down?
23  MR. SLOSAR:  And John, just to – the
24  indictment that I have, PL757 is –
25  MR. KELLY:  I'm sorry?

Page 141

1   MR. SLOSAR:  PL757, the actual indictment, is
2   different than what you just represented to – that
3   there were charge – that some of the stuff
4   allegedly happened in February, as well, according
5   to that –
6   MR. KELLY:  Oh, yeah.  I'm saying the
7   indictment came down on March 8; is that wrong?
8   MR. SLOSAR:  I thought that you were saying
9   that everything that he was charged with –
10  MR. KELLY:  No, no.  I beg your pardon.
11  MR. SLOSAR:  Sorry.
12  MR. KELLY:  I'm sorry, the indictment came down
13  – my question is was he arrested before the
14  indictment?
15  MR. SLOSAR:  I've got you.  Sorry.
16  THE WITNESS:  Was I arrested before the
17  indictment?
18  BY MR. KELLY:
19  Q   Yes, sir.
20  A   I don't know.
21  Q   Okay.  Do you remember having any encounters
22  with the Knox County deputies or sheriff before you were
23  arrested on the indictment for those charges?
24  A   Yeah.  I was arrested.  I wasn't indicted on
25  them charges yet.  Yeah.  I was arrested before I got

Page 142

1 indicted on them.

2 Q Yeah. Yeah. That only makes sense.

3 A Yeah.

4 Q Okay. You remember the circumstances of that

5 arrest; where it occurred, when it occurred?

6 A Yes.

7 Q Okay. Tell me about it.

8 A They come to my house and slammed me on the

9 ground and arrested me for it.

10 Q Okay. Who did?

11 A Pickard.

12 Q Okay. Who else?

13 A Adam Townsley.

14 Q I'm sorry?

15 A Adam Townsley.

16 Q All right.

17 A Claude Hudson.

18 Q All right.

19 A And I don't remember the other one.

20 Q They were all Knox County deputy sheriffs –

21 A Yes, sir.

22 Q – along with the Sheriff? Was anything said

23 on that occasion about the murder of Katherine Mills?

24 A On the way to the jail, yeah.

25 Q Okay. And I'm talking about when they – when

Page 143

1 you were first arrested for the charge.

2 A Yeah.

3 Q What was said?

4 A He said if I tell them what they want to hear

5 that they would help me out on it.

6 Q I missed – maybe – I want to clarify but I

7 thought you said earlier in the answer to Mr. Slosar's

8 questions –

9 A Right.

10 Q – was that when you were arrested, based upon

11 the indictment he said those things.

12 A No.

13 MR. SLOSAR: Objection to form. How he states

14 –

15 A I was arrested and got a bond.

16 Q Okay.

17 A And that was the agreement upon the arrest

18 that I – that they give me a bond if I tell them what

19 they want to hear.

20 Q Were you in jail when you were indicted or

21 were you out of jail by then?

22 A I was out. I got out on bond.

23 Q All right. So were you rearrested after the

24 indictment was issued on March 8?

25 A I'm sure I was.

Page 144

1 Q All right. Who arrested you then?

2 A I can't remember.

3 Q Now, at the – was it Sheriff Pickard that

4 told you – I beg your pardon.

5 A Go ahead. Go ahead. I'm sorry.

6 Q Sheriff – talking about the arrest first.

7 Sheriff Pickard that told you – again, what were his

8 exact words, the best you can remember?

9 MR. SLOSAR: Objection to form. Asked and

10 answered multiple times.

11 Q If you'll indulge me.

12 A He just said if I tell him what he wants to

13 hear that they'd help me out on these charges –

14 Q All right. What –

15 A – and give me a bond.

16 Q What did he say he wanted to hear?

17 A About the murder.

18 Q All right. Did he tell you anything about –

19 A No.

20 Q – what he wanted you to say?

21 A Not in particular. No.

22 Q Did he tell you that you were to say that

23 Amanda Hoskins did it?

24 A No.

25 Q Did he tell you that you were supposed to

Page 145

1 implicate William Lester in this?

2 A No. I mean –

3 Q Did he tell you anything that was part of the

4 statement you ultimately gave on March 8, 2011?

5 A No, sir.

6 Q No?

7 A No.

8 Q Okay. I may have written this down wrong but

9 it's my understanding that what the conversation was at

10 that time is that you would get a bond if you would

11 cooperate.

12 MR. SLOSAR: Objection to form. Misstates his

13 testimony.

14 Q Did I – have I misstated what your testimony

15 is?

16 A He said he would give me a bond and there

17 wouldn't be no more charges brought up.

18 Q By the way, who's Andi Helton?

19 A Who?

20 Q Andi Helton.

21 A Andi?

22 Q A-N-D-I? Maybe it's Sandi. Maybe it's

23 supposed to be Sandi.

24 A That's my wife.

25 Q Did she put up a bond for you?

Page 146

1    A    No.

2    Q    She didn't act as a surety on your bond?

3    A    Yeah, she signed the bond; she didn't put no

4    money.

5    Q    And you got a $1,000 bond; is that correct?

6    A    On what?

7    Q    For these charges.

8    A    Surety?

9    Q    That you were – you were released on a surety

10   bond for $1,000; is that wrong?

11   A    Right.

12   Q    By the way, have you – did you tell your wife

13   about your communications with Sheriff Pickard and –

14   A    No.

15   Q    – Detective York?

16   A    No.

17   Q    Mention it ever to any of your children?  Tell

18   anybody else besides –

19   A    No.

20   Q    Were you ever contacted by – ultimately,

21   after the charges were issued against Amanda Hoskins and

22   Jonathan Taylor, were you contacted then by anybody?

23   A    No.

24   Q    Were you contacted by their defense team, the

25   ones that were defending Ms. Hoskins and Mr. Taylor with

Page 147

1    regard to their criminal charges?

2         MR. SLOSAR:  Objection to form.

3    A    Was I ever –

4    Q    Did they ever call you up and say, "What do

5    you know about this?"

6    A    No, later on they had come to the London jail

7    and seen me.  Yeah.

8    Q    Who did?

9    A    I can't remember who it was.

10   Q    Was it a man or a woman?

11   A    A man and a woman.

12   Q    Okay.

13   A    Investigator.

14   Q    Was the name Lisa Evanson?

15   A    I don't remember.  I mean, I – it was – I

16   don't remember it.  It was back in 2012 – '13.

17   Q    All right.  What was said during that

18   conversation?

19   A    I really don't remember.

20   Q    Why were you in the London jail on that

21   occasion?

22   A    On them charges.

23   Q    Which charges?

24   A    3rd degree burglary and criminal mischief.

25   Q    So you had plead guilty by that time?

Page 148

1    A    Yeah.

2    Q    All right.  Between – after you were first

3    arrested for these charges, you're in jail and somebody

4    puts up a bond for you, did you have any further

5    meetings with Sheriff Pickard during that period of

6    time?

7    A    No.  Not with Pickard.

8    Q    All right.  Next thing I know is you're

9    indicted and you're picked up again; is that fair?

10   A    Well, I was picked up again in between that

11   for – a cop from London come to Knox County and

12   arrested me for something.

13   Q    Okay.

14   A    And that's – then I was in jail, then they

15   indicted me on that charge.

16   Q    Okay.  So where were you at the time that you

17   learned of your indictment?

18   A    I was already in jail.

19   Q    You were in Laurel County jail?

20   A    Yeah.

21   Q    Did Sheriff Pickard ever see you in the Laurel

22   County jail?

23   A    No.

24   Q    Were you ever approached by Detective York

25   while in the Laurel County jail?

Page 149

1    A    No.

2    Q    Were you brought from the Laurel County jail,

3    then, to Sheriff Pickard's office?

4    A    No.

5    Q    Okay.  Where were you when you were – were

6    you out on bond by that time?

7    A    What do you mean was I out on bond?

8    Q    You said you were picked up and taken to the

9    Laurel County jail.

10   A    Right.

11   Q    What were you picked up for?

12        MR. SLOSAR:  Can you get a timeframe?  I –

13        MR. KELLY:  Yeah, I'm trying to understand the

14   time frame, I'm not sure.  I thought you said before

15   I was – you were arrested for the charges that are

16   the source of this indictment and then I thought he

17   said he was bonded out because there's an

18   implication with Sandy Helton, given a bond –

19        MR. SLOSAR:  On 3-8.  He was bonded out on 3-8.

20        MR. KELLY:  That's right.

21        MR. SLOSAR:  The indictment was April.

22        MR. KELLY:  Well, all right.  Between there

23   he's arrested, am I right?

24        MR. SLOSAR:  No.  He was in – but after he had

25   bonded out, before he was indicted in April, he got

Page 150

1    rearrested.
2        MR. KELLY:  That's right.
3        MR. SLOSAR:  I think what you're looking for is
4    between 3-7 and 3-8.  He got arrested by Pickard –
5    BY MR. KELLY:
6        Q    How are you – how long were you in the Laurel
7    County jail?
8        A    How long?
9        Q    Yes, sir.
10       A    For 12 months – 13 months.
11       Q    Okay.  So, in April of 2012, where were you?
12       MR. SLOSAR:  Objection to form.  Foundation.
13       A    April?  I believe I was in Laurel County jail,
14   I think.  I don't know.
15       Q    Okay.
16       MR. SLOSAR:  Can we go off the record for a
17   second?
18       MR. KELLY:  Sure.
19       VIDEOGRAPHER:  Off the record at 2:45 p.m.
20       (OFF THE RECORD)
21       VIDEOGRAPHER:  Back on the record at 2:51 p.m.
22   BY MR. KELLY:
23       Q    Your ride to Sheriff Pickard's office to give
24   a statement with Sheriff Pickard and Deputy York –
25   where had you been before that?  Where did they bring

Page 151

1    you from?
2        A    Knox County jail.
3        Q    All right.  Was it deputy that brought you
4    over?
5        A    Yeah.
6        Q    Remember which deputy it was?
7        A    No.
8        Q    Did that deputy stay?
9        A    No.  I don't remember.
10       Q    All right.  Where were you in the – you were
11   in the Knox County Sheriff's Department at this time?  Is
12   that where the statement was given?
13       A    The sheriff's office.
14       Q    The sheriff's office.  Gotcha.  Were you in a
15   room by yourselves?
16       A    Pickard's office.
17       Q    Pickard's office.  All right.  The only people
18   in there were you, Sheriff Pickard, and Deputy York –
19   excuse me – Detective York –
20       A    Yes.
21       Q    – is that correct?
22       A    Correct.
23       Q    Was there anybody that could hear?
24       A    I have no idea.
25       Q    Was there anybody that could see you in there?

Page 152

1        A    I don't know.
2        Q    What did John Pickard say at that time?
3        MR. SLOSAR:  Objection to form.  Foundation.
4        A    I don't remember.
5        Q    Did he tell you about Amanda Hoskins?
6        A    No.
7        Q    Did he mention William Lester?
8        A    No.
9        Q    Did he tell you about having this meeting out
10   at – I forgot the name of the market – Escoe's Market,
11   is it?
12       A    No.
13       Q    Did he tell you anything to say during the
14   statement you gave?
15       A    No.
16       Q    Correct me if I'm wrong, but when I think when
17   Mr. Slosar asked if Sheriff Pickard was there the entire
18   time you said you didn't know; is that your testimony?
19       MR. SLOSAR:  Objection to form.  Misstates the
20   record.  You can answer.
21       Q    Was he there the entire time?
22       A    I believe he was.  Yeah.
23       Q    Okay.  How long were you – again, how long
24   did it take before you went on record on that occasion?
25       A    I don't – I really don't remember.

Page 153

1        Q    Was it a half hour?
2        A    Not that long.
3        Q    Was it more than 15 minutes?
4        A    I don't remember.
5        Q    All right.  Don't have any concept of the
6    length of time?
7        A    No.  I mean, I don't want to say.  I don't
8    know for sure.
9        Q    All right.  But you can't even estimate the
10   time?
11       A    I'm not going to.  No.
12       Q    Okay.  Who told you what to say on the record?
13       A    Well, I mean, I ain't dumb.  I mean, I heard
14   stuff from the street and I kindly knew what they wanted
15   to hear so to my advantage, I told them what they wanted
16   to hear.
17       Q    How do you know what they wanted to hear?
18       A    Because it was so many rumors going around and
19   everything.  I mean, I knew.
20       Q    So the statement you gave was based upon what
21   you heard on the street?
22       A    No.
23       MR. SLOSAR:  Objection to form.
24       A    I mean –
25       MR. SLOSAR:  Misstates his earlier testimony.

Page 154

1    A   I -- what I've heard from them and --
2    Q   What did them say is what I'm trying to get
3  at?
4    A   What you -- what I said.
5    Q   All of it?
6    A   I mean, I put pieces in it.
7    Q   I'm sorry?
8    A   I put pieces in it.
9    Q   Yeah.  You put pieces --
10   A   But I know who they wanted me to talk about,
11  you know?
12   Q   All right.  When did John Pickard tell you
13  what he wanted you to talk about?
14   A   I didn't say John Pickard did.
15   Q   All right.  Then did Detective York tell you
16  what he wanted you to say?
17       MR. WRIGHT:  Object to form.
18   A   I'm just saying that I knew -- I mean, they
19  kept on telling and I'd done know, you know, that they
20  had Amanda and William and Jonathan all as suspects so I
21  just put it together, you know.
22   Q   All right.  So you put together the story?
23   A   Yeah.  I mean --
24       MR. SLOSAR:  Objection to form.
25   A   He told me what to say I just agreed with it.

Page 155

1    Q   Who was he?
2    A   Jason York.
3    Q   Did the Sheriff ever tell you what to say?
4    A   I mean, he didn't say nothing.  He just wanted
5  me to tell them.
6    Q   He wanted you to tell what you knew about the
7  murder; is that fair?
8        MR. SLOSAR:  Objection to form.  Misstates his
9    testimony.
10   Q   Sheriff Pickard wanted you -- encouraged you
11  to tell what you knew about the murder; is that fair?
12       MR. SLOSAR:  Objection to form.
13   Q   Did he ever tell you any specific things he
14  wanted you to say?
15   A   No.
16   Q   I'm trying to figure out what portions were
17  the things you heard on the street and what things you
18  were told by Detective York, or alleged that Detective
19  York told you.  What things did you hear on the street?
20       MR. SLOSAR:  Objection to form.
21   A   I don't remember.  I mean, I just --
22   Q   Did Amanda Hoskins name come up in the rumor
23  mill?
24   A   Yes.
25   Q   Who did you hear that from?

Page 156

1    A   York.  Jason York.
2    Q   But I'm saying did you learn elsewhere or hear
3  elsewhere about Amanda Hoskins from the other people --
4  people other than Detective York?
5    A   No.
6    Q   No?  Who told you about William Lester?
7    A   York.
8    Q   So, I'm trying to get -- you said that you put
9  together things you heard on the street; am I right?
10   A   Yeah.
11   Q   What did you hear on the street?
12   A   I mean, I just --
13       MR. SLOSAR:  Objection to form.  Asked and
14   answered.
15   A   I just seen them going after William and
16  stopping them and -- you know, like they did me.
17   Q   When did you see them going after William?
18   A   Later on after the murder.
19   Q   When did they -- when did William Lester's
20  name first come up?
21       MR. SLOSAR:  Objection to form.
22   A   I don't remember.
23   Q   Was it after the polygraph?
24       MR. SLOSAR:  Objection to form.
25   A   It was during the polygraph.

Page 157

1    Q   Okay.
2    A   You heard it.
3    Q   Yeah.  Did Detective York continue it on after
4  the --
5    A   Yeah.
6    Q   But again, did Sheriff Pickard ever bring up
7  William Lester's name?
8    A   Honest, I don't recall.
9    Q   After the statement that you gave on March 8,
10  2012, did you have any further contact with Sheriff
11  Pickard?
12   A   No, sir.
13   Q   Did you have any further contact with
14  Detective York?
15   A   No, sir.
16   Q   Eventually you do and the next thing you know
17  is that you're being called to come down and testify at
18  trial, is that when you were coming down for?
19   A   Kelly Farris give me a summons for something.
20  Yeah.
21   Q   Yeah, a subpoena.
22   A   All right.  Yeah.
23   Q   And that's in 2015; is that your recollection?
24   A   I don't remember.
25   Q   Nobody talked to you during that entire time,

Page 158

1 right, between 2012 and 2015 –

2   A   Right.

3   Q   – about the murder?  Okay.  Had you talked to

4 any – had you talked to Sheriff Pickard on the phone

5 about the murder investigation after that statement?

6   A   No.

7   Q   Were you ever arrested by Sheriff Pickard or

8 anybody at the Knox County Sheriff's office after March

9 2012?

10   A   I don't know.

11   Q   Or in jail in Knox County after March of 2012?

12   A   I believe I was.

13   Q   All right.  During the time you were in jail

14 were you ever contacted by the sheriff – did anybody

15 from the Sheriff's office come over to talk to you about

16 the murder of Katherine Mills?

17   A   No.

18   Q   Do you know how many times you've been

19 convicted or plead guilty to a felony?

20   A   Yeah.

21   Q   How many?

22   A   This makes twice.

23   Q   Twice?

24   A   Yeah.  Three times.

25   Q   Three times.

Page 159

1   A   But my first one was amended down.

2   Q   Have you had encounters with the present

3 sheriff?

4   A   No.

5   Q   Never been in contact with Sheriff Smith?

6   A   No.

7   Q   Okay.  Ever been in contact with – have you

8 ever complained to anybody at the Knox County Sheriff's

9 Department after March 2012 and told them, "I lied

10 during that statement."

11   A   Did I contact anybody?

12   Q   Well, I know you were in jail and I know you

13 were arrested since then and I know you had contact with

14 the Sheriff's Department, haven't you, since you gave

15 that statement in March of 2012, didn't you?

16       MR. SLOSAR:  Objection to form.

17   Q   You've had contact with the Knox County

18 Sheriff's Department.

19   A   Right.

20   Q   Did you ever tell them, "Hey, I gave this

21 statement back in March of 2012 – it was all a lie."

22   A   No.

23   Q   All right.  Did you ever have any conversation

24 with the present administration?

25   A   (NO VERBAL RESPONSE.)

Page 160

1   Q   No?

2   A   No.

3   Q   Who else did you tell besides Kelly Farris and

4 Detective York that the statement you gave was a lie?

5   A   An investigator that come to my house.

6   Q   Okay.  When did that occur?

7   A   I don't know.  I don't remember.

8   Q   How – was it within a year of the – no?

9   A   No.  It's 2015, I believe.

10   Q   2015.  All right.

11   A   I think.  I don't know.

12   Q   All right.  Do you remember who came by your

13 house?

14   A   No, I don't remember his name.

15   Q   All right.  It was a man, though.

16   A   Yeah.

17   Q   Did he say he was representing Amanda Hoskins

18 or –

19   A   He said he was an investigator for Jonathan

20 Taylor.

21   Q   For Jonathan Taylor.  All right.  And what did

22 he tell you about what he had learned?

23       MR. SLOSAR:  Objection to form.

24   A   I don't really remember.

25   Q   Did he ask you about the statement you gave in

Page 161

1 March of 2012?

2   A   I can't remember.  I'm sure he did, though.

3   Q   All right.  And what did you tell him?

4   A   That I didn't tell the truth when he asked me.

5   Q   All right.  Did you tell him that what you had

6 said in March of 2012 was something that Detective York

7 had – that the police had put you up to say?

8   A   Yeah.

9   Q   You told him that?

10   A   Yeah.  I can't remember.  I ain't going to say

11 yeah.  I can't remember.

12   Q   You can't remember?

13   A   I can't remember what I said to him.

14   A   I mean, did it bother you after you gave that

15 statement that you had given – you had just implicated

16 somebody in a murder and you knew it not to be true?

17   A   Yeah.

18   Q   Well, who did you tell?

19   A   Nobody.

20       MR. KELLY:  That's all I have.  Yeah.  Sure.

21           EXAMINATION

22 BY MR. FARAH:

23   Q   Mr. Helton, I'll be very brief.  I represent

24 Mike Broughton and the City of Barbourville.

25   A   Yes, sir.

Page 162

1    Q   I'm going to try to do this in chronological
2   order, and that's when -- I'm going to ask you primarily
3   about Mike Broughton, okay.  December 23, 2010, when
4   Detective York and Sowders came to your house to
5   interview you and they searched your house, Mike
6   Broughton wasn't present that day, correct?
7    A   Correct.
8    Q   No one else from Barbourville was present that
9   day, correct?
10   A   Correct.
11   Q   Okay.  The next time I understand you're
12  involved with any police officers in this is a January
13  4, 2011, York and Pickard pull you over for a DUI,
14  correct?
15   A   Yes.
16   Q   Mike Broughton wasn't there for the stop,
17  correct?
18   A   Correct.
19   Q   Okay.  You were then taken to the hospital and
20  had blood drawn, correct?
21   A   Correct.
22   Q   Neither Mike Broughton nor any other member of
23  the Barbourville Police Department were at the hospital
24  when you had the blood drawn, correct?
25   A   Correct.

Page 163

1    Q   Okay.  Then you were taken on that same day
2   back to the Barbourville Police Department where you
3   were interviewed, correct?
4    A   Correct.
5    Q   And that was Detective York and Mefford of the
6   KSP, correct?
7    A   Correct.
8    Q   And you said that Detective Broughton was
9   present.
10   A   Correct.
11   Q   Okay.  Now, if I understand it, you said that
12  York and Mefford were interviewing you and that Mike was
13  standing by the door in the interview room; is that
14  correct?
15   A   Correct.
16   Q   And in fact, will you look at Exhibit 5 in
17  front of you?  Do you have that in front of you, sir?
18  Thank you, Elliot.  It's your Statement of Rights and
19  your Waiver of Rights.
20   A   Yeah.
21   Q   You signed that, correct?
22   A   Yes, sir.
23   Q   And the witnesses who signed that were Mark
24  Mefford and Jason York.
25   A   Correct.

Page 164

1    Q   Now, when you testified earlier you said that
2   the only thing that you recall Mike Broughton saying to
3   you was he asked to have a minute with you and that he
4   told you to tell the truth.
5    A   Right.
6    Q   That's your recollection?
7    A   Yes, sir.
8    Q   Do you recall anything else that Mike
9   Broughton said to you or any questions that he asked you
10  during your time there?
11   A   He just told me I need to tell them the truth.
12   Q   Was it Detective York that was primarily
13  asking you questions that day?
14   A   I believe him and Mark Mefford both were.
15   Q   Okay.  But Mike Broughton not so much; he was
16  just there.
17   A   Yeah.
18   Q   And, of course, you were at the Barbourville
19  Police Department, correct?
20   A   Right.
21   Q   Okay.  The next interaction you had with
22  anybody or officers was when York and Pickard came to
23  your house to ask you to take a polygraph test, correct?
24   A   Correct.
25   Q   Mike Broughton wasn't present then, right?

Page 165

1    A   Correct.
2    Q   Then you went to Frankfort on January 21, 2011
3   for the polygraph test.  Mike Broughton was not present
4   then, correct?
5    A   Correct.
6    Q   You had an interview after the polygraph test
7   by Detective York; Mike Broughton wasn't present during
8   that interview, correct?
9    A   No, sir.
10   Q   The next thing I see is spring of 2011 you ran
11  into Detective York outside of Knox County courthouse
12  and he made some comment to you; Mike Broughton wasn't
13  present then, correct?
14   A   No, sir.
15   Q   The next time I see you interacting with
16  police in this is that March 8, 2012 statement you gave
17  where you said -- this is at the Knox County Sheriff's
18  office and York and Pickard were  interviewing you,
19  correct?
20   A   Correct.
21   Q   Mike Broughton was not present then, correct?
22   A   No, sir.
23   Q   And then, it looks like in 2015 you spoke to
24  York about a court appearance that you indicated you
25  were going to testify differently than you had given

Page 166

1 statements. Mike Broughton wasn't involved in that
2 interaction, correct?
3
4     A. No.
5     Q. So other than the January 4, 2011 interview at
6 the Barbourville Police Department where Detective
7 Broughton told you to tell the truth and was present
8 during your interview, is there any other involvement or
9 interaction in the Katherine Mills murder investigation
10 that you're aware of that Mike Broughton had any
11 involvement in?
12    A. No.
13    Q. How about any other member of the Barbourville
14 Police Department? Did you have any interaction with
15 any of them in the Katherine Mills murder investigation?
16    A. No.
17       MR. FARAH: That's all I've got. Thank you.
18       THE WITNESS: Thank you.
19       MR. SLOSAR: Go ahead, you might get done.
20          EXAMINATION
21 BY MR. WEBER:
22    Q. Okay. I represent KSP Officers Mark Mefford,
23 Jackie Joseph Pickerell, Brian Johnson, Dallas Eubanks,
24 and Kelly Farris. First I'm going to start off with
25 Trooper Mark Mefford. We know that you've said that he

Page 167

1 was present for the interview on January 4, 2011 with
2 Mike Broughton and Jason York; have you had any other
3 interaction or meetings were Kelly -- or Mark Mefford
4 was present besides that one event?
5     A. No.
6     Q. No? So, you went to the Barbourville Police
7 Department where Mark Mefford was there.
8     A. Yeah.
9     Q. Were you ever alone in a room with Mark
10 Mefford?
11    A. No.
12    Q. Okay. You were questioned by Mark Mefford and
13 Jason York. What specifically did Mark Mefford say to
14 you on that day, do you recall?
15    A. I mean, I don't really remember it's been so
16 long. I mean --
17    Q. Did he ask any questions that day or was it
18 only Jason York?
19       MR. SLOSAR: Objection to form.
20    A. I can't remember.
21    Q. So you don't remember anything Mark Mefford
22 said to you on that day?
23    A. Not really.
24    Q. Did he talk about the Katherine Mills murder?
25    A. I'm sure he did.

Page 168

1     Q. Did he tell you how to answer the questions?
2     A. No.
3     Q. Did anything Mark Mefford say think that you
4 were involved in the murder?
5     A. I don't know.
6     Q. Did he tell you how to -- do you remember how
7 long the interview lasted?
8     A. I really don't.
9     Q. Do you remember any other specifics that Mark
10 -- about Mark Mefford on that January 4th interview?
11    A. I don't.
12    Q. And you said besides that one day, you have
13 not had any interactions with Mark Mefford?
14    A. No.
15    Q. Nothing involving this murder investigation?
16    A. No.
17    Q. Trooper Kelly Farris. You talked about he
18 served you a subpoena in 2015. Besides that date, have
19 you had any interactions, meetings, anything, prior
20 arrests involving Trooper Farris?
21    A. No.
22    Q. Okay. Where did he serve -- where were you
23 located when he served that subpoena?
24    A. Where I live at now.
25    Q. Where you live now?

Page 169

1     A. Yeah.
2     Q. Was anyone with him?
3     A. No.
4     Q. No? And so he came to your house --
5     A. Yeah.
6     Q. -- in 2015?
7     A. Yeah.
8     Q. Okay. What did he say to you when he arrived?
9     A. I don't really remember.
10    Q. Did he hand you a subpoena?
11    A. I had to meet him at -- in, like, at the RECC
12 building, like going towards Corbin for some reason. I
13 don't remember why the -- he had to clarify some
14 paperwork or something.
15    Q. You said -- I'm sorry -- the RECC building?
16    A. Yeah.
17    Q. What's that? I'm sorry.
18    A. That's where they meet up.
19    Q. Okay.
20    A. The law meets up.
21    Q. And so you didn't meet him at your house?
22    A. Yeah. He come to my house and then I had to
23 meet him and sign some papers or something. I can't
24 remember.
25    Q. Did he take you there to meet --

Page 170

1    A   No, I met him there later.

2    Q   Yeah.  Okay.  And then you had previously said

3 that you had told Trooper Farris that they weren't going

4 to like what you had to say; is that what you told him

5 on that day?

