IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF KENTUCKY, LONDON DIVISION


AMANDA HOSKINS and JONATHAN                    )
TAYLOR,                                         )
                                                )        Case No. 17-CV-84
            Plaintiffs,                          )
                                                )        Hon. ROBERT E. WEIR
        v.                                       )
                                                )        Mag. HANLY A. INGRAM
KNOX COUNTY, ET AL.,                            )
                                                )        JURY TRIAL DEMANDED
            Defendants.                          )



# EXHIBIT 43

NO. 6:17-CV-00084-DLB

AMANDA HOSKINS AND JONATHAN TAYLOR

V.

KNOX COUNTY, ET AL.


DEPONENT:

LISA EVANS


DATE:

September 10, 2018

1        UNITED STATES DISTRICT COURT

2        EASTERN DISTRICT OF KENTUCKY

3        CENTRAL DIVISION AT LEXINGTON

4        CASE NO: 6:17-CV-00084-DLB

5

6      AMANDA HOSKINS AND JONATHAN TAYLOR,

7           PLAINTIFFS

8

9             V.

10

11       KNOX COUNTY, ET AL.,

12         DEFENDANTS

13

14

15

16

17

18

19

20

21

22

23  DEPONENT: LISA EVANS

24  DATE:    SEPTEMBER 10, 2018

25  REPORTER: MADELINE WILLIAMSON

APPEARANCES

ON BEHALF OF THE PLAINTIFFS, AMANDA HOSKINS AND

JONATHAN TAYLOR:

ELLIOT SLOSAR

AMY ROBINSON STAPLES

LOEVY & LOEVY

311 NORTH ABERDEEN STREET

THIRD FLOOR

CHICAGO, ILLINOIS 60607

TELEPHONE NO.: (312) 243-5900

E-MAIL: ELLIOT@LOEVY.COM

ON BEHALF OF THE DEFENDANT, KNOX COUNTY, KENTUCKY:

JOHN KELLEY

WILLIAMS FARMER & TOWE

303 SOUTH MAIN STREET

P.O. BOX 3199

LONDON, KENTUCKY 40743

TELEPHONE NO.: (606) 877-5291

E-MAIL: JOHN@WFTLAW.COM

1

2              APPEARANCES (CONTINUED)

3

4    ON BEHALF OF THE DEFENDANT, BARBOURVILLE POLICE

5    DEPARTMENT:

6    ALEXANDRA DEMOSS-CAMPBELL

7    WARD HOCKER THORNTON

8    333 WEST VINE STREET

9    SUITE 1100

10   LEXINGTON, KENTUCKY 40507

11   TELEPHONE NO.: (859) 422-6000

12   EMAIL: ALEXANDRA.DEMOSS-CAMPBELL@WHTLAW.COM

13

14

15   ON BEHALF OF THE DEFENDANTS, JASON YORK

16   and JASON BUNCH:

17   DERRICK T. WRIGHT

18   STURGILL, TURNER, BARKER & MOLONEY, PLLC.

19   333 WEST VINE STREET SUITE 1500

20   LEXINGTON, KENTUCKY 40507

21   TELEPHONE NO.: (859) 255-8581

22   E-MAIL: DWRIGHT@STURGILLTURNER.COM

23

24

25

1               APPEARANCES (CONTINUED)

2

3   ON BEHALF OF THE DEFENDANTS, RIAN JOHNSON, MARK

4   MEFFORD, JACKIE JOSEPH and DALLAS EUBANKS:

5   CODY WEBER

6   KENTUCKY STATE POLICE GENERAL COUNSEL

7   919 VERSAILLES ROAD

8   FRANKFORT, KENTUCKY 40601

9   TELEPHONE NO.: (502) 573-1636

10  E-MAIL: CODY.WEBER@KY.GOV

11

12  ALSO PRESENT: JESSIE SMITH- ASSOCIATE AT WILLIAMS,

13              FARMER & TOWE

14

15

16

17

18

19

20

21

22

23

24

25

1                    INDEX

2                              Page

3   DIRECT EXAMINATION BY MR. KELLEY              8

4   EXAMINATION BY MR. WRIGHT              205

5   EXAMINATION BY MR. WEBER              320

6   EXAMINATION BY MS. DEMOSS-CAMPBELL         323

7

8                    EXHIBITS

9                              Page

10

11  1  NOTICE OF DEPO AND SUBPOENA              111

12  2  ANSWERS TO INTERROGATORIES              131

13  3  REPORT: MARCH 10 2014              155

14  4  AMENDED DISCLOSURES              158

15  5  LOG              168

16  6  LETTER AND NOTES              181

17  7  HAND WRITTEN NOTES              185

18  8  HAND WRITTEN NOTES              197

19  9  PRIVILEGE LOG: AMANDA HOSKINS              240

20  10 REPORT              246

21  11 FAX              250

22  12 STATEMENT/AUTHORIZATION              252

23  13 ATTORNEY CLIENT PRIVILEGE AND PHOTO       262

24  14 ATTORNEY CLIENT PRIVILEGE AND PHOTO       271

25  15 LOAN PAYMENT INVOICE              285

1           EXHIBITS (CONTINUED)

2

3   16 ATTORNEY CLIENT PRIVILEGE           286

4   17 ATTORNEY CLIENT PRIVILEGE           295

5   18 CRIME SUPPLEMENT              312

6   19 ATTORNEY CLIENT PRIVILEGE           319

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    STIPULATION

2

3   The deposition of LISA EVANS taken at HOLIDAY INN

4   EXPRESS & SUITES, 506 MINTON DRIVE, LONDON, KENTUCKY

5   40741 on MONDAY, the 10th day of SEPTEMBER 2018 at

6   approximately 11:30 a.m.; said deposition was taken

7   pursuant to the FEDERAL Rules of Civil Procedure. It is

8   agreed that MADELINE WILLIAMSON, being a Notary Public

9   and Court Reporter for the State of KENTUCKY, may swear

10  the witness.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

COURT REPORTER:  Will you please raise your right hand for me?  Do you solemnly swear or affirm that the testimony you are about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  I do.

COURT REPORTER:  Thank you.

DIRECT EXAMINATION

BY MR. KELLEY:

Q    Ms. Evans, we met just briefly before the deposition began.  My name is John Kelley.  I represent Knox County along with Sheriff Pickard in this lawsuit brought by Amanda Hoskins and Jonathan Taylor, and, obviously, there are a number of other defendants and they'll get a chance to ask questions of you, I'm sure. Let me ask you just right off the bat, what do you know about Sheriff Pickard's role in the investigation of the murder of Katherine Mills?

A    I believe his role was to assist the state police with various interviews and tracking down witnesses.

Q    Do you know of any specific interviews that

1    he attended?

2        A    I don't recall off of the top of my head.

3    Nothing specifically he would have attended.

4        Q    Do you have any criticisms concerning the

5    role that Sheriff Pickard played in this investigation?

6            MR. SLOSAR:  Object to form.  You can answer.

7        A    You know, various witnesses made statements

8    about actions, I guess, that Mr. Pickard would use when

9    he was attempted to talk to witnesses or solicit

10   information from witnesses.  That stands out from what

11   I recall without reviewing the records.

12       Q    Okay.  What witnesses do you remember seeing

13   and criticizing Sheriff Pickard's techniques?

14       A    Bob Smith.  I believe there were -- there

15   were two individuals that was arrested with Mr. Smith.

16   One was William Bingham.  The other one, his last name

17   was Edwards.  I think he went by a nickname, Bit.  I'm

18   not sure what his first name was.

19       Q    Bit Edwards?

20       A    The information came from them, would be

21   those three, I believe.

22       Q    Okay.  I listened to a tape of an interview

23   with, I believe, Ms. Heather Gatnarek --

24       A    Uh-huh.

25       Q    -- and Josh Powell.  Were you also present

1    during their interview of Bob Smith?

2        A    Not with them, no.

3        Q    Okay.  There was mention on that -- you're

4    absolutely right because there was mention on that tape

5    that he had talked with you earlier.

6        A    Uh-huh.

7        Q    Yes?

8        A    We spoke on two occasions.

9        Q    Okay.

10       A    Once I spoke with him alone and then the

11   second time I spoke with him, I was with Jim Cox both

12   times at the detention center, I believe.

13       Q    Okay.  Jim Cox?

14       A    Yes.

15       Q    All right.  Did you record either interview?

16       A    I don't believe that I recorded Bob's

17   interviews.  We were inside the jail.  I normally -- if

18   I did, I would've turned it over, so you would have it

19   without, you know, reviewing what I did -- without

20   reviewing the file, I won't say 100 percent that I

21   didn't. I don't believe that I recorded Bob Smith.

22       Q    Well, I don't believe I've gotten an

23   interview of yours with Bob Smith that was recorded.

24       A    Should have a memorandum, probably.

25       Q    I should -- a memorandum.  Okay.

1    A    Uh-huh.

2    Q    You were -- which came first, the interview

3 you had with him alone?

4    A   I believe so.

5    Q    All right.  Do you know -- and where was that

6 interview conducted?

7    A   Both of those were conducted, I think, it was

8 in the detention center.  I think it was Leslie County

9 Detention Center.

10    Q    All right.  Do you know the date of that

11 interview?

12    A   No.  I do not.

13    Q    Do you know what year it occurred in?

14    A   I believe probably 2014.

15    Q    Okay.  Again, you mentioned -- well, I know

16 you said you were alone.  Did you prepare notes as you

17 were talking to him?

18    MR. SLOSAR:  Object to form.  Foundation.  You

19  can answer the question.

20    A   Probably.

21    Q    All right.  What would you have done with

22 those notes?

23    A   I would've put then in my file.

24    Q    Okay.  Is it your standard practice to keep

25 all your notes?

1    A    Probably not all of them.  It depends on how

2  big they are, or how complex, or how long the interview

3  was.

4    Q    Do you remember how --

5    A    If I did something short and I went back to

6  the office and produced a report.  Those notes may or

7  may not find their way into the file somewhere.

8  Probably -- they're probably in a legal pad somewhere

9  with many other legal pads.

10    Q    Okay.  Well, where would the repository for

11  these legal pads be?

12    A    In a file.  I'm sorry.

13    Q    In a file?

14    A    Uh-huh.

15    Q    Yes?

16    A    Yes.

17    Q    How long was this interview?  The first one

18  you had with Mr. Smith?

19    A    Goodness.  I honestly don't know.  Maybe

20  could've been 30 minutes, could've been an hour.

21    Q    Okay.  Had you ever met Bob Smith before?

22    A    Not prior to the first interview, no.

23    Q    Okay.  Did you know anything about Bob Smith

24  before?

25    A    I generally try to do some background

1  investigation before I -- before I interview a witness.

2      Q    Uh-huh.

3      A    So I would've looked at his record.  Probably

4  would've gotten information that led me to Bob Smith

5  from someone.  Other than that, no.

6      Q    What information did you get in order to lead

7  you to Bob Smith on this occasion?

8      A    There was a lot of talk about various drug

9  dealers being interviewed by Mr. York during the course

10  of his investigation.  And Bob Smith lived in an area

11  where, you know, central -- a central location to where

12  all the events took place, where a lot of the people

13  lived, and he was a known drug dealer.

14      Q    Okay.  All right.  How long had you known him

15  to be a drug dealer in Knox County?  Did you know him

16  before Ms. Mills' murder in 2010?

17      A    I didn't know anything about him until I

18  started working on this case.  And then the only

19  information that I gained as far as his history goes is

20  that it was a long time, he was a long-time drug

21  dealer.

22      Q    Do you remember anybody specifically telling

23  you that Jason York or John Pickard had talked with Bob

24  Smith before you went to interview him?

25      A    Yes.  There was a -- there was multiple

1   people I specifically recall a female, but I do not

2   recall her name.  I interviewed her.  She was in the

3   Knox County Detention Center.  She -- I may be getting

4   her mixed up. I don't want to give you the wrong

5   information.  I can't be for sure without reviewing the

6   record if she was at Bob's on one of the occasions, or

7   if she was at the home of another individual in that

8   area that was familiar with the incident and that gave

9   me that information.

10      Q    Okay.  Did you conduct an interview of this

11  female?

12      A    Yes.  I spoke with her at the Knox County

13  Jail. I'm pretty sure she was at the Knox County Jail

14  at the time.

15      Q    And am I to understand do you remember her

16  name?

17      A    I do not recall her name right now.

18      Q    Do you know what prompted you to see her?

19      A    You know, I'm going to assume that someone

20  else gave me her name and led me to her, but I can't be

21  sure without reviewing the record.

22      Q    All right.  Did you record your interview

23  with her?

24      A    If I did, I gave it to Mr. Slosar but I -- I

25  don't think that I did, because, again, I was in the

1   detention center, but I can't be sure.

2        Q    So am I to understand, then, everything

3   you've collected as part of your investigation, you've

4   given to Mr. Slosar?

5        A    Yes.

6        Q    Every bit of it?

7        A    Every bit of it.

8        Q    Okay.  That would include memorandum and

9   notes?

10       A    Yes.

11       Q    Okay.  Memoranda and notes I should've said.

12       A    Reports, memorandum.

13       Q    Okay.  The second occasion with Mr. Cox, do

14  you remember the circumstances of that?  Where was it?

15       A    It was also at the detention center.

16       Q    I assume the same one?

17       A    Yes.  I believe so.

18       Q    Okay.  Was it also in 2014?

19       A    Probably.

20       Q    Was this within days, weeks, months of the --

21  of your interview?

22       A    I do not recall.

23       Q    Do you know if you recorded that one?

24       A    I don't know for sure.  If I did, I turned

25  that over.  I don't think so.

1  Q   Do you know how long that -- well, would it

2  be -- did Mr. Cox make a -- did he tape it?

3     MR. SLOSAR:  Objection to form.

4  A   I do not believe that he did.

5  Q   Okay.  Would it be typical if you went with -

6  - Mr. Cox is an attorney?

7  A   He is.

8  Q   All right.  Would it be typical for you to --

9  for him to bring along a tape recorder, or was he

10  depending upon you as an investigator to do that?

11     MR. SLOSAR:  Objection to form.  Calls for

12  speculation.

13     MR. KELLEY:  Yeah.  My bad.

14  BY MR. KELLEY:

15  Q   Just in your usual practice and protocol, was

16  it -- was it typical for you to record the interviews

17  and him to be asking questions?

18     MR. SLOSAR:  Same objection.  You can answer.

19  A   This was the first time I worked with Mr.

20  Cox, but to my knowledge, I don't recall him carrying a

21  tape recorder.  I would assume that most attorneys,

22  it's common practice that as the investigator, I would

23  be the notetaker or the person that would record

24  interviews if that were the case.

25  Q   Doesn't seem fair, does it?

1      A    It doesn't.  I don't -- it's my job.  I don't

2  know.

3      Q    On the second occasion do you -- was it Mr.

4  Cox that did most of the questioning or was it -- was

5  he there simply to listen to you conduct interviews?

6         MR. SLOSAR:  Objection to form.

7      A    I recall it just being a conversation between

8  the three of us.  I don't think that anyone went in

9  with a ...

10      Q    I apologize.  I think I've asked this, and I

11  forgot.

12      A    Okay.

13      Q    I'm much older than you so I have an excuse.

14  How long was that interview?

15      A    How long was the second interview?

16      Q    Yes, ma'am.

17      A    Again, I'm really not sure.  Probably around

18  the same amount of time, maybe 30 minutes to an hour.

19      Q    Okay.  All right.  What did Bob Smith tell

20  you?

21      A    What did he tell me?

22      Q    Uh-huh.  Did he tell you the same thing on

23  the second interview as he did the first, or...

24      A    He did.

25      Q    Okay.

1    A    He did.  The thing that stood out for me and

2  I -- you know, without reviewing it I can't recall

3  everything, but I remember him talking about officers

4  coming to his home on multiple occasions.  Usually I

5  believe it was Mr. York, offering to -- I think he told

6  him -- from what I remember, Mr. York told him that we

7  know you have been trafficking.  Basically, if you'll

8  tell me how much money Amanda Hoskins or I think

9  William Lester.  I don't think Jonathan's name was

10  mentioned.  If you'll tell us how much money they've

11  been spending here, we'll sweep that under the rug.

12  We'll ignore it, and then you'll be good.  Bob did not

13  -- Bob told him repeatedly that they had not spent any

14  money there.  I think he even told -- I think he even

15  mentioned on one -- during one of the interviews or

16  maybe both, that William actually owed him money from

17  some years ago that he'd never paid him. But nothing,

18  you know, he had not been there recently or hadn't been

19  spending any money there.

20    Q    Okay.

21    A    I don't believe that he said that Amanda had

22  ever come to his -- to my recollection, Amanda had

23  never been there.

24    Q    Okay.  By William, you mean William Lester, I

25  assume?

1    A    William Lester, yes.

2    Q    Okay.

3    A    He is -- Bob is the source for the

4  information on William Bingham and the -- and Bit is

5  the nickname. I'm sorry.  They all called him Bit.  And

6  so that's what I remember but I think his last name was

7  maybe Frank or Franks.  No.  I'm sorry.  Edward.  Maybe

8  Frank Edward. That they were at his residence on some

9  of the occasions. That the officers came and that, at

10  least I believe one of them was arrested with Bob on

11  one occasion.  Maybe both of them.  Let's see, William

12  Bingham was with him on one occasion at his residence

13  when the police came to make an arrest, and according

14  to Bob, William Bingham had a gun as well as drugs on

15  him.  And Bob said that Mr. York negotiated a deal with

16  them where he would charge Bob with the trafficking so

17  that he didn't have to charge Mr. Bingham with having

18  the gun and the trafficking because that would then

19  become a felony and Bob agreed to take the charge for

20  the drugs, and it was -- you know, there was

21  conversations like that with these two individuals as

22  well as they were arrested.  Money was taken off all of

23  the individuals and the money that was put into the

24  reports as having been taken was less than what was

25  actually taken. Drugs were not maybe logged into the

1    officer's report, and that kind of surprised me and I -

2    - you know, I guess he could tell that I was surprised.

3    And he was, like, "Well that's, you know, I remember

4    him saying that's the price of doing business, doing

5    this business," or something like that.  That's I think

6    the things that stand out most in those interviews.

7        Q    Okay.  I'm specifically interested in what

8    Bob Smith said about John Pickard.

9        A    I believe that Pickard was present when those

10   things happened.  And I believe if -- I believe if you

11   look at Bob Smith's record, you'll find that he was

12   arrested on many occasions, and on a lot of those

13   occasions he was charged with, like, you know,

14   something really small, trafficking and marijuana first

15   offense every time.  And those risks -- it seems that

16   Bob inferred that those risks, you know, he was

17   obviously dealing larger drugs, more serious drugs,

18   that it was recorded that way, the police kept the

19   money, and he -- you know, there was, like he said,

20   that was the price of doing business.  The police kept

21   the money, they gave him a slap on the wrist.  You

22   know, he would go to jail for a day or two and he would

23   be back at the house in business again.

24       Q    Okay.  What -- are you saying that he

25   specifically said that John Pickard or members of the

1  Knox County Sheriff's Department were taking money from

2  him in regard to these arrests?

3      A    You -- I would have to look at the report to

4  be sure on that.  I think the things that -- if you

5  look at the arresting officers in those -- in the cases

6  that I'm talking about, the prior cases, I guess -- I

7  may be assuming because John's name was an arresting

8  officer that he collected the evidence which would

9  include any drugs or money and would be responsible for

10 that.  So I don't want to say without reviewing the

11 report that he specifically said John's name.  But --

12     Q    The report you're talking about is which

13 report, the arrest?

14     A    Any reports that I did based on my interviews

15 should reflect that.

16     Q    Okay.  How many reports would you -- well,

17 you would expect a specific report for each witness or

18 how were your reports done?

19        MR. SLOSAR:  Objection to form.  Foundation.

20      You can answer to the extent you understand the

21      question.

22      A    I would certainly have done at least one, and

23 if there was anything new and what I would -- have

24 considered to have been significant in the second

25 interview, I would've generated another one if the

1    first one had already been done.  You know, there could

2    be two.  There could be one.  There should absolutely

3    be one report from Bob Smith.

4        Q    Okay.  All right.  In other words, as we sit

5    here today, do you remember whether you made separate

6    reports for both your initial interview and your second

7    interview with Mr. Cox?

8           MR. SLOSAR:  Objection to form.

9        A    I don't believe so, but I could -- you know,

10   I can't say for sure.

11       Q    All right.  And that report would, I assume,

12   include a narrative or summary of your conversation?

13       A    Yes.

14       Q    That would've been part of your file; is that

15   correct?

16       A    Yes.

17       Q    And you gave your entire file to Mr. Slosar?

18       A    Yes.

19          MR. SLOSAR:  John, just for your sake, the

20      memorandum was referenced in the letter sent to

21      your office last week, so to the extent that you're

22      looking for it.

23          MR. KELLEY:  I'm not sure which letter you're

24      referring to.

25          MR. SLOSAR:  The Bob Smith report that she was

1  just testifying about, the memorandum.  You guys

2  have it.

3      MR. KELLEY:  I didn't get it, but I'm not

4  saying Jason didn't.

5  BY MR. KELLEY:

6      Q    All right.  Did you have a conversation with

7  William Bingham?

8      A    Yes.

9      Q    All right.  Do you remember the circumstances

10  of that interview?

11      A    I remember interviewing him in Knox County at

12  his parent's home early in the morning.  I do not

13  remember the date.  It would certainly been after

14  Bob's.  I believe in his interview we discussed the

15  particular occasion when he was -- I can't remember if

16  they arrested Mr. Bingham or if Bob took the blame for

17  everything and he was let go completely, or if they

18  just -- I think that was the scenario with him.  But I

19  believe in his interview, he told me that there were a

20  lot of people at the residence when the police officers

21  came to make the arrest.  He said they were doing

22  drugs.  They were high.  The police didn't arrest

23  anyone else.  He just wanted to arrest -- they just

24  wanted Bob -- they talked to Bob.  They talked to

25  William.

1    Q    Let me be more direct.  I'm kind of under --

2  trying to understand.  There you are talking to Bob and

3  Bob was the first person to tell you that William

4  Bingham is going to know something about it, or did you

5  know before you talked to Bob that William Bingham was

6  part of this meeting.

7    A    I can't say that I never heard his name

8  before, but I -- but I do not specifically recall where

9  I heard it.  I believe that it was Bob, but I could be

10  mistaken. It could've come -- I mean these people were

11  all -- all of these people lived in the same general

12  area, and their names came up multiple times from

13  multiple interviews. So, you know, I can't sit here

14  without reviewing something and tell you, you know, 100

15  percent but I believe that that information came from

16  Bob.

17    Q    Okay.  So you went to his house, Mr.

18  Bingham's house?

19    A    It was his parent's home.  It was early in

20  the morning.  He was sleeping on the couch.

21    Q    Do you know his parents' names?

22    A    I do not.  I believe he told me that his

23  mother was a school teacher, but I don't recall their

24  names.

25    Q    Do you remember where they lived?

1    A   I don't recall the exact address.  It was in

2  Barbourville.  It was in the town, in the city.

3    Q   As far as the street; do you remember?

4    A   I do not recall, no.

5    Q   Do you remember any kind of landmark?

6    A   It seems like it was close in relation to the

7  center of the town.  Wasn't in the center but it seems

8  like it was close.

9    Q   Was it near Union College or was it near a

10  store?  Was it near downtown?  Was it near the

11  courthouse?

12    A   I believe that it was near -- I don't think

13  it was near the college.  I believe it was back the

14  other way.

15    Q   Okay.  Were his parents there?

16    A   No.

17    Q   Was anyone else there?

18    A   No.  Not that I was aware of.  No one ever

19  entered the room where we were.

20    Q   Were you with anyone?

21    A   No.

22    Q   Did you, again, tape that interview?

23    A   I don't believe I did.  But, again, if I did

24  I would have turned it over.

25    Q   All right.  Can you expect you took notes?

1    MR. SLOSAR:  Objection to form.  You can

2    answer.

3    A    If it was a long interview I probably would

4    have taken notes for sure.

5    Q    Was it a long interview?

6    A    I knew you were going to ask that.

7    Q    You invited it.

8    A    You know, probably, again, probably 30

9    minutes to an hour maybe.

10    Q    All right.  Now, he said officers were there.

11    Is that your recollection?  Officers came to this -- he

12    was at Bob Smith's house --

13    A    Yes.

14    Q    -- at the time.  Okay.  All right.  And --

15    sorry.  There were other people present.  Did he give

16    you the names of anyone there?

17    A    I don't recall any, but if he did that would

18    certainly be in the report.

19    Q    Did he name the officers that were there?

20    A    I don't recall without looking at the report.

21    Q    Okay.  Did he tell you whether it was

22    Kentucky State Police, or Knox County Sheriffs, or did

23    he give you any other indication as to what law

24    enforcement agency was there?

25    A    It seemed as though, I definitely recall him

1  saying the state police, because there was -- I

2  remember him saying that the state police harassed and

3  were there often, and that they would put roadblocks up

4  in front of Bob's home.  And he felt that it was to, I

5  guess, intimidate Bob, not just from the aspect of, you

6  know, we're going to catch you dealing, but we're going

7  to, you know, we're going to keep you from having your

8  customers are not going to come around because we're

9  here.

10     Q    Let me understand.  You considered that

11  harassment if a state trooper who believes that

12  somebody -

13          -

14     A    I'm not saying I considered it harassment.

15     Q    Okay.

16     A    I'm saying they felt as though --

17     Q    Okay.

18     A    -- they were being harassed.  You know, that

19  they -- they were there multiple times.  They said, you

20  know, multiple times trying to solicit information

21  about the defendants coming there to purchase drugs,

22  and multiple times they said, "No, that never

23  happened."

24     Q    Okay.  Did Mr. Bingham say Sheriff Pickard

25  did that?

1     A    I do not recall.

2     Q    Would you have named names in any report that

3  you prepared?

4     A    I hope so.  I would like to think I would,

5  yes.

6     Q    Okay.  All right.  Again, I apologize.  I'm

7  sorry.  Did he name -- did he say Bob Smith -- he said

8  Bob Smith was there on that occasion; is that correct?

9  Mr. Bingham identified Bob Smith?

10    A    Yes.

11    Q    Did he identify Bit Edwards as being there?

12    A    I do not recall if we talked about Bit or

13 not.

14    Q    Okay.  Did he give you the names of any other

15 persons who may have been there for the party or

16 whatever was going on?

17    A    I don't recall.  One of them gave me the name

18 of a female that they thought was a CI that was being

19 sent in, but I don't recall what that name was.

20    Q    Informant?

21    A    An informant.

22    Q    Thank you.  Do you remember her name?  You

23 just said you didn't.

24    A    I don't recall without looking at the report.

25 And I don't remember which one told me that either.

1   One of the two.

2       Q    Okay.  You mean between Bob and William, or -

3   -

4       A    William and Bit.

5       Q    -- William and Bit.  Okay.  You were alone on

6   this occasion, am I correct?

7       A    Yes.

8       Q    All right.  Did you report back to the

9   attorney?

10      A    I would've sent a report to the attorney.

11      Q    Okay.  Was there particular -- do you know

12  why Mr. Cox -- why did you go back a second time to

13  talk with Bob?  Why did you -- why did Mr. Cox -- why

14  did you include Mr. Cox, I guess, on the second --

15          MR. SLOSAR:  We're going to be asserting

16      privilege over any communication or direction given

17      by the attorneys on the defense team to

18      investigator, so unless you can ask that question

19      in a way that doesn't invoke either the attorney-

20      client or work product privilege, I'm going to

21      instruct the witness not to answer.

22  BY MR. KELLEY:

23      Q    Based upon your initial interview with Mr.

24  Smith, did you believe that Bob Smith was somebody that

25  the defense would likely call as a witness at any trial

1   with regard to Amanda Hoskins?

2       MR. SLOSAR:  Objection to form.  Calls for

3    speculation.  You can answer.

4     A   I do.

5     Q   You do.

6     A   Uh-huh.

7     Q   Did you think the same about Mr. Bingham?

8     A   I mean, I don't know if the attorney would've

9   chosen to utilize someone who was going to give the

10  same information again, but I mean certainly it

11  could've been.

12      Q   The impression I have from the initial

13  circumstances is that you wanted Mr. Cox to hear

14  directly from this witness, Mr. Smith; is that fair?

15      MR. SLOSAR:  Objection to form.  You can

16   answer. Sorry.

17      MR. KELLEY:  On that one?

18      MR. SLOSAR:  He didn't go through the rules

19   earlier, but I'm going to make a lot of objections

20   so that the record is actually clear, but sometimes

21   I'll instruct you not to answer.

22      THE WITNESS:  Sure.

23      MR. SLOSAR:  Sorry.

24     A   You know, I don't recall a specific reason

25  why - - I mean why he wanted to go a -- or even if he

1   wanted to go back as far as that goes.  You know, there

2   was times if we were working on a case we would do

3   things together, wasn't really planned, and then I did

4   a lot of things on my own as far as following up on

5   talking to other witnesses that his name would come up

6   in an interview.

7   BY MR. KELLEY:

8       Q    Did you believe Mr. Smith when you first

9   talked to him?

10          MR. SLOSAR:  Objection to form.

11      A   I did.

12      Q    Okay.  Did you believe Mr. Bingham?

13      A   I did.

14      Q    Did you know their criminal records before

15  you went to talk to each individual?

16      A   I did.

17      Q    Do you know if they had been convicted of

18  felonies?

19          MR. SLOSAR:  Objection to form.

20      A    I can't recall if they had felonies.  They

21  certainly had a record which was consistent with the

22  things that they were telling me which is, you know,

23  why I believed.

24      Q    Okay.  Mr. Edwards, what were the

25  circumstances of your meeting with Mr. Edwards?

1    A    I believe that I located Mr. Edwards maybe at

2   the -- I want to say I talked to him in a parking lot

3   at a store.  I was in the area, you know, on multiple

4   occasions looking for multiple witnesses.

5    Q    Uh-huh.

6    A    And as I would come up on one, and generally

7   it would take multiple attempts to find these people,

8   and I believe that I ran into him in a store and talked

9   to him briefly.  It was very brief in the parking lot.

10  I think I only talked to him on that one occasion.

11   Q    Was it Escoe's?

12   A    I believe it was, yes.

13   Q    When you say area, were you mainly operating

14  in Stinking Creek at Flat Lick, or are you talking

15  about the entire county?

16       MR. SLOSAR:  Objection to form.

17   A    I think the majority of it was certainly

18  there in the Stinking Creek area but was not limited to

19  there by any means.  So yeah, I was also out in other

20  areas of Knox County quite often.

21   Q    I understand, but in particular when you were

22  trying to locate Mr. Edwards and Mr. Bingham?

23   A    I believe he lived in that area if I'm not

24  mistaken, so that --

25   Q    Mr. Edwards?

1    A    Yes.

2    Q    Okay.  And, again, did you record the

3  interview?

4    A    I don't believe that I did but if I did I

5  would've turned that over.

6    Q    Did you -- did you take notes?

7    A    It's possible.  I recall that one being

8  brief.

9    Q    Did you prepare a report concerning your

10  interview?

11    A    I believe that I did.  I'm not positive but I

12  believe so.

13    Q    Okay.  How long did the meeting last?

14    A    That one was really -- I recall that one

15  being brief.

16    Q    By that you mean ten minutes, 15 minutes?

17        MR. SLOSAR:  Objection to form.

18    A    15 minutes.

19    Q    Was anyone else around?

20    A    No.

21    Q    What did Mr. Edwards tell you?

22    A    I believe that Mr. Edwards was also arrested

23  with Bob on one occasion.  There was money taken from

24  both Bob and Mr. Edwards.  I believe that Mr. Edwards

25  told me that the amount of money that was taken was not

1  consistent with the officer's reports.  And Mr. Edwards

2  in particular, I think now that I'm thinking about it,

3  I believe that multiple people were giving me a story

4  about during the arrest for those two individuals at

5  that time, Mr. Edwards said that when they were

6  arrested, the officer which was Mr. York that come to

7  make the arrest called for some assistance and that the

8  two of those were transported together in another

9  police officer's vehicle to the detention center.  And

10  multiple witnesses believed that Mr. York stopped at a

11  location near Bob Smith's home, which I believe was

12  Allen Helton's, maybe, uncle or family member.  Some

13  family member, where Allen may have been staying at the

14  time.  Allen Helton may have been staying at the time.

15  And a lot of people were speculating that Mr. York had

16  given Allen Helton some money and/or drugs from the

17  proceeds of their arrest.  And Bob Smith, yeah Bob

18  Smith directed me to Mr. Edwards for that information.

19  I don't recall specifically if they said he had told

20  them that, or if they just -- it was just rumor.  But I

21  believe Mr. Edwards denied seeing whether or not there

22  was a transfer.  Mr. Edwards did confirm that Mr. York

23  pulled into the driveway and that Allen went out to the

24  vehicle from what I recall.  And then he suggested that

25  I should follow up and talk to his wife who might have

1   more information and I don't recall why he thought she

2   would but, and I was never able to locate her.

3       Q    You're talking about Allen Helton's wife?

4       A    No.  Mr. Edwards' wife I believe he told me

5   his wife.  Maybe it was his wife.  He gave me the name

6   of the relative who lived in that home and it was a

7   Helton, but I don't recall his first name.  It would be

8   in the report though.

9       Q    Okay.  I'm sorry.  I had trouble following

10  you there.

11      A    It's a lot.  Okay.

12      Q    When did this arrest occur with Mr. Edwards?

13  Was it at Bob Smith's house?

14      A    It was at Bob Smith's house.

15      Q    All right.  Was it the same time as the

16  arrest of Mr. Bingham?

17      A    I don't believe so.  I think this was a

18  separate incident, but I may have been -- I may be

19  wrong about that.  It could've been, but I don't

20  believe so.  I think this was separate.

21      Q    Separate.  All right.  By the way, was mister

22  -- was the arrest that caused Mr. Smith to be in the

23  detention center, was that when Mr. Bingham was

24  arrested or when Mr. Bingham was present, or, and

25  likewise, was it when Mr. Edwards was present?

1    A    I believe -- I don't believe so.  I believe

2  this was after those two incidents, another arrest.

3    Q    So these are three separate incidents?

4    A    I believe so.  Because it was sometime from

5  when all of that was going on.

6    Q    In each instance, that is the reason he was

7  in the detention center obviously Bob Smith was

8  arrested then.  Mr. Smith arrested at the time that Mr.

9  Bingham recounted.

10    A    He was arrested.  I just don't recall whether

11  or not Mr. Bingham was arrested because it seems there

12  was an agreement that Bob would take responsibility for

13  whatever Mr. Bingham had done in order to keep Mr.

14  Bingham from getting a felony.

15    Q    Was that --

16    A    I would have to go back and look at the

17  records to be sure.

18    Q    Is that the instance where Mr. Bingham had a

19  gun on him?

20    A    Yes.

21    Q    Okay.  So you don't believe that the arrest

22  that Mr. Bingham told you about was the one that caused

23  Mr. Smith to be in the detention center in 2014?

24        MR. SLOSAR:  Objection to form.  You can

25    answer.

1    A    I do not.

2    Q    Okay.  Likewise Mr. Edwards told you about a

3  completely different arrest; is that correct?

4    A    Yes.

5    Q    And when -- when -- do you know what year

6  that occurred in?

7    A    No.  I do not.

8    Q    Do you know when Mr. Bingham -- well, all

9  right. I have to admit I got lost when the officers,

10  you said, arrested Mr. Edwards and you specifically

11  mentioned Jason York; is that correct?

12    A    Uh-huh.

13    Q    Yes?

14    A    Yes.

15    Q    And do you know whether Sheriff Bingham was

16  there --

17        MR. SLOSAR:  Sheriff Bingham?

18    Q    -- at the time of Edwards arrest.

19        MR. SLOSAR:  Objection for Sheriff Bingham.  I

20    think --

21    Q    Did I say Sheriff Bingham?  Sheriff Pickard,

22  I'm sorry.

23    A    I do not recall.

24    Q    One way or another?

25    A    One way or another.  I don't recall.

1    Q    All right.

2        MR. SLOSAR:  I won't comment on whether they

3    were doing the same type of conduct.

4        MR. KELLEY:  I'm sorry.

5        MR. SLOSAR:  Just joking.  Keep going.

6  BY MR. KELLEY:

7    Q    Do you know whether any other Knox County

8  deputies or members of the sheriff's department were

9  present?

10    A    I do not know.

11    Q    See if I've got this right.  They arrest Mr.

12  Edwards.  Is that your understanding?

13    A    Yes.

14    Q    Do you know what crime they charged him with?

15    A    It would've been a drug related crime.

16    Q    Okay.  And he was taken by some officer to

17  jail? They were heading that way I take it?

18    A    Yes.

19    Q    But they made a stop at --

20    A    They did not make a stop.  Bob was arrested

21  at the same time as Mr. Edwards.

22    Q    Okay.

23    A    From my recollection, he -- he remembered

24  York calling for assistance, having another cruiser or

25  another officer come onto the scene to transport both

1  he and Bob together in that cruiser.  Mr. York pulled

2  out in front of them and according to Bit, pulled into

3  a residence and Bit and Bob Smith went on to the

4  detention center.

5      Q    So where did the information concerning money

6  being paid to, where did that come from?

7      A    I believe that it arose from rumors from

8  multiple individuals but --

9      Q    Do you know any of those individuals?

10     A    But --

11     Q    I'm sorry.

12     A    I would have to review the record to tell you

13  the names of those individuals.  But Bob Smith directed

14  me to Bit for that -- or for that information.

15     Q    Okay.  What did it have to do with the

16  investigation -- your investigation into Katherine

17  Mills' murder?

18     A    I assumed that it was -- you know, there was

19  multiple allegations that witnesses were being coerced

20  and harassed.  And I believe that it was their position

21  at the time that maybe Mr. York was given Allen Helton

22  who was one of the -- I think he made multiple

23  statements to the officers on multiple occasions, you

24  know, that he was giving him money or drugs to

25  cooperate with him and give him a statement against

1  these individuals.

2      Q    Okay.  Was Sheriff Pickard giving anybody

3  money?

4      A    I don't recall hearing that, no.

5      Q    Okay.  was any member of the Knox County

6  Sheriff's Department giving Mr. Helton or anybody else

7  money in return for some kind of --

8      A    I don't recall hearing that one way or

9  another.

10     Q    Multiple people, can you give me a name?

11     A    Not without reviewing my records.

12     Q    All right.  How many reports were made --

13  well, was there -- I probably asked this and I

14  apologize again. There was a report -- you think there

15  was a report done of your interview of Mr. Edwards?

16     A    Yes.  There should've been.  I would -- I

17  would assume.

18     Q    All right.  And did that report contain the

19  information you gave concerning money being passed to -

20  - and I wasn't in clear -- who was the money given to

21  purportedly?

22         MR. SLOSAR:  Objection to form.  You can

23     answer.

24     A    The story was that money was -- money or

25  drugs was being passed from Mr. York to Allen Helton.

Q    On the occasion that you described that Mr.
Edwards described to you, I was again confused.  Is it
his understanding that money was paid directly to Mr.
Helton? Is that what Mr. Edwards told you?

A    Mr. Edwards told me that he witnessed him
pull in and Allen come out.  He did not witness any
transfer personally himself because he obviously had
passed on by. And I don't remember if he told me it was
his wife or Mr. Helton's wife that may have more
information.  Someone else at that location at the time
might have more information and I should go talk to
them.

Q    Did you?

A    I -- I remember looking for a female.  I do
not -- I don't believe that I ever found her.

Q    All right.  Were you looking for Ms. Helton
or you were looking for Ms. Edwards or both?

A    I don't remember which one.  I probably
looked for both, but I don't recall.  It should be --
that should be in the report.

Q    All right.  And you would've kept some kind
of record of your attempts to contact these people?

A    Possibly.  I mean I, normally, I probably
would, so I can't be sure without looking at the
record.

1    Q    Okay.  Let me take you back all the way to

2  the first conversation you had with Bob Smith if I

3  could. Here's what I remember your testimony to be and

4  please correct me if I'm wrong, is that someone, one of

5  the officers, offered -- said to Bob Smith we'll get

6  rid of these charges if you'll tell us whether I guess

7  Amanda or William, or Jonathan bought drugs from him.

8        MR. SLOSAR:  Objection to form.

9    Q    Is that your testimony or did I get it wrong?

10       MR. SLOSAR:  Objection to form.  You can

11   answer.

12    A    I remember him saying William Lester or

13  Amanda. I do not recall if he mentioned Jonathan Taylor

14  saying, but he said that they told him if you tell us

15  how much they've been spending here, I'll sweep these

16  trafficking charges under the rug.

17    Q    So as an exchange for information, then.  Is

18  that your understanding?

19       MR. SLOSAR:  Objection to form.

20    Q    The quid pro quo was we'll let you -- we'll

21  sweep these drug charges if you'll give us information;

22  is that fair?

23       MR. SLOSAR:  Objection to form.

24    A    Fair.

25    Q    All right.  Was -- based upon what Bob Smith

1  said, did he ever say they told me they would sweep

2  these drug cases under the mat if you will testify

3  against Amanda Hoskins or William Lester?

4     A   I don't -- I don't recall him saying it that

5  way.

6     Q   All right.  Did you get any impression that

7  the quid pro quo, the consideration was that if they

8  would sweep away the charges if he would help them

9  frame Amanda Hoskins or William Lester?

10     A   His comment was, "We'll sweep this under the

11  rug if you tell us how much they've spent here."  And I

12  believe that if there was any -- I believe that the

13  fact that it happened more than once, multiple times,

14  many times, that Bob assumed I've already given you the

15  answer, why are we still talking about this.  That was

16  the gist of how I remember the conversation occurring.

17  You know, I told you they've not been here.

18     Q   I get the impression that you thought the

19  police were being very insistent on getting this

20  information; is that your understanding?

21       MR. SLOSAR:  Objection to form.

22     A   I think that's how he felt.

23     Q   Well did he think that he was being told,

24  we'll drop the charges if you name these people as drug

25  buyers, as buying drugs from you?

1    A    I don't know how he took it.  All I can tell

2    you is that he told me multiple times they asked him,

3    "Tell us how much money they've been spending here.

4    Tell us what we want to know."  And multiple times they

5    were told they've not been here.

6    Q    All right.  Have you been involved in other

7    investigations where these officers, in order to get

8    information would agree  to try to help negotiate

9    charges?

10    A    I mean, I've heard these allegations.  I've

11    never heard an officer admit that.  But I've heard

12    allegations, you know.

13    Q    Okay.

14    A    Over the last 20-some years.

15    Q    All right.  Again, are you willing to say

16    that that is something that John Pickard or any member

17    of the Knox County Sheriff's Department said?

18         MR. SLOSAR:  Objection to form.

19    A    I do not recall other specific names.  I

20    would have to review the reports.

21    Q    Likewise, I'm obviously trying to represent

22    my clients right now, but I'm trying to understand, has

23    Mr. Bingham specifically identified John Pickard or any

24    Knox County deputy or member of the sheriff's

25    department as being someone either involved in the

1    arrest or some kind of negotiation of charges?

2        MR. SLOSAR:  Objection to form.

3        A    I would have to review the record to tell you

4    definitively if that were the case.

5        Q    It doesn't stick out in your mind, obviously

6    that he named somebody with the sheriff's department?

7        MR. SLOSAR:  Objection to form.  Asked and

8        answered.

9        A    It doesn't stick out, no.

10       Q    Bit Edwards, same question.  What role did

11   Bit say that John Pickard or anybody in the Knox County

12   Sheriff's Department played in this arrest that you

13   talked about and the exchange of the money with Mr.

14   Helton?

15       A    I don't recall other than York, specific

16   names of other officers without reviewing the record,

17   although it seems like -- I believe that multiple times

18   I was told multiple officers, but I can't tell you the

19   names without reviewing the record.

20       Q    The multiple allegations that there was some

21   kind of kickback scheme going on in Knox County, who

22   told you that during the course of your investigation?

23       A    Certainly, Bob and Mr. Bingham, and I would -

24   - I would have to review the report to be certain on

25   Mr. Edwards, but I believe that he did.  That's all

1   that I can think of at the moment.

2       Q    Okay.  You feel there are other people that

3   told you this?

4       A    I do not recall.

5       Q    At any time did you bring this to the

6   attention to the Commonwealth's attorney for Knox

7   County, Jackie Steele?

8       A    Me personally, no.

9       Q    Do you know of anybody at the office of

10  public advocacy that brought this to the attention of

11  the Commonwealth's attorney?

12      A    I do not.  No.

13      Q    Did you report it to any other law

14  enforcement authority such as the Federal Bureau of

15  Investigation, the

16  DVA?

17      A    I only report to the attorney on the case.

18      Q    Do you know of anyone at the office of public

19  advocacy reporting it to another law enforcement

20  authority?

21          MR. SLOSAR:  Objection to form.

22      A    Not that I'm aware of.

23      Q    In other words, if you believe you have

24  credible information from credible individuals as you

25  believe these gentlemen are, telling you that there's a

1  kickback scheme in Knox County, you feel you have no

2  duty to reveal this information to any other law

3  enforcement agency?

4      MR. SLOSAR:  Objection to form.  Asked and

5      answered.  You're harassing the witness, Mr.

6      Kelley.  You can answer again, Lisa.

7      A    You know, no.  I assume I did not.  My

8  reporting is to the attorney and what the attorneys --

9  who the attorneys have a conversation with about it at

10  that point -- I do recall Barbara Carnes at least, who

11  was one of Ms. Hoskins' initial attorneys talking to,

12  or at least telling me that she spoke to Mr. Steele

13  about some of the improprieties but what those -- what

14  her specific conversation with him, I have no idea.  I

15  was not there.

16      Q    I got the impression Barbara Carnes was

17  involved in 2012 at the time of the initial indictment

18  and I thought she was out by 2014.

19      A    I don't recall when she left, and I don't

20  recall, you know, what information she would have had

21  at the time.  I recall -- I simply recall her saying

22  that she had spoke -- had spoken with Jackie Steele

23  regarding, you know, some of the inconsistencies or

24  improprieties.

25      Q    Well, was Ms. Carnes representing Ms. Hoskins

1    or anybody in this murder investigation at the time you

2    first spoke to Bob Smith?

3        A    I don't believe that she was, but I could be

4    mistaken.  There was a period of time when both she and

5    Jim were on the case together, and I do not recall the

6    date that she left.

7        Q    Do you remember telling her, inviting her to

8    go to the detention center to talk?

9        A    No.  I don't.

10            MR. SLOSAR:  And, again, we're asserting

11       privilege over --

12            THE WITNESS:  Sorry.

13            MR. SLOSAR:  -- communication between Ms.

14       Evans and attorneys in the defense team.

15   BY MR. KELLEY:

16       Q    What other information do you have from any

17   other investigations you performed concerning Mr.

18   Smith, Mr. Bingham, or Mr. Edwards either before or

19   since this investigation?

20       A    None on Mr. Edwards.  None on Mr. Bingham I

21   don't believe.

22       Q    All right.  Have you been made aware of any

23   or received any continuing allegations of a kickback

24   scheme in Knox County since 2014?

25       A    On other cases?

1    Q    Yes.

2    A    Okay.  I was involved in William Anderson's

3 case.

4    Q    Uh-huh.

5    A    And there were allegations from Jeff Gray

6 that that was the case.  That he was giving the

7 sheriff's office, in particular, money kind of as a

8 payoff to let him do business.

9    Q    Okay.

10   A    Another drug dealer.

11   Q    I, for some reason know Mr. Anderson as Bill

12 Bill.  Is that Bill Bill Anderson?

13   A    Yes.

14   Q    Are we talking about the same person?

15   A    Yes.  We are.

16   Q    When did you talk to Jeff Gray?

17   A    It's been in the last -- within the last

18 year.

19   Q    2017?

20   A    I was present during the conversation with

21 him.

22   Q    What were the circumstances?

23   A    I met with Elliott.  Elliott was coming down

24 from Chicago to look for him.  We -- I believe he set

25 up the -- or the interview and we met with him at a

1   restaurant.

2       Q    Okay.  Were you working for the Office of

3   Public Advocacy at that time?

4       A    No.  Not -- not in that capacity, no.

5       Q    Okay.  You were still an employee of the

6   State?

7       A    Yes.  Uh-huh.

8       Q    So you were acting outside of your --

9           MR. SLOSAR:  Objection to form.

10          MR. KELLEY:  I haven't finished yet.

11          MR. SLOSAR:  I didn't know if you were done,

12   or...

13          MR. KELLEY:  No.  I'm just slow.

14   BY MR. KELLEY:

15      Q    You were acting outside of your job as an

16   investigator, then?

17          MR. SLOSAR:  Objection to form still.

18      A    I was not -- I did not feel that I was there

19   as an investigator.  I felt like I was there as a, you

20   know...

21      Q    Was it a weekday?

22      A    -- what you call a witness or a --

23      Q    Beg your pardon?

24      A    I don't recall what day of the week it was.

25      Q    You think it was a weekday or a weekend?

1     MR. SLOSAR:  Objection.  Asked and answered.

2     Q    If you can clarify for me whether -- the

3   difference between a weekend and a weekday?

4     MR. SLOSAR:  Like a Saturday and Sunday versus

5    a Monday through Friday?

6     MR. KELLEY:  Yes.  I do.

7     MR. SLOSAR:  Yes.

8     A    I believe it was a weekend, but -- and I

9   didn't do any reports on that or anything, so I don't

10   know for sure, but I believe it was a weekend day.

11   BY MR. KELLEY:

12     Q    Okay.  So you weren't on the clock?

13     A    No.  I was not.

14     Q    How did -- how often did you meet with Mr.

15   Slosar outside of your job as an investigator?

16     A    Several times, probably.  I mean I'm not

17   sure. I met with him and talked to him on multiple

18   occasions.

19     Q    Okay.  Was this after the dismissal of

20   charges against Amanda Hoskins, and William Lester, and

21   Jonathan Taylor?

22     MR. SLOSAR:  You know that they're --

23     MR. KELLEY:  They're different times.  I

24    apologize.

25     A    Yeah.

BY MR. KELLEY:

    Q    If you could clarify to me where in that time

frame it was, or...

    A    That we spoke?

        MR. SLOSAR:  Yeah.  I don't understand your

    question either.  You can answer to the extent you

    understand it.

BY MR. KELLEY:

    Q    When did you first talk with Mr. Slosar?

    A    It would've been after Mr. Anderson's

acquittal. Sometime after Mr. Anderson's acquittal in

Bell County.

    Q    Okay.  With Mr. Anderson's acquittal, were

you - - was there still a role for you to play as an

investigator in that -- in the investigation of that?

    A    Not -- not on his case.  No.

    Q    All right.

    A    I think -- no.  My job was done.

    Q    Okay.  How about were you still working as

the investigator on Amanda Hoskins' case?

    A    I can't remember which came first, the

acquittal or the dismissal.  I believe that the

acquittal was after the dismissal, so...

    Q    I do, too.  Okay.  So was there an active

investigation going on involving Amanda Hoskins or even

1   Bill Bill Anderson at the time you talked with Mr.

2   Slosar the first time?

3     A   No.

4     Q   How did you come to talk to him?

5       MR. SLOSAR:  We are continuing to assert the

6   attorney-client work product privileges as to any

7   communication between Ms. Evans, attorneys from the

8   defense team, attorneys from our firm unless there

9   was a third-party present in those conversations

10   that was not a member of the legal team that would

11   somehow waive the privilege.

12       MR. KELLEY:  I don't think I've asked her the

13   content of any conversation yet.  I asked her when

14   it occurred.

15       MR. SLOSAR:  No.  You just started going into

16   the content.

17       MR. KELLEY:  "How did it come about," I

18   thought was the question.

19       MR. SLOSAR:  Yeah.  So communication -- I mean

20   you need --

21       MR. KELLEY:  You're saying that if she calls

22   you up --

23       MR. SLOSAR:  I'm saying --

24       MR. KELLEY:  -- or you call her up, you can't

25   -- that that falls within the privilege?

1      MR. SLOSAR:  I'm saying that if she came into

2  contact with me based on conversations with our

3  client, that is privileged.  If she came in -- like

4  you're delving into the privilege by asking how any

5  of my clients got representation.

6  BY MR. KELLEY:

7      Q    Was Amanda Hoskins working at the Office of

8  Public Advocacy when you first contacted Mr. Slosar?

9      MR. SLOSAR:  Objection to the form of the

10  question.  You can answer to the extent you recall

11  when Ms. Hoskins began working at DPA.

12      A    She began working at DPA really soon after

13  her release from the detention center.  And to the best

14  of my knowledge, she was there a year, year-and-a-half,

15  maybe.

16  BY MR. KELLEY:

17      Q    Was she still there when Bill Anderson was

18  acquitted?

19      A    I'm not sure.  I don't recall.

20      Q    Was she present at any meetings you had with

21  Mr. Slosar?

22      MR. SLOSAR:  Was Amanda Hoskins present?  Is

23  that the question?

24      MR. KELLEY:  That's what I meant, yes.  I'm

25  sorry.

1    A    I believe -- I'm not sure.  I don't think --

2  I don't recall whether she was --

3  BY MR. KELLEY:

4    Q    When you say you've had several meetings with

5  Mr. Slosar, how many?

6    A    I cannot give you a -- I don't recall an

7  exact number of times.

8    Q    Can you give me a ballpark?

9       MR. SLOSAR:  Objection to form.  Asked and

10    answered.  Calls for speculation.

11    Q    50 times?

12    A    Oh, no.

13    Q    25 times?

14    A    I'd be totally guessing or speculating if I

15  gave you a number.  I mean I've seen him on other

16  occasions outside of -- I can't -- I don't have an

17  exact number.

18    Q    Okay.  Over what period of time have you had

19  meetings with him?  Beginning with the acquittal of

20  Bill Bill Anderson, how long has it been since these

21  meetings have been going on?

22       MR. SLOSAR:  Objection to form still.  You can

23    answer.

24    A    I would -- it would've been sometime after

25  the acquittal and I'm not sure of the time frame, but

1   it would certainly have been after and, you know,

2   randomly, I haven't -- I don't even recall the last

3   time I saw him.

4       Q   Did you see him today before you came here?

5       A   Sure. Well, in the parking lot.

6       Q   Okay. Did you talk with him before this

7   deposition?

8       A   We spoke, yes.

9       Q   Did you talk to him about the questions that

10   might be asked during this deposition?

11       MR. SLOSAR: I'm -- I mean, again, unless

12       you're -- I have no objection to you asking her if

13       -- what documents she was asked to review prior to

14       today or any documents that I showed her, but if

15       you're going into the contents of communication

16       between our office and Ms. Evans, the privilege

17       still exists.

18       MR. KELLEY: So you -- I'm sorry. You're --

19       MR. SLOSAR: I'm trying to --

20       MR. KELLEY: The court reporter can read back

21       the question. Are you objecting to that question?

22       I take it and are you instructing her that the

23       attorney-client privilege applies to that --

24       MR. SLOSAR: Well --

25       MR. KELLEY: -- question.

1    MR. SLOSAR:  It's not -- I am not Ms. Evans'

2  attorney.  I'm saying that the work product

3  doctrine and the attorney-client privilege between

4  Ms. Evans and my client continues to exist.  So to

5  the extent that you're delving into conversation

6  and communication between Ms. Evans and us --

7    MR. KELLEY:  Uh-huh.  I know.

8    MR. SLOSAR:  -- about the internal workings of

9  the defense team, and strategic discussions that

10  happened relating to the underlying investigation

11  in this case that was conducted, I think the

12  privilege does still exist.  If you want to ask --

13    MR. KELLEY:  I consider her a third person

14  unless you're telling me that -- have you been

15  retained as an expert witness in this case?

16    MR. SLOSAR:  John, do you understand the

17  question?  I'm trying to work with you.  She's not

18  a typical third person.  She is here in the

19  capacity as if she was Amanda Hoskins' attorney.

20  The investigators that are part of the defense team

21  exact that same authority. So my clients are

22  continuing to maintain the attorney- client

23  privilege.  They have a right to do that.  DPA may

24  still be retaining that privilege as well.  I --

25  I'm not here representing her, but I'm saying my

1    clients are enforcing the attorney-client privilege

2    as to conversations between Ms. Evans and them, Ms.

3    Evans' defense team and us, and because of that, I

4    would instruct the witness not to answer questions

5    about communication that she had with my clients,

6    with attorneys that she worked under, or with

7    members of our team.  If you want to go into what

8    documents we gave her to review, I think that's

9    perfectly appropriate, but the content of

10    communication is not.

11         MR. KELLEY:  Can you read back that -- the

12    question, wherever it was back way back then?

13         (REPORTER PLAYS BACK REQUESTED TESTIMONY)

14         MR. KELLEY:  I don't think that was the

15    question.  I thought it would be --

16         MR. SLOSAR:  I think we were past that.

17         MR. KELLEY:  Yeah.  I think we were past that.

18    Forget it.  Let me go ahead and ask the question

19    and then he can object and instruct accordingly.

20  BY MR. KELLEY:

21    Q    Did you discuss with Mr. Slosar what

22  questions might be asked during this deposition today?

23         MR. SLOSAR:  You can answer that limited

24    question.

25    A    I recall being told that I might be asked

1   about Bob Smith. That's, I mean, other than specific

2   questions, that --

3     Q   That was it?

4     A   That's all that I recall being asked -- being

5   told about specific questions.

6     Q   And when did this conversation occur?

7     A   Yes.

8     Q   All right. Did you then go try to find your

9   reports?

10     A   I was asked to review that report.

11     Q   Okay. Did you look at all three reports as

12   you would've done for Mr. Bingham or Mr. Edwards?

13     A   No.

14     Q   Okay. Did you look at other reports, for

15   example in the Bill Bill Anderson case, to help you

16   remember what Jeff Gray said?

17     A   No. I did not. Mr. Smith was the only thing

18   that I reviewed before today.

19     Q   Okay. Have you ever listened to the taped

20   conversation taken by Josh Powell I believe and Ms.

21   Gatnarek?

22     A   Of Bob Smith?

23     Q   Of Bob Smith?

24     A   No. I haven't.

25     Q   Okay. During the course of the

1  investigation, did you tell them that Bob Smith was

2  somebody of interest and that they needed to talk to

3  him as well?

4      MR. SLOSAR:  Again, the privilege continues to

5    exist between members of the --

6      MR. KELLEY:  Not between the defendants.

7      MR. SLOSAR:  Absolutely.  They had a joint

8    defense privilege.

9  BY MR. KELLEY:

10     Q    I would disagree, but -- am I correct, and I

11 think you even say this in a conversation you had with

12 my client in the Anderson case that normally you keep

13 separate your investigations where your -- where the

14 office is representing two defendants on a particular

15 investigation?

16     MR. SLOSAR:  Objection to form.

17     A    I believe we -- I believe I do recall having

18 that conversation with Mr. Pickard and that generally

19 is the case, although there are limited reasons why a

20 spouse, or -- but in this case, it was very unusual to

21 me to work across with all three defendants but we did

22 feel that it was appropriate.

23     Q    Right.  And you shared information you got;

24 is that fair?

25     A    Yes.

1    Q    And you would've shared your entire

2    investigation with Josh and Ms. Gatnarek, or whoever

3    was representing Mr. Taylor?

4    A    I would not say that I -- that either of us

5    shared our entire investigations.

6    Q    All right.  Did you also share it with --

7       MR. WRIGHT:  David Hoskins.

8    Q    There you go.  David Hoskins.

9    A    Some of the things would've been shared with

10   David Hoskins as well.

11   Q    All right.  During the course of the

12   investigation, I know you didn't keep a recollection of

13   every meeting you had, but was it typical for you to

14   talk to Josh on a daily basis?

15   A    No.

16      MR. SLOSAR:  Objection to form.  You can

17   answer.

18   A    Certainly not on a daily basis.  No.

19   Q    How often would you have, would be a --

20   A    I don't know how often.  I mean, there were

21   occasions, other occasions when I would've been with

22   Josh and seen Josh that we may have talked about it,

23   but and there were certainly times when we talked about

24   it -- that was our intent was to talk about it but as

25   far as how many times, maybe -- I don't want to guess.

1     Q    Okay.  Do you know how many times you

2  would've talked with David Hoskins or members of his

3  office, or --

4       MR. SLOSAR:  Objection to form.

5     A   It would've been a much lower number.  I did

6  not -- I didn't communicate.  Maybe -- I don't want to

7  feel like I have to give an answer and that's how I

8  feel, but five times, maybe total.

9     Q    Okay.  Did you actually meet face to face

10  with -

11       -

12     A   A couple of times.

13     Q    Was Mr. Powell or somebody from the Jonathan

14  Taylor team present as well at these meetings?

15     A   For sure on one.  There may have been more

16  than one, but at least one.  I do recall the team --

17  all teams being there.

18     Q    Did you discuss these meetings with Bob Smith

19  or -- and/or William Bingham, and/or Bit Edwards during

20  any meetings with Josh Powell or Heather Gatnarek?

21       MR. SLOSAR:  Again, we're continuing to assert

22    the work product, attorney-client, and joint

23    defendant privileges as to any communication

24    amongst members of the defense teams unless there

25    was a third-party present that would somehow waive

1 such privileges.  I would instruct the witness not

2 to answer on that basis unless you can develop a

3 record that indicates the privilege is waived.

4     MR. KELLEY:  Again, I don't know that there

5 are any instructions to be made by him.  He's not

6 representing you, is he?

7     MR. SLOSAR:  On behalf of my clients, we are

8 asserting the privileges --

9     MR. KELLEY:  Right.

10     MR. SLOSAR:  -- of attorney-client joint

11 defense and work product, and on behalf of them, I

12 would instruct Ms. Evans not to answer that

13 question.

14     MR. KELLEY:  I think the discretion lies with

15 Ms. Evans --

16     MR. SLOSAR:  Absolutely --

17     MR. KELLEY:  -- and her job as an

18 investigator, a paid investigator, somebody paid by

19 the state to gather information.

20     MR. SLOSAR:  It is unethical for you as an

21 officer of the court to inform Ms. Evans that she

22 should waive -- that it is her decision as to

23 whether to waive a privilege that is maintained by

24 both parties, my clients, and the attorneys.  It's

25 not a waivable privilege from any member of the

1    defense team.

2        MR. KELLEY:  Well, again --

3        MR. SLOSAR:  Without my clients' consent.

4        MR. KELLEY:  She can answer the question or

5    not.

6        MR. SLOSAR:  I'm instructing her not to answer

7    on behalf of my clients.

8  BY MR. KELLEY:

9    Q    I'm waiting for an answer.

10   A    I'm not going to give one.

11   Q    Outside of the defense teams, the attorneys

12  and investigators and other staff representing Amanda

13  Hoskins, Jonathan Taylor, and William Lester, did you

14  have discussions outside of the -- with others other

15  than Mr. Slosar concerning your investigation or what

16  you learned during your investigation of the Katherine

17  Mills murder?

18   A    I'm not I understand the question.  Did I --

19  did I discuss any of this with anyone outside of --

20   Q    Yeah.  You found out some startling

21  information about this kickback scheme that's going on

22  and I want to know who you talked about -- talked to

23  about it.

24       MR. SLOSAR:  Objection to the form, especially

25   to the word "startling."

1    A    DPA conducts case reviews with other

2  attorneys and investigators before -- and before

3  trials.  And some of this information may have come out

4  during those case reviews, certainly.

5    Q    All right.  Who would be party to those case

6  reviews?

7    A    It would be other attorneys or investigators

8  that were set up by generally the attorneys who are on

9  the case.

10    Q    Do you know the names of the attorneys that

11  were involved in the case review of Amanda Hoskins'

12  case?

13    A    Tom Griffith was present in a case review.

14    Q    Okay.  What is his position?

15    A    He's an attorney.

16    Q    Okay.  What office does he work out of?

17    A    I believe that he was the lead of capital

18  trials during that time.  I'm not sure where Mr.

19  Griffith works now or what office he's with.

20    Q    Who else would've been present?

21    A    Barbara Carnes was there at the time.  I

22  don't remember what other attorneys were there outside

23  of the teams.  I don't recall specifically who else was

24  there outside of the teams.

25    Q    Okay.  How many meetings were had with regard

1   to Amanda's case.  Amanda Hoskins?

2     A   With outside attorneys, or...

3     Q   Uh-huh.

4     A   I'm -- I'm not sure if there was more than

5   that one or not.  I remember that one specifically.  I

6   don't recall if there were any more.

7     Q   Do you remember when it was?

8     A   I don't remember when it was.

9     Q   Do you remember what year it was?

10     A   I don't but it would've been before Ms.

11   Carnes left because she was present.

12     Q   Was Ms. Carnes working as a contracted

13   attorney or was she a member of...

14     A   No.  At the time, I believe she was a full-

15   time attorney.

16     Q   Full time.  Okay.

17     A   I think she did contract after for a while

18   and she may still be.  I'm not sure.

19     Q   And were you present at these meetings as

20   well?

21     A   Certainly, yeah.

22     Q   All right.  Who else would be there besides

23   you, Barbara, and Tom Griffith?

24     A   Generally, at least one or more members of

25   the defense team.

1    Q    Okay.

2    A    Ideally, all of the members of the defense

3 team.

4    Q    What constituted the defense team for Amanda

5 Hoskins?

6        MR. SLOSAR:  Objection to form.  Foundation.

7    You can answer.

8    A    When we started, it was Barbara Carnes, at

9 some point, I don't recall when, but a short period

10 after Barbara came to me and asked me to investigate

11 the case, we added Jim Cox.  When Barbara left, we

12 added Teresa Whitaker and that's -- that's it.

13    Q    Any other investigators besides yourself?

14    A    Not any that were assigned to the team.

15 There was an investigator who began working for the

16 Harlan County office and I don't recall what the time

17 frame was, but she accompanied me -- I want to say to a

18 few of the interviews that I did.

19    Q    What was her name?

20    A    Jessica Wells.

21    Q    Is she still employed by the --

22    A    She's still in the Harlan office.

23    Q    Do you remember which interview she went

24 along?

25    A    I remember specifically her going to Michael

1    Crump's interview.  She accompanied me to others, but I

2    -- I would have to look at the record to recall which

3    one specifically.

4        Q    Are there any other instances you would've

5    met with attorneys outside of the team for Amanda

6    Hoskins other than this review by Tom Griffith, et al.

7        A    Not that I recall.

8        Q    Do you remember how close you were to trial,

9    or is this something you did as you were about to go

10   into trial, or...

11       A    Ms. Hoskins was scheduled for trial --

12       Q    Many times.

13       A    Many times.

14       Q    Yes.  I understand.

15       A    So it certainly would've been prior to one of

16   those, but I don't recall which one.

17       Q    Okay.  Are minutes kept of those meetings?

18       A    No.

19       Q    Do you keep notes during those meetings?

20       A    I keep notes if there's any suggestions made

21   or something that I want to, you know, someone makes a

22   suggestion you should follow up on this, I would make a

23   note to that extent, but as far as detailed notes, I

24   wouldn't.

25       Q    Do you remember any suggestions made during

1   that meeting?

2        MR. SLOSAR:  I mean, again, we're going to

3   continue to assert the same privileges --

4        MR. KELLEY:  Okay.

5        MR. SLOSAR:  -- that we've asserted earlier.

6   The third parties that you're talking about are

7   obviously consulting attorneys which would not

8   waive the privilege. So unless there are third

9   parties who are not members of the legal team or

10   are serving as consulting counsel, the same

11   privileges exist, and we would instruct Ms. Evans

12   not to answer that question.

13        MR. KELLEY:  Okay.

14  BY MR. KELLEY:

15    Q    I went down this rabbit hole asking you about

16  conversations you've had with Mr. Slosar and you've

17  described them.  And I think I was asking you about the

18  last meeting and I take it it was a telephone call

19  yesterday; is that correct?

20    A    Correct.

21    Q    All right.  Did Mr. Slosar ask you to review

22  any documents at that time?

23        MR. SLOSAR:  You can answer.

24    A    Just the Bob Smith interview.

25    Q    Okay.  And, again, did you go farther to look

1    at anything else on your own?

2        A    I did not.

3        Q    Okay.  Do you have access to your entire

4    file, investigative file?

5        A    Yes.

6        Q    Did you make any effort to look at the rest

7    of the file in anticipation of any of these scheduled

8    depositions --

9        A    No.

10       Q    -- in this case?

11       A    No.

12       Q    All right.  Why?

13       A    Probably because I'm -- got a lot of cases.

14   I don't know.  I just don't -- busy.

15       Q    Do you have a lot of cases in which you're

16   testifying by deposition?

17           MR. SLOSAR:  Objection to form.  You can

18       answer to the extent you understand.

19       A    No.

20       Q    Have you ever testified in a civil case

21   before?

22       A    I've testified.  I've not done a deposition -

23   -

24       Q    Okay.

25       A    -- in a civil case.

1    Q   Civil case.  What were the circumstances?

2    A   Personal injury that I was involved in --

3    Q   Okay.

4    A   -- 25 years ago.

5    Q   Okay.

6    A   That's the only time.

7    Q   Have you ever testified in a case involving

8  an allegation of under 42 U.S. C 1983.  That is civil

9  rights or constitutional rights violations?

10    A   No.

11    Q   Okay.  But this -- so this -- but this case

12  doesn't stick out in your mind as something that you

13  wanted to prepare for?

14    MR. SLOSAR:  Objection to form.  Asked and

15    answered.  You can answer again, Lisa, if you

16    understand his question.

17    A   I'm not sure that I do, but I didn't feel

18  like I needed to look through every form that was in my

19  file, no.

20  BY MR. KELLEY:

21    Q   You only looked at what?

22    A   I didn't look at any of them, other than --

23    Q   You only looked at one report as I understand

24  it.

25    A   Correct.

1     Q    And you felt no greater need to prepare than

2   that?

3        MR. SLOSAR:  Objection.  Asked and answered.

4     You're harassing the witness, Mr. Kelley, move on.

5     She's asked and answered your question four times

6     now.

7   BY MR. KELLEY:

8     Q    Answer it one more time if you wouldn't mind,

9   please.

10       MR. SLOSAR:  Same objection.  Harassing.  You

11    can answer to the extent you understand his

12    question, or you can refer him to the answer you've

13    given four times, whatever you want to do.

14    A    It's the same answer.  I'm not changing.

15  BY MR. KELLEY:

16    Q    I'm not sure what the answer was, but okay.

17  This deposition's been scheduled many times and I think

18  I understand your answer that you've looked at nothing

19  else but on this one occasion?

20    A    That's correct.

21    Q    All right.  Did you assist in the preparation

22  of the complaint in this case?

23    A    I answered questions if anyone had any.  I

24  didn't get -- I'm not sure how you mean.  But --

25       MR. SLOSAR:  I'm going to object to the form

1    of the question.

2       Q    Did you review the complaint before it was

3    filed in this case?

4          MR. SLOSAR:  Objection to form.

5       A    I believe I saw -- I know I saw it.  I've

6    seen it.  I don't know if it was before or after, to be

7    honest with you.

8       Q    Okay.  Did you assist in answering

9    interrogatories that were posed by any of the

10   defendants?

11      A    No.

12      Q    Okay.

13         MR. SLOSAR:  They're plaintiffs now.  Here

14      clients of the defendant.

15         MR. KELLEY:  I said, "Posed by any of the

16      defendants," is what I meant to the plaintiff.  I

17      should've said to be clear.

18   BY MR. KELLEY:

19      Q    Hopefully, you understood my question and I

20   assume it's the same answer.

21      A    I did not participate in any capacity in

22   answering any interrogatories.

23      Q    All right.  Have you assisted in finding

24   witnesses for Mr. Slosar or his firm, or members of the

25   plaintiff's team in this case?

1     A    I may have given them information if I had it

2 if they requested specific -- I turned over the files.

3 So, I mean, if I had it, they would have it. They

4 would know who it is. But I don't recall an instance

5 where I directed anyone to a particular place.

6     Q    Where was your file handed over? I know --

7 I'm not asking at the beginning or after Bill Bill

8 Anderson is giving you the -- Mr. Powell talked about

9 an instance where Mr. Slosar came down to the office is

10 my recollection of his testimony. Is that when your

11 file was given up or do you remember?

12     A    There was another individual that collected

13 my file. It wasn't -- he wasn't there at all when I

14 handed over the file.

15     Q    Somebody with his firm, or...

16     A    I assume it was some assistant of his. I

17 didn't -- he told me that someone would be there to

18 collect it, and that I should give it to him, and I

19 did.

20     Q    Okay. All right. I see. Have you handed

21 over any portions of your file to any other attorneys?

22     A    No.

23     MS. ROBINSON STAPLES: John, when you get to a

24    stopping point, can we take a break.

25     MR. KELLEY: Yeah. I'm sorry. I didn't mean

1    it to be a death march.  I apologize.

2        MS. ROBINSON STAPLES:  No.  I just --

3        MR. KELLEY:  Yeah.  This is as good as any.

4         (OFF THE RECORD)

5  BY MR. KELLEY:

6      Q    The interview you had with Jeff Gray, when

7  did that occur?

8      A    I don't recall the exact -- I didn't

9  interview Jeff Gray first of all.  I mean I was present

10  and all.

11     Q    Did you interview him as part of your

12  investigation in --

13     A    I did not.

14     Q    Okay.  And to  either of them or -- I can't

15  remember the name of the -- and to Bill Bill Anderson's

16  case or Amanda Hoskins' case, you did not --

17     A    No.  I did not.

18     Q    -- talk to Jeff Gray?  Okay.  How did you

19  come to learn of Jeff Gray?  Through Mr. Slosar or

20  through someone else?

21     A    Oh, no.  I was well aware of Mr. Gray.  I

22  just could never find him.

23     Q    Okay.  And you found him on this occasion?

24     A    I don't believe I found him.  I did not find

25  him.  I think that meeting was scheduled but I assume

1    someone, Mr. Slosar, or someone from his office.  I

2    didn't schedule that.

3        Q    Well, I do have a tape of an interview --

4        A    Okay.

5        Q    -- with Mr. Slosar.  Was Mr. Slosar present

6    in person?  Okay.  I got the impression he was on the

7    phone.

8            MR. SLOSAR:  Can you be -- I'm going to object

9        to form.  Can you just lay a foundation as to

10       whether you're talking to her about the meeting

11       that she discussed earlier or whether you're

12       talking to her about the recording that you just

13       mentioned?  I think its --

14           MR. KELLEY:  They're two different things?

15           MR. SLOSAR:  Yes.

16           MR. KELLEY:  I didn't realize that.

17   BY MR. KELLEY:

18       Q    The meeting you were at, was it recorded?

19       A    I don't -- I didn't record anything.

20       Q    Okay.  Who else was there besides you and Mr.

21   Slosar and -- who else?

22       A    That was all.

23       Q    Okay.  And where was it done?

24       A    We met in a restaurant in Barbourville, a

25   Mexican restaurant.  I'm not sure of the name of it.

1    Q    Okay.  How long did it last?

2    A    Maybe 30 minutes.  I'm guessing, totally

3  guessing, but maybe 30 minutes.

4    Q    Okay.  What was said during the interview?

5       MR. SLOSAR:  Objection to form.  You can

6    answer.

7    A    Well, we talked about -- that interview was

8  regarding Mr. Anderson's case from my recall.  I don't

9  think -- I don't think we talked about anything other

10 than that.

11   Q    I'm confused.  This was after Mr. Anderson

12 had been acquitted?

13   A    Uh-huh.

14   Q    Yes?

15   A    Yes.

16   Q    Okay.  Go ahead.  I'm sorry.

17   A    That's okay.  I made many attempts to locate

18 Mr. Gray.  He told us that -- we talked about whether

19 or not he was involved in Mr. Anderson's case.  He

20 denied being involved in that case.

21   Q    Did you question him concerning the Lowes

22 tape? Do you know what I'm talking about?

23   A    I'm sure that that came up.

24   Q    All right.

25   A    Yeah.

1    Q    What was his explanation there?

2    A    There were, I believe three explanations, so

3    I don't want to get -- I don't want to be inaccurate

4    about which one he gave on that date.  I believe -- I

5    believe his explanation on that date was due to a -- he

6    made the purchase at Lowe's to repair a broken water

7    line.

8    Q    Okay.  You heard other explanations from Mr.

9    Gray?

10    A    No.  That's the only time I spoke or heard

11    Mr. Gray speak at all.

12    Q    Where'd the other explanations come from?

13    A    His nephew, James Otis Sizemore.  He gave

14    multiple explanations.

15    Q    Okay.

16    A    That --

17    Q    That was the convicted -- Mr. Sizemore who

18    pled guilty to the killing?

19    A    Uh-huh.

20    Q    All right.  Yes?

21        MR. SLOSAR:  Objection to form.

22    A    Yes.  I'm sorry.

23    Q    Okay.  All right.  What else was said during

24    that meeting?

25    A    He talked about his relationship with Mr.

1    Pickard.

2        Q    Okay.

3        A    I believe he was angry that Mr. Pickard

4    didn't do an investigation to his liking on a -- maybe

5    a theft or a robbery from his home.  He said that he,

6    for some period of time, had paid Mr. Pickard -- I

7    think I said this earlier.  He paid Mr. Pickard to let

8    him conduct his illegal business.  I want to say he

9    said he paid him $1,000 a month or something like that.

10       Q    Did you believe him?

11           MR. SLOSAR:  Objection to form.

12       A    I guess I believed him.  I didn't -- I mean,

13   it's just shocking to hear something like that.  So...

14       Q    Yeah.

15       A    Yeah.

16       Q    Startling.

17       A    It's -- it wasn't so much after hearing it

18   from other individuals I guess as to him.  But, you

19   know --

20       Q    Okay.

21       A    -- what else.  That's all that I recall off

22   the top of my head from that meeting.

23       Q    All right.  Did you think he was involved,

24   and I forgot the gentleman's name who was killed in the

25   Anderson case?

1    A    Bob Wiggins?

2    Q    Yes.  Do you believe he was involved in the

3    Bob Wiggins murder?

4    A    I do.

5    Q    So you give him -- and do you think he was

6    lying to you concerning the Lowe's tape?  His

7    explanation for the Lowe's tape?

8    A    I do, yes.

9    Q    But you believe him on other things?

10    MR. SLOSAR:  Objection to form.  Foundation.

11    A    I'm not saying I do or don't believe anything

12    he said.  I mean there was the majority of -- I mean do

13    I believe he was involved in that case?  I absolutely

14    do. In that murder, I absolutely do.

15    Q    You believed he was a drug dealer?

16    A    I certainly believe that.

17    Q    All right.  Do you believe that he may have

18    assisted Mr. Sizemore, aided, and abetted the murder of

19    Mr. Wiggins, don't you?

20    A    I do.

21    Q    All right.  And yet you believe him when he

22    says, "I was paying John Pickard $1,000 a month"?

23    A    I'm not saying I do, or I don't believe on

24    that.

25    Q    Okay.  All right.  What other interviews did

1   you attend with Mr. Slosar?

2       A    That's it.

3       Q    Okay.  What other documents have you given

4   Mr. Slosar other than your file?

5       A    None that I can recall.

6       Q    All right.  Have you conducted any continuing

7   -- any continuing interviews with regard to the Mills

8   homicide since Amanda Hoskins -- the charges have been

9   dismissed against Amanda Hoskins?

10          MR. SLOSAR:  Objection to form.  You can

11      answer.

12      A    No.

13      Q    Have you done anything in the investigation

14  as to the circumstances of that murder or the basis for

15  the charges asserted against Ms. Hoskins?

16          MR. SLOSAR:  Ever?

17          MR. KELLEY:  Yes.

18      A    Ever no.

19          MR. SLOSAR:  I just -- I object based on

20      foundation.  I think the question's unclear about

21      whether you're asking her have you ever

22      investigated this case --

23          MR. KELLEY:  No.  I'm sorry.  I --

24          MR. SLOSAR:  -- or have you ever investigated

25      this case since the beginning of dismissal--

1      MR. KELLEY:  I'm talking about the period

2    after her dismissal.  The charges being dismissed

3    against her.

4      A    No.

5  BY MR. KELLEY:

6      Q    Okay.  Likewise, have you done any further

7    investigation concerning the Anderson case, Mr.

8    Wiggins' murder, since Mr. Anderson's acquittal other

9    than go to talk with Mr. Pickard?  Excuse me, with Mr.

10   Gray.

11     A    No.

12     Q    Other than giving your file and attending the

13   interview with Mr. Gray, what other things have you

14   done to assist Mr. Slosar?

15     MR. SLOSAR:  Objection to form.

16     A    Other than answer any questions that he's

17   had, none.

18     Q    And you've talked to him, again, you couldn't

19   tell me the number of times I believe, but those would

20   be phone conversations?

21     A    Phone conversations.  He's been in my office.

22     Q    How often?

23     A    Face-to-face, and phone conversations but I'm

24   not sure of the number of times.

25     Q    How many times has been in your office?

1      MR. SLOSAR:  Objection to form.  Asked and

2   answered.

3      A    Once for sure.  That's all that I can be sure

4   of.  One time for sure.

5      Q    When was that?

6      A    Oh, within the last year.  I'm not sure of

7   the exact date.

8      Q    What were the circumstances?

9      MR. SLOSAR:  I'm going to object to the extent

10   that you are seeking communication amongst members

11   of the team to which the privilege would still

12   exact.  So...

13      MR. KELLEY:  All right.  Well, if it's not

14   clear, please understand that I disagree with your

15   assertion of privilege as to any conversations

16   you've had with her.  So to that end, I don't know

17   whether you're instructing her not to answer this

18   question, or...

19      MR. SLOSAR:  I think the way that you're -- I

20   think the way that you've phrased the question

21   delves into communication among members of the

22   defense team and our firm and may include even

23   conversations amongst our client, so yes.  I would

24   instruct the witness not to answer questions that

25   would affect those privilege assertions.

1    BY MR. KELLEY:

2    Q    I assume you would comply with that

3    instruction?

4    A    Yes.

5    Q    All right.  Was Ms. Hoskins at this meeting?

6    A    I don't recall her being there.

7    Q    Was she working there then?

8    A    I do not believe so.

9    Q    Okay.  Do you know what prompted -- why was

10   the meeting -- why was he in your office?

11       MR. SLOSAR:  Same privilege assertion.  Same

12   instruction.

13   Q    You'll follow that instruction?

14   A    Yes, sir.

15   Q    Any other occasions you remember meeting with

16   Mr. Slosar face to face?

17   A    We have met on other occasions.

18   Q    Okay.  Where and -- when and where?

19   A    I cannot give you a date.

20   Q    Can you tell me in the scheme of things?

21   A    I think we have -- we had a meeting at a

22   restaurant in Middlesboro.  I've seen him at DPA

23   functions on one occasion.  I don't recall specific

24   time.  I know we've had face to face.  I can't give you

25   a number or a date.

1    Q    To discuss the case?  To discuss this case,

2    the one -- the civil case?

3        MR. SLOSAR:  Objection to form.  You can

4     answer.

5     A    I'm sure we did.

6     Q    Okay.  Did you provide him information during

7    those discussions?

8        MR. SLOSAR:  I'll let you -- you can answer

9     that question.  Just don't go into the content of

10     the information that we discussed.

11     A    Yes.

12    BY MR. KELLEY:

13     Q    Did you ever initiate communications with Mr.

14    Slosar?  Call him before he called you?

15        MR. SLOSAR:  Objection to form.  You can

16     answer.

17     A    Probably.

18     Q    Do you remember the circumstances why you

19    would've called him?

20        MR. SLOSAR:  Again, I would -- you can answer

21     the question to the extent that it doesn't go into

22     any communication amongst members of your office or

23     my office.

24    BY MR. KELLEY:

25     Q    Did you want to give him information?

1      MR. SLOSAR:  Objection to form.  You can

2   answer that.

3     A    Can you repeat the question?

4     Q    Did you want to give him additional

5   information that he might not have gleaned from

6   reviewing your file?

7      MR. SLOSAR:  Objection to form.  Foundation.

8    You can answer.

9     A    Perhaps, but I'm not certain.  I'm not sure I

10  even -- I mean to answer the question I think I would

11  have to give information that I probably --

12     MR. SLOSAR:  If it goes --

13    A    -- would fall under the privilege.

14     MR. SLOSAR:  Yeah.

15    Q    So there are instances where you've called

16  him to discuss information you consider confidential to

17  his civil case?

18     MR. SLOSAR:  Again, she's already answered

19   this question.  If you're --

20     MR. KELLEY:  Did she?

21     MR. SLOSAR:  If you're -- she did.  If you're

22   trying to delve deeper into it, we're making the

23   same privilege assertions that we've made earlier.

24   I would instruct her not to go into communication

25   that would reveal such privileged information.

BY MR. KELLEY:

    Q    Did you ever call him with the purpose of

helping him out in the civil case?

       MR. SLOSAR:  Objection to form.  Again, same

   privileges.  Like, you're literally asking that

   same question, just different ways.  So we're going

   to make the same privilege assertions.  She's said

   she's called us. We've discussed the case.

       MR. KELLEY:  Are you instructing her not to

   answer?

       MR. SLOSAR:  Yes.

       MR. KELLEY:  All right.

BY MR. KELLEY:

    Q    I'm not asking you what information you

conveyed.  I'm asking whether you called to help him

out in the case.  Do you understand the -- my question?

       MR. SLOSAR:  You can answer the question.  I'm

   going to object to the form of it since it's poorly

   worded.  You can answer the question, just don't go

   into the content of any of our communication.

    A    My goal was to convey information whether,

however it would be used would be a -- or if it was

helpful or not helpful, that would be up to him.

BY MR. KELLEY:

    Q    Did you ever call my office?

1      A     Before today I never knew who you were, so

2   no.

3      Q     Okay.  All right.  Did you ever call anybody

4   in the Kentucky State Police to provide them

5   information that might help them in this case?

6      A     No.

7      Q     Okay.

8      A     I've not called them.

9      Q     Were you asked to make that call by Amanda

10  Hoskins?

11       MR. SLOSAR:  Same objection.  Same privilege.

12  Move on.  Same instruction.  She's not answering.

13      Q     Did you do it on your own?

14       MR. SLOSAR:  Objection to form.  Foundation.

15  To the extent that you have communicated with

16  members of the defense team or members of my firm,

17  at the direction of anybody on the part of those

18  teams, I believe that it still falls under the same

19  privileges.  To the extent that some third party

20  who's not a member of either team asked for you to

21  make a phone call, you can answer the question.

22       MR. KELLEY:  So am I to understand, Counsel,

23  that you will object to any question asked as to

24  unsolicited calls she made to your office to

25  communicate information.  Not to ask the content of

1    that conversation but to establish the fact that

2    there was such a call.

3        MR. SLOSAR:  What you just asked her was:

4    First, did Amanda Hoskins ever ask you to call her

5    lawyer.  I asserted the privilege.  Then you said,

6    "Well, did you ever do that at the direction of

7    anyone?"

8        MR. KELLEY:  No.  I said, "Did you do it on

9    your own?"

10        MR. SLOSAR:  You can answer the question as to

11    whether you did it on your own.

12     A    You know, I know that I made calls.  Whether

13    I did it on my own or I did it -- we've had

14    communications and I don't want to try to give you an

15    answer about how it come up or why.  I don't -- you

16    know, I don't recall the specific reasons or what

17    prompted me to make the call. We've talked so many

18    times, you know, I don't --

19    BY MR. KELLEY:

20     Q    Did you want to help Amanda Hoskins win her

21    case against these defendants?

22        MR. SLOSAR:  Objection to form.

23     A    I wanted to see justice served in that case,

24    and I believe that she was innocent.

25     Q    Okay.  And you would call from your office at

1   times to do this?

2        MR. SLOSAR:  Objection to form.  Foundation.

3        A    Call him from my office?

4        Q    Yes.

5        A    Is that what you're asking?

6        Q    Uh-huh.

7        A    I would most likely call him from my cell

8   phone.

9        Q    Okay.  While you were working?

10       A    Potentially, yes.

11       Q    As an employee of the Office of Public

12   Advocacy you were calling him to assist in his suit

13   against the other -- against members of the

14   Commonwealth?

15       MR. SLOSAR:  Objection to form.  You can

16   answer the question to the extent you understand

17   it.

18       A    I wasn't calling on behalf of the department

19   or anyone.  I was -- if I -- you know, if there was

20   information that I learned that I didn't ask for

21   previously and I didn't know the answer to and then I

22   discovered it through a conversation or whatever, then

23   I might relay it, you know.

24       Q    Well, are you saying if I had called you, you

25   would be relying information to me?

1    MR. SLOSAR:  Objection to form.  Again, first

2  of all, this is harassing.  As a party in the case,

3  you understand that when you cannot contact an

4  attorney or their staff who has represented my

5  clients previously when a privilege is being

6  maintained, so there is no good faith basis for

7  posing the type of question that's being posed

8  right now.

9    MR. KELLEY:  I disagree.  But okay, let's get

10  over that.

11    MR. SLOSAR:  Let me make my record, John.

12    MR. KELLEY:  Okay.

13    MR. SLOSAR:  Okay.  We're in federal court

14  now. To the extent that this continues, this

15  harassing nature of the questions that are clearly

16  done to -- for no legitimate purpose, we'll seek

17  recourse from the magistrate.

18    MR. KELLEY:  You don't think a witness' bias

19  has anything to do with this case?

20    MR. SLOSAR:  You're --

21    MR. KELLEY:  I'm inquiring as to the biases of

22  this witness.

23    MR. SLOSAR:  She's already -- she's testified

24  to the legitimate questions you've posed so far.

25  What you're doing now is harassing her.  You've

1   already --

2      MR. KELLEY:  I'm asking about her biases in

3   this lawsuit.

4      MR. SLOSAR:  No --

5      MR. KELLEY:  I think that a legitimate area of

6   examination.  I sat and listened to you.  Now,

7   listen to me.  I think these are all -- not once

8   have I asked for content.  I've asked her what

9   biases she bears in this case, and I think she does

10  have a clear bias in this case.

11     MR. SLOSAR:  What you asked is if you called

12  an agent of my client's defense team, would she

13  talk to you. The obvious answer is no because my

14  clients asserted various privileges.  That doesn't

15  go to bias.  That goes to my client's

16  constitutional right to maintain attorney- client

17  privilege and work product privilege which you

18  can't, on your own, violate.  Because of that,

19  these questions are harassing because you would be

20  violating my client's constitutional right if you

21  contacted members of their defense team to get

22  around privileges that have been asserted.

23     MR. KELLEY:  Okay.

24     MR. SLOSAR:  That is not a good question that

25  could go before a federal jury.  I am confident of

1    that.

2        MR. KELLEY:  Okay.  We'll see.

3  BY MR. KELLEY:

4      Q    This is a strange question to ask in the

5  middle of a deposition.  Is your full name Lisa Hueson

6  Evans; is that correct?

7      A    Hueson is my maiden name.

8      Q    Okay.

9      A    My middle name is Gail.

10     Q    Gail?

11     A    Uh-huh.

12     Q    You told me your age before the deposition,

13  so I won't repeat it on the record, but I know you're

14  over 18; is that right?

15     A    Yes.

16     Q    All right.  You married?

17     A    Yes.  I am.

18     Q    To whom?

19     A    Wallace Evans.

20     Q    How long have you been married to Mr. Evans?

21     A    15 years.

22     Q    You live in Middlesboro; is that correct?

23     A    Yes.

24     Q    All right.  What is your address presently?

25        MR. SLOSAR:  We would agree to provide her

1   personal address off the record.

2     MR. KELLEY:  Okay.

3     MR. SLOSAR:  We'll do so after the deposition.

4     MR. KELLEY:  That's fine.  Likewise, I would

5   ask for her phone number as well.

6     MR. SLOSAR:  For what purpose would you want

7   the phone number of a member --

8     MR. KELLEY:  In case I need to contact her to

9   appear at trial.

10     MR. SLOSAR:  Again, we're not -- no.  I

11   wouldn't agree to that.

12     MR. KELLEY:  Okay.  So you're not --

13     MR. SLOSAR:  We don't agree for you to have

14   contact with members of the defense team because

15   you've already --

16     MR. KELLEY:  To find out where she is.

17     MR. SLOSAR:  A few moments -- well, we're --

18   you contact her through us.  We are going to be

19   presenting her at trial.  And to be -- you just

20   went on the record a few minutes ago and asked Ms.

21   Evans questions about if you contacted her, would

22   she have a conversation with you and I told you the

23   ways that I didn't think that it was ethically

24   appropriate for you to communicate with members of

25   the defense team when my clients have asserted a

1    privilege.  So for you to go five minutes later and

2    ask for her phone number to me that means that

3    you're going --

4        MR. KELLEY:  My question was intended to say

5    she was -- she wouldn't provide information to me.

6    She's obviously biased in favor of Amanda Hoskins,

7    and I don't blame her for that.  She worked with

8    her for those many years.  But that was what the

9    purpose of that question was.  My concern is that I

10   don't know what's going to happen in a year from

11   now when we go to trial.

12       MR. SLOSAR:  If you --

13       MR. KELLEY:  I want to be able to find the

14   witness.

15       MR. SLOSAR:  She's working at the Department

16   of Public Advocacy --

17       MR. KELLEY:  Well, I don't know that she'll be

18   doing that a year from now or not.  I don't know.

19       MR. SLOSAR:  Then we'll amend our disclosures.

20       MR. KELLEY:  All right.  All right.

21       MR. SLOSAR:  You can contact members of the

22   defense team through our office.

23       MR. KELLEY:  I didn't think it was all that

24   big of a deal, but okay.  All right.

25   BY MR. KELLEY:

1    Q   Where else have you lived?  Have you always

2 lived in Bell County?

3    A   No.

4    Q   Okay.  Where were you -- were you born and

5 raised in Eastern Kentucky?

6    A   I was born and raised in Bell County and,

7 other than probably about three years, I lived in

8 Virginia Beach, Virginia for a few years.

9    Q   Was your husband in the Navy, or something?

10    A   My ex-husband was in the Navy.

11    Q   Got you.  Was he at Little Creek, Amphib

12 Base?

13    A   Yes, he was.  Little Creek.

14    Q   The largest amphibious base in the world.  I

15 was there.  Probably a different time.  Okay.

16 Graduated from Pineville or from Bell County,

17 Middlesboro.

18    A   Bell County High School.

19    Q   There you go.  All right.  Do you have

20 relatives that live in the Eastern District of Kentucky

21 Counties and that would go as far as Hazard, Harlan,

22 Bell, Knox, Laurel, all the way over to Somerset and

23 Pulaski County?

24    A   Do I have relatives that live in those

25 counties?

1    Q    Those areas, yeah.

2    A    Yes.

3    Q    Okay.  I may ask you through Mr. Slosar to

4  provide me with the names of those relatives.  My

5  concern is with members that might be on a jury in this

6  area and they pick from that wide of an area.

7        MR. SLOSAR:  You can ask for it here.

8        MR. KELLEY:  I don't want to ask her here.

9    Q    Well, how long you got?  How many relatives

10  you have?

11    A    I don't have a lot.

12    Q    Okay.  Let's go ahead.  Tell me who your

13  relatives are.

14    A    My -- I have a mother, Cora Fuson.

15    Q    Okay.  Where does she live?

16    A    She lives in Middlesboro.

17    Q    Is your mother retired or is she working, or

18  is she --

19    A    No.  She is disabled.  She's not working.

20    Q    Okay.  Who else do you have?

21    A    I have a daughter.  Brittany Niebel.

22    Q    Brittany.

23    A    Niebel.

24    Q    How do you spell the last name?

25    A    N-I-E-B-E-L.

Q   All right.  She's an adult, correct?

A   She is.

Q   Is she employed?

A   She is not.

Q   Is she married?

A   She is.

Q   Who's her husband?

A   Cody.

Q   What is -- is he employed?

A   I believe he just stopped a job, and that was
at -- that was a trailer -- he assembled trailers in --
Knox county.

Q   All right.  Other relatives?

A   I have a son, Brandon, Saylor, S-A-Y-L-O-R.

Q   Brandon.

A   Saylor.

Q   Is that the name of your first husband, or...

A   That's the name of my second husband.

Q   Okay.  I didn't ask your husband's name, did
I?  What's your husband's name?

A   My husband's name now?

Q   Uh-huh.

A   Wallace Evans.

Q   Okay.  You told me that.

A   Yes.

Q    Who's Brandon's father?

A    His name is Kenneth Saylor.

Q    Okay.  How many times have you been married?

A    This is number three.

Q    Okay.  Who was your first husband?

A    Eugene Hensley.  He's deceased.

Q    Okay.  Is either Mr. Saylor or Mr. Hensley from Eastern Kentucky?

A    Yes.  Both.

Q    Okay.

A    Although Mr. Hensley lived in, before his death, lived in North Carolina for probably 20 years.

Q    All right.  Do you have other children besides Brittany and Brandon?

A    I do.  I have a minor daughter that I adopted. Her name is Charli with an I.

Q    And by what name does she go?

A    Evans.

Q    Evans.  Okay.  Does she go to school?

A    She does.

Q    Where?

A    Yellow Creek Elementary.

Q    Any other relatives?

A    How far out are you wanting, here?

Q    Well, as I say, I'm more than willing to let

1  it go until we get closer to the trial, but I'd like to

2  go all the way through first cousins.

3      A    Okay.

4          MR. SLOSAR:  I mean, I know that -- I believe

5  I proposed a suggestion before, but typically what

6  happens in voir dire in a federal court trial is

7  that a list of witnesses or potential witnesses is

8  provided to the entire venire and they're asked if

9  they know or are related to any of those witnesses

10  and we can deal with it that way. But if the

11  defendants want to do it this way, we have no

12  objection.  You can continue questioning --

13          MR. KELLEY:  My request was 30 days before and

14  the reason why is sometimes you're not given that

15  list until very close to trial.

16          MR. SLOSAR:  30 days before.

17          MR. KELLEY:  You will not get a list at this

18  federal court 30 days before trial.

19          MR. SLOSAR:  Well, that's typically something

20  that we during the voir dire process, so if you

21  want to do this, let's keep going.

22  BY MR. KELLEY:

23      Q    Do you have any relatives that are employed

24  in law enforcement?

25      A    My husband works for the Department of

1    Corrections, not a police officer, but...

2    Q    What is his -- where does he work?

3    A    He works at the Bell County Forestry Camp.

4    Q    Bell County Boy's Camp?

5    A    Forestry Camp.

6    Q    Forestry.

7    A    Uh-huh.  It's a minimum-security prison.

8    Q    Okay.  All right.  Do you have anybody in

9    your family that holds public office?

10   A    No.

11   Q    Do you have any relatives in Knox County?

12   A    No.

13   Q    You went to Lincoln Memorial University; is

14   that correct?

15   A    Correct.

16   Q    And when did you graduate?

17   A    I'm totally guessing at this but maybe 2008

18   when I graduated from there.

19   Q    What was your degree in?

20   A    Criminal justice.

21   Q    Okay.  Was it a bachelor's degree?

22   A    Uh-huh.

23   Q    Yes?

24   A    Yes.

25   Q    All right.  What additional education have

1    you had beyond your bachelor's degree?

2        A    Attended Southeast Community College.  I have

3    an Associate's there in Applied Science.

4        Q    Okay.  I assume that was before going to LMU?

5        A    Yes.

6        Q    Okay.

7        A    I attended Computer Dynamics Institute in

8    Virginia for a year.

9        Q    Okay.  What else?

10       A    That's it.

11       Q    All right.  Have you had any law enforcement

12   experience?

13       A    No.

14       Q    I think I saw you went -- looks like you

15   began work at the Office of Public Advocacy in February

16   of 1995?

17       A    Yes.  As a -- or we didn't have a full-time

18   office in Bell County until '98, but I began working

19   for the contract attorney for DPA for that county in

20   '95.

21       Q    All right.  What other work had you done

22   before

23   1995?

24       A    I worked at a law firm in Virginia Beach,

25   Shapiro and Burson.

1    Q   Did they have a general practice or did

2  they...

3    A   We did bankruptcy and foreclosure work for

4  creditors.

5    Q   Okay.  What other types of work did you do

6  before '95?

7    A   I was -- I'm sorry.  Since you asked me that,

8  I attended Collins School of Cosmetology for a year

9  also, so I cut hair.

10    Q   Okay.

11    A   Before I left here to go to Virginia Beach I

12  did hair for about maybe a year or less.

13    Q   Okay.  Where else were you employed besides?

14    A   Probably Sears.  I worked for Sears.  I

15  worked for a drug store.  I can't remember the name of

16  the drugstore while I was going to school in Virginia

17  Beach. I worked at Burger King.  I think that was my

18  first job.

19    Q   Okay.  Do you think of any jobs that you've

20  held before going to work at the Office of Public

21  Advocacy that prepared you for working as an

22  investigator?

23    MR. SLOSAR:  Objection to form.  You can

24   answer.

25    A   I think, other than my experience at the law

1  office in Virginia, I had no other legal or law

2  enforcement kind of training.

3      Q    And doing bankruptcies and foreclosures, I'm

4  not sure.

5      A    We did research and that sort of -- that was

6  my job was to do research on, particularly,

7  bankruptcies. Not -- certainly not interviewing

8  witnesses or anything like that.

9      Q    Okay.  Any other education or experience you

10  have had before '95 that you felt made you --

11      A    Not before -- not before '95 probably.

12      Q    All right.  What additional training have you

13  had since '95 that you think augments your ability to

14  work as an investigator?

15      A    I've been certified as a criminal defense

16  investigator.

17      Q    By whom?

18      A    Through the Criminal Defense Investigative

19  Council.

20      Q    When did you obtain that certification?

21      A    202, I believe.  Or '02, I believe.

22      Q    Okay.

23      A    And ongoing -- we do ongoing training to keep

24  that accreditation or that certification, I'm sorry,

25  every year.  We are required to additional training.

1    Q   Okay.  Do you have -- do you undergo testing,

2  or oral interviews in order to get the certification?

3    A   No testing.

4    Q   Okay.  What are the requirements for becoming

5  a certified defense --

6    A   Oh, we had to attend a 40-hour course with

7  the council and we had to have a number of -- I believe

8  it was -- I believe the requirement was two capital

9  cases and recommendations from attorneys that we --

10  letters of recommendations from attorneys that we

11  worked with.  I'd have to go back now and look at the

12  entire list to see what the requirements were, but

13  those were the big things that I recall.

14    Q   Okay.  What specific training have you had in

15  the interrogation of witnesses?

16    A   Interrogation?

17    Q   Uh-huh.

18    A   None.  I mean, I've -- training to do it, or

19  just far as --

20    Q   Training to do it.

21    A   None to do it.  No.  I mean there's training

22  for interviewing witnesses, but I don't interrogation

23  is not how we do it.

24    Q   Okay.  All right.  Let me ask then do you

25  have training in interviewing witnesses?

1    A   Yes.

2    Q   All right.  Who provides that?

3    A   The department through various sources.  They

4  bring in experts from various sources including

5  attorney and council that we've received our

6  certification from.

7    Q   Okay.  Do you believe that that training

8  provides you with a sufficient basis to comment as to

9  interrogation techniques that may be employed by a

10  state trooper or any law enforcement?

11     MR. SLOSAR:  Objection to form.  Again, we

12    don't intend to have Ms. Evans just like we don't

13    intend to have Mr. Powell testify as an expert

14    witness on police practices.  To the extent that we

15    decide to change course, we would certainly create

16    an expert report and disclose that during the

17    expert discovery period.  That being said you can

18    certainly answer the question.

19    A   Can you ask the question again?  I'm sorry.

20  BY MR. KELLEY:

21    Q   Do you believe that the training you've

22  received in interviewing through the office of public

23  advocacy provides you with a sufficient basis to

24  comment on or criticize interrogation techniques used

25  by law enforcement?

1      A    I don't know if the knowledge that I have

2    regarding techniques are a part of -- we don't sit down

3    and talk about how officers do it versus how we do it.

4    I'm familiar with the Reid technique, and the

5    techniques that some of the techniques that are used

6    during those types of interrogations.

7      Q    I'm particularly interested in -- one of my

8    first questions, I believe, is whether you're critical

9    of things that my client, Mr. Pickard, did during the

10   course of the Mills investigation and that led us into

11   a conversation, a lengthy one admittedly concerning Mr.

12   Smith and his cohorts.

13     A    Uh-huh.

14     Q    Do you think you stand in a position to --

15   yourself, to criticize what Mr. Pickard did or didn't

16   do during the course of this investigation?

17         MR. SLOSAR:  Objection to form.

18     A    If you're asking my personal feelings, I

19   don't think that offering someone money in exchange for

20   anything of a law enforcement officer -- I know they do

21   it for confidential informants and I know that that's

22   legal, but it's usually disclosed.  You know, there's -

23   - personally, I have a problem with that.

24     Q    Okay.  And do you have proof that that

25   affected the prosecution of -- caused the arrest and

1   prosecution of Amanda Hoskins?

2      MR. SLOSAR:  Objection to form.  Relevance.

3   Again, none of this is --

4      MR. KELLEY:  I'm trying to find out if it is

5   relevant.

6      MR. SLOSAR:  These types of questions aren't

7   relevant to admissible testimony at trial.  You can

8   answer the question.

9    A   To the extent that any of the allegations

10   that were made were true, if Mister -- particularly if

11   Mr. Helton received any money from a law enforcement

12   officer and then gave a statement that was a lie, then

13   that would be my, you know --

14   BY MR. KELLEY:

15    Q   And, again, I'm very concerned about Mr.

16   Pickard; do you believe that Mr. Pickard gave Mr.

17   Helton money?

18      MR. SLOSAR:  Objection to form.  Calls for

19   speculation.  You can answer.

20    A   I don't believe that I learned -- gained any

21   information to that effect about Mr. Pickard.

22    Q   Okay.  And I'd like to go one step further;

23   do you believe that anybody in the Knox County

24   Sheriff's Department gave money to Mr. Helton?

25    A   Not that I'm aware of.

1    Q   All right.  I get -- too old.  I get diverted

2  so easily these days.  Have you always been a class

3  three investigator for the Office of Public Advocacy

4  since your initial --

5    A   No.  You start at one.

6    Q   Okay.

7    A   And three is the highest.

8    Q   When did you get to reach the level of three,

9  the year?

10    A   Without -- without looking at the records, I

11  have -- I don't have any idea.

12    Q   Would it have occurred before or after --

13    A   Before either --

14    Q   -- certification?

15    A   I don't know the answer to that.

16    Q   Okay.  Well, you mentioned as part of the

17  requirements that you had to work on a capital trial?

18    A   Uh-huh.

19    Q   Yes?

20    A   Yes.

21    Q   Did capital -- do state -- do class one

22  investigators, are they involved in capital trials?

23    A   They could be.

24    Q   Okay.

25    A   I don't think that they would be the lead

1   investigator on a capital case.

2       Q    I think you've answered my question in that

3   by the time you got around to working with Amanda

4   Hoskins you were a class three?

5       A    Yes.

6       Q    How many capital trials had you worked on

7   before Amanda Hoskins?

8       A    I'm going to make a total guess of 30, here.

9   Maybe around 30.

10      Q    All right.  I've also made a presumption that

11  may not be true.  I've always assumed you worked out of

12  a Bell County office, is that wrong, or right?

13      A    No.  That's my home office.  It's always been

14  my home office.  However, it's not unusual at all for

15  investigators in the department to be called upon from

16  other counties for conflict purposes or multiple

17  defendants like in this case to work in other counties.

18      Q    I'm not going to ask you 30 names but is it

19  possible for you to generate a list of the cases you've

20  worked on?

21          MR. SLOSAR:  Objection to form.

22      A    I -- it could be.  I don't know what -- I

23  mean, I don't know if there's records maybe in our

24  Frankfort office that would have that information.  I'm

25  not sure.

1    Q    Do you remember the names of any other

2  capital trials you worked on?

3    A    Sure.  Carla Crider (phonetic).  Do you want

4  prior to, I assume?

5    Q    Yes.

6    A    Prior to.  Carla Crider, there was an Ann

7  Burgey (phonetic) not long before hers.  Normally, I

8  could answer that question.  I had a case out of

9  Lincoln County and that guy's name was -- he was a

10  teenager, 15 years old.

11    Q    He was how old?

12    A    He was 15.

13    Q    On, I thought you said he was 10 years old.

14    A    15.  I'd have to look through my records to

15  give you specific names which I'm happy to do.

16    Q    Could you generate a list and give it to Mr.

17  Slosar in hopes that I might get it?

18    A    Sure.

19    Q    Thank you.  That'd be  Exhibit 1, I guess, to

20  the deposition.

21        MR. SLOSAR:  I don't know.  It -- that's not -

22    - she hasn't created a list yet.  When she creates

23    one --

24        MR. KELLEY:  Okay.

25        MR. SLOSAR:  We'll forward it.  I don't think

1   that it should be marked as an exhibit since it

2   doesn't actually exist.

3        MR. WRIGHT:  Circulate it to counsel.  The

4   list.

5        MR. SLOSAR:  After she creates the list, we

6   will disclose it with a Bates number to the extent

7   that she can do it based on the information that

8   she has accessible to her, but it will not be an

9   exhibit.

10  BY MR. KELLEY:

11      Q    All right.  Are you working on any capital

12  cases at the present time?

13      A    No.

14      Q    Okay.  When was the last time you worked on a

15  capital case?  Was it Amanda, or has it been some other

16  since?

17      A    That was the last -- Amanda, William, Daniel

18  Keene, I worked three at the same time during that

19  five-year period were the last.

20      Q    Okay.  Amanda, Daniel King, and who else?

21      A    Daniel Keene, K-E-E-N-E, and William

22  Anderson.

23      Q    Okay.

24      A    And William's was a -- just like Amanda's

25  case, you know, when I say capital, I guess I should --

1   there were threats from the prosecution that they were

2   going to file notice of seeking the death penalty.  I

3   know that they did that on Jonathan's case.  I don't

4   believe they ever filed that notice on Amanda, but we

5   certainly worked that case as though it was going to be

6   a capital case and it qualified with the charges.  Same

7   thing for Mr. Anderson.  His charges qualified him, and

8   we were, you know, told on different occasions that he

9   would -- she was -- the prosecutor would file a notice

10   and I don't believe she ever filed one.

11      Q   I don't think it was a death penalty case.

12   All right.  Who was your supervisor at the time of that

13   -- well, do you have a supervisor other than the

14   attorney that you report to?

15      A   Linda West.

16      Q   Okay.  How long as Ms. West been your

17   supervisor?

18      A   At least ten years.

19      Q   How does she monitor your cases?

20      MR. SLOSAR:  Objection to form.  Calls for

21   speculation.  You can answer to the extent you.

22      A   As far as monitoring goes, we, you know, I

23   don't think she monitors every case if it's not

24   particularly hers.  She's aware of, you know, what

25   cases I have and if I'm working out of the office on

1   those cases.  She's made aware of that.

2       Q    Is she aware of the information you're

3   obtaining through witnesses?

4           MR. SLOSAR:  Objection to form.  Foundation.

5       Q    Well, I mean, do you report to her as far as

6   what information you may have received during the

7   interview?

8       A    I'm not saying that I -- you know, we never

9   discussed any information or interviews I'm conducting

10  or whatever, but as far as, you know, on a continuous

11  basis if they're not her cases, you know, she doesn't -

12  -

13      Q    Okay.  I understand.

14      Q    So is the only person you report to as far as

15  the information you're gathering the attorney that has

16  been assigned to the case?

17      A    Yes.

18      Q    By the way, is Ms. West aware that you're

19  here today?

20      A    She is.

21      Q    Is she aware of your contacts with Mr.

22  Slosar?

23          MR. SLOSAR:  Objection to form.

24      Q    Do you make her aware of your contacts with

25  Mr. Slosar?

1    A    I don't go in and tell her every time I've

2 spoke with Mr. Slosar, no.

3    Q    Okay.  Have you told her about the work

4 you've done with regard to the civil case?

5        MR. SLOSAR:  Objection to form.  Misstates her

6    testimony.  You can answer to the extent you

7    understand his question.

8    A    I've not done any work other than providing

9 the file --

10 BY MR. KELLEY:

11    Q    Well, we can go back to the "you called him"

12 situation.

13        MR. SLOSAR:  Objection to form.  Again, these

14    types of questions are harassing in nature, Mr.

15    Kelley.

16        MR. KELLEY:  Can she answer it?

17        MR. SLOSAR:  I haven't asserted a privilege.

18    You can answer the question to the extent that Mr.

19    Kelley asks you --

20    A    Are you asking did I tell her that I called

21 him?

22 BY MR. KELLEY:

23    Q    Yeah.

24    A    I mean, I wouldn't assume that I did.  I

25 wouldn't know why -- I don't know why I would.

1    Q    Okay.  But would she have reason to know the

2    number of times that you've actually talked to Mr.

3    Slosar?

4        MR. SLOSAR:  Objection to form.  Asked and

5        answered and calls for speculation.

6    A    No.

7    Q    Does Mr. Cox still work at the Office of

8    Public Advocacy?

9    A    He was a private attorney, I believe, at the

10   time under contract.  I know he's worked for DPA in the

11   past.  I had never worked with him before on a case,

12   but at the time of the case, I believe he was a private

13   attorney.

14   Q    Was he out of Mount Vernon?  Is that where --

15   A    Yes.

16   Q    Oh, okay.  I've now figured  out who he is.

17   A    Yeah.

18   Q    Little guy.

19       MR. SLOSAR:  Objection to form.

20   Q    Do you continue to see Amanda Hoskins?

21   A    I've seen her from time to time, yes.

22   Q    Is she a friend of yours?

23   A    I consider her a friend.

24   Q    These days I don't get the -- do you -- is

25   she a Facebook friend, for example?

1   A   I don't think Amanda has a Facebook.

2   Q   Okay.  How often do you see her as a friend?

3   A   Since she's not at the office, obviously,

4   when she was at the office, I saw her every day through

5   the week.  Well, let's just go for the last year, maybe

6   three or four times.

7   Q   Okay.  And has she ever been to your house?

8   A   Yes.

9   Q   A social gathering, I assume, those reasons?

10      MR. SLOSAR:  Objection to form.

11   A   It was not work related.  So a social

12   gathering as far as --

13   Q   Did she come there to talk about the case

14   with you?

15   A   No.

16   Q   Okay.  Do you have any continued contact with

17   anyone else affiliated -- well, have ever you

18   considered Mr. Taylor to be -- Jonathan Taylor to be a

19   friend?

20   A   I don't have regular communications with him.

21   I don't have any communications with him, really.

22   Q   Have you ever --

23   A   I wouldn't consider him to be a friend.

24   Q   Have you had contact with him outside of this

25   investigation?

1    A    Yes.

2    Q    All right.  Do you remember the occasions?

3    A    The -- he came to my office about -- within

4  the last month and he had a piece of paper that he

5  wanted me to look at.  He was thinking about buying or

6  renting or leasing a trailer somewhere in Pineville.

7  He wanted me to look at it and give him an opinion and

8  I told him that I couldn't give him any type of civil,

9  for sure, and any type of legal opinion.  But I told

10  him that I thought he should probably see an attorney

11  about the paperwork that he had.  Someone was offering

12  to sell him something and they had some -- it looked

13  like very unofficial not legitimate paperwork and he

14  wanted to --

15    Q    Did he believe that -- did you believe he was

16  trying to seek legal advice from you?  Is that the

17  circumstances?

18    A    I think he wanted my opinion and I didn't

19  feel comfortable giving him -- because I thought the

20  situation called for a legal opinion and I didn't feel

21  comfortable doing that.

22    Q    Okay.  It wasn't a question about what you

23  know about real estate in that area, I take it?

24        MR. SLOSAR:  Objection to form.

25    A    It was a question about the paperwork that he

1   -- that someone had given him -- given to him.  It was

2   in another person's name other than the person that was

3   offering to -- you know, it's just obviously not

4   legitimate to me, but...

5      Q   Any occasion to talk with Mr. Lester, William

6   Lester?

7      A   The last time I talked to Mr. Lester,

8   actually, it was I think I sent him a message last

9   night.  He does construction work and I'm in the

10   process of remodeling a church in Pineville and I sent

11   him a message and asked him if he knew any plumbers.

12   That was our last conversation. Other than that, we've

13   not had any social meetings or --

14      Q   Is your church on Virginia Avenue?

15      A   It's on -- it's not my church.  It's on

16   Kentucky Avenue, and --

17      Q   Okay.

18      A   -- I'm hoping that I can -- I will love this

19   church.  Baptist church now.  It used to be a

20   Presbyterian Church.  It's been empty for about ten

21   years, and I -- my hopes are to -- is to eventually

22   start a youth organization in the church.  So...

23      Q   Good.  Has -- prior to this, prior to her

24   indictment with regard to Ms. Mills' murder, had -- did

25   you know Ms. Hoskins?

1    A    No.

2    Q    Do you know if she'd ever been represented by

3    the Office of Public Advocacy?

4    A    I believe that she was.

5    Q    I was a little bit thrown off whenever I

6    looked at the web site for the Office of Public

7    Advocacy when they talk about Knox County they point me

8    to London.

9    A    Uh-huh.

10   Q    Yes?

11   A    Yes.

12   Q    Okay.  So it would be unusual for the Bell --

13   for the Bell County office to handle a case other than

14   a capital case that was from  Knox --

15   A    No.

16       MR. SLOSAR:  Objection to form.

17   Q    It's commonplace?

18   A    There's lots of reasons for conflicts that

19   call for --

20   Q    Got you.

21   A    -- attorneys from other counties.

22   Q    Okay.  Likewise, do you know if your office -

23   - have you or your office ever represented Mr. Taylor

24   before this murder case?

25   A    I'm sure that the department has.  I'm not

1 sure whether or not my office in particular did. I did

2 not have anything to do with any prior cases.

3     Q    How about William Lester?

4     A    No.

5     Q    How about Allen Helton?

6     A    I don't believe that the Bell County office

7 handled any cases, but I could be wrong. He could've

8 had a Bell County case. I didn't -- was not involved

9 in any case --

10     Q    All right.

11     A    -- with him.

12     Q    Mike Simpson?

13     A    I believe that he used to live in Bell County

14 and may have had some Bell County cases, but I was not

15 on those cases.

16     Q    Anybody that you interviewed in this case

17 that you knew from prior cases?

18     A    That I interviewed?

19         MR. SLOSAR:  Objection to form.

20     Q    Yes.

21     A    Not that I recall, prior cases that I was a

22 party to. They certainly could've been witnesses that

23 have been handled by the department, or even by our

24 office, but I don't recall being involved with the ones

25 that I can recall.

1    Q    Okay.  How many cases have you worked

2  involving matters pending in the Knox Circuit Court,

3  criminal cases that are have their locus in Knott

4  County?

5        MR. SLOSAR:  Objection to form.

6    A    I would say several over the years.

7    Q    Okay.  How many occasions have you had to

8  work with Sheriff Pickard if any?

9    A    Other than these two cases, I don't recall

10  specifically working with him or interviewing him, or

11  anything like that.

12    Q    Do you remember any Knott County cases where

13  you've had to work with Knott County law enforcement

14  prior to Amanda Hoskins' case?

15    A    Not that I recall.

16    Q    With regard to Amanda Hoskins' case -- well,

17  I know you had an interview with Sheriff Pickard in the

18  Bill Bill Anderson case?

19    A    Uh-huh.

20    Q    Yes?

21    A    Yes.

22    Q    All right.  And there was mention as I

23  remember, there was some mention of the Amanda Hoskins

24  case; do you remember that as well?

25    A    Not without looking at it or reviewing the

1    records, I don't.

2        Q    Okay.  You don't know what was said

3    concerning Amanda Hoskins?

4        MR. SLOSAR:  Objection.  Asked and answered.

5        A    I believe I remember him saying something

6    about the fact that he was surprised that that case

7    wasn't over already and beyond that I don't recall

8    without seeing the record.

9        Q    Okay.  During your conversation with -- well,

10   did you have -- do you remember having a separate

11   interview with Sheriff Pickard specific to Amanda

12   Hoskins' case?

13       A    Not that I recall.

14       Q    I guess I should've asked this before, but

15   what is your practice or protocol with regard to

16   interviews? Do you record all of them?

17       MR. SLOSAR:  Objection to form.  Foundation.

18   You can answer.

19       A    I do not record all interviews.

20       Q    All right.  What criteria?

21       MR. SLOSAR:  Objection to form.  Foundation.

22   You can answer.

23       A    If I'm specifically requested by an attorney

24   to record an interview then I would certainly record

25   that interview.  And then beyond that it's really,

1   unless I've been told specifically not to record

2   interviews, it's really kind of up to my discretion.

3   And, generally, if I'm recording an interview, you

4   know, if I'm afraid that I won't be able to locate a

5   witness again, I might record it based on that.  It

6   just really depends on the situation. If I -- if a

7   recorder is available at a particular time that I

8   locate a witness, you know.

9       Q    Okay.  With regard to Mr. Bingham, Mr.

10  Edwards, Mr. Smith, do you remember any specific

11  instructions you received concerning whether to record

12  it or not?

13          MR. SLOSAR:  Objection to form and also that

14      delves into the attorney-client work product

15      privileges that we discussed earlier.  Any

16      communication by counsel to their investigator

17      would be internal defense team communication.

18      That's protected by the privileges and I would

19      instruct the witness not to answer the question.

20  BY MR. KELLEY:

21      Q    I take it you're going to follow those

22  instructions?

23      A    Yes, sir.

24      Q    Did you ever mention your conversations with

25  Bob Smith to Sheriff Pickard or anybody at the Knox

 1  County Sheriff's Department?

 2      MR. SLOSAR:  Objection to form.

 3      A   Can you repeat that because I'm not sure I

 4  understood it.

 5      Q   Okay.  At some point you got into 2014.  You

 6  had these conversations with Mr. Smith?

 7      A   Uh-huh.

 8      Q   Did you discuss that -- did you ever raise

 9  that with Sheriff Pickard?

10      A   Not that I recall.

11      Q   Did you ever raise it with mister -- with

12  anybody in the Knox County Sheriff's?

13      A   Not that I recall, no.

14      Q   You told no one outside of your defense team

15  about these conversations with Sheriff Pickard --

16  excuse me, with Bob Smith?

17      A   I don't recall telling anyone else.

18      Q   Likewise as far as sharing information, the

19  reports you did, did you share those reports with any

20  law enforcement including Sheriff Pickard and/or

21  members of the Knox County Sheriff's Department?

22      MR. SLOSAR:  John, can I make sure I

23  understand this question, right?  Did she share any

24  of the memorandum that she created in her capacity

25  as an investigator with outside law enforcement

1    agencies; is that the question?

2         MR. KELLEY:  Well, in particular, I'm asking

3    about Bob Smith and I guess that would include Mr.

4    Bingham and the -- and Mr. Edwards.

5         MR. SLOSAR:  I understand the question.  I'll

6    object to the form.  You can answer the question.

7      A    Not -- no.  I don't know that I'd have any

8    reason to do that.  No.

9    BY MR. KELLEY:

10     Q    Okay.  Let me show what I've marked as

11   Exhibit 1 deposition.  It's several pages.  Take a look

12   if you would.

13         (EXHIBIT 1 MARKED FOR IDENTIFICATION)

14     A    Okay.

15     Q    Have you ever seen Exhibit 1 before?

16     A    Yes.

17     Q    All right.  Did you see the subpoena?

18     A    I saw the subpoena, yes.

19     Q    All right.  Did you see that the subpoena

20   asked you to bring your entire investigative file with

21   regard to Katherine Mills murder charges?

22     A    I saw -- I saw these two documents.  Are you

23   asking me --

24     Q    Well, the front page of it, if you'll look.

25   Do you see the subpoena that you testify that was

1  issued?

2   A   Yes.

3   Q   All right.  Do you see -- she didn't mark it,

4  but it says, "Production of entire investigative file

5  with regard to the Katherine Mills murder charges"?

6   A   Yes.

7   Q   Did you bring it?

8   A   I did not bring everything today, no.

9   Q   Okay.  Why not?

10   A   I provided the entire file to Mr. Slosar.

11   Q   That's the very reason I want it.  You didn't

12  feel an obligation to bring it?

13      MR. SLOSAR:  We have produced nearly --

14      MR. KELLEY:  I want it all.

15      MR. SLOSAR:  I'm putting on the record, John,

16  so if you --

17      MR. KELLEY:  Okay.

18      MR. SLOSAR:  -- could just give me a moment.

19  Ms. Evans has testified at length today about the

20  production of her files for her office.  We have

21  produced more than 34,000 pages of documents in

22  this case.  We've also produced a privilege log

23  which I know Mr. Kelley has and is likely to use as

24  an exhibit in this litigation.  It is absolutely

25  unduly burdensome for an attorney to provide a

1    subpoena to a witness the week before a deposition

2    requesting for her to bring a half dozen or more

3    boxes of material that's already been produced and

4    material for which we've actually asserted various

5    privileges over so even if you did produce it, Mr.

6    Kelley would not be able to undertake a review of

7    that material since we've asserted work product and

8    attorney-client privileges over certain documents.

9    He has all the materials from Ms. Evans which she

10    has testified to.  I think the record is very clear

11    in that regard.

12  BY MR. KELLEY:

13    Q    Well, let me say that I've actually served

14  the subpoena at least once before when we had scheduled

15  one other deposition I believe that was at least one

16  other that was produced.  Do you remember receiving the

17  subpoena previous to?

18    A    No.  This is the only subpoena --

19    Q    The only indication that you had that a

20  demand was being made that you produce the entire

21  investigative file?

22    A    Yes.

23    Q    Okay.  How does your office keep track of

24  material as it comes in, documents that have come in?

25  Do you organize it and Bates stamp it as it comes in,

1   or...

2       A    No.  We do not Bates stamp.

3       Q    Do you follow any system for keeping track of

4   your documents?

5           MR. SLOSAR:  Objection to form.  Foundation.

6    You can answer that one.

7       A    We have a system at DPA called JustWare where

8   forms are entered into that system (sneezes).  I beg

9   your pardon.

10      Q    Bless you.

11      A    We have a system at the office called

12  JustWare.

13      Q    JustWare.

14      A    Uh-huh.

15      Q    Okay.

16      A    And cases are entered into that system.  It's

17  up to each individual to put those materials into that

18  system.

19      Q    Put all your reports in there?

20      A    I'm terrible at putting all my reports in

21  there. My reports usually go in a box.  I'm very old

22  school, paper.  I like hard copies of everything, and

23  that's what I, generally, that's what I use.

24      Q    Could you tell me whether the reports

25  concerning the reports concerning Mr. Smith, Mr.

1    Edwards, and Mr. Bingham are in JustWare?

2        A    They are --

3            MR. SLOSAR:  Objection to form.  It misstates

4        her earlier testimony.  You can answer the

5        question.

6        A    Most likely.

7        Q    Okay.  If they're in JustWare, are they --

8    who can see them?

9        A    Only the attorneys on the case and all the

10    team members of the case.

11        Q    Could Linda West see them?

12            MR. SLOSAR:  Objection to form.  Calls for

13        speculation.

14        A    And I don't know the answer to that.

15        Q    Could Tom -- I'm sorry, could anybody of what

16    I'm going to call management of the Office of Public

17    Advocacy see it?

18            MR. SLOSAR:  Objection to form.  Calls for

19        speculation.

20        A    I'd be speculating.  I don't know the answer

21    to that.

22        Q    All right.  Does OPA have a custodian for

23    Open Records Act purposes?

24            MR. SLOSAR:  Objection to form.

25        A    I'm not sure.

1    Q    Have you ever received an open records

2  request?

3    A   I have not.  No.

4    Q    Do you know of attorneys in your office or

5  people from staff in your office that have received

6  open records requests?

7    A   I do not.

8    Q   Okay.

9    A   I'm not aware of any.

10    Q    I'll hand you what I've marked as  Exhibit 2.

11  Take a look at that.  If you want to look at it -- let

12  me ask you --

13    A    Do you want me to look at the whole thing, or

14  do you want me to refer to --

15    Q    Off the top, do you think you've ever seen

16  this document before?

17         (EXHIBIT 2 MARKED FOR IDENTIFICATION)

18    A   I do not.

19    Q    Okay.  During the course of the pendency of

20  this case, we have served certain written questions

21  termed interrogatories.  You're familiar with the term,

22  I'm sure. And request for production of documents, and

23  this is the answer we -- these are the answers we

24  received.

25         MR. SLOSAR:  Just for clarity's sake, and as I

1    mentioned in the letter last week, defendants --

2    Knox County defendants to my knowledge have never

3    served requests for production, so I just want the

4    record to be clear.  I know that you're looking at

5    the interrogatories.

6        MR. KELLEY:  I sure think we did, but all

7    right.

8        MR. SLOSAR:  What page?

9    BY MR. KELLEY:

10       Q    I'm sorry.  If you'd look on page 2 at the

11   bottom, please.

12       A    Okay.

13       Q    Through these interrogatories I've tried to

14   glean what specific things Mr. Pickard or Sheriff

15   Pickard was involved in of those of the Knox County

16   Sheriff's Department and he said that Defendant Pickard

17   pulled over. Allen Helton was present.  Thereafter,

18   when Defendant Jason York appeared on the scene and

19   made statements to Mr. Helton regarding Helton's

20   involvement in killing Ms. Mills.  First of all, have

21   you talked to Allen Helton as part of your

22   investigation?

23       A    Yes.

24       Q    How many times?

25       A    At least two.

1    Q    Okay.  Where were you and what were the

2    circumstances?

3        MR. SLOSAR:  Objection to form.  You can

4     answer.

5    A    I believe the first time I spoke with him he

6    was at the Laurel County Detention Center, I believe.

7    Of course, that was just to obtain the statement

8    regarding his involvement and knowledge.  And the

9    second time, that I recall vividly was at his home

10   after the last trial date was scheduled in Ms. Hoskins'

11   case.

12   Q    Okay.  Who was with you at the Laurel County

13   Detention Center?

14   A    Jessica Wells, I believe attended that.

15   Q    Okay.  Was Mr. Cox or an attorney there?

16   A    No.

17   Q    Was the interview recorded?

18   A    I'm not sure.  That one may have been

19   recorded. I'd have to see the record.

20   Q    The one at his home, who attended that?

21   A    I think Josh Powell was with me on that one.

22   Q    I'm sorry.

23   A    Joshua Powell, I believe, was with me during

24   that.

25   Q    Okay.  Anyone else?

1    A    No.

2    Q    Was that recorded?

3    A    I don't recall.

4    Q    Do you know if Mr. Powell recorded it?

5    A    I do not know.

6    Q    If he were recording it, would you have

7  recorded it as well?

8    A    No.

9        MR. SLOSAR:  Objection to form.

10    A    Not necessarily.  No.

11    Q    In other words, would you know whether or not

12  he was recording it?  Did he tell you?

13        MR. SLOSAR:  Objection to form.  Asked and

14    answered.

15    A    He certainly could have answered it -- I

16  mean, he certainly could've recorded it, but I don't

17  recall him saying he was recording it.

18    Q    Okay.  So when you're going in together, you

19  don't say, "Are you recording this?"

20        MR. SLOSAR:  Same objection.

21    Q    That's not your practice?

22        MR. SLOSAR:  Objection to form.

23    Q    No?

24    A    No.

25    Q    Okay.  All right.  Read a little bit further

1    so I understand the whole -- actually, it goes on to

2    page 3. Okay.  Did Mr. Helton tell you about being

3    pulled over by Sheriff Pickard?

4        MR. SLOSAR:  Objection to form.  Foundation.

5      You can answer.

6      A    He did tell me about being pulled over.  I do

7    not recall who he stated was the officer that pulled

8    him over at that time.

9      Q    Did he tell you what happened when he was

10   pulled over?

11     A    I believe he told me that he was pulled over.

12   I don't recall what the cause, what the cause for the

13   stop was, but I believe it resulted in a DUI charge.

14     Q    Okay.  Did he tell you that he was driving

15   with bad PEP tags at that time, too?

16     A    I don't recall if he told me that or not.

17     Q    Did you have reason to doubt the probable

18   cause?

19        MR. SLOSAR:  Objection to form.

20     A    No.  I didn't.

21     Q    Okay.  Would else did he tell you about that

22   stop?

23     A    That he was taken -- I'm not -- I believe

24   that it was to the sheriff's office, but it could've

25   been another location.  I'm not positive.  That he was

1   interviewed regarding Ms. Mills' death, and I believe

2   that was probably a -- it was -- certainly wasn't the

3   first time he had been questioned about the death, and

4   I believe without reviewing my notes, I believe that

5   before he left that interview he was under the

6   assumption that if he gave them information regarding

7   Ms. Mills' death that that DUI would be dismissed or

8   somehow resolved in his favor.

9       Q    Well, in this answer they said "Additionally,

10  Defendant Pickard was present when Defendant York

11  searched Helton's truck and found a wet coat on the

12  floorboard. Did he tell you that?  Did he tell you

13  about any wet coat being found?

14      A    I do not recall that.

15      Q    Okay.

16      A    Without -- I -- I need to look at my records.

17      Q    Would you have prepared a written report

18  either way?

19          MR. SLOSAR:  Objection to form.

20      Q    Whether or not you recorded it or not?

21          MR. SLOSAR:  Objection to form.

22      A    I would assume that I would have.

23      Q    It says that he transported Mr. Helton to

24  Barbourville Police Station.  Do you know, did he tell

25  you that it was Sheriff Pickard that took him to the

1  Barbourville Police Station?

2      A    I don't recall.  The only thing I recall is

3  that there were multiple officers, York was -- York was

4  there. Pickard was there.  I can't -- I don't recall if

5  there were any other people at the time.

6      Q    All right.  The answer to the interrogatory

7  says, "During that questioning, Sheriff Pickard and

8  other defendants examined him at length."  Do you know,

9  did he tell you that Sheriff Pickard grilled him while

10 he was at the Barbourville Police Station?

11         MR. SLOSAR:  Objection to form.

12     A    I honestly don't recall him saying that.

13     Q    Okay.  Did he tell you of another occasion

14 when they went to his house to ask him to take a

15 polygraph exam?

16     A    We discussed the polygraph, yes.  I'm not

17 sure which -- I assume that would've been at the Laurel

18 County Detention Center, too.  So, yes.

19     Q    Okay.  Do you remember what he said about

20 what Sheriff Pickard did while at his house?

21     A    No.  I don't.

22     Q    Okay.  Did you talk with Mike Simpson during

23 the course of this investigation -- of your

24 investigation?

25     A    I did not.

1    Q    Okay.  So did you receive information that

2  Sheriff Pickard and Defendant York went to speak with

3  Mike Simpson after learning that he and Allen Helton

4  had gone to Florida?  Did you find that out from other

5  people?

6        MR. SLOSAR:  Objection to form.  You can

7    answer.

8    A    Sorry.  I believe that was part of the

9  discovery.

10   Q    Okay.  That Sheriff Pickard had gone there?

11   A    I believe so.

12   Q    Okay.  Do you know what was said then?

13       MR. SLOSAR:  Objection to form.

14   A    Between --

15   Q    Do you remember any additional information

16  that was gleaned -- that was provided you during

17  discovery?

18   A    Not without reviewing it, I don't.

19   Q    Okay.  All right.  Next has to do, if you'll

20  go down to the bottom of the page, has to do with Bob

21  Smith.

22   A    Same page?

23   Q    Yes.

24   A    Okay.

25   Q    Sheriff Pickard did, as is indicated, testify

1  that he met -- that he and Detective York went to see

2  Bob Smith. My question is in the next sentence:

3  "During this conversation Mr. Smith informed Sheriff

4  Pickard and Detective York that Ms. Hoskins and William

5  Lester never purchased drugs from him"; is that

6  something, information you received as well?

7      MR. SLOSAR: Objection to form.

8   A  Yes.

9   Q  Okay. If you turn to page 5, it was alleged

10  in the complaint that Sheriff Pickard questioned Mr.

11  Helton on January 11, 2011 at Barbourville Police

12  Department and within that -- is that the instance

13  where you believed that he was arrested?

14      MR. SLOSAR: Objection to form. Calls for

15   speculation. You can answer.

16   A  I would be speculating but it certainly

17  could've been.

18   Q  Okay. All right. If you'll turn to page 6,

19  it says, "Additionally Defendant Pickard arrested Mr.

20  Helton on burglary and criminal mischief charges on

21  March 7, 2012." Do you know why Mr. Helton was in the

22  Laurel Detention Center when you went to see him?

23   A  I believe that he was there. I believe it

24  had something to do with maybe stealing some heavy

25  equipment.

1    Q   Do you think it's related to these burglary

2  and criminal mischief charges that he discussed?

3      MR. SLOSAR:  Objection to form.

4    A   Something like that, I suppose. .

5    Q   All right.  When you visited him, did he tell

6  you -- did Mr. Helton tell you, on the way to jail and

7  again at the sheriff's office, detective -- it says,

8  "Detective Pickard told Helton he could get him out of

9  criminal charges by repeating what officers wanted him

10  to say"; did he tell you that?

11    A   Not at that time, no.

12    Q   All right.  Did he tell you at the subsequent

13  meeting you had with him?

14    A   I believe so, but I'd have to review -- I'd

15  have to review my records.

16    Q   All right.  So you would substantiate that --

17  and it says, Detective Pickard, I would assume that

18  Sheriff Pickard told him he could get out of the

19  criminal charges against him by repeating what the

20  officers wanted him to say?

21    A   I won't say he said Sheriff Pickard.  I'd

22  have to review my records.

23    Q   All right.  Was his actions --

24    A   And --

25    Q   I'm sorry.  Go ahead.

1    A   I don't believe he ever said Mr. Pickard told

2  him that.

3    Q   All right.  Did he ever say that Sheriff

4  Pickard in any way coerced him or enticed him to frame

5  Amanda Hoskins or to -- to frame Amanda Hoskins and/or

6  Jonathan Taylor, and/or William Lester for the death --

7  for the murder of Ms. Mills?

8       MR. SLOSAR:  Objection to form.

9    A   Not that I recall, no.

10    Q   Okay.  Did he tell you about the statement he

11  gave -- the recorded statement he gave to Detective

12  York?

13    A   Did sergeant Allen--

14    Q   Allen Helton tell you about a statement, a

15  recorded statement he gave to him?

16    A   Yes.

17    Q   What did he tell you about that?

18    A   I think at the time that I talked to him I

19  was concerned with how many statements he had given Mr.

20  York and how many times he was recorded, and I believe

21  that he told me at least two.  He told a different

22  story from what I recall in my interview than what was

23  in the discovery about I guess the interview that he

24  had given.  We have one taped interview in discovery

25  from Allen Helton, and what he told me was different

1  than what was in the discovery on the first interview.

2      Q    Did he explain why there was a difference?

3      A    I don't recall.  I would have to look at the

4  record to give you a specific incident, or a specific

5  example.  I can tell you that I believe that I learned

6  from the discovery that the -- that he had money for

7  the Florida trip from one source, and then when I went

8  to interview him, he told me, "Oh, no.  That's not

9  true.  I didn't get it there."  And I asked, you know,

10  "Well, why did you say that," and he said, "Well, I

11  lied."  And I was, like, "Oh, why," you know, and he

12  couldn't give me an answer but he -- he recalled that

13  he got it from another source during that interview

14  than what he'd given Mr. York.

15      Q    Did he ever tell you that York or Pickard

16  told him what to say?

17          MR. SLOSAR:  Objection to form.

18      A    I believe what he said to me was that over

19  the course of many conversations with Mr. York he was

20  given information about the case and was told, you

21  know, you know what you need to tell me if you want my

22  help on charges, and that -- that would've been not the

23  first interview, but would've come from the second

24  interview, I believe.

25      Q    Did he ever tell you that either Sheriff

1    Pickard or Detective York put words in his mouth; in

2    other words, had him say things that he didn't know or

3    considered to be a lie?

4        A    I believe that he told me that on the

5    interview at his home, and I believe that -- I

6    particularly recall him saying that Detective York did.

7        Q    The interview at his home was after the last

8    scheduled trial, wasn't it?

9        A    I believe so.

10       Q    Where he had failed to attend?

11       A    Yes.

12       Q    Okay.  Did you interview Michael Crump?

13       A    Yes.

14       Q    Just saw this one.  What do you remember

15   Michael Crump telling you?

16           MR. SLOSAR:  Objection to form.  Foundation.

17       You can answer.

18       A    We had a very long interview, Mr. Crump

19   and I.

20       Q    Yeah.  I think all of his interviews would be

21   long but go ahead.  Sorry.

22       A    We discussed everything from the number of

23   times he was interviewed and the people he talked to to

24   the content which was, from what I recall, different

25   from what was reported in Mr. York's reports.  So we --

1   I mean I didn't have anything to go on other than Mr.

2   York's reports when I went to interview Mr. Crump so we

3   kind of started from just his recollection of what

4   happened from the beginning and went through to the

5   end.  He told me that he was leaving his residence

6   which was -- would've been up above Ms. Mills'

7   residence.  That he was leaving his residence to go

8   check for -- to check and see if the school was in

9   session that day.  That he didn't have any media

10  connection, so he wasn't -- the school bus hadn't run

11  when he thought it did, so he needed to go out to -- to

12  the store, to Escoe's market to find out if there was

13  school that day.  He couldn't recall if there was or

14  was not school that day.  He recalled seeing -- as he

15  drove by Ms. Mills' home seeing a vehicle backed into

16  her driveway and he described the vehicle and gave me

17  some limited descriptions of an individual sitting in

18  the vehicle.  He described a male that he saw standing

19  at the back of Ms. Mills' residence.  He told me how he

20  came into contact with a police officer which I believe

21  was the following day after the incident.  He had, I

22  guess, was coming up the street and maybe stopped his

23  vehicle or parked his vehicle somewhere near the

24  residence and approached an officer and asked them if

25  it had anything to do with the incident from the day

1    before, that he had seen it on the news, and then

2    proceeded to give them a recorded interview which was

3    not in discovery.  And --

4        Q    Did he tell you what he saw?

5        A    He did.

6        Q    What did he see?

7        A    Without looking at my records, he said that

8    he saw a blue vehicle backed into Ms. Mills' driveway.

9    He believed that there was a blonde female inside the

10   vehicle.  He said that he saw a male at the back corner

11   of the residence in a, I believe he said, a camouflage

12   jacket which he said he had the hood on.  He said he

13   had his sleeves pushed up and that what got his

14   attention was a brightly colored tattoo on his forearm.

15   That that was actually what caused him to look that

16   way, or I guess see the man or notice it.  He said he

17   thought that was unusual that he didn't normally see

18   vehicles in her driveway and described -- I remember

19   him describing a bump -- he said the vehicle had a

20   bumper sticker on the back window after he told me that

21   it was backed into the driveway.  I think he told me

22   that the guy had -- the guy that he saw at the back of

23   the residence had hair below his shoulders, but he also

24   told me the guy was wearing a hood.  That's some of the

25   most significant things I remember.

1    Q    Did he talk about his interview with either

2  Detective York or Sheriff Pickard?

3    A    He told me that he did a recorded interview

4  in the driveway.  I don't recall who he said the

5  interview was with.  And he told me that he did an

6  interview later at his residence with multiple

7  officers, and I think that's when they, maybe, rendered

8  a sketch of the individual he allegedly saw.

9    Q    Do you remember whether any of them were

10  Sheriff Pickard or whether any of them were Detective

11  York?

12    A    I do not recall.  I believe -- I don't recall

13  without looking.

14    Q    Okay.  The next indication is that Sheriff

15  Pickard also accompanied Detective York to the

16  Appalachian Children's Home to determine who had

17  possession of their blue vehicle on December 20, 2010.

18  Were you aware of that encounter?

19    A    Yes.

20    Q    And do you remember who they talked with?

21    A    Do I remember who the people at the

22  children's home?

23    Q    They met with at the Appalachian Children's

24  Home.

25    A    The only -- I only recall them saying

1  Detective York.

2      Q    I guess do you know who they talked with at

3  the Appalachian Children's Home?

4          MR. SLOSAR:  Objection to form.

5      A    I believe that they talked with Steve Yeary.

6  He's the director of the children's home.  And I

7  believe that they talked to maybe a maintenance person

8  who was over the vehicle.  I don't recall his name.

9      Q    Did you talk to both of those gentleman?

10     A    Yes.

11     Q    What'd they tell you?

12     A    Mr. Yeary stated that he had provided

13  receipts, maybe gas receipts, for the use of the

14  vehicle and that I think Mr. Yeary led the officer to

15  the maintenance man and he was questioned about whether

16  or not the vehicle could've left, or did he know if the

17  vehicle ever left and was -- was told, "No."

18     Q    Okay.  Do you remember anything being

19  attributed to Sheriff Pickard as far as what he may

20  have asked or what he may have -- what information he

21  might be  seeking?

22     A    No.  I don't recall any.

23     Q    The next has to do with Jonathan Taylor.  As

24  part of your investigation, did you interview Jonathan

25  Taylor?

1    A    No.

2    Q    Okay.  What do you know about the photos that

3  were created and I think, ultimately, sent to Mr. Crump

4  involving Mr. Taylor?

5        MR. WRIGHT:  Object to form, foundation.

6        MR. SLOSAR:  I'll join.

7    A    Are you talking about the one where the

8  defendant was dressed up to look like a description

9  that was given --

10    A    Uh-huh.

11    Q    -- by someone?

12    A    I believe the only thing I recall about Mr.

13  Crump saying about that was that I asked him in the

14  interview if he was shown any photographs before he

15  rendered the sketch, and I believe he gave me at least

16  two and maybe three answers.  The first one, I believe

17  he said he -- he didn't or maybe know, and then later

18  on in the interview, he said that he believed that

19  someone did go out to a police cruiser and come back in

20  and show him a photograph.  And that was -- that would

21  have been during his interview when he rendered the

22  sketch, when they rendered the sketch.

23    Q    Okay.  So the information you got concerning

24  this -- the photos or the creation of these photos

25  where Mr. Taylor was wearing a jacket came through Mr.

1  Crump?

2      MR. SLOSAR:  Objection to form.

3      A    I mean that photograph was in the discovery.

4      Q    I understand.

5      A    And then, yes, that --

6      Q    But as far as what happened in creation of

7  those photos, the circumstances of the meeting --

8      A    Came from --

9      Q    -- they came from Mr. Crump?

10     A    Yes.  That's right.

11     Q    All right.  In other words, you did not learn

12  it from other people that may have been named at this -

13  - during this session where the photos were taken?

14     A    No, sir.

15     Q    Okay.  Did you talk to Christy Branson?

16     A    I believe so, yes.

17     Q    Was she helpful at all?

18     A    She's the one that was at Pewee Valley when I

19  interviewed her.

20     Q    Okay.

21     A    And I believe she was.  She was not -- she --

22  I believe her statement was that she had been in a car

23  accident and didn't have any memory of anything.

24     Q    That's what we got, too.  In other words,

25  have you talked to anybody that somehow imparted

1   information concerning what went on when Sheriff

2   Pickard and Defendant York met with Ms. Branson?

3       A    Not when they met with her.  I interviewed

4   inmates I believe at the Harlan County -- they were at

5   the Harlan County Detention Center when this story came

6   about.

7       Q    Uh-huh.

8       A    And were cellmates with both Christy and Ms.

9   Hoskins.  And I interviewed other cellmates and asked

10  if they had heard any conversations between those two,

11  or if she'd given them any, you know, talked to them

12  about the case at all.  And I believe there were some

13  affidavits rendered, and I don't recall their names,

14  but they are part of the case.

15      Q    Sure.  I'll state that I saw those, and I

16  think they were -- that most of them said they -- she

17  had never said any --

18      A    That's what I --

19      Q    -- such thing to them.  Did any of them

20  recount any -- were they witnesses to the statement

21  that Defendant York --

22      A    No.

23      Q    -- took from them?

24      A    Not that I recall.

25      Q    Okay.

1    MR. WRIGHT:  Can we take a quick break, John?

2    MR. KELLEY:  Sure.

3           (OFF THE RECORD)

4    BY MR. KELLEY:

5    Q    Would you have had a chance to talk to Kayla

6    Mills at any point during your investigation?

7    A    No.

8    Q    Okay.  Did you talk to her mother?

9    A    I did talk to her mother, yes.

10   Q    All right.  On page 8 of this answers to

11   interrogatories, it says, "Defendant Pickard spoke with

12   Ms. Mills on several occasions and it think that Ms.

13   Mills that he's referring to is Kayla Mills.  Did you

14   learn from her mother about those contacts between --

15   A    Well, I learned through discovery, but I

16   certainly discussed it with mother.

17   Q    In particular, instances where she spoke with

18   Sheriff Pickard as opposed to Detective York?

19   A    Did I learn about that from her mother; is

20   that your question?

21   Q    Let's start back at the beginning.  Do you

22   know -- do you know on your own that Sheriff Pickard

23   spoke with Kayla Mills on several occasions?

24   MR. SLOSAR:  Objection to form.

25   A    I mean, I know, but to tell you where I first

1    heard that or first learned that, I'm not sure.

2        Q    Okay.  And one of those occasions it says,

3    "Kayla informed Defendant Pickard that she didn't have

4    anything to do with the murder, nor did she have any

5    knowledge of who did."  Is that consistent with your

6    investigation?

7        A    Yes.

8        Q    Who told you that?

9        A    I believe her mother told me that.

10        Q    Okay.  Do you know of other instances where

11    my client was there when Defendant York was present as

12    well?

13        A    With Kayla?

14        Q    Yes.

15        A    I don't -- I don't recall.

16        Q    Do you know of a meeting that was held with

17    her attorney, Kenneth Boggs?

18        A    I believe he was present during the time that

19    she gave her statement, and I believe that Ms. Mills

20    told me that they had met prior to.  That's my

21    recollection but I would have to review the record

22    to --

23        Q    Did you find out about that meeting from

24    other sources or find out more about what happened at

25    that meeting?

A    Not that I recall.

Q    Okay.  Did you find any -- did you obtain any
information that you felt important to your -- to the
defense of Amanda Hoskins concerning what Kayla Mills
may or may not have said?

A    I'm sorry, you're going to have to repeat
that.

Q    Do you know whether Kayla Mills ever
implicated Amanda Hoskins in the murder of Ms. Mills?

MR. SLOSAR:  Objection to form.  Foundation.

Q    I meant Katherine Mills.

A    Sure.

Q    Go ahead.

MR. SLOSAR:  Same objection.

A    I -- without -- I've not looked at her
statement in a while, but I don't recall if she
implicated Ms. Hoskins in her original statement or
not.

Q    I admit that there's a statement out there
where she implicates Jonathan Taylor.  Are you --

A    Yes.  I'm familiar with that --

Q    All right.

A    -- statement.

Q    Are you aware of her saying, "Oh, Amanda was
with them," or do you remember receiving any

1  information that Kayla Mills ID'd --

2      MR. SLOSAR:  Objection to form.

3      A    I honestly don't recall if that was in the

4  statement or not.

5      Q    Okay.  All right.  And then on page 10, this

6  has to do with a conversation and it goes over to 11.

7  It's the answers to interrogatory number 6.  And can --

8  in particular, the actual substantive portion of the

9  answer begins as the last paragraph on page 10 and it

10 extends over to page 11.  Can you look at that?

11     A    Okay.

12     Q    Is that an accurate answer based upon your

13 investigation?

14     A    I do not recall if Mr. Smith said Mr. Pickard

15 was there or not without looking at my records.  I

16 don't recall -- I don't recall him saying that he was

17 instructed to do or say anything in particular other

18 than, you know, the fact that he'd been asked multiple

19 times if that had occurred, if Mr. Lester or Ms.

20 Hoskins had spent any money there, and he consistently

21 said, "No."  So other than that, they --

22     Q    I'm particularly interested in the last

23 portion of what I think is the first sentence in that

24 paragraph.

25     A    Okay.

1    Q    And instead that they would sweep these drug

2    cases under the rug so long as he deviated from his

3    prior allegations against Mr. Simms and Mr. Helton and

4    instead falsely implicated plaintiffs in the murder of

5    Katherine

6          Mills.  Let me ask you first: Did he ever

7    tell you that he believed that Mike Simpson and Allen

8    Helton committed the murder?

9          MR. SLOSAR:  Objection to form.

10    A    I don't recall if he said he thought they

11    were involved, or he knew they were involved, but I

12    think he implicated that he thought they were involved.

13    Q    All right.  Lastly, did he say that either

14    Defendant York or Defendant Pickard told him to falsely

15    implicate the plaintiffs in the murder of Katherine

16    Mills; did he tell you that?

17          MR. SLOSAR:  Objection to form.

18    A    Not that.  No.

19    Q    I only have one copy of this but it's a

20    statement, I guess you said.  Yeah, what I'm handing

21    you I'm marking as  Exhibit 3.  All right?

22    A    Yes.

23    Q    Okay.  I'm lost already.  It's a report we

24    received concerning a March 10, 2014 report of an

25    interview on Ms. Evans with Charles Robert Bob Smith.

1  And it is Bates stamp numbers 2405, 2406, 2407, and

2  2408.

3      (EXHIBIT 3 MARKED FOR IDENTIFICATION)

4      MR. SLOSAR:  PL before each of those numbers.

5      MR. KELLEY:  Yes.  Plaintiff's exhibit.

6  BY MR. KELLEY:

7      Q    Do you need a minute, or do you recognize it

8  right off the bat?

9      A    It appears to be a report that I made, yes.

10      Q    All right.  Do you know of any other reports

11  you made concerning conversations you made with Bob

12  Smith?

13      A    Not without reviewing the records.  I do not

14  recall.

15      Q    Okay.  And, again, it's because I'm so

16  doggone old.  You, for a fact, can you remember whether

17  you did similar statements for William Bingham and Bit

18  Edwards?

19      MR. SLOSAR:  Objection to form.

20      A    I don't recall but I would assume so.

21      Q    That you did.  Okay.  All right.  I see

22  Sheriff Pickard's name mentioned once in that memo.

23  Maybe I missed it, but and he describes what we've been

24  talking about just a second ago, conversation he had

25  where Detective York and Sheriff Pickard went to see

1  Bob Smith and told him he'd put aside the drug charges

2  if you'll just please give us information concerning

3  whether or not they bought drugs from you.  And that

4  seems to be portrayed in your statement; is that your

5  recollection as well?

6       MR. SLOSAR:  Objection to form.

7     A   It's in my first sentence on the second

8  paragraph.

9     Q   All right.  Any -- I couldn't find any other

10  instance where you mentioned -- there's talk about the

11  encounter with Allen Helton where he's arrested, and

12  the money goes somehow to somebody.  I couldn't see

13  Sheriff Pickard mentioned in here.

14     A   No.  I do not see his name anywhere else.

15     Q   All right.  Do you remember him, though it

16  may not have been included in your report, do you

17  remember him being mentioned as being involved in any

18  of the other --

19     A   I don't recall him -- whether he did, or he

20  didn't.

21     Q   Okay.  As you look at the report, I mean this

22  is -- you would verify its -- as you look at it, that

23  sparks your memory and that's the way you remember it?

24     A   Uh-huh.

25     Q   Yes?

1    A   Yes.

2    Q   I'm going to hand you the amended disclosures

3  which Mr. Slosar and his firm provided within discovery

4  in the federal court action.  Have you seen this

5  before?

6       ( EXHIBIT 4 MARKED FOR IDENTIFICATION)

7    A   I don't believe so, no.

8    Q   All right.  Did you actually -- do you

9  remember participating in providing -- was any call

10  made to you where you said, "Please list everybody you

11  talked to"?

12    A   No.

13    Q   Okay.  Did you talk to any law enforcement

14  officers as part of your investigation?

15    A   I talked to Mr. York a couple -- on a couple

16  of occasions.  I believe I talked to mike Smith,

17  although I think that might -- I'm sorry.  That might

18  have been in Mr. Anderson's case.

19    Q   Mike Smith, the present --

20    A   Sheriff.

21    Q   Knox County Sheriff?

22    A   Uh-huh.

23    Q   Yes?

24    A   I don't believe --

25    Q   And I do know you talked to John Pickard with

1  regard to Anderson.

2      A   With regard to Anderson, yes.

3      Q   Yeah.  Okay.

4      A   I believe he's the only officer I talked to,

5  Mr. York Amanda's case.

6      Q   Okay.  In other words, if you'd look at the

7  bottom of page 2.  These are people who were the

8  Kentucky State Police and the Knox County Sheriff's

9  Department. And at least until the bottom of the page

10 are people that are supposedly regarding officers and

11 people who have knowledge regarding misconduct in the

12 criminal investigation and the first, one, two, three,

13 four, five, six, and actually seven are associated with

14 the Kentucky State Police.

15       MR. SLOSAR:  Objection to the form to the

16    extent that there's a question.

17     Q   Have you talked with any of those people?

18     A   I certainly have talked with Rob Farley.  He

19 was the property officer at KSP.

20     Q   Uh-huh.

21     A   And I was there to review the evidence.  I

22 don't know that we talked or discussed the case in

23 particular.

24     Q   Okay.

25     A   There was an officer -- I don't remember who

1  was there, during the conversation with Rob that was

2  about some of the evidence, but I don't recall what his

3  name was.  Other than that, I don't know --

4      Q    In other words, were there any comments

5  concerning what had been during the course of the

6  criminal investigation by either the state police or

7  the Knox County Sheriff's Department?

8          MR. SLOSAR:  Objection to form.

9      A    No.

10     Q    Okay.  Did you talk to a DEA agent?

11     A    No.

12     Q    Okay.  Anybody on the -- well, I know you --

13  well, who have you talked to on page 3?

14     A    Jonathan Patterson looks familiar.  Dave Fox,

15  I've certainly interviewed him.  Jeremy Ferrell, I've

16  interviewed him.  I was present during conversations

17  for Jeff Gray with Elliott.  I didn't interview James

18  Sizemore.  I interviewed --

19     Q    Well, let me ask, are Dave Fox, Jeremy

20  Ferrell, Jeffrey Gray, James Otis Sizemore, have to do

21  with the --

22     A    Those were in Mr. Anderson's case.

23     Q    Okay.

24     A    Do you want me to be exclusive to this case

25  for these people?

1    Q    No.  No.  I'm interested that you talked to

2    them but --

3    A    Okay.  Certainly, I talked to Mr. Helton.

4    Q    Yes.

5    A    I talked to Jessie Lawson.

6    Q    Okay.

7    A    And I talked to Bob Smith.

8    Q    Okay.  Next page?  I know you talked to Mike

9    Crump and I know you tried to talk to Christy Branson?

10   A    I did.  Joe King, Larry Warren, Amber

11   Simpson.

12   Q    You actually took a -- I should ask -- I know

13   you took a -- or I saw a transcript, I think, or a

14   recorded statement you took of Dr. Warren; is that

15   correct?

16   A    Yes.

17   Q    Okay.  Maybe I should ask of those you

18   recognized talking to, tell me whether you took a

19   recorded statement.

20   A    I know I recorded Mr. Crump.

21   Q    How about Joe King?

22   A    I don't recall if I recorded him --

23   Q    Okay.

24   A    -- or not.  I know I did a report on him.

25   Q    How about Amber Simpson?

1     A    I did not record Amber.

2     Q    You told me you talked to Donna Mills, of

3  course.

4     A    I talked to Donna.  I don't believe that I

5  recorded her.

6     Q    How about did you talk to her husband?

7     A    No.

8     Q    Did you talk to Dan Wilson?

9     A    I did.

10    Q    Okay.  Did you record that?

11    A    Not that I recall, no.

12    Q    Robert Beach?

13    A    I did not talk to Robert Beach.  I spoke with

14  Randy Merida at one of the detention facilities.  And I

15  don't believe I recorded that.

16    Q    Okay.  Did you talk to -- I think Margaret

17  Polly is Robert Beach's sister, or something?

18    A    I don't -- I don't believe that I spoke with

19  her.

20    Q    Okay.  Elsie Abner?

21    A    I don't believe so, no.

22    Q    Did you talk to Mikey Brunner?

23    A    No.  I spoke with Rhonda Abner.

24    Q    Okay.

25    A    I don't believe that I recorded her, but if I

1    did I would have turned it over.  Tasha Abner sounds

2    really familiar.  I -- I think I may have interviewed

3    her. Don't know if I recorded her.  I don't believe so.

4    I would've turned it over if I did.  I spoke -- I

5    believe I spoke with Vernon Bennett.  I believe I spoke

6    with Cleo Brown.  I believe that I spoke with Dickie

7    and Lacey. Raymond Hammonds looks familiar.  I'm not

8    sure.

9        Q    Did you talk with Ms. Bunch?

10       A    No.

11       Q    Okay.

12       A    Jennifer Lawson.  I interviewed her.  I

13   talked to Stephen Parker, Carson, and Susie Trent.  I

14   believe that's all on that page.  Same thing on the

15   next page?

16       Q    Uh-huh.

17       A    I talked with Dr. Rolf.  I believe that I

18   talked with Christie Sanders.

19       Q    Did you talk to an Angela Fletcher?

20       A    She with Enterprise?

21       Q    Yeah.  Thought so.

22       A    And then I believe --

23       Q    But she was in Middlesboro, huh?

24       A    Yes.  I spoke with an agent at the

25   Middlesboro location, and I spoke with someone over the

1    phone, and I believe that's all.

2        Q    Okay.

3        A    Of course, Theresa was the attorney.  Jim

4    spoke with Sam, Heather, Josh.

5        Q    How about Mike Arnett or Mickey Hatmaker?

6        A    I don't believe I spoke with either of those.

7        Q    Keith Lyford?

8        A    No.

9        Q    Curtis Pingleton?

10       A    No.

11       Q    In looking at what was provided, it looked

12   like you may have talked to many, many more people and

13   I'm not going to make you go through each one.  Do you

14   remember any witness telling you of additional

15   encounters that they might have had with Sheriff

16   Pickard or anybody at the Knox County Sheriff's

17   Department with regard to the Katherine Mills murder

18   investigation?

19       A    Not from my recollection.

20       Q    Did Josh Powell -- did you-all reinvent the

21   wheel each time or did Josh -- did you and Josh share

22   information concerning witnesses?

23       MR. SLOSAR:  Objection to form.  Asked and

24   answered.  You can answer again.

25       A    We did our own independent investigations,

1    particularly as it applied to our clients.

2        Q    Let me get more to the point, then.  Did Josh

3    give you any information concerning witnesses who had

4    talked about --

5        A    I'm sure that we probably discussed -- I

6    mean, specifically I can't give you any examples.

7    But --

8        Q    He's going to object to my asking you about

9    what you discussed.

10       A    Uh-huh.

11       Q    My question is: Do you recall him saying this

12   witness when I talked to them said John Pickard did

13   this to me to coerce me into saying something, or to

14   affect the investigation?

15           MR. SLOSAR:  Objection to form, and, again, I

16       think this delves into privileged communication.  I

17       would instruct the witness not to answer based on

18       the privilege assertions we've made earlier in the

19       deposition.

20   BY MR. KELLEY:

21       Q    You're going to follow those instructions, I

22   bet.

23       A    Follow those instructions.

24       Q    All right.  When you worked with -- well,

25   those encounters you had with Sheriff Pickard outside

1    of this investigation, did he cooperate with you?

2        A    I feel like he was pretty candid, yes.

3        Q    All right.  In particular, like Bill

4    Anderson, it sounded like --

5        A    I think that's the only time I spoke with

6    him. So I don't think that there was a -- I don't

7    believe that I interviewed him as a part of Ms.

8    Hoskins' case.

9        Q    Did you find him candid on that occasion?

10       A    I did on that occasion, yes.

11       Q    Okay.  Did you, as far as getting information

12   from the Knox, at any time, getting information from

13   the Knox County Sheriff's Department, did you have any

14   difficulty doing that?

15           MR. SLOSAR:  Objection to form.

16       A    I don't recall any specific times although I

17   recall in Mr. Anderson's, and I may have very well done

18   it in Ms. Hoskins, I probably thought reports or

19   documents about their involvement once I discovered

20   their names in the --

21       Q    Uh-huh.

22       A    -- in the discovery and there were no reports

23   included in the discovery from any of those officers

24   about their involvement and I think I requested on

25   numerous occasions, you know, is there a report from

1   this person who was --

2       Q    Are we talking about Mr. Anderson's case now

3   in particular?

4       A    For sure on that one, and I'm not --

5       Q    You didn't get the recorded statement they

6   took of Bill Anderson?

7       A    No.

8           MR. SLOSAR:  Objection to form.

9       A    No.  I'm not talking about interviews, yes, I

10  got a recorded interview from Mr. Anderson.  But I'm

11  talking about as far as my inquiries from them would've

12  been for reports based on activities that it looked

13  they may have performed in other parts of the

14  discovery.

15      Q    Okay.

16      A    You know, such as if they were at the crime

17  scene or alleged crime scene, you know, was there any

18  report about what your activity was while you were

19  there. There was not anything from the Knox County

20  Sheriff's Office in either case that I recall, and I

21  could be wrong but that's my recollection.

22      Q    Well, am I correct, the case was actually

23  tried in Bell County and, of course, it came up to

24  London.

25      A    Correct, but it started in Knox County and

1  the first officers involved in that case was Mr.

2  Pickard and Mr. Eubanks.  They actually questioned Mr.

3  Anderson.

4      Q    And you got -- but you got that.

5          MR. SLOSAR:  Objection to form.

6      A    We got that recorded, so yes.

7          MR. SLOSAR:   Exhibit 5?

8          MR. KELLEY:  It is 5 is what -- is my count.

9      Q    Let me show you what I've marked as Exhibit

10  5. Have you seen this log before?

11          (EXHIBIT 5 MARKED FOR IDENTIFICATION)

12      A    No.  I have not.

13      Q    Okay.  Were you asked to participate in

14  preparing any privilege log?

15      A    No.  I was not.

16      Q    Okay.

17      A    What I'm going to ask you to do is very

18  difficult probably, but there are a number of instances

19  where there's a person identified as an unnamed defense

20  team member.  Can you look through here and tell me if

21  any of these that you believe, were you?

22      A    I really would have no way of knowing what --

23  which specific -- I don't know how I would possibly be

24  able to do that.

25      Q    Okay.  Did you have a way of identifying

1  things that you had authored, notes and such as that?

2  Were they segregated and in your file, at least as to

3  what your notes were and what -- as opposed to anyone

4  else's notes that might have been in the file?

5      A    Well, I mean I would know, obviously, the

6  reports I have put my name on those, and any notes,

7  other than my handwriting, which I don't, you know, I'm

8  not sure if I'm understanding your question right, but

9  I mean that's the only --

10     Q    Well, it says, "Handwritten notes regarding

11  Amanda Hoskins and case, 94 pages."  Admittedly, that

12  could be an attorney.  That could be anybody.  But

13  would there be a folder in there for Mr. Cox -- well,

14  maybe not Mr. Cox's notes, but your notes as opposed to

15  Ms. West's notes, as opposed to somebody else?

16         MR. SLOSAR:  Objection to form.  Calls for

17      speculation.

18     A    If -- if it came from the file that I turned

19  over, it would have been in a file labeled from the

20  person, with the person's name that it came from.  So

21  if you would've written some notes and you gave those

22  to me, I would've made a file and labeled your name and

23  stuck those in there.

24     Q    Okay.  So, you know, as far as what was in

25  your file, you could identify it to the team member

1    that actually generated it; is that fair?

2        MR. SLOSAR:  Objection to form.

3    A    Generally, I would say yes.

4    Q    Okay.  Down to -- on the front page, your

5    name is mentioned in particular.

6    A    On the front page?

7    Q    Yep.  November 1, 2012, third from the

8    bottom?

9    A    Uh-huh.

10   Q    Did you have e-mail with Jason York?

11   A    Yes.

12   Q    Concerning Michael Simpson?

13   A    I believe yes.

14   Q    What was the exchange?

15   A    I believe it was in regards to the alibi note

16   that Mr. York had included in his -- one of his

17   reports. I believe he stated that Mr. Simms wouldn't

18   talk to him but when he went to talk to him, he

19   immediately approached him with an alibi note for his

20   whereabouts on the day of the incident.  It was a

21   handwritten, just a sticky note and I believe that our

22   exchange was in regards to that and the fact that I

23   couldn't -- it was not legible.  I think he had maybe

24   faxed it to me or something in the writing, the names

25   on the note was not legible.

```
 1      Q    Okay.  I'm trying to find out why that would
 2   be privileged where you're having a conversation with
 3   the other side.
 4          MR. SLOSAR:  Objection to that.
 5      Q    Do you know why?
 6          MR. SLOSAR:  Form.  Calls for speculation.
 7      Q    Do you know why?
 8      A    I don't know why.
 9      Q    Okay.  At the top of the next page, it looks
10   like there are 26 pages involving you and Angela
11   Fletcher, and David Stewart, Sam Cox.  All members of
12   the defense team?
13      A    No.
14      Q    Who is not?
15      A    Angela Fletcher, I believe, we have just
16   talked about her.  I believe she was Enterprise.
17      Q    That's what I thought.
18      A    David Stewart.  I believe David Stewart is
19   the jailer at Knox County and that may have been from
20   William Anderson's case, maybe.
21      Q    Well, it says, "E-mail regarding Michael
22   Simpson, and I don't think of him as being involved
23   with the Anderson case, was he?
24          MR. SLOSAR:  Objection to form
25      A    Not that I recall, no.
```

1    Q   Do you know what reference is being made

2  there why it's privileged?

3    A   I would not -- without seeing it, no.

4    Q   Okay.  Down to January 23, 2014, Angela

5  Fletcher.  Again, if somebody asked, I'd say she was

6  the car rental agency?

7    A   I believe so.

8    Q   And you would've written her and -- yes?

9    A   Yes.  E-mails.

10    Q   Do you know why that would be?

11    MR. SLOSAR:  Objection to form.  Questions

12  posed to Ms. Evans about why things were asserted

13  to be privileged by plaintiff's counsel are

14  inappropriate as counsel knows.  She didn't assert

15  the privilege on these designations.  We did.  It's

16  not appropriate to ask her why those designations

17  were made.

18    MR. KELLEY:  Well, I certainly have an inquiry

19  as to the legitimacy of claiming communications

20  with third parties.

21    MR. SLOSAR:  Sure, and you're doing that but,

22  ask why -- asking the follow-up question, asking

23  the witness for a legal opinion --

24    MR. KELLEY:  I'm sorry.  I don't intend to do

25  that, but --

1      MR. SLOSAR:  -- is inappropriate.

2  BY MR. KELLEY:

3      Q    It mentions notes and I'm kind of wondering,

4  did you write something on there that you considered

5  for attorney's eyes only?

6      MR. SLOSAR:  Well, you haven't -- the problem

7      is you have no way of knowing from this whether Ms.

8      Evans --

9      MR. KELLEY:  That's true.

10     MR. SLOSAR:  -- forwarded e-mails to defense

11     team members that include communication, so it's --

12     you know, going into the privilege process in this

13     way --

14     MR. KELLEY:  Well, it's because you haven't

15     told me why its privileged.  I mean all you have

16     for this is the statement saying it's work product

17     and attorney-client privilege and I'm not sure why

18     I should accept that when it seems to be

19     communications with a third party.

20     MR. SLOSAR:  Mr. Kelley, as an officer of the

21     Court, I think that the proper way to address

22     privilege logs, especially one that was disclosed

23     many months ago is to confer --

24     MR. KELLEY:  Many months ago.

25     MR. SLOSAR:  -- is to confer amongst counsel

1    not to ask third party witnesses why counsel from a

2    different law firm are asserting privilege

3    objections.  It's merely wasting everybody's time

4    here.

5        MR. KELLEY:  Okay.

6        MR. SLOSAR:  If you have issues with things

7    not being appropriately designated.

8        MR. KELLEY:  I'm going to plod on in my stupid

9    way if you don't mind.

10        MR. SLOSAR:  You should.  The only thing I

11    want to mention for the record is under 30(b)(1),

12    you are limited to seven hours, and --

13        MR. KELLEY:  Yes.  I know.  I'm almost done.

14        MR. SLOSAR:  I anticipate that defense counsel

15    having been attorneys for a number of years

16    would've conferred amongst themselves as to how to

17    split up their time allocation here today.  We're

18    well past the three- hour mark and I'm assuming

19    that you're going to leave appropriate time for the

20    remaining defense counsel to ask questions.

21        MR. KELLEY:  Sure am.

22        MR. SLOSAR:  That's all.

23  BY MR. KELLEY:

24     Q   Okay.  All right.  Next page, who's Jessica

25  Gibson, please?

1    A    Jessica Gibson Wells is the investigator in

2  the Harlan office.

3    Q    Okay.  And the next one August 20, you're

4  identifying as being part of a chain of e-mails where

5  Jason York -- who is Pat Nally?  I don't know who that

6  is.

7    A    Pat Nally is Jason Steele's secretary, I

8  guess.

9    Q    Jackie Steele's?

10    A    Uh-huh.

11    Q    Okay.

12    A    Can you tell me what page you are on?

13    Q    I'm sorry.

14    A    That's okay.  I think I've flipped through

15  it.

16    Q    I think the third page.

17    A    Okay.

18    Q    Looks like that.

19    A    Yes.

20    Q    Okay.  But you would agree that that one, the

21  one was listed August 30th where your name appears are

22  instances where third parties are included?

23       MR. SLOSAR:  Objection to form.  It calls for

24    speculation.  There's no way for this witness

25    sitting here without looking at the actual

1  documents to determine who the e-mails were

2  between.  If you want to ask her did she send e-

3  mails to Angela Fletcher, she'll respond to that,

4  but asking her from looking at a chart as to what

5  the chart is referring to is not an appropriate way

6  to determine whether privilege exists.  Obviously,

7  you're --

8      MR. KELLEY:  No.  That's not also a good log.

9  I mean, a good log would be telling me why in the

10  world communications with a third person --

11      MR. SLOSAR:  John, John, John, I respectfully

12  disagree, but what should have happened before a

13  deposition, and I said this at Mr. Powell's

14  deposition, is that if you -- if you believe that

15  things were inappropriately designated as

16  privileged, your firm should send a letter via e-

17  mail or fast mail or pigeon, however you prefer to

18  my firm and we can confer about those issues

19  instead of asking third-party witnesses who have no

20  knowledge as to the contents of the privilege log

21  that is before you.  So --

22      MR. KELLEY:  So far, I've been --

23      MR. SLOSAR:  -- prior to today's date you have

24  never on a single occasion reached out to

25  plaintiff's counsel to have a conferral about

1  designations on this log.

2     MR. KELLEY:  Okay.

3     MR. SLOSAR:  I'm sure you don't disagree with

4  that because it is absolutely true.

5     MR. KELLEY:  Yeah.  And I also know that this

6  is a log that's not rendered anywhere near what is

7  required of a privilege log.

8     MR. SLOSAR:  And again --

9     MR. KELLEY:  But, you know, okay.  We'll --

10  I'm not sure I'm going to get much cooperation from

11  the person who prepared this.  I just don't.  But

12  never mind then.

13     MR. SLOSAR:  Well, you certainly -- well, it

14  is impossible to get cooperation when defense

15  counsel doesn't actually seek any clarification of

16  the privileges that are designated on this log.

17     MR. KELLEY:  Okay.

18     MR. SLOSAR:  So if you stand silent, I have no

19  way of knowing that you're unhappy or displeased

20  with the privilege log.

21     MR. KELLEY:  This is the only way I -- please

22  understand, I am, and on those instances where it's

23  clear it involves a third person, more explanation

24  needs to be given by work product attorney-client

25  privilege, period.

1     MR. SLOSAR:  So send a letter.  But this isn't

2  the appropriate place to do it.  I know that you're

3  going to continue forward but I'd be happy to work

4  through this with you outside of a deposition

5  setting.

6     MR. KELLEY:  Okay.

7  BY MR. KELLEY:

8     Q    Ms. Evans, who is on the next -- I forgot

9  what page I'm on.  Page 5.

10    A    Okay.

11    Q    All right.  Who is Doug Blair?

12    A    Doug Blair?

13    Q    Do you see that?  Yeah.

14    A    Which --

15    Q    The third one down on page 5.

16    A    Yes, we are.  I'm just trying to --

17    Q    Are anybody in that list not part of -- it

18  says, "KSP," but are there any other persons that are

19  not part of the defense team?

20    A    I believe so, yes.

21    Q    Okay.  Go down to the 2000 -- one down where

22  it says, "2014."  It says, "John Greenberg, Stephanie

23  Beine," or Beine.  I don't know, and you as well as I

24  know who Ms. Gatnarek is.

25    A    Uh-huh.

1    Q   Are all those people associated with the

2  defense team?

3    A   I don't know who John Greenberg is.

4    Q   Okay.  How about Stephanie, who is she?

5    A   She is a -- she's an expert -- not one that I

6  don't think our team consulted with, so -- I don't

7  believe.

8    Q   Did you retain an expert to look at the

9  polygraph?  I know Ms. Gatnarek was an expert?

10    A   I don't believe so.

11    Q   Okay.  But was --

12    A   I don't think our team did.

13    Q   Was this Ms Beine, I guess is what I'm

14  asking.

15    A   Beine -- what's your question with regards to

16  her?

17    Q   I know there was an expert that went with

18  Ms. Gatnarek to Frankfort PSP to, I think, to

19  discuss the --

20    A   I don't have any knowledge of that.

21    Q   The polygraph of Mr. Lawson and Mr. Helton.

22    MR. SLOSAR:  Objection to form.

23    Q   All right.  Jessica Gibson, who is she?

24    A   Harlan County investigator.

25    Q   Okay.  Was she part of the team that --

1    A   Yes.

2    Q  -- worked on the file?  That's all I'm going

3 to ask you about that one.

4    A   Okay.  Do you get these back, or...

5    Q   You're going to give them to the court

6 reporter, okay?

7    A   Okay.

8    MR. WRIGHT:  :  Are you just finished with

9 that exhibit are you done altogether?

10    MR. KELLEY:  I'm not done altogether.

11    MR. SLOSAR:  Okay.

12    MR. KELLEY:  Look at this, Counsel, will you

13 please?

14    MR. SLOSAR:  Do you have copies?

15    MR. KELLEY:  Was that intended to be revealed?

16    MR. SLOSAR:  Oh.  Can we take a break?

17    MR. WRIGHT:  Yeah.  Let's go off the record.

18       (OFF THE RECORD)

19    MR. SLOSAR:  As we noted when we produced

20 documents in this case, we were producing those

21 documents with the understanding that we're not

22 waiving the work product or attorney-client

23 privileges.  We have no objections to you asking

24 Ms. Evans about the contents of the documents that

25 you've showed me.  We do have an objection based on

1    privilege as to any communication she would've had

2    with members of the defense team after she wrote

3    these documents.  But if you ask her about these

4    various to do lists, I'm sure she'll describe the

5    steps she took during the investigation.

6  BY MR. KELLEY:

7    Q    I'm going to hand you what I've marked as

8  Exhibit 6.  It's PL034627-628.  Have you seen this

9  document before?

10         (EXHIBIT 6 MARKED FOR IDENTIFICATION)

11    A    I'm sure that I have.  These are my

12  handwritten notes --

13    Q    Yeah.

14    A    -- and this is a letter -- cover letter for

15  something that I sent to an attorney.

16    Q    One thing I was confused about.  I found,

17  obviously, these next to each other.

18    A    Uh-huh.  They do not belong together.

19    Q    That was my question.

20    A    Yes.

21    Q    Okay.  So you sent -- at one point you sent

22  Ms. Carnes a report?

23    A    Uh-huh.

24    Q    Or if I may ask this question: What was in

25  that report?

1    MR. SLOSAR:  Objection.  Privileged.  Don't

2  answer.

3    Q    Okay.  What photographs did you send her?

4    A    They would have been photographs from the

5  discovery.

6    Q    Do you remember what photographs you may have

7  sent in March of 2013?

8    A    Not without looking at the report, no.

9    Q    Normally if I were looking at your file,

10  would you expect the report to be with the letter?

11    A    I don't know that I would've attached it.  I

12  may have put the cover letter and the report into a

13  file together.  I would assume they would be, you know,

14  next to each other.  But as far as did I staple it or

15  attach it in any way, I don't know the answer to that.

16    Q    In other words when I organize things, I keep

17  correspondence separate from investigating material.

18  Is that the way you do it or do you --

19    MR. SLOSAR:  Objection to form.

20    A    You know, correspondence, I'm sure I created

21  a file for correspondence.  Probably created a file for

22  reports, although most likely I put those into the

23  specific file that they belong to as far as the

24  individual or --

25    Q    Okay.  Well, then let's look at 628.  Who's

1  Bonnie?

2      A    Bonnie is a nurse at the Knox County

3  Detention Center.

4      Q    Okay.  And what -- is this medication she's

5  giving Amanda or what is this about, the initial note?

6      A    I believe that -- I believe that during this

7  time, Amanda was in the Harlan County Detention Center.

8  She had been transported to the Knox County Detention

9  Center for court purposes, and they didn't transport

10  her medications with her.  So her mom picked those up

11  and dropped them off, and that's what I believe this is

12  about.

13      Q    Okay.

14      A    So I had a conversation with Bonnie.

15      Q    Okay.  So, in other words, you have a sheet

16  of paper where you're writing down during a given day

17  the phone conversations you might have with --

18      A    That certainly could happen, and that's --

19      Q    Okay.

20      A    And who I was talking to and what we were

21  talking about.

22      Q    In other words, do you have a specific way of

23  recording phone conversations or are you putting notes

24  from a phone conversation?

25          MR. SLOSAR:  Objection to form.  Foundation.

1    A    Normally if I deemed it was something

2    relevant and noteworthy, I would generate a note.

3    Q    Okay.  Did you talk with -- the next note

4    concerns Mike Broughton.  Did it -- were you talking to

5    Mike Broughton?  Do you remember was that Mike

6    Broughton?

7    A    The only time I talked to Mike Broughton was

8    when I subpoenaed him, and this was probably in

9    reference to, you know, I had to subpoena these people

10   multiple times, multiple trials, and I believe that

11   that note was probably just that I needed to look for

12   him because he was no longer at the police department.

13   Q    Okay.  What does this next note concern?

14   A    A male that's file a lawsuit against the Knox

15   County jail because the nurse did not administer his

16   meds for one week and he had a heart attack.  I don't

17   remember who told me that, but I believe that probably

18   the reference was made into -- or due to the fact that

19   Ms. Hoskins had some ongoing medical issues and we felt

20   like they were not being -- that she wasn't getting the

21   proper treatment she should be getting and I --

22   somebody's told me that and I wrote it down.

23   Q    Okay.  So it has no specific relevance to the

24   murder investigation?

25   A    Other -- right.  Other than just the urgency

1   that she needed treatment that we didn't feel like she

2   was getting.  I think that's what it was relevant to at

3   the time.

4      Q   Guards pass out meds and nurse part time, is

5   that what you --

6      A   "Nurse pass out meds.  Nurse part time

7   through the county."  She, I guess, is not an official

8   employee of the -- or she's not an employee of the jail

9   specifically but of the county.

10      Q   I would, again, assume that had more to do

11   with her detention and getting her the right medication

12   than it had to do with the murder investigation?

13      A   Yes.

14      Q   Okay.  I think this is 7.  Am I right?

15       ( EXHIBIT 7 MARKED FOR IDENTIFICATION)

16      A   Yes.

17      Q   I got the impression from looking at Exhibit

18   7 that, first of all, this is your handwriting, and

19   second of all, this was a thing to do or maybe just

20   a --

21      MR. SLOSAR:  Objection to form.

22      A   Notes to myself, a to do list.

23      Q   Okay.  All right.  You were listing things

24   that you felt were exculpatory of your client Amanda

25   Hoskins; is that correct?

1    A   Yes.

2    Q   All right.  I can't read the first one.

3    A   "Tip line call in tip line what was there."

4    Q   What is that?

5    A   I had a conversation with one witness, Amber

6 Simpson, who, and her parents.  Her mother and father,

7 who told me repeatedly that she was told that she would

8 be given a cash reward in exchange for her testimony

9 and she told me that there were two sources for that

10 reward.  One was from a crime stop or some sort of tip

11 line, and the other was to come directly from the

12 family.

13    Q   Okay.  Who --

14    A   And I did not have any -- that was not part

15 of the discovery, and other than that source, I wanted

16 to follow up and see if that was the case.

17    Q   Okay.  Number one, what did you find out?

18    A   We addressed that issue in court on several

19 occasions and I think specifically Sam multiple times,

20 Cox, for Jonathan Taylor, and we were told that that

21 was not -- that there was no such -- that never

22 occurred.

23    Q   All right.  Did you ever find out who told

24 Amanda, or led Amanda Simpson to believe that she --

25    A   Amber said that Jason York told her that

1  there was a reward offered.

2      Q    Okay.  The rental car records, I assume, are

3  -- you're looking at the date and time of the rental

4  car records for Michael Simpson and Allen Helton?

5      A    Who rented it, yeah, all that -- everything

6  there is to know about a car.  It was not part of the

7  discovery, so --

8      Q    Okay.  Do you know what all recorded

9  statements were?

10     A    Yeah.  I felt like there were multiple

11 recorded statements missing from the discovery when I

12 reviewed my initial review of the discovery.

13     Q    Which report -- do you know off the top of

14 your head which recorded statements you felt were

15 missing?

16     A    I made a list of them.  Certainly, two

17 recordings for Michael Crump, recordings from Allen

18 Helton.  I'd have to go back and look at the discovery

19 now, but I felt like there were several.

20     Q    Did you think there was more than one from

21 Allen Helton?

22     A    Possibly.

23     Q    Okay.  Why did you think that?

24     A    Because of the number of times that I was

25 told that the officers went to their residence and

1    other locations and I believe, even in the grand jury,

2    Mr. York said that he went there repeatedly and

3    harassed these people often.  So...

4        Q    He said they harassed them during --

5        A    Something to that effect.  You'll have to

6    read it but there's a reference made in there about,

7    you know, how persistent he was.  I'll say it that way.

8        Q    Okay.  There's one where it's recorded with

9    Allen Helton and Sheriff Pickard's in the room.  He's

10   actually, I think, identified on the recorded

11   statement. Did you hear that one?

12       A    If that was the one from the DUI arrest, then

13   yes.

14       Q    Juvenile records-- I'm sorry.  Any other

15   recorded statements you think were missing off the top

16   of your head?

17       A    I feel like I believe there were multiple

18   recordings possible -- you know, several, but I don't

19   recall specifically at this time which.

20       Q    Do you know of any that either would've been

21   taken by Sheriff Pickard, members of the Knox County

22   Sheriff's Department or ones where they would've been

23   present?

24       MR. SLOSAR:  Objection to form.  Calls for

25    speculation.  Foundation.

1      A    I don't.  I don't know of any off the top of

2  my head, no.

3      Q    Okay.  Why did you want to see the juvenile

4  records on Amber Simpson?

5      A    I had information that she had some legal

6  issues and that potentially those were a factor in her

7  statements.

8      Q    I'm sorry.

9      A    I had information that Ms. Simpson had some

10  legal issues that were pending and, in fact, when she

11  was at the -- when she was interviewed by, which is

12  probably how I gained it initially, interviewed by Mr.

13  York at the Alternative School which indicates an issue

14  of some sort. So I believe that I thought those were

15  relevant because those may have played into the

16  statement that she had given Mr. York.

17      Q    What did you find out?  Did you get them?

18      A    I don't believe that we got them but I'm not

19  certain.  I don't recall whether they did or did not.

20      Q    All right.  Next is the polygraph recordings.

21  Did you actually get those?

22      A    Yes.  I got those.

23      Q    Okay.  For both Mr. Lawson and Mr. Helton?

24      A    Yes.

25      Q    Okay.  Did you -- what was your own

1    impression of Mr. Helton's credibility?

2        MR. SLOSAR:  Objection to form.

3    A    My impression was that his story changed

4    every time I spoke with him and, you know --

5    Q    Do you think -- I'm sorry.

6    A    I think if he would say what he needed to to

7    help himself at the time he was being, you know, if he

8    could gain some -- if he could gain some assistance

9    somehow, he'd be happy to do that, to tell you

10   whatever.

11   Q    All right.  Well, you were aware that he at

12   least failed the test as to the having any knowledge as

13   to Ms. Mills' murder that came --

14   A    Yes.  I'm aware of that.

15   Q    Okay.  Rewarded, was that different from the

16   tip line or...

17   A    Yes.  Just that there were two sources given

18   by Ms. Simpson about where this money would come from

19   and one was there was a tip line set up and then there

20   would be a second source.  I think there was a -- she

21   gave me a phone and I don't recall what it was.  I

22   believe that she said was being offered by the son of

23   Ms. Mills.  And I believe that issue was brought up in

24   court on more than one occasion.

25   Q    Next has to do -- interview or info from all

1    drug dealers on Stinking Creek, and you said down at

2    the bottom, especially Bob Smith.  So this would've

3    come before you talked to Bob?

4        A    I would assume so.

5        Q    Who are all the drug dealers on Stinking

6    Creek?

7        A    Well, that's what I wanted to know.  That was

8    what was in the discovery, I think, at -- and I'm not

9    sure maybe even from multiple sources of discovery from

10   Mr. York that he had talked or spoke with all the drug

11   dealers on Stinking Creek, and I -- and there were no

12   recordings, no names, identifying information at all

13   from Mr. York in the discovery.  So it was my goal to

14   learn who those people were.

15       Q    Well, you put down especially Bob Smith, and

16   actually it looks kind of different.  I don't know but

17   --

18       A    I believe that's mine and it probably is

19   because I heard his name as being a drug dealer on so

20   many occasions.  Just that there were repeated attempts

21   with him.

22       Q    Was Jeff Gray ever identified as being a drug

23   dealer on Stinking Creek?

24       A    I don't know if he was identified as a part

25   of Ms. Hoskins' case.  Certainly was identified in Mr.

1    Anderson's case.

2        Q    Was he identified as a drug dealer, or

3    somebody who took lime and a shovel up to the murder

4    scene?

5        A    Do I identify him that way?  I think he was

6    both.

7        Q    Okay.  I understand but did you know him to

8    be a drug dealer before you talked to him?  I think you

9    would've talked to him had he just been seen on the --

10   and just because he's --

11       A    I attempted to talk to him.

12           MR. SLOSAR:  Objection to form.

13       A    I was never able to locate him.

14       Q    Okay.

15       A    But I certainly attempted to talk to him.

16       Q    All right.  What other drug dealers did you

17   talk with in the course of your investigation?

18       A    I'd have to review my records for names.

19       Q    All right.

20       A    They're, you know, they're Knox County

21   people, but Cleo Brown was alleged to be a drug dealer.

22   I believe her son, and I can't recall his name.

23       Q    Which Brown was he -- okay.

24       A    I can't recall his name.

25       Q    But he's a Brown, right?

1    A    I believe so, yes.

2    Q    Okay.

3    A    There were others and they should be -- those

4  names should be contained within some of the records

5  that I turned over.

6    Q    Any of those suspected drug dealers tell you

7  of a -- either a pay to play, or a kickback kind of

8  scheme?

9       MR. SLOSAR:  Objection to form.  Asked and

10      answered.  Other than what she testified to

11      earlier?

12      MR. KELLEY:  Well, I thought she's now

13      including a list of others beyond those she named.

14      MR. SLOSAR:  Okay.

15    A    No.  I'm not.  I would have --

16  BY MR. KELLEY:

17    Q    Oh, I --

18    A    I would have -- I mean, as far as the pay to

19  play, there were other drug dealers, certainly,

20  mentioned. And probably interviewed, but as far as ones

21  that told me that there --

22    Q    I'm sorry.  Maybe what I'm trying to ask you,

23  you said Cleo Brown was somebody else who was a

24  suspected drug dealer that you talked with.

25    A    Uh-huh.

Q    Did she tell you of a kick-back scheme or
kind of --

A    No.

Q    -- a pay to play?

A    Not that I recall.  No.

Q    All right.  You mentioned that her son may
have been a drug dealer, did he also -- did you ever
run him down?

A    I believe that we talked.  I believe so.

Q    All right.  Did he tell you that information?

A    Not that I recall.

Q    All right.  Likewise, and I think you're
telling me you may have talked to other drug dealers
whose name you can't remember; is that fair or is that
wrong?

A    That's fair.

Q    Okay.  Do you remember any of those drug
dealers, whatever their name might be, telling you
there's a pay to play or kick-back scheme in Knox
County?

A    Not from my recollection.

Q    Okay.  Next one is general interviews with
Jessie Lawson.

A    Several interviews with Jessie Lawson.  I
believe at the bond hearing Mr. York testified that

1   there were several interviews with Jessie Lawson and I

2   probably was inquiring to whether or not -- or intended

3   to inquire as to whether or not any of those were

4   recorded is my best guess from this note.

5      Q   What'd you find out?

6      A   I know that there were multiple interactions

7   between the two, Mr. York and Jessie.  I do not recall

8   whether or not I learned of other recorded statements.

9      Q   Okay.  Do you know of any additional

10   interviews he may have had where Sheriff Pickard was

11   either present or conducting the interview?

12      A   I believe that he was, but that's I'm going

13   from recollection.  I don't -- I can't say with

14   certainty.

15      Q   All right.  You did a criminal background

16   check of Allen Helton, is that what you're suggesting

17   to me --

18      A   I wanted to do an -- I wanted to run an NCIC

19   on Allen.  I don't believe I did that.

20      Q   And I don't know what victim --

21      A   I was surprised that there was not a victim

22   phone record in -- there were lots of phone records,

23   but the victim's phone record was not there.  Just as a

24   -- I mean, if I were an officer, I'd like to know who

25   she -- maybe who she talked to last, or -- it wasn't

1   there, and I wondered if they collected it and had they

2   not collected it was it too late for me to do that.

3       Q    What did you find out?

4       A    They had -- they did not collect it.

5       Q    Uh-huh.

6       A    And I believe the phone company -- I did not

7   collect it.

8       Q    Okay.  You wanted to do a KASPER report,

9   background report for whom?  I assume KASPER meaning

10  the medication log?

11      A    Uh-huh.  I'm not sure if that's a note as to

12  Mr. Helton or who that was in --

13      Q    How about --

14      A    -- reference to.

15      Q    Well, it's a cross also from a statement of

16  Wesley Roark?  Did it have anything to do with Wesley

17  Roark?

18      A    It very well could have.  You know, I don't

19  know at this point what those --

20      Q    And what the word "confessed" means?

21      A    If I knew when I wrote this, and I don't,

22  there's no note on there, I might be able to pinpoint

23  that.  There were statements that a couple of

24  individuals maybe also Browns but I'm not 100 percent

25  sure on that, of individuals that had confessed to this

1  incident.  And there was nothing in the discovery as to

2  that.

3      Q    Okay.  All right.  That's number 7.  I meant

4  to say that it's Bates stamp number PL014449.  All

5  right. Let me hand you what is number 8.

6          ( EXHIBIT 8 MARKED FOR IDENTIFICATION)

7      A    I don't think we did a few of those.  You may

8  not need to, but we didn't review these.

9      Q    You didn't review that?

10     A    Out here.  We just looked at these two, this

11  and there.

12     Q    I meant to give you -- I didn't give it to

13  you?

14         MR. SLOSAR:  Yeah.  Wait a minute.  Read that.

15     A    Did we look at these.  Okay.

16         MR. KELLEY:  Okay.

17         MR. SLOSAR:  Yep. Just look at the bottom.

18     A    OK, yes.  Sorry.

19  BY MR. KELLEY:

20     Q    Do you recognize what's been marked as

21  Exhibit

22  8?

23     A    It looks like my handwriting.  It looks like

24  some notes from the case.

25     Q    Okay.  The 12-20-2010 obviously you weren't

1  writing -- hand writing  the date?

2     A   No.  That's the date of Ms. Mills' death.

3     Q   I'm presuming you did not begin your

4  investigation until --

5     A   No, sir.

6     Q   -- after she was arrested that night?

7     A   That's correct.

8     Q   Okay.

9       MR. SLOSAR:  Objection to form.

10     Q   Okay.  Both cases -- when you say, "both

11  cases," are you referring to Jonathan Taylor or what

12  are you referring to, or does that word say, "both

13  cases"?

14     A   It does say, "Both cases."  Sorry about my

15  handwriting.  And I don't know what it's in reference

16  to.

17     Q   Okay.  Incomplete discovery was the first red

18  flag; is that what you're saying?

19     A   Uh-huh.  Yes.

20     Q   Alleged eye witness with two missing --

21     A   Statements.

22     Q   -- statements.  No contact information for --

23     A   Eyewitness.

24     Q   I can't read that.  Mr. Something Withers?

25       MR. SLOSAR:  No.  It says, "eyewitness."

1    Q    Eyewitness.

2    A    Eyewitness.  Sorry.

3    Q    Beg your pardon.  Okay.  The reference, I

4  take it is to Mr. Crump?

5    A    That one yes, correct.

6    Q    Okay.  You located him, I guess?

7    A    I did.

8    Q    All right.  Others failed polygraph.  Do you

9  mean others besides Mr. Lawson and Mr. Helton?

10    A    I know it was probably a note for me to look

11  into that.  Were there any other polygraphs period or

12  failed polygraphs by any other individuals other than

13  those two.

14    Q    Are you aware of anybody else taking a

15  polygraph?

16    A    I am not.

17    Q    Okay.  Maybe you'd best read the next one.

18    A    "Others far better suspects."

19    Q    Okay.  And are you talking about Mr. Helton

20  and Mr. Simpson, or who do you --

21    A    Certainly, those would've been on the list.

22    Q    Okay.  Who else would've been on the list?

23    A    I'd have to go back and review the file to be

24  sure.

25    Q    Did you consider Jessie Lawson to be a --

1     A    I did look at Jessie Lawson as a potential

2  suspect, yes.

3     Q    Anyone else you can remember off the top of

4  your head as being --

5     A    Not off the top of my head.

6     Q    Okay.  The reference down on Helton and the

7  DUI, do you know what that has to do with it?  Did you

8  want to check the record?

9     A    Probably was there.  Probably check the

10  record, find out what happened with the DUI, and was it

11  -- was the investigation recorded or the interview

12  recorded.

13     Q    Okay.  Do you know what Mr. Crump denied?

14     A    He denied a lot of things from what I recall,

15  but what I was referencing in this note, I don't know.

16     Q    Okay.  Did you consider what you heard from

17  Mr. Crump to be reliable?

18     MR. SLOSAR:  Objection to form.

19     Q    Maybe credible is a better --

20     MR. SLOSAR:  Same objection.

21     A    I did not.

22     Q    Whose medical records are you talking about?

23     A    Probably Ms. Mills.  Her grandson had made

24  reference to a health condition during his interview

25  and that, I assume was probably what that meant.

1    Q   Did you reach a conclusion as to whether she

2  was murdered?

3    A  I did not.

4    MR. SLOSAR:  Objection to form.

5    A  I'm sorry.

6    Q   Or whether she thought it could've been an

7  accident that she fell.

8    MR. SLOSAR:  Objection to form.

9    A   Yes.

10    Q   Okay.  Mike and Allen, are you trying to find

11  out whether they made the payments on these various

12  things?  When you say, "Mike and Allen rent, car rental

13  and utilities"?

14    A   Was I trying to discover if they made those

15  payments; is that your question?

16    Q   Well, what is the reference to there?

17    A   That's probably what the reference was to

18  check and see if they made any of those payments on or

19  near that date.

20    Q   Did you?

21    A   Yes.

22    Q   Did you think it corroborated your belief as

23  to whether or not they were involved?

24    A   Yes.

25    Q   Okay.  Dr. Warren, I assume you wanted to get

1    a statement from him?

2      A   I did, but I believe from this, it looks like

3    from this, I was making notes as I went through the

4    discovery, and Dr. Warren, there was a reference from

5    Mr. York in one of his reports that he had gone to

6    speak with

7        Dr. Warren, and that Dr. Warren refused to

8    give him an interview and stated that he would give him

9    a letter in lieu of that, and that was not in the

10   discovery.  So my question was: Did that -- did he get

11   a letter and where was it.

12      Q   Okay.  And ultimately you talked with -- you

13   actually get a recorded statement from Dr. Warren?

14      A   Yes.

15      Q   Did you talk to him more than once yourself?

16      A   I did.

17      Q   Okay.

18      A   You know, it happened that every time I

19   subpoenaed people we would have some conversation and I

20   did that on many occasions.

21      Q   Okay.  Well, on those many occasions, I'm

22   particularly interested in what additional information

23   you might have found out about Sheriff Pickard's or the

24   Knox County Sheriff's Department's involvement.  Do you

25   remember any occasions in talking with witnesses where

1 you felt, ah, this is something that Sheriff Pickard

2 didn't disclose, or Sheriff Pickard did outside of what

3 you would consider proper investigation?

4      MR. SLOSAR:  Objection to form.

5    A    I don't recall.

6    Q    Okay.  All right.  I saw you accumulated

7 medical records concerning Ms. Hoskins in 2014 and '15.

8 What was your purpose?

9      MR. SLOSAR:  Objection to form.

10    A    I had knowledge that she was involved in a

11 car accident was one reason, and I believe that I was -

12 - you know, without reviewing the specific records or

13 my notes, I'm not -- I don't know.  I know that it's

14 pretty common practice to request a large volume of

15 records, you know, to examine in case they are

16 relevant.  Not necessarily thinking, you know, on the

17 front end, that they would be. You know, we use -- we

18 do that for a couple of reasons. We also do it with

19 education records, so if there's any mental health

20 records or anything like that we might want to obtain

21 a, you know, another expert to come onto the case.  I

22 would have to see the records and the notes about, you

23 know, what we requested.

24    Q    Do you remember retaining any experts such as

25 that in Ms. Hoskins' case?

1    A    I do not recall retaining.

2    Q    Okay.  Did any of the records prove to be

3 relevant, at least from your perspective, relevant to

4 the criminal investigation?

5    A    Well --

6        MR. SLOSAR:  Objection to form.

7    A    -- certainly, the record about her visits

8 with Dr. Warren and whether or not she was there the

9 day that this incident happened.  We certainly would've

10 requested that.  For obvious reasons, we would've

11 requested that, and we did.

12    Q    Uh-huh.

13    A    And I do feel like it was relevant.

14    Q    Okay.  Any other records that you considered

15 relevant to your investigation?

16    A    Not that I recall.

17    Q    Okay.

18    A    Some of them also may have been from her

19 illnesses while she was incarcerated, maybe.

20    Q    They were.  You're correct.  Did you consider

21 those relevant to your criminal investigation?

22        MR. SLOSAR:  Objection to form.

23    A    Not necessarily to the investigation --

24    Q    Okay.

25    A    -- into the murder, no.

1    Q   What relevance did they have, as from your

2 perspective?

3    A   Whether or not we needed to take further

4 steps to get her treatment in the jail.  How serious

5 her condition was and whether or not we needed to do

6 anything else on that.

7    Q   Okay.  Did you?

8    A   I don't recall.  I would've turned over what

9 I found to the attorneys.  I don't recall any other

10 steps being taken but I'd have to look at the records.

11 I don't recall though.

12    MR. KELLEY:  Okay.  You've worn me out.  I

13    don't have any more questions, but I've got to give

14    it up to these guys.

15    THE WITNESS:  Okay.

16    MR. KELLEY:  Thank you very much.

17    MR. WRIGHT:  You okay to continue, or do you

18    need a break?

19    THE WITNESS:  Yeah.  I'm fine.

20    MR. WRIGHT:  Okay.  Let me know if you get to

21    a point where you need to stop.

22    THE WITNESS:  Okay.

23        EXAMINATION

24 BY MR. WRIGHT:

25    Q   My name's Derrick Wright.  I represent

1    Detective York and Jason Bunch in this case.  I'll try

2    not to rehash what we went over.  There might be a few

3    things where I didn't catch everything, but we'll jump

4    around a little bit, okay?

5        A    Okay.

6        Q    Did you listen to any tapes or recordings to

7    prepare for today's deposition?

8        A    No.

9        Q    And the only thing you reviewed was the Bob

10   Smith report you prepared that's Exhibit 3?

11       A    Yes.

12       Q    How long have you worked at the Department of

13   Public Advocacy?

14       A    As an official full-time employee since 1998,

15   so 20 years.

16       Q    How many cases have you worked on, 50-plus?

17       A    Oh, a lot more than 50.

18       Q    Okay.  I know they get a lot of cases, so you

19   think over 100?

20       A    Yeah.  Oh, yes.  Easy.

21       Q    Over 1,000?

22       A    Yes.

23       Q    All right.  That's more than enough.  Have

24   you had any discipline at the department?

25       A    No, sir.

1    Q    Any complaints against you?

2    A    No, sir.

3    Q    Have you ever been removed from a case?

4    A    No, sir.

5    Q    Are you aware of anybody at the DPA, an

6  investigator, who's been removed from a case for any --

7    A    Any case?

8    Q    Yeah.  For a disciplinary reason?

9    A    Yes.

10   Q    You do?  Who was that?

11   A    Valerie Bryant.

12   Q    When did that happen?

13   A    That was -- it was during the King case in

14  Jackson County.  So Irvin King was the defendant in the

15  case.  It was a capital case, and his -- one of his

16  initial investigators was Ms. Bryant.  I was contacted

17  by the department sometime after the case -- the --

18  this case was pending for quite some time.  I was not

19  initially on the case.

20   Q    What year was it; do you know?  Before this

21  one? Before the Katherine Mills?

22   A    Oh, yeah.  15 years ago.

23   Q    Okay.  Go ahead, I'm sorry.

24   A    That's okay.  Approximately 15 years ago.

25   Q    Okay.

1     A    12 maybe.  And I don't recall the specific

2  allegations against Ms. Bryant, but I think at some

3  point the Court even instructed that all of DPA be

4  removed from that case based on some allegations that

5  Mr. King had made.  They retained -- the department

6  retained private counsel which was Mr. David Hoskins,

7  and an -- or I'm sorry, an attorney in Richmond.  What

8  was his name?

9     Q    Is that a part of the record?  We don't have

10  to put it down.

11     A    It is certainly a part of the record.

12     Q    Okay.  If that case -- all right --

13     A    And I was just called and asked by the

14  department to review all the records to see if all the

15  investigation had been completed, and so I kind of got

16  into it from there.

17     Q    Any other issues of discipline that you're

18  aware of investigators with the department?

19     A    Not that I'm aware of, no.

20     Q    You work for the attorney who's assigned to

21  represent indigent defendant, correct?

22     A    Yes, sir.

23     Q    Okay.  Do you consider that criminal

24  defendant your client like the attorney would?

25     A    I do.

1    Q    Okay.  Your duty is to the client, correct?

2    A    Yes.

3    Q    In upholding that duty, if you find

4    incriminating evidence against your client, do you

5    report that to police?

6         MR. SLOSAR:  Objection to form.

7    A    No.  I report it to the attorney.

8    Q    Right.  Have you ever reported incriminating

9    evidence of one of your clients to police?

10   A    No.

11   Q    Have you ever found incriminating evidence

12   one of your -- from a witness involving one of your

13   clients?

14   A    From a witness?

15   Q    Yeah.

16        MR. SLOSAR:  Objection to form.

17   A    I'm sure -- sure.

18   Q    Sure you have, right?

19   A    Yeah.

20   Q    I know, over thousands of cases, it's surely

21   come up, right?

22   A    Sure.

23   Q    And you've never reported that to law

24   enforcement, right?

25   A    No.

1    Q    Is it also part of your job that if there's

2  evidence against your client that you try to discredit

3  that evidence?

4         MR. SLOSAR:  Objection to form.

5    Q    Is that fair?

6    A    I would certainly follow up on any --

7  anything negative or positive against the client that,

8  you know, seemed important or --

9    Q    If a witness said that your client has

10  confessed, are you going to look into the credibility

11  of that witness?

12        MR. SLOSAR:  Objection to form.  Incomplete

13   hypothetical.  You can answer.

14   A    I believe the answer is yes.

15   Q    Yes.  So you're going to look for bias?

16   A    Sure.

17        MR. SLOSAR:  Same objection.

18   Q    Lack of memory.  Maybe they're intoxicated.

19   A    Sure.

20        MR. SLOSAR:  Objection to form.

21   Q    Look into credibility of the police officer?

22        MR. SLOSAR:  Objection to form.

23   A    Certainly I would.

24   Q    That's just part of your job, isn't?

25   A    Yes.  It is.

Q    You talked a little bit about your training

at the department.

A    Uh-huh.

Q    Is it appropriate to coach witnesses when you

interview them?

     MR. SLOSAR:  Objection to form.

A    No.

Q    Is it appropriate to have them rehearse

statements?

A    No.

Q    Is it appropriate to feed them information?

A    No.

Q    Do you ever share your beliefs about the case

with witnesses?

     MR. SLOSAR:  Objection to form.

A    I don't -- I can't give you a specific

instance when I did, but I certainly wouldn't say

without a doubt no.

Q    Do you discuss evidence with witnesses,

evidence that they may not know?

     MR. SLOSAR:  Objection to form.

A    Not any that I recall.

Q    You said, I believe in prior testimony that

some, maybe not all, but some of the fact gathering by

each of the criminal defense teams in the Mills case

 1   was shared; is that fair?

 2       A    That's fair.

 3       Q    Did you review any recorded interviews by

 4   Josh Powell, listen to them?

 5       A    I believe so.

 6       Q    Did you listen to any recorded interviews by

 7   Del Dorning?

 8       A    No.

 9       Q    Do you know who Dale Dorning is?

10       A    I know he's an investigator.

11       Q    Is he with DPA?

12       A    No.

13       Q    Do you know whether he was an investigator in

14   this case?

15       A    I believe he was an investigator for Sam Cox

16   for a brief period of time.

17       Q    You had no interactions with him?

18       A    No.

19       Q    Was he off the case before you were on it?

20       A    No.  He was -- I think I was on the case

21   before any of their investigators, maybe.  That might

22   not be accurate.  I believe I met Dale during one of

23   the court hearings, but we didn't, other than maybe hi

24   or something, we never had --

25       Q    Nothing substantive?

1    A   No.

2    Q   Okay.  Do you ever misrepresent who you work

3  for to try to get witnesses to talk to you?

4    A   No.

5       MR. SLOSAR:  Objection to form.

6    Q   Do witnesses ever misunderstand who you work

7  for and you allow that misunderstanding to continue so

8  they'll talk to you?

9       MR. SLOSAR:  Same objection.  You can answer.

10    A   I do my best to make it clear who I am.  I

11  generally give everyone that I talk to a card and tell

12  them who I am.  I've certainly encountered people who

13  were -- who appeared to not understand no matter what I

14  said or how many times I said it.    Q   Do you tell

15  witnesses that you're recording them, or do you do that

16  secretly?

17    A   Sometimes I do and sometimes I don't.

18    Q   I believe you testified that it's possible

19  that you may not have documented every witness that you

20  interviewed in the Mills case; is that fair?

21    A   That's fair.

22    Q   Sitting here today, you don't know which ones

23  you documented and which ones you didn't?

24    A   If I had an extensive conversation with

25  someone, I would have documented that.  If I went to

1    speak to someone and they said, "No.  We don't know

2    anything," or "No.  I can't help you," or whatever, I

3    may or may not have written that down.

4        Q    If a witness gives you the same thing they

5    said before, do you document that -- document it again?

6        MR. SLOSAR:  Objection to form.

7        Q    Might that be a time where you just rely on

8    the prior document and move on?

9        MR. SLOSAR:  Same objection.

10    Q    Is that fair?

11    A    That's fair.

12    Q    Have you ever had, and I know you've had a

13    lot of cases, have you ever had a witness tell you

14    something in your instigation but then change their

15    story at trial?

16    A    Yes.

17    Q    How often does that happen?

18        MR. SLOSAR:  Objection to form.

19    A    At least 50 percent of the time I would say.

20    Q    Okay.  Does it tend to happen more with

21    witnesses who are inmates?

22        MR. SLOSAR:  Objection to form.

23    A    I've never really thought about that to be

24    honest with you.  Certainly could.

25    Q    Yeah.

1    A    If you don't know, I'm just asking you what

2  your impression is.  If you don't have an impression

3  one way or the other that's okay.

4    Q    Okay.  Have you ever had a witness that you

5  interviewed ask not to be recorded before they'll talk

6  to you?

7    A    Not from my recollection.

8    Q    I don't want to go back into the privilege

9  fight that we fought here, but I do want to ask, there

10  was a mention to a joint defense agreement.  Have you

11  ever heard anything of that?

12    A    Joint defense agreement as far as with the

13  three defendants in this?

14    Q    Yes.

15    A    I think there was a verbal agreement that if

16  -- I can't -- I don't -- I mean the attorneys talked

17  about this and between themselves, not in my presence.

18  But there were certainly -- I think every attorney

19  would probably have a little apprehension about -- in a

20  case like this, a capital case like this, for sure,

21  about working across.  It was this case, to me, was so

22  unusual. You know, almost every codefendant case I've

23  been involved in at some point somebody's pointing

24  their fingers, and that never happened in this case.

25  So we felt confident that we could work with each

1    other.  I think if there was an agreement, it seems

2    like there may have been some sort of verbal agreement

3    that if there was ever a time when that was -- the

4    agreement to work together was going to cease or stop,

5    that we would maybe not use information gathered from

6    another person in the -- or another team.

7        Q    As a general rule, have you been trained in

8    privilege as part of your training with the department?

9        A    Yes.  I wouldn't -- I mean it's not an

10   extensive thing but, certainly.

11       Q    Do you understand from your training that if

12   you talked to a codefendant who is not your client that

13   that is not privileged?

14       MR. SLOSAR:  Objection to form and calls for a

15    legal conclusion.

16       Q    You can answer the best you can.

17       A    I would say that would certainly be the case

18   if we were not in an agreement to work together,

19   certainly I would think, could be wrong.

20       Q    Have you ever had -- been on any case where

21   there was any type of agreement like you're describing

22   now?

23       MR. SLOSAR:  Aside from this one?

24       MR. WRIGHT:  That's what I said.

25       A    I've been in cases where, you know,

1  defendants, codefendants work together before but as

2  far as, you know, any type of actually discussing an

3  agreement, no.

4      Q    Did you ever interview Mr. Taylor?

5      A    Jonathan Taylor, no.

6      Q    Did you ever interview William Lester?

7      A    No.

8      Q    Did you ever sit in or witness an interview

9  of either of those?

10     A    No.

11     Q    All right.  That kind of answers the question

12  anyway.  Thanks.

13     A    Sure.

14     Q    We talked about incriminating evidence.  Did

15  you ever get any incriminating evidence from a witness

16  relating to your client, Amanda Hoskins?

17         MR. SLOSAR:  Objection to form.

18     Q    Do you understand what I meant by

19  incriminating?

20     A    I do.  As far as this case goes, or in

21  general?

22     Q    As far as this case goes?

23     A    No.

24     Q    What about did you interview Amber Simpson?

25     A    I did interview Amber Simpson.

1 Q And did she confirm that Jonathan Taylor had

2 confessed to her?

3 A She did.

4  MR. SLOSAR: Objection to form.

5 A Without reviewing the record, I recall that

6 she admitted that she had made a statement to Mr. York

7 and that she was standing by that statement.

8 Q And in that statement, to your memory,

9 Jonathan Taylor had identified Amanda Hoskins as the

10 driver; is that true?

11  MR. SLOSAR: Objection to form.

12 A I don't recall but it certainly could be.

13 Q All right. Would you consider that

14 incriminating?

15 A Yes.

16 Q Did you receive any information from

17 witnesses in your investigation that suggested that

18 your client, Amanda Hoskins, was abusing drugs in

19 December 2010 when Katherine Mills was found dead?

20  MR. SLOSAR: Objection to form.

21 A I'm sure that I was told that she was using

22 drugs.

23 Q Probably more --

24 A If you're asking me what source, I don't

25 know.

1    Q    Would it be fair to say more than one

2  witness?

3    A    Yes.

4    Q    Did you receive information from witnesses in

5  your investigation that around the time of December

6  2010, when Katherine Mills was found dead, that Amanda

7  Hoskins had stolen from others?

8        MR. SLOSAR:  Objection to form.

9    A    I believe it was part of the discovery that

10  she may have stolen something from some of Ms. Mills,

11  one of Ms. Mills' granddaughters or family member.

12    Q    Michelle Edwards, Michelle Hammonds?

13    A    That sounds right.

14    Q    Did you interview Michelle Hammonds?

15    A    I did.

16    Q    She told you that, didn't she?

17        MR. SLOSAR:  Objection to form.

18    A    She did.

19    Q    Anybody else tell you that Amanda Hoskins had

20  stolen from them?

21    A    No one else told me that.  I was aware of the

22  gun charge and I -- I think that I did some amount of

23  work on that.  I don't recall anyone telling me about

24  it other than my inquiries.

25    Q    Did you talk to John Valdez?

1    A    No.

2    Q    Why not?

3    A    I attempted to locate him a couple of times

4  and was unable to locate him.

5    Q    I believe in the discovery Jessie Lawson

6  identified some instances of theft by Amanda Hoskins;

7  do you recall that?

8        MR. SLOSAR:  Objection to form.

9    A    I do not recall that.

10    Q    Do you recall talking to him at all?

11    A    I did speak with him, yes.

12    Q    Do you recall any discussions with him about

13  Amanda Hoskins stealing items?

14    A    I do not recall that, no.

15    Q    I would like to kind of do that with that

16  same questioning with a few other individuals.

17  Jonathan Taylor, did you receive any evidence from

18  witnesses that incriminated him in the murder of

19  Katherine Mills?

20    A    Other than the witness statements contained

21  in discovery, I don't recall anyone else.  There was a

22  lady that I interviewed at the jail in Knox County, I

23  can't remember her name, that gave me information

24  regarding Jonathan and a lady named Heather.

25    Q    Heather Warren, Heather Carnes?

1    A    Possibly.  Without reviewing the records, I

2  can't be sure on any of it, but it seems like I heard

3  information about that from the source other than what

4  was in the discovery.

5    Q    And you think that may have been a lady by

6  the name of Heather who was an inmate in Knox County?

7    A    She was not an inmate.  Heather wasn't.  This

8  was information about Heather and Jonathan.

9    Q    Heather and Jonathan, okay.  Do you know any

10  -- I know it's been a while since, as you sit here

11  today, any other specifics you know about that?

12    A    I think we got a late CD from Mr. York about

13  that, like really late in the case.

14    Q    Thomas Mikey Brunner?

15    A    See, Mr. Brunner and Mr. Beach were not

16  people that made allegations toward my client and I

17  didn't interview either one of those -- well, I did --

18  no.  I did not interview either one of those witnesses.

19    Q    Okay.  Did you receive any information from

20  witnesses or other sources where you got records from

21  that would tend to indicate that --

22    A    I don't recall.

23    Q    Well, let me finish my question.  Whether

24  Johnathan Taylor was a drug abuser in December 2010?

25        MR. SLOSAR:  Objection to form.

1    A    I don't recall that specifically, but that's

2    -- I mean, I would have to review the record to say no

3    or yes either way.

4    Q    What about whether any information you

5    received that he had -- was -- had stolen from others?

6        MR. SLOSAR:  Objection to form.

7    A    Yes.

8    Q    What was that information?

9    A    I believe there was an allegation from -- I

10    don't know where the information came from.  Maybe

11    something stolen from a Mark Hobbs, but I don't recall.

12    Q    You don't know where that came from?

13    A    No.  Not without reviewing the record.

14    Q    I know she wasn't charged but she was

15    identified in some of the witness statements, Kayla

16    Mills.  Any -- any information that she -- that you

17    received that incriminated her in the murder of

18    Katherine Mills?

19        MR. SLOSAR:  Object to the form the question

20        as it misstates evidence in the record, but you can

21        answer.

22    A    Yes.  You're going to want to know from who.

23    Q    Yeah.

24    A    It seems that there were maybe a low number

25    of multiple sources about her involvement, but I don't

1    recall specifically who they came from.  The lady that

2    I interviewed at the Knox County Jail was one of them,

3    and I don't recall her name.

4        Q    Was it Tasha Abner?

5        A    That may have been the one.

6        Q    Anybody else you recall giving information

7    about Kayla Mills as being involved in the murder?

8        A    I feel like the answer is yes, but without

9    reviewing the record, I can't --

10       Q    You can't recall.

11       A    -- say for certain.

12       Q    What about any information that she was a --

13   was stealing items or stealing from people?

14           MR. SLOSAR:  Objection to form.  You can

15       answer.

16       A    I believe that William Bingham told me that

17   she had stolen items from him.  I don't recall if there

18   were others.

19       Q    Okay.  Take a little bit of a detour here.

20   Detective York, we talked about the Anderson case in

21   this case.  Any other cases that you've been involved

22   in where he was an investigator?

23       A    No.

24       Q    As you sit here today, what would your

25   criticisms, if any, of Detective York be?

1     MR. SLOSAR:  Objection to form.

2     A    I feel like that there's a lot of missing

3   discovery that we never got.  Where to start.  Mr.

4   York. You know, I took issue with the discovery

5   automatically. It was like nothing I'd ever seen

6   before.  I was missing statements, missing pages from

7   reports, I received draft reports in some cases and

8   never final reports.  There was never any reports that

9   were reviewed by a supervisor.  I was really puzzled by

10  the fact that Mr. Taylor had been dressed up and

11  photographed to look like a description. And then from

12  there, I felt like he probably at a minimum misled, and

13  maybe lied to a grand jury to get an indictment against

14  Ms. Hoskins.  I -- he violated HIPPA laws to obtain two

15  separate medical records from two separate locations.

16  And then used one of those and I feel like maybe used

17  one of those to make her look bad because it was long

18  before the incident that we're talking about here

19  today.  I feel like he altered one of the records that

20  he obtained illegally to frame my client for murder, a

21  murder that she didn't commit.  I feel like he probably

22  coerced and threatened witnesses.  In fact, I was told

23  that on many occasions.  Without reviewing the record,

24  I'm not limiting myself to that, but I would have to

25  review the record further.

1     Q    HIPPA applies to the healthcare provider,

2  right?

3     A   Uh-huh.

4     Q   Yes?

5     A   I guess so.

6     Q   Okay.  The grand jury, what parts of the

7  grand jury as you sit here today were inaccurate to

8  your belief?

9     A   I felt like he knew that the blue car at the

10  children's home was not involved.  I felt like that

11  question had been answered by the time he had testified

12  to the grand jury.  I think there was -- I remember

13  it's been a long time since I reviewed that, but I

14  remember thinking all through there that there was

15  certainly misleading statements made probably regarding

16  Dr. Warren and an affair with Dr. Warren.

17     Q   In the grand jury?

18     A   Yes.

19     Q   Anything else about the grand jury as you sit

20  here today?

21     A   I can't recall specifically but I feel like

22  there was multiple things in that grand jury that --

23     Q   The missing discovery, do police -- you said

24  that you don't always document every witness interview,

25  correct?

1    A    Uh-huh.

2    Q    You have to answer yes.

3    A    That's correct.  Yes.

4    Q    In your practice, do police document every

5    single time they encounter a witness?

6         MR. SLOSAR:  Objection to form.

7    A    I mean I would have to speculate probably

8    not, but you would think that an eyewitness and what,

9    you know, their statements, particularly recorded ones,

10   would be important.

11   Q    So the missing discovery you're focusing on

12   Crump?

13   A    Crump, and then I knew there were other

14   recorded statements like from Allen Helton that we

15   received much later on in the case that we kept

16   insisting existed and, you know, we were being told,

17   "No.  It wasn't."

18   Q    Crump and Helton, anybody else stand out in

19   your mind?

20   A    I can't -- I don't recall off the top of my

21   head.

22   Q    You've got -- you spoke to Crump yourself,

23   right?

24   A    Uh-huh.  Yes.

25   Q    Yes.  And you made a recorded statement,

1    didn't you?

2       A    Yes.

3       Q    Did you have any reason information to

4    believe that what he told you was different than what

5    he told police?

6          MR. SLOSAR:  Objection to form.  Calls for

7       speculation.

8       A    Yes.  I mean, I feel like what was in the

9    report, because that's all I had to go on what was in

10   Mr. York's report, and in his grand jury testimony

11   differed.

12      Q    In what way?

13      A    His descriptions of Jonathan certainly seemed

14   really different to me.  I'd have to review the records

15   to tell you everything, but certainly I didn't -- when

16   I interviewed him, he was certainly not sure of anyone

17   that -- who -- who -- what the identification was of

18   the person that committed this --  it was a murder.

19      Q    Let me clarify that a bit.  A witness may not

20   be able to make an identification, but they can give a

21   description; is that fair?

22      A    Yes.

23      Q    And, in this case, Crump gave a description;

24   is that fair?

25      A    Yes.

1     Q   Of what he saw?

2     A   Yes.

3     Q   I agree with you.  I don't think Crump ever

4 said he could positively identify anybody.  Did he ever

5 tell you that?

6        MR. SLOSAR:  Objection to form.

7     A   He did not.

8     Q   Did York ever tell you or indicate to you or

9 indicate in the discovery that he had positively

10 identified somebody?

11     A   I don't recall him saying anywhere,

12 positively, that he said he could positively identify

13 him.

14     Q   Okay.  When you say that Crump wasn't

15 certain, again, we've talked he wasn't certain he could

16 identify, did he seem reasonably certain of the

17 description, the facts he gave?

18        MR. SLOSAR:  Objection to form.

19     A   He did.

20     Q   Yeah.  Did you review Amanda's statement to

21 Detective York that she gave, I believe, in February of

22 2011?

23     A   I reviewed everything that was in the

24 discovery, yes.

25     Q   Was that truthful to the best of your

1    knowledge?

2        MR. SLOSAR:  Objection to form.

3        A    From what I can recall, yes.

4        Q    Were you ever of the understanding that she

5    had given false information to Detective York?

6        A    No.

7        MR. SLOSAR:  Objection to form.

8        A    Sorry.

9        Q    Did she give you any description of York's

10   interactions with her at that interview?

11       MR. SLOSAR:  Again, we're going to instruct

12       the witness not to answer this question because it

13       delves into protected communication between client

14       and her counsel and defense team.  For that reason,

15       we'll assert the privilege.

16   BY MR. WRIGHT:

17       Q    The statement that she gave, what's your

18   understanding of how she came to be at the police

19   department when she gave that statement?

20       MR. SLOSAR:  I would caution the --

21       Q    I'm not asking for just the case file.  It

22   doesn't have to be based on the conversations between

23   the criminal defense and her.  As I understand it, she

24   was picked up at her house and taken there that day.

25       A    That's my understanding.

1    Q   Was Jonathan Taylor taken at the same time?

2    MR. SLOSAR:  Objection to form.

3    A   I do not recall.

4    Q   When do you understand that the pictures of

5 him were taken?

6    A   I don't -- I don't think I ever knew the

7 answer to that.

8    Q   Did you ever have an impression, a belief?

9    A   Not that I recall.

10    Q   Do you -- are you have any understanding

11 awareness of any facts that he would've been in the

12 custody of police to have those pictures taken before

13 Amanda's interview?

14    MR. SLOSAR:  Objection to form.  Calls for

15  speculation.

16    Q   I'm asking her if she has an understanding,

17 any information or knowledge.  Do you?

18    MR. SLOSAR:  Same objection.

19    A   Not on Mr. Taylor, no.

20    Q   Are you of the understanding that his

21 pictures were taken at a police department?

22    MR. SLOSAR:  Same objection.

23    A   I believe so but I'm not sure.

24    Q   Do you know who Rodney Elliott is?

25    A   I don't know that I know that name.

1    Q    Was there ever a jailer who got in trouble

2  for getting contraband to inmates--

3    A    Was he a jailer at the Knox County Detention

4  Center?

5    Q    I think he may have been in Laurel County.

6    A    I know the incident that you're referring to

7  but I'm not sure where he was -- you know, where he

8  worked.  I believe he was an employee at one of the

9  jails.

10    Q    And he got in trouble for promoting

11  contraband to inmates?

12    A    Yes.

13    Q    And was one of those inmates Amanda Hoskins?

14      MR. SLOSAR:  Objection to form.

15    A    I believe so.

16    Q    Do you know who the other inmates were?

17    A    I do not.

18    Q    Was that while she was -- when did that

19  happen to your knowledge?

20      MR. SLOSAR:  Objection to form.

21    A    I don't recall any dates.

22    Q    Was that while you were her investigator?

23    A    I do not believe so.

24    Q    Was it after her arrest on these charges?

25    A    Probably.  I mean I -- I don't know if there

1   was another -- I believe so.

2      Q    I'm sorry.  I'm going to flip around here for

3   a minute.  Exhibit number 4, could you pull that out?

4      A    Okay.

5      Q    Page 4, I think I caught most of this, but I

6   just want to make sure.  You interviewed Michael Crump,

7   yes?

8      A    Yes.

9      Q    You interviewed Christy Branson, but she

10  claimed no memory?

11     A    Yes.

12     Q    Is that recorded?

13     A    I don't believe so.

14     Q    How many times did you speak to Michael

15  Crump?

16     A    Once.

17     Q    And that was recorded?

18     A    Yes.

19     Q    When I listened to that recording it sounded

20  like it started after the conversions already began.

21  Do you have any memory of how that got started?

22     A    I do.  I was not recording when I went to the

23  door.  He answered the door and I told him who I was

24  and what I was there for.  He invited us in and

25  started --

Q    Just unloading?

A    -- just unloading.  And I recall, you know, taking the recorder out of my brief case and probably the file, and turned it on and sat it on the kitchen table where we were talking.

Q    Joe King, you interviewed him, correct?

A    Yes.

Q    How many times?

A    For sure, two.

Q    Were those recorded?

A    I don't believe so; I don't recall, though. If they were, they were turned over.

Q    You talked about Larry Warren and Amber Simpson. Did you have more than one interview with her?

A    No.  Only one.

Q    Was it recorded?

A    It was not.

Q    Kayla Mills, did you interview her?

A    No.

Q    Donna Mills, I know that you interviewed her at least once and made a report, correct?

A    Yes.

Q    Did you record that interview as well?

A    I don't believe so.  I don't recall.  If I did, I turned it over.

1    Q    Now, any other interviews of Donna Mills?

2    A    I don't believe so.

3    Q    I think I caught the rest of them.  I just

4    wanted to make sure I had that correct as we go through

5    here.  I'm going to jump around from witness to witness

6    now.  Christy Branson, you interviewed some of her

7    cellmates that overlapped with her and Amanda Hoskins;

8    is that true?

9    A    Yes.

10    Q    Do you know whether you interviewed all of

11    them?

12    A    I do not recall.  I don't -- I don't recall.

13    Q    Did any of the inmates that you interviewed

14    confirm what Christy Branson had said?

15    A    No.

16    Q    Do you remember how many of them you

17    interviewed as you sit here today?

18    A    I know for sure two.

19    Q    Did any of those inmates that you interviewed

20    give you any information about the police talking to

21    them as well?

22        MR. SLOSAR:  Objection to form.

23    A    Not that I recall.

24    Q    Daniel Wilson, I believe you said you did

25    interview him; is that right?

1    A   I spoke to him briefly at the Knox County

2 Detention Center from what I remember.

3    Q   Did you do the talking or were you with

4 attorneys?

5    A   I don't recall.

6    Q   Okay.  What did he say?

7    A   I would have to review his statement, and I

8 think that I -- I traveled a distance to find Daniel on

9 another occasion, but that wasn't successful.  So I

10 would have to -- I'd have to review the record on him.

11    Q   Do you know whether you recorded that one at

12 the Knox County Detention Center?

13    A   I don't believe so.  If I did, I turned it

14 over.

15    Q   Just briefly about the record retention,

16 you've indicated you turned the whole file over to the

17 plaintiff's attorneys, correct?

18    A   Uh-huh.

19    Q   Did you help them go through it, or did you

20 just turn it over to them and let them go through it?

21    A   No.  I didn't.

22    Q   As far as these privilege logs, you didn't

23 make any determination about privilege, right?

24    A   No, sir.

25    Q   Have you been asked to go back through the

1    file to look for missing items in this case?

2        A    I've not -- I don't think I've been asked to

3    go back through the file and look for missing items.  I

4    think I remember a couple of occasions where I was

5    asked about additional recordings other than --

6        Q    Have you found items that were requested of

7    you -- I know that you turned it over once and you've

8    said that you've looked for additional items.  Did you

9    find those additional items?

10       A    No.

11       Q    Do you know how many times you've been asked

12   to go back through your materials?

13       A    Maybe a couple of times I've been asked about

14   additional recordings.  If I was aware of additional

15   recordings, and, I mean, they wouldn't have been

16   anywhere else but in the file.

17       Q    Okay.  Well, as I've listened to some of your

18   testimony about reports, it's a lot of pages, and I've

19   done my best to catalog it, but several of them I've

20   not seen.  So does that -- do you think you didn't make

21   a report?  Do you think it's been destroyed?

22           MR. SLOSAR:  Objection to form.

23       A    I wouldn't destroy a report.  So no, for sure

24   on that.  And if you have a specific report that you're

25   referring to or something maybe I can --

1    Q   I don't have any record of a report from an

2  Allen Helton interview at the Laurel County Detention

3  Center.

4    A   There should've been a report in the file on

5  that one and it would've been turned over.

6    Q   I don't have any record of an interview of

7  the Edwards that was associated with Bob Smith and

8  Bingham.

9    A   I believe that I would've made a report on

10  that one and would have turned it over.

11    Q   You can't explain why it would be missing

12  either of those?

13    A   No.  I cannot.

14    Q   You indicated you talked to Bob Smith twice,

15  correct?

16    A   Correct.

17    Q   Did you do a report both times?

18    A   I don't recall if I did one the second time.

19  If there had been additional information outside of the

20  first one, I would have.

21    Q   Well, you said before that if a witness says

22  the same thing you might not make a second report,

23  right?

24    A   Sure.

25    Q   Yeah.  You said you did a report of Wilson.

1      I don't have one of Wilson from you.

2          A    I did say I did a report from Wilson?

3          Q    Well, you said you saw him at the Knott

4      County Detention Center.

5          A    I did, and I remember that being very brief.

6      I don't recall, as I sit here, the information that I

7      learned from that.  I just remember that it was really

8      brief before what we thought was going to be a court

9      appearance that never happened.

10         Q    So you may not have made a report, right?

11         A    I may not have.  If I did, I would've turned

12     it over.

13         Q    Vernon Bennett, did you record your

14     conversation with him?

15         A    I don't recall.

16         Q    Did you do a report?

17         A    I would assume I did if I talked to Vernon

18     Bennett.

19         Q    I don't have one for him.

20         A    If I did, it would've been in the file and I

21     would've turned it over.

22         Q    We'll go through there and identify more as

23     we go along but suffice it to say if you recall a

24     report, but we don't have one, you can't explain why

25     it's missing, right?

1      A    I can't, no.

2      Q    Do you remember what was said in your meeting

3   with Daniel Wilson?

4      A    No.

5      Q    No.  And I believe you said you never spoke

6   to Robert Beach?

7      A    No.  I did not.

8      Q    Or his sister, Margaret Polly?

9      A    I did not.

10     Q    You never spoke to Thomas Mikey Brunner?

11     A    I did not.

12     Q    And when I say, "talk," I'm -- I'll include

13  that as you doing the talking or you being there

14  listening to the talking, okay.

15     A    Okay.

16     Q    Joe King, I believe you said you had two

17  interviews with him?

18     A    That I recall, yes.

19     Q    Let's take them one by one.  When was the

20  first one best you can remember?

21     A    He was in the Bell County Detention Center

22  awaiting -- he was going to be called, I believe, as a

23  witness in another case in Bell County.

24     Q    Do you remember --

25     A    So it would've been -- do I remember the

1    case?

2        Q    No.  You don't have to remember the case,

3    just the month and year.

4        A    I don't.

5        Q    Anybody else with you?

6        A    Jessica may have been with me, but I'm not

7    certain.

8            MR. WRIGHT:  I'm sorry.  I haven't got enough

9        for everybody.  I'm going to make that exhibit --

10       what are we on?

11           MR. SLOSAR:  Do you just want to refer to the

12       log that --

13           MR. WRIGHT:  This is a different log.

14           THE WITNESS:  We're on 8 or 9?

15           MR. WRIGHT:   Exhibit 9?

16            (EXHIBIT 9 MARKED FOR IDENTIFICATION)

17           COURT REPORTER:  Yes.

18           MR. WRIGHT:  Would you please put that sticker

19       on there for me?

20           THE WITNESS:  Yes.

21           MR. WRIGHT:  Thank you.

22           THE WITNESS:  Uh-huh.

23    BY MR. WRIGHT:

24        Q    This is a privilege log for Amanda Hoskins in

25    particular and it references an April 17, 2013 item by

1   you to the attorneys regarding Joe King in the middle

2   of the page; do you see that?

3       A   I do.

4       Q   Would that April 2013 time period be accurate

5   when you spoke with him?

6       A   It could be.  There should be a report with a

7   date on it for that.

8       Q   Well, it was withheld here.  Is there --

9       A   The report was?

10      Q   Yes.

11      A   From my interview?

12      Q   Yes.

13      A   Okay.

14      Q   Well --

15          MR. SLOSAR:  Objection to form.

16          MR. WRIGHT:  Are you disputing that this is

17   your privilege log?

18          MR. SLOSAR:  No.  I'm objecting.  You have no

19   idea of what -- I mean the description is what it

20   is.  To characterize --

21          MR. WRIGHT:  It says, "A summary of her

22   impressions and interview of Joe King."

23          MR. SLOSAR:  It says, "typewritten notes," and

24   you're characterizing it as a report.  I'm just

25   saying that there --

1      MR. WRIGHT:  Okay.

2    BY MR. WRIGHT:

3      Q    So there's notes of that interview.  Why

4    don't you tell me what information, to your memory, Joe

5    King told you?

6      A    Joe told me that Mr. York had come to the

7    detention center at some point to interview him.  I

8    know he was in the detention center because he felt

9    like he -- I believe he made reference to Mr. York

10   wearing his gun into the jail and felt like his

11   language was being intimidating toward him.  And he

12   said that Mr. York had come in and told him that Amanda

13   had -- Amanda and others had given him information that

14   he was involved in this incident, and that maybe Mr.

15   York played some part of an interview for him, or

16   something to that -- and I don't know what interview,

17   but I believe he told me played an interview for him

18   and told him that he could -- had information that he

19   could charge him with murder and he wanted to do an

20   interview with him.  I believe he told me that Mr. York

21   asked to record it and he refused to participate in the

22   recorded interview.

23     Q    Joe King refused?

24     A    Joe King refused.  We didn't have any

25   statements from Joe in the discovery.  He told me that

1    -- I don't want to confuse what he told me with what I

2    read in the discovery, but I believe there was

3    discussions about him giving Amanda money for filling a

4    suboxone prescription that he had given to Mr. York.

5    And he also gave him information about Ms. Hoskins

6    making purchases at a pawnshop.

7        Q    And was this Joe King telling you this?

8        A    Joe King telling me that this is what he

9    told --

10       Q    Detective York.

11       A    -- Detective York.  And I want to say he

12   talked about conversations -- other conversations maybe

13   that came from William Lester as far as Ms. Mills being

14   tied up or tied into a toilet, an outdoor toilet.

15   That's the things that I recall.  I don't --

16       Q    Did you take anything with you?  I believe

17   there was a crime supplement by Detective York about

18   Joe King and did you review that with Joe?

19       A    I could have asked him about the comments of

20   Mr. York having written into a report.  There was no

21   statement --

22       Q    Right.

23       A    -- to review with him.

24       Q    As you said, Joe King told you he declined to

25   do a recorded statement; correct?

1      MR. SLOSAR:  Objection to form.

2   A    Correct.

3   Q    That's your understanding or memory, right?

4      MR. SLOSAR:  Objection to form.

5   A    That's my memory.

6   Q    As we sit here today, do you remember

7   anything inconsistent between what Joe King told you --

8   A    I could totally be wrong about that because I

9   know I read that in the discovery from Mr. York, too,

10  and it's been -- I've not looked at the statement from

11  Mr. King.  So I want to be clear that I'm not sure if

12  he told me that or if I'm getting that from the

13  discovery, but somebody said he declined to do a

14  recorded statement.

15  Q    Okay.  As we sit here today, do you have any

16  memory of Joe King giving you information that was

17  inconsistent with what Detective York had put in that

18  crime supplement?

19      MR. SLOSAR:  Objection to form.

20  A    No.  Not on that interview.  I don't believe

21  so. I -- the only thing I remember from that interview

22  was that he felt like Mr. York was telling him that

23  Amanda had implicated him and that he needed to give

24  him some information or he was going to be arrested.

25  And then I believe he agreed with what was in the

1  report from Mr. York.

2      Q    And to your understanding, both -- is it fair

3  to say both Amanda Hoskins and William Lester told

4  Detective York that they had talked about robbing

5  Katherine Mills --

6      MR. SLOSAR:  Objection.

7      Q   -- in Joe King's presence?

8      MR. SLOSAR:  Objection to form.  Misstates the

9    record.

10      A   I believe they did in their statements.

11      Q   Now, did you undertake efforts to try to

12  discredit the information that Joe King had given to

13  Detective York?

14      A   Yes.

15      Q   What efforts were those?

16      A   I went -- I collected the record from

17  Walgreens to see if the event that he described as when

18  he paid for the suboxone was accurate.  I discovered it

19  was not.

20      Q   Did Detective York put that in his report?

21      A   I believe that that may -- I believe that

22  that was in the grand jury testimony or somewhere in

23  the discovery I saw that.

24      Q   Okay.

25      A   I also went to the pawnshop that was not

1   included in the discovery as to whether or not Mr. York

2   had followed up on that.  I did and there should be a

3   report in the pawnshop and I don't recall the name of

4   it right now.

5       Q    Isn't it fair -- County Gun & Pawn.  Does

6   that sound right?

7       A    Yes.

8       Q    Is it fair to say that Amanda Hoskins had

9   told you that she may have been there a day or two

10  after the murder?

11      MR. SLOSAR:  Objection to form.  It also goes

12      into conversations that would be privileged

13      communication between Ms. Evans and a client.

14  BY MR. WRIGHT:

15      Q    I'm going to hand you a document labeled

16  "PL52." Make it  Exhibit 10.  Pass that around.  Is

17  this the report -- does this appear to be a true and

18  accurate copy of your report?

19          (EXHIBIT 10 MARKED FOR IDENTIFICATION)

20      A    It does.

21      MR. SLOSAR:  Hold on.  We're going to take a

22      short break.

23              (OFF THE RECORD)

24      COURT REPORTER:  Back on the record.

25      MR. SLOSAR:  It seems the defendants have

1    handed us what's been marked as PL52.  There seems

2    to be a part of this that was not redacted

3    mistakenly by plaintiffs during the course of

4    discovery, and it's an inadvertent disclosure and

5    we would ask that counsel not ask for any

6    communication between Ms. Evans and Ms. Hoskins

7    that is referred to in the second paragraph first

8    sentence by Ms. Hoskins may have possibly have

9    pawned something off on that date.  So it goes into

10    work product and attorney- client privilege.  We

11    will re-Bates stamp a version that is properly

12    redacted so that our privilege is maintained. I

13    don't have any objection to you questioning Ms.

14    Evans about any of the other contents of the

15    statement that's before you.  I would just ask that

16    this exhibit be redacted as an attachment to the

17    deposition.

18         MR. WRIGHT:  I will agree to preliminarily

19    redact that and reserve rights whether to follow up

20    and whether there's been a waiver of privilege on

21    that.  But given the time, we'll move on as far as

22    that particular line that he's identified.

23  BY MR. WRIGHT:

24      Q    Is it fair to say, Ms. Evans, that you

25  couldn't confirm or deny whether Amanda Hoskins had

1  been at that pawnshop after Katherine Mills was found

2  dead?

3      A    I reviewed the log to see if she'd made any

4  purchases or pawned.

5      Q    I know that you reviewed the log.  You had

6  questions --

7      A    She had not.  But other than --

8      Q    But now you -- is it fair to say that you

9  questioned the reliability of those records; is that

10  true?

11      A    I don't think -- I don't think I -- that I

12  questioned the reliability of those records as much as

13  did I ask the proper questions while I was there as far

14  as would that also reflect her making -- obviously, I

15  think pawnshops log purchases or pawns that they make,

16  but do they, once the pawn time period has lapsed, and

17  they sell those items, I think my question was should I

18  have gone further in ask him are those sales then

19  logged, too.

20      Q    So you're --

21      A    I was not clear on that myself.

22      Q    So your investigation on that point was

23  incomplete?

24          MR. SLOSAR:  Objection to form.

25      Q    Is that fair?

1      MR. SLOSAR:  Same objection.

2      A    I intended to follow up on that.

3      Q    And you didn't to your knowledge?

4      A    I'm not sure.  I know I went back.  I believe

5   I went back, but I would have to review the records to

6   say for certain.

7      Q    To your understanding, is that pawnshop owner

8   now deceased?  I think he is.

9      A    Mr. Gooding is.  There were co-owners.  I

10   believe the other owner was Frankie Ingram I believe is

11   his last name.

12      Q    Was one of the other items discussed by Dr.

13   King a settlement that she had -- that Amanda Hoskins

14   was there and spending money because she'd gotten money

15   from a settlement.  Does that sound familiar?

16      MR. SLOSAR:  Objection to form.  Foundation.

17      A    I'm not familiar with a Dr. King.

18      Q    I'm sorry.  Not Dr. King.  Mr. King, in the

19   information that Mr. Kinzer reported to Detective York,

20   was part of that information that she had got the money

21   from a lawsuit settlement?

22      MR. SLOSAR:  Objection to form.

23      A    I don't know if Mr. King stated that.

24      Q    Do you have any memory of that conversation

25   with him when you saw him at the detention center?

1    A   I don't know if he and I discussed that.  I

2   know what you're talking about, but I don't know if I

3   discussed it with Mr. King, or if Mr. King discussed it

4   with Mr. York without seeing the -- what you're

5   referring to.

6    Q   Well, I can't see your notes, so I don't know

7   either.  Is it true that you went and -- did you

8   subpoena records from her attorney?

9    A   I did.

10    Q   And was her attorney's name Dan Partin?

11    A   I believe that's who it was.

12    Q   Let me just hand you these for the record.

13   I'll hand you PL20938-20940.  I'll try to get these

14   labeled before I send them your way this time.  Here

15   you go.  Now, is that purported to be a fax to you from

16   Dan Partin's office?

17       ( EXHIBIT 11 MARKED FOR IDENTIFICATION)

18    A   Yes.

19    Q   And there's a subpoena for Dan Partin.  Did

20   you -- was he going to be a witness in one of the

21   trials?

22    A   I would assume so, yes.

23    Q   I think the last page is a settlement check.

24    A   Uh-huh.

25    Q   Is that true?

1    A    Yes.

2    Q    Now, on the cover of this, it's got

3  advancements.  Do you see that that handwriting?

4    A    I do.

5    Q    Whose handwriting is that?

6    A    That's my handwriting.

7    Q    Where did that information come from?

8    A    Probably Johnny Turner, because his name is

9  there, but I'm totally guessing.  I'm sure there's

10  probably -- I don't recall without looking at the

11  records, my records.

12    Q    You don't recall where that information came

13  from?

14    A    I'm assuming, like I said, Johnny Turner

15  because his name is there.  He's also an attorney and

16  that's why when you said, "Dan," I was not sure, and

17  I'm still not sure.  If Johnny handled that case, or if

18  Dan did.  And if these actually -- the settlement's

19  from Dan, so...

20    Q    Is Johnny Turner a criminal defense attorney

21  to your understanding?

22    A    I believe that he does do criminal defense

23  work.

24    Q    I think I can maybe clarify this.  I'll hand

25  you documents PL15826 and 827.  Is this 13 or 12?

1      COURT REPORTER:  12.

2      Q    Are these documents that you acquired in your

3  investigation?  Have you seen these?

4          ( EXHIBIT 12 MARKED FOR IDENTIFICATION)

5      A    It seems reasonable that I would've requested

6  them.

7      Q    Yeah.  But you don't have --

8      A    But I can't recall specifically.

9      Q    But that authorization, does that purport to

10 be Amanda Hoskins' signature on there?

11     A    Yes.

12     Q    Do you recognize that as her signature?

13     A    I do.

14     Q    Okay.  And that purports to be a release, an

15 advance of sorts, of the settlement to Johnny L. Turner

16 representing her in a Knox County District Court case,

17 correct?

18     A    Yes.

19     Q    What was the purpose of the Dan Partin

20 records?

21          MR. SLOSAR:  Objection to form.

22     Q    To your memory.

23     A    I mean I do, but it would require me

24 disclosing conversation -- dispensing conversations

25 between --

1    MR. SLOSAR:  To the extent that there -- that

2    the reason for obtaining these records was as a

3    result of communication between the defense team of

4    strategy, I would instruct you not to answer the

5    question.  The basis of the privilege is as I

6    mentioned earlier.

7    BY MR. WRIGHT:

8        Q    Joe King had reported that Amanda Hoskins was

9    buying, making purchases from a pawnshop shortly after

10   the murder.  Is that your memory?

11       MR. SLOSAR:  Objection to form.  Calls for

12   speculation.  Foundation.

13       A    Yes.

14       Q    And he reported that Amanda Hoskins said that

15   was from a -- the proceeds from a lawsuit settlement,

16   correct?

17       MR. SLOSAR:  Objection to form.

18       A    That I do not recall at all.

19       Q    Don't recall?

20       A    No.  I don't recall that at all.

21       Q    The -- this fax, this is a document that you

22   received in the course of your investigation, correct,

23   from Dan Partin?

24       MR. SLOSAR:  Objection to form.

25       Q    Sent to you --

1    A   That's my fax number, yes.

2    Q   Did you talk to a person by the name of

3 Jerome Ferguson?

4    A   I did.

5    Q   Who is that?

6    A   I believe he was the individual that was

7 present with Mr. King and William Lester, and Amanda.

8 I think he accompanied them to the drug store, too.  I

9 think it was Walgreens.

10    Q   Did he -- did you actually speak to him?

11    A   I did.

12    Q   Did you make a report of that?

13    A   I would assume that I did, but it's possible

14 I didn't.  Our communication was very brief.

15    Q   What information did he give you?

16    A   That he was with them.  That he -- I believe

17 he said that he went into the pharmacy with Ms. Hoskins

18 and was not present during conversations between Will

19 and didn't recall any of the other conversations that I

20 was asking him about.  He was -- I don't remember what

21 he was in jail for, but he was in the Bell County Jail

22 at the time.

23    Q   Do you remember -- so you interviewed him at

24 Bell County Jail?

25    A   Yes.

1    Q   Just one interview?

2    A   Just one.

3    Q   And he -- he claimed he was not present when

4 that discussion occurred, right?

5    A   To the best of my knowledge.  If he had

6 claimed otherwise it would be in a report and I

7 would've turned it over.

8    Q   Do you know when that interview was?

9    A   I don't but I feel like it was late in the

10 investigation because I didn't learn his identity until

11 later on.

12    Q   Did Joe King give you his identity?

13    A   I don't recall.

14    Q   Did he clarify what day that that would've

15 been on, because as we said before, the records didn't

16 quite match up to the date that Joe gave, that's your

17 memory, right?

18    MR. SLOSAR:  Objection to form.

19    A   My memory is that Mr. York's reports was that

20 that happened the day before the incident at the drug

21 store, but actually the records reflected that it was

22 the day of Ms. Mills' death.

23    Q   Did you get records for more than just one

24 week from Walgreens?

25    A   I don't recall.

1    Q    Did -- to your memory, did Amanda Hoskins

2  report that this interaction with Joe King was the day

3  before?

4        MR. SLOSAR:  Objection to form.  And again --

5    Q    I'll say, too, in your reading of her

6  statement to Detective York, not you personally.  I'm

7  sorry.

8    A    I don't recall what -- if she made any

9  records of that in her statement.

10   Q    You don't know whether she said that that may

11  have happened more than a day before.  It may have been

12  a week or more before?

13        MR. SLOSAR:  Objection to form.  Asked and

14     answered.

15   A    I do not recall without looking at it what

16  she said -- would've said about that.

17   Q    Were you the one who tracked down the

18  Walgreens records, or would that have been somebody

19  else on the criminal defense team?  What's your memory?

20   A    I'm sure that we would've requested them.

21   Q    But I was asking if you remember requesting

22  it or if somebody --

23   A    No.  That -- it could have been someone else.

24   Q    All right.  I'll come back to that in a

25  minute. Did Joe King discuss with you whether he had

1    suspicions that Amanda Hoskins was having a

2    relationship with Dr. Larry Warren?

3         MR. SLOSAR:  Objection to form.

4      A    I know I read that.  I do not recall if he

5    told me that without reviewing the records.

6      Q    Did you investigate that issue?

7      A    I interviewed Dr. Warren, so yes.

8      Q    Well, what did he tell you?

9      A    That he had not had an affair with Ms.

10   Hoskins.

11     Q    Did he say whether she flirted with him?

12     A    I don't recall that without looking at the

13   record.  I do not recall him saying that.

14     Q    Do you -- I think you've said you've had two

15   interviews with Dr. Larry Warren?

16     A    Correct.

17     Q    One was recorded, right?

18     A    One was recorded.

19     Q    One was not?

20     A    Correct.

21     Q    Was the one that you had recorded, was it the

22   -- did you record the whole shebang or was there parts

23   left out?

24         MR. SLOSAR:  Objection to form.  You can

25     answer.

1    A    I recorded the entire conversation.

2    Q    Okay.  Did you interview anybody else whether

3  Amanda Hoskins had been referred to as a special

4  patient of Dr. Larry Warren?

5        MR. SLOSAR:  Objection to form.

6    A    I don't believe so.

7    Q    Did you ever have -- receive any information

8  of that sort?

9    A    Not that I recall.

10    Q    So that was one interview with Joe King.  I

11  believe you mentioned there's two, correct?

12    A    Yeah.  The second one was in my office.  It

13  was really short.  It was after he had an encounter

14  with Jackie Steele, I believe at the Laurel County

15  Detention Center.

16    Q    You can't give a date range on that?

17    A    No.  I can tell you it was close to one of

18  the trial dates, perhaps one of the last.

19    Q    So closer to 2015?

20    A    Trial dates, yes.

21    Q    The privilege log indicates that your -- at

22  least your notes of the first interview was April 2013,

23  correct?  So that would've been the first interview, I

24  believe, right?

25    A    Yes.

1    Q    The second one was closer towards the end,

2  and that one was about Jackie Steele?

3    A    Yes.

4    Q    Did he mention anything about York?

5    A    Not that I recall.

6    Q    What did he -- what do you recall him saying

7  to you on this occasion?

8    A    I would have to look at my notes to be sure.

9  I remember the conversation was, I believe Jackie had

10  some follow-up questions, maybe, from York's interview

11  and then the conversations about whether or not he was

12  going to testify or something to that effect.  I'd have

13  to review the records on the second one.

14    Q    I don't know of any records on the second

15  one. Did you record it?

16    A    I don't believe that I recorded that one, but

17  if I did, I turned it over.

18    Q    Do you recall making a report?

19    A    It's certainly possible.  I mean, if I did, I

20  would have turned it over.

21    Q    He said you made notes of the meeting.  Do

22  you recall that?

23       MR. SLOSAR:  Objection.

24    Q    While he was there.

25    A    I don't recall it --

1      MR. SLOSAR:  Objection to form.

2    A  I do not recall it but it's certainly

3 possible. His -- I believe that second interview was

4 really short, too.  I believe.  I could be wrong.

5    Q  Your recollection was that Jackie Steele, he

6 told you Jackie Steele was asking him whether he was

7 going to testify; is that your memory?

8      MR. SLOSAR:  Objection to form.

9    A  It had to do with his testimony.

10    Q  Did he -- any other memory about what else it

11 had to do about his testimony?

12    A  I can't recall specifically.

13    Q  Did he say anything to indicate that Jackie

14 Steele had acted inappropriately or done something

15 wrong?

16      MR. SLOSAR:  Objection to form.

17    A  My feeling -- my feeling was that he felt

18 that way, but I cannot tell you specifically what he

19 said without looking at the record.

20    Q  Is it true that you never subpoenaed, neither

21 you or anyone else to your knowledge, subpoenaed Joe

22 King to testify on behalf of Amanda; is that correct?

23    A  I don't recall subpoenaing Joe.  I can't say

24 that I didn't, but I don't recall subpoenaing Joe.

25    Q  And that's because the information he had was

1   averse to your client, correct?

2       MR. SLOSAR:  Objection to form.

3     A    I would say that was based on --

4       MR. SLOSAR:  To the extent that --

5       THE WITNESS:  Well, yeah.

6       MR. SLOSAR:  -- that decision whether to

7   subpoena somebody or not to subpoena somebody

8   delves into the strategic discussions from the

9   defense team.  I would instruct you not to answer

10   that question based on the privilege assertions I

11   mentioned earlier.

12  BY MR. WRIGHT:

13     Q    Did any other information from Joe King -- I

14  know that you described that he felt intimidated by

15  York at the -- when he interviewed at the detention

16  center. Any other information you recall from Joe King

17  that Detective York had acted inappropriately?

18     A    He felt that his demeanor was very

19  inappropriate.  But, specifically, anything -- any

20  words that were spoken, I can't recall.

21     Q    To your memory, he didn't tell you anything

22  about the accuracy of the report?

23       MR. SLOSAR:  Objection to form.

24     A    Not that I recall.

25     Q    Okay.  Let's move on to Amber Simpson.  I

1  think you said you talked to her once, correct?

2      A    Correct.

3      Q    I believe that was on the phone.

4      A    It was on the phone.

5      Q    But you were at her parents' house?

6      A    I was at her parents' house, yes.

7      Q    And I -- that wasn't recorded, right?

8      A    It was not recorded.

9      Q    But you did make a report of it, true?

10     A    True.

11         MR. WRIGHT:  Where are we at on time?

12         COURT REPORTER:  About five hours and 43

13     minutes.

14         MR. WRIGHT:  What are we on now, 14?

15         COURT REPORTER:  13.

16         MR. WRIGHT:  I keep running one ahead.

17  BY MR. WRIGHT:

18     Q    Give you a document that begins PL30.  That's

19  your report.

20         ( EXHIBIT 13 MARKED FOR IDENTIFICATION)

21     A    Okay.

22     Q    On Amber Simpson.  If you'll just take a

23  second to review that.

24     A    Sure.

25     Q    You just let me know when you're finished,

1  okay.

2      A    Uh-huh.

3      Q    Having read this report, to your memory,

4  isn't it true that when you talked to her, she did tell

5  you that Jonathan, in fact, had told her that he killed

6  Ms. Mills?

7          MR. SLOSAR:  Objection to form.

8      A    Yes.

9      Q    She also told you that Jonathan told her

10 Amanda Hoskins drove the getaway car?

11         MR. SLOSAR:  Objection to form.

12     Q    Correct?

13     A    Yes.

14     Q    She told you that Jonathan Taylor told her

15 that Kayla Mills was the lookout?

16     A    Correct.

17         MR. SLOSAR:  Objection to form.

18     Q    And she told you that Jonathan Taylor had

19 told her that William Lester had planned it, correct?

20         MR. SLOSAR:  Objection to form.

21     A    That's correct.

22     Q    Yeah.  She gave some other details to you

23 that Jonathan told her that he placed five $100 bills

24 in a circle, true?

25     A    True.

1        MR. SLOSAR:  Objection to form.

2    Q    That the car had been hidden for two months

3  after the event?

4    A    True.

5        MR. SLOSAR:  Objection to form.

6    Q    You were not willing to subpoena Amber

7  Simpson to trial, correct?

8        MR. SLOSAR:  Objection to form and I would

9    instruct you not to answer to the extent that

10    that --

11        MR. WRIGHT:  It's in the report.

12        MR. SLOSAR:  -- goes into communications --

13  BY MR. WRIGHT:

14    Q    You told them that you were not going to

15  subpoena --

16        MR. SLOSAR:  Let me make my record, please,

17    Derrick.

18        MR. WRIGHT:  Go ahead.

19        MR. SLOSAR:  I would object and instruct the

20    witness not to answer to the extent that it delves

21    into communication amongst members of the defense

22    team about their trial strategy.

23  BY MR. WRIGHT:

24    Q    You told her you weren't going to subpoena

25  her, right?

1     A     What page is that on?  Is that the second

2  page, or --

3     Q     The third full paragraph on the second page.

4  Where she -- you say, "They kept asking when we wanted

5  her to come and we told them we were not there to ask

6  her to come to court."

7     A     That's correct.  I was not there on that

8  occasion to tell her to come to court.

9     Q     Did you also follow up with the guidance

10  counselor who sat in on the interview?

11     A     I did.

12     Q     And was her name Rhonda Abner?

13     A     Yes.

14     Q     What do you recall her telling you?

15     A     She told me that she couldn't recall a lot of

16  the communications between them.  The only thing she

17  could -- that I recall that she specifically was clear

18  on and could recall at the time was that Mr. York had

19  told her that if she would talk to him it would help

20  her brother who was also facing legal troubles, I

21  believe.

22     Q     Did she indicate to you that the whole

23  conversation was recorded?

24          MR. SLOSAR:  Objection to form.

25     A     I don't recall if she did.

1    Q   Did Amber Simpson -- do you have a memory

2  whether Amber Simpson indicated to you that the whole

3  conversation was recorded?

4      MR. SLOSAR:  Objection to form.  Asked and

5   answered.

6    A   I don't recall either way.

7    Q   Okay.  If your report says that Ms. Abner

8  stated she believes the entire conversation was

9  recorded, would you dispute that?

10    A   No.

11      MR. SLOSAR:  Objection to form.

12    Q   Okay.

13    A   We didn't receive any such recording through

14  discovery.

15    Q   You didn't receive a recording of Amber

16  Simpson's statement?

17    A   Amber Simpson, yes, but I guess that was at

18  the -- with Ms. Abner there.  I don't recall hearing

19  anything from Ms. Abner but if that's when he recorded

20  the conversation then I received that.

21    Q   Okay.  Do you recall any information from

22  Amber Simpson that Jonathan Taylor was intoxicated when

23  he gave the statement?

24      MR. SLOSAR:  Objection to form.

25    A   From Amber?

1    Q   Yeah.

2    A   I don't recall.

3    Q   It wasn't in your report, was it?

4    A   No.

5    Q   Same thing, do you recall her saying that she

6 thought Jonathan Taylor was covering up for somebody

7 else?

8       MR. SLOSAR:  Objection to form.

9    A   I don't recall.

10    Q   And that's not in the report either, is it?

11    A   No.

12    Q   Did she -- do you recall any information from

13 Amber Simpson that she believed he wasn't in his right

14 state of mind?

15    A   Not that I recall.

16    Q   And that wasn't in your report either, was

17 it?

18    A   No.

19    Q   She didn't make any excuses for his

20 confession to her to you, did she?

21    A   No.

22       MR. SLOSAR:  Objection to form.

23    Q   Did you ever listen to Dale Dorning's

24 interview of Amber Simpson?

25    A   No.

1    Q    Did you ever listen to Josh Powell's

2  interview with Amber Simpson?

3    A    No.

4    Q    Have you seen her deposition in this case,

5  her transcript or video?

6    A    From Josh?

7    Q    No.  Of Amber Simpson.  I'm sorry.

8    A    Of Amber from Josh?

9    Q    No.  Of her deposition in this case either

10  the video or the transcript; have you seen that?  She's

11  given testimony just like you have.  Have you seen her

12  testimony?

13    A    No.

14    Q    No.  Have you ever interviewed a witness in

15  jail who was detoxing?

16    A    I'm sure.  Probably.

17    Q    You -- would you think that would be a good

18  condition to interview a witness in?

19       MR. SLOSAR:  Objection to form.

20    A    I mean I -- answer that if I was a party to

21  the conversation but I've certainly had interviews --

22  I've probably gone to do interviews and decided not to,

23  in fact.

24    Q    Because they weren't in a -- didn't seem to

25  be in good condition?

1    A    Yes.

2    Q    Okay.

3    A    Can I -- I hate to ask but I need a restroom

4  break.

5    Q    That's fine.

6              (OFF THE RECORD)

7  BY MR. WRIGHT:

8    Q    Ms. Evans, we previously talked about in

9  reference to your client, Amanda Hoskins that you did

10  obtain subpoena and I believe records from Walgreens

11  and maybe another pharmacy.  I've handed you documents

12  labeled PL17228-234.  Have you had a chance to review

13  those?

14    A    I have.

15    Q    Does that appear to be the records with the

16  certifications that you obtained in the course of your

17  investigation?

18    A    It does.  The only thing I would add is I

19  don't believe they were ever subpoenaed.  I believe we

20  sent a HIPPA and a letter requesting.

21    Q    I see, I apologize.  So it was not a

22  subpoena, it was a request with a HIPPA release?

23    A    Correct.

24    Q    Okay.  And they did provide you a

25  certification?

1    A    Yes.  We always ask for that.

2    Q    All right.  And we're not going to make that

3 an exhibit since that has personally identifying

4 information, but we've got the PL number.  Thank you.

5    A    Yes.  You're welcome.

6    Q    One thing before I leave that, there were two

7 pharmacy records in that group.  One was Walgreens and

8 the other one was Hometown; is that right?

9    A    It was an H, I thought it said, maybe said

10 Hinkle, but it could've said --

11    Q    Here.  I'll hand it back to you.

12    A    Okay, certainly, it says--

13    Q    Oh, I think you are right.

14    A    It says, "Hinkle Hometown Drug Store."

15    Q    We were both right.  Hinkle and Hometown.

16    A    Yes.  We were.

17    Q    Okay.  We were both right and both wrong.

18 We'll move on.  Let's talk about Donna Mills for a

19 little bit. It's my understanding you had one

20 discussion with her, correct?

21    A    Correct.

22    Q    And that was not recorded to your memory?

23    A    To my memory, it was not.

24    Q    But you did make a report?

25    A    Yes.

1    Q    I'll hand you 14.  Take a moment to go

2  through that. Just let me know when you're finished,

3  okay.

4         ( EXHIBIT 14 MARKED FOR IDENTIFICATION)

5    A    Okay.  Okay.

6    Q    All right.  Does this appear to be a true and

7  accurate copy of your report of your Donna Mills

8  interview?

9    A    Yes.

10   Q    Is there any other materials that would

11  refresh your memory as to what occurred in that

12  interview?

13   A    Not that I'm aware of.

14   Q    Okay.  I want to call your attention to page

15  4, I believe it's PL77.

16   A    Okay.

17   Q    And in the third to last paragraph, she says

18  she repeatedly tried to give York information regarding

19  Kayla's whereabouts and circumstances to show she could

20  not have been involved but he would never list to her.

21  Do you see that?

22   A    I do.

23   Q    Did you ask her what that information was,

24  because it's not -- it's not in the report, is it?

25   A    It's not in the report, and I -- I can't be

1    for certain.  I mean --

2        Q    Anything at all that you recall about where

3    Kayla was, or at least what her mother said -- where

4    her mother said she was?

5        A    It might be in here, I don't think so, but

6    the information -- some information that stands out to

7    me was about her car being towed before the incident

8    occurred. Kayla's car being towed.  I guess it ran out

9    of gas and or broke down and was left in a street and

10   she called and had it towed and put the car away and

11   she wanted to show -- I think she may have said

12   something about wanting to maybe get proof from that

13   tow that, you know, the car wasn't available to her at

14   that time.  I recall something to that effect.

15       Q    But her whereabouts on the day of the murder.

16       A    Other than that, I don't recall.

17       Q    Is there any reason why you wouldn't document

18   that?

19           MR. SLOSAR:  Objection to form.

20       A    I certainly should have documented it if she

21   told me.

22       Q    Do you have any memory of disbelieving any of

23   the information she gave you?

24           MR. SLOSAR:  Objection to form.

25       A    Nothing stood out as having --

1    Q    The date of this memo is August 8, 2013.

2  Does that appear to be --

3    A    Yes.

4    Q    -- consistent with your memory?

5    A    That's on the report so it's probably when it

6  happened.

7    Q    Okay.  Do you know how much time would've

8  elapsed between writing the report and when you

9  interviewed her?

10    A    I certainly do not know as I sit here.

11    Q    Did you ever talk -- she said that she was

12  dating Derek Wagers, or -- I'm sorry.  I should not use

13  the pronouns.  Donna Mills told you that Kayla Mills

14  was dating Derek Wagers in December 2010.  That seems

15  to be what's indicated by your report; is that true?

16    A    Yes.

17    Q    Did you ever talk to Derek Wagers?

18    A    I don't recall if I talked to Derek.

19    Q    Are you aware of anybody who talked to him to

20  confirm that?

21    A    I'm not aware, no.

22    Q    You had a chance to review the report.

23  What's your memory of what Donna Mills told you

24  happened in that interview room.

25        MR. SLOSAR:  Objection to form.

1    Q    Best you can remember.

2    A    The interview with Kayla and Mr. York?

3    Q    Uh-huh.  Yes.  And I -- let's take a step

4 back. I'm sorry, I jumped ahead.  It sounds like from

5 your report that there were multiple people in that

6 interview. There was Detective York, yes?

7    A    Yes.

8    Q    There was Kayla?

9    A    Yes.

10    Q    There was Donna Mills?

11    A    Yes.

12    Q    There was Scott Mills?

13    A    Yes.

14    Q    And there was an attorney, Ken Boggs, true?

15    A    Yes.

16    Q    And to your understanding did Ken Boggs

17 represent Kayla Mills?

18    A    Yes.  Was Mr. Pickard also there?  Did I see

19 that?

20    Q    I don't know that he was.  I didn't see that

21 in here.  I think he interacted with her before but not

22 at this particular interview.

23    A    Okay.

24    Q    Anybody else she reported to you that was

25 present?

1    A    Not that I recall.

2    Q    Did she tell you that -- did she ever tell

3    you whether anybody ever left the room?

4         MR. SLOSAR:  Objection to form.

5    A    I don't recall if she told me that or not.

6    Q    Okay.  Did she -- what do you recall her

7    telling you about Detective York's conduct in that

8    interview?

9    A    During the interview?  I mean, other than

10   what's in this report, I don't recall anything.

11   Q    Okay.  There's no mention of your report of

12   Detective York turning the recorder on and off, is

13   there?

14   A    No.  Not in the report.

15   Q    To your memory, that was -- she never told

16   that to you, did she?

17        MR. SLOSAR:  Objection to form.

18   A    To my memory, I don't recall either way.

19   Q    Okay.  That's something you would have

20   documented, isn't it?

21        MR. SLOSAR:  Objection to form.

22   A    I would think so.  Hope so.

23   Q    Did you ever attempt to contact Ken Boggs?

24   A    No.  Was he deceased?

25   Q    He had died eventually, yes.  He's deceased

1  now.

2    A   Okay.  I'm not sure when he died but I did --

3  I don't recall interviewing him or trying to interview

4  him.

5    Q   Why wouldn't you try to call him or contact

6  him?

7    A   I don't -- I don't know that I never would

8  have but I hadn't -- when I talked to Donna, I hadn't.

9  I didn't know who her attorney was, I don't think.  Let

10  me pull some of her records, I'm not sure.  I don't

11  know when he died, but it seems to me that there was --

12  at the time that I considered doing it, it seems like I

13  was told he was deceased, or ill, or --

14    Q   Were you aware that Scott Mills and Lester,

15  William Lester are friends?

16    A   Yes.

17      MR. SLOSAR:  Objection to form.

18    Q   Would you agree that they were close friends?

19      MR. SLOSAR:  Objection to form.

20    A   I would agree that they were certainly

21  friends to some degree.  I -- I don't think I --

22    Q   That's fine.  Were you aware that Donna Mills

23  and Scott Mills had both put up their property for

24  William Lester's bond?

25    A   I believe they put up half and someone else,

1    maybe one of his daughters put up half of the bond.

2        Q    Do you know how much they put up?

3        A    I certainly don't.  I don't recall.  I'm

4    sure --

5        Q    Was it a trivial amount?

6        A    Did they do a cash bond or a property bond?

7        Q    Property bond to my knowledge.

8        A    Property bond.  I don't recall the amount,

9    but I know that it took two people to meet the bond,

10   whatever it was.

11       Q    Anything else -- you've read the report.  Is

12   there anything not in this report that sticks out in

13   your memory from your interview with Donna Mills?

14       A    Nothing that I recall.

15       Q    Let's talk about Jessie Lawson.  How many

16   times did you talk to him?

17       A    At least two, maybe three.

18       Q    Did you --

19       A    From my recollection.

20       Q    Did you record them all?

21           MR. SLOSAR:  Objection to form.  Asked and

22       answered.

23       A    I don't believe I recorded any of those, but

24   if I did, I would have turned them over.

25       Q    Do you have a recollection of making a

1  report?

2      A    I would assume that I did.  I would assume

3  that I did, but I don't recall specifically.

4      Q    In your two -- I don't know that I've got a

5  report of any.  I do believe there was one or maybe two

6  recordings.  There are several recordings.  I don't

7  know if you were present for all of them.  What

8  information do you recall receiving from Jessie Lawson?

9      A    Other than the information that he gave

10  through discovery, for his statement to York, I

11  remember him talking about feeling really intimidated

12  by Mr. York, particularly when he came to take him for

13  the polygraph. There was some big to-do around that --

14  around that time. I believe he told me that he and Mr.

15  Helton were transported to the polygraph separately,

16  but maybe on the same day, but they were transported in

17  separate vehicles. A lot of talk about him being really

18  afraid of Detective York is what I recall.

19      Q    I think you testified earlier that you

20  considered Jessie Lawson a suspect, possible suspect?

21      A    It certainly seemed like someone that could

22  potentially be a suspect at the time that I was looking

23  at it.

24      Q    Why is that?

25      A    I think he had made stories to the officer

1  that were maybe inconsistent with -- such as her home

2  had been ransacked but, in fact, it hadn't.  I believe

3  there was stories, don't know if they came from him or

4  from Jennifer about not noticing Ms. Mills when they

5  first drove up to her home.

6      Q    Yeah.

7      A    Which I don't think would be possible unless

8  you were intoxicated.

9      Q    Okay.

10     A    I believed the original information about the

11  timber came from Jessie or Jennifer, or both, maybe.

12  Those are the things that stick out in my mind.

13     Q    He failed the polygraph.

14     A    He failed the polygraph, certainly.

15     Q    Now, as a suspect, he was -- he's part of the

16  family, correct?

17         MR. SLOSAR:  Objection to form.

18     Q    He's an in-law to the victim's granddaughter,

19  or he's married to the victim's granddaughter; is that

20  your understanding?

21     A    That was my understanding, yes.

22     Q    He could be seen as a suspect.  Would you

23  agree that he felt pressure to take the poly from his

24  own family?

25         MR. SLOSAR:  Objection to form.  Calls for

1    speculation.

2        A    I really have no idea about -- I don't recall

3    him telling me that.

4        Q    He didn't tell you that?

5        A    I don't recall that.

6        Q    Did any of the family members tell you that

7    they wanted him to take that polygraph to clear his

8    name?

9        A    Not that I recall, no.

10       Q    No.  You mentioned you'd have to be

11   intoxicated to miss Ms. Mills where she was found.  Did

12   you receive information that Lawson was a drug abuser?

13           MR. SLOSAR:  Objection to form.

14       A    Yes.

15       Q    Who did you receive that from?

16       A    I believe multiple sources, but I do not

17   recall specifically which sources those were.

18       Q    And you mentioned he gave inconsistent

19   stories about his description when he came upon the

20   scene; is that fair?

21       A    Yes.

22       Q    Did he give any other inconsistent stories?

23       A    I don't recall specifically but it's

24   certainly possible.

25       Q    Do you have any knowledge that -- did you

1  ever receive any information that he said Cleo Brown

2  had told him she saw Mike Simpson?

3     A    I believe that was in one of Mr. York's

4  reports that he had told him that.  I do not recall if

5  he confirmed that with me or not.

6     Q    And that's fair.  That may be where that came

7  from.  I just -- I've seen that in the file.

8     A    Yeah.

9     Q    Did you follow up on that?

10    A    I did.

11    Q    And you talked to Cleo Brown?

12    A    I went to her home a couple of times.  I left

13  a card in her door and she called me and that was the

14  only way I could talk to her.  She would never agree to

15  an interview and was -- I'm not able to locate her in

16  person. And so, yeah, I spoke to her over the phone.

17    Q    Did she confirm what Jessie Lawson had

18  reported, or did she deny it?

19    A    She denied it.

20    Q    Did you document that in a report?

21    A    I'm sure that I would have.

22    Q    Did she give you any other information to

23  your knowledge?

24    A    I recall having more conversation with her

25  other than that, but I can't specifically say what it

1   was without --

2      Q    I'm going to give you a -- could we go off

3   the record for just one second.

4                (OFF THE RECORD)

5   BY MR. WRIGHT:

6      A    All right, Ms. Evans, we're back on.  I've

7   handed you a document, PL33835, two pages.  Does this

8   appear to be a true and accurate copy of your report of

9   your interview with Cleo Brown?

10     A    Yes.

11     Q    And that report confirms what you recall that

12  she said she did not tell Jessie Lawson that she saw

13  Mike Simpson, correct?

14     A    Correct.

15     Q    What's the date of this report?

16     A    November 26, 2012.

17     Q    Would this have been your first or one of

18  your very first interviews?

19         MR. SLOSAR:  Objection to form.

20     A    Certainly close to in time when I received

21  the case, though.

22     Q    Okay.  When did you receive the case?

23     A    I'd have to go back and look at my file to be

24  sure, but it was probably late summer of 2012, maybe.

25     Q    When you received the case, did you read

1  everything in the file?

2      A    I did.

3      Q    All the discovery to date?

4      A    Yes.

5      Q    Okay.  Did you do that before you started

6  interviewing witnesses?

7      A    Yes.

8      Q    Was there any reason why Cleo Brown was one

9  of the first documented interviews we have?

10     A    There was a report in the file from Mr. York

11  stating that she was seen in Ms. Mills' yard.  So it

12  seemed like it was pretty important.

13     Q    Good place to start.  But I take it you

14  didn't -- couldn't confirm that any farther, right?

15     A    Correct.

16     Q    She also gave some information about William

17  Lester.  Did you see that?

18     A    I did.

19     Q    Do you recall that?

20     A    I do recall her talking about Mr. Lester.

21     Q    Did you follow up on any of that information

22  that he was at her house at 10:45 to give her some

23  money?

24     A    No.  I wasn't going to interview Mr. Lester,

25  so no.

1    Q    No.  She reports that Lester sat on her dad's

2    porch until about 12:30 talking with him.  Did you talk

3    to her dad?

4    A    That he sat on her dad's porch?

5    Q    On the second page, it says, "Afterwards she

6    reports that he sat on her dad's porch until about

7    12:30 talking with him; do you see that?

8    A    Yes.  I don't recall talking to her father at

9    all -- Chloe's.  Well, I think Cleo, I think is -- I

10   didn't interview him, but I may have asked him where

11   she was prior to talking to her.

12   Q    Is it your understanding of the case that

13   William Lester was at the doctor's office or supposed

14   to be at the doctor's office around noon --

15        MR. SLOSAR:  Objection to form.

16   Q    -- with Amanda?

17        MR. SLOSAR:  Objection to form.

18   A    Yes.

19   Q    This information contradicts that, doesn't

20   it?

21        MR. SLOSAR:  Objection to form.

22   A    It appears to, yes.

23   Q    And you didn't follow up on it, did you?

24   A    No.

25   Q    It does say that she reports that he left to

1   work on someone's house and had to be there at 1:00

2   p.m. Do you have a memory of that?

3      A   I recall her -- yes.

4      Q   Do you know whose house that was?

5      A   No.  I do not.

6      Q   I'm going to show you a document.  I don't

7   know where this came from so I'm just going to ask you

8   if you can identify it.  This is PL15534.  I'll just

9   make this exhibit -- what are we on?

10      COURT REPORTER:  15.

11      Q   Have you ever seen this document before?

12      A   Yes.

13         ( EXHIBIT 15 MARKED FOR IDENTIFICATION)

14      Q   And it purports to be a receipt for William

15   Lester, correct?

16      A   Correct.

17      Q   At 1:08 on the day of the murder, right?

18      A   Yes.

19         MR. SLOSAR:  Objection to form.

20      Q   Do you understand that date and time to be

21   correct, what I read, 1:08?

22      A   Yes.

23      Q   I don't know where this came from.  Can you

24   explain how you got a hold of that?

25         MR. SLOSAR:  Objection to form.  You can

1     answer.

2       A    Not without reviewing more records, although

3    I can tell you that I received some -- I believe I

4    received a bunch of records from Melinda Taylor.

5       Q    You did?

6       A    I won't say a bunch.  I'll say appointment

7    cards, I believe, that Amanda had and this -- I don't

8    know if this was in with that or not.  I would have --

9    I'd have to look at the record to see if there was any

10   note about where it came from.

11      Q    Okay.  But you had seen this as part of your

12   investigation?

13      A    Yes.

14      Q    Okay.  Did you confirm with that institution

15   whether he showed up and made that payment?

16      A    I did not.

17      Q    Okay.  I got a little sidetracked there.  I

18   was talking about Jessie Lawson and we started talking

19   about Cleo Brown.  Is there anything in Cleo, to your

20   memory, with Cleo Brown that you have a memory of any

21   other information from Cleo Brown that's not in your

22   report?

23          ( EXHIBIT 16 MARKED FOR INDENTIFICATION)

24      A    Not to my recollection, no.

25      Q    Did Jessie Lawson tell you he was a

1  confidential informant?

2      A    I believe that he told me that he was, and

3  that Mr. York had requested that he do that.

4      Q    Did he indicate whether it was just for the

5  Mills investigation, or other investigations?  Did he

6  give you any information on that?

7          MR. SLOSAR:  Objection to form.

8      A    I don't recall that.

9      Q    And I'm -- I asked it poorly.  You don't

10  recall -- do you recall any specifics on who he was

11  doing the CI, what case in?

12      A    Other than possibly Amanda's at York's

13  request, I do not recall one way or another if he told

14  me about others.

15      Q    When he said it was at York's request, did he

16  say that -- was he indicating that York was requesting

17  to do it in this case and this case only?

18          MR. SLOSAR:  Objection to form.

19      A    I believe that I assumed that it was in this

20  case, but wether or not he specifically stated that,

21  I'm not sure.

22      Q    Okay.  Did you ever receive any information

23  about instances when he performed as a CI for police?

24      A    I don't believe that I did.

25      Q    Was there ever a point in time when you

1    gained information that a couple of people had

2    purportedly confessed?

3        A    Did I learn -- yes.

4        Q    Yes.  I want to say it was a Jerry Brown and

5    a Cleveland Brown; does that sound right?

6        A    That sounds right.

7        Q    Are those the sons of Cleo Brown, or are they

8    related?

9        A    I'm not sure.

10       Q    There's a lot of Browns.

11       A    Yes.  I'm not sure.

12       Q    Did you interview any of the Browns; I'm

13   talking about Cleveland and Jerry?

14       A    I don't recall if I -- I know I looked for

15   them, but I don't recall if I -- I -- I want to say I

16   did not locate them, but I'm not 100 percent sure on

17   that.

18       Q    Do you as you sit here where that information

19   came from?

20       A    Yes.  I believe that there were -- there was

21   gossip from multiple sources.  However, the source that

22   I relied on was from Ms. Mills' granddaughters,

23   Michelle, and Jennifer.

24       Q    And who did they get it from?

25       A    They -- their statement to me was that it

1    came from their mother.

2      Q    Did you ever talk to the mother?

3      A    No.  I attempted to talk to her on one

4    occasion, I believe, and was unable to locate her.

5      Q    To your understanding, did the mother deny

6    that?

7      A    Yes.  She did.

8      Q    Did you only try to talk to the mother on

9    that one occasion, or did you try to talk to her for

10   other reasons about the case?

11     A    I believe that I tried to locate her at her

12   home and then maybe where -- I believe she worked at

13   Walmart, and I think I went there to look for her but I

14   -- I wanted to talk to her in general about the case,

15   but I was not able to locate her.

16     Q    Okay.  Did you talk to any of the other

17   family members?  I know there was a Steve Mills.  Let's

18   exclude Jessie Lawson, Jennifer Lawson, and Michelle

19   Hammonds for the moment.  Other family members, to your

20   knowledge -- to your memory, I should say.

21     A    I don't recall specifically talking to them.

22   If I did, there would be a report.

23     Q    Okay.

24     A    Should be.

25     Q    I think you did talk to Jennifer Lawson at

1    least once; is that right?

2       A    Yes.

3       Q    Was that recorded?

4       A    I don't recall.

5       Q    Okay.  Do you have any recollection of

6    talking to her a second or multiple times?

7       A    I believe I spoke with her at least twice.

8       Q    At least twice?

9       A    I believe so.

10       Q    I do have one recording.  As far as the

11    second or any other ones, do you have a memory whether

12    you made a report or recorded it?

13       A    I don't have -- I don't recall.  I can tell

14    you that -- where was the first time I talked to her?

15    The last time I talked to her, which was probably the

16    second time, was in my office.  I don't recall where

17    the first time was.  I don't know if there was any

18    indication in the report of where we were.  That

19    might --

20       Q    Now, the -- you did describe that you got

21    your information on the Brown confessions from the

22    daughter, so that would include Jennifer Lawson, right?

23       A    Yes.

24       Q    Any other memory from Jennifer Lawson stick

25    out to you as you sit here today?

1    A   Not a memory.  It seems like I learned

2  information that I certainly would have put in a

3  report, but I -- to recall it specifically, I can't.

4    Q   If you don't have a report of any subsequent

5  interview with her, does that suggest that she didn't

6  give you anything useful or anything new?

7    A   Probably.  I mean --

8    Q   Now, Michelle Hammonds, let me switch gears

9  with her.

10    A   I -- I -- I do -- I remember one conversation

11  with her.  I believe that took place at my office.  I

12  don't want to guess.

13    Q   You do remember one conversation with

14  Michelle Hammonds?

15    A   I remember part of one, not Michelle,

16  Jennifer. I talked to Michelle -- is her last --

17    Q   It's changed.  It was Edwards.  I think it's

18  now Hammonds.

19    A   Edwards I believe when I interviewed her, she

20  was Edwards.  Interviewed her too, yes.

21    Q   It's a pretty long report and we're running

22  out of time, so I don't want to go over the whole

23  thing.  Do you recall that she told you that Kayla

24  Mills and Jonathan Taylor were living with William

25  Lester at one point in time?

1      MR. SLOSAR:  Objection to form.

2      A    I don't recall that, but if it's in the

3    report, then she would've told me that.

4      Q    Do you recall that she told you that Lester

5    had told her that they were stealing from him?

6          MR. SLOSAR:  Objection to form.

7      A    I don't recall that.  But, again, I would --

8    if that's in the report, then --

9      Q    You wouldn't dispute it?

10     A    I don't dispute it.

11     Q    If she said that she suspected that -- do you

12   recall that she suspected that Amanda Hoskins had

13   stolen from her?

14         MR. SLOSAR:  Objection to form.

15     A    Yes.

16     Q    Did she -- do you recall that she also said

17   that her ex-husband, Nathaniel Edwards had stolen from

18   her as well?

19     A    From Michelle?

20     Q    Yeah.

21     A    I don't recall that but if it's in the

22   report.

23     Q    I asked the same question of Powell just

24   because it seems odd to me that you-all have a lot of

25   background reports and kicked a lot of tires, but I

1   didn't see anything in there about Daniel Edwards,

2   that's her ex- husband.  Does that name sound familiar

3   to you?

4       A    I don't recall discussing her ex-husband with

5   her.

6       Q    Is there any reason why you wouldn't

7   investigate somebody who she said had stolen off the

8   family?

9       A    I can't give you a reason why.  I don't know.

10      Q    Okay.  All right.  Ford Collett, did you

11  interview him?

12      A    Yes.

13      Q    What do you recall about that interview?

14      A    I think he was early -- one of the early

15  ones, too, from what I recall.  I believe that he may

16  have dated Amanda.  I'd have to see the -- I would have

17  to see the report.

18      Q    Sitting here today, you don't remember

19  anything substantive that he reported to you?

20      A    Not that I can recall off the top of my head.

21      Q    The Trents, the neighbors, you interviewed

22  them?

23      A    Yes.

24      Q    Sitting here today, anything stand out in

25  your memory of your interview of them?

1    A    I don't -- I believe that both of them

2  relayed that they did not hear or see any vehicles, or

3  hear any sounds, or see anyone over there.

4    Q    Were they hard of hearing?

5    A    I believe that Carson may have been, but I --

6  I'd have to see the report to say for sure.  I believe

7  that he -- one of them was, but I'm speculating at this

8  point, guessing.

9    Q    Anything else or any of the information from

10  them stick out in your memory other than what you just

11  said that they didn't hear or see anything to their

12  memory?

13    A    I recall Susie talking about conversations

14  that she had with Ms. Mills regarding her grandson who

15  was living with her at the time, and that she wasn't

16  satisfied, I guess, with his efforts to be employed.

17  She didn't like his friends.  I believe he may have

18  come to see them after the incident, but they refused

19  to talk to him.  We talked about William, she was

20  familiar with William Lester.  She knew who he was.

21  She had had interactions with him.  She had a high

22  opinion of him.

23    Q    That's about the gist of it?

24    A    Without seeing it.

25    Q    Yeah.  I'm going to hand you a document

1    PL34173. This is your report of the Ford Collett. What

2    number are we on? I know it's a long day when

3    Elliott's lost track.

4         COURT REPORTER: 17.

5           ( EXHIBIT 17 MARKED FOR IDENTIFICATION)

6    Q    Short report. You had a chance to read this?

7    A    Yes.

8    Q    Mr. Collett referred you to a Mr. Brown; is

9    that accurate?

10   A    Yes.

11   Q    Did you ever interview Jeff Brown?

12   A    I don't have a memory of having interviewing

13   Jeff Brown, although I can't be sure.

14   Q    Any reason why?

15   A    I -- I may have. I'm just not sure if I did

16   or did not.

17   Q    Marcy Baker. Did you interview a Marcy

18   Baker?

19   A    I think I talked to her on the phone, I

20   believe.

21   Q    And what do you remember from her report, or

22   her interview with you?

23   A    If she's the one that I'm thinking about, I

24   called her. I made multiple attempts to find her and I

25   think a neighbor in a trailer park in Knox County told

1  me that she had gotten married and moved and gave me a

2  phone number.  If she's the one -- if that's the one

3  I'm thinking about, a neighbor gave me a phone number.

4  She didn't know where she had moved to.  And when I

5  called her she was very upset.  She didn't want to

6  talk.  I asked her if I could meet with her and

7  interview her about the case, and she said, "No," that

8  she did not want to talk -- that she would not talk to

9  me.  I asked -- I believe I -- I asked her why she

10  didn't want to talk to me and she said, "It doesn't

11  matter, I lied about all of it anyway."  And she wasn't

12  satisfied with something that Mr. York told her he

13  would do or something in exchange for the statement is

14  my best recollection of talking to her.

15      Q    Did you ever follow up on what it was she was

16  asking for?

17      A    It may have been in the -- it should be in

18  the report if she told me.

19      Q    Okay.  There's a couple of other larger

20  witnesses I'm going to come back to in just a second,

21  but I want to check off a few people.  Have you ever

22  heard the name Larry Gregory?

23      A    Yes.

24      Q    Who is that?

25      A    I'm not sure.

1    Q   Okay.  Does he own property that William

2  Lester was taking care of?

3    A  I believe so.

4    Q   Okay.  Does he live out of state in Florida?

5    A  Yes.  If he's the owner of the truck that Mr.

6  Lester was driving.  I spoke with someone in Florida

7  and I believe that was his name.

8    Q   Did he give you any information about the

9  case?

10    A  I don't recall any information about the

11  case.

12    Q   Did he indicate that Lester had been calling

13  him around the time of the murder?

14    A  I don't recall anything to that.

15    Q   Did he indicate that Lester had been using

16  his house or that he had been letting his house to

17  Amanda?

18      MR. SLOSAR:  Objection to form.

19    A  Not that I recall.  I want to say he had

20  access to it to take to -- to take care of it.  I don't

21  recall if he told me anything about anyone staying in

22  the house.

23    Q   Is it your understanding that when Joe King

24  and Amanda Hoskins were arrested after the murder had

25  happened that they were at Larry Gregory's home?

1       MR. SLOSAR:  Objection to form.

2       A    I don't know from my recollection.

3       Q    Okay.  Did you ever talk to Jerry Wayne

4   Taylor, Jonathan's brother?

5       A    Yes.

6       Q    What did he tell you?  Well, let me stop.

7   How many times did you talk to him?

8       A    I believe that -- I'm not sure but I -- for

9   sure, one time.

10       Q    Okay.  At least once.  What about Linda

11   Taylor?

12       A    Certainly, I talked to her on multiple

13   occasions.

14       Q    How, for Jerry Wayne, the one time you

15   remember, was that recorded?

16       A    Not -- I'm not sure.  I don't recall.

17       Q    Did you do a report?

18       A    I probably did.  I don't recall.

19       Q    Okay.  You don't have any reference of it.

20   Did you record any conversations with Linda Taylor?

21       A    Not to my recollection, but --

22       Q    Did you do a report of any conversations with

23   Linda Taylor?

24       A    I don't know the answer to that.

25       Q    Jerry Wayne let's start with him.  Did --

1   what did he tell you to your memory?

2      MR. SLOSAR:  Objection to form.

3     A   He was certainly early on.  I recall asking

4   him if he knew whether or not Mr. Taylor was home

5   during the day, if he had left at any time during that

6   day.

7     Q   What did he tell you?

8     A   From my recollection, he told me that he was

9   home.

10     Q   Anything else he told you?

11     A   I'm sure he told me more, but nothing stands

12   out that I can recall specifically.

13     Q   Did he talk about whether he was watching

14   Amanda's kids on the day that Katherine Mills was found

15   dead?

16      MR. SLOSAR:  Objection to form.

17     A   I don't recall if he told me that or not.  I

18   don't -- it wasn't unusual for her to watch her --

19     Q   For him to watch her kids?

20     A   For him to watch her kids, from what I

21   recall.

22     Q   Did -- what did Linda Taylor tell you?

23     A   I remember Linda telling me that she worked

24   that day.  Amanda was home when she left.

25     Q   Did she tell you what hours?

1    A   Probably, but I mean I don't -- I don't

2  recall if we talked about the time.  I know she told me

3  that she talked to Amanda on the phone throughout the

4  day.  I don't recall specifically anything else that

5  she -- I'm sure there was a lot more but --

6    Q   Did she tell you whose phone?  Did Amanda

7  have her own phone?

8       MR. SLOSAR:  Objection to form.

9    A   I don't know if she had her own phone at the

10  time or if she -- I believe I recall them all

11  interchanging their phones when one person wouldn't

12  have one maybe Amanda would use Jerry's or Jonathan

13  would use one of theirs or I'm totally speculating

14  here.

15    Q   Yeah.

16    A   But I don't recall specifically if she told

17  me she had a phone or not.

18    Q   Okay.  You have a memory, though, that they

19  shared phones?

20    A   Uh-huh.

21    Q   Is that a "yes"?

22    A   Yes.  I'm sorry.

23    Q   You're fine.  Heather Warren or Heather

24  Carnes. Do you recall ever talking to somebody by that

25  name?

1    A    It sounds familiar but without knowing some

2 content, I -- I don't recall specifically.

3    Q    Okay.  Let's go to Bob Smith.  I'll try to be

4 brief on this.  It's Exhibit number 3, your report.

5        MR. SLOSAR:  Again, you guys have an agreement

6    about how you're going to split up the remaining 20

7    minutes?

8        MR. WRIGHT:   We'll manage it or we'll ask for

9    relief from the Court, one or the other.

10 BY MR. WRIGHT:

11    Q    All right.  You ready?

12    A    Ready.

13    Q    That phone number, did you find that or did

14 Bob Smith give that to you?

15    A    I would assume Bob gave it to me.

16    Q    Okay.  Now your report, your testimony was

17 that Bob explained this that cops would bust him, seize

18 his money, he'd do some plea that was the cost doing

19 business, I think was your words; is that fair?  Your

20 report doesn't mention anything about the cost of doing

21 business, does it?

22        MR. SLOSAR:  Objection to form.

23    Q    Let me explain another way.  Your report only

24 references one time where police seized his cash,

25 right?

     MR. SLOSAR:  Objection to form.

A    Yes.  I believe.

Q    Bob Smith's now dead, right?

A    He is.

Q    You didn't record this, did you?

A    I don't believe that this is recorded.

Q    Yeah.  Now, the time that this happened where he was seized -- arrested, and his cash and pills seized, I think you indicated that Bob Edwards, Ray Bit Edwards, and William Bingham had suspected that that was given to Allen Helton by police; is that right?  Is that your memory of your conversation with Bob?

     MR. SLOSAR:  Objection to form.

A    I believe that it was Bit that --

Q    What I'm getting at is Bob never told you he saw that, right?

     MR. SLOSAR:  Objection to form.

A    No.

Q    Bingham never told you he saw police give that to Allen Helton?

A    No.

Q    Did Ray Bit Edwards tell you that he saw that or did he also, was he in a different car and didn't see it either?

     MR. SLOSAR:  Objection to form.

1    Q   Or he wasn't there maybe. That might have

2  been a different occasion where Ray Bit Edwards was --

3    A   I believe that Ray told me that he didn't

4  witness money or any transfer like that. That he

5  witnessed York pull into this location and whether or

6  not he said Allen came out I'm not positive about, but

7  it seems like, from what I recall, that Allen came out

8  and then, you know, his knowledge about what happened

9  from there was secondhand.

10    Q   Fair enough. So none of those three

11  individuals saw York give anything to Allen Helton,

12  right?

13    A   Correct.

14    Q   Now your report indicates that they referred

15  to a Dan Helton at the top of the second page. Do you

16  see his name?

17    A   Yes.

18    Q   Did you ever talk to him?

19    A   I don't recall if I spoke with him or not.

20  If I did, there would be a report and I certainly

21  would've searched for him. But...

22    Q   Did you think that this was evidence that --

23  of favoritism towards Allen Helton by police?

24    MR. SLOSAR: Objection to form.

25    A   It certainly potentially could've been.

1      Q     Now, this date of May 1, 2012, that's when

2    they said this occurred.  Do you see that on the

3    beginning of the second paragraph, first page?

4      A     Yes.

5      Q     Did you look for any evidence that Helton was

6    not receiving favoritism by police at that time period?

7      A     Other than trying to locate the witnesses

8    that were conveying that information to me.  I mean

9    that would've been all that I would've done.

10      Q     So you didn't look to see whether he had been

11    recently indicted?

12      A     I remember checking the records for sure on

13    Bob. I can't say for sure on the other ones, but I

14    don't know why I wouldn't have.

15      Q     Okay.  All right.  Let's talk about Michael

16    Crump for a minute.  You showed Mr. Crump pictures,

17    didn't you?

18           MR. SLOSAR:  Objection to form.  You can

19    answer.

20      A     Yes.

21      Q     Did you show him pictures of Jonathan Taylor?

22      A     I believe we looked at the -- I believe so,

23    yes.

24      Q     The ones produced in discovery where he had

25    the jacket and the hood?

1 A Probably.

2 Q Did you show him pictures of Mike Simpson?

3 A I believe I -- I believe that one for sure.

4 Q Did you show him pictures of any other male

5 suspects, Allen Helton?

6 A Possible.

7 Q William Lester?

8 A That's possible.  I'd have to see -- I'd have

9 to review the records, but I certainly recall showing

10 him photographs.

11 Q Now, you testified you asked him, or you-all

12 talked about whether he had seen pictures before from

13 police, true?

14 A True.

15 Q And I believe you said he gave you multiple

16 different answers, right?

17 A Yes.

18 Q Isn't it true he first told you that he had

19 seen no pictures?

20 A Yes.

21 Q Isn't it true that then you told him that you

22 thought he had seen pictures?

23  MR. SLOSAR:  Objection to form.

24 A I don't recall that, but it certainly should

25 be reflected in the record.

1    Q    Did you -- let's go off the record for a

2 minute and I'll just play a part of that tape.  Tell me

3 if you can't hear this.  I didn't bring the speakers.

4    A    Okay.

5    Q    What I'm going to play this is from the Crump

6 recording, 1548.

7         (OFF THE RECORD)

8 BY MR. WRIGHT:

9    Q    All right.  Do you recognize the voices on

10 that recording?

11    A    Yes.

12    Q    Is that your voice?

13    A    It is.

14    Q    Do you recognize that to be the voice of

15 Michael Crump?

16    A    Yes.

17    Q    And that's the interview where pictures were

18 shown?

19    A    Yes.

20    Q    In that clip we played, he told you that he

21 had seen no pictures; is that true?

22         MR. SLOSAR:  Objection to form.

23    A    Yes.

24    Q    And you indicated it was my understanding

25 that you'd seen pictures.  Did you hear that, where you

1   said, "My understanding"?

2        A    Yes.

3        Q    I just want to ask, what was your

4   understanding of what pictures he had seen?

5        A    I don't recall what I would've been referring

6   to without reviewing the record.  I'm not -- I'm not

7   sure.

8        Q    Other than the pictures of him from the

9   police department with his coat and hood on, are you

10  aware of any other pictures that had been taken of him

11  in this case?

12           MR. SLOSAR:  Objection to form.

13       A    I'm not aware of any.

14       Q    Other than those pictures, are there any

15  other pictures that you could have been referring to?

16       A    No.  Maybe --

17           MR. SLOSAR:  Same objection.

18       A    Possibly just the picture of him in the

19  discovery, because I know I was puzzled from the

20  beginning why he was dressed up in put in that --

21       Q    Well, that was what I was referring to.  The

22  picture and the discovery of him in the coat.

23       A    Yeah.  Just, other than it being there, and I

24  wasn't clear on why it occurred, why it would be there.

25  Maybe I assumed that he had showed it to him, I'm not

1    sure.  I'm not sure what I was thinking at that time.

2       Q    As we sit here today, all I've got is the

3    recording.

4       A    Uh-huh.

5       Q    So I don't know what pictures you showed him,

6    but is it the pictures from discovery?  Is that the

7    pictures you had that day?

8          MR. SLOSAR:  Objection to form.

9       A    I believe that would be the only picture I

10   would've had of Jonathan.  I believe I showed him a

11   picture of Michael Simpson, and that would've probably

12   been a mug shot.  I believe I showed him a photograph

13   of Amanda which probably would've also been a mug shot,

14   because I think everything I had in the way of pictures

15   may have even been pulled up on my phone, to be honest

16   with you, from JailTracker.  I recall wanting to go

17   back with pictures.

18      Q    Did you?

19      A    I did not.

20      Q    Is there a reason why?

21      A    Yes.  Shortly after that interview, there was

22   a -- I believe it was a bond hearing and Mr. York

23   learned that I had interviewed him, Mr. Crump.  And he

24   had called Mr. Crump or talked to him, I'm not -- I'm

25   assuming he called.  I don't know how he spoke with Mr.

1 Crump.  But Mr. York called me and had a phone

2 conversation about that he didn't know who I was.  He

3 didn't really want to talk to me, or he wouldn't have

4 talked to me if he have known who I was and was upset

5 that I had interviewed him, so I didn't feel like I

6 should -- I didn't feel like I should go back at that

7 point.

8     Q    Based on the reported feelings of Michael

9 Crump?

10        MR. SLOSAR:  Objection to the form.

11    A    Yes.

12    Q    Okay.

13    A    Now, I'm not --

14    Q    Did you show him the sketch?

15    A    I believe I showed him the sketch.

16    Q    What did he tell you about the sketch?

17    A    I think --

18    Q    I think you said that the scruff was more

19 like peach fuzz.

20        MR. SLOSAR:  Objection to the form.

21    A    I believe I recall that, yes.

22    Q    Other than that, did he say it was pretty

23 good?

24    A    It's possible that he said that.

25    Q    do you have any memory of any other issues he

1    had with the sketch?

2      A    Not from recollection, I don't.

3      Q    Now, in that clip we heard he said that he

4    talked to police twice.  Did you hear that?

5      A    I did.

6      Q    One would've been shortly after the murder.

7    I don't know exactly how long, but he was driving by --

8      A    It was the next day.

9      Q    -- the next day, maybe a couple of days, you

10   were talking to him a couple years after the fact,

11   right?

12     A    Yes.

13     Q    But it was sometime shortly after the murder

14   or she had been found dead.  Do you have any indication

15   that he would've been shown the pictures at that very

16   first interview with police?

17        MR. SLOSAR:  Objection to form.  Calls for

18     speculation.

19     A    I don't recall that being the case, no.

20     Q    They weren't even -- they didn't even know

21   about him.  He came to them is your understanding,

22   right?

23     A    Yes.

24     Q    Wouldn't be surprising that they wouldn't

25   have pictures of suspects at that point to show him,

1    right?

2        A    Correct.

3        Q    And then there was a second interview that

4    they had, correct?

5        A    Correct.

6        Q    And now the first one I'm sorry, I've skipped

7    ahead, but now the first one was by Detective Cornet;

8    is that your understanding?

9        A    I believe so.

10        Q    And Detective Cornet recorded that interview;

11    is that right?

12        A    That was my understanding.

13        Q    But that couldn't be found, right?

14            MR. SLOSAR:  Objection to form.

15        Q    To your knowledge?

16        A    Right.

17        Q    The second interview was with Detective York

18    and at least one other officer who did the sketch,

19    right?

20        A    Correct.

21        Q    Any other officers that you're aware of that

22    were involved in that, or you had information that were

23    present?

24        A    I don't recall if he said there were other

25    officers or not.

1    Q   Was there a crime supplement of that second

2 Crump?

3    A  I don't recall.

4    Q   I'll show you a document, KSP272.  Pass that

5 down.  What exhibit are we on?

6     COURT REPORTER:  18.

7    Q   If you'd just take a minute to review the

8 narrative portion of that.

9     ( EXHIBIT 18 MARKED FOR IDENTIFICATION)

10    A   Okay.

11    Q   Now, the narrative indicates that he gave a

12 recorded statement to Detective Mike Cornet; do you see

13 that, the second sentence?

14    A   I do.

15    Q   But this narrative is from 2-2-11 with

16 Detective York and Josh Bunch; do you see that in the

17 first line?

18    A   Yes.

19    Q   There's no reference in this narrative that

20 this second interview was recorded, correct?

21    A   Correct.

22     MR. SLOSAR:  Objection to form.

23    Q   Do you have any -- strike that.  Do you know

24 whether this February 2, 2011 date was before the

25 pictures were taken of Jonathan Taylor?

1    A    No.

2        MR. SLOSAR:  Objection to form.

3    A    I don't know.

4    Q    Do you know whether you reviewed that crime

5  supplement before you interviewed detective, I mean

6  Michael Crump?

7    A    I don't know specifically.  If it was

8  included in the first batch of discovery in reports

9  that we received, then I most likely I would have.

10   Q    Okay.  And there's nothing in here, this

11  gives a description of what Mr. Crump said.  It never

12  says he identified anybody, does it?

13   A    No.

14   Q    Same way with the Detective Cornet report.

15  To your knowledge, did it say he identified somebody,

16  or did it just give a description?

17   A    I don't recall exactly what his report said.

18   Q    Okay.  If this meeting between this interview

19  with Detective York and Crump on February 2, 2011 was

20  before the photos of Jonathan Taylor were taken, that

21  means you were the first person to show it to him,

22  weren't you?

23       MR. SLOSAR:  Objection to form.  Calls for

24   speculation.

25   A    I showed him a photograph.  Whether anyone

1   showed him before me, I don't have any -- I mean, other

2   than what he said.

3      Q   The only photos you showed him were ones from

4   discovery, right?

5      A   I -- I would assume that would've been the

6   one that I showed him.

7      Q   Okay.

8      A   I recall pulling up photographs on

9   JailTracker while I was there and showing him those.

10  So...

11     Q   The blue car, did you do any follow-up

12  investigation as -- on that issue?

13     A   Yes.

14     Q   Did you come to any suspicions whose blue car

15  it was?  I know you got a lot of records from the DMV.

16     A   I did not come to any conclusion based on

17  those records.

18     Q   A Corey Byers, did you ever investigate

19  whether he may have been the owner of a blue car?

20     A   I recall him being the owner of a blue car.

21     Q   Did you --

22     A   I don't know -- I don't recall exactly what I

23  did by way of investigation, but I know he was the

24  owner of a blue car.  I believe he was also -- there

25  was photographs of him in a camo jacket in the

1    discovery as well.

2        MR. WRIGHT:  All right.  How much time --

3    what's our time on the record?

4        COURT REPORTER:  Six hours and 58 minutes.

5    BY MR. WRIGHT:

6        Q    All right.  I'm going to be fast on these

7    last two.  Mike Simpson and Allen Helton, you talked

8    about two recording -- two interviews with Allen

9    Helton; one was in May of 2015 after a trial date,

10   correct?  Does that sound right?

11       MR. SLOSAR:  Objection to form.  Misstates the

12   evidence.

13       A    I talked to him after a trial date.

14       Q    Yeah.  And one was in the Laurel County

15   Detention Center.  That was the first one, right?

16       A    Yes.

17       Q    And in that first interview, he confirmed to

18   you what he told Detective York; is that fair?

19       MR. SLOSAR:  Objection to form.

20       A    I would certainly have to review that one to

21   be sure of what he said.

22       Q    There's nothing that exists to review that

23   I'm aware of.  If he would've denied it or if he

24   would've said it was all a lie, you would've documented

25   that, wouldn't you?

1       MR. SLOSAR:  Objection to form.

2    A    Certainly I would have.

3    Q    Did you ever subpoena, I think he said that

4  he had gotten his money from Lewis Recycling.  Does

5  that sound familiar to you?

6    A    I believe that was one of the locations.  I

7  remember recycling.

8    Q    I've seen a subpoena for Lewis Recycling, but

9  have no response.  Did you-all get one?

10   A    Not that I recall is my recollection.

11   Q    And I want to make sure the record's clear.

12  Are you saying that they responded, said, "We have no

13  record," or are they saying, "We don't have records

14  from that time period"; what's your memory of that?

15       MR. SLOSAR:  Objection to form.  Asked and

16    answered.

17   A    I would assume if we subpoenaed them, there

18  was -- he had something relevant to say to the

19  situation, but what it -- I mean, without reviewing my

20  records, I don't recall specifically.

21   Q    I would expect a response.  I just didn't see

22  one.  I also believe that you-all got a court order and

23  I don't know if it was accompanied by a subpoena or

24  not, but for pharmacy records for Allen Helton and Mike

25  Simpson in Florida; does that sound familiar?

1      MR. SLOSAR:  Objection to form.

2    A    I don't recall doing that.

3    Q    That might have been Taylor's group.

4    A    That could've happened.

5    Q    And did you track down Simpson's rental car

6   records?

7    A    I did.

8    Q    Did you get a verification for that?

9    A    I got records.

10    Q    Did you subpoena those?

11    A    I believe so and I believe those were turned

12   over to Jackie Steele, and of course, if they were part

13   of my records, they were turned over.

14    Q    Did you collect water utility records from

15   him as well?

16    A    I know I attempted to.  I don't recall -- it

17   seems like maybe from -- I was able to collect records

18   from one of the utilities and maybe not the other is my

19   recollection.

20      MR. SLOSAR:  Counsel, at this point, I believe

21      we have exceeded the seven-hour limit pursuant to

22      Federal Rule 30(d)(1).  I know with Defendant

23      York's deposition when I had come up to the seven-

24      hour limit, there was not an agreement to allow me

25      to go over.  How many further questions do you have

1  so that we can determine whether the deposition

2  should cease?

3      MR. WRIGHT:  I want to just have her look over

4  the utility records she got for Simpson.  We could

5  probably do that by some other stipulation, or we

6  can do it now.

7      MR. SLOSAR:  To authenticate that she didn't

8  get any additional records?

9      MR. WRIGHT:  What's that?

10      MR. SLOSAR:  To authenticate that she didn't

11  get any additional records?

12      MR. WRIGHT:  Just to -- for her to confirm

13  that these are the records that she subpoenaed

14  related to his utilities.

15      MR. SLOSAR:  Okay.  How many -- how much time

16  do you guys have?

17      MS. DEMOSS-CAMPBELL:  My normal -- I don't

18  anticipate more than five to ten questions limited

19  to about five to seven minutes.

20      MR. WEBER:  I would say about the same unless

21  there's answers that come up that I'm not

22  anticipating.

23      MR. WRIGHT:  I believe there's verifications

24  for the Enterprise and the KU records.  I'm just

25  going to show her the water utility ones, because

1    those were sent to her.  Is that okay?

2        MR. SLOSAR:  Sure.

3        MR. WRIGHT:  All right.  I appreciate it.

4    Thank you, Elliott.

5  BY MR. WRIGHT:

6        Q    Ms. Hoskins, I'm just going to ask you to

7  review those documents, PL -- I'm sorry -- 16009-16011

8  because I believe those were made to your attention.

9  Oh, I gave you too many copies.  I'm sorry.

10       A    That's okay.  Okay.

11       MR. WRIGHT:  What exhibit are we on?

12       COURT REPORTER:  That would be 19.

13       MR. WRIGHT:   Exhibit 19.

14        (EXHIBIT 19 MARKED FOR IDENTIFICATION)

15  BY MR. WRIGHT:

16       Q    Did you request the water records for Michael

17  Simpson?

18       A    I'm sure that I did.

19       Q    And this was from the Knox County Utility

20  Commission?

21       A    Yes.

22       Q    And does that appear to be a true and

23  accurate copy of the records you received from the

24  Utility Commission relating to Mike Simpson?

25       A    Yes.

 1      MR. WRIGHT:  That's all I have.  I'll pass the

 2   witness.  Thank you.

 3                 EXAMINATION

 4   BY MR. WEBER:

 5      Q    Ms. Evans, my name's Cody Weber.  I will try

 6   to be as brief as possible.  I represent some KSP

 7   officers, Mark Mefford, Brian Johnson, Jackie Joseph,

 8   Dallas Eubanks, and Kelly Farris.  Are you aware of --

 9   I'm not sure I've heard any of these individual's names

10   being mentioned yet today.  Are you aware of how any of

11   these individuals are involved in this investigation?

12   I'll start with Mark Mefford.

13      A    I believe Mr. Mefford was present at the

14   scene or maybe did some canvassing, neighborhood

15   canvassing. I'm not certain about that, although he did

16   accompany me to the scene after the incident.  I can't

17   recall if he maybe was -- that's all I can recall from

18   my recollection.

19      Q    Brian Johnson, are you aware of how he's

20   involved?

21      A    In this case --

22      Q    Yes.

23      A    -- or either --

24      Q    In this case.

25      A    In this case I'm not.

1    Q    Okay.

2    A    Not from my memory.

3    Q    Jackie Joseph, how she's involved in this

4  case?

5    A    I believe she interviewed witnesses and I

6  believe maybe she was a supervisor at the time.

7    Q    Do you recall which witnesses she

8  interviewed?

9    A    I believe she interviewed some from the

10  owners from the sawmill maybe, and beyond that, I can't

11  recall.

12    Q    Did you interview those?

13    A    I did.

14    Q    Did you make a recording of those?

15    A    I don't recall if I made a recording.  There

16  should be a report of some sort.

17    Q    So based off of, I guess, some -- if there

18  was anything -- I'm paraphrasing.  If there was

19  anything of a whole lot of substance from those

20  interviews, there would be a recording or a report; is

21  that --

22    A    I believe the owner was Larry Smith, and I

23  don't recall his wife's name, but I believe I recall

24  doing a report on Larry Smith, from my recollection.

25    Q    But nothing else other than, obviously, you

1  mentioned being a supervisor, but nothing particular

2  with your supervisory duties in this ?

3      A    No.

4      Q    Dallas Eubanks, are you aware of how he's

5  involved in this investigation?

6      A    No.  Not -- I don't recall.

7      Q    And the last one is Kelly Farris.

8      A    I believe Mr. Farris interviewed some out of

9  state witnesses.  I -- if I had a few minutes, the

10 names would probably come to me.  There was a husband

11 and a wife.  I believe they lived in Indiana.  My

12 recollection is that Mr. Farris called them and told

13 them that their vehicle which I believe was an SUV, but

14 I could be mistaken about that, was seen in their

15 driveway and that while he didn't -- I don't think he

16 believed that they were involved, but he said he needed

17 to interview them and ask -- I think he asked them to

18 come to Kentucky.

19     Q    The Jones, Rebecca Brock Jones, and Brian

20 Jones?

21     A    Yes.

22     Q    And that's the only instance you're aware of

23 with Mr. Farris?

24     A    That I can recall, yes.

25         MR. WEBER:  Okay.  No further questions.

1    Thank you.

2         THE WITNESS:  Uh-huh.

3              EXAMINATION

4    BY MS. DEMOSS-CAMPBELL:

5    Q    Hi.  I'm Alexandra Demoss-Campbell.  I'm here

6    on behalf of Mike Broughton and the City of

7    Barbourville.  My questions are going to be similarly

8    limited.  Other than on Exhibit 6, page 2 which is

9    Bates stamped 34628 --

10   A    You said that was 6?

11   Q    Exhibit 6.  Yes, ma'am.

12   A    Okay.

13   Q    And that'll be the second page where Mike

14   Broughton is mentioned?

15   A    Uh-huh.

16   Q    I believe earlier you testified that you

17   believed the only thing you needed to talk to him about

18   was the location to serve a subpoena?

19   A    I believe that's what this note was in

20   reference to.  It seems like I recall him being

21   involved and maybe he interviewed Ms. Hoskins or some

22   witness that I may have wanted to talk to him about,

23   but in this note, I'm sure it was because I was looking

24   for his new location for service of a subpoena.

25   Q    Okay.  So if there is only one subpoena in

1  the record that's been provided so far, and that would

2  be for September 14, 2015, does that seem like the

3  subpoena you were looking to serve?

4      A    I served one at the police department, at the

5  city police department on Mr. Broughton.  And I

6  would've looked for him, you know, for any future trial

7  dates that we had.

8      Q    Okay.

9      A    That's all that I recall.

10     Q    Okay.  And you were just saying that you were

11 wanting to talk to him about interviews with Amanda

12 Hoskins?

13     A    Potentially.  It seemed like he interviewed

14 maybe a witness and I believe that it was Ms. Hoskins

15 but I'm totally going from --

16     Q    Okay.  And you had said earlier that you had

17 looked into potential actions of police officers.  Was

18 there anything that led you to look into Mike Broughton

19 in this investigation or prosecution?

20         MR. SLOSAR:  Objection to the form.

21     A    Not from my recollection.

22     Q    Okay.  So other than potentially being

23 present for an interview, you don't have any personal

24 knowledge of Mike Broughton's involvement?

25     A    Without reviewing the record, I don't.

1    Q    Okay.  And at no point is there a subpoena

2  issued to any other Barbourville Police Department

3  officer; isn't that correct?

4    A   I don't recall issuing subpoenas to another

5  city employee, but I'm not sure.  There was probably 70

6  or more subpoenas going -- or at least attempting to be

7  served on witnesses.  So...

8    Q   And do you have any personal knowledge of any

9  actions of any other Barbourville City Police

10  Department officers in the investigation or

11  prosecution?

12    A   Not from my -- not from memory, no.

13    Q   And in your -- I don't want to get into

14  anything privileged, but in your review or attempts to

15  locate Mike Broughton, were you aware of any

16  allegations or any misconduct by Mike Broughton?

17    A   I don't recall from memory any specific thing

18  regarding Mr. Broughton.

19    MS. DEMOSS-CAMPBELL:  Elliott, that concludes

20  my questions.  Thank you.

21    MR. SLOSAR:  I have nothing and we'll -- at

22  the end of the deposition, we haven't been doing

23  this, but we should.  You have the ability to

24  review the deposition, make sure that the court

25  reporter took down all your answers accurately and

1  so you can waive your signature, check out the

2  transcript.  You can reserve signature, check out

3  the transcript, or you can waive it, trust that she

4  wrote it down accurately.  It doesn't matter to any

5  of us, but you have that option, so just let her

6  know whether you want to read it, reserve

7  signature, or waive it and be done, okay.

8       THE WITNESS:  Okay.

9       MR. SLOSAR:  What do you want to do?

10       THE WITNESS:  I probably would want to review

11  it.

12       MR. SLOSAR:  Okay.  So the witness will

13  reserve signature and we'll get you a copy of the

14  address where to send it to.  Thank you.

15       (DEPOSITION CONCLUDED AT 7:19 P.M.)

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF REPORTER

COMMONWEALTH OF KENTUCKY AT LARGE

I do hereby certify that the witness in the foregoing

transcript was taken on the date, and at the time and

place set out on the Title page here of by me after

first being duly sworn to testify the truth, the whole

truth, and nothing but the truth; and that the said

matter was recorded stenographically and mechanically by

me and then reduced to typewritten form under my

direction, and constitutes a true record of the

transcript as taken, all to the best of my skill and

ability.  I certify that I am not a relative or employee

of either counsel, and that I am in no way interested

financially, directly or indirectly, in this action.

MADELINE WILLIAMSON,

COURT REPORTER/NOTARY

COMMISSION EXPIRES:  05/11/2022

SUBMITTED ON:  09/24/2018

## Exhibits

**exh 1** 111:19
126:11,13,15

**exh 2** 131:10,
17

**exh 3** 155:21
156:3 206:10
301:4

**exh 4** 158:6
232:3

**exh 5** 168:7,9,
10,11

**exh 6** 181:8,10
323:8,11

**exh 7** 185:15,
17,18

**exh 8** 197:6,21,
22

**exh 9** 240:15,
16

**exh 10** 246:16,
19

**exh 11** 250:17

**exh 12** 252:4

**exh 13** 262:20

**exh 14** 271:4

**exh 15** 285:13

**exh 16** 286:23

**exh 17** 295:5

**exh 18** 312:9

**exh 19** 319:13,
14

## $

**$1,000** 79:9
80:22

**$100** 263:23

## 0

**02** 104:21

## 1

**1** 111:19
126:11,13,15
170:7 304:1

**1,000** 206:21

**10** 111:13
154:5,9 155:24
246:16,19

**100** 10:20
24:14 196:24
206:19 288:16

**10:45** 283:22

**11** 139:11
154:6,10
250:17

**12** 208:1 251:25
252:1,4

**12-20-2010**
197:25

**12:30** 284:2,7

**13** 251:25
262:15,20

**14** 262:14
271:1,4 324:2

**15** 33:16,18
93:21 111:10,
12,14 203:7
207:22,24
285:10,13

**1548** 306:6

**16** 286:23

**16009-16011**
319:7

**17** 240:25
295:4,5

**18** 93:14 312:6,
9

**19** 319:12,13,14

**1983** 71:8

**1995** 102:16,23

**1998** 206:14

**1:00** 285:1

**1:08** 285:17,21

## 2

**2** 131:10,17
132:10 159:7
312:24 313:19
323:8

**2-2-11** 312:15

**20** 99:12 146:17
175:3 206:15
301:6

**20-some** 44:14

**2000** 178:21

**2008** 101:17

**2010** 13:16
146:17 218:19
219:6 221:24
273:14

**2011** 139:11
228:22 312:24
313:19

**2012** 47:17
139:21 170:7
282:16,24
304:1

**2013** 182:7
240:25 241:4
258:22 273:1

**2014** 11:14
15:18 36:23
47:18 48:24
125:5 155:24
172:4 178:22
203:7

**2015** 258:19
315:9 324:2

**2017** 49:19

**202** 104:21

**23** 172:4

**2405** 156:1

**2406** 156:1

**2407** 156:1

**2408** 156:2

**25** 55:13 71:4

**26** 171:10
282:16

## 3

**3** 135:2 155:21
156:3 160:13
206:10 301:4

**30** 12:20 17:18
26:8 77:2,3
100:13,16,18
110:8,9,18

**30(b)(1)** 174:11

**30(d)(1)** 317:22

**30th** 175:21

**34,000** 127:21

**34628** 323:9

## 4

**4** 158:6 232:3,5
271:15

**40-hour** 105:6

**42** 71:8

**43** 262:12

## 5

**5** 139:9 168:7,8,
10,11 178:9,15

**50** 55:11 206:17
214:19

**50-plus** 206:16

**58** 315:4

## 6

**6** 139:18 154:7
181:8,10 323:8,
10,11

**628** 182:25

## 7

**7** 139:21

**1:08** 285:17,21

**185:14,15,18**
197:3

**70** 325:5

**7:19** 326:15

## 8

**8** 151:10 197:5,
6,22 240:14
273:1

**827** 251:25

## 9

**9** 240:14,15,16

**94** 169:11

**95** 102:20 103:6
104:10,11,13

**98** 102:18

## A

**abetted** 80:18

**ability** 104:13
325:23

**Abner** 162:20,
23 163:1 223:4
265:12 266:7,
18,19

**absolutely**
10:4 22:2 60:7
63:16 80:13,14
127:24 177:4

**abuser** 221:24
280:12

**abusing**
218:18

**accept** 173:18

**access** 70:3
297:20

**accessible**
112:8

**accident**
149:23 201:7
203:11

**accompanied**
67:17 68:1
146:15 254:8
316:23

**accompany**
320:16

**accreditation**
104:24

**accumulated**
203:6

**accuracy**
261:22

**accurate**
154:12 212:22
241:4 245:18
246:18 271:7
282:8 295:9
319:23

**accurately**
325:25 326:4

**acquired**
252:2

**acquittal**
52:11,13,22,23
55:19,25 82:8

**acquitted**
54:18 77:12

**Act** 130:23

**acted** 260:14
261:17

**acting** 50:8,15

**action** 158:4

**actions** 9:8
140:23 324:17
325:9

**active** 52:24

**activities**
167:12

**activity** 167:18

**actual** 154:8
175:25

**add** 269:18

**added** 67:11,
12

**additional**
86:4 101:25
104:12,25
138:15 164:14
195:9 202:22
236:5,8,9,14
237:19 318:8,
11

**Additionally**
136:9 139:19

**address** 25:1
93:24 94:1
173:21 326:14

**addressed**
186:18

**administer**
184:15

**admissible**
108:7

**admit** 37:9
44:11 153:19

**admitted** 218:6

**admittedly**
107:11 169:11

**adopted** 99:16

**adult** 98:1

**advance**
252:15

**advancements**
251:3

**advice** 118:16

**advocacy**
46:10,19 50:3
54:8 90:12
95:16 102:15
103:21 106:23
109:3 116:8
120:3,7 130:17
206:13

**affair** 225:16
257:9

**affect** 83:25
165:14

**affected**
107:25

**affidavits**

150:13

**affiliated**
117:17

**affirm** 8:4

**afraid** 124:4
278:18

**age** 93:12

**agencies**
126:1

**agency** 26:24
47:3 172:6

**agent** 92:12
160:10 163:24

**agree** 44:8
93:25 94:11,13
175:20 228:3
247:18 276:18,
20 279:23
281:14

**agreed** 19:19
244:25

**agreement**
36:12 215:10,
12,15 216:1,2,
4,18,21 217:3
301:5 317:24

**ahead** 58:18
77:16 97:12
140:25 143:21
153:13 207:23
262:16 264:18
274:4 311:7

**aided** 80:18

**Alexandra**
323:5

**alibi** 170:15,19

**allegation** 71:8
222:9

**allegations**
39:19 44:10,12
45:20 48:23
49:5 108:9
155:3 208:2,4
221:16 325:16

**alleged** 139:9
167:17 192:21
198:20

**allegedly**
146:8

**Allen** 34:12,13,
14,16,23 35:3
39:21 40:25
41:6 121:5
132:17,21
138:3 141:14,
25 155:7
157:11 187:4,
17,21 188:9
195:16,19
201:10,12
226:14 237:2
302:11,20
303:6,7,11,23
305:5 315:7,8
316:24

**Allen--** 141:13

**allocation**
174:17

**altered** 224:19

**Alternative**
189:13

**altogether**
180:9,10

**Amanda** 8:16
18:8,21,22 30:1
42:7,13 43:3,9
51:20 52:20,25
54:7,22 57:19
64:12 65:11
66:1 67:4 68:5
75:16 81:8,9
88:9 89:4,20
95:6 108:1
110:3,7 112:15,
17,20 113:4
116:20 117:1
122:14,16,23
123:3,11 141:5
153:4,9,24
169:11 183:5,7
185:24 186:24
217:16 218:9,
18 219:6,19
220:6,13
231:13 234:7
240:24 242:12,
13 243:3
244:23 245:3
246:8 247:25

249:13 252:10
253:8,14 254:7
256:1 257:1
258:3 260:22
263:10 269:9
284:16 286:7
292:12 293:16
297:17,24
299:24 300:3,6,
12 308:13
324:11

**Amanda's**
66:1 112:24
159:5 228:20
230:13 287:12
299:14

**Amber** 161:10,
25 162:1 186:5,
25 189:4
217:24,25
233:13 261:25
262:22 264:6
266:1,2,15,17,
22,25 267:13,
24 268:2,7,8

**amend** 95:19

**amended**
158:2

**amount** 17:18
33:25 219:22
277:5,8

**Amphib** 96:11

**amphibious**
96:14

**and/or** 34:16
62:19 125:20
141:5,6

**Anderson**
49:11,12 53:1
54:17 55:20
59:15 60:12
74:8 77:11
79:25 82:7
112:22 113:7
122:18 159:1,2
166:4 167:6,10
168:3 171:23
223:20

**Anderson's**
49:2 52:10,11,

13 75:15 77:8,
19 82:8 158:18
160:22 166:17
167:2 171:20
192:1

**Angela** 163:19
171:10,15
172:4 176:3

**angry** 79:3

**Ann** 111:6

**answering**
73:8,22 88:12

**answers**
131:23 148:16
151:10 154:7
217:11 305:16
318:21 325:25

**anticipate**
174:14 318:18

**anticipating**
318:22

**anticipation**
70:7

**apologize**
17:10 28:6
40:14 51:24
75:1 269:21

**Appalachian**
146:16,23
147:3

**appearance**
238:9

**appeared**
132:18 213:13

**appears** 156:9
175:21 284:22

**applied** 102:3
165:1

**applies** 56:23
225:1

**appointment**
286:6

**apprehension**
215:19

**approached**
144:24 170:19

**appropriately**
174:7

**Approximately**
207:24

**April** 240:25
241:4 258:22

**area** 13:10 14:8
24:12 32:3,13,
18,23 92:5 97:6
118:23

**areas** 32:20
97:1

**Arnett** 164:5

**arose** 39:7

**arrest** 19:13
21:13 23:21,22,
23 34:4,7,17
35:12,16,22
36:2,21 37:3,18
38:11 45:1,12
107:25 188:12
231:24

**arrested** 9:15
19:10,22 20:12
23:16 33:22
34:6 35:24
36:8,10,11
37:10 38:20
139:13,19
157:11 198:6
244:24 297:24
302:8

**arresting** 21:5,
7

**arrests** 21:2

**asks** 115:19

**aspect** 27:5

**assembled**
98:11

**assert** 53:5
62:21 69:3
172:14 229:15

**asserted** 69:5
81:15 89:5
92:14,22 94:25
115:17 128:4,7
172:12

**asserting**
29:15 48:10
63:8 174:2

**assertion**
83:15 84:11

**assertions**
83:25 86:23
87:7 165:18
261:10

**assigned**
67:14 114:16
208:20

**assist** 8:22
72:21 73:8
82:14 90:12

**assistance**
34:7 38:24
190:8

**assistant**
74:16

**assisted** 73:23
80:18

**Associate's**
102:3

**assume** 14:19
15:16 16:21
18:25 22:11
40:17 47:7
73:20 74:16
75:25 84:2
102:4 111:4
115:24 117:9
136:22 137:17
140:17 156:20
182:13 185:10
187:2 191:4
196:9 200:25
201:25 238:17
250:22 254:13
278:2 301:15
314:5 316:17

**assumed**
39:18 43:14
110:11 287:19
307:25

**assuming** 21:7
174:18 251:14
308:25

**assumption**

136:6

**attach** 182:15

**attached**
182:11

**attachment**
247:16

**attack** 184:16

**attempt** 275:23

**attempted** 9:9
192:11,15
220:3 289:3
317:16

**attempting**
325:6

**attempts** 32:7
41:22 77:17
191:20 295:24
325:14

**attend** 81:1
105:6 143:10

**attended** 9:1,3
102:2,7 103:8
133:14,20

**attending**
82:12

**attention** 46:6,
10 145:14
271:14 319:8

**attorney** 16:6
29:9,10 30:8
46:6,11,17 47:8
57:2,19 65:15
66:13,15 91:4
102:19 106:5
113:14 114:15
116:9,13
118:10 123:23
127:25 133:15
152:17 164:3
169:12 181:15
208:7,20,24
209:7 215:18
250:8 251:15,
20 274:14
276:9

**attorney's**
173:5 250:10

**attorney-**
29:19 57:22
92:16 247:10

**attorney-client**
53:6 56:23 57:3
58:1 62:22
63:10 124:14
128:8 173:17
177:24 180:22

**attorneys**
16:21 29:17
47:8,9,11 48:14
53:7,8 58:6
63:24 64:11
65:2,7,8,10,22
66:2 68:5 69:7
74:21 105:9,10
120:21 130:9
131:4 174:15
205:9 215:16
235:4,17 241:1

**attributed**
147:19

**augments**
104:13

**August** 175:3,
21 273:1

**authenticate**
318:7,10

**authored**
169:1

**authority**
46:14,20 57:21

**authorization**
252:9

**automatically**
224:5

**Avenue**
119:14,16

**averse** 261:1

**awaiting**
239:22

**aware** 25:18
46:22 48:22
75:21 108:25
113:24 114:1,2,
18,21,24 131:9
146:18 153:24

190:11,14
199:14 207:5
208:18,19
219:21 236:14
271:13 273:19,
21 276:14,22
307:10,13
311:21 315:23
320:8,10,19
322:4,22
325:15

**awareness**
230:11

___

**B**

**bachelor's**
101:21 102:1

**back** 12:5
20:23 25:13
29:8,12 31:1
36:16 42:1
56:20 58:11,12,
13 105:11
115:11 144:19
145:10,20,22
148:19 151:21
180:4 187:18
199:23 215:8
235:25 236:3,
12 246:24
249:4,5 256:24
270:11 274:4
282:6,23
296:20 308:17
309:6

**backed** 144:15
145:8,21

**background**
12:25 195:15
196:9 292:25

**bad** 16:13
135:15 224:17

**Baker** 295:17,
18

**ballpark** 55:8

**bankruptcies**
104:3,7

**bankruptcy**
103:3

**Baptist** 119:19

**Barbara** 47:10,
16 65:21 66:23
67:8,10,11

**Barbourville**
25:2 76:24
136:24 137:1,
10 139:11
323:7 325:2,9

**base** 96:12,14

**based** 21:14
29:23 42:25
54:2 81:19
112:7 124:5
154:12 165:17
167:12 180:25
208:4 229:22
261:3,10 309:8
314:16 321:17

**Basically** 18:7

**basis** 61:14,18
63:2 81:14 91:6
106:8,23
114:11 253:5

**bat** 8:19 156:8

**batch** 313:8

**Bates** 112:6
128:25 129:2
156:1 197:4
323:9

**Beach** 96:8
102:24 103:11,
17 162:12,13
221:15 239:6

**Beach's**
162:17

**bears** 92:9

**beg** 50:23
129:8 199:3

**began** 8:14
54:11,12 67:15
102:15,18
232:20

**begin** 198:3

**beginning**
55:19 74:7
81:25 144:4

**Baptist** continued... 151:21 304:3
307:20

**begins** 154:9
262:18

**behalf** 63:7,11
64:7 90:18
260:22 323:6

**Beine** 178:23
179:13,15

**belief** 201:22
225:8 230:8

**beliefs** 211:13

**believed** 31:23
34:10 79:12
80:15 139:13
145:9 148:18
155:7 267:13
279:10 322:16
323:17

**believes** 27:11
266:8

**Bell** 52:12 96:2,
6,16,18,22
101:3,4 102:18
110:12 120:12,
13 121:6,8,13,
14 167:23
239:21,23
254:21,24

**belong** 181:18
182:23

**Bennett** 163:5
238:13,18

**bet** 165:22

**bias** 91:18
92:10,15
210:15

**biased** 95:6

**biases** 91:21
92:2,9

**big** 12:2 95:24
105:13 278:13

**Bill** 49:11,12
53:1 54:17
55:20 59:15
74:7 75:15
122:18 166:3

167:6

**bills** 263:23

**Bingham** 9:16
19:4,12,14,17
23:7,16 24:4,5
27:24 28:9 30:7
31:12 32:22
35:16,23,24
36:9,11,13,14,
18,22 37:8,15,
17,19,21 44:23
45:23 48:18,20
59:12 62:19
124:9 126:4
130:1 156:17
223:16 237:8
302:10,19

**Bingham's**
24:18

**bit** 9:17,19
15:6,7 19:4,5
28:11,12 29:4,5
39:2,3,14
45:10,11 62:19
120:5 134:25
156:17 206:4
211:1 223:19
227:19 270:19
302:9,14,22
303:2

**Blair** 178:11,12

**blame** 23:16
95:7

**Bless** 129:10

**blonde** 145:9

**blue** 145:8
146:17 225:9
314:11,14,19,
20,24

**Bob** 9:14 10:1,
21,23 12:21,23
13:4,7,10,23
17:19 18:12,13
19:3,10,14,15,
16,19 20:8,11,
16 22:3,25
23:16,24 24:2,
3,5,9,16 26:12
27:5 28:7,8,9
29:2,13,24

33:23,24 34:11,
17 35:13,14
36:7,12 38:20
39:1,3,13 42:2,
5,25 43:14
45:23 48:2
59:1,22,23 60:1
62:18 69:24
80:1,3 124:25
125:16 126:3
138:20 139:2
155:25 156:11
157:1 161:7
191:2,3,15
206:9 237:7,14
301:3,14,15,17
302:3,9,12,15
304:13

**Bob's** 10:16
14:6 23:14 27:4

**Boggs** 152:17
274:14,16
275:23

**bond** 194:25
276:24 277:1,6,
7,8,9 308:22

**Bonnie** 183:1,
2,14

**born** 96:4,6

**bottom** 132:11
138:20 159:7,9
170:8 191:2
197:17

**bought** 42:7
157:3

**box** 129:21

**boxes** 128:3

**Boy's** 101:4

**Brandon**
98:14,15 99:14

**Brandon's**
99:1

**Branson**
149:15 150:2
161:9 232:9
234:6,14

**break** 74:24
151:1 180:16

205:18 246:22
269:4

**Brian** 320:7,19
322:19

**briefly** 8:13
32:9 235:1,15

**brightly** 145:14

**bring** 16:9 46:5
106:4 126:20
127:7,8,12
128:2 306:3

**Brittany** 97:21,
22 99:14

**Brock** 322:19

**broke** 272:9

**broken** 78:6

**brother** 265:20
298:4

**brought** 8:16
46:10 190:23

**Broughton**
184:4,5,6,7
323:6,14 324:5,
18 325:15,16,
18

**Broughton's**
324:24

**Brown** 163:6
192:21,23,25
193:23 281:1,
11 282:9 283:8
286:19,20,21
288:4,5,7
290:21 295:8,
11,13

**Browns** 196:24
288:10,12

**Brunner**
162:22 221:14,
15 239:10

**Bryant** 207:11,
16 208:2

**bump** 145:19

**bumper** 145:20

**bunch** 163:9
206:1 286:4,6

312:16

**burdensome**
127:25

**Bureau** 46:14

**Burger** 103:17

**Burgey** 111:7

**burglary**
139:20 140:1

**Burson** 102:25

**bus** 144:10

**business** 20:4,
5,20,23 49:8
79:8 301:19,21

**bust** 301:17

**busy** 70:14

**buyers** 43:25

**buying** 43:25
118:5 253:9

**Byers** 314:18

———————

**C**

**call** 29:25
50:22 53:24
69:18 85:14
87:2,25 88:3,9,
21 89:2,4,17,25
90:3,7 120:19
130:16 158:9
186:3 271:14
276:5

**called** 19:5
34:7 85:14,19
86:15 87:8,15
88:8 90:24
92:11 110:15
115:11,20
118:20 129:7,
11 208:13
239:22 272:10
281:13 295:24
296:5 308:24,
25 309:1
322:12

**calling** 38:24
90:12,18
297:12

**calls** 16:11
30:2 53:21
55:10 88:24
89:12 108:18
113:20 116:5
130:12,18
139:14 169:16
171:6 175:23
188:24 216:14
227:6 230:14
253:11 279:25
310:17 313:23

**camo** 314:25

**camouflage**
145:11

**Camp** 101:3,4,
5

**candid** 166:2,9

**canvassing**
320:14,15

**capacity** 50:4
57:19 73:21
125:24

**capital** 65:17
105:8 109:17,
21,22 110:1,6
111:2 112:11,
15,25 113:6
120:14 207:15
215:20

**car** 149:22
172:6 187:2,4,6
201:12 203:11
225:9 263:10
264:2 272:7,8,
10,13 302:23
314:11,14,19,
20,24 317:5

**card** 213:11
281:13

**cards** 286:7

**care** 297:2,20

**Carla** 111:3,6

**Carnes** 47:10,
16,25 65:21
66:11,12 67:8
181:22 220:25
300:24

**Carolina** 99:12

**carrying** 16:20

**Carson** 163:13
294:5

**case** 13:18
16:24 31:2 45:4
46:17 48:5
49:3,6 52:16,20
57:11,15 59:15
60:12,19,20
65:1,4,5,9,11,
12,13 66:1
67:11 70:10,20,
25 71:1,7,11
72:22 73:3,25
75:16 77:8,19,
20 79:25 80:13
81:22,25 82:7
85:1,2 86:17
87:3,8,16 88:5
89:21,23 91:2,
19 92:9,10 94:8
110:1,17 111:8
112:15,25
113:3,5,6,11,23
114:16 115:4
116:11,12
117:13 120:13,
14,24 121:8,9,
16 122:14,16,
18,24 123:6,12
127:22 130:9,
10 131:20
133:11 142:20
150:12,14
158:18 159:5,
22 160:22,24
166:8 167:2,20,
22 168:1
169:11 171:20,
23 180:20
186:16 191:25
192:1 197:24
203:15,21,25
206:1 207:3,6,
7,13,15,17,18,
19 208:4,12
211:13,25
212:14,19,20
213:20 215:20,
21,22,24
216:17,20
217:20,22
221:13 223:20,

21 226:15
227:23 229:21
233:3 236:1
239:23 240:1,2
251:17 252:16
268:4,9 282:21,
22,25 284:12
287:11,17,20
289:10,14
296:7 297:9,11
307:11 310:19
320:21,24,25
321:4

**cases** 21:5,6
43:2 48:25
70:13,15 105:9
110:19 112:12
113:19,25
114:1,11 121:2,
7,14,15,17,21
122:1,3,9,12
129:16 155:2
198:10,11,13,
14 206:16,18
209:20 214:13
216:25 223:21
224:7

**cash** 186:8
277:6 301:24
302:8

**catalog** 236:19

**catch** 27:6
206:3

**caught** 232:5
234:3

**caused** 35:22
36:22 107:25
145:15

**caution** 229:20

**CD** 221:12

**cease** 216:4
318:2

**cell** 90:7

**cellmates**
150:8,9 234:7

**center** 10:12
11:8,9 14:3
15:1,15 25:7
34:9 35:23

36:7,23 39:4
48:8 54:13
133:6,13
137:18 139:22
150:5 183:3,7,9
231:4 235:2,12
237:3 238:4
239:21 242:7,8
249:25 258:15
261:16 315:15

**central** 13:11

**certainty**
195:14

**certification**
104:20,24
105:2 106:6
109:14 269:25

**certifications**
269:16

**certified**
104:15 105:5

**chain** 175:4

**chance** 8:18
151:5 269:12
273:22 295:6

**change** 106:15
214:14

**changed** 190:3
291:17

**changing**
72:14

**characterize**
241:20

**characterizing**
241:24

**charge** 19:16,
17,19 135:13
219:22 242:19

**charged** 20:13
38:14 222:14

**charges** 42:6,
16,21 43:8,24
44:9 45:1 51:20
81:8,15 82:2
113:6,7 126:21
127:5 139:20
140:2,9,19
142:22 157:1

231:24

**Charles**
155:25

**Charli** 99:16

**chart** 176:4,5

**check** 144:8
195:16 200:8,9
201:18 250:23
296:21 326:1,2

**checking**
304:12

**Chicago** 49:24

**children** 99:13

**children's**
146:16,22,23
147:3,6 225:10

**Chloe's** 284:9

**chosen** 30:9

**Christie**
163:18

**Christy** 149:15
150:8 161:9
232:9 234:6,14

**church** 119:10,
14,15,19,20,22

**CI** 28:18
287:11,23

**circle** 263:24

**Circuit** 122:2

**Circulate**
112:3

**circumstance
s** 15:14 23:9
30:13 31:25
49:22 71:1
81:14 83:8
85:18 118:17
133:2 149:7
271:19

**city** 25:2 323:6
324:5 325:5,9

**civil** 70:20,25
71:1,8 85:2
86:17 87:3
115:4 118:8

**claimed**
232:10 255:3,6

**claiming**
172:19

**clarification**
177:15

**clarify** 51:2
52:2 227:19
251:24 255:14

**clarity's**
131:25

**class** 109:2,21
110:4

**clear** 30:20
40:20 73:17
83:14 92:10
128:10 132:4
177:23 213:10
244:11 248:21
265:17 280:7
307:24 316:11

**Cleo** 163:6
192:21 193:23
281:1,11 282:9
283:8 284:9
286:19,20,21
288:7

**Cleveland**
288:5,13

**client** 29:20
54:3 57:4,22
60:12 83:23
92:16 107:9
152:11 185:24
208:24 209:1,4
210:2,7,9
216:12 217:16
218:18 221:16
224:20 229:13
246:13 247:10
261:1 269:9

**client's** 92:12,
15,20

**clients** 44:22
54:5 57:21
58:1,5 63:7,24
64:7 73:14 91:5
92:14 94:25
165:1 209:9,13

**clients'** 64:3

**clip** 306:20
310:3

**clock** 51:12

**close** 25:6,8
68:8 100:15
258:17 276:18
282:20

**closer** 100:1
258:19 259:1

**co-owners**
249:9

**coach** 211:4

**coat** 136:11,13
307:9,22

**codefendant**
215:22 216:12

**codefendants**
217:1

**Cody** 98:8
320:5

**coerce** 165:13

**coerced** 39:19
141:4 224:22

**cohorts** 107:12

**collect** 74:18
196:4,7 317:14,
17

**collected** 15:3
21:8 74:12
196:1,2 245:16

**college** 25:9,
13 102:2

**Collett** 293:10
295:1,8

**Collins** 103:8

**colored** 145:14

**comfortable**
118:19,21

**comment** 38:2
43:10 106:8,24

**comments**
160:4 243:19

**clients'** 64:3

**clip** 306:20
310:3

**Commission**
319:20,24

**commit** 224:21

**committed**
155:8 227:18

**common** 16:22
203:14

**commonplace**
120:17

**Commonwealt
h** 90:14

**Commonwealt
h's** 46:6,11

**communicate**
62:6 88:25
94:24

**communicate
d** 88:15

**communicatio
n** 29:16 48:13
53:7,19 56:15
57:6 58:5,10
62:23 83:10,21
85:22 86:24
87:20 124:16,
17 165:16
173:11 181:1
229:13 246:13
247:6 253:3
254:14 264:21

**communicatio
ns** 85:13 89:14
117:20,21
172:19 173:19
176:10 264:12
265:16

**Community**
102:2

**company**
196:6

**complaint**
72:22 73:2
139:10

**complaints**
207:1

**completed**
208:15

completely 23:17 37:3

complex 12:2

comply 84:2

Computer 102:7

concern 95:9 97:5 184:13

concerned 108:15 141:19

concerns 184:4

CONCLUDED 326:15

concludes 325:19

conclusion 201:1 216:15 314:16

condition 200:24 205:5 268:18,25

conduct 14:10 17:5 38:3 79:8 275:7

conducted 11:6,7 57:11 81:6

conducting 114:9 195:11

conducts 65:1

confer 173:23, 25 176:18

conferral 176:25

conferred 174:16

confessed 196:20,25 210:10 218:2 288:2

confession 267:20

confessions 290:21

confident 92:25 215:25

confidential 86:16 107:21 287:1

confirm 34:22 218:1 234:14 247:25 273:20 281:17 283:14 286:14 318:12

confirmed 281:5 315:17

confirms 282:11

conflict 110:16

conflicts 120:18

confuse 243:1

confused 41:2 77:11 181:16

connection 144:10

consent 64:3

consideration 43:7

considered 21:24 27:10,14 117:18 143:3 173:4 204:14 276:12 278:20

consistent 31:21 34:1 152:5 273:4

consistently 154:20

constituted 67:4

constitutional 71:9 92:16,20

construction 119:9

consulted 179:6

consulting 69:7,10

contact 41:22 54:2 91:3 94:8, 14,18 95:21 117:16,24 144:20 198:22 275:23 276:5

contacted 54:8 92:21 94:21 207:16

contacts 114:21,24 151:14

contained 193:4 220:20

content 53:13, 16 58:9 85:9 87:20 88:25 92:8 143:24 301:2

contents 56:15 176:20 180:24 247:14

continue 69:3 100:12 116:20 178:3 205:17 213:7

continued 117:16

continues 57:4 60:4 91:14

continuing 48:23 53:5 57:22 62:21 81:6,7

continuous 114:10

contraband 231:2,11

contract 66:17 102:19 116:10

contracted 66:12

contradicts 284:19

conversation 17:7 22:12 23:6 42:2 43:16 47:9,14 49:20

53:13 57:5 59:6,20 60:11, 18 89:1 90:22 94:22 107:11 119:12 123:9 139:3 154:6 156:24 160:1 171:2 183:14, 24 186:5 202:19 213:24 238:14 249:24 252:24 258:1 259:9 265:23 266:3,8,20 268:21 281:24 291:10,13 302:12 309:2

conversations 19:21 53:9 54:2 58:2 69:16 82:20,21,23 83:15,23 124:24 125:6, 15 142:19 150:10 156:11 160:16 183:17, 23 229:22 243:12 246:12 252:24 254:18, 19 259:11 294:13 298:20, 22

conversions 232:20

convey 87:21

conveyed 87:15

conveying 304:8

convicted 31:17 78:17

cooperate 39:25 166:1

cooperation 177:10,14

copies 129:22 180:14 319:9

cops 301:17

copy 155:19 246:18 271:7

282:8 319:23 326:13

Cora 97:14

Corey 314:18

corner 145:10

Cornet 311:7, 10 312:12 313:14

correct 22:15 28:8 29:6 37:3, 11 42:4 60:10 69:19,20 71:25 72:20 93:6,22 98:1 101:14,15 161:15 167:22, 25 185:25 198:7 199:5 204:20 208:21 209:1 225:25 226:3 233:6,21 234:4 235:17 237:15,16 243:25 244:2 252:17 253:16, 22 257:16,20 258:11,23 260:22 261:1 262:1,2 263:12, 16,19,21 264:7 265:7 269:23 270:20,21 279:16 282:13, 14 283:15 285:15,16,21 303:13 311:2,4, 5,20 312:20,21 315:10 325:3

Corrections 101:1

corresponden ce 182:17,20,21

corroborated 201:22

Cosmetology 103:8

cost 301:18,20

couch 24:20

could've 12:20 24:10 30:11

35:19 121:7,22
134:16 135:24
139:17 147:16
201:6 270:10
303:25 317:4

**council** 104:19
105:7 106:5

**counsel** 69:10
88:22 112:3
124:16 172:13,
14 173:25
174:1,14,20
176:25 177:15
180:12 208:6
229:14 247:5
317:20

**counselor**
265:10

**count** 168:8

**counties**
96:21,25
110:16,17
120:21

**county** 8:15
11:8 13:15
14:3,12,13 21:1
23:11 26:22
32:15,20 38:7
40:5 44:17,24
45:11,21 46:7
47:1 48:24
52:12 67:16
96:2,6,16,18,23
98:12 101:3,4,
11 102:18,19
108:23 110:12
111:9 120:7,13
121:6,8,13,14
122:4,12,13
125:1,12,21
132:2,15 133:6,
12 137:18
150:4,5 158:21
159:8 160:7
164:16 166:13
167:19,23,25
171:19 179:24
183:2,7,8
184:15 185:7,9
188:21 192:20
194:20 202:24
207:14 220:22
221:6 223:2

231:3,5 235:1,
12 237:2 238:4
239:21,23
246:5 252:16
254:21,24
258:14 295:25
315:14 319:19

**couple** 62:12
158:15 196:23
203:18 220:3
236:4,13
281:12 288:1
296:19 310:9,
10

**court** 8:3,9
56:20 63:21
91:13 100:6,18
122:2 158:4
173:21 180:5
183:9 186:18
190:24 208:3
212:23 238:8
240:17 246:24
252:1,16
262:12,15
265:6,8 285:10
295:4 301:9
312:6 315:4
316:22 319:12
325:24

**courthouse**
25:11

**cousins** 100:2

**cover** 181:14
182:12 251:2

**covering**
267:6

**Cox** 10:11,13
15:13 16:2,6,20
17:4 22:7
29:12,13,14
30:13 67:11
116:7 133:15
169:13 171:11
186:20 212:15

**Cox's** 169:14

**create** 106:15

**created** 111:22
125:24 148:3
182:20,21

**creates** 111:22
112:5

**creation**
148:24 149:6

**credibility**
190:1 210:10,
21

**credible** 46:24
200:19

**creditors**
103:4

**Creek** 32:14,18
96:11,13 99:22
191:1,6,11,23

**Crider** 111:3,6

**crime** 38:14,15
167:16,17
186:10 243:17
244:18 312:1
313:4

**criminal** 31:14
101:20 104:15,
18 122:3
139:20 140:2,9,
19 159:12
160:6 195:15
204:4,21
208:23 211:25
229:23 251:20,
22 256:19

**criteria** 123:20

**critical** 107:8

**criticisms** 9:4
223:25

**criticize**
106:24 107:15

**criticizing** 9:13

**cross** 196:15

**cruiser** 38:24
39:1 148:19

**Crump** 143:12,
15,18 144:2
148:3,13 149:1,
9 161:9,20
187:17 199:4
200:13,17
226:12,13,18,

22 227:23
228:3,14 232:6,
15 304:16
306:5,15
308:23,24
309:1,9 312:2
313:6,11,19

**Crump's** 68:1

**Curtis** 164:9

**custodian**
130:22

**custody**
230:12

**customers**
27:8

**cut** 103:9

—————

**D**

**dad** 284:3

**dad's** 284:1,4,6

**daily** 61:14,18

**Dale** 212:9,22
267:23

**Dallas** 320:8
322:4

**Dan** 162:8
250:10,16,19
251:16,18,19
252:19 253:23
303:15

**Daniel** 112:17,
20,21 234:24
235:8 239:3
293:1

**date** 11:10
23:13 48:6
78:4,5 83:7
84:19,25
133:10 176:23
187:3 198:1,2
201:19 241:7
247:9 255:16
258:16 273:1
282:15 283:3
285:20 304:1
312:24 315:9,
13

**dated** 293:16

**dates** 231:21
258:18,20
324:7

**dating** 273:12,
14

**daughter**
97:21 99:15
290:22

**daughters**
277:1

**Dave** 160:14,19

**David** 61:7,8,
10 62:2 171:11,
18 208:6

**day** 20:22
50:24 51:10
117:4 144:9,13,
14,21,25
170:20 183:16
204:9 229:24
246:9 255:14,
20,22 256:2,11
272:15 278:16
285:17 295:2
299:5,6,14,24
300:4 308:7
310:8,9

**days** 15:20
100:13,16,18
109:2 116:24
310:9

**DEA** 160:10

**dead** 218:19
219:6 248:2
299:15 302:3
310:14

**deal** 19:15
95:24 100:10

**dealer** 13:13,
15,21 49:10
80:15 191:19,
23 192:2,8,21
193:24 194:7

**dealers** 13:9
191:1,5,11
192:16 193:6,
19 194:13,18

**dealing** 20:17
27:6

**death** 75:1
99:12 113:2,11
136:1,3,7 141:6
198:2 255:22

**deceased** 99:6
249:8 275:24,
25 276:13

**December**
146:17 218:19
219:5 221:24
273:14

**decide** 106:15

**decided**
268:22

**decision** 63:22
261:6

**declined**
243:24 244:13

**deemed** 184:1

**deeper** 86:22

**defendant**
62:23 73:14
132:16,18
136:10 138:2
139:19 148:8
150:2,21
151:11 152:3,
11 155:14
207:14 208:21,
24 317:22

**defendants**
8:17 27:21
60:6,14,21
73:10,16 89:21
100:11 110:17
132:1,2 137:8
215:13 217:1
246:25

**defense** 29:17,
25 48:14 53:8
57:9,20 58:3
60:8 62:24
63:11 64:1,11
66:25 67:2,4
83:22 88:16
92:12,21 94:14,
25 95:22

104:15,18
105:5 124:17
125:14 153:4
168:19 171:12
173:10 174:14,
20 177:14
178:19 179:2
181:2 211:25
215:10,12
229:14,23
251:20,22
253:3 256:19
261:9 264:21

**definitively**
45:4

**degree** 101:19,
21 102:1
276:21

**Del** 212:7

**delve** 86:22

**delves** 83:21
124:14 165:16
229:13 261:8
264:20

**delving** 54:4
57:5

**demand**
128:20

**demeanor**
261:18

**Demoss-
campbell**
318:17 323:4,5
325:19

**denied** 34:21
77:20 200:13,
14 281:19
315:23

**deny** 247:25
281:18 289:5

**department**
21:1 38:8 40:6
44:17,25 45:6,
12 90:18 95:15
100:25 106:3
108:24 110:15
120:25 121:23
125:1,21
132:16 139:12

159:9 160:7
164:17 166:13
184:12 188:22
206:12,24
207:17 208:5,
14,18 211:2
216:8 229:19
230:21 307:9
324:4,5 325:2,
10

**Department's**
202:24

**depending**
16:10

**depends** 12:1
124:6

**deposition**
8:14 56:7,10
58:22 70:16,22
93:5,12 94:3
111:20 126:11
128:1,15
165:19 176:13,
14 178:4 206:7
247:17 268:4,9
317:23 318:1
325:22,24
326:15

**deposition's**
72:17

**depositions**
70:8

**deputies** 38:8

**deputy** 44:24

**Derek** 273:12,
14,17,18

**Derrick** 205:25
264:17

**describe** 181:4
290:20

**describes**
156:23

**describing**
145:19 216:21

**description**
148:8 224:11
227:21,23
228:17 229:9

241:19 280:19
313:11,16

**descriptions**
144:17 227:13

**designated**
174:7 176:15
177:16

**designations**
172:15,16
177:1

**destroy** 236:23

**destroyed**
236:21

**detailed** 68:23

**details** 263:22

**detective**
139:1,4 140:7,
8,17 141:11
143:1,6 146:2,
10,15 147:1
151:18 156:25
206:1 223:20,
25 228:21
229:5 243:10,
11,17 244:17
245:4,13,20
249:19 256:6
261:17 274:6
275:7,12
278:18 311:7,
10,17 312:12,
16 313:5,14,19
315:18

**detention**
10:12 11:8,9
14:3 15:1,15
34:9 35:23
36:7,23 39:4
48:8 54:13
133:6,13
137:18 139:22
150:5 162:14
183:3,7,8
185:11 231:3
235:2,12 237:2
238:4 239:21
242:7,8 249:25
258:15 261:15
315:15

**determination**

235:23

**determine**
146:16 176:1,6
318:1

**detour** 223:19

**detoxing**
268:15

**develop** 63:2

**deviated** 155:2

**Dickie** 163:6

**died** 275:25
276:2,11

**differed** 227:11

**difference**
51:3 142:2

**difficult** 168:18

**difficulty**
166:14

**dire** 100:6,20

**direct** 8:10
24:1

**directed** 34:18
39:13 74:5

**direction**
29:16 88:17
89:6

**directly** 30:14
41:3 186:11

**director** 147:6

**disabled** 97:19

**disagree** 60:10
83:14 91:9
176:12 177:3

**disbelieving**
272:22

**disciplinary**
207:8

**discipline**
206:24 208:17

**disclose**
106:16 112:6
203:2

**disclosed**

107:22 173:22

**disclosing**
252:24

**disclosure**
247:4

**disclosures**
95:19 158:2

**discover**
201:14

**discovered**
90:22 166:19
245:18

**discovery**
106:17 138:9,
17 141:23,24
142:1,6 145:3
149:3 151:15
158:3 166:22,
23 167:14
182:5 186:15
187:7,11,12,18
191:8,9,13
197:1 198:17
202:4,10 219:9
220:5,21 221:4
224:3,4 225:23
226:11 228:9,
24 242:25
243:2 244:9,13
245:23 246:1
247:4 266:14
278:10 283:3
304:24 307:19,
22 308:6 313:8
314:4 315:1

**discredit**
210:2 245:12

**discretion**
63:14 124:2

**discuss** 58:21
62:18 64:19
85:1 86:16
125:8 179:19
211:19 256:25

**discussed**
23:14 76:11
85:10 87:8
114:9 124:15
137:16 140:2
143:22 151:16

159:22 165:5,9
249:12 250:1,3

**discussing**
217:2 293:4

**discussion**
255:4 270:20

**discussions**
57:9 64:14 85:7
220:12 243:3
261:8

**dismissal**
51:19 52:22,23
82:2

**dismissal--**
81:25

**dismissed**
81:9 82:2 136:7

**dispensing**
252:24

**displeased**
177:19

**dispute** 266:9
292:9,10

**disputing**
241:16

**distance** 235:8

**District** 96:20
252:16

**diverted** 109:1

**DMV** 314:15

**doctor's**
284:13,14

**doctrine** 57:3

**document**
131:16 181:9
214:5,8 225:24
226:4 246:15
253:21 262:18
272:17 281:20
282:7 285:6,11
294:25 312:4

**documented**
213:19,23,25
272:20 275:20
283:9 315:24

**documents**
56:13,14 58:8
69:22 81:3
126:22 127:21
128:8,24 129:4
131:22 166:19
176:1 180:20,
21,24 181:3
251:25 252:2
269:11 319:7

**doggone**
156:16

**Donna** 162:2,4
233:20 234:1
270:18 271:7
273:13,23
274:10 276:8,
22 277:13

**door** 232:23
281:13

**Dorning** 212:7,
9

**Dorning's**
267:23

**doubt** 135:17
211:18

**Doug** 178:11,
12

**downtown**
25:10

**dozen** 128:2

**DPA** 54:11,12
57:23 65:1
84:22 102:19
116:10 129:7
207:5 208:3
212:11

**draft** 224:7

**dressed** 148:8
224:10 307:20

**driver** 218:10

**driveway**
34:23 144:16
145:8,18,21
146:4 322:15

**driving** 135:14
297:6 310:7

**drop** 43:24

**dropped**
183:11

**drove** 144:15
263:10 279:5

**drug** 13:8,13,
15,20 38:15
42:21 43:2,24
49:10 80:15
103:15 155:1
157:1 191:1,5,
10,19,22 192:2,
8,16,21 193:6,
19,24 194:7,13,
17 221:24
254:8 255:20
270:14 280:12

**drugs** 19:14,
20,25 20:17
21:9 23:22
27:21 34:16
39:24 40:25
42:7 43:25
139:5 157:3
218:18,22

**drugstore**
103:16

**due** 78:5
184:18

**DUI** 135:13
136:7 188:12
200:7,10

**duties** 322:2

**duty** 47:2
209:1,3

**DVA** 46:16

**Dynamics**
102:7

———

**E**

———

**e-** 176:2,16

**e-mail** 170:10
171:21

**e-mails** 172:9
173:10 175:4
176:1

**earlier** 10:5
30:19 69:5
76:11 79:7
86:23 124:15
130:4 165:18
193:11 253:6
261:11 278:19
323:16 324:16

**early** 23:12
24:19 293:14
299:3

**easily** 109:2

**Eastern** 96:5,
20 99:8

**Easy** 206:20

**education**
101:25 104:9
203:19

**Edward** 19:7,8

**Edwards** 9:17,
19 28:11 31:24,
25 32:1,22,25
33:21,22,24
34:1,5,18,21,22
35:12,25 37:2,
10,18 38:12,21
40:15 41:2,4,5,
17 45:10,25
48:18,20 59:12
62:19 124:10
126:4 130:1
156:18 219:12
237:7 291:17,
19,20 292:17
293:1 302:9,10,
22 303:2

**Edwards'** 35:4

**effect** 108:21
188:5 259:12
272:14

**effort** 70:6

**efforts** 245:11,
15 294:16

**elapsed** 273:8

**Elementary**
99:22

**Elliott** 49:23
160:17 230:24

319:4 325:19

**Elliott's** 295:3

**else's** 169:4

**Elsie** 162:20

**employed**
67:21 98:3,9
100:23 103:13
106:9 294:16

**employee** 50:5
90:11 185:8
206:14 231:8
325:5

**empty** 119:20

**encounter**
146:18 157:11
226:5 258:13

**encountered**
213:12

**encounters**
164:15 165:25

**end** 83:16
144:5 203:17
259:1 325:22

**enforcement**
26:24 46:14,19
47:3 100:24
102:11 104:2
106:10,25
107:20 108:11
122:13 125:20,
25 158:13
209:24

**enforcing** 58:1

**entered** 25:19
129:8,16

**Enterprise**
163:20 171:16
318:24

**enticed** 141:4

**entire** 22:17
32:15 61:1,5
70:3 100:8
105:12 126:20
127:4,10
128:20 258:1
266:8

**equipment**
139:25

**Escoe's** 32:11
144:12

**establish** 89:1

**estate** 118:23

**et al** 68:6

**ethically** 94:23

**Eubanks**
168:2 320:8
322:4

**Eugene** 99:6

**Evans** 8:13
48:14 53:7
56:16 57:4,6
58:2 63:12,15,
21 69:11 93:6,
19,20 94:21
98:23 99:18,19
106:12 127:19
128:9 155:25
172:12 173:8
178:8 180:24
246:13 247:6,
14,24 269:8
282:6 320:5

**Evans'** 57:1
58:3

**event** 245:17
264:3

**events** 13:12

**eventually**
119:21 275:25

**everybody's**
174:3

**evidence** 21:8
159:21 160:2
209:4,9,11
210:2,3 211:19,
20 217:14,15
220:17 222:20
303:22 304:5
315:12

**ex-** 293:2

**ex-husband**
96:10 292:17
293:4

**exact** 25:1
55:7,17 57:21
75:8 83:7,12

**exam** 137:15

**examination**
8:10 92:6
205:23 320:3
323:3

**examine**
203:15

**examined**
137:8

**examples**
165:6

**exceeded**
317:21

**exchange**
42:17 45:13
107:19 170:14,
22 186:8
296:13

**exclude**
289:18

**exclusive**
160:24

**exculpatory**
185:24

**excuse** 17:13
82:9 125:16

**excuses**
267:19

**exhibit** 111:19
112:1,9 126:11,
13,15 127:24
131:10,17
155:21 156:3,5
158:6 168:7,9,
11 180:9 181:8,
10 185:15,17
197:6,21
206:10 232:3
240:9,15,16
246:16,19
247:16 250:17
252:4 262:20
270:3 271:4
285:9,13
286:23 295:5
301:4 312:5,9

319:11,13,14
323:8,11

**exist** 57:4,12
60:5 69:11
112:2

**existed** 226:16

**exists** 56:17
176:6 315:22

**expect** 21:17
25:25 182:10
316:21

**experience**
102:12 103:25
104:9

**expert** 57:15
106:13,16,17
179:5,8,9,17
203:21

**experts** 106:4
203:24

**explain** 142:2
237:11 238:24
285:24 301:23

**explained**
301:17

**explanation**
78:1,5 80:7
177:23

**explanations**
78:2,8,12,14

**extends**
154:10

**extensive**
213:24 216:10

**extent** 21:20
22:21 52:6
54:10 57:5
68:23 70:18
72:11 83:9
85:21 88:15,19
90:16 91:14
106:14 108:9
112:6 113:21
115:6,18
159:16 253:1
261:4 264:9,20

**eye** 198:20

**eyes** 173:5

**eyewitness**
198:23,25
199:1,2 226:8

**F**

**face** 62:9
84:16,24

**Face-to-face**
82:23

**Facebook**
116:25 117:1

**facilities**
162:14

**facing** 265:20

**fact** 43:13 89:1
123:6 154:18
156:16 170:22
184:18 189:10
211:24 224:10,
22 263:5
268:23 279:2
310:10

**factor** 189:6

**facts** 228:17
230:11

**failed** 143:10
190:12 199:8,
12 279:13,14

**fair** 16:25 30:14
42:22,24 60:24
170:1 194:14,
16 210:5 212:1,
2 213:20,21
214:10,11
219:1 227:21,
24 245:2 246:5,
8 247:24 248:8,
25 280:20
281:6 301:19
303:10 315:18

**faith** 91:6

**fall** 86:13

**falls** 53:25
88:18

**false** 229:5

**falsely** 155:4, 14

**familiar** 14:8 107:4 131:21 153:21 160:14 163:2,7 249:15, 17 293:2 294:20 301:1 316:5,25

**family** 34:12,13 101:9 186:12 219:11 279:16, 24 280:6 289:17,19 293:8

**Farley** 159:18

**Farris** 320:8 322:7,8,12,23

**farther** 69:25 283:14

**fast** 176:17 315:6

**father** 99:1 186:6 284:8

**favor** 95:6 136:8

**favoritism** 303:23 304:6

**fax** 250:15 253:21 254:1

**faxed** 170:24

**February** 102:15 228:21 312:24 313:19

**federal** 46:14 91:13 92:25 100:6,18 158:4 317:22

**feed** 211:11

**feel** 46:2 47:1 50:18 60:22 62:7,8 71:17 118:19,20 127:12 166:2 185:1 188:17 204:13 223:8 224:2,16,19,21 225:21 227:8

**255:9** 309:5,6

**feeling** 260:17 278:11

**feelings** 107:18 309:8

**fell** 201:7

**felonies** 31:18, 20

**felony** 19:19 36:14

**felt** 27:4,16 43:22 50:19 72:1 104:10 153:3 184:19 185:24 187:10, 14,19 203:1 215:25 224:12 225:9,10 242:8, 10 244:22 260:17 261:14, 18 279:23

**female** 14:1,11 28:18 41:14 145:9

**Ferguson** 254:3

**Ferrell** 160:15, 20

**fight** 215:9

**figured** 116:16

**file** 10:20 11:23 12:7,12,13 22:14,17 70:4,7 71:19 74:6,11, 13,14,21 81:4 82:12 86:6 113:2,9 115:9 126:20 127:4, 10 128:21 169:2,4,18,19, 22,25 180:2 182:9,13,21,23 184:14 199:23 229:21 233:4 235:16 236:1,3, 16 237:4 238:20 281:7 282:23 283:1, 10

**filed** 73:3 113:4,10

**files** 74:2 127:20

**filling** 243:3

**final** 224:8

**find** 12:7 20:11 32:7 59:8 75:22,24 94:16 95:13 108:4 138:4 144:12 152:23,24 153:2 157:9 166:9 171:1 186:17,23 189:17 195:5 196:3 200:10 201:10 209:3 235:8 236:9 295:24 301:13

**finding** 73:23

**fine** 94:4 205:19 269:5 276:22 300:23

**fingers** 215:24

**finish** 221:23

**finished** 50:10 180:8 262:25 271:2

**firm** 53:8 73:24 74:15 83:22 88:16 102:24 158:3 174:2 176:16,18

**five-year** 112:19

**flag** 198:18

**Flat** 32:14

**Fletcher** 163:19 171:11, 15 172:5 176:3

**flip** 232:2

**flipped** 175:14

**flirted** 257:11

**floorboard** 136:12

**Florida** 138:4 142:7 297:4,6 316:25

**focusing** 226:11

**folder** 169:13

**follow** 34:25 68:22 84:13 124:21 129:3 165:21,23 186:16 210:6 247:19 249:2 265:9 281:9 283:21 284:23 296:15

**follow-up** 172:22 259:10 314:11

**Ford** 293:10 295:1

**forearm** 145:14

**foreclosure** 103:3

**foreclosures** 104:3

**Forestry** 101:3,5,6

**Forget** 58:18

**forgot** 17:11 79:24 178:8

**form** 9:6 11:18 16:3,11 17:6 21:19 22:8 26:1 30:2,15 31:10, 19 32:16 33:17 36:24 40:22 42:8,10,19,23 43:21 44:18 45:2,7 46:21 47:4 50:9,17 54:9 55:9,22 60:16 61:16 62:4 64:24 67:6 70:17 71:14,18 72:25 73:4 76:9 77:5 78:21 79:11 80:10 81:10 82:15

**83:1** 85:3,15 86:1,7 87:4,18 88:14 89:22 90:2,15 91:1 103:23 106:11 107:17 108:2, 18 110:21 113:20 114:4, 23 115:5,13 116:4,19 117:10 118:24 120:16 121:19 122:5 123:17, 21 124:13 125:2 126:6 129:5 130:3,12, 18,24 133:3 134:9,13,22 135:4,19 136:19,21 137:11 138:6, 13 139:7,14 140:3 141:8 142:17 143:16 147:4 148:5 149:2 151:24 153:10 154:2 155:9,17 156:19 157:6 159:15 160:8 164:23 165:15 166:15 167:8 168:5 169:16 170:2 171:6,24 172:11 175:23 179:22 182:19 183:25 185:21 188:24 190:2 192:12 193:9 198:9 200:18 201:4,8 203:4,9 204:6,22 209:6, 16 210:4,12,20, 22 211:6,15,21 213:5 214:6,18, 22 216:14 217:17 218:4, 11,20 219:8,17 220:8 221:25 222:6,19 223:14 224:1 226:6 227:6 228:6,18 229:2, 7 230:2,14 231:14,20 234:22 236:22

241:15 244:1,4,
19 245:8
246:11 248:24
249:16,22
252:21 253:11,
17,24 255:18
256:4,13 257:3,
24 258:5 260:1,
8,16 261:2,23
263:7,11,17,20
264:1,5,8
265:24 266:4,
11,24 267:8,22
268:19 272:19,
24 273:25
275:4,17,21
276:17,19
277:21 279:17,
25 280:13
282:19 284:15,
17,21 285:19,
25 287:7,18
292:1,6,14
297:18 298:1
299:2,16 300:8
301:22 302:1,
13,17,25
303:24 304:18
305:23 306:22
307:12 308:8
309:10,20
310:17 311:14
312:22 313:2,
23 315:11,19
316:1,15 317:1
324:20

**forms** 129:8

**forward** 111:25
178:3

**forwarded**
173:10

**fought** 215:9

**found** 41:15
64:20 75:23,24
136:11,13
181:16 202:23
205:9 209:11
218:19 219:6
236:6 248:1
280:11 299:14
310:14 311:13

**foundation**
11:18 21:19

67:6 76:9 80:10
81:20 86:7
88:14 90:2
114:4 123:17,
21 129:5 135:4
143:16 148:5
153:10 183:25
188:25 249:16
253:12

**Fox** 160:14,19

**frame** 43:9
52:3 55:25
67:17 141:4,5
224:20

**Frank** 19:7,8

**Frankfort**
110:24 179:18

**Frankie** 249:10

**Franks** 19:7

**Friday** 51:5

**friend** 116:22,
23,25 117:2,19,
23

**friends** 276:15,
18,21 294:17

**front** 27:4 39:2
126:24 170:4,6
203:17

**full** 66:16 93:5
265:3

**full-** 66:14

**full-time**
102:17 206:14

**functions**
84:23

**Fuson** 97:14

**future** 324:6

**fuzz** 309:19

---

**G**

**Gail** 93:9,10

**gain** 190:8

**gained** 13:19
108:20 189:12

288:1

**gas** 147:13
272:9

**gather** 63:19

**gathered**
216:5

**gathering**
114:15 117:9,
12 211:24

**Gatnarek** 9:23
59:21 61:2
62:20 178:24
179:9,18

**gave** 14:8,20,
24 20:21 22:17
28:17 35:5
40:19 55:15
58:8 78:4,13
108:12,16,24
136:6 141:11,
15 144:16
148:15 152:19
169:21 190:21
220:23 227:23
228:17,21
229:17,19
243:5 255:16
263:22 266:23
272:23 278:9
280:18 283:16
296:1,3 301:15
305:15 312:11
319:9

**gears** 291:8

**general** 24:11
103:1 194:22
216:7 217:21
289:14

**generally**
12:25 32:6
60:18 65:8
66:24 124:3
129:23 170:3
213:11

**generate**
110:19 111:16
184:2

**generated**
21:25 170:1

**gentleman**
147:9

**gentleman's**
79:24

**gentlemen**
46:25

**getaway**
263:10

**Gibson** 174:25
175:1 179:23

**gist** 43:16
294:23

**give** 8:5 14:4
26:15,23 28:14
30:9 39:25
40:10 42:21
55:6,8 62:7
64:10 74:18
80:5 84:19,24
85:25 86:4,11
89:14 111:15,
16 118:7,8
127:18 142:4,
12 145:2 157:2
165:3,6 180:5
197:12 202:8
205:13 211:16
213:11 227:20
229:9 234:20
244:23 254:15
255:12 258:16
262:18 271:18
280:22 281:22
282:2 283:22
287:6 291:6
293:9 297:8
301:14 302:19
303:11 313:16

**giving** 34:3
39:24 40:2,6
49:6 74:8 82:12
118:19 183:5
223:6 243:3
244:16

**glean** 132:14

**gleaned** 86:5
138:16

**goal** 87:21
191:13

**good** 18:12
75:3 91:6 92:24
119:23 176:8,9
268:17,25
283:13 309:23

**Gooding** 249:9

**Goodness**
12:19

**gossip** 288:21

**graduate**
101:16

**graduated**
96:16 101:18

**grand** 188:1
224:13 225:6,7,
12,17,19,22
227:10 245:22

**granddaughte
r** 279:18,19

**granddaughte
rs** 219:11
288:22

**grandson**
200:23 294:14

**Gray** 49:5,16
59:16 75:6,9,
18,19,21 77:18
78:9,11 82:10,
13 160:17,20
191:22

**greater** 72:1

**Greenberg**
178:22 179:3

**Gregory**
296:22

**Gregory's**
297:25

**Griffith** 65:13,
19 66:23 68:6

**grilled** 137:9

**group** 270:7
317:3

**Guards** 185:4

**guess** 9:8 20:2
21:6 27:5 29:14
42:6 61:25

79:12,18 110:8
111:19 112:25
123:14 126:3
141:23 144:22
145:16 147:2
155:20 175:8
179:13 185:7
195:4 199:6
225:5 266:17
272:8 291:12
294:16 321:17

**guessing**
55:14 77:2,3
101:17 251:9
294:8

**guidance**
265:9

**guilty** 78:18

**gun** 19:14,18
36:19 219:22
242:10 246:5

**guy** 116:18
145:22,24

**guy's** 111:9

**guys** 23:1
205:14 301:5
318:16

---

**H**

**hair** 103:9,12
145:23

**half** 128:2
276:25 277:1

**Hammonds**
163:7 219:12,
14 289:19
291:8,14,18

**hand** 8:4
131:10 158:2
181:7 197:5
198:1 246:15
250:12,13
251:24 270:11
271:1 294:25

**handed** 74:6,
14,20 247:1
269:11 282:7

**handing**
155:20

**handle** 120:13

**handled** 121:7,
23 251:17

**handwriting**
169:7 185:18
197:23 198:15
251:3,5,6

**handwritten**
169:10 170:21
181:12

**happen** 95:10
183:18 207:12
214:17,20
231:19

**happened**
20:10 27:23
43:13 57:10
135:9 144:4
149:6 152:24
176:12 200:10
202:18 204:9
215:24 238:9
255:20 256:11
273:6,24
297:25 302:7
303:8 317:4

**happy** 111:15
178:3 190:9

**harassed** 27:2,
18 39:20 188:3,
4

**harassing**
47:5 72:4,10
91:2,15,25
92:19 115:14

**harassment**
27:11,14

**hard** 129:22
294:4

**Harlan** 67:16,
22 96:21 150:4,
5 175:2 179:24
183:7

**hate** 269:3

**Hatmaker**
164:5

**Hazard** 96:21

**head** 9:2 79:22
187:14 188:16
189:2 200:4,5
226:21 293:20

**heading** 38:17

**health** 200:24
203:19

**healthcare**
225:1

**hear** 30:13
79:13 188:11
294:2,3,11
306:3,25 310:4

**heard** 24:7,9
44:10,11 78:8,
10 150:10
152:1 191:19
200:16 215:11
221:2 296:22
310:3 320:9

**hearing** 40:4,8
79:17 194:25
266:18 294:4
308:22

**hearings**
212:23

**heart** 184:16

**Heather** 9:23
62:20 164:4
220:24,25
221:6,7,8,9
300:23

**heavy** 139:24

**held** 103:20
152:16

**helpful** 87:23
149:17

**helping** 87:3

**Helton** 34:14,
16 35:7 39:21
40:6,25 41:4,16
45:14 108:11,
17,24 121:5
132:17,19,21
135:2 136:23
138:3 139:11,
20,21 140:6,8

**Helton's** 34:12
35:3 41:9
132:19 136:11
190:1

**Hensley** 99:6,
7,11

**hidden** 264:2

**high** 23:22
96:18 294:21

**highest** 109:7

**Hinkle** 270:10,
14,15

**HIPPA** 224:14
225:1 269:20,
22

**history** 13:19

**Hobbs** 222:11

**hold** 246:21
285:24

**holds** 101:9

**hole** 69:15

**home** 14:7
18:4 23:12
24:19 27:4
34:11 35:6 79:5
110:13,14
133:9,20 143:5,
7 144:15
146:16,22,24
147:3,6 225:10
279:1,5 281:12
289:12 297:25
299:4,9,24

**Hometown**
270:8,14,15

**141**:14,25
155:3,8 157:11
161:3 179:21
187:4,18,21
188:9 189:23
195:16 196:12
199:9,19 200:6
226:14,18
237:2 278:15
302:11,20
303:11,15,23
304:5 305:5
315:7,9 316:24

**Helton's** 34:12
35:3 41:9
132:19 136:11
190:1

**Hensley** 99:6,
7,11

**hidden** 264:2

**high** 23:22
96:18 294:21

**highest** 109:7

**Hinkle** 270:10,
14,15

**HIPPA** 224:14
225:1 269:20,
22

**history** 13:19

**Hobbs** 222:11

**hold** 246:21
285:24

**holds** 101:9

**hole** 69:15

**home** 14:7
18:4 23:12
24:19 27:4
34:11 35:6 79:5
110:13,14
133:9,20 143:5,
7 144:15
146:16,22,24
147:3,6 225:10
279:1,5 281:12
289:12 297:25
299:4,9,24

**Hometown**
270:8,14,15

**homicide** 81:8

**honest** 73:7
214:24 308:15

**honestly** 12:19
137:12 154:3

**hood** 145:12,
24 304:25
307:9

**hope** 28:4
275:22

**hopes** 111:17
119:21

**hoping** 119:18

**Hoskins** 8:16
18:8 30:1 43:3,
9 47:25 51:20
22 61:7,8,10
62:2 64:13 66:1
67:5 68:6,11
81:8,9,15 84:5
88:10 89:4,20
95:6 108:1
110:4,7 116:20
119:25 122:23
123:3 139:4
141:5 150:9
153:4,9,17
154:20 166:18
169:11 184:19
185:25 203:7
208:6 217:16
218:9,18 219:7,
19 220:6,13
224:14 231:13
234:7 240:24
243:5 245:3
246:8 247:6,8,
25 249:13
253:8,14
254:17 256:1
257:1,10 258:3
263:10 269:9
292:12 297:24
319:6 323:21
324:12,14

**Hoskins'**
47:11 52:20
57:19 65:11
75:16 122:14,
16 123:12
133:10 166:8

191:25 203:25
252:10

**hour** 12:20
17:18 26:9
174:18 317:24

**hours** 174:12
262:12 299:25
315:4

**house** 20:23
24:17,18 26:12
35:13,14 117:7
137:14,20
229:24 262:5,6
283:22 285:1,4
297:16,22

**Hueson** 93:5,7

**husband** 96:9
98:7,17,18 99:5
100:25 162:6
293:2 322:10

**husband's**
98:19,20,21

**hypothetical**
210:13

———

**I**

**ID'D** 154:1

**idea** 47:14
109:11 241:19
280:2

**Ideally** 67:2

**identification**
126:13 131:17
156:3 158:6
168:11 181:10
185:15 197:6
227:17,20
240:16 246:19
250:17 252:4
262:20 271:4
285:13 295:5
312:9 319:14

**identified** 28:9
44:23 168:19
188:10 191:22,
24,25 192:2
218:9 220:6
222:15 228:10

247:22 313:12,
15

**identify** 28:11
169:25 192:5
228:4,12,16
238:22 285:8

**identifying**
168:25 175:4
191:12 270:3

**identity**
255:10,12

**ignore** 18:12

**ill** 276:13

**illegal** 79:8

**illegally**
224:20

**illnesses**
204:19

**immediately**
170:19

**imparted**
149:25

**implicate**
155:15

**implicated**
153:9,17 155:4,
12 244:23

**implicates**
153:20

**important**
153:3 210:8
226:10 283:12

**impossible**
177:14

**impression**
30:12 43:6,18
47:16 76:6
185:17 190:1,3
215:2 230:8

**impressions**
241:22

**improprieties**
47:13,24

**in-law** 279:18

**inaccurate**

78:3 225:7

**inadvertent**
247:4

**inappropriate**
172:14 173:1
261:19

**inappropriately** 176:15 260:14
261:17

**incarcerated**
204:19

**incident** 14:8
35:18 142:4
144:21,25
170:20 197:1
204:9 224:18
231:6 242:14
255:20 272:7
294:18 320:16

**incidents** 36:2,
3

**include** 15:8
21:9 22:12
29:14 83:22
126:3 173:11
239:12 290:22

**included**
157:16 166:23
170:16 175:22
246:1 313:8

**including**
106:4 125:20
193:13

**incomplete**
198:17 210:12
248:23

**inconsistencies** 47:23

**inconsistent**
244:7,17 279:1
280:18,22

**incriminated**
220:18 222:17

**incriminating**
209:4,8,11
217:14,15,19
218:14

**INDENTIFICAT
ION** 286:23

**independent**
164:25

**Indiana** 322:11

**indicating**
287:16

**indication**
26:23 128:19
146:14 290:18
310:14

**indicted**
304:11

**indictment**
47:17 119:24
224:13

**indigent**
208:21

**individual** 14:7
31:15 74:12
129:17 144:17
146:8 182:24
254:6

**individual's**
320:9

**individuals**
9:15 19:21,23
34:4 39:8,9,13
40:1 46:24
79:18 196:24,
25 199:12
220:16 303:11
320:11

**inferred** 20:16

**info** 190:25

**inform** 63:21

**informant**
28:20,21 287:1

**informants**
107:21

**information**
9:10,20 13:4,6,
19 14:5,9 19:4
24:15 27:20
30:10 34:18
35:1 39:5,14
40:19 41:10,11

42:17,21 43:20
44:8 46:24
47:2,20 48:16
60:23 63:19
64:21 65:3 74:1
85:6,10,25
86:5,11,16,25
25 90:20,25
95:5 108:21
110:24 112:7
114:2,6,9,15
125:18 136:6
138:1,15 139:6
142:20 147:20
148:23 150:1
153:3 154:1
157:2 164:22
165:3 166:11,
12 189:5,9
191:12 194:10
198:22 202:22
211:11 216:5
218:16 219:4
220:23 221:3,8,
19 222:4,8,10,
16 223:6,12
227:3 229:5
230:17 234:20
237:19 238:6
242:4,13,18
243:5 244:16,
24 245:12
249:19,20
251:7,12
254:15 258:7
260:25 261:13,
16 266:21
267:12 270:4
271:18,23
272:6,23 278:8,
9 279:10
280:12 281:1,
22 283:16,21
284:19 286:21
287:6,22 288:1,
18 290:21
291:2 294:9
297:8,10 304:8
311:22

**informed**
139:3 152:3

**Ingram** 249:10

**initial** 22:6

29:23 30:12
47:11,17 109:4
183:5 187:12
207:16

**initially** 189:12
207:19

**initiate** 85:13

**injury** 71:2

**inmate** 221:6,7

**inmates** 150:4
214:21 231:11,
13,16 234:13,
19

**inmates--**
231:2

**innocent** 89:24

**inquire** 195:3

**inquiries**
167:11 219:24

**inquiring**
91:21 195:2

**inquiry** 172:18

**inside** 10:17
145:9

**insistent** 43:19

**insisting**
226:16

**instance** 36:6,
18 74:4,9
139:12 157:10
211:17 322:22

**instances** 68:4
86:15 151:17
152:10 168:18
175:22 177:22
220:6 287:23

**instigation**
214:14

**Institute** 102:7

**institution**
286:14

**instruct** 29:21
30:21 58:4,19
63:1,12 69:11
83:24 86:24

124:19 165:17
229:11 253:4
261:9 264:9,19

**instructed**
154:17 208:3

**instructing**
56:22 64:6
83:17 87:9

**instruction**
84:3,12,13
88:12

**instructions**
63:5 124:11,22
165:21,23

**intend** 106:12,
13 172:24

**intended** 95:4
180:15 195:2
249:2

**intent** 61:24

**interacted**
274:21

**interaction**
256:2

**interactions**
195:6 212:17
229:10 294:21

**interchanging**
300:11

**interest** 60:2

**interested**
20:7 107:7
154:22 161:1
202:22

**internal** 57:8
124:17

**interrogation**
105:15,16,22
106:9,24

**interrogations**
107:6

**interrogatorie
s** 73:9,22
131:21 132:5,
13 151:11

**interrogatory**

137:6 154:7

**interview** 9:22
10:1,15,23
11:2,6,11 12:2,
17,22 13:1,24
14:10,22 15:21
17:14,15,23
21:25 22:6,7
23:10,14,19
25:22 26:3,5
29:23 31:6
33:3,10 40:15
49:25 67:23
68:1 69:24
75:6,9,11 76:3
77:4,7 82:13
114:7 122:17
123:11,24,25
124:3 133:17
136:5 141:22,
23,24 142:1,8,
13,23,24 143:5,
7,12,18 144:2
145:2 146:1,3,
5,6 147:24
148:14,18,21
155:25 160:17
167:10 190:25
195:11 200:11,
24 202:8 211:5
217:4,6,8,24,25
219:14 221:17,
18 225:24
229:10 230:13
233:14,18,23
234:25 237:2,6
241:11,22
242:3,7,15,16,
17,20,22
244:20,21
255:1,8 258:2,
10,22,23
259:10 260:3
265:10 267:24
268:2,18 271:8,
12 273:24
274:2,6,22
275:8,9 276:3
277:13 281:15
282:9 283:24
284:10 288:12
291:5 293:11,
13,25 295:11,
17,22 296:7
306:17 308:21

310:16 311:3,
10,17 312:20
313:18 315:17
321:12 322:17
324:23

**interviewed**
13:9 14:2
121:16,18
136:1 143:23
149:19 150:3,9
160:15,16,18
163:2,12 166:7
189:11,12
193:20 213:20
215:5 220:22
223:2 227:16
232:6,9 233:6,
20 234:6,10,13,
17,19 254:23
257:7 261:15
268:14 273:9
291:19,20
293:21 308:23
309:5 313:5
321:5,8,9 322:8
323:21 324:13

**interviewing**
23:11 104:7
105:22,25
106:22 122:10
276:3 283:6
295:12

**interviews**
8:23,25 10:17
16:16,24 17:5
18:15 20:6
21:14 24:13
67:18 80:25
81:7 105:2
114:9 123:16,
19 124:2
143:20 167:9
194:22,24
195:1,10 212:3,
6 234:1 239:17
257:15 268:21,
22 282:18
283:9 315:8
321:20 324:11

**intimidate**
27:5

**intimidated**
261:14 278:11

**intimidating**
242:11

**intoxicated**
210:18 266:22
279:8 280:11

**investigate**
67:10 257:6
293:7 314:18

**investigated**
81:22,24

**investigating**
182:17

**investigation**
8:20 9:5 13:1,
10 15:3 39:16
45:22 46:15
48:1,19 52:15,
25 57:10 60:1,
15 61:2,12
64:15,16 75:12
79:4 81:13 82:7
107:10,16
117:25 132:22
137:23,24
147:24 151:6
152:6 154:13
158:14 159:12
160:6 164:18
165:14 166:1
181:5 184:24
185:12 192:17
198:4 200:11
203:3 204:4,15,
21,23 208:15
218:17 219:5
248:22 252:3
253:22 255:10
269:17 286:12
287:5 314:12,
23 320:11
322:5 324:19
325:10

**investigations**
44:7 48:17
60:13 61:5
164:25 287:5

**investigative**
70:4 104:18
126:20 127:4
128:21

**investigator**
16:10,22 29:18

50:16,19 51:15
52:15,20 63:18
67:15 103:22
104:14,16
109:3 110:1
124:16 125:25
175:1 179:24
207:6 212:10,
13,15 223:22
231:22

**investigators**
57:20 64:12
65:2,7 67:13
109:22 110:15
207:16 208:18
212:21

**invited** 26:7
232:24

**inviting** 48:7

**invoke** 29:19

**involved** 44:6,
25 47:17 49:2
65:11 71:2
77:19,20 79:23
80:2,13 109:22
121:8,24
132:15 155:11,
12 157:17
168:1 171:22
201:23 203:10
215:23 223:7,
21 225:10
242:14 271:20
311:22 320:11,
20 321:3 322:5,
16 323:21

**involvement**
132:20 133:8
166:19,24
202:24 222:25
324:24

**involves**
177:23

**involving**
52:25 71:7
122:2 148:4
171:10 209:12

**Irvin** 207:14

**issue** 186:18
189:13 190:23

224:4 257:6
314:12

**issued** 127:1
325:2

**issues** 174:6
176:18 184:19
189:6,10
208:17 309:25

**issuing** 325:4

**item** 240:25

**items** 220:13
223:13,17
236:1,3,6,8,9
248:17 249:12

———————

**J**

———————

**jacket** 145:12
148:25 304:25
314:25

**Jackie** 46:7
47:22 175:9
258:14 259:2,9
260:5,6,13
317:12 320:7
321:3

**Jackson**
207:14

**jail** 10:17 14:13
20:22 38:17
140:6 184:15
185:8 205:4
220:22 223:2
242:10 254:21,
24 268:15

**jailer** 171:19
231:1,3

**jails** 231:9

**Jailtracker**
308:16 314:9

**James** 78:13
160:17,20

**January**
139:11 172:4

**Jason** 13:23
23:4 37:11
132:18 170:10
175:5,7 186:25

206:1

**Jeff** 49:5,16
59:16 75:6,9,
18,19 160:17
191:22 295:11,
13

**Jeffrey** 160:20

**Jennifer**
163:12 279:4,
11 288:23
289:18,25
290:22,24
291:16

**Jeremy**
160:15,19

**Jerome** 254:3

**Jerry** 288:4,13
298:3,14,25

**Jerry's** 300:12

**Jessica** 67:20
133:14 174:24
175:1 179:23
240:6

**Jessie** 161:5
194:23,24
195:1,7 199:25
200:1 220:5
277:15 278:8,
20 279:11
281:17 282:12
286:18,25
289:18

**Jim** 10:11,13
48:5 67:11
164:3

**job** 17:1 50:15
51:15 52:18
63:17 98:10
103:18 104:6
210:1,24

**jobs** 103:19

**Joe** 161:10,21
233:6 239:16
241:1,22 242:4,
6,23,24,25
243:7,8,18,24
244:7,16 245:7,
12 253:8
255:12,16

256:2,25
258:10 260:21,
23,24 261:13,
16 297:23

**John** 8:14
13:23 20:8,25
22:19 44:16,23
45:11 57:16
74:23 80:22
91:11 125:22
127:15 151:1
158:25 165:12
176:11 178:22
179:3 219:25

**John's** 21:7,11

**Johnathan**
221:24

**Johnny** 251:8,
14,17,20
252:15

**Johnson**
320:7,19

**join** 148:6

**joint** 60:7 62:22
63:10 215:10,
12

**joking** 38:5

**Jonathan** 8:16
42:7,13 51:21
62:13 64:13
117:18 141:6
147:23,24
153:20 160:14
186:20 198:11
217:5 218:1,9
220:17,24
221:8,9 227:13
230:1 263:5,9,
14,18,23
266:22 267:6
291:24 300:12
304:21 308:10
312:25 313:20

**Jonathan's**
18:9 113:3
298:4

**Jones** 322:19,
20

**Joseph** 320:7

321:3

**Josh** 9:25
59:20 61:2,14,
22 62:20
133:21 164:4,
20,21 165:2
212:4 268:1,6,8
312:16

**Joshua** 133:23

**jump** 206:3
234:5

**jumped** 274:4

**jury** 92:25 97:5
188:1 224:13
225:6,7,12,17,
19,22 227:10
245:22

**justice** 89:23
101:20

**Justware**
129:7,12,13
130:1,7

**juvenile**
188:14 189:3

———————

**K**

———————

**K-E-E-N-E**
112:21

**KASPER**
196:8,9

**Katherine** 8:21
39:16 64:16
126:21 127:5
153:11 155:5,
15 164:17
207:21 218:19
219:6 220:19
222:18 245:5
248:1 299:14

**Kayla** 151:5,
13,23 152:3,13
153:4,8 154:1
222:15 223:7
233:18 263:15
272:3 273:13
274:2,8,17
291:23

**Kayla's** 271:19 272:8

**Keene** 112:18, 21

**keeping** 129:3

**Keith** 164:7

**Kelley** 8:12,14 16:13,14 22:23 23:3,5 29:22 30:17 31:7 38:4,6 47:6 48:15 50:10,13, 14 51:6,11,23 52:1,8 53:12, 17,21,24 54:6, 16,24 55:3 56:18,20,25 57:7,13 58:11, 14,17,20 60:6,9 63:4,9,14,17 64:2,4,8 69:4, 13,14 71:20 72:4,7,15 73:15,18 74:25 75:3,5 76:14, 16,17 81:17,23 82:1,5 83:13 84:1 85:12,24 86:20 87:1,9, 12,13,24 88:22 89:8,19 91:9, 12,18,21 92:2, 5,23 93:2,3 94:2,4,8,12,16 95:4,13,17,20, 23,25 97:8 100:13,17,22 106:20 108:4, 14 111:24 112:10 115:10, 15,16,19,22 124:20 126:2,9 127:14,17,23 128:6,12 132:6, 9 151:2,4 156:5,6 165:20 168:8 172:18, 24 173:2,9,14, 20,24 174:5,8, 13,21,23 176:8, 22 177:2,5,9, 17,21 178:6,7 180:10,12,15 181:6 193:12,

**16** 197:16,19 205:12,16

**Kelly** 320:8 322:7

**Ken** 274:14,16 275:23

**Kenneth** 99:2 152:17

**Kentucky** 26:22 88:4 96:5,20 99:8 119:16 159:8, 14 322:18

**kick-back** 194:1,19

**kickback** 45:21 47:1 48:23 64:21 193:7

**kicked** 292:25

**kids** 299:14,19, 20

**killed** 79:24 263:5

**killing** 78:18 132:20

**kind** 20:1 24:1 25:5 40:7 41:21 45:1,21 49:7 104:2 124:2 144:3 173:3 191:16 193:7 194:2 208:15 217:11 220:15

**King** 103:17 112:20 161:10, 21 207:13,14 208:5 233:6 239:16 241:1, 22 242:5,23,24 243:7,8,18,24 244:7,11,16 245:12 249:13, 17,18,23 250:3 253:8 254:7 255:12 256:2, 25 258:10 260:22 261:13, 16 297:23

**King's** 245:7

**Kinzer** 249:19

**kitchen** 233:4

**knew** 26:6 88:1 119:11 121:17 155:11 196:21 225:9 226:13 230:6 294:20 299:4

**Knott** 122:3,12, 13 238:3

**knowing** 168:22 173:7 177:19 301:1

**knowledge** 16:20 54:14 107:1 132:2 133:8 152:5 159:11 176:20 179:20 190:12 203:10 229:1 230:17 231:19 249:3 255:5 260:21 277:7 280:25 281:23 289:20 303:8 311:15 313:15 324:24 325:8

**Knox** 8:15 13:15 14:3,12, 13 21:1 23:11 26:22 32:20 38:7 40:5 44:17,24 45:11, 21 46:6 47:1 48:24 96:22 98:12 101:11 108:23 120:7, 14 122:2 124:25 125:12, 21 132:2,15 158:21 159:8 160:7 164:16 166:12,13 167:19,25 171:19 183:2,8 184:14 188:21 192:20 194:19 202:24 220:22 221:6 223:2 231:3 235:1,12 252:16 295:25

319:19

**KSP** 159:19 178:18 320:6

**KSP272** 312:4

**KU** 318:24

---

**L**

**labeled** 169:19,22 246:15 250:14 269:12

**Lacey** 163:7

**Lack** 210:18

**lady** 220:22,24 221:5 223:1

**landmark** 25:5

**language** 242:11

**lapsed** 248:16

**large** 203:14

**larger** 20:17 296:19

**largest** 96:14

**Larry** 161:10 233:13 257:2, 15 258:4 296:22 297:25 321:22,24

**Lastly** 155:13

**late** 196:2 221:12,13 255:9 282:24

**Laurel** 96:22 133:6,12 137:17 139:22 231:5 237:2 258:14 315:14

**law** 26:23 46:13,19 47:2 100:24 102:11, 24 103:25 104:1 106:10, 25 107:20 108:11 122:13 125:20,25

158:13 174:2 209:23

**laws** 224:14

**Lawson** 161:5 163:12 179:21 189:23 194:23, 24 195:1 199:9, 25 200:1 220:5 277:15 278:8, 20 280:12 281:17 282:12 286:18,25 289:18,25 290:22,24

**lawsuit** 8:15 92:3 184:14 249:21 253:15

**lawyer** 89:5

**lay** 76:9

**lead** 13:6 65:17 109:25

**learn** 75:19 149:11 151:14, 19 191:14 255:10 288:3

**learned** 64:16 90:20 108:20 142:5 151:15 152:1 195:8 238:7 291:1 308:23

**learning** 138:3

**leasing** 118:6

**leave** 174:19 270:6

**leaving** 144:5, 7

**led** 13:4 14:20 107:10 147:14 186:24 324:18

**left** 47:19 48:6 66:11 67:11 103:11 136:5 147:16,17 257:23 272:9 275:3 281:12 284:25 299:5, 24

**legal** 12:8,9,11
53:10 69:9
104:1 107:22
118:9,16,20
172:23 189:5,
10 216:15
265:20

**legible** 170:23,
25

**legitimacy**
172:19

**legitimate**
91:16,24 92:5
118:13 119:4

**length** 127:19
137:8

**lengthy** 107:11

**Leslie** 11:8

**Lester** 18:9,24
19:1 42:12
43:3,9 51:20
64:13 119:5,6,7
121:3 139:5
141:6 154:19
217:6 243:13
245:3 254:7
263:19 276:14,
15 283:17,20,
24 284:1,13
285:15 291:25
292:4 294:20
297:2,6,12,15
305:7

**Lester's**
276:24

**letter** 22:20,23
132:1 176:16
178:1 181:14
182:10,12
202:9,11
269:20

**letters** 105:10

**letting** 297:16

**level** 109:8

**Lewis** 316:4,8

**Lick** 32:14

**lie** 108:12 143:3
315:24

**lied** 142:11
224:13 296:11

**lies** 63:14

**lieu** 202:9

**likewise** 35:25
37:2 44:21 82:6
94:4 120:22
125:18 194:12

**liking** 79:4

**lime** 192:3

**limit** 317:21,24

**limited** 32:18
58:23 60:19
144:17 174:12
318:18 323:8

**limiting** 224:24

**Lincoln** 101:13
111:9

**Linda** 113:15
130:11 298:10,
20,23 299:22,
23

**Lisa** 47:6 71:15
93:5

**list** 100:7,15,17
105:12 110:19
111:16,22
112:4,5 158:10
178:17 185:22
187:16 193:13
199:21,22
271:20

**listed** 175:21

**listen** 17:5 92:7
206:6 212:4,6
267:23 268:1

**listened** 9:22
59:19 92:6
232:19 236:17

**listening**
239:14

**listing** 185:23

**lists** 181:4

**literally** 87:5

**litigation**

127:24

**live** 93:22
96:20,24 97:15
121:13 297:4

**lived** 13:10,13
24:11,25 32:23
35:6 96:1,2,7
99:11,12
322:11

**lives** 97:16

**living** 291:24
294:15

**LMU** 102:4

**locate** 32:22
35:2 77:17
124:4,8 192:13
220:3,4 281:15
288:16 289:4,
11,15 304:7
325:15

**located** 32:1
199:6

**location** 13:11
34:11 41:10
135:25 163:25
303:5 323:18,
24

**locations**
188:1 224:15
316:6

**locus** 122:3

**log** 127:22
168:10,14
176:8,9,20
177:1,6,7,16,20
196:10 240:12,
13,24 241:17
248:3,5,15
258:21

**logged** 19:25
248:19

**logs** 173:22
235:22

**London** 120:8
167:24

**long** 12:2,17
13:14,20 16:1
17:14,15 26:3,5

33:13 55:20
77:1 93:20 97:9
111:7 113:16
143:18,21
155:2 206:12
224:17 225:13
291:21 295:2
310:7

**long-time**
13:20

**longer** 184:12

**looked** 13:3
41:19 71:21,23
72:18 118:12
120:6 153:15
164:11 167:12
197:10 236:8
244:10 288:14
304:22 324:6,
17

**lookout** 263:15

**lost** 37:9
155:23 295:3

**lot** 13:8,12
20:12 23:20
30:19 31:4
32:2,9 34:15
35:11 56:5
70:13,15 97:11
200:14 206:17,
18 214:13
224:2 236:18
265:15 278:17
288:10 292:24,
25 300:5
314:15 321:19

**lots** 120:18
195:22

**love** 119:18

**low** 222:24

**Lowe's** 78:6
80:6,7

**lower** 62:5

**Lowes** 77:21

**Lyford** 164:7

**lying** 80:6

_____

**M**

**made** 9:7 22:5
38:19 39:22
40:12 48:22
63:5 68:20,25
77:17 78:6
86:23 88:24
89:12 104:10
108:10 110:10
114:1 128:20
132:19 156:9,
11 158:10
165:18 169:22
172:1,17
184:18 187:16
188:6 200:23
201:11,14,18
208:5 218:6
221:16 225:15
226:25 233:21
237:9 238:10
242:9 248:3
256:8 259:21
278:25 286:15
290:12 295:24
319:8 321:15

**magistrate**
91:17

**maiden** 93:7

**mail** 176:17

**mails** 176:3

**maintain** 57:22
92:16

**maintained**
63:23 91:6
247:12

**maintenance**
147:7,15

**majority** 32:17
80:12

**make** 16:2
19:13 23:21
30:19 34:7
38:20 68:22
70:6 87:7 88:9,
21 89:17 91:11
110:8 114:24
125:22 164:13
213:10 224:17

227:20 232:6 234:4 235:23 236:20 237:22 240:9 246:16 248:15 254:12 262:9 264:16 267:19 270:2, 24 285:9 316:11 321:14 325:24

**makes** 68:21

**making** 86:22 202:3 243:6 248:14 253:9 259:18 277:25

**male** 144:18 145:10 184:14 305:4

**man** 145:16 147:15

**manage** 301:8

**management** 130:16

**march** 75:1 139:21 155:24 182:7

**Marcy** 295:17

**Margaret** 162:16 239:8

**marijuana** 20:14

**mark** 127:3 174:18 222:11 320:7,12

**marked** 112:1 126:10,13 131:10,17 156:3 158:6 168:9,11 181:7, 10 185:15 197:6,20 240:16 246:19 247:1 250:17 252:4 262:20 271:4 285:13 286:23 295:5 312:9 319:14

**market** 144:12

**marking** 155:21

**married** 93:16, 20 98:5 99:3 279:19 296:1

**mat** 43:2

**match** 255:16

**material** 128:3, 4,7,24 182:17

**materials** 128:9 129:17 236:12 271:10

**matter** 213:13 296:11 326:4

**matters** 122:2

**meaning** 196:9

**means** 32:19 95:2 196:20 313:21

**meant** 54:24 73:16 153:11 197:3,12 200:25 217:18

**media** 144:9

**medical** 184:19 200:22 203:7 224:15

**medication** 183:4 185:11 196:10

**medications** 183:10

**meds** 184:16 185:4,6

**meet** 51:14 62:9 277:9 296:6

**meeting** 24:6 31:25 33:13 61:13 69:1,18 75:25 76:10,18 78:24 79:22 84:5,10,15,21 140:13 149:7 152:16,23,25 239:2 259:21 313:18

**meetings** 54:20 55:4,19, 21 62:14,18,20 65:25 66:19 68:17,19 119:13

**Mefford** 320:7, 12,13

**Melinda** 286:4

**member** 34:12, 13 40:5 44:16, 24 53:10 63:25 66:13 88:20 94:7 168:20 169:25 219:11

**members** 20:25 38:8 58:7 60:5 62:2,24 66:24 67:2 69:9 73:24 83:10,21 85:22 88:16 90:13 92:21 94:14,24 95:21 97:5 125:21 130:10 171:11 173:11 181:2 188:21 264:21 280:6 289:17, 19

**memo** 156:22 273:1

**Memoranda** 15:11

**memorandum** 10:24,25 15:8, 12 22:20 23:1 125:24

**Memorial** 101:13

**memory** 149:23 157:23 210:18 218:8 232:10,21 242:4 244:3,5, 16 249:24 252:22 253:10 255:17,19 256:1,19 260:7, 10 261:21 263:3 266:1 270:22,23

**meetings** 271:11 272:22 273:4,23 275:15,18 277:13 285:2 286:20 289:20 290:11,24 291:1 293:25 294:10,12 295:12 299:1 300:18 302:12 309:25 316:14 321:2 325:12, 17

**mental** 203:19

**mention** 10:3,4 122:22,23 124:24 174:11 215:10 259:4 275:11 301:20

**mentioned** 11:15 18:10,15 37:11 42:13 76:13 109:16 132:1 156:22 157:10,13,17 170:5 193:20 194:6 253:6 258:11 261:11 280:10,18 320:10 322:1 323:14

**mentions** 173:3

**Merida** 162:14

**message** 119:8,11

**met** 8:13 12:21 49:23,25 51:17 68:5 76:24 84:17 139:1 146:23 150:2,3 152:20 212:22

**Mexican** 76:25

**Michael** 67:25 143:12,15 170:12 171:21 187:4,17 232:6, 14 304:15 306:15 308:11 309:8 313:6 319:16

**Michelle** 219:12,14 288:23 289:18 291:8,14,15,16 292:19

**Mickey** 164:5

**middle** 93:5,9 241:1

**Middlesboro** 84:22 93:22 96:17 97:16 163:23,25

**mike** 121:12 137:22 138:3 155:7 158:16, 19 161:8 164:5 184:4,5,7 201:10,12 281:2 282:13 305:2 312:12 315:7 316:24 319:24 323:6, 13 324:18,24 325:15,16

**Mikey** 162:22 221:14 239:10

**Mills** 8:21 64:17 81:7 107:10 126:21 127:5 132:20 141:7 151:6,12, 13,23 152:19 153:4,8,9,11 154:1 155:6,16 162:2 164:17 190:23 200:23 207:21 211:25 213:20 218:19 219:6,10 220:19 222:16, 18 223:7 233:18,20 234:1 243:13 245:5 248:1 263:6,15 270:18 271:7 273:13,23 274:10,12,17 276:14,22,23 277:13 279:4 280:11 287:5 289:17 291:24 294:14 299:14

**Mills'** 13:16
39:17 119:24
136:1,7 144:6,
15,19 145:8
190:13 198:2
219:11 255:22
283:11 288:22

**mind** 45:5
71:12 72:8
174:9 177:12
226:19 267:14
279:12

**mine** 191:18

**minimum**
224:12

**minimum-
security** 101:7

**minor** 99:15

**minute** 156:7
197:14 232:3
256:25 304:16
306:2 312:7

**minutes** 12:20
17:18 26:9
33:16,18 68:17
77:2,3 94:20
95:1 262:13
301:7 315:4
318:19 322:9

**mischief**
139:20 140:2

**misconduct**
159:11 325:16

**misleading**
225:15

**misled** 224:12

**misrepresent**
213:2

**missed** 156:23

**missing**
187:11,15
188:15 198:20
224:2,6 225:23
226:11 236:1,3
237:11 238:25

**misstates**
115:5 130:3
222:20 245:8

315:11

**mistaken**
24:10 32:24
48:4 322:14

**mistakenly**
247:3

**mister** 35:21
108:10 125:11

**misunderstan
d** 213:6

**misunderstan
ding** 213:7

**mixed** 14:4

**mom** 183:10

**moment** 46:1
127:18 271:1
289:19

**moments**
94:17

**Monday** 51:5

**money** 18:8,
10,14,16,19
19:22,23 20:19,
21 21:1,9
33:23,25 34:16
39:5,24 40:3,7,
19,20,24 41:3
44:3 45:13 49:7
107:19 108:11,
17,24 142:6
154:20 157:12
190:18 243:3
249:14,20
283:23 301:18
303:4 316:4

**monitor**
113:19

**monitoring**
113:22

**monitors**
113:23

**month** 79:9
80:22 118:4
240:3

**months** 15:20
173:23,24
264:2

**morning** 23:12
24:20

**mother** 24:23
97:14,17 151:8,
9,14,16,19
152:9 186:6
272:3,4 289:1,
2,5,8

**Mount** 116:14

**mouth** 143:1

**move** 72:4
88:12 214:8
247:21 261:25
270:18

**moved** 296:1,4

**mug** 308:12,13

**multiple** 13:25
18:4 24:12,13
27:19,20,22
32:3,4,7 34:3,
10 39:8,19,22,
23 40:10 43:13
44:2,4 45:17,
18,20 51:17
78:14 110:16
137:3 146:6
154:18 184:10
186:19 187:10
188:17 191:9
195:6 222:25
225:22 274:5
280:16 288:21
290:6 295:24
298:12 305:15

**murder** 8:21
13:16 39:17
48:1 64:17
80:3,14,18
81:14 82:8
119:24 120:24
126:21 127:5
141:7 152:4
153:9 155:4,8,
15 164:17
184:24 185:12
190:13 192:3
204:25 220:18
222:17 223:7
224:20,21
227:18 242:19
246:10 253:10
272:15 285:17

297:13,24
310:6,13

**murdered**
201:2

───────
**N**
───────

**N-I-E-B-E-L**
97:25

**Nally** 175:5,7

**name's** 205:25
320:5

**named** 28:2
45:6 149:12
193:13 220:24

**names** 24:12,
21,24 26:16
28:2,14 39:13
44:19 45:16,19
65:10 97:4
110:18 111:1,
15 150:13
166:20 170:24
191:12 192:18
193:4 320:9
322:10

**narrative**
22:12 312:8,11,
15,19

**Nathaniel**
292:17

**nature** 91:15
115:14

**Navy** 96:9,10

**NCIC** 195:18

**necessarily**
134:10 203:16
204:23

**needed** 60:2
71:18 144:11
184:11 185:1
190:6 205:3,5
244:23 322:16
323:17

**negative** 210:7

**negotiate** 44:8

**negotiated**

19:15

**negotiation**
45:1

**neighbor**
295:25 296:3

**neighborhood**
320:14

**neighbors**
293:21

**nephew** 78:13

**news** 145:1

**nickname** 9:17
19:5

**Niebel** 97:21,
23

**night** 119:9
198:6

**noon** 284:14

**normal** 318:17

**North** 99:12

**note** 68:23
170:15,19,21,
25 183:5 184:2,
3,11,13 195:4
196:11,22
199:10 200:15
286:10 323:19,
23

**noted** 180:19

**notes** 11:16,
22,25 12:6
15:9,11 25:25
26:4 33:6
68:19,20,23
136:4 169:1,3,
4,6,10,14,15,21
173:3 181:12
183:23 185:22
197:24 202:3
203:13,22
241:23 242:3
250:6 258:22
259:8,21

**notetaker**
16:23

**noteworthy**
184:2

**notice** 113:2,4,
9 145:16

**noticing** 279:4

**November**
170:7 282:16

**number** 8:17
55:7,15,17 62:5
82:19,24 84:25
94:5,7 95:2
99:4 105:7
112:6 116:2
143:22 154:7
168:18 174:15
186:17 187:24
197:3,4,5
222:24 232:3
254:1 270:4
295:2 296:2,3
301:4,13

**numbers**
156:1,4

**numerous**
166:25

**nurse** 183:2
184:15 185:4,6

**O**

**object** 9:6
11:18 58:19
72:25 76:8
81:19 83:9
87:18 88:23
126:6 148:5
165:8 222:19
264:19

**objecting**
56:21 241:18

**objection**
16:3,11,18 17:6
21:19 22:8 26:1
30:2,15 31:10,
19 32:16 33:17
36:24 37:19
40:22 42:8,10,
19,23 43:21
44:18 45:2,7
46:21 47:4
50:9,17 51:1
54:9 55:9,22
56:12 60:16

61:16 62:4
64:24 67:6
70:17 71:14
72:3,10 73:4
77:5 78:21
79:11 80:10
81:10 82:15
83:1 85:3,15
86:1,7 87:4
88:11,14 89:22
90:2,15 91:1
100:12 103:23
106:11 107:17
108:2,18
110:21 113:20
114:4,23 115:5,
13 116:4,19
117:10 118:24
120:16 121:19
122:5 123:4,17,
21 124:13
125:2 129:5
130:3,12,18,24
133:3 134:9,13,
20,22 135:4,19
136:19,21
137:11 138:6,
13 139:7,14
140:3 141:8
142:17 143:16
147:4 149:2
151:24 153:10,
14 154:2 155:9,
17 156:19
157:6 159:15
160:8 164:23
165:15 166:15
167:8 168:5
169:16 170:2
171:4,24
172:11 175:23
179:22 180:25
182:1,19
183:25 185:21
188:24 190:2
192:12 193:9
198:9 200:18,
20 201:4,8
203:4,9 204:6,
22 209:6,16
210:4,12,17,20,
22 211:6,15,21
213:5,9 214:6,
9,18,22 216:14
217:17 218:4,
11,20 219:8,17

220:8 221:25
222:6 223:14
224:1 226:6
227:6 228:6,18
229:2,7 230:2,
14,18,22
231:14,20
234:22 236:22
241:15 244:1,4,
19 245:6,8
246:11 247:13
248:24 249:1,
16,22 252:21
253:11,17,24
255:18 256:4,
13 257:3,24
258:5 259:23
260:1,8,16
261:2,23 263:7,
11,17,20 264:1,
5,8 265:24
266:4,11,24
267:8,22
268:19 272:19,
24 273:25
275:4,17,21
276:17,19
277:21 279:17,
25 280:13
282:19 284:15,
17,21 285:19,
25 287:7,18
292:1,6,14
297:18 298:1
299:2,16 300:8
301:22 302:1,
13,17,25
303:24 304:18
305:23 306:22
307:12,17
308:8 309:10,
20 310:17
311:14 312:22
313:2,23
315:11,19
316:1,15 317:1
324:20

**objections**
30:19 174:3
180:23

**obligation**
127:12

**obtain** 104:20
133:7 153:2

203:20 224:14
269:10

**obtained**
224:20 269:16

**obtaining**
114:3 253:2

**obvious** 92:13
204:10

**occasion** 13:7
15:13 17:3
19:11,12 23:15
28:8 29:6 32:10
33:23 41:1
72:19 75:23
84:23 119:5
137:13 166:9,
10 176:24
190:24 235:9
259:7 265:8
289:4,9 303:2

**occasions**
10:8 14:6 18:4
19:9 20:12,13
32:4 39:23
51:18 55:16
61:21 84:15,17
113:8 118:2
122:7 151:12,
23 152:2
158:16 166:25
186:19 191:20
202:20,21,25
224:23 236:4
298:13

**occur** 35:12
59:6 75:7

**occurred**
11:13 37:6
53:14 109:12
154:19 186:22
255:4 271:11
272:8 304:2
307:24

**occurring**
43:16

**odd** 292:24

**offense** 20:15

**offered** 42:5
187:1 190:22

**offering** 18:5
107:19 118:11
119:3

**office** 12:6
22:21 46:9,18
49:7 50:2 54:7
56:16 60:14
62:3 65:16,19
67:16,22 74:9
76:1 82:21,25
84:10 85:22,23
87:25 88:24
89:25 90:3,11
95:22 101:9
102:15,18
103:20 104:1
106:22 109:3
110:12,13,14,
24 113:25
116:7 117:3,4
118:3 120:3,6,
13,22,23 121:1,
6,24 127:20
128:23 129:11
130:16 131:4,5
135:24 140:7
167:20 175:2
250:16 258:12
284:13,14
290:16 291:11

**officer** 21:8
34:6 38:16,25
44:11 63:21
101:1 107:20
108:12 135:7
144:20,24
147:14 159:4,
19,25 173:20
195:24 210:21
278:25 311:18
325:3

**officer's** 20:1
34:1,9

**officers** 18:3
19:9 21:5 23:20
26:10,11,19
37:9 39:23 42:5
44:7 45:16,18
107:3 137:3
140:9,20 146:7
158:14 159:10
166:23 168:1
187:25 311:21,
25 320:7

324:17 325:10

**official** 185:7
206:14

**older** 17:13

**ongoing**
104:23 184:19

**OPA** 130:22

**open** 130:23
131:1,6

**operating**
32:13

**opinion** 118:7,
9,18,20 172:23
294:22

**opposed**
151:18 169:3,
14,15

**option** 326:5

**oral** 105:2

**order** 13:6
36:13 44:7
105:2 316:22

**organization**
119:22

**organize**
128:25 182:16

**original** 153:17
279:10

**Otis** 78:13
160:20

**outdoor**
243:14

**overlapped**
234:7

**owed** 18:16

**owner** 249:7,
10 297:5
314:19,20,24
321:22

**owners** 321:10

_____

**P**
_____

**p.m.** 285:2

**pad** 12:8

**pads** 12:9,11

**pages** 126:11
127:21 169:11
171:10 224:6
236:18 282:7

**paid** 18:17 39:6
41:3 63:18
79:6,7,9 245:18

**paper** 118:4
129:22 183:16

**paperwork**
118:11,13,25

**paragraph**
154:9,24 157:8
247:7 265:3
271:17 304:3

**paraphrasing**
321:18

**pardon** 50:23
129:9 199:3

**parent's** 23:12
24:19

**parents** 25:15
186:6

**parents'** 24:21
262:5,6

**park** 295:25

**parked** 144:23

**Parker** 163:13

**parking** 32:2,9
56:5

**part** 15:3 22:14
24:6 57:20
75:11 88:17
107:2 109:16
132:21 138:8
147:24 150:14
158:14 166:7
175:4 178:17,
19 179:25
185:4,6 186:14
187:6 191:24
208:9,11 210:1,
24 216:8 219:9
242:15 247:2

**pages** 326:15

**participate**
73:21 168:13
242:21

**participating**
158:9

**parties** 63:24
69:6,9 172:20
175:22

**Partin** 250:10,
19 252:19
253:23

**Partin's**
250:16

**parts** 167:13
225:6 257:22

**party** 28:15
65:5 88:19 91:2
121:22 173:19
174:1 268:20

**pass** 185:4,6
246:16 312:4
320:1

**passed** 40:19,
25 41:8

**past** 58:16,17
116:11 174:18

**Pat** 175:5,7

**patient** 258:4

**Patterson**
160:14

**pawn** 246:5
248:16

**pawned** 247:9
248:4

**pawns** 248:15

**pawnshop**
243:6 245:25
246:3 248:1
249:7 253:9

**pawnshops**
248:15

**pay** 193:7,18
194:4,19

249:20 279:15
286:11 291:15
306:2 317:12

**paying** 80:22

**payment**
286:15

**payments**
201:11,15,18

**payoff** 49:8

**peach** 309:19

**penalty** 113:2,
11

**pendency**
131:19

**pending** 122:2
189:10 207:18

**people** 13:12
14:1 23:20
24:10,11 26:15
32:7 34:3,15
40:10 41:22
43:24 46:2
131:5 137:5
138:5 143:23
146:21 149:12
159:7,10,11,17
160:25 164:12
179:1 184:9
188:3 191:14
192:21 202:19
213:12 221:16
223:13 274:5
277:9 288:1
296:21

**PEP** 135:15

**percent** 10:20
24:15 196:24
214:19 288:16

**perfectly** 58:9

**performed**
48:17 167:13
287:23

**period** 48:4
55:18 67:9 79:6
82:1 106:17
112:19 177:25
199:11 212:16
241:4 248:16
304:6 316:14

**persistent**
188:7

**person** 16:23
24:3 49:14
57:13,18 76:6
114:14 119:2
147:7 167:1
168:19 169:20
176:10 177:11,
23 216:6
227:18 254:2
281:16 300:11
313:21

**person's**
119:2 169:20

**personal** 71:2
94:1 107:18
324:23 325:8

**personally**
41:7 46:8
107:23 256:6
270:3

**persons** 28:15
178:18

**perspective**
204:3 205:2

**Pewee** 149:18

**pharmacy**
254:17 269:11
270:7 316:24

**phone** 76:7
82:20,21,23
88:21 90:8
94:5,7 95:2
164:1 183:17,
23,24 190:21
195:22,23
196:6 262:3,4
296:2,3 300:3,
6,7,9,17 301:13
308:15 309:1

**phones**
300:11,19

**phonetic**
111:3,7

**photograph**
148:20 149:3
308:12 313:25

**photographed**
224:11

**photographs**
148:14 182:3,4,
6 305:10 314:8,
25

**photos** 148:2,
24 149:7,13
313:20 314:3

**phrased** 83:20

**pick** 97:6

**Pickard** 8:15
9:5,8 13:23
20:8,9,25 27:24
37:21 40:2
44:16,23 45:11
60:18 79:1,3,6,
7 80:22 82:9
107:9,15
108:16,21
122:8,17
123:11 124:25
125:9,15,20
132:14,15,16
135:3 136:10,
25 137:4,7,9,20
138:2,10,25
139:4,10,19
140:8,17,18,21
141:1,4 142:15
143:1 146:2,10,
15 147:19
150:2 151:11,
18,22 152:3
154:14 155:14
156:25 157:13
158:25 164:16
165:12,25
168:2 188:21
195:10 203:1,2
274:18

**Pickard's** 8:20
9:13 156:22
188:9 202:23

**picked** 183:10
229:24

**picture** 307:18,
22 308:9,11

**pictures** 230:4,
12,21 304:16,
21 305:2,4,12,
19,22 306:17,
21,25 307:4,8,
10,14,15 308:5,

6,7,14,17
310:15,25
312:25

**piece** 118:4

**pigeon** 176:17

**pills** 302:8

**Pineville** 96:16
118:6 119:10

**Pingleton**
164:9

**pinpoint**
196:22

**PL** 156:4 270:4
319:7

**PL014449**
197:4

**PL034627-628**
181:8

**PL15534** 285:8

**PL15826**
251:25

**PL17228-234**
269:12

**PL20938-
20940** 250:13

**PL30** 262:18

**PL33835** 282:7

**PL34173** 295:1

**PL52** 246:16
247:1

**PL77** 271:15

**place** 13:12
74:5 178:2
283:13 291:11

**plaintiff** 73:16

**plaintiff's**
73:25 156:5
172:13 176:25
235:17

**plaintiffs** 73:13
155:4,15 247:3

**planned** 31:3
263:19

**play** 52:14
193:7,19 194:4,
19 306:2,5

**played** 9:5
45:12 189:15
242:15,17
306:20

**PLAYS** 58:13

**plea** 301:18

**pled** 78:18

**plod** 174:8

**plumbers**
119:11

**point** 47:10
67:9 74:24
120:7 125:5
151:6 165:2
181:21 196:19
205:21 208:3
215:23 242:7
248:22 287:25
291:25 294:8
309:7 310:25
317:20 325:1

**pointing**
215:23

**police** 8:23
19:13 20:18,20
23:20,22 26:22
27:1,2 34:9
43:19 88:4
101:1 106:14
136:24 137:1,
10 139:11
144:20 148:19
159:8,14 160:6
184:12 209:5,9
210:21 225:23
226:4 227:5
229:18 230:12,
21 234:20
287:23 301:24
302:11,19
303:23 304:6
305:13 307:9
310:4,16 324:4,
5,17 325:2,9

**Polly** 162:17
239:8

**poly** 279:23

**polygraph**
137:15,16
179:9,21
189:20 199:8,
15 278:13,15
279:13,14
280:7

**polygraphs**
199:11,12

**poorly** 87:18
287:9

**porch** 284:2,4,
6

**portion** 154:8,
23 312:8

**portions** 74:21

**portrayed**
157:4

**posed** 73:9,15
91:7,24 172:12

**posing** 91:7

**position** 39:20
65:14 107:14

**positive** 33:11
135:25 210:7
303:6

**positively**
228:4,9,12

**possession**
146:17

**possibly** 41:23
168:23 187:22
221:1 247:8
287:12 307:18

**potential** 100:7
200:1 324:17

**potentially**
90:10 189:6
278:22 303:25
324:13,22

**Powell** 9:25
59:20 62:13,20
74:8 106:13
133:21,23
134:4 164:20
212:4 292:23

**poly** 279:23

**Powell's**
176:13 268:1

**practice** 11:24
16:15,22 103:1
123:15 134:21
203:14 226:4

**practices**
106:14

**prefer** 176:17

**preliminarily**
247:18

**preparation**
72:21

**prepare** 11:16
33:9 71:13 72:1
206:7

**prepared** 28:3
103:21 136:17
177:11 206:10

**preparing**
168:14

**Presbyterian**
119:20

**prescription**
243:4

**presence**
215:17 245:7

**present** 9:25
20:9 26:15
35:24,25 38:9
49:20 53:9
54:20,22 62:14,
25 65:13,20
66:11,19 75:9
76:5 112:12
132:17 136:10
152:11,18
158:19 160:16
188:23 195:11
254:7,18 255:3
274:25 278:7
311:23 320:13
324:23

**presenting**
94:19

**presently**
93:24

**pressure** 279:23

**presuming** 198:3

**presumption** 110:10

**pretty** 14:13 166:2 203:14 283:12 291:21 309:22

**previous** 128:17

**previously** 90:21 91:5 269:8

**price** 20:4,20

**prior** 12:22 21:6 56:13 68:15 111:4,6 119:23 121:2, 17,21 122:14 152:20 155:3 176:23 211:23 214:8 284:11

**prison** 101:7

**private** 116:9, 12 208:6

**privilege** 29:16,20 48:11 53:11,25 54:4 56:16,23 57:3, 12,23,24 58:1 60:4,8 63:3,23, 25 69:8 83:11, 15,25 84:11 86:13,23 87:7 88:11 89:5 91:5 92:17 95:1 115:17 127:22 165:18 168:14 172:15 173:12, 17,22 174:2 176:6,20 177:7, 20,25 181:1 215:8 216:8 229:15 235:22, 23 240:24 241:17 247:10, 12,20 253:5 258:21 261:10

**privileged** 54:3 86:25 165:16 171:2 172:2,13 173:15 176:16 182:1 216:13 246:12 325:14

**privileges** 53:6 62:23 63:1,8 69:3,11 87:5 88:19 92:14,22 124:15,18 128:5,8 177:16 180:23

**pro** 42:20 43:7

**probable** 135:17

**problem** 107:23 173:6

**proceeded** 145:2

**PROCEEDINGS** 8:1

**proceeds** 34:17 253:15

**process** 100:20 119:10 173:12

**produce** 128:5,20

**produced** 12:6 127:13,21,22 128:3,16 180:19 304:24

**producing** 180:20

**product** 29:20 53:6 57:2 62:22 63:11 92:17 124:14 128:7 173:16 177:24 180:22 247:10

**production** 127:4,20 131:22 132:3

**promoting** 231:10

**prompted** 14:18 84:9 89:17

**pronouns** 273:13

**proof** 107:24 272:12

**proper** 173:21 184:21 203:3 248:13

**properly** 247:11

**property** 159:19 276:23 277:6,7,8 297:1

**proposed** 100:5

**prosecution** 107:25 108:1 113:1 324:19 325:11

**prosecutor** 113:9

**protected** 124:18 229:13

**protocol** 16:15 123:15

**prove** 204:2

**provide** 85:6 88:4 93:25 95:5 97:4 127:25 269:24

**provided** 100:8 127:10 138:16 147:12 158:3 164:11 324:1

**provider** 225:1

**providing** 115:8 158:9

**PSP** 179:18

**public** 46:10, 18 50:3 54:8 90:11 95:16 101:9 102:15 103:20 106:22 109:3 116:8

**Pulaski** 96:23

**pull** 41:6 232:3 276:10 303:5

**pulled** 34:23 39:1,2 132:17 135:3,6,7,10,11 308:15

**pulling** 314:8

**purchase** 27:21 78:6

**purchased** 139:5

**purchases** 243:6 248:4,15 253:9

**purport** 252:9

**purported** 250:15

**purportedly** 40:21 288:2

**purports** 252:14 285:14

**purpose** 87:2 91:16 94:6 95:9 203:8 252:19

**purposes** 110:16 130:23 183:9

**pursuant** 317:21

**pushed** 145:13

**put** 11:23 19:23 27:3 129:17,19 143:1 157:1 169:6 182:12, 22 191:15 208:10 240:18 244:17 245:20 272:10 276:23, 25 277:1,2 291:2 307:20

**putting** 127:15 129:20 183:23

**puzzled** 224:9

120:3,6 130:16 206:13

**Pulaski** 96:23

**pull** 41:6 232:3 276:10 303:5

307:19

---

**Q**

**qualified** 113:6,7

**question** 11:19 21:21 29:18 45:10 52:6 53:18 54:10,23 56:21,25 57:17 58:12,15,18,24 63:13 64:4,18 69:12 71:16 72:5,12 73:1,19 77:21 83:18,20 85:9,21 86:3, 10,19 87:6,16, 17,19 88:21,23 89:10 90:16 91:7 92:24 93:4 95:4,9 106:18, 19 108:8 110:2 111:8 115:7,18 118:22,25 124:19 125:23 126:1,5,6 130:5 139:2 151:20 159:16 165:11 169:8 172:22 179:15 181:19, 24 201:15 202:10 217:11 221:23 222:19 225:11 229:12 248:17 253:5 261:10 292:23

**question's** 81:20

**questioned** 136:3 139:10 147:15 168:2 248:9,12

**questioning** 17:4 100:12 137:7 220:16 247:13

**questions** 8:18 16:17 56:9 58:4,22 59:2,5 72:23 82:16 83:24 91:15,24

92:19 94:21
107:8 108:6
115:14 131:20
172:11 174:20
205:13 248:6,
13 259:10
317:25 318:18
322:25 323:7
325:20

**quick** 151:1

**quid** 42:20 43:7

**quo** 42:20 43:7

---

**R**

---

**rabbit** 69:15

**raise** 8:3 125:8,
11

**raised** 96:5,6

**ran** 32:8 272:8

**randomly** 56:2

**Randy** 162:14

**range** 258:16

**ransacked**
279:2

**Ray** 302:9,22
303:2,3

**Raymond**
163:7

**re-bates**
247:11

**reach** 109:8
201:1

**reached**
176:24

**read** 56:20
58:11 134:25
186:2 188:6
197:14 198:24
199:17 243:2
244:9 257:4
263:3 277:11
282:25 285:21
295:6 326:6

**reading** 256:5

**ready** 301:11,
12

**real** 118:23

**realize** 76:16

**reason** 30:24
36:6 49:11
100:14 116:1
126:8 127:11
135:17 203:11
207:8 227:3
229:14 253:2
272:17 283:8
293:6,9 295:14
308:20

**reasonable**
252:5

**reasons** 60:19
89:16 117:9
120:18 203:18
204:10 289:10

**Rebecca**
322:19

**recall** 9:2,11
14:1,2,17 15:22
16:20 17:7 18:2
24:8,23 25:1,4
26:17,20,25
28:1,12,17,19,
24 30:24 31:20
33:7,14 34:19,
24 35:1,7 36:10
37:23,25 40:4,8
41:19 42:13
43:4 44:19
45:15 46:4
47:10,19,20,21
48:5 50:24
54:10,19 55:2,6
56:2 58:25 59:4
60:17 62:16
65:23 66:6
67:9,16 68:2,7,
16 74:4 75:8
77:8 79:21 81:5
84:6,23 89:16
105:13 121:21,
24,25 122:9,15
123:7,13
125:10,13,17
133:9 134:3,17
135:7,12,16
136:14 137:2,4,

12 141:9,22
142:3 143:6,24
144:13 146:4,
12,25 147:8,22
148:12 150:13,
24 152:15
153:1,16 154:3,
14,16 155:10
156:14,20
157:19 160:2
161:22 162:11
165:11 166:16,
17 167:20
171:25 188:19
189:19 190:21
192:22,24
194:5,11 195:7
200:14 203:5
204:1,16 205:8,
9,11 208:1
211:22 218:5,
12 219:23
220:7,9,10,12,
14,21 221:22
222:1,11 223:1,
3,6,10,17
225:21 226:20
228:11 229:3
230:3,9 231:21
233:2,11,24
234:12,23
235:5 237:18
238:6,15,23
239:18 243:15
246:3 251:10,
12 252:8
253:18,19,20
254:19 255:13,
25 256:8,15
257:4,12,13
258:9 259:5,6,
18,22,25 260:2,
12,23,24
261:16,20,24
265:14,15,17,
18,25 266:6,18,
21 267:2,5,9,
12,15 272:2,14,
16 273:18
275:1,5,6,10,18
276:3 277:3,8,
14 278:3,8,18
280:2,5,9,17,23
281:4,24
282:11 283:19,
20 284:8 285:3

287:8,10,13
288:14,15
289:21 290:4,
13,16 291:3,23
292:2,4,7,12,
16,21 293:4,13,
15,20 294:13
297:10,14,19,
21 298:16,18
299:3,12,17,21
300:2,4,10,16,
24 301:2 303:7,
19 305:9,24
307:5 308:16
309:21 310:19
311:24 312:3
313:17 314:8,
20,22 316:10,
20 317:2,16
320:17 321:7,
11,15,23 322:6,
24 323:20
324:9 325:4,17

**recalled**
142:12 144:14

**receipt** 285:14

**receipts**
147:13

**receive** 138:1
218:16 219:4
220:17 221:19
258:7 266:13,
15 280:12,15
281:1 282:22
287:22

**received** 48:23
106:5,22
108:11 114:6
124:11 131:1,5,
24 139:6
155:24 222:5,
17 224:7
226:15 253:22
266:20 282:20,
25 286:3,4
313:9 319:23

**receiving**
128:16 153:25
278:8 304:6

**recently** 18:18
304:11

**recognize**
156:7 197:20
252:12 306:9,
14

**recognized**
161:18

**recollection**
18:22 26:11
38:23 61:12
74:10 144:3
152:21 157:5
164:19 167:21
194:21 195:13
215:7 260:5
277:19,25
286:24 290:5
296:14 298:2,
21 299:8 310:2
316:10 317:19
320:18 321:24
322:12 324:21

**recommendati
ons** 105:9,10

**record** 10:15
13:3 14:6,21,22
16:16,23 20:11
30:20 31:21
33:2 39:12
41:22,25 45:3,
16,19 63:3 68:2
75:4 76:19
91:11 93:13
94:1,20 123:8,
16,19,24 124:1,
5,11 127:15
128:10 132:4
133:19 142:4
151:3 152:21
162:1,10
174:11 180:17,
18 195:22,23
200:8,10 204:7
208:9,11 218:5
222:2,13,20
223:9 224:23,
25 233:23
235:10,15
237:1,6 238:13
242:21 245:9,
16 246:23,24
250:12 257:13,
22 259:15
260:19 264:16
269:6 277:20

282:3,4 286:9
298:20 302:5
305:25 306:1,7
307:6 315:3
316:13 324:1,
25

**record's**
316:11

**recorded**
10:16,21,23
15:23 20:18
76:18 133:17,
19 134:2,4,7,16
136:20 141:11,
15,20 145:2
146:3 161:14,
19,20,22 162:5,
15,25 163:3
167:5,10 168:6
187:8,11,14
188:8,10,15
195:4,8 200:11,
12 202:13
212:3,6 215:5
226:9,14,25
232:12,17
233:10,16
235:11 242:22
243:25 244:14
257:17,18,21
258:1 259:16
262:7,8 265:23
266:3,9,19
270:22 277:23
290:3,12
298:15 302:6
311:10 312:12,
20

**recorder** 16:9,
21 124:7 233:3
275:12

**recording**
76:12 124:3
134:6,12,17,19
183:23 213:15
232:19,22
266:13,15
290:10 306:6,
10 308:3 315:8
321:14,15,20

**recordings**
187:17 188:18
189:20 191:12

206:6 236:5,14,
15 278:6

**records** 9:11
31:14 36:17
40:11 109:10
110:23 111:14
123:1 130:23
131:1,6 136:16
140:15,22
145:7 154:15
156:13 187:2,4
189:4 192:18
193:4 195:22
200:22 203:7,
12,15,19,20,22
204:2,14
205:10 208:14
221:1,20
224:15,19
227:14 248:9,
12 249:5 250:8
251:11 252:20
253:2 255:15,
21,23 256:9,18
257:5 259:13,
14 269:10,15
270:7 276:10
286:2,4 304:12
305:9 314:15,
17 316:13,20,
24 317:6,9,13,
14,17 318:4,8,
11,13,24
319:16,23

**records--**
188:14

**recount** 150:20

**recounted**
36:9

**recourse**
91:17

**recycling**
316:4,7,8

**red** 198:17

**redact** 247:19

**redacted**
247:2,12,16

**refer** 72:12
131:14 240:11

**reference**
172:1 184:9,18
188:6 196:14
198:15 199:3
200:6,24
201:16,17
202:4 242:9
269:9 298:19
312:19 323:20

**referenced**
22:20

**references**
240:25 301:24

**referencing**
200:15

**referred** 247:7
258:3 295:8
303:14

**referring** 22:24
151:13 176:5
198:11,12
231:6 236:25
250:5 307:5,15,
21

**reflect** 21:15
248:14

**reflected**
255:21 305:25

**refresh** 271:11

**refused** 202:7
242:21,23,24
294:18

**regard** 21:2
30:1 65:25 81:7
115:4 119:24
122:16 123:15
124:9 126:21
127:5 128:11
159:1,2 164:17

**regular** 117:20

**rehash** 206:2

**rehearse**
211:8

**Reid** 107:4

**reinvent**
164:20

**related** 38:15

100:9 117:11
140:1 288:8
318:14

**relating** 57:10
217:16 319:24

**relation** 25:6

**relationship**
78:25 257:2

**relative** 35:6

**relatives**
96:20,24 97:4,
9,13 98:13
99:23 100:23
101:11

**relay** 90:23

**relayed** 294:2

**release** 54:13
252:14 269:22

**relevance**
108:2 184:23
205:1

**relevant** 108:5,
7 184:2 185:2
189:15 203:16
204:3,13,15,21
316:18

**reliability**
248:9,12

**reliable** 200:17

**relied** 288:22

**relief** 301:9

**rely** 214:7

**relying** 90:25

**remaining**
174:20 301:6

**remember**
9:12 12:4 13:22
14:15 15:14
18:3,6 19:6
20:3 22:5 23:9,
11,13,15 24:25
25:3,5 27:2
28:22,25 41:8,
14,18 42:3,12
43:16 48:7
52:21 59:16

65:22 66:5,7,8,
9 67:23,25
68:8,25 74:11
75:15 84:15
85:18 103:15
111:1 118:2
122:12,23,24
123:5,10
124:10 128:16
137:19 138:15
143:14 145:18,
25 146:9,20,21
147:18 153:25
156:16 157:15,
17,23 158:9
159:25 164:14
182:6 184:5,17
194:14,17
200:3 202:25
203:24 220:23
225:12,14
234:16 235:2
236:4 238:5,7
239:2,20,24,25
240:2 244:6,21
254:20,23
256:21 259:9
274:1 278:11
291:10,13,15
293:18 295:21
298:15 299:23
304:12 316:7

**remembered**
38:23

**remodeling**
119:10

**removed**
207:3,6 208:4

**rendered**
146:7 148:15,
21,22 150:13
177:6

**rent** 201:12

**rental** 172:6
187:2,3 201:12
317:5

**rented** 187:5

**renting** 118:6

**repair** 78:6

**repeat** 86:3

93:13 125:3
153:6

**repeated**
191:20

**repeatedly**
18:13 186:7
188:2 271:18

**repeating**
140:9,19

**report** 12:6
20:1 21:3,11,
12,13,17 22:3,
11,25 26:18,20
28:2,24 29:8,10
33:9 35:8
40:14,15,18
41:20 45:24
46:13,17 59:10
71:23 106:16
113:14 114:5,
14 136:17
155:23,24
156:9 157:16,
21 161:24
166:25 167:18
181:22,25
182:8,10,12
187:13 196:8,9
206:10 209:5,7
227:9,10
233:21 236:21,
23,24 237:1,4,
9,17,22,25
238:2,10,16,24
241:6,9,24
243:20 245:1,
20 246:3,17,18
254:12 255:6
256:2 259:18
261:22 262:9,
19 263:3
264:11 266:7
267:3,10,16
270:24 271:7,
24,25 273:5,8,
15,22 274:5
275:10,11,14
277:11,12
278:1,5 281:20
282:8,11,15
283:10 286:22
289:22 290:12,
18 291:3,4,21
292:3,8,22

293:17 294:6
295:1,6,21
296:18 298:17,
22 301:4,16,20,
23 303:14,20
313:14,17
321:16,20,24

**reported**
143:25 209:8,
23 249:19
253:8,14
274:24 281:18
293:19 309:8

**reporter** 8:3,9
56:20 58:13
180:6 240:17
246:24 252:1
262:12,15
285:10 295:4
312:6 315:4
319:12 325:25

**reporting**
46:19 47:8

**reports** 15:12
19:24 21:14,16,
18 22:6 34:1
40:12 44:20
51:9 59:9,11,14
125:19 129:19,
20,21,24,25
143:25 144:2
156:10 166:18,
22 167:12
169:6 170:17
182:22 202:5
224:7,8 236:18
255:19 281:4
284:1,6,25
292:25 313:8

**repository**
12:10

**represent** 8:14
44:21 205:25
208:21 274:17
320:6

**representation**
54:5

**represented**
91:4 120:2,23

**representing**
47:25 57:25

60:14 61:3 63:6
64:12 252:16

**request** 100:13
131:2,22
203:14 269:22
287:13,15
319:16

**requested**
58:13 74:2
123:23 166:24
203:23 204:10,
11 236:6 252:5
256:20 287:3

**requesting**
128:2 256:21
269:20 287:16

**requests**
131:6 132:3

**require** 252:23

**required**
104:25 177:7

**requirement**
105:8

**requirements**
105:4,12
109:17

**research**
104:5,6

**reserve** 247:19
326:2,6,13

**residence**
19:8,12 23:20
39:3 144:5,7,
19,24 145:11,
23 146:6
187:25

**resolved** 136:8

**respectfully**
176:11

**respond** 176:3

**responded**
316:12

**response**
316:9,21

**responsibility**
36:12

**responsible**
21:9

**rest** 70:6 234:3

**restaurant**
50:1 76:24,25
84:22

**restroom**
269:3

**result** 253:3

**resulted**
135:13

**retain** 179:8

**retained** 57:15
208:5,6

**retaining**
57:24 203:24
204:1

**retention**
235:15

**retired** 97:17

**return** 40:7

**reveal** 47:2
86:25

**revealed**
180:15

**review** 39:12
44:20 45:3,24
56:13 58:8
59:10 65:11,13
68:6 69:21 73:2
128:6 140:14,
15,22 152:21
159:21 187:12
192:18 197:8,9
199:23 208:14
212:3 222:2
224:25 227:14
228:20 235:7,
10 243:18,23
249:5 259:13
262:23 269:12
273:22 305:9
312:7 315:20,
22 319:7
325:14,24
326:10

**reviewed**
59:18 187:12

206:9 224:9
225:13 228:23
248:3,5 313:4

**reviewing** 9:11
10:19,20 14:5,
21 18:2 21:10
24:14 40:11
45:16,19 86:6
122:25 136:4
138:18 156:13
203:12 218:5
221:1 222:13
223:9 224:23
257:5 286:2
307:6 316:19
324:25

**reviews** 65:1,
4,6

**reward** 186:8,
10 187:1

**Rewarded**
190:15

**Rhonda**
162:23 265:12

**Richmond**
208:7

**rid** 42:6

**rights** 71:9
247:19

**risks** 20:15,16

**roadblocks**
27:3

**Roark** 196:16,
17

**Rob** 159:18
160:1

**robbery** 79:5

**robbing** 245:4

**Robert** 155:25
162:12,13,17
239:6

**ROBINSON**
74:23 75:2

**Rodney** 230:24

**role** 8:20,22 9:5
45:10 52:14

**Rolf** 163:17

**room** 25:19
188:9 273:24
275:3

**rug** 18:11 42:16
43:11 155:2

**rule** 216:7
317:22

**rules** 30:18

**rumor** 34:20

**rumors** 39:7

**run** 144:10
194:8 195:18

**running**
262:16 291:21

———————

**S**

**S-A-Y-L-O-R**
98:14

**sake** 22:19
131:25

**sales** 248:18

**Sam** 164:4
171:11 186:19
212:15

**Sanders**
163:18

**sat** 92:6 233:4
265:10 284:1,4,
6

**satisfied**
294:16 296:12

**Saturday** 51:4

**sawmill** 321:10

**Saylor** 98:14,
16 99:2,7

**says--** 270:12

**scenario** 23:18

**scene** 38:25
132:18 167:17
192:4 280:20
320:14,16

**schedule** 76:2

**scheduled**
68:11 70:7
72:17 75:25
128:14 133:10
143:8

**scheme** 45:21
47:1 48:24
64:21 84:20
193:8 194:1,19

**school** 24:23
96:18 99:19
103:8,16
129:22 144:8,
10,13,14
189:13

**Science** 102:3

**Scott** 274:12
276:14,23

**scruff** 309:18

**searched**
136:11 303:21

**Sears** 103:14

**secondhand**
303:9

**secretary**
175:7

**secretly**
213:16

**seek** 91:16
118:16 177:15

**seeking** 83:10
113:2 147:21

**segregated**
169:2

**seize** 301:17

**seized** 301:24
302:8,9

**sell** 118:12
248:17

**send** 176:2,16
178:1 182:3
250:14 326:14

**sentence**
139:2 154:23
157:7 247:8

312:13

**separate** 22:5
35:18,20,21
36:3 60:13
123:10 182:17
224:15 278:17

**separately**
278:15

**September**
324:2

**sergeant**
141:13

**serve** 323:18
324:3

**served** 89:23
128:13 131:20
132:3 324:4
325:7

**service** 323:24

**serving** 69:10

**session** 144:9
149:13

**set** 49:24 65:8
190:19

**setting** 178:5

**settlement**
249:13,15,21
250:23 252:15
253:15

**settlement's**
251:18

**seven-** 317:23

**seven-hour**
317:21

**Shapiro**
102:25

**share** 61:6
125:19,23
164:21 211:13

**shared** 60:23
61:1,5,9 212:1
300:19

**sharing** 125:18

**she'd** 120:2
150:11 248:3

249:14

**she'll** 95:17
176:3 181:4

**shebang**
257:22

**sheet** 183:15

**Sheriff** 8:15,20
9:5,13 27:24
37:15,17,19,21
40:2 122:8,17
123:11 124:25
125:9,15,20
132:14 135:3
136:25 137:7,9,
20 138:2,10,25
139:3,10
140:18,21
141:3 142:25
146:2,10,14
147:19 150:1
151:18,22
156:22,25
157:13 158:20,
21 164:15
165:25 188:9,
21 195:10
202:23 203:1,2

**sheriff's** 21:1
38:8 40:6
44:17,24 45:6,
12 49:7 108:24
125:1,12,21
132:16 135:24
140:7 159:8
160:7 164:16
166:13 167:20
188:22 202:24

**Sheriffs** 26:22

**shocking**
79:13

**short** 12:5 67:9
246:22 258:13
260:4 295:6

**shortly** 253:9
308:21 310:6,
13

**shot** 308:12,13

**should've**
15:11 40:16
73:17 123:14

237:4

**shoulders**
145:23

**shovel** 192:3

**show** 126:10
148:20 168:9
271:19 272:11
285:6 304:21
305:2,4 309:14
310:25 312:4
313:21 318:25

**showed** 56:14
180:25 286:15
304:16 307:25
308:5,10,12
309:15 313:25
314:1,3,6

**showing** 305:9
314:9

**shown** 148:14
306:18 310:15

**side** 171:3

**sidetracked**
286:17

**signature**
252:10,12
326:1,2,7,13

**significant**
21:24 145:25

**silent** 177:18

**similar** 156:17

**similarly** 323:7

**Simms** 155:3
170:17

**simply** 17:5
47:21

**Simpson**
121:12 137:22
138:3 155:7
161:11,25
170:12 171:22
186:6,24 187:4
189:4,9 190:18
199:20 217:24,
25 233:14
261:25 262:22
264:7 266:1,2,

17,22 267:13,
24 268:2,7
281:2 282:13
305:2 308:11
315:7 316:25
318:4 319:17,
24

**Simpson's**
266:16 317:5

**single** 176:24
226:5

**sir** 84:14
124:23 149:14
198:5 206:25
207:2,4 208:22
235:24

**sister** 162:17
239:8

**sit** 22:4 24:13
107:2 217:8
221:10 223:24
225:7,19
234:17 238:6
244:6,15
273:10 288:18
290:25 308:2

**site** 120:6

**sitting** 144:17
175:25 213:22
293:18,24

**situation**
115:12 118:20
124:6 316:19

**Sizemore**
78:13,17 80:18
160:18,20

**sketch** 146:8
148:15,22
309:14,15,16
310:1 311:18

**skipped** 311:6

**slap** 20:21

**sleeping** 24:20

**sleeves** 145:13

**Slosar** 9:6
11:18 14:24
15:4 16:3,11,18
17:6 21:19

22:8,17,19,25
26:1 29:15
30:2,15,18,23
31:10,19 32:16
33:17 36:24
37:17,19 38:2,5
40:22 42:8,10,
19,23 43:21
44:18 45:2,7
46:21 47:4
48:10,13 50:9,
11,17 51:1,4,7,
15,22 52:5,9
53:2,5,15,19,23
54:1,8,9,21,22
55:5,9,22
56:11,19,24
57:1,8,16
58:16,21,23
60:4,7,16 61:16
62:4,21 63:7,
10,16,20 64:3,
6,15,24 67:6
69:2,5,16,21,23
70:17 71:14
72:3,10,25
73:4,13,24 74:9
75:19 76:1,5,8,
15,21 77:5
78:21 79:11
80:10 81:1,4,
10,16,19,24
82:14,15 83:1,
9,19 84:11,16
85:3,8,14,15,20
86:1,7,12,14,
18,21 87:4,11,
17 88:11,14
89:3,10,22
90:2,15 91:1,
11,13,20,23
92:4,11,24
93:25 94:3,6,
10,13,17 95:12,
15,19,21 97:3,7
100:4,16,19
103:23 106:11
107:17 108:2,6,
18 110:21
111:17,21,25
112:5 113:20
114:4,22,23,25
115:2,5,13,17
116:3,4,19
117:10 118:24
120:16 121:19

122:5 123:4,17,
21 124:13
125:2,22 126:5
127:10,13,15,
18 129:5 130:3,
12,18,24
131:25 132:8
133:3 134:9,13,
20,22 135:4,19
136:19,21
137:11 138:6,
13 139:7,14
140:3 141:8
142:17 143:16
147:4 148:6
149:2 151:24
153:10,14
154:2 155:9,17
156:4,19 157:6
158:3 159:15
160:8 164:23
165:15 166:15
167:8 168:5,7
169:16 170:2
171:4,6,24
172:11,21
173:1,6,10,20,
25 174:6,10,14,
22 175:23
176:11,23
177:3,8,13,18
178:1 179:22
180:11,14,16,
19 182:1,19
183:25 185:21
188:24 190:2
192:12 193:9,
14 197:14,17
198:9,25
200:18,20
201:4,8 203:4,9
204:6,22 209:6,
16 210:4,12,17,
20,22 211:6,15,
21 213:5,9
214:6,9,18,22
216:14,23
217:17 218:4,
11,20 219:8,17
220:8 221:25
222:6,19
223:14 224:1
226:6 227:6
228:6,18 229:2,
7,11,20 230:2,
14,18,22

231:14,20
234:22 236:22
240:11 241:15,
18,23 244:1,4,
19 245:6,8
246:11,21,25
248:24 249:1,
16,22 252:21
253:1,11,17,24
255:18 256:4,
13 257:3,24
258:5 259:23
260:1,8,16
261:2,4,6,23
263:7,11,17,20
264:1,5,8,12,
16,19 265:24
266:4,11,24
267:8,22
268:19 272:19,
24 273:25
275:4,17,21
276:17,19
277:21 279:17,
25 280:13
282:19 284:15,
17,21 285:19,
25 287:7,18
292:1,6,14
297:18 298:1
299:2,16 300:8
301:5,22 302:1,
13,17,25
303:24 304:18
305:23 306:22
307:12,17
308:8 309:10,
20 310:17
311:14 312:22
313:2,23
315:11,19
316:1,15 317:1,
20 318:7,10,15
319:2 324:20
325:21 326:9,
12

**slow** 50:13

**small** 20:14

**Smith** 9:14,15
10:1,21,23
12:18,21,23
13:4,7,10,24
17:19 20:8
22:3,25 28:7,8,

9 29:24 30:14
31:8 34:17,18
35:22 36:7,8,23
39:3,13 42:2,5,
25 48:2,18
59:1,17,22,23
60:1 62:18
69:24 107:12
124:10,25
125:6,16 126:3
129:25 138:21
139:2,3 154:14
155:25 156:12
157:1 158:16,
19 161:7 191:2,
15 206:10
237:7,14 301:3,
14 321:22,24

**Smith's** 20:11
26:12 34:11
35:13,14 302:3

**sneezes** 129:8

**social** 117:9,11
119:13

**solemnly** 8:4

**solicit** 9:9
27:20

**somebody's**
184:22 215:23

**someone's**
285:1

**Somerset**
96:22

**son** 98:14
190:22 192:22
194:6

**sons** 288:7

**sort** 104:5
186:10 189:14
216:2 258:8
321:16

**sorts** 252:15

**sound** 246:6
249:15 288:5
293:2 315:10
316:5,25

**sounded** 166:4
232:19

**sounds** 163:1 219:13 274:4 288:6 294:3 301:1

**source** 19:3 142:7,13 186:15 190:20 218:24 221:3 288:21

**sources** 106:3,4 152:24 186:9 190:17 191:9 221:20 222:25 280:16,17 288:21

**Southeast** 102:2

**sparks** 157:23

**speak** 78:11 138:2 202:6 214:1 220:11 232:14 254:10

**speakers** 306:3

**special** 258:3

**specific** 8:25 21:17 30:24 44:19 45:15 47:14 59:1,5 74:2 84:23 89:16 105:14 111:15 123:11 124:10 132:14 142:4 166:16 168:23 182:23 183:22 184:23 203:12 208:1 211:16 236:24 325:17

**specifically** 9:3 13:22 14:1 20:7,25 21:11 24:8 34:19 37:10 44:23 65:23 66:5 67:25 68:3 122:10 123:23 124:1 165:6 185:9 186:19 188:19 222:1 223:1 225:21

252:8 260:12, 18 261:19 265:17 278:3 280:17,23 281:25 287:20 289:21 291:3 299:12 300:4, 16 301:2 313:7 316:20

**specifics** 221:11 287:10

**speculate** 226:7

**speculating** 34:15 55:14 130:20 139:16 294:7 300:13

**speculation** 16:12 30:3 55:10 108:19 113:21 116:5 130:13,19 139:15 169:17 171:6 175:24 188:25 227:7 230:15 253:12 280:1 310:18 313:24

**spell** 97:24

**spending** 18:11,19 42:15 44:3 249:14

**spent** 18:13 43:11 154:20

**split** 174:17 301:6

**spoke** 10:8,10, 11 14:12 47:12, 22 48:2 52:4 56:8 78:10 115:2 133:5 151:11,17,23 162:13,18,23 163:4,5,6,24,25 164:4,6 166:5 190:4 191:10 226:22 235:1 239:5,10 241:5 281:16 290:7 297:6 303:19 308:25

**spoken** 47:22 261:20

**spouse** 60:20

**staff** 64:12 91:4 131:5

**stamp** 128:25 129:2 156:1 197:4 247:11

**stamped** 323:9

**stand** 20:6 107:14 177:18 226:18 293:24

**standard** 11:24

**standing** 144:18 218:7

**stands** 9:10 272:6 299:11

**staple** 182:14

**STAPLES** 74:23 75:2

**start** 109:5 119:22 151:21 224:3 283:13 298:25 320:12

**started** 13:18 53:15 67:8 144:3 167:25 232:20,21,25 283:5 286:18

**startling** 64:20,25 79:16

**state** 8:22 26:22 27:1,2,11 50:6 63:19 88:4 106:10 109:21 150:15 159:8, 14 160:6 267:14 297:4 322:9

**stated** 135:7 147:12 170:17 202:8 249:23 266:8 287:20

**statement** 39:25 108:12 133:7 141:10,

11,14,15 149:22 150:20 152:19 153:16, 17,19,23 154:4 155:20 157:4 161:14,19 167:5 173:16 188:11 189:16 196:15 202:1, 13 218:6,7,8 226:25 228:20 229:17,19 235:7 243:21, 25 244:10,14 247:15 256:6,9 266:16,23 278:10 288:25 296:13 312:12

**statements** 9:7 39:23 132:19 141:19 156:17 187:9, 11,14 188:15 189:7 195:8 196:23 198:21, 22 211:9 220:20 222:15 224:6 225:15 226:9,14 242:25 245:10

**stating** 283:11

**Station** 136:24 137:1,10

**staying** 34:13, 14 297:21

**stealing** 139:24 220:13 223:13 292:5

**Steele** 46:7 47:12,22 258:14 259:2 260:5,6,14 317:12

**Steele's** 175:7, 9

**step** 108:22 274:3

**Stephanie** 178:22 179:4

**Stephen**

163:13

**steps** 181:5 205:4,10

**Steve** 147:5 289:17

**Stewart** 171:11,18

**stick** 45:5,9 71:12 279:12 290:24 294:10

**sticker** 145:20 240:18

**sticks** 277:12

**sticky** 170:21

**Stinking** 32:14,18 191:1, 5,11,23

**stipulation** 318:5

**stolen** 219:7, 10,20 222:5,11 223:17 292:13, 17 293:7

**stood** 18:1 272:25

**stop** 38:19,20 135:13,22 186:10 205:21 216:4 298:6

**stopped** 34:10 98:10 144:22

**stopping** 74:24

**store** 25:10 32:3,8 103:15 144:12 254:8 255:21 270:14

**stories** 278:25 279:3 280:19, 22

**story** 34:3 40:24 141:22 150:5 190:3 214:15

**strange** 93:4

**strategic** 57:9 261:8

**strategy** 253:4 264:22

**street** 25:3 144:22 272:9

**strike** 312:23

**stuck** 169:23

**stupid** 174:8

**suboxone** 243:4 245:18

**subpoena** 126:17,18,19, 25 128:1,14,17, 18 184:9 250:8, 19 261:7 264:6, 15,24 269:10, 22 316:3,8,23 317:10 323:18, 24,25 324:3 325:1

**subpoenaed** 184:8 202:19 260:20,21 269:19 316:17 318:13

**subpoenaing** 260:23,24

**subpoenas** 325:4,6

**subsequent** 140:12 291:4

**substance** 321:19

**substantiate** 140:16

**substantive** 154:8 212:25 293:19

**successful** 235:9

**suffice** 238:23

**sufficient** 106:8,23

**suggest** 291:5

**suggested** 34:24 218:17

**suggesting** 195:16

**suggestion** 68:22 100:5

**suggestions** 68:20,25

**suit** 90:12

**summary** 22:12 241:21

**summer** 282:24

**Sunday** 51:4

**supervisor** 113:12,13,17 224:9 321:6 322:1

**supervisory** 322:2

**supplement** 243:17 244:18 312:1 313:5

**suppose** 140:4

**supposed** 284:13

**supposedly** 159:10

**surely** 209:20

**surprised** 20:1,2 123:6 195:21

**surprising** 310:24

**Susie** 163:13 294:13

**suspect** 200:2 278:20,22 279:15,22

**suspected** 193:6,24 292:11,12 302:10

**suspects** 199:18 305:5

310:25

**suspicions** 257:1 314:14

**SUV** 322:13

**swear** 8:4

**sweep** 18:11 42:15,21 43:1, 8,10 155:1

**switch** 291:8

**system** 129:3, 7,8,11,16,18

---

**T**

---

**table** 233:5

**tags** 135:15

**taking** 21:1 199:14 233:3 297:2

**talk** 9:9 13:8 29:13 31:15 34:25 41:11 48:8 49:16 52:9 53:4 56:6,9 60:2 61:14,24 75:18 82:9 92:13 107:3 117:13 119:5 120:7 137:22 146:1 147:9 149:15 151:5,8, 9 157:10 158:13 160:10 161:9 162:6,8, 13,16,22 163:9, 19 170:18 184:3 192:11, 15,17 202:15 213:3,8,11 215:5 219:25 239:12 254:2 265:19 270:18 273:11,17 277:15,16 278:17 281:14 284:2 289:2,3, 8,9,14,16,25 294:19 296:6,8, 10 298:3,7 299:13 303:18

304:15 309:3 323:17,22 324:11

**talked** 10:5 13:23 23:24 24:5 28:12 31:9 32:2,8,10 45:13 51:17 53:1 61:22,23 62:2 64:22 74:8 77:7,9,18 78:25 82:18 89:17 116:2 119:7 132:21 141:18 143:23 146:20 147:2,5,7 149:25 150:11 158:11,15,16, 25 159:4,17,18, 22 160:13 161:1,3,5,7,8 162:2,4 163:13, 17,18 164:12 165:4,12 171:16 184:7 191:3,10 192:8, 9 193:24 194:9, 13 195:25 202:12 211:1 215:16 216:12 217:14 223:20 228:15 233:13 237:14 238:17 243:12 245:4 262:1 263:4 269:8 273:18, 19 276:8 281:11 290:14, 15 291:16 294:19 295:19 298:12 300:2,3 305:12 308:24 309:4 310:4 315:7,13

**talking** 11:17 18:3 21:6,12 24:2 31:5 32:14 35:3 43:15 47:11 49:14 69:6 76:10,12 77:22 82:1 148:7 156:24 161:18 167:2,9, 11 183:20,21 184:4 199:19

200:22 202:25 220:10 224:18 233:5 234:20 235:3 239:13, 14 250:2 278:11 283:20 284:2,7,8,11 286:18 288:13 289:21 290:6 294:13 296:14 300:24 310:10

**tape** 9:22 10:4 16:2,9,21 25:22 76:3 77:22 80:6,7 306:2

**taped** 59:19 141:24

**tapes** 206:6

**Tasha** 163:1 223:4

**tattoo** 145:14

**Taylor** 8:16 42:13 51:21 61:3 62:14 64:13 117:18 120:23 141:6 147:23,25 148:4,25 153:20 186:20 198:11 217:4,5 218:1,9 220:17 221:24 224:10 230:1,19 263:14,18 266:22 267:6 286:4 291:24 298:4,11,20,23 299:4,22 304:21 312:25 313:20

**Taylor's** 317:3

**teacher** 24:23

**team** 29:17 48:14 53:8,10 57:9,20 58:3,7 62:14,16 64:1 66:25 67:3,4,14 68:5 69:9 73:25 83:11,22 88:16, 20 92:12,21 94:14,25 95:22

124:17 125:14
130:10 168:20
169:25 171:12
173:11 178:19
179:2,6,12,25
181:2 216:6
229:14 253:3
256:19 261:9
264:22

**teams** 62:17,24
64:11 65:23,24
88:18 211:25

**technique**
107:4

**techniques**
9:13 106:9,24
107:2,5

**teenager**
111:10

**telephone**
69:18

**telling** 13:22
31:22 46:25
47:12 48:7
57:14 125:17
143:15 164:14
176:9 194:13,
18 219:23
243:7,8 244:22
265:14 275:7
280:3 299:23

**ten** 33:16
113:18 119:20
318:18

**tend** 214:20
221:21

**Teresa** 67:12

**term** 131:21

**termed** 131:21

**terrible** 129:20

**test** 190:12

**testified** 70:20,
22 71:7 91:23
127:19 128:10
193:10 194:25
213:18 225:11
278:19 305:11
323:16

**testify** 43:2
106:13 126:25
138:25 259:12
260:7,22

**testifying** 23:1
70:16

**testimony** 8:5
42:3,9 58:13
74:10 108:7
115:6 130:4
186:8 211:23
227:10 236:18
245:22 260:9,
11 268:11,12
301:16

**testing** 105:1,3

**That'd** 111:19

**that'll** 323:13

**theft** 79:5 220:6

**Theresa** 164:3

**thing** 17:22
18:1 59:17
113:7 131:13
137:2 148:12
150:19 163:14
174:10 181:16
185:19 206:9
214:4 216:10
237:22 244:21
265:16 267:5
269:18 270:6
291:23 323:17
325:17

**things** 20:6,10
21:4 31:3,4,22
61:9 76:14 80:9
82:13 84:20
105:13 107:9
132:14 143:2
145:25 169:1
172:12 174:6
176:15 182:16
185:23 200:14
201:12 206:3
225:22 243:15
279:12

**thinking** 34:2
118:5 203:16
225:14 295:23
296:3 308:1

**third-party**
53:9 62:25
176:19

**Thomas**
221:14 239:10

**thought** 28:18
35:1 43:18
47:18 53:18
58:15 111:13
118:10,19
144:11 145:17
155:10,12
163:21 166:18
171:17 189:14
193:12 201:6
214:23 238:8
267:6 270:9
305:22

**thousands**
209:20

**threatened**
224:22

**threats** 113:1

**three-** 174:18

**thrown** 120:5

**tied** 243:14

**timber** 279:11

**time** 10:11
13:20 14:14
16:19 17:18
20:15 26:14
29:12 34:5,14
35:15 36:8
37:18 38:21
39:21 41:10
46:5 47:17,21
48:1,4 50:3
52:2 53:1,2
55:18,25 56:3
65:18,21 66:14,
15,16 67:16
69:22 71:6 72:8
78:10 79:6 83:4
84:24 96:15
110:3 112:12,
14,18 113:12
115:1 116:10,
12,21 119:7
124:7 133:5,9
135:8,15 136:3

137:5 140:11
141:18 152:18
164:21 166:5,
12 174:3,17,19
183:7 184:7
185:3,4,6 187:3
188:19 190:4,7
202:18 207:18
212:16 214:7,
19 216:3 219:5
225:11,13
226:5 230:1
237:18 241:4
247:21 248:16
250:14 254:22
262:11 265:18
272:14 273:7
276:12 278:14,
22 282:20
285:20 287:25
290:14,15,16,
17 291:22,25
294:15 297:13
298:9,14 299:5
300:2,10
301:24 302:7
304:6 308:1
315:2,3 316:14
318:15 321:6

**times** 10:12
24:12 27:19,20,
22 31:2 43:13,
14 44:2,4 45:17
51:16,23 55:7,
11,13 61:23,25
62:1,8,12
68:12,13 72:5,
13,17 82:19,24,
25 89:18 90:1
99:3 116:2
117:6 132:24
141:20 143:23
154:19 166:16
184:10 186:19
187:24 213:14
220:3 232:14
233:8 236:11,
13 237:17
277:16 281:12
290:6 298:7

**tip** 186:3,10
190:16,19

**tires** 292:25

**to-do** 278:13

**today** 22:5
56:4,14 58:22
59:18 88:1
114:19 127:8,
19 174:17
213:22 221:11
223:24 224:19
225:7,20
234:17 244:6,
15 290:25
293:18,24
308:2 320:10

**today's** 176:23
206:7

**toilet** 243:14

**told** 18:5,6,13,
14 23:19 24:22
28:25 33:25
34:19 35:4
36:22 37:2
41:4,5,8 42:14
43:1,17,23
44:2,5 45:18,22
46:3 58:25 59:5
74:17 77:18
93:12 94:22
98:24 113:8
115:3 118:8,9
124:1 125:14
135:11,16
140:8,18 141:1,
21,25 142:8,16,
20 143:4 144:5,
19 145:20,21,
24 146:3,5
147:17 152:8,9,
20 155:14
157:1 162:2
173:15 184:17,
22 186:7,9,20,
23,25 187:25
193:21 218:21
219:16,21
223:16 224:22
226:16 227:4,5
232:23 242:5,6,
12,17,18,20,25
243:1,9,24
244:7,12 245:3
246:9 257:5
260:6 263:5,9,
14,18,19,23
264:14,24

265:5,15,19
272:21 273:13,
23 275:5,15
276:13 278:14
281:2,4 287:2,
13 291:23
292:3,4,5
295:25 296:12,
18 297:21
299:8,10,11,17
300:2,16
302:15,19
303:3 305:18,
21 306:20
315:18 322:12

**Tom** 65:13
66:23 68:6
130:15

**top** 9:2 79:22
131:15 171:9
187:13 188:15
189:1 200:3,5
226:20 293:20
303:15

**total** 62:8 110:8

**totally** 55:14
77:2 101:17
244:8 251:9
300:13 324:15

**tow** 272:13

**towed** 272:7,8,
10

**town** 25:2,7

**track** 128:23
129:3 295:3
317:5

**tracked** 256:17

**tracking** 8:23

**trafficking**
18:7 19:16,18
20:14 42:16

**trailer** 98:11
118:6 295:25

**trailers** 98:11

**trained** 216:7

**training** 104:2,
12,23,25
105:14,18,20,

21,25 106:7,21
211:1 216:8,11

**transcript**
161:13 268:5,
10 326:2,3

**transfer** 34:22
41:7 303:4

**transport**
38:25 183:9

**transported**
34:8 136:23
183:8 278:15,
16

**traveled** 235:8

**treatment**
184:21 185:1
205:4

**Trent** 163:13

**Trents** 293:21

**trial** 29:25 68:8,
10,11 94:9,19
95:11 100:1,6,
15,18 108:7
109:17 133:10
143:8 214:15
258:18,20
264:7,22 315:9,
13 324:6

**trials** 65:3,18
109:22 110:6
111:2 184:10
250:21

**trip** 142:7

**trivial** 277:5

**trooper** 27:11
106:10

**trouble** 35:9
231:1,10

**troubles**
265:20

**truck** 136:11
297:5

**true** 108:10
110:11 142:9
173:9 177:4
218:10 234:8
246:17 248:10

250:7,25
260:20 262:9,
10 263:4,24,25
264:4 271:6
273:15 274:14
282:8 305:13,
14,18,21
306:21 319:22

**trust** 326:3

**truth** 8:6,7

**truthful** 228:25

**turn** 139:9,18
235:20

**turned** 10:18
15:24 25:24
33:5 74:2
163:1,4 169:18
193:5 205:8
233:4,12,25
235:13,16
236:7 237:5,10
238:11,21
255:7 259:17,
20 277:24
317:11,13

**Turner** 251:8,
14,20 252:15

**turning** 275:12

**type** 38:3 91:7
118:8,9 216:21
217:2

**types** 103:5
107:6 108:6
115:14

**typewritten**
241:23

**typical** 16:5,8,
16 57:18 61:13

**typically**
100:5,19

———————

**U**

**U.S.** 71:8

**Uh-huh** 9:24
10:6 11:1 12:14
13:2 17:22 30:6
32:5 37:12 49:4

50:7 57:7 66:3
77:13 78:19
90:6 93:11
98:22 101:7,22
105:17 107:13
109:18 120:9
122:19 125:7
129:14 148:10
150:7 157:24
158:22 159:20
163:16 165:10
166:21 170:9
175:10 178:25
181:18,23
193:25 196:5,
11 198:19
204:12 211:3
225:3 226:1,24
235:18 240:22
250:24 263:2
274:3 300:20
308:4 323:2,15

**ultimately**
148:3 202:12

**unable** 220:4
289:4

**uncle** 34:12

**unclear** 81:20

**undergo** 105:1

**underlying**
57:10

**understand**
14:15 15:2
21:20 24:2
27:10 32:21
44:22 52:5,7
57:16 64:18
68:14 70:18
71:16,23 72:11,
18 83:14 87:16
88:22 90:16
91:3 114:13
115:7 125:23
126:5 135:1
149:4 177:22
192:7 213:13
216:11 217:18
229:23 230:4
285:20

**understanding**
38:12 41:3
42:18 43:20

169:8 180:21
229:4,18,25
230:10,16,20
244:3 245:2
249:7 251:21
270:19 274:16
279:20,21
284:12 289:5
297:23 306:24
307:1,4 310:21
311:8,12

**understood**
73:19 125:4

**undertake**
128:6 245:11

**unduly** 127:25

**unethical**
63:20

**unhappy**
177:19

**Union** 25:9

**University**
101:13

**unloading**
233:1,2

**unnamed**
168:19

**unofficial**
118:13

**unsolicited**
88:24

**unusual** 60:20
110:14 120:12
145:17 215:22
299:18

**upholding**
209:3

**upset** 296:5
309:4

**urgency**
184:25

**usual** 16:15

**utilities** 201:13
317:18 318:14

**utility** 317:14
318:4,25

319:19,24

**utilize** 30:9

_____

**V**
_____

**Valdez** 219:25

**Valerie** 207:11

**Valley** 149:18

**vehicle** 34:9,24
144:15,16,18,
23 145:8,10,19
146:17 147:8,
14,16,17
322:13

**vehicles**
145:18 278:17
294:2

**venire** 100:8

**verbal** 215:15
216:2

**verification**
317:8

**verifications**
318:23

**verify** 157:22

**Vernon** 116:14
163:5 238:13,
17

**version** 247:11

**versus** 51:4
107:3

**victim** 195:20,
21

**victim's**
195:23 279:18,
19

**video** 268:5,10

**violate** 92:18

**violated**
224:14

**violating** 92:20

**violations** 71:9

**Virginia** 96:8
102:8,24

103:11,16
104:1 119:14

**visited** 140:5

**visits** 204:7

**vividly** 133:9

**voice** 306:12,
14

**voices** 306:9

**voir** 100:6,20

**volume** 203:14

_____

**W**
_____

**Wagers**
273:12,14,17

**Wait** 197:14

**waiting** 64:9

**waivable**
63:25

**waive** 53:11
62:25 63:22,23
69:8 326:1,3,7

**waived** 63:3

**waiver** 247:20

**waiving**
180:22

**Walgreens**
245:17 254:9
255:24 256:18
269:10 270:7

**Wallace** 93:19
98:23

**Walmart**
289:13

**wanted** 23:23,
24 30:13,25
31:1 71:13
89:23 118:5,7,
14,18 140:9,20
186:15 191:7
195:18 196:8
201:25 234:4
242:19 265:4
272:11 280:7
289:14 323:22

**wanting** 99:24
272:12 308:16
324:11

**Warren**
161:10,14
201:25 202:4,7,
13 204:8
220:25 225:16
233:13 257:2,7,
15 258:4
300:23

**wasting** 174:3

**watch** 299:18,
19,20

**watching**
299:13

**water** 78:6
317:14 318:25
319:16

**Wayne** 298:3,
14,25

**ways** 87:6
94:23

**wearing**
145:24 148:25
242:10

**web** 120:6

**Weber** 318:20
320:4,5 322:25

**week** 22:21
50:24 117:5
128:1 132:1
184:16 255:24
256:12

**weekday**
50:21,25 51:3

**weekend**
50:25 51:3,8,10

**weeks** 15:20

**Wells** 67:20
133:14 175:1

**Wesley** 196:16

**West** 113:15,16
114:18 130:11

**West's** 169:15

**wet** 136:11,13

**wether** 287:20

**What'd** 147:11
195:5

**wheel** 164:21

**Where'd** 78:12

**whereabouts**
170:20 271:19
272:15

**Whitaker**
67:12

**wide** 97:6

**wife** 34:25
35:3,4,5 41:9
322:11

**wife's** 321:23

**Wiggins** 80:1,
3,19

**Wiggins'** 82:8

**William** 9:16
18:9,16,24
19:1,4,11,14
23:7,25 24:3,5
29:2,4,5 42:7,
12 43:3,9 49:2
51:20 62:19
64:13 112:17,
21 119:5 121:3
139:4 141:6
156:17 171:20
217:6 223:16
243:13 245:3
254:7 263:19
276:15,24
283:16 284:13
285:14 291:24
294:19,20
297:1 302:10
305:7

**William's**
112:24

**Wilson** 162:8
234:24 237:25
238:1,2 239:3

**win** 89:20

**window** 145:20

**Withers** 198:24

**withheld** 241:8

**witness'** 91:18

**witnessed**
41:5 303:5

**witnesses**
8:24 9:7,9,10,
12 31:5 32:4
34:10 39:19
73:24 100:7,9
104:8 105:15,
22,25 114:3
121:22 150:20
164:22 165:3
174:1 176:19
202:25 211:4,
14,19 213:3,6,
15 214:21
218:17 219:4
220:18 221:18,
20 224:22
283:6 296:20
304:7 321:5,7
322:9 325:7

**wondered**
196:1

**wondering**
173:3

**word** 64:25
196:20 198:12

**worded** 87:19

**words** 22:4
46:23 134:11
143:1,2 149:11,
24 159:6 160:4
182:16 183:15,
22 261:20
301:19

**work** 29:20
53:6 57:2,17
60:21 62:22
63:11 65:16
92:17 101:2
102:15,21
103:3,5,20
104:14 109:17
110:17 115:3,8
116:7 117:11
119:9 122:8,13
124:14 128:7

173:16 177:24 178:3 180:22 208:20 213:2,6 215:25 216:4, 18 217:1 219:23 247:10 251:23 285:1

**worked** 16:19 58:6 95:7 102:24 103:14, 15,17 105:11 110:6,11,20 111:2 112:14, 18 113:5 116:10,11 122:1 165:24 180:2 206:12, 16 231:8 289:12 299:23

**working** 13:18 31:2 50:2 52:19 54:7,11,12 66:12 67:15 84:7 90:9 95:15 97:17,19 102:18 103:21 110:3 112:11 113:25 122:10 215:21

**workings** 57:8

**works** 65:19 100:25 101:3

**world** 96:14 176:10

**worn** 205:12

**would've** 10:18 11:23 13:3,4 21:25 22:14 29:10 30:8 33:5 38:15 41:21 52:10 55:24 59:12 61:1,9,21 62:2, 5 65:20 66:10 68:4,15 85:19 137:17 142:22, 23 144:6 163:4 167:11 169:21, 22 172:8 174:16 181:1 182:11 188:20, 22 191:2 192:9

199:21,22 204:9,10 205:8 230:11 237:5,9 238:11,20,21 239:25 252:5 255:7,14 256:16,20 258:23 273:7 292:3 303:21 304:9 307:5 308:10,11,13 310:6,15 314:5 315:23,24 324:6

**Wright** 61:7 112:3 148:5 151:1 180:8,17 205:17,20,24, 25 216:24 229:16 240:8, 13,15,18,21,23 241:16,21 242:1,2 246:14 247:18,23 253:7 261:12 262:11,14,16, 17 264:11,13, 18,23 269:7 282:5 301:8,10 306:8 315:2,5 318:3,9,12,23 319:3,5,11,13, 15 320:1

**wrist** 20:21

**write** 173:4

**writing** 170:24 183:16 198:1 273:8

**written** 131:20 136:17 169:21 172:8 214:3 243:20

**wrong** 14:4 35:19 42:4,9 110:12 121:7 167:21 194:15 216:19 244:8 260:4,15 270:17

**wrote** 181:2 184:22 196:21 326:4

———————

**Y**

**yard** 283:11

**year** 11:13 37:5 49:18 54:14 66:9 83:6 95:10,18 102:8 103:8,12 104:25 109:9 117:5 207:20 240:3

**year-and-a-half** 54:14

**years** 18:17 44:14 71:4 93:21 95:8 96:7,8 99:12 111:10,13 113:18 119:21 122:6 174:15 206:15 207:22, 24 310:10

**Yeary** 147:5, 12,14

**Yellow** 99:22

**yesterday** 69:19

**York** 13:9,23 18:5,6 19:15 34:6,10,15,22 37:11 38:24 39:1,21 40:25 45:15 132:18 136:10 137:3 138:2 139:1,4 141:12,20 142:14,15,19 143:1,6 146:2, 11,15 147:1 150:2,21 151:18 152:11 155:14 156:25 158:15 159:5 170:10,16 175:5 186:25 188:2 189:13, 16 191:10,13 194:25 195:7 202:5 206:1 218:6 221:12 223:20,25

224:4 228:8,21 229:5 242:6,9, 12,15,20 243:4, 10,11,17,20 244:9,17,22 245:1,4,13,20 246:1 249:19 250:4 256:6 259:4 261:15, 17 265:18 271:18 274:2,6 275:12 278:10, 12,18 283:10 287:3,16 296:12 303:5, 11 308:22 309:1 311:17 312:16 313:19 315:18

**York's** 143:25 144:2 227:10 229:9 255:19 259:10 275:7 281:3 287:12, 15 317:23

**you-all** 164:20 292:24 305:11 316:9,22

**youth** 119:22