IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF KENTUCKY, LONDON DIVISION

AMANDA HOSKINS and JONATHAN TAYLOR,  )
)
)       Case No. 17-CV-84
Plaintiffs,   )
)       Hon. ROBERT E. WEIR
v.       )
)       Mag. HANLY A. INGRAM
KNOX COUNTY, ET AL.,   )
)       JURY TRIAL DEMANDED
Defendants.   )

# EXHIBIT 49

# NO. 17-CV-84

# AMANDA HOSKINS, ET AL.

# V.

# KNOX COUNTY, ET AL.

# DEPONENT:

# AMBER SIMPSON

# DATE:

# April 13, 2018

1   IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN

2                 DISTRICT OF KENTUCKY

3                    NO. 17-CV-84

4                 HON. DAVID L. BUNNING

5                 HON. CANDACE J. SMITH

6

7            AMANDA HOSKINS, ET AL.

8                 PLAINTIFFS

9

10                      V.

11

12            KNOX COUNTY, ET AL.

13                 DEFENDANTS

14

15

16

17

18

19

20

21

22

23   DEPONENT: AMBER SIMPSON

24   DATE:     APRIL 13, 2018

25   REPORTER: KELLEY BOHAN

Page 2

```
1                    APPEARANCES
2
3  ON BEHALF OF THE PLAINTIFFS, AMANDA HOSKINS, et al.:
4  ELLIOT SLOSAR
5  AMY ROBINSON STAPLES
6  LOEVY & LOEVY
7  311 NORTH ABERDEEN STREET, THIRD FLOOR
8  CHICAGO, ILLINOIS 60607
9  TELEPHONE NO.: (312) 243-5900
10 E-MAIL: ELLIOT@LOEVY.COM
11
12
13 ON BEHALF OF THE DEFENDANTS, BRYAN (**BRYAN?) JOHNSON,
14 MARK MEFFORD, JACKIE JOSEPH, DALLAS EUBANKS, AND KELLY
15 FARRIS:
16 CODY WEBER
17 KENTUCKY STATE POLICE GENERAL COUNSEL
18 919 VERSAILLES ROAD
19 FRANKFORT, KENTUCKY 40601
20 TELEPHONE NO.: (502) 573-1636
21 E-MAIL: CODY.WEBER@KY.GOV
22
23
24
25
```

Page 3

```
1              APPEARANCES CONTINUED
2
3  ON BEHALF OF THE DEFENDANTS, JASON YORK and TROOPER
4  BUNCH:
5  DERRICK T. WRIGHT
6  STURGILL, TURNER, BARKER & MOLONEY, PLLC
7  333 WEST VINE STREET, SUITE 1500
8  LEXINGTON, KENTUCKY 40507
9  TELEPHONE NO.: (859) 255-8581
10 E-MAIL: DWRIGHT@STURGILLTURNER.COM
11
12
13 ON BEHALF OF THE DEFENDANTS, MIKE BROUGHTON and CITY OF
14 BARBOURVILLE:
15 LICHA H. FARAH, JR.
16 WARD HOCKER THORNTON
17 333 WEST VINE STREET, SUITE 1100
18 LEXINGTON, KENTUCKY 40507
19 TELEPHONE NO.: (859) 422-6000
20 E-MAIL: LFARAH@WHTLAW.COM
21
22
23
24
25
```

Page 4

```
1
2              APPEARANCES CONTINUED
3
4  ON BEHALF OF THE DEFENDANTS, JOHN PICKARD and DEREK
5  EUBANKS:
6  JASON WILLIAMS
7  WILLIAMS FARMER & TOWE
8  303 SOUTH MAIN STREET
9  P.O. BOX 3199
10 LONDON, KENTUCKY 40743
11 TELEPHONE NO.: (606) 877-5291
12 E-MAIL: JASON@WFTLAW.COM
13
14
15
16
17
18
19
20
21
22
23
24 ALSO PRESENT: CAITLYN LEONARD - VIDEOGRAPHER KENTUCKIANA
25 REPORTERS
```

