IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF KENTUCKY, LONDON DIVISION

| | | |
|---|---|---|
| AMANDA HOSKINS and JONATHAN TAYLOR, | ) ) | |
| | ) | Case No. 17-CV-84 |
| Plaintiffs, | ) | |
| | ) | Hon. ROBERT E. WEIR |
| v. | ) | |
| | ) | Mag. HANLY A. INGRAM |
| KNOX COUNTY, ET AL., | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendants. | | |

# EXHIBIT 52



# KENTUCKIANA
## — COURT REPORTERS —

**CASE NO. 17-CV-84**

# AMANDA HOSKINS, ET AL.

V.

# KNOX COUNTY, ET AL.

**DEPONENT:**

**DONNA  MILLS**

**DATE:**

**September 07, 2018**



schedule@kentuckianareporters.com

877.808.5856 | 502.589.2273

www.kentuckianareporters.com

<pre>
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF KENTUCKY

 3                  CASE NO: 17-CV-84

 4

 5               AMANDA HOSKINS, ET AL.,

 6                    PLAINTIFFS

 7

 8                        V.

 9

10               KNOX COUNTY, ET AL.,

11                    DEFENDANTS

12

13

14

15

16

17

18

19

20

21

22

23   DEPONENT: DONNA MILLS

24   DATE:     SEPTEMBER 7, 2018

25   REPORTER: MADELINE WILLIAMSON
</pre>



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 2

```
 1               APPEARANCES
 2
 3  ON BEHALF OF THE PLAINTIFFS, AMANDA HOSKINS, ET AL.:
 4  ELLIOT SLOSAR
 5  AMY ROBINSON STAPLES
 6  LOEVY & LOEVY
 7  311 NORTH ABERDEEN STREET
 8  THIRD FLOOR
 9  CHICAGO, ILLINOIS 60607
10  TELEPHONE NO.: (312) 243-5900
11  E-MAIL: ELLIOT@LOEVY.COM
12
13  ON BEHALF OF THE DEFENDANT, KNOX COUNTY, ET AL.:
14  JASON WILLIAMS
15  WILLIAMS FARMER & TOWE
16  303 SOUTH MAIN STREET
17  P.O. BOX 3199
18  LONDON, KENTUCKY 40741
19  TELEPHONE NO.: (606) 877-5291
20  E-MAIL: JASON@WFTLAW.COM
21
22
23
24
25
```

Page 3

```
 1            APPEARANCES (CONTINUED)
 2
 3  ON BEHALF OF THE DEFENDANT, BARBOURVILLE POLICE
 4  DEPARTMENT:
 5  ALEXANDRA DEMOSS-CAMPBELL
 6  WARD HOCKER & THORNTON, PLLC
 7  333 WEST VINE STREET
 8  SUITE 1100
 9  LEXINGTON, KENTUCKY 40507
10  TELEPHONE NO.: (859) 422-6000
11  EMAIL: ALEXANDRA.DEMOSS-CAMPBELL@WHTLAW.COM
12
13
14
15  ON BEHALF OF THE DEFENDANTS, JASON YORK and JASON BUNCH:
16  DERRICK T. WRIGHT
17  STURGILL, TURNER, BARKER & MOLONEY, PLLC
18  333 WEST VINE STREET
19  SUITE 1500
20  LEXINGTON, KENTUCKY 40507
21  TELEPHONE NO.: (859) 255-8581
22  E-MAIL: DWRIGHT@STURGILLTURNER.COM
23
24
25
```

