IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF KENTUCKY, LONDON DIVISION

| | | |
|---|---|---|
| AMANDA HOSKINS and JONATHAN TAYLOR, | ) | |
| | ) | |
| | ) | Case No. 17-CV-84 |
| Plaintiffs, | ) | |
| | ) | Hon. ROBERT E. WEIR |
| v. | ) | |
| | ) | Mag. HANLY A. INGRAM |
| KNOX COUNTY, ET AL., | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendants. | | |

# EXHIBIT 107

**AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.**
**William Lester on 10/09/2018**

```
 1              IN THE UNITED STATES DISTRICT COURT FOR THE

 2                    EASTERN DISTRICT OF KENTUCKY

 3

 4

 5
        AMANDA HOSKINS, et al.,           )
 6                                        )
                         Plaintiffs,      )
 7                                        ) NO. 17-cv-84
            -vs-                          )
 8                                        )
        KNOX COUNTY, et al.,              )
 9                                        )
                         Defendants.      )
10      _____  )

11

12

13              Videotaped deposition of WILLIAM LESTER,

14      taken on behalf of the Plaintiff, pursuant to the

15      stipulations agreed to herein, before SANDRA

16      BERKELAND, Certified Court Reporter and Notary

17      Public, at Regus Business Center, 128 Millport

18      Circle, Greenville, South Carolina, on the 9th day of

19      October, 2018 commencing at the hour of 9:19 a.m.

20

21

22

23

24

25
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                    Page 2

```
 1                  APPEARANCES OF COUNSEL

 2

 3    On behalf of the Plaintiffs:

 4         LOEVY & LOEVY
           BY:  ELLIOT SLOSAR, ESQ.
 5              AMY ROBINSON STAPLES, ESQ.
           311 N Aberdeen St,
 6         Chicago, Illinois 60607
           (312) 243-5900
 7         elliot@loevy.com
           amy@lovey.com
 8
      On behalf of the Defendants, Knox
 9    County, John Pickard, Derek Eubanks:

10         WILLIAMS FARMER & TOWE LAW GROUP
           BY: JOHN F. KELLEY, ESQ.
11         303 S. Main Street
           London, Kentucky 40741
12         606-877-5291
           john@wftlaw.com
13
      On behalf of the Defendants, City of
14    Barbourville & Mike Broughton:

15         WARD HOCKER THORNTON
           BY:  ALEXANDRA DEMOSS-CAMPBELL,
16                ESQ.
           Vine Center
17         333 West Vine Street, Suite 1100
           Lexington, Kentucky 40507
18         859-422-6000

19
      On behalf of the Defendants, Jason
20    York & Jason Bunch:

21         STURGILL, TURNER, BARKER &
            MOLONEY, PLLC
22         BY:  DERRICK T. WRIGHT, ESQ.
           333 W Vine Street
23         Suite 1500
           Lexington, Kentucky 40507
24         (859) 255-8581
           dwright@sturgillturner.com
25
```

**AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.**
**William Lester on 10/09/2018**                    Page 3

```
 1
     On behalf of the Defendants, Kentucky
 2   State Troopers:  Mark Mefford, Dallas
     Eubanks, Brian Johnson, Kelly Farris,
 3   Jackie Joseph

 4        KENTUCKY STATE POLICE LEGAL
           OFFICE
 5        BY:  CODY WEBER, ESQ.
          BY:   SHAWNA VIRGIN KINCER, ESQ.
 6        919 Versailles Road
          Frankfort, Kentucky 40601
 7        (502) 782-4261
          cody.weber@ky.gov
 8        shawna.kincer@ky.gov

 9
     ALSO PRESENT:
10
          Cliff Williams, Videographer
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                        I N D E X

2

3                 WITNESS:  WILLIAM LESTER

4             EXAMINATION                         PAGE

5

      BY MR. SLOSAR                              6
6
      BY MR. WRIGHT                        68,324
7
      BY MR. KELLEY                          306
8
      BY MS. DEMOSS-CAMPBELL                 319
9
      BY MR. WEBER                           322
10

11

                      EXHIBITS
12
   Number              Description                 Page
13
   Exhibit 1    Phone Record                        234
14
   Exhibit 2    Transcript of 4/15/11 Interview    234
15
   Exhibit 3    PL020213 Diary Entry with
16              Michelle's Phone Numbers            267

17
             (Exhibits attached to transcript.)
18

19

20

21

22

23

24

25

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                    Page 5

```
 1                 VIDEOGRAPHER:  This is the video

 2    deposition of William Lester taken by the plaintiffs

 3    in the matter of Amanda Hoskins, et al., the

 4    plaintiffs, versus Knox County, et al., the

 5    defendants.  The case number is 17-cv-84 in the

 6    United States District Court for the Eastern District

 7    of Kentucky.

 8                 Today is Tuesday October 9, 2018.  The

 9    time on the video camera is 9:19 a.m.

10                 We are in, Greenville, South Carolina.

11    The court reporter is Sandra Berkeland from the firm

12    of Huseby, Incorporated.  The videographer is Cliff

13    Williams also from Huseby, Incorporated.

14                 Will counsel present, including those on

15    the phone, please introduce yourselves for the

16    record.

17                 MR. SLOSAR:  Elliot Slosar, S-L-O-S-A-R,

18    for the plaintiffs, Amanda Hoskins & Jonathan Taylor.

19                 MS. STAPLES:  Amy Robinson Staples for

20    plaintiff, Hoskins & Taylor.

21                 MR. WRIGHT:  Derrick Wright for

22    defendants, Jason York and Jason Bunch.

23                 MR. KELLEY:  My name is John Kelley.

24    I'm here on behalf of defendant, John Pickard and

25    Knox County.
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                      Page 6

```
 1              MS. KINCER:  Shawna Kincer and Cody
 2   Weber are here on behalf of defendants, Mark Mefford,
 3   Jackie Joseph, Kelly Farris, Brian Johnson and Dallas
 4   Eubanks.
 5              MS. DEMOSS-CAMPBELL:  Alexandra
 6   DeMoss-Campbell present on behalf of defendants, City
 7   of Barbourville, and defendant, Mike Broughton.
 8
 9   WILLIAM LESTER, residing at 1654 Moores Creek Road,
10   Fourmile, Kentucky, having been duly sworn, testified
11   as follows:
12   EXAMINATION BY MR. SLOSAR:
13        Q.    Good morning, Mr. Lester.
14        A.    Good morning.
15        Q.    Have you ever given a deposition before?
16        A.    Never.
17        Q.    Okay.  Before we get started, I just
18   want to go over some of the rules for today.  Does
19   that sound all right?
20        A.    Okay.
21        Q.    You're already doing a great job.  If
22   you would just continue answering the questions
23   verbally.  That will help the court reporter and all
24   of us understand your testimony.  Okay?
25        A.    All right.
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                    Page 7

```
 1          Q.      There is a number of lawyers here in
 2    person.  There are some on the phone as well.  They
 3    all have a right to make objections.  There is no
 4    judge here today physically to decide the validity of
 5    those objections, so what I would ask is after a
 6    question is asked of you, if people are making
 7    objections, you can let them object, but then you're
 8    going to answer the question.  Okay?
 9          A.      Okay.
10          Q.      All right.  If there is a question -- I
11    tend not to ask questions perfectly, so if there is a
12    question that I ask you and you don't understand it,
13    just let me know and I'd be happy to ask it a better
14    way.  Okay?
15          A.      Okay.
16          Q.      I won't get offended, I promise.
17          A.      All right.
18          Q.      If at any time you want to use the
19    restroom, make a phone call, go get something to eat,
20    stretch your legs, whatever, just let us know.  We'd
21    be happy to accommodate you.  Okay?
22          A.      Okay.
23          Q.      The only thing that I'd ask is if there
24    is a question pending, that you answer the question
25    first and we take a break.
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.

**William Lester on 10/09/2018**                                              Page 8

```
1          A.      Right.

2          Q.      All right.  Okay.  Mr. Lester, what's

3   your full name?

4          A.      William Lester.

5          Q.      Okay.  And how old are you?

6          A.      Fifty-six.

7          Q.      Are you currently employed?

8          A.      Yes.

9          Q.      Where are you currently employed?

10         A.      I work for Mid-South Geothermal,

11   Memphis, Tennessee.

12         Q.      How long have you worked for them?

13         A.      Seven years.

14         Q.      What type of work do you do for them?

15         A.      I'm -- weld pipe, work behind the drill

16   run equipment.  Basically on their paper as a

17   laborer, but I do about every job there.

18         Q.      And I know today we're doing the

19   deposition down here in Greenville --

20         A.      Yes.

21         Q.      -- South Carolina.  What are you doing

22   out here in Greenville?

23         A.      I work down in Spartanburg.  We're doing

24   the new school Reidville Elementary.  Done probably

25   four schools here in the last six years.
```

1      Q.     What's your role in that project?

2      A.     I'm the pipe welder, laborer on the

3   drill, grouting the holes, tying in the circuits,

4   setting the ball.

5      Q.     Do you -- where do you currently live?

6      A.     1654 Moores Creek Road, Fourmile,

7   Kentucky 40939.

8      Q.     How long have you lived there?

9      A.     How long have I lived there?  Two years

10   at that address.

11      Q.     Prior to living there, did you live at

12   another address in Kentucky?

13      A.     Uh-huh.

14      Q.     Where was that?

15      A.     I lived at Moores Creek Road.  I lived

16   besides Escoes Market.  I think my box number was 121

17   Dewitt, Kentucky.  I'm pretty sure is what that was.

18      Q.     What type of trades have you done in

19   your life?

20      A.     Carpenter, auto body man, hardwood

21   floor, tile, roofing, logging.  Just about anything

22   except medical or something like that.

23      Q.     Is it fair to say that you have worked

24   consistently for --

25      A.     I worked since I was 15.

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                    Page 10

```
 1        Q.     Have you provided for yourself since you
 2   were 15?
 3        A.     Yes.  This is the only public job I've
 4   had in my life.  Until then I ran my own business.
 5        Q.     What type of business did you run?  What
 6   was the first business that you ran?
 7        A.     Car business.  I had a body shop and car
 8   lot.
 9        Q.     What was the name of that?
10        A.     I ran it -- bought in with Cecil
11   Buttery.  I was using his dealership.  One of his
12   license plates.  I worked in it for several years and
13   then when he decided to move on and return to a
14   different thing, I just paid other people to use
15   their license to buy cars and sell, because I had
16   people that would come and buy from me from other
17   lots where I already established a business with
18   them.
19        Q.     What year were you doing that through,
20   the car sales?
21        A.     1986 through '98.
22        Q.     And in 1998, did you start a new
23   business?
24        A.     Well, I had my body shop and stuff on my
25   ex-mother-in-law's land.  Me and my wife was having
```

1  problems so I bought a dozer instead and went into

2  logging.  I still left the stuff on her land.  She

3  told me that I could come and go as I please, but I

4  didn't continue no business there.

5       Q.     What did you do in the logging industry

6  in the late '90s?

7       A.     I bought timber and cut it and sold it

8  at the mill.

9       Q.     How long did you do that for?

10      A.     Three years.

11      Q.     After cutting and buying and selling

12 timber, what did you do next in your career?

13      A.     I went to work doing carpenter work,

14 maintaining rental property.  Then I got connected

15 completely with Treadways in Barbourville.  Paul

16 Hale.  I maintained his rental property up to

17 probably -- it was 2006 because I left in 2006 and

18 went to New Orleans during Katrina and worked down

19 there.

20      Q.     What did you do during Hurricane

21 Katrina?

22      A.     Cleanup.

23      Q.     How long were you down there?

24      A.     I was down there from when the hurricane

25 hit.  They were still pumping water out of the street

 1   when I went, and I stayed until March of the next

 2   year.

 3          Q.     After coming back from Louisiana, what

 4   did you do next?

 5          A.     I went to a friend of mine, Larry Smith,

 6   auto sales.  His body man was down.  He had nobody,

 7   and he asked me to fix his cars until his man got

 8   back on his feet.  I worked for him from March until

 9   August.

10          Q.     Of what year?

11          A.     '06.

12          Q.     Okay.  After that what did you do next?

13          A.     I went back in my business because his

14   body man got healthy, came back from open heart

15   surgery, and I left when he could maintain the cars

16   and I went back to my stuff.

17          Q.     Where did you go to high school?

18          A.     Lone Jack.

19          Q.     Where is that?

20          A.     Fourmile, Kentucky.

21          Q.     All right.  Did you ever get any sort of

22   like certificates relating to any of the trades that

23   you have been in?

24          A.     No.  I got married at a young age and I

25   quit school.

```
 1          Q.      Who did you get married to?

 2          A.      Diane Mills.  Catherine Mills' daughter.

 3          Q.      And when did you and Diane get married?

 4          A.      1980.

 5          Q.      How long were you and Diane Mills

 6   married for?

 7          A.      Nineteen years.

 8          Q.      Did you and Diane have any children

 9   together?

10          A.      Yes.  Got two.

11          Q.      And what are their names?

12          A.      Michelle Hammonds, 38 years old.

13   Jennifer Lawson, 34 years old.

14          Q.      So is it fair to say -- did you and

15   Diane get divorced in approximately 1998, 1999?  Is

16   that --

17          A.      We started our problems in '98/'99.  My

18   divorce wasn't final.  It drug out a long time.  It

19   took -- I think it was a year 2000 -- I believe it

20   was September 6, 2000, when it became final.

21          Q.      Okay.  How was your relationship with

22   Diane after the divorce?

23          A.      Mine and her relationship?

24          Q.      Yes.

25          A.      We had none.  We never spoke.
```

 1        Q.    Did you -- well, how was your
 2   relationship -- let me withdraw the question.
 3              During your relationship with Diane
 4   Mills, did you come to know her family?
 5        A.    Yeah.
 6        Q.    And while you were married, did you form
 7   any sort of relationship with Diane's mother,
 8   Catherine Mills?
 9        A.    Yeah.  I lived behind her house for 13
10   years.  Uh-huh.
11        Q.    And how is your relationship with
12   Catherine?
13        A.    It was good.  It was good.
14        Q.    When you were married to Diane, would
15   you ever go over to Catherine's home?
16        A.    Yeah.  To pick my kids up after school.
17   Most of the time walk down there and get them.
18        Q.    And did you ever help Catherine with
19   anything on the house?
20        A.    Yeah.  Last time I was ever in her house
21   was 2008.  I installed city water for her and got her
22   indoor plumb -- indoor water going for her.
23        Q.    Is it fair to say that your divorce with
24   Diane didn't affect you helping Catherine Mills?
25        A.    No.  Because I was the one she would

```
 1   call if her furnace went out.  She called me one

 2   year.  It was about New Year's Eve.  I was in

 3   Gatlinburg.  Furnace went out.  I said, Well, I can't

 4   come to you tonight, I'm drinking.  That was back

 5   when I drank.  I said, I'll be there in the morning.

 6            I went Sunday morning first thing, left

 7   Gatlinburg, straight to her house, fixed her furnace,

 8   got it going.

 9        Q.    Do you recall what year it was you

10   helped her fix her furnace?

11        A.    That would have been probably '03.

12        Q.    How would you describe your relationship

13   with Catherine Mills after your divorce with Diane?

14        A.    It was good.  Actually, we got tighter

15   after the divorce when she saw what was going on with

16   her daughter and I told her we would always be

17   friends as long as she treated my grandchildren good

18   and as long as she treated them good, we'd stay.  If

19   she was not good to them, our friendship was over.

20        Q.    Did Catherine continue maintaining a

21   good relationship with her grandchildren?

22        A.    Oh, yes, yes, yes.

23        Q.    Did you appreciate that?

24        A.    Oh, yes, yes.

25        Q.    Do you know a woman by the name of
```

```
 1    Amanda Hoskins?

 2          A.     Yes.

 3          Q.     Approximately when did you first meet

 4    Ms. Hoskins?

 5          A.     2006.

 6          Q.     And do you recall where you and Amanda

 7    met?

 8          A.     Mustang Bar & Lounge, Tazewell,

 9    Tennessee.

10          Q.     And at some point, did you and

11    Ms. Hoskins begin to date?

12          A.     Yeah.

13          Q.     Approximately when was that?

14          A.     That was in on leave from Katrina.  I

15    met her that Saturday night.  Actually on the next

16    day, she came to my house that Sunday evening.

17          Q.     And would this have been 2006 or 2007?

18          A.     It would have been 2000 -- been 2006.

19    Yeah.  We came home for Thanksgiving.  Yeah, 2006.

20          Q.     How would you describe your relationship

21    now with Ms. Hoskins?

22          A.     Now?

23          Q.     Yes.

24          A.     We're still friends.

25          Q.     Is it fair to say that you remained
```

```
 1   friends with Ms. Hoskins since 2006?

 2        A.     Yes, sir.

 3               MR. WRIGHT:  Object to form.

 4        Q.     And at some point during that time

 5   period, did you date Ms. Hoskins?

 6        A.     Well, I considered it dating.  But we

 7   would get along for pretty good while and then she

 8   would leave, but she would always come back.

 9        Q.     Mr. Lester, where were you working in

10   December of 2010?

11        A.     Treadways.

12        Q.     What's Treadways?

13        A.     It's a lumber place in Barbourville.

14   It's a hardware store, but they got rental property

15   and I was working for them and Paul Hale.

16        Q.     Where is the rental property that

17   Treadways owned in December of 2010?

18        A.     It's all over the city of Barbourville,

19   College Street, Cumberland Avenue, Smith Street.

20   They own it all over town.

21        Q.     And what was your job with Treadways in

22   December 2010?

23        A.     Just whatever went wrong or broke down

24   or plumbing busted, I went and fixed it.  Yeah.

25        Q.     And --
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                    Page 18

```
 1          A.      Just wasn't one special thing.

 2          Q.      Was that a full-time job?

 3          A.      Yeah.

 4          Q.      Do you recall approximately how much you

 5   were making back in December 2010 by working for

 6   Treadways?

 7          A.      Every week varied because the jobs

 8   processed differently.  They didn't pay me by the

 9   hour.  They paid me by the job.

10          Q.      Okay.

11          A.      Uh-huh.

12          Q.      During 2010, did you know a person by

13   the name of Scott Mills?

14          A.      Yes.

15          Q.      And how would you describe your

16   relationship with Scott Mills back then?

17          A.      We've been friends so many years, but

18   when he was a kid growing up, he actually stayed on

19   out at my mother-in-law's with her son Steve back in

20   the day.

21          Q.      And in 2010, were you friends with Scott

22   Mills?

23          A.      Yes.

24          Q.      Did you have any employment that related

25   to Scott Mills?
```

1      A.     I done several things at his home,

2   repaired his rental property when a storm blew a tree

3   through it.

4      Q.     Did you ever help -- in 2010 did you

5   help Scott Mills upkeep trailers and houses?

6              MR. WRIGHT:  Object to the form.  Go

7   ahead.

8      A.     One rental house --

9      Q.     You can answer.

10     A.     One rental house that he had up on the

11  creek where his dad was living?

12     Q.     What creek was that?

13     A.     Big Creek.  Stinking Creek.

14     Q.     Okay.  In Kentucky?

15     A.     Yeah.

16     Q.     And in December of 2010, where were you

17  living?

18     A.     Mouth of Moores Creek, besides Escoes

19  Market.

20     Q.     Were you living with anybody at that

21  time?

22     A.     Just me.

23     Q.     Mr. Lester, how do you first recall

24  learning about Catherine Mills' death?

25     A.     My oldest daughter Michelle called me,

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                    Page 20

```
 1    and she was into a spasm and finally I understood
 2    what she said, and I had to go up to her trailer and
 3    get her and take her up to Catherine's house.
 4          Q.     And was that -- did she call you on the
 5    day that Catherine was found dead?
 6          A.     Uh-huh.  Five o'clock that evening.
 7          Q.     And where were you at at the time that
 8    she called?
 9          A.     In my trailer.
10          Q.     Who were you there with?
11          A.     Amanda.
12          Q.     And do you recall what specifically was
13    said to you in that phone call?
14          A.     Said that -- I believe the way she said,
15    UPS man had found her laying on -- in the back, and
16    that they was pretty sure she was dead.  She was
17    screaming.  I said, Well, I'll come get you, take you
18    up there and we'll see.
19          Q.     And how did you react to that phone
20    call?
21          A.     It hurt me.  I was in shock.  I didn't
22    think something like that had happened, but, you
23    know, I didn't know that somebody would be that
24    liable to pull a trick on her like that to call her
25    and tell her that, you know.  I pretty well figured
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                    Page 21

1   she had the truth.

2        Q.      And who was with you at the time you had

3   the phone call?

4        A.      Amanda.

5        Q.      And after you got off the phone, did you

6   tell Amanda what you had just learned?

7        A.      Yes.

8        Q.      What did you tell Amanda?

9        A.      I told her it was Michelle calling and

10  that somebody found Catherine at the back porch.  I

11  was going to get Michelle and the kids.  Gonna drop

12  the kids off at the trailer with her and I was taking

13  Michelle on up there.

14       Q.      And does December 20th, 2010 seem to be

15  the day that this event happened or that you found

16  out that Catherine had died?

17       A.      That's when I found out.  Five o'clock

18  that evening.

19       Q.      I'm going to ask you a series of

20  questions now about what you did earlier the day

21  before you found out that Catherine had passed away.

22  Okay?

23       A.      Yeah.

24       Q.      Questions about the activities that you

25  engaged in on December 20th, 2010.

1          A.      Okay.

2          Q.      All right.  Where did you wake up in the

3    morning of December 20th, 2010?

4          A.      My home.

5          Q.      Where was your home at?

6          A.      Mouth of Moores Creek Road besides

7    Escoes Market.

8          Q.      Was anybody staying with you overnight?

9          A.      No.

10         Q.      Do you recall approximately what time?

11         A.      I got up at seven because I had to be at

12   Treadways at eight when they opened.

13         Q.      After waking up, what did you do?

14         A.      I got dressed, bought gas, went to

15   McDonald's, got breakfast, and went on to Treadways.

16         Q.      Did you have a favorite breakfast back

17   then at McDonald's?

18         A.      Gravy and biscuits always.

19         Q.      And I believe you said that started off

20   your day by going to Treadways?

21         A.      Yes, sir.

22         Q.      Approximately what time did you arrive

23   at Treadways?

24         A.      Eight, 8:05, something like that.

25         Q.      When you arrive at Treadways, where

 1   was -- was there an office or where did you go?

 2          A.     I went straight up to the counter where

 3   you would make your purchase and pay.  That's where

 4   everybody sits behind, Buck and Don and Sharon and

 5   Paul, Paul's mother at the time, Emily.

 6          Q.     Who was working -- do you know any of

 7   the last names of people that were working at

 8   Treadways on December 20th, 2010?

 9          A.     That would be Emily Hale, Paul Hale.

10          Q.     Is that Helton?

11          A.     Hale, H-A-L-E.

12          Q.     Hale, okay.  Emily Hale, Paul Hale?

13          A.     Uh-huh.

14          Q.     Who else?

15          A.     Sharon, but I don't know her last name.

16   I can't remember her last name.  She still works

17   there.

18          Q.     She still works there?

19          A.     She still works there.  Buc Treadway,

20   Don Treadway.

21          Q.     What did you say?

22          A.     Buc, B-U-C.

23          Q.     Buc Treadway?

24          A.     Yes.

25          Q.     Okay.  I'm sorry, Mr. Lester.

 1        A.      You're all right.  And Don Treadway.

 2   They're brothers.

 3        Q.      So you recall seeing each of these five

 4   people at Treadways when you arrived there around

 5   8 a.m. on December 20th, 2010.  Is that right?

 6        A.      Yes, sir.

 7        Q.      Okay.  What did you recall doing after

 8   you got to Treadways that morning?

 9        A.      Inquired with Paul, what he had for me

10   to do that day.  Told him that I had doctor's

11   appointment, had to take Amanda to Dr. Warren's and

12   that I would work around his schedule what he had for

13   me to do.  He said he would call me back and

14   establish what they had done that day.

15              And at that time, Sharon gave me a card,

16   and the lady that lives down the street, Dorothy

17   Paterson, she had gave me a car and wanted it removed

18   from her property before she got back from Washington

19   on the Christmas holiday.

20        Q.      Let me try to break this down.  Sharon

21   gave you some sort of card when you were at

22   Treadways?

23        A.      Uh-huh.

24        Q.      Is that a yes?

25        A.      Yes.

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018

Page 25

```
 1          Q.     And what was on that card?

 2          A.     It was just a Christmas card, and

 3    Dorothy said you've been asking about this car

 4    forever.  I'm giving it to you.  Have it out of my

 5    driveway when I come home -- when I return home from

 6    Washington.

 7          Q.     So, what did you do after you received

 8    the card from Sharon and Dorothy?

 9          A.     I went down to Dorothy's house, which

10    she lives right before you get to North Central

11    School on Main Street.

12          Q.     Is this in Barbourville?

13          A.     Yes, it's in Barbourville.

14          Q.     Is she still alive, Dorothy?

15          A.     Yes.  As far as I know.

16          Q.     Her last name is Paterson, you said?

17          A.     Yes.  I went down there and pulled in

18    the driveway, because the car had sat there forever

19    but it had rotted down.  I called Jay Gregory's

20    Towing and told him I had a car I wanted moved.  He

21    said he would be right over.

22                 He came and said, Where do you want this

23    took?  I said, I want you to take it to Louis's Scrap

24    Metal.  He said, I can't do that because if I did

25    that, people would keep me busy all day and I'd lose
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                    Page 26

 1   business from the other customers.  He said, I will

 2   buy it from you.

 3                I asked him what would he give.  I think

 4   the said $150, $175.  I said, You can have it.  He

 5   said, Do you have a title?  I said, No, but I will

 6   write you a receipt.

 7                I wrote him a receipt for the car, dated

 8   it for the day and the price.  I signed it.  He

 9   signed it.

10        Q.     So, Mr. Lester, is it your testimony

11   that there is some sort of receipt that would --

12        A.     Yes.

13        Q.     -- exist for the transfer of the car

14   from yourself to Mr. Jay Gregory on December 20th,

15   2010?

16        A.     Yes, there is.

17        Q.     Okay.  Will you take steps after this

18   deposition to find that receipt and provide a copy to

19   the parties?

20        A.     Yes, I will.

21        Q.     Now, you said that you called Jay

22   Gregory.  Is that right?

23        A.     Yes, sir.

24        Q.     What -- did Jay -- what did Jay Gregory,

25   what was his business back in December of 2010?

1      A.      He does towing.  He tows cars.  Still

2  does.  Got a little junkyard out there on Route 11

3  going towards Manchester.

4      Q.      Okay.  And were you -- do you recall

5  what your cell phone number was back in December of

6  2010?

7      A.      I had a phone that was actually Scott

8  Mills' girlfriend.  When she left, he gave me the

9  phone.  I just have to pay the bill until the

10  contract was up.  622-1212 or 1222.  I can't remember

11  exactly.

12      Q.      Okay.  So you don't recall the exact

13  number?

14      A.      No, sir, I don't.

15      Q.      Okay.  Were you using that phone that

16  was formerly possessed by Scott Mills' girlfriend to

17  call Jay Gregory on December 20, 2010?

18      A.      Yes, I was.

19      Q.      Now, after you sold this vehicle to

20  Mr. Gregory, what did you do next?

21      A.      I left Barbourville when he paid me and

22  I went to Topaz Court where Amanda Hoskins lived and

23  checked on her.

24      Q.      Do you know who she was living with on

25  Topaz Court?

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                Page 28

```
 1          A.      Her mother.

 2          Q.      What's her mother's name?

 3          A.      Linda Taylor.

 4          Q.      Now, do you recall approximately what

 5    time you would have left Dorothy Paterson's residence

 6    and gone over to Topaz Court?

 7          A.      I got there at Topaz Court around 9:30.

 8          Q.      Is that in the morning or evening?

 9          A.      Morning.

10          Q.      When you -- after you arrived over at

11    Ms. Hoskins' residence at around approximately

12    9:30 a.m. on December 20th, 2010, did you ever come

13    in contact with any other people at the residence

14    that day?

15          A.      Only Jerry Wayne.

16          Q.      And were any of Ms. Hoskins' children at

17    the home?

18          A.      Yes.  Landon and Lexi.

19          Q.      So when you arrived at the Topaz Court

20    residence around 9:30 a.m., you came into contact

21    with four people?

22          A.      Yes.

23          Q.      Amanda Hoskins, Jerry Wayne, Lexi and

24    Landon.  Is that right?

25                  MR. WRIGHT:  Object to the form.
```

```
 1          A.      Uh-huh.

 2          Q.      Is that a yes?

 3          A.      Yes, sir.

 4          Q.      What did you do after arriving over at

 5   Topaz Court?

 6          A.      I went back to the bedroom where she was

 7   at.  She was laying in bed.  She was in a cold sweat,

 8   chilling, almost had diarrhea.  She was going through

 9   withdrawals, and I talked to her about her doctor

10   appointment with Dr. Warren.

11          Q.      Did you have to get permission from your

12   work to leave in the morning of December 20th, 2010?

13          A.      No.  I just told him what I had to do

14   that morning.

15          Q.      What did you -- who did you talk to at

16   work about what you had to do?

17          A.      I told Sharon.  I told Paul.

18          Q.      What did you tell them?

19          A.      That I had a doctor's appointment that

20   morning.  I had to take Amanda to Dr. Warren, and I

21   would call them back after the appointment in the

22   city.  Have the arrangements made of where he needed

23   me to go and what he needed me to do.

24          Q.      And so did you know prior to

25   December 20th that you were going to take Ms. Hoskins
```

1    to the doctor that day?

2         A.     Yes.  I took her every Monday for

3    several weeks because she went to Dr. Warren's office

4    every Monday and got seven Suboxone.

5         Q.     All right.  So you're in the house with

6    Amanda and she is very sick.  What happens next?

7         A.     I confront her about she has to go to

8    the doctor.  She says she can't because she hadn't

9    had no medicine, no narcotics.  So I made a phone

10   call and I went and got her two Roxicet 30s and

11   brought them back to the house.

12        Q.     Where did you get the Roxicet?

13        A.     Cleo Brown.

14        Q.     Okay.  Did anybody go with you?

15        A.     No.

16        Q.     All right.  How long did it take you to

17   go to Cleo's house and then come back to Topaz Court?

18        A.     Thirty minutes.

19        Q.     When you came back to Topaz Court, what

20   did you do next?

21        A.     Took the medicine to her and gave her.

22   I got Lex and went in the living room and sat down

23   and played with her.

24        Q.     Who was at the house with you at that

25   time other than Amanda Hoskins?

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                    Page 31

```
 1        A.     Just the kids and Jerry Wayne.

 2        Q.     Okay.  At some point, did you and

 3   Ms. Hoskins leave the Topaz Court residence on

 4   December 20, 2010?

 5        A.     Uh-huh.  We left around 10:30.  It was

 6   about the time she got her fix done and got dressed

 7   and got ready and we went to Dr. Warren's office.

 8        Q.     And who went with you to Dr. Warren's

 9   office?

10        A.     Me and her and Lexi.

11        Q.     And how far was Dr. Warren's office from

12   the Topaz Court address?

13        A.     Two miles.

14        Q.     Do you recall -- did you arrive -- do

15   you recall arriving at Dr. Warren's office before or

16   after noon on December 20th, 2010?

17        A.     It was before, but when we got

18   registered, they said they couldn't see us at that

19   time.  There was things going on.  That they -- we

20   had to sit there.  We weren't going in on our regular

21   time.  That they would call us in when they got the

22   situation took care of.

23        Q.     And who was it that was with you at

24   Dr. Warren's office with Amanda?

25        A.     Me, Amanda and Lexi.
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.

William Lester on 10/09/2018                                Page 32

```
 1        Q.      And approximately how long do you recall

 2   waiting at Dr. Warren's office with Ms. Hoskins and

 3   Lexi?

 4        A.      It was until that afternoon.  Until

 5   after 12, around 12, 12:15, something like that.

 6        Q.      At some point, did Dr. Warren see Ms.

 7   Hoskins?

 8        A.      Yes, but it was later than the scheduled

 9   appointment.

10        Q.      And did Ms. Hoskins receive a

11   prescription from Dr. Warren that day?

12        A.      For the seven Suboxone.

13        Q.      Were you and Ms. Hoskins dating in

14   December of 2010?

15        A.      We seeing each other, yeah.

16        Q.      And by that time, is it fair to say that

17   you had known Ms. Hoskins for approximately two

18   years?

19        A.      Oh, yeah.  Yeah.

20        Q.      I know you testified earlier that you

21   continued being friends with Ms. Hoskins.

22        A.      Yes.  I have seen her since 2006, but

23   it's just off and on.

24        Q.      Since 2006, have you ever learned any

25   information that would indicate that Ms. Hoskins was
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                    Page 33

```
 1    having an affair with Dr. Warren?

 2         A.    No.

 3         Q.    Since 2006, have you learned any

 4    information that would indicate that Ms. Hoskins had

 5    a romantic relationship with Dr. Warren?

 6         A.    No.  Never heard that.

 7         Q.    Since 2006, have you learned any

 8    information that would indicate that Ms. Hoskins was

 9    involved in anything other than a patient/doctor

10    relationship with Dr. Warren?

11         A.    No.

12         Q.    After Ms. Hoskins received her

13    prescription from Dr. Warren --

14         A.    Uh-huh.

15         Q.    -- where did y'all go next?

16         A.    Took Lexi home back to Topaz Court and

17    dropped her off.  I went to Central Finance, made one

18    of my payments.  Left Barbourville, went to Pineville

19    to Walgreens, dropped off the prescription.

20              While they was filling it, rode down the

21    hill, went through McDonald's drive-thru, came back

22    up, got the prescription, went back to Moores Creek

23    to my house, arrived there around 2 o'clock.

24         Q.    And was Ms. Hoskins and Lexi, were they

25    both with you during that entire time period?
```

1      A.     Lexi wasn't.  After the doctor's

2   appointment, we dropped her back home.

3      Q.     Okay.  So after the doctor's appoint-

4   ment --

5      A.     To Jerry Wayne.

6      Q.     -- you and Ms. Hoskins dropped Lexi off

7   over at the Topaz Court address?

8      A.     Yes.  To Jerry Wayne.

9      Q.     Did you see Jerry Wayne when you dropped

10  her off?

11     A.     Yeah.  He came to the door and got her.

12     Q.     Okay.  Then after dropping Lexi off, is

13  that when you and Ms. Hoskins went to get the

14  prescription filled and do the other stuff you just

15  testified to?

16     A.     I went first and made the payment to

17  Central Finance.

18     Q.     Okay.

19     A.     Then I went to Pineville, Walgreens,

20  dropped off the prescription.  While they told me how

21  long it would take, we hadn't ate no dinner, so we

22  went down and went through McDonald's drive-thru, got

23  some food, come back up, picked up the prescription

24  at Walgreens and come right back to Moores Creek to

25  my trailer.

1      Q.    Okay.  And at some point when you and

2    Ms. Hoskins were at your trailer, is that when you

3    learned that Ms. Mills had passed away?

4      A.    That evening at five, yes.

5      Q.    Okay.  And I believe you testified a few

6    moments ago -- did you testify that you believe that

7    you and Ms. Hoskins returned to the trailer sometime

8    around 2 p.m.

9           MR. WRIGHT:  Object to form.

10     A.    Around two, yeah.

11     Q.    At any time between 2 p.m. and 5 p.m.

12   when you ultimately found out that Ms. Mills passed

13   away, at any time in that three-hour time period, did

14   you go get any pills with Ms. Hoskins?

15     A.    Yes.  I took her to Bob Smith's.

16     Q.    What happened?

17     A.    And bought some Roxicets.

18     Q.    What happened when you -- why did you

19   take Ms. Hoskins to Bob Smith's house in that time

20   period?

21     A.    I let her ride with me to go up there,

22   and on the way up there we had to stop in the road in

23   front of James Allen and Michael Simpson's house and

24   pull over to let a log truck and a trailer, pulling a

25   trailer with apprentice loader on the back to get

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                    Page 36

```
 1   around us.

 2            At that time, Mr. Helton came to the

 3   truck and I rolled the windows down and said that

 4   they was going to Florida and he would call me when

 5   he got back and that he would sell me pills cheaper

 6   than Bob Smith.

 7       Q.    Did you see -- when you pulled over,

 8   were you close to Bob Smith's house?

 9       A.    I was probably a mile below there, or

10   above it.

11       Q.    When Mr. Helton walked up to your

12   vehicle, was Mike Simpson with him?

13       A.    Mike was standing in the door of his

14   house drying his hair.

15       Q.    Could you see him at that time?

16       A.    Yeah.

17       Q.    From viewing Mr. Simpson, what did you

18   think?  Why did you think he was drying his hair?

19            MR. WRIGHT:  Object to form.

20       A.    I figured he was getting ready to go on

21   their trip.  I know everybody up there that sold

22   drugs run to Florida to the pain clinics and got

23   their drugs.

24       Q.    After you saw -- after Mr. Helton made

25   these comments to you, what did you do next?
```

**AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.**
William Lester on 10/09/2018                                    Page 37

 1          A.      When the log truck and the trailer got

 2     by me, I went on to Bob's and bought the pills and we

 3     came back home.

 4          Q.      And at some point that evening around

 5     5 o'clock, is that when you got the phone call?

 6          A.      That's when Michelle called me, yeah.

 7          Q.      What kind of vehicle were you driving on

 8     December 20th, 2010?

 9          A.      It was older model Ford Ranger, extended

10     cab, two-wheel drive truck with Florida plate on it,

11     silver color.

12          Q.      Silver?

13          A.      Uh-huh.

14          Q.      And in December of 2010, did you own any

15     other vehicles at that time?

16          A.      I owned a '99 Chevrolet Camaro.  It was

17     black.  Owned a '88 Silverado Chevrolet truck with a

18     camper on it.  It was red.

19          Q.      Was the '99 Camaro operable in

20     December 2010?

21          A.      No.  It was ripped down.

22          Q.      What was wrong with it at that time?

23          A.      Fuel pump was out.

24          Q.      And was the 1988 truck operable at that

25     time?

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                              Page 38

```
 1        A.      No.   Transmission was out of it.

 2        Q.      And who -- did you own the Ford Ranger

 3   that you were driving?

 4        A.      No.   It was provided to me by Larry

 5   Gregory from Orlando, Florida.  Because he owned a

 6   house in Phillip Branch Road and he had came in here

 7   and built his house and I met him through Treadways.

 8   I plumbed it, wired it, finished it, and I became

 9   caretaker of the place.

10                So he sent me -- the truck, brought it

11   to me so that I could, like, if he needed mulch

12   brought or he needed things done or moved or bought

13   things.  He bought things at Lowe's.  He'd contact me

14   to go pick it up.  I'd take the truck down there and

15   get it and they'd load it and I'd bring it back and

16   put it in the house.

17        Q.      Now, I think around 5 o'clock you got

18   the phone call that informed you that Catherine Mills

19   was found dead; right?

20        A.      Yes, sir.

21        Q.      What happened after you got that phone

22   call?

23        A.      I went and got Michelle and came back to

24   my house with Michelle's two kids.  I left the two

25   kids with Amanda, and I took Michelle up to
```

 1  Catherine's house.

 2       Q.     And how long did you -- were you at

 3  Catherine's house with Michelle?

 4       A.     Five 'til 8 o'clock.  Would be three

 5  hours.

 6       Q.     Do you remember who else in the family

 7  lived at the house at that time?

 8       A.     At my house?

 9       Q.     No.  At Catherine's house.

10       A.     Jennifer and Jesse was up there.  We all

11  parked across the road in front of her house in the

12  lady's yard, Sudie Mae and Carson Trent's place and

13  Jennifer had her kids in the car, so when they all

14  went over there, I wouldn't go.  I went over and sat

15  in the car with Jennifer's kids.

16       Q.     Can you describe the conversation that

17  the family was having during that time period?

18            MR. WRIGHT:  Object to form.

19       A.     They never talked to me.  I seen Diane

20  pull up from work.  Some lady brought her and got out

21  in front of the mailbox.  My girls was over there

22  with her.  I never did see Catherine's boy Steve,

23  Diane's brother.

24            I never seen -- most of them was just

25  neighbors.  They all just stopped in there.  Some of

```
 1   them come over and talked to me.  Sudie Mae did and
 2   Carson.  Wesley Roark came over and spoke to me for a
 3   minute.
 4        Q.    How were you -- what were you feeling at
 5   that time?
 6        A.    I was just in shock and hurt because I
 7   didn't really know what had happened for sure, you
 8   know.
 9        Q.    Now, I believe you said you stayed until
10   approximately 8 p.m.  Is that right?
11        A.    Yes, uh-huh.
12        Q.    What happened after 8 p.m.?  What did
13   you do then?
14        A.    I went back to my house, picked up
15   Michelle's two kids and took her and her two kids
16   home.  Came back over to my trailer, got Amanda and
17   we went back to Topaz Court to her mom's house and
18   ate.
19        Q.    Do you recall what time --
20              (Note:  Beeping noise.)
21              MR. WRIGHT:  Nothing exploded.
22   BY MR. SLOSAR:
23        Q.    When you got back to Topaz Court with
24   Amanda Hoskins in the evening of December 20, 2010,
25   did you go inside the house?
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                    Page 41

```
 1        A.     Yeah.  We went in and ate.  I sat down
 2   and there was a -- the living room.  It was like a
 3   duplex.  I sat down on the step.  They went out the
 4   kitchen into the living room, sat there and ate.
 5        Q.     And do you recall who you ate with?
 6        A.     Me and her, Amanda was there, Jerry
 7   Wayne, the kids.
 8        Q.     At some point, did you leave the house
 9   after --
10        A.     11 o'clock.
11        Q.     What did you do after you left at 11?
12        A.     Come back home and went to bed.
13        Q.     Mr. Lester, do you know a person by the
14   name of Mike Simpson?
15        A.     Uh-huh.
16        Q.     Is that a yes?
17        A.     Yes, sir.  Yes, sir.
18        Q.     And how long have you known Mr. Simpson
19   for?
20        A.     Well, where I was born and raised in
21   Fourmile, his mom and dad lived about a half mile
22   down the road.  I knew him since he was born.  But he
23   got in trouble after I got married and left there.
24   He got caught selling drugs next to Bell County
25   school, I think.  He got sent away.
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.

William Lester on 10/09/2018                          Page 42

```
 1              I never seen him probably for 18 years,

 2    and one day I went over to Escoes, pulled in to get

 3    gas and he was in the store there.  And we caught up

 4    on old talk and I found out he moved up above me

 5    probably a mile in the Ed Miller home.

 6        Q.    Did -- back in 2010, did you ever

 7    purchase pills from Mr. Simpson for Ms. Hoskins to

 8    use?

 9        A.    Yes.

10        Q.    Now, I'm going to ask you some questions

11    about December 21, 2010, the day after Ms. Mills was

12    found dead.  Okay?

13        A.    Yeah.

14        Q.    Did you happen to see Mr. Simpson -- or

15    actually, let me withdraw that question.

16              The day after Ms. Mills was found dead,

17    on December 21, 2010 --

18        A.    Right.

19        Q.    -- did you happen to purchase pills from

20    anybody that day?

21        A.    I bought some pills from Bob Smith that

22    morning.

23        Q.    And was anyone with you when you went to

24    Mr. Smith's house that morning?

25        A.    No.
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.

William Lester on 10/09/2018                                        Page 43

```
 1        Q.     And where was Mr. Smith generally living
 2    back then?
 3        A.     He lived in the Moores Creek on the Knox
 4    and Bell County line.
 5        Q.     When you went over the Mr. Smith's house
 6    on December 21, 2010, did you go inside?
 7        A.     Oh, yeah.  Yeah.
 8        Q.     What happened after you went inside?
 9        A.     I went inside, sitting at the kitchen
10    table drinking a cup of coffee.  I went over and sat
11    down, me and him started talking.  Somebody knocked
12    on the door.  Told them to come in.  This guy came
13    in.
14        Q.     Who knocked on the door?
15        A.     Mr. Sizemore.  He was the guy that got
16    convicted of the Bobby Wiggins' murder.
17        Q.     Was this James Otis Sizemore?
18        A.     Uh-huh.
19        Q.     Yes?
20        A.     Yes.  I can't think of his name.  I know
21    Sizemore.  I don't know his first name.
22        Q.     Okay.  But the Sizemore that came over
23    the house was the same one who was later convicted of
24    killing Bobby Wiggins?
25        A.     Yes.
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                              Page 44

```
 1         Q.      Okay.  What happened when Mr. Sizemore
 2   came over?
 3         A.      As he came through the living room
 4   walking in the kitchen, he asked Bobbie, Did you hear
 5   about the lady up on the creek and what had happened.
 6   And Bob looked at me and winked and said, No, what
 7   happened?  And he said, She was found up there
 8   murdered and robbed, but they left this amount of
 9   money, it was 500 and some dollars.  He even spoke to
10   change that was laying on the kitchen table.
11              And Bobby said, Well, if they robbed
12   her, they left some.  And that was all that was said.
13   He gave him what he wanted and he left.  And he
14   looked at me and said, Do you want to call your
15   daughter and tell her to call the law.  He said, How
16   did he know that?
17         Q.      What did -- how did -- did Mr. Sizemore
18   pay Bob Smith in your presence --
19         A.      Uh-huh.
20         Q.      -- for the drugs?
21         A.      Uh-huh.
22         Q.      Is that a yes?
23         A.      Yes, sir.
24         Q.      Okay, sorry.  It's easier for the
25   transcript.
```

**AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.**
William Lester on 10/09/2018                                    Page 45

```
 1          A.      I'm sorry.

 2          Q.      No, no, you're good.

 3                  And how -- what form of payment did

 4   Mr. Sizemore use when he bought the drugs?

 5          A.      He had cash.  It was just wadded up.

 6   Unfolded it out on the table and gave him back some

 7   change.  He didn't have much coming.

 8          Q.      Did you see how much money Mr. Sizemore

 9   had on him that day?

10          A.      No.  He got it out in his fist out of

11   his pocket.

12          Q.      Earlier you described Mr. Sizemore

13   giving a wad of cash.  Is that right?

14                  MR. WRIGHT:  Object to the form.

15          A.      It was in his hand.  Yes.  It was in his

16   hand.  I don't know how much.

17          Q.      Okay.  How long did Mr. Sizemore stay

18   over at Mr. Smith's house when you were there?

19          A.      Fifteen minutes, the most.

20          Q.      Did Mr. Sizemore say how he had learned

21   the information that he got about Catherine Mills?

22          A.      No.

23          Q.      When Mr. Sizemore revealed that

24   Catherine Mills had been killed and that -- and

25   robbed and that a particular amount of money was
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018

1   left, how did that make you feel?

2          A.     Well, I was shocked because in my mind,

3   I thought if you had robbed somebody, you would take

4   everything, if you went far enough to kill them.  But

5   also I was -- already heard about what had happened,

6   but I'm thinking how do you know that this exact --

7   this amount of money, how would you know?

8          Q.     Did you -- at that moment, did you

9   suspect that Mr. Sizemore may have been involved in

10  killing Catherine Mills?

11         A.     I suspected he was involved or informed

12  by whoever had done it.

13         Q.     To this day, do you believe that

14  Mr. Sizemore could be involved in the death of

15  Catherine Mills?

16                MR. WRIGHT:  Object to the form.

17         Q.     You can answer.

18         A.     Yes, I do.

19         Q.     And is part of the basis of that belief

20  the statements that Mr. Sizemore made in your

21  presence on December 21, 2010?

22                MR. WRIGHT:  Object to form.

23         A.     Repeat it.  I couldn't hear you.

24         Q.     Is the basis for your belief the

25  statements that Mr. Sizemore made in your presence on

1    December 21, 2010?

2         A.    Yes.  I believe because when I called my

3    daughter and told her the dollar amount, she said

4    that's exactly what was found on her kitchen table.

5    Who told you this?  I told her.  You need to call

6    Mr. York and tell him.

7         Q.    Did your daughter ever tell you whether

8    she gave that information to Mr. York or not?

9         A.    No.  She never did tell me.  But I did.

10        Q.    We're going to get there.

11             Now, Mr. Lester, prior to Ms. Mills

12    passing away, did you ever make comments to anybody

13    about taking her money?

14        A.    Yes.  Five people.

15        Q.    And what -- generally, what comments do

16    you recall making?

17        A.    We was talking about money flow and hard

18    times and I said, Well, my daughter told me she sold

19    the timber.  She had 15 or 25,000.  I said, She's got

20    an outdoor toilet, and I was thinking about with

21    times get harder, when she goes in the toilet, I

22    would just tie the door shut and go in and take the

23    money.

24        Q.    Do you remember having a conversation

25    with a person by the name of Wesley Roark?

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018

Page 48

```
 1        A.     Yes, I do.

 2        Q.     Okay and --

 3        A.     Messer's Market.

 4        Q.     When approximately do you recall having

 5    that conversation with Mr. Roark?

 6        A.     It was probably a week before this

 7    happened.

 8        Q.     Okay.  And in the conversation with

 9    Mr. Roark, how did Catherine Mills come up?

10        A.     I had been fixing rental property for

11    Paul Hale.  They had a real cold spell come through,

12    lot of pipes froze and busted.  I went in there, had

13    mud and stuff all over here.  I stopped and put gas

14    on the truck.  I went in there and got a gallon of

15    milk.  I was getting Amanda a carton of pop and pack

16    of cigarettes.

17               He looked at me and he said, Do I look

18    grub?  I said, Yeah and I'll look this way tomorrow.

19    I said, What I made today, when I pay for this, is

20    gone.

21               They was sitting him and Timmy, his

22    brother, in voice range, was sitting on a big display

23    of pop that is for sale, Pepsi products, and I walked

24    over there to him and he said -- his brother said,

25    Well, they take in 50, $60,000 here on the poker
```

```
 1    machines.  You're a short guy.  We'll put you up in

 2    the roof.  You can take the money and we'll get you

 3    down.

 4                   I said, No.  Before I will do that, I

 5    just let my mother-in-law go to the restroom and I'll

 6    tie the door shut on the toilet and I'd go in and

 7    take her money.

 8                   They said she had 15 or 25,000 out of

 9    that timber, and there was no way they had that much.

10         Q.    Did you ever make any comments to

11    anybody indicating that you had hurt Catherine Mills?

12         A.    Hurt her?

13         Q.    Yes.

14         A.    No, sir.

15         Q.    Have you ever made any comments to

16    anybody indicating that you would kill Catherine

17    Mills?

18         A.    No, sir.

19         Q.    Let's go off the record real quick.

20               VIDEOGRAPHER:  Going off the record at

21    camera time 10:08.

22               (A discussion was held off the record.)

23               VIDEOGRAPHER:  Going back on the record

24    at camera time 10:09.

25         Q.    Sorry about that, Mr. Lester.
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                    Page 50

```
 1        A.     That's okay.

 2        Q.     When you made this comment to Mr. Roark,

 3   were you being serious?

 4        A.     No.  I was joking.

 5        Q.     Okay.

 6        A.     I've known him 30-plus years.

 7        Q.     After you made the comment, did Mr.

 8   Roark or yourself laugh at all?

 9        A.     Yeah.  We all laughed.  All four of us.

10        Q.     Was it understood that y'all were joking

11   around?

12               MR. WRIGHT:  Object to the form.

13        A.     Yes.

14        Q.     And at the time in December of 2010,

15   were you financially stable?

16               MR. WRIGHT:  Object to the form.

17        A.     Financially stable?  Yeah.  I was just

18   working job to job.

19        Q.     Did you have your own money during that

20   time period?

21        A.     Yes, I did.

22        Q.     Okay.  Were you desperate for money?

23               MR. WRIGHT:  Object to the form.

24        A.     No.

25        Q.     Were you -- in December of 2010, did you
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                              Page 51

```
 1    continue to have love for Catherine Mills?

 2         A.     Yes.  Yes.

 3         Q.     Did you care about Catherine Mills in

 4    December of 2010?

 5         A.     Yes.

 6         Q.     In December of 2010, did you treat

 7    Catherine like your mother?

 8                MR. WRIGHT:  Object to the form.

 9         A.     Yes.

10         Q.     And in December of 2010, was Ms. Mills a

11    good grandmother to your grandchildren?

12         A.     Yes, she was.

13         Q.     Mr. Lester, did you have anything to do

14    with Ms. Mills' death?

15         A.     No, sir.

16         Q.     Do you have any reason to believe that

17    Ms. Hoskins was in any way involved with Ms. Mills'

18    death?

19         A.     No.  She never even knew where she

20    lived.

21         Q.     Do you have any reason to believe that

22    Jonathan Taylor was involved with Ms. Mills' death?

23         A.     No.  He never knew.

24         Q.     Now, in December of 2010, did you live

25    in close proximity to Scott or Donna Mills?
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.

William Lester on 10/09/2018                                     Page 52

```
 1        A.      I lived close to Donna.

 2        Q.      Okay.  How close to Donna Mills did you

 3   live in December 2010?

 4        A.      Thousand feet.

 5        Q.      So she lived --

 6        A.      Across the street from me at that time.

 7        Q.      And did you know -- did you happen to

 8   know Donna's daughter?

 9        A.      Yes.

10        Q.      What was her name?

11        A.      Kayla.

12        Q.      Okay.  In December of 2010, were you

13   familiar with a blue vehicle that was owned by Donna

14   Mills?

15        A.      Kayla's little car, yes.

16        Q.      Yeah.  You were familiar with that blue

17   vehicle back in December 2010?

18        A.      Yes.  It was broke down.

19        Q.      How do you know that that vehicle was

20   broke down in 2010?

21        A.      Because I went and picked her and

22   Jonathan up in front of the guy that used to be the

23   jailor in Knox County, Larry Hammond's old house,

24   they pulled over in front of that mailbox.  I went

25   down there and got them.
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                    Page 53

1        Q.     And --

2        A.     It was very cold that day.

3        Q.     After you went and got them, what

4    happened to the vehicle?

5        A.     It was brought up to Donna's house and

6    put behind her garage and blocked in with John

7    Valdez's camper.

8        Q.     At the time that Ms. Mills was found

9    dead in December of 2010, was that blue vehicle still

10   inoperable and behind Mr. Valdez's camper?

11              MR. WRIGHT:  Object to the form.

12       A.     Yes, it was inoperable.  It was broke

13   down, yes.

14       Q.     Were you able to see that every time you

15   left your home?

16       A.     Yes.

17       Q.     When did you first learn that the police

18   were investigating you for the death of Catherine

19   Mills?

20       A.     When Jason York showed up in my

21   driveway.

22       Q.     And approximately what month or year was

23   it that Mr. York showed up in your driveway?

24       A.     It was either late January or early

25   February in 2011.

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                    Page 54

```
1         Q.     What do you recall happening after

2    Detective York showed up in the driveway?

3         A.     I was trying to get the Camaro running.

4    I had the hood up.  I heard the gravel turning in my

5    driveway and I raised up -- I raised up under the

6    hood.  I looked and I saw it was him.

7               He gets out of the car.  He's got a big

8    camera, and he told me to face him.  He told me to

9    turn right.  He told me to turn left.  He told me to

10   put my hood up on my coat.  Turn right, turn left.

11              He told me that was the same coat that

12   was spotted on the guy wearing -- that had been at

13   the murder scene.

14        Q.     What did you say?

15        A.     I told him, I said, This coat was given

16   to me by my mom and sister for Christmas, and I'm

17   sure I've not got the only coat that Walmart sells.

18        Q.     So when Detective York accused you of

19   using that coat in December of 2010, is it fair to

20   say that you told him that you had actually received

21   that coat on Christmas after Ms. Mills was found

22   dead?

23              MR. WRIGHT:  Object to the form.

24        A.     I opened it, yes, Christmas morning.

25        Q.     And how did Detective York respond when
```

```
 1    you informed him that you did not even have the coat

 2    on December 20th, 2010?

 3          A.    He told me that I had been running my

 4    mouth over at Escoes.  I told him if you acted on

 5    everything that come out of Escoes Market, you'd have

 6    to bring a bus up on the creek and round everybody

 7    up.

 8          Q.    And how -- you said that Mr. York or

 9    Detective York was having you face different

10    positions.  Is that right?

11          A.    Yes, sir.

12          Q.    Did he take any photographs of you that

13    day?

14          A.    He snapped the camera.

15          Q.    Okay.  And was it a cell phone camera or

16    what was kind of --

17          A.    Camera around his neck.  Had -- you hold

18    it in your hand, big square.

19          Q.    Did he tell you what he was going to do

20    with those photographs?

21          A.    No.

22          Q.    How long did the conversation between

23    yourself and Detective York last?

24          A.    Five minutes, at the most.

25          Q.    When was the next time you saw Detective
```

```
 1   York in relation to this case?

 2        A.      David Hoskins' office.

 3        Q.      And was that sometime in 2011?

 4        A.      That's in 2011, yeah.

 5        Q.      Okay.  And how long did that

 6   conversation last with Detective York in your

 7   attorney's office?

 8        A.      At that time, David was not my attorney

 9   but he was a friend of my sisters's people, and he

10   said that we would meet and he would meet for me with

11   Mr. York free.

12        Q.      Okay.

13        A.      And but the second time I had to meet

14   Mr. York, I had to pay him a thousand dollars.

15        Q.      At the first meeting, how long did that

16   last?

17        A.      Maybe an hour.

18        Q.      And in that meeting, was it recorded, to

19   your knowledge?

20        A.      Uh-huh.  He picked up -- pulled out the

21   recorder, stated his name, where he was at and who he

22   was taking statements from and laid it on the table.

23        Q.      Did Detective York ever touch the

24   recorder at any time during the conversation before

25   he left?
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                    Page 57

```
 1                    MR. WRIGHT:  Object to form.

 2         A.      One time he said he's going to get up

 3    and leave the room, and I could talk to David and he

 4    come back.  He reached over and cut it out.

 5         Q.      At any point in that conversation, did

 6    Detective York threaten you?

 7         A.      He smacked the table with both hands

 8    and cussed and said if he had his way and I didn't

 9    have a lawyer, he would done have me put in jail for

10    murder.

11         Q.      Were you scared when he threatened you?

12                    MR. WRIGHT:  Object.

13         A.      Little bit.

14         Q.      What were you scared of?

15         A.      Well, police have a better reputation

16    than just the main guy -- the walking the ground, and

17    I knew that his thoughts and ways would probably come

18    through before mine.

19         Q.      Were you scared that he was going to

20    charge you with murder?

21                    MR. WRIGHT:  Object to form.

22         A.      Yes.

23         Q.      And you said that Detective York -- did

24    he ever raise his voice at you during that meeting?

25         A.      Yes.  He got very loud and cussed me.
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                    Page 58

 1  Told me if he had his M-F'n way, he's have my A
 2  double S in jail for murder.
 3      Q.    He was swearing at you as well?
 4      A.    Uh-huh.
 5      Q.    Is that a yes?
 6      A.    Yes.
 7      Q.    And did you tell Mr. York all the
 8  knowledge that you had?
 9      A.    Yes.  I told him of the Sizemore, was
10  the first thing I actually told him.
11      Q.    So -- and what did you tell Detective
12  York in that meeting about Mr. Sizemore?
13      A.    I told him that I was at Bob Smith's.
14  Actually, I told him every drug dealer that I did
15  business with for her.  Even the ones in Bell County.
16          I told him I was there to get pills and
17  Mr. Sizemore walked in and asked Bob, Did you hear
18  about the lady?  He called off the dollar amount of
19  money and the change.  And then when I got back in
20  phone service, I called my daughter Jennifer.  She
21  said that was the exact amount, and I told her to
22  call him.
23      Q.    What did Detective York tell you after
24  you gave him this information about Mr. Sizemore?
25      A.    He didn't say nothing.

1      Q.      How did that first meeting end between

2   yourself, Detective York and Mr. Hoskins?

3      A.      Well, it was peaceful.  And I told him

4   that if he had any more to say, when we met again, he

5   better get ready to file charges because that was my

6   last time.

7      Q.      Were you forthcoming with Detective York

8   during that first meeting about the comments you had

9   made --

10     A.      Uh-huh.

11     Q.      -- about locking Catherine in the

12  outhouse?

13     A.      I told him the five people I said it in

14  front of.

15     Q.      And it was your belief that Detective

16  York was actually recording that first meeting.  Is

17  that right?

18     A.      Yes, sir.

19     Q.      To this day, have you ever heard any

20  recorded interview that was conducted by Detective

21  York?

22     A.      No.

23     Q.      Now, you met with Detective York a

24  second time.  Is that right?

25     A.      In David Hoskins' office, yes.

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.

William Lester on 10/09/2018                    Page 60

```
 1        Q.      Were any other officers present during
 2   the second meeting?
 3        A.      Neither time I met him.
 4        Q.      Both times you met with Detective York,
 5   it was yourself, Detective York and Mr. Hoskins.  Is
 6   that right?
 7        A.      Yes.
 8        Q.      And there was a third time where you
 9   were at your home and it was just yourself and
10   Detective York.  Is that right?
11        A.      Yes.
12        Q.      During this second interview by
13   Detective York, where do you recall that happening?
14        A.      Where?
15        Q.      Yes.
16        A.      In David's office.
17        Q.      And how long approximately did that one
18   last?
19        A.      Four or five minutes.
20        Q.      And during that interview, what do you
21   recall talking about with Detective York?
22        A.      We just went over actually the same
23   thing he asked me in the first one.
24        Q.      Do you recall whether there was a
25   recorder out for the second meeting?
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                    Page 61

```
 1        A.      Uh-huh.

 2        Q.      Is that yes?

 3        A.      Yes.

 4        Q.      Did Detective York ever touch the

 5   recorder at any point from the time he turned it on

 6   until the time the meeting ended?

 7                MR. WRIGHT:  Object to form.

 8        A.      Just when the meeting was over.

 9        Q.      Did Detective York threaten to charge

10   you with murder at all during that second meeting?

11        A.      Uh-huh.

12        Q.      Is that a yes?

13        A.      Yes, he did.

14        Q.      Did he raise his voice during the second

15   meeting?

16        A.      Yes.

17        Q.      At some point, Mr. Lester, were you

18   eventually charged with murder?

19        A.      May the 3rd, 19 -- wait, 2012.  I was in

20   Fayetteville University.  We was doing their heating

21   and air.  My sister called me and told me I had been

22   indicted.

23        Q.      And at that time, why were you out of

24   state?

25        A.      The job I have takes me all over the
```

**AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.**
William Lester on 10/09/2018                                      Page 62

 1   south.  I go from Arkansas all the way to Fort Bragg.

 2       Q.    Is that the same job you currently have

 3   today?

 4       A.    Same job I have now.  Only public job

 5   I've had.

 6       Q.    And, generally, when does your work

 7   schedule bring you back into the state each week?

 8       A.    Every Friday evening or Friday night.

 9       Q.    And then when do you leave Kentucky to

10   go to the south?

11       A.    Every Monday morning at 5 o'clock.

12   Sometimes four.  According to how far we're going.

13       Q.    So is it fair to say that in May of

14   2012, you were out of state for work and not because

15   you were running from any charges?

16       A.    I was out of state for work.  My company

17   has my records, the job sites I was on, motels where

18   I stayed.

19       Q.    And did you ultimately, after learning

20   that charges had been initiated against you, did you

21   come back to Kentucky?

22       A.    Came straight back that night.

23       Q.    What did you do when you came back that

24   night?

25       A.    I called David Hoskins, told him what

```
 1   had happened.  He was in Texas.  He told me he
 2   wouldn't be back from Texas until Wednesday.  He told
 3   me not to be out.  He didn't want me picked up until
 4   he got here.  Told me that he would take me and turn
 5   me in Wednesday morning to the police station and for
 6   me not to talk to anybody until he got here.
 7         Q.     And were you ultimately brought into
 8   jail?
 9         A.     Yes.  Wednesday morning David took me to
10   the city police station, turned myself in.  They
11   transported me over to the Knox County Jail, booked
12   me.
13         Q.     And you were booked into jail, what
14   happened next?
15         A.     I was just in jail for six months.  My
16   lawyer visited me a couple times.  His partner came
17   one time.  Mr. York came once and took my DNA.  That
18   was it.
19         Q.     Did you ultimately bond out?
20         A.     I bonded out October the 5th of 2012.
21         Q.     And at some point were the charges
22   against you ultimately dismissed?
23         A.     It was dismissed two years ago.
24   September -- mine was dismissed last because I was
25   the last one charged.
```

1     Q.     From the time that you were charged in

2  May of 2012 to the time that the charges were

3  dismissed last year, how did that change your life?

4     A.     Changed me completely.  It was my kids'

5  grandma.  They thought I killed her and I didn't.

6     Q.     You -- just take a moment.  We're gonna

7  get you a tissue.

8     A.     It's okay.  But I didn't.  But until I

9  showed them the films from everything that took place

10  during the indictment hearing, then they changed

11  their mind.

12     Q.     How did it make you feel when Detective

13  York repeatedly told you that he was going to get you

14  on this murder?

15     A.     It scared me.  I knew he would because

16  he was a cop and that it would happen.

17     Q.     And how did those murder charges for

18  those four years that they remained pending against

19  you, how did it affect your daily life?

20     A.     It changed everybody around.  People

21  wouldn't speak.  I'd have to go take people with me

22  to cash my check.  You couldn't never speak first

23  because they used to do it.  And found out fast when

24  I got out how many people hated me.  And I quit

25  speaking.  I quit going anywhere.  I just worked.

**AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.**
William Lester on 10/09/2018                                    Page 65

1        Q.      After the charges were dismissed, were

2   you able to try to rebuild the life that you had

3   lost?

4        A.      Oh, yeah.  God restored my life.  Some

5   of the people that wouldn't speak to me, they came

6   forward and apologized, told me that they were sorry.

7   I said, Wasn't no problem.

8              Until this happened, I believed the

9   news, everything I saw on the news, I heard on TV,

10  anything that was said.  I told them it was okay.

11             There are still a few that don't, but

12  it's all right.

13       Q.      And to this day, do you think of police

14  differently now than before you were charged with the

15  murder of Ms. Mills?

16             MR. WRIGHT:  Object to form.

17       A.      Well, I look at everything openly.  I've

18  had in-laws that were state troopers.  Good people,

19  you know.  I mean, I look at everything different.

20             If I read something in the paper, I wait

21  until both sides come out.  I don't gossip about it.

22  I don't put my opinion until everything is done.

23       Q.      If you are driving and see a police car,

24  does that result in a different -- in a fear now that

25  you didn't have before you were charged?

1              MR. WRIGHT:  Object to form.

2       A.     No.  I respect their job.  I know they

3   live in danger every day.  I'm around cops on my jobs

4   more than ever now, and I don't fear them.  I respect

5   their job.  I try to abide the law that they try to

6   enforce.

7       Q.     Does your family, you and your children,

8   your grandchildren, do you still want the police to

9   find out who is responsible for Catherine's death?

10      A.     Yes.

11      Q.     And to your knowledge, has anyone at the

12  Kentucky State Police or Knox County Sheriff's

13  Department or Barbourville Police Department reached

14  out to you or any of your children in the last two

15  years to indicate that there was any investigation

16  going on into the death of Catherine Mills?

17             MR. KELLEY:  Objection.

18             MR. WRIGHT:  Join.

19      A.     No.  Not to me.  If they said anything

20  to them, they probably wouldn't say nothing to me.

21      Q.     Take a short break.  Okay?

22      A.     All right.

23             VIDEOGRAPHER:  Going off the record at

24  camera time 10:28.

25             (Recess is taken.)

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                    Page 67

```
 1                    VIDEOGRAPHER:  Going back on the record
 2    at camera time 10:38.
 3    BY MR. SLOSAR:
 4         Q.    Mr. Lester, just one other area that I
 5    wanted to ask you about.  Do you know a person by the
 6    name of Mikey Brunner?
 7         A.    Yes.
 8         Q.    Okay.  And how do you know Mr. Brunner?
 9         A.    His mother, Angela Mills, was Scott
10    Mills' girlfriend at one time.
11         Q.    And after you were released on bond, did
12    you ever have any conversations with Ms. Angela
13    Mills?
14         A.    One.
15         Q.    Okay.
16         A.    Actually, I have had two.  Last one was
17    when my mother died last month.  She came to the
18    funeral.  Only second one.
19         Q.    I'm sorry about that.
20         A.    Thank you.
21         Q.    The first conversation that you had with
22    Angela Mills, did she talk at all about her son's
23    involvement in the investigation of Catherine Mills'
24    death?
25         A.    She said it had changed his life
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                    Page 68

```
 1  completely.  He was in torment.  Investigators coming

 2  to the scene.  Couldn't have a normal life.  I told

 3  her he was lucky.  Change places with me.

 4      Q.    How did she react to that?

 5      A.    She just looked at me.

 6      Q.    All right.  I don't think we have any

 7  further questions for you.  I know that defense

 8  counsel will.  Thank you for your time, Mr. Lester.

 9      A.    Thank you.

10            MR. WRIGHT:  Can we go off the record so

11  I can switch my paralegal?

12            VIDEOGRAPHER:  Going off the record at

13  camera time 10:40.

14            (A discussion was held off the record.)

15            VIDEOGRAPHER:  Going back on the record

16  at camera time 10:41.

17  EXAMINATION BY MR. WRIGHT:

18      Q.    All right, Mr. Lester.  We've been

19  introduced off the record.  My name is Derrick

20  Wright.  I represent Detective York.  I do have some

21  follow-up and then you had a lot of involvement in

22  the case.  Could be a lot of questions.

23            Whenever you need a break, let me know

24  and we'll take a break.

25      A.    Okay.
```

```
 1        Q.     If you need lunch, we can do that.  Just
 2   answer the question that is on the table and we'll
 3   accommodate your needs.  Okay?
 4        A.     All right.
 5        Q.     All right.  I'm going to jump around
 6   just a little bit because some of this was covered by
 7   Mr. Slosar.
 8               You mentioned that you lived at one time
 9   at the mouth of Moores Creek at Escoes?
10        A.     Yes, sir.
11        Q.     What time period was that?
12        A.     I lived there from 2004 until 2015.
13        Q.     And I believe there was a group of
14   trailers in that area?
15        A.     Yes, there was.
16        Q.     Did you own one?  Were you renting?
17        A.     I owned my trailer but not the land.
18        Q.     Okay.  I believe currently that trailers
19   are no longer there.  Is that right?
20        A.     Just my landlord's son.  He gave it all
21   to him and we all had to move, and he brought in a
22   modular home and put it there.
23        Q.     Okay.  Was that in 2015?
24        A.     It was in '15, yeah.
25        Q.     And I believe you said now you live on
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                    Page 70

```
 1    farther back Moores Creek Road?

 2         A.    Yes.  Another two miles.

 3         Q.    Have you lived in that same place from

 4    2015 to present?

 5         A.    Yes.  I bought it.

 6         Q.    You mentioned you work out of state a

 7    lot?

 8         A.    Yes, sir.

 9         Q.    Do you have any plans of moving out of

10    state in the future?

11         A.    No, sir.

12         Q.    So you'd be available to testify at

13    trial?

14         A.    I'd have to have a notice.

15         Q.    Sure.  You'd get a subpoena, but

16    otherwise, you live in Kentucky.  You maintain your

17    residence there?

18         A.    Yes.

19         Q.    Okay.  And what was the address of that

20    again?

21         A.    1654 Moores Creek Road.

22         Q.    And you indicated you don't have any

23    intentions of moving out of state, any plans of

24    moving from that residence?

25         A.    No.
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.

William Lester on 10/09/2018                                    Page 71

```
 1          Q.      Okay.  You talked a little bit about
 2   your work history.  I won't go over all of that
 3   again, but when did you -- I believe in December 2010
 4   you were working for Treadways.  Is that right?
 5          A.      Yes, sir.
 6          Q.      You mentioned Paul Hale.  Is Paul Hale
 7   like the manager of Treadways?
 8          A.      No, sir.  He just worked there ever
 9   since he was in high school.  His mom worked there,
10   and had his own rental property and he kind of hung
11   around there.  He didn't really have any ownership in
12   the Treadways at all.
13          Q.      He may not have been an owner, but was
14   he like a manager?
15          A.      Yes.
16          Q.      You got your assignments from Treadways
17   from Paul Hale?
18          A.      Yes, sir.
19          Q.      And did he employ you separately to work
20   on his rental properties?
21          A.      Yes.
22          Q.      Any other regular employment in
23   December 2010?
24          A.      I can't remember.
25          Q.      Okay.  I believe you testified that your
```

```
 1    work for Treadways and Paul was by the job; right?

 2         A.     Yes, sir.

 3         Q.     So money varied week by week?

 4         A.     Yup -- yes.

 5         Q.     As you sit here today, do you know how

 6    much you earned on average?  I know it varied but

 7    just on average?

 8         A.     I averaged around 500 a week.

 9         Q.     Did you have any loans on your trailer?

10         A.     Yes.  Against it.

11         Q.     How much did you have to pay per week on

12    that?

13         A.     That was per month, 160.

14         Q.     Did you have to pay for your land, rent

15    the land, the spot?

16         A.     $85 a month.

17         Q.     Did you have loans on any vehicles?

18         A.     I think at that time I might have had

19    one on the Camaro.  I think.  I think I did.

20         Q.     Do you know how much that was?

21         A.     It wasn't -- maybe 120 some bucks.  I'm

22    not for sure.

23         Q.     A month?

24         A.     Yeah.

25         Q.     And I guess you probably had regular
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.

William Lester on 10/09/2018                                    Page 73

```
 1   utility bills; water, electric?

 2         A.     Yeah.

 3         Q.     TV?

 4         A.     Just water, electric.  I had a

 5   satellite.  Back then you get these cards from people

 6   and slide it in the box and two, three months take it

 7   back and buy another 20 bucks from them.

 8         Q.     Your phone, did you pay for that?

 9         A.     My cell phone?

10         Q.     Yes.

11         A.     Yes.

12         Q.     How much was that?

13                MR. SLOSAR:  Objection to form.

14         Q.     Best you can remember.

15         A.     It was no more than 40, I know.

16         Q.     Did you only have one phone, a cell

17   phone?

18         A.     At that time?

19         Q.     Yes.

20         A.     Yeah.

21         Q.     If I showed you the number, do you think

22   you would recognize it?  I know that you described it

23   as like a 1223 or something along those lines.

24                MR. SLOSAR:  Objection to form.

25   Misstates his testimony.
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                          Page 74

```
 1        A.    Yes.  I would look at it.

 2        Q.    Okay.  I'll show that to you in a little

 3   bit.

 4              You said that was in Scott Mills'

 5   account?

 6        A.    Yes, sir.

 7        Q.    Do you know how long you had that phone

 8   with Scott?

 9        A.    Two years I know for sure.

10        Q.    And this Catherine Mills was found dead

11   December 2010.  Where did that fall, the two-year

12   period?

13        A.    I had it before then.  I got a different

14   phone the day I got indicted.

15        Q.    So that would have been in May?

16        A.    May 2012.

17        Q.    2012.  You didn't have a new number by

18   February of 2011?

19        A.    No.

20        Q.    Okay.  Any other loans?  Did you have

21   any just loans for personal reasons in December 2010?

22              MR. SLOSAR:  Objection to the form.  You

23   can answer.

24        A.    I had one at Central Finance.

25        Q.    How much did you have to pay on that per
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                    Page 75

```
 1   month?

 2         A.     It was cheap.  But I don't remember.  It

 3   was around a hundred.

 4         Q.     Did you pay taxes on your 500 per week?

 5         A.     No.

 6         Q.     And most people have it withheld out of

 7   their check.  You didn't have withholdings; right?

 8         A.     They paid me cash.

 9         Q.     And you didn't report that?

10         A.     No.

11         Q.     Did you ever get tax refunds then?

12         A.     No.  No.

13         Q.     Any other bills that you can recall?

14         A.     I had one that was for my daughter but

15   she paid it.  It was on her car.

16         Q.     Let me specify.  I'm talking about

17   December 2010.  You were paying a bill?

18         A.     She was but it was in my name.  It was

19   her car.  The loan was in my name.

20         Q.     You didn't pay it?

21         A.     No.  She paid it.

22         Q.     Did you spend any money on any of your

23   daughters or family?

24         A.     No.  Just at Christmas.

25         Q.     Okay.  You mentioned that you may have
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                          Page 76

 1    done a project for Scott Mills.

 2         A.    Yes.

 3         Q.    When was that?

 4         A.    I believe I done the apartment in early

 5    part of 2011.

 6         Q.    So you wouldn't have had the money on

 7    that December 2010?

 8         A.    No.  No.  I just worked for him by the

 9    hour on that one because he was my friend.

10         Q.    Okay.  I don't believe you mentioned

11    doing any other odd jobs for anybody else in

12    December 2010.  Is that fair?

13         A.    I did things but sometimes Treadways

14    their self would send me -- a person would call me

15    that came in there wanted a hot water tank installed

16    or needing some tile laid, but they did not pay me.

17    It would be that person.

18         Q.    Do you have any memory of doing any of

19    those types of projects in December 2010?

20         A.    Not December, but I think before.

21    Before December.

22         Q.    Close in time?  Do you know?

23         A.    In the month of January -- November.

24         Q.    Do you know who those projects were for?

25         A.    The guy's Crawley.  I can't think of his

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018

```
 1   first name.  He lives down by the National Guard
 2   Armory in Barbourville.
 3        Q.    Were those projects also paid in cash?
 4        A.    Yes.
 5        Q.    So as we sit here today, there would be
 6   no way to corroborate how much money you were being
 7   paid in December 2010.
 8              MR. SLOSAR:  Objection.
 9        Q.    It was all in cash and no taxes were
10   filed; right?
11              MR. SLOSAR:  Objection to form.
12        A.    No, sir.
13              MR. SLOSAR:  You can answer.
14        Q.    Let me ask it the other way.  Is there
15   any way I could corroborate other than asking the
16   people?
17        A.    What I made?
18        Q.    Do you have any documentation to show
19   how much money you earned?
20              MR. SLOSAR:  Objection to form.  You can
21   answer.
22              THE WITNESS:  You have to speak plain to
23   me.
24        A.    I used to keep a little book with
25   everything wrote down in it, but that don't mean I
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                    Page 78

 1   can back it up, just what I wrote in it.

 2        Q.    Do you still have that book?

 3        A.    I have to look because I bought a new

 4   home.  I kept all that stuff in the old house.  When

 5   I was in jail, my mom and sister and them come and

 6   cleaned the place out and burnt all the garbage.

 7        Q.    Okay.

 8        A.    Boarded up the doors.

 9        Q.    Okay.  The other attorney asked that you

10   look for a receipt from a Jay Gregory and provide it

11   if you had it.  Do you recall that?

12        A.    Yes.

13        Q.    Would you do the same thing regarding

14   this book?  You don't have to provide it.  Make a

15   copy of it.

16        A.    If I can find it.

17        Q.    I understand.

18        A.    Yes.  If I can find it.  Yes.  If I can

19   find it.

20        Q.    Okay.  You mentioned doing some projects

21   for Catherine either -- while your divorce was

22   pending, I believe.  One you said you fixed a furnace

23   for her?

24        A.    Uh-huh.

25        Q.    You have to say yes or no.

```
 1        A.      Yes.  Yes.

 2        Q.      I believe you said that was 2003?

 3        A.      Roughly.

 4        Q.      Did she pay you for that?

 5        A.      No.  No.  I never charged her for

 6   anything.

 7        Q.      And you also said you had installed her

 8   city water?

 9        A.      Yes.

10        Q.      I didn't catch the time frame of that.

11        A.      2008.

12        Q.      Any other projects for Catherine other

13   than those two that you can think of?

14        A.      That's the last time I ever set foot in

15   her house.

16        Q.      Did you get paid for the city water

17   work?

18        A.      No, sir.  I didn't charge her.

19        Q.      Did she give you any kind of like in

20   kind, cook you a meal, do anything like that?

21        A.      At times, yes.

22        Q.      2008 was the last time you stepped foot

23   on her property?

24        A.      Yes.  I was there twice.  I did go hook

25   up her ice maker on her refrigerator.
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                              Page 80

1        Q.      Was that after 2008?

2        A.      No.  That you was the city water time.

3    She bought a refrigerator.  She wanted the ice maker

4    to work.

5        Q.      But she didn't have indoor plumbing for

6    a bathroom, though; right?

7        A.      No, sir.  Just a kitchen sink and hot

8    water tank and a washing machine.

9        Q.      Sorry.  I've got notes on different

10   spots.  Just give me a second and we'll get back

11   going.

12              You mentioned you lived at the mouth of

13   Escoes from -- up to 2015 and when did you say you

14   were there beginning of 2008?

15       A.      2004.

16       Q.      I'm sorry about that.  You mentioned

17   Donna Mills was within a thousand feet of your home.

18       A.      Yes, sir.

19       Q.      What time period did she live in that

20   residence?

21       A.      She lived there before I moved down

22   there.

23       Q.      So before 2004?

24       A.      Yes, sir.

25       Q.      And was she there after 2015?

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.

William Lester on 10/09/2018                              Page 81

```
 1          A.      I think she done moved in with Scott.

 2          Q.      Okay.  Was she there in December 2010?

 3          A.      Yes, sir.

 4          Q.      So she moved out of there and in with

 5   Scott sometime after that?

 6          A.      Yes, sir.

 7          Q.      Do you know whether Donna Mills was with

 8   Scott Mills in December 2010?

 9          A.      No, sir.  John Valdez.

10          Q.      All right.  Do you know John Valdez?

11          A.      When I see him.

12          Q.      Okay.  I think there is some sort of

13   four-wheeler club?

14          A.      Yes.  We rode together at one time.

15          Q.      Okay.

16          A.      I don't ride no more.

17          Q.      I know that is not like the Republican

18   Party, that formal and register for, but did you

19   consider yourself a member of that club?

20                  MR. SLOSAR:  Objection to form.

21          A.      I was one of first four that formed it.

22          Q.      Who was the other three?

23          A.      It was Scott Mills, Jack Bradley Davis,

24   and Nathan Parks.

25          Q.      John Valdez, was he a member?
```

```
 1         A.      He became.

 2         Q.      Was he a member of that in

 3  December 2010?

 4         A.      Earlier in the summer, yes.

 5         Q.      Okay.

 6         A.      But at that time in the winter, I think

 7  him and Donna was having some problems.  Still had

 8  stuff up there.

 9         Q.      Do you know whether he was living at her

10  house in December 2010?

11         A.      Pretty sure he was.

12         Q.      Okay.  But you think they were having

13  problems at that time?

14         A.      Yeah.

15         Q.      Do you know how long it was after that

16  that he had moved out?

17         A.      I know he was gone in 2012 for sure.

18         Q.      Okay.

19         A.      I know he was gone in '012.

20         Q.      Is that when Donna and Scott got

21  together in 2012?

22         A.      It was actually a little bit before

23  that, but I know it wasn't during '012 because Scott

24  was going up there and staying with her sometimes

25  because she was afraid.
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.

William Lester on 10/09/2018                                    Page 83

```
 1        Q.      Afraid of what?

 2        A.      Neighbors, you know, people.  Somebody

 3   was always trampling around her backyard and stuff.

 4   Lot of dope heads around there.

 5        Q.      Was there a trailer park up above her

 6   home?

 7        A.      Still there.

 8        Q.      Okay.  Did any other relatives of Donna

 9   live at that home that you know of?

10        A.      After she moved out.

11        Q.      A Wendy Mills?

12        A.      Wendy Mills, yeah.

13        Q.      Did you know Wendy Mills?

14        A.      Yeah.

15        Q.      Would you call Wendy Mills?

16        A.      Don't even have her number.

17        Q.      Okay.  Did Wendy Mills -- where did she

18   live in December 2010?  Do you know?

19        A.      I don't know.  At that time, where she

20   lived -- I think she could have been working at the

21   creek store at that time, but where she lived, I

22   don't know.

23        Q.      And the creek store, where is that?

24        A.      On 25 at the Matheson Creek going

25   towards Barbourville.
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.

William Lester on 10/09/2018                      Page 84

```
 1          Q.      That's on down the road?

 2          A.      Yes, on the side of the main road.

 3          Q.      Okay.

 4          A.      The main road.

 5          Q.      I think you mentioned Messer's Everyday

 6   Mart?

 7          A.      Yes.

 8          Q.      Where you saw Wesley Roark?

 9          A.      Wesley Tammy's brother.  Yes.  Boris

10   Reins' neighbor.

11          Q.      Where is that at?

12          A.      Right before you get to the City of

13   Barbourville on the main road.

14          Q.      Okay.

15          A.      Inside the city limits.

16          Q.      Trying to keep track of all these little

17   marts.

18                  Now, Kayla Mills was Donna's daughter;

19   correct?

20          A.      Yes, sir.

21          Q.      Was she living at Donna Mills' home in

22   December 2010 or had Donna kicked her out?

23          A.      She was living there.

24          Q.      Do you know whether she dated Jonathan

25   Taylor?
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                              Page 85

```
 1          A.      Yes.

 2          Q.      How do you know that?

 3          A.      I went picked them up a couple times

 4   before and it was sometimes that I let him -- her

 5   come over the house and stay with him.

 6          Q.      Were you picking them up before

 7   December 2010?

 8          A.      Yeah.  When the car broke down.

 9          Q.      Were you letting them stay at your house

10   before December 2010?

11          A.      Best I remember, yes.

12          Q.      Did you continue that after

13   December 2010, either one of those activities?

14          A.      I never let them stay.  Not in '011,

15   nah.

16          Q.      After December 2010, they never stayed

17   at your house?

18          A.      No.  He was in the 2010 year period, but

19   it wasn't that close to December.

20          Q.      Did you ever tell your daughter Michelle

21   that they were stealing from you?

22                  MR. SLOSAR:  Objection to the form.

23          A.      Kayla and Jonathan?

24          Q.      Yes.  Or at least Kayla?

25          A.      No, sir.
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                    Page 86

```
 1        Q.      Did they ever steal from you, to your

 2   knowledge?

 3        A.      Not as I know of.  If they did it was

 4   small.  Wasn't something I missed.

 5        Q.      Okay.  This car getting broke down, it

 6   was Kayla Mills' car; correct?

 7        A.      Yes, sir.

 8        Q.      And that was a blue, was it a Pontiac?

 9        A.      Pontiac.  It looks like the Chevrolet

10   Cobalt.  It's a Pontiac I think G5 or something like

11   that.  I'm not sure, but it looked like a little

12   Chevrolet Cobalt.

13        Q.      And they called you to pick them up?

14        A.      Told me to come to them, yeah.  I went

15   down there and they sitting in from the ex-jailor

16   Knox County, Larry Hammonds' house, at the wide spot

17   on the road where his mailbox sits.

18        Q.      Where is that at?

19        A.      It's on Stinking Creek.  It's probably

20   two miles below Donna's house.

21        Q.      Towards Barbourville?

22        A.      Towards Barbourville, yeah.

23        Q.      Do you have a recollection of why the

24   car broke down?

25        A.      It was something to do with they never
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                          Page 87

```
 1   have fixed it.  I think something to do with the key

 2   switch going bad in it.

 3        Q.    Did you understand they were dating when

 4   you picked them up?

 5        A.    Oh, yeah.

 6              MR. SLOSAR:  Object to form.  You can

 7   answer.

 8        A.    Yes.

 9        Q.    And you said it was cold out?

10        A.    Yes.

11        Q.    So was this in winter?

12        A.    Yes.  It was after Thanksgiving.

13        Q.    Okay.

14        A.    We had a real cold spell that year.

15        Q.    Did you ever know them to stop dating?

16              MR. SLOSAR:  Objection to form.

17        A.    Oh, yes.

18        Q.    How do you know that?

19        A.    He would talk about it.  Asked me if I

20   seen her.  If I seen anybody over her house.

21        Q.    Love sick?

22        A.    Yeah.  Yes.

23        Q.    Do you remember whether they had -- so

24   it was on and off, their relationship was?

25        A.    Yes, sir.
```

```
 1        Q.     Do you remember whether they were off
 2   anytime in December 2010?
 3        A.     I think they was off the whole month, to
 4   the best of my knowledge.
 5        Q.     Okay.  You indicated they were together
 6   after Thanksgiving when you picked them up; right?
 7        A.     Yeah.  It was right at the end of the
 8   month, probably one of the last times I saw them
 9   together.
10        Q.     Uh-huh.
11        A.     At that time.
12        Q.     That was 2010 you're talking about?
13        A.     Yeah.  Up in 2011, I seen them a couple
14   more times, you know, but then she got with another
15   guy.
16        Q.     Who was the other guy?
17        A.     I think his name is Derrick Wajers
18   (phonetic), or was his name.
19        Q.     Okay.  Did you see them together?  Did
20   you hear that from somebody?
21        A.     I saw them on Facebook.
22        Q.     Were you -- I'm sorry.  Go ahead.
23        A.     And we -- I think he's got a nickname,
24   Dollar Man, and I heard something talking about
25   Dollar Man had Kayla at a party.
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.

William Lester on 10/09/2018                         Page 89

```
 1          Q.      Do you have a recollection what time
 2   that was?
 3          A.      No, sir, I don't.  It was in the winter.
 4          Q.      Could have been 2011?
 5          A.      Could have been 2011, yes, sir.
 6          Q.      Was there any other men, or males I'll
 7   say, that were with Kayla in the December 2010 time
 8   period that you had any knowledge of?
 9          A.      No, sir.  Not that I have knowledge of.
10          Q.      It either would have been Derrick
11   Wajers, Jonathan Taylor or nobody?
12          A.      Yes, sir.
13          Q.      Okay.
14          A.      If it was anybody, it was somebody I
15   didn't know.
16          Q.      Okay.  Do you know whether Kayla at
17   times would stay with any of her relatives instead of
18   Donna's in December 2010?
19          A.      No, I don't.
20          Q.      Okay.
21          A.      Well, let's see.  Her grandma I think
22   was still alive then.
23          Q.      What's her name?
24          A.      Sylvia.
25          Q.      And was that a Bingham?
```

```
 1        A.      Sylvia Bingham.

 2        Q.      She was married to Oliver?

 3        A.      Oliver Smith.

 4        Q.      Right.

 5        A.      She's dead.  Oliver is still alive.  I

 6  know sometimes she would get me to run her -- drop

 7  her off at her grandma's, she'd call.

 8        Q.      Okay.

 9        A.      Like if Donna would be at work and she'd

10  see me come in from work.

11        Q.      Where did they live in December 2010?

12        A.      Sylvia?

13        Q.      Yes.

14        A.      She lived at Road Fork.

15        Q.      Where is that in relation to your house?

16        A.      That's probably five miles above it.

17        Q.      Is it like towards Walker?

18        A.      No.  It's towards Kinny Gap and

19  Broughton Hall (phonetic).

20        Q.      Would you go past Catherine Mills' house

21  to get there?

22        A.      You go that way or you could go towards

23  Walker and around the loop.  It makes a circle.

24        Q.      It does, 223?

25        A.      Yes.
```

**AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.**
William Lester on 10/09/2018                                    Page 91

```
 1        Q.      The quickest way would be to turn off,

 2   go past Catherine's --

 3        A.      Just turn at the bridge.

 4                MS. STAPLES:  Objection to form.

 5        Q.      Does Oliver and Sylvia live there?

 6        A.      No, sir.  I think he's in a nursing

 7   home.

 8        Q.      Did you know them very well other than

 9   their names?

10        A.      Oliver and Sylvia?

11        Q.      Yes?

12        A.      Yes.

13        Q.      You did?

14        A.      I knew them -- well, they had been

15   residents of the creek the whole time I ever lived

16   there.

17        Q.      Okay.

18        A.      Everybody lived there knew them.

19        Q.      I see.

20        A.      Knew them when you saw them.

21        Q.      Would you call them?

22        A.      I have no number.

23        Q.      Okay.

24        A.      If I needed contact, I had to drive to

25   their house.
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                              Page 92

```
 1        Q.     Got it.  Would the same be true of them,

 2   they wouldn't be calling you?

 3        A.     No, sir.

 4        Q.     I think her dad was Roger Mills?

 5        A.     Roger Mills, yes, sir.

 6        Q.     Do you know him?

 7        A.     Yes.

 8        Q.     Does he live in the area?

 9        A.     Roger lives in Barbourville.  Actually,

10   between Barbourville and Corbin.

11        Q.     Kind of like around Gray?

12        A.     Around Gray, above RECC, just a little

13   bit.

14        Q.     I believe he's married to a Hope?

15               MS. STAPLES:  Objection to the form.

16        A.     I think.

17        Q.     Okay.

18        A.     They're still married, I'm not sure.

19        Q.     Was he living in that area in

20   December 2010?

21        A.     Yes.  His mom lives there.  He's either

22   at his residence or he was staying with his mom

23   because he dad got killed in 2006.

24        Q.     Roger did?

25        A.     Roger's dead.
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                         Page 93

1         Q.      Did you have any phone contact with

2    them?  Were you that close to them?

3         A.      No.  He was -- he was a little upset at

4    me.

5         Q.      Over what?

6         A.      Thought I was getting his girl access to

7    drugs.

8         Q.      Were you?

9         A.      No, sir.

10        Q.      Do you know -- did he tell you why he

11   believed that?

12        A.      He never did confront me.  I just got

13   the message.  They said she was in -- had some kind

14   of therapy or something and rumor was she told that

15   she was -- I was getting them for her.  It was not

16   true.

17        Q.      Was this after December 2010?

18        A.      Way before.

19        Q.      Okay.  Did y'all ever come to terms?

20        A.      When I see him, he turns his head, so I

21   keep walking.

22        Q.      What about Donna Mills, did you get

23   along with her?

24        A.      Always.

25        Q.      Did she ever confront you about any

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                    Page 94

```
 1    issues with her daughter, Kayla?

 2         A.    No.  I heard that is what they was told.

 3    I sent her a message.

 4         Q.    You heard what now?

 5         A.    That she was told through the therapy,

 6    or whatever Kayla was taking, that I was the one

 7    getting access.  I sent her a message that I did not.

 8    I had children too.

 9         Q.    Who passed that information along to

10    you.  You said it wasn't Roger.  Someone else?

11         A.    I can't remember.

12         Q.    Okay.

13         A.    I can't remember.  It was -- I got it in

14    a text.

15         Q.    Okay.  I believe Kayla's related to some

16    Grays and Broughtons in the area?

17         A.    The Grays are on -- she's related to

18    some Grays because -- just by marriage, as far as I

19    know.

20         Q.    Okay.

21         A.    Now the Broughtons, I don't know.

22         Q.    Is there a Terry Gray?

23         A.    Terry Gray, Jeff Gray.

24         Q.    Jeff Gray and Shawn --

25         A.    Shawn Gray, Heather Gray.
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                    Page 95

```
 1        Q.      Yeah.  I think Shawn and Heather are

 2   married; right?

 3        A.      Shawn and Heather are married.  She's

 4   married -- she's --

 5        Q.      Her obituary said Shawn was her uncle.

 6        A.      Yeah.  She has an aunt that is married

 7   to Gary Cooper.  I don't know her name.  Might be

 8   Theresa.  I'm not sure.

 9        Q.      Let me ask you about the Terry Gray.  Is

10   he related to Shawn Gray?

11        A.      Shawn's dad.

12        Q.      Is that Shawn's dad?

13        A.      (The witness nods.)

14        Q.      In December 2010, did --  where did

15   Terry Gray live?

16        A.      2010, Graytown Road.

17        Q.      Where is that at?

18        A.      It's below the Salt Gum post office.

19   It's in Middleport.

20        Q.      That's along the 223 loop; right?

21        A.      That's the circle but it's close to the

22   mouth of Big Creek.  You know how the circle --

23        Q.      It's on the opposite side of Catherine's

24   house?

25        A.      You go 718, go to Big Creek and Red
```

```
 1    Bird, Clay County or you go up 223 and you hit the
 2    post office.
 3          Q.    Did Shawn Gray live with his dad, Terry
 4    Gray, or live somewhere else?
 5          A.    No.  He lived --
 6          Q.    And I'm talking about December 2010.
 7    I'm sorry?
 8          A.    Yeah.  Shawn lived at the old home place
 9    where Roger's father lived before he got killed.
10          Q.    Where was that at?
11          A.    It's in Little Fork.
12          Q.    Is that close to Terry Gray?
13          A.    It's above him.
14          Q.    Okay.
15          A.    It's above Beech Branch.
16          Q.    Do you know if Kayla Gray -- or Kayla
17    Mills was staying with those relatives in
18    December 2010?
19          A.    I have no idea.
20          Q.    Would you be communicating with them?  I
21    don't know how close you are.  Were you very close to
22    those?
23          A.    To Shawn?
24          Q.    To Shawn.  Yes.
25          A.    I hadn't talked to him in a long time.
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.

```
 1    I talked to him lot when I was in the car business

 2    because I did mechanical work for him or helped him

 3    get a truck or something he needed.

 4         Q.     How about Terry Gray, would you interact

 5    with him?

 6         A.     No.  I been at his house one time in my

 7    lifetime.

 8         Q.     Okay.  Call him on the phone?

 9         A.     On the phone, no.

10         Q.     I know I'm getting into a lot of

11    history.  I'm just about done with this.  The

12    Broughtons, are you familiar whether Kayla Mills is

13    any relationship to Broughton?

14         A.     Which Broughton?

15         Q.     Nina Broughton, how about that one?

16         A.     Don't know her.

17         Q.     Is there a Stephanie Broughton?

18         A.     Not up on the creek.

19         Q.     Okay.  Is there a Sally Broughton?

20         A.     A Sally?

21         Q.     Maybe Sally Brown now.

22         A.     Oh, oh, oh.  Talking about Freddie

23    Cole's granddaughter.  She's not related to them.

24         Q.     Okay.  Freddie Cole, did he live near

25    Catherine Mills?
```

| | |
|---|---|
| 1 | A.    He lived below there.  Where you turn up |
| 2 | the bridge, 223 makes the loop -- |
| 3 | Q.    Yeah. |
| 4 | A.    -- he's the second house on the right |
| 5 | when you turn off that ridge. |
| 6 | Q.    How far away is he from Catherine Mills' |
| 7 | home? |
| 8 | A.    Catherine Mills, two miles. |
| 9 | Q.    Is it close to that Hale's Fork? |
| 10 | A.    Hale's Creek. |
| 11 | Q.    Hale's Creek, I'm sorry. |
| 12 | A.    Catherine's is.  He lives before you get |
| 13 | to Brices Creek. |
| 14 | Q.    So you would go by Brices Creek on the |
| 15 | way to Catherine Mills? |
| 16 | A.    Yes. |
| 17 | Q.    Okay.  Did you -- were you friends with |
| 18 | Freddie Cole? |
| 19 | A.    I've been friends with Freddie for |
| 20 | years. |
| 21 | Q.    Did you interact with him? |
| 22 | A.    I haven't seen him in a long time.  He's |
| 23 | been sick.  I don't do no more cars building or paint |
| 24 | jobs. |
| 25 | Q.    I'm talking about December 2010. |

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                    Page 99

```
 1        A.      2010?

 2        Q.      Yes.

 3                MR. SLOSAR:   Objection to form.

 4        A.      If I saw him at the creek store or over

 5   at the post office, we talked.  That would be it.

 6        Q.      Would you talk to him on the phone?

 7        A.      No, but his wife called me.

 8        Q.      Who is his wife?

 9        A.      Adean.

10        Q.      Adean Cole?

11        A.      Uh-huh.

12        Q.      Were you friends with her?

13        A.      Well, we just friends on Facebook.

14        Q.      She still alive?

15        A.      Yes.

16        Q.      Were there any other neighbors of

17   Catherine Mills that you were friends with?

18        A.      Everybody around there.

19        Q.      Okay.

20        A.      Because I lived there all those years.

21        Q.      Were there any -- anybody close enough

22   that you talked to them on the phone very regularly?

23        A.      No.  Until this, after this happened, I

24   didn't know Sudie Mae's number.

25        Q.      Is that --
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                    Page 100

```
 1          A.      She lived right in front of her.

 2          Q.      Okay.  If you were talking to a number

 3   associated with Freddie Cole, would it have been

 4   Adean?  Would it have been Freddie, somebody living

 5   with them?

 6                  MR. SLOSAR:  Objection to form.

 7          A.      It was Adean.

 8          Q.      It was Adean?

 9          A.      It was Adean who called me.

10          Q.      On the day Catherine was found dead?

11          A.      No.

12          Q.      When did she talk to you?

13          A.      It was way before that.  Somebody told

14   her that I had sold her daughter some dope.

15          Q.      Okay.

16          A.      Her granddaughter.

17          Q.      Who is that?  Who is her granddaughter?

18          A.      Got one named Natasha.

19          Q.      Natasha Broughton, or is she a Broughton

20   now?

21          A.      I don't know if she married this guy or

22   not.  I think she's still Broughton.

23          Q.      Okay.  I talked about a Sally Brown or

24   Sally Broughton.

25          A.      Sally Broughton.  That's her baby
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                    Page 101

```
 1   sister.

 2          Q.      That's Natasha's sister?

 3          A.      Uh-huh.

 4          Q.      Do you know whether they may have been

 5   living with Freddie and Adean Cole in December 2010?

 6          A.      I know that I gave them a ride, the

 7   middle girl.

 8          Q.      We listed Natasha, Sally, who is the

 9   middle?

10          A.      I can't think of her name.  It was cold.

11   There is a stop sign at the end of the road where I

12   live.  I heard a baby crying.  I pulled the curtain

13   back, looked out the bedroom window.  She was

14   standing there with a diaper bag and had it wrapped

15   up.

16                  I got out and walked over and asked her,

17   What's wrong.  She said her and somebody got into it,

18   and she was trying to get back to her mammo's.  I

19   told her to come over.  I put her in the truck and I

20   took them up there.  The hill was iced over because I

21   couldn't get up Freddie's driveway to let her out.

22   Went down and turned went back home.  That was

23   11 o'clock that night.

24          Q.      That was in 2010?

25          A.      2010.  The month, I don't remember.  I
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                    Page 102

```
 1    know it was after Thanksgiving.

 2         Q.     Okay.

 3         A.     During that real cold spell when Kayla's

 4    car broke down.

 5         Q.     Kind of the same time frame as that?

 6         A.     Yes.

 7         Q.     You don't remember that -- name of that?

 8         A.     No, I don't.

 9         Q.     That's okay.  Anybody else who lived

10    with Freddie and Adean?

11         A.     No.

12         Q.     Sally Broughton also goes by Sally

13    Brown.  Is that --

14         A.     Same.

15         Q.     -- same person?

16         A.     Same person, yeah.

17         Q.     Who did she marry to get the name Brown?

18         A.     Jerry Wayne Brown, but I don't really

19    know if they was ever married.  I can't say that, but

20    I know they got a kid together.

21         Q.     Did they have the kid together in

22    December 2010?

23         A.     Oh, yeah.  Little Reilly, yeah.

24         Q.     Did they live at Freddie Cole and Adean

25    Cole's, in that area?
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.

William Lester on 10/09/2018                    Page 103

```
 1        A.      Huh-uh.

 2        Q.      You have to say yes or no.  I'm sorry.

 3        A.      No, sir.

 4        Q.      Where did they live?

 5        A.      I'm not sure.

 6        Q.      Jerry Wayne Brown is the son of Cleo

 7   Brown?

 8        A.      Yes, sir.

 9        Q.      She has another son, Cleveland Brown?

10        A.      No.  That's Earnest Brown's son.

11        Q.      I'm sorry.  Did she have any other kids,

12   Jerry Wayne Brown --

13        A.      Has a sister named Amy.

14        Q.      Amy Brown?

15        A.      Yes.

16        Q.      Where did -- in December of 2010, where

17   did Cleo live?

18        A.      She lived at Binghamton Curve (phonetic)

19   coming up Stinking Creek.

20        Q.      I know some of this but not all of it.

21   If you're going to Catherine Mills, would it be on

22   the way there, past it?

23        A.      It would be on the way there.  It's

24   close to the mouth of the creek.  Very close.

25        Q.      Is it close to where Freddie and Adean
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                      Page 104

```
 1    Cole live?

 2         A.      Couple miles away.

 3         Q.      You said that the Coles were about a

 4    mile or two from Catherine's; right?

 5         A.      Yes.

 6         Q.      So was Cleo's house a mile or two before

 7    the Coles?

 8         A.      Yeah.  Yeah.

 9         Q.      Did you ever buy drugs from Cleo?

10         A.      Yes.

11         Q.      For you?

12         A.      No.  I never took a drug in my life.  I

13    bought it for Amanda.

14         Q.      Did you buy drugs for anybody other than

15    Amanda?

16         A.      No.

17         Q.      Jesse was deposed last week.  Did you

18    talk to him about this case?

19         A.      No.

20                 MR. SLOSAR:  Objection to the form.

21         A.      No.

22         Q.      He didn't talk to you about the

23    deposition?

24         A.      Only thing we talked about was when my

25    mom died, he said he had the deposition on Thursday,
```

```
 1   and I said I've got one coming up in October in South
 2   Carolina.
 3        Q.    Okay.  He indicated that there'd usually
 4   be a lot of people living in Cleo Brown's house.  Is
 5   that your understanding when you go there and buy
 6   drugs?
 7             MR. SLOSAR:  Objection to form.
 8        A.    Yes.
 9        Q.    All right.  Can you, in December 2010,
10   just kind of -- who you recall living there?
11        A.    It's hard to distinguish who was living
12   there and who was just there coming in and buying
13   meds.  Sometimes they would be -- Jerry Wayne would
14   stop by there and Sally.  Her daughter Amy would be
15   there sometimes.  It was a lady there once.  I never
16   did get introduced to her.  I don't know who she was
17   couple times.
18        Q.    Did Cleo live near her parents?
19        A.    No.
20        Q.    Okay.  Who is her dad?  What's his name?
21        A.    Glen Brown, I think.
22        Q.    Do you know who Cleo's mother is?
23        A.    No, I don't.
24        Q.    Did Glen live on his own?
25        A.    I was only at his house one time, and
```

1    actually I bought a car across the branch from him.

2    I had to get it out of this guy's garden.  He lived

3    in the hill of holler Browns Branch as far as you can

4    go.

5            Q.      On 223?

6            A.      Yes.

7            Q.      Is that the top of the loop?  Is that

8    what you mean by as far as you can go?

9            A.      No.  The holler he lived in, he lived in

10   the very back end of it.  Browns Branch.

11           Q.      The turnoff to go to Browns Branch, I

12   want to say that that's on the opposite side of the

13   loop from Catherine's house?

14           A.      Yes, it is.

15           Q.      I want to talk a little bit about your

16   interactions with Detective York.  Sorry about that.

17   Sounds like you had three interactions with him.  Is

18   that right?

19           A.      Yes.

20           Q.      The first one was he showed up at your

21   trailer?

22           A.      At my driveway, yes, sir.

23           Q.      And do you know I think you dated that

24   as late January, early February?

25           A.      Yes, sir, in '011.

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.

```
 1        Q.      Now, did he ask you for a statement at
 2   that first encounter?
 3        A.      No.  Told me he would be in contact with
 4   me because I was running my mouth, and it came from
 5   Escoes.  And that's when I told him, If you're going
 6   to believe what comes out of Escoes, you better bring
 7   a bus up here and load everybody because everybody up
 8   there lying.  That's the way it goes.  It's a big
 9   gossip center.
10        Q.      So your only reference was that he heard
11   you were talking at Escoes?
12        A.      Uh-huh.
13        Q.      Yes?
14        A.      Yes.  Yes.
15        Q.      You basically said you can't believe
16   everything you hear at Escoes?
17        A.      Yes.
18        Q.      That was all the dialogue that happened
19   to your memory.  Is that right?
20        A.      And in the driveway that day, yes.
21        Q.      You mentioned that he did take
22   photographs?
23        A.      Pictures, yes.
24        Q.      Do you remember how many?
25        A.      He made me face him, put my hood up,
```

```
 1   turn right, turn left, take my hood down, face him,
 2   turn right, turn left.  Then he put the camera back
 3   in the car.
 4        Q.    Did you have the jacket on when you
 5   pulled in?
 6        A.    Yes.  It was cold working on the car.
 7   It was very cold.
 8        Q.    Was there anybody else around to your
 9   memory to witness this?
10        A.    No.  Just me and him.
11        Q.    Did anybody ever tell you after the
12   fact, Hey, I saw the police at your trailer?
13        A.    Yes.
14        Q.    Who told you?
15        A.    Shawn over at Escoes.
16        Q.    Shawn did?
17        A.    Yeah.
18        Q.    Anybody else remark to you after the
19   fact that they had seen this happen?
20        A.    No, sir.
21        Q.    Did you talk to anybody about it?
22        A.    Yeah.
23        Q.    Who did you talk to?
24        A.    I let them know over at Escoes.
25        Q.    Did you talk to your family about it?
```

1          A.     Yes.

2          Q.     Who did you talk to?

3          A.     All of them.

4          Q.     All of them.  Are you talking about your

5     daughters?

6          A.     My daughters, my mom, my sister.

7          Q.     Okay.  What did they -- did they tell

8     you to get a lawyer?

9          A.     Said if this is the way it was going,

10    talk no more and they would contact and get me legal

11    help because it looked like it was headed for a

12    downfall.

13         Q.     You mentioned I think your connection to

14    David Hoskins is you had a sister who worked for him?

15         A.     No.  She's just works for people that

16    works for him, and I'm very -- I done a lot of work

17    for Judge Mills and his family.  John Knox, I don't

18    know if you know him.

19         Q.     Huh-uh.

20         A.     I did a lot of work for him, and I also

21    went and talked to him and his mom and told them what

22    was going on.  If they heard anything, wasn't true.

23    If they needed me, and I still did work for them

24    right up until -- before I took this job and left.

25                The day I turned myself in and they took

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                    Page 110

1    me in front of the judge, he was the judge and he

2    stepped down.  He told them I was a personal friend

3    of the family.  Did work for his family and he

4    couldn't, he wouldn't oversee it or what the word is

5    for it.

6         Q.    Recused?

7         A.    Yes.

8         Q.    Did you talk to this -- the judge who

9    you worked for after the York interaction with the

10   photographs?

11        A.    Don't think so.

12        Q.    Okay.  At what point did you tell

13   Detective York that David Hoskins was your attorney?

14        A.    It wasn't the day he was in my driveway,

15   but I don't remember.

16        Q.    Maybe we'll walk into it and you'll

17   remember.  Did he say that he would be in contact

18   with you?

19        A.    Said he would be back.

20        Q.    He'd be back?

21        A.    Uh-huh.

22        Q.    Did he ever show up again at your

23   trailer?

24        A.    No.

25        Q.    So you met him at David Hoskins' office

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                        Page 111

```
 1   after that; correct?

 2          A.      How he -- yes.  How he knows that David

 3   was my lawyer, because when I told my sister and them

 4   what happened, they made contact with David and he

 5   said, The next time, tell him to come here.

 6          Q.      To his office?

 7          A.      Yes.  David called his post, I'm pretty

 8   sure, and left a message.

 9          Q.      Okay.  So was there one or two meetings

10   with York at David Hoskins' office?

11          A.      Two.  Best of my knowledge.

12          Q.      Any other meetings with Detective York

13   other than those after --

14          A.      Just the one in the jail when he come

15   and took my DNA.

16          Q.      Okay.  You're right.  I forgot about

17   that.

18                  Was there any discussion about that

19   interaction?

20          A.      No.  David was with him.

21          Q.      Okay.  So how did he know to go to David

22   Hoskins' office to -- for this first interaction?

23          A.      Because --

24                  MR. SLOSAR:  Objection to form.  You can

25   answer.
```

```
 1          A.      Because my sister had contacted David,

 2    and David contacted the post and told them if they

 3    had any more discussions with me, to bring it to his

 4    office.

 5          Q.      Do you know how close in time that would

 6    have been after you saw Detective York at your

 7    trailer?

 8          A.      It would have been within that week.

 9          Q.      And so did Detective York follow that

10    request?

11          A.      Yes.

12          Q.      He didn't contact you directly; did he?

13          A.      No.  He never did because David.

14          Q.      So that first interview then was set up.

15    David Hoskins' office called you to arrange the time

16    and place; right?

17          A.      Yes.

18          Q.      And you met Detective York there, you

19    said?

20          A.      In Corbin.

21          Q.      Did David just have one office or two?

22          A.      Just had one but he's moved to a new

23    one.

24          Q.      He has?

25          A.      Yes.  He's moved to a new one but still
```

 1   in Corbin.

 2        Q.     Was that after his move --

 3        A.     No, it was before.

 4        Q.     Before what?

 5        A.     Before his move was after my

 6   release -- right before my release.

 7        Q.     He moved right before your release.  For

 8   the most part, he was in the same office during all

 9   this time period that you were interacting with York;

10   right?

11        A.     Yes.

12        Q.     Do you know the -- let's see.  I think

13   that you said that the arrangements to have York go

14   through David Hoskins was within a week?

15        A.     Yes.

16        Q.     Were you contacted by David Hoskins

17   within that same week or was there any delay?

18        A.     No.  I wasn't contacted until York

19   wanted to see me.

20        Q.     That's what I was going to get at.  So

21   David Hoskins' office sets up the first interview.

22   Do you have a recollection of when that was?

23               MR. SLOSAR:  Objection to form.

24        A.     No.

25               MR. SLOSAR:  You can answer.

1        A.      No, I don't.  It was short time.  It
2    could have been in March.  I'm not for sure.
3        Q.      All right.  Then the second interview,
4    the date listed on the recording was April 15, 2011.
5    Does that sound --
6        A.      Sounds about right.
7        Q.      Sounds right?  And the second interview,
8    David was with you?
9        A.      Yes.
10       Q.      For the whole interview?
11       A.      Yes.
12       Q.      And for the second meeting, was anybody
13   with you?
14       A.      No.
15               MR. SLOSAR:  Objection to the form.
16       Q.      Other than Detective York?
17       A.      Just York and Hoskins.
18       Q.      Did he ask you about why David wasn't
19   with you?  Did that come up in the conversation?
20       A.      David was with me both times.
21       Q.      He was with you both times?
22       A.      Yes.
23       Q.      I'm sorry.
24       A.      Yes.
25       Q.      Okay.  Do you recall any interaction

1   between Detective York and David Hoskins at the first

2   interview?

3        A.    What do you mean by "interaction"?

4        Q.    Did they talk or was it just you talking

5   to Detective York?

6        A.    They spoke one time.  Mr. York told him

7   that he was kin to some of the Hoskins and David told

8   him he was from Harlan.  Talking about Ms. Hoskins

9   too here.  David said he didn't know who they was.

10       Q.    David wasn't any relation to Amanda, to

11  your knowledge?

12       A.    No.

13       Q.    Talked a little bit about relationships,

14  York and David Hoskins too, but they didn't talk

15  about Catherine Mills?

16       A.    Everything was said there on the table

17  was in front of all of us.

18       Q.    Okay.

19       A.    Because Detective York came in after I

20  got there.

21       Q.    Okay.  And who ended the conversation,

22  the first one?  David, you or Detective York?

23       A.    Detective York.

24       Q.    Did -- all right.  Let's talk about the

25  second interview.  Was there anything different

```
 1   between your first interview and your second

 2   interview to your memory of the details you gave

 3   Detective York?

 4                MR. SLOSAR:  Objection to form.

 5        A.      Not as I can remember.

 6        Q.      Okay.  Were you truthful to Detective

 7   York in both of those statements?

 8        A.      Yes.  I offered to take the lie detector

 9   test in the very first meeting.

10        Q.      Okay.  I appreciate the lie detector

11   part.  I want to make sure the information you told

12   York was truthful and accurate to the best of your

13   memory.

14                MR. SLOSAR:  Objection to form.

15        A.      Yes.  Yes, it was.

16        Q.      Did you ever see a transcript or listen

17   to a recording of any of your interviews with

18   Detective York?

19        A.      I never read any of that because I was

20   in jail.  My sister did.

21        Q.      Okay.  Your sister reviewed it but you

22   didn't?

23        A.      (The witness nods.)

24        Q.      Yes?

25        A.      Yes.
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018

1     Q.    Okay.  Detective York subpoenaed a phone

2  number that he believed to be associated with you.

3  Did you ever look at your phone records that were

4  subpoenaed?

5     A.    No, sir.

6     Q.    Do you know if your sister did?

7     A.    I have no idea.

8     Q.    Okay.  Now, I think you indicated that

9  you told Detective York about a -- information

10  involving a James Otis Sizemore?

11     A.    Yes.

12     Q.    Who else did you tell that to?

13     A.    My daughter.  I called my daughter,

14  Jennifer, as soon as I got phone service, because I

15  couldn't call Michelle.  She was too tore up.

16  Jennifer said that's the dollar amount I gave her.

17  She said it was exactly what was on that table.

18     Q.    I believe that you indicated that you

19  found that out at Bob Smith's the next day?

20     A.    The next morning between eight, 8:30.

21     Q.    Did you -- after James Otis Sizemore

22  left, did you immediately call your daughter, call

23  her soon thereafter?

24     A.    Ten minutes later.  Because I got my

25  stuff.  I went to Bob's store and left and probably a

```
 1   mile down the road before you get phone service back.

 2   I had my cell phone.  I called my daughter Jennifer.

 3        Q.     Jennifer?

 4        A.     Jennifer Lawson.

 5        Q.     Had Jennifer told you that there was

 6   money on the floor at that time?

 7               MR. SLOSAR:  Objection to the form.

 8        A.     No, sir.

 9        Q.     So tell me what was going through your

10   mind when you decided to call her after you got that

11   information.

12        A.     I felt that the police needed to know

13   that this guy, the very next morning, knew what was

14   there and the dollar amount.  How would he know that

15   if he wasn't tied to it?

16        Q.     Well, at the time, you didn't know that

17   there was money laying there.

18        A.     I was never told that at the time.  Not

19   until I was booked.

20        Q.     Did you --

21        A.     I mean, my daughter told me what I told

22   her was the exact dollar amount.  I never saw no more

23   nor heard no more about it until I was with her.

24        Q.     So when you called Jennifer about this,

25   she told you that's the exact dollar amount of money
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                        Page 119

```
 1    I saw; right?

 2              MR. SLOSAR:  Objection to the form.

 3    Misstates the testimony.

 4         A.    She said, That's exact amount that was

 5    there.

 6         Q.    And I guess that's the first time you

 7    heard out of her mouth that she had seen any money

 8    there.  Is that right?

 9         A.    Yes.  Yes.

10         Q.    Did anybody else tell you they had seen

11    money on the floor?

12         A.    No.

13         Q.    How sure are you that this encounter

14    with Otis Sizemore was the morning after?  Pretty

15    sure?

16         A.    Oh, stake my life on it.

17         Q.    Did you talk to Jennifer about -- before

18    that morning that you ran into James Otis Sizemore,

19    did you talk to Jennifer about what she had seen?

20         A.    No.

21         Q.    What had happened?

22         A.    No.

23         Q.    So you didn't talk to her at the scene

24    at all?

25         A.    No.  She went across the street with her
```

```
 1   other sister, met her mom.  They stayed there.  It
 2   was getting colder and my car was sitting there
 3   idling, had her kid in it.  She came over and told me
 4   if I wanted to take him back and go home and she
 5   would be on down in a little bit.  And I asked her --
 6   she did tell me that the UPS man is the guy that
 7   found her, but she was coming up there to give him a
 8   Christmas card.  She always gave him a Christmas card
 9   for Christmas.
10           Q.    Did you know she was going there to get
11   her Christmas card before she went there?
12           A.    No.
13           Q.    Did she tell you whether anybody else
14   was with her when she found Catherine?
15           A.    Jesse.
16           Q.    Jesse?
17           A.    (The witness nods.)
18           Q.    Did you talk to Jesse about what he had
19   seen?
20           A.    No.
21           Q.    Did you hear secondhand, I know that you
22   said you -- I think you said you didn't talk to
23   Jennifer.  She was with the other members of the
24   family; right?
25           A.    Yes.
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.

William Lester on 10/09/2018                           Page 121

1        Q.      Did you talk to her later that night on

2   the phone?

3        A.      That night?

4        Q.      Yes.

5        A.      Not as I can remember.

6        Q.      Did you talk to Jesse later that night

7   on the phone?

8        A.      I'm not sure.  I know I think I called

9   him the next day or he called me telling me about the

10  meeting, some kind of meeting.  They may not have

11  even had it that next day.  I could be wrong on the

12  time frame.

13       Q.      Okay.  Did you see Jesse talking to

14  anybody at the scene?

15       A.      There was so many people there.

16       Q.      Okay.

17       A.      If headlights wasn't shining on at that

18  time of the night, you couldn't tell who was walking

19  up there.  Because the hours go back and it gets dark

20  early in the wintertime.

21       Q.      Exactly.  I think this was

22  December 20th --

23       A.      Yes.

24       Q.      -- I believe is the date.  Usually the

25  21st --

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.

William Lester on 10/09/2018                              Page 122

```
 1        A.     It was 5 o'clock when I was called to go

 2   get Michelle.

 3        Q.     It was kind of --

 4        A.     Dusky dark when I went to her house and

 5   got her.  It was dark by the time got to her mammo's.

 6        Q.     What I was getting at with seeing them

 7   talk, that night or in the early morning of the next

 8   day, you didn't hear secondhand from anybody any

 9   details of what anybody had seen at Catherine Mills'

10   home?

11               MR. SLOSAR:  Objection to form.

12        A.     They was talking over at Escoes.  I

13   didn't pay attention.  I told them I took them up

14   there, let them out and came back.  I did not cross

15   the road.

16               And somebody said she was found on the

17   back porch.  Somebody said she was out in the yard.

18   I did not know until David showed me the picture.

19        Q.     You didn't hear the $500 rumor at

20   Escoes, though?

21        A.     No.

22        Q.     Now, your first interaction with

23   Detective York was at your trailer in late January,

24   early February; right?

25        A.     Yes.
```

1      Q.      You found this information out the day
2   after about the $500?
3      A.      The next morning.
4      Q.      Why didn't you tell that to the police
5   beforehand?
6             MR. SLOSAR:  Objection to form.
7      A.      I didn't tell him because I called
8   Jennifer, and her and York was like that, so I
9   figured she would call and relay the message to him.
10     Q.      Did you ever follow up with her on that?
11     A.      No.  I felt she -- that would be in her
12   memo if she would have done what I told her.
13     Q.      Do you know whether she did or not?
14     A.      I have no idea.
15     Q.      Do you know whether anybody else -- do
16   you know whether she talked to anybody else in the
17   family about that information?
18     A.      No.  Like I said, when that -- very
19   shortly after that happened, they all turned on me.
20     Q.      When would you -- try to put a time
21   frame on that when you felt like they had turned on
22   you.
23     A.      After York's visit to my driveway and
24   this family meeting.
25     Q.      So you mentioned the $500 to your

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                    Page 124

```
 1   daughter Jennifer soon after you hear it --

 2        A.    Yes.

 3        Q.    -- correct?

 4        A.    Yes.

 5        Q.    You say you mentioned it to York in one

 6   or both of the interviews?

 7        A.    Both.  I told him what the boy said, and

 8   if you can maintain statements that they got from Bob

 9   Smith, I know he told them too.

10        Q.    How do you know he told them?

11        A.    He told me.

12        Q.    Did he give you any details as to who he

13   told and when he told it?

14        A.    He told me he told the police.

15              MR. KELLEY:  Objection.

16              MR. SLOSAR:  You can answer.

17        A.    He told me he told the police.  He told

18   me that when they came and got him on Tuesday night,

19   that Mr. York told him, he said, I told you I'd let

20   you sell your drugs until I had to press charges, and

21   now I have William Lester coming to jail and I'm here

22   to get you.

23              And when I checked in jail the next

24   morning, Bob was laying in the open cell, him and

25   Bibbs.  Bob was like, I know you's coming.
```

1        Q.      That was 2012?

2        A.      Yes, sir.

3        Q.      Did Bob tell you before that that he had

4    given --

5        A.      They made visits because I told

6    Detective York every drug dealer that I dealt with.

7        Q.      You told Detective York about what now?

8        A.      Every drug dealer that I went to and

9    bought drugs from.

10       Q.      Did Bob tell you that he told the $500

11   info from Sizemore to the police before 2012?

12       A.      Yes, he did.

13       Q.      Do you know when that came up between

14   you and Bob?

15       A.      All the times I was up there buying

16   medicine.

17       Q.      Just one other time?

18       A.      Yes.  One of the times, you know.

19       Q.      What did he tell you then?

20       A.      He told me he wished that they would

21   make a move on it.  Sound like that would be valuable

22   information.

23       Q.      Can you put a time frame on that?

24       A.      It would have been -- it would have been

25   between '010 and '012.

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                    Page 126

1          Q.      And then you saw --

2          A.      Because I don't frequent him.

3          Q.      And then you talked a little bit about

4     seeing him in jail in 2012 when you were --

5          A.      Yes.  Yes.

6          Q.      Is that Knox County?

7          A.      Knox County, yeah.

8          Q.      I didn't follow along with everything

9     that you said happened, so kind of walk me through

10    it.  You see Bob in the same cell or different cell?

11         A.      Well, they have a holding cell that you

12    have to stay in 24 hours before they put you in a

13    regular cell.

14         Q.      Okay.

15         A.      And they picked him up on Tuesday night.

16    I turned myself in on Wednesday morning.  So when I

17    went in, they booked me and put me in that cell.  He

18    was laying over there on the corner.  Him and Bibbs,

19    that's the guy that used to help sell for

20    him.  He said, I knew you was coming.  He said, They

21    came got me last night and told me you'd be here

22    today.

23         Q.      Did he say anything else about how they

24    knew you were coming?

25         A.      Jason York told him that I was turning

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                          Page 127

 1   myself in the next morning.

 2         Q.     Did they work that out with police that

 3   you were turning yourself in, or did you show up and

 4   that was a surprise to everybody?  Do you have any

 5   knowledge?

 6         A.     David Hoskins had it all arranged.

 7         Q.     Had it all arranged for you to turn

 8   yourself in?

 9         A.     Yes.

10         Q.     When you came into jail, Detective York

11   could have very well known that you were turning

12   yourself in when they picked him up the day before?

13              MR. SLOSAR:  Objection to form.  Calls

14   for speculation.  He can answer.

15         A.     He should have known because I took a

16   week off of work to meet him.  I called David before

17   I was ever indicted.  David was in Texas on another

18   case.  David said, You can't go talk to him without

19   me.  I said, Okay.

20              I made several attempts to get ahold of

21   him.  He would not return my call.  I called

22   Jennifer.  I missed a weeks work at Fort Bragg.  I

23   called Jennifer and told her, I said, You tell him

24   that if he wants to see me, I'm going back to North

25   Carolina Monday morning, next time, meet me at

 1   David's.  David said not to meet him without him.

 2              So she called and she calls back and she

 3   said, He said come down.  He wanted to meet you at

 4   RECC at the little room they have there for State

 5   Police.

 6              I said, I'm not going without David.

 7              And then she called back and said he

 8   said, If you see any police officer, just turn

 9   yourself in for the murder of Catherine Mills.

10              I said, I'm not stupid.  I'm not turning

11   myself in for nothing, without David.

12       Q.    And who was it that you said you were

13   talking with about this?

14       A.    Jennifer, my daughter.

15       Q.    Okay.  Did Don Smith tell you any other

16   information that York had shared with him about you

17   being arrested?

18       A.    Huh-uh.  Just told him, said, I've let

19   you, you know, pedal your medicine.  I told you when

20   I got all the ends tied up on the Catherine Mills

21   case, I'd be back to get you.  So I'm here to get

22   you 'cause William is turning himself in in the

23   morning.

24       Q.    So you talked to Bob Smith about

25   Sizemore, your daughter, Jennifer Lawson, and

1    Detective York.  Anybody else you talked to about

2    James Otis Sizemore and his information about the

3    $500?

4         A.    I'm pretty sure that over the time I

5    have told Amanda.  I told Linda.  I told several

6    people.  I even told David.

7         Q.    Okay.  Detective York had some

8    interactions with your family and other people you

9    know.  Has anybody talked to you about that?

10             MR. SLOSAR:  Objection to form.  You can

11   answer.

12        A.    I think Jesse told me that he came to

13   their house, walked up the driveway, left the car

14   somewhere and come up there.  I think it was him and

15   Jay Sauters.  I'm not for sure.

16        Q.    Do you remember when?

17        A.    This is during -- this is between

18   December and falling over into '011.

19        Q.    Okay.  And any other information he told

20   you about his interaction with Detective York?

21        A.    He never told me, but I saw tapes at

22   David Hoskins' office of his interactions.

23        Q.    With York?

24        A.    With York, I guess, and maybe the Knox

25   County.  I'm not sure.

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                Page 130

1        Q.      Okay.  He also had recordings with the

2    investigators for Amanda and Taylor.  Do you know

3    whether those may have been the recordings?

4        A.      Huh-uh.

5        Q.      Don't know?

6        A.      Don't know.

7        Q.      Let me stop back one other thing.  We

8    talked a lot about York.  Did you have any other

9    interactions with other police officers relating to

10   the Catherine Mills investigation?

11       A.      Never saw any of them.

12       Q.      Other than the Catherine Mills, you were

13   arrested.  I know the charges were dismissed.  Have

14   you been convicted of any other felonies?

15       A.      That's the only one.

16              MR. SLOSAR:  Objection to the form.  He

17   wasn't convicted of this felony.

18       A.      I've never been charged with anything in

19   my life.

20       Q.      Okay.  Not even a misdemeanor?  No?

21       A.      No.  Maybe one speeding ticket.

22       Q.      You said "charged."  That brings up not

23   necessarily convicted of a crime.  You've never even

24   been arrested or charged or anything with a

25   misdemeanor or felony?

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                      Page 131

 1        A.      Only thing I ever been arrested for was

 2   during my divorce.  I was domestic violence and I was

 3   put on probation.

 4        Q.      Do you remember when that was?

 5        A.      It would have been filed in '98, '99.

 6   Somewhere through there.  I stayed in jail maybe for

 7   one day, two hours until I could get somebody come

 8   get me out.  Finally Judge Mills brought it to a

 9   halt.

10        Q.      And you mentioned Jesse had talked a

11   little bit about an interaction he had with York and

12   Jay Sauders.  Did anyone else you know talk to you

13   about their interactions with Detective York?

14               MR. SLOSAR:  Objection to form.

15   Foundation.

16        A.      Michelle said something, but I can't

17   remember what it was.  I know that he talked to her

18   one time, but I don't even know what it was about.

19        Q.      Did you ever talk to Amanda?

20        A.      Did I?

21        Q.      Yes.  About her interactions with York?

22        A.      She told me some things.  I don't -- one

23   thing was at a house I was letting her stay at, she

24   came -- he came out there.  She had Lexi on her side

25   and he had a gun out.  He come to her house one time.

 1    They had a cussing match or something.

 2          Q.      You weren't present for any of those --

 3          A.      No, sir.

 4          Q.      -- where she talked about -- Jonathan

 5    Taylor talk to you about his interactions with

 6    Detective York?

 7          A.      He told me about being interrogated.

 8    Maybe he was in jail at the time when York made him

 9    go.  Came and seen him.  I think.  He may not have

10    been in jail.  I'm not sure.

11          Q.      Okay.  Did he talk to Kayla Mills about

12    any of her interactions with Detective York?

13          A.      No.  She never said nothing.  Her mom

14    told me some things, but...

15          Q.      What did her mom tell you?

16          A.      That they came there several times

17    wanting her to testify against us and that -- told

18    her that, you know, she either do it or she was going

19    to be charged.

20          Q.      Do you remember when that was that you

21    had those conversations with Donna?

22          A.      No, sir.  I don't.  It was before --

23    between '010 and '12.

24          Q.      Sure.  She ended up giving a statement

25    in March of 2012.  Did you ever talk to Scott or

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                    Page 133

 1    Donna about that statement?

 2         A.      They called me.

 3         Q.      When did they call you?

 4         A.      Right before I got indicted.

 5         Q.      To talk about her statement?

 6         A.      Well, to tell me that they had been

 7    there and I was going to be charged.  They had to

 8    take Kayla to the lawyer and that I would be charged

 9    next, and that -- felt my phone was bugged because --

10    stated York told him something about -- since your

11    association, that would bring on guilt.  You don't

12    have to be guilty but it's who you associate with

13    that will make you guilty.

14              So I didn't -- I just lied about it, but

15    I felt then time was coming short because he called

16    me and Donna called me different times but the same

17    day.

18         Q.      Did they tell you different things?

19         A.      No.  Just told the same story a little

20    different, you know, about the same information.

21         Q.      Did they talk to you about anything that

22    had happened during her interview with Detective

23    York?

24         A.      Just said he was there.  Pressing her.

25         Q.      And you said they had gotten an attorney

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                    Page 134

 1   for her?

 2         A.      Yeah.  He's dead now.  He died.

 3         Q.      Was it Ken Boggs?

 4         A.      Ken Boggs, yes.

 5         Q.      Did they say how long he had been her

 6   attorney?

 7         A.      I reckon they got him that day, best of

 8   my memories.  Not the day of the murder but the day

 9   they called me.

10         Q.      Yeah.  They got him that day.  Yeah,

11   that time frame.

12         A.      Yeah.

13         Q.      Now, you got out on a bond; right?

14         A.      Yes, sir.

15         Q.      And did Scott and Donna post that bond?

16         A.      They posted two-thirds of it.

17         Q.      Through property?

18         A.      Through property.

19         Q.      Did you talk to them about that?

20         A.      Jennifer went and talked to them.

21         Q.      She did that on your behalf?

22         A.      Yes.

23         Q.      I believe you mentioned you heard -- you

24   recall vaguely one discussion with your daughter

25   Michelle about York, but as far as her or Jennifer,

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                    Page 135

```
 1   that's all you remember?

 2        A.     That's all I remember.

 3        Q.     Did Jesse ever talk to you about being

 4   an informant for Detective York?

 5        A.     Never.  But I saw it on the tape.

 6        Q.     What tape are you talking about?

 7        A.     Tapes that I saw on David Hoskins'

 8   office he let me watch.

 9        Q.     A videotape or audio recording?

10        A.     Videotape.

11        Q.     Okay.  Was he -- was it a videotape of

12   him doing controlled buys from people?

13        A.     It was him at the -- when they took him

14   to Frankfort, I guess, for the lie detector test.

15        Q.     Of his polygraph video?

16        A.     Yeah.  Him sitting talking to him.  I

17   watched it all.

18        Q.     Was there anything that stands out in

19   your memory that was untruthful that he said in his

20   polygraph video to police?

21             MR. SLOSAR:  Objection to form.

22        A.     No.  He just -- blew my mind that he was

23   an informant.

24        Q.     I'm going to clarify a little bit when

25   he's talking about informant, when I was talking
```

```
 1   about it, I meant that he was buying drugs from

 2   people trying to get information, trying to get drug

 3   charges on them.  Did he mention any of that?

 4              MR. SLOSAR:  Objection to form.  You can

 5   answer.

 6        A.    Yes.  He mentioned it and I knew that he

 7   knew things that he could send a lot of people to

 8   jail on.  He hadn't floated that note.

 9        Q.    What are you talking about?

10              MR. SLOSAR:  Objection to form.

11        A.    Dealers, you know.  There was dealers

12   that never did get arrested that he frequented or

13   went by.

14        Q.    Do you know what dealers he was doing

15   these controlled buys from?

16        A.    Well, the guy's dead now, so...

17        Q.    Bob Smith?

18        A.    That was one.  Yeah.

19        Q.    Who was the other one that is dead?

20        A.    Just got a nickname.  I can't

21   remember -- I don't remember his name.  Just had a

22   nickname.  Honest, I don't know.

23        Q.    All right.  Did he have a drug habit in

24   2010?

25              MR. SLOSAR:  Objection to form.
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                    Page 137

```
 1          A.     That, I can't answer.  I can't give you
 2     the truth on.  He could have had, he could not have
 3     had.
 4          Q.     Did you ever buy pills for him?
 5          A.     Have I ever bought pills for him?
 6          Q.     Yeah.
 7          A.     Long time ago.
 8          Q.     Before 2010?
 9          A.     Uh-huh.
10          Q.     Yes?
11          A.     Yes.
12          Q.     Okay.  Did you -- I use the word "buy."
13     Did you ever give him pills?
14          A.     Give him?
15          Q.     Yes.
16          A.     No.  Not as I can remember.
17          Q.     Did your daughter ever talk to you, and
18     Jennifer Lawson I'm referring to, about whether he
19     had any drug problems?
20          A.     No.  She didn't want me to know, but I
21     knew that he was, you know, had a problem.  I knew
22     that he had an injury that caused him to get started.
23     He had to take pills where he got his hand crushed,
24     and I knew that that would lead into bigger things.
25          Q.     When you say you knew, how did you know?
```

 1    What are you basing that on?

 2                MR. SLOSAR:   Objection to form.  You can

 3    answer.

 4        A.    I've seen people, you know, that's clean

 5    that stretch the day is long, but if they get on a

 6    narcotic the doctor puts them on, then they float the

 7    bigger stuff.

 8        Q.    They do what?

 9        A.    They get on bigger stuff that don't help

10    no more.  Back when I first started drinking, one

11    beer would knock me out, and before I quit, I could

12    drink a 30 pack and right there wherever, you

13    wouldn't even know I had one.  It took more to get me

14    going.

15        Q.    You mentioned you stopped drinking

16    currently?

17        A.    Yes.  I ain't drunk in six years.

18        Q.    Six years.  Okay.  Is that after you

19    went to jail on these charges?

20        A.    Before.

21        Q.    Okay.  How soon before had you stopped?

22        A.    I stopped drinking in the beginning of

23    '012.  It's my last one.

24        Q.    How heavily were you drinking in

25    December 2010?

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                              Page 139

```
 1          A.       Every weekend I went to the bar.

 2          Q.       Were you drinking through the week?

 3          A.       Through the week, maybe a six pack,

 4   something like that.  Beer didn't --

 5          Q.       Didn't phase you?

 6          A.       Didn't bother me, no.  Took liquor.

 7          Q.       We talked a little bit about Jesse being

 8   an informant and you referenced the polygraph video.

 9   Any other information to believe he was an informant

10   to police other than that polygraph video?

11          A.       I would have never knew it.

12          Q.       As we sit here today, nothing sticks out

13   to you about what he told police in that polygraph

14   video?

15          A.       No.

16          Q.       Did you ever talk to Mike Simpson about

17   his interactions with Detective York?

18          A.       He called me.  Wasn't exactly about

19   York.  It was when Jay Sauders.

20          Q.       When did he call you?

21          A.       He called me -- first time he called me

22   he come -- he got back -- first time I talked to him

23   since the day that that happened was on Christmas

24   Day.  He called me.  It was bad weather.  He asked me

25   would I run to Pineville and get him some kerosene
```

 1   for his heaters 'cause where he lived had free gas

 2   and the gas would freeze up during cold weather.  He

 3   never had no way of getting there.

 4            I said, Yeah, I'll go before I go down

 5   and eat with mom and them.

 6            So I ran to Pineville.  Only place I

 7   could find it, actually.  I tried to get it local,

 8   and everybody was out.  I went to Pineville, got a

 9   ten gallon kerosene took back to his house.

10   Q.      That was on Christmas Day 2010?

11   A.      Christmas Day 2010.

12   Q.      He talked about Jay Sauders?

13   A.      Said they came to his house and -- went

14   through his house and found a .38 shell.  I think it

15   was a .38 shell.

16   Q.      Tell you anything else?

17   A.      Only thing he said was they started

18   interrogating him.  He told them that's all he had to

19   say.  That any more they'd talk through a lawyer, I

20   think is what he said.

21   Q.      Okay.  Did he say who his lawyer was?

22   A.      To my knowledge, he never had one.

23   Q.      Did you talk to James Allen Helton about

24   his -- any interactions he may have had with

25   Detective York about the Catherine Mills

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                    Page 141

1    investigation?

2         A.    No.  Because when I found out they was

3    talking to him, I knew where he -- I knew which

4    side -- where he was going so I didn't talk to him.

5         Q.    What do you mean by that?

6         A.    Well, he worked for the county forever

7    an informant.  He sent my best friend to prison --

8         Q.    Who was that?

9         A.    -- for no reason.  Timmy Jordan.  Called

10   him Pork.

11        Q.    And prior to Catherine Mills being found

12   dead in December 2010, had Pork already been

13   sentenced and in jail?

14        A.    I can't remember.  He had went -- he

15   went to prison before the weather got cold the year

16   he went.  Might have been '09 when he went.  I'm not

17   sure.

18        Q.    Sounds like it was probably before

19   December 2010?

20        A.    Yeah.  It was warm weather because I

21   went and seen him on a Sunday.  He was leaving on

22   Monday.

23        Q.    To go to jail, prison?

24        A.    Uh-huh.

25        Q.    Yes?

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.

William Lester on 10/09/2018                                        Page 142

```
 1      A.      Yes.

 2      Q.      Did Pork tell you that Helton was the

 3   informant?

 4      A.      Yeah.  He saw the deposition.  He saw

 5   everything and read it.

 6      Q.      Did anybody else tell you that Helton

 7   had been the informant in that case against Pork?

 8      A.      Uh-huh.

 9      Q.      Who else told you?

10      A.      I think Wesley told me.

11      Q.      Wesley Roark?

12      A.      Yes.  I think he told me, best I

13   remember.  Some people from down -- Bob Smith told

14   me.

15      Q.      Okay.

16      A.      Because Bob didn't really like him

17   hanging around.

18      Q.      Is it true you didn't really like Allen

19   Helton because of what he done?

20      A.      Yeah.

21              MR. SLOSAR:  Objection to form.

22      Q.      Did you --

23      A.      We're kin.  I mean...

24      Q.      How close?

25      A.      His great grandpa would have been my
```

 1   uncle.

 2        Q.    Okay.  Kind of distant?

 3        A.    We're distant, but you know, I

 4   acknowledge him, see him, talk to him, but when I

 5   seen where he was going and what he tried to swear

 6   and the deal he cut to get out of all the stealing

 7   and stuff he done, I knew he was dangerous.  Done,

 8   not hanging around him.

 9        Q.    You mentioned Bob Smith that talked to

10   you at jail about an interaction with Detective York.

11   Any other interactions that Bob Smith talked to you

12   about relating to Catherine Mills?

13        A.    No.

14        Q.    Did you buy drugs from Bob Smith?

15        A.    Yes.

16        Q.    For Amanda?

17        A.    Yes.

18              MR. SLOSAR:  Objection.  Asked and

19   answered.

20        Q.    Did you buy drugs from James Helton?

21        A.    Yes.  At one time.

22        Q.    For Amanda?

23        A.    Yes.

24              MR. SLOSAR:  Objection to form.

25        Q.    Would that have been before Catherine

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.

William Lester on 10/09/2018

Page 144

```
 1    Mills was found dead?

 2                 MR. SLOSAR:   Objection to form.

 3         A.     Yes.

 4         Q.     Before you discovered he had been an

 5    informant against Pork?

 6         A.     Yes.

 7         Q.     After that, did you stop buying from

 8    him?

 9         A.     Yes.

10         Q.     Mike Simpson, did you buy drugs from

11    him?

12         A.     Yes.

13         Q.     For Amanda?

14                 MR. SLOSAR:   Objection to form.

15         A.     Yes.

16         Q.     Over what time period were you buying

17    drugs from Mike Simpson for Amanda?

18                 MR. SLOSAR:   Objection to form.

19         A.     I think I started dealing with him a

20    little bit in the last of '08.

21         Q.     How long did it continue?

22         A.     Until he went broke.  Got robbed, he

23    did.  I guess I bought him on up -- up to '011 from

24    him.

25         Q.     I think you testified that you and him
```

```
 1    knew each other from growing up?

 2        A.    Yeah.  Yeah.  I watched him grow up.  He

 3    watched me grow up.  I'm older than him.  We rode the

 4    bus together.  We all met at the same bus stop.

 5        Q.    Was that in Bell County?

 6        A.    Bell County, Fourmile, Kentucky.

 7        Q.    And I know you talked about this a

 8    little bit but I lost track.  He knew Dan moved down

 9    to Moores Creek when, to your memory?

10        A.    To the best of my memory was in '08 when

11    I discovered him over there at Escoes.

12        Q.    That's what I was going to get at.  You

13    described this meeting running into Mike Simpson at

14    Escoes.  You believe that would have been 2008?

15        A.    Yes, sir.

16        Q.    After you realized -- how far did he

17    live from you at that time in 2010?

18        A.    Mile and a half.

19        Q.    Pretty close?

20        A.    Yeah.  He lived up there where the

21    church is.

22        Q.    Did you interact with him more once you

23    realized that you lived close together?

24        A.    No.  I didn't go and make a visit when I

25    seen him.  I spoke to him about seeing did he need a
```

 1  ride.  Sometimes he walk out to the store.  I'd give

 2  him his ride, but once that -- I kind of let --

 3  figured out that he had some things I might need,

 4  then I went and seen him, yeah.

 5       Q.    When you say things you might need,

 6  you're talking about drugs?

 7       A.    Drugs for Amanda, yes.

 8       Q.    How regularly did you visit him?

 9       A.    He didn't keep a lot.  He might have

10  something you could maybe buy from him two days and

11  might be two weeks before he be back in business

12  again.

13       Q.    Okay.  Did you interact with him in any

14  other ways?

15       A.    No.  He -- if he seen me out or if he

16  called, he needed -- my mom's was on free gas there

17  too.  Her place was right below there.  He knew I had

18  stuff to work the oil wells with.

19            He was having gas problems, heat

20  problems, he would call, say, do you have this or

21  that.  I say, Yeah.  He knew I done all that

22  maintenance work.  If he was doing odd job for

23  somebody and it's late, couldn't get the loads or

24  something, he come say, You have a pipe fitting or

25  some glue or something?

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                              Page 147

1            Yeah, come by and get it.

2       Q.    Okay.  We're about at a break.  Let's go

3   off the record for a second.

4            VIDEOGRAPHER:  Going off the record at

5   camera time 12:10.

6            (Recess is taken.)

7            VIDEOGRAPHER:  Going back on the record

8   at camera time 12:27.

9   BY MR. WRIGHT:

10      Q.    All right, Mr. Lester.  Talking a little

11  bit about some of the people you bought drugs from

12  for Amanda.  You mentioned you bought drugs from Bob

13  Smith for Amanda.  What time frame were you buying

14  drugs from him?

15           MR. SLOSAR:  Objection to form.

16      A.    2006 to '012.

17      Q.    How often would you see him?

18      A.    At least three times a week.

19      Q.    You mentioned Cleo.  How often would --

20  what time frame were you buying drugs from her for

21  Amanda?

22           MR. SLOSAR:  Objection to form.

23      A.    Six months.

24      Q.    Do you know what time period that was?

25      A.    That was in '010.

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.

William Lester on 10/09/2018                          Page 148

```
 1          Q.     Is there any reason why that one was
 2   such a small time frame?
 3          A.     She didn't keep a lot.
 4          Q.     Do you recall Detective York asking you
 5   about people who Amanda -- who you buy drugs from for
 6   Amanda?
 7          A.     I volunteered the information to him.
 8          Q.     Okay.  I'm going to go through that and
 9   see if there are some different ones.  Jason Messer?
10          A.     Yes.
11          Q.     When did you buy drugs from him for
12   Amanda?
13          A.     '09 to '012.
14          Q.     How often?
15          A.     Two, three times a week.
16          Q.     There is somebody by the name of a Ford
17   Simmies?
18          A.     Huh.
19          Q.     Simmies Ford?
20          A.     Simmons Fork, Arjay.
21          Q.     Okay.
22          A.     It's the name of the holler.
23          Q.     Who is up there?
24          A.     I just know the guy's name Jackie.  I
25   don't really know his last name.
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                              Page 149

```
 1      Q.      Jackie?

 2      A.      Uh-huh.

 3      Q.      When did you buy from him?

 4      A.      '09.  '08 to '012.

 5      Q.      How often?

 6      A.      Three, four times a week.

 7      Q.      Rick Neighbor?

 8      A.      Napier.

 9      Q.      Napier.  Okay.  This is a transcript?

10      A.      Yes, sir.

11      Q.      Sometimes they get it wrong.

12              Where did he live?

13      A.      Simmons Fork.

14      Q.      Is that the same --

15      A.      That's a different dealer.

16      Q.      When did you visit him?

17      A.      Two, three times a week.

18      Q.      What time period?

19      A.      Probably -- probably the year of '09.

20   Just that year.

21      Q.      Any reason why that -- just that year

22   for that person?

23      A.      He got arrested, I think.

24      Q.      Jackson, some female by the name of

25   Jackson?
```

```
 1                  MR. SLOSAR:  Objection to form.

 2        Q.     Does that ring a bell?

 3        A.     No.

 4        Q.     Danny Jackson, maybe?  No?

 5        A.     No.

 6        Q.     Somebody by the name of Red Bones?

 7        A.     Yeah.

 8        Q.     Who is that?

 9        A.     Don't know his real name.  Just know

10   where he lives.  That's what everybody called him at

11   that time.

12        Q.     Where did he live?

13        A.     Quiet Mountain.

14        Q.     Is that in Knox County?

15        A.     No, it's in Bell County.  Arjay.

16        Q.     When did you buy from that person?

17        A.     Some in '010.

18        Q.     How often?

19        A.     Maybe once a week.  He didn't keep a

20   lot.

21        Q.     Any reason why you stopped going there

22   in 2010?

23        A.     He's just so far up there and he didn't

24   keep a lot.  You could never get ahold of him except

25   you went to his house.
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                              Page 151

1        Q.      Anybody else come to mind?

2        A.      No.

3        Q.      I believe you testified that you dated

4   your -- you pegged the beginning of your on-and-off

5   relationship with Amanda to 2006?

6        A.      Yes.

7        Q.      Okay.  Now during that time period, did

8   Amanda Hoskins have a job --

9                MR. SLOSAR:  Objection to form.

10       Q.      -- to your knowledge?

11               MR. SLOSAR:  Same objection.

12       A.      I have no idea when I first met her.  I

13  have no idea.

14       Q.      I know when you first met her.  After

15  you --  you were in from 2006 to December 2010, that

16  was a four-year period; right?

17       A.      Yes.

18       Q.      Did she have any employment during that

19  four years?

20               MR. SLOSAR:  Objection to form.

21       Q.      To your knowledge?

22       A.      Not as I know it.

23       Q.      Do you know where she got any income

24  from?

25               MR. SLOSAR:  Objection to form.

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                    Page 152

```
 1        Q.     What was that?

 2        A.     I didn't say.

 3               What did you say?  Did she get income

 4   from --

 5        Q.     From child support, family paying her

 6   bills, just to your knowledge.

 7        A.     She drew a -- some kind of little ole

 8   check on Landon and Lexi.  I think it was, like, 250

 9   a month, 258.  I know it wasn't much.

10        Q.     Is that from Joe King?

11               MR. SLOSAR:  Objection to form.

12        A.     He has -- no.  He never -- he hasn't

13   paid a dime on Landon as far as I know since 2008.

14   If he has, she never told me.

15        Q.     Okay.  Other than that you said about

16   $250 check a month she got?

17        A.     Something like that.

18        Q.     Are you aware of any other financial

19   support she received in 2010?

20        A.     I'm sure there was more persons than me

21   giving her money.

22        Q.     Were you giving her money and buying

23   drugs for her?

24               MR. SLOSAR:  Objection to form.

25        A.     No.  I consider it money buying the
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                      Page 153

1    drugs.

2         Q.    Cost money; doesn't it?

3         A.    Cost me money.

4         Q.    Do you have any information to believe

5    that other men were buying drugs for her?

6              MR. SLOSAR:  Objection to form.

7         A.    I'm sure but I never knew.

8         Q.    Okay.  Why are you sure?

9              MR. SLOSAR:  Same objection.

10        A.    Because when I ran out, somebody else

11   picked her up.  When I ran out of money, she'd leave.

12        Q.    Was that the nature of the on and off?

13        A.    Yes.

14             MR. SLOSAR:  Objection to form.

15        Q.    Did you ever see her with other men?

16        A.    Well, I seen her with Joe, you know.

17        Q.    Anybody else?

18        A.    Yeah.  I don't know his name.  He was a

19   guard down at the jail.

20        Q.    Is that Rodney Elliott?

21        A.    Yes, that's it.

22        Q.    Okay.  When was -- when was she with

23   him, to your knowledge?

24        A.    I'm pretty sure sometime 2011.

25        Q.    That's a good point.  We've talked about

1   from 2006 to 2010.  Did your on-and-off relationship

2   with Amanda continue past December 2010?

3          A.     Yes.

4          Q.     Is it still on and off to this today?

5          A.     No, sir.  I haven't seen her since March

6   of 2012.  What I mean is personally seen her.  I see

7   her every Saturday when I go pick up the kid.  I

8   don't talk to her.  I mean, she may be outside, throw

9   her hand up.  If not, Lexi comes out to the car.

10         Q.     Do you share custody with one of the

11  kids, one of her kids?

12         A.     No, sir.  No, sir.

13         Q.     But you pick -- which one is it that you

14  pick up?

15         A.     Her daughter.

16         Q.     Okay.  Are you the father of her

17  daughter?

18         A.     That I don't know, but I've been there

19  for her since the day she come in the nursery.  I

20  consider myself her dad, but I don't know I'm her dad

21  for sure.

22         Q.     I understand, but you treat yourself as

23  one?

24         A.     Yes, I do.

25         Q.     Was -- I don't know the ages of the

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                        Page 155

 1  children.  I don't want to put that on the record,

 2  but was the daughter born during the on-and-off

 3  relationship while you were with Amanda?

 4              MR. SLOSAR:  Objection to form.

 5       A.     Yes.

 6       Q.     What year?  You don't have to get into

 7  the month and date.

 8       A.     It was November 2008, I'm pretty sure.

 9       Q.     Is there anybody else who treats the

10  daughter the same way you do?

11       A.     No, sir.

12              MR. SLOSAR:  Objection to form.

13       Q.     Do you have any information who the

14  other potential father may be?

15              MR. SLOSAR:  Objection to form.  Calls

16  for speculation.

17       A.     No, sir.

18       Q.     No.  All right.  So you indicated that

19  the on-and-off relationship with Amanda ended in

20  March 2012.  Is that right?

21       A.     Yes, sir.

22       Q.     Now, I know for a period of time she was

23  in jail.  You were in jail.  Y'all both been out

24  since, I guess, 2015.  Is that correct?

25              MR. SLOSAR:  Objection to form.

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                    Page 156

```
 1        A.      I've been out since 2012, October the
 2   5th.
 3        Q.      You were out before she was?
 4        A.      Yes, sir.
 5        Q.      Did you visit the daughter once you got
 6   out of jail?
 7        A.      I picked up where I left off, yes.
 8        Q.      Okay.  And that continued after Amanda
 9   got out of jail?
10        A.      Yes, but I never went inside the house.
11   Lexi come to the car.
12        Q.      That's the question.  Any interaction
13   with Amanda?
14        A.      No, sir.
15        Q.      Is there any reason why it went from on
16   and off to just completely off?
17        A.      Well, the day they declared our bond
18   that we was eligible, we was all three set the same
19   amount, and when I told David that that was fine, I
20   could do that, I could get that, she looked over at
21   me and told me, Well, you'll get out but I know I
22   won't.  I said, You will.
23               We left the courtroom on a Friday, and
24   on a Wednesday, I made my bond, got out.  And then at
25   our appearances, in-court appearance, they finally
```

```
 1   set her bond that they could reach, but when it was

 2   reached, they told her -- her lawyers spoke to the

 3   judge and said that we would have no contact if they

 4   would let her out.  There would be no contact between

 5   me and her, even though we was going to be tried

 6   together, if we went on the trial, me and her was.

 7              And when he said that, she stepped on

 8   the other side of her lawyer and we never really

 9   talked -- we never talked since.  I mean, she might

10   call and say Lexi needs this or something, but that

11   would be it.  That's it.

12      Q.    So, did you have the understanding that

13   she would have been able to get out on bond sooner

14   than 2015?

15              MR. SLOSAR:  Objection to form.

16      A.    No.  I know she couldn't reach the

17   amount I could.  I knew there was no way.

18      Q.    So, the -- Rodney Elliott, the time that

19   she was with him was 2011 to your understanding.  Is

20   that right?

21              MR. SLOSAR:  Objection to form.

22      A.    I'm not sure, but I think.

23      Q.    Yeah.  What information do you have that

24   makes you believe that?

25      A.    She seeing me too.
```

```
 1          Q.      Okay.  Did she talk about Rodney Elliott
 2   to you?
 3          A.      No.  Me and him confronted each other
 4   one time at the house in the driveway, but nothing
 5   happened.
 6          Q.      At your house?
 7          A.      Her house.
 8          Q.      And her house, is that Linda Taylor's
 9   house?
10          A.      Topaz Court when this happened.
11          Q.      What was the confrontation like?  What
12   was it about?
13          A.      She wasn't supposed to have been
14   nowhere, but she went Christmas shopping with me.  I
15   brought her back and he was there waiting on her.
16          Q.      What happened after that?
17          A.      Just a little -- I didn't go to church
18   then, so we had a little cussing and we just spoke
19   our mind, and I got in the car and drove off.  That's
20   as far as it went.
21          Q.      Was she in jail during 2011?
22          A.      Yeah.  Knox County, but they sent her to
23   Harlan.
24          Q.      She was in Knox for part of it, though?
25          A.      Yeah.  I'm pretty sure.
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                        Page 159

```
 1          Q.     He was the deputy jailer at Knox County,

 2   your understanding?

 3          A.     I don't know if he was a deputy jailer

 4   he was a jailer.

 5          Q.     Yeah.

 6          A.     He was a guard, actually.  I think the

 7   deputy jailer is David Stewart and David -- couple

 8   more at that time.

 9          Q.     She ever tell you that he would procure

10   items for her when she was in jail while he was a

11   guard?

12                 MR. SLOSAR:  Objection to form.

13          A.     No.  Never mentioned his name.  I never

14   knew about him until later.

15          Q.     Was he later arrested?

16          A.     Him?

17          Q.     Yeah.  For promoting contraband?

18          A.     He was arrested, I remember it made the

19   news, in '012 after she was sent to Harlan County

20   when she was arrested.

21          Q.     Was the charges related to Amanda

22   Hoskins providing items to her?

23                 MR. SLOSAR:  Objection to form.

24          A.     The ones that they talked about in the

25   news, no.  It was about other female prisoners, he
```

 1   was pushing the drugs to them.

 2          Q.     Do you know who those female prisoners

 3   were?

 4          A.     The girl was a Powers.  She died earlier

 5   this year.  She overdosed.  The only one I know.

 6          Q.     Did Amanda ever talk about anything he

 7   did for her while she was in jail?

 8          A.     No.

 9          Q.     Any other men that Amanda may have been

10   romantically involved with while you were on and off

11   with her from 2006 to 2012?

12          A.     That's the only ones I know.

13          Q.     Did you have any other confrontations

14   with Elliott besides that one?

15          A.     No.  No.  Just that was the only one.

16          Q.     How would you describe Amanda's drug use

17   in December 2010?

18          A.     Her drug use?

19          Q.     Yes.

20                 MR. SLOSAR:  Objection to form.

21          Q.     Was she a heavy user?

22          A.     Yes.

23          Q.     She got prescriptions from Dr. Warren in

24   that time period; correct?

25          A.     For a month, yeah.

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                   Page 161

```
 1        Q.     But --

 2        A.     Little over a month, I think.

 3        Q.     You were furnishing drugs to her that

 4   were not prescribed; right?

 5               MR. SLOSAR:  Objection to form.

 6        A.     Yes.

 7        Q.     Did she use the drugs at her mom's

 8   house?

 9        A.     That, I don't know.

10        Q.     Did she use them at your house?

11        A.     Yes.

12        Q.     Did you see it?

13        A.     Sometimes, yes.

14        Q.     Did she snort it?

15               MR. SLOSAR:  Objection to form.

16        A.     When she first started out, yeah.

17        Q.     Did she start using needles?

18               MR. SLOSAR:  Objection to form.

19        A.     Yes.

20        Q.     Had she started using needles by

21   December 2010?

22        A.     Yes.

23        Q.     At your house?

24        A.     Yes.

25        Q.     If Jesse Austin said he saw needles at
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.

William Lester on 10/09/2018                                    Page 162

```
 1    your house, would they be for anyone other than

 2    Amanda?

 3         A.    No.  That's the only person that ever

 4    did medicine at my house.

 5         Q.    Yeah.  I think you indicated you only

 6    bought drugs for her; right?

 7         A.    Yes.

 8         Q.    Now, you indicated that she would --

 9    this on and off would change when you didn't have the

10    money to buy her drugs; right?

11               MR. SLOSAR:  Objection to form.

12         A.    Yes.

13         Q.    The work wasn't steady enough to support

14    her all the time; was it?

15         A.    Well, if you go to a big dollar habit, I

16    couldn't bring it in --

17         Q.    I understand.

18         A.    -- every day.

19         Q.    I understand.  Had she reached that big

20    dollar habit before December 2010?

21               MR. SLOSAR:  Objection to form.

22         A.    Yes.

23         Q.    When you say big dollars habit how much

24    are you talking about a week that you would be

25    spending?
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                    Page 163

1                    MR. SLOSAR:  Objection to form.

2           A.     If I turned the money loose to her, I

3    could go 500 a day if I wanted to, but I wouldn't.  I

4    wouldn't turn it loose.

5           Q.     Around the time approaching

6    December 2010 and the late part of that year, how

7    much money were you turning loose on her?

8                    MR. SLOSAR:  Objection to form.

9           A.     I would only let her have max would be

10   two pills.  Maybe one -- one day a week I might let

11   her get three.  I mean, I might not let her --

12          Q.     A day?

13          A.     One day.

14          Q.     Yeah.  So one, two, maybe three pills a

15   day?

16          A.     No.  One day three.  The rest of the

17   time I just get her two.

18          Q.     Okay.  One day three.  Rest of the days

19   two.  How much did a pill usually cost?

20          A.     They would go, according to which dealer

21   you went to, anywhere from 25 to $40.

22          Q.     What kind of pills were you buying?

23          A.     Roxicet 30s.

24          Q.     Did her drug use ever vary or was it

25   always the Roxicets?

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.

William Lester on 10/09/2018                              Page 164

```
 1        A.     Well, when I first met her it was
 2   Oxycontin.  When she first came on, came across
 3   honest to me.
 4        Q.     When to your memory did she switch to
 5   the Roxicet?
 6        A.     When they changed the production on
 7   Oxycontin where you couldn't scratch them and snort
 8   them.  They were gel.  You could do nothing but
 9   swallow them.
10        Q.     Do you know when that was?
11        A.     No, sir, I don't.
12        Q.     It was before 2010?
13        A.     Yes.
14        Q.     In December 2010, was anybody else --
15   you said you had a maximum.  Was anybody else
16   supporting her on the side, to your knowledge?
17        A.     I don't know because if it was, she
18   would not have told me, no way.
19        Q.     Okay.  Did you have any information to
20   believe that Amanda stole?
21               MR. SLOSAR:  Objection to form.
22        A.     Stole from who?
23        Q.     Let's start, stole from anybody.
24        A.     That I have information?
25        Q.     Yeah.
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                    Page 165

1          A.      One time.

2          Q.      Doesn't have to be firsthand.

3    Secondhand, this is a discovery deposition.  I'm just

4    curious what you heard.

5          A.      Only one time.

6          Q.      You only have information she stole

7    once?

8          A.      Rest of it was -- that the information

9    was on, I knew that other people was with her, and I

10   knew that she didn't have knowledge of where that

11   was, so...

12         Q.      Okay.  Let's identify who we're talking

13   about.  Who was the person who had something stolen

14   from them?

15              MR. SLOSAR:  Objection to form.

16         A.      Would have been Donna.

17         Q.      Donna Mills?

18         A.      Would have been John Valdez, but it was

19   at Donna Mills' house.

20         Q.      What was stolen from him?

21         A.      Supposed to have been a gun.

22         Q.      What information did you have about

23   Amanda's role?

24         A.      Amanda wasn't the one who stole it, but

25   I seen Amanda in the driveway as I was coming home

```
 1   from work, and Donna's daughter was crawling out the
 2   window, but I never did tell nobody.
 3          Q.     All right.
 4          A.     So they blamed Amanda.  Amanda was
 5   never -- not out of the car.
 6          Q.     What was stolen, to your knowledge?
 7          A.     The best I can remember, it was a
 8   nine-millimeter.  I'm not sure.
 9          Q.     So a gun was stolen from John Valdez is
10   what you heard?
11                 MR. SLOSAR:  Objection to form.
12          A.     What I was told, yes.
13          Q.     Who told you that?
14          A.     He did.  He filed charges, I think.
15          Q.     You said that Amanda was in Donna Mills'
16   driveway?
17          A.     She was sitting in the driveway and the
18   garage is on the upper side of the house.  She was
19   sitting in front of the garage doors in the van.  I
20   seen it because it was Linda's van as I was coming to
21   work.  And as I looked like, like this, I saw Kayla
22   coming through the bedroom window out onto the porch
23   and I knew then something is not going on good there.
24          Q.     Did Amanda know you were driving by?
25          A.     No.
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                          Page 167

```
 1          Q.      That was just a coincidence?

 2                  MR. SLOSAR:  Objection to form.

 3          A.      I was in a different vehicle.

 4          Q.      Did you see Donna or John Valdez at the

 5    time?

 6          A.      They was gone.  They both was at work.

 7    John worked at Advanced and Donna worked at the

 8    Barbourville Hospital, and I wouldn't tell Donna

 9    anything because I didn't want her to discipline

10    Kayla or -- I didn't want to get involved in it.

11          Q.      Did you talk to Amanda about it?

12          A.      Yeah, I told her.  I saw, and I knew she

13    was sitting in the driveway, but they all switched

14    the blame on Amanda.

15          Q.      Was anybody else there?

16          A.      Not to my knowledge.  If they was, they

17    stood in the house.

18          Q.      You didn't have any information to

19    believe people were stuck at the house, other people

20    besides Kayla?

21          A.      No.  The only vehicle there was Linda's

22    van.

23          Q.      Did you ever find out why she was going

24    out a window if no one was there?

25                  MR. SLOSAR:  Objection to form.
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.

William Lester on 10/09/2018                                 Page 168

```
 1        A.     At that period of time, her momma had

 2   took her house key from her.  The best I can

 3   remember.

 4        Q.     Did Amanda explain why she was there?

 5        A.     Huh-uh.

 6        Q.     No?

 7        A.     No.

 8        Q.     Did you ever have any information that

 9   she's the one who sold the gun back to John Valdez?

10               MR. SLOSAR:  Objection to form.

11        A.     No, sir.  Just rumor, but I don't know.

12   I couldn't say it was true.

13        Q.     Did she plead guilty to the charge --

14               MR. SLOSAR:  Objection.

15        Q.     -- that stemmed out of the incident, to

16   your knowledge?

17               MR. SLOSAR:  Objection to form.

18        A.     I can't.  I didn't go around the court

19   when that happened.

20        Q.     Okay.  Any other information that Amanda

21   had stolen from others?

22        A.     Just a few little birthday outfits was

23   gone from my daughter.

24        Q.     Which daughter?

25        A.     Michelle.
```

1        Q.      Did you -- when was that?

2        A.      That would have been Madison's, my

3    granddaughter's birthday party.  It would have been

4    past '06.

5        Q.      Did you ever talk to Amanda about that?

6        A.      No.

7        Q.      No?

8        A.      No.  I just went and got the stuff back.

9        Q.      Got the stuff back from where?

10       A.      That pawn shop.

11       Q.      You don't know how it ended up at the

12   pawn shop?

13       A.      Huh?

14       Q.      You don't know how it ended up at the

15   pawn shop?

16       A.      I just know her routine.

17       Q.      Amanda's routine?

18       A.      (The witness nods.)

19       Q.      Is that yes?

20       A.      Yes.

21       Q.      When you say "routine," would she steal

22   things and sell it to the pawn shop?

23               MR. SLOSAR:  Objection to form.

24       A.      If anything -- yes.  If anything that I

25   am missing, I knew that's where it would go.

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                    Page 170

```
 1        Q.     What did you ever have missing that
 2   ended up at the pawn shop?
 3             MR. SLOSAR:  Objection to form.
 4        A.     It wasn't a big amount.  Just some hand
 5   tools one time, but I went and got it out back.  The
 6   guy knew me up there.  He just told us I can come
 7   pick it up.  He knew I was coming, I'd be back for
 8   it.
 9        Q.     When was that?
10        A.     In that time frame.
11        Q.     Around December 2000 --
12        A.     Oh, no, no, no.  From '06 to '12.
13        Q.     Okay.  Do you know if it was before
14   Catherine Mills was found dead?
15        A.     Oh, yeah.  I couldn't tell you the year.
16        Q.     Any other information to believe that
17   she was stealing from you?
18        A.     No.
19        Q.     Did she ever steal toys from one or both
20   of your daughters?
21        A.     Never.
22        Q.     Never heard that from Michelle Edwards?
23             MR. SLOSAR:  Objection to form.
24        A.     Oath thing that was took there
25   was -- it's a little game, DS I think is what they
```

```
 1   call them.

 2          Q.     A game system?

 3          A.     Just a little game you pack it.  It

 4   don't come with things that you leave in your house.

 5   DS, had my granddaughter's name on it, Madison.

 6          Q.     Did that end up go missing?

 7          A.     Yeah.  Went to the pawn shop and we got

 8   it.

 9          Q.     So you mentioned tools, baby clothes,

10   game system.  Anything else you went and got from the

11   pawn shop that had been taken from you or your

12   family?

13          A.     That was it.

14          Q.     Jesse Lawson said that in the polygraph

15   video that a bunch of items had been stolen during

16   Thanksgiving dinner from, I guess, your sister's

17   bathroom?

18          A.     She never ate a holiday dinner at my

19   sister's house in her life.

20          Q.     Okay.  Any other crimes?  We've talked

21   about drug use and stealing.  Any other crimes that

22   you have information that Amanda may have committed?

23          A.     No.

24          Q.     Did she get convicted of a hit and run?

25          A.     Well, yeah.  I thought your topic was
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                    Page 172

1    stealing.

2          Q.      Yeah.  We talked about the stealing.

3    Was there anything else about the stealing?  Have we

4    covered everything now?

5          A.      Yes.

6          Q.      We talked about the drug use.  Now I'm

7    talking about other crimes?

8          A.      Hit and run.

9          Q.      Do you remember when that was?

10         A.      That was in early of '07 or '08.

11         Q.      That was during the period you were on

12   and off with Amanda?

13         A.      Yeah.

14         Q.      Do you know the man she was with?

15         A.      At the time?

16         Q.      Yeah.

17         A.      Frankie Messer.

18         Q.      Was he in the car with her?

19         A.      Oh, that, I don't know.  I didn't even

20   know nothing about it until I saw it on the news the

21   next morning.

22         Q.      So that was when you were off?

23         A.      Off.  I was off.

24         Q.      Did Amanda ever tell you about her

25   interview with Detective York?

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                           Page 173

```
 1                    MR. SLOSAR:  Objection to form,
 2    foundation.
 3         A.    No.  Not really.
 4         Q.    There was an attempt during that
 5    interview to call you.
 6         A.    Oh, I was led to believe that it was
 7    from the Barbourville City Police Department.
 8         Q.    That was --
 9         A.    She called me.  I was in London laying
10    tile in a house.
11         Q.    Okay.  Did she talk to you about that
12    afterwards?
13         A.    She never did.
14         Q.    No?
15         A.    After that.
16         Q.    In that -- here it is.  In that
17    interview, she said that, Everyone knows he's been
18    out of work since last November, talking about you.
19         A.    Yeah.
20         Q.    Is that true?
21         A.    No.  That's not true.
22         Q.    She said that you were talking to Joe
23    King at one point before Catherine Mills was found
24    dead, and you were telling Joe King that they were
25    going to take your trailer.  Is that true?
```

1       A.      They tried to take it.

2       Q.      Who tried to take it?

3       A.      The bank.

4       Q.      Was that taking place before Catherine
5   Mills was found dead?

6       A.      Yeah.

7       Q.      Because you were behind on --

8       A.      I was not behind.

9               MR. SLOSAR:  Objection to form.

10      Q.      Why were they trying to take it?

11      A.      I put the trailer and the car up for my
12  daughter, Jennifer Lawson, to get a loan for her new
13  car, and Jennifer was three payments behind.  I had
14  to leave the job where I was remodeling and putting
15  in apartments and a post office to go down there and
16  confront the guy about what was going on.

17      Q.      That was all before December?

18      A.      Yes.

19      Q.      Before Catherine Mills was found dead?

20      A.      Yes.

21      Q.      She said you told them that they were
22  getting ready to take your car.  Is that the same?

23      A.      They tried to do it that day.  All in
24  the same day.

25      Q.      What day was it?  Do you know?

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                    Page 175

```
 1          A.      I have no idea.

 2          Q.      Was it after Thanksgiving?

 3          A.      I have no idea.  It was still warm.

 4          Q.      Okay.  It was earlier in the year?

 5          A.      I believe it was more past then because

 6   Jason York was down there talking to Jennifer and he

 7   tried to run the repo guy off.

 8          Q.      Did --

 9          A.      So it would be past December.

10          Q.      They said that -- she said you told them

11   that they cut your water off.  Did that ever happen?

12          A.      I cut it off because the lines was

13   busted.

14          Q.      When was that?

15          A.      In that same time frame because I had

16   another water meter with my name on it for my

17   daughter that was behind on the car and she hadn't

18   paid the bill.  If you've got two meters, they cut

19   both meters.

20          Q.      What time frame would that have been?

21          A.      Had to be in early '010.  Early '010.

22   Middle of summer, actually.

23          Q.      She said they cut your electricity off?

24          A.      They never cut my electricity off during

25   that time.
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                    Page 176

```
 1        Q.      She said all your bills got paid at
 2   once.  Is that true after Catherine Mills was found
 3   dead?
 4        A.      That is a lie.
 5        Q.      That's not true?
 6        A.      No, sir.
 7        Q.      Do you have any reason why she would
 8   have lied?
 9                MR. SLOSAR:  Objection to form.  Calls
10   for speculation.
11        A.      No.  I have no idea.
12        Q.      And you mentioned that you talked to
13   Wesley Roark about Catherine Mills' money before she
14   was found dead; right?
15        A.      Yes.  At Messer's Market, yeah.
16        Q.      And part of the conversation was if work
17   doesn't pick up; right?
18        A.      Uh-huh.
19        Q.      Yes?
20        A.      Yes.
21        Q.      Because work was slow at that time?
22        A.      Yes.
23        Q.      You mentioned that you don't interact
24   much with Amanda.  Do you interact with other members
25   of her -- I know the daughter, but putting the
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                        Page 177

1    daughter aside, other members of the family, Jerry

2    Wayne, Linda Taylor?

3        A.    I talk to Linda whenever she calls.  I

4    gave -- Jerry Wayne got an apartment.  I gave him

5    some furniture for it this year.

6        Q.    You just -- your connection to Linda

7    Taylor now is mainly over the phone?

8              MR. SLOSAR:  Objection to form.

9        A.    Nine out of ten times.  Nine out of ten

10   conversations, yeah.

11       Q.    I think while you were dating Amanda you

12   would visit her home; right?

13       A.    Yes.

14       Q.    Eat with them?

15       A.    Yes.

16       Q.    Did you ever spend the night?

17       A.    No, sir.

18       Q.    Why not?

19       A.    Because of, I guess, my respect of

20   Linda.  She was Christian.

21       Q.    But Amanda would spend the night with

22   you?

23       A.    At my house, yes.

24       Q.    You don't eat with them anymore?

25       A.    No.

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.

1           MR. SLOSAR:  Objection to form.

2      Q.     You said you let Jerry Wayne have some

3   furniture.  Do you interact with him?

4      A.     No.  If he has a problem, you know, car

5   wrecks, something goes wrong with his car, he's got a

6   question, he'll call me, if he knows it's anything I

7   have knowledge of, you know.

8      Q.     Back in December 2010, did you interact

9   much with Jerry Wayne then?

10     A.     Yes.

11     Q.     What would you do?

12     A.     If he needed pop, brought it home to him

13   because he always was babysitting, getting Landon off

14   the bus or whatever.  Keeping the house clean.

15     Q.     Would you be in contact with him very

16   regularly?

17     A.     Well, at that time I was coming and

18   going at Linda's house.  At the time I was there, I

19   saw him.  He didn't have a license then or nothing.

20     Q.     I believe you said that Amanda Hoskins

21   lived with Linda Taylor at Topaz Court in

22   December 2010?

23     A.     Yes, sir.  Barbourville.

24     Q.     Barbourville?

25     A.     Yeah.

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                          Page 179

```
1        Q.      Sometimes that little area I think is
2   called Bimble?
3        A.      Yes, sir.
4        Q.      How far is -- at that time was the Topaz
5   Court residence to your Moores Creek residence?
6        A.      About seven miles.
7        Q.      How long would it take to travel that?
8        A.      Fifteen minutes.
9        Q.      At the time Mike Simpson lived a mile,
10  mile and a half down the road from you?
11       A.      Up above me.
12       Q.      On Moores Creek?
13       A.      Yes.
14       Q.      Wouldn't have been much more different
15  to travel from Mike's house to hers?
16       A.      Huh-uh.
17       Q.      No?
18       A.      No, sir.
19       Q.      At the Topaz Court residence,
20  did -- while Amanda was there, did she have a car?
21       A.      No.
22       Q.      Did she have a phone, cell phone?
23       A.      Yeah.  She had a cell phone.
24       Q.      She did?
25       A.      Uh-huh.
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                    Page 180

1        Q.     Do you remember what the number was?

2        A.     Only one I can definitely quote you is

3    Linda's, and that was 269-5987.

4        Q.     Okay.  Did -- when you say it was

5    Linda's, was it in Linda's name?

6        A.     I don't know if it was prepaid or had a

7    contract.  I don't remember.

8        Q.     I see.  Did Amanda use it as if it were

9    her own?

10              MR. SLOSAR:  Objection to form.

11       A.     Sometimes.  Yes, sometimes.

12       Q.     What about December 2010?

13       A.     She had a -- she had a phone, but I

14   cannot remember the number.

15       Q.     Okay.  Did Linda have a separate phone?

16       A.     Not to my knowledge.

17       Q.     Did she have a home phone?

18       A.     Sometimes.

19       Q.     Did she have a home phone in

20   December 2010?

21       A.     Maybe.  I'm not sure.

22       Q.     Not sure?  Jerry Wayne have a phone?

23              MR. SLOSAR:  Objection to form.

24       A.     That, I don't know.

25       Q.     Don't know?

```
 1          A.     No.

 2          Q.     Would you call Jerry Wayne?

 3          A.     Not at that time.

 4          Q.     Did Jonathan Taylor have a phone?

 5                 MR. SLOSAR:  Objection to form.

 6          A.     Sometimes.

 7                 MR. SLOSAR:  Objection to form.

 8          Q.     Would you ever call Jonathan Taylor?

 9          A.     Or he would call me.

10          Q.     So you two would call each other in

11   December 2010?

12          A.     All through the year.  Not every day,

13   not every week, but when he had something on his

14   mind, needed a ride, go up to his grandma's store,

15   he'd call me if he couldn't find no other way.

16          Q.     Okay.  Now is it true you knew Amanda

17   before you knew Jonathan?

18          A.     Yes, yes.

19          Q.     How long had you known Jonathan before

20   December 2010?

21          A.     I met him the year that she had the

22   accident.

23          Q.     That he had the accident?

24          A.     No.  She had the accident.  She had hers

25   first.  She hit the little girl.
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                    Page 182

```
 1        Q.     Oh, okay.  Then he had an accident in

 2   his home; right?

 3        A.     Yes.  Guy got killed.

 4        Q.     Did he live at Linda Taylor's?

 5               MR. SLOSAR:  Objection to form.

 6        A.     Sometimes.

 7        Q.     He would stay there?

 8        A.     Yes, sir.

 9               MR. SLOSAR:  Objection to form.

10        Q.     In December 2010, was he staying at

11   Linda Taylor's?

12        A.     He was staying but when he stayed, he

13   never come out of the bedroom except to go to the

14   bathroom or go to the refrigerator.

15               So if you went there, you did not know

16   he was back there because him and Jerry Wayne shared

17   the bedroom together.  They had their game system

18   back there and chairs, and he only came out to go to

19   the refrigerator to get a drink or when food was

20   prepared, he'd take it and go back.

21               So if he was there, I don't know if he

22   was or not.  I'm not saying he wasn't because he

23   never come down the hallway.

24        Q.     You didn't interact with him much if he

25   was there; right?
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.

```
 1          A.     Oh, when he walked out was stop me and
 2   we have a conversation about something, you know, cut
 3   up a little bit.  He got what he came out to get and
 4   go back.
 5          Q.     Okay.  When did y'all become close
 6   enough that he'd be calling you, you'd be calling
 7   him, give him rides, that sort of thing?
 8          A.     It was actually after he had the bad
 9   accident because used to take her down there to
10   change his gauze and all that packing that he had to
11   have.
12          Q.     And did he always have his own cell
13   phone?
14          A.     I don't know.
15          Q.     In December 2010, how long had he had a
16   cell phone, to your knowledge?
17          A.     I don't know.
18          Q.     All right.  Did you call Mike Simpson?
19          A.     Yes.  I've called Mike.
20          Q.     In December 2010, would you be calling
21   him on occasion?
22          A.     Yes.
23          Q.     What about James Helton, would you be
24   calling him?
25          A.     Occasionally.
```

```
 1          Q.      Okay.  Bob Smith, would you be calling
 2    him?
 3          A.      Oh, yes.
 4          Q.      Donna Mills -- I'm sorry, Kayla Mills,
 5    she dated on and off with Jonathan.  Did Jonathan
 6    ever stay at Donna's house, to your knowledge?
 7          A.      He may have came there and eat, but I
 8    don't know of him staying all night.
 9          Q.      Okay.
10          A.      If he did, he never told me.
11          Q.      Did Kayla have a cell phone?
12                  MR. SLOSAR:  Objection to form.
13          A.      That, I don't know.
14          Q.      Would you ever be calling Kayla Mills?
15          A.      No.
16          Q.      Would you ever be calling Donna Mills?
17          A.      Yes.
18          Q.      In December 2010?
19          A.      Not at that point, no.  But I've called
20    her prior to that, you know, on the rides and stuff.
21          Q.      When you're on what?
22          A.      When we would be going on a ride or
23    something, seeing what time we's leaving, what time
24    we meeting.
25          Q.      Okay.  That sounds like that would be
```

```
 1    like a weekend thing?

 2         A.     Yeah.

 3         Q.     Do you know whether Linda Taylor knew

 4    that you were buying drugs for Amanda?

 5                MR. SLOSAR:  Objection to form.  Calls

 6    for speculation.

 7         Q.     Did you ever talk about that with Linda?

 8                MR. SLOSAR:  Same objection.

 9         A.     She had called me, confronted me about

10    it several times.

11         Q.     Several times?

12         A.     Yeah.

13         Q.     Before December 2010?

14                MR. SLOSAR:  Objection to form.

15         A.     All the way up through '12.

16         Q.     When did that start?

17         A.     I guess once they -- it became knowledge

18    that she was becoming an addict.

19         Q.     Did she -- what would she tell you that

20    she knew?

21         A.     She just said she didn't know if I was a

22    drug dealer or if I was buying, but please don't.

23         Q.     Did she say she had any information from

24    Amanda or somebody else to know that you were the

25    supplier for Amanda?
```

1                    MR. SLOSAR:   Objection to form.

2           A.      She never once said that, but she

3     knew -- if she passed me going up Stinking Creek

4     yards, she knew where I was going, you know.

5           Q.      Yeah.   You said she called several

6     times?

7           A.      Uh-huh.

8           Q.      Up through 2012?

9           A.      Yes.

10          Q.      And before December 2010?

11          A.      Yeah.

12          Q.      Did you ever admit to her that you

13    were --

14          A.      No, not until I got arrested.

15          Q.      Why wouldn't you admit that?

16          A.      Because I knew I was doing wrong, but I

17    was kind of, you know, just trying to keep her happy,

18    and if I knew if I got where I couldn't get access to

19    her and she would change my access to Amanda, then I

20    would be the loser, I thought.

21          Q.      Now, you've had -- you treat Amanda's

22    daughter like your own.

23          A.      Yes, sir.

24          Q.      Were you doing that in December 2010?

25          A.      Done it since the day she come in the

 1   nursery when she was born.

 2          Q.     So do you know whether Linda Taylor knew

 3   that your relationship with Amanda was romantic?

 4                 MR. SLOSAR:  Objection to form.

 5          A.     I have no idea.

 6          Q.     She never questioned why you treated the

 7   daughter like a father figure?

 8          A.     No.  Because I treated Landon the same

 9   way.

10          Q.     Okay.

11          A.     And Joe King is his daddy.

12          Q.     She never confronted you about your

13   relationship with Amanda other than just the drug

14   use?

15          A.     No.

16          Q.     Did it ever work the other way, that you

17   told Linda that you were concerned about Amanda

18   because she was a heavy drug user?

19          A.     No.  No.  Not until later, you know.

20          Q.     Did you ever tell Linda that -- about

21   this routine where items would be at the pawn shop

22   and you would have to go get them?

23          A.     Not as I can remember.

24                 VIDEOGRAPHER:  Excuse me, sir.  Could

25   you move that bottle?

```
 1                    MR. WRIGHT:  Is the food here?  I might
 2     be at a point --
 3                    MR. SLOSAR:  No.  They don't deliver.
 4     When we go on the break, we're just going to go.
 5                    MR. WRIGHT:  That's fine.  I'm kind of
 6     at a point where we'll start -- this might be a good
 7     break.
 8                    MR. SLOSAR:  Before we go on a break,
 9     where are we at?
10                    VIDEOGRAPHER:  Three hours, 26 minutes.
11                    MR. SLOSAR:  So, I just want to put on
12     the record that, you know, at this point, Mr. York's
13     counsel, obviously, has conducted the questioning on
14     behalf of the defendants.  We're going to object to
15     any questioning that exceeds the seven-hour limit and
16     we'll move to stop the deposition at that point.
17                    So my hope an expectation is that
18     defense counsel have reached an agreement how to
19     split up the deposition time today.  Plaintiffs used
20     roughly 70 minutes, so the defendants should have a
21     wealth of time to split up.
22                    That's all.  Go off the record.
23                    VIDEOGRAPHER:  Going off the record at
24     camera time 13:14.
25                    (Lunch recess.)
```

```
 1              VIDEOGRAPHER:  We're going back on the
 2   record at camera time 13:54.
 3   BY MR. WRIGHT:
 4        Q.    All right, Mr. Lester.  In your
 5   statement to Detective York in April 2011, you
 6   reference that, My kids, they don't really like her.
 7   Talking about Amanda.  Is that true?
 8              MR. SLOSAR:  Objection to form.
 9        A.    Yes.
10        Q.    And why do you note that?
11        A.    Well, they didn't want me having a
12   younger woman around, was the biggest reason.
13        Q.    Any other reasons?
14        A.    The second reason was that I spent all
15   my time and all my money with her.
16        Q.    Did they tell you that or did you just
17   feel it?
18        A.    They told me.
19              MR. SLOSAR:  Objection to form.
20        Q.    Both of them?
21        A.    Michelle more than Jennifer.
22        Q.    And was that something that they
23   expressed to you prior to Catherine being found dead?
24        A.    Oh, when I first met her.
25        Q.    Did you ever feel like you were used by
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                          Page 190

```
 1   Amanda?

 2             MR. SLOSAR:  Objection to form.

 3        A.    No.  Because I willingly gave it to her.

 4        Q.    Okay.  Did you -- you didn't feel taken

 5   advantage of?

 6             MR. SLOSAR:  Same objection.

 7        A.    No.  I just -- anything to keep her

 8   around, I did it.

 9        Q.    Okay.

10        A.    Money wise.

11        Q.    Now, the victim was Catherine Mills.

12   She was your ex-mother-in-law?

13        A.    Yes, sir.

14        Q.    She lived along Kentucky 223 in Knox

15   County?

16        A.    Yes, sir.

17        Q.    And I think you mentioned the neighbors

18   right across the road were the Trents?

19        A.    The Trents.  Sudie Mae and Carson.

20        Q.    We talked a little bit, Freddie and

21   Adean Cole, not too far down the road.

22        A.    Yes, sir.

23        Q.    Was a Jerry Gray, did he live nearby?

24        A.    He lived -- he lived between Freddie and

25   her.
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                          Page 191

```
 1        Q.      Would you go past her house to get to
 2   Jerry Gray's?
 3        A.      No.  Just past Freddie's.
 4        Q.      He lived just past Freddie's?
 5        A.      Yes.
 6        Q.      How close was he to the victim's home?
 7        A.      Actually, probably don't live a thousand
 8   feet from Freddie.
 9        Q.      Okay.
10        A.      Yeah.
11        Q.      Were you friends of Jerry Gray?
12        A.      Jerry and Betty, yes, sir.
13        Q.      Who is Benny?
14        A.      Betty, his wife.  I'm sorry.
15        Q.      Would you talk to them on the phone?
16   Were you that close of friends?
17        A.      Oh, yes, yes.
18        Q.      In December 2010?
19        A.      Yes.
20        Q.      Did you talk on the phone with the
21   neighbors after Catherine Mills was found dead?
22        A.      Which one, sir?
23        Q.      Any of them.
24        A.      No.  I never had Sudie Mae's number
25   until I guess it was in '015 when we supposed to --
```

```
 1    went to trial in September.  I went to her house.

 2          Q.    I know Jerry Gray wasn't right across

 3    the road, but did you talk to him on the phone about

 4    the news?

 5          A.    Yes, yes.

 6          Q.    Did you talk to the Coles?

 7          A.    No.

 8          Q.    No?

 9          A.    No.

10          Q.    Anybody who may have lived at the Cole's

11    residence?

12          A.    No.

13          Q.    Any Broughtons?

14          A.    No.

15          Q.    Any Browns?

16          A.    Maybe.  Maybe Jerry Wayne.  Not for

17    sure.  Maybe Cleo.

18          Q.    All right.  In December of 2010, do you

19    know approximately how old Catherine was?

20          A.    All I know she was in her 60s.

21          Q.    And you identified a couple of things

22    that you would do for her, but on a regular basis, do

23    you know who would help take care of her?

24          A.    Her grandson, Michael, lived with her

25    off and on.  It was a guy up the road named Pete
```

```
 1   Mills that mowed her grass, done tree trimming, just
 2   worked on her roof at times.
 3        Q.    Did your daughters help out?
 4        A.    Michelle did.  Michelle took her to town
 5   to the store.  If Michelle couldn't go get her,
 6   Jennifer would.
 7        Q.    How often would your daughters visit
 8   her?  Weekly?
 9        A.    Maybe two times a month.  Michelle might
10   have went once a week.
11        Q.    Okay.
12        A.    Definitely, but Jennifer didn't go as
13   often.
14        Q.    Would you -- would that come up in your
15   conversation with your daughters, that they're taking
16   Catherine to town or would that ever come up?
17        A.    No.  I'd be doing a job, and if Michelle
18   needed money or had something she wanted to talk to
19   me about, they would come by the job.  If she has
20   Catherine in the car, she'd roll the window down and
21   wave.  I'd walk over to the car and talk to them.
22        Q.    Do you know whether -- did she ever get
23   visited by any sort of home health service to your
24   knowledge?
25        A.    Not to my knowledge.  She was
```

1    very -- she did not like doctors or hospitals.  She

2    didn't like to be around that kind of thing.

3         Q.    Now, I think she had sold her timber

4    once before while you were married?

5         A.    While I was married, she sold the timber

6    in 1996.  The market was twice better than it was in

7    2010, and it only brought 10,000.  That's why I made

8    jokes about it.  I said, There is no way it was cut

9    in '96 when it was virgin timber.  The market was

10   double and only brought ten then, so if you got 25

11   now, you would have had to got 50 because he

12   supposedly gave her 50 percent.  There is no way it

13   would have brought $50,000.

14        Q.    I want to back that up.  The $25,000

15   number, was that from Jennifer Lawson?

16        A.    Yes.

17        Q.    And she told you about it?

18        A.    Yes.

19        Q.    Was Jesse Lawson around when she --

20        A.    We all three sat there and joked about

21   it.

22        Q.    Was it at your house?

23        A.    Yes.

24        Q.    Did she say 20 or did she say, like, 15

25   to 25?

1    A.    She said she thought that her Ma Maw

2 said 25.  I said, That can't because Raymond Hammonds

3 pays 50 percent.  Timber would have had to have

4 brought 50,000 for Catherine to get 25.

5    Q.    Did this come up because your daughter

6 said she had seen the cash on Catherine's person?

7    A.    No.  She never told me she ever seen

8 cash.

9    Q.    How did she explain it had come up?

10    A.    They had -- the part owner, silent owner

11 in the car lot where my daughter Jennifer worked, he

12 logged timber.  He wanted the timber.  So he tried to

13 get Jennifer to buy it for him.

14        She told him she done struck a deal with

15 Raymond and what it had brought and he told her to

16 tell him that there is no way she can get an honest

17 payday on 50 percent from him because for him to pay

18 50 percent, you know, a logger is not going to make

19 the money, and tell her that I'll pay her this.

20        So she went up there and told Catherine.

21 Catherine told Raymond.  Raymond come to confront

22 Vernon and had a few words about it and it ended.

23 That what the joke is on, I said, Well, Vernon isn't

24 right.  They can't pay 50 percent and make no money.

25 It won't bring them -- won't bring money.

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                    Page 196

1          Q.      Now, you heard this --

2          A.      That was before it was logged.  The

3    beginning.

4                  After it was logged, she said, Ma Maw

5    said she had 25,000.  I said, There is no way.  She

6    would have had to get 50 to have 25.

7          Q.      You heard this from your daughter before

8    you mentioned it to Wesley Roark; right?

9          A.      Yes.

10         Q.      And the -- would this have been -- when

11   you talked to your daughter about it, about when

12   would that have been?

13         A.      When we talked about it is when they

14   first started because that's when they had the little

15   argument at the car lot or at Escoes.  I can't

16   remember where they had the argument, but then when

17   she come back and said, Raymond is done or almost

18   finished and Ma Maw already said she's got 25,000, I

19   said, It couldn't have brought 25,000.  It would have

20   had to bring 50 for her to have 25.

21         Q.      In Jessie's presence, did you indicate

22   that you may just have to tie Catherine up and rob

23   her?

24         A.      We all three talked about it.

25         Q.      Your daughter and Jesse?

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                      Page 197

```
 1        A.      We've have to tie granny up in the
 2   toilet and take the money.
 3        Q.      Was anyone else there?
 4        A.      Just us three sitting there.
 5        Q.      So that was joking?
 6        A.      Yes.
 7        Q.      The next time you talked about this was
 8   Wesley Roark; right?
 9        A.      Wesley.
10        Q.      And that was, I'm going to say that was
11   closer in time to December?
12        A.      That's probably two weeks before --
13        Q.      Okay.
14        A.      -- it happened.
15        Q.      How did it come up with Wesley Roark?
16        A.      He seen me walk in all nasty, covered in
17   mud.  I had frost on my coveralls.  I had been -- it
18   was very cold that day.  I been fixing water leaks.
19   I had a gallon of milk in my hand and I was getting a
20   carton of pop and pack of cigarettes for Amanda.  I
21   was getting gas in the truck.
22                He said, Looks like you had a rough day.
23   I said, Been a rough day.  I said, Bad thing about it
24   is when I spend here and leave, I'll be broke and
25   I'll have to look like this again tomorrow to make
```

1  this back, but we have plenty of leaks to fix.

2         I walked over there and that's when

3  Timmy said, Well, if you're so short, why don't you

4  go back in there where they got the poker machines

5  and I'll put you in the ceiling because they take in

6  40, $60,000 on weekends.  You can rob it and we'll

7  let you down, take you out.

8         I said, No, I wouldn't do that.  I said,

9  They said my mother-in-law has got 15 or 25,000 out

10  of her timber.  I'll just wait until she comes out to

11  the toilet and I'll run and lock the door and tie her

12  in the toilet and go in the house and take the money.

13     Q.     Then what happened?

14     A.     They laughed.  Him, Timmy and Boris

15  Reins.

16     Q.     Were you laughing?

17     A.     Yeah.

18     Q.     In your statement to York, it indicates

19  that Wesley told you he knew where 50,000 was, you

20  know a bag of dope, and he cut off a camera.  Is that

21  what you're talking about or is this something

22  different?

23     A.     Repeat that.

24     Q.     In your statement to Detective York in

25  April 2011, you say, Wesley proceeded to tell me that

 1    he knew where 50,000 was, you know, a bag of dope and

 2    he put one camera up and we'd go down.

 3            I said, No, I'd rather just take a

 4    chance on tying the toilet door shut.

 5        A.    It wasn't about dope.  It was about the

 6    poker machines.

 7        Q.    Poker machines?

 8        A.    Yes.

 9        Q.    Where were the poker machines at?

10        A.    Ronnie Messer's.

11        Q.    In the back?

12        A.    Yes.

13        Q.    Guessing those are illegal; right?

14        A.    I guess.  I'm not sure.

15        Q.    Was Wesley Roark at the scene at

16    Catherine Mills that night?

17        A.    That night when I got there, yes.

18        Q.    Did you talk to him?

19        A.    Walked over, talked to him, and when the

20    detectives got there, it was two loads.  The guy at

21    the time, the Blevins guy, I guess he's the county

22    coroner.

23        Q.    Yes.

24        A.    He was there.  Wes said, Step back.  The

25    calvary is here.  He looked at me and laughed.  I

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.

William Lester on 10/09/2018                                    Page 200

```
 1    didn't -- I just looked at him, and they had raised

 2    their trunk lids and walked up her driveway.

 3         Q.     Is that all you talked to with Wesley?

 4         A.     And Sudie Mae and Carson.

 5         Q.     Is that all you talked about with Wesley

 6    at the scene?

 7         A.     Yes, sir.

 8         Q.     Where does Wesley Roark live?

 9         A.     Above her about half a mile.

10         Q.     Did you ever come to -- did you ever

11    receive information that Wesley Roark had relayed

12    your conversation with him about her money to Sheriff

13    Pickard or other law enforcement?

14         A.     I was told that, that he went to Pickard

15    personally.  I never -- you know, we and him been

16    friends over 30 years.  I didn't believe it because I

17    definitely knew more things on him that he could have

18    went to Pickard and told about.

19         Q.     What are you talking about?

20         MR. SLOSAR:  Objection to form.

21         A.     Just the life he lived.

22         Q.     You're saying you wouldn't think he

23    would tell Pickard anything about you because you had

24    more to tell about him?

25         A.     Yes, sir.
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                        Page 201

1        Q.     Did you ever talk to Wesley whether he

2    went to Pickard?

3        A.     Me and him, he quit speaking to me and

4    we never spoke no more until the first Saturday in

5    August of this year.

6        Q.     Did you talk about this case at all?

7        A.     He came to me.  We was at a car show in

8    Barbourville and he walked over talking to me.  And

9    asked me about a truck, the truck I have for sale.  I

10   told him.  He said, Did they say that I gave a

11   statement on you?

12              I said, No.

13              He said, Well, I didn't.  He said,

14   That's a lie.

15              I said, It don't matter if you did or if

16   you didn't.  I said, God's taken care of all this.

17   If you did, it's okay.  If you didn't, it's okay.

18   That's the way we left it.

19       Q.     Was Wesley a drug dealer?

20       A.     No, sir.

21       Q.     Was he -- did you have any information

22   that he was a thief?

23       A.     Wesley?

24       Q.     Yeah.

25       A.     No.

```
 1          Q.      Was he known for violence?

 2          A.      Well, you wouldn't want to mess with

 3   him.

 4          Q.      Did you have any information to believe

 5   he committed crimes?  You said you had stuff on him.

 6          A.      Well, I knew if you crossed him what

 7   would happen.  And if, you know, he was down here

 8   growing dope and he wanted your patch he'd come take

 9   it.  I knew plenty of those that had happened.

10          Q.      Who had he done that to?

11          A.      Just some people up in Redbird.

12          Q.      Do you know who it is?

13          A.      No, sir.

14          Q.      Now, is it true that you also

15   told -- you discussed Catherine having money and

16   robbing her with Joe King?

17          A.      Yes, sir.  And some boy that was with

18   him.  Some black boy.  Me and Amanda was in the truck

19   and made him stand outside the truck.

20          Q.      Tell me about that, what you remember.

21          A.      We went to Pineville that night, and

22   there is a little ole Lee Mart out there that's got a

23   car wash.  We pulled up there to get something to

24   drink, pack of cigarettes, and Joe was there -- came

25   in there.
```

```
 1                    We went out to the truck.  Talk to

 2      Amanda.  Talking about buying her Suboxones.  Then we

 3      started talking about, you know, this time of year

 4      things are slow.  You know, How's the weather.  I

 5      talk about, Well they say my mom's got this amount of

 6      money.  I said, Things don't pick up, I'll wait until

 7      she goes out to the toilet and tie the door shut and

 8      take the money.  In front of him and the black guy.

 9      I don't know who the black guy's name was.

10           Q.    Was Amanda with you when you said it?

11           A.    Yes.

12           Q.    So she heard that as well?

13           A.    Yes.

14           Q.    Do you recall describing this discussion

15      to Detective York during the April 2011 interview?

16           A.    I told him what I said in front of every

17      person that I said that.

18           Q.    So you had indicated to him that

19      sometimes she'd take them.  Sometimes she wouldn't.

20      This is one of the times she didn't want to take

21      them.  She wanted to sell them.  Is that accurate?

22                 MR. SLOSAR:  Objection to form.

23           A.    Yes.

24           Q.    So the prescriptions from Dr. Warren,

25      occasionally she wouldn't want them.  She would want
```

1    to sell them and you'd sell them to Joe?

2         A.      Anybody that would buy them.  She'd have

3    to keep one.  You have to give blood work to get

4    another wrote.  You have to have Suboxone in your

5    system to get another prescription wrote, so keep one

6    to take.

7         Q.      In December of 2010, how long had she

8    been seeing Dr. Warren, if you remember?

9         A.      I think we had been going down there

10   about a month.

11        Q.      Was it a regular day?

12        A.      Every Monday.

13        Q.      Okay.  Was it a -- kind of standard

14   time?

15        A.      Yes, sir.

16        Q.      You indicated to Detective York it would

17   be 11:30, 11:45, something like that.  Does that

18   sound right?

19        A.      I wasn't for sure.  Last night I had to

20   think about it.  I was thinking 10:30, but I called

21   my sister because we have all the things there were

22   on filled prescriptions and stuff and had all this

23   thing -- everything on file, and she said that it was

24   like 11:30, 1145.  I was thinking 10:30, but I know

25   we was down there at 10:30 that day.  I know we was.

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.

William Lester on 10/09/2018                                    Page 205

1      Q.      All right.  We'll get to that in a

2  minute.  Is that file stuff items you have given to

3  your attorney?

4      A.      Yes, he's got it all.  We kept copies.

5      Q.      Would you be willing to provide that

6  file stuff, talk to your attorney whether he would be

7  willing to provide it?

8      A.      I can talk to him or you can call him.

9      Q.      Okay.  Would you usually go fill the

10  prescription from Dr. Warren on the same day that you

11  would go to visit on Mondays?

12      A.      Yes, sir.

13      Q.      Okay.  Was that consistent on that whole

14  month that he was seeing her?

15      A.      Yes.

16      Q.      And I believe you went to Pineville to

17  fill the prescription; right?

18      A.      I went to different drug stores.  Not

19  just one, because they was such a demand, they

20  wouldn't be in stock.  You'd have to call around to

21  see who had them.

22      Q.      Okay.

23      A.      And a lot of drug stores didn't have

24  them.  The one place you found them would be double

25  priced.  I always shopped on the phone.

1        Q.      You indicated to Detective York that

2    when you had this with meeting with Joe King it was

3    at the Walgreens parking lot.  Does that sound right?

4        A.      No.  It was at Lees Mart.

5        Q.      Did you sell the prescriptions to

6    persons other than Joe?

7        A.      Ever who I could get that wanted them.

8        Q.      Anybody come to mind other than Joe

9    before December?

10       A.      It would be like Bob Smith or any one of

11   the drug dealers.

12       Q.      Okay.

13       A.      Because they get 25 out of them, apiece,

14   and I'd take $10 or 15 for them.

15       Q.      December 20th was a Monday.  That was

16   the regular day you went to Dr. Warren with Amanda;

17   right?

18       A.      Yes, sir.

19       Q.      And you said you had been maybe doing

20   that with her for maybe a month?

21       A.      She had been seeing him approximately a

22   month, I think.

23       Q.      You probably only had three, maybe four

24   prior Mondays before Catherine was found dead?

25       A.      Most likely.

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                          Page 207

1       Q.      Was it likely then that your time that
2   you met with Joe was in December of 2010?
3       A.      It was just -- it was the -- her first
4   Monday, I guess, of that month because it was, I
5   know, two weeks before this happened.
6       Q.      That you talked to Joe?
7       A.      Yeah.
8       Q.      She indicated that it was a week, maybe
9   a week and a half.  Is it possible it could have been
10  the week before?
11              MR. SLOSAR:  Objection.
12      A.      Could be a week and a half or two.  I'm
13  in this ballpark.
14      Q.      Right.  That's what I was getting at.
15  It's possible it could have been the week before?
16      A.      Possible.
17      Q.      If it was, it would have been on that
18  Monday.
19      A.      I don't know if it was a Monday or a
20  Sunday.  I know when we met him at Lees Mart we
21  hadn't been to the doctor yet.  We was going.
22      Q.      You usually got the prescription and
23  filled it the same day; right?
24      A.      Same day, yeah.
25      Q.      Probably would have been Monday?

```
1        A.     When I got the prescription and got it
2    filled, yes.  The day I talked to him, it was middle
3    of the night.  We didn't have the prescription.  We
4    hadn't been to the doctor yet.
5        Q.     It was nighttime that you talked to Joe?
6        A.     Yes.  Evening.  Lees Mart.
7        Q.     Did you talk to Joe about where
8    the -- you're going to sell him the prescription;
9    right?
10       A.     So many, yeah.  He couldn't afford them
11   all.
12       Q.     Did you reference to him where the
13   prescription had come from, who had written the
14   prescription?
15       A.     I don't even know if we talked about
16   where she was going to the doctor.  I'm not sure.  I
17   don't even know if that was brought up.
18       Q.     Okay.  Is it true that when -- let me
19   back up.  Did you take Amanda to Dr. Warren?
20       A.     Office?
21       Q.     Yes.
22       A.     Yes, sir.
23       Q.     Did you stay there with her?
24       A.     Yes, sir.
25              MR. SLOSAR:  Objection to form.
```

 1        Q.     I'm talking about all the occasions from

 2    the day that Catherine Mills was found dead and the

 3    month prior?

 4        A.     Yes.  I never left her sitting in the

 5    waiting room.  I never went past the waiting room.

 6        Q.     Was she ever referred to as a special

 7    patient of his?

 8               MR. SLOSAR:  Objection to form.

 9        A.     Not to my knowledge.

10        Q.     Is it true that she got in and out?

11               MR. SLOSAR:  Objection to form.

12    Misstates earlier testimony.

13        A.     Thirty minutes.  About 30 minutes at a

14    time.

15        Q.     Is it true that Dr. Warren later got in

16    trouble?

17        A.     Yes.

18        Q.     And after he got in trouble, when she

19    would go visit the clinic, would she have to wait?

20        A.     When he got in trouble, he was escorted

21    from the clinic.

22        Q.     Were you there that day?

23        A.     Yes, sir.

24        Q.     Do you remember when that was?

25        A.     That was the 20th.

1        Q.      The day that Catherine was found dead?

2        A.      Yes.  He got caught having an affair

3    with a lady at the hospital.

4        Q.      Who did you hear that from?

5        A.      I can't say, but it's from one of the

6    board members, one of the board member's wife.  So

7    that hospital was affiliated with his little medical

8    clinic, so they come got him and his papers.

9    Finished what he was doing right there and they took

10   him out.

11       Q.      Did she see Dr. Warren that day?

12       A.      Yes, sir.

13       Q.      This happened after she saw him?

14       A.      He was escorted out that evening.

15       Q.      Was -- so she would have been one of the

16   last patients he saw?  You didn't stick around there?

17       A.      No.  There was two other people sitting

18   in there when me and her left.

19       Q.      But he was being escorted out?

20       A.      He was getting all his stuff gathered

21   up.

22       Q.      Was there any other doctors in that

23   clinic?

24       A.      I have no idea.  His name was the only

25   one ever on the sign.

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.

William Lester on 10/09/2018                                    Page 211

```
 1        Q.      Do you know whether any of the records
 2   that your attorney has, are they the records relating
 3   to Amanda's doctor visits?
 4              MR. SLOSAR:  Objection to form.  Calls
 5   for speculation.
 6        A.      The only thing that would be on there
 7   would be like copies of the appointed -- appointment
 8   time, like a sheet they would give you say your
 9   appointment time.  Say you seen him today, the 7th,
10   and you coming back the 14th, he would have that.
11        Q.      Did you know that Catherine kept the
12   money in her purse?
13        A.      No, sir.
14        Q.      When Amanda Hoskins gave her statement
15   to York, she said that she heard you say when she was
16   using the bathroom, locked her in there and just take
17   her purse, and York asked, Why the purse?  And she
18   said, That's just what I heard him say.
19              MR. SLOSAR:  Objection to the form, to
20   the extent there is a question.
21        Q.      Is that true?  Is that accurate?
22        A.      No.  That's not true.  That's a lie.
23        Q.      Your testimony is you just said, Lock
24   her in the outhouse?
25        A.      I said, I would lock her in the
```

```
 1   outhouse.
 2          Q.      And you'd take the money?
 3          A.      Go in and take the money.
 4          Q.      Did any of your family members tell you
 5   that they had seen her have the money on her person?
 6          A.      No.  Not until afterwards.  Michelle
 7   told me she had some money in her purse.  She took
 8   her to the grocery store.  That was later but not
 9   before.
10          Q.      When did she tell you that?
11          A.      The week of, but she didn't know how
12   much.  I said, Well, when I done the last work for
13   her, we needed a faucet and we needed some supplies
14   that I didn't have.
15                  I told her I called and got a price on
16   it, and I told her how much it was.  She said, I
17   don't keep money here no more.  I keep all my money
18   in the bank.  I have to write you a check.  I said,
19   Go ahead and write it.
20                  She said, How much did you say?  I said,
21   Let me call back, get tax and all.  They just price
22   the stuff without tax.
23                  I called back, got the price, and she
24   wrote me the check.  I went to Pope's and picked it
25   up, come back and installed it, finished up the job.
```

1            She told me she didn't keep no money on

2    her.  She kept all her money in the bank.  That was

3    in 2008.

4            Q.    You knew where she lived, though,

5    Catherine; right?

6            A.    Yeah.  I lived there several years.

7            Q.    You knew she --

8            A.    Thirteen years.

9            Q.    You knew she had the outhouse?

10           A.    Anybody passes her house does.

11           Q.    You knew she used the back door?

12           A.    That's the only way she came in and out.

13           Q.    You knew she had sold her timber.

14                 MR. SLOSAR:  Objection to form.  All

15   these questions have been asked and answered,

16   Derrick.  You're beginning to harass the witness.

17                 MR. WRIGHT:  I'm just perfecting the

18   impeachment.

19                 MR. SLOSAR:  This isn't impeachment.

20   Objection to form, asked and answered.  You're

21   beginning to harass the witness.

22                 MR. WRIGHT:  That's fine.  I'm just

23   going to run through the questions now.

24           Q.    Now, you knew she sold the timber;

25   right?

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                Page 214

1        A.      Yes, sir.

2                MR. SLOSAR:  Objection to form.  Asked

3    and answered.

4        Q.      And you were of the opinion it was

5    25,000 or so; right?

6                MR. SLOSAR:  Objection to form.

7    Misstates his earlier testimony.  Asked and answered.

8        A.      That's what I was told.

9        Q.      Now, she would recognize you; right?

10       A.      Catherine?

11       Q.      Yes.

12       A.      Oh, yeah.

13       Q.      She didn't know Amanda; did she?

14       A.      She didn't know Amanda.  Amanda never

15   knew even where she lived.  Never even knew what she

16   looked like.

17       Q.      Same goes for Jonathan?

18       A.      Yes.

19       Q.      Did you ever find out who the black guy

20   was with Joe King?

21       A.      Never seen him but the one time.

22       Q.      There's a report where Joe King

23   indicated it was Jerome Ferguson.  Do you know that

24   name?

25       A.      Only Ferguson name I know in Bell County

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                Page 215

```
 1   is the jailer up there, Gary Ferguson.  He's a black

 2   guy.

 3        Q.    Did you ever -- you said you never used

 4   drugs.  Did you ever --

 5        A.    No, sir.

 6        Q.    Did you ever sell them?

 7        A.    Did I sell them?

 8        Q.    Yes.

 9        A.    I have, yes.

10        Q.    What time of your life did you do that?

11        A.    Couple years.

12        Q.    How far back in the past?

13        A.    In the past?

14        Q.    Yes.

15        A.    '08, '09.

16        Q.    Okay.  So in your statement to Detective

17   York in April of 2011, you said that Joe said he

18   wanted a hundred oxy's -- Oxy's.  And he said, What

19   are you talking about?  He said, you used to know the

20   man's in prison.  I said, Before I fool with all that

21   I know there is a little old lady.  I told him I'd

22   tie her up and rob her before I fool with any more

23   drugs.  Is that accurate?

24             MR. SLOSAR:  Objection to form.

25        A.    No.
```

1      Q.      That wasn't how the conversation came

2   up?

3      A.      I was asked for the hundred oxy's.

4      Q.      You were asked?

5      A.      (The witness nods.)

6      Q.      Did you tell him that -- what did you

7   tell him?

8      A.      I told him that the guy I got them from

9   is in prison, and I don't do drugs no more.

10      Q.      Did you tell him that you'd tie up an

11   old lady?

12      A.      No.  Not in that conversation.  Same day

13   we was -- only day we talked was at Lee's and I told

14   him about that, was joking about times.  I told him I

15   would tie the toilet door shut, go in and get the

16   money.

17      Q.      Did you ever reference to him who it

18   was?

19      A.      I said my ex-mother-in-law.

20      Q.      You didn't say her name, though; right?

21      A.      No, sir.  I was smarter than that.

22      Q.      Because you were afraid he might do it?

23             MR. SLOSAR:  Objection to form.

24      A.      Not trustable.

25      Q.      Why do you say that?

**AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.**
William Lester on 10/09/2018                                    Page 217

```
 1        A.      Well, lots of reasons I'd say that.

 2        Q.      What are they?

 3        A.      If you were raised into crime, drug

 4   dealing, you kind of go along that path.

 5        Q.      So are you saying his family was into

 6   crime?

 7        A.      Well, didn't he witness against his dad

 8   and send him to federal prison?

 9        Q.      Is that what you heard?

10        A.      That's what I heard.

11        Q.      Has Joe been to prison?

12        A.      I think so.  Not sure.

13        Q.      Seem kind of hostile to Joe.  Do you

14   like him, not like him?

15                MR. SLOSAR:  Objection to form.

16        A.      I got nothing against him at all.  It's

17   just that if somebody lives on the wrong side of the

18   road, you don't tell them where things are that they

19   got the nerve to go and take it or bother somebody.

20                No matter who they are, I wouldn't relay

21   no information, no names if I thought they were

22   capable of something.

23        Q.      Did you think Joe was capable of

24   stealing the money from her?

25        A.      I have no idea, but I don't know who his
```

 1   buddy is standing there with him.  I don't know what

 2   kind of lifestyle he lives.  So you don't sling out a

 3   name there, somebody standing there you know nothing

 4   about.

 5         Q.    Amanda Hoskins in her statement to York

 6   in February 2011 said you referred to Catherine as a

 7   bitch in that conversation with Joe.

 8         A.    No.

 9               MR. SLOSAR:  Objection to form.

10         A.    No.

11         Q.    Never did that?

12         A.    No.

13         Q.    That wouldn't sound like joking; would

14   it?

15               MR. SLOSAR:  Objection to form.

16         A.    Joking on whose side?

17         Q.    On your side?

18         A.    No.  No.  I would never call her that.

19         Q.    Now, there is a report from Detective --

20   by Detective York with a conversation with Joe King,

21   and in that report Joe says that he was called for

22   money to fill a prescription.  Is that accurate?

23         A.    If he was called, he was called by

24   Amanda, not me.

25         Q.    You never talked to Joe on the phone?

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                              Page 219

1        A.       I never asked him for money in his life.

2        Q.       You did say that he did ask about a

3   hundred oxy's in that conversation and you said, No?

4                 MR. SLOSAR:  Objection to form.

5        A.       No.  I don't deal drugs no more.

6        Q.       Because your connection was in jail?

7        A.       Uh-huh.

8        Q.       Who was that?

9        A.       Timmy Jordan.

10       Q.       Now, did Amanda and Joe get back

11  together, to your knowledge, after Catherine Mills

12  was found dead?

13       A.       Yeah.

14       Q.       When were they together?

15       A.       It was sometime in '011, I let them stay

16  at that house I oversee for a week or two.

17       Q.       Does April 2011 sound right?

18       A.       It was whenever the last time I met

19  with the Detective York, they went out there while I

20  was -- left David Hoskins' office and they went out

21  there and arrested her.  But I did not tell where she

22  was.  I wasn't even asked where she was.

23       Q.       So they got busted the same day that you

24  or they got arrested the same day that you were

25  meeting with Detective York with David Hoskins?

1          A.      Yes, sir.

2          Q.      I think you said they had been staying

3    at that place for a couple weeks?

4          A.      Yeah.  Off and on.

5          Q.      Do you know where else they were staying

6    at that time?

7          A.      I guess Linda's.

8          Q.      While they were at -- can I refer to it

9    as Larry Gregory's?

10         A.      Yes, sir, you can.  That's where they

11   was at.

12         Q.      Okay.  Were you providing them drugs?

13         A.      No, sir.

14         Q.      Were you providing them any food or

15   anything?

16         A.      They got their food from Linda.

17         Q.      You just provided them a place?

18         A.      I called Larry and had the satellite

19   turned on.  I went out and watched the UK and some of

20   the tournament.  We all sat and watched the game.  We

21   ate and I left them there.  I told them -- He said,

22   How long you want to leave it on?  He said, when I

23   turned it on, they charge me for a month.  I said,

24   Leave it a month and have it cut off.

25         Q.      Now, I think you may have mentioned

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                    Page 221

```
 1   where Larry Gregory's was but I didn't quite catch

 2   it.  Where is his place?

 3         A.     Philip Springs Road on 1304.

 4         Q.     Is that anywhere near 223?

 5         A.     No, sir.

 6         Q.     What part -- is it Knox County?

 7         A.     Yes.  You come there where the Bimble

 8   area is where Jerry Aldens (phonetic) is, the gas

 9   station is, the Shell market and straight up that

10   road.

11         Q.     So it's closer to Linda Taylor's home?

12         A.     Yes.

13         Q.     Back there on Topaz?

14         A.     Yes.

15         Q.     Was it kind of in a secluded lot?

16         A.     Yeah.  It looked just like a cabin you

17   would go to Gatlinburg and rent.  We spent $246,000

18   in cash building it.

19         Q.     Did it have a garage?

20         A.     It had a garage.

21         Q.     Did it have a barn?

22         A.     No barn.

23         Q.     Was the garage large enough for a car?

24         A.     Yeah.  But it's full of tools at one

25   time.
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.

William Lester on 10/09/2018                                   Page 222

```
 1        Q.     Now Larry Gregory, did he live in
 2   Florida?
 3        A.     Yes.
 4        Q.     Was he living in Florida at this point
 5   in time?
 6        A.     Yes.
 7        Q.     I guess did he kind of go between
 8   residences in Florida and here?
 9        A.     He came here back and forth just during
10   holiday season or if he wanted to come in and go
11   camping with us and riding with us, at that time with
12   the meg lamps (sic), and he came here to try to get a
13   job and move back, but he was a foil painter.  He
14   done houses for, like, Larry the Cable Guy, Ron,
15   these big name people, and it brought more money in
16   Florida than it would bring in Knox County.
17               And people only wanted to pay him $10 to
18   paint.  He couldn't make it here.
19        Q.     Was he from Knox County?
20        A.     He was originally from Knox County.
21        Q.     Did you know him before you built the
22   house?
23        A.     No, sir.
24        Q.     When did you build that house?
25        A.     We started in '08.
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                      Page 223

```
1        Q.     Okay.  So that's when you first got to
2   know him was '08?
3        A.     That's when I first met him.  I met him
4   through Treadways.
5        Q.     Do you know whether he called police
6   about the people on his property that led to their
7   arrest?
8               MR. SLOSAR:  Objection to form.
9        A.     I have no idea.  I know the Knox County
10  deputy that got shot, Liford.  His daddy lived down
11  there at the foot of the holler, Cecil.
12              I had keys for the place, and when
13  people wanted to get permission to come there and
14  stay, Larry would call me and tell me to go put a key
15  out or let them in and give them a key and go back
16  when they left and pick up the key.
17              When they was picking up Amanda and Joe
18  there, Mr. Liford acted like he didn't know who I
19  was, and I called Larry and I said, Are you having me
20  arrested?  He said, No, why?  I said, Well,
21  Mr. Liford said he didn't know how they got in.  They
22  broke in.
23              I said, I gave them a key.  I'm the one
24  that let them in.  Mr. Liford knows me.  I'm the one
25  that's let him in before.
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.

William Lester on 10/09/2018                              Page 224

```
 1          Q.      And did you say you talked to Larry
 2  Gregory before Joe and Amanda stayed there?
 3          A.      Yes.  Mr. Gregory's dead now.
 4          Q.      Who is dead?
 5          A.      Mr. Gregory.
 6          Q.      Mr. Gregory is?
 7          A.      Yes.  He got cancer and died.
 8          Q.      Now, as of April 2011, did you have any
 9  information that Joe King had talked to police about
10  your discussions with him?
11          A.      No, sir.
12          Q.      Did you ever find out that he talked to
13  police?
14          A.      Not until later in '012.
15          Q.      The report -- Detective York, their
16  conversation was June of 2011.  Do you have any
17  reason to dispute that date?
18          A.      No.  I have no idea.
19          Q.      After he got arrested on this
20  April 2011?
21          A.      He could have.  I don't know that York
22  talked to King or talked to anybody.  I didn't know
23  anything that took place until I went to jail.  And I
24  saw depositions.
25          Q.      When you went to talk to Detective York,
```

**AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.**
William Lester on 10/09/2018                                Page 225

```
 1   you had the opportunity or went over there and

 2   socialized with Amanda and Joe King; didn't you?

 3              MR. SLOSAR:  Objection to form.

 4        A.    No.  Repeat that.

 5        Q.    You said you were over there with them

 6   before they got arrested?

 7        A.    Yeah.  I went and watched the ball game.

 8        Q.    That's before you talked to Detective

 9   York on the day they got arrested?

10        A.    Yes.

11        Q.    He hadn't talked to police yet, had he?

12              MR. SLOSAR:  Objection to form.

13        Q.    Joe King.

14        A.    I have no idea.

15        Q.    You were still in an on-and-off-again

16   relationship with Amanda at that time; weren't you?

17        A.    I was off at that time, yes.

18        Q.    But you were still helping her be with

19   another man?

20              MR. SLOSAR:  Objection to form.

21        A.    Helping her?  I let her stay.

22        Q.    But you knew she was staying with him;

23   right?

24        A.    Oh, I knew.  They was together when they

25   come by the house.
```

```
 1        Q.     Did it ever come up that y'all -- or you

 2   had mentioned this lady having money and stealing it

 3   and then later on she is found dead and the money is

 4   gone?  Did that ever come up with Joe King?

 5               MR. SLOSAR:  Objection to form.

 6        A.     No.  I never talked to him after he was

 7   arrested at the house until I got out in '012.  It

 8   actually was '013.  He lived across the street to her

 9   in one of Escoes' trailers with a girl, Maneea,

10   Manaka -- Manaka I think is her name.  Saw me over

11   there mowing grass and came over and jumped out and

12   he said, I heard you think I'm a rat.  I looked at

13   him and I said, A rat about what?

14        Q.     And when was this?

15        A.     It had to be '013.  I said, I don't care

16   what you told Mr. York.  I read what you told him.  I

17   will not deny I told you about the money, not the

18   place, not the name and what I would do.  I said, I

19   told five people.

20        Q.     So you read his report or the report

21   that Detective York did?

22        A.     Well, David Hoskins read me some.  He

23   highlighted.  I never picked up every paper and went

24   over it because he had boxes of stuff.

25        Q.     Did it ever come up that you were going
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                    Page 227

```
 1   to be giving a statement to Detective York with David

 2   Hoskins while you were with them?

 3            MR. SLOSAR:  Objection to form.

 4       A.    No. I had never been even in -- hadn't

 5   been in my driveway yet, except the one time he had

 6   been in my driveway before that, but...

 7       Q.    How far in advance was the April 2011

 8   interview set out?

 9       A.    I was called I think at the beginning of

10   the week.  David asked me when I could meet.  I said,

11   I could meet you anytime.  Just let me know ahead of

12   time.

13       Q.    To meet with him and Detective York?

14       A.    Huh?

15       Q.    To meet with him and Detective York?

16       A.    Yes.

17       Q.    And you never discussed those plans with

18   Amanda?

19       A.    No.

20       Q.    Never discussed those plans with Joe?

21       A.    No.

22       Q.    Did you and Amanda talk about the case,

23   the investigation at all?

24       A.    We talked off and on some.

25       Q.    What would you talk about?
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                    Page 228

```
 1        A.      She just asked me what they asked me,
 2   what did I say, stuff like that.  Or how -- did I get
 3   nervous or, you know.  I'd never been in trouble.
 4   Well, you know, yeah.  I'm nervous when I look at
 5   somebody facing what they're accusing me of.
 6        Q.      Did you talk to Jonathan Taylor about
 7   the investigation?
 8        A.      I talked a little bit about the
 9   interrogation, what he said, and he talked about how
10   Mr. York had smacked the table on him and had said
11   some things, but I can't remember how he said, what
12   he said to him.
13        Q.      You never talked to Jonathan Taylor
14   about Catherine Mills; right?
15        A.      Not until after it was over.
16        Q.      The only way he would have -- withdraw
17   that.
18              Amanda Hoskins, in her statement to
19   Detective York and in her deposition to me, said she
20   overheard you talking about Catherine Mills having
21   money to Mike Simpson.  Is that true?
22              MR. SLOSAR:  Objection to form.
23        A.      No.  To talk to Mike Simpson, you walked
24   in his house.  I never took Amanda out.  Never let
25   her get out of the truck.  I walked in Mike's house
```

1   every day.

2          Q.    He never stepped outside?

3          A.    He might have opened the door and stand

4   at the porch and go (indicating).  That would be it.

5          Q.    You never talked to him in the driveway?

6          A.    Yeah.  But not with her with me.

7          Q.    What if she was in the car with the

8   window rolled down?

9                MR. SLOSAR:  Objection to form.

10         A.    We never discussed anything close to the

11  vehicle at all.  Anytime that he would be outside it

12  would be warm weather.  Only times she was ever with

13  me in warm weather, the Camaro was sitting there

14  running with air conditioning running with windows

15  up.

16         Q.    Do you have any reason why she would say

17  that, that she overheard you and Mike talking about

18  it?

19               MR. SLOSAR:  Objection to form.

20         A.    No.  I have no idea, unless she was just

21  scared being interrogated, and maybe was offered a

22  deal and a way out -- way out of whatever was going

23  on.

24         Q.    Her complaint says that Mike Simpson and

25  James Helton were mostly responsible for the murder

```
 1    of Catherine Mills.  Have you seen that complaint?
 2                   MR. SLOSAR:  Objection to form.
 3         A.    No.
 4         Q.    Do you share that belief?
 5         A.    No.
 6         Q.    Why not?
 7         A.    Well, I share it because of --you have
 8    to know the area.  Have you ever been to the house?
 9         Q.    Catherine Mills' home?
10         A.    Uh-huh.
11         Q.    I don't believe the family owns it
12    anymore; do they?
13         A.    I have no idea.
14         Q.    I've driven by it, but I can't say I've
15    been in there.
16         A.    Okay.  Before all this happened you
17    couldn't see nothing from the road to either corner
18    of the house.  To go there and visit her, you have to
19    go up the driveway.  You can't just sit on the side
20    of the road.  You have to pull up her driveway.
21                   There is a concrete sidewalk goes to her
22    concrete porch.  Snow on the ground that day.  There
23    was not a tar track in the driveway, not a foot track
24    on the sidewalk or on the porch or in the yard -- the
25    backyard.  Only thing out front is where the postal
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                    Page 231

```
1   man came.

2               So if anybody had been there, they

3   had -- I don't know how they did it.  Because I

4   wasn't told that she was killed.  Mr. Blevins come

5   over there and said that looks like she laid there

6   and froze to death.  That was his first statement to

7   us.

8       Q.    What did your daughter tell you?  Did

9   they say that she looked like she had been injured,

10  hurt, shot?

11              MR. SLOSAR:  Objection to form.

12      A.    Said she was just laying there when she

13  looked around the porch for her.

14      Q.    Did you ever talk to Mike Simpson about

15  the Catherine Mills' investigation?

16      A.    Not as I know of.  I don't think so.

17      Q.    You did this with Mr. Slosar.  I'm going

18  to walk through a couple of the days right around

19  this time.  Okay?

20      A.    Yes, sir.

21              MR. SLOSAR:  I'm going to object to the

22  extent that you're going to go through the entire

23  timeline again.  He's already was asked and answered

24  those questions about the 20th.

25              MR. WRIGHT:  You can make your
```

1   objection.

2   BY MR. WRIGHT:

3         Q.    I'm going to start with the day before.

4   What do you remember about the day before?

5         A.    The 19th?

6         Q.    Yes.

7         A.    19th was a Sunday.  I stayed home all

8   day.  Amanda was home sick.  She called me a couple

9   times wanting a fix.  I wouldn't get it.  I had bills

10  the next day to pay.  I told her I was broke.  I

11  wasn't but I wasn't going to give up no money.

12              I talked to her that night after church.

13  Saw her for a few minutes.  Went back home.

14        Q.    Did -- I believe Michelle Edwards had

15  said she took Catherine out to the store that day.

16        A.    The 19th?

17        Q.    Yes.

18        A.    I have no idea.

19        Q.    She was out to 9 p.m.  You didn't know

20  about that?

21        A.    No, sir.

22        Q.    Do you recall whether you spoke to

23  Michelle Edwards that day?

24        A.    The 19th?

25        Q.    Yes.

1    A.    I can't say I did or didn't.  I don't
2  remember it if I did.
3    Q.    Do you know whether the victim had a
4  routine of calling people, friends, family?
5    A.    No.  I don't know about her phone
6  conversations.
7    Q.    I think there was some evidence that she
8  talked to a friend or a neighbor usually each night,
9  she talked to that person that night before.
10    A.    Could have been Sudie Mae, possible.
11  Nobody else there close that she ever really dealt
12  with.  She might have talked to Larry Jeter (sic) who
13  owned the saw mill every now and then.
14    Q.    I'm going to take one quick break.  I'm
15  going to give you a copy of your transcript and I'm
16  going to walk you through that.  Okay?
17         MR. SLOSAR:  Where are we at with the
18  time?
19         VIDEOGRAPHER:  We are at four hours,
20  19 minutes, 39 seconds.
21         MR. SLOSAR:  Again, before we go off the
22  record, I just want to say again that it's my
23  expectation that the defendants have communicated
24  amongst themselves to divi up the time.  We will be
25  moving to end this deposition at the seven-hour mark.

 1                 MR. WRIGHT:  We can go off.

 2                 VIDEOGRAPHER:  Going off the record at

 3     camera time 14:47.

 4                 (Recess is taken.)

 5                 (Court Reporter marks Phone Record

 6     Exhibit No. 1.)

 7                 (Court Reporter marks Transcript of

 8     4/15/11 Interview Exhibit No. 2.)

 9                 VIDEOGRAPHER:  We're back on the record

10     at camera time 14:52.

11     BY MR. WRIGHT:

12          Q.     All right, Mr. Lester, I've handed you

13     what we have labeled, I believe, Exhibit No. 2 is the

14     transcript of your April 15, 2011, interview with

15     Detective York, and then Exhibit 1 is KSP-529 through

16     545.

17                 On the first exhibit, let's get this out

18     of the way, if you flip a couple of pages in, one

19     more page, in the top left corner, it's small so I'll

20     read it for you.  You may have a hard time.  It says

21     for the number 606-622-1223, does that sound like the

22     cell phone number that you were using in

23     December 2011?

24                 MR. SLOSAR:  Objection to form.

25          A.     It does.  I thought it was 1222, but --

1    or 1212.

2           Q.      And then the page before that indicates

3    that the financial liable party is Scott Mills?

4           A.      Yes, sir.

5           Q.      And that's whose account you were --

6    tied your cell phone to in December --

7                   MR. SLOSAR:  Objection to form.

8           A.      Yes.

9           Q.      You can put that to the side for a

10   minute.  Now, the second exhibit is the transcript

11   of the statement that we talked about.  I'm going to

12   go -- if you look at the bottom, there is a little

13   red hash that has page numbers.  I'm going to go to

14   page 13.  I think that is when we kind of start going

15   through the timeline that you did with Detective

16   York.

17                  You tell me when you're there and I'll

18   point out the line numbers.

19          A.      I'm there.

20          Q.      So you believe that they went to church

21   in the evening.  Is that right?

22                  MR. SLOSAR:  Objection to form,

23   foundation.

24          A.      Yes.

25          Q.      All right.  What time was the evening

```
 1   service that they would go to, to your memory?

 2       A.      The best I recollect is 6 o'clock.

 3       Q.      Six to seven?

 4       A.      Probably six to 7:30 or eight probably.

 5       Q.      Where did they go to church?

 6       A.      Victory Baptist Stray Creek.

 7       Q.      Victory Baptist what?

 8       A.      Victory Baptist Church, it's at Stray

 9   Creek, Kentucky.

10       Q.      How far is that from their home?

11       A.      Oh, lord.  Maybe 15 miles or more.

12       Q.      Okay.  And I think you -- you got a pill

13   for Amanda before she went to church; right?

14       A.      I think I may have traded some XBox

15   games or something for it, for one.  I think that I

16   went.  I did not give up no money.

17       Q.      The statement indicates that you gave

18   her a pill and she wanted more.  So you ended up

19   trading in a washing machine out of your house to get

20   the second pill.  Does that sound right?

21               MR. SLOSAR:  Objection to form.

22       A.      If that's what I said on that statement.

23       Q.      Did you have an extra washing machine to

24   trade away?

25       A.      No.
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                         Page 237

```
 1          Q.      So you traded off the only washing
 2    machine in your house to get her a pill?
 3                  MR. SLOSAR:  Objection to form.
 4          A.      If I traded it, yes.
 5          Q.      On the next page at the top it says that
 6    when she got out of church, came back in, you took it
 7    down to her.  She went in the bathroom to do her
 8    thing.
 9          A.      Yeah.
10          Q.      And that was at Linda's house; right?
11          A.      Yes.
12          Q.      Did she do that regularly?
13                  MR. SLOSAR:  Objection to form.  Calls
14    for speculation.
15          Q.      Use drugs, to your knowledge?
16                  MR. SLOSAR:  Same objection.
17          A.      When she needed a fix, she done it.
18          Q.      Do you know what the word "track marks"
19    mean?
20          A.      Yeah.
21          Q.      What does it mean to you?
22          A.      Well, to me it shows bad spots in their
23    veins, top of their hands.
24          Q.      Where you're using needles?
25          A.      Where they're using needles.
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                    Page 238

```
 1        Q.    Did Amanda have track marks during this
 2  period?
 3        A.    Yes.
 4        Q.    Was that -- would that have been
 5  noticeable to her mother?
 6              MR. SLOSAR:  Objection to form.
 7        A.    No, because Amanda always wore a hoodie
 8  or sweatshirt.
 9        Q.    To hide it?
10              MR. SLOSAR:  Objection to form.  Calls
11  for speculation.
12        A.    Yes.
13        Q.    Now, in your statement to York, it said
14  that you -- that they fixed something to eat.  We
15  just sat there, talked, eating and then you dozed
16  off.  You woke up and it's 1:15, one something like
17  that.  That's on line 254 through 256.  Is that
18  right?
19        A.    Yes.
20        Q.    So she comes in --
21              MR. SLOSAR:  Hey Derrick, I'm sorry.  I
22  think that that was said wrong.  You said it was
23  1:15.
24              MR. WRIGHT:  It says, one, 15 to one.
25  I'm sorry.  One and 15 to one.  So one or 12:45.
```

1              MR. SLOSAR:   Thank you.

2        A.      It was late.  I know it was late.

3        Q.      And did you meet her there when she got

4    back from church?

5        A.      Yes, sir.

6        Q.      And church services are 7:30.  That

7    would have been 8 o'clock or so when they got home?

8        A.      Most likely, yeah.  You're lucky if you

9    make it in 30 minutes out of there.

10       Q.      Your statement doesn't mention anybody

11   else coming or going during that time?

12       A.      No.

13       Q.      Do you recall that?

14       A.      I don't remember anybody other than the

15   direct family that night.

16       Q.      So who would have -- when you say they

17   were eating and talking, who are you talking about?

18       A.      Me, Linda, Lexi, Landon, Amanda and

19   Jerry Wayne.

20       Q.      If you look at Exhibit 1, your phone

21   records, if you flip to page two and there is an item

22   number on the left-hand side.  Do you see those item

23   numbers?

24       A.      Yeah.

25       Q.      Item number 61, 62.

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                    Page 240

1        A.      Yeah.

2        Q.      That's a phone call from a

3   (606) 269-5987 number.  Do you recognize that?

4        A.      Yes.

5        Q.      That's the one used by Amanda Hoskins?

6        A.      That's Linda's number.  That was Linda's

7   personal phone.

8        Q.      And that was between 10:27 and 11:09;

9   right?  P.m.

10       A.      I can't see the time on here.

11       Q.      You can't explain a call to you from

12  them when you're at their house at that time; can

13  you?

14               MR. SLOSAR:  Objection to form.

15       A.      No, I can't.

16       Q.      Now, going back to your statement, you

17  indicate -- I'm back on page 14 of your statement --

18  that you wake Amanda up and said you're going home

19  and tell her that you'll pick her up in the morning

20  to go to the doctor's appointment.

21               Do you see that?

22       A.      Page 14, what number?

23       Q.      Line 257 to 259.

24       A.      Yes.

25       Q.      So you made the plans to pick her up

 1    that night; right?

 2          A.     That morning.

 3          Q.     Or, I'm sorry.  That night to pick her

 4    up the next day.

 5          A.     Yes.

 6          Q.     Did -- I think you said you usually

 7    would go fill the prescription same day; right?

 8          A.     After she got out of the doctor's

 9    office.

10          Q.     Was that part of the plans?

11          A.     Yeah.

12          Q.     Now, I believe you testified earlier

13    that you did work that morning; correct?

14          A.     I went to work.

15          Q.     Did you have any plans of working any

16    more that day?

17          A.     If he had called me with stuff to do,

18    yes.

19          Q.     Okay.  That was just left open ended?

20          A.     Yes.

21          Q.     Now, on page 14, next couple of lines,

22    said that you went out to Mike's.  I believe you're

23    referring to Mike Simpson?

24                 MR. SLOSAR:  Objection to form.

25          Q.     Do you see that?

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.

William Lester on 10/09/2018                                        **Page 242**

```
 1          A.      Which number you at?

 2          Q.      Line --

 3          A.      262?

 4          Q.      -- 262.  I rode up there check and see

 5     about a grinder that Mike had.  Is that who you're

 6     talking about, Mike Simpson?

 7          A.      Yes.

 8          Q.      And when you go on down there, you say

 9     that was between eight and 8:15 at the very bottom.

10     Do you see that?

11          A.      Uh-huh.

12          Q.      Is that a yes?

13          A.      Yes.

14          Q.      Okay.  Is that true?

15          A.      Yes.

16          Q.      You didn't mention that earlier today.

17     You indicated that you went straight into work.  I

18     think you may have testified you were at work at

19     eight.

20          A.      I went to work.

21          Q.      Do you know exactly what time you were

22     at work?

23          A.      Would have been after that.  That's the

24     only stop I made because he as wanting a heater.  I

25     was going to trade him the old heater for the grinder
```

1  but the grinder was nothing I could use.  So I turned

2  around and come on back.

3        Q.    Well on here, line 262, you said it was

4  your grinder that you let Mike have.

5        A.    My grinder?

6        Q.    Yeah.

7              MR. SLOSAR:  Derrick, I think you're

8  misinterpreting that paragraph in light of the next

9  page.

10             MR. WRIGHT:  I'm just reading.  It says,

11  So I had a grinder that I had let Mike have.

12             MR. SLOSAR:  Previously he was seeking

13  to buy it back.  That's what the two pages talked

14  about.

15       A.    I don't remember that.  I remember him

16  trying to trade me a heater because his heater wasn't

17  keeping his house warm.

18       Q.    Okay.  Now, I think on the next page you

19  indicate that you went back home, went to Escoes,

20  went to McDonald's and by nine I was at Treadways.

21  So that's kind of from 280 to 282.

22       A.    Yes.

23       Q.    Does that sound about right?

24       A.    Yeah.

25       Q.    And you talk about Paul told me what he

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.

```
 1   wanted to do.  That's Paul Hale?

 2        A.     Yes, sir.

 3        Q.     And then Sharon said, Ms. -- and they

 4   don't know who this is, they say a Ms. Everson.  Is

 5   that supposed to be Paterson?

 6        A.     Now that I'm thinking, maybe she's an

 7   Eperson.

 8        Q.     Eperson?

 9        A.     May be an Eperson.

10        Q.     Is that a Dorothy Eperson?

11        A.     Yes.  I was thinking she was a Paterson.

12   She may be an Eperson.  Eperson, she could be

13   Eperson.

14        Q.     Now where did you say Dorothy Eperson or

15   Paterson lived?

16        A.     She lived on the main street going

17   towards Treadways past the Knox Central, it's a

18   regional high school on Scott Philips Church.

19        Q.     Is that very close to Treadways?

20        A.     Yeah.  You could walk there in five

21   minutes.

22        Q.     I believe you testified in your

23   statement you indicated she had a car that she traded

24   to you and --

25        A.     She gave me.
```

1        Q.      Gave you.  I think she wanted you to do

2    some work for her?

3        A.      No.  I had been doing work for her and

4    tried to get the car.

5        Q.      Okay.

6        A.      She gave me the car.

7        Q.      In your statement to York, you said she

8    wanted to check the antifreeze in the other truck.

9        A.      Yeah.  She had an old truck there that

10   belonged to her husband.

11       Q.      You called Jay Gregory?

12       A.      Right.

13       Q.      And he towed it away?

14       A.      Yeah.  I sold it to him.

15       Q.      You signed off on a receipt and you

16   think you have that?

17       A.      If I don't, David Hoskins does.

18       Q.      Was it -- is it just dated or does it

19   have the time as well?

20       A.      I can't remember.

21       Q.      Did you call him from this cell phone,

22   your 122 number?

23       A.      Yes.

24       Q.      Does he have a business phone that you

25   would have used or a personal phone?

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                          Page 246

1        A.     Had an old phone there in that old

2   garage.  Last four numbers 66 something.  I don't

3   remember the last two.

4        Q.     Sixty-six, six, four?

5        A.     It could be it.  I'm not sure.

6        Q.     Okay.  Now, you say that it was around

7   9:30 that he -- if you look on page 16 of your

8   transcript, beginning at 298, you say that he

9   paid -- he went on and I come back over to Paul's and

10  I seen what time it was.  Detective York asked you

11  and you say around 9:30.  Is that about right?

12       A.     That's about right.

13       Q.     Okay.  So all that happened in

14  30 minutes?

15       A.     Paul's house is directly behind, at that

16  time, Ms. Eperson.  All I had to do is walk through

17  the yard.

18       Q.     Did you have any more communications

19  with Jay Gregory after he left?

20       A.     Not that day.

21       Q.     So on the next page, being page 17 of

22  the transcript, line 316, you indicate that you

23  hadn't brought your torch so you're going back to the

24  creek.  Do you see that?

25       A.     Yes.

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                    Page 247

```
 1        Q.      And that you made a stop to get a pill.
 2   Do you see that?
 3        A.      Yes.
 4        Q.      Who did you buy the pill from?
 5        A.      Cleo Brown.
 6        Q.      Was that for Amanda?
 7        A.      Yeah.
 8        Q.      Cleo Brown lives -- I believe she lives
 9   around 223, that loop; right?
10        A.      No, sir.  She lives at the mouth of
11   Stinking Creek at that time.
12        Q.      Close to where you live?
13        A.      Below me.
14        Q.      Did you get that pill -- let me strike
15   that.
16                Line 230, it says you swung back by
17   Mike's again, which was between ten and 10:30.  Do
18   you see that?
19        A.      Yes.
20        Q.      You didn't mention going back to Mike's
21   again the first time around.
22                MR. SLOSAR:  Objection to form.
23        A.      You're talking eight years ago when I
24   told everything pre-exactly.  I know I went back to
25   Mike's.
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.

William Lester on 10/09/2018

Page 248

```
 1        Q.      Okay.  What were you doing at Mike's the
 2   second time around?
 3        A.      I was getting different pills.
 4        Q.      You were getting more pills?
 5        A.      He didn't have it.  I was getting a
 6   different pill.
 7        Q.      You were getting a different pill?
 8        A.      Uh-huh.
 9        Q.      For what?
10        A.      For her.
11        Q.      So did you stop at Cleo's first?
12        A.      Yes.  Pretty sure.
13        Q.      And then you went to Mike's second?
14        A.      Yeah.  Then I come back off to her
15   house.
16        Q.      So if you got a pill at Cleo's, why did
17   you need to go get another pill at Mike's?
18        A.      She didn't have a Roxicet 30.
19        Q.      What did you get at Cleo's?
20        A.      I think it was Percocet 10, I think is
21   all she had.
22        Q.      Now, moving on down page 17, Detective
23   York at line 323 asks, You still hadn't seen Amanda?
24   You said, No, I seen her in bed.  I stopped by her
25   house and she was in bed.
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                              Page 249

```
 1                    He says, What time?  You say, When I
 2   left town on the way through between 9:30 and ten.
 3        A.     Uh-huh.
 4        Q.     Is that right?
 5        A.     That's right.
 6        Q.     So when you stopped to see her, she
 7   didn't have a pill at that time?
 8        A.     No, sir.  She was going through
 9   withdrawals.
10        Q.     Who else did you see at the house?
11        A.     Just the kids and Jerry Wayne.
12               MR. SLOSAR:  Objection to form.  Asked
13   and answered.
14        Q.     Linda Taylor wasn't there?
15        A.     She done gone to work.
16        Q.     Do you remember what hours she worked
17   back then?
18               MR. SLOSAR:  Objection to form.
19        A.     I'm thinking she worked nine to five or
20   eight to five.
21        Q.     Do you know where she worked?
22        A.     The children's home where she still
23   works.
24        Q.     So from the sounds of this, you saw her
25   around 9:30 to ten.  You were at Mike's between 10:30
```

1    and -- ten and 10:30 but you stopped at Cleo's in

2    between; right?

3         A.    On than the way up.

4               MR. SLOSAR:  Objection to form.

5         Q.    Somewhere around 10 o'clock?

6         A.    Somewhere in that area.  Because when I

7    leave there, it ain't ten minutes some to her house

8    at the most at that time.

9         Q.    So the next page, you're still talking

10   about the pit stop you made with Amanda, on line 335,

11   telling her that you're going up the creek and be

12   back and did all that and came back.  I sat there

13   and watched the kids while she got ready to go up to

14   Dr. Warren's.

15              Do you see that on line 335 to 337?

16        A.    Yes, sir.  I do.

17        Q.    When you say, I did all that, all that I

18   see is you stopped at hers, stopped at Cleo's,

19   stopped at Mike's and then went back.  Is that right?

20              MR. SLOSAR:  Objection to form.

21        A.    From when I left town, you're right.

22        Q.    Okay.  I think you testified earlier

23   that it's about a seven minute drive from your house

24   to Linda Taylor's?

25        A.    Approximately, yeah.

1      Q.     And it wouldn't be much farther than

2   that from Mike Simpson's; right?

3      A.     No.   Mile at the most.

4      Q.     How long were you waiting on her at

5   Linda Taylor's?  You said you watched the kids and

6   waited on her.  Do you remember?

7      A.     Thirty, 45 minutes, something like that,

8   while she was getting ready in the bathroom.

9      Q.     I know that these are ranges, but

10  it's -- you left Mike's at ten to 10:30, drove seven

11  minutes or so and waited 30 to 45 minutes.  That puts

12  you past 10:30 at Dr. Warren's.

13     A.     We got there early.

14     Q.     What is it in your memory that makes you

15  think you got there early?

16            MR. SLOSAR:  Objection to form.  Asked

17  and answered.

18     A.     It was straight circle shot to go, and I

19  was thinking about the appointment.  We was already

20  late, which we wasn't because we had to wait on

21  Dr. Warren's deal to go through, so...

22            Also, I've got my time frame a little

23  bit off, but, you know, it's been eight years.

24     Q.     I know.  Would you say that your

25  description to Detective York was probably more

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                    Page 252

```
 1    accurate than your description today?

 2               MR. SLOSAR:  Objection to form.

 3       A.      Sometimes.

 4       Q.      This was given about four months

 5    afterwards; right?

 6       A.      Uh-huh.

 7               MR. SLOSAR:  Objection to form.

 8       Q.      Is that yes?

 9       A.      Yes.

10       Q.      I may have gotten something wrong on

11    these numbers.  The 6-6, there is a -- if you go to

12    Exhibit 1, the phone records, the 6-6-4 is on page

13    three at the top, items number 79 and 82.  When I

14    Googled that, it's for a CSC call center in

15    Barbourville.  Jesse said that his wife, your

16    daughter, was working there at that time.

17       A.      Jennifer?

18       Q.      Yes.  The does that sound right?

19       A.      I can't remember.  At that time?

20       Q.      That's what he indicated in his

21    deposition.

22       A.      No.  She didn't work there.  She worked

23    at the car lot.

24       Q.      What car lot did she work at?

25       A.      B&W Auto Sales.
```

1          Q.       Where was that?

2          A.       Behind my house.

3          Q.       When I was Googling Jay Gregory, the

4    number that came up was 6-9-1-5 which is on your --

5          A.       5-4-6.

6          Q.       546-6915?

7          A.       I know it was probably 6615 but she is

8    six something.  I have his cell phone number now, but

9    he didn't have a cell phone then.

10         Q.       That cell phone call is item number 78

11   at 9:51.

12         A.       It never happened at 9:51.  I can assure

13   you that.

14         Q.       Why can you assure me that?

15         A.       Because I was still in town when I

16   called him.  I had never left -- never left nothing

17   but Treadways.

18         Q.       You never left what?

19         A.       Nothing but Treadways to come straight

20   to Ms. Eperson's.

21         Q.       You said you left town by 9:30; right?

22         A.       Huh-uh.  I left town when the deal was

23   done.

24         Q.       Yeah.  You said that you never talked to

25   him anymore that day.

**AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.**

William Lester on 10/09/2018                     Page 254

```
 1        A.      Not as I can remember.

 2        Q.      So you can't explain the 9:51 phone

 3   call?

 4        A.      May be just when it went on record from

 5   the tower, but it didn't happen then.  I can assure

 6   you that.

 7        Q.      You didn't see Jonathan Taylor at Linda

 8   Taylor's house that morning; did you?

 9        A.      No.

10        Q.      Did you see him there that day?

11        A.      The day of the 20th?

12        Q.      Yes.

13        A.      Not as I can remember.  He could have

14   been there, but he don't come out of the room except

15   for the bathroom and the kitchen.

16        Q.      Did you see --

17        A.      He could have not been there, I don't

18   know.

19        Q.      Did you go back to Linda's house that

20   night?

21        A.      After 8 o'clock, yeah.

22        Q.      Did you see him there at that point in

23   time?  Do you recall?

24        A.      I can't recall because everything was

25   going on then.  I don't remember.
```

```
 1        Q.      Did you see Jerry Wayne both times?

 2        A.      Yes.  Jerry Wayne was there all the

 3   time.  Every time I stopped.

 4        Q.      He was awake?

 5        A.      Jerry Wayne, yes.

 6        Q.      All right.  So on page 19, did you see

 7   anybody at the doctor's office?

 8        A.      Did I see anybody?

 9        Q.      Like that would recognize you?

10        A.      Yes.

11        Q.      Who did you see?

12        A.      I don't know the lady's name but my best

13   friend worked for her husband.

14        Q.      You reference on page 19 at line 361 a

15   Davey Gamble?

16        A.      David Gamble's wife.

17        Q.      Who is that?

18        A.      I don't remember her name but she was

19   the receptionist over at the Knox County Middle

20   School.

21        Q.      She's there --

22        A.      She had her little girl there and she

23   was playing with Lexi.  When she said who she was, I

24   said, Well, my friend Willard Smith, she says, Oh,

25   Willard drives a truck for David.  I said, Yes, he
```

 1   does.

 2          Q.      Anybody else that you remember?

 3          A.      That I would know.  The other people

 4   that was there, I wouldn't know them, and I wouldn't

 5   have known her if she hadn't told me who her husband

 6   was.

 7          Q.      You said David Gamble's wife, what was

 8   her name again?

 9          A.      I can't remember.  I know she was

10   receptionist over where Lexi went to grade school.

11          Q.      Does David Gamble still live in the

12   area?

13          A.      Last I heard they got divorced.  Bank

14   took his trucks, took his garage.  I don't know where

15   he's at.

16          Q.      What about his ex-wife?

17          A.      I have no idea if she's still even there

18   at school.

19          Q.      So at the bottom of page 19, Detective

20   York asks what time you leave the doctor's office and

21   you said, Between 12:30 and one, on the next page.

22   Do you see that?

23          A.      Page 20.

24          Q.      Started on page 19, carries over to page

25   20.

1        A.      Yeah.

2        Q.      And then you indicate that you went to

3   Walgreens in Pineville.

4        A.      Yeah.

5        Q.      To get her prescription filled.

6        A.      Yeah.

7        Q.      Was she with you?

8        A.      Yes.

9        Q.      Anybody else with you?

10       A.      No.

11       Q.      Between the doctor's office and going to

12   Pineville, any other stops?

13              MR. SLOSAR:  Objection to form.  Asked

14   and answered.

15       A.      Yes.  I went to Central Finance to make

16   my payment.  Took Lexi home.  Took her home actually

17   first.  Went by there, made my payment.  Then I went

18   to Pineville, went to McDonalds and came home.

19       Q.      Do you have a receipt for that payment

20   too?

21       A.      Not after eight years.

22       Q.      No?

23       A.      Central Finance has sold out.

24       Q.      What was that payment for, which loan?

25       A.      Just a little loan.  Finance payment was

1   a hundred some bucks, I think.  Best I remember.

2         Q.     A hundred dollars?

3         A.     Most likely, yeah.  It was over a

4   hundred or hundred.  Little over a hundred.

5         Q.     All right.  So on page 20, you indicate

6   that you went to -- at line 381, went to McDonald's

7   to get something to eat and your daughter called you

8   and wanted some pills for Jesse.  Is that true?

9         A.     Yes.

10        Q.     We got them filled, and you said it ws

11   2:00 when we got them filled.  You say, I got there

12   it was almost three.  Are you saying you got home by

13   three?

14        A.     Yeah.

15        Q.     Because we stopped to get something to

16   eat at McDonald's.  Then you say that Jennifer walked

17   in, parked in the car lot.  And you indicate at the

18   very last line, at your driveway at your house.  Do

19   you see that?

20        A.     Uh-huh.

21        Q.     So your memory is that she came to your

22   house around three to get some pills for Jesse?

23        A.     Uh-huh.

24        Q.     Was that usual that she would get pills

25   from you for Jesse?

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.

William Lester on 10/09/2018                                  Page 259

```
 1                    MR. SLOSAR:  Objection to form.

 2        A.    No.

 3        Q.    It was not?

 4        A.    No.

 5        Q.    How many times did that happen?

 6        A.    That's the only time.

 7        Q.    Was there any explanation?

 8        A.    He was trying to get off his drugs, and

 9   Suboxone is the way they say you can leave them but I

10   don't know.

11        Q.    The next page where it's talking about

12   you, it says, Jennifer came up and got what she

13   wanted and the other boy pulled in there to talk to

14   me.  Do you see that?

15        A.    Twenty-one?

16        Q.    Twenty-one, yeah, at the very top.

17        A.    Yup.

18        Q.    Who is the other boy you're talking

19   about?

20        A.    Frank is his name.  I don't know his

21   last name.  Frank.

22        Q.    Frank.  What was Frank doing there?

23        A.    He wanted Suboxone for his wife.

24        Q.    Did you give him pills, sell him pills?

25        A.    What was left except the one I had to
```

**AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.**
**William Lester on 10/09/2018** Page 260

```
 1   keep for her.

 2         Q.     You say, We never left the house until

 3   Jesse called me.  You're saying "we."  Are you

 4   referring to you and Amanda?

 5         A.     Yeah.

 6         Q.     And I think you testified earlier today

 7   that it was your daughter who called you?

 8         A.     It was her calling me first.

 9         Q.     And you're saying that Jesse called you

10   too?

11         A.     If I said it here, I don't remember him

12   calling.  But I do remember Michelle.

13         Q.     Was it right around five?

14         A.     It was right close to five.

15         Q.     Yeah.  Maybe just a little after?

16         A.     Could have been either way.  I know it

17   was dark time we got to Kathy's.

18         Q.     I think you stayed at the scene.  I

19   think your description was Amanda was with you and

20   you went to go get Michelle Edwards?

21         A.     That's my oldest daughter.  She was

22   Edwards at the time.  She's Hammonds now.  She got

23   remarried.

24         Q.     That's right.  You took her to the

25   scene?
```

```
 1        A.     Yes.

 2        Q.     Was that in her vehicle?

 3        A.     I don't know if it was her G6 or my

 4  Ranger.  I can't remember.

 5        Q.     And Amanda took the kids back to your

 6  trailer?

 7        A.     Yes.  We took -- dropped them off there,

 8  yeah.

 9        Q.     Did she go to Michelle's with you?

10        A.     I don't remember.  I thought I went up

11  there by myself.  I know for sure she was at the

12  trailer.

13        Q.     And either she went and got the kids

14  with you or you already dropped them off at the

15  trailer?

16        A.     Yes.

17        Q.     I think at that time did Michelle live

18  back Moores Creek as well?

19        A.     She lived between Mack and Bob.

20        Q.     You dropped the kids off, go on to the

21  scene with Michelle; correct?

22        A.     Yes.

23        Q.     Do you recall, did you say it was

24  Michelle Edwards is the one that called you with the

25  news?
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.

William Lester on 10/09/2018                    Page 262

```
 1        A.      Yes.

 2        Q.      Do you remember any of their phone

 3   numbers from that time period?

 4        A.      No.

 5        Q.      Okay.  There was a picture taken of

 6   Catherine's contact list.  We'll get that out in a

 7   second, see if you recognize the numbers.  Do you

 8   want to dig that out?  Jennifer and Jesse were

 9   already at the scene; right?

10        A.      Uh-huh.

11        Q.      Yes?  I'm sorry, you have to say yes.

12        A.      Yes.

13        Q.      Was their kids with them?

14        A.      I know one was for sure.

15        Q.      Okay.

16        A.      He was in the car and left the car

17   running.

18        Q.      They had two kids; right?

19        A.      Got two boys.

20        Q.      Michelle has two kids too?

21        A.      She has a boy and a girl.

22        Q.      Michelle's kids -- I'm sorry.  Amanda's

23   kids weren't with her at the trailer; right?

24        A.      No.

25        Q.      When you went to take Amanda to the
```

 1    doctor's office, did she have a cell phone with her?

 2         A.    I don't remember.  She could have.  I

 3    don't know.

 4         Q.    Do you remember whether she had a cell

 5    phone with her at your trailer?

 6         A.    My trailer?  I don't remember.  She

 7    could have.  I think -- I think she had been on the

 8    phone with her mom, maybe, telling why we was late.

 9    Asking about food, when I come through the door, when

10    I came back with Gavin?

11         Q.    Would that have been like at eight?

12         A.    Yeah.  Somewhere in that area.

13         Q.    Would that have been your phone or would

14    that have been --

15         A.    It would have had to have been her

16    phone.  I kept my phone with we.

17         Q.    When you went to the scene?

18         A.    Yeah.  Yeah.  I'm pretty sure.

19         Q.    Did you talk to her while you were at

20    the scene?

21         A.    Oh, no.  There is no phone service

22    there, cell phone service.

23         Q.    And you were at the scene from about

24    what, 5:30 to eight?

25         A.    Yeah.  Somewhere in that area.

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.

William Lester on 10/09/2018                    Page 264

1       Q.      How long would it have taken you to get

2   from the scene to your trailer?  It's not too far; is

3   it?

4       A.      Ten minutes, 15.  It took a while to

5   get --

6       Q.      Through the crowd?

7       A.      -- get the cars moved.  Everybody had

8   parked in Sudie Mae and Carson's yard.  I was back by

9   the chain link fence.  I had to get people out of the

10  way to get the car out.

11      Q.      Did you leave the scene at eight or did

12  you get back to your trailer at eight?

13      A.      That -- I was thinking I got home at

14  eight.  I know I was tied up, it was little over

15  three hours.  Not much over, but I was up there

16  involved, so if I got there at 5:15, it would have

17  been 8:15.  If I got there at 5:30, it would have

18  been 8:30.

19      Q.      How late was it when your kids came back

20  to pick up your grandkids?

21      A.      They come on down probably 20 minutes

22  after I got there, give or take.

23      Q.      Wasn't too long?

24      A.      Wasn't too long.

25      Q.      Did they both come at the same time or

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.

William Lester on 10/09/2018                                    Page 265

```
 1   what's your memory of that?

 2        A.    Well, yeah.  Because they had to

 3   drove -- Michelle would have had to rode back with

 4   them because I brought Jennifer's car out because

 5   Gavin was in it.  So I brought Jennifer's car, so

 6   whenever I took Michelle up there, they had to ride

 7   back with them.

 8        Q.    So you think they all went together?

 9              MR. SLOSAR:  Objection to form.

10        A.    They had to.  They would have had no way

11   home.

12        Q.    Did they stick around your house at all?

13        A.    Not just a few minutes.  Amanda said,

14   Well, I was going to have mom come.  We was gonna

15   take and feed them.  Michelle said, I'm going to take

16   them on home, feed them.  Everybody left.  Me and

17   Amanda loaded up and went to Linda's.

18        Q.    How long were you at Linda's?

19        A.    Until up in the morning.

20        Q.    Past midnight?

21        A.    Somewhere around there.

22        Q.    Were you talking to people about the

23   news?

24        A.    I had people calling me, yeah.

25        Q.    On page 22 -- just for context, on page
```

 1   121, you said, After we get back to Linda's, we was

 2   talking, sitting there eating.  And then on 22 at the

 3   top you said, Jesse called me.  He's like do you want

 4   to bid on some 30's?  I can get some 30's for 20

 5   apiece.

 6           I was like with all that's going on, I

 7   ain't worried about pills at the moment.  Do you see

 8   that?

 9       A.    Yes, sir.

10       Q.    Jesse said he didn't have any phone call

11   with you about buying pills.

12       A.    Yes, he did.

13       Q.    Do you know why he would lie about that?

14       A.    I have no idea.

15       Q.    Did it bother you that he was talking

16   about buying drugs after what had just happened?

17           MR. SLOSAR:  Objection to form.

18       A.    Did it bother me?

19       Q.    Yes.

20       A.    Yes.  Because I think what was going on

21   was more in our life, more important than a pill fix

22   for anybody, either him or Amanda.

23       Q.    Did you talk to him about that at all?

24       A.    I just told him what was going on.  I

25   wasn't worried about it.

1      Q.     Do you remember any conversation between

2  your kids or you and Amanda when they came back to

3  the trailer to pick the kids back up?

4      A.     Amanda just asked us -- actually wasn't

5  really accusing all of us when we came in, What

6  happened?  What went on with her?

7           I said, I don't know for sure.  You can

8  go across the road.  I believe maybe Jennifer or

9  Michelle told her what was going on.

10          (Court Reporter marks Diary Entry with

11  Michelle's Phone Numbers Exhibit No. 3.)

12      Q.     This is PL 020213.  That was taken from

13  the scene and it references two phone numbers for

14  Michelle.  Do you see that?

15      A.     Yes, I do.

16      Q.     Do you recognize those numbers?

17      A.     I recognize the top one.  It seems

18  familiar.

19      Q.     Sitting here today, you don't recognize

20  those numbers, whether they were Michelle's or not?

21      A.     No, I don't.

22          MR. SLOSAR:  Objection to form.

23      Q.     Go on to Exhibit 1.

24          MR. SLOSAR:  Just for the record, are we

25  outside of that foundation -- objection to the actual

1    exhibit itself.

2         Q.    On page four, item number 135, that's

3    from a (606) 622-3983, and I'll represent to you that

4    that was identified by her as her cell phone number,

5    Jennifer Lawson.

6         A.    Jennifer.

7         Q.    Does that look familiar?

8              MR. SLOSAR:  Objection to form.

9         A.    If she says it was hers, it was hers.

10   She's changed her number so many times.  Different

11   phone companies.

12        Q.    Hard to keep up?

13        A.    I just pull up her name on her phone.

14        Q.    Now the -- that's at 5:06.  That would

15   have been close in time to when the news broke;

16   right?

17        A.    Yeah.

18        Q.    And then -- do you have a memory of

19   talking to her right before you got the news from

20   Michelle?

21        A.    That could have been Jesse using her

22   phone calling and saying when the city called.

23        Q.    You indicated in your statement you got

24   the news from Jesse; right?

25        A.    I thought it was Michelle.  I heard her

```
 1   screaming in the background.  They may have been

 2   together.  I don't know.

 3        Q.     You do --

 4        A.     Alls I know because I went up to her

 5   house, the only body up there was Michelle's car.

 6        Q.     A couple items down there is a call from

 7   one of these numbers for Michelle, 2-4-5-0, but it

 8   doesn't have any talk time.  Item number 337?

 9        A.     Three thirty-seven?  What page?

10        Q.     Page four.  I'm sorry, item 137.  I'm

11   very sorry, 137.

12        A.     I can't see the numbers but you can read

13   it off to me.

14        Q.     It looks like from your phone records

15   that the call came from Jennifer or Jesse first

16   rather than Michelle.  Is that possible?

17        A.     Could be possible.  I thought I was

18   talking to Michelle first.  Or he could have been

19   calling telling me to go get her.  She called them.

20   She was in bad shape, but I do remember hearing her

21   screaming on the phone.

22        Q.     In between those calls between the

23   number for Jennifer or Jesse and the number for

24   Michelle, there is a phone call to the item number

25   136 to 5-9-8-7 which is Linda Taylor's number.
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                    Page 270

1      A.      Right.

2      Q.      What's your recollection of

3  communicating with Linda Taylor?

4      A.      Amanda may have called her mom and told

5  her what was going on from my phone.  I'm not sure.

6      Q.      This was big news; wasn't it?

7      A.      Oh, yes.

8              MR. SLOSAR:  Objection to form.

9      Q.      So within the time that this news broke,

10  who do you remember alerting calling to tell?

11             MR. SLOSAR:  Objection to form.  Asked

12  and answered repeatedly.

13     A.      Who I called?

14     Q.      Right.  I mean, I know you talked.  I'm

15  talking other than your daughters?

16     A.      I could have called my sister, but on

17  the exit out of the hollering going to the crime

18  scene, I knew once I passed Freddie Cole's house I

19  was out of service, so the calls would have been --

20  would have been short.

21     Q.      One of the first calls that you make is

22  item number 142 -- 143, I'm sorry, at 5:24.  And it's

23  to a (606) 304-3345 number.  Do you see that?

24     A.      I see it.

25     Q.      And it shows six minutes of elapsed

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                    Page 271

 1    time.

 2         A.      Right.

 3         Q.      Who is that number?

 4         A.      I have no idea.  It could be Knox

 5    County.  It could be Bell County.  I've had people

 6    using both counties, 304 and 302.

 7         Q.      Sitting here today, you don't know who

 8    it is?  You can't really explain it?

 9                 MR. SLOSAR:  Objection to form.

10         A.      No.

11                 MR. SLOSAR:  Asked and answered.

12         A.      No.  I can't.

13         Q.      Now, by 6 o'clock, were you at the

14    scene?

15         A.      Oh, yes, yes.

16         Q.      If you flip to the next page, item

17    number 155, there is a phone call from your number,

18    1-2-2-3 to the Linda Taylor number 5-9-8-7.  Do you

19    see that?

20         A.      I can see the number.  I can see 135 or

21    the 155.  That's all I can see.

22         Q.      It's for over 20 minutes.  You don't

23    have a memory of talking to Linda Taylor; do you?

24         A.      No.  No, I don't.

25         Q.      You indicated before that that would

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                              Page 272

```
 1    have been Amanda using your phone to call her mom.

 2         A.     I left my phone there but I don't

 3    remember.

 4         Q.     Were you talking to Jonathan Taylor?

 5         A.     No, sir.

 6         Q.     You wouldn't have any reason to; would

 7    you?

 8         A.     No.

 9                MR. SLOSAR:  Objection to form.

10         A.     No.  He didn't know the lady.

11         Q.     So can you explain that phone call?

12                MR. SLOSAR:  Objection to form.  Asked

13    and answered.  He answered your last question.  You

14    followed up with an attempt to attack him through

15    cross.  He answered it again.  Move on.

16         A.     The thing about the phone record is I

17    can see right there where the Jay Gregory call, it's

18    not accurate because I know when I called him.  I've

19    had things on my phone show up that somebody had

20    called me hours ago and it never came in until later.

21                So it's not accurate, not at all on that

22    one.  Because God, don't let me get up out of this

23    seat, I talked to Jay Gregory before 9 o'clock.

24         Q.     All right.  I'm going to run through and

25    see if you recognize a couple of these numbers.
```

1    There is a 5-1-9-4.

2          A.      That's Jerry Gray's.

3          Q.      Jerry Gray's?

4          A.      Yes, sir.

5          Q.      Do you recall talking to him?

6          A.      Betty, his wife, always was calling.

7    What's going on?  What have they found out?  She even

8    babysitted Jennifer's kids so they could go to the

9    funeral.

10         Q.      Did you say they lived nearby?

11         A.      Uh-huh.  Between -- they live 500 to

12   1000 feet from Adean and Freddie.

13         Q.      Is that Jerry Gray related to the Grays

14   who are related to Kayla Mills?  We talked about some

15   of those Grays.

16                 MR. SLOSAR:  Objection to form.

17   Compound question.

18         A.      I wouldn't know if they are.

19         Q.      Okay.

20         A.      Grays and Browns and Mills are plentiful

21   there.

22         Q.      I understand.  And 2-8-7-5 I believe was

23   Scott Mills.

24         A.      That's Scott Mills' number, yes, sir.

25         Q.      And there is 5-0-4-3, does that ring a

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                    Page 274

```
 1   bell?

 2        A.      Is it 6-2-7, 6-2-2?

 3        Q.      542-5043.

 4        A.      5-0-4-3?

 5        Q.      I saw some reference to a Flora Smith.

 6   Does that --

 7        A.      That's Alan Smith.

 8        Q.      Who is Alan Smith?

 9        A.      He's is a neighbor that lives below my

10   ex-mother-in-law's place.  I done a lot of work on

11   his house.  I built cars for him.

12        Q.      Okay.  And then there is another number

13   that seems to -- that the background information that

14   I run goes to Flora Smith, 627-8542.  Is that Alan

15   Smith as well?

16        A.      His cell phone.

17        Q.      Okay.  Do you have a memory of talking

18   to them?

19        A.      That day?

20        Q.      Yes.

21        A.      I think he called me.

22        Q.      To see what's going on?

23        A.      Yeah.  He heard and wanted to know if it

24   was true.  I don't know what time.

25        Q.      There is a phone number that you called
```

```
 1   quite a bit that day, 542-4797.  Do you recognize

 2   that?

 3           A.     4-7-9-7?

 4           Q.     The stuff -- the background that I have

 5   run indicates it's associated with Freddie Cole and a

 6   Dean Cole.  Does that ring a bell as one of their

 7   numbers?

 8           A.     I don't know.  On the 10th I called it?

 9           Q.     What's that?

10           A.     The tenth month, the 20th day I called

11   it?

12           Q.     The 20th of December.

13           A.     Yeah.  I mean 2010.

14           Q.     Yes.

15           A.     December 20th?  I don't know.

16           Q.     You call a 6-6-2 -- I'm sorry, 627-3170.

17           A.     Oh, yes, yes.

18           Q.     Who is that?

19           A.     Cindy Engle.

20           Q.     You how do you know her?

21           A.     She used to run Engles, little drive-in

22   there in town.  Her dad owned it.  Her Uncle Tommy

23   who owns Hillbilly's Restaurant, he owned it.  He

24   actually still owns it but there's several times he

25   tried to pass it on down to family members and they
```

1   couldn't make it work.  Been friends forever.

2          Q.     That's like, you're just acquaintances?

3          A.     Yeah.  Yeah.  She called me every night,

4   talk for hours.

5          Q.     There is a number that you dialed some

6   that day, a 627-0899.

7          A.     0-8-9-9?

8          Q.     Yeah.

9          A.     I don't know who that would be.

10         Q.     A 545-3950?

11         A.     5-4-5?  That could be a home, that could

12  be a cell phone.  I'm not sure.

13         Q.     You don't recognize who that would be?

14         A.     No.

15         Q.     545-8107, that's my background

16  information indicates Ford Collette.  Does that sound

17  correct?

18         A.     It could be.

19         Q.     You're not for sure?

20         A.     Me and him wasn't friends.

21         Q.     You weren't friends?

22         A.     No.  We went to school together but I

23  never seen him after I got out of school, but that

24  would have probably came from Amanda.  That was

25  her --

1        Q.      Using your phone to call him?

2        A.      Could have been.

3        Q.      A 455-8733?

4        A.      8-7-3-3, that sounds very familiar.

5        Q.      When I Googled it, there was a Wendy

6    Mills that had that number, but I'm not for sure what

7    time frame.

8        A.      I never knew Wendy's number.

9        Q.      Okay.

10       A.      We only talked at the Creek Mart.

11       Q.      627-0184?

12       A.      Would that have been Leroy Warren.

13       Q.      Leroy Ward?

14       A.      Warren.

15       Q.      Warren?

16       A.      I think that was Leroy's number.

17       Q.      Who is that?

18       A.      He's a guy that lived besides the Dewitt

19   school.  He's got a body shop I used to go do some

20   painting and framework for him.  He's dead now, but I

21   think that was his number.

22       Q.      Did you remember talking to him that

23   day?

24       A.      It's possible.  He all the time calling

25   me to pull a frame.

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                    Page 278

```
 1          Q.      Okay.   Kind of work related?

 2          A.      Yes.

 3          Q.      628-3095, 3-0-9-5?

 4          A.      6-2-8?

 5          Q.      Uh-huh.

 6          A.      I have no idea who that is.

 7          Q.      All right.  Did you know that Mike

 8     Simpson was going to Florida?

 9          A.      Not until he told me the day -- he

10     didn't tell me.  James Allen told me the day he was

11     leaving.

12          Q.      What time did he tell you?

13          A.      It was after I had come back from

14     Walgreens and I was going up to Bob's.

15          Q.      When he said he could sell you drugs

16     cheaper?

17          A.      When he got back.

18          Q.      You had seen Mike earlier that day at

19     least twice; right?

20          A.      Yes.

21          Q.      Did you see him with any wad of money on

22     his person?

23          A.      No.  He never would pack it like that.

24     If he had money.  He wouldn't know it.  If you took

25     him a hundred dollar bill to buy a $30 pill, he might
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                    Page 279

```
 1   leave the room or turn his back to you.

 2         Q.      Did he mention anything about the

 3   Florida trip?

 4         A.      That morning?

 5         Q.      Yes.

 6         A.      He never said anything to me about it.

 7   I actually -- he was more concerned about the gas

 8   freezing up and what was going on with the heat and

 9   stuff like that.

10         Q.      Did you notice whether he was packed up,

11   looked like he was ready to go anywhere?

12         A.      That morning.

13         Q.      That morning?

14         A.      No.   Actually I stepped inside the door

15   briefly.

16         Q.      Did Mike mention he talked to Jay

17   Sauders who visited his house after this?

18         A.      After everything went down and he came

19   back, yeah.

20         Q.      Did he mention that he had given an

21   alibi note?

22         A.      No.

23         Q.      No.   Did he ever talk to you about being

24   a potential alibi?

25         A.      No.
```

```
 1          Q.      Now, the time that you would have
 2   been -- you said you were leaving Treadways and
 3   stopped by Amanda's.  You left town around 9:30,
 4   stopped at her house between 9:30 and ten.  Is that
 5   right?
 6          A.      Yeah.
 7                  MR. SLOSAR:  Objection to form.
 8          Q.      Cleo said that you stopped by.  She told
 9   Lisa Evans that you stopped by her house at 10:45.
10          A.      No.
11          Q.      That's not accurate?
12          A.      No.
13                  MR. SLOSAR:  Objection to form.
14          Q.      She also told Lisa Evans that you were
15   on her dad's porch until about 12:30 after that.
16                  MR. SLOSAR:  Objection to form.
17          A.      Her dad?
18          Q.      Yeah.  Glen Brown.
19          A.      I never been to Glen's house but one
20   time, and it was not of a day.
21          Q.      So that's inaccurate?
22          A.      That's inaccurate.
23          Q.      Now, a number associated with Mike
24   Simpson is 622-1780.  Does that sound familiar?
25          A.      Could be with him because he had a phone
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                           Page 281

1   on James Allen's mom's plan.  There was several

2   phones on that plan.

3        Q.     Okay.

4        A.     She would stop there once a month and

5   get the money from Mike for the phone bill.  They had

6   five or six phones on that plan.

7        Q.     How did you know that his plan was on

8   James Allen?

9        A.     I was there buying a pill and she

10  stopped to get her money.  I said, What do you owe

11  her for?  Said, My phone is on her bill.

12       Q.     Okay.  I think you said you left Mike's

13  around 10:30 to go back to Amanda's?

14       A.     That's what it says there.  I thought it

15  was earlier than that.

16       Q.     What time would you have gotten back to

17  Amanda's house?

18       A.     Ten minutes at the most.

19       Q.     So 10:40 would have been the latest but

20  you think it was earlier?

21       A.     I thought it was earlier, but...

22       Q.     If you turn to page three of the phone

23  records --

24       A.     Yeah.

25       Q.     -- item number 87, there is a call at

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                    Page 282

 1   10:44 from the 1-7-8-0 number associated with Simpson

 2   to you.  Do you see that?

 3             MR. SLOSAR:  Objection to form.

 4       A.    Eighty-seven what?

 5       Q.    At 10:44.  It's item number 87.

 6       A.    Yeah.

 7       Q.    On page three at 10:44.  There is a call

 8   from the 1-7-8-0 number.  I'm just doing the last

 9   four digits to keep it easy.

10       A.    Right.

11       Q.    To you at 10:44.  Do you see that?

12       A.    Yes.

13       Q.    Do you have any recollection of Mike

14   calling you that day in addition to seeing him?

15       A.    No, I don't.

16       Q.    After that -- that call, you make a

17   phone call to a number that's 6-2-6 -- I'm sorry,

18   269-5912.  Do you recognize that number?

19       A.    5-9-1-2, no.

20       Q.    That number is associated with Jerry

21   Wayne.  Jerry Wayne Smith, Jonathan Taylor's brother?

22       A.    9-1-2?  I don't remember.

23       Q.    Those three calls were at 10:45 to

24   10:48.  Another call from Simpson at 10:53 and then

25   there is some more phone calls between you and the

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                              Page 283

 1    5-9-1-2 number up until 11:28.

 2              Now, if that's Jerry Wayne's number, you

 3    should have already been at Amanda's house at that

 4    time, 10:45?

 5         A.    Right, I was.

 6              MR. SLOSAR:  Objection to form.

 7         Q.    Do you have any explanation of why a

 8    number associated with you would be calling a number

 9    associated with Jerry Wayne at that time?

10              MR. SLOSAR:  Objection to the form.

11    Calls for -- hold on.  Objection to form.  Calls for

12    speculation, and this is an incomplete hypothetical

13    because there is absolutely no foundation for the

14    number that you're attempting --

15         Q.    Jerry Wayne indicated that was his

16    number in his deposition.

17         A.    It was his number.  I don't know why I

18    would be calling him at that time unless I was

19    calling back to see if he brought the kids back, he

20    could watch them.  That would be the only thing I can

21    think of.

22         Q.    At 12:36, item number 108.

23         A.    One 08?

24         Q.    Yeah, 108 at 12:36.  Your phone number,

25    the number associated with you, calls the 1-7-8-0

1   number associated with Mike Simpson.  Do you have any

2   recollection of talking to Mike at noon?

3        A.    No, I don't.  Was that Mike's number or

4   was it just on that bill?  I mean, it would be on the

5   bill but I can't remember his number.

6        Q.    It's on his rental car bill.

7        A.    So, his number.

8        Q.    To your knowledge, had Mike Simpson left

9   his house that he indicated he'd been anywhere that

10  day prior to that 12:36 phone call?

11       A.    No.

12       Q.    Do you know what time he left the area

13  to go rent the car for Florida?

14       A.    I had no idea until he got back that he

15  even had rented a car.  They was usually riding with

16  some guys, people that give him so much to go, took

17  some many of the pills and went home.

18       Q.    Amanda's statement to Detective York

19  indicated that you dropped her off at the doctor's

20  office.  Is that accurate?

21       A.    That was unaccurate (sic).

22       Q.    Throughout the day, had you talked to

23  your daughter's any on the 20th before Catherine

24  Mills was found dead?

25       A.    I talked to Jennifer I'm pretty sure.  I

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                Page 285

```
 1   can't remember about Michelle.  I think Michelle was
 2   working for the daycare at that time.
 3            Q.    Did any of them indicate any concern
 4   that they hadn't heard from their grandmother that
 5   day?
 6            A.    Huh-uh.
 7            Q.    No?
 8            A.    No.
 9            Q.    Now, when the -- I believe the
10   prescription records from Walgreens indicated that
11   the prescription was filled at or sold at 3:22 in
12   Pineville.
13            A.    That's way off.
14            Q.    You were back home by then.  That's your
15   testimony?
16            A.    I know I was.
17            Q.    Did anybody see you back home other than
18   Amanda, Jennifer Lawson and the Frank person?
19            A.    At that moment?
20            Q.    Yes.
21            A.    That's the only ones, yeah.
22            Q.    Did anybody else see you back home
23   anywhere near that time?
24            MR. SLOSAR:  Objection to form.  Calls
25   for speculation.
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                Page 286

```
 1        A.      Near three or two?

 2        Q.      Near three.

 3        A.      They were the only ones that saw me.

 4        Q.      Let's talk a little bit about the next

 5   day.  Do you need a break?

 6        A.      No.

 7                MR. SLOSAR:  What's the time at?

 8                VIDEOGRAPHER:  We've been on the record

 9   for five hours, 27 minutes.

10   BY MR. WRIGHT:

11        Q.      Good to go?

12        A.      Yeah.

13        Q.      All right.

14                MR. SLOSAR:  Again --

15                MR. WRIGHT:  We know your objection.

16   You don't need to -- you've made it.

17                MR. SLOSAR:  I'm going to state it for

18   the record, Derrick, because there have been

19   depositions, including recently, where you went over

20   the seven hours, and today that's not going to

21   happen.

22                So, to the extent that defense counsel

23   is waiving their ability to question Mr. Lester,

24   that's their prerogative, but plaintiff will stop

25   this deposition at the seven-hour limit.
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                    Page 287

 1   BY MR. WRIGHT:

 2        Q.    What do you recall on the following day?

 3        A.    Following day?

 4        Q.    Yes.

 5        A.    Just going to Bob's, getting a pill.

 6   Pills, two pills.  Sizemore coming in saying what he

 7   said.  Calling my daughter.  Taking, dropping it off

 8   at Amanda's house and going to work.

 9        Q.    Where did you work at that day?

10        A.    One of the rental houses in town.

11        Q.    Was that for Paul?

12        A.    Yeah.  We're on College Street.

13        Q.    Did you see Jonathan Taylor that day?

14        A.    I don't remember.

15        Q.    Did you see?

16        A.    I could have saw him that evening.  I'm

17   not sure.

18        Q.    Did you get the pill for Amanda?

19        A.    Yeah.

20        Q.    Did you drop that off to her?

21        A.    Yeah.

22        Q.    Is that the only time you saw her that

23   day to your memory?

24        A.    Until that evening at nine.

25        Q.    After work?

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.

William Lester on 10/09/2018                                    Page 288

```
 1        A.      Yeah.  To the best of my knowledge.

 2        Q.      Do you remember talking to them through

 3   the day?

 4        A.      She could have called.  Sometimes I'd

 5   answer, sometimes I wouldn't.  According to what I

 6   was doing.

 7        Q.      Do you recall talking to your daughters

 8   or anything about the investigation at that point or

 9   was it still kind of --

10        A.      I had called Jennifer that morning to

11   tell her what Sizemore said.

12        Q.      That's right.  Any follow-up that day

13   with anybody?

14        A.      I can't remember.

15        Q.      Do you recognize a number 627-4529?

16        A.      4-5-2-9?  I think that might be Scott's

17   brother Alan.

18        Q.      Scott's brother Alan?

19        A.      I think.

20        Q.      Alan Mills?

21        A.      Yes, sir.

22        Q.      Were you friends with him?

23        A.      Yeah.

24        Q.      He live in the area?

25        A.      He lives in Jeffs Creek.
```

```
1          Q.     Where?

2          A.     Jeffs Creek.

3          Q.     Is that along the 222 mile?

4          A.     It's middle ways.  It's the 11 mile

5     marker, 11 to the center either way you go.

6          Q.     So it's at the top?

7          A.     That's Kinny Gap.

8          Q.     Did you talk to Mike Simpson that day?

9          A.     Possible.  I think he may have called me

10    that night.  He called me one night after that

11    happened.  Thought -- said he heard about what went

12    on.  Thought it was my mom.  He was crying.  I said,

13    It's not my mom.  It's my mother-in-law.

14         Q.     Do you think that could have happened

15    the day after Catherine Mills was found dead?

16                MR. SLOSAR:  Objection to form.

17         A.     I don't know.  It was in that week, in

18    that time frame.

19         Q.     Did he say where he had heard the news

20    from?

21         A.     He did not, no.

22         Q.     Did Allen Helton tell you he was going

23    to Florida with Mike or did you just assume?

24         A.     He told me.  He's the one told me.  Mike

25    didn't tell me.  Mike was standing in the door drying
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                               Page 290

```
 1   his hair.

 2          Q.      Do you recognize a number 337-6285?

 3          A.      3-3-7?

 4          Q.      Yes.  When I run it through our system,

 5   it indicated a Ray Brock?

 6          A.      That would be Amanda's aunt.

 7          Q.      Who?

 8          A.      Amanda's I wasn't.  Jonathan's

 9   stepfather.  Jonathan's mom lives with him.

10          Q.      Who lives in the home?

11          A.      Ray and -- I can't think of her name.

12   Linda's sister.  Y'all know Jonathan's mom's name?

13          Q.      Donna?

14          A.      Donna.

15          Q.      She was with Ray?

16          A.      Yeah.

17          Q.      Okay.  Do you recall calling a Ray

18   Brock?

19          A.      That's the man she lives with.

20          Q.      Do you recall calling him on the day

21   after the murder?

22          A.      I could have.  I'm not sure.

23          Q.      What would you have been calling him

24   for?

25                  MR. SLOSAR:  Objection to form.  Calls
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                    Page 291

```
 1    for speculation.
 2           A.      What I would been calling for is
 3    sometimes when everybody was out, there was one place
 4    that Donna could go get a pill and that was -- she
 5    could ride with him to get it.  Nobody else could get
 6    in.
 7           Q.      Where was that from?
 8           A.      That'd been up behind her house in Brog
 9    holler (sic) on top the mountain.
10           Q.      Is -- I forget how Jerry Wayne and
11    Jonathan are related.  Is Ray Brock also related?
12           A.      Stepfather.
13           Q.      Stepfather to Jerry Wayne?
14           A.      Both of them.  He's not the father of
15    either one.
16           Q.      Yeah.  Okay.  Do you know whether
17    Jonathan Taylor left town after Catherine Mills was
18    found dead?
19           A.      To the best of my knowledge, he was --
20    stayed with Linda.
21           Q.      Do you know whether it was his birthday?
22           A.      His birthday was, I'm thinking, was on a
23    Sunday.  I'm not sure.  I think it was the 19th.
24    Either the 19th or 20th.  I think.
25           Q.      Okay.
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.

William Lester on 10/09/2018                                    Page 292

```
 1        A.     But I don't know.  I know it's in
 2   December.  I can't tell you the date.
 3        Q.     He indicated it was afterwards, the
 4   21st?
 5        A.     Could be.
 6        Q.     You don't remember anything for him on
 7   that day, the day after?
 8             MR. SLOSAR:  Objection to form.
 9        A.     No, I don't.  I think they may have said
10   they may have had some cake for him.  Linda may have
11   brought something from the children's home, but I
12   wasn't there involved.
13        Q.     Did you talk to Jesse that day
14   afterwards about what had happened?
15        A.     He called me basically every day for a
16   while.
17        Q.     Y'all would talk about the
18   investigation?
19             MR. SLOSAR:  Objection to form.
20        A.     We talk about what was happening,
21   business he had, how he was scared, things like that.
22   Maybe it was visits.
23        Q.     Was your sister's number 545-9142?
24        A.     Yes, sir.
25        Q.     Is that Melissa Abner.
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                          Page 293

```
1          A.      Melissa Abner, yup.

2          Q.      Did you have any other siblings?

3          A.      No.

4          Q.      Okay.  Where did she live?

5          A.      She lives Davis Bend in Barbourville.

6          Q.      Do you remember talking to her on the

7   day that Catherine Mills was found dead?

8          A.      I probably talked to her several times.

9          Q.      Was that regular?

10         A.      It's regular.  Because my mom lived with

11  her.  Wouldn't just have been her.  I would have been

12  calling my mom, checking on her.

13         Q.      That's a home phone?

14         A.      Yeah.

15         Q.      I'm about done.  I just want to go to

16  the next day after.  I believe there was a report by

17  Detective Cornet (phonetic) of a witness who had

18  reported seeing a blue car and gave a description of

19  a male at the scene.

20                 Did you ever hear about that?

21         A.      Saw it on the news and read -- it was on

22  the front page of the Mountain Advocate.

23         Q.      Did you -- the date of that report was

24  December 22, two days after Catherine Mills was found

25  dead.  Did you hear about it at that time frame?
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                    Page 294

```
 1          A.      Just when I saw it on the news.

 2          Q.      Okay.  It came out that quickly?

 3          A.      Ever what day it came out was the only

 4   thing I heard.

 5          Q.      They published a picture of a car.  I

 6   think that was quite a bit later.

 7          A.      Yeah.  The thing I saw was a guy with

 8   the hood up -- hoodie on.

 9          Q.      You're talking about the sketch?

10          A.      The sketch, yeah.

11          Q.      You referenced earlier a family meeting.

12   You made it sound like it was close in time to when

13   Catherine Mills was found dead.

14          A.      It was.  It involved my ex-wife, my

15   brother-in-law, her brothers, her sister, my children

16   and it didn't involve me.

17          Q.      Didn't involve you?

18          A.      No, sir.

19          Q.      But it is the immediate family --

20          A.      Yeah.

21          Q.      -- and the granddaughters?

22          A.      Uh-huh.

23          Q.      Do you know whether Jesse was there?

24          A.      I have no idea.

25          Q.      Do you know what day it was?
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                          Page 295

```
 1         A.     No.

 2         Q.     Is it possible it could have been

 3    December 22nd?

 4         A.     I don't know.

 5         Q.     Did anybody -- did any of your daughters

 6    call you?

 7         A.     Michelle did.

 8         Q.     Okay.

 9         A.     Ever which day it was she called me.  It

10    was her and my -- her and her uncle had got into it

11    at the meeting.  He was saying things about me and

12    she said she didn't believe it.  And that's kind of

13    where it was left at.

14         Q.     Did she tell you anything about any

15    information the police had got from a witness?

16         A.     Not as I remember it.

17         Q.     Take a look at the phone records and go

18    to page eight if you could, please.

19         A.     Page eight?

20         Q.     Yeah.  We'll go over that in just a

21    second.

22                Do you have any memory of what you did

23    that day, two days afterwards?

24         A.     Two days after?  It's either working or

25    running errands.
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.

William Lester on 10/09/2018                    Page 296

```
1        Q.    Do you know who you saw, where you went?

2        A.    No.

3        Q.    On the 22nd, the first phone call --

4   this is just phone calls, text messages are

5   different.  Item number 287.  Well, there is an item

6   at 10:52.  It's a voicemail.  Was 3,002.  At 11:24,

7   item 287, there is a call between the number

8   associated with you and the 1-7-8-0 number associated

9   with Mike Simpson.  Do you remember talking to him?

10       A.    No.  But he could have called.

11       Q.    Next phone call is with 5-1-9-4.  I

12  believe you said that is Jerry Gray?

13       A.    That's his wife, yeah.

14       Q.    And that's a pretty lengthy phone call.

15       A.    You cannot get her off the phone.  We

16  fell out about two years ago when I got dismissed.

17       Q.    What was that?

18       A.    When the charges got dismissed on it.

19       Q.    What were the charges?

20       A.    Murder, robbery.

21       Q.    Oh, these charges.  I thought she was

22  talking about charges with her.

23             And then there is a sequence of calls

24  to -- between you and this 627-0899.

25       A.    Did you Google it?
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                        Page 297

```
 1          Q.      I did.

 2          A.      Who was it?

 3          Q.      I don't know.

 4          A.      Didn't have a name?

 5          Q.      Huh-uh.

 6          A.      I'm not for sure what Paul's cell phone

 7   would have been.  I don't remember Pork's cell phone.

 8          Q.      He was in jail at the time; wasn't he?

 9          A.      I'm thinking so, or later.

10          Q.      That number texted you one, two, three,

11   four, five texts at 10:52 before you started trying

12   to call it.  You don't remember anybody trying to get

13   ahold of you that morning?

14          A.      I can't remember that far back about

15   that.

16          Q.      You do finally get in contact, item

17   number 291.  Five-plus-minute phone call with that

18   0-8-9-9 number.

19          A.      Right.

20          Q.      And after that, there are one, two,

21   three, four, five calls in consecutive order to this

22   304-3345 number?

23          A.      Uh-huh.

24          Q.      Anybody you were trying to get ahold of

25   urgently?
```

1        A.        Could have been on -- could have been on
2    somebody owing me money or could have been on drug
3    dealing or could have been on a job that I was needed
4    at.  I'm not for sure.
5        Q.        It's also on Jesse Lawson's phone
6    number.  Would that help refresh your memory?
7        A.        Could be Jack Davis' number.
8        Q.        Why do you say "Jack Davis"?
9        A.        He was a drug dealer.
10       Q.        It's also on Mike Simpson's.  Would he
11   be talking to Jack Davis?
12       A.        He would be talking to anybody about
13   selling medicine.
14       Q.        On Jerry Wayne's phone number?
15       A.        Somebody borrowed his phone and used it.
16   Jerry Wayne's never done medicine.
17       Q.        It's on Linda Taylor's phone number.
18       A.        Somebody would have borrowed her phone
19   and used it.
20       Q.        Okay.
21       A.        If that's Jack's number.
22       Q.        If you flip the page to page nine.
23       A.        Nine?
24       Q.        Yes.  The very first one is a 4-0-7.
25   That's the Florida number.  Is that Larry Gregory,

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                Page 299

```
 1   Florida area code?

 2        A.     3-8-5 or 3-0-5?

 3        Q.     Yeah.

 4        A.     It is -- if it's Florida, that would be

 5   Larry.

 6        Q.     Do you remember what you were talking to

 7   him about?

 8               MR. SLOSAR:  Objection to form,

 9   foundation.

10        A.     No.  It would have been something with

11   the house.

12        Q.     Beginning at about 157, the next item

13   down, through 319, there is one, two, three, four,

14   five, six -- six calls or attempted calls from

15   0-7-7-9.  Do you recognize that, 542-0779?

16        A.     0-7-7-9?  Did you Google it?

17        Q.     It's Donna Mills' number based on

18   information in the record.  Do you recall talking to

19   her that afternoon?

20        A.     She called me see if I knew what was

21   going on.  I can't tell you what day.  She called me

22   several times throughout.

23        Q.     That was the only -- these phone records

24   only go from the 19th to the 22nd.  That is the only

25   time she called you those five times that I listed.
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                    Page 300

```
 1    You don't remember what that was about?

 2         A.    No.  Could have even been Kayla wanting

 3    to know if I had seen Jonathan.  I'm not sure.

 4         Q.    Was Kayla living with her at that time?

 5         A.    Yeah, as far as I know.

 6         Q.    You're also called -- a number calls you

 7    from Jerry Wayne four times in that same period.  Is

 8    there something going on right then --

 9               MR. SLOSAR:  Objection to form.

10         A.    Not that I know of unless Jerry Wayne

11    was trying to see if Amanda was with me.  Maybe the

12    kids was needing something.  I'm not sure.

13         Q.    -- you get a call from Jesse Lawson's

14    phone number at 3:30, their home phone number at

15    3:49, their cell phone at 4:24 and Michelle Edwards

16    at 4:34.  Kind of a cluster of calls.  Does that ring

17    a bell whether there was any news to you about any

18    break in the case?

19               MR. SLOSAR:  Objection to form.

20         A.    They was just -- every day for a

21    while -- not every day but multiple times when they

22    did call, they call to see -- if they couldn't get

23    ahold of me, if I was all right, where I was working,

24    what was going on.

25               Because a lot of times I was doing a
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.

William Lester on 10/09/2018                                Page 301

```
 1   refurbishing job, and where I was doing it that day
 2   was no phone service.
 3       Q.    Well, item number 331 and 332, there is
 4   a period of almost three hours from five to eight
 5   where there is no phone activity at all.
 6       A.    Uh-huh.
 7       Q.    That's a little odd on your phone
 8   records.  There is usually not a three-hour gap.
 9       A.    Right.
10             MR. SLOSAR:  Objection to form.
11       Q.    Do you have any memory of being out of
12   contact?
13             MR. SLOSAR:  Objection to form.
14       A.    I'd have been one of three places.
15       Q.    Where?
16       A.    I'd have been at Bob Smith's.  I'd have
17   been at Big Creek almost to Red Bird, or I'd have
18   been up there in Salt Gum on those apartments
19   working.
20       Q.    Jesse Lawson's phone records have an
21   approximate three-hour gap for the same time period.
22       A.    Well, if he's home -- if he was home
23   that night at that time, unless you laid a cell phone
24   in the window there, you had no service.
25             (A woman from Regus came in to instruct
```

 1  that they have to close up the office at 5:00 p.m.)

 2  BY MR. WRIGHT:

 3       Q.    At 9 o'clock, after this time on your

 4  phone records, you make one, two, three, four, five,

 5  six, seven, eight, nine calls to that 304-3345 number

 6  between 9:17 and 9:50.  So a little over a half hour,

 7  nine phone calls.  Who were you trying to reach at

 8  that time?

 9            MR. SLOSAR:  Objection.

10       A.    If that many calls was made to that

11  number, it would have to be a drug dealer.  It would

12  have had to have been.  Have you Googled it?

13       Q.    No.  I subpoenaed it.  It's a TracFone.

14  Have you ever heard of a TracFone?

15       A.    TracFones, yes.

16       Q.    What are they?

17       A.    Little phones prepaid you buy at the

18  dollar store.

19       Q.    Yeah.  So you don't have a person

20  associated with it; right?

21       A.    Do I?

22       Q.    To your knowledge.

23            MR. SLOSAR:  Objection to form.

24       A.    I could have had.

25       Q.    What's that?

```
 1        A.      I could have had a guy, my best friend

 2   for years, I'm pretty sure he had a TracFone.

 3        Q.      This TracFone was purchased on -- or the

 4   service indicated it when from 12/17, three days

 5   before the murder, to two days, 12/22.

 6        A.      No.  He had his longer than that.

 7        Q.      Your drug dealer?

 8        A.      My friend.

 9                MR. SLOSAR:  Objection to form.

10        Q.      So then you can't explain that number?

11                MR. SLOSAR:  Objection to form.  Asked

12   and answered, Derrick.

13        A.      I have no idea who it was.

14        Q.      Okay.  Did you take a trip to Gatlinburg

15   not long after Catherine Mills was found dead?

16                MR. SLOSAR:  Objection to form.

17        A.      No.

18        Q.      Did you ever tell Jesse Lawson that you

19   had got money from a tax refund?

20        A.      Jesse?

21        Q.      Yes.

22        A.      I could have.

23        Q.      And you indicated earlier that you never

24   filed taxes, though?

25        A.      I could have told him that.
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                    Page 304

```
 1          Q.      Why would you --

 2          A.      That don't mean I did.

 3          Q.      Why do you think you could have told him

 4   that?

 5                  MR. SLOSAR:  Objection to the form.

 6   Calls for speculation.

 7          A.      Why would I have told him?  Cutting up

 8   with him, mostly.

 9          Q.      Because what?

10          A.      Cutting up with him mostly.  But if you

11   want to file and check on my taxes, I never filed

12   taxes from 2001.  I started in '98 and worked to 2001

13   and tried to file them through my divorce, and she

14   grabbed the first thing and ran.  Because I was

15   self-employed, mine was always filed on April 14th.

16   She got the money every year.

17                  We tried to get it turned around.

18   Everything they said, they said they couldn't give me

19   the money.  I have to pay back the money she got.  I

20   told them to take my number out of the system.  I

21   wouldn't file taxes no more, and I never filed taxes

22   back to 2011.

23          Q.      Do you recall whether you paid a water

24   bill that day?

25          A.      I could have.
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                    Page 305

```
 1                    MR. SLOSAR:  Objection to form.

 2        Q.     Is there -- was there a particular time

 3   water bills were due?

 4        A.     You're cut off at the 19th.  If you let

 5   it go past -- actually, you need to pay it by the

 6   19th.  If it goes to the evening of the 20th, the

 7   next morning you're cut off.

 8        Q.     Were you behind on your water bill?

 9        A.     I always let it go to the last minute of

10   every month.

11        Q.     Could you have paid your water bill on

12   the 20th?

13        A.     20th?  Pretty sure it was paid before

14   then.  I don't remember -- I never went there that

15   day.

16        Q.     Would you have called there?  Any reason

17   to?

18        A.     Not as I know.  Because my daughter done

19   moved.  She didn't live in front of me no more.

20        Q.     And then Joe King indicated in his

21   statement that Amanda was at the pawn shop buying

22   stuff and got money from a settlement.  Are you aware

23   of any settlement?

24        A.     Yes.  She had a car wreck.

25        Q.     Was the car wreck before Catherine Mills
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                                  Page 306

```
 1   was found dead?

 2        A.     Oh, yes.

 3        Q.     Was the settlement before or after?

 4        A.     Before.

 5        Q.     The settlement was before?

 6        A.     I'm pretty sure.

 7        Q.     Okay.

 8        A.     You'd have to contact her to get the

 9   lawyers out of Harlan.  Dan Green, I think.

10        Q.     Dan Partin, maybe?

11        A.     Dan Partin.

12        Q.     Was -- did he ever represent you on

13   anything?

14        A.     No.

15               MR. WRIGHT:  Let's just go off the

16   record.  I think I'm done.

17               VIDEOGRAPHER:  Going off the record at

18   camera time 16:24.

19               (A discussion was held off the record.)

20               VIDEOGRAPHER:  Going back on the record

21   at camera time 16:25.

22   EXAMINATION BY MR. KELLEY:

23        Q.     Mr. Lester, again, my name is John

24   Kelley.  I'm here today representing John Pickard and

25   Knox County.  Obviously I want to get to the point
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.

William Lester on 10/09/2018                          Page 307

```
 1   real fast.

 2         A.     Yes.

 3         Q.     Do you know John Pickard?

 4         A.     Briefly, yes.

 5         Q.     Okay.  Prior to December of 2010, had he

 6   ever arrested you?

 7         A.     No, sir.

 8         Q.     Had he ever stopped you?

 9         A.     No, sir.

10         Q.     Had you ever had any encounter where he

11   was acting as sheriff?

12         A.     No, sir.

13         Q.     Likewise, do you have friends that might

14   have worked for the Knox County Sheriff's Department

15   back in 2010 and before?

16         A.     Maybe one deputy.

17         Q.     Who was that?

18         A.     He's a constable now.  He got hurt and

19   jumped out of a courtroom window pursuing a runway.

20   Got broke up.  I can't think of his name.

21         Q.     Claude Hudson?

22         A.     Huh?

23         Q.     Claude Hudson?

24         A.     No.

25         Q.     You mentioned Deputy Liford; didn't you?
```

1        A.      Yes, sir.

2        Q.      You knew him by virtue of the fact he

3    lived close to --

4        A.      His dad lived besides the house that I

5    take care of.

6        Q.      Okay.  Had you had any contact with him

7    outside of being a deputy?

8        A.      Just a room at the house.  I'd have to

9    take him a key, maybe.

10       Q.      All right.

11       A.      Then we finally got a key made for his

12   dad Cecil, and Cecil kept the key from that point on.

13       Q.      Prior to December of 2010 had you ever

14   been stopped by any Knox County deputies?

15       A.      No, sir.

16       Q.      Ever been arrested by any Knox County

17   deputy?

18       A.      No, sir.

19       Q.      You mentioned before that there were

20   three encounters you had with law enforcement

21   relevant to Catherine Mills' murder.  That was all

22   with Jason York.  Is that correct?

23       A.      Yes, sir.

24       Q.      Were there -- was any Knox County -- was

25   either Sheriff Pickard or Knox County deputies

 1    around, proximate to your driveway, when Jason York

 2    was there?

 3          A.      No, sir.

 4          Q.      He was the only one there?

 5          A.      He was the only one there.

 6          Q.      All right.  Likewise, no one else came

 7    to your interviews --

 8          A.      No, sir.

 9          Q.      While you were at David Hoskins' office?

10          A.      No.

11          Q.      Did Amanda Hoskins ever talk to you

12    about her encounters with Sheriff Pickard or any of

13    the Knox County deputies?

14          A.      Not until after she got out.

15          Q.      All right.  What did she tell you then?

16          A.      Said she had came to her mom's work.  I

17    think Mr. Pickard had --

18          Q.      Uh-huh.

19          A.      -- investigating a car they thought was

20    the one that had been spotted at the house.  They

21    found out it was somewhere else in another state.

22    That was all that I was ever told.

23          Q.      All right.  Likewise, do you remember

24    her talking about any other encounter she had with

25    Sheriff Pickard relative to Catherine Mills' murder?

1        A.      No, sir.

2        Q.      Same question with regard to Jonathan

3    Taylor, did he ever talk to you about encounters he

4    had with either John Pickard or with the other Knox

5    County law enforcement?

6        A.      No, sir.

7        Q.      Did Linda Taylor tell you of any contact

8    she had with Sheriff Pickard or Knox County deputies?

9        A.      Only thing she told me was the same

10   story about the blue car.

11       Q.      Okay.  How about Donna Mills, did she

12   happen to talk to you about encounters she had with

13   Sheriff Pickard or Knox County deputies?

14       A.      Said she'd only had one.  Pickard and

15   York came to her house to interrogate Taylor.

16       Q.      Okay.  Comment on anything about bad

17   acts or bad things that John Pickard did while he was

18   there?

19       A.      Never said anything.

20       Q.      All right.

21       A.      To me.

22       Q.      All right.  Do you know of anybody who

23   might have been interviewed during this investigation

24   of Catherine Mills' murder that told you that John

25   Pickard acted out of line or any Knox County deputies

 1   acted out of line?

 2        A.    No, sir.

 3        Q.    Okay.  James Otis Sizemore

 4   identification I think -- well, when he comes to Bob

 5   Smith's house the next day after the murder --

 6        A.    Yes.

 7        Q.    -- you said you told your daughter about

 8   it and that meant Jesse Lawson?

 9        A.    Jesse Lawson's wife, Jennifer.

10        Q.    Jennifer is your daughter, obviously.

11   Now, did you know about the Wiggins' murder and --

12   where James Otis Sizemore was -- pled guilty to that

13   murder?

14        A.    Only what I read in the paper.

15        Q.    All right.  Was that after you had --

16   out of jail by that time?

17        A.    I think so.

18        Q.    Okay.

19        A.    I know so.

20        Q.    Did that trigger anything in your mind

21   when you read about that murder?

22        A.    No.  I had never forgot what he said

23   that morning at Bob's.  I'm just thinking, Well,

24   maybe he did, maybe he didn't.  I don't know.

25        Q.    Okay.  But, again, when you read that or

```
 1   heard that, did you go down and say, Maybe I need to
 2   go down and tell law enforcement about this.  This
 3   guy's a murderer?
 4              MR. SLOSAR:  Objection to form.  Asked
 5   and answered.
 6       A.    No.  Because I done told Mr. York twice
 7   and I told Mr. Hoskins once.
 8       Q.    Okay.  So you told -- so I take it you
 9   did tell -- during these interviews you had with
10   Jason York, you told him about the encounter with
11   James Otis Sizemore?
12       A.    Yes, sir.
13       Q.    Do you know a fellow Bill Bill Anderson?
14       A.    Just his name.
15       Q.    Okay.  Do you know what -- do you know
16   any relationship he has with James Otis Sizemore?
17       A.    No, sir.
18       Q.    How do you know Bill Bill Anderson?
19       A.    I'm thinking that Scott's father may
20   have let him stay at his house some, best I remember.
21   Clem Mills let Bill Bill live there a little bit.
22   I'm pretty sure.
23       Q.    Okay.
24       A.    That Clem used to date Bill Bill's
25   mother.
```

1      Q.      Did you know of any ties that Bill Bill

2  had with the Wiggins' murder, the fact he was

3  prosecuted for it?

4      A.      No, sir.

5      Q.      Okay.  All right.  You were talking

6  about Amanda being a heavy user in 2010, and I think

7  you answered this question and counsel will certainly

8  object if you have answered it.

9              How long had she been a heavy user?  I

10 know you met her in 2006.

11             MR. SLOSAR:  Objection to form.

12     Q.      Was she a heavy user when you first met

13 her?

14     A.      No, sir.

15     Q.      How long into the relationship?

16     A.      Two years.

17     Q.      Okay.  About 2007/2008?

18     A.      Somewhere in there.

19     Q.      All right.  At the time she was pregnant

20 with Lexi, was she using?

21     A.      She was trying, yes.

22     Q.      Okay.  Did you keep her from it?

23     A.      I couldn't control her.  I didn't buy it

24 but, you know.

25     Q.      Other people bought it for her?

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                          Page 314

1          A.     Probably.

2          Q.     Okay.

3          A.     I can't say yes, they did, because that

4    would be a lie.

5          Q.     This is one of these questions where,

6    you know, judge not and you will not be judged, but

7    why didn't the question of rehab come up at any point

8    during this?  Spend more money sending her to rehab

9    than --

10                MS. STAPLES:  Objection to form.

11         A.     I took her before.

12         Q.     Did she actually go to a rehab?

13         A.     One time for two days.

14         Q.     Two days?

15         A.     (The witness nods.)

16         Q.     How often would she suffer -- you

17   mentioned the day of Ms. Mills' murder that you found

18   her in a cold sweat and she was suffering withdrawal.

19   Was that typical every day?

20         A.     Not every day.

21         Q.     Every week?

22         A.     Once about every two weeks.

23         Q.     All right.  Couldn't be much of a mother

24   during that period of time?

25                MS. STAPLES:  Objection to form.

```
 1        A.     Well, she always tried to do her best.

 2        Q.     All right.  When she'd take a pill,

 3   would she be high?

 4        A.     It took a lot to get her high.

 5        Q.     Okay.  What would be a lot?

 6               MS. STAPLES:  Objection.  Calls for

 7   speculation.

 8        A.     It'd take more than two.

 9        Q.     How would you know -- on those days you

10   gave her three, would she be different then?

11        A.     She would just be some more cutting up,

12   joking, having a bigger smile, you know.  When she

13   was suffering sick, she would have a straight face,

14   frown.  Be a little hateful.

15        Q.     When you had gotten her pills, would you

16   let her drive?

17        A.     Oh, no, no, no.  Never let her drive.

18        Q.     Okay.  Whether it be two pills or three?

19        A.     Never let her drive.  I always drove

20   her.

21        Q.     Did you want her alone with her

22   children?

23               MS. STAPLES:  Objection to form.

24        A.     Did I want her alone with her children?

25        Q.     Yes.
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                          Page 316

1        A.      I took her back to them, yeah.

2        Q.      Did you have any questions about if

3    Ms. Taylor wasn't there, nobody was around but her --

4        A.      They would never be left alone.  It

5    would almost be at least Jerry Wayne there.

6        Q.      Okay.  So you wanted somebody who wasn't

7    using to be there?

8        A.      He would always be there.

9        Q.      Okay.  Was he a user?

10       A.      Jerry Wayne, no, sir.

11       Q.      He was a straight guy?

12       A.      Straight little kid.  He never had a

13   car.  He never had a job at this time.

14       Q.      But you didn't want her to be alone

15   with, in particular, Lexi?

16               MS. STAPLES:  Objection.  Asked and

17   answered.

18       A.      I would -- you know, I always knew that

19   Jerry Wayne was there.

20       Q.      Okay.  I've been sitting here wondering,

21   I have to ask.  You're aware that Amanda and Jonathan

22   have sued not only Jason York but several other --

23       A.      Yes.

24       Q.      -- involved in the investigation.  John

25   Pickard, Knox County?

 1        A.      I saw it in the paper, yeah.

 2        Q.      Did you ever contemplate bringing a

 3   lawsuit yourself?

 4        A.      No, sir.

 5        Q.      Why?

 6        A.      Freedom is priceless.  God restored

 7   everything I lost.  I was making $43 an hour when I

 8   was put in jail.  The day after I got out of jail, I

 9   was called by my company, said you can have your job

10   back if you can leave the state.

11              After my charges was dismissed, I could

12   have took a deal from Mr. Steel and lied and they

13   would have had a trial.  I told him, No.  We'll have

14   the trial.  If you give me life, I'll take it.  I'll

15   go on.

16              So, after I said that, charges was

17   dismissed.  I qualified for a loan, bought a farm,

18   put a new home on it.  I'm going home.  I got work.

19   I have money.  God took care of me.  I don't need

20   nothing back.

21        Q.      I got my question answered.  I

22   appreciate that.  Thank you.

23              Did you ever talk with an attorney

24   about -- I assume you're talking to Mr. Hoskins

25   during the course of that criminal --

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.

William Lester on 10/09/2018                                    Page 318

```
 1        A.      Yes, sir.
 2        Q.      Apparently there was a plea deal made
 3    were you would turn state's evidence?
 4        A.      I was offered.  I never took it.
 5        Q.      Okay.  Likewise, did you ever talk with
 6    an attorney about the possibility of bringing a
 7    lawsuit?
 8        A.      No, sir.
 9        Q.      Advantages or disadvantages?
10        A.      No, sir.
11        Q.      When was the first time you talked with
12    the attorneys involved representing Amanda Hoskins?
13        A.      They had contacted me about this
14    deposition a couple times during September when my
15    mom was in the hospital passing away.  We stayed in
16    touch, me and her.
17        Q.      Ms. Staples?
18        A.      Yes.  And before that, I was in Atlanta
19    and it was brought up.  And I said, If you can get it
20    done on a Saturday, I can come meet you, but other
21    than that, we have one job going down.  If I miss the
22    ride out of town, I miss a week's work.  I can't
23    afford that, and so they said that they would come to
24    my job.  I said, That's fine.
25        Q.      That's all I have.  I'll let hopefully
```

```
 1   them on the phone.
 2                   MS. STAPLES:  Are you guys there?
 3                   MR. KELLEY:  Cody?
 4                   MS. DEMOSS-CAMPBELL:  I'm here.
 5                   MR. WEBER:  I am here.
 6                   MS. STAPLES:  We'll have to make it
 7   really quick if you guys can because they're kicking
 8   us out.
 9                   MS. DEMOSS-CAMPBELL:  I don't anticipate
10   mine being long.
11                   MS. STAPLES:  We have five minutes.
12                   MS. DEMOSS-CAMPBELL:  We have five
13   minutes pursuant to the rules?
14                   MS. STAPLES:  Pursuant to them kicking
15   us out.
16                   How much time have we been on?
17   EXAMINATION BY MS. DEMOSS-CAMPBELL:
18       Q.    Mr. Lester, my name is Alexandra
19   Demoss-Campbell.  I represent Defendant, City of
20   Barbourville and Defendant, Mike Broughton.  All of
21   my questions are going to be kind of limited to these
22   two particular parties.
23                   Are you familiar with Mike Broughton?
24       A.    I met him the day I turned myself in.
25       Q.    Okay.  So you would recognize him and
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.

William Lester on 10/09/2018                                    Page 320

```
 1    now know what he looks like?

 2         A.     Yes.

 3         Q.     Okay.  And you testified there was some

 4    members of law enforcement present at the scene.  Is

 5    that correct?

 6         A.     Yes.

 7         Q.     Was Mike Broughton present?

 8         A.     Only thing I seen was two state trooper

 9    cars pulling in --

10         Q.     Okay.

11         A.     -- while I was there.

12         Q.     You didn't see any Barbourville Police

13    Department officers?

14         A.     No.  Not while I was there.

15         Q.     Okay.  And then you've talked about your

16    interactions with Jason York.  Was Mike Broughton

17    present during any of these encounters?

18         A.     No, ma'am.

19         Q.     Okay.  Was any other member of the

20    Barbourville Police Department present?

21         A.     No, ma'am.

22         Q.     Okay.  And you've testified that you

23    believe you saw Mike Broughton the day you turned

24    yourself in.  Was that the only interaction you had

25    with him?
```

1        A.      Yes.

2        Q.      Okay.  Have you ever been arrested by

3    Mike Broughton or any member of the Barbourville

4    Police Department?

5        A.      No.

6        Q.      Okay.

7        A.      Not to my knowledge.

8        Q.      That would be covering before or after

9    Catherine Mills' death?

10       A.      Pardon me.

11       Q.      That was covering anytime before or

12   after Ms. Mills was found?

13       A.      Before I was arrested one time during my

14   divorce from an Officer Brown that worked there.

15       Q.      Okay.  And was that -- you said that

16   would have been sometime between 1999 and 2006?

17       A.      Would have been between '98 and 2001.

18       Q.      Okay.  I'm sorry.  I didn't mean to

19   misstate.  So I assume during that time there was no

20   mention of Jonathan Taylor or Amanda Hoskins?

21       A.      I didn't know him then.

22       Q.      Sure.  Did Amanda Hoskins ever talk to

23   you about her interactions with Mike Broughton or any

24   member of the Barbourville Police Department?

25       A.      No, ma'am.

1      Q.      Same question with Jonathan Taylor.  Did

2    he ever tell you about any interactions with Mike

3    Broughton or a member of the Barbourville Police

4    Department?

5      A.      No, ma'am.

6      Q.      And do you have any knowledge -- I'm

7    trying to be as broad as I can with this question.

8    Do you have any knowledge about any involvement by

9    Mike Broughton or any member of Barbourville Police

10   Department in the Catherine Mills' investigation or

11   prosecution?

12     A.      No, ma'am.

13     Q.      Okay.  And did Mike Broughton make any

14   statements to you at the time that you turned

15   yourself in?

16     A.      No, he didn't.

17     Q.      And were you present with your attorney

18   present at that time?

19     A.      Yes, he was.

20     Q.      Okay.  I believe that concludes my

21   questions.  Thank you so much for your time.  I

22   appreciate it.

23     A.      Thank you.

24   EXAMINATION BY MR. WEBER:

25     Q.      Mr. Lester, my name is Cody Weber.  I'll

1    be very brief.  Can you hear me?

2          A.     Yes, sir.

3          Q.     Like I said, my name is Cody Weber.  I

4    represent the state troopers, Mark Mefford, Brian

5    Johnson, Kelly Farris, Dallas Eubanks and Jackie

6    Joseph.

7                 Were any of those individuals present at

8    any of your interviews with Detective York or any

9    other interviews related to this investigation?

10         A.     No, sir.

11         Q.     Are you aware of Amanda Hoskins ever

12   mentioning any of those individuals being involved in

13   this investigation?

14         A.     She never told me.

15         Q.     And what about any of your interactions

16   with Jonathan Taylor, did he mention any of those

17   individuals being involved with this investigation?

18         A.     No, sir.

19         Q.     Are you aware of anything else, being

20   very broad, of your knowledge of those individuals

21   being involved in this investigation or prosecution

22   in any way?

23         A.     No, I'm not.  Not until today.

24         Q.     Okay.  That's all the questions I have.

25   I appreciate it.  Thank you.

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.

William Lester on 10/09/2018                                     Page 324

```
 1        A.      You're welcome.

 2                MR. WRIGHT:  Do you have anything?

 3                MS. STAPLES:  We've got to go.

 4                MR. WRIGHT:  There was one thing I had

 5    to ask before I got to leave.

 6    EXAMINATION BY MR. WRIGHT:

 7        Q.      A phone number of 622-2576, I believe

 8    it's associated with a Terry Gray.  Do you recognize

 9    that number?

10        A.      Could have been Terry's.

11        Q.      Or maybe Shawn.  That was his son.  Is

12    that right?

13        A.      That would have probably been Terry's.

14        Q.      Probably Terry's?

15        A.      It was probably Terry's.

16        Q.      That's all I have.

17                VIDEOGRAPHER:  This concludes the

18    deposition of William Lester.  We're going off the

19    record at camera time 16:44.

20                (Deposition concluded at 4:44 p.m.)

21                REPORTER:  Mr. Weber, would you like a

22    copy of the transcript?

23                MR. WEBER:  Yes, please

24                REPORTER:  Anything besides an etran?

25                MS. DEMOSS-CAMPBELL:  Same.   Etran.
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.

```
 1                  REPORTER'S CERTIFICATE

 2         I, SANDRA BERKELAND, CCR No. XIO1666, Certified

 3    Court Reporter, certify;

 4         That the foregoing proceedings were taken

 5    before me at the time and place therein set forth, at

 6    which time the witness was put under oath by me;

 7         That the testimony of the witness, the

 8    questions propounded, and all objections and

 9    statements made at the time of the examination were

10    recorded stenographically by me and were thereafter

11    transcribed;

12         That the foregoing is a true and correct

13    transcript of my shorthand notes as taken.  I further

14    certify that I am not a relative or employee of any

15    attorney or the parties, nor financially interested

16    in the action.

17         I declare under penalty of perjury under the

18    laws of South Carolina that the foregoing is true and

19    correct.

20              Dated this 19th day of October, 2018

21              Sandra Berkeland

22

23              SANDRA BERKELAND, CSR No. XIO1666

24

25
```

**AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.**
William Lester on 10/09/2018                    Index: $10..10:53

```
      Exhibits

LesterW 1
  4:13
  234:6,15
  239:20
  252:12
  267:23

LesterW 2
  4:14
  234:8,13

LesterW 3
  4:15
  267:11


         $

$10   206:14
  222:17

$150   26:4

$175   26:4

$246,000
  221:17

$25,000
  194:14

$250   152:16

$30   278:25

$40   163:21

$43   317:7

$50,000
  194:13

$500   122:19
  123:2,25
```

```
  125:10
  129:3

$60,000
  48:25
  198:6

$85   72:16


         -

--you   230:7


         0

0-7-7-9
  299:15,16

0-8-9-9
  276:7
  297:18

010   125:25
  132:23
  147:25
  150:17
  175:21

011   85:14
  106:25
  129:18
  144:23
  219:15

012   82:19,
  23 125:25
  138:23
  147:16
  148:13
  149:4
  159:19
  224:14
```

```
  226:7

013   226:8,
  15

015   191:25

020213
  267:12

03   15:11

06   12:11
  169:4
  170:12

07   172:10

08   144:20
  145:10
  149:4
  172:10
  215:15
  222:25
  223:2
  283:23

09   141:16
  148:13
  149:4,19
  215:15


         1

1   234:6,15
  239:20
  252:12
  267:23

1-2-2-3
  271:18

1-7-8-0
  282:1,8
  283:25
```

```
  296:8

10   248:20
  250:5

10,000   194:7

1000   273:12

108   283:22,
  24

10:08   49:21

10:09   49:24

10:27   240:8

10:28   66:24

10:30   31:5
  204:20,24,
  25 247:17
  249:25
  250:1
  251:10,12
  281:13

10:38   67:2

10:40   68:13
  281:19

10:41   68:16

10:44   282:1,
  5,7,11

10:45   280:9
  282:23
  283:4

10:48   282:24

10:52   296:6
  297:11

10:53   282:24
```

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018

| | | | |
|---|---|---|---|
| **10th**  275:8 | **12:36** | **155**  271:17, | **1:15** |
| | 283:22,24 | 21 | 238:16,23 |
| **11**  27:2 | 284:10 | | |
| 41:10,11 | | **157**  299:12 | _____ |
| 101:23 | **12:45**  238:25 | | **2** |
| 289:4,5 | | **16**  246:7 | _____ |
| | **13**  14:9 | | |
| **1145**  204:24 | 235:14 | **160**  72:13 | **2**  33:23 |
| | | | 35:8,11 |
| **11:09**  240:8 | **1304**  221:3 | **1654**  6:9 | 234:8,13 |
| | | 9:6 70:21 | |
| **11:24**  296:6 | **135**  268:2 | | **2-4-5-0** |
| | 271:20 | **16:24**  306:18 | 269:7 |
| **11:28**  283:1 | | | |
| | **136**  269:25 | **16:25**  306:21 | **2-8-7-5** |
| **11:30** | | | 273:22 |
| 204:17,24 | **137**  269:10, | **16:44**  324:19 | |
| | 11 | | **20**  27:17 |
| **11:45**  204:17 | | **17**  246:21 | 31:4 40:24 |
| | **13:14**  188:24 | 248:22 | 73:7 |
| **12**  32:5 | | | 194:24 |
| 132:23 | **13:54**  189:2 | **17-cv-84**  5:5 | 256:23,25 |
| 170:12 | | | 258:5 |
| 185:15 | **14**  240:17, | **18**  42:1 | 264:21 |
| | 22 241:21 | | 266:4 |
| **12/17**  303:4 | | **19**  61:19 | 271:22 |
| | **142**  270:22 | 233:20 | |
| **12/22**  303:5 | | 255:6,14 | **2000**  13:19, |
| | **143**  270:22 | 256:19,24 | 20 16:18 |
| **120**  72:21 | | | 170:11 |
| | **14:47**  234:3 | **1980**  13:4 | |
| **121**  9:16 | | | **2001**  304:12 |
| 266:1 | **14:52**  234:10 | **1986**  10:21 | 321:17 |
| | | | |
| **1212**  235:1 | **14th**  211:10 | **1988**  37:24 | **2003**  79:2 |
| | 304:15 | | |
| **122**  245:22 | | **1996**  194:6 | **2004**  69:12 |
| | **15**  9:25 | | 80:15,23 |
| **1222**  27:10 | 10:2 47:19 | **1998**  10:22 | |
| 234:25 | 49:8 69:24 | 13:15 | **2006**  11:17 |
| | 114:4 | | 16:5,17, |
| **1223**  73:23 | 194:24 | **1999**  13:15 | 18,19 17:1 |
| | 198:9 | 321:16 | 32:22,24 |
| **12:10**  147:5 | 206:14 | | 33:3,7 |
| | 234:14 | **19th**  232:5, | 92:23 |
| **12:15**  32:5 | 236:11 | 7,16,24 | |
| | 238:24,25 | 291:23,24 | |
| **12:27**  147:8 | 264:4 | 299:24 | |
| | | 305:4,6 | |
| **12:30**  256:21 | | | |
| 280:15 | | | |

**AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.**
**William Lester on 10/09/2018**                    Index: 2007..20th

147:16
151:5,15
154:1
160:11
313:10
321:16

**2007**   16:17

**2007/2008**
313:17

**2008**   14:21
79:11,22
80:1,14
145:14
152:13
155:8
213:3

**2010**   17:10,
17,22
18:5,12,21
19:4,16
21:14,25
22:3 23:8
24:5
26:15,25
27:6,17
28:12
29:12
31:4,16
32:14
37:8,14,20
40:24
42:6,11,17
43:6 46:21
47:1
50:14,25
51:4,6,10,
24 52:3,

12,17,20
53:9 54:19
55:2 71:3,
23 74:11,
21 75:17
76:7,12,19
77:7 81:2,
8 82:3,10
83:18
84:22
85:7,10,
13,16,18
88:2,12
89:7,18
90:11
92:20
93:17
95:14,16
96:6,18
98:25 99:1
101:5,24,
25 102:22
103:16
105:9
136:24
137:8
138:25
140:10,11
141:12,19
145:17
150:22
151:15
152:19
154:1,2
160:17
161:21
162:20
163:6

164:12,14
178:8,22
180:12,20
181:11,20
182:10
183:15,20
184:18
185:13
186:10,24
191:18
192:18
194:7
204:7
207:2
275:13
307:5,15
308:13
313:6

**2011**   53:25
56:3,4
74:18 76:5
88:13
89:4,5
114:4
153:24
157:19
158:21
189:5
198:25
203:15
215:17
218:6
219:17
224:8,16,
20 227:7
234:14,23
304:22

**2012**   61:19
62:14
63:20 64:2
74:16,17
82:17,21
125:1,11
126:4
132:25
154:6
155:20
156:1
160:11
186:8

**2015**   69:12,
23 70:4
80:13,25
155:24
157:14

**2018**   5:8

**20th**   21:14,
25 22:3
23:8 24:5
26:14
28:12
29:12,25
31:16 37:8
55:2
121:22
206:15
209:25
231:24
254:11
275:10,12,
15 284:23
291:24
305:6,12,
13

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                          Index: 21..5-1-9-4

**21**  42:11,17
43:6 46:21
47:1

**21st**  121:25
292:4

**22**  265:25
266:2
293:24

**222**  289:3

**223**  90:24
95:20 96:1
98:2 106:5
190:14
221:4
247:9

**22nd**  295:3
296:3
299:24

**230**  247:16

**24**  126:12

**25**  83:24
163:21
194:10,25
195:2,4
196:6,20
206:13

**25,000**  47:19
49:8
196:5,18,
19 198:9
214:5

**250**  152:8

**254**  238:17

**256**  238:17

**257**  240:23

**258**  152:9

**259**  240:23

**26**  188:10

**262**  242:3,4
243:3

**269-5912**
282:18

**269-5987**
180:3

**27**  286:9

**280**  243:21

**282**  243:21

**287**  296:5,7

**291**  297:17

**298**  246:8

**2:00**  258:11

---
---
**3**

**3**  267:11

**3,002**  296:6

**3-0-5**  299:2

**3-0-9-5**
278:3

**3-3-7**  290:3

**3-8-5**  299:2

**30**  138:12
200:16
209:13

**239**:9
246:14
248:18
251:11

**30's**  266:4

**30-plus**  50:6

**302**  271:6

**304**  271:6

**304-3345**
297:22
302:5

**30s**  30:10
163:23

**316**  246:22

**319**  299:13

**323**  248:23

**331**  301:3

**332**  301:3

**335**  250:10,
15

**337**  250:15
269:8

**337-6285**
290:2

**34**  13:13

**361**  255:14

**38**  13:12
140:14,15

**381**  258:6

**39**  233:20

**3:22**  285:11

**3:30**  300:14

**3:49**  300:15

**3rd**  61:19

---
---
**4**

**4-0-7**  298:24

**4-5-2-9**
288:16

**4-7-9-7**
275:3

**4/15/11**
234:8

**40**  73:15
198:6

**40939**  9:7

**45**  251:7,11

**455-8733**
277:3

**4:24**  300:15

**4:34**  300:16

**4:44**  324:20

---
---
**5**

**5**  35:11
37:5 38:17
62:11
122:1

**5-0-4-3**
273:25
274:4

**5-1-9-4**

**AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.**
William Lester on 10/09/2018                    Index: 5-4-5..90s

273:1
296:11

5-4-5   276:11

5-4-6   253:5

5-9-1-2
282:19
283:1

5-9-8-7
269:25
271:18

50   48:25
194:11,12
195:3,17,
18,24
196:6,20

50,000   195:4
198:19
199:1

500   44:9
72:8 75:4
163:3
273:11

542-0779
299:15

542-4797
275:1

542-5043
274:3

545   234:16

545-3950
276:10

545-8107
276:15

545-9142
292:23

546-6915
253:6

5:00   302:1

5:06   268:14

5:15   264:16

5:24   270:22

5:30   263:24
264:17

5th   63:20
156:2

─────────────
6

6   13:20
236:2
271:13

6-2-2   274:2

6-2-6   282:17

6-2-7   274:2

6-2-8   278:4

6-6   252:11

6-6-2   275:16

6-6-4   252:12

6-9-1-5
253:4

606 269-5987
240:3

606 304-3345
270:23

606 622-3983
268:3

606-622-1223
234:21

60s   192:20

61   239:25

62   239:25

622-1212
27:10

622-1780
280:24

622-2576
324:7

627-0184
277:11

627-0899
276:6
296:24

627-3170
275:16

627-4529
288:15

627-8542
274:14

628-3095
278:3

66   246:2

6615   253:7

─────────────
7

70   188:20

718   95:25

78   253:10

79   252:13

7:30   236:4
239:6

7th   211:9

─────────────
8

8   24:5 39:4
40:10,12
239:7
254:21

8-7-3-3
277:4

82   252:13

87   281:25
282:5

88   37:17

8:05   22:24

8:15   242:9
264:17

8:30   117:20
264:18

─────────────
9

9   5:8
232:19
272:23
302:3

9-1-2   282:22

90s   11:6

**AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.**
William Lester on 10/09/2018

Index: 96..air

96   194:9

98   10:21
  131:5
  304:12
  321:17

98/'99   13:17

99   37:16,19
  131:5

9:17   302:6

9:19   5:9

9:30   28:7,
  12,20
  246:7,11
  249:2,25
  253:21
  280:3,4

9:50   302:6

9:51
  253:11,12
  254:2

─────────

A

─────────

a.m.   5:9
  24:5
  28:12,20

abide   66:5

ability
  286:23

Abner   292:25
  293:1

absolutely
  283:13

access   93:6
  94:7
  186:18,19

accident
  181:22,23,
  24 182:1
  183:9

accommodate
  7:21 69:3

account   74:5
  235:5

accurate
  116:12
  203:21
  211:21
  215:23
  218:22
  252:1
  272:18,21
  280:11
  284:20

accused
  54:18

accusing
  228:5
  267:5

acknowledge
  143:4

acquaintances
  276:2

acted   55:4
  223:18
  310:25
  311:1

acting
  307:11

activities
  21:24
  85:13

activity
  301:5

acts   310:17

actual
  267:25

addict
  185:18

addition
  282:14

address
  9:10,12
  31:12 34:7
  70:19

Adean   99:9,
  10 100:4,
  7,8,9
  101:5
  102:10,24
  103:25
  190:21
  273:12

admit
  186:12,15

advance
  227:7

Advanced
  167:7

advantage
  190:5

Advantages
  318:9

Advocate
  293:22

affair   33:1
  210:2

affect   14:24
  64:19

affiliated
  210:7

afford
  208:10
  318:23

afraid   82:25
  83:1
  216:22

afternoon
  32:4
  299:19

age   12:24

ages   154:25

agreement
  188:18

ahead   19:7
  88:22
  212:19
  227:11

ahold   127:20
  150:24
  297:13,24
  300:23

air   61:21
  229:14

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018          Index: Alan..answering

**Alan** 274:7,
8,14
288:17,18,
20

**Aldens** 221:8

**alerting**
270:10

**Alexandra**
6:5 319:18

**alibi**
279:21,24

**alive** 25:14
89:22 90:5
99:14

**Allen** 35:23
140:23
142:18
278:10
281:8
289:22

**Allen's**
281:1

**Alls** 269:4

**Amanda** 5:3,
18 16:1,6
20:11
21:4,6,8
24:11
27:22
28:23
29:20
30:6,25
31:24,25
38:25
40:16,24

41:6 48:15
104:13,15
115:10
129:5
130:2
131:19
143:16,22
144:13,17
146:7
147:12,13,
21 148:5,
6,12
151:5,8
154:2
155:3,19
156:8,13
159:21
160:6,9
162:2
164:20
165:24,25
166:4,15,
24 167:11,
14 168:4,
20 169:5
171:22
172:12,24
176:24
177:11,21
178:20
179:20
180:8
181:16
185:4,24,
25 186:19
187:3,13,
17 189:7
190:1

197:20
202:18
203:2,10
206:16
208:19
211:14
214:13,14
218:5,24
219:10
223:17
224:2
225:2,16
227:18,22
228:18,24
232:8
236:13
238:1,7
239:18
240:5,18
247:6
248:23
250:10
260:4,19
261:5
262:25
265:13,17
266:22
267:2,4
270:4
272:1
276:24
285:18
287:18
300:11
305:21
309:11
313:6
316:21

318:12
321:20,22
323:11

**Amanda's**
160:16
165:23
169:17
186:21
211:3
262:22
280:3
281:13,17
283:3
284:18
287:8
290:6,8

**amount** 44:8
45:25 46:7
47:3
58:18,21
117:16
118:14,22,
25 119:4
156:19
157:17
170:4
203:5

**Amy** 5:19
103:13,14
105:14

**Anderson**
312:13,18

**Angela** 67:9,
12,22

**answering**
6:22

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                        Index: anticipate..ate

| | | |
|---|---|---|
| anticipate | 24:11 | area  67:4 |
| 319:9 | 29:10,19, | 69:14 |
| | 21 32:9 | 92:8,19 |
| antifreeze | 34:2 | 94:16 |
| 245:8 | 211:7,9 | 102:25 |
| | 240:20 | 179:1 |
| anymore | 251:19 | 221:8 |
| 177:24 | | 230:8 |
| 230:12 | apprentice | 250:6 |
| 253:25 | 35:25 | 256:12 |
| | | 263:12,25 |
| anytime  88:2 | approaching | 284:12 |
| 227:11 | 163:5 | 288:24 |
| 229:11 | | 299:1 |
| 321:11 | approximate | |
| | 301:21 | argument |
| apartment | | 196:15,16 |
| 76:4 177:4 | approximately | |
| | 13:15 | Arjay  148:20 |
| apartments | 16:3,13 | 150:15 |
| 174:15 | 18:4 | |
| 301:18 | 22:10,22 | Arkansas |
| | 28:4,11 | 62:1 |
| apiece | 32:1,17 | |
| 206:13 | 40:10 48:4 | Armory  77:2 |
| 266:5 | 53:22 | |
| | 60:17 | arrange |
| apologized | 192:19 | 112:15 |
| 65:6 | 206:21 | |
| | 250:25 | arranged |
| Apparently | | 127:6,7 |
| 318:2 | April  114:4 | |
| | 189:5 | arrangements |
| appearance | 198:25 | 29:22 |
| 156:25 | 203:15 | 113:13 |
| | 215:17 | |
| appearances | 219:17 | arrest  223:7 |
| 156:25 | 224:8,20 | |
| | 227:7 | arrested |
| appoint- | 234:14 | 128:17 |
| 34:3 | 304:15 | 130:13,24 |
| | | 131:1 |
| appointed | | 136:12 |
| 211:7 | | 149:23 |
| | | |
| appointment | | |

| |
|---|
| 159:15,18, |
| 20 186:14 |
| 219:21,24 |
| 223:20 |
| 224:19 |
| 225:6,9 |
| 226:7 |
| 307:6 |
| 308:16 |
| 321:2,13 |
| |
| arrive |
| 22:22,25 |
| 31:14 |
| |
| arrived  24:4 |
| 28:10,19 |
| 33:23 |
| |
| arriving |
| 29:4 31:15 |
| |
| asks  248:23 |
| 256:20 |
| |
| assignments |
| 71:16 |
| |
| associate |
| 133:12 |
| |
| association |
| 133:11 |
| |
| assume |
| 289:23 |
| 317:24 |
| 321:19 |
| |
| assure |
| 253:12,14 |
| 254:5 |
| |
| ate  34:21 |

40:18
41:1,4,5
171:18
220:21

Atlanta
318:18

attack
272:14

attempt
173:4
272:14

attempted
299:14

attempting
283:14

attempts
127:20

attention
122:13

attorney
56:8 78:9
110:13
133:25
134:6
205:3,6
211:2
317:23
318:6
322:17

attorney's
56:7

attorneys
318:12

audio   135:9

August   12:9
201:5

aunt   95:6
290:6

Austin
161:25

auto   9:20
12:6
252:25

Avenue   17:19

average
72:6,7

averaged
72:8

awake   255:4

aware   152:18
305:22
316:21
323:11,19

_____

B

_____

B&w   252:25

B-U-C   23:22

baby   100:25
101:12
171:9

babysitted
273:8

babysitting
178:13

back   12:3,
8,13,14,16

15:4 17:8
18:5,16,19
20:15
21:10
22:16
24:13,18
26:25 27:5
29:6,21
30:11,17,
19 33:16,
21,22
34:2,23,24
35:25 36:5
37:3
38:15,23
40:14,16,
17,23
41:12 42:6
43:2 45:6
49:23
52:17 57:4
58:19
62:7,21,
22,23 63:2
67:1 68:15
70:1 73:5,
7 78:1
80:10
101:13,18,
22 106:10
108:2
110:19,20
118:1
120:4
121:19
122:14,17
127:24
128:2,7,21

130:7
138:10
139:22
140:9
146:11
147:7
158:15
168:9
169:8,9
170:5,7
178:8
182:16,18,
20 183:4
189:1
194:14
196:17
198:1,4
199:11,24
208:19
211:10
212:21,23,
25 213:11
215:12
219:10
221:13
222:9,13
223:15
232:13
234:9
237:6
239:4
240:16,17
243:2,13,
19 246:9,
23 247:16,
20,24
248:14
249:17

250:12,19
254:19
261:5,18
263:10
264:8,12,
19 265:3,7
266:1
267:2,3
278:13,17
279:1,19
281:13,16
283:19
284:14
285:14,17,
22 297:14
304:19,22
306:20
307:15
316:1
317:10,20

**background**
269:1
274:13
275:4
276:15

**backyard**
83:3
230:25

**bad**  87:2
139:24
183:8
197:23
237:22
269:20
310:16,17

**bag**  101:14
198:20

199:1

**ball**  9:4
225:7

**ballpark**
207:13

**bank**  174:3
212:18
213:2
256:13

**Baptist**
236:6,7,8

**bar**  16:8
139:1

**Barbourville**
6:7 11:15
17:13,18
25:12,13
27:21
33:18
66:13 77:2
83:25
84:13
86:21,22
92:9,10
167:8
173:7
178:23,24
201:8
252:15
293:5
319:20
320:12,20
321:3,24
322:3,9

**barn**
221:21,22

**based**  299:17

**basically**
8:16
107:15
292:15

**basing**  138:1

**basis**  46:19,
24 192:22

**bathroom**
80:6
171:17
182:14
211:16
237:7
251:8
254:15

**bed**  29:7
41:12
248:24,25

**bedroom**  29:6
101:13
166:22
182:13,17

**Beech**  96:15

**Beeping**
40:20

**beer**  138:11
139:4

**begin**  16:11

**beginning**
80:14
138:22
151:4
196:3

213:16,21
227:9
246:8
299:12

**behalf**  5:24
6:2,6
134:21
188:14

**belief**
46:19,24
59:15
230:4

**believed**
65:8 93:11
117:2

**bell**  41:24
43:4 58:15
145:5,6
150:2,15
214:25
271:5
274:1
275:6
300:17

**belonged**
245:10

**Bend**  293:5

**Benny**  191:13

**Berkeland**
5:11

**Betty**
191:12,14
273:6

**Bibbs**  124:25

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                    Index: bid..book

126:18

bid   266:4

big   19:13
  48:22 54:7
  55:18
  95:22,25
  107:8
  162:15,19,
  23 170:4
  222:15
  270:6
  301:17

bigger
  137:24
  138:7,9
  315:12

biggest
  189:12

bill   27:9
  75:17
  175:18
  278:25
  281:5,11
  284:4,5,6
  304:24
  305:8,11
  312:13,18,
  21,24
  313:1

Bill's
  312:24

bills   73:1
  75:13
  152:6
  176:1

232:9
305:3

Bimble   179:2
  221:7

Bingham
  89:25 90:1

Binghamton
  103:18

Bird   96:1
  301:17

birthday
  168:22
  169:3
  291:21,22

biscuits
  22:18

bit   57:13
  69:6 71:1
  74:3 82:22
  92:13
  106:15
  115:13
  120:5
  126:3
  131:11
  135:24
  139:7
  144:20
  145:8
  147:11
  183:3
  190:20
  228:8
  251:23
  275:1

286:4
294:6
312:21

bitch   218:7

black   37:17
  202:18
  203:8,9
  214:19
  215:1

blame   167:14

blamed   166:4

Blevins
  199:21
  231:4

blew   19:2
  135:22

blocked   53:6

blood   204:3

blue   52:13,
  16 53:9
  86:8
  293:18
  310:10

board   210:6

Boarded   78:8

Bob   35:15,
  19 36:6,8
  42:21
  44:6,18
  58:13,17
  117:19
  124:8,24,
  25 125:3,
  10,14

126:10
128:24
136:17
142:13,16
143:9,11,
14 147:12
184:1
206:10
261:19
301:16
311:4

Bob's   37:2
  117:25
  278:14
  287:5
  311:23

Bobbie   44:4

Bobby   43:16,
  24 44:11

body   9:20
  10:7,24
  12:6,14
  269:5
  277:19

Boggs   134:3,
  4

bond   63:19
  67:11
  134:13,15
  156:17,24
  157:1,13

bonded   63:20

Bones   150:6

book   77:24
  78:2,14

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018          Index: booked..Broughton

booked
  63:11,13
  118:19
  126:17

Boris  84:9
  198:14

born  41:20,
  22 155:2
  187:1

borrowed
  298:15,18

bother  139:6
  217:19
  266:15,18

bottle
  187:25

bottom
  235:12
  242:9
  256:19

bought  10:10
  11:1,7
  22:14
  35:17 37:2
  38:12,13
  42:21 45:4
  70:5 78:3
  80:3
  104:13
  106:1
  125:9
  137:5
  144:23
  147:11,12
  162:6

313:25
317:17

box  9:16
  73:6

boxes  226:24

boy  39:22
  124:7
  202:17,18
  259:13,18
  262:21

boys  262:19

Bradley
  81:23

Bragg  62:1
  127:22

branch  38:6
  96:15
  106:1,3,
  10,11

break  7:25
  24:20
  66:21
  68:23,24
  147:2
  188:4,7,8
  233:14
  286:5
  300:18

breakfast
  22:15,16

Brian  6:3
  323:4

Brices
  98:13,14

bridge  91:3
  98:2

briefly
  279:15
  307:4

bring  38:15
  55:6 62:7
  107:6
  112:3
  133:11
  162:16
  195:25
  196:20
  222:16

bringing
  317:2
  318:6

brings
  130:22

broad  322:7
  323:20

Brock  290:5,
  18 291:11

Brog  291:8

broke  17:23
  52:18,20
  53:12 85:8
  86:5,24
  102:4
  144:22
  197:24
  223:22
  232:10
  268:15
  270:9

307:20

brother
  39:23
  48:22,24
  84:9
  282:21
  288:17,18

brother-in-law
  294:15

brothers
  24:2
  294:15

brought
  30:11
  38:10,12
  39:20 53:5
  63:7 69:21
  131:8
  158:15
  178:12
  194:7,10,
  13 195:4,
  15 196:19
  208:17
  222:15
  246:23
  265:4,5
  283:19
  292:11
  318:19

Broughton
  6:7 90:19
  97:13,14,
  15,17,19
  100:19,22,
  24,25

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018          Index: Broughtons..call

102:12
319:20,23
320:7,16,
23 321:3,
23 322:3,
9,13

**Broughtons**
94:16,21
97:12
192:13

**Brown**  30:13
97:21
100:23
102:13,17,
18 103:6,
7,9,12,14
105:21
247:5,8
280:18
321:14

**Brown's**
103:10
105:4

**Browns**
106:3,10,
11 192:15
273:20

**Brunner**
67:6,8

**Buc**  23:19,
22,23

**Buck**  23:4

**bucks**  72:21
73:7 258:1

**buddy**  218:1

**bugged**  133:9

**build**  222:24

**building**
98:23
221:18

**built**  38:7
222:21
274:11

**bunch**  5:22
171:15

**burnt**  78:6

**bus**  55:6
107:7
145:4
178:14

**business**
10:4,5,6,
7,17,23
11:4 12:13
26:1,25
58:15 97:1
146:11
245:24
292:21

**busted**  17:24
48:12
175:13
219:23

**busy**  25:25

**Buttery**
10:11

**buy**  10:15,
16 26:2
73:7

104:9,14
105:5
137:4,12
143:14,20
144:10
146:10
148:5,11
149:3
150:16
162:10
195:13
204:2
243:13
247:4
278:25
302:17
313:23

**buying**  11:11
105:12
125:15
136:1
144:7,16
147:13,20
152:22,25
153:5
163:22
185:4,22
203:2
266:11,16
281:9
305:21

**buys**  135:12
136:15

———————

———————

C

———————

**cab**  37:10

**cabin**  221:16

**Cable**  222:14

**cake**  292:10

**call**  7:19
15:1 20:4,
13,20,24
21:3 24:13
27:17
29:21
30:10
31:21 36:4
37:5
38:18,22
44:14,15
47:5 58:22
76:14
83:15 90:7
91:21 97:8
117:15,22
118:10
123:9
127:21
133:3
139:20
146:20
157:10
171:1
173:5
178:6
181:2,8,9,
10,15
183:18
205:8,20
212:21
218:18
223:14
240:2,11

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018          Index: called..cancer

245:21
252:14
253:10
254:3
266:10
269:6,15,
24 271:17
272:1,11,
17 275:16
277:1
281:25
282:7,16,
17,24
284:10
295:6
296:3,7,
11,14
297:12,17
300:13,22

**called** 15:1
19:25 20:8
25:19
26:21 37:6
47:2
58:18,20
61:21
62:25
86:13 99:7
100:9
111:7
112:15
117:13
118:2,24
121:8,9
122:1
123:7
127:16,21,
23 128:2,7

133:2,15,
16 134:9
139:18,21,
24 141:9
146:16
150:10
173:9
179:2
183:19
184:19
185:9
186:5
204:20
212:15,23
218:21,23
220:18
223:5,19
227:9
232:8
241:17
245:11
253:16
258:7
260:3,7,9
261:24
266:3
268:22
269:19
270:4,13,
16 272:18,
20 274:21,
25 275:8,
10 276:3
288:4,10
289:9,10
292:15
295:9
296:10

299:20,21,
25 300:6
305:16
317:9

**calling** 21:9
92:2
183:6,20,
24 184:1,
14,16
233:4
260:8,12
265:24
268:22
269:19
270:10
273:6
277:24
282:14
283:8,18,
19 287:7
290:17,20,
23 291:2
293:12

**calls** 127:13
128:2
155:15
176:9
177:3
185:5
211:4
237:13
238:10
269:22
270:19,21
282:23,25
283:11,25
285:24

290:25
296:4,23
297:21
299:14
300:6,16
302:5,7,10
304:6
315:6

**calvary**
199:25

**Camaro**
37:16,19
54:3 72:19
229:13

**camera** 5:9
49:21,24
54:8
55:14,15,
17 66:24
67:2
68:13,16
108:2
147:5,8
188:24
189:2
198:20
199:2
234:3,10
306:18,21
324:19

**camper** 37:18
53:7,10

**camping**
222:11

**cancer** 224:7

**AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.**
William Lester on 10/09/2018          Index: capable..Catherine

**capable**
217:22,23

**car**  10:7,20
24:17
25:3,18,20
26:7,13
39:13,15
52:15 54:7
65:23
75:15,19
85:8 86:5,
6,24 97:1
102:4
106:1
108:3,6
120:2
129:13
154:9
156:11
158:19
166:5
172:18
174:11,13,
22 175:17
178:4,5
179:20
193:20,21
195:11
196:15
201:7
202:23
221:23
229:7
244:23
245:4,6
252:23,24
258:17
262:16

264:10
265:4,5
269:5
284:6,13,
15 293:18
294:5
305:24,25
309:19
310:10
316:13

**card**  24:15,
21 25:1,2,
8 120:8,11

**cards**  73:5

**care**  31:22
51:3
192:23
201:16
226:15
308:5
317:19

**career**  11:12

**caretaker**
38:9

**Carolina**
5:10 8:21
105:2
127:25

**carpenter**
9:20 11:13

**carries**
256:24

**cars**  10:15
12:7,15
27:1 98:23

264:7
274:11
320:9

**Carson**  39:12
40:2
190:19
200:4

**Carson's**
264:8

**carton**  48:15
197:20

**case**  5:5
56:1 68:22
104:18
127:18
128:21
142:7
201:6
227:22
300:18

**cash**  45:5,
13 64:22
75:8 77:3,
9 195:6,8
221:18

**catch**  79:10
221:1

**Catherine**
13:2 14:8,
12,18,24
15:13,20
19:24 20:5
21:10,16,
21 38:18
45:21,24

46:10,15
48:9
49:11,16
51:1,3,7
53:18
59:11
66:16
67:23
74:10
78:21
79:12
90:20
97:25
98:6,8,15
99:17
100:10
103:21
115:15
120:14
122:9
128:9,20
130:10,12
140:25
141:11
143:12,25
170:14
173:23
174:4,19
176:2,13
189:23
190:11
191:21
192:19
193:16,20
195:4,20,
21 196:22
199:16
202:15

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018     Index: Catherine's..children's

206:24
209:2
210:1
211:11
213:5
214:10
218:6
219:11
228:14,20
230:1,9
231:15
232:15
284:23
289:15
291:17
293:7,24
294:13
303:15
305:25
308:21
309:25
310:24
321:9
322:10

Catherine's
  14:15 20:3
  39:1,3,9,
  22 66:9
  91:2 95:23
  98:12
  104:4
  106:13
  195:6
  262:6

caught   41:24
  42:3 210:2

caused

137:22

Cecil   10:10
  223:11
  308:12

ceiling
  198:5

cell   27:5
  55:15
  73:9,16
  118:2
  124:24
  126:10,11,
  13,17
  179:22,23
  183:12,16
  184:11
  234:22
  235:6
  245:21
  253:8,9,10
  263:1,4,22
  268:4
  274:16
  276:12
  297:6,7
  300:15
  301:23

center   107:9
  252:14
  289:5

Central
  25:10
  33:17
  34:17
  74:24
  244:17

257:15,23

certificates
  12:22

chain   264:9

chairs
  182:18

chance   199:4

change   44:10
  45:7 58:19
  64:3 68:3
  162:9
  183:10
  186:19

changed
  64:4,10,20
  67:25
  164:6
  268:10

charge   57:20
  61:9 79:18
  168:13
  220:23

charged
  61:18
  63:25 64:1
  65:14,25
  79:5
  130:18,22,
  24 132:19
  133:7,8

charges   59:5
  62:15,20
  63:21
  64:2,17
  65:1

124:20
130:13
136:3
138:19
159:21
166:14
296:18,19,
21,22
317:11,16

cheap   75:2

cheaper   36:5
  278:16

check   64:22
  75:7
  152:8,16
  212:18,24
  242:4
  245:8
  304:11

checked
  27:23
  124:23

checking
  293:12

Chevrolet
  37:16,17
  86:9,12

child   152:5

children
  13:8 28:16
  66:7,14
  94:8 155:1
  294:15
  315:22,24

children's

249:22
292:11

chilling
29:8

Christian
177:20

Christmas
24:19 25:2
54:16,21,
24 75:24
120:8,9,11
139:23
140:10,11
158:14

church
145:21
158:17
232:12
235:20
236:5,8,13
237:6
239:4,6
244:18

cigarettes
48:16
197:20
202:24

Cindy  275:19

circle  90:23
95:21,22
251:18

circuits  9:3

city  6:6
14:21
17:18

29:22
63:10
79:8,16
80:2
84:12,15
173:7
268:22
319:19

clarify
135:24

Claude
307:21,23

Clay  96:1

clean  138:4
178:14

cleaned  78:6

Cleanup
11:22

Clem
312:21,24

Cleo  30:13
103:6,17
104:9
105:4,18
147:19
192:17
247:5,8
280:8

Cleo's  30:17
104:6
105:22
248:11,16,
19 250:1,
18

Cleveland
103:9

Cliff  5:12

clinic
209:19,21
210:8,23

clinics
36:22

close  36:8
51:25
52:1,2
76:22
85:19 93:2
95:21
96:12,21
98:9 99:21
103:24,25
112:5
142:24
145:19,23
183:5
191:6,16
229:10
233:11
244:19
247:12
260:14
268:15
294:12
302:1
308:3

closer
197:11
221:11

clothes
171:9

club  81:13,
19

cluster
300:16

coat  54:10,
11,15,17,
19,21 55:1

Cobalt
86:10,12

code  299:1

Cody  6:1
319:3
322:25
323:3

coffee  43:10

coincidence
167:1

cold  29:7
48:11 53:2
87:9,14
101:10
102:3
108:6,7
140:2
141:15
197:18
314:18

colder  120:2

Cole  97:24
98:18
99:10
100:3
101:5
102:24

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018          Index: Cole's..controlled

104:1
190:21
275:5,6

Cole's  97:23
102:25
192:10
270:18

Coles  104:3,
7 192:6

College
17:19
287:12

Collette
276:16

color  37:11

comment
50:2,7
310:16

comments
36:25
47:12,15
49:10,15
59:8

committed
171:22
202:5

communicated
233:23

communicating
96:20
270:3

communications
246:18

companies
268:11

company
62:16
317:9

complaint
229:24
230:1

completely
11:15 64:4
68:1
156:16

Compound
273:17

concern
285:3

concerned
187:17
279:7

concluded
324:20

concludes
322:20
324:17

concrete
230:21,22

conditioning
229:14

conducted
59:20
188:13

confront
30:7
93:12,25

174:16
195:21

confrontation
158:11

confrontations
160:13

confronted
158:3
185:9
187:12

connected
11:14

connection
109:13
177:6
219:6

consecutive
297:21

considered
17:6

consistent
205:13

consistently
9:24

constable
307:18

contact
28:13,20
38:13
91:24 93:1
107:3
109:10
110:17
111:4

112:12
157:3,4
178:15
262:6
297:16
301:12
306:8
308:6
310:7

contacted
112:1,2
113:16,18
318:13

contemplate
317:2

context
265:25

continue
6:22 11:4
15:20 51:1
85:12
144:21
154:2

continued
32:21
156:8

contraband
159:17

contract
27:10
180:7

control
313:23

controlled
135:12

Case: 6:17-cv-00084-REW-HAI   Doc #: 200-107   Filed: 07/31/19   Page: 345 of 414 - Page ID#: 13412
AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018        Index: conversation..Crawley

136:15

conversation
39:16
47:24
48:5,8
55:22
56:6,24
57:5 67:21
114:19
115:21
176:16
183:2
193:15
200:12
216:1,12
218:7,20
219:3
224:16
267:1

conversations
67:12
132:21
177:10
233:6

convicted
43:16,23
130:14,17,
23 171:24

cook  79:20

Cooper   95:7

cop  64:16

copies  205:4
211:7

cops  66:3

copy  26:18

78:15
233:15
324:22

Corbin  92:10
112:20
113:1

corner
126:18
230:17
234:19

Cornet
293:17

coroner
199:22

correct
84:19 86:6
111:1
124:3
155:24
160:24
241:13
261:21
276:17
308:22
320:5

corroborate
77:6,15

cost  153:2,
3 163:19

counsel  5:14
68:8
188:13,18
286:22
313:7

counter  23:2

counties
271:6

county  5:4,
25 41:24
43:4 52:23
58:15
63:11
66:12
86:16 96:1
126:6,7
129:25
141:6
145:5,6
150:14,15
158:22
159:1,19
190:15
199:21
214:25
221:6
222:16,19,
20 223:9
255:19
271:5
306:25
307:14
308:14,16,
24,25
309:13
310:5,8,
13,25
316:25

couple  63:16
85:3 88:13
104:2
105:17
159:7

192:21
215:11
220:3
231:18
232:8
234:18
241:21
269:6
272:25
318:14

court  5:6,11
6:23
27:22,25
28:6,7,19
29:5
30:17,19
31:3,12
33:16 34:7
40:17,23
158:10
168:18
178:21
179:5,19
234:5,7
267:10

courtroom
156:23
307:19

coveralls
197:17

covered  69:6
172:4
197:16

covering
321:8,11

Crawley

76:25

**crawling**
  166:1

**creek**  6:9
  9:6,15
  19:11,12,
  13,18 22:6
  33:22
  34:24 43:3
  44:5 55:6
  69:9 70:1,
  21 83:21,
  23,24
  86:19
  91:15
  95:22,25
  97:18
  98:10,11,
  13,14 99:4
  103:19,24
  145:9
  179:5,12
  186:3
  236:6,9
  246:24
  247:11
  250:11
  261:18
  277:10
  288:25
  289:2
  301:17

**crime**  130:23
  217:3,6
  270:17

**crimes**
  171:20,21

172:7
202:5

**criminal**
  317:25

**cross**  122:14
  272:15

**crossed**
  202:6

**crowd**  264:6

**crushed**
  137:23

**crying**
  101:12
  289:12

**CSC**  252:14

**Cumberland**
  17:19

**cup**  43:10

**curious**
  165:4

**curtain**
  101:12

**Curve**  103:18

**cussed**  57:8,
  25

**cussing**
  132:1
  158:18

**custody**
  154:10

**customers**
  26:1

**cut**  11:7
  57:4 143:6
  175:11,12,
  18,23,24
  183:2
  194:8
  198:20
  220:24
  305:4,7

**cutting**
  11:11
  304:7,10
  315:11

───────────

**D**

───────────

**dad**  19:11
  41:21
  92:4,23
  95:11,12
  96:3
  105:20
  154:20
  217:7
  275:22
  280:17
  308:4,12

**dad's**  280:15

**daddy**  187:11
  223:10

**daily**  64:19

**Dallas**  6:3
  323:5

**Dan**  145:8
  306:9,10,
  11

**danger**  66:3

**dangerous**
  143:7

**Danny**  150:4

**dark**  121:19
  122:4,5
  260:17

**date**  16:11
  17:5 114:4
  121:24
  155:7
  224:17
  292:2
  293:23
  312:24

**dated**  26:7
  84:24
  106:23
  151:3
  184:5
  245:18

**dating**  17:6
  32:13
  87:3,15
  177:11

**daughter**
  13:2 15:16
  19:25
  44:15
  47:3,7,18
  52:8 58:20
  75:14
  84:18
  85:20 94:1
  100:14
  105:14

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                    Index: daughter's..day

| | | | |
|---|---|---|---|
| 117:13,22 | **David** 56:2,8 | **day** 16:16 | 186:25 |
| 118:2,21 | 57:3 59:25 | 18:20 20:5 | 197:18,22, |
| 124:1 | 62:25 63:9 | 21:15,20 | 23 204:11, |
| 128:14,25 | 109:14 | 22:20 | 25 205:10 |
| 134:24 | 110:13,25 | 24:10,14 | 206:16 |
| 137:17 | 111:2,4,7, | 25:25 26:8 | 207:23,24 |
| 154:15,17 | 10,20,21 | 28:14 30:1 | 208:2 |
| 155:2,10 | 112:1,2, | 32:11 | 209:2,22 |
| 156:5 | 13,15,21 | 42:2,11, | 210:1,11 |
| 166:1 | 113:14,16, | 16,20 45:9 | 216:12,13 |
| 168:23,24 | 21 114:8, | 46:13 53:2 | 219:23,24 |
| 174:12 | 18,20 | 55:13 | 225:9 |
| 175:17 | 115:1,7,9, | 59:19 | 229:1 |
| 176:25 | 10,14,22 | 65:13 66:3 | 230:22 |
| 177:1 | 122:18 | 74:14 | 232:3,4,8, |
| 186:22 | 127:6,16, | 100:10 | 10,15,23 |
| 187:7 | 17,18 | 107:20 | 241:4,7,16 |
| 195:5,11 | 128:1,6,11 | 109:25 | 246:20 |
| 196:7,11, | 129:6,22 | 110:14 | 253:25 |
| 25 231:8 | 135:7 | 117:19 | 254:10,11 |
| 252:16 | 156:19 | 121:9,11 | 274:19 |
| 258:7 | 159:7 | 122:8 | 275:1,10 |
| 260:7,21 | 219:20,25 | 123:1 | 276:6 |
| 287:7 | 226:22 | 127:12 | 277:23 |
| 305:18 | 227:1,10 | 131:7 | 278:9,10, |
| 311:7,10 | 245:17 | 133:17 | 18 280:20 |
| **daughter's** | 255:16,25 | 134:7,8,10 | 282:14 |
| 284:23 | 256:7,11 | 138:5 | 284:10,22 |
| **daughters** | 309:9 | 139:23,24 | 285:5 |
| 75:23 | | 140:10,11 | 286:5 |
| 109:5,6 | **David's** | 154:19 | 287:2,3,9, |
| 170:20 | 60:16 | 156:17 | 13,23 |
| 193:3,7,15 | 128:1 | 162:18 | 288:3,12 |
| 270:15 | **Davis** 81:23 | 163:3,10, | 289:8,15 |
| 288:7 | 293:5 | 12,13,15, | 290:20 |
| 295:5 | 298:8,11 | 16,18 | 292:7,13, |
| **Davey** 255:15 | **Davis'** 298:7 | 174:23,24, | 15 293:7, |
| | | 25 181:12 | 16 294:3, |

25 295:9,
23 299:21
300:20,21
301:1
304:24
305:15
311:5
314:17,19,
20 317:8
319:24
320:23

daycare
285:2

days  146:10
163:18
231:18
293:24
295:23,24
303:4,5
314:13,14
315:9

dead  20:5,
16 38:19
42:12,16
53:9 54:22
74:10 90:5
92:25
100:10
134:2
136:16,19
141:12
144:1
170:14
173:24
174:5,19
176:3,14
189:23

191:21
206:24
209:2
210:1
219:12
224:3,4
226:3
277:20
284:24
289:15
291:18
293:7,25
294:13
303:15
306:1

deal  143:6
195:14
219:5
229:22
251:21
253:22
317:12
318:2

dealer  58:14
125:6,8
149:15
163:20
185:22
201:19
298:9
302:11
303:7

dealers
136:11,14
206:11

dealership
10:11

dealing
144:19
217:4
298:3

dealt  125:6
233:11

Dean  275:6

death  19:24
46:14
51:14,18,
22 53:18
66:9,16
67:24
231:6
321:9

December
17:10,17,
22 18:5
19:16
21:14,25
22:3 23:8
24:5
26:14,25
27:5,17
28:12
29:12,25
31:4,16
32:14
37:8,14,20
40:24
42:11,17
43:6 46:21
47:1
50:14,25
51:4,6,10,
24 52:3,
12,17 53:9

54:19 55:2
71:3,23
74:11,21
75:17
76:7,12,
19,20,21
77:7 81:2,
8 82:3,10
83:18
84:22
85:7,10,
13,16,19
88:2 89:7,
18 90:11
92:20
93:17
95:14
96:6,18
98:25
101:5
102:22
103:16
105:9
121:22
129:18
138:25
141:12,19
151:15
154:2
160:17
161:21
162:20
163:6
164:14
170:11
174:17
175:9
178:8,22

Case: 6:17-cv-00084-REW-HAI   Doc #: 200-107   Filed: 07/31/19   Page: 349 of 414 - Page
ID#: 13416
AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018          Index: decide..Detective

180:12,20
181:11,20
182:10
183:15,20
184:18
185:13
186:10,24
191:18
192:18
197:11
204:7
206:9,15
207:2
234:23
235:6
275:12,15
292:2
293:24
295:3
307:5
308:13

**decide**   7:4

**decided**
10:13
118:10

**declared**
156:17

**defendant**
5:24  6:7
319:19,20

**defendants**
5:5,22
6:2,6
188:14,20
233:23

**defense**   68:7

188:18
286:22

**delay**   113:17

**deliver**
188:3

**demand**
205:19

**Demoss-
campbell**
6:5,6
319:4,9,
12,17,19
324:25

**deny**   226:17

**Department**
66:13
173:7
307:14
320:13,20
321:4,24
322:4,10

**deposed**
104:17

**deposition**
5:2  6:15
8:19  26:18
104:23,25
142:4
165:3
188:16,19
228:19
233:25
252:21
283:16
286:25

318:14
324:18,20

**depositions**
224:24
286:19

**deputies**
308:14,25
309:13
310:8,13,
25

**deputy**
159:1,3,7
223:10
307:16,25
308:7,17

**Derrick**   5:21
68:19
88:17
89:10
213:16
238:21
243:7
286:18
303:12

**describe**
15:12
16:20
18:15
39:16
160:16

**describing**
203:14

**description**
251:25
252:1
260:19

293:18

**desperate**
50:22

**details**
116:2
122:9
124:12

**Detective**
54:2,18,25
55:9,23,25
56:6,23
57:6,23
58:11,23
59:2,7,15,
20,23
60:4,5,10,
13,21
61:4,9
64:12
68:20
106:16
110:13
111:12
112:6,9,18
114:16
115:1,5,
19,22,23
116:3,6,18
117:1,9
122:23
125:6,7
127:10
129:1,7,20
131:13
132:6,12
133:22
135:4

139:17
140:25
143:10
148:4
172:25
189:5
198:24
203:15
204:16
206:1
215:16
218:19,20
219:19,25
224:15,25
225:8
226:21
227:1,13,
15  228:19
234:15
235:15
246:10
248:22
251:25
256:19
284:18
293:17
323:8

detectives
199:20

detector
116:8,10
135:14

Dewitt  9:17
277:18

dialed  276:5

dialogue

107:18

Diane  13:2,
3,5,8,15,
22  14:3,
14,24
15:13
39:19

Diane's  14:7
39:23

diaper
101:14

diarrhea
29:8

Diary  267:10

died  21:16
67:17
104:25
134:2
160:4
224:7

differently
18:8  65:14

dig  262:8

digits  282:9

dime  152:13

dinner  34:21
171:16,18

direct
239:15

directly
112:12
246:15

disadvantages

318:9

discipline
167:9

discovered
144:4
145:11

discovery
165:3

discussed
202:15
227:17,20
229:10

discussion
49:22
68:14
111:18
134:24
203:14
306:19

discussions
112:3
224:10

dismissed
63:22,23,
24  64:3
65:1
130:13
296:16,18
317:11,17

display
48:22

dispute
224:17

distant

143:2,3

distinguish
105:11

District  5:6

divi  233:24

divorce
13:18,22
14:23
15:13,15
78:21
131:2
304:13
321:14

divorced
13:15
256:13

DNA  63:17
111:15

doctor  29:9
30:1,8
138:6
207:21
208:4,16
211:3

doctor's
24:10
29:19
34:1,3
240:20
241:8
255:7
256:20
257:11
263:1
284:19

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018          Index: doctors..dropping

doctors
  194:1
  210:22

documentation
  77:18

dollar  47:3
  58:18
  88:24,25
  117:16
  118:14,22,
  25 162:15,
  20 278:25
  302:18

dollars  44:9
  56:14
  162:23
  258:2

domestic
  131:2

Don  23:4,20
  24:1
  128:15

Donna  51:25
  52:1,2,13
  80:17 81:7
  82:7,20
  83:8
  84:21,22
  90:9 93:22
  132:21
  133:1,16
  134:15
  165:16,17,
  19 166:15
  167:4,7,8
  184:4,16

290:13,14
291:4
299:17
310:11

Donna's  52:8
53:5 84:18
86:20
89:18
166:1
184:6

door  34:11
36:13
43:12,14
47:22 49:6
198:11
199:4
203:7
213:11
216:15
229:3
263:9
279:14
289:25

doors  78:8
166:19

dope  83:4
100:14
198:20
199:1,5
202:8

Dorothy
24:16
25:3,8,14
28:5
244:10,14

Dorothy's

25:9

double  58:2
  194:10
  205:24

downfall
  109:12

dozed  238:15

dozer  11:1

drank  15:5

dressed
  22:14 31:6

drew  152:7

drill  8:15
  9:3

drink  138:12
  182:19
  202:24

drinking
  15:4 43:10
  138:10,15,
  22,24
  139:2

drive  37:10
  91:24
  250:23
  315:16,17,
  19

drive-in
  275:21

drive-thru
  33:21
  34:22

driven

230:14

drives
  255:25

driveway
  25:5,18
  53:21,23
  54:2,5
  101:21
  106:22
  107:20
  110:14
  123:23
  129:13
  158:4
  165:25
  166:16,17
  167:13
  200:2
  227:5,6
  229:5
  230:19,20,
  23 258:18
  309:1

driving  37:7
  38:3 65:23
  166:24

drop  21:11
  90:6
  287:20

dropped
  33:17,19
  34:2,6,9,
  20 261:7,
  14,20
  284:19

dropping

34:12
287:7

**drove**  158:19
251:10
265:3
315:19

**drug**  13:18
58:14
104:12
125:6,8
136:2,23
137:19
160:16,18
163:24
171:21
172:6
185:22
187:13,18
201:19
205:18,23
206:11
217:3
298:2,9
302:11
303:7

**drugs**  36:22,
23  41:24
44:20  45:4
93:7
104:9,14
105:6
124:20
125:9
136:1
143:14,20
144:10,17
146:6,7

147:11,12,
14,20
148:5,11
152:23
153:1,5
160:1
161:3,7
162:6,10
185:4
215:4,23
216:9
219:5
220:12
237:15
259:8
266:16
278:15

**drunk**  138:17

**drying**
36:14,18
289:25

**DS**  170:25
171:5

**due**  305:3

**duly**  6:10

**duplex**  41:3

**Dusky**  122:4

----

**E**

----

**earlier**
21:20
32:20
45:12  82:4
160:4
175:4

209:12
214:7
241:12
242:16
250:22
260:6
278:18
281:15,20,
21  294:11
303:23

**early**  53:24
76:4
106:24
121:20
122:7,24
172:10
175:21
251:13,15

**earned**  72:6
77:19

**Earnest**
103:10

**easier**  44:24

**Eastern**  5:6

**easy**  282:9

**eat**  7:19
140:5
177:14,24
184:7
238:14
258:7,16

**eating**
238:15
239:17
266:2

**Ed**  42:5

**Edwards**
170:22
232:14,23
260:20,22
261:24
300:15

**Eighty-seven**
282:4

**elapsed**
270:25

**electric**
73:1,4

**electricity**
175:23,24

**Elementary**
8:24

**eligible**
156:18

**Elliot**  5:17

**Elliott**
153:20
157:18
158:1
160:14

**Emily**  23:5,
9,12

**employ**  71:19

**employed**
8:7,9

**employment**
18:24
71:22

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018          Index: encounter..exist

151:18

encounter
107:2
119:13
307:10
309:24
312:10

encounters
308:20
309:12
310:3,12
320:17

end  59:1
88:7
101:11
106:10
171:6
233:25

ended  61:6
115:21
132:24
155:19
169:11,14
170:2
195:22
236:18
241:19

ends  128:20

enforce  66:6

enforcement
200:13
308:20
310:5
312:2
320:4

engaged
21:25

Engle  275:19

Engles
275:21

entire  33:25
231:22

Entry  267:10

Eperson
244:7,8,9,
10,12,13,
14 246:16

Eperson's
253:20

equipment
8:16

errands
295:25

Escoes  9:16
19:18 22:7
42:2 55:4,
5 69:9
80:13
107:5,6,
11,16
108:15,24
122:12,20
145:11,14
196:15
243:19

Escoes'
226:9

escorted
209:20

210:14,19

establish
24:14

established
10:17

et al  5:3,4

etran
324:24,25

Eubanks  6:4
323:5

Evans  280:9,
14

Eve  15:2

evening
16:16 20:6
21:18 28:8
35:4 37:4
40:24 62:8
208:6
210:14
235:21,25
287:16,24
305:6

event  21:15

eventually
61:18

Everson
244:4

Everyday
84:5

evidence
233:7
318:3

ex-jailor
86:15

ex-mother-in-
law  190:12
216:19

ex-mother-in-
law's  10:25
274:10

ex-wife
256:16
294:14

exact  27:12
46:6 58:21
118:22,25
119:4

EXAMINATION
6:12 68:17
306:22
319:17
322:24
324:6

exceeds
188:15

Excuse
187:24

exhibit
234:6,8,
13,15,17
235:10
239:20
252:12
267:11,23
268:1

exist  26:13

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                    Index: exit..Ferguson

exit  270:17

expectation
  188:17
  233:23

explain
  168:4
  195:9
  240:11
  254:2
  271:8
  272:11
  303:10

explanation
  259:7
  283:7

exploded
  40:21

expressed
  189:23

extended
  37:9

extent
  211:20
  231:22
  286:22

extra  236:23

─────────────
           F
─────────────

face  54:8
  55:9
  107:25
  108:1
  315:13

Facebook

  88:21
  99:13

facing  228:5

fact
  108:12,19
  308:2
  313:2

fair  9:23
  13:14
  14:23
  16:25
  32:16
  54:19
  62:13
  76:12

fall  74:11

falling
  129:18

familiar
  52:13,16
  97:12
  267:18
  268:7
  277:4
  280:24
  319:23

family  14:4
  39:6,17
  66:7 75:23
  108:25
  109:17
  110:3
  120:24
  123:17,24
  129:8
  152:5

  171:12
  177:1
  212:4
  217:5
  230:11
  233:4
  239:15
  275:25
  294:11,19

farm  317:17

Farris  6:3
  323:5

farther  70:1
  251:1

fast  64:23
  307:1

father  96:9
  154:16
  155:14
  187:7
  291:14
  312:19

faucet
  212:13

favorite
  22:16

Fayetteville
  61:20

fear  65:24
  66:4

February
  53:25
  74:18
  106:24

  122:24
  218:6

federal
  217:8

feed
  265:15,16

feel  46:1
  64:12
  189:17,25
  190:4

feeling  40:4

feet  12:8
  52:4 80:17
  191:8
  273:12

fell  296:16

fellow
  312:13

felonies
  130:14

felony
  130:17,25

felt  118:12
  123:11,21
  133:9,15

female
  149:24
  159:25
  160:2

fence  264:9

Ferguson
  214:23,25
  215:1

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018          Index: Fifteen..forever

| | | | |
|---|---|---|---|
| **Fifteen** | **final** 13:18, | **firm** 5:11 | **Florida** |
| 45:19 | 20 | **firsthand** | 36:4,22 |
| 179:8 | **finally** 20:1 | 165:2 | 37:10 38:5 |
| **Fifty-six** | 131:8 | **fist** 45:10 | 222:2,4,8, |
| 8:6 | 156:25 | **fitting** | 16 278:8 |
| **figure** 187:7 | 297:16 | 146:24 | 279:3 |
| **figured** | 308:11 | **Five-plus-** | 284:13 |
| 20:25 | **Finance** | **minute** | 289:23 |
| 36:20 | 33:17 | 297:17 | 298:25 |
| 123:9 | 34:17 | **fix** 12:7 | 299:1,4 |
| 146:3 | 74:24 | 15:10 31:6 | **flow** 47:17 |
| **file** 59:5 | 257:15,23, | 198:1 | **foil** 222:13 |
| 204:23 | 25 | 232:9 | **follow** 112:9 |
| 205:2,6 | **financial** | 237:17 | 123:10 |
| 304:11,13, | 152:18 | 266:21 | 126:8 |
| 21 | 235:3 | **fixed** 15:7 | **follow-up** |
| **filed** 77:10 | **financially** | 17:24 | 68:21 |
| 131:5 | 50:15,17 | 78:22 87:1 | 288:12 |
| 166:14 | **find** 26:18 | 238:14 | **food** 34:23 |
| 303:24 | 66:9 | **fixing** 48:10 | 182:19 |
| 304:11,15, | 78:16,18, | 197:18 | 188:1 |
| 21 | 19 140:7 | **flip** 234:18 | 220:14,16 |
| **fill** 205:9, | 167:23 | 239:21 | 263:9 |
| 17 218:22 | 181:15 | 271:16 | **fool** |
| 241:7 | 214:19 | 298:22 | 215:20,22 |
| **filled** 34:14 | 224:12 | **float** 138:6 | **foot** 79:14, |
| 204:22 | **fine** 156:19 | **floated** | 22 223:11 |
| 207:23 | 188:5 | 136:8 | 230:23 |
| 208:2 | 213:22 | **floor** 9:21 | **Ford** 37:9 |
| 257:5 | 318:24 | 118:6 | 38:2 |
| 258:10,11 | **finished** | 119:11 | 148:16,19 |
| 285:11 | 38:8 | **Flora** 274:5, | 276:16 |
| **filling** | 196:18 | 14 | **forever** |
| 33:20 | 210:9 | | 25:4,18 |
| **films** 64:9 | 212:25 | | 141:6 |

276:1

**forget**
  291:10

**forgot**
  111:16
  311:22

**Fork**  90:14
  96:11 98:9
  148:20
  149:13

**form**  14:6
  17:3 19:6
  28:25 35:9
  36:19
  39:18
  45:3,14
  46:16,22
  50:12,16,
  23 51:8
  53:11
  54:23
  57:1,21
  61:7 65:16
  66:1
  73:13,24
  74:22
  77:11,20
  81:20
  85:22
  87:6,16
  91:4 92:15
  99:3 100:6
  104:20
  105:7
  111:24
  113:23
  114:15

116:4,14
118:7
119:2
122:11
123:6
127:13
129:10
130:16
131:14
135:21
136:4,10,
25 138:2
142:21
143:24
144:2,14,
18 147:15,
22 150:1
151:9,20,
25 152:11,
24 153:6,
14 155:4,
12,15,25
157:15,21
159:12,23
160:20
161:5,15,
18 162:11,
21 163:1,8
164:21
165:15
166:11
167:2,25
168:10,17
169:23
170:3,23
173:1
174:9
176:9

177:8
178:1
180:10,23
181:5,7
182:5,9
184:12
185:5,14
186:1
187:4
189:8,19
190:2
200:20
203:22
208:25
209:8,11
211:4,19
213:14,20
214:2,6
215:24
216:23
217:15
218:9,15
219:4
223:8
225:3,12,
20 226:5
227:3
228:22
229:9,19
230:2
231:11
234:24
235:7,22
236:21
237:3,13
238:6,10
240:14
241:24

247:22
249:12,18
250:4,20
251:16
252:2,7
257:13
259:1
265:9
266:17
267:22
268:8
270:8,11
271:9
272:9,12
273:16
280:7,13,
16 282:3
283:6,10,
11 285:24
289:16
290:25
292:8,19
299:8
300:9,19
301:10,13
302:23
303:9,11,
16 304:5
305:1
312:4
313:11
314:10,25
315:23

**formal**  81:18

**formed**  81:21

**Fort**  62:1
  127:22

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018          Index: forthcoming..front

forthcoming
  59:7

forward   65:6

found   20:5,
  15 21:10,
  15,17,21
  35:12
  38:19
  42:4,12,16
  44:7 47:4
  53:8 54:21
  64:23
  74:10
  100:10
  117:19
  120:7,14
  122:16
  123:1
  140:14
  141:2,11
  144:1
  170:14
  173:23
  174:5,19
  176:2,14
  189:23
  191:21
  205:24
  206:24
  209:2
  210:1
  219:12
  226:3
  273:7
  284:24
  289:15
  291:18

293:7,24
294:13
303:15
306:1
309:21
314:17
321:12

foundation
  131:15
  173:2
  235:23
  267:25
  283:13
  299:9

four-wheeler
  81:13

four-year
  151:16

Fourmile
  6:10 9:6
  12:20
  41:21
  145:6

frame   79:10
  102:5
  121:12
  123:21
  125:23
  134:11
  147:13,20
  148:2
  170:10
  175:15,20
  251:22
  277:7,25
  289:18

293:25

framework
  277:20

Frank
  259:20,21,
  22 285:18

Frankfort
  135:14

Frankie
  172:17

Freddie
  97:22,24
  98:18,19
  100:3,4
  101:5
  102:10,24
  103:25
  190:20,24
  191:8
  270:18
  273:12
  275:5

Freddie's
  101:21
  191:3,4

free   56:11
  140:1
  146:16

Freedom
  317:6

freeze   140:2

freezing
  279:8

frequent

126:2

frequented
  136:12

Friday   62:8
  156:23

friend   12:5
  56:9 76:9
  110:2
  141:7
  233:8
  255:13,24
  303:1,8

friends
  15:17
  16:24 17:1
  18:17,21
  32:21
  98:17,19
  99:12,13,
  17 191:11,
  16 200:16
  233:4
  276:1,20,
  21 288:22
  307:13

friendship
  15:19

front   35:23
  39:11,21
  52:22,24
  59:14
  100:1
  110:1
  115:17
  166:19
  203:8,16

Case: 6:17-cv-00084-REW-HAI   Doc #: 200-107   Filed: 07/31/19   Page: 358 of 414 - Page ID#: 13425
AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                    Index: frost..Glen

230:25
293:22
305:19

frost   197:17

frown   315:14

froze   48:12
231:6

Fuel   37:23

full   8:3
221:24

full-time
18:2

funeral
67:18
273:9

furnace
15:1,3,7,
10  78:22

furnishing
161:3

furniture
177:5
178:3

future   70:10

_____

G

_____

G5   86:10

G6   261:3

gallon   48:14
140:9
197:19

Gamble

255:15
256:11

Gamble's
255:16
256:7

game   170:25
171:2,3,10
182:17
220:20
225:7

games   236:15

gap   90:18
289:7
301:8,21

garage   53:6
166:18,19
221:19,20,
23  246:2
256:14

garbage   78:6

garden   106:2

Gary   95:7
215:1

gas   22:14
42:3  48:13
140:1,2
146:16,19
197:21
221:8
279:7

gathered
210:20

Gatlinburg
15:3,7

221:17
303:14

gauze   183:10

gave   24:15,
17,21  27:8
30:21
44:13  45:6
47:8  58:24
69:20
101:6
116:2
117:16
120:8
177:4
190:3
194:12
201:10
211:14
223:23
236:17
244:25
245:1,6
293:18
315:10

Gavin   263:10
265:5

gel   164:8

generally
43:1  47:15
62:6

Geothermal
8:10

get along
17:7

girl   93:6

101:7
160:4
181:25
226:9
255:22
262:21

girlfriend
27:8,16
67:10

girls   39:21

give   26:3
79:19
80:10
120:7
124:12
137:1,13,
14  146:1
183:7
204:3
211:8
223:15
232:11
233:15
236:16
259:24
264:22
284:16
304:18
317:14

giving   25:4
45:13
132:24
152:21,22
227:1

Glen
105:21,24

Case: 6:17-cv-00084-REW-HAI   Doc #: 200-107   Filed: 07/31/19   Page: 359 of 414 - Page ID#: 13426
AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018          Index: Glen's..guess

280:18

Glen's
 280:19

glue  146:25

God  65:4
 272:22
 317:6,19

God's  201:16

good  6:13,
 14 14:13
 15:14,17,
 18,19,21
 17:7 45:2
 51:11
 65:18
 153:25
 166:23
 188:6
 286:11

Google
 296:25
 299:16

Googled
 252:14
 277:5
 302:12

Googling
 253:3

gossip  65:21
 107:9

grabbed
 304:14

grade  256:10

grandchildren
 15:17,21
 51:11 66:8

granddaughter
 97:23
 100:16,17

granddaughter'
s  169:3
 171:5

granddaughters
 294:21

grandkids
 264:20

grandma  64:5
 89:21

grandma's
 90:7
 181:14

grandmother
 51:11
 285:4

grandpa
 142:25

grandson
 192:24

granny  197:1

grass  193:1
 226:11

gravel  54:4

Gravy  22:18

Gray  92:11,
 12 94:22,
 23,24,25

95:9,10,15
 96:3,4,12,
 16 97:4
 190:23
 191:11
 192:2
 273:13
 296:12
 324:8

Gray's  191:2
 273:2,3

Grays  94:16,
 17,18
 273:13,15,
 20

Graytown
 95:16

great  6:21
 142:25

Green  306:9

Greenville
 5:10 8:19,
 22

Gregory
 26:14,22,
 24 27:17,
 20 38:5
 78:10
 222:1
 224:2,5,6
 245:11
 246:19
 253:3
 272:17,23
 298:25

Gregory's
 25:19
 220:9
 221:1
 224:3

grinder
 242:5,25
 243:1,4,5,
 11

grocery
 212:8

ground  57:16
 230:22

group  69:13

grouting  9:3

grow  145:2,
 3

growing
 18:18
 145:1
 202:8

grub  48:18

guard  77:1
 153:19
 159:6,11

guess  72:25
 119:6
 129:24
 135:14
 144:23
 155:24
 171:16
 177:19
 185:17

Case: 6:17-cv-00084-REW-HAI   Doc #: 200-107   Filed: 07/31/19   Page: 360 of 414 - Page ID#: 13427
AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018          Index: Guessing..happening

191:25
199:14,21
207:4
220:7
222:7

Guessing
  199:13

guilt  133:11

guilty
  133:12,13
  168:13
  311:12

Gum  95:18
  301:18

gun  131:25
  165:21
  166:9
  168:9

guy  43:12,
  15 49:1
  52:22
  54:12
  57:16
  88:15,16
  100:21
  118:13
  120:6
  126:19
  170:6
  174:16
  175:7
  182:3
  192:25
  199:20,21
  203:8
  214:19

215:2
216:8
222:14
277:18
294:7
303:1
316:11

guy's  76:25
  106:2
  136:16
  148:24
  203:9
  312:3

guys  284:16
  319:2,7

———————————
            H
———————————

H-A-L-E
  23:11

habit  136:23
  162:15,20,
  23

hair  36:14,
  18 290:1

Hale  11:16
  17:15
  23:9,11,12
  48:11
  71:6,17
  244:1

Hale's  98:9,
  10,11

half  41:21
  145:18
  179:10

200:9
207:9,12
302:6

Hall  90:19

hallway
  182:23

halt  131:9

Hammond's
  52:23

Hammonds
  13:12
  195:2
  260:22

Hammonds'
  86:16

hand  45:15,
  16 55:18
  137:23
  154:9
  170:4
  197:19

handed
  234:12

hands  57:7
  237:23

hanging
  142:17
  143:8

happen
  42:14,19
  52:7 64:16
  108:19
  175:11
  202:7

254:5
259:5
286:21
310:12

happened
  20:22
  21:15
  35:16,18
  38:21
  40:7,12
  43:8 44:1,
  5,7 46:5
  48:7 53:4
  63:1,14
  65:8 99:23
  107:18
  111:4
  119:21
  123:19
  126:9
  133:22
  139:23
  158:5,10,
  16 168:19
  197:14
  198:13
  202:9
  207:5
  210:13
  230:16
  246:13
  253:12
  266:16
  267:6
  289:11,14
  292:14

happening

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018          Index: happy..holes

54:1 60:13
292:20

happy  7:13,
21 186:17

harass
213:16,21

hard  47:17
105:11
234:20
268:12

harder  47:21

hardware
17:14

hardwood
9:20

Harlan  115:8
158:23
159:19
306:9

hash  235:13

hated  64:24

hateful
315:14

he'll  178:6

head  93:20

headed
109:11

headlights
121:17

heads  83:4

health
193:23

healthy
12:14

hear  44:4
46:23
58:17
88:20
107:16
120:21
122:8,19
124:1
210:4
293:20,25
323:1

heard  33:6
46:5 54:4
59:19 65:9
88:24
94:2,4
101:12
107:10
109:22
118:23
119:7
134:23
165:4
166:10
170:22
196:1,7
203:12
211:15,18
217:9,10
226:12
256:13
268:25
274:23
285:4
289:11,19

294:4
302:14
312:1

hearing
64:10
269:20

heart  12:14

heat  146:19
279:8

heater
242:24,25
243:16

heaters
140:1

Heather
94:25
95:1,3

heating
61:20

heavily
138:24

heavy  160:21
187:18
313:6,9,12

held  49:22
68:14
306:19

helped  15:10
97:2

helping
14:24
225:18,21

Helton  23:10

36:2,11,24
140:23
142:2,6,19
143:20
183:23
229:25
289:22

Hey  108:12
238:21

hide  238:9

high  12:17
71:9
244:18
315:3,4

highlighted
226:23

hill  33:21
101:20
106:3

Hillbilly's
275:23

history  71:2
97:11

hit  11:25
96:1
171:24
172:8
181:25

hold  55:17
283:11

holding
126:11

holes  9:3

**holiday**
24:19
171:18
222:10

**holler**
106:3,9
148:22
223:11
291:9

**hollering**
270:17

**home** 14:15
16:19 19:1
22:4,5
25:5 28:17
33:16 34:2
37:3 40:16
41:12 42:5
53:15 60:9
69:22 78:4
80:17
83:6,9
84:21 91:7
96:8 98:7
101:22
120:4
122:10
165:25
177:12
178:12
180:17,19
182:2
191:6
193:23
221:11
230:9
232:7,8,13

236:10
239:7
240:18
243:19
249:22
257:16,18
258:12
264:13
265:11,16
276:11
284:17
285:14,17,
22 290:10
292:11
293:13
300:14
301:22
317:18

**honest**
136:22
164:3
195:16

**hood** 54:4,
6,10
107:25
108:1
294:8

**hoodie** 238:7
294:8

**hook** 79:24

**hope** 92:14
188:17

**Hoskins** 5:3,
18,20
16:1,4,11,
21 17:1,5

27:22
28:23
29:25
30:25 31:3
32:2,7,10,
13,17,21,
25 33:4,8,
12,24
34:6,13
35:2,7,14,
19 40:24
42:7 51:17
59:2 60:5
62:25
109:14
110:13
113:14,16
114:17
115:1,7,8,
14 127:6
151:8
159:22
178:20
211:14
218:5
219:25
226:22
227:2
228:18
240:5
245:17
309:11
312:7
317:24
318:12
321:20,22
323:11

**Hoskins'**
28:11,16
56:2 59:25
110:25
111:10,22
112:15
113:21
129:22
135:7
219:20
309:9

**hospital**
167:8
210:3,7
318:15

**hospitals**
194:1

**hostile**
217:13

**hot** 76:15
80:7

**hour** 18:9
56:17 76:9
302:6
317:7

**hours** 39:5
121:19
126:12
131:7
188:10
233:19
249:16
264:15
272:20
276:4
286:9,20

Case: 6:17-cv-00084-REW-HAI   Doc #: 200-107   Filed: 07/31/19   Page: 363 of 414 - Page ID#: 13430
AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                    Index: house..idea

301:4

**house**  14:9,
  19,20 15:7
  16:16
  19:8,10
  20:3 25:9
  30:5,11,
  17,24
  33:23
  35:19,23
  36:8,14
  38:6,7,16,
  24 39:1,3,
  7,8,9,11
  40:14,17,
  25 41:8
  42:24
  43:5,23
  45:18
  52:23 53:5
  78:4 79:15
  82:10
  85:5,9,17
  86:16,20
  87:20
  90:15,20
  91:25
  95:24 97:6
  98:4 104:6
  105:4,25
  106:13
  122:4
  129:13
  131:23,25
  140:9,13,
  14 150:25
  156:10
  158:4,6,7,

8,9 161:8,
  10,23
  162:1,4
  165:19
  166:18
  167:17,19
  168:2
  171:4,19
  173:10
  177:23
  178:14,18
  179:15
  184:6
  191:1
  192:1
  194:22
  198:12
  213:10
  219:16
  222:22,24
  225:25
  226:7
  228:24,25
  230:8,18
  236:19
  237:2,10
  240:12
  243:17
  246:15
  248:15,25
  249:10
  250:7,23
  253:2
  254:8,19
  258:18,22
  260:2
  265:12
  269:5

270:18
  274:11
  279:17
  280:4,9,19
  281:17
  283:3
  284:9
  287:8
  291:8
  299:11
  308:4,8
  309:20
  310:15
  311:5
  312:20

**houses**  19:5
  222:14
  287:10

**How's**  203:4

**Hudson**
  307:21,23

**Huh-uh**  103:1
  109:19
  128:18
  130:4
  168:5
  179:16
  253:22
  285:6
  297:5

**hundred**  75:3
  215:18
  216:3
  219:3
  258:1,2,4
  278:25

**hung**  71:10

**hurricane**
  11:20,24

**hurt**  20:21
  40:6
  49:11,12
  231:10
  307:18

**husband**
  245:10
  255:13
  256:5

**Huseby**  5:12,
  13

**hypothetical**
  283:12

_____

         I
_____

**ice**  79:25
  80:3

**iced**  101:20

**idea**  96:19
  117:7
  123:14
  151:12,13
  175:1,3
  176:11
  187:5
  210:24
  217:25
  223:9
  224:18
  225:14
  229:20
  230:13

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018    Index: identification..interaction

232:18
256:17
266:14
271:4
278:6
284:14
294:24
303:13

identification
311:4

identified
192:21
268:4

identify
165:12

idling   120:3

illegal
199:13

immediately
117:22

impeachment
213:18,19

important
266:21

in-court
156:25

in-laws
65:18

inaccurate
280:21,22

incident
168:15

including

5:14
286:19

income
151:23
152:3

incomplete
283:12

Incorporated
5:12,13

indicating
49:11,16
229:4

indicted
61:22
74:14
127:17
133:4

indictment
64:10

individuals
323:7,12,
17,20

indoor   14:22
80:5

industry
11:5

info   125:11

informant
135:4,23,
25 139:8,9
141:7
142:3,7
144:5

information
32:25
33:4,8
45:21 47:8
58:24 94:9
116:11
117:9
118:11
123:1,17
125:22
128:16
129:2,19
133:20
136:2
139:9
148:7
153:4
155:13
157:23
164:19,24
165:6,8,22
167:18
168:8,20
170:16
171:22
185:23
200:11
201:21
202:4
217:21
224:9
274:13
276:16
295:15
299:18

informed
38:18
46:11 55:1

initiated
62:20

injured
231:9

injury
137:22

inoperable
53:10,12

Inquired
24:9

inside   40:25
43:6,8,9
84:15
156:10
279:14

installed
14:21
76:15 79:7
212:25

instruct
301:25

intentions
70:23

interact
97:4 98:21
145:22
146:13
176:23,24
178:3,8
182:24

interacting
113:9

interaction
110:9

**AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.**
**William Lester on 10/09/2018**                    Index: interactions..jail

111:19,22
114:25
115:3
122:22
129:20
131:11
143:10
156:12
320:24

**interactions**
106:16,17
129:8,22
130:9
131:13,21
132:5,12
139:17
140:24
143:11
320:16
321:23
322:2
323:15

**interrogate**
310:15

**interrogated**
132:7
229:21

**interrogating**
140:18

**interrogation**
228:9

**interview**
59:20
60:12,20
112:14
113:21

114:3,7,10
115:2,25
116:1,2
133:22
172:25
173:5,17
203:15
227:8
234:8,14

**interviewed**
310:23

**interviews**
116:17
124:6
309:7
312:9
323:8,9

**introduce**
5:15

**introduced**
68:19
105:16

**investigating**
53:18
309:19

**investigation**
66:15
67:23
130:10
141:1
227:23
228:7
231:15
288:8
292:18
310:23

316:24
322:10
323:9,13,
17,21

**investigators**
68:1 130:2

**involve**
294:16,17

**involved**
33:9 46:9,
11,14
51:17,22
160:10
167:10
264:16
292:12
294:14
316:24
318:12
323:12,17,
21

**involvement**
67:23
68:21
322:8

**involving**
117:10

**issues**   94:1

**item**
239:21,22,
25 253:10
268:2
269:8,10,
24 270:22
271:16
281:25

282:5
283:22
296:5,7
297:16
299:12
301:3

**items**
159:10,22
171:15
187:21
205:2
252:13
269:6

---

**J**

**Jack**   12:18
81:23
298:7,8,11

**Jack's**
298:21

**jacket**   108:4

**Jackie**   6:3
148:24
149:1
323:5

**Jackson**
149:24,25
150:4

**jail**   57:9
58:2 63:8,
11,13,15
78:5
111:14
116:20
124:21,23

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                    Index: jailer..Jesse

126:4
127:10
131:6
132:8,10
136:8
138:19
141:13,23
143:10
153:19
155:23
156:6,9
158:21
159:10
160:7
219:6
224:23
297:8
311:16
317:8

**jailer**
  159:1,3,4,
  7 215:1

**jailor**  52:23

**James**  35:23
  43:17
  117:10,21
  119:18
  129:2
  140:23
  143:20
  183:23
  229:25
  278:10
  281:1,8
  311:3,12
  312:11,16

**January**
  53:24
  76:23
  106:24
  122:23

**Jason**  5:22
  53:20
  126:25
  148:9
  175:6
  308:22
  309:1
  312:10
  316:22
  320:16

**Jay**  25:19
  26:14,21,
  24 27:17
  78:10
  129:15
  131:12
  139:19
  140:12
  245:11
  246:19
  253:3
  272:17,23
  279:16

**Jeff**  94:23,
  24

**Jeffs**  288:25
  289:2

**Jennifer**
  13:13
  39:10,13
  58:20

117:14,16
118:2,3,4,
5,24
119:17,19
120:23
123:8
124:1
127:22,23
128:14,25
134:20,25
137:18
174:12,13
175:6
189:21
193:6,12
194:15
195:11,13
252:17
258:16
259:12
262:8
267:8
268:5,6
269:15,23
284:25
285:18
288:10
311:9,10

**Jennifer's**
  39:15
  265:4,5
  273:8

**Jerome**
  214:23

**Jerry**  28:15,
  23 31:1
  34:5,8,9

41:6
102:18
103:6,12
105:13
177:1,4
178:2,9
180:22
181:2
182:16
190:23
191:2,11,
12 192:2,
16 221:8
239:19
249:11
255:1,2,5
273:2,3,13
282:20,21
283:2,9,15
291:10,13
296:12
298:14,16
300:7,10
316:5,10,
19

**Jesse**  39:10
  104:17
  120:15,16,
  18 121:6,
  13 129:12
  131:10
  135:3
  139:7
  161:25
  171:14
  194:19
  196:25
  252:15

Case: 6:17-cv-00084-REW-HAI   Doc #: 200-107   Filed: 07/31/19   Page: 367 of 414 - Page ID#: 13434
AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                    Index: Jessie's..Kayla

258:8,22,
25 260:3,9
262:8
266:3,10
268:21,24
269:15,23
292:13
294:23
298:5
300:13
301:20
303:18,20
311:8,9

**Jessie's**
196:21

**Jeter**  233:12

**job**  6:21
8:17 10:3
17:21
18:2,9
50:18
61:25
62:2,4,17
66:2,5
72:1
109:24
146:22
151:8
174:14
193:17,19
212:25
222:13
298:3
301:1
316:13
317:9
318:21,24

**jobs**  18:7
66:3 76:11
98:24

**Joe**  152:10
153:16
173:22,24
187:11
202:16,24
204:1
206:2,6,8
207:2,6
208:5,7
214:20,22
215:17
217:11,13,
23 218:7,
20,21,25
219:10
223:17
224:2,9
225:2,13
226:4
227:20
305:20

**John**  5:23,
24 53:6
81:9,10,25
109:17
165:18
166:9
167:4,7
168:9
306:23,24
307:3
310:4,17,
24 316:24

**Johnson**  6:3

323:5

**Join**  66:18

**joke**  195:23

**joked**  194:20

**jokes**  194:8

**joking**  50:4,
10 197:5
216:14
218:13,16
315:12

**Jonathan**
5:18 51:22
52:22
84:24
85:23
89:11
132:4
181:4,8,
17,19
184:5
214:17
228:6,13
254:7
272:4
282:21
287:13
291:11,17
300:3
310:2
316:21
321:20
322:1
323:16

**Jonathan's**
290:8,9,12

**Jordan**  141:9
219:9

**Joseph**  6:3
323:6

**judge**  7:4
109:17
110:1,8
131:8
157:3
314:6

**judged**  314:6

**jump**  69:5

**jumped**
226:11
307:19

**June**  224:16

**junkyard**
27:2

_____

K
_____

**Kathy's**
260:17

**Katrina**
11:18,21
16:14

**Kayla**  52:11
84:18
85:23,24
86:6 88:25
89:7,16
94:1,6
96:16
97:12
132:11

Case: 6:17-cv-00084-REW-HAI   Doc #: 200-107   Filed: 07/31/19   Page: 368 of 414 - Page ID#: 13435
AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                    Index: Kayla's..knew

133:8
166:21
167:10,20
184:4,11,
14 273:14
300:2,4

**Kayla's**
52:15
94:15
102:3

**keeping**
178:14
243:17

**Kelley** 5:23
66:17
124:15
306:22,24
319:3

**Kelly** 6:3
323:5

**Ken** 134:3,4

**Kentucky** 5:7
6:10 9:7,
12,17
12:20
19:14
62:9,21
66:12
70:16
145:6
190:14
236:9

**kerosene**
139:25
140:9

**key** 87:1
168:2
223:14,15,
16,23
308:9,11,
12

**keys** 223:12

**kicked** 84:22

**kicking**
319:7,14

**kid** 18:18
102:20,21
120:3
154:7
316:12

**kids** 14:16
21:11,12
31:1
38:24,25
39:13,15
40:15 41:7
103:11
154:11
189:6
249:11
250:13
251:5
261:5,13,
20 262:13,
18,20,22,
23 264:19
267:2,3
273:8
283:19
300:12

**kids'** 64:4

**kill** 46:4
49:16

**killed** 45:24
64:5 92:23
96:9 182:3
231:4

**killing**
43:24
46:10

**kin** 115:7
142:23

**Kincer** 6:1

**kind** 37:7
55:16
71:10
79:19,20
92:11
93:13
102:5
105:10
121:10
122:3
126:9
143:2
146:2
152:7
163:22
186:17
188:5
194:2
204:13
217:4,13
218:2
221:15
222:7
235:14

243:21
278:1
288:9
295:12
300:16
319:21

**King** 152:10
173:23,24
187:11
202:16
206:2
214:20,22
218:20
224:9,22
225:2,13
226:4
305:20

**Kinny** 90:18
289:7

**kitchen** 41:4
43:9 44:4,
10 47:4
80:7
254:15

**knew** 41:22
51:19,23
57:17
64:15
91:14,18,
20 118:13
126:20,24
136:6,7
137:21,24,
25 139:11
141:3
143:7
145:1,8

Case: 6:17-cv-00084-REW-HAI   Doc #: 200-107   Filed: 07/31/19   Page: 369 of 414 - Page ID#: 13436
AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                    Index: knock..late

146:17,21
153:7
157:17
159:14
165:9,10
166:23
167:12
169:25
170:6,7
181:16,17
185:3,20
186:3,4,
16,18
187:2
198:19
199:1
200:17
202:6,9
213:4,7,9,
11,13,24
214:15
225:22,24
270:18
277:8
299:20
308:2
316:18

**knock**  138:11

**knocked**
43:11,14

**knowledge**
56:19 58:8
66:11 86:2
88:4 89:8,
9 111:11
115:11
127:5

140:22
151:10,21
152:6
153:23
164:16
165:10
166:6
167:16
168:16
178:7
180:16
183:16
184:6
185:17
193:24,25
209:9
219:11
237:15
284:8
288:1
291:19
302:22
321:7
322:6,8
323:20

**Knox**  5:4,25
43:3 52:23
63:11
66:12
86:16
109:17
126:6,7
129:24
150:14
158:22,24
159:1
190:14
221:6

222:16,19,
20 223:9
244:17
255:19
271:4
306:25
307:14
308:14,16,
24,25
309:13
310:4,8,
13,25
316:25

**KSP-529**
234:15

--------

**L**

--------

**labeled**
234:13

**laborer**  8:17
9:2

**lady**  24:16
39:20 44:5
58:18
105:15
210:3
215:21
216:11
226:2
272:10

**lady's**  39:12
255:12

**laid**  56:22
76:16
231:5

301:23

**lamps**  222:12

**land**  10:25
11:2 69:17
72:14,15

**landlord's**
69:20

**Landon**
28:18,24
152:8,13
178:13
187:8
239:18

**large**  221:23

**Larry**  12:5
38:4 52:23
86:16
220:9,18
221:1
222:1,14
223:14,19
224:1
233:12
298:25
299:5

**late**  11:6
53:24
106:24
122:23
146:23
163:6
239:2
251:20
263:8
264:19

Case: 6:17-cv-00084-REW-HAI   Doc #: 200-107   Filed: 07/31/19   Page: 370 of 414 - Page ID#: 13437
AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                    Index: latest..Leroy's

**latest**
  281:19

**laugh**  50:8

**laughed**  50:9
  198:14
  199:25

**laughing**
  198:16

**law**  44:15
  66:5
  200:13
  308:20
  310:5
  312:2
  320:4

**Lawson**  13:13
  118:4
  128:25
  137:18
  171:14
  174:12
  194:15,19
  268:5
  285:18
  303:18
  311:8

**Lawson's**
  298:5
  300:13
  301:20
  311:9

**lawsuit**
  317:3
  318:7

**lawyer**  57:9

63:16
109:8
111:3
133:8
140:19,21
157:8

**lawyers**  7:1
  157:2
  306:9

**laying**  20:15
  29:7 44:10
  118:17
  124:24
  126:18
  173:9
  231:12

**lead**  137:24

**leaks**  197:18
  198:1

**learn**  53:17

**learned**  21:6
  32:24
  33:3,7
  35:3 45:20

**learning**
  19:24
  62:19

**leave**  16:14
  17:8 29:12
  31:3 41:8
  57:3 62:9
  153:11
  171:4
  174:14
  197:24

220:22,24
250:7
256:20
259:9
264:11
279:1
317:10
324:5

**leaving**
  141:21
  184:23
  278:11
  280:2

**led**  173:6
  223:6

**Lee**  202:22

**Lee's**  216:13

**Lees**  206:4
  207:20
  208:6

**left**  11:2,
  17 12:15
  15:6 27:8,
  21 28:5
  31:5 33:18
  38:24
  41:11,23
  44:8,12,13
  46:1 53:15
  54:9,10
  56:25
  108:1,2
  109:24
  111:8
  117:22,25
  129:13

156:7,23
201:18
209:4
210:18
219:20
220:21
223:16
234:19
241:19
246:19
249:2
250:21
251:10
253:16,18,
21,22
259:25
260:2
262:16
265:16
272:2
280:3
281:12
284:8,12
291:17
295:13
316:4

**left-hand**
  239:22

**legal**  109:10

**legs**  7:20

**lengthy**
  296:14

**Leroy**
  277:12,13

**Leroy's**
  277:16

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                          Index: Lester..live

**Lester**  5:2
  6:9,13
  8:2,4 17:9
  19:23
  23:25
  26:10
  41:13
  47:11
  49:25
  51:13
  61:17 67:4
  68:8,18
  124:21
  147:10
  189:4
  234:12
  286:23
  306:23
  319:18
  322:25
  324:18

**letting**  85:9
  131:23

**Lex**  30:22

**Lexi**  28:18,
  23 31:10,
  25 32:3
  33:16,24
  34:1,6,12
  131:24
  152:8
  154:9
  156:11
  157:10
  239:18
  255:23
  256:10

  257:16
  313:20
  316:15

**liable**  20:24
  235:3

**license**
  10:12,15
  178:19

**lids**  200:2

**lie**  116:8,
  10 135:14
  176:4
  201:14
  211:22
  266:13
  314:4

**lied**  133:14
  176:8
  317:12

**life**  9:19
  10:4 64:3,
  19 65:2,4
  67:25 68:2
  104:12
  119:16
  130:19
  171:19
  200:21
  215:10
  219:1
  266:21
  317:14

**lifestyle**
  218:2

**lifetime**

  97:7

**Liford**
  223:10,18,
  21,24
  307:25

**light**  243:8

**Likewise**
  307:13
  309:6,23
  318:5

**limit**  188:15
  286:25

**limited**
  319:21

**limits**  84:15

**Linda**  28:3
  129:5
  158:8
  177:2,3,6,
  20 178:21
  180:15
  182:4,11
  185:3,7
  187:2,17,
  20 220:16
  221:11
  239:18
  249:14
  250:24
  251:5
  254:7
  269:25
  270:3
  271:18,23
  291:20

  292:10
  298:17
  310:7

**Linda's**
  166:20
  167:21
  178:18
  180:3,5
  220:7
  237:10
  240:6
  254:19
  265:17,18
  266:1
  290:12

**lines**  73:23
  175:12
  241:21

**link**  264:9

**liquor**  139:6

**Lisa**  280:9,
  14

**list**  262:6

**listed**  101:8
  114:4
  299:25

**listen**
  116:16

**live**  9:5,11
  51:24 52:3
  66:3 69:25
  70:16
  80:19
  83:9,18
  90:11 91:5

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018

| | | | |
|---|---|---|---|
| 92:8 95:15 | 100:1 | 30:22 | **logged** |
| 96:3,4 | 102:9 | 41:2,4 | 195:12 |
| 97:24 | 103:18 | 43:1 44:3 | 196:2,4 |
| 101:12 | 106:2,9 | 82:9 | |
| 102:24 | 140:1 | 84:21,23 | **logger** |
| 103:4,17 | 145:20,23 | 92:19 | 195:18 |
| 104:1 | 178:21 | 100:4 | **logging** 9:21 |
| 105:18,24 | 179:9 | 101:5 | 11:2,5 |
| 145:17 | 190:14,24 | 105:4,10, | **London** 173:9 |
| 149:12 | 191:4 | 11 222:4 | |
| 150:12 | 192:10,24 | 300:4 | **Lone** 12:18 |
| 182:4 | 200:21 | **load** 38:15 | **long** 8:12 |
| 190:23 | 213:4,6 | 107:7 | 9:8,9 |
| 191:7 | 214:15 | | 11:9,23 |
| 200:8 | 223:10 | **loaded** | 13:5,18 |
| 222:1 | 226:8 | 265:17 | 15:17,18 |
| 247:12 | 244:15,16 | **loader** 35:25 | 30:16 32:1 |
| 256:11 | 261:19 | **loads** 146:23 | 34:21 39:2 |
| 261:17 | 273:10 | 199:20 | 41:18 |
| 273:11 | 277:18 | | 45:17 |
| 288:24 | 293:10 | **loan** 75:19 | 55:22 |
| 293:4 | 308:3,4 | 174:12 | 56:5,15 |
| 305:19 | | 257:24,25 | 60:17 74:7 |
| 312:21 | **lives** 24:16 | 317:17 | 82:15 |
| | 25:10 77:1 | **loans** 72:9, | 96:25 |
| **lived** 9:8,9, | 92:9,21 | 17 74:20, | 98:22 |
| 15 14:9 | 98:12 | 21 | 134:5 |
| 27:22 39:7 | 150:10 | **local** 140:7 | 137:7 |
| 41:21 43:3 | 217:17 | | 138:5 |
| 51:20 | 218:2 | **lock** 198:11 | 144:21 |
| 52:1,5 | 247:8,10 | 211:23,25 | 179:7 |
| 69:8,12 | 274:9 | **locked** | 181:19 |
| 70:3 | 288:25 | 211:16 | 183:15 |
| 80:12,21 | 290:9,10, | **locking** | 204:7 |
| 83:20,21 | 19 293:5 | 59:11 | 220:22 |
| 90:14 | **living** 9:11 | | 251:4 |
| 91:15,18 | 19:11,17, | **log** 35:24 | 264:1,23, |
| 96:5,8,9 | 20 27:24 | 37:1 | 24 265:18 |
| 98:1 99:20 | | | |

Case: 6:17-cv-00084-REW-HAI   Doc #: 200-107   Filed: 07/31/19   Page: 373 of 414 - Page ID#: 13440
AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018          Index: longer..maintaining

303:15
313:9,15
319:10

**longer** 69:19
303:6

**looked** 44:6,
14 48:17
54:6 68:5
86:11
101:13
109:11
156:20
166:21
199:25
200:1
214:16
221:16
226:12
231:9,13
279:11

**loop** 90:23
95:20 98:2
106:7,13
247:9

**loose** 163:2,
4,7

**lord** 236:11

**lose** 25:25

**loser** 186:20

**lost** 65:3
145:8
317:7

**lot** 10:8
48:12
68:21,22

70:7 83:4
97:1,10
105:4
109:16,20
130:8
136:7
146:9
148:3
150:20,24
195:11
196:15
205:23
206:3
221:15
252:23,24
258:17
274:10
300:25
315:4,5

**lots** 10:17
217:1

**loud** 57:25

**Louis's**
25:23

**Louisiana**
12:3

**Lounge** 16:8

**love** 51:1
87:21

**Lowe's** 38:13

**lucky** 68:3
239:8

**lumber** 17:13

**lunch** 69:1

188:25

**lying** 107:8

_____

_____
**M**
_____

**M-F'N** 58:1

**Ma** 195:1
196:4,18

**machine** 80:8
236:19,23
237:2

**machines**
49:1 198:4
199:6,7,9

**Mack** 261:19

**made** 29:22
30:9 33:17
34:16
36:24
46:20,25
48:19
49:15
50:2,7
59:9 77:17
107:25
111:4
125:5
127:20
132:8
156:24
159:18
194:7
202:19
240:25
242:24
247:1

250:10
257:17
286:16
294:12
302:10
308:11
318:2

**Madison**
171:5

**Madison's**
169:2

**Mae** 39:12
40:1
190:19
200:4
233:10
264:8

**Mae's** 99:24
191:24

**mailbox**
39:21
52:24
86:17

**main** 25:11
57:16
84:2,4,13
244:16

**maintain**
12:15
70:16
124:8

**maintained**
11:16

**maintaining**
11:14

15:20

maintenance
146:22

make  7:3,19
23:3 46:1
47:12
49:10
64:12
78:14
116:11
125:21
133:13
145:24
195:18,24
197:25
222:18
231:25
239:9
257:15
270:21
276:1
282:16
302:4
319:6
322:13

maker  79:25
80:3

makes  90:23
98:2
157:24
251:14

making  7:6
18:5 47:16
317:7

male  293:19

males  89:6

mammo's
101:18
122:5

man  9:20
12:6,7,14
20:15
88:24,25
120:6
172:14
225:19
231:1
290:19

man's  215:20

manager
71:7,14

Manaka
226:10

Manchester
27:3

Maneea  226:9

March  12:1,8
114:2
132:25
154:5
155:20

mark  6:2
233:25
323:4

marker  289:5

market  9:16
19:19 22:7
48:3 55:5
176:15

194:6,9
221:9

marks  234:5,
7 237:18
238:1
267:10

marriage
94:18

married
12:24
13:1,3,6
14:6,14
41:23 90:2
92:14,18
95:2,3,4,6
100:21
102:19
194:4,5

marry  102:17

Mart  84:6
202:22
206:4
207:20
208:6
277:10

marts  84:17

match  132:1

Matheson
83:24

matter  5:3
201:15
217:20

Maw  195:1
196:4,18

max  163:9

maximum
164:15

Mcdonald's
22:15,17
33:21
34:22
243:20
258:6,16

Mcdonalds
257:18

meal  79:20

meant  136:1
311:8

mechanical
97:2

medical  9:22
210:7

medicine
30:9,21
125:16
128:19
162:4
298:13,16

meds  105:13

meet  16:3
56:10,13
127:16,25
128:1,3
227:10,11,
13,15
239:3
318:20

meeting

56:15,18
57:24
58:12
59:1,8,16
60:2,25
61:6,8,10,
15 114:12
116:9
121:10
123:24
145:13
184:24
206:2
219:25
294:11
295:11

meetings
111:9,12

Mefford 6:2
323:4

meg 222:12

Melissa
292:25
293:1

member
81:19,25
82:2
320:19
321:3,24
322:3,9

member's
210:6

members
120:23
176:24

177:1
210:6
212:4
275:25
320:4

memo 123:12

memories
134:8

memory 76:18
107:19
108:9
116:2,13
135:19
145:9,10
164:4
236:1
251:14
258:21
265:1
268:18
271:23
274:17
287:23
295:22
298:6
301:11

Memphis 8:11

men 89:6
153:5,15
160:9

ment 34:4

mention
136:3
239:10
242:16
247:20

279:2,16,
20 321:20
323:16

mentioned
69:8 70:6
71:6 75:25
76:10
78:20
80:12,16
84:5
107:21
109:13
123:25
124:5
131:10
134:23
136:6
138:15
143:9
147:12,19
159:13
171:9
176:12,23
190:17
196:8
220:25
226:2
307:25
308:19
314:17

mentioning
323:12

mess 202:2

message
93:13
94:3,7
111:8

123:9

messages
296:4

Messer 148:9
172:17

Messer's
48:3 84:5
176:15
199:10

met 16:7,15
38:7 59:4,
23 60:3,4
110:25
112:18
120:1
145:4
151:12,14
164:1
181:21
189:24
207:2,20
219:18
223:3
313:10,12
319:24

Metal 25:24

meter 175:16

meters
175:18,19

Michael
35:23
192:24

Michelle
13:12
19:25

**AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.**
William Lester on 10/09/2018                    Index: Michelle's..Mills

21:9,11,13
37:6
38:23,25
39:3 85:20
117:15
122:2
131:16
134:25
168:25
170:22
189:21
193:4,5,9,
17 212:6
232:14,23
260:12,20
261:17,21,
24 262:20
265:3,6,15
267:9,14
268:20,25
269:7,16,
18,24
285:1
295:7
300:15

**Michelle's**
38:24
40:15
261:9
262:22
267:11,20
269:5

**Mid-south**
8:10

**middle**
101:7,9
175:22

208:2
255:19
289:4

**Middleport**
95:19

**midnight**
265:20

**Mike**  6:7
36:12,13
41:14
139:16
144:10,17
145:13
179:9
183:18,19
228:21,23
229:17,24
231:14
241:23
242:5,6
243:4,11
251:2
278:7,18
279:16
280:23
281:5
282:13
284:1,2,8
289:8,23,
24,25
296:9
298:10
319:20,23
320:7,16,
23 321:3,
23 322:2,
9,13

**Mike's**
179:15
228:25
241:22
247:17,20,
25 248:1,
13,17
249:25
250:19
251:10
281:12
284:3

**Mikey**  67:6

**mile**  36:9
41:21 42:5
104:4,6
118:1
145:18
179:9,10
200:9
251:3
289:3,4

**miles**  31:13
70:2 86:20
90:16 98:8
104:2
179:6
236:11

**milk**  48:15
197:19

**mill**  11:8
233:13

**Miller**  42:5

**Mills**  13:2,5
14:4,8,24

15:13
18:13,16,
22,25 19:5
35:3,12
38:18
42:11,16
45:21,24
46:10,15
47:11 48:9
49:11,17
51:1,3,10,
25 52:2,14
53:8,19
54:21
65:15
66:16
67:9,13,22
74:10 76:1
80:17
81:7,8,23
83:11,12,
13,15,17
84:18
92:4,5
93:22
96:17
97:12,25
98:8,15
99:17
103:21
109:17
115:15
128:9,20
130:10,12
131:8
132:11
140:25
141:11

143:12
144:1
165:17
170:14
173:23
174:5,19
176:2
184:4,14,
16 190:11
191:21
193:1
199:16
209:12
219:11
228:14,20
230:1
235:3
273:14,20,
23 277:6
284:24
288:20
289:15
291:17
293:7,24
294:13
303:15
305:25
310:11
312:21
321:12

Mills'  13:2
19:24
27:8,16
51:14,17,
22 67:10,
23 74:4
84:21 86:6
90:20 98:6

122:9
165:19
166:15
176:13
230:9
231:15
273:24
299:17
308:21
309:25
310:24
314:17
321:9
322:10

mind  46:2
64:11
118:10
135:22
151:1
158:19
181:14
206:8
311:20

mine  12:5
13:23
57:18
63:24
304:15
319:10

minute  40:3
205:2
235:10
250:23
305:9

minutes
30:18
45:19

55:24
60:19
117:24
179:8
188:10,20
209:13
232:13
233:20
239:9
244:21
246:14
250:7
251:7,11
264:4,21
265:13
270:25
271:22
281:18
286:9
319:11,13

misdemeanor
130:20,25

misinterpretin
g 243:8

missed  86:4
127:22

missing
169:25
170:1
171:6

misstate
321:19

Misstates
73:25
119:3
209:12

214:7

model  37:9

modular
69:22

mom  41:21
54:16 71:9
78:5
92:21,22
104:25
109:6,21
120:1
132:13,15
140:5
263:8
265:14
270:4
272:1
289:12,13
290:9
293:10,12
318:15

mom's  40:17
146:16
161:7
203:5
281:1
290:12
309:16

moment  46:8
64:6 266:7
285:19

moments  35:6

momma  168:1

Monday  30:2,
4 62:11

Case: 6:17-cv-00084-REW-HAI   Doc #: 200-107   Filed: 07/31/19   Page: 378 of 414 - Page ID#: 13445
AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                    Index: Mondays..move

127:25
141:22
204:12
206:15
207:4,18,
19,25

Mondays
205:11
206:24

money  44:9
45:8,25
46:7
47:13,17,
23 49:2,7
50:19,22
58:19 72:3
75:22 76:6
77:6,19
118:6,17,
25 119:7,
11 152:21,
22,25
153:2,3,11
162:10
163:2,7
176:13
189:15
190:10
193:18
195:19,24,
25 197:2
198:12
200:12
202:15
203:6,8
211:12
212:2,3,5,

7,17
213:1,2
216:16
217:24
218:22
219:1
222:15
226:2,3,17
228:21
232:11
236:16
278:21,24
281:5,10
298:2
303:19
304:16,19
305:22
314:8
317:19

month  53:22
67:17
72:13,16,
23 75:1
76:23
88:3,8
101:25
152:9,16
155:7
160:25
161:2
193:9
204:10
205:14
206:20,22
207:4
209:3
220:23,24
275:10

281:4
305:10

months  63:15
73:6
147:23
252:4

Moores  6:9
9:6,15
19:18 22:6
33:22
34:24 43:3
69:9 70:1,
21 145:9
179:5,12
261:18

morning
6:13,14
15:5,6
22:3 24:8
28:8,9
29:12,14,
20 42:22,
24 54:24
62:11
63:5,9
117:20
118:13
119:14,18
122:7
123:3
124:24
126:16
127:1,25
128:23
172:21
240:19
241:2,13

254:8
265:19
279:4,12,
13 288:10
297:13
305:7
311:23

motels  62:17

mother  14:7
23:5 28:1
51:7 67:9,
17 105:22
238:5
312:25
314:23

mother's
28:2

mother-in-law
49:5 198:9
289:13

mother-in-law'
s  18:19

mountain
150:13
291:9
293:22

mouth  19:18
22:6 55:4
69:9 80:12
95:22
103:24
107:4
119:7
247:10

move  10:13

69:21
113:2,5
125:21
187:25
188:16
222:13
272:15

moved  25:20
38:12 42:4
80:21
81:1,4
82:16
83:10
112:22,25
113:7
145:8
264:7
305:19

moving  70:9,
23,24
233:25
248:22

mowed  193:1

mowing
226:11

mud  48:13
197:17

mulch  38:11

multiple
300:21

murder  43:16
54:13
57:10,20
58:2
61:10,18

64:14,17
65:15
128:9
134:8
229:25
290:21
296:20
303:5
308:21
309:25
310:24
311:5,11,
13,21
313:2
314:17

murdered
44:8

murderer
312:3

Mustang  16:8

────────
         N
────────

nah  85:15

named  100:18
103:13
192:25

names  13:11
23:7 91:9
217:21

Napier
149:8,9

narcotic
138:6

narcotics

30:9

nasty  197:16

Natasha
100:18,19
101:8

Natasha's
101:2

Nathan  81:24

National
77:1

nature
153:12

nearby
190:23
273:10

necessarily
130:23

neck  55:17

needed
29:22,23
38:11,12
91:24 97:3
109:23
118:12
146:16
178:12
181:14
193:18
212:13
237:17
298:3

needing
76:16
300:12

needles
161:17,20,
25 237:24,
25

neighbor
84:10
149:7
233:8
274:9

neighbors
39:25 83:2
99:16
190:17
191:21

nerve  217:19

nervous
228:3,4

news  65:9
159:19,25
172:20
192:4
261:25
265:23
268:15,19,
24 270:6,9
289:19
293:21
294:1
300:17

nickname
88:23
136:20,22

night  16:15
62:8,22,24
101:23

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018          Index: nighttime..objection

121:1,3,6,
18 122:7
124:18
126:15,21
177:16,21
184:8
199:16,17
202:21
204:19
208:3
232:12
233:8,9
239:15
241:1,3
254:20
276:3
289:10
301:23

**nighttime**
208:5

**Nina** 97:15

**nine-
millimeter**
166:8

**Nineteen**
13:7

**nods** 95:13
116:23
120:17
169:18
216:5
314:15

**noise** 40:20

**noon** 31:16
284:2

**normal** 68:2

**North** 25:10
127:24

**note** 40:20
136:8
189:10
279:21

**notes** 80:9

**notice** 70:14
279:10

**noticeable**
238:5

**November**
76:23
155:8
173:18

**number** 5:5
7:1 9:16
27:5,13
73:21
74:17
83:16
91:22
99:24
100:2
117:2
180:1,14
191:24
194:15
234:21,22
239:22,25
240:3,6,22
242:1
245:22
252:13

253:4,8,10
268:2,4,10
269:8,23,
24,25
270:22,23
271:3,17,
18,20
273:24
274:12,25
276:5
277:6,8,
16,21
280:23
281:25
282:1,5,8,
17,18,20
283:1,2,8,
14,16,17,
22,24,25
284:1,3,5,
7 288:15
290:2
292:23
296:5,7,8
297:10,17,
18,22
298:6,7,
14,17,21,
25 299:17
300:6,14
301:3
302:5,11
303:10
304:20
324:7,9

**numbers**
235:13,18
239:23

246:2
252:11
262:3,7
267:11,13,
16,20
269:7,12
272:25
275:7

**nursery**
154:19
187:1

**nursing** 91:6

---

O

**Oath** 170:24

**obituary**
95:5

**object** 7:7
17:3 19:6
28:25 35:9
36:19
39:18
45:14
46:16,22
50:12,16,
23 51:8
53:11
54:23
57:1,12,21
61:7 65:16
66:1 87:6
188:14
231:21
313:8

**objection**

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018          Index: objections..offered

| | | | |
|---|---|---|---|
| 66:17 | 157:15,21 | 218:9,15 | 289:16 |
| 73:13,24 | 159:12,23 | 219:4 | 290:25 |
| 74:22 | 160:20 | 223:8 | 292:8,19 |
| 77:8,11,20 | 161:5,15, | 225:3,12, | 299:8 |
| 81:20 | 18 162:11, | 20 226:5 | 300:9,19 |
| 85:22 | 21 163:1,8 | 227:3 | 301:10,13 |
| 87:16 91:4 | 164:21 | 228:22 | 302:9,23 |
| 92:15 99:3 | 165:15 | 229:9,19 | 303:9,11, |
| 100:6 | 166:11 | 230:2 | 16 304:5 |
| 104:20 | 167:2,25 | 231:11 | 305:1 |
| 105:7 | 168:10,14, | 232:1 | 312:4 |
| 111:24 | 17 169:23 | 234:24 | 313:11 |
| 113:23 | 170:3,23 | 235:7,22 | 314:10,25 |
| 114:15 | 173:1 | 236:21 | 315:6,23 |
| 116:4,14 | 174:9 | 237:3,13, | 316:16 |
| 118:7 | 176:9 | 16 238:6, | |
| 119:2 | 177:8 | 10 240:14 | **objections** |
| 122:11 | 178:1 | 241:24 | 7:3,5,7 |
| 123:6 | 180:10,23 | 247:22 | **occasion** |
| 124:15 | 181:5,7 | 249:12,18 | 183:21 |
| 127:13 | 182:5,9 | 250:4,20 | **occasionally** |
| 129:10 | 184:12 | 251:16 | 183:25 |
| 130:16 | 185:5,8,14 | 252:2,7 | 203:25 |
| 131:14 | 186:1 | 257:13 | |
| 135:21 | 187:4 | 259:1 | **occasions** |
| 136:4,10, | 189:8,19 | 265:9 | 209:1 |
| 25 138:2 | 190:2,6 | 266:17 | **October** 5:8 |
| 142:21 | 200:20 | 267:22,25 | 63:20 |
| 143:18,24 | 203:22 | 268:8 | 105:1 |
| 144:2,14, | 207:11 | 270:8,11 | 156:1 |
| 18 147:15, | 208:25 | 271:9 | **odd** 76:11 |
| 22 150:1 | 209:8,11 | 272:9,12 | 146:22 |
| 151:9,11, | 211:4,19 | 273:16 | 301:7 |
| 20,25 | 213:14,20 | 280:7,13, | |
| 152:11,24 | 214:2,6 | 16 282:3 | **offended** |
| 153:6,9,14 | 215:24 | 283:6,10, | 7:16 |
| 155:4,12, | 216:23 | 11 285:24 | **offered** |
| 15,25 | 217:15 | 286:15 | 116:8 |

229:21
318:4

**office**  23:1
30:3 31:7,
9,11,15,24
32:2 56:2,
7 59:25
60:16
95:18 96:2
99:5
110:25
111:6,10,
22 112:4,
15,21
113:8,21
129:22
135:8
174:15
208:20
219:20
241:9
255:7
256:20
257:11
263:1
284:20
302:1
309:9

**officer**
128:8
321:14

**officers**
60:1 130:9
320:13

**oil**  146:18

**older**  37:9

145:3

**oldest**  19:25
260:21

**ole**  152:7
202:22

**Oliver**  90:2,
3,5 91:5,
10

**on-and-off**
151:4
154:1
155:2,19

**on-and-off-
again**  225:15

**open**  12:14
124:24
241:19

**opened**  22:12
54:24
229:3

**openly**  65:17

**operable**
37:19,24

**opinion**
65:22
214:4

**opportunity**
225:1

**opposite**
95:23
106:12

**order**  297:21

**originally**

222:20

**Orlando**  38:5

**Orleans**
11:18

**Otis**  43:17
117:10,21
119:14,18
129:2
311:3,12
312:11,16

**outdoor**
47:20

**outfits**
168:22

**outhouse**
59:12
211:24
212:1
213:9

**overdosed**
160:5

**overheard**
228:20
229:17

**overnight**
22:8

**oversee**
110:4
219:16

**owe**  281:10

**owing**  298:2

**owned**  17:17
37:16,17

38:5 52:13
69:17
233:13
275:22,23

**owner**  71:13
195:10

**ownership**
71:11

**owns**  230:11
275:23,24

**oxy's**  215:18
216:3
219:3

**Oxycontin**
164:2,7

_____

P

**p.m.**  35:8,
11 40:10,
12 232:19
240:9
302:1
324:20

**pack**  48:15
138:12
139:3
171:3
197:20
202:24
278:23

**packed**
279:10

**packing**
183:10

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                    Index: pages..payment

pages 234:18
  243:13

paid 10:14
  18:9 27:21
  75:8,15,21
  77:3,7
  79:16
  152:13
  175:18
  176:1
  246:9
  304:23
  305:11,13

pain 36:22

paint 98:23
  222:18

painter
  222:13

painting
  277:20

paper 8:16
  65:20
  226:23
  311:14
  317:1

papers 210:8

paragraph
  243:8

paralegal
  68:11

Pardon
  321:10

parents
  105:18

park 83:5

parked 39:11
  258:17
  264:8

parking
  206:3

Parks 81:24

part 46:19
  76:5 113:8
  116:11
  158:24
  163:6
  176:16
  195:10
  221:6
  241:10

parties
  26:19
  319:22

Partin
  306:10,11

partner
  63:16

party 81:18
  88:25
  169:3
  235:3

pass 275:25

passed 21:21
  35:3,12
  94:9 186:3
  270:18

passes
  213:10

passing
  47:12
  318:15

past 90:20
  91:2
  103:22
  154:2
  169:4
  175:5,9
  191:1,3,4
  209:5
  215:12,13
  244:17
  251:12
  265:20
  305:5

patch 202:8

Paterson
  24:17
  25:16
  244:5,11,
  15

Paterson's
  28:5

path 217:4

patient
  209:7

patient/doctor
  33:9

patients
  210:16

Paul 11:15
  17:15
  23:5,9,12
  24:9 29:17

48:11
  71:6,17
  72:1
  243:25
  244:1
  287:11

Paul's 23:5
  246:9,15
  297:6

pawn
  169:10,12,
  15,22
  170:2
  171:7,11
  187:21
  305:21

pay 18:8
  23:3 27:9
  44:18
  48:19
  56:14
  72:11,14
  73:8 74:25
  75:4,20
  76:16 79:4
  122:13
  195:17,19,
  24 222:17
  232:10
  304:19
  305:5

payday
  195:17

paying 75:17
  152:5

payment

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018          Index: payments..phone

34:16 45:3
257:16,17,
19,24,25

payments
33:18
174:13

pays  195:3

peaceful
59:3

pedal  128:19

pegged  151:4

pending  7:24
64:18
78:22

people  7:6
10:14,16
23:7 24:4
25:25
28:13,21
47:14 56:9
59:13
64:20,21,
24 65:5,18
73:5 75:6
77:16 83:2
105:4
109:15
121:15
129:6,8
135:12
136:2,7
138:4
142:13
147:11
148:5

165:9
167:19
202:11
210:17
222:15,17
223:6,13
226:19
233:4
256:3
264:9
265:22,24
271:5
284:16
313:25

Pepsi  48:23

percent
194:12
195:3,17,
18,24

Percocet
248:20

perfecting
213:17

perfectly
7:11

period  17:5
33:25
35:13,20
39:17
50:20
69:11
74:12
80:19
85:18 89:8
113:9
144:16

147:24
149:18
151:7,16
155:22
160:24
168:1
172:11
238:2
262:3
300:7
301:4,21
314:24

permission
29:11
223:13

person  7:2
18:12
41:13
47:25 67:5
76:14,17
102:15,16
149:22
150:16
162:3
165:13
195:6
203:17
212:5
233:9
278:22
285:18
302:19

personal
74:21
110:2
240:7
245:25

personally
154:6
200:15

persons
152:20
206:6

Pete  192:25

phase  139:5

Philip  221:3

Philips
244:18

Phillip  38:6

phone  5:15
7:2,19
20:13,19
21:3,5
27:5,7,9,
15 30:9
37:5
38:18,21
55:15
58:20
73:8,9,16,
17 74:7,14
93:1 97:8,
9 99:6,22
117:1,3,14
118:1,2
121:2,7
133:9
177:7
179:22,23
180:13,15,
17,19,22
181:4

183:13,16
184:11
191:15,20
192:3
205:25
218:25
233:5
234:5,22
235:6
239:20
240:2,7
245:21,24,
25 246:1
252:12
253:8,9,10
254:2
262:2
263:1,5,8,
13,16,21,
22 266:10
267:11,13
268:4,11,
13,22
269:14,21,
24 270:5
271:17
272:1,2,
11,16,19
274:16,25
276:12
277:1
280:25
281:5,11,
22 282:17,
25 283:24
284:10
293:13
295:17

296:3,4,
11,14,15
297:6,7,17
298:5,14,
15,17,18
299:23
300:14,15
301:2,5,7,
20,23
302:4,7
319:1
324:7

phones
281:2,6
302:17

phonetic
88:18
90:19
103:18
221:8
293:17

photographs
55:12,20
107:22
110:10

physically
7:4

pick   14:16
38:14
86:13
154:7,13,
14 170:7
176:17
203:6
223:16
240:19,25

241:3
264:20
267:3

Pickard   5:24
200:13,14,
18,23
201:2
306:24
307:3
308:25
309:12,17,
25 310:4,
8,13,14,
17,25
316:25

picked   34:23
40:14
52:21
56:20 63:3
85:3 87:4
88:6
126:15
127:12
153:11
156:7
212:24
226:23

picking   85:6
223:17

picture
122:18
262:5
294:5

Pictures
107:23

pill   163:19

236:12,18,
20 237:2
247:1,4,14
248:6,7,
16,17
249:7
266:21
278:25
281:9
287:5,18
291:4
315:2

pills   35:14
36:5 37:2
42:7,19,21
58:16
137:4,5,
13,23
163:10,14,
22 248:3,4
258:8,22,
24 259:24
266:7,11
284:17
287:6
315:15,18

Pineville
33:18
34:19
139:25
140:6,8
202:21
205:16
257:3,12,
18 285:12

pipe   8:15
9:2 146:24

| | | | |
|---|---|---|---|
| **pipes** 48:12 | **plate** 37:10 | 306:25 | 23 178:12 |
| **pit** 250:10 | **plates** 10:12 | 308:12 | 197:20 |
| **PL** 267:12 | **played** 30:23 | 314:7 | **Pope's** |
| **place** 17:13 | **playing** | **poker** 48:25 | 212:24 |
| 38:9 39:12 | 255:23 | 198:4 | **porch** 21:10 |
| 64:9 70:3 | **plea** 318:2 | 199:6,7,9 | 122:17 |
| 78:6 96:8 | **plead** 168:13 | **police** 53:17 | 166:22 |
| 112:16 | **pled** 311:12 | 57:15 | 229:4 |
| 140:6 | **plentiful** | 63:5,10 | 230:22,24 |
| 146:17 | 273:20 | 65:13,23 | 231:13 |
| 174:4 | **plenty** 198:1 | 66:8,12,13 | 280:15 |
| 205:24 | 202:9 | 108:12 | **Pork** |
| 220:3,17 | **plumb** 14:22 | 118:12 | 141:10,12 |
| 221:2 | **plumbed** 38:8 | 123:4 | 142:2,7 |
| 223:12 | **plumbing** | 124:14,17 | 144:5 |
| 224:23 | 17:24 80:5 | 125:11 | **Pork's** 297:7 |
| 226:18 | **pocket** 45:11 | 127:2 | **positions** |
| 274:10 | **point** 16:10 | 128:5,8 | 55:10 |
| 291:3 | 17:4 31:2 | 130:9 | **possessed** |
| **places** 68:3 | 32:6 35:1 | 135:20 | 27:16 |
| 301:14 | 37:4 41:8 | 139:10,13 | **possibility** |
| **plain** 77:22 | 57:5 61:5, | 173:7 | 318:6 |
| **plaintiff** | 17 63:21 | 223:5 | **post** 95:18 |
| 5:20 | 110:12 | 224:9,13 | 96:2 99:5 |
| 286:24 | 153:25 | 225:11 | 111:7 |
| **plaintiffs** | 173:23 | 295:15 | 112:2 |
| 5:2,4,18 | 184:19 | 320:12,20 | 134:15 |
| 188:19 | 188:2,6, | 321:4,24 | 174:15 |
| **plan** 281:1, | 12,16 | 322:3,9 | **postal** |
| 2,6,7 | 222:4 | **polygraph** | 230:25 |
| **plans** 70:9, | 235:18 | 135:15,20 | **posted** |
| 23 227:17, | 254:22 | 139:8,10, | 134:16 |
| 20 240:25 | 288:8 | 13 171:14 | **potential** |
| 241:10,15 | | **Pontiac** | 155:14 |
| | | 86:8,9,10 | |
| | | **pop** 48:15, | |

279:24

Powers  160:4

pre-exactly
247:24

pregnant
313:19

prepaid
180:6
302:17

prepared
182:20

prerogative
286:24

prescribed
161:4

prescription
32:11
33:13,19,
22 34:14,
20,23
204:5
205:10,17
207:22
208:1,3,8,
13,14
218:22
241:7
257:5
285:10,11

prescriptions
160:23
203:24
204:22
206:5

presence
44:18
46:21,25
196:21

present  5:14
6:6 60:1
70:4 132:2
320:4,7,
17,20
322:17,18
323:7

press  124:20

Pressing
133:24

pretty  9:17
17:7
20:16,25
82:11
111:7
119:14
129:4
145:19
153:24
155:8
158:25
248:12
263:18
284:25
296:14
303:2
305:13
306:6
312:22

Previously
243:12

price  26:8

212:15,21,
23

priced
205:25

priceless
317:6

prior  9:11
29:24
47:11
141:11
184:20
189:23
206:24
209:3
284:10
307:5
308:13

prison
141:7,15,
23 215:20
216:9
217:8,11

prisoners
159:25
160:2

probation
131:3

problem  65:7
137:21
178:4

problems
11:1 13:17
82:7,13
137:19
146:19,20

proceeded
198:25

processed
18:8

procure
159:9

production
164:6

products
48:23

project  9:1
76:1

projects
76:19,24
77:3 78:20
79:12

promise  7:16

promoting
159:17

properties
71:20

property
11:14,16
17:14,16
19:2 24:18
48:10
71:10
79:23
134:17,18
223:6

prosecuted
313:3

prosecution
322:11

323:21

**provide**
26:18
78:10,14
205:5,7

**provided**
10:1 38:4
220:17

**providing**
159:22
220:12,14

**proximate**
309:1

**proximity**
51:25

**public** 10:3
62:4

**published**
294:5

**pull** 20:24
35:24
39:20
230:20
268:13
277:25

**pulled** 25:17
36:7 42:2
52:24
56:20
101:12
108:5
202:23
259:13

**pulling**

35:24
320:9

**pump** 37:23

**pumping**
11:25

**purchase**
23:3 42:7,
19

**purchased**
303:3

**purse**
211:12,17
212:7

**pursuant**
319:13,14

**pursuing**
307:19

**pushing**
160:1

**put** 38:16
48:13 49:1
53:6 54:10
57:9 65:22
69:22
101:19
107:25
108:2
123:20
125:23
126:12,17
131:3
155:1
174:11
188:11
198:5

199:2
223:14
235:9
317:8,18

**puts** 138:6
251:11

**putting**
174:14
176:25

___

**Q**

___

**qualified**
317:17

**question**
7:6,8,10,
12,24 14:2
42:15 69:2
156:12
178:6
211:20
272:13
273:17
286:23
310:2
313:7
314:7
317:21
322:1,7

**questioned**
187:6

**questioning**
188:13,15

**questions**
6:22 7:11
21:20,24

42:10
68:7,22
213:15,23
231:24
314:5
316:2
319:21
322:21
323:24

**quick** 49:19
233:14
319:7

**quickest**
91:1

**quickly**
294:2

**Quiet** 150:13

**quit** 12:25
64:24,25
138:11
201:3

**quote** 180:2

___

**R**

___

**raise** 57:24
61:14

**raised** 41:20
54:5 200:1
217:3

**ran** 10:4,6,
10 119:18
140:6
153:10,11
304:14

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018          Index: range..recollection

range  48:22

Ranger  37:9
  38:2 261:4

ranges  251:9

rat  226:12,
  13

Ray  290:5,
  11,15,17
  291:11

Raymond
  195:2,15,
  21 196:17

reach  157:1,
  16 302:7

reached  57:4
  66:13
  157:2
  162:19
  188:18

react  20:19
  68:4

read  65:20
  116:19
  142:5
  226:16,20,
  22 234:20
  269:12
  293:21
  311:14,21,
  25

reading
  243:10

ready  31:7
  36:20 59:5

174:22
  250:13
  251:8
  279:11

real  48:11
  49:19
  87:14
  102:3
  150:9
  307:1

realized
  145:16,23

reason
  51:16,21
  141:9
  148:1
  149:21
  150:21
  156:15
  176:7
  189:12,14
  224:17
  229:16
  272:6
  305:16

reasons
  74:21
  189:13
  217:1

rebuild  65:2

recall  15:9
  16:6 18:4
  19:23
  20:12
  22:10
  24:3,7

27:4,12
  28:4
  31:14,15
  32:1 40:19
  41:5 47:16
  48:4 54:1
  60:13,21,
  24 75:13
  78:11
  105:10
  114:25
  134:24
  148:4
  203:14
  232:22
  239:13
  254:23,24
  261:23
  273:5
  287:2
  288:7
  290:17,20
  299:18
  304:23

RECC  92:12
  128:4

receipt
  26:6,7,11,
  18 78:10
  245:15
  257:19

receive
  32:10
  200:11

received
  25:7 33:12
  54:20

152:19

recently
  286:19

receptionist
  255:19
  256:10

recess  66:25
  147:6
  188:25
  234:4

reckon  134:7

recognize
  73:22
  214:9
  240:3
  255:9
  262:7
  267:16,17,
  19 272:25
  275:1
  276:13
  282:18
  288:15
  290:2
  299:15
  319:25
  324:8

recollect
  236:2

recollection
  86:23 89:1
  113:22
  270:2
  282:13
  284:2

record  5:16
49:19,20,
22,23
66:23 67:1
68:10,12,
14,15,19
147:3,4,7
155:1
188:12,22,
23 189:2
233:22
234:2,5,9
254:4
267:24
272:16
286:8,18
299:18
306:16,17,
19,20
324:19

recorded
56:18
59:20

recorder
56:21,24
60:25 61:5

recording
59:16
114:4
116:17
135:9

recordings
130:1,3

records
62:17
117:3

211:1,2
239:21
252:12
269:14
281:23
285:10
295:17
299:23
301:8,20
302:4

Recused
110:6

red  37:18
95:25
150:6
235:13
301:17

Redbird
202:11

refer  220:8

reference
107:10
189:6
208:12
216:17
255:14
274:5

referenced
139:8
294:11

references
267:13

referred
209:6
218:6

referring
137:18
241:23
260:4

refresh
298:6

refrigerator
79:25 80:3
182:14,19

refund
303:19

refunds
75:11

refurbishing
301:1

regard  310:2

regional
244:18

register
81:18

registered
31:18

regular
31:20
71:22
72:25
126:13
192:22
204:11
206:16
293:9,10

regularly
99:22
146:8

178:16
237:12

Regus  301:25

rehab  314:7,
8,12

Reidville
8:24

Reilly
102:23

Reins  198:15

Reins'  84:10

related
18:24
94:15,17
95:10
97:23
159:21
273:13,14
278:1
291:11
323:9

relating
12:22
130:9
143:12
211:2

relation
56:1 90:15
115:10

relationship
13:21,23
14:2,3,7,
11 15:12,
21 16:20

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018        Index: relationships..reporter

18:16
33:5,10
87:24
97:13
151:5
154:1
155:3,19
187:3,13
225:16
312:16
313:15

**relationships**
115:13

**relative**
309:25

**relatives**
83:8 89:17
96:17

**relay**  123:9
217:20

**relayed**
200:11

**release**
113:6,7

**released**
67:11

**relevant**
308:21

**remained**
16:25
64:18

**remark**
108:18

**remarried**

260:23

**remember**
23:16
27:10 39:6
47:24
71:24
73:14 75:2
85:11
87:23 88:1
94:11,13
101:25
102:7
107:24
110:15,17
116:5
121:5
129:16
131:4,17
132:20
135:1,2
136:21
137:16
141:14
142:13
159:18
166:7
168:3
172:9
180:1,7,14
187:23
196:16
202:20
204:8
209:24
228:11
232:4
233:2
239:14

243:15
245:20
246:3
249:16
251:6
252:19
254:1,13,
25 255:18
256:2,9
258:1
260:11,12
261:4,10
262:2
263:2,4,6
267:1
269:20
270:10
272:3
277:22
282:22
284:5
285:1
287:14
288:2,14
292:6
293:6
295:16
296:9
297:7,12,
14 299:6
300:1
305:14
309:23
312:20

**remodeling**
174:14

**removed**

24:17

**rent**  72:14
221:17
284:13

**rental**
11:14,16
17:14,16
19:2,8,10
48:10
71:10,20
284:6
287:10

**rented**
284:15

**renting**
69:16

**repaired**
19:2

**Repeat**  46:23
198:23
225:4

**repeatedly**
64:13
270:12

**repo**  175:7

**report**  75:9
214:22
218:19,21
224:15
226:20
293:16,23

**reported**
293:18

**reporter**

5:11 6:23
234:5,7
267:10
324:21,24

**represent**
68:20
268:3
306:12
319:19
323:4

**representing**
306:24
318:12

**Republican**
81:17

**reputation**
57:15

**request**
112:10

**residence**
28:5,11,
13,20 31:3
70:17,24
80:20
92:22
179:5,19
192:11

**residences**
222:8

**residents**
91:15

**residing** 6:9

**respect**
66:2,4

177:19

**respond**
54:25

**responsible**
66:9
229:25

**rest**
163:16,18
165:8

**Restaurant**
275:23

**restored**
65:4 317:6

**restroom**
7:19 49:5

**result** 65:24

**return** 10:13
25:5
127:21

**returned**
35:7

**revealed**
45:23

**reviewed**
116:21

**Rick** 149:7

**ride** 35:21
81:16
101:6
146:1,2
181:14
184:22
265:6

291:5
318:22

**rides** 183:7
184:20

**ridge** 98:5

**riding**
222:11
284:15

**ring** 150:2
273:25
275:6
300:16

**ripped** 37:21

**road** 6:9
9:6,15
22:6 35:22
38:6 39:11
41:22
70:1,21
84:1,2,4,
13 86:17
90:14
95:16
101:11
118:1
122:15
179:10
190:18,21
192:3,25
217:18
221:3,10
230:17,20
267:8

**Roark** 40:2
47:25
48:5,9

50:2,8
84:8
142:11
176:13
196:8
197:8,15
199:15
200:8,11

**rob** 196:22
198:6
215:22

**robbed** 44:8,
11 45:25
46:3
144:22

**robbery**
296:20

**robbing**
202:16

**Robinson**
5:19

**rode** 33:20
81:14
145:3
242:4
265:3

**Rodney**
153:20
157:18
158:1

**Roger** 92:4,
5,9,24
94:10

**Roger's**
92:25 96:9

Case: 6:17-cv-00084-REW-HAI   Doc #: 200-107   Filed: 07/31/19   Page: 393 of 414 - Page ID#: 13460
AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                    Index: role..school

role  9:1
  165:23
roll  193:20
rolled  36:3
  229:8
romantic
  33:5 187:3
romantically
  160:10
Ron  222:14
Ronnie
  199:10
roof  49:2
  193:2
roofing  9:21
room  30:22
  41:2,4
  44:3 57:3
  128:4
  209:5
  254:14
  279:1
  308:8
rotted  25:19
rough
  197:22,23
roughly  79:3
  188:20
round  55:6
Route  27:2
routine
  169:16,17,
  21 187:21

233:4
Roxicet
30:10,12
  163:23
  164:5
  248:18
Roxicets
  35:17
  163:25
rules  6:18
  319:13
rumor  93:14
  122:19
  168:11
run  8:16
  10:5 36:22
  90:6
  139:25
  171:24
  172:8
  175:7
  198:11
  213:23
  272:24
  274:14
  275:5,21
  290:4
running  54:3
  55:3 62:15
  107:4
  145:13
  229:14
  262:17
  295:25
runway

307:19

_____

S
_____

S-L-O-S-A-R
  5:17
sale  48:23
  201:9
sales  10:20
  12:6
  252:25
Sally  97:19,
  20,21
  100:23,24,
  25 101:8
  102:12
  105:14
Salt  95:18
  301:18
Sandra  5:11
sat  25:18
  30:22
  39:14
  41:1,3,4
  43:10
  194:20
  220:20
  238:15
  250:12
satellite
  73:5
  220:18
Saturday
  16:15
  154:7

201:4
  318:20
Sauders
  131:12
  139:19
  140:12
  279:17
Sauters
  129:15
scared
  57:11,14,
  19 64:15
  229:21
  292:21
scene  54:13
  68:2
  119:23
  121:14
  199:15
  200:6
  260:18,25
  261:21
  262:9
  263:17,20,
  23 264:2,
  11 267:13
  270:18
  271:14
  293:19
  320:4
schedule
  24:12 62:7
scheduled
  32:8
school  8:24

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                    Index: schools..sheet

12:17,25
14:16
25:11
41:25 71:9
244:18
255:20
256:10,18
276:22,23
277:19

schools  8:25

Scott  18:13,
  16,21,25
  19:5 27:7,
  16 51:25
  67:9 74:4,
  8 76:1
  81:1,5,8,
  23 82:20,
  23 132:25
  134:15
  235:3
  244:18
  273:23,24

Scott's
  288:16,18
  312:19

Scrap  25:23

scratch
  164:7

screaming
  20:17
  269:1,21

season
  222:10

seat  272:23

secluded
  221:15

secondhand
  120:21
  122:8
  165:3

seconds
  233:20

seeking
  243:12

self-employed
  304:15

sell  10:15
  36:5
  124:20
  126:19
  169:22
  203:21
  204:1
  206:5
  208:8
  215:6,7
  259:24
  278:15

selling
  11:11
  41:24
  298:13

sells  54:17

send  76:14
  136:7
  217:8

sending
  314:8

sentenced
  141:13

separate
  180:15

separately
  71:19

September
  13:20
  63:24
  192:1
  318:14

sequence
  296:23

series  21:19

service
  58:20
  117:14
  118:1
  193:23
  236:1
  263:21,22
  270:19
  301:2,24
  303:4

services
  239:6

set  79:14
  112:14
  156:18
  157:1
  227:8

sets  113:21

setting  9:4

settlement

305:22,23
306:3,5

seven-hour
  188:15
  233:25
  286:25

shape  269:20

share  154:10
  230:4,7

shared
  128:16
  182:16

Sharon  23:4,
  15 24:15,
  20 25:8
  29:17
  244:3

Shawn  94:24,
  25 95:1,3,
  5,10 96:3,
  8,23,24
  108:15,16
  324:11

Shawn's
  95:11,12

Shawna  6:1

she'd  90:7,9
  153:11
  193:20
  203:19
  204:2
  310:14
  315:2

sheet  211:8

**shell**
140:14,15
221:9

**sheriff**
200:12
307:11
308:25
309:12,25
310:8,13

**Sheriff's**
66:12
307:14

**shining**
121:17

**shock** 20:21
40:6

**shocked** 46:2

**shop** 10:7,
24 169:10,
12,15,22
170:2
171:7,11
187:21
277:19
305:21

**shopped**
205:25

**shopping**
158:14

**short** 49:1
66:21
114:1
133:15
198:3
270:20

**shortly**
123:19

**shot** 223:10
231:10
251:18

**show** 74:2
77:18
110:22
127:3
201:7
272:19

**showed**
53:20,23
54:2 64:9
73:21
106:20
122:18

**shows** 237:22
270:25

**shut** 47:22
49:6 199:4
203:7
216:15

**siblings**
293:2

**sic** 222:12
233:12
284:21
291:9

**sick** 30:6
87:21
98:23
232:8
315:13

**side** 84:2

95:23
106:12
131:24
141:4
157:8
164:16
166:18
217:17
218:16,17
230:19
235:9
239:22

**sides** 65:21

**sidewalk**
230:21,24

**sign** 101:11
210:25

**signed** 26:8,
9 245:15

**silent**
195:10

**silver**
37:11,12

**Silverado**
37:17

**Simmies**
148:17,19

**Simmons**
148:20
149:13

**Simpson**
36:12,17
41:14,18
42:7,14

139:16
144:10,17
145:13
179:9
183:18
228:21,23
229:24
231:14
241:23
242:6
278:8
280:24
282:1,24
284:1,8
289:8
296:9

**Simpson's**
35:23
251:2
298:10

**sink** 80:7

**sir** 17:2
22:21 24:6
26:23
27:14 29:3
38:20
41:17
44:23
49:14,18
51:15
55:11
59:18
69:10
70:8,11
71:5,8,18
72:2 74:6
77:12

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                    Index: sister..sling

79:18
80:7,18,24
81:3,6,9
84:20
85:25 86:7
87:25
89:3,5,9,
12 91:6
92:3,5
93:9
103:3,8
106:22,25
108:20
117:5
118:8
125:2
132:3,22
134:14
145:15
149:10
154:5,12
155:11,17,
21 156:4,
14 164:11
168:11
176:6
177:17
178:23
179:3,18
182:8
186:23
187:24
190:13,16,
22 191:12,
22 200:7,
25 201:20
202:13,17
204:15

205:12
206:18
208:22,24
209:23
210:12
211:13
214:1
215:5
216:21
220:1,10,
13 221:5
222:23
224:11
231:20
232:21
235:4
239:5
244:2
247:10
249:8
250:16
266:9
272:5
273:4,24
288:21
292:24
294:18
307:7,9,12
308:1,15,
18,23
309:3,8
310:1,6
311:2
312:12,17
313:4,14
316:10
317:4
318:1,8,10

323:2,10,
18

sister  54:16
61:21 78:5
101:1,2
103:13
109:6,14
111:3
112:1
116:20,21
117:6
120:1
204:21
270:16
290:12
294:15

sister's
171:16,19
292:23

sisters's
56:9

sit  31:20
72:5 77:5
139:12
230:19

sites  62:17

sits  23:4
86:17

sitting  43:9
48:21,22
86:15
120:2
135:16
166:17,19
167:13

197:4
209:4
210:17
229:13
266:2
267:19
271:7
316:20

situation
31:22

Sixty-six
246:4

Sizemore
43:15,17,
21,22
44:1,17
45:4,8,12,
17,20,23
46:9,14,
20,25
58:9,12,
17,24
117:10,21
119:14,18
125:11
128:25
129:2
287:6
288:11
311:3,12
312:11,16

sketch
294:9,10

slide  73:6

sling  218:2

**Slosar**  5:17
 6:12 40:22
 67:3 69:7
 73:13,24
 74:22
 77:8,11,
 13,20
 81:20
 85:22
 87:6,16
 99:3 100:6
 104:20
 105:7
 111:24
 113:23,25
 114:15
 116:4,14
 118:7
 119:2
 122:11
 123:6
 124:16
 127:13
 129:10
 130:16
 131:14
 135:21
 136:4,10,
 25 138:2
 142:21
 143:18,24
 144:2,14,
 18 147:15,
 22 150:1
 151:9,11,
 20,25
 152:11,24
 153:6,9,14

155:4,12,
 15,25
 157:15,21
 159:12,23
 160:20
 161:5,15,
 18 162:11,
 21 163:1,8
 164:21
 165:15
 166:11
 167:2,25
 168:10,14,
 17 169:23
 170:3,23
 173:1
 174:9
 176:9
 177:8
 178:1
 180:10,23
 181:5,7
 182:5,9
 184:12
 185:5,8,14
 186:1
 187:4
 188:3,8,11
 189:8,19
 190:2,6
 200:20
 203:22
 207:11
 208:25
 209:8,11
 211:4,19
 213:14,19
 214:2,6

215:24
 216:23
 217:15
 218:9,15
 219:4
 223:8
 225:3,12,
 20 226:5
 227:3
 228:22
 229:9,19
 230:2
 231:11,17,
 21 233:17,
 21 234:24
 235:7,22
 236:21
 237:3,13,
 16 238:6,
 10,21
 239:1
 240:14
 241:24
 243:7,12
 247:22
 249:12,18
 250:4,20
 251:16
 252:2,7
 257:13
 259:1
 265:9
 266:17
 267:22,24
 268:8
 270:8,11
 271:9,11
 272:9,12

273:16
 280:7,13,
 16 282:3
 283:6,10
 285:24
 286:7,14,
 17 289:16
 290:25
 292:8,19
 299:8
 300:9,19
 301:10,13
 302:9,23
 303:9,11,
 16 304:5
 305:1
 312:4
 313:11

**slow**  176:21
 203:4

**smacked**  57:7
 228:10

**small**  86:4
 148:2
 234:19

**smarter**
 216:21

**smile**  315:12

**Smith**  12:5
 17:19 36:6
 42:21 43:1
 44:18 90:3
 124:9
 128:15,24
 136:17
 142:13

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018          Index: Smith's..standing

143:9,11,
14 147:13
184:1
206:10
255:24
274:5,7,8,
14,15
282:21

**Smith's**
35:15,19
36:8 42:24
43:5 45:18
58:13
117:19
301:16
311:5

**snapped**
55:14

**snort**  161:14
164:7

**Snow**  230:22

**socialized**
225:2

**sold**  11:7
27:19
36:21
47:18
100:14
168:9
194:3,5
213:13,24
245:14
257:23
285:11

**son**  18:19

69:20
103:6,9,10
324:11

**son's**  67:22

**sooner**
157:13

**sort**  12:21
14:7 24:21
26:11
81:12
183:7
193:23

**sound**  6:19
114:5
125:21
204:18
206:3
218:13
219:17
234:21
236:20
243:23
252:18
276:16
280:24
294:12

**sounds**
106:17
114:6,7
141:18
184:25
249:24
277:4

**south**  5:10
8:21 62:1,
10 105:1

**Spartanburg**
8:23

**spasm**  20:1

**speak**  64:21,
22 65:5
77:22

**speaking**
64:25
201:3

**special**  18:1
209:6

**specifically**
20:12

**speculation**
127:14
155:16
176:10
185:6
211:5
237:14
238:11
283:12
285:25
291:1
304:6
315:7

**speeding**
130:21

**spell**  48:11
87:14
102:3

**spend**  75:22
177:16,21
197:24
314:8

**spending**
162:25

**spent**  189:14
221:17

**split**
188:19,21

**spoke**  13:25
40:2 44:9
115:6
145:25
157:2
158:18
201:4
232:22

**spot**  72:15
86:16

**spots**  80:10
237:22

**spotted**
54:12
309:20

**Springs**
221:3

**square**  55:18

**stable**
50:15,17

**stake**  119:16

**stand**  202:19
229:3

**standard**
204:13

**standing**
36:13

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                     Index: stands..stepped

| | | | |
|---|---|---|---|
| 101:14 | **state** 61:24 | 305:21 | **staying** 22:8 |
| 218:1,3 | 62:7,14,16 | | 82:24 |
| 289:25 | 65:18 | **statements** | 92:22 |
| | 66:12 | 46:20,25 | 96:17 |
| **stands** | 70:6,10,23 | 56:22 | 182:10,12 |
| 135:18 | 128:4 | 116:7 | 184:8 |
| | 286:17 | 124:8 | 220:2,5 |
| **Staples** 5:19 | 309:21 | 322:14 | 225:22 |
| 91:4 92:15 | 317:10 | | |
| 314:10,25 | 320:8 | **States** 5:6 | **steady** |
| 315:6,23 | 323:4 | | 162:13 |
| 316:16 | | **station** | |
| 318:17 | **state's** | 63:5,10 | **steal** 86:1 |
| 319:2,6, | 318:3 | 221:9 | 169:21 |
| 11,14 | | | 170:19 |
| 324:3 | **stated** 56:21 | **stay** 15:18 | |
| | 133:10 | 45:17 | **stealing** |
| **start** 10:22 | | 85:5,9,14 | 85:21 |
| 161:17 | **statement** | 89:17 | 143:6 |
| 164:23 | 107:1 | 126:12 | 170:17 |
| 185:16 | 132:24 | 131:23 | 171:21 |
| 188:6 | 133:1,5 | 182:7 | 172:1,2,3 |
| 232:3 | 189:5 | 184:6 | 217:24 |
| 235:14 | 198:18,24 | 208:23 | 226:2 |
| | 201:11 | 219:15 | |
| **started** 6:17 | 211:14 | 223:14 | **Steel** 317:12 |
| 13:17 | 215:16 | 225:21 | |
| 22:19 | 218:5 | 312:20 | **stemmed** |
| 43:11 | 227:1 | | 168:15 |
| 137:22 | 228:18 | **stayed** 12:1 | |
| 138:10 | 231:6 | 18:18 40:9 | **step** 41:3 |
| 140:17 | 235:11 | 62:18 | 199:24 |
| 144:19 | 236:17,22 | 85:16 | |
| 161:16,20 | 238:13 | 120:1 | **stepfather** |
| 196:14 | 239:10 | 131:6 | 290:9 |
| 203:3 | 240:16,17 | 182:12 | 291:12,13 |
| 222:25 | 244:23 | 224:2 | |
| 256:24 | 245:7 | 232:7 | **Stephanie** |
| 297:11 | 268:23 | 260:18 | 97:17 |
| 304:12 | 284:18 | 291:20 | |
| | | 318:15 | **stepped** |
| | | | 79:22 |
| | | | 110:2 |
| | | | 157:7 |

229:2
279:14

steps  26:17

Steve  18:19
39:22

Stewart
159:7

stick  210:16
265:12

sticks
139:12

Stinking
19:13
86:19
103:19
186:3
247:11

stock  205:20

stole
164:20,22,
23 165:6,
24

stolen
165:13,20
166:6,9
168:21
171:15

stood  167:17

stop  35:22
87:15
101:11
105:14
130:7
144:7

145:4
183:1
188:16
242:24
247:1
248:11
250:10
281:4
286:24

stopped
39:25
48:13
138:15,21,
22 150:21
248:24
249:6
250:1,18,
19 255:3
258:15
280:3,4,8,
9 281:10
307:8
308:14

stops  257:12

store  17:14
42:3
83:21,23
99:4
117:25
146:1
181:14
193:5
212:8
232:15
302:18

stores
205:18,23

storm  19:2

story  133:19
310:10

straight
15:7 23:2
62:22
221:9
242:17
251:18
253:19
315:13
316:11,12

Stray  236:6,
8

street  11:25
17:19
24:16
25:11 52:6
119:25
226:8
244:16
287:12

stretch  7:20
138:5

strike
247:14

struck
195:14

stuck  167:19

stuff  10:24
11:2 12:16
34:14
48:13 78:4
82:8 83:3
117:25

138:7,9
143:7
146:18
169:8,9
184:20
202:5
204:22
205:2,6
210:20
212:22
226:24
228:2
241:17
275:4
279:9
305:22

stupid
128:10

Suboxone
30:4 32:12
204:4
259:9,23

Suboxones
203:2

subpoena
70:15

subpoenaed
117:1,4
302:13

Sudie  39:12
40:1 99:24
190:19
191:24
200:4
233:10
264:8

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                    Index: sued..talked

sued  316:22

suffer
  314:16

suffering
  314:18
  315:13

summer  82:4
  175:22

Sunday  15:6
  16:16
  141:21
  207:20
  232:7
  291:23

supplier
  185:25

supplies
  212:13

support
  152:5,19
  162:13

supporting
  164:16

supposed
  158:13
  165:21
  191:25
  244:5

supposedly
  194:12

surgery
  12:15

surprise
  127:4

suspect  46:9

suspected
  46:11

swallow
  164:9

swear  143:5

swearing
  58:3

sweat  29:7
  314:18

sweatshirt
  238:8

switch  68:11
  87:2 164:4

switched
  167:13

sworn  6:10

swung  247:16

Sylvia  89:24
  90:1,12
  91:5,10

system
  171:2,10
  182:17
  204:5
  290:4
  304:20

_____

T

table  43:10
  44:10 45:6
  47:4 56:22
  57:7 69:2

115:16
117:17
228:10

takes  61:25

taking  21:12
  47:13
  56:22 94:6
  174:4
  193:15
  287:7

talk  29:15
  42:4 57:3
  63:6 67:22
  87:19 99:6
  100:12
  104:18,22
  106:15
  108:21,23,
  25 109:2,
  10 110:8
  115:4,14,
  24 119:17,
  19,23
  120:18,22
  121:1,6
  122:7
  127:18
  131:12,19
  132:5,11,
  25 133:5,
  21 134:19
  135:3
  137:17
  139:16
  140:19,23
  141:4
  143:4

154:8
158:1
160:6
167:11
169:5
173:11
177:3
185:7
191:15,20
192:3,6
193:18,21
199:18
201:1,6
203:1,5
205:6,8
208:7
224:25
227:22,25
228:6,23
231:14
243:25
259:13
263:19
266:23
269:8
276:4
279:23
286:4
289:8
292:13,17,
20 309:11
310:3,12
317:23
318:5
321:22

talked  29:9
  39:19 40:1
  71:1 96:25

**AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.**
William Lester on 10/09/2018                    Index: talking..Taylor

97:1 99:5,
22 100:23
104:24
109:21
115:13
123:16
126:3
128:24
129:1,9
130:8
131:10,17
132:4
134:20
139:7,22
140:12
143:9,11
145:7
153:25
157:9
159:24
171:20
172:2,6
176:12
190:20
196:11,13,
24 197:7
199:19
200:3,5
207:6
208:2,5,15
216:13
218:25
224:1,9,
12,22
225:8,11
226:6
227:24
228:8,9,13

229:5
232:12
233:8,9,12
235:11
238:15
243:13
253:24
270:14
272:23
273:14
277:10
279:16
284:22,25
293:8
318:11
320:15

**talking**
43:11
47:17
60:21
75:16
88:12,24
96:6 97:22
98:25
100:2
107:11
109:4
115:4,8
121:13
122:12
128:13
135:6,16,
25 136:9
141:3
146:6
147:10
162:24
165:12

172:7
173:18,22
175:6
189:7
198:21
200:19
201:8
203:2,3
209:1
215:19
228:20
229:17
239:17
242:6
247:23
250:9
259:11,18
265:22
266:2,15
268:19
269:18
270:15
271:23
272:4
273:5
274:17
277:22
284:2
288:2,7
293:6
294:9
296:9,22
298:11,12
299:6,18
309:24
313:5
317:24

**Tammy's**  84:9

**tank**  76:15
80:8

**tape**  135:5,
6

**tapes**  129:21
135:7

**tar**  230:23

**tax**  75:11
212:21,22
303:19

**taxes**  75:4
77:9
303:24
304:11,12,
21

**Taylor**  5:18,
20 28:3
51:22
84:25
89:11
130:2
132:5
177:2,7
178:21
181:4,8
185:3
187:2
228:6,13
249:14
254:7
270:3
271:18,23
272:4
287:13

291:17
310:3,7,15
316:3
321:20
322:1
323:16

Taylor's
158:8
182:4,11
221:11
250:24
251:5
254:8
269:25
282:21
298:17

Tazewell
16:8

telling
121:9
173:24
250:11
263:8
269:19

ten   117:24
140:9
177:9
194:10
247:17
249:2,25
250:1,7
251:10
264:4
280:4
281:18

tend   7:11

Tennessee
8:11  16:9

tenth   275:10

terms   93:19

Terry   94:22,
23  95:9,15
96:3,12
97:4  324:8

Terry's
324:10,13,
14,15

test   116:9
135:14

testified
6:10 32:20
34:15 35:5
71:25
144:25
151:3
241:12
242:18
244:22
250:22
260:6
320:3,22

testify   35:6
70:12
132:17

testimony
6:24 26:10
73:25
119:3
209:12
211:23
214:7

285:15

Texas   63:1,2
127:17

text   94:14
296:4

texted
297:10

texts   297:11

Thanksgiving
16:19
87:12 88:6
102:1
171:16
175:2

That'd   291:8

therapy
93:14  94:5

there'd
105:3

Theresa   95:8

thief   201:22

thing   7:23
10:14 15:6
18:1 58:10
60:23
78:13
104:24
130:7
131:1,23
140:17
170:24
183:7
185:1
194:2

197:23
204:23
211:6
230:25
237:8
272:16
283:20
294:4,7
304:14
310:9
320:8
324:4

things   19:1
31:19
38:12,13
76:13
131:22
132:14
133:18
136:7
137:24
146:3,5
169:22
171:4
192:21
200:17
203:4,6
204:21
217:18
228:11
272:19
292:21
295:11
310:17

thinking
46:6 47:20
204:20,24

244:6,11
249:19
251:19
264:13
291:22
297:9
311:23
312:19

**Thirteen**
213:8

**Thirty** 30:18
209:13
251:7

**thirty-seven**
269:9

**thought** 46:3
64:5 93:6
171:25
186:20
195:1
217:21
234:25
261:10
268:25
269:17
281:14,21
289:11,12
296:21
309:19

**thoughts**
57:17

**thousand**
52:4 56:14
80:17
191:7

**threaten**
57:6 61:9

**threatened**
57:11

**three-hour**
35:13
301:8,21

**throw** 154:8

**Thursday**
104:25

**ticket**
130:21

**tie** 47:22
49:6
196:22
197:1
198:11
203:7
215:22
216:10,15

**tied** 118:15
128:20
235:6
264:14

**ties** 313:1

**tighter**
15:14

**til** 39:4

**tile** 9:21
76:16
173:10

**timber** 11:7,
12 47:19
49:9

194:3,5,9
195:3,12
198:10
213:13,24

**time** 5:9
7:18 13:18
14:17,20
17:4 19:21
20:7 21:2
22:10,22
23:5 24:15
28:5 30:25
31:6,19,21
32:16
33:25
35:11,13,
19 36:2,15
37:15,22,
25 39:7,17
40:5,19
49:21,24
50:14,20
52:6 53:8,
14 55:25
56:8,13,24
57:2 59:6,
24 60:3,8
61:5,6,23
63:17
64:1,2
66:24
67:2,10
68:8,13,16
69:8,11
72:18
73:18
76:22
79:10,14,

22 80:2,19
81:14
82:6,13
83:19,21
88:11
89:1,7
91:15
96:25 97:6
98:22
102:5
105:25
111:5
112:5,15
113:9
114:1
115:6
118:6,16,
18 119:6
121:12,18
122:5
123:20
125:17,23
127:25
129:4
131:18,25
132:8
133:15
134:11
137:7
139:21,22
143:21
144:16
145:17
147:5,8,
13,20,24
148:2
149:18
150:11

Case: 6:17-cv-00084-REW-HAI   Doc #: 200-107   Filed: 07/31/19   Page: 405 of 414 - Page ID#: 13472
AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018
Index: timeline..today

151:7
155:22
157:18
158:4
159:8
160:24
162:14
163:5,17
165:1,5
167:5
168:1
170:5,10
172:15
175:15,20,
25 176:21
178:17,18
179:4,9
181:3
184:23
188:19,21,
24 189:2,
15 197:7,
11 199:21
203:3
204:14
207:1
209:14
211:8,9
214:21
215:10
219:18
220:6
221:25
222:5,11
225:16,17
227:5,12
231:19
233:18,24

234:3,10,
20 235:25
239:11
240:10,12
242:21
245:19
246:10,16
247:11,21
248:2
249:1,7
250:8
251:22
252:16,19
254:23
255:3
256:20
259:6
260:17,22
261:17
262:3
264:25
268:15
269:8
270:9
271:1
274:24
277:7,24
278:12
280:1,20
281:16
283:4,9,18
284:12
285:2,23
286:7
287:22
289:18
293:25
294:12

297:8
299:25
300:4
301:21,23
302:3,8
305:2
306:18,21
311:16
313:19
314:13,24
316:13
318:11
319:16
321:13,19
322:14,18,
21 324:19

timeline
231:23
235:15

times  47:18,
21 60:4
63:16
79:21 85:3
88:8,14
89:17
105:17
114:20,21
125:15,18
132:16
133:16
147:18
148:15
149:6,17
177:9
185:10,11
186:6
193:2,9

203:20
216:14
229:12
232:9
255:1
259:5
268:10
275:24
293:8
299:22,25
300:7,21,
25 318:14

Timmy  48:21
141:9
198:3,14
219:9

tissue  64:7

title  26:5

today  5:8
6:18 7:4
8:18 48:19
62:3 72:5
77:5
126:22
139:12
154:4
188:19
211:9
242:16
252:1
260:6
267:19
271:7
286:20
306:24
323:23

toilet
  47:20,21
  49:6 197:2
  198:11,12
  199:4
  203:7
  216:15

told   11:3
  15:16 21:9
  24:10
  25:20
  29:13,17
  34:20
  43:12
  47:3,5,18
  54:8,9,11,
  15,20
  55:3,4
  58:1,9,10,
  13,14,16,
  21 59:3,13
  61:21
  62:25
  63:1,2,4
  64:13
  65:6,10
  68:2 86:14
  93:14
  94:2,5
  100:13
  101:19
  107:3,5
  108:14
  109:21
  110:2
  111:3
  112:2
  115:6,7

116:11
117:9
118:5,18,
21,25
120:3
122:13
123:12
124:7,9,
10,11,13,
14,17,19
125:5,7,
10,20
126:21,25
127:23
128:18,19
129:5,6,
12,19,21
131:22
132:7,14,
17 133:10,
19 139:13
140:18
142:9,10,
12,13
152:14
156:19,21
157:2
164:18
166:12,13
167:12
170:6
174:21
175:10
184:10
187:17
189:18
194:17
195:7,14,

15,20,21
198:19
200:14,18
201:10
202:15
203:16
212:7,15,
16 213:1
214:8
215:21
216:8,13,
14 220:21
226:16,17,
19 231:4
232:10
243:25
247:24
256:5
266:24
267:9
270:4
278:9,10
280:8,14
289:24
303:25
304:3,7,20
309:22
310:9,24
311:7
312:6,7,8,
10 317:13
323:14

Tommy   275:22

tomorrow
  48:18
  197:25

tonight   15:4

tools   170:5
  171:9
  221:24

top   106:7
  234:19
  237:5,23
  252:13
  259:16
  266:3
  267:17
  289:6
  291:9

Topaz   27:22,
  25 28:6,7,
  19 29:5
  30:17,19
  31:3,12
  33:16 34:7
  40:17,23
  158:10
  178:21
  179:4,19
  221:13

topic   171:25

torch   246:23

tore   117:15

torment   68:1

touch   56:23
  61:4
  318:16

tournament
  220:20

towed   245:13

tower   254:5

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                Index: towing..truck

towing  25:20
  27:1

town  17:20
  193:4,16
  249:2
  250:21
  253:15,21,
  22 275:22
  280:3
  287:10
  291:17
  318:22

tows  27:1

toys  170:19

Tracfone
  302:13,14
  303:2,3

Tracfones
  302:15

track  84:16
  145:8
  230:23
  237:18
  238:1

trade  236:24
  242:25
  243:16

traded
  236:14
  237:1,4
  244:23

trades  9:18
  12:22

trading

236:19

trailer
  20:2,9
  21:12
  34:25
  35:2,7,24,
  25 37:1
  40:16
  69:17 72:9
  83:5
  106:21
  108:12
  110:23
  112:7
  122:23
  173:25
  174:11
  261:6,12,
  15 262:23
  263:5,6
  264:2,12
  267:3

trailers
  19:5
  69:14,18
  226:9

trampling
  83:3

transcript
  44:25
  116:16
  149:9
  233:15
  234:7,14
  235:10
  246:8,22
  324:22

transfer
  26:13

Transmission
  38:1

transported
  63:11

travel
  179:7,15

Treadway
  23:19,20,
  23 24:1

Treadways
  11:15
  17:11,12,
  17,21 18:6
  22:12,15,
  20,23,25
  23:8 24:4,
  8,22 38:7
  71:4,7,12,
  16 72:1
  76:13
  223:4
  243:20
  244:17,19
  253:17,19
  280:2

treat  51:6
  154:22
  186:21

treated
  15:17,18
  187:6,8

treats  155:9

tree  19:2

193:1

Trent's
  39:12

Trents
  190:18,19

trial  70:13
  157:6
  192:1
  317:13,14

trick  20:24

trigger
  311:20

trimming
  193:1

trip  36:21
  279:3
  303:14

trooper
  320:8

troopers
  65:18
  323:4

trouble
  41:23
  209:16,18,
  20 228:3

truck  35:24
  36:3 37:1,
  10,17,24
  38:10,14
  48:14 97:3
  101:19
  197:21
  201:9

202:18,19
203:1
228:25
245:8,9
255:25

trucks
  256:14

true  92:1
  93:16
  109:22
  142:18
  168:12
  173:20,21,
  25  176:2,5
  181:16
  189:7
  202:14
  208:18
  209:10,15
  211:21,22
  228:21
  242:14
  258:8
  274:24

trunk  200:2

trustable
  216:24

truth  21:1
  137:2

truthful
  116:6,12

Tuesday  5:8
  124:18
  126:15

turn  54:9,

10 63:4
91:1,3
98:1,5
108:1,2
127:7
128:8
163:4
279:1
281:22
318:3

turned  61:5
  63:10
  101:22
  109:25
  123:19,21
  126:16
  163:2
  220:19,23
  243:1
  304:17
  319:24
  320:23
  322:14

turning  54:4
  126:25
  127:3,11
  128:10,22
  163:7

turnoff
  106:11

turns  93:20

TV  65:9
  73:3

Twenty-one
  259:15,16

two-thirds
  134:16

two-wheel
  37:10

two-year
  74:11

tying  9:3
  199:4

type  8:14
  9:18 10:5

types  76:19

typical
  314:19

——————————
——————————
U
——————————

uh-huh  9:13
  14:10
  18:11 20:6
  23:13
  24:23 29:1
  31:5 33:14
  37:13
  40:11
  41:15
  43:18
  44:19,21
  56:20 58:4
  59:10
  61:1,11
  78:24
  88:10
  99:11
  101:3
  107:12
  110:21

137:9
141:24
142:8
149:2
176:18
179:25
186:7
219:7
230:10
242:11
248:8
249:3
252:6
258:20,23
262:10
273:11
278:5
294:22
297:23
301:6
309:18

UK  220:19

ultimately
  35:12
  62:19
  63:7,19,22

unaccurate
  284:21

uncle  95:5
  143:1
  275:22
  295:10

understand
  6:24 7:12
  78:17 87:3
  154:22

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018         Index: understanding..wake

162:17,19
273:22

**understanding**
105:5
157:12,19
159:2

**understood**
20:1 50:10

**Unfolded**
45:6

**United** 5:6

**University**
61:20

**untruthful**
135:19

**upkeep** 19:5

**upper** 166:18

**UPS** 20:15
120:6

**upset** 93:3

**urgently**
297:25

**user** 160:21
187:18
313:6,9,12
316:9

**usual** 258:24

**utility** 73:1

─────────
**V**
─────────

**vaguely**
134:24

**Valdez** 81:9,
10,25
165:18
166:9
167:4
168:9

**Valdez's**
53:7,10

**validity** 7:4

**valuable**
125:21

**van** 166:19,
20 167:22

**varied** 18:7
72:3,6

**vary** 163:24

**vehicle**
27:19
36:12 37:7
52:13,17,
19 53:4,9
167:3,21
229:11
261:2

**vehicles**
37:15
72:17

**veins** 237:23

**verbally**
6:23

**Vernon**
195:22,23

**versus** 5:4

**victim**
190:11
233:3

**victim's**
191:6

**Victory**
236:6,7,8

**video** 5:1,9
135:15,20
139:8,10,
14 171:15

**videotape**
135:9,10,
11

**viewing**
36:17

**violence**
131:2
202:1

**virgin** 194:9

**virtue** 308:2

**visit** 123:23
145:24
146:8
149:16
156:5
177:12
193:7
205:11
209:19
230:18

**visited**
63:16
193:23

279:17

**visits** 125:5
211:3
292:22

**voice** 48:22
57:24
61:14

**voicemail**
296:6

**volunteered**
148:7

─────────
**W**
─────────

**wad** 45:13
278:21

**wadded** 45:5

**wait** 61:19
65:20
198:10
203:6
209:19
251:20

**waited**
251:6,11

**waiting** 32:2
158:15
209:5
251:4

**waiving**
286:23

**Wajers** 88:17
89:11

**wake** 22:2

Case: 6:17-cv-00084-REW-HAI   Doc #: 200-107   Filed: 07/31/19   Page: 410 of 414 - Page ID#: 13477
AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018          Index: waking..Wayne's

240:18

waking  22:13

Walgreens
  33:19
  34:19,24
  206:3
  257:3
  278:14
  285:10

walk  14:17
  110:16
  126:9
  146:1
  193:21
  197:16
  231:18
  233:16
  244:20
  246:16

walked  36:11
  48:23
  58:17
  101:16
  129:13
  183:1
  198:2
  199:19
  200:2
  201:8
  228:23,25
  258:16

Walker
  90:17,23

walking  44:4
  57:16
  93:21

121:18

Walmart
  54:17

wanted  24:17
  25:20
  44:13 67:5
  76:15 80:3
  113:19
  120:4
  128:3
  163:3
  193:18
  195:12
  202:8
  203:21
  206:7
  215:18
  222:10,17
  223:13
  236:18
  244:1
  245:1,8
  258:8
  259:13,23
  274:23
  316:6

wanting
  132:17
  232:9
  242:24
  300:2

Ward  277:13
warm  141:20
  175:3
  229:12,13
  243:17

Warren
  29:10,20
  32:6,11
  33:1,5,10,
  13 160:23
  203:24
  204:8
  205:10
  206:16
  208:19
  209:15
  210:11
  277:12,14,
  15

Warren's
  24:11 30:3
  31:7,8,11,
  15,24 32:2
  250:14
  251:12,21

wash  202:23

washing  80:8
  236:19,23
  237:1

Washington
  24:18 25:6

watch  135:8
  283:20

watched
  135:17
  145:2,3
  220:19,20
  225:7
  250:13
  251:5

water  11:25
  14:21,22
  73:1,4
  76:15
  79:8,16
  80:2,8
  175:11,16
  197:18
  304:23
  305:3,8,11

wave  193:21

Wayne  28:15,
  23 31:1
  34:5,8,9
  41:7
  102:18
  103:6,12
  105:13
  177:2,4
  178:2,9
  180:22
  181:2
  182:16
  192:16
  239:19
  249:11
  255:1,2,5
  282:21
  283:9,15
  291:10,13
  300:7,10
  316:5,10,
  19

Wayne's
  283:2
  298:14,16

**AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.**
William Lester on 10/09/2018                Index: ways..withdrawals

ways  57:17
  146:14
  289:4

we's  184:23

wealth
  188:21

wearing
  54:12

weather
  139:24
  140:2
  141:15,20
  203:4
  229:12,13

Weber  6:2
  319:5
  322:24,25
  323:3
  324:21,23

Wednesday
  63:2,5,9
  126:16
  156:24

week  18:7
  48:6 62:7
  72:3,8,11
  75:4
  104:17
  112:8
  113:14,17
  127:16
  139:2,3
  147:18
  148:15
  149:6,17
  150:19

162:24
163:10
181:13
193:10
207:8,9,
10,12,15
212:11
219:16
227:10
289:17
314:21

week's
  318:22

weekend
  139:1
  185:1

weekends
  198:6

Weekly  193:8

weeks  30:3
  127:22
  146:11
  197:12
  207:5
  220:3
  314:22

weld  8:15

welder  9:2

wells  146:18

Wendy  83:11,
  12,13,15,
  17 277:5

Wendy's
  277:8

Wes  199:24

Wesley  40:2
  47:25
  84:8,9
  142:10,11
  176:13
  196:8
  197:8,9,15
  198:19,25
  199:15
  200:3,5,8,
  11 201:1,
  19,23

wide  86:16

wife  10:25
  99:7,8
  191:14
  210:6
  252:15
  255:16
  256:7
  259:23
  273:6
  296:13
  311:9

Wiggins
  43:24

Wiggins'
  43:16
  311:11
  313:2

Willard
  255:24,25

William  5:2
  6:9 8:4

124:21
128:22
324:18

Williams
  5:13

willingly
  190:3

window
  101:13
  166:2,22
  167:24
  193:20
  229:8
  301:24
  307:19

windows  36:3
  229:14

winked  44:6

winter  82:6
  87:11 89:3

wintertime
  121:20

wired  38:8

wise  190:10

wished
  125:20

withdraw
  14:2 42:15
  228:16

withdrawal
  314:18

withdrawals
  29:9 249:9

AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.
William Lester on 10/09/2018                    Index: withheld..ws

**withheld**
  75:6

**withholdings**
  75:7

**woke** 238:16

**woman** 15:25
  189:12
  301:25

**wondering**
  316:20

**word** 110:4
  137:12
  237:18

**words** 195:22

**wore** 238:7

**work** 8:10,
  14,15,23
  11:13
  24:12
  29:12,16
  39:20
  62:6,14,16
  70:6 71:2,
  19 72:1
  79:17 80:4
  90:9,10
  97:2
  109:16,20,
  23 110:3
  127:2,16,
  22 146:18,
  22 162:13
  166:1,21
  167:6
  173:18

176:16,21
187:16
204:3
212:12
241:13,14
242:17,18,
20,22
245:2,3
249:15
252:22,24
274:10
276:1
278:1
287:8,9,25
309:16
317:18
318:22

**worked** 8:12
  9:23,25
  10:12
  11:18 12:8
  64:25
  71:8,9
  76:8
  109:14
  110:9
  141:6
  167:7
  193:2
  195:11
  249:16,19,
  21 252:22
  255:13
  304:12
  307:14
  321:14

**working**

17:9,15
18:5 23:6,
7 50:18
71:4 83:20
108:6
241:15
252:16
285:2
295:24
300:23
301:19

**works** 23:16,
  18,19
  109:15,16
  249:23

**worried**
  266:7,25

**wrapped**
  101:14

**wreck**
  305:24,25

**wrecks** 178:5

**Wright** 5:21
  17:3 19:6
  28:25 35:9
  36:19
  39:18
  40:21
  45:14
  46:16,22
  50:12,16,
  23 51:8
  53:11
  54:23
  57:1,12,21
  61:7 65:16

66:1,18
68:10,17,
20 147:9
188:1,5
189:3
213:17,22
231:25
232:2
234:1,11
238:24
243:10
286:10,15
287:1
302:2
306:15
324:2,4,6

**write** 26:6
  212:18,19

**written**
  208:13

**wrong** 17:23
  37:22
  101:17
  121:11
  149:11
  178:5
  186:16
  217:17
  238:22
  252:10

**wrote** 26:7
  77:25 78:1
  204:4,5
  212:24

**ws** 258:10

**AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.**
William Lester on 10/09/2018                    Index: XBOX..you's

---

**X**

XBOX   236:14

---

**Y**

y'all   33:15
  50:10
  93:19
  155:23
  183:5
  226:1
  290:12
  292:17

yard   39:12
  122:17
  230:24
  246:17
  264:8

yards   186:4

year   10:19
  12:2,10
  13:19
  15:2,9
  53:22 64:3
  85:18
  87:14
  141:15
  149:19,20,
  21 155:6
  160:5
  163:6
  170:15
  175:4
  177:5
  181:12,21
  201:5

203:3
304:16

Year's   15:2

years   8:13,
  25 9:9
  10:12
  11:10
  13:7,12,13
  14:10
  18:17
  32:18 42:1
  50:6 63:23
  64:18
  66:15 74:9
  98:20
  99:20
  138:17,18
  151:19
  200:16
  213:6,8
  215:11
  247:23
  251:23
  257:21
  296:16
  303:2
  313:16

York   5:22
  47:6,8
  53:20,23
  54:2,18,25
  55:8,9,23
  56:1,6,11,
  14,23
  57:6,23
  58:7,12,23
  59:2,7,16,

21,23
60:4,5,10,
13,21
61:4,9
63:17
64:13
68:20
106:16
110:9,13
111:10,12
112:6,9,18
113:9,13,
18 114:16,
17 115:1,
5,6,14,19,
22,23
116:3,7,
12,18
117:1,9
122:23
123:8
124:5,19
125:6,7
126:25
127:10
128:16
129:1,7,
20,23,24
130:8
131:11,13,
21 132:6,
8,12
133:10,23
134:25
135:4
139:17,19
140:25
143:10

148:4
172:25
175:6
189:5
198:18,24
203:15
204:16
206:1
211:15,17
215:17
218:5,20
219:19,25
224:15,21,
25 225:9
226:16,21
227:1,13,
15 228:10,
19 234:15
235:16
238:13
245:7
246:10
248:23
251:25
256:20
284:18
308:22
309:1
310:15
312:6,10
316:22
320:16
323:8

York's
  123:23
  188:12

you's   124:25

**AMANDA HOSKINS, ET AL. vs KNOX COUNTY, ET AL.**
William Lester on 10/09/2018

**young**  12:24

**younger**
  189:12

**yup**  72:4
  259:17
  293:1