IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF KENTUCKY

| | | |
|---|---|---|
| AMANDA HOSKINS, et al., | ) | |
| | ) | |
| PLAINTIFFS, | ) | |
| | ) | |
| v. | ) | CASE NO. 17-cv-84 |
| | ) | HON. ROBERT E. WIER |
| KNOX COUNTY, et al., | ) | |
| | ) | |
| DEFENDANTS. | ) | |

_____

### **Expert Report of John J. Ryan**

1.  My name is John Ryan.  I have been actively involved in police practices and law enforcement since 1981.  I was an active police officer for twenty years.  In the final year of my active career and since my retirement in June of 2002 from police services, I have been involved in police and law enforcement practices as a private consultant regarding law enforcement issues.

2.  My education includes a Bachelor of Science Degree in the Administration of Justice from Roger Williams University in Bristol, Rhode Island; a Master of Science Degree in the Administration of Justice from Salve Regina University in Newport, Rhode Island and; a Juris Doctor Degree from Suffolk University Law School.

3.  From 1993 until 2002 I served as an adjunct faculty member in the graduate Administration of Justice Program at Salve Regina University in Newport, Rhode Island.  In that capacity I was responsible for graduate courses on Constitutional Issues in Law Enforcement; Police Misconduct/Civil Liability; Managing Police

Organizations; Contemporary Issues in the Justice Field; Juvenile Justice; Mental Health Law; and Business Crime.

4. Since 2000, I have written several manuals for use by police officers. Two of these manuals are extensively used by Rhode Island Law Enforcement agencies. These manuals are: Rhode Island Law Enforcement Officers' Guide to Criminal Procedure, 2000, and Rhode Island Law Enforcement Officers' Bill of Rights, A Guide to Investigations and Hearings, 2000. The other manuals are nationally distributed by the Public Agency Training Council as materials used in conjunction with training programs for public employees. These manuals are: Legal and Liability Issues in the Public Schools, 2001; Policy Development for Public Safety Agencies, 2002, Civil Liability and Risk Management for Law Enforcement Agencies, 2003, Use of Force, 2004, Administrative Investigations In Law Enforcement Agencies, 2004, Legal and Liability Issues for Hostage Negotiators, 2005, Public Safety Media Relations (Manual and Guide) 2005, Arrest Search and Seizure, 2005, and Law and Best Practices for Successful Police Operations, 12 High Risk Critical Tasks That Impact Law Enforcement Operations and Create Exposure to Liability Litigation 2007, 2010, 2013 and 2016 editions, Legal and Liability Risk Management Manual Guide-The Law and Best Practices of Successful Jail/corrections Operations 2009 and 2016 editions.

5. I also author an annual publication for law enforcement officers titled, Case Law for Critical Tasks in Law Enforcement. This field guide provides officers with a legal update on critical tasks such as search, seizure, use of force, pursuit,

investigations and interrogations.  This guide has been adopted by agencies around the United States for use by law enforcement personnel.

6. I am currently the co-director of the Legal and Liability Risk Management Institute along with James Alsup, and Lou Reiter.  In that capacity I author and edit the institute's legal update service for law enforcement.  This update service and an archive of all articles that I have written can be found at www.patc.com and www.llrmi.com.  Additionally, I provide multiple on-line video roll-call trainings annually for both the road and jail operations. This on-line roll-call series is a subscription service offered by the Legal & Liability Risk Management Institute.

7. As part of the Legal and Liability Risk Management Institute I also conduct policy, training and operations reviews for law enforcement agencies and jails throughout the United States.  These reviews focus on the manner in which agencies treat the critical tasks in law enforcement and jail operations.  As part of these reviews I assist agencies in identifying areas in policy, training and operations that may be improved upon to bring the agency within the legal mandates and generally accepted practices in law enforcement and jail operations.

8. Since 1993, I have conducted numerous training sessions for public employees. Participants in this training have included law enforcement officials, school officials, attorneys and judges.  I have provided training in the following areas:

    a.  Policy development for public safety agencies.

    b.  Legal Issues in police use of force.

    c.  Legal Issues in internal affairs investigations.

3

    d.  Police misconduct/civil liability.

    e.  Legal/Liability Issues in Narcotics Operations.

    f.  Arrest, Search and Seizure, & Interrogation.

    g.  Racial profiling.

    h.  Legal issues in public schools.

    i.  Media relations for public safety agencies.

    j.  Constitutional update for law enforcement officers.

    k.  Basic training for detectives.

    l.  Law enforcement officers' bill of rights/due process in administrative investigations.

    m.  Legal/policy and decision-making factors in law enforcement pursuits including use of force/intervention tactics.

    n.  Legal and policy Issues for hostage negotiators.

    o.  Legal and liability issues for SWAT operations

    p.  Legal and liability issues for jails

    q.  High Risk Critical Tasks/Best Practices in Law Enforcement Operations.

9.  I am a former police Captain of the Providence Police Department in Providence, Rhode Island where I served for twenty years before retiring in 2002.  During my tenure as a police officer I served in the following capacities: patrol officer in both the Patrol Division and the Tactical Unit; a detective in the Detective Bureau; a sergeant in the Patrol Division; a lieutenant in the Patrol Division; Director of Training; Director of the Department's Office of Public Affairs and; Director of

the Department's Administrative Staff.  During most of my career I also took an active role in researching and authoring department policy.

10. Since my retirement in June of 2002 I have taught numerous courses on police policy and procedure, arrest, search and seizure, use of force, police pursuits, dealing with the mentally ill, emotionally disturbed, and suicidal, domestic violence, law enforcement's response to autism, law and best practices in the internal affairs process, civil liability for law enforcement agencies, and specialized courses for narcotics officers, SWAT commanders, and internal affairs officers.   Participants in these courses have come from thousands of law enforcement agencies around the United States.  Officers in attendance have come from departments with under ten sworn officers and departments with sworn officers numbering in the thousands.  These programs are conducted numerous times annually throughout the United States and also include on-line courses on these topics for law enforcement.

11. The course on policy and procedure focuses on critical tasks in law enforcement and includes, inter alia, policy issues relating to use of force; police pursuits; domestic violence; sexual harassment and external sexual misconduct; off-duty conduct; hiring & retention issues; internal affairs; supervisory practices; search and seizure; property and evidence; care, custody and transport of prisoners as well as training issues relating to critical tasks in law enforcement.

12. The program on High Risk Critical Tasks/Best Practices in Law Enforcement includes instruction on Use of Force including inter alia: dealing with individuals of diminished capacity i.e. emotionally disturbed, mentally impaired; and

suicidal, excited delirium, as well as persons with disabilities and use of electronic control devices; Search-Seizure and Arrest; Pursuit and Emergency Vehicle Operation; Care, Custody, Control, and Restraint of Prisoners; Domestic Violence; Off-Duty Conduct; Sexual Harassment, Discrimination, and Misconduct; Selection and Hiring; Internal Affairs; Special Operations; and Property and Evidence.

13.  As a co-director of the Legal & Liability Risk Management Institute I regularly research and draft policies for law enforcement agencies and jails relating to high-risk critical tasks including use of force, arrest-search & seizure, pursuit, emergency vehicle operation, special operations, internal affairs, hiring and selection-retention of officers, care-custody-control & restraint of prisoners, sexual harassment-discrimination & sexual misconduct, domestic violence, arrest procedures, care, custody, and control of persons with disabilities, and dealing with the mentally ill.  In addition, I write, record, produce, and distribute on-line training videos for law enforcement nationwide.

14. In 2002, I was a featured speaker at the national conference for the International Association of Law Enforcement Planners, which was held in Long Beach, California.

15. In 2002, I was a featured speaker at the National Internal Affairs Investigators Association conference, which was held in Tampa, Florida.

16. In 2004, I was a featured speaker at the Rhode Island Bar Association's Annual Meeting, speaking on Constitutional Issues related to Law Enforcement practices.

17. In 2005, I was a featured speaker at the National Sheriffs' Association Annual Conference, held in Louisville, Kentucky, where I presented training for legal advisors on Internal Affairs and Employee Discipline.

18. In 2005, I was a featured speaker at the annual national conference for Public Risk Managers (PRIMA) in Milwaukee where I conducted training for risk managers and attorneys representing police departments. One of the trainings involved use of force while the second covered the high liability areas in law enforcement operations to include arrest, warrants, and other issues involving search and seizure, as well as police pursuits.

