# In the matter re:

## Amanda Hoskins and Jonathon Taylor
## V.
## Knox County et al.

## Case No: 6:17-CV-00084-DLB
## United States District Court
## Eastern District of Kentucky

---

# Report

## of

# CHARLES W. DRAGO
# DRAGO PROFESSIONAL CONSULTANTS, LLC

---

December 21, 2018

# <u>Table of Contents</u>

Table of Contents.................................................................... 2

Introduction............................................................................ 3

Qualifications........................................................................... 3

Opinions................................................................................... 6

Materials Relied Upon............................................................ 35

Past Expert Witness Testimony............................................ 36

Publications............................................................................. 51

Compensation.......................................................................... 52

Appendix 1 – Curriculum Vitae of Charles W. Drago

Mr. Elliot Slosar
Loevy & Loevy
311 N. Aberdeen, 3rd F
Chicago, IL. 60607

Dear Attorney Elliot Slosar,

I have been retained as a consultant and expert in the matter known to me as Amanda Hoskins and Jonathon Taylor v. Knox County et al., Case No: 6:17-CV-00084-DLB, United States District Court, Eastern District of Kentucky.

I was asked to review documents relevant to this matter and render expert opinions about the police actions of the defendants involved in this matter.

After evaluation of all the facts and circumstances that are known to the witnesses at the time of this incident, I employed comparative methodology in determining my opinions and in evaluating the officer's actions. This method of comparing the actions of the officers with accepted practice and training in the law enforcement profession is a common and consistently applied method when evaluating an officer's actions. Therefore, I formed a number of opinions to a reasonable degree of professional certainty, as to suspect and witness interrogation/interview, criminal investigation procedures, production of exculpatory evidence, supervision, training, and general police procedures used by the Defendants in this matter and whether or not certain actions of the defendant police officers were consistent with accepted police practices.

My opinions are based not only on the facts presented by all parties, but my experience and training concerning proper policies and police practices in criminal investigation, witness interviews/interrogations, witness identification, police supervision, and training. Pursuant to the requirements of Rule 26 of the Federal Rules of Civil Procedure, I have studied the reports and other material provided to me regarding this case. Please be advised that if there are any additional depositions, policies, or other materials produced in this case, a supplemental report may be necessary; thus I reserve the right to supplement my opinions and/or this report.

## I.  Qualifications

I am a 30 year career law enforcement officer who advanced through the ranks of the police department with an exemplary record.  Recognized for integrity and leadership, I was appointed as assistant police chief, police chief as well as deputy chief of staff and senior law enforcement advisor to the Governor of Florida.

As a senior leader of major law enforcement agencies and a member of the department's review boards; I have investigated hundreds of police misconduct allegations in all areas including use of force/Taser/pepper spray, deadly force, k-9, and police pursuits. I have broad-based experience in high liability areas including the management and development of policies and procedures in those areas.

During my career, I have attained a significant amount of experience in police officer involved shootings as a police officer in the field as well as a line supervisor and homicide detective supervisor who investigated police officer involved shootings. As a police executive, I have also developed use of force policies and evaluated trends and individualized cases. In addition, I served as a union representative on many officer involved shootings.  I received training in criminal investigations, homicide investigations, police officer bill of rights and internal police investigations.

As an experienced frontline law enforcement officer who was directly or indirectly involved in thousands of arrests, my experience includes service in various capacities with direct hands on involvement and/or supervision in areas such as patrol, street narcotics, SWAT, k-9, street crimes, criminal investigations, training and homicide. I have advanced through the ranks and served as a police officer, field training officer, detective, sergeant, detective sergeant, captain, major, and assistant chief with 18 of those years as a commanding officer.  My career includes significant experience with the investigation of police officer use of force, as an officer, immediate supervisor and senior administrator.

My experience as a criminal investigator included service in the Organized Crime Division, Vice, Narcotics and Homicide. I was involved in these criminal investigations at various levels to include detective, homicide sergeant and Commander of the Criminal Investigations Division. I conducted long term, complex organized crime investigations which in some cases involved the highest levels of organized crime syndicates. In addition, as the homicide supervisor, I was responsible for overseeing hundreds of death investigations including homicide, officer involved shootings, suicide, and accidental deaths.

My education includes an Associate's Degree in Criminal Justice, a Bachelor's Degree in Criminal Justice, and graduation from the Southern Police Institute Command Officer's School at The University of Louisville. In addition, I have had numerous hours of training in the use of force, Tasers, arrests, firearms, supervision, patrol procedures and the management of those.

As a certified police instructor, I trained thousands of police officers in the use of force, criminal investigations, search warrant procedures, narcotics investigations, and patrol procedures.

Note: The material reveals that there is conflicting information between witnesses. Resolving such conflicts involves assessing witness credibility and assigning weight to the given testimony, and is the responsibility of the trier of fact. Accordingly, the opinions offered in this case related to facts in dispute are based on assumptions that are identified in the basis for my opinion, and the totality of my knowledge, training and experience.

## II. Professional Homicide Investigation Practices

Homicide cases and investigations in police agencies across the United States are given priority and resources not normally provided to other types of investigations. More experienced,

trained and knowledgeable detectives are assigned. Their investigations result in detailed documentation, commonly referred to as "investigation files" or "murder book" in some jurisdictions. These investigative records provide a step by step record of all evidence gathered, all witnesses interviewed, statements taken, leads followed (whether productive or not), medical records, autopsy photographs and reports, photographs of the crime scene, wound descriptions, weapon (gun, bullet, shell, knife, vehicle, objects, etc.) analysis, chain of custody and evidence logs, vehicle impounds, search warrant applications and returns. It is not uncommon for a typical murder investigation to contain many hundreds (and often times thousands) of pages – even if there is thought to be a "known" suspect. There are well-established criteria and a broad range of literature for these practices.

Professional investigation and documentation are critically important for a number of reasons, some of which include but are not limited to:

- Case integrity
- Continuity of investigation
- Supervisory oversight
- Facilitation of case management
- Inclusion of investigative notes and investigators actions
- Ensuring thoroughness of the investigation
- Allowing other investigators to assist or replace initial investigators
- Providing a "paper trail" of what steps were taken (or not taken)
- Focusing on important aspects of the case
- Identifying what remains to be done and what has already been done and by whom
- Eliminating suspicion from some possible initial suspects
- Providing sufficient information to identify and arrest a suspect
- Providing insight for prosecutor considering charges
- Providing an objective basis for charging and trying the suspect
- Providing an objective basis for the court to determine challenges
- To have a single document for discovery and disclosure (Brady rule)

These standards were in place by 2011.

## III.     Individual, Supervisory, and Institutional Failures in the Investigation Into Katherine Mills' Death

The "investigation" of Hoskins and Lester by the Kentucky State Police, Knox County Sheriff's Department, Barbourville Police Department, including the named defendants employed by these agencies was conducted in such an improper manner that it targeted and resulted in the wrongful arrest and charging of Amanda Hoskins and Jonathan Taylor.

**Opinion #1: Defendants York, Pickard, Mefford, Johnson, and Broughton failed to act in accordance with accepted police practices when conducting interviews of witnesses and suspects in the underlying criminal investigation.**

Detective York, Sheriff Pickard, Detective Johnson, Detective Mefford and Detective Broughton participated in interviews and interrogations of witnesses and suspects which were later recanted and/or found to be false statements. Based on my review of the records in this case, the interview techniques used by the aforementioned Defendants in these interviews/interrogations are contrary to police training and accepted police practices. In each case described below, the person being questioned provided an incriminating statement after Detective York and/or other police officers threatened or made promises in exchange for those false statements.

Police officers are trained in interview/interrogation techniques that are designed to get truthful answers from the subject and greatly limit the possibility of false statements. The training and subsequent policies instruct police officers that all confessions/incriminating statements must be voluntary. The voluntariness of a statement will come in question when a police officer threatens or makes promises in exchange for that statement. Based on my experience and training, these types of statements are considered to be coerced statements and would not be acceptable for a police investigator and certainly not accepted as evidence in a criminal court:

    1.    **International Association of Chiefs of Police Training Key #500**: *Interrogation techniques: Guarding against False Confessions, P.3: Types of False Confessions:  1. Coerced Compliant Confessions. Perhaps the most frequent of these are false confessions resulting from the suspect's belief that there will be some instrumental gain from the confession. Possible gains include being allowed to go home, bringing the interrogation to an end (duress) or escaping the inherent psychological or physical pressures of the interrogation (coerced). Some studies suggest that nearly half of all false confessions are of this type.*

    2.    *Psychological Coercion: causing a suspect to believe that he or she has no choice but to comply with the wishes of the interrogator, is not specific to any one technique but may be the cumulative result of the interrogation methods as a whole. When suspects perceive there is no choice but to comply, their resulting compliance and confession are, by definition, involuntary and the product of coercion.* **( Police Interrogations and False Confessions by G. Daniel Lassiter and Christian A. Mesisner, Ofshe & Leo, 1997:p.18)**

3.    **IACP Interrogations and Confessions Concepts and Issue Paper p.1: The Concept of Voluntariness:** *This point is essential, for one of the key concepts in the law of interrogations and confessions is voluntariness. To be admissible, the confession must be voluntary; that is to say, it must have been made freely, without any coercion or intimidation on the part of the police or their agents.*

According to the records, Detective York and Sheriff Pickard used a pattern of improper interrogation techniques where subjects were threatened with arrest unless they told what the officers wanted to hear in the statement. These Defendants are also accused of offering promises of consideration to subjects in exchange for the incriminating evidence being sought against select individuals, namely Ms. Hoskins and Mr. Taylor. All the while, the record reveals that on certain occasions (such as with Daniel Wilson, Robert Beach, and Allen Helton, for instance) Defendants Johnson, Mefford, and Broughton respectively were present with the misconduct discussed above and below occurred. On no occasion did any of these Defendants take steps to stop the fabrication of evidence, promises of consideration, or coercion of witnesses. Even after the interviews took place, these Defendants remained silent about the misconduct that they witnessed and never informed the prosecutors, defense attorneys, or grand-jurors that such tactics were used to obtain statements. Such a pattern of improper conduct would cause a reasonable police officer to suspect that these statements were coerced and not voluntary. Further, witnessing such misconduct would cause a reasonable police officer to take steps to stop the misconduct from taking place and reporting such misconduct thereafter.

Any reasonably trained investigator knows that testimony from witnesses who are incarcerated or with pending cases should be viewed with skepticism. Incarcerated witnesses and those charged with pending cases are known to use their cooperation in a criminal investigation as a means to curry favor with those who wield (or are perceived to wield) some control over their criminal charges; their housing; their visiting privileges; and their ability to earn money. Investigators should be very careful when interacting with incarcerated witnesses to ensure that those witnesses do not have a misperception about any *quid pro quo* for information.

The easiest and safest course when dealing with witnesses in these situations is to never provide any benefits to the witness and to ensure that the witness is promised nothing in exchange. With this approach, law enforcement officers must take a firm line on anything that could be perceived as a benefit.

Indeed, even a small amount of money provided to an inmate can have a powerful effect, because an incarcerated witness or one with a pending case often has limited means to earn money. Likewise, any leniency for a witness's own criminal charges or sentence, beneficial changes in house (such as to a less- restrictive prison or to a prison closer to an inmate's family), or consideration in visits (providing additional visits, contact visits, phone calls, conjugal visits), can have a powerful influence over a witness who often cannot obtain any of these benefits absent intervention by a law enforcement officer or prosecutor.

