# In The Matter Of:

*Amanda Hoskins, et al. v.*
*Knox County, et al.*

---

*John J. Ryan*
*May 21, 2019*

---



402 BNA Drive, Suite 108
Nashville, TN 37217
(615) 726-2737
cleetondavis.com

Exhibit 4

*Min-U-Script®*

**John J. Ryan - May 21, 2019**

1          IN THE UNITED STATES DISTRICT COURT FOR THE

2                  EASTERN DISTRICT OF KENTUCKY

3

  AMANDA HOSKINS, et al.,            )
4                                    )
        Plaintiffs,                  )
5                                    ) No. 17-cv-000 84
  vs.                                )
6                                    ) Hon. DAVID J.
  KNOX COUNTY, et al.,               ) BUNNING
7                                    ) Hon. CANDACE J.
        Defendants.                  ) SMITH
8    ------------------------------

9

10          Videotaped Deposition of:

11          JOHN J. RYAN

12

13          Taken on behalf of the Plaintiffs

14          May 21, 2019

15

16

17

18

19

20

21

22

23          CLEETON DAVIS COURT REPORTERS
                402 BNA Drive, Suite 108
24           Nashville, Tennessee  37217
                  (615) 726-2737
25              www.cleetondavis.com

John J. Ryan - May 21, 2019

```
 1    APPEARANCES:
      For the Plaintiffs      Elliot Slosar, Esq.
 2                            Amy Robinson Staples, Esq.
                                (By speakerphone)
 3                            Loevy & Loevy
                              311 North Aberdeen Street
 4                            3rd Floor
                              Chicago, IL  60607
 5                            (312) 243-5900
                              elliot@loevy.com
 6                            staples@lovey.com

 7    For Defendants          John F. Kelley, Esq.
      Sheriff John Pickard    Of Counsel
 8    and Knox County:        Williams, Farmer & Towe
                              303 S. Main Street
 9                            P.O. Box 3199
                              London, KY 40741
10                            (606) 877-5291
                              john@wftlaw.com
11
      For Defendants Derek    Brenn O. Combs, Esq.
12    Eubanks, Brian          Kentucky State Police
      Johnson, Mark           Staff Attorney
13    Mefford, Jackie         919 Versailles Road
      Pickrell (by            Frankfort, KY  40601
14    speakerphone):          Brenn.combs@ky.gov

15    For Defendants Jason    L. Scott Miller, Esq.
      York and Jason Bunch:   Sturgill, Turner, Barker
16                              & Moloney, PLLC
                              333 W. Vine Street
17                            Suite 1500
                              Lexington, KY  40507
18                            (859) 255-8581
                              smiller@sturgillturner.com
19
      For Defendant           Licha H. Farah, Jr., Esq.
20    City of                 Ward, Hocker & Thornton, PLC
      Barbourville:           Vine Center
21                            333 West Vine Street
                              Suite 1100
22                            Lexington, KY  40507
                              (859) 422-6000
23                            lfarah@whtlaw.com


24    Videographer:  Matt Martin, CMLV

25
```

**John J. Ryan - May 21, 2019**

```
 1                       I N D E X

 2   Questions by Mr. Slosar                        11

 3                   E X H I B I T S

 4   No. 1:   Oath of office, sergeant
              (Bates Ryan Subpoena Resp. 004030)    13
 5
     No. 2:   Letter to John J. Ryan from
 6            Donald W. Lawton, 4/14/89
              (Bates Ryan Subpoena Resp. 030747)    15
 7
     No. 3:   FBI 302 report re John Ryan,
 8            9/14/00
              (Bates Ryan Subpoena Resp. 002955
 9            through 59)                            17

10   No. 4:   FBI 302 report re John Ryan,
              9/20/00
11            (Bates Ryan Subpoena Resp. 002963
              through 64)                           49
12
     No. 5:   FBI 302 report re John Ryan,
13            10/4/00
              (Bates Ryan Subpoena Resp. 002966
14            through 79)                           57

15   No. 6:   FBI 302 report re John Ryan,
              11/03/00
16            (Bates Ryan Subpoena Resp. 002899
              through 912)                          64
17
     No. 7:   Deposition of John J. Ryan            76
18
     No. 8:   FBI 302 report re Urbano Pignano,
19            10/7/00
              (Bates Ryan Subpoena Resp. 002930
20            through 31)                           87

21   No. 9:   FBI interview report re John Ryan,
              10/16/00
22            (Bates Ryan Subpoena Resp. 001521
              through 002928)                       92
23
     No. 10:  FBI 302 report re Dennis Aiken,
24            10/17/00
              (Bates Ryan Subpoena Resp. 002927
25            through 28)                           105
```

**John J. Ryan - May 21, 2019**

```
 1                    I N D E X (Resumed)

 2    No. 11:   FBI 302 report re John Ryan,
                3/21/01
 3                (Bates Ryan Subpoena Resp. 002996
                through 998)                              110
 4
      No. 12:   Document titled "This packet
 5              contains the FBI Ryan Case
                summary as well as their
 6              declination letter"
                (Bates Ryan Subpoena Resp. 00278
 7              through 320)                               114

 8    No. 13:   Document titled "Providence
                Police Department Testing
 9              Investigation Report"
                (Bates Ryan Subpoena Resp. 000922
10              through 001183)                            135

11    No. 14:   Document titled "Suggested Actions
                In The Test Scandal Matter"
12              (Bates Ryan Subpoena Resp. 005308
                through 09)                                140
13
      No. 15:   Memo to Chief Andrew R. Rosenzweig
14              from Inspector Robert A. Bennett,
                1/27/03, Subject: Promotional
15              Examination Investigation
                (Bates Ryan Subpoena Resp. 003774
16              through 003777)                            143

17    No. 16:   Document titled "Testing
                Investigation"
18              (Bates Ryan Subpoena Resp. 005230
                through 31)                                153
19
      No. 17:   Document titled "Beneficiary
20              Designation"
                (Bates Ryan Subpoena Resp. 030773
21              through 774)                               160

22    No. 18:   Deposition of Jack Ryan, 11/23/15
                (Bates RS 031359 through 031414)           165
23
      No. 19:   Letter from Colonel Dean Esserman
24              to Major Andrew Rosenzweig
                8/6/03
25              (Bates Ryan Subpoena Resp. 00279)          177
```

John J. Ryan - May 21, 2019

```
 1                    I N D E X  (Resumed)

 2    No. 20:   Transcript, grand jury testimony        181
                (Remarked as Exhibit No. 20)            183
 3
      No. 21:   Audio recording, grand jury, 2/11/03    184
 4
      No. 22:   Deposition of John J. Ryan,
 5              6/26/02                                  184

 6    No. 23:   Expert Report of John J. Ryan
                2/4/19                                   254
 7
      No. 24:   Expert Report of John J. Ryan
 8              2/1/19                                   256

 9    No. 25:   Interview summary notes, Pasquale
                Granata, 3/3/03                          257
10
      No. 26:   Document titled "This packet
11              contains the original FBI summary"
                with attachments
12              (Bates Ryan Subpoena Resp. 00257
                through 277)                             263
13
      No. 27:   Letter from Major Richard T. Sullivan
14              to the Testing Investigation Team,
                Subject:  Testing Scandal, 4/3/03        263
15
      No. 28:   Transcript of grand jury testimony
16              of Urbano Prignano, Jr.                  266

17    No. 29:   LLRMI/LERMG New Case/Client
                Request Form                             268
18
      No. 30:   Legal and Liability Risk Management
19              Institute consultation fee schedule
                and expense policy                       270
20
      No. 31:   Legal & Liability Risk Management
21              Institute Invoice No. 2726               273

22    No. 32:   Email from Tracy Baldwin to Kelly
                Hylton and Jacob Williams, 2/4/19,
23              Subject:  Hoskins/Taylor v. Knox
                County                                   300
24

25
```

John J. Ryan - May 21, 2019

```
 1                    I N D E X (Resumed)

 2   No. 33:  Report to Jackie Steele from John.
                 D. Pickard
 3               (Bates PL004844 through 855)          354

 4          (Exhibits 34 through 40 do not exist.)

 5   No. 41:  Deposition of James Allen Helton        364

 6   No. 42:  Deposition of John Pickard              373

 7   No. 43:  Letter to John Sparks from Jason
                 E. Williams, 1/28/19                 381
 8
     No. 44:  Document titled Domestic
 9               Investigations and Operations
                 Guide
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

John J. Ryan - May 21, 2019

1        The videotaped deposition of JOHN J. RYAN was

2   taken by counsel for the Plaintiffs, by notice, at

3   Cleeton Davis Court Reporters, 402 BNA Drive, Suite

4   108, Nashville, Tennessee, on May 21, 2019, for all

5   purposes under the Federal Rules of Civil Procedure.

6        The formalities as to notice, caption,

7   certificate, et cetera, are waived.  All objections,

8   except as to the form of the questions, are reserved

9   to the hearing.

10       It is agreed that Brian V. Ratekin, being a

11  licensed court reporter and notary public for the

12  State of Tennessee, may swear the witness, and that

13  the reading and signing of the completed deposition

14  by the witness are waived.

15                      * * *

09:20:06 16       MR. KELLEY:  My name is John Kelley.  I

17  am here on behalf of Knox County Fiscal Court and

18  Sheriff John Pickard.  They are defendants in a

19  lawsuit brought

09:20:18 20   by Amanda Hoskins and Jonathan Taylor that's pending

21  in the United States District Court for the Eastern

22  District of Kentucky, London Division.  Civil Action

23  No. is 17-CV-00084.  We're here today to take the

24  discovery deposition of my clients.

09:20:40 25       MR. FARAH:  Is anything happening?  I

John J. Ryan - May 21, 2019

| | |
|---|---|
| 1 | heard John for a moment there barely. |
| 09:20:46  2 | MR. KELLEY:  Let me finish.  Let me go |
| 3 | ahead and finish it. |
| 09:20:49  4 | MR. MILLER:  I don't know, Lisha.  I |
| 5 | can hear you.  But I heard John briefly. |
| 09:20:50  6 | Amy? |
| 09:20:50  7 | MS. STAPLES:  Amy Staples for the |
| 8 | plaintiffs. |
| 09:20:55  9 | MR. SLOSAR:  All right.  For people on |
| 10 | the phone, for people on the phone, John is putting |
| 11 | something on the record.  The witness is not yet |
| 12 | testifying.  So just hold on and, you know, let him |
| 13 | do whatever he is going to do on the record. |
| 09:21:10 14 | MR. KELLEY:  Okay.  We're here today to |
| 15 | take the Rule 26 expert witness identified by my |
| 16 | clients.  The deponent is Jack Ryan. |
| 09:21:27 17 | Prior to today's deposition -- in fact, over |
| 18 | the course of several weeks -- plaintiffs' counsel |
| 19 | has subpoenaed and now obtained records from the |
| 20 | Providence, Rhode Island, Police Department, where |
| 09:21:45 21 | Mr. Ryan was once an officer.  The records |
| 22 | specifically concern incidents that occurred in the |
| 23 | late 90s, nearly 20 years old. |
| 09:21:57 24 | They consist of an investigation that was |
| 25 | performed both by the state and federal government. |

**John J. Ryan - May 21, 2019**

|  |  |  |
|---|---|---|
| | 1 | Mr. Ryan was not charged with anything, nor was any |
| | 2 | attempt made to indict him, and, you know, he has -- |
| 09:22:19 | 3 | MR. SLOSAR:  John, just -- |
| 09:22:20 | 4 | MR. KELLEY:  I'll keep it short. |
| 09:22:20 | 5 | MR. SLOSAR:  I know that you're going |
| | 6 | to keep it short.  That -- that part also wasn't |
| | 7 | factually accurate.  So you can go on.  I'm not sure |
| | 8 | what your objection is, but keep going.  But that |
| | 9 | part was not accurate. |
| 09:22:30 | 10 | MR. KELLEY:  Well, the reason I raised |
| | 11 | this objection, we don't have any -- we don't have |
| | 12 | any problems during the course of this discovery |
| | 13 | deposition with Mr. Ryan discussing and answering |
| | 14 | questions concerning those investigations.  However, |
| | 15 | it should not be considered a waiver of our general |
| | 16 | objections to the relevance of this material as well |
| | 17 | as whether or not it constitutes allowable testimony |
| | 18 | under Federal Rule 608 and 609.  I don't want to |
| | 19 | interrupt counsel constantly with these objections. |
| | 20 | I hope that he will recognize that objection and let |
| | 21 | me proceed. |
| 09:23:13 | 22 | MR. SLOSAR:  I understand the |
| | 23 | objection.  A court will sort this out in pretrial |
| | 24 | motions. |
| 09:23:22 | 25 | MR. KELLEY:  Good. |

**John J. Ryan - May 21, 2019**

| | |
|---|---|
| 09:23:23 1 | MR. SLOSAR:  We don't agree with it, |
| 2 | but we understand your objection. |
| 09:23:27 3 | MR. KELLEY:  I simply don't want to put |
| 4 | every question that you ask as being objectionable. |
| 09:23:31 5 | MR. SLOSAR:  Sure. |
| 09:23:31 6 | MR. KELLEY:  I would assume that you |
| 7 | would allow me a blanket objection over those |
| 8 | questions concerning the investigation. |
| 09:23:37 9 | MR. SLOSAR:  Your relevance objections |
| 10 | are maintained.  Do you have any -- prior to today's |
| 11 | deposition we requested all invoices for Mr. Ryan and |
| 12 | any facts or assumptions -- |
| 09:23:50 13 | MR. KELLEY:  Right. |
| 09:23:51 14 | MR. SLOSAR:  -- that were provided to |
| 15 | him.  Have you brought any of those documents to this |
| 16 | deposition? |
| 09:23:54 17 | MR. KELLEY:  I did.  I saw your email |
| 18 | late last night, but I did get them to forward me. |
| 19 | These are the invoices Jack has sent to us.  One of |
| 20 | them you recognize, I think. |
| 09:24:07 21 | MR. SLOSAR:  Yes. |
| 09:24:09 22 | THE WITNESS:  I hate to tell you guys |
| 23 | this, but this phone went blank.  So I don't know if |
| 24 | they're still on. |
| 09:24:17 25 | MR. SLOSAR:  Is anyone there? |

John J. Ryan - May 21, 2019

| | | |
|---|---|---|
| 09:24:24 | 1 | MR. KELLEY:  All right. |
| 09:24:29 | 2 | MR. SLOSAR:  Let's go off the record. |
| 09:28:26 | 3 | (Proceedings held off the record.) |
| 09:28:39 | 4 | THE VIDEOGRAPHER:  Here begins the |
| | 5 | deposition of Jack Ryan.  Today's date is May 21st, |
| | 6 | 2019.  Time on the monitor is 9:28. |
| 09:28:47 | 7 | Will the court reporter please swear in the |
| | 8 | witness. |
| 09:28:48 | 9 | JOHN J. RYAN |
| 09:28:48 | 10 | was called as a witness, and after having been first |
| 09:28:48 | 11 | duly sworn, testified as follows: |
| 09:28:48 | 12 | EXAMINATION |
| 09:28:49 | 13 | QUESTIONS BY MR. SLOSAR: |
| 09:28:55 | 14 | Q.     Good morning, Mr. Ryan. |
| 09:28:56 | 15 | A.     Good morning. |
| 09:29:00 | 16 | Q.     Approximately how many depositions have you |
| | 17 | given this year? |
| 09:29:04 | 18 | A.     This year?  I have no idea.  I don't keep a |
| | 19 | count, but it's probably -- I don't know.  What month |
| | 20 | are we in?  We're in -- |
| 09:29:10 | 21 | Q.     May. |
| 09:29:12 | 22 | A.     May?  I -- I would guess 12, anyway. |
| 09:29:15 | 23 | Q.     Okay.  You're familiar with the rules that go |
| | 24 | along with federal civil depositions, correct? |
| 09:29:19 | 25 | A.     Of course. |

**John J. Ryan - May 21, 2019**

| | |
|---|---|
| 09:29:22 1 | Q.       Okay.  If at any point in time today you |
| 2 | would like to take a break, get something to eat, |
| 3 | consult with an attorney, please let me know. |
| 09:29:28 4 | A.       Certainly. |
| 09:29:32 5 | Q.       As you know, attorneys have the right to make |
| 6 | objections.  You're an attorney yourself.  I would |
| 7 | ask for you to allow them to make the objection |
| 8 | before you answer the question, okay? |
| 09:29:41 9 | A.       Of course. |
| 09:29:46 10 | Q.       I tend not to ask questions perfectly.  You |
| 11 | may remember this, especially if you read over our |
| 12 | last deposition together.  So if there's a question I |
| 13 | ask you and you don't understand it, please let me |
| 14 | know, okay? |
| 09:29:55 15 | A.       Of course. |
| 09:29:59 16 | Q.       In that same respect, if you answer a |
| 17 | question that I ask of you, I'm going to assume that |
| 18 | you understood what was being asked.  Fair? |
| 09:30:03 19 | A.       Of course. |
| 09:30:05 20 | Q.       Okay.  Sir, are you represented for purposes |
| 21 | of this deposition today? |
| 09:30:09 22 | A.       Of course not. |
| 09:30:11 23 | Q.       Have you consulted with a criminal defense |
| 24 | attorney before testifying here today? |
| 09:30:15 25 | A.       Of course not. |

**John J. Ryan - May 21, 2019**

09:30:18 1    Q.        Sir, I intend to question you about the

2    recently obtained personnel files from Providence

3    Police Department and the FBI and prior testimony

4    that you have given under oath.  If at any point in

5    time you would like to consult with an attorney

6    before you would answer those questions, please let

7    me know, okay?

09:30:33 8    A.        Of course.

09:30:35 9    Q.        Mr. Ryan, have you ever lied under oath?

09:30:37 10   A.        Absolutely not.

09:30:40 11   Q.        Sir, you took an oath to be a police officer

12   at the Providence Police Department, correct?

09:30:42 13   A.        Of course.

09:30:45 14   Q.        And I show you what we'll mark as Exhibit

15   No. 1.

09:30:55 16             For those on the phone, this is Ryan 4030.

09:30:57 17             (The document was marked Exhibit No. 1.)

09:30:59 18                  MR. KELLEY:  Thank you.

09:30:59 19   BY MR. SLOSAR:

09:31:02 20   Q.        Have you seen that document prior to today,

21   sir?

09:31:04 22   A.        No.

09:31:06 23   Q.        When were you given this document prior to

24   being hired at the Providence Police Department?

09:31:12 25   A.        No, I would not have been given this document

**John J. Ryan - May 21, 2019**

|          |    |                                                          |
|----------|----|----------------------------------------------------------|
|          |  1 | prior to being hired.                                    |
| 09:31:15 |  2 | Q.      Were you given this document when you were        |
|          |  3 | promoted to a sergeant at the Providence Police           |
|          |  4 | Department?                                               |
| 09:31:19 |  5 | A.      I don't think I was given the document.  This     |
|          |  6 | would have been read by probably the mayor at the         |
|          |  7 | time and would have been repeated, but I wouldn't         |
|          |  8 | have been given the document.                            |
| 09:31:31 |  9 | Q.      Okay.  Did you take this oath prior to            |
|          | 10 | becoming a sergeant at the Providence Police              |
|          | 11 | Department?                                               |
| 09:31:34 | 12 | A.      Of course.                                       |
| 09:31:36 | 13 | Q.      And what year would that have been,              |
|          | 14 | approximately?                                            |
| 09:31:39 | 15 | A.      I would have to go through my file, but my        |
|          | 16 | guess would be somewhere around '88, '87, something       |
|          | 17 | like that.  I'd have to go look at my CV.  For            |
|          | 18 | sergeant; is that what you're saying?                     |
| 09:31:46 | 19 | Q.      Yes.                                             |
| 09:31:49 | 20 | A.      Yeah.  I would say it's -- it's either '87 or     |
|          | 21 | '88, I think.                                             |
| 09:31:54 | 22 | Q.      Sir, when did you first apply to be an           |
|          | 23 | officer at the Providence Police Department?             |
| 09:31:59 | 24 | A.      1981.  It might have been '80.  I was            |
|          | 25 | accepted into the academy and went and started the        |

**John J. Ryan - May 21, 2019**

|  |  |  |
|---|---|---|
| | 1 | academy in '81. |
| 09:32:05 | 2 | Q.      Sir, when you first applied to the Providence |
| | 3 | Police Department, were you hired? |
| 09:32:11 | 4 | A.      I don't know what that means.  I -- I don't |
| | 5 | understand the question. |
| 09:32:15 | 6 | Q.      When you first applied to be an officer at |
| | 7 | the Providence Police Department, was your |
| | 8 | application accepted? |
| 09:32:20 | 9 | A.      Yes. |
| 09:32:24 | 10 | Q.      It's your testimony here today that you, |
| | 11 | after first applying to the Providence Police |
| | 12 | Department, you were selected to attend the next |
| | 13 | training academy? |
| 09:32:36 | 14 | A.      They selected two academies when I was hired. |
| | 15 | They selected two.  They selected the 47th and 48th |
| | 16 | police academy. |
| 09:32:43 | 17 | Q.      Were you accepted into the 47th police |
| | 18 | academy? |
| 09:32:49 | 19 | A.      I was not.  I went into the 48th academy. |
| 09:32:52 | 20 | Q.      I'm going to show you what we'll mark as |
| | 21 | Exhibit No. 2.  This is Ryan 30747 for folks on the |
| | 22 | phone. |
| 09:33:03 | 23 |         (The document was marked Exhibit No. 2.) |
| 09:33:03 | 24 | BY MR. SLOSAR: |
| 09:33:05 | 25 | Q.      Sir, have you seen this document before |

John J. Ryan - May 21, 2019

```
        1    today?
09:33:09 2    A.      You know, I'm sure back in that time I saw
        3    it.  I mean, it doesn't mean anything to me today.  I
        4    haven't seen it in years.  But it looks like it's
        5    from 1980.
09:33:21 6    Q.      After you applied to the Providence Police
        7    Department, did you have to fill out any type of
        8    questionnaire?
09:33:32 9    A.      Of course.  In my initial application; is
       10    that what you're saying?
09:33:33 11   Q.      Yes.
09:33:35 12   A.      Yeah.  There was nothing in between this and
       13    my selection.
09:33:40 14   Q.      But this letter was sent to you after you
       15    went through the application process, correct?
09:33:46 16   A.      It was sent to everyone, I'm sure, that was
       17    not selected in that first 30 or 40 people.
09:33:52 18   Q.      Were you informed why you were not selected
       19    as the -- as part of that first 30 or 40 people?
09:33:58 20   A.      No.  I was aware that I had finished very
       21    high on the test, and I was told at the time by the
       22    chief of police, Angelo Ricci, that he felt that I
       23    was young and that I should wait for the second
       24    academy.
09:34:13 25   Q.      Do you recall approximately how old you were
```

**John J. Ryan - May 21, 2019**

|          |    |                                                       |
|----------|----|-------------------------------------------------------|
|          | 1  | when you first applied?                               |
| 09:34:16 | 2  | A.      Sure.  I was right out of high school.  I     |
|          | 3  | graduated high school in '79.  I think this letter is |
|          | 4  | dated 1980.  I would have been 18, 19 at best.        |
| 09:34:29 | 5  | Q.      Have you worked for any other law enforcement |
|          | 6  | agency outside of the Providence Police Department?   |
| 09:34:36 | 7  | A.      Again, to be clear on the record, not as a    |
|          | 8  | sworn officer.  I have done work for departments all  |
|          | 9  | over the country --                                   |
| 09:34:39 | 10 | Q.      Sure.                                         |
| 09:34:41 | 11 | A.      -- at this point in time.                     |
| 09:34:44 | 12 | Q.      As a sworn officer, your experience derives   |
|          | 13 | from the -- your work at the Providence Police        |
|          | 14 | Department, correct?                                  |
| 09:34:50 | 15 | A.      Correct.                                      |
| 09:35:06 | 16 | Q.      Okay.  Sir -- for folks on the phone, Exhibit |
|          | 17 | No. 3 is being marked.  It's Ryan Subpoena Response   |
|          | 18 | 2955 through 2959.  It's the September 14th, 2000,    |
|          | 19 | 302.                                                  |
| 09:35:22 | 20 | (The document was marked Exhibit No. 3.)              |
| 09:35:25 | 21 | MR. SLOSAR:  For some reason, it looks                |
|          | 22 | like I only have two hard copies of this.  Brenn, I'm |
|          | 23 | -- I'm sorry about that.  I've got a computer with an |
|          | 24 | external hard drive.                                  |
| 09:35:36 | 25 | MR. COMBS:  I've got all the stuff back               |

**John J. Ryan - May 21, 2019**

|  |  |  |
|---|---|---|
| | 1 | at the office. |
| 09:35:39 | 2 | BY MR. SLOSAR: |
| 09:35:42 | 3 | Q.      Okay.  Okay.  Mr. Ryan, did you meet with |
| | 4 | Special Agents Chad Johnson and Dennis Aiken on |
| | 5 | September 13, 2000? |
| 09:35:48 | 6 | A.      Again, I -- I have no memory of the dates, |
| | 7 | but I met with them several times, actually. |
| 09:35:53 | 8 | Q.      Looking at Exhibit No. 3, does that refresh |
| | 9 | your recollection as to whether you met with these |
| | 10 | FBI agents on September 13, 2000?  And I would refer |
| | 11 | you to the bottom of Page 2955 in the left-hand |
| | 12 | corner. |
| 09:36:08 | 13 | A.      I do see September 13, 2000. |
| 09:36:11 | 14 | Q.      What was this interview in relation to? |
| 09:36:18 | 15 | A.      I don't know which meeting this was.  Let me |
| | 16 | take a look at it first and try to refresh my |
| | 17 | recollection. |
| 09:36:27 | 18 | Q.      Sure.  And generally, what was this meeting |
| | 19 | in relation to? |
| 09:36:31 | 20 | A.      Again, I need to look at it first -- |
| 09:36:31 | 21 | Q.      Sure. |
| 09:36:35 | 22 | A.      -- to -- to refresh my recollection.  I had a |
| | 23 | number of meetings with them, several, where I went |
| | 24 | down to explain both the recruiting process and |
| | 25 | the -- the promotional process. |

**John J. Ryan - May 21, 2019**

| | | |
|---|---|---|
| 09:36:42 | 1 | Q.       Okay. |
| 09:36:45 | 2 | A.       Several meetings.  I'm not even sure they |
| | 3 | documented every one of them. |
| 09:36:46 | 4 | Q.       Have you -- |
| 09:36:49 | 5 | A.       So I have to take a look at that.  So do you |
| | 6 | -- we -- can I finish looking at that? |
| 09:36:51 | 7 | Q.       Sure. |
| 09:36:54 | 8 | A.       Okay.  Thank you.  (Examining |
| | 9 | document.)  Yeah, this seems to be solely based on |
| | 10 | this kid Maggiacomo, who came into the police |
| | 11 | academy. |
| 09:37:30 | 12 | Q.       Okay.  And to your knowledge, was the FBI |
| | 13 | investigating whether Mr. Maggiacomo had financially |
| | 14 | bribed someone in the Providence Police Department to |
| | 15 | be hired? |
| 09:37:47 | 16 | A.       I don't think that was ever -- well, I don't |
| | 17 | think at -- certainly at this meeting that was my |
| | 18 | understanding.  And I don't think at the end of the |
| | 19 | day they thought anyone in the Providence Police |
| | 20 | Department was bribed.  I think they thought that |
| | 21 | somebody at city hall was bribed.  I don't think |
| | 22 | there was ever any indication that anybody in the |
| | 23 | police department was involved in that, at least to |
| | 24 | my knowledge. |
| 09:38:06 | 25 | Q.       Is it your testimony that the FBI never asked |

**John J. Ryan - May 21, 2019**

| | |
|---|---|
| | 1 |
| | 2 |
| 09:38:13 | 3 |
| | 4 |
| | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 09:38:37 | 10 |

1    you if you accepted money from somebody named Rick

2    Autiello?

3    A.      I don't believe they ever asked me that

4    question.  I -- but again, you know, you're talking

5    20 years ago.  But I don't think they ever asked me

6    that question.  I think it was pretty clear that this

7    was somebody at city hall, and -- and I think -- I

8    think people were convicted related to that.  I think

9    Autiello and Frank Corrente were convicted over that.

10         But I don't think it ever -- I think -- I

11   don't think there was ever any -- and again, did they

12   ask the question?  I don't recall.  But I think at

13   the end of the day it was very clear that it had

14   nothing to do with the police department.

15   Q.      Did the FBI ever tell you that?

16   A.      Yes.  Well, I think they did.  At -- at one

17   of the meetings, I think they made it pretty clear.

18   And I think the prosecution made it pretty clear,

19   because two people were prosecuted for it.

20   Q.      Was that before or after you requested a

21   lawyer?

22   A.      That they told me that or that I told them

23   the whole story?

24   Q.      That you told them that.  That they told you.

25   A.      Again, I don't recall if -- I'm -- I'm quite

John J. Ryan - May 21, 2019

|   |   |   |
|---|---|---|
| | 1 | sure that I was told that nobody in the police |
| | 2 | department was a target or a subject, and -- |
| | 3 | throughout all of this -- throughout all of this, me |
| | 4 | specifically. |
| 09:39:25 | 5 | Q.     So you never -- you -- |
| 09:39:27 | 6 | A.     But I don't recall if they specifically |
| | 7 | said, "We cleared this out of the police department." |
| | 8 | But the fact that they charged people in city hall |
| | 9 | and a vendor related to this would tell you, and |
| | 10 | not -- not a single, to my knowledge, police witness |
| | 11 | from the police department was called on this would |
| | 12 | tell me that they reached a conclusion that nobody in |
| | 13 | the police department was involved in it. |
| 09:39:56 | 14 | Q.     Based on your conversations with the FBI, did |
| | 15 | you believe that you were a target of their |
| | 16 | investigation? |
| 09:40:02 | 17 | A.     No.  I knew I wasn't.  They specifically told |
| | 18 | me I was never a target, and the U.S. attorney told |
| | 19 | me I was never a target.  In fact, go beyond target. |
| | 20 | You probably know this, because you're in the |
| | 21 | business, but they have to give you a target letter. |
| | 22 | I don't have a target letter, never got one.  In |
| | 23 | fact, they were very specific that I was not even the |
| | 24 | subject of an investigation, let alone a target. |
| 09:40:23 | 25 | Q.     So throughout your interactions with the FBI |

John J. Ryan - May 21, 2019

|   | |
|---|---|
| | 1  and the U.S. Attorney's Office, you never came to |
| | 2  believe that you were a target of their |
| | 3  investigation? |
| 09:40:30 | 4  A.        Absolutely not. |
| 09:40:32 | 5  Q.        Okay.  And throughout your interactions with |
| | 6  the FBI and the U.S. Attorney's Office, you never |
| | 7  came to believe that you were even a subject of their |
| | 8  investigation? |
| 09:40:43 | 9  A.        I was specifically told that I was not. |
| 09:40:51 | 10  Q.        Now, at the time of your initial meeting with |
| | 11  the FBI on September 13, 2000, were you informed that |
| | 12  you could be prosecuted for providing false |
| | 13  statements to federal agents? |
| 09:41:03 | 14  A.        No. |
| 09:41:03 | 15  Q.        Did you know -- |
| 09:41:03 | 16  A.        No. |
| 09:41:06 | 17  Q.        Did you know at the time you met with the FBI |
| | 18  on September 13, 2000, that you could be criminally |
| | 19  charged for providing false statements? |
| 09:41:15 | 20  A.        Of course.  But I want to -- I want to make |
| | 21  something clear on the record.  I don't know that |
| | 22  this is the initial meeting. |
| 09:41:18 | 23  Q.        Sure. |
| 09:41:20 | 24  A.        My memory is that there were -- some of my |
| | 25  initial meetings were before this.  But I don't know |

**John J. Ryan - May 21, 2019**

```
          1   that for sure.  I don't -- I just don't have any
          2   recollection of the dates more than 20 years ago.
09:41:30  3   Q.      Now, my understanding is that you've reviewed
          4   some of these documents before this deposition.  Is
          5   that right?
09:41:35  6   A.      I have not.
09:41:38  7   Q.      You have not?  What documents did you review
          8   for today's deposition?
09:41:42  9   A.      I reviewed my report before today's
         10   deposition.
09:41:48 11   Q.      Did you learn before -- well, let me withdraw
         12   that.
09:41:53 13           So it's your testimony that in preparation
         14   for today's deposition, that you have not reviewed
         15   any of the 35,000 pages of material that was produced
         16   from your personnel files?
09:42:03 17   A.      It is absolutely my testimony that I did not
         18   do that in preparation for this deposition.
09:42:07 19   Q.      Did you request any of those materials?
09:42:10 20   A.      I did not.  I was sent some of them I think
         21   last week.  But I was doing a SWAT training for
         22   officers throughout the state of Florida and
         23   throughout the country, and then I followed that up
         24   with a loss control training, and then I came right
         25   out here to Nashville and I did a training for all of
```

**John J. Ryan - May 21, 2019**

|       |    |                                                          |
|-------|----|----------------------------------------------------------|
|       | 1  | the trainers in Tennessee.  So no, I have not looked     |
|       | 2  | at any of those documents.                               |
| 09:42:39 | 3  | Q.      Fair to say that, from your review of this       |
|       | 4  | document, that the majority of the questioning and       |
|       | 5  | this interview on September 13, 2000, related to the     |
|       | 6  | application and hiring process of the Providence         |
|       | 7  | Police Department?                                       |
| 09:42:53 | 8  | A.      Based on this 302 --                             |
| 09:42:53 | 9  | Q.      Yes.                                             |
| 09:42:55 | 10 | A.      -- I would not agree that that's what took       |
|       | 11 | place at the meeting, because you know that the FBI      |
|       | 12 | agents put whatever they want in the 302s.  In fact,     |
|       | 13 | Dennis Aiken was not allowed to testify at the           |
|       | 14 | mayor's trial because he had a Giglio issue.  And so     |
|       | 15 | -- so in fact whether or not other things were           |
|       | 16 | discussed, only Dennis Aiken could answer that.  And     |
|       | 17 | I'm not sure he could answer that at this point in       |
|       | 18 | time.  Again, this is 2000.  So this is 19 years ago.    |
| 09:43:20 | 19 | Q.      So --                                            |
| 09:43:22 | 20 | A.      So I can't say, because remember, the agent      |
|       | 21 | gets to put whatever he wants in the 302.  That's        |
|       | 22 | been a constant criticism of the FBI for years.          |
| 09:43:33 | 23 | Q.      Well, what else was discussed with you in the    |
|       | 24 | September 13, 2000, interview with Special Agent         |
|       | 25 | Aiken and Johnson?                                       |

**John J. Ryan - May 21, 2019**

09:43:39  1    A.      There could have very well been promotional

2    issues discussed.  I have no idea.  Again, I have no

3    way to even, even come up with that 19 years ago.

09:43:48  4            And again, you know, my memory over time is

5    probably not as good as it was the day after the

6    interview.  You know, this is -- this is 19 years

7    ago.

09:43:55  8    Q.      Would the same be true for the officers who

9    were questioning you?

09:44:01 10    A.      I would think that it would be difficult for

11   them as well.

09:44:05 12    Q.      Would you agree that it would have been

13   important for those officers to contemporaneously

14   take notes based on the information that you were

15   giving them?

09:44:15 16    A.      No.  By that point in time, it would have

17   been important for them to record it so we would have

18   been a verbatim record of what actually took place,

19   because we know that some of the 302s aren't

20   accurate.

09:44:24 21    Q.      Would that have been consistent with the

22   generally accepted practices at the time?

09:44:29 23    A.      By the time we got into the 2000s?

09:44:30 24    Q.      Yes.

09:44:33 25    A.      Yeah.  I think at that point in time,

John J. Ryan - May 21, 2019

1    certainly most -- well, I shouldn't say "most," but

2    agencies that were doing major investigations were

3    recording.

09:44:42  4    Q.      And would you consider this type of

5    investigation that they were conducting something

6    that would be major?

09:44:49  7    A.      When they're trying to take down a mayor and

8    put a mayor in prison, a mayor of 25 years, yeah, I

9    think that that would be a major investigation for

10   the FBI.

09:44:56 11   Q.      Would a homicide investigation be something

12   that you would consider to be a major investigation?

09:45:01 13   A.      In the -- in the early 2000s, yeah, of

14   course.  I mean, it would be any time somebody is

15   killed.

09:45:06 16   Q.      You're saying that generally accepted

17   practices in a major investigation at least in the

18   early 2000s would have been to either

19   contemporaneously document the information or record

20   the interview?

09:45:20 21   A.      Well, I think at that point in time,

22   certainly the investigator that's leading the

23   investigation, Dennis Aiken, yes, he should have

24   documented and he should have documented it

25   consistently with what actually was said and what

**John J. Ryan - May 21, 2019**

1   actually occurred.

09:45:32   2   Q.        Sure.  So not just information that you

3   provided to him but information that he provided to

4   you as well, correct?

09:45:40   5   A.        Well, again, I don't know what information he

6   provided to me.  I really -- again, you're talking 19

7   years ago.  I do know that -- that once I did have an

8   attorney present in the last meeting or maybe the

9   last two meetings.  The attorney took voluminous

10   notes of everything that was said.  And what he found

11   after the fact, that his notes were inconsistent with

12   Dennis Aiken's 302s.

09:46:14   13            So -- so yeah.  I mean, there should have

14   been a proper summary.  If you're going to -- if

15   you're going to use a 302, then it should be a proper

16   summary of the entire meeting.

09:46:42   17   Q.        Sure.  Now, at the Providence Police

18   Department in the late 1990s, can you explain how the

19   background investigation into a potential employee's

20   background was conducted?

09:46:58   21   A.        Yeah.  And again, I only did backgrounds in

22   2001.  So after all this went on, we had a recruit

23   class that we did backgrounds on, and I did some of

24   the background investigations myself.  I trained

25   everybody how to do them, and then I actually took

John J. Ryan - May 21, 2019

```
           1    some on myself because we had so many to do.
09:47:19   2          Again, that was after all this that I was
           3    assigned by the chief of police, the new chief of
           4    police, to do backgrounds and to train everybody how
           5    to do them.
09:47:27   6    Q.     But you were aware of how background
           7    investigations were conducted in the late 1990s as a
           8    captain at the Providence Police Department?
09:47:35   9    A.     I knew that we assigned people to do
          10    background investigations.  I knew that they sought
          11    out the references that were included on the
          12    applications.  They would check with local police
          13    departments to see if the person had any contacts,
          14    things of that nature.
09:47:54  15          But again, I -- I don't want to confuse.
          16    That may be the process that I put in place after all
          17    this.  But I do know, for example, with respect to
          18    Maggiacomo, I do know that Eddie McConnell did a
          19    background investigation and I know that Mike
          20    Sweeney, I think it was Mike Sweeney, also did a
          21    background on Maggiacomo.
09:48:19  22          Sweeney, for purposes of Maggiacomo becoming
          23    a reserve officer after I washed him out of the first
          24    police academy that he was in, which is -- he got in
          25    the police academy on a bribe.  I washed him out.  I
```

**John J. Ryan - May 21, 2019**

1    threw him out of the police academy.  No, I did it

2    because he was injured with the understanding that if

3    he recovered from his injury, he would be placed in

4    the next police academy as long as behavior between

5    those two points was good.

09:48:46    6    Q.        You made that promise to him, right?

09:48:48    7    A.        We gave him a letter.  We did it with every

8    recruit that ever washed out for an injury.  It was

9    -- it was the standard practice.

09:48:54   10    Q.        Can you think of a single person aside from

11    Mr. Maggiacomo that you ever drafted a letter

12    promising them that they would get into the next

13    academy?

09:49:02   14    A.        Absolutely, yeah.

09:49:03   15    Q.        What are the names?

09:49:04   16    A.        And I don't remember his first name, but his

17    brother is currently the -- the U.S. Marshal for the

18    State of Rhode Island.  So Wing Chau's brother came

19    through the police academy.  It would have been the

20    academy -- I think it was the academy prior to -- I

21    don't know which academy he was in, but Wing Chau's

22    brother was in the academy.  Same thing, got injured.

23    And we gave him a letter and we told him he would be

24    in the next academy, and he was in the next academy,

25    whatever it was.  I just don't recall if it was one

**John J. Ryan - May 21, 2019**

|  |  |  |
|---|---|---|
| | 1 | before, one after.  But that was common practice. |
| | 2 | That happened to a number of people over the years. |
| 09:49:42 | 3 | Q.     Did Mr. -- Wing Charles? |
| 09:49:44 | 4 | A.     Well, Wing Chau was the -- is the -- |
| 09:49:44 | 5 | Q.     Wing Chau? |
| 09:49:46 | 6 | A.     -- is currently the U.S. Marshal for the |
| | 7 | State of Rhode Island. |
| 09:49:47 | 8 | Q.     Right. |
| 09:49:50 | 9 | A.     He got sworn in, like, within the last week. |
| | 10 | Wing Chau worked at ATF.  But it was -- it's not him. |
| | 11 | It was his brother. |
| 09:49:57 | 12 | Q.     Did -- |
| 09:49:58 | 13 | A.     So I don't know what his -- if his -- if the |
| | 14 | names are any different. |
| 09:50:04 | 15 | Q.     I see.  Did Mr. Wing Chau's brother pay a |
| | 16 | bribe to anyone to be hired at the Providence Police |
| | 17 | Department? |
| 09:50:09 | 18 | A.     Oh, I don't think anybody has ever made that |
| | 19 | kind of allegation, no.  I'm not aware of any of |
| | 20 | that.  Again, the only one I'm aware of is this kid |
| | 21 | right here, and again -- |
| 09:50:17 | 22 | Q.     Maggiacomo? |
| 09:50:22 | 23 | A.     Right, yeah.  And you know what I mean?  And |
| | 24 | I'm not sure he paid it himself.  My understanding is |
| | 25 | that his parents paid it.  And again, this is all |

**John J. Ryan - May 21, 2019**

|  |  |  |
|---|---|---|
| | 1 | from the trial and reading in the newspaper and after |
| | 2 | the fact. |
| 09:50:33 | 3 | Q.     Did you inform the FBI in this September 13, |
| | 4 | 2000, interview that if derogatory information was |
| | 5 | uncovered, that a judgment is made as to whether that |
| | 6 | individual will or will not go to the academy? |
| 09:50:43 | 7 | A.     Of course. |
| 09:50:47 | 8 | Q.     And was the person who had made that decision |
| | 9 | Col. Prignano? |
| 09:50:53 | 10 | A.     Col. Prignano would ultimately make the call |
| | 11 | as the chief of police on the recommendation not of |
| | 12 | the person who did the background but on the -- on |
| | 13 | the recommendation.  The person would go through an |
| | 14 | oral interview first and then would be presented to |
| | 15 | the chief of police.  And the chief of police would |
| | 16 | potentially look at that background and -- and give |
| | 17 | it a thumbs up or thumbs down depending on how he |
| | 18 | felt about whatever the background was. |
| 09:51:16 | 19 | Q.     Did politics have anything to do with the |
| | 20 | selection process? |
| 09:51:21 | 21 | A.     Absolutely.  No question about it. |
| 09:51:22 | 22 | Q.     How so? |
| 09:51:24 | 23 | A.     And again -- well, you had -- you had majors |
| | 24 | who sat on that oral board.  And I'll just give you |
| | 25 | an example, in Maggiacomo's case.  And I told the FBI |

**John J. Ryan - May 21, 2019**

```
         1    this.  All's they've got to do is pull the documents.
         2    Five majors sat on that board, four or five majors.
         3    So it was Maj. Semoneau, it was Maj. Sullivan, it was
         4    Maj. Veraccia, and Maj. Young.  Those four sat on
         5    that oral board.
09:51:46 6            And I will tell you that the -- the first two
         7    people with almost a perfect score on that oral board
         8    were Major Young's son and Major Semoneau's son.
         9    Perfect scores.  Perfect.  I didn't learn any of this
        10    until after the fact.  I learned this through the
        11    documents after the fact, when the FBI asked me to
        12    start looking at documents.  And Maggiacomo tied
        13    second with almost a perfect score with Kevin Lanni.
        14    Kevin Lanni's dad was a lieutenant who was best
        15    friends with Richard Sullivan.
09:52:18 16           So, yeah, there was definitely --
09:52:21 17   there's -- there's no way in my mind, I mean, I'm not
        18    -- I'm not a believer in -- in coincidence, those
        19    four people don't get almost perfect scores on the
        20    oral board unless the oral board played games.  But I
        21    was never asked to sit on the oral board, because I
        22    was never entrusted with that kind of stuff.
09:52:39 23   Q.      Now, you did sit on the oral board at other
        24    police departments, correct?
09:52:41 25   A.      Absolutely.
```

**John J. Ryan - May 21, 2019**

09:52:43  1   Q.      Yeah.  And one of those police departments

2   was Warwick, correct?

09:52:50  3   A.      I don't recall.  I might have.  I think I

4   might have sat on a promotional board in Warwick.

5   I -- I might have sat on a promotional board in

6   Warwick.  I don't think I ever sat on a selection

7   process there.  I think the only place I sat on a

8   selection process was Jamestown, I think.

09:53:10  9   Q.      Did campaign contributions come into play

10   regarding the selection process?

09:53:12 11   A.      With the police department?

09:53:12 12   Q.      Yeah.

09:53:20 13   A.      I have no idea.

09:53:23 14   Q.      Did you tell the FBI on September 3rd, 2000,

15   that you would like to believe that politics does not

16   have anything to do with the selection process?

09:53:29 17   A.      Of course.

09:53:33 18   Q.      But you knew in fact that it did have

19   something to do with it, correct?

09:53:37 20   A.      No.  I was -- never sat on one of those

21   boards.  I never knew exactly how things played out.

09:53:41 22   Q.      But you believed --

09:53:46 23   A.      I was -- but when I see -- and again,

24   politics is -- is not necessarily -- nepotism would

25   have been probably the right word.

**John J. Ryan - May 21, 2019**

| | | |
|---|---|---|
| 09:53:54 | 1 | When I see that -- myself included.  I mean, |
| | 2 | I was a cop's kid, you know.  And officers' kids tend |
| | 3 | to come on the Providence Police Department. |
| 09:54:02 | 4 | Q.     So your -- |
| 09:54:04 | 5 | A.     So there's some level of nepotism anyway to |
| | 6 | get on the department. |
| 09:54:08 | 7 | Q.     Does your brother still work for the |
| | 8 | Providence Police Department? |
| 09:54:11 | 9 | A.     My brother retired a couple years ago, yeah, |
| | 10 | is retired now. |
| 09:54:15 | 11 | Q.     Did you know Joseph Maggiacomo, III, prior to |
| | 12 | his enrollment in the 57th academy? |
| 09:54:20 | 13 | A.     I didn't know him until the day he walked in |
| | 14 | the door.  I had no involvement with the selection |
| | 15 | process.  I had no involvement with him.  The only |
| | 16 | thing is -- and -- and again, I'm very -- I'm unclear |
| | 17 | on this, but I think I told the FBI Autiello may have |
| | 18 | come to me during that process because he was pushing |
| | 19 | for this kid, for some reason.  I didn't know |
| | 20 | anything about a bribe.  He knew the family.  They |
| | 21 | were nice people.  The kid was a cop in Florida. |
| 09:54:48 | 22 | I don't know when that happened.  I don't |
| | 23 | know if that -- I don't think I spoke to Autiello |
| | 24 | until after I washed the kid out.  But I'm not sure. |
| | 25 | 20 years later, I'm just not sure.  I would have to |

**John J. Ryan - May 21, 2019**

|          |    |                                                          |
|----------|----|----------------------------------------------------------|
|          | 1  | see a document of -- if I explained that to the FBI       |
|          | 2  | or not.                                                   |
| 09:55:04 | 3  | Q.      Did you advise Mr. Maggiacomo that it would        |
|          | 4  | be in his best interest to withdraw and start a new       |
|          | 5  | class when he was fully healed from his injury?           |
| 09:55:12 | 6  | A.      Absolutely.  Yeah.  He wasn't going to pass        |
|          | 7  | the PT test.                                              |
| 09:55:15 | 8  | Q.      Did you promise Mr. Maggiacomo that he could       |
|          | 9  | come back in the next academy?                            |
| 09:55:19 | 10 | A.      Again, I think "promise" is the wrong word.        |
| 09:55:21 | 11 | Q.      Did you give him your word?                        |
| 09:55:23 | 12 | A.      And again, I think what I did was, I told him      |
|          | 13 | we would do for him what we did for everyone else.        |
|          | 14 | And I went to the chief of police and -- and got that     |
|          | 15 | authorization like I had with other people and like I     |
|          | 16 | had seen done with other people, like I saw with Wing     |
|          | 17 | Chau's brother.                                           |
| 09:55:50 | 18 | Q.      Look at Page 4 of your FBI 302, first             |
|          | 19 | paragraph.                                                |
| 09:55:53 | 20 | A.      Again, be clear, this is not my FBI 302.          |
|          | 21 | This is Dennis Aiken's words on here.  These are not      |
|          | 22 | necessarily my words.                                     |
| 09:55:57 | 23 | Q.      Sure.                                              |
| 09:55:58 | 24 | A.      So where am I looking?                             |
| 09:56:00 | 25 | Q.      About Line -- it's about six lines up from        |

**John J. Ryan - May 21, 2019**

| | | |
|---|---|---|
| | 1 | the bottom of the first paragraph.  Do you see where |
| | 2 | it says -- |
| 09:56:05 | 3 | A.      Which page, please? |
| 09:56:07 | 4 | Q.      Page 4.  At the top, top right it says -- it |
| | 5 | has page numbers. |
| 09:56:11 | 6 | A.      Okay. |
| 09:56:14 | 7 | Q.      Do you see where it says, "Ryan pointed out |
| | 8 | that he had given Maggiacomo his word that he would |
| | 9 | be in the next academy"? |
| 09:56:22 | 10 | A.      Yeah.  These are Dennis' words.  I have no |
| | 11 | idea that I said that.  I think what I probably said |
| | 12 | is, I told him he would be in the next academy as |
| | 13 | long as he -- you know, I'm not disputing the fact |
| | 14 | that I did tell him he would be in the next academy |
| | 15 | as long as he was of good behavior between then and |
| | 16 | the next academy.  I'm not disputing that.  But I |
| | 17 | don't know that I used -- it doesn't sound like me to |
| | 18 | say I gave him my word.  I am certain that we gave |
| | 19 | him a letter just like we did everybody else. |
| 09:56:51 | 20 | Q.      And the only other person that you can think |
| | 21 | of is the brother of the U.S. Marshal, Mr. Wing Chau? |
| 09:57:01 | 22 | A.      As I sit here right now?  Yes.  But there |
| | 23 | were -- there were other people.  I'm trying to |
| | 24 | think.  I could probably come up with some names with |
| | 25 | more time to think about it.  Wing Chau stands in my |

**John J. Ryan - May 21, 2019**

|          |    |                                                            |
|----------|----|------------------------------------------------------------|
|          | 1  | mind because I think I was director of the academy         |
|          | 2  | when he came through.                                      |
| 09:57:20 | 3  | Q.      After Mr. Maggiacomo withdrew, then applied         |
|          | 4  | to be a reserve officer, was another background            |
|          | 5  | investigation conducted?                                   |
| 09:57:27 | 6  | A.      Yes.                                                |
| 09:57:30 | 7  | Q.      Okay.  And did that investigation uncover          |
|          | 8  | conduct that led you to believe that Mr. Maggiacomo        |
|          | 9  | should not be hired at the Providence Police               |
|          | 10 | Department?                                                 |
| 09:57:37 | 11 | A.      Not initially, because I didn't know anything      |
|          | 12 | about that second background.  I knew nothing about        |
|          | 13 | it.                                                         |
| 09:57:40 | 14 | Q.      When did --                                         |
| 09:57:42 | 15 | A.      And then -- and then what happened was, the        |
|          | 16 | chief presented me with it one day, and I -- I agreed      |
|          | 17 | with him ultimately that the kid should not get in         |
|          | 18 | based on these other events, none of which were            |
|          | 19 | criminal or none which of he was charged.  But I was       |
|          | 20 | certainly in agreement when I read these other             |
|          | 21 | events.  But that was presented to me very late in         |
|          | 22 | the game.  There was a lot of going back and forth         |
|          | 23 | before that happened.                                       |
| 09:58:18 | 24 | Q.      Did you inform the FBI that there were two         |
|          | 25 | red flags with regard to Mr. Maggiacomo's prior           |

**CLEETON DAVIS COURT REPORTERS, LLC**
**(615) 726-2737**

37

**John J. Ryan - May 21, 2019**

1    conduct?

09:58:27  2    A.      No idea.  I may have.  I don't -- I don't

3    have anything that he did committed to memory.  At

4    this point, I mean, if you want me to read the

5    document, I'll see if it, you know, refreshes my

6    recollection, but --

09:58:38  7    Q.      Were you made aware that Mr. Maggiacomo lied

8    to a supervisor at the Miami Police Department?

09:58:44  9    A.      I have no idea if I knew that or not.  Again,

10   I'll be happy to look at the document to try to

11   refresh my recollection, but I have no idea.

09:58:49  12   Q.      Were you made --

09:58:53  13   A.      I -- I do -- it seems to me, as I'm saying

14   that, it seems to me there was two supervisors in

15   Miami, one that gave him glowing remarks, according

16   to Eddie McConnell, and one who he had a personality

17   conflict with.  And I think Eddie McConnell had tried

18   to sort that out in the original piece and thought

19   that the -- that the one supervisor was just not a

20   great supervisor, the one that had a problem with

21   him.  I think that's how McConnell came down on it.

09:59:20  22          But again, you know, you're talking -- with

23   respect to Maggiacomo, I mean, this -- this 302 was

24   written in 2000.  I'm going to guess that Maggiacomo

25   -- probably, I would have to look, and maybe it's in

**John J. Ryan - May 21, 2019**

1     here somewhere -- his first academy had to be, like,

2     maybe 1996 or something, the one that he washed out

3     of.  Maybe even '95.  So it -- it may have even been

4     before Prignano was chief.  I don't know.

09:59:51  5           But the -- the fact of the matter is, that --

6     I mean, you are talking even further out.  So maybe

7     talking 24 years ago.

09:59:59  8           So I don't remember that.  I knew there

9     were -- there was nothing in the background that was

10    concerning that McConnell did, and then there was

11    some things that were very concerning in what Sweeney

12    did.

10:00:12  13  Q.      And that concerning as to what Sweeney did,

14    it's just what Sweeney found in his investigation,

15    correct?

10:00:17  16  A.      Correct.  Yeah, he found some things, I

17    think, from the Cranston Police Department that Eddie

18    McConnell did not find, for whatever reason.

10:00:28  19  Q.      And according to the -- this 302, do you see

20    in that same paragraph it says, "During" --

10:00:32  21  A.      I don't even know where you are, because I

22    haven't been looking at it.

10:00:35  23  Q.      Fourth -- fourth line, Page 4, first

24    paragraph.  "During the course of this investigation

25    about Maggiacomo's involvement with the Cranston and

**John J. Ryan - May 21, 2019**

|  |  |  |
|---|---|---|
|  | 1 | Warwick Police Departments, that was not turned up |
|  | 2 | during the previous background investigation, came to |
|  | 3 | light." Do you disagree with any -- anything in |
|  | 4 | that? |
| 10:00:54 | 5 | A.    Again, I don't disagree, but I don't remember |
|  | 6 | this. I just don't have any memory of those two |
|  | 7 | backgrounds, to be honest with you. |
| 10:01:02 | 8 |        Again, I wasn't involved in any of the |
|  | 9 | background investigations. I was not involved in his |
|  | 10 | selection. I wasn't involved in the reserve program. |
|  | 11 | So this all comes to me on the backside of me saying, |
|  | 12 | "Hey, I washed this kid out. We gave him a letter. |
|  | 13 | Why is he not in?" And then at some point the chief |
|  | 14 | kind of throws this -- this file at me and |
|  | 15 | says, "Have you read this"? |
| 10:01:27 | 16 | Q.    Sure. |
| 10:01:29 | 17 | A.    And that's -- that's when I read this file -- |
| 10:01:29 | 18 | Q.    And that -- |
| 10:01:30 | 19 | A.    -- and agreed. |
| 10:01:31 | 20 | Q.    And during those conversations, Chief |
|  | 21 | Prignano was telling you that Mr. Maggiacomo wasn't |
|  | 22 | fit to be at the Providence Police Department, |
|  | 23 | correct? |
| 10:01:42 | 24 | A.    No. See, you -- you changed it. There was |
|  | 25 | one conversation with the chief where he presented me |

John J. Ryan - May 21, 2019

|          |    |                                                             |
|----------|----|-------------------------------------------------------------|
|          | 1  | with the file.                                              |
| 10:01:49 | 2  | Q.      Mr. Autiello was present, correct?                  |
| 10:01:52 | 3  | A.      I don't know.                                        |
| 10:01:53 | 4  | Q.      Did you tell --                                      |
| 10:01:53 | 5  | A.      I don't remember.                                    |
| 10:01:56 | 6  | Q.      Have you ever told the FBI that Mr. Autiello        |
|          | 7  | was present for a conversation between yourself and         |
|          | 8  | Chief Prignano?                                             |
| 10:02:04 | 9  | A.      I could very well have.  Again, you are             |
|          | 10 | talking memory over 20 years ago or 19 years ago as         |
|          | 11 | far as what I told the FBI.  And we're talking a            |
|          | 12 | meeting that would have been over 20 years ago.  It's       |
|          | 13 | very possible that he was there.  That would not be         |
|          | 14 | surprising to me at all.                                    |
| 10:02:19 | 15 | Q.      It's --                                             |
| 10:02:21 | 16 | A.      And if he was, I would have been very               |
|          | 17 | truthful that Autiello was in the room.                     |
| 10:02:24 | 18 |              MR. KELLEY:  Note an objection to that.        |
| 10:02:25 | 19 |              MR. SLOSAR:  Sure.                             |
| 10:02:25 | 20 | BY MR. SLOSAR:                                              |
| 10:02:26 | 21 | Q.      Sure.  Because Mr. -- Mr. Autiello was              |
|          | 22 | frequently around the Providence Police Department,         |
|          | 23 | correct?                                                    |
| 10:02:31 | 24 | A.      He was, because we had -- you know, we had a        |
|          | 25 | fleet management -- manager, and he worked daily with       |

John J. Ryan - May 21, 2019

|  |  |  |
|---|---|---|
|  | 1 | the fleet manager.  And so it wasn't unusual for him |
|  | 2 | to be in the police station. |
| 10:02:43 | 3 | Q.     And you worked closely with Mr. Autiello on |
|  | 4 | some contractual issues as well, correct? |
| 10:02:50 | 5 | A.     Not on contractual issues.  That would be |
|  | 6 | incorrect.  I worked with him closely on something |
|  | 7 | probably the closest, and it was more a woman that |
|  | 8 | worked for him. |
| 10:03:00 | 9 | There were a lot of car accidents that were |
|  | 10 | not the fault of police officers, and so I would take |
|  | 11 | those accident cases.  Any time there was a police |
|  | 12 | car accident, I would take the accident and I would |
|  | 13 | read through it and make a determination as to |
|  | 14 | whether or not I thought that the police officer was |
|  | 15 | at fault.  And if the officer was not at fault, I |
|  | 16 | would call the insurance company. |
| 10:03:22 | 17 | And Autiello had something called -- I think |
|  | 18 | they called it the small dent contract.  He would fix |
|  | 19 | all of those car crashes.  He had a contract to do |
|  | 20 | that.  I didn't give him that.  That all went through |
|  | 21 | the Board of Contracting and Supply. |
| 10:03:33 | 22 | Q.     Sure. |
| 10:03:35 | 23 | A.     All that was done through the Commissioner of |
|  | 24 | Public Safety's office.  I had zero to do with his |
|  | 25 | contract and him getting his contract. |

**John J. Ryan - May 21, 2019**

| | | |
|---|---|---|
| 10:03:44 | 1 | Q.        Autiello had two contracts that renewed, one |
| | 2 | for approximately $800,000 to fix cars, to do |
| | 3 | maintenance on cars, another one for $50,000 to deal |
| | 4 | with the small-dent accidents that you just |
| | 5 | described, correct? |
| 10:03:58 | 6 | A.        No, that would be two different things. |
| | 7 | Well, that would be three different things. |
| 10:04:00 | 8 | Q.        Can you describe -- |
| 10:04:02 | 9 | A.        Because the small dent would -- and again, |
| | 10 | maybe that's my fault, because I was thinking the |
| | 11 | small dent was the accidents.  It's not.  Well, it |
| | 12 | is, but it's not. |
| 10:04:10 | 13 |          The small dent, we were paying to fix the |
| | 14 | car.  The accident cases that I'm talking about that |
| | 15 | I worked closely with him on -- |
| 10:04:16 | 16 | Q.        That's outside? |
| 10:04:19 | 17 | A.        -- that was -- that was a separate contract, |
| | 18 | as far as I know.  So I think he must have had three. |
| | 19 | Or maybe it was done under the small-dent contract; I |
| | 20 | don't know.  Maybe it was done under the small-dent |
| | 21 | contract where he had authority to fix the car, but |
| | 22 | if we could get the insurance company for the other |
| | 23 | guy to pay for it, maybe -- maybe that's how it |
| | 24 | worked.  I don't remember.  It's a long time ago now. |
| 10:04:46 | 25 | Q.        Did Chief Prignano ever inform you that |

**John J. Ryan - May 21, 2019**

```
           1    Mr. Maggiacomo would not be allowed to return to the
           2    academy?
10:04:53   3    A.      We made the decision that day that he showed
           4    me the file.  I was in the office that day, and he
           5    said, "He's not going in.  And here is why.  Read the
           6    file."  And he -- he tossed the file to me across the
           7    desk.
10:05:03   8            And I read the file and I said, "You know
           9    what?  After reading that, I agree with you."
10:05:08  10    Q.      So you're saying that after Chief Prignano
          11    told -- gave you the file and you reviewed it, that
          12    you then did not push in any way for Mr. Maggiacomo
          13    to be allowed into the Providence Police Academy?
10:05:24  14    A.      Any pushing I did was prior to seeing that
          15    second file.
10:05:31  16    Q.      And if Mr. Prignano testified or gave a
          17    statement that differed, he would be lying?
10:05:36  18    A.      Absolutely.  Or he would just be incorrect.
10:05:40  19    Q.      Who is Dick Autiello?
10:05:42  20    A.      Dick is a -- a friend of mine.  I have known
          21    him since I was a little boy.  I'm friends --
10:05:45  22    Q.      Is he still a friend?
10:05:47  23    A.      Absolutely.  I talk to him every holiday.
          24    I'm trying to get together with him down in Florida.
          25    He's getting old now.  But -- he goes to Florida for
```

**John J. Ryan - May 21, 2019**

```
 1    the winter.  He is somewhere near West Palm Beach.

 2    He is a very -- I have known him, like I said, since

 3    I was a little boy.  I grew up in the same

 4    neighborhood with him and his kids, where he lived

 5    with his wife, and I hung around with his kids and

 6    played baseball with his kids.  I have know him

 7    forever.  He fixed my car when I was a young man.  He

 8    fixed my dad's car.  Known him for -- since I was a

 9    young boy.
```

10:06:19 10    Q.      To your knowledge, has Mr. Autiello ever been

           11    a target of a criminal investigation?

10:06:24 12    A.      Mr. Autiello was convicted.  He went to jail.

10:06:24 13    Q.      This --

10:06:27 14    A.      He went to jail over this stuff, and

           15    including, I think, Maggiacomo.  I think he was

           16    convicted for providing the money to Frank Corrente

           17    over Maggiacomo.  At least that's my understanding.

           18    My understanding was, that was part of his

           19    conviction.

10:06:40 20    Q.      Did you ever visit Mr. Autiello when he was

           21    in federal prison?

10:06:43 22    A.      No, I did not.

10:06:45 23    Q.      Why not?

10:06:47 24    A.      I don't know.  I -- I mean, it just wasn't

           25    something -- I wasn't on his visitor list or anything

**John J. Ryan - May 21, 2019**

1   like that.  I mean, I wasn't -- I wasn't that close

2   to him.  But I will tell you that after he was out of

3   prison, I had dinner with him and the head of our 911

4   center and other people from the police department on

5   -- on Christmas.  Not on Christmas Day itself but for

6   Christmas.

10:07:08   7        So yeah, I mean, I -- I'm still friendly with

8   him.  He made some mistakes.  But, you know, I -- I

9   think he paid the price, and -- and I was friendly

10   with him before he made those mistakes, and I'm

11   friendly with him after.

10:07:20   12   Q.      Did you communicate with Mr. Autiello when he

13   was incarcerated?

10:07:24   14   A.      I don't know.  I don't know if I might have

15   sent a letter to him.  I'm not sure.  No idea.

10:07:28   16   Q.      Did Mr. --

10:07:29   17   A.      Long ago.

10:07:32   18   Q.      -- Autiello lobby you for Mr. Maggiacomo to

19   be hired?

10:07:37   20   A.      I don't think I was ever involved in when he

21   first got hired.  I think Autiello came to me -- and

22   again, my memory is really fuzzy on this.  I think

23   Autiello only came to me after he washed out of the

24   first academy.  I think that's when Autiello came to

25   me.

John J. Ryan - May 21, 2019

10:07:55  1    Q.      Okay.  So did Mr. Autiello ever lobby you for

        2    Mr. Maggiacomo to be let into the academy a second

        3    time?

10:08:02  4    A.      Well, I think the only thing he said

        5    was, "Are you certain this kid is going to go in?

        6    I'm friendly with his parents."  I think I have a

        7    memory of that.  As I sit here today, that's my

        8    recollection.

10:08:13  9            But again, it's -- a lot of this is fuzzy,

       10    it's so long ago.  But I certainly never knew

       11    anything about Autiello taking a bribe or anything

       12    like that.  I didn't know any of that.

10:08:29 13    Q.      Were you present for a meeting with Chief

       14    Prignano where Mr. Autiello was present?

10:08:34 15    A.      Hundreds.

10:08:38 16            Somebody just dropped off or somebody is

       17    trying to call in.

10:08:41 18                  MR. SLOSAR:  You know, it's -- it's

       19    okay.  It's going to get a lot of phone calls.

10:08:49 20    BY MR. SLOSAR:

10:08:54 21    Q.      Mr. Ryan, after leaving the September 3rd,

       22    2000, meeting with the FBI, September 13th, 2000,

       23    meeting, with the FBI, did you go back to the

       24    Providence Police Department and have any

       25    conversations with Chief Prignano or any other law

John J. Ryan - May 21, 2019

| | |
|---|---|
| 1 | enforcement about the topics that were discussed? |
| 10:09:10 2 | A.        Absolutely. |
| 10:09:12 3 | Q.        Why did you do that? |
| 10:09:13 4 | A.        Because I wanted to tell the chief what was |
| 5 | going on, that there was these allegations about this |
| 6 | kid paying a bribe and that that's what they were |
| 7 | looking into. |
| 10:09:24 8 | Q.        Why did you want to tell the chief what was |
| 9 | going on with regard to the bribe allegations? |
| 10:09:29 10 | A.        Because I work in a paramilitary organization |
| 11 | for the chief of police, and I certainly didn't think |
| 12 | the chief was involved in any kind of criminal |
| 13 | activity.  And certainly, the chief has the right to |
| 14 | know if somebody's paying money to get on to his |
| 15 | police department. |
| 10:09:43 16 | Q.        What if the chief was involved in it? |
| 10:09:44 17 | A.        I don't believe that the chief was involved |
| 18 | in anything illegal anywhere along the way.  I just |
| 19 | don't believe that.  I knew the chief well enough, I |
| 20 | think, by that point.  I didn't know him very well |
| 21 | until he made chief.  But I -- I knew him well enough |
| 22 | by that point in the almost five years that he was |
| 23 | chief that I certainly didn't think he was capable of |
| 24 | committing any kind of criminal activity. |
| 10:10:06 25 | Q.        Did you discuss with Chief Prignano whether |

**John J. Ryan - May 21, 2019**

1    or not there was a meeting between Prignano,

2    yourself, and Mr. Autiello regarding Mr. Maggiacomo?

10:10:15   3    A.        That I have no clue.  I don't -- I don't

4    know.  I don't -- I don't know why we would have

5    discussed that.  The chief would have known, because

6    he would have been at the meeting.  I am not sure

7    what that relates to.

10:10:27   8    Q.        Show you what we will mark as Exhibit 4.

9    This is Ryan 2963, for those on the phone, the

10   September 20th, 2000, 302.

10:10:39   11        (The document was marked Exhibit No. 4.)

10:10:41   12   BY MR. SLOSAR:

10:10:45   13   Q.        Sir, have you seen this document before

14   today?

10:10:49   15   A.        I don't have any idea.

10:10:52   16   Q.        Were you ever provided with any of these 302s

17   prior to this deposition?

10:10:56   18   A.        I have seen some of them before, because I

19   know that Joe Penza and I talked about how inaccurate

20   they were in -- in -- compared to his notes that he

21   took.  But that was specifically when he was present

22   at the meeting and took notes.  But I don't know

23   whether this is one or not.

10:11:14   24   Q.        Does your attorney still have those notes?

10:11:17   25   A.        I don't have any idea.  I don't believe so.

**John J. Ryan - May 21, 2019**

```
          1   I think there was a point where he stripped the file.

          2   I don't believe he does.  I don't know.  I -- I

          3   suppose that's a question I could ask him.

10:11:31  4   Q.      Do you see on the third paragraph of this 302

          5   where it says, "Ryan stated that he has been

          6   discussing the matter regarding Joseph Maggiacomo,

          7   III, with Col. Urbano Prignano and other Providence

          8   Police Department" -- "other Providence police

          9   officers"?

10:11:45 10   A.      Yes.

10:11:46 11   Q.      Is that true?

10:11:48 12   A.      I'm sure it is.  I -- I went back to the

         13   station and -- and I made it very clear to the FBI

         14   agents that I was going to go back to the station and

         15   have a discussion with the chief of police.

10:11:57 16   Q.      Did they say anything to dissuade you?

10:12:01 17   A.      Well, I don't think they wanted me to.  And I

         18   told them that I was a -- I wasn't bound by any

         19   privilege or any requirement and that I could

         20   absolutely go talk to the chief of police, and the

         21   chief had every right to know about it, because it

         22   was potentially criminal activity in his police

         23   department.

10:12:15 24   Q.      You're a loyal -- it fair to say that you're

         25   loyal to the chief?
```

John J. Ryan - May 21, 2019

```
10:12:17  1   A.       I was loyal to the Providence Police
          2   Department.  I certainly wouldn't have stood by if I
          3   thought the chief was committing a crime.
10:12:27  4   Q.       Were you loyal to the Providence -- well,
          5   Chief Prignano, prior to you becoming captain, Chief
          6   Prignano gave you source information for the exam,
          7   correct?
10:12:38  8   A.       And again, I mean, you know -- you know these
          9   answers, because I think you went over this last
         10   time, but it's -- it's pretty clear what happened.  I
         11   took the test the first time.  I didn't study because
         12   I was told that I wasn't making it.  I still beat
         13   everybody on the test.
10:12:50 14   Q.       Your testimony --
10:12:50 15   A.       Still beat everybody on the test.
10:12:52 16   Q.       Your testimony is that from your first
         17   captain's exam, the written exam, that you had the
         18   highest score out of all the applicants?
10:13:00 19   A.       Absolutely, on the written test.  On the
         20   written test, if you go and look at it, the only one
         21   that was close to me was Richard Tarlaian.  And my
         22   memory is that I still beat Richard.  Richard was
         23   also an attorney.
10:13:12 24   Q.       Sir, did -- did Chief Prignano give you the
         25   source information for the captain's exam prior to
```

John J. Ryan - May 21, 2019

1   you taking the second test?  Yes or no.

10:13:20  2   A.       For about ten seconds.  For about ten

3   seconds.  It was on a pile of mail.  And I made this

4   very clear to the FBI:  And when I saw what it was, I

5   either threw it down on his desk or -- and there was

6   an ante-office, one of the other.  And that's the

7   part I don't remember and didn't remember even back

8   then.  There were majors sitting in the room when he

9   gave it to me.  I was told the year before that I was

10   going to be first on the list.

10:13:45  11        And I think, you know, if -- if you -- if you

12   looked at the whole file, you will find there's grand

13   jury testimony, because I have been told that it

14   exists, that the people that sat on the selection

15   board for captain made it very clear that the chief

16   selected who was going to be made captain on the oral

17   board.  The test had nothing to do with it.  And they

18   would -- they would maneuver the points that way.

10:14:04  19   Q.       Contributions had something to do with it,

20   correct?

10:14:07  21   A.       No one ever tells you that.  But --

10:14:09  22   Q.       You believe that contributions had something

23   to do with getting promoted at the Providence Police

24   Department, correct?

10:14:17  25   A.       I knew that for more than 25 years, no one

John J. Ryan - May 21, 2019

|        |    |                                                          |
|--------|----|----------------------------------------------------------|
|        | 1  | made captain without contributing to the mayor's         |
|        | 2  | fundraisers.                                             |
| 10:14:21 | 3  | Q.      So you contributed to the mayor's             |
|        | 4  | fundraisers, correct?                                    |
| 10:14:23 | 5  | A.      I absolutely did.                              |
| 10:14:24 | 6  | Q.      Does --                                        |
| 10:14:25 | 7  | A.      Without question.                              |
| 10:14:25 | 8  | Q.      Same mayor who was --                          |
| 10:14:27 | 9  | A.      After the -- after the first test.             |
| 10:14:30 | 10 | Q.      Same mayor who was convicted and sent to       |
|        | 11 | federal prison, correct?                                 |
| 10:14:32 | 12 | A.      Absolutely.                                    |
| 10:14:34 | 13 | Q.      Same mayor who was convicted and sent to       |
|        | 14 | prison for taking bribes, correct?                       |
| 10:14:39 | 15 | A.      He was not convicted of taking bribes.         |
|        | 16 | That's not true.                                         |
| 10:14:40 | 17 | Q.      What was he convicted of?                      |
| 10:14:43 | 18 | A.      He was convicted of a RICO violation for       |
|        | 19 | being the head of an organization that took bribes.      |
|        | 20 | He was never convicted of any underlying offense.        |
|        | 21 | There was no evidence offered, I think, that he          |
|        | 22 | personally took a bribe.                                 |
| 10:14:59 | 23 | Q.      Did you tell the FBI on September 19, 2000 --  |
|        | 24 | I'm looking at Ryan 2963, third paragraph -- that you     |
|        | 25 | had not lobbied for Maggiacomo but may have stated       |

**John J. Ryan - May 21, 2019**

1    that he -- that you had promised Maggiacomo a

2    position in the next academy class and indicated to

3    Prignano that they should allow Maggiacomo to go into

4    the class based on this promise?

10:15:30   5              MR. KELLEY:  Note the objection.

10:15:31   6         Go ahead and answer.

10:15:32   7              THE WITNESS:  Again, some of the

8    wording would be inaccurate.

10:15:38   9              I would have absolutely told them that I had

10   told him that if he was of good behavior between

11   Class 1 and Class 2, that he would get in.  I would

12   have told him that as the director of the academy.

10:15:51  13             Using the word "promise" is what Dennis Aiken

14   says.  I didn't lobby.  I did go to the chief of

15   police and say, "Look, we did tell this kid he would

16   be in the next class like we did with everybody

17   else."  And it was at -- at one of these meetings or

18   at maybe even the only meeting where the chief showed

19   me the file and I said, "You know what?  I agree with

20   you.  I had no idea that -- that this even existed."

10:16:20  21  Q.        On September 19, 2000, did you tell the FBI

22   that you did not -- I'm looking about six lines down,

23   "Ryan stated that it was possible that he had said

24   these things, but he does not remember.  Ryan also

25   stated that when he and Prignano and possibly

**John J. Ryan - May 21, 2019**

```
 1    Autiello were discussing Maggiacomo, someone may have
 2    brought the file into the room which contained the
 3    prior arrest information.  Ryan did not recall when
 4    this meeting took place in relation to Maggiacomo's
 5    rejection letter."
```

10:16:53  6       Is anything that I just read not true?

10:16:54  7             MR. KELLEY:  Note the objection.

10:16:54  8             MR. MILLER:  I have -- I have no idea

```
 9    that it even existed that way.  My memory is that it
10    was a meeting.  I have no idea if Autiello was there
11    as we sit here today.  That does not refresh my
12    recollection at all.
```

10:17:07 13       My memory today is that there was a meeting

```
14    where I had no idea about the subsequent background.
15    The chief showed it to me, and I agreed with him.  I
16    don't have any memory of Autiello being there, but I
17    don't dispute the possibility that it could have
18    been.
```

10:17:20 19  BY MR. SLOSAR:

10:17:21 20  Q.    Did you --

10:17:22 21  A.    I don't agree with anything that Dennis Aiken

```
22    wrote in the 302 because Dennis Aiken wrote a lot of
23    stuff in the 302.
```

10:17:29 24  Q.    Did you tell Mr. Prignano at any point that

```
25    the Providence Police Department should allow
```

John J. Ryan - May 21, 2019

|  |  |  |
|---|---|---|
|  | 1 | Maggiacomo to go into the class based on your promise |
|  | 2 | to him? |
| 10:17:38 | 3 | A.      I wouldn't use the word "promise."  But I |
|  | 4 | think that -- it wouldn't have been my promise.  I |
|  | 5 | think the chief wrote a letter telling him he would |
|  | 6 | be in the next academy.  That's my memory as I sit |
|  | 7 | here today. |
| 10:17:47 | 8 | Q.      If the chief -- |
| 10:17:50 | 9 | A.      It would have been the chief's promise based |
|  | 10 | on the letter. |
| 10:17:52 | 11 | Q.      Okay.  If the chief wrote that letter, it |
|  | 12 | would have been at your direction, correct? |
| 10:17:54 | 13 | A.      No, absolutely not. |
| 10:17:55 | 14 | Q.      Oh.  You would have been the one that had the |
|  | 15 | conversation with Maggiacomo about coming to the next |
|  | 16 | academy, correct? |
| 10:18:00 | 17 | A.      Absolutely.  The academy was a different |
|  | 18 | site.  I would have gone downtown like I did every |
|  | 19 | day when I was the academy director when we had an |
|  | 20 | academy in session, and I would have told the chief, |
|  | 21 | "Hey, we're losing a candidate," as I was required to |
|  | 22 | do with every candidate, "and here is why we're |
|  | 23 | losing a candidate."  The chief then would have made |
|  | 24 | a decision.  When it's an injury, the decision was |
|  | 25 | always put him in the next school.  That was always |

**John J. Ryan - May 21, 2019**

```
               1    the decision.

10:18:33       2    Q.      On October 4th, 2000, did you have an

               3    opportunity to meet with the FBI again regarding

               4    their investigation into the Providence Police

               5    Department?

10:18:42       6    A.      I don't have the dates committed to memory.

               7    I met with them several times.

10:18:48       8    Q.      Show you what we'll mark as Exhibit No. 5.

               9    For those folks on the phone, this is Ryan 2966

              10    through 2979, the October 4th, 2000, transcription of

              11    an interview with yourself and the FBI.

10:19:03      12         (The document was marked Exhibit No. 5.)

10:19:04      13    BY MR. SLOSAR:

10:19:09      14    Q.      Sir, have you seen this document before

              15    today?

10:19:15      16    A.      This doesn't look familiar at all.

10:19:21      17    Q.      Do you recall meeting in October of 2000 with

              18    the FBI where they had a prepared list of questions

              19    for you?

10:19:28      20    A.      I don't -- I don't ever recall them

              21    presenting me with a list of questions.  They could

              22    have asked questions.  They may have had a list of

              23    questions.  I don't -- I don't recall that.  Or they

              24    might have typed this up after the fact, which is

              25    what usually happens with a 302.
```

**John J. Ryan - May 21, 2019**

| | | |
|---|---|---|
| 10:19:43 | 1 | Q.        Did you meet with the FBI on October 3rd, |
| | 2 | 2000, at the U.S. Attorney's Office in Rhode Island? |
| 10:19:49 | 3 | A.        Absolutely no idea. |
| 10:19:54 | 4 | Q.        Having looked at this report, do you dispute |
| | 5 | that you met with them on that particular day? |
| 10:20:00 | 6 | A.        I mean, it -- it says "investigation" on it. |
| | 7 | There's nothing in here that says that was the day I |
| | 8 | was there.  I don't know what they could have been. |
| | 9 | But -- but I mean, it does say that.  So I mean, I |
| | 10 | have no way to know. |
| 10:20:17 | 11 | Q.        Looking at Page 5 of this document, sir, did |
| | 12 | you deny having any involvement in the scoring of |
| 10:20:26 | 13 | Mr. Maggiacomo's physical agility exam? |
| 10:20:35 | 14 | A.        Where are we looking? |
| 10:20:35 | 15 | Q.        Page 5. |
| 10:20:38 | 16 | A.        Of course.  I mean, I never did any physical |
| | 17 | agility exams. |
| 10:20:41 | 18 | Q.        You were a -- |
| 10:20:42 | 19 | A.        The only physical agility where I would have |
| | 20 | been involved was once they were already in the |
| | 21 | academy.  I had zero to do with the selection |
| | 22 | process. |
| 10:20:48 | 23 | Q.        You did -- |
| 10:20:50 | 24 | A.        I wasn't certified to do any of these testing |
| | 25 | processes. |

**John J. Ryan - May 21, 2019**

```
10:20:54  1    Q.        You did have involvement in changing the
          2    standards from 50 percent to 40 percent with regard
          3    to physical agility, correct?
10:21:02  4    A.        I don't know that that had any relationship
          5    to the time frame of Maggiacomo.
10:21:05  6    Q.        All those standards were changed with regard
          7    to Maggiacomo prior to him -- his attempt to go to
          8    the academy, correct?
10:21:12  9                   MR. KELLEY:  Objection.
10:21:12 10                   THE WITNESS:  Then if that's -- then if
         11    that's the case, I did not have anything to do with
         12    changing it for him.
10:21:16 13    BY MR. SLOSAR:
10:21:17 14    Q.        Well, why would you --
10:21:18 15    A.        Because I wouldn't have been involved in it
         16    then.
10:21:21 17    Q.        Why are you so sure of that?
10:21:23 18    A.        Because my -- my memory is that we had a
         19    problem with the Cooper Institute.  And my
         20    involvement with that process was, there was a guy
         21    named Larry King.  I think that was the 55th academy,
         22    and Larry King came in and almost had a heart attack
         23    the first day.  And we had some issues with the
         24    Cooper Institute related to the standards, and the
         25    Cooper Institute felt that that level, that 50th
```

John J. Ryan - May 21, 2019

1    percentile, was too high.  And then there were other

2    issues that it -- with it as well.  They

3    wouldn't -- they wouldn't in any way back up their

4    standard.  We were sending everybody to Cooper

5    Institute to get certified to do these fitness tests,

6    and they wouldn't -- they wouldn't do anything as far

7    as back you up if somebody got hurt or somebody

8    didn't -- you know, somebody sued you for -- for not

9    being able to meet the fitness standards.

10:22:15  10           But I don't -- I don't think I had anything

11   to do with that.  I mean, show me in here if I said I

12   did, but I think I would be wrong.  I don't think I

13   had anything to do with it prior to Maggiacomo.

10:22:28  14   Q.        Looking at Page 7 of the report, during this

15   meeting on October 3rd, 2000, did you inform the FBI

16   that you first --

10:22:34  17   A.        You've -- slow down.  I've got to -- I've got

18   to get to Page 7.

10:22:36  19   Q.        Did you --

10:22:39  20   A.        You've got to tell me where on Page 7.

10:22:43  21   Q.        The first real paragraph below the Camston --

22   Cranston Police report's header.

10:22:46  23   A.        Okay, yeah.

10:22:50  24   Q.        Did you inform the FBI on October 3rd, 2000,

25   that you first learned of the Cranston Police reports

|  | 1 | regarding Maggiacomo right before the 58th academy |
|---|---|---|
|  | 2 | began? |
| 10:22:59 | 3 | A.        Correct. |
| 10:23:02 | 4 | Q.        And how did you first learn about those |
|  | 5 | reports? |
| 10:23:07 | 6 | A.        It seems to me that I first learned about it |
|  | 7 | before I had the meeting with the chief that there |
|  | 8 | was something about a second, a second background |
|  | 9 | that Sweeney did, and then we had this meeting in the |
|  | 10 | office.  And I want to see it.  I want to know.  And |
|  | 11 | the chief showed it to me, and then I agreed with it. |
| 10:23:30 | 12 | Q.        Did you tell the FBI on October 3rd, 2000, |
|  | 13 | that the only time you remember discussing Maggiacomo |
|  | 14 | was in Col. Prignano's office when Autiello was |
|  | 15 | there? |
| 10:23:41 | 16 | A.        Again, I don't remember as I sit here today, |
|  | 17 | 19 years later, 20 years later, that -- that Autiello |
|  | 18 | was there.  In fact, it would have been longer than |
|  | 19 | that.  I mean, I would have talked to the FBI about |
|  | 20 | this.  But if I did tell the FBI that Autiello was |
|  | 21 | there, then chances are, he was there. |
| 10:23:56 | 22 | Q.        Sure.  Did you tell the FBI on October 3rd, |
|  | 23 | 2000, quote, "I thought he should go in.  The stuff |
|  | 24 | on him was two years old, and he had been a cop on |
|  | 25 | two departments," end quote? |

John J. Ryan - May 21, 2019

10:24:09  1    A.        Very well could have.  On -- on -- on initial

2    learning of what it was, until I read the file, I may

3    have very well said that.  There was a point when the

4    chief actually gave me the file and I read it sitting

5    in his office, and then I agreed with him.

10:24:27  6    Q.        Were you present or did you participate in

7    any conversations with Ms. Searles regarding

8    Maggiacomo's Cranston Police reports?

10:24:36  9    A.        I don't know that I had a conversation with

10    her about the reports.  She was going down and

11    meeting with Frank Corrente on her own.  So she was

12    bypassing the whole chain of command, and she was

13    tied in with Frank Corrente.  And she was going down

14    and meeting with -- with Frank Corrente on her own.

15    I never had a private meeting with Frank Corrente.

16    And she was bypassing the system and meeting Frank

17    Corrente about Maggiacomo.  And that came to my

18    attention.

10:25:03  19         In fact, I don't know if it's in the 35,000

20    documents -- I doubt it -- that you got, but there is

21    actually her daily calendar, she had the meeting

22    noted, several of them, that she was meeting with

23    Frank Corrente relative to Maggiacomo.  So I know

24    there was a discussion where I told her, I

25    said, "Look."  And again, I would have to look at the

John J. Ryan - May 21, 2019

```
         1    document.  But my memory, as I sit here today, was, I
         2    told her that it was beyond both our pay grades.
10:25:29 3    Q.      Did you tell the FBI that you may have been
         4    shown Maggiacomo's expunged arrest record in
         5    Prignano's office when Autiello was present?
10:25:38 6    A.      When I looked at that file, yeah, of course,
         7    I could have been.  I may have told him that.  I
         8    don't recall that.  As I sit here today, I don't
         9    remember him having an expunged record.
10:25:44 10   Q.      In this --
10:25:46 11   A.      I don't -- I don't think he was -- I don't
         12   recall him having any kind of conviction whatsoever.
10:25:51 13   Q.      Well, arrests can be expunged too.  Do -- are
         14   you aware of that?
10:25:56 15   A.      We don't do that in Rhode Island.  We don't
         16   expunge arrests.  We expunge convictions.  So I
         17   don't -- but I don't recall him have -- having any
         18   convictions.  But he may have had his file sealed
         19   or -- or -- and again, I could be wrong.  Maybe you
         20   can have an arrest record expunged.  I don't know as
         21   I sit here and think about it.
10:26:18 22   Q.      In this meeting, that you recall, did Chief
         23   Prignano tell you that if the Providence Police
         24   Department hired Maggiacomo, that it would become a
         25   big issue with the media?
```

John J. Ryan - May 21, 2019

| | | |
|---|---|---|
| 10:26:28 | 1 | A.        I don't recall that whatsoever. |
| 10:26:33 | 2 | Q.        In this meeting, did Chief Prignano tell you |
| | 3 | that Mr. Maggiacomo would not be an officer at the |
| | 4 | Providence Police Department? |
| 10:26:40 | 5 | A.        I mean, where are you reading this from?  Is |
| | 6 | this here? |
| 10:26:45 | 7 | Q.        Yes or no?  Did he tell you -- |
| 10:26:45 | 8 | MR. KELLEY:  Objection to the question. |
| 10:26:46 | 9 | THE WITNESS:  I have no memory of |
| | 10 | anything you're talking about right now.  So if you |
| | 11 | have a document to again refresh my recollection, |
| | 12 | I'll be happy to look at it.  But I have absolutely |
| | 13 | no recollection of anything you are talking about |
| | 14 | right now. |
| 10:26:58 | 15 | BY MR. SLOSAR: |
| 10:27:01 | 16 | Q.        Have you ever reviewed any of Mr. Prignano's |
| | 17 | 302s? |
| 10:27:57 | 18 | A.        I have not. |
| 10:28:02 | 19 | Q.        Show you what we'll mark as Exhibit No. 6. |
| | 20 | For the people on the phone, it's Ryan 2899 through |
| | 21 | 2912, Prignano 302 from October 31st, 2000. |
| 10:28:19 | 22 | (The document was marked Exhibit No. 6.) |
| 10:28:19 | 23 | BY MR. SLOSAR: |
| 10:28:27 | 24 | Q.        Sir, I'm going to refer you to Page 5, second |
| | 25 | paragraph.  Do you see where it says, "Prignano |

John J. Ryan - May 21, 2019

1    recalls Autiello brought up Maggiacomo one or two

2    times.  Both times Prignano told Autiello 'no' as it

3    relates to Maggiacomo becoming a police officer"?  Do

4    you see that, sir?

10:28:53  5    A.      Yes.

10:29:00  6    Q.      At the bottom, the last paragraph, three

7    lines down -- well, we will start at the first

8    sentence.  Do you see where it says, "Prignano stated

9    that Ryan was present during a meeting in Prignano's

10   office with Autiello when Maggiacomo was discussed.

11   Searles may have brought Maggiacomo's file to

12   Prignano's office during that meeting."  Do you see

13   that, sir?

10:29:20  14   A.      Yes.

10:29:24  15   Q.      Okay.  Is that generally familiar with your

16   recollection of being present in a meeting with

17   Mr. Prignano where Mr. Maggiacomo's file was brought

18   in?

10:29:34  19   A.      Again, I think I've told you probably ten

20   times that Prignano -- Chief Prignano gave me the

21   file.  It was the first time I ever read it.  The

22   second background that was done by Sweeney, and he

23   may have said, "He is out," I don't -- I don't

24   remember that.  But I do remember that I agreed with

25   him once I read the file.

**John J. Ryan - May 21, 2019**

10:29:54  1    Q.       So you don't dispute that Mr. Prignano told
         2    you and Mr. Autiello that Maggiacomo was out?

10:29:59  3    A.       I don't have any memory whatsoever of
         4    Autiello being in the room.  I do remember having a
         5    meeting, and I've said this over and over again,
         6    where Chief Prignano handed me the file from Mike
         7    Sweeney's background, which was totally different
         8    than the one done by Ed McConnell.  And when I read
         9    that file, I specifically said to him, "I agree with
        10    you."  That's what I remember.

10:30:24 11    Q.       Sir, Chief Prignano -- did Chief Prignano
        12    ever ask you if you took a $5,000 bribe from
        13    Mr. Maggiacomo to get into the academy?

10:30:34 14    A.       Absolutely not.

10:30:36 15    Q.       Mr. Prignano never asked you that?

10:30:37 16    A.       Absolutely not.

10:30:39 17    Q.       And if he told the FBI that, he would be
        18    lying?

10:30:41 19    A.       He would absolutely be lying if he said he
        20    asked me that question.

10:30:45 21    Q.       And I ask you to turn to the next page, first
        22    paragraph.  Do you see, fourth line down, where it
        23    says, "Prignano stated that when he heard the rumor
        24    that Maggiacomo had paid $5,000 to get an appointment
        25    to the police department, he found it hard to fathom

**John J. Ryan - May 21, 2019**

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
|          | 1  | that anyone had to pay to get on the job."  Do you           |
|          | 2  | see that, sir?                                               |
| 10:31:16 | 3  | A.       Absolutely.                                         |
| 10:31:19 | 4  | Q.       Do you see where it says, "Prignano told Ryan       |
|          | 5  | that if Autiello took $5,000 from Maggiacomo,                |
|          | 6  | Prignano as chief of the police was going to get             |
|          | 7  | blamed"?  Do you see that?                                    |
| 10:31:27 | 8  | A.       Yes.                                                 |
| 10:31:30 | 9  | Q.       Did Mr. Prignano ever tell you that?                |
| 10:31:32 | 10 | A.       I don't believe he did.  But I -- I will tell       |
|          | 11 | you, my memory of what Prignano said about it was            |
|          | 12 | that -- that Autiello knew the family, and the               |
|          | 13 | family, after the kid got in the police academy the          |
|          | 14 | first time, gave Autiello a ham at Christmas.  That's        |
|          | 15 | what he told me.  I don't know anything about $5,000.        |
|          | 16 | Prignano never said anything to me about $5,000.            |
|          | 17 | When -- when all this came up, he and I were shaking         |
|          | 18 | our heads together.  We were both shaking our                |
|          | 19 | heads.                                                       |
| 10:31:57 | 20 | Q.       Well, why would -- do you know why                  |
|          | 21 | Maggiacomo's family would have to give Autiello any          |
|          | 22 | item?                                                        |
| 10:32:04 | 23 | A.       They shouldn't have to.  They shouldn't have        |
|          | 24 | to.  I think Autiello -- at least it was testified or        |
|          | 25 | proffered at trial, that he looked at it as a                |

John J. Ryan - May 21, 2019

|   |   |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| 10:32:22 | 4 |
| | 5 |
| 10:32:25 | 6 |
| | 7 |
| 10:32:35 | 8 |
| | 9 |
| | 10 |
| 10:32:39 | 11 |
| 10:32:42 | 12 |
| | 13 |
| 10:32:48 | 14 |
| | 15 |
| | 16 |
| 10:32:55 | 17 |
| 10:32:58 | 18 |
| | 19 |
| | 20 |
| 10:33:12 | 21 |
| | 22 |
| 10:33:19 | 23 |
| 10:33:24 | 24 |
| | 25 |

1  headhunting fee.  The 5,000, he admitted that he took

2  it as a headhunting fee.  I think that came up at

3  trial.  At least that's what was reported.

4  Q.      And who did Autiello testify that he gave the

5  money to?

6  A.      I don't think he did.  I don't think he

7  testified that he gave it to anybody.

8  Q.      Do you see where it says, "Prignano then

9  asked Ryan if he took the money, and Ryan said he did

10  not"?

11  A.      I see that.

12  Q.      Did Chief Prignano ever ask you if you took

13  any of the money received from Mr. Autiello?

14  A.      Absolutely not.  He knew that I wasn't

15  involved in this.  He knew from day one.  I washed

16  the kid out.  How dumb would that be?

17  Q.      Well, you told him to come back, right?

18  A.      Absolutely, like we did everybody else that

19  got injured while they were in the police academy or

20  came to the police academy injured.

21  Q.      Did Chief Prignano ever tell you that he was

22  not going to take a hit for hiring Mr. Maggiacomo?

23  A.      No idea.

24  Q.      And it's your testimony that you started

25  backing off your support for Mr. Maggiacomo during

John J. Ryan - May 21, 2019

1     this meeting that you had?

10:33:30  2     A.      When I read the file -- and again, I'm

3     assuming it was right at the meeting, based on -- on

4     what -- what you have shown me.  And again, it's 20

5     years ago.  I don't have a complete recollection.

6     But -- but when I read the file, I agreed with him.

7     When I -- when I actually delved into the file, I

8     don't recall if I spent a half hour, that I don't

9     know if I had another meeting and came back to it.  I

10    have no idea.  But when I read the file, I agreed

11    with him.  But he was at a meeting that he gave me

12    the file.

10:34:02  13    Q.      Did Mr. Maggiacomo's expunged arrest record

14    come up during this meeting with Mr. Prignano and

15    Autiello?

10:34:12  16    A.      No idea.

10:34:15  17    Q.      Sir, isn't it true that you began backing off

18    of Mr. Maggiacomo when you learned that he lied to

19    the recruit oral board?

10:34:25  20    A.      I don't have any idea.  I don't -- I don't

21    have any memory of it.  If you've got a document that

22    refreshes my recollection, certainly show it to me.

10:34:32  23    Q.      What's the recruit oral board?

10:34:34  24    A.      The recruit oral board would have been the

25    majors that selected him, that put him tied for

John J. Ryan - May 21, 2019

```
 1    second with one of their own sons, one of the other
 2    one's own sons.  And Kevin Lanni, best friend -- the
 3    son of the best friend of Maj. Sullivan, went on to
 4    be the chief of police after Prignano left, he tied
 5    for second with almost a perfect score with Kevin
 6    Lanni.  That would have been the oral board.  I had
 7    zero to do with that.  I never had anything to do
 8    with that.  I didn't sit on a single one the whole
 9    time it was there.
```

10:35:07 10    Q.     Did you ever learn that Mr. Maggiacomo lied
      11    to the oral board?

10:35:09 12    A.     I don't recall that.  I don't have any
      13    recollection of that.

10:35:15 14    Q.     Did you tell the FBI that you backed off of
      15    your support for Mr. Maggiacomo when you learned that
      16    he lied to the recruit oral board?

10:35:23 17    A.     Could be if it was in that file, if it was in
      18    that file that -- that there was something in there
      19    that he lied about, and that could have been
      20    something I said, but I have no recollection of
      21    saying anything to anybody.  I have no -- no
      22    recollection of there being a lie at the oral board.
      23    I -- I don't know how I would know he lied at the
      24    oral board, because I didn't sit on the oral board.

10:35:41 25    Q.     Did Mr. Autiello ever approach you about

John J. Ryan - May 21, 2019

|   | |
|---|---|
| | 1  Maggiacomo being in the police reserve? |
| 10:35:46 | 2  A.      I don't have any memory of that.  I would |
| | 3  have to -- I would have to look at it.  I would have |
| | 4  to see something to remind me.  I have no idea. |
| 10:35:57 | 5  Q.      Go to Page 10 of Exhibit 5.  See if that |
| | 6  refreshes your memory.  Second question, second line. |
| | 7  Do you see where it says, "Ryan stated that Autiello |
| | 8  may have come to him" -- "may have come to Ryan and |
| | 9  asked him what he thought about Maggiacomo going to |
| | 10  the reserves"?  Did that happen? |
| 10:36:22 | 11  A.      I don't have any memory of it today as I sit |
| | 12  here.  I mean, obviously -- |
| 10:36:25 | 13  Q.      Do you have any reason -- |
| 10:36:28 | 14  A.      -- I agree -- I agree that I don't think much |
| | 15  of the program.  I would have never recommended that |
| | 16  he go in that program, because God forbid, if |
| | 17  something happens while he was working in that |
| | 18  reserve program, then he is out of the full-time |
| | 19  academy.  Reserves didn't get paid.  It was a |
| | 20  volunteer position. |
| 10:36:41 | 21  Q.      So you may have had that conversation -- |
| 10:36:42 | 22  A.      So -- |
| 10:36:43 | 23  Q.      -- with Mr. Autiello?  You don't recall? |
| 10:36:46 | 24  A.      Could very well had that conversation.  I |
| | 25  just don't remember it as I sit here today. |

John J. Ryan - May 21, 2019

10:36:50 1    Q.        And you may have told the FBI that?  You just

2    don't recall?

10:36:52 3    A.        I don't have any memory of it, but I don't

4    know how it would -- they would know that

5    information, particularly that I didn't think much of

6    the program unless I said it.

10:36:59 7    Q.        Sure.  So you don't have any reason to

8    dispute the accuracy of it, correct?

10:37:02 9    A.        I don't.

10:37:04 10   Q.        Okay.  Now, you eventually learned of

11   Mr. Sweeney's background investigation into

12   Mr. Maggiacomo, correct?

10:37:10 13   A.        Correct.

10:37:13 14   Q.        These allegations made hiring Mr. Maggiacomo

15   a red flag for you, correct?

10:37:19 16   A.        Again, I don't know that I used the term "red

17   flag."  I may very well have.  But I do know that I

18   agreed with the Colonel after reading the -- the

19   entire thing.

10:37:28 20   Q.        And after reading it, you had a conversation

21   with the colonel, correct?

10:37:33 22   A.        Again, my recollection is that it all

23   happened at the same meeting, but if -- if -- if we

24   could dig the colonel up and bring him in here and he

25   said, "No, Jack, you're wrong.  You left with the

John J. Ryan - May 21, 2019

|   |   |   |
|---|---|---|
| | 1 | file and came back a half hour later and agreed with |
| | 2 | me," and it could very well have been, if he said, |
| | 3 | "Jack, you went in and read it, came back."  I don't |
| | 4 | -- I don't have any memory today.  My -- |
| 10:37:51 | 5 | Q.      Do you -- |
| 10:37:53 | 6 | A.      -- my recollection is that it all happened at |
| | 7 | the same meeting. |
| 10:37:55 | 8 | Q.      Did you eventually have another conversation |
| | 9 | with Chief Prignano and John Glancy? |
| 10:38:02 | 10 | A.      No idea.  I see -- I see that Glancy is |
| | 11 | mentioned in the next paragraph.  I -- I would be -- |
| | 12 | I just don't remember. |
| 10:38:12 | 13 | Q.      Look at Page 11, first question. |
| 10:38:13 | 14 | MR. KELLEY:  We're still on the same |
| | 15 | October 3rd? |
| 10:38:14 | 16 | MR. SLOSAR:  Yes. |
| 10:38:14 | 17 | BY MR. SLOSAR: |
| 10:38:17 | 18 | Q.      Are you -- you're on 11?  You're already over |
| | 19 | there? |
| 10:38:18 | 20 | A.      Yeah. |
| 10:38:21 | 21 | Q.      Will you read through that paragraph?  And |
| | 22 | let me know if it refreshes your memory as to whether |
| | 23 | you had a conversation with Mr. Glancy about |
| | 24 | Maggiacomo. |
| 10:38:51 | 25 | A.      (Examining document.)  It doesn't even make |

John J. Ryan - May 21, 2019

1    any sense to me, no.  This -- I have no memory of

2    this, and it doesn't make sense.

10:38:57  3    Q.      Were you ever in a meeting with

10:39:02  4    Col. Prignano and Mr. Glancy where you were shown a

5    folder containing derogatory information from

6    Mr. Maggiacomo?

10:39:09  7    A.      No.  Well, again, my memory is that I was

8    shown the folder once.  It was Sweeney's background.

9    And after reading it, I agree with the colonel.

10   That's my memory as I sit here today.

10:39:21 11         What doesn't make sense at all is, "I'll bet

12   I called him on it."  I didn't call anybody on

13   Maggiacomo.  I had nothing to do with any of his

14   background.

10:39:29 15   Q.      Well, did you ever tell Chief Prignano that

16   the information in the folder was old?

10:39:37 17   A.      Again, I don't have any recollection of that

18   at all.  I mean, none.  I -- I just don't remember

19   having that conversation.  I mean, it's possible.

20   Again, I'm just speculating here, pure speculation,

21   that when they first told me there was derogatory

22   information, I would have said, "We did a

23   background."  McConnell was a great investigator,

24   phenomenal, phenomenal detective.  I would have

25   said, "McConnell had to come up with that.  This is

John J. Ryan - May 21, 2019

```
          1    old information."  I wouldn't be surprised at all if

          2    I said that.

10:40:10  3          But when I was presented with -- with the new

          4    background and saw the information, I was in

          5    agreement.  I don't remember having, like, ten

          6    meetings on this.  My memory is, this was one

          7    meeting.  I don't remember Glancy being there.  I

          8    don't know why Glancy would have been there.

10:40:33  9    Q.      Sir, do you recall testifying in a lawsuit

         10    against the Providence Police Department by the

         11    estate of Mr. Young?

10:40:41 12    A.      Yes.

10:40:42 13    Q.      How many depositions do you recall giving in

         14    that case?

10:40:45 15    A.      I think there were two.  I think there was

         16    one as a defendant and one as the 30(b)(6) for the

         17    department.

10:40:51 18    Q.      You were a defendant in that lawsuit?

10:40:52 19    A.      I was.

10:40:56 20    Q.      And how was that lawsuit ultimately resolved?

10:41:01 21    A.      A defense verdict for the City.  I was out,

         22    dismissed by the plaintiff before the second trial.

10:41:08 23    Q.      At the second trial, was a defense verdict

         24    issued there?

10:41:10 25    A.      Yes.
```

**John J. Ryan - May 21, 2019**

| | | |
|---|---|---|
| 10:41:12 | 1 | Q.        Okay.  So after it got reversed, it came back |
| | 2 | down? |
| 10:41:16 | 3 | A.        I'm not following you.  Start again. |
| 10:41:17 | 4 | Q.        Like after the court of appeals reversed the |
| | 5 | initial decision, there was a second trial where |
| | 6 | there was a defense verdict? |
| 10:41:24 | 7 | A.        Correct. |
| 10:41:28 | 8 | Q.        Okay.  And that related to the estate of |
| | 9 | Cornel Young; is that right? |
| 10:41:32 | 10 | A.        Correct. |
| 10:41:40 | 11 | Q.        I'm going to show you what we will mark as |
| | 12 | Exhibit No. 7.  It's a deposition transcript from |
| | 13 | July 23rd, 2003, in the Cornel Young case. |
| 10:41:57 | 14 |          (The document was marked Exhibit No. 7.) |
| 10:41:57 | 15 | BY MR. SLOSAR: |
| 10:42:02 | 16 | Q.        Sir, did you testify at a deposition on July |
| | 17 | 21st, 2003, in Leisa Young versus City of Providence, |
| | 18 | et al.? |
| 10:42:12 | 19 | A.        It appears that I did.  I mean, this is the |
| | 20 | deposition.  It's done by a great court reporter, |
| | 21 | Linda, so I'm sure she's got the dates right. |
| 10:42:18 | 22 | Q.        Do you know Linda? |
| 10:42:20 | 23 | A.        I do.  I know her well. |
| 10:42:23 | 24 | Q.        Probably does a lot of your depositions as an |
| | 25 | expert witness. |

**John J. Ryan - May 21, 2019**

| | | |
|---|---|---|
| 10:42:26 | 1 | A.       When I'm at home in Rhode Island, yes, she |
| | 2 | does. |
| 10:42:45 | 3 | Q.       Turning to Page 147, Line 10.  Were you asked |
| | 4 | this question, and did you give this answer? |
| 10:42:49 | 5 |          "That's her opinion. |
| 10:42:54 | 6 |          "And obviously you deny vehemently having any |
| | 7 | involvement in having anything to do with Maggiacomo? |
| | 8 |          "A.  Absolutely." |
| 10:43:01 | 9 | A.       Yes. |
| 10:43:02 | 10 |                MR. KELLEY:  Note the objection. |
| 10:43:02 | 11 |          Go ahead. |
| 10:43:02 | 12 | BY MR. SLOSAR: |
| 10:43:04 | 13 | Q.       Did you testify to that effect? |
| 10:43:06 | 14 | A.       Absolutely with respect to anything to do |
| | 15 | with him paying a bribe to get in the police academy, |
| | 16 | absolutely.  I had a lot to do with him.  But |
| | 17 | anything to do with him paying a bribe and getting |
| | 18 | into the police academy, absolutely, I had absolutely |
| | 19 | zero to do with it. |
| 10:43:21 | 20 | Q.       You did have conversations with Mr. Autiello |
| | 21 | during -- prior to Mr. Maggiacomo being accepted into |
| | 22 | the second police academy, correct? |
| 10:43:33 | 23 | A.       Again, I would have to see a document.  I |
| | 24 | have no idea.  You know, I do know that he came to |
| | 25 | both the chief and I about him being rejected.  I |

**John J. Ryan - May 21, 2019**

```
 1    know that Autiello came to me after I washed him out
 2    and asked was it a fact that he would be put in the
 3    next academy, and I said, "Heck, there's no reason
 4    for you to have to even ask that.  We do that for
 5    everybody."
```

10:44:00 `6`    Q.      And then you went to Chief Prignano, and a
```
 7    letter was written to Mr. Maggiacomo assuring him
 8    that he would be accepted at the next academy,
 9    correct?
```

10:44:07 `10`   A.     I would think that that was done before,
```
11    because I used to go every morning.  If somebody
12    washed out, I would have to notify the chief that
13    day.  In fact, sometimes I would do it from the
14    academy.  I would get on the phone and do it.  So I
15    would -- I would think that that would have already
16    taken place.  It would have had nothing to do with
17    Autiello.
```

10:44:25 `18`   Q.     Sir, was there ever a time where you placed
```
19    Mr. Maggiacomo back on the 58th academy roster after
20    he was removed?
```

10:44:33 `21`   A.     No, I didn't have authority to do that.

10:44:36 `22`   Q.     Did you tell the FBI that you would have done
```
23    that if Simoneau took him off?
```

10:44:40 `24`   A.     Absolutely.  Simoneau had no authority to
```
25    take him off.
```

**John J. Ryan - May 21, 2019**

| | | |
|---|---|---|
| 10:44:45 | 1 | Q.        So if Mr. Simoneau took him off, you |
| 10:44:48 | 2 | May have placed Mr. Maggiacomo back on the academy |
| | 3 | roster? |
| 10:44:51 | 4 | A.        Not I may have; I probably would have.   If |
| | 5 | Simoneau did it, absolutely, I probably would have. |
| | 6 | Simoneau was the patrol commander.  He had nothing to |
| | 7 | do with human resources.  Human resources, Donna |
| | 8 | Searles worked for me.  I would have told her to put |
| | 9 | him back on, and I would have told her it would be |
| | 10 | the decision of the chief of police.  I wouldn't have |
| | 11 | -- I wouldn't have let Simoneau go around the chain |
| | 12 | of command and take somebody off that list. |
| 10:45:14 | 13 | Q.        If Prignano took him off the list, would you |
| | 14 | have placed him back on it? |
| 10:45:14 | 15 | A.        No. |
| 10:45:16 | 16 | Q.        Why not? |
| 10:45:18 | 17 | A.        Because he's the chief of police.  Ultimately |
| | 18 | it's his decision. |
| 10:45:32 | 19 | Q.        Did you ever learn if it was Mr. Simoneau as |
| | 20 | opposed to Mr. Prignano who removed Maggiacomo from |
| | 21 | the 58th academy list? |
| 10:45:40 | 22 | A.        I don't have any idea what you're talking |
| | 23 | about right now.  You'd have to show me something to |
| | 24 | try to refresh my recollection.  I have no idea. |
| 10:45:47 | 25 | I know that at some point we had this |

**John J. Ryan - May 21, 2019**

```
       1    meeting, the chief showed me the file, I agreed with

       2    him, and Maggiacomo was off the list.

10:45:56   3    Q.      Did you have any conversation with Major

       4    Sullivan in 1996 about the expunged arrest or other

       5    misconduct allegations against Mr. Maggiacomo?

10:46:08   6    A.      I don't recall having any discussion with

       7    Sullivan about that.  You'd have to show me a

       8    document to refresh my recollection.  But I -- I

       9    would doubt it.  You've got to understand, there was

      10    a lot of dynamics there, and -- and Sullivan and I

      11    did not get along.  Simoneau and I did not get along.

10:46:21  12    Q.      Did you have any conversations with Sullivan

      13    in 1998 in the human resources department?

10:46:29  14    A.      I don't -- I don't recall that.  I may have

      15    said, you know, "You guys are the ones who put this

      16    kid in the academy, and -- and I knew you played

      17    games with it."  I -- I know I had that discussion,

      18    but I thought that was after I retired.

10:46:42  19    Q.      What do you mean by you knew that he played

      20    games with it?

10:46:47  21    A.      How does the kid tie for second to get in the

      22    police academy with two majors' sons and a

      23    lieutenant's son where the -- where the -- the father

      24    is a lieutenant and best friend of Richard Sullivan?

      25    How does that happen?  That didn't happen by
```

**John J. Ryan - May 21, 2019**

| | |
|---|---|
| 1 | coincidence.  So they played games with that list; |
| 2 | there's no question in my mind.  Now, I didn't know |
| 3 | that when they did it.  I found that out after the |
| 4 | fact.  I never even looked at those lists until all |
| 5 | this happened.  And so I think -- you know, there was |
| 6 | a time when I -- when I had a confrontation with |
| 7 | Sullivan over it.  But I believe it was after I |
| 8 | retired. |
| 10:47:20  9 | Q.     In 1996, did you tell Major Sullivan |
| 10 | that -- I'm sorry; let me withdraw that question. |
| 10:47:29 11 | Did you ever tell Mr. Sullivan that you had |
| 12 | the Maggiacomo information in 1996? |
| 10:47:34 13 | A.     I don't -- |
| 10:47:36 14 | MR. KELLEY:  Object to form. |
| 10:47:36 15 | THE WITNESS:  I don't even know what |
| 16 | you're talking about.  What Maggiacomo information? |
| 10:47:38 17 | BY MR. SLOSAR: |
| 10:47:39 18 | Q.     Like the background investigation. |
| 10:47:42 19 | A.     If that's when you get in the first academy, |
| 20 | I would have only had the first background.  I |
| 21 | wouldn't have the second background, because I don't |
| 22 | think it was even done then. |
| 10:47:51 23 | Q.     Have you ever conducted any personal |
| 24 | financial transactions with your friend, |
| 25 | Mr. Autiello? |

John J. Ryan - May 21, 2019

10:47:59  1    A.        Only my car repairs.  And again, they weren't

       2    really financial transactions, because more often

       3    than not he would not accept money, so I bought him

       4    something in return.  But I did buy a car off him,

       5    and I provided the FBI with the paper trail for

       6    borrowing the money from my pension to buy the car

       7    from him.  And that's -- that's really the only major

       8    financial transaction I had with him.

10:48:23  9    Q.        Did the FBI question you about your

      10    transactions with Mr. Autiello during this October

      11    2000 interview that is Exhibit No. 5?

10:48:32 12    A.        Yeah.  My memory is, they talked to me about

      13    the car.  That's what I remember.

10:48:47 14    Q.        After -- did -- did the FBI ask you, "Have

      15    you ever received any item of monetary value directly

      16    or indirectly from Dick Autiello"?  Bottom of Page

      17    13.

10:48:55 18    A.        I don't recall if they did, but I can tell

      19    you that I did.  I got Christmas gifts from him.  And

      20    I will tell you that on occasion he fixed my car and

      21    didn't charge me, and then I went and bought him

      22    something.

10:49:05 23    Q.        Actually, let me -- before we get there, did

      24    the FBI ask you on October 3rd, 2000, "Have you ever

      25    conducted any personal financial transaction with

John J. Ryan - May 21, 2019

|  |  |  |  |
|---|---|---|---|
| | 1 | | Dick Autiello"? |
| 10:49:13 | 2 | A. | Where is it? |
| 10:49:17 | 3 | Q. | Page 13.   Third question. |
| 10:49:21 | 4 | A. | Page 13.   And where are we? |
| 10:49:25 | 5 | Q. | Third question, Page 13. |
| 10:49:28 | 6 | A. | Maybe I'm on the wrong one.   I'm sorry. |
| 10:49:29 | 7 | Q. | Exhibit 5. |
| 10:49:29 | 8 | A. | What's -- what exhibit? |
| 10:49:29 | 9 | Q. | Exhibit 5. |
| 10:49:31 | 10 | A. | I am on the wrong one. |
| 10:49:31 | 11 | Q. | Sorry. |
| 10:49:36 | 12 | A. | Let me find it.   All right.   I'm not stupid |
| | 13 | | here.   No.   And what page?   I'm sorry. |
| 10:49:55 | 14 | Q. | 13. |
| 10:50:02 | 15 | A. | Apparently they did. |
| 10:50:05 | 16 | Q. | After asking this question, did you become -- |
| | 17 | | after being asked that question, did you become |
| | 18 | | visibly upset? |
| 10:50:11 | 19 | A. | I wouldn't say that I became visibly upset. |
| 10:50:13 | 20 | Q. | How would you describe your reaction? |
| 10:50:14 | 21 | A. | Angry. |
| 10:50:18 | 22 | Q. | Did you ask the FBI, "Where is this going to |
| | 23 | | us"? |
| 10:50:21 | 24 | A. | I think I started by asking them to go out in |
| | 25 | | the hallway and check with all the agents that were |

John J. Ryan - May 21, 2019

```
              1   out there that had their personal cars fixed by Dick

              2   Autiello.  I think that was the start of it.

10:50:30      3          And in fact, as a result of that statement

              4   that I made, one of the agents in charge got removed

              5   from his position and got transferred, Pete Bickmore.

              6   So I think that's how I started the conversation.

10:50:43      7          And then I said something to the effect of,

              8   "Dennis, I'm not sure where you're going with this.

              9   You -- you -- I'm not a target or a subject."  "No,

             10   no, you're not."

10:50:52     11          And then the next thing I know, you know, he

             12   is asking these questions about stuff that was -- I

             13   knew -- I knew Dick Autiello since I was a little

             14   kid.  Dick Autiello fixed -- fixed my car before I

             15   was ever a cop and didn't charge me.  Dick was a very

             16   nice guy to me.  I knew his sons.  I knew Nick very

             17   well.  I was very friendly with his son Nick.

10:51:13     18   Q.      You father was a police officer, right?

10:51:13     19   A.      He was.

10:51:14     20   Q.      A lieutenant?

10:51:16     21   A.      He retired as a lieutenant.

10:51:19     22   Q.      And Mr. Autiello knew your father as well,

             23   correct?

10:51:19     24   A.      Absolutely.

10:51:21     25   Q.      During the time period that he knew your
```

John J. Ryan - May 21, 2019

| | | |
|---|---|---|
| | 1 | father, he also had contracts with the Providence |
| | 2 | Police Department, correct? |
| 10:51:27 | 3 | A.    I don't -- I don't know that he did.  I think |
| | 4 | my father might have been retired by the time he got |
| | 5 | the contract. |
| 10:51:39 | 6 | Q.    Did you tell the FBI during this October 3rd, |
| | 7 | 2000, interview that "I'm not going to answer any |
| | 8 | questions about my personal business"? |
| 10:51:47 | 9 | A.    I told them to take a hike is what I told |
| | 10 | them, and I left. |
| 10:51:55 | 11 | Q.    Did the FBI ask you -- it's the last question |
| | 12 | on Page 13 -- "Have you ever received any item of |
| | 13 | monetary value directly or indirectly from Dick |
| | 14 | Autiello?"   Did they ask you that? |
| 10:52:05 | 15 | A.    They may very well have. |
| 10:52:09 | 16 | Q.    After being asked that question, did you |
| | 17 | become visibly upset? |
| 10:52:12 | 18 | A.    Again, I wouldn't use the term "visibly |
| | 19 | upset."  That's Dennis Aiken's word. |
| 10:52:14 | 20 | Q.    Well, what -- |
| 10:52:16 | 21 | A.    Because I think he was embarrassed by the way |
| | 22 | I treated him. |
| 10:52:19 | 23 | Q.    How would you describe your reaction? |
| 10:52:20 | 24 | A.    Angry, angry.  I hadn't done anything wrong. |
| | 25 | I didn't like the way Dennis Aiken was acting.  I |

**John J. Ryan - May 21, 2019**

1  knew of his history, and at that point I got up and

2  walked out, because he wanted me to say things that

3  would not be truthful, because he did not care about

4  the facts; he cared about indicting the mayor, maybe

5  the chief of police, and he did not want to let the

6  facts get in the way of a good story.  And that's

7  exactly what I told the U.S. attorney.

10:52:47  8  Q.     Did you tell Mr. Aiken on October 3rd, 2000,

9  that you did not like the way the interview was

10  going?

10:52:51  11  A.     May very well have.

10:52:56  12  Q.     Did you tell Mr. Aiken on October 3rd, 2000,

13  that you believe that you had become a target of the

14  investigation?

10:53:02  15  A.     I don't believe I ever said that.

10:53:05  16  Q.     So you're saying that if Mr. Aiken wrote that

17  in his 302, that this is a false report?

10:53:13  18  A.     Check his history and you'll find he has made

19  them before.  That's why he's got a Giglio issue.  I

20  don't ever recall saying anything like that.

10:53:21  21         But I can tell you that when the

22  U.S. attorney called me following this meeting where

23  I walked out, the U.S. attorney made it clear that I

24  was not a target or a subject.

10:53:29  25  Q.     That's not my question.  My question to you

John J. Ryan - May 21, 2019

|    |    |
|----|----|
| 1  | is, did you ever tell Mr. Aiken that you believed |
| 2  | that you had become a target of the investigation? |
| 10:53:37  3 | A.      No, I don't believe I ever told him that.  I |
| 4  | have no memory of telling him that, none whatsoever. |
| 10:53:43  5 | Q.      Did you tell Mr. Aiken that you were not |
| 6  | going to answer any further questions until you |
| 7  | obtained legal counsel? |
| 10:53:49  8 | A.      I don't believe I told him that at all, |
| 9  | because I got up and walked out. |
| 10:53:57 10 | Q.      Sir, were you ever made aware that |
| 11 | Mr. Prignano was interviewed by the FBI on October 6, |
| 12 | 2000? |
| 10:54:08 13 | A.      I have no idea when Chief Prignano went down. |
| 14 | I knew he went down because he would come back and |
| 15 | tell me about some of the -- the interview issues. |
| 10:54:14 16 | Q.      Just like you would go and tell him about |
| 17 | your interviews, correct? |
| 10:54:18 18 | A.      I told him initially what the -- the FBI had |
| 19 | told me they were looking at, because I felt that he |
| 20 | had the right to know if there was some illegality in |
| 21 | his police department, absolutely. |
| 10:54:28 22 | Q.      Show you what we'll mark as Exhibit No. 8. |
| 23 | It's Ryan 2930. |
| 10:54:31 24 |       (The document was marked Exhibit No. 8.) |
| 10:54:33 25 | BY MR. SLOSAR: |

CLEETON DAVIS COURT REPORTERS, LLC
(615) 726-2737

87

**John J. Ryan - May 21, 2019**

| | | |
|---|---|---|
| 10:54:51 | 1 | Q.      Sir, looking at -- prior to October 6, 2000, |
| | 2 | did you have any conversations with Prignano about |
| | 3 | the FBI investigation that was ongoing? |
| 10:55:01 | 4 | A.      Again, I have no idea.  I -- I told you |
| | 5 | several times that I did go back and talk to him |
| | 6 | particularly about the Maggiacomo incident.  I made |
| | 7 | it clear to the chief that I would always tell the |
| | 8 | truth and that I would never be untruthful.  But I |
| | 9 | also told the chief that I knew of nothing illegal. |
| 10:55:19 | 10 | Q.      Did you tell Chief Prignano prior to October |
| | 11 | 6, 2000, that if the FBI asked you about promotions, |
| | 12 | that you were going to give the chief up on that? |
| 10:55:30 | 13 | A.      Absolutely not.  There was nothing to give |
| | 14 | him up on.  There was nothing illegal. |
| 10:55:38 | 15 | Q.      So looking at the second paragraph of Page 1 |
| | 16 | of this report, where it says, second |
| | 17 | sentence, "Prignano stated that Captain John Ryan had |
| | 18 | told him that if the FBI asks Ryan about the |
| | 19 | promotions, Ryan was going to," quote," "'give me up |
| | 20 | on that,'" end quote. |
| 10:55:55 | 21 | A.      No. |
| 10:55:58 | 22 | Q.      You're saying that Mr. Prignano lied -- |
| 10:55:58 | 23 | A.      I don't -- |
| 10:56:00 | 24 | Q.      -- to the FBI when he said this? |
| 10:56:01 | 25 | A.      I don't even -- I don't even believe he said |

John J. Ryan - May 21, 2019

1    it.

10:56:08  2    Q.      Where it says -- the next sentence where it

3    says -- do you see where it says, "Prignano stated

4    that Ryan was going to say that they were," quote,

5    "'fixing,'" end quote, "the promotional examinations

6    by giving up a source sheet," do you see that, sir?

10:56:23  7    A.      I -- I see it written here.

10:56:25  8    Q.      Were you -- did you ever tell Chief Prignano

9    that you were going to tell the FBI that you were

10   helping to fix the promotional exams by giving out

11   source documents?

10:56:33  12   A.      Absolutely not.  By this point I had probably

13   already told the FBI what went on with promotions,

14   because that was in some of the initial meetings

15   before I even had a lawyer.  So I don't -- I don't

16   know why Prignano would have to say that.  And it's

17   certainly not something that I would have told

18   Prignano.  If anything, I would have told him I

19   explained the issues with the promotions.

10:56:52  20           So I don't -- I don't -- again, there was no

21   fix.  There was -- there was resolving some problems

22   with the union.  There was no wrongdoing in it that I

23   was involved in or that I was even aware of.

10:57:06  24   Q.      Did Mr. Prignano ever tell you that if an FBI

25   or grand jury investigated promotions, that the

John J. Ryan - May 21, 2019

```
          1    Providence Police Department would be destroyed?
10:57:13  2    A.        Absolutely not.
10:57:15  3    Q.        Never told you that?
10:57:17  4    A.        Absolutely not.  I don't -- I don't have any
          5    memory of that whatsoever.
10:57:22  6    Q.        Prior to today, were you aware that
          7    Mr. Prignano told the FBI that?
10:57:25  8                   MR. KELLEY:  Objection.
10:57:26  9                   THE WITNESS:  I don't -- again, you're
          10   asking me if I'm aware that he told the FBI.  I don't
          11   believe he told the FBI.
10:57:31  12   BY MR. SLOSAR:
10:57:32  13   Q.        That's not my question to you.
10:57:33  14   A.        No.  Your question presumes --
10:57:33  15   Q.        Assuming --
10:57:35  16   A.        -- that he did.  If you change it to
          17   "assumes," assuming he said it, then I'll agree with
          18   you.
10:57:41  19            No, I have never heard that before.  And in
          20   all the discussions we had until the day he died, it
          21   never came up.
10:57:51  22   Q.        Sir, on October 10th, 2000, did you provide a
          23   proffer to the FBI with your counsel present?
10:57:56  24   A.        I don't know the date, but I certainly did a
          25   proffer agreement, yes.
```

John J. Ryan - May 21, 2019

10:57:59 1    Q.       What was your understanding of the proffer?

10:58:01 2    A.       My understanding of the proffer was, it would

3    protect me from the prior statements that I had made

4    with respect to the new statement I was about to

5    make, because my attorney was concerned that the 302s

6    from the prior interviews might not be accurate.   And

7    because there's no recording, he wanted to ensure

8    that he protected me from these new statements.

10:58:23 9             However, it was not -- it did not protect me

10   from anything derivative from my statements, so

11   anything they discovered they could use against me.

12   They just couldn't use the statements themselves.

13   That's my memory of it.

10:58:42 14   Q.       In this October 10, 2000, meeting with the

15   FBI, did you explain Mr. Autiello's financial

16   arrangement with the Providence Police Department?

10:58:51 17   A.       I am not sure what that means.   I mean, I

18   know we had a contract.

10:58:54 19   Q.       Sure.   The contracts.

10:58:57 20   A.       I don't -- I don't recall that.   I would have

21   to see something that refreshes my recollection.   I

22   would have -- if I did, I would have told him that he

23   goes through the Board of Contract and Supply.

10:59:07 24   Q.       I'll show you what we'll mark as Exhibit

25   No. 9.   This is the October 10th, 2000, 302, Ryan

**John J. Ryan - May 21, 2019**

|          |    |                                                               |
|----------|----|---------------------------------------------------------------|
|          | 1  | 1521 through 1534.                                            |
| 10:59:21 | 2  | (The document was marked Exhibit No. 9.)                      |
| 10:59:30 | 3  | BY MR. SLOSAR:                                                 |
| 10:59:32 | 4  | Q.      Have you seen this document prior to today,           |
|          | 5  | sir?                                                          |
| 10:59:35 | 6  | A.      I don't recall.                                        |
| 10:59:44 | 7  | Q.      Looking at Page 3, fourth paragraph, on               |
|          | 8  | October 10, 2000, did you inform the FBI that                 |
|          | 9  | Mr. Autiello used to spend a lot of time at the               |
|          | 10 | police station?  Sometimes he was there just to talk          |
|          | 11 | or to complain about the slowness of payments?                |
| 10:59:59 | 12 | A.      Stand by, because I want to put it in                 |
|          | 13 | context, please.                                              |
| 11:00:03 | 14 | Q.      I'm sorry?                                             |
| 11:00:04 | 15 | A.      I would like to put it in context.  I                 |
| 11:00:04 | 16 | don't --                                                      |
| 11:00:06 | 17 | Q.      Well, I'm asking, did you make those                  |
|          | 18 | statements to the FBI on October 10, 2000?                    |
| 11:00:10 | 19 | MR. KELLEY:  Go ahead and answer the                          |
|          | 20 | question.                                                     |
| 11:00:11 | 21 | THE WITNESS:  I can't answer the                              |
|          | 22 | question without putting it in context.  If you -- if         |
|          | 23 | you want me to refresh my recollection, which I asked         |
|          | 24 | for the document to begin with, I would be happy to           |
|          | 25 | do that.  But I'm not going to -- I'm not going to            |

John J. Ryan - May 21, 2019

```
            1    answer a question that I don't know the context of
            2    it.
11:00:21    3    BY MR. SLOSAR:
11:00:23    4    Q.      Review the document.  Let me -- review that
            5    page and let me know if it refreshes your
            6    recollection as to whether you made those statements
            7    to the FBI.
11:01:11    8    A.      (Examining document.)
11:01:12    9                MR. SLOSER:  We're getting some
           10    background noise from somebody's phone.  Would you
           11    mind putting it on mute?
11:01:20   12                That's better now.
11:01:30   13                We're getting it again.
11:01:34   14                MR. FARAH:  Is it a phone or is it a --
           15    I had a heater on by my feet.
11:01:40   16                MR. SLOSAR:  I don't know what it is.
           17    All I know is, it sounds like we're in a wind tunnel.
11:01:45   18                MR. FARAH:  All right.  Is that -- is
           19    that better?
11:01:49   20                MR. SLOSAR:  It is better, yes.
11:01:52   21                MR. FARAH:  It's -- it's cold here,
           22    though, Elliot.  I'm -- I'm going to -- I'm going to
           23    be a little chilly.
11:01:55   24                MR. KELLEY:  It's -- it's 90 -- it's
           25    almost 90 degrees here.
```

**John J. Ryan - May 21, 2019**

| | | |
|---|---|---|
| 11:02:03 | 1 | MR. FARAH:  More like 70 here.  No, |
| | 2 | it's 62 here.  Dammit. |
| 11:02:14 | 3 | MR. SLOSAR:  You're on the record, |
| 11:02:14 | 4 | so -- |
| 11:02:18 | 5 | MR. FARAH:  That's okay. |
| 11:02:18 | 6 | Licha Farah. |
| 11:02:56 | 7 | THE WITNESS:  Okay.  What was the |
| | 8 | question? |
| 11:02:57 | 9 | BY MR. SLOSAR: |
| 11:03:02 | 10 | Q.    The question was, on October 10th, 2000, did |
| | 11 | you inform the FBI that Mr. Autiello used to spend a |
| | 12 | lot of time at the Providence Police Department? |
| 11:03:11 | 13 | A.    With respect to the rest of it, yeah, just to |
| | 14 | talk to the chief of police sometimes, I would see |
| | 15 | him.  He would complain about the slowness of his |
| | 16 | payment on his contract that he had since 1991, and |
| | 17 | he complained about the abuse of the vehicles by |
| | 18 | officers that he had to repair. |
| 11:03:33 | 19 | Q.    Sure.  Did Mr. Autiello admit to you that he |
| | 20 | defrauded the Providence Police Department for |
| | 21 | reimbursements from four vehicles that he did not |
| | 22 | repair? |
| 11:03:41 | 23 | A.    No.  I don't -- I think the use of the word |
| | 24 | "defraud" is incorrect. |
| 11:03:44 | 25 | Q.    What word would you use? |

**John J. Ryan - May 21, 2019**

```
11:03:47   1    A.       What he did was, Tasca Ford was paying him

           2    for warranty work, and they were paying him direct.

           3    He got checks for eight cars, but they were -- they

           4    were actually -- they were going directly to him.

           5    But he was very honest about it; he only fixed four

           6    of them.

11:04:01   7             So I brought it up that he shouldn't be paid

           8    for the other -- the four that he hadn't fixed until

           9    such time as we got paid, and those checks should

          10    pass through us first so we could control that.  So

          11    -- so --

11:04:11  12    Q.       Did he give you the money?

11:04:13  13    A.       I don't recall.  Again, I didn't handle money

          14    per se.  I notified the commissioner's office,

          15    because all of his contract, all of his money, all --

          16    all the stuff, it wasn't handled by the police

          17    department; it was handled by the commissioner's

          18    office.  They controlled the budget.  His contract

          19    was controlled by the Board of Contract and Supply.

11:04:29  20             If anything, I would have to go down and

          21    testify before the Board of Contract and Supply how

          22    many cars we had, those kinds of things.

11:04:37  23             But I had nothing to do with his contract.

          24    If anything, I think I was critical at a couple of

          25    points about his contract.
```

**John J. Ryan - May 21, 2019**

| | |
|---|---|
| 11:04:44 | 1 |
| | 2 |
| 11:04:49 | 3 |
| | 4 |
| | 5 |
| 11:05:01 | 6 |
| | 7 |
| | 8 |
| | 9 |
| | 10 |
| | 11 |
| | 12 |
| 11:05:26 | 13 |
| | 14 |
| | 15 |
| 11:05:40 | 16 |
| | 17 |
| 11:05:46 | 18 |
| | 19 |
| | 20 |
| | 21 |
| | 22 |
| | 23 |
| 11:06:03 | 24 |
| | 25 |

Q.       Have you ever spoken to Mr. Autiello about

donations to the mayor?

A.       I don't recall about having that conversation

with Dick Autiello.  I'm not sure if after the fact I

did, but I -- I don't recall it.

Q.       Page 5, Paragraph 3, did you tell the FBI on

October 10th, 2000, that you recalled a comment by

Mr. Autiello that "He legitimately raises so much

money for the mayor's campaign fund, why would he do

so illegally?"  Did you tell him -- did you tell the

FBI that Mr. Autiello made a comment to that effect

to you?

A.       I'm sure I did, that he legitimately raises

money for the -- from the -- from the towers, yes,

I'm -- I'm sure I did.

Q.       Did Mr. Autiello ever make comments to you

about illegal donations made to the mayor's fund?

A.       I don't -- again, I -- I think this is the

only comment that I see here.  And -- and again, I

didn't even remember that until -- until I read this

about the towers.  I'd -- I'd kind of forgotten that

he represented the towers too, which was something

different.

Q.       Sir, on October 10, 2000, isn't it true that

you told the FBI that you walked Mr. Maggiacomo's

**John J. Ryan - May 21, 2019**

1    employment application to personnel on behalf of

2    Mr. Autiello?

11:06:14  3    A.      Again, I'm -- I'm very confused by that, and

4    that's why I said it that way earlier.  I don't

5    remember whether I did or I didn't.  I think what I

6    told the FBI is that if -- if Dick Autiello came to

7    me with that contract -- that application, I would

8    have walked it down to HR.  I think that's what I

9    told him.  But I had no memory then or now if that

10   happened.

11:06:34  11          If anybody I knew walked into my office, even

12   -- even another police officer, with -- with an

13   application for a relative or a friend, I would have

14   walked it down to HR.  So, you know, that

15   wasn't -- that wasn't any big deal.

11:06:47  16   Q.      Sir, isn't it true that Mr. Autiello asked

17   you to give Mr. Maggiacomo a letter promising him a

18   slot in the next academy?

11:06:57  19   A.      I don't know.  That was our -- I don't have

20   any memory of that.  That was our -- basically what

21   we did all the time.

11:07:05  22   Q.      On October 10, 2000, Page 6, at the very

23   bottom, did you tell the FBI that Mr. Autiello asked

24   you if you can give Maggiacomo a letter promising him

25   a slot in the next academy?

**John J. Ryan - May 21, 2019**

| | | |
|---|---|---|
| 11:07:17 | 1 | A.        Where is it? |
| 11:07:20 | 2 | Q.        Last line of Page 6. |
| 11:07:33 | 3 | MR. KELLEY:  Objection to the question. |
| 11:07:35 | 4 | THE WITNESS:  It may be that I told him |
| | 5 | that, because we did that for everybody. |
| 11:07:37 | 6 | BY MR. SLOSAR: |
| 11:07:41 | 7 | Q.        And in fact, on the next page, did you tell |
| | 8 | the FBI on October 10, 2000, that you told |
| | 9 | Mr. Autiello that that would be no problem, to do |
| | 10 | such a letter? |
| 11:07:51 | 11 | A.        Of course, it would be no problem, because we |
| | 12 | did it for everybody. |
| 11:07:54 | 13 | Q.        Did you tell the FBI that? |
| 11:07:56 | 14 | A.        Of course.  I -- I would have had no reason |
| | 15 | not to.  I mean, I don't have any recollection of it |
| | 16 | now, but I -- I don't dispute what it says there. |
| 11:08:04 | 17 | Q.        And after that conversation, isn't it true |
| | 18 | that Mr. Autiello continued to call you asking about |
| | 19 | Mr. Maggiacomo's start in the next academy? |
| 11:08:13 | 20 | A.        Again, I don't recall that.  I see what's |
| | 21 | written here.  It's entirely possible. |
| 11:08:22 | 22 | Q.        And in fact, Mr. Corrente also called the |
| | 23 | academy to speak with you regarding Mr. Maggiacomo, |
| | 24 | correct? |
| 11:08:28 | 25 | A.        On one occasion he called me about a workers' |

**John J. Ryan - May 21, 2019**

```
          1   comp claim, because he wanted Maggiacomo to be able
          2   to collect workman's comp for his injury, apparently.
11:08:39  3   Q.      This happened about a month or two later; is
          4   that right?
11:08:42  5   A.      Yeah.  But again, time-frame-wise, and it's
          6   not clear from this document, this would have been a
          7   month or two after I washed him out.
11:08:48  8   Q.      Sure.
11:08:50  9   A.      Not a month or two of the next academy.
11:08:52 10   Q.      Because at that period of time Mr. Maggiacomo
         11   was trying to allege that his injury was caused from
         12   the academy, right?
11:09:01 13   A.      I don't -- I have to read this.  Let me --
         14   let me take a look, because I don't remember that,
         15   quite frankly.  (Examining document.)
11:09:30 16           Yeah, I -- I don't have much memory of it,
         17   but I -- I think that maybe HR did accept the second
         18   form saying that he had -- he had worsened the injury
         19   at the academy.  I don't think he ever got workers'
         20   comp, though.
11:09:44 21   Q.      Fair to say that Mr. Autiello pestered you
         22   about Mr. Maggiacomo going into the academy?
11:09:49 23   A.      Again, I don't remember that.  Could very
         24   well be if I said it, then he did.
11:09:56 25   Q.      Did Mr. Autiello ever tell you that
```

**John J. Ryan - May 21, 2019**

```
           1    Mr. Maggiacomo's mother was, quote, "driving him

           2    crazy," end quote?

11:10:04   3    A.        Very, very possible.  My memory is that he

           4    was an only child and he was living in Florida and

           5    they wanted him back in Rhode Island.  That's --

           6    that's what I recall about it.

11:10:13   7    Q.        And you eventually battled to get

           8    Mr. Maggiacomo into the academy, correct?

11:10:16   9    A.        No, that would be incorrect.

11:10:20  10    Q.        Well, you eventually wrote a letter or had

          11    somebody write a -- you directed someone to write a

          12    letter?

11:10:24  13    A.        I couldn't direct the chief of police to

          14    write a letter.  I believe the chief of police sent

          15    the letter.

11:10:28  16    Q.        You could have directed Donna Searles to

          17    write the letter, correct?

11:10:31  18    A.        She could have prepared it for the chief of

          19    police, but the chief of police would have had to

          20    sign it.

11:10:37  21    Q.        In fact, you told the FBI on October 10,

          22    2000, that you believe that you caused Donna Searles

          23    to send Maggiacomo a letter documenting his promised

          24    position in the next academy?

11:10:48  25    A.        It would have been signed --
```

**John J. Ryan - May 21, 2019**

| | | |
|---|---|---|
| 11:10:49 | 1 | MR. KELLEY:  Objection. |
| 11:10:49 | 2 | THE WITNESS:  -- by the chief of |
| | 3 | police.  It wouldn't have been signed by Donna |
| | 4 | Searles, didn't have that authority.  I didn't have |
| | 5 | that authority. |
| 11:10:53 | 6 | BY MR. SLOSAR: |
| 11:10:55 | 7 | Q.    Did you ever direct Donna Searles to draft |
| | 8 | such a letter? |
| 11:10:56 | 9 | A.    No idea. |
| 11:11:02 | 10 | Q.    Did you ever tell the FBI that you caused |
| | 11 | Donna Searles to send Maggiacomo a letter documenting |
| | 12 | the promised position at the next academy? |
| 11:11:13 | 13 | A.    Could very well have.  Would have had no |
| | 14 | reason not to. |
| 11:11:22 | 15 | Q.    It's your testimony that you didn't receive |
| | 16 | any compensation from Mr. Autiello for your services |
| | 17 | in fighting for Mr. Maggiacomo's employment? |
| 11:11:31 | 18 | A.    Absolutely zero.  I had nothing to do with |
| | 19 | Maggiacomo.  And -- and -- and I think the FBI |
| | 20 | understood this.  At the end of the day, I had zero |
| | 21 | to do with Maggiacomo getting into the academy, zero. |
| 11:11:43 | 22 | Q.    Were you -- when were you first made aware of |
| | 23 | the $5,000 payment from Maggiacomo's family to |
| | 24 | Mr. Autiello? |
| 11:11:49 | 25 | A.    It would have been after the FBI started |

```
      1  investigating.
11:11:52  2  Q.      And you would agree that Mr. Maggiacomo
      3  should have never been a police officer, correct?
11:11:59  4  A.      Again, based on the second background, he
      5  certainly wasn't somebody who we would hire in
      6  Providence.  Whether he should have been a police
      7  officer, Florida did a background on him and hired
      8  him.  I'm assuming they found it.  They hired him.
      9  I'm not saying he should never be a police officer,
     10  but he certainly was not going to be a police officer
     11  in Providence.
11:12:20 12  Q.      Prior to the Maggiacomo situation, you
     13  purchased a 1984 Trailblazer from Mr. Autiello,
     14  correct?
11:12:25 15  A.      That's correct.
11:12:25 16  Q.      You purchased that --
11:12:26 17  A.      Long before.
11:12:28 18  Q.      You purchased that vehicle for approximately
     19  $1,000 less than what Mr. Autiello did, correct?
11:12:33 20  A.      I don't know if that's true or not.  That's
     21  what I have been told.
11:12:37 22  Q.      Mr. Autiello regularly performed free
     23  services on your vehicle, correct?
11:12:40 24  A.      I have already said that.
11:12:41 25  Q.      Yes?
```

**John J. Ryan - May 21, 2019**

| | | |
|---|---|---|
| 11:12:43 | 1 | A.        Yes.  Well, free in the sense that he |
| | 2 | wouldn't accept money, so I would buy him things in |
| | 3 | return. |
| 11:12:47 | 4 | Q.        And -- |
| 11:12:49 | 5 | A.        And I provided all of those receipts to the |
| | 6 | FBI that proved that I bought him things in return. |
| 11:12:53 | 7 | Q.        In January of 2000 you had an accident with |
| | 8 | your Explorer that caused pretty significant damage, |
| | 9 | correct? |
| 11:12:58 | 10 | A.        I thought it was significant, yes. |
| 11:13:01 | 11 | Q.        Mr. Autiello fixed your vehicle without |
| | 12 | payment, correct? |
| 11:13:03 | 13 | A.        That's correct. |
| 11:13:06 | 14 | Q.        During the holidays Mr. Autiello gave you |
| | 15 | gift certificates to local malls, correct? |
| 11:13:10 | 16 | A.        Absolutely.  Gave them to half the police |
| | 17 | department. |
| 11:13:13 | 18 | Q.        In 1998 he gave you a certificate to the |
| | 19 | Warwick Mall, correct? |
| 11:13:18 | 20 | A.        I know he gave me gift certificates.  I have |
| | 21 | no idea if it was Warwick Mall or not today.  If it |
| | 22 | says it in there, then I -- then that's accurate. |
| 11:13:25 | 23 | Q.        In 1999 he gave you a certificate for $450 to |
| | 24 | the Providence Mall, correct? |
| 11:13:29 | 25 | A.        That's correct.  And that was because it was |

**John J. Ryan - May 21, 2019**

1    below the state ethics law, and he gave it to

2    everybody in the police department, Commissioner of

3    Public Safety on down.

11:13:36   4    Q.      During this time --

11:13:39   5    A.      Not everybody, not all 500 people.  But a

6    number of people.

11:13:41   7    Q.      During this period of time, the Providence

8    Police Department had policies regarding accepting

9    money and gifts from persons with whom the Providence

10   Police Department did business with, correct?

11:13:51  11    A.      You know, I -- I -- I know I probably said

12   that, but I'm not sure that we had any issue with it.

13   And they certainly didn't have an issue with it if

14   the Commissioner of Public Safety, who makes the

15   rules, was -- it was at his Christmas party where we

16   all received the gifts.

11:14:06  17    Q.      On October 10, 2000, did you tell the FBI

18   that you believed that the Providence Police

19   Department has rules regarding taking money and gifts

20   from persons with whom the Providence Police

21   Department does business, but he did not follow those

22   rules?

11:14:19  23    A.      I may have said that, because there are those

24   rules.  But again, if the Commissioner of Public

25   Safety, who is the final policymaker for the police

John J. Ryan - May 21, 2019

 1  department, is in the room and is accepting a gift

 2  himself, then it wouldn't be a violation.

11:14:36  3  Q.     You would agree that if the practice of a

 4  police department is to do things in contradiction of

 5  written policies and procedures, that those policies

 6  and procedures would have no meaningful effect,

 7  correct?

11:14:48  8  A.     That particular policy would have no

 9  meaningful effect if the final policymaker changed it

10  by words or conduct, yes.

11:14:55 11  Q.     Sure.  So if a custom contradicts written

12  policies and procedures, the custom would control?

11:15:01 13  A.     Of course.

11:15:05 14  Q.     Sir, were you aware that Mr. Prignano met

15  with the FBI on October 10, 2000?

11:15:09 16  A.     I have no idea when he met with the FBI.  I

17  know we -- that he met with the FBI.

11:15:25 18  Q.     Hand to you what we'll mark as Exhibit

19  No. 10.  It's Ryan 2927 for Bates.

11:15:32 20        (The document was marked Exhibit No. 10.)

11:15:34 21  BY MR. SLOSAR:

11:15:49 22  Q.     Sir, did Chief Prignano ever tell you that he

23  knew that the results of the federal investigation

24  were going to be bad for himself and the Providence

25  Police Department?

**John J. Ryan - May 21, 2019**

| | | |
|---|---|---|
| 11:16:00 | 1 | MR. KELLEY:  Objection. |
| 11:16:00 | 2 | THE WITNESS:  No. |
| 11:16:00 | 3 | BY MR. SLOSAR: |
| 11:16:09 | 4 | Q.     Prior to October 10, 2000, did you ever tell |
| | 5 | Chief Prignano that you were going to tell the FBI |
| | 6 | about how you helped resolve another potential |
| | 7 | lawsuit by providing Ms. Kessler with the source |
| | 8 | document? |
| 11:16:24 | 9 | A.     Again, I -- where were you pointing |
| | 10 | to?  Because I -- I don't see where it is. |
| 11:16:27 | 11 | Q.     I'm not pointing to anything on here, sir. |
| | 12 | I'm asking you a question. |
| 11:16:30 | 13 | A.     I would have told him that I was going to |
| | 14 | tell the truth about Kessler, because there was no |
| | 15 | wrongdoing.  And I definitely did tell him that. |
| 11:16:35 | 16 | I said, "Look, there's nothing to hide here. |
| | 17 | There's no wrongdoing.  The union and you tell the |
| | 18 | truth."  And I called Kessler.  I actually called |
| | 19 | Kessler on the telephone and I told her to tell the |
| | 20 | truth. |
| 11:16:48 | 21 | Q.     Provide -- |
| 11:16:49 | 22 | A.     I said there's absolutely no wrongdoing here. |
| 11:16:52 | 23 | Q.     Providing source documents to candidates is |
| | 24 | in violation of the Providence Police Department's |
| | 25 | policies and procedures, correct? |

**John J. Ryan - May 21, 2019**

| | | |
|---|---|---|
| 11:16:58 | 1 | A. It would have been if the union wasn't |
| | 2 | involved. With the union's involvement, it was not |
| | 3 | in violation of anything, because the -- the |
| | 4 | promotions were a creature of the union and the |
| | 5 | administration, and they had done this before. |
| 11:17:07 | 6 | So -- |
| 11:17:10 | 7 | Q. Sir, did you -- do you recall testifying |
| | 8 | under oath in the Young case on July 21st, 2003? |
| 11:17:26 | 9 | A. I would have to see it. |
| 11:17:28 | 10 | Q. You've got it in front of you. It's Exhibit |
| | 11 | 7. Go to Page 189, please. |
| 11:17:42 | 12 | A. (The witness complied.) What's -- |
| 11:17:47 | 13 | Q. I'm sorry; I -- yeah, 189. |
| 11:17:55 | 14 | Sir, providing source documents to candidates |
| | 15 | is in violation of the contract, correct? |
| 11:18:01 | 16 | A. Well, I think, you know, go to the page that |
| | 17 | you first mentioned, 189, and read what I said. The |
| | 18 | practice as ceded to by the union, no. |
| 11:18:11 | 19 | Q. The written contract, yes. Correct? |
| 11:18:12 | 20 | A. The written contract. Of course, if we -- |
| 11:18:14 | 21 | Q. Providing source documents. |
| 11:18:16 | 22 | A. If we did it -- if we did it unilaterally, of |
| | 23 | course. But because the -- because the promotional |
| | 24 | process was a creature of the union and the |
| | 25 | administration, once the union agreed with it, it |

**John J. Ryan - May 21, 2019**

1    didn't violate anything.

11:18:31   2    Q.     Sir, was it your belief at the time you made

3    available the source document to Ms. Kessler that

4    presumably no others had access to that document,

5    correct?

11:18:43   6    A.     That was my belief, yes.

11:18:47   7    Q.     And it was your intention in making available

8    that source document to assist that candidate if that

9    candidate chose to avail themselves of it with the

10    promotional exam, correct?

11:18:57   11    A.     And again, just to make clear, it wasn't just

12    me.  It was the chief of police and it was the union.

11:19:04   13    Q.     And it was your belief that making that

14    source document available to one candidate was

15    consistent with the rules and regulations of the

16    department?

11:19:15   17    A.     Based on the fact that the union ceded to it,

18    yes.  And it was part of these meetings that we had

19    with the union that came out of those meetings, yes.

11:19:25   20    Q.     There were no written policies and procedures

21    that allowed for that type of process to take place,

22    correct?

11:19:41   23    A.     There were none that prohibited it, either.

11:19:46   24    Q.     Sir, during the period of time that the FBI

25    investigation was going on, were you dating a

John J. Ryan - May 21, 2019

|  | 1 | producer from the television series named Cops? |
| 11:19:55 | 2 | A.      Absolutely. |
| 11:19:58 | 3 | Q.      And were you married at the time? |
| 11:20:01 | 4 | A.      No.  I was -- if I -- I think I started |
|  | 5 | dating her when I was separated for a long time, but |
|  | 6 | then I was divorced, I think, for most of the -- the |
|  | 7 | relationship that we had -- that we had, I guess. |
| 11:20:10 | 8 | Q.      What was that woman's name? |
| 11:20:14 | 9 | A.      Angela Heller. |
| 11:20:18 | 10 | Q.      Did you spend money on air fare to see her? |
| 11:20:19 | 11 | A.      Absolutely. |
| 11:20:21 | 12 | Q.      Did you purchase thousands of dollars worth |
|  | 13 | of jewelry for her? |
| 11:20:25 | 14 | A.      I don't recall spending thousands of dollars. |
|  | 15 | I don't think I had thousands of dollars to spend.  I |
|  | 16 | know I bought her earrings on a -- on a -- one time |
|  | 17 | and I bought her a ring one time. |
| 11:20:38 | 18 | Q.      What -- what was your salary at the |
|  | 19 | Providence Police Department around the year 1996, do |
|  | 20 | you recall? |
| 11:20:46 | 21 |          MR. KELLEY:  Note a continuing |
|  | 22 | objection to this line of testimony. |
| 11:20:49 | 23 |          THE WITNESS:  I don't. |
| 11:20:50 | 24 |          MR. KELLEY:  Or questioning; beg your |
|  | 25 | pardon. |

John J. Ryan - May 21, 2019

| | |
|---|---|
| 11:20:52 1 | BY MR. SLOSAR: |
| 11:20:55 2 | Q.     Did you use any money received from |
| 3 | Mr. Autiello to engage in your relationship with |
| 4 | Ms. Heller? |
| 11:21:02 5 | A.     I never received any money from Autiello. |
| 6 | And absolutely not.  I ran up credit cards mostly |
| 7 | quite a bit in my relationship with Ms. Heller. |
| 11:21:19 8 | Q.     Mr. Ryan, did you engage in another proffer |
| 9 | agreement with the FBI on or about March 20th, 2001? |
| 11:21:26 10 | A.     I think there's only one proffer agreement. |
| 11 | You would have to show me.  I don't -- I don't think |
| 12 | there's two.  I think that would be wrong.  That |
| 13 | would be incorrect. |
| 11:21:41 14 | Q.     Show you what we'll mark as Exhibit No. 11. |
| 15 | 2996 is the Bates beginning. |
| 11:21:48 16 | (The document was marked Exhibit No. 11.) |
| 11:21:51 17 | BY MR. SLOSAR: |
| 11:21:56 18 | Q.     Have you seen this document before, Mr. Ryan? |
| 11:22:02 19 | A.     No. |
| 11:22:04 20 | Q.     Would you agree that this is -- purports to |
| 21 | be a second proffer agreement with yourself and the |
| 22 | FBI? |
| 11:22:11 23 | A.     No.  This purports to be a 302. |
| 11:22:15 24 | Q.     At the top, does this say, "Ryan interviewed |
| 25 | under the terms of a proffer agreement with his |

John J. Ryan - May 21, 2019

|   |   |   |
|---|---|---|
| | 1 | attorney, Joseph Penza, present"? |
| 11:22:21 | 2 | A.      Same proffer agreement.  This is just another |
| | 3 | meeting.  That's all it is.  It's -- there was one |
| | 4 | proffer agreement. |
| 11:22:27 | 5 | Q.      It was your understanding at the time you did |
| | 6 | this March 21st, 2001, meeting that you were under |
| | 7 | the same proffer as previously agreed upon? |
| 11:22:36 | 8 | A.      It's not my understanding.  It was.  It |
| | 9 | was -- there was -- there was -- again, I don't |
| | 10 | remember there being a second meeting.  My -- my |
| | 11 | recollection was, there was only one.  But I mean, |
| | 12 | there could have been two, it's so long ago. |
| 11:22:49 | 13 | Q.      In this meeting, did you inform the FBI that |
| | 14 | it was your perception that contributions would help |
| | 15 | officers gain promotions at the Providence Police |
| | 16 | Department? |
| 11:22:58 | 17 | A.      Hey, it was very clear.  As I said, I |
| | 18 | finished first on the first test and was told before |
| | 19 | I ever took the test that I wasn't going to make it. |
| | 20 | I knew that the test had nothing to do with -- with |
| | 21 | whether or not you made it.  I was probably the most |
| | 22 | highly decorated lieutenant, I was probably the most |
| | 23 | active lieutenant.  I had the best education of any |
| | 24 | of the lieutenants.  And I was told that I was not |
| | 25 | going to make it notwithstanding whatever I scored on |

**John J. Ryan - May 21, 2019**

```
         1    the test.  So I knew that there was a political

         2    nature to it.

11:23:28 3           Now, I thought that the chief of police could

         4    carry that day.  I was told that maybe even the union

         5    could carry the day, that the union got one pick on

         6    the list.  But the bottom line is, I also knew and

         7    had been told that nobody in 25 years had made

         8    captain without going to mayoral fundraisers even

         9    under the previous mayor.

11:23:47 10   Q.       So after you were denied the initial

        11    promotion to captain, you began donating money to the

        12    mayor's campaign, correct?

11:23:56 13   A.       Openly and notoriously like everybody else in

        14    the city did, absolutely.

11:24:01 15   Q.       And did you believe when you were making

        16    those contributions that it would assist you in

        17    getting promoted at the Providence Police Department?

11:24:09 18   A.       I really didn't know.  I really didn't know,

        19    because I had been told by the chief that I was going

        20    to be first on the next list anyway.  But I

        21    was -- it's -- you know, the bottom line is, was I

        22    hopeful that I was going to make captain the next

        23    time around?  Absolutely.

11:24:24 24   Q.       Sir, were you paid a portion of the $5,000

        25    given to Mr. Autiello from Maggiacomo's family in
```

John J. Ryan - May 21, 2019

|  | 1 | exchange for assisting him into the Providence Police |
|---|---|---|
|  | 2 | Department? |
| 11:24:33 | 3 | A.    Let me -- let me make something perfectly |
|  | 4 | clear.  I had no involvement in Maggiacomo paying a |
|  | 5 | bribe, I had no involvement in Maggiacomo being |
|  | 6 | selected for the police department, I had no |
|  | 7 | involvement whatsoever in anything to do with money |
|  | 8 | for a job position.  And I think that two people were |
|  | 9 | convicted of that, so I think the proof is in |
|  | 10 | the -- in the outcome. |
| 11:25:06 | 11 |                   MR. KELLEY:  Can we take a break? |
| 11:25:07 | 12 |                   MR. SLOSAR:  Sure.  Off the record. |
| 11:25:08 | 13 |                   THE VIDEOGRAPHER:  Going off the |
|  | 14 | record, time on the monitor is 11:24. |
| 11:25:13 | 15 |                       (Recess.) |
| 11:30:49 | 16 |                   THE VIDEOGRAPHER:  We're back on the |
|  | 17 | record.  Time on the monitor is 11:30. |
| 11:30:52 | 18 | BY MR. SLOSAR: |
| 11:30:57 | 19 | Q.    Sir, I believe that we were just going over |
|  | 20 | another 302, this one from March of 2001.  Do you |
|  | 21 | have that exhibit in front of you? |
| 11:31:07 | 22 | A.    Yes, sir. |
| 11:31:10 | 23 | Q.    And I believe it's Exhibit No. 11. |
| 11:31:18 | 24 |       In this meeting, did you inform the FBI that |
|  | 25 | your perception was that contributions would help |

John J. Ryan - May 21, 2019

| | | |
|---|---|---|
| | 1 | officers gain promotions at the Providence Police |
| | 2 | Department?  That's on Page 1, Paragraph 2. |
| 11:31:27 | 3 | A.      It's on what, please? |
| 11:31:48 | 4 | Q.      Page 1, Paragraph 2. |
| 11:31:51 | 5 | A.      Yeah.  I mean, I -- I think that's accurate. |
| | 6 | It's just what I just said.  I mean, no one told you |
| | 7 | you had to do it, but 25 years, you know, no one ever |
| | 8 | got promoted. |
| 11:32:06 | 9 | Q.      Were you paid any portion of the $5,000 given |
| | 10 | to Mr. Autiello by Mr. Maggiacomo's mother in |
| | 11 | exchange for her son getting into the academy? |
| 11:32:13 | 12 | MR. KELLEY:  Objection. |
| 11:32:14 | 13 | THE WITNESS:  I think -- I think I |
| | 14 | answered that already.  I think maybe you're a couple |
| | 15 | questions behind.  But I got nothing.  I had nothing |
| | 16 | to do with Maggiacomo other than washing him out and |
| | 17 | -- and talking to the chief because we had -- we had |
| | 18 | said we would put him back in.  Beyond that, I had |
| | 19 | nothing to do with money, I knew nothing about a |
| | 20 | bribe, I knew nothing about it. |
| 11:32:31 | 21 | BY MR. SLOSAR: |
| 11:32:34 | 22 | Q.      I'll show you what we'll mark as Exhibit |
| | 23 | 13 -- Exhibit 12.  I'm sorry.  This is Ryan 278 |
| | 24 | through 320, the FBI Ryan case summary. |
| 11:32:54 | 25 | (The document was marked Exhibit No. 12.) |

**John J. Ryan - May 21, 2019**

| | |
|---|---|
| 11:32:57 | 1 |
| 11:32:59 | 2 |
| | 3 |
| 11:33:07 | 4 |
| 11:33:12 | 5 |
| | 6 |
| 11:33:23 | 7 |
| | 8 |
| | 9 |
| | 10 |
| 11:33:42 | 11 |
| 11:33:55 | 12 |
| 11:34:02 | 13 |
| | 14 |
| | 15 |
| | 16 |
| 11:34:10 | 17 |
| | 18 |
| | 19 |
| 11:34:15 | 20 |
| | 21 |
| | 22 |
| 11:34:23 | 23 |
| | 24 |
| | 25 |

BY MR. SLOSAR:

Q.      Have you ever seen this document before today, Mr. Ryan?

A.      No.  I don't know what it is.

Q.      On Page 10, Paragraph 4 -- please let me know when you get there.

        Prior to today, were you ever informed that Mary Maggiacomo admitted that she paid a $5,000 cash bribe to Mr. Autiello that was supposed to be delivered to an unnamed City of Providence official?

A.      Where is this, now?

Q.      Page 10, Paragraph 3.

A.      I have no doubt that I probably knew this but not from this letter.  I mean, obviously, they were criminally charged.  People were criminally charged with this.

Q.      Who was the City of Providence official that was supposed to be assisting as a result of the bribe?

A.      I think it was Frank Corrente.  I think that's why -- that's why he was charged criminally, and I believe that he was convicted of it.

Q.      Do you see where it says, "That investigation also revealed that Autiello and Capt. John Ryan took extraordinary steps attempting to reinstate

| | | |
|---|---|---|
| | 1 | Maggiacomo to the PPD academy after he left due to |
| | 2 | injury"? |
| 11:34:35 | 3 | MR. KELLEY:  Note my objection.  Go |
| | 4 | ahead. |
| 11:34:36 | 5 | THE WITNESS:  I see -- I see that |
| | 6 | opinion, yeah. |
| 11:34:36 | 7 | BY MR. SLOSAR: |
| 11:34:38 | 8 | Q.    Yeah.  Did you have any conversations with |
| | 9 | Frank Corrente at any point in time about |
| | 10 | Mr. Maggiacomo going to the academy? |
| 11:34:49 | 11 | A.    Not about going to the academy.  The only |
| | 12 | conversation I ever had with him was about the |
| | 13 | workers' comp issue, as far as I remember.  And that |
| | 14 | became the issue with Donna Searles, because she set |
| | 15 | up private meetings with Frank Corrente over trying |
| | 16 | to get this kid in, and she had it on her calendar. |
| 11:35:05 | 17 | BY MR. SLOSAR: |
| 11:35:07 | 18 | Q.    Sir, do you acknowledge that you were |
| | 19 | involved in abusing the promotion process by |
| | 20 | assisting officers in cheating on examinations by |
| | 21 | giving them the source documents? |
| 11:35:16 | 22 | MR. KELLEY:  Note the objection. |
| 11:35:17 | 23 | THE WITNESS:  Absolutely not, not the |
| | 24 | way you phrased the question. |
| | 25 | I will agree that I absolutely, positively |

John J. Ryan - May 21, 2019

```
          1    provided those source documents as directed and as

          2    agreed to by the union.  But there was absolutely no

          3    abuse and there was absolutely no cheating.

11:35:29  4    BY MR. SLOSAR:

11:35:31  5    Q.      So you don't believe that selectively giving

          6    source documents was an abuse of the promotion

          7    process of the Providence Police Department?

11:35:40  8    A.      Based on what was occurring at the time,

          9    absolutely, positively not.  And I have said this

         10    before, I'll say it again, particularly with respect

         11    to Kessler, I would do the same thing today.  I would

         12    document it differently.

11:35:55 13    Q.      And again, you never were a sworn law

         14    enforcement officer for any agency other than the

         15    Providence Police Department, correct?

11:36:01 16    A.      Correct.

11:36:14 17    Q.      So to the extent that any opinions that you

         18    generate in this case come from your experience as a

         19    law enforcement officer, all of that experience would

         20    be derived from the Providence Police Department,

         21    correct?

11:36:24 22    A.      As far as the way you worded the question --

11:36:25 23    Q.      Yes.

11:36:26 24    A.      -- it was the only place I was a police

         25    officer.  Certainly my experience is much more
```

John J. Ryan - May 21, 2019

|       |    |                                                                        |
|-------|----|------------------------------------------------------------------------|
|       | 1  | broad-based than that.                                                 |
| 11:36:32 | 2 | Q.      You have only been a law enforcement officer                |
|       | 3  | for the Providence Police Department, correct?                         |
| 11:36:38 | 4 | A.      That is correct.                                            |
| 11:36:46 | 5 | Q.      Sir, you offered a source sheet to Rhonda                   |
|       | 6  | Kessler for her to use to study for the sergeant's                     |
|       | 7  | examination, correct?                                                  |
| 11:36:54 | 8 | A.      Absolutely.  As I said, I would do it again                 |
|       | 9  | today.                                                                 |
| 11:36:57 | 10 | Q.      Isn't it true that you told Ms. Kessler that              |
|       | 11 | you could get in trouble for what you were giving her                 |
|       | 12 | and that you hoped she was not tape-recording the                     |
|       | 13 | meeting?                                                               |
| 11:37:04 | 14 | A.      Absolutely false.  If I thought that for a               |
|       | 15 | second, do you think I would have done it that way?                   |
| 11:37:08 | 16 | Q.      If Ms. --                                                |
| 11:37:10 | 17 | A.      I mean, how ridiculous is that?                          |
| 11:37:12 | 18 | Q.      If Ms. Kessler told the FBI that, are you               |
|       | 19 | saying that she would be lying?                                       |
| 11:37:13 | 20 |                 MR. KELLEY:  Objection.                         |
| 11:37:14 | 21 |                 THE WITNESS:  One, I don't believe she          |
|       | 22 | told the FBI that.  But if she did say that, it would                 |
|       | 23 | be a lie.                                                             |
| 11:37:17 | 24 | BY MR. SLOSAR:                                                   |
| 11:37:22 | 25 | Q.      Sir, I'm going to refer you to the last                |

**John J. Ryan - May 21, 2019**

1  exhibit that we were looking at, Page 28, second full

2  paragraph.  Do you see where it says, "On October

3  23rd, 2000, Kessler was interviewed by the FBI.  She

4  had no agreement with the government."  Do you see

5  that, sir?

11:37:49  6  A.      Yes.

11:37:51  7  Q.      About five lines down, do you see where it

8  says, "Captain Ryan told Kessler that he could get in

9  trouble for what he was giving her and that he hoped

10  she was not tape-recording the meeting."  Do you see

11  that?

11:38:04  12  A.      I see that.

11:38:07  13  Q.      Did you ever tell Ms. Kessler that you can

14  get in trouble for giving her the source document and

15  that you hoped she was not tape-recording the

16  meeting?

11:38:15  17  A.      Absolutely not.  It's the most ridiculous

18  thing that I have ever heard.

11:38:21  19  Q.      Did you tell Ms. Kessler that you would take

20  it to your grave?

11:38:26  21  A.      No.  That comment was made but not by me.

22  That comment was made by her when I called her and

23  told her to tell the FBI the truth when the issue

24  came up.

11:38:36  25  Q.      Why did -- in what context?

John J. Ryan - May 21, 2019

| | | |
|---|---|---|
| 11:38:38 | 1 | A.      In the context that she basically said she |
| | 2 | was not going to tell the truth, and I told her she |
| | 3 | would be in a lot of trouble if she didn't, that |
| | 4 | there was no wrongdoing, particularly on her part, |
| | 5 | particularly on anybody's part, and that -- that in |
| | 6 | fact it was done for a legitimate reason and that she |
| | 7 | should tell the truth.  And her response to that was, |
| | 8 | "I'm going to take it to the grave." |
| 11:38:59 | 9 | Q.      Sir, were you aware that Ms. Kessler |
| | 10 | tape-recorded your meeting with her? |
| 11:39:04 | 11 | A.      I don't believe she did. |
| 11:39:07 | 12 | Q.      Prior to today, had anyone ever informed you |
| | 13 | that Ms. Kessler had tape-recorded a meeting? |
| 11:39:12 | 14 | A.      I've heard that statement before, and she has |
| | 15 | been asked multiple times to produce that.  The |
| | 16 | union, when they went to her, she said she had the |
| | 17 | union recorded when they told her she was going to be |
| | 18 | added to the list when she had the -- the valid |
| | 19 | grievance.  She made all those statements but yet she |
| | 20 | lost every one of these recordings.  She didn't have |
| | 21 | a single one of them that she could produce.  I don't |
| | 22 | believe it ever happened. |
| 11:39:39 | 23 | Q.      Sir, isn't it true that Ms. Kessler refused |
| | 24 | to take the source document? |
| 11:39:42 | 25 | A.      I don't have any idea. |

John J. Ryan - May 21, 2019

11:39:44  1    Q.      Did she refuse to look at it in your

      2    presence?

11:39:47  3    A.      No, she did not.  I don't have any idea.

      4    What -- what happened was, I was going out to a

      5    meeting when she came in.  Remember, this was in the

      6    middle of the work day.  This was no big deal.  This

      7    really was no big deal.

11:39:55  8    Q.      Because this regularly happened?

11:39:56  9    A.      But I did tell her, I did tell her that it

      10    was her choice whether she thought she could handle

      11    the exam without it or whether she wanted to go

      12    forward with her lawsuit without it, and I left it on

      13    the desk.  I said, "I'm going out.  Do not remove

      14    this from the office, because I do not want this to

      15    get out to anybody else," and out the door I went.

      16    This is my memory today of what happened.

11:40:17  17    Q.      Why was it no big deal to you?

11:40:20  18    A.      Because the union agreed.  This was -- this

      19    was to resolve a potential lawsuit.  This had nothing

      20    to do with the mayor, this had nothing to do with

      21    wrongdoing, this had nothing to do with anything

      22    other than trying to resolve a legal issue that she

      23    had.  And she was right.  At the end of the day, she

      24    was right.

11:40:41  25    Q.      So is it fair to say that you were assisting

**John J. Ryan - May 21, 2019**

1    Ms. Kessler in providing her with the source document

2    in order to resolve a potential lawsuit?

11:40:51  3    A.      I wasn't just assisting Ms. Kessler.  This

4    was an agreement.  The union was in all the meetings,

5    the chief was in all the meetings.  I hadn't been

6    involved in -- in showing anybody a source document

7    before.  Other people had.  I hadn't.  I hadn't used

8    that as a resolution in the past.

11:41:06  9    Q.      Well, you had received a source document

10   yourself prior to becoming captain, correct?

11:41:10  11   A.      I had been handed a source document on the

12   top of mail.  I never even looked at it.

11:41:18  13   Q.      And when you offered that source document, it

14   was with the intention of assisting Ms. Kessler in

15   getting promoted, correct?

11:41:24  16   A.      Absolutely, positively.

11:41:26  17   Q.      And you did that because you wanted to avoid

18   any liability for the Providence Police Department,

19   correct?

11:41:31  20   A.      Not the -- not the Providence Police

21   Department alone.  The union as well, the union had

22   breached their duty of fair representation when they

23   told her not to file the grievance.  In fact, they

24   were concerned because she made a statement at that

25   point in time that she had the union vice president

John J. Ryan - May 21, 2019

```
          1    on tape.
11:41:47  2    Q.      And in this case, you have been retained by
          3    the Knox County defendants, correct?
11:41:50  4    A.      Correct.
11:41:51  5    Q.      You understand that they're being sued as
          6    well, correct?
11:41:56  7    A.      Well, I wasn't being sued.
11:41:58  8    Q.      You understand that they're being sued,
          9    correct?
11:41:58 10    A.      Yes.
11:42:03 11    Q.      And you understood that your report was being
         12    given to assist them in defending this lawsuit,
         13    correct?
11:42:10 14    A.      No.  My -- my report's being given to offer
         15    expert testimony to assist the jury in understanding
         16    the police practices involved in the case.
11:42:20 17    Q.      And that's based -- the only law enforcement
         18    experience that you have to base your opinions on is
         19    when you were at the Providence Police Department,
         20    correct?
11:42:29 21    A.      No, that's incorrect, because I've got almost
         22    40 years of law enforcement now with respect to --
11:42:34 23    Q.      As a sworn --
11:42:35 24    A.      -- law enforcement experience.
11:42:35 25                 MR. KELLEY:  Let him finish his answer.
```

John J. Ryan - May 21, 2019

| | | |
|---|---|---|
| 11:42:35 | 1 | BY MR. SLOSAR: |
| 11:42:37 | 2 | Q.      As a sworn officer, you have never been hired |
| | 3 | as a sworn officer at any other police department |
| | 4 | other than Providence, correct? |
| 11:42:43 | 5 | A.      Why don't you have him reread the question |
| | 6 | back?  Because that's not what you asked. |
| 11:42:45 | 7 | Q.      I'll withdraw the question. |
| 11:42:46 | 8 | Have you ever been hired as a police officer |
| | 9 | after you put in your resignation from the Providence |
| | 10 | Police Department? |
| 11:42:55 | 11 | A.      Again, inappropriate questioning.  You know I |
| | 12 | didn't resign from the Providence Police Department. |
| 11:42:58 | 13 | Q.      We're going to get into that. |
| 11:43:00 | 14 | A.      You know that I retired from the Providence |
| | 15 | Police Department.  I never resigned. |
| 11:43:02 | 16 | Q.      By phone. |
| 11:43:03 | 17 | A.      There was no reason to resign. |
| 11:43:05 | 18 | Q.      You retired by phone, right? |
| 11:43:08 | 19 | A.      That's false.  I retired -- look at when the |
| | 20 | chief of police signed my retirement papers. |
| 11:43:11 | 21 | Q.      We're going to get there. |
| 11:43:12 | 22 | A.      Months before.  Months before. |
| 11:43:13 | 23 | Q.      When? |
| 11:43:14 | 24 | A.      Months before. |
| 11:43:14 | 25 | Q.      When did -- |

**John J. Ryan - May 21, 2019**

| | | |
|---|---|---|
| 11:43:16 | 1 | A.        Maybe, like, April. |
| 11:43:17 | 2 | Q.        April? |
| 11:43:18 | 3 | A.        And I retired in June. |
| 11:43:21 | 4 | Q.        It's your testimony that the chief of police |
| | 5 | signed your retirement papers in April of 2002? |
| 11:43:27 | 6 | A.        Absolutely had to.  You can't -- you can't |
| | 7 | retire on what they pay at the Providence Police |
| | 8 | Department.  All's you've got to do, if you've got |
| | 9 | the documents, if you truthfully have all the |
| | 10 | documents, if they -- if they comply with your |
| | 11 | subpoena, you will see that the chief of police, |
| | 12 | Richard Sullivan, signed my paperwork a month, maybe |
| | 13 | two months before I even retired.  I went in to him |
| | 14 | on the last day of work and said goodbye to him. |
| 11:43:57 | 15 | Q.        Prior to giving Ms. Kessler the source |
| | 16 | documents, you had discussions with Chief Prignano, |
| | 17 | correct? |
| 11:44:02 | 18 | A.        In the union.  They were all at the meeting. |
| | 19 | There may have been some majors in there as well. |
| 11:44:08 | 20 | Q.        You told the FBI that Chief Prignano gave you |
| | 21 | a wink before you gave her the source documents; is |
| | 22 | that right? |
| 11:44:16 | 23 | A.        I don't recall saying a wink. |
| 11:44:19 | 24 | Q.        Was that understood?  Did Chief Prignano |
| | 25 | understand what you were about to do? |

John J. Ryan - May 21, 2019

| | | |
|---|---|---|
| 11:44:21 | 1 | MR. KELLEY:  Objection. |
| 11:44:23 | 2 | THE WITNESS:  Absolutely.  So did the |
| | 3 | union.  They denied it later, but they absolutely |
| | 4 | knew what was going to take place, and they thanked |
| | 5 | me for it after. |
| 11:44:29 | 6 | BY MR. SLOSAR: |
| 11:44:30 | 7 | Q.     And to accomplish this, you requested that |
| | 8 | Ms. Searles give you the source document, correct? |
| 11:44:34 | 9 | A.     Absolutely. |
| 11:44:36 | 10 | Q.     When -- and Ms. Searles initially refused to |
| | 11 | give you the source document, correct? |
| 11:44:39 | 12 | A.     That's not what happened. |
| 11:44:39 | 13 | Q.     What happened? |
| 11:44:41 | 14 | A.     She said she didn't have it. |
| 11:44:42 | 15 | Q.     What did you tell her? |
| 11:44:43 | 16 | A.     And I directed her to get it. |
| 11:44:45 | 17 | Q.     How did you direct her to get it? |
| 11:44:47 | 18 | A.     The way I would direct any subordinate. |
| 11:44:48 | 19 | Q.     What did you tell her to do? |
| 11:44:49 | 20 | A.     Get a copy. |
| 11:44:51 | 21 | Q.     From who? |
| 11:44:52 | 22 | A.     From the test maker. |
| 11:44:55 | 23 | Q.     And that was for the purpose of providing |
| | 24 | that source document to Ms. Kessler, correct? |
| 11:44:59 | 25 | A.     It was for that and to make sure we went over |

John J. Ryan - May 21, 2019

|     |     |     |
| --- | --- | --- |
|          | 1  | it as well, because we had an obligation to go over |
|          | 2  | it.  But in addition to that, it was absolutely my |
|          | 3  | intention to comply with the order that I was |
|          | 4  | directed by the chief and with the agreement of the |
|          | 5  | union -- |
| 11:45:12 | 6  | Q.      Chief -- |
| 11:45:12 | 7  | A.      -- absolutely. |
| 11:45:14 | 8  | Q.      Chief Prignano also told you to assist |
|          | 9  | Mr. Glancy on the captain's exam, correct? |
| 11:45:20 | 10 | A.      Told me to assist him with the exam portion, |
|          | 11 | yes, which had nothing to do with him being made -- |
| 11:45:25 | 12 | Q.      Chief Prignano told you that Mr. Glancy had a |
|          | 13 | lot of problems, correct? |
| 11:45:28 | 14 | A.      That's true; he was having a lot of problems. |
| 11:45:32 | 15 | Q.      After that conversation, you then got the |
|          | 16 | source document to help Mr. Glancy with the |
|          | 17 | examination, correct? |
| 11:45:38 | 18 | A.      Absolutely. |
| 11:45:41 | 19 | Q.      And you understood by getting him the source |
|          | 20 | document that that would aid him in becoming a |
|          | 21 | captain, correct? |
| 11:45:45 | 22 | A.      I knew it would not. |
| 11:45:47 | 23 | Q.      Why not? |
| 11:45:49 | 24 | A.      Because the test didn't mean anything. |
|          | 25 | Captains were made at the oral board, did not matter |

```
      1    what you scored on the test.
11:45:53 2   Q.      Then what -- what's the point of getting
      3    somebody a source document if the written -- written
      4    examination has no meaning?
11:45:58 5   A.      Because he didn't have a chance to study, and
      6    the chief didn't want him embarrassed by getting a
      7    low score and have to be bootstrapped up on the oral
      8    board; that's why.  That's exactly what it was.
      9    There's no question in my mind that's what it was.
11:46:12 10  Q.      So the written examination has some factor in
      11   whether somebody is promoted, correct?
11:46:15 12  A.      Zero.  None.
11:46:17 13  Q.      And yet you went out of your way to get
      14   source documents for at least two people?
11:46:22 15  A.      Oh, it does for sergeant but not for captain.
      16   Two different things.  Sergeant is 85 percent test;
      17   captain is 35 percent test.  Sergeant has no oral
      18   board.  Captain has a 50 percent oral board where the
      19   numbers were -- were done in a way that the -- the
      20   people that the chief wanted to be captain got made.
11:46:41 21  Q.      You went over the source document with
      22   Mr. Glancy prior to him taking the exam, correct?
11:46:46 23  A.      No.  It was very similar to what happened
      24   with Kessler.  I made it available to him.
11:46:50 25  Q.      You told Mr. Glancy that you were going to
```

**John J. Ryan - May 21, 2019**

1    leave the office and leave the source document on

2    your desk for him to review, correct?

11:46:56  3    A.      Yeah.  I don't -- I don't remember if I

4    talked to him on the phone or if he was actually in

5    the office.  I don't remember.  I would have to look

6    at a document.  I have no recollection at this point.

7    I don't remember what I told him.

11:47:09  8    Q.      I'll refer you to Exhibit 11, Page 2.  Did

9    you -- actually, at the bottom of Page 1, did you

10   tell the FBI on March 20th, 2001, last paragraph --

11:47:24 11   A.      On where?

11:47:27 12   Q.      Exhibit 11, Page 1, bottom paragraph.  Did

13   you tell the FBI that you called Glancy into your

14   office, told him --

11:47:35 15              MR. KELLEY:  I'm sorry.

11:47:35 16   BY MR. SLOSAR:

11:47:37 17   Q.      -- that you were giving him the source

18   document to the promotion examination, and you were

19   going to leave the office with the source document on

20   your desk, and that Glancy could not make copies of

21   the source document after you left?

11:47:50 22   A.      Yeah.  I don't know again based on that

23   whether I called him on the phone or whether I

24   actually had him in the office.  I may have called

25   him on the phone and said, "Hey, John, I'm going over

John J. Ryan - May 21, 2019

this.  I'm going over this document.  I'm going to

leave it here for you to take a look at."  I -- I may

very well have well done that.  I have no idea.

11:48:04  Q.     But you --

11:48:06  A.     I don't know if I was in the office with him

or not.  And again, we're talking 20 years ago.  I

don't know.

11:48:11  Q.     You did in fact make the source document

available to Mr. Glancy for him to use before the

exam, correct?

11:48:17  A.     Of course, I did.  Absolutely.  No question

about it.

11:48:19  Q.     And again, you did not make captain on your

first attempt, correct?

11:48:21  A.     That's true.

11:48:24  Q.     Others made it before you, correct?

11:48:24  A.     Correct.

11:48:26  Q.     Prior to your second attempt, Col. Prignano

gave you a source document for the exam, correct?

11:48:31  A.     He made it available to me.  I didn't accept

it.

11:48:37  Q.     You took that document with you, correct?

11:48:38  A.     I don't think I did.  And I think I made this

pretty clear to the FBI, I'm not sure that it ever

made it out of his suite.  I think I threw it back on

John J. Ryan - May 21, 2019

```
 1   the desk, but it may have gone into the ante-room.
 2   But I never -- I never, ever looked at it.  And I
 3   made that pretty clear to the FBI.
```
11:48:59
```
 4   Q.       I'm going to refer you to Exhibit No. 9, sir,
 5   Page 13, third paragraph, last sentence -- or
 6   second-to-last sentence.  Did you tell the FBI on
 7   October 2000 that the second time Chief Prignano gave
 8   you a copy of the source document for the captain's
 9   exam, you stated that you did not look at the
10   document but put it in a drawer?
```
11:49:43
```
11   A.       Yeah.  I mean, again, if I put it in his
12   anteroom I would have put it in the drawer where I
13   put all the mail.  But I also told him that I may
14   have thrown it right back on the desk.  So again,
15   these are the kinds of things that -- that Joe Penza,
16   you know, had voluminous notes on and they're not in
17   the 302.  But --
```
11:49:58
```
18   Q.       So it's your testimony that police officers
19   lie?
```
11:49:58
```
20   A.       Excuse me?
```
11:50:04
```
21   Q.       Based on your experience, police officers lie
22   in reports?
```
11:50:09
```
23   A.       FBI agents.  I think certainly that Dennis --
24   Dennis Aiken had a history.  He's got a Giglio issue.
25   It's -- it's well documented.
```

John J. Ryan - May 21, 2019

| | | |
|---|---|---|
| 11:50:15 | 1 | Q.       Before -- |
| 11:50:15 | 2 | A.       You can Google it and find it. |
| 11:50:18 | 3 | Q.       Even aside from FBI agents, have you |
| | 4 | experienced cases where other law enforcement |
| | 5 | agencies provide false information in reports? |
| 11:50:29 | 6 | A.       I have read certainly cases where I have |
| | 7 | believed that the officer was not being totally |
| | 8 | truthful, of course. |
| 11:50:36 | 9 | Q.       Sir, after your second examination, you |
| | 10 | became a captain at the Providence Police Department, |
| | 11 | correct? |
| 11:50:42 | 12 | A.       Correct. |
| 11:50:45 | 13 | Q.       Sir, after meeting with the FBI, isn't it |
| | 14 | true that you told Chief Prignano that you believe |
| | 15 | that you were going to be disbarred? |
| 11:50:55 | 16 | A.       Absolutely not.  There was never any issue |
| | 17 | with my law license, none. |
| 11:51:00 | 18 | Q.       That's not what I'm asking.  I'm asking -- |
| 11:51:01 | 19 | MR. KELLEY:  Well -- |
| 11:51:01 | 20 | BY MR. SLOSAR: |
| 11:51:03 | 21 | Q.       -- did you tell Chief Prignano at any point |
| | 22 | in time that you believe that you were going to get |
| | 23 | disbarred due to the allegations of misconduct? |
| 11:51:15 | 24 | A.       Absolutely not. |
| 11:51:37 | 25 | Q.       Now, refer you to Exhibit No. 6, sir, Page |

John J. Ryan - May 21, 2019

|   | |
|---|---|
| | 1 |  14.   Were you aware that Mr. Prignano told the FBI |

1   14.   Were you aware that Mr. Prignano told the FBI

2   that he had a conversation with you after your

3   interview and that you told him that you believed you

4   were going to get disbarred and that the FBI was

5   going to take away your children?

11:52:06   6                    MR. KELLEY:   Objection.

11:52:06   7                    THE WITNESS:   When -- when -- when was

8   this?   Where is this?

11:52:08   9   BY MR. SLOSAR:

11:52:10  10   Q.      Fourth sentence.

11:52:10  11   A.      You said Page 14.

11:52:11  12   Q.      Fourth sentence, first paragraph.

11:52:13  13   A.      I mean, think about how stupid that is, that

14   I get my children taken away --

11:52:16  15   Q.      I -- I am asking you --

11:52:16  16   A.      -- over this.

11:52:20  17   Q.      -- did you ever tell Mr. Prignano that you

18   believed you were going to get disbarred as a result

19   of the FBI investigation?

11:52:25  20   A.      Absolutely not.

11:52:28  21   Q.      Did you ever tell Mr. Prignano that you

22   believe the FBI could take your children away?

11:52:33  23   A.      If you think that I would ever even think

24   that, so I would say that then obviously we have

25   serious issues.   No, I never said anything like that.

John J. Ryan - May 21, 2019

| | | |
|---|---|---|
| 11:52:40 | 1 | It's ridiculous. |
| 11:52:41 | 2 | Q.      Did you ever tell Mr. Prignano -- |
| 11:52:42 | 3 | A.      It's ridiculous that that would even be |
| | 4 | written in a 302. |
| 11:52:47 | 5 | Q.      Did you tell Mr. Prignano that you were going |
| | 6 | to tell the FBI everything you knew? |
| 11:52:52 | 7 | A.      I would -- I -- let me tell you something.  I |
| | 8 | would tell Prignano and I -- you know, I had a lot of |
| | 9 | discussions with him until the day he died, I would |
| | 10 | -- I always tell the truth, because the truth, there |
| | 11 | was no wrongdoing in any of -- anything that I knew |
| | 12 | about in the Providence Police Department.  There was |
| | 13 | zero wrongdoing.  So Chief Prignano knew from day one |
| | 14 | that I was going to tell the truth. |
| 11:53:18 | 15 | Q.      Sir, fair to say you did not take any steps |
| | 16 | to cooperate with Colonial [sic] Sullivan's |
| | 17 | investigation into the promotional scheme at the |
| | 18 | Providence Police Department? |
| 11:53:25 | 19 |                 MR. KELLEY:  Colonel. |
| 11:53:29 | 20 |                 THE WITNESS:  Col. Sullivan never had |
| | 21 | an investigation while I was there.  That's the |
| | 22 | problem. |
| 11:53:38 | 23 | BY MR. SLOSAR: |
| 11:53:40 | 24 | Q.      Did any meetings take place with |
| 11:53:46 | 25 | Col. Sullivan where an investigation was discussed? |

John J. Ryan - May 21, 2019

| | | |
|---|---|---|
| 11:53:47 | 1 | A.         Absolutely. |
| 11:53:50 | 2 | Q.         What -- when did those meetings take place? |
| 11:53:52 | 3 | A.         Almost when he was named chief of police, I |
| | 4 | had a meeting with him, and I asked him to |
| | 5 | immediately start an investigation.  That was in |
| | 6 | January of 2001. |
| 11:54:03 | 7 | If you get some news articles, you would find |
| | 8 | that he actually announced that he was going to do |
| | 9 | it, and then he never did. |
| 11:54:11 | 10 | I went to him again in the -- in the spring. |
| | 11 | He made an announcement in the newspaper in April of |
| | 12 | 2001 that he was going to start an investigation, and |
| | 13 | he never did.  This is documented. |
| 11:54:20 | 14 | And then he did a press release in August of |
| | 15 | 2001 saying he was finally going to do the |
| | 16 | investigation, and he never did.  And then I retired |
| | 17 | in June of 2002, and then he makes an announcement |
| | 18 | that I retired because he was starting the |
| | 19 | investigation that he had announced three times over |
| | 20 | the course of a year and a half, when he knew very |
| | 21 | well that I was retiring. |
| 11:54:40 | 22 | Q.         Sir, I'm going to hand you what we'll mark as |
| | 23 | Exhibit No. 13.  This is Ryan 922 through 1361. |
| 11:54:51 | 24 | (The document was marked Exhibit No. 13.) |
| 11:54:51 | 25 | BY MR. SLOSAR: |

**John J. Ryan - May 21, 2019**

| | | |
|---|---|---|
| 11:54:55 | 1 | Q.        Have you ever presented -- have you ever |
| | 2 | reviewed this full report and the appendices before |
| | 3 | today? |
| 11:55:01 | 4 | A.        The whole thing?  Absolutely not. |
| 11:55:04 | 5 | Q.        Sir, were you aware that Col. Sullivan |
| | 6 | received a letter from the Rhode Island Attorney |
| | 7 | General's Office on June 5th, 2002, allowing for you |
| | 8 | to be questioned subject to Garrity versus New Jersey |
| | 9 | as to your knowledge of and/or participation in a |
| | 10 | promotional examination, irregularities? |
| 11:55:22 | 11 | A.        What date? |
| 11:55:24 | 12 | Q.        June 5th, 2002. |
| 11:55:26 | 13 | A.        No, I did not know that. |
| 11:55:28 | 14 | Q.        I refer you to Ryan 1000, the Bates number. |
| | 15 | It's -- let me know when you're there. |
| 11:55:46 | 16 |           Sir, prior to today, have you ever seen this |
| | 17 | letter from the Attorney General's Office for the |
| | 18 | State of Rhode Island? |
| 11:56:02 | 19 | A.        I have not seen this before. |
| 11:56:05 | 20 | Q.        What is -- do you have an understanding of |
| | 21 | what Garrity versus New Jersey is? |
| 11:56:08 | 22 | A.        Of course. |
| 11:56:09 | 23 | Q.        What is it? |
| 11:56:13 | 24 | A.        It's basically so that a department can ask |
| | 25 | an officer questions notwithstanding their Fifth |

**John J. Ryan - May 21, 2019**

1        Amendment privilege.  But the statements cannot be

2        used against them in any criminal setting.  I

3        don't -- I don't know that -- that Mr. Whitehouse

4        sent this letter.

11:56:28   5   Q.      This letter purports to be signed by the

6        Attorney General for the State of Rhode Island,

7        correct?

11:56:33   8   A.      Senator Whitehouse, yes.  He wasn't senator

9        at the time.

11:56:38  10   Q.      And copied on this letter are the deputy

11        attorney general, the deputy chief, and the assistant

12        attorney general for the State of Rhode Island,

13        correct?

11:56:46  14   A.      Correct.  Peter Nerohna is now a

15        U.S. attorney.  He is a really nice guy.  Gerry Coyne

16        is a friend of mine.  His -- his kid plays hockey

17        with my kids or did years ago.  And Steve Dambruch I

18        know pretty well too.

11:57:00  19   Q.      Prior to today, there's testimony, is you had

20        no idea that the Attorney General for the State of

21        Rhode Island wrote a letter to Col. Sullivan allowing

22        for you to be interviewed subject to Garrity versus

23        New Jersey about your knowledge of and/or

24        participation in promotional examination

25        irregularities?

**John J. Ryan - May 21, 2019**

| | |
|---|---|
| 11:57:23 | 1 |
| 11:57:24 | 2 |
| 11:57:26 | 3 |
| 11:57:26 | 4 |
| 11:57:28 | 5 |
| | 6 |
| | 7 |
| 11:57:36 | 8 |
| | 9 |
| | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| 11:57:59 | 15 |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| | 20 |
| 11:58:12 | 21 |
| | 22 |
| | 23 |
| | 24 |
| | 25 |

1  A.        No idea --

2                   MR. KELLEY:  Object to the form.

3                   THE WITNESS:  I have seen this letter.

4  BY MR. SLOSAR:

5  Q.        You had no idea that there were discussions

6  between the Providence Police Department and the

7  Attorney General about criminal prosecution?

8  A.        You know, I confronted Richard Sullivan one

9  morning about -- he said that he didn't agree with

10  some things that I said in my deposition in the Young

11  case.  And I said, "Richard, well, I didn't

12  appreciate you opening an investigation knowing that

13  I was retired and making it look like I retired

14  because of this investigation."

15          And what he said was, and maybe it makes

16  sense now, what he said was, it wasn't because of me;

17  it was because of Sheldon.  He knew Sheldon and I

18  were friends.  He said it wasn't because of me; it

19  was because of Sheldon.  That was his response that

20  day.

21          So maybe that -- maybe this is what he was

22  talking about.  All this time, I thought he was just

23  a liar, because he lied about some other things.

24  But -- but, you know, I see him every Sunday in

25  church.  Maybe I'll have a discussion with him about

**John J. Ryan - May 21, 2019**

|  |  |  |
|---|---|---|
| | 1 | this letter. |
| 11:58:29 | 2 | Q.      With who, the former attorney general or the |
| | 3 | former chief of police? |
| 11:58:32 | 4 | A.      No.  I don't see Sheldon very often.  Once in |
| | 5 | a while at the airport we -- we run and we have a |
| | 6 | nice conversation together.  But I don't see him very |
| | 7 | often.  But I see Chief Sullivan every Sunday |
| | 8 | morning.  He is retired now, but I see him every |
| | 9 | Sunday at 7:00 mass at St. Augustine's. |
| 11:58:47 | 10 | Q.      According to this letter from Col. Sullivan, |
| | 11 | there was a conversation the prior day where |
| | 12 | Mr. Sullivan asked if the Attorney General had any |
| | 13 | objection to the Providence Police Department |
| | 14 | conducting an interview of you subject to Garrity |
| | 15 | versus New Jersey. |
| 11:59:03 | 16 | MR. KELLEY:  Objection.  Go ahead. |
| 11:59:03 | 17 | THE WITNESS:  You know, I'm -- I'm sure |
| | 18 | there was, because I'm out the door already.  Backing |
| | 19 | himself up, I'm already out the door.  I think I left |
| | 20 | -- my last day was a Thursday.  The 9th was Monday. |
| | 21 | I was -- I was gone.  This is probably on the heels |
| | 22 | of my -- of my having my meeting with Chief Sullivan, |
| | 23 | my exit meeting. |
| 11:59:23 | 24 | BY MR. SLOSAR: |
| 11:59:25 | 25 | Q.      It's your testimony that you had an exit |

John J. Ryan - May 21, 2019

|       |    |                                                      |
|-------|----|------------------------------------------------------|
|       | 1  | meeting with Chief Sullivan?                         |
| 11:59:37 | 2  | A.     I absolutely did in his office.  I mean, we  |
|       | 3  | didn't call it an exit meeting, but it was an exit   |
|       | 4  | meeting.  I told him where I was going to be and how |
|       | 5  | to get ahold of me if he needed any information.     |
| 11:59:51 | 6  | Q.     Sir, I'm going to hand you what we'll mark as |
|       | 7  | Exhibit No. 14, February 23rd, 2003 letter.  It's    |
|       | 8  | Bates Ryan 5308.                                     |
| 12:00:04 | 9  |        (The document was marked Exhibit No. 14.)    |
| 12:00:05 | 10 | BY MR. SLOSAR:                                        |
| 12:00:08 | 11 | Q.     Have you ever seen this document before       |
|       | 12 | today?                                               |
| 12:00:14 | 13 | A.     No.                                           |
| 12:00:16 | 14 | Q.     Prior to today, were you aware that the       |
|       | 15 | deputy attorney general and assistant U.S. attorney, |
|       | 16 | city solicitor and former prosecutor Jim Ryan were   |
|       | 17 | working with the Providence Police Department to     |
|       | 18 | discuss criminal, departmental, and civil charges    |
|       | 19 | against yourself and other individuals from the      |
|       | 20 | Providence Police Department?                        |
| 12:00:39 | 21 | A.     Well, this doesn't --                          |
| 12:00:40 | 22 |                  MR. KELLEY:  Note my objection.     |
| 12:00:40 | 23 |                  THE WITNESS:  This doesn't even say  |
|       | 24 | that.                                                |
| 12:00:41 | 25 | BY MR. SLOSAR:                                        |

John J. Ryan - May 21, 2019

| | | |
|---|---|---|
| 12:00:44 | 1 | Q.      Look at the backside.  Sir -- |
| 12:00:45 | 2 | A.      This doesn't even say that. |
| 12:00:46 | 3 | Q.      Are -- are you -- |
| 12:00:47 | 4 | A.      That they were working with him. |
| 12:00:49 | 5 | Q.      Are you one of the possible defendants that's |
| | 6 | listed on this sheet? |
| 12:00:55 | 7 | A.      This is suggested actions.  And one of the |
| | 8 | suggested actions is that they confer with these |
| | 9 | people.  There's nothing to say that they ever did |
| | 10 | confer with these people.  And there's nothing to say |
| | 11 | that these people were in agreement. |
| 12:01:12 | 12 | Q.      Sir, prior to today, were you aware that |
| | 13 | these individuals were being conferred with about |
| | 14 | potential criminal or departmental charges against |
| | 15 | yourself and other individuals? |
| 12:01:23 | 16 | A.      I'm still not -- |
| 12:01:23 | 17 |                    MR. KELLEY:  Objection. |
| 12:01:25 | 18 |                    THE WITNESS:  I'm still not aware that |
| | 19 | they were conferred with.  That's not what this |
| | 20 | letter says.  This is written by a guy that was |
| | 21 | brought in to be deputy chief of police who, by the |
| | 22 | way, when he left, he contacted me to see if he could |
| | 23 | get a job. |
| 12:01:40 | 24 | BY MR. SLOSAR: |
| 12:01:42 | 25 | Q.      Who was it written by? |

**John J. Ryan - May 21, 2019**

12:01:45  1    A.        Andy Rosenzweig.

12:01:46  2    Q.        What was his title?

12:01:48  3    A.        He was brought in by Dean Esserman to be the

4    deputy chief of police.  He is a retired New York

5    City Police Department detective.

12:01:58  6    Q.        According to this memorandum, isn't it true

7    that suggested actions listed on this sheet included

8    potential criminal charges, departmental charges,

9    and/or a civil action based on the promotional

10    scandal at the Providence Police Department?

12:02:21  11            MR. KELLEY:  Objection.  That's not

12    what it says.

12:02:23  13            THE WITNESS:  No, it's -- it's not what

14    it says.  I mean, this is -- this is a guy who is

15    retired as an NYPD detective saying these are his

16    suggested actions.  This is his opinion.  And one of

17    his suggested actions is to confer with people.  We

18    don't even know if he ever conferred with any of them

19    or what they said.

12:02:40  20    BY MR. SLOSAR:

12:02:46  21    Q.        Sir, prior to today, were you aware that the

22    U.S. Attorney's Office declined to prosecute you

23    because much of the misconduct was outside the reach

24    of the five-year federal statute of limitations?

12:03:02  25    A.        Yeah.  I mean, that's just -- that's just

John J. Ryan - May 21, 2019

1    incorrect.

12:03:08  2    Q.      Are you disputing that?

12:03:10  3    A.      I know -- I think I have seen that letter

4    before.  But go back -- think about this for a

5    second.  Go back to everything you just presented

6    with me, all these 302s with dates on them, and look

7    at the dates.  They date back to 2000.  Rhonda

8    Kessler's promotion was 1997, 1998.  It's certainly

9    not outside the statute of limitations of five years.

12:03:34  10   Q.      By 2003 it would have been, correct?

12:03:37  11   A.      Yeah, because somebody tried to resurrect it.

12   Imagine that.  Imagine that somebody tried to

13   resurrect this after nobody was charged criminally.

12:03:47  14   Q.      Were you aware that Department Inspector

15   Bennett from the Providence Police Department wrote a

16   memorandum about potential prosecution --

12:03:56  17   A.      No.

12:04:00  18   Q.      -- based on the promotional examination

19   that's at issue?

12:04:02  20   A.      No, I'm not familiar with that at all.  And

21   if poor Bob Bennett wrote it, then it's probably not

22   very good.

12:04:11  23              MR. SLOSAR:  I'll mark this as Exhibit

24   15.

12:04:14  25         (The document was marked Exhibit No. 15.)

John J. Ryan - May 21, 2019

| | | |
|---|---|---|
| 12:04:26 | 1 | MR. SLOSAR:  For those folks on the |
| | 2 | phone, this is Ryan 3774 through 3777. |
| 12:04:34 | 3 | BY MR. SLOSAR: |
| 12:04:36 | 4 | Q.      Sir, prior to today, have you ever seen that |
| | 5 | document? |
| 12:04:40 | 6 | A.      No, I have not. |
| 12:04:49 | 7 | Q.      Prior to today, did you know that Inspector |
| | 8 | Bennett wrote a letter to the special assistant to |
| | 9 | the chief of police regarding individuals who |
| | 10 | obtained and are suspect in obtaining prior source |
| | 11 | promotional examination material? |
| 12:05:10 | 12 | A.      I have never seen this before. |
| 12:05:16 | 13 | Q.      Were you ever made aware that Tonya Harris |
| | 14 | was charged with violating department regulations? |
| 12:05:23 | 15 | A.      You know, she worked for the department for a |
| | 16 | number of years, and this internal affairs guy who |
| | 17 | had been there since I was a kid can't even spell her |
| | 18 | name correctly.  It's Tonya Harris, not Tanya Harris. |
| 12:05:33 | 19 | Q.      Can you answer my question, sir? |
| 12:05:35 | 20 | A.      Did I -- was I aware of what? |
| 12:05:37 | 21 | Q.      That she was charged with violating |
| | 22 | department regulations. |
| 12:05:43 | 23 | A.      She was.  I also know what the finding was. |
| 12:05:45 | 24 | Q.      Were you aware that she was charged with |
| | 25 | violating department regulations with regard to |

**John J. Ryan - May 21, 2019**

|  |  |  |
|---|---|---|
|  | 1 | receiving source sheets before promotional |
|  | 2 | examinations? |
| 12:06:00 | 3 | A.      I am.  I also know what the outcome is. |
| 12:06:05 | 4 | Q.      Sir, at the time of your retirement in 2002, |
|  | 5 | you were well aware that a criminal investigation was |
|  | 6 | ongoing into allegations of police misconduct at the |
|  | 7 | Providence Police Department, correct? |
| 12:06:16 | 8 | A.      As far as I knew, it was over. |
| 12:06:19 | 9 | Q.      You're saying that at the time that you left |
|  | 10 | the Providence Police Department, you believed that |
|  | 11 | the FBI investigation had concluded? |
| 12:06:28 | 12 | A.      It was very clear to me. |
| 12:06:29 | 13 | Q.      How so? |
| 12:06:31 | 14 | A.      It was very clear to me because I was merely |
|  | 15 | a witness and I was on their witness list for the |
|  | 16 | mayor's trial.  And I didn't leave until after the |
|  | 17 | mayor's trial.  They -- they made public statements |
|  | 18 | that it was concluded. |
| 12:06:43 | 19 | Q.      When you left the Providence Police |
|  | 20 | Department in 2002, you knew that there was going to |
|  | 21 | be an investigation, correct? |
| 12:06:52 | 22 | A.      I don't know what you're talking about.  I |
|  | 23 | knew absolutely nothing about an investigation.  As |
|  | 24 | far as I knew, all of the criminal investigation was |
|  | 25 | over with respect to the mayor and with respect to |

John J. Ryan - May 21, 2019

|  | 1 | what the FBI was looking at.  I knew that the grand |
|---|---|---|
|  | 2 | jury, that nothing was coming out of the statewide |
|  | 3 | grand jury, and I knew nothing about an investigation |
|  | 4 | of the Providence Police Department that I had asked |
|  | 5 | for for 18 months.  And it never happened. |
| 12:07:19 | 6 | Q.      Sir, do you recall testifying in the Young |
|  | 7 | case in July of 2003? |
| 12:07:23 | 8 | A.      Absolutely. |
| 12:07:26 | 9 | Q.      You were under oath then just like you are |
|  | 10 | under oath now? |
| 12:07:26 | 11 | A.      Yes. |
| 12:07:28 | 12 | Q.      You were under oath then just like you were |
|  | 13 | under oath in you report in this case? |
| 12:07:32 | 14 | A.      Yes.  Well, I wasn't under oath in my report. |
|  | 15 | I signed it under penalty of perjury. |
| 12:07:36 | 16 | Q.      Well, Do you understand what penalty of |
|  | 17 | perjury means? |
| 12:07:38 | 18 | A.      Of course. |
| 12:07:43 | 19 | Q.      Sir, looking at Page 230, were you asked this |
|  | 20 | question:  "Did you give us" -- |
| 12:07:46 | 21 | A.      Slow down.  I've got to get to 230.  And I'm |
|  | 22 | going to have to put it in context. |
| 12:08:04 | 23 |         Oops. |
| 12:08:06 | 24 | Q.      This is Exhibit 7. |
| 12:08:08 | 25 | A.      It's the deposition, right? |

**John J. Ryan - May 21, 2019**

| | | |
|---|---|---|
| 12:08:08 | 1 | Q.        Yes. |
| 12:08:11 | 2 | A.        Yeah, I'm trying to get to it, but with the |
| | 3 | double-sided pages I'm having a tough time.  I |
| | 4 | apologize. |
| 12:08:25 | 5 |          230.  Go ahead. |
| 12:08:28 | 6 | Q.        Lines 11 through 13, were you asked this |
| | 7 | question, did you give this answer: |
| 12:08:32 | 8 |          "You left understanding there was going to be |
| | 9 | an investigation? |
| 12:08:35 | 10 |          "A.   Yes." |
| 12:08:36 | 11 |          Did you -- were you asked that question and |
| | 12 | did you give that answer? |
| 12:08:39 | 13 | A.      No.  I think you -- put it -- put it in |
| | 14 | context. |
| 12:08:40 | 15 |                MR. KELLEY:  Read the next question. |
| 12:08:44 | 16 |                THE WITNESS:  Put it in context. |
| 12:08:44 | 17 | BY MR. SLOSAR: |
| 12:08:46 | 18 | Q.      Were you asked that question, did you give |
| | 19 | that answer? |
| 12:08:48 | 20 | A.      I was asked that question -- |
| 12:08:49 | 21 | Q.      Did you give that answer? |
| 12:08:53 | 22 | A.        -- because on Monday, the actual day of my |
| | 23 | retirement, I was gone.  Wasn't even in town.  I get |
| | 24 | a call that I'm in the newspaper, that there's going |
| | 25 | to be an investigation.  So yeah, the answer to that |

John J. Ryan - May 21, 2019

|   |   |
|---|---|
| | 1 | is yes.  The answer is yes.  But I didn't know it |
| | 2 | before I left on Thursday and had my exit meeting |
| | 3 | with the chief of police. |
| 12:09:15 | 4 | I found out Monday when I was already gone, I |
| | 5 | wasn't coming back.  I had already turned in all my |
| | 6 | stuff, my car, everything.  My car was parked in my |
| | 7 | parking space in the basement.  I was gone. |
| 12:09:24 | 8 | Q.     You're saying that your -- |
| 12:09:26 | 9 | A.     I found out in the newspaper. |
| 12:09:28 | 10 | Q.     You're saying that you returned your police |
| | 11 | cruiser to the Providence Police Department? |
| 12:09:31 | 12 | A.     Absolutely. |
| 12:09:33 | 13 | Q.     It was never seized from your mother's house? |
| 12:09:36 | 14 | A.     Absolutely not.  Guido Laorenzo, who I worked |
| | 15 | for, who was a friend of mine, he came and picked it |
| | 16 | up so that I could drive it home to get home on |
| | 17 | Thursday.  I put my equipment, what was left of it, |
| | 18 | in the trunk.  I left the keys for him.  He came |
| | 19 | and -- and got the keys from my mother.  And I'll -- |
| | 20 | I'll tell you what, I'll get an affidavit from him |
| | 21 | that says that.  I mean, that's ridiculous. |
| 12:09:58 | 22 | Q.     So they -- the car was at your mother's |
| | 23 | house? |
| 12:10:01 | 24 | A.     Absolutely.  That is where I lived. |
| 12:10:04 | 25 | Q.     Why were you living at your mother's house as |

**John J. Ryan - May 21, 2019**

1   a captain at the Providence Police Department?

12:10:09  2   A.     Because I had gotten divorced, and I was

3   living on the second floor of my mother's house in

4   between buying something.  That's why I was living at

5   my mother's house.

12:10:17  6   Q.     At the time you left the Providence Police

7   Department, you understood there was going to be an

8   investigation, correct?

12:10:23  9   A.     No.  Not until the Monday.  I was already

10   gone.  I was out the door.  The chief never said one

11   word about an investigation when I had my exit

12   meeting with him.

12:10:35 13   Q.     By 2002, you were questioned by the FBI on

14   nearly a half dozen occasions, correct?

12:10:39 15   A.     By 2002?

12:10:39 16   Q.     Yes.

12:10:40 17   A.     By 2000.

12:10:42 18   Q.     Yeah.  During what of those --

12:10:45 19   A.     I stayed 18 months after all that happened,

20   after we got a new chief.  Actually, I stayed for two

21   years, because I stayed for six months under

22   Prignano.

12:10:52 23   Q.     During one of those meetings you told the FBI

24   that you felt that you were a target of the

25   investigation, correct?

John J. Ryan - May 21, 2019

| | |
|---|---|
| 12:10:59 | 1 |

12:10:59   1   A.        I don't ever --- I don't think I ever said

2   that, because they made it so perfectly clear that I

3   was not, as well as the U.S. attorney.

12:11:05   4   Q.       You don't have an exact recollection,

5   correct?

12:11:08   6   A.       No, I never said it.  I don't have any

7   recollection of saying that, and I don't know why I

8   would say that, because -- because they made it

9   entirely clear that I was not a target, I was not a

10   subject.  And even after I walked out, the

11   U.S. attorney called and said, "You are not a target.

12   You are not a subject."

12:11:24  13   Q.       On October 4, 2000, you refused to answer any

14   questions after disclosing that you felt like a

15   target, correct?

12:11:28  16   A.       That's not accurate.

12:11:30  17   Q.       On October 4, 2000, you walked out and

18   refused to answer any questions until you retained

19   counsel, correct?

12:11:36  20   A.       I did retain counsel.

12:11:37  21   Q.       You didn't speak --

12:11:38  22   A.       After the U.S. attorney asked me to come

23   back.

12:11:41  24   Q.       You didn't speak to the FBI again without the

25   presence of counsel, correct?

John J. Ryan - May 21, 2019

| | | |
|---|---|---|
| 12:11:44 | 1 | A.          Absolutely.  That's absolutely true. |
| 12:11:44 | 2 | Q.          You didn't -- |
| 12:11:47 | 3 | A.          I did not like the way that Agent Aiken was |
| | 4 | acting. |
| 12:11:50 | 5 | Q.          You didn't speak with the FBI again without a |
| | 6 | proffer of immunity, correct? |
| 12:11:55 | 7 | A.          That's not immunity.  I'm sure you understand |
| | 8 | immunity. |
| 12:11:57 | 9 | Q.          You couldn't be -- you couldn't be charged |
| | 10 | with any crime based on the statements you were |
| | 11 | giving to them?  That was your proffer -- |
| 12:12:02 | 12 |                    MR. KELLEY:  Note my objection. |
| 12:12:02 | 13 |                    THE WITNESS:  No, no, no, that's |
| | 14 | entirely wrong.  I could be charged with any crime |
| | 15 | that I talked about.  The statements themselves could |
| | 16 | not be used at a trial.  It was not immunity in |
| | 17 | federal court.  I'm sure you're a lawyer, you |
| | 18 | understand this, that you can only get immunity from |
| | 19 | a federal judge, and immunity in federal court is use |
| | 20 | derivative, use immunity.  I did not have that. |
| 12:12:21 | 21 | BY MR. SLOSAR: |
| 12:12:25 | 22 | Q.          In April of 2002, you were aware that Chief |
| | 23 | Prignano testified at the federal Plunder Dome trial |
| | 24 | that he gave source sheets to certain officers, |
| | 25 | correct? |

John J. Ryan - May 21, 2019

| | | |
|---|---|---|
| 12:12:36 | 1 | A.      I don't -- I don't know that I knew that.  I |
| | 2 | might have read it in the newspaper.  I certainly |
| | 3 | wasn't at the trial, because I was on the witness |
| | 4 | list. |
| 12:12:43 | 5 | Q.      In May of 2002 you became aware that |
| 12:12:47 | 6 | Col. Sullivan spoke with members of the city |
| | 7 | solicitor's office about questions that could be |
| | 8 | asked of you and other members of the Providence |
| | 9 | Police Department, correct? |
| 12:12:56 | 10 | A.      That's total baloney. |
| 12:12:59 | 11 | Q.      Sir, isn't it true that as the Providence |
| | 12 | Police Department was preparing to question you |
| | 13 | regarding your involvement in the testing scheme, |
| | 14 | that you became unavailable? |
| 12:13:06 | 15 | A.      Totally false. |
| 12:13:08 | 16 | Q.      Isn't it true that you were tipped off by |
| | 17 | Maj. Simoneau or Maj. Laorenzo of the Garrity |
| | 18 | hearing? |
| 12:13:15 | 19 | A.      Totally false.  Semoneau would not have told |
| | 20 | me anything.  And I suppose if -- if Guido Laorenzo |
| | 21 | knew, maybe he would have.  I don't know, but |
| | 22 | Semoneau never told me. |
| 12:13:22 | 23 | Q.      What about Inspector Bennett?  Did he ever |
| | 24 | tip you off of the Garrity hearing? |
| 12:13:24 | 25 | A.      Absolutely not. |

**John J. Ryan - May 21, 2019**

12:13:25  1    Q.        Who tipped you off?

12:13:27  2    A.        Nobody tipped me off.  Nobody tipped me off.

3    I read that.  I found out from the newspaper article

4    on Monday, and I wasn't even in town.

12:13:46  5    Q.        Sir, I'm going to hand you what we'll mark as

6    Exhibit 16.

12:13:52  7              (The document was marked Exhibit No. 16.)

12:13:52  8    BY MR. SLOSAR:

12:14:01  9    Q.        Memorandum.  Please let me know if you have

10    seen this document before.

12:14:06 11              It's 5230 for the folks on the phone.

12:14:09 12              Have you seen this before?

12:14:12 13    A.        No.

12:14:16 14    Q.        Were you aware that Major Sullivan was

15    interviewed regarding the testing investigation?

12:14:21 16    A.        This must have been when he got demoted from

17    chief, because he was chief when I left in 2002.

18    This is 2003.  So this must be when he got demoted.

19    Q.        Sir, looking at the backside, first full

20    paragraph, were you aware that Mr. Sullivan reported

21    that in May of 2002, Whitehouse, with the assistance

22    of Soli- -- city solicitor McKue, called Sullivan

23    with questions which would -- could be asked during

24    the Garrity hearing conducted by the department

25    inspector?  Were you aware of that?

**John J. Ryan - May 21, 2019**

12:15:07   1   A.       I doubt this is even true, to be quite frank

2   with you.   I don't know who did this.   It is not

3   signed.   But I doubt that's even true.

12:15:16   4           I will tell you that Kevin McHugh, whose name

5   is spelled differently, I still speak to today.

6   He -- he laughs at this document because there's some

7   falsehoods in here that he knows are false.

12:15:28   8   Q.       So you have never seen this document before

9   today, but you have had conversations with Mr. McHugh

10   about it?

12:15:34   11   A.       I did.   I had a conversation with him about

12   it.   And it might have been after our last

13   deposition.   But somebody asked me at a deposition

14   whether I met with the testmaker, and I had.   But in

15   this document, it would indicate that I met with the

16   testmaker before I took the test for captain.

12:15:47   17   Q.       Sir --

12:15:49   18   A.       I did meet with the testmaker, with Kevin

19   McHugh, in Boston relative to a different case after

20   I was already a captain.   And I told Kevin, I said,

21   you know, "They presented me with a document, and

22   listen to what it says."   So yeah, I had that

23   discussion following the deposition.

12:16:06   24   Q.       Sir, isn't it true that officers from the

25   Providence Police Department called you in early May

John J. Ryan - May 21, 2019

1    of 2002 but you did not return their calls?

12:16:15  2    A.      Early May of 2002 I was still there.  I went

3    to work every day.

12:16:17  4    Q.      Do you know --

12:16:18  5    A.      Why would they call me and I wouldn't be

6    there?  I went to work every day.

12:16:25  7    Q.      Did any officers from the Providence Police

8    Department call you in early June of 2002 and you did

9    not return their calls?

12:16:30  10   A.      Absolutely not.

12:16:35  11   Q.      Isn't it true that the Providence Police

12   Department had your police vehicle towed from your

13   mother's driveway?

12:16:42  14   A.      That is nonsense.  I'll tell you what:  If it

15   got towed, I'm going to -- I'm going to ask Guido

16   Laorenzo that question.  I still have a cell phone

17   number for him.  But my --

12:16:49  18   Q.      What's his cell -- what's his cell phone

19   number?

12:16:52  20   A.      I don't know that he would like me giving it

21   out, but I'm sure that I do.

12:17:03  22   Q.      Your testimony is that Mr. Laorenzo took the

23   vehicle from your mother's house and dropped it off

24   at the Providence Police Department?

12:17:08  25   A.      My memory is that he had the vehicle.  He --

John J. Ryan - May 21, 2019

```
     1    I don't know that he personally did it, but he
     2    absolutely had the vehicle picked up.  I have no -- I
     3    put equipment in the trunk that I had that I was
     4    going to turn in because I was going out of town for
     5    the weekend.  I went up to -- I went down to the Cape
     6    to watch powerboat races and took my kids.
12:17:33  7             I'm sorry; I don't have his number.  I would
     8    have to track it down.
12:17:36  9    Q.      Does he still live in Providence?
12:17:38 10    A.      He doesn't live in Providence.
12:17:45 11    Q.      How far was the Providence Police Department
    12    from your mother's house in 2002?
12:17:51 13    A.      Three miles, four miles.
12:17:52 14    Q.      How long do you think it would have taken you
    15    to drop the car off?
12:17:58 16    A.      I would have had to get somebody else to
    17    follow me down and give me a ride.  That wasn't the
    18    issue.  The issue was convenience.
12:18:05 19    Q.      How long have you worked --
12:18:06 20    A.      This -- this -- this -- this stuff about --
    21    this is nonsense.  I mean, I've never heard this
    22    before about towing the car.  Like, this is new to
    23    me.
12:18:13 24    Q.      How long -- how long have you -- have you
    25    worked at the Providence Police Department before
```

John J. Ryan - May 21, 2019

|  |  |  |
|--|--|--|
| | 1 | retiring? |
| 12:18:15 | 2 | A.        20 years. |
| 12:18:17 | 3 | Q.        You had friends there, right? |
| 12:18:18 | 4 | A.        Of course. |
| 12:18:22 | 5 | Q.        Still have friends there? |
| 12:18:22 | 6 | A.        Of course. |
| 12:18:24 | 7 | Q.        You ever received a ride from any of your |
| | 8 | friends at the Providence Police Department? |
| 12:18:30 | 9 | A.        The point was, that's exactly what happened |
| | 10 | in this case.  That was exactly what happened.  I |
| | 11 | worked for Guido Laorenzo.  He was a friend of mine. |
| | 12 | There's no question. |
| 12:18:38 | 13 | And I said to him, "Hey, I'm going to leave |
| | 14 | the car at my mother's house.  Will you have somebody |
| | 15 | pick it up?"  "Absolutely."  I said, "I'm going to |
| | 16 | put the remaining equipment in the trunk so that I |
| | 17 | don't have to turn it in, because I'm going down to |
| | 18 | the Cape for the weekend." |
| 12:18:51 | 19 | And that's what happened.  I took my two sons |
| | 20 | and I went to Cape Cod, because they wanted to go to |
| | 21 | powerboat racing.  And we went down and watched |
| | 22 | offshore powerboat racing down on the Cape. |
| 12:19:00 | 23 | Q.        Sir, isn't it true that you called Lieutenant |
| | 24 | Cohen's voicemail to reveal that you were going to |
| | 25 | retire? |

**John J. Ryan - May 21, 2019**

12:19:07 1  A.      I called him to tell him that I wasn't coming

2  in on Monday, because Monday was my last technical

3  day, because I was down at the offshore powerboat

4  races.  That's a fact; I did call and leave that

5  message.

12:19:20 6  Q.      So you told Lt. Cohen you were retiring,

7  right?

12:19:23 8  A.      No.  He knew I was retiring.  Everybody knew

9  I was retiring.  They had signed my paperwork months

10  before.  He was the head of HR.

12:19:28 11  Q.      You didn't come in on your last day, right?

12:19:29 12  A.      On the Monday --

12:19:29 13  Q.      You didn't come --

12:19:31 14  A.      -- because I was down on the Cape.  That's

15  true.

12:19:34 16  Q.      You didn't return your police vehicle, right?

12:19:36 17  A.      No.  My police vehicle was already returned.

12:19:39 18  Q.      Somebody else got your police vehicle, right?

12:19:40 19  A.      I drove it home, and somebody picked it up.

20  That's absolutely true.

12:19:43 21  Q.      You -- sitting here today, you have no idea

22  as to how Guido Laorenzo had your car brought to the

23  Providence Police Department, correct?

12:19:55 24  A.      This is the first I've heard about it being

25  towed.  But he would have never done that.  There was

John J. Ryan - May 21, 2019

|  |  |  |
|--|--|--|
|  | 1 | no reason to do that.  He knew he was picking it up. |
| 12:19:58 | 2 | Q.      But you -- |
| 12:20:00 | 3 | A.      I -- I know for a fact that he picked the car |
|  | 4 | up.  I mean, I -- he had the car picked up.  This |
|  | 5 | towing business is -- is something new to me. |
| 12:20:06 | 6 | Q.      You weren't there when the car was taken |
|  | 7 | away, right? |
| 12:20:08 | 8 | A.      No, but I think my mother would have known if |
|  | 9 | a tow truck towed it out of the driveway. |
| 12:20:13 | 10 | Q.      Did your mother have a car in 2002? |
| 12:20:13 | 11 | A.      No. |
| 12:20:15 | 12 | Q.      Did it -- who else lived at your house in |
|  | 13 | 2002? |
| 12:20:23 | 14 | A.      That's it, my mother and me and my two kids. |
| 12:20:25 | 15 | Q.      You didn't sign any paperwork for your |
|  | 16 | retirement on June 5th, 2002, correct? |
| 12:20:32 | 17 | A.      No.  I signed it in March or April. |
| 12:20:35 | 18 | Q.      During that time, isn't it true that Major |
|  | 19 | Laorenzo authorized furlough time for you? |
| 12:20:40 | 20 | A.      No. |
| 12:20:42 | 21 | Q.      Did you ever get any furlough time at the end |
|  | 22 | before you retired? |
| 12:20:47 | 23 | A.      Oh, that was part of -- yeah.  No, no, no, I |
|  | 24 | -- I was on -- I -- they had to use up what time I |
|  | 25 | had left. |

John J. Ryan - May 21, 2019

| | |
|---|---|
| 12:20:51 | 1 |

12:20:51  1    Q.      How much time did they have left?

12:20:52  2    A.      But they always do that.  I don't know; it

3    was nine, ten days, whatever it was.  They have to --

4    they have to use up certain times that -- that you

5    can't carry with you.

12:21:04  6    Q.      You were never questioned by the Providence

7    Police Department regarding your involvement in the

8    promotion scheme, correct?

12:21:14  9    A.      Not once.  And -- and Sullivan was there for

10   18 months, could have brought me in in any day under

11   a Garrity.  I asked him to do it.  He announced it in

12   the newspaper three times, and it never happened.

12:22:32 13                   MR. SLOSAR:  Take a short break.

12:22:33 14                   THE VIDEOGRAPHER:  Going off the

15   record, time on the monitor is 12:22.

12:22:41 16                         (Recess.)

12:22:41 17            (Exhibit No. 17 was marked.)

12:29:52 18                   THE VIDEOGRAPHER:  We're back on the

19   record.  Time on the monitor is 12:29.

12:29:55 20    BY MR. SLOSAR:

12:29:57 21    Q.      Sir, I have just handed you what we have

22   marked as Exhibit No. 17.  And this is Ryan 30773 to

23   -74.

12:30:13 24            Can you -- do you recognize the first page of

25   this document, sir?

John J. Ryan - May 21, 2019

| | | |
|---|---|---|
| 12:30:17 | 1 | A.        I recognize the handwriting.  It's all mine. |
| 12:30:18 | 2 | Q.        And what is this document? |
| 12:30:20 | 3 | A.        This would have probably been on my last day |
| | 4 | that I -- I did the designation of beneficiaries. |
| 12:30:29 | 5 | Q.        And what day is this document signed? |
| 12:30:32 | 6 | A.        It's signed by me on June 5th, which would |
| | 7 | have been at the exit meeting.  And then if you |
| | 8 | notice, on the -- on the next page, I made my |
| | 9 | request.  And -- and that's not accurate.  I mean, it |
| | 10 | said May 28th.  I would have had to do -- I would |
| | 11 | have had to do my retirement months before this at |
| | 12 | the retirement board. |
| 12:30:55 | 13 | Q.        So you're saying that the Human Resource |
| | 14 | Bureau's documentation of when you requested for |
| | 15 | retirement is false? |
| 12:31:03 | 16 | A.        No.  I think it's -- I think it's probably |
| | 17 | the day they did their paperwork.  But remember that |
| | 18 | there's a city retirement board that you have to go |
| | 19 | through.  So we should have the documents.  I'm sure |
| | 20 | if you've got all these documents, you've probably |
| | 21 | got the city retirement board documents that would |
| | 22 | show that was done months before and that -- and that |
| 12:31:20 | 23 | Col. Sullivan signed off on it once before.  I don't |
| | 24 | know the exact date.  But these would have been |
| | 25 | documents that were prepared for my last day. |

**John J. Ryan - May 21, 2019**

12:31:32   1   Q.      According to the second page of this

2   document, it states that this request for retirement

3   was not received until June 17, 2002.  Is that right?

12:31:46   4   A.      Well, that's not -- that's not true.  This

5   document, I don't know who that -- who that is

6   received.  Look at the top.  It was made out on May

7   28th.

12:32:01   8   Q.      Whose initials are next to June 10th?

12:32:02   9   A.      No clue.

12:32:03  10   Q.      Are those yours?

12:32:04  11   A.      No.

12:32:09  12   Q.      What handwriting on this document is yours?

12:32:11  13   A.      The only thing is, that's definitely my

14   signature on the Respectfully Submitted part.

12:32:17  15   Q.      What date did you sign this?

12:32:19  16   A.      I don't have any idea.  I would think that I

17   signed it May 28th, the day it's dated.  And then

18   they -- they sort out -- you know, they sort out

19   dates as far as, you know, what they're going to show

20   as a retirement date.

12:32:34  21   Q.      Sir, prior to your retirement -- well, let me

22   withdraw that.

12:32:40  23          You retired prior to ever testifying or

24   giving any statements at a Garrity hearing, correct?

12:32:45  25   A.      I was never asked to give a statement at a

John J. Ryan - May 21, 2019

|  |  |  |
|--|--|--|
|  | 1 | Garrity hearing. |
| 12:32:49 | 2 | Q.    Prior to your retirement, you did not have to |
|  | 3 | participate in a Garrity hearing, correct? |
| 12:32:52 | 4 | A.    Right.  Because there was never an |
|  | 5 | investigation. |
| 12:32:57 | 6 | Q.    Sir, do you recall testifying in a wrongful |
|  | 7 | conviction lawsuit named Rodell Sanders versus City |
|  | 8 | of Chicago Heights? |
| 12:33:06 | 9 | A.    Yes. |
| 12:33:09 | 10 | Q.    You gave an opinion for the defendant in that |
|  | 11 | case, correct? |
| 12:33:15 | 12 | A.    I'm sure I did. |
| 12:33:18 | 13 | Q.    Were you aware that that case settled for |
| 12:33:21 | 14 | $15 million? |
| 12:33:23 | 15 | A.    No, I was not. |
| 12:33:26 | 16 | Q.    Were you aware that a number of your opinions |
|  | 17 | were barred from being introduced at the federal |
|  | 18 | trial? |
| 12:33:31 | 19 | A.    No.  I think I've read the decision after |
|  | 20 | somebody asked me about it, and I think I was -- I |
|  | 21 | was barred from rendering any legal opinions is my |
|  | 22 | recollection. |
| 12:33:40 | 23 | Q.    Sure.  You understand in this case, just like |
|  | 24 | Sanders, you're not allowed to testify as to whether |
|  | 25 | the officers had probable cause? |

**John J. Ryan - May 21, 2019**

| | | |
|---|---|---|
| 12:33:47 | 1 | MR. KELLEY:  Objection. |
| 12:33:48 | 2 | THE WITNESS:  That terminology, yes, I |
| | 3 | am. |
| 12:33:54 | 4 | And again, that -- that -- it -- that will |
| | 5 | depend on the judge.  Some judges do allow the expert |
| | 6 | to testify in the ultimate issue because the rule |
| | 7 | allows it.  So that's going to depend on the judge. |
| | 8 | If the judge says I can, then, obviously, I can. |
| | 9 | That will be up to you guys to argue about. |
| 12:34:07 | 10 | BY MR. SLOSAR: |
| 12:34:09 | 11 | Q.     Well, your report doesn't have an opinion as |
| | 12 | to whether the officers have probable cause, correct? |
| 12:34:13 | 13 | A.     My report has opinions as to whether they |
| | 14 | acted consistently with generally accepted |
| | 15 | practices. |
| 12:34:18 | 16 | Q.     That -- that wasn't my question.  My question |
| | 17 | was, does your report contain an opinion as to |
| | 18 | whether the officers had probable cause to initiate |
| | 19 | charges against the plaintiffs?  Yes or no? |
| 12:34:31 | 20 | A.     I'd have to look at it.  I don't think that |
| | 21 | the sheriff had anything to do with initiating |
| | 22 | charges, so it may not. |
| 12:34:55 | 23 | Q.     Ah, here it is.  I'll hand you what we'll |
| | 24 | mark as Exhibit 18.  I'm glad you've got your |
| | 25 | glasses, because that's the condensed version of your |

John J. Ryan - May 21, 2019

```
          1    November 23rd, 2015, deposition in Sanders versus

          2    Chicago Heights.

12:35:12  3         (The document was marked Exhibit No. 18.)

12:35:12  4              THE WITNESS:  Can I get a magnifying

          5    glass?  No, I'm --

12:35:22  6    BY MR. SLOSAR:

12:35:23  7    Q.     You can read it, right?

12:35:26  8    A.     Yeah.

12:35:30  9    Q.     If not, I'll lend you my glasses.

12:35:38 10         Sir, do you recall being deposed in Sanders

         11    versus Chicago Heights on November 23rd, 2015?

12:35:47 12    A.     You know, I recall being deposed.  I don't

         13    have any recollection of the date or any of that,

12:35:50 14    but --

12:35:52 15    Q.     In fact, I asked you questions that day,

         16    correct?

12:35:54 17    A.     Correct.

12:36:43 18    Q.     Sir, looking at Page 98, Page [sic] 21, were

         19    you asked this question, did you give this answer?

12:36:47 20    A.     I'm sorry, Page 98?

12:36:49 21    Q.     98.

12:36:49 22    A.     Okay.

12:36:55 23    Q.     "Do you recall what years that was?

12:36:57 24         "A.   The second time would have been the

         25    late 90s.  There was some spillover investigation
```

**John J. Ryan - May 21, 2019**

|  |  |  |
|---|---|---|
|  | 1 | that all of us were involved in when the mayor got |
|  | 2 | investigated.  Not a single officer -- to my |
|  | 3 | knowledge -- was ever a target or a subject of that |
|  | 4 | investigation. |
| 12:37:14 | 5 | "Were you a subject to that investigation? |
| 12:37:18 | 6 | "A.   Never a suspect or a target.  I was |
|  | 7 | specifically told I was not." |
| 12:37:21 | 8 | THE WITNESS:  Correct. |
| 12:37:21 | 9 | BY MR. SLOSAR: |
| 12:37:23 | 10 | Q.    Did you give those questions and were -- did |
|  | 11 | you -- were you asked those questions and did you |
|  | 12 | give that answer? |
| 12:37:27 | 13 | A.    Of course.  They are exactly the same |
|  | 14 | questions I was asked today and gave the same answer |
|  | 15 | today. |
| 12:37:34 | 16 | Q.    Sir, earlier today, you -- well, the 302 |
|  | 17 | report that you reviewed earlier documents that you |
|  | 18 | told the agent that you believed that you were a |
|  | 19 | target of the investigation at the time you concluded |
|  | 20 | your interview in 2000, correct? |
| 12:37:50 | 21 | A.    That's the words and the opinion of that |
|  | 22 | agent.  That's not something I ever said.  I was |
|  | 23 | specifically told I was not a target or a subject |
|  | 24 | throughout the whole thing.  So I don't know where he |
|  | 25 | is coming up with that from.  But he says a lot of |

John J. Ryan - May 21, 2019

```
          1   things in those 302s that aren't accurate.  They're
          2   -- they're twists of what was actually said.
12:38:11  3   Q.      If that FBI agent's report is true, would you
          4   have committed perjury in Sanders when you testified
          5   that you were never a suspect or a target?
12:38:20  6                   MR. KELLEY:  Objection.
12:38:21  7                   THE WITNESS:  Absolutely -- absolutely
          8   not, because it's not true.  And it's not material
          9   anyway.
12:38:23 10   BY MR. SLOSAR:
12:38:27 11   Q.      Isn't it true that officers in the Providence
         12   Police Department were subjects in the investigation
         13   being conducted by the FBI?
12:38:38 14   A.      To my knowledge, absolutely, positively not.
         15   I was never aware of any single officer being a
         16   target or a subject, and I was specifically told that
         17   I was not.  So I have absolutely zero knowledge of
         18   any officer that was a target or subject.  In fact,
         19   my knowledge is that nobody was.
12:39:41 20   Q.      Sir, on January 30th, 2004, the Providence
         21   Police Department completed a report relating to the
         22   allegations of misconduct that we have been
         23   discussing earlier today.  Have you reviewed that
         24   report?
12:39:51 25   A.      Again, I have not reviewed it in its
```

John J. Ryan - May 21, 2019

1    entirety.  I am not sure it's a Providence Police

2    Department report, because nobody signed the darned

3    thing.  It purports to be a Providence Police

4    Department report.  But I do agree that the date on

5    it is -- is 2004.

12:40:11  6    Q.      And you have that report before you as an

7    exhibit, correct?

12:40:13  8                MR. KELLEY:  When was that?  What

9    number was it?

12:40:17  10                MR. SLOSAR:  Stand by.  Stand by.

12:40:19  11                THE WITNESS:  Yes.  No. 13.

12:40:21  12                MR. KELLEY:  Okay.

12:40:21  13    BY MR. SLOSAR:

12:40:23  14    Q.      When were you first made aware of this

15    report?

12:40:28  16    A.      At a deposition.  I don't know which one it

17    was, but some years later at a deposition, somebody

18    presented this to me, and it was the first time I saw

19    it.  They did not give me a copy of it.

12:40:41  20    Q.      Sir, isn't it true that this report found

21    that the promotional procedures at the Providence

22    Police Department were corrupted by cheating,

23    collusion, and political influence?

12:40:52  24    A.      I have no idea what the opinions were of

25    anybody that wrote this report, and I don't have any

**John J. Ryan - May 21, 2019**

|        |    |                                                              |
|--------|----|--------------------------------------------------------------|
|        | 1  | idea who wrote this report.                                  |
| 12:40:59 | 2  | Q.     Do you agree that the promotional procedures        |
|        | 3  | at the Providence Police Department were corrupted by        |
|        | 4  | cheating, collusion, and political influence?                |
| 12:41:06 | 5  | A.     Not with respect to anything I had knowledge         |
|        | 6  | of, which was merely Kessler and Glancy.  No.                |
| 12:41:15 | 7  | Q.     I refer you to Page 56, sir.                         |
| 12:41:33 | 8  | A.     I'm sorry.  I'm having trouble finding it.           |
| 12:41:36 | 9  | Q.     56.  That's also 970.                                |
| 12:41:38 | 10 | A.     Okay.  I got it.  Yeah.                              |
| 12:41:41 | 11 | Q.     First paragraph.  Isn't it true that the            |
|        | 12 | report found that the promotional procedures at the          |
|        | 13 | Providence Police Department were corrupted by               |
|        | 14 | cheating, collusion, and political influence?                |
| 12:41:53 | 15 | A.     Yeah.  The report says that.  I don't know           |
|        | 16 | who wrote the report or whose opinion that is.               |
| 12:41:59 | 17 | Q.     Isn't it true that the report found that the         |
|        | 18 | former chief of police as well as certain individuals        |
|        | 19 | of his command staff desired to promote and place            |
|        | 20 | individuals of their choosing in command positions?          |
| 12:42:12 | 21 | A.     I have no idea what the chief of police's            |
|        | 22 | mindset was when he made that choice.  I certainly           |
|        | 23 | didn't have any influence over captains, zero.  And I        |
|        | 24 | will tell you that the only reason that what was done        |
|        | 25 | for Kessler was done was for the -- was for the legal        |

**John J. Ryan - May 21, 2019**

|  |  |  |
|--|--|--|
| | 1 | issues that were coming up with that particular case. |
| 12:42:31 | 2 | Q.     Did the report make that finding? |
| 12:42:34 | 3 | A.     Again, I don't know who wrote this report.  I |
| | 4 | see what it says on the page here.  The report speaks |
| | 5 | for itself. |
| 12:42:39 | 6 | Q.     Did it make that finding, yes or no? |
| 12:42:41 | 7 | A.     The report speaks for itself.  I mean, I'm |
| | 8 | not -- I'm not arguing with you.  It says that.  I |
| | 9 | don't even know who wrote this report.  Nobody had |
| | 10 | the nerve to even sign this report. |
| 12:42:53 | 11 | Q.     Isn't it true that political influence played |
| | 12 | a part in the selection of captains? |
| 12:43:00 | 13 | A.     Either political influence or the chief's |
| | 14 | influence.  The chief decided the captains.  Was I |
| | 15 | ever in a conversation that he had with the mayor |
| | 16 | where -- where the mayor got involved?  No, I was |
| | 17 | not. |
| 12:43:09 | 18 |        The chief definitely selected the captains |
| | 19 | through the oral board; there's no question about it. |
| | 20 | Now, was he influenced by politics?  He could very |
| | 21 | well have been. |
| 12:43:20 | 22 | Q.     Isn't it true that yourself had advance |
| | 23 | access to source documents and that you never |
| | 24 | reported this to any federal or state authorities? |
| 12:43:29 | 25 | A.     I don't know why I would.  There was nothing |

John J. Ryan - May 21, 2019

```
          1   illegal about it.  There was nothing to report.  And
          2   by the way, I didn't -- I didn't accept it.  So there
          3   was nothing to report.  There was no need to report
          4   it.  There's nothing illegal about this.
12:43:40  5   Q.      Well, the source documents that you provided
          6   to officers, you obviously had the access to those
          7   ones as well, correct?
12:43:45  8   A.      I had access to those.
12:43:47  9   Q.      You accepted those?
12:43:47 10   A.      Of course.
12:43:50 11   Q.      You requested those, correct?
12:43:52 12   A.      I am not sure that I requested the captain's
         13   one.  I requested the -- Kessler, the sergeant's one,
         14   yes.  I had every right to.  I was the boss of the
         15   administrative staff.
12:44:05 16   Q.      And these actions would have been in
         17   violation of the collective bargaining agreement by
         18   the administration of the Providence Police
         19   Department, correct?
12:44:13 20   A.      As we have already discussed, then as we
         21   pointed out in the context of testimony, only if the
         22   union was not involved.  Did it violate the letter of
         23   the contract?  Yes.  But did the union and
         24   administration make agreements to resolve grievances
         25   and legal issues with the promotions on a regular
```

John J. Ryan - May 21, 2019

basis?  Absolutely.  Was there anything illegal about
it?  Absolutely not.

12:44:47   Q.       Isn't it true that this report found that
corruption relating to testing was rampant because of
this, along with corroborating evidence, any
promotional testing that occurred during

12:44:59   Col. Prignano's tenure is open to criticism and
appears suspect?

12:45:05   A.       You know, again, does the words on the report
say that?  Yes.  Would you think that as the chief of
police when you concluded this investigation,
assuming the chief saw this investigation -- we don't
know, because nobody signed it -- wouldn't you think
that he'd put people up on charges and get results?
Yes.  Were there any results?  No, not a single
person, not a single person was ever disciplined for
the promotional process.  Two were put up on charges.
They were not found guilty of anything related to
the -- to the testing process.  One of them, Rhonda
Kessler, lied, and she was found guilty of lying and
demoted.  The other one was found guilty by a Bill of
Rights panel, and it was overturned by the Rhode
Island Superior Court.

12:45:51   Q.       Sir, on Page 58 of this report, second
paragraph --

**John J. Ryan - May 21, 2019**

| | | |
|---|---|---|
| 12:45:52 | 1 | A.        What page? |
| 12:45:57 | 2 | Q.        58, the epilogue, second sentence, the second |
| | 3 | paragraph.  Well -- |
| 12:46:06 | 4 | A.        I'm sorry; I went too far.  Stand by. |
| 12:46:07 | 5 | Q.        Let's start with the first sentence in the |
| | 6 | second paragraph.  Do you see where it says, "During |
| | 7 | the course of this investigation, the investigative |
| | 8 | team pursued numerous avenues for potential |
| | 9 | prosecution criminally, as well as civilly.  These |
| | 10 | avenues included reopening the FBI investigation into |
| | 11 | potential improprieties committed by Captain John |
| | 12 | Ryan"? |
| 12:46:27 | 13 | A.        Absolutely.  I see that it says that. |
| 12:46:29 | 14 | Q.        Prior to today have you ever seen this? |
| 12:46:31 | 15 | A.        I don't think I have ever seen that |
| | 16 | particular epilogue, no. |
| 12:46:36 | 17 | Q.        Have you ever -- do you see where it says, |
| | 18 | "These potential improprieties included, but were not |
| | 19 | limited to, conspiracy to use the mail to assist John |
| | 20 | Glancy and Rhonda Kessler in obtaining money under |
| | 21 | false pretenses"? |
| 12:46:49 | 22 | A.        Yeah.  I'm not sure exactly what that means, |
| | 23 | but I do see that it says that. |
| 12:46:55 | 24 | Q.        According to this report, the FBI |
| | 25 | investigation was reopened to investigate you for |

John J. Ryan - May 21, 2019

|       |    |                                                                        |
|-------|----|------------------------------------------------------------------------|
|       | 1  | potential conspiracy to use mail fraud.                                |
| 12:47:05 | 2  | MR. KELLEY:  Objection, that question.                           |
| 12:47:06 | 3  | THE WITNESS:  Again, I guess we know                             |
|       | 4  | the outcome.  I was never charged.  So obviously,                      |
|       | 5  | there was a conclusion.                                                |
| 12:47:09 | 6  | BY MR. SLOSAR:                                                    |
| 12:47:12 | 7  | Q.      But prior to today, were you aware that the              |
|       | 8  | FBI investigated you for conspiracy to commit mail                     |
|       | 9  | fraud?                                                                  |
| 12:47:19 | 10 | A.      I don't even believe that's true, to be quite           |
|       | 11 | honest with you.  I don't believe any of this is                       |
|       | 12 | true.                                                                  |
| 12:47:24 | 13 | Q.      Isn't it true that state or federal                     |
|       | 14 | authorities investigated you for the purchase of a                     |
|       | 15 | vehicle from Mr. Autiello?                                             |
| 12:47:30 | 16 | A.      I don't believe that's true, either.                    |
| 12:47:32 | 17 | Q.      Well, the FBI certainly questioned you about            |
|       | 18 | that, correct?                                                        |
| 12:47:35 | 19 | A.      They did question me about it, but that                 |
|       | 20 | was -- I was not a target or a subject, never got a                    |
|       | 21 | target letter, never was a subject.  It was made very                  |
|       | 22 | clear to me.  So to say investigate me, I think                        |
|       | 23 | that's incorrect.  They investigated the situation,                    |
|       | 24 | but I think they were investigating Mr. Autiello, not                  |
|       | 25 | investigating me, because I was not a target or a                      |

**John J. Ryan - May 21, 2019**

1    subject.

12:47:57  2    Q.        Prior to today, you had seen the February

3    2003 letter from the DOJ declining prosecution,

4    correct?

12:48:06  5    A.        You know, I -- I would have to see it again,

6    but I think I was shown that.  And it might even be

7    something you showed me today.

12:49:00  8    Q.        Sir, I'm going to refer you to Ryan 1001, the

9    Bates number.  Let me know when you get there.

12:49:29  10         Have you ever reviewed a memo from William

11   Ferland, the assistant attorney general --

12:49:34  12   A.        I'm sorry; I'm having trouble because of the

13   two-sided pages.

12:49:38  14   Q.        -- to Sheldon Whitehouse, the Attorney

15   General of Rhode Island, that was sent on June 11,

16   2002?  Have you ever seen this prior to today?

12:49:48  17   A.        No.  I don't -- and again, if I did, I don't

18   remember it.  I don't know that it has ever been

19   presented to me before.  It doesn't look familiar.

12:49:56  20   Q.        Looking at 1002, do you see the second

21   paragraph where it says --

12:49:59  22   A.        Well, let me -- let me finish 1001 first.

23   Well, I don't know why I'm having trouble here.

12:51:04  24   Q.        Are you on those pages, sir?

12:51:07  25   A.        I'm on 1002.  So go ahead.

John J. Ryan - May 21, 2019

| | |
|---|---|
| 12:51:13 | 1 |

12:51:13   1    Q.       Were you aware that the Rhode Island Attorney

2    General was investigating you and Mr. Prignano for

3    the promotional issues?

12:51:22   4    A.       I'm -- you know, I have been reading this,

5    and I'm not sure it even says that.  It says they

6    were trying to do an investigation to determine who

7    was there, still there, and -- and all of that.  And

8    it's interesting, this I know for a fact, because I

9    was told by an attorney, that -- that the -- they did

10   go after one officer, Lou Perrota.  They wanted to

11   make a claim that -- that he had cheated on the exam

12   and that he obtained money under false pretenses,

13   which I see what is what they're going after here in

14   the beginning.

12:51:53   15        And the -- one of the justices of the Rhode

16   Island Supreme Court actually laughed at them and

17   said that was never -- there's -- he acted as a

18   sergeant, so there's no obtaining money under false

19   pretenses and told him there's no criminal act there.

20   So I mean, I -- I don't know what this is about.  I

21   mean, you're going to have to ask a specific

22   question.

12:52:13   23   Q.       Were you aware that the Rhode Island Attorney

24   General was conducting a criminal investigation into

25   the promotion scheme at the Rhode Island Police

John J. Ryan - May 21, 2019

1   Department -- or the Providence Police Department?

12:52:27  2   A.        Again, I knew they were conducting --

3   obviously, I went to the grand jury.  I don't think

4   they ever identified any targets or subject.  I have

5   never seen this letter before.  I don't know what

6   Billy Ferland is thinking about.  But again, I -- I

7   don't -- I have no idea.

12:52:52  8   Q.        I've got a highlighted version that I'll just

9   substitute out at the conclusion of the deposition.

10   But it's Bates stamped Ryan 279 to 280.

12:53:10  11        Sir, have you seen this August 6th, 2003,

12   correspondence from First Assistant U.S. Attorney

13   Craig Moore to Col. Esserman prior to today's date?

12:53:29  14        (The document was marked Exhibit No. 19.)

12:53:42  15        THE WITNESS: I have seen this before,

16   yeah.

12:53:42  17   BY MR. SLOSAR:

12:53:47  18   Q.        According to the first page of that document,

19   did the federal authorities indicate that they would

20   not pursue prosecution of the promotional examination

21   scheme due to the statute of limitations?

12:54:03  22   A.        That's what this letter in 2003 says.  But

23   think about this.  I mean, this is -- this is the

24   reopening of an investigation they already did and

25   had already decided not to prosecute, apparently,

John J. Ryan - May 21, 2019

```
          1   because -- because they had the information back in

          2   the 2000s, as you have gone through all those 302s

          3   with me and spent hours going through 302s, so, yeah,

          4   absolutely.  And I know you're doing your job, but I

          5   also know no judge has ever allowed this in and is

          6   not going to allow this in.

12:54:28  7   Q.     Sir, are you the judge in this case?

12:54:29  8   A.     I'm not.  But it's -- but -- but I am

          9   familiar with the rules of evidence.

12:54:43 10   Q.     Well, we will see what happens.

12:54:44 11   A.     We will.

12:54:50 12   Q.     Prior to this case, you have never been

         13   provided with the quantity of documents that I have

         14   gone through with you today from the federal

         15   investigation, correct?

12:55:04 16   A.     I have been piecemealed, some of it.  I have

         17   seen 302s.  I'm sure there is attorneys that have

         18   Dropboxes full of these 302s.  I'm not sure that --

         19   and I know that there are certain groups that have

         20   Dropboxes of these 302s.  So yeah, I mean, I think

         21   probably there are people that have it.  But most of

         22   the attorneys don't even spend this kind of time on

         23   it because they know the rules of evidence.

12:55:27 24   Q.     Well, we happen to believe that your

         25   credibility is important, Mr. Ryan.
```

**John J. Ryan - May 21, 2019**

12:55:31  1   A.        I don't think there's anything that

2   impinges -- impeaches my credibility in any of this,

3   because there's no wrongdoing.   There's no wrongdoing

4   ever found --

12:55:37  5   Q.        Sir, you testified --

12:55:39  6   A.        -- and there was no wrongdoing in any of it.

12:55:41  7   Q.        -- you testified today that you never

8   believed that you were the subject or target of a

9   criminal investigation, correct?

12:55:48 10   A.        Not never believed.   I was told that.   I was

11   told that by both the FBI and the U.S. attorney, and

12   I was told specifically by Peter Nerohna, the

13   prosecuting attorney for the Attorney General's

14   Office, that there was no target or subject named in

15   the -- in the state investigation.   So yes,

16   absolutely.

12:56:07 17   Q.        And -- and it's your testimony -- well, did

18   you -- and during your employment at the Providence

19   Police Department, did you ever take any action that

20   you believed could subject you to criminal

21   prosecution?

12:56:20 22   A.        No.   None.

12:56:21 23   Q.        Did you ever --

12:56:21 24   A.        Zero.

12:56:28 25   Q.        -- knowingly violate any criminal laws as a

**John J. Ryan - May 21, 2019**

```
         1    Providence police officer?
12:56:34 2    A.      Absolutely not, never.
12:56:37 3    Q.      Sir, when did you become an attorney?
12:56:43 4    A.      I became an attorney in 1994.
12:56:51 5    Q.      Is it fair to say that by 2000 you were
         6    trained on the constitutional rights of individuals
         7    that you would question in an investigation?
12:57:03 8    A.      Of course.
12:57:11 9    Q.      By 2000, you had a decent understanding of
        10    what the invocation of the Fifth Amendment meant?
12:57:16 11   A.      Of course.
12:57:19 12   Q.      And by 2000, you understood that you could
        13    only assert the Fifth Amendment if you had a belief
        14    that truthful testimony could subject you to criminal
        15    prosecution, correct?
12:57:33 16   A.      If you had a belief that you were exposed to
        17    criminal prosecution even by an overzealous
        18    prosecutor.
12:57:36 19   Q.      Yes.
12:57:37 20   A.      Yeah, sure, of course.
12:57:41 21   Q.      And you understood that in February of 2003,
        22    when you testified before the grand jury in Rhode
        23    Island, correct?
12:57:50 24   A.      Of course.  Under the advice of counsel and
        25    certainly even with the -- with the agreement of
```

**John J. Ryan - May 21, 2019**

|          |    |                                                      |
|----------|----|------------------------------------------------------|
|          | 1  | Peter Nerohna.  Absolutely.                          |
| 12:57:59 | 2  | Q.     Sir, I'm handing you what we'll mark as       |
|          | 3  | Exhibit No. 21.                                      |
| 12:58:03 | 4  |        (The document was marked Exhibit No. 21.)     |
| 12:58:03 | 5  | BY MR. SLOSAR:                                        |
| 12:58:05 | 6  | Q.     It's your grand jury testimony from February  |
|          | 7  | 11, 2003.                                            |
| 12:58:12 | 8  | A.     Okay.                                          |
| 12:58:12 | 9  |              MR. KELLEY:  It's 21?                    |
| 12:58:14 | 10 |              MR. SLOSAR:  Yes.                        |
| 12:58:15 | 11 |              MR. KELLEY:  I must have missed one.     |
| 12:58:15 | 12 | BY MR. SLOSAR:                                        |
| 12:58:18 | 13 | Q.     Sir, after leaving the Providence Police      |
|          | 14 | Department, you were eventually called to testify    |
|          | 15 | before a grand jury in Rhode Island, correct?        |
| 12:58:27 | 16 | A.     I don't know why.  I thought I was still on   |
|          | 17 | the police department, so I went back to check the   |
|          | 18 | date.                                                |
| 12:58:31 | 19 |        Yes, absolutely.                               |
| 12:58:34 | 20 | Q.     In fact, you were called to testify in       |
|          | 21 | February 11, 2003, correct?                          |
| 12:58:38 | 22 | A.     Correct.                                       |
| 12:58:40 | 23 | Q.     Sir, when asked whether you intended to      |
|          | 24 | invoke your Fifth Amendment right against self       |
|          | 25 | incrimination, in response to any questions relating |

**John J. Ryan - May 21, 2019**

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | to your involvement in the Providence Police                 |
|       | 2  | Department's examinations, you testified that you            |
|       | 3  | intended to exercise your constitutional rights,             |
|       | 4  | correct?                                                     |
| 12:58:59 | 5  | A.        Where are we pointing to?                        |
| 12:59:01 | 6  | Q.        Sure.                                            |
| 12:59:03 | 7  | MR. KELLEY:  Back page.                                     |
| 12:59:13 | 8  | MR. SLOSAR:  Page 38 to 39.                                 |
| 12:59:16 | 9  | THE WITNESS:  Yes.                                          |
| 12:59:16 | 10 | BY MR. SLOSAR:                                              |
| 12:59:19 | 11 | Q.        In fact, on February 11, 2003, you refused to   |
|       | 12 | testify before the grand jury and invoked your Fifth         |
|       | 13 | Amendment constitutional rights for fear that               |
|       | 14 | truthful testimony may subject you to criminal              |
|       | 15 | prosecution?                                                 |
| 12:59:32 | 16 | A.        No.  That's not entirely accurate.  I did so    |
|       | 17 | under the advice of counsel, because as you know,           |
|       | 18 | it's pretty easy to get an indictment.  In fact, you        |
|       | 19 | know the terminology:  You can indict a ham sandwich.        |
|       | 20 | And my attorney felt that we would not offer any            |
|       | 21 | testimony.                                                   |
| 12:59:48 | 22 | However, we had a very nice conversation with              |
|       | 23 | Peter Nerohna, who is a very nice guy, who made it          |
|       | 24 | clear that I was not a target or not a subject.  He         |
|       | 25 | didn't know who the targets or subjects were going to       |

John J. Ryan - May 21, 2019

```
 1   be or if there were going to be any.  And we offered
 2   to come back should they make a determination as to
 3   who the targets or subjects would be.  We were never
 4   called back, and -- and it's pretty clear that the
 5   grand jury concluded that there was no criminal
 6   wrongdoing by anybody in that.
 7        My understanding is, there's a letter to that
 8   effect, which you probably have in all those
 9   documents.
10             MR. KELLEY:  Can you -- are you -- are
11   you sure this is 21?  I think it's 20, I think.
12   Because 19 was the letter from -- 19 was this letter.
13             MR. SLOSAR:  Maybe it is.
14             MR. KELLEY:  I just want to make sure I
15   wasn't sleeping during No. 20.
16             MR. SLOSAR:  All right.  We will mark
17   this Exhibit 20.  My apologies for that.
18             MR. KELLEY:  No problem.
19      (Exhibit No. 21 was remarked as Exhibit No. 20.)
20             MR. SLOSAR:  Bear with me one moment.
21   Bear with me one minute.  I'm trying to get an
22   exhibit.
23             MR. KELLEY:  Sure.
24             THE WITNESS:  Mind if I run to the
25   men's restroom while you're doing that?
```

John J. Ryan - May 21, 2019

| | | |
|---|---|---|
| 13:02:20 | 1 | MR. SLOSAR:  Yes.  That's totally fine. |
| 13:02:21 | 2 | THE VIDEOGRAPHER:  Going off the |
| | 3 | record, time on the monitor is 13:01. |
| 13:02:25 | 4 | (Recess.) |
| 13:10:48 | 5 | THE VIDEOGRAPHER:  Back on the record. |
| | 6 | Time on the monitor is 13:10. |
| 13:10:51 | 7 | BY MR. SLOSAR: |
| 13:10:53 | 8 | Q.    I am going to leave a little bit of gap in |
| | 9 | the exhibits.  I believe we finished on 20.  Exhibit |
| | 10 | 21 is going to be grand jury audio from February 11, |
| | 11 | 2003.  It's the testimony from Mr. Ryan. |
| 13:11:11 | 12 | (The recording was designated to be Exhibit No. 21.) |
| 13:11:14 | 13 | MR. SLOSAR:  Exhibit No. 22 will be |
| | 14 | Mr. Ryan's deposition testimony in the Young case on |
| | 15 | June 26, 2002. |
| 13:11:25 | 16 | (The document was marked Exhibit No. 22.) |
| 13:11:27 | 17 | MR. KELLEY:  Are there two separate |
| | 18 | depositions? |
| 13:11:28 | 19 | MR. SLOSAR:  There are. |
| 13:11:32 | 20 | MR. KELLEY:  Oh, obviously.  Okay. |
| 13:11:32 | 21 | BY MR. SLOSAR: |
| 13:11:47 | 22 | Q.    Sir, you recall testifying twice in that |
| | 23 | case, correct? |
| 13:11:51 | 24 | A.    Correct.  And actually, this is just a couple |
| | 25 | of weeks after I retired when they couldn't find me, |

John J. Ryan - May 21, 2019

|  | 1 | apparently. |
| 13:12:02 | 2 | Q.      By then, your police car had already been |
|  | 3 | seized, correct? |
| 13:12:04 | 4 | A.      Let me tell you something.  That is such |
|  | 5 | nonsense, that's the first I have ever heard of that. |
|  | 6 | And it's such nonsense, it's ridiculous that it would |
|  | 7 | even be stated that way by anybody. |
| 13:12:11 | 8 | Q.      You didn't drop it off -- |
| 13:12:13 | 9 | A.      I don't own the police car. |
| 13:12:14 | 10 | Q.      You didn't drop off the police car, correct? |
| 13:12:16 | 11 | A.      Well, I could have gotten a ride home from |
|  | 12 | work that day.  Instead, the major said, "Drive the |
|  | 13 | car home and I'll have somebody pick it up."  I mean, |
|  | 14 | it's six of one, half dozen of the other. |
| 13:12:22 | 15 | Q.      Who is the major who told you that? |
| 13:12:24 | 16 | A.      Laorenzo.  That's who I worked for at the |
|  | 17 | time.  And it would be ridiculous to tow when you've |
|  | 18 | got keys to it. |
| 13:12:34 | 19 | Q.      Sir, was it a generally accepted practice in |
|  | 20 | the Providence Police Department for the appointment |
|  | 21 | of supervisors to be politically enabled? |
| 13:12:41 | 22 | A.      I don't know what you're talking about. |
|  | 23 | You'll have to point me at something. |
| 13:12:44 | 24 | Q.      I'm asking you. |
| 13:12:45 | 25 | A.      I don't know what you mean by "politically |

**John J. Ryan - May 21, 2019**

```
          1    enabled."
13:12:51  2    Q.      Well, either through suggestions from the
          3    mayor, donations to the mayor, any sort of
          4    political -- was the -- was it a generally accepted
          5    practice in the Providence Police Department for the
          6    appointment of supervisors to have some sort of
          7    political enabling?
13:13:11  8    A.      Again, I'm not understanding the term
          9    "political enabling."  Are you talking about with
         10    respect to being promoted?
13:13:15 11    Q.      Yes.
13:13:17 12    A.      Okay.  So I think I have already testified
         13    with respect to captain.  No one ever told you you
         14    have to.  There's no question that the chief of
         15    police directed that oral board who to promote.
13:13:32 16    Q.      Sure.
13:13:33 17    A.      There's no question about that.  So if you
         18    want to call that political enabling by the chief of
         19    police, yes.
13:13:39 20    Q.      My -- my question to you is different.  Was
         21    it a generally accepted practice in the Providence
         22    Police Department for the appointment or promotion of
         23    captains to be politically enabled?
13:13:51 24    A.      And again, I can only tell you what my
         25    understanding is.  And this is my memory from 20
```

1    years later, right?

13:13:59  2         My understanding is that the chief of police

3    directed -- and some of this maybe I learned after

4    the fact -- directed that oral board, because there's

5    grand jury testimony to that effect that I have been

6    shown at -- at depositions.  And all of that was done

7    by the chief of police.

13:14:13  8    Q.      Sir, I'm going to --

13:14:14  9    A.      Was the mayor directed -- directing the chief

10    of police?  Quite possibly.

13:14:21 11    Q.      I'm going to point you to Exhibit 7, Page 65.

12    Perhaps after reviewing that, you'll answer my actual

13    question --

13:14:26 14    A.      I've got to go back.

13:14:28 15    Q.      -- which is --

13:14:35 16    A.      What page are we on?

13:14:45 17    Q.      65.  65, 12 through 20.  Were you asked this

18    question, did you give this answer?

13:14:50 19         "Q.  Is there anything different about

20    Providence that enabled politically appointed

21    supervisors to engender respect through the chain of

22    command?

13:14:59 23         "A.  I think it was such a generally

24    accepted practice in the Providence Police Department

25    for so long that nobody really challenged that

John J. Ryan - May 21, 2019

```
          1    authority."

13:15:07  2    A.       Okay.

13:15:08  3    Q.       Were you asked that question and gave that

          4    answer?

13:15:10  5    A.       That's a very different question.  It would

          6    -- that talks about --

13:15:11  7    Q.       Did you testify?

13:15:13  8    A.       That talks about respect of the command

          9    structure.

13:15:18  10   Q.       Did you testify in 2003 that it was a

          11   generally accepted practice in the Providence Police

          12   Department --

13:15:26  13            MR. KELLEY:  Will you let him answer?

13:15:26  14   BY MR. SLOSAR:

13:15:28  15   Q.       -- for the appointment of supervisors to be

          16   politically enabled?

13:15:32  17   A.       Again, I don't -- I don't know where you're

          18   coming up with this term "politically enabled."

13:15:35  19   Q.       The question says --

13:15:37  20   A.       But this is about the authority, whether or

          21   not that it -- it was a problem with the chain of

          22   command, because there was a political bent to

          23   appointing captains.

13:15:43  24   Q.       Sure.

13:15:46  25   A.       And my answer was, no, there was no problem,
```

John J. Ryan - May 21, 2019

1    because it was a generally accepted practice for

2    years.  Captains were appointed.  The union was

3    involved in the appointment, the -- the -- the

4    administration was involved in the appointment.

5    Everyone was involved.

13:15:58   6            I will tell you that the union president told

7    me on the first test that he was going to appoint

8    Billy Campbell because he was going to have one of

9    the picks.  So even the union was involved in this.

13:16:07   10           And there's no civil service.  This is a

11   creature of the union and the administration.  So

12   that's how they chose to do it.  It came up at union

13   meetings for years, long before Barney was chief of

14   police.  I mean, this is -- this is something, this

15   was the -- this was what -- how you got promoted to

16   the rank of captain in the Providence Police

17   Department.

13:16:25   18           Was it political?  I can't even answer that,

19   because I don't know what the mayor said to Barney.

20   It could be that the chief of police was just picking

21   based on what he saw as merit.

13:16:39   22   Q.       Will you agree that the system that was in

23   place for promoting captains at the Providence Police

24   Department at the time you retired and prior to that

25   was contrary to written policies and procedures for

**John J. Ryan - May 21, 2019**

```
         1    the promotion of captains?

13:16:55  2    A.      It was certainly contrary from the standpoint

         3    of the test didn't mean anything.  It meant zero,

         4    even though it was supposed to be 35 percent.

         5    Because what would happen is, the chief would direct

         6    the oral board that he appointed from the Providence

         7    Police Department, so his people, his command staff,

         8    he would direct them who would come out of that oral

         9    board.  So I will tell you that for -- and -- and use

        10    myself as an example.

13:17:22 11    Q.      The promotion of captains at the Providence

        12    Police Department was -- at the time you retired was

        13    contrary to the written policies and procedures for

        14    promotions, correct?

13:17:30 15    A.      No, that's not correct.  If I said that

        16    before, that's incorrect.

13:17:32 17    Q.      Sir --

13:17:34 18    A.      It would be contrary to the written contract.

13:17:34 19    Q.      Sir --

13:17:35 20    A.      Not the policies and procedures.

13:17:41 21    Q.      I'm going to ask that you turn to Page 68,

        22    Lines --

13:17:48 23    A.      Which -- which document?  22 or 7 or what?

13:17:55 24    Q.      This is -- we're still on -- we're still on

        25    7.
```

John J. Ryan - May 21, 2019

| | |
|---|---|
| 13:17:57 | 1 | A.      On what?  I'm sorry. |
| 13:17:58 | 2 | Q.      7.  68 -- |
| 13:17:59 | 3 | A.      On 7. |
| 13:18:03 | 4 | Q.      -- Lines 15 through 21.  Let me know when you |
| | 5 | get there. |
| 13:18:07 | 6 | A.      68? |
| 13:18:21 | 7 | Q.      Page 68.  Are you there? |
| 13:18:24 | 8 | A.      No, I'm getting confused because of the |
| | 9 | double pages.  All right. |
| 13:18:29 | 10 | Q.      Were you asked this question and did you get |
| | 11 | this answer? |
| 13:18:34 | 12 |         "Okay.  Would you agree that the system that |
| | 13 | was in place for promoting captains and majors at |
| | 14 | Providence Police Department at the time that you |
| | 15 | retired and prior to that was contrary to written |
| | 16 | policy and procedure for promotions? |
| 13:18:51 | 17 |         "A.   With respect to captains, yes, not with |
| | 18 | respect to majors." |
| 13:18:53 | 19 | A.      It's the same -- it's the same answer I just |
| | 20 | gave.  Understand there's nothing in policy and |
| | 21 | procedure related to promoting anybody.  It was in |
| | 22 | the contract. |
| 13:19:01 | 23 | Q.      You didn't testify to that effect, correct? |
| 13:19:03 | 24 | A.      No.  It -- and again, it's just -- but -- but |
| | 25 | it was in the contract, it's not in the -- it's |

John J. Ryan - May 21, 2019

```
13:19:05   1    not -- there's no --

13:19:05   2    Q.       You testified --

13:19:07   3    A.       -- there's no policy and procedure per se.

13:19:08   4    Q.       You test- --

13:19:11   5    A.       I read this to mean, was it inconsistent with

           6    the written word?  And yes, it was.

13:19:17   7    Q.       Assuming that people were being promoted

           8    based on political contributions, that would be

           9    contrary to the generally accepted police practices

          10    at the time, correct?

13:19:27  11                    MR. KELLEY:  Object.  Objection.

13:19:28  12                    THE WITNESS:  If they're doing it just

          13    on -- on contributions, of course.

13:19:32  14    BY MR. SLOSAR:

13:19:55  15    Q.       Even if the promotions were based in part on

          16    political contributions, that too would still be

          17    contrary to the generally accepted police practices

          18    at the time?

13:20:04  19                    MR. KELLEY:  Objection.

13:20:04  20                    THE WITNESS:  Correct.

13:20:04  21    BY MR. SLOSAR:

13:20:05  22    Q.       Correct?

13:20:07  23    A.       They shouldn't have been based on

          24    contribution at all.

13:20:11  25    Q.       Will you agree that training is a
```

**John J. Ryan - May 21, 2019**

|       |    |                                                       |
|-------|----|-------------------------------------------------------|
|       | 1  | multi-tiered process?                                 |
| 13:20:13 | 2  | A.      Of course.                                 |
| 13:20:16 | 3  | Q.      For example, in order to ensure that officers |
|       | 4  | are properly trained, you have to first ensure that   |
|       | 5  | there's clear policies and procedures?  Second, that  |
|       | 6  | they're properly trained in those policies and        |
|       | 7  | procedures?  And third, that they're properly         |
|       | 8  | supervised on those policies and procedures?          |
| 13:20:31 | 9  | A.      Of course.                                 |
| 13:20:35 | 10 | Q.      In order for a department to determine that a  |
|       | 11 | policy or procedure is operational, those three       |
|       | 12 | things have to happen, correct?                       |
| 13:20:43 | 13 | A.      Of course.  You can't hold somebody        |
|       | 14 | responsible for a policy they don't know.  You can't  |
|       | 15 | ask a supervisor to enforce a policy that they don't  |
|       | 16 | know.  So of course.                                  |
| 13:20:52 | 17 | Q.      And there's a variety of ways the department   |
|       | 18 | can determine whether or not a policy has become      |
|       | 19 | operational, correct?                                 |
| 13:21:02 | 20 | A.      I mean, the easiest way is to just audit   |
|       | 21 | operations.                                           |
| 13:21:04 | 22 | Q.      Well, there's -- a department could do     |
|       | 23 | testing, correct?                                     |
| 13:21:09 | 24 | A.      Yeah.  We don't see too many departments   |
|       | 25 | doing that.  We see more of the auditing of           |

John J. Ryan - May 21, 2019

1    operations.

13:21:14   2    Q.      Department could do an evaluation of

3    performance, correct?

13:21:17   4    A.      Yeah.  They don't do them very well.  That's

5    not a good practice in law enforcement.  We don't do

6    that very well.

13:21:21   7    Q.      Department -- departments can do statistics

8    on how officers are acting on a broader scale,

9    correct?

13:21:27  10    A.      They can look at an overall picture, sure.

13:21:30  11    Q.      Department could interview supervisors,

12    correct?

13:21:33  13    A.      They could.

13:21:35  14    Q.      Department could observe supervisors,

15    correct?

13:21:39  16    A.      Well, I think you can observe supervisors,

17    employees.  That's -- that's, you know,

18    doing -- doing hands-on performance evaluation.

13:21:47  19    Q.      Would you agree that it is and always has

20    been the responsibility of the Providence Police

21    Department to create policies on critical tasks?

13:21:57  22    A.      Say that again.

13:22:00  23    Q.      Would you agree that it -- that it is and it

24    has always been, to your knowledge, the

25    responsibility of the Providence Police Department to

John J. Ryan - May 21, 2019

1    create clear policies and procedures on critical

2    tasks?

13:22:12   3    A.      Well, it would be the responsibility of the

4    Commissioner of Public Safety, but, yeah, of course.

5    I mean, the City would have that responsibility, but

6    it would be the Commissioner of Public Safety.

13:22:21   7    Q.      Would you agree that as an expert, one of the

8    things you rely upon as your experience at the

9    Providence Police Department, to evaluate other

10   departments and other police officers?

13:22:32   11   A.      Certainly, you always rely on your police

12   experience as an expert.

13:22:35   13   Q.      Would -- would you agree that adequate

14   supervision is critical to insuring that

15   constitutional rights are protected?

13:22:44   16   A.      Or proper training and action.  I mean, you

17   know, I mean, certainly we have situations and --

18   and, you know, use myself, as a young cop, we had no

19   supervision yet.  We were not violating people's

20   rights.  But obviously --

13:22:54   21   Q.      Sure.

13:22:57   22   A.      -- it makes it a lot easier with proper

23   supervision.

13:23:00   24   Q.      But even if adequate training is given

25   without proper supervision, things could go wrong,

John J. Ryan - May 21, 2019

|       |    |                                                       |
|-------|----|-------------------------------------------------------|
|       | 1  | correct?                                              |
| 13:23:08 | 2  | A.      Things can go wrong even with proper       |
|       | 3  | supervision.                                          |
| 13:23:12 | 4  | Q.      Would you agree that adequate supervision  |
|       | 5  | requires consistent comprehensive training on the     |
|       | 6  | policies and procedures in place?                     |
| 13:23:20 | 7  | A.      Not all policies and procedures.  You know, I |
|       | 8  | have trained for years now, and this isn't in place   |
|       | 9  | everywhere in the country.  It's probably not the     |
|       | 10 | generally accepted practice.  But certainly high-risk  |
|       | 11 | critical tasks should be trained on a regular basis.  |
| 13:23:34 | 12 | Q.      And I'll refer you to Page 30 of your      |
|       | 13 | deposition.  This is still Exhibit 7.                 |
| 13:23:56 | 14 | MR. KELLEY:  This is Young 2; is that              |
|       | 15 | correct?                                              |
| 13:23:57 | 16 | MR. SLOSAR:  Yes.                                  |
| 13:24:00 | 17 | THE WITNESS:  Yeah, this is from 16               |
|       | 18 | years ago.  Go ahead.                                 |
| 13:24:05 | 19 | BY MR. SLOSAR:                                        |
| 13:24:26 | 20 | Q.      At that deposition, on Page 31, Lines 14   |
|       | 21 | through 16, were you asked, "Then after that,         |
|       | 22 | day-to-day supervision to ensure that" --            |
| 13:24:33 | 23 | A.      Wait a minute.  You changed.  I thought you |
|       | 24 | were on Page 30.                                      |
| 13:24:37 | 25 | Q.      Yeah, sorry, 31, 14 through 16.  Were you   |

John J. Ryan - May 21, 2019

1       asked this question, did you give this answer?

13:24:42  2              "Then after that, day-to-day supervision to

3       ensure that the policies and training are being

4       followed?

13:24:45  5              "A.  Yes.

13:24:47  6       A.      I'm sorry.  I'm having trouble following

7       these double pages.  Is there any -- go ahead.  Say

8       it one more time.  And what?  Where are we?

13:24:54  9       Q.      Lines 14 through 16, were you asked this

10      question, did you give this answer?

13:24:58 11              "Then after that, day-to-day supervision to

12      ensure that the policies and training are being

13      followed?

13:25:02 14              "A.  Yes."

13:25:04 15      A.      Correct.  Going back to those critical tasks

16      that I answered on Page 30, of course.

13:25:11 17      Q.      Would you agree that adequate supervision

18      requires consistent and comprehensive training on the

19      policies and procedures?

13:25:19 20      A.      On the critical tasks, yes.  Going back to

21      Page 30, the answer is putting it in context.

13:25:24 22      Q.      Would you agree that adequate supervision

23      requires audits or evaluations of policies and

24      procedures to ensure that they're up to date and

25      serve their purpose?

John J. Ryan - May 21, 2019

13:25:33  1    A.      And again, I think all of these are the best

2    practices, yes.

13:25:37  3    Q.      And they are all consistent with the

4    generally accepted practices at the time, correct?

13:25:42  5    A.      Yeah.  I -- I will say this.  And as I do

6    more audits -- remember, this is in 2003 -- but as I

7    do more audits of departments nationally, as I have

8    done since then, I find that there's an awful lot of

9    agencies that aren't doing this stuff.  And certainly

10    we recommend it.  I don't know that we can say it's

11    the generally accepted practice, but it's certainly

12    the best practice.

13:26:00 13    Q.      Well, in 2003, you said it was the generally

14    accepted practice.

13:26:03 15    A.      Yeah.  With the -- with the experience of the

16    Providence Police Department and -- and just breaking

17    into this national perspective.  To -- to understand

18    the generally accepted practice you've got to know

19    kind of what everybody out there is doing.

13:26:13 20    Q.      Well, the generally accepted --

13:26:15 21    A.      And it was -- it surprised me when I did get

22    on the road to learn that there were an awful of lot

23    of agencies that were not doing these regularly.

13:26:22 24    Q.      Well, the generally accepted practices

25    haven't gotten less stringent since 2003, correct?

**John J. Ryan - May 21, 2019**

13:26:29 1    A.        No, no, no.  You're -- I think you're missing

2    the point.  The generally accepted practices as I

3    understood them in 2003, I didn't have the broad

4    national perspective that I have today.  I can tell

5    you that certain things that I believed everybody was

6    doing they weren't necessarily doing.  So they

7    weren't generally accepted practices, even though I

8    believed they were.

13:26:49 9    Q.        Sure.  And at your conferences you give

10    presentations to law enforcement agencies around the

11    country on how to improve their policies, procedures,

12    and training to be consistent with the generally

13    accepted practices of today, correct?

13:27:07 14    A.        To be consistent with the best practices.

13:27:08 15    Q.        And --

13:27:09 16    A.        If they were all doing it, then it would be

17    the generally accepted practices.  If they're not all

18    doing it, if it is not a generally accepted practice,

19    if the bulk of the departments aren't doing it, then

20    it's not a generally accepted practice yet.

13:27:21 21    Q.        And your testimony is that now through your

22    experience law enforcement agencies aren't

23    consistently doing the same practices?  Is that your

24    testimony?

13:27:28 25    A.        Say that again.

John J. Ryan - May 21, 2019

| | | |
|---|---|---|
| 13:27:30 | 1 | Q.      Is it your testimony sitting here today that |
| | 2 | agent -- law enforcement agencies around the country |
| | 3 | are not using the same practices with regard -- |
| 13:27:41 | 4 | A.      Well, that's true.  There's an awful lot of |
| | 5 | deviation out there.  And we try to bring them into |
| | 6 | some level of consistency with the best practices, |
| | 7 | yes.  I think that's true. |
| 13:27:48 | 8 | Q.      And so if law enforcement -- |
| 13:27:48 | 9 | A.      When you -- when you think about -- I would |
| | 10 | like to finish, if I could. |
| 13:27:52 | 11 | When you consider the fact that 48 percent of |
| | 12 | the departments in the country have less than 10 |
| | 13 | officers, there's a lot of practices that we would |
| | 14 | say are the generally accepted practices that the |
| | 15 | smaller agencies just aren't doing.  And then -- so |
| | 16 | we've got to then question ourselves.  We've got to |
| | 17 | critically analyze our own thinking and say it's not |
| | 18 | a generally accepted practice if half the country is |
| | 19 | not doing it. |
| 13:28:13 | 20 | Q.      So -- |
| 13:28:14 | 21 | A.      So we've got to -- we've got to try to bring |
| | 22 | those -- those agencies along to the best practice, |
| | 23 | and -- and eventually it becomes a generally accepted |
| | 24 | practice. |
| 13:28:19 | 25 | Q.      So is it your testimony sitting here today |

John J. Ryan - May 21, 2019

```
              1    that because of the divergence in training and

              2    written policies and procedures at small agencies

              3    versus large agencies that there are not generally

              4    accepted practices today?

13:28:34      5    A.       No.  I'm not saying that at all.  I think

              6    that mischaracterizes it.  There are certainly some

              7    generally accepted practices, but there's other areas

              8    where there's not.

13:28:54      9    Q.       Sir, in 2013, did you testify that aside from

             10    day-to-day supervision, that more regular evaluations

             11    were necessary to ensure that the policies and

             12    procedures are being followed?

13:29:05     13    A.       Are we off this stuff, this stuff?

13:29:06     14    Q.       No, still there.  31.

13:29:07     15    A.       Well, that's 2003.

13:29:08     16    Q.       31.

13:29:08     17    A.       This is 2003.

13:29:09     18    Q.       Yes.

13:29:10     19    A.       You said 2013.

13:29:11     20                 MR. KELLEY:   '13.

13:29:11     21    BY MR. SLOSAR:

13:29:12     22    Q.       2003.

13:29:14     23    A.       Okay.  So where are we, again?

13:29:15     24    Q.       31.

13:29:19     25    A.       Okay.  Go ahead.  And where are we?
```

**John J. Ryan - May 21, 2019**

| | | |
|---|---|---|
| 13:29:21 | 1 | Q.       17 through 20. |
| 13:29:21 | 2 | A.       Yeah. |
| 13:29:24 | 3 | Q.       Did you testify the more regular type |
| | 4 | evaluations such as monthly or yearly evaluations are |
| | 5 | necessary to ensure that policies and procedures are |
| | 6 | being followed? |
| 13:29:33 | 7 | A.       Correct.  It should be done on a daily basis, |
| | 8 | whatever the policies and procedures of the |
| | 9 | particular agency are, of course. |
| 13:29:39 | 10 | Q.       And after that, a mechanism should be in |
| | 11 | place to ensure that any violations of policies and |
| | 12 | procedures related to critical tasks are covered, |
| | 13 | correct? |
| 13:29:48 | 14 | A.       Correct. |
| 13:29:51 | 15 | Q.       And supervision for any professional police |
| | 16 | organization that is following generally accepted |
| | 17 | practices would include all of the things we just |
| | 18 | discussed, correct? |
| 13:30:01 | 19 | A.       At some level. |
| 13:30:02 | 20 |          Oh, shit.  I'm sorry. |
| 13:30:05 | 21 | Q.       Through the chain of command, any |
| | 22 | professional police organization will ensure that |
| | 23 | those critical tasks are being accomplished, correct? |
| 13:30:14 | 24 | A.       Say that again.  We had a little spill over |
| | 25 | here.  Go ahead. |

**CLEETON DAVIS COURT REPORTERS, LLC**
**(615) 726-2737**

John J. Ryan - May 21, 2019

13:30:17  1                    MR. KELLEY:  We're good.

13:30:18  2                    MR. SLOSAR:  Are you all right?

13:30:18  3                    MR. KELLEY:  Yeah.

13:30:20  4                    THE WITNESS:  It's my fault.  Move this

       5  -- move these a little more, because that's right

       6  there.

13:30:21  7                    MR. SLOSAR:  Yeah.  Why -- why don't --

       8  why don't we -- why don't we go off the record?

13:30:25  9                    THE VIDEOGRAPHER:  Going off the

      10  record.  Time on the monitor is 13:29.

13:30:33 11                         (Recess.)

13:32:11 12                    THE VIDEOGRAPHER:  We're back on the

      13  record.  Time on the monitor is 13:31.

13:32:14 14  BY MR. SLOSAR:

13:32:15 15  Q.     Through the chain of command, any

      16  professional police organization will ensure that

      17  those tasks are being accomplished, correct?

13:32:23 18  A.     The critical tasks, yes.

13:32:29 19  Q.     And through the chain of command, would you

      20  agree that the sheriff's role at the Knox County

      21  Sheriff's Department would be to ensure on a

      22  day-to-day basis that the department is applying

      23  generally accepted police practices to critical

      24  tasks?

13:32:43 25  A.     Critical tasks for that agency, of course,

John J. Ryan - May 21, 2019

```
            1    yes.

13:32:45    2    Q.        Would you agree --

13:32:46    3    A.        Whatever those critical tasks are.

13:32:48    4    Q.        Would you agree that the epitome of

            5    deliberate indifference or recklessness, whether it

            6    be final policymaker or supervisor, would be someone

            7    who recognizes potential risks of failing to provide

            8    adequate training and policy in an area of a critical

            9    task yet fail to provide adequate training or

           10    policies in that area?

13:33:10   11              MR. KELLEY:  Note the objection.

13:33:10   12          Go ahead.

13:33:12   13              THE WITNESS:  Of course.  A critical

           14    task for that agency.

13:33:15   15    BY MR. SLOSAR:

13:33:17   16    Q.        Would you agree that training like

           17    supervision is a broad term that's used by police

           18    managers that has many components?

13:33:24   19    A.        Of course.

13:33:27   20    Q.        In any police department would you agree that

           21    adequate training would necessarily include a clear

           22    guideline policy on critical tasks?

13:33:36   23    A.        And again, the critical task for that agency,

           24    yes.  So I would just want to make that clear.

13:33:52   25    Q.        Would you agree that these guidelines or
```

John J. Ryan - May 21, 2019

|    |    |
|----|----|
| | 1  policies on critical tasks should be in written form? |
| 13:33:58 | 2  A.      Most of them should be, yes. |
| 13:34:02 | 3  Q.      Wouldn't you agree that any professional |
| | 4  organization that follows generally accepted police |
| | 5  practices has written directives for all tasks that |
| | 6  they determine to be critical? |
| 13:34:11 | 7  A.      Critical for their agency, yes. |
| 13:34:14 | 8  Q.      Then they have clear and consistent training |
| | 9  on those written directives, correct? |
| 13:34:18 | 10  A.      I wouldn't say that's the generally accepted |
| | 11  practice, because there's an awful lot of agencies |
| | 12  that do not train that.  That's something that I have |
| | 13  certainly discovered -- |
| 13:34:23 | 14  Q.      But they should? |
| 13:34:24 | 15  A.      -- since I have been doing audits. |
| 13:34:24 | 16  Q.      They should? |
| 13:34:26 | 17  A.      That's the best practice to do so, but I |
| | 18  don't think it's a generally accepted practice. |
| 13:34:36 | 19  Q.      Well, on Page 44 in 2013, were you asked this |
| | 20  question, did you give this answer, Line 8: |
| 13:34:42 | 21       "Q.   Wouldn't you agree that any |
| | 22  professional organization, any organization that |
| | 23  follows generally accepted police practices has |
| | 24  written directives for all tasks that they determine |
| | 25  to be critical? |

**John J. Ryan - May 21, 2019**

13:34:54  1          "A.    They should.

13:34:56  2          "Q.    And then they have clear and consistent

3  training on those written directives, correct?

13:35:01  4          "A.    They should."

13:35:02  5          Were you asked those questions and did you

6  give those answers?

13:35:05  7  A.       Absolutely not, not in 2013.

13:35:06  8  Q.       I said -3.

13:35:09  9  A.       No.  Go back and pull it up.  You said 2013

10  again.

13:35:14  11          Obviously, I said that in 2003, and that's

12  accurate.  That's accurate.

13:35:18  13  Q.      And those -- in 2003 --

13:35:19  14  A.      Or that -- but -- but notice the -- notice

15  what it says there, for the critical tasks that they

16  determine for their agency.

13:35:26  17  Q.      Sir, we're going to get -- we're going to get

18  to that.

13:35:36  19          Sir, on February 11th, 2003, you testified

20  before a grand jury, correct?

13:35:42  21  A.      What are we looking at now?  No idea.

13:35:44  22  Q.      Not looking at anything.  You testified

23  before a grand jury then, correct?

13:35:48  24  A.      Is that the state grand jury date?  Because

25  that's the problem I have.  I don't know.

**John J. Ryan - May 21, 2019**

| | | |
|---|---|---|
| 13:35:51 | 1 | Q.      It is. |
| 13:35:53 | 2 | A.      Yeah.  I didn't testify.  I -- I exercised my |
| | 3 | privilege. |
| 13:35:54 | 4 | Q.      Sure. |
| 13:35:56 | 5 | A.      On the advice of counsel. |
| 13:35:57 | 6 | Q.      I'm going to play a portion of this recording |
| | 7 | and ask you some questions, so please listen.  I'll |
| | 8 | ask you some questions on this. |
| 13:36:04 | 9 | MR. KELLEY:  Note an objection. |
| 13:36:04 | 10 | (A recording was played, transcribed to the best of |
| | 11 | my ability:) |
| 13:36:04 | 12 | Q.      State your name, please. |
| 13:36:08 | 13 | A.      Yes, it's John J. Ryan, R-Y-A-N. |
| 13:36:09 | 14 | UNIDENTIFIED SPEAKER:  Mr. Foreperson, |
| | 15 | Deputy Foreperson, could you swear the witness, |
| | 16 | please? |
| 13:36:13 | 17 | THE DEPUTY FOREPERSON:  Please raise |
| | 18 | your right hand. |
| 13:36:16 | 19 | Do you solemnly swear that the testimony that |
| | 20 | you are about to give before this grand jury touching |
| | 21 | on any crime that has been entered and may be |
| | 22 | inquired about shall be the truth, the whole truth, |
| | 23 | and nothing but the truth, so help you God? |
| 13:36:28 | 24 | THE WITNESS:  I do. |
| 13:36:28 | 25 | (The recording was ended.) |

John J. Ryan - May 21, 2019

13:36:28  1    BY MR. SLOSAR:

13:36:31  2    Q.      Sir, did you take an oath before the grand

          3    jury in February 2003?

13:36:34  4    A.      Of course.

13:36:36  5    Q.      Same oath you took today?

13:36:36  6    A.      Of course.

13:36:40  7    Q.      And did you recognize your voice on that

          8    recording?

13:36:43  9    A.      Sounds -- certainly sounds like me, certainly

          10   my name.

13:36:50  11   Q.      And this is going to be Exhibit 21, the grand

          12   jury recording of Jack Ryan.  I'm going to ask you

          13   some questions after I play the next part.  Please

          14   listen.

13:36:57  15   (A recording was played, transcribed to the best of

          16   my ability:)

13:37:00  17   Q.      Okay.  Sir, could you state your date of

          18   birth for us, please?

13:37:05  19   A.      5/6/61.

13:37:07  20   Q.      And where do you live, sir?

13:37:10  21   A.      At this point in time, with all due respect

          22   to this process, to the Grand Jury, based on the

          23   advice of counsel, I'm going to exercise my

          24   privileges under the United States Constitution.

13:37:21  25   Q.      Okay.  And I understand what you're saying,

John J. Ryan - May 21, 2019

|    |    |
|----|----|
| | 1 | then, sir.  With respect to even your address, you |
| | 2 | are going to assert your Fifth Amendment privilege? |
| 13:37:28 | 3 | A.      Correct. |
| 13:37:31 | 4 | Q.      Okay.  And is it your intention, sir, to |
| | 5 | assert that privilege with respect to any questions |
| | 6 | which are -- are posed either by me or members of the |
| | 7 | Grand Jury concerning your involvement in Providence |
| | 8 | police promotional examinations? |
| 13:37:45 | 9 | A.      At this point in time, yes. |
| 13:37:49 | 10 | Q.      Okay.  Thank you, sir. |
| 13:37:50 | 11 | Can we go off the record? |
| 13:37:50 | 12 | (End of recording.) |
| 13:37:50 | 13 | BY MR. SLOSAR: |
| 13:37:55 | 14 | Q.      Sir, did that recording accurately summarize |
| | 15 | the entirety of your testimony before the grand jury |
| | 16 | in February of 2013? |
| 13:38:03 | 17 | A.      Yeah, I think it's actually -- it's the same |
| | 18 | thing as the transcript that you have already shown |
| | 19 | me. |
| 13:38:11 | 20 | Q.      Okay.  And does that recording capture your |
| | 21 | invocation of the Fifth Amendment response to any |
| | 22 | questioning relating to the promotional scandal at |
| | 23 | the Providence Police Department? |
| 13:38:21 | 24 | A.      Yeah.  And I don't like the term "scandal," |
| | 25 | because I don't think there was one, particularly, |

John J. Ryan - May 21, 2019

|   |   |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 13:38:38 | 5 |
| | 6 |
| | 7 |
| 13:38:46 | 8 |
| 13:38:52 | 9 |
| | 10 |
| 13:38:56 | 11 |
| 13:38:58 | 12 |
| 13:39:00 | 13 |
| | 14 |
| 13:39:02 | 15 |
| | 16 |
| 13:39:04 | 17 |
| 13:39:08 | 18 |
| | 19 |
| 13:39:11 | 20 |
| 13:39:13 | 21 |
| | 22 |
| 13:39:14 | 23 |
| 13:39:16 | 24 |
| 13:39:16 | 25 |

1   since no officer was ever punished for it, even

2   administratively.  But that certainly reflects my

3   testimony that day, February 11th, with respect to

4   that grand jury.

5   Q.      And after leaving the Providence Police

6   Department, you have forged a career as a police

7   practices expert, correct?

8   A.      I had started it even before.

9   Q.      After leaving, your -- you have started a

10  company, right?

11  A.      I formed an S corp even before.

12  Q.      Okay.  What's the name of your S corp?

13  A.      It's Law Enforcement Research and Consulting,

14  Limited.

15  Q.      And you have police practices experts that

16  work for you, correct?

17  A.      No.

18  Q.      You have contract people that do expert

19  opinions under your company's name, correct?

20  A.      No.

21  Q.      Who else gives opinions under your company's

22  name?

23  A.      No one.

24  Q.      Never have?

25  A.      Never have.

**John J. Ryan - May 21, 2019**

13:39:20  1   Q.         Never taken a percentage of income for

2   somebody else to generate opinions?

13:39:23  3   A.         Absolutely not.

13:39:28  4   Q.         If somebody has testified that they had a

5   contractual relationship with your company where they

6   gave police practices expert opinions and you took a

7   percentage of the retainer fee, would they be

8   committing perjury?

13:39:41  9   A.         They would be incorrect.

13:39:46 10   Q.         Explain to me who else works at your company.

13:39:48 11   A.         No one else.  I have a son that works for me

12   now.  No one else works at my company, my S corp.

13:39:54 13   Q.         Has anybody else ever given or generated any

14   opinions under your S corp aside from you?

13:39:59 15   A.         No, absolutely not.

13:40:01 16   Q.         Sir, you claim to be an expert in police

17   misconduct, correct?

13:40:06 18   A.         A police practices expert.

13:40:08 19   Q.         In this particular case, you formed opinions

20   that Defendants Pickard and Knox County did not

21   commit any misconduct, correct?

13:40:14 22   A.         Correct.

13:40:16 23   Q.         You formed opinions that Mr. Pickard and Knox

24   County did not violate any of the generally accepted

25   practices in place in 2011, correct?

**John J. Ryan - May 21, 2019**

13:40:24  1    A.        In what date, what year?

13:40:25  2    Q.        2011.

13:40:27  3    A.        Yes.

13:40:28  4    Q.        You formed these opinions based on your

5    training and experience as an officer for the

6    Providence Police Department, correct?

13:40:37  7    A.        As well as my continued experience for the

8    last 17 years traveling the country, training

9    officers, working with police agencies, auditing

10    police agencies, doing audits of investigations in

11    agencies, as well as my experience as an adjunct

12    professor while I was still a police officer, yes,

13    and my education.

13:41:04 14    Q.        You retired from Salve during the course of

15    the -- you retired from Salve prior to testifying

16    before the 2003 grand jury, correct?

13:41:20 17    A.        I think I -- I think I -- I left Salve as

18    soon as I started this business and going on the

19    road.  I think I -- I did one class just prior to, so

20    it would have been probably a year before that.

13:41:33 21    Q.        You have only been a sworn law enforcement

22    officer for the Providence Police Department,

23    correct?

13:41:38 24    A.        Yeah.  I answered that about six times so

25    far.

John J. Ryan - May 21, 2019

13:41:41  1   Q.       Same police department that investigated you

       2   for allegations of misconduct, correct?

13:41:47  3   A.       And again, the term "the department

       4   investigated me" I have trouble with, because they

       5   never even opened an investigation until after I left

       6   and then never even came and asked me a question

       7   after I left.

13:41:58  8   Q.       The same department where you assisted in

       9   giving at least two individuals source documents for

      10   promotional exams, correct?

13:42:04 11   A.       Where I absolutely without wrongdoing gave

      12   people source -- made -- made available source

      13   documents.  Whether they accept it or not is a

      14   different question.

13:42:13 15   Q.       The same department where you were appointed

      16   captain after being given the source document prior

      17   to your exam, correct?

13:42:19 18   A.       A source document that was on a pile of mail

      19   that I -- that never left the chief's suite.

13:42:26 20   Q.       The same department where you were employed

      21   as you met with the FBI agents on approximately a

      22   half dozen occasions about allegations of misconduct

      23   taking place at the Providence Police Department,

      24   correct?

13:42:41 25   A.       No.  And again, I'm not sure they were ever

**John J. Ryan - May 21, 2019**

```
 1   looking at misconduct in the Providence Police
 2   Department, because as I said, I -- to my knowledge,
 3   nobody in the police department was a subject or a
 4   target.  They were certainly looking at misconduct in
 5   the mayor's office, but I think it stayed -- they
 6   thought that it was connected to things that happened
 7   in the police department and they wanted police
 8   officers to be witnesses to that effect.  I don't
 9   think anybody in the police department was ever a
10   target or subject.
13:43:06 11   Q.      You continued, even though you now are
12   testifying that you don't believe that you were ever
13   a target or subject, you did retain criminal counsel
14   during the FBI investigation, correct?
13:43:17 15   A.      Oh, I absolutely retained counsel.  He is not
16   a criminal defense attorney, though.  I never
17   retained a criminal defense attorney.
13:43:24 18   Q.      You retained an attorney to give you advice
19   related to a criminal investigation, correct?
13:43:28 20   A.      Yeah, more to be a witness.
13:43:32 21   Q.      You sought advice from that attorney
22   throughout the investigation, correct?
13:43:36 23   A.      Throughout the investigation?  Actually
24   throughout my interview process.  I was never -- I
25   was never investigated certainly in that federal
```

1    piece.

13:43:48  2    Q.      Was that the same attorney that attended the

3    2003 grand jury hearing with you where you invoked

4    your Fifth Amendment right?

13:43:57  5    A.      I believe it was Joe Penza that did.  But he

6    could have sent Mike Colucci.  I don't recall.  I --

7    I -- I believe Penza came with me to the grand jury,

8    and he was the one that we met with, Peter Nerohna,

9    the three of us.

13:44:07  10   Q.      And the Providence Police Department is the

11   only law enforcement agency that you have ever worked

12   for.  This is the department that you were working at

13   when you accepted gifts from Mr. Autiello, correct?

13:44:19  14   A.      I accepted a gift, and every bit of it was

15   lawful.

13:44:19  16   Q.      The same --

13:44:20  17   A.      I gave gifts as well.

13:44:23  18   Q.      The same department that you were at where

19   you tried to get Mr. Maggiacomo to the second

20   academy, correct?

13:44:34  21   A.      I absolutely did try to honor our standard

22   practice of putting somebody who was there in that

23   second academy, absolutely, until I learned of a

24   second background investigation, and then I agreed

25   with the fact that he got washed out.

**John J. Ryan - May 21, 2019**

13:44:46  1    Q.      The same department where you requested that

2    Ms. Searles obtain the source key so that you can

3    give it to people for their promotion, correct?

13:44:58  4    A.      Understand something:  Donna Searles was

5    supposed to get that source key at the outset and

6    maintain that, and it was my responsibility to go

7    over it before the test.  So there wasn't anything

8    untoward, you know, in that, but apparently, she

9    got -- I don't know what she did, but she got the

10   source key, according to her, and then she destroyed

11   it.

13:45:19  12   Q.      Because she didn't want to give it to you,

13   correct?

13:45:21  14   A.      I don't think that's the case at all.  I

15   don't think that's the case at all.  I -- I don't

16   know what she said after the fact.  But I don't think

17   that's the case at all, because she came up to me at

18   Rhonda Kessler's promotion and said, "Thank you for

19   what you took care of."  So I'm -- I don't know what

20   she said after the fact.

13:45:39  21   Q.      Let me ask you this.  Your testimony is that

22   you still have a good relationship with people at the

23   Providence Police Department, correct?

13:45:44  24   A.      Yes.

13:45:46  25   Q.      You live in Rhode Island still, correct?

John J. Ryan - May 21, 2019

| | | |
|---|---|---|
| 13:45:46 | 1 | A.        Yes. |
| 13:45:51 | 2 | Q.        What percentage of your income is generated |
| | 3 | from giving police practices opinions in cases? |
| 13:46:02 | 4 | A.        I would say half, at least.  Maybe a little |
| | 5 | better.  Sometimes -- it depends on the year. |
| 13:46:07 | 6 | Q.        How many cases has the Providence Police |
| | 7 | Department or the City of Providence ever retained |
| | 8 | you as a police practices expert? |
| 13:46:14 | 9 | A.        I don't think they would retain me, because |
| | 10 | it would be perceived as bias toward the agency. |
| 13:46:20 | 11 | Q.        Now, how many times have they retained you as |
| | 12 | an expert on police practices? |
| 13:46:24 | 13 | A.        They have not.  And I wouldn't expect them |
| | 14 | to, because I would be seen as biased toward the |
| | 15 | agency. |
| 13:46:30 | 16 | Q.        How many agencies in the state of Rhode |
| | 17 | Island have ever retained you as a police practices |
| | 18 | expert? |
| 13:46:35 | 19 | A.        Just Woonsocket, I think, is the only case I |
| | 20 | have done.  I've done some for Fall River, which is |
| | 21 | right nearby. |
| 13:46:40 | 22 | Q.        When was the last time you were retained from |
| | 23 | one of those agencies? |
| 13:46:44 | 24 | A.        The Woonsocket case is probably within the |
| | 25 | last five years, but I don't have an exact date on |

```
 1   it.  I would say that the Fall River cases, I just

 2   finished one, and I have a second one now.  And Fall

 3   River is just outside the -- the Rhode Island border.

 4   Q.      You testified earlier that you do various

 5   trainings now of other agencies.  Is that right?

 6   A.      Yes.

 7   Q.      Have you ever provided any of those agencies

 8   with any of the documents relating to the allegations

 9   that we've discussed earlier this morning?

10   A.      I don't maintain these documents.  I don't

11   keep these documents.  There's no wrongdoing.  These

12   are documents that exist out there, and the only time

13   I ever see them is at a deposition.

14   Q.      Have you ever told any of the agencies that

15   you trained that you invoked the Fifth Amendment

16   before a grand jury into allegations of police

17   misconduct?

18   A.      I don't know that I have ever specifically

19   discussed the Fifth Amendment, but I have discussed

20   at length with numerous agencies and numerous

21   officers around the country, and sometimes I include

22   it in a presentation, the fact that the department

23   came after my pension after I retired.  And when I

24   say that, they tried to open an investigation, and it

25   never got off the ground, and that there's a renowned
```

Timestamps in left margin:
- 13:47:05 (line 4)
- 13:47:09 (line 6)
- 13:47:12 (line 7)
- 13:47:23 (line 10)
- 13:47:33 (line 14)
- 13:47:45 (line 18)

John J. Ryan - May 21, 2019

1    Supreme Court decision in my favor that foreclosed

2    them from ever even opening an investigation.

13:48:14  3         So yeah, I have discussed that, absolutely.

4    And actually, I think I have mentioned the fact about

5    the Fifth Amendment, now that I think about it, on

6    multiple occasions.  I believe I have.

13:48:30  7    Q.     If you didn't believe that you committed any

8    conduct that would open you to criminal exposure, you

9    understood that you actually could not assert the

10   Fifth Amendment, correct?

13:48:43 11   A.     Well, I think you have to go back and look at

12   the cases.  To cite old Professor Cronin, who is one

13   of the top constitutional scholars in the country,

14   who was one of my professors, if there's any

15   possibility of exposure, then you certainly have the

16   right to -- to exercise your privilege.  And if your

17   lawyer tells you, "Hey, they could indict a ham

18   sandwich, and this is a very political situation, and

19   I'm instructing you to plead the Fifth," then you can

20   certainly plead the Fifth.

13:49:14 21   Q.     Sir, is it fair to say that when you became

22   head of the training academy at the Providence Police

23   Department, that you took it upon yourself to make

24   sure that you were well versed in what was going on

25   around the country in training issues?

**John J. Ryan - May 21, 2019**

13:49:28 1  A.      I think that we were probably, when I took

2  over, we were probably ahead of the game.

13:49:36 3  Q.      Can you answer my actual question?  Is it

4  fair to say that when you became head of the training

5  academy at the Providence Police Department, that you

6  took it upon yourself to make yourself well versed in

7  what was going on around the country in training

8  issues?

13:49:51 9  A.      I think I always did that, even before I

10  became director of the training academy.

13:49:55 11  Q.      When did you become the director of the

12  training academy?

13:49:57 13  A.      You know, I have -- I have looked at this --

14  these documents a bunch of times, and -- and my

15  memory is that it was right after my dad died in

16  1994, because I was at the police academy talking to

17  the sergeant when I got the phone call that my dad

18  had passed away.  And I think we were discussing the

19  fact that the department wanted to detail me up

20  there.

13:50:20 21       But as I look at documents and -- and

22  particularly graduation dates, it looks to me like it

23  was probably closer to 1995, early in 1995.  So

24  sometime between '94 and 1995 I was detailed there.

25  I wasn't transferred there, but I was detailed there.

John J. Ryan - May 21, 2019

13:50:37  1    Q.        And you understood when you were head of the
         2    trading academy that one of your responsibilities was
         3    to ensure that -- that Providence was providing
         4    comparable or probably better training than other
         5    departments around the country, correct?

13:50:50  6    A.        Oh, I think we were trying to do better.

13:50:53  7    Q.        And as head of training, you were responsible
         8    for insuring that Providence was providing comparable
         9    training in comparison to other Metropolitan Police
        10    Departments around the country, correct?

13:51:05 11    A.        Sure, agencies that -- with 500 officers, of
        12    course.

13:51:07 13    Q.        One of the things you did to ensure the
        14    training was comparable or better than training at
        15    other departments was to attend training sessions
        16    yourself, correct?

13:51:16 17    A.        I still attend training sessions myself.

13:51:19 18    Q.        Was it true then, in '95?

13:51:21 19    A.        Yes,  I did go to training sessions, sure.

13:51:24 20    Q.        In fact, one of the things you did was read
        21    literature regarding training from around the
        22    country, correct?

13:51:27 23    A.        Of course.

13:51:28 24    Q.        Read court cases?

13:51:30 25    A.        Every day.

**John J. Ryan - May 21, 2019**

13:51:32  1   Q.      You did that to keep yourself abreast of what

2   was going on in other departments around the country,

3   correct?

13:51:37  4   A.      Other departments and the court, the legal

5   issues related to law enforcement.

13:51:41  6   Q.      And when you were head of the training

7   academy, was it your understanding that you were

8   responsible for insuring that your trainees were well

9   versed in all of the policies and procedures --

13:51:51 10   procedures relating to critical issues?

13:51:54 11   A.      They were related -- there -- it was -- it

12   was certainly policies and procedures on critical

13   tasks, yes, some things like use of force and

14   pursuit, things of that nature, of course.

13:52:06 15           But we were very specific.  One of the things

16   we did was, we did a job task for patrol officers.

17   So, for example, a patrol officer is never going to

18   in a million years do a search warrant in a murder

19   case.  So we weren't concerned about teaching a

20   patrol officer how to do a search warrant in a murder

21   case.

13:52:25 22           In fact, on a homicide, we taught them how

23   to -- how to contain the scene and stop and do

24   nothing, because it wasn't in their job task.

13:52:34 25           So what we did was, we sat down as soon as I

John J. Ryan - May 21, 2019

```
            1    got up there, and I said, "Look, we need to decide.
            2    We -- we -- this department has spent a lot of time
            3    training officers on stuff that's not within their
            4    job task."
13:52:46    5         So we want to train them just on those things
            6    that are within the job task, and we develop the job
            7    task analysis first.
13:52:53    8    Q.   But in terms of with detectives or officers
            9    who would be involved in a homicide investigation,
           10    you certainly would have had training in policies and
           11    procedures that guided those officers on how to
           12    investigate a homicide?
13:53:06   13    A.   I developed the first school for detectives
           14    in the Providence Police Department.  I wrote the
           15    curriculum myself in conjunction with detective
           16    commanders.  I sat them down and had them all
           17    separately do a job task analysis of their
           18    detectives, and then I wrote the curriculum.
13:53:20   19    Q.   What did --
13:53:22   20    A.   I also taught at the Rhode Island State
           21    Police Academy.
13:53:26   22    Q.   What year, generally, was that?
13:53:29   23    A.   Probably 1996.
13:53:32   24    Q.   Did your curriculum include guidance to
           25    officers on what in -- on how to document information
```

John J. Ryan - May 21, 2019

|       |    |                                                        |
|-------|----|--------------------------------------------------------|
|       | 1  | during a criminal investigation?                       |
| 13:53:43 | 2  | A.      I don't know that we had to go back to that    |
|       | 3  | job task, because that's something we train at the     |
|       | 4  | police academy.  That's something that -- that, you    |
|       | 5  | know, officers would know what the practice is in      |
|       | 6  | their particular agency, how to document things.  So   |
|       | 7  | I don't know that we had to go.                        |
| 13:53:56 | 8  |         But we had to do, for example,               |
|       | 9  | interrogation, taking statements, you know, doing      |
|       | 10 | search warrants, because you don't -- as a patrolman,  |
|       | 11 | you don't do search warrants.  Anything beyond basic   |
|       | 12 | crime scene you wouldn't do until you became a         |
|       | 13 | detective.  So --                                      |
| 13:54:14 | 14 | Q.      So you would have -- you would have either    |
|       | 15 | created or -- or potentially revised the written       |
|       | 16 | policies and procedures to make sure that the -- that  |
|       | 17 | methods of interrogation were covered for officers     |
|       | 18 | involved in criminal investigations?                   |
| 13:54:32 | 19 | A.      Yeah.  I know you switched gears there.  I    |
|       | 20 | don't think we had a policy on that issue.  I develop  |
|       | 21 | the training for it.  I don't think many agencies in   |
|       | 22 | 1995 had policies on interrogation.  In fact, I just   |
|       | 23 | wrote one very recently for one of our insurance       |
|       | 24 | groups.  Actually, no, I think it was a state entity   |
|       | 25 | that asked us to write one.                            |

**John J. Ryan - May 21, 2019**

13:54:56  1    Q.      Are you -- you would have at least created

2    curriculum for training that provided guidance to

3    officers on interrogation in 1996?

13:55:07  4    A.      To detectives that were going to handle those

5    cases --

13:55:08  6    Q.      Sure.

13:55:09  7    A.      -- yes, that we're going to lead as

8    investigators of those cases, sure.

13:55:15  9    Q.      And that training would have not only

10   provided guidance to officers on how to question

11   witnesses or suspects but also what information

12   needed to be documented as a result of those

13   interviews, correct?

13:55:30  14   A.      Yeah.  And I mean, you know, every --

15   agencies at that time did things differently.  There

16   were some agencies that were starting to record, but

17   they were few and far between.  Almost nobody

18   recorded back then.

13:55:38  19   Q.      Sure.

13:55:41  20   A.      We got a lot of agencies I wouldn't even say

21   that recording is a generally accepted practice yet,

22   although it's -- we're getting closer to that.

13:55:50  23           But agencies document it differently.  My

24   particular agency, we took verbatim statements, so we

25   did a Q and A verbatim.  So we taught them how to do

John J. Ryan - May 21, 2019

1    the Q and A verbatim.  But not only that, we taught

2    them how to develop and make sure the statements --

3    they asked specific questions related to the elements

4    of a particular crime.  So yeah, I mean, there were

5    things that we taught in that process that the

6    average patrolman didn't necessarily know.

13:56:19   7    Q.       And that's because those aspects weren't part

8    of the basic academy, correct?

13:56:26   9    A.       You know, there probably was some level of

10    discussion at the basic academy how to interview a

11    witness, because, obviously, the patrolman has to

12    interview a witness.  But remember that a -- a CIF

13    package or a grand jury package had to have

14    statements, actual typed statements.  It couldn't be

15    -- you couldn't just hand-write a summary in a report

16    and send it over to court; you actually had to have a

17    package put together that included statements.

13:56:51   18           So because of that, you do a -- you taught

19    them how to do a Q and A.  And again, I mean, we

20    could -- I could spend a half a day with you on -- on

21    what we taught them.  But the patrolman didn't have

22    that degree of training because the patrolman is

23    never going to handle a murder.

13:57:08   24    Q.       Sure.  And they're certainly not going to

25    handle it at your department without being trained on

1    how to handle one, correct?

13:57:14  2    A.       Well, they're not going to handle it at all,

3    because it's going to be turned over to detectives.

4    You know, we see a lot of small agencies around the

5    country.  We're not going to train a small agency how

6    to handle a murder, because they're going to call in

7    the outside entity to do it.

13:57:28  8            So we -- we -- they're not going to --

9    they're not going to be trained on those particular

10   tasks.  They're not going to have policies on those

11   tasks, because they're going to -- their policy is

12   going to be, "Hey, we're going to call GBI," for

13   example.  You know, in Georgia they call GBI out on

14   every officer-involved shooting.  So we're not going

15   to train investigators in that agency how to do

16   officer-involved shootings.  They're never going to

17   do them.

13:57:49 18   Q.       Is there any written -- we're going to get to

19   this.

13:57:55 20            Is it fair to say that the chief of police at

21   the Providence Police Department was ultimately

22   responsible for ensuring that officers were properly

23   trained in connection with other written policies and

24   procedures?

13:58:07 25   A.       No.  That wouldn't be accurate.  It would be

John J. Ryan - May 21, 2019

|  | 1 | the Commissioner of Public Safety.  And again, that |
|---|---|---|
|  | 2 | wasn't always the case.  I would have believed |
|  | 3 | otherwise.  But there was a federal court decision in |
|  | 4 | Rhode Island that said it was the Commissioner of |
|  | 5 | Public Safety -- |
| 13:58:18 | 6 | Q.      Did you ever -- |
| 13:58:20 | 7 | A.      -- that was department policymaker. |
| 13:58:25 | 8 | Q.      Did you testify in 2002? |
| 13:58:27 | 9 | A.      I'm sure I probably did, that it was the |
|  | 10 | chief.  And -- and again, that decision may have come |
|  | 11 | out after that. |
| 13:58:33 | 12 | Q.      Okay.  So you're not disputing your prior |
|  | 13 | testimony.  You're just saying it may have changed |
|  | 14 | after that. |
| 13:58:36 | 15 | A.      Well, I think what happened was, the city |
|  | 16 | charter was clear all the way along that the chief of |
|  | 17 | police didn't have authority to sign a general order |
|  | 18 | under his own name, that he had to get the |
|  | 19 | Commissioner of Public Safety to sign off.  So a |
|  | 20 | determination, -- I think it was Judge Torres decided |
|  | 21 | that it was actually the Commissioner of Public |
|  | 22 | Safety was the final policymaker.  And again, I'm |
|  | 23 | assuming that's what your question is. |
| 13:58:58 | 24 |         I think the chief certainly had some |
|  | 25 | responsibility, but he was not the final policymaker. |

John J. Ryan - May 21, 2019

| | | |
|---|---|---|
| 13:59:02 | 1 | Q.      After the shooting of Cornel Young, it was |
| | 2 | recommended that you review the existing training and |
| | 3 | policies relating to use of force at the Providence |
| | 4 | Police Department, correct? |
| 13:59:12 | 5 | A.      I don't recall that recommendation. |
| 13:59:19 | 6 | Q.      138 of Exhibit 22. |
| 13:59:21 | 7 | A.      138? |
| 13:59:23 | 8 | Q.      138. |
| 13:59:28 | 9 |            MR. KELLEY:  Small one. |
| 13:59:28 | 10 | BY MR. SLOSAR: |
| 14:00:06 | 11 | Q.      Okay.  Let me ask it a certain way. |
| 14:00:10 | 12 |            Ultimately, the training that you recommended |
| | 13 | became the catalyst for policy change; is that right? |
| 14:00:14 | 14 | A.      Yeah.  But I -- I don't think it had to do |
| | 15 | with use of force.  If we are talking about Young, I |
| | 16 | don't think there was a use of force policy change, |
| | 17 | to be honest with you.  And again, unless |
| | 18 | you -- unless you've got something here that would |
| | 19 | refresh my recollection -- |
| 14:00:29 | 20 | Q.      What kind of policies do you -- do you recall |
| | 21 | changing? |
| 14:00:33 | 22 | A.      I changed -- I immediately wanted to make a |
| | 23 | change to policy related to off-duty officer |
| | 24 | involvement in -- in events.  You know, I wanted to |
| | 25 | go with a very -- a different policy.  We had changed |

John J. Ryan - May 21, 2019

```
 1    it so that off-duty officers did not have to carry

 2    their guns.  In fact, there's some confusion in my

 3    depositions that we cleared up by the time of the

 4    second trial that we had actually changed the always

 5    armed, always on duty policy.  But I wanted to make a

 6    change to make it even more clear that an officer --

 7    an officer's first option was not to be always armed,

 8    always on duty, that it would be to be a good witness

 9    so that we would not run into this friendly fire

10    situation that we ran into in that case again.

11    Q.    The training that you recommended ultimately

12    became a catalyst for policy change, correct?

13    A.    Correct, on that friendly fire issue, sure,

14    it did.

15    Q.    You authored those policy changes, correct?

16    A.    I sure did.

17    Q.    And in connection with authoring those policy

18    changes, you reviewed policies and procedures from

19    other departments, correct?

20    A.    Absolutely.

21    Q.    And you reviewed policies from IACP, correct?

22    A.    Again, probably, if they had any.  I don't

23    recall them having a policy, but I think what I did

24    was, I had access to something called, and that may

25    be what I'm talking about if I say that in there, I
```

Timestamps in left margin: 14:01:20 (line 11), 14:01:25 (line 13), 14:01:27 (line 15), 14:01:29 (line 16), 14:01:31 (line 17), 14:01:35 (line 20), 14:01:40 (line 21), 14:01:43 (line 22)

John J. Ryan - May 21, 2019

```
 1   had access to something called IACP.net, so it wasn't

 2   the IACP policies.  But you had the ability to go on

 3   and ask other agencies for their policies, and I'm

 4   sure that I went on IACP.net to see some if anybody

 5   else had anything else out there.

 6   Q.       And you also took into account policies that

 7   were being used by other departments that accepted

 8   the CALEA guidelines, correct?

 9   A.       I certainly looked to see if there were any

10   CALEA.  I always did that.  I did that -- any time I

11   was working on policies, I looked to see what else

12   was out there, and I would look to, you know, whether

13   there were any CALEA agencies, whether the IACP had

14   anything, and then I would critically analyze.  I

15   still do that today.  I still from time to time will

16   run a survey on -- on policies.

17            I just ran one on explosive breaches a few

18   weeks ago and -- and got, I don't know, 300 policies

19   from around the country.

20   Q.       Would you agree that it's essential for the

21   custom and practice to be entirely consistent with

22   written polices and procedures at a law enforcement

23   agency?

24   A.       Custom and practice should be consistent with

25   your written policies.  Again, that does not
```

14:02:12  (line 6)
14:02:21  (line 9)
14:02:48  (line 20)
14:02:56  (line 24)

John J. Ryan - May 21, 2019

|   |   |
|---|---|
| | 1 |necessarily mean that your -- you could have a -- a |
| | 2 |very good custom and practice and a very good policy |
| | 3 |that are both -- that are inconsistent with each |
| | 4 |other but are both very constitutional. |
| 14:03:12 | 5 |Q.      Have you testified previously that anything |
| | 6 |different could be a recipe for disaster? |
| 14:03:17 | 7 |A.      Absolutely, yeah, particularly if they're -- |
| | 8 |if they conflict to a point that nobody knows what to |
| | 9 |do, sure, of course. |
| 14:03:21 | 10 |Q.      Would you agree that the quality of |
| | 11 |supervision is one of the most important factors in |
| | 12 |whether a law enforcement agency is policing |
| | 13 |consistent with generally accepted practices? |
| 14:03:30 | 14 |A.      Sure. |
| 14:03:33 | 15 |Q.      Would you agree that no professional police |
| | 16 |organization following generally accepted practices |
| | 17 |could expect their officers to follow the rules and |
| | 18 |regulations of the department if the top |
| | 19 |administrators were not? |
| 14:03:44 | 20 |A.      Of course.  Yeah, sure. |
| 14:03:47 | 21 |Q.      Wouldn't you agree that in a law enforcement |
| | 22 |organization, it's essential that the top of the |
| | 23 |chain of command set an example through their conduct |
| | 24 |that the rules and regulations are important and |
| | 25 |should be followed? |

John J. Ryan - May 21, 2019

| | | |
|---|---|---|
| 14:03:57 | 1 | A.        Of course. |
| 14:04:00 | 2 | Q.        Wouldn't you agree that any serious violation |
| | 3 | of rules and regulations of the department has the |
| | 4 | danger of sending a message through the chain of |
| | 5 | command that the rules and regulations are not |
| | 6 | important? |
| 14:04:09 | 7 | A.        Of course. |
| 14:04:11 | 8 | Q.        Would you agree that if a chief of the |
| | 9 | department is flagrantly violating rules and |
| | 10 | regulations, that would necessarily send a bad |
| | 11 | message through the chain of command? |
| 14:04:18 | 12 | A.        Of course. |
| 14:04:21 | 13 | Q.        And if in fact it was widely known that a |
| | 14 | chief was flagrantly violating rules and regulations |
| | 15 | with no action taken to correct it, that would send a |
| | 16 | bad message through the chain of command? |
| 14:04:30 | 17 | A.        Of course. |
| 14:04:32 | 18 | Q.        If you had a situation where the chief of |
| | 19 | police flagrantly violated rules and regulations |
| | 20 | without any discipline or investigation, that a |
| | 21 | police department would be hard-pressed under those |
| | 22 | circumstances to expect the chain of command to |
| | 23 | consistently follow the rules and regulations of the |
| | 24 | department? |
| 14:04:49 | 25 | A.        Particularly as they relate to whatever that |

**John J. Ryan - May 21, 2019**

```
            1   issue was that the chief was undertaking, sure.

14:04:55    2   Q.       Would you agree that if a chief of a

            3   department is not properly trained -- trained, that

            4   would necessarily send a bad message through the

            5   chain of command?

14:05:04    6   A.       Depends on the agency.  So in other words,

            7   there's -- you know, there's places all over the

            8   country where the CEO does not have to be trained.

            9   So I deal with a lot of places where -- for example,

           10   New Hampshire has a couple of police departments

           11   where the -- where the police chief is elected, is

           12   not required to be trained.  I've got some places --

           13   well, there's -- there's places in the country where

           14   sheriffs are not required to go through the -- the

           15   state training.

14:05:30   16   Q.       But -- you under -- you under -- what about,

           17   you understand in this case that Sheriff Pickard was

           18   the policymaker during his period of time at Knox

           19   County Sheriff's Department, correct?

14:05:38   20                MR. KELLEY:  Objection.

14:05:39   21                THE WITNESS:  Elected.  Elected sheriff

           22   is probably the final policymaker, yeah.

14:05:41   23   BY MR. SLOSAR:

14:05:44   24   Q.       Yeah.  And you would agree that if the

           25   policymaker is not properly trained, that would
```

1   necessarily send a bad message through the chain of

2   command?

14:05:57   3               MR. KELLEY:  Objection.

14:05:57   4               THE WITNESS:  No, I wouldn't agree with

5   that if -- if the State did not require the elected

6   sheriff to be trained.

14:06:05   7        I mean, we have that in a lot of states; if

8   they're not required to be trained, then they are not

9   required to be trained.  We've got to make sure the

10   sheriff, you know, takes steps to put the right stuff

11   in place.  And sometimes that's by getting a good

12   number too, you know, because the -- the sheriff has

13   the ability to bring a chief deputy in, for example,

14   or a -- you know, a deputy.  They call it different

15   things, assistant sheriff.

14:06:28   16        So, you know, the sheriff may not be trained.

17   I know it might even be in Kentucky, I think,

18   the -- the new sheriff is a former prosecutor, I

19   think it might be Bullet County, Sheriff Scholar, and

20   he is not -- you know, he's not been through -- he's

21   a former prosecutor, but what he did immediately, and

22   I happen to know this, because I read the articles,

23   is, he brought in a very high level police officer

24   from another agency to run day-to-day operations who

25   has more experience as a police officer.

**John J. Ryan - May 21, 2019**

14:06:57  1    Q.       There's nothing in the record indicating that

        2    Sheriff Pickard did that in this case, correct?

14:07:02  3    A.       No.  But that -- I mean, that -- that wasn't

        4    the question.  That is a new question.

14:07:06  5    Q.       Well, I'm asking you a new question.  There's

        6    nothing in the report --

14:07:08  7    A.       Yeah.  I don't -- I don't know who his number

        8    two was.  I don't -- I don't recall that from the

        9    reading materials.

14:07:12 10    Q.       There's nothing in Sheriff Pickard's

       11    testimony or anybody else's testimony saying that

       12    Sheriff Pickard assigned his responsibilities or

       13    duties as a policymaker to somebody under his command

       14    that was properly trained?

14:07:27 15               MR. KELLEY:  Objection.

14:07:27 16               THE WITNESS:  Well, you can't assign

       17    the responsibility.  You'll always have the

       18    responsibility.  You can delegate authority.  You

       19    can't -- you can't do that.

14:07:34 20               But, you know, every other person in the

       21    agency that's a sworn officer would have to go

       22    through DOCJT or else they couldn't be a sworn

       23    officer.

14:07:41 24    BY MR. SLOSAR:

14:07:43 25    Q.       You never reviewed any of the records in this

**John J. Ryan - May 21, 2019**

1    case from DOCJT prior to forming your opinions,

2    correct?

14:07:49  3    A.      You don't have to.  You can't be a sworn

4    officer in the state of Kentucky without going

5    through DOCJT.  So you wouldn't -- you wouldn't be

6    able to make an arrest.  You wouldn't be able to

7    carry a gun.

14:07:58  8    Q.      Sheriff Pickard never went to -- through

9    DOCJT, correct?

14:08:02 10    A.      But he is the elected sheriff, and I think

11   there's an exemption for elected sheriffs just like

12   there is constables in the state of Kentucky.

14:08:09 13    Q.      Is there an exemption from -- that prevents

14   elected sheriffs from violating people's

15   constitutional rights?

14:08:17 16    A.      No.  Nobody can be exempt --

14:08:17 17    Q.      Are sheriffs -- are sheriffs --

14:08:18 18    A.      -- from violating constitutional rights, if I

19   understood your question.

14:08:22 20    Q.      Are sheriffs immune, to your knowledge, from

21   constitutional violations as a result of their

22   election?

14:08:28 23    A.      No state actor is immune from constitutional

24   violations.

14:08:33 25    Q.      Sure.  So in this case, prior to forming your

John J. Ryan - May 21, 2019

```
           1    opinions, you were not provided with any of the
           2    training files for Sheriff Pickard or anybody under
           3    his command, correct?
14:08:42   4    A.     I would have to go through my list and see if
           5    it was part of the production.  Or if you did
           6    discovery on that issue -- I don't know if you did or
           7    not -- I don't know.  There may be questions that I
           8    read along the way that would indicate that he did
           9    not go to training, he was not a certified officer.
          10    But that's not unusual in a state that does not
          11    require the sheriff to be a certified officer.  It's
          12    an elected position.
14:09:05  13    Q.     But you agree that if a chief of the
          14    department is unaware of any written policies and
          15    procedures, that that would send a bad message
          16    through the chain of command?
14:09:14  17    A.     If they're totally unaware of any policies
          18    and procedures?
14:09:16  19    Q.     Yeah.
14:09:19  20    A.     I mean, an agency should have policies and
          21    procedures.
14:09:24  22    Q.     And you, prior to forming your opinions in
          23    this case, you did not review the testimony from the
          24    new Knox County sheriff, Mike Smith, correct?
14:09:34  25    A.     If it's not on my list, I did not.
```

John J. Ryan - May 21, 2019

| | | |
|---|---|---|
| 14:09:37 | 1 | Q.      And if -- if in fact it was widely known that |
| | 2 | a chief was not properly trained, yet no action was |
| | 3 | taken to correct it, that would also send a bad |
| | 4 | message through the chain of command, correct? |
| 14:09:48 | 5 | MR. KELLEY:  Note the objection. |
| 14:09:49 | 6 | THE WITNESS:  Again, no.  I think -- I |
| | 7 | think that misstates what's going -- you have a lot |
| | 8 | of states, and I deal with them, where the elected |
| | 9 | official does not require.  Now, if you're talking |
| | 10 | about a chief of police, yeah, because they're |
| | 11 | supposed to be a sworn officer.  So if they're not |
| | 12 | trained, then that's -- that becomes problematic. |
| | 13 | That's why, you know, I recommend that up in Ashland, |
| | 14 | New Hampshire, that the chief go through the academy. |
| | 15 | But as far as elected officials, sometimes you do |
| | 16 | have elected officials that they're exempt from the |
| | 17 | training. |
| 14:10:15 | 18 | BY MR. SLOSAR: |
| 14:10:17 | 19 | Q.      Sir, I'm going to forward -- I'm going to |
| | 20 | refer you to Exhibit 7, your deposition, on July |
| | 21 | 21st, 2003, Page 54 and 55.  Let me know when you get |
| | 22 | there. |
| 14:10:31 | 23 | A.      Go ahead.  What page number? |
| 14:10:31 | 24 | Q.      54. |
| 14:10:43 | 25 | A.      All right. |

John J. Ryan - May 21, 2019

14:10:45  1    Q.       Were you asked this question, did you give

       2    this answer?

14:10:48  3             "Would you agree that if a chief of the

       4    department is flagrantly violating rules and

       5    regulations, that would necessarily send a bad

       6    message to the chain of command?

14:10:57  7             "A.   Yes.

14:10:59  8             "Q.   And if in fact it was widely known" --

14:11:01  9    A.       Wait a minute.  I don't -- I don't know where

      10    you are.  I'm sorry.

14:11:06 11    Q.       That was 54, Line 18, going on to 55.

14:11:09 12    A.       54, Line 18.  Okay.  Go ahead.

14:11:11 13    Q.       Okay.  55, Line 2.

14:11:13 14             "Q.   And if in fact it was widely known that

      15    a chief was flagrantly violating rules and

      16    regulations, yet no action was taken to remedy it,

      17    that would also send a bad message through the chain

      18    of command?

14:11:24 19             "A.   Yes.

14:11:26 20             "Q.   If you had a situation where a chief of

      21    police is flagrantly violating rules and regulations,

      22    there is no remediation, no discipline, no

      23    investigation, a police department would be hard

      24    pressed under those circumstances to expect the chain

      25    of command to consistently follow the rules and

John J. Ryan - May 21, 2019

1    regulations of the department, correct?

14:11:45   2    "A.   I think police officers generally try

3    to follow rules and regulations.  Does that lead to

4    breakdown of discipline?  Yes, sure, it does."

14:11:53   5    Did you give those questions and did you give

6    those answers?

14:11:55   7    A.   Yeah, that's -- those are all different

8    questions from what you asked, though.  Those are

9    completely different than the question you just asked

10   me.  And I have already answered those questions.

14:12:02  11    Q.   Sir --

14:12:04  12    A.   We went through that whole list of questions

13   before.

14:12:10  14    Q.   Are you a member of the American Association

15   for the Advancement of Science?

14:12:13  16    A.   I am not.

14:12:14  17    Q.   Are you a member of the American

18   Psychological Society?

14:12:16  19    A.   I am not.

14:12:19  20    Q.   Are you a member of the Association for

21   Research in Visit -- Vision and Ophthalmology?

14:12:22  22    A.   No.

14:12:25  23    Q.   Are you a member of the association Society

24   for Computers in Psychology?

14:12:28  25    A.   No.

John J. Ryan - May 21, 2019

14:12:31   1    Q.        Are you a member of the Society of

           2    Experimental Psychologists?

14:12:32   3    A.        No.

14:12:35   4    Q.        Have you ever had an article published on

           5    photo array procedures?

14:12:39   6    A.        I am sure that I have articles that talk

           7    about photo arrays.  And again, they should be -- if

           8    I do, they should be listed on the CV.  In all

           9    likelihood, they may be about cases related to that

          10    issue.

14:12:55  11    Q.        In any of the articles that you may have

          12    published on photo array procedures, have you ever

          13    suggested that a police officer conduct a show-up

          14    with a -- with photographs of a single suspect?

14:13:09  15    A.        Only in a case where the witness knows the

          16    suspect and you're trying to verify identity.

14:13:14  17              So, for example, you know, the witness

          18    says, "Hey, I know this Jack Ryan.  He is the one who

          19    did it," then we show a single photograph to make

          20    sure the Jack Ryan that we know is the same Jack Ryan

          21    that they know.  But that would be the only time you

          22    would do it with a photograph.

14:13:31  23    Q.        Sure.  And why would that be the only

          24    circumstance that you would only want to do a process

          25    such as that?

John J. Ryan - May 21, 2019

14:13:37  1    A.        Well -- well, because we have procedures for
        2    when they don't know who the suspect is and they're
        3    just working on a description and -- you know, and
        4    maybe a potential suspect, that we have procedures
        5    that we put a photo with five fillers.  And that's
        6    the way we do it.
14:13:49  7    Q.        Was that the -- was that the generally
        8    accepted practice in 2011?
14:13:55  9    A.        Yes.
14:13:59 10    Q.        Have you ever had an article published on
       11    homicide investigation procedures?
14:14:05 12    A.        I'm sure I have.  And again, it might not be
       13    titled Homicide Investigation Procedures, but I'm
       14    sure I have written articles that related to, for
       15    example, whether there's a crime scene exception
       16    to -- to -- in a homicide case, probably eyewitness
       17    identification in a homicide case.
14:14:26 18    Q.        What about documentation of interviews?  Have
       19    you ever written anything about that?
14:14:29 20    A.        You know, I'm sure I have written articles on
       21    interview and interrogation.  I don't know that I
       22    have got one that specifically says "Documentation."
       23    I don't know that I have that.
14:14:40 24    Q.        How many articles have you published on the
       25    subject of police departments being exposed to civil

**John J. Ryan - May 21, 2019**

|            |    |                                                          |
|------------|----|----------------------------------------------------------|
|            | 1  | liability?                                               |
| 14:14:46   | 2  | A.        Hundreds.                                       |
| 14:14:49   | 3  | Q.        And in fact, you've published extensively on   |
|            | 4  | risk management, correct?                                |
| 14:14:52   | 5  | A.        I do an awful lot of work on trying to         |
|            | 6  | professionalize law enforcement to reduce risk, yes.     |
| 14:14:57   | 7  | Q.        You've given speeches on those topics,         |
|            | 8  | correct?                                                 |
| 14:15:03   | 9  | A.        All the time.                                  |
| 14:15:10   | 10 | Q.        Where are you currently employed?              |
| 14:15:13   | 11 | A.        I am currently employed by my own S            |
|            | 12 | corp, which we talked about, and I am a -- a -- my S     |
|            | 13 | corp serves as a contract employee, so I get -- I get    |
|            | 14 | all my work through a group called the Law               |
|            | 15 | Enforcement Risk Management Group, which is a company    |
|            | 16 | that's owned by Jim Alsup and Cheryl Alsup.  At least    |
|            | 17 | I think she is an owner.  And all my work comes          |
|            | 18 | through them, but I'm not employed by them.  I'm --      |
|            | 19 | it's an independent contractor situation.                |
| 14:15:43   | 20 | Q.        What percentage of your income do you give to  |
|            | 21 | them?                                                    |
| 14:15:47   | 22 | A.        It doesn't really work that way, so I don't    |
|            | 23 | have any idea.                                           |
| 14:15:49   | 24 | Q.        How does that work?                            |
| 14:15:53   | 25 | A.        So I get paid generally specific amounts for   |

John J. Ryan - May 21, 2019

1    the particular types of project.  So, you know, if we

2    do a policy project, we write policies for a state, I

3    might get, you know, $40,000 to do that project that

4    takes months.  If I do a case and it's 8,500, which

5    this case is, then I'll see 6,000 of that.  Today,

6    you wrote a check for 2,500.  I will see 2,000 of

7    that.

14:16:23  8         So it all depends on the particular project.

9    I did training yesterday, and I'll get paid $1,000

10   for the training day.  So yesterday they might have

11   charged 3,500, so they're getting a big piece of that

12   yesterday.  Today I'm getting a bigger piece.  So it

13   all -- all depends.  You know, I don't break it out

14   that way.  I have no idea what they get, what the

15   company gets at the end of the day, because I don't

16   track it.  I know what I end up seeing out of certain

17   types of projects, and others, I don't.

14:16:52 18   Q.      Well, for instance, in this, you would get a

19   1099 from the check you received today, correct?

14:16:57 20   A.      I get a 1099 for everything I do at the end

21   of the year.

14:16:59 22   Q.      Yeah.  And then how do you sort that out

14:17:00 23   with --

14:17:01 24   A.      I don't.

14:17:02 25   Q.      -- Mr. Alsup?

John J. Ryan - May 21, 2019

14:17:04   1    A.      I don't.  I get one 1099 for everything.

14:17:08   2    Q.      And does that come from Mr. Alsup?

14:17:11   3    A.      So that comes from Mr. Alsup and goes to my S

           4    corp.  Then my accountant figures out, do I have any

           5    personal expenses?  One of my sons works for me,

           6    and I -- I pay him through the S corp.  I pay his

           7    health insurance through the S corp.  So I -- I've

           8    got that.  You know, I've got some expenses.  And

           9    then we determine -- you know, then I take a -- a --

          10    whatever is left, if I haven't taken it as pay

          11    throughout the year, then I -- I draw a bonus at the

          12    end with whatever is left.

14:17:41  13    Q.      What does your son do for your company?

14:17:45  14    A.      Does mostly research, so, you know, I write

          15    articles and I do videos, online training videos.  So

          16    he does most of my research for me.

14:17:53  17    Q.      Does he ever assist in the formation of your

          18    reports?

14:17:57  19    A.      No, he doesn't.  He doesn't have any police

          20    background.  He is a great writer.  He was a -- a law

          21    clerk for a judge and he was an intern for a federal

          22    judge and -- but he is -- he is a great writer and a

          23    great researcher, but no, he doesn't have any police

          24    experience.

14:18:20  25    Q.      How many hours have you worked this year as a

John J. Ryan - May 21, 2019

1    police practices consultant?

14:18:24    2    A.      Depends how you define police practices

3    consultant.  If you're saying cases, I don't have any

4    idea, because most of my cases I charge a flat fee

5    and don't track hours.

14:18:37    6         I can tell you that I work somewhere between

7    60 and sometimes 80 hours a week every week.  But

8    it's not just doing cases.

14:18:48    9         As I said, two weeks ago, I started on a -- I

10    haven't been home but for one day in -- in the last

11    three weeks.  And so three weeks ago I started in

12    Florida on a Tuesday and did a SWAT class Wednesday,

13    Thursday, Friday.  I spent the weekend.  I did a loss

14    control risk management class on Tuesday, Wednesday,

15    Thursday.  I flew home Thursday night and flew out to

16    Nashville Friday morning.

14:19:18   17         I -- I trained in -- in Tennessee, every

18    trainer has to go through a annual program to -- to

19    maintain their status as a trainer, and I trained

20    that yesterday.

14:19:35   21    Q.      I'm sorry, sir.  How much -- how much did

22    your S corp make last year?

14:19:41   23    A.      I think it runs somewhere between 5- and

24    600,000.  I think some years it's been 4, some years

25    it's been 6.

**John J. Ryan - May 21, 2019**

14:19:49   1    Q.        And what percentage of that was from

2    providing expert opinions or testimony as a police

3    practices expert?

14:19:56   4    A.        And I think it's ranged.   It depends on the

5    year.   But I think --

14:19:57   6    Q.        Sure.

14:19:59   7    A.        -- I think it would be safe to say somewhere

8    close to half probably comes out of the cases.

14:20:06   9    Q.        So -- and would you say that that would be

10   true for the past four or five years?

14:20:10  11    A.        No, no.   I had a lot of big projects, and

12   I -- I -- so as a result, I backed off on the cases

13   for a few years.

14:20:18  14    Q.        When did you have a lot of big projects?

14:20:20  15    A.        I couldn't tell you the year.   But, for

16   example, I mean, I wrote policies for Kansas,

17   Nebraska, Arkansas, so -- so those years I slowed

18   down on cases because I had those big projects.   So

19   whatever years those were, I would have to go back

20   and look.   But that's why I think there's -- there's

21   years where I would have to say that those big

22   projects were the -- where I made more.   The

23   percentages changed.

14:20:43  24    Q.        But last year, you would estimate you made

25   250- to $300,000 as a -- from generating police

John J. Ryan - May 21, 2019

|  | 1 | practices opinions or testifying? |
| 14:20:52 | 2 | A.        Again, please don't hold me to it, because I |
|  | 3 | don't track it that way.  I don't track it at all |
|  | 4 | that way. |
| 14:20:55 | 5 | Q.        Uh-huh. |
| 14:20:59 | 6 | A.        But just in my mind, I think it's probably 50 |
|  | 7 | percent or somewhere thereabouts, could be 40 |
|  | 8 | percent, but -- |
| 14:21:06 | 9 | Q.        And are you on pace this year to be higher or |
|  | 10 | lower than that? |
| 14:21:10 | 11 | A.        I don't have any idea, none -- none |
|  | 12 | whatsoever. |
| 14:21:15 | 13 | Q.        You authored a report in this case, correct? |
| 14:21:15 | 14 | A.        Correct. |
| 14:21:17 | 15 | Q.        Are you intending to offer any opinions in |
|  | 16 | this case other than the opinions disclosed in your |
|  | 17 | report? |
| 14:21:24 | 18 | A.        No, not unless you ask me questions and open |
|  | 19 | the door to new -- new opinions. |
| 14:21:31 | 20 | Q.        Did you obtain any textbooks after authoring |
|  | 21 | this report that you relied upon? |
| 14:21:36 | 22 | A.        Not that I'm aware of, no.  I mean, I -- I |
|  | 23 | read all the time, but I don't think there's anything |
|  | 24 | directly related to this report, no. |
| 14:21:44 | 25 | Q.        Have you received any additional material |

**John J. Ryan - May 21, 2019**

| | | |
|---|---|---|
| | 1 | after forming the opinions contained in your February |
| | 2 | 2019 report? |
| 14:21:51 | 3 | A.       You know, I checked this morning.  The only |
| | 4 | thing that I saw was, I saw that I got the subpoenas, |
| | 5 | one to Lexington and one to Providence.  That is the |
| | 6 | only thing that I saw as material that came in |
| | 7 | afterwards.  I got copies of those subpoenas that you |
| | 8 | did. |
| 14:22:03 | 9 | Q.       Wait.  You were provided with the physical |
| | 10 | subpoenas that I sent out for your personnel files? |
| 14:22:09 | 11 | A.       I saw copies of it. |
| 14:22:09 | 12 | Q.       Okay. |
| 14:22:11 | 13 | A.       I was actually in the police station, I |
| | 14 | think, when it came in, sitting in the deputy chief's |
| | 15 | office. |
| 14:22:16 | 16 | Q.       What were you doing there? |
| 14:22:18 | 17 | A.       Talking to the deputy chief and dropping some |
| | 18 | things off for the chief, some training materials |
| | 19 | that -- for some concerns they have that they -- they |
| | 20 | asked me about and wanted my help with. |
| 14:22:29 | 21 | Q.       What type of training materials? |
| 14:22:31 | 22 | A.       On First Amendment audits.  The chief called |
| | 23 | me because they have some issues related to First |
| | 24 | Amendment audits.  And so I dropped off some |
| | 25 | documents that I had written on First Amendment |

1    audits.  I sat down with the deputy chief of police

2    for maybe, I don't know, an hour and talked about

3    that training.  And then I have actually provided

4    them with an online training video, because I don't

5    have the time to physically go in and do the training

6    for them.

14:22:57 7   Q.      And, you know, Mr. Ryan, just for the record,

8    we object to the idea that you're going to expand

9    your opinions in any way through today's deposition.

10   So if I ask you any questions that you believe would

11   require you to disclose new opinions, I would like

12   for you to tell me that, because that's not my

13   intention, okay?

14:23:14 14  A.      Well, it's -- it may not be.  But if you ask

15   the question, I'm going to answer the question.  So,

16   you know, I mean, then you guys can argue about

17   whether I have expanded and I've -- I've been

18   nonresponsive to the question, because we have had

19   this happen before.  And -- and the judge always

20   allows me to answer questions and be responsive.

14:23:31 21          So, you know, that's -- that's the jeopardy

22   that you run of being a lawyer and asking the right

23   questions.  That's not my jeopardy, and it's not my

24   job to bring it to your attention, that you have

25   asked a bad question.

John J. Ryan - May 21, 2019

14:23:41  1   Q.      Well, we are going to move to exclude any

2   additional opinions that you testified to.

14:23:45  3   A.      And I think you have done that -- that your

4   firm has done that before and lost.

14:23:49  5   Q.      I think we have done that before and

6   succeeded.

14:23:51  7   A.      Well, I think you have done it before and

8   lost too.

14:23:57  9   Q.      And you read the Daubert opinion in the last

10   case that we went up against each other in, right?

14:23:59 11   A.      No, I don't think I did.  I'm not sure I did.

14:24:01 12   Q.      You didn't review that in the Sanders case?

14:24:02 13   A.      Which one?  I've read the --

14:24:04 14            MR. KELLEY:  The Sanders case is not a

15   Daubert opinion.

14:24:05 16            MR. SLOSAR:  It was.

14:24:06 17            MR. KELLEY:  It was not.

14:24:07 18            MR. SLOSAR:  It was.

14:24:08 19            MR. KELLEY:  Well, let's put it in,

20   because it's not a Daubert opinion.  It's a 703.

14:24:12 21            MR. SLOSAR:  John, you should -- you

22   should probably read the briefs.

14:24:15 23            MR. KELLEY:  Well, I should read

24   the -- I've -- I've got the opinion right here.

14:24:17 25            MR. SLOSAR:  He wasn't -- he wasn't

**John J. Ryan - May 21, 2019**

```
 1    excluded from testifying based on his qualifications.

 2    But it was a Daubert motion, and certain opinions

 3    were excluded.

14:24:27  4           MR. KELLEY:  It was a 703 opinion.  But

 5    okay.  Go ahead.

14:24:30  6           THE WITNESS:  Well, the basis of -- the

 7    basis of the judge's order is what -- what you go by.

 8    But, again I'm -- I'm -- I'm telling you that there

 9    has been a case where it came out the other way,

10    where the opinions were expanded at a deposition by a

11    member of your firm --

14:24:42 12           MR. SLOSAR:  All right.

14:24:43 13           THE WITNESS:  -- by asking a question

14    that shouldn't have been asked.

14:24:45 15  BY MR. SLOSAR:

14:24:46 16  Q.      Fair to say that any of the materials that

17    you relied upon and reviewed prior to forming your

18    opinions, that you put them in your report?

14:24:56 19  A.      Absolutely.  I put the list together.

14:25:00 20  Q.      And would you agree with me that if you

21    received additional materials after authoring your

22    report, that those would not have been materials that

23    you've reviewed or relied upon prior to forming your

24    opinions?

14:25:11 25  A.      Correct.  I would have -- if I had, I would
```

John J. Ryan - May 21, 2019

1    have supplemented the report and -- and made it

2    available.  And if I get new materials, I'll

3    certainly do that.

14:25:18  4    Q.      There's no supplementation that you have done

5    in this case, correct?

14:25:21  6    A.      Not to this date, no.

14:25:52  7    Q.      Hand you what we will mark as Exhibit No. 23,

8    which is a lucky number for a few people in Chicago.

14:25:58  9    A.      I'm sorry; I don't know what that means.

14:26:00  10              MR. KELLEY:  That's Michael Jordan's

11    number.

14:26:04  12              MR. SLOSAR:  There you go.

14:26:06  13              THE WITNESS:  I've got an issue, I only

14    follow hockey.  Oops.

14:26:10  15              MR. KELLEY:  Thank you.

14:26:12  16        (The document was marked Exhibit No. 23.)

14:26:12  17    BY MR. SLOSAR:

14:26:14  18    Q.      Sir, the Exhibit that I just handed to you,

19    is that the February 4th expert report that you've

20    tendered in this case?

14:26:21  21    A.      Yes.

14:26:21  22    Q.      Okay.

14:26:24  23    A.      Let me just check the date on the back.

24    Yes.

14:26:45  25    Q.      And looking at Page 12 of your report, does

John J. Ryan - May 21, 2019

1    this page include all of the material that you

2    reviewed prior to forming the opinions generated in

3    this case?

14:26:59  4    A.      Yes.

14:27:04  5    Q.      You were not provided with nor did you review

6    any additional material outside of this page,

7    correct?

14:27:11  8    A.      No, I didn't.  And again, the only thing that

9    I saw that came in after was those two subpoenas,

10   yeah.

14:27:16  11   Q.      And there was nothing substantive in the

12   subpoenas that caused you to change your opinions,

13   correct?

14:27:20  14   A.      No.

14:27:26  15          MR. SLOSAR:  Okay.  Perhaps we can

16   take, like, a -- like, a ten-minute break.  Is that

17   okay?

14:27:32  18          MR. KELLEY:  Sure.

14:27:32  19          THE VIDEOGRAPHER:  Going off the

20   record.  Time on the monitor is 14:26.

14:43:06  21                    (Recess.)

14:43:29  22          THE VIDEOGRAPHER:  Back on the record.

23   Time on the monitor is 14:42.

14:43:33  24   BY MR. SLOSAR:

14:43:36  25   Q.      All right.  Exhibit No. 24 is going to be

John J. Ryan - May 21, 2019

|   | 1 | Mr. Ryan's February 1st, 2019, report in this case. |
|---|---|---|
|   | 2 | Here you go, sir.  There you go. |
| 14:43:57 | 3 | (The document was marked Exhibit No. 24.) |
| 14:43:57 | 4 | THE WITNESS:  Well, wait a minute. |
| 14:43:57 | 5 | MR. KELLEY:  Didn't we put it in? |
| 14:43:57 | 6 | THE WITNESS:  You just gave me -- |
| 14:44:01 | 7 | we put it in as 23. |
| 14:44:01 | 8 | BY MR. SLOSAR: |
| 14:44:06 | 9 | Q.     No.  23 is the February 4th report.  24 is |
|   | 10 | your February 1st report.  You sent a report first |
|   | 11 | that was signed under oath, again, under penalty of |
|   | 12 | perjury, as you clarified earlier, before you then |
|   | 13 | did a second report. |
| 14:44:31 | 14 | A.     I must have -- I must have had to make a |
|   | 15 | change of some sort. |
| 14:44:34 | 16 | Q.     We'll go through it later. |
| 14:44:35 | 17 | A.     Yeah. |
| 14:44:38 | 18 | Q.     Exhibit 25, sir, is going to be a -- well, |
|   | 19 | let me ask you a question about this first. |
| 14:44:43 | 20 | Do you know Pasquale Granata? |
| 14:44:47 | 21 | A.     Pat Granata, yep.  He's on the job. |
| 14:44:49 | 22 | Q.     Pat -- would you consider him to be a friend |
|   | 23 | of yours? |
| 14:44:53 | 24 | A.     No, no.  Nice guy. |
| 14:44:57 | 25 | Q.     Nice guy.  Has he ever lied to you before? |

John J. Ryan - May 21, 2019

| | | |
|---|---|---|
| 14:44:59 | 1 | A.        Has he ever lied to me? |
| 14:45:00 | 2 | Q.        Yeah. |
| 14:45:02 | 3 | A.        Not that I'm aware of. |
| 14:45:15 | 4 | Q.        Did you interact with him during the -- while |
| | 5 | you were employed at the Providence Police |
| | 6 | Department? |
| 14:45:22 | 7 | A.        Yeah.  I think he was on the opposite relief |
| | 8 | initially, but I -- he worked in human resources for |
| | 9 | a period of time, I think, while I was still there. |
| | 10 | So I think, you know, I would have been -- he would |
| | 11 | have worked under Searles and I would have worked |
| | 12 | over -- over Searles.  So he would have been in my |
| | 13 | chain of command. |
| 14:45:39 | 14 | Q.        He was -- and Granata was in the human |
| | 15 | resources department, correct? |
| 14:45:41 | 16 | A.        He was, yeah. |
| 14:45:45 | 17 | Q.        And Granata was a person that you were |
| | 18 | dealing with when you were filling out your |
| | 19 | retirement paperwork, correct?  Exhibit 17? |
| 14:45:54 | 20 | A.        I doubt it.  I mean, he could be, but I doubt |
| | 21 | it. |
| 14:45:57 | 22 | Q.        You can take out Exhibit 17.  I'm going to |
| | 23 | give you what we'll mark as Exhibit 25. |
| 14:46:07 | 24 | (The document was marked Exhibit No. 25.) |
| 14:46:07 | 25 | BY MR. SLOSAR: |

John J. Ryan - May 21, 2019

14:46:09  1    Q.      You have multiple copies of this one.  And

2    I'm sorry; it's actually highlighted, which may make

3    things easier for you, because you'll know what I

4    want to talk to you about.  But were you --

14:46:20  5    A.      What am I looking for, 7?

14:46:25  6    Q.      17.  Your retirement paperwork.

14:46:28  7    A.      Stand by.  And again, I think -- I think this

8    is confused, because this is not my retirement

9    paperwork.  I thought I made that clear before.

14:46:35 10    Q.      Well, it's human resources paperwork related

11    to your retirement.

14:46:36 12    A.      Right.  But the -- but the retirement

13    paperwork comes out of city hall out of the

14    retirement board, out of the pension board.  And that

15    was filled out months earlier, and I would have been

16    working with probably -- I know her name -- Nicky at

17    the retirement board.  I think she was the one that I

18    sat down with, and I had to elect what I was going to

19    take as my -- because you have different options for

20    your pension.  She is the one that figures out your

21    time.  She calculates your pension.  So I worked with

22    her months before to get this done.

14:47:04 23            MR. KELLEY:  So you're replacing what?

24    I'm sorry.  Oh, you want him to look at 17.  I beg

25    your pardon.

**John J. Ryan - May 21, 2019**

14:47:08  1              MR. SLOSAR:  I'm not replacing

        2    anything.  This is Exhibit 25 we're looking at, plus

        3    Exhibit 17 is in front of him as well.

14:47:12  4              MR. KELLEY:  Got you.  25.

14:47:12  5    BY MR. SLOSAR:

14:47:16  6    Q.      Sir, did you -- were you ever informed that

        7    Mr. Granata was interviewed by Detective Sergeant

        8    Mansolilo and Springer --

14:47:24  9    A.      No.

14:47:30 10    Q.      -- in 2003?  Did you ever come into

       11    Mr. Granata's office a few times indicating that you

       12    were going to retire?

14:47:37 13    A.      I have no idea.  I mean, I -- everybody knew

       14    I was going to retire.

14:47:40 15    Q.      Did you call Mr. Granata a few times about

       16    your retirement?

14:47:47 17    A.      Not that I recall.  I don't think I ever had

       18    a conversation with Pat directly.

14:47:52 19    Q.      Were you aware that Col. Sullivan told

       20    Mr. Granata that if you came into the Providence

       21    Police Department, to notify the colonel?

14:48:01 22    A.      No.  I don't know anything about this.  I

       23    mean, it -- when was this?  When is this supposed to

       24    have happened?

14:48:06 25    Q.      Prior to your retirement, sir.

**John J. Ryan - May 21, 2019**

14:48:11  1   A.        You know, the -- Col. Sullivan was the chief

2   from January of 2001 to June of 2002, when I left.

3   So for 18 months, I went to work every day.  So I

4   don't know -- I don't -- I don't even know what

5   you're talking about.  Like, in other words, I -- it

6   doesn't even make sense, because I was there every

7   day working.

14:48:29  8   Q.        Sir, do you see -- do you -- looking at

9   Exhibit 17, do you see where it says June 10, 2002,

10   with some initials above it?

14:48:37 11   A.        Where is it?  Is it on the front or the back?

14:48:42 12   Q.        Second page.  Do you see it?  Got some

13   initials above it, June 10th, 2002.

14:48:49 14   A.        No, I'm sorry; I don't see that.

14:48:52 15   Q.        Exhibit 17.  No, no, no, that's 25.  I'm

16   sorry, Exhibit 17.

14:48:55 17   A.        Okay.

14:49:01 18   Q.        Page 2.  Do you see where there are initials

19   above June 10th?

14:49:06 20   A.        I see something there.  I can't tell if it is

21   initials.  I see some chicken scratches there, but I

22   -- I mean, I don't know if you can read it, but I

23   certainly can't read that.

14:49:14 24   Q.        Did you ask for anybody to white out your

25   retirement date, your final?

John J. Ryan - May 21, 2019

14:49:18 1   A.       Absolutely not.  I mean, why would I have to

2   do that?

14:49:20 3   Q.       Do you have any knowledge about whether your

4   final working day was changed?

14:49:25 5   A.       No.  I think what -- I think what's happened

6   is, see down here, they -- they figure out what

7   you've got coming to you and what they can pay you

8   for.  And then that's supposed to be your date up

9   here.  I mean, that's the only thing I can think of

10   why it would be changed.  I have no idea what was

11   done.

14:49:42 12   Q.       Sir, did you have to appear before any type

13   of hearing, and June 10th was the date that the

14   hearing was supposed to appear?

14:49:48 15   A.       Absolutely not.

14:49:50 16   Q.       Were you supposed to have your Garrity

17   hearing on June 10th, 2002?

14:50:07 18   A.       Absolutely not.

14:50:10 19   Q.       Did -- did you have any conversations with

20   Mr. Granata about why you were retiring on -- by June

21   10th, 2002?

14:50:19 22   A.       Let me -- let me make something perfectly

23   clear:  Everybody knew I was retiring.  Everybody

24   knew I had my last day.  I went in and saw the chief

25   and told the chief that I had a lot of institutional

**John J. Ryan - May 21, 2019**

1    knowledge, and even though we didn't get along, if he

2    needed something, to call me, because it was my last

3    day, and I left.  I wasn't coming back.  I made that

4    clear.  I was going down to the powerboat races in --

5    in Cape Cod.

14:50:41  6    Q.      Did Donna --

14:50:44  7    A.      There was no indication whatsoever that there

8    was going to be any kind of inquiry, any kind of

9    Garrity, any kind of anything.  I might have stayed

10   if I thought that were the case.

14:50:58  11   Q.      Did Donna Searles ever refuse to give you the

12   source documents?

14:51:01  13   A.      No.

14:51:01  14   Q.      Did you ever --

14:51:03  15   A.      I don't -- I don't recall her refusing.  I --

16   I remember telling her to get it for me.  I don't --

17   I don't -- at this point, you know, all these years

18   later, I have no idea what the conversation was.  If

19   she initially said, "No, it's all set," and I said,

20   "No, get it anyway," I don't know.

14:51:17  21   Q.      Did you ever tell Donna Searles that refusing

22   to give you the documentation key would be

23   insubordination?

14:51:24  24   A.      No.  I can't imagine that I would have said

25   that to her.  I can't imagine that her and I would

|   |   |   |
|---|---|---|
|  | 1 | have had that discussion. |
| 14:51:32 | 2 | Q.      I'm going to hand what you we'll mark as |
|  | 3 | Exhibit No. 26.   This is the original FBI summary. |
| 14:51:37 | 4 | (The document was marked Exhibit No. 26.) |
| 14:51:37 | 5 | BY MR. SLOSAR: |
| 14:51:50 | 6 | Q.      It's Bates 257 through 277.  I don't have any |
|  | 7 | questions for you on that at this time, sir, I'm just |
|  | 8 | introducing it as a record. |
| 14:51:57 | 9 | MR. KELLEY:  Wait a minute.  Is this |
|  | 10 | something different than -- |
| 14:52:01 | 11 | MR. SLOSAR:  It is.  They had multiple |
|  | 12 | summaries. |
| 14:52:07 | 13 | MR. KELLEY:   Okay. |
| 14:52:07 | 14 | BY MR. SLOSAR: |
| 14:52:11 | 15 | Q.      Sir, I'm going to hand you what we'll mark as |
|  | 16 | Exhibit 27.  It's an April 3rd, 2003, memorandum from |
|  | 17 | Major Sullivan to the testing investigation team. |
| 14:52:35 | 18 | (The document was marked Exhibit No. 27.) |
| 14:52:35 | 19 | BY MR. SLOSAR: |
| 14:52:36 | 20 | Q.      There you go.  Sir, have you ever seen this |
|  | 21 | document before today? |
| 14:52:41 | 22 | A.      No. |
| 14:52:43 | 23 | Q.      Sir, were you aware, looking at Page 2 of |
|  | 24 | this document, that there was a plan in place for you |
|  | 25 | to have a Garrity hearing at the Providence Police |

John J. Ryan - May 21, 2019

1    Department?

14:52:54  2    A.        Absolutely not.

14:52:58  3    Q.        Were you aware that there were several pages

4    of prearranged questions that were designed to ask

5    you before you retired?

14:53:05  6    A.        Absolutely not.  I know nothing about any of

7    this.

14:53:08  8    Q.        Were you aware that the Providence Police

9    Department planned to question you first in a Garrity

10   hearing?

14:53:14  11   A.        I mean, this is -- I -- I've got to be honest

12   with you.  I'm reading this.  This is absolutely

13   ridiculous.  I was still working there at the end of

14   May.  It talks about a mad scramble.  I was still

15   working there.  I was going in every day.  All's they

16   had to do was walk in my office and order me to come

17   down to Internal Affairs and -- and -- and sit me

18   down and -- and Garrity me.  It's the most ridiculous

19   thing I have ever -- I have ever seen.

14:53:36  20   Q.        How did you find out that there was a -- how

21   did you first find out about the Garrity hearing?

14:53:40  22   A.        I -- I didn't find out.  I found out there

23   was an investigation on, I think, the Monday it was

24   in the newspaper.  And I think what happened was, I

25   wasn't even home.  I was still on the Cape, and my

**John J. Ryan - May 21, 2019**

1    mother called me and said, "My God.  You're in the

2    newspaper.  They said that they -- that you retired

3    because they were going to investigate you."

14:53:59   4    Q.       Prior to today, were you aware that the

5    Providence Police Department was investigating you

6    for potential violations of law, good faith, FOP

7    promotional contractual issues and rules,

8    regulations, policies, general orders, and

9    memorandums of the Providence Police Department

10    governing contact -- conduct in accepted testing

11    procedures --

14:54:20  12    A.       Absolutely --

14:54:22  13    Q.       -- as reflected on Page 3 of this memorandum?

14:54:29  14    A.       Absolutely not.

14:54:35  15    Q.       Were you aware that four Bill of Rights

16    hearings were recommended by Major Sullivan on April

17    3rd, 2003, against other employed officers of the

18    Providence Police Department?

14:54:50  19    A.       Well, I'm aware that Lou Perrota admitted

20    that he -- he wasn't truthful, and he got demoted.

21    Beraducci stayed on the job, as far as I know.  I

22    don't think he was disciplined in any way, and I

23    don't think there was a Bill of Rights hearing.

24    Glancy was never -- was never ever charged or even

25    put up on disciplinary charges, to my knowledge.  And

**John J. Ryan - May 21, 2019**

1    then Rhonda Kessel was, but she -- she was not found

2    guilty of anything to do with promotion.  She was

3    found guilty of lying during the investigation.

14:55:23  4    Q.       Sir, were you aware that Mr. Prignano also

5    testified before the grand jury?

14:55:28  6    A.       No, I wasn't.  I'm surprised he never brought

7    it up.

14:55:31  8    Q.       So even though you were close friends with

9    Mr. Prignano, he never told you that he went before a

10   grand jury?

14:55:37 11    A.       I carried his casket.  I was one of the

12   pallbearers at his funeral.  That was last November.

14:55:42 13    Q.       That wasn't my question.  My question was --

14:55:44 14    A.       No, but you said it like I wasn't -- that

15   wasn't really true, and it is true.

14:55:46 16    Q.       Even though you were a close friend of

17   Mr. Prignano, he never informed you that he testified

18   at a grand jury?

14:55:52 19    A.       He did not.

14:55:55 20    Q.       Prior to today, were you ever informed that

21   Mr. Prignano invoked the Fifth Amendment right in

22   response to every question relating to police

23   misconduct to the Providence Police Department?

14:56:06 24    A.       No, I did not.  I didn't even know he was

25   called over to that grand jury.

**John J. Ryan - May 21, 2019**

14:56:07  1          (The document was marked Exhibit No. 28.)

14:56:07  2    BY MR. SLOSAR:

14:56:09  3    Q.      And this exhibit is Exhibit No. 28,

        4    Mr. Prignano's grand jury testimony.

14:56:15  5          All right.  Let's get back to the report.

14:56:21  6          Sir, when you were first retained in this

        7    case, what were you retained to do?

14:56:29  8    A.      As in most cases, I was retained to look at

        9    materials and then call the attorneys and let them

       10    know if I had any opinions that I could -- that would

       11    help the jury understand the police practices

       12    involved with respect to their particular case.

14:56:46 13    Q.      And you understood that you were being

       14    retained by defendant -- the Knox County defendants,

       15    correct?

14:56:51 16    A.      Correct.

14:57:01 17    Q.      Sir, does your corporation or the corporation

       18    that you work for, does it have some sort of

       19    electronic new client request form that people can

       20    fill out?

14:57:14 21    A.      They have a new case form that is done by

       22    them.

14:57:22 23    Q.      I'm going to hand you what we'll mark as

       24    Exhibit --

14:57:27 25                  MR. KELLEY:   29.

John J. Ryan - May 21, 2019

| | | |
|---|---|---|
| 14:57:30 | 1 | MR. SLOSAR:   No. 29. |
| 14:57:30 | 2 | (The document was marked Exhibit No. 29.) |
| 14:57:30 | 3 | BY MR. SLOSAR: |
| 14:57:38 | 4 | Q.      Have you seen this document? |
| 14:57:39 | 5 | I'm sorry, sir. |
| 14:57:44 | 6 | Have you seen this document prior to today? |
| 14:57:48 | 7 | A.      I probably brought a copy of it with me, |
| | 8 | because I generally asked them to send the copy of |
| | 9 | this.  But that's -- I don't -- I don't even look at |
| | 10 | it.  I mean, this is just an in-house thing to track |
| | 11 | the file. |
| 14:57:58 | 12 | Q.      According to this document, when did the |
| | 13 | defendants first reach out to retain you as an expert |
| | 14 | witness? |
| 14:58:07 | 15 | A.      Says December 18, 2018. |
| 14:58:09 | 16 | Q.      Fair to say that you would not have reviewed |
| | 17 | any documents prior to this request? |
| 14:58:15 | 18 | A.      I have to look at the file and see if any |
| | 19 | documents came in before then.  That would be the |
| | 20 | only way I would know.  You know, sometimes these |
| | 21 | don't get filled out and they get filled out a month |
| | 22 | later.  But those dates are usually pretty good. |
| | 23 | Again, I don't fill these out, so I don't know the |
| | 24 | answer to that. |
| 14:58:39 | 25 | Q.      Did you review any documents after receiving |

John J. Ryan - May 21, 2019

|         |    |                                                      |
|---------|----|------------------------------------------------------|
|         | 1  | this form prior to accepting the agreement?          |
| 14:58:49| 2  | A.      Again, I enter the agreement usually, and    |
|         | 3  | then I review all the documents, and then I call them|
|         | 4  | and say, "Hey, look, here is what I see."  Sometimes |
|         | 5  | I tell them, "Hey, I think you've got issues here,   |
|         | 6  | and there's nothing I can do to help you explain to  |
|         | 7  | the jury the police practices, because what the      |
|         | 8  | officer did was incorrect."                          |
| 14:59:08| 9  | Q.      When is the last time that happened?         |
| 14:59:09| 10 | A.      Yesterday.                                   |
| 14:59:10| 11 | Q.      What kind of case was it?                    |
| 14:59:11| 12 | A.      A use of force case.                         |
| 14:59:14| 13 | Q.      What was the jurisdiction?                   |
| 14:59:16| 14 | A.      Arkansas.                                    |
| 14:59:24| 15 | Q.      And eventually -- is it fair to say that you |
|         | 16 | would not have begun any work as an expert witness   |
|         | 17 | without a contractual agreement between yourself and |
|         | 18 | the Knox County defense counsel?                     |
| 14:59:34| 19 | A.      Generally, we would have a retainer          |
|         | 20 | agreement, but once again, that -- they don't always |
|         | 21 | get signed when they should.                         |
| 14:59:41| 22 | I had one a couple of weeks ago where we             |
|         | 23 | still didn't have a signed retainer agreement.  And  |
|         | 24 | we were already at deposition.  It just fell through |
|         | 25 | the cracks.  Again, I have an assistant that does    |

John J. Ryan - May 21, 2019

|   |    |                                                          |
|---|----|----------------------------------------------------------|
|          | 1  | that.  She didn't realize it.  And it is what it is.     |
| 14:59:57 | 2  | Q.      In this case, we do have a signed agreement      |
|          | 3  | that I'll show you as Exhibit No. 30.                    |
| 15:00:02 | 4  |         (The document was marked Exhibit No. 30.)        |
| 15:00:02 | 5  | BY MR. SLOSAR:                                            |
| 15:00:04 | 6  | Q.      Have you seen this document prior to today,      |
|          | 7  | sir?                                                     |
| 15:00:08 | 8  | A.      Again, this particular one, I'm sure I           |
|          | 9  | probably have a copy of it with me.                      |
| 15:00:10 | 10 | Q.      Does it have your signature on it?               |
| 15:00:12 | 11 | A.      No.                                              |
| 15:00:16 | 12 | Q.      Whose signature is that?                         |
| 15:00:18 | 13 | A.      That looks to me like Jim Alsup's, the owner     |
|          | 14 | of the company.                                          |
| 15:00:21 | 15 | Q.      So you did not sign this agreement, correct?     |
| 15:00:24 | 16 | A.      No.  I don't ever sign any of these              |
|          | 17 | agreements.                                              |
| 15:00:27 | 18 | Q.      Did you consult with Jim Alsup about the         |
|          | 19 | substance of this case before being assigned to it?      |
| 15:00:30 | 20 | A.      No.  Jim has no law enforcement background       |
|          | 21 | other than organizing training and coordinating          |
|          | 22 | training.  He doesn't have a -- he was never a cop.      |
|          | 23 | He has got no law enforcement background.                |
| 15:00:41 | 24 | Q.      So there's no vetting by Mr. Alsup, correct?     |
| 15:00:43 | 25 | A.      Correct.                                         |

John J. Ryan - May 21, 2019

15:00:46   1   Q.        How were you first provided with documents in

       2   this case?

15:00:49   3   A.        I don't know the answer to that.  Usually all

       4   the documents come in electronically.  And if they

       5   don't come in electronically, we have an assistant

       6   that scans them in and makes them electronic so I can

       7   review them electronically.

15:01:02   8   Q.        In this case, do you have any memory as to

       9   how you received documents?

15:01:03   10  A.        No.

15:01:06   11  Q.        Did you ever request additional documents?

15:01:08   12  A.        No, I don't believe so.  I don't -- I don't

       13  recall anything that I requested.  You know,

       14  sometimes when I -- I'm reading an opposing expert's

       15  opinion, I see something that's not in my documents,

       16  and I might ask for them.  But I don't recall in this

       17  particular case that that happened.

15:01:23   18  Q.        Why don't -- why do you charge a flat fee

       19  without knowing the size of the record?

15:01:30   20  A.        Because I find it much easier for the most

       21  part.  I find that then I don't have to track hours.

       22  With my travel schedule, I might decide to work on a

       23  plane, so I find it much easier not to have to track

       24  the hours.  That's No. 1.

15:01:44   25            More importantly, I think it's better for

John J. Ryan - May 21, 2019

1    open communication.  Whether I'm on the plaintiff's

2    side or the defense side, I want the attorney to be

3    able to call me at 9:00 at night and say, "Jack, I

4    just thought of something" and not have to worry

5    about running up the bill on -- on, you know, the

6    client or, in some case, maybe the plaintiff.

7    So -- so I find it easier to do that way.

15:02:07  8          I -- I learned from Lou Reiter, who, you

9    know, kind of broke me into this business.  That's

10    what he has always done.  So that's the way I have

11    always done it.

15:02:17 12    Q.     In this case did you review the material that

13    was sent to you?

15:02:19 14    A.     Yes.

15:02:22 15    Q.     And that material is contained on Page 12 of

16    your second report, correct?

15:02:27 17    A.     Correct, yeah.  I want to -- again, I'm --

15:02:29 18    Q.     We're going to go through the differences in

19    your two reports.

15:02:32 20    A.     Yeah.  I just don't -- I don't recall why --

21    I think I might have updated something.  I don't

22    know.

15:02:36 23    Q.     We'll get to that.

15:02:38 24    A.     Well, I want to look at the list and make

25    sure we don't have two different lists.

John J. Ryan - May 21, 2019

15:02:40   1   Q.        You do have --

15:02:42   2   A.        Like, did I -- did I add something different

           3   because I read something different?

15:02:45   4   Q.        Well, I have a couple of questions before you

           5   get there, sir.

15:02:47   6   A.        Okay.

15:02:51   7   Q.        What -- was one of the first documents that

           8   you reviewed in this case the report of Mr. Drago?

15:02:56   9   A.        Is it one of the first documents I review?

15:02:57  10   Q.        Yeah.

15:02:59  11   A.        No, it's generally one of the last documents

          12   I review.

15:03:01  13   Q.        So you don't look at the other police

          14   practices expert report until last?

15:03:05  15   A.        I usually do that last.

15:03:07  16   Q.        Why?

15:03:08  17   A.        You know, it's been my practice because I

          18   want an open mind going in.  And sometimes I think

          19   what happens, human nature is such that -- that you

          20   -- you might get skewered by reading another expert's

          21   report, either way.  So I always -- I generally

          22   always leave that to last.  So I would guess that I

          23   left it to last in this case, because that's my

          24   practice.

15:03:35  25   Q.        And I will introduce this as Exhibit 31.

**John J. Ryan - May 21, 2019**

| | | |
|---|---|---|
| 15:03:35 | 1 | (The document was marked Exhibit No. 31.) |
| 15:03:35 | 2 | BY MR. SLOSER: |
| 15:03:37 | 3 | Q.     But to date, you have only generated a single |
| | 4 | invoice to the Knox County defendants for your work |
| | 5 | in this case; is that right? |
| 15:03:43 | 6 | A.     That's correct. |
| 15:03:45 | 7 | Q.     And how much was that invoice for? |
| 15:03:46 | 8 | A.     8,500. |
| 15:03:50 | 9 | Q.     And when did you generate that invoice? |
| 15:03:54 | 10 | A.     And again, bear in mind I don't generate the |
| | 11 | invoices. |
| 15:03:57 | 12 | Q.     When did your company generate this invoice? |
| 15:03:57 | 13 | A.     December 13th. |
| 15:03:59 | 14 | Q.     At that time had you received -- reviewed any |
| | 15 | of the materials in this case? |
| 15:04:04 | 16 | A.     I don't have any idea.  I would doubt it, |
| | 17 | because I generally get the invoice, and -- and, you |
| | 18 | know, it's a nonrefundable up front whether I end up |
| | 19 | doing a report or not. |
| 15:04:13 | 20 | Q.     How did -- so you would take the $8,500 |
| | 21 | regardless of whether you create a report? |
| 15:04:18 | 22 | A.     Absolutely. |
| 15:04:19 | 23 | Q.     When is the last time you did that? |
| 15:04:21 | 24 | A.     Happens all the time.  If -- if I get through |
| | 25 | the materials and I find that there's nothing I can |

John J. Ryan - May 21, 2019

```
 1   be helpful with, I call the attorney up and say,

 2   "Look, here is what I see in this -- in these

 3   materials.  You know, that's -- there's -- there's

 4   issues here and I can write a report for you, but

 5   here is what it is going to say."  And I have a lot

 6   of plaintiff's attorneys say to me, "No, please don't

 7   write a report."

 8          I think the last one was -- was a plaintiff's

 9   attorney out of California.  It was fairly recent.  I

10   want to say it's Arnoldo Castille or something like

11   that.  I forget his name.  But it was a shooting

12   case.

13   Q.     Sir, how many other cases have you been

14   retained by the defense firm that hired you here?

15   A.     I don't know that I have -- I don't think I

16   have ever done any with Mr. Kelley.  I don't know

17   that I have ever done any with Jason Williams.  I

18   think this may be the first one.  I am not sure.

19   There -- I mean, there could be one other, but I

20   don't recall it if there was.

21   Q.     How many cases have you provided expert

22   opinions on within the Commonwealth of Kentucky?

23   A.     I'm going to guess a couple of dozen, anyway,

24   I think, probably over the years.

25   Q.     What are some of the --
```

Timestamps:
15:04:45 (line 8)
15:04:59 (line 13)
15:05:05 (line 15)
15:05:23 (line 21)
15:05:31 (line 23)
15:05:33 (line 25)

**John J. Ryan - May 21, 2019**

| | | |
|---|---|---|
| 15:05:35 | 1 | A.        Maybe less, I don't know, maybe more. |
| 15:05:39 | 2 | Q.        What are some -- what are some of the -- do |
| | 3 | you remember the names of any of those cases? |
| 15:05:44 | 4 | A.        I don't recall them.  I mean, whatever I |
| | 5 | testify, it will be on my CV. |
| 15:05:50 | 6 | Q.        Have you ever testified in a federal court in |
| | 7 | Kentucky as a police practices expert? |
| 15:05:56 | 8 | A.        I'm quite sure that I have. |
| 15:06:00 | 9 | Q.        Can you name a single case where you |
| | 10 | testified in a federal court as a police practices |
| | 11 | expert in the state of Kentucky? |
| 15:06:06 | 12 | A.        No, because I'm not certain.  But if you go |
| | 13 | through my list, if it's since 2011, you will find |
| | 14 | it.  But I have had a bunch of cases.  I'm just |
| | 15 | trying to think if any of them ever made it by |
| | 16 | summary judgment and qualified immunity. |
| 15:06:22 | 17 | Q.        For a settlement? |
| 15:06:23 | 18 | A.        Yeah, there could be some that could settle |
| | 19 | too, absolutely.  Actually, I think there are a |
| | 20 | couple that settled. |
| 15:06:54 | 21 |          I do believe -- and -- and again, I forget |
| | 22 | the name of the case.  But I believe that I testified |
| | 23 | in a case where the attorney was Spencer Noe.  I |
| | 24 | don't know why I believe that I testified in federal |
| | 25 | court on a case for him, but I'm -- I'm not 100 |

|   | |
|---|---|
| 1 | percent sure.  I could be confusing a deposition with |
| 2 | trial testimony. |
| 15:07:34 3 | Q.     Have you ever testified before a jury in a |
| 4 | Kentucky federal court as a police practices expert? |
| 15:07:39 5 | A.     Again, it's the same answer.  I -- I can't |
| 6 | say for sure.  But I believe I have.  And I believe |
| 7 | it was a case for Spencer Noe, if I'm not mistaken. |
| 8 | And there may be others as well.  I just don't -- I |
| 9 | don't commit that to memory. |
| 15:07:54 10 | Q.     Did you review documents electronically or in |
| 11 | paper form? |
| 15:07:56 12 | A.     Electronically is what I work. |
| 15:07:58 13 | Q.     Do you highlight those documents as you are |
| 14 | reviewing them? |
| 15:08:00 15 | A.     I don't.  I don't ever take a note.  I don't |
| 16 | ever highlight. |
| 15:08:03 17 | Q.     So how do you draft a report after you're |
| 18 | done with that process? |
| 15:08:06 19 | A.     So what I do is, I read through the documents |
| 20 | once.  And then after going through them once, I go |
| 21 | through them a second time, a lot quicker the second |
| 22 | time, because there are some documents that just |
| 23 | don't pertain to what I'm, you know, looking at. |
| 15:08:22 24 | But the -- the -- I draft on the second -- |
| 25 | the second time around.  And I have had a |

John J. Ryan - May 21, 2019

| | | |
|---|---|---|
| | 1 | conversation with the attorneys between the first |
| | 2 | time around and second time around.  It's always been |
| | 3 | the way I have done it. |
| 15:08:51 | 4 | Q.      Looking at Exhibit 23, your February 4th, |
| | 5 | 2019, report, Page 12, did you create this list? |
| 15:08:55 | 6 | A.      Actually, I have.  My assistant maintains the |
| | 7 | list for me, and then I check them off as I go |
| | 8 | through them. |
| 15:09:18 | 9 | Q.      And are you careful when you go through them |
| | 10 | that everything is accurate? |
| 15:09:23 | 11 | A.      I certainly try to be.  But I'm -- I'm -- I'm |
| | 12 | confused.  I don't know if I was asked to do |
| | 13 | something here.  I -- I don't know. |
| 15:09:32 | 14 | Q.      Were you careful in making sure that every |
| | 15 | piece of material that you were provided was |
| | 16 | contained within this list? |
| 15:09:38 | 17 | A.      I certainly try to.  And again, I don't keep |
| | 18 | the list.  I have Tracy in my office maintain a list, |
| | 19 | and I check them off as I'm going through them. |
| 15:09:47 | 20 | Q.      Is it fair to say that the opinions that you |
| | 21 | generated in this report are based upon the materials |
| | 22 | that you reviewed as reflected on Page 12? |
| 15:09:57 | 23 | A.      Correct. |
| 15:09:59 | 24 | Q.      And is it fair to say that you have not |
| | 25 | reviewed any additional materials that are not |

John J. Ryan - May 21, 2019

|          |    |                                                          |
|----------|----|----------------------------------------------------------|
|          | 1  | reflected on Page 12 aside from the two subpoenas you   |
|          | 2  | discussed earlier?                                       |
| 15:10:09 | 3  | A.      Yes.                                             |
| 15:10:13 | 4  | Q.      Now, according to your report, you reviewed     |
|          | 5  | the complaint filed by plaintiffs; is that right?       |
| 15:10:18 | 6  | A.      Correct.                                        |
| 15:10:20 | 7  | Q.      And according to your report, you also          |
|          | 8  | reviewed the deposition transcript from March 16th,     |
|          | 9  | 2018, relating to Plaintiff Amanda Hoskins, correct?    |
| 15:10:29 | 10 | A.      I'm sorry; say it again.  Yes.  Hoskins         |
|          | 11 | deposition, yes.                                         |
| 15:10:35 | 12 | Q.      Yes.  According to your report, you reviewed    |
|          | 13 | the deposition transcript and exhibits for Jason        |
|          | 14 | York's deposition, correct?                             |
| 15:10:42 | 15 | A.      Correct.                                        |
| 15:10:45 | 16 | Q.      Is it fair to say that when you reviewed the    |
|          | 17 | exhibits to the deposition, that you made sure to       |
|          | 18 | document that on Page 12?                                |
| 15:10:52 | 19 | A.      Well, I included them, yeah.                    |
| 15:10:53 | 20 | Q.      Yeah.                                           |
| 15:10:56 | 21 | A.      I probably have things in the -- in the -- in   |
|          | 22 | the materials that mention them.                         |
| 15:11:03 | 23 | Q.      Now, for the other depositions -- well, let's  |
|          | 24 | keep going.                                              |
| 15:11:06 | 25 |         You also reviewed the deposition transcript     |

John J. Ryan - May 21, 2019

|  | 1 | of Derek Eubanks from June 6, 2018, correct? |
|--|---|--|
| 15:11:10 | 2 | A.      Correct. |
| 15:11:13 | 3 | Q.      And you reviewed the March 22nd, 2018, |
|  | 4 | deposition transcript of John Pickard, correct? |
| 15:11:18 | 5 | A.      Correct. |
| 15:11:23 | 6 | Q.      You reviewed the Jonathan Taylor deposition |
|  | 7 | transcript from April 13, 2018, correct? |
| 15:11:27 | 8 | A.      Correct. |
| 15:11:29 | 9 | Q.      And you reviewed the deposition transcript |
|  | 10 | from James Allen Helton on April 9, 2018; is that |
|  | 11 | right? |
| 15:11:36 | 12 | A.      Correct.  I see that I missed that in one of |
|  | 13 | them, and I'm not sure how I did that, but -- |
| 15:11:47 | 14 | Q.      Now, for Defendant York's deposition, you |
|  | 15 | documented that you reviewed all of the accompanying |
|  | 16 | exhibits, correct? |
| 15:11:52 | 17 | A.      Correct. |
| 15:11:56 | 18 | Q.      You did not document that you reviewed any of |
|  | 19 | the exhibits for the deposition of Amanda Hoskins, |
|  | 20 | correct? |
| 15:11:59 | 21 | A.      Correct. |
| 15:12:02 | 22 | Q.      You did not document that you reviewed any of |
|  | 23 | the exhibits for Derek Hoskins, correct?  Or Derek |
|  | 24 | Eubanks, correct? |
| 15:12:06 | 25 | A.      Correct. |

John J. Ryan - May 21, 2019

15:12:09  1    Q.       You did not document that you reviewed any of

2    the exhibits for John Pickard, correct?

15:12:10  3    A.       Correct.

15:12:14  4    Q.       You did not document that you reviewed any of

5    the exhibits for Jonathan Taylor's April 13, 2018,

6    deposition, correct?

15:12:20  7    A.       Correct.  To the extent there were exhibits

8    in all those depositions, I did not mark them.  It

9    may be that they were attached in a different way to

10   the depositions.  I don't know.

15:12:29 11    Q.       And also you did not review -- you did not

12   document that you reviewed any exhibits the

13   deposition transcript from James Allen Helton on

14   April 9, 2018, correct?

15:12:39 15    A.       Correct.  And -- and again, note that there

16   are some exhibits listed. 8, 9, 10, 11, 12 were some

17   exhibits listed.

15:12:49 18    Q.       Sure.  Each of these existed -- exhibits that

19   you have listed between 8 and 12 were actually

20   exhibits to Defendant York's deposition?  Do you

21   agree with that?

15:12:58 22    A.       They may very well have been.

15:12:58 23    Q.       Okay.  Now --

15:13:00 24    A.       May have done it twice, yeah.

15:13:03 25    Q.       For Amanda Hoskins, you did not review the

John J. Ryan - May 21, 2019

1    accompanying exhibits for her deposition, correct?

15:13:09  2    A.      Unless I've got them listed or they fell in

3    with -- in one of the responses as well.  So it may

4    be that I did.  I'd have to know what the exhibits

5    were.  And if they fell in within one of these other

6    categories, it may be the case.

15:13:21  7    Q.      Well, you mean unless they fell into

8    Defendant York's deposition or to the five separate

9    exhibits that you've listed, right?

15:13:28 10    A.      No.  Let's -- let's suppose that they were

11    part of discovery somewhere else.  So, you know, they

12    were part of -- I don't know, they -- they came up in

13    another discovery request, then, you know, I would

14    have -- I would have seen them in that other

15    discovery request.

15:13:39 16    Q.      Well, sir --

15:13:41 17    A.      But I don't -- I don't see where there was

18    any plaintiff production here, so I'm -- I'm going to

19    guess that unless they were produced by plaintiff,

20    no.

15:13:52 21    Q.      Okay.  The request -- the responses to the

22    discovery requests that you list here, you understand

23    that those are written -- formal responses to written

24    discovery without accompanying documents, correct?

15:14:09 25    A.      They may very well be.  Sometimes I do have,

**John J. Ryan - May 21, 2019**

1    and I would have to look at the file, but I would

2    have to look, because sometimes I have documents that

3    are attached to the formal pleading.

15:14:18    4         So in other words, I will -- I will get

5    a -- right here it says, "Responses to request for

6    production."  Well, I will get the formal pleading,

7    but then I'll also get 700 pages of documents

8    attached to it with those -- which are the actual

9    substance of the request for production.

15:14:36   10    Q.    Sure.  In this case, I will represent to you

11    that the plaintiffs' 26(a)(1) disclosures consisted

12    of over 20,00 pages of documents, and they certainly

13    weren't reproduced in response to any of the

14    individual requests.  Fair to say that you did not

15    review 20- to 30,000 pages of discovery in this case

16    prior to forming your opinions?

15:15:01   17    A.    I don't believe that I looked at that many

18    documents.  But I certainly looked at a lot of

19    documents.  And -- and -- and some of them are -- you

20    know, you'll see them as you -- as you go through the

21    substance of the report.

15:15:10   22    Q.    Sure.  You reviewed the exhibits that were

23    attached to Defendant York's deposition in addition

24    to the exhibits documented in 8 through 12, correct?

15:15:25   25    A.    Absolutely.

**John J. Ryan - May 21, 2019**

| | | |
|---|---|---|
| 15:15:26 | 1 | Q.      Yes.  And then you reviewed a total of six |
| | 2 | deposition transcripts, correct? |
| 15:15:34 | 3 | A.      Yes. |
| 15:15:42 | 4 | Q.      Between 13 and 29, it looks like you have |
| | 5 | documented that you have reviewed plaintiffs' written |
| | 6 | discovery responses to all the defendants in this |
| | 7 | case; is that fair? |
| 15:16:01 | 8 | A.      Say that again.  Yes.  Yeah.  Hoskins, yeah, |
| | 9 | right. |
| 15:16:04 | 10 | Q.      Well, Hoskins and Taylor. |
| 15:16:06 | 11 | A.      And Taylor is down at the bottom, yeah, |
| | 12 | absolutely. |
| 15:16:08 | 13 | Q.      Both those.  Aside from that, the only |
| | 14 | additional documents that you reviewed were |
| | 15 | plaintiffs' expert reports of Charles Drago, the |
| | 16 | formal document disclosures, the 26(a)(2) formal |
| | 17 | document disclosures from plaintiff, and a summary |
| | 18 | letter by Jason Williams.  Is that right? |
| 15:16:30 | 19 | A.      I certainly looked at all those documents. |
| | 20 | Again, I don't know if there were other documents |
| | 21 | attached to any of these.  We would have to look at |
| | 22 | the actual file. |
| 15:16:38 | 23 | Q.      You don't have your file here with you, |
| | 24 | correct? |
| 15:16:42 | 25 | A.      I -- no.  But I -- I mean, I could try to get |

John J. Ryan - May 21, 2019

1    on the server and look.

15:16:47  2    Q.      If you reviewed documents outside of this,

3    you would have made sure that that was in your

4    materials reviewed, right?

15:16:55  5    A.      Unless they were labeled under one of these

6    headings and they were incorporated into one of these

7    headings, and then I would have left it under the

8    heading that they were -- that was given to me.

15:17:04  9    Q.      You have no reason to believe that that

10    occurred in this case?

15:17:08  11    A.      Happens all the time.

15:17:10  12    Q.      All right.  Well, why don't we go off the

13    record, and you go on your server and see if there

14    are any additional documents that you reviewed that

15    were attached to any of these written discovery

16    requests.

15:17:22  17    A.      I can certainly try and see if I can get on

18    it.

15:17:24  19              MR. SLOSAR:  Off the record.

15:17:25  20              THE VIDEOGRAPHER:  Going off the

21    record, time on the monitor is 15:16.

15:17:30  22                          (Recess.)

15:22:13  23              THE VIDEOGRAPHER:  Going back on the

24    record, time on the monitor is 15:21.

15:22:18  25    BY MR. SLOSAR:

John J. Ryan - May 21, 2019

15:22:29  1    Q.      All right.  Sir, have you made attempts to

2    conduct a review of the internal filing system as it

3    relates to documents that you received in this case?

15:22:41  4    A.      Oh, ours?  Yeah.  I'm sorry.  I didn't have a

5    clue what you were talking about.

15:22:45  6            I attempted to, and the problem is, I can't

7    get through on the server to see if more documents

8    exist under these labels as I've -- I've got them

9    listed in the report.

15:23:00 10    Q.      Okay.  So outside of, as far as you know,

11    everything that you listed in the report, are the

12    documents that you reviewed in forming your opinions

13    correct?

15:23:07 14    A.      Correct.  But to the extent that some

15    documents may fall under these categories, I would

16    have to get into the server to look at them.

15:23:14 17    Q.      You have no independent recollection of

18    reviewing 20,000 pages of discovery in this case,

19    correct?

15:23:20 20    A.      I remember looking at a lot of documents in

21    this case and I have cited to a lot of documents in

22    this case, but I don't recall looking at 20,000.

15:23:27 23    Q.      I'll represent to you that the documents that

24    you have cited to have been exhibits to Defendant

25    York's deposition and other deposition transcripts.

1      Is that fair?

15:23:37   2      A.      That may very well be.

15:23:42   3      Q.      Now, let's talk about what you did not

4      review.  Were you provided with a complete set of

5      police reports regarding the Mills homicide

6      investigation prior to forming your opinions in this

7      case?

15:23:56   8      A.      I don't think I had the complete

9      investigation done by KSP in this.

15:24:02  10      Q.      You have -- you also have not reviewed the

11      deposition of Christy Branson, correct?

15:24:09  12      A.      If it is not on my list, I did not.

15:24:11  13      Q.      You also have not reviewed the deposition

14      transcript of Mike Broughton, correct?

15:24:15  15      A.      Mike who?

15:24:15  16      Q.      Broughton.

15:24:17  17      A.      If it's not on my list, no.

15:24:18  18      Q.      You also have not reviewed the deposition

19      transcript of Mikey Bruner, correct?

15:24:24  20      A.      No.  If it's not on my list, I did not.

15:24:26  21      Q.      You also have not reviewed the deposition

22      transcript of Shannon Cobb-Bunch, correct?

15:24:30  23      A.      If it's not on my list, I did not.

15:24:33  24      Q.      You also have not reviewed the deposition

25      transcript of Michael Crump, correct?

John J. Ryan - May 21, 2019

15:24:36 1 A.        That's correct; I have not.

15:24:39 2 Q.        You also have not reviewed the deposition

3 transcript of Dallas Eubanks, correct?

15:24:44 4 A.        I thought I did have one of the Eubankses.

15:24:45 5            MR. KELLEY:  Derek.

15:24:46 6            THE WITNESS:  I have Derek.  I don't

7 have Dallas.

15:24:47 8 BY MR. SLOSAR:

15:24:50 9 Q.        You also have not reviewed the deposition

10 transcript of Lisa Evans, correct?

15:24:52 11 A.        Correct.

15:24:55 12 Q.        You also have not reviewed the deposition of

13 Kelly Farris, correct?  F-A-R-R-I-S.

15:25:00 14 A.        I know I had -- I had a Farris.  I have some

15 material from Farris, I think, but not Kelley Farris.

16 I have the Farris discovery request.

15:25:08 17 Q.        You also have not reviewed the deposition

18 transcript of Bryan Johnson, correct?

15:25:11 19 A.        Correct.

15:25:14 20 Q.        You also have not reviewed the deposition

21 transcript of Jackie Joseph, correct?

15:25:16 22 A.        Correct.

15:25:19 23 Q.        You also have not reviewed the deposition

24 transcript of Joe King, correct?

15:25:22 25 A.        Correct.

John J. Ryan - May 21, 2019

15:25:24  1    Q.      You also have not reviewed the deposition

       2    transcript of Jesse Lawson, correct?

15:25:29  3    A.      No, I don't think I had Jesse's.

15:25:29  4    Q.      Do --

15:25:32  5    A.      That statement is related to Jesse but not

       6    his deposition.

15:25:35  7    Q.      You also have not reviewed the deposition

       8    transcript of William Lester, correct?

15:25:39  9    A.      No.   Again, I had documents related to

      10    Luster, but I don't think I had a deposition from

      11    Luster.

15:25:42 12    Q.      You also have not reviewed the deposition

      13    transcript of Mark Medford, correct?

15:25:46 14    A.      Correct.

15:25:48 15    Q.      You also have not reviewed the deposition

      16    transcript of Kayla Mills, mother, and Donna Mills,

      17    correct?

15:25:55 18    A.      Correct.   I had information related to her

      19    but not -- I don't think I had a deposition from her.

      20    In fact, I know I didn't.

15:26:00 21    Q.      You also have not reviewed the deposition

      22    transcript of Amber Simpson, correct?

15:26:03 23    A.      Correct.

15:26:05 24    Q.      You have not reviewed the deposition

      25    transcript of Mike Simpson, correct?

John J. Ryan - May 21, 2019

| | | |
|---|---|---|
| 15:26:08 | 1 | A.        Correct. |
| 15:26:09 | 2 | Q.        You have not reviewed the deposition |
| | 3 | transcript of Jerry Wayne Smith, correct? |
| 15:26:12 | 4 | A.        Correct. |
| 15:26:14 | 5 | Q.        You have not reviewed the deposition |
| | 6 | transcript of current Knox County Sheriff Mike Smith, |
| | 7 | correct? |
| 15:26:18 | 8 | A.        Correct. |
| 15:26:21 | 9 | Q.        You have not reviewed the deposition |
| | 10 | transcript of the prosecutor, Jackie Steele, correct? |
| 15:26:24 | 11 | A.        Correct. |
| 15:26:27 | 12 | Q.        You have not reviewed the deposition -- the |
| | 13 | March 28, 2018, deposition of Jonathan Taylor, |
| | 14 | correct? |
| 15:26:31 | 15 | A.        Correct. |
| 15:26:34 | 16 | Q.        You have not reviewed the deposition |
| | 17 | transcript of Linda Taylor, correct? |
| 15:26:37 | 18 | A.        Correct. |
| 15:26:39 | 19 | Q.        You have not reviewed the deposition |
| | 20 | transcript of Daniel Wilson, correct? |
| 15:26:41 | 21 | A.        Correct. |
| 15:26:42 | 22 | Q.        You have not reviewed the deposition |
| | 23 | transcript of Reuben York, correct? |
| 15:26:45 | 24 | A.        Correct. |
| 15:26:47 | 25 | Q.        You have not reviewed the written |

John J. Ryan - May 21, 2019

```
            1   interrogatory responses from Defendant Pickard to

            2   plaintiffs, correct?

15:26:55    3   A.      If it's not in my list, I did not.

15:26:56    4   Q.      You have not reviewed the written

            5   interrogatory responses from Defendant Knox County to

            6   plaintiff, correct?

15:27:02    7   A.      If it's not on my list, I did not.

15:27:04    8   Q.      You have not reviewed any of the personnel

            9   files of Defendants Pickard or Eubanks, correct?

15:27:08   10   A.      Correct.

15:27:11   11   Q.      You have not reviewed any of the training

           12   records of Defendants Pickard or Eubanks, correct?

15:27:17   13   A.      Not unless it was included with one of these

           14   production of pleadings.  If it was, then I did.

15:27:23   15              MR. KELLEY:  I think they're responses

           16   to production of documents No. 20.

15:27:25   17   BY MR. SLOSAR:

15:27:28   18   Q.      And you have -- you have -- you have not

           19   reviewed any of the written policies or procedures of

           20   the Knox County defendants, correct?

15:27:35   21   A.      Only to the extent they would have been

           22   included in the request for production or something

           23   like that.

15:27:40   24   Q.      And you have no independent recollection of

           25   ever having reviewed such policies or procedures,
```

```
         1    correct?

15:27:45 2    A.      I don't recall looking at a -- whether I did

         3    or I didn't.  It could very well have.  I just don't

         4    recall it right at this minute.

15:27:51 5    Q.      You did not review any of the exhibits

         6    attached to Defendants Eubanks' or Pickard's

         7    depositions, correct?

15:27:59 8    A.      I don't have any listed.  So unless they were

         9    attached and I just made an error in -- in not

        10    including it.  That's a possibility, but I don't have

        11    them listed.

15:28:06 12   Q.      You have not reviewed any of the deposition

        13    transcripts from the William Anderson versus Knox

        14    County litigation, correct?

15:28:12 15   A.      What is it?  I'm sorry.

15:28:13 16   Q.      William Anderson versus Knox County.

15:28:14 17   A.      No.

15:28:17 18   Q.      Were you ever made aware that these same

        19    defendants were sued for allegedly malicious

        20    prosecuting -- maliciously prosecuting another person

        21    for murder between 2011 and 2016?

15:28:34 22   A.      I know nothing about this other case, no.

15:28:37 23   Q.      Were you provided with any police reports

        24    from the homicide investigation that Sheriff Pickard

        25    and Deputy Eubanks participated in relating to the
```

John J. Ryan - May 21, 2019

```
          1   death of Bobby Wiggins?
15:28:48  2                  MR. KELLEY:  Objection to the form of
          3   the question.
15:28:50  4                  MR. SLOSAR:  You can answer.
15:28:50  5                  THE WITNESS:  Yeah.  I mean, I don't --
          6   the word "participate" is -- is kind of foreign to me
          7   only because of what I know about what they do with a
          8   case.  They -- they turn it over.  But --
15:28:58  9   BY MR. SLOSAR:
15:28:59 10   Q.      Were you --
15:28:59 11   A.      But no, I don't have any documents.
15:29:00 12                  MR. KELLEY:  That's what they did.
15:29:01 13   BY MR. SLOSAR:
15:29:02 14   Q.      Were you ever --
15:29:04 15           And I object to your telling the witness how
         16   to testify, John.
15:29:07 17                  MR. KELLEY:  I object to the form of
         18   the question when you say that they participated in a
         19   homicide investigation.
15:29:10 20                  MR. SLOSAR:  Well, I think as an
         21   officer of the court you will probably remember the
         22   deposition we had earlier this week where Deputy
         23   Eubanks talked quite a bit about interrogating
         24   Mr. Sizemore.
15:29:20 25   BY MR. SLOSAR:
```

John J. Ryan - May 21, 2019

```
15:29:22   1    Q.        Were you ever aware that Deputy Eubanks --
15:29:24   2              MR. KELLEY:   In a missing persons
           3    investigation.
15:29:26   4    BY MR. SLOSAR:
15:29:27   5    Q.        -- and Sheriff Pickard interrogated James
           6    Otis Sizemore in December of 2011 and ultimately
           7    received a confession from Mr. Sizemore for the
           8    murder of Bobby Wiggins?
15:29:37   9    A.        I know nothing about another case other than
          10    what they did in this case.
15:29:41  11    Q.        Well, you reviewed Sheriff Pickard's
          12    deposition transcript, correct?
15:29:45  13    A.        Correct.  And I do remember there was some
          14    discussion maybe about another case, but I -- I don't
          15    recall that it really meant much to me in light of
          16    this case.
15:29:53  17    Q.        Yeah.  And that's because you weren't
          18    provided with any of the police reports relating to
          19    the investigation into the death of Bobby Wiggins,
          20    correct?
15:30:00  21    A.        Again, I had nothing to do -- that that was
          22    not part of this case.  Right.
15:30:05  23    Q.        Were you aware that Sheriff Pickard and
          24    Deputy Eubanks interrogated Mr. Sizemore in December
          25    of 2011 during the course of the Mills investigation?
```

John J. Ryan - May 21, 2019

| | | |
|---|---|---|
| 15:30:14 | 1 | MR. KELLEY:  Of the what? |
| 15:30:17 | 2 | MR. SLOSAR:  The Mills investigation. |
| 15:30:17 | 3 | MR. KELLEY:  Mills investigation? |
| 15:30:19 | 4 | MR. SLOSAR:  Yes.  The Mills |
| | 5 | investigation was contemporaneously going on with -- |
| 15:30:23 | 6 | MR. KELLEY:  Yes, but it wasn't. |
| 15:30:23 | 7 | MR. SLOSAR:  -- the Wiggins |
| | 8 | investigation. |
| 15:30:25 | 9 | MR. KELLEY:  I object to the form of |
| | 10 | the question.  That wasn't -- they weren't |
| | 11 | interviewing Sizemore with regard to Mills. |
| 15:30:30 | 12 | MR. SLOSAR:  Well, I actually disagree |
| | 13 | with that, and maybe you'll learn that a little bit |
| | 14 | later in that case, but -- |
| 15:30:35 | 15 | MR. KELLEY:  Oh, okay. |
| 15:30:35 | 16 | BY MR. SLOSAR: |
| 15:30:37 | 17 | Q.    But were you aware that Sheriff Pickard and |
| | 18 | Deputy Eubanks were questioning James Otis Sizemore |
| | 19 | about the murder of Bobby Wiggins at -- during the |
| | 20 | period of time that the Mills investigation was still |
| | 21 | not solved? |
| 15:30:51 | 22 | A.    I've got to be honest with you, I don't even |
| | 23 | recall that coming up in the sheriff's deposition or |
| | 24 | anything else.  I just -- |
| 15:30:55 | 25 | MR. KELLEY:  I object to the |

John J. Ryan - May 21, 2019

```
        1    characterization.  I mean, they're a year apart.
15:30:59 2              MR. MILLER:  I just -- I don't -- I
        3    don't have any memory of that coming up in his
        4    deposition.  If it did, it didn't mean anything to
        5    me.
15:31:03 6    BY MR. SLOSAR:
15:31:04 7    Q.      Well, it's your understanding in this case
        8    that charges were not initiated against the
        9    plaintiffs until March of 2012, correct?
15:31:12 10   A.      Correct.  Yeah.  I think it was -- this was
        11   sometime after the event.
15:31:14 12   Q.      There's no disagreement that December of 2011
        13   is prior to March of 2012, correct?
15:31:20 14   A.      No, I wouldn't disagree with that.  We agree
        15   on something.
15:31:23 16   Q.      We may agree on something.
15:31:28 17           And to date, you have never been provided
        18   with any of the interview or interrogation recordings
        19   or transcripts between Sheriff Pickard, Deputy
        20   Eubanks, and James Otis Sizemore, correct?
15:31:41 21   A.      Correct.  I know nothing about that
        22   particular case other than it might have come up.
        23   And -- and again, I don't even remember if it came up
        24   in the sheriff's deposition.
15:31:49 25   Q.      And in fact, is it fair to say that the basis
```

John J. Ryan - May 21, 2019

|   | |
|---|---|
| | 1 | of a lot of your opinions is that it relies upon the |
| | 2 | fact that the Knox County Sheriff's Department does |
| | 3 | not participate in homicide investigations?  Would |
| | 4 | you agree with that? |
| 15:32:05 | 5 | A.      Well, based on the overall facts and what |
| | 6 | occurred here.  I mean, even -- if you look at what |
| | 7 | Jason York says happened, how he gets notified, and |
| | 8 | he responds, and -- and basically conducts the |
| | 9 | investigation separate and apart, and, yeah, the |
| | 10 | sheriff is there on a couple of occasions, but he is |
| | 11 | basically, you know, helping him locate people or |
| | 12 | standing in his background. |
| 15:32:24 | 13 | Q.      Well -- |
| 15:32:26 | 14 | A.      So there's no indication in any of the |
| | 15 | materials, even -- even the witnesses who were |
| | 16 | interviewed, you know, don't really talk much about |
| | 17 | the sheriff doing much of anything -- |
| 15:32:33 | 18 | Q.      Well -- |
| 15:32:34 | 19 | A.      -- in this case.  So -- |
| 15:32:36 | 20 | Q.      Mr. Helton -- |
| 15:32:39 | 21 | A.      So it's not just based on -- it's not just |
| | 22 | based on, you know, what York County sheriff -- I'm |
| | 23 | sorry, what the sheriff's office does; it -- it |
| | 24 | counts on the overall picture and on the facts even |
| | 25 | as reported by all of the various witnesses that were |

John J. Ryan - May 21, 2019

|   |   |
|---|---|
| | 1 questioned by law enforcement during this event. |
| 15:32:57 | 2 Q.    Well, again, you only reviewed six deposition |
| | 3 transcripts out of approximately 40, so you're not |
| | 4 sure what these witnesses have said. |
| 15:33:05 | 5 A.    No, but I'm sure as a good attorney, you know |
| | 6 this is your deposition and this is your opportunity. |
| | 7 So if you have something that you think will change |
| | 8 my opinion, you can certainly present that to me, and |
| | 9 I'll be happy to change my opinion, if it does.  I |
| | 10 mean, that's what your job is.  So I'll be -- |
| 15:33:16 | 11 Q.    When -- |
| 15:33:18 | 12 A.    -- I'll be happy to look at anything that you |
| | 13 have. |
| 15:33:21 | 14 Q.    Sure.  When is the -- Jack, when is the last |
| | 15 time that you were presented -- presented with |
| | 16 material in the course of a deposition and changed |
| | 17 your opinion against the party who retained you? |
| 15:33:32 | 18 A.    My whole opinion?  I don't think that's ever |
| | 19 happened, because I don't think anybody has ever had |
| | 20 material to do that with.  But I have certainly maybe |
| | 21 backed off on certain aspects of the opinion because |
| | 22 of it.  I can't recall what particular case, but it |
| | 23 happens many times where I learn something at the |
| | 24 deposition that changes the way things should have |
| | 25 been done. |

**John J. Ryan - May 21, 2019**

15:33:55  1   Q.      What is the last case you did that on?

15:33:58  2   A.      Again, I don't have it committed to memory.

3   I'm sure the minute I walk out the door, I'll

4   remember.

15:34:09  5   Q.      Show you -- sir, I'm going to hand you --

6   first of all, is there a reason why you didn't read

7   the entire deposition of Plaintiff Jonathan Taylor?

15:34:19  8   A.      Who says I didn't read the entire deposition?

9   To the extent that I had --

15:34:21 10   Q.      There were two deposition transcripts for

11   Plaintiff Jonathan Taylor.  You only reviewed the

12   second one.  Is there a reason why you didn't review

13   them first?

15:34:32 14   A.      I reviewed what I had.

15:34:34 15   Q.      Never requested anything more, right?

15:34:36 16   A.      I don't know that I even knew that a second

17   one existed.  I would have to go back and look at the

18   end of the first one and see.

15:34:45 19   Q.      You don't have the first one?  You only have

20   the second one, according to Page 12.

15:34:50 21   A.      Okay.  Then -- then for the same purposes, I

22   don't know -- know if I realized it was picking up

23   after a -- after a previous day of deposition.

15:35:08 24   Q.      Sir, I'm going to hand you some disclosures

25   that have been turned over to us in this case,

John J. Ryan - May 21, 2019

|   |   |   |
|---|---|---|
| | 1 | specifically some communication.  What I'm going to |
| | 2 | do is make this a group exhibit, No. 32. |
| 15:35:54 | 3 | (The document was marked Exhibit No. 32.) |
| 15:35:55 | 4 | BY MR. SLOSAR: |
| 15:36:02 | 5 | Q.      Sir, who is Tracy Baldwin? |
| 15:36:04 | 6 | A.      So that's my assistant in the office. |
| 15:36:11 | 7 | Q.      Okay.  And going to the last page of this |
| | 8 | document -- actually, I'm sorry, going to the second |
| | 9 | page of this document, do you see where it says |
| | 10 | February 1st, 2019, at 1:58 p.m.? |
| 15:36:21 | 11 | A.      I'm sorry; what page? |
| 15:36:26 | 12 | Q.      Second page.  That Tracy Baldwin sent an |
| | 13 | email to Jason Williams and Kelley Hylton while |
| | 14 | copying yourself and Jim Alsup. |
| 15:36:39 | 15 | A.      This is on February 1st, the 1:58, that |
| | 16 | one? |
| 15:36:40 | 17 | Q.      Yes. |
| 15:36:41 | 18 | A.      Yes, I see that. |
| 15:36:49 | 19 | Q.      Okay.  On that date, did Ms. Baldwin send a |
| | 20 | report to the Knox County counsel that retained you? |
| 15:36:57 | 21 | A.      She should have.  That's what it looks like |
| | 22 | to me. |
| 15:36:59 | 23 | Q.      That's a report that you prepared, correct, |
| | 24 | sir? |
| 15:37:01 | 25 | A.      Yes.  I mean, she wouldn't have any other |

John J. Ryan - May 21, 2019

1    report.

15:37:13  2    Q.      And prior to her sending that, looking at

3    Page 3, you had actually emailed her at 1:46 p.m.

4    asking for her to get the draft to the Knox County

5    defense counsel, correct?

15:37:31  6    A.      I'm -- I'm sorry; I'm missing what you're

7    saying.

15:37:33  8    Q.      Page -- Page 3, I think, is an email from

9    yourself.  That's you.

15:37:35 10                MR. KELLEY:  From the back.

15:37:35 11                THE WITNESS:  Oh, "Tracy, can you get

12    this to Jason Williams for review?"  Is that what

13    you're talking about?

15:37:39 14    BY MR. SLOSAR:

15:37:40 15    Q.      Yes.

15:37:40 16    A.      Yeah.

15:37:41 17    Q.      Did you do that?

15:37:41 18    A.      Of course.

15:37:42 19    Q.      Okay.  Now, you gave her the electronic

20    version of the report, correct?

15:37:46 21    A.      Right.

15:37:48 22    Q.      That's on February 1st, correct?

15:37:49 23    A.      Correct.  That's what I'm seeing.

15:37:53 24    Q.      Looking at Exhibit 24.  Go to the Page 43.

15:38:00 25    A.      Wait a minute.  That's 23.  Yeah.  Okay.

**John J. Ryan - May 21, 2019**

15:38:04 1    Q.       This report was signed by you electronically,

2    correct?

15:38:05 3    A.       Correct.

15:38:07 4    Q.       And it was signed under penalty of perjury,

5    correct?

15:38:09 6    A.       Correct.

15:38:11 7    Q.       And the total number of pages of this report

8    is how many?

15:38:13 9    A.       46.

15:38:28 10   Q.       All right.   Now, after sending that report on

11   Page -- this is Saturday at 1:44 p.m., did you send

12   an email to Jason Williams saying that you "added a

13   little an tracted - no changes and opinions"?

15:38:45 14   A.       It certainly looks like it, so that must be a

15   change.   I mean, I must have thought about it and

16   made a change.

15:38:52 17   Q.       Sir, looking at your first report, please go

18   to Page 12.   Are you there?

15:39:03 19   A.       Yes.   I just want to make sure I got that

20   right.

15:39:06 21   Q.       Prior -- prior to forming your opinions on

22   February 1st, 2019, that you formed under penalty of

23   perjury, is it fair to say or accurate to say that

24   you formed those opinions without reviewing the

25   deposition transcript of Allen Helton?

John J. Ryan - May 21, 2019

15:39:24  1    A.        Again, I don't know.  I don't know if

          2    I -- that was something that I had missed in the

          3    draft or -- or if I had reviewed it and not included.

          4    I'm not sure.  I have no way to reconstruct that in

          5    my head.  I don't remember.

15:39:37  6    Q.        Is Allen Helton's name mentioned anywhere on

          7    your materials reviewed?

15:39:44  8    A.        No.  That's why I'm saying, the question I

          9    would have is, I'm sure he is mentioned throughout

         10    the substance, you know, so -- so he is mentioned in

         11    the substance.  I just don't know.  I may have added

         12    something from his deposition.  I may not have

         13    included anything in his deposition and said, "Oh,

         14    man, I forgot to include that" and I might have added

         15    it too and I knew it wasn't due yet, so the first one

         16    was a draft.  And so then I just repeated and did the

         17    second one.

15:40:14 18    Q.        You formed your initial opinions without

         19    reviewing the deposition transcript of Allen Helton?

15:40:18 20    A.        No, I wouldn't -- I wouldn't say that.  I --

         21    I left it off the list.  I just don't know, you know,

         22    at what point I made sure that I added it to.  I

         23    might have realized that, you know, I wouldn't have

         24    gone back and started reviewing again.

15:40:30 25    Q.        Why not?

**John J. Ryan - May 21, 2019**

```
15:40:33  1   A.        Because I must have realized that I forgot

          2   something.  I -- I mean, I don't know.  I don't have

          3   a -- a clear explanation for you, but obviously,

          4   I -- I couldn't have put this all together in the

          5   time frame.  And I know that I have things in -- in

          6   here, in both documents, about Allen Helton.  I just

          7   don't know that I have --

15:40:50  8   Q.        Well, let me --

15:40:51  9   A.        -- things about his deposition.

15:40:58 10   Q.        Let me -- let me point you specifically to --

         11   if you want to take out Exhibit 23 and put it next to

         12   24.

15:41:03 13   A.        Sure.

15:41:26 14   Q.        Now, on Page 26 of your final report, you

         15   have a header called "Allen Helton Deposition."  Is

         16   that right?

15:41:55 17   A.        Wait a minute.  Yes.

15:41:58 18   Q.        If you go to Page 26 of your first report,

         19   Exhibit 24, let me know what header is there.

15:42:04 20   A.        Right.  It says "District Court Hearing March

         21   27th."  Right.

15:42:20 22   Q.        If you go to Page 27 of your final report,

         23   what header is it?

15:42:26 24   A.        27?  I'm getting confused between which one

         25   is the final and which is the -- there's no header on
```

John J. Ryan - May 21, 2019

|   |   |
|---|---|
| | 1   27 on Exhibit 24. |
| 15:42:32 | 2   Q.      23. |
| 15:42:36 | 3   A.      It's "District Court Hearing" on Exhibit 23. |
| 15:42:41 | 4   Q.      In your final report you added in a section |
| | 5   from Allen Helton's deposition testimony that was not |
| | 6   contained in your first report, correct? |
| 15:42:48 | 7   A.      Absolutely. |
| 15:42:53 | 8   Q.      All of your opinions remain the same from |
| | 9   your first report to your second report, correct? |
| 15:42:58 | 10  A.      Correct. |
| 15:43:00 | 11  Q.      The only thing that changed is that you added |
| | 12  in Allen Helton's -- a page of Allen Helton's |
| | 13  deposition testimony? |
| 15:43:07 | 14  A.      I added some pages in, yes, correct. |
| 15:43:10 | 15  Q.      Who told you to do that? |
| 15:43:12 | 16  A.      I don't think anybody told me to do that.  I |
| | 17  think what happened was, I probably said, "Oh, man, I |
| | 18  -- I didn't put anything on Helton's |
| | 19  deposition."  Again, if I can get on the server, I |
| | 20  can see what date I got it.  I would be able to tell |
| | 21  you if it was something that I didn't have and then |
| | 22  added it in.  I'll be able to tell that from the |
| | 23  server, because we'll have a date after that first |
| | 24  piece.  But I'm certain that I didn't get anything |
| | 25  after I -- I did the draft.  So again, I -- the |

John J. Ryan - May 21, 2019

|  | 1 | problem I'm having is, I -- I can get in a little |
|---|---|---|
|  | 2 | bit, but I can't get into the files. |
| 15:43:55 | 3 | Q.      Sir, sitting here today, you haven't reviewed |
|  | 4 | any of the written policies or procedures of the Knox |
|  | 5 | County Sheriff's Department, correct? |
| 15:44:03 | 6 | A.      Unless they were in the discovery materials, |
|  | 7 | and then if it was pertinent to my opinions, I would |
|  | 8 | have included it. |
| 15:44:09 | 9 | Q.      Oh, you haven't documented -- you haven't |
|  | 10 | mentioned at all in either of your two reports the |
|  | 11 | written policies or procedures of the Knox County |
|  | 12 | Sheriff's Department, correct? |
| 15:44:22 | 13 | A.      Other than what I say about their policy of |
|  | 14 | turning murders over to the state police.  That's |
|  | 15 | their policy. |
| 15:44:29 | 16 | Q.      Did you do anything to determine whether they |
|  | 17 | had a written policy that instructed officers to turn |
|  | 18 | over serious criminal investigations to the Kentucky |
|  | 19 | state police? |
| 15:44:40 | 20 | A.      No.  The final policymaker made it clear, the |
|  | 21 | sheriff.  He made it clear through his testimony. |
|  | 22 | The words out of his mouth are the -- are the policy. |
| 15:44:49 | 23 | Q.      And again, earlier you testified that a |
|  | 24 | policy can be contradicted by an actual practice, |
|  | 25 | correct? |

**John J. Ryan - May 21, 2019**

15:45:02  1    A.        Yeah, unless it's the final policymaker.

15:45:05  2    Q.        Well, what if the final policymaker is

       3    participating in homicide investigations prior to

       4    March of 2012?

15:45:14  5    A.        Then --

15:45:14  6    Q.        Would that contradict what --

15:45:17  7    A.        Then that becomes the policy, because he is

       8    the final policymaker.

15:45:22  9    Q.        Sure.  So if Sheriff Pickard and officers

      10    under his command are interviewing suspects in a

      11    homicide investigation without the presence of the

      12    Kentucky state police, would you agree that that

      13    would be inconsistent with having a policy to inform

      14    an outside agency when a murder investigation is

      15    taking place?

15:45:46 16                    MR. KELLEY:  Note an objection.

15:45:47 17                    THE WITNESS:  To the extent that they

      18    decided to investigate a homicide on their own and

      19    not include the outside entity, that would be

      20    inconsistent with the -- what is clearly what he says

      21    about "We -- we always turn it over."

15:46:00 22    BY MR. SLOSAR:

15:46:02 23    Q.        And your opinions are based on what Sheriff

      24    Pickard says, correct?

15:46:06 25    A.        No, not just what he says but the actions.  I

John J. Ryan - May 21, 2019

```
 1    mean, all's you've got to do is look and -- and see

 2    when Knox was notified to respond, the fact that he

 3    did respond, he took over the crime scene, the body

 4    was still there.  So it's -- it's clear even from

 5    what occurred from the overall picture, the objective

 6    evidence, you don't even need the testimony to know

 7    that the Kentucky state police took over the

 8    investigation.

 9    Q.      Did you understand -- prior to making your

10    opinions, you were never provided with any materials

11    relating to this other homicide investigation that

12    Sheriff Pickard and Deputy Eubanks worked on,

13    correct?

14    A.      I don't have anything on the other homicide

15    investigation.

16              MR. KELLEY:  Yeah.

17    BY MR. SLOSAR:

18    Q.      You -- you did review the audio-recorded

19    interview from Dave Fox, right?

20    A.      Yes.

21    Q.      Did you realize that that was a witness in a

22    separate homicide investigation?

23    A.      Yeah.  It was clear that it was unrelated.

24    Q.      Yeah.  Did you disagree -- well, let me

25    withdraw that question.
```

Time stamps: 15:46:29 (line 9), 15:46:39 (line 14), 15:46:41 (line 16), 15:46:41 (line 17), 15:46:44 (line 18), 15:46:47 (line 20), 15:46:50 (line 21), 15:46:53 (line 23), 15:46:56 (line 24)

John J. Ryan - May 21, 2019

15:47:01  1          Were any of the actions taken by any law

2   enforcement officer in the Dave Fox audio-recorded

3   interview inconsistent with generally accepted police

4   practices at the time?

15:47:10  5                    MR. KELLEY:  Note an objection.

15:47:13  6                    THE WITNESS:  I didn't hear any.

7   Again, I think they were consistent with the -- the

8   interview process.

15:47:18  9   BY MR. SLOSAR:

15:47:21 10   Q.      You reviewed Defendant York's deposition

11   testimony as to his admission of hitting an article

12   of clothing off the witness' head?

15:47:31 13   A.      He hit the baseball hat, yeah.

15:47:31 14   Q.      Have you ever done that?

15:47:32 15   A.      No.

15:47:35 16   Q.      Have you ever thrown a chair at a witness

17   while questioning them in a criminal investigation?

15:47:39 18   A.      No.  And I'm sorry, but I don't recall him

19   saying that he did that.

15:47:43 20   Q.      You also didn't review the deposition

21   testimony from Sergeant Joseph where she testified

22   that Defendant York threw a chair at a wall in that

23   interrogation room, did you?

15:47:57 24   A.      I don't recall that.  But that's not throwing

25   it at the person.

**John J. Ryan - May 21, 2019**

15:48:02  1    Q.      The wall was behind the person.  Do you

2    understand that?

15:48:03  3                      MR. MILLER:  Object.

15:48:06  4                      THE WITNESS:  Again, I -- I need to

5    know more.  I can't answer it.  You know, if a -- if

6    a supervisor or a detective got up and slammed his

7    chair into the wall to -- to show a level of

8    frustration with the answers, I wouldn't have a

9    problem with that.

15:48:18  10   BY MR. SLOSAR:

15:48:20  11   Q.      Would you have a problem with --

15:48:20  12                     MR. KELLEY:  Note an objection.  We

13   have not retained Mr. -- we have not retained this

14   expert to testify in the Knox County versus Anderson

15   case, which you're asking -- going afield in, and

15:48:29  16   so --

15:48:30  17                     MR. SLOSAR:  That case --

15:48:31  18                     MR. KELLEY:  -- he has nothing relevant

19   presently to say about that case.

15:48:34  20                     MR. SLOSAR:  Well, he actually -- he --

21   you actually provided him with the audio recording of

22   the Dave Fox interview, so you understand its

23   relevance.

15:48:41  24                     MR. KELLEY:  Well, it was part of Jason

25   York's deposition that you put in.  Yes, it was

John J. Ryan - May 21, 2019

|  |  |
|---|---|
| | 1 | there. |
| 15:48:44 | 2 | MR. SLOSAR:  Sir -- |
| 15:48:45 | 3 | MR. KELLEY:  We -- we did not interject |
| | 4 | it into this -- in this proceeding. |
| 15:48:49 | 5 | MR. SLOSAR:  Great, well -- |
| 15:48:50 | 6 | MR. KELLEY:  And -- and you're twisting |
| | 7 | what was actually going on in Knox County -- |
| 15:48:54 | 8 | MR. SLOSAR:  John, are you going to -- |
| | 9 | okay.  The -- |
| 15:48:55 | 10 | MR. KELLEY:  Well, I think this is |
| | 11 | going way far afield. |
| 15:48:57 | 12 | MR. SLOSAR:  I -- I think your speaking |
| | 13 | objection is kind of way far afield.  We are in |
| | 14 | agreement on that. |
| 15:49:01 | 15 | MR. KELLEY:  Well, you're asking him |
| | 16 | questions about another case that has nothing to do |
| | 17 | with the Mills case. |
| 15:49:03 | 18 | MR. SLOSAR:  I'm asking -- I'm asking |
| | 19 | -- I'm asking a question on materials that he |
| | 20 | reviewed. |
| 15:49:07 | 21 | MR. KELLEY:  The Mills investigation, |
| | 22 | which is the subject of this lawsuit. |
| 15:49:13 | 23 | MR. SLOSAR:  Yep.  You'll -- you'll |
| | 24 | understand what this lawsuit is about at trial. |
| 15:49:16 | 25 | BY MR. SLOSAR: |

John J. Ryan - May 21, 2019

| | | |
|---|---|---|
| 15:49:18 | 1 | Q.      Sir, when -- |
| 15:49:19 | 2 | MR. KELLEY:  Well, you'd better make it |
| | 3 | plain before you -- so you get there, because nobody |
| | 4 | else understands that. |
| 15:49:23 | 5 | BY MR. SLOSAR: |
| 15:49:27 | 6 | Q.      Sir, was there any -- |
| 15:49:27 | 7 | MR. KELLEY:  So you're -- you're |
| | 8 | admitting that you plan on trying this case by |
| | 9 | ambush?  Is that -- is that your idea? |
| 15:49:34 | 10 | MR. SLOSAR:  I think that if you have |
| | 11 | been awake during discovery, John, you would |
| | 12 | understand what this case is about. |
| 15:49:39 | 13 | MR. KELLY:  I guess so.  I didn't -- I |
| | 14 | didn't -- |
| 15:49:39 | 15 | MR. SLOSAR:  So let's keep going |
| | 16 | forward.  We've got about an hour and a half left. |
| | 17 | Let's see -- |
| 15:49:44 | 18 | MR. KELLY:  Yeah, let's get -- let's |
| | 19 | get back to the -- |
| 15:49:46 | 20 | MR. SLOSAR:  Let's get back to -- |
| 15:49:46 | 21 | MR. KELLEY:  -- Amanda Hoskins versus |
| | 22 | Knox County case. |
| 15:49:48 | 23 | BY MR. SLOSAR: |
| 15:49:49 | 24 | Q.     Let's get -- let's get back to an audio |
| | 25 | recording that you listened to, sir. |

**John J. Ryan - May 21, 2019**

15:49:57 1          Were the actions conducted in the audio

2     recorded interview that you listened to consistent

3     with generally accepted police practices in 2011?

15:50:04 4                    MR. KELLEY:  Asked and answered.

15:50:06 5                    THE WITNESS:  I believe they were.  And

6     again, I don't know that I remember that -- I

7     think -- I think Fox's, you know, I am not even sure

8     York -- I don't remember how the hat comes up, but

9     somehow I have in my head that it was the hat that

10    got flipped off his head.

15:50:22 11   BY MR. SLOSAR:

15:50:23 12   Q.      Have you ever done that?

15:50:25 13   A.      I said no, I haven't.

15:50:29 14   Q.      Sir, have you ever lied to a witness in a

15    homicide investigation while questioning them?

15:50:32 16   A.      Absolutely.

15:50:34 17   Q.      Was that consistent with your training?

15:50:36 18   A.      Absolutely.

15:50:45 19   Q.      Have you ever threatened a witness in a

20    homicide investigation while questioning them?

15:50:50 21   A.      Not with physical threats.  Certainly we've

22    -- we've threatened people with arrest if they don't

23    tell the truth.

15:50:57 24   Q.      How do you determine what the truth is before

25    you make that threat?

John J. Ryan - May 21, 2019

| | | |
|---|---|---|
| 15:51:00 | 1 | A.      Sometimes you have facts already, objective |
| | 2 | evidence, and -- and they give you a statement that's |
| | 3 | inconsistent with the objective evidence, and it's |
| | 4 | clear that they know the facts. |
| 15:51:09 | 5 | Q.      At other times do you not have facts and |
| | 6 | you're making a gut assumption? |
| 15:51:15 | 7 | A.      I'd have to think if I ever did that or not. |
| | 8 | But -- but certainly, you can -- you can tell |
| | 9 | somebody that if they don't tell the truth, that |
| | 10 | they'll be subject to arrest.  And sometimes you can |
| | 11 | tell them that if they -- depending on the particular |
| | 12 | situation, they may be obstructing justice.  They may |
| | 13 | be, you know, an accessory after the fact. |
| 15:51:34 | 14 | Q.      Have you ever initiated charges against |
| | 15 | someone for murder without consulting with a |
| | 16 | prosecutor? |
| 15:51:41 | 17 | A.      We did it all the time.  But that doesn't |
| | 18 | mean that that's -- avoids the checks and balances, |
| | 19 | because they still have to go before a judge within |
| | 20 | 48 hours of arrest, they still have to get a grand |
| | 21 | jury indictment, they still have to go through all |
| | 22 | the suppression hearings.  So there's all the checks |
| | 23 | and balances in place. |
| 15:52:01 | 24 | Q.      Sure.  Was any of that done with Kayla Mills |
| 15:52:03 | 25 | based on the single deposition that you read -- |

John J. Ryan - May 21, 2019

| | | |
|---|---|---|
| 15:52:04 | 1 | A.        With Kayla Mills? |
| 15:52:06 | 2 | Q.        -- of Defendant York? |
| 15:52:07 | 3 | A.        Was any what done? |
| 15:52:10 | 4 | Q.        Defendant -- do you understand -- did you |
| | 5 | know prior to forming your opinions in this case that |
| | 6 | Defendant York initiated charges against Kayla Mills |
| | 7 | for the murder of Katherine Mills? |
| 15:52:18 | 8 | A.        Absolutely.  Got a warrant, yeah. |
| 15:52:21 | 9 | Q.        Yeah.  Yeah.  And you read in his deposition |
| | 10 | that Ms. Mills -- that a bond, a million dollar bond, |
| | 11 | was issued for Ms. Mills prior to questioning her, |
| | 12 | correct? |
| 15:52:27 | 13 | A.        Correct. |
| 15:52:29 | 14 | Q.        And Defendant York -- and you read prior to |
| | 15 | issuing your opinions that Defendant York told |
| | 16 | Ms. Mills that if she gave a statement implicating |
| | 17 | Jonathan Taylor, that she would be allowed to walk |
| | 18 | out of the police station, correct? |
| 15:52:41 | 19 |             MR. MILLER:  Object to form.  This is |
| | 20 | Scott Miller. |
| 15:52:43 | 21 |             THE WITNESS:  Yeah, I don't -- I don't |
| | 22 | recall that he said it that way. |
| 15:52:46 | 23 |             MR. SLOSAR:  I can -- |
| 15:52:47 | 24 |             THE WITNESS:  I'd have to see the |
| | 25 | transcript of that deposition.  I don't -- and -- and |

John J. Ryan - May 21, 2019

```
              1    she may have said that.  I don't think York says

              2    that.

15:52:53      3    BY MR. SLOSAR:

15:52:56      4    Q.    Well, she's -- she's dead, so she can't say

              5    that any longer.  But Defendant York testified in his

              6    deposition extensively about the agreement that he

              7    reached with Ms. Mills.  Do you recall reviewing

              8    that?

15:53:12      9    A.    I think I have some of that --

15:53:13     10             MR. MILLER:  Object to form.

15:53:14     11             THE WITNESS:  I think I have some of

             12    what went on there in my report.

15:53:18     13    BY MR. SLOSAR:

15:53:21     14    Q.    Sir, in 2011, would witnessing misconduct

             15    cause a reasonable police officer to take steps to

             16    stop the misconduct from taking place?

15:53:30     17    A.    We see, particularly in the use of force

             18    arena, where there's a duty to intervene in the use

             19    of force, but it's got to be obvious and there's got

             20    to be an opportunity to intervene.  So it would have

             21    to be obvious.  Obviously, particularly if there was

             22    force being used, and yes, that's the easy one.  It's

             23    a lot harder when you're dealing with an

             24    investigation.

15:53:52     25    Q.    Would witnessing misconduct cause a
```

John J. Ryan - May 21, 2019

|   |    |                                                              |
|---|----|--------------------------------------------------------------|
|            | 1  | reasonable police officer to report such misconduct         |
|            | 2  | thereafter?                                                  |
| 15:53:59   | 3  | MR. KELLEY:  Objection to the form.                          |
| 15:53:59   | 4  | THE WITNESS:  Depends what it is.                            |
| 15:54:00   | 5  | MR. MILLER:  Object to form.                                 |
| 15:54:00   | 6  | THE WITNESS:  Yes.                                           |
| 15:54:01   | 7  | MR. MILLER:  This is Scott Miller                            |
|            | 8  | again.                                                       |
| 15:54:03   | 9  | THE WITNESS:  Depends on what it is.                         |
|            | 10 | In other words, you would have to know it was                |
|            | 11 | misconduct.  So yeah, of course, if you saw an              |
|            | 12 | officer planting evidence, yeah, then, of course,           |
|            | 13 | there would be a duty to report.                            |
| 15:54:11   | 14 | BY MR. SLOSAR:                                               |
| 15:54:13   | 15 | Q.    How about in 2011 if you saw an officer               |
|            | 16 | fabricating evidence?                                        |
| 15:54:15   | 17 | A.    If you --                                             |
| 15:54:17   | 18 | MR. KELLEY:  Objection as to form.                           |
| 15:54:18   | 19 | THE WITNESS:  If you in fact knew they                       |
|            | 20 | were fabricating evidence?                                   |
| 15:54:20   | 21 | MR. SLOSAR:  Yes.                                            |
| 15:54:21   | 22 | THE WITNESS:  And they were going to                         |
|            | 23 | use it against someone?                                      |
| 15:54:22   | 24 | BY MR. SLOSAR:                                               |
| 15:54:23   | 25 | Q.    Doesn't matter.                                        |

**John J. Ryan - May 21, 2019**

| | | |
|---|---|---|
| 15:54:25 | 1 | A.        Oh, yes, it does.  It most certainly does. |
| 15:54:27 | 2 | Q.        Isn't it -- isn't -- are you -- are you |
| | 3 | testifying that you were ever trained that it was a |
| | 4 | generally accepted practice to fabricate evidence? |
| 15:54:36 | 5 | A.        No, no, no.  Understand -- |
| 15:54:37 | 6 | Q.        Has anybody ever -- |
| 15:54:37 | 7 | A.        Under -- |
| 15:54:38 | 8 | Q.        Has anybody ever trained you on that? |
| 15:54:39 | 9 | MR. KELLEY:  Let him finish the |
| | 10 | question. |
| 15:54:39 | 11 | THE WITNESS:  You know, you're not |
| | 12 | letting me answer the question. |
| 15:54:45 | 13 | And so it is absolutely, unequivocally within |
| | 14 | generally accepted practices to fabricate evidence |
| | 15 | when you're trying to get a statement from someone. |
| 15:54:54 | 16 | BY MR. SLOSAR: |
| 15:54:55 | 17 | Q.        Give an example. |
| 15:54:57 | 18 | A.        Again, what I'm -- what I'm saying by that |
| | 19 | is, for example, you can tell Mr. Matthiason that you |
| | 20 | got his prints in one of the burglaries.  You can |
| | 21 | tell him that. |
| 15:55:05 | 22 | Q.        That's not -- that's your opinion -- |
| 15:55:07 | 23 | A.        That's fabricating evidence. |
| 15:55:08 | 24 | Q.        You're making a -- you're lying to somebody. |
| | 25 | What I'm asking you is something different. |

John J. Ryan - May 21, 2019

15:55:10  1    A.        No.  Well, you're fabricating evidence

        2    because the evidence doesn't exist.

15:55:16  3    Q.        Have you ever been trained that it was a

        4    generally accepted practice to manufacture a false

        5    statement for a witness or a suspect in a criminal

        6    investigation?

15:55:30  7                    MR. KELLEY:  Note an objection.

15:55:33  8                    THE WITNESS:  In order to get a

        9    statement, it happens all the time, and it is

       10    consistent with training to say, "Hey, listen.

       11    Listen, Joe.  Your co-conspirator just gave us this

       12    statement, and the statement says that you're the one

       13    who pulled the trigger.  Here is the statement right

       14    here."

15:55:49 15    BY MR. SLOSAR:

15:55:52 16    Q.        Is it a -- in your opinion, is it a generally

       17    accepted police practice to feed information to a

       18    witness or suspect for the purpose of creating a

       19    fabricated statement?

15:56:03 20    A.        From that person?

15:56:03 21    Q.        Yes.

15:56:05 22    A.        No.

15:56:10 23    Q.        2011, officers knew around the country that

       24    that was inconsistent with generally accepted

       25    practices, correct?

**John J. Ryan - May 21, 2019**

15:56:15  1    A.      You can't feed somebody --

15:56:16  2               MR. KELLEY:  Objection.

15:56:17  3               THE WITNESS:  You can't feed somebody

4    information to get a fabricated statement out of

5    them.

15:56:21  6    BY MR. SLOSAR:

15:56:22  7    Q.      And why not?

15:56:24  8    A.      But you can certainly fabricate a statement

9    to get them to open up and -- and -- and make

10   admissions?

15:56:30 11    Q.      Sure.  And that's -- so we're talking about

12   two different things.  You're -- you're talking about

13   an interrogation where you're trying to get somebody

14   to confess, correct?

15:56:39 15    A.      Or give us -- get a statement from a witness

16   to tell the truth.

15:56:43 17    Q.      Would you have investigated to determine what

18   the truth is before you started feeding information

19   to a witness?

15:56:50 20    A.      Again, the term "feeding" is problematic for

21   me.  Are you feeding them -- you can't ever feed a

22   witness or even a suspect information that they then

23   regurgitate back to you --

15:57:03 24    Q.      Why not?

15:57:05 25    A.      -- and you rely on that.  Because -- because

John J. Ryan - May 21, 2019

|       |    |                                                                  |
|-------|----|------------------------------------------------------------------|
|       | 1  | you have given them the -- the essential information             |
|       | 2  | that you want in the statement.                                  |
| 15:57:09 | 3  | Q.      Not reliable, right?                                   |
| 15:57:11 | 4  | A.      Well, it loses its reliability if -- if               |
|       | 5  | that's the case.  There's no question.                          |
| 15:57:14 | 6  | Q.      That's not consistent with generally accepted        |
|       | 7  | practices?                                                       |
| 15:57:16 | 8  | A.      No, you -- you don't do that.                         |
| 15:57:22 | 9  | Q.      Yeah.  And -- and would you agree that if            |
|       | 10 | you're in a situation where that is happening, that a           |
|       | 11 | reasonable police officer witnessing those types of            |
|       | 12 | actions would have an obligation to stop that                   |
|       | 13 | misconduct from taking place?                                   |
| 15:57:38 | 14 |                 MR. KELLEY:  Note an objection.              |
| 15:57:39 | 15 |                 THE WITNESS:  It all depends on that          |
|       | 16 | officer's level of knowledge.  So for example, you             |
|       | 17 | know, I'm a -- I'm a lieutenant.  I get called down            |
|       | 18 | to the detective division to watch an interview                |
|       | 19 | that's taking place, and I hear the detective saying           |
|       | 20 | things to the person that sound to me like they're            |
|       | 21 | leading, but that detective has had ten conversations         |
|       | 22 | with the guy, and he is essentially verifying                  |
|       | 23 | information that the guy already told him.  I'm not            |
|       | 24 | going to intervene in that.  That's his                         |
|       | 25 | investigation.  I'm not even going to do that in my           |

John J. Ryan - May 21, 2019

```
        1    own agency where I'm the boss.  I would never do

        2    that.

15:58:10  3  BY MR. SLOSAR:

15:58:12  4      Q.       Why not?

15:58:14  5      A.       Because he's not doing anything wrong.  He

        6    can -- he can -- if he's had conversations with the

        7    subject and the subject has provided him information,

        8    he can certainly lead the subject into -- into the

        9    same information that the subject already gave him.

       10    We would have to know that the subject -- and I can

       11    just give you this as an example.  I -- I listened to

       12    a confession --

15:58:33 13      Q.       What if -- what if the subject went to you

       14    beforehand as the witness and said, "I don't have any

       15    information about this.  I don't know anything about

       16    this"?

15:58:43 17              MR. KELLEY:  Note an objection.

15:58:45 18              THE WITNESS:  It all depends on if, in

       19    the intervening period, that lead investigator had

       20    conversations with him.

15:58:52 21          But again, you are not going to intervene at

       22    that point.  You're not -- you're not going -- you're

       23    not the investigator.  You're certainly not going to

       24    do it -- and -- and I think maybe -- and it just hit

       25    me what you're trying to get at.  You're certainly
```

John J. Ryan - May 21, 2019

```
         1   not going to do it if it is another agency that's

         2   the -- the investigating agency.

15:59:04 3   BY MR. SLOSAR:

15:59:06 4   Q.      Then what's the purpose of being there at

         5   all?

15:59:10 6   A.      The purpose of being there is for safety.

15:59:11 7   Q.      The --

15:59:13 8   A.      The purpose is to stand by.

15:59:14 9   Q.      Sheriff Pickard --

15:59:15 10  A.      It may be your building.

15:59:17 11  Q.      Sheriff Pickard -- it wasn't -- it wasn't his

         12  building.

15:59:20 13          Sheriff Pickard, did -- have you read

         14  anything in the record indicating that any of these

         15  interviews happened in the Knox County Sheriff's

         16  Department?

15:59:26 17  A.      No, because none of the investigation really

         18  had anything to do with the Knox County Sheriff's

         19  Office.

15:59:29 20  Q.      All right.  So okay.  Well, you brought up

         21  the building thing, and it's just not relevant here.

15:59:37 22          Have -- have you seen a single document in

         23  this case, a single report, that was drafted by

         24  Sheriff Pickard relating to the murder of Katherine

         25  Mills?
```

John J. Ryan - May 21, 2019

| | | |
|---|---|---|
| 15:59:46 | 1 | A.      No.  And I would not expect it to be a single |
| | 2 | report.  He did not participate in the investigation. |
| | 3 | He was not an investigator in this case.  There is |
| | 4 | nothing in this case, when you talk about relevancy, |
| | 5 | there is nothing in this case, nothing in the |
| | 6 | materials to indicate that he was a participant.  He |
| | 7 | stood in the background in a couple of things and he |
| | 8 | helped find some people. |
| 16:00:07 | 9 | Q.      You're saying that in this case, there's not |
| | 10 | a single document that was drafted by Sheriff Pickard |
| | 11 | relating to his participation in the investigation |
| | 12 | into Katherine Mills' death? |
| 16:00:20 | 13 | A.      Again, he went out to the scene and he |
| | 14 | immediately turned it over to state police. |
| 16:00:22 | 15 | Q.      Yes. |
| 16:00:23 | 16 | A.      And again -- |
| 16:00:24 | 17 | Q.      Yes or no to my question. |
| 16:00:25 | 18 | A.      No, I don't think anything that I would say |
| | 19 | would show that he -- |
| 16:00:27 | 20 | Q.      Nothing that you reviewed. |
| 16:00:29 | 21 | A.      -- was a participant.  No.  Even if -- well, |
| | 22 | I mean, if you have something that I didn't review, |
| | 23 | that may change my mind.  But certainly in the |
| | 24 | materials that I reviewed, there's nothing to show |
| | 25 | that he was an active participant in this |

John J. Ryan - May 21, 2019

```
          1    investigation.

16:00:40  2    Q.      If Sheriff Pickard wrote a document

          3    disclosing promises of consideration that he made to

          4    a suspect or a witness in the Mills homicide

          5    investigation, would that affect your opinion?

16:00:53  6    A.      No.

16:00:55  7                  MR. MILLER:  Object to form.

16:00:56  8                  THE WITNESS:  Not at all.  Not at all,

          9    because I think --

16:00:56 10                  MR. MILLER:  This is Scott Miller

         11    again.  I just wanted to identify myself.

16:00:59 12          Am I coming through?

16:01:01 13                  MR. KELLEY:  You are.

16:01:01 14                  MR. MILLER:  All right.  Sorry to

         15    interrupt you, Elliot.  Go ahead.

16:01:07 16                  THE WITNESS:  Oh, I thought he had

         17    something to say.

16:01:10 18                  MR. SLOSAR:  No.

16:01:10 19                  THE WITNESS:  No.  I -- I think I saw

         20    the document where he says that, you know, he got

         21    the -- he got a call from the jail that Helton wanted

         22    to talk to him and he had Helton brought down, and he

         23    told Helton, "Just tell the truth.  If what you're

         24    telling me is the truth, then -- then I will contact

         25    the prosecutor on these theft charges."  I mean, I'm
```

John J. Ryan - May 21, 2019

```
            1    fully aware of that.  But that's not being a

            2    participant in the investigation.

16:01:30    3    BY MR. SLOSAR:

16:01:32    4    Q.      Making promises to a -- you understand that

            5    Allen Helton was a suspect in the homicide, correct?

16:01:37    6    A.       Absolutely.  And -- and let me tell you

            7    something.  We do this all the time with suspects.

            8    "If you tell the truth, yeah, I'll contact the

            9    prosecutor for you."  That's -- that's common police

           10    practice.

16:01:46   11    Q.      Would you document that?  Would -- would it

           12    have been your practice as a police officer to

           13    document that?

16:01:51   14    A.       No.  You would pick up the phone and you

           15    would call the investigator, you would let them

           16    handle it, and then you would pick up the phone and

           17    call the prosecutor.

16:01:55   18    Q.      Wait.  You're saying that in your 20-year

           19    career at the Providence Police Department that if

           20    you made a promise of consideration to a witness or

           21    suspect, that it would have been your practice to not

           22    document that promise?

16:02:09   23    A.       No.  It's got to be -- it's got to be

           24    documented by the investigator, not by -- not by the

           25    guy who gets the phone call.
```

John J. Ryan - May 21, 2019

```
16:02:15   1          You know, you get calls from prior informants
           2   all the time, and they say, "Hey, can you help me out
           3   with this?"
16:02:21   4          I mean, I had a guy on a murder case come
           5   into my office because he wanted to get his stupid
           6   driver's license back, and I didn't -- I said, "Hey,
           7   I'll help you get the driver's license back if you're
           8   truthful with the detectives about the murder."
16:02:35   9   Q.     And it would have been your practice not to
          10   document that type of information?
16:02:39  11   A.     No.  What I did was, I told the lead
          12   detective that it had to be documented that this guy
          13   wants to get his license back, and that's his
          14   motivation.
16:02:44  15   Q.     Did you have any --
16:02:46  16   A.     I wouldn't -- I wouldn't have done a
          17   document.  I would have -- I would have let Detective
          18   Bathgate do the document.
16:02:52  19   Q.     So it would have been your practice to have a
          20   conversation with the lead detective to have some
          21   sort of assurance that that promise was going to be
          22   documented in the case file?
16:03:02  23   A.     I would have told the lead detective, "Look,
          24   this is what he wants.  I'm putting him with you.
          25   It's your case."  It's a murder case.  That's what's
```

|          |    |                                                        |
|----------|----|--------------------------------------------------------|
|          | 1  | important.                                             |
| 16:03:08 | 2  | Q.      You wouldn't --                                |
| 16:03:10 | 3  | A.      "He wants his -- he wants his license back.    |
|          | 4  | You sort it out.  I don't know if you can get him his  |
|          | 5  | license back or not."                                  |
| 16:03:15 | 6  | Q.      Would you have consulted with the detective    |
|          | 7  | about whether he was going to document the promise he  |
|          | 8  | made?                                                  |
| 16:03:21 | 9  | A.      No, because he would have consulted with the   |
|          | 10 | prosecutor about that.  That's -- that's up to the     |
|          | 11 | detective that's leading the investigation to do.      |
| 16:03:26 | 12 | Q.      Sir, what is Brady versus Maryland?            |
| 16:03:28 | 13 | A.      Brady versus Maryland is a case that was       |
|          | 14 | decided in 1963 where two people were involved in a    |
|          | 15 | scam --                                                |
| 16:03:35 | 16 | Q.      What does it mean?  I don't care about the     |
|          | 17 | facts.                                                 |
| 16:03:35 | 18 |            MR. KELLEY:  Let him -- let him finish       |
|          | 19 | the answer.                                            |
| 16:03:38 | 20 |            MR. SLOSAR:  No, John, settle down over      |
|          | 21 | there.                                                 |
| 16:03:39 | 22 |            MR. KELLEY:  Well --                         |
| 16:03:39 | 23 | BY MR. SLOSAR:                                          |
| 16:03:39 | 24 | Q.      What -- what does it mean?                      |
| 16:03:40 | 25 |            MR. KELLEY:  -- you cannot interrupt a       |

**John J. Ryan - May 21, 2019**

|         |    |                                                          |
|---------|----|----------------------------------------------------------|
|         | 1  | witness.                                                 |
| 16:03:41| 2  | BY MR. SLOSAR:                                           |
| 16:03:42| 3  | Q.       You are a lawyer.                               |
| 16:03:43| 4  | A.       Well, do you want to know what Brady -- I       |
|         | 5  | mean, you're being -- and again --                       |
| 16:03:45| 6  | Q.       I know that you know what Brady means.          |
|         | 7  | Explain generally what principle comes from Brady.      |
| 16:03:52| 8  | A.       Brady means that the prosecutor has a duty, a   |
|         | 9  | strict liability duty, to disclose exculpatory          |
|         | 10 | information that's material to guilt or innocence.      |
|         | 11 | That's what it means.                                    |
| 16:04:01| 12 | Q.       And since Brady, that duty has been extended    |
|         | 13 | out to the police officers, correct?                     |
| 16:04:06| 14 | A.       For purposes of liability, yes.  But            |
|         | 15 | the -- the duty runs for them to turn the information    |
|         | 16 | over to the prosecutor.                                  |
| 16:04:10| 17 | Q.       Sure.                                           |
| 16:04:11| 18 | A.       Not to the defense.                             |
| 16:04:13| 19 | Q.       In order to turn that information over, they    |
|         | 20 | would need to either do it orally or in writing,         |
|         | 21 | correct?                                                 |
| 16:04:18| 22 | A.       Correct.  They could do it -- they'd very       |
|         | 23 | easily do it.                                            |
| 16:04:21| 24 | Q.       And the type of promise that you're             |
|         | 25 | discussing right now would surely qualify as Giglio     |

John J. Ryan - May 21, 2019

|   |   |
|---|---|
| | 1 |   material? |
| 16:04:27 | 2 |   A.      Well, it's not -- |
| 16:04:27 | 3 |   Q.      Correct? |
| 16:04:29 | 4 |   A.      -- it's not the promise.  It's -- it's the |
| | 5 |   promise carried out. |
| 16:04:34 | 6 |   Q.      No.  Absolutely.  If you make a promise -- if |
| | 7 |   you make a promise to a witness now and that witness |
| | 8 |   makes a statement a year later to a different |
| | 9 |   detective, is it your testimony that the promise that |
| | 10 |   you made is not relevant to a statement that is given |
| | 11 |   to somebody else? |
| 16:04:53 | 12 |   A.      I would have to give that some thought. |
| 16:04:55 | 13 |              MR. MILLER:  Object. |
| 16:04:55 | 14 |              THE WITNESS:  I mean, I would have to |
| | 15 |   give that some thought, because that new investigator |
| | 16 |   might not even know about the promise. |
| 16:04:59 | 17 |   BY MR. SLOSAR: |
| 16:05:01 | 18 |   Q.      Because you don't -- you have no idea what's |
| | 19 |   going through that witness' mind when he meets with |
| | 20 |   the investigator later, correct? |
| 16:05:07 | 21 |              MR. KELLEY:  Objection to the |
| | 22 |   hypothetical. |
| 16:05:08 | 23 |              THE WITNESS:  And you don't even know |
| | 24 |   if it -- if he is even thinking about the promise |
| | 25 |   from a year ago that never happened. |

**John J. Ryan - May 21, 2019**

```
16:05:14   1   BY MR. SLOSAR:

16:05:16   2   Q.      Well, the promise happened.  You don't -- the

           3   promise wasn't fulfilled is what you're talking

           4   about, correct?

16:05:22   5   A.      Well, it wasn't fulfilled on either part.

16:05:23   6   Q.      Well, the --

16:05:24   7   A.      I mean, under your hypothetical, I mean, I

           8   don't -- I --

16:05:27   9   Q.      Well, the hypothetical is one that -- that --

          10   that you initially brought up.  But I think that --

16:05:33  11   A.      No, mine wasn't hypothetical.  Vinnie Lato

          12   came in, and he was a witness to the killing of Kevin

          13   Hanrahan.  I'm certain of it, yeah.

16:05:40  14   Q.      Okay.

16:05:40  15   A.      Mine was not hypothetical at all.

16:05:41  16   Q.      If you made a promise to him, how do you know

          17   that he did not expect you to follow through with

          18   that promise when he gave a statement to the next

          19   detective?

16:05:51  20   A.      How do I know?  Say that again.

16:05:53  21   Q.      How do you know that that witness did not

          22   expect follow-through on the promise from a different

          23   law enforcement officer?

16:06:02  24   A.      Well, because Detective Bathgate was aware

          25   from me that that's what he expected if he -- if he
```

John J. Ryan - May 21, 2019

```
           1    provided help.  Now, ultimately, he did not provide
           2    the help, because he was afraid the Mafia was going
           3    to kill him if he did.
16:06:11   4    Q.      Would you agree that any reasonably trained
           5    investigator knows that testimony or statements from
           6    witnesses who are incarcerated or with pending cases
           7    should be viewed with skepticism?
16:06:23   8    A.      I think you'd certainly have to --
16:06:24   9                    MR. MILLER:  Object to form.
16:06:25  10                    THE WITNESS:  I think you certainly
          11    have to closely scrutinize jailhouse informants, yes.
16:06:27  12    BY MR. SLOSAR:
16:06:32  13    Q.      Would you agree that any reasonably trained
          14    investigator knows that they should be careful when
          15    interacting with incarcerated witnesses to ensure
          16    that those witnesses do not have a misperception
          17    about any quid pro quo in exchange for information?
16:06:46  18    A.      I think you have to be careful --
16:06:47  19                    MR. MILLER:  Object.
16:06:48  20                    THE WITNESS:  I think you always have
          21    to be careful with jailhouse informants all the time
          22    because of their particular motivations.  I think
          23    that's -- that's clear.  But that doesn't mean you
          24    don't interact with them, because sometimes that's
          25    all you have.  And sometimes they're just
```

John J. Ryan - May 21, 2019

```
         1   corroborating what somebody else has already told
         2   you.
16:07:04 3   BY MR. SLOSAR:
16:07:06 4   Q.       Would you agree that any reasonably trained
         5   law enforcement investigator would know that any
         6   benefit of any kind promised to a witness must be
         7   disclosed to the prosecution?
16:07:18 8   A.       For the most part, yes.
16:07:20 9   Q.       Would you agree that it would violate
        10   commonly accepted law enforcement practices to
        11   promise a benefit to a witness and not disclose that
        12   promise to law enforcement, to the prosecutor?
16:07:38 13  A.       It -- it depends.  If the -- if one -- either
        14   side didn't come through on -- on either of it.  So
        15   in other words, if I just say, "Hey, tell the truth,"
        16   if that's what I say, "Tell the truth, and I'll see
        17   what I can do," you haven't really made any promise
        18   about anything.
16:07:52 19  Q.       Well, what --
16:07:55 20  A.       You tell them, "Tell the truth."
16:07:55 21  Q.       If a person is facing pending criminal
16:07:55 22  charges --
16:07:57 23  A.       You tell him to tell the truth.  "If you tell
        24   the truth, I'll see what I can do for you."
16:08:01 25  Q.       "Tell the truth" is a euphemism for "give me
```

1    a statement"?

16:08:03   2    A.      Oh no, it's not.  Because -- because --

16:08:03   3    Q.      Did you explain that --

16:08:06   4    A.      -- they have to know the information.

16:08:08   5    Q.      Did you explain that -- under your

6    hypothetical, was it your practice to explain what

7    "tell the truth" meant?

16:08:15   8    A.      I think the common person knows that "tell

9    the truth" means tell the truth.

16:08:20  10    Q.      Well, is "tell the truth" --

16:08:20  11    A.      I don't think -- I don't think you -- I don't

12    think you have to explain it to them.  If I said --

13    if I said to Vinnie Lato, if I said, "Hey, Vinnie,

14    here is what I want you to do.  I want you to tell

15    the truth that you were standing out on the sidewalk

16    after getting slapped in the face by Kevin Hanrahan

17    and you -- your cousin, Vinnie Lato, the head of he

18    New England Crime Family, ordered somebody to whack

19    him on the sidewalk, and -- and you saw another guy

20    at the bar go out and whack him, just tell that bit

21    of truth, and -- and I'll see if I can get your

22    license back," yeah that's bad.

16:08:53  23            If I tell Vinnie Lato, "Hey, just go tell the

24    truth and I'll see what I can do," I haven't really

25    made him any promises and I haven't provided him with

John J. Ryan - May 21, 2019

```
            1    any information, I haven't done anything.  I don't --
            2    I don't see that that's necessarily a Brady issue
            3    there.
16:09:14    4    Q.      In 2011, should law enforcement officers have
            5    been careful to ensure that facts provided by the
            6    witness originate from the witness rather than being
            7    leaked to the witness from the law enforcement
            8    officer?
16:09:27    9                   MR. KELLEY:  Objection.
16:09:27   10                   THE WITNESS:  Again, that is what I
           11    said before about regurgitation.  If you -- if you --
           12    if the witness knows nothing and you give them all
           13    the information and then they regurgitate it back,
           14    yeah, of course, that's not good.
16:09:37   15    BY MR. SLOSAR:
16:09:40   16    Q.      That -- that would not be consistent with
           17    generally accepted practices, correct?
16:09:42   18    A.      Right.
16:09:46   19    Q.      Were you trained to document witness
           20    statements through contemporaneous note-taking or
           21    recording?
16:09:54   22    A.      I'm not sure what you mean by that.  We took
           23    Q and A's.  I think I explained that already.
16:09:57   24    Q.      What do -- can you explain --
16:09:58   25    A.      So we did a verbatim witness statement.
```

**John J. Ryan - May 21, 2019**

16:09:59  1   Q.       What's a -- what's a Q and A?

16:10:00  2   A.       Question and answer.

16:10:03  3   Q.       How do you do that when you're interviewing a

          4   witness?  Are you typing it out rapidly?

16:10:07  5   A.       You bet your life.

16:10:10  6   Q.       So that was your practice at the Providence

          7   Police Department?

16:10:12  8   A.       Absolutely.  I did it on murders, I did it on

          9   all kinds of --

16:10:12 10   Q.       Can -- can you explain --

16:10:14 11   A.       -- serious crimes.

16:10:15 12   Q.       Can you explain it, without me interrupting

         13   you, explain what your practice was in terms of

         14   contemporaneously creating a Q and A during an

         15   interview in a criminal investigation?

16:10:27 16   A.       Yeah.  Can you -- are you going to let me

         17   finish?  All right.

16:10:30 18            So what we would do -- and this is the way we

         19   trained it, but, again, this goes back a number of

         20   years.  We didn't have -- have computers; we actually

         21   did it on a typewriter.

16:10:36 22   Q.       The 90s?

16:10:37 23   A.       Bet your life.

16:10:38 24   Q.       Yeah.

16:10:39 25   A.       Yeah.  Even -- even going into the early

|  | 1 | 2000s.  Late 90s.  We got our first computers in the |
|--|---|------|
|  | 2 | late 90s. |
| 16:10:52 | 3 | So we would say, you know, "Elliot, we are |
|  | 4 | investigating a homicide that occurred on June 9th at |
|  | 5 | 5 a.m.  You have been identified as a witness.  Tell |
|  | 6 | us what you know."  And then I would let them do a |
|  | 7 | narrative.  And I would type the narrative as they |
|  | 8 | went.  Sometimes I would stop and say, "Hold on a |
|  | 9 | minute," and I would catch up.  And I would let them |
|  | 10 | finish. |
| 16:11:17 | 11 | They would go through their whole narrative, |
|  | 12 | everything they knew.  And then I would ask specific |
|  | 13 | questions related to the narrative.  And that way we |
|  | 14 | get, first, what they know and then we work from |
|  | 15 | there.  And sometimes -- |
| 16:11:29 | 16 | Q.    Well -- |
| 16:11:31 | 17 | A.        -- at that point you might ask questions that |
|  | 18 | might be seen as leading, but you have the narrative |
|  | 19 | to work from. |
| 16:11:37 | 20 | Q.    And do you know -- and by that, during that |
|  | 21 | time or by that time, you had been the director of |
|  | 22 | the training program at the Providence Police |
|  | 23 | Department, right? |
| 16:11:48 | 24 | A.    No.  I -- I mean, I did them that way when I |
|  | 25 | was a detective. |

John J. Ryan - May 21, 2019

16:11:49  1    Q.       Okay.

16:11:54  2    A.       Back in, you know, the early 80s.

16:11:58  3    Q.       What was the purpose of doing the

       4    memorialization of a witness interview in the manner

       5    you just described?

16:12:06  6    A.       Well, if they were a -- if they were a

       7    first-hand witness that -- you know, a percipient

       8    witness to the -- to the case, then you would

       9    document what they had to say.

16:12:19 10    Q.       Was it important to document that information

      11    contemporaneously?

16:12:23 12    A.       You would do it when you sat them down to

      13    take a statement.  Now, there's other people that you

      14    wouldn't even take a statement from.  If -- if, for

      15    example, you know, you got identified as a witness in

      16    a case, we come to you and we say, "Elliot, we want

      17    to get a statement from you about what happened," and

      18    you say, "Look, I wasn't there.  I wasn't there at

      19    all.  John told me what happened," then we might not

      20    even bother with you, because you're -- you're going

      21    to be, like, you know, "You're not a firsthand

      22    witness, you're not an eyewitness, you're not a

      23    percipient witness.  We're going to go to John and

      24    get the statement for him as opposed to from you."

16:13:00 25    Q.       In 2011, was it a generally accepted practice

John J. Ryan - May 21, 2019

1    for police officers to corroborate information

2    provided by witnesses who were promised a benefit in

3    exchange for information?

16:13:15   4                    MR. KELLEY:  Note an objection.

16:13:16   5                    THE WITNESS:  To the extent you can.

6    You can't always corroborate.  You know, sometimes

7    you -- you are stuck with what you've got.

16:13:22   8    BY MR. SLOSAR:

16:13:24   9    Q.      But it would be a generally accepted practice

10   for police officers in that type of situation to at

11   least make attempts to corroborate the information,

12   correct?

16:13:32  13   A.      If there was objective evidence that you

14   could use to corroborate, if there were other

15   witnesses that you could use to corroborate, then

16   certainly, you would try to do that.  But if not,

17   then you would present what you have to the

18   prosecutor, you would present what you have to the

19   judge, you would present what you have maybe to the

20   grand jury and -- and see what happens.

16:13:53  21   Q.      In 2011, did generally accepted police

22   practices establish that police officers were

23   expected to document their involvement in homicide

24   investigations?

16:14:02  25   A.      Certainly the lead investigator would

**John J. Ryan - May 21, 2019**

```
              1   document or keep a running documentation of who we

              2   talked to, who were percipient witnesses to the case.

16:14:13      3   Q.      And if the lead investigator was not involved

              4   in specific interactions with witnesses in 2011,

              5   would the generally accepted police practices require

              6   officers to document their involvement in the

              7   homicide investigation?

16:14:28      8                MR. KELLEY:  Note an objection.

16:14:29      9                THE WITNESS:  I'm -- I'm not sure.  It

             10   depends on what their involvement was.

16:14:32     11          So in other words, if I was the first officer

             12   at the scene, and I get there and I can tell that

             13   the -- this was recently happening, yeah, then I

             14   would document chronologically "I arrived at the

             15   scene.  I saw the body on the floor.  It was obvious

             16   to me they were shot in the head.  I set up crime

             17   scene tape."

16:14:50     18          And then the next officer might put, "I

             19   responded to the scene and I took photographs."  So

             20   yeah, those kinds of things would be documented in

             21   supplementary reports if they took an active role in

             22   the case.

16:14:59     23   BY MR. SLOSAR:

16:15:02     24   Q.      Well, let me ask it a different way.  If an

             25   officer who was not the lead detective interviewed a
```

John J. Ryan - May 21, 2019

1   witness or suspect in a homicide investigation

2   without the presence of the lead detective, would

3   generally accepted police practices in 2011 expect or

4   require that officer to document any information

5   learned?

16:15:28   6          MR. KELLEY:  Enter an objection.

16:15:29   7          THE WITNESS:  All depends.  And again,

8   in most cases, if they're going to be turned over to

9   the lead detective to do a Q and A, then no, there

10  would be no reason to.  In other words, you're going

11  to -- you're going to take the person and -- and turn

12  them over.  They say, "Hey, Jack, I want to talk to

13  you.  I know about the murder.  You have -- I have --

14  you have arrested me before.  I am going to take you

15  to Vinnie Manzanillo, and let -- hey, Vinnie's

16  handling the case.  Talk to him."

16:15:54 17  BY MR. SLOSAR:

16:15:55 18  Q.      But outside --

16:15:56 19  A.      I'm not going to -- I'm not going to document

20  that.

16:15:59 21  Q.      Your -- your example is basically the

22  secondary officer merely is a path to get to the

23  primary officer for the purpose of questioning.

24  My -- what I'm saying is, there's an officer involved

25  in the investigation, in a murder investigation, that

1   speaks to you and interviews a witness or a suspect

2   in that homicide investigation without the presence

3   of a lead detective.  Wouldn't generally accepted

4   practices in 2011 require that officer to document

5   any information learned from that witness or suspect?

16:16:33   6   A.      If you did a complete --

16:16:34   7                MR. KELLEY:  Objection to the

8   hypothetical.

16:16:35   9                THE WITNESS:  If you get a complete

10   interview by yourself of a witness and nobody else

11   was there, yeah, of course.  Again, assuming they're

12   a percipient witness to the case.

16:16:44  13   BY MR. SLOSAR:

16:16:49  14   Q.      Sure.  Like in this case, Kayla Mills was

15   charged with murder in 2012.  So would you agree that

16   if Kayla Mills was interviewed or questioned by

17   officers other than the lead detective prior to being

18   charged, that they would have -- that the generally

19   accepted police practices in place in 2011 would have

20   required those officers to talk about any information

21   learned from Kayla Mills relating to the murder

22   investigation of Kathryn Mills?

16:17:18  23   A.      If she said --

16:17:20  24                MR. KELLEY:  Note an objection.

16:17:20  25                MR. MILLER:  Objection.

John J. Ryan - May 21, 2019

16:17:22  1                    THE WITNESS:  Oh, I'm sorry.

16:17:25  2              If she said that she had firsthand

3    information, then of course.

16:17:28  4    BY MR. SLOSAR:

16:17:31  5    Q.      And if she said that she did not have

6    firsthand information, wouldn't have -- those

7    officers have likewise been obligated to document it

8    under Giglio and Brady, as we discussed earlier?

16:17:45  9    A.      No.  I mean, I would recommend they document

10    it so she don't show up later and say, "Hey, I saw

11    the whole thing, and the guy you got didn't do

12    it."  But -- but it's not a Giglio issue because she

13    is not identifying anybody.  She is not -- how

14    she -- it's not going to be an issue unless she gives

15    a subsequent statement that's opposite and says, "I

16    saw everything" --

16:18:04 17    Q.      In this case, she did?

16:18:04 18    A.      -- you know.

16:18:06 19    Q.      Correct?

16:18:06 20                    MR. KELLEY:  Objection.

16:18:07 21                    THE WITNESS:  That's the -- that's the

22    statement that you document.

16:18:08 23    BY MR. SLOSAR:

16:18:11 24    Q.      And then you would have to document the first

25    statement as well, right?  Wouldn't Giglio require

|  |  |
|---|---|
| | 1 |  you to document the initial statement where a person |
| | 2 |  denies any direct knowledge? |
| 16:18:22 | 3 |  A.      You know, we do this all the time, and we do |
| | 4 |  canvasses all the time on murder cases.  And |
| | 5 |  we -- it's -- it's as simple as this:  Somebody |
| 16:18:27 | 6 |  says -- |
| 16:18:30 | 7 |  Q.      Answer -- under -- like, we're talking about |
| | 8 |  -- specifically about Kayla. |
| 16:18:31 | 9 |                       MR. KELLEY:  Can he answer the |
| | 10 |  question? |
| 16:18:32 | 11 |                       MR. SLOSAR:  We're talking about -- he |
| | 12 |  is not answering it.  We're talking about Kayla |
| | 13 |  Mills. |
| 16:18:34 | 14 |                       MR. KELLEY:  Let him answer the |
| | 15 |  question and then you can ask another. |
| 16:18:36 | 16 |  BY MR. SLOSAR: |
| 16:18:39 | 17 |  Q.      We're talking about Kayla Mills, not about |
| | 18 |  some canvass.  If Kayla Mills told law enforcement in |
| | 19 |  separate interviews -- |
| 16:18:45 | 20 |                       MR. KELLEY:  Who -- who did she tell? |
| 16:18:45 | 21 |  BY MR. SLOSAR: |
| 16:18:48 | 22 |  Q.      -- that she didn't have direct knowledge, |
| | 23 |  didn't have any firsthand knowledge, of who killed |
| | 24 |  Katherine Mills, wouldn't generally accepted police |
| | 25 |  practices in place in 2011 require any officer that |

1   she told that to -- to document that information in a

2   report?

16:19:02   3   A.        Not necessarily.

16:19:04   4              MR. KELLEY:   Note an objection.

16:19:05   5              MR. MILLER:   Object to form.

16:19:05   6   BY MR. SLOSAR:

16:19:07   7   Q.        That's based on the training that you

8   received at the Providence Police Department?

16:19:10   9   A.        Absolutely, it's based on training that I

10   give today.  If I had a murder outside a Wal-Mart and

11   I interviewed every person at Wal-Mart and said, "Did

12   you see anything," I don't have to document every

13   person that says, "No, Officer, I just pulled in.  I

14   didn't see a thing."

16:19:24   15   Q.        Well, if you got a subsequent statement from

16   any of those people saying that they saw the murder,

17   wouldn't you then have an obligation to document the

18   first statement?

16:19:32   19   A.        If you were aware of it.

16:19:33   20   Q.        And wouldn't generally accepted police

21   practices in place in 2011 require that?

16:19:41   22   A.        If you were aware of the first statement.

16:19:50   23   Q.        Now, 2011, wasn't it a generally accepted

24   police practice for officers to document when they

25   conduct an identification procedure?

**John J. Ryan - May 21, 2019**

| | | |
|---|---|---|
| 16:19:58 | 1 | A.        Of course. |
| 16:20:02 | 2 | Q.        In 2011, wasn't it a generally accepted |
| | 3 | police practice for officers to document if a witness |
| | 4 | does not make an identification as a result of an |
| | 5 | identification procedure? |
| 16:20:17 | 6 | A.        If you are doing eyewitness identification |
| | 7 | and you're the -- the lead detective on it and the |
| | 8 | person says, "No, that's not him," then yes, you |
| | 9 | would document the fact that this witness was not |
| | 10 | able to pick out a photo from the six pack, sure. |
| 16:20:31 | 11 | Q.        So you would agree in this case -- you've |
| | 12 | reviewed the deposition testimony from Mr. York, |
| | 13 | correct? |
| 16:20:34 | 14 | A.        Correct. |
| 16:20:37 | 15 | Q.        You would agree that given Mr. York's |
| | 16 | deposition testimony, that generally accepted police |
| | 17 | practices would have required that he document the |
| | 18 | fact that Mr. Crump did not make an identification of |
| | 19 | Jonathan Taylor after being shown photographs? |
| 16:20:54 | 20 | A.        York didn't do any identification proceeding |
| | 21 | with Crump. |
| 16:20:59 | 22 | Q.        Who did? |
| 16:21:02 | 23 | A.        York didn't.  That was done in Oklahoma by |
| | 24 | somebody else. |
| 16:21:03 | 25 | Q.        So you're saying -- |

John J. Ryan - May 21, 2019

16:21:04   1    A.        And he didn't make an ID.

16:21:06   2    Q.        So you're saying that the obligation to

3    document the nonidentification would have been on the

4    Oklahoma law enforcement agency?

16:21:20   5    A.        Well, again, I don't think it's either -- at

6    that point they're going to call back and say, "Yeah,

7    we showed the -- the photo array" or whatever.   And

8    -- and again, I -- I know there's some argument in

9    the case about it being a single photo.   But -- but

10   they would have called back and said, "No, we -- we

11   showed the photo to Crump, and it's not the guy.

12   And" --

16:21:38  13    Q.        Whose obligation would it have been to

14   document that an identification was not made?

16:21:43  15    A.        Depends if it is pertinent to your case.   You

16   know, it depends on -- on what the deal is with it.

16:21:48  17    Q.        How --

16:21:50  18    A.        Again, if anybody, it would flow back -- in

19   other words, the lead detective might say, "Hey, I

20   got a call back from Oklahoma.   They said the guy

21   couldn't ID him."   And that's what you'd put.   It

22   would be a simple "no" to that effect.

16:22:00  23    Q.        So generally accepted police practices would

24   have required someone to document the fact that an

25   identification was not made, correct?

John J. Ryan - May 21, 2019

| | | |
|---|---|---|
| 16:22:07 | 1 | A.      If -- if that was part of your case -- |
| 16:22:08 | 2 |             MR. MILLER:  Object to form. |
| 16:22:08 | 3 |             THE WITNESS:  If that was part of your |
| | 4 | case and you sent the photo out to Oklahoma to be |
| | 5 | shown to a witness and the witness says, "I don't see |
| | 6 | the guy here," then it should be documented somewhere |
| | 7 | in the case file. |
| 16:22:22 | 8 | BY MR. SLOSAR: |
| 16:22:27 | 9 | Q.      Would you agree that failing to document |
| | 10 | critical information in a police report during a |
| | 11 | homicide investigation is inconsistent with generally |
| | 12 | accepted practices and training in 2011? |
| 16:22:39 | 13 | A.      Depends what you're identifying as critical |
| | 14 | information.  But certainly, anything that's material |
| | 15 | that you're aware of should be documented.  I mean, |
| | 16 | there's voluminous supplements in this case done by |
| | 17 | York where he details a tremendous amount of |
| | 18 | information. |
| 16:22:54 | 19 | Q.      You haven't seen the entire investigative |
| | 20 | file in this case, correct? |
| 16:22:57 | 21 | A.      I can't even imagine that it must be even |
| | 22 | bigger.  I haven't seen it.  But there's an awful lot |
| | 23 | of information that he does provide through the |
| | 24 | documents that I did see. |
| 16:23:08 | 25 | Q.      As a police practices expert, do you believe |

John J. Ryan - May 21, 2019

|        |    |                                                                      |
|--------|----|----------------------------------------------------------------------|
|        | 1  | that police departments should make sure that all                    |
|        | 2  | exculpatory materials should be turned over?                         |
| 16:23:18 | 3 | A.      Turned over to the prosecutor.  Yeah.                       |
| 16:23:18 | 4 | Q.      Sure.                                                        |
| 16:23:19 | 5 | A.      To the extent you're aware of exculpatory                  |
|        | 6  | material, it should be turned over to the prosecutor,              |
|        | 7  | again, assuming it's material and assuming it's                     |
|        | 8  | something that, you know, only you have.                            |
| 16:23:29 | 9 | Q.      Would you agree that if you have a policy or               |
|        | 10 | practice that says officers can pick which reports or              |
|        | 11 | notes or investigative material they want to                        |
|        | 12 | disclose, that that would be a problem?                             |
| 16:23:40 | 13 | A.      I'm not sure I have ever seen a policy that              |
|        | 14 | says that.  Generally, you know, a murder file is put              |
|        | 15 | together, and the whole thing is turned over to the                 |
|        | 16 | prosecutor.                                                          |
| 16:23:53 | 17 | Q.      Isn't it important to have an officer -- that           |
|        | 18 | officers are trained adequately on the written                      |
|        | 19 | policies and procedures in place?                                   |
| 16:24:00 | 20 | A.      High-risk policies, sure.                                |
| 16:24:02 | 21 | Q.      Critical policies?                                        |
| 16:24:04 | 22 | A.      Critical task policies.                                  |
| 16:24:07 | 23 | Q.      Would conducting identification procedures              |
|        | 24 | fall into that?                                                     |
| 16:24:12 | 25 | A.      Most departments don't have such a policy.              |

John J. Ryan - May 21, 2019

1    Even today, 2018.

16:24:17    2    Q.      What -- can conducting a criminal

3    investigate -- any policies related to the conducting

4    of a criminal investigation fall into that?

16:24:24    5    A.      Most departments don't have that policy

6    today.

16:24:28    7    Q.      You haven't seen any of the policies and

8    procedures of the Kentucky state police, correct?

16:24:32    9    A.      I haven't looked at the policies of the

10    Kentucky state police, but I can tell you from doing

11    audits around the country that most departments don't

12    have that policy today.

16:24:41    13    Q.      Sure.  But you -- again, you have no idea

14    what policies and procedures KSP had as it relates to

15    homicide investigations, correct?

16:24:48    16    A.      No.  But to the extent they had a policy on

17    homicide investigations, they would be ahead of the

18    power curve, because most agencies don't have that

19    policy in place.

16:25:05    20    Q.      In 2011 would generally accepted police

21    practices require an officer to document promises of

22    consideration made to a witness in exchange for a

23    statement in a criminal case?

16:25:18    24    A.      Promises to a witness that were

25    consideration, yes.

16:25:26  1    Q.      In 2011, would generally accepted police

2    practices require an officer to contemporaneously

3    document promises of consideration made to a witness

4    in exchange for information in a criminal case?

16:25:39  5            MR. KELLEY:  Objection to the

6    hypothetical.

16:25:41  7            THE WITNESS:  If you -- if you were the

8    officer who received the information and that

9    information was based on consideration, then of

10   course.

16:25:51 11  BY MR. SLOSER:

16:25:53 12  Q.      So if an officer made promises of

13   consideration and was present when the statement was

14   obtained in exchange for those promises, you would

15   agree that generally accepted practices in 2011 would

16   require documentation, correct?

16:26:08 17  A.      That would be up to the investigator to

18   include in their file to give to the prosecutor.

19   That would not be up to the person who maybe produced

20   the work -- person to begin with.  They're not going

21   to jump in on somebody else's case like that.

16:26:22 22  Q.      Sir, would you agree that the trier of fact

23   should know whether promises of consideration were

24   made to a witness in exchange for a statement that

25   was obtained?

John J. Ryan - May 21, 2019

| | | |
|---|---|---|
| 16:26:31 | 1 | MR. KELLEY:  Objection to the question. |
| 16:26:32 | 2 | THE WITNESS:  If the witness -- |
| 16:26:33 | 3 | MR. MILLER:  Object to form. |
| 16:26:34 | 4 | THE WITNESS:  If the witness is going |
| | 5 | to give testimony in a criminal case at trial, |
| | 6 | absolutely.  That's what Brady stands for.  That's |
| | 7 | the proposition. |
| 16:26:40 | 8 | BY MR. SLOSAR: |
| 16:26:44 | 9 | Q.     Would you agree that the grand -- the trier |
| | 10 | of fact, be it grand jurors or a judge at a probable |
| | 11 | cause hearing, should be informed as to whether a |
| | 12 | witness was made promises of consideration in |
| | 13 | exchange for a statement? |
| 16:26:59 | 14 | MR. KELLEY:  Objection. |
| 16:27:00 | 15 | THE WITNESS:  I know of no case that |
| | 16 | says that it has to be at that point in time.  Brady |
| | 17 | applies to a criminal trial. |
| 16:27:05 | 18 | BY MR. SLOSAR: |
| 16:27:06 | 19 | Q.     I understand. |
| 16:27:08 | 20 | A.     And -- and I think there's an open question |
| | 21 | on that.  In fact, I think the Supreme Court |
| | 22 | actually, and again, not to give a legal opinion, but |
| | 23 | I think the Supreme Court had a couple of cases that |
| | 24 | were going to raise that question, and they did not |
| | 25 | take the cases. |

John J. Ryan - May 21, 2019

16:27:21  1    Q.       Well --

16:27:23  2    A.       So there's a -- there is an open question as

          3    to whether or not there is any duty to disclose it in

          4    -- in those preliminary hearings.

16:27:31  5    Q.       And I didn't ask whether there was a duty to

          6    disclose it.  What I asked is, would you agree that a

          7    trier of fact should be provided with any promises of

          8    consideration made to a witness in exchange for a

          9    statement that that statement is being produced in

          10   support of the initiation of charges?

16:27:54  11                  MR. KELLEY:  I don't think that was

          12   your question before.

16:27:57  13                  MR. SLOSAR:  That's my question.  Now,

          14   John --

16:27:57  15                  MR. KELLEY:  I object.

16:27:57  16                  MR. SLOSAR:  So you answer my question.

16:27:59  17                  MR. KELLEY:  Now I object.

16:28:00  18                  THE WITNESS:  I think it -- I think

          19   it's pretty much the same answer.  I mean, the duty

          20   runs to a criminal prosecution.  And you have to give

          21   it to the prosecution before there's a trial.  For

          22   preliminary matters, I don't think there is any such

          23   duty.

16:28:16  24           Do I tell officers it's a good practice?

          25   Yes, I do.  But does everybody do it that way?  No.

1   And is there a legal duty to do it that way?  I -- if

2   I were training right now, I would tell investigators

3   I know of no legal duty to do it that way.  I would

4   have to go back and see if in their particular

5   circuit somebody has made that decision.

16:28:36  6   BY MR. SLOSAR:

16:28:39  7   Q.      Sir, I'm going to point you to Exhibit 23.

8   It's your second report in this case.  Page -- well,

9   let me give you what we'll mark as Exhibit No. 33.

16:29:00 10      (The document was marked Exhibit No. 33.)

16:29:00 11   BY MR. SLOSAR:

00:00:00 12   Q.      It says Bates PL844 through 855.  Have you

13   seen this document prior to today, sir?

16:29:58 14   A.      I remember this.  I don't know if it was from

15   the particular document, but I remember all of this,

16   including the fact that he pled to under 500 and the

17   other guy paid the -- the plaintiff -- the -- the

18   victim on it 550.  I remember every bit of this, so

19   it may be that I did read this letter.

16:30:16 20          MR. SLOSAR:  Hold on one second.

16:30:23 21      (Discussion held off the record.)

16:30:39 22          THE VIDEOGRAPHER:  Going off the

23   record.  Time on the monitor is 16:30.

16:39:23 24      (Proceedings held off the record.)

16:39:29 25          THE VIDEOGRAPHER:  We're back on the

John J. Ryan - May 21, 2019

|  | 1 | record time on the monitor is 16:38. |
| 16:39:33 | 2 | MR. SLOSAR:  All right, sir. |
| 16:39:34 | 3 | MR. MILLER:  All right.  Let's go. |
| 16:39:35 | 4 | MR. KELLEY:  I think he -- I think he |
|  | 5 | was mid answer, as I remember. |
| 16:39:39 | 6 | MR. SLOSAR:  Are you answering? |
| 16:39:41 | 7 | MR. KELLEY:  I think you were about to |
|  | 8 | -- he was answer -- he was going to answer the |
|  | 9 | question about Exhibit No. 33. |
| 16:39:47 | 10 | MR. SLOSAR:  I don't know what -- |
| 16:39:49 | 11 | MR. KELLEY:  I would like for him to |
|  | 12 | answer. |
| 16:39:51 | 13 | MR. SLOSAR:  Do you -- do you remember |
|  | 14 | what you were answering? |
| 16:39:53 | 15 | THE WITNESS:  My answer was that |
|  | 16 | obviously the -- Sheriff Pickard documented, because |
|  | 17 | he sent this to the prosecutor. |
| 16:39:57 | 18 | BY MR. SLOSAR: |
| 16:39:59 | 19 | Q.    Was it generally consistent with |
|  | 20 | practice -- law enforcement practices in 2011 to |
|  | 21 | document promises of consideration to a witness more |
|  | 22 | than nearly two years after your conversation with |
|  | 23 | that witness? |
| 16:40:14 | 24 | A.    If it was before the trial, of course. |
| 16:40:17 | 25 | Q.    Sitting here today, do you have any idea when |

John J. Ryan - May 21, 2019

```
         1   this case was first set for trial?
16:40:20 2   A.      No idea.
16:40:22 3   Q.      Do you have any idea sitting here today
         4   whether Sheriff Pickard's letter was before -- before
         5   or after the initial trial date?
16:40:32 6   A.      I don't know.  But as long as they got it
         7   before trial, then it's consistent.
16:40:36 8   Q.      Sir, on Page 33 -- and are you relying upon
         9   any training key for that opinion?
16:40:41 10  A.      Any training key?
16:40:42 11  Q.      Yeah.  Is there any --
16:40:44 12  A.      No, I'm -- I'm relying -- I mean --
16:40:45 13  Q.      Is there any --
16:40:47 14  A.      We train -- we train to the law on Brady, and
         15  Brady says there's -- as long as they have a
         16  pretrial, then -- then we're -- we're good.
16:40:56 17  Q.      Sir, on Page 33 of your opinion, do you state
         18  that -- I'm sorry, Page 24 of your opinion.
16:41:08 19  A.      Which exhibit, please?
16:41:16 20  Q.      This is your February 4th report.  On Page
16:41:16 21  24 --
16:41:18 22  A.      Remember, they're not two separate reports.
         23  One is a draft.
16:41:21 24  Q.      Well, both of them were signed under penalty
         25  of perjury, correct?
```

John J. Ryan - May 21, 2019

| | | |
|---|---|---|
| 16:41:24 | 1 | A.       Of course.  But one is a draft. |
| 16:41:25 | 2 | Q.       Well, does it -- |
| 16:41:26 | 3 | A.       And I think that's clear through the -- |
| 16:41:26 | 4 | Q.       Does it -- does it -- |
| 16:41:27 | 5 | A.       -- emails that you -- that you delivered. |
| 16:41:28 | 6 | Q.       Does it say "draft" anywhere? |
| 16:41:29 | 7 | A.       I don't ever write "draft."   But it -- it's |
| | 8 | clearly a draft. |
| 16:41:33 | 9 | Q.       If it was a draft, why would you sign it |
| | 10 | under penalty of perjury? |
| 16:41:35 | 11 | A.       I sign every one of them under penalty of |
| | 12 | perjury when I send it, even the drafts. |
| 16:41:39 | 13 | Q.       Look.  Maybe -- I mean, you're a lawyer, but |
| | 14 | now you'll know that when you sign things under |
| | 15 | penalty of perjury, they're no longer a draft and |
| | 16 | they are discoverable. |
| 16:41:46 | 17 | A.       Well -- |
| 16:41:47 | 18 |             MR. KELLEY:  Boy. |
| 16:41:47 | 19 | BY MR. SLOSAR: |
| 16:41:50 | 20 | Q.       Sir, looking at Page 24, do you see where it |
| | 21 | says, "Additionally, York determined that Hoskins was |
| | 22 | not at a doctor's appointment at the time Katherine |
| | 23 | Mills was killed."  Do you see that, sir?  First |
| | 24 | paragraph? |
| 16:42:05 | 25 | A.       I'm trying to answer that, but it is double |

John J. Ryan - May 21, 2019

|           |    |                                                          |
|-----------|----|----------------------------------------------------------|
|           | 1  | sided.   It's messing me up.   So go ahead, what?        |
| 16:42:09  | 2  | Q.       "Additionally" -- you state, "Additionally,     |
|           | 3  | York determined that Hoskins was not at a doctor's       |
|           | 4  | appointment at the time that Katherine Mills was         |
|           | 5  | killed."                                                 |
| 16:42:15  | 6  | A.       Correct.                                        |
| 16:42:19  | 7  | Q.       Okay.   Sir, again, you have not been provided  |
|           | 8  | with the entire KSP investigative file, correct?        |
| 16:42:24  | 9  | A.       Correct.                                        |
| 16:42:26  | 10 | Q.       Is it your testimony, based on the six          |
|           | 11 | deposition transcripts that you reviewed, that there     |
|           | 12 | was ever a time of death associated with Katherine      |
|           | 13 | Mills' murder?                                           |
| 16:42:39  | 14 | A.       Oh, I don't -- I don't know the answer to       |
|           | 15 | that.   I would have to go back and -- and determine     |
|           | 16 | if there was an autopsy where the -- where the          |
|           | 17 | medical examiner determined time of death.              |
| 16:42:48  | 18 | Q.       But you're certainly not --                     |
| 16:42:52  | 19 | A.       I think -- I think the issue was that -- and    |
|           | 20 | again, the issue here is not what the time of death      |
|           | 21 | was.   The issue was that -- that, you know, Hoskins     |
|           | 22 | says she was in an appointment at the time that it      |
|           | 23 | was -- they were looking at, and she was not.   It's    |
|           | 24 | not a matter of whether or not what time the death      |
|           | 25 | occurred.                                                |

John J. Ryan - May 21, 2019

16:43:10  1    Q.       She was in an appointment within 30 minutes

2    of the point in time.

16:43:13  3    A.       30 minutes later.

16:43:15  4    Q.       Sure.  But you had no idea sitting here today

5    when Katherine Mills was killed?

16:43:19  6    A.       And that's not -- that's not what York even

7    tried to explain there.

16:43:21  8    Q.       I'm -- your --

16:43:22  9    A.       You're asking -- you're asking -- you're

10    asking --

16:43:24 11    Q.       I'm asking you about your opinion.  Your

12    opinion says, "York determined that Hoskins was not

13    at a doctor's appointment at the time Katherine Mills

14    was killed."

16:43:33 15    A.       Correct, because they were working on a time

16    frame based on a -- all of the different evidence

17    that they had.

16:43:41 18    Q.       Detective York never specifically determined

19    when exactly Katherine Mills was killed, correct?

16:43:46 20    A.       Again, I would have to see the whole

21    investigation to make that determination.

16:43:49 22    Q.       And -- and you didn't receive that prior to

23    forming your opinions in this case?

16:43:51 24    A.       Correct.

16:43:56 25    Q.       Sir, on Page 26 of your report, you state, "I

1  would note," first -- 71, Paragraph 71, "I would note

2  that many of the witnesses who reportedly implicated

3  Hoskins and Taylor in the murder of Katherine Mills

4  subsequently recanted the statements previously made

5  and some indicated the information in prior

6  statements was fed to them by Detective York."  Do

7  you see that, sir?

16:44:16   8  A.      Yes.

16:44:18   9  Q.      I am not going to go through it again, but

10  you acknowledge that the majority of these witnesses

11  who recanted, that you did not actually review any of

12  their deposition transcripts, correct?

16:44:30  13  A.      I mean, we went through the list of

14  depositions --

16:44:31  15  Q.      Yeah.

16:44:32  16  A.      -- that I did review, yes.

16:44:33  17  Q.      Yeah.

16:44:34  18  A.      But I do know --

16:44:34  19  Q.      So --

16:44:35  20  A.      -- they recanted, and I have included them in

21  my report.

16:44:37  22  Q.      You have no idea whether any of those

23  witnesses implicate Sheriff Pickard or any other Knox

24  County personnel in the fabrication of their

25  statements, correct?

John J. Ryan - May 21, 2019

| | | |
|---|---|---|
| 16:44:49 | 1 | MR. KELLEY:  Objection. |
| 16:44:50 | 2 | MR. MILLER:  Object to form. |
| 16:44:51 | 3 | THE WITNESS:  Again, I don't know what |
| | 4 | they say in the depositions, because I didn't review |
| | 5 | them.  You know, but certainly if you have |
| | 6 | information from those depositions that you think |
| | 7 | shows me that he did -- wasn't -- you know, |
| | 8 | participated in some fabrication of evidence, then, |
| | 9 | you know, certainly share it with me and I'll -- I'll |
| | 10 | say, "Yeah, it looks like he was -- he was involved." |
| 16:45:07 | 11 | BY MR. SLOSAR: |
| 16:45:10 | 12 | Q.    Well, you weren't provided with any of that |
| | 13 | prior to forming your opinions? |
| 16:45:14 | 14 | A.    No.  But you have the opportunity to do that |
| | 15 | right now. |
| 16:45:17 | 16 | Q.    Sure.  Yeah, I do.  I think you will learn |
| | 17 | that when we're in trial. |
| 16:45:23 | 18 | Sir, on page -- |
| 16:45:24 | 19 | MR. KELLEY:  So -- |
| 16:45:25 | 20 | MR. SLOSAR:  -- 26 -- |
| 16:45:26 | 21 | MR. KELLEY:  -- you're saying you're -- |
| | 22 | you're purposely not telling us about evidence that |
| | 23 | you might bring up to this witness? |
| 16:45:33 | 24 | MR. SLOSAR:  I have 25 minutes to |
| | 25 | conduct my examination, John.  And while I am -- |

John J. Ryan - May 21, 2019

16:45:36  1                    MR. KELLEY:  Well, that's what I

       2    understood you to say.

16:45:38  3                    MR. SLOSAR:  -- fascinated with your --

16:45:39  4                    MR. KELLEY:  If your excuse --

16:45:40  5                    MR. SLOSAR:  What is your -- what is

       6    your objection right now?  Please tell me the federal

       7    law.

16:45:43  8                    MR. KELLEY:  My objection is, is

16:45:43  9    that --

16:45:43 10                    MR. SLOSAR:  What is the objection?

      11                    MR. KELLEY:  -- what I learned early in

      12    life, that you don't try by ambush in federal court.

      13    If you have something, bring it up.

16:45:51 14                    MR. SLOSAR:  Oh.  Well, that's a very

      15    interesting federal rule you pointed to.  I

      16    appreciate it.

16:45:55 17                    MR. KELLEY:  It's one I learned from

      18    Judge Coffman, as a matter of fact.

16:45:59 19    BY MR. SLOSAR:

16:46:04 20    Q.      Sir, Mr. Helton in fact claims that Sheriff

      21    Pickard was present when his statement was

      22    fabricated, correct?

16:46:09 23    A.      Oh, I think he says he was in the room, but

      24    he does not say anything about him participating in

      25    any way.  And in fact, he -- he -- I think he is one

John J. Ryan - May 21, 2019

|  |  |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| 16:46:26 | 4 |
| | 5 |
| | 6 |
| | 7 |
| 16:46:41 | 8 |
| | 9 |
| 16:46:48 | 10 |
| | 11 |
| 16:46:54 | 12 |
| 16:46:54 | 13 |
| 16:46:55 | 14 |
| | 15 |
| | 16 |
| 16:46:58 | 17 |
| 16:47:02 | 18 |
| | 19 |
| | 20 |
| | 21 |
| 16:47:13 | 22 |
| | 23 |
| | 24 |
| 16:47:20 | 25 |

1    that says that Pickard said, "Just tell the truth."
2    I don't think he says that Pickard did anything by
3    way of trying to entice him to tell a story.
4    Q.      Sir, is it your testimony that Mr. Helton did
5    not testify at his deposition that Mr. Pickard told
6    him that he would get a deal as long as he told them
7    what they wanted to hear?
8    A.      I would have it in here, I think, if I -- if
9    I read that.
10   Q.      You would agree that that's a little bit
11   different than "tell the truth," correct?
12   A.      Well, not --
13                MR. SLOSAR:  Object to form.
14                THE WITNESS:  -- not if you don't feed
15   him the information.  I mean, tell -- tell us
16   what -- what you know.
17   BY MR. SLOSAR:
18   Q.      No.  That -- do you -- did you read in Allen
19   Helton's deposition where he testified that Sheriff
20   Pickard told him that he would get a deal so long as
21   he told the officers what they wanted to hear?
22   A.      Wanted to hear, I don't recall that.  I've
23   got right in my report a quote where he said what we
24   need to hear.  I've included that --
25   Q.      Is there a difference?

**John J. Ryan - May 21, 2019**

| | | |
|---|---|---|
| 16:47:21 | 1 | A.        -- in my report. |
| 16:47:21 | 2 | Q.        Is there a difference? |
| 16:47:23 | 3 | A.        Well, no.  They need to hear the truth. |
| 16:47:24 | 4 | Q.        That's not what Mr. -- |
| 16:47:25 | 5 | A.        So that is -- that is -- |
| 16:47:27 | 6 | Q.        That's not what Mr. Helton said, right? |
| | 7 | Exhibit 41 is Allen Helton's deposition. |
| 16:47:30 | 8 |               MR. KELLEY:  I -- I object to that, |
| | 9 | because Mr. Helton -- okay. |
| 16:47:32 | 10 |               MR. SLOSAR:  Yeah. |
| 16:47:36 | 11 |        (The document was marked Exhibit No. 41.) |
| 16:47:36 | 12 | BY MR. SLOSAR: |
| 16:47:40 | 13 | Q.        Sir, did you review this deposition |
| | 14 | transcript prior to forming the February 4th, 2019, |
| | 15 | opinions? |
| 16:47:51 | 16 | A.        I'm sure that I reviewed it before either one |
| | 17 | of them.  I can't say for certain, but I -- I believe |
| | 18 | that I did. |
| 16:48:01 | 19 | Q.        You -- you did not document having reviewed |
| | 20 | this prior to your February 1st report, right? |
| 16:48:05 | 21 | A.        And I think I've already explained to you |
| | 22 | that it's possible that I finished the report and |
| | 23 | said, "Oh, my God, I didn't include Helton."  And I |
| | 24 | should have.  That's entirely possible.  So I went |
| | 25 | back and included it.  As I said, the first one, I |

John J. Ryan - May 21, 2019

| | | |
|---|---|---|
| | 1 | always send the draft. |
| 16:48:38 | 2 | MR. KELLEY:  So what's the question? |
| 16:48:38 | 3 | BY MR. SLOSAR: |
| 16:48:52 | 4 | Q.      Page 70, Lines 19 through 25.  Did you -- did |
| | 5 | you -- |
| 16:48:54 | 6 | MR. KELLEY:  I object to the |
| 16:48:54 | 7 | question -- |
| 16:48:54 | 8 | BY MR. SLOSAR: |
| 16:48:55 | 9 | Q.       -- review this? |
| 16:48:55 | 10 | MR. KELLEY:  -- to the extent that it |
| | 11 | doesn't include what he said on Line 3 at Page 155. |
| 16:49:02 | 12 | MR. SLOSAR:  John -- John, can you |
| | 13 | please give me the federal rule that allows for you |
| | 14 | to jump into my questioning with -- |
| 16:49:07 | 15 | MR. KELLEY:  Sure.  It's the rule |
| | 16 | that's -- |
| 16:49:08 | 17 | MR. SLOSAR:  What -- what is the |
| | 18 | number? |
| 16:49:10 | 19 | MR. KELLEY:  I can object to the form |
| | 20 | of the question and tell you how to form that |
| | 21 | question so it is a correct question. |
| 16:49:16 | 22 | MR. SLOSAR:  I would actually |
| | 23 | appreciate if you kept that strategy discussion |
| | 24 | between yourself and Jason. |
| 16:49:20 | 25 | BY MR. SLOSAR: |

John J. Ryan - May 21, 2019

| | | |
|---|---|---|
| 16:49:22 | 1 | Q.      Sir, are you on Page 70? |
| 16:49:23 | 2 | A.      Yes. |
| 16:49:24 | 3 | Q.      Okay.  Do you see where it says: |
| 16:49:26 | 4 | "Q.   And what did you and Sheriff Pickard |
| | 5 | talk about on your way to the jail? |
| 16:49:32 | 6 | "A.   I just said -- I asked him what I could |
| | 7 | do to get out of this. |
| 16:49:36 | 8 | "Q.   What did Sheriff Pickard say? |
| 16:49:38 | 9 | "A.   Tell us what we need to hear about the |
| | 10 | murder case." |
| 16:49:41 | 11 | Did you see that, sir? |
| 16:49:42 | 12 | A.      Yeah. |
| 16:49:44 | 13 | Q.      Did you review that testimony prior to |
| | 14 | forming your opinion? |
| 16:49:46 | 15 | A.      Of course. |
| 16:49:51 | 16 | Q.      On the following page: |
| 16:49:54 | 17 | "Q.   Did Sheriff Pickard made any promises |
| | 18 | to help you out on your pending criminal case if you |
| | 19 | told him what he wanted to hear?" |
| 16:50:01 | 20 | "A.   He offered to get -- he said he would |
| | 21 | give me a bond to get me out and there wouldn't be no |
| | 22 | more charges brought up on me." |
| 16:50:09 | 23 | Did you read those questions and answers, |
| | 24 | sir, before forming your opinion? |
| 16:50:13 | 25 | A.      Absolutely.  And I also read that he was the |

John J. Ryan - May 21, 2019

|  |  |  |
|---|---|---|
|  | 1 | one who asked what he could do to get out.  And -- |
| 16:50:16 | 2 | Q.      Sir -- |
| 16:50:18 | 3 | A.      -- the sheriff says, "Tell us what we need to |
|  | 4 | hear about the murder." |
| 16:50:19 | 5 | Q.      Did Allen -- |
| 16:50:21 | 6 | A.      The sheriff didn't say, "Tell us that Amanda |
|  | 7 | Hoskins did it," didn't tell us -- didn't tell us, |
|  | 8 | "Jonathan Taylor did it."  He said, "Tell us what we |
|  | 9 | need to hear about the murder.  Tell us the details." |
|  | 10 | I don't have any problem with any of that. |
| 16:50:34 | 11 | Q.      Yeah.  Well, he doesn't -- he does not |
|  | 12 | testify that Sheriff Pickard ever told him to tell |
|  | 13 | the truth, correct? |
| 16:50:40 | 14 |           MR. KELLEY:  Objection. |
| 16:50:40 | 15 |           THE WITNESS:  I think -- I think |
|  | 16 | somewhere in the deposition he says that. |
| 16:50:43 | 17 | BY MR. SLOSAR: |
| 16:50:45 | 18 | Q.      Sir, let me ask you this.  You never reviewed |
|  | 19 | the deposition transcript from Donna Mills, correct? |
| 16:50:49 | 20 | A.      From who? |
| 16:50:49 | 21 | Q.      Donna Mills. |
| 16:50:52 | 22 | A.      We went through all the depositions.  I |
|  | 23 | didn't look at it. |
| 16:50:53 | 24 | Q.      You can answer again. |
| 16:50:54 | 25 | A.      And -- and -- again, if you want to -- if you |

**John J. Ryan - May 21, 2019**

|   |    |   |
|---|----|---|
|          | 1  | want to show me a deposition, I'll be happy to.  But |
|          | 2  | it is -- |
| 16:51:00 | 3  | Q.     If you answer the question, I might actually |
|          | 4  | show you it. |
| 16:51:02 | 5  |         Did you review it, yes or no? |
| 16:51:04 | 6  | A.     Haven't I answered that already?  It's not on |
|          | 7  | my list. |
| 16:51:06 | 8  | Q.     Answer it again.  It's not on your list, so |
|          | 9  | you did not review it? |
| 16:51:07 | 10 | A.     Correct. |
| 16:51:09 | 11 | Q.     You have -- sitting here today, you have no |
|          | 12 | idea as to whether Defendant Pickard pressured or |
|          | 13 | coerced Kayla Mills in any way prior to her giving a |
|          | 14 | statement to Detective York, correct? |
| 16:51:23 | 15 | A.     I don't necessarily know that Donna Mills |
|          | 16 | would know the answer to that.  That would be |
|          | 17 | secondhand unless she was present. |
| 16:51:30 | 18 | Q.     And -- since you weren't -- since you didn't |
|          | 19 | review her deposition, you have no idea, right? |
| 16:51:34 | 20 | A.     Yeah, I don't recall reading anything about |
|          | 21 | her being present when -- when -- when the interview |
|          | 22 | took place, but again -- |
| 16:51:38 | 23 | Q.     You also -- |
| 16:51:40 | 24 | A.     -- like I said, you're more than welcome to |
|          | 25 | show me the deposition. |

John J. Ryan - May 21, 2019

| | | |
|---|---|---|
| 16:51:43 | 1 | Q.        You also never reviewed the deposition |
| | 2 | transcripts of Joe King, Daniel Wilson, Amber |
| | 3 | Simpson, Mike Simpson, Michael Crump, Jonathan |
| | 4 | Taylor's first deposition, or Christy Branson, |
| | 5 | correct? |
| 16:51:53 | 6 | A.        Correct. |
| 16:51:54 | 7 | Q.        So you have no idea who was involved in |
| | 8 | obtaining any false or fabricated statements from any |
| | 9 | of those people, correct? |
| 16:51:59 | 10 | A.        Correct. |
| 16:52:06 | 11 | Q.        Sir, you state on Page 26 of your second |
| | 12 | report, because your first report doesn't discuss |
| | 13 | Allen Helton's deposition, that, quote, "When asked |
| | 14 | leading questions regarding whether York had fed him |
| | 15 | information, Helton responded affirmatively."  Do you |
| | 16 | see that, sir? |
| 16:52:20 | 17 | A.        Yes. |
| 16:52:23 | 18 | Q.        Sir, you understand that you are not an |
| | 19 | attorney in any upcoming trial in this case?  You |
| | 20 | can't object to questioning based on whether they are |
| | 21 | leading or not.  You understand that, right? |
| 16:52:37 | 22 | A.        That's not -- that's not what that is there |
| | 23 | for. |
| 16:52:38 | 24 | Q.        What's -- what's that there for? |
| 16:52:40 | 25 | A.        Because we don't know if that's -- if he is |

John J. Ryan - May 21, 2019

|   |   |   |
|---|---|---|
| | 1 | being fed the information by the attorney who is |
| | 2 | asking the leading question. |
| 16:52:44 | 3 | Q.      Sir -- |
| 16:52:46 | 4 | A.      Just the same way that -- that you're arguing |
| | 5 | that -- that the detective does that. |
| 16:52:56 | 6 | Q.      Sir, on Page 70, Lines 19 through 25, do you |
| | 7 | consider that to be leading questioning? |
| | 8 | Specifically the question "And what did you and |
| | 9 | Sheriff Pickard talk about on your way to jail?"  Or |
| | 10 | the next question, "What did Sheriff Pickard say?" |
| 16:53:17 | 11 | A.      No.  That's not leading. |
| 16:53:24 | 12 | Q.      Sure.  Okay.  Sir, on Page 32 of your |
| 16:53:26 | 13 | report -- |
| 16:53:31 | 14 | A.      But I will say this just so the record is |
| | 15 | clear: "And was that exchange -- were those promises |
| | 16 | made in exchange for you telling Sheriff Pickard what |
| | 17 | he wanted to hear?"  That's definitely leading. |
| 16:53:41 | 18 | Q.      All right.  Well, that -- I mean -- I mean, |
| | 19 | you are not a lawyer in this case? |
| 16:53:45 | 20 | A.      No, but that's -- |
| 16:53:45 | 21 | Q.      What's -- you know -- |
| 16:53:45 | 22 | A.      That's -- that is feeding -- |
| 16:53:47 | 23 | Q.      When is the last time you practiced -- when |
| | 24 | is the last time you practiced law? |
| 16:53:49 | 25 | A.      I don't practice law. |

John J. Ryan - May 21, 2019

16:53:50  1    Q.        Yeah.

16:53:52  2    A.        I think you know that.  And that's not the

          3    purpose of me pointing that out.

16:53:54  4    Q.        When -- you know --

16:53:57  5    A.        The very purpose is, we're trying to get at

          6    credibility of the statement, and by you doing

          7    leading questions or whoever did it, that's not

          8    necessarily going to give you the -- the credible

          9    answer.

16:54:06 10    Q.        Well, the Court in Sanders barred you from

         11    making credibility determinations, right?

16:54:09 12    A.        Well, I'm not saying it's a credibility

         13    determination.  It's -- it's a criticism of the

         14    method of asking questions to get an answer that --

         15    that you choose to get.

16:54:19 16    Q.        Yeah.  But you had absolutely no criticism of

         17    Detective York's questioning style of Mr. Helton from

         18    the recording, correct?

16:54:27 19    A.        Detective York -- and again, if you want my

         20    opinion on that, I'll give it to you.

16:54:30 21              Detective York had numerous conversations

         22    with him, and I think Helton admits that prior to

         23    this occasion.  And he was simply asking him

         24    questions based on the information that Helton had

         25    given him on a prior occasion.  So no, I would have

John J. Ryan - May 21, 2019

|       |    |                                                                        |
|-------|----|------------------------------------------------------------------------|
|       | 1  | no problem with that.  I have already explained that.                  |
| 16:54:50 | 2  | Q.      Sir, isn't it true -- well, on Page 32, you                 |
|       | 3  | say that "Pickard said that this agency then called                    |
|       | 4  | the state police to start an investigation, because                   |
|       | 5  | the sheriff's office did not handle murders."  Do you                  |
|       | 6  | see that?                                                              |
| 16:54:59 | 7  | A.      Yes.                                                        |
| 16:55:02 | 8  | Q.      And what's the entire basis for that opinion?               |
| 16:55:05 | 9  | A.      The entire basis is that plus the fact that                 |
|       | 10 | Jason York says that he immediately responds, the                      |
|       | 11 | body is still on the ground, the crime scene is still                  |
|       | 12 | there, it's still set up.  So it's a -- it's a                         |
|       | 13 | combination of testimony and objective evidence.                       |
| 16:55:21 | 14 | Q.      You understand that Sheriff Pickard assisted                |
|       | 15 | Detective York in more than a half dozen witness                       |
|       | 16 | interviews after leaving the crime scene, correct?                     |
| 16:55:28 | 17 | A.      I don't -- I don't know that we would say he                |
|       | 18 | assisted.  York ran the interviews, and -- and                         |
|       | 19 | certainly the sheriff went out and helped him find                     |
|       | 20 | people.                                                                |
| 16:55:35 | 21 | Q.      Are you saying that Sheriff Pickard did not                 |
|       | 22 | testify that he assisted Detective York?                               |
| 16:55:39 | 23 | A.      I think he assisted by way of helping find                  |
|       | 24 | people and being the local officer there.                              |
| 16:55:43 | 25 | Q.      That is not my question.  Did Sheriff --                    |

**John J. Ryan - May 21, 2019**

| | | |
|---|---|---|
| 16:55:45 | 1 | A.      I don't -- I don't think he had asked any |
| | 2 | questions, as -- as I recall. |
| 16:55:47 | 3 | Q.      Did Sheriff Pickard testify -- |
| 16:55:48 | 4 | MR. KELLEY:  He said it in his report. |
| 16:55:48 | 5 | BY MR. SLOSAR: |
| 16:55:52 | 6 | Q.      Did Sheriff Pickard testify, admit to |
| | 7 | assisting Detective York in the homicide |
| | 8 | investigation?  Yes or no? |
| 16:56:01 | 9 | A.      No.  I don't think that's what he says.  In |
| | 10 | fact, I mean -- |
| 16:56:02 | 11 | Q.      All right. |
| 16:56:03 | 12 | A.      -- I have in my report what he says.  He |
| | 13 | says, "We didn't assist in the investigation." |
| 16:56:07 | 14 | Q.      Jack, what does -- |
| 16:56:09 | 15 | A.      "He had some names he needed to talk to, and |
| | 16 | he didn't know the people, and I did.  I just rode |
| | 17 | with him and helped him find them." |
| 16:56:15 | 18 | Q.      Great.  Exhibit 42.  Maybe this will refresh |
| | 19 | your memory. |
| 16:56:15 | 20 | (The document was marked Exhibit No. 42.) |
| 16:56:18 | 21 | THE WITNESS:  Well, this is right from |
| | 22 | his deposition too. |
| 16:56:18 | 23 | MR. SLOSAR:  Sure. |
| 16:56:19 | 24 | THE WITNESS:  So, you know, if you want |
| | 25 | to take something out of context. |

John J. Ryan - May 21, 2019

| | | |
|---|---|---|
| 16:56:20 | 1 | BY MR. SLOSAR: |
| 16:56:22 | 2 | Q.      Page -- Page 14, 5 through 7. |
| 16:56:37 | 3 | A.      Yeah, it's exactly what I said.  "I helped |
| | 4 | him some, locating people, yes."  Exactly what I |
| | 5 | said, and it's exactly what's in my report. |
| 16:56:46 | 6 | Q.      All right.  And why don't -- you know what? |
| | 7 | Here, I'll -- I'll read it for you in case there's |
| | 8 | any confusion. |
| 16:56:53 | 9 | A.      I don't have any trouble reading, so there's |
| | 10 | no confusion. |
| 16:56:55 | 11 | Q.      What is -- what was the question? |
| 16:56:57 | 12 | A.      You can -- you can read it because we can |
| | 13 | take it out of context. |
| 16:56:59 | 14 | Q.      What was the question? |
| 16:57:02 | 15 | A.      The question was whether or not he assisted |
| | 16 | in the investigation. |
| 16:57:04 | 17 | Q.      And how -- |
| 16:57:05 | 18 | A.      He says he didn't. |
| 16:57:05 | 19 | Q.      How did -- |
| 16:57:07 | 20 | A.      He says he didn't, and I've got it |
| | 21 | documented.  That's on Page 15.  Okay?  And then you |
| | 22 | asked, "Oh, but he didn't help talk to people?  You |
| | 23 | said he was interviewing people."  That's what you |
| | 24 | asked, that he was involved in the interview of a |
| | 25 | number of people right after the homicide.  And what |

John J. Ryan - May 21, 2019

```
          1   does he say?  "I helped him locate people.  That's

          2   what I did.  I went around with him, helped him

          3   locate people."

16:57:29  4   Q.      Sir, on Page 14, was Sheriff Pickard asked

          5   this question, did he give this answer?

16:57:33  6           "Is it fair to say that you assisted Jason

          7   York in his investigation?

16:57:37  8           "A.   I helped him some, locating people,

          9   yes.

16:57:41 10           Did you read that question and answer prior

         11   to forming your opinion?

16:57:44 12   A.      Yes.  In fact, I think I've included it in my

         13   report.

16:57:46 14              MR. KELLEY:  Then the -- the next

         15   question, "Is it fair that you" --

16:57:48 16              MR. SLOSAR:  And in fact -- you know

         17   what, John?  Look, John, John --

16:57:50 18              MR. KELLEY:  York also --

16:57:50 19              MR. SLOSAR:  I don't -- I don't --

         20              MR. KELLEY:  You can't --

16:57:52 21              THE COURT REPORTER:  Hold on.  Hold on.

         22   I can't take two at a time.

16:57:55 23              MR. SLOSAR:  That's -- you know, John,

         24   this is -- this is exactly why federal rules exist,

         25   for the -- this type of issue.
```

John J. Ryan - May 21, 2019

| | | |
|---|---|---|
| 16:58:02 | 1 | MR. KELLEY:  You're saying the federal |
| | 2 | rules allow you to quote out of context in an effort |
| | 3 | to confuse the witness as to what the witness |
| | 4 | actually said? |
| 16:58:10 | 5 | MR. SLOSAR:  There's no -- there's |
| 16:58:10 | 6 | no -- |
| 16:58:11 | 7 | MR. KELLEY:  If you say that that's -- |
| | 8 | the federal rules say that, then I guess you're |
| | 9 | right.  But I don't think the federal rules provide |
| | 10 | that. |
| 16:58:19 | 11 | MR. SLOSAR:  John, I am right.  Let me |
| | 12 | continue my questions. |
| 16:58:20 | 13 | THE WITNESS:  Just for the record, it |
| | 14 | says exactly what I've got in the report and exactly |
| | 15 | what I said. |
| 16:58:23 | 16 | MR. SLOSAR:  Great.  Thank -- Jack, |
| | 17 | thanks -- thanks for your opinion.  I am not actually |
| | 18 | asking for one in this case. |
| 16:58:27 | 19 | BY MR. SLOSAR: |
| 16:58:30 | 20 | Q.     Now, my next question to you is, Sheriff |
| | 21 | Pickard acknowledged in his deposition on Page 20 |
| | 22 | that he spoke to Allen Helton without the presence of |
| | 23 | Jason York, correct? |
| 16:58:54 | 24 | A.     I think I have that in the report as well. |
| 16:59:06 | 25 | Q.     Lines 14 through 21. |

John J. Ryan - May 21, 2019

16:59:10   1                    MR. KELLEY:   I'm sorry, Page 20?

16:59:20   2   BY MR. SLOSAR:

16:59:21   3   Q.      Do you see that, sir?

16:59:22   4   A.      Yes.

16:59:26   5   Q.      Sheriff Pickard admitted at his deposition

           6   that he spoke with Allen Helton without the

           7   president -- presence of Detective York, correct?

16:59:33   8   A.      I think I might have talked to him one time,

           9   I think.  And -- and he wasn't told anything.

16:59:39  10   Q.      And then Line 19:

16:59:41  11           "And Allen Helton never told you anything

          12   like what he said on March 8, 2012, correct?

16:59:46  13           "A.  Not before that, no."

16:59:48  14   A.      Right.

16:59:53  15   Q.      Sir, Sheriff Pickard would generally -- well,

          16   I'm not going to get into it.  You acknowledged that

          17   Sheriff Pickard also admits to accompanying Detective

          18   York to investigate the blue car.  Do you recall that

          19   part?

17:00:08  20   A.      He did go out to look at the -- the blue

          21   car.  And I'm not sure York went with him.  I don't

          22   recall if York went with him or not.  I know he went

          23   out to look at -- went out to the -- whatever, yeah.

17:00:17  24   Q.      Sheriff Pickard -- Sheriff Pickard obviously

          25   never created any police reports regarding that,

John J. Ryan - May 21, 2019

|       |    |                                                           |
|-------|----|-----------------------------------------------------------|
|       | 1  | correct?                                                  |
|17:00:21| 2  | A.      Correct.                                          |
|17:00:26| 3  | Q.      And on Page 32 to 33 of your report, you          |
|       | 4  | stated at the very bottom, Paragraph 81, "I would         |
|       | 5  | note that an officer from an assisting agency that        |
|       | 6  | was not assigned as an investigator in this case          |
|       | 7  | would not, consistent with generally accepted             |
|       | 8  | practices, take notes or do reports simply for            |
|       | 9  | accompanying an investigator to a location so the         |
|       | 10 | investigator can pursue their case."                      |
|17:00:46| 11 |         Do you see that, sir?                             |
|17:00:47| 12 | A.      Absolutely.                                       |
|17:00:50| 13 | Q.      Are you relying upon any training key from        |
|       | 14 | IACP for this opinion?                                     |
|17:00:53| 15 | A.      Absolutely not.                                   |
|17:00:54| 16 | Q.      Are you relying --                                |
|17:00:55| 17 | A.      I am relying on my experience as an               |
|       | 18 | investigator, my experience in auditing police            |
|       | 19 | agencies, which includes going through their              |
|       | 20 | investigative packages.                                   |
|17:01:02| 21 | Q.      My -- my --                                       |
|17:01:02| 22 | A.      My experience --                                  |
|17:01:04| 23 | Q.      My question wasn't what you are relying upon.     |
|       | 24 | My question was, were you relying upon any training       |
|       | 25 | key from ICAP when you formed this opinion?               |

**John J. Ryan - May 21, 2019**

17:01:10  1    A.        Absolutely not.

17:01:12  2    Q.        Were you relying upon any model policies from

3    CALEA when you formed this opinion?

17:01:17  4    A.        CALEA doesn't have a model policy directive

5    that says that -- that -- that somebody who is

6    providing this kind of assistance has to do that kind

7    of documentation, to my knowledge.

17:01:32  8    Q.        Were you relying upon any -- well, you did

9    not receive any policies and procedures from Knox

10   County prior to forming your opinions, so is it fair

11   to say this opinion is not relying upon any of those

12   policies and procedures?

17:01:44 13    A.        No, other than their policy that they don't

14   do murder investigations and they turn them over to

15   the Kentucky state police.

17:01:48 16    Q.        And you're -- and you're just relying upon

17   Sheriff Pickard's testimony for that?

17:01:52 18    A.        No.   I'm also relying on what happened in

19   this case, because it's very clear what happened in

20   this case, and -- and everybody testifies pretty much

21   consistently.

17:02:00 22    Q.        And -- and you weren't provided with any

23   documents relating to the Bobby Wiggins homicide

24   investigation that Sheriff Pickard and Deputy Eubanks

25   participated in, correct?

**John J. Ryan - May 21, 2019**

17:02:07 1              MR. KELLEY:  Objection.

17:02:08 2              THE WITNESS:  I have nothing to do with

3       the Bobby Wiggins homicide.

17:02:09 4       BY MR. SLOSAR:

17:02:10 5       Q.      Yeah.  Well, you are forming opinions about

6       the Knox County Sheriff's Department without any

7       information or documents relating to a simultaneous

8       homicide investigation that they participated in?

17:02:20 9       A.      Based on --

17:02:21 10             MR. KELLEY:  Objection to the question.

17:02:22 11             THE WITNESS:  Based on a

12      distinguishable case that only you are providing

13      testimony on at this point.

17:02:27 14      BY MR. SLOSAR:

17:02:30 15      Q.      Well, maybe you'll request those documents.

17:02:33 16             Are you relying upon any training that

17      Sheriff Pickard testified to at his deposition that

18      supports this opinion?

17:02:42 19      A.      No, no.  I'm -- I'm relying on my own

20      experience and -- and current experience.

17:02:47 21      Q.      That's your own experience from also -- that

22      also includes the 20 years that you're at -- a law

23      enforcement officer at the Providence Police

24      Department, correct?

17:02:56 25      A.      Yeah, in the last almost 20 of doing audits

**John J. Ryan - May 21, 2019**

|         |    |                                                                   |
|---------|----|-------------------------------------------------------------------|
|         | 1  | of departments nationwide, including looking at their             |
|         | 2  | homicide investigations.                                          |
| 17:03:03 | 3  | Q.      Sir, I'm going to mark this January 28, 2019,            |
|         | 4  | letter as Exhibit 43.  This is an item that you                   |
|         | 5  | reviewed.  It's a letter from Jason Williams to an                |
|         | 6  | insurance company about Dr. Neuschatz's testimony.                |
| 17:03:18 | 7  |         (The document was marked Exhibit No. 43.)               |
| 17:03:18 | 8  | BY MR. SLOSAR:                                                    |
| 17:03:21 | 9  | Q.      Is this something that is listed on Page 12            |
|         | 10 | of your materials reviewed?                                       |
| 17:03:22 | 11 | A.      Yes.                                                    |
| 17:03:24 | 12 | Q.      Okay.  Something you reviewed, right?                  |
| 17:03:24 | 13 | A.      Yes.                                                    |
| 17:03:28 | 14 | Q.      Now, you also formed some opinion in your             |
|         | 15 | report relating to the lack of recording from the                 |
|         | 16 | FBI.  Do you recall making some opinions relating to              |
|         | 17 | the FBI?                                                          |
| 17:03:40 | 18 | A.      It's -- it's just pointing out the fact that          |
|         | 19 | even the FBI doesn't record.                                      |
| 17:03:46 | 20 | Q.      Sure.  And when is the last time you reviewed         |
|         | 21 | any policies or procedures from the FBI?  Go to Page             |
|         | 22 | 46.  That's where your opinions are.                              |
| 17:03:52 | 23 | A.      You know, I probably have done it within the          |
|         | 24 | last week.                                                        |
| 17:03:56 | 25 | Q.      Okay.  Is it your testimony under oath that           |

**John J. Ryan - May 21, 2019**

```
       1   in 2011, the FBI did not allow for the recording of

       2   interviews in criminal cases?

17:04:07   3   A.       It's not that they did not allow.  They just

       4   didn't do it.  It's a recent change, and again, I --

       5   I don't know exactly what year it was, but it's a

       6   recent change where they started doing it.

17:04:16   7   Q.       Sir, isn't it true that in October -- as of

       8   October 15, 2011 -- I'm handing you Exhibit 16 and 17

       9   from Christianson's deposition as a group exhibit --

      10   isn't it true that in 2011, the FBI did in fact

      11   record witness interviews in criminal cases and

      12   specifically Statute 18 -- or not statute but Policy

      13   18.5.6.4.16?

17:04:44  14   A.       Let me see it, because I don't think that's

      15   accurate.  I'll have to take a look at it.

17:04:58  16   Q.       I only have the table of contents for one.

17:05:04  17            Have you ever seen that document prior to

      18   today, sir?

17:05:06  19   A.       Well, I'm looking at -- I'm looking at the

      20   first one, and the first one says it's got to be

      21   documented on a 302 -- it's got to be recorded on

      22   a -- a 302, which means they record it by writing it

      23   down.  So that's the first one that you handed me.

17:05:22  24   Q.       I'm looking at the electronic recording of

      25   interviews.  Do you see that?
```

John J. Ryan - May 21, 2019

17:05:25  1   A.       No.  Where is it?

17:05:30  2   Q.       18. -- it's Page 2.  It's the backside of --

        3   it's the backside.  Yeah.  No, no, no, no, look to

        4   your left.  Sorry.  It's the second page.  Yeah.

        5   18 -- it ends with 4.16.

17:05:42  6                    MR. KELLEY:  What was your question,

        7   again?  Was it --

17:05:43  8   BY MR. SLOSAR:

17:05:44  9   Q.       2011 --

17:05:45 10                    MR. KELLEY:  Was it required?  Is that

       11   what you're saying?

17:05:47 12                    THE WITNESS:  Yeah.  No, it wasn't

       13   required.  In fact --

17:05:49 14                    MR. SLOSAR:  I never said -- I never

       15   said it was required.

17:05:50 16                    THE WITNESS:  -- I had to get

       17   permission -- I had to get permission.  Now it's

       18   required.

17:05:53 19                    MR. SLOSAR:  Recorded --

17:05:54 20                    THE WITNESS:  They weren't recording.

       21   Now it's required.  It's a recent change.  It's

       22   within the last maybe two years, maybe three.

17:05:59 23   BY MR. SLOSAR:

17:06:02 24   Q.       Now, what your opinion says is, this -- the

       25   FBI had a policy of not recording interviews or

John J. Ryan - May 21, 2019

|   |   |
|---|---|
| | 1 |
| | 2 |
| 17:06:13 | 3 |
| 17:06:14 | 4 |
| 17:06:16 | 5 |
| 17:06:18 | 6 |
| | 7 |
| | 8 |
| 17:06:29 | 9 |
| 17:06:30 | 10 |
| | 11 |
| 17:06:31 | 12 |
| 17:06:33 | 13 |
| | 14 |
| | 15 |
| | 16 |
| 17:06:41 | 17 |
| 17:06:43 | 18 |
| 17:06:44 | 19 |
| 17:06:47 | 20 |
| | 21 |
| 17:06:49 | 22 |
| 17:06:51 | 23 |
| | 24 |
| | 25 |

1 interrogations but rather relying on summaries

2 provided by agents in a 303 -- 302 report?

3 A.      That's absolutely true.

4 Q.      That's your opinion?

5 A.      It's not my opinion.  That's absolutely true.

6 Q.      This -- this exhibit, the FBI's actual

7 policies and procedures, is a policy that indicates a

8 process for recording interviews with witnesses

9 for --

10 A.      No.  I think -- I think you ought to read the

11 whole thing.

12 Q.      I have --

13 A.      Because what it says, what it says is, "If

14 they think it's anticipated the results may become

15 the subject of court testimony, it must be recorded

16 on a 302," which is a paper document.

17 Q.      And --

18 A.      That's what they must do.

19 Q.      Go to 4.16 on the page.

20 A.      Correct.  If they want to record it, they've

21 got to get permission first.

22 Q.      Yeah.  But that doesn't --

23 A.      Yeah.  The FBI agent can't even -- can't even

24 record it on his own.  He's got to get permission

25 first.

**John J. Ryan - May 21, 2019**

17:06:54 1    Q.       So you -- so you -- so you --

17:06:56 2    A.       So how many do you think get permission?

17:06:58 3    Q.       Your opinion is that because an FBI agent has

4    to ask for permission, they have a policy of not

5    allowing recording?

17:07:05 6    A.       They didn't do it.  I can tell you that --

7    that I had a discussion with Romel Velasquez, the FBI

8    agent in charge, at my house when he came for dinner

9    about their lack of recording.

17:07:14 10           I just had another discussion with him at

11    Chief Canario's house probably within the last three

12    or fours months, and it was just before he retired,

13    about the fact that they don't record and that they

14    had just made the change.  So yeah, he said nobody

15    was recording.

17:07:31 16    Q.       Sir, you wish they had recorded the

17    interviews that they conducted during the -- their

18    criminal investigation of the Providence Police

19    Department, correct?

17:07:39 20    A.       There never was a criminal investigation of

21    the Providence Police Department.  There was a

22    criminal investigation of the mayor's office.  Nobody

23    in the police department, to my knowledge, was ever a

24    target or a subject of the investigation.

17:07:49 25    Q.       Even though --

**John J. Ryan - May 21, 2019**

17:07:50  1    A.      I absolutely, positively wish they had

2    recorded every bit of the discussions that I had with

3    them as a witness.

17:08:00  4    Q.      And in fact, sitting here today, you disputed

5    the accuracy of some of the police reports or some of

6    the 302s that the FBI generated, correct?

17:08:10  7    A.      Absolutely.  And -- and Joe Penza would

8    absolutely dispute them too when he took voluminous

9    notes as an attorney.

17:08:17 10    Q.      Sure.  And for that reason, you have some

11    personal understanding for why it's important for

12    police officers to accurately and contemporaneously

13    memorialize information learned during

14    investigations, correct?

17:08:31 15    A.      It's important to put down truthful

16    information.

17:08:33 17    Q.      Yeah.  And that's -- and that -- and that

18    belief is consistent with generally accepted

19    practices?

17:08:38 20    A.      If you are the lead investigator, absolutely.

17:08:41 21    Q.      And there's nothing that you can cite to

22    that -- that you can rely on for the proposition that

23    assisting agencies are not required to document

24    investigative tasks that they conduct during a

25    criminal investigation?

**John J. Ryan - May 21, 2019**

17:09:00   1              MR. KELLEY:  Objection.

17:09:02   2              THE WITNESS:  As I sit here right now,

3   I can't say that I can point to a particular

4   department.  But I can tell you that -- anecdotally,

5   I can tell you it's almost in every department, and,

6   you know, if you would like me to, I could probably

7   get you a thousand documents that support that

8   proposition.

17:09:15   9   BY MR. SLOSAR:

17:09:18   10   Q.     Well, you didn't cite to any of those

11   documents in your report, correct?

17:09:21   12   A.     No, because I thought it was common sense and

13   common practice in law enforcement so much so that no

14   expert would say otherwise.

17:09:30   15             MR. SLOSAR:  Sir, I appreciate your

16   testimony here today.  I have no questions.

17:09:38   17             THE VIDEOGRAPHER:  Nothing further?

17:09:40   18             MR. SLOSAR:  No.  Reserve signature?

17:09:42   19             MR. KELLEY:  Do you want to read it?

17:09:42   20             THE WITNESS:  Not really.

17:09:44   21             THE VIDEOGRAPHER:  This concludes the

22   deposition of Jack Ryan.  Time on the monitor is

23   17:09.

17:09:49   24             FURTHER DEPONENT SAITH NOT.

25

John J. Ryan - May 21, 2019

```
 1              C E R T I F I C A T E

 2

 3          I, Brian V. Ratekin, Registered Diplomate

 4   Reporter and Notary Public, State of Tennessee at

 5   Large, do hereby certify that I recorded to the best

 6   of my skill and ability by machine shorthand the

 7   deposition contained herein, that same was reduced to

 8   computer transcription by myself, and that the

 9   foregoing is a true, accurate and complete transcript

10   of the deposition testimony heard in this cause.

11          I further certify that the witness was first

12   duly sworn by me and that I am not an attorney or

13   counsel of any of the parties, nor a relative or

14   employee of any attorney or counsel connected with

15   the action, nor financially interested in the action.

16          This 3rd day of June, 2019.

17

18

19   _____

     Brian V. Ratekin
20   LCR No. 067; Exp. 6/30/20

21

22   My Commission Expires:

23   April 19, 2021

24

25
```