6    A   I believe it was.

7    Q   And what was his response?

8    A   I can't remember.

9    Q   Did he have any sort of reaction to that

10 statement?

11    A   I can't remember.

12    Q   Did you say anything else on that day?

13    A   I was -- I can't remember.

14    Q   Do you remember anything else that Trooper

15 Farris said to you?

16    A   No.

17    Q   Did he talk to you at all about the criminal

18 case or the investigation?

19    A   No.

20    Q   Is that the only time that you've interacted

21 with Trooper Farris?

22    A   I believe he arrested me once before that, I

23 think.

24    Q   Before that?

25    A   I think.  Just on a fine payment or something.

Page 171

1    Q   Do you remember when that -- what year that

2 would have been?

3    A   2014.

4    Q   2014?

5    A   Yeah.  '13 or '14.  Yeah.

6    Q   Do you remember what the arrest -- you said it

7 was for a fine?

8    A   Fine payment or something.

9    Q   Where was that?  Where was that arrest at?

10    A   I lived in Bimble.

11    Q   Where?  I'm sorry.

12    A   In Bimble.

13    Q   Bimble?  Is that -- which county is that?

14    A   Knox County.

15    Q   In Knox County.

16    A   Yeah.

17    Q   Was he alone when he arrested you on that day?

18    A   Yeah.

19    Q   Was there any discussion of the Katherine

20 Mills murder or the investigation?

21    A   No.  No.

22    Q   Was there any other discussions, besides just

23 arresting you upon a fine that day?

24    A   No.

25    Q   No?  Do you have any reason to believe that

Page 172

1 Trooper Farris was involved in any way in this

2 investigation, other than that one day in 2015 serving

3 the subpoena?

4    A   I don't.

5    Q   Any information?

6    A   I don't know.

7    Q   But in 2015 you don't remember anything

8 Trooper Farris said to you?

9    A   I don't.

10    Q   Did he tell you where you had to go and when

11 to show up, what time?

12    A   See, I'd missed a -- I didn't go to the

13 subpoena, right, and he come there to arrest me really

14 but I had had a -- I can't remember -- some kind of

15 excuse or something and Jason York had contacted him and

16 I went and met him and signed some paperwork and got it

17 took care of.

18    Q   This Jason York contacted Trooper Farris?

19    A   Something.  I don't know.

20    Q   And that was about a previous subpoena?

21    A   Yeah.

22    Q   And then -- so he served -- but he did later

23 serve a subpoena to you?

24    A   Might have.  I don't -- I can't remember.

25    Q   So you don't know what this --

Page 173

1    A   I just know I've met him and signed some

2 paperwork and

3    Q   But you don't know what the paperwork was?

4    A   No.  I can't remember what it was.

5    Q   And nobody else was present --

6    A   No.

7    Q   -- when you signed that?

8    A   Right.

9    Q   And you don't remember what the subpoena --

10 any specifics of the subpoena either?

11    A   Uh-uh.

12    Q   As I said, I also represent Trooper Jackie

13 Joseph Pickerell, Brian Johnson, and Dallas Eubanks.

14 Have you ever had any interactions with any of those

15 individuals?

16    A   Not as I know.

17    Q   Were they ever present for any interviews or

18 any arrests?

19    A   No.

20    Q   Were you ever an informant for any of those

21 individuals?

22    A   No.

23    Q   Do you have any idea why they would be a

24 defendant in this case?  Were they involved in any way

25 that you know of?

Page 174

1       MR. SLOSAR: Objection to form.
2    A   I don't know.
3    Q   And so just – your testimony is the only two
4    interactions of those five individuals that I spoke
5    about is in 2015, one interaction with Trooper Farris
6    and in 2011, Trooper Mefford was present for an
7    interview?
8    A   Yes.
9    Q   There's no other interactions with any of
10   those other defendants?
11   A   No.
12      MR. WEBER: Okay. No further questions.
13      MR. WRIGHT: Go off the record for one second.
14      VIDEOGRAPHER: Off the record at 3:18 p.m.
15      (OFF THE RECORD)
16      VIDEOGRAPHER: Back on the record at 3:18 p.m.
17          EXAMINATION
18   BY MR. WRIGHT:
19   Q   Mr. Helton, my name's Derek Wright. I
20   represent Detective York and Jason Bunch and I'll start
21   with Trooper Jason Bunch; do you know him?
22   A   No, I don't.
23   Q   Did you have any involvement with him in the
24   Katherine Mills murder investigation?
25   A   I don't even know him.

Page 175

1    Q   Wouldn't recognize him if you saw him?
2    A   Probably not.
3    Q   Have you seen the civil complaint filed by
4    Jonathan Taylor and Amanda Hoskins?
5    A   What do you mean, seen?
6    Q   This lawsuit. Have you seen their complaint?
7    A   No.
8    Q   Okay. Do you know that their complaint claims
9    that they're innocent of the murder of Katherine Mills?
10   A   I don't know nothing about it.
11   Q   Since they say they didn't do it did you know
12   that their complaint says that you and Mr. Simpson are
13   likely responsible for killing Katherine Mills?
14      MR. SLOSAR: Objection to form.
15   A   I don't care what it says.
16   Q   You don't care what it says?
17   A   I can't help that.
18   Q   Did you know they were blaming you for the
19   murder?
20   A   No.
21   Q   No. Their complaint also says that they were
22   protecting you because you were an informant; were you
23   ever an informant for Jason York?
24   A   No.
25      MR. SLOSAR: Objection to form.

Page 176

1    Q   Their complaint says that they protected you
2    to not jeopardize their investigations while you were an
3    informant; have you heard that?
4       MR. SLOSAR: Objection to form.
5    A   No.
6    Q   No. Let's talk about an informant. You said
7    you were an informant for U.N.I.T.E.; is that correct?
8    A   Yeah.
9    Q   And is that a task force to your
10   understanding?
11   A   Yeah.
12   Q   And you don't have any knowledge that
13   Detective York was a member of that task force, right?
14   A   No.
15   Q   How many cases or investigations were you
16   involved in for U.N.I.T.E.?
17   A   Just one.
18   Q   Just one. Who was that?
19   A   What do you mean?
20   Q   Was it from an individual – an undercover
21   drug buy?
22   A   Yeah.
23   Q   In the amount of $100; does that sound right?
24   A   Yeah.
25   Q   And was it from an individual named Tim

Page 177

1    Jordan?
2    A   Yeah.
3    Q   Yes?
4    A   Yeah.
5    Q   Did you ever testify?
6    A   No.
7    Q   Do you know whether he was ever arrested?
8    A   Yeah.
9    Q   Was he convicted?
10   A   Yeah.
11   Q   At what point was he convicted, do you know?
12   A   I don't know.
13   Q   But you didn't have to testify against him?
14   A   No.
15   Q   And you did no other undercover drug buys for
16   U.N.I.T.E.?
17   A   No.
18   Q   Did you do any other confidential informant
19   activity for U.N.I.T.E.?
20   A   No.
21   Q   Do you know when that undercover drug buy was
22   from Tim Jordan?
23   A   I don't remember.
24   Q   You don't remember?
25   A   No.

Page 178

1    Q   Do you remember the time that you acted as an
2  informant -- what time period that was?
3    A   No.
4    Q   After the undercover drug buy from Tim Jordan,
5  did you stop being an informant?
6    A   Yeah.
7    Q   Was that something you told them or was it up
8  front you were only going to do this for one time?
9    A   I just -- I did it for a personal reason and
10  that's it.
11    Q   Did the members of the U.N.I.T.E. task force
12  that you talked to, did they know that you were only
13  going to do one undercover drug buy?
14    A   No, they didn't know.
15    Q   After you did that undercover drug buy did you
16  tell them you were done being an informant?
17    A   Yeah.
18    Q   You told them that?
19    A   I never did tell them I just didn't do it no
20  more.
21    Q   So what was the understanding, then, when you
22  became an informant?  How long would you be an informant
23  for them?
24    A   We hadn't worked out no deal or nothing.
25    Q   I'll hand you two documents labeled PL004853

Page 179

1  and PL004854.  Will you take a look at those documents?
2    A   Yeah.
3    Q   Do those documents have your signature on
4  there?
5    A   Yeah.
6    Q   Yes?
7    A   Yeah.
8    Q   Did you sign those documents when you did
9  informant activity for U.N.I.T.E.?
10    A   Yeah.
11    Q   Is the U.N.I.T.E. task force referenced on
12  those documents?
13    A   Yes.
14    Q   When you signed those documents did you date
15  them as well?
16    A   Yeah.
17    Q   What's the date?
18    A   12-3-2009.
19    Q   Does that seem accurate about the time that
20  you would have done the undercover drug buy from Tim
21  Jordan?
22    A   Probably.
23    Q   December 2009?
24    A   Probably.
25    Q   Is it fair to say that by one year later,

Page 180

1  December 2010 when Katherine Mills was found dead, you
2  were no longer an informant, were you?
3      MR. SLOSAR:  Objection to form.
4    A   Right.
5    Q   Right?
6      MR. SLOSAR:  Same objection.
7    Q   Is that true?
8      MR. SLOSAR:  Same objection.
9    Q   Is that true?
10    A   Yeah.
11    Q   Yeah.  You hadn't done any informant activity
12  for over a year; is that right?
13    A   Right.
14    Q   Did you get a confidential informant number
15  with U.N.I.T.E?
16    A   Not as I know of.
17    Q   Not that you know of?  Going to hand you
18  another document labeled PL004855; take a second to look
19  at that.  And that purports to be a document from the
20  Cumberland Task Force U.N.I.T.E., correct, at the top?
21    A   (NO VERBAL RESPONSE.)
22    Q   Yes?
23    A   If it says it is I guess it is.
24    Q   Okay.  And I'm sorry I'm rushing.  We've got
25  limited time.

Page 181

1    A   I mean --
2    Q   I'm sorry about this.
3    A   -- you're, like, intimidating.  You are.  I
4  mean.
5    Q   The --
6    A   Coming at me.
7    Q   The information on there, it references in the
8  comments a Tim Jordan, correct?  Do you see that in the
9  comments?
10    A   Yeah.
11    Q   Yes?
12    A   Yeah.
13    Q   And there's also a date column; do you see
14  that?
15    A   Yeah.
16    Q   And that date on that column is what?
17    A   12-3-09.
18    Q   And that's the same date of the documents that
19  you signed for the Cumberland U.N.I.T.E. Task Force,
20  correct?
21    A   Right.
22    Q   Okay.  So do you have -- so you weren't
23  functioning as a -- having looked at that document, are
24  you -- does that appear to be the timeframe, December
25  2009, when you did that undercover drug buy from Tim

Page 182

1  Jordan?
2     A   Yeah.
3     Q   Let's label these Cumberland Task Force
4  documents as just a collective exhibit.  Are you doing
5  plaintiff's or are you just doing --
6        MR. SLOSAR:  I've always done it the same way,
7  just straight numbers.
8        MR. WRIGHT:  Straight numbers.  What number are
9  we on?
10       COURT REPORTER:  11.
11       MR. WRIGHT:  11?
12       (EXHIBIT 11 MARKED FOR IDENTIFICATION)
13       MR. SLOSAR:  It's written on them.
14       MR. WRIGHT:  Did you skip some?
15       MR. SLOSAR:  Some are audio.  Oh, I'm sorry.
16       MR. WRIGHT:  So since you've never seen a copy
17  of their complaint I'm going to hand you a copy.  Do
18  you need a copy of your complaint?
19       MR. SLOSAR:  Sure.  Thanks for bringing
20  exhibits this time.
21  BY MR. WRIGHT:
22     Q   Oh, you're welcome.  And I've turned to
23  paragraph 47; can you take a second to read that?
24     A   What now?
25     Q   Paragraph 47; can you read that?  And do you

Page 183

1  see in paragraph 47 where it says that Mr. Helton and
2  Mr. Simpson were likely responsible for killing Ms.
3  Mills?  Is that true?
4     A   No, sir.
5     Q   Can you read paragraph 48?  That would be the
6  next one.  Do you see where it says they protected you
7  because Mr. Helton was an informant for them at the time
8  of the murder?
9     A   Yeah.
10    Q   Do you see that?
11    A   Yeah.
12    Q   That's not true is it?  You weren't an
13  informant, were you?
14    A   No.
15       MR. SLOSAR:  Objection to form.  Calls for
16  speculation.
17    Q   Can you read the next paragraph -- number 49?
18  Do you see where it says that the officers believe their
19  investigations would be jeopardized if you were held
20  accountable for the murder of Ms. Mills?  Do you see
21  that?
22    A   Do what, now?
23    Q   Where it says that the officers believe their
24  investigations in which you were an informant would be
25  jeopardized if you were held accountable for the murder

Page 184

1  of Ms. Mills; do you see that sentence?
2     A   Yeah.
3     Q   Isn't it true there was only one investigation
4  you ever did as an informant, correct?
5     A   Right.
6     Q   And that's Tim Jordan, right?
7     A   Yeah.
8     Q   And the forms included with Exhibit 7 said
9  that was a $100 drug buy, didn't it?
10    A   Right.  Right.
11    Q   Does it make any sense to you that police
12  would protect an informant in one $100 drug buy from
13  murder?  Does that make any sense to you?
14       MR. SLOSAR:  Objection to form.  Calls for
15  speculation and is in the mindset of your client,
16  Mr. Pickard.
17    Q   Now, if you go read paragraph 48 it said the
18  defendant officers protected the two likely
19  perpetrators, including you; do you see that in
20  paragraph 48?
21    A   (NO VERBAL RESPONSE.)
22    Q   Yeah?  I'm sorry.  You have to say yes or no -
23  -
24    A   Yes.
25    Q   -- for the record.  Yes?

Page 185

1     A   Yes.
2     Q   Did you ever feel protected?
3     A   No.
4     Q   In fact, how many times have you been arrested
5  by police since Katherine murder -- Katherine Mills was
6  found dead in December 2010?
7     A   I don't know.
8     Q   More than a half dozen?
9     A   I don't know.
10    Q   Haven't you been convicted of a crime since
11  she was found dead?
12    A   Have I been convicted of a crime?
13    Q   Yes.
14    A   I don't know, have I?  I think I have.  I
15  don't know.
16    Q   You're in prison today, right?
17    A   Right.
18    Q   Yeah.  So you've been convicted of at least
19  one, right?
20    A   Yeah.
21    Q   What was that crime?
22    A   What I'm in here now for?
23    Q   Yes.
24    A   Receiving over ten.
25    Q   Okay.  And you were also convicted of criminal

Page 186

1  mischief; that was a felony, too, right?
2     A   Right.
3     Q   So you've been convicted of two felonies –
4     A   Yeah.
5     Q   – since Katherine Mills was found dead in
6  2010; is that true?
7     A   Right.
8     Q   You've also been arrested for other
9  misdemeanor offenses?
10     A   Yeah.
11     Q   Yes.  I want to make sure I've gotten all your
12  interactions with Detective York in this Katherine Mills
13  investigation and so I've – I believe you testified
14  about talking to him on December 23, 2010 when you got
15  back from Florida; does that sound right?
16     A   Yeah.
17     Q   Then you had a DUI stop on January 4, 2011;
18  does that sound right?
19     A   Yeah.
20     Q   And they stopped by – is it your testimony
21  that they met with you again to ask you to take a
22  polygraph or did they do that during the July, or the
23  January 4, 2011 stop?
24     A   No.
25     Q   That was a separate visit?

Page 187

1     A   Yeah.
2     Q   Was that in – so that would have been in mid-
3  January 2011, right?
4     A   Yeah.
5     Q   And then you went to Frankfort, I believe, on
6  January 21, 2011 for the polygraph, right?
7     A   Right.
8     Q   Then you testified that in the spring of 2011
9  you saw Detective York at the courthouse; does that
10  sound right?
11     A   Right.
12     Q   And your next interaction with him was the
13  March 8, 2012 meeting at Sheriff Pickard's office; is
14  that right?
15     A   Right.
16     Q   And you communicated with him, I believe, in
17  May of 2015 when you were subpoenaed to be at trial and
18  that was by phone?
19     A   Right.
20     Q   Any other interactions that you've had with
21  Detective York relating to the Katherine Mills
22  investigation?
23     A   (NO VERBAL RESPONSE.)
24     Q   No?
25     A   No.

Page 188

1     Q   I'm sorry.  You have to verbalize it.  No?
2     A   No.
3     Q   And I want to flip it around and ask you about
4  your contact with anybody on behalf of Amanda Hoskins or
5  Jonathan Taylor or William Lester after they were
6  charged in connection with the Katherine Mills
7  investigation, did you meet with – did you talk to any
8  of their criminal defense attorneys?
9     A   I believe Amanda Hoskins' attorney come to
10  London jail and seen me once.
11     Q   Do you know who that was?
12     A   No, I don't.
13     Q   Was it a man or a woman?
14     A   I believe it was a man and a woman.
15     Q   Does the name Sam Cox ring a bell?
16     A   I'm not for sure.
17     Q   How about maybe a Barbara Karnes?
18     A   No.
19     Q   A David Hoskins?
20     A   No.
21     Q   Lisa Evans?
22     A   I've heard that name before.
23     Q   Is that somebody you've talked to?
24     A   I don't – I can't remember who it was.
25     Q   A Joshua Powell?

Page 189

1     A   I don't know.
2     Q   Did you speak to a woman with blonde hair who
3  said she was an investigator?
4     A   I think I did.  I'm not for sure.  I can't
5  remember what color hair she had.
6     Q   That's fine.  Do you remember how many times
7  you spoke to that person?
8     A   Just – I believe they just come once to
9  London jail and seen me.
10     Q   And that was a man and a woman that visited
11  you?
12     A   I'm thinking, yeah.
13     Q   And I believe you've talked about it but we've
14  talked about a lot of different arrests so I just want
15  to get the timeframe.  When were you in the London jail,
16  do you remember?
17        MR. SLOSAR:  Did you say London?
18        MR. WRIGHT:  Yeah, he said the Lon- – Laurel
19  County jail, right?
20     A   Yeah.  I did, like, 12 months there and – for
21  that criminal mischief.  I can't remember when I was
22  there.  I got out in 2013.
23     Q   You know when you got out in 2013 – what
24  month?
25     A   April the 1st.

Page 190

1    Q    And you were in jail for about how long to
2  your memory?
3    A    12, 13, 14 months or something.
4    Q    So about a year?
5    A    Yeah.
6    Q    So that would go back to about April 2012;
7  does that sound about right?
8    A    I really – I'd say it's right.  I can't
9  remember when I went in.
10   Q    Was it after your March 2012 meeting with
11  Detective York –
12   A    Yeah.
13   Q    – and Sheriff Pickard?
14   A    Yeah, it was after that.
15   Q    Did you talk about your statement to Detective
16  York when they visited you in the Laurel County jail?
17   A    I can't remember.
18   Q    What do you remember talking about?
19   A    I really don't remember a whole lot about
20  that. I just remember they come and seen me.  I – it's
21  been so long ago.
22   Q    Did you tell them that your March 2012
23  statement was true?
24   A    I can't remember what I told them.
25   Q    And that's the only meeting you can remember

Page 191

1  with any attorneys or investigators for any of those
2  criminal defendants, Lester, Hoskins, or Taylor; is that
3  right?
4    A    Yeah.
5    Q    Isn't it true that after you were subpoenaed
6  to come to court in May 2015 that some of their
7  attorneys or investigators came to your house to talk to
8  you about that subpoena?
9    A    Yeah.
10   Q    So that's at least a second occasion isn't it?
11   A    Yeah.  I guess.
12   Q    But do you remember that or not?
13   A    Yeah, there was a guy that come to my house
14  after that, that's what I told you a while ago, wasn't
15  it?
16   Q    Well, I'm sorry, I'm trying to keep up and I'm
17  taking notes.  So a guy came to –
18   A    I don't know what you're doing.
19   Q    So a guy came to your house; was it just one
20  person?
21   A    Yeah.
22   Q    Do you remember who it was?
23   A    No, I don't.
24   Q    You don't remember a name?
25   A    No.

Page 192

1    Q    Was he a law enforcement officer?
2    A    He's an investigator, he said.
3    Q    But he didn't say an investigator for who?
4    A    For Jonathan Taylor.
5    Q    Did he feed you any information?
6    A    No.
7    Q    Well, how do you know; do you remember?
8    A    I remember him coming there.
9    Q    Well then, what did you-all talk about?
10   A    He asked me about what I said and stuff.
11   Q    What you had said when?
12   A    You know, about the report and stuff.
13   Q    About what report?
14   A    The statement I give.
15   Q    The March 2012 –
16   A    Yes.
17   Q    – statement?
18   A    Yeah.
19   Q    He talked to you about that in May 2015?
20   A    I mean – yeah.  I told him that it wasn't
21  true.  Yeah.
22   Q    Is that the first time you – well, let me
23  take that back.  You talked to Detective York on a phone
24  call on the day you were subpoenaed to be at trial,
25  right and what'd you tell Detective York?

Page 193

1    A    I told him the stuff I told him that wasn't
2  true.
3    Q    Is that the first time you'd have told anybody
4  that it wasn't true?
5         MR. SLOSAR:  Objection to form.  Asked and
6  answered.
7    A    I'm not going to say it is.  I don't know.  I
8  don't know if it was the first time or not.
9    Q    So you're saying that that statement wasn't
10  true?
11   A    Yeah.
12   Q    Did that weigh on you?
13   A    What do you mean?
14   Q    Did you feel guilty about it?
15   A    Somewhat, yeah.
16   Q    Somewhat.  And why wouldn't you feel guilty
17  about falsely accusing somebody?
18   A    I mean, I was looking out for my best
19  interest, you know.
20   Q    Was it a relief when you told the truth or
21  purportedly told the truth?
22   A    Kindly.  I mean, I didn't want to see somebody
23  that's innocent spend the rest of their life in the
24  penitentiary, you know.
25   Q    But you can't remember when that happened,

Page 194

1  though.
2    A   What?
3    Q   The first time you told that.  That that
4  wasn't – that that statement was false.
5       MR. SLOSAR:  Objection to form.  Asked and
6    answered.
7    A   No.
8    Q   When you were visited in May of 2015 after you
9  were subpoenaed to be at trial, did you know whether you
10  were being recorded?
11   A   No.
12   Q   An investigator came to your house, you said,
13  for Taylor?
14   A   Yeah.
15   Q   But he didn't tell you he was recording the
16  conversation?
17   A   No.
18   Q   Did you see a recorder?
19   A   No.
20   Q   Were you being truthful to him?
21   A   Yeah.
22   Q   And you said you talked to him about the March
23  2012 statement and that you told him it was false; is
24  that right?
25   A   Yeah.

Page 195

1    Q   What else did you tell him?
2    A   I can't remember what I told him.
3    Q   You don't remember talking about anything
4  else?
5    A   I can't remember.
6    Q   Other than those two occasions, do you have
7  any memory of talking to any attorneys or investigators
8  for Amanda Hoskins, William Lester, or Jonathan Taylor?
9    A   No, sir.
10   Q   Are you related to William Lester?
11   A   Not really.  No.
12   Q   Is it, like, distant?
13   A   Yeah.
14   Q   Is it true that you and him don't always see
15  eye-to-eye?
16   A   Right.
17   Q   Why is that?
18   A   Because of what happened with Pork there.
19   Q   What was that?
20   A   The what happened with Timmy Jordan.
21   Q   Is that Pork?
22   A   Yeah.
23   Q   So William Lester knew you were the informer
24  who got him convicted?
25       MR. SLOSAR:  Objection to form.

Page 196

1    Q   Is that true?
2       MR. SLOSAR:  Calls for speculation.
3    A   I don't know if he did or not.  He – I guess
4  he did.
5    Q   Did he tell you?  What'd he tell you?
6    A   I heard it but, you know, he didn't say it to
7  my face.  Yeah.
8    Q   So since 2000 – December 2009 you hadn't seen
9  eye-to-eye with William Lester?
10   A   Right.
11   Q   You had said that you went to Florida with
12  Mike Simpson to get pills on the day Katherine Mills was
13  found dead, is that right?
14   A   Right.
15   Q   And you said you had a doctor's appointment?
16   A   Yeah.
17   Q   Was it just one or more than one?
18   A   What?
19   Q   Appointments.
20   A   What do you mean?
21   Q   Doctor's appointments.  Did you have one
22  appointment, more than one appointment – how many
23  doctors –
24   A   I had one appointment.
25   Q   One appointment?  Did you make that in

Page 197

1  advance?
2    A   Yeah.
3    Q   How far in advance had you set up that
4  doctor's appointment?
5    A   It was from the month before.
6    Q   Month before.
7    A   Yeah.
8    Q   Where did you get the money to go buy pills in
9  Florida?
10       MR. SLOSAR:  Objection, asked and answered.
11   A   To go buy pills?
12   Q   Yeah.  Did you buy – did you use – did you
13  have to purchase the pills that you got in Florida?
14   A   I picked them up at a pharmacy when I got a
15  prescription for them.
16   Q   Did you have to pay for them?
17   A   Of course I did.
18   Q   Okay.  Where'd you get the money to pay for
19  that prescription?
20       MR. SLOSAR:  Objection to form.  Asked and
21  answered already.
22   A   I got it from working and I borrowed the rest
23  off my neighbor.
24   Q   How much did you borrow from your neighbor?
25   A   I can't remember.

Page 198

1   Q   And you said you got the rest from working?
2   A   Yeah.
3   Q   Where did you work?
4   A   Well, I hauled some junk off I had.
5   Q   Is that for, like, an employer or do you just
6   do that yourself?
7   A   I do it myself.
8   Q   So, how much money did you take to Florida?
9   A   Probably $2,000.
10  Q   Did Mike Simpson take any money with him?
11  A   I don't know.  I guess he did.
12  Q   Did you see him with any money?
13  A   He had a little.
14  Q   He had a little?
15  A   He had some.
16  Q   Did he tell you how much it was?
17  A   No.
18  Q   Did you ever see him with a wad of money?
19  A   I seen with some money; I don't know how much
20  it was.
21  Q   Did it look like $15,000?
22  A   No.
23  Q   Not that much?
24  A   No.
25  Q   Did you ever hear how much money had been

Page 199

1   stolen from Katherine Mills?
2   A   I had – I heard.
3   Q   What was the amount you'd heard?
4   A   $15,000.
5   Q   Did you believe that Simpson had got his money
6   from the Katherine Mills robbery?
7   A   I don't know.
8   Q   You don't know?
9   A   I don't know.
10  Q   Did you ever lead police to believe that's
11  where it had come from?
12  A   I mean, I said it but I don't know where it
13  come from.
14  Q   And I want to be clear; you never told them
15  you knew that's where it came from, right?
16  A   Right.
17  Q   But did you ever tell police that you
18  suspected that it may have come from Katherine Mills,
19  right?
20  A   Yeah.
21  Q   Yes?
22  A   But, yeah, I think I did say that.  Yeah.
23  Q   Yeah.  And you volunteered that yourself,
24  didn't you?
25  A   Right.