Page 5

```
1                      INDEX
2                                     Page
3  DIRECT EXAMINATION BY MS. ROBINSON STAPLES     8
4  CROSS EXAMINATION BY MR. WRIGHT            25
5  CROSS EXAMINATION BY MR. WILLIAMS          88
6  CROSS EXAMINATION BY MR. FARAH             96
7  CROSS EXAMINATION BY MR. WEBER             98
8  RECROSS EXAMINATION BY MR. WRIGHT          107
9
10
11                    EXHIBITS
12                                     Page
13 1 - STATEMENT TO DETECTIVE YORK            22
14 2 - DEPARTMENT OF PUBLIC ADVOCACY REPORT    65
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

STIPULATION

1
2
3
4    The deposition of AMBER SIMPSON taken at the Holiday Inn
5    Express & Suites, 506 Minton Drive, London, Kentucky, on
6    Friday the 13th day of April 2018 at approximately 10:06
7    A.M.; Said deposition was taken pursuant to the Kentucky
8    Rules of Civil Procedure.
9    It is agreed that Kelley Bohan, being a Notary Public
10   and Court Reporter for the State of Kentucky, may swear
11   the witness.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

PROCEEDINGS

1
2    VIDEOGRAPHER:  We are now on record.  My name
3    is Caitlyn Waltermire Leonard.  I'm the video
4    technician today, and Kelley Bohan is the court
5    reporter.  Today is the 13th day of April 2018.
6    The time is 10:06 a.m. We are at the Holiday Inn
7    Express & Suites located in London, Kentucky, to
8    take the deposition of Amber Simpson in the matter
9    of Amanda Hoskins, et al., versus Knox County, et
10   al., pending in the United States District Court
11   for the Eastern District of Kentucky, Number 17-CV-
12   84. Will counsel please identify themselves for the
13   record?
14   MS. ROBINSON STAPLES:  Amy Robinson Staples
15   for Plaintiffs, Amanda Hoskins and Jonathan Taylor.
16   MR. SLOSAR:  Elliot Slosar also on behalf of
17   the Plaintiffs.
18   MR. WRIGHT:  Derrick Wright on behalf of the
19   Defendants, Jason York and Jason Bunch.
20   MR. WEBER:  Cody Weber on behalf of
21   Defendants, Mark Mefford, Bryan Johnson, Jackie
22   Joseph Pickrell, Dallas Eubanks, and Kelly Farris.
23   MR. WILLIAMS:  Jason Williams on behalf of
24   Knox County, Derek Eubanks, and John Pickard.
25   MR. FARAH:  Licha Farah on behalf of Mike

Page 8

1    Broughton and the City of Barbourville.
2    VIDEOGRAPHER:  Thank you, Counsel.
3    Ms. Simpson, will you please raise your right
4    hand to be sworn in by the reporter?
5    THE WITNESS:  Yes.
6    COURT REPORTER:  Do you solemnly swear or
7    affirm that the testimony you are about to give is
8    the truth, the whole truth, and nothing but the
9    truth?
10   THE WITNESS:  Yes.
11   DIRECT EXAMINATION
12   BY MS. ROBINSON STAPLES:
13   Q.  Good morning, Amber.  How are you?
14   A.  I'm fine.  How are you?
15   Q.  Good.  Have you ever given a deposition
16   before?
17   A.  No.
18   Q.  All right.  So I'm just going to explain,
19   like, some of the ground rules.  I'm going to ask you
20   some questions.  Thereafter, some of these fine
21   gentlemen may ask you questions as well.  They may
22   object while I'm asking questions, so let their – let
23   me do their objection, and then you'll be able to finish
24   –
25   A.  Okay.

Page 9

1    Q.  – with your answer. If at any time you need a
2    break, just let us know and we'll take a break, okay?
3    A.  All right.
4    Q.  And one more thing:  If I ask you a question
5    that you don't understand because I've not worded it
6    correctly, just ask me to rephrase that and I'll do that
7    for you, okay?
8    A.  Okay.
9    Q.  All right.  So do you know Jonathan Taylor?
10   A.  Yes.
11   Q.  When did you meet him?
12   A.  I'm not for sure of the exact date.  It was,
13   like, maybe 2010 or something – or about 2012.  I'm not
14   for sure.
15   Q.  Okay.  How old were you back then, do you
16   think?
17   A.  About 16, 17.
18   Q.  Okay.  Did you know him prior to December 20,
19   2010?
20   A.  No.
21   Q.  How did you know Jonathan?
22   A.  He moved in as my next-door neighbor.
23   Q.  You guys were neighbors?
24   A.  Yeah.
25   Q.  Who did you live with at that time?

Page 10

1    A.  My parents.
2    Q.  Did anyone else live with you?
3    A.  My brother stayed there sometimes.
4    Q.  Okay.
5    A.  Not all the time.
6    Q.  Did you and Jonathan ever date?
7    A.  No, not really.  I just hung out with him a
8  lot. We was just mainly friends.
9    Q.  Were the two of you ever alone?
10   A.  Yeah, sometimes.  But, I mean, not for a long
11 period at a time.  Just if somebody else stepped out or
12 something.
13   Q.  What would you do during those times?
14   A.  Just hang out.  Just watch TV or something.
15   Q.  Did you have discussions during – have a talk
16 during those times?
17   A.  Sometimes, but not really, no.
18   Q.  Okay.
19   A.  I mean, I mainly was there to help him with
20 his health problems really.
21   Q.  Did Jonathan ever talk with you about the
22 Katherine Mills death?
23   A.  No.
24   Q.  Not at all?
25   A.  No.

Page 11

1    Q.  Did Jonathan ever confess to you about killing
2  –
3    A.  No.
4    Q.  – Ms. Mills?
5    A.  No.
6    Q.  Do you know Kentucky State Police Detective
7  Jason York?
8    A.  Yeah.  I've met with him twice.
9    Q.  When did you first meet with him?
10   A.  When he had come to my mom's house and talked
11 to her and threatened to get charges on me and stuff.
12 She told him he could come to the school I was
13 attending, and if I wanted to talk to him, I could, and
14 if not, not to press me too hard.
15   Q.  All right.  Let's back up a little bit.
16 So the first you knew of Detective York is when he came
17 to your mother's house?
18   A.  Yeah.
19   Q.  What's your mom's name?
20   A.  Tammy Simpson.
21   Q.  Can you recall when he came to her house?
22   A.  I'm not for sure of the date.  It's been so
23 long ago, I'm not for sure of dates.
24   Q.  That's quite understandable. Do you think it
25 could have been in 2012?

Page 12

1    A.  Yeah.
2    Q.  Okay.  And what school are you attending at
3  that time.
4    A.  Knox County Learning Academy.
5    Q.  And so your mom told Detective York that
6  that's where you were?
7    A.  Yeah.
8    Q.  He came to her house looking for you?
9    A.  Yeah.
10   Q.  Okay.  And what did you say that he said to
11 her at that time?
12   A.  He had –
13       MR. WRIGHT:  Object to form and foundation,
14   but go ahead.
15       MR. WILLIAMS:  Join.
16 BY MS. ROBINSON STAPLES:
17   Q.  You can go ahead.
18   A.  Okay.  He had told her that he could get
19 charges on me for withholding evidence, and I think he
20 had told her something about a reward maybe, and she had
21 told him he could come talk to me.
22   Q.  Okay.  So did Detective York come talk to you?
23   A.  Yeah.
24   Q.  And he came to the alternative school?
25   A.  Yeah.

Page 13

1    Q.  Did you request to meet with him?
2    A.  No.
3    Q.  So he came looking for you?
4    A.  Yeah.
5    Q.  Okay.  Who else was present, if anyone, during
6  your meeting with Detective York that day?
7    A.  The school counselor, Rhonda Abner.
8    Q.  Can you recall where the meeting took place?
9    A.  In her office.
10   Q.  Okay.  Can you recall how long that meeting
11 lasted?
12   A.  Maybe about an hour.
13   Q.  Okay.  Do you know if it was in the morning?
14 The afternoon?
15   A.  The morning.  Well, about lunchtime.
16   Q.  Lunchtime?  Okay.
17       You said it lasted about an hour?
18   A.  Uh-huh (affirmative).
19   Q.  At some point during that hour meeting or so,
20 did Detective York record the conversation that you had
21 with him?
22   A.  Yeah.  He started out with the recorder in his
23 hand, and he would turn it on.  And then he would talk,
24 and then he would stop.  You know, he would stop it and
25 talk.  Turn it back on.  Let me talk.  I mean, he was –

Page 14

1  kept turning it on and off.
2      Q.  Okay.  Did he start the recorder at the very
3  beginning of your conversation?
4      A.  No.  When he first come in, he told me that I
5  could be charged for withholding evidence in a murder
6  case.  And I was only, like, 17, and I was scared, so –
7  and he said something about maybe getting my brother out
8  of jail that had been arrested for manufacturing, but
9  that wasn't even necessary because the charges was being
10  dismissed. And a reward – said the family was offering
11  a reward, and he would get it.
12      Q.  Okay.  And so this was all – he had said all
13  of this to you before he started the recording?
14      A.  Yes.
15      Q.  And when you said that he – said that he –
16  or threatened to charge you with withholding evidence in
17  a murder case –
18          MR. WRIGHT:  Object to form.
19      A.  Yeah.
20          MR. WRIGHT:  Go ahead.
21      Q.  – was that based on the Katherine Mills case?
22      A.  Yeah.
23      Q.  Okay.  Did he talk to you about what he was
24  going to be asking you during that interview?
25      A.  Well, yeah, he said that.  He had told me it

Page 15

1  was to do with Jonathan and a murder, and he said he
2  would not be able to sleep until he prosecuted the
3  people who done it, pretty much that he knowed who done
4  it.  He just didn't have all of the evidence he needed
5  to prosecute him.
6      Q.  During those times that the recorder was
7  turned on and off, did Detective York give you any
8  indication of what he wanted to hear from you?
9          MR. WRIGHT:  Object to form. Go ahead.
10      A.  Yeah, he – in some – yeah, he was telling me
11  about a car that had first been hid at the children's
12  home and then was moved to Stinking Creek, that it was a
13  Cavalier.  He pretty much told me what kind it was, what
14  color, where it was hid at.  Told me that the purse was
15  left setting beside of her with money spread out, I
16  think, like this (indicating) in front of it. I mean, he
17  would tell me something to say and then turn the
18  recorder off.
19      Q.  Were you –
20      A.  And pretty much told me to reword it.
21      Q.  Okay.  Were you aware of any of those details
22  before Detective York told you those details?
23      A.  No.  I mean, I had no clue of the – a murder
24  even happening before – before Detective York coming to
25  me.  Well, I mean, I had heard of it after Jonathan

Page 16

1  moved in, but I didn't, from the neighbors and stuff
2  trying to talk about it.  But, no, I had no idea of
3  nothing.
4      Q.  And you said earlier that Jonathan never
5  talked with you about Katherine –
6      A.  No.
7      Q.  – Mills whatsoever?
8          MR. WRIGHT:  I'll object to form.
9      Q.  Was it – you said something about Detective
10  York talking beforehand about a reward. Was it your
11  understanding that if you told him what he wanted to
12  hear, that you would be given that reward?
13      A.  Yeah.
14          MR. WRIGHT:  Object to form.
15      Q.  Can you recall how much that reward was?
16      A.  10,000.
17      Q.  Okay.  Did you ever get a reward?
18      A.  No.
19      Q.  Okay.  I want to go through a report with you
20  –
21      A.  Okay.
22      Q.  – that Detective York took that day.  And
23  this is PL 15049.
24      Q.  All right.  Amber, can you just look over this
25  real quickly for me?

Page 17

1      A.  Yeah, that's what I was doing.  Okay.
2      Q.  All right.  I'm going to go through this with
3  you –
4      A.  Okay.
5      Q.  – a little bit, okay?  So we can figure out
6  what was said here. Do you see here in the report, it's
7  the second paragraph, where it says that "Amber stated
8  she had a conversation with Jonathan in September of
9  2011 about Katherine Mills.  Amber stated she was at
10  Jonathan's apartment, just him and her, when he started
11  talking about it.  Amber stated Jonathan told her Will
12  had planned it." Is any of that information true?
13      A.  No.
14      Q.  Did you tell – did Jonathan ever have a
15  conversation with you about Katherine Mills' death?
16      A.  No.
17      Q.  Did Jonathan ever tell you that Will had
18  planned her death?
19      A.  No.  I had heard of Will, but I never knew
20  Will.
21      Q.  Didn't know him?
22      A.  Or nothing about him.
23      Q.  So who provided you with that information?
24      A.  Detective York.
25      Q.  Okay.  Let's go down just a couple of

Page 18

1  sentences.

2     A.  Okay.

3     Q.  "Amber stated Will is the one who told

4  Jonathan" – supposed to be "where" – "Katherine lived,

5  where the money was at, when she got the money, and when

6  it was the best time to do it.  Jonathan told her Kayla

7  Mills was a lookout, but didn't have nothing to do with

8  killing Katherine.  Jonathan described to Amber how he

9  hit Katherine in the head with the hammer, but he did

10 not hit Katherine hard enough to allow him enough time

11 to get the money, so he struck her again in the head and

12 killed her."  Is any in that information true?

13    A.  No.

14    Q.  Did Jonathan ever tell you that Will told him

15 where Ms. Mills lived?

16    A.  No.

17    Q.  Did he ever tell you that Will told him where

18 and when Ms. Mills would get her money?

19    A.  No.

20    Q.  Did he ever tell you that Kayla Mills was a

21 lookout?

22    A.  No.

23    Q.  Did he describe to you how he allegedly hit

24 Ms. Mills in the head with the hammer?

25    A.  No.

Page 19

1     Q.  Where did that information come from?

2     A.  Well, the information come from Detective

3  York. He had – when the recorder was off, he had stated

4  something about Amanda is supposed to have been the one

5  to pick up Jonathan when it went wrong, and she was

6  waiting around the corner in the car. He's the one that

7  told me about the hammer. I didn't know nothing about

8  nothing like that, or that she was even hit with one or

9  hit more than one time or nothing.  I knew none of them

10 details.  I knowed I didn't know anything until he told

11 me.

12    Q.  Okay.  And that takes me to the next sentence

13 I wanted to ask you about where Jonathan – well, no.

14 That's not true. Let me ask you first about the money.

15 Then I want to get to Amanda –

16    A.  Okay.

17    Q.  – okay? See in the – one, two, three –

18 fourth paragraph down –

19    A.  Uh-huh (affirmative).

20    Q.  – where it says, "Jonathan went on to talk

21 about" Katherine – "to talk about after Katherine was

22 dead, he got the money and he left five $100 bills on

23 the floor by her purse in a half circle"? That's what

24 you were telling us about earlier, correct?

25    A.  Yeah.

Page 20

1     Q.  Was that information true?

2     A.  No.  Jonathan didn't tell me that.

3     Q.  Okay.  Who provided you with that information?

4     A.  Detective York, like I said earlier.

5        MR. WRIGHT:  Object to form.

6     Q.  Okay.  So now let's talk about what this

7  report says about Amanda.  It's at the bottom of the

8  page.

9     A.  Yeah.

10    Q.  Says, "I asked her about Amanda Hoskins, and

11 she stated she was parked in a vehicle down from the

12 house waiting for Jonathan and Kayla.  I asked Amber if

13 Jonathan told her what kind of car it was, and she

14 stated, 'A blue or black Cavalier, and he paid somebody

15 in Stinking Creek to hide the car for a couple of

16 months.' "Also, Jonathan told law enforcement

17 thought it was the Cavalier that sat at the children's

18 home in Bimble where Amanda's mother works at, but it

19 wasn't. It was a totally different one." Was any of that

20 information true?

21    A.  No.  I was 16, and I didn't even know what a

22 Cavalier was or nothing at the time until he told me

23 that.  You know, till he told me the color and the make

24 of the car, I would have never known.

25    Q.  So Jonathan never told you about a blue or

Page 21

1  black Cavalier?

2     A.  No.

3     Q.  Did he ever tell you that Amanda was parked

4  down the street waiting for them?

5     A.  No.

6     Q.  Did he ever tell you that he had paid someone

7  in Stinking Creek to hide the car?

8     A.  No.

9     Q.  And who provided you with those details?

10    A.  Detective York.

11    Q.  Okay.  Did you simply repeat what Detective

12 York wanted you to say?

13       MR. WRIGHT:  Object to form.

14    A.  Yes.  Yes.

15    Q.  Was it your understanding that if you stated

16 what he wanted to hear, that he would go through with

17 those promises that he had made to you that you stated

18 earlier?

19       MR. WRIGHT:  Object to form.

20    A.  Yes.

21    Q.  And that included helping get your brother out

22 of jail that day?

23    A.  Yeah.

24    Q.  And the $10,000 reward?

25    A.  Yeah.

**Page 22**

1    Q.  And not pressing charges against you for –
2    A.  Right.
3         MR. WRIGHT:  Object to form.
4    Q.  – withholding information?
5    A.  Right.
6    Q.  So is that fair to say that the majority of
7  the false information found in this report came from
8  Detective York?
9         MR. WRIGHT:  Object to form.
10   A.  Yes.
11   Q.  Amber, have you met with Detective York since
12 you gave a – well, I'm sorry – first, let me mark this
13 as Exhibit 1 before I forget.
14        (EXHIBIT 1 MARKED FOR IDENTIFICATION)
15        VIDEOGRAPHER:  And, Counsel, with the
16   tightness of the shot, would you be sure to keep
17   your hand –
18        MS. ROBINSON STAPLES:  I can't.  I talk with
19   my hands, so it's going to be hard.
20 BY MS. ROBINSON STAPLES:
21   Q.  Have you met with Detective York since you
22 gave that March 2002 statement?
23   A.  He come to my house after that one time and
24 brought me a summons to appear in court.  Said I
25 wouldn't have to go in front of the judge or nothing,

**Page 23**

1  but to just show up in case they needed me.
2    Q.  Did you-all have any other discussion about
3  that?
4    A.  No, not that day.
5    Q.  Have you met with any other police or law
6  enforcement about this case?
7    A.  No.
8    Q.  Can you recall meeting with any of Jonathan or
9  Amanda's defense team, anyone on their team, such as
10 investigators, in 2013?
11   A.  Yes.
12   Q.  And in those statements to those defense
13 investigators, did you simply repeat what you had said
14 in this statement to Detective York?
15        MR. WRIGHT:  Object to form.
16   A.  Yes.
17   Q.  And why did you do that?
18   A.  I was just ready for it to be over, and I was
19 just not wanting to be in the middle of it.  And I was
20 saying what I was told pretty much to say in the first
21 beginning, and I was just saying what I – you know,
22 repeating what I had already been told to get it over
23 with.
24   Q.  All right.  Can you recall speaking with a
25 Mr. Josh Powell in 2015?

**Page 24**

1    A.  Yeah.
2    Q.  It was early 2015, January?
3    A.  Yeah.
4    Q.  Do you recall telling Josh at that time that
5  Detective York had told you what to say before he hit
6  the recorder?
7         MR. WRIGHT:  Object to form.
8    A.  Yes.
9    Q.  And was that true?
10   A.  Yes.
11        MR. WRIGHT:  Object to form.
12   Q.  Do you recall telling him that Detective York
13 told you where to say that the car was hidden?
14        MR. WRIGHT:  Object to form.
15   A.  Yes.
16   Q.  And do you remember telling Josh that
17 Detective York told you that they had been waiting
18 awhile to get Jonathan?
19        MR. WRIGHT:  Object to form.
20   A.  Yes.
21   Q.  So I just want to be sure that we understand.
22   A.  Okay.
23   Q.  Jonathan Taylor never confessed to you
24 anything about the death of Katherine Mills?
25   A.  No.

**Page 25**

1         MR. WRIGHT:  Object to form.
2    Q.  He never said anything to you about Amanda?
3         MR. WRIGHT:  Object to form.  Leading.
4    A.  No.
5    Q.  In fact, Jonathan never told you anything
6  whatsoever –
7         MR. WRIGHT:  Object to form.
8    Q.  – about the Katherine Mills death?
9    A.  No.
10   Q.  And it was Detective York who provided you
11 with the details that you gave in this statement?
12        MR. WRIGHT:  Object to form.
13   A.  Yes.
14   Q.  Did Detective York tell you that he had been
15 waiting awhile to get Jonathan?
16        MR. WRIGHT:  Object to form.
17   A.  Yes.  He told me that the day at the school
18 when he come and seen me.
19        MS. ROBINSON STAPLES:  Okay.  I'm done with my
20   questions.  Thank you.
21        THE WITNESS:  Okay.
22        CROSS EXAMINATION
23 BY MR. WRIGHT:
24   Q.  Ms. Simpson, my name is Derrick Wright.  I'm
25 an attorney for Detective York.  I've just got a few

Page 26

1 questions.
2  A. Okay.
3  Q. Do you realize that you're under oath today?
4 Took your oath, right?
5  A. Yes.
6  Q. And you realize that that oath here is the
7 same oath you would be under in a trial, right?
8  A. Yes.
9  Q. Okay. Do you have any – now, I don't want
10 you to disclose any medical condition specifically, but
11 are you aware of any medication or condition you have
12 that might affect your ability to remember or recall
13 events?
14  A. No.
15  Q. Okay.
16  A. Not that I'm aware of.
17  Q. All right. And I'm just going to go over a
18 little bit of background education – or, I mean,
19 background information. What's your highest level of
20 education?
21  A. I was in the 12th grade but didn't graduate.
22  Q. Did you ever get a GED?
23  A. No.
24  Q. No. Okay. What about employment? Have you
25 worked anywhere – are you working anywhere currently?

Page 27

1  A. No. Well, I work for Wiley Brown every two
2 months mowing and picking up garbage, but other than
3 that, no, I don't have a full-time job.
4  Q. And what was the name of that?
5  A. Wiley Brown.