Page 4

```
 1            APPEARANCES (CONTINUED)
 2
 3  ON BEHALF OF THE DEFENDANTS, RIAN JOHNSON, MARK MEFFORD,
 4  JACKIE JOSEPH and DALLAS EUBANKS:
 5  CODY WEBER
 6  KENTUCKY STATE POLICE GENERAL COUNSEL
 7  919 VERSAILLES ROAD
 8  FRANKFORT, KENTUCKY 40601
 9  TELEPHONE NO.: (502) 573-1636
10  E-MAIL: CODY.WEBER@KY.GOV
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1                  INDEX
 2                                           Page
 3  DIRECT EXAMINATION BY MR. SLOSAR           7
 4  CROSS-EXAMINATION BY MR. WILLIAMS          70
 5  CROSS-EXAMINATION BY MR. WRIGHT            118
 6  CROSS-EXAMINATION BY MR. WEBER             186
 7  CROSS-EXAMINATION BY MS. DEMOSS-CAMPBELL   187
 8  REDIRECT EXAMINATION BY MR SLOSAR          189
 9
10                 EXHIBITS
11                                           Page
12  1   PHOTO                                 31
13  2   CRIME SUPPLEMENT                      60
14  3   ARREST WARRANT                        60
15  4   CITATION AND ARREST WARRANT           171
16
17
18
19
20
21
22
23
24
25
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 6

STIPULATION

The deposition of DONNA MILLS taken at HOLIDAY INN
EXPRESS & SUITES, 506 MINTON DRIVE, LONDON, KENTUCKY
40741 on FRIDAY the 7th day of SEPTEMBER 2018 at
approximately 9:50 a.m.; said deposition was taken
pursuant to the FEDERAL Rules of Civil Procedure. It is
agreed that MADELINE WILLIAMSON, being a Notary Public
and Court Reporter for the State of KENTUCKY, may swear
the witness.

Page 7

PROCEEDINGS

VIDEOGRAPHER:  Today is the 7th day of
September 2018.  The time is 9:51 a.m.  We're here
to take the deposition of Donna Mills.  Will the
counsel please identify themselves for the record?

MR. SLOSAR:  Elliot Slosar for plaintiffs
Amanda Hoskins and Jonathan Taylor.

MR. WILLIAMS:  I'm Jason Williams.  I'm here on
behalf of John Pickard and Knox County.

MS. DEMOSS-CAMPBELL:  Alexandra Demoss
Campbell.  I'm here on behalf of Mike Broughton and
the City of Barbourville.

MR. WRIGHT:  Derrick Wright on behalf of
defendants Jason York and Jason Bunch.

VIDEOGRAPHER:  Ms. Mills, will you please raise
your right hand to be sworn in by the reporter?

COURT REPORTER:  Do you solemnly swear or
affirm that the testimony you are about to give will
be the truth, the whole truth and nothing but the
truth?

THE WITNESS:  Yes.

COURT REPORTER:  Thank you.

DIRECT EXAMINATION

BY MR. SLOSAR:

Q   Good morning, Ms. Mills.

Page 8

A   Good morning.

Q   Before we get started, I just wanted to go
over some of the rules today; is that okay?

A   Yes.

Q   Okay.  Have you ever given a deposition
before?

A   No.  I think so once.  One other time.

Q   I'm going to go over some of the rules just so
you know what's going on here, okay?

A   Yes.

Q   So there are a number of attorneys here and
there are some attorneys participating by phone who will
be here in person shortly, and those attorneys have a
right to make objections.  There's no judge here to
determine whether the objections are valid.  So all I'm
going to ask is that when somebody asks a question and
somebody else is objecting, just allow for them to
object.  You're going to almost always continue to
answer the question.  It's just easier for the court
reporter if there's only one person talking at a time,
okay?

A   Okay.

Q   If at any point in time you want to go use the
wash room or go get some air or it just becomes too
much, just let any of us know and we'd be happy to take

Page 9

a break, okay?

A   Yes.

Q   You're doing wonderful at this so far, but
just continue answering the questions verbally.

A   Okay.

Q   You know, because the court reporter can't
pick up a head nod or something like that, okay?

A   Okay.

Q   I tend to not ask perfect questions.  You've
met me before today, you probably know that by now.  But
if there is a question that I ask you and you don't
understand it, just let me know and I'll be happy to ask
it a better way, okay?

A   Yes.

Q   Okay.  Ms. Mills, what city do you reside in?

A   Barbourville.

Q   And how long have you lived in Barbourville,
Kentucky?

A   I have lived there my entire life.

Q   Okay.  And I know that I'm not supposed to ask
this question, but how old are you ma'am?

A   46.

Q   Okay.  And are you currently married?

A   Yes, I am.

Q   Who are you married to?



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 10

1    A    Scott Mills.

2    Q    How long have you and Scott been married?

3    A    We'll be married a year September 29th.

4    Q    Were you and Scott in a relationship in 2012?

5    A    Yes.

6    Q    Are you currently employed?

7    A    Yes.

8    Q    Where are you employed?

9    A    At Barbourville ARH.

10   Q    What is your position there?

11   A    I'm an RN.

12   Q    How long have you been an RN at ARH?

13   A    18, almost 19 years.

14   Q    And at some point prior to being an RN, did

15   you have a different type of license as a nurse?

16   A    Yes, I was an LPN, yes.

17   Q    Okay.  And as an LPN, were you continuing to

18   work at ARH as well?

19   A    Yes.  At the time it was Knox County.  But,

20   yes.  Knox County Hospital.

21   Q    Where did you go to high school?

22   A    At Knox Central High School.

23   Q    And after going to Knox Central did you

24   receive any additional education relating to your -- the

25   field that you're employed in?

Page 11

1    A    Yes, I went to the LPN school at Southeast

2    Community College.

3    Q    And how long did it take for you to get your

4    LPN license?

5    A    Like around 18 months.

6    Q    And did you have to receive additional

7    training to get licensure as an RN?

8    A    Yes.

9    Q    Okay.  What additional training did you

10   receive?

11   A    I had to return back to school for my RN and I

12   started around 2008 or maybe 2007, completed it in 2009.

13   Q    Ms. Mills, do you have any children?

14   A    No.  I had just only the one daughter.

15   Q    And what was your daughter's name?

16   A    Kayla Mills.

17   Q    And what year was Kayla born in?

18   A    In 1991.

19   Q    Now, Ms. Mills, you understand that you are

20   here to be asked some questions about your daughter's

21   interactions with police officers in the criminal

22   investigation?

23   A    Yes.

24   Q    Obviously, today isn't going to be easy for

25   you talking about your daughter.  So if at any point in

Page 12

1    time, you need to take a break just please let me or any

2    of the other attorneys know, okay?

3    A    Okay.

4    Q    Ms. Mills, when did you first learn that

5    Katherine Mills had died?

6    A    The day of her -- the day that she passed away

7    -- the day -- I was at work and one of the CNAs had come

8    in that lived in that area and said that they heard that

9    she had passed away -- had fell and hit her head is what

10   they were saying.  That's there in the area because they

11   live relatively close to there.  The girl that told me

12   that.

13   Q    Do you -- do you recall the name of the woman

14   that first informed you that Katherine Mills had passed

15   away?

16   A    Uh-huh.  Her name was Charlotte Bangleman. She

17   lived like maybe two miles from there and she had come

18   in to work on 2nd shift and I was still there and she

19   told me.

20   Q    Did she tell you where she learned that

21   Katherine Mills had passed away?

22   A    I really don't -- I think her husband had told

23   her.  He may have even -- I think that she had told me

24   that he had maybe went out there to the area where

25   people had kind of gathered and that's what they were

Page 13

1    saying at the time.

2    Q    Did you know Katherine Mills?

3    A    I knew who she was, and I knew her kids and

4    her family.  I never had spoken to her myself, but I had

5    seen her before.  Knew where she lived.

6    Q    Have you ever been over to her home?

7    A    No.

8    Q    Okay.  After -- at the time that you found out

9    that Katherine Mills had passed away, would this had

10   been in December of 2010?

11   A    Uh-huh.  Yes.

12   Q    And in terms of Katherine's death to when you

13   found out, did you find out the same day that the police

14   found her dead or was it a week later or can you provide

15   any estimate?

16   A    The same exact time it was happening, my --

17   the girl that came into work had went by there and the

18   cars were there.  She talked to her husband and he told

19   her that that's what happened.

20   Q    Okay.  Now, at the time that you found this

21   information out was Kayla Mills -- was Kayla living with

22   you?

23   A    She was not living with me.

24   Q    Where was she living at that time?

25   A    She was living with her boyfriend.  His name



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 14

1 was Derrick Wagers.
2 Q Do you remember what town Kayla and Derrick
3 were living?
4 A They lived in Knox County, but it was an area
5 -- Girdler, Kentucky.
6 Q How do you spell that?
7 A I guess, G-I-R-D-L-E-R.
8 Q Okay. And do you know what type of residence
9 Kayla and Derrick Wagers had at the time?
10 A Yeah, they have lived in a mobile home next to
11 his parents' house.
12 Q I believe you testified a few moments ago that
13 Kayla Mills was dating a person by the name of Derrick
14 Wagers; is that right?
15 A Yes, sir.
16 Q Okay. Were they in a relationship in December
17 of 2010?
18 A Yes.
19 Q Do you know approximately how long they had
20 been dating by that time?
21 A She had lived with him since early spring and
22 had still been living with him at this time.
23 Q So in December of 2010, was your daughter,
24 Kayla, dating Jonathan Taylor?
25 A No.

Page 15

1 Q And to your knowledge, was Kayla in
2 communication with Jonathan Taylor --
3 A No --
4 Q -- in December of 2010?
5 A -- not that I -- uh-uh.
6 Q Is that a no?
7 A No. It's not -- yes, it is.
8 Q Sorry.
9 A No, she is not in any kind of contact, as far
10 as I know with him.
11 Q To your knowledge, when did -- approximately
12 when did Jonathan Taylor and Kayla break up?
13 A Probably late 2009. And probably around
14 August -- which that's not late. In my -- the best I
15 can remember, they stopped dating around -- probably
16 even earlier than that. It might have been -- yes, it
17 was earlier than that because I graduated from nursing
18 school in 2009 and they was not dating at that time. So
19 I remember that specifically. They had stopped dating
20 around May 2009.
21 Q When Jonathan and Kayla were dating, was there
22 a point in time where they both lived in your residence?
23 A Jonathan had a car accident and he was really
24 disabled. He stayed with us probably 3 or 4 months. He
25 was hardly even able to walk, and he lost his apartment

Page 16

1 while he was in the hospital. He was in the hospital
2 for several months and he really had nowhere to go so
3 yeah, I had let him stay with us for maybe 3 or 4
4 months.
5 Q Do you recall what year that would have been
6 in?
7 A Probably around 2000 -- sometime in 2008,
8 maybe late. Around 2000 -- late in the year. It was
9 winter 2008.
10 Q And maybe take a quick break and go off the
11 record real quick. We just lost one of the attorneys.
12 VIDEOGRAPHER: The time is 10:02 a.m. and we're
13 off the record.
14 (OFF THE RECORD)
15 VIDEOGRAPHER: The time is 10:07 a.m. and we
16 are back on the record.
17 BY MR. SLOSAR:
18 Q Ms. Mills, before we went on a break, I was
19 asking you some questions I think about Jonathan and
20 Kayla dating and the time frame that that was happening
21 in. So at some point in 2008 or 2009 was Jonathan
22 Taylor living with you?
23 A Yes.
24 Q And what city would that have been in?
25 A It was in Flat Lick, Kentucky at my home.

Page 17

1 Which is still in Knox County, but the Flat Lick area.
2 Q And at that point in time were Jonathan and
3 Kayla dating?
4 A Yes.
5 Q Okay. And I believe you testified earlier
6 that Kayla and Jonathan stopped dating by May of 2009;
7 is that right?
8 A Uh-huh.
9 Q Is that a yes?
10 A Yes.
11 Q Yes.
12 A I'm sorry.
13 Q You're good. And some time after that Kayla
14 began dating a person by the name of Derrick Wagers; is
15 that right?
16 A That's correct, yes.
17 Q And at some point after her and Derrick began
18 dating, they moved to a place called Girdle?
19 A Girdle. Girdler.
20 Q Girdler, Kentucky; is that right?
21 A Yes.
22 Q And is that still in Knox County? Girdler?
23 A Uh-huh, it is. Yes.
24 Q Okay. In December 2010 was your daughter
25 living with her boyfriend, Derrick Wagers in Girdler,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 18

1  Kentucky?

2      A    Yes.

3      Q    Now at some point after the time that

4  Katherine Mills passed away, did you come to learn that

5  Kayla was being approached by law enforcement relating

6  to an ongoing criminal investigation?

7      A    Yes.

8      Q    How did you first learn that Kayla was being

9  approached by law enforcement about Katherine Mills'

10 death?

11     A    Because she told me each time that they

12 approached her asking questions about Katherine,

13 Jonathan, Amanda, William.

14     Q    Did -- did Kayla ever tell you the names of

15 officers that were approaching her about the ongoing

16 investigation?

17     A    Yes.

18     Q    And which officers did Kayla tell you had

19 approached her about the investigation into the death of

20 Katherine Mills?

21     A    Justin York and John Pickard.

22     Q    And at the time was Mr. Pickard the Sheriff of

23 Knox County?

24     A    Yes.

25     Q    What did Kayla tell you about any conversation

Page 19

1  she had with Sheriff Pickard and the death of Katherine

2  Mills?

3          MR. WILLIAMS:  Let me just make an ongoing

4      objection or continuing objection to hearsay.  With

5      that objection, you may -- please go on.

6          MR. WEBER:  I'll join.

7      A    Several times he approached her at different

8  places, maybe the store or came to my mom's house one

9  day that she was there.  Told her what he thought

10 happened and was telling her that if she didn't

11 cooperate with the police that she was going to be

12 arrested and put in jail forever.  Her whole life would

13 be ruined and she would get really upset and call me.  I

14 told her to not talk to them because I knew where she

15 was the day -- she wasn't with Jonathan and not to worry

16 about it.  But it was really upsetting for her.  She was

17 19 years old and I was just thinking that maybe she was

18 just over-exaggerating the fact like the first couple of

19 times.  But it just became more and more and more

20 harassing.

21 BY MR. SLOSAR:

22     Q    So after -- I believe after Sheriff Pickard

23 approached Kayla, on at least one occasion did she call

24 you immediately after?

25     A    Immediately.  Immediately.

Page 20

1      Q    And in that conversation that you had with

2  your daughter, did she tell you what Sheriff Pickard had

3  requested her to say or do?

4      A    Just that he informed her of what he had

5  thought had happened and that he knew -- she said that

6  he knew that she was at least involved and that if she

7  would just cooperate and tell them that Jonathan and

8  Amanda and William Lester had killed Ms. Mills that he

9  would make sure that she would not get in trouble.  That

10 if she did not cooperate that she was going to get in

11 trouble.

12     Q    And when she was telling you this, was Kayla -

13 - what was her temperament?

14     A    She was very afraid.  Very afraid.  And it was

15 just upsetting.  She cried, and it was just hard for

16 her.  She didn't understand.  I didn't understand

17 because I kept on thinking I knew where she was, I

18 talked to her, I remembered the day.  I talked to her

19 several times and it was -- I guess I was in shock that

20 this was happening to my daughter.  Like, I just could

21 not believe it.   That they was making these accusations

22 and me knowing that it wasn't true.

23     Q    And when -- after Kayla had this conversation

24 with Sheriff Pickard, was she -- did she display any

25 sort of emotion during the phone call that she made to

Page 21

1  you afterwards?

2      A    She was tearful and scared, and she would

3  always say "I don't know what they were doing.  I don't

4  know."  You know, we would discuss how she did -- not to

5  worry about it because I knew that she didn't have any

6  idea what happened.  And she -- at the beginning, I

7  think when they first started talking to her about this,

8  she wasn't even -- had talked to Jonathan.  But, I mean,

9  they started talking afterwards again.  They had broke -

10 - been dating and broke up and then started talking.

11 And then I even asked her, "Well, has Jonathan ever said

12 anything to you?  If Jonathan has said anything to you,

13 you need to tell them because you don't need to be

14 involved in this."  And she was like, "Mom, Jonathan has

15 never said anything to me about this.  Nothing.  He

16 don't know anything at all."  Like he had never said

17 anything to her.  She always -- every single time she

18 said -- I would tell her, "If you know anything, you

19 tell them.  You tell what you know.  And she's like, "I

20 don't know anything."

21     Q    What did -- after you had the conversation

22 with your daughter over the phone after Sheriff Pickard

23 approached her, do you know where Sheriff Pickard had

24 approached her at during the first telephone

25 conversation you had with Kayla?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 22

1    A    I think the very first --
2         MR. WILLIAMS:  Object to form.
3    Q    Go ahead.
4    A    The first time is he had followed her into my
5  mom's -- mother's house.
6    Q    What is your mother's name?
7    A    Her -- my mama's name was Sylvia Smith.
8    Q    Okay.
9    A    Followed her there.
10   Q    And when you are referencing her, are you
11 talking about your daughter, Kayla?
12   A    Kayla, yeah.  Kayla followed her to my mom's
13 house.
14   Q    And after following Kayla to your mom's house,
15 did Kayla tell you about the interaction that she had
16 with Sheriff Pickard?
17   A    Just that he come and told -- questioned her
18 again about Katherine and that he knew that she was
19 involved.  That he had witness' statements and that if
20 she didn't tell them the truth about the -- what
21 happened that she was going to jail.  That's what they
22 always told her every time.  Same story.
23   Q    At some point in time did Kayla ever tell you
24 -- well, let me withdraw that.  A few moments ago, you
25 had testified about Sheriff Pickard telling Kayla who to

Page 23

1  implicate in the case in order to get out of any
2  charges.
3    A    Yes.
4    Q    Do you know when Sheriff Pickard --
5         MR. WILLIAMS:  Object to form.
6    Q    -- first made comments like that to Kayla?
7    A    The best -- I mean, it's so -- been a while
8  back.  The -- I remember that specific time at my
9  mother's house and there was another time they had
10 arrested them on charges that was never brought forth.
11 That the whole city police was there and they arrested
12 five people, my daughter being one of them.  And all he
13 talked about was the murder case.  Had her on the couch
14 while they were going through like a SWAT team is how
15 she explained it to me.  It's how I feel it was.  I
16 wasn't there but -- and all he wanted to talk about was
17 the murder case, Katherine, and Kayla didn't tell them
18 that Jonathan, Amanda and William was involved.  That
19 she was going to go to jail and he would -- if she would
20 help him it might be better for this case that she was
21 in.  They arrested them for meth at Jonathan Taylor's
22 apartment and of course, she never said anything to him.
23 Because she didn't -- she never knew anything.  My
24 daughter told me everything.  She never lied to me no
25 matter how bad it was.  She never lied to me.  And I

Page 24

1  told her that if she had any knowledge of anything about
2  this when it -- toward the end when the harassment got
3  so bad with the -- them coming more often and sitting
4  out in front of my house -- that if she knew anything
5  that we would get a lawyer.  And she was like, "Mom, I
6  don't know anything.  They've not told me anything."
7    Q    So is it fair to say that based on your
8  conversations with Kayla that Sheriff Pickard was
9  telling her what to say instead of asking her to tell
10 the truth?
11        MR. WILLIAMS:  Objection to form.
12        MR. WRIGHT:  Object to form.
13   Q    You can answer.
14   A    She was just -- would say that he wanted her
15 to say the story that he knew -- the witnesses had told
16 them that she was in the car and that's what she needed
17 to say, basically.  I mean, I don't know really the full
18 conversation that -- the way that I took her statement
19 from what she was saying to me he was saying that he had
20 witness statements saying that she was in the car.  That
21 she was at least involved and that she didn't tell them
22 that then she was going to go to jail.  That she was
23 going to end up staying in the jail the rest of her
24 life.
25   Q    And after she had this conversation with

Page 25

1  Sheriff Pickard, did she call you?
2    A    Yes.
3    Q    In that conversation, was she emotionally
4  describing the interaction that she had just had with
5  Sheriff Pickard?
6    A    Yes.
7         MR. WRIGHT:  Object to form.
8         MR. WILLIAMS:  Join.
9    Q    You referenced a few moments ago about
10 harassing, or harassment sort of picking up towards the
11 end, what are you referring to?
12   A    Just that my daughter -- we lived close to the
13 store and she didn't have any transportation at this
14 time because I had took her car.  And she had walked to
15 the store and he would be -- John Pickard would be
16 sitting at the store just waiting for her to come out of
17 the house.  Or that's how she felt.  Like he, I mean,
18 maybe he wasn't, I don't know.  But she felt harassed.
19 She felt that every time she come out of the house, he
20 was just sitting there watching her.
21   Q    And because --
22   A    She felt really harassed and threatened.  She
23 told me this herself.  That she felt they were
24 harassing, and she felt threatened, and she was scared.
25   Q    Did she tell you who she was scared of?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 26

1    A    Jack -- mostly John -- Jason York.  John
2 Pickard come off as trying to help her.  I mean, she
3 felt like that he was trying to help her is what he made
4 her feel like.  But I think that it was just, like, he
5 was just wanting her to say that she did know something
6 and was trying to befriend her because she was so young
7 and she didn't understand.
8    Q    When these interactions were going on between
9 your daughter, Kayla, and these law enforcement
10 officers, approximately how old was Kayla at the time?
11   A    At 19 -- she was 19.  It may have even started
12 when she was 18.
13   Q    And earlier you had provided some testimony
14 about having conversations with your daughter after
15 discovering that police officers continued to question
16 her about the Katherine Mills homicide.
17   A    Uh-huh.
18   Q    Did you ever ask your daughter whether she had
19 any information about --
20   A    Yes.
21   Q    -- the death of Katherine Mills?
22   A    I absolutely did.
23   Q    And what did she tell you?
24   A    No, she had no information.  And I told her
25 every single time this happened to, if she knew anything

Page 27

1 to tell the truth.  And she said, "Mom, I don't know
2 anything about it.  No -- Jonathan has never told me
3 anything ever."  And she would never lie to me no matter
4 how bad, whatever she did, she would tell me the truth.
5    Q    Did you ever pointedly ask your daughter
6 whether Jonathan Taylor had ever confessed any
7 involvement to her in the death of Katherine Mills?
8    A    Yes.  Absolutely.
9    Q    And what did she tell you?
10   A    She said no.  No.  Never.
11   Q    Now, at some point, do you recall -- well,
12 before we get there.  Earlier you had testified that you
13 knew your daughter was doing on the date of Katherine
14 Mills' death.
15   A    Yes.
16   Q    Do you recall testifying about that?
17   A    Uh-huh.
18   Q    How do you recall knowing what Kayla was doing
19 that day?
20   A    Because she was out Christmas shopping and I
21 knew because I had to use her boyfriend's phone to call
22 her, to contact her, because her phone was tore up.  So
23 I had called all day long his phone and -- to talk to
24 her.
25   Q    And who was her boyfriend at the time?

Page 28

1    A    Derrick Wagers.
2    Q    Okay.  And what -- how did that day sort of
3 stand out in your mind?
4    A    Just because that -- the area where this
5 happened is where I grew up and I knew the family and I
6 mean, it was kind of a big deal.   You know, stuff like
7 that doesn't happen that often.
8    Q    To your knowledge, what was your daughter
9 doing on December 20, 2010?  The day that Katherine
10 Mills was found dead?
11   A    She had been with her boyfriend.  They had
12 went Christmas shopping and just a normal day.  I mean -
13 -
14   Q    And during that day, did you have an
15 opportunity to talk to Kayla?
16   A    Yeah, I talked to her several times.   I
17 talked to her several times every day.  Probably had
18 talked to her 10 times at least.
19   Q    Now, prior to December -- on December 20,
20 2010, did Kayla -- was Kayla in possession of a blue
21 vehicle that your family owned?
22   A    No.
23   Q    Okay.  And the blue vehicle that I'm referring
24 to, do you recall the vehicle that I'm referring to?
25   A    Her car, yes.

Page 29

1    Q    Okay.  What type of car did Kayla have --
2 well, when did she first get that car?  That blue car?
3    A    I think she had got it probably maybe a year
4 before that.
5    Q    Sometime in 2009?
6    A    Yeah.
7    Q    And --
8    A    Around August because she had started school
9 and she was going to Southeast College and she had to
10 have a car for transportation.  So --
11   Q    Where is Southeast College?
12   A    Middlesboro.
13   Q    Do you remember what she was studying there?
14   A    She was going -- taking classes towards
15 nursing.
16   Q    Do you recall what type of vehicle the blue
17 car was?
18   A    I think it was a Pontiac G-5.  Probably -- I
19 think it was a 2007 model Pontiac.
20   Q    Now -- and on December 20, 2010 was Kayla in
21 possession of that vehicle?
22   A    No.
23   Q    And why is that?
24   A    Because on December 3rd, she had got into a
25 fight with her boyfriend or argument and she was going

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  to my mom's and she got above where we lived and went on
2  it creek and the car, I don't know, I think it ran out
3  of gas, broke down, and she just left it. And called my
4  mom to come and get her. The weather was really bad, so
5  they wasn't able to go and my mother had tried to call
6  me and I didn't get the phone call to -- I had to work
7  the next morning. So I had to leave work, go up the
8  road past my house --
9     Q    Where did she leave the vehicle?
10    A    Sitting around the Stinking Creek Fire
11  Department area. She just left it sitting on the side
12  of the road almost in the road. So I had to call a
13  wrecker, Ellis Gregory's wrecker service, get the car,
14  and I was very upset with her because the weather was
15  bad and she shouldn't have been driving the car anyway -
16  -
17     Q    And --
18    A    -- so I take the car and parked it and took
19  the keys. She never got the car.
20     Q    So what did -- so you were -- as a parent, you
21  were frustrated with Kayla leaving the car there, right?
22    A    Yes. I was frustrated because she was in
23  the car, the weather was bad, she shouldn't have been
24  driving in the snow. It was really slick. It had
25  snowed. The roads was really bad. My mom wasn't even

1  able to get over to where she was because the weather
2  was so -- roads were so bad.
3     Q    What did -- did you ultimately punish Kayla
4  for leaving the car --
5    A    I did.
6     Q    -- or going out in it? And what -- what did
7  you do to punish Kayla?
8    A    I took the car.
9     Q    And what did you do with the car?
10    A    I parked the car between -- I took the car to
11  my house and I backed it in by my garage. And I had a
12  camper at that time and pulled the camper out, put the
13  car there, put the camper in front of the car, took the
14  battery out, took the keys.
15     Q    I'm going to show you what we'll mark as
16  Exhibit number 1. Here you go, Ms. Mills. Ms. Mills,
17  do you recognize the garage that we're looking at?
18        (EXHIBIT 1 MARKED FOR IDENTIFICATION)
19    A    Uh-huh. That's my garage.
20     Q    Okay. And is that the garage that was at your
21  residence in December of 2010?
22    A    Yes.
23     Q    Okay. Next to that garage, do you recognize a
24  blue vehicle?
25    A    Uh-huh. Yes, I do.

1     Q    And how do you recognize that vehicle?
2    A    Because it's my car. It's my -- that my
3  daughter drove.
4     Q    Okay. Is that the car that you took away from
5  Kayla after December 3, 2010?
6    A    Yes.
7     Q    Okay. And I believe a few moments ago, you
8  were describing that as part of the punishment you did
9  certain things to the vehicle to make it inoperable; is
10  that right?
11    A    Yes.
12     Q    And what did you do?
13    A    At the time, I had a camper and the camper was
14  parked in front of the car. And on -- you can't really
15  tell in this picture on this photograph, but on the
16  right side there is a ditch. Like a very deep ditch --
17  it's growed but it's probably that deep.
18     Q    Okay. Like --
19    A    Probably that deep.
20     Q    -- like 2 or 3 feet?
21    A    Yeah.
22     Q    Okay.
23    A    And I put the camper in front of it and took
24  the battery out and took the keys.
25     Q    Can you just mark on this photograph where you

1  put the camper in front of the car?
2    A    I mean, the camper was backed up all the way
3  to where it was probably 3 feet in front of the -- it
4  was right-- I mean, you couldn't pull that much in
5  front of the -- because -- the front of the -- you
6  couldn't move, like pull. And then there's --
7     Q    Okay. How big was the camper?
8    A    It was a big camper. Like huge. Fifth wheel
9  with a -- the big campers.
10     Q    Did Kayla have any way to move the camper?
11    A    No, it had to be pulled by a truck. Like you
12  had to hook it to the truck and move it. There's no
13  way. The car wasn't able to move.
14     Q    And what -- what else did you do to the car
15  aside from putting a camper in front of it to make sure
16  that Kayla could not use the vehicle after the wrecking
17  service dropped it off?
18    A    We removed the battery, took some kind of fuse
19  out that wouldn't let the car start. Something -- I
20  really don't know but it was something that even if you
21  put the battery in, unless you know how to fix that
22  back, you couldn't fix it back, and put the camper in
23  front of it.
24     Q    So after the wrecking service dropped the car
25  off, would this have been around December 4, 2010?



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 34

1    A    It was -- yeah.
2    Q    Okay.  After -- after the car was brought back
3  to your property and these certain things were done to
4  it to make it inoperable, did Kayla ever take it off of
5  your property in December 2010?
6        MR. WRIGHT:  Object to form.
7    A    No.  She did not.
8    Q    Okay.  Was the car operable on December 20,
9  2010?
10   A    No.
11   Q    Was Kayla Mills in possession of the car on
12 December 20, 2010?
13   A    No, she was not.
14   Q    And when did you ultimately make the car
15 operable and return it back to Kayla?
16   A    I gave the car back to Kayla in September in
17 2012.
18   Q    And when you gave the car back to Kayla, where
19 was she living then?
20   A    In Louisville.
21   Q    Between December 3, 2010 and September of
22 2012, did Kayla ever have possession of the car?
23   A    No.
24   Q    Ms. Mills, do you recall the day that Kayla
25 ultimately gave the statement at the police station in

Page 35

1  2012 implicating Jonathan Taylor in the Katherine Mills
2  homicide?
3    A    Yes.
4    Q    And on that date, what -- do you recall any of
5  the events leading up to Kayla giving a statement that
6  day to Detective York?
7    A    The day before that she give her statement, I
8  had been staying the night at my boyfriend's, so I come
9  home that morning --
10   Q    Who is your boyfriend?
11   A    My boyfriend at the time, my fiance, was Scott
12 Mills.
13   Q    Okay.
14   A    And I had come home, and he was -- Jason York
15 and John -- Chase Sowders, like, within minutes after I
16 got there that morning around 9:30 he come to the house.
17   Q    And what house was -- did they come to?
18   A    My house on Flat Lick.
19   Q    Okay.  And at the time, what vehicle were you
20 driving?
21   A    At that time, I had used Kayla's car.  This --
22 I used it.
23   Q    Okay.
24   A    Because my car was in the garage.
25   Q    And why was your car in the garage?

Page 36

1    A    The fuel pump had quit working.  And I had to
2  get it fixed.
3    Q    So the day before Kayla gave her statement,
4  which was on March 16, 2012, the day before that, you
5  were driving in the blue vehicle that you've identified
6  in Exhibit number 1; is that right?
7    A    That's right.
8    Q    Okay.  And when did you put -- when did you
9  make that car operable so that you could drive it?
10   A    The -- I had drove it probably two days
11 because my car had been tore up about a couple days.  I
12 had to get a new battery and fix that fuse and the time
13 -- at this time, the camper was moved probably about 4
14 or 5 months because -- or longer, because I had bought
15 the camper with -- this had been several years ago.  At
16 the time that Ms. Mills had passed away, I was living
17 with another man.  This was like in 2008 -- from 2005 to
18 2008.  Maybe '10.  Yeah.  And we had the camper together
19 and when he left, he took it.
20   Q    Okay.
21   A    And he left in 2011, so that's when the camper
22 was gone.
23   Q    Okay.  So sometime in 2011, is it John Valdez
24 --
25   A    Yeah.

Page 37

1    Q    -- he took the camper?
2    A    Yeah.
3    Q    Okay.
4    A    Around September 2011.  But it sat there until
5  then.
6    Q    But -- so is it fair to say that from December
7  -- approximately December 4, 2010 until September of
8  2011 the camper sat on your property in front of the
9  blue car?
10   A    Uh-huh.
11   Q    Okay.  Is that a yes?
12   A    Never moved.  Yes.
13   Q    Okay.
14   A    Until he left and then he was actually living
15 in the camper.
16   Q    And then at some point around March of 2012,
17 you made the car operable because your car was having
18 issues; is that right?
19   A    Yeah.
20   Q    And so a few moments ago, you were talking
21 about how on March 15, 2012 you had some interaction
22 with Detective York and Chase Sowders?
23   A    Yes.
24   Q    And where did that interaction occur?
25   A    At my home at Flat Lick.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 38

1    Q    And what happened when you arrived at your
2  home in Flat Lick?
3    A    I come home and I unlocked the door, went in
4  the house and was flipping off my shoes and, like,
5  briefly turned around and I could see them coming up the
6  sidewalk.  Like, they literally must have been
7  following me coming straight there, if I was coming.
8    Q    And on March 15, 2012 did you have blonde hair
9  like you do today?
10   A    Yes.
11   Q    And at that time, did your daughter, Kayla,
12 also have blonde hair?
13   A    Yes.
14   Q    Okay.  What happened after you arrived home on
15 March 15, 2012?
16   A    I went in and then they come to the door.  I
17 opened the door and let them in and they just walked in
18 like looking around, went halfway down the hallway and
19 looking for Kayla.  And I'm like, "She's not here.  I
20 have not seen Kayla in a couple days."
21   Q    Did you eventually have a conversation with
22 Detective York?
23   A    Yes.
24   Q    And during that conversation, what did
25 Detective York tell you?

Page 39

1    A    He told me -- I was trying to explain to him
2  that I knew where Kayla was the day that Ms. Mills died.
3  He told me, and this was the quote, "I don't give a shit
4  where she was that day."  It's that he said.  I don't
5  care what you say.
6    Q    Did you --
7    A    "I need to talk to Kayla.  She knows what I
8  need her to say.  And if she doesn't come by 2:00 today
9  to the City police station and tell me what she knows, I
10 want her to say specifically" -- is what he said.  I'll
11 never forget it.  "And she knows what that is, she is
12 going to jail because I have a warrant for her arrest
13 and she is going to jail.  And I don't even need her
14 statement anyway because I already have enough evidence
15 to arrest her."
16   Q    And during this conversation, did that take
17 place inside or outside your home?
18   A    Inside.
19   Q    Was anybody else there aside from the two
20 officers?
21   A    No.
22   Q    And when Detective York was saying these
23 things to you, did you ever make any attempts to tell
24 Detective York about Kayla's whereabouts --
25   A    I did.

Page 40

1    Q    -- on the day that Katherine Mills was found
2  dead?
3    A    I did.
4    Q    And what did you -- did you -- what did you
5  tell them?
6    A    I said, "I know you've talked to my daughter a
7  few times and I don't know why you've been here when
8  I've not been here.  I don't think you should be talking
9  to a 19-year-old child without me present and I didn't
10 appreciate that."  And I said, "She was -- I know where
11 she was that day.  She wasn't even dating Jonathan.  She
12 hadn't been seeing Jonathan in probably at least a year.
13 And I don't know why you're doing this.  I -- she was
14 dating another boy.  I know where she was.  I talked to
15 her.  You can talk to him.  You can verify that she was
16 with him.  You can get his phone records where I talked
17 to her on his cell phone.  You can talk to his parents.
18 You can probably even get Walmart video where they
19 were."  He said, "I don't give a shit what you're
20 saying.  I don't care.  She's going to come in here
21 today and tell me what she -- I want her to say.  And
22 she knows what that is because I've talked to her
23 several times.  And if she doesn't, she's going to go to