19. I have been a featured speaker annually, to include the 2011 session, of Georgetown Law Center's annual §1983 Civil Rights Litigation program. I have regularly presented materials related to law enforcement policy, training and supervisory practices as well as use of force. In 2009 I presented materials for two sessions one of which was on the use of TASER and one which was a panel discussion on strip searches. I have been published annually in materials from Georgetown Law Center related to this program. The 2011 session was focused on reviewing current law enforcement practices and civil liability related to TASER.

20. In November of 2005, I was a featured speaker at the annual National Conference of the National Leagues of Cities & Towns in Seattle, Washington speaking on Contemporary Liability Risks for Law Enforcement Agencies.

21. In October of 2006, I was a featured speaker at the annual conference of National Internal Affairs Investigators' Association in Gatlinburg, Tennessee.

22. I have also provided lectures for attorneys on civil rights litigations relating to law enforcement operations, including a November of 2006 presentation for the Georgia Bar Association's ICLE program.

23. In 2007 I was a featured speaker at the annual conference for the International Municipal Lawyers Association.

24. In 2007, 2008, 2009, 2012 and 2013, I was a featured speaker at the Practising Law Institute's Annual Section 1983 Civil Rights Litigation program. My 2007 presentation in this program resulted in a law review article in the Touro Law Review (Volume 24, Number 3, pages 569-600) "Recent Developments in the Use of Excessive Force by Law Enforcement" Karen Blum/Jack Ryan. It is noted that my materials have been included in their annual publication related to this program.

25. In 2008 I was a featured speaker at the annual conference for the Association of American Law Schools, Civil Rights section, where I presented material on law enforcement policy, training, and generally accepted practices in pursuits and use of force.

26. In 2009 I was a featured speaker for the national conference for public risk managers.

27. In 2009 I conducted executive level training on law enforcement pursuit operations for the Utah Highway Patrol.

28. In 2009 I was certified with TASER by the Muncie Indiana Police Department by a TASER certified instructor.

8

29. In 2009, I was a featured speaker at the Annual Kentucky Tactical Officers' Association Conference where I lectured on high risk tasks in tactical operations including high risk entries.

30. In 2009 I was the featured speaker at the Alabama Attorney General's annual "Law Enforcement Summit" where I lectured on high risk critical tasks in law enforcement to include use of force, pursuit, arrest, search and care, custody and control of prisoners.

31. In 2010, I was a featured speaker at the annual national conference for PRIMA where I presented a law enforcement risk management program titled: "Promoting Professionalism while Reducing Liability; The Impact of Policy, Training, and Supervision and Auditing Strategies."

32. In 2010, I was a featured speaker at the National Internal Affairs Investigators Association annual conference held in Indianapolis, Indiana where I lectured on Bias Free Law Enforcement/Profiling.

33. In 2010, I was a featured speaker at the annual conference of the National Council of County Association Executives, where I spoke on law enforcement liability and strategies to reduce liability by increasing professionalism.

34. In 2012 I developed a training program for law enforcement and attorneys dealing with use of force; electronic control devices; and sudden custody death.  This program, which I am presenting throughout the United States is accompanied by a text manual which I wrote and is also being distributed nationwide.  As part of this program I have trained thousands of officers with respect to the expected and

9

appropriate response in dealing with persons who have been injured or otherwise shown physical distress during the subdual process.

35. In 2012, I was a featured speaker at the National Internal Affairs Investigators Association Annual Conference where I spoke on Use of Force and Sudden In-Custody Death.

36. In 2012 I was a featured speaker at the Texas Commission of Law Enforcement Officers Standards and Education where I presented to law enforcement trainers from throughout the State of Texas on training liability and the need for training in the high-risk critical tasks in law enforcement.

37. In 2013, I was a featured speaker and panel member in a program titled "Policing in Trying Times" at Suffolk University Law School in Boston Massachusetts.

38. In 2013, I was a featured speaker at "Police K-9" magazine's national Handler Instructor Training Seminar, an annual conference for K-9 handlers and trainers. This presentation focused on the law and best practices for use of law enforcement K-9s as a tool of apprehension.

39. In 2015, I was a featured speaker at the spring conference as well as the annual conference of the International Municipal Lawyer's Association. The presentation topic was officer involved shootings and qualified immunity post Plumhoff.

40. In 2015, I was a featured speaker for the annual conference of IADLEST, International Association of Directors of Law Enforcement Standards and Training. My topics included "Training Liability" and "Emerging Liability Trends."

41. In 2015, I was a featured speaker at the Georgia Jail Association's Annual Conference in Savannah, Georgia where I presented topics relating to high-risk critical tasks in the jail operation.

42. In 2015, I was a featured speaker at the Arkansas Association of Chiefs of Police annual meeting where I presented materials on the Law and Best Practices for Policing in Trying Times.

43. In 2015, I was a featured speaker at the South Carolina Municipal Association's Annual Meeting for Elected Officials where I presented materials on Law Enforcement in Trying Times as well as covering issues related to law enforcement body cameras.

44. In 2015, I was a featured speaker for the Texas Commission on Law Enforcement where I provided training for 750 law enforcement trainers from throughout the State of Texas covering topics related to law enforcement liability and proper training.

45. In 2015, I was a featured speaker at the National Internal Affairs Investigators' Annual Conference where I presented training on emerging trends in law enforcement liability and the interplay of the Internal Affairs process with agency liability.

46. In 2016, I was a featured speaker at the annual conference of the Defense Research Institute in Austin, Texas.

47. Since 2002, I have been involved in the auditing of law enforcement operations throughout the United States conducting several audits annually based on either a need or as a proactive measure of agency performance in the high liability areas

of the road and jail operation.  I have been involved in assisting dozens of departments nationally through these audits in developing policy, training, and enhancing operations for law enforcement services.

48. My experience, training and background are more fully described in the attached curriculum vitae, which I incorporate by reference to this report.

49. I have reviewed the following materials to date regarding this case:

1. Complaint
2. Deposition Transcript - Amanda Hoskins 3-16-18
3. Deposition Transcript and Exhibits - Jason York
4. Deposition Transcript - Derek Eubanks 6-6-18
5. Deposition Transcript - John Pickard Revised 3-22-18
6. Deposition Transcript - Jonathan Taylor 4-13-18
7. Deposition Transcript- James Allen Helton 4-9-18
8. EXH 1 Pl 27706 David Fox 12-3-2011 Audio
9. EXH 4 WS_30067 Grand Jury Audio
10. EXH 6 Pl 009652 – Amber Simpson
11. EXH 13 PL 009650 – Kayla Mills Audio
12. EXH 32 Amanda Hoskins Audio
13. Hoskins Response to Def. City of Barbourville discovery request
14. Hoskins Response to Def. Dallas Eubanks discovery request
15. Hoskins Response to Def. Farris discovery request
16. Hoskins Response to Def. Johnson discovery request
17. Hoskins Response to Def. Joseph discovery request
18. Hoskins Response to Def. Mefford discovery request
19. Hoskins Response to Def. York discovery request
20. Pickard Responses to RFPD
21. Plaintiff's Answers to Discovery – Pickard
22. Responses to Def. Knox County Interrogatories
23. Taylor Response to Def. City of Barbourville discovery request
24. Taylor Response to Def. Johnson discovery request
25. Taylor Response to Def. Joseph discovery request
26. Taylor Response to Def. Mefford discovery request
27. Taylor Response to Def. York discovery request
28. Taylors Response to Def. Dallas Eubanks discovery request
29. Taylors Response to Def. Farris discovery requests
30. CV and Expert Report – Charles Drago
31. Plaintiffs' Rule 26(A)(2) Disclosures
32. Summary letter of deposition of Dr. Jeffery Neuschatz, PhD. By Jason Williams, Esq.

12

50. This expert report is based upon the materials provided to this date. The opinions presented in this report are based upon my specialized experience, training and knowledge of police practices as well as my continued research and work with law enforcement nationally. This work includes conducting training for law enforcement around the United States as well as auditing the policies and operations of law enforcement agencies around the United States. My opinions are provided with a reasonable degree of certainty within the fields of law enforcement, police activity and police administration and supervision. I am familiar with police civil litigation and know the normal phases of discovery. With this in mind I recognize that there may be additional documentation as the case progresses.   In the event that additional material is produced I shall be prepared to supplement this report.