Accordingly, reasonably trained law enforcement investigators are aware that any benefit of any kind provided to a witness must be disclosed to the prosecution and thereby to the criminal defendant as well. It would violate commonly accepted law enforcement practices to either promise or provide a benefit to a witness and not disclose the promise or benefit.

Finally, because witnesses in these circumstances may be seeking a benefit in exchange for their testimony, law enforcement officers must be careful to ensure that any facts provided by the witness originate from the witness, rather than being leaked to the witness from the investigator. While preventing non-public facts from being provided to suspects or witnesses is a commonly accepted practice with any witness, it is crucially important with witnesses who have a motive to fabricate false testimony in a separate criminal investigation.  Below is a discussion of some of the troubling circumstances where the Defendants ignored commonly accepted police practices.

## A. <u>Allen Helton</u>

Detective York and Sheriff Pickard interviewed Helton at the Knox County Sheriff's Office on 3/8/12. During that interview, Detective York asked Helton a series of questions which were leading and suggestive. Detective York was supplying the answers to his questions and allowing Helton to respond yes or no. This is a dangerous practice often committed by an investigator who is attempting to elicit responses that match the investigators theory of what occurred during the incident. Such actions can lead to false confessions or statements. (International Association of Chiefs of Police IACP Training Key #500)

Detective York conducted his investigation under the theory that Katherine Mills was robbed and murdered by William Lester, Johnathon Taylor and Amanda Hoskins. As such, the leading questions were instrumental in eliciting a statement from Helton which implicated those people in this crime.

Allen Helton had already proven unreliable when he submitted to a polygraph examination which showed deception on his part to all questions regarding the robbery and death of Ms. Mills. Detective York then began this statement by providing an excuse for Helton when he lied in the polygraph:

*Det. York: "But you just…you know who was and you've seen the money that was stolen from her and is that the reason why you had trouble with the polygraph?"*

*J. Helton: "Right"*

**March 8, 2012 Statement of Allen Helton at PL 15842:21**

In his statement, Helton alleged that he had a conversation with Ms. Hoskins and Mr. Lester the day before Ms. Mills died. In that conversation, Ms. Hoskins asked him if he wanted to make some money "by going in and tying this old woman up when she came out of the bathroom." Mr. Helton then revealed that the woman Ms. Hoskins referred to was Katherine Mills. (Helton Statement PL 15842). The leading nature of questioning is exemplified below:

> **Det. York: And She said** *"Do you want to make money?" William's ex-mother-in-law has got $15,000.00". Is that right?"*
>
> **J. Helton***: "Right".*
>
> **March 8, 2012 Statement of Allen Helton at PL 15844:65: Helton Statement**

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

> ***Det. York****: She goes out every morning to use the bathroom. Was they going to tie her up or what? Or just lock her in?"*
>
> *J. Helton: "Lock her in the… Det. York: "Tie her…you mean" J. Helton "Yeah".*
>
> **March 8, 2012 Statement of Allen Helton at PL 15844:*68***

Mr. Helton also alleged in his statement that he met with Ms. Hoskins at Mike Simpson's house and Hoskins stated "we got the job done". Helton claimed he knew that Hoskins was referring to the robbery of Ms. Mills because she had a "stack" of money with her at the time. According to the statement, Ms. Hoskins was in possession of thousands of dollars.

According to Helton, Ms. Hoskins never told him specifically that the money was from the robbery of Ms. Mills.  In fact, Hoskins never told Helton that they had committed the robbery. (Helton Statement PL 15847: 125:

> **Det. York***: "Okay, Did they tell you that they had done it?"*
>
> **J. Helton***: "No. They never actually told me that they had done it"*
>
> **Det. York***: "What did they say?"*
>
> **J. Helton***: "They said, we got the job done."*

Nevertheless, Detective York began his line of questioning with a leading mischaracterization of what Helton stated: (Helton Statement PL15851:191):

**Det. York**: *"So at 12:00 that day, when they were up there and she was saying that she got the job done and **this was part of the money from killing Katherine**...uh...he didn't know that she was dead either.*

**J. Helton:**" *Right"*

Helton testified in his deposition that Detective York gave him details of the robbery/murder during his interview on January 4, 2012. Helton also stated Detective Mefford and Detective Broughton were also at that interview. (Helton April 9, 2018 Dep. Tr. at 42:1-22.

Helton stated that later, on March 8, 2012, Sheriff Pickard promised to help him with pending charges if he told them what they wanted to hear.

**Q** *"Did Sheriff Pickard make any promises to help you out on your pending criminal case if you told him what he wanted to hear?*

**A** *"He offered to get -- he said he'd get me a bond to get me out and there wouldn't be no more charges brought up on me."*

(Helton April 9, 2018 Dep. Tr. at 71)

Helton further explained in his deposition that the information he provided in his statement on March 8, 2012 was all false and that he provided that he agreed to go along with the information provided by Sheriff Pickard and Detective York because they promised to assist him with pending charges. (Helton April 9, 2018 Dep. Tr. at 80). Helton testified in his deposition that the false information implicating Plaintiffs in the Mills' murder was provided to him by the above named officers.

## B. Joe King

According to his supplemental report, Detective York interviewed Joe King on June 4, 2011 at the Bell County Detention Center.  York Report at PL15069.  Detective York documented that Mr. King refused to be recorded for the interview. According to the report, King revealed that Amanda Hoskins and William Lester came to him looking for money to fill a prescription for Suboxin. King stated neither of them had any money so he arranged for Hoskins to get enough money to fill the prescription. The report further claims that King went on to say Hoskins and Lester went on to talk about robbing an old lady that was Lester's mother in law. King stated Lester told him they were going to lock her in the outhouse while they robbed her. Hoskins said she was going to dress up like a home health nurse and use that as a way to rob her. According to Lester, she had a great deal of money from the sale of timber.

According to Detective York, King was contacted by Hoskins two days after the robbery and she said she was buying stuff at a pawn shop. Hoskins told King that she received $10,000.00 from a settlement.

Joe King testified in a deposition on June 6, 2018 in a way that greatly contradicted the representations contained in York's Supplement report which credited King with making several statements implicating Hoskins and Lester. According to King, Detective York began the interview by telling King many of the details concerning the robbery/murder of Katherine Mills. (King deposition 22-5: *A · · And he's like, let me tell you what I know so far. And then he started telling me this stuff that he'd got from other -- from other witnesses in the case.*)

Reliable confessions or witness statements contain information unknown to the police that can be independently corroborated. If the information cannot be corroborated then some investigators may question the subject about specific information that was known only to the police. When police investigators do that, they open themselves to the likelihood of false statements from the subject. In this case, King denied making the statements as reported by Detective York and also claimed that Detective York told him what he wanted him to say and felt like Detective York was putting words in his mouth. (King Dep. Tr. June 6, 2018 at 22-8). For example:

> *Q · · So when you look over this statement as a whole, is this information that you provided Detective York, or is it information that Detective York provided to you?*
>
> *A · · It was what York provided to me and was trying to get me to agree with -- with this stuff –*
>
> *Q · · Okay.*
>
> *A · ·-- and then -- and then put it down like -like I'd said it. · And that's what -- that's what was outrageous to me, so · ·*
>
> *Q Because you had not said it?*
>
> *A · · Yes.*

King Dep. Tr. June 6, 2018 at 30-4

Further, Detective York met with Joe King alone and failed to properly record the conversation. Police officers are trained to properly record witness statements which allegedly provide significant incriminating evidence against a suspect in a murder case. The documentation can be accomplished through electronic recordings, witness police officers and

contemporaneous notes which directly quotes the witness statements. This illustration with regarding to Mr. King is emblematic of a widespread occurrence through the entire investigation into Ms. Mills' death.  Throughout the investigation, the Defendants failed to fully and properly document and/or record their investigation. Those failures included the following:

- Failure to fully and properly conduct, document, and/or record interviews;
- Missing and merging of investigative facts often precludes ability to actually know which officer (who) did what, when, where, how and why;
- Failure to accurately (if at all) identify dates, times, locations, and individuals present for significant events (statements, investigatory actions, etc.);
- Investigative "tunnel vision" by York and others and refusal to investigate potential suspects other than the department's chosen suspect;
- No documentation of numerous "witnesses" statements, either audio, visual, or written; particularly where the information tended to exculpate the department's chosen suspect;
- Failure to document a show-up that was conducted with the only eyewitness;
- Virtually no chronological documentation of investigative steps taken; and
- Failure to maintain and complete an investigation file;

Police files should include information about alternative theories and suspects or information about how certain theories or suspects were allegedly eliminated. That is particularly true in a case like this.

**Amber Simpson**

According to the transcript of Amber Simpson's statement to Detective York, Simpson stated: (1) Jonathon Taylor told her Lester had planned the robbery of Ms. Mills; (2) Kayla Mills participated in the robbery as a lookout; (3) Jonathon Taylor was the one who hit Ms. Mills over the head with a hammer twice; and (4) Taylor told her he placed five one hundred dollar bills in a half circle near Mills purse. Transcript of Simpson Statement at PL15856.  Further, Simpson's statement claims that Amanda Hoskins was parked in a blue or black cavalier parked a little ways from the house. Taylor didn't tell Simpson if Lester was at the scene of the crime or not. Id. at 15859.

At her deposition in this litigation, Ms. Simpson revealed that her statement was a product of fabrication by law-enforcement.  There, Simpson denied that Taylor ever confessed to the robbery and murder of Katherine Mills. (Simpson Dep. Tr. April 13, 2018 at 11). In fact Simpson stated Taylor never had a conversation with her about Ms. Mills' death (Id. at 17:14).

*Q. · Did Jonathan ever tell you that Will had planned her death?*

*A.  · ·No. · I had heard of Will, but I never knew Will. ·*

*Q:  ·didn't know him?*

*A.  · ·or nothing about him.*

Id. at 17:17

According to Simpson, Detective York provided her with all the details concerning the robbery/murder of Katherine Mills. She did not know the information or details of the crime before she met with detective York (Id. at 17-23).

Simpson stated Taylor never told her that he hit Ms. Mills in the head with a hammer. Simpson revealed that Detective York provided that information to her when the recorder was turned off. York also told her that Amanda Hoskins was supposed to pick up Taylor if anything went wrong. Simpson didn't know anything about the hammer or how many times Ms. Mills had been hit before Detective York told her. (Id. at 19).

Simpson also revealed that Detective York provided her with the information regarding the five one hundred dollar bills dispersed on the floor. Taylor never told her that. (Id. at 19-20).

Once again Simpson denied having any knowledge of the blue cavalier or Hoskins presence in the vehicle during the robbery. Detective York provided that information as well. (Id. at 20)

Simpson explained in her deposition she believed that if she told Detective York what he wanted her to repeat that she would receive the benefits of the promises he made prior to her giving the statement. (Id. at 21).

Further, according to Simpson, Detective York promised to help get her brother out of jail and advised Simpson and her mother that there was a $10,000.00 reward for information about the robbery of Ms. Mills. (Id. at 21).

Simpson stated Detective York did not turn on the recorder right away before taking her statement. Detective York told her "*I could be charged for withholding evidence in a murder case. · And I was only, like, 17, and I was scared, so -and he said something about maybe getting my brother out of jail that had been arrested for manufacturing, but that wasn't even necessary because the charges was being dismissed. And a reward -- said the family was offering a reward, and he would get it*.

(Id. at 14-5).

If Simpson's account is accurate then Detective York failed to follow accepted police practices for conducting witness/suspect interviews. By providing details unknown to the witness, Detective York set up an opportunity for a false statement. It would be impossible for the detective to corroborate the information or know whether the witness is truthful since he provided all the unknown details.