Page 200

1       MR. SLOSAR:  Objection to form.  Misstates his
2   earlier testimony.
3   Q   And at what point had you heard that the
4   robbery from Katherine Mills was in the range of
5   $15,000?  How long did it take for that to come out?
6   A   I don't know.
7   Q   Is that something you heard way later or was
8   it pretty soon after the robbery?
9   A   I don't know.  I heard that when it – a few
10  days after it happened.
11  Q   So then, you – it would have been consistent
12  for you to say that the money you saw Mike Simpson had,
13  he didn't have all of the $15,000, did he?
14      MR. SLOSAR:  Objection to form.  Calls for
15  speculation.
16  A   I mean, I don't know if it was the money or
17  not.  I'm not going to say –
18  Q   But you told me you –
19  A   – as far as
20  Q   – saw that he had a little bit of money,
21  right?
22  A   Right.
23  Q   And you said it didn't look like 15,000,
24  right?
25  A   Right.

Page 201

1   Q   So when you tell – isn't it true you told
2   police that there had to have been somebody else who had
3   some of the money?
4       MR. SLOSAR:  Objection to form.
5   Q   Isn't that true?  Isn't that what you said?
6       MR. SLOSAR:  Objection to form.  Misstates the
7   record.
8   A   Probably did.
9   Q   And do you know when you said that?  Was that
10  during your January 4, 2011 interview?
11  A   I can't remember.
12  Q   You didn't need the police to tell you that;
13  you volunteered that, didn't you?
14  A   I guess.
15  Q   Now, where were you at on the morning
16  Katherine Mills was found dead, December 20, 2010?
17  A   Where was I?
18  Q   Yes.
19  A   I was probably getting ready to go to Florida.
20  Q   Were you at your house?
21  A   I don't know where I was.  I don't –
22  Q   Were you with Mike Simpson that morning?
23  A   I took him to get a – rent a car and pay his
24  bills, yeah.  I mean, I went to his house, yeah.
25  Q   Did you pay bills with him before you went to

Page 202

1  the rental car or after?
2    A  Before.
3    Q  Do you know when you picked him up?
4    A  No, I don't.
5    Q  If I said after lunch or before lunch, would
6  that give you any context?
7    A  I think it was after lunch.
8    Q  Did you go to Florida on about a monthly basis
9  at that time to get pills?
10   A  Yes.
11   Q  How long had you been doing that?
12   A  Over a year.
13   Q  So it wasn't – when you left on December 20,
14  2010, it wasn't uncommon for you to be making a trip to
15  Florida, was it?
16   A  No.
17   Q  And when you left to go to Florida, did you
18  intend to come back?
19   A  Yeah.
20   Q  And isn't it true you did come back?
21   A  Huh?
22   Q  And isn't it true you did return back to
23  Kentucky, right?
24   A  Yeah.
25   Q  On December 23rd, does that sound right?

Page 203

1    A  I believe, yeah.
2    Q  So you weren't running from police or fleeing
3  from police, were you?
4    A  No.
5    Q  Now, while you were in Florida with Mike
6  Simpson on the way back is it true that he received a
7  call from Jesse Lawson at some point?
8    A  Yes.
9    Q  And, to your understanding, Jesse Lawson told
10  him that William's ex-mother-in-law had been killed?
11   A  Yes.
12   Q  And his ex-mother-in-law is Katherine Mills,
13  right?
14   A  Right.
15   Q  And after Simpson received that information he
16  started crying.
17   A  Yes.
18   Q  Did you tell that information to police after
19  you got back and were interviewed by them?
20   A  Yeah.
21   Q  That Mike had been crying?
22   A  Yeah.
23   Q  Why would Mike Simpson cry about William's ex-
24  mother-in-law?
25   A  I didn't ask him.

Page 204

1    Q  You didn't ask him?  Did he ever tell you?
2    A  No, sir.
3    Q  Is it fair to say he seemed surprised by the
4  news that Katherine Mills had been found dead?
5    A  I don't know.
6    Q  And how many times had you seen Mike Simpson
7  cry?
8    A  None.
9    Q  None?  Is he the type of guy who cries very
10  often?
11   A  I mean, he don't really cry.
12   Q  Is that the one and only time you've ever seen
13  him cry?
14   A  Yeah.  I'm tired.
15       MR. WRIGHT:  Let's go off the record for just a
16  second and see how we're doing here.
17       VIDEOGRAPHER:  Off the record at 3:55 p.m.
18       (OFF THE RECORD)
19       VIDEOGRAPHER:  Back on the record at 4:00 p.m.
20  BY MR. WRIGHT:
21   Q  All right, Mr. Helton, we're back on.  It
22  looks like we've got some more time so we'll keep on
23  moving, okay?
24   A  Yeah.
25   Q  All right.  So the – you interact with

Page 205

1  Detective York December 23rd, after you get back from
2  Florida, is that right?
3    A  Yes.
4    Q  And then your next interaction is – well,
5  before I leave that, you didn't give him any information
6  to implicate William Lester, Jonathan Taylor, or Amanda
7  Hoskins on December 23rd, right?
8    A  No.
9    Q  Is that a no?  I'm sorry.
10   A  No.
11   Q  No.  Your next run-in with Detective York was
12  January 4, 2011 when you got stopped for a DUI, is that
13  right?
14   A  Right.
15   Q  Isn't it true that in your discussions with
16  him you did not give any information to implicate
17  Jonathan Taylor, William Lester, or Amanda Hoskins
18  during that interview, right?
19   A  Right.
20   Q  Was Amanda Hoskins even mentioned on January
21  4th to your memory?
22   A  I don't remember.
23   Q  Was she mentioned on December 23rd?
24   A  Uh-uh.
25   Q  No?

Page 206

1    A    No.

2    Q    Was Jonathan Taylor mentioned on December

3  23rd?

4    A    No.

5    Q    Was he mentioned on January 4th?

6    A    Not as I recall.

7    Q    What about William Lester, was he mentioned

8  during one of those two occasions?

9    A    I don't recall.

10    Q    Did you ever indicate to police that William

11  Lester may have been the person with the rest of the

12  money stolen from Katherine Mills?

13        MR. SLOSAR:  Objection to form.

14    A    I don't know if I did or not.

15    Q    Can't deny it, right, if you can't remember?

16    A    I mean, I don't know if I said it or not.

17    Q    And at that time you and William Lester didn't

18  see eye-to-eye, right?

19    A    Right.

20    Q    But, for the December 23rd meeting, tell me

21  exactly what you remember Detective York telling you.

22        MR. SLOSAR:  Objection to form.  Asked and

23  answered.

24    A    What did he ask me?

25    Q    What did he tell you or ask you?

Page 207

1    A    He just wanted me to come there and we walked

2  in the house he just said do you got an alibi and I

3  said, "Why?"  And he said, "Well, Mike give me one."  I

4  said, "Why do I need one?"  And then he kept on saying,

5  "Where's the pills at?"

6    Q    So December 23rd interaction was at your

7  house?

8    A    Yeah.

9    Q    And he asked if you had an alibi?

10    A    Yeah.

11    Q    And he asked where the pills were at?

12    A    Yeah.

13    Q    Anything else?

14    A    Sowders said he found some boxes there that my

15  wife had brought home from work and he said, "Oh,

16  there's where he spent the money," talking about that

17  they were new computer boxes and that's all he really

18  was said.

19    Q    Anything else?

20    A    Not that I know of.

21    Q    At the January 4, 2011 interaction with

22  Detective York, where was that?

23    A    When they pulled me over?

24    Q    Yes.

25    A    I was on the side of the road on 223.

Page 208

1    Q    So first it was on the side of the road. Did

2  you interact with him later on at a police department?

3    A    Yeah.

4    Q    All right.  Well, let's talk about the side of

5  the road.  You said he reached for you, right?

6    A    He tried to grab my face.

7    Q    And you jumped –

8    A    Moved away.

9    Q    So he never touched you, correct?

10    A    Right.

11    Q    And then tell me what he said to you.

12    A    He said, "I ought to take you down there and

13  let his family beat the fuck out of you for killing that

14  old woman."

15    Q    What else did he say?

16    A    He said that about probably a coat in my truck

17  that was probably the coat that I killed that old lady

18  with – in.

19    Q    Anything else he told you at the traffic stop?

20    A    Not as I recall.

21    Q    Did you talk to him any at the traffic stop?

22    A    What do you mean, talk to him?

23    Q    Did you say anything to him?

24    A    No.

25    Q    And at the December 23rd meeting you had with

Page 209

1  him you said that you don't need an alibi; is that

2  right?

3    A    Yeah.

4    Q    Did you say anything else to him on December

5  23rd?

6    A    I can't remember what all I said to him.

7    Q    All right.  Sorry I'm jumping around.

8  Anything else you remember him telling you at the

9  January 4, 2011 traffic stop at the roadside?

10    A    No.

11    Q    Then you're taken for a blood test from there;

12  is that right?

13    A    Yes.

14    Q    Who transported you?

15    A    I can't remember who it is.

16    Q    You don't remember if that was Detective York

17  or not?

18    A    I can't remember if I rode with him or

19  Pickard. I can't remember.

20    Q    Do you remember if Detective York was at the

21  hospital or the ER where you had the blood test?

22    A    I got – I can't remember.

23    Q    And after the blood test where did you go to

24  then?

25    A    To Barbourville Police Department.

Page 210

1    Q   And was Detective York at the Laurel Police
2   Department?
3    A   Barbourville Police Department.
4    Q   Barbourville.  I'm sorry.  Barbourville Police
5   Department.  Was he there?
6    A   Yeah.
7    Q   What did he tell you at the Barbourville
8   Police Department?
9    A   He just was insinuating what if I went in on
10  that old woman and she fell down and hit her head that I
11  didn't kill her.  Just kept on saying stuff like that.
12   Q   Well, tell me the details.  Do you remember
13  anything --
14   A   I mean, I don't remember.  It's been five, six
15  year ago.  I don't remember everything he said.  But I
16  do remember him telling me that.
17   Q   Did he talk about who you went over there
18  with?
19   A   No.  I can't remember.  I don't know what was
20  said.
21   Q   Did he ask you any questions?
22   A   I'm sure he did.
23   Q   Do you remember what the questions were?
24   A   No, I don't.
25   Q   Anything else you remember him telling you

Page 211

1   January 4, 2011 at the police department?
2    A   No, I don't.
3    Q   Do you remember anything you told him at the
4   police department on January 4, 2011?
5    A   No.  That I didn't know nothing about it.
6    Q   Do you know whether the -- your discussions
7   with the police at the Barbourville Police Department on
8   January 4, whether that was recorded?
9    A   I don't recall.
10   Q   Do you recall whether your meeting with
11  Detective York at your home on December 23rd, whether it
12  was recorded?
13   A   I don't recall.
14   Q   When he mentioned this if she fell and hit her
15  head, how did you respond?
16   A   I don't know what he's talking about.
17   Q   So was that the end of that conversation?
18   A   I mean, he -- I can't remember.  He asked me a
19  few more questions and I can't really remember what they
20  were, I guess.
21   Q   Then I think you said your next interaction
22  was sometime before your polygraph exam they came to
23  your house in January 2011; is that right?
24   A   Yes.
25   Q   And that was Detective York?

Page 212

1    A   Uh-huh.
2    Q   Is that a yes?
3    A   Yes.
4    Q   Who was with him?
5    A   Pickard.
6    Q   Anybody else?
7    A   No.
8    Q   What did Detective York tell you when they
9   came to your house?
10   A   He just wanted me to go take a polygraph test.
11   Q   So he asked you if you'd do that?
12   A   Yeah.
13   Q   Anything else he tell you?
14   A   I really don't remember what all he said.
15   Q   Anything else he asked you?
16   A   I don't remember.
17   Q   Did you agree to take the polygraph test?
18   A   Yeah.
19   Q   Is that yes?
20   A   Yeah.
21   Q   Anything else you remember talking to him at
22  the -- at that visit where they asked you to take a
23  polygraph test in January 2011?
24   A   I don't remember.
25   Q   So, so far, I haven't heard you say any memory

Page 213

1   of him talking about Amanda Hoskins, right?
2    A   Right.
3    Q   Or Jonathan Taylor, right?
4    A   Right.
5    Q   Or William Lester, right?
6    A   Right.
7    Q   Your next interaction is he transports you to
8   Frankfort to take the polygraph exam in January --
9    A   Right.
10   Q   -- 2011; is that right?
11   A   Right.
12   Q   And you said it's your memory you rode in the
13  car with him to Frankfort.
14   A   Yes.
15   Q   Where'd he pick you up at?
16   A   My house.
17   Q   And there was no one else with him?
18   A   No.
19   Q   What do you remember being talked about in the
20  car?
21   A   He just said that -- I remember him saying
22  that he thought -- the reason he thought that William
23  had done it was because there was $500 left behind and
24  it was meant for his girls to get it.
25   Q   Anything else he said to you?

Page 214

1    A    That he had – him and Jay Sowders had betted
2  on who was going to fail the polygraph test.
3    Q    You understanding was he bet on you to pass,
4  right?
5    A    I guess.
6    Q    That's how you took it?
7    A    I guess.
8    Q    Anything else talked about during the car ride
9  up there to your memory?
10    A    Not as I know of.
11    Q    What's that?
12    A    I can't remember.
13    Q    Do you remember how William Lester's name came
14  up during the car ride?
15    A    I don't remember.  No.
16    Q    What happens once you get to Frankfort?  Walk
17  me through that day.
18    A    I took a polygraph test.
19    Q    Well, I know that but how long was the day?
20  Was it a couple of hours; were you up there for a long
21  time?
22    A    We was up there three or four hours, yeah.
23    Q    Did Detective York stay with you the whole
24  time?
25    A    No, he had left after we was done and we rode

Page 215

1  back with Jay Sowders.
2    Q    When you get to Frankfort does he take you
3  into a building where they do the polygraph?
4    A    Yeah.
5    Q    Were you in handcuffs?
6    A    No.
7    Q    Did you see anybody else there – Jesse
8  Lawson?
9    A    Yeah.
10    Q    Did you – were you following in a car with
11  him or did you just see him for the first time there?
12    A    We followed him up there.
13    Q    Did you ever tell police that you thought
14  Jesse Lawson was a suspect?
15    A    I mean, I don't know if I did or not.
16    Q    Did you ever tell police that you'd seen Jesse
17  Lawson spending a lot of money on drugs?
18    A    I don't know if I did or not.
19    Q    So you get into the building; does Detective
20  York sit in there with you until you take the polygraph
21  or does he leave you in a room; what happens?
22      MR. SLOSAR:  Objection to form.
23    A    He leaves me and Jesse out in the waiting room
24  and they go in the back.  I don't know where they went.
25    Q    That's fair.  I know that you – once they

Page 216

1  left you don't know where they went, right?
2    A    Yeah.
3    Q    But you were in some sort of waiting room?
4    A    We – yeah, we was out front in the waiting
5  room.
6    Q    And did somebody come out to get you
7  eventually?
8    A    Yeah.
9    Q    Was it Detective York?
10    A    I really don't remember who come out and got
11  us.  They come out and got us one at a time and took us
12  back.
13    Q    Who went back first?
14    A    I believe I did.
15    Q    And when they came to get you to take you back
16  was Detective York there?
17    A    He was – I can't remember.  I can't remember.
18  He was there, yeah, I seen him, I believe.  Well, I'm
19  not going to say.  He was there, though.  But when we
20  went in the room it wasn't nobody in there but me and
21  the guy.
22    Q    And by the guy, are you referring to the guy
23  who administered the polygraph?
24    A    Yeah.
25    Q    Did you have an interview with him before he

Page 217

1  actually put the equipment on you?
2    A    I don't remember.  I don't remember if he did
3  or not.
4    Q    Do you remember did anybody else come in
5  during your polygraph exam?
6    A    I don't think.  I don't remember.
7    Q    Just you and him?
8    A    I think it was.
9    Q    You ballpark how long you were with the
10  examiner?
11    A    30 minutes.
12    Q    After the examination, what happened?
13    A    They come back in, or York come back in and
14  questioned me about the murder again and said, "If you
15  know anything about it, now is the time to tell me."
16    Q    And that was after the polygraph was over,
17  right?
18    A    Yeah.
19    Q    Was anybody in there with him?
20    A    I can't remember.
21    Q    How long did you talk to York after the
22  polygraph was over?
23    A    I'm not for sure.
24    Q    I mean, was it an hour, half hour, a long
25  time?

Page 218

1    A   I'm not sure.  Probably 30 minutes or
2  something.  I don't know.
3    Q   Did it seem like a fast interview to you?
4        MR. SLOSAR:  Objection to form.
5    A   Not really.  I mean, it wasn't seem long to
6  me, you know.
7    Q   And that was in 2011, right?
8    A   I believe.
9    Q   January 2011.
10   A   I believe.
11   Q   So that would be over seven years ago, today?
12  Yes?
13   A   Yeah, I guess.  It's been a while.
14   Q   Do you remember exactly what was said?
15   A   Sure don't.
16   Q   Do you remember the sequence in which things
17  were said?
18   A   I mean, what I heard a while ago, him asking
19  me about money and stuff.
20   Q   Yeah.  And how much time do you think you
21  heard, about a minute's worth?
22       MR. SLOSAR:  Objection to form.  He heard a lot
23  of clips earlier.  I mean –
24       MR. WRIGHT:  I mean, I object to – I mean –
25       MR. SLOSAR:  You object to your

Page 219

1  mischaracterization of –
2        MR. WRIGHT:  I object to your
3  mischaracterization.  How much time do you think you
4  just sit here and heard?
5        MR. SLOSAR:  Which exhibit?
6        MR. WRIGHT:  From the polygraph exam.
7        THE WITNESS:  I don't know.
8  BY MR. WRIGHT:
9    Q   You didn't hear all of it, did you?
10   A   The polygraph exam?
11   Q   All of the discussion you had with Detective
12  York, that was not played for you today, was it?
13   A   Not all of it.  I mean, I don't know.  I don't
14  know how much it was of it.  I'm not going to say it is
15  or it ain't.
16   Q   What you heard today, did that seem like all
17  the time that you talked to Detective York that day –
18       MR. SLOSAR:  Objection.
19   Q   – or did you feel like you talked to him
20  longer than that?
21       MR. SLOSAR:  Objection to form.  Asked and
22  answered.
23   A   I don't know.
24   Q   You can't remember what was said in the parts
25  of that polygraph exam that was not played to you; is

Page 220

1  that right?
2        MR. SLOSAR:  Objection to form.
3    Q   I mean, that's a fair question isn't it?  You
4  can't remember exactly what was said during that
5  polygraph interview with Detective York that wasn't
6  played.
7        MR. SLOSAR:  Objection to form.  Compound
8    question.
9    A   I mean, I don't remember it.  No, I don't
10  remember everything that was said seven year ago.  No, I
11  sure don't.
12   Q   Yeah, I'm not – it's not a trick question.
13  So you – if you were to see – if that full tape were
14  to be played, you wouldn't have any reason to dispute
15  its accuracy if you were wrong, right?
16   A   Probably not.
17       MR. SLOSAR:  Objection to form.
18   A   What do you mean?
19   Q   You were asked whether Detective York told you
20  about William Lester or told you about certain
21  information in the case; do you recall that testimony?
22   A   Do I recall him asking me about it?
23   Q   Do you recall the plaintiff's attorney asking
24  you about whether Detective York told you details in the
25  case; do you recall that part of your testimony today?

Page 221

1    A   I'm not getting what you're saying.
2    Q   I'm sorry.  Do you recall plaintiff's attorney
3  asking you about what was talked about between you and
4  Detective York on the day you had your polygraph
5  examination?
6    A   Right.
7    Q   He asked you some questions, right?
8    A   Right.
9    Q   Is it fair to say he was leading you?
10       MR. SLOSAR:  Objection.
11   Q   He was telling you what to say, wasn't he?
12       MR. SLOSAR:  Objection to form.
13   A   I mean, I didn't take it like that.
14   Q   You didn't take it that way?
15   A   No, I didn't.
16       MR. SLOSAR:  Objection to form.
17   Q   But you would agree you didn't hear the whole
18  interview, right?
19   A   Right.
20   Q   And you don't know what was on the other parts
21  you didn't hear, did you?
22   A   No, not really.
23   Q   Isn't it true that you were the one who told
24  Detective York that there had to have been – the money
25  had to have been split?

Page 222

1    MR. SLOSAR:  Objection to form.  Misstates the
2  --
3    A   I heard -- yeah, I did say it.  I heard myself
4  say it.  Yeah, I did.
5    Q   Yeah.  Isn't it true you were the one who told
6  that to Detective York?
7    A   Right.
8    Q   Isn't it true that you're the one who told
9  Detective York that you thought William Lester may have
10  been the one who got the other part of the money?
11    MR. SLOSAR:  Objection to form.  Misstates the
12  record.
13    A   I don't know if I did or not.
14    Q   It's possible?
15    A   I don't know if I did or not.
16    Q   You're not for sure, right?
17    A   I'm not going to say I --
18    Q   You haven't heard the whole recording, have
19  you?
20    MR. SLOSAR:  Objection.  Asked and answered.
21    Q   Right, haven't heard the whole recording?
22    A   Right.
23    Q   To your memory was Jonathan Taylor or Amanda
24  Hoskins ever discussed when you were in Frankfort for
25  the polygraph examination between you and Detective

Page 223

1  York?
2    A   I can't remember.  I'm not for sure.  I'm not
3  for sure what was talked about.
4    Q   All right.  Well, just sitting here, what do
5  you remember Detective York telling you?  Anything?
6    MR. SLOSAR:  Objection to form.  Foundation.
7    A   In Frankfort?
8    Q   In Frankfort.
9    A   I don't remember him tell -- I don't remember
10  what was talked about in Frankfort.
11    Q   So after the polygraph exam in Frankfort and
12  after that was -- after that exam is when you talked to
13  Detective York, right, after the exam --
14    MR. SLOSAR:  Objection to form.
15    Q   -- in Frankfort?  Detective York talked to you
16  after your polygraph exam in Frankfort?
17    A   Yeah.
18    Q   Did he eventually leave the room?
19    A   I can't remember.
20    Q   But you said you got transported back home by
21  a different officer; is that right?
22    A   Right.
23    Q   Did Detective York talk to you in the same
24  room where you had your polygraph exam?
25    A   Yeah.

Page 224

1    Q   Did you talk to Detective York in Frankfort
2  anywhere else, other than in that room?
3    A   No.  I don't think so.
4    Q   Okay.  So since a different officer
5  transported you home you didn't have any more
6  conversation with him that day outside that room, right?
7    A   Right.
8    Q   I think your next interaction with Detective
9  York was at a courthouse in spring 2011?
10    A   Yeah.
11    Q   Which courthouse was it?
12    A   Knox County.
13    Q   What did Detective York tell you there?
14    A   He just told me if I tell him what he needs to
15  hear that he would get that DUI took care of.
16    Q   Anything else?
17    A   No.
18    Q   No?  Did you say anything to him?
19    A   I just told him I done got it took care of.
20    Q   You done got it taken care of?
21    A   Yeah.
22    Q   So to your memory Jonathan Taylor hadn't come
23  up yet.
24    A   No.
25    Q   Right?

Page 225

1    A   Right.
2    Q   So to your memory, Amanda Hoskins had not come
3  up in any of your discussions with Detective York,
4  right?
5    A   (NO VERBAL RESPONSE.)
6    Q   So that was spring of 2011 was the courthouse
7  encounter, correct?
8    A   Right.
9    Q   Your next interaction with Detective York was
10  about a year later in March of 2012; does that sound
11  right?
12    A   Yes.
13    Q   But before you interacted with him you said
14  that you were -- was it arrested by Sheriff Pickard?
15    A   One of them.
16    Q   One of them.  What do you mean one of them?
17    A   Him or Claude Hudson or somebody.
18    Q   Are you referring to the Knox Sheriff's
19  Department?
20    A   Right.  I can't remember who arrested me but
21  they were there.
22    Q   Was that at your house?
23    A   Yeah.
24    Q   How many people were there -- law enforcement?
25    A   Four.

Page 226

1    Q   Four?
2    A   Yeah.
3    Q   And to your memory they were all sheriff's
4    department?
5    A   Yeah.
6    Q   Was -- did you have any family or guests in
7    your house?
8    A   Mike Simpson was there.
9    Q   What happened to him?
10   A   They arrested him.
11   Q   They arrested him, too?
12   A   Yeah.
13   Q   Did you get transported together?
14   A   No.
15   Q   Do you remember which officer transported you?
16   A   Claude Hudson transported me.
17       MR. KELLY: I'm sorry. I didn't hear.
18   Q   Claude Hudson transported him. Do you
19   remember which officer transported Simpson?
20   A   No.
21   Q   You said Claude Hudson; any other sheriff's
22   department deputies that you can remember being there?
23   A   It was another one riding with us; I don't
24   remember who it was.
25   Q   But Detective York wasn't there then, right?

Page 227

1    A   (NO VERBAL RESPONSE.)
2    Q   Isn't it true that -- did they transport you
3    to jail after they arrested?
4    A   Yeah.
5    Q   Yes. And was it just you and Claude Hudson in
6    the vehicle?
7    A   No, there was another deputy. I don't know
8    who it was. I can't remember who it was. I don't know.
9    Q   Isn't it true that I believe you testified
10   that during that way to jail you asked what you could do
11   to get help on your charges?
12   A   I might have, yeah.
13   Q   It was your idea, right?
14   A   (NO VERBAL RESPONSE.)
15   Q   Yes?
16   A   Yes.
17   Q   And you would have told that then to the
18   deputies transporting you, Claude Hudson and one other,
19   right?
20   A   Yeah.
21   Q   Is that right?
22   A   Yeah.
23   Q   And is it your memory that you met with
24   Sheriff Pickard and Detective York the next day?
25   A   Yes.

Page 228

1    Q   And where was that at?
2    A   In Pickard's office.
3    Q   What time was that?
4    A   I don't recall.
5    Q   And I'm sorry, I know it's been a long time
6    ago.
7    A   I don't know what time it was.
8    Q   You don't remember if it was the morning,
9    afternoon?
10   A   I don't.
11   Q   Do you remember who brought you there? Was it
12   the jail guard or was it the sheriff's department?
13   A   The guy that -- he's retired now. He used to
14   stand in the courtroom. I forget his name. I believe
15   he came over and got me out to the jail.
16   Q   Were you in handcuffs?
17   A   I believe I was. I can't remember. I believe
18   I was.
19   Q   Who was the person -- I'm sorry. I can't
20   hear. Who did you say the person transporting you was?
21   A   I don't know his -- we walked over to the
22   sheriff's office from the jail.
23   Q   Oh, you didn't drive?
24   A   No. Just a walk.
25   Q   And I'm sorry, I don't know the area so you

Page 229

1    just -- he escorted you by foot?
2    A   Yeah.
3    Q   Did he stick around once you got to the
4    sheriff's department?
5    A   I don't know where he went.
6    Q   And did he take you back to Sheriff Pickard?
7    Does he have his own office?
8    A   I went in the office.
9    Q   Is it just like a wide open room or do they
10   have separate offices?
11   A   Like a room like that. Just went in the room.
12   It was an office with a door.
13   Q   Who was in there?
14   A   Him and Jason York. Pickard and Jason York.
15   Q   And to your memory, the person who walked you
16   over there, he didn't stick around, right?
17   A   He waited for a minute or something, I can't
18   remember, but he walked me back over to the jail, yeah.
19   He was there somewhere.
20   Q   Are there other rooms in that office building
21   or is it just one room?
22   A   Yeah. There's other rooms.
23   Q   Do you know if anybody else was in that
24   sheriff's office in general?
25   A   I can't remember. I mean, I really wasn't

Page 230

1  looking for nobody else.