6  Q. When did you work there?
7  A. I work there every two months starting
8 September of last year.
9  Q. So, that would be September of 2017?
10  A. Yeah.
11  Q. To present?
12  A. Yeah. It's only a program they do every two
13 months from the – for the surrounding counties.
14  Q. Okay. Any other jobs you've had?
15  A. No.
16  Q. And are you currently living with your
17 parents?
18  A. Sometime – yeah, pretty much.
19  Q. Where –
20  A. Them and my girlfriend.
21  Q. Where do you live right now?
22  A. Right now I live at 139 Pine Street.
23  Q. And what city is that?
24  A. Barbourville.
25  Q. And is that your home alone?

Page 28

1  A. No.
2  Q. You had a roommate you said?
3  A. It's – yes, it's my girlfriend.
4  Q. Okay. And your parents live in a separate
5 residence?
6  A. Right now, she's in the hospital, and she
7 don't currently have a house right now, my mom.
8  Q. Okay. Is your father still fine?
9  A. Yeah.
10  Q. Okay. Does – where he's at?
11  A. He's with my mother in UK, in the hospital.
12  Q. I understand. How long have you been living at
13 the Pine Street address in Barbourville?
14  A. I had lived there awhile back, and then I
15 moved out and moved back in. So going on for a few
16 years, about four years. I mean, I don't know for sure.
17 It's just –
18  Q. I understand if you can't get perfect dates,
19 but –
20  A. Okay.
21  Q. – on and off for about the last four years –
22  A. Yeah.
23  Q. – you've been living there? When you're not
24 living there, are you with your parents?
25  A. Yeah.

Page 29

1  Q. Anywhere else you've been living in the last
2 four or five years?
3  A. No. Uh-uh (negative).
4  Q. Now, is it true you've never met me before
5 today, right?
6  A. Right.
7  Q. Have you met any of the gentlemen down this
8 row?
9  A. No.
10  Q. Have you ever met Ms. Staples?
11  A. Yes.
12  Q. When did you meet her?
13  A. She come to Leslie County Detention Center and
14 seen me back in August of 2017.
15  Q. And what did you talk about?
16  A. She just come and asked me about the
17 statements that I had – I had said before and stuff,
18 and she just told me that when I was released, there
19 would be a – a meeting, that she would have to contact
20 me.
21  Q. Did she tell you any information?
22  A. No.
23  Q. And she said there would be a meeting?
24  A. She just told me, yes, that she would have to
25 contact me and that we would – there would be a

Page 30

1 meeting.
2    Q.  Is this the meeting she's referring to, or did
3 you have a second meeting with her?
4    A.  No.  This is the one, I guess, she was
5 referring to, because I've not met her since.
6    Q.  So you've had one meeting with her?
7    A.  Yeah.
8    Q.  How about the gentleman sitting beside her?
9 Have you met with him?
10    A.  No.  Never before today.
11    Q.  Have you met with any – I know that you've
12 referenced a couple of investigators for Jonathan Taylor
13 or Amanda Hoskins back when the charges were pending
14 again them. Do you recall that testimony?
15    A.  Yeah.
16    Q.  Since their charges have been dismissed, do
17 you recall speaking to any other persons, investigators,
18 anybody, talking to you about this case?
19    A.  No.  No.
20    Q.  Ms. Staples was the only one?
21    A.  Yeah.
22    Q.  And that was while you were in detention?
23    A.  Yeah.
24    Q.  In August of 2017, you believe?
25    A.  Yeah.

Page 31

1    Q.  How long was the conversation?
2    A.  Maybe five, ten minutes.  Not even that long.
3    Q.  Did she show you any documents?
4    A.  No.
5    Q.  And just can you recall what was said?
6    A.  I think – I'm not for sure if she brought the
7 state.  I – I don't really remember the – I mean, I
8 don't think she showed me no papers, no.  She didn't –
9 wasn't there long enough to – I mean, she just told me
10 when I got out, that they would be a meeting, that there
11 was going to be – a meeting was all. I mean, I'm – I'm
12 getting a little bit nervous now.  I don't know why.
13 Hold on.
14    Q.  It's okay.  I just –
15    A.  Let me get a drink of water.
16    Q.  Sure.  Take a drink.
17    A.  I'm not really a people person.  All right.
18    Q.  Are you okay?
19    A.  Yeah.
20    Q.  Do you want to take a break off the record?
21    A.  No, I'm – I'm fine.
22    Q.  So you think you may have – why don't you
23 take a look at Exhibit 1 and see if you've seen that
24 before.
25    A.  I've never seen this paper until now.  I don't

Page 32

1 think she brought no paperwork.  She just was telling –
2 asking me –
3    Q.  Telling you?
4    A.  No.  Asking me.  I'm sorry.  I don't really
5 know how to speak like – how lawyers and stuff do, but
6 I meant she come and asked me about the statements, that
7 – about me giving this one to Jason York is all.
8 She just – and then that was it.  Told me there would
9 be a meeting.
10    Q.  Did she ask about any of the details?
11    A.  No, she didn't ask about no details.
12    Q.  Did she ask –
13    A.  She just asked if I remembered to give them my
14 statement at the time, and that was it.
15    Q.  Did you tell her about whether any of that
16 statement was true?
17        MS. ROBINSON STAPLES:  Object to form.
18    A.  We didn't discuss that.
19        THE WITNESS:  I mean, I'm not understanding
20    what he's asking.
21    Q.  I'm just asking:  You said that she brought a
22 statement.
23    A.  No.  I said I wasn't for sure, but I don't –
24 no, I've never seen this statement before.
25    Q.  Okay.

Page 33

1    A.  No.
2    Q.  You've not seen that before she said, "There's
3 going to be a meeting"?
4    A.  Which is this one I'm –
5    Q.  Okay.  And she just asked if you gave a
6 statement?
7    A.  I don't remember specifically what she asked,
8 but, I mean, I just feel like you're asking me the same
9 questions –
10    Q.  Okay.
11    A.  – and I'm getting confused.
12    Q.  All right.
13    A.  I feel like you're confusing me a little bit.
14    Q.  All right.  I just wanted to know what all was
15 discussed. And as far as you remember, it was just she
16 told you about a meeting?
17    A.  Yes.
18        MS. ROBINSON STAPLES:  Object.  Asked and
19    answered.
20    Q.  All right.  And I don't mean to do this for
21 embarrassment, but we do this for all witnesses –
22    A.  Okay.
23    Q.  – just go over their criminal history.
24    A.  I have a pretty bad one.  I'm not going to
25 lie.

Page 34

1    Q. And I appreciate that. I believe you've pled
2  guilty to a theft charge. That was – goes back to 2013,
3  but you didn't plead guilty to 2015; does that sound
4  right?
5    A. Yeah.
6    Q. I believe there was a receipt of a credit card
7  violation in 2014 that you pled guilty to in 2015; does
8  that sound right?
9    A. Yes.
10     MS. ROBINSON STAPLES: Objection to form.
11   Q. And I believe in 2015, January, you were
12  charged with promoting contraband first degree; is that
13  –
14   A. Yeah.
15     MS. ROBINSON STAPLES: Objection to form.
16   Q. Were you under that charge when Mr. Powell
17  came to talk to you? Were you in custody on that
18  charge?
19   A. I'm not for sure. I think I had been picked
20  up on, like, just a regular warrant, and when I got
21  there, I caught a promoting contraband charge when I
22  come in and was booked in, but I'm not for sure if it
23  was the same time.
24   Q. Okay. And you pled guilty to that promoting
25  contraband charge, correct?

Page 35

1    A. Yeah.
2    Q. And that was a felony?
3    A. No. They had left it downstairs.
4    Q. Okay. And then 2016, you were charged with a
5  possession of a meth precursor; does that sound correct?
6    A. Yes.
7      MS. ROBINSON STAPLES: Objection to form.
8    Q. And you pled guilty to that in 2016?
9    A. Yeah.
10     MS. ROBINSON STAPLES: Objection to form.
11   Q. And the meth precursor, to your understanding,
12  that's a felony?
13   A. Yeah.
14   Q. Are you aware of whether you've been charged
15  with another theft charge in 2017?
16   A. Do what?
17   Q. Another theft by unlawful taking charge from
18  2017?
19   A. Yeah.
20   Q. And that charge is still pending, right?
21   A. Yeah. Yeah.
22   Q. Are you aware of whether any warrants are
23  outstanding for you?
24   A. No.
25   Q. Okay. Have you been in jail on these charges?

Page 36

1    A. On what charges specifically?
2    Q. Any of them.
3    A. Yeah, I've done jail time.
4    Q. Okay. While you were in jail, did you ever
5  hear of any inmates being rumored to be an informant for
6  police?
7      MS. ROBINSON STAPLES: Objection to form.
8    A. No.
9    Q. You've never heard a rumor of an inmate who
10  was an informant?
11   A. Well, I mean, I've heard of them, but, yeah.
12  I mean –
13   Q. And I know it's just a rumor.
14     You didn't know for sure, right?
15   A. I mean, anybody that I've ever heard –
16     MS. ROBINSON STAPLES: Objection to form.
17   A. – has been an informant, you're never for
18  sure.
19     It's just talk.
20   Q. Just talk. Those people who are rumored to be
21  informants, are they treated differently in the jail?
22   A. Yeah.
23   Q. Are they treated bad?
24   A. I mean –
25     MS. ROBINSON STAPLES: Objection.

Page 37

1    A. – if people understand. I mean, if people
2  knows. Sorry.
3    Q. You can answer. Are they treated worse?
4    A. I mean, by other inmates if people knows for
5  sure that they've done it, yeah. I mean, the guard and
6  stuff don't treat them no different that I've seen.
7    Q. Is it dangerous to be known – have a
8  reputation as an informant in jail?
9      MS. ROBINSON STAPLES: Objection. Speculation.
10   A. Yeah, where's – I mean, yeah. What does –
11   Q. Now, you talked a little bit about your
12  relationship to Jonathan Taylor. You mentioned he was a
13  neighbor of yours?
14   A. Yeah.
15   Q. Do you know where that was?
16   A. It was in Miles's apartment. It's beside of
17  the children's home in Barbourville.
18   Q. And I want to say that was called Full Moon
19  something?
20   A. Court maybe. Full Moon Court.
21   Q. Does that sound right?
22   A. Yeah.
23   Q. And do you know how long he was a neighbor of
24  yours?
25   A. Maybe about a year or so, or not even that

Page 38

1  long, before he got busted for manufacturing. And then
2  – then he never got back out, so...
3      Q.  And did he live on his own at that time?
4      A.  Well, him and Kayla Mills lived there. But
5  Kayla wasn't always there, but she was there the
6  majority of the time.
7      Q.  And that's fair. Anybody else living with him
8  or staying with him to your memory?
9      A.  Yeah.
10     Q.  Who?
11     A.  Well, just Kayla is who I was talking about.
12     Q.  And I'm sorry for the confusion. Anybody other
13  than Kayla?
14     A.  No.
15     Q.  And you were living in that same complex with
16  your family?
17     A.  Yeah.
18     Q.  And who – I know you have a few brothers. So
19  at that time, who was your family members living in the
20  complex?
21     A.  Tammy Simpson, my mom. Larry Simpson, my dad.
22  And my brother, Josh Garland, at the time was staying
23  there sometimes.
24     Q.  Was he friends with Jonathan Taylor?
25     A.  Yeah, they had become friends.

Page 39

1      Q.  Had they become friends when they became
2  neighbors, or were they friends before that?
3      A.  When they became neighbors. We – none of us
4  ever knew him before then.
5      Q.  Do you have other brothers?
6      A.  Yeah.
7      Q.  Who are they?
8      A.  Casey Garland and Bobby Garland.
9      Q.  Do you know whether they ever became friends
10  with Jonathan Taylor?
11     A.  I know Bobby didn't. He's been in prison.
12  And Casey, I think he might have talked to him a couple
13  times, but I don't think he ever become – they really
14  become friends.
15     Q.  I understand. Did your parents ever meet
16  Jonathan Taylor, to your knowledge?
17     A.  Yeah.
18     Q.  Was that because he would come over regularly,
19  or was it just in passing, to your knowledge?
20         MS. ROBINSON STAPLES:  Objection to form.
21     A.  He would come over sometimes and talk to my
22  dad. They would hang out. I don't know really.
23     Q.  Did he have a home phone?
24     A.  Jonathan? I don't believe he did.
25     Q.  Did he have a cell phone?

Page 40

1      A.  Yeah, I think.
2      Q.  Okay. Do you know the number of it?
3      A.  No.
4      Q.  I know that's been a long time ago.
5      A.  No. I didn't know the number then.
6      Q.  Did your house have a home phone?
7      A.  No.
8      Q.  No?
9      A.  Uh-uh (negative).
10     Q.  Did anybody have a cell phone?
11     A.  My mom did, yeah, her and my dad.
12         THE WITNESS:  This has come off. How do I –
13         MR. WRIGHT:  Take your time.
14         THE WITNESS:  How do I put this back on? Just
15  stick it?
16         MR. WRIGHT:  Why don't we go off the record.
17         VIDEOGRAPHER:  We are off record at 10:37.
18             (OFF THE RECORD)
19         VIDEOGRAPHER:  We are back on the record –
20         MR. SLOSAR:  Back on record.
21         VIDEOGRAPHER:  – at 10:37 a.m.
22  BY MR. WRIGHT:
23     Q.  And I'm sorry. We got a little scrambled up
24  with the malfunction there. You mentioned your mom had a
25  cell phone. Did any anybody else in your family have a

Page 41

1  cell phone?
2      A.  No. Her and my dad shared one.
3      Q.  Your – you? Did you have a cell phone?
4      A.  Not at the time, no.
5      Q.  Your brothers?
6      A.  No.
7      Q.  How long did you-all live at the Full Moon
8  Court?
9      A.  I'm not for sure. Maybe two years. I'm not
10  positive.
11     Q.  Approximately how long were you there after
12  Jonathan was arrested on the meth?
13     A.  Maybe close to a year. I'm not for sure.
14     Q.  I understand. Now, what would you do for
15  Jonathan? Did you clean for him?
16     A.  I cleaned –
17         MS. ROBINSON STAPLES:  Objection to form.
18     A.  I cleaned his house. So when I was there, I
19  would help him change his colostomy bags. I mean, we
20  just was friends and hung out and watched TV, listened
21  to music, I mean, but I would help him change his
22  colostomy bags and clean his house a little bit.
23     Q.  Did you cook for him?
24         MS. ROBINSON STAPLES:  Objection to form.
25     A.  Sometimes, yeah.

Page 42

1    Q.  Did you get close to him?

2    A.  As a friend, kind of close, but, I mean, no.

3  We didn't have enough time to get close.

4    Q.  Did – do you know whether anybody else would

5  help him change his bags, colostomy bags?

6        MS. ROBINSON STAPLES:  Objection.

7    Speculation.

8    A.  I don't know.

9    Q.  Did he tell you whether he had anybody else

10  helping him?

11    A.  No.

12    Q.  To your knowledge, you were the only person

13  who was helping him with that?

14    A.  Yeah.  He could do it on his own, but, I mean,

15  I would just help him sometimes if he needed it.

16    Q.  Was that something he would call you to come

17  over and help?

18    A.  No.  If I was there and he needed it changed,

19  I mean, I would just get him his fresh bags and stuff

20  and bring them to him, and help him wipe off around it

21  is about all I would do.  And he would do it self,

22  put it back together.

23    Q.  Then he would – would he call over to ask you

24  to come bring food or cook?

25        MS. ROBINSON STAPLES:  Objection to –

Page 43

1    A.  No.

2        MS. ROBINSON STAPLES:  – form.

3    A.  If – I wouldn't do it if I wasn't at his

4  house. He wouldn't call me or bother me –

5    Q.  Okay.

6    A.  – if I wasn't already there.

7    Q.  And did you go over there by yourself to do

8  these things on occasion?

9    A.  I mean, he would have people, company, there,

10  and I would be over there and I would do it.

11    Q.  You would go there by yourself and there might

12  be other people there; is that true?

13        MS. ROBINSON STAPLES:  Objection.  Asked and

14    answered.

15    Q.  Is that what you're saying?

16    A.  Yeah.

17    Q.  Okay.  Was there times that you would go there

18  by yourself and no one else was there?

19    A.  Yeah.

20    Q.  And you-all would talk, wouldn't you?

21        MS. ROBINSON STAPLES:  Objection to form.

22    A.  No.  I mean, we would not necessarily talk.

23  We would just hang out, watch TV, or I would stay there

24  by myself and he would leave and go somewhere.  I mean,

25  it was just a friend thing.  I mean, we never really had

Page 44

1  full-on conversations.  I'm not the type to just sit

2  down and have a conversation with somebody.

3    Q.  He would let you stay at the house alone?

4    A.  Yeah.

5    Q.  How often would that happen?

6    A.  Hardly ever.  I mean, if he had to go

7  somewhere and I was there, and my parents was gone and I

8  was locked out, I mean, I would sit at his house while

9  waiting on somebody to get home at mine or something.

10    Q.  And your testimony is, when you-all were

11  alone, sometimes you wouldn't talk, you would just sit

12  together?

13        MS. ROBINSON STAPLES:  Objection.  Asked and

14    answered.

15    A.  I mean, we would sit and watch TV or listen to

16  music with the radio, or something.  I mean, I'm sure we

17  would talk, but not – I mean, not conversations

18  conversations.  Not personal stuff really.

19    Q.  Was the sitting and listening to music and

20  watching TV, was that throughout the whole time he was

21  there?

22    A.  I wouldn't be there for long periods at a

23  time.  I mean, I would be there for maybe 30 minutes or

24  an hour sometimes.  It just varied.

25    Q.  But as far as you knew, the whole time you

Page 45

1  were there, you could watch TV?

2    A.  Yeah.

3    Q.  Or listen to music?

4    A.  Yeah.  I would occupy myself, turn on the

5  music and clean house or – just to give myself

6  something to do really.

7    Q.  Or turn on the TV maybe?

8    A.  Yeah.

9    Q.  Now, I want to go over your – the statements

10  you've given. The first statement you gave about

11  Jonathan's confession of the Katherine Mills murder was

12  to Detective York; is that fair?

13    A.  Yeah.

14    Q.  You didn't talk to your family members about

15  Jonathan Taylor having confessed?

16        MS. ROBINSON STAPLES:  Objection to form.

17    A.  No.

18    Q.  You mentioned, I want to know if I heard this

19  correctly, that you had heard about the Katherine Mills

20  murder investigation at the time he was living there?

21    A.  Yeah, from a – well, a neighbor across the

22  building who was really nosy, he just would try to – he

23  would say, "That's that one guy been accused of murder

24  and stuff," but I never really paid attention to it

25  because I never even knew there had been a murder.  I

Page 46

1  hadn't heard about it.

2   Q.  So some nosy neighbor said Taylor had been

3  accused of murder, to your memory?

4   A.  Yeah.  I mean, he would just -- yeah.

5   Q.  Did you remember hearing any other details

6  about the murder?

7   A.  No.  That's the only thing ever said about it,

8  was that he was accused of it or something, is what the

9  neighbor had said.  But I figured he was just a nosy

10  person that didn't know what he was talking about.

11   Q.  Other than Detective York, did you hear any

12  details about the murders from any other source?

13   A.  No.

14   Q.  So your only details about the murder, to your

15  memory, came from Detective York?

16   MS. ROBINSON STAPLES:  Objection.  Asked and

17  answered.

18   A.  Yes.

19   Q.  And when I'm saying that, I'm meaning up to

20  2015 when you met with Josh Powell.

21   A.  What do you mean?

22   Q.  You hadn't heard any new details about the

23  murder?

24   A.  No.

25   Q.  No? Now, you mentioned in your testimony that

Page 47

1  Detective York had come to your family's home before the

2  statement you gave to him.

3   Do you recall saying that?

4   A.  Yes.

5   Q.  Did you hear about that secondhand, or were

6  you there?

7   A.  My mom had told me.

8   Q.  So you --

9   A.  Well, he told me that.  When he got to the

10  school where I was at, he let me know that he had been

11  to see my mom.

12   Q.  So the truth is, you only met him in person

13  one time up to that point?

14   A.  Up at that point, yeah, that's the only time,

15  was at the school, and then later on he had brought a

16  summons to my house.

17   Q.  And do you remember when the summons was?

18   A.  No, I'm not for sure.  I don't remember.

19   Q.  Did you have any interaction with him when he

20  brought the summons?

21   A.  No.

22   MS. ROBINSON STAPLES:  Objection.  Asked and

23  answered.

24   Q.  Nothing was discussed during the summons?

25   MS. ROBINSON STAPLES:  Objection.  Asked and

Page 48

1  answered.

2   A.  No.

3   Q.  So your understanding of what he said when he

4  came to your family's home, that came from your mother?

5   MS. ROBINSON STAPLES:  Objection to form.

6   A.  Yeah.  And -- and he had told me that he had

7  met with her when he got to where I was at.

8   Q.  What did he tell you about his meeting with

9  your mother?

10   A.  He told me that he had let her know I could be

11  charged for withholding evidence, and then he was

12  telling me about a reward.  I'm -- I don't recall or

13  don't remember if he told me that he had told her or

14  what when he was there, but...

15   Q.  What do you remember your mom telling you

16  about Detective York?

17   A.  When I got home after I had talked to him, she

18  just told me that he come over there and said I could be

19  charged and asked if he could come talk to me.  He had