24 jail today."
25   Q    And to your knowledge, well -- I'll withdraw

Page 41

1  the question.  Did Detective York or Chase Sowders do
2  anything else when they were inside your home?
3    A    Chase Sowders didn't do anything or really say
4  anything.  But he went into my daughter's room, didn't
5  even really ask me if he could.  And was looking through
6  old cell phones that didn't even work and looked through
7  her drawers.  A couple of her nightstand drawers.  And
8  just telling me that he knew Kayla had did it and I was
9  arguing with him that I knew she didn't.  And he was
10 really rude to me and he was very unprofessional and
11 treated me really bad in my own house.
12   Q    Did Detective York ever show you any type of
13 search warrant to search your residence?
14   A    No.
15   Q    Did you ever give him approval to search the
16 residence?
17   A    He come in and he asked could he look for
18 Kayla.  So I guess I really gave him approval to look
19 for her.
20   Q    And you --
21   A    She wasn't there.  I would not lie to them.
22   Q    Did you tell Detective York that she wasn't
23 there?
24   A    Yes.
25   Q    Okay.  Did you ever give Detective York

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1 permission to search Kayla's room?

2    A    No.

3    Q    Did he ever give --

4         MR. WRIGHT:  Object to form.

5    Q    -- Detective York permission to search any of

6 her drawers?

7    A    No.

8    Q    After approximately how long did the

9 conversation last between yourself and Detective York

10 and Mr. Sowders?

11    A    Probably, the best I can remember, around 30

12 minutes.

13    Q    Okay.

14    A    Maybe a little more.  Maybe a little -- at

15 least 30 minutes.

16    Q    And what happened?  What did you do after

17 these officers left?

18    A    I had to go find Kayla and locate her because

19 he told me that if I didn't have her there, that he was

20 coming back at 2:00 and he would find her.  I mean, I

21 really think he was going to arrest her.  He brought

22 Jason -- Jay Sowders with him in a police car.  I don't

23 know -- I felt like maybe that he was going to try to

24 arrest her.  I don't know.

25    Q    And to your knowledge, was Jay Sowders Jason

1 York's brother-in-law at that time?

2    A    Yes.

3    Q    So what -- after these officers left your

4 home, what did you do?

5    A    I got into my car, we went up Stinking Creek

6 up into -- I called around a few places to see if

7 anybody had seen Kayla on the -- some numbers I had of

8 her friends and one told me where she might be and I

9 went and found her on an old back road up Stinking

10 Creek.  And I found her and brought her home and we went

11 to the -- I had called a lawyer to go with me and the

12 lawyer wasn't able to come on Thursday.  I think the

13 date was -- the day was Thursday maybe of the week.  But

14 he told me he could come Friday is how I think I

15 remember it.

16    Q    Who -- who was the lawyer that you reached out

17 to?

18    A    Kenneth Boggs.  So I went ahead and went to

19 the City Police station and spoke with Jason York and

20 told him that.  I will bring Kayla back tomorrow I think

21 at the same time to give a statement when the lawyer was

22 available to go with me.  And he said, "Okay."

23    Q    The next day, did you ultimately go to the

24 police station?

25    A    Yes.

1    Q    Okay.  And who did you go to the police

2 station with?

3    A    Me and Kayla drove -- rode in the car

4 together.  And my fiancé Scott Mills, well my husband now,

5 went with us.  And the lawyer, Kenneth Boggs, met us

6 there.

7    Q    And what police station did you go to?

8    A    The Barbourville City Police station.

9    Q    When you went to the Barbourville Police

10 Department, what happened after you and Kayla got there?

11    A    We just went in and sat down and Jason York

12 just stated, "You're going to tell me something today.

13 You're going to tell me what you -- I want you to know."

14 He said, "I want you to tell me what you know -- to tell

15 me or you're going to jail.  And we discussed this,

16 Kayla" -- is what he said.  "We've discussed this

17 several times.  You know what you have to say.  If you

18 don't tell me this, you're going to jail today."

19    Q    And did Detective York tell that to Kayla in

20 front of you?

21    A    Yes.

22    Q    And was your now husband, Scott Mills, was he

23 also present?

24    A    He was, yes.

25    Q    Okay.  And prior to -- what sort of room were

1 you brought into where this conversation happened?

2    A    It was -- I think when we went in, we went to

3 the left and just a little small room with a table.  I

4 don't know.  I don't have -- probably only -- that's the

5 only time I remember being in there.

6    Q    Were any other law enforcement officers a part

7 of this conversation?

8    A    No.  None that -- just Jason York.

9    Q    Now, prior to being in an interrogation room

10 or a questioning room on March 16, 2012, did Kayla ever

11 tell you about any conversation she had had with

12 Detective York about the death of Katherine Mills?

13    A    Yes, he approached Kayla several times, and

14 each time she told me that he did, and I told her not to

15 talk to him.

16    Q    During those conversations, did Kayla ever

17 tell you what Detective York had told her?

18    A    Just that he knew he had witness statements

19 saying that some Brown man up on Browns Branch had told

20 him that Kayla had told him that Kayla had told her --

21 Jason York told Kayla that some Brown man that lived on

22 Browns Branch told him that Kayla told him, the Brown

23 man, I'm sorry, that her, Jonathan, William Lester and

24 Amanda Hoskins had robbed Katherine.  He knew it.  He

25 had statements.  And if she didn't tell him this, that

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 46

1  she was going to jail.
2      Q     And after --
3      A     That's what he had told her up to this time.
4  The day that we went to the -- give the statement, he
5  had had a statement from another girl, this time.  But
6  originally, he was saying -- and I don't even remember
7  the man's first name, but he was a Brown.  He give a
8  statement saying that Kayla had told this Brown man that
9  they had robbed Ms. Mills.
10     Q     And so in these --
11     A     And he wanted her to tell him that.
12     Q     Okay.
13     A     Jason York wanted Kayla to tell him that.
14     Q     Okay.  So Kayla told you that Detective York
15 was telling her to say that she was involved in the
16 murder of Katherine Mills with Amanda Hoskins, Jonathan
17 Taylor and William Lester; is that right?
18     A     Yes.
19     Q     And after she had these conversations with
20 Detective York where he was trying to get her to repeat
21 that information, did she call you or did she talk to
22 you in person about the things that Detective York was
23 trying to get her to say?
24     A     She talked to me in person.  When I'd get off
25 work she would come.  If I couldn't talk to her at work,

Page 47

1  as soon as I would get home she would tell me that he
2  told her this.  And then I would just say, "Kayla,
3  they're just trying to intimidate you.  Don't worry
4  about it.  You know where you was.  I know where you
5  were.  There's no way that you're going to get in
6  trouble.  But if you know anything about Jonathan, if
7  Jonathan has told you anything, you need to tell me."
8      Q     And each time you told her that, did she --
9  how did she respond?
10     A     She would always respond, "Jonathan has not
11 ever told me this."  I even spoke to Jonathan.  I even
12 called Jonathan myself and told Jonathan, "Jonathan, if
13 you know anything about this or anything, you need to
14 tell them."
15     Q     What did Jonathan tell you?
16     A     He said, "I promise you, Donna, that I don't
17 even know this lady.  I've never been -- I don't even
18 know where her house is.  I've never been there.  I
19 don't know her.  I don't know anything about it."
20     Q     Now, let's fast forward --
21     A     I even asked her had William said anything to
22 him or Amanda?  He said, "Never.  Nothing."
23     Q     So let's -- let's go back into this into each
24 room with yourself and your now husband, Scott Mills,
25 and Ken Boggs and your daughter, Kayla, with Detective

Page 48

1  York.  You already testified about the statement that
2  Detective York made to Kayla at the beginning of this
3  questioning.  What information did Kayla tell Detective
4  York in response?
5      A     In the beginning when it first started, she
6  was telling him she didn't know anything, and he kept on
7  insisting.  "You know.  You know.  You know this.  You
8  know you're going to have to tell me."
9      Q     Did Kayla --
10     A     And each time she told him no, he got each --
11 more angry.
12     Q     And could you visi -- like visibly, could you
13 tell that Detective York was getting more upset?
14     A     Yes, I could tell.  And I was even somewhat
15 frightened.  I mean, it was very scary for me to sit
16 there with my daughter knowing that she hadn't -- I knew
17 she hadn't done this.  I knew in my heart 100 percent.
18 There wasn't a doubt in my mind that I knew that Kayla
19 had nothing to do with this.  I knew 100 percent.  I
20 knew.  And to sit here and to see these police officers
21 that you think are going to protect you from this stuff
22 and they're sitting here telling your 19-year-old
23 daughter they're going to prison for murder and robbery.
24 Maybe like -- maybe the death penalty for something.
25 "You're going to tell me or you're going.  You're going

Page 49

1  to tell me."  Hitting his desk and just acting irate.
2  It was terrible.  I've never seen anything like it in my
3  life.  I couldn't believe that police officers was doing
4  this.  Harassing a 19-year-old child.
5      Q     How did it make you feel when Detective York
6  was getting angry?
7      A     I was really scared.  I was.  I was really
8  scared.
9      Q     And could you tell --
10     A     Not for like my life but just like "Oh my God,
11 I cannot believe this is happening."  Like, this is
12 America.  Who comes in here and tries to make you tell
13 something.  And you were telling him over and over "I
14 don't know.  I don't know. I don't know."
15     Q     And did Detective --
16     A     And to the point, "You are going to tell me or
17 you're going to jail.  You are."
18     Q     Did Detective York ever hit the table?
19     A     Yes, he did hit the table.
20     Q     Did he raise his voice?
21     A     He did raise his voice.
22     Q     Could you tell how Kayla was reacting to --
23     A     She was frightened.  She was -- she didn't --
24 she was afraid to go to jail for the rest of her life
25 for something that she had no idea.  Like if she knew

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 50

1 anything, she would have told them like in the
2 beginning. She would have not lied about it and she
3 would have never lied to me.
4     Q    And at the -- at the beginning of this
5 questioning session, did Kayla ever inform Detective
6 York that Jonathan Taylor had never made any statements
7 to her?
8     A    Yes, she had told her. I heard her tell him
9 that she didn't know anything about it. That she did
10 not know and he would not take that -- he was not going
11 to take that for an answer at all.
12     Q    When Kayla was telling Detective York that
13 Jonathan had never confessed to her, that she didn't
14 have any knowledge relating to Katherine Mills' death,
15 how did Detective York react to that?
16     A    He was just angry. He was -- just kept on
17 telling her that she was -- over and over and over and
18 over that he knew she was lying, and he had. He had
19 witness statements. He didn't even need her statement
20 anymore. That he had had another statement from Amber
21 Simpson. He went on to play a few minutes of that tape
22 that this girl made and Kayla looked at him and she
23 said, "That's not true. That girl is lying, because if
24 Jonathan would have told her that, he would have told me
25 this." She said, "I know that's a lie."

Page 51

1     Q    Now, at some point during this interaction
2 with Detective York, did you ever see any sort of
3 recording device on the table?
4     A    Yes.
5     Q    Okay.
6     A    Because he had played that other type of
7 recording.
8     Q    And what was Detective York doing with the
9 recording device as Kayla was telling him that she
10 didn't have any knowledge relating to Katherine Mills'
11 death or that Jonathan didn't confess to her?
12     A    He had actually stopped the tape a few times.
13 I mean, I don't remember how many times. It's been a
14 while ago. I was very, very upset. But yes, he did ask
15 her questions and when she didn't answer appropriately,
16 he would stop it and then -- go over it again what he
17 thought she should -- he knew she knew. Because the
18 story -- I didn't tell this in the beginning. They had
19 went to my aunt's house and told my aunt that they had a
20 witness statement that Kayla was passed out in that blue
21 car.
22     Q    And who -- who -- which officer -- well, let's
23 -- let's hold off on that real quick, okay?
24     A    Sorry.
25     Q    When Detective York would stop the recorder,

Page 52

1 were you able to tell whether he ever deleted any of the
2 recordings? What Kayla was saying?
3     A    No, I didn't.
4     Q    Couldn't get a good enough look?
5     A    No.
6     Q    Okay. And -- but after Kayla, I believe what
7 you testified to, was Kayla would deny any knowledge,
8 Detective York would fumble around with his recording
9 device and stop it and then sort of rehearse what he
10 wanted her to say again; is that right?
11     A    Yes.
12     MR. WRIGHT: Object to form.
13     Q    And how would Detective York sort of rehearse
14 or instruct Kayla on what to say after he would stop the
15 recording device?
16     A    He would just say, "According to this witness
17 statement, that you was in the car, that you may have
18 been passed out. And that's all you need to tell me and
19 you won't get in trouble. You need to tell me what you
20 told this witness." And she said, "I never told him
21 that." "You did tell him that, Kayla. You was in the
22 car, you woke up and this was happening at Ms. Mills'
23 house. And you need to tell the truth. You need to
24 tell this what you told this gentleman." And she was
25 like, "I never talked to him. I never told him that."

Page 53

1 And he was -- she -- he was -- he said, "Then why is
2 everybody on Stinking Creek saying this about you?" And
3 she said, "Because you've went around and told everybody
4 this." She said, "Everywhere I go you've been there
5 asking questions and telling them that I killed this old
6 lady and I'm going to have to leave. I'm going to have
7 to move out of Knox County because of you."
8     Q    Did -- and to your knowledge, before having to
9 give a statement on March 16, 2012, was Kayla -- did the
10 police interactions with her about this case and all the
11 pressure that they were putting on her, how did that
12 affect her?
13     MR. WILLIAMS: Object to the form of the
14 question.
15     Q    It's a good question. That's why they
16 objected. You can answer.
17     A    She was upset. Kayla had -- earlier when she
18 was around 16 or 17 had got on drugs really bad. She
19 had got off drugs and was doing better. When this all
20 started, she had a really bad relapse. She really did.
21 I mean, it was really hard on her. I mean, it was
22 really hard -- more hard on her than I really realized
23 because I knew in my mind, well, what can they do to
24 her? She doesn't know anything. I know where she was.
25 I didn't -- I mean, I knew she didn't have that car. I

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1 knew where she was that day.  100 percent I know she was
2 nowhere around Jonathan Taylor.  I know.  And I'm like,
3 this ain't nothing going to happen.  But in her mind, I
4 didn't hear a lot of the conversations, just what she
5 said.  I wasn't as worried about it.  But after I talked
6 to Jason York and I seen how he approached, I can
7 imagine how she felt.  Like she was really worried that
8 she was going to go to jail and that he was going to --
9 she was worried -- afraid to even go out of the house
10 sometimes.  She got really paranoid and it was awful.
11 It really got bad.  Like she was -- she really had
12 relapsed and it was bad.  It was.
13    Q    After she broke up with -- after her and
14 Jonathan broke up in 2009, was there a period of Kayla's
15 life where she had, you know, stopped doing -- like
16 sobered up?
17    A    She did.  She went into a rehab and stayed for
18 her full course of inpatient treatment.  I think she
19 stayed around 60 days maybe and got out.  And she had
20 lacked one class of finishing high school.  She finished
21 that class in a summer program, sent her in May and then
22 we got her signed up for college, she was going to
23 school.  She got out of the rehab in May and she didn't
24 talk to Jonathan.  While she was there, maybe one time.
25 And she had no more contact with him.  They realized in

1 her group therapy that they was not good for each other
2 and they only brought each other, you know, with the
3 drugs and so she wanted to -- and I tried to steer her
4 clear of him.  Not that I thought he was a bad person,
5 they was just bad.
6    Q    Together.
7    A    Together.  And so she had stopped and then she
8 met that -- met Derrick and they dated for a few months
9 and when she turned 18 she moved in with him and they
10 was doing really good.   Like they did things young kids
11 do.  Went to the movies and went shopping and went to
12 the Bristol race and just done things and she was going
13 to school and I got her the car.  She was doing good and
14 then around January, February her and Derrick broke up.
15 And then I don't know -- her and Jonathan started
16 talking again maybe --
17    Q    Would that have been January or February of
18 2011 or 2012?
19    A    Probably '11.  2011.  I mean, I'm not really
20 for sure of the date.  Her and Derrick dated for a long
21 time.  I mean, they were even talking about -- they were
22 engaged and was talking about being married.  They were
23 together during this time that Ms. Mills got -- they
24 were living together when Ms. Mills was murdered or
25 whatever happened to her.

1    Q    Okay.  During this questioning by Detective
2 York on March 16, 2012 when you were at the police
3 station with Kayla, I believe you testified earlier that
4 Kayla had repeatedly informed Detective York that
5 Jonathan had never confessed any involvement in Ms.
6 Mills' death; is that right?
7    A    Yes, I did.
8    Q    And in spite of that, did Detective York keep
9 telling Kayla what he wanted her to say?
10    A    Yes, he did.
11    Q    And when Detective York was telling Kayla what
12 he wanted to say, did Kayla continue telling Detective
13 York that she didn't know any of that?
14    A    She did.
15    Q    Did she tell Detective York that it wasn't --
16 that she didn't have any knowledge of Amanda, Jonathan
17 or William participating in Katherine Mills' death?
18    A    She did tell him that.
19    Q    And did Detective York take Kayla's responses
20 and stop the questioning or did he continue pressuring
21 her?
22    A    He continued and continued and continued.
23    Q    And at some point, how did that -- did
24 Detective York's questioning of Kayla become more
25 aggressive?

1    A    It did.
2    Q    And at some point, did it become so aggressive
3 that you yourself became physically ill?
4    A    Yes, I did.  I got so ill I had to leave the
5 room and literally go out in the parking lot and throw
6 up.  It was so bad.  Really, it was that bad.
7    Q    And do you know approximately, I'm sure it
8 felt like forever when you were there.   But do you know
9 approximately how much time sort of existed from the
10 time that you first met with Detective York at the
11 police station to when you had to leave the room and
12 throw up?
13    A    Just probably 40 minutes, maybe.  Around 30-40
14 minutes.  45, I don't know -- I don't know for sure.
15 I'll be honest with you.  It really did seem like
16 forever.
17    Q    And after you had to go outside to throw up,
18 what happened next?
19    A    When I got up to go outside, he jumped up, hit
20 the table, and went out and told Kayla that he was going
21 to come back with her arrest warrant.  Is what he said.
22 So I thought, "Oh, my God.  They are going to sit here
23 and arrest my 19-year-old daughter for murder and I
24 don't even know what to do."  I mean, I was, like, I
25 don't even know.  I don't even -- I can't understand

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 58

1  this.  I mean, I was like this -- how can the court
2  system, the sheriffs, the state police do this.  This is
3  so wrong.  I was like -- I can't believe -- I was in
4  shock.  So when I get up and go outside, I guess he
5  returns, and he wasn't in there very long.  So then I
6  get up and turn around and Kayla and my husband now, my
7  fiance then, was walking out.  He said, "Well, good luck
8  Kayla.  I hope you do good."  I don't know, I mean, what
9  happened in that few minutes.
10      Q   So is it fair to say that you -- while you
11  were there Kayla was continuing to tell Detective York
12  that she didn't have any knowledge of Jonathan Taylor or
13  Amanda Hoskins or William Lester, or any involvement
14  that they may or may not have had in Katherine Mills'
15  death; is that --
16      A   That's correct.
17      Q   And then when you left to go throw up, is it
18  fair to say that that is when Detective York apparently
19  broke down your daughter --
20      A   He did.
21          MR. WILLIAMS:  Object to form.
22      A   I mean, he probably was worse than I --
23  probably when I was in there.  I mean, I guess it was
24  bad for her to say anything.  Because I mean, I know she
25  lied because she did not know anything.  If she had

Page 59

1  knowed anything, she would have told me.  I mean, I
2  don't know exactly what all happened in there in that
3  short period of time, but whatever he did, my husband
4  said he did act ugly and of course he wasn't involved as
5  much as I was to be -- know how hurtful it was.  But --
6  so I don't know what happened after I left.  She hadn't
7  said anything to him when I was in there about Jonathan,
8  Amanda, her, Will doing anything.
9      Q   When you were in there she continued denying
10  having any knowledge of the information that he wanted
11  her to say, right?
12      A   Yes.
13      Q   Earlier -- well, how was Kayla when you-all
14  left the police station?
15      A   She was really, really upset.  She was very
16  upset.
17      Q   Did she cry on the way home?
18      A   She cried all the way home.
19      Q   And when you-all got home, do you recall what
20  she did when she got home?
21      A   She just went in her room and she did not even
22  want to talk about anything that happened to me.  She
23  just -- she didn't want to talk about it.  I don't even
24  know -- I think even when we got home, she left.
25      Q   Did you -- were you even given a copy of the

Page 60

1  statement that Kayla ultimately gave that day?  Let's
2  take a little bit of a break; is that okay?
3      A   Yeah.
4      Q   Okay.  Let's go off the record.
5          VIDEOGRAPHER:  The time is 11:00 a.m. and we
6  are off the record.
7          (OFF THE RECORD)
8          VIDEOGRAPHER:  The time is 11:06 a.m. and we are
9  back on the record.
10  BY MR. SLOSAR:
11      Q   Ms. Mills, I'm going to show you what we'll
12  mark as Exhibit number 2, which is a report drafted by
13  Detective York about the statement from Kayla Mills on
14  March 16, 2012.  I'm going to hand you what we'll mark
15  as Exhibit number 3, which is a copy of the arrest
16  warrant against Kayla for the murder of Katherine Mills.
17  Looking at the second exhibit, did you ever -- at some
18  point in your life, did you -- well, do you have a
19  nickname, Ms. Mills?
20          (EXHIBITS 2 AND 3 MARKED FOR IDENTIFICATION)
21      A   Yeah.
22      Q   What's your nickname?
23      A   Cricket.
24      Q   Okay.  So --
25      A   It's actually like my real name.  Everybody

Page 61

1  calls me that.
2      Q   Oh, really?
3      A   Yeah.
4      Q   Okay.  Have you had it since you were young?
5      A   Yeah.
6      Q   Okay.  Have you ever seen this police report
7  before today?
8      A   No.
9      Q   Okay.  Why don't you take a moment to read
10  through it and let me know when you're finished, okay?
11  Are you finished?
12      A   Yes.
13      Q   Earlier you testified that Kayla and Jonathan
14  had dated, and I think maybe broke up sometime in 2009;
15  is that right?
16      A   Uh-huh.
17      Q   Okay.  Do you know the reason why they broke
18  up?  Did Kayla ever tell you the reason why they broke
19  up?
20      A   They broke up because that she had gotten on
21  drugs so bad that she had to go this -- to the rehab.
22  And so when she was there and got clean and sober, she
23  just had to move out.  They -- in her group therapy they
24  told her she needed to stay away from the people that,
25  you know, everybody that was in -- got her in the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 62

1  situation.  So she was trying to stay away.  So they
2  just -- that's why they ultimately broke up.
3      Q    So when it says -- in Detective York's report
4  it says that "Kayla stated she knew she had it in him to
5  kill somebody and that was the reason why she broke up
6  with him."  And him referring to Jonathan Taylor.  Was
7  that true based on the information that Kayla told you?
8      A    No, because Kayla had broke up with him before
9  this happened like -- I don't know.  I don't even know
10  what the means.  I don't know -- she knew he had it in
11  him.  I don't understand.
12      Q    Detective York wrote this report that Kayla
13  said she was afraid that Jonathan Taylor was going to
14  kill her.  Did Kayla ever tell you that she was fearful
15  of Jonathan Taylor killing her?
16      A    No.
17      Q    Okay.  Is that true?
18      A    No, it's -- she never told me that she was
19  afraid that he was going to kill her.  No.
20      Q    Yeah.  In this report, Detective York wrote
21  that Kayla stated she was -- or, I'm sorry.  "Kayla
22  Mills stated Jonathan Taylor confessed to killing
23  Katherine Mills a lot to her."  Ms. Mills, was that
24  true?
25      A    No, I mean she never confessed -- she never

Page 63

1  told me he confessed at all.  She never said anything
2  about that.
3      Q    And in fact --
4      A    Not a lot -- ever.  Zero times.
5      Q    -- and in fact when you frequently would talk
6  to her about what was going on with the police and
7  Jonathan Taylor, did Kayla repeatedly tell you that
8  Jonathan had never confessed to her
9      A    Repeatedly.
10      Q    Okay.
11      A    I mean, we discussed this.  Every time that
12  they approached her, we discussed it in length that if
13  you know anything, you need to tell the police, Kayla.
14  You need to.  And she did not know anything.  She had no
15  idea of anything that happened to Ms. Mills.  She had
16  not even talked to Jonathan at this point.  She didn't
17  talk to him until later.
18      Q    Sure.
19      A    Like --
20      Q    At some point in 2011?
21      A    Yeah.
22      Q    When -- when you were in the interrogation
23  room, did Kayla tell Detective York that Jonathan Taylor
24  had never confessed any involvement in Katherine Mills'
25  death?

Page 64

1      A    Yes.
2      Q    And when you were present, was Detective York
3  continuing to pressure Kayla to say something
4  differently?
5      A    Yes, he was.
6      Q    When you were present in the interrogation
7  room, was Detective York telling Kayla to say that
8  Amanda Hoskins, Jonathan Taylor and William Lester were
9  all involved in the death of Katherine Mills?
10          MR. WRIGHT:  Object to form.
11      A    Yes.
12      Q    And in response did Kayla ever tell Detective
13  York that she had no knowledge of any of their
14  participation in Katherine Mills' death?
15      A    When I was present, she told him repeatedly
16  that she had no knowledge of anything that happened to
17  Katherine Mills.  That nobody ever told her anything,
18  she didn't know anything.
19      Q    Based on all of the communication that you had
20  with your daughter about Katherine Mills' investigation
21  and the knowledge that you have of Kayla Mills'
22  relationship with Jonathan Taylor, is the information
23  contained in this report truthful?
24      A    It's not truthful at all.  None of this --
25  none of this is true.  None of it.  In my opinion, to

Page 65

1  what I heard in that interrogation room, this is
2  ridiculous.  Like I don't even know where this come
3  from.  Up to where I was in there.  I don't even know
4  where -- how this could have come up in 10 minutes.
5      Q    Now, when -- earlier you had testified about I
6  believe it was an aunt of yours or an aunt of Kayla's.
7      A    My aunt.  Kayla's great-aunt.  But she was
8  more like my mom because I had to live with her when my
9  parents divorced for a few years.
10      Q    Sure.
11      A    And we were really, really close.
12      Q    What was her name?
13      A    Stella Smith.
14      Q    And Ms. Stella, did she have any interactions
15  with law enforcement prior to Kayla giving this
16  statement?
17      A    Yeah, in October -- late October, I guess in
18  2011, she -- John Pickard and Jason York went to my
19  aunt's house and told them that Kayla had been passed
20  out in that blue car and that they had witness
21  statements, several witness statements, saying that
22  Kayla was with them, Amanda, William and Jonathan, and
23  that they had killed the lady.  That they knew Kayla was
24  not very involved because she was passed out in the car
25  at the time.  And my aunt called me irate crying, like



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 66

1 terrified, of what they had told her and wanted me to
2 make -- have Kayla go to the police station to tell
3 them. And I was like, "Stella, don't worry about what
4 they're saying because it's not true." I said, "I've
5 never lied to you in my life and you can trust me." And
6 I said, "Kayla was not with Jonathan that day. I mean,
7 I don't know where Jonathan and Amanda was. I don't
8 think -- I mean, I don't know their whereabouts, but I
9 know where Kayla was and I know Kayla has never told me
10 that Jonathan has told her anything, so don't worry."
11 And she was like upset and crying and begging me to have
12 Kayla go to the police station because John Pickard and
13 Jason York had told her all this. And she -- they was -
14 - they was so convincing that they -- that she believed
15 them.
16     Q     Did -- did your aunt Stella ever tell you
17 whether Sheriff Pickard or Detective York like why they
18 were telling her this story or --
19     A     Yeah, because John Pickard actually went to
20 church with her and they was like "You need to help
21 Kayla. Save her life from being a life in prison." And
22 coming off like that, which I knew better. Even my aunt
23 knew better.
24     Q     Did Sheriff Pickard or Detective York ask your
25 aunt to convince Kayla to repeat that story?

Page 67

1     A     Yeah. To get Kayla to tell the story.
2 Because they knew she wasn't really involved, that she
3 was asleep. Even if she was passed out in the car and
4 she just needed to tell them that when she woke up she
5 was there and what had happened.
6     Q     Did Sheriff Pickard or Detective York tell
7 your aunt Stella what would happen to Kayla if she
8 repeated the story?
9     A     That she would not get in any --
10     MR. WILLIAMS: Object to form.
11     MR. WRIGHT: Join.
12     A     -- trouble at all. That Kayla would not get
13 in trouble if she told the story.
14     Q     And based on all the conversations you've had
15 with your daughter -- your daughter, Kayla, is it fair
16 to say the story that they were trying to get her to
17 tell was false?
18     A     It was false.
19     MR. WILLIAMS: Object to form.
20     MR. WRIGHT: Join.
21     A     It was absolutely false. I know for myself
22 and this is no hearsay or anything, it was false because
23 I know where Kayla was that day. I'll -- almost like
24 every hour of every day, that day I talked to her.
25 Almost every hour of every day I talked to her a lot.

Page 68

1 But that day, yeah. She was not with Jonathan.
2     Q     And when you were present in the interrogation
3 room with Kayla and Detective Pickard, was Kayla telling
4 -- I'm sorry. Let me withdraw the question.
5     MR. WILLIAMS: Yeah. Objection.
6     Q     I'll withdraw the question. When you were
7 present in the interrogation room with yourself and
8 Kayla and Detective York, was Kayla continuing to tell
9 Detective York that that story was false?
10     A     Yes.
11     Q     Now, we -- we met prior to today, right?
12     A     Uh-huh.
13     Q     Is that a yes?
14     A     Yes.
15     Q     We met last night; is that right?
16     A     Yes.
17     Q     And how long do you think our conversation
18 last night lasted?
19     A     Probably close to two hours. Less -- maybe 2.
20     Q     And in that conversation, did I do anything
21 other than to ask you to tell the truth today?
22     A     No, you did not ask me to do anything but tell
23 the truth.
24     Q     And --
25     A     You didn't -- just told me to tell exactly

Page 69

1 what happened. As best as I could remember it.
2     Q     During that conversation, do you remember me
3 showing you what's marked as Exhibit number 3, an arrest
4 warrant for -- against Kayla Mills --
5     A     I did.
6     Q     -- for the murder of Katherine?
7     A     Last night. This is the first time I seen it
8 was last night.
9     Q     Prior to last night, had you ever seen that
10 document?
11     A     No.
12     Q     Prior to last night, were you ever made aware
13 that Jason York had initiated charges against Kayla for
14 --
15     A     He had told me that he was going to -- he was
16 going to arrest her that day, but I actually did not
17 believe him. I thought he was just being intimidating.
18     Q     Were you ever made aware that Detective York
19 had successfully obtained a million-dollar deal for your
20 daughter's arrest?
21     A     No. I didn't know -- that he told me he was
22 going to arrest her and that's it. I never seen it and
23 -- but he did tell me but I didn't ever know or see
24 this.
25     Q     Ms. Mills, I don't have any further questions.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 70

1  I think some attorneys on the other side will.  Again,
2  we're all grateful that you're here and if at any point
3  in time you need a break, just let us know, okay?
4      A    Okay.
5              CROSS-EXAMINATION
6  BY MR. WILLIAMS:
7      Q    Ma'am, my name is Jason Williams.  I represent
8  Sheriff Pickard and Knox County.  Before we proceed, do
9  you need to take another break?
10     A    No, I'm fine.  Thank you.
11     Q    Okay.  I need to get a little bit of
12 background information about Kayla if I could please
13 just starting out.  Now, approximately -- or what was
14 her birthday again?
15     A    September 7 -- 27, 1991.
16     Q    And was she a lifelong resident of Knox
17 County?
18     A    Yes.  She lived in Louisville for maybe 8
19 months.
20     Q    And what period of time was that?
21     A    That was in -- she moved in July 2012 and she
22 lived there until she passed away in January 2013.
23     Q    Was she living in Louisville when she passed
24 away?
25     A    She was, yes.

Page 71

1      Q    Was she living with anybody at the time?
2      A    No.  She wasn't.
3      Q    She was living at a residence on her own?
4      A    She was.
5      Q    Did she have a boyfriend up there in
6  Louisville?
7      A    She did not.
8      Q    Do you know what led her to live in Louisville
9  during that time period?
10     A    She just wanted to get away from Knox County.
11 Honestly, it was due to all this going on with this
12 case, and everybody was gossiping, and it was just hard
13 on her.
14     Q    Did she have any close friends that she
15 associated with up in Louisville?
16     A    She had made some friends.
17     Q    Do you know any of their names?
18     A    I can't recall any of their names, honestly.
19     Q    Okay.  All right.  Kayla went to -- all
20 through school in Knox County?
21     A    She did.
22     Q    What grade of school did she complete?
23     A    She graduated from high school in 2009 and
24 took a couple semesters of college classes at Southeast
25 Middlesboro.

Page 72

1      Q    Okay.  What led her to stop her studies at
2  Southeast?
3      A    Just -- I don't know what really led her to.
4  She was just kind of lazy and didn't want to go.
5      Q    Now, before the time that she turned 18, did
6  she receive any kind of treatment for psychiatric or
7  psychological issues?
8      A    She had, yeah.
9      Q    Okay.  And what were those issues?
10     A    They had put her on Celexa for depression.
11 She was in that drug rehab.  I don't think she had a
12 clinical diagnosis of any kind of mental disorder, but -
13 - other than just drug abuse.
14     Q    Who treated her for the depression?
15     A    She had seen a psychiatrist inpatient up
16 there.  I don't -- and her family doctor, I guess, Dr.
17 Sturgill in Barbourville, had continued giving her
18 Celexa and then eventually she just quit taking it.  She
19 never seen anybody here at home, just when she was in
20 the inpatient rehab.
21     Q    You mentioned that at some point she developed
22 a drug problem, correct?
23     A    Yes.
24     Q    How old was she when she started using drugs,
25 to your knowledge?

Page 73

1      A    Probably maybe 17.
2      Q    Was she living in your home at that time?
3      A    She was, yes.
4      Q    What type of -- what -- what drugs did she
5  have a problem with?
6      A    I really don't know this.  She never did the
7  drugs in front of me, but I did know that she was doing
8  drugs.  I don't -- I don't know what kind of drugs.  To
9  be honest with you, I don't.
10     Q    So in your observation, she was on drugs?
11     A    Yes.
12     Q    What were your observations?
13     A    Just her -- I could just tell when she was
14 different.  I mean, not alcohol but just the drugs.  She