51. At the outset it is important to note that this report is based upon the facts as presented by the material and specifically avoids drawing conclusions based upon credibility issues of the parties.

Deposition of Jason York

52. York testified that he has lied to witnesses as a tactic during investigations. (12). York acknowledged that he used this tactic during the investigation into the death of Katherine Mills. (13). York noted that everything he did was documented in the case file or recorded. (13).   York acknowledged that he has yelled at witnesses during homicide investigations while questioning them as a tactic.  (23).   York

13

acknowledged that he also threatened witnesses during the interview process. (24-25).

53. Detective York testified that he documented every witness with first-hand knowledge who provided information but did not document when persons did not give him first-hand information. (15-16).

54. York denied showing Michael Crump photographs of Jonathan Taylor and reported: "There was a police officer in Oklahoma that did. (16). York did not recall showing Crump a single photograph of Taylor during the investigation.

55. Detective York testified that he informed Kayla Mills that he had an arrest warrant for her for murder and Mills responded: "by telling me that she wasn't a part of it, that it was Jonathan who killed her. (29).  York testified that he had gotten his information regarding Kayla Mills involvement in the murder from several witnesses, one of who he identified as Heather Warren. (29).   York acknowledged that after Kayla Mills gave her statement she was allowed to leave law enforcement custody "because when she gave her statement, at that point, we did not feel like that she was involved in it." (31).

56. In describing his belief that there had been probable cause to arrest Kayla Mills, York testified: "As far as—again, if we want to—I need to start back, starting with Michael Crump that as he drove by the house in the morning, that he saw a blue car with a blonde female in it, and a male subject coming around.  Now, could he positively identify the female? No, but given the other aspects of the investigation, as far as the statements that Amanda Hoskins had made that—that would—and Christy Branson and all the other ones that indicated that Amanda was involved,

14

that Jonathan was involved, and Jonathan was dating Kayla at the time was all that information felt like there was probable cause." (32).

Documents

57. In a criminal complaint dated March 14, 2012 Detective York sought a warrant for Kayla Mills for the December 20, 2010 murder of Katherine Mills, indicating that Mills had unlawfully "committed the offense of murder and robbery 1st by taking the life of Katherine Mills and by taking approximately $12,280.00 from her residence." (Exhibit 12).   As a result of this signed complaint, a warrant was issued by the Knox Circuit Court on March 14, 2012. (Exhibit 12).

58. In a crime supplement report Detective York summarized a March 16, 2012 recorded statement given by Kayla Mills in the presence of her attorney, writing: "Kayla Mills stated that she dated Jonathan Taylor, I asked Kayla to tell me about all the times Jonathan talked about killing Katherine Mills.  She stated she knew he had it in him to kill somebody and that was the reason she broke up with him. Kayla stated she was afraid Jonathan Taylor was going to kill her.  Kayla Mills stated Jonathan Taylor confessed to killing Katherine Mills a lot to her.  She stated he would say I done left one lying up on the creek and I don't care to leave another one.  Kayla stated Jonathan never went in details on how he killed her but that he felt guilty because of it.  Kayla stated that Jonathan brought up Amanda Hoskins and William Lester and the money that was taken from Katherine Mills.  Kayla went on to describe how William Lester told Jonathan that Law Enforcement was going around to all the drug dealers and asking if they had spent a lot of money.

Kayla stated William was really worried about the police asking questions."
(Exhibit 11).

59. In a supplement report in the case, Detective York documented: "On 01-21-11 this unit took Allen Helton and Jesse Lawson for a polygraph in Frankfort. Allen Helton is a person of interest in this case. He and Mike Simpson went to Florida the day that Katherine Mils was robbed and found dead. Allen had stated to this unit prior to the polygraph that Mike Simpson did not have any money the day before Katherine was robbed. Allen stated that Mike had told him on Sunday, 12-19-10, that he would have the money the next day. Allen stated to this unit that Mike paid for the trip to Florida, including renting the car from Enterprise Car Rentals in Middlesboro. Allen also stated when they were on there (sic) way back Jesse Lawson called Mike Simpson and Mike started crying when Jesse told him Katherine was dead. Allen also stated to this unit Jesse told Mike the State Police was looking for him." (Exhibit 14). York wrote: "Investigative Note: When I first located Mike Simpson after he and Allen got back from Florida, the first thing he did was hand me a sticky note with list of person's that was his alibi. This was handed to me before I asked him any question's or told him why I was there to talk to him. This was on 12-24-10, a copy of the sticky is attached to this case. Jesse Lawson is married to Katherine Mills grand daughter, Jennifer Lawson. Jesse had stated to this unit he called Mike to try to buy a pain pill. He stated when he asked Mike about Katherine that he started to cry. Jesse also stated that Cleo Brown had told him that Mike Simpson was seen at Katherine Mills residence the day she was robbed and found dead. I have interviewed Jesse

16

several times and every time I interview Jesse, he gives this unit more information about the incident with Katherine.  Allen Helton polygraph examiner was Richard Kurtz U/1505. (Exhibit 14). Mr. Kurtz concluded that deception was indicated when Allen Helton was answering material questions about the murder during the polygraph. (Exhibit 14).   It is noted that an Enterprise Rental agreement showing a vehicle rented by Michael Simpson on 12/20/2010 at 2:06 p.m. with a return date of 12/23/2010 was paid with either cash or a check. (Exhibit 16).   The agreement showed an initial payment of $400.62 with a $66.46 refund upon the vehicle's return.  (Exhibit 16).

60. A KSP polygraph report for a polygraph of James Helton indicated: "Investigation disclosed between December 19, 2010 to December 20, 2010, at 6845 KY 223, DeWitt, Kentucky, the victim, Katherine MILLS, was found near her back porch, with an injury to the back of her head, unresponsive and later pronounced dead at the scene.  Investigator found that only the victim's purse seemed to be out of place, as it and the contents were found on the floor including $500.00.  It was later discovered by investigator that approximately $12,280.00 was stolen from the victim's purse.  The examinee is suspected in this investigation because he was known to leave for Florida on the same day of the victim's death and was traveling with Mike SIMPSON.  Both men were known not to have any money before the victim's death, but had a large amount of cash on the day of her death to rent a vehicle and travel to Florida for a doctors appointment.  The examinee lived just down the road from the examinee.  The examinee was interviewed,

17

denied any knowledge or involvement in victim's death and is willing to undergo a polygraph examination." (Exhibit 18).

61. In a supplemental report Detective York wrote: "On 3-08-12 at approximately 1513 hrs I took a recorded statement from Allen Helton, DOB 01-14-80, reference the murder of Katherine Mills.  Present at the interview was Sheriff John Pickard. In an earlier conversation he stated he knew who was involved with the murder of Katherine Mills and saw some money the individual had stolen.  [Helton] stated that on Sunday, 122-19-10, he was pumping gas at Escoes Market in Dewitt, when Amanda Hoskins and William Lester approached him.  Allen stated Amanda asked him if he wanted to make some money and told him how.  I then asked him to explain how, Amanda told him about tying an old women up when she came out to the bathroom.  I then asked him if she stated which old woman he was and he replied Katherine.  He went on to state Amanda described her as Williams Lester ex-mother-in-law.  I asked Allen how did they know Katherine came out to the bathroom every morning and he stated William knew.  I asked Allen if he wanted to be a part of it and he stated he said no.  Allen also stated Amanda told him Katherine had $15,000.00 dollars. Again I asked about the details of tying her up, he said the plan was to lock her in the outhouse, that was what he meant by tying her up.  Allen stated the next morning, 12-20-10, he was going to see his father at Larry Smiths when he saw William Lester's car traveling on KY 223. This would be less than one half mile from Katherine Mill's residence.  Allen stated that was between 0815 hrs and 0830 hrs.  I asked him how he knew it was William Lester's car and he stated he knew it because of the place on the hood.