Detective York also made promises to Simpson and according to Simpson offered them in exchange for providing information about the murders. Detective York should have known that making promises in exchange for information is one of the most common causes of false confessions and statements. Especially when the detective should have known that Simpson had no independent knowledge about the case.  Whenever a witness is getting a benefit in exchange for a statement or testimony, or expects a benefit based upon a past relationship with the officer. the police need to be very careful in analyzing whether what he or she is saying is true and can be corroborated.  That is no less true for Amber Simpson.  The Defendants did no investigation to determine whether Simpson's statement could be corroborated.   Finally, Detective York failed to document any of the information contained above: that he promised consideration to Ms. Simpson and provided her with the details contained in her statement.

## Daniel Wilson

On 7/18/12, Detectives York and Mefford interviewed Daniel Wilson. York reported that Wilson gave an unrecorded statement which implicated Taylor and Hoskins. Wilson allegedly advised Detective York that Taylor described how he killed an old woman. Wilson stated Hoskins arranged for the robbery. According to the statement, Wilson said Taylor never said what he used to kill Mills but said Taylor" moved his arms and hands when he described beating the lady. The motion would be if he had something like a club or hammer in his hands."  York Supplement Report at PL18057.

At his deposition, Wilson denied that Taylor ever confessed to killing Katherine Mills. (Wilson Dep. Tr. July 9, 2018 at 12). Wilson said he never gave any information relating to the Mills death investigation to York during that interview. (Id. at 19).

According to Wilson, he didn't know Hoskins and hadn't heard the name before Detective York brought it up to him. (Id. at 20).

For his part, Detective Mefford does not remember the details of the conversation during the Wilson interview and couldn't confirm or deny the statements noted in Detective York's Supplement Report. (Mefford Dep. Tr. June 5, 2018 at 47).   Notably, Detective Mefford did not write a supplement report after meeting with Wilson. In fact, he

stated he wrote no reports documenting his participation in the death investigation of Kathrine Mills between December 2010 and March 23, 2013. (Id. at 58).

As discussed above, police investigators are expected to document their involvement in criminal investigations, especially in homicide investigations. It would be inconsistent with accepted police practices and training for an officer to neglect such an important aspect of his duty. Detective Mefford stated in his deposition that he collected clothing from the medical Examiner after the autopsy. However, Detective Mefford failed to complete a report regarding that evidence collection as is required by KSP General Order OMB-18.

Wilson is alleging that detective York falsified the supplement report and falsified evidence in the case against Hoskins and Taylor. Wilson stated Detective York provided him with information regarding the robbery that was unknown to Wilson prior to the interview. According to the record, Detective Mefford did not make any attempts to intervene in the fabrication of evidence and likewise did not submit a report. Today, he can't remember what occurred and Detective York didn't ensure that the statement was recorded. Such conduct by Detective York and Detective Mefford would have been unlawful and inconsistent with accepted police practices for conducting witness interviews in a criminal investigation.

## Kayla Mills

Detective York summarized a statement given to Detective York on 3/16/12 which incriminated Jonathon Taylor in the robbery/murder of Katherine Mills. York Supplement Report at KSP18052. In this report, Detective York claims that: Mills told him that Taylor made this statement to her *"I done left one lying up on the creek and I don't care to leave another one."* According to Detective York that was a confession that Taylor killed Katherine Mills. Detective York didn't mention in his report that Mills told him that Taylor never actually said he killed Katherine Mills. Mills assumed that he was talking about Katherine Mills and Detective York reported it as if Taylor had actually said he killed Katherine Mills. Detective York's summary was misleading and mischaracterized Kayla Mills' statement.

Kayla Mills' mother, Donna testified in deposition that the police were threatening to arrest her daughter for the murder of Katherine Mills if she didn't give them information implicating Lester, Hoskins and Taylor. (Donna Mills deposition 20-1).

*And she was like, "Mom, Jonathan has never said anything to me about this. · Nothing. · He don't know anything at all." · Like he had never said anything to her. ·*

*She always -- every single time she said -- I would tell her, "If you know anything, you tell them.  · You tell what you know." · And she's like, "I don't know anything."*

Donna Mills' Dep. Tr. September 7, 2018 at 21-14

Kayla Mills made a similar allegation in her statement to Detective York and Sheriff Pickard. Kayla Mills stated she tried for a month to get Taylor to speak about the murder because John Pickard had threatened her with arrest. *"I wouldn't lie to you." He was like, "You're going to get charged with this. They're going to be figuring out what happened."*

3/16/12 Mills Statement at PL15872.

According to Donna Mills, she repeatedly asked Kayla point blank if Taylor ever confessed to his part in the murder of Katherine Mills and Kayla said *"No, never"*. (Donna Mills' Dep. Tr. September 7, 2018 at 27-5). Donna Mills also stated in her deposition that Detective York came to her house and threatened to arrest Kayla if she didn't come to the police station and say what he wanted her to say: "*And she knows what that is, she is going to jail because I have a warrant for her arrest and she is going to jail.  · And I don't even need her statement anyway because I already have enough evidence to arrest her."* (Id. at 39-11).

Kayla Mills and Donna Mills eventually met with Detective York and Sheriff Pickard at the Barbourville Police Department. According to Donna Mills, Detective York opened the meeting with: "A. We just went in and sat down and Jason York just stated, *"You're going to tell me something today …You're going to tell me what you -- I want you to know."* He said, "*I want you to tell me what you know -- to tell me or you're going to jail. And we discussed this, Kayla"* -- is what he said.  · *"We've discussed this several times.  · You know what you have to say.  · If you don't tell me this, you're going to jail today.* (Id. at 45-11).

Donna Mills further testified that Detective York named Taylor, Lester and Hoskins as suspects in the robbery/murder of Katherine Mills in conversations with Kayla Mills on dates prior to Kayla's statement. (Id. at 45-16).

Donna Mills testified throughout her deposition that Detective York provided details of what he wanted Kayla to say and when she refused he became very angry. Detective York intimidated Kayla by slamming the table and shouting at her. He also turned the recorder on and off throughout the statement. When off the recorder, Detective York instructed Kayla and what he wanted her to stay. Detective York accused her of

participating in the robbery/murder and attempted to get her to give a false statement. (Id. at 52-13).

Detective York's interrogation became so coercive that Donna Mills became sick and had to leave the room. (Id. at 57-17).

Donna Mills also revealed in her deposition that Detective York turned off the recorder during the statement and intimidated Kayla while telling her what to say. When listening to the audio recording, it is apparent that Detective York turned off the recorder in the middle of a sentence and never properly closed out the interview with a sign off including the time.

Shockingly, Detective York also secured an arrest warrant for Kayla Mills for the murder of Katherine Mills prior to fabricating her false statement that implicated Plaintiffs in the murder. According to the prosecutor, Jackie Steele, Detective York never revealed that information to the prosecutor that charges were initiated against Kayla Mills for the underlying murder. The prosecutor – and defense – were likewise never informed that Detective York agreed to not arrest Kayla – even though he obtained a million dollar bail – if she agreed to give a statement incriminating Jonathon Taylor. Mills did eventually agree to give that statement and Detective York never pursued the murder charges that he initiated against her. As noted above, Detective York never reported that arrangement in his police reports, to Prosecutor Steele, or to the Grand Jury.

The strawman set forth by Detective York is easily broken in another aspect. Immediately after giving the statement, the detective stated they no longer believed Kayla Mills was involved after she gave a statement which implicated Jonathon Taylor. Detective York was unable to disclose the evidence he possessed that would have supported probable cause before the statement. (York Dep. Tr. Feb. 13, 2018 at 32-2).

After reviewing Kayla Mills' statement, it is difficult to understand how Detective York changed his mind about Mill's involvement based on her statement. The methods used to manufacture Ms. Mills' statement by Defendants Pickard and York were unlawful and inconsistent with accepted police practices for conducting witness interviews in a criminal investigation.

**<u>Amanda Hoskins</u>**

Detective York and Detective Mike Broughton conducted an interview of Amanda Hoskins. There, Detective York used the same tactic with Hoskins as he did with Kayla Mills. In doing so, Detective York secured an arrest warrant for her and threatened to arrest her if she didn't tell him what he wanted to hear. Because Hoskins was different

than Mills - Hoskins refused to make a false statement - and as a result was criminally charged in the robbery/murder of Katherine Mills.  Detective Broughton did nothing to intervene on Ms. Hoskins behalf when Detective York made such threats.  He likewise failed to document any of this information in a report or disclose such information to the prosecutors.

In her deposition, Amanda Hoskins testified that Detective York threatened to arrest her if she didn't make a telephone call to William Lester (Hoskins Dep. Tr. at 37-9). Ms. Hoskins further stated Detective York and Detective Broughton were together at her interview when Detective York told her what to say in her statement. Detective York banged on the table and threatened to charge her with murder if she didn't say what he wanted her to say. Broughton made no effort to stop Detective York or intervene in any way.

Detective York acquired the arrest warrants for Kayla Mills and Amanda Hoskins on the same day. However, he was unable to explain how he could have had probable cause to arrest both of them based on the evidence he had at the time.

**Opinion B: Detective York and Sheriff John Pickard used threats and promises to coerce Kayla Mills into making a statement.**

It is now undisputed that Detective York secured an arrest warrant for Kayla Mills for the robbery/murder of Katherine Mills prior to taking her statement. Detective York used that arrest warrant to threaten and intimidate Kayla into saying what he wanted her to say.  Detective York, of course, readily acknowledged using these types of tactics during interrogations or interviews with suspects and witnesses. (York Dep. Tr. at 13-28).

Detective York even acknowledged that Kayla Mills knew he had secured a warrant for her arrest. (Id. at 157-19). Detective York also acknowledged that he had an agreement with Kayla Mills that he would not charge her with the murder if she provided a stamen implicating Taylor in the murder. (Id. at 162:9).

Prosecutor Jackie Steele was not aware that detective York secured an arrest nor was he aware that the detective used that arrest warrant to coerce Kayla Mills into a statement. Steele acknowledged that he would have expected a police officer to divulge that kind of information. He also acknowledged that he would have disclosed that information to the defense. (Steele Dep. Tr. at 112-8).

Kayla Mills made a similar allegation in her statement to Detective York and Sheriff Pickard. There, Kayla Mills stated she tried for a month to get Taylor to speak

about the murder because John Pickard had threatened her with arrest. *"I wouldn't lie to you." He was like, "You're going to get charged with this."* Mills Statement at PL15872.

Detective York and Sheriff Pickard's interactions that led to Ms. Mills giving a statement were coercive in nature. Put simply, the methods used to manufacture Ms. Mills' statement by Defendants Pickard and York were unlawful and inconsistent with accepted police practices for conducting witness interviews in a criminal investigation. According to the IACP, such practices are inconsistent with the accepted police practices at the time.

> **IACP Interrogations and Confessions Concepts and Issue Paper p.1**: The Concept of Voluntariness: *This point is essential, for one of the key concepts in the law of interrogations and confessions is voluntariness. To be admissible, the confession must be voluntary; that is to say, it must have been made freely, without any coercion or intimidation on the part of the police or their agents.*

Further, additional research supports that the methods used by Defendants Pickard and York were coercive in nature.