2  Q  I understand.  Was the door to the room closed

3  when you were talking to them?

4  A  I'm going to say yeah but I really don't know.

5  Q  And to your memory it was just Detective York

6  and Sheriff Pickard in the room?

7  A  Yes.

8  Q  And Detective York had a recording device,

9  correct?

10  A  Correct.

11  Q  And he used it, didn't he?

12  A  Yeah.

13  Q  Did you see when he turned that on?

14  A  Later and after we talked there.

15  Q  Did you to talk to Detective York before he

16  turned the recorder on?

17  A  Yes.

18  Q  Tell me exactly what you told him.

19  A  I mean, I just – we come – yeah, he was

20  wanting to know about the murder and just like, "If you

21  tell me what I need to know about the murder I'll help

22  you out.  I'll get you a bond and there won't be no more

23  charges brought up against you."  And I was, "What do

24  you want to know," and he's like, tell me what he wants

25  to know about the murder.  I just agreed to it.

Page 231

1  Q  And then you provided details to them in the

2  recorded statement based on what you'd been hearing out

3  on the street; is that right?

4  MR. SLOSAR:  Objection to form.  It misstates

5  his testimony.

6  A  I really didn't say a whole lot in the

7  recorded statement if you look at it.  I just agreed

8  with what he was saying.

9  Q  Did the details you provided to him, is that

10  what you were making up –

11  A  Yes.

12  Q  – based on what you'd been hearing?

13  A  Yes.

14  MR. SLOSAR:  Objection to form.  Misstates his

15  testimony.

16  Q  Is that testimony you just told me accurate?

17  MR. SLOSAR:  Objection to form.

18  Q  It is, isn't it?

19  MR. SLOSAR:  Objection to form.  What's your

20  question?

21  Q  You're telling the truth, right?

22  MR. SLOSAR:  To what question, Derek?  He has a

23  legitimate –

24  MR. WRIGHT:  The one you just objected to.

25  A  I mean, what I told you is the truth.

Page 232

1  Q  That's what I thought.  And you said that you

2  were told they would help you with the charges.  Did

3  they actually use the word they would promise to drop

4  the charges?

5  A  Yeah, they did.  Promised.  A word is a word,

6  ain't it?

7  Q  Well, I don't know.  What exactly when they –

8  A  They said that they would help me with the

9  charges.

10  Q  They'd help you with the charges.  Okay.  And

11  that's all they said, right?

12  A  And give me a bond that night.

13  Q  And who said that?  Was that Detective –

14  A  Both of them.

15  Q  Both of them?

16  A  Yeah.

17  Q  Now, isn't it true that – I believe you

18  testified that you did get a bond on the –

19  A  Yeah.

20  Q  – charges, right?

21  A  Yeah.

22  Q  But you ended up getting indicted on the

23  charges later on, correct?

24  A  I did.

25  Q  And you were arrested, right?

Page 233

1  A  Yeah.

2  Q  And then you ended up pleading guilty to one

3  of the charges, right?

4  A  Right.

5  Q  And it was a felony for criminal mischief,

6  right?

7  A  Right.

8  Q  And you were sentenced to jail, right?

9  A  Right.

10  Q  And you served time, didn't you?

11  A  Yeah.

12  Q  And I believe that you testified after you got

13  out on bond on those charges you were rearrested on

14  other charges, right?

15  A  Yeah.

16  Q  And was that for receiving stolen property?

17  A  I can't remember what I was arrested for.

18  Q  Were you rearrested again in March?

19  A  I can't remember.  I mean, I don't know.

20  Q  Were some of the charges dropped after you

21  plead guilty?

22  A  Like what?  The charges.

23  Q  Well, there were multiple charges –

24  A  Yeah but –

25  Q  – against you, right?

Page 234

1    A   Yeah, but they couldn't convict me of them
2  because I wasn't -- you know, that was just bogus
3  charges they was just trying to build on me.  So
4  therefore, they had to drop them.
5    Q   Are you talking about the time you got
6  rearrested in March or are we talking about the original
7  charges?
8    A   I don't know.  Whatever charges about the
9  receiving the stolen property you just said.  I don't
10  know when it was.
11    Q   So you ended up pleading guilty to a felony
12  for criminal mischief and that would have been sometime
13  after the March 2012 meeting with Pickard and York,
14  correct?
15    A   Yeah.
16    Q   Had you been convicted of a felony before
17  then?
18    A   Yeah.
19    Q   Do you know how long ago that would have been?
20    A   2001.
21    Q   Okay.  Did you serve any time on that?
22    A   No.  I got a pre-trial diversion on it.
23    Q   In January of 2011 and December of 2010 when
24  you had those first interactions with Detective York, is
25  it fair to say there were no felony charges pending

Page 235

1  against you then, right?
2    A   No.
3    Q   And you didn't give up any information to
4  directly implicate anybody at that time, did you?
5    A   What do you mean?
6    Q   Well, you didn't tell Detective York in
7  January 2011 that you had to implicate anybody in the
8  murder of Katherine Mills, right?
9       MR. SLOSAR:  Objection to form.
10    A   No.
11    Q   Well, your March 2012 statement, it implicated
12  Amanda Hoskins; is that fair to say?
13    A   Right.
14    Q   Before that March 2012 statement and your
15  interactions with Detective York in January 2011, you
16  hadn't implicated anybody; is that fair?
17    A   Right.
18    Q   And there were no felony charges pending
19  against you, right?
20    A   Right.
21    Q   So when you finally implicated someone, it was
22  after you had been arrested on felony charges, right?
23    A   Yeah.
24    Q   And you ended up serving time for that
25  conviction on one of those charges after March 2012,

Page 236

1  right?
2    A   Right.
3    Q   And you got out of jail, I believe you said,
4  April 2013, isn't that right?
5    A   Yeah.
6    Q   Yeah.  And you indicated to me that before May
7  of 2015 you can't remember ever telling anybody that
8  that statement in March of 2012 was false.
9    A   I don't remember.
10    Q   Yeah.  So by the time you took that statement
11  back, you were in the same position as you were in
12  January 2011; you didn't have any felony charges pending
13  against you in 2015 --
14    A   No.
15    Q   -- did you?
16    A   No.
17    Q   In January 2011, you didn't have anything to
18  gain by ratting out anybody, did you?
19       MR. SLOSAR:  Objection to form.
20    Q   Let me rephrase.  In January 2011 you didn't
21  have anything to gain to give up information to
22  implicate somebody in the Katherine Mills murder
23  investigation; is that true?
24    A   Yes.
25    Q   You weren't -- no felony charges were pending,

Page 237

1  correct?
2       MR. SLOSAR:  Objection to form.
3    A   I didn't have no felony charges when I turned
4  Porky, if that's what you're getting at.  I mean, there
5  wasn't no felony charges against me then.
6    Q   You -- I'll withdraw the question.  Did word
7  get out that you had informed on Pork?
8    A   I don't know.  I don't -- I didn't question
9  it.  I'm not worried about it.
10    Q   Well, did you feel like people treated you
11  differently?
12    A   I could care less.
13    Q   Did it cause you any problems?
14    A   (NO VERBAL RESPONSE.)
15    Q   None that you remember?  Yes or no?
16    A   I'm here.
17    Q   What?
18    A   I'm here.  Didn't cost me a lot.
19    Q   In May of 2015 when you were subpoenaed to
20  appear in court, do you remember that?
21    A   Yeah.
22    Q   Is it possible that Detective York called you?
23    A   No.
24    Q   You remember --
25    A   I remember I called him because I done almost

Page 238

1   got arrested over not showing up once so I called him
2   when I was headed to the courthouse to tell him I would
3   be late and I told him that the stuff I was – that if I
4   testified that he wouldn't like what I testified.
5       Q   And was that the – when you talked to him was
6   that the day of the court appearance?
7       A   Yeah.
8       Q   You were on your way?
9       A   I was supposed to be there. Yeah.
10      Q   Is it possible that you told your wife to
11  contact Detective York and then he called you later?
12      A   I don't know. I might have. I don't know.
13  had surgery that day – that night.
14      Q   And I think that's a good point. You had –
15  hadn't you also been traveling because of a relative who
16  had been in the hospital?
17      A   That's one of the reasons I was there plus I
18  had a problem myself. Yeah.
19      Q   So you had been making several trips back and
20  forth between –
21      A   Right.
22      Q   – Lexington and home; is that fair?
23      A   Yeah.
24      Q   Not getting much sleep?
25      A   I hadn't been home in, like, a week.

Page 239

1       Q   Okay. Do you remember what time you called
2   Detective York?
3       A   I don't.
4       Q   Is it possible it could have been after lunch?
5       A   I don't remember. I'm not going to say.
6       Q   You don't know whether by the time you called
7   Detective – well, I don't want to say you called. You
8   don't know that by the time you talked to Detective York
9   on the phone the trial had already been canceled?
10          MR. SLOSAR: Objection to form. Calls for
11  speculation.
12      A   I don't know.
13      Q   You don't know?
14      A   I don't know.
15      Q   Is it true that you talked to him on your cell
16  phone?
17      A   Yeah.
18      Q   Did you talk about your conversation with
19  Detective York on the phone – did you talk about that
20  to the investigator who came to your house after that
21  had happened? Do you remember?
22      A   I believe he come there before that. I don't
23  know. I can't remember.
24      Q   Do you know what your cell phone number was in
25  2015?

Page 240

1       A   Not really. 2084, I believe.
2       Q   Would it have been – did you ever use a phone
3   number 627-6331?
4       A   That was my friend's that just passed away. I
5   probably did use it. Yeah.
6       Q   You may have been using that number at the
7   time?
8       A   I think I did.
9       Q   And as you sit here today you can't remember
10  whether – for sure whether it was you calling York or
11  York calling you?
12      A   I'm pretty sure I called him.
13      Q   But you don't remember the time?
14      A   No.
15      Q   Now, tell me, to your memory, exactly what you
16  told Detective York on that phone call.
17      A   I told him that I'd be late, that I was coming
18  but what I – that the stuff I told him wasn't true.
19      Q   Was any of it true?
20      A   No.
21      Q   What about – did you talk about Simpson
22  crying in your interview with Detective York?
23      A   No.
24      Q   You don't remember that in March of 2012 with
25  Sheriff Pickard?

Page 241

1       A   I remember talking to him about it. Yeah,
2   that was true but –
3       Q   So there were parts of it that were true,
4   right?
5       A   I mean, yeah. I'm talking about the statement
6   that's right here. I told him this statement wasn't
7   true, the statement that I give him.
8       Q   Now, that's Detective York's report of your
9   statement, right?
10      A   Right. That's what I said that wasn't true.
11      Q   Yeah. You haven't heard the whole recording,
12  right?
13      A   Well, I've seen it.
14      Q   You've seen it?
15      A   Yeah.
16      Q   Have you seen a transcript?
17      A   Yeah.
18      Q   You have?
19      A   Yeah.
20      Q   When did you see that?
21      A   I've seen it.
22      Q   Can you tell me when you've seen it?
23      A   I just remember looking at it. But I've seen
24  it.
25      Q   Where were you at?

Page 242

1   A   I was here.
2   Q   In jail?
3   A   Yeah.
4   Q   Who showed it to you?
5   A   He did.
6   Q   This attorney right here?
7   A   Yeah.
8   Q   When did you meet with him?
9   A   I don't know. I don't know what day it was.
10  Q   How many times have you talked to him?
11  A   A couple.
12  Q   A couple?
13  A   Yeah.
14  Q   In person?
15  A   Yeah.
16  Q   You talked to him on the phone?
17  A   No.
18  Q   No?
19  A   No.
20  Q   Do you know where he works? The name of his
21  law firm?
22  A   Not really.
23  Q   Have you talked to anybody who might be
24  associated with him, another attorney, investigator?
25  A   No.

Page 243

1   Q   Have you talked to anybody about this case
2   since May of 2015?
3   A   No.
4   Q   No?
5   A   Not as I know of.
6   Q   Just him?
7   A   Yeah.
8   Q   On two occasions here in this jail?
9   A   Yeah.
10  Q   And isn't it true you just came over here
11  within the last couple of weeks, right?
12  A   I ain't talked to him here. I talked to you.
13  Her.
14  Q   Okay. So now you've also talked -- you've
15  identified the female attorney?
16  A   Yeah. That's the only one I've talked to
17  here.
18  Q   Had you talked to the male attorney?
19  A   No.
20  Q   No? So you were meaning the female attorney?
21  A   Yeah.
22  Q   Did she give you a name?
23  A   What do you mean?
24  Q   Did she tell you who she was?
25  A   Yes.

Page 244

1   Q   What's her name?
2   A   I don't know.
3   Q   Amy Staples, does that sound right?
4   A   Yeah.
5   Q   And you've talked to her twice?
6   A   Yeah.
7   Q   What did she tell you?
8   A   About what?
9   Q   Anything. What'd she tell you?
10  A   That you guys would be coming to talk to me.
11  Q   So she came all the way from Shelbyville just
12  to tell you that we were going --
13  A   I guess.
14  Q   -- talk to you?
15  A   I guess she did.
16  Q   Did she tell you that the complaint accused
17  you of being the likely responsible person for killing
18  Katherine Mills?
19  A   No, we didn't go into all that, but --
20  Q   She didn't tell you that part? She didn't
21  tell you that?
22  A   Uh-uh.
23  Q   No? No?
24  A   No.
25  Q   I'm sorry. You've got to verbalize.

Page 245

1   A   Right.
2   Q   What did she tell you?
3   A   She just said that you'd all be here to talk
4   to me.
5   Q   That's it. I find that hard to believe.
6   A   Well, I mean, that's what I'm telling you.
7       MR. SLOSAR: Objection to form.
8   A   That's what I'm telling you.
9   Q   What all did she show you?
10  A   Just a transcript of my -- of what was said
11  and this statement. That's about it.
12  Q   How many transcripts?
13  A   I just seen one.
14  Q   Was it that report there?
15  A   No. I think another one.
16  Q   Did you go over it line by line with her?
17  A   I went over it.
18  Q   Did you tell her any of it was true?
19  A   No.
20  Q   What?
21  A   No, I didn't tell her it was true.
22  Q   Did you tell her it was false? What'd you
23  tell her?
24  A   I told her it wasn't true.
25  Q   Did she tell you anything to say?

Page 246

1    A   No.
2    Q   Did she tell you any details of the case?
3    A   No.
4    Q   How long was your meeting?
5    A   30 minutes.
6    Q   And there were two of them?
7    A   No, just her.
8    Q   I'm just saying two meetings.
9    A   Oh.  Yeah.
10   Q   And was it at LaGrange?
11   A   Yeah.
12   Q   Both of them?
13   A   One.  One here.
14       MR. WRIGHT:  Let's go off the record for a
15   second.  You need to take a break?
16       VIDEOGRAPHER:  We're off the record at
17   4:50 p.m.
18       (OFF THE RECORD)
19       VIDEOGRAPHER:  Back on the record at 4:54 p.m.
20   BY MR. WRIGHT:
21   Q   All right, Mr. Helton, we're back on the
22   record.  I've just got a few more questions.  You'd
23   indicated that you had a drug habit to one of the
24   questions, do you remember that testimony?
25   A   Yeah.

Page 247

1    Q   And that was in the 2010-2011 timeframe; is
2    that fair?
3    A   Yeah.
4    Q   Did you take those pills to get high or for
5    pain?
6    A   For pain.
7    Q   Isn't it true that when one of the
8    investigators – I think it was for Taylor – came to
9    talk to you at your house you told him that you thought
10   Taylor and Hoskins had committed the murder of Katherine
11   Mills?
12       MR. SLOSAR:  Objection to form.
13   A   I don't remember what I told him.
14   Q   Is it possible you may have told him that?
15       MR. SLOSAR:  Objection to form.
16   A   I'm not going to say.  I don't know even what
17   I told him.  I can't remember.
18       MR. WRIGHT:  All right.  No further questions.
19       REDIRECT EXAMINATION
20   BY MR. SLOSAR:
21   Q   Mr. Helton, I have some limited questions, I
22   promise.  Is it fair to say that when you were getting
23   polygraphed on January 21, 2011, was Detective York
24   trying to get you to implicate Mike Simpson in the
25   murder of Katherine Mills that day?

Page 248

1        MR. WRIGHT:  Object to form.  Leading.
2    A   Yeah.
3    Q   Is that right?
4    A   Yes.
5    Q   And, in fact, prior to that interview do you
6    recall police officers telling you that $10 to $12,000
7    was missing from Katherine Mills?
8    A   I can't remember.
9    Q   Okay.  I'm going to play a clip from your
10   polygraph video, all right.  Just listen to this and let
11   me know if it refreshes your memory.
12       (VIDEO PLAYING)
13   Q   Mr. Helton, was that your voice?
14   A   Yeah.
15   Q   And on January 21, 2011, did you tell the
16   polygraph examiner that the cops had told you that
17   somewhere around $10,000 was missing from Katherine
18   Mills?
19   A   Yeah.
20   Q   Was the police officer who told you that
21   approximately $10,000 was missing from Katherine Mills'
22   death, was that police officer Detective York?
23       MR. WRIGHT:  Object to form.
24   A   I'm pretty sure it was.
25   Q   Now, Detective York's attorney right here, Mr.

Page 249

1    Wright, was asking a lot of questions a few moments ago
2    about the statement you gave on March 8, 2012; do you
3    recall Mr. Wright asking you those questions?
4    A   Yeah.
5    Q   Okay.  Mr. Wright was trying to say that
6    because you were charged with a criminal offense that
7    you voluntarily came into the – Sheriff York's office
8    and made up a story without any police officer telling
9    you to do that.  Do you recall Derek Wright asking
10   questions about a theft, Mr. Helton?
11   A   Yes.
12       MR. WRIGHT:  Object to form.
13   A   Yeah.
14   Q   Now, you testified earlier today that
15   Detective York told you what to say in your March 8,
16   2012 statement; is that right?
17   A   Right.
18   Q   And prior to the recorder being turned on, did
19   Detective York feed you some of the information that he
20   wanted you to say?
21       MR. WRIGHT:  Object to form.
22   A   Yes.
23   Q   Did Detective York, prior to the recording
24   being turned on, tell you that he wanted you to
25   implicate Amanda Hoskins, William Lester, and Jonathan

Page 250

1 Taylor in the murder of Katherine Mills?

2     MR. WRIGHT: Object to form.

3   A Yes.

4   Q And was it your understanding that if you went

5 along with this false story that Detective York wanted

6 you to say that you would get a bond that night and that

7 he would help you on your criminal cases?

8     MR. WRIGHT: Object to form.

9   A Right.

10   Q And was Sheriff Pickard there when Detective

11 York was telling you to say this stuff?

12   A Yes.

13     MR. WRIGHT: Object to form.

14   Q Did Sheriff Pickard do anything to stop

15 Detective York from giving you this information?

16   A No.

17   Q Did Sheriff Pickard do anything to stop

18 Detective York from making you promises if you went

19 along with this false statement?

20     MR. WRIGHT: Object to form.

21   A No.

22   Q Fair to say that Sheriff Pickard just sat

23 there and watched?

24   A Yeah.

25   Q Now, you met with Ms. Staples a couple of

Page 251

1 times before this deposition, right?

2   A Right.

3   Q I've also met with you before the deposition,

4 right?

5   A Right.

6   Q I haven't met you here though, right?

7   A Right.

8   Q All right. And of the conversations you had

9 with Ms. Staples and I, did we tell you to tell the

10 truth?

11   A Yes.

12   Q Did we tell you to come in here and tell the

13 truth?

14   A Yes.

15     MR. WRIGHT: Objection. Asked and answered.

16   Q We didn't feed you any information, right?

17   A Right.

18   Q We weren't doing what Detective York did,

19 right?

20     MR. WRIGHT: Object to form.

21   A Right.

22   Q Now, do you remember earlier when you

23 testified about your December – or, I'm sorry. Do you

24 remember testifying earlier about your January 4th

25 encounter with Detective York and Sheriff Pickard when

Page 252

1 you got pulled over for the DUI?

2   A Yeah.

3   Q Do you remember testifying about how Detective

4 York took this coat out of your truck and said something

5 to the effect that this is probably the coat that you

6 used when you killed the old lady or something?

7   A Yes.

8   Q Okay. Now, was – when Detective York was

9 saying that stuff I believe you testified earlier that

10 Sheriff Pickard was around, right?

11   A Yes.

12   Q Was Detective York speaking to Sheriff Pickard

13 when he made that statement?

14   A I don't know who he was talking to.

15   Q Okay. But you could hear, right?

16   A Yeah.

17   Q And Sheriff Pickard could hear, too?

18   A Yeah.

19   Q Mr. Helton, did Detective York or any other

20 police officer ever ask you to take photographs?

21   A No.

22   Q Now, when you met with the investigator or

23 lawyers for Amanda Hoskins or Jonathan Taylor or William

24 Lester during the underlying investigation, did they ask

25 you to tell the truth?

Page 253

1   A Yes.

2   Q Rather than asking you to lie, right?

3   A Yeah.

4     MR. WRIGHT: What was that? I'm sorry, other

5   than what? What did you say? I couldn't hear that

6   last question. Other than –

7     MR. SLOSAR: None of them asked you to lie,

8   right?

9     MR. WRIGHT: Okay. I'm sorry. I can't hear

10   with this machine.

11 BY MR. SLOSAR:

12   Q Sir, you testified a few moments ago that

13 there was this conversation on March 7, 2012 with you

14 and Sheriff Pickard when he was driving you to the jail;

15 do you remember that?

16     MR. WRIGHT: Object to form.

17   Q I think this is where the deal came up.

18   A I don't know how it come involved about the

19 deal.

20   Q Okay.

21   A I really don't remember.

22   Q But prior to March 7, 2012, you had already

23 had a conversation with Detective York in front of the

24 courthouse in the spring of 2011, right?

25   A Right.

Page 254

1   Q   In that conversation did Detective York tell
2   you something to the effect, you tell me what I want to
3   hear and I'll help you out on your criminal case?
4       A   Yes.
5       MR. WRIGHT:  Object to form.
6       Q   So you knew March 7, 2012 when you were
7   arrested on the new charges that as long as you said
8   whatever Detective York wanted you to say that you would
9   get help on your criminal case, right?
10      MR. WRIGHT:  Object to form.
11      A   Yeah.
12      MR. WRIGHT:  Leading.
13      Q   Allen, when you gave your March 8, 2012
14  statement, is it fair to say that you were just doing
15  whatever Detective York told you to do that day?
16      MR. WRIGHT:  Object to form.
17      A   Yes.
18      Q   Was that because you wanted to get out of
19  trouble?
20      A   Yeah.
21      Q   And that information that's in that statement
22  that's before you recorded that is false, right?
23      A   Yes.
24      Q   And this false information, did that come from
25  Detective York?

Page 255

1       MR. WRIGHT:  Object to form.
2       A   Yes.
3       Q   And you just repeated what he wanted you to
4   say, right?
5       A   Right.
6       Q   Sheriff Pickard was in the room, right?
7       A   Yes.
8       MR. SLOSAR:  Nothing further.
9           RECROSS EXAMINATION
10  BY MR. KELLY:
11      Q   I could not hear what one of his questions
12  was. I thought the text of the question was if they --
13  if somebody promised you in the car that they could do
14  something about the charges.  You said, "I don't
15  remember."  All right.  I may have the whole question
16  wrong.
17      MR. SLOSAR:  He didn't remember who brought it
18  up.
19      MR. KELLY:  Okay.
20      THE WITNESS:  I don't remember who brought the
21  deal up.
22  BY MR. KELLY:
23      Q   So you could have brought it up?
24      A   I could have.
25      Q   Okay.  Were you guilty of the charges that

Page 256

1   were being levied against you right then?
2       A   Do what?
3       Q   You thought they had you on those charges,
4   right?  You were guilty of them.
5       A   I was guilty on the criminal mischief and
6   stuff because somebody told on me, but the other
7   charges, no, I wasn't guilty of it.  They didn't find
8   none of the stuff around me.  They had me charged with
9   12 times receiving over $10,000.  No, I wasn't.
10      Q   Why were you so worried about it?
11      A   What do you mean why was I worried about it?
12  I wasn't --
13      Q   Why did you lie -- why did you lie in order
14  to avoid those charges --
15      A   I wasn't --
16      Q   -- if you thought you could beat them?
17      A   I wasn't worried about them.  I knew I
18  couldn't beat the criminal mischief.
19      Q   Okay.  So it all had to do with the criminal
20  mischief?
21      A   Yeah.  I mean, I wasn't worried about the
22  other ones.
23      Q   And that's the one you plead guilty to on?
24      A   Right.
25      MR. KELLY:  Thank you.

Page 257

1           RE-EXAMINATION
2   BY MR. WRIGHT:
3       Q   Well, he brought it up so I'll have to ask.
4   Do you remember what was said before that recorder was
5   turned on?  Can you sit here and tell me exactly what
6   was said?
7       A   I just asked him what did he want to hear and
8   he said about the murder, about Jonathan Taylor, Amanda
9   Hoskins, and William Lester and the murder of Katherine
10  Mills.  So I just --
11      Q   Any --
12      A   -- come up with a story and give it to him.
13      Q   Anything else?
14      A   I mean, I can't remember word for word.  No.
15      MR. WRIGHT:  No further questions.
16          FURTHER DIRECT EXAMINATION
17  BY MR. SLOSAR:
18      Q   Mr. Helton, the story that you ended up
19  telling, Was this based on information that Detective
20  York gave to you?
21      A   Yes, sir.
22      MR. WRIGHT:  Object to form.  Asked and
23  answered.
24      Q   Did you just agree with whatever Detective
25  York was telling you to say?

Page 258

1   A   Yes, sir.

2       MR. SLOSAR:  Nothing.

3           FURTHER EXAMINATION

4   BY MR. WRIGHT:

5       Q   One last question.  Are you just agreeing with

6   whatever --

7       A   No, sir.

8       Q   -- the plaintiff's attorney says?

9       A   No, I'm not.  Look at the transcript, you'll

10  see yourself.  All I said was all right; he's the one

11  that said all the words.  I said okay, all right.  Look

12  at it.

13      Q   We -- the jury will get to look at it.

14      A   Right.

15      MR. WRIGHT:  No further questions.

16      MR. SLOSAR:  Let me ask that the non-question

17  be stricken from the record.  Thank you, Mr. Helton.

18      MR. HELTON:  Thank you.

19      VIDEOGRAPHER:  This closes today's deposition.

20  We're now off record.

21      (EXHIBIT 12 MARKED FOR IDENTIFICATION)

22      (DEPOSITION CONCLUDED AT 5:09 P.M.)

23

24

25

Page 259

1   CERTIFICATE OF REPORTER

2   COMMONWEALTH OF KENTUCKY AT LARGE

3

4   I do hereby certify that the witness in the foregoing

5   transcript was taken on the date, and at the time and

6   place set out on the Title page hereof by me after first

7   being duly sworn to testify the truth, the whole truth,

8   and nothing but the truth; and that the said matter was

9   recorded by me and then reduced to typewritten form

10  under my direction, and constitutes a true record of the

11  transcript as taken, all to the best of my skills and

12  ability. I certify that I am not a relative or employee

13  of either counsel, and that I am in no way interested

14  financially, directly or indirectly, in this action.