20  told her about the reward, and she told him he could

21  come and speak with me.

22   Q.  So I -- and I want to make sure I understand

23  this:  So it sounds like to me you didn't find out that

24  Detective York had come to your family's home until

25  after Detective York had spoken to you?

Page 49

1   MS. ROBINSON STAPLES:  Objection to form.

2   A.  No.  I -- I told you, he told me when he got

3  to the school that he had went to see my mom.

4   Q.  Yeah, and I -- I'm sorry.  It was a big

5  question. So he told you that he had seen your mom when

6  he came to you, right?

7   A.  Yeah.

8   Q.  But your mom hadn't told you that yet?

9   A.  No.  She had contacted the school and let the

10  lady in the front office know he was on his way and when

11  he got there, he could talk to me.  But she didn't speak

12  to me, no.

13   Q.  And you testified a little bit about this, but

14  I just want to make sure I got it right:  Your testimony

15  was at the school, right?

16   A.  Yeah.

17   Q.  Or I'm sorry.  Not your testimony.  Your

18  statement to Detective York --

19   A.  My statement was at the school.

20   Q.  -- was at the school?

21   A.  Yeah.

22   Q.  And the name of that school was?

23   A.  Knox County Learning Academy.

24   Q.  And I believe you said within that school, the

25  statement was in the office of the guidance counselor?

Page 50

1    A. Right.
2    Q. And that was Rhonda Abner?
3    A. Yes.
4    Q. Were you brought into her office by who?
5    A. By the lady out of the front office, come and
6  got me from class.
7    Q. And was Rhonda Abner in there when you came in
8  the office?
9    A. Yes. When I got in her office, she was in
10  there, her and Detective York.
11    Q. So she was in there the whole time for the
12  interview, right?
13    A. Yeah.
14    Q. And how long did you say you were in this
15  room?
16    A. Maybe about an hour. I'm not for sure on the
17  right time.
18    Q. How old were you at the time?
19    A. 17 probably.
20    Q. Were you under any type of illicit drugs at
21  that time?
22    A. No.
23    Q. Any other medical condition that would have
24  impaired your ability to tell the truth?
25    A. No.

Page 51

1    Q. Any other medicine or condition that would
2  have impaired your ability to recall events?
3    A. No.
4    Q. Now, you had said that -- tell me -- did
5  Detective York talk to you before he turned the
6  recording on? Is that your testimony?
7    A. Yes.
8        MS. ROBINSON STAPLES: Objection. Asked and
9    answered.
10    Q. Did you see the recording device?
11    A. He had got it out, but he hadn't started it
12  yet. He had got it out of his briefcase or something he
13  was carrying.
14    Q. Okay. Did he put it on a table? Where did he
15  put it?
16    A. He still had it in his hand getting all of his
17  -- or getting all of his stuff together before he -- and
18  he was talking to me then while he was getting
19  everything set up and ready.
20    Q. And was that just chitchat, or was he talking
21  about --
22    A. He was telling me I could be charged, and he
23  was telling me that he could get my brother out on the
24  manufacturing charge that he had caught at Jonathan's
25  house and was telling me about a reward being offered by

Page 52

1  the family that he could get -- that he could get to me.
2    Q. Was it true that he just said he could -- he'd
3  pass along your cooperation to the prosecution?
4        MS. ROBINSON STAPLES: Objection to form.
5    A. For what?
6    Q. About your brother?
7    A. No. He told me he could go get him out.
8    Q. What did he -- is that all he said about the -
9  - your brother's criminal charges?
10    A. Yeah, was that he would get him out of jail
11  for me -- for my statement, plus the other things.
12    Q. And I want to know, to the best of your
13  memory, what it was he said, not how you took it. What
14  did he say?
15        MS. ROBINSON STAPLES: Objection. Asked and
16    answered.
17    Q. And I'm sorry, but --
18    A. I'm not for sure of the specific words that he
19  said. He told me that -- I mean, I don't know his
20  specific words, but it was that he could get him out
21  because he was a cop pretty much.
22    Q. Okay. So you don't know his specific words?
23    A. Uh-uh (negative), no, but I do know --
24  remember what he was offering.
25    Q. Then you also mentioned a reward. To your

Page 53

1  memory, what did he specifically say about a reward?
2        MS. ROBINSON STAPLES: Objection. Asked and
3    answered.
4    A. That the family was offering a $10,000 reward
5  and that he could get a -- get a hold of them and get it
6  for me. He could contact the family and get it for me.
7    Q. Yeah. But he did tell you that was -- the
8  family was offering the reward, right?
9        MS. ROBINSON STAPLES: Objection to form.
10    A. Yeah.
11    Q. It wasn't the state police that was giving the
12  money away, right?
13        MS. ROBINSON STAPLES: Objection to form.
14    A. Well, no, but he pretty much told me that I
15  would get it for sure -- I mean, that he knowed that
16  they would give it, that he was going to contact them
17  and get it for me.
18    Q. And when your mother told you about her
19  conversations with York, what was it that she said she
20  had spoken to him about?
21        MS. ROBINSON STAPLES: Objection. Asked and
22    answered.
23    A. He just had come and looking for me, and she
24  told him I was at school. And he was telling her about
25  the reward and asked if he could come and see me,

Page 54

1  threatening that I could be charged.
2     Q.   He didn't mention to her anything about the
3  charges against your brother?
4     A.   No.  He didn't mention that till he got to me.
5  I was pretty much 17, alone, and scared when he come,
6  and, I mean, I just done what he told me to do pretty
7  much.
8     Q.   Well, that – that's your description of what
9  happened before you believe he turned the recorder on.
10  Anything else that he talked about before you believe he
11  turned the recorder on?
12     A.   No.
13     Q.   Now, tell me what – how the conversation goes
14  after he turns the recorder on?
15     A.   He says my name, what day it is, what time it
16  is, and then he would stop it every few minutes.  I
17  don't remember the specific details of how it went or
18  what I said or what he said, but I remember he would
19  stop the recorder, turn it on and off, and I do remember
20  he's the one who, while the recorder was off, would give
21  me certain details to say and pretty much tell me to say
22  it in my own words when the recorder was turned back on.
23  There was a witness in the room the whole time, Rhonda
24  Abner, if she remembers anything.
25     Q.   So the recorder, was that laying down while

Page 55

1  your statement was going on?
2     A.   He laid it down first, and then the first time
3  he stopped it, he just kept it in his hand and kept
4  turning it on and off.
5     Q.   Was he telling you he was turning it on and
6  off?
7     A.   I don't remember.  I don't remember if he told
8  me, but I don't think so.  But I don't want to say for
9  sure that he did.
10     Q.   How do you even know he was turning it off?
11     A.   Because I seen him.  And, I mean, I don't
12  remember that he told me, but I'm – I'm pretty sure he
13  did.  Because when he turned it off is when he would
14  start telling me about the details about what kind of
15  car it was and where it was hid, and just the details
16  that he told me.
17     Q.   Do you remember what details he told you?
18     A.   I mean, pretty much my –
19        MS. ROBINSON STAPLES:  Objection.  Asked and
20     answered.
21     A.   Pretty much my statement, just reworded in my
22  words.  I mean, I don't – it's been so long ago, I
23  don't remember every specific detail to anything.  I
24  mean, it's just been a long time, and I've been through
25  a lot since then.

Page 56

1     Q.   And I understand that. At what point did you
2  put those details out of your mind?
3     A.   What do you mean?  Could you –
4     Q.   Well, you said you don't remember specifically
5  the details, right, today?
6     A.   Well, after – after it was all supposed to be
7  said and done, I tried to just forget about it, because
8  I wanted that part to be over.  I never wanted it to
9  begin.  I didn't want to be in the middle of it.  So I
10  tried to just forget it, and I –
11     Q.   So –
12     A.   It's been how many years ago?  Like six or
13  something?  And I don't – I just – I can't hardly
14  remember something that happened a month ago.
15     Q.   So are you saying you tried to forget it after
16  you had that meeting with Detective York?
17        MS. ROBINSON STAPLES:  Objection to form.
18     A.   Not specifically tried to forget it.  I just
19  moved on with my life.
20     Q.   From that day, right?
21     A.   From – from it all.
22     Q.   Right.
23     A.   At that time we had just found out my mom was
24  sick with cancer, and I had more important things to
25  worry about.

Page 57

1     Q.   So you're 17 at the time, right?
2     A.   Yeah.
3     Q.   You said you were scared?
4     A.   I was young and scared, yeah.  And knowing my
5  mom was sick, I didn't want to go to jail.
6     Q.   And you said – it's your testimony that you
7  hadn't heard any details about the murder, right?
8     A.   Not before then.
9     Q.   And the only details that you had were given
10  to you by Detective York at that interview; is that your
11  testimony?
12     A.   Yes.
13     Q.   And your testimony is you tried to forget
14  those details and move on after that meeting, right?
15        MS. ROBINSON STAPLES:  Objection.  Asked and
16     answered.
17     A.   Not forget the details.  Just forget about the
18  whole situation and move on with my life to take care of
19  my mom and start my own life.  I don't have – I don't
20  know if I have health problems or what, but I don't have
21  a good enough memory, like I said, to hardly remember
22  something that went on a month ago.
23     Q.   And have you had that kind of condition, hard
24  to remember what you said a month ago, has that been
25  something you've been dealing with for –

Page 58

1     A.  For my – for my whole life pretty much.  I
2  mean, it's hard – I mean, for the past about four
3  years, yeah, it's been – it's just hard to remember
4  stuff.  I don't know if there's something wrong with me.
5  I just don't want to go to the doctor and find out.  I
6  don't like doctors.
7     Q.  Now, I think you said that after Detective
8  York, probably the next year, you may have met with
9  attorneys or investigators for either Jonathan Taylor or
10  Amanda Hoskins; is that correct?
11     A.  Yeah.
12     Q.  Did – were one of those people by the name of
13  Lisa Evans?  Does that ring a bell?
14     A.  I'm not for sure.  None of their names that I
15  met with, I don't remember their names.
16     Q.  And I understand. Do you recall whether one of
17  these investigators for either Jonathan Taylor or Amanda
18  Hoskins talked to you by phone?
19     A.  I don't really recall talking on the phone
20  with one of them.  I don't remember that occurring, but
21  it – I'm not saying it didn't happen.  I just don't
22  recall it.
23     Q.  Do you recall what you would have said to
24  those investigators?
25     A.  No.  I mean, I – I – I don't remember what

Page 59

1  the conversation could have been on the phone, but, I
2  mean, I – I do remember a couple of the meetings.  I
3  mean, like she had – this lady had asked me about the
4  meeting with Josh Gibson, if I remembered telling him
5  then that Jason York was the one who had told me the
6  details and stuff.  Yeah, I remember that meeting.
7     Q.  She asked you if Jason York was the one who
8  told you this stuff?
9     A.  Sitting here, right here when we was doing
10  this a while ago, and she was questioning me, she worded
11  a question somehow about did I recall telling Josh, the
12  investigator at that time, that Jason York was the one
13  who had given me this – their – told me what to say
14  and stuff.  You was sitting here.  I mean, the – I
15  don't remember the specific question she asked.  That's
16  how bad it is.
17     Q.  Okay.  You don't remember her asking – you
18  have a recollection of practicing those questions when
19  you met with her in the jail?
20        MS. ROBINSON STAPLES:  Objection.
21     A.  No.
22     Q.  I'm – I'm just trying to understand.
23        MR. SLOSAR:  You misconstrued.
24        MS. ROBINSON STAPLES:  That is not –
25        MR. WRIGHT:  I'm sorry.  I'm sorry.  Okay.

Page 60

1        MS. ROBINSON STAPLES:  That is not what she
2  said at all.
3        THE WITNESS:  No.
4  BY MR. WRIGHT:
5     Q.  Okay.  So you – I'll strike the question and
6  move on.  Do you – so you don't recall talking to an
7  investigator for either Jonathan Taylor or Hoskins by
8  phone, but you don't deny that it happened?
9     A.  Right.
10     Q.  Do you remember an investigator for Jonathan
11  Taylor coming to meet you, I believe, outside of the
12  apartment complex and interviewing you?
13     A.  When was this supposed to have happened?
14     Q.  I believe it was July of 2013.
15     A.  Out the apartment complex?  Yeah, I – I think
16  I remember that.
17     Q.  And I believe his name was a – maybe a Dale
18  Doming?
19     A.  I don't know the name.
20     Q.  Okay.  Do you remember what was said with him?
21     A.  No.  There was so many of them that come to
22  see me a couple different times, and I don't remember
23  who's what or what was said with who.  I mean...
24     Q.  Were you aware, though, that they were working
25  on behalf of either Jonathan Taylor or Amanda Hoskins?

Page 61

1     A.  Yeah.  They always stated who they was and
2  told me specifically who they was when they come.
3     Q.  Did you tell them about the – you believe you
4  were promised a reward. Did you tell that belief to
5  these people, to your memory?
6     A.  If they asked about it, I mean, I told them.
7  I just answered the questions that they asked me pretty
8  much.  I don't remember specific questions or specific
9  answers, but what questions they asked, I answered the
10  best I could.
11     Q.  Were you being truthful to them?
12        MR. SLOSAR:  Objection to form.  Foundation.
13     A.  I mean, yeah.
14     Q.  So if the July 2013 meeting with the
15  investigator by the name of Dale, if he recorded your
16  statement, what you told him would be true, wouldn't it?
17        MR. SLOSAR:  Objection –
18     A.  I don't remember what would be in the
19  statement. I mean, I –
20        MR. SLOSAR:  Derrick, I think it's improper to
21  ask the question in that way considering that she's
22  already told you she doesn't remember specifically
23  what she told these investigators.  So if you want
24  to play her statement and ask her if it's true or
25  not and why she gave that statement, you should do

Page 62

1  it rather than doing this vague manner that you're
2  doing it under.
3        MR. WRIGHT: I think it's fair to ask: Do you
4  have any recollection of being untruthful to any
5  investigators?
6        MR. SLOSAR: She's already answered that
7  question.
8        A. I mean, what – what do you mean? Being
9  untruthful to any of them? No. I tried to – I tried
10 to answer every question asked to me as truthfully as I
11 can, as I remember it, I mean, and stuff.
12 BY MR. WRIGHT:
13     Q. In July of 2013, do you remember – strike
14 that. Did any of these investigators coach you to tell
15 you [sic] that Detective York had lied to you?
16        MS. ROBINSON STAPLES: Objection to form.
17     A. No.
18     Q. Did any of these investigators tell you that
19 Detective York was under investigation about the reward?
20     A. No.
21        MS. ROBINSON STAPLES: Objection to form.
22     Q. Did any of these investigators tell you that
23 Detective York would not sleep until he arrested
24 Jonathan Taylor?
25     A. No. He told me that the day that he took my

Page 63

1  statement at the school. Told me he couldn't seem to
2  sleep because the old lady was trying to build herself a
3  bathroom, I think he told me, and he couldn't sleep
4  until he prosecuted the people that done it.
5     Q. When was that told to you in that statement?
6  Was that on the record or off the record?
7     A. I don't think the recorder was on when he said
8  that to me.
9     Q. Is that something that was before the recorder
10 was ever turned on, or was that after the recorder was
11 being turned on and off?
12     A. He told me that in the beginning I'm pretty
13 sure.
14     Q. Did any of these investigators for Amanda
15 Hoskins or Jonathan Taylor tell you anything negative
16 about Detective York?
17        MS. ROBINSON STAPLES: Objection.
18     A. No.
19     Q. Is it true that after Jonathan Taylor was
20 arrested, he called your family's house?
21     A. Called my family's house?
22     Q. Yes.
23     A. I don't remember. I don't think so. I mean,
24 I don't remember.
25     Q. Do you recall telling that to one of the – do

Page 64

1  you recall one of the investigators being told that he
2  had been calling your house and asking for you?
3        MS. ROBINSON STAPLES: Objection.
4  Speculation.
5     A. I don't – I don't know. I mean, I don't
6  remember him calling. I don't know if I told them that
7  or what. I mean, I don't – I can't say that I didn't
8  tell him that, because if he did, I probably told them,
9  but I don't remember if he did or if he didn't.
10     Q. Is it true that you told Detective York – I'm
11 sorry – Jonathan Taylor to stop calling you?
12     A. I don't know. I mean, I don't remember if he
13 ever called me. I don't know how he would have. I
14 mean, I didn't have a phone.
15     Q. So you're not denying it, you just can't
16 remember?
17        MS. ROBINSON STAPLES: Objection to form.
18     A. I just – I can't remember.
19        MR. SLOSAR: Asked and answered.
20     Q. Did you or your family ever believe that that
21 was attempts by Jonathan Taylor to intimidate a witness?
22        MS. ROBINSON STAPLES: Objection to form.
23     A. No. I mean, if it happened, no.
24     Q. I'm going to give you a document that is
25 labeled, this one, PL 30, a two-page document.

Page 65

1        MR. WRIGHT: Can I have the exhibit stickers?
2        MS. ROBINSON STAPLES: Yes.
3        MR. WRIGHT: May I have that back for just one
4  second?
5        THE WITNESS: Okay.
6        (EXHIBIT 2 MARKED FOR IDENTIFICATION)
7  BY MR. WRIGHT:
8     Q. If you turn to the back page, the last
9  paragraph. If you want to take a minute –
10     A. Okay. That's fine.
11     Q. – off the record to read it, that's fine.
12     A. No.
13     Q. I don't want to rush you into anything.
14     A. It's fine. Oh, go ahead.
15     Q. The last paragraph, second sentence, where it
16 says, "Larry and Tammy Simpson stated that Jonathan
17 Taylor had recently been calling their house for Amber
18 and that Amber had talked to him briefly and told him
19 not to call," is that – did that happen?
20     A. You're asking me some question from a while
21 ago. I don't remember if it happened, if he called or
22 what. I mean, I was so much younger then. I been
23 through so much. I can't – I don't want to answer
24 questions that I don't remember the right answer to.
25 If my parents told them that, then I don't know. That's

Page 66

1  not coming from me.
2  Q.  Okay.  If you look at the first page, the
3  second paragraph says, "I told Amber why I was looking
4  for her, and she stated that Jonathan had, in fact, told
5  her that he killed Ms. Mills." Isn't it true that you
6  told this investigator that Jonathan had confessed to
7  you?
8  A.  I was just basically repeating the same thing
9  that I had said in my statement from Detective York,
10  because I was just repeating what I was told from the
11  first time.  I mean, I was just trying to get it over
12  with.
13  Q.  Well, the date of this is April 10, 2013.
14  Do you see that at the top?
15  A.  Yeah.
16  Q.  And your interview with Detective York, I
17  believe, was March 2012, correct?
18  A.  Yeah, about a year apart.
19  Q.  You've testified earlier that you can't
20  remember very well one month back in time; isn't that
21  true?
22  MS. ROBINSON STAPLES:  Objection to form.
23  A.  It depends on certain things.  I mean, I can't
24  remember specific things that I talked about with
25  certain people.  I mean, the same – answer is going to

Page 67

1  be the same.  I don't remember everything.  I mean, I
2  remember certain things, but I don't remember
3  everything.  I can only answer what I can answer with
4  the truth when it's asked.
5  Q.  So your testimony, then, is that you just
6  repeated what Detective York had said to this
7  investigator; is that what you're saying?
8  MS. ROBINSON STAPLES:  Objection.  Asked and
9  answered.
10  A.  Yeah.
11  Q.  But you don't remember exactly what he said to
12  you today, right?
13  MS. ROBINSON STAPLES:  Objection.
14  MR. SLOSAR:  Objection.  Misstates her
15  testimony.
16  A.  One more time?
17  Q.  You repeated the details to this investigator;
18  is that true?
19  A.  Yeah.  I mean, that's been a – that was –
20  that's not been years ago since – I had talked to York
21  and then talked to investigator.  That had been about a
22  year apart.  I – in my statement earlier, I said that
23  in about the past four years, I've started where I can't
24  hardly remember good from, I mean, days to days, months