15 would talk more and sleep more and just how I always
16 know what her day-to-day.  She was different.
17     Q    All right.  Did you ask her to seek treatment?
18     A    Yeah, we -- she seeked [sic] treatment.  She
19 went to -- that's when she went to the inpatient.
20 First, I had her going to the Comp Care, local Comp Care
21 and she was in the drug court program for school.  And
22 she -- her Dad -- she didn't have -- was Court-ordered
23 to go but we had took her on the drug court herself to
24 get her -- because she had to be randomly drug tested,
25 she was in that program.  She went to Comp Care and then

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 74

1 she was in that inpatient.  I think it was called
2 Rivendell in Bowling Green, Kentucky.
3      Q     Who is Kayla's father?
4      A     Roger Mills.
5      Q     Is he still living locally?
6      A     Yes, he lives in Graves, Kentucky.
7      Q     Okay.  Was he -- were you-all still married
8 when Kayla's drug problem began?
9      A     No.
10     Q     How long had you been divorced from Mr. Mills?
11     A     We'd been divorced several years.  We got -- I
12 think we got divorced in 2004, so it would have been
13 several years.  She was, like, 11 years old when it --
14 when we got divorced.
15     Q     Okay.  Now, you mentioned that you would
16 observe your daughter on drugs.  Did you ask her if she
17 was taking drugs?
18     A     Yeah.
19     Q     And I guess she admitted at that point to
20 using drugs?
21     A     Yeah.  Uh-huh.
22     Q     What drugs did she admit to using?
23     A     She never told me what kind of drugs they
24 were.  I don't -- I don't know.
25     Q     Did you ask her what types of drugs she used?

Page 75

1      A     Yeah.  And she would just -- she didn't -- I
2 don't.  She didn't never really tell me what kind of
3 drugs it was.  I honestly don't know.  To be -- to be
4 completely honest, I don't know.
5      Q     So when did you first ask Kayla if she was
6 using drugs?
7      A     Sometime probably early 2017 she was being --
8 missing school a lot and --
9      Q     I'm sorry, ma'am.  Did you mean 2007?
10     A     '07, yeah.  I'm sorry.  2007, I apologize.
11     Q     No problem.
12     A     She -- her attitude changed, her grades
13 dropped.  She was staying away from home a lot.  Just
14 her -- just everything was different.  I mean, it just
15 started being really noticeable that her attitude was
16 changed and --
17     Q     When you asked her about how she was changing,
18 I assume you asked her about that?  Why she was
19 changing?
20     A     Uh-huh.
21     Q     Did she -- did she admit to using drugs that
22 very first time?
23     A     She would always say yes she did but she was
24 going to stop.
25     Q     So the very first time you asked her if she

Page 76

1 was using drugs, she admitted to it?
2      A     She -- I think I had found some drug
3 paraphernalia and she really didn't deny it when I found
4 it.
5      Q     Okay.  What type of drug paraphernalia did you
6 find?
7      A     Just some spoons in her room.  And I had found
8 some needles in the bathroom.
9      Q     Now, in 2007 when you first noticed these
10 problems, did Kayla have persons that she associated
11 with who were her friends?
12     A     She had friends, yes.
13     Q     Okay.  Now, do you believe -- do you believe
14 that the friends that she was associating with were also
15 using drugs?
16     A     I thought so, yes.  I'm not for sure, but I
17 thought so.
18     Q     Who were those persons?
19     A     There was other people, but it was her and
20 Jonathan.  And some girls she went to school with and I
21 can't even recall their names.  It was several of the
22 younger -- some young kids.  A few girls and some boys.
23     Q     Jonathan Taylor?
24     A     He was one, yes.
25     Q     But you don't know the names of any of the

Page 77

1 other persons?
2      A     I can't recall.
3      Q     To your knowledge, when did Kayla and Jonathan
4 Taylor become acquainted?
5            MR. SLOSAR:  Objection to form.
6      A     I mean, just -- probably around 2007, maybe.
7      Q     Okay.  How did you learn that Kayla and
8 Jonathan knew each other?
9      A     Just because she told me.
10     Q     Okay.  What did she tell you?
11     A     That she had met a boy and he worked at Save-
12 A-Lot and she liked him and I mean, I really didn't know
13 anything about him other than that.
14     Q     Was this before or after she had been in drug
15 court?
16     A     Way -- this was before any of this.  When she
17 met -- first met him she wasn't in drug court or
18 anything.  No.
19     Q     To your knowledge, were they going to school
20 together?
21     A     No, they was not going to school together.
22     Q     She met him at Save-A-Lot is what you --
23     A     Yes.  He worked there, yes.
24     Q     Did she also work there?
25     A     No.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 78

1    Q    Did Kayla work before she turned 18?

2    A    Yes.

3    Q    Where did she work?

4    A    She had a job at Kentucky Fried Chicken. She
5  worked at and also at Long John Silver's. While she was
6  in school.

7    Q    After she turned 18, did she work anywhere?

8    A    No, I don't think so.

9    Q    Okay.

10   A    Not as my knowledge, she did not.

11   Q    To your knowledge, after she turned 18 she was
12 not employed anywhere?

13   A    No.

14   Q    Do you know how she was able to afford the
15 drugs she was using if she was not employed?

16        MR. SLOSAR: Objection to form. Foundation.

17   A    Yeah, she was getting money. I give her money
18 and her dad give her money. My mother give her money.
19 Like, my family was very helpful to Kayla.

20   Q    I guess that stopped immediately after you
21 found the drug paraphernalia?

22   A    I limited the money closer, but she would
23 always get -- if I didn't give her money she would ask
24 my mom for money. And if I didn't ask her -- or she
25 didn't give her, my stepdad would give her money. Just

Page 79

1  -- I mean, I don't know every way that -- I don't know
2  how she got drugs, to be honest with you, every time.

3    Q    You would agree with me illegal drugs is an
4  expensive habit?

5        MR. SLOSAR: Objection to form.

6    A    Yes.

7    Q    About how long do you think Kayla had a
8  problem with drugs?

9    A    I guess for at least -- from 16, I mean, 17 to
10 probably 8 or 9 months until she went to that rehab in
11 2009. And then she was clean and then started dating
12 Derrick Wagers and she was doing really, really, really
13 good.

14   Q    All right. So in approximately 2007, you said
15 you learned she met Jonathan Taylor. Did they, to your
16 knowledge, develop a relationship?

17   A    Yes.

18   Q    And go on dates and that type of thing?

19   A    Yeah. Yes.

20   Q    Did that relationship become serious?

21   A    Yes.

22   Q    Okay. In your observation, why was it
23 serious?

24        MR. SLOSAR: Objection to form. Calls for
25   speculation.

Page 80

1    Q    Did you observe them spending more time
2  together, for example?

3    A    Yes.

4    Q    Would he stay the night at your home, for
5  example?

6    A    He didn't until after he had that accident.
7  He needed to stay because he was very disabled.

8    Q    Okay. All right. And that accident occurred
9  approximately when?

10   A    In November -- around November 2009.

11   Q    Okay. So they were in some type of
12 relationship from approximately 2007 on through 2009,
13 correct?

14   A    Yeah.

15   Q    Now, when -- when Jonathan Taylor -- did he
16 come to your home from time to time during this period?

17   A    Occasionally. Not very often, but
18 occasionally.

19   Q    Okay. What was your -- what was your opinion
20 of Mr. Taylor?

21        MR. SLOSAR: Objection to form.

22   A    He was always respectful to me. He never did
23 anything to me. I didn't like the things that him and
24 Kayla done together, but I mean, he never done anything
25 disrespectful to me.

Page 81

1    Q    Okay. Tell me the kinds of things you didn't
2  like that they did together?

3        MR. SLOSAR: Objection to form. Relevance.

4    A    Mostly just the suspicion that they were doing
5  drugs together. I never seen them do them myself, but I
6  suspected it. And I didn't like that.

7    Q    You suspected Jonathan Taylor of using drugs?

8    A    Actually, I just suspected that Kayla did. I
9  don't -- when sometimes that she was around him. I
10 don't know about Jonathan.

11   Q    Did you ask your daughter if Jonathan Taylor
12 was a drug user?

13   A    I don't recall ever asking her that.

14   Q    Why not?

15   A    I don't remember. I mean, I may have. I just
16 don't remember a conversation that I could tell you
17 exactly what she would have said or anything.

18   Q    If you had a concern that your daughter was
19 using drugs with Jonathan Taylor, wouldn't it be normal
20 to ask him if he had a drug problem?

21        MR. SLOSAR: Objection to form. Asked and
22   answered.

23   A    I just was more concerned about my daughter.
24 I don't know. I mean, I'm sure I probably did but I'm
25 not -- I can't recall what I would have said. I don't

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 82

1 remember a specific conversation about it. I really
2 don't.
3    Q    Did Kayla tell you that Jonathan had a drug
4 problem?
5    A    I think that she may have told me that.
6    Q    When did she tell you that?
7    A    I don't recall. I really don't. I mean, at
8 some point in the relationship I realized that they --
9 he might have had a drug problem, but I don't recall
10 when or -- the conversation how I found out.
11    Q    You've said that you didn't like some of the
12 things that your daughter and Jonathan Taylor did
13 together. Other than use drugs, what else didn't you
14 like?
15    A    She would take my car without asking and go to
16 his house. Or she would miss school and be truant with
17 school. I got in trouble because she had missed school.
18 Stuff like that I didn't like.
19    Q    Okay. Did she ever get in trouble with the
20 truancy issue?
21    A    Yes, she did.
22    Q    How did that -- how was that handled?
23    A    I guess that's when she got put in drug court.
24 One of the reasons they used to put her in the drug
25 court program is she was truant from school.

Page 83

1    Q    Was that in Knox County?
2    A    Yes.
3    Q    Did she successfully complete drug court?
4    A    She didn't complete the program because she
5 turned 18 and because she was in that inpatient in
6 Bowling Green, Kentucky.
7    Q    Okay. When -- when did she first go into
8 rehab to your knowledge?
9    A    Probably -- it was in -- it was in 2009 and I
10 guess it was probably -- or actually, it might have been
11 2010. No, it was 2009, I'm sorry. Early 2009 probably
12 around April or March. Maybe March because she stayed
13 until May.
14    Q    Was that before or after Jonathan's accident?
15    A    It was after Jonathan's accident.
16    Q    Okay. How long was she in rehab?
17    A    She stayed probably around 60 days.
18    Q    That was --
19    A    These dates are all confusing me. I'm trying
20 to think of the -- I think Jonathan's accident, I might
21 have said it, was in November. But I don't think it was
22 in November now.
23    Q    Do you have trouble remembering things?
24    A    It's been so long.
25       MR. SLOSAR:  Objection to form.

Page 84

1    A    Not things, but dates of when. I don't
2 remember what happened. I just kind of try to remember
3 the years. It's been a bit.
4    Q    How long did Jonathan live in your home after
5 his accident?
6    A    Just for a few months until he was able to get
7 up and walk around.
8    Q    A few months?
9    A    Yeah. Maybe a month at the -- maybe not a few
10 months. Maybe a month, or maybe 2 months.
11    Q    Did anyone visit him in your home during that
12 time?
13    A    No. Not long -- not as at my knowledge, they
14 did not.
15    Q    All right. You were working during that time
16 period, right?
17    A    I was. And going to school.
18    Q    And going to school. So you can't testify as
19 to what went on in your home during those time periods?
20    A    No.
21    Q    No one else living in the home at that time
22 other than you and Kayla and Jonathan?
23    A    And my fiancat the time. His name was John
24 Valdez.
25    Q    Valdez. Did he work during the day or was he

Page 85

1 there all the time?
2    A    He worked some during the day but he was home
3 more than I was.
4    Q    All right. To your knowledge, did Kayla know
5 Amanda Hoskins?
6    A    Yeah, she knew Amanda.
7    Q    How did she know her?
8    A    Just probably -- I guess they become
9 acquainted with her through Jonathan, I guess. I mean,
10 I don't think she knew her prior to this. Dating
11 Jonathan.
12    Q    Did Amanda Hoskins ever come over to your
13 home?
14    A    I had seen her there a couple times, yes.
15 When Jonathan was in the hospital, she came a few times
16 to pick Kayla up to take her -- they went to visit him
17 with her -- with Amanda's mom, Linda, that come and got
18 Kayla to go visit Jonathan.
19    Q    Was Amanda Hoskins ever in your home after
20 Katherine Mills passed away?
21    A    I don't remember her being there afterwards. I
22 don't recall it. I'm not -- I don't recall her being
23 there after.
24    Q    Have you spoken with Amanda Hoskins since
25 Katherine Mills passed away?



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 86

1     A    I don't think I've spoken to her. I think I
2 seen her at a court hearing one day and maybe said
3 "Hello."
4     Q    Have you spoken with Jonathan Taylor since Ms.
5 Mills passed away?
6     A    Yes, I've spoken to him.
7     Q    Okay. Where have you had occasion to speak
8 with him?
9     A    I seen him when he got out of jail. At
10 Linda's -- at his aunt's house. We had lunch together
11 one day after he got out of jail. I actually went and
12 seen him a couple times in jail. A few times.
13     Q    Why is that?
14     A    I don't know. I just really always felt sorry
15 for him because he never had a lot of family and --
16     Q    Would you consider him a friend?
17     A    I guess so, maybe. A friend, yeah.
18     Q    Want to do whatever you can to help him.
19     A    Yeah.
20          MR. SLOSAR: Objection to form.
21     Q    Your answer, ma'am?
22     A    I would do --
23     Q    I think your answer was yeah.
24     A    -- what I could legally to help him. I mean,
25 I wouldn't lie or anything for him.

Page 87

1     Q    You'd like to see him succeed in this lawsuit,
2 for example?
3          MR. SLOSAR: Objection to form.
4     A    I really -- this lawsuit really does have no
5 meaning whatsoever for me. I have no interest in it
6 other than seeing what happened to my daughter. I
7 thought was wrong, to be brought to -- brought out.
8 That's all I want to see. Money, or whatever in this
9 lawsuit, has no meaning to me at all. It's not any
10 benefit to me whatsoever.
11     Q    You feel that success by the plaintiffs in
12 this lawsuit would be a vindication for your daughter,
13 for example, right?
14          MR. SLOSAR: Objection to form. Harassing.
15     A    I really have no -- I'm just telling the truth
16 about -- I don't have anything with this lawsuit. It
17 doesn't mean anything either way to me. I don't have an
18 opinion on the lawsuit. I honestly don't. I'm just
19 wanting to tell the truth.
20     Q    Now, you mentioned earlier that you had given
21 a deposition before, correct?
22     A    Uh-huh.
23     Q    Now, what was that for?
24     A    For a contractor that worked on my house. I
25 had paid him to do the work for my house and then he

Page 88

1 hadn't paid some of the bills for some window
2 treatments. So we had to do a deposition and went to
3 the court and they ordered him to pay the money and
4 found that he was involved. That he should have paid
5 the money because I had the receipts where I had paid
6 him.
7     Q    Okay.
8     A    And it just kind of got drawn out. Nothing
9 major.
10     Q    Kind of a contract action or something?
11     A    Yes.
12     Q    Have you ever been arrested yourself?
13     A    No.
14     Q    All right. So at some point, as I understand
15 your testimony, Jonathan Taylor and Kayla split up.
16     A    They did.
17     Q    And what --
18     A    That's when had to go to the rehab and she
19 -- they split up when she was -- while she was there.
20 In early 2009. I guess it was probably March 2009.
21     Q    Is -- just so I'm clear, it is your
22 understanding they split up because they were physically
23 separated or --
24     A    They basically split up because she realized
25 when she got clean that that life -- that they -- her

Page 89

1 counselors told her that she needed to stay away from
2 anything like this and they wasn't very good together.
3 So she wanted to move on with her life and she did.
4     Q    And as I understand your testimony, tell me if
5 I'm wrong, the reason they weren't good together was
6 because Mr. Taylor was using drugs and she wanted to be
7 off of them?
8          MR. SLOSAR: Objection to form.
9     A    No, I mean, that's to exactly what I'm saying.
10 Just that she wanted to get back in school and I don't
11 know. In her eyes, she just wanted a different life. I
12 mean, that was bad and she -- it wasn't just him or her.
13 It's just the whole situation.
14     Q    Well, if he was a good influence, she would
15 want to stay with him, right?
16          MR. SLOSAR: Objection to form.
17     A    I can't answer that for her. Why her reason
18 was. I really don't.
19     Q    You mentioned that there was some times where
20 Kayla would call you about some discussion she had with
21 Sheriff Pickard.
22     A    Yes.
23     Q    Did you keep any phone records of those
24 conversations?
25     A    I did not. I always just didn't -- told her

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 90

1  not to worry about it because I knew it wasn't true.
2      Q    Okay.
3      A    And I wasn't worried about it. At that time,
4  I wasn't worried about it because I thought there wasn't
5  anything going to happen.
6      Q    Did you make any notes -- I'm sorry.
7      MR. SLOSAR:  Please let her finish.
8      A    I'm sorry.
9      Q    I'm talking over top of you, I apologize.
10     A    That's okay.
11     Q    Did you keep any notes or other records of the
12  conversations that you had with Kayla at that time?
13     A    I did not. Just the few things I remember the
14  most. I mean, there was more times he approached Kayla,
15  but the most important times was when he approached her
16  at my mom's house and when he approached her at -- went
17  to my aunt's house and then the time that they were
18  arrested at Jonathan's apartment. Those are the most
19  things that stick out in my mind that I can remember the
20  most.
21     Q    Do you know John Pickard yourself?
22     A    Yes, I do.
23     Q    Okay. How do you know him?
24     A    Actually, he was a security guard at the
25  hospital where I work for a short period of time. And I

Page 91

1  knew him because he's the sheriff. I mean, I don't know
2  him personally. I mean, I know who he is. If he seen
3  me, he probably wouldn't know who I am.
4      Q    During the time he was a security guard at the
5  hospital, did you have any encounters with him one way
6  or the other?
7      A    Just basically he might come through and say
8  hello. I had to check all the departments. I worked
9  in ICU at that time and he made a round every evening
10  before I left.
11     Q    Okay.
12     A    I didn't really have a conversation with him
13  though.
14     Q    No complaints about him one way or the other?
15     A    No.
16     Q    Do you have any opinion of former Sheriff
17  Pickard?
18     MR. SLOSAR:  Objection to form. Foundation.
19     A    I don't have an opinion about him. I don't
20  really dislike him. I just think that the way he done
21  my daughter was wrong, and approached her when I wasn't
22  around, and tried to make her say things that wasn't
23  true, or give her ideas of things that other people said
24  and then wanted her to repeat it. Or I don't know if
25  people said that or if he just -- I don't know. I mean,

Page 92

1  he said other people told him that and wanted her to
2  repeat it. And he was going to try to help her from
3  going to prison and --
4      Q    Just so I'm clear, you weren't present at any
5  time where Mr. Pickard --
6      A    I was not ever present, no.
7      Q    -- and just as I talked over you earlier,
8  ma'am, I'd ask you to let me get my whole question out.
9      A    I'm sorry.
10     Q    That's okay.
11     A    Okay.
12     Q    We need to have a clean record so we can look
13  at this later. Just so I'm clear, you were never
14  present when Sheriff Pickard spoke with your daughter at
15  any time; is that correct?
16     A    Correct.
17     Q    And you weren't listening in on the phone at
18  any time that he spoke with her on the phone if in fact
19  that occurred, correct?
20     A    Yeah. I didn't -- I don't think he ever
21  called her on the -- I don't know if he ever called her
22  on the phone.
23     Q    Okay. And you haven't heard any recordings of
24  him speaking with your daughter, have you?
25     A    No, sir.

Page 93

1      Q    And on -- have you ever talked with Mr.
2  Pickard privately about any of the issues that you
3  testified to today?
4      A    Uh-uh. I have not.
5      VIDEOGRAPHER:  The time is 11:45 a.m. and we
6  are off the record.
7      (OFF THE RECORD)
8      VIDEOGRAPHER:  The time is 11:45 a.m. and we
9  are back on the record.
10  BY MR. WILLIAMS:
11     Q    All right. So you don't have any audio or
12  video recordings of Sheriff Pickard of any kind?
13     A    No.
14     Q    And you never heard -- overheard any
15  conversations yourself involving Mr. Pickard?
16     A    No.
17     Q    The information that you've testified to --
18  the information that you've testified to today, as I
19  understand it, was relayed to you by your daughter?
20     MR. SLOSAR:  Objection to form.
21     A    Yeah, she had -- yes.
22     MR. SLOSAR:  Misstates her testimony.
23     Q    And I think you've made it very clear, but I
24  just want to again ask the interview that you discussed
25  in this case today where your daughter met with Jason



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 94

1  York at the Barbourville Police station, Sheriff Pickard
2  was not there?
3      A   He was not there.
4      Q   Okay.  Now, have you heard a -- have you heard
5  a recording of the statements that your daughter gave in
6  that interview in this regard?
7      A   I have not.
8      Q   After that interview, I think you said that
9  your daughter didn't speak with you about what had
10 occurred; is that correct?
11     A   She didn't really say anything about it
12 afterward.  She was just very tearful and upset.  I don't
13 know.  I don't know -- I don't recall what we discussed
14 afterwards.  I mean, I don't even know what she said in
15 the interviews.  It was just very -- just -- I don't
16 know.  I guess we just -- none of us wanted to discuss
17 it.  It was just very hard.
18     Q   She didn't discuss anything that she -- should
19 we take a short break to see what that issue is?
20         MR. SLOSAR:  Keep going.
21     Q   All right.  Ma'am, did -- did you discuss
22 anything with your daughter after you-all left the
23 police station that night?
24     A   We did talk -- we -- I did discuss something,
25 but I honestly can't recall what our conversation was.

Page 95

1  I mean, I couldn't say for sure because I just -- I
2  don't know.  I mean, I don't remember what we talked
3  about to be honest with you.  I even told you that I
4  don't remember our conversation when we left.  I don't.
5      Q   You have trouble remembering some of these
6  things?
7      A   No, I don't have trouble remembering things.
8  It's just I don't remember what we discussed.  I didn't
9  even know what she said in her statement.  I never --
10 even my fiancat the time, when I asked him he said, "She
11 really didn't say anything," and that's about basically
12 what happened.  That he told me.
13     Q   Now, as I understand it, you contacted
14 attorney Ken Boggs to represent your daughter at this
15 statement?
16     A   Yes.
17     Q   Did you meet with Mr. Boggs prior to going to
18 the police station?
19     A   No.  Met him at the police station.
20     Q   Okay.  Was he representing you at that time?
21     A   He might have been representing me on that --
22 the contractor case.  It might have been going on at
23 that time.
24     Q   You're not sure about that?
25     A   I don't know if it was at that -- at that

Page 96

1  time.  But I had used him before.  I mean, for a case.
2      Q   Did you relay to Mr. Boggs that your daughter
3  didn't know anything about what Mr. York wanted to
4  question her about?
5      A   I think so, yes.  Maybe.
6      Q   Did he advise you that she should not meet
7  with Mr. York and not give the statement?
8      A   I don't think so, no.  I don't recall him
9  saying that.
10     Q   Did you discuss any of the things with him
11 that had occurred at your home when Jason York and Mr. -
12 - was it Mr. Sowders?
13     A   Sowders.
14     Q   I'm sorry.  Arrived at your home?
15     A   I'm sure I probably did.  I mean, I don't -- I
16 talked to his assistant the day before and he couldn't
17 make it on the day that I was supposed to come on the
18 day that I talked to Jason York.  And then I don't
19 remember talking to him really very much before we went
20 into the -- I met him there at the City Police station.
21 And I'm sure I probably talked to him about what Jason
22 York did or said.  I'm not for sure what the
23 conversation was.
24     Q   Did -- after that visit to your home that you
25 have described, did you make any complaints to the

Page 97

1  Kentucky State Police about the behavior you have
2  alleged of the officers?
3      A   I did not, no.
4      Q   Did you ask Mr. Boggs to make any complaints
5  to the Kentucky State Police about the behavior you
6  testified to today?
7      A   No, I did not.  I don't -- I don't recall if I
8  did.  I don't remember if I did or not.  I probably did
9  say something about it because I was very upset about
10 how he come in and was rude to me and cussed.
11     Q   What I'm trying to determine is whether you
12 made any complaints to Mr. York's superiors?
13     A   I did not.
14     Q   Did you ask Mr. Boggs --
15     A   I felt threatened by him.  I really didn't
16 trust him.
17     Q   Did you ask Mr. Boggs --
18     A   For retaliation.  I thought I didn't know what
19 he might even do to me after what he was doing to my
20 daughter.
21     Q   And did you make any requests to Mr. Boggs to
22 make any complaints to the Kentucky State Police?
23     A   No, I just was -- felt threatened by
24 retaliation and I still really feel threatened by
25 retaliation.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 98

1    Q    Did -- after having conversations with your
2   daughter about Mr. Pickard talking with her, did you
3   make any complaints to anyone about Mr. Pickard?
4    A    No, because I really didn't know where to go
5   forward with it -- with the Sheriff in town.  You know,
6   doing this.
7    Q    Did you make inquiries on how to make a
8   complaint over that?
9    A    No, I did not.
10    Q    All right.  You would agree with me that -
11        MR. SLOSAR:  Objection to form.
12    Q    -- in any -- any time someone ends up deceased
13   that its -- its normal for police to ask persons
14   questions about what they know.
15        MR. SLOSAR:  Objection to form.
16    A    It might be normal, but I don't think it's
17   normal for them to tell someone that they know something
18   and they won't tell what -- I mean, tell them what they
19   think and they want them to tell it back.  I don't think
20   that's normal.
21    Q    As far as just asking questions though, you
22   don't --
23    A    I don't think he was asking questions.  The
24   way my daughter told me personally, he was telling her
25   what he thought happened and he wanted her to tell him

Page 99

1   that back.
2    Q    And then --
3    A    Or she was going to get in trouble.
4    Q    I understand.
5    A    I don't think that's normal.
6    Q    I have -- I understand you have an answer you
7   want to give, but I need to have you answer the question
8   that I ask you.
9        MR. SLOSAR:  Jason, she answered your question.
10   You just didn't appreciate the response.
11    A    No, I did not think --
12    Q    No, it was non-responsive.
13    A    -- it's normal for them to, I guess they'll
14   ask questions, but they wasn't asking questions.  They
15   never asked questions.
16    Q    Here's my question.  Do you think it's normal
17   for law enforcement officers to investigate the death of
18   an individual?
19        MR. SLOSAR:  Objection to form.
20    A    I think that he should have investigated where
21   she was first before he tried to say, I mean, go around
22   it and ask her where she was.  When she told him where
23   she was -- they didn't want to hear where she was.
24        MR. SLOSAR:  And let me put my objection on the
25   record.  Objection to form.  Also, Mr. Williams, you

Page 100

1   know that these types of questions are absolutely
2   not admissible in a court of law, and if you
3   continue down this course, we're going to need to
4   call the Magistrate.
5        MR. WILLIAMS:  You're -- you're thinking --
6        MR. SLOSAR:  A witness --
7        MR. WILLIAMS:  -- that I can't ask this witness
8   a question regarding bias of the police against a
9   police investigation?
10        MR. SLOSAR:  Do you -- exactly.  Do you believe
11   that it's normal for a police officer to do XY or Z?
12   That type of testimony would never be admissible in
13   any federal court.  Would her belief of what a
14   police officer could or could not do is not
15   admissible evidence.
16        MR. WILLIAMS:  I'd like to know why.  But I'll
17   just make a note in the record that her answers to
18   these questions are non-responsive as they seek a
19   yes or no answer and not an explanation about her
20   feelings.
21        MR. SLOSAR:  They are absolutely responsive,
22   and the record will reflect that.
23   BY MR. WILLIAMS:
24    Q    All right.  So let me ask you some questions
25   about this -- I'm sorry.  Strike that.  I have one more

Page 101

1   question to ask you about Sheriff Pickard.  You
2   mentioned that you didn't like him sitting at a store.
3   You had some quarrel with that.
4    A    I didn't --
5        MR. SLOSAR:  Objection to form.
6    A    I think I said that my daughter felt harassed
7   that he was sitting there.  Maybe I --
8    Q    I mean, did he get out of his car and wave his
9   gun at her or --
10        MR. SLOSAR:  Objection to form.
11    Q    -- scream profanities at her?
12    A    I don't know.  I wasn't there.
13    Q    Well, how did she describe --
14    A    I mean, but she felt threatened because she
15   would call me upset.  So I don't know what he did to her
16   but she felt threatened by it.  She felt harassed.  She
17   made a statement that she was feeling harassed.
18    Q    But to your knowledge, this involved,
19   according to what she told you, Mr. Pickard sitting in a
20   car in a store parking lot?
21    A    And across from my house, yeah.
22    Q    Okay.  Do other people live --
23    A    Several times.
24    Q    -- in that area?
25    A    They do.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 102

1    Q    Is that in the middle of town?

2    A    No, it's up in a rural area in Stinking Creek.

3    Q    Are there other people that live near there?

4    A    Yes.

5    Q    Is there a store near there?

6    A    It was a store parking lot, yes.

7    Q    Do you suspect that from time to time, there

8    may be criminal activity in that area?

9         MR. SLOSAR:  Objection to form.  Calls for

10   speculation.

11   A    I don't --

12   Q    You don't know one way or the other?

13   A    Not one way or the other.  Yeah, I suspect

14   there probably is.

15   Q    Let's go back to the interview with Mr. York.

16   Ken Boggs was there during the interview?

17   A    Yes.

18   Q    You've testified that, as I understand it,

19   that you saw Mr. York manipulate his recorder during

20   this interview?

21   A    Yeah, he stopped it a few times, yes.

22   Q    Okay.  Did Mr. Boggs say, "Hey, what are you

23   doing?"

24        MR. SLOSAR:  Objection to form.

25   A    He may have said something.  I don't know.  He

Page 103

1    actually went out and talked to him.

2    Q    Outside your presence?

3    A    Yes, outside my presence.

4    Q    Did he later tell you what they discussed?

5    A    I think he discussed with him his behavior.

6    Q    Well, do you know or not?

7    A    I do not know.  But I think that's what it

8    was.  Because everybody was upset.

9    Q    You didn't hear what Mr. Boggs said to Mr.

10   York, if anything?

11   A    I did not.

12   Q    All right.  So after the -- I'm sorry.  Let me

13   back up.  During the interview, you said that Mr. York

14   did some things that you didn't care for.

15   A    Yes.

16   Q    And did you complain to Mr. Boggs about any of

17   those things during the interview?

18        MR. SLOSAR:  Objection to form.  Asked and

19   answered.  You questioned her about this 10 minutes

20   ago, Jason.  Did you complain to Mr. Boggs?  Did you

21   complain to KSP?  Did you have Mr. Boggs complain to

22   KSP?

23        MR. WILLIAMS:  This is in a particular

24   circumstance.

25        MR. SLOSAR:  Same objection.  It's beginning to

Page 104

1    be harassing.

2    A    I think I did speak to Kenneth Boggs about it.

3    I don't remember the conversation.  I mean, I was very

4    unhappy with everything that was going on.  I was very

5    upset.  I was very unhappy.  I was very fearful about

6    her.  He was telling her he was going to put her in

7    prison.  Over and over again for 40 minutes, for

8    murder, and she was never going to get out.

9    BY MR. WILLIAMS:

10   Q    After --

11   A    It was very intimidating.

12   Q    I'm sorry.  During the meeting in that room,

13   did Mr. Boggs ever voice any objections in your presence

14   to Mr. York about how he was conducting the interview?

15   A    I think that's when he took him outside for a

16   brief period, yes.

17   Q    What did he say to Mr. York?

18   A    He said, "We need to step out for a second."

19   Q    Did you hear him voice any complaints about

20   how --

21   A    I did not hear it.

22   Q    -- the interview was being conducted?

23   A    No.

24   Q    Did Mr. Boggs, at any point, stop the

25   interview?

Page 105

1         MR. SLOSAR:  Objection.  She just answered

2    that.

3         MR. WILLIAMS:  You may answer.

4         MR. SLOSAR:  She just did.  She -- Jason, this

5    is becoming --

6         MR. WILLIAMS:  She is not your client.  You

7    can't direct her not to answer.

8         MR. SLOSAR:  What I'm saying is, this is --

9    when you ask the person -- you literally just went

10   through an interaction where she said that he took

11   York outside and you're asking her now, "Did he ever

12   stop the interview?"  It's asked and answered.

13   Objection.  Asked and answered.  Move on.

14   BY MR. WILLIAMS:

15   Q    At any time, did Mr. Boggs ever stop the

16   interview?

17        MR. SLOSAR:  Objection.  Asked and answered.

18   A    Only that time that he stopped.

19   Q    Okay.  Just the one time?

20   A    As I remember -- recall.  Best I recall.

21   Q    Now, following -- just so I'm clear.  Did you

22   leave the room alone or did your fianceleave with you?

23   A    I left alone.  Only me.

24   Q    So your fianceremained inside the interview the

25   entire time?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 106

1    A    He did.

2    Q    All right.  Did he relay to you, after it was
3 over, what your daughter had given a statement about?

4    A    I asked him, and he said, "She really didn't
5 say anything."  I said, "What?  I mean, what does that
6 mean?"  He's like, "I don't know.  She really didn't say
7 anything."  I said, "Nothing?"  He said -- and I don't
8 know if he just told me that because he didn't want me
9 to be further upset.  Because I was really upset.  I
10 don't know.  But he -- I mean, I never knew any of this
11 on this paper was said.

12    Q    Your --

13    A    It's the first time I seen it.  Even Kayla
14 didn't say anything about it.

15    Q    Was it your impression after speaking with him
16 that Kayla --

17    A    I --

18    Q    -- let me please finish my whole question.
19 Was it your impression after speaking with your fianc
20 that Kayla had remained silent during the time period
21 that you were outside of the room?

22    A    I do remember that he said that -- that Kayla
23 had said that Jonathan could have possibly had it in him
24 to do something like that.  But he said that he also
25 felt pressured that she had to -- she had to say

Page 107

1 something.  I mean, it was just -- she had to say
2 something or she was going to jail.

3    Q    So after speaking with your fiancyou were
4 under the impression that Kayla had said that Jonathan
5 had it in him to do it?

6    A    Yeah, I think.  And that's all I remember that
7 he said she said.  He said, "She really didn't say
8 anything else."

9    Q    To your knowledge, did Kayla and Jonathan
10 always get along?

11    A    They always didn't get along.

12    Q    Did they fight from time to time?

13    A    Argue, yes.

14    Q    To your knowledge, did those fights ever turn
15 physical?

16    A    I think one time they had an altercation of
17 she said something to him and shoved him and he pushed
18 her back and she fell into the couch.  But not nothing
19 really physical.

20    Q    You did not consider pushing your daughter
21 into a couch to be physical?

22    A    Well, I mean, not like --

23    MR. SLOSAR:  Objection to form.

24    A    -- he didn't, like, leave physical marks on
25 her.  But yeah, I didn't like that.  They got into a

Page 108

1 fight over a bowl of macaroni and cheese, so.  I don't
2 know.

3    Q    It's kind of funny to you?

4    A    I mean, no, it was not funny.  But at the -- I
5 don't know.  That they got into it over a bowl of
6 macaroni and cheese.