18

He was referring to William's Chevy Camaro.  Allen stated that after he left seeing his dad he went to Mike Simpson house on Moore's Creek. Allen stated he did not drive by Katherine house because he knew what was going on and figure the law would be coming there.  I then asked him he knew they was robbing lady, Katherine, and he stated yes.  Allen stated around 1200 hrs he saw William Lester and Amanda Hoskins at Mike Simpson's residence at Moores Creek.  I asked him if they told him they had done it.  He stated Amanda Hoskins told him they got the job done, referring to robbing Katherine Mills.  Allen stated at that time he did not know they had killed her, he thought they tied her up and took her money.  I asked Allen if they had the money they had stolen from Katherine and he stated yes.  Allen stated Amanda had approximately four thousand dollars one her.  Allen state Amanda Hoskins had the money folded up like you would put a rubber band on it.  Allen stated Amanda told him the money came from the job, robbing Katherine Mills.  He stated Amanda put in order to him and Mike to buy drugs in Florida.  Allen stated it was true that Mike Simpson knew William and Amanda was going to rob Katherine but did not know they were going to kill her.  He stated Mike found out and started crying when Jesse called and told him when they were in Florida.  He then stated he heard Jonathan Taylor helped Amanda rob and kill Katherine Mills but Amanda never told him that." (Exhibit 19- Exhibit 20).  It is noted that in a summary of a statement given by Mike Simpson, Simpson denied hearing the statements made by William Lester about Katherine Mills. (Exhibit 24).

19

62. In a letter to Jackie Steele, Sheriff Pickard wrote: "On 3-27-2012 former Deputy Roy Gambrel arrested James Allen Helton on a warrant for receiving stolen property U/$10,000.00.  Former Deputy Roy Gambrel then brought James Allen Helton to the Sheriff's Office to speak with me; James Allen Helton told me that if I would help him with the receiving stolen property charges that he could give a lot of information on the Mills ladies murder.  I told James Allen Helton that if his information was true I would see what could be done on the receiving stolen property charges.  I then contacted Detective Jason York and Det. York came to Sheriff's Office and interviewed James Allen Helton.  I was never contacted or made contact to assist James Allen Helton with his charges, according to court net and former deputies Roy Gambrel and Adam Townsley the victim in the receiving stolen property case wanted restitution in the amount of $550.  James Allen Helton plead to receiving stolen property u/$500 and ordered to pay restitution in the amount of $300 codefendant Michael Simpson took same plea and ordered to pay restitution in the amount of $250." (Exhibit 22).

63. On 5/18/2015 Detective York wrote a supplemental report asserting: "On 5-18-2015 this unit talked to Allen Helton via telephone from the Knox County Courthouse phone.  He stated he was at UK hospital, he stated he had infection around the metal plates in his head.  He also advised me he had lied when he gave a statement about Amanda Hoskins and William Lester at Escoes Market in Dewitt.  He stated that incident never happened."  (Exhibit 21).

64. It is noted that Lieutenant Catron confirmed that Jesse Lawson had served as a CI on six of Detective York's cases.  (Exhibit 26).

20

65. In a supplemental report York summarized a statement he took from Amanda Hoskins as follows: "I asked Amanda if she knew Katherine Mills, and she replied yes it was the ex-mother-in-law of William Lester.  Amanda stated she and William Lester have been dating on and off for the past six years.  I asked if she and William were dating around Christmas of 2010 and she stated yes.  Next, I asked her if William ever talked about Katherine having any type of money.  She stated she was told Katherine had sold her timber during a phone conversation.  I next asked her if she ever heard William talk about stealing Katherine's money or killing her.  Amanda replied yes, she stated William had been going through money troubles and been out of work.  She went on to state William stated he should go up and lock Katherine in the out house when she was using the bathroom.  Amanda went on to state that William said he would go in her house an take her purse.  I asked Amanda how William would know when Katherine would be in the out house and she stated she guess sit and watch.  I asked Amanda when William told her about stealing from Katherine, and she stated a couple of day before it happened.   Amanda stated William told Mike Simpson about Katherine.  It was asked to Amanda how she knew it was Mike Simpsons and she stated she knew Mike Simpson and they were in his driveway.  I asked her if she ever heard William talk about that anymore.  She stated yes in Pineville.  Amanda stated he talked about it to her little boy's father within a week of Katherine dying.  She stated the father of her boy was Joe King.  She stated William told Joe King he was out of work, he was going to lose his car and trailer, his water was going to be cut off, and his electric was already cut off. Then Amanda stated everything

21

got paid at once.  William stated to Amanda his family gave him money to pay everything off.  Amanda heard William state to Joe he should catch his ex-mother-in-law that bitch, catch in her in the out house and not hurt her, then leave her in there and take her money.   I asked Amanda when William received the phone call from his son-in-law telling him Katherine was dead how did William react.  Amanda stated his mouth dropped and his face was red.  Amanda stated that William stated after Katherine had been killed, William told her he couldn't believe he said that and then it happened.  As the interview continued I asked Amanda if she had anything to do with the robbery of Katherine Mills and she stated 'No sir I didn't.'  I then asked her if she knew who did, an she answered again 'No sir I didn't.'" (Exhibit 31).

66. In a supplemental report Detective York wrote: "On 06-24-2011 at approximately 1400 hrs this unit interview Joe King at the Bell County Courthouse.  Mr. King is currently lodge in the Bell County Detention Center and was brought to the courthouse by the Bell County Sheriff's Department for the interview.  Mr. King has a child in common and has dated Amanda Hoskins off and on for the past five years.  Ms. Hoskins is a person of interest in this case.  King refused to be recorded but stated he would testify in court on what he was about to tell me concerning Amanda Hoskins.  Mr. King started telling me about Sunday night, 12-19-2010, day before Katherine Mills was robbed and found dead.  Joe King stated he was in Pineville with his friend Jerome Ferguson, when Amanda Hoskins and William Lester came to him looking for some money to get a prescription of Suboxin filled.  Joe stated neither of them had money.  Joe stated he arranged for Amanda to get

22

enough money to fill the prescription and the four of them went to Walgreens Pharmacy in Pineville.  Joe stated Jerome and Amanda went in and he and William Lester set out in the vehicle while she got the prescription filled.  Joe stated it was dark outside but was not sure on what time it was.  Joe went on to state that while all of this was taking place, Amanda and William was talking about robbing an old lady, that was William's ex-mother-in-law.  Joe stated he remembered William talking about locking her in the outhouse while they robbed her.  He stated Amanda told him she was going to dress up like a home health nurse and use that as her way in to rob her.  I ask Joe if they said why Katherine, and he stated William had told them she came into a bunch of money from selling timber.  Joe stated he did not think much about it until the next day when he saw were Katherine was found dead on the news.  Joe stated he tried to call Amanda but she did not answer the phone.  He stated he got contacted Tuesday an Amanda stated she was at County Gun and Pawn buying stuff.  Joe thought that was strange because of them borrowing money on Sunday night.  When he asked her where she got money, Amanda stated she had got ten thousand dollars from a settlement. Joe stated that was a lie.  Joe went on to state that Amanda did not come back around him until she was broke again. Joe advise this unit to talk to a Doctor Warren in Barbourville, he stated that Amanda had been having an affair with him and he might help in the case.  I thought that was interesting because in an earlier statement form Amanda Hoskins, she stated the morning Katherine was killed an robbed she was at the Doctor Warrens office." (Exhibit 28).  It is noted that York followed up with the Walgreens Pharmacy as well as information provided by

King with respect to Hoskins' relationship with Dr. Warren. (Exhibit 29).  York determined that Hoskins prescription was filled on 12/20 and not the 19th. (Exhibit 29).  Additionally, York determined that Hoskins was not at a doctor's appointment at the time Katherine Mills was killed. (Exhibit 29).   Hoskins appointment had been scheduled for 11:30 however she did not arrive until 11:54. (Exhibit 29).

67. In a supplemental report completed by Detective Cornett, Cornett described his encounter with Michael Crump writing: "Mr. Crump stated that own 12/20/10 he drove by this residence and he observed a blue car parked near the road in front of the house.  He states that he observed a white male wearing a hooded camoflauge coat walking from the rear corner of the residence towards the road. He states that the man had tatoos on one or both of his hands." (Exhibit 37).  It is noted that in addition to re-interviewing Crump, York had Crump work with a detective to develop a sketch of the subject Crump had seen. (Exhibit 40).