> Psychological Coercion: causing a suspect to believe that he or she has no choice but to comply with the wishes of the interrogator, is not specific to any one technique but may be the cumulative result of the interrogation methods as a whole. When suspects perceive there is no choice but to comply, their resulting compliance and confession are, by definition, involuntary and the product of coercion. (Police Interrogations and False Confessions by G. Daniel Lassiter and Christian A. Mesisner, Ofshe & Leo, 1997:p.18)

**Opinion C: Detective York failed to follow accepted police practices when he failed to disclose exculpatory evidence to the prosecutor.**

The following definitions are relevant to this opinion, and others:

**Duty to Disclose**: The landmark decision of *Brady v Maryland* (1963) places an affirmative constitutional duty on a prosecutor to disclose exculpatory evidence to a defendant. This duty has been extended to police agencies through case law, requiring law enforcement agencies to notify the prosecutor of any potential exculpatory information.

**Exculpatory Evidence/Brady Material**: Evidence in the government's possession that is favorable to the accused and that is material to either guilt or punishment, including evidence that may impact the credibility of a witness.

Detective York and his fellow officers conducted this investigation with a pre-determined theory and discounted information/evidence which did not correspond with his theory. Therefore,

the detective often failed to document interviews, show ups, and other significant exculpatory evidence.

According to Police Chief Magazine: Chief's Council by Julie Risher: *Although an extensive discussion of tunnel vision is beyond the scope of this column, supervisors and officers alike should be aware that this phenomenon might lead investigators to discard information that does not support a hypothesis and to focus on information that does. It is precisely the information that does not support a hypothesis that may prove to be exculpatory (or, at least, that a defense attorney may convincingly argue is exculpatory). Consequently, as agencies work to improve their officers' understanding of both Brady and the importance of compliance, helping officers understand their vulnerability to tunnel vision is key. At least in more serious cases such as rapes, kidnappings, robberies, and homicides, classifying anything as "irrelevant" early in the investigation is fraught with hazards.*

## A.  Michael Crump

Mr. Crump gave a recorded statement to Detective Mike Cornett stating he saw a blue car at Mill's residence on the morning she was robbed and murdered. Cornett supplement report at PL 14435. He also stated he saw a white male coming wearing a hooded camouflage coat walking from the rear corner of the residence towards the road. Crump stated the man had tattoos on one or both of his hands.

After this, Detective York and Detective Josh Bunch interviewed Michael Crump on 2/2/11.  York supplement report at PL15065. There, Mr. Crump stated he saw a blue car at Katherine Mills' house the morning she was robbed and found dead. He also stated he saw a white male coming from the corner of the Mills residence where she was later found dead. Mr. Crump described the male as having a hood on his head and wearing a hunting jacket with a camouflage pattern. With the help of Mr. Crump, Detective Bunch drew a sketch of the suspect of the man seen at the Mills' residence.

After obtaining this sketch, Detective York, Detective Broughton and Sheriff Pickard interviewed Jonathon Taylor. (Taylor Dep. Tr. at 145:1-10; 146:2-5,15-23; 147:3-4; Pickard Dep. Tr. at 97, 11-13).  Detective York and Sheriff Pickard viewed the composite sketch created by Mr. Crump and Officer Bunch prior to this date. (York Dep. Tr. at 343-345; Pickard Dep. Tr. at 237:11-16).  After that interview, they instructed Jonathon Taylor to dress in hooded jacket and place the hood over his head so he would look like the sketch drawn by detective Bunch. There, Defendant York, Pickard, and Broughton intentionally requested that Mr. Taylor put on a coat on prior to instructing him to place the hood over his head.  (Taylor Dep. Tr. 3/28/18 at 145:1-5; 147:10-13; York Dep. Tr. at 349:7-25; 350:1-25; 351:1-8).  The detectives then gave Taylor directions on how to stand as Detective Broughton photographed him from the side in an effort to

make him appear similar in nature to the sketch. (Id. at 349:7). Detective York then sent the photographs to a police department in Oklahoma who showed the photograph to Michael Crump to see if he could identify Taylor as the man he saw at Katherine Mills' house. (Id. at 69:14).

Defendants Broughton and York engaged in a discussion during the photo-taking process according to deposition transcripts. (Taylor Dep. Tr. 4/13/18 at 16-18). Defendants Broughton and York boasted about how they were taking the photographs in a suggestive manner that would cause Mr. Crump to identify Mr. Taylor and allow for law-enforcement to finally initiate charges against him. (Id. at 16:16-17:14). Mr. Taylor alleged that the Defendants bragged as they concocted a suggestive photo identification process, exclaiming "Oh, yeah, we got him." Defendant Broughton admits to taking the photographs of Mr. Taylor and reveals that he "knew they were going to be used in some capacity in the investigation." (Broughton Dep. Tr. at 125-126.). None of the individuals involved in this – Detective Broughton, Detective York, and Sheriff Pickard – documented any of the activities referenced above.

The lack of documentation did not end there, though. Detective York later learned from Mr. Crump that he could not positively identify the photograph of Taylor as the person he saw at Katherine Mills' house (York Dep. Tr. at 69). Detective York never documented in a police report that he sent the photograph of Taylor to Oklahoma for Mr. Crump to identify. (Id. at 70-5).

Detective York did not document in a police report which photograph or how many photographs he sent to Oklahoma for Mr. Crump to view. (Id. at 70-10). Detective York never documented in a police report the fact that Mr. Crump did not identify Taylor as the person he saw at Katherine Mills' house. (Id. at 70-14). Detective York further testified that he had a number of contacts and interviews with Mr. Crump that were not documented in a police report. (York deposition 99-17). As is discussed above and below, the failure to document such information is inconsistent with the accepted police practices at the time.

> **U.S. DOJ: Eyewitness Evidence: A Guide For Law Enforcement: Section IV.B.** *Recording Show up Results: When conducting a show up, the investigator shall preserve the outcome of the procedure by documenting any identification or nonidentification results obtained from the witness*

A police investigator is obligated to document all his/her activities that are relevant to the case. All evidence must be carefully collected and properly documented in the proper police report. The investigator must document all evidence whether it is exculpatory or inculpatory. It is not up to the investigator to decide what evidence he will document and what evidence he will conceal. Mr. Crump was the only eye witness of the robbery/murder which would make him one of the most important witnesses in the investigation.

**IACP Eyewitness Identification Model Policy: IV. 17**. *Document the time and location of the show up, the officers present, the result of the procedure, and any other relevant information.*

Further, as these officers should have known, line ups and show ups are a highly scrutinized aspect of a criminal investigation. The investigator is trained to recognize that fact and therefore obligated to document all his/her actions when utilizing a show up or line up investigative technique. This includes a description of how the show up was conducted, what officers were present, maintain copies of the photographs used, and document exactly what the witness said about the photograph. The information must them be documented on the proper police report regardless of whether the witness identified the photograph or not.

**IACP Criminal Investigations Concepts and Issues Paper P5:** *Completeness. The report should be complete in that is must contain all the facts that were uncovered during the investigation and are relevant to the case. An incomplete report can hinder the validity of the investigation and prove to be inadmissible in court.*

Failing to document critical information in a police report during a criminal investigation is inconsistent with accepted police practices and police training in criminal investigation. Detective York, Sheriff Pickard, and Detective Broughton failed to document significant exculpatory information relating to the show-up and comments made therein.   Further, Detective York failed to document that Mr. Crump did not identify Mr. Taylor after participating in the show-up.

Even more, Detective York never told Mr. Steele whether or not Mr. Crump was able to identify the person he saw at Katherine Mills' house. That information was not included in either police report containing Mr. Crump's witness statement.   Mr. Steele's deposition is illuminating on this score:

> Q. · Are you aware of any other reports that were created during the course of the Katherine Mills investigation that give any indication as to whether Mr. Crump is or is unable to make an identification of the ·male subject he saw at Katherine Mills' residence on December 20, 2010?
>
> A · · There's none other that I'm aware of. · No.
>
> (Steele Dep. Tr. at 101)

None of the individuals referenced above told the Commonwealth Prosecutor Jackie Steele that a Taylor show up was conducted with Mr. Crump where he was unable to identify Taylor as the person he saw at Katherine Mills' house. There were no police reports done at all disclosing that information.

*Q· · Okay. · So, would it have been important for you, as a prosecutor, to know that Mr. Crump looked at a photograph of Jonathan Taylor and declined to make an identification of him as the person who he saw at Katherine Mills' residence on December 20, 201011· · · ·*

*A· · I think all information's important for me to have, so yeah, I think -- yeah. · Obviously, any information would've been important to have.*

       (Id. at 102:4)

Detective York also never told the Grand jury that he presented a photograph of Taylor dressed like the sketch to Mr. Crump and Mr. Crump was unable to positively identify Taylor as the person he saw at Katherine Mills' house. (York Dep. Tr. at 356-12).  In fact, his grand-jury testimony indicates that he informed them of the exact opposite.

### B. Mike Simpson

On February 15, 2011 Detective York authored a Search Warrant Affidavit stating that "Mr. Simpson had been identified by Michael Crump (UI) being at Katherine Mills' residence the morning she was robbed and found dead". Search Affidavit at KSP18106. Detective York also never revealed that information to prosecutor Jackie Steele. (Steele Dep. Tr. at 122:8)

### C. Kayla Mills

Detective York also secured an arrest warrant for Kayla Mills but agreed to not arrest her if she gave a statement which incriminated Jonathon Taylor. Mills did eventually agree to give that statement and Detective York never charged Mills with the murder of Katherine Mills. Detective York never reported that arrangement in his police reports, to Prosecutor Steele, or to the Grand Jury.

### Opinion D: Detective York misled the grand jury with fabricated misinformation which was not supported by the evidence.

Detective York appeared before the Grand Jury to initiate charges against William Lester, Jonathon Taylor and Amanda Hoskins. There, Detective York testified falsely in a number of respects based on the investigation conducted to date.  Some of those inaccuracies are detailed below:

*"It was February 15th, 2011, is when I interviewed her. And she told me that she was at her doctor's office at 9:30 that morning. And her doctor was there. Dr. Larry Warren. He worked at the Hope Medical Center and at the Barbourville ER, the mercy room. And she used that as her alibi that she was at the doctor's office during the time. Well, I went in the doctor's office and pulled the records. And I've got documentation showing that she didn't*

*show up. She was late for an appointment and that she did not show up to the doctor until noon that day. So she lied about that."*

Grand Jury at PL15889

The record reveals something different altogether. Ms. Hoskin's patient medical card shows the appointment time for Ms. Hoskins was 11:30AM. Records at PL 4165. It also showed that she arrived at 11:54 AM. Detective York had this information prior to his appearance before the Grand Jury. (York Dep. Tr. at 306-4) yet he testified that Ms. Hoskins lied about her appointment time and claimed that Ms. Hoskins was attempting to establish a false alibi. The detective did not have any documentation to support that Ms. Hoskins claimed to have had a 9:30 appointment. (York Dep. Tr. at 304-14). (York Report at KSP 18034) (Hoskins statement PL 15903). In fact, Detective York never asked her about her activities the day of the robbery/murder when he took her statement.

Detective York further informed the Grand-Jury of the following information which was not corroborated by investigation.

*"And also she was having an affair with Dr. Warren. And for you also documentation there were, for example, there one week because she was trying to use him as an alibi."* Detective York had no evidence to prove or even suspect Dr. Warren was having an affair with Hoskins. The detective made this statement to the Grand Jury as if he was able to prove such a statement. The only information he had was from Hoskins' ex-boyfriend Joe King and none of that was ever corroborated.