15

16

17

18

19

20

21

22  BETHANY BELLOFATTO,

23  COURT REPORTER / NOTARY

24  COMMISSION EXPIRES ON: 09/11/2021

25  SUBMITTED ON:  04/24/2018

### Exhibits

**EXHIBIT 1**
21:19,21

**EXHIBIT 4**
35:17,22 40:23
116:5,7 132:17

**EXHIBIT 5**
39:11 163:16

**EXHIBIT 6**
50:3,4,6,15

**EXHIBIT 8**
69:15,19 73:17

**EXHIBIT 10**
94:7,10 96:8

**EXHIBIT 11**
182:12

### $

**$1,000** 146:5,
10

**$10** 248:6

**$10,000** 11:1
248:17,21
256:9

**$100** 176:23
184:9,12

**$12,000** 248:6

**$15,000** 75:1,
18 198:21
199:4 200:5,13

**$2,000** 198:9

**$4,000** 79:3,8

**$400.62** 22:20

**$500** 213:23

**$7-** 128:11

**$700** 128:14

**$800** 128:11

### 1

**1** 21:19,21 60:5

**10** 94:7,10 96:8

**11** 127:19
129:21 182:10,
11,12

**11-10** 133:10

**1108** 66:20

**11:39** 8:6

**12** 150:10
189:20 190:3
256:9 258:21

**12-20-2010**
22:3

**12-23-2010**
22:18

**12-3-09** 181:17

**12-3-2009**
179:18

**125** 88:6

**12:00** 78:2

**13** 147:16
150:10 171:5
190:3

**13:00** 116:14

**14** 171:5 190:3

**15** 137:7 139:12
153:3

**15,000** 200:23

**15646** 21:19

**16** 12:20 136:19
137:19

**17** 136:19

**17-cv-84** 8:12

**1792** 50:4,16
51:13

**18** 94:25 96:11,
18

**180** 127:23,24

**18952** 35:19

**19** 73:25 74:8
88:23 92:19,22

**19th** 24:20 25:7

**1:00** 116:14

**1:15** 85:21

**1:25** 85:23

**1:42** 97:24

**1:43** 98:1

**1st** 140:17
189:25

### 2

**2** 27:21,25
29:18

**20** 17:12,13,16
18:3,16 19:15
20:21 21:2
24:17 64:7
76:3,20,24
77:23 78:7
88:23 201:16
202:13

**2000** 196:8

**2001** 234:20

**2009** 122:9,25
179:23 181:25
196:8

**2010** 11:10,12,
15,18 12:5,11
15:18 16:23
17:12,13,16,23
18:4,16 19:15
20:21 21:2
24:17 31:7,11
33:15,20 35:1
64:2,7 73:25
74:8 76:3,20,24
77:3,11,23 78:7
80:2 88:23
92:19,22 93:4,
9,19,25 101:12,
17 132:23
133:8 162:3
180:1 185:6
186:6,14
201:16 202:14
234:23

**2010-2011**
247:1

**2011** 18:13,22
27:10,17 29:14

**35:**9,18 36:5
39:17 40:5,7
41:3 51:24
52:25 53:11
54:11 58:13,16,
25 59:12,23
62:23 63:2
64:8,11,18
66:1,5 67:3
68:9 83:1,7,11,
22 84:7 101:8
102:11 116:14
123:1 124:8
127:3 129:8
132:23 133:6,7
136:18,21
139:10 145:4
162:13 165:2,
10 166:5 167:1
174:6 186:17,
23 187:3,6,8
201:10 205:12
207:21 209:9
211:1,4,23
212:23 213:10
218:7,9 224:9
225:6 234:23
235:7,15
236:12,17,20
247:23 248:15
253:24

**2012** 69:17,18
80:21 82:7
84:15,23 85:6,
16 86:3,10,15
91:11,14,23
92:5 93:15
98:3,6 123:14
140:3,5,19
147:16 150:11
157:10 158:1,9,
11 159:9,15,21
161:1,6 165:16
187:13 190:6,
10,22 192:15
194:23 225:10
234:13 235:11,
14,25 236:8
240:24 249:2,
16 253:13,22
254:6,13

**2013** 123:15
189:22,23
236:4

**2014** 171:3,4

**2015** 94:4 95:1
96:11,18
123:22 157:23
158:1 160:9,10
165:23 168:18
169:6 172:2,7
174:5 187:17
191:6 192:19
194:8 236:7,13
237:19 239:25
243:2

**2018** 8:6

**2084** 240:1

**21** 18:22 51:23
52:25 53:11
54:11 58:13,16,
25 59:12,23
62:23 63:2
64:8,11,18
66:1,5 67:3
83:1,7,11,22
84:7 93:4,9,19,
24 165:2 187:6
247:23 248:15

**21st** 57:10,17
58:3 65:9,13
139:12

**22** 137:17

**223** 76:5,21
117:5,6,8
118:12 207:25

**23** 31:7,11 35:1
101:8 137:17,
19 162:3
186:14

**23rd** 127:18
202:25 205:1,7,
23 206:3,20
207:6 208:25
209:5 211:11

**25** 137:2

**2928** 27:23

**2:00** 22:20
104:9

**2:06** 22:5,8

**2:30** 104:9,10

**2:45** 150:19

**2:51** 150:21

---

**3**

**3** 27:21 28:1
58:8

**3-7** 150:4

**3-8** 149:19
150:4

**30** 20:1 48:9
128:4 138:22
217:11 218:1
246:5

**306** 89:1

**38** 10:20,21

**3:18** 174:14,16

**3:55** 204:17

**3rd** 116:17,19
117:2,14
140:17 147:24

---

**4**

**4** 35:9,17,18,22
36:5 39:17
40:5,7,23 41:3
102:11 116:5,7,
14 120:15
127:3 129:21
132:16,17
162:13 166:5
167:1 186:17,
23 201:10
205:12 207:21
209:9 211:1,4,8

**413** 50:21

**414** 50:20

**415** 50:21

**47** 182:23,25
183:1

**48** 183:5
184:17,20

**49** 183:17

**4:00** 204:19

**4:50** 246:17

**4:54** 246:19

**4th** 68:15
127:18 168:10
205:21 206:5
251:24

---

**5**

**5** 39:6,7,11
163:16

**52** 29:19

**5314** 58:10

**54:44** 19:5

**55:10** 19:5

**5:09** 258:22

---

**6**

**6** 50:4,6,13,15
132:23

**627-6331**
240:3

**6:20** 90:8

**6th** 133:7
139:10

---

**7**

**7** 50:10,11,13
55:19,20,23,25
60:5 62:15
66:19 184:8
253:13,22
254:6

---

**8**

**8** 69:15,17,18,
19 70:12 73:17
80:21 82:7
84:15,23 85:6,
16 86:3,10,15
91:11,14,23
92:5 93:15
98:3,6 137:7
140:3 141:7

143:24 145:4
157:9 165:16
187:13 249:2,
15 254:13

**854** 56:1

**8:15** 76:7,24

**8:30** 76:7,24

---

**9**

**9** 86:2,4

**919** 62:15

**9th** 8:6

---

**A**

**A-N-D-I** 145:22

**a.m.** 8:7

**abilities** 18:20

**ability** 67:18,22

**accept** 42:21
58:22

**accepting** 59:9

**accident**
103:23 122:6,
11,17,22 124:1,
5

**accountable**
183:20,25

**accuracy**
220:15

**accurate**
179:19 231:16

**accused**
100:21 244:16

**accusing**
114:21 193:17

**act** 146:2

**acted** 178:1

**activity** 177:19
179:9 180:11

**actual** 106:7
141:1

**Adam** 100:12
142:13,15

**addicted**
124:7,9

**additional**
81:9 131:1

**address**
129:12 135:10,
13

**administered**
216:23

**administration**
159:24

**admit** 101:2
117:4

**advance**
197:1,3

**advantage**
153:15

**affirm** 9:6

**afternoon** 9:13
104:10,15
109:6 228:9

**aggravated**
85:8

**agree** 59:16,25
84:14 137:25
212:17 221:17
257:24

**agreed** 80:23
81:21 87:25
92:6 154:25
230:25 231:7

**agreeing**
86:11,16 88:9,
15 90:1,11
258:5

**agreement**
143:17

**ahead** 89:8
144:5 166:19

**alcohol** 117:14

**alibi** 30:21,24
207:2,9 209:1

**alleged** 99:17
155:18

**allegedly**
141:4

**Allen** 8:9 73:24
74:2,22,24,25
75:4 76:2,6,10,
12 78:2,18,25
79:2,3,13 80:4,
14 81:13 85:25
88:9 89:1 94:3
96:12 254:13

**Amanda** 8:10
11:13,25 65:17
74:1,2,9,12,18,
21 75:1,8,11,
14,17,20 78:3,
6,10,14 79:2,3,
7,10,14,15,18,
21,24 80:1,5,
15,16 81:7,25
87:18 88:22
92:13,22,25
93:5,9,24 94:4
98:4 131:11
138:6 144:23
146:21 152:5
154:20 155:22
156:3 160:17
175:4 188:4,9
195:8 205:6,17,
20 213:1
222:23 225:2
235:12 249:25
252:23 257:8

**amended**
159:1

**amount** 176:23
199:3

**Amy** 8:16
244:3

**and/or** 78:15
79:19

**Andi** 145:18,
20,21

**ankle** 45:5,8
46:6 121:15

**answers** 53:20

**anybody's**
111:3

**anymore** 55:8
134:9,10,13

139:14

**apparently**
124:16

**appearance**
165:24 238:6

**appeared**
37:10

**appointment**
17:19,20,21
196:15,22,24,
25 197:4

**appointments**
196:19,21

**approached**
74:2,10 148:24

**approximately**
16:21 19:21
20:24 72:25
79:2 248:21

**April** 8:6
149:21,25
150:11,13
189:25 190:6
236:4

**area** 228:25

**arrest** 30:2
47:8,16 100:16
110:8 116:22
117:4,19 124:8
133:4,14,17
136:1,3 142:5
143:17 144:6
171:6,9 172:13

**arrested** 15:17
70:14 99:11
100:3,9 116:17,
19 129:21
134:4 135:13
140:21 141:13,
16,23,24,25
142:9 143:1,10,
15 144:1 148:3,
12 149:15,23
150:4 158:7
159:13 170:22
171:17 177:7
185:4 186:8
225:14,20
226:10,11
227:3 232:25

233:17 235:22
238:1 254:7

**arresting**
116:2 171:23

**arrests** 168:20
173:18 189:14

**arrived** 169:8

**assist** 81:20
92:8

**assistance**
82:2

**assume**
112:25 122:10
137:17

**attorney** 188:9
220:23 221:2
242:6,24
243:15,18,20
248:25 258:8

**attorneys**
10:13,14 188:8
191:1,7 195:7

**audio** 55:4
63:1 82:23
85:15,25 86:5
88:5,8,11,17
89:3,11 90:9,10
182:15

**auto** 102:15,16
111:12,13,21
112:5,7,9,15,
22,25 113:4
117:10

**avoid** 256:14

**aware** 120:1
166:10

———————

**B**
———————

**back** 18:16
19:17 23:9,15,
22 24:1 26:19
27:8 28:24
29:5,25 30:8,
10,15 31:2,25
33:14,19 35:1
36:1 45:19
85:23 95:14
98:1 101:10

112:5 119:7,8,
16 123:11
126:18 127:21
129:1,8,20
132:16,17
134:5 136:18,
21 137:3,5
140:4 147:16
150:21 159:21
163:2 174:16
186:15 190:6
192:23 202:18,
20,22 203:6,19
204:19,21
205:1 215:1,24
216:12,13,15
217:13 223:20
229:6,18
236:11 238:19
246:19,21

**bad** 110:2,7,8

**ballpark** 217:9

**band** 79:4,11

**Barbara**
188:17

**Barbourville**
9:1 14:3,13
16:8 20:10
38:19,21 40:1
100:12 115:16
119:5 161:24
162:8,23 163:2
164:18 166:6,
13 167:6
209:25 210:3,4,
7 211:7

**barely** 15:23

**based** 58:2
62:11 143:10
153:20 231:2,
12 257:19

**Basham** 8:4

**basis** 202:8

**bathroom**
74:19,23 75:9

**beat** 37:15
106:12 208:13
256:16,18

**Beetle** 21:11,

12,16

**beg** 141:10
144:4

**beginning**
27:23 62:15
66:19 88:6 89:1
90:8

**begins** 29:19
58:9

**behalf** 8:23,25
188:4

**belief** 59:15

**believed**
27:11,17

**bell** 188:15

**Bellofatto** 8:5

**Berea** 96:20

**bet** 49:13,17
214:3

**Bethany** 8:5

**betted** 214:1

**betting** 49:18

**bills** 19:16,22
20:12 201:24,
25

**Bimble** 171:10,
12,13

**bit** 18:15 30:1
121:20 200:20

**blacktop**
121:19

**blaming**
175:18

**blocking**
112:21

**blonde** 189:2

**blood** 38:18
115:16 120:4,
21 129:22
162:20,24
209:11,21,23

**blue** 21:16
33:9,14,19

12,16

**board** 38:4

**bogus** 234:2

**bond** 44:25
45:2 71:7 73:11
85:9 129:5
134:4 143:15,
18,22 144:15
145:10,16,25
146:2,3,5,10
148:4 149:6,7,
18 230:22
232:12,18
233:13 250:6

**bonded** 45:14,
18 149:17,19,
25

**borrow** 197:24

**borrowed**
197:22

**bother** 161:14

**bottom** 22:15
39:10

**box** 22:17

**boxes** 34:6
207:14,17

**bracelet**
132:19

**brain** 122:16

**break** 10:9
246:15

**Brian** 8:20
166:23 173:13

**bring** 60:14,17
127:21 131:11
150:25 157:6

**bringing** 60:22
182:19

**broke** 24:25
25:11 121:15,
16

**brought** 14:24
15:2 34:6 60:24
70:5 71:8 72:1,
7 73:12 81:9
145:17 149:2
151:3 207:15
228:11 230:23

255:17,20,23
257:3

**Broughton** 9:1
14:5,7,8,14
16:7,13,16
31:14,15,22
39:1,4 40:3
41:8 42:12
43:3,8,16,19
44:22 45:19
129:11,14
130:17 135:12
136:9 161:24
162:3,6,16,22
163:8 164:2,9,
15,25 165:3,7,
12,21 166:1,7,
10 167:2

**Broward**
125:21 126:12

**build** 234:3

**building**
169:12,15
215:3,19
229:20

**Bunch** 8:18
174:20,21

**burglary** 70:2
85:8 140:17
147:24

**businesses**
113:14

**buy** 79:25 80:2
128:9 176:21
177:21 178:4,
13,15 179:20
181:25 184:9,
12 197:8,11,12

**buys** 177:15

—— **C** ——

**call** 26:20,24
30:20 95:3,4,7
96:18,22 147:4
192:24 203:7
240:16

**called** 27:1
95:3,5 157:17
237:22,25

238:1,11 239:1,
6,7 240:12

**calling** 240:10,
11

**Calls** 99:20
113:5 183:15
184:14 196:2
200:14 239:10

**Camaro** 76:10,
25 77:4,9

**canceled**
239:9

**car** 21:8 22:16
23:7 24:14 32:2
33:9,14,19,20
35:14 48:22
49:4 76:4,8,21
108:3 113:21,
23 122:1 125:9
201:23 202:1
213:13,20
214:8,14
215:10 255:13

**care** 68:14,23,
24 69:3 123:1
135:3 172:17
175:15,16
224:15,19,20
237:12

**cars** 104:20,22

**case** 10:25
11:5 15:6 44:19
49:9 51:16 69:7
70:25 71:2 85:5
88:1 133:10
170:18 173:24
220:21,25
243:1 246:2
254:3,9

**cases** 82:3
176:15 250:7

**cash** 20:19,20,
22,24

**caused** 63:16

**cell** 239:15,24

**Center** 8:8
10:22

**change** 121:20

**Chapel** 133:20

**charge** 44:11
47:23 48:1
141:3 143:1
148:15

**charged** 36:1
44:16 70:4
141:9 188:6
249:6 256:8

**charges** 70:5
71:7 73:12
81:9,20 92:9
117:13 141:23,
25 144:13
145:17 146:7,
21 147:1,22,23
148:3 149:15
227:11 230:23
232:2,4,9,10,
20,23 233:3,13,
14,20,22,23
234:3,7,8,25
235:18,22,25
236:12,25
237:3,5 254:7
255:14,25
256:3,7,14

**charging**
35:18

**chase** 110:12

**chased** 110:10

**check** 87:16

**Chelsea**
137:13,14

**Chelsea's**
137:19

**Chevy** 76:10,
25

**Chief** 14:7,8,14
16:6,13 40:3
41:8 42:12
43:3,8,16,19
44:22 130:16

**children**
146:17

**chronological**
162:1

**chronology**

134:16

**circumstance
s** 142:4

**citation** 35:18
40:23,24
115:23 124:16
127:8 132:22

**city** 9:1 20:7
118:18 125:19
130:8 133:16
161:24

**civil** 175:3

**claims** 175:8

**clarify** 143:6
169:13

**Claude** 100:10
142:17 225:17
226:16,18,21
227:5,18

**clear** 61:22
89:22 91:18
199:14

**client** 184:15

**clinic** 126:11

**clinics** 126:6

**clip** 19:3 27:23
29:17 61:2 63:1
89:6 90:7,10
248:9

**clips** 55:4,6
82:22,23
218:23

**close** 70:8
102:18 111:8
115:8

**closed** 230:2

**closes** 258:19

**coat** 38:4,5,13
114:10,15
115:13 117:21
208:16,17
252:4,5

**Cody** 8:19

**cold** 32:6

**collective**

182:4

**color** 21:12
189:5

**column**
181:13,16

**comment**
165:12

**comments**
34:3,12 37:11
47:5 181:8,9

**committed**
60:18 67:7
247:10

**communicate
d** 187:16

**communicatio
ns** 146:13

**complained**
159:8

**complaint**
175:3,6,8,12,21
176:1 182:17,
18 244:16

**Compound**
220:7

**computer** 34:6
207:17

**concept** 153:5

**CONCLUDED**
258:22

**confidential**
13:9 177:18
180:14

**connection**
188:6

**connections**
131:8,10

**consent** 120:2,
3,4,17

**consequences**
120:3

**considered**
30:4

**consistent**
200:11

**contact** 35:5
70:11 99:23
132:15 134:10,
11,13 157:10,
13 159:5,7,11,
13,17 188:4
238:11

**contacted**
146:20,22,24
158:14 172:15,
18

**contained**
81:14

**context** 202:6

**continue** 106:1
110:16,24
157:3

**conversation**
24:21 25:7,10
34:16 58:12
82:19 86:7
94:25 119:18
145:9 147:18
159:23 194:16
211:17 224:6
239:18 253:13,
23 254:1

**conversations**
58:2 91:13
251:8

**convict** 234:1

**convicted**
44:17 85:7
116:21 158:19
177:9,11
185:10,12,18,
25 186:3
195:24 234:16

**conviction**
235:25

**cook** 135:4

**cooperate**
54:19 145:11

**cooperating**
67:14

**cop** 103:1
148:11

**copies** 21:20

50:5

**cops** 248:16

**copy** 21:24
36:2 50:17 51:7
182:16,17,18

**Corbin** 169:12

**corner** 22:2

**correct** 50:18
56:23 58:4,5
82:19 92:17
93:16,17,20,21
94:2 101:5,8,
11,21 102:8,9,
22 105:6 114:1,
4 122:3 139:21
146:5 151:21,
22 152:16
162:6,7,9,10,
14,17,18,20,21,
24,25 163:3,4,
6,7,10,14,15,
21,25 164:19,
23,24 165:1,4,
5,8,13,19,20,21
166:2 176:7
180:20 181:8,
20 184:4 208:9
225:7 230:9,10
232:23 234:14
237:1

**Correctional**
8:8 10:22

**cost** 237:18

**counsel** 8:13
9:2

**county** 8:10,23
11:7 20:8 36:9
68:12 96:13
98:25 99:24
100:4 102:24
103:3 105:1
119:4 120:22
125:22 126:12
130:13 137:20
140:11 141:22
142:20 148:11,
19,22,25 149:2,
9 150:7,13
151:2,11 158:8,
11 159:8,17
165:11,17

171:13,14,15
189:19 190:16
224:12

**couple** 93:19
126:22 214:20
242:11,12
243:11 250:25

**court** 8:5,11
9:4,5,10,21
39:6 55:19
95:24 96:5 97:4
134:5 165:24
182:10 191:6
237:20 238:6

**courthouse**
68:8,11,19
95:13 96:13,21
165:11 187:9
224:9,11 225:6
238:2 253:24

**courtroom**
228:14

**Cox** 188:15

**crazy** 112:2

**Creek** 20:4,5
23:10,13 76:12
78:4

**cries** 204:9

**crime** 185:10,
12,21

**criminal** 70:3
71:2 82:3 85:5,
7,8 88:1 92:9
94:4 140:17
147:1,24
170:17 185:25
188:8 189:21
191:2 233:5
234:12 249:6
250:7 254:3,9
256:5,18,19

**CROSS** 98:22

**cruiser** 103:15
106:19

**cry** 203:23
204:7,11,13

**crying** 26:25
203:16,21

240:22

**Cumberland**
180:20 181:19
182:3

**D**

**dad** 76:11
111:6,8,13
112:2 113:1

**dad's** 111:16

**Dade** 125:24

**Dallas** 8:21
166:23 173:13

**date** 100:16
132:23 168:18
179:14,17
181:13,16,18

**daughter**
137:22

**David** 188:19

**day** 8:6 13:3,
21,24 18:5
19:12,22 20:11
23:20 24:5,24
25:3,5,12,23,24
26:4 35:12 36:6
40:12,20 41:5
44:5,17 45:13
46:17,20 47:3,
24 48:2,5,8,13
57:2 67:21 68:5
70:13 72:1,13,
20 77:16 81:8
89:13,16 92:14
93:12 96:5 97:4
98:7 104:2,8
108:24 109:4,9,
12 112:16
124:21 129:20
133:17,21
134:5 137:9
162:6,9 163:1
164:13 167:14,
17,22 168:12
170:5,12
171:17,23
172:2 192:24
196:12 214:17,
19 219:17
221:4 224:6

227:24 238:6,
13 242:9
247:25 254:15

**daylight**
104:17,18

**days** 16:23
93:19 127:19
139:12 200:10

**dead** 26:21
64:22 67:21
112:18 180:1
185:6,11 186:5
196:13 201:16
204:4

**deal** 90:2
178:24 253:17,
19 255:21

**deals** 91:25
97:16

**death** 13:4,6,
16,19 14:15
15:15 16:9 31:4
32:8,13 34:17
35:2,5 37:2
38:20 40:8
42:4,17 46:17
49:5,8 50:1
52:12,16 55:12
57:13 59:1
61:19,23 62:3
63:18,24 64:6,
7,14 67:2 79:22
82:2 83:4 84:4
91:15 248:22

**December**
11:10,12,15,18
12:5,11 15:17
17:12,13,15,22
18:3,16,22
19:15 20:21
21:2 24:17,20
25:6 31:7,11
33:14,20 35:1
64:2,7 73:25
74:8 76:3,20,24
77:3,11,23 78:7
80:2 88:23
92:19,22 93:4,
9,19,24 101:8
162:3 179:23
180:1 181:24
185:6 186:14

196:8 201:16
202:13,25
205:1,7,23
206:2,20 207:6
208:25 209:4
211:11 234:23
251:23

**defendant**
8:23 99:15,17
173:24 184:18

**defendants**
8:17,19 174:10
191:2

**defending**
146:25

**defense**
146:24 188:8

**degree** 70:2
140:17,18
147:24

**denied** 52:15
125:7

**deny** 206:15

**department**
14:13 16:9
38:22 40:1
99:25 100:4
118:18 133:17
140:12 151:11
159:9,14,18
162:23 163:2
164:19 166:6,
14 167:7 208:2
209:25 210:2,3,
5,8 211:1,4,7
225:19 226:4,
22 228:12
229:4

**deposition** 8:9
251:1,3 258:19,
22

**deputies**
141:22 226:22
227:18

**deputy** 99:1
103:3,11
104:25 105:1,5
107:4 114:9
118:15 119:12
142:20 150:24

151:3,6,8,18
227:7

**Derek** 8:24
99:1,2,11
174:19 231:22
249:9

**Derrick** 8:17

**desiccation**
100:25

**details** 42:3
75:2,21 210:12
220:24 231:1,9
246:2

**Detect** 49:4

**detective**
12:23 13:5,7,
10,15,18 14:5
15:8 32:10
34:16,19,21,25
35:5 37:10,13,
21,24 38:10,13,
16 39:21 40:4
41:11,22 42:2,
9,10,12,15
44:10 45:22
46:8,14,16,20
48:1,13,24
49:1,5,16 53:24
54:7,10,11,15,
18,24 55:10
56:6,9,21 57:1,
6,10,17 58:3,
13,15,16,20,24,
25 59:5,12,15,
24,25 60:10,13,
17,23 61:2,9,
13,17,21 62:2,6
63:2,12,15,21
64:12,19,25
65:3,4,8,25
66:4,8,13,24
67:2,9,14 68:8,
18 69:6,10,16
72:15,19,22
73:1,6,8 80:22
81:6,16,19,24
82:8 83:2,7,12,
13,17,23 84:3,
8,14,18,22
85:1,16 86:7,
10,12,16,22
87:4,10,15,17
88:10,16 89:4,

10,16,22 90:3,
11,22 91:3,10,
14,18,24 92:1,7
93:15,18,23
95:3,6,14,17,21
96:17,22 97:3,
6,10,15,16
98:16 101:19,
20 103:11,14
114:3 115:21
117:20 118:7,
20 120:16
130:17,25
134:10,14
135:17 139:2,
14,18 146:15
148:24 151:19
154:15 155:18
156:4 157:3,14
160:4 161:6
162:4 163:5,8
164:12 165:7,
11 166:6
174:20 176:13
186:12 187:9,
21 190:11,15
192:23,25
205:1,11
206:21 207:22
209:16,20
210:1 211:11,
25 212:8
214:23 215:19
216:9,16
219:11,17
220:5,19,24
221:4,24 222:6,
9,25 223:5,13,
15,23 224:1,8,
13 225:3,9
226:25 227:24
230:5,8,15
232:13 234:24
235:6,15
237:22 238:11
239:2,7,8,19
240:16,22
241:8 247:23
248:22,25
249:15,19,23
250:5,10,15,18
251:18,25
252:3,8,12,19
253:23 254:1,8,
15,25 257:19,
24