25  to months. But, I mean, it's been years ago now from

Page 68

1  this time to this time, I probably – yeah, in that
2  amount of time.  At that time, my memory hadn't been
3  going away.
4  Q.  Do you know what – at what point your memory
5  went away that you couldn't remember the details that
6  you say Detective York told you?
7  A.  It's – I mean, about four years ago is when
8  I've started having trouble remembering things.  About
9  three or four years ago is when I've had trouble
10  remembering just anything that I do on a daily basis or
11  anything else.  So, I mean...
12  Q.  What was it that happened four years ago that
13  caused your memory to change?
14  A.  Nothing has happened to me.  I just – I don't
15  know what it is.  I won't go to the doctor and have any
16  tests done to see if I have a health problem or not.
17  It's just I've noticed it over the past three or four
18  years.
19  Q.  So four years ago from today would be about
20  2014, right?
21  A.  Yeah.
22  Q.  Isn't it true that you gave a statement to a
23  second investigator, this time for Jonathan Taylor,
24  about what had happened?
25  A.  I'm not saying I completely lost my memory.

Page 69

1  I'm just saying that I've had trouble with it in the
2  last three or four years, not that I've completely lost
3  my whole memory from everything in my past.
4  Q.  I understand.  You had this discussion with
5  Lisa Evans, and I believe you indicated you have a vague
6  memory of a second discussion with an investigator
7  outside of your apartment complex; is that right?
8  A.  I mean, I remember them coming, yeah.
9  Q.  And isn't it true that you also told him the
10  details?
11  A.  I don't know.  I mean, I don't remember.  I
12  don't just want to say I don't know.  That's why I'm
13  saying I don't remember, because I'm not – I'm not
14  trying to confuse anybody or confuse myself either.
15  Q.  So you remember the details to tell the two
16  investigators in 2013 in separate interviews; is that
17  your testimony?
18  MR. SLOSAR:  Yeah, Derrick, I object.  And she
19  has told you repeatedly that she doesn't remember
20  the details.  You are trying to manipulate her
21  testimony.
22  Show her the second statement to Dale Dorning,
23  which you're referring to.  Ask her if she
24  remembers it.  Ask her whether it's true or false.
25  To do it the way you're doing it is completely

Page 70

1    inappropriate. You don't have a good faith basis
2    for doing so.
3        MR. WRIGHT: All right. Well, let's take a
4    little break, and I'll queue the recording up,
5    okay?
6        (OFF THE RECORD)
7    BY MR. WRIGHT:
8    Q.   All right. Ms. Simpson, did you have a chance
9    to take a break?
10   A.   Yes.
11   Q.   Did you have a chance to talk to anybody while
12   you were on break?
13   A.   No. I mean, I just asked them how much longer
14   it's going to take, because my grandma needs to get to
15   the heart doctor. She has an appointment.
16   Q.   Okay. What time is that?
17   A.   Well, it's my girlfriend's grandma, and I
18   think it's at 1:00 –
19   Q.   Okay.
20   A.   – for – she has got to leave before 1:00. I
21   think she has to go all the way to Corbin from
22   Barbourville, so...
23   Q.   What is your girlfriend's name?
24   A.   Dana.
25   Q.   Can I have the last –

Page 71

1    A.   Hubbard.
2    Q.   Hubbard? All right. I'm going to play a
3    recording for you and see if this is your voice. And
4    this is PL 9647, 1414A.
5        (PLAYS AUDIO)
6        MR. WRIGHT: All right. Can you play...
7        (PLAYS AUDIO)
8    Q.   Was that your voice on the recording?
9    A.   Yeah.
10   Q.   And would you agree that you were telling the
11   details to that investigator on that recording?
12   A.   Yeah.
13   Q.   And you led that investigator to believe that
14   Jonathan Taylor had told those details to you, didn't
15   you?
16   A.   Yeah.
17   Q.   Okay. Now, isn't it – now I want to play a
18   second clip.
19       MR. WRIGHT: Can you play clip number 12?
20       (PLAYS AUDIO)
21   Q.   Did – isn't it true you reference crawling,
22   that the victim was crawling in that video clip?
23   A.   Yeah.
24   Q.   Isn't that true that's not even a detail that
25   you told Detective York?

Page 72

1    A.   Yeah, I guess it's just the detail I threw in
2    on my own, but, I mean, everything else was just – I
3    was just basically repeating what I was told in the
4    beginning. And then, I mean, in the end, I finally just
5    decided to come out and tell the truth, that I just
6    pretty much was, like, led on to say the things I was –
7    doesn't say in my statement, give the details.
8    Q.   Did Detective York say anything to you to make
9    excuses for Jonathan?
10   A.   No.
11   Q.   Did – when you repeated these details to the
12   investigators, why did you – what's your testimony why
13   you did that?
14   A.   Just trying to get it over with. I mean, I
15   was just trying to stick to the same statement. And at
16   that time, I mean, I wasn't willing to just tell the
17   truth and say that I was told what to say pretty much.
18   I mean, I just was still trying these details just
19   trying to get it over with, wanting everybody to leave
20   me alone.
21       MS. ROBINSON STAPLES: Derrick, I think she's
22   now answered that question about ten times.
23   Q.   Okay. Do you recall going off script at all
24   to this investigator about whether or not what –
25   whether or not that statement to you – your statement

Page 73

1    to York was true?
2    A.   What do you mean?
3    Q.   I'm sorry. That was a bad question. Do you
4    remember going off script with your statement to these
5    investigators to maybe excuse Jonathan Taylor's conduct?
6    A.   No. I mean, I wasn't trying to make no
7    excuses for him.
8    Q.   And why would you not be trying to come up
9    with excuses for him?
10   A.   He wasn't nothing to me for me to make excuses
11   for nothing he done, and he wasn't my responsibility.
12   Q.   Didn't you tell the investigator that you
13   didn't think he did it because he's not the type?
14   A.   I did say that after I said the truth, that it
15   was – that I was told what to say. But, I mean, I just
16   told them so that they would leave me alone. I just
17   wanted them to stop coming around and harassing me, I
18   felt like.
19   Q.   So your statement is, you said you didn't
20   believe Jonathan Taylor did it because he's not the
21   type. Your testimony is, you didn't say that until
22   2015?
23   A.   When I –
24       MS. ROBINSON STAPLES: Derrick, she has said
25   over and over that she cannot recall all the

Page 74

1    specifics. So I don't remember – did you play
2    that in that statement?
3         MR. WRIGHT: I'm – I think I'm allowed to ask
4    her her memory, and if she doesn't, I'll play it.
5         That's classic impeachment. I understand.
6         MS. ROBINSON STAPLES: And she's told you,
7    though, that she cannot remember all the specific
8    details, so...
9    A. I don't remember when I told that to one
10   investigator. I mean, I don't remember when I said it.
11 BY MR. WRIGHT:
12   Q. Did you ever tell the investigator that you
13 didn't know if you could believe the statement because
14 Taylor was intoxicated?
15   A. Do what?
16   Q. Did you ever tell an investigator that you
17 didn't believe Taylor's statement because he was
18 intoxicated?
19   A. That was just – I mean, I'm – that was just
20 made up pretty much trying – I mean, I don't remember
21 when I told him that, but if I did, when I did, I mean,
22 I don't...
23   Q. Didn't you tell the investigator that you
24 thought Taylor was covering up for somebody else?
25   A. I don't recall –

Page 75

1        MS. ROBINSON STAPLES: Objection.
2    A. – saying that.
3    Q. And that's fine. If you don't recall, that's
4    fine.
5    A. I don't recall.
6    Q. Do you recall that – telling the
7    investigator, saying that if Taylor did it, he was not
8    in his right state of mind?
9    A. I mean, I – I don't remember. I mean, I
10 don't remember hardly any of the conversations with, I
11 mean, hardly anybody no more. I don't know if any of
12 you-all could, but I can't hardly remember that far
13 back. I mean... I'm sure if it's in the statement, I
14 probably said it, yeah.
15   Q. So if you were afraid to not tell the truth,
16 why would you come up with these new excuses for
17 Jonathan Taylor?
18   A. I wasn't trying to excuse him for nothing. I
19 was just trying to get out of the middle of it period.
20   Q. By coming up with new excuses, weren't you
21 getting more –
22   A. New excuses?
23   Q. – in the middle of it?
24       MS. ROBINSON STAPLES: Objection to form –
25   A. I don't know.

Page 76

1        MS. ROBINSON STAPLES: – and asked and
2    answered.
3    A. I don't know.
4        MR. WRIGHT: Could you play clip 8?
5        (PLAYS AUDIO)
6    Q. Is that your voice on the recording?
7    A. Yes, sir.
8        MR. WRIGHT: Would you play clip 9?
9        (PLAYS AUDIO)
10   Q. Is that your voice on the recording?
11   A. Yeah, that's when I was confused about whether
12 to step up and tell the truth about the statement that I
13 had gave or not. And, I mean, my parents ended up
14 having to step in to get the – and my dad, I think,
15 told a couple of investigators that I wasn't up for
16 talking a couple times just because I was getting too
17 stressed out with it all and I just wanted it to be
18 over.
19   Q. So now your testimony is, you became confused
20 about whether or not to tell the truth in these
21 statements?
22       MS. ROBINSON STAPLES: Objection. She did not
23    say that.
24   A. I don't – no. I don't – I don't know what
25 you're saying

Page 77

1        MR. WRIGHT: Could you play clip 10?
2        (PLAYS AUDIO)
3    Q. Is that your voice?
4    A. Yeah, that's my voice.
5        MR. WRIGHT: Could you play clip 11?
6        (PLAYS AUDIO)
7        MR. WRIGHT: All right. And could you play
8    clip 12?
9 BY MR. WRIGHT:
10   Q. Well, before we move on, in that audio clip,
11 was that –
12   A. Uh-huh (affirmative).
13   Q. – your voice on the recording?
14   A. Yeah.
15       MR. WILLIAMS: 12?
16       MR. WRIGHT: Yes, please.
17       (PLAYS AUDIO)
18   Q. Is that your voice in the clip?
19   A. Yeah.
20   Q. And in that clip, you're trying to tell the
21 investigator that he never intended to kill her, just
22 rob her?
23   A. I don't – I mean, I – I know I said it
24 because it's on the recording, but, I mean, I don't know
25 what specific answer to give you why I did. I mean, I

Page 78

1   don't even know -- I don't remember what year that --
2   that that conversation even occurred. Do you know?
3       Q.   Yeah, we can play --
4            (PLAYS AUDIO)
5       Q.   So that -- on the recording, the investigator
6   says, I believe, July 30, 2013.
7            Did you hear that?
8       A.   Yeah.
9       Q.   Does that sound about right to you?
10      A.   Yeah.  And the investigator had asked me
11  questions, like, if I thought he was that type of person
12  to do it, so I -- and the questions that led to them
13  answers, that's why I give them answers or -- and then -
14  - but me saying that I don't think he's that type of
15  person or nothing, I wasn't making excuses for nobody.
16  But, I mean, that should prove a point, that I didn't --
17  wasn't saying that he told me them things, that I was
18  told what to say pretty much, because I thought he was a
19  different type of person.  I mean, I didn't say he
20  confessed nothing to me.  I mean, I was told what to
21  say, and that's what I said.  Then the investigator
22  asked me if I -- what type of person I thought he was,
23  and I told them.
24      Q.   So you would agree with me, though, that the
25  excuses we talked about, not the type, intoxicated,

Page 79

1   covering up, not the right state of mind, you never
2   mentioned that to Detective York, correct?
3       A.   Well, I mean, I don't -- I don't remember if I
4   mentioned it to him or not.  I don't -- I don't know if
5   I did or if I didn't.
6       Q.   Okay.  But you did reference it to him in
7   2013, correct?
8       A.   Because that's the questions he asked me,
9   yeah.
10      Q.   So you made up these excuses, but you did not
11  tell -- the first time you told anybody that York told
12  you what to say was January 2015 when you met with Josh
13  Powell; isn't that true?
14      A.   Yeah.
15      MS. ROBINSON STAPLES:  Objection.  That is not
16  --
17      THE WITNESS:  Or --
18      MS. ROBINSON STAPLES:  -- what the record will
19  reveal -- or what the record reveals.  As you know,
20  in -- later in this tape, she talks about being
21  prepped by Detective York.
22      MR. WRIGHT:  Well, I think you've
23  misrepresented the record, but we can move on.
24  BY MR. WRIGHT:
25      Q.   Isn't it true that you told the -- this

Page 80

1   investigator that you were looking for somebody to talk
2   to about the Taylor case?
3       A.   What do you mean specifically by that?
4       Q.   I don't know.  You told -- you said on the
5   tape that you're looking for somebody to talk to.  Is
6   that -- do you recall saying that?
7       A.   No, I don't recall saying that, but if I did,
8   I probably meant someone to tell the truth to about the
9   statements and things that happened.
10      Q.   But you didn't tell him the truth then
11  according to you, right?
12      A.   I might not have felt comfortable with him, I
13  don't know, with telling him --
14      Q.   But you made --
15      A.   -- at the time.
16      Q.   But you made up new excuses for it; is that
17  true?
18      A.   I just answer the questions --
19      MS. ROBINSON STAPLES:  Asked and answered.
20      A.   -- that I was asked.
21      Q.   Okay.
22      MR. WRIGHT:  Could you play clip 5?
23           (PLAYS AUDIO)
24      Q.   Is that your voice in the recording?
25      A.   Yeah.

Page 81

1       Q.   And when he first asked if Detective York lied
2   to you, you didn't give a -- an affirmative answer, did
3   you?
4       A.   What, a yes or no?
5       Q.   Right.
6       A.   No.  I mean --
7       Q.   But isn't it true he --
8       MS. ROBINSON STAPLES:  Let her finish her
9   statement, please.
10      Q.   That's fine.  Go ahead.
11      A.   I was just going to say that, no, I didn't
12  give a yes-or-no answer, but, I mean, I -- I don't --
13  when I talk, I don't talk proper.  Like if I'm asked a
14  question, I don't give a straight yes-or-no answer
15  sometimes and stuff, and when I didn't understand his
16  specific question, answer with a specific answer.
17      Q.   Isn't it true that investigator for Jonathan
18  Taylor coaxed you to say detective lied to you?
19      MS. ROBINSON STAPLES:  Objection.
20      A.   Well, no.
21      MS. ROBINSON STAPLES:  That is not what
22  happened in that video -- audio.
23      A.   No.
24      Q.   You disagree with that?
25      A.   Yeah.  He just reworded the questions in a --

Page 82

1   the way I understood.
2       Q.   Now, the statement to Josh Powell, do you
3   recall that being his name?
4       A.   To who?
5       Q.   Josh Powell.  This was your --
6       A.   When?
7       Q.   -- last statement.
8       A.   The last one?  I remember that guy.
9       Q.   Yeah.
10      A.   I mean, I kind of remember him a little bit.
11      Q.   Okay.  Do you remember -- is that his name?
12      A.   I'm pretty sure, yeah.
13      Q.   Okay.  And does it sound right that that would
14  have been in January 2015?
15      A.   Yeah.
16      Q.   And he would have been meeting you in jail at
17  that time, right?
18      A.   Yeah.
19      Q.   Do you remember what you were in custody on?
20      A.   No.  I'm not for sure what I was in there on.
21      Q.   Is it true that you were detoxing at that
22  time?
23      A.   That I was detoxing?  I don't know how many
24  days I had been in jail or if I was done detoxed or -- I
25  mean, I don't remember the time or what I was arrested

Page 83

1   for to know if I was even detoxing.
2       Q.   Have you ever had to go through detox?
3       A.   Yeah.
4       Q.   How does it feel?
5       A.   It's terrible.
6       Q.   Do you feel weak?
7       A.   You just -- your body aches and hurts is about
8   it.  I mean, other than just pain in your body, there's
9   not really much to detox.
10      Q.   And for somebody who's never been through it,
11  does it -- is it like the flu pain?  Can you compare it
12  to something?
13      A.   Your muscles just ache and stuff.  I mean,
14  it's kind of like a -- just like -- I guess if you got a
15  bad flu, yeah, and you're aching all over and stuff,
16  then, yeah.  I mean, I don't really know how to compare
17  it, what to compare it to.
18      Q.   I think you said it might be like a bad flu?
19      A.   Yeah.
20      Q.   You weren't detoxing when you talked to
21  Detective York, right?
22      A.   No.
23      Q.   And to your -- best of your memory, you
24  weren't detoxing when you spoke to the investigators in
25  2013, were you?

Page 84

1       A.   Not -- no, not that I'm aware.
2       Q.   But if you told Josh Powell on the recording
3   that you were going through detox, you would have no
4   reason to dispute that, would you?
5       A.   No.  I mean, if I told him, then I was, but I
6   don't recall.  I mean, I don't remember the day.
7       Q.   And just as a side note, you've mentioned
8   you've been through detox.  When did you, to your memory,
9   did you start abusing substances?
10      A.   When I found out my mom was sick with cancer,
11  I done it to just not have to deal with it.  So
12  probably, I don't know, 2011 or '12.
13      Q.   And I -- did you do that to -- for the pain,
14  the emotional pain, or to get high?
15      A.   The --
16          MS. ROBINSON STAPLES:  Objection to relevancy.
17      A.   The emotional.  I mean, to deal with the
18  emotional pain with my mom, I guess.  That's why I
19  started abusing drugs, was over my mother.
20      Q.   Is it fair to say that when you gave your
21  statement to Detective York in March of 2012, you
22  weren't in jail, were you?
23      A.   No.
24      Q.   And to your memory, did you have any criminal
25  charges against you at that age?

Page 85

1       A.   No.  I mean...
2       Q.   In 2013, when you spoke to these
3   investigators, to your memory, were you in jail at that
4   time?
5       A.   No, not in 2013.
6       Q.   Do you know whether you were facing any
7   charges?
8       A.   I don't know.
9       Q.   But it is true that after 2013, you were in
10  and out of jail, weren't you?
11      A.   Yeah.
12      Q.   And would it be fair to say that by the time
13  Josh Powell saw you in January 2015, you told him you
14  couldn't stay out of jail; is that fair?
15      A.   I mean, yeah, it was just something I said,
16  because I felt like I was going in and out an awful lot.
17  You don't even really have to do nothing to go to jail
18  around here.
19      Q.   And you referenced a reward, but you never
20  received a reward, right?
21      A.   No.
22      Q.   And by January 2015, did you have any
23  expectation of a reward?
24      A.   No.
25      Q.   So you didn't have anything to gain to stand

Page 86

1 by your statement to Jonathan Taylor, did you?
2      MS. ROBINSON STAPLES: Objection to form.
3     A. What do you mean, to stand by my statement to
4 Jonathan?
5     Q. You weren't going to get a reward? You had no
6 expectation of a reward, right?
7     A. No.
8     Q. And, in fact, at that point, you had said you
9 had been in and out of jail, right?
10     A. Uh-huh (affirmative).
11     Q. Yes?
12     A. Yes.
13      MS. ROBINSON STAPLES: Asked and answered.
14     A. I'm sorry.
15     Q. And you had said that in jail, it's dangerous
16 to be an informant, isn't it?
17     A. Yeah.
18     Q. Yeah. So isn't it true the reason you took
19 back that statement was because you didn't want to be an
20 informant being in jail?
21     A. No.
22     Q. That's not it?
23     A. No. I don't really – I mean, that kind of
24 offended me a little bit.
25     Q. I'm sorry. I – I'll move on. If the

Page 87

1 statement to Detective York was all a lie, as you say,
2 did you feel any guilt or remorse about it?
3     A. What do you mean? About what? About the –
4 about giving the statement with his details and stuff?
5 I mean, yeah, I started feeling bad for lying, I felt
6 like.
7     Q. Is it true that Taylor never laid a hand on
8 you?
9     A. I mean, I was never his girlfriend for him to
10 put his hands on me.
11     Q. Haven't you – and I meant not lay a hand on
12 you in a romantic way, but in a – like an assault.
13     A. That's what I mean, though. He's never had a
14 reason to. I mean...
15     Q. And haven't you described Taylor as sweet as
16 could be?
17     A. I mean, he's a nice person. I mean, he was
18 back then. I mean, I never seen him be mean to nobody.
19     Q. So if you – so if that statement was a lie
20 that you're saying it was against Taylor, would you have
21 taken that reward money?
22     A. What do you mean? So the statement that I
23 gave York? If I – I mean, I felt like he was offering
24 me the reward to say what he wanted me to say in my
25 words, is kind of what I felt like.

Page 88

1     Q. So would you have taken the reward money if it
2 were given to you?
3     A. Why, yeah.
4     Q. Even though you felt – even though you
5 believed it was a lie?
6     A. Yeah, I mean, because he pretty much, I felt
7 like, was going to pay me to say it. I don't know. And