7    Q    Okay.  And -- but it is your understanding
8 that Jonathan, during that fight, laid hands on Kayla?

9    A    I think he nudged her maybe to go around and
10 she did fall into the couch.  But that's all I ever know
11 about any kind of altercation.

12    Q    Do you know if Kayla ever reported any
13 physical abuse by Jonathan to the police?

14    A    I think she reported that to the police, yes.

15    Q    Do you know what the outcome of that report
16 was?

17    A    I honestly don't.  I don't know of anything --
18 I think they arrested him, and he got out, and I don't
19 know anything else that come of it.

20    Q    Is the occasion that they fought over the
21 macaroni and cheese the same occasion that she called
22 the police, to your knowledge?

23    A    Yeah, it was.

24    Q    Were there any other occasions that she called
25 the police on Jonathan to your knowledge?

Page 109

1    A    I'm not for sure to be honest with you.  I
2 don't recall but I'm not 100 percent positive.  I don't
3 want to say positive.  I don't recall any other -- any
4 other.  There's a lot that went on in all these years.

5    Q    All right.  Following the interview of your
6 daughter at the Barbourville Police station, do you
7 speak with Mr. Boggs about what had transpired in the
8 meeting?

9    A    I think I did talk to him and briefly after we
10 left -- I had already -- I was outside waiting.  I mean,
11 I was getting ready to go back in when they come out.
12 They went on and came out.

13    Q    So your daughter is there, you believe
14 wrongfully --

15    A    Oh yeah.  Definitely.

16    Q    -- and after the meeting occurs, after you've
17 been outside of the room, you don't ask Mr. Boggs what
18 happened?

19    A    I talked to Mr. Boggs, yes.  But I mean --

20    Q    What did he tell you?

21    A    I don't recall exactly what we talked about
22 word for word.

23    Q    Do you remember anything that he told you?

24    MR. SLOSAR:  Objection to form.  Asked and
25    answered.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A    I'm thinking honestly I can't say what he said
2  because it wouldn't be truthful.  I don't remember the
3  complete conversation.  I don't.
4      Q    Did he tell you that Kayla had given a
5  recorded statement to Officer York?
6          MR. SLOSAR:  Objection to form.  Asked and
7      answered.
8      A    I don't even know if he told me that.  I don't
9  -- I honestly don't.  I didn't know anything about the
10  recorded statement.  I've never even seen this
11  statement.  All I now is --
12      Q    At any time after that meeting, did Kayla tell
13  you what she had told Officer York?
14      A    She didn't really tell me anything that she
15  told him.  I mean, because she had told me so many times
16  nothing.  I don't know.  I guess she didn't want to say
17  anything what she said.  I don't recall what she said
18  after it.  She was very upset and none of us wanted to -
19  - to keep on reliving it.  It was a nightmare.  I mean,
20  I don't know if I've just walked out not wanting to
21  think about it.  It was just a nightmare.  I don't
22  remember.  I remember driving home with her and I
23  remember her crying and me just comforting her.  But I
24  didn't say "What did you say in there, Kayla?"  I mean,
25  I don't.  I don't remember.

1      Q    You testified about a number of things you did
2  to disable your automobile.
3      A    Yes.
4      Q    And was this based upon a concern that Kayla
5  would go to any length to use the automobile?
6      A    No, just that I didn't want her in it.  Just
7  didn't -- I was really upset that she had drove that
8  night in that snow storm and left the car sitting on the
9  side of the road, practically almost in the road.
10      Q    You had the battery removed, correct?
11      A    I did.
12      Q    You had a fuse removed, correct?
13      A    Uh-huh.
14      Q    You had it blocked with a camper?
15      A    Yep.
16      Q    Those sound like extreme measures to me.
17      A    Uh-huh.
18      Q    Were they to you?
19      A    I was just really mad.  Yeah, it was extreme.
20  I didn't want her to have the car.  I did not want her
21  to have it because I was afraid that she would drive
22  again on the snow and I -- and the car was in my name,
23  the insurance was in my name.  I didn't want her to get
24  hurt.  I didn't want her to have an accident.  She was
25  out in the middle of the night, 2:00 in the morning or

1  3:00 and...
2      Q    Have you ever heard that there was some
3  discussion prior to Ms. Mills' death that she should be
4  locked in her outhouse and robbed?
5      A    Did I ever hear that?
6      Q    Uh-huh.
7      A    Before this happened?
8      Q    Yes.
9      A    Or during it happened?  What now?  Can you
10  repeat that please?
11      Q    Did you ever hear anyone talk about locking
12  Ms. Mills up in her outhouse or locking her up in some
13  way and robbing her?
14          MR. SLOSAR:  Objection to form.
15      A    No.
16      Q    At any time?
17      A    At any time.
18      Q    Did you know -- I'm sorry.  Do you know
19  William Lester?
20      A    I do know him well.
21      Q    I'm sorry.  Are you saying you know him well?
22      A    I do know him well, yes.
23      Q    How do you know Mr. Lester?
24      A    He was -- lived close to me when I was married
25  to Kayla's dad.  We lived probably three or four miles

1  apart.  Seen him at the store all the time.  Around our
2  little community.
3      Q    How long have you known him?
4      A    Probably 20 years or longer.
5      Q    Is he a friend?
6      A    I would say, yes.  He was a friend.
7      Q    Did you ever hear that he had joked about
8  robbing Katherine Mills?
9      A    No.
10          MR. SLOSAR:  Objection to form.
11      A    I've not heard that.  Did I hear it?  Or did I
12  hear somebody say it?
13      Q    Did you ever hear anybody discuss it one way
14  or the other?
15      A    I heard discussion about it afterwards, yeah.
16      Q    Okay.  Tell me what you heard.
17      A    He told me himself that somebody at the Market
18  says that he come in there, said something about it was
19  too hard to work.  That they would just rob his stepmom
20  or something like that to that effect.  But I didn't
21  hear it -- I mean, him say that.  That was just
22  something that had got told in the court and just
23  general knowledge.  Everybody had heard it.
24      Q    And by that, you mean -- when you say "it" --
25      A    Just in a community gossip that it was going

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 114

1  around that somebody said that.

2  Q   When you say "it," it is --

3  A   That statement.

4  Q   -- William Lester saying something about

5  robbing Katherine Mills?

6  A   I didn't hear him say that.

7  Q   I understand that.

8  A   I did hear gossip of it.  Somebody heard him

9  say it.

10  Q   Okay.  Do you know who that was?

11  A   No.

12  Q   Do you know if Amanda Hoskins ever heard him

13  say it?

14  MR. SLOSAR:  Objection to form.

15  A   I've never even had a conversation with Amanda

16  Hoskins. Full conversation other -- I mean, I don't

17  really even know Amanda.  I mean, I know who she is.

18  We're not friends.  I really don't even care that much

19  for her either way.  I mean, we're not like on a friend

20  level whatsoever.

21  Q   You mentioned when Kayla came back from rehab

22  that she and Jonathan broke up, correct?

23  A   Yes.

24  Q   But later she had a relapse of drugs again,

25  correct?

Page 115

1  A   Yes.

2  MR. SLOSAR:  Objection to form.

3  Q   Did she get back together with Jonathan before

4  or after that relapse?

5  A   After, I'm sure.  I think after.

6  Q   Do you have any knowledge as to what caused

7  her relapse?

8  A   I'm not going to say anything what caused it.

9  I -- I don't know.  I don't really have any knowledge.

10  I feel like it was a lot to do with after this murder

11  case and stuff happening, but I can't say that's what

12  happened.

13  Q   When was her relapse?

14  A   Probably mid-2011 or early 2011.

15  Q   When did she get back with Jonathan Taylor?

16  Or when did she restart her relationship?

17  A   They just became acquaintances.  I don't know

18  if they ever really got back into a serious

19  relationship.  But I guess it was around -- I don't know

20  how serious the relationship was, but I'm trying to

21  think when.  Probably right before they got arrested.  I

22  don't know the date they got arrested all together.  She

23  had just started back talking to him.  I don't know when

24  that was.  It was in the wintertime.  Maybe late 2011.

25  Maybe.

Page 116

1  Q   How did you become aware that they were back

2  in some type of relationship again?

3  A   I don't know how I originally became aware of

4  it.

5  Q   Was Kayla living with you at that time or with

6  Jonathan?

7  A   She was living with me.  She went and visited

8  Jonathan, but they never lived together.

9  Q   How did you know she had relapsed back into

10  drugs?

11  A   Just because her personality changed again,

12  and she started wanting more money from me, asking for

13  money from my mom.  She would get money from my fiance,

14  John Valdez, and was -- I wouldn't know that he give her

15  money and then I would give her money.  And just I -- it

16  all come together.

17  Q   What type of money would you give her?

18  A   I wouldn't give her any more than $20.00 ever

19  at a time.

20  Q   And how often would that be?

21  A   Maybe once or twice a week.

22  Q   Did she go back into rehab after that arrest?

23  A   No, I don't think so.  She was in a rehab

24  before that some time, I think.  She was at the Hope

25  Center.  She wasn't dating Jonathan then, but I can't

Page 117

1  remember when that was.

2  Q   After she became an adult or turned 18, did

3  she have any -- have any arrests that resulted in

4  convictions?

5  A   I think one maybe arrest.  Maybe that one.

6  Q   Okay.  What was that for, if you know?

7  A   Taking -- I think she took a TV out of

8  Jonathan's -- Jonathan Taylor's apartment.

9  Q   And Jonathan charged her with theft?

10  A   I don't know how -- I don't really remember --

11  I honestly don't remember what happened.  But I know it

12  was a TV and that she got stopped at a road check with

13  another friend, Jeffrey Brown, and the TV was in there.

14  And I don't know -- I don't remember.  I honestly can't

15  recall the whole situation of this TV deal.  I don't

16  know.  And I think she went ahead and just plead guilty

17  to something because she was doing -- had to pay

18  restitution on something about the TV

19  Q   Okay.

20  A   I don't remember or recall all the details

21  about it.

22  Q   Ma'am.  I think that's all the questions I

23  have.  I appreciate you answering my questions.  Thank

24  you.

25  MR. SLOSAR: Let's take a short break.  We'll be

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 118

1  right back.
2      VIDEOGRAPHER:  The time is 12:14 p.m.  We are
3  off the record.
4      (OFF THE RECORD)
5      VIDEOGRAPHER: The time is 12:23 p.m. and we are
6  back on the record.
7          CROSS-EXAMINATION
8  BY MR. WRIGHT:
9      Q   Ms. Mills, my name is Derrick Wright.  I
10 represent Detective York and Jason Bunch.  Again, I
11 apologize I was late and had to phone in to begin this
12 and sorry if that caused some delay on your part in
13 getting this started.  You testified a little bit about
14 Detective York.  I just kind of want to nail down the
15 specifics.  I believe that you testified that he
16 approached your daughter before she gave her statement
17 in March of 2012; is that correct?
18     A   Yes.  Multiple times.
19     Q   And as I understand it, you were never present
20 for any of those interactions between Detective York and
21 your daughter prior to that statement; right?
22     A   I was not, no.
23     Q   Sitting here today, do you know where or when
24 those interactions happened between Detective York and
25 your daughter?

Page 119

1      A   They happened at my home.  He come there each
2  time that he made contact with her.
3      Q   Do you -- did she telephone you and tell you?
4      A   She did.
5      Q   Okay.  So each time it was a telephone --
6      A   Immediate.  Almost immediate call as soon as
7  he left.
8      Q   Do you remember the time frame when this was
9  happening?
10     A   In the daytime.  I don't remember dates or
11 times, I'm sorry.
12     Q   Okay.  Would it have been what year?  Do you
13 know?
14     A   2011.  Probably mid-year starting.  Early
15 maybe that year.  I don't really recall, to be honest
16 with you.  But it was in 2011.
17     Q   I know you may not be able to recall in
18 specific detail each phone call, but just sitting here,
19 can you estimate how many times you remember being
20 called by your daughter?
21     A   Probably around 5 times, maybe.  Maybe more.
22 But at least that many.
23     Q   To your memory, were those -- did it come in
24 spurts or a big group?  Was it spread out?  Do you have
25 any memory?

Page 120

1      A   Spread out.
2      Q   She gave her statement I want to say in March
3  of 2012; does that sound right?
4      A   That's right.
5      Q   When was the last time he had approached that
6  prior to that statement?
7      A   He had contacted her frequently during those
8  last months before that -- March.  And -- but I don't
9  recall when.  If it was maybe a week, two weeks before.
10 I'm not sure.  It was frequent that he had contacted her
11 more often.
12     Q   Did you --
13     A   It was real spread out and then it got like a
14 lot.  He was making contact with her.
15     Q   So it sounds like at first it was spread out
16 then before her statement, there was a few more
17 contacts?
18     A   Yes.
19     Q   Did she ever indicate whether anybody else was
20 around when that happened?
21     A   No, she did not.  I don't think anybody -- I
22 don't -- I'm not for sure -- remember that she told me
23 ever anybody was around.  I'm not for sure if there was
24 or not.
25     Q   Did she indicate whether any other police was

Page 121

1  with him?
2      A   No.  I think -- I'm not for sure.  I know the
3  time he came when I spoke to him John Sowders was with
4  him.  But I don't remember or recall if John Pickard and
5  Jason ever come together.  I don't recall her saying
6  that.
7      Q   Okay.  And I'm skipping a little bit here, but
8  as far as Jay Sowders, I was trying to follow along and
9  you had said that they had asked to look for Kayla in
10 your home; is that right?
11     A   They asked was Kayla at home.
12     Q   Okay.  Did you let them look for her?
13     A   I let them in, yes.
14     Q   Okay.  Was it Sowders?  Was he the one that
15 was going through drawers?
16     A   No.
17     Q   Who was?
18     A   It was Jason York.
19     Q   What drawers was he going through?
20     A   He opened her nightstand drawers, looked in
21 her closet, looked around.  Looked in phones.  Looked in
22 a book.
23     Q   Did he --
24     A   Address book.  A journal book.
25     Q   Did he take anything?



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 122

1     A    He did not.

2     Q    Did you ever say anything to stop him?

3     A    I don't recall what I said to him.  I don't

4  remember what I said to him.  I don't remember other

5  than I didn't like the way he had been approaching

6  Kayla.  That I didn't think he should have done it with

7  me not around and he never come when I was there.  I

8  always thought it was odd that he never approached my

9  daughter when I was home.  Just only when I was gone.

10  Like he was trying to intimidate her -- I felt like it

11  was intimidation.  I felt, I mean.  I guess that's

12  overstating, but that's my opinion -- opinion about it.

13     Q    And she was 19 at the time, or maybe older?

14     A    She turned 20 in September.

15     Q    Of 2011?

16     A    Uh-huh.

17     Q    So it would have been right around the time

18  frame that she was close to or a little after she was 20

19  years old, right?

20     A    Yeah.

21     Q    And I believe your testimony was she had moved

22  out on her own at around 18; is that correct?

23     A    Uh-huh.

24     Q    With Derrick Wagers?

25     A    But she had come back home.  They had broken

Page 123

1  up.

2     Q    After they broke up?

3     A    Yeah.

4     Q    You may have given a date.  I know it's been a

5  long day.  Can you remember exactly when she broke up

6  with Derrick Wagers and came back home?

7     A    Probably in the spring of 2011.

8     Q    Did she ever --

9     A    But I'm not -- I mean, I'm not for sure about

10  this date, but just as I remember it was something like

11  that.

12     Q    And I understand.  If you can't remember

13  specifics, just let me know.  If you can, kind of give

14  me the best you can.  Like you did a season, that's

15  fine.  Just the best you can remember.

16     A    Okay.

17     Q    To your memory, did she ever explain to you

18  why her and Derrick Wagers broke up?

19     A    For one thing, he lived a long ways from where

20  I lived.  I took her car and I think she just had -- was

21  stuck down there at his house and never had -- he worked

22  -- he worked night shift.  He worked like the evenings

23  to 2:00 in the morning.  He went in like maybe 6:00 and

24  worked until 2:00 and she felt like she was really

25  stranded down there and --

Page 124

1     Q    Home sick?

2     A    Yeah.  Just -- at least if she was home, I

3  would take her to Walmart, we'd go visit my mom or go

4  shopping and --

5     Q    How far is Girdler from Flat Lick?

6     A    It's probably at least 40 -- about 30 minutes.

7  And he lived almost to Manchester.  I don't know like

8  that far out -- Girdler to Clay County that way.  So it

9  was quite a bit.

10     Q    And just to kind of put a range on that, you

11  indicated that you thought it was spring 2011 when they

12  broke up.  When did you say that they -- when did she

13  move in with him?

14     A    Probably the fall and spring of 2010.

15     Q    The prior spring?

16     A    Yeah.  Maybe 2010.  I think it was 2010.

17     Q    And they had probably been together before she

18  moved in, right?

19     A    Yeah.

20     Q    And how long had that been?

21     A    A few months.  I don't know.  I think she --

22  she moved in with her after she was -- after her

23  birthday and I guess 18th birthday.

24     Q    So that would be in September of --

25     A    Uh-huh.  Maybe 2000 --

Page 125

1     Q    2009?

2     A    2009.  So they must -- they started dating, I

3  guess, earlier that spring.  I don't know -- I'm trying

4  to think.  Anyway, it was in the spring and she moved in

5  with him in September of --

6     Q    Around her 18th birthday.

7     A    Yeah.

8     Q    And to your memory, she was living with him in

9  December 2010 when --

10     A    Yeah, she was living there.  All her

11  belongings was there.  She was living ever -- I mean,

12  all her personal stuff, clothes.  She had been living

13  there for -- when is mother's day?  Because I ate

14  Mother's day dinner there.  I don't know what month --

15  May?  So she was living there May, June, July, August,

16  October, November, December.

17     Q    Now, you mentioned he worked a night shift.

18  Do you know where he worked?

19     A    He worked at Pepsi.  I guess it was second

20  shift at Pepsi.

21     Q    Was he working at Pepsi in December 2010?

22     A    He was.

23     Q    Same shift?

24     A    Uh-huh.

25     Q    And what shift did you say that was?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 126

1    A    He got off work at 2:00 a.m.  I think it was
2  2:00 a.m.
3    Q    When did he go in?
4    A    Around 6:00 or 7:00.  After dinner.
5    Q    Did he have a like a Monday through Friday
6  job?
7    A    I think so, yeah.
8    Q    Now when Kayla moved out, did she have a cell
9  phone?
10   A    Uh-huh.
11   Q    I'm sorry.  You have to say yes or no.
12   A    Yes.  I'm sorry.
13   Q    It's fine.  Everybody does it.  Do you
14  remember what that number was?
15   A    I can't remember.  She had several numbers, so
16  I don't remember what number she had at that particular
17  time.  I don't -- I really don't.
18   Q    And I believe your testimony was that around
19  December 20th when Katherine Mills was found dead in
20  December 2010, you were calling Derrick's phone?
21   A    Yeah, I was.
22   Q    And that was because her phone was broken?
23   A    Uh-huh.  It was broke.  Something was wrong
24  with her phone and she didn't have access.  It wouldn't
25  work at that time.  I don't remember exactly what was

Page 127

1  wrong with her phone.  But she always had a cell phone,
2  but for a few days she didn't have the cell phone.  That
3  day in particular she didn't have a cell phone.
4    Q    Is there any reason why that stands out in
5  your memory?
6    A    Well, because not long after that, I guess I
7  keep remembering it because all the questions started
8  not long after that.  And it was fresh in my mind.  I
9  remember that day because I knew like after that they
10  started asking Kayla questions.  I -- it wasn't that
11  long after and I can remember where she was -- exactly
12  where she was that day.
13   Q    Were you -- you were working at the ARH?
14   A    I was at work that day.
15   Q    And was it ARH back then or Knox County
16  Hospital?
17   A    Knox County.
18   Q    And by that time, you were a nurse, right?
19   A    I had been a nurse.  I've been a nurse for 20
20  years.  I was -- I was finished with school at that time
21  and I was an RN, but I was also a LPN for 10 years prior
22  to that.  And worked there also.
23   Q    And I'm sorry.  I thought you were finished.
24  December 2010, do you recall what your work schedule
25  was?

Page 128

1    A    Yeah, I was the supervisor in a nursing home
2  at the hospital and I just went in -- I had to work 8
3  hours and I went in whenever I wanted to and then 8
4  hours.  If I wanted to go in the evening or morning.  I
5  normally went in around 9:00 and stayed until 5:00 or
6  6:00.
7    Q    So you didn't have a -- you didn't have to
8  clock in and out because you --
9    A    I did have to clock in but I just had to work
10  8 hours.  I didn't have to be there at 6:00 or 7:00 or
11  8:00.  But then I was just administrative duties.
12   Q    And that was a close to the holidays, December
13  20th, with Christmas coming up, do you recall taking off
14  work or anything that particular week after this?
15   A    I didn't -- I don't know if I took off maybe
16  Christmas, if it -- Christmas Eve, Christmas Day.
17   Q    So I believe December 20th was a Monday.  Does
18  that sound -- stand out that it would have been a Monday
19  when you found out?
20   A    Yes, it does stand out because I was going to
21  work, and my mom usually calls me every morning and --
22  oh, I don't.  I don't know why that date stands out.  I
23  don't know if I knew it was a Monday.  I really don't.
24  I don't remember.  I don't recall.
25   Q    But to your memory, it was a normal work week?

Page 129

1    A    Yeah.
2    Q    Did you -- do you remember Derrick Wagers'
3  phone number?
4    A    I don't remember it, I'm sorry.  No.
5    Q    Would it be kept in anything?
6    A    Let me see.  I might have it still in my
7  phone, I'm not sure.  I mean, if you needed his number,
8  I could probably contact him and ask him.  But I don't
9  even know if this phone -- I have it.
10   Q    Okay.  What is it?
11   A    627-4422.  I mean, if this is the same number.
12  I'm sure it is.
13   Q    627-4422?
14   A    Uh-huh.  My husband had transferred all these
15  numbers to my phone so I'm sure it's the same.
16   Q    Is that a mobile number?
17   A    Mobile, yeah.
18   Q    Did he have a home phone back then?
19   A    I don't think -- I'm not for sure.  I don't
20  think they had a home phone.  I'm not for sure they did.
21  And the number I have for Kayla now is not the phone
22  number she used, so it wouldn't be helpful.
23   Q    Is it okay if I just take it down?
24   A    Yes.
25   Q    What is it?



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 130

1      A      The number I have in my phone it says 225 --
2  let me make sure this is the right Kayla.  Because I
3  have another friend named Kayla.  Okay.  622-1223.
4  Sorry.
5      Q      That's for Kayla Mills?
6      A      Yeah, Kayla Mills.
7      Q      Now, was Derrick Wagers from Girdler or do you
8  know where he's from?
9      A      Yeah, he's from Girdler.  His parents live
10  there.  They live right behind him -- behind their place
11  they lived.  And he still lives there.
12      Q      What his parents' name?
13      A      Karen -- his mom's name is Karen Wagers.  But
14  I don't -- I don't remember his dad's name, to be honest
15  with you.  I met him a few times, but I don't recall his
16  name.
17      Q      Okay.  Now, on the Monday that she was -- now,
18  I won't use Monday.  On December 20, 2010 when she was -
19  - when Katherine Mills was found dead, you testified
20  that you talked to your daughter on Derrick's phone,
21  correct?
22      A      Uh-huh.
23      Q      Yes?
24      A      Yes, I did.
25      Q      Do you remember what times of the day you were

Page 131

1  calling her?
2      A      I called her -- she talked to me throughout
3  the day because she was buying Christmas gifts for
4  family and she was calling me.  "Do you think" -- her
5  mamaw, she called her, "would like this?"  Or "Papaw
6  would like that?"  Or "do you think John would like
7  this?"  And then she was asking like -- I mean, she
8  called me like several stores and it was just all
9  through the day.  Like he -- they were out like maybe it
10  was early.  I think it was around 10:00 in the morning
11  they went shopping.
12      Q      Is that when you first heard from her?
13      A      I think it was maybe around 10:00 a.m.
14      Q      And was she calling you at work or did you
15  have a mobile phone that she was --
16      A      She called me -- I was at work and I think she
17  maybe called me on my cell phone.  And she may have even
18  called me a few times at work.  I don't know.
19      Q      What was your cell phone number at the time?
20      A      It's the same thing as it is now.
21      Q      Can I have that?
22      A      627-4594.
23      Q      Did she tell you where she was at buying those
24  gifts?
25      A      Just several places.  I recall she was at

Page 132

1  Walmart and --
2      Q      Let me back up.  Do you recall the city?
3      A      She was in Barbourville.  In Barbourville.
4      Q      Just Barbourville?  I'm sorry.  I thought you
5  -- so your knowledge she went shopping, she was in
6  Barbourville and that was --
7      A      She may have -- I'm not 100 percent sure, but
8  she may have even went to Corbin.  The next town over.
9  But...
10      Q      Did you see her that day?
11      A      I don't think I seen her that day.  I'm not
12  for sure if I seen her or not that day, to be honest
13  with you.  She might have stopped by work but I'm not
14  100 percent sure.  I don't recall for sure if I seen
15  her.  Sometimes she did stop by but I'm not for sure if
16  she stopped by that day.
17      Q      Let's go off the record for a second.
18          VIDEOGRAPHER:  The time is 12:40 p.m.  We are
19      off the record.
20          (OFF THE RECORD)
21          VIDEOGRAPHER:  The time is 12:58 p.m.  We are
22      back on the record.
23  BY MR. WRIGHT:
24      Q      Okay, Ms. Mills.  We left off -- sorry about
25  that interruption.  And we were talking about your

Page 133

1  daughter's whereabouts on December 20th, the day that
2  Katherine Mills was found dead and I believe you
3  testified that she was out shopping in Barbourville,
4  maybe Corbin.  I believe your testimony was you're not
5  for sure if you saw her that day; is that right?
6      A      That's right.
7      Q      And I know that was the holidays as we talked
8  about.  Do you recall seeing her that week?  Did she
9  come home any?
10      A      She came home.  We had Christmas dinner
11  together.  I don't remember if I seen her Christmas
12  Eve.  I think I seen her Christmas Eve at -- yeah, I did
13  see her Christmas Eve and Christmas Day.  She actually
14  cooked dinner at my house for -- helped me cook dinner
15  and I think that -- I'm almost thinking Derrick's family
16  came.
17      Q      To your home in Flat Lick?
18      A      Yeah, I think.
19      Q      And to the best your memory is, the next time
20  you saw your daughter after you found out about
21  Katherine Mills being found dead was Christmas Eve?
22      A      I'm sure I probably seen her that week.  I'm
23  sure I did because I mean -- I probably even maybe even
24  seen her that day.  I just don't recall if I did for
25  sure.  But I'm sure I seen her that day or the next -- I

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  mean, probably two or three times that week.

2      Q    Okay.

3      A    I seen her almost every day.

4      Q    And that would probably have been after work,

5  right?

6      A    Yeah.    Sometimes she stopped by work and

7  sometimes we left and went and ate lunch.

8      Q    Okay.

9      A    She would stop by frequently at my work.  A

10 lot.

11     Q    If her car was immobile at the time, how would

12 she get around?

13     A    She only went like -- that's why they were out

14 with Derrick.  She only went when he was home.

15     Q    I see.

16     A    From work.

17     Q    What did he drive?

18     A    He had two cars.  And he had a Maxima -- well,

19 he had one car.  Sometimes he borrowed another car.  I

20 don't know if that car was his, but he sometimes drove a

21 little car.  Then he had his own, a gold Maxima.

22     Q    Gold Maxima?  What was the color of the other

23 car?

24     A    It was like a little gray gold car.  I don't

25 even remember what kind it was.  I think it was his

1  aunt's car.

2      Q    At the time of December 2010, the only other

3  person living with you was John Valdez; is that correct?

4      A    That's correct, yes.

5      Q    Where did he work?

6      A    At Advance Auto Parts.

7      Q    Is that separate from Larry Smith's Auto Parts

8  or is that --

9      A    Oh, yeah.  This was Advance Auto Parts in

10 Barbourville.  The chain Advance Auto Parts.

11     Q    Okay.  I've just seen reference to Larry

12 Smith's.  I didn't know if that was the same place but

13 that's a different auto place?

14     A    Oh, yeah.

15     Q    So he worked at Advance Auto Parts?    What

16 was his work schedule, the best you remember?

17     A    He had different schedules.  He usually worked

18 -- he usually went in and closed the store because he

19 was the assistant manager.  So the manager stayed at the

20 day and he worked in the evenings.

21     Q    Okay.  When you say "evenings," what does that

22 mean?  Did he go in after lunch?

23     A    No, probably 2:00 to close or something like -

24 -

25     Q    2:00 to close?

1      A    I'm not for sure.  He had different schedule

2  times.  His schedules fluctuated a lot.

3      Q    You mentioned that you are friends with

4  William Lester going pretty far back, right?

5      A    Yes.

6      Q    Did you call --

7      A    When I say friends, I don't mean that we

8  talked on the phone or -- we were just friendly like.

9      Q    Okay.  And that's what I was going to ask.

10     A    Yeah.

11     Q    So you don't recall having called him --

12 having his phone number and communicating with him over

13 the phone?  Being that type of friend?

14     A    I'm sure I may have called him.  My husband is

15 really -- is good friends with him.  My husband is.

16     Q    But your husband now is Scott Mills, right?

17     A    Yes.  My husband.

18     Q    Were they good friends back in 2010?

19     A    Yes, they've been friends for 25 years.  Or 20

20 -- 20 years.  I've probably been friends with him longer

21 but --

22     Q    He's a closer friend?

23     A    He's a closer friend, yes.

24     Q    Okay.  What about John Valdez?  Was he close

25 friends with William Lester?

1      A    Just acquaintances.

2      Q    Did you ever know John Valdez to call him on

3  the phone?

4      A    I don't know that he did but possible he could

5  have.  But I don't recall a time that I know he did.

6      Q    Okay.  That's the long away around, I'm sorry.

7  We got off on a sidetrack.  I was asking about Detective

8  York's interactions.  You mentioned he had the one

9  encounter with you at your home.  Before that, any other

10 interactions you had with Detective York?

11     A    No, never.

12     Q    I know that your daughter -- I'm sorry.

13     A    That's okay.

14     Q    I know that your daughter mentioned some.

15 Other than your daughter, any other friends or family

16 tell you about any interactions with York?

17     A    My aunt did.

18     Q    Is that this Stella?

19     A    My aunt Stella, yeah.

20     Q    Any other?

21     A    No, I don't -- I'm wanting to think that he

22 approached a second aunt of mine, but I don't know for

23 sure if he did.

24     Q    Do you know who that aunt's name is?

25     A    Geraldine Mills.  But I don't know for sure if

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 138

1  she was just -- I know for sure Stella.  But I'm not for
2  sure about Geraldine.
3       Q    Okay.  And this --
4       A    Geraldine Mills.
5       Q    -- this Stella one, I think you mentioned
6  Sheriff Pickard was also there at that time.
7       A    Yes.
8       Q    And you weren't there, but this was reported
9  to you by Stella, correct?
10      A    Yeah.
11      Q    Do you remember when that interaction was?
12      A    In October 2011.
13      Q    Does that cover all of the interactions that
14 you recall that was reported to you --
15      A    That I recall, yes.
16      Q    -- yeah, regarding Detective York as it
17 pertains to your daughter?
18      A    Yes.
19      Q    Okay.  And for Stella Smith, it was just one
20 interaction to your understanding, right?  Where does
21 she live at?
22      A    She lives in Flat Lick.  Not at Stinking
23 Creek, but actually in Flat Lick.
24      Q    So she's still living?
25      A    No, she's not.

Page 139

1       Q    Oh, she's passed?
2       A    She passed away about 2 years ago.
3       Q    Do you know --
4       A    I don't know if her husband was there, but he
5  possibly could have been, and he's still living.
6       Q    What's his name?
7       A    Bill Smith.
8       Q    Where does he live?
9       A    In the house that -- residence in Flat Lick.
10      Q    Do you know where Derrick Wagers is living?
11      A    He's still living.  He recently -- he's
12 married now and he lives somewhere in the same area.
13 Him and his aunt -- he got married, his wife has two
14 children.  So they traded houses with his aunt.  His mom
15 -- her mom -- his wife's mother told me that they moved
16 into the aunt's house and the aunt moved in the small
17 trailer.
18      Q    And by the same area you're talking about
19 Girdler?
20      A    Yeah, I mean it's probably in the same --
21 right there.  There was several little houses.
22      Q    Do you know his wife's name?
23      A    She was a Woolum.
24      Q    It's okay if you don't.
25      A    I know her well.  She was friends with Kayla.

Page 140

1  I mean, she's been to my house but right now I just
2  can't remember her name.  I'm sorry.
3       Q    Drawing a blank?  That's fine.
4       A    Yeah, I'm just drawing a blank.
5       Q    I don't know if it was in your testimony today
6  or if I've just read about it in materials.  So pardon
7  me, but I'll try to keep this open-ended.  I've heard
8  reference to a grandmother or I've seen reference to it.
9  Did she have any grandmothers living in December 2010?
10 Kayla?
11      A    Uh-huh.  My mother is living.
12      Q    What was her name?
13      A    Sylvia.
14      Q    What was her last name?
15      A    Smith.
16      Q    Did she ever remarry?  Or was she married
17 prior to that?
18      A    My mom?
19      Q    Yeah.
20      A    She was married at that time.  And she was
21 married to my stepdad.  They was probably married 25
22 years.
23      Q    Is that Oliver Smith?
24      A    It is.
25      Q    Is Sylvia Smith still living?

Page 141

1       A    No.
2       Q    When did she pass?
3       A    April 11th -- April 2011.
4       Q    My kids call my mom Nana.  What did -- did
5  your daughter have any name for --
6       A    She called her Mamaw.
7       Q    Mamaw?
8       A    Uh-huh.
9       Q    Her -- who was the -- and that was your mom.
10 So who was her paternal grandparents?
11      A    Her --
12      Q    Her dad's side?
13      A    Linda Mills.
14      Q    Is she still living?
15      A    Yeah, she is living.
16      Q    Does she go by -- does she call her the same
17 name?  Mamaw?
18      A    Uh-huh.  Yes.
19      Q    Was she close to either one of these
20 grandparents?
21      A    She was close to them, yes.
22      Q    Did she ever live with them?
23      A    No.
24      Q    Not to your knowledge?
25      A    Uh-uh.  Maybe spent the night but never lived



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 142

1  there.  Never stayed more than a few days.
2      Q    Okay.  Do you know whether she visited either
3  of her grandparents on December 20th when Katherine
4  Mills was found dead?
5      A    Yeah.  She actually had been up there --
6  Derrick had took her up there that evening and she
7  stayed all night and he came back and picked her up
8  around 9:00 or 10:00 that morning.
9      Q    So she was at her grandparents' on the morning
10  of the 20th; is that right?
11     A    Yes.  Uh-huh.
12     Q    And to your understanding  Derrick picked her
13  up at what time?
14     A    Around 9:00 or 10:00 probably.
15     Q    How do you know that?
16     A    Because I talked to my mom on the phone and
17  talked to her at my mom's -- my mother's.
18     Q    And which grandparent was it?
19     A    Sylvia, my mother.  Maternal mother.
20  Grandmother.
21     Q    Is Oliver Smith still living?
22     A    He is.  He was also there too.
23     Q    So you said that you talked to your daughter
24  at your -- at her grandparents' house?
25     A    Uh-huh.

Page 143

1      Q    Is that a yes?