68. Detective York also spoke with Daniel Wilson, a former cell mate of Jonathan Taylor, which York summarized as follows: "He stated he was in a cell with Jonathan Taylor at Whitley County. He stated while he was in the cell with Jonathan, he talked about killing an old woman over money.  He stated it was arranged by his cousin Amanda.  Daniel did not know any last names.  I asked him if Jonathan describe how he killed the lady.  Daniel stated he never said what he used, however when he talked about he would get into it.  He said Jonathan would move his arms and hands when he described beating the lady.  The motion would be if he had something like a club or hammer in his hands.  On 7-30-2012

24

I made the Commonwealths Attorneys Office aware of the interview." (Exhibit 44). York also interviewed Shawn Kinningham who reported being in the Knox County Jail in December of 2011 when a cell mate, Brian Mills reported that he and his friends had struck Katherine Mills over the head and stolen her timber money. (Exhibit 46).

69. Detective York also detailed an interview with Thomas Bruner, who reported that Johnathan Taylor had admitted to Bruner that he killed an old lady for her purse and medication. (Exhibit 47).  According to Bruner, Hoskins had planned this crime and was the one who drove the car.  Bruner reported that Taylor said that he and Kayla Mills went to the door and Kayla knocked.  (Exhibit 47).  Bruner reported that when Mills came to the door "Jonathan rushed in and tried to take her purse.  Jonathan told him the old lady tried to fight back and he hit her on the head, took the purse and left her laying." (Exhibit 47).  Bruner said that Taylor indicated that they had gotten a couple of hundred dollars. (Exhibit 47).

70. On March 13, 2012 York took a statement from Amber Simpson, who reported on a conversation she had with Jonathan Taylor in September 2011. (Exhibit 5). Simpson reported that Taylor provided a number of details regarding the murder of Katherine Mills including Taylor's statement that Will had planned the crime on his ex-mother-in-law. (Exhibit 5). Amber said that Jonathan told her how he had struck Mills in the head with a hammer. (Exhibit 5).  Amber reported that Jonathan said that Kayla had served as a lookout but was not involved in the murder and that Amanda Hoskins parked down from the house and waited for Kayla and Jonathan.  (Exhibit 5).

25

71. I would note that many of the witnesses who reportedly implicated Hoskins and Taylor in the murder of Katherine Mills, subsequently recanted the statements previously made and some indicated the information in the prior statements was fed to them by Detective York.

Allen Helton Deposition

72. Allen Helton testified that the reason he went to Florida on December 20, 2010 with Simpson is because Helton ha a doctor's appointment. (17).   Helton acknowledged that on the 19th, Simpson no money but indicated that he would have money on the 20th.  (25).

73. Helton denied being an informant for either Jason York or Sheriff Pickard.  (13-15).  Helton acknowledged being pulled over by Sheriff Pickard on January 4, 2011. (36). Helton said that during this stop Pickard did not ask any questions but York "just tried to grab me by my face and said, 'I ought to take you down there and let this family beat the fuck out of you for killing this old woman.'" (37).  Helton said he was brought to the Barbourville Police Station and questioned. (38).  When asked who was present Helton testified: "Jason York, Mark Mefford, and Mike Broughton.  (38-39).

74. It is noted that Helton first testified that he could not remember what York was telling him during the interview. (41).  When asked leading questions regarding whether York had fed him information, Helton responded affirmatively. (41-42).

75. With respect to the March 8. 2012 interview, Helton reported that when being driven to jail the day before he asked Pickard what he could do to get out of his charges.  (70).  Helton said that the sheriff's response was "Tell us what we need

to hear about the murder case.  (70).   Helton said that the Pickard said he would

get Helton bon and the charges would be dropped. (71).

76. It is noted that in his deposition denied all of the content of his recorded statement.

(75).

District Court Hearing March 27, 2012

77. Detective York summarized the case against Jonathan Taylor and Amanda

Hoskins, testifying: "Yes.  On December 20, 2012 I received a call to respond to

Stinking Creek to the home of Katherine Mills.  That she was found dead at her

residence.  Upon my arrival I observed her, she was laying face down, her feet

was on the back of her concrete porch. She was laying face down.  She had

appeared to be wearing house shoes, had gray sweats on.  As I went into the back

of the residence I didn't see no signs of a altercation or anything of that when I

walked into the back.  The only thing that was out of place was her that her purse

was laying in the floor and the contents was dumped out.  I also noticed that her,

in her sink she had dirty dishes an she had her breakfast food still on the stove.  I

did not think, also there was an altercation inside the residence because it was a

really small house, older house, and it was very cluttered.  As I walked through

the house the stuff on the shelves would actually shake.  So given all that, I

assumed whatever happened to her at the time happened that morning.  So we sent

Ms. Mills away for an autopsy.  The medical examiner, after I talked to her after

the autopsy was performed, advised she had two injuries to her head, real bad

lacerations.  She also had some broken ribs on her left side, and contusions on her

hand.  And at that time it would be consistent with an assault or altercation.  A

closer examination from the outside of the residence, Katherine was actually laying to the left of the back door. And between the back door and where Katherine was laying was a swing. And on that swing there was blood found on the cushion of the swing, which also indicated that she was bleeding prior to her falling. So the thought that she, it was an accidental fall was ruled out in my mind because if she had fallen an injured her head at the back door, there would have obviously been blood there. But there was no sign of blood except for on the swing and obviously where she was laying. So as our investigation continued, there was three names kept on coming up. One was Amanda Hoskins, Jonathan Taylor and William Lester. I started getting reports that William had been going around and telling everybody that Katherine had a large sum of money and had come up with a plan to take the money. The interesting fact about William Lester is that obviously giving the fact that inside the residence nothing was disturbed except for the purse indicated to me that whoever came in an took the money knew exactly what they were going for exactly where it was at. William is the ex-son-in-law of Katherine Mills who was also acquainted with Amanda Hoskins. So I believe I interviewed Amanda back in February 2011, and actually she was the first one indicated to me that Will had started talk or had talked about William telling her about selling the timber and had came up with a plan that to take. Also during 2011 interviewed Joe King which is the ex-boyfriend of Amanda and that's where I started to really focus my attention to them. He told me that, that Sunday night, the night before Katherine was killed that William and Amanda had came to Pineville wanting to get a Soboxen script filled but they didn't have no money

28

and that Amanda and Will started talking about Katherine. And that Katherine had sold some timber and that she had a lot of money. And even to the fact that, Joe stated to me, that Amanda had came with the plan of dressing up as a home health nurse because she had worked in the medical field prior to that, to get her to come to the door. And that also William you know he relayed a message that Katherine did not have no indoor plumbing. So every morning she would have to go out to the outhouse to use the bathroom. And that was different from, and that Joe hadn't no relationship to Katherine what so ever except through Amanda and William. Also, during the course of all this, a subject by the name of Michael Crump came forward. And he said on the morning…Crump. CRUMP. He's not from this area. He had moved here because his wife was at Stinking Creek and he was living in the Stinking area that morning. But he came forward and said as he was driving by the morning that Katherine was killed, that he saw a blue car there. And he described Jonathan Taylor coming from the corner of the house, that from Katherine's house. And that was the same corner where Katherine was found laying dead. And he described this time being around 8:00 in the morning. He also described a female. He did not give no descriptive details on the female in the car except for they was a female in the car and appeared to have blondish-brown hair, but he did not give no other descriptives of that. As far as he was adamant about a tattoo and all that obviously that he saw coming from the corner of the house. Then we go on and earlier this year I during two interviews with Jonathan Taylor's ex-girlfriends, it was determined that he had a lot of knowledge about the crime scene, knowledge that you would have been there to have that

29

knowledge. Because this was something that was not given out in the newspapers or anything like that. Even described to one a hammer was used to kill Katherine that the first time that he hit her he did not have enough time to get the money that he had to hit her again using a hammer. So, after getting that information from both of those females I contacted the medical examiner again, advised her of the situation, and asked her if a hammer could cause those injuries and she stated yes. Also through other interviews with a inmate from a, that was in a cell with Amanda, Amanda had told her that she was involved with Katherine, the only different thing that she said according to all the other statements that I got was that Amanda had implicated Joe King into it, as far as the one hitting Katherine beside Jonathan Taylor…. Yes. One other thing, in prior interviews with Amanda and William Lester they both give me alibis that she had a doctors appointment at 9:30 that morning from Doctor Warren of Hope Medical Center. And I was able to pull the record where she signed in and they both lied to me. She actually didn't sign in I believe it was actually 11:57 that morning also another important statement I took was from Allen Helton. I initially looked at Allen Helton at the beginning and gave him a polygraph. Which they had some indication on the polygraph and over the course of the year talking to Allen and asking him about the polygraph he finally came and told me the truth. That Amanda and William had approached him the day before at Esco's Market, and propositioned him the same as they did Joe King and some other people as far as that. And the way that he described Amanda told him she referred to Katherine as Will's ex-mother-in-law. That she had sold some money from the timber and that she every morning