Grand Jury at PL 15889

By that time, the underlying investigation revealed that Hoskins and Warren denied that they were having an affair. (Hoskins Dep. Tr. 57:7). Detective York next misled the grand-jury when he testified about Mr. Helton. In doing so, he stated:

Detective York: Allen Helton. *"I polygraphed him. He didn't pass it. This was back in January of 2011. But he ... talking to the polygraphers he wasn't about if he killed her or not. He was lying about when he was asked about the money."*

Grand Jury at PL 15891

According to Detective York's supplement report at PL 1106, the polygraph examiner concluded that deception was indicated when Helton was answering the relevant Questions. The relevant questions listed in the report all dealt with the robbery and murder of Katherine Mills. Detective York's testimony to the Grand Jury was inconsistent with his own police report and that of the polygraph examiner.

Detective York also didn't disclose that fact that the polygraph examiner found Jesse Lawson to be deceptive when answering questions regarding the robbery/murder of Katherine Mills. According to Detective York, he didn't reveal that information to the Grand Jury because he was not "appearing for Jesse Lawson". (York Dep. Tr. at 358-23).

Detective York falsely gave the impression to the grand-jury that Mr. Crump identified Mr. Taylor. Grand Jury at PL 15894. Detective York testified that Mr. Crump positively identified Taylor as the same man as in the sketch and the same man Mr. Crump saw at the home of Katherine Mills. However, Detective York knew that Mr. Crump was unable to make identification from the photograph. Mr. Crump never identified Taylor as the same man as in the sketch yet Detective York told the Grand Jury that he had identified or as the man on the sketch. Detective York admitted as much in his deposition. (York Dep. Tr. at 354:11, 356:24). In addition, Detective York never told the Grand Jury that Mr. Crump looked at a photograph of Taylor and was unable to identify Taylor as the same man he saw at Katherine Mills' house.

Detective York mislead the Grand Jury by telling them that Mr. Crump had identified Taylor as the man he saw at the house. Not only was that untrue but detective York had written in a search warrant affidavit that Mr. Crump had identified Mike Simpson as the man he saw at the house.

Detective York had no information that Hoskins had access to a blue cavalier by stealing one from the orphanage. In fact, Detective York had evidence that Hoskins did not have the blue cavalier on the day of robbery/murder. In spite of that information, Detective York made the following statement to the Grand Jury: "Also, Amanda Hoskins' mother works at the orphanage. And she was driving a blue Cavalier. She sneak up there and steal a Cavalier that belonged to the orphanage. And take it and drive." Grand Jury at PL 15895.

At his deposition, Mr. York admitted that such testimony was false. (York Dep. Tr. 178).

*Q· Now, Detective York, you also test -- or, sorry, Sergeant York, you testified that Ms. Hoskins would sneak up there and steal a Caviler that belonged to the orphanage and take it and drive it; do you recall testifying to that?*

*A  Yes.*

*Q· Prior to April 27, 2012, did you have any evidence indicating that Ms. Hoskins ever snuck up to the orphanage and took a blue vehicle to drive on December 20, 2010?*

*A · No.*

In sum, Detective York made a baseless allegation regarding the blue cavalier when he had absolutely no supportive information to corroborate such an allegation. Yet, Detective York testified in a manner that would have misled the grand jury. The methods used by Detective York – actively testifying falsely before the grand-jury to initiate charges against Ms. Hoskins and Mr. Taylor – were unlawful and inconsistent with accepted police practices.

**Opinion E:  The County of Knox through Sheriff John Pickard failed to provide policies, adequate training and proper supervision of their law enforcement officers in criminal investigations, interrogations, and production of exculpatory evidence.**

To have effective constitutional policing, every law enforcement agency must have the three critical pillars which link the operational standards of the department; policy, training and supervision.  First, the department must have current written policies, secondly the department has to have proper training on those policies and lastly the department must hold the police officers accountable to follow those policies.

Police departments must decide if it is reasonably foreseeable that department members will be required to complete a particular task. Is that task one that can result in injury or violations of protections provided to citizens through federal and state laws or constitution? As such, it would be reasonably foreseeable to expect a member of the Knox County Sheriff's Office might have to conduct a criminal investigation at some time and /or might have to interview witnesses to a crime or interrogate suspects in a crime. Nevertheless, Sheriff Pickard testified that the Know County Sheriff's Office had no polices regulating the proper procedures for criminal investigations, interrogations or production of exculpatory evidence.

As a matter of fact, that occurred in this case where Sheriff Pickard became very involved in this criminal investigation involving the robbery and death of Ms. Mills.  Sheriff Pickard assisted in finding many of the persons of interest, witnesses and suspects in this homicide investigation such as Kayla Mills, Allen Helton, Jonathon Taylor and Bob Smith (Pickard deposition 14-15). Sheriff Pickard also participated in the interview of Allen Helton on 3/8/12 and spoke to him one time prior to that (Deposition 20-14).  In addition, sheriff Pickard participated in the interview and show-up of Jonathon Taylor as well. The sheriff also travelled to The Appalachian Children's Home with Detective York and spoke with staff about Amanda Hoskins having access to a blue vehicle.

Sheriff Pickard participated in all these aspects of the homicide investigation but failed to document his activities in any type of report, memo, note to file or personal notes. This is in contravention of police training and practices as it relates to criminal investigations. Police officers are trained to understand that they must record or document all of his/her activities in a criminal investigation. The investigator may be expected to testify in a criminal or civil

procedure at a later time and expected to provide details on his/her participation in that investigation.  This can be extremely difficult after years pass between the investigation and the legal proceedings requiring the investigators testimony.

> "*I'm not going -- no. · I mean, I just, you know, I didn't take any notes, period, through this whole thing, and -- I mean, Jason did all that.  I didn't do any of that. · I was just there.*"

Sheriff Pickard further stated he didn't take any notes even after all the meetings and interactions with Kayla Mills, Bob Smith, Allen Helton and Jonathon Taylor. (Pickard Dep. Tr. at 25-23).

## Policies

Sheriff Pickard confirmed in his deposition that the Knox County Sheriff's Office did not have any policies or procedures to guide police officers in criminal investigations or interrogations. Sheriff Pickard was not aware of any polices or procedures that gave instructions to document interviews conducted in homicide investigations, (Pickard Dep. Tr. 27-1). Mr. Pickard's lack of familiarity with policies and procedures that govern criminal investigations is because no such policies or procedures exist in Knox County, as reflected by the documents reviewed in this case.

## Training

Further, the bulk of Sheriff Pickard's training came from three Sheriff's Conferences. He never attended any outside investigation schools. Sheriff Pickard acknowledged in his deposition that he didn't go through any training at the sheriff's department regarding the documentation of interviews in a homicide investigation (Pickard Dep. Tr. at 26-1).

Sheriff Pickard was never trained in the following police practices:  interview techniques, Interrogations techniques, preparing police reports, lineups, retention of physical evidence, production of exculpatory evidence, (Pickard Dep. Tr. at 33-19).  Sheriff Pickard did not have any training on department policies for the employees: (Pickard Dep. Tr. at 61-8). There were likewise no formal mechanisms for communicating the policies and procedures on the Know County Sheriff's Office to its employees. (Pickard Dep. Tr. at 62-3).

## Supervision

Sheriff Pickard doesn't remember ever disciplining any employees between December 20, 2010 and when he left the Sheriff's office. (Pickard Dep. Tr. at 71:10)

An agency's disciplinary system is a critical reinforcement of its policies and rules. It is important that an agency's policies are followed and that an appropriate disciplinary scheme is established for violations. An important function of the disciplinary action is the message that is sent to others when an officer is disciplined or when he or she is not disciplined for a policy violation. All officers must understand the importance of the rules and regulations and the consequences for violating them. For example, if an officer is involved in a preventable accident, it is important to have a disciplinary scheme established.

A first violation may result in a letter to the file, while a second violation may require some remedial training. A third violation may result in a change of duty so the individual does not have an opportunity to use force to control a suspect. At some point a department will have to take more drastic action and those steps must also be made known to the officers. A policy without a meaningful disciplinary system will not be taken as seriously as one which includes an effective system of discipline. Similarly, a disciplinary system that can be subverted or manipulated will not serve as a deterrent. There is no room for "winking" at a violation and excusing poor judgment or deliberate actions which result in a violation of policy.

The Knox County Sheriff's Office doesn't have any policies or procedures for conducting criminal investigations or for conducting witness interviews or suspect interrogations. Sheriff Pickard confirmed that he was never trained in these areas and he never offered training in these areas to the members of the department. Any reasonable law enforcement officer would believe that it is more than likely that a member of the Knox County Sheriff's Office would be tasked with conducting a criminal investigation or interview witnesses or suspects in criminal activity at some time. Therefore, it would be reasonable and expected for the Knox County Sheriff's Office to have policies, procedures and training in these areas of policing.

Because of their refusal to implement policies, procedures, and training on such vitals areas, the Knox County Sheriff's Office has given tacit approval to the members of the agency to violate citizen's constitutional rights as it relates to criminal investigations, interrogations, interviews, production of exculpatory evidence, preservations of evidence etc. It is common for a police department to develop de facto, unofficial policies to fill the void when there are no official policies.

**Opinion F:  Kentucky State Police Sergeant Jackie Joseph failed to properly supervise detective York and the investigation into the robbery/death of Katherine Mills.**

Although there is a KSP policy and procedure requiring that all supervisory personnel shall be accountable for the activities of employees under their immediate control.  Supervisory responsibility shall be accompanied by commensurate authority, that certainly did not occur with

regard to this case. KSP AMB-3: Assignment and Responsibility of Commanders.  For starters, Detective York and the testified at length about the lack of training and supervision he was given at his deposition.  On her own volition, made the following startling admissions at her deposition, each of which confirmed that she failed to adequately supervise the officers under her command who were engaged in the type of activities discussed herein during the course of a homicide investigation.  Sgt. Joseph further admitted that prior to December 20, 2010, she personally had never received any outside training on how to conduct a homicide investigation. Joseph Dep. Tr. at 16.  Ms. Joseph further admitted that even at the police academy she did not receive any specific training on how to conduct a homicide investigation.  Because Ms. Joseph did not have training herself in how to investigate a homicide, she "rarely" gave advice to those under her supervision because she considered it to be "very inappropriate."

Q; And when you reviewed police reports that were generated by detectives under your command, did you ever give these detectives suggestions on what they should do in their investigation?

A: Rarely.

Q: How come?

A: Because I was never a homicide investigator. If it was a case about child pornography, you know, I've got experience in that.  So I could make suggestions on, you know, a way to investigate that, or a different route to take, or a next step.  You know, I've got experience with interviews, with kids, and preserving evidence in those cases.  I've got lots and lots of training on preserving electronic evidence, how to --what to look for in those cases as far as computers, and thumb drives, and hard drives, and all that kind of stuff.  But as far as, like, a homicide goes, I've never worked one in my career, so it would be, I feel, very inappropriate for me to tell somebody who's been doing homicide investigations for ten years how they should be doing their job.

Id. at 52

Sergeant Joseph failed to properly supervise Detectives York, Mefford, and Johnson to ensure that they followed all appropriate polices, law and procedures for conducting a criminal homicide investigation.

**Opinion G: Detective York acted contrary to accepted police practices when he conducted a "Show Up" with Michael Crump**.

As referred to above in Opinion C, Detectives York, Broughton and Sheriff Pickard conducted a show-up identification of Jonathan Taylor for the purpose of initiating charges against him.  See above.  Ultimately, Mr. Crump viewed the photographs but was unable to

identify Jonathon Taylor as the person he saw at Katherine Mills' residence. A critical piece of evidence which was never documented by Detective York. (York Dep. Tr. 69-24, 70-4, 14-23, 7-3) or disclosed to Prosecutor Jackie Steele.