**detectives**
14:1,10,14 16:7
31:7,10,21
32:15,17,23
40:11 41:8 43:2
44:22

**determine**
108:6

**device** 230:8

**Dewitt** 74:1

**died** 65:11
92:14 93:13

**differently**
165:25 237:11

**difficulty** 114:9

**direct** 9:11
82:9 257:16

**direction**
118:7,9

**directly** 115:6
235:4

**disappear**
30:1

**discussed**
80:25 222:24

**discussion**
171:19 219:11

**discussions**
171:22 205:15
211:6 225:3

**dismissed**
44:19

**dispute** 220:14

**distant** 195:12

**District** 8:11,
12

**diversion**
234:22

**doctor** 26:7
122:19 124:23,
25

**doctor's** 17:21
123:1 196:15,
21 197:4

**doctors** 196:23

**document**
22:14 35:21
39:8,10,23,25
180:18,19
181:23

**documents**
129:5 178:25
179:1,3,8,12,14
181:18 182:4

**door** 14:17
163:13 229:12
230:2

**doorway** 16:7
43:9

**dosage** 109:11

**Dovie** 134:25
135:2

**dozen** 185:8

**drawn** 162:20,
24

**drive** 30:14
76:12 77:18
110:16 119:2
228:23

**driveway**
31:25 32:1

**driving** 30:8
35:11 36:14,16
76:25 103:15,
22 109:19
253:14

**drop** 232:3
234:4

**dropped**
130:11 233:20

**drug** 176:21
177:15,21
178:4,13,15
179:20 181:25
184:9,12
246:23

**drugs** 79:25
80:2 113:21
128:10 215:17

**drunk** 41:3

**DUI** 35:8 40:24
43:1 44:16,24
45:12 68:14,15
102:7 116:17,
21 162:13
186:17 205:12
224:15 252:1

**dumb** 153:13

---

**E**

---

**earlier** 16:6
18:4 82:17,18,
21 85:17 86:20
88:21 90:20
91:8 109:4
123:20 143:7
153:25 164:1
200:2 218:23
249:14 251:22,
24 252:9

**Early** 134:25
135:2

**ears** 15:24

**earshot** 139:4,
7

**Eastern** 8:12

**easy** 125:12

**effect** 252:5
254:2

**Elliot** 8:15
163:18

**employer**
198:5

**encounter**
102:6 140:10
225:7 251:25

**encounters**
141:21 159:2

**encouraged**
155:10

**end** 51:5 84:7
211:17

**ended** 25:24
232:22 233:2
234:11 235:24
257:18

**enforcement**
101:7,23 102:4
192:1 225:24

**Enterprise**
22:24

**entire** 72:16
152:17,21
157:25

**equipment**
217:1

**ER** 209:21

**erratically**
109:19

**Escoe's** 73:25
74:9 88:23
92:23 152:10

**escorted**
229:1

**estimate** 153:9

**estimated**
102:10

**et al** 8:10

**ETS-01** 19:5

**Eubanks** 8:21,
24 99:1,2,11
166:23 173:13

**evading**
140:18

**Evans** 188:21

**Evanson**
147:14

**event** 167:4

**eventually**
27:7 44:19,25
72:12 84:13
157:16 216:7
223:18

**evidence** 34:2

**ex-** 203:23

**ex-mother-in-
law** 27:3 74:22
75:12 203:10,
12

**exact** 13:3
117:3 129:12

144:8

**exam** 13:22
45:23 46:1
48:14,16 56:6
60:11 65:13
67:24 82:19
211:22 213:8
217:5 219:6,10,
25 223:11,12,
13,16,24

**examination**
9:11 18:12
48:18 49:24
50:23 52:1
53:18 54:11
56:21 83:12
90:23 98:22
125:13 161:21
166:20 174:17
217:12 221:5
222:25 247:19
255:9 257:16
258:3

**examine**
126:17

**examinee**
50:25

**examiner**
18:21 19:1
27:16 28:7
29:13,14,23
49:25 51:23
52:10 53:10,14,
25 217:10
248:16

**exchange**
71:9,10 73:13
86:22

**excuse** 104:25
123:14 151:19
172:15

**exhibit** 21:19,
21 27:21,25
28:1 29:18
35:17,22 39:5,
11 40:23 50:3,
6,15 55:18,23,
25 58:8 60:4
62:15 66:19
69:15,19 73:17
86:2,4 94:7,10
96:8 116:4,5,7

132:17 163:16
182:4,12 184:8
219:5 258:21

**EXHIBITION**
94:10

**exhibits**
182:20

**experience**
15:9 48:4

**explain** 74:17

**eye** 122:4

**eye-to-eye**
195:15 196:9
206:18

**eyes** 108:19,21

---

**F**

---

**face** 37:14 97:1
105:5,7,9,19
106:5,7,8
115:13 117:22
121:23 122:4,
23 123:16,17
196:7 208:6

**fact** 77:3 82:14
163:16 185:4
248:5

**fail** 214:2

**failed** 53:25
54:4 121:7,8,
12,14

**failing** 49:19

**failure** 117:14,
15,16

**fair** 25:23 27:10
28:21 40:7
54:23 57:9
60:23 64:5
67:13 73:4
81:13,15 90:1
93:8 98:14
122:11 130:5
137:18,25
148:9 155:7,11
179:25 204:3
215:25 220:3
221:9 234:25

235:12,16
238:22 247:2,
22 250:22
254:14

**false** 66:10
75:24 80:19
81:14,21 95:22
98:15 194:4,23
236:8 245:22
250:5,19
254:22,24

**falsely** 81:25
87:18 99:18
100:21 193:17

**family** 11:22
37:15 208:13
226:6

**Farah** 8:25
50:7 51:11,18,
20 161:22
166:17

**Farris** 8:21
14:21,23 15:2,8
94:11,13,15
157:19 160:3
166:24 168:17,
20 170:3,15,21
172:1,8,18
174:5

**farther** 118:12

**fast** 218:3

**father** 76:3,22

**February**
141:4

**feed** 192:5
249:19 251:16

**feel** 37:17
100:20 185:2
193:14,16
219:19 237:10

**feeling** 132:3

**fell** 41:14
131:23 210:10
211:14

**felonies** 186:3

**felony** 158:19
186:1 233:5
234:11,16,25

235:18,22 236:12,25 237:3,5

**felt** 56:12 98:10

**female** 243:15, 20

**field** 108:8,13 112:11

**figure** 155:16

**figured** 44:13 76:14 77:19

**filed** 175:3

**fill** 26:7 126:20

**filled** 120:16

**finally** 91:10 118:9 235:21

**find** 33:7 34:2 38:2,3 138:24 245:5 256:7

**fine** 136:3 170:25 171:7,8, 23 189:6

**firm** 242:21

**first-hand** 67:6,16

**flashlight** 108:19

**fleeing** 140:18 203:2

**flip** 188:3

**floor** 38:4

**Florida** 17:13, 15,18 18:3 24:9,10 25:8,25 26:2,6,9,19 27:4,8,12 28:25 29:6 30:1,9 31:2 43:4 54:16 58:18 67:17 79:25 80:2 93:10,16 101:11 125:1,3, 5 126:24 127:16,21 186:15 196:11 197:9,13 198:8

201:19 202:8, 15,17 203:5 205:2

**folded** 79:4,11 91:4

**foot** 229:1

**football** 112:11

**force** 16:19 17:1 176:9,13 178:11 179:11 180:20 181:19 182:3

**forced** 98:11

**Ford** 35:13

**forget** 124:24 228:14

**forgot** 116:4 152:10

**fork** 117:9

**form** 21:17 27:13 28:13,19 29:2,9,15 33:11,23 41:18, 25 42:5,23 44:12 45:3 49:10 55:2,14 56:11,24 57:5, 14,21 58:1,6 59:4,18,22 60:2,16,20,25 61:6,12,25 62:4,9,14 63:5, 8,13,19,25 64:23 65:2,6 66:11 67:4 69:9,12 71:13, 20,24 73:10,16 77:5,10,14 81:2,11,17,22 82:4,15 83:5,9, 15,21 84:1,6, 12,16,21 85:4, 11 86:14,18,25 87:6,13,21 88:3,12 89:7, 14,19,24 90:5, 14 91:6,17 92:3,10 93:22 94:1,23 96:1 97:19 98:8,12,

17 99:20 109:17 113:5 116:24 122:18 123:19 133:1, 11 140:13,20 143:13 144:9 145:12 147:2 150:12 152:3, 19 153:23 154:17,24 155:8,12,20 156:13,21,24 159:16 160:23 167:19 174:1 175:14,25 176:4 180:3 183:15 184:14 193:5 194:5 195:25 197:20 200:1,14 201:4, 6 206:13,22 215:22 218:4, 22 219:21 220:2,7,17 221:12,16 222:1,11 223:6, 14 231:4,14,17, 19 235:9 236:19 237:2 239:10 245:7 247:12,15 248:1,23 249:12,21 250:2,8,13,20 251:20 253:16 254:5,10,16 255:1 257:22

**forms** 184:8

**found** 26:21 67:21 138:23 180:1 185:6,11 186:5 196:13 201:16 204:4 207:14

**Foundation** 150:12 152:3 223:6

**fourth** 51:1,3

**frame** 149:14

**Frankfort** 13:22 18:13 48:19 52:2 62:2 139:13,18,21

165:2 187:5 213:8,13 214:16 215:2 222:24 223:7,8, 10,11,15,16 224:1

**fresher** 18:15

**friend** 11:22,25 18:1 30:4,7

**friend's** 240:4

**friends** 12:2 29:1,7,13 64:2

**front** 96:8 107:5,6,7 112:6 116:5,11 119:15 133:20 163:17 178:8 216:4 253:23

**fuck** 37:16 106:12 208:13

**full** 220:13

**functioning** 181:23

---

**G**

**gain** 236:18,21

**garage** 111:6, 10 112:3

**gas** 73:25 74:8

**gathered** 107:8

**gave** 53:20 72:16 84:22 85:6 98:3,6 140:6 145:4 152:14 153:20 157:9 159:14, 20 160:4,25 161:14 165:16 249:2 254:13 257:20

**general** 229:24

**girls** 136:22 137:3,8 213:24

**girls'** 137:11,12

**give** 9:6 36:2 43:16 75:20 91:14 98:15 126:11,17 143:18 144:15 145:16 150:23 157:19 192:14 202:6 205:5,16 207:3 232:12 235:3 236:21 241:7 243:22 257:12

**giving** 42:1,3 53:10 72:13 91:10 140:3,7 250:15

**God** 116:3

**good** 9:13,15 238:14

**Gotcha** 151:14

**grab** 37:14 105:7,9,12,19 106:8 115:13 117:21 208:6

**grabbed** 105:5

**grabbing** 106:5,7

**gravel** 121:15, 18

**green** 21:15 33:13

**ground** 142:9

**guard** 228:12

**guess** 27:20 116:16,19 123:15 180:23 191:11 196:3 198:11 201:14 211:20 214:5,7 218:13 244:13, 15

**guests** 226:6

**guilty** 116:21 147:25 158:19 193:14,16 233:2,21 234:11 255:25 256:4,5,7,23

**guy** 191:13,17, 19 204:9 216:21,22 228:13

**guys** 12:19 244:10

---

**H**

---

**habit** 124:10 246:23

**hair** 189:2,5

**half** 77:1 153:1 185:8 217:24

**Hammonds** 133:20

**hand** 9:3 105:16 169:10 178:25 180:17 182:17

**handcuffed** 119:10

**handcuffs** 215:5 228:16

**handed** 50:17

**handle** 138:18

**happen** 131:11

**happened** 31:21 38:15 85:5 115:14 120:6 129:23 132:24 141:4 193:25 195:18, 20 200:10 217:12 226:9 239:21

**happening** 19:14 23:25 90:16

**hard** 245:5

**hauled** 198:4

**head** 41:23 52:20 53:3 96:15,24 105:22 122:2 123:5 131:23 134:25 135:2,3

210:10 211:15

**headed** 24:9 95:12 96:21 105:18 238:2

**hear** 15:23 39:2 46:24 68:24 69:1,3 70:24 71:3,12,18,22 73:14 86:23 87:11 135:1 143:4,19 144:13,16 151:23 153:15, 16,17 155:19, 25 156:2,11 198:25 219:9 221:17,21 224:15 226:17 228:20 252:15, 17 253:5,9 254:3 255:11 257:7

**heard** 61:7 67:1,10 80:15 82:18 83:8 107:13 114:23, 24 153:13,21 154:1 155:17 156:9 157:2 176:3 188:22 196:6 199:2,3 200:3,7,9 212:25 218:18, 21,22 219:4,16 222:3,18,21 241:11

**hearing** 231:2, 12

**heel** 108:15

**held** 183:19,25

**helped** 80:15

**helpful** 9:21

**Helton** 8:9 9:13 10:19 12:16 14:20 15:11 17:11 19:7 21:25 22:1 27:23 28:4 35:19,21 39:7, 13 50:15 51:22 53:18 54:23

55:5,20 56:3 58:7,12 59:23 60:5,9 62:16,19 65:8 66:20,23 69:14,17 73:19 74:4 76:1,16 77:17 84:13 85:14 86:6 89:4 90:7,10 91:7 96:11,12 98:3, 24 111:17 145:18,20 149:18 161:23 174:19 183:1,7 204:21 246:21 247:21 248:13 249:10 252:19 257:18 258:17, 18

**Hey** 132:11 159:20

**HGN** 121:8

**high** 41:5 109:14 247:4

**hit** 41:22 52:20 53:3 131:23 210:10 211:14

**holler** 31:14, 15,23 45:19 47:7,8,12,13 129:11,14 135:12 136:9

**home** 12:10 31:6,11 34:3,6 35:4 42:21 45:3,4,19,23,25 46:4,21 67:25 68:2,5 132:18, 25 133:3,15,23, 24 134:6,17 135:19 137:8 207:15 211:11 223:20 224:5 238:22,25

**homicide** 15:6

**honest** 34:24 54:21 67:12 120:11 157:8

**hood** 76:9

**Hook** 8:8

**Hoskins** 8:10 11:13,25 65:17 74:1,9,12 75:17,20 78:3, 6,10,14 79:3,7, 10,21 80:1 81:7,25 87:18 88:22 92:14,23, 25 93:5,9,24 94:4 98:4 99:19 131:11 138:6 144:23 146:21, 25 152:5 155:22 156:3 160:17 175:4 188:4,19 191:2 195:8 205:7,17, 20 213:1 222:24 225:2 235:12 247:10 249:25 252:23 257:9

**Hoskins'** 188:9

**hospital** 38:18 96:14,19 115:15 118:19, 20,24 119:2,4, 21 129:22 162:19,23 209:21 238:16

**hounded** 100:22

**hour** 40:21 48:7 60:5 153:1 217:24

**hours** 76:7 78:2 214:20,22

**house** 13:3 19:17 23:9,13 30:2 31:22 32:6,19,21 34:13 47:2,3 70:13 76:11,13, 22 77:16,19 101:20 102:20 110:14 111:3,4 127:15 129:17 133:14 134:18, 20 136:2,4,6,21 142:8 160:5,13 162:4,5 164:23 169:4,21,22

191:7,13,19 194:12 201:20, 24 207:2,7 211:23 212:9 213:16 225:22 226:7 239:20 247:9

**houses** 113:12

**How'd** 37:17

**Hudson** 100:10 142:17 225:17 226:16, 18,21 227:5,18

**hundred** 112:12

---

**I**

---

**idea** 17:18 77:22 98:14,15 151:24 173:23 227:13

**IDENTIFICATI ON** 21:21 27:25 28:1 35:22 39:11 50:6 55:23 69:19 86:4 182:12 258:21

**identified** 117:8 243:15

**idiot** 37:18

**immediately** 85:12

**impair** 124:1

**implicate** 61:22 62:3 63:17 81:7 87:18 145:1 205:6,16 235:4, 7 236:22 247:24 249:25

**implicated** 81:25 98:4 161:15 235:11, 16,21

**implication** 149:18

**implied** 120:2, 17

**incarcerated** 69:24 70:1 135:10

**incarceration** 45:3,4 46:4 132:18,25 133:4 134:1,6

**incident** 115:12

**included** 184:8

**including** 184:19

**incriminating** 99:18

**Indiana** 137:23

**indicted** 140:16 141:24 142:1 143:20 148:9,15 149:25 232:22

**indictment** 140:22,24 141:1,7,12,14, 17,23 143:11, 24 148:17 149:16,21

**individual** 176:20,25

**individuals** 173:15,21 174:4

**indulge** 144:11

**infection** 96:14,23 97:2

**influence** 117:14

**inform** 53:21

**informant** 13:9 15:20 16:1,15, 18,22,25 173:20 175:22, 23 176:3,6,7 177:18 178:2,5, 16,22 179:9 180:2,11,14

**183**:7,13,24 184:4,12

**information** 29:21 41:16 42:16 47:20 60:1 62:7 65:5 66:10,14 81:14, 15,21 84:14 88:10 89:5,10, 17 90:2 91:15 92:6 172:5 181:7 192:5 203:15,18 205:5,16 220:21 235:3 236:21 249:19 250:15 251:16 254:21,24 257:19

**informed** 237:7

**informer** 195:23

**injury** 122:2,16 123:5

**innocent** 66:17 84:10 175:9 193:23

**insinuating** 210:9

**insurance** 117:17

**intend** 202:18

**intended** 97:7, 10,15 105:13

**interact** 204:25 208:2

**interacted** 16:13 170:20 225:13

**interacting** 165:15

**interaction** 164:21 166:2,9, 14 167:3 174:5 187:12 205:4 207:6,21 211:21 213:7 224:8 225:9

**interactions** 38:16 59:6 168:13,19 173:14 174:4,9 186:12 187:20 234:24 235:15

**interest** 132:7 193:19

**interview** 16:12 54:25 55:5 59:11,15 60:10,13 61:14, 21 63:1,12,16, 22 64:18 83:1, 11,23 84:8 90:21 162:5 163:13 165:6,8 166:5,8 167:1 168:7,10 174:7 201:10 205:18 216:25 218:3 220:5 221:18 240:22 248:5

**interviewed** 99:13 163:3 203:19

**interviewing** 163:12 165:18

**interviews** 89:18,21 173:17

**intimidating** 181:3

**introduce** 8:13

**investigation** 15:15 99:8 100:1 131:2,21 132:4,8 138:2 158:5 166:9,15 168:15 170:18 171:20 172:2 174:24 184:3 186:13 187:22 188:7 236:23 252:24

**investigations** 176:2,15 183:19,24

**investigator** 147:13 160:5,

19 189:3 192:2, 3 194:12 239:20 242:24 252:22

**investigators** 191:1,7 195:7 247:8

**invited** 32:5

**involved** 37:6 61:15,19 79:18 132:12 138:15 162:12 166:1 168:4 172:1 173:24 176:16 253:18

**involvement** 99:7 166:8,11 174:23

**involving** 168:15,20

**issued** 143:24 146:21

_____

**J**

**Jackie** 8:20 11:6 166:23 173:12

**Jacksonville** 125:21

**jail** 43:1 44:24 45:12 70:14,17, 20 72:4 81:8 84:10 85:9 92:8 133:18,19 134:5,9,13 142:24 143:20, 21 147:6,20 148:3,14,18,19, 22,25 149:2,9 150:7,13 151:2 158:11,13 159:12 188:10 189:9,15,19 190:1,16 227:3, 10 228:12,15, 22 229:18 233:8 236:3 242:2 243:8 253:14

**James** 8:9 39:13 111:17

**January** 18:13, 22 27:10,17 29:14 35:9,18 36:5 39:16 40:5,7 41:3 51:23 52:24 53:11 54:11 57:10,17 58:3, 13,16,25 59:12, 23 62:23 63:2 64:8,11,18 65:9,13 66:1,5 67:2 68:15 83:1,7,11,22 84:7 102:11 116:14 124:8 127:3,18 129:21 132:23 133:6,7 136:21 139:12 162:12 165:2 166:5 167:1 168:10 186:17,23 187:3,6 201:10 205:12,20 206:5 207:21 209:9 211:1,4, 8,23 212:23 213:8 218:9 234:23 235:7, 15 236:12,17, 20 247:23 248:15 251:24

**Jason** 8:18 12:24 13:1,20 14:16 35:18 37:9 38:1 39:1 46:2 48:21 72:9 94:25 103:19 105:1 115:12 116:9 120:16 127:13 134:17 135:23 155:2 156:1 163:24 167:2,13,18 172:15,18 174:20,21 175:23 229:14

**Jay** 68:3 214:1 215:1

**jeopardize** 176:2

**jeopardized** 183:19,25

**jerked** 105:15, 22 106:2

**Jesse** 27:1 30:20 49:15 64:13 203:7,9 215:7,14,16,23

**job** 78:11,15 79:14

**John** 8:22,23 15:11 36:7,8 46:2 70:18 72:9 98:24,25 106:21,22 134:18 140:23 152:2 154:12, 14

**Johnson** 8:20 17:2,3 166:23 173:13

**Join** 71:5,15,25 87:7 88:19 90:6

**Jonathan** 11:16 12:2 80:15 81:7 82:1 87:18 94:5 98:4 131:12 138:10 146:22 154:20 160:19,21 175:4 188:5 192:4 195:8 205:6,17 206:2 213:3 222:23 224:22 249:25 252:23 257:8

**Jordan** 177:1, 22 178:4 179:21 181:8 182:1 184:6 195:20

**Joseph** 8:20 166:23 173:13

**Joshua** 188:25

**judge** 10:15 133:20

**July** 186:22

**jumped** 208:7

**jumping** 209:7

**junk** 198:4

**jury** 258:13

---

**K**

**Karnes** 188:17

**Katherine** 12:6 13:6,16 14:15 15:4,15 16:9 26:21 27:12,18 31:3 34:17 35:2,6 38:21 40:8 42:4,17 44:2 46:17 49:5 50:1 52:16 53:3,15 54:8 55:11 56:18 57:7,12,18 59:2,13 61:10, 23 62:3,24 63:3,18,23 64:6,14,21 65:10,14,18,22 67:1,21 69:7 74:21,23 75:1, 11,15,18,21 76:6,15 77:1,22 78:12,16 79:1, 15,19,22 80:6, 8,12,16 82:1,10 83:4,19,25 84:4 87:19 91:15 92:14 93:1,12 99:9 100:1,25 102:20 111:4 117:20 118:4 142:23 158:16 166:9,15 167:24 171:19 174:24 175:9, 13 180:1 185:5 186:5,12 187:21 188:6 196:12 199:1,6, 18 200:4 201:16 203:12 204:4 206:12 235:8 236:22 244:18 247:10, 25 248:7,17,21 250:1 257:9

**Katherine's** 76:13 77:18

**Kelly** 8:21,22 14:21 15:23 16:2,4 39:2 46:24 50:11,19, 24 51:5,14 69:1,4 71:4,15, 20,24 81:1,12 82:6,15 85:4 86:18 87:1,7, 14,22 88:4,18 90:6 92:4,11 94:11,12,15 97:19 98:23,24 101:13,16 116:7,10 127:5, 7 129:3,6 140:25 141:6, 10,12,18 149:13,20,22 150:2,5,18,22 157:19 160:3 161:20 166:24 167:3 168:17 226:17 255:10, 19,22 256:25

**Kentucky** 8:8, 12 17:3 30:10 76:5,21 96:19 125:7 126:21 202:23

**Kevin** 136:25

**kidding** 21:20

**kids** 32:1 135:3

**kill** 80:7,15 93:1 210:11

**killed** 27:2 38:5,6 44:1 56:18 57:7 63:3 65:15,19,23 77:23 78:19 80:9,12 82:10 83:19 114:15 203:10 208:17 252:6

**killing** 37:16 75:15 78:15 79:19 106:12 175:13 183:2 208:13 244:17

**kind** 10:25 21:10 35:11 101:7 108:5 122:21 172:14

**kindly** 153:14 193:22

**knew** 25:20 34:17 42:16 47:20 54:16 62:24 64:21 65:10,14,17,21 74:24 76:8,9, 13,15 77:19 80:5,8 83:4 93:23,25 127:13,14 131:17 153:14, 19 154:18 155:6,11 161:16 195:23 199:15 254:6 256:17

**knocked** 122:10 136:11

**knowledge** 67:6,16 80:7,11 82:9 176:12

**Knox** 8:10,23 11:7 20:8 36:8 68:12 96:12 98:25 99:24 100:4 102:24 103:3 105:1 119:4 120:21 130:13 137:20 140:10,11 141:22 142:20 148:11 151:2, 11 158:8,11 159:8,17 165:11,17 171:14,15 224:12 225:18

**KSP** 51:14,15 163:6 166:22

**KSP1791** 50:4 51:18

**KSP341** 39:7

---

**L**

**label** 182:3

**labeled** 178:25 180:18

**lady** 76:15 208:17 252:6

**Lagrange** 246:10

**lamppost** 136:10

**large** 63:23 64:9

**Larry** 76:4,22 102:15,16 111:12,13,21 112:2,15,22,25 113:4 117:9

**lasted** 168:7

**late** 95:8,15 238:3 240:17

**Laurel** 148:19, 21,25 149:2,9 150:6,13 189:18 190:16 210:1

**law** 76:14 77:20 101:7,23 102:4 169:20 192:1 225:24 242:21

**lawfully** 36:14, 16

**Lawson** 30:20 64:13 203:7,9 215:8,14,17

**Lawsons** 51:5

**lawsuit** 99:16, 17 175:6

**lawyers** 252:23

**lead** 199:10

**leading** 41:18 44:12 55:2 56:24 71:13 77:14 82:6 93:22 94:1 96:1

97:14,20 98:12
221:9 248:1
254:12

**learn** 156:2

**learned** 131:21
148:17 160:22

**leave** 18:8
72:19 205:5
215:21 223:18

**leaves** 215:23

**leaving** 23:7
31:24

**left** 19:12 20:3
22:2 23:14 24:7
35:4 59:11 62:2
76:11 202:13,
17 213:23
214:25 216:1

**leg** 121:10

**legal** 126:25

**legitimate**
231:23

**lends** 128:19

**length** 153:6

**Lester** 11:19,
21,23 60:14
61:3,23 62:3
63:4,17,23
64:3,9,20 65:21
74:1,9 75:20
78:3,6 81:7
82:1 83:3,13,24
87:19 88:22
92:20,23 93:5,
9,24 98:5 138:8
145:1 152:7
156:6 188:5
191:2 195:8,10,
23 196:9 205:6,
17 206:7,11,17
213:5 220:20
222:9 249:25
252:24 257:9

**Lester's** 60:17,
24 74:22 75:12
76:4,8,21 77:4,
9 156:19 157:7
214:13

**levied** 256:1

**Lexington**
95:11 123:8
238:22

**Licha** 8:25

**lie** 66:2,6 84:9
97:12 98:7
159:21 160:4
253:2,7 256:13

**lied** 159:9

**life** 11:24 16:19
193:23

**lights** 110:19

**Likewise**
130:13

**limited** 180:25
247:21

**Lisa** 147:14
188:21

**list** 32:24 33:5,
6 126:11

**listed** 116:1

**listen** 19:2
55:6,21 58:8
60:6 62:16
66:20 82:23
86:1 88:6 89:2
90:8 248:10

**listened** 82:18

**listening** 90:25

**live** 111:5
129:7,15
137:20 168:24,
25

**lived** 135:7
171:10

**lives** 129:13,17

**living** 31:13,17
63:23 64:9
129:8 135:5,13
136:20

**loaned** 128:15

**located** 8:8
168:23

**location** 117:3

**lock** 75:3

**locking** 75:21

**Lon-** 189:18

**London** 147:6,
20 148:11
188:10 189:9,
15,17

**long** 11:23
12:19,21 17:23
19:24 20:1 24:3
26:2 30:9 40:17
45:8,11 72:25
103:19,22,25
110:16 122:8,
13 123:4 125:2,
11 126:1,2
127:20 130:20
138:21 150:6,8
152:23 153:2
167:16 168:7
178:22 190:1,
21 200:5
202:11 214:19,
20 217:9,21,24
218:5 228:5
234:19 246:4
254:7