8 I was scared on top of that over the charges and stuff
9 that he was threatening. I mean, I was a poor person.
10     Of course, I would have took the reward.
11     MR. WRIGHT: No further questions.
12     CROSS EXAMINATION
13 BY MR. WILLIAMS:
14     Q. Ms. Simpson?
15     A. Yes.
16     Q. Good afternoon. I know we've been going a
17 while, but at the beginning, I let you know that I
18 represent Knox County former sheriff, John Pickard –
19     A. Yeah.
20     Q. – and Derek Eubanks?
21     A. Yes.
22     Q. I'm going to try not to ask you anything
23 you've already been asked, okay?
24     A. Okay.
25     Q. But it's been – we've been here for a while,

Page 89

1 so if I stray into something you've already said –
2     A. I know.
3     Q. – you'll have to forgive me ahead of time.
4 First of all, during your testimony here today, I
5 haven't heard any reference to the folks that I
6 represent.
7     A. Yeah.
8     Q. Would you agree with that?
9     A. Yes.
10     Q. During the times you met with Detective York,
11 whether at your home to receive a subpoena or during his
12 interview of you that was recorded, other than the lady
13 from your school, Rhonda Abner, was anyone else present?
14     A. No.
15     Q. Have you ever met John Pickard?
16     A. No, I've never personally had any run-ins with
17 him or nothing, but I know who he is.
18     Q. Okay. Now – and by that, you mean you know
19 he's the former sheriff –
20     A. Yeah.
21     Q. – of Knox County?
22     A. Yes.
23     Q. He's never been involved in any arrests that
24 you've been a party to?
25     A. No.

Page 90

1    Q.  How about Derek Eubanks?  Do you know Derek?
2    A.  No, I've never even seen him or – I don't
3  know him at all.
4    Q.  Okay.  Have you had any prior arrests that
5  involve the Knox County sheriff's department?
6    A.  Knox County sheriff's department?  I don't
7  think I've ever been arrested by the Knox County
8  Sheriff's Office.  I'm not positive, but I don't think
9  so.
10    Q.  All right.  Well, and that's why I'm asking,
11  because it's my one chance to talk to you.
12    A.  Okay.
13    Q.  So if you have any information about any of
14  those parties, it's my chance to get to ask you –
15    A.  Okay.
16    Q.  – about it, okay?  So as I understand it,
17  then, you don't have anything to say here today about
18  the folks that I represent –
19    A.  No, sir.
20    Q.  – is that fair?  Okay.
21    A.  Uh-huh (affirmative).
22    Q.  You said that Rhonda Abner was a guidance
23  counselor at the school?
24    A.  Yes.
25    Q.  And she was present during Detective York's

Page 91

1  interview of you?
2    A.  Yes.
3    Q.  The whole time?
4    A.  Yes.
5    Q.  Do you remember anything she said during the
6  interview?
7    A.  I don't think she spoke.  I think she just sat
8  there and listened.
9    Q.  Okay.  Now, do you know William Lester?
10    A.  No.  Not personally, no.
11    Q.  Okay.  Do you know Amanda Hoskins?
12    A.  I knowed of her because it was Jonathan's
13  cousin, but, no.  I mean, I never personally hung out
14  with her or knowed her really.
15    Q.  Never spoken with her?
16    A.  I mean, I'm sure if I'd, you know, spoke to
17  her on the way by or something, but, no, I've never sat
18  down and had a conversation with her.
19    Q.  Was she – I'm sorry – was she ever at
20  Jonathan's place?
21    A.  She showed up once or twice.  Straight in,
22  straight back out.  Come in and talked to him for a
23  second and straight back out.
24    Q.  During the time that you were living close to
25  Jonathan Taylor, was he a drug user?

Page 92

1    A.  Sometimes I think he did, yeah, but not all
2  the time I don't think he was.
3    Q.  What drugs do you have knowledge of him using
4  at the time that he lived near you?
5    A.  Maybe Roxy 30s, but I don't think he used them
6  all the time.  I think it was just every now and then.
7    Q.  Did William Lester ever come over to his
8  place?
9    A.  No, not that I'm aware of.
10    Q.  Have you ever told any police officer that you
11  think that Amanda Hoskins or William Lester was involved
12  in the Katherine Mills murder?
13    A.  No.
14    Q.  You've never – have you ever told anyone
15  that, police or otherwise?
16    A.  I mean, I've never really been questioned over
17  nobody other than Jonathan really, because that's the
18  only one I ever knowed.  But, no, I've never told no
19  one.  It's in my statement from York, but it's pretty
20  much what he had told me.  So that's the only reason
21  it's stated in that.
22    Q.  Did you know Katherine Mills?
23    A.  No.
24    Q.  You had mentioned some testimony about – and
25  I'm just kind of paraphrasing here, but Detective York

Page 93

1  had mentioned something about your brother getting out
2  of jail –
3    A.  Yeah.
4    Q.  – correct?
5    A.  Yeah.
6    Q.  Did your brother get out of jail?
7    A.  Not by Detective York.  The charges was later
8  dropped.  Like the next day or so after he was posted,
9  the charges was dropped on everyone in the case.
10    Q.  Do you have any children?
11    A.  No.
12    Q.  You had mentioned your current girlfriend,
13  correct?
14    A.  Yeah.
15    Q.  Who are your prior girlfriends?
16    A.  Well, I don't really have no prior – not many
17  prior girlfriends.  One was back when I was younger.
18  There's one named Danielle Corzine, but she's dead.  And
19  I was a – used to date boys when I was younger, so I
20  don't really have many prior girlfriends.  The only
21  prior boyfriend I ever really had was Dustin Messer.
22    Q.  Okay.  During what time were you and Dustin in
23  a relationship?
24    A.  About 2000 – maybe '14 or – well, from,
25  like, 2013 maybe to '15 or – yeah.

Page 94

1   Q.  2013 to approximately '15?
2   A.  Yeah, something like that, or maybe before.
3   It was right after all this started happening when I got
4   with him, and I was with him up until 2015.
5   Q.  Did you ever discuss with Dustin the things
6   that you're discussing here with us today?
7   A.  No, not really.  Uh-uh (negative).
8   Q.  Does "not really" mean, no, you never did, or
9   something –
10  A.  No, I never discussed details or nothing like
11  that with him at all.
12  Q.  Did you ever discuss with him that you had
13  given a statement to Detective York?
14  A.  He knowed about it, yeah, but I never told –
15  I think I told him that the statement was – or that the
16  statement was, you know, false and York had given him the
17  details, but he wasn't much in on the conversation
18  wanting to talk about it.
19  Q.  Where does Dustin live now, if you know?
20  A.  I don't know.
21  Q.  Now, you've been asked a number of questions
22  about statements you've given to Detective York –
23  A.  Yeah.
24  Q.  – and defense lawyers for Ms. Hoskins or
25  Mr. Taylor and then this last statement that you gave to

Page 95

1   Mr. Powell.
2       MS. ROBINSON STAPLES:  Jason, for the record,
3   those are defense investigators, not lawyers.
4       MR. WILLIAMS:  I'm sorry.  Thank you for the
5   correction.
6   BY MR. WILLIAMS:
7   Q.  Defense investigator for Ms. Hoskins and
8   Mr. Taylor.  And then you also gave a statement to an
9   investigator named Josh Powell, correct?
10  A.  Yes.
11  Q.  And we've listened to some of that recording
12  today.
13  A.  Yeah.
14  Q.  Did you know Mr. Powell was coming to see you?
15  A.  No.
16  Q.  He just showed up out of nowhere?
17  A.  Yeah.
18      MS. ROBINSON STAPLES:  Jason, I don't believe
19  we listened to the recording from Josh.  The
20  recording that was played was an interview with
21  Dale Dorning.
22      Correct, Derrick?
23      MR. WRIGHT:  Yeah, that's right.
24      MR. WILLIAMS:  Thank you for clarifying.
25      MR. WRIGHT:  But I think it was confirmed that

Page 96

1   there was a recording, but I'm not – I'm not for
2   sure about that.
3   BY MR. WILLIAMS:
4   Q.  Did you know Mr. Powell was coming to see you?
5   A.  No.
6   Q.  During that conversation, though, with him,
7   you – that's when you started talking about Detective
8   York and him supplying you information –
9   A.  Yeah.
10  Q.  – for lack of a better way to put it,
11  correct?
12  A.  Yeah.
13  Q.  What was it about that interview that you
14  decided to change your story?
15  A.  I was just under a lot of stress about it all,
16  and I was just ready to come out and tell the truth so
17  that it would be done with and I would, you know, have
18  it off my chest about it all and would feel better.
19  Q.  You had pending charges at that time?
20  A.  Yeah.
21      MR. WILLIAMS:  That's all I have, ma'am.
22  Thank you.
23      THE WITNESS:  Okay.  You're welcome.
24          CROSS EXAMINATION
25  BY MR. FARAH:

Page 97

1   Q.  Ms. Simpson, I'll be very brief.  I represent
2   Mike Broughton and the City of Barbourville Police
3   Department, so all of my questions are going to kind of
4   like be Jason's, limited to them, okay?
5   A.  Okay.
6   Q.  This interview you had with Detective York
7   that you've talked about extensively today, Mike
8   Broughton was not present, correct?
9   A.  No.
10  Q.  No member of the Barbourville Police
11  Department was present, correct?
12  A.  No.
13  Q.  Later, you said York came to your house to
14  serve a summons later – after the interview, correct?
15  A.  Yes.
16  Q.  Neither Mike Broughton or anyone with
17  Barbourville was present during that visit, correct?
18  A.  No.
19  Q.  Have you had any interaction – as it relates
20  to the Katherine Mills investigation and prosecution, or
21  the murder investigation, have you had any interaction
22  or have you spoken to Mike Broughton or anybody with the
23  Barbourville Police Department?
24  A.  No.
25  Q.  Do you have any knowledge – I'm trying to be

Page 98

1 as broad as I can with this question – do you have any
2 knowledge about any involvement by Mike Broughton, or
3 any member of the Barbourville Police Department, in the
4 Katherine Mills murder or investigation?
5   A. No.
6   Q. You talked very candidly earlier that you had
7 had a lot of criminal charges in the past, correct?
8   A. Yes.
9   Q. I noted in some of the records that several
10 times you were arrested for various charges by various
11 members of the Barbourville Police Department, correct?
12   A. Yes.
13   Q. Those all appear to be after the Katherine
14 Mills murder, like in the 2012, '13, '14-time period?
15   A. Yes.
16   Q. My question is: During any of those arrests,
17 was there any reference or discussion concerning the
18 Mills murder, Jonathan Taylor, Amanda Hoskins, anything
19 involving that murder?
20   A. No, sir.
21     MR. FARAH: That's all I have.
22     THE WITNESS: All right.
23        CROSS EXAMINATION
24 BY MR. WEBER:
25   Q. Ms. Simpson, I represent some KSP, Kentucky

Page 99

1 State Police, troopers, Mark Mefford, Bryan Johnson –
2 there's five of them, so I'm just going to list them all
3 right away.
4   A. Okay.
5   Q. Jackie Joseph Pickrell, Dallas Eubanks, and
6 Kelly Farris, okay?
7   A. Okay.
8   Q. I don't believe their names have been brought
9 up at all today so far, have they?
10   A. No.
11   Q. And were any of those individuals, and if you
12 need me to repeat the names, just let me know – were
13 they present at any of your – either of your interviews
14 with Detective York?
15   A. No.
16   Q. What about when, I think you said, Detective
17 York served you a summons?
18   A. No. It was just him.
19   Q. Have you had any interactions with Mark
20 Mefford relating to this case?
21   A. No.
22   Q. What about Bryan Johnson?
23   A. No.
24   Q. Jackie Joseph Pickrell?
25   A. No.

Page 100

1   Q. Dallas Eubanks?
2   A. No.
3   Q. Kelly Farris?
4   A. No.
5   Q. Have you met any of those individuals before?
6   A. I don't think so. Kelly Farris, my dad might
7 have had a few run-ins with back in the day, but, no,
8 I've never personally had any. I don't know any of
9 them. I don't think I've ever met none of them.
10   Q. Okay. And what about Kentucky State Police
11 Trooper Jason Bunch?
12   A. Jason Bunch? The name sounds familiar, but I
13 don't recall nothing – having no run-ins with him or
14 nothing.
15   Q. Wasn't present during any of the interviews?
16   A. No. He wasn't present, no. None of them was.
17   Q. Okay. And I want to ask you about something
18 that you testified to early, because I may have misheard
19 it or – I want to make sure I heard it correctly, okay?
20   A. Okay.
21   Q. So you said you met with Ms. Staples back in
22 2017; is that correct?
23   A. Yes.
24   Q. And was that – you've only met with her one
25 time?

Page 101

1   A. Yes.
2   Q. Okay. Have you spoke with her over the phone
3 as well outside of that one time meeting her?
4   A. Yeah. I mean, just to set up a ride to get
5 here is all, and just – I mean, that's about it. We
6 just –
7   Q. A ride to get her today for the –
8   A. Yeah.
9   Q. – for the deposition?
10   A. Yeah.
11   Q. Do you remember when, approximately, you would
12 have spoken to her about that?
13   A. Yesterday. She was helping me set up the ride
14 to make sure I could get here today.
15   Q. Okay. And what else – did you speak about
16 anything else besides setting up the ride?
17   A. Oh, she just told me that there would be the
18 lawyers present and her, and she would have to ask me
19 some questions, and then you-all would, but nothing
20 other than that.
21   Q. Okay. And the other individual that was in
22 here, Mr. Slosar –
23   A. Yeah.
24   Q. – you, I believe, testified you have never
25 met with him?

Page 102

1    A.  I never met or spoke to – with him until
2  today.
3    Q.  You never communicated with him at all?
4    A.  No.
5    Q.  Okay.  When you did either meet or when you
6  spoke with Ms. Staples, did you discuss with her any of
7  your meetings with any of the investigators?
8    A.  No.
9    Q.  Was it not brought up at all?
10    A.  It wasn't brought up at all.
11    Q.  Okay.  And then – did you – and you may have
12  testified to this earlier.  I just want to remember.
13  Did you speak about your meeting with Detective York
14  back in 2012, the statements?
15    A.  I don't remember the specific thing, but when
16  she come to the jail, she had just, I – I think, had
17  mentioned something about we was – they would – we
18  would have to meet.  When I got out of jail, there would
19  have to be a meeting to discuss, you know, my statements
20  and stuff.  But we didn't even go over – we didn't go
21  over no statements or nothing.  She was just telling me
22  we would have to have a meeting once I was released from
23  jail.
24         MR. WEBER:  Okay.  I think that's all the
25    questions I have.  Thank you.

Page 103

1         THE WITNESS:  All right.  Thank you.
2         MS. ROBINSON STAPLES:  I have a few follow-up
3    questions, but if we could take just like a two-
4    minute break, I would appreciate that.
5         MR. WEBER:  No problem.
6         MS. ROBINSON STAPLES:  Thanks.
7         VIDEOGRAPHER:  We are off the record at 12:05.
8         (OFF THE RECORD)
9         VIDEOGRAPHER:  We are back on record at 12:07
10    p.m.
11  BY MS. ROBINSON STAPLES:
12    Q.  Okay.  Amber, I just have a few follow-up
13  questions for you.  I'm going to try to –
14    A.  Okay.
15    Q.  – make it as quick as I can.  There's been a
16  lot of discussion today about the statements you've
17  given and your memory –
18    A.  Yeah.
19    Q.  – regarding those statements.  So I just want
20  to make sure we're clear on the record.  Did Jonathan
21  Taylor ever confess to you about having anything
22  whatsoever to do with the death of Katherine Mills?
23         MR. WRIGHT:  Object to form.
24    A.  No.
25    Q.  Can you recall the meeting that you had with

Page 104

1  Detective York at the Knox County school?
2    A.  Yeah.
3    Q.  And you said you were 17 then?
4    A.  Yeah.
5    Q.  And you testified earlier that you were
6  scared?
7    A.  Yeah
8         MR. WRIGHT:  Object to form.
9    Q.  And you were scared because he had threatened
10  to bring charges against you, correct?
11         MR. WRIGHT:  Object to form.
12    A.  Yes.
13    Q.  Based on the threats of bringing charges and
14  also the promises he made, did you say what he wanted
15  you to say during this statement?
16         MR. WRIGHT:  Object to form.
17    A.  Yes.
18         MR. WEBER:  Join.
19    Q.  And the statement that is written here –
20    A.  Yeah.
21    Q.  – that Detective York typed up –
22    A.  Uh-huh (affirmative).
23    Q.  – that statement is false –
24    A.  Yes.
25    Q.  – is that correct?

Page 105

1         MR. WRIGHT:  Object to form.  Leading.
2    Q.  Now, there have been questions about your
3  conversations with some of the other investigators
4  throughout the years.
5    A.  Yeah.
6    Q.  And you've stated that you can't recall all of
7  the specific details; is that right?
8    A.  Yes.
9    Q.  If you had told any of those investigators
10  that Jonathan had confessed to you, at any time, would
11  that be a lie?
12    A.  Yeah.
13    Q.  And why would you have told them that?
14         MR. WRIGHT:  Object to form.
15    A.  Just trying to stick with the same story that
16  – from the statement from mine and York's conversation.
17    Q.  You heard the – part of your interview with
18  Investigator Dorning.  You didn't hear the whole thing.
19  But if I were to tell you that in that audio, you say
20  that you felt like Detective York was prepping you and
21  priming you as to what to say during this first
22  statement with him, would you agree with that?
23    A.  Yeah.
24         MR. WRIGHT:  Object to form and foundation.
25    Leading.

Page 106

1    MR. WEBER: Join.
2 BY MS. ROBINSON STAPLES:
3    Q.  There was a question about -- or some
4 questions about you detoxing. Even if you were detoxing
5 when you talked to Josh Powell and told him that JT had
6 never confessed, would that in any way affect your
7 ability to tell the truth?
8    MR. WRIGHT: Object to form.
9    A.  No.  Detoxing won't.
10    Q.  Do you think you will ever forget what
11 Detective York did to you that day?
12    MR. WRIGHT: Object to form.
13    A.  No.
14    Q.  Do you think you'll ever forget that he
15 offered you a reward for $10,000 to say what he wanted
16 to hear?
17    A.  No.
18    MR. WRIGHT: Object to form.
19    Q.  Do you think you'll ever forget that he
20 promised to get your brother out of jail that day if you
21 said what he wanted to hear?
22    A.  No.
23    MR. WRIGHT: Object to form.
24    Q.  Do you think you will ever forget that he
25 threatened to bring charges against you if you did not

Page 107

1 give him the information he wanted to hear?
2    MR. WRIGHT: Object to form.
3    A.  No.
4    Q.  And the information that you provided that day
5 was information that Detective York provided to you?
6    MR. WRIGHT: Object to form.
7    A.  Yes.
8    MS. ROBINSON STAPLES: That's all the
9 questions I have.
10    THE WITNESS: All right.
11    MR. WRIGHT: Just a couple of follow-ups on
12 that.
13        RECROSS EXAMINATION
14 BY MR. WRIGHT:
15    Q.  She referenced "prepping" and "priming," I
16 believe. Do you recall the question and answer?
17    A.  Yeah.
18    Q.  Do you recall who said that? Was that the
19 investigator or you? Do you have any memory?
20    A.  I don't remember who asked or if I just
21 straight out forward come out and told him, or if he
22 asked. But I think I just was telling him.
23    Q.  And --
24    A.  Think I'm the one that offered the
25 information.

Page 108

1    Q.  But you didn't offer the information that
2 Detective York had told you those details? You didn't
3 say that, did you?
4    A.  I don't recall, I mean, if I said that in that
5 conversation or not.
6    Q.  You told -- we listened to it. You told Dale
7 Dorning that Jonathan Taylor told you those details;
8 isn't that true?
9    A.  Yeah, that's true, but that wasn't the truth.
10 I mean, are we talking about the same conversation, I
11 mean, where in the end I tell him that I feel like York
12 was prepping me, or is that the same conversation I had
13 listened to?
14    Q.  Who do you recall this prepping and priming
15 conversation being with?
16    A.  That's -- I was just asking if the recording I
17 listened to -- who was that with? The Dale Dorning?
18    Q.  Yes.
19    A.  Okay. And ain't it in the end of it where I
20 tell him about the prepping and stuff?
21    Q.  I don't know. Are you saying you did it at the
22 end of the interview? Do you have an independent memory
23 of that?
24    A.  No. I mean, I'm -- I didn't get to listen to
25 the full recording, and I don't understand that question

Page 109

1 you asked me.
2    Q.  So you wouldn't know whether that was
3 referring to the rewards, so-called reward, saying, help
4 with the prosecution, correct?
5    A.  I don't know what I -- I mean, I don't -- when
6 I told him I felt like he was leading me or something, I
7 don't know what I -- I mean, if it would have been about
8 a -- the reward, we would have talked about the reward
9 in the recording, I think, because every time they asked
10 me about it, it was -- I mean, they specifically
11 mentioned the reward.
12    Q.  Okay. Last question: Do you have any reason
13 to believe that Jonathan Taylor committed the murder of
14 Katherine Mills?
15    A.  No.
16    MR. WRIGHT: No further questions
17    THE WITNESS: Thank you.
18    VIDEOGRAPHER: This ends the deposition of
19 Amber Simpson. We are off record. The time is 12:13
20 p.m.
21        (DEPOSITION CONCLUDED AT 12:13 P.M.)
22
23
24
25

Page 110