2      A    Yes.  Sorry.
3      Q    What -- and she didn't have a phone?
4      A    There was no cell phone service up there
5  anyway.  Just the landline.
6      Q    Landline?
7      A    Yeah.
8      Q    Do you know what number that was?
9      A    542-5095.
10     Q    What was the last four digits?
11     A    5095.
12     Q    Did they live -- see -- I want to say that
13  Katherine Mills lived along Kentucky 223; does that
14  sound right?
15     A    Uh-huh.
16     Q    Yes?
17     A    Yes.
18     Q    Did they live along Kentucky 223?
19     A    Uh-huh.  I did, they did.  Yes.
20     Q    How far did Oliver and Sylvia Smith live from
21  Katherine Mills' house?
22     A    Several miles.  I don't know for sure how far.
23  Probably 6 or 7 miles, I guess.  Maybe more.
24     Q    Do you know an address?  I don't -- I know
25  their names but I don't know exactly where they lived?

Page 144

1      A    They didn't have like a post office box.  But
2  the lane was called Old Hammond Post Office Road.
3      Q    I feel like that there's a lot of people that
4  I've come across that lived around an area called Scalf?
5      A    Yeah.
6      Q    Is that kind of where they lived or is that --
7  or am I off there?
8      A    Off a little.  I lived there when I was
9  married to Kayla's dad.  That's where we lived.
10     Q    Okay.
11     A    But it's not far.  I mean, it's still -- it
12  makes a circle.
13     Q    That's right.  It does, yeah. But it -- so she
14  lives along that 223 circle?
15     A    Yeah.
16     Q    Sylvia did?
17     A    Uh-huh.
18     Q    What vehicles did Sylvia and Oliver Smith have
19  in December 2010?
20     A    I honestly don't even know if they even had a
21  vehicle.  My mom never even had a license.  And I want
22  to say they had a -- some kind of a red 4-door Chevrolet
23  car, but I don't know what -- like an older car.
24     Q    Okay.
25     A    A maroon color, but I don't know what kind It

Page 145

1  was and I don't even know if they had it at that
2  particular time.  I don't even know if they had a
3  vehicle at that particular time.  They probably did.
4  Some sort of, to get to the store.  But...
5      Q    That's fine.  Did you visit them very often?
6      A    Yeah.  Yes, I did.
7      Q    Did you talk to your mom or your stepdad or
8  did you just talk to your daughter that morning?
9      A    I talked to my mother and my daughter that
10  morning.
11     Q    Can you put a time on that?
12     A    I talked to my mother early like -- oh, I
13  probably -- I talked to my mother every morning on my
14  way to work.  So I know I talked to her around 7:30,
15  8:00 on my way into work.   And I know I talked to Kayla
16  before Derrick picked her up.  I never talked to my
17  stepdad.  But I talked to my mom, my mother.
18     Q    Did -- did your mom talk about Kayla being
19  there?
20     A    Yeah.
21     Q    She did?
22     A    Uh-huh.
23     Q    Did you say she went there the night before?
24     A    She went there -- he took her there that night
25  before he went to work.  Derrick Wagers took her to my

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 146

1  mom's, dropped her off and then picked her up early the
2  next morning and then he took her back and ate and --
3  before she went -- before he left to go back to work
4  because she didn't want to stay -- being the holidays
5  and she just didn't want to be stuck there by herself in
6  Girdler. So that's why she was staying at -- at my
7  mom's. And she didn't get along really well with my
8  fiance at the time. Not -- they didn't hate each other,
9  but he was a lot younger than me, and they kind of
10 argued like kids sometimes over TV, phone, everything.
11 It was kind of ridiculous.
12     Q    Okay. Did you ever tell anybody that she was
13 with Sylvia?
14     A    Yeah. I'm sure I did.
15     Q    Who did you tell that to?
16     A    I don't recall who I told it to. I'm not
17 sure. Sorry. I don't understand who you're referring
18 to. I mean, I don't --
19     Q    To the police --
20     A    I think I told the police, yeah. I told -- I
21 think I even told Jason York he could go talk -- I'm
22 sure I remember telling him he could talk to my mother.
23 My mother knew she was up there that morning and Derrick
24 picked her up.
25     Q    When you testified earlier, you mentioned

Page 147

1  Christmas shopping. You didn't mention her being at
2  your mother's that morning. Is there any reason why you
3  forgot that?
4      A    No, I didn't. Actually, I didn't even think
5  about it until you was asking me about that. There was
6  no reason why. I just didn't. I don't know -- didn't -
7  - no reason.
8      Q    All right. I'm going to shift gears a little
9  bit. There was some questioning about your daughter's
10 substance abuse. I won't read this and all that, but
11 from a different perspective, did you have any knowledge
12 or information that she was stealing from others?
13         MR. SLOSAR: Objection to form. Foundation.
14     A    Not others. She had took some stuff from me,
15 personally. Little items but I mean, not really other
16 people.
17     Q    What did she take from you?
18     A    Just a few dollars out of my purse would be
19 missing. Nothing -- not substantial, but...
20     Q    Do you -- can you pinpoint when that started?
21     A    That started probably 2011. When she relapsed
22 when she took stuff before -- that she went to
23 Louisville.
24     Q    Did William Lester ever tell you that her and
25 Jonathan had stolen money from him?

Page 148

1      A    Uh-uh. He never told me that.
2      Q    Did John Valdez ever tell you that she had
3  stolen stuff from him?
4      A    Yeah, I'm sure he probably had mentioned it
5  and we discussed it, yeah.
6      Q    Did you believe him or disbelieve him?
7          MR. SLOSAR: Objection to form.
8      A    Sometimes, maybe I believed him and sometimes
9  I just thought he didn't like her and I didn't believe
10 him.
11     Q    Anybody else in the community tell you any
12 issues where they suspected Kayla of stealing?
13         MR. SLOSAR: Objection to form. Foundation.
14     A    Not as I recall. I mean, I really don't
15 recall. I mean, that she stole. I mean, there was that
16 TV incident. But, no.
17     Q    What about criminal charges? Are you of the
18 understanding that the TV incident resulted in a
19 criminal charge?
20     A    Yeah.
21     Q    Any other criminal charges for theft,
22 burglary, anything like that?
23         MR. SLOSAR: Objection to form.
24     Q    Not to your knowledge?
25     A    Not to my knowledge, no. No, not as I recall.

Page 149

1      Q    Now, is it true that in 2011, 2012 when the
2  interactions with Detective York were going on regarding
3  the Katherine Mills case, your -- did you have an
4  understanding that your daughter was also involved in
5  other crimes? Had been arrested, charged?
6          MR. SLOSAR: Objection to form.
7      A    She had been arrested, but yeah.
8      Q    What -- what crimes do you recall her being
9  arrested on?
10     A    The meth charge that was at Jonathan's
11 apartment and then another one at my house. At Flat
12 Lick. My house that I own.
13     Q    Were you at home when that happened?
14     A    I was home. I come -- I was home. I had
15 worked the night prior -- the day prior, sorry. Come
16 home went to bed, was off the next following day and the
17 police come that morning and said that somebody had been
18 making meth and they -- I mean, I don't know. I don't
19 even understand how they arrested her. I don't
20 understand the whole thing. They didn't take me to ail
21 or Scott to jail, but they took her to jail.
22     Q    What time --
23     A    Except she was at the house.
24     Q    What time frame was that?
25     A    It was early in the morning and they were

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 150

1 there until probably noon. They had the squad, whole
2 meth squad out investigating and everything. It was
3 awful. It was very embarrassing.
4    Q    And I was meaning time frame as in like month,
5 year.
6    A    Oh. It was in the spring and it was probably
7 in 2012.
8    Q    Okay. And by that time, you were with Scott
9 Mills?
10   A    I was with Scott at this time. Me and John
11 split up, broke up in July 2011. We split up.
12   Q    Was she ever on home arrest at this time?
13 2011, 2012?
14   A    She was on home arrest. I think that was for
15 the time her and Jonathan got arrested. I'm not for
16 sure, but I think it was. Not really for sure what. If
17 it was for the TV, or that with Jonathan.
18   Q    Was she ever arrested for being found away
19 from home in violation of that home incarceration?
20   A    Yes, she was.
21   Q    Did she give a false name when she was pulled
22 over by police?
23        MR. SLOSAR: Objection to form. Calls for
24   speculation.
25   A    I really don't know what happened. I honestly

Page 151

1 don't.
2    Q    Okay. Are you aware of a criminal trespassing
3 charge?
4    A    Uh-huh.
5    Q    She pled guilty to in March?
6    A    Oh, yeah. I do recall that, yes.
7    Q    What was that?
8        MR. SLOSAR: Objection to form.
9    A    She had been friends with this boy and I don't
10 know what happened, but she had been going down there.
11 I don't know what got that started because they were
12 friends -- ongoing friends and then at certain time he
13 knew she would get in trouble if he called the police.
14 But she -- I didn't know -- I wasn't aware until after
15 the fact that she told me that she had been taking the
16 ankle bracelet off and the only reason they caught her
17 is because they come up the road knowing it was her.
18 But I don't know that she give them a false name. But
19 she had been going down there to his house a lot. But
20 for some reason they had a falling out. I don't know
21 why. I mean, they wasn't in a relationship, they was
22 just friends.
23   Q    Did you find out about this stuff after the
24 charges or did she --
25   A    After the charges.

Page 152

1    Q    So she didn't tell you about it up front,
2 right?
3    A    Oh, no. Not that. Not -- I mean, about
4 taking the ankle bracelet off? About being friends with
5 the --
6    Q    About taking the ankle bracelet off.
7    A    Yeah, she had told me later she took it off a
8 couple times.
9    Q    I talked about the interactions with Detective
10 York and I've kind of segregated the statement. So I'm
11 going to talk about that a little bit. I'm going to try
12 to avoid rehashing. But as I understand it, he asked
13 that she come to the police department, and you couldn't
14 locate her, and you went down and said, "I'll bring her
15 in the next day;" is that right?
16   A    No, I told him I'd bring her in -- he told me
17 I had to have her there at 2:00. I did locate her. The
18 attorney was not available that day. I took her anyway
19 to the city police station and just told him that we
20 couldn't get the attorney until the next prior day
21 because he was in a deposition and I knew he was out of
22 town.
23   Q    I understand. Was -- you said Kayla was with
24 you when you did that?
25   A    Yeah. I located her the day that he told me

Page 153

1 to.
2    Q    And he said that was fine, right?
3    A    Yeah. Yes, he did.
4    Q    And Ken Boggs, did he represent her on any of
5 her criminal charges to your knowledge?
6    A    Yeah. Yes, he did.
7    Q    Was he privately retained by you or Scott or
8 her?
9    A    Just by me.
10   Q    Okay. He wasn't like a public defender
11 appointed, right? Had you retained his services for her
12 before this statement or after?
13       MR. SLOSAR: Objection to form. Foundation.
14   Can you clarify as to whether you're talking about
15   the 15th or the 16th?
16 BY MR. WRIGHT:
17   Q    Well, they run right together. Before the
18 statement, either the 15th or the 16th of March.
19   A    I called him the day that Jason York come to
20 my house and wanted me to come there. I called him
21 about this case.
22   Q    And what I'm -- I'm sorry. I see the -- where
23 I made a mistake. I was asking -- you had indicated
24 he'd represented her in other criminal issues and I was
25 wanting to know were -- was that representation before

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 154

1 the March 2012 statement or after the March 2012
2 statement?
3     A    I think he was -- it was -- he was
4 representing her on a case were the meth charge at my
5 house.  I don't know if it was -- I think it was before.
6 I think this was ongoing.
7     Q    Okay.
8     A    Like during this time.  I'm not 100 percent
9 for sure, but I think it was before.  I think.
10    Q    Did you ever meet with him that first day?
11    A    No.
12    Q    Did you talk to him that day?
13    A    I really don't even know if I talked to him or
14 if I talked to his receptionist and he got back with me.
15 I'm not really for sure to be honest with you.
16    Q    Did you go to his office the next day?
17    A    No.
18    Q    I know I'm saying "you"; do you know whether
19 Kayla Mills, your --
20    A    No, she did not go with -- because I took her
21 to the police station with me.  Me and her went together
22 in my car.
23    Q    And then the day before, did she ever see him
24 separately from you, to your understanding?
25    A    No, she did not.  Not as I'm aware of.  I

Page 155

1 don't think she did, because I found her up in the
2 middle of Stinking Creek and brought her home, and we
3 went, and she came back home, and then we went back the
4 next day.  I don't think she went anywhere to talk to
5 him.  And I know she didn't -- I'm pretty sure she
6 didn't talk to him.
7     Q    Do you have any reason to believe she may have
8 talked to him on the phone that night before she went in
9 to see Detective York the next day?
10    A    No.  Don't have any reason to think she did.
11 I don't recall her talking to him.  I don't think she
12 did.
13    Q    Did you -- and I -- so it's your testimony
14 you, Kayla and Scott met him at the police dep0artment?
15    A    Uh-huh.  Scott was in his vehicle.  Me and
16 Kayla rode in mine.
17    Q    Did you-all have a conference with him before
18 you met --
19    A    Not as I recall.  We didn't speak with him
20 prior.  He met us there.
21    Q    And know that I'm saying "you-all," did you
22 see her step away privately with her?
23    A    I don't think he did.
24    Q    Okay.  Once you-all went in to the interview
25 room, and that was at the Barbourville P.D.; is that

Page 156

1 right?
2     A    Uh-huh.
3     Q    You stepped out when you started to feel ill,
4 correct?
5         MR. SLOSAR:  Objection to form.  Foundation.
6     Q    You stepped out at one point, correct?  I
7 believe you testified that Mr. Boggs and Detective York
8 may have stepped out at one point?
9     A    They did step out at one point, yes.
10    Q    Any other people step out during the interview
11 from start to finish?
12    A    No.  Kayla remained in there.  I think Scott
13 never -- I don't remember him leaving.  And I'm -- I
14 left.  And they stepped out briefly.  Jason jumped up
15 and went to get the arrest warrant, so he said.  And
16 then that's when I left.  Got up and left the room.
17    Q    Okay.
18    A    And I got up and left because I thought he was
19 going to come back and arrest her.
20    Q    You didn't see him come back in?
21    A    I don't think I seen him come back in.  I
22 don't recall.  I don't think.  I don't remember seeing
23 him come back.
24    Q    And you mentioned there was a recording
25 device?  Was there just one or was there two?

Page 157

1     A    I only -- I think there was one I know because
2 he played the Ashley -- or Amber Simpson's statement to
3 us.
4     Q    Okay.
5     A    And I don't remember if there was one or two.
6 I think that was maybe it.
7     Q    Did he use that same device to record the
8 conversation he was having with Kayla Mills?
9         MR. SLOSAR:  Objection to form.
10    A    I'm not sure.  I don't really -- I don't know
11 if he had an -- another one or not.  I don't know.  I
12 don't recall.
13    Q    Do you recall when he was interacting with
14 your daughter?
15    A    If he had two or not.
16    Q    Where he -- did he lay it on a table?
17    A    There was one on the table, yes.
18    Q    When you-all got there, was there
19 introductions made?
20    A    Briefly.
21    Q    Did that happen at the very beginning?
22    A    Yes.
23    Q    And I think he may have referred to you as
24 Cricket?
25    A    Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 158

1    Q    And I think that was corrected, right?
2  Somebody said your name was actually Donna.
3    A    Oh yeah. Yes.
4    Q    Yes. And so -- I think your testimony was
5  after this introduction and you-all started talking, he
6  was turning the recording on and off?
7    A    He -- he did.
8    Q    Do you remember what points -- what they were
9  talking about when he would do that?
10    A    He would start something and then Kayla would
11  say something and then he would start over.
12    Q    Do you need to take that?
13    A    No, it's fine.
14    Q    Okay. Did he ever restart the whole process
15  and give introductions again or was it just an ongoing
16  process?
17    A    It was really an ongoing process. I don't
18  think he started introductions. I don't remember him
19  starting the introduction over.
20    Q    Okay. If I played the tape, would you be able
21  to point out where you think the recording was stopped?
22  I know it's been a while.
23    A    I don't know if I could or not. I really
24  don't. I mean, it's just like -- the only thing I
25  remember is him being angry and screaming for Kayla to

Page 159

1  tell me -- tell him that she was asleep in that car and
2  woke p there and that he knew, that he had witnesses and
3  he knew that's what she was supposed to say and he said
4  it over and over and over and over again. There was
5  nothing else said. When anybody attempted to say
6  anything else, he got angry and stopped. And just
7  become more angry. He really needs some kind of anger
8  issue class because he's got very bad anger issues.
9    Q    Would he reach for the recorder and turn it
10  off if it was laying on the table?
11    A    I don't recall him doing it every time. Maybe
12  just when we started. I might need to take this, I'm
13  sorry. Can we stop just a second?
14    Q    Let's take a break. Sure.
15    VIDEOGRAPHER:    The time is 1:30p.m. and we're
16  off the record.
17    VIDEOGRAPHER:    The time is 1:33 p.m. and we are
18  back on the record.
19    (OFF THE RECORD)
20  BY MR. WRIGHT:
21    Q    At that interview, do you have -- when you
22  stepped out, did you say anything that I need to step
23  out, or did you just --
24    A    He was out of the room. There wasn't anybody
25  in there but Kayla, Kenneth Boggs and Scott.

Page 160

1    Q    Okay. When you walked out?
2    A    I mean, I really didn't say nothing because I
3  was literally -- when I say I was sick, I was sick.
4  Like so sick I had to run out and throw up. It was that
5  bad.
6    Q    Did Kayla continue to interact with her
7  attorney to your knowledge in her other cases? Ken
8  Boggs?
9    MR. SLOSAR:    Objection to form. Foundation.
10    Q    Did he continue to represent her?
11    A    He did.
12    Q    You were paying the legal bills, right?
13    A    I was.
14    Q    So you were paying legal bills after March
15  2012, correct?
16    MR. SLOSAR:    Objection to form. Calls for
17  speculation.
18    A    I'm sure I was. I mean, I'm sure.
19    Q    We might come back to that in a minute. I'm
20  going to move on just to keep things going. After the
21  March 2012 statement by your daughter, did you have any
22  more interactions with Detective York?
23    A    I did not.
24    Q    Did your daughter report any more
25  interactions?

Page 161

1    A    She did not. She actually -- no, she didn't.
2    Q    Did she report any interactions with the
3  Commonwealth Attorney's Office? The prosecutors?
4    A    No, I don't think so.
5    Q    Did she report any interactions with Jonathan
6  Taylor after March of 2012? Did she go see him in jail
7  or correspond to him?
8    A    I'm not for sure if she did. She maybe
9  visited him in jail.
10    Q    To your knowledge, she never said anything
11  about that?
12    A    I don't recall that she did but I don't -- she
13  may have. I just don't know for sure.
14    Q    What about with Amanda Hoskins? Did she ever
15  say that she communicated with Amanda Hoskins after her
16  statement in 2012?
17    A    I don't think -- I don't recall her saying
18  anything about it.
19    Q    Okay. Same for William Lester. Did she talk
20  about contacting him? Being in communication with him
21  after her statement in March 2012?
22    A    I don't think so.
23    Q    Now, all of them had attorneys and
24  investigators and their criminal defense team. Did your
25  daughter, Kayla Mills, ever say that she had spoken to

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 162

1  any attorneys or investigators or anybody on behalf of
2  Jonathan Taylor, Amanda Hoskins or William Lester?
3        MR. SLOSAR:  Objection to form.
4     A    I don't think so.  I honestly don't think she
5  talked to anybody about him.  About any of -- about
6  anything.  I don't think.  I mean, I'm not for sure.  I
7  don't recall anything.
8     Q    I know you don't know.  I'm just asking if she
9  told you and your answer is that you don't recall it.
10    A    I don't recall her telling me any of this.
11    Q    And I believe your daughter passed in January
12  2013; is that the right time frame?
13    A    It is.
14    Q    When did she move up to Louisville?
15    A    In -- around July 2012.
16    Q    After July 2012, after she had moved away, did
17  she talk to you about anybody communicating or anything
18  about this case with her?
19    A    She did not.
20    Q    Before she moved away in July of 2012, did she
21  tell you about anybody talking to her about this case?
22    A    I don't recall her saying anything about it.
23    Q    Okay.
24    A    Nothing sticks out.
25    Q    Do you know if she had to make any court

Page 163

1  appearances for this case?
2     A    For this case?
3     Q    Yes.
4     A    No.  I don't think so.        Ô
5     Q    Was she ever subpoenaed?  Do you know?  Let me
6  switch it to you?  I think you have at least met with a
7  -- an investigator for Amanda Hoskins by the name of
8  Lisa Evans?
9     A    I did, yes.
10    Q    And I want to say the date of her -- she made
11  a report of this that's dated August 8, 2013.  August
12  2013.  Does that sound about right?
13    A    Uh-huh.
14    Q    Yes?
15    A    Yes.  I'm sorry.  I'm sure it is.
16    Q    Did she record that?
17    A    I think she may have.
18    Q    Was that the first statement you gave about
19  what had happened to anybody?
20    A    Uh-huh.  I think so.
21    Q    How did that get set up?  Did she just show up
22  one day?  Did she call and leave messages?  What
23  happened?
24    A    Well, I think she may have called me by phone.
25  Or maybe contacted me at work.  One or the other.

Page 164

1     Q    Was there a period of time where people were
2  trying to contact you and you just didn't want to get
3  involved in it?  Was there any -- anything to the time?
4     A    I feel like I don't want to get involved in it
5  right now, to be honest with you.  Yes.  I don't
6  remember anybody ever contacting me, but I've never
7  wanted to get involved in this.  I don't want -- really
8  want the retaliation against him on me, on Jason York or
9  any of the -- else involved.  I've never wanted to be
10  involved in this.
11    Q    So August 2013 is to the best of your memory
12  the first time you talked about what had happened when
13  your daughter gave her March 2012 statement; does that
14  sound about right?
15    A    Best I can remember.  I also talked to
16  somebody on Jonathan's case, but she was a mediation
17  specialist on -- he was in a death penalty case.  She
18  came to talk to me about mostly about his childhood,
19  which I don't really know anything about.  I talked to
20  her also.
21    Q    Do you know that person's name?
22    A    I don't recall her name.
23    Q    And was the substance of that conversation
24  mostly about Jonathan Taylor, not about your daughter?
25    A    Yeah.  All about Jonathan.

Page 165

1     Q    All about Jonathan?
2     A    They asked questions about my daughter, but
3  mostly Jonathan.
4     Q    Did you --
5     A    She did.  The lady did.
6     Q    Do you know when that was?  Would that have
7  been after this?
8     A    I think it was after.
9     Q    Did you have any follow-up meetings with Ms.
10  Evans?
11    A    I think that's the only time I spoke with her
12  as I recall.  I think so.
13    Q    Now, Mr. Taylor had an investigator, Dale
14  Dorning and a Josh Powell.  Are you familiar with either
15  of those names?
16    A    Josh Powell?
17    Q    Yes.
18    A    I met with him.
19    Q    How many times did you meet him?
20    A    A couple times, maybe.
21    Q    I don't think he became involved in the case
22  until 2014, does that sound right?
23    A    Yeah.
24    Q    Did he record any of his conversations with
25  you?



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 166

1    A    I don't know if he did nor not. I don't
2  remember if he did. I don't recall him recoding
3  anything.
4    Q    Did you tell him, as best that you can
5  remember, did you tell them anything different than what
6  you testified to here today?
7    A    I don't think so. I don't -- it's been so
8  long. I mean, I might have forgotten something. I
9  don't recall telling anything different. I'm not sure.
10  I mean, I would not have told a lie. But --
11   Q    Right.
12   A    -- I might have forgotten a few things. It's
13  been a long 8 years -- 7, 8 years.
14   Q    Let me reverse the question. Is there
15  anything you've said today that has come out in your
16  memory that you may have forgotten to mention to them?
17       MR. SLOSAR: Objection to form. Calls for
18  speculation.
19   A    I mean, maybe. I'm not for sure.
20   Q    Okay. Nothing stands out? Was anybody with
21  Ms. Evans?
22       MR. SLOSAR: Objection to form. Foundation.
23   Q    When she came to visit you in August 2013?
24   A    No. I don't -- I honestly don't remember. It
25  seems -- I think there was somebody with her that was

Page 167

1  recording, typing, or -- I don't remember.
2    Q    Man or a woman?
3    A    I think there may have been a man and a woman
4  and her.
5    Q    Three people?
6    A    I think so, yeah. I think.
7    Q    Was anybody with you? Was Scott with you?
8  Anybody? Attorney?
9    A    Nobody was there.
10   Q    Do you remember where it was at? At your
11  home?
12   A    At my home.
13   Q    Do you have any recollection of talking to any
14  attorneys for either -- and I'm talking about the
15  criminal defense attorneys for Amanda or William or
16  Jonathan?
17   A    I think I had spoke to them briefly at --
18  going to court because I had been subpoenaed for
19  Jonathan's case.
20   Q    Okay.
21   A    But nothing stands out that we discussed. But
22  I had spoke with him. A girl and a man, actually.
23   Q    Was there anything substantive about those
24  conversations?
25   A    I can't remember that sticks out.

Page 168

1    Q    You mentioned you'd spoke to Mr. Slosser,
2  correct?
3    A    A few times, yeah.
4    Q    Yesterday?
5    A    Yesterday.
6    Q    When else?
7    A    Probably when Jonathan -- after he got out of
8  jail, a while after that. I don't know when. I don't
9  remember the date.
10   Q    Okay. What did you-all talk about that day?
11   A    Just about Kayla. Just -- he asked me a few
12  questions about what happened with Jason York, John
13  Pickard.
14   Q    Did he tell you anything?
15   A    No.
16   Q    Did he tell you anything yesterday?
17   A    No, he did not. Other than he showed me this
18  arrest warrant I had never seen.
19   Q    Have you talked to Ms. Staples who is sitting
20  beside him?
21   A    I never seen her before.
22   Q    Have you seen me before?
23   A    Have I ever seen you?
24   Q    Yeah.
25   A    I don't recall.

Page 169

1    Q    No, we've never talked, have we?
2    A    I don't think so.
3    Q    Have you talked to anybody else on this side
4  of the room? Any of these attorneys to your knowledge?
5    A    To my knowledge, no.
6    Q    They have an investigator, I think by the name
7  of Jim. Have you spoken to him?
8    A    I don't think so. Don't sound familiar at
9  all. The only investigator I remember talking to is
10  Josh is his -- Josh?
11   Q    Josh Powell.
12   A    And Lisa.
13   Q    Ms. Evans?
14   A    Ms. Evans.
15   Q    I believe you said you remember one interview
16  with Ms. Evans and maybe a couple with Josh Powell,
17  right?
18   A    Yeah.
19   Q    Before I forget, on this -- I think its
20  exhibit supplement, the exhibit 2. Yeah, 2. She
21  identifies a phone number in there. Do you see that?
22   A    That's my home number.
23   Q    Okay. And -- at Flat Lick?
24   A    Yes.
25   Q    Was that a landline or a cell phone?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 170

1    A    It was.
2    Q    Okay.  And you don't live there anymore,
3  correct?
4    A    No, I don't.
5    Q    When did you leave there?
6    A    After my daughter passed away, I guess.  But I
7  stayed a little bit.  Probably back in 2014.
8    Q    Did you put your property up for bond for
9  William Lester?
10   A    I did.
11   Q    How did -- how did that come about?  Did he
12 ask you?
13   A    Uh-uh.  He did not.
14   Q    Did his attorney?
15   A    No.  His -- my husband wanted to help him get
16 out so together, I guess they had lacked so much money
17 and I wasn't even down there, but I did go in to do it
18 because I didn't think -- I thought it was wrong because
19 I didn't believe he had anything to do with it.  But my
20 husband was wanting to help him.
21   Q    Did he put up any property?
22   A    He did.
23   Q    Has your husband told you anything that
24 William has told him about the case?
25   A    We talked to him about it several times and he

Page 171

1  just -- he's always denied everything.  And my husband
2  would never believe he did anything that way.  He would
3  never believe -- I mean, he didn't believe anything
4  because he -- I mean, he is a good person.  William is a
5  good person.  He really is.
6    Q    Did he ever say where he was at that morning?
7    A    He said he took Amanda to the doctor's
8  appointment.
9    Q    Did he say anything else about where he was?
10   A    I don't really recall our conversation.  My
11 husband would and he's better friends with him than I
12 am.  I -- I mean, I recall him saying that that he was
13 at a doctor's appointment that morning.  Or the day.
14   Q    I'm going to make -- I'm going to hand you a
15 couple of documents that have been produced in the case
16 labeled PL9193, PL9201 and 9202.  I'll just give you a
17 second to take a look at that.  Is this 4?
18       MR. SLOSAR:  What's that?
19       MR. WRIGHT:  Exhibit 4?
20       MR. SLOSAR:  Yes.
21       (EXHIBIT 4 MARKED FOR IDENTIFICATION)
22 BY MR. WRIGHT:
23   Q    Did you have a moment to review those?
24   A    Yes.
25   Q    So the first one --

Page 172

1    A    There's two different --
2    Q    Yeah, there's two different things.  One's a
3  separate date.
4    A    I took my glasses off and left them in the
5  car.  Yes, I looked.
6    Q    All right, so the first one, the date on the
7  form is September 1, 2009 and it -- in the narrative
8  portion in the bottom half it says that the victim said
9  "He had struck her in the back of the head causing
10 substantial pain and a pump knot," I believe is what it
11 is.  Do you -- do you have any recollection of Kayla
12 Mills talking about this incident?
13   A    This is the time that I recall her saying that
14 he pushed her and she hit her -- I guess hit her head
15 when they got into an argument over macaroni.
16   Q    Okay.  Did she -- did she give you that
17 explanation close in time to this September 9 or
18 September 2009 date or was that something she explained
19 to you later on?
20   A    She explained it to me.  I had -- I went and
21 picked her up.
22   Q    Okay.
23   A    I picked her up.
24   Q    Now the second one indicates at the bottom of
25 the page after the all caps that "The Defendant had kept

Page 173

1  Kayla Mills against her will and beat her in the eyes
2  with his fists and used his hands to open her mouth with
3  force and cause injury to Kayla Mills."  Do you see that
4  at the bottom?
5    A    I see this.  I don't even -- I don't even
6  remember this.  Like I really don't.
7    Q    Okay.
8    A    Like I mean, I -- I don't recall any of this
9  thing -- this.
10   Q    Okay.  And that has --
11   A    I mean, I'm sure it's -- but I don't -- I
12 don't remember any of this.
13   Q    And that has a date of February 2010.
14 February 19, 2010.  Does that time frame refresh your
15 recollection?
16   A    I don't -- I don't know.  It seems like I
17 recall her dad going and getting this -- something about
18 Jonathan.  He hated Jonathan.  I don't know -- this must
19 have been -- I don't -- I didn't get around Jonathan.
20 Or I don't know -- I don't even -- I don't remember --
21 recall any of this.  But I do recall something about her
22 dad doing it.  They might have got -- they had might
23 have got into an argument and he went and done this.
24 Kayla's father.  You would probably have to talk to him
25 about it.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 174

1    Q    Is he still living?
2    A    He is.
3    Q    Where does he live at?
4    A    He lived in Graves.
5    Q    Did Kayla ever talk to you about having to
6  make any court appearances for any domestic issues
7  relating to Jonathan Taylor?
8    A    I don't remember having to go to court about
9  anything.  I don't.
10   Q    Did she ever indicate that she was going to
11 drop her charges against Jonathan Taylor?
12       MR. SLOSAR: Objection to form.
13   A    I don't recall.  I don't recall having a
14 conversation about charges against Jonathan.  I really
15 don't.  I'm sorry.  And I don't even -- I briefly
16 remember some of this.  But I -- not some of this that
17 happened.  I kind of remember her dad doing this.
18   Q    Okay.
19   A    He did -- he -- I think he did file this
20 report for Kayla.
21   Q    And is that from your memory information
22 coming from him to you or did Kayla explain that her dad
23 did this?
24   A    He told me, I think.  He told me.  Maybe she
25 also told me.

Page 175

1    Q    Do you speak with her dad?  Before she passed,
2  did you speak with your -- with her dad about Kayla very
3  regularly?
4    A    Not -- well, yeah.  We talked a lot.
5    Q    Okay.
6    A    Not a lot.  But we did talk.  Not regularly
7  but some about Kayla.
8    Q    Did he ever give you any information that --
9  or did he express any concerns that she was abusing
10 drugs?
11       MR. SLOSAR: Objection to form.
12   A    I think he had his suspicions that she had
13 been just from gossip and...
14   Q    Did he express any concerns that she was
15 stealing?
16   A    No.  I don't recall anything -- him saying
17 anything about her stealing.  I don't think she had
18 taken anything from him as I remember.  I don't recall.
19   Q    You mentioned that when you lived at Flat Lick
20 you lived by a store?  Is that Esco's?
21   A    Yes.
22   Q    Can you see that out your front door?
23   A    Yeah.
24   Q    Yeah.  Did William Lester live around the
25 corner at -- across from Esco's?

Page 176

1    A    He did, yes.
2    Q    And I'm talking about the December 2010 time
3  period.
4    A    Yeah, he did.  He lived there.
5    Q    I think there was a trailer.
6    A    Yes, it was.
7    Q    Yeah, there's an intersection.
8    A    Uh-huh.  Morse Creek.
9    Q    Yeah.  Valdez, John Valdez, had given a
10 recorded statement indicated that he moved out because
11 of issues with Kayla Mills.  Did he explain that to you?
12   A    He moved out because we went camping on the
13 4th of July weekend and I caught him in the camper next
14 door with a girl.  That's why he moved out.  So I don't
15 know where this come from but that's why he moved out.
16   Q    Caught him with his pants down?
17   A    I woke up and he was gone.  Looked out and he
18 was coming out of her camper.
19   Q    Do you know who the woman was?
20   A    Jennifer Lawson, yes.  And she told me so I'm
21 sure she wouldn't care to tell you.  He didn't tell me,
22 but she did.  But then he admitted it.
23   Q    Is that the same Jennifer Lawson that's
24 married to Jessie Lawson?
25   A    No, this is -- she's married to Randy Lawson.

Page 177

1    Q    Okay.  I'm sorry.  I only know one Jennifer
2  Lawson in the case.
3    A    No.  And I do remember that specifically.
4    Q    Did Kayla ever tell you that Jonathan had said
5  that he's left one laying?
6        MR. SLOSAR: Objection to form.
7    A    Did Kayla tell me?
8    Q    Yes.
9    A    I recall her saying that, yes.
10   Q    Tell me about what you recall her telling you
11 about that.
12   A    Only because of -- that she was so pressured
13 to say something, and he had told her that prior -- I
14 think even before Katherine had died.  This was like
15 something about a fight like -- and the way I remember
16 it, and I don't even -- I'm almost positive that this --
17 he told her this prior to it and then when she got in
18 the interrogation room that's the only thing in my
19 opinion that she could think of to say.  But, I mean,
20 she really didn't talk about it in general.  Not names,
21 not anything.  Or...
22   Q    So you heard about him telling Kayla that he
23 had left one laying after her statement to police?
24       MR. SLOSAR: Objection to form.
25   A    After?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 178

1    Q    Yeah.  Since you testified.

2    A    Oh, no.  I think that's what --

3    Q    And let me clarify my question.  What I was

4  getting at is you're saying that Kayla Mills heard him

5  say that before Katherine Mills was found dead?

6    A    I think she was -- no, this was in the

7  statement that she gave.  But I think that she meant

8  that that happened before Katherine died.  She was

9  thinking that he told her that before Katherine died.

10 That this was something in the past.  That she might

11 have thought he -- I don't know.  That she thought maybe