30

that she went out to the outhouse and the plan to take the money, lock her in the outhouse and take her money. Allen Helton said he did not do that. And, but the following day that he saw Allen and William, excuse me, Allen saw Amanda and William together at Mike Simpson's house. And that Amanda made a statement the job was done referring to Katherine. And that Amanda had a wad of money rolled up in a rubber band, three or four thousand dollars, he didn't know the exact amount but it was a large sum of money. Also one thing that Amanda, William and Mike Simpson all, they were all broke Sunday night. Monday morning after William Lester meets Mike Simpson, Mike Simpson and Allen Helton, they have money and they take off to Florida. And Allen said actually they Amanda had put in an order for Roxycet's, I believe they get them from pain clinics in Florida to bring back. And that's what lead us to this.

78. In testifying as to who, besides himself worked on the case, York reported: "There's been several other Detectives that worked on it from Post 10" including Mark Melford, Mike Cornell, and Sergeant Jackie Pickle.

79. Detective York testified: "That William told Wesley Roark that Katherine had the money had sold some timber. That he should go knock them in the head. And that from that given the fact that William said that prior, that was the first indication that I had with William had come up with the plan." York reported that Roark reported this information to Sheriff Pickard.

Sheriff John Pickard Deposition

80. Sheriff Pickard acknowledged that the murder of Katherine Mills occurred within the jurisdictional boundaries of Knox County while he was the sitting sheriff. (13).

31

Pickard described that he went to the scene after a deputy responded to the 911 call and found Katherine Mills. (126). Pickard said that his agency then called the state police to start an investigation because the Sheriff's Office did not handle murders. (126). Pickard testified that Jason York was the lead investigator in the Katherine Mills' murder. (14). Pickard acknowledged that he assisted York in locating people. (14). Pickard reported that he recalled sitting in on one interview conducted by York. Pickard explained: "I—we didn't assist in the investigation. We just, you know, like I say, he was—when he—he had some names he needed to talk, and he didn't know the people and I did, and I just rode with him and helped him find them." (15). Pickard agreed that the individuals he helped find included: Kayla Mills, Allen Helton, Jonathan Taylor, and Bob Smith. (14-15). Pickard testified that he had no direct knowledge of Hoskins' or Taylor's involvement in the murder of Katherine Mills. (16). Pickard acknowledged that he did not personally charge Hoskins or Taylor with the murder of Katherine Mills. (17). Pickard also agreed that he had no control over Jason York, a detective for the Kentucky State Police. (18). Sheriff Pickard testified that he did not have the information on the case in which to make determinations because it was York who worked the case. (19).

81. Sheriff Pickard acknowledged that he was present on March 8, 2012 when Helton was interviewed by York in the Sheriff's office. (20). Pickard also noted that he went to the Appalachian Children's Home to talk to an employee about a blue vehicle. (21-22). Sheriff Pickard reported that he did not take notes while with York because it was York's case. (24). I would note that an officer from an

32

assisting agency that was not assigned as an investigator in the case would not, consistent with generally accepted practices, take notes or do reports for simply accompanying an investigator to a location so the investigator could pursue their case.

82. Sheriff Pickard testified that at the time of Mills' murder he had seven or eight deputies working for him.  (50). Pickard testified that the Sheriff's Office only handled smaller investigations such as burglaries or car wrecks. (52). Pickard said that the Sheriff's Office did not get involved in homicide investigations.  (52). Pickard testified that homicide investigations were referred to the Kentucky State Police.  (52).   Sheriff Pickard noted that in the Mills' murder case he did not do any investigating but stated that he merely helped locate people and agreed that he sat in on interviews of Allen Helton and Jonathan Taylor. (97).   With respect to Taylor, Pickard reported: "I don't remember questioning him.  I was there, but I don't remember asking anything." (98).   Pickard did not recall crime scene photos being placed on the table while Taylor was being questioned. (98).  Pickard acknowledged that during the ongoing investigation of the murder of Katherine Mills, he had conversation with: Allen Helton, Mike Simpson, Jonathan Taylor, Kayla Mills and Bob Smith. (101-102).  Pickard said that during 2011 and 2012 he was unaware that Helton was a person of interest in the death of Mills. (102-103).

83. Sheriff Pickard testified that he had no knowledge that Allen Helton was working as an informant during the course of the Hill investigation.  (92).

84. Sheriff Pickard's testimony indicated that Detective York never informed him that he was charging Amanda Hoskins or Jonathan Taylor with the murder of Katherine Mills. (173).

85. Sheriff Pickard reported that he was notified by the jail on March 8, 2012 that Allen Helton wanted to talk to Pickard about the murder. (191). Pickard said he then had Helton brought from the jail to his office. (191). Pickard reported that he called Jason York after Helton told Pickard what was on his mind. (193). Pickard reported that he told Helton that he would try and help him on the theft charges he was being held for as long as Helton told the truth. (197). Pickard described his conversation with Helton testifying: "He just—he told me, you know, to-who killed Katherine Mills. And he wanted to give a statement on it and I'm—I told him that anyone that'd help on them—those charges, I told him that was Detective York's case, I would contact him, and if he wanted to tell him, you know, I said as long as you're telling me the truth. If you want to tell Jason—Mr. York that, you can. And I called Jason and it seemed like it was a short time thereafter, he came down and—and talked to him." (202). Pickard acknowledged that Helton gave Pickard no specifics prior to the arrival of Detective York only indicating that he was prepared to give a statement on the murder of Mills. (203). During his deposition Pickard acknowledged numerous leading questions that were asked by Detective York during Helton's interview and Pickard was asked if he took any steps to stop York, to which Pickard acknowledged he did not. (224-226). I would note that an officer who locates a witness or suspect in a major case being investigated by another agency would not halt the lead investigator

34

during the interview process for a variety of reasons and to do so would be inconsistent with generally accepted policies, practices, training and legal mandates trained to officers and investigators for application in the investigative operation.   It should also be noted that in the case of Helton, Helton sought out the investigators based on his decision to provide information on the Mills' murder in exchange for favorable treatment on unrelated charges.  This is the opposite of coercion by law enforcement.

Helton Interview Audio Recording

86. As noted in the transcript, York makes clear that he and Helton have had conversations over the course of the investigation and presumably before the taping of the interview.  While York outlined some preliminary facts such as where Helton ha met up with Hoskins, York then asked open ended questions about what occurred, which is what was material to the murder investigation.  It is note that when the audio is reviewed, it is clear that there was nothing coercive about the manner in which any of the questioning was presented.

87. It is my opinion, based upon my specialized background, education, training, and experience as well as my continued research, authoring, auditing, consulting and training on law enforcement practices nationwide that the actions of Sheriff Pickard throughout the Mills Murder investigation were consistent with generally accepted policies, practices, training, and legal mandates trained to officers for application in field operations and investigative operations.

88. At the outset, it is clear from the materials that the Sheriff's Office, as the first responding agency to the 911 call, did not conduct the murder investigation, but

instead called in the Kentucky State Police to conduct the investigation from its inception.