> Q · · *Are you aware of any other reports that were created during the course of the Katherine Mills investigation that give any indication as to whether Mr. Crump is or is unable to make an identification of the ·male subject he saw at Katherine Mills' residence on December 20, 2010?*
>
> A · · *There's none other that I'm aware of. · No*
>
> Steele Dep. Tr. at 101:22

The fact that Mr. Crump was unable to identify the photograph as the person he saw at the Mills' residence was consistent with his previous testimony where he told the police he was unable to identify that person. (Crump deposition 16-9). When Detective York had one photograph of one individual shown to Mr. Crump, he conducted what is known as a "Show Up". A "Show Up" is different from the proper witness identification process known as a "photo array" or "Line Up". The following policies prove instructive.

> **IACP Eyewitness Identification Model Policy:** *Showup: The presentation of a suspect to an eyewitness within a short time frame following the commission of a crime to either confirm or eliminate him or her as a possible perpetrator. Showups, sometimes referred to as field identifications, are conducted in a contemporaneous time frame and proximity to the crime.*
>
> **IACP Eyewitness Identification Model Policy:** *IV.   PROCEDURES       A. Showups : The use of showups should be avoided whenever possible in preference to the use of a lineup or photo array procedure. However, when circumstances require the prompt presentation of a suspect to a witness, the following guidelines shall be followed to minimize potential suggestiveness and increase reliability*
>
> **IACP Eyewitness Identification Model Policy**: *Photo array:  A means of presenting photographs to an eyewitness for the purpose of identifying or eliminating suspects.*
>
> **IACP Eyewitness Identification Model Policy** : *Lineup: The process of presenting live individuals to an eyewitness for the purpose of identifying or eliminating suspects*

Even the Commonwealth Attorney, Jackie Steele, was shocked that the officers engaged in this process as any identification would likely have been suppressed at trial.

> A: "A photo show-up would -- could be one individual. Of course, if you do that, you do have a very high likelihood of it being suppressed for a photo show-up, unless there's some very limited instances in which it would not be suppressed. So, I believe the best course of action is six, to get around the suppression issues. There can be a photo show-up with one, but again, your likelihood of suppression of that will be suppressed."

(Steele Dep. Tr. at 91:2-10).

The use of the "Show Up" in this case was improper, contrary to accepted police practices and y suggestive. A reasonable police officer would not expect an accurate identification under these circumstances.

**Opinion H: From a police perspective, the information reviewed would not have supported probable cause to arrest Amanda Hoskins or Jonathon Taylor for the robbery/murder of Katherine Mills**.

Probable cause must come from specific facts and circumstances, rather than simply from the officer's hunch or suspicion. Detective York appeared before the Grand Jury to initiate charges against Amanda Hoskins and Jonathon Taylor for the robbery and murder of Katherine Mills. In doing so, Detective York presented his evidence and support for probable cause to charge Hoskins and Taylor.

The following IACP Model Arrest Policy is ripe for review:

> Probable cause for Arrest: When facts and circumstances within an officer's knowledge are sufficient to warrant a prudent person, or one of reasonable caution to believe that the suspect has committed, is committing, or is about to commit an offense.

Detective York's evidence to support his probable cause to arrest Hoskins and Taylor mostly consisted of uncorroborated statements from people who had extensive criminal histories and whom were never proven to be reliable. According to the witnesses who provided statements, they were coerced into fabricating evidence against Hoskins and Taylor through threats of arrest and promises of special treatment.

Detective York testified that Amber Simpson told him that Taylor confessed to the killing and said he hit Ms. Mills with a hammer. Detective York asked the medical examiner if a hammer could have been used in the murder and medical examiner said" yes, a hammer could have been used to cause the injuries". Detective York didn't say if he asked the Medical examiner if a rock could have been used, or if a stick could have been used or possibly a chair. The point is, Detective York focused on the hammer and didn't ask what other blunt objects could have caused

the injury. The fact that the medical examiner said "yes, it could have been a hammer doesn't mean it couldn't have been something else. Detective York never found "the hammer" or any other murder weapon.

It should be noted that Amber Simpson recanted her statement at a later time and stated Detective York provided the details of the investigation and she was coerced into giving that statement.

Detective York testified Joe King provided a statement which implicated Hoskins and Lester. King said Lester and Hoskins were looking for money the day before the murder to fill a prescription. They were able to fill the prescription after the murder.  Joe King, who had a criminal record and was in jail at the time of the statement. Mr. King also recanted his statement.

Detective York testified he interviewed Hoskins who told him that she was at the doctor at 9:30 am on the morning of the robbery/murder. Hoskins denies saying that and the medical records show that Amanda arrived at 11:54 am. Detective York had no documentation that Hoskins claimed to be at the doctor's office at 9:30.

Detective York was told by Joe King that Dr. Warren and Hoskins were having an affair. Detective York testified to that as a fact before the Grand Jury. There was no proof of that and Hoskins and Dr. Warren denied it. Detective York used false, uncorroborated information to support probable cause.

Christy Branson was interviewed by detective York while she was in jail. Branson told Detective York Hoskins talked about the robbery/murder while they were both in jail. Branson had the information confused but Detective York told the Grand Jury Branson said Lester was the mastermind behind the crime and Joe King was the one who killed Ms. Mills. Christy Branson could not remember giving this statement several years later. This statement conflicts with Simpson's statement which incriminated Taylor as the killer.

Detective York told the Grand Jury he took a statement from Allen Helton. According to Detective York, Helton is a drug user and dealer. York testified Lester and Hoskins went to a drug dealer Mike Simpson and Helton and gave them money to purchase drugs. According to York, this was done after the robbery/murder. Helton also reportedly said Hoskins and Lester asked him if he wanted to make some money, Williams's mother in law sold a bunch of lumber.

Helton also stated he saw Amanda after the robbery/murder with a stack of money, 3-4 thousand. Hoskins said "Heres the money, we got the job done".

Helton was never proven to be reliable and was found to be deceptive during a polygraph where he was asked about the robbery/murder.  However, Detective York was not truthful about

the results when he testified before the grand jury. York said Helton didn't pass the polygraph but he wasn't talking about "if he killed her or not". Helton also recanted his statement and said he had been given the details to state in the interview and was coerced into giving the statement that would incriminate Hoskins.

Detective York testified Mr. Crump had driven by the house on the morning of the robbery/murder and he saw a blue car nearby and a male with a hood coming around the corner with tattoos on his hands. That was Jonathon Taylor. Detective York misinformed the Grand Jury as Mr. Crump never identified that person as Taylor. In fact, York had sworn in an affidavit that Mr. Crump identified different person as the person he saw at the house.

Detective York went on to say Mr. Crump saw a blonde girl in the blue car and Hoskins had blonde hair.  Detective York never found the blue car but he misinformed the Grand Jury again when he said Hoskins mother had access to a blue car at the orphanage where she worked. York knew at the time that the blue cavalier in question was not available to Hoskins on the day of the robbery/murder.

Detective York told the Grand Jury Lester and Taylor were calling each other the day of the robbery/murder.

Detective York based his probable cause on the statements of people with serious reliability issues.  All people with a great deal to lose and people who can be manipulated by police officers. Helton was a prime suspect in the robbery/murder and stated he was coerced into making the statement. King was a criminal in jail who gave a recorded statement to York and recanted his statement. Amber Simpson recanted her statement and said she had coerced and promised a reward and the possibility of helping her brother who was in jail.

The information provided by the witness statements was not corroborated by physical evidence or reliable testimony. The police didn't have a murder weapon, didn't find the stolen cash, didn't find the car, and had no eye witnesses that could identify the suspects. The only physical evidence came in the form of fingerprint and DNA evidence and Hoskins and Taylor were eventually cleared through them as well. Detective York's probable cause was based solely on the statements (which were reported to be coerced) of unreliable criminals and drug addicts.

The following IACP key is relevant to my opinions here:

> **Key #597: Assessing Witness IACP Training Credibility**: *There is an adage in conducting investigations that physical evidence does not lay, but people do. This adage is accepted as true because items of physical evidence lack the human characteristics of pride, greed, envy, anger, and lust that motivate people to be deceptive in their actions and words.*

It is the credibility of witnesses that affects the believability and trustworthiness of their statements and that provides the investigator with a basis to rely on witnesses' statements as factual or to choose between conflicting stories, in order to determine the truth of the matter under investigation. A factor used to determine the credibility of a witness is to show the witness has the character to be a reliable witness. A witness credibility analysis in this case would indicate that none of Detective York's witnesses were credible based on their character. The only way an investigator could use their statements would be if he corroborated their information. Detective York either wasn't able or didn't attempt to do that.

Detective York presented a case of probable cause through misinformation, unreliable and uncorroborated sources and innuendo. There is little to no substantive evidence to support probable cause. Reasonable police officers would not have believed that probable cause existed for the arrest. The fact that so many people recanted their statements and claimed coercion of one sought or another represents why an investigator would never presume to have probable cause for an arrest based on evidence available to Detective York at the time he went to the grand-jury in this case.

### Opinion I:  The City of Barbourville failed to provide policies, adequate training and proper supervision of their law enforcement officers in criminal investigations, interrogations, and production of exculpatory evidence.

The City of Barbourville did not have any policies in place to guide the officers in the proper procedures for criminal investigations. Detective Broughton confirmed that the department didn't offer any training in those areas either. Any reasonable law enforcement officer would believe that it is more than likely that a member of the Barbourville Police Department would be tasked with conducting a criminal investigation or interview witnesses or suspects in criminal activity at some time. Therefore, it would be reasonable and expected for the Barbourville Police Department to have policies, Procedures and training in these areas of policing.

Detective Broughton failed to document or record any of his activity in this criminal investigation. He questioned a suspect who was later charged and assisted in the composition of a show up of another suspect who was also later charged. Detective Broughton showed his lack of knowledge concerning criminal investigations when he failed to document these activities. Detective Broughton further participated in the process of a show-up, failed to document it, and engaged with other officers about how the suggestive process would result in charges against Mr. Taylor.  A properly trained police officer would have known to document that activity and need to permanently record his involvement.

Detective Broughton wasn't instructed by any of his superiors to document the activity either. This would demonstrate a failure to supervise the department's police officers in the area of criminal investigation.

To have effective constitutional policing, every law enforcement agency must have the three critical pillars which link the operational standards of the department; policy, training and supervision.  First, the department must have current written policies, secondly the department has to have proper training on those policies and lastly the department must hold the police officers accountable to follow those policies.

Police departments must decide if it is reasonably foreseeable that department members will be required to complete a particular task. Is that task one that can result in injury or violations of protections provided to citizens through federal and state laws or constitution? As such, it would be reasonably foreseeable to expect a member of the Barbourville Police Department might have to conduct a criminal investigation at some time and /or might have to interview witnesses to a crime or interrogate suspects in a crime. Nevertheless, Detective Broughton testified that the Barbourville Police Department had no policies regulating the proper procedures for criminal investigations, interrogations or production of exculpatory evidence.

The Barbourville Police Department doesn't have any policies or procedures for conducting criminal investigations or for conducting witness interviews or suspect interrogations. Mr. Broughton confirmed that he was never trained in these areas and he never offered training in these areas to the members of the department. Any reasonable law enforcement officer would believe that it is more than likely that a member of the Barbourville Police Department would be tasked with conducting a criminal investigation or interview witnesses or suspects in criminal activity at some time. Therefore, it would be reasonable and expected for Barbourville Police Department to have policies, procedures and training in these areas of policing.