**longer** 180:2
219:20

**looked** 181:23

**lose** 49:14

**lost** 30:17

**lot** 9:18 10:13
11:9 35:16
189:14 190:19
215:17 218:22
231:6 237:18
249:1

**lunch** 202:5,7
239:4

---

**M**

---

**M-E-R-I-D-A**
129:1

**machine**
253:10

**machines**
101:3

**made** 69:16
71:10 73:13
84:19 85:1
86:22 88:16
116:23 134:4
165:12 249:8
252:13

**maintain**
117:16

**majority** 81:13

**make** 10:14,16
27:21 34:3,12
37:11,17 46:23
47:5 55:17
61:21 66:14
71:1 73:8 74:3,
13 89:22 91:18
97:4 101:15
184:11,13
186:11 196:25

**makes** 142:2
158:22

**making** 62:12
63:12 97:17
125:2 202:14
231:10 238:19
250:18

**male** 243:18

**man** 147:10,11
160:15 188:13,
14 189:10

**March** 69:17,
18 70:12 80:21
82:7 84:15,23
85:6,16 86:3,
10,15 91:11,14,
23 92:5 93:15
98:3,6 140:3,5,
19 141:7
143:24 145:4
157:9 158:8,11
159:9,15,21
161:1,6 165:16
187:13 190:10,
22 192:15
194:22 225:10
233:18 234:6,
13 235:11,14,
25 236:8

240:24 249:2,
15 253:13,22
254:6,13

**marijuana**
113:23

**mark** 8:19
13:12 14:16
19:5 21:18
39:1,5 50:3
69:15 94:7
130:19 163:23
164:14 166:22,
25 167:3,7,9,
12,13,21 168:3,
9,10,13

**marked** 21:21
27:25 28:1
35:22 39:11
50:6 55:23
69:19 86:4
94:10 132:21
182:12 258:21

**market** 73:25
74:9 88:23
152:10

**matter** 8:10

**meaning**
243:20

**meant** 71:21
75:4 213:24

**medication**
124:4,13
126:23

**medications**
124:20

**meet** 13:1 18:4,
8 69:21 169:11,
18,21,23,25
188:7 242:8

**meeting** 13:5
43:3 44:10 56:5
57:1,10,17
58:15,24 59:24
63:21 66:1,4,9
67:2 69:17
72:18 73:4
80:21 82:7
86:10,15 99:4
101:6,19
123:14 132:3

**140:2** 152:9
187:13 190:10,
25 206:20
208:25 211:10
234:13 246:4

**meetings** 58:3
91:9,19 139:14
140:6 148:5
167:3 168:19
246:8

**meets** 169:20

**Mefford** 8:20
13:13,15,18
14:2,10,14 16:7
39:1,21 40:4
41:8 42:9 44:22
130:19 163:5,
12,24 164:14
166:22,25
167:3,7,10,12,
13,21 168:3,10,
13 174:6

**member** 99:24
140:11 162:22
166:13 176:13

**members**
100:4 178:11

**memory** 18:15
19:1 29:18
190:2 195:7
205:21 212:25
213:12 214:9
222:23 224:22
225:2 226:3
227:23 229:15
230:5 240:15
248:11

**men** 119:15

**mention**
146:17 152:7

**mentioned**
130:18 205:20,
23 206:2,5,7
211:14

**mentions**
132:22

**Merida** 45:17,
18 128:22,24,
25 129:7

**met** 13:7 18:21,
25 19:16 27:16
29:14 44:4 65:8
66:1 70:8,15
170:1 172:16
173:1 186:21
227:23 250:25
251:3,6 252:22

**metal** 96:14,23
121:22 123:16

**Miami** 125:22,
24

**mid-** 187:2

**middle** 22:16

**Middlesboro**
21:7 22:12 23:8

**Mike** 8:25 14:5,
7,16 16:15
17:17,23 18:4
19:16,22,24
20:12,14,21,24
21:3 24:4,16,
22,24 26:3,14,
20 27:5,11,17
28:17,21 29:1,
2,3,7,13,25
30:8,19 33:5,19
34:22 39:1,4
43:4 54:16,25
57:19 58:17,21
59:1,6 60:19
63:3,18 64:20
76:11 78:3,7
79:25 80:1,5,8
83:3,14 93:10
131:5,15,18
161:24 162:3,5,
16,22 163:12
164:2,8,15,25
165:3,7,12,21
166:1,10 167:2
196:12 198:10
200:12 201:22
203:5,21,23
204:6 207:3
226:8 247:24

**mile** 76:5 77:1
110:18,24

**milepost** 117:5

**miles** 110:17

**mill** 155:23

**milligram**
128:3

**Mills** 12:6,8
13:6,16 15:4
16:9 26:21
27:12,18 34:17
35:6 37:2 38:21
40:9 42:4,17
44:2 46:18 49:6
52:17 53:3,15
54:8 55:11
56:18 57:7,12,
19 59:2,14
61:10,23 62:24
63:3,18 64:21
65:15,18,22
67:21 69:7
75:11,15,18,21
77:22 78:12,16
79:15,19,22
80:8,12,16
82:10 83:19,25
87:20 91:15
92:14 93:1,13
99:9 100:25
117:21 118:4
142:23 158:16
166:9,15
167:24 171:20
174:24 175:9,
13 180:1 183:3,
20 184:1 185:5
186:5,12
187:21 188:6
196:12 199:1,6,
18 200:4
201:16 203:12
204:4 206:12
235:8 236:22
244:18 247:11,
25 248:7,18
250:1 257:10

**Mills'** 12:10
13:19 14:15
15:15 31:3
32:13 35:2 50:1
61:19 62:3
63:23 64:6,7,14
67:1 76:6 77:1
82:1 84:4
100:1,25 101:7
102:20 248:21

**mindset**
184:15

**mine** 17:19
50:21

**minute** 19:5
43:13,16 97:23
164:3 229:17

**minute's**
218:21

**minutes** 20:1
48:9 103:21
138:22 153:3
217:11 218:1
246:5

**mischaracteri
zation** 219:1,3

**mischief** 70:3
140:17 147:24
186:1 189:21
233:5 234:12
256:5,18,20

**misdemeanor**
186:9

**Misleading**
29:9

**missed** 101:3
143:6 172:12

**missing** 248:7,
17,21

**misstated**
145:14

**misstates**
123:19 145:12
152:19 153:25
155:8 200:1
201:6 222:1,11
231:4,14

**Mills'** 111:4

**moment** 66:20

**moments**
68:16 71:16
249:1 253:12

**money** 20:14,
16 24:16,18,19
25:4,12,15,18,
24 27:5,11,18
28:18,22 32:7

**mindset** 184:15

34:7 53:6,14
55:11 56:10,14
57:3,11,18
58:17,21 59:1,
7,13 61:4,9
62:24 64:21
65:10,15,18,22
74:3,13 78:20
79:1,4,10,14,22
83:4,24 84:4
91:4 128:16,19
146:4 197:8,18
198:8,10,12,18,
19,25 199:5
200:12,16,20
201:3 206:12
207:16 215:17
218:19 221:24
222:10

**monitor** 45:6,9
46:6

**month** 189:24
197:5,6

**monthly** 202:8

**months** 45:10
150:10 189:20
190:3

**morning** 9:13
19:15 70:15
74:24 76:2
201:15,22
228:8

**Morris** 20:4,5
23:10,13 76:12
78:4

**mother-in-law**
203:24

**motor** 117:13,
15 122:5

**moved** 10:22
106:10 208:8

**moving** 204:23

**MRI** 125:18

**multiple**
144:10 233:23

**murder** 40:13
41:17 44:11
47:20 60:18
61:15 67:7

70:24 73:15
83:14 87:19
99:8 100:1
101:7 117:20
118:4 131:1,23
132:8,12 138:2,
15 142:23
144:17 155:7,
11 156:18
158:3,5,16
161:16 166:9,
15 167:24
168:4,15
171:20 174:24
175:9,19 183:8,
20,25 184:13
185:5 217:14
230:20,21,25
235:8 236:22
247:10,25
250:1 257:8,9

**murdered**
41:14

**Murry** 128:23

_____

**N**

**name's** 174:19

**named** 176:25

**names** 17:7
126:3,6 137:12

**Natalia** 8:4

**nearby** 113:12,
14

**neck's** 121:16

**needed** 43:22

**neighbor**
45:15 128:15,
17,19,21
197:23,24

**news** 204:4

**night** 24:20
84:25 103:22
232:12 238:13
250:6

**non-question**
258:16

**note** 30:24

**notes** 44:4
191:17

**number** 8:12
21:19 29:18
35:17 39:5
40:23 50:4,7
69:15 73:17
91:9 94:7 96:8
116:4 120:15
133:10 180:14
182:8 183:17
239:24 240:3,6

**numbers**
182:7,8

_____

**O**

**object** 21:17
27:13 28:13,19
29:2,9,15
33:11,23 41:18,
25 42:5,23
44:12 49:10
55:2,14 56:11,
24 57:5,14,21
58:1,6 59:4,18,
22 60:2,16,20,
25 61:6,12,25
62:4,9,14 63:5,
8,13,19,25
64:23 65:2,6
66:11 67:4
69:9,12 71:13
73:10,16 77:5,
10,14 81:2,11,
17,22 82:4
83:5,9,15,21
84:1,6,12,16,21
85:4,11 86:14,
25 87:6,13,21
88:3,12 89:7,
14,19,24 90:5,
14 91:6 92:3,10
93:22 94:1,23
96:1 97:19
98:8,12,17
132:4 154:17
218:24,25
219:2 248:1,23
249:12,21
250:2,8,13,20
251:20 253:16
254:5,10,16
255:1 257:22

**objected**
231:24

**objection**
10:16 47:21
71:4,15,20,24
81:1,12 82:6,15
86:18 87:1,14,
22 88:4,18
91:16,21 92:4,
11,16 93:2,6
97:14,20 99:20
109:17 113:5
116:24 122:18
123:19 133:1,
11 140:13,20
143:13 144:9
145:12 147:2
150:12 152:3,
19 153:23
154:24 155:8,
12,20 156:13,
21,24 159:16
160:23 167:19
174:1 175:14,
25 176:4 180:3,
6,8 183:15
184:14 193:5
194:5 195:25
197:10,20
200:1,14 201:4,
6 206:13,22
215:22 218:4,
22 219:18,21
220:2,7,17
221:10,12,16
222:1,11,20
223:6,14 231:4,
14,17,19 235:9
236:19 237:2
239:10 245:7
247:12,15
251:15

**objections**
10:14

**occasion**
105:4,5 115:24
126:24 134:14
135:17 142:23
147:21 152:24
191:10

**occasions**
195:6 206:8
243:8

**occur** 160:6

**occurred**
102:11 104:4
109:5 116:13
122:25 140:19
142:5

**occurring**
52:13 77:24
103:24

**offence** 117:14

**offense** 249:6

**offenses**
116:18 186:9

**offered** 71:6

**office** 8:7
69:23 72:2,6,8
140:4,7 149:3
150:23 151:13,
14,16,17 158:8,
15 165:18
187:13 228:2,
22 229:7,8,12,
20,24 249:7

**officer** 13:12
14:20,23 15:2,8
36:5 45:22 72:3
116:2 130:13
139:15 192:1
223:21 224:4
226:15,19
248:20,22
249:8 252:20

**officers** 16:24
17:8 31:3 33:7,
9,24 34:2 37:5
40:12 42:16
43:23 80:24
82:9 91:10
100:8,21
101:24 102:4,
25 127:11
135:16 162:12
164:22 166:22
183:18,23
184:18 248:6

**offices** 229:10

**old-ass** 110:11

**one-half** 76:5

**occur** (continued right column)

**open** 111:21
229:9

**operating** 77:9
117:13

**order** 79:25
80:1 128:9
162:2 256:13

**original** 234:6

**originally**
51:15

**outhouse**
75:3,22

**owner** 117:16

_____

**P**

**p.m.** 22:5,8,20
85:21,23 98:1
116:14 150:19,
21 174:14,16
204:17,19
246:17,19
258:22

**pages** 35:19
50:8

**paid** 23:5

**pain** 124:4,12,
17 126:8 247:5,
6

**paper** 35:17

**papers** 169:23

**paperwork**
169:14 172:16
173:2,3

**paragraph**
73:23 76:1 78:1
80:14 182:23,
25 183:1,5,17
184:17,20

**pardon** 141:10
144:4

**parked** 115:5

**part** 18:24
29:17 58:12
60:9 61:14
74:25 75:15
88:5 89:7 145:3

220:25 222:10 244:20

**participate**
52:11 114:8

**participating**
52:16

**parts** 219:24
221:20 241:3

**pass** 21:25
77:16 104:20
214:3

**passed** 104:22
121:12 240:4

**past** 100:8

**pay** 19:16,22
20:12 22:24
128:9 197:16,
18 201:23,25

**payment**
170:25 171:8

**PD** 38:19
100:13 115:16

**pending** 8:11
71:2 81:20 82:2
92:8 234:25
235:18 236:12,
25

**penitentiary**
193:24

**people** 9:18
30:24 54:7
61:18 104:24
106:12 112:15,
17 151:17
156:3,4 225:24
237:10

**perfect** 10:3

**performed**
114:4

**period** 28:24,
25 29:6 46:3
48:10 148:5
178:2

**perpetrators**
184:19

**persist** 105:24,
25

**person** 14:4
57:20 60:18
84:10 91:3
111:23 113:19
131:14 132:7
189:7 191:20
206:11 228:19,
20 229:15
242:14 244:17

**personal**
178:9

**personally**
11:12

**pharmacy**
197:14

**phone** 26:24
30:20 95:6
96:13,18,22
158:4 187:18
192:23 239:9,
16,19,24 240:2,
16 242:16

**photographs**
252:20

**physically**
23:4

**physician**
125:15

**physicians**
126:4

**pick** 213:15

**Pickard** 8:23
15:12,14,21
16:1 36:7,8,12,
20 37:1,21,24
38:10,17 46:2,
9,12,16,20
47:11,16,23
69:18,21 70:9,
12,18,19,23
71:1,12,17,21
72:9,15,19
73:1,5,8,11
80:22 82:8
84:19,23 85:1,
15 86:11,21
87:4,10,15,17
88:16 90:3,15
92:1,7 97:17
98:16 99:1,5,25

100:16,19
102:7,22 103:1,
8 105:1 106:24
107:16 114:6
115:1,5 118:3,
23 119:13,22,
24 120:10,11
130:2,8 132:11
134:11,18
135:17,24
138:23 139:15,
22 140:6
142:11 144:3,7
146:13 148:5,7,
21 150:4,24
151:18 152:2,
17 154:12,14
155:10 157:6,
11 158:4,7
162:13 164:22
165:18 184:16
190:13 209:19
212:5 225:14
227:24 229:6,
14 230:6
234:13 240:25
250:10,14,17,
22 251:25
252:10,12,17
253:14 255:6

**Pickard's** 72:2
100:17 106:21,
22 115:21
140:4 149:3
150:23 151:16,
17 187:13
228:2

**picked** 136:13,
14 148:9,10
149:8,11
197:14 202:3

**Pickerel** 8:20

**Pickerell**
166:23 173:13

**pieces** 154:6,8,
9

**pills** 26:8,10,
12,15,17 30:13
108:24 109:1,3,
6 124:17 125:6,
7 127:16,20
196:12 197:8,
11,13 202:9

207:5,11 247:4

**Pineville** 17:5

**PL** 51:14,20

**PL004853**
178:25

**PL004854**
179:1

**PL004855**
180:18

**PL15643** 21:19

**PL1791** 50:16
51:13,19

**PL1792** 51:22

**PL18949** 35:19

**PL25962** 86:2

**PL757** 140:24
141:1

**PL9686** 19:4
27:21

**PL9688** 27:22

**PL9689** 55:25

**place** 21:8 23:8
45:19 53:18
76:9 111:1,2
112:6 135:5,7

**plaintiff's**
182:5 220:23
221:2 258:8

**plaintiffs** 8:15,
16

**plan** 75:3,15
81:6 93:1

**plate** 97:1

**plates** 96:15,23
121:22

**play** 18:24
27:22 29:17
55:4,17 58:7
60:4 62:15
66:19 85:25
88:5 89:1 90:7
248:9

**played** 82:21
90:21 219:12,

25 220:6,14

**playing** 19:6
28:3 29:20
56:1,2 58:11
60:8 62:18
66:22 82:23
86:5 88:8 89:3
90:9 248:12

**plead** 147:25
158:19 233:21
256:23

**pleading**
116:20 233:2
234:11

**point** 16:18,19
17:24 18:7
20:11 21:2
26:20 34:1 37:5
45:11,21 53:20
61:17 69:10
72:18,20,22
74:12 104:12
110:5 123:13
131:21 177:11
200:3 203:7
238:14

**pointed** 131:4

**poked** 32:19

**poking** 32:20

**police** 14:3,13,
20 16:8 17:4
27:7 31:3 35:4
37:3 38:21 40:1
69:15 72:3
73:19 77:17
96:7 102:24
103:15 118:18
129:24 130:4,5,
8,18,20 133:16
139:15 140:18
161:7 162:12,
23 163:2
164:19 165:16
166:6,14 167:6
184:11 185:5
199:10,17
201:2,12 203:2,
3,18 206:10
208:2 209:25
210:1,3,4,8
211:1,4,7
215:13,16

248:6,20,22
249:8 252:20

**polygram**
139:11

**polygraph**
13:22 18:12,21,
25 27:16 28:6
29:12,14,23
45:23 46:1,10
48:14,16 49:2,
14,24 51:23
52:10 53:10,17,
25 54:11 55:5,
10 56:6,21
60:11 65:13
67:24 82:19,22
83:12,22 84:7
90:22 135:20
137:25 138:18
139:11,13,25
140:7 156:23,
25 164:23
165:3,6 186:22
187:6 211:22
212:10,17,23
213:8 214:2,18
215:3,20
216:23 217:5,
16,22 219:6,10,
25 220:5 221:4
222:25 223:11,
16,24 248:10,
16

**polygraphed**
64:8 247:23

**Pork** 195:18,21
237:7

**Porky** 237:4

**portions** 91:7
155:16

**position**
236:11

**possessed**
58:18

**Powell** 188:25

**practice**
124:25

**pre-trial**
234:22

**prescribed**
124:4,12,21,23

**prescript**
127:20

**prescription**
126:17,25
127:12 197:15,
19

**prescriptions**
126:20 127:19

**present** 14:10
23:4 34:10
38:10,24 39:19,
21 42:9,12
72:15 90:15
159:2,24 162:6,
8 163:9 164:25
165:3,7,13,21
166:7 167:1,4
173:5,17 174:6

**pressure**
54:24

**pressured**
56:12

**pretty** 9:15
48:4,10 70:8
200:8 240:12
248:24

**previous** 58:3
172:20

**previously**
170:2

**primarily**
162:2 164:12

**prior** 11:12,15,
18 12:5 13:5
15:14 16:12
18:3 61:8,13,17
62:23 65:13
67:2 77:23
82:7,11 83:4
86:20,21 87:3
88:17 91:14,19
93:15 116:18
168:19 248:5
249:18,23
253:22

**prison** 66:16
185:16

**problem**
238:18

**problems**
237:13

**PROCEEDING
S** 8:1

**promise** 46:23
232:3 247:22

**promised** 90:2
91:25 97:17
232:5 255:13

**promises**
71:1,9 73:9,13
80:25 84:18
85:2 86:22
88:15 250:18

**property**
140:19 233:16
234:9

**prosecutor**
11:4

**protect** 184:12

**protected**
176:1 183:6
184:18 185:2

**protecting**
175:22

**provide** 89:11

**provided**
81:21 84:15
89:12,17 92:6
231:1,9

**providing** 60:1
62:8 88:10
89:4,5,9

**pull** 37:6 114:9
162:13

**pulled** 31:24,
25 35:8 36:4,5,
12,21,23 37:2
38:15 40:24
111:7 112:4,5,
22 207:23
252:1

**pumping**
73:25 74:8

**purchase**
197:13

**purportedly**
193:21

**purports**
180:19

**purpose** 26:9

**put** 45:6 79:4,
11,24 80:1
102:3 134:5,6
145:25 146:3
154:6,8,9,21,22
156:8 161:7
217:1

**puts** 148:4

———

**Q**

**question** 10:4,
17 13:15 14:15
29:5 33:8 39:9
49:23 52:11,13,
19,23 53:5,9
54:12 59:14
82:16 87:16
91:8 141:13
220:3,8,12
231:20,22
237:6,8 253:6
255:12,15
258:5

**questioned**
13:4,19 14:2
27:7 31:3,6
38:20,25 40:4,
8,12 41:7,12
44:21 51:23
54:14,18 99:13
167:12 217:14

**questioning**
14:11 16:8
40:18 42:2,3
43:6 54:5,8
55:9 56:20
64:11

**questions**
9:22 10:4 11:10
17:12 19:4
27:24 37:1
43:11 46:17
49:25 52:7

**55:7,22 58:9**
60:6 62:17
66:21 86:2 88:7
89:2 131:1,4
143:8 164:9,13
167:17 168:1
174:12 210:21,
23 211:19
221:7 246:22,
24 247:18,21
249:1,3,10
255:11 257:15
258:15

———

**R**

**raise** 9:3

**ran** 46:22 47:2
165:10

**Randy** 45:17
128:22,23
129:7

**range** 51:10,11
200:4

**Ranger** 35:13

**ratting** 236:18

**RE-
EXAMINATIO
N** 257:1

**reach** 107:1

**reached** 208:5

**reaction** 170:9

**read** 96:11
117:4 120:2
121:9 182:23,
25 183:5,17
184:17

**reading** 120:17

**ready** 24:2
201:19

**rearrested**
143:23 150:1
233:13,18
234:6

**reason** 99:16
109:24 110:1,4,
9,10 169:12

171:25 178:9
213:22 220:14

**reasons**
238:17

**recall** 13:18
16:15 17:2,12
18:10 19:14,21,
24 21:5,10,12
23:25 24:4,21
25:2 26:2,5,20,
23 27:15 28:6
29:10,12 30:9
34:19 35:8
36:6,18 37:13
39:8 40:17,18
41:11 43:19
45:8,11 48:16
49:24 51:22
52:10,13,23
53:9,17,24 54:6
55:15 64:12,25
65:25 69:17
70:4,5,16
72:12,22,25
82:21,24 83:2
84:8 91:11 94:8
95:9 100:3
132:2 138:4,7
157:8 164:2,8
167:14 206:6,9
208:20 211:9,
10,13 220:21,
22,23,25 221:2
228:4 248:6
249:3,9

**RECC** 169:11,
15

**received** 59:1
79:22 203:6,15

**receiving** 11:1
115:23 122:22
140:18 185:24
233:16 234:9
256:9

**recognize**
175:1

**recollection**
19:9 28:17 56:8
86:9 157:23
164:6

**reconstructive**
122:23

**record** 8:3,14
85:20,21,22,23
97:22,24,25
98:1 150:16,19,
20,21 152:20,
24 153:12
174:13,14,15,
16 184:25
201:7 204:15,
17,18,19
222:12 246:14,
16,18,19,22
258:17,20

**record's**
101:15

**recorded** 44:7
73:5 85:15
86:3,21 194:10
211:8,12 231:2,
7 254:22

**recorder** 72:23
73:1,9 89:12
194:18 230:16
249:18 257:4

**recording**
82:22 86:5
87:3,9 88:8
89:3,8,11 90:9
194:15 222:18,
21 230:8
241:11 249:23

**recordings**
90:21,25 91:2

**RECROSS**
255:9

**REDIRECT**
247:19

**reference**
78:15

**referenced**
179:11

**references**
181:7

**referring** 76:10
78:11 114:18
216:22 225:18

**refresh** 19:9
28:17 56:8

**refreshes** 19:1
29:18 248:11

**regard** 99:8,25
147:1

**register/
transfer**
117:15

**regurgitate**
92:6

**related** 50:1
132:22 195:10

**relating** 13:6,
16 15:3 16:9
42:3,16 187:21

**relationship**
106:18

**relative** 238:15

**released** 45:22
84:24 146:9

**relief** 193:20

**remember**
12:13 13:2 14:1
15:1,19 16:23,
24 17:7 18:12
19:23 21:13
24:12,23 28:16,
20 29:16 30:11,
12,15,16 31:6
34:14 36:25
38:14 40:14,19
41:19 44:6,7,9,
14,15 46:19
47:22 49:7,8,
22,23 60:21,22
64:1,17 66:12,
13 67:11 68:7
70:7 72:8,21
73:3 90:20,23,
25 91:2 94:3,14
95:16 100:8
101:23 103:2
104:13 107:22,
24,25 108:2,16,
17,18 109:7,8,
11,13 111:19
115:11,18,19,
23 116:1,3,20
118:14 119:18,
23 120:9,12,14,
23,24 121:3,5,

10,12 122:13,
15 123:21,22
125:19,23,25
126:3,6,8,14
130:1,3,7,22
131:16 132:13,
14 133:12
135:22 141:21
142:4,19 144:2,
8 147:9,15,16,
19 151:6,9
152:4,25 153:4
155:21 156:22
157:24 160:7,
12,14,24 161:2,
10,11,12,13
167:15,20,21
168:6,9 169:9,
13,24 170:8,11,
13,14 171:1,6
172:7,14,24
173:4,9 177:23,
24 178:1
188:24 189:5,6,
16,21 190:9,17,
18,19,20,24,25
191:12,22,24
192:7,8 193:25
195:2,3,5
197:25 201:11
205:22 206:15,
21 209:6,8,15,
16,18,19,20,22
210:12,14,15,
16,19,23,25
211:3,18,19
212:14,16,21,
24 213:19,21
214:12,13,15
216:10,17
217:2,4,6,20
218:14,16
219:24 220:4,9,
10 223:2,5,9,19
225:20 226:15,
19,22,24 227:8
228:8,11,17
229:18,25
233:17,19
236:7,9 237:15,
20,24,25 239:1,
5,21,23 240:9,
13,24 241:1,23
246:24 247:13,
17 248:8
251:22,24

252:3 253:15,
21 255:15,17,
20 257:4,14

**rent** 21:3
201:23

**rental** 21:8
22:9 23:7 33:20
202:1

**rented** 21:6,10
23:20 24:14

**repeat** 62:7
65:4 84:14

**repeated**
91:24 255:3

**repeatedly**
57:8 59:5
123:11

**repeating** 66:9

**rephrase**
236:20

**replaced**
100:18

**replied** 74:20

**report** 8:5
69:15 73:18,20
77:18 81:14
96:7 120:16
192:12,13
241:8 245:14

**reporter** 9:4,5,
10,22 39:6
55:19 182:10

**represent**
98:25 99:1
161:23 166:22
173:12 174:20

**represented**
141:2

**representing**
98:25 160:17

**required**
117:16

**residence**
32:18 76:6 77:1
78:4,7

**respond**

211:15

**responded**
52:12

**responding**
52:24

**response** 48:6
64:10 65:7 96:9
138:9 159:25
170:7 180:21
184:21 187:23
225:5 227:1,14
237:14

**responsible**
84:9 175:13
183:2 244:17

**rest** 126:8
193:23 197:22
198:1 206:11

**restroom**
10:10 85:18

**result** 124:5
133:4

**results** 50:23
53:22

**retired** 228:13

**return** 202:22

**returned** 22:16

**ride** 49:4
150:23 214:8,
14

**riding** 226:23

**rights** 39:16,20
120:3 163:18,
19

**ring** 188:15

**road** 102:19
104:19 112:5
117:9 207:25
208:1,5

**roadside**
209:9

**rob** 80:6,15
93:1 131:22

**robbed** 77:23

**robbery** 199:6

200:4,8

**robbing** 75:15
76:15 78:11,15
79:15,19

**rode** 115:18
118:22,23
209:18 213:12
214:25

**room** 40:3
53:21 54:12
59:11 139:1
151:15 163:13
167:9 215:21,
23 216:3,5,20
223:18,24
224:2,6 229:9,
11,21 230:2,6
255:6