```
 1        CERTIFICATE OF REPORTER

 2        COMMONWEALTH OF KENTUCKY AT LARGE

 3

 4   I do hereby certify that the witness in the foregoing

 5   transcript was taken on the date, and at the time and

 6   place set out on the Title page here of by me after

 7   first being duly sworn to testify the truth, the whole

 8   truth, and nothing but the truth; and that the said

 9   matter was recorded stenographically and mechanically by

10   me and then reduced to typwritten form under my

11   direction, and constitutes a true record of the

12   transcript as taken, all to the best of my skill and

13   ability.  I certify that I am not a relative or employee

14   of either counsel, and that I am in no way interested

15   financially, directly or indirectly, in this action.

16

17

18

19

20

21

22   KELLEY BOHAN,

23   COURT REPORTER/NOTARY

24   COMMISSION EXPIRES:  05/19/2020

25   SUBMITTED ON:  05/02/2018
```

**Exhibits**

**EXHIBIT 1**

**EXHIBIT 2**

---

**$**

**$10,000** 21:24 53:4 106:15

**$100** 19:22

---

**1**

**1** 22:13,14 31:23

**10** 66:13 77:1

**10,000** 16:16

**10:06** 7:6

**10:37** 40:17,21

**11** 77:5

**12** 71:19 77:8, 15 84:12

**12:05** 103:7

**12:07** 103:9

**12:13** 109:19, 21

**12th** 26:21

**13** 98:14

**139** 27:22

**13th** 7:5

**14** 93:24

**14-time** 98:14

**1414A** 71:4

**15** 93:25 94:1

**15049** 16:23

**16** 9:17 20:21

**17** 9:17 14:6 50:19 54:5 57:1 104:3

**17-CV-** 7:11

**1:00** 70:18,20

---

**2**

**2** 65:6

**20** 9:18

**2000** 93:24

**2002** 22:22

**2010** 9:13,19

**2011** 17:9 84:12

**2012** 9:13 11:25 66:17 84:21 98:14 102:14

**2013** 23:10 34:2 60:14 61:14 62:13 66:13 69:16 78:6 79:7 83:25 85:2,5,9 93:25 94:1

**2014** 34:7 68:20

**2015** 23:25 24:2 34:3,7,11 46:20 73:22 79:12 82:14 85:13,22 94:4

**2016** 35:4,8

**2017** 27:9 29:14 30:24 35:15,18 100:22

**2018** 7:5

---

**3**

**30** 44:23 64:25 78:6

**30s** 92:5

---

**5**

**5** 80:22

---

**8**

**8** 76:4

**84** 7:12

---

**9**

**9** 76:8

**9647** 71:4

---

**A**

**a.m.** 7:6 40:21

**ability** 26:12 50:24 51:2 106:7

**Abner** 13:7 50:2,7 54:24 89:13 90:22

**abusing** 84:9, 19

**Academy** 12:4 49:23

**accused** 45:23 46:3,8

**ache** 83:13

**aches** 83:7

**aching** 83:15

**address** 28:13

**affect** 26:12 106:6

**affirm** 8:7

**affirmative** 13:18 19:19 77:12 81:2 86:10 90:21 104:22

**afraid** 75:15

**afternoon** 13:14 88:16

**age** 84:25

**agree** 71:10 78:24 89:8 105:22

**ahead** 12:14,17 14:20 15:9 65:14 81:10 89:3

**allegedly** 18:23

**allowed** 74:3

**alternative** 12:24

**Amanda** 7:9, 15 19:4,15 20:7,10 21:3 25:2 30:13 58:10,17 60:25 63:14 91:11 92:11 98:18

**Amanda's** 20:18 23:9

**Amber** 7:8 8:13 16:24 17:7,9,11 18:3,8 20:12 22:11 65:17,18 66:3 103:12 109:19

**amount** 68:2

**Amy** 7:14

**answers** 61:9 78:13

**apartment** 17:10 37:16 60:12,15 69:7

**appointment** 70:15

**approximately** 41:11 94:1 101:11

**April** 7:5 66:13

**arrested** 14:8 41:12 62:23 63:20 82:25 90:7 98:10

**arrests** 89:23 90:4 98:16

**assault** 87:12

**attempts** 64:21

**attending**

**11:13** 12:2

**attention** 45:24

**attorney** 25:25

**attorneys** 58:9

**audio** 71:5,7, 20 76:5,9 77:2, 6,10,17 78:4 80:23 81:22 105:19

**August** 29:14 30:24

**aware** 15:21 26:11,16 35:14, 22 60:24 84:1 92:9

**awful** 85:16

**awhile** 24:18 25:15 28:14

---

**B**

**back** 9:15 11:15 13:25 28:14,15 29:14 30:13 34:2 38:2 40:14,19,20 42:22 54:22 65:3,8 66:20 75:13 86:19 87:18 91:22,23 93:17 100:7,21 102:14 103:9

**background** 26:18,19

**bad** 33:24 36:23 59:16 73:3 83:15,18 87:5

**bags** 41:19,22 42:5,19

**Barbourville** 8:1 27:24 28:13 37:17 70:22 97:2,10,17,23 98:3,11

**based** 14:21 104:13

**basically** 66:8 72:3

**basis** 68:10 70:1

**bathroom** 63:3

**begin** 56:9

**beginning** 14:3 23:21 63:12 72:4 88:17

**behalf** 7:16,18, 20,23,25 60:25

**belief** 61:4

**believed** 88:5

**bell** 58:13

**big** 49:4

**bills** 19:22

**Bimble** 20:18

**bit** 11:15 17:5 26:18 31:12 33:13 37:11 41:22 49:13 82:10 86:24

**black** 20:14 21:1

**blue** 20:14,25

**Bobby** 39:8,11

**body** 83:7,8

**Bohan** 7:4

**booked** 34:22

**bother** 43:4 106:20

**bottom** 20:7

**boyfriend** 93:21

**boys** 93:19

**break** 9:2 31:20 70:4,9,12 103:4

**briefcase** 51:12

**briefly** 65:18

**bring** 42:20,24 104:10 106:25

**bringing** 104:13

**broad** 98:1

**brother** 10:3 14:7 21:21 38:22 51:23 52:6 54:3 93:1, 6

**brother's** 52:9

**brothers** 38:18 39:5 41:5

**brought** 22:24 31:6 32:1,21 47:15,20 50:4 99:8 102:9,10

**Broughton** 8:1 97:2,8,16,22 98:2

**Brown** 27:1,5

**Bryan** 7:21 99:1,22

**build** 63:2

**building** 45:22

**Bunch** 7:19 100:11,12

**busted** 38:1

---

**C**

**Caitlyn** 7:3

**call** 42:16,23 43:4 65:19

**called** 37:18 63:20,21 64:13 65:21

**calling** 64:2,6, 11 65:17

**cancer** 56:24 84:10

**candidly** 98:6

**car** 15:11 19:6 20:13,15,24 21:7 24:13

55:15

**card** 34:6

**care** 57:18

**carrying** 51:13

**case** 14:6,17, 21 23:1,6 30:18 80:2 93:9 99:20

**Casey** 39:8,12

**caught** 34:21 51:24

**caused** 68:13

**Cavalier** 15:13 20:14,17,22 21:1

**cell** 39:25 40:10,25 41:1,3

**Center** 29:13

**chance** 70:8, 11 90:11,14

**change** 41:19, 21 42:5 68:13 96:14

**changed** 42:18

**charge** 14:16 34:2,16,18,21, 25 35:15,17,20 51:24

**charged** 14:5 34:12 35:4,14 48:11,19 51:22 54:1

**charges** 11:11 12:19 14:9 22:1 30:13,16 35:25 36:1 52:9 54:3 84:25 85:7 88:8 93:7,9 96:19 98:7,10 104:10, 13 106:25

**chest** 96:18

**children** 93:10

**children's** 15:11 20:17 37:17

**chitchat** 51:20

**circle** 19:23

**city** 8:1 27:23 97:2

**clarifying** 95:24

**class** 50:6

**classic** 74:5

**clean** 41:15,22 45:5

**cleaned** 41:16, 18

**clear** 103:20

**clip** 71:18,19, 22 76:4,8 77:1, 5,8,10,18,20 80:22

**close** 41:13 42:1,2,3 91:24

**clue** 15:23

**coach** 62:14

**coaxed** 81:18

**Cody** 7:20

**color** 15:14 20:23

**colostomy** 41:19,22 42:5

**comfortable** 80:12

**committed** 109:13

**communicated** 102:3

**company** 43:9

**compare** 83:11,16,17

**completely** 68:25 69:2,25

**complex** 38:15,20 60:12, 15 69:7

**CONCLUDED** 109:21

**condition**

26:10,11 50:23 51:1 57:23

**conduct** 73:5

**confess** 11:1 103:21

**confessed** 24:23 45:15 66:6 78:20 105:10 106:6

**confession** 45:11

**confirmed** 95:25

**confuse** 69:14

**confused** 33:11 76:11,19

**confusing** 33:13

**confusion** 38:12

**contact** 29:19, 25 53:6,16

**contacted** 49:9

**contraband** 34:12,21,25

**conversation** 13:20 14:3 17:8,15 31:1 44:2 54:13 59:1 78:2 91:18 94:17 96:6 105:16 108:5, 10,12,15

**conversations** 44:1,17,18 53:19 75:10 105:3

**cook** 41:23 42:24

**cooperation** 52:3

**cop** 52:21

**Corbin** 70:21

**corner** 19:6

**correct** 19:24
34:25 35:5
58:10 66:17
79:2,7 93:4,13
95:9,22 96:11
97:8,11,14,17
98:7,11 100:22
104:10,25
109:4

**correction**
95:5

**correctly** 9:6
45:19 100:19

**Corzine** 93:18

**counsel** 7:12
8:2 22:15

**counselor**
13:7 49:25
90:23

**counties** 27:13

**County** 7:9,24
12:4 29:13
49:23 88:18
89:21 90:5,6,7
104:1

**couple** 17:25
20:15 30:12
39:12 59:2
60:22 76:15,16
107:11

**court** 7:4,10
8:6 22:24 37:20
41:8

**cousin** 91:13

**covering**
74:24 79:1

**crawling**
71:21,22

**credit** 34:6

**Creek** 15:12
20:15 21:7

**criminal** 33:23
52:9 84:24 98:7

**CROSS** 25:22
88:12 96:24
98:23

**current** 93:12

**custody** 34:17
82:19

———————

**D**

**dad** 38:21
39:22 40:11
41:2 76:14
100:6

**daily** 68:10

**Dale** 60:17
61:15 69:22
95:21 108:6,17

**Dallas** 7:22
99:5 100:1

**Dana** 70:24

**dangerous**
37:7 86:15

**Danielle** 93:18

**date** 9:12 10:6
11:22 66:13
93:19

**dates** 11:23
28:18

**day** 7:5 13:6
16:22 21:22
23:4 25:17
54:15 56:20
62:25 84:6 93:8
100:7 106:11,
20 107:4

**days** 67:24
82:24

**dead** 19:22
93:18

**deal** 84:11,17

**dealing** 57:25

**death** 10:22
17:15,18 24:24
25:8 103:22

**December**
9:18

**decided** 72:5
96:14

**Defendants**
7:19,21

**defense** 23:9,
12 94:24 95:3,7

**degree** 34:12

**deny** 60:8

**denying** 64:15

**department**
90:5,6 97:3,11,
23 98:3,11

**depends** 66:23

**deposition** 7:8
8:15 101:9
109:18,21

**Derek** 7:24
88:20 90:1

**Derrick** 7:18
25:24 61:20
69:18 72:21
73:24 95:22

**describe** 18:23

**description**
54:8

**detail** 55:23
71:24 72:1

**details** 15:21,
22 19:10 21:9
25:11 32:10,11
46:5,12,14,22
54:17,21 55:14,
15,17 56:2,5
57:7,9,14,17
59:6 67:17 68:5
69:10,15,20
71:11,14 72:7,
11,18 74:8 87:4
94:10,17 105:7
108:2,7

**detective** 11:6,
16 12:5,22
13:6,20 15:7,
22,24 16:9,22
17:24 19:2 20:4
21:10,11 22:8,
11,21 23:14
24:5,12,17
25:10,14,25
45:12 46:11,15

47:1 48:16,24,
25 49:18 50:10
51:5 56:16
57:10 58:7
62:15,19,23
63:16 64:10
66:9,16 67:6
68:6 71:25 72:8
79:2,21 81:1,18
83:21 84:21
87:1 89:10
90:25 92:25
93:7 94:13,22
96:7 97:6
99:14,16
102:13 104:1,
21 105:20
106:11 107:5
108:2

**detention**
29:13 30:22

**detox** 83:2,9
84:3,8

**detoxed** 82:24

**detoxing**
82:21,23 83:1,
20,24 106:4,9

**device** 51:10

**differently**
36:21

**DIRECT** 8:11

**disagree** 81:24

**disclose** 26:10

**discuss** 32:18
94:5,12 102:6,
19

**discussed**
33:15 47:24
94:10

**discussing**
94:6

**discussion**
23:2 69:4,6
98:17 103:16

**discussions**
10:15

**dismissed**
14:10 30:16

**dispute** 84:4

**District** 7:10,
11

**doctor** 58:5
68:15 70:15

**doctors** 58:6

**document**
64:24,25

**documents**
31:3

**Dorning** 60:18
69:22 95:21
105:18 108:7,
17

**downstairs**
35:3

**drink** 31:15,16

**dropped** 93:8,
9

**drug** 91:25

**drugs** 50:20
84:19 92:3

**Dustin** 93:21,
22 94:5,19

———————

**E**

**earlier** 16:4
19:24 20:4
21:18 66:19
67:22 98:6
102:12 104:5

**early** 24:2
100:18

**Eastern** 7:11

**education**
26:18,20

**Elliot** 7:16

**embarrassme
nt** 33:21

**emotional**
84:14,17,18

**employment**
26:24

114

**end** 72:4
108:11,19,22

**ended** 76:13

**ends** 109:18

**enforcement**
20:16 23:6

**et al** 7:9

**Eubanks** 7:22,
24 88:20 90:1
99:5 100:1

**Evans** 58:13
69:5

**events** 26:13
51:2

**evidence**
12:19 14:5,16
15:4 48:11

**exact** 9:12

**EXAMINATIO
N** 8:11 25:22
88:12 96:24
98:23 107:13

**excuse** 73:5
75:18

**excuses** 72:9
73:7,9,10
75:16,20,22
78:15,25 79:10
80:16

**exhibit** 22:13,
14 31:23 65:1,6

**expectation**
85:23 86:6

**explain** 8:18

**Express** 7:7

**extensively**
97:7

———

**F**

———

**facing** 85:6

**fact** 25:5 66:4
86:8

**fair** 22:6 38:7
45:12 62:3

84:20 85:12,14
90:20

**faith** 70:1

**false** 22:7
69:24 94:16
104:23

**familiar** 100:12

**family** 14:10
38:16,19 40:25
45:14 52:1
53:4,6,8 64:20

**family's** 47:1
48:4,24 63:20,
21

**Farah** 7:25
96:25 98:21

**Farris** 7:22
99:6 100:3,6

**father** 28:8

**feel** 33:8,13
83:4,6 87:2
96:18 108:11

**feeling** 87:5

**felony** 35:2,12

**felt** 73:18 80:12
85:16 87:5,23,
25 88:4,6
105:20 109:6

**figure** 17:5

**figured** 46:9

**finally** 72:4

**find** 48:23 58:5

**fine** 8:14,20
28:8 31:21
65:10,11,14
75:3,4 81:10

**finish** 8:23
81:8

**floor** 19:23

**flu** 83:11,15,18

**folks** 89:5
90:18

**follow-up**
103:2,12

**follow-ups**
107:11

**food** 42:24

**forget** 22:13
56:7,10,15,18
57:13,17
106:10,14,19,
24

**forgive** 89:3

**form** 12:13
14:18 15:9
16:8,14 20:5
21:13,19 22:3,9
23:15 24:7,11,
14,19 25:1,3,7,
12,16 32:17
34:10,15 35:7,
10 36:7,16
39:20 41:17,24
43:2,21 45:16
48:5 49:1 52:4
53:9,13 56:17
61:12 62:16,21
64:17,22 66:22
75:24 86:2
103:23 104:8,
11,16 105:1,14,
24 106:8,12,18,
23 107:2,6

**forward** 107:21

**found** 22:7
56:23 84:10

**foundation**
12:13 61:12
105:24

**fourth** 19:18

**fresh** 42:19

**friend** 42:2
43:25

**friends** 10:8
38:24,25 39:1,
2,9,14 41:20

**front** 15:16
22:25 49:10
50:5

**full** 37:18,20
41:7 108:25

**full-on** 44:1

**full-time** 27:3

———

**G**

———

**gain** 85:25

**garbage** 27:2

**Garland** 38:22
39:8

**gave** 22:12,22
25:11 33:5
45:10 47:2
61:25 68:22
76:13 84:20
87:23 94:25
95:8

**GED** 26:22

**gentleman**
30:8

**gentlemen**
8:21 29:7

**Gibson** 59:4

**girlfriend**
27:20 28:3 87:9
93:12

**girlfriend's**
70:17,23

**girlfriends**
93:15,17,20

**give** 8:7 15:7
32:13 45:5
53:16 54:20
64:24 72:7
77:25 78:13
81:2,12,14
107:1

**giving** 32:7
53:11 87:4

**good** 8:13,15
57:21 67:24
70:1 88:16

**grade** 26:21

**graduate**
26:21

**grandma**
70:14,17

**ground** 8:19

**guard** 37:5

**guess** 30:4
72:1 83:14
84:18

**guidance**
49:25 90:22

**guilt** 87:2

**guilty** 34:2,3,7,
24 35:8

**guy** 45:23 82:8

**guys** 9:23

———

**H**

———

**half** 19:23

**hammer** 18:9,
24 19:7

**hand** 8:4 13:23
22:17 51:16
55:3 87:7,11

**hands** 22:19
87:10

**hang** 10:14
39:22 43:23

**happen** 44:5
58:21 65:19

**happened**
54:9 56:14
60:8,13 64:23
65:21 68:12,14,
24 80:9 81:22

**happening**
15:24 94:3

**harassing**
73:17

**hard** 11:14
18:10 22:19
57:23 58:2,3

**head** 18:9,11,
24

**health** 10:20
57:20 68:16

**hear** 15:8 16:12
21:16 36:5
46:11 47:5 78:7
105:18 106:16,

21 107:1

**heard** 15:25 17:19 36:9,11, 15 45:18,19 46:1,22 57:7 89:5 100:19 105:17

**hearing** 46:5

**heart** 70:15

**helping** 21:21 42:10,13 101:13

**hid** 15:11,14 55:15

**hidden** 24:13

**hide** 20:15 21:7

**high** 84:14

**highest** 26:19

**history** 33:23

**hit** 18:9,10,23 19:8,9 24:5

**hold** 31:13 53:5

**Holiday** 7:6

**home** 15:12 20:18 27:25 37:17 39:23 40:6 44:9 47:1 48:4,17,24 89:11

**Hoskins** 7:9,15 20:10 30:13 58:10,18 60:7, 25 63:15 91:11 92:11 94:24 95:7 98:18

**hospital** 28:6, 11

**hour** 13:12,17, 19 44:24 50:16

**house** 11:10, 17,21 12:8 20:12 22:23 28:7 40:6 41:18,22 43:4 44:3,8 45:5 47:16 51:25

63:20,21 64:2 65:17 97:13

**Hubbard** 71:1, 2

**hung** 10:7 41:20 91:13

**hurts** 83:7

———

**I**

**idea** 16:2

**IDENTIFICATION** 22:14 65:6

**identify** 7:12

**illicit** 50:20

**impaired** 50:24 51:2

**impeachment** 74:5

**important** 56:24

**improper** 61:20

**inappropriate** 70:1

**included** 21:21

**independent** 108:22

**indicating** 15:16

**indication** 15:8

**individual** 101:21

**individuals** 99:11 100:5

**informant** 36:5,10,17 37:8 86:16,20

**informants** 36:21

**information** 17:12,23 18:12 19:1,2 20:1,3,

20 22:4,7 26:19 29:21 90:13 96:8 107:1,4,5, 25 108:1

**inmate** 36:9

**inmates** 36:5 37:4

**Inn** 7:6

**intended** 77:21

**interaction** 47:19 97:19,21

**interactions** 99:19

**interview** 14:24 50:12 57:10 66:16 89:12 91:1,6 95:20 96:13 97:6,14 105:17 108:22

**interviewing** 60:12

**interviews** 69:16 99:13 100:15

**intimidate** 64:21

**intoxicated** 74:14,18 78:25

**investigation** 45:20 62:19 97:20,21 98:4

**investigator** 59:12 60:7,10 61:15 66:6 67:7,17,21 68:23 69:6 71:11,13 72:24 73:12 74:10,12, 16,23 75:7 77:21 78:5,10, 21 80:1 81:17 95:7,9 105:18 107:19

**investigators** 23:10,13 30:12, 17 58:9,17,24 61:23 62:5,14,

18,22 63:14 64:1 69:16 72:12 73:5 76:15 83:24 85:3 95:3 102:7 105:3,9

**involve** 90:5

**involved** 89:23 92:11

**involvement** 98:2

**involving** 98:19

———

**J**

**Jackie** 7:21 99:5,24

**jail** 14:8 21:22 35:25 36:3,4,21 37:8 52:10 57:5 59:19 82:16,24 84:22 85:3,10, 14,17 86:9,15, 20 93:2,6 102:16,18,23 106:20

**January** 24:2 34:11 79:12 82:14 85:13,22

**Jason** 7:19,23 11:7 32:7 59:5, 7,12 95:2,18 100:11,12

**Jason's** 97:4

**job** 27:3

**jobs** 27:14

**John** 7:24 88:18 89:15

**Johnson** 7:21 99:1,22

**Join** 12:15 104:18 106:1

**Jonathan** 7:15 9:9,21 10:6,21 11:1 15:1,25 16:4 17:8,11, 14,17 18:4,6,8,

18,22 63:14 64:1 69:16 72:12 73:5 76:15 83:24 85:3 95:3 102:7 105:3,9

14 19:5,13,20 20:2,12,13,16, 25 23:8 24:18, 23 25:5,15 30:12 37:12 38:24 39:10,16, 24 41:12,15 45:15 58:9,17 60:7,10,25 62:24 63:15,19 64:11,21 65:16 66:4,6 68:23 71:14 72:9 73:5,20 75:17 81:17 86:1,4 91:25 92:17 98:18 103:20 105:10 108:7 109:13

**Jonathan's** 17:10 45:11 51:24 91:12,20

**Joseph** 7:22 99:5,24

**Josh** 23:25 24:4,16 38:22 46:20 59:4,11 79:12 82:2,5 84:2 85:13 95:9,19 106:5

**JT** 106:5

**judge** 22:25

**July** 60:14 61:14 62:13 78:6

———

**K**

**Katherine** 10:22 14:21 16:5 17:9,15 18:4,8,9,10 19:21 24:24 25:8 45:11,19 92:12,22 97:20 98:4,13 103:22 109:14

**Kayla** 18:6,20 20:12 38:4,5, 11,13

Kelley 7:4

Kelly 7:22 99:6 100:3,6

Kentucky 7:7, 11 11:6 98:25 100:10

kill 77:21

killed 18:12 66:5

killing 11:1 18:8

kind 15:13 20:13 42:2 55:14 57:23 82:10 83:14 86:23 87:25 92:25 97:3

knew 11:16 17:19 19:9 44:25 45:25

knowed 15:3 19:10 39:4 53:15 91:12,14 92:18 94:14

knowing 57:4

knowledge 39:16,19 42:12 92:3 97:25 98:2

Knox 7:9,24 12:4 49:23 88:18 89:21 90:5,6,7 104:1

KSP 98:25

**L**

labeled 64:25

lack 96:10

lady 49:10 50:5 59:3 63:2 89:12

laid 55:2 87:7

Larry 38:21 65:16

lasted 13:11,17

law 20:16 23:5

lawyers 32:5 94:24 95:3 101:18

lay 87:11

laying 54:25

leading 25:3 105:1,25 109:6

Learning 12:4 49:23

leave 43:24 70:20 72:19 73:16

led 71:13 72:6 78:12

left 15:15 19:22 35:3

Leonard 7:3

Leslie 29:13

Lester 91:9 92:7,11

level 26:19

Licha 7:25

lie 33:25 87:1, 19 88:5 105:11

lied 62:15 81:1, 18

life 56:19 57:18,19 58:1

limited 97:4

Lisa 58:13 69:5

list 99:2

listen 44:15 45:3 108:24

listened 41:20 91:8 95:11,19 108:6,13,17

listening 44:19

live 9:25 10:2 27:21,22 28:4 38:3 41:7 94:19

lived 18:4,15 28:14 38:4 92:4

living 27:16

28:12,23,24 29:1 38:7,15,19 45:20 91:24

located 7:7

locked 44:8

London 7:7

long 10:10 11:23 13:10 28:12 31:1,2,9 37:23 38:1 40:4 41:7,11 44:22 50:14 55:22,24