12 he could do it as her statement because she didn't know

13 what else to say with all the pressure because she told

14 them time and time again that he hadn't told her

15 anything.  But she had to come up with something to say

16 to Jason York in order to get out and go home that day.

17   Q    Before you went in to the statement in March

18 of 2012 with your daughter, had she mentioned this

19 comment by Jonathan Taylor?

20   A    I don't recall, no.

21   Q    So this discussion about his comment that he

22 had left one laying, that came up after this -- after

23 she gave her statement to police is when you talked

24 about it with her, right?

25        MR. SLOSAR:  Objection to form.

Page 179

1    A    I think that was one of the things my fianchad

2  told me at the time that she said.  But I don't -- I

3  don't really recall.  But I did hear that statement

4  somewhere.  But I don't remember when.

5    Q    So you're not sure if you talked to your

6  daughter about it or if you talked to Scott?

7    A    I don't.  I heard it, but I don't remember who

8  -- yeah.  I don't recall.  I'm sorry.

9    Q    I'm just going to go through some people in

10 this case and just ask what relationship, if any, you

11 have with them.  Friends, family, etcetera.  We talked a

12 little bit about William Lester and your fiancScott

13 Mills.  There is another man by the name of Alan Helton.

14 And he actually gave a statement that says -- well, let

15 me strike that.  Do you know an Alan Helton?

16   A    I don't think I've ever spoke to him.  I don't

17 even know if I know what he looked like, but I have

18 heard of him.  I mean, I know -- I know some of his

19 family.  They live at Morse Creek.  And I may have seen

20 him before.  But I mean, I'm not an acquaintance with

21 him, never talked to him.  I've never had a conversation

22 with him.

23   Q    And his name is James Alan Helton, but I think

24 he goes by Alan Helton.  Does that make a difference?

25   A    No.

Page 180

1    Q    Mike Simpson.  Michael Simpson.  Do you know

2  him?

3    A    I've never -- don't even -- I wouldn't even

4  know him if he walked in.

5    Q    Did you ever hear William Lester talk about a

6  Mike Simpson?

7    A    No.

8    Q    A Bob Smith?

9    A    No.  I know who they are.  I mean, I've heard

10 talk of them.  But...

11   Q    As?  What about?

12   A    Like Bob Smith.  Everybody knows he was the

13 local bootlegger.

14   Q    Drug dealer?

15   A    Drug -- yeah.

16   Q    What about Mike Simpson?  Was he also known as

17 a drug dealer?

18   A    I -- I think mostly I just heard talk about

19 him being a thug and somebody that would steal off of

20 you.  Just that kind of reputation.

21   Q    Okay.

22   A    But I don't know him.

23   Q    Do you know a Joe King?

24   A    I don't know him.  I've never spoke to him.  I

25 wouldn't -- I think I seen him in the courtroom one day

Page 181

1  and never talked to him.  I don't know him.

2    Q    Christy Branson?

3    A    I know who she is because they -- all these

4  people except Joe King lives up where I lived.  I don't

5  know Christy, but I remember her when she was really

6  little.

7    Q    Okay.

8    A    But I've never talked to her as an adult.  I

9  don't know who she is.

10   Q    There was some background report that was in

11 the discovery that the criminal defense team had done

12 and yours was in there.  And it mentioned a Lettie Mills

13 was somehow related to you.  Do you know a Lettie Mills?

14   A    No.

15   Q    No?

16   A    I'm not related to anybody by that name.

17   Q    Okay.

18   A    I don't think, no.  As far as I know.

19   Q    What about a Wendy Mills?  Do you know a Wendy

20 Mills?

21   A    Yes.

22   Q    Who is that?

23   A    She is my cousin.

24   Q    Okay.  Did she ever live with you?

25   A    She lived -- she lived in my house when I



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 182

1 moved out.
2    Q    Okay.
3    A    She rented it and lived there for maybe a
4 year.  Now, my other cousin lives there now.
5    Q    Okay.  Who is that?
6    A    Bill Mills.
7    Q    Okay.  Does Wendy Mills know William Lester to
8 your knowledge?
9    A    She probably knows him.  I mean, I don't know
10 that she does.  I couldn't -- I'm sure she knows him.
11 But we've never had a conversation really that she's
12 told me "I talked to William Lester today."  But I'm
13 sure she knows who he is.  She worked at the store at --
14 the Crick store.  She knows a lot of people.
15    Q    She worked at Esco's?
16    A    No.  Another store that's on 25 before you
17 turn into --
18    Q    What is that?
19    A    Hmm?
20    Q    What's the name of that store?
21    A    It was called the Crick store.  Now, it's
22 called -- it's a Sunoco now.  But not...
23    Q    Okay.  You probably have never heard of these
24 names either.  Robert Beach.  No?  Can you just say?
25

Page 183

2    A    No, I'm sorry.
3    Q    You're fine.
4    A    I'm tired.  I'm sorry.  I've been up all
5 night.  I apologize.
6    Q    Daniel Wilson?
7    A    No.
8    Q    Thomas Bruner?
9    A    No.
10    Q    I think he is -- is it Mikey that he goes by?
11 Mikey Bruner?
12    A    Oh, I do know him.
13    Q    How do you know him?
14    A    They guy I'm married to right now --
15    Q    Right.
16    A    -- his mother, Angie Mills --
17    Q    Okay.
18    A    -- lived with Scott and she hates me.  Like
19 they dated.  They dated.  They lived together.  They
20 were together for 5 or 6 years.
21    Q    Angie and Scott were?
22    A    Yes.
23    Q    Has --
24    A    And John and Angie are stepbrother and sister.
25 John Valdez.

Page 184

1    Q    Okay.  Have -- I take it then you've not
2 talked to Angie about the case?
3    A    No.
4    Q    And you've not talked to Mikey Bruner about
5 the case?
6    A    No.
7    Q    You just know of him through that
8 relationship?
9    A    Yeah, I don't really -- I mean, I know that's
10 her son.
11    Q    Okay.  Was there ever a time when you -- when
12 you kicked out Kayla from living in your house because
13 of the drugs and issues she was getting into?
14    A    I would -- I had her to go to my mom's for a
15 little bit.  Yeah.  And I don't remember the dates.  But
16 yeah, I think I had asked her to leave some in the
17 winter.  I don't remember.  Maybe 2011 in the winter.
18    Q    And she was living with -- was that Sylvia?
19    A    It was just briefly.  I mean, I never kicked
20 her out and -- I'd mostly would just get mad maybe for a
21 day and then she would come home.  Like we just needed a
22 little space.
23    Q    So that wasn't a very long spell then?
24    A    No, she never like indefinitely I kicked her
25 out and wouldn't let her come home.

Page 185

1    Q    Was there any particular thing that caused
2 that to your memory?
3    MR. SLOSAR:  Objection to form.
4    A    I had been out of town for a couple days.  The
5 biggest thing I remember -- and she took my bedroom door
6 off and my door looking for her car keys because she
7 wanted to use the car.
8    Q    Oh.  I might be done.  Let me just go over a
9 few notes and I'll probably be finished here in just a
10 few seconds.  Let me just go off for a minute.
11    VIDEOGRAPHER:  The time is 2:06 p.m. and we are
12 off the record.
13    (OFF THE RECORD)
14    VIDEOGRAPHER:  The time is 2:18 p.m.  We are
15 back on the record.
16 BY MR. WRIGHT:
17    Q    All right, Ms. Mills.  We'll defer playing the
18 video.  I can't say it won't happen at trial, but it
19 won't be here.  I will -- I just want to confirm a
20 couple details though before I pass the witness.  To
21 your memory, how many times did he turn the recorder on
22 or off before you left the room?
23    A    Maybe twice.  Maybe.
24    Q    And everybody was in the room when that
25 happened, right?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 186

1   A   Yes.

2   Q   And when you left the room the next time you
3   saw them the interview was finished; is that right?

4   A   It was concluded, yes. And it was very short
5   because it seemed like it was not very long. After I
6   left they were exiting the building also. It was -- it
7   didn't seem like 5 minutes. But I don't know. It might
8   have been -- maybe it just seemed like that to me.  It
9   didn't seem long.

10   Q   And as you sit here today you can't remember
11   how far into the introductions the conversation
12   progressed before he started turning it on and off; is
13   that right?

14   A   I really don't remember. I honestly don't. If
15   I did, I would say but I don't want to say because I
16   don't recall. I really don't.

17   Q   All right. That's all the questions I have.

18          CROSS-EXAMINATION

19   BY MR. WEBER:

20   Q   Ms. Mills, my name is Cody Weber. I represent
21   some of the Kentucky State Troopers. There's five of
22   them, so I'll just list them all first: Kelly Farris,
23   Dallas Eubanks, Jackie Joseph, Brian Johnson and Mark
24   Metford. Do you know any of those individuals?

25   A   No. No, I don't.

Page 187

1   Q   One second, I'm sorry. Their names haven't
2   been brought up yet today as being present at any of
3   these interviews, but did Kayla ever mention their names
4   as being present during any of these interviews?

5   A   No.

6   Q   Did Kayla ever mention their names in any form
7   or fashion?

8   A   No.

9   Q   Did any other members of your family or
10   friends mention their names as being present in any
11   interviews?

12   A   I don't recall any of those names.

13   Q   So you have no idea how they're involved in
14   this lawsuit?

15   A   I have no idea how they're involved.

16   Q   Okay.

17   A   Personally, I don't.

18   Q   Okay. That's all the questions I have.  Very
19   brief. Thank you.

20          CROSS-EXAMINATION

21   BY MS. DEMOSS-CAMPBELL:

22   Q   Mine are going to be similarly limited.  I'm
23   Alexandra Demoss-Campbell. I represent Mike Broughton
24   and the city of Barbourville. And similarly, Mike
25   Broughton's name has not been brought up today; is that

Page 188

1   correct?

2   A   That's correct.

3   Q   Okay. Do you know Mike Broughton?

4   A   I actually do know him, yes.

5   Q   Okay. And so you would recognize him if you
6   saw him?

7   A   Uh-huh. Yes, I would.

8   Q   Okay. And other than the interview taking
9   place at the Barbourville Police Department, and the
10   interview we've talked about, Mike Broughton was not
11   present.

12   A   I've never -- I don't know anything about him
13   in this case.

14   Q   Okay.

15   A   I didn't see him at the police station.

16   Q   You never saw him at the police station?  Did
17   you see any Barbourville Police Department officers come
18   into the room during the interview?

19   A   No.

20   Q   And earlier you had said when York and Sowders
21   had come to your house the day before the interview, was
22   Mike Broughton or any member of the Barbourville Police
23   Department present?

24   A   No.

25   Q   Okay. And have you had any interaction as it

Page 189

1   relates to the Katherine Mills investigation or
2   prosecution or have you spoken with Mike Broughton or
3   any member of the Barbourville Police Department?

4   A   No.

5   Q   Okay. And do you have any knowledge, and I'm
6   trying to be as broad as possible, about any involvement
7   by Mike Broughton or the Barbourville Police Department
8   in this investigation?

9   A   No.

10   Q   Okay. And that includes any information about
11   them talking to any of your family members?

12   A   I don't think -- I don't recall them talking
13   to any of my family members.

14   Q   That concludes my questions. Thank you.

15          REDIRECT EXAMINATION

16   BY MR SLOSAR:

17   Q   I just want to clarify one thing before we get
18   out of here. I believe earlier you testified that from
19   the time you got to the police station on March 16, 2012
20   and the time that you left to go outside and throw up it
21   was approximately 40 or 45 minutes.

22   A   Inside?

23   Q   Yes.

24   A   Yes.

25          MR. WRIGHT:  Object to form.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 190

1    Q    I know just a few minutes ago you answered a
2  question that was a little bit different to Mr. Wright,
3  which was: From the time of questioning to the time that
4  Detective York turned on the recorder, did you know the
5  timing, and you answered no.  And I just want to make
6  sure the record was clear.  So with that, I don't have
7  any further questions, and we appreciate you being here
8  today.
9    A    Okay.
10        VIDEOGRAPHER:  The time is 2:23 p.m. and this
11    concludes the deposition.
12        (DEPOSITION CONCLUDED AT 2:23 P.M.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 191

1  CERTIFICATE OF REPORTER
2  COMMONWEALTH OF KENTUCKY AT LARGE
3
4  I do hereby certify that the witness in the foregoing
5  transcript was taken on the date, and at the time and
6  place set out on the Title page hereof by me after first
7  being duly sworn to testify the truth, the whole truth,
8  and nothing but the truth; and that the said matter was
9  recorded by me and then reduced to typewritten form
10  under my direction, and constitutes a true record of the
11  transcript as taken, all to the best of my skills and
12  ability. I certify that I am not a relative or employee
13  of either counsel, and that I am in no way interested
14  financially, directly or indirectly, in this action.
15
16
17
18
19
20
21
22  MADELINE WILLIAMSON,
23  COURT REPORTER / NOTARY
24  COMMISSION EXPIRES ON: 05/11/2022
25  SUBMITTED ON: 09/20/2018



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

## Exhibits

**EXHIBIT 1**
31:16,18 36:6

**EXHIBIT 2**
60:12 169:20

**EXHIBIT 3**
60:15 69:3

**EXHIBIT 4**
171:19,21

---

**$**

**$20.00** 116:18

---

**0**

**07** 75:10

---

**1**

**1** 31:16,18 36:6
172:7

**10** 28:18 36:18
65:4 103:19
127:21

**100** 48:17,19
54:1 109:2
132:7,14 154:8

**10:00** 131:10,
13 142:8,14

**10:02** 16:12

**10:07** 16:15

**11** 55:19 74:13

**11:00** 60:5

**11:06** 60:8

**11:45** 93:5,8

**11th** 141:3

**12:14** 118:2

**12:23** 118:5

**12:40** 132:18

**12:58** 132:21

**15** 37:21 38:8,
15

**15th** 153:15,18

**16** 36:4 45:10
53:9,18 56:2
60:14 79:9
189:19

**16th** 153:15,18

**17** 53:18 73:1
79:9

**18** 10:13 11:5
26:12 55:9 72:5
78:1,7,11 83:5
117:2 122:22

**18th** 124:23
125:6

**19** 10:13 19:17
26:11 122:13
173:14

**19-year-old**
40:9 48:22 49:4
57:23

**1991** 11:18
70:15

**1:30p.m**
159:15

**1:33** 159:17

---

**2**

**2** 32:20 60:12,
20 68:19 84:10
139:2 169:20

**20** 28:9,19
29:20 34:8,12
113:4 122:14,
18 127:19
130:18 136:19,
20

**2000** 16:7,8
124:25

**2004** 74:12

**2005** 36:17

**2007** 11:12
29:19 75:9,10
76:9 77:6 79:14
80:12

**2008** 11:12
16:7,9,21
36:17,18

**2009** 11:12
15:13,18,20
16:21 17:6 29:5
54:14 61:14
71:23 79:11
80:10,12 83:9,
11 88:20 125:1,
2 172:7,18

**2010** 13:10
14:17,23 15:4
17:24 28:9,20
29:20 31:21
32:5 33:25
34:5,9,12,21
37:7 83:11
124:14,16
125:9,21
126:20 127:24
130:18 135:2
136:18 140:9
144:19 173:13,
14 176:2

**2011** 36:21,23
37:4,8 55:18,19
63:20 65:18
115:14,24
119:14,16
122:15 123:7
124:11 138:12
141:3 147:21
149:1 150:11,
13 184:17

**2012** 10:4
34:17,22 35:1
36:4 37:16,21
38:8,15 45:10
53:9 55:18 56:2
60:14 70:21
118:17 120:3
149:1 150:7,13
154:1 160:15,
21 161:6,16,21
162:15,16,20
164:13 178:18
189:19

**2013** 70:22
162:12 163:11,
12 164:11
166:23

**2014** 165:22
170:7

**2017** 75:7

**2018** 7:3

**20th** 126:19
128:13,17
133:1 142:3,10

**223** 143:13,18
144:14

**225** 130:1

**25** 136:19
140:21 182:16

**27** 70:15

**29th** 10:3

**2:00** 39:8 42:20
111:25 123:23,
24 126:1,2
135:23,25
152:17

**2:06** 185:11

**2:18** 185:14

**2:23** 190:10,12

**2nd** 12:18

---

**3**

**3** 15:24 16:3
32:5,20 33:3
34:21 60:15,20
69:3

**30** 42:11,15
124:6

**30-40** 57:13

**3:00** 112:1

**3rd** 29:24

---

**4**

**4** 15:24 16:3
33:25 36:13
37:7 171:17,19,
21

**4-door** 144:22

**40** 57:13 104:7

124:6 189:21

**45** 57:14 189:21

**46** 9:22

**4th** 176:13

---

**5**

**5** 36:14 119:21
183:20 186:7

**5095** 143:11

**542-5095**
143:9

**5:00** 128:5

---

**6**

**6** 143:23 183:20

**60** 54:19 83:17

**622-1223**
130:3

**627-4422**
129:11,13

**627-4594**
131:22

**6:00** 123:23
126:4 128:6,10

---

**7**

**7** 70:15 143:23
166:13

**7:00** 126:4
128:10

**7:30** 145:14

**7th** 7:2

---

**8**

**8** 70:18 79:10
128:2,3,10
163:11 166:13

**8:00** 128:11
145:15



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

**9**

**9** 79:10 172:17

**9202** 171:16

**9:00** 128:5 142:8,14

**9:30** 35:16

**9:51** 7:3

**A**

**A-LOT** 77:12

**a.m.** 7:3 16:12, 15 60:5,8 93:5, 8 126:1,2 131:13

**absolutely** 26:22 27:8 67:21 100:1,21

**abuse** 72:13 108:13 147:10

**abusing** 175:9

**access** 126:24

**accident** 15:23 80:6,8 83:14, 15,20 84:5 111:24

**accusations** 20:21

**acquaintance** 179:20

**acquaintances** 115:17 137:1

**acquainted** 77:4 85:9

**act** 59:4

**acting** 49:1

**action** 88:10

**activity** 102:8

**additional** 10:24 11:6,9

**address** 121:24 143:24

**administrative** 128:11

**admissible** 100:2,12,15

**admit** 74:22 75:21

**admitted** 74:19 76:1 176:22

**adult** 117:2 181:8

**Advance** 135:6,9,10,15

**advise** 96:6

**affect** 53:12

**affirm** 7:18

**afford** 78:14

**afraid** 20:14 49:24 54:9 62:13,19 111:21

**afterward** 94:12

**aggressive** 56:25 57:2

**agree** 79:3 98:10

**ahead** 22:3 43:18 117:16

**ail** 149:20

**air** 8:24

**Alan** 179:13, 15,23,24

**alcohol** 73:14

**Alexandra** 7:10 187:23

**alleged** 97:2

**altercation** 107:16 108:11

**Amanda** 7:7 18:13 20:8 23:18 45:24 46:16 47:22 56:16 58:13 59:8 64:8 65:22

66:7 85:5,6,12, 19,24 114:12, 15,17 161:14, 15 162:2 163:7 167:15 171:7

**Amanda's** 85:17

**Amber** 50:20 157:2

**America** 49:12

**anger** 159:7,8

**Angie** 183:16, 21,24 184:2

**angry** 48:11 49:6 50:16 158:25 159:6,7

**ankle** 151:16 152:4,6

**answering** 9:4 117:23

**answers** 100:17

**anymore** 50:20 170:2

**apartment** 15:25 23:22 90:18 117:8 149:11

**apologize** 75:10 90:9 118:11 183:5

**apparently** 58:18

**appearances** 163:1 174:6

**appointed** 153:11

**appointment** 171:8,13

**approached** 18:5,9,12,19 19:7,23 21:23, 24 45:13 54:6 63:12 90:14,15, 16 91:21 118:16 120:5 122:8 137:22

**approaching** 18:15 122:5

**appropriately** 51:15

**approval** 41:15,18

**approximately** 14:19 15:11 26:10 37:7 42:8 57:7,9 70:13 79:14 80:9,12 189:21

**April** 83:12 141:3

**area** 12:8,10,24 14:4 17:1 28:4 30:11 101:24 102:2,8 139:12, 18 144:4

**Argue** 107:13

**argued** 146:10

**arguing** 41:9

**argument** 29:25 172:15 173:23

**ARH** 10:9,12,18 127:13,15

**arrest** 39:12,15 42:21,24 57:21, 23 60:15 69:3, 16,20,22 116:22 117:5 150:12,14 156:15,19 168:18

**arrested** 19:12 23:10,11,21 88:12 90:18 108:18 115:21, 22 149:5,7,9,19 150:15,18

**arrests** 117:3

**arrived** 38:1,14 96:14

**Ashley** 157:2

**asks** 8:16

**asleep** 67:3 159:1

**assistant** 96:16 135:19

**associating** 76:14

**assume** 75:18

**ate** 125:13 134:7 146:2

**attempted** 159:5

**attempts** 39:23

**attitude** 75:12, 15

**attorney** 95:14 152:18,20 160:7 167:8 170:14

**Attorney's** 161:3

**attorneys** 8:11,12,13 12:2 16:11 70:1 161:23 162:1 167:14,15 169:4

**audio** 93:11

**August** 15:14 29:8 125:15 163:11 164:11 166:23

**aunt** 51:19 65:6,7,25 66:16,22,25 67:7 137:17,19, 22 139:13,14, 16

**aunt's** 51:19 65:19 86:10 90:17 135:1 137:24 139:16

**auto** 135:6,7,9, 10,13,15

**automobile** 111:2,5

**avoid** 152:12

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**aware** 69:12,18
116:1,3 151:2,
14 154:25

**awful** 54:10
150:3

---

**B**

**back** 11:11
16:16 23:8
33:22 34:2,15,
16,18 42:20
43:9,20 47:23
57:21 60:9
89:10 93:9
98:19 99:1
102:15 103:13
107:18 109:11
114:21 115:3,
15,18,23 116:1,
9,22 118:1,6
122:25 123:6
127:15 129:18
132:2,22 136:4,
18 142:7 146:2,
3 154:14 155:3
156:19,20,21,
23 159:18
160:19 170:7
172:9 185:15

**backed** 31:11
33:2

**background**
70:12 181:10

**bad** 23:25 24:3
27:4 30:4,15,
23,25 31:2
41:11 53:18,20
54:11,12 55:4,5
57:6 58:24
61:21 89:12
159:8 160:5

**Bangleman**
12:16

**Barbourville**
7:12 9:16,17
10:9 44:8,9
72:17 94:1
109:6 132:3,4,6
133:3 135:10
155:25 187:24
188:9,17,22

189:3,7

**based** 24:7
62:7 64:19
67:14 111:4

**basically**
24:17 88:24
91:7 95:11

**bathroom** 76:8

**battery** 31:14
32:24 33:18,21
36:12 111:10

**Beach** 182:24

**beat** 173:1

**bed** 149:16

**bedroom**
185:5

**befriend** 26:6

**began** 17:14,
17 74:8

**begging** 66:11

**begin** 118:11

**beginning**
21:6 48:2,5
50:2,4 51:18
103:25 157:21

**behalf** 7:9,11,
13 162:1

**behavior** 97:1,
5 103:5

**belief** 100:13

**believed** 66:14
148:8

**belongings**
125:11

**benefit** 87:10

**bias** 100:8

**big** 28:6 33:7,8,
9 119:24

**biggest** 185:5

**Bill** 139:7 182:6

**bills** 88:1
160:12,14

**birthday** 70:14
124:23 125:6

**bit** 60:2 70:11
84:3 118:13
121:7 124:9
147:9 152:11
170:7 179:12
184:15 190:2

**blank** 140:3,4

**blocked**
111:14

**blonde** 38:8,12

**blue** 28:20,23
29:2,16 31:24
36:5 37:9 51:20
65:20

**Bob** 180:8,12

**Boggs** 43:18
44:5 47:25
95:14,17 96:2
97:4,14,17,21
102:16,22
103:9,16,20,21
104:2,13,24
105:15 109:7,
17,19 153:4
156:7 159:25
160:8

**bond** 170:8

**book** 121:22,24

**bootlegger**
180:13

**born** 11:17

**borrowed**
134:19

**bottom** 172:8,
24 173:4

**bought** 36:14

**bowl** 108:1,5

**Bowling** 74:2
83:6

**box** 144:1

**boy** 40:14
77:11 151:9

**boyfriend**
13:25 17:25

27:25 28:11
29:25 35:10,11
71:5

**boyfriend's**
27:21 35:8

**boys** 76:22

**bracelet**
151:16 152:4,6

**Branch** 45:19,
22

**Branson** 181:2

**break** 9:1 12:1
15:12 16:10,18
60:2 70:3,9
94:19 117:25
159:14

**Brian** 186:23

**briefly** 38:5
109:9 156:14
157:20 167:17
174:15 184:19

**bring** 43:20
152:14,16

**Bristol** 55:12

**broad** 189:6

**broke** 21:9,10
30:3 54:13,14
55:14 58:19
61:14,17,18,20
62:2,5,8 114:22
123:2,5,18
124:12 126:23
150:11

**broken** 122:25
126:22

**brother-in-law**
43:1

**brought** 23:10
34:2 42:21
43:10 45:1 55:2
87:7 155:2
187:2,25

**Broughton**
7:11 187:23
188:3,10,22
189:2,7

**Broughton's**
187:25

**Brown** 45:19,
21,22 46:7,8
117:13

**Browns** 45:19,
22

**Bruner** 183:8,
11 184:4

**building** 186:6

**Bunch** 7:14
118:10

**burglary**
148:22

**buying** 131:3,
23

---

**C**

**call** 19:13,23
20:25 25:1
27:21 30:5,6,12
46:21 89:20
100:4 101:15
119:6,18 136:6
137:2 141:4,16
163:22

**called** 17:18
27:23 30:3
43:6,11 47:12
65:25 74:1
92:21 108:21,
24 119:20
131:2,5,8,16,
17,18 136:11,
14 141:6 144:2,
4 151:13
153:19,20
163:24 182:21,
22

**calling** 126:20
131:1,4,14

**calls** 61:1
79:24 102:9
128:21 150:23
160:16 166:17

**Campbell** 7:11

**camper** 31:12,
13 32:13,23



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

33:1,2,7,8,10,
15,22 36:13,15,
18,21 37:1,8,15
111:14 176:13,
18

**campers** 33:9

**camping**
176:12

**caps** 172:25

**car** 15:23
24:16,20 25:14
28:25 29:1,2,
10,17 30:2,13,
15,18,19,21,23
31:4,8,9,10,13
32:2,4,14 33:1,
13,14,19,24
34:2,8,11,14,
16,18,22 35:21,
24,25 36:9,11
37:9,17 42:22
43:5 44:3 51:21
52:17,22 53:25
55:13 65:20,24
67:3 82:15
101:8,20 111:8,
20,22 123:20
134:11,19,20,
21,23,24 135:1
144:23 154:22
159:1 172:5
185:6,7

**care** 39:5 40:20
73:20,25
103:14 114:18
176:21

**cars** 13:18
134:18

**case** 23:1,13,
17,20 53:10
71:12 93:25
95:22 96:1
115:11 149:3
153:21 154:4
162:18,21
163:1,2 164:16,
17 165:21
167:19 170:24
171:15 177:2
179:10 184:2,5
188:13

**cases** 160:7

**caught** 151:16
176:13,16

**caused** 115:6,
8 118:12 185:1

**causing** 172:9

**Celexa** 72:10,
18

**cell** 40:17 41:6
126:8 127:1,2,3
131:17,19
143:4 169:25

**Center** 116:25

**Central** 10:22,
23

**chain** 135:10

**changed**
75:12,16
116:11

**changing**
75:17,19

**charge** 148:19
149:10 151:3
154:4

**charged** 117:9
149:5

**charges** 23:2,
10 69:13
148:17,21
151:24,25
153:5 174:11,
14

**Charlotte**
12:16

**Chase** 35:15
37:22 41:1,3

**check** 91:8
117:12

**cheese** 108:1,
6,21

**Chevrolet**
144:22

**Chicken** 78:4

**child** 40:9 49:4

**childhood**
164:18

**children** 11:13
139:14

**Christmas**
27:20 28:12
128:13,16
131:3 133:10,
11,12,13,21
147:1

**Christy** 181:2,
5

**church** 66:20

**circle** 144:12,
14

**circumstance**
103:24

**city** 7:12 9:15
16:24 23:11
39:9 43:19 44:8
96:20 132:2
152:19 187:24

**clarify** 153:14
178:3 189:17

**class** 54:20,21
159:8

**classes** 29:14
71:24

**Clay** 124:8

**clean** 61:22
79:11 88:25
92:12

**clear** 55:4
88:21 92:4,13
93:23 105:21
190:6

**client** 105:6

**clinical** 72:12

**clock** 128:8,9

**close** 12:11
25:12 65:11
68:19 71:14
112:24 122:18
128:12 135:23,
25 136:24
141:19,21
172:17

**closed** 135:18

**closer** 78:22
136:22,23

**closet** 121:21

**clothes** 125:12

**CNAS** 12:7

**Cody** 186:20

**college** 11:2
29:9,11 54:22
71:24

**color** 134:22
144:25

**comforting**
110:23

**comment**
178:19,21

**comments**
23:6

**Commonwealt
h** 161:3

**communicate
d** 161:15

**communicatin
g** 136:12 162:17

**communicatio
n** 15:2 64:19
161:20

**community**
11:2 113:2,25
148:11

**Comp** 73:20,25

**complain**
103:16,20,21

**complaint**
98:8

**complaints**
91:14 96:25
97:4,12,22 98:3
104:19

**complete**
71:22 83:3,4
110:3

**completed**
11:12

**completely**
75:4

**concern** 81:18
111:4

**concerned**
81:23

**concerns**
175:9,14

**concluded**
186:4 190:12

**concludes**
189:14 190:11

**conducted**
104:22

**conducting**
104:14

**conference**
155:17

**confess** 51:11

**confessed**
27:6 50:13 56:5
62:22,25 63:1,
8,24

**confirm** 185:19

**confusing**
83:19

**contact** 15:9
27:22 54:25
119:2 120:14
129:8 164:2

**contacted**
95:13 120:7,10
163:25

**contacting**
161:20 164:6

**contacts**
120:17

**contained**
64:23

**continue** 8:18
9:4 56:12,20
100:3 160:6,10

**continued**
26:15 56:22
59:9 72:17



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**continuing**
10:17 19:4
58:11 64:3 68:8

**contract** 88:10

**contractor**
87:24 95:22

**conversation**
18:25 20:1,23
21:21,25 24:18,
25 25:3 38:21,
24 39:16 42:9
45:1,7,11
68:17,20 69:2
81:16 82:1,10
91:12 94:25
95:4 96:23
104:3 110:3
114:15,16
157:8 164:23
171:10 174:14
179:21 182:11
186:11

**conversations**
24:8 26:14
45:16 46:19
54:4 67:14
89:24 90:12
93:15 98:1
165:24 167:24

**convictions**
117:4

**convince**
66:25

**convincing**
66:14

**cook** 133:14

**cooked** 133:14

**cooperate**
19:11 20:7,10

**copy** 59:25
60:15

**Corbin** 132:8
133:4

**corner** 175:25

**correct** 17:16
58:16 72:22
80:13 87:21
92:15,16,19

94:10 111:10,
12 114:22,25
118:17 122:22
130:21 135:3,4
138:9 156:4,6
160:15 168:2
170:3 188:1,2

**corrected**
158:1

**correspond**
161:7

**couch** 23:13
107:18,21
108:10

**counsel** 7:5

**counselors**
89:1

**County** 7:9
10:19,20 14:4
17:1,22 18:23
53:7 70:8,17
71:10,20 83:1
124:8 127:15,
17

**couple** 19:18
36:11 38:20
41:7 71:24
85:14 86:12
152:8 165:20
169:16 171:15
185:4,20

**court** 7:17,22
8:19 9:6 58:1
73:21,23 77:15,
17 82:23,25
83:3 86:2 88:3
100:2,13
113:22 162:25
167:18 174:6,8

**Court-ordered**
73:22

**courtroom**
180:25

**cousin** 181:23
182:4

**cover** 138:13

**creek** 30:2,10
43:5,10 53:2
102:2 138:23

155:2 176:8
179:19

**Crick** 182:14,
21

**Cricket** 60:23
157:24

**cried** 20:15
59:18

**crimes** 149:5,8

**criminal** 11:21
18:6 102:8
148:17,19,21
151:2 153:5,24
161:24 167:15
181:11

**CROSS-
EXAMINATIO
N** 70:5 118:7
186:18 187:20

**cry** 59:17

**crying** 65:25
66:11 110:23

**cussed** 97:10

---

**D**

**dad** 73:22
78:18 112:25
144:9 173:17,
22 174:17,22
175:1,2

**dad's** 130:14
141:12

**Dale** 165:13

**Dallas** 186:23

**Daniel** 183:6

**date** 27:13 35:4
43:13 55:20
115:22 123:4,
10 128:22
163:10 168:9
172:3,6,18
173:13

**dated** 55:8,20
61:14 163:11
183:19

**dates** 79:18
83:19 84:1
119:10 184:15

**dating** 14:13,
20,24 15:15,18,
19,21 16:20
17:3,6,14,18
21:10 40:11,14
79:11 85:10
116:25 125:2

**daughter**
11:14,25 14:23
17:24 20:2,20
21:22 22:11
23:12,24 25:12
26:9,14,18
27:5,13 28:8
32:3 38:11 40:6
47:25 48:16,23
57:23 58:19
64:20 67:15
74:16 81:11,18,
23 82:12 87:6,
12 91:21 92:14,
24 93:19,25
94:5,9,22 95:14
96:2 97:20
98:2,24 101:6
106:3 107:20
109:6,13
118:16,21,25
119:20 122:9
130:20 133:20
137:12,14,15
138:17 141:5
142:23 145:8,9
149:4 157:14
160:21,24
161:25 162:11
164:13,24
165:2 170:6
178:18 179:6

**daughter's**
11:15,20 41:4
69:20 133:1
147:9

**day** 7:2 12:6,7
13:13 19:9,15
20:18 27:19,23
28:2,9,12,14,17
34:24 35:6,7
36:3,4 39:2,4
40:1,11 43:13,
23 46:4 54:1

60:1 66:6
67:23,24,25
68:1 69:16
84:25 85:2
86:2,11 96:16,
17,18 123:5
125:13,14
127:3,9,12,14
128:16 130:25
131:3,9 132:10,
11,12,16 133:1,
5,13,24,25
134:3 135:20
149:15,16
152:15,18,20,
25 153:19
154:10,12,16,
23 155:4,9
163:22 168:10
171:13 178:16
180:25 184:21
188:21

**day-to-day**
73:16

**days** 36:10,11
38:20 54:19
83:17 127:2
142:1 185:4

**daytime**
119:10

**dead** 13:14
28:10 40:2
126:19 130:19
133:2,21 142:4
178:5

**deal** 28:6 69:19
117:15

**dealer** 180:14,
17

**death** 13:12
18:10,19 19:1
26:21 27:7,14
45:12 48:24
50:14 51:11
56:6,17 58:15
63:25 64:9,14
99:17 112:3
164:17

**deceased**
98:12

**December**



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

13:10 14:16,23
15:4 17:24
28:9,19 29:20,
24 31:21 32:5
33:25 34:5,8,
12,21 37:6,7
125:9,16,21
126:19,20
127:24 128:12,
17 130:18
133:1 135:2
140:9 142:3
144:19 176:2

**deep** 32:16,17,
19

**Defendant**
172:25

**defendants**
7:14

**defender**
153:10

**defense**
161:24 167:15
181:11

**defer** 185:17

**delay** 118:12

**deleted** 52:1

**Demoss** 7:10

**Demoss-
campbell** 7:10
187:21,23

**denied** 171:1

**deny** 52:7 76:3

**denying** 59:9

**dep0artment**
155:14

**department**
30:11 44:10
152:13 188:9,
17,23 189:3,7

**departments**
91:8

**deposition** 7:4
8:5 87:21 88:2
152:21 190:11,
12

**depression**
72:10,14

**Derrick** 7:13
14:1,2,9,13
17:14,17,25
28:1 55:8,14,20
79:12 118:9
122:24 123:6,
18 129:2 130:7
134:14 139:10
142:6,12
145:16,25
146:23

**Derrick's**
126:20 130:20
133:15

**describe**
101:13

**describing**
25:4 32:8

**desk** 49:1

**detail** 119:18

**details** 117:20
185:20

**Detective** 35:6
37:22 38:22,25
39:22,24 41:1,
12,22,25 42:5,9
44:19 45:12,17
46:14,20,22
47:25 48:2,3,13
49:5,15,18
50:5,12,15
51:2,8,25 52:8,
13 56:1,4,8,11,
12,15,19,24
57:10 58:11,18
60:13 62:3,12,
20 63:23 64:2,
7,12 66:17,24
67:6 68:3,8,9
69:18 118:10,
14,20,24 137:7,
10 138:16
149:2 152:9
155:9 156:7
160:22 190:4

**determine**
8:15 97:11

**develop** 79:16

**developed**
72:21

**device** 51:3,9
52:9,15 156:25
157:7

**diagnosis**
72:12

**died** 12:5 39:2
177:14 178:8,9

**difference**
179:24

**differently**
64:4

**digits** 143:10

**dinner** 125:14
126:4 133:10,
14

**direct** 7:23
105:7

**disable** 111:2

**disabled** 15:24
80:7

**disbelieve**
148:6

**discovering**
26:15

**discovery**
181:11

**discuss** 21:4
94:16,18,21,24
96:10 113:13

**discussed**
44:15,16 63:11,
12 93:24 94:13
95:8 103:4,5
148:5 167:21

**discussion**
89:20 112:3
113:15 178:21

**dislike** 91:20

**disorder** 72:12

**display** 20:24

**disrespectful**
80:25

**ditch** 32:16

**divorced** 65:9
74:10,11,12,14

**doctor** 72:16

**doctor's**
171:7,13

**document**
69:10

**documents**
171:15

**dollars** 147:18

**domestic**
174:6

**Donna** 7:4
47:16 158:2

**door** 38:3,16,
17 175:22
176:14 185:5,6

**Dorning**
165:14

**doubt** 48:18

**drafted** 60:12

**drawers** 41:7
42:6 121:15,19,
20

**drawing** 140:3,
4

**drawn** 88:8

**drive** 36:9
111:21 134:17

**driving** 30:15,
24 35:20 36:5
110:22

**drop** 174:11

**dropped**
33:17,24 75:13
146:1

**drove** 32:3
36:10 44:3
111:7 134:20

**drug** 72:11,13,
22 73:21,23,24
74:8 76:2,5
77:14,17 78:21
81:12,20 82:3,

9,23,24 83:3
180:14,15,17

**drugs** 53:18,19
55:3 61:21
72:24 73:4,7,8,
10,14 74:16,17,
20,22,23,25
75:3,6,21 76:1,
15 78:15 79:2,
3,8 81:5,7,19
82:13 89:6
114:24 116:10
175:10 184:13

**due** 71:11

**duties** 128:11

———————

**E**

**earlier** 15:16,
17 17:5 26:13
27:12 53:17
56:3 59:13
61:13 65:5
87:20 92:7
125:3 146:25
188:20 189:18

**early** 14:21
75:7 83:11
88:20 115:14
119:14 131:10
145:12 146:1
149:25

**easier** 8:19

**easy** 11:24

**education**
10:24

**effect** 113:20

**Elliot** 7:6

**Ellis** 30:13

**embarrassing**
150:3

**emotion** 20:25

**emotionally**
25:3

**employed**
10:6,8,25
78:12,15

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

encounter 137:9

encounters 91:5

end 24:2,23 25:11

ends 98:12

enforcement 18:5,9 26:9 45:6 65:15 99:17

engaged 55:22

entire 9:19 105:25

Esco's 175:20, 25 182:15

estimate 13:15 119:19

etcetera 179:11

Eubanks 186:23

Evans 163:8 165:10 166:21 169:13,14,16

Eve 128:16 133:12,13,21

evening 91:9 128:4 142:6

evenings 123:22 135:20, 21

events 35:5

eventually 38:21 72:18

evidence 39:14 100:15

exact 13:16

EXAMINATION 7:23 189:15

exhibit 31:16, 18 36:6 60:12, 15,17 69:3 169:20 171:19, 21

EXHIBITS 60:20

existed 57:9

exiting 186:6

expensive 79:4

explain 39:1 123:17 174:22 176:11

explained 23:15 172:18, 20

explanation 100:19 172:17

express 175:9, 14

extreme 111:16,19

eyes 89:11 173:1

— F —

fact 19:18 63:3, 5 92:18 151:15

fair 24:7 37:6 58:10,18 67:15

fall 108:10 124:14

falling 151:20

false 67:17,18, 21,22 68:9 150:21 151:18

familiar 165:14 169:8

family 13:4 28:5,21 72:16 78:19 86:15 131:4 133:15 137:15 179:11, 19 187:9 189:11,13

Farris 186:22

fashion 187:7

fast 47:20

father 74:3 173:24

fearful 62:14 104:5

February 55:14,17 173:13,14

federal 100:13

feel 23:15 26:4 49:5 87:11 97:24 115:10 144:3 156:3 164:4

feeling 101:17

feelings 100:20

feet 32:20 33:3

fell 12:9 107:18

felt 25:17,18, 19,22,23,24 26:3 42:23 54:7 57:8 86:14 97:15,23 101:6, 14,16 106:25 122:10,11 123:24

fianc 106:19

fiancat 84:23 95:10

fiance 35:11 58:7 116:13 146:8

fianchad 179:1

fiancleave 105:22

fiancremained 105:24

fiancscott 44:4 179:12

fiancyou 107:3

field 10:25

fight 29:25 107:12 108:1,8 177:15

fights 107:14

file 174:19

find 13:13 42:18,20 76:6 151:23

fine 70:10 123:15 126:13 140:3 145:5 153:2 158:13 183:3

finish 90:7 106:18 156:11

finished 54:20 61:10,11 127:20,23 185:9 186:3

finishing 54:20

Fire 30:10

fists 173:2

fix 33:21,22 36:12

fixed 36:2

Flat 16:25 17:1 35:18 37:25 38:2 124:5 133:17 138:22, 23 139:9 149:11 169:23 175:19

flipping 38:4

fluctuated 136:2

follow 121:8

follow-up 165:9

force 173:3

forever 19:12 57:8,16

forget 39:11 169:19

forgot 147:3

forgotten 166:8,12,16

form 22:2 23:5 24:11,12 25:7 34:6 42:4 52:12

53:13 58:21 64:10 67:10,19 77:5 78:16 79:5,24 80:21 81:3,21 83:25 86:20 87:3,14 89:8,16 91:18 93:20 98:11,15 99:19,25 101:5, 10 102:9,24 103:18 107:23 109:24 110:6 112:14 113:10 114:14 115:2 147:13 148:7, 13,23 149:6 150:23 151:8 153:13 156:5 157:9 160:9,16 162:3 166:17, 22 172:7 174:12 175:11 177:6,24 178:25 185:3 187:6 189:25

forward 47:20 98:5

fought 108:20

found 13:8,13, 14,20 28:10 40:1 43:9,10 76:2,3,7 78:21 82:10 88:4 126:19 128:19 130:19 133:2, 20,21 142:4 150:18 155:1 178:5

Foundation 78:16 91:18 147:13 148:13 153:13 156:5 160:9 166:22

frame 16:20 119:8 122:18 149:24 150:4 162:12 173:14

frequent 120:10

frequently 63:5 120:7 134:9



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

fresh 127:8

**Friday** 43:14
126:5

**Fried** 78:4

**friend** 86:16,17
113:5,6 114:19
117:13 130:3
136:13,22,23

**friendly** 136:8

**friends** 43:8
71:14,16 76:11,
12,14 114:18
136:3,7,15,18,
19,20,25
137:15 139:25
151:9,12,22
152:4 171:11
179:11 187:10

**frightened**
48:15 49:23

**front** 24:4
31:13 32:14,23
33:1,3,5,15,23
37:8 44:20 73:7
152:1 175:22

**frustrated**
30:21,22

**fuel** 36:1

**full** 24:17 54:18
114:16

**fumble** 52:8

**funny** 108:3,4

**fuse** 33:18
36:12 111:12

---

**G**

---

**G-5** 29:18

**G-I-R-D-L-E-R**
14:7

**garage** 31:11,
17,19,20,23
35:24,25

**gas** 30:3

**gathered**
12:25

**gave** 34:16,18,
25 36:3 41:18
60:1 94:5
118:16 120:2
163:18 164:13
178:7,23
179:14

**gears** 147:8

**general** 113:23
177:20

**gentleman**
52:24

**Geraldine**
137:25 138:2,4

**get along**
107:10,11
146:7

**gifts** 131:3,24

**Girdle** 17:18,19

**Girdler** 14:5
17:19,20,22,25
124:5,8 130:7,9
139:19 146:6

**girl** 12:11 13:17
46:5 50:22,23
167:22 176:14

**girls** 76:20,22

**give** 7:18 35:7
39:3 40:19
41:15,25 42:3
43:21 46:4,7
53:9 78:17,18,
23,25 91:23
96:7 99:7
116:14,15,17,
18 123:13
150:21 151:18
158:15 171:16
172:16 175:8

**giving** 35:5
65:15 72:17

**glasses** 172:4

**God** 49:10
57:22

**gold** 134:21,22,
24

**good** 7:25 8:1

17:13 52:4
53:15 55:1,10,
13 58:7,8 79:13
89:2,5,14
136:15,18
171:4,5

**gossip** 113:25
114:8 175:13

**gossiping**
71:12

**grade** 71:22

**grades** 75:12

**graduated**
15:17 71:23

**grandmother**
140:8 142:20

**grandmothers**
140:9

**grandparent**
142:18

**grandparents**
141:10,20
142:3

**grandparents'**
142:9,24

**grateful** 70:2

**Graves** 74:6
174:4

**gray** 134:24

**great-aunt**
65:7

**Green** 74:2
83:6

**Gregory's**
30:13

**grew** 28:5

**group** 55:1
61:23 119:24

**growed** 32:17

**guard** 90:24
91:4

**guess** 14:7
20:19 41:18
58:4,23 65:17
72:16 74:19

78:20 79:9
82:23 83:10
85:8,9 86:17
88:20 94:16
99:13 110:16
115:19 122:11
124:23 125:3,
19 127:6
143:23 170:6,
16 172:14

**guilty** 117:16
151:5

**gun** 101:9

**guy** 183:14

---

**H**

---

**habit** 79:4

**hair** 38:8,12

**half** 172:8

**halfway** 38:18

**hallway** 38:18

**Hammond**
144:2

**hand** 7:16
60:14 171:14

**handled** 82:22

**hands** 108:8
173:2

**happen** 28:7
54:3 67:7 90:5
157:21 185:18

**happened**
13:19 19:10
20:5 21:6 22:21
26:25 28:5
38:1,14 42:16
44:10 45:1
55:25 57:18
58:9 59:2,6,22
62:9 63:15
64:16 67:5 69:1
84:2 87:6 95:12
98:25 109:18
112:7,9 115:12
117:11 118:24
119:1 120:20
149:13 150:25

151:10 163:19,
23 164:12
168:12 174:17
178:8 185:25

**happening**
13:16 16:20
20:20 49:11
52:22 115:11
119:9

**happy** 8:25
9:12

**harassed**
25:18,22 101:6,
16,17

**harassing**
19:20 25:10,24
49:4 87:14
104:1

**harassment**
24:2 25:10

**hard** 20:15
53:21,22 71:12
94:17 113:19

**hate** 146:8

**hated** 173:18

**hates** 183:18

**head** 9:7 12:9
172:9,14

**hear** 54:4 99:23
103:9 104:19,
21 112:5,11
113:7,11,12,13,
21 114:6,8
179:3 180:5

**heard** 12:8
50:8 65:1 92:23
93:14 94:4
112:2 113:11,
15,16,23 114:8,
12 131:12
140:7 177:22
178:4 179:7,18
180:9,18
182:23

**hearing** 86:2

**hearsay** 19:4
67:22

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

heart 48:17

helped 133:14

helpful 78:19
129:22

Helton 179:13,
15,23,24

Hey 102:22

high 10:21,22
54:20 71:23

hit 12:9 49:18,
19 57:19
172:14

Hitting 49:1

Hmm 182:19

hold 51:23

holidays
128:12 133:7
146:4

home 13:6
14:10 16:25
35:9,14 37:25
38:2,3,14 39:17
41:2 43:4,10
47:1 59:17,18,
19,20,24 72:19
73:2 75:13
80:4,16 84:4,
11,19,21 85:2,
13,19 96:11,14,
24 110:22
119:1 121:10,
11 122:9,25
123:6 124:1,2
128:1 129:18,
20 133:9,10,17
134:14 137:9
149:13,14,16
150:12,14,19
155:2,3 167:11,
12 169:22
178:16 184:21,
25

homicide
26:16 35:2

honest 57:15
73:9 75:4 79:2
95:3 109:1
119:15 130:14
132:12 154:15