89. I note that Mr. Drago has opined that "Detective York and Sheriff Pickard used a pattern of improper interrogation techniques where subjects were threatened with arrest unless they were told what the officers wanted to hear in the statement. These Defendants are also accused of offering promises of consideration in exchange for the incriminating evidence being sought against select individuals, namely Ms. Hoskins and Mr. Taylor.  All the while, the record reveals that on certain occasions (such as with Daniel Wilson, Robert Beach, and Allen Helton, for instance) Defendants Johnson, Mefford, and Broughton respectively were present with the misconduct discussed above and below occurred.  On no occasion did any of the Defendants take steps to stop the fabrication of evidence, promises of consideration, or coercion of witnesses.  Even after the interviews took place, these Defendants remained silent about the misconduct that they witnessed and never informed the prosecutors, defense attorneys, or grand-jurors that such tactics were used to obtain statements.  Such a pattern of improper conduct would cause a reasonable police officer to suspect that such statements were coerced and not voluntary.  Further, witnessing such misconduct would cause a reasonable police officer to take steps to stop the misconduct from taking place and reporting such misconduct thereafter."  (Drago Report).  It should be noted that the contemporaneous reports that were completed during the murder investigation and not through the prism of a lawsuit, the testimony of the defendants, specifically Sheriff Pickard, do not support the net opinion offered by Mr. Drago.

36

90.  I would note that although it is my opinion that Pickard played no investigative role in this case, there are a number of concepts that I would be prepared to testify to that relate to the overall investigation of the murder of Katherine Mills.

91. Officers throughout the United States are trained that there are two distinct justifications for depriving a citizen of liberty relating to the investigation of criminal activity.  The first of these justifications is commonly referred to as a "Terry Stop" or investigative detention.  Officers are trained that these stops do not require probable cause to believe the person has committed a crime, but rather are justified on a lesser degree of proof, specifically "reasonable suspicion."[1]  It is noted that during a reasonable suspicion-based detention officers are trained that the purpose is to confirm their suspicion through the development of probable cause or dispel their suspicion.[2]

92. Officers throughout the United States are trained that the second justification for deprivation of liberty of a citizen is when an officer has probable cause to believe that the subject has committed a criminal offense.  Additionally, training and texts make clear that: "All arrests-whether with or without a warrant–must be based on probable cause. You must have sufficient knowledge of facts and circumstances that would lead a reasonable police officer to conclude that the suspect probably committed the crime."[3]

---

[1] See e.g. The Law Enforcement Officer's Pocket Manual 2008 Edition, Miles, Richardson, and Scudellari, Bureau of National Affairs Arlington Va. 2008. § 2:8; See also Quick Reference Legal Guide for Law Enforcement, Critical Legal Tasks in Law Enforcement 2008-2009, Jack Ryan, PATC Books, 2009  P. 10.

[2] See, The Law Officer's Pocket Manual 2008 Edition, Miles, Richardson, and Scudellari, The Bureau of National Affairs, Inc. Arlington, Va. 2008. §2.14.

[3] See, The Law Officer's Pocket Manual 2008 Edition, Miles, Richardson, and Scudellari, The Bureau of National Affairs, Inc. Arlington, Virginia 2008.  at §4:2

93. All officers are trained on the concept of "totality of circumstances" when considering reasonable suspicion or probable cause. Simply stated, an officer looks at a number of factors, some of which standing alone would not support any law enforcement action, but when grouped together with the other facts in totality, action is justified. Officers throughout the United States are trained that they may rely upon a combination of facts and circumstances based upon information they obtain and observations that they make.

94. It is clear from the materials that the investigator in this case was receiving information from various sources that focused the investigation on a small group of individuals that had relationships with each, some of whom had a relationship to the victim, who made statements regarding the motive as well as the method of the crime. This was not a rush to judgment, in fact the investigation took more than a year before York came to the conclusion that there was sufficient information to seek an arrest of some of the individuals.

95. It is noted that officers do not themselves decide if a suspect for who they believe should be arrest is formally brought into the criminal justice system. Instead there are a number of processes that come into play to protect a person from being erroneously accused. These various processes are the checks and balances on law enforcement to ensure that the investigator's conclusions and investigation is reviewed or, in the case of a probable cause hearing, challenged. Investigators do not work in isolation and understand that their work will be reviewed before charges are brought to trial. It is noted that these processes were followed here

including a grand jury review as well as adversarial hearings where the defendants were able to challenge York's investigative conclusions.

96. Officers throughout the United States are trained that there are three general categories of informants.  The first type is the anonymous informant whose reliability and veracity is unknown.  In the case of anonymous information officers must take steps to corroborate information within the anonymous tip, which would only be known to a person with intimate knowledge of the subject.  The second type is the informant who is providing information for monetary gain or for consideration of leniency for charges related to them.  Law enforcement is trained that this group of informants has a motivation to provide information and therefore officers must take steps to establish the reliability of the informant and the information.  Finally, officers are trained that victims of crime and witnesses to crime are "good citizen" informants who generally tell the truth and therefore have an indicia of reliability.[4]  Officers are trained that "a crime victim's report and his description of his assailant may be enough by themselves to justify an arrest of a person who meets the description and who could have been in the vicinity at the time of the crime."[5]

97. It is well-known in law enforcement through both training and texts used by law enforcement that officers may rely on hearsay information for purposes of

---

[4] See, Introduction to Criminal Evidence and Court Proceedings, Hanley, Schmidt and Robbins, McCutchen Publishing, 1987. P.149; see also, Arkansas Law Enforcement Pocket Manual, 2nd Edition, June  2004 Arkansas Attorney General Mike Beebe, 2004. P. 29 "Reliability of Information/Informant" Information from citizen-witnesses or 'identified citizen informants' is presumed to be reliable.  The law presumes that a person who comes forward as an identified witness and provides information to the police does so as a good citizen, thus, that citizen should be identified and named.
[5] The Law Officer's Pocket Manual 2008 Edition, Miles, Richardson, and Scudellari, The Bureau of National Affairs, Inc. Arlington, Va. 2008. §4:6

establishing both reasonable suspicion and probable cause. "Officers can rely on secondhand information, hearsay, either partly or completely. Officers get information secondhand through victims, witnesses, other police officers, and professional informants. According to the hearsay rule, courts can't admit secondhand evidence to prove guilt, but the rule doesn't apply to probable cause if it's both reliable and truthful." "The technical rules of criminal trials don't suit the evaluations of police actions on the street and at the police station… Police officers on the street and at the precinct station aren't lawyers, and they aren't supposed to be. Nor do they have the leisure to sort out the evidence they've acquired. They have to either act immediately or forever lose their chance to arrest suspects. Allowing hearsay to show probable cause reflects the deference that courts give to the realities of police work."[6] It is clear from the reports made during the investigation that York was seeking information from a number of sources and witnesses to various aspects of the murder of Katherine Mills. The steps taken by York are all valid investigative techniques used by investigators to corroborate any other information, including identifications made by witnesses/victims of suspects.

98. Not all statements or identifications that are provided to the investigators in the course of a criminal investigation are truthful or accurate. Some of these statements come from persons who have an interest in the outcome of the case and provide police with false or misleading information. Identifications are sometimes made based on the witness' or victim's best efforts. There are often conflicting accounts from witnesses

---

[6] Criminal Procedure, 5th Edition, Joel Samaha, Wadsworth/Thomson Learning 2002. P. 222-223.

of what occurred based on their perspective.  This is the type of direct evidence that is presented at suppression hearings, probable cause hearings, and to juries at trial as the finders of fact weigh the credibility of the witnesses and decide the truth of the matter. It is not the job of the detective to determine the facts to be adopted by the fact-finder.

99. It is well-known in law enforcement that the actual identification of a suspect occurs not in the law enforcement identification process but rather, through an in-court identification.  The question for law enforcement is whether their investigative practices occurring pre-trial, have been overly suggestive such that the law enforcement identification process has, in some way, tainted the in-court identification.

100.   There are several identification procedures used by law enforcement to identify suspects in criminal cases.  They are show-ups, photo arrays or photo packs, and line ups.  All of these procedures are in some way suggestive.  In some criminal investigations the victim and the witnesses do not know the identity of the suspect. They have never seen the suspect prior to the crime. There are several factors that can contribute to the difficulty in making eyewitness identification, including, for example, the length of time the witness viewed the suspect, the distance between them, the lighting conditions at the time, and the witness's degree of attention at the time.

101.   I would note that Dr. Jeffery Neuschatz has criticized the fact that a photo was taken of Jonathan Taylor and sent to Oklahoma where Mr. Crump was residing in an effort to get an identification.  While there is no indication that an identification from this photo was made it must be recognized that although Pickard was

41

present, Taylor testified that York directed that the photo be taken and the photo was taken by a Barbourville officer. There is no indication that Sheriff Pickard participated in any way with respect to the taking of the photo or more importantly even had knowledge of what the photo would be used for.