Because of their refusal to implement policies, procedures, and training on such vitals areas, the Barbourville Police Department has given tacit approval to the members of the agency to violate citizen's constitutional rights as it relates to criminal investigations, interrogations, interviews, production of exculpatory evidence, preservations of evidence etc. It is common for a police department to develop de facto, unofficial policies to fill the void when there are no official policies.

### Materials Relied Upon

Complaint
Nueschatz Expert Report
Garrett Expert Report

**<u>Depositions</u>**

      Jackie Steele
      Jason York
      John Pickard
      Jonathan Taylor
      Michael Crump
      Jonathan Taylor 3/28/18
      Jonathon Taylor 4/13/18
      Mike Broughton
      Mike Bruner
      Dallas Eubanks
      Donna Mills
      Kelly Farris
      Amanda Hoskins
      Amber Simpson
      Bryan Johnson
      Christy Branson
      Daniel Wilson
      James Helton
      Jesse Lawson
      Joe King
      Reuben York
      William Lester
      Training Files Mefford and Fariss
      Crime Scene Photos
      Hospital Photos
      Pickard Training File
      PL 10634: York Grand Jury Transcript
      PL 14390 &91: York Polygraph report
      PL 14432: York report: Helton statement
      PL14401: York report: Bank Records
      PL 14402: Pickrell Report: Smith Interview
      PL14406:York Report: Polygraph Results
      PL14408: York Report: Hoskins statement
      PL14412: York Report: Branson statement
      PL14414: York report: King Interview
      KSP18031: York Report: Missing money
      KSP18038: York Report: Crump interview

KSP18058: Lee Report: Original responder
KSP18059: Bunch Report: Original responder
KSP18060: Eubanks Report
KSP18061: York Report: Jennifer Lawson interview
KSP18063: York Report: Simpson interview
KSP18071: York report: T Bruner statement
KSP18073: York Report: Helton telephone call
KSP18105: York SW Affidavit: SW Simpson's phone
Criminal Complaint: Kayla Mills
KSP18134: Sketch
KSP18135: Polygraph Report
KSP18151: DNA Report
PL15903: Hoskins statement
PL18045: York Report: Walgreens interview
PL18047: York report: Kenningham interview
PL18050: York Report: Simpson statement
PL18052: York Report: Kayla Mills statement
PL18053: York Report: Wilson interview
PL18054: Connett Report: Crump interview
PL18057: York Original Report
PL18061: York Report: Lawson interview
PL18065: Warren statement
Helton Audio statement
Warren audio statement
PL2667: Crump interview by Wells/Evans
PL2532: Memo of Interview of M. Polly/Powell
PL2550: Memo: interview of Polly by Cox
PL2731: Letter from Beach to Cox
PL9640: Robert Beach Audio Statement
PL5896: Helton statement
PL15856: Simpson interview
PL2590: T. Bruner interview
PL2414: Heather Warren interview
PL18057: Mefford Report: Wilson interview
PL24843: Kayla Mills statement
PL2975: Charles Bob Smith interview/Evans
PL1653: York Report: Heather Warren interview
PL2532: Bennett interview/Powell

PL3350: Helton interview/Powell

PL9647: Audio interview/Dorning

PL2975: Interview Bob Smith/Evans

Polices & Procedures Kentucky State Police 2011 Training Manual

T Polices & Procedures Barbourville

Training Records for John Pickard & Dereck Eubanks

Polices & Procedures Barbourville

Polices & Procedures Knox County 2014 Policy

Defendant Mike Broughton's Answers to Interrogatories & Responses to Requests for Production of Documents Propounded by Plaintiffs, October 9, 2018

Defendant John Pickard Answers to Interrogatories Propounded by Plaintiffs, September 5, 2017

Defendant Knox County Answers to Interrogatories Propounded by Plaintiffs, September 28, 2017

Defendant Jason York's Answers to Plaintiffs' First Set of Interrogatories, October 12, 2017

Defendant Jason York's Responses to Plaintiffs' First Set of Requests for Production of Documents, October 12, 2017

IACP Training Key #500

IACP Training Key #597

IACP Interrogations and Confessions Concepts and Issues Paper

IACP Model Policy; Arrests

IACP Eyewitness Identification Model Policy

Police Interrogations and False Confessions; G. Daniel Lassiter and Christian A. Meissner

U.S. DOJ Eyewitness Evidence, A Guide For Law Enforcement


**Expert Witness Testimony for the Past Four Years:**

Bodden v. Deputy Cole, (plaintiff)
U.S. District Court, Middle District of Florida Case No. 3:11-ev-127-J-20MCR
Use of Force/officer involved shooting/traffic stop
Testified in Deposition

Washington v. Peoria Police Department (plaintiff)
10th Judicial Circuit, Peoria County, Illinois
Testified in Deposition

Murphy V. City of Birmingham, Alabama (plaintiff)
Circuit Court of Birmingham, Alabama
Testified in Deposition

State of Florida v. Smithey (criminal)
18th Judicial Circuit Court, Seminole County
Testified in Deposition

State of Illinois v K Meinders (criminal)
Circuit Court of the 11th judicial Circuit
Woodford County, Ill.
Testified in Trial

State of Florida v. Smithey (criminal)
18th Judicial Circuit Court, Seminole County
Testified in Trial

Murphy V. City of Birmingham, Alabama (plaintiff)
Circuit Court of Birmingham, Alabama
Testified in Trial

Alvin Notice v Town of Plainville (plaintiff)
Connecticut Superior Ct.
Testified in Deposition

State of Arkansas v. Benton Ned Bass (criminal)
District Court of Hot Springs, Garland County
Testified in Trial

Frazier v Kansas City (plaintiff)
Circuit Court of Jackson County, Missouri
Testified in Deposition

Williams V. 711 (plaintiff non police)
7th Judicial Circuit Court, Volusia County, Florida
Testified in Deposition

Williams V. 711 (plaintiff non police)
7th Judicial Circuit Court, Volusia County, Florida
Testified in Trial

Smith v. Sherry Appledorn (plaintiff)
United States District Court, District of Minnesota
Testified in Trial

Cheron Hampton- Bates v City of Gainesville/ Timothy Durst (defense)
United States District Court, Northern District of Florida, Gainesville Division
Testified in Deposition

Kyle Bermingham v. The City of Clermont, Florida (plaintiff)
United States District Court, Middle District of Florida, Ocala Division
Testified in Deposition

Frazier v Kansas City (plaintiff)
Circuit Court of Jackson County, Missouri
Police Vehicular Pursuits
Testified in Trial

Brown v. Orange County Sheriff's Office (plaintiff)
U.S. District Court, Middle District of Florida, Orlando Division
Use of Force
Testified in Deposition

Mitchell Schutt v. City of Ocoee (plaintiff)
United Sates District Court, Middle District of Florida, Orlando Division
Use of Force
Testified in Deposition

State of Florida vs. Juan Caamano (criminal)
10th Judicial Circuit, Polk County, Florida
Use of Force
Testified in Trial

Maurice Washington v. Oktibbeha County, Mississippi, Et al. (defense)
United States District Court for the Northern District of Mississippi Aberdeen Division
Use of Force
Testified in Deposition

Alvin Notice v Town of Plainville (plaintiff)
Connecticut Superior Ct.
Criminal Investigation/Domestic Violence
Testified in Trial

LaDrena Thomas v. The City of Jacksonville, JSO (plaintiff)
Fourth Judicial Circuit Court, Duval County, Florida
Use of Force
Testified in Deposition

Estate of Trey Williams v. City of Shelbyville, et.al. (Plaintiff)
United States District Court, Western District of Kentucky at Louisville
Use of Force
Testified in Deposition

Ramirez v Sheriff Grady Judd (plaintiff)
United States District Court of Florida, Tampa Division Case No. 8:12-CV-2819-T-27EAJ
Use of Force/Negligent Supervision
Testified in Deposition

Martignetti v. Serge Celestin and Broward Sheriff's Office (plaintiff)
17th Circuit Court, Broward County, Florida Case No. 11-05179
Use of Force/Negligent Supervision
Testified in Deposition

Hamilton v Beaufort County Sheriff's Office (plaintiff)
County of Beaufort, 14th Judicial Circuit, State of South Carolina Case No. 2011-CP-07-04548
Negligent Retention, Supervision
Testified in Deposition

State of Florida v. Smithey (criminal)
18th Judicial Circuit Court, Seminole County Case No. 10-01851-CFA
Criminal Investigation/Use of Force/Firearm
Testified in deposition

Johnson v. City of Tampa (plaintiff)
13th Judicial Circuit, Hillsborough County Case No. 10-014672
Police Driving/Accident
Testified in Deposition

Brown v. Orange County Sheriff's Office (plaintiff)
U.S. District Court, Middle District of Florida, Orlando Division Case No. 6:12-cv-1299-Orl-37GJK
Use of Force/Negligent Supervision
Testified in Deposition
Testified in Trial

Brown v City of Kingman (plaintiff)
United States District Court of Arizona Case No. 3:13 cv- 08191
Use of Force
Testified in Deposition

Cutino v City of Miramar (defense)
United States District Court, Southern District of Florida
Miami Division, CASE NO: 1:12-CV-22201
Use of Force
Testified in Deposition

Keefe Harden v. City of St. Petersburg (plaintiff)
Circuit Court of Pinellas County; Case No. 12-1686-CI-15
State of Florida
Use of Force/K-9
Testified in Trial

Davis v. City of Warner Robins (plaintiff)
Houston County Case No. 2012-V-45637
State of Georgia
Vehicular pursuit
Testified in Deposition

Devine v. Fusaro (plaintiff)
United States District Court, District of Connecticut
Case No: 3:14-CV-1019(JAM)
Use of Force/Less Lethal
Testified in Deposition

Florida v. Nannini (criminal)
Circuit Court of 16th Judicial Circuit
Monroe County, Florida
Case No.: 2014-CF-00142-A-P
Use of force, Investigative stops
Testified in Trial

Booth v. Daytona Beach (defense)
Union Arbitration Teamsters 385
Daytona Beach, Florida
Use of force, investigative detentions
Testified in Hearing

State of Florida v. Coleman (criminal defense)
Case No.: 2014-CF-7184
Circuit Court of the Ninth Circuit
Orlando, Florida
Use of Force/Firearm
Testified in Deposition

Earl v Indianapolis Metropolitan Police Department (plaintiff)
Marion County Superior Court
Cause No. 49D04-0904-PL-018356
Indianapolis, Indiana
Police Vehicular Pursuit

Testified in Deposition

State of Florida v. Coleman (criminal defense)
Case No.: 2014-CF-7184
Circuit Court of the Ninth Circuit
Orlando, Florida
Use of Force/Firearm
Testified in Hearing

Rhodera Earl v. Indianapolis Metropolitan Police Department (plaintiff)
Marion County Superior Court
Cause No. 49D04-0904-PL-018356
Indianapolis, Indiana
Police Vehicular Pursuit
Testified in Trial

Brown v. Orange County Sheriff's Office (plaintiff)
U.S. District Court, Middle District of Florida, Orlando Division
Case No. 6:12-cv-1299-Orl-37GJK
Use of Force/Negligent Supervision/Investigative Detention/Arrest Techniques
Testified in Trial

Betancourt v. Miami Dade County (plaintiff)
United States District Court, Southern District
Case No.: 1:13-cv-22614-DLG
Miami, Florida
Confidential Informants/Use of Force/Officer Involved Shooting
Testified in Deposition