**rooms** 229:20,
22

**route** 117:5,6,8

**routine** 120:1

**Roxicet** 109:9,
12,14

**Roxicets**
113:16 124:7,
15,18 128:1

**Roxies** 26:13

**Roxy** 26:18

**rubber** 79:4,11

**rules** 9:19

**rumor** 155:22

**rumors** 67:5
153:18

**run-in** 205:11

**running** 203:2

**Rural** 117:8

**rushing** 180:24

**Ryan** 17:3

————————

**S**

————————

**Sale** 112:22

**sales** 102:15,

16 111:12,14,
23 112:5,8,9,
15,25 113:4

**salvage** 104:5,
7 128:15

**Sam** 188:15

**Sandi** 145:22,
23

**Sandy** 8:7,8
10:22,23 12:16
31:19 149:18

**sat** 22:25 23:2
250:22

**scared** 37:19
56:13

**scene** 84:15
103:12,14
118:1,5,10,18

**school** 136:17

**search** 33:24
37:25 46:21
113:25 114:4,6

**searched** 38:2
47:3 162:5

**searching**
32:18 34:3,12
47:6

**seatbelt** 121:7

**seatbelts**
117:15

**seconds** 60:5

**sell** 128:5

**send** 66:16

**sending** 84:10

**sense** 142:2
184:11,13

**sentence** 11:2
74:16 78:9,18,
25 79:24 80:4
184:1

**sentenced**
233:8

**separate**
186:25 229:10

**sequence**
218:16

**serve** 168:22
172:23 234:21

**served** 94:8,13
168:18,23
172:22 233:10

**serving** 172:2
235:24

**set** 197:3

**Shelby** 137:13,
15,16,19,21

**Shelbyville**
244:11

**sheriff** 15:11,
14,20 16:1
36:8,12,20
37:1,21,24
38:10,16 46:9,
12,16,20 47:16,
23 69:18,21
70:9,11,19,23
71:1,12,17,21
72:2,15,18
73:1,5,8 80:22
81:6 82:8
84:19,23 85:1,
15 86:10,21
87:4,10,15,17
88:16 90:3,15
92:1,7 97:17
98:16,25 99:1,
5,25 100:16,17,
19 102:7,22
103:4,8 104:25
105:1 106:20,
24 107:4,16
108:12 114:6
115:1,5,21
118:3,15
119:13,21,23
120:9 130:2,7
132:11 134:11
135:17,24
138:23 139:14,
22 140:4,6
141:22 142:22
144:3,6,7
146:13 148:5,
21 149:3
150:23,24
151:18 152:17

155:3,10 157:6,
10 158:4,7,14
159:3,5 187:13
190:13 225:14
227:24 229:6
230:6 240:25
249:7 250:10,
14,17,22
251:25 252:10,
12,17 253:14
255:6

**sheriff's** 69:23
72:6,8 99:24
100:4 140:11
151:11,13,14
158:8,15 159:8,
14,18 165:17
225:18 226:3,
21 228:12,22
229:4,24

**sheriffs** 142:20

**short** 27:23
48:10

**show** 21:18,24
39:4 50:3 69:14
98:5 172:11
245:9

**showed** 31:22
103:20 242:4

**showing** 238:1

**shy** 10:9

**sic** 28:18 29:1
74:20

**side** 207:25
208:1,4

**sign** 39:16,25
47:7,13,14,15
136:2,5,6,9
138:24 169:23
179:8

**signature**
39:9,14 179:3

**signed** 39:20,
23 146:3
163:21,23
172:16 173:1,7
179:14 181:19

**signing** 39:8

**similar** 15:3

**simply** 101:4

**Simpson**
17:17,23 18:4,8
19:12,24 20:2,
12,14,16,22,25
21:3,5 22:9,23
23:8,12,16,22
24:1,4,7,16,22,
24 25:2,6,7,10,
14,17,24 26:3,
14,20,23 27:11,
18 28:21 29:3,
7,25 30:19
33:19 34:22
43:4 54:16,25
57:19 58:17,21
59:1,7 60:19
63:3,18 64:20
80:5,8 83:3,14
93:10 131:5,8,
15,18 175:12
183:2 196:12
198:10 199:5
200:12 201:22
203:6,15,23
204:6 226:8,19
240:21 247:24

**Simpson's**
76:11 78:3,7

**sir** 9:2 11:8
12:25 13:8,11
17:14 18:24
22:25 23:6 26:1
36:10,13 37:4
38:23 39:4,12
41:4 44:3 45:20
52:21 66:18
73:17 78:12,21
79:5 80:17,19
92:21 96:15
98:18 104:1
108:23 109:18,
20,21 130:9,15
131:3 141:19
142:21 145:5
150:9 157:12,
15 161:25
163:17,22
164:7 165:9,14,
22 183:4 195:9
204:2 253:12
257:21 258:1,7

**siren** 110:22

**sit** 32:1 126:10
215:20 219:4
240:9 257:5

**sitting** 80:11
223:4

**situation**
126:16

**skip** 182:14

**skipped** 89:7

**slammed**
142:8

**sleep** 238:24

**Slosar** 8:15
9:12 15:25
16:3,5 29:4
50:8,10,12,14,
20,22 51:1,3,6,
9,13,16,19,21
69:2,5 85:20,24
97:22 98:2,19
99:20 101:12,
14 109:17
113:5 116:6,8,
24 122:18
123:19 127:3,6
129:1,4 133:1,
11 140:13,20,
23 141:1,8,11,
15 143:13
144:9 145:12
147:2 149:12,
19,21,24 150:3,
12,16 152:3,17,
19 153:23,25
154:24 155:8,
12,20 156:13,
21,24 159:16
160:23 166:19
167:19 174:1
175:14,25
176:4 180:3,6,8
182:6,13,15,19
183:15 184:14
189:17 193:5
194:5 195:25
196:2 197:10,
20 200:1,14
201:4,6 206:13,
22 215:22
218:4,22,25
219:5,18,21

**220**:2,7,17
221:10,12,16
222:1,11,20
223:6,14 231:4,
14,17,19,22
235:9 236:19
237:2 239:10
245:7 247:12,
15,20 253:7,11
255:8,17
257:17 258:2,
16

**Slosar's** 143:7

**Smith** 28:18
29:1,3 159:5

**Smith's** 76:4,
22 102:15,16
111:12,13,21
112:3,15,22,25
113:4 117:9

**sober** 41:9

**sobriety** 108:6,
13

**socket** 122:4

**solemnly** 9:5

**somebody's**
110:14

**son** 136:11,14,
16,18,22

**son's** 136:24

**sort** 170:9
216:3

**sound** 10:1
176:23 186:15,
18 187:10
190:7 202:25
225:10 244:3

**sounds** 41:21

**source** 149:16

**Sowders** 31:8,
10,22 32:10,15,
17 34:9 49:13
68:3,4 101:20
162:4 207:14
214:1 215:1

**speak** 68:18
189:2

**speaking**
252:12

**specific** 49:25
52:7 155:13

**specifically**
167:13

**specifics**
168:9 173:10

**speculation**
99:21 113:6
183:16 184:15
196:2 200:15
239:11

**speeding**
109:22

**spend** 193:23

**spending**
215:17

**spent** 207:16

**split** 55:12
56:10,15,22
57:3,11,19
221:25

**spoke** 25:3
70:16 72:25
165:23 174:4
189:7

**spring** 68:9
165:10 187:8
224:9 225:6
253:24

**stamp** 60:5

**stand** 228:14

**standing** 43:9
106:18,19,22,
25 107:7
114:25 121:10
163:13

**Staples** 8:16
50:9 51:2,15
244:3 250:25
251:9

**start** 54:7
134:25 135:2,3
166:24 174:20

**started** 9:20
51:18 54:5

**203**:16

**starting** 56:1

**state** 17:4
74:21 93:12,19,
25

**stated** 73:24
74:2,20,24,25
75:1 76:2,6,8,
10,12,15 78:2,
10,18 79:2,3,
14,24 80:4,14
96:13,14

**statement**
69:16 72:13,16
84:22 85:6,15
86:3,21 91:11
95:22 97:11,17
98:4,6,15 121:6
140:3,8 145:4
150:24 151:12
152:14 153:20
157:9 158:5
159:10,15,21
160:4,25
161:15 163:18
165:16 170:10
190:15,23
192:14,17
193:9 194:4,23
231:2,7 235:11,
14 236:8,10
241:5,6,7,9
245:11 249:2,
16 250:19
252:13 254:14,
21

**statements**
62:11 63:11
81:24 166:1

**states** 8:11
30:14 143:13

**station** 14:3
37:3 115:16
129:24 130:4,5,
8,18,21

**stay** 151:8
214:23

**staying** 26:2

**steal** 53:6,14

**Steele** 11:6,7

**step** 73:18,19
107:21

**stick** 229:3,16

**stimulant**
121:8

**stolen** 79:1
140:18 199:1
206:12 233:16
234:9

**stood** 14:16
16:7

**stop** 90:18
103:24 104:3
109:24 110:1,4,
8,10,11 115:14
123:2 162:16
178:5 186:17,
23 208:19,21
209:9 250:14,
17

**stopped** 12:12
29:1,7,13
102:7,14,22
106:3,4 109:15,
20 110:17,25
112:10 113:3,
17 186:20
205:12

**stopping**
107:17,23
108:1 156:16

**story** 87:25
91:19,24
154:22 249:8
250:5 257:12,
18

**straight** 182:7,
8

**street** 47:14,15
67:5 153:14,21
155:17,19
156:9,11 231:3

**stricken**
258:17

**strike** 34:15,25
39:20 59:14

**stuck** 127:9

**stuff** 32:7,8
41:14 43:22
127:16 141:3
153:14 192:10,
12 193:1
210:11 218:19
238:3 240:18
250:11 252:9
256:6,8

**subject** 121:7,
20 129:20

**subpoena**
94:8,13 157:21
168:18,23
169:10 172:3,
13,20,23 173:9,
10 191:8

**subpoenaed**
94:3 187:17
191:5 192:24
194:9 237:19

**suffer** 122:16

**summons**
14:24 15:2
157:19

**Sunday** 73:24

**supervision**
45:3

**supposed**
22:16 144:25
145:23 238:9

**surety** 146:2,8,
9

**surgery** 96:25
122:22,23
123:5,16
238:13

**surprised**
204:3

**suspect** 40:13,
15 215:14

**suspected**
199:18

**suspects**
154:20

**swear** 9:5

**sworn** 9:3

---

**T**

---

**tags** 110:2,11

**takes** 119:21

**taking** 18:12
19:22 44:4
48:16 53:18
72:23 191:17

**talk** 30:20 32:4,
12 36:20 49:1,5
70:19 117:20,
21 123:13
154:10,13
158:15 167:24
170:17 176:6
188:7 190:15
191:7 192:9
208:4,21,22
210:17 217:21
223:23 224:1
230:15 239:18,
19 240:21
244:10,14
245:3 247:9

**talked** 33:21
68:15 70:14
82:14,17 96:12,
17 127:8
131:14 157:25
158:3,4 168:17
178:12 188:23
189:13,14
192:19,23
194:22 213:19
214:8 219:17,
19 221:3 223:3,
10,12,15
230:14 238:5
239:8,15
242:10,16,23
243:1,12,14,16,
18 244:5

**talking** 32:9
49:9 69:7
142:25 144:6
186:14 190:18
195:3,7 207:16
211:16 212:21
213:1 230:3
234:5,6 241:1,5
252:14

**talks** 120:17,21
132:18

**tape** 220:13

**task** 16:19 17:1
176:9,13
178:11 179:11
180:20 181:19
182:3

**Taylor** 11:16
12:3 80:15 81:8
82:1 87:19 94:5
98:5 99:19
131:12 138:10
146:22,25
160:20,21
175:4 188:5
191:2 192:4
194:13 195:8
205:6,17 206:2
213:3 222:23
224:22 247:8,
10 250:1
252:23 257:8

**team** 146:24

**technician** 8:4

**telephone**
24:21 26:20
94:24 96:12

**telling** 25:2
27:16 28:6
29:12 34:19
37:13 41:12,16
43:23 53:25
56:9 57:2,9
58:25 61:3,8,
13,17 64:12,25
65:11,25 66:13
71:10 83:2 84:8
86:23 109:25
154:19 206:21
209:8 210:16,
25 221:11
223:5 231:21
236:7 245:6,8
248:6 249:8
250:11 257:19,
25

**ten** 185:24

**tend** 10:3

**terms** 110:12

**test** 38:18
49:14 54:1
108:8,13 120:4
121:8,10
129:22 135:21
137:25 164:23
165:3,6 209:11,
21,23 212:10,
17,23 214:2,18

**testified** 16:6
71:16 86:20
91:9 97:8 164:1
186:13 187:8
227:9 232:18
233:12 238:4
249:14 251:23
252:9 253:12

**testify** 94:4,9,
16 95:18 97:11,
16 157:17
165:25 177:5,
13

**testifying**
251:24 252:3

**testimony** 9:6
101:5 123:20
145:13,14
152:18 153:25
155:9 174:3
186:20 200:2
220:21,25
231:5,15,16
246:24

**testing** 49:25
108:6

**text** 255:12

**theft** 249:10

**theory** 138:13,
14

**thing** 134:16
148:8 157:16
164:2 165:10

**things** 9:20
32:22 54:25
63:16 95:19
101:3 121:10
132:1,16
143:11 155:13,
17,19 156:9
218:16

**thinking** 124:2
189:12

**Thompson**
134:25 135:2

**thought** 16:2
64:12 78:20
101:4 112:2
141:8 143:7
149:14,16
213:22 215:13
222:9 232:1
247:9 255:12
256:3,16

**threaten** 44:11

**tied** 78:20

**till** 23:15 111:2

**Tim** 176:25
177:22 178:4
179:20 181:8,
25 184:6

**time** 8:6 10:8,9
12:21 14:25
17:22 19:21
22:9 23:16 24:3
25:11 28:9,24,
25 29:6 31:13,
17 36:9 43:15
46:3 48:10,12
59:11 60:4 61:8
62:1,17 64:5,6,
7 69:24 70:8
72:16 74:13
77:6 78:19 87:9
95:10 102:2,5
104:8,13,14
106:15 109:5
111:3 113:17
116:15 121:23
124:7,13
128:11,12
130:25 131:13
132:10,15
134:20 135:10
138:3,14,16,17
140:6,7,12
145:10 147:25
148:6,16 149:6,
14 151:11
152:2,18,21
153:6,10
157:25 158:13
162:11 164:10

165:15 170:20
172:11 178:1,2,
8 179:19
180:25 182:20
183:7 192:22
193:3,8 194:3
202:9 204:12,
22 206:17
214:21,24
215:11 216:11
217:15,25
218:20 219:3,
17 228:3,5,7
233:10 234:5,
21 235:4,24
236:10 239:1,6,
8 240:7,13

**timeframe**
149:12 181:24
189:15 247:1

**times** 126:22
139:2 144:10
158:18,24,25
185:4 189:6
204:6 242:10
251:1 256:9

**Timmy** 195:20

**tired** 204:14

**today** 8:5 9:18
10:14 11:10
35:21 73:20
80:11 82:17,18,
21 86:20 88:21
90:20 91:8
185:16 218:11
219:12,16
220:25 240:9
249:14

**today's** 258:19

**toe** 108:15

**told** 27:1 28:21
32:1,2,3,12
33:12 34:15
35:1 43:12,21
46:15 47:10
53:13 64:20
65:9,14 67:11
68:22 71:2,17,
22 73:11 74:3,
13,18 75:1
78:10,11 79:14
80:16 83:3 91:3

92:25 93:15,18
94:19 95:19,21
96:25 97:5
112:2 124:16
139:17 144:4,7
153:12,15
154:25 155:18,
19 156:6 159:9
161:9 164:4,11
166:7 170:3,4
178:7,18
190:24 191:14
192:20 193:1,3,
20,21 194:3,23
195:2 199:14
200:18 201:1
203:9 208:19
211:3 220:19,
20,24 221:23
222:5,8 224:14,
19 227:17
230:18 231:16,
25 232:2 238:3,
10 240:16,17,
18 241:6
245:24 247:9,
13,14,17
248:16,20
249:15 254:15
256:6

**top** 22:2 132:22
133:9 180:20

**tops** 20:1

**Total** 126:8

**touch** 105:14
107:1

**touched** 208:9

**town** 126:11

**Townsley**
100:12 142:13,
15

**traffic** 208:19,
21 209:9

**trailer** 129:18,
19

**transcript**
241:16 245:10
258:9

**transcripts**
245:12

**transport**
227:2

**transported**
209:14 223:20
224:5 226:13,
15,16,18,19

**transporting**
227:18 228:20

**transports**
213:7

**traveling** 76:4,
21 118:8
238:15

**treated** 123:5,7
237:10

**treatment**
122:21 125:5

**Trees** 112:23

**trespassing**
85:8

**trial** 94:4,16
123:15 157:18
187:17 192:24
194:9 239:9

**trick** 220:12

**trip** 25:25 26:9,
14 27:4,12
30:10 34:21
43:3 54:16
58:18 67:17
93:16 125:11
126:1,2 202:14

**trips** 125:2
238:19

**trooper** 99:5
119:7 124:17
166:25 168:17,
20 170:3,14,21
172:1,8,18
173:12 174:5,6,
21

**trouble** 84:17
88:14 98:13
254:19

**truck** 22:25
37:25 38:2
114:20 208:16
252:4

**true** 59:20 74:6
75:6 76:18
78:24 80:5 85:2
94:22 95:20
117:1 124:18
161:16 180:7,9
183:3,12 184:3
186:6 190:23
191:5 192:21
193:2,4,10
195:14 196:1
201:1,5 202:20,
22 203:6
205:15 221:23
222:5,8 227:2,9
232:17 236:23
239:15 240:18,
19 241:2,3,7,10
243:10 245:18,
21,24 247:7

**trunk** 115:8

**truth** 9:7,8
18:21 43:22,23
65:11 97:7
161:4 164:4,11
166:7 193:20,
21 231:21,25
251:10,13
252:25

**truthful** 28:11
29:21 34:25
52:15 53:2,13
62:21 66:23
77:20 78:23
194:20

**truthfully**
95:18

**turn** 52:4 121:9

**turned** 73:2,9
87:3,9 88:17
89:12 182:22
230:13,16
237:3 249:18,
24 257:5

**tying** 74:18
75:2,4,9,21

**type** 9:25 17:20
20:16 26:12,17
204:9

**U**

U.n.i.t.e 180:15

U.N.I.T.E.
16:19 17:1,9
176:7,16
177:16,19
178:11 179:9,
11 180:20
181:19

Uh-huh 47:4
126:13 212:1

Uh-uh 109:2
173:11 205:24
244:22

UK 96:13
123:9,24

ultimately
117:13 135:7
145:4 146:20

uncommon
202:14

unconscious
122:11,13

undercover
176:20 177:15,
21 178:4,13,15
179:20 181:25

undergo 108:5
125:13

underlying
252:24

understand
10:5 71:21
101:2 115:11
127:6 130:16
134:16 140:15
149:13 162:11
163:11 230:2

understanding
57:16 62:1
63:10,11 65:4
77:8 80:23 81:5
87:17,24 91:23
92:5 114:9
140:16 145:9
176:10 178:21
203:9 214:3

250:4

understood
57:23

unit 96:12

United 8:11

University
96:18

**V**

vehicle 21:3,6,
10 22:10,24
23:17 33:25
35:11 103:6,9
106:14,18,21,
22 107:17,20,
21 113:16,25
115:6,9 117:14,
16 119:8 122:5
227:6

vehicles
115:20

VERBAL 48:6
64:10 65:7 96:9
138:9 159:25
180:21 184:21
187:23 225:5
227:1,14
237:14

verbalize
188:1 244:25

verbally 9:23

video 8:4 18:25
19:6 27:20 28:3
29:20 56:2
58:11 60:8
62:18 66:22
248:10,12

view 110:5
112:21

visit 123:4
139:10 186:25
212:22

visited 189:10
190:16 194:8

voice 19:7 28:4
56:3 62:19 86:6
248:13

Volkswagen
21:11,16 23:18,
19 24:13

voluntarily
249:7

volunteered
199:23 201:13

VTS-01-3
27:22

**W**

wad 24:16 61:3
83:24 91:3
198:18

wait 10:16

waited 19:17
23:1,14 229:17

waiting 215:23
216:3,4

Waiver 39:16,
20 163:19

walk 108:15
112:7 121:9
214:16 228:24

walked 207:1
228:21 229:15,
18

wanted 32:4,7,
12 57:18,23
59:13,16,25
61:22 62:2
63:17 65:4
66:10 69:11
71:3,12,18,22
73:14 74:3,13,
25 75:14 80:24
86:12,16,23
87:5,10,18
89:23 90:11
91:19,25
117:25 144:16,
20 153:14,15,
17 154:10,13,
16 155:4,6,10,
14 207:1
212:10 249:20,
24 250:5 254:8,
18 255:3

wanting 49:20
230:20

watched
250:23

watching
14:18

water 10:10

ways 55:12
56:10,14,22
57:3,11

wear 117:15

wearing 24:4
121:7

Weber 8:19
166:21 174:12

week 238:25

weekday
111:18,20

weekend
111:18

weeks 10:24
243:11

weigh 193:12

wet 38:4

what'd 36:23
47:1 51:14
94:21 95:6
192:25 196:5
244:9 245:22

where'd 32:7
197:18 213:15

whereabouts
67:20

wide 111:1,2
112:6 229:9

wife 12:14,15,
17 31:18 32:1
34:6 134:22
136:22 145:24
146:12 207:15
238:10

William 11:19
12:9 60:14,17,
24 61:3,22 62:3
63:4,17,23
64:3,9,20 65:21

74:1,9,22,24
75:12,20 76:4,
8,20 77:3 78:3,
6 80:5 81:7
82:1 83:3,13,24
87:19 88:22
92:19,23 93:5,
9,24 98:5 138:8
145:1 152:7
154:20 156:6,
15,17,19 157:7
188:5 195:8,10,
23 196:9 205:6,
17 206:7,10,17
213:5,22
214:13 220:20
222:9 249:25
252:23 257:9

William's 27:2
76:10,25
203:10,23

winning 49:20

withdraw 29:5
33:8 33:9 49:23
91:8 237:6

witnesses
30:21 32:24
163:23

woman 12:6
37:16 41:14,22
52:12,20 53:7
74:18,20 75:9
106:13 131:23
147:10,11
188:13,14
189:2,10
208:14 210:10

woman's 32:8

word 232:3,5
237:6 257:14

words 126:10
144:8 258:11

work 134:23,24
198:3 207:15

worked 16:25
17:8 111:6,9,13
112:2 134:25
178:24

working 77:4
111:23 112:15,

17 113:1
128:12 197:22
198:1

**works** 100:12
242:20

**worried** 237:9
256:10,11,17,
21

**worry** 55:8
95:23 96:3

**worth** 218:21

**wreck** 122:1

**Wright** 8:17
21:17,22 27:13
28:13,19 29:2,
9,15 33:11,23
41:18,25 42:5,
23 44:12 47:21
49:10 50:13,21,
25 51:8 55:2,14
56:11,24 57:5,
14,21 58:1,6
59:4,18,22
60:2,16,20,25
61:6,12,25
62:4,9,14 63:5,
8,13,19,25
64:23 65:2,6
66:11 67:4
69:9,12 71:5,
13,25 73:10,16
77:5,10,14
81:2,11,17,22
82:4 83:5,9,15,
21 84:1,6,12,
16,21 85:11
86:14,25 87:6,
13,21 88:3,12,
19 89:7,14,19,
24 90:5,14
91:6,16,21
92:3,10,16,18
93:2,6,22 94:1,
23 96:1 97:14,
20 98:8,12,17
154:17 174:13,
18,19 182:8,11,
14,16,21
189:18 204:15,
20 218:24
219:2,6,8
231:24 246:14,
20 247:18

248:1,23 249:1,
3,5,9,12,21
250:2,8,13,20
251:15,20
253:4,9,16
254:5,10,12,16
255:1 257:2,15,
22 258:4,15

**write** 30:24

**written** 145:8
182:13

**wrong** 27:1
36:11 101:6
141:7 145:8
146:10 152:16
220:15 255:16

────────

**X**

────────

**Xanax** 124:18

────────

**Y**

────────

**yard** 104:5,7
128:15

**yards** 112:12

**year** 125:4
160:8 171:1
179:25 180:12
190:4 202:12
210:15 220:10
225:10

**years** 11:3
12:20 16:21
17:25 18:18
24:4 116:22
137:16,17
218:11

**York** 8:18
12:24 13:1,5,7,
10,20 14:1,11,
14 16:8 31:7,
10,21 32:10,15,
17 33:2 34:10,
12,16,19,21
35:1,5,18 37:9,
10,13,22,24
38:1,11,13,16
39:1,21 40:4
41:8,11,22
42:2,10,13,15

44:10,22 45:22
46:2,8,11,14,
16,20 48:1,13,
21,24 49:1,5,17
53:24 54:7,10,
12,15,18,24
55:10 56:6,9,21
57:1,6,10,17
58:3,13,15,16,
20,24,25 59:5,
12,15,24,25
60:10,13,17,23
61:2,9,13,18,21
62:2,6 63:2,12,
15,21 64:12,19,
25 65:3,4,8,25
66:4,8,13,24
67:2,9,14 68:8,
18 69:6,11,16
72:9,15,19,22
73:1,6,8 80:22
81:6,16,19 82:8
83:2,8,12,13,
17,23 84:3,8,
14,19,22 85:1,
16 86:7,10,12,
16,22 87:4,10,
15,17 88:10,16
89:4,10,16,22
90:3,11,22
91:3,10,14,18,
24 92:1,7
93:15,18,23
94:25 95:4,6,
14,17,21 96:17,
22 97:3,6,10,
15,16 98:16
99:5 101:20
103:11,14,19
105:1,5 114:3,9
115:12 116:9
117:20 118:7,
21 120:17
127:13 130:17,
25 134:14,17
135:17,23
139:2,14,18,22
146:15 148:24
150:24 151:18,
19 154:15
155:2,18,19
156:1,4,7
157:3,14 160:4
161:6 162:4,13
163:5,12,24
164:12,22

165:7,11,18,24
167:2,13,18
172:15,18
174:20 175:23
176:13 186:12
187:9,21
190:11,16
192:23,25
205:1,11
206:21 207:22
209:16,20
210:1 211:11,
25 212:8
214:23 215:20
216:9,16
217:13,21
219:12,17
220:5,19,24
221:4,24 222:6,
9 223:1,5,13,
15,23 224:1,9,
13 225:3,9
226:25 227:24
229:14 230:5,8,
15 234:13,24
235:6,15
237:22 238:11
239:2,8,19
240:10,11,16,
22 247:23
248:22 249:15,
19,23 250:5,11,
15,18 251:18,
25 252:4,8,12,
19 253:23
254:1,8,15,25
257:20,25

**York's** 81:6,24
115:21 241:8
248:25 249:7

**you-all** 30:17
192:9