longer 70:13

lookout 18:7, 21

lost 68:25 69:2

lot 10:8 55:25 85:16 96:15 98:7 103:16

lunchtime 13:15,16

lying 87:5

**M**

made 21:17 74:20 79:10 80:14,16 104:14

majority 22:6 38:6

make 20:23 48:22 49:14 72:8 73:6,10 100:19 101:14 103:15,20

making 78:15

malfunction 40:24

manipulate 69:20

manner 62:1

manufacturing 14:8 38:1 51:24

March 22:22 66:17 84:21

mark 7:21 22:12 99:1,19

MARKED 22:14 65:6

matter 7:8

meaning 46:19

meant 32:6 80:8 87:11

medical 26:10 50:23

medication 26:11

medicine 51:1

meet 9:11 11:9 13:1 29:12 39:15 60:11 102:5,18

meeting 13:6, 8,10,19 23:8 29:19,23 30:1, 2,3,6 31:10,11 32:9 33:3,16 48:8 56:16 57:14 59:4,6 61:14 82:16 101:3 102:13, 19,22 103:25

meetings 59:2 102:7

Mefford 7:21 99:1,20

member 97:10 98:3

members 38:19 45:14 98:11

memory 38:8 46:3,15 52:13 53:1 57:21 61:5 68:2,4,13,25 69:3,6 74:4 83:23 84:8,24 85:3 103:17 107:19 108:22

mention 54:2,4

mentioned 37:12 40:24

45:18 46:25 52:25 79:2,4 84:7 92:24 93:1,12 102:17 109:11

Messer 93:21

met 11:8 22:11, 21 23:5 29:4,7, 10 30:5,9,11 46:20 47:12 48:7 58:8,15 59:19 79:12 89:10,15 100:5, 9,21,24 101:25 102:1

meth 35:5,11 41:12

middle 23:19 56:9 75:19,23

Mike 7:25 97:2, 7,16,22 98:2

Miles's 37:16

Mills 10:22 11:4 14:21 16:7 17:9 18:7,15, 18,20,24 24:24 25:8 38:4 45:11,19 66:5 92:12,22 97:20 98:4,14,18 103:22 109:14

Mills' 17:15

mind 56:2 75:8 79:1

mine 44:9 105:16

minute 65:9 103:4

minutes 31:2 44:23 54:16

misconstrued 59:23

misheard 100:18

misrepresented 79:23

Misstates

67:14

**mom** 12:5 28:7
38:21 40:11,24
47:7,11 48:15
49:3,5,8 56:23
57:5,19 84:10,
18

**mom's** 11:10,
19

**money** 15:15
18:5,11,18
19:14,22 53:12
87:21 88:1

**month** 56:14
57:22,24 66:20

**months** 27:2,7,
13 67:24,25

**months.'** 20:16

**Moon** 37:18,20
41:7

**morning** 8:13
13:13,15

**mother** 20:18
28:11 48:4,9
53:18 84:19

**mother's**
11:17

**move** 57:14,18
60:6 77:10
79:23 86:25

**moved** 9:22
15:12 16:1
28:15 56:19

**mowing** 27:2

**murder** 14:5,
17 15:1,23
45:11,20,23,25
46:3,6,14,23
57:7 92:12
97:21 98:4,14,
18,19 109:13

**murders** 46:12

**muscles** 83:13

**music** 41:21
44:16,19 45:3,5

---

**N**

---

**named** 93:18
95:9

**names** 58:14,
15 99:8,12

**necessarily**
43:22

**needed** 15:4
23:1 42:15,18

**negative** 29:3
40:9 52:23
63:15 94:7

**neighbor** 9:22
37:13,23 45:21
46:2,9

**neighbors**
9:23 16:1 39:2,
3

**nervous** 31:12

**next-door** 9:22

**nice** 87:17

**nosy** 45:22
46:2,9

**note** 84:7

**noted** 98:9

**noticed** 68:17

**number** 7:11
40:2,5 71:19
94:21

---

**O**

---

**oath** 26:3,4,6,7

**object** 8:22
12:13 14:18
15:9 16:8,14
20:5 21:13,19
22:3,9 23:15
24:7,11,14,19
25:1,3,7,12,16
32:17 33:18
69:18 103:23
104:8,11,16
105:1,14,24
106:8,12,18,23

107:2,6

**objection** 8:23
34:10,15 35:7,
10 36:7,16,25
37:9 39:20
41:17,24 42:6,
25 43:13,21
44:13 45:16
46:16 47:22,25
48:5 49:1 51:8
52:4,15 53:2,9,
13,21 55:19
56:17 57:15
59:20 61:12,17
62:16,21 63:17
64:3,17,22
66:22 67:8,13,
14 75:1,24
76:22 79:15
81:19 84:16
86:2

**occasion** 43:8

**occupy** 45:4

**occurred** 78:2

**occurring**
58:20

**offended**
86:24

**offer** 108:1

**offered** 51:25
106:15 107:24

**offering** 14:10
52:24 53:4,8
87:23

**office** 13:9
49:10,25 50:4,
5,8,9 90:8

**officer** 92:10

**outstanding**
35:23

---

**P**

---

**p.m.** 103:10
109:20,21

**paid** 20:14 21:6
45:24

**pain** 83:8,11
84:13,14,18

**paper** 31:25

**papers** 31:8

**paperwork**
32:1

**paragraph**
17:7 19:18
65:9,15 66:3

**paraphrasing**
92:25

**parents** 10:1
27:17 28:4,24
39:15 44:7
65:25 76:13

**parked** 20:11
21:3

**part** 56:8
105:17

**parties** 90:14

**party** 89:24

**pass** 52:3

**passing** 39:19

**past** 58:2 67:23
68:17 69:3 98:7

**pay** 88:7

**pending** 7:10
30:13 35:20
96:19

**people** 15:3
31:17 36:20
37:1,4 43:9,12
58:12 61:5 63:4
66:25

**perfect** 28:18

**period** 10:11
75:19 98:14

**periods** 44:22

**person** 31:17
42:12 46:10
47:12 78:11,15,
19,22 87:17
88:9

**personal**
44:18

**personally**
89:16 91:10,13
100:8

**persons** 30:17

**phone** 39:23,
25 40:6,10,25
41:1,3 58:18,19
59:1 60:8 64:14
101:2

**pick** 19:5

**Pickard** 7:24
88:18 89:15

**picked** 34:19

**picking** 27:2

**Pickrell** 7:22
99:5,24

**Pine** 27:22
28:13

**PL** 16:23 64:25
71:4

**place** 13:8
91:20 92:8

**Plaintiffs** 7:15,
17

**planned** 17:12,
18

**play** 61:24
71:2,6,17,19
74:1,4 76:4,8
77:1,5,7 78:3
80:22

**played** 95:20

**PLAYS** 71:5,7,
20 76:5,9 77:2,
6,17 78:4 80:23

**plead** 34:3

**pled** 34:1,7,24
35:8

**point** 13:19
47:13,14 56:1
68:4 78:16 86:8

**police** 11:6
23:5 36:6 53:11
92:10,15 97:2,
10,23 98:3,11
99:1 100:10

118

**poor** 88:9

**positive** 41:10 90:8

**possession** 35:5

**posted** 93:8

**Powell** 23:25 34:16 46:20 79:13 82:2,5 84:2 85:13 95:1,9,14 96:4 106:5

**practicing** 59:18

**precursor** 35:5,11

**prepped** 79:21

**prepping** 105:20 107:15 108:12,14,20

**present** 13:5 27:11 89:13 90:25 97:8,11, 17 99:13 100:15,16 101:18

**press** 11:14

**pressing** 22:1

**pretty** 15:3,13, 20 23:20 27:18 33:24 52:21 53:14 54:5,6,21 55:12,18,21 58:1 61:7 63:12 72:6,17 74:20 78:18 82:12 88:6 92:19

**priming** 105:21 107:15 108:14

**prior** 9:18 90:4 93:15,16,17,20, 21

**prison** 39:11

**problem** 68:16 103:5

**problems** 10:20 57:20

**PROCEEDINGS** 7:1

**program** 27:12

**promised** 61:4 106:20

**promises** 21:17 104:14

**promoting** 34:12,21,24

**proper** 81:13

**prosecute** 15:5

**prosecuted** 15:2 63:4

**prosecution** 52:3 97:20 109:4

**prove** 78:16

**provided** 17:23 20:3 21:9 25:10 107:4,5

**purse** 15:14 19:23

**put** 40:14 42:22 51:14,15 56:2 87:10 96:10

───────

**Q**

**question** 9:4 49:5 59:11,15 60:5 61:21 62:7,10 65:20 72:22 73:3 81:14,16 98:1, 16 106:3 107:16 108:25 109:12

**questioned** 92:16

**questioning** 59:10

**questions** 8:20,21,22 25:20 26:1 33:9 59:18 61:7,8,9 65:24 78:11,12

79:8 80:18 81:25 88:11 94:21 97:3 101:19 102:25 103:3,13 105:2 106:4 107:9 109:16

**queue** 70:4

**quick** 103:15

**quickly** 16:25

───────

**R**

**radio** 44:16

**raise** 8:3

**read** 65:11

**ready** 23:18 51:19 96:16

**real** 16:25

**realize** 26:3,6

**reason** 84:4 86:18 87:14 92:20 109:12

**recall** 11:21 13:8,10 16:15 23:8,24 24:4,12 26:12 30:14,17 31:5 47:3 48:12 51:2 58:16,19, 22,23 59:11 60:6 63:25 64:1 72:23 73:25 74:25 75:3,5,6 80:6,7 82:3 84:6 100:13 103:25 105:6 107:16,18 108:4,14

**receipt** 34:6

**receive** 89:11

**received** 85:20

**recently** 65:17

**recollection** 59:18 62:4

**record** 7:2,13 13:20 31:20 40:16,17,18,19,

20 63:6 65:11 70:6 79:18,19, 23 95:2 103:7, 8,9,20 109:19

**recorded** 61:15 89:12

**recorder** 13:22 14:2 15:6,18 19:3 24:6 54:9, 11,14,19,20,22, 25 63:7,9,10

**recording** 14:13 51:6,10 70:4 71:3,8,11 76:6,10 77:13, 24 78:5 80:24 84:2 95:11,19, 20 96:1 108:16, 25 109:9

**records** 98:9

**RECROSS** 107:13

**reference** 71:21 79:6 89:5 98:17

**referenced** 30:12 85:19 107:15

**referring** 30:2, 5 69:23 109:3

**regular** 34:20

**regularly** 39:18

**relates** 97:19

**relating** 99:20

**relationship** 37:12 93:23

**released** 29:18 102:22

**relevancy** 84:16

**remember** 24:16 26:12 31:7 33:7,15 46:5 47:17,18 48:13,15 52:24 54:17,18,19

55:7,12,17,23 56:4,14 57:21, 24 58:3,15,20, 25 59:2,6,15,17 60:10,16,20,22 61:8,18,22 62:11,13 63:23, 24 64:6,9,12, 16,18 65:21,24 66:20,24 67:1, 2,11,24 68:5 69:8,11,13,15, 19 73:4 74:1,7, 9,10,20 75:9, 10,12 78:1 79:3 82:8,10,11,19, 25 84:6 91:5 101:11 102:12, 15 107:20

**remembered** 32:13 59:4

**remembering** 68:8,10

**remembers** 54:24 69:24

**remorse** 87:2

**repeat** 21:11 23:13 99:12

**repeated** 67:6, 17 72:11

**repeatedly** 69:19

**repeating** 23:22 66:8,10 72:3

**rephrase** 9:6

**report** 16:19 17:6 20:7 22:7

**reporter** 7:5 8:4,6

**represent** 88:18 89:6 90:18 97:1 98:25

**reputation** 37:8

**request** 13:1

residence 28:5

responsibility 73:11

reveal 79:19

reveals 79:19

reward 12:20 14:10,11 16:10, 12,15,17 21:24 48:12,20 51:25 52:25 53:1,4,8, 25 61:4 62:19 85:19,20,23 86:5,6 87:21,24 88:1,10 106:15 109:3,8,11

rewards 109:3

reword 15:20

reworded 55:21 81:25

Rhonda 13:7 50:2,7 54:23 89:13 90:22

ride 101:4,7,13, 16

ring 58:13

rob 77:22

Robinson 7:14 8:12 12:16 22:18,20 25:19 32:17 33:18 34:10,15 35:7, 10 36:7,16,25 37:9 39:20 41:17,24 42:6, 25 43:2,13,21 44:13 45:16 46:16 47:22,25 48:5 49:1 51:8 52:4,15 53:2,9, 13,21 55:19 56:17 57:15 59:20,24 60:1 62:16,21 63:17 64:3,17,22 65:2 66:22 67:8,13 72:21 73:24 74:6 75:1,24 76:1,22 79:15,

18 80:19 81:8, 19,21 84:16 86:2,13 95:2,18 103:2,6,11 106:2 107:8

romantic 87:12

room 50:15 54:23

roommate 28:2

row 29:8

Roxy 92:5

rules 8:19

rumor 36:9,13

rumored 36:5, 20

run-ins 89:16 100:7,13

rush 65:13

— S —

sat 20:17 91:7, 17

scared 14:6 54:5 57:3,4 88:8 104:6,9

school 11:12 12:2,24 13:7 25:17 47:10,15 49:3,9,15,19, 20,22,24 53:24 63:1 89:13 90:23 104:1

scrambled 40:23

script 72:23 73:4

secondhand 47:5

sentence 19:12 65:15

sentences 18:1

separate 28:4 69:16

September 17:8 27:8,9

serve 97:14

served 99:17

set 51:19 101:4,13

setting 15:15 101:16

shared 41:2

sheriff 88:18 89:19

sheriff's 90:5, 6,8

shot 22:16

show 23:1 31:3 69:22

showed 31:8 91:21 95:16

sic 62:15

sick 56:24 57:5 84:10

side 84:7

simply 21:11 23:13

Simpson 7:8 8:3 11:20 25:24 38:21 65:16 70:8 88:14 97:1 98:25 109:19

sir 76:7 90:19 98:20

sit 44:1,8,11,15

sitting 30:8 44:19 59:9,14

situation 57:18

sleep 15:2 62:23 63:2,3

Slosar 7:16 40:20 59:23 61:12,17,20 62:6 64:19 67:14 69:18

101:22

so-called 109:3

solemnly 8:6

sound 34:3,8 35:5 37:21 78:9 82:13

sounds 48:23 100:12

source 46:12

speak 32:5 48:21 49:11 101:15 102:13

speaking 23:24 30:17

specific 52:18, 20,22 54:17 55:23 59:15 61:8 66:24 74:7 77:25 81:16 102:15 105:7

specifically 26:10 33:7 36:1 53:1 56:4,18 61:2,22 80:3 109:10

specifics 74:1

Speculation 37:9 42:7 64:4

spoke 83:24 85:2 91:7,16 101:2 102:1,6

spoken 48:25 53:20 91:15 97:22 101:12

spread 15:15

stand 85:25 86:3

Staples 7:14 8:12 12:16 22:18,20 25:19 29:10 30:20 32:17 33:18 34:10,15 35:7, 10 36:7,16,25 37:9 39:20 41:17,24 42:6,

25 43:2,13,21 44:13 45:16 46:16 47:22,25 48:5 49:1 51:8 52:4,15 53:2,9, 13,21 55:19 56:17 57:15 59:20,24 60:1 62:16,21 63:17 64:3,17,22 65:2 66:22 67:8,13 72:21 73:24 74:6 75:1,24 76:1,22 79:15, 18 80:19 81:8, 19,21 84:16 86:2,13 95:2,18 100:21 102:6 103:2,6,11 106:2 107:8

start 14:2 55:14 57:19 84:9

started 13:22 14:13 17:10 51:11 67:23 68:8 84:19 87:5 94:3 96:7

starting 27:7

state 11:6 31:7 53:11 75:8 79:1 99:1 100:10

stated 17:7,9, 11 18:3 19:3 20:11,14 21:15, 17 61:1 65:16 66:4 92:21 105:6

statement 22:22 23:14 25:11 32:14,16, 22,24 33:6 45:10 47:2 49:18,19,25 52:11 55:1,21 61:16,19,24,25 63:1,5 66:9 67:22 68:22 69:22 72:7,15, 25 73:4,19 74:2,13,17 75:13 76:12 81:9 82:2,7

84:21 86:1,3,19 87:1,4,19,22 92:19 94:13,15, 16,25 95:8 104:15,19,23 105:16,22

**statements** 23:12 29:17 32:6 45:9 76:21 80:9 94:22 102:14,19,21 103:16,19

**States** 7:10

**stay** 43:23 44:3 85:14

**stayed** 10:3

**staying** 38:8, 22

**step** 76:12,14

**stepped** 10:11

**stick** 40:15 72:15 105:15

**stickers** 65:1

**Stinking** 15:12 20:15 21:7

**stop** 13:24 54:16,19 64:11 73:17

**stopped** 55:3

**story** 96:14 105:15

**straight** 81:14 91:21,22,23 107:21

**stray** 89:1

**street** 21:4 27:22 28:13

**stress** 96:15

**stressed** 76:17

**strike** 60:5 62:13

**struck** 18:11

**stuff** 11:11 16:1 29:17 32:5 37:6 42:19 44:18

45:24 51:17 58:4 59:6,8,14 62:11 81:15 83:13,15 87:4 88:8 102:20 108:20

**subpoena** 89:11

**substances** 84:9

**Suites** 7:7

**summons** 22:24 47:16,17, 20,24 97:14 99:17

**supplying** 96:8

**supposed** 18:4 19:4 56:6 60:13

**surrounding** 27:13

**swear** 8:6

**sweet** 87:15

**sworn** 8:4

———————

**T**

**table** 51:14

**takes** 19:12

**taking** 35:17

**talk** 10:15,21 11:13 12:21,22 13:23,25 14:23 16:2 19:20,21 20:6 22:18 29:15 34:17 36:19,20 39:21 43:20,22 44:11, 17 45:14 48:19 49:11 51:5 70:11 80:1,5 81:13 90:11 94:18

**talked** 11:10 16:5 37:11 39:12 48:17 54:10 58:18

65:18 66:24 67:20,21 78:25 83:20 91:22 97:7 98:6 106:5 109:8

**talking** 16:10 17:11 30:18 38:11 46:10 51:18,20 58:19 60:6 76:16 96:7 108:10

**talks** 79:20

**Tammy** 11:20 38:21 65:16

**tape** 79:20 80:5

**Taylor** 7:15 9:9 24:23 30:12 37:12 38:24 39:10,16 45:15 46:2 58:9,17 60:7,11,25 62:24 63:15,19 64:11,21 65:17 68:23 71:14 73:20 74:14,24 75:7,17 80:2 81:18 86:1 87:7,15,20 91:25 94:25 95:8 98:18 103:21 108:7 109:13

**Taylor's** 73:5 74:17

**team** 23:9

**technician** 7:4

**telling** 15:10 19:24 24:4,12, 16 32:1,3 48:12,15 51:22, 23,25 53:24 55:5,14 59:4,11 63:25 71:10 72:18 75:6 80:13 102:21 107:22

**ten** 31:2 72:22

**terrible** 83:5

**testified** 49:13

66:19 100:18 101:24 102:12 104:5

**testimony** 8:7 30:14 44:10 46:25 49:14,17 51:6 57:6,11,13 67:5,15 69:17, 21 72:12 73:21 76:19 89:4 92:24

**tests** 68:16

**theft** 34:2 35:15,17

**thing** 9:4 43:25 46:7 66:8 102:15 105:18

**things** 43:8 52:11 56:24 66:23,24 67:2 68:8 72:6 78:17 80:9 94:5

**thought** 20:17 74:24 78:11,18, 22

**threatened** 11:11 14:16 104:9 106:25

**threatening** 54:1 88:9

**threats** 104:13

**threw** 72:1

**tightness** 22:16

**till** 20:23 54:4

**time** 7:6 9:1,25 10:5,11 12:3,11 18:6,10 19:9 20:22 22:23 24:4 32:14 34:23 36:3 38:3,6,19,22 40:4,13 41:4 42:3 44:20,23, 25 45:20 47:13, 14 50:11,17,18, 21 54:15,23 55:2,24 56:23 57:1 59:12

66:11,20 67:16 68:1,2,23 70:16 72:16 79:11 80:15 82:17,22, 25 85:4,12 89:3 91:3,24 92:2,4, 6 93:22 96:19 100:25 101:3 105:10 109:9, 19

**times** 10:13,16 15:6 39:13 43:17 60:22 72:22 76:16 89:10 98:10

**today** 7:4,5 26:3 29:5 30:10 56:5 67:12 68:19 89:4 90:17 94:6 95:12 97:7 99:9 101:7,14 102:2 103:16

**told** 11:12 12:5, 18,20,21 14:4, 25 15:13,14,20, 22 16:11 17:11 18:3,6,14,17 19:7,10 20:13, 16,22,23,25 23:20,22 24:5, 13,17 25:5,17 29:18,24 31:9 32:8 33:16 47:7,9 48:6,10, 13,18,20 49:2, 5,8 52:7,19 53:14,18,24 54:6 55:7,12, 16,17 59:5,8,13 61:2,6,16,22,23 62:25 63:1,3,5, 12 64:1,6,8,10 65:18,25 66:3, 4,6,10 68:6 69:9,19 71:14, 25 72:3,17 73:15,16 74:6, 9,21 76:15 78:17,18,20,23 79:11,25 80:4 84:2,5 85:13 92:10,14,18,20 94:14,15

101:17 105:9,
13 106:5
107:21 108:2,6,
7 109:6

**top** 66:14 88:8

**totally** 20:19

**treat** 37:6

**treated** 36:21,
23 37:3

**trial** 26:7

**Trooper**
100:11

**troopers** 99:1

**trouble** 68:8,9
69:1

**true** 17:12
18:12 19:14
20:1,20 24:9
29:4 32:16
43:12 52:2
61:16,24 63:19
64:10 66:5,21
67:18 68:22
69:9,24 71:21,
24 73:1 79:13,
25 80:17 81:7,
17 82:21 85:9
86:18 87:7
108:8,9

**truth** 8:8,9
47:12 50:24
67:4 72:5,17
73:14 75:15
76:12,20 80:8,
10 96:16 106:7
108:9

**truthful** 61:11

**truthfully**
62:10

**turn** 13:23,25
15:17 45:4,7
54:19 65:8

**turned** 15:7
51:5 54:9,11,22
55:13 63:10,11

**turning** 14:1
55:4,5,10

**turns** 54:14

**TV** 10:14 41:20
43:23 44:15,20
45:1,7

**two-** 103:3

**two-page**
64:25

**type** 44:1 50:20
73:13,21 78:11,
14,19,22,25

**typed** 104:21

———

**U**

**Uh-huh** 13:18
19:19 77:12
86:10 90:21
104:22

**Uh-uh** 29:3
40:9 52:23 94:7

**UK** 28:11

**understand**
9:5 24:21
28:12,18 37:1
39:15 41:14
48:22 56:1
58:16 59:22
69:4 74:5 81:15
90:16 108:25

**understandable** 11:24

**understanding**
16:11 21:15
32:19 35:11
48:3

**understood**
82:1

**United** 7:10

**unlawful** 35:17

**untruthful**
62:4,9

**user** 91:25

———

**V**

**vague** 62:1

**69:5**

**varied** 44:24

**vehicle** 20:11

**versus** 7:9

**victim** 71:22

**video** 7:3 71:22
81:22

**violation** 34:7

**visit** 97:17

**voice** 71:3,8
76:6,10 77:3,4,
13,18 80:24

———

**W**

**waiting** 19:6
20:12 21:4
24:17 25:15
44:9

**Waltermire** 7:3

**wanted** 11:13
15:8 16:11
19:13 21:12,16
33:14 56:8
73:17 76:17
87:24 104:14
106:15,21
107:1

**wanting** 23:19
72:19 94:18

**warrant** 34:20

**warrants**
35:22

**watch** 10:14
43:23 44:15
45:1

**watched** 41:20

**watching**
44:20

**water** 31:15

**weak** 83:6

**Weber** 7:20
98:24 102:24
103:5 104:18
106:1

**whatsoever**
16:7 25:6
103:22

**Wiley** 27:1,5

**William** 91:9
92:7,11

**Williams** 7:23
12:15 77:15
88:13 95:4,6,24
96:3,21

**wipe** 42:20

**withholding**
12:19 14:5,16
22:4 48:11

**witnesses**
33:21

**worded** 9:5
59:10

**words** 52:18,
20,22 54:22
55:22 87:25

**work** 27:1,6,7

**worked** 26:25

**working** 26:25
60:24

**works** 20:18

**worry** 56:25

**worse** 37:3

**Wright** 7:18
12:13 14:18,20
15:9 16:8,14
20:5 21:13,19
22:3,9 23:15
24:7,11,14,19
25:1,3,7,12,16,
23,24 40:13,16,
22 59:25 60:4
62:3,12 65:1,3,
7 70:3,7 71:6,
19 74:3,11
76:4,8 77:1,5,7,
9,16 79:22,24
80:22 88:11
95:23,25
103:23 104:8,
11,16 105:1,14,
24 106:8,12,18,
23 107:2,6,11,

14 109:16

**written** 104:19

**wrong** 19:5
58:4

———

**Y**

**year** 27:8 37:25
41:13 58:8
66:18 67:22
78:1

**years** 28:16,21
29:2 41:9 56:12
58:3 67:20,23,
25 68:7,9,12,
18,19 69:2
105:4

**yes-or-no**
81:12,14

**Yesterday**
101:13

**York** 7:19 11:7,
16 12:5,22
13:6,20 15:7,
22,24 16:10,22
17:24 19:3 20:4
21:10,12 22:8,
11,21 23:14
24:5,12,17
25:10,14,25
32:7 45:12
46:11,15 47:1
48:16,24,25
49:18 50:10
51:5 53:19
56:16 57:10
58:8 59:5,7,12
62:15,19,23
63:16 64:10
66:9,16 67:6,20
68:6 71:25 72:8
73:1 79:2,11,21
81:1 83:21
84:21 87:1,23
89:10 92:19,25
93:7 94:13,16,
22 96:8 97:6,13
99:14,17
102:13 104:1,
21 105:20
106:11 107:5
108:2,11

122

**York's** 90:25
105:16

**you-all** 23:2
41:7 43:20
44:10 75:12
101:19

**young** 57:4

**younger** 65:22
93:17,19