164:5

honestly
71:11,18 75:3
87:18 94:25
108:17 110:1,9
117:11,14
144:20 150:25
162:4 166:24
186:14

hook 33:12

hope 58:8
116:24

Hoskins 7:7
45:24 46:16
58:13 64:8
85:5,12,19,24
114:12,16
161:14,15
162:2 163:7

hospital 10:20
16:1 85:15
90:25 91:5
127:16 128:2

hour 67:24,25

hours 68:19
128:3,4,10

house 14:11
19:8 22:5,13,14
23:9 24:4
25:17,19 30:8
31:11 35:16,17,
18 38:4 41:11
47:18 51:19
52:23 54:9
65:19 82:16
86:10 87:24,25
90:16,17
101:21 123:21
133:14 139:9,
16 140:1
142:24 143:21
149:11,12,23
151:19 153:20
154:5 181:25
184:12 188:21

houses
139:14,21

huge 33:8

hurt 111:24

hurtful 59:5

husband 12:22
13:18 44:4,22
47:24 58:6 59:3
129:14 136:14,
15,16,17 139:4
170:15,20,23
171:1,11

_____

_____

I

ICU 91:9

idea 21:6 49:25
63:15 187:13,
15

ideas 91:23

IDENTIFICATI
ON 31:18 60:20
171:21

identified 36:5

identifies
169:21

identify 7:5

ill 57:3,4 156:3

illegal 79:3

imagine 54:7

immediately
19:24,25 78:20

immobile
134:11

implicate 23:1

implicating
35:1

important
90:15

impression
106:15,19
107:4

incarceration
150:19

incident
148:16,18
172:12

includes
189:10

indefinitely
184:24

individual
99:18

individuals
186:24

influence
89:14

inform 50:5

information
13:21 26:19,24
46:21 48:3
59:10 62:7
64:22 70:12
93:17,18
147:12 174:21
175:8 189:10

informed
12:14 20:4 56:4

initiated 69:13

injury 173:3

inoperable
32:9 34:4

inpatient 54:18
72:15,20 73:19
74:1 83:5

inquiries 98:7

inside 39:17,18
41:2 105:24
189:22

insisting 48:7

instruct 52:14

insurance
111:23

interact 160:6

interacting
157:13

interaction
22:15 25:4
37:21,24 51:1
105:10 138:11,
20 188:25

interactions
11:21 26:8
53:10 65:14
118:20,24

137:8,10,16
138:13 149:2
152:9 160:22,
25 161:2,5

interest 87:5

interrogation
45:9 63:22 64:6
65:1 68:2,7
177:18

interruption
132:25

intersection
176:7

interview
93:24 94:6,8
102:15,16,20
103:13,17
104:14,22,25
105:12,16,24
109:5 155:24
156:10 159:21
169:15 186:3
188:8,10,18,21

interviews
94:15 187:3,4,
11

intimidate
47:3 122:10

intimidating
69:17 104:11

intimidation
122:11

introduction
158:5,19

introductions
157:19 158:15,
18 186:11

investigate
99:17

investigated
99:20

investigating
150:2

investigation
11:22 18:6,16,
19 64:20 100:9
189:1,8

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

investigator
163:7 165:13
169:6,9

investigators
161:24 162:1

involved 20:6
21:14 22:19
23:18 24:21
46:15 59:4 64:9
65:24 67:2 88:4
101:18 149:4
164:3,4,7,9,10
165:21 187:13,
15

involvement
27:7 56:5 58:13
63:24 189:6

involving
93:15

irate 49:1 65:25

issue 82:20
94:19 159:8

issues 37:18
72:7,9 93:2
148:12 153:24
159:8 174:6
176:11 184:13

items 147:15

—————

**J**

—————

Jack 26:1

Jackie 186:23

jail 19:12 22:21
23:19 24:22,23
39:12,13 40:24
44:15,18 46:1
49:17,24 54:8
86:9,11,12
107:2 149:21
161:6,9 168:8

James 179:23

January 55:14,
17 70:22
162:11

Jason 7:8,14
26:1 35:14
42:22,25 43:19

44:11 45:8,21
46:13 54:6
65:18 66:13
69:13 70:7
93:25 96:11,18,
21 99:9 103:20
105:4 118:10
121:5,18
146:21 153:19
156:14 164:8
168:12 178:16

Jay 42:22,25
121:8

Jeffrey 117:13

Jennifer
176:20,23
177:1

Jessie 176:24

Jim 169:7

job 78:4 126:6

Joe 180:23
181:4

John 7:9 18:21
25:15 26:1
35:15 36:23
65:18 66:12,19
78:5 84:23
90:21 116:14
121:3,4 131:6
135:3 136:24
137:2 148:2
150:10 168:12
176:9 183:24,
25

Johnson
186:23

join 19:6 25:8
67:11,20

joked 113:7

Jonathan 7:7
14:24 15:2,12,
21,23 16:19,21
17:2,6 18:13
19:15 20:7
21:8,11,12,14
23:18,21 27:2,6
35:1 40:11,12
45:23 46:16
47:6,7,10,11,

12,15 50:6,13,
24 51:11 54:2,
14,24 55:15
56:5,16 58:12
59:7 61:13
62:6,13,15,22
63:7,8,16,23
64:8,22 65:22
66:6,7,10 68:1
76:20,23 77:3,8
79:15 80:15
81:7,10,11,19
82:3,12 84:4,22
85:9,11,15,18
86:4 88:15
106:23 107:4,9
108:8,13,25
114:22 115:3,
15 116:6,8,25
117:8,9 147:25
150:15,17
161:5 162:2
164:24,25
165:1,3 167:16
168:7 173:18,
19 174:7,11,14
177:4 178:19

Jonathan's
83:14,15,20
90:18 117:8
149:10 164:16
167:19

Joseph 186:23

Josh 165:14,16
169:10,11,16

journal 121:24

judge 8:14

July 70:21
125:15 150:11
162:15,16,20
176:13

jumped 57:19
156:14

June 125:15

Justin 18:21

—————

**K**

—————

Karen 130:13

Katherine
12:5,14,21
13:2,9 18:4,9,
12,20 19:1
22:18 23:17
26:16,21 27:7,
13 28:9 35:1
40:1 45:12,24
46:16 50:14
51:10 56:17
58:14 60:16
62:23 63:24
64:9,14,17,20
69:6 85:20,25
113:8 114:5
126:19 130:19
133:2,21 142:3
143:13,21
149:3 177:14
178:5,8,9 189:1

Katherine's
13:12

Kayla 11:16,17
13:21 14:2,9,
13,24 15:1,12,
21 16:20 17:3,
6,13 18:5,8,14,
18,25 19:23
20:12,23 21:25
22:11,12,14,15,
23,25 23:6,17
24:8 26:9,10
27:18 28:15,20
29:1,20 30:21
31:3,7 32:5
33:10,16 34:4,
11,15,16,18,22,
24 35:5 36:3
38:11,19,20
39:2,7 41:8,18
42:18 43:7,20
44:3,10,16,19
45:10,13,16,20,
21,22 46:8,13,
14 47:2,25
48:2,3,9,18
49:22 50:5,12,
22 51:9,20
52:2,6,7,14,21
53:9,17 56:3,4,
9,11,12,24
57:20 58:6,8,11
59:13 60:1,13,
16 61:13,18
62:4,7,8,12,14,

21 63:7,13,23
64:3,7,12,21
65:15,19,22,23
66:2,6,9,12,21,
25 67:1,7,12,
15,23 68:3,8
69:4,13 70:12
71:19 75:5
76:10 77:3,7
78:1,19 79:7
80:24 81:8 82:3
84:22 85:4,16,
18 88:15 89:20
90:12,14
106:13,16,20,
22 107:4,9
108:8,12 110:4,
12,24 111:4
114:21 116:5
121:9,11 122:6
126:8 127:10
129:21 130:2,3,
5,6 139:25
140:10 145:15,
18 148:12
152:23 154:19
155:14,16
156:12 157:8
158:10,25
159:25 160:6
161:25 168:11
172:11 173:1,3
174:5,20,22
175:2,7 176:11
177:4,7,22
178:4 184:12
187:3,6

Kayla's 35:21
39:24 42:1
54:14 56:19
65:6,7 74:3,8
112:25 144:9
173:24

Kelly 186:22

Ken 47:25
95:14 102:16
153:4 160:7

Kenneth 43:18
44:5 104:2
159:25

Kentucky 9:18
14:5 16:25
17:20 18:1



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

74:2,6 78:4
83:6 97:1,5,22
143:13,18
186:21

**keys** 30:19
31:14 32:24
185:6

**kicked** 184:12,
19,24

**kids** 13:3 55:10
76:22 141:4
146:10

**kill** 62:5,14,19

**killed** 20:8 53:5
65:23

**killing** 62:15,22

**kind** 12:25 15:9
28:6 33:18
72:4,6,12 73:8
74:23 75:2 84:2
88:8,10 93:12
108:3,11
118:14 123:13
124:10 134:25
144:6,22,25
146:9,11
152:10 159:7
174:17 180:20

**kinds** 81:1

**King** 180:23
181:4

**knew** 13:3,5
19:14 20:5,6,17
21:5 22:18
23:23 24:4,15
26:25 27:13,21
28:5 39:2 41:8,
9 45:18,24
48:16,17,18,19,
20 49:25 50:18
51:17 53:23,25
54:1 62:4,10
65:23 66:22,23
67:2 77:8 85:6,
10 90:1 91:1
106:10 127:9
128:23 146:23
151:13 152:21
159:2,3

**knot** 172:10

**knowed** 59:1

**knowing** 20:22
27:18 48:16
151:17

**knowledge**
15:1,11 24:1
28:8 40:25
42:25 50:14
51:10 52:7 53:8
56:16 58:12
59:10 64:13,16,
21 72:25 77:3,
19 78:10,11
79:16 83:8
84:13 85:4
101:18 107:9,
14 108:22,25
113:23 115:6,9
132:5 141:24
147:11 148:24,
25 153:5 160:7
161:10 169:4,5
182:8 189:5

**Knox** 7:9
10:19,20,22,23
14:4 17:1,22
18:23 53:7
70:8,16 71:10,
20 83:1 127:15,
17

**KSP** 103:21,22

_____

**L**

_____

**labeled** 171:16

**lacked** 54:20
170:16

**lady** 47:17 53:6
65:23 165:5

**laid** 108:8

**landline** 143:5,
6 169:25

**lane** 144:2

**Larry** 135:7,11

**lasted** 68:18

**late** 15:13,14
16:8 65:17

115:24 118:11

**law** 18:5,9 26:9
45:6 65:15
99:17 100:2

**Lawson**
176:20,23,24,
25 177:2

**lawsuit** 87:1,4,
9,12,16,18
187:14

**lawyer** 24:5
43:11,12,16,21
44:5

**lay** 157:16

**laying** 159:10
177:5,23
178:22

**lazy** 72:4

**leading** 35:5

**learn** 12:4 18:4,
8 77:7

**learned** 12:20
79:15

**leave** 30:7,9
53:6 57:4,11
105:22 107:24
163:22 170:5
184:16

**leaving** 30:21
31:4 156:13

**led** 71:8 72:1,3

**left** 30:3,11
36:19,21 37:14
42:17 43:3 45:3
58:17 59:6,14,
24 91:10 94:22
95:4 105:23
109:10 111:8
119:7 132:24
134:7 146:3
156:14,16,18
172:4 177:5,23
178:22 185:22
186:2,6 189:20

**legal** 160:12,14

**legally** 86:24

**length** 63:12
111:5

**Lester** 20:8
45:23 46:17
58:13 64:8
112:19,23
114:4 136:4,25
147:24 161:19
162:2 170:9
175:24 179:12
180:5 182:7,12

**Lettie** 181:12,
13

**level** 114:20

**license** 10:15
11:4 144:21

**licensure** 11:7

**Lick** 16:25 17:1
35:18 37:25
38:2 124:5
133:17 138:22,
23 139:9
149:12 169:23
175:19

**lie** 27:3 41:21
50:25 86:25
166:10

**lied** 23:24,25
50:2,3 58:25
66:5

**life** 9:19 19:12
24:24 49:3,10,
24 54:15 60:18
66:5,21 88:25
89:3,11

**lifelong** 70:16

**limited** 78:22
187:22

**Linda** 85:17
141:13

**Linda's** 86:10

**Lisa** 163:8
169:12

**list** 186:22

**listening** 92:17

**literally** 38:6
57:5 105:9

160:3

**live** 12:11 65:8
71:8 84:4
101:22 102:3
130:9,10
138:21 139:8
141:22 143:12,
18,20 170:2
174:3 175:24
179:19 181:24

**lived** 9:17,19
12:8,17 13:5
14:4,10,21
15:22 25:12
30:1 45:21
70:18,22
112:24,25
116:8 123:19,
20 124:7
130:11 141:25
143:13,25
144:4,6,8,9
174:4 175:19,
20 176:4 181:4,
25 182:3
183:18,19

**lives** 74:6
130:11 138:22
139:12 144:14
181:4 182:4

**living** 13:21,23,
24,25 14:3,22
16:22 17:25
34:19 36:16
37:14 55:24
70:23 71:1,3
73:2 74:5 84:21
116:5,7 125:8,
10,11,12,15
135:3 138:24
139:5,10,11
140:9,11,25
141:14,15
142:21 174:1
184:12,18

**local** 73:20
180:13

**locally** 74:5

**locate** 42:18
152:14,17

**located** 152:25

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

locked 112:4

locking 112:11,12

long 9:17 10:2, 12 11:3 14:19 27:23 42:8 55:20 58:5 68:17 74:10 78:5 79:7 83:16,24 84:4, 13 113:3 123:5, 19 124:20 127:6,8,11 137:6 166:8,13 184:23 186:5,9

longer 36:14 113:4 136:20

looked 41:6 50:22 121:20, 21 172:5 176:17 179:17

lost 15:25 16:11

lot 54:4 57:5 62:23 63:4 67:25 75:8,13 86:15 101:20 102:6 109:4 115:10 120:14 134:10 136:2 144:3 146:9 151:19 175:4,6 182:14

Louisville 34:20 70:18,23 71:6,8,15 147:23 162:14

LPN 10:16,17 11:1,4 127:21

luck 58:7

lunch 86:10 134:7 135:22

lying 50:18,23

M

macaroni 108:1,6,21 172:15

mad 111:19 184:20

made 20:25 23:6 26:3 37:17 48:2 50:6,22 69:12,18 71:16 91:9 93:23 97:12 101:17 119:2 153:23 157:19 163:10

Magistrate 100:4

major 88:9

make 8:14 19:3 20:9 32:9 33:15 34:4,14 36:9 39:23 49:5,12 66:2 90:6 91:22 96:17,25 97:4, 21,22 98:3,7 100:17 130:2 162:25 171:14 174:6 179:24 190:5

makes 144:12

making 20:21 120:14 149:18

mama's 22:7

mamaw 131:5 141:6,7,17

man 36:17 45:19,21,23 46:8 167:2,3,22 179:13

man's 46:7

manager 135:19

Manchester 124:7

manipulate 102:19

March 36:4 37:16,21 38:8, 15 45:10 53:9 56:2 60:14 83:12 88:20 118:17 120:2,8 151:5 153:18

154:1 160:14, 21 161:6,21 164:13 178:17 189:19

mark 31:15 32:25 60:12,14 186:23

marked 31:18 60:20 69:3 171:21

Market 113:17

marks 107:24

maroon 144:25

married 9:23, 25 10:2,3 55:22 74:7 112:24 139:12,13 140:16,20,21 144:9 176:24, 25 183:14

materials 140:6

Maternal 142:19

matter 23:25 27:3

Maxima 134:18,21,22

meaning 87:5, 9 150:4

means 62:10

meant 178:7

measures 111:16

mediation 164:16

meet 95:17 96:6 154:10 165:19

meeting 104:12 109:8, 16 110:12

meetings 165:9

member 188:22 189:3

members 187:9 189:11, 13

memory 119:23,25 123:17 125:8 127:5 128:25 133:19 164:11 166:16 174:21 185:2,21

mental 72:12

mention 147:1 166:16 187:3,6, 10

mentioned 72:21 74:15 87:20 89:19 101:2 114:21 125:17 136:3 137:8,14 138:5 146:25 148:4 156:24 168:1 175:19 178:18 181:12

messages 163:22

met 9:10 44:5 55:8 57:10 68:11,15 77:11, 17,22 79:15 93:25 95:19 96:20 130:15 155:14,18,20 163:6 165:18

Metford 186:24

meth 23:21 149:10,18 150:2 154:4

Michael 180:1

mid-2011 115:14

mid-year 119:14

middle 102:1 111:25 155:2

Middlesboro 29:12 71:25

Mike 7:11

180:1,6,16 187:23,24 188:3,10,22 189:2,7

Mikey 183:10, 11 184:4

miles 12:17 112:25 143:22, 23

million-dollar 69:19

Mills 7:4,15,25 9:15 10:1 11:13,16,19 12:4,5,14,21 13:2,9,21 14:13 16:18 18:4,20 19:2 20:8 26:16,21 27:7 28:10 31:16 34:11,24 35:1, 12 36:16 39:2 40:1 44:4,22 45:12 46:9,16 47:24 55:23,24 60:11,13,16,19 62:22,23 63:15 64:9,17 69:4,25 74:4,10 85:20, 25 86:5 112:12 113:8 114:5 118:9 126:19 130:5,6,19 132:24 133:2, 21 136:16 137:25 138:4 141:13 142:4 143:13 149:3 150:9 154:19 157:8 161:25 172:12 173:1,3 176:11 178:4,5 179:13 181:12, 13,19,20 182:6, 7 183:16 185:17 186:20 189:1

Mills' 18:9 27:14 50:14 51:10 52:22 56:6,17 58:14 63:24 64:14,20, 21 112:3



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

143:21

**mind** 28:3
48:18 53:23
54:3 90:19
127:8

**mine** 137:22
155:16 187:22

**minute** 160:19
185:10

**minutes** 35:15
42:12,15 50:21
57:13,14 58:9
65:4 103:19
104:7 124:6
186:7 189:21
190:1

**missed** 82:17

**missing** 75:8
147:19

**Misstates**
93:22

**mistake**
153:23

**mobile** 14:10
129:16,17
131:15

**model** 29:19

**mom** 21:14
24:5 27:1 30:4,
25 65:8 78:24
85:17 116:13
124:3 128:21
139:14,15
140:18 141:4,9
142:16 144:21
145:7,17,18

**mom's** 19:8
22:5,12,14 30:1
90:16 130:13
142:17 146:1,7
184:14

**moment** 61:9
171:23

**moments**
14:12 22:24
25:9 32:7 37:20

**Monday** 126:5
128:17,18,23

130:17,18

**money** 78:17,
18,22,23,24,25
87:8 88:3,5
116:12,13,15,
17 147:25
170:16

**month** 84:9,10
125:14 150:4

**months** 11:5
15:24 16:2,4
36:14 55:8
70:19 79:10
84:6,8,10 120:8
124:21

**morning** 7:25
8:1 30:7 35:9,
16 111:25
123:23 128:4,
21 131:10
142:8,9 145:8,
10,13 146:2,23
147:2 149:17,
25 171:6,13

**Morse** 176:8
179:19

**mother** 30:5
78:18 139:15
140:11 142:19
145:9,12,13,17
146:22,23
183:16

**mother's** 22:5,
6 23:9 125:13,
14 142:17
147:2

**mouth** 173:2

**move** 33:6,10,
12,13 53:7
61:23 89:3
105:13 124:13
160:20 162:14

**moved** 17:18
36:13 37:12
55:9 70:21
122:21 124:18,
22 125:4 126:8
139:15,16
162:16,20
176:10,12,14,

15 182:1

**movies** 55:11

**Multiple**
118:18

**murder** 23:13,
17 46:16 48:23
57:23 60:16
69:6 104:8
115:10

**murdered**
55:24

---

**N**

**nail** 118:14

**named** 130:3

**names** 18:14
71:17,18 76:21,
25 143:25
165:15 177:20
182:24 187:1,3,
6,10,12

**Nana** 141:4

**narrative**
172:7

**needed** 24:16
61:24 67:4 80:7
89:1 129:7
184:21

**needles** 76:8

**nickname**
60:19,22

**night** 35:8
68:15,18 69:7,
8,9,12 80:4
94:23 111:8,25
123:22 125:17
141:25 142:7
145:23,24
149:15 155:8
183:5

**nightmare**
110:19,21

**nightstand**
41:7 121:20

**nod** 9:7

**non-
responsive**
99:12 100:18

**noon** 150:1

**normal** 28:12
81:19 98:13,16,
17,20 99:5,13,
16 100:11
128:25

**note** 100:17

**notes** 90:6,11
185:9

**noticeable**
75:15

**noticed** 76:9

**November**
80:10 83:21,22
125:16

**nudged** 108:9

**number** 8:11
31:16 36:6
60:12,15 69:3
111:1 126:14,
16 129:3,7,11,
16,21,22 130:1
131:19 136:12
143:8 169:21,
22

**numbers** 43:7
126:15 129:15

**nurse** 10:15
127:18,19

**nursing** 15:17
29:15 128:1

---

**O**

**object** 8:18
22:2 23:5 24:12
25:7 34:6 42:4
52:12 53:13
58:21 64:10
67:10,19
189:25

**objected** 53:16

**objecting** 8:17

**objection**

19:4,5 24:11
68:5 77:5 78:16
79:5,24 80:21
81:3,21 83:25
86:20 87:3,14
89:8,16 91:18
93:20 98:11,15
99:19,24,25
101:5,10 102:9,
24 103:18,25
105:1,13,17
107:23 109:24
110:6 112:14
113:10 114:14
115:2 147:13
148:7,13,23
149:6 150:23
151:8 153:13
156:5 157:9
160:9,16 162:3
166:17,22
174:12 175:11
177:6,24
178:25 185:3

**objections**
8:14,15 104:13

**observation**
73:10 79:22

**observations**
73:12

**observe** 74:16
80:1

**obtained** 69:19

**occasion**
19:23 86:7
108:20,21

**occasionally**
80:17,18

**occasions**
108:24

**occur** 37:24

**occurred** 80:8
92:19 94:10
96:11

**occurs** 109:16

**October** 65:17
125:16 138:12

**odd** 122:8

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**office** 144:1,2
154:16 161:3

**officer** 51:22
100:11,14
110:5,13

**officers** 11:21
18:15,18 26:10,
15 39:20 42:17
43:3 45:6 48:20
49:3 97:2 99:17
188:17

**older** 122:13
144:23

**Oliver** 140:23
142:21 143:20
144:18

**One's** 172:2

**ongoing** 18:6,
15 19:3 151:12
154:6 158:15,
17

**open** 173:2

**open-ended**
140:7

**opened** 38:17
121:20

**operable** 34:8,
15 36:9 37:17

**opinion** 64:25
80:19 87:18
91:16,19
122:12 177:19

**opportunity**
28:15

**order** 23:1
178:16

**ordered** 88:3

**originally** 46:6
116:3

**outcome**
108:15

**outhouse**
112:4,12

**over-**
**exaggerating**
19:18

**overheard**
93:14

**overstating**
122:12

**owned** 28:21

———
**P**
———

**P.D.** 155:25

**p.m.** 118:2,5
132:18,21
159:17 185:11,
14 190:10,12

**paid** 87:25
88:1,4,5

**pain** 172:10

**pants** 176:16

**Papaw** 131:5

**paper** 106:11

**paranoid**
54:10

**paraphernalia**
76:3,5 78:21

**pardon** 140:6

**parent** 30:20

**parents** 40:17
65:9 130:9

**parents'** 14:11
130:12

**parked** 30:18
31:10 32:14

**parking** 57:5
101:20 102:6

**part** 32:8 45:6
118:12

**participating**
8:12 56:17

**participation**
64:14

**Parts** 135:6,7,
9,10,15

**pass** 141:2
185:20

**passed** 12:6,9,
14,21 13:9 18:4
36:16 51:20
52:18 65:19,24
67:3 70:22,23
85:20,25 86:5
139:1,2 162:11
170:6 175:1

**past** 30:8
178:10

**paternal**
141:10

**pay** 88:3
117:17

**paying** 160:12,
14

**penalty** 48:24
164:17

**people** 12:25
23:12 61:24
76:19 91:23,25
92:1 101:22
102:3 144:3
147:16 156:10
164:1 167:5
179:9 181:4
182:14

**Pepsi** 125:19,
20,21

**percent** 48:17,
19 54:1 109:2
132:7,14 154:8

**perfect** 9:9

**period** 54:14
59:3 70:20 71:9
80:16 84:16
90:25 104:16
106:20 164:1
176:3

**periods** 84:19

**permission**
42:1,5

**person** 8:13,20
14:13 17:14
46:22,24 55:4
105:9 135:3
171:4,5

**person's**

164:21

**personal**
125:12

**personality**
116:11

**personally**
91:2 98:24
147:15 187:17

**persons** 76:10,
18 77:1 98:13

**perspective**
147:11

**pertains**
138:17

**phone** 8:12
20:25 21:22
27:21,22,23
30:6 40:16,17
89:23 92:17,18,
22 118:11
119:18 126:9,
20,22,24 127:1,
2,3 129:3,7,9,
15,18,20,21
130:1,20
131:15,17,19
136:8,12,13
137:3 142:16
143:3,4 146:10
155:8 163:24
169:21,25

**phones** 41:6
121:21

**photograph**
32:15,25

**physical**
107:15,19,21,
24 108:13

**physically**
57:3 88:22

**pick** 9:7 85:16

**Pickard** 7:9
18:21,22 19:1,
22 20:2,24
21:22,23 22:16,
25 23:4 24:8
25:1,5,15 26:2
65:18 66:12,17,
19,24 67:6 68:3

70:8 89:21
90:21 91:17
92:5,14 93:2,
12,15 94:1
98:2,3 101:1,19
121:4 138:6
168:13

**picked** 142:7,
12 145:16
146:1,24
172:21,23

**picking** 25:10

**picture** 32:15

**pinpoint**
147:20

**PL9193** 171:16

**PL9201** 171:16

**place** 17:18
39:17 130:10
135:12,13
188:9

**places** 19:8
43:6 131:25

**plaintiffs** 7:6
87:11

**play** 50:21

**played** 51:6
157:2 158:20

**playing** 185:17

**plead** 117:16

**pled** 151:5

**point** 8:23
10:14 11:25
15:22 16:21
17:2,17 18:3
22:23 27:11
37:16 49:16
51:1 56:23 57:2
60:18 63:16,20
70:2 72:21
74:19 82:8
88:14 104:24
156:6,8,9
158:21

**pointedly** 27:5

**points** 158:8



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

police 11:21
13:13 19:11
23:11 26:15
34:25 39:9
42:22 43:19,24
44:1,7,8,9
48:20 49:3
53:10 56:2
57:11 58:2
59:14 61:6
63:6,13 66:2,12
94:1,23 95:18,
19 96:20 97:1,
5,22 98:13
100:8,9,11,14
108:13,14,22,
25 109:6
120:25 146:19,
20 149:17
150:22 151:13
152:13,19
154:21 155:14
177:23 178:23
188:9,15,16,17,
22 189:3,7,19

Pontiac 29:18,
19

portion 172:8

position 10:10

positive 109:2,
3 177:16

possession
28:20 29:21
34:11,22

possibly
106:23 139:5

post 144:1,2

Powell 165:14,
16 169:11,16

practically
111:9

presence
103:2,3 104:13

present 40:9
44:23 64:2,6,15
68:2,7 92:4,6,
14 118:19
187:2,4,10
188:11,23

pressure
53:11 64:3
178:13

pressured
106:25 177:12

pressuring
56:20

pretty 136:4
155:5

prior 10:14
28:19 44:25
45:9 65:15
68:11 69:9,12
85:10 95:17
112:3 118:21
120:6 124:15
127:21 140:17
149:15 152:20
155:20 177:13,
17

prison 48:23
66:21 92:3
104:7

privately 93:2
153:7 155:22

problem 72:22
73:5 74:8 75:11
79:8 81:20
82:4,9

problems
76:10

proceed 70:8

PROCEEDING
S 7:1

process
158:14,16,17

produced
171:15

profanities
101:11

program 54:21
73:21,25 82:25
83:4

progressed
186:12

promise 47:16

property 34:3,
5 37:8 170:8,21

prosecution
189:2

prosecutors
161:3

protect 48:21

provide 13:14

provided
26:13

psychiatric
72:6

psychiatrist
72:15

psychological
72:7

public 153:10

pull 33:4,6

pulled 31:12
33:11 150:21

pump 36:1
172:10

punish 31:3,7

punishment
32:8

purse 147:18

pushed 107:17
172:14

pushing
107:20

put 19:12
31:12,13 32:23
33:1,21,22 36:8
72:10 82:23,24
99:24 104:6
124:10 145:11
170:8,21

putting 33:15
53:11

Q

quarrel 101:3

question 8:16,

19 9:11,21
26:15 41:1
53:14,15 68:4,6
92:8 96:4 99:7,
9,16 100:8
101:1 106:18
166:14 178:23
190:2

questioned
22:17 103:19

questioning
45:10 48:3 50:5
56:1,20,24
147:9 190:3

questions 9:4,
9 11:20 16:19
18:12 51:15
53:5 69:25
98:14,21,23
99:14,15 100:1,
18,24 117:22,
23 127:7,10
165:2 168:12
186:17 187:18
189:14 190:7

quick 16:10,11
51:23

quit 36:1 72:18

quote 39:3

R

race 55:12

raise 7:15
49:20,21

ran 30:2

randomly
73:24

Randy 176:25

range 124:10

reach 159:9

reached 43:16

react 50:15

reacting 49:22

read 61:9 140:6
147:10

ready 109:11

real 16:11
51:23 60:25
120:13

realized 53:22
54:25 82:8
88:24

reason 61:17,
18 62:5 89:5,17
127:4 147:2,6,7
151:16,20
155:7,10

reasons 82:24

recall 12:13
16:5 27:11,16,
18 28:24 29:16
34:24 35:4
59:19 71:18
76:21 77:2
81:13,25 82:7,9
85:22 94:13,25
96:8 97:7
105:20 109:2,3,
21 110:17
117:15,20
119:15,17
120:9 121:4,5
122:3 127:24
128:13,24
130:15 131:25
132:2,14 133:8,
24 136:11
137:5 138:14,
15 146:16
148:14,15,25
149:8 151:6
155:11,19
156:22 157:12,
13 159:11
161:12,17
162:7,9,10,22
164:22 165:12
166:2,9 168:25
171:10,12
172:13 173:8,
17,21 174:13
175:16,18
177:9,10
178:20 179:3,8
186:16 187:12
189:12

receipts 88:5

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

receive 10:24
11:6,10 72:6

recently
139:11

receptionist
154:14

recoding
166:2

recognize
31:17,23 32:1
188:5

recollection
167:13 172:11
173:15

record 7:5
16:11,13,14,16
60:4,6,7,9
92:12 93:6,7,9
99:25 100:17,
22 118:3,4,6
132:17,19,20,
22 157:7
159:16,18,19
163:16 165:24
185:12,13,15
190:6

recorded
110:5,10
176:10

recorder 51:25
102:19 159:9
185:21 190:4

recording
51:3,7,9 52:8,
15 94:5 156:24
158:6,21 167:1

recordings
52:2 92:23
93:12

records 40:16
89:23 90:11

red 144:22

REDIRECT
189:15

reference
135:11 140:8

referenced
25:9

referencing
22:10

referred
157:23

referring 25:11
28:23,24 62:6
146:17

reflect 100:22

refresh 173:14

regard 94:6

regularly
175:3,6

rehab 54:17,23
61:21 72:11,20
79:10 83:8,16
88:18 114:21
116:22,23

rehashing
152:12

rehearse 52:9,
13

relapse 53:20
114:24 115:4,7,
13

relapsed 54:12
116:9 147:21

related 181:13,
16

relates 189:1

relating 10:24
18:5 50:14
51:10 174:7

relationship
10:4 14:16
64:22 79:16,20
80:12 82:8
115:16,19,20
116:2 151:21
179:10 184:8

relay 96:2
106:2

relayed 93:19

Relevance
81:3

reliving 110:19

remained
106:20 156:12

remarry
140:16

remember
14:2 15:15,19
23:8 29:13
42:11 43:15
45:5 46:6 51:13
69:1,2 81:15,16
82:1 84:2 85:21
90:13,19 95:2,
4,8 96:19 97:8
104:3 105:20
106:22 107:6
109:23 110:2,
22,23,25 117:1,
10,11,14,20
119:8,10,19
120:22 121:4
122:4 123:5,10,
12,15 126:14,
15,16,25 127:9,
11 128:24
129:2,4 130:14,
25 133:11
134:25 135:16
138:11 140:2
146:22 156:13,
22 157:5 158:8,
18,25 164:6,15
166:2,5,24
167:1,10,25
168:9 169:9,15
173:6,12,20
174:8,16,17
175:18 177:3,
15 179:4,7
181:5 184:15,
17 185:5
186:10,14

remembered
20:18

remembering
83:23 95:5,7
127:7

removed
33:18 111:10,
12

rented 182:3

repeat 46:20
66:25 91:24

92:2 112:10

repeated 67:8

repeatedly
56:4 63:7,9
64:15

report 60:12
61:6 62:3,12,20
64:23 108:15
160:24 161:2,5
163:11 174:20
181:10

reported
108:12,14
138:8,14

reporter 7:16,
17,22 8:20 9:6

represent 70:7
95:14 118:10
153:4 160:10
186:20 187:23

representation
153:25

represented
153:24

representing
95:20,21 154:4

reputation
180:20

requested
20:3

requests
97:21

reside 9:15

residence
14:8 15:22
31:21 41:13,16
71:3 139:9

resident 70:16

respectful
80:22

respond 47:9,
10

response 48:4
64:12 99:10

responses
56:19

responsive
100:21

rest 24:23
49:24

restart 115:16
158:14

restitution
117:18

resulted 117:3
148:18

retained 153:7,
11

retaliation
97:18,24,25
164:8

return 11:11
34:15

returns 58:5

reverse 166:14

review 171:23

ridiculous
65:2 146:11

right-- 33:4

Rivendell 74:2

RN 10:11,12,14
11:7,11 127:21

road 30:8,12
43:9 111:9
117:12 144:2
151:17

roads 30:25
31:2

rob 113:19

robbed 45:24
46:9 112:4

robbery 48:23

robbing
112:13 113:8
114:5

Robert 182:24

rob 113:19

rode 44:3
155:16

Roger 74:4



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

room 8:24 41:4 42:1 44:25 45:3,9,10 47:24 57:5,11 59:21 63:23 64:7 65:1 68:3,7 76:7 104:12 105:22 106:21 109:17 155:25 156:16 159:24 169:4 177:18 185:22, 24 186:2 188:18

round 91:9

rude 41:10 97:10

ruined 19:13

rules 8:3,8

run 153:17 160:4

rural 102:2

**S**

sat 37:4,8 44:11

Save 66:21

Save- 77:11

Save-a-lot 77:22

Scalf 144:4

scared 21:2 25:24,25 49:7,8

scary 48:15

schedule 127:24 135:16 136:1

schedules 135:17 136:2

school 10:21, 22 11:1,11 15:18 29:8 54:20,23 55:13 71:20,22,23 73:21 75:8 76:20 77:19,21 78:6 82:16,17,

25 84:17,18 89:10 127:20

Scott 10:1,2,4 35:11 44:22 47:24 136:16 149:21 150:8, 10 153:7 155:14,15 156:12 159:25 167:7 179:6 183:18,21

scream 101:11

screaming 158:25

search 41:13, 15 42:1,5

season 123:14

seconds 185:10

security 90:24 91:4

seek 73:17 100:18

seeked 73:18

segregated 152:10

semesters 71:24

separate 135:7 172:3

separated 88:23

separately 154:24

September 7:3 10:3 34:16,21 37:4,7 70:15 122:14 124:24 125:5 172:7,17, 18

service 30:13 33:17,24 143:4

services 153:11

session 50:5

set 163:21

sheriff 18:22 19:1,22 20:2,24 21:22,23 22:16, 25 23:4 24:8 25:1,5 66:17,24 67:6 70:8 89:21 91:1,16 92:14 93:12 94:1 98:5 101:1 138:6

sheriffs 58:2

shift 12:18 123:22 125:17, 20,23,25 147:8

shit 39:3 40:19

shock 20:19 58:4

shoes 38:4

shopping 27:20 28:12 55:11 124:4 131:11 132:5 133:3 147:1

short 59:3 90:25 94:19 117:25 186:4

shortly 8:13

shoved 107:17

show 31:15 41:12 60:11 163:21

showed 168:17

showing 69:3

sic 73:18

sick 124:1 160:3,4

side 30:11 32:16 70:1 111:9 141:12 169:3

sidetrack 137:7

sidewalk 38:6

signed 54:22

silent 106:20

Silver's 78:5

similarly 187:22,24

Simpson 50:21 180:1,6, 16

Simpson's 157:2

single 21:17 26:25

sir 14:15 92:25

sister 183:24

sit 48:15,20 57:22 186:10

sitting 24:3 25:16,20 30:10, 11 48:22 101:2, 7,19 111:8 118:23 119:18 168:19

situation 62:1 89:13 117:15

skipping 121:7

sleep 73:15

slick 30:24

Slosar 7:6,24 16:17 19:21 60:10 77:5 78:16 79:5,24 80:21 81:3,21 83:25 86:20 87:3,14 89:8,16 90:7 91:18 93:20,22 94:20 98:11,15 99:9, 19,24 100:6,10, 21 101:5,10 102:9,24 103:18,25 105:1,4,8,17 107:23 109:24 110:6 112:14 113:10 114:14 115:2 117:25 147:13 148:7, 13,23 149:6 150:23 151:8

153:13 156:5 157:9 160:9,16 162:3 166:17, 22 171:18,20 174:12 175:11 177:6,24 178:25 185:3 189:16

Slosser 168:1

small 45:3 139:16

Smith 22:7 65:13 138:19 139:7 140:15, 23,25 142:21 143:20 144:18 180:8,12

Smith's 135:7, 12

snow 30:24 111:8,22

snowed 30:25

sober 61:22

sobered 54:16

solemnly 7:17

son 184:10

sort 20:25 25:10 28:2 44:25 51:2 52:9,13 57:9 145:4

sound 111:16 120:3 128:18 143:14 163:12 164:14 165:22 169:8

sounds 120:15

Southeast 11:1 29:9,11 71:24 72:2

Sowders 35:15 37:22 41:1,3 42:10, 22,25 96:12,13 121:3,8,14 188:20

space 184:22

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

speak 86:7
94:9 104:2
109:7 155:19
175:1,2

speaking
92:24 106:15,
19 107:3

specialist
164:17

specific 23:8
82:1 119:18

specifically
15:19 39:10
177:3

specifics
118:15 123:13

speculation
79:25 102:10
150:24 160:17
166:18

spell 14:6
184:23

spending 80:1

spent 141:25

spite 56:8

split 88:15,19,
22,24 150:11

spoke 43:19
47:11 92:14,18
121:3 165:11
167:17,22
168:1 179:16
180:24

spoken 13:4
85:24 86:1,4,6
161:25 169:7
189:2

spoons 76:7

spread 119:24
120:1,13,15

spring 14:21
123:7 124:11,
14,15 125:3,4
150:6

spurts 119:24

squad 150:1,2

stand 28:3
128:18,20

stands 127:4
128:22 166:20
167:21

Staples 168:19

start 33:19
156:11 158:10,
11

started 8:2
11:12 21:7,9,10
26:11 29:8 48:5
53:20 55:15
72:24 75:15
79:11 115:23
116:12 118:13
125:2 127:7,10
147:20,21
151:11 156:3
158:5,18
159:12 186:12

starting 70:13
119:14 158:19

state 58:2 97:1,
5,22 186:21

stated 44:12
62:4,21,22

statement
24:18 34:25
35:5,7 36:3
39:14 43:21
46:4,5,8 48:1
50:19,20 51:20
52:17 53:9
60:1,13 65:16
95:9,15 96:7
101:17 106:3
110:5,10,11
114:3 118:16,
21 120:2,6,16
152:10 153:12,
18 154:1,2
157:2 160:21
161:16,21
163:18 164:13
176:10 177:23
178:7,12,17,23
179:3,14

statements
22:19 24:20
45:18,25 50:6,

19 65:21 94:5

station 34:25
39:9 43:19,24
44:2,7,8 56:3
57:11 59:14
66:2,12 94:1,23
95:18,19 96:20
109:6 152:19
154:21 188:15,
16 189:19

stay 16:3 61:24
62:1 80:4,7
89:1,15 146:4

stayed 15:24
54:17,19 83:12,
17 128:5
135:19 142:1,7
170:7

staying 24:23
35:8 75:13
146:6

steal 180:19

stealing
147:12 148:12
175:15,17

steer 55:3

Stella 65:13,14
66:3,16 67:7
137:18,19
138:1,5,9,19

step 104:18
155:22 156:9,
10 159:22

stepbrother
183:24

stepdad 78:25
140:21 145:7,
17

stepmom
113:19

stepped 156:3,
6,8,14 159:22

stick 90:19

sticks 162:24
167:25

Stinking 30:10
43:5,9 53:2

102:2 138:22
155:2

stole 148:15

stolen 147:25
148:3

stop 51:16,25
52:9,14 56:20
72:1 75:24
104:24 105:12,
15 122:2
132:15 134:9
159:13

stopped 15:15,
19 17:6 51:12
54:15 55:7
78:20 102:21
105:18 117:12
132:13,16
134:6 158:21
159:6

store 19:8
25:13,15,16
101:2,20 102:5,
6 113:1 135:18
145:4 175:20
182:13,14,16,
20,21

stores 131:8

storm 111:8

story 22:22
24:15 51:18
66:18,25 67:1,
8,13,16 68:9

straight 38:7

stranded
123:25

strike 100:25
179:15

struck 172:9

stuck 123:21
146:5

studies 72:1

studying 29:13

stuff 28:6 48:21
82:18 115:11
125:12 147:14,
22 148:3

151:23

Sturgill 72:17

subpoenaed
163:5 167:18

substance
147:10 164:23

substantial
147:19 172:10

substantive
167:23

succeed 87:1

success 87:11

successfully
69:19 83:3

summer 54:21

Sunoco 182:22

superiors
97:12

supervisor
128:1

supplement
169:20

supposed
9:20 96:17
159:3

suspect 102:7,
13

suspected
81:6,7,8 148:12

suspicion 81:4

suspicions
175:12

SWAT 23:14

swear 7:17

switch 163:6

sworn 7:16

Sylvia 22:7
140:13,25
142:19 143:20
144:16,18
146:13 184:18

system 58:2



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**T**

**table** 45:3
49:18,19 51:3
57:20 157:16,
17 159:10

**taking** 29:14
72:18 74:17
117:7 128:13
151:15 152:4,6
188:8

**talk** 19:14
23:16 27:23
28:15 39:7
40:15,17 45:15
46:21,25 54:24
59:22,23 63:5,
17 73:15 94:24
109:9 112:11
145:7,8,18
146:21,22
152:11 154:12
155:4,6 161:19
162:17 164:18
168:10 173:24
174:5 175:6
177:20 180:5,
10,18

**talked** 13:18
20:18 21:8
23:13 28:16,17,
18 40:6,14,16,
22 46:24 52:25
54:5 63:16
67:24,25 92:7
93:1 95:2
96:16,18,21
103:1 109:19,
21 130:20
131:2 133:7
136:8 142:16,
17,23 145:9,12,
13,14,15,16,17
152:9 154:13,
14 155:8 162:5
164:12,15,19
168:19 169:1,3
170:25 175:4
178:23 179:5,6,
11,21 181:1,8
182:12 184:2,4
188:10

**talking** 8:20
11:25 21:7,9,10
22:11 37:20
40:8 55:16,21,
22 90:9 96:19
98:2 115:23
132:25 139:18
153:14 155:11
158:5,9 162:21
167:13,14
169:9 172:12
176:2 189:11,
12

**tape** 50:21
51:12 158:20

**Taylor** 7:7
14:24 15:2,12
16:22 27:6 35:1
46:17 50:6 54:2
58:12 62:6,13,
15,22 63:7,23
64:8,22 76:23
77:4 79:15
80:15,20 81:7,
11,19 82:12
86:4 88:15 89:6
115:15 161:6
162:2 164:24
165:13 174:7,
11 178:19

**Taylor's** 23:21
117:8

**team** 23:14
161:24 181:11

**tearful** 21:2
94:12

**telephone**
21:24 119:3,5

**telling** 19:10
20:12 22:25
24:9 41:8 46:15
48:6,22 49:13
50:12,17 51:9
53:5 56:9,11,12
64:7 66:18 68:3
87:15 98:24
104:6 146:22
162:10 166:9
177:10,22

**temperament**
20:13

**tend** 9:9

**terms** 13:12

**terrible** 49:2

**terrified** 66:1

**tested** 73:24

**testified** 14:12
17:5 22:25
27:12 48:1 52:7
56:3 61:13 65:5
93:3,17,18 97:6
102:18 111:1
118:13,15
130:19 133:3
146:25 156:7
166:6 178:1
189:18

**testify** 84:18

**testifying**
27:16

**testimony**
7:18 26:13
88:15 89:4
93:22 100:12
122:21 126:18
133:4 140:5
155:13 158:4

**theft** 117:9
148:21

**therapy** 55:1
61:23

**thing** 79:18
123:19 131:20
149:20 158:24
173:9 177:18
185:1,5 189:17

**things** 32:9
34:3 39:23
46:22 55:10,12
80:23 81:1
82:12 83:23
84:1 90:13,19
91:22,23 95:6,7
96:10 103:14,
17 111:1
160:20 166:12
172:2 179:1

**thinking** 19:17
20:17 100:5
110:1 133:15

178:9

**Thomas** 183:8

**thought** 19:9
20:5 51:17 55:4
57:22 69:17
76:16,17 87:7
90:4 97:18
98:25 122:8
124:11 127:23
132:4 148:9
156:18 170:18
178:11

**threatened**
25:22,24 97:15,
23,24 101:14,
16

**throw** 57:5,12,
17 58:17 160:4
189:20

**thug** 180:19

**Thursday**
43:12,13

**time** 7:3 8:7,20,
23 10:19 12:1
13:1,8,16,20,24
14:9,20,22
15:18,22 16:12,
15,20 17:2,13
18:3,11,22
21:17 22:4,22,
23 23:8,9
25:14,19 26:10,
25 27:25 31:12
32:13 35:11,19,
21 36:12,13,16
38:11 43:1,21
45:5,14 46:3,5
47:8 48:10
54:24 55:21,23
57:9,10 59:3
60:5,8 63:11
65:25 69:7
70:3,20 71:1,9
72:5 73:2
75:22,25 79:2
80:1,16 84:12,
15,19,21,23
85:1 90:3,12,
17,25 91:4,9
92:5,15,18
93:5,8 95:10,
20,23 96:1

**times** 19:7,19
20:19 28:16,17,
18 40:7,23
44:17 45:13
51:12,13 63:4
85:14,15 86:12
89:19 90:14,15
101:23 102:21
110:15 118:18
119:11,19,21
130:15,25
131:18 134:1
136:2 152:8
165:19,20
168:3 170:25
185:21

**timing** 190:5

**tired** 183:4

**today** 7:2 8:3
9:10 11:24 38:9
39:8 40:21,24
44:12,18 61:7
68:11,21 93:3,
18,25 97:6

98:12 102:7
105:15,18,19,
25 106:13,20
107:12,16
110:12 112:16,
17 113:1 116:5,
19,24 118:2,5
119:2,5,8 120:5
121:3 122:13,
17 126:17,25
127:18,20
131:19 132:18,
21 133:19
134:11 135:2
137:5 138:6
140:20 142:13
145:2,3,11
146:8 149:22,
24 150:4,8,10,
12,15 151:12
154:8 159:11,
15,17 162:12
164:1,3,12
165:11 172:13,
17 173:14
176:2 178:14
179:2 184:11
185:11,14
186:2 189:19,
20 190:3,10



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

118:23 140:5
166:6,15
182:12 186:10
187:2,25 190:8

**told** 12:11,19,
22,23 13:18
18:11 19:9,14
22:17,22 23:24
24:1,6,15 25:23
26:24 27:2
39:1,3 42:19
43:8,14,20
45:14,17,19,20,
21,22 46:3,8,14
47:2,7,8,11,12
48:10 50:1,8,24
51:19 52:20,24,
25 53:3 57:20
59:1 61:24
62:7,18 63:1
64:15,17 65:19
66:1,9,10,13
67:13 68:25
69:15,21 74:23
77:9 82:5 89:1,
25 92:1 95:3,12
98:24 99:22
101:19 106:8
109:23 110:8,
13,15 113:17,
22 120:22
139:15 146:16,
20,21 148:1
151:15 152:7,
16,19,25 162:9
166:10 170:23,
24 174:24,25
176:20 177:13,
17 178:9,13,14
179:2 182:12

**tomorrow**
43:20

**top** 90:9

**tore** 27:22
36:11

**town** 14:2 98:5
102:1 132:8
152:22 185:4

**traded** 139:14

**trailer** 139:17
176:5

**training** 11:7,9

**transferred**
129:14

**transpired**
109:7

**transportation**
25:13 29:10

**treated** 41:11
72:14

**treatment**
54:18 72:6
73:17,18

**treatments**
88:2

**trespassing**
151:2

**trial** 185:18

**Troopers**
186:21

**trouble** 20:9,11
47:6 52:19
67:12,13 82:17,
19 83:23 95:5,7
99:3 151:13

**truancy** 82:20

**truant** 82:16,25

**truck** 33:11,12

**true** 20:22
50:23 62:7,17,
24 64:25 66:4
90:1 91:23
149:1

**trust** 66:5
97:16

**truth** 7:19,20
22:20 24:10
27:1,4 52:23
68:21,23 87:15,
19

**truthful** 64:23,
24 110:2

**turn** 58:6
107:14 159:9
182:17 185:21

**turned** 38:5
55:9 72:5 78:1,

7,11 83:5 117:2
122:14 190:4

**turning** 158:6
186:12

**TV** 117:7,12,13,
15,18 146:10
148:16,18
150:17

**type** 10:15 14:8
29:1,16 41:12
51:6 73:4 76:5
79:18 80:11
100:12 116:2,
17 136:13

**types** 74:25
100:1

**typing** 167:1

———————

**U**

**ugly** 59:4

**Uh-huh** 12:16
13:11 17:8,23
26:17 27:17
31:19,25 37:10
61:16 68:12
74:21 75:20
87:22 111:13,
17 112:6
122:16,23
124:25 125:24
126:10,23
129:14 130:22
140:11 141:8,
18 142:11,25
143:15,19
144:17 145:22
151:4 155:15
156:2 163:13,
20 176:8 188:7

**uh-uh** 15:5
93:4 141:25
148:1 170:13

**ultimately** 31:3
34:14,25 43:23
60:1 62:2

**understand**
9:12 11:19
20:16 26:7
57:25 62:11

88:14 89:4
93:19 95:13
99:4,6 102:18
114:7 118:19
123:12 146:17
149:19,20
152:12,23

**understanding**
88:22 108:7
138:20 142:12
148:18 149:4
154:24

**unhappy**
104:4,5

**unlocked** 38:3

**unprofessiona
l** 41:10

**upset** 19:13
30:14 48:13
51:14 53:17
59:15,16 66:11
94:12 97:9
101:15 103:8
104:5 106:9
110:18 111:7

**upsetting**
19:16 20:15

**user** 81:12

———————

**V**

**Valdez** 36:23
84:24,25
116:14 135:3
136:24 137:2
148:2 176:9
183:25

**valid** 8:15

**vehicle** 28:21,
23,24 29:16,21
30:9 31:24
32:1,9 33:16
35:19 36:5
144:21 145:3
155:15

**vehicles**
144:18

**verbally** 9:4

**verify** 40:15

**victim** 172:8

**video** 40:18
93:12 185:18

**vindication**
87:12

**violation**
150:19

**visi** 48:12

**visibly** 48:12

**visit** 84:11
85:16,18 96:24
124:3 145:5
166:23

**visited** 116:7
142:2 161:9

**voice** 49:20,21
104:13,19

———————

**W**

**Wagers** 14:1,9,
14 17:14,25
28:1 79:12
122:24 123:6,
18 130:7,13
139:10 145:25

**Wagers'** 129:2

**waiting** 25:16
109:10

**walk** 15:25
84:7

**walked** 25:14
38:17 110:20
160:1 180:4

**walking** 58:7

**Walmart** 40:18
124:3 132:1

**wanted** 8:2
23:16 24:14
46:11,13 52:10
55:3 56:9,12
59:10 66:1
71:10 89:3,6,
10,11 91:24
92:1 94:16 96:3
98:25 110:18



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

128:3,4 153:20 164:7,9 170:15 185:7

**wanting** 26:5 87:19 110:20 116:12 137:21 153:25 170:20

**warrant** 39:12 41:13 57:21 60:16 69:4 156:15 168:18

**wash** 8:24

**watching** 25:20

**wave** 101:8

**ways** 123:19

**weather** 30:4, 14,23 31:1

**Weber** 19:6 186:19,20

**week** 13:14 43:13 116:21 120:9 128:14, 25 133:8,22 134:1

**weekend** 176:13

**weeks** 120:9

**Wendy** 181:19 182:7

**whatsoever** 87:5,10 114:20

**wheel** 33:8

**whereabouts** 39:24 66:8 133:1

**wife** 139:13

**wife's** 139:15, 22

**William** 18:13 20:8 23:18 45:23 46:17 47:21 56:17 58:13 64:8 65:22 112:19 114:4 136:4,25

147:24 161:19 162:2 167:15 170:9,24 171:4 175:24 179:12 180:5 182:7,12

**Williams** 7:8 19:3 22:2 23:5 24:11 25:8 53:13 58:21 67:10,19 68:5 70:6,7 93:10 99:25 100:5,7, 16,23 103:23 104:9 105:3,6, 14

**Wilson** 183:6

**window** 88:1

**winter** 16:9 184:17

**wintertime** 115:24

**withdraw** 22:24 40:25 68:4,6

**witness'** 22:19

**witnesses** 24:15 159:2

**woke** 52:22 67:4 159:2 176:17

**woman** 12:13 167:2,3 176:19

**wonderful** 9:3

**Woolum** 139:23

**word** 109:22

**work** 10:18 12:7,18 13:17 30:6,7 41:6 46:25 77:24 78:1,3,7 84:25 87:25 90:25 113:19 126:1, 25 127:14,24 128:2,9,14,21, 25 131:14,16, 18 132:13 134:4,6,9,16

135:5,16 145:14,15,25 146:3 163:25

**worked** 77:11, 23 78:5 85:2 87:24 91:8 123:21,22,24 125:17,18,19 127:22 135:15, 17,20 149:15 182:13,15

**working** 36:1 84:15 125:21 127:13

**worried** 54:5,7, 9 90:3,4

**worry** 19:15 21:5 47:3 66:3, 10 90:1

**worse** 58:22

**wrecker** 30:13

**wrecking** 33:16,24

**Wright** 7:13 24:12 25:7 34:6 42:4 52:12 64:10 67:11,20 118:8,9 132:23 153:16 159:20 171:19,22 185:16 189:25 190:2

**wrong** 58:3 87:7 89:5 91:21 126:23 127:1 170:18

**wrongfully** 109:14

**wrote** 62:12,20

———————
**X**
———————

**XY** 100:11

———————
**Y**
———————

**year** 10:3 11:17 16:5,8 29:3

40:12 119:12, 15 150:5 182:4

**years** 10:13 19:17 36:15 65:9 74:11,13 84:3 109:4 113:4 122:19 127:20,21 136:19,20 139:2 140:22 166:13 183:20

**yesterday** 168:4,5,16

**York** 7:14 18:21 26:1 35:6,14 37:22 38:22,25 39:22, 24 41:1,12,22, 25 42:5,9 43:19 44:11,19 45:8, 12,17,21 46:13, 14,20,22 48:1, 2,4,13 49:5,18 50:6,12,15 51:2,8,25 52:8, 13 54:6 56:2,4, 8,11,13,15,19 57:10 58:11,18 60:13 62:12,20 63:23 64:2,7,13 65:18 66:13,17, 24 67:6 68:8,9 69:13,18 94:1 96:3,7,11,18,22 102:15,19 103:10,13 104:14,17 105:11 110:5, 13 118:10,14, 20,24 121:18 137:10,16 138:16 146:21 149:2 152:10 153:19 155:9 156:7 160:22 164:8 168:12 178:16 188:20 190:4

**York's** 43:1 56:24 62:3 97:12 137:8

**you-all** 59:13, 19 74:7 94:22

155:17,21,24 157:18 158:5 168:10

**young** 26:6 55:10 61:4 76:22

**younger** 76:22 146:9

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com