102. I note that there is a great deal of criticism of York's interviewing methods which in two cases, Helton and Taylor, were in the presence of Sheriff Pickard. Officers throughout the United States are trained that they may not deceive a person to obtain a waiver of Miranda warnings when questioning an in-custody suspect. Additionally, if the subject has bot been restrained in manner closely associated with formal arrest Miranda and thus policies and rules related to Miranda would not apply. Officers are trained that if Miranda does not apply or if the suspect has waived, that it is a proper law enforcement tactic to deceive the person being questioned in order to obtain truthful admissions or statements. Providing a suspect with false information regarding what evidence or witnesses have connected the suspect to the crime is not a coercive tactic and has long been a generally accepted practice in law enforcement as well as authorized by the courts, including the United States Supreme Court.

103. Mr. Drago opines that providing benefits to incarcerated witnesses should not occur in an investigation. This opinion disregards common and generally accepted law enforcement, prosecutorial, and judicial action that routinely occurs in major investigations. The underlying foundation of the United States Secret Service's Witness Protection Program was largely taking involved criminals in major organized crime case, who, in exchange for leniency or even transactional

immunity provided testimony against other defendants.  Drago's opinion: "The easiest and safest course when dealing with witnesses in these situations is to never provide any benefits to the witness and to ensure that the witness is promised nothing in exchange.  With this approach, law enforcement officers must take a firm line on anything that could be perceived as a benefit."  (Drago Report). The approach that Mr. Drago suggests is inconsistent with generally accepted law enforcement, prosecutorial, and judicial practice and the practical realities of investigating major crimes, conspiracies, and criminal organizations.

104. I would also note that Mr. Drago has broadly accused York of feeding information to Allen Helton through leading questions during the interview process.  Mr. Drago fails to point out that at the outset of the March 8, 2012 interview, York noted on record, that He and Helton had numerous conversations between the date of the murder and March 8, 2012.  (PL015841).  Drago also disregards that prior to asking questions York said: "Earlier you stated to me" thus with respect to many of York's questions, Helton had already provided the information to York and it was actually York repeating Helton's information and not the other way around.  And while there were initial questions relating to running into Hoskins and Lester at the gas station, York asked an open-ended question: "Alright.  And what did..what hap..what did the conversation curtail? (PL015842).  Helton responded to this open-ended question: "She asked me, did I want to make some money.  And told me how." (PL015842).  York then responded with another open-ended question: "And how was that?" (PL015842).  Helton responded: "By going in and tying this old woman up when she came out

to the bathroom." (PL015842).  York then asked: "Did she say which old woman it was? "Yeah Katherine." (PL015842).  When asked if Hoskins called Katherine Mills by name, Helton responded "William's ex-mom-in-law." (PL015842).

105.   It is noted that Sheriff Pickard was asked numerous questions regarding the Sheriff's Office policies related to criminal investigations.   There is no information in the materials provided to indicate that anyone from the Sheriff's Office was involved in the investigation of the Mills' murder.  As noted by the Sheriff in his testimony as well as by the clear evidence in the investigative materials provided, the Sheriff's Office did not handle major cases including homicide cases but instead, referred these cases to the KSP.  Thus, policies, or even the lack of policies on criminal investigations has no bearing on the conduct of the Sheriff or the Sheriff's Officer since they were not conducting a criminal investigation.  In essence, the Sheriff's Office did have a policy for homicide cases which was simple and to the point, refer the case to the Kentucky State Police, and this is the policy they followed in the Mills homicide case.  It is noted that 48 percent of the law enforcement agencies in the United States have less than ten officers.  As a result, the policy of turning all major crimes to a state entity is common practice throughout the United States.   The importance of particular policies or training in a particular agency is determined by the job tasks of officers within that agency.   It is clear from the materials, that major criminal investigations such as a homicide is not within the job task of Sheriff Pickard's Office.

106.    A common law enforcement practice is for an investigating agency/detectives to notify the local agency such as the Sheriff's Office when conducting an investigation or even a portion of the investigation within the local jurisdiction. Equally common is for the local agency, which is familiar with the area, the people, escape routes, etc. to respond and stand by with the investigating agency while investigators complete their work. This does not in any way make the local agency part of the investigation, they are merely serving a support role and have no decision-making or investigative authority with respect to tactics, techniques or arrest decisions.

107.    Sheriff Pickard took no steps to bring charges against any person questioned or associated with the Katherine Mills murder. It is clear from the materials that Pickard never filed a criminal complaint or any other document outlining probable cause against an individual involved in this case. Sheriff Pickard never testified or, in any way presented evidence to the grand jury that indicted Hoskins and Taylor. There is no indication, based on the recorded interviews and summaries that, to the extent that Pickard was present, he asked or was affirmatively involved in the questioning of individuals associated with this case. This fact, in combination with the fact that the Sheriff's Office was not the agency handling the murder investigation, would make the fact that the Sheriff did not do any reports, consistent with generally accepted policies, practices, training, and legal mandates trained to officers for application in field and investigative operations.

108.    I note that Mr. Drago has criticized Detective York for not recording some of the witness interviews. I would note that during the time of this investigation, the

United States' leading law enforcement agency, specifically, the F.B.I. had a policy of not recording interviews or interrogations but rather relying on summaries provided by agents in a 302 report.  Only recently, the F.B.I. has changed the policy to now record interviews/interrogations of targets/subjects of their investigation.   Mr. Drago has opined: "Throughout the investigation, the Defendants failed to fully and properly document and/or record their investigation."  There is no indication of what failures were committed by which individual defendant other than this broad stroke that encompasses all the defendants.  This broad stroke opinion fails to recognize that the generally accepted practice in law enforcement is for the lead investigator to document the investigation in the investigative file or the murder book.

109.   Sheriff Pickard has been criticized for his presence when photographs were taken of Taylor.  There is nothing in the materials to suggest that Pickard, due to the fact that he had no investigative role in the murder investigation, had any information with respect to how the photos would be used during the investigative process.  I would note that officers throughout the country are trained that when conducting identification proceedings such as line-ups, the subjects including the suspect and the fillers can be directed to put on a particular piece of clothing as long as all of the subjects put the clothing on in turn.  The same is true for a photo-array, as long as each of the subjects in the array had the particular clothing on there would be nothing overly suggestive about the photo-array.

110.   It is my opinion, based upon my specialized knowledge, background, education, and training as well as my continued research, authoring, auditing,

46

consulting, and training on law enforcement practices nationwide that there is no evidence of any deficiency by the Sheriff's Office in policy or training as general matter and specifically as it relates to this case.

111.   It is clear from the materials that the Sheriff called the KSP because his agency lacked the resources to investigate a major crime such as a murder.  The Sheriff made clear that when such a crime was committed, his policy was to notify the state police to respond and conduct the investigation.  As such, there was no breach of a generally accepted practice by not having a specific criminal investigations policy or specific training on this function.  Small agencies that do not handle a particular job task, do not generally have a policy directing officers on the handling of such tasks.  It is clear from the Sheriff's testimony, as well as from what occurred in this case, that the policy is to turn the matter over to thee state police for investigation and thus policy or training on this particular job task is unnecessary.  Additionally, the Sheriff testified as to his own training and did not speak to the required basic training of Kentucky Law Enforcement officers as directed by DOCJT.   I would note that all Kentucky officers, with exception of elected officers, must go through specific training mandated by the Kentucky Department of Criminal Justice Training which includes various courses on criminal investigation.

112.   While Mr. Drago also criticizes the Sheriff's Office regarding discipline, there is nothing in the material to indicate that any officer has committed misconduct related to a criminal investigation that should have led to discipline.   `

113.  At this stage of my review I do not know if I may be asked to review additional documents.  Should I be asked to review any additional documents I will be prepared to render additional opinions or supplement the opinions stated within this report.

114.  At this point in the development of this case I do not know whether I will be using any demonstrative aids during my testimony.  Should I decide to use any such tool; I will assure that they are made available for review, if requested, prior to their use.

115.  My fees for these professional services are outlined in the attached retainer agreement.

This report is signed under penalty of perjury on this 4th day of February 2019, in Las Vegas, NV.

_____*s/John J. Ryan*_____
John J. Ryan

48