Robert Leone v. Towanda Borough, et al. (plaintiff)
United States District Court for the Middle District of Pennsylvania
Case No: 3:12-cv-00429-ARC
Wilkes-Barre, Pa.
Use of Force/Taser/Arrest Techniques
Testified in Trial

Davis v. City of Warner Robbins (plaintiff)
State Court of Houston County, State of Georgia
Case No: 2012-V-45637
Warner Robins, Georgia
Emergency Vehicle Operation/Vehicular Pursuit/Foot Pursuit
Testified in Trial

State of Florida v. Miller (criminal defense)

18th Judicial Circuit
Case No: 2012-01992-CFA
Sanford, Florida
Criminal Investigation
Testified in Deposition

Holcomb v. Winkler (plaintiff non police)
Circuit Court of Mercer County, West Virginia
Case No.: 12-C-544-WS
Charleston, West Virginia
Failure to train/Failure to supervise
Testified in Trial

Cohen v. McGuire et al. (plaintiff)
US District Court, Middle District of Florida
Case No: 3:15-cv-133-J-34JRK
Miami, Florida 33176
Police officer hiring practices
Testified in deposition

Ferguson v. Ken Mascara
19th Judicial Circuit Court
Case No. 56 2014 CA001032 (ON)
St. Lucie County, Florida
Use of Force/Canine
Testified in trial

Kristopher Lee Madson v. City of Gainesville, Florida et al. (plaintiff)
United States District Court
Northern District of Florida
Case No: 1:15-cv-00063-MW-GRJ
Gainesville, Florida
Use of Force/Canine
Testified in deposition

Oberist Lee Saunders v. George Duke et al. (plaintiff)
United States District Court
Middle District of Florida
Case No: 6:10-cv-120-orl-35GJK
Orlando, Florida
Use of force/Narcotics Investigation
Testified in Deposition

Clark (FOP) v. Boca Raton (defense)

City of Boca Raton, Florida Arbitration
Employee Termination/Use of Force/OIS/Vehicular Pursuit
Testified in Arbitration Hearing

Nicasia v. Mickens, et al (plaintiff)
Connecticut Superior Court
New London, Ct.
CV-14-60220885S
Officer Involved Shooting
Testified in Deposition

Crowley v. Town of Enfield (plaintiff)
United States District Court
District of Connecticut
Case No. 3:14CV01903 (MPS)
Use of force/Training/Supervision

Jonathan Santiago v. Thomas Lafferty et al. (plaintiff)
United States District Court
District of Massachusetts
Case No: 13-cv-12172-IT
Confidential Informants
Testified in deposition

Catherine Daniels v. City of Miami Gardens et al. (plaintiff)
United States District Court
Southern District of Florida
Case No.: 1:15-CV-21068-JLK
Officer Involved Shooting
Testified in deposition

Christopher Demski v. Town of Enfield (plaintiff)
United States District Court
District of Connecticut
Case No.: 3:14cv01568 (JAM)
Use of Force/Taser/K-9
Testified in deposition

Stanford v. Union County Sheriff's Office (defense)
Sixteenth Judicial Circuit
Union County, South Carolina
Case No.: 2013-CP-44-227
Vehicular Pursuits
Testified in deposition

Lowrie v. General Motors et al. (plaintiff non police)
Twenty Second Judicial Circuit
St. Louis, Mo.
Case No.: 1422-CC08909
Traffic control/Management
Testified in deposition

Standard v. Conner   (plaintiff non police)
Fifth Judicial Circuit Court
Citrus County, Florida
Case No.: 2013-CA-000071 A
Criminal investigation
Testified in deposition

Robinson v. Easterwood (plaintiff)
United States District Court
Northern District of Alabama
Case No.: 2:14-cv-01886 MHH
Officer Involved Shooting
Testified in deposition

Moody v. Stop Stick et.al (Plaintiff)
Jackson County Circuit Court, Kansas City Mo.
Case No.: 1316-CV03362
Stop Sticks/Vehicular Pursuit
Testified in trial

Jose Diaz v. City of Orlando (plaintiff)
Ninth Judicial Circuit, Orlando, Fl.
Case No.: 2011-CA-014041-0
Use of force
Testified in deposition

Santiago/Mosko v. Thomas Lafferty et al. (plaintiff)
United States District Court
District of Massachusetts
Case No: 13-cv-12172-IT
Confidential Informants
Testified in deposition

Secic v. City of St. Louis (plaintiff)
Missouri Circuit Court
Twenty Second Judicial Circuit (St. Louis City)

Case No: 1522-cc-00228
Vehicular Pursuit
Testified in deposition

Jose Diaz v. City of Orlando (plaintiff)
Ninth Judicial Circuit, Orlando, Fl.
Case No.: 2011-CA-014041-0
Use of force
Testified in trial

Darnell v. Alejandro Rivera et al. (plaintiff)
United States District Court
Middle District of Florida, Orlando Division
Case No.: 6:15-cv-00999-RBD-TBS
Criminal Investigations/False Arrest
Testified in deposition

Perez v. Collier County (plaintiff)
United States District Court
Middle District of Florida
Case No.: 2:15-cv-238-FTM-CM
Use of force/Taser/Flashlight
Testified in deposition

Doel Santiago v. City of New Haven (plaintiff)
Superior Court at New Haven, Ct.
Case No.: NNH-CV-13-6037147-S
Use of Force
Testified in deposition

Parnoff v. Aquarion Company et Al. (plaintiff)
Superior Court, Bridgeport, Ct.
Case No.: CV14-6045191-S
Criminal Investigations/Arrest Procedures
Testified in deposition

Secic v. City of St. Louis (plaintiff)
Missouri Circuit Court
Twenty Second Judicial Circuit (St. Louis City)
Case No: 1522-cc-00228
Vehicular Pursuit
Testified in Trial

Lowrie v. General Motors et al. (plaintiff)

Missouri Circuit Court
Twenty Second Judicial Circuit, St. Louis , Mo.
Case No: 1422-CC08909
Traffic management/control

Michael Ray West v. Bartow County, Georgia et al. (plaintiff)
United States District Court
Northern District of Georgia
Case No: 15-CV-00168
Use of Force (Taser)
Testified in deposition

Ray v. Markley, Cain & Washington City  (Plaintiff)
United States District Court
Western District of Pennsylvania
Pittsburgh, Pa.
Case No.: CV-13-1483-DSC
Use of Force /handcuffing
Testified in trial

Myers v. City of Haleyville et al (plaintiff)
Circuit Court of Marion County, Alabama
Case No.: 49-CV-2015-9000152
Emergency vehicle operation
Testified in deposition

James v City of Chicago (plaintiff)
United States District Court
Northern District of Illinois
Eastern Division
Case No.:14 CV 7955
Use of Force
Testified in deposition

Capasso, et al. v. City of Westlake, Ohio et Al. (plaintiff)
United States District Court
Northern District of Ohio, Eastern Division
Case No.: 1:16-cv-01753
Vehicular Pursuit/Stop Sticks
Testified in deposition

Janice Wilson v. City of New Haven et Al. (plaintiff)
Judicial District of New Haven
New Haven Connecticut

Case No: CV10-6010876-S
Narcotics Investigation/Fail to provide medical aid
Testified in deposition

Otha Johnson v Daytona Beach (defense)
United States District Court
Middle District of Florida, Orlando Division
Case no.: 6:16-cv-9410Orl-40-TBS
Use of force /Temporary Detentions//Arrest
Testified in deposition

BethAnne Thomas v. City of Blue Island et Al. (plaintiff)
United States District Court
Northern District of Illinois
Case No.: 14-cv-11183
Criminal investigation/internal affairs
Testified in deposition

David Shearon v. Womack et Al. (defense)
United States District Court, Middle District of Tennessee
Nashville Division
Case No.: 3:15-cv-01061
Internal affairs/Supervision
Testified in deposition

James v City of Chicago (plaintiff)
United States District Court
Northern District of Illinois
Eastern Division
Case No.:14 CV 7955
Use of Force
Testified in trial
David Potter v. City of Dothan (plaintiff)
United States District Court
Northern District of Alabama, Southern Division
Case No.: CV-1:16CV-749-CSC
Use of Force
Testified in deposition

Andrew Aragon v. City of Espanola et Al. (plaintiff)
First Judicial District, Rio Arriba, New Mexico
Case No.: D-117-CV-2016-00147
Use of Force (Taser)
Testified in deposition

Myers v. City of Haleyville et al (plaintiff)
Circuit Court of Marion County, Alabama
Case No.: 49-CV-2015-9000152
Emergency vehicle operation
Testified in trial

Julian Ray Betton v. Bill Knowles et al (plaintiff)
Case No. : 4:15-cv-04638-RBH-KDW
United States District Court
District of South Carolina
Florence Division
Officer Involved Shooting/Search Warrant Execution
Testified in deposition

McGowan v. County of Kern (plaintiff)
Case No.: 1:15-CV-01365-DAD-SKO
United States District Court
Eastern District of California
Emergency driving
Testified in deposition

Nelson v. Brevard County Sheriff's Office (plaintiff)
Case No: 05-2013-CA-038400
Eighteenth Judicial Circuit, Brevard County
Narcotics investigation/Search Warrants
Testified in deposition

Chelsey Marie Browder V. Greenville County Sheriff's Office, et al.  (defense)
Case No: 6:16-cv-02493-HMH-JDA
United States District Court
District of South Carolina
Officer Involved Shooting/Failure to supervise/train
Testified in deposition

Byron Jordan v. Iverson Mall (plaintiff)
Case No.: 8:14-cv-00037-RWT
United States District Court
District of Maryland
Use of force/Taser
Testified in trial

Childress v. North Charleston Police Department (plaintiff)

Case No.: 2017-CP10-1119
State of South Carolina
County of Charleston
Temporary detention/use of force
Testified in deposition

LeGrier v Chicago (plaintiff)
Case No.: 15-L 12964
Circuit Court of Cook County
Cook County, Illinois
Testified in deposition
OIS/Use of Force

Estate of Fritz Severe v. City of Miami (plaintiff)
Case No.: 17-cv-22153-DPG
United States District Court
Southern District of Florida
OIS/Use of Force
Testified in deposition

Ortega v. Pierce County (plaintiff)
Case N.: 17-2-11836-8
Superior Court of the State of Washington
Pierce County, Washington
Domestic Violence/Criminal Investigation
Testified in deposition

Joseph v. Bartlett, et al. (plaintiff)
Case No.: 17-cv-5051
United States District Court
Eastern District of Louisiana
Use of Force/Taser/Medical Care
Testified in deposition

Lweh Htoo    (plaintiff)
Case No.: HHD-CV17-6079945-S
Superior Court, Hartford, Ct.
Vehicle Pursuit
Testified in deposition

## **Publications:**

Dig Deeper To Address Officer Involved Shootings: Orlando Sentinel, 5/26/13

Police Leaders Must Walk the Walk, Pursuit Driving: Orlando Sentinel, 2/19/12
Save Community Policing: Orlando Sentinel, 5/25/11
State Cracks Down On Unlicensed Activity, Orlando Sentinel, 3/18/09
The Threat Abatement Group, Police and Security News, 11/95

**Compensation**:

My fees for this case are $225.00 per hour to review and analyze relevant material and $325.00 per hour to testify in depositions or trial in the State of Florida and $2,500.00 per day plus expenses to testify in deposition or trial out of the State of Florida.

Submitted by:

**Charles W. Drago**