NO. 17-CV-84

# AMANDA HOSKINS, ET AL.

V.

# KNOX COUNTY, ET AL.

**DEPONENT:**

**JACKIE STEELE**

**DATE:**

**June 18, 2018**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION AT LONDON

| | | |
|---|---|---|
| AMANDA HOSKINS, et al., | ) | |
| | ) | No. 17-cv-84 |
| Plaintiffs, | ) | |
| v | ) | Hon. DAVID L. BUNNING, |
| . | ) | |
| KNOX COUNTY, et al., | ) | |
| | ) | Hon. CANDACE J. SMITH |
| Defendants. | ) | |

DEFENDANT JASON YORK'S ANSWERS
TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

Comes the Defendant Jason York and for his answers to the Plaintiffs' First Set of Interrogatories to the Individual Kentucky State Police (KSP) Defendants states as follows:

**GENERAL OBJECTIONS**

1.      Counsel objects to Definition and Instruction No. 3 to the extent that it could be construed as defining "Defendant" or "you" as referring to all Defendants collectively. Subject to and without waiving counsel's objection, Defendant York will respond to the Interrogatories and Requests as if directed to him individually and is not responding on behalf of other Defendants.

2.      Counsel objects to Definition and Instruction No. 15 to the extent that it could be construed as defining "Complaint" as any instance where an individual expresses dissatisfaction with police. Subject to and not waiving counsel's objection, Defendant York will treat "Complaint" as limited to those filed in a court of law or with the Kentucky State Police in accordance with its formal policy and procedures.

3.      Counsel objects to these Interrogatories to the extent they seek information protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or rule of confidentiality provided by law.  Nothing in these answers is intended as, or shall in any way be deemed, a waiver of any privilege.  Defendant does not intend to disclose privileged or otherwise protected information.

## INTERROGATORIES

1.      Please identify by name and address all Persons who, to the best of your understanding, have knowledge of facts that relate to any of the claims or defenses in this action, including but not limited to all Persons who are not listed in the Defendants' Rule 26 Initial Disclosures. For each Person with knowledge responsive to this interrogatory, please describe with particularity any categories of facts known by each such Person, including all categories of facts about which the Person may be competent to testify at trial. If this Interrogatory is answered by incorporating Documents, please state under oath whether there are any categories of facts known to any witness relating to the claims or defenses in this action that are not reflected in the documents upon which you rely; in the event you fail to do so, Plaintiffs will assume the substance of the witnesses' testimony is strictly limited to what is contained in such documents.

**OBJECTION**: Counsel objects to describing the facts known to each witness with "particularity" because it purports to require a detailed narrative response that would be oppressive and unduly burdensome to do so in writing and for which discovery by deposition instead of interrogatory would be the more appropriate discovery method. For the same reasons, counsel correspondingly objects to Plaintiffs' attempt to treat witness testimony as "strictly limited" to the content of Defendant York's response to this interrogatory. Subject to and without waiving counsel's objection, Defendant York will either provide a general description of the facts known to each witness or refer Plaintiffs to documentation from which such information can be ascertained consistent with civil rules.

_Attorney for Defendant_

**ANSWER:** From my understanding of the case, those persons having knowledge of any facts relating to the claims or defenses in this case can be ascertained from the KSP case file for the Catherine Mills murder investigation, plus any additional persons identified by my answer to Interrogatory No. 10. A general description of the information believed to be known by those persons can also be ascertained from the KSP case file or my answer to Interrogatory No. 10. Although Commonwealth Attorney Jackie Steele is specifically referenced in regard to particular events, he is believed to be knowledgeable of the entire investigation in general and the subsequent prosecution of Plaintiffs. Additional witnesses may have information relating to Plaintiffs' alleged damages, which are currently unknown and will be supplemented.

2.      For any Document requested in Plaintiffs' discovery requests which has been lost,

discarded or destroyed, please identify each such document as completely as possible and state

the approximate date it was lost, discarded or destroyed; the circumstances and manner in which

it was lost, discarded or destroyed, including the identities of all persons involved; the reasons

for disposing of the Document; the identity of any persons with knowledge of its content; and the

identity of the last person known to have seen it.

**OBJECTION:** Defendant York will in good faith attempt to identify any lost, discarded, or destroyed Documents within his knowledge; however, counsel objects to any assumption or inference that such documents would have been within Defendant York's possession, custody, or control

_Attorney for Defendant_

**ANSWER:** Based on my current knowledge and understanding, a recorded statement taken from Michael Crump by KSP Detective Michael Cornett on 12/22/2010 is the only Document that has been lost that would be responsive to Plaintiffs' discovery requests. Detective Cornett is the last person known by me to have seen the 12/22/2010 recorded statement from Crump. Both Detective Cornett and Crump should have knowledge of the contents of the 12/22/2010 recorded statement. Detective Cornett also reported the substance of the 12/22/2010 recorded statement from Crump to me and other KSP personnel; however, I do not believe I heard the recording before it was lost and I am unaware whether other KSP personnel may have heard the recording. I do not believe I ever had custody of the 12/22/2010 recorded statement from Crump, and I lack knowledge of the circumstances or manner in which the recording was lost or the identities of the persons involved.

3.     Under oath, please identify all Complaints that have ever been made against you relating to your role as a law enforcement official (including Plaintiffs' Complaint or any Complaints which presently remain pending), including but not limited to any and all internal affairs intra- or inter-departmental, and citizen complaints alleging dishonest behavior, lying under oath, witness manipulation, improper behavior during interrogations or interviews, use of improperly suggestive, coercive methods on suspects, arrestees, or witnesses, use of excessive force, false arrest, malicious prosecution, fabrication or planting of evidence, concealment of evidence, and lawsuits or administrative complaints filed in state or federal courts or agencies alleging police misconduct. A complete answer to this Interrogatory will include, but is not limited to, the following information: (1) the date of each Complaint; (2) a detailed description of the nature of each Complaint; (3) an identifying number of each Complaint; and (4) how each Complaint was resolved, including any discipline imposed in connection with each Complaint. If you do not possess an identifying number of a particular Complaint, please investigate and obtain it.

**OBJECTION**: Defendant York will respond subject to counsel's general objection No. 2. Counsel also objects to the extent that the some of the requested information can be ascertained from public records equally available to Plaintiffs, which Plaintiffs can obtain as conveniently and with less burden to Defendant York from that source.

Attorney for Defendant

**ANSWER**: I am aware of only two lawsuits filed against me that would qualify as complaints as defined by counsel's objection. The identifying number of each lawsuit as requested by subpart (3) is as follows: Action No. 6:17-cv-00084-DLB and Action No. 6:17-cv-00133-KCC. The Complaint in each lawsuit is a matter of public record equally available to Plaintiffs, and Plaintiffs are directed to ascertain the information requested by subparts (1) and (2) from that source, which is more convenient and less burdensome to Defendant. As to the information requested by subpart (4), the allegations of each Complaint have been denied, both lawsuits are pending, and I have not been disciplined in connection with either Complaint.

4.     Under oath, please identify every Communication that you have had with any Person, including but not limited to Plaintiffs and any of the Individual Defendants, about any of the allegations, events, or circumstances described in Plaintiffs' Complaint. For each such Communication, please: (a) provide a summary of the Communication; (b) identify when and with whom the Communications occurred; and (c) provide the date of the Communication. If you answer this Interrogatory by referring to Documents, please affirm under oath that the sum total of your Communications responsive to this Interrogatory are contained in the Documents that you reference.

**OBJECTION:** Counsel objects to disclosing "every" communication with any person about the allegations of Plaintiffs' Complaint because that would include, on its face, communications protected by attorney-client privilege or the attorney work product doctrine. Defendant York's response will accordingly exclude any communications in any form with counsel. Counsel further objects to identifying "every" communication, which would be oppressive and unduly burdensome to respond to in writing and for which discovery by deposition instead of interrogatory would be the more appropriate discovery method, especially considering the number of communications that would occurred given the size and length of the investigation at issue in this lawsuit. For the same reasons, counsel correspondingly objects to Plaintiffs' attempt to treat Defendant's response to this interrogatory as the "sum total of [his] communications." Subject to and without waiving counsel's objection, Defendant York will provide a general description of the principal communications, further identifying specific dates and other persons if known.

Attorney for Defendant

**ANSWER:** Pursuant to Rule 33 and subject to counsel's objection, a general description of the principal communications can be ascertained from the Kentucky State Police (KSP) case file for the Catherine Mills murder investigation, plus any additional communications identified by my answer to Interrogatory No. 10. For many communications, the report or recording of the communication within the KSP case file will reflect the date of the communication and other persons who were present; otherwise, specific dates and persons involved cannot be itemized given the large number of communications that occurred in an investigation of this size and length. I would have also spoken with other KSP personnel and Commonwealth Attorney Jackie Steele regarding the investigation, but those communications would be too numerous and burdensome to recall specific dates.

5.      Please identify any and all criminal convictions of any party or witness with knowledge relating to any of the claims or defenses of this action. For each such responsive conviction, identify: (a) the witness who has been convicted and the nature of the conviction and (b) the complete factual basis as to why the conviction qualifies as admissible under FRE 609. Please be advised that your duty to supplement your answer to this Interrogatory remains ongoing as discovery progresses, and that Plaintiffs intend to move in limine to bar any references to convictions not identified in the manner requested.

**OBJECTION:** Counsel objects because the criminal conviction information requested by this interrogatory can be ascertained from public record equally available to Plaintiffs, which Plaintiffs can obtain as conveniently and with less burden to Defendant York from that source.

_____
Attorney for Defendant

6.      Do you contend that Plaintiffs participating in killing Katherine Mills, or committed any other illegal act relating to the incidents in Plaintiffs' Complaint? If so, please describe each alleged illegal act that you contend was committed by Plaintiffs and provide the complete factual basis for your contention, and identify all evidence and witnesses upon which you may rely to support your contention.

**OBJECTION:** Counsel objects to the extent this interrogatory lacks relevancy or purports to impose an undue burden on Defendant York. The relevant issue is whether Defendant York had probable cause for the criminal charges against Plaintiffs, not whether he contends and can prove that they, in fact, participated in murdering Catherine Mills. Subject to and without waiving counsel's objection, Defendant York will either provide a general description of the principal facts or evidence to support probable cause or refer Plaintiffs to documentation from which such information can be ascertained consistent with civil rules.

_____
Attorney for Defendant

**ANSWER:** Pursuant to Rule 33 and subject to counsel's objection, a general description of the principal facts and evidence to establish probable cause for the criminal charges against Plaintiffs can be ascertained from the Kentucky State Police (KSP) case file for the Catherine

Mills murder investigation, plus additional information as identified by my answer to Interrogatory No. 10.

7.     For any affirmative defenses that you have asserted or will assert in this matter, please describe the entire factual basis supporting each such defense and specifically identify any witnesses or physical, documentary, or testimonial evidence that supports each such defense. The information sought by this interrogatory is not a mere recitation of the statutory sections, case law, or common law invoked in the defense. Plaintiffs request that you provide a detailed description of every fact and legal basis on which the affirmative defense is asserted so that Plaintiff may have the opportunity to investigate by way of additional discovery requests. For example, if you intend at any point in this litigation to assert an immunity defense, please state all facts, evidence, and legal bases for such a defense, identifying any witnesses or physical, documentary, or testimonial evidence relating to the immunity defense.

**OBJECTION**: Counsel objects to describing the "entire factual basis" for any affirmative defenses because it purports to require a detailed narrative response that would be oppressive and unduly burdensome to do so in writing and for which discovery by deposition instead of interrogatory would be the more appropriate discovery method. Counsel also objects because this interrogatory is premature inasmuch as Defendant York has filed a motion to dismiss that is currently pending and he is not yet required to file an Answer with affirmative defenses. Subject to and without waiving counsel's objection, Defendant York will timely supplement his response to this interrogatory once an Answer has been filed of record by describing the principal facts and legal grounds for any affirmative defenses that are asserted.

Attorney for Defendant

8.     For punitive damages purposes, please estimate your net financial worth. Please describe how that net worth has been calculated by providing a balance sheet of all assets greater than $2,500 USD (including a description of any ownership of stock, mutual funds, real estate, etc.) and including all liabilities. Please also provide an income statement for the five years prior

to the filing of this complaint, including your annual salary and any income from any other source for those years.

**OBJECTION:** Counsel objects to disclosing Defendant York's financial information to the murder suspects that he investigated as lacking relevancy and based on harassment, annoyance, or embarrassment. Even if such information may be discoverable, disclosing that information based on mere allegation is premature, especially when the lawsuit is against an individual as opposed to a corporate litigant. Counsel accordingly objects to disclosing such information prior to Plaintiffs establishing an adequate foundation to the Court's satisfaction, and subject to a protective order to restrict the information to attorney's-eyes-only.

Attorney for Defendant

9.      Given the sum total of your personal knowledge of the policies, customs, and practices of the Kentucky State Police as you understand them  (formal or informal, written or unwritten), please state whether you, or to your knowledge, any of the other Defendants acted inconsistently with any of those policies, customs, or practices at any time during the entire encounter or interaction with Plaintiffs as described in the Complaint. If the answer is in the affirmative, please: (a) identify any particular policy, custom, or practice which, to your knowledge was violated; (b) describe the circumstances and manner in which said policy, custom, or practice was violated; and (c) state whether any discipline  resulted from that violation.

**OBJECTION:** Counsel objects to describing the "sum total of [his] personal knowledge" of KSP policies, customs, and practices, which entails an extensive amount of information that is largely irrelevant to the issues in this lawsuit and not proportional to the needs of the case.  Subject to and without waiving counsel's objection, Defendant York will generally describe any actions that may have been inconsistent with KSP policy.

Attorney for Defendant

**ANSWER:** For this investigation, the recorded statement taken from Michael Crump on 12/22/2010 may have been lost due to actions inconsistent with KSP policy. However, see my answer to Interrogatory No. 2 regarding my lack of knowledge of the circumstances or manner in which the recording was lost or the identities of the persons involved. Given my lack knowledge, I also cannot

identify which particular KSP policy may have been violated, if any. Otherwise to my knowledge and recollection, neither myself nor other KSP Defendants acted inconsistent with KSP policies.

10.    Please state with specificity each activity and investigative task that you participated in during the Mills murder investigation. For each activity and task, please describe the Person who assigned you each task and the Person to whom you reported for each task. Please note that the scope of this Interrogatory includes any investigation undertaken at any time from 2010 up to and including the present day. If you answer this Interrogatory by referring to Documents, please affirm under oath that the sum total of your participation in the Mills murder investigation is described in the Documents that you reference.

**OBJECTION**: Counsel objects to describing each investigatory activity or task with "specificity" because it purports to require a detailed narrative response that would be oppressive and unduly burdensome to do so in writing and for which discovery by deposition instead of interrogatory would be the more appropriate discovery method. For the same reasons, counsel correspondingly objects to Plaintiffs' attempt to treat Defendant's response to this interrogatory as the "sum total of [his] participation" in the Catherine Mills murder investigation. Subject to and without waiving counsel's objection, Defendant York will either provide a general description of the principal investigatory activities or tasks or refer Plaintiffs to documentation from which such information can be ascertained consistent with civil rules.

Attorney for Defendant

**ANSWER**: My assignment to investigate the murder of Catherine Mills originated from KSP Lt. Mickey Hatmaker. From my understanding and recollection, the conduct of the investigation was generally within my discretion and I received no further assignments from my superiors to conduct specific investigatory activities or tasks. To my knowledge and recollection, my superiors, Sgt. Jackie Joseph (then Pickrell) and Lt. Hatmaker, monitored my investigation and I updated them on the progress of the investigation from time to time, but I did not report each investigatory activity or task to them on a task-by-task basis. However, I generally documented the principal investigatory activities and tasks the using KSP's KYIBERS REPORT and CRIME SUPPLEMENT forms, which are maintained in the KSP case file that I have previously reviewed. The KSP case file documentation, however, is not an exhaustive record of every investigatory detail or fact, which would be impractical. Having reviewed the KSP case file documentation, other principal investigatory activities or tasks that may not be fully described within the file materials includes the following:

-    On the day of the murder, KSP personnel conducted an initial canvass of the area near the scene of the crime, which is noted in the case file documentation. A group of KSP

detectives gathered at the scene of the crime on December 22, 2010 to conduct a second canvass. The second canvassing is alluded to within the case file. To my knowledge and recollection, the only useful information obtained from either canvassing was the recorded statement taken from Michael Crump by KSP Detective Michael Cornett on December 22, 2010.

- The victim's family members regularly contacted KSP with information. To my knowledge and recollection, most of the information from the victim's family was neither useful nor documented, except for limited information from Jennifer and Jesse Lawson. Early in the investigation, Jennifer Lawson had described Amanda Hoskins's reaction to the murder as strange and suspicious. Although not contemporaneously documented, I reconfirmed this information with Jennifer Lawson on April 2, 2013 as noted by my report from that date. My January 21, 2011 report also noted "several interviews" with Jesse Lawson that were not separately documented. To my knowledge and recollection, my initial information relating to Mike Simpson and Allen Helton and their trip to Florida first came from Jesse Lawson, and I believe he was also the first source to direct my attention to Johnathon Taylor. Jesse Lawson also performed a limited number of controlled drug buys from Bob Smith in an attempt to gain information from him. Although Smith was arrested based on the buys, he provided no useful information relating to the Catherine Mills murder investigation and it was not further documented.

- To my knowledge and recollection based on the information from Jesse Lawson, I first contacted Mike Simpson regarding the Catherine Mills investigation on December 24, 2010 at his residence upon his return from Florida. To my memory, additional uniformed KSP Troopers were present and assisted. Simpson gave consent to search his property and pictures were also taken that were included within the KSP case file. Otherwise, Simpson denied any involvement and provided a sticky-note with purported alibi witnesses. My January 21, 2011 report alludes to my earlier December 24, 2010 encounter with Simpson and his sticky-note, which was included within the KSP case file.

- To my knowledge and recollection, either myself or other KSP Troopers investigated the alibi witnesses identified by Mike Simpson's sticky-note. I recall interviewing Vernon Bennett, who was one of Simpson's witnesses. To my knowledge and recollection, Bennett denied giving Simpson money to go to Florida as claimed by Simpson. I do not recall the date I interviewed Bennett.

- In addition to my February 2, 2011 report of my interview of Michael Crump on that date, I recall having interviewed Crump on one more occasion prior to trial at the KSP Post in Morehead, Kentucky near where Crump was then living. To my knowledge and recollection of both interviews, Crump consistently described the persons he saw at the victim's residence on the day of the murder, but could not positively identify any suspect. During the second interview, I recall Crump complaining to me that Plaintiffs' investigators were harassing him. He also noted that he did not believe in the death penalty and was reluctant to testify. Between my two interviews of Crump, I may have also sent one or more pictures of Johnathan Taylor to a police department in Oklahoma

where Crum was then living for him to review.

- In addition to my February 15, 2011 report of my recorded interview of Amanda Hoskins on that date, I recall having interviewed Hoskins on one more occasion with her investigator Lisa Evans while Hoskins was incarcerated at the Laurel County Detention Center, but to my knowledge and recollection no useful information was obtained and it was not further documented.

- My February 16, 2011 report references my attempts to interview William Lester, which was later scheduled for April 15, 2011. The interview was recorded and Lester's attorney David Hoskins was present. However, I stopped the interview and recording to inform Lester and Hoskins that I believed Lester was being untruthful. Hoskins indicated agreement with me and requested to speak privately with his client, after which Lester declined to be further interviewed.

- My May 16, 2011 report references my recorded interview of Christy Bronson on that date. I do not believe I had previously known of Bronson, and to my knowledge and recollection, I came into contact with her after she had approached the local Sheriff's Department to request to provide information in the Catherine Mills murder investigation. To my knowledge and recollection, an attorney for Bronson later informed Commonwealth Attorney Jackie Steele that Bronson had lost memory of her conversations with Amanda Hoskins after suffering a head injury in a car accident.

- My June 27, 2011 report references an interview of Joe King on June 24, 2011. King declined to be recorded during my interview, but to my knowledge and recollection, Commonwealth Attorney Jackie Steele interviewed King again and the information from him during that second interview was consistent with my earlier report. In my interview of King, he reported having spoken to Amanda Hoskins on the phone the day after the Catherine Mills murder, and she told King that she was at County Pawn and Gun buying stuff. Although I recall visiting the pawn shop to request to review the records, I came to believe the recordkeeping was not accurate or reliable.

- My June 29, 2011 report references multiple investigatory activities, including my initial interaction with Dr. Larry Warren. I requested a recorded statement from Dr. Warren but he refused and offered to provide a signed letter by July 1, 2011. To my knowledge and recollection, Dr. Warren failed to provide any letter and my subsequent efforts to contact him were unsuccessful.

- My December 7, 2011 report references an interview with Shawn Wayne Kinningham on that date, who indicated that Brian Mills had confessed to murdering Catherine Mills. However, KSP Trooper Kelly Farris later informed me that he knew Mills was not in Kentucky at the time of the murder.

- My March 8, 2012 report regarding the recorded interview of Allen Helton on that date references earlier conversations with him. I had multiple conversations with Helton throughout the Catherine Mills murder investigation that were not all documented. Helton

was consistently in trouble and offering information. I also recall stopping Helton and arresting him for driving under the influence while the Catherine Mills murder investigation was ongoing.

- In addition to my March 16, 2012 report of my recorded interview of Kayla Mills on that date, I recall having spoken to Mills on one prior occasion that was unrecorded. To my knowledge and recollection, Kayla Mills advised that her mother was in a relationship with John Valdez and that she was "sleeping" with him, too. Kayla Mills also said her mother supplied her with needles. I separately recall speaking with Valdez on one occasion that was unrecorded. He indicated that Kayla Mills's car had been kept on his property, but could not confirm the dates to me.

- My April 30, 2013 report references an interview with Heather Warren on that date. To my knowledge and recollection, Ford Colliet had informed me that Warren had information relating to the Catherine Mills investigation and advised me to speak to her. He also indicated having been in on-and-off relationships with both Warren and Amanda Hoskins.

- My April 30, 2013 report references an interview with Thomas Michael Bruner on that date. To my knowledge and recollection, Bruner's mother had informed me that he had information relating to the Catherine Mills investigation and advised me to speak to him.

- I recall one recorded interview of Marcie Baker on March 13, 2012. I believe I would have ordinarily prepared a supplemental report following the interview, but did not locate a report relating to Baker in my review of the KSP case file, which may have been inadvertently misplaced or omitted. The interview, however, was recorded.

- I recall receiving information from an individual who indicated that Amanda Hoskins had access to a blue car owned by the company where her mother worked. The individual, however, did not otherwise want to cooperate or be involved in the investigation and I do not currently remember the individual's name. However, I recall following up with the manager Steve Yeary, who indicated that Hoskins could not have accessed the car.

- I recall one interview of Robert Beach with Commonwealth Attorney Jackie Steele while he was incarcerated in Indiana. I did not previously know of Beach, and to my knowledge and recollection, I came into contact with him after he had attempted to contact the prosecutor to request to provide information in the Catherine Mills murder investigation. I believe I may have also contacted Beach's sister, Margaret Polly, to confirm his location. My interview of Beach may not have been documented in the KSP case file because the Commonwealth Attorney attended.

- The KSP case file contains pictures of Johnathan Taylor that may not be referenced by my reports. To my knowledge and recollection, those pictures were taken after Taylor was arrested on unrelated charges.

- The KSP case file also contains phone records of suspects that were subpoenaed but may

not be referenced by my reports.

11.     Did any Investigator in the Mills murder investigation (including yourself) conduct or participate in any formal or informal witness interviews or have any Communications with witnesses that were not memorialized in a police report or audio/video recording? If the answer to this question is anything other than an unqualified "no," please list the dates and locations of all such interviews or Communications, the names of each person involved in each interview or Communication, and the content of any such interview or Communication.

**OBJECTION**: Counsel objects to identifying "all" witness interviews, which would be oppressive and unduly burdensome to respond to in writing and for which discovery by deposition instead of interrogatory would be the more appropriate discovery method, especially given the size and length of the investigation at issue in this lawsuit. Subject to and without waiving counsel's objection, Defendant York will provide a general description of the principal communications.

_____
Attorney for Defendant

**ANSWER**: See my answer to Interrogatory No. 10 for a general description of the principal communications that may not have been memorialized within the KSP case file for the Catherine Mills murder investigation. For those communications, specific dates and persons involved cannot be itemized and recalled given the size and length of this investigation.

12.     Did you provide or promise any Consideration to any witness relating to the Mills murder investigation? If so, please state with specificity (a) who provided/promised the Consideration; (b) when the Consideration was provided/promised; (c) to whom the Consideration was given/promised; and (d) what Consideration was given/promised.

**OBJECTION**: Counsel objects to the reference to "Consideration" as vague and ambiguous.

_____
Attorney for Defendant

**ANSWER:** Subject to and without waiving counsel's objections, my communications with witnesses complied with KSP policy and included no promises to my understanding.

13.    Did you make any threats, including any comments that could be considered a threat, to any witness in the Mills' murder investigation? If so, please state with specificity (a) who was threatened; (b) when the threat was made; (c) what was the threat involving; and (d) who was present for the threat.

**OBJECTION:** Counsel objects to the reference to "threat" or broader reference to "comments that could be considered a threat" as vague and ambiguous.

Attorney for Defendant

**ANSWER:** Subject to and without waiving counsel's objections, my communications with witnesses complied with KSP policy and included no threats to my understanding.

14.    Please describe in detail each and every contact that you had with any of the following witnesses during the investigation into the murder of Katherine Mills.   (1) Allen Helton; (2) Mike Simpson; (3) Jesse Lawson; (4) William Lester; (5) Bob Smith; (6) Michael Crump; (7) Christy Branson; (8) Joe King; (9) Dr. Warren; (10) Amber Simpson; (11) Daniel Wilson; (12) Robert Beach; (13) Kayla Mills; (14) Donna Mills, and (15) Margaret Polly. For each contact, please identify (a) when you made such contact(s) with that witness; (b) who you contacted that witness with; (c) what information was provided by any party during that contact (including from the officer(s) involved); (d) whether any documentation from that contact was created; (e) whether any documentation exists today from that contact; and (f) why that individual was contacted.

**OBJECTION:** Counsel objects to a detailed description of "each and every contact" with the above witnesses, which would be oppressive and unduly burdensome to respond to in writing and for which discovery by deposition instead of interrogatory would be the more appropriate discovery method, especially given the size and length of the investigation at issue in

this lawsuit. Subject to and without waiving counsel's objection, Defendant York will provide a general description of the principal communications, further identifying specific dates and other persons if known. Counsel also objects to the structure of this interrogatory as combining fifteen separate interrogatories into one and does not waive objection to further interrogatories as being in excess of the limit under civil rule by counting each subpart as a separate interrogatory.

Attorney for Defendant

**ANSWER**: Pursuant to Rule 33 and subject to counsel's objection, a general description of the principal communications for each of the above witnesses can be ascertained from the Kentucky State Police (KSP) case file for the Catherine Mills murder investigation, plus any additional communications identified by my answer to Interrogatory No. 10. For many communications, the report or recording of the communication within the KSP case file will reflect the date of the communication, the general substance of the communication, and other persons who were present; otherwise, specific dates and persons involved cannot be itemized given the large number of communications that occurred in an investigation of this size and length.

15.     Please describe in detail each and every investigatory step you took to determine whether Allen Helton and Mike Simpson were involved in the death of Katherine Mills. For each activity and task, please describe the Person who assigned you each task, who you consulted with, and the Person to whom you reported for each task. In addition, please provide any information learned from each such investigatory step taken. Please note that the scope of this Interrogatory includes any investigation undertaken at any time from 2010 up to and including the present day. If you answer this Interrogatory by referring to Documents, please affirm under oath that the sum total of your participation in the Mills murder investigation is described in the Documents that you reference.

**OBJECTION**: Counsel objects to a detailed description of "each and every" investigatory step relating to Allen Helton and Mike Simpson, which would be oppressive and unduly burdensome to respond to in writing and for which discovery by deposition instead of interrogatory would be the more appropriate discovery method, especially given the size and length of the investigation at issue in this lawsuit. Subject to and without waiving counsel's objection, Defendant York will either provide a general description of the principal investigatory actions taken in regard to Mike Simpson and Allen Helton or refer Plaintiffs to documentation from which such information can be ascertained consistent with civil rules.

Attorney for Defendant

**ANSWER**: Pursuant to Rule 33 and subject to counsel's objection, a general description of the principal investigatory actions taken in regard to Mike Simpson and Allen Helton can be ascertained from the Kentucky State Police (KSP) case file for the Catherine Mills murder investigation, plus any additional communications identified by my answer to Interrogatory No. 10.

Respectfully Submitted,

*s/Derrick T. Wright*
L. Scott Miller
Charles D. Cole
Derrick T. Wright
Sturgill, Turner, Barker & Moloney, PLLC
333 W. Vine Street, Suite 1500
Lexington, Kentucky 40507
(859) 255-8581—Telephone
(859) 231-0851—Fax
ccole@sturgillturner.com
dwright@sturgillturner.com
smiller@sturgillturner.com
ATTORNEYS FOR DEFENDANT
JASON YORK

x:\wdox\clients\64872\0006\discover\00876383.docx

## VERIFICATION

I hereby certify that the foregoing answers and responses are true and accurate to the best of my knowledge and belief.

_Jason York_
Jason York

## NOTARY CERTIFICATE

**COMMONWEALTH OF KENTUCKY**

**COUNTY OF** _Harlan_

Subscribed, acknowledged and sworn to before me by _Jason York_ on this _11_ day of _OCTOBER_ , 2017.

My commission expires: _06-10-2018_

_#513050_

NOTARY PUBLIC, STATE AT LARGE
KENTUCKY

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served via email to the following on this the 12th day of October, 2017:

Arthur Loevy                                        loevylaw@loevy.com
Jon Loevy                                           jon@loevy.com
Michael Kanovitz                                    mike@loevy.com
Elliot Slosar                                       elliot@loevy.com
Amy Robinson Staples                                amy@loevy.com
ATTORNEYS FOR PLAINTIFFS

Matthew J. Johnson                                  mattj.johnson@ky.gov
ATTORNEY FOR DEFENDANTS
BRIAN JOHNSON, JACKIE PICKRELL
MARK MEFFORD, KELLY FARRIS,
Kentucky State Police Officers in their
Individual Capacity


Jason E. Williams                                   jewilliamslaw@windstream.net
COUNSEL FOR KNOX COUNTY,
KENTUCKY; JOHN PICKARD AND
DEREK EUBANKS

Licha H. Farah , Jr.                                lfarah@whtlaw.com
Nicole L. Antolic                                   nicole.antolic@whtlaw.com
Alexandra Deaton DeMoss-Campbell                    alexandra.demoss-campbell@whtlaw.com
COUNSEL FOR CITY OF BARBOURVILLE
AND MIKE BROUGHTON

Christian Matthew Feltner, Esq.                     mattfeltner@msn.com
ATTORNEY FOR DEFENDANTS
DALLAS EUBANKS & JASON BUNCH

                                                    s/Derrick T. Wright
                                                    COUNSEL FOR DEFENDANT
                                                    JASON YORK

1    IN THE UNITED STATES DISTRICT COURT FOR THE

2         EASTERN DISTRICT OF KENTUCKY

3              NO. 17-CV-84

4         HON. DAVID L. BUNNING

5         HON. CANDACE J. SMITH

6

7    AMANDA HOSKINS, ET AL.,

8         PLAINTIFFS

9

10             V.

11

12    KNOX COUNTY, ET AL.,

13         DEFENDANTS

14

15

16

17

18

19

20

21

22

23  DEPONENT:   JACKIE STEELE

24  DATE:      JUNE 18, 2018

25  REPORTER:   LACEE TOWNSEND

Page 2

```
1                   APPEARANCES
2
3   ON BEHALF OF THE PLAINTIFFS, AMANDA HOSKINS, ET AL.:
4   ELLIOT SLOSAR
5   AMY ROBINSON STAPLES
6   LOEVY & LOEVY
7   311 NORTH ABERDEEN STREET
8   THIRD FLOOR
9   CHICAGO, ILLINOIS 60607
10  TELEPHONE NO.: (312) 243-5900
11  E-MAIL: ELLIOT@LOEVY.COM
12
13  ON BEHALF OF THE DEFENDANTS, BRIAN JOHNSON, MARK
14  MEFFORD, JACKIE JOSEPH AND DALLAS EUBANKS:
15  SHAWNA KINCER
16  KENTUCKY STATE POLICE GENERAL COUNSEL
17  919 VERSAILLES ROAD
18  FRANKFORT, KENTUCKY 40601
19  TELEPHONE NO.: (502) 573-1636
20  E-MAIL: SHAWNA.KINCER@KY.GOV
21
22
23
24
25
```

Page 3

```
1                   APPEARANCES CONTINUED
2
3   ON BEHALF OF THE DEFENDANTS, JASON YORK AND TROOPER
4   BUNCH:
5   DERRICK T. WRIGHT
6   STURGILL, TURNER, BARKER & MOLONEY, PLLC
7   333 WEST VINE STREET
8   SUITE 1500
9   LEXINGTON, KENTUCKY 40507
10  TELEPHONE NO.: (859) 255-8581
11  E-MAIL: DWRIGHT@STURGILLTURNER.COM
12
13  ON BEHALF OF THE DEFENDANTS, MIKE BROUGHTON AND CITY OF
14  BARBOURVILLE:
15  LICHA H. FARAH, JR.
16  WARD HOCKER & THORNTON, PLLC
17  333 WEST VINE STREET
18  SUITE 1100
19  LEXINGTON, KENTUCKY 40507
20  TELEPHONE NO.: (859) 422-6000
21  E-MAIL: LFARAH@WHTLAW.COM
22
23
24
25
```

Page 4

```
1                   APPEARANCES CONTINUED
2
3   ON BEHALF OF THE DEFENDANTS, JOHN PICKARD AND DEREK
4   EUBANKS:
5   JOHN KELLEY
6   JASON WILLIAMS
7   WILLIAMS FARMER & TOWE
8   303 SOUTH MAIN STREET
9   P.O. BOX 3199
10  LONDON, KENTUCKY 40743
11  TELEPHONE NO.: (606) 877-5291
12  E-MAIL: JASON@WFTLAW.COM
13
14  ALSO PRESENT:  AMANDA HOSKINS, PLAINTIFF
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
1                   INDEX
2                                     Page
3   DIRECT EXAMINATION BY MR. SLOSAR            8
4   CROSS EXAMINATION BY MR. WRIGHT           168
5   EXAMINATION BY MR. KELLEY           214
6   EXAMINATION BY MS. KINCER           220
7   EXAMINATION BY MR. FARAH           229
8   REDIRECT EXAMINATION BY MS. STAPLES       235
9   RECROSS EXAMINATION BY MR. WRIGHT       237
10  RE-EXAMINATION BY MR. KELLEY           241
11
12                  EXHIBITS
13                                     Page
14  1  ARREST WARRANT FOR AMANDA HOSKINS       14
15  2  ARREST WARRANT FOR JOHNATHAN TAYLOR     16
16  3  ARREST WARRANT FOR WILLIAM LESTER       18
17  4  INDICTMENT                    19
18  5  GRAND JURY CHECKLIST             21
19  6  MOTION FOR DISCOVERY PL24490-PL24492    32
20  7  MOTION FOR SPECIFIC DISCOVER
21     PL24455-PL24458             35
22  8  MOTION FOR SPECIFIC DISCOVER
23     PL026183-PL026185               36
24  9  MOTION PL024494-PL024501          38
25  10 MOTION PL24511-PL24540          42
```

VIDEO DEPOSITION OF JACKIE STEELE taken at the HOLIDAY INN, JUNE 2018                    6..9

Page 6

1                EXHIBITS CONTINUED

2                                    Page

3    11  MOTION PL024553- PL024558              44

4    12  CASE REPORT PL25395-PL25516              48

5    13  ELECTORNIC FILE DISCOVERY

6        PL25239-PL25296                    50

7    14  MOTION TO DISMISS                  51

8    15  KAYLA MILLS ARREST WARRANT              95

9    16  YORK TRANSCRIPT                    94

10   17  SKETCH                        94

11   18  PHOTOS OF JOHNATHAN TAYLOR              95

12   19  AFFIDAVIT KSP000337               118

13   20  AFFIDAVIT KSP000339               118

14   21  LETTER                     132

15   22  MOTION TO DISMISS                141

16   23  SUPPLEMENTAL REPORT                 152

17   24  PL024722-PL024728                 241

18

19

20

21

22

23

24

25

Page 7

1                STIPULATION

2

3    The deposition of JACKIE STEELE taken at the HOLIDAY INN

4    EXPRESS & SUITES, 506 MINTON DRIVE, LONDON, KENTUCKY

5    40741 on MONDAY, the 18TH day of JUNE, 2018 at

6    approximately 9:30 a.m.; said deposition was taken

7    pursuant to the FEDERAL Rules of Civil Procedure.

8    It is agreed that LACEE TOWNSEND, being a Notary Public

9    and Court Reporter for the State of INDIANA, may swear

10   the witness and that the reading and signing of the

11   completed transcript by the witness is not waived.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 8

1                PROCEEDINGS

2

3        COURT REPORTER:  Will you raise your right

4    hand?  Do you solemnly swear or affirm that the

5    testimony you are about to give will be the truth,

6    the whole truth, and nothing but the truth?

7        THE WITNESS:  I do.

8        VIDEOGRAPHER:  Thank you.

9            DIRECT EXAMINATION

10   BY MR. SLOSAR:

11   Q   Good afternoon, Mr. Steele.

12   A   Good afternoon.

13   Q   Have you given a deposition before?

14   A   Not to my recollection, no.

15   Q   Okay.  I'm going to go over some of the rules

16   real quick before we plow forward, okay?

17   A   Okay.

18   Q   As you know, there are a lot of attorneys

19   here, and one of them has a very nice tie on, and they

20   may make objections.

21       MR. WRIGHT:  So you don't like my tie.

22       MR. KELLEY:  It could be me.  I don't know.

23       MR. SLOSAR:  You're right.  There – they –

24   I'm sorry about that.  The purple caught my eye.

25       MR. FARAH:  So two of you don't have very nice

Page 9

1    ties.

2        MR. KELLEY:  I know.  Nonverbal LAUGHTER

3        MR. WRIGHT:  Well, that's the implication.

4        MS. STAPLES:  Great start.

5        MR. KELLEY:  Don't like my tie.

6    BY MR. SLOSAR:

7    Q   They're nice, as well, I was telling Jason.

8    They may make objections.  There's no judge here today,

9    so if you'll allow for them to make their record, I'd

10   appreciate it.  If you want to use the restroom, take a

11   break, just let any of us know, okay?

12   A   Okay.

13   Q   You know verbal answers are better than non-

14   verbal, so if you're able to do that, that'd be great.

15   A   Yes, sir.

16   Q   I also tend not to ask questions perfectly, so

17   if there's a question I ask you, you don't understand

18   it, please let me know and I will ask it a better way;

19   is that fair?

20   A   Fair enough.

21   Q   If you answer the question, I'm going to

22   assume that you understood what was being asked; is that

23   fair?

24   A   Yes, sir.

25   Q   All right.  Mr. Steele, prior to coming in

Video Deposition of Jackie Steele taken June 12, 2018

Page 10

1 here today, did you hear about the allegations in this
2 lawsuit?
3     A   I have read the complaint filed in the
4 lawsuit.
5     Q   Okay.  And I believe – well, several months
6 ago, your office tendered the complete files that you
7 possessed relating to the criminal prosecution against
8 Amanda Hoskins, Jonathan Taylor, and William Lester; is
9 that right?
10    A   That is correct.
11    Q   Okay.  I remember, in reviewing those files, I
12 think I actually saw a copy of the complaint; does that
13 seem right to you?
14    A   It does.  Yes, sir.
15    Q   Okay.  How did you first find out about the
16 lawsuit?
17    A   In all honesty, I can't answer that.  I
18 honestly can't remember.
19    Q   Prior to – right now, what is your – what is
20 your title?
21    A   I'm the Commonwealth Attorney for the 27th
22 Judicial Circuit, which includes Knox and Laurel
23 Counties here in Kentucky.
24    Q   How long have you held that title?
25    A   I've been the Commonwealth Attorney for in

Page 11

1 excess of ten years and was an assistant for five years
2 prior.
3     Q   Where were you an Assistant Commonwealth
4 Attorney at?
5     A   Here in the same office.
6     Q   Where did you go to law school?
7     A   Salmon P. Chase College of Law, Northern
8 Kentucky University.
9     Q   When'd you graduate from there?
10    A   2001.
11    Q   Prior to going to law school, where'd you go
12 to college?
13    A   Graduate college or go to college?
14    A   Graduate.
15    A   Graduated college University of the
16 Cumberlands, Cumberland College at the time, in
17 Williamsburg, Kentucky.
18    Q   What was your major?
19    A   I had a double major in accounting and
20 finance.
21    Q   Were you born and raised in Kentucky?
22    A   I was born in Knoxville, Tennessee, but all of
23 my life that I know of I was raised here in Kentucky.
24 Yes.
25    Q   What are your day-to-day responsibilities as

Page 12

1 the elected Commonwealth Attorney for Knox and Laurel
2 County?
3     A   Oversee the prosecution of indicted felony
4 cases would be a day-to-day responsibility, to include
5 Grand Jury preparation, review of files.  Now I've
6 trimmed back my trial workload, so I just try murder
7 cases.  I don't do all cases.
8     Q   In 2011, do you recall how many criminal cases
9 your office handled?
10    A   Specifically, no.  I could tell you, on
11 average, we would've handled in the course of year
12 somewhere around 600 or more.
13    Q   And approximately in 2011, how many of those
14 600 would've been felonies?
15    A   That would've been all felonies.  My – my –
16    Q   All felonies?
17    A   – my office does not handle any misdemeanor
18 cases.
19    Q   In 2011, can you give an estimate as to how
20 many murder cases your office would've been handling?
21    A   Again, I can't give a specific number.  I can
22 tell you, on average, I probably may have anywhere from 8 to
23 12 pending at any point in time.
24    Q   And in 2011, was it the practice of your
25 office to initiate charges in felony murder cases by way

Page 13

1 of indictment or preliminary hearing?
2     A   My office, it would have to come through an
3 indictment.  We don't initiate – my office will not
4 self-initiate a felony charge.  There's two – two
5 manners in which it could come through, one from a
6 preliminary hearing at a district court, and the second
7 is just by the correct indictment of the Grand Jury.
8     Q   What sort of process, in 2011, existed for
9 police officers to initiate charges in a felony case; so
10 before there's a Grand Jury indictment, what would a
11 police officer need to do in order to begin the
12 initiation of charges?
13    A   We'll make sure we're talking about the same
14 thing.  When you say "initiate charges," do you mean
15 begin an investigation or do you mean go and arrest
16 somebody?
17    Q   Go and arrest someone.
18    A   At that point in time, they'd have to –
19 before Grand Jury, it would have to be through an arrest
20 warrant, which they would have to lay out before a
21 judge.
22    Q   And from your experience, is the arrest
23 warrant – is that the same thing as a criminal
24 complaint or is that different?
25        MR. WRIGHT:  Object to form.  Answer best you

Page 14

1   can.
2       A   I – I don't understand the – I'm...
3       Q   Sure.  I'm –
4       A   I don't – I don't understand the question
5   then.
6       Q   Show you what we'll mark as Exhibit 1.  So,
7   Exhibit 1 will be the arrest warrant and criminal
8   complaint against Amanda Hoskins; do you recognize this
9   document?
10          (EXHIBIT 1 MARKED FOR IDENTIFICATION)
11      A   I do.  Yes.
12      Q   Okay.  And what does this document appear to
13  be?
14      A   It appears to be the – what I would call an
15  arrest warrant for Amanda Hoskins on the charge of
16  murder and robbery.
17      Q   From looking at this document, are you able to
18  determine who initiated the arrest warrant against Ms.
19  Hoskins for the murder and robbery of Katherine Mills?
20      A   Yes.  On the bottom of page 1, it's got
21  "Affiant's Name."  It would be Detective Jason York.  It
22  also appears to be Detective Jason York's signature and
23  badge number as the final signature.
24      Q   Okay.  Do you recognize Detective York's
25  signature from your years of working with him?

Page 15

1       A   Yes.  That appears to be the signature I would
2   associate with Detective York.
3       Q   Okay.  And on the second page, do you see
4   where it says "Warrant of Arrest" with a check mark next
5   to it?
6       A   I do.  Yes, sir.
7       Q   Okay.  What does that mean, sir?
8       A   This would be – it actually serves a – as –
9   just as it says, a warrant of arrest for law enforcement
10  officers to – to serve the warrant with – and this was
11  notated as a main or a cash bail.
12      Q   From looking at this document, does it appear
13  that this was issued on March 14, 2012?
14      A   March 14.  Yes, sir.
15      Q   Okay.  And can you explain to me the process
16  of how an arrest warrant against Ms. Hoskins would've
17  been issued back in 2012?
18      A   I – I – I can't personally.
19      Q   Well, would a detective, if they had an arrest
20  warrant that was filled out, where would that detective,
21  in 2012, need to submit the arrest warrant in order for
22  someone to sign off on it?
23      A   In this – (coughs).  Excuse me.  In this
24  case, it appears to be a handwritten signature, so we've
25  had a e-warrants process come in, so I'm assuming this

Page 16

1   was before the e-warrants.  I can't remember when that
2   was initiated.  The officer or detective in this matter
3   would've had to submit it to the judge.
4       Q   Okay.  Is it fair to say that you would not
5   have had any role in the filling out of the arrest
6   warrant on March 14, 2012?
7       A   Yes.
8          MR. WRIGHT:  Object to form.
9       Q   You can answer.
10      A   That is correct.  I – I had no personal
11  involvement in this arrest warrant.
12      Q   Okay.  I'm going to show you what we'll mark
13  as Exhibit number 2.  It's the arrest warrant and
14  criminal complaint against Jonathan Taylor, with the
15  same date, March 14, 2012, and do you recognize this
16  document, Mr. Steele?
17          (EXHIBIT 2 MARKED FOR IDENTIFICATION)
18      A   I do.
19      Q   Okay.  What does this document appear to be?
20      A   Oh, you've got it.  I'm sorry.
21          MR. WRIGHT:  No, I don't.
22      A   And you don't have that.  Okay.  This appears
23  to be a – the arrest warrant – what I'd call an arrest
24  warrant for Jonathan Taylor, again for the murder and
25  robbery in the first degree.

Page 17

1       Q   Did you have any role in completing the arrest
2   warrant against Jonathan Taylor for the murder and
3   robbery of Katherine Mills?
4       A   Personally, no.
5       Q   And according to your review of this document,
6   who initiated the arrest warrant against Mr. Taylor on
7   March 14, 2012?
8       A   Detective Jason York.
9       Q   I'm going to show you what we'll mark as
10  Exhibit number 3, Mr. Steele.  Again, is this a document
11  that you're familiar with?
12          (EXHIBIT 3 MARKED FOR IDENTIFICATION)
13      A   Yes, it is.
14      Q   What does this appear to be?
15      A   This is a – what I would call, again, an
16  arrest warrant for William Lester on the murder and
17  robbery in the first degree charges.
18      Q   Did you have any role in completing the arrest
19  warrant and criminal complaint against William Lester on
20  March 14, 2012?
21      A   Personally, no.
22      Q   Okay.  And according to your review of this
23  document, who initiated that process?
24      A   It'd be Detective Jason York.
25      Q   Okay.  Thank you, sir.  Can you tell me

Page 18

1 generally, in 2012, the process by which Knox County
2 Commonwealth Attorney's office proceeds forward with
3 charges after an arrest warrant or criminal complaint
4 has been issued by a law enforcement officer?
5      A   We'd proceed based upon the manner in which
6 the – the law enforcement officer's the one that would
7 direct the manner in which it'd proceed at this point in
8 time.
9      Q   Sure.  So after Detective York fills out a
10 criminal complaint and arrest warrant, gets a judge to
11 sign off on it against Ms. Hoskins or Mr. Taylor, at
12 what point in the process would your office step into
13 that initiation of criminal charges?
14      A   Once a preliminary hearing – I'm sorry.  I
15 cut you off.  Once a preliminary hearing's been held in
16 district court and probable cause had been found, the –
17 then the district judge waives it over, bounds it over
18 to the Grand Jury, my office becomes involved.  Or the
19 officer decides to go ahead and present it to the Grand
20 Jury prior to the preliminary hearing, at which point in
21 time we would get involved.
22      Q   Okay.  And when you – is it fair to say –
23 well, do you recall the names of Commonwealth Attorneys
24 that were working for your office in April of 2012?
25      A   I – I think I can.  If I leave one out, I

Page 19

1 will apologize.  We just had some turnover.  Terry
2 Beckner, Mike Pratt, Harold Dyche, Brandon Jones, Danny
3 Evans.
4      Q   In this case, it's my recollection that Danny
5 Evans was the Assistant Commonwealth Attorney who
6 presented the case to the Grand Jury; do you recall
7 having any involvement in presenting evidence in the
8 criminal prosecution against Amanda Hoskins, Jonathan
9 Taylor, or William Lester in April of 2012?
10          MR. WRIGHT:  Object to form.
11      A   You can answer.
12      A   I do not recall.
13      Q   I'm going to show you – did you have any –
14 do you recall, sitting here today, having any
15 conversations with Danny Evans or any Assistant
16 Commonwealth Attorney prior to the presentation of
17 evidence before a Knox County Grand Jury in April of
18 2012?
19      A   I don't recall.
20      Q   I'm going to show you what we'll mark as
21 Exhibit 4.  It's a copy of the indictment.  I'm going to
22 – I'm looking for it.  Looks like I only have three
23 extras.  I'm sorry.  This is PL25392 to PL25393.  Mr.
24 Steele, do you recognize this document?
25      A   The one you handed me, –

Page 20

1      Q   Yes.
2      A   – Exhibit number 4?
3      Q   Yes.
4      A   Yes, I do.
5      Q   Okay.  And what is this document?
6      A   This is the indictment returned by the Knox
7 County Grand Jury against Jonathan Taylor, Amanda
8 Hoskins, and William Lester.
9      Q   And looking at this document, are you able to
10 determine the Assistant Commonwealth Attorney who
11 presented evidence to the Grand Jury on April 27, 2012?
12      A   No.
13      Q   Sitting here today, do you have any
14 recollection of personally presenting any evidence to
15 the Knox County Grand Jury on that day?
16      A   I have no personal recollection, sitting here.
17      Q   Can you explain the process, in 2012, for how
18 an Assistant Commonwealth Attorney would receive a
19 criminal complaint and arrest warrant from law
20 enforcement officials in March or April of 2012?
21      A   The same way in which I described earlier, be
22 to bound it over by a district judge after finding
23 probable cause, then bound it over to the Grand Jury or
24 the officer bringing it straight to the Grand Jury.
25      Q   If an officer in 2012 wanted to bring a matter

Page 21

1 straight to a Grand Jury, would that officer need to
2 reach out to an Assistant Commonwealth Attorney first?
3      A   No.
4          MR. WRIGHT:  Object to form.
5      Q   What process would the officer be able to go
6 through in the spring of 2012 to initiate charges by way
7 of a Grand Jury indictment?
8      A   So the Grand Jury meets on – typically meets
9 on Monday to hear evidence.  We return indictments on
10 Friday.  That Monday morning, if they showed up with a
11 case and wanted to present it to the Grand Jury, we
12 would've made a – I'd say a precursory look of the file
13 to make sure they had everything in there that they
14 needed, you know, speaking in general.  I don't know how
15 this one came in or have any recollection, but that's the
16 manner in which they would come.  They would show up
17 that Monday morning.
18      Q   Let me show you what we'll mark as – is that
19 4?
20      A   Yeah.  This one.  The previous one you gave me
21 was number 4.
22      Q   Thank you.  Sorry.  Going to show you what
23 we'll mark as Exhibit number 5.  Mr. Steele, please let
24 me know if you recognize this document.  Sorry.  And I
25 think I might be one off a lot of these are mixed up.

Page 22

1  This is PL26180 through PL26182. It's a Grand Jury
2  checklist.
3        (EXHIBIT 5 MARKED FOR IDENTIFICATION)
4    A  Okay.
5    Q  Mr. Steele, do you recognize this document?
6    A  I do.  Yes.
7    Q  And what is this?
8    A  This is what we refer to in my office as a
9  Dinkins form, and we -- we use this form basically as a
10  cheat sheet for the prosecutors when we may be thrown a
11  file in the middle of a court proceeding so that we can
12  quickly look and assess for what we're looking at
13  without going through a -- a massive file.
14    Q  Would this document have been created prior to
15  the Grand Jury session or is this something that gets
16  created after an indictment has been issued?
17    A  This is prepared before Grand Jury, before
18  they go into the Grand Jury room.
19    Q  Okay.  Now, looking at the second page in this
20  document, are you able to determine who the charges were
21  being initiated against?
22    A  By looking on the second page?
23    Q  Or on the first page.  I'm sorry.
24    A  Yeah.  On the first page, it's -- "Accused"
25  has all three, Jonathan Taylor, Amanda Hoskins, and

Page 23

1  William Lester listed.
2    Q  And was that for that death of Katherine Mills
3  in December of 2010?
4    A  Yes.
5    Q  Okay.  Do you see on the second page where it
6  has a list of witnesses?
7    A  I do.
8    Q  Okay.  In this case, we've been produced a
9  Grand Jury audio recording of Detective York testifying
10  before the Grand Jury, but I had -- I have never seen
11  any audio recordings of third-party witnesses or other
12  detectives testifying before the Grand Jury.  Can you
13  explain to me what it means in the witness column that
14  all of these people are listed there; does that
15  necessarily mean that they testified or does it
16  represent that their statements to the police were
17  submitted to the Grand Jury?
18    A  It does just represent that they are witnesses
19  in the case, not witnesses at Grand Jury.
20    Q  Okay.  So would it be accurate if -- to assume
21  that if Allen Helton's name is listed as a witness that
22  his statement was either testified to by Detective York
23  or submitted directly to the Grand Jury for
24  consideration prior to the issuance of an indictment?
25    A  No.

Page 24

1        MR. WRIGHT:  Object to form.
2    A  No.
3    Q  Okay.  Then why would Mr. Helton be listed
4  here?
5    A  He may be a witness, but your question asked
6  would his -- would his statement have been read -- read
7  to the Grand Jury or testified to by.  I cannot say that
8  it was.  I can tell you that when the officer comes in
9  the Grand Jury, he will bring his case file for the
10  Grand Jury to consider after his testimony ends.
11    Q  Okay.  So that's helpful.  So was it the
12  practice in 2012 for the officer who testified at the
13  Grand Jury to present their investigative file to the
14  grand jurors for review prior to the issuance of an
15  indictment?
16        MR. WRIGHT:  Object to form.
17    A  What are you calling an investigative file?
18  What would your definition of "investigative file" be?
19    Q  I'm not sure.  What file were you talking
20  about?
21    A  It's -- it -- it may have just been as
22  simple as his police -- as his investigative report.  It
23  may not be the -- you know, many of the times, these
24  things are -- discovery's an ongoing process, so the
25  transcripts or a lot of those things may not have been

Page 25

1  included at that point in time in a case.  The -- the
2  autopsy may not have been included with the case file at
3  that point in time, so if -- and I don't know what was
4  presented actually at Grand Jury in this case, but the -
5  the officer's case report is included.
6    Q  And officer -- would the lead detective's case
7  reports be included to the Grand Jury for submission?
8        MR. WRIGHT:  Objection to form.
9    Q  Like in this case, since Detective York was
10  the lead detective and the person who testified before
11  the grand jurors, would it have been his case report
12  that was presented for their review?
13    A  Yes.
14        MR. WRIGHT:  Object to form.
15    A  His case report would have been in that he had
16  prepared it at the time of the Grand Jury presentation.
17    Q  Okay.  And then on the third page, where it
18  says "Murder Case Checklist," is this a summary of the
19  documents that would've been submitted to the Grand Jury
20  for review or does this relate to another part of this
21  process?
22    A  This would've been another part of the
23  process.  This would not have been completed or done by
24  the Grand Jury.  This would've been done by a lady in my
25  office that goes through and makes sure all discoverable

Page 26

1  items are – are done and just a checklist for us to
2  keep up with things.
3      Q   Okay.  So this is something that would be
4  updated throughout the prosecution?
5      A   That's correct.
6      Q   Okay.  Earlier I asked you some questions
7  relating to the criminal complaint that was issued in
8  this case against Ms. Hoskins, and you testified that
9  Detective York's signature was on that; is that right?
10     A   Yes, sir.
11     Q   Okay.  And I believe you testified earlier
12 that you didn't have any role in the process of
13 Detective York filling out the criminal complaint and
14 initiating charges against Ms. Hoskins; is that right?
15     A   Yes, sir.
16     Q   Okay.  And would the same be true for other
17 individuals that were working under your supervision in
18 March of 2012?
19         MR. WRIGHT:  Object to form.  Foundation.
20     Q   You can answer.
21     A   I have no idea if – if Detective York
22 would've called an assistant in my office at that point
23 in time.
24     Q   Okay.  Is it fair to say that the decision on
25 whether to fill out a criminal complaint in this case

Page 27

1  would've rested with the lead law enforcement officer?
2         MR. WRIGHT:  Object to form.
3      A   Yes.
4      Q   And is it fair to say that that person, based
5  upon the documents that you reviewed and your knowledge
6  of this case, would've been Detective York?
7      A   Yes.
8         MR. WRIGHT:  Object to form.
9         THE WITNESS:  (Phone vibrates.)  I'm sorry.  My
10     – can you –
11        MR. WRIGHT:  No.  You go ahead.
12        THE WITNESS:  I apologize.
13        MR. WRIGHT:  You're fine.
14 BY MR. SLOSAR:
15     Q   I'm going to ask you a lot of boring questions
16 now about training, okay?  After law school and apart
17 from on-the-job training and your general continuing
18 legal education requirements, have you had any training
19 or education relevant to your duties?
20     A   Did you say other than our continuing legal
21 education?
22     Q   Yes.
23     A   I have had other courses that I've taken.  Yes.
24     Q   And what sort of – well, what position did
25 you first hold at the Knox County Commonwealth

Page 28

1  Attorney's office?
2      A   I would've been an assistant.
3      Q   Were you trained after becoming an assistant
4  Knox County Commonwealth Attorney?
5      A   Yes, sir.
6      Q   What sort of training did you receive?
7      A   I began volunteering as an Assistant
8  Commonwealth Attorney under Tom Handy as the
9  Commonwealth Attorney in 2002.  My first Kentucky
10 Prosecutors Conference I went to would've been in the
11 fall of 2002.  I've attended those annually since 2002.
12 I have had trainings – other trainings in regards to
13 drug court, alternative sentencing plans.  I've had
14 others in regards to evidence collection, accident
15 reconstruction, DUI, expertise trial and training.  And
16 I may be missing some.  I apologize.  I didn't realize
17 how long I've been doing this and I'm trying to think
18 back.
19     Q   After being hired as an assistant Knox County
20 Commonwealth Attorney, did you have any training on your
21 ethical obligations as a prosecutor?
22     A   Yes.
23     Q   And after being elected as the Commonwealth
24 Attorney, have you had any training on your ethical
25 obligations as a prosecutor?

Page 29

1      A   Yes.
2      Q   One of the things we're going to talk about
3  today is Brady vs. Maryland, as I'm sure you've guessed;
4  are you familiar with that case?
5      A   I am.
6      Q   And I apologize for having to ask you these
7  questions.  Try and go as quickly as I can.  Are you
8  familiar with a prosecutor's obligation to turn over
9  exculpatory evidence to the accused?
10     A   Yes.
11     Q   Are you familiar with a prosecutor's
12 obligation to turn over evidence that may be used to
13 impeach a state's witnesses?
14     A   Yes.
15        MR. WRIGHT:  Object to form.
16     Q   Are you familiar with a prosecutor's
17 obligation not to destroy material evidence in a case?
18     A   Yes.
19     Q   Are you – were you familiar with those duties
20 for the entire time that the prosecution against Amanda
21 Hoskins and Jonathan Taylor was going on from March of
22 2012 until the dismissal of charges in the summer of
23 2016?
24     A   Yes.
25     Q   Were you familiar during your time as the

VIDEO DEPOSITION OF JACKIE STEELE taken on June 26, 2018

30..33

Page 30

1  prosecutor with Kentucky Supreme Court Rule 3.8, which
2  outlines the special responsibilities of prosecutors?
3      A   Yes.
4      Q   Are you familiar with the part of the rule
5  that requires prosecutors to make timely disclosures to
6  the defense of all evidence or information known to the
7  prosecutor that tends to negate the guilt of the accused
8  or mitigates the offense?
9      A   Yes.
10         MR. WRIGHT:  Object to form.
11     Q   Does Kentucky have a criminal rule that
12  requires –
13     A   Let me – let me interrupt you.  Can you –
14  the statement you just asked me, in regards to
15  exculpatory evidence, and what was the other part?
16     Q   Well, the question that I just asked was –
17  says: Were you familiar with the part of the rule of 3.8
18  – Supreme Court Rule – that requires prosecutors to
19  make timely disclosure to the defense of all evidence or
20  information known to the prosecutor that tends to negate
21  the guilt of the accused or mitigates the offense?
22     A   Yes.
23     Q   So you're obviously aware that a failure to
24  follow the rules about disclosing exculpatory evidence
25  as a prosecutor in Kentucky can lead to violations of

Page 31

1  the rules of professional conduct, correct?
2         MR. WRIGHT:  Object to form.
3      A   Yes.
4      Q   And are you aware, or were you aware between
5  2012 and 2017, that police and prosecutors are sued –
6  well, I'll withdraw that question.  Did you receive
7  training in criminal law when you were in law school?
8      A   Yes.
9      Q   Were you familiar with the Brady obligation
10  since you've been in law school?
11     A   Since I've been in law school?
12     Q   Like, since you were in law school, have you
13  been familiar with what Brady requires?
14     A   I would hope, but I can't say I found that out
15  in law school.
16     Q   Okay.  All right.  But since you've been a
17  Knox Count Commonwealth Attorney, you have understood
18  and complied with your obligations under Brady, –
19     A   Yes, sir.
20     Q   – right?
21     A   Yes, sir.
22     Q   All right.  In your experience in the Knox
23  County Commonwealth Attorney's office, were lawyers in
24  that office aware of their Brady obligations?
25     A   Yes.

Page 32

1      Q   I'm going to show you a series of motions. I'm
2  going to show you what we'll mark as Exhibit number 6.
3  It's a motion for discovery by Ms. Hoskins, Bates
4  stamped PL24490 through PL24492. Mr. Steele, having
5  reviewed this motion, are you able to determine what
6  this appears to be?
7         (EXHIBIT 6 MARKED FOR IDENTIFICATION)
8      A   If you'll give me just one second to finish
9  reading it.
10     Q   Yes.
11     A   Yes.  This appears to be a motion filed by
12  James Cox in Knox Circuit Court, Bates number  40070 –
13     Q   And what –
14     A   – through 72.
15     Q   – what's the motion requesting, generally,
16  Mr. Steele?
17     A   It – it's a request – he gave it a heading,
18  "Request for Exculpatory Evidence."
19     Q   So, and is this something that you were
20  tendered with while you were prosecuting a criminal case
21  against Ms. Hoskins and Mr. Taylor?
22     A   I don't have any independent recollection of
23  – of – of this one at this point in time.  I can tell
24  you – and one of the reasons I wanted to read it,
25  because all the things listed on here are things that I

Page 33

1  – I remember discussing and going through in discovery
2  process, but I don't have any independent recollection
3  of this motion.
4      Q   Do you have any reason to dispute that this
5  was a motion that was tendered in May of 2013 in the
6  criminal prosecution against Amanda Hoskins?
7      A   Other than it's not file – has a – doesn't
8  have a file stamp on it, which I would expect to be on a
9  tender document that's been filed in the court.  It –
10  it may have just been a copy that he had.  I – I don't
11  know. But obviously, if it's a – it was a tendered
12  document, it would be file stamped in the clerk's
13  office.
14     Q   And I'll represent to you that, at least the
15  Bates range that we're looking at now, these documents
16  were all pulled from the prosecution files that –
17     A   Okay.
18     Q   – you turned over in this case.  So is – if
19  this is something that would've been maintained as part
20  of the files that you turned over in this case, is it
21  fair to assume that this is something that you would've
22  been tendered in discovery?
23     A   Yeah.  He probably e-mailed it to me.  My
24  guess would be he emailed it to me when – before he
25  filed it.

Video Deposition of Jackie Steele, taken on June 26, 2008

34..37

Page 34

1    Q   Okay.  And after receiving a motion for
2  discovery, would you have taken steps to assure that
3  your office was complying with your disclosure
4  obligations, both under the rules of the Kentucky
5  Supreme Court and under Brady vs. Maryland?
6    A   Yes.
7    Q   Okay.  I'm going to show you what we're
8  marking as Exhibit number 7.  That's another motion for
9  a specific discovery filed by Barbara Carnes.  It's
10  PL24455 through 24458; Mr. Steele, do you recognize this
11  document?
12    (EXHIBIT 7 MARKED FOR IDENTIFICATION)
13    A   I do.
14    Q   What does this document appear to be?
15    A   It appears to be a motion for specific
16  discovery in Amanda Hoskins' file filed by, as you said,
17  Ms. Barbara Carnes.
18    Q   Okay.  And looking at this document, would you
19  agree that, according to the certificate of service, it
20  was filed December 6, 2012?
21    A   That is correct.
22    Q   And on the first page of this document, do you
23  see where it requests "all reports, field notes, case
24  supplements, and lab requests for any law enforcement
25  officer, coroner, or emergency personnel who were

Page 35

1  involved in the investigation of this case, including
2  but not limited to," and then it goes on to name a
3  number of law enforcement officials?
4    A   I do.
5    Q   Okay.  Would you have complied with that
6  request pursuant to Kentucky Supreme Court rules and
7  your ethical obligations under Brady vs. Maryland?
8    MR. WRIGHT:  Object to form.
9    Q   You can answer.
10    A   I would not have complied with this request.
11  If I'm not mistaken, we had a hearing on this issue.
12  Specifically, they – there were requesting things that
13  were not included or had to be included in discovery.
14    Q   I'm going to hand you what we'll mark as
15  Exhibit 8.  This is a court order for the compliance of
16  Ms. Hoskins' discovery request.  Mr. Steele, can you
17  look at this document?  Do you recognize this court
18  order?
19    (EXHIBIT 8 MARKED FOR IDENTIFICATION)
20    A   (No verbal response.)
21    Q   Okay.  And is it fair to say – well, is this
22  order signed by a judge?
23    A   It is.
24    Q   Okay.  When was it signed by a judge?
25    A   It appears to be signed on the 5th day of

Page 36

1  February, 2013.
2    Q   Okay.  And you're copied on this order, right?
3    A   I am.
4    Q   Okay.  And this order instructs your office to
5  disclose all of the requests made in the motion for
6  specific discovery by Barbara Carnes that was filed in
7  December of 2012; is that right?
8    MR. WRIGHT:  Object to form.
9    A   That is correct.
10    Q   Would you have complied with this court order
11  and disclosed all of the materials that your office
12  possessed relating to each of the discovery requests
13  outlined in the February 7, 2013 court order?
14    A   If I did not file a motion to alter, amend, or
15  vacate this order, I would have complied with it.  Yes.
16    Q   Sitting here today, do you have any
17  recollection of filing a motion to alter, amend, or
18  vacate the court order that was issued by the Honorable
19  Thomas Jensen on February 5, 2013?
20    A   I – I – I do have a memory of the issue, and
21  as you can see on Exhibit number 7, as you said, this
22  was taken from my file, on the – on page 1, paragraph
23  1, you'll notice "Field Notes" is highlighted, and then
24  on the bottom of page 4, the notes are on top of –
25  number 4, there are notes of summaries of interviews,

Page 37

1  and also a copy of their taped statement recorded in –
2  in parentheses.  These are notes that I remember making
3  on this.  One is that field notes were not required to
4  be turned over under criminal rules in discovery, so I
5  would've objected to that.  "A copy of their taped
6  statement" is in parentheticals because I would've
7  agreed to that under criminal rule 7.24 as being a
8  verbatim statement or – either a verbatim recorded
9  statement or a statement similar to – of which is their
10  statement initialed or signed.  I would've turned that
11  over, but I – I – I remember us having discussions
12  regarding field notes, but what – ultimately, whatever
13  the court would've decided, we would have complied with
14  entirely.  Yes, sir.
15    Q   And you would've – looking at page 2 of
16  Exhibit 7, the – we're actually – you know, why don't
17  we just stick with the order?
18    A   Okay.
19    Q   Exhibit 8.
20    A   Exhibit 8?
21    Q   Looking at paragraph 2, it requests a copy of
22  the recorded statement of witness Michael Crump,
23  referred to in the investigative report of Detective
24  York; do you see that?
25    A   I do.

Videotaped Deposition of Jackie Steele taken 9-14-2018

38..41

Page 38

1    Q.  Okay.  And if your office was ever provided
2  with a copy or a recorded statement of Michael Crump,
3  would you have disclosed that pursuant to this court
4  order?
5    A.  Yes.
6    Q.  Paragraph 3 requests the copy of any
7  investigative reports and taped statements of additional
8  witnesses, including jail informants; if your office
9  possessed copies of such reports or recorded interviews,
10  would you disclose that pursuant to this court order in
11  your ethical obligations under the Kentucky Supreme
12  Court rules?
13    A.  Yes.
14    Q.  I'm going to hand you what we'll mark as
15  Exhibit number 9.  This is one of the objections that
16  you recalled.  This is PL24494 through 501.  It's an
17  objection to defendant's request for exculpatory
18  evidence; Mr. Steele, do you recognize this document?
19        (EXHIBIT 9 MARKED FOR IDENTIFICATION)
20    A.  I do.
21    Q.  Did you draft this motion?
22    A.  I'd say my office – this may be a collective
23  effort on my office.
24    Q.  Okay.  Did you sign the last page of this
25  motion?

Page 39

1    A.  I did.  Yes.
2    Q.  Okay.  On the second page of this motion, do
3  you see where it says "recorded interviews of Mr. Crump"
4  in the first paragraph, the first numbered paragraph?
5    A.  Yes.
6    Q.  Okay.  And according to this document, is it
7  fair to say that the Commonwealth produced all recorded
8  statements relating to Mr. Crump that it either was
9  aware of or had in its possession?
10        MR. WRIGHT:  Object to form.
11    A.  Can you restate the question?
12    Q.  Well, according to this paragraph, what did
13  your office produce relating to Mr. Crump?
14    A.  We informed the court that we obviously had
15  provided any and all statements that we had received at
16  that point in time.  If any of them were – were located
17  afterwards, we would provide those.
18    Q.  Okay.  And to the best of your knowledge and
19  recollection sitting here today, did your office produce
20  the recorded statements or police reports relating to
21  the recorded statements relating to Mr. Crump?
22    A.  In regard to Mr. Crump, a recorded statement
23  was never identified, found.  I believe Mr. – Detective
24  Comer, if I'm not mistaken, was the officer that took
25  Mr. Crump's statement.  Mr. Comer – and I – and I

Page 40

1  believe it's in a supplement to the file, stated that he
2  would – stated that he had recorded it on a digital
3  recorder and left it with the detectives, but then when
4  he gave his supplement in regards to his conversation
5  with Mr. Crump.
6    Q.  Were you ever made aware that Detective York
7  only requested that Detective Mefford search his own
8  computer for the recorded conversation of Mr. Crump and
9  not any other law enforcement computer or file –
10        MR. WRIGHT:  Object to form.
11    Q.  – at the Kentucky State Police?
12    A.  I wasn't aware of any methodology they used in
13  searching for the – the recording, other than to say
14  that they could not find it.
15    Q.  Did you ever request that Detective York only
16  ask Detective Mefford to search his office computer for
17  the missing Crump recording?
18        MR. WRIGHT:  Object to form.
19    A.  No.
20    Q.  So if that – if those are the steps that
21  Detective York took to attempt to locate a recorded
22  conversation of Michael Crump, is it fair to say that he
23  did that on his own volition?
24        MR. WRIGHT:  Object to form.
25    A.  Yes.

Page 41

1    Q.  Looking at the paragraph that's numbered 3,
2  where it says, "Deals, incentives, or any favorable
3  treatment given to prosecution witnesses," according to
4  this document, were there – were you aware, was your
5  office aware of any deals, incentives, or favorable
6  treatment given to prosecution witnesses at the time
7  that you filed this motion?
8    A.  Obviously, my annex says that we're aware of
9  none at this time.
10    Q.  And if you were aware of any promises of
11  consideration made to witnesses, would you have
12  disclosed such promises to defense counsel in the
13  underlying criminal case?
14    A.  Yes.
15    Q.  And would you have done that pursuant to your
16  ethical obligations under the Kentucky Supreme Court
17  rules and Brady v. Maryland?
18    A.  Yes.
19    Q.  Looking at page 4, paragraph 8, do you see
20  where it says "inconsistent statements"?
21    A.  Yes.
22    Q.  Is it fair to say that, according to this
23  response, that your office disclosed any inconsistent
24  statements of witnesses in the underlying criminal
25  proceeding that your office was aware of?

Page 42

1    A   Yes.
2    Q   Show you some -- exhibit that we'll label
3  number 10.  So this is a motion that was filed on behalf
4  of Jonathan Taylor in the underlying criminal
5  proceeding.  It's Bates stamped PL24511 through 24540;
6  do you see this, sir?
7        (EXHIBIT 10 MARKED FOR IDENTIFICATION)
8    A   I do.  Yes.
9    Q   And from looking at this document, does it
10  purport to be a motion to produce all potentially
11  exculpatory evidence on behalf of Jonathan Taylor?
12    A   That is the heading of the motion.  Yes.
13    Q   From looking at this document, when was it
14  filed?
15    A   It was file stamped in the clerk's office
16  July 2, 2013.
17    Q   In the upper right-hand corner, do you
18  recognize that handwriting?
19    A   I think I do.  Yes.
20    Q   Is that your handwriting?
21    A   It is not.
22    Q   Whose handwriting do you believe that to be?
23    A   Terry Beckner's.
24    Q   Was that one of the Assistant Commonwealth
25  Attorneys assisting you in the criminal prosecution

Page 43

1  against Amanda Hoskins and Jonathan Taylor?
2    A   It is.  Yes.
3    Q   And would you generally agree with me that
4  this motion filed on behalf of Mr. Taylor requests
5  additional exculpatory information in the underlying
6  criminal proceeding?
7        MR. WRIGHT:  Object to form.
8    Q   Well, let me -- I'll withdraw the question.
9  What type of information does this motion request of
10  your office, generally?
11    A   Generally, any deals, rewards, incentives,
12  favorable treatment, or agreements not to prosecute any
13  accountable witnesses, time-date stamp photographs,
14  recordings of Mr. Crump's statements or information what
15  happened to the recording, detective's notes from his
16  interview with Mr. Crump, confirmed contents of certain
17  photographs, explanation of notes, signatures on a
18  suspects sketch, full reports, recordings, and notes of
19  the polygraph tests administered by Allen Helton and
20  Jessie Lawson, all recordings and notes of Jesse
21  Lawson's conversation with police, recordings and notes
22  from Detective York's conversations, in quotations,
23  "every drug dealer in Stinking Creek", all recordings
24  and notes of Allen Helton's conversations with the
25  police, recordings and notes of interviews with Wesley

Page 44

1  Roark, juvenile records of Amber Simpson, and I believe
2  that is everything in the request.
3    Q   And if a court ordered you to disclose this
4  information, would you have complied with such an order?
5    A   Yes.
6    Q   Okay.  And throughout the criminal prosecution
7  of Amanda Hoskins and Jonathan Taylor, did you and your
8  office comply with the ethical obligations under the
9  Kentucky Supreme Court rule 3.8 and your obligations
10  under Brady vs. Maryland in tendering exculpatory and/or
11  impeachment evidence to defense counsel for Ms. Hoskins
12  and Mr. Taylor?
13    A   Yes, sir.
14    Q   Going to show what we'll mark as Exhibit
15  number 11; is this another motion filed on behalf of
16  Jonathan Taylor and Amanda Hoskins in the underlying
17  criminal case?
18        (EXHIBIT 11 MARKED FOR IDENTIFICATION)
19    A   Yes, sir.
20    Q   And generally, what does this motion request
21  of your office?
22    A   Give me one second.
23    Q   Sure.
24    A   And generally, they're just asking for
25  exculpatory evidence and this is a memorandum in regards

Page 45

1  to officers.  But reading this, we'd already had some
2  discussions in court regarding the criminal rules and
3  the officer's notes not discoverable under 7.24.  They
4  cite that and the reasons why they should be required.
5  Also, confidential records and I can't -- just from
6  review real quick, I think there was juvenile records
7  and possibly some mental health records that were issues
8  in this that we also argued about in here.  Ms.
9  Simpson's juvenile record is one of the issues they're
10  talking about in this.
11    Q   Mr. Steele, is it fair to say that a defense
12  attorney practicing in Knox County would expect that
13  your office would produce all exculpatory evidence in a
14  case in response to a discovery order from the court?
15        MR. WRIGHT:  And I'll object to form.
16    Q   You can answer.
17    A   Can you say that again for me?
18    Q   All right.  Is it fair to say that, in 2012, a
19  defense attorney practicing in Knox County would expect
20  to receive any exculpatory or impeachment evidence
21  maintained by your office?
22    A   Yes.
23    Q   Are you aware of any instance in which you
24  have withheld exculpatory or impeachment evidence from a
25  defense in a criminal case?

Video Deposition of Jackie Steele taken 8/1/2018

46..49

Page 46

1    A  No.

2    Q  Are you aware of any instance where any

3  prosecutor you've supervised has withheld any

4  exculpatory or impeachment evidence from the defense?

5    A  No.

6    Q  Are you aware of any instance where any

7  prosecutor you have ever worked with -- well, I'm going

8  to withdraw that question.  In your own words, can you

9  describe for us your personal practice when it came to

10  disclosing evidence to the defense in a felony or

11  capital murder case while you were at the Knox County

12  Commonwealth Attorney's office?

13    A  Our position then and it is today is that we

14  practice with -- with an open file discovery, in that if

15  we have it, they have it, good, bad, or indifferent, to

16  the point that the offer's always extended to defense

17  attorneys in preparation for trial in a case we know

18  going to trial, they can come to my office and review my

19  file.

20    Q  And aside from reviewing your file, if

21  additional documents are made available to your office,

22  would you take steps to affirmatively supplement the

23  discovery that you tendered in a criminal case?

24    A  Yes.  We --

25      MR. WRIGHT:  Object to form.  Go ahead.

Page 47

1    A  Sorry.  Yes, and we do do supplemental

2  discoveries affirmatively..

3    Q  Let's talk a little bit about the file system

4  in your office; how were the criminal files maintained

5  at the Knox County Commonwealth Attorney's office in

6  2012?

7    A  They are maintained -- since we have two

8  courts, we keep those in two separate filing systems,

9  one for Laurel County and one for Knox County.  At that

10  point in time, they're -- they're filed in numerical

11  sequence.

12    Q  And is there a certain area of your office

13  where those files are kept?

14    A  In 2012, yes, there -- we -- we just recently

15  moved, but in 2012, yeah, we had a file room that housed

16  some of the older files, but some of the ongoing files

17  that were continually in court were maintained in the

18  secretary's office that is responsible for that county.

19    Q  All right.  Do you recall producing documents

20  in this litigation in response to a subpoena?

21    A  In this litigation, the one we're on today?

22    Q  In this civil case, yes.

23    A  Civil case.  Yes, I did.

24    Q  Okay.  And to the best of your knowledge and

25  recollection, did you produce an electronic copy of all

Page 48

1  of the files that were maintained by your office in

2  regards to the criminal prosecution against Amanda

3  Hoskins, Jonathan Taylor, and William Lester for the

4  murder of Katherine Mills?

5    A  To the best of my knowledge, everything we

6  have, you all have.

7    Q  Okay.  Going to hand you what we'll mark as

8  Exhibit 12.  In the electronic files that you gave us,

9  Mr. Steele, this was titled "Case Report 12-CR-70" and

10  the Bates range is PL25395 through 25516.  Mr. Steele,

11  can you describe what the case report consists of and

12  your findings presented in this case?

13      (EXHIBIT 12 MARKED FOR IDENTIFICATION)

14    A  Yeah.  (Coughs.)  Excuse me.  Generally, this

15  is the case report that was prepared by the officer --

16  detective in this matter, Jason York.  It has a front

17  sheet on it, which is a cover system that the state

18  police use.  From there, it goes into the actual

19  reporting system as far as witnesses and what they've

20  done and when they did it.  Any other officers that were

21  involved may include their information in here.  I

22  believe there are some supplementals by other officers

23  in the -- in the case report.

24    Q  Would you expect the case report maintained by

25  your office to include all of the police reports

Page 49

1  tendered to you by the law enforcement agency

2  investigative team?

3    A  It would.  Yes.

4    Q  Having reviewed the document before you, does

5  this seem to be an accurate representation of the

6  reports that law enforcement officers produced to your

7  office relating to the criminal investigation into the

8  death of Katherine Mills?

9      MR. WRIGHT:  Object to form.

10    Q  You can answer.

11    A  Well, obviously this is a several pages

12  document.  It appears to be, but if there's a sheet

13  missing, I wouldn't be able to tell you right off the

14  top of my head, but it appears to be the -- the police

15  report as -- as I know it to be.

16    Q  When you reviewed your case files, did you

17  take steps to ensure that those files were complete and

18  accurate to the best of your recollection?

19    A  In response to your subpoena or just in

20  general?

21    Q  In general.

22    A  Yes.

23    Q  Okay.  And in response to our subpoena, as

24  well?

25    A  Yes.  In the initial phase criminal --

VIDEO DEPOSITION OF JACKIE STEELE, taken on June 11, 2009

50..53

Page 50

1  obviously, I would've made -- there are several safety
2  guards and checks to make sure that everything is turned
3  over to defendants in criminal cases.  Not that your
4  subpoena wasn't any more important, but there -- the
5  multiple reviews of it wasn't done like it would've been
6  done in a criminal case.
7      Q   Sure.  To the best of your knowledge and
8  recollection, have all the documents retained by your
9  office relating to the criminal investigation into the
10  death of Katherine Mills been turned over?
11     A   As far as my -- as far as I know, yes.
12     Q   I'm going to hand you what we'll mark as
13  Exhibit 13.  In the electronic files, this was titled
14  "Discovery Knox 12-CR-070" and the Bates range is
15  PL25239 through 25296.  Mr. Steele, if there was a file
16  labeled "Discovery" with that case number, what would
17  you expect to be maintained in that file?
18         (EXHIBIT 13 MARKED FOR IDENTIFICATION)
19         MR. WRIGHT:  Object to form.  Go ahead.
20     A   In this file, the way we do discovery is, for
21  our convenience and also for the court, this would've
22  been filed in the court's file also.  The top file --
23  the top sheet, anyway, the supplemental discovery
24  request for a civil discovery and it lays out exactly
25  what we were -- what we were turning over.

Page 51

1      Q   Is it fair to say that the electronic file
2  labeled "Discovery" which you now hold in your hand as
3  Exhibit 14 would be a set of --
4      A   Exhibit 13.
5      Q   -- supplemental discovery produced to the
6  defense counsel in the underlying criminal prosecution?
7          MR. WRIGHT:  Object to form.
8      A   Is it Exhibit 13?
9      Q   13.  You're right.  Yes.
10     A   This would've been turned over to defense
11  counsel, yes.
12     Q   Okay.  And does this group exhibit accurately
13  reflect, to the best of your knowledge and recollection,
14  all of the supplemental discovery that your office
15  tendered to the defense during the criminal prosecution
16  against Ms. Hoskins, Mr. Taylor, and Mr. Lester?
17         MR. WRIGHT:  Object to form.
18     A   I honestly don't recall all the supplemental
19  discovery we did in this case.  I can tell you that if
20  it's in my file it was made as discovery to -- to
21  defense counsel.
22     Q   Are there situations where you tender evidence
23  to the defense and would not create a supplemental
24  response?
25     A   There are on limited occasions and it's done

Page 52

1  without the supplemental discovery form, and I can't say
2  it was done in this case, but we have tendered something
3  in a courtroom because we got it that day.  An officer
4  brought it to us, we'd go ahead and tender it and it's
5  put on the record -- "Judge, for the record, we have
6  tendered this to defense counsel today.  It is
7  reciprocal discovery."
8      Q   Do you have any independent recollection of
9  that happening in this case?
10     A   I do not.
11     Q   Is it fair to say that the receipt is a way to
12  keep track of what has been tendered by your office to
13  the defense in a criminal prosecution?
14     A   I would say it's the best way for us to keep
15  up with it.  Yes.  Unfortunately, we don't always follow
16  that.
17     Q   And in the -- well, generally, between 2002 --
18  '12 -- between 2012 and 2017, is it fair to say that the
19  files maintained in your office for ongoing criminal
20  prosecution was a separate set of files than those
21  maintained at the law enforcement agencies that
22  investigated the case?
23     A   Yes.
24     Q   Okay.  And as relates to the criminal
25  prosecution against Amanda Hoskins and Jonathan Taylor,

Page 53

1  is it fair to say that between 2012 and 2017, your
2  office maintained a separate set of files than that of
3  the law enforcement agencies involved in the criminal
4  investigation?
5      A   Yes.
6      Q   Is it fair -- well, the case file that is
7  before you is Exhibit 12 with the various police
8  reports; whose responsibility would it have been during
9  the criminal investigation and prosecution into
10  Katherine Mills' death to provide you with whatever law
11  enforcement reports exist?
12         MR. WRIGHT:  Object to form.
13         MR. WILLIAMS:  Join.
14     A   It would be -- it would be the individual
15  officer's responsibility to provide that to me, most
16  times, and a lot of times the lead detective is the one
17  that tracks them down, but I think each officer has a --
18  has an independent responsibility to make sure that if
19  the -- they have a supplement or if they've done
20  something in the case that it gets to the proper people.
21     Q   During your role as a prosecutor in the
22  criminal prosecution against Amanda Hoskins, Jonathan
23  Taylor, and William Lester, did you expect that the
24  police officers investigating the case would provide you
25  with any documents, notes, recordings, or other evidence

Video Deposition of Jackie Steele taken on June 20, 2019

54..57

Page 54

1  that they created or obtained during the underlying
2  criminal investigation?
3       MR. WRIGHT:  Object to form.  Foundation.
4       MR. WILLIAMS:  Join.
5    Q   You can answer.
6    A   That is my expectation.  Yes.
7    Q   And pursuant to your office filing practice,
8  would you have maintained possession of whatever reports
9  or evidence was tendered to you by law enforcement
10  officials in the file that was maintained internally at
11  the Knox County Commonwealth Attorney's office?
12    A   I didn't understand your question.  I didn't
13  hear a question there, I guess.
14    Q   No.  Any of the documents or evidence
15  submitted to your office by law enforcement officials --
16    A   Uh-huh.
17    Q   -- in this case, would you have maintained
18  those documents and that evidence as part of your file?
19    A   Yes.
20    Q   Is it fair to say that anything that might
21  become evidence that was tendered to you by law
22  enforcement officers would go into the file, with the
23  exception of things that couldn't actually physically
24  fit inside of it?
25    A   That is correct.

Page 55

1       MR. WRIGHT:  Object to form.
2    Q   Once the information or documents were placed
3  into your office's file, other than by use of other
4  prosecutors, is there any reason that you can think of
5  why it would've been removed or destroyed?
6       MR. WRIGHT:  Object to form.
7    A   While in my office, can I think of any reason?
8  No.  It would not be removed.
9    Q   And was there a retention policy for -- was
10  there any sort of retention policy for files at your
11  office between 2012 and 2017?
12    A   There is.
13    Q   What was that policy?
14    A   Any active cases, no matter what, would remain
15  in the office.  Inactive cases would remain in the
16  office two, sometimes three years before they would be
17  sent to the state archives.
18    Q   In this case, are you aware of any files being
19  removed or destroyed prior to responding to the subpoena
20  that was issued?
21    A   No.
22    Q   All right.  I want to talk to you generally
23  about the investigative activities of Knox County
24  prosecutors, okay?
25    A   Okay.

Page 56

1    Q   And I want to be completely clear by what I
2  mean by "investigation"; I am talking about prosecutors
3  leaving the prosecutorial role, going out on the street,
4  and investigating crimes, okay?
5    A   Okay.
6    Q   During the pendency of the criminal charges
7  against plaintiffs from 2012 to 2017, were prosecutors
8  at the Knox County Commonwealth Attorney's office known
9  to investigate crimes independently of the police agency
10  who brought the crimes to the prosecutor's office?
11    A   No.
12    Q   Did you ever investigate Katherine Mills'
13  homicide independent of the Kentucky State Police, Knox
14  County Sheriff's Department, or Barbourville Police
15  Department?
16    A   No.
17       MR. WILLIAMS:  Object to the form.
18       MR. FARAH:  Objection to the form.
19       MR. WRIGHT:  Join.
20       THE WITNESS:  Sorry.
21  BY MR. SLOSAR:
22    Q   Has that, to your knowledge, always been the
23  practice of the Knox County Commonwealth Attorney's
24  office to not investigate crimes independently of the
25  law enforcement agencies?

Page 57

1    A   Yes.
2    Q   While you were employed -- you're still
3  employed -- while you have still been employed at the
4  Knox County Commonwealth Attorney's office, have you
5  ever known Knox County prosecutors to independently
6  investigate crimes?
7    A   No.
8    Q   Did you ever assign any prosecutor to
9  independently investigate crimes?
10    A   No.
11    Q   Is it fair to say that the Knox County
12  Commonwealth Attorney's office relies upon the
13  information that police agencies bring to you about
14  criminal cases?
15       MR. WRIGHT:  Object to form.
16       MR. Williams:  Join.
17    A   Solely rely, do -- or just rely upon?
18    Q   Well, let me withdraw the question.  I'll ask
19  it a better way.  Does the Knox County Commonwealth
20  Attorney's office rely upon information brought to your
21  office by law enforcement agencies?
22    A   Yes.
23    Q   Is it fair to say that your office typically
24  relies on information from law enforcement agencies
25  about criminal cases?

Page 58

1    A   Yes.
2    Q   Other than — let me withdraw that.  Is it
3  fair to say that the Knox County Commonwealth Attorney's
4  office relies upon the information provided by law
5  enforcement agencies to be complete and accurate?
6    A   Yes.
7    Q   Is it fair to say that the prosecution of
8  Amanda Hoskins was based on evidence brought to your
9  office by law enforcement officials?
10    A   Yes.
11        MR. WRIGHT:  Object to form.
12    Q   Is it fair to say that the prosecution of
13  William Lester was based upon evidence brought to your
14  office by law enforcement officials?
15        MR. WRIGHT:  Object to form.
16    A   Yes.
17    Q   Is it fair to say that the prosecution of
18  Jonathan Taylor was based on evidence brought to your
19  office by law enforcement officials?
20        MR. WRIGHT:  Object to form.
21    A   Yes.
22    Q   Is it fair to say that your prosecution as a
23  Knox County Commonwealth Attorney regarding the
24  Katherine Mills homicide was based on evidence developed
25  by local law enforcement agencies and not by the Knox

Page 59

1  County Commonwealth Attorney's office?
2        MR. WRIGHT:  Object to form.
3        MR. WILLIAMS:  Objection.
4    Q   You can answer.
5    A   Yes.
6    Q   Is it fair to say that your prosecution as the
7  Knox County Commonwealth Attorney regarding the
8  Katherine Mills homicide was based on evidence developed
9  by the Kentucky State Police, Knox County Sheriff's
10  Department, and Barbourville Police Department, and not
11  by an independent investigation by the Knox County
12  Commonwealth Attorney's office?
13        MR. WRIGHT:  Object to form.
14        MR. KELLEY:  Object to form.
15        MR. FARAH:  Object to form.
16  BY MR. SLOSAR:
17    Q   You can answer.
18    A   I don't know which agencies you would say
19  developed evidence or investigated.  I will say that
20  none of it was developed or acquired by my office.
21    Q   For instance, the criminal complaint that you
22  reviewed earlier today was prepared by Detective York of
23  the Kentucky State Police; is that right?
24        MR. WRIGHT:  Object to form.  Foundation.
25    A   Yes.

Page 60

1    Q   The three criminal complaints and arrest
2  warrants that were issued all on March 14, 2012 against
3  Amanda Hoskins, Jonathan Taylor, and William Lester, is
4  it your recollection that each of those were initiated
5  by Detective Jason York of the Kentucky State Police?
6        MR. WRIGHT:  Object to form.  Foundation.
7    A   Detective York signed all of the arrest
8  warrants and presented them to the court.  Yes.
9    Q   And is it fair to say that your office did not
10  have any role in filling out the arrest warrant and
11  criminal complaint against Amanda Hoskins and Jonathan
12  Taylor in March of 2012?
13    A   That —
14        MR. WRIGHT:  Object to form.  Foundation.
15    A   — that is correct.
16    Q   In this case, who made the decision on whether
17  to charge Mr. Taylor with capital murder?
18        MR. WRIGHT:  Object to form.  Foundation.
19    A   I would've made that decision.
20    Q   And was that — would that have been based
21  upon the case file presented to you from law enforcement
22  agencies?
23    A   At —
24        MR. WRIGHT:  Object to form.
25        MR. WILLIAMS:  Object to the form.

Page 61

1    A   — at the time I made the — yes, at the time
2  I made the filing.
3    Q   And at the time that you made the filing
4  charging Jonathan Taylor with capital murder, was it
5  your expectation that the reports and statements
6  obtained in the case file were truthful and accurate?
7        MR. WRIGHT:  Object to form.  Foundation.
8    A   Can you rephrase that question for me?
9    Q   Sure.
10    A   Because —
11    Q   So at the time that you charged or proceeded
12  forward with the charges against Jonathan Taylor for
13  capital murder, was it your expectation and
14  understanding that the case file presented to you, which
15  included written statements, audio recorded statements,
16  that the evidence presented to you was true?
17    A   Yes.
18        MR. WRIGHT:  Object to — same objection.
19    Q   Aside from — well, let me ask you this
20  question:  Is it — do the arrest warrant and criminal
21  complaints as indicated in Exhibit number 1, does this
22  usually include the factual predicate for the underlying
23  charges?
24    A   I don't know.  The — the county attorneys in
25  both our respective counties handle those.  I may — I

Video Deposition of Jackie Steele taken on June 5, 2019

62..65

Page 62

1  – I've seen more today than I've probably seen in the
2  last year.
3      Q   Okay.  Is it fair to say that in Exhibit
4  number 1 that the information listed in the criminal
5  complaint is minimal?
6          MR. WRIGHT:  Object to form.
7          MR. WILLIAMS:  Join.
8      A   I can't say that's minimal.  I don't know what
9  is typically included in those.
10     Q   Have you ever seen a criminal complaint that
11 actually names the witnesses or the exact evidence that
12 implicates the person being charged with a crime?
13     A   In state court I cannot say that I have.  No.
14     Q   In another court have you?
15     A   Federal court I have seen them, which they go
16 into great detail.
17     Q   In 2012, would the Knox County Commonwealth
18 Attorney's office have any written or unwritten policy
19 about the promises – promising incentives to witnesses
20 who might testify in a criminal case?
21     A   Could you say that again; in the Commonwealth
22 Attorney's office?
23     Q   Yeah.  So in 2012, did the Knox County
24 Commonwealth Attorney's office have any policies, be it
25 written or unwritten, about promising incentives to

Page 63

1  witnesses who might testify in a criminal case?
2      A   Our office, yes.  We don't make promises to
3  anybody, any witnesses, in my office.  No.
4      Q   So – and by "promises," I just want to make
5  sure we're talking about the same thing here.
6      A   Okay.
7      Q   If your office was to – have you ever reached
8  an agreement with an individual to plead guilty to a
9  crime in exchange for testimony against another
10 individual?
11     A   Yes.
12     Q   Okay.  In an instance like that, does your
13 office have any policy requiring the disclosure of the
14 consideration promise to the individual who pled guilty
15 in exchange for testifying?
16     A   Sure.  Those are included in the
17 Commonwealth's offers on pleas of guilty, then there's a
18 motion or a guilty plea, then there's a judgment or an
19 order.  All it is in the public record, but even in
20 those type cases, we will make sure the defense
21 attorney, who's probably sitting right there and watches
22 the plea, is aware and has a copy of – of the
23 Commonwealth's offer.
24     Q   So between 2012 and 2017, would it have been
25 your practice – your personal practice to disclose any

Page 64

1  such offers of consideration to a witness in a pending
2  criminal case?
3      A   Yes.
4      Q   And same question, but about your office
5  policy, not your personal –
6      A   Okay.
7      Q   – practice or policy:  Between 2012 and 2017,
8  would it have been the office policy of the Knox County
9  Commonwealth Attorney to disclose any promises of
10 consideration made to a witness in a pending criminal
11 case?
12     A   If we would have made such a promise, yes.
13     Q   Sure.  Can you think of any circumstance where
14 a prosecutor from your office would have made such a
15 promise to a witness and not disclose such evidence to a
16 defendant in a pending criminal case?
17     A   No.
18     Q   To your knowledge, has the Knox County
19 Commonwealth Attorney's office ever paid money to any
20 witness to testify in a criminal case?
21     A   Personally, no.  Obviously there are
22 reimbursements that – that our office is required to
23 assist.  I mean, I'm just making sure we're clear.
24     Q   For, like, expenses or subpoenas –
25     A   Expenses and travel.  We – we will – we

Page 65

1  assist in those and prepare orders, so just for
2  clarification, we have not made any personal
3  expenditures from my office or personally to any
4  witness.  No.
5      Q   Yeah.  The example that I'll give you is, you
6  know, we have got a case somewhere where a witness was
7  promised a monetary, you know – a sum of money, a lump
8  of money in exchange for testifying; are you –
9      A   No.
10     Q   – aware of that ever happening in your
11 office?
12     A   No.
13     Q   Okay.  Are you aware of, in this case, any
14 Knox County Commonwealth Attorney making a promise of
15 consideration to a witness in exchange for a statement
16 against Ms. Hoskins, Mr. Taylor, or Mr. Lester?
17     A   I made an offer to Mr. Lester through his
18 attorney, Mr. Hoskins, in regards to a statement in
19 contemplation of a plea agreement.
20     Q   And what was your offer, as best you can
21 recall, to Mr. Lester?
22     A   I cannot recall.  I – I'm – I can tell you
23 one reason I don't recall.  It was a very short, quick
24 conversation because Mr. Hoskins said he's not – best
25 of my knowledge, wasn't going to entertain any type of

VIDEO DEPOSITION OF JACKIE STEELE taken on June 19, 2019

Page 66

1  felony plea, so it wasn't -- we didn't get much farther
2  than that.
3      Q    Okay.  In terms of non-defendants, but
4  witnesses, do you have any recollection of promising
5  consideration to any witness involved in the criminal
6  investigation or prosecution of Ms. Hoskins and Mr.
7  Taylor?
8      A    No.
9      Q    Have yourself or any other prosecutor, to your
10 knowledge, made any promises to assist a witness with
11 bond conditions in exchange for a statement or testimony
12 in the underlying criminal investigation and prosecution
13 of Amanda Hoskins and Jonathan Taylor?
14     A    Has -- have myself or my office made --
15     Q    Yes.
16     A    No.
17     Q    Do you recall when you were first brought the
18 criminal prosecution file relating to Amanda Hoskins and
19 Jonathan Taylor?
20     A    I do not, as far as the day.  No, I do not.
21     Q    Do you recall what year you got involved in
22 the prosecution?
23     A    It would've been in 2012.
24     Q    At the time that you first became involved in
25 the criminal prosecution against Amanda Hoskins and

Page 67

1  Jonathan Taylor, did you expect that law enforcement
2  officers would provide your office with any statements
3  or evidence obtained from witnesses in the underlying
4  criminal investigation?
5      A    Yes.
6      Q    Did you independently investigate the
7  Katherine Mills homicide independent of what the law
8  enforcement agencies provided to you?
9          MR. WRIGHT:  Object to form.
10         MR. WILLIAMS:  Object to form.
11     Q    You can answer.
12     A    Can you rephrase the question for me?
13     Q    Sure.  Between 2012 and 2017, did you
14 independently investigate the Katherine Mills homicide
15 independent of law enforcement agencies?
16         MR. WRIGHT:  Object to form.
17     A    I know this -- not trying to be petty, but
18 what -- when you're saying "investigate" can you -- can
19 you tell me what you mean by "investigate"?
20     Q    Sure.  Did you go talk to witnesses without
21 police officers present?
22     A    Yes.
23     Q    What witnesses did you speak with without law
24 enforcement officers present?
25     A    I specifically remember talking to Joe King

Page 68

1  outside of law enforcement presence.
2      Q    Did you talk to Joe King at the county jail?
3      A    I did.  We were in a parking lot at the Laurel
4  County Detention Center.
5      Q    How did you discover that Mr. King was at the
6  Laurel County Detention Center?
7      A    Obviously, he'd given a statement that was
8  included in the case file regarding Mr. Lester and
9  Amanda.  We were trying to get in touch with him,
10 couldn't find him.  Well, one of the problems is he had
11 an address in Tennessee.  We knew he frequented Bell
12 County and Pineville, but nobody'd seen him in a while.
13 Come to find he was on federal parole, I believe it was
14 -- probation or parole, and the -- their federal
15 probation and parole officer helped us come make contact
16 with him.  Help -- my first recollection of talking to
17 Mr. King was on the telephone and I just told him who I
18 was and I wanted to talk to him and to get some things
19 straightened out and ironed out.  And then he told me
20 that he was coming to visit, I believe, a family member
21 -- his dad, if I'm not mistaken, who was in the Laurel
22 County Detention Center that Sunday, so I -- I was
23 there on Sunday afternoon to meet him.
24     Q    When you said, "We were having trouble getting
25 ahold of him," who's the "we" that you're referring to?

Page 69

1      A    That would've been myself, law enforcement
2  officers who had to subpoena.  Typically, law -- the
3  Knox County Sheriff's Department in this case would be
4  given the subpoenas to issue.  They couldn't -- they
5  were having a hard time locating him.  Bell County
6  wasn't of any assistance, in my recollection, because he
7  had a -- I think a Bell County address at one point in
8  time.  Nobody could -- could find him and -- and locate
9  him, so our next step would be to call the Kentucky
10 State Police to see if they could assist us in locating
11 him, and I'm not sure how we found out he was on federal
12 probation and parole.
13     Q    Was Detective York one of the officers
14 assisting in the finding of Joe King?
15     A    I honestly can't speak to that.  I don't know.
16     Q    How long did your conversation with Mr. King
17 last at the Laurel County Detention Center?
18     A    I don't recall.  I really don't.
19     Q    Fair to say, it's been a long time?
20     A    It has been a long time.  Yes.
21     Q    Do you recall the statements that you made to
22 Mr. King during that conversation?
23     A    I do remember the general context of our
24 conversation.  I mean, I can remember the -- it was a
25 nice day.  It was sunny.  It wasn't like we were running

VIDEOTAPED DEPOSITION OF JACKIE STEELE taken on THURSDAY, 2018

70..73

Page 70

1 trying to race to get out. We actually stood in the
2 parking lot and, you know, had a pleasant conversation
3 and – and the fact that, you know, he wasn't upset and
4 – or short with me and he answered all my questions. I
5 – I served him a subpoena that day because of we had a
6 trial date coming up, so I made sure he was served. The
7 context of the conversation was I went through his
8 statement with him and at the end of his – end of his
9 statement, he basically just said he – he just didn't
10 remember any of that. Of course, I'm sure I asked him a
11 couple different ways and he – "Man, I just – I don't
12 remember any of that." And it wasn't that he didn't
13 remember the – the conversation with York. He was just
14 saying he didn't remember anything in the conversations
15 with Amanda and William up there.
16    Q   So is that fair to say that Mr. King told you
17 that the statement that was attributed to him in the
18 police report, that that wasn't truthful?
19        MR. WRIGHT: Object to form.
20        MR. WILLIAMS: Join.
21    A   He never told me it wasn't truthful.
22    Q   Well, let me ask you a different way. You're
23 saying Joe – Mr. King represented to you that he didn't
24 recall any of the stuff listed in Detective York's
25 report, actually included, right?

Page 71

1        MR. WRIGHT: Object to form.
2        MR. WILLIAMS: Join.
3    A   He didn't remember anything, the – the –
4 talking to Detective York or talking about this or
5 anything. He didn't remember anything at the Pineville
6 Walgreens, I believe, was where his conversation with
7 Amanda and William took place. He just said he didn't
8 remember anything, and that's – he just – every time I
9 remember asking him a question, it was, "I don't
10 remember. I don't remember."
11    Q   Did he tell you that he was going to testify
12 to that effect at trial?
13    A   He told me he just couldn't remember is what
14 he'd tell – tell the jury.
15    Q   How come you wanted to subpoena him for a
16 trial still?
17    A   I served him a subpoena because at that point
18 in time I needed to – time to digest it and look at Mr.
19 King's statement again, see if there was any independent
20 verification that I could use in regards to this
21 statement that – one of these I do remember was that
22 Amanda's statement kind of verified what he said about
23 this Walgreens meeting in – I'm going to say Walgreens
24 Pineville. They met in Pineville somewhere. So I – I
25 did – I'd already served him a subpoena. I just wanted

Page 72

1 him to be there. Many times witnesses, when they don't
2 want to testify until they get there and they're like,
3 "Man, just – fine. I'll – I'll – I'll testify just
4 to get this thing over with." So I did have him
5 subpoenaed to be there at trial.
6    Q   Did you ever talk to Joe King again after that
7 day?
8    A   If I – if I – I don't have any recollection
9 of speaking to him again. I – I may have, but I don't
10 – I just don't remember.
11    Q   Showing you what we'll mark as Exhibit 14, the
12 motion to dismiss that you filed against Amanda Hoskins,
13 July 29, 2016; do you recognize the document, sir?
14        (EXHIBIT 14 MARKED FOR IDENTIFICATION)
15    A   I do.
16    Q   What is this document?
17    A   This is the Commonwealth's motion to dismiss
18 in regards to Amanda Hoskins and William Lester that was
19 filed by myself.
20    Q   Did you draft this document?
21    A   I did.
22    Q   Looking on the second page, paragraph 5.
23    A   Uh-huh. Yes, sir.
24    Q   Is it fair to say that the first three to four
25 sentences of that paragraph are basically a summary of

Page 73

1 the case report that was provided to you from Detective
2 York?
3        MR. WRIGHT: Object to form.
4    Q   All right. Sir, can you also take that
5 Exhibit 12. I'm going to point you to page number at
6 the bottom, 25418.
7    A   25418?
8    Q   Yeah.
9    A   Okay.
10    Q   Okay. All right. Is this a police report
11 that was provided to you during the criminal prosecution
12 against Amanda Hoskins and Jonathan Taylor?
13    A   Yes.
14    Q   And sitting here today, is this the only
15 report that you're aware of that exists relating to any
16 statements from Joe King in the criminal prosecution
17 relating to the death of Katherine Mills?
18    A   Yes.
19    Q   Okay. Now, having looked at Exhibit 12, this
20 case report, –
21    A   Uh-huh.
22    Q   – is it fair to say that the first three
23 sentences of paragraph 5 of the motion to dismiss is a
24 summary of the narrative that was drafted by Detective
25 York on June 27, 2011?

VIDEO DEPOSITION OF JACKIE STEELE, taken on Thursday, 2009

Page 74

1      MR. WRIGHT:  Object to form.
2      Q   I'm sorry?
3      MR. WRIGHT:  I said, "Object to form."
4      It -- it -- it appears that the first -- I'm
5  trying to count -- the first three sentences are, in a
6  very concise statement, a brief summary of Mr. King's
7  statement to law enforcement.  Yes.
8      Q   Were you with Detective York on June 24, 2011
9  when he originally interviewed Joe King and subsequently
10  created this report?
11     A   No, I was not.
12     Q   Okay.  Looking at the fourth sentence, do you
13  see where it says, "Joe King has since changed his story
14  in that he never heard anyone talking about robbing an
15  elderly lady and that he did not see or know of Amanda
16  spending money"?
17     A   I do.
18     Q   Is that information that you learned from Joe
19  King?
20     A   It is.
21     Q   Is that information that he personally told
22  you?
23     A   It was.
24     Q   Is that information that he told you when you
25  met with him at the Laurel County Detention Center?

Page 75

1      A   It is.
2      Q   Is it fair to say that in your summary of the
3  conversation you had with Joe King that's contained in
4  this motion to dismiss, that it does not say anywhere in
5  here that Joe King forgot or doesn't remember?
6      A   It does not.
7      Q   Okay.  And in fact, your -- the summary in --
8  contained in your motion to dismiss says that Joe King
9  affirmatively denied to you the statements contained in
10  this paragraph; is that right?
11     MR. WRIGHT:  Object to form.
12     A   I think -- I think the sentence speaks for
13  itself and that it -- he's changed his story.  I don't
14  -- I -- I think it speaks for itself, yes.
15     Q   All right.  Let's go back to some questions.
16     A   Thank you.
17     Q   Would it be fair to say that with respect to
18  Amanda Hoskins and Jonathan Taylor, you relied on
19  information that law enforcement officers brought to you
20  to prosecute the case?
21     MR. WRIGHT:  Object to the form.
22     MR. WILLIAMS:  Join.
23     A   Yes.
24     Q   And would it be fair to say that during the
25  time you were a prosecutor at the Knox County

Page 76

1  Commonwealth Attorney's office, you only prosecuted
2  criminal cases where probable cause was present?
3      A   Yes.
4      Q   If at any time during the prosecution of a
5  criminal case you learned facts which negated probable
6  cause, would you have taken steps to immediately stop
7  the prosecution?
8      MR. WRIGHT:  Object to form.
9      A   Yes.
10     Q   Could you have reviewed the criminal complaint
11  at some point during your prosecution of Ms. Hoskins and
12  Mr. Taylor?
13     A   No.
14     Q   We saw earlier today that there wasn't really
15  any information contained in the criminal complaint to
16  review; is that right?
17     MR. WRIGHT:  Object to form.
18     MR. WILLIAMS:  Object to the form.
19     A   Again, I -- I don't deal with those.
20  Obviously, that's an issue for the court to decide.
21  There must have been enough information for the judge to
22  sign it for an arrest warrant, but...
23     Q   Did you rely upon evidence generated by law
24  enforcement officers and testimony from those officers
25  to the Grand Jury to begin your prosecution against

Page 77

1  Amanda Hoskins and Jonathan Taylor in the death of
2  Katherine Mills?
3      MR. WRIGHT:  Object to form.
4      MR. WILLIAMS:  Object to the form.
5      Q   You can answer.
6      A   Yes.
7      Q   Aside from Joe King, do you recall meeting
8  with any other witnesses during the criminal prosecution
9  against Ms. Hoskins and Mr. Taylor?
10     A   Yes.
11     Q   Who else?
12     A   Christy Branson.  Well, I would've spoke to
13  her without law enforcement.
14     Q   Can you give an estimate of when,
15  approximately, you met with Joe King?
16     A   No, but I -- I can't as I sit here today, but
17  if you look through the court records, the first time he
18  would've been subpoenaed would've been by me and he
19  would've -- he would've been -- it would've been before
20  that subpoena was issued.  That would be the best I can
21  provide.  I really don't know.
22     Q   As best you can recall, when did you meet with
23  Ms. Branson?
24     A   I -- honestly, I -- this -- this case seemed
25  like drug on forever, and it would've been before a --

Video Deposition of Jackie Steele taken 11/17/2018; 2018

78..81

Page 78

1  if I'm not mistaken, she was in court for something and
2  I – I spoke to her in a witness room in the back of the
3  Knox County Courthouse, but it'd been after I'd been
4  notified that she had had a vehicle accident, I believe,
5  or some type of head trauma and was claiming she didn't
6  remember anything, and – and I was – I remember
7  speaking to her attorney first to – to her civil
8  attorney at the time and verified because it'd been –
9  she'd had a lawsuit and Sam Castle was – I had talked
10  to Sam Castle – Sam Castle, who did confirm with me she
11  had been in a wreck.  So then I went to speak to her
12  just to see what her competency level would be or what
13  she'd be willing – what she could remember.
14     Q    When you spoke to Ms. Branson, what do you
15  recall her saying?
16     A    I remember her just being real fidgety and
17  talking a – a mile a minute, but in essence is that she
18  – you know, she just can't remember anything.  She'd
19  been in a – can't – I can't remember if it was a car
20  wreck or motorcycle wreck or something, but she'd had
21  head injury and she just couldn't remember anything.
22     Q    Did Ms. Branson tell you in that conversation
23  that she didn't recall Ms. Hoskins making any statements
24  to her in the county jail?
25     A    Yeah.  Yes, she said she didn't recall

Page 79

1  anything.  I mean, she didn't recall anything during
2  that period of time.
3     Q    Well, did you ask her – did you ask Ms.
4  Branson in that conversation if Amanda Hoskins made any
5  statements to her while they were incarcerated together?
6     A    I don't specifically remember that question.  I
7  do remember the general framework of the question was
8  her remember to give me a statement to law enforcement,
9  her remember the contents of that statement, and her
10  remembering anything regarding the murder of Katherine
11  Mills, and she just repeat – kept saying, "I can't
12  remember anything.  I don't remember any of that."
13     Q    I'm going to – aside from Christy Branson and
14  Joe King, did you meet with any other witnesses during
15  the criminal prosecution of –
16     A    Personally meet with, no.  I did have
17  conversations with Daniel Wilson and Robert Beach.  I'm
18  trying to think if there was somebody else.  I can't
19  remember if I talked to Mr. Crump or not.  I want to
20  think I did have a phone conversation with Mr. Crump at
21  some point in time.
22     Q    Do you remember the contents of that
23  conversation?
24     A    Knew that he was not coming back to testify.
25     Q    Anything subsequently about the case?

Page 80

1     A    No.
2     Q    With Daniel Wilson and Robert Beach, did you
3  speak with them over the phone or in person?
4     A    Been over the phone.
5     Q    Do you recall, sitting here today, when you
6  spoke to Daniel Wilson over the phone?
7     A    Daniel Wilson, if I'm not mistaken, was being
8  held in Campbell County, Kentucky, northern Kentucky,
9  somewhere in there.  Campbell – Campbell or Kenton, but
10  he was – he would've been the last person I spoke to
11  right before I filed my motion to dismiss the...
12     Q    So would that have been close in time to
13  the –
14     A    It –
15     Q    – moment when you filed the motion to
16  dismiss in June of 2016 for Mr. Taylor and in July of
17  2016 for Ms. Hoskins?
18     A    It would've been before the June –
19     Q    Sure.
20     A    You kind of threw me – I –
21     Q    Yeah.
22     A    – I don't – did I file them on the same day?
23  I honestly don't remember.
24     Q    No.  So they were filed apart.  Let me
25  withdraw the question.  I'll ask it a better way.

Page 81

1     A    Okay.
2     Q    Would you have spoken to Daniel Wilson close
3  in time to the first motion to dismiss you filed in June
4  of 2016?
5     A    Yes.  It would've been in – I would put it a
6  couple to a few days at the most.
7     Q    And in the conversation that you had with
8  Daniel Smith, what do you recall him telling you?
9        MR. WILLIAMS:  Daniel Wilson.
10     Q    I'm sorry.  Let me withdraw the question.
11  You're right.  In the conversation – it'll be a rare
12  thing where we're on the same page.  In the conversation
13  that you had with Daniel Wilson close in time to June of
14  2016, what do you recall Mr. Wilson telling you?
15     A    I'm – I'm going to look at my motion to –
16  motion to dismiss –
17     Q    Sure.
18     A    – which is – think we've marked as Exhibit
19  number 14, and under paragraph number 1, I actually put
20  on there the date that I spoke to him, on June 23, 2016
21  in preparation for trial, and I state that he – and I
22  contacted him at the Campbell County jail and it – Mr.
23  Wilson had changed his story.  He did not remember Mr.
24  Taylor making any statements about the death of an
25  elderly lady where he mentioned his cousin, Amanda

VIDEO DEPOSITION OF JACKIE STEVE JOSEPH JOSEPH ICE, taken on June 21, 2019

82..85

Page 82

1   Hoskins, in a robbery. I asked about his previous
2   statements and he restated that he didn't know anything
3   about those statements, did not remember making them.
4       Q   Do you recall anything independently about the
5   conversation you had with him, other than what's written
6   in your motion?
7       A   No. I mean, obviously I read that in about
8   ten seconds, but it was -- we were on the phone for a
9   few minutes, but it was a -- and he just didn't remember
10  anything about his conversation with the officer in this
11  case.
12      Q   Did you ask Daniel Wilson about any of his
13  interactions with Detective York?
14      A   I did ask him about his previous statement to
15  Detective York, and I believe it's reflected in here
16  that he did not remember making any of it. Other than
17  that, no, I don't remember him making any other
18  statements.
19      Q   And Robert Beach -- what do you recall about
20  your interaction with Mr. Beach?
21      A   In general, or just my independent talking to
22  him -- talking on the phone?
23      Q   Your independent.
24      A   Independently on the phone, again, it was just
25  much like Mr. Wilson. He was an inmate in Indiana.

Page 83

1   There was a -- there is an out-of-state process we had
2   to go through to get him before the court. If I'm not
3   mistaken, we were calling to verify that he was still in
4   the same prison or trying to figure out where he was at.
5   He had been transported a couple times already, if I'm
6   not mistaken, to court. I was -- I don't remember
7   making him -- talking to him at all in court. If I did,
8   it would just be to say, "Sorry. It's been continued
9   again. We'll bring you back the next time." Nothing of
10  any substance. The phone conversation I remember having
11  with him was telling him that I think we were finally
12  going to get this thing over with and that I hoped this
13  would be the last time we have to transport him and
14  bring him back and forth, because it was a -- a rather
15  lengthy drive and at that -- that point in time I
16  believe is when he told me.
17      Q   It's paragraph 2.
18      A   Yeah, paragraph 2. I go into what he -- what
19  he tells me at that point in time.
20      Q   Aside from the phone conversation you had with
21  Robert Beach in June of 2016, do you have any
22  recollection of any other conversations that you had
23  with him?
24      A   Again, I -- I don't have any recollection of
25  anything of substance to the case, other than just,

Page 84

1   like, scheduling when he was in court and didn't have to
2   be there because of transporters had already been in.
3       Q   Do you have any independent recollection of
4   ever meeting with Robert Beach in person?
5       A   Yes.
6       Q   When -- what do you recall about meeting with
7   Mr. Beach in person?
8       A   Myself, Detective York, and I believe he was a
9   detective at the time -- Brian Johnson, left here,
10  London. I want to say they picked me up in the London
11  office and we drove to the Indiana penitentiary or
12  prison system he's being housed in. Came in and they
13  had -- I can't remember if somebody called ahead and
14  told them we were coming, but they gave us an area to
15  which we could speak to Mr. Beach about any information
16  we had in regards to this case.
17      Q   And how long were you all in that prison with
18  Mr. Beach?
19      A   I -- I wouldn't guess no more than -- and
20  again, I'm -- I'm guessing, but the prison record would
21  show when we checked in and when we checked out, but I
22  would -- I -- I can't imagine it's more than 30, 45
23  minutes.
24      Q   How big was the room?
25      A   Maybe 15 by 15. It was a -- it was an office

Page 85

1   area. There was an office desk in there and -- and
2   chairs to sit around the office desk.
3       Q   Was Mr. Beach handcuffed?
4       A   I don't recall.
5       Q   Did Detective Johnson or Detective York have a
6   recorder with them during the interview?
7       A   Yeah, somebody did, because it was recorded,
8   but I don't -- I'm not sure who -- who brought that.
9       Q   Is it your -- do you have any recollection of
10  whether the entire meeting was recorded or whether it
11  was just a statement that was recorded to him -- from
12  him at the end of the meeting?
13      A   It was just a statement that recorded. The
14  entire meeting was not recorded.
15      Q   Do you recall ever leaving the room at any
16  point during the meeting with Mr. Beach?
17      A   No, I did not. I -- I did not leave the room.
18  I was in the room the entire time, best of my relection
19  -- best of my recollection.
20      Q   Who took the lead in questioning Mr. Beach?
21      A   I don't know that I would say "lead" in
22  regards to -- I don't know if I'd call it a lead. I
23  think me and -- me and Detective York just talked to
24  him. It was a -- just same as you'd throw three people
25  in a room. We were just having a conversation to begin

Video Deposition of Jackie Steele taken on June 25, 2008
86..89

Page 86

1  with. I don't remember Detective Johnson ever – of
2  course, he didn't know anything about the case other
3  than that he was a new detective and I think he got
4  thrown into driving us and – and possibly just see how
5  this – these things are done, but I don't remember – I
6  don't remember him asking any questions about the case,
7  because his knowledge of it would've been very limited.
8     Q   Do you know whether Detective York spoke to
9  Mr. Beach prior to the meeting that you all had with him
10 at that prison?
11    A   I do not know.
12    Q   Did Detective York ever tell you whether he
13 had any telephone conversations with Mr. Beach prior to
14 you joining in that prison visit?
15    A   Not that I can recall.
16    Q   Did Detective York ever tell you whether he
17 made any promises to Mr. Beach prior to you meeting with
18 him in that prison visit?
19    A   No.
20    Q   All right. Aside from the four witnesses that
21 you just testified to interacting with personally, Joe
22 King, Christy Branson, Daniel Wilson, Robert Beach, do
23 you have any independent recollection of speaking to any
24 other witness involved in the criminal prosecution?
25    A   I think you said four, but I believe I

Page 87

1  identified five.
2     Q   Oh, you're right. And –
3     A   Mr. Crump.
4     Q   – a phone call with Mr. Crump that was mainly
5  about scheduling, correct?
6     A   Other than those five, I do not have any
7  independent recollection as I sit here today of any
8  conversation.
9     Q   Is it fair to say that most of your
10 interactions with these witnesses were towards the end
11 of the prosecution?
12    A   I think it's fair to say that it was after the
13 initiation of the indictment. Danny Wilson and Robert
14 Beach was obviously at the end – end – end of the
15 prosecution. I – I can't recall on Christy Branson,
16 Joe King, and Michael Crump. I'm not – honestly can't
17 remember.
18    Q   Okay. All right. A few questions that I have
19 to ask and then we're going to start getting into some
20 specifics.
21        MR. WRIGHT: Can we take a break, Elliot?
22        MR. SLOSAR: Yeah. Let me just get through
23    these few first.
24        MR. WILLIAMS: It's been two hours.
25 BY MR. SLOSAR:

Page 88

1     Q   Sure. Just give me a minute. Did you make
2  any promises to witnesses in the underlying criminal
3  prosecution against Jonathan Taylor and Amanda Hoskins?
4     A   No.
5     Q   Did you offer any money to witnesses in the
6  underlying criminal prosecution against Amanda Hoskins
7  and Jonathan Taylor?
8     A   No.
9     Q   Did you coerce any witnesses in the underlying
10 prosecution against Amanda Hoskins and Jonathan Taylor?
11    A   No.
12    Q   Did you assist in fabricating any statements
13 from witnesses in the underlying criminal prosecution
14 against Amanda Hoskins and Jonathan Taylor?
15    A   No.
16        MR. SLOSAR: Okay. Let's take a break.
17            (OFF THE RECORD)
18 BY MR. SLOSAR:
19    Q   All right. Mr. Steele, I think these are some
20 of the easy questions for you. I'm going to show you
21 some more exhibits, okay?
22    A   It's about time. Okay.
23    Q   In Ms. Hoskins' and Mr. Taylor's criminal
24 case, were you aware of any efforts by police officers
25 to coerce witnesses into giving false statements against

Page 89

1  Mr. – Ms. Hoskins or Mr. Taylor?
2     A   No.
3     Q   In Ms. Hoskins' and Mr. Taylor's criminal
4  case, were you aware of any efforts by police officers
5  to threaten witnesses into giving false statements
6  against Ms. Hoskins or Mr. Taylor?
7     A   No.
8     Q   If you had been aware of any efforts by police
9  officers to threaten witnesses into giving false
10 statements against Ms. Hoskins and Mr. Taylor, would you
11 have disclosed that information to the defense?
12    A   Yes.
13    Q   Would you have taken other actions with
14 respect to the police officers if you had learned that
15 type of conduct was taking place?
16    A   Yes.
17    Q   That is not conduct that you would have
18 tolerated, correct?
19    A   That is correct.
20    Q   That is not conduct that you would've approved
21 of, correct?
22    A   Correct.
23    Q   In Mr. Taylor's criminal case, were you aware
24 of any efforts by police officers to conduct a photo
25 show-up for Michael Crump?

Video Deposition of Jackie Steele taken on June 6, 2008                                90..93

Page 90

1       MR. WILLIAMS:  Object to the form.
2       A   Can you state that one more time for me?
3       Q   In Mr. Taylor's criminal case, were you aware
4   of any efforts by police officers to conduct a photo
5   show-up for Michael Crump?
6       MR. WRIGHT:  Objection.
7       MR. WILLIAMS:  Same objection.
8       A   I don't have any independent recollection of
9   – of that one way or the other if they did or did not.
10      Q   And sitting here today, do you – maybe let me
11  define what a photo show-up is.  Are you aware of what a
12  photo array would be?
13      A   Yes.
14      Q   Okay.  Sorry.
15      A   That's okay.
16      Q   And is it – in your general experience, does
17  a photo array include six photographs of similarly
18  depicted individuals?
19      MR. WRIGHT:  Object to form.
20      A   Yes.  I believe the Supreme Court spoke on
21  that issue and I think six is the minimum number.
22      Q   Okay.  And is it your understanding that a
23  photo show-up would generally just be a single
24  photograph?
25      A   No.

Page 91

1       Q   What do you – what does a photo show-up –
2       A   Well, let me – let me rephrase that.  A photo
3   show-up would – could be one individual.  Of course, if
4   you do that, you do have a very high likelihood of it
5   being suppressed for a photo show-up, unless there's
6   some very limited instances in which it would not be
7   suppressed.  So I believe the best course of action is
8   six, to get around the suppression issues.  There can be
9   a photo show-up with one, but again, your likelihood of
10  suppression of that will be suppressed.
11      Q   In your experience, is a photo show-up – or
12  let me withdraw that question.  In your experience, why
13  would a single photograph being shown to a witness be
14  likely to get suppressed at a court hearing?
15      MR. WRIGHT:  Objection to form.
16      MR. WILLIAMS:  Object to the form.  Objection.
17      Q   You can answer.
18      A   Again, it's  very specific circumstances, but
19  if I was to say – giving you an example, if I was to
20  say, "Elliot Slosar hit my vehicle out in the parking
21  lot as we left this hotel," and the officer said,
22  "Elliot Slosar" and they pull a photo of you up and
23  said, "Is that who you're talking about?" and I said,
24  "Yup, that's him.  That's Elliot Slosar," I have
25  independent knowledge of who Elliot Slosar is.  It's not

Page 92

1   somebody that I did not know, whereas if it's somebody
2   who says, "Hey, you know, I – I came home and it was
3   dark and – and I saw somebody run across the back, you
4   know, back of the kitchen on the way out the back door
5   and then they show a photo lineup, they don't know who
6   it is, but, "Yeah, that looks like the same person,"
7   that's a very high likelihood of being suppressed.
8       Q   Okay.  And the photo lineup that you just
9   talked about, would that be just the showing of a single
10  photograph?
11      MR. WRIGHT:  Object to form.
12      A   Well, I think –
13      A   In my – in my example?
14      Q   Yes.  In your example.
15      A   Yes.  The single photo.  Yes.
16      Q   And is that because, in your experience,
17  courts have found that the showing of a single
18  photograph of an unknown suspect is unduly suggestive?
19      MR. WRIGHT:  Object to form.
20      A   I think that's the – the language that the
21  courts would use.  Yes.
22      Q   Sitting here today, were you aware that
23  Detective York, Sheriff Pickard, and Chief Broughton
24  staged photographs of Jonathan Taylor at the
25  Barbourville Police Department and requested that Mr.

Page 93

1   Taylor put a hood on his head?
2       MR. WRIGHT:  Objection to the form. Foundation.
3       MR. WILLIAMS:  Objection to form.
4       MR. FARAH:  Objection to form.
5       A   I remember this issue coming up talking to
6   defense attorneys for Mr. Taylor, but I don't – I don't
7   have any knowledge of that through the officers of that
8   ever happening.  No.
9       Q   Did Detective York, Chief Broughton, or
10  Sheriff Pickard ever inform you that they were going to
11  request that Jonathan Taylor put a hoodie on – put a
12  hood on his head prior to taking photographs of him at
13  the Barbourville Police Department?
14      MR. WRIGHT:  Objection to form.
15      MR. KELLEY:  Objection to the form. Foundation.
16      MR. FARAH:  Objection.  Form.
17  BY MR. SLOSAR:
18      Q   You can answer.
19      A   No.  They did not call me beforehand, but let
20  me go back to your last question: Was I aware of that
21  being done?  I believe there's some photos in this
22  matter – this is why I think this is the manner in
23  which we were talking, discussing with defense
24  attorneys.  They would not file a motion to suppress or
25  quash the use of photos with a hoodie on and something

Video Deposition of Jack Miller, taken on June 6, 2008

94..97

Page 94

1  – I can't remember.  There was something other issue
2  early on in the – in this court proceeding, if I'm not
3  mistaken.  So the – the last question is: Was I aware
4  of that?  Yes.  Was I notified by law enforcement that
5  – no, I was not.
6      Q   Is it fair to say that you were aware that –
7  that photographs had been taken of Jonathan Taylor?
8      A   Yes.  That is correct.
9      Q   Were you aware that officers took certain
10  actions prior to taking those photographs?
11      MR. WRIGHT:  Object to the form.  Foundation.
12      MR. WILLIAMS:  Object to form.
13      A   Certain actions such as putting on a hoodie as
14  you were talking about before?
15      Q   Yes.  So I guess let me make it more specific.
16  Let me show you what we'll mark as Exhibit – this will
17  be 17.
18      A   Skipped – the last exhibit I've got is 15.
19  We've not –
20      Q   I know.  Yeah.  I'm going to give you –
21  sorry.  I'm going to hand you what is marked as Exhibit
22  16.  It's the deposition of Jason York.  And then I will
23  hand you what we'll mark as Exhibit 17, which is a
24  sketch that's done by Trooper Bunch for – based on
25  Michael Crump's description.

Page 95

1      (EXHIBIT 16 MARKED FOR IDENTIFICATION)
2      (EXHIBIT 17 MARKED FOR IDENTIFICAITON)
3      A   Okay.
4      Q   Okay?  So ignore Jason York's transcript for
5  now.
6      A   Okay.
7      Q   I'm going to ask you some questions about
8  this –
9      MR. FARAH:  What's Exhibit 15?
10      MR. SLOSAR:  15 is an arrest warrant and
11  criminal complaint.
12      MR. FARAH:  Oh, okay.
13      MR. SLOSAR:  It's Kayla Mills.
14      MR. FARAH:  Okay.  Thank you.
15  BY MR. SLOSAR:
16      Q   Okay.  I'm going to hand you what we'll mark
17  as Exhibit 18, which are photographs of Jonathan Taylor.
18  All right.  Sir, looking at Exhibit 18, do you see the
19  photographs of Jonathan Taylor?
20      (EXHIBTI 18 MARKED FOR IDENTIFICATION)
21      A   I do.  Yes.
22      Q   Okay.  During the criminal prosecution of Mr.
23  Taylor, did you learn that those photographs were taken
24  of him?
25      A   I believe these were the ones that was given

Page 96

1  to you by my office, correct?
2      Q   Sure.
3      A   Yeah.  I did.
4      Q   Actually, I don't know if this exact Bates
5  range was, but similar ones were –
6      A   Okay.
7      Q   – reproduced by your –
8      A   Yes.
9      Q   – office.  Yes.  Okay.  So having Exhibit 18
10  in front of you and 17 in front of you, which should be
11  the sketch.
12      A   Yes sir.
13      Q   Did any law enforcement officer tell you,
14  prior to the photographs taken of Jonathan Taylor at the
15  Barbourville Police Department, that they were going to
16  request that Mr. Taylor put a hoodie on his head in
17  order to take photographs for Michael Crump to view?
18      MR. WRIGHT:  Object to the form.
19      MR. WILLIAMS:  Object to the form.
20      Q   You can answer.
21      A   I don't recall that.  No.
22      Q   All right.  So you can put those down for
23  right now.  Thank you, sir.  Prior to today, were you
24  ever made aware that Detective York sent a photograph of
25  Jonathan Taylor with a hood on his head and the sketch

Page 97

1  done by Michael Crump to Oklahoma for Mr. Crump to make
2  an identification?
3      MR. WRIGHT:  Object to form.
4      A   I think you said a sketch done by Mr. Crump.
5  It was a sketch done by Mr. Bunch –
6      Q   Mr. Bunch, on behalf –
7      A   – based upon Mr. Crump's –
8      Q   Yes.  Description.
9      A   – identification – descriptions.
10      Q   Yeah.
11      A   I don't recall that I was aware of him sending
12  it to Oklahoma, no.
13      Q   Okay.  Prior to today, did Detective York ever
14  inform you that Mr. Crump viewed the photograph of Mr.
15  Taylor with a hood on his head and the sketch that was
16  done based on his description and informed Detective
17  York that he could not make an identification of Mr.
18  Taylor?
19      MR. WRIGHT:  Object to form and foundation.
20      MR. WILLIAMS:  Object to hearsay.
21      A   I – I believe I've always known that Mr.
22  Crump could not make an identification as to who it was,
23  Mr. Taylor, or if it wasn't Mr. Taylor, even the
24  individual that it was the – the person that – am I
25  answering your question?

Video Deposition of Michael Crump taken on June 18, 2008

Page 98

1    Q   My question's a little bit different.  Did –
2    A   Okay.
3    Q   – Detective York ever tell you that he sent a
4    photograph or photographs of Jonathan Taylor to
5    Oklahoma, along with a sketch, and then Mr. Crump looked
6    at Mr. Taylor's photograph and informed Detective York
7    that he could not make an identification of Mr. Taylor?
8         MR. WRIGHT:  Object to form.
9    A   Yeah.  I – I'm going to – I've answered the
10   fact that I didn't know he sent it to Oklahoma, so based
11   upon that response, I have to beg no on this response,
12   but I will say that Mr. York, even in his report, I
13   believe, says that Mr. Crump couldn't make an
14   identification of him, but I did not know of this
15   sequence of events in which you said that – Oklahoma,
16   could not make an identification.
17   Q   Okay.  Would you agree that sending a
18   photograph or photographs of Mr. Taylor by himself along
19   with a sketch to Mr. Crump would constitute a photo
20   show-up?
21        MR. WRIGHT:  Object to form.
22   A   That would be considered a photo show-up by
23   the courts, –
24   Q   And in your experience –
25   A   – in my opinion.

Page 99

1    Q   – with this type of – if an identification
2    had been made, would this type of investigative tactic
3    have likely been suppressed?
4         MR. WRIGHT:  Objection to form.
5         MR. WILLIAMS:  Trying to speculate.
6    Q   You can answer it.
7    A   I – I think it would've been brought to the
8    court's attention for the court to decide.
9    Q   If you had known that Detective York send a
10   photograph with Jonathan Taylor to Oklahoma and that an
11   identification was not made, would you have disclosed
12   that information to the defense?
13        MR. WRIGHT:  Object to form.  Foundation.
14   A   I'm not trying to split hairs here, but I
15   believe that had – that was made – I believe that
16   disclosure that he could not identify the individual was
17   made in the police report.  In his – if I'm not
18   mistaken, in the original police report Detective York
19   provided us was that he could not get an identification
20   of the – kind of gave a description that he had tattoos
21   on his hands, but didn't know the individual, couldn't
22   identify the individual.
23   Q   But you agree that there's not a – do you
24   recall there being a single police report that says that
25   Michael Crump looked at photographs and could not make

Page 100

1    an identification?
2         MR. WRIGHT:  Object to form.
3    A   No.  That is not included.
4    Q   Okay.
5    A   I'm sorry.  I interrupted.
6    Q   Is there any police report that you're aware
7    of that documents that the – some law enforcement
8    officers at the Barbourville Police Department attempted
9    to dress Jonathan Taylor like the sketch?
10        MR. FARAH:    Object to the form.
11        MR. WRIGHT:  Object to form.
12        MR. WILLIAMS:  Join.
13   BY MR. SLOSAR:
14   Q   Do you recall seeing a report like that, Mr.
15   Steele?
16   A   I do not remember seeing a report that they
17   dressed him up.
18   Q   Okay.  And I'm looking at page 25414 of the
19   police reports, which is an interview from
20   February 2, 2011 with Josh Bunch, Detective York, and
21   Michael Crump; are you there?
22   A   What was that number again?
23   Q   25414.
24   A   Okay.  I am.
25   Q   Will you review that and let me know when

Page 101

1    you're finished?
2    A   I reviewed it.
3    Q   Does that report document – let me withdraw
4    that.  Does that report that you just reviewed indicate
5    whether Mr. Crump could or could not make an
6    identification of the male who he saw at Katherine
7    Mills's residence on December 20, 2010?
8    A   It does not.
9    Q   Turning to page 25461, the case supplement
10   from Mike Cornett.
11   A   Uh-huh.
12   Q   Would you please review that document, as
13   well?
14        MR. WRIGHT:  What number is that one?
15   Q   25461.
16   A   I have reviewed it.
17   Q   Does this report by Detective Cornett give any
18   indication as to whether Mr. Crump could or could not
19   make an identification of the male he saw at Katherine
20   Mills' residence on December 20, 2010?
21   A   It does not.
22   Q   Are you aware of any other reports that were
23   created during the course of the Katherine Mills
24   investigation that give any indication as to whether Mr.
25   Crump is or is unable to make an identification of the

Video Deposition of Jackie Steele taken on June 24, 2019

Page 102

1 male subject he saw at Katherine Mills' residence on
2 December 20, 2010?
3     A    There's none other that I'm aware of.  No.
4     Q    Okay.  So, would it have been important for
5 you, as a prosecutor, to know that Mr. Crump looked at a
6 photograph of Jonathan Taylor and declined to make an
7 identification of him as the person who he saw at
8 Katherine Mills' residence on December 20, 2010?
9         MR. WRIGHT:  Object to form.
10        MR. WILLIAMS:  Foundation.
11    A    I think all information's important for me to
12 have, so yeah, I think – yeah.  Obviously, any
13 information would've been important to have.
14    Q    Should the law enforcement officer or officers
15 involved in that attempt to make an identification have
16 documented their efforts?
17        MR. WRIGHT:  Object to form.
18        MR. WILLIAMS:  Objection to the form.
19    A    I don't know that I'm qualified to answer that
20 from what they should or should not do from a job
21 perspective, in that I don't set the policy for state
22 police in – in what they should and should not
23 document.
24    Q    Well, would you have – in a capital murder
25 case, would you have expected the law enforcement agency

Page 103

1 that's conducting the criminal investigation to document
2 any efforts to obtain an identification from Michael
3 Crump?
4         MR. WRIGHT:  Objection to the form.
5         MR. KELLEY:  Object to form.
6         MR. WILLIAMS:  Join.
7     A    My expectation would be the same in a capital
8 murder case or a class D felony case.  I'm – what I
9 would want them to do would be to document it and make
10 sure I have it.  Yes.
11    Q    All right.  In the underlying criminal case,
12 were you aware of any efforts by police officers to
13 provide facts about the crime to witnesses so that they
14 could construct a false statement implicating Amanda
15 Hoskins or Jonathan Taylor?
16        MR. WRIGHT:  Object to form.
17        MR. KELLEY:  Objection to the form.
18        MR. WILLIAMS:  Object to form.
19 BY MR. SLOSAR:
20    Q    You can answer.
21    A    No.
22    Q    If you had been aware of any efforts by police
23 officers to provide facts about the crime to witnesses
24 so that they could falsely implicate Amanda Hoskins or
25 Johnathan Taylor, would you have disclosed that

Page 104

1 information to the defense?
2     A    Yes.
3     Q    Would you have taken other actions with
4 respect to the police officers if you had learned that
5 type of conduct was taking place?
6     A    Yes.
7     Q    That is not conduct that you would have
8 tolerated, correct?
9     A    That is correct.
10    Q    That is not conduct that you would've approved
11 of, correct?
12    A    Correct.
13    Q    In the underlying criminal case, would – were
14 you aware of any efforts by police officers to fabricate
15 statements implicating Amanda Hoskins or Jonathan
16 Taylor?
17    A    No.
18    Q    If you had been aware of efforts like this,
19 would you have disclosed that information to the
20 defense?
21    A    Yes.
22    Q    Would you have taken other actions with
23 respect to the law enforcement officers if you had
24 learned that type of conduct was taking place?
25    A    Yes.

Page 105

1     Q    That is not conduct that you would have
2 tolerated, correct?
3     A    Correct.
4     Q    That is not conduct that you would've approved
5 of, correct?
6     A    Correct.
7     Q    In Ms. Hoskins and Ms. Taylor – and Mr.
8 Taylor's criminal case, were you aware of any efforts by
9 police officers to destroy evidence?
10    A    No.
11    Q    If you had been aware of any efforts by police
12 officers to destroy evidence, would you have disclosed
13 that information to the defense?
14    A    Yes.
15    Q    Would you have taken other actions with
16 respect to the law enforcement officers if you had
17 learned that was taking place?
18    A    Yes.
19    Q    That is not conduct that you would've
20 tolerated, correct?
21    A    Correct.
22    Q    That is not conduct that you would've approved
23 of, correct?
24    A    Correct.
25    Q    In Ms. Hoskins' or Mr. Taylor's criminal case,

Video Deposition of Jackie R. Steele, taken on June 06, 2018
106..109

Page 106

1  were you aware of any efforts by police officers to hide
2  police interviews or statements obtained from witnesses?
3      A   No.
4      Q   If you had been aware of that type of conduct,
5  would you have disclosed that information to the
6  defense?
7      A   Yes.
8      Q   Would you have taken other actions with
9  respect to the police officers if you had learned that
10  was taking place?
11      A   Yes.
12      Q   That is not conduct that you would've
13  tolerated, correct?
14      A   Correct.
15      Q   That is not conduct that you would've approved
16  of, correct?
17      A   Correct.
18      Q   In Ms. Hoskins' or Mr. Taylor's criminal case,
19  were you aware of any efforts by police officers to hide
20  recorded interviews from witnesses?
21      A   No.
22      Q   If you had been aware of any efforts by
23  officers to hide police recordings from witnesses, would
24  you have disclosed that information to the defense?
25      A   Yes.

Page 107

1      Q   Would you have taken other actions with
2  respect to the police officers if you had known that was
3  taking place?
4      A   Yes.
5      Q   That is not conduct that you would've
6  tolerated, correct?
7      A   Correct.
8      Q   That is not conduct that you would've approved
9  of, correct?
10      A   Correct.
11      Q   In Ms. Hoskins' or Mr. Taylor's criminal case,
12  were you aware of any efforts by police officers to hide
13  police reports?
14      A   No.
15      Q   If you had been aware of any efforts by
16  officers to hide police reports, would you have
17  disclosed that information to the defense?
18      A   Yes.
19      Q   Would you have taken other actions with
20  respect to the officers if you had learned that was
21  taking place?
22      A   Yes.
23      Q   That is not conduct that you would've
24  tolerated, correct?
25      A   Correct.

Page 108

1      Q   That is not conduct that you would've approved
2  of, correct?
3      A   Correct.
4      Q   In Ms. Hoskins' or Mr. Taylor's criminal case,
5  were you aware of any efforts by Detective York to
6  testify falsely at the Grand Jury?
7      A   No.
8      Q   If you had been aware of efforts by Detective
9  York to testify falsely at the Grand Jury, would you
10  have disclosed that information to the defense?
11      A   Yes.
12      Q   Would you have taken other actions with
13  respect to Detective York?
14      A   Yes.
15      Q   That is not conduct that you would've
16  tolerated, correct?
17      A   Correct.
18      Q   That is not conduct that you would've approved
19  of, correct?
20      A   Correct.
21      Q   In Ms. Hoskins' or Mr. Taylor's criminal case,
22  were you aware of any efforts by police officers to hide
23  witness recantations?
24      A   No.
25      Q   If you had been aware of any efforts by police

Page 109

1  officers to hide witness recantations, would you have
2  disclosed that information to the defense?
3      A   Yes.
4      Q   Would you have taken other actions with
5  respect to the law enforcement officers if you had
6  learned that was taking place?
7      A   Yes.
8      Q   That is not conduct that you would've
9  tolerated or approved, correct?
10      A   Correct.
11      Q   Up through the time -- well, up through the
12  time that you filed a motion to dismiss in July of 2016,
13  were you ever made aware that the March 16, 2012
14  statement from Kayla Mills was false?
15      MR. WILLIAMS:  Object to the form.
16      Q   Up through the time that you filed a motion to
17  dismiss in July of 2016, were you ever made aware that
18  the March 16, 2012 statement of Kayla Mills was
19  fabricated by law enforcement officials?
20      MR. WILLIAMS:  Objection to the form.
21      MR. KELLEY:  Objection to form.
22      MR. WRIGHT:  Join.
23      A   No.
24  BY MR. SLOSAR:
25

Video Deposition of Jackie Steele taken 11/5 2008

110..113

Page 110

1    Q   Up through the time the charges were dismissed
2  against Amanda Hoskins and Jonathan Taylor in the summer
3  of 2016, were you ever made aware that Detective York
4  initiated criminal charges against Kayla Mills on
5  March 14, 2012 for the murder of Katherine Mills?
6       MR. WRIGHT:  Object to form.
7    A   No.
8    Q   Going to show you what's marked as Exhibit 15
9  and ask for you to take a look at this document, sir.
10      (EXHIBIT 15 MARKED FOR IDENTIFICATION)
11   A   Okay.
12   Q   Prior to coming in here today, have you ever
13 seen the criminal complaint and arrest warrant that was
14 signed by Detective York on March 14, 2012, initiating
15 charges against Kayla Mills for the murder of Katherine
16 Mills?
17      MR. WRIGHT:  Object to form.
18   A   No.  Not that I can recall ever seeing this
19 before.
20   Q   Is this something that, as a prosecutor in the
21 criminal felony murder case against Amanda Hoskins and
22 Jonathan Taylor, that you would've wanted to know about
23 during the pending prosecution?
24      MR. WRIGHT:  Object to form.
25   A   Yes.

Page 111

1    Q   Up through the time that you dismissed the
2  criminal charges against Ms. Hoskins and Mr. Taylor in
3  the summer of 2016, were you ever made aware that Kayla
4  Mills was promised consideration prior to giving a
5  statement against Jonathan Taylor on March 16, 2012?
6       MR. WRIGHT:  Objection to form.
7       MR. KELLEY:  Object to the form.
8    A   No.
9    Q   Sir, I'm going to ask for you to look at a
10 deposition transcript.  It's Exhibit 16.  And turn to
11 page 158.  Actually, I'm sorry, 162.  When you get
12 there, I'm going to ask that you read lines 9 through 18
13 and tell me when you're done.
14      MR. WRIGHT:  What page is he on?  I'm sorry.
15      MR. SLOSAR:  162.
16      THE WITNESS:  162.
17 BY MR. SLOSAR:
18   Q   I'd actually ask you to read up until line 21,
19 so 9 through 21.
20   A   Okay.
21   Q   And tell me when you're done.
22   A   Okay.
23   Q   Prior to today's deposition, were you ever
24 made aware that Detective York reached an agreement with
25 Kayla Mills that if she gave a statement implicating

Page 112

1  Jonathan Taylor in the murder of Katherine Mills that
2  Detective York would not proceed forward with the arrest
3  warrant criminal complaint filed against her for the
4  murder of Katherine Mills?
5       MR. WRIGHT:  Object to form.
6    A   No.  I don't recall ever being notified of
7  that.
8    Q   Is that information, as a prosecutor, that you
9  would've expected a law enforcement agency to provide to
10 you during the course of the criminal prosecution?
11      MR. WRIGHT:  Object to form.
12      MR. KELLEY:  Objection to form.
13   A   Yes.
14   Q   Is that information that, if you had known it,
15 you would've disclosed it to the defense?
16      MR. WRIGHT:  Object to form.
17   A   Yes.
18   Q   And would you have disclosed such information
19 to the defense because you would believe it to be either
20 defined as exculpatory evidence under Brady vs. Maryland
21 or impeachment under -- evidence under Giglio that you
22 would be required to turn over?
23   A   Yes.
24      MR. WRIGHT:  Object to form.
25   A   Yes.

Page 113

1    Q   If you learned that Kayla Mills'
2  March 16, 2002 statement against Jonathan Taylor and
3  Amanda Hoskins was either false or fabricated by law
4  enforcement officers, would you have used that evidence
5  to continue charges against Ms. Hoskins and Mr. Taylor?
6       MR. WRIGHT:  Object to form.
7       MR. KELLEY:  Objection.  Form.
8    A   Can you repeat that for me again?  I'm sorry.
9    Q   Sure.  If you learned that Kayla Mills'
10 statement was false and fabricated by law enforcement
11 officers, would you have used that evidence to continue
12 the initiation of charges against Amanda Hoskins and
13 Jonathan Taylor?
14      MR. WRIGHT:  Object to form.
15   A   No.
16   Q   If you learned that Kayla Mills was threatened
17 by police or promised consideration for giving a false
18 and fabricated statement, would you have used that
19 evidence to continue the initiation of charges against
20 Amanda Hoskins and Jonathan Taylor?
21      MR. WRIGHT:  Object to form.
22      MR. KELLEY:  Objection.
23   A   No.
24   Q   If you learned that Kayla Mills' statement was
25 fabricated and false, would you have allowed any

VIDEO Deposition of JACKIE STEELE taken on Tuesday, June 4, 2019
114..117

Page 114

1  prosecutor in your office to use that evidence to
2  initiate charges against Amanda Hoskins or Jonathan
3  Taylor?
4      MR. WRIGHT:  Object to form.
5      A   I think I know what you're getting at, but we
6  don't initiate charges out of my office, regardless.
7      Q   I guess, let me withdraw the question.  If you
8  learned that Kayla Mills' statement was false and
9  fabricated, would you have allowed any prosecutor in
10 your office to have that evidence presented before a
11 Grand Jury?
12      MR. WRIGHT:  Object to form.
13     A   No.
14     Q   If you had learned that law enforcement
15 officers threatened Kayla Mills into repeating a false
16 and fabricated statement, would you have taken steps to
17 immediately stop the criminal charges against Amanda
18 Hoskins and Jonathan Taylor?
19      MR. WILLIAMS:  Objection to form.
20      MR. KELLEY:  Objection.
21      MR. WRIGHT:  Object to form.
22     A   No.
23 BY MR. SLOSAR:
24     Q   So it's your testimony here today that if you
25 learned that evidence was false and fabricated, that you

Page 115

1  would've still continued the charges against the
2  defendants?
3      A   If that was the only evidence, I would have
4  stopped the prosecution, obviously, under my
5  responsibilities and duties, and in this case, Kayla
6  Mills' – Kayla Mills' statement wasn't the only
7  statement we had.  Even – even after Kayla Mills died,
8  I knew we weren't going to use her statement and we
9  proceeded on with the prosecution.
10     Q   We're going to get to these other witness
11 statements –
12     A   Okay.
13     Q   – in short order.  Sitting here today, can
14 you recall a single other case where a detective signed
15 a criminal complaint and arrest warrant against a
16 witness in your prosecution for murder and then released
17 that person from a police station in exchange for giving
18 a statement?
19      MR. WRIGHT:  Object to form.
20     A   I don't recall.
21     Q   Can you recall a single other case where a
22 detectives signed a criminal complaint and arrest
23 warrant against a witness for murder charges and did not
24 inform you during the pending prosecution that was
25 ongoing against other defendants in that case?

Page 116

1      A   I don't recall.
2      MR. WRIGHT:  Object to form.
3      Q   Does this type of conduct shock you?
4      MR. WRIGHT:  Object to form.
5      A   No.
6      Q   Is this the type of conduct that you would
7  expect Detective York to use in criminal investigations?
8      MR. WRIGHT:  Object to form.
9      A   No.
10     Q   How come you're not shocked by Detective
11 York's initiation of charges against Kayla Mills in the
12 murder of Katherine Mills without ever disclosing that
13 to your office; why doesn't that shock you?
14      MR. WRIGHT:  Object to form.
15     A   I guess – I guess you could say that if
16 you've done this so long, the things you've seen, the –
17 the level that requires you to shock value increases,
18 unfortunate.  Is this the type of investigative work I'd
19 like to see?  No.  But does it shock me?  No.  So, you
20 know, I – unfortunately, officers make mistakes and
21 some of them make a lot worse mistakes than this and –
22 some of them are in federal prison now.  Those are the
23 things that shock me, I guess you could say.
24     Q   It's your understanding prior to today that
25 Michael Crump has never made an identification in this

Page 117

1  case, correct?
2      A   It's my understanding.  Yes.
3      Q   Have you ever referred law enforcement
4  officers to an outside agency for prosecution?
5      A   I have.  Yes, sir.
6      Q   And do you believe that when law enforcement
7  officers lie under oath that they should be held
8  criminally responsible?
9      A   I do.
10     Q   Do you believe that when law enforcement
11 officers lie under oath in a capital murder case, that
12 should – that they should be held criminally
13 responsible?
14     A   I believe if they lie under oath regarding a
15 capital murder case or a possession of methamphetamine
16 case they should be held responsible.
17     Q   Mr. Steele, I am going to assume that you
18 would never want to be put in the position where you
19 wrongfully convict somebody as a prosecutor; is that
20 right?
21     A   Absolutely.
22     Q   And I'm going to assume that you would never
23 want to be in a position where you could wrongfully
24 convict somebody and send them to death row as a
25 prosecutor?

Video Deposition of Jackie STEELE taken on June 19, 2018

118..121

Page 118

1    A    That's correct.

2    Q    Is that one of your worst fears?

3    A    Absolutely.

4    Q    Going to show you what we'll mark as Exhibit
5  number 19, which is Bates stamped KSP337, an affidavit
6  for a search warrant.  Going to show you what we'll mark
7  as Exhibit number 20, KSP339, another application for a
8  search warrant.  Mr. Steele, looking at Exhibit 19, --

9    A    Okay.

10    Q    -- do you recognize this type of document?

11        (EXHIBIT 19 MARKED FOR IDENTIFICATION)

12        (EXHIBIT 20 MARKED FOR IDENTIFICATION)

13    A    Yeah.  This is an affidavit for a search
14  warrant.

15    Q    Okay.  Are you familiar with these in your
16  capacity as a prosecutor?

17    A    I am.

18    Q    And can you generally explain to me the
19  process for what a law enforcement officer has to go
20  through to get a search warrant?

21    A    Yeah.  They have to have probable cause for
22  the issuance of a search warrant.  They would also
23  document, you know, what they want to search, place or
24  person they want to search for the court, and then
25  they'd attach an affidavit to the search warrant given

Page 119

1  the court guides and background as to why -- why
2  probably cause had been met.

3    Q    Is it your understanding that affidavits for
4  search warrants are signed and sworn under oath?

5    A    Yes.

6    Q    Okay.  And from looking at KSP337, can you
7  determine who the affiant is on this search warrant --
8  affidavit for a search warrant?

9    A    You're still looking at KSP3 --

10    Q    Oh, yes.

11    A    -- oh, I'm sorry.  I didn't see it-- different
12  numbering system.  All right.  So on the back of K -- on
13  the back page of that, it's KSP338 and it appears to be
14  Detective Jason York's signature as the officer.

15    Q    Okay.  And from looking at this document, are
16  you able to determine when this was -- when Detective
17  York's sworn -- the statements that are made in this
18  affidavit?

19    A    Appears to be it was sworn between district
20  judges.  It appears that signature is Wendell Skip
21  Hammons' on February 15, 2011 at 11:02 a.m.

22    Q    Would you agree with me that this is a little
23  bit more than a year prior to the initiation of charges
24  against Amanda Hoskins and Jonathan Taylor in March of
25  2012?

Page 120

1    A    Yes.

2    Q    Okay.  According to this affidavit, do you see
3  where it says, at the -- 338 in the first paragraph,
4  "Jessie Lawson stated he called Mike Simpson to advise
5  him that Katherine Mills had died.  Jessie Lawson stated
6  Mike Simpson started crying.  This call took place on
7  12-22-2010.  Mike Simpson has been identified to be near
8  Katherine Mills' residence the day she was robbed and
9  found dead"; do you see that, sir?

10    A    I do.

11    Q    Prior to today's date, did Detective York ever
12  tell you that Mike Simpson had been identified as the
13  male individual at Katherine Mills' residence on
14  December 20, 2010?

15    A    No.

16    Q    Is that information that you would've expected
17  a law enforcement officer to inform you during the
18  ongoing criminal charges against Amanda Hoskins and
19  Jonathan Taylor?

20        MR. WRIGHT:  Object to form.

21    A    (Coughs.) Excuse me.  I would think if -- if
22  an individual had been identified in the -- just looking
23  at the affidavit, reading from the -- identified at the
24  residence, that they -- they would be included in the
25  case report as -- as such.

Page 121

1    Q    Is that information that you would've expected
2  a law enforcement officer to tell you yourself or a
3  member of your office prior to testifying at the Grand
4  Jury proceeding to initiate charges against Amanda
5  Hoskins, Jonathan Taylor, and William Lester?

6        MR. WRIGHT:  Object to form.

7    A    I -- I -- again, like I said, I think it would
8  -- should've been included in their case report, which
9  we would've had at the Grand Jury, so I guess the answer
10  to all that's "yes," since they're -- they're providing
11  their report at Grand Jury, we would all be notified.

12    Q    And asking you to turn to Exhibit 20, which is
13  KSP339.  Again, this looks like an affidavit that was
14  signed on February 15, 2011; is that right, sir?

15    A    February 15, 2011.  Yes.

16    Q    And according to the paragraph -- do you see
17  where it says that, "This affiant has learned
18  information on February 4, 2011, approximately 9:30
19  a.m.," and then it says, "The following information, do
20  you see that, sir"?

21    A    I do.  Yes.

22    Q    Okay.  Do you see where it says, "Mike Simpson
23  gave this unit a number of 606-622-1780 as a contact
24  number for him.  Mr. Simpson has been identified by
25  Michael Crump being at Katherine Mills' residence the

VIDEO Deposition of JACKIE STEELE taken on June 25, 2008

122..125

Page 122

1  morning she was robbed and found dead"; do you see that,
2  sir?
3     A   I do.
4     Q   Prior to today's date, have you ever seen this
5  search warrant affidavit signed by Detective York on
6  February 15, 2011?
7     A   I don't recall ever seeing this, sir.
8     Q   Prior to today's date, did Detective York ever
9  inform you that Michael Crump identified Mike Simpson as
10  the male seen at Katherine Mills' residence on
11  December 20, 2010?
12     A   No.
13     Q   Between the time that charges were initiated
14  against Amanda Hoskins and Jonathan Taylor and the time
15  that you filed the motion to dismiss their case in the
16  summer of 2016, were you ever made aware that Michael
17  Crump identified Mike Simpson as the male individual he
18  saw leaving Katherine Mills' residence on
19  December 20, 2010?
20        MR. WRIGHT:  Object to form.
21     A   Not that I recall.  No.
22     Q   In any of your conversations with Mr. Crump,
23  did he ever inform you that he identified Mike Simpson
24  as the male individual he saw leaving Katherine Mills'
25  residence on December 20, 2010?

Page 123

1     A   No.
2     Q   If you had been made aware of the information
3  contained in Detective York's affidavit, namely that
4  Michael Crump identified Mike Simpson, would you have
5  disclosed that information to the defense?
6     A   Yes.
7        MR. WRIGHT:  Object to form.
8     A   Yes.
9     Q   And is that because you would consider that
10  the three – Kentucky Supreme Court rule 3.8 and your
11  ethical obligations under Brady would require you to
12  disclose such evidence?
13        MR. WRIGHT:  Object to form.
14     A   I think under Giglio, also, I think it'd be
15  impeachment evidence, so yes.  I – under – several
16  different reasons, I believe that should be discovered.
17     Q   If you learned that Mr. Crump identified Mike
18  Simpson, would you have taken steps to reevaluate the
19  pending criminal charges you had against Amanda Hoskins
20  and Jonathan Taylor?
21        MR. WRIGHT:  Object to form.
22     A   Yes.
23     Q   And earlier, if you had learned that Kayla
24  Mills' statement was false and fabricated, would you
25  have taken steps to reevaluate the pending charges that

Page 124

1  you had against Amanda Hoskins and Jonathan Taylor?
2        MR. WRIGHT:  Object to form.
3     A   Yes.
4     Q   Sir, as Detective York informed the Grand Jury
5  that Michael Crump described Jonathan Taylor as the male
6  that he saw at Katherine Mills' residence, are you aware
7  of Mr. Crump ever identifying Jonathan Taylor as the
8  male individual that he saw walking around Katherine
9  Mills' residence on December 20, 2010?
10        MR. WRIGHT:  Object to the form of the
11  question.
12     Q   You can answer.
13     A   No.  I am not.
14     Q   In your conversations with Mr. Crump, did he
15  ever tell you that Mr. Taylor is the male individual he
16  that he saw walking around Katherine Mills' residence?
17     A   No, he did not.
18     Q   Sir, Detective York has testified in this case
19  that he sent photographs of Jonathan Taylor to Oklahoma
20  so that Mr. Crump could make an identification.  Were
21  you ever informed about that at any point prior to the
22  dismissal of charges in the summer of 2016?
23     A   I don't recall ever being informed of anything
24  about Oklahoma in this case.
25     Q   Were you made aware that Sheriff Pickard,

Page 125

1  Chief Broughton, and Detective York dressed Mr. Taylor
2  up at the Barbourville Police Department to have him
3  appear similar to the sketch that was created by Mr.
4  Bunch?
5        MR. WRIGHT:  Objection to the form of the
6  question.
7        MR. KELLEY:  Objection.  Foundation.
8        MR. WILLIAMS:  Object to form.
9        MR. FARAH:  Objection.
10     A   Yes.
11     Q   And is it fair to say that you were only made
12  aware of that after receiving the photographs?
13        MR. WRIGHT:  Object to form.
14     A   I don't know if it was – it was after we –
15  in my – my recollection is it was after it was done,
16  but I don't know if it was after I received the
17  photographs or before I received the photographs, but it
18  was already done.  That was my recollection of that.
19     Q   Did any of those law enforcement officers ever
20  tell you that they dressed Mr. Taylor up to look like
21  the sketch?
22        MR. WRIGHT:  Objection to form.
23        MR. WILLIAMS:  Object to the form of the
24  question.  Lack of foundation.
25        MR. FARAH:  Object to the form.

Video Deposition of Rodney Scott Harris, June 25, 2019
126..129

Page 126

1      A    I don't remember – no, I don't remember
2   officers ever telling me they dressed him like the
3   sketch.  I believe I was – the defense attorneys were
4   the ones who brought it up in the court proceeding, and
5   I want to say that's when I became aware of it.
6      Q    If law enforcement officers had told you,
7   prior to taking photographs of Mr. Taylor, that they
8   were going to ask that he put on a hoodie, put a hood on
9   his head, take some of his hair off so that he could
10  appear as similar as possible to the sketch for the
11  purpose of having Michael Crump look at it, what would
12  you have advised them to do?
13     MR. WRIGHT:  Object to form.
14     A    I would've advised them first in the
15  difference of a photo array or a photo show-up, and then
16  I would – I would've cautioned them not to use a photo
17  show-up, and that if they're going to put one person in
18  the hoodie, coat, whatever they were using, to put them
19  all in that.  That would've been the advice I gave them.
20     Q    And why would you want to assure that it was
21  done in the manner that you just described?
22     A    Again, going back to the guides that we've
23  been given by the federal courts and supreme courts in
24  regards to show-ups and lineups, that's the guide –
25  that's – my deciphering of those cases would've been

Page 127

1   the reason why I gave them that guidance.
2      Q    Up through the time that you dismissed the
3   charges against Ms. Hoskins and Mr. Taylor in the summer
4   of 2016, were you ever made aware the the June 24, 2011
5   statement of Joe King was false and fabricated by law
6   enforcement officials?
7      A    No.
8      MR. WRIGHT:  Objection to form.
9      MR. KELLEY:  Object to form.
10     MR. WILLIAMS:  Join.
11  BY MR. SLOSAR:
12     Q    If you had been made aware of that
13  information, would you have disclosed that to the
14  defense?
15     A    Yes.
16     Q    And is that because you would consider this
17  evidence to be material and required to be turned over?
18     A    Yes.
19     Q    If you learned that Mr. King's statement was
20  false, fabricated by law enforcement officers, would you
21  have continued using that evidence to continue charges
22  against Ms. Hoskins and Mr. Taylor?
23     MR. WRIGHT:  Object to form.
24     MR. WILLIAMS:  Join.
25     A    No.

Page 128

1      Q    And if you learned that Mr. King's statement
2   was false and fabricated by law enforcement officers,
3   would you have reevaluated the continuation of criminal
4   charges against Amanda Hoskins and Jonathan Taylor?
5      MR. WRIGHT:  Object to form.
6      A    Yes.
7      Q    If you learned that Mr. King was threatened by
8   law enforcement into giving a false statement, would you
9   have used that evidence to continue the initiation of
10  charges against Amanda Hoskins and Jonathan Taylor?
11     MR. WRIGHT:  Object to form.
12     MR. KELLEY:  Objection to form.
13     A    No.
14     Q    Up through the time that charges were
15  dismissed – well, let me withdraw that question.  Up to
16  the time that you moved to dismiss charges against
17  Amanda Hoskins and Jonathan Taylor in the summer of
18  2016, were you ever made aware that the March 13, 2012
19  statement of Amber Simpson was false?
20     A    No.
21     Q    Up through the time that you moved to dismiss
22  criminal charges against Amanda Hoskins and Jonathan
23  Taylor in the summer of 2016, were you ever made aware
24  that the March 13, 2012 statement of Amber Simpson was
25  fabricated by law enforcement officials?

Page 129

1      MR. WRIGHT:  Object to the form.
2      A    No.
3      Q    If you had been made aware of that
4   information, would you have disclosed that to the
5   defense?
6      A    Yes.
7      Q    Would you have disclosed that to the defense
8   because you would believe that this evidence is material
9   and required to be turned over?
10     A    Yes.
11     Q    If you learned that Ms. Simpson's statement
12  was false or fabricated by the police, would you have
13  used that evidence to continue charges against Amanda
14  Hoskins and Jonathan Taylor?
15     A    No.
16     MR. WRIGHT:  Object to form.
17     Q    If you learned that Ms. Simpson was threatened
18  by police or promised consideration for giving her false
19  and fabricated statement, would you have used that
20  evidence to initiate or continue charges against Ms.
21  Hoskins and Mr. Taylor?
22     MR. WRIGHT:  Object to form.
23     A    No.
24     Q    If you learned that the police threatened Ms.
25  Simpson into a false and fabricated statement, would you

VIDEOTAPED DEPOSITION OF JACKIE STEELE - taken 11/29/2018

130..133

Page 130

1  have reevaluated the continuation of charges against
2  Amanda Hoskins and Jonathan Taylor?
3      MR. WRIGHT:  Object to form.
4  A  Yes.
5  Q  Up until the summer of 2016 when you filed
6  motions to dismiss criminal charges against Amanda
7  Hoskins and Jonathan Taylor, were you ever made aware
8  that the March 8, 2012 statement of Allen Helton was
9  false and fabricated by law enforcement officials?
10     MR. WRIGHT:  Objection to form.
11     MR. KELLEY:  Object to form.
12     MR. WILLIAMS:  Lack of foundation.
13 BY MR. SLOSAR:
14  Q  Up through the time that you moved to dismiss
15  the criminal cases against Amanda Hoskins and Jonathan
16  Taylor in the summer of 2016, were you ever made aware
17  that Allen Helton was promised consideration from law
18  enforcement officials in exchange for giving his false
19  March 8, 2012 statement?
20     MR. WRIGHT:  Object to form.
21     MR. KELLEY:  Objection to form.
22     MR. WILLIAMS:  Objection.
23  A  No.
24  Q  If you had been made aware of that
25  information, would you have disclosed that to the

Page 131

1  defense?
2      MR. WRIGHT:  Object to form.
3  A  Yes.
4  Q  And is that because you would consider this
5  evidence to be material and thus required to be turned
6  over under your ethical obligations?
7  A  Yes.
8  Q  If you learned that Mr. Helton's March 8, 2012
9  statement was false and fabricated by law enforcement,
10  would you have used that evidence to continue criminal
11  charges against Amanda Hoskins and Jonathan Taylor?
12     MR. WRIGHT:  Object to form.
13     MR. KELLEY:  Object to form
14     MR. WILLIAMS:  Objection to form.
15  A  No.
16  Q  If you learned that Mr. Helton was threatened
17  by police or promised consideration in exchange for
18  giving a false and fabricated statement, would you have
19  used that evidence to initiate or continue charges
20  against Amanda Hoskins and Jonathan Taylor?
21  A  No.
22     MR. WILLIAMS:  Same objection.
23     MR. WRIGHT:  Join.
24  Q  If you learned that law enforcement made
25  promises of consideration to Allen Helton in exchange

Page 132

1  for a false and fabricated statement, would you have
2  reevaluated the continuation of criminal charges against
3  Amanda Hoskins and Jonathan Taylor?
4      MR. WRIGHT:  Object to form.
5      MR. WILLIAMS:  Same objection.
6  A  Sorry.  Yes.
7  Q  Now, I'm going to hand you Exhibit 21.  Sir,
8  this is a letter Bates stamped PL4844; do you recognize
9  this letter?
10     (EXHIBIT 21 MARKED FOR IDENTIFICATION)
11  A  Yes.
12  Q  Okay.  Now, I asked you some questions earlier
13  relating to promises of consideration in exchange for
14  giving a false and fabricated statement.
15  A  Uh-huh.
16  Q  Would you agree that nothing in this document
17  indicates that Sheriff Pickard promised Mr. Helton
18  consideration in exchange for giving a false and
19  fabricated statement against Amanda Hoskins and Jonathan
20  Taylor?
21  A  I would agree with that.
22  Q  Okay.  According to this document, Sheriff
23  Pickard reveals that he made some promises to Mr. Helton
24  in exchange for "a lot of information on the Mills
25  lady's murder"; is that right?

Page 133

1      MR. WRIGHT:  I'll object to form on that.
2  Q  Quoting from the statement.
3  A  That's what the statement says.  Yes.
4  Q  Okay.  So is it fair to say that Sheriff
5  Pickard never told you that he promised Mr. Helton
6  consideration or assistance in his criminal cases in
7  exchange for a false and fabricated statement against
8  Amanda Hoskins and Jonathan Taylor?
9      MR. KELLEY:  Objection as to form.
10  A  That's true.
11  Q  Okay.  Did Sheriff Pickard ever ask you to
12  help Mr. Helton on his criminal cases after sending you
13  this letter?
14  A  No, he did not.
15  Q  Okay.  Did you ever provide any assistance for
16  Mr. Helton on his criminal cases?
17  A  I did not.
18  Q  Okay.  All right.  Up until the time that you
19  moved to dismiss the criminal charges against Amanda
20  Hoskins and Jonathan Taylor in the summer of 2016, were
21  you ever informed by law enforcement officials that
22  Christy Branson's statement was false?
23     MR. WRIGHT:  Objection as to form.
24     MR. KELLEY:  Object to form, as well.
25  A  No.

VIDEO DEPOSITION OF JACKIE STEELE - Wednesday, June 6, 2018

134..137

Page 134

1    Q   Up through the time that you moved to dismiss
2  criminal charges against Amanda Hoskins and Jonathan
3  Taylor in the summer of 2016, were you ever informed by
4  law enforcement officials that Christy Branson's
5  statement was fabricated?
6       MR. WRIGHT:  Objection as to form.
7       MR. KELLEY:  Join.
8    A   No.
9    Q   If you had been made aware of that
10 information, would you have disclosed that to the
11 defense?
12   A   Yes.
13   Q   Would you have done so because of your ethical
14 obligations as a prosecutor?
15      MR. WRIGHT:  Object to form.
16   A   Yes.
17   Q   If you learned that Ms. Branson's statement
18 was declared false or fabricated, would you have used
19 that evidence to continue charges against Amanda Hoskins
20 and Jonathan Taylor?
21      MR. WRIGHT:  Object to form.
22   A   No.
23   Q   If you learned that Ms. Branson's statement
24 was either false or fabricated, would you have
25 reevaluated the pending charges against Amanda Hoskins

Page 135

1  and Jonathan Taylor?
2       MR. WRIGHT:  Object to form.
3    A   Yes.
4    Q   Almost there.  Up through the time of --
5    A   Only four more to go.
6    Q   -- the dismissal against -- in the summer of
7  2016, were you ever informed by law enforcement
8  officials that Daniel Wilson's July 18, 2012 statement
9  was false?
10      MR. WRIGHT:  Object to form.
11   A   No.
12   Q   Up until the time that you moved to dismiss
13 charges against Ms. Hoskins in July of 2016, were you
14 ever informed by law enforcement officials that Daniel
15 Wilson's July 18, 2012 statement was fabricated by law
16 enforcement?
17      MR. WRIGHT:  Object to form.
18      MR. KELLEY:  Objection.
19   A   No.
20   Q   If you had been made aware of that
21 information, would you have disclosed that to the
22 defense?
23   A   Yes.
24   Q   And is that because of your ethical
25 obligations as a prosecutor?

Page 136

1    A   Yes.
2    Q   If you learned that Mr. Wilson's statement was
3  either false or fabricated by the police, would you have
4  used that evidence to continue charges against Ms.
5  Hoskins and Mr. Taylor?
6       MR. WRIGHT:  Object to form.
7       MR. KELLEY:  Objection as to form.
8    A   No.
9    Q   If you learned that Mr. Wilson was threatened
10 by a police or promised consideration in exchange for
11 giving a false and fabricated statement, would you have
12 used that evidence to initiate or continue charges
13 against Ms. Hoskins and Mr. Taylor?
14   A   No.
15      MR. WRIGHT:  Object to form.
16   Q   If you learned that law enforcement officers
17 fabricated Mr. Wilson's false statement, would you have
18 taken steps to immediately reevaluate the pending
19 criminal charges against Amanda Hoskins and Jonathan
20 Taylor?
21   A   Yes.
22   Q   Sir, I'm going to ask for you to take out the
23 case report.  This is Exhibit number 12.  You know what?
24 Sorry about this.  Mr. Steele, do you recall
25 participating in an interview with Robert Beach,

Page 137

1  Detective York, and Detective Johnson on
2  February 26, 2014?
3    A   I do.
4    Q   That seem right to you?
5    A   I wouldn't -- just seems -- if I remember, it
6  was -- it was the winter months and it was cool outside,
7  but I -- the exact date I couldn't tell you.
8    Q   Is it fair --
9    A   I wasn't involved on interviews.
10   Q   Is it your recollection that the interview and
11 statement from Robert Beach was after the initiation of
12 charges against Amanda Hoskins and Jonathan Taylor?
13   A   That is correct.
14   Q   In fact, is it your recollection that the
15 statement obtained from Robert Beach was taken more than
16 two years after the initiation of charges against Amanda
17 Hoskins and Jonathan Taylor, --
18      MR. WRIGHT:  Object to form.
19   Q   -- which would've been March of 2012?
20   A   Yes.
21   Q   Okay.
22   A   Been -- been around the two-year mark.
23   Q   Okay.  So is it fair to say that the statement
24 obtained from Robert Beach was not used to initiate
25 criminal charges against Amanda Hoskins and Jonathan

Video Deposition of Jackie Steele taken June 26, 2018

138..141

Page 138

1 Taylor for the murder of Katherine Mills?
2    A   That's correct.
3    Q   Is it fair to say that for the first two years
4 and -- that the statement from Robert Beach was not used
5 to continue the charges against Amanda Hoskins and
6 Jonathan Taylor, because it had not yet been obtained?
7    A   For -- yeah, the time period before it was
8 obtained, obviously it was not used.
9    Q   You testified earlier here today that you were
10 unaware of any conversations that may have taken place
11 between any law enforcement officer with Robert Beach
12 prior to your meeting with him at the prison in February
13 of 2014; is that right?
14    A   No.  I believe your question earlier was if I
15 -- I was aware if Jason York had any conversations with
16 him prior to.  There -- there was obviously at some
17 point in time law enforcement of some nature that had
18 talked to him and then forwarded the information to us,
19 but I -- the question earlier was if Jason York had any
20 conversations with him.  I'm not aware of any
21 conversation Jason York had with Mr. Beach beforehand.
22    Q   Are you aware, sitting here today, of any
23 conversation that any other law enforcement officer
24 other than Jason York had with Robert Beach prior to
25 your meeting with him?

Page 139

1    A   Again, some -- somebody -- he talked to
2 somebody in law enforcement that would've contacted -- I
3 believe it was Allen Trimble's office, the Commonwealth
4 Attorney of Whitley County, and Mr. Trimble wrote me a
5 letter advising me of -- of -- that Mr. Beach wanted to
6 make a statement, but I don't know who he -- I -- I
7 don't think -- you know, I don't know who he spoke to or
8 what initiated that conversation.  I don't know.
9    Q   Prior to the motions to dismiss that you filed
10 in the summer of 2016, were you ever informed by law
11 enforcement officials that Robert Beach's 2014 statement
12 was false and fabricated?
13        MR. WRIGHT:  Object to form.
14    A   No.
15    Q   If you had been made aware of that
16 information, would you have disclosed it to the defense?
17    A   Yes.
18    Q   And is that because of your ethical
19 obligations as a prosecutor?
20    A   Yes.
21    Q   If you had learned that Mr. Beach's statement
22 was either false or fabricated by the police, would you
23 have used that evidence to continue charges against Ms.
24 Hoskins or Mr. Taylor?
25    A   No.

Page 140

1    Q   If you learned that Mr. Beach's statement was
2 either false or fabricated, would you have reevaluated
3 the continuation of charges against Ms. Hoskins and Mr.
4 Taylor?
5    A   Yes.
6    Q   If you learned that law enforcement officers
7 promised consideration to Mr. Beach in exchange for his
8 statement, would you have disclosed that information to
9 the defense?
10        MR. WRIGHT:  Object to form.
11        MR. KELLEY:  Objection to form.
12    A   Yes.
13    Q   And is that because of your ethical
14 obligations as a prosecutor and your belief that this
15 evidence would be material under Brady and Giglio?
16    A   Yes.
17    Q   If you learned that Mr. Beach was promised
18 consideration in exchange for his statement, would you
19 have reevaluated the continuation of charges against Ms.
20 Hoskins and Mr. Taylor?
21        MR. WRIGHT:  Object to form.
22    A   I lost you there.  I'm sorry, Mr. Slosar.  Can
23 you say that one again?
24    Q   Sure.  If you learned that Mr. Beach was
25 promised consideration in exchange for his statement,

Page 141

1 would you have reevaluated the continuation of charges
2 against Ms. Hoskins and Mr. Taylor?
3    A   Yes.
4    Q   Prior to -- well, I'm going to show you what
5 we'll mark as Exhibit 22, the motion to dismiss you
6 filed in Jonathan Taylor's case.  To the best of your
7 knowledge and recollection, what is -- the evidence that
8 you outlined in your motion to dismiss, is that the
9 evidence that you believed, at some point in time,
10 supported the probable cause determination against
11 Amanda Hoskins and Jonathan Taylor?
12        (EXHIBIT 22 MARKED FOR IDENTIFICATION)
13        MR. WRIGHT:  Objection to form.  Answer the
14 best you can.
15    A   I believe (clears throat) -- excuse me.  I
16 believe that at the time the Grand Jury met, all of the
17 individuals and their statements would've been provided
18 for the Grand Jury's consideration, other than Robert
19 Beach.
20    Q   Okay.  Sorry.  Let me -- I'm going to ask it a
21 little bit differently.  There's -- in your motion to
22 dismiss, there's no mention of this person by the name
23 of Mikey Bruner; would you agree with that?
24    A   Who?
25    Q   Mikey Bruner?

Video Deposition of Jackie Steele taken 6/11/2019

142..145

Page 142

1    A   No.  I'll agree that that's not included in
2 the motion to dismiss.
3    Q   Okay.  And is that because you believe that
4 Mr. Bruner's statement wasn't credible?
5        MR. WRIGHT:  Object to form.
6    A   I'm drawing a blank on Mikey Bruner.
7    Q   Okay.  Let me ask you some basic questions.
8 Mikey Bruner's statement that Jason York – in 2015,
9 April of 2015.
10   A   Okay.
11   Q   And Mr. Bruner claims that Mr. Taylor
12 confessed to him four years before about the Mills
13 homicide.  Between – up until the time that you moved
14 to dismiss charges against Jonathan Taylor in the summer
15 of 2016, were you ever informed that Mikey Bruner was
16 intoxicated – actually, let me withdraw that question.
17 Up until the time that you moved to dismiss charges
18 against Jonathan Taylor in the summer of 2016, did any
19 law enforcement officer inform you that Mikey Bruner
20 admitted that he was intoxicated during the supposed
21 confession that he had years before with Jonathan
22 Taylor?
23       MR. WRIGHT:  Object to form.
24   A   Can you – (coughs.)  Excuse me.  Can you
25 point me to Mikey Bruner's supplement or statement or

Page 143

1 help me refresh my memory?  I don't –
2    Q   Yeah.
3    A   – I'm just drawing a complete blank on Mikey
4 Bruner right now.
5    Q   Sure.  I'm not sure if it's – let me try to
6 find it in here.  I'm not sure if it's going to be in
7 here because it was done so late in the investigation.
8 It might be in the supplements file.  Oh, yeah.  Here it
9 is.  It's in the supplements, Exhibit 3 at 25251.  Yeah.
10 Figured that's where it was..
11   A   Is that Exhibit...
12   Q   That's the statement that Mr. York claims to
13 have gotten from Mr. Bruner in 2015.  Does that refresh
14 your recollection?
15   A   It – it does.  Yes, sir.  Thank you.
16   Q   Okay.  So, at any time prior to the dismissal
17 of charges against Mr. Taylor in June of 2016, did any
18 law enforcement officer inform you that they learned
19 from Mikey Bruner that he was intoxicated at the time of
20 his conversation with Mr. Taylor many years earlier?
21       MR. KELLEY:  Objection as to form.
22       MR. WRIGHT:  I'll join.
23   Q   You can answer.
24   A   Just for clarification, when you say that he
25 was intoxicated, are you talking about Mr. Bruner being

Page 144

1 intoxicated or Mr. – Jonathan being?
2    Q   Mr. Bruner.
3    A   No.
4    Q   I know that the report does document that Mr.
5 Taylor was –
6    A   Yes.
7    Q   – intoxicated.  I'm asking you a different
8 question.  If you had been made aware of that
9 information, would you have disclosed it to the defense?
10       MR. WRIGHT:  Object to form.
11   Q   That Mr. Bruner was intoxicated during a
12 conversation where he claimed somebody confessed to him?
13   A   If I'd been made aware of it, yeah, I would.
14   Q   And would you have disclosed that to the
15 defense because of your obligations under Brady and
16 Giglio?
17       MR. WRIGHT:  Object to form.
18   A   I don't know that it goes to Brady and Giglio
19 just as much as I just have an open-file policy and that
20 it would've been a, you know – I don't know that I'd
21 have made a formal filing of it other than just tell
22 defense attorneys in talking about these statements,
23 "Well, you know, they were drunk.  Couple of drunks
24 having some drinks and – and he made his statements." I
25 would've made sure they were aware of it.  I don't – I

Page 145

1 just don't know that that rises to the level of Brady
2 and Giglio.
3    Q   Well, if somebody's intoxicated and they claim
4 that somebody made a statement to them, would you agree
5 with me that that would be a form of impeachment?
6        MR. WRIGHT:  Object to form.
7    Q   From a defense perspective?
8    A   We can agree to disagree on this.  I would
9 still turn it over regardless.
10   Q   Okay.  If you learned that Mikey Bruner was
11 intoxicated, either through drugs or alcohol, at the
12 time of this supposed statement by Mr. Taylor, would you
13 have reevaluated the continuation of criminal charges
14 against Mr. Taylor for the murder of Katherine Mills?
15       MR. WRIGHT:  Object to form.
16   A   Yes.
17   Q   All right.  Almost done.  Then if you could
18 take out your motion to dismiss.
19   A   I've heard that before.
20   Q   If you could take out your motion to dismiss
21 – I'm running out of exhibits.
22   A   Go ahead.  Let me give you this back.  That
23 was yours you handed me.
24   Q   Oh, thank you.  So I'm just going to – would
25 you agree with me that the motion to dismiss that you

VIDEO DEPOSITION OF JACKIE STEELE taken on June 28, 2018

Page 146

1  filed in Jonathan Taylor appears to be, except for the
2  caption, the same one that you filed in Amanda Hoskins'
3  and William Lester's case?
4      A   It – it is. Yes, sir.
5      Q   Okay. From looking at the motion to dismiss,
6  is it fair to say that at some point in the prosecution
7  you learned that a number of witnesses denied making
8  statements to the police?
9          MR. WRIGHT: Object to form.
10     Q   Joe King, for instance?
11     A   I – I don't think he ever denied making
12  statements to the police to me, he just did not –
13  didn't remember.
14     Q   All right. Well, let's go to paragraph 5,
15  page 2. Do you see where it says, "Joe King has since
16  changed his story and that he never heard anyone talking
17  about robbing an elderly lady and that he did not see or
18  know of Amanda spending money"; do you see that?
19     A   Uh-huh. I do.
20     Q   Okay. But you agree with me that he is
21  denying having any knowledge of the information
22  contained in Detective York's June 24, 2011 statement?
23         MR. WRIGHT: Object to form.
24     Q   You can answer.
25         MR. WRIGHT: That's – this motion is not Joe

Page 147

1  King's writing.
2          MR. SLOSAR: Is that on objection or –
3          MR. WRIGHT: Yes. It is an objection. Object
4  to form.
5          MR. SLOSAR: If you want to testify, I'd be
6  happy to...
7          MR. WRIGHT: Do you want to call for that one
8  question?
9  BY MR. SLOSAR:
10     Q   You can answer.
11     A   The – the –
12         MR. WRIGHT:  His testimony would be limited
13  then.
14     A   The – okay. The – can you restate the
15  question for me?
16     Q   Sure. Earlier, a few moments ago, you said
17  something to the effect that Joe King told you that he
18  didn't remember something and my question to you was:
19  Did he deny making a statement?  So I'm trying to get
20  past that.
21     A   Okay. Yeah. He –
22     Q   The last –
23     A   – he never denied making a statement, though.
24     Q   He – but he told you when he spoke with you
25  – he told you that he denied any of the knowledge that

Page 148

1  was attributed to him in that earlier statement drafted
2  by Detective York?
3      A   Correct.
4          MR. WRIGHT: Object to form. Asked and
5  answered. That's not his testimony. Answer best
6  you can.
7      Q   He already did. Is that correct?
8      A   That – that is correct. What I have in my –
9  in my motion is the – that he had changed his story,
10  not that he had not given a statement but that he had
11  changed his story and then never heard anyone talking
12  about robbing an elderly lady. That's correct.
13     Q   So he told you that the information contained
14  in the statement –
15     A   Uh-huh.
16     Q   – wasn't true, right?
17         MR. WRIGHT: Object to form.
18     A   In essence, without saying those words, yes.
19  In – based upon his statements, yes.
20     Q   And according to paragraph two, it says you
21  contacted Robert Beach on June 23, 2016, and his version
22  of events had changed from what was recorded in the
23  statement, correct?
24     A   Correct.
25     Q   Okay. So Robert Beach gave you information in

Page 149

1  that phone call that was different than the two-minute
2  and 40 second recording that yourself and Detective
3  Johnson and Detective York obtained from him in an
4  Indiana prison, correct?
5          MR. WRIGHT: Object to form.
6      A   That would be correct.
7      Q   Okay. And Daniel Wilson, in paragraph 1, told
8  you that he did not recall Jonathan Taylor ever making
9  any statements about the murder of Katherine Mills or an
10  old lady; is that right?
11         MR. WRIGHT: Object to form.
12     A   Specifically, he stated that, when I asked
13  about his previous statements, he didn't know anything
14  about those statements and he didn't remember making
15  them.
16     Q   Okay. So, you had spoke to witnesses close in
17  time to June of 2016 when you filed this motion to
18  dismiss; is that right?
19     A   Yes.
20     Q   Okay. And those witnesses told you that the
21  statements attributed to them earlier in the
22  investigation were not true, correct?
23         MR. WRIGHT: Object to form.
24     Q   You can answer.
25     A   Again, I'm not going to – for instance, Mr.

Video Deposition of Jackie Steele taken on June 25, 2019

150..153

Page 150

```
 1   Wilson didn't say they weren't true, he said he just
 2   didn't remember making them.  Mr. King didn't change his
 3   statement in regards to what he saw and heard.  One of
 4   them's not true.  That's – that's for somebody to else
 5   to decide which one's not true.
 6        Q   Well, yeah.  Not – I'm not asking you to sit
 7   here and say whether somebody is – whether the police
 8   report is true or whether their, you know, telephone
 9   conversation with you is true.  That's going to be for a
10   jury to decide later on.  All I'm asking you is: Did
11   these people, when you spoke to them around the time you
12   filed the motion to dismiss, say that their knowledge in
13   the criminal investigation was not what was reported to
14   be their knowledge in earlier investigative reports?
15        MR. WRIGHT:  Object.  Asked and answered.
16        A   Again, I – it – it had changed.
17        Q   Okay.  Now we're past that hurdle.  Once you
18   learned that witness statements were not as they were
19   reported to be in the earlier police report, did you
20   take affirmative steps to reevaluate the criminal
21   charges against Amanda Hoskins, Jonathan Taylor, and
22   William Lester?
23        A   Yes, I did, and I – let me just say, I took
24   them as they came in.  So Joe King was the first one I
25   can remember.  Well, Kayla Mills obviously died before
```

Page 151

```
 1   anybody else, and at that point in time, we would look
 2   as we would in any case as any discovery issue comes in,
 3   discovery item comes in, we reevaluate that case as they
 4   come in.  I specifically remember Joe King because I
 5   spoke to him on a Sunday, if I'm not mistaken.  Amanda
 6   and William were scheduled for trial earlier that week
 7   and I immediately, that Sunday afternoon, contacted Mr.
 8   Hoskins, who is Mr. Lester's attorney.  I cannot
 9   remember who was representing Amanda at the time –
10   contacted them on Sunday afternoon and then we got a
11   phone call with the judge to make sure they were aware
12   immediately of – under my prosecutorial duties and –
13   and Giglio and Brady, of the change in Mr. King's
14   testimony.  So it's something I – I take care –
15        Q   Seriously?
16        A   – take very serious and I take care of
17   immediately once those issues come up.
18        Q   I'm going to show you – and I have a copy of
19   this that I will get to you all.  This is KSP382 and
20   383.  I've got to find it in my file folder down here.
21   It's a – just the affixed  supplemental report from
22   December 6, 2012.  Mr. Steele, will you review that
23   document for a moment?
24        A   I'm familiar with this document.
25        Q   You're familiar with it?
```

Page 152

```
 1        A   I am.
 2        Q   And what is that document?  Did you receive
 3   that document during the criminal prosecution?
 4        A   I did.  Yes.
 5        Q   Okay.  And is it fair to say that you believed
 6   during the underlying investigation that – I have it.
 7   Sorry.  Here it is.  Sorry.
 8        A   Want to mark these as an exhibit?
 9        Q   Yeah.  You're right.  This will be 23.  And
10   that number is 23.
11        MR. KELLEY:  Well, for some reason, I don't
12   know what I have written down.
13        MR. SLOSAR:  Here.  Here.
14        MR. KELLEY:  What is John Pickard's statement
15   number?
16        THE WITNESS:  Let's see.  His last exhibit was
17   21.
18        MR. SLOSAR:  Yeah.
19        THE WITNESS:  It was John Pickard's letter, and
20   22 was my motion to dismiss.
21   BY MR. SLOSAR:
22        Q   Okay.  So Exhibit 23 – so, is it fair to say
23   that the criminal – in – during the criminal
24   investigation, the theory was that the perpetrator or
25   perpetrators left five $100 bills at the crime scene?
```

Page 153

```
 1        (EXHIBIT 23 MARKED FOR IDENTIFICATION)
 2        A   There were five $100 bills left at the crime
 3   scene.  Yes.
 4        Q   Okay.  And did – was it your understanding
 5   that law enforcement officers believed that this
 6   physical evidence could help solve who really was
 7   responsible for Katherine Mills' death?
 8        MR. WRIGHT:  Object to the form.
 9        MR. WILLIAMS:  Join.
10        A   Can you – I think any physical evidence, your
11   hope when you send it to the lab for testing, is that it
12   will help either include or exclude a potential
13   defendant.
14        Q   And during the criminal prosecution against
15   Amanda Hoskins and Jonathan Taylor, which was initiated
16   in March of 2012 by Detective York, did you as a
17   prosecutor keep close attention to the results of
18   scientific testing in this case?
19        A   Yes, as good as – as well as we could, and
20   that's one of the reasons we have what we referred to
21   earlier as a Dinkins form on the Grand Jury forms.  They
22   bring it to the Grand Jury so we have a checklist of
23   what has been provided and what's outstanding.  And the
24   state police crime lab, it has instituted a – a new
25   system – I'm going to call it a new system, the B
```

Video Deposition of Jackie Steele taken 6/13/2018

154..157

Page 154

1   system, which allows prosecutors access to that system
2   to check reports instead of waiting on officers to check
3   and bring them to us, so we try to keep up with that.
4   And I'm – I'm not sure when that system was initiated,
5   but we obviously would've known fingerprints were
6   outstanding and waited for that analysis.
7       Q   And at some point in or around December of
8   2012, were you made aware that latent print comparisons
9   were conducted between Amanda Hoskins, Jonathan Taylor,
10  and William Lester and the currency found at the Mills
11  crime scene?
12      A   I was – I was made aware of sometime after
13  the date of the report of December 6, 2012.  Yes.
14      Q   And did you learn sometime after
15  December 6, 2012 that the latent prints excluded Amanda
16  Hoskins, Jonathan Taylor, and William Lester from
17  contributing any prints on the currency at issue?
18      A   That is correct.
19      Q   Okay.  Now, at the time that you received this
20  report, did you reevaluate the pending criminal charges
21  against Amanda Hoskins, Jonathan Taylor for the murder
22  of Katherine Mills?
23      A   Yes.
24      Q   Is it fair to say that you continued with the
25  pending criminal charges due to the statements obtained

Page 155

1   from law enforcement officers during the underlying
2   criminal investigation?
3           MR. WILLIAMS:  Object to the form.
4           MR. WRIGHT:  Join.
5       Q   You can answer.
6       A   It – looking at the case as a whole, it's
7   fair to say we were seeing not just statements, but –
8   but – and that's a lot of what this case is, but not
9   just statements that – that we went through today, but
10  of – of Ms. Hoskins' statement, all those going forward
11  is what we considered to go forward on.  Yes.
12      Q   Well, is it fair to say that prior to the
13  dismissal of charges in 2016, no law enforcement
14  official ever made you aware of any confession that
15  Amanda Hoskins made to the police?
16      A   That's fair.
17          MR. WRIGHT:  Object to form.
18      Q   Prior to the dismissal of charge against
19  Jonathan Taylor in the summer of 2016, had any law
20  enforcement officer ever informed you as to whether Mr.
21  Taylor ever made a confession to police?
22      A   No.  Nobody ever did.
23      Q   Prior to the initiation of charges against –
24  well, let me withdraw that question.  At the time when
25  you first got the criminal case against Amanda Hoskins

Page 156

1   and Jonathan Taylor for the murder of Katherine Mills,
2   had any law enforcement official ever told you that
3   Amanda Hoskins or Jonathan Taylor confessed –
4       A   No.
5       Q   – to the police?
6       A   No.
7       Q   At any point between the initiation of charges
8   in March of 2012 and you sitting here today, has any law
9   enforcement officer ever told you that Jonathan Taylor
10  confessed to the police?
11      A   No.
12      Q   Between the initiation of charges in March of
13  2012 and today, has any law enforcement officer ever
14  told you that Amanda Hoskins confessed to the police?
15      A   No.
16      Q   Is it fair to say that the initiation and
17  continuation of the criminal charges against Jonathan
18  Taylor was never based on any confession that he gave to
19  police?
20      A   That is true.
21      Q   Is it fair to say that the initiation and
22  continuation of charges against Amanda Hoskins for the
23  murder of Katherine Mills was never based on any
24  confession that she gave to police?
25      A   That is true.

Page 157

1       Q   All right.  Is it fair to say that at the time
2   you filed the motion to dismiss against Jonathan Taylor
3   on June 29, 2016 that you no longer believed that
4   probable cause existed to continue the criminal
5   prosecution against him?
6       A   That is correct.  It's noted so in my motion.
7       Q   Is it fair to say that at the time that you
8   filed a motion to dismiss against Ms. Hoskins that you
9   no longer believed that you had probable cause to
10  continue the criminal prosecution against her for the
11  murder of Katherine Mills?
12      A   Again, same as Mr. Taylor, it's notated in –
13  in my motion.
14      Q   Is it fair to say that at the time you filed
15  the motion to dismiss in William Lester's case in July
16  of 2016 that you no longer believed you had probable
17  cause to continue the criminal prosecution against him?
18      A   That is correct and also noted in the motion.
19      Q   If law enforcement officials had informed you
20  earlier in the prosecution that witness statements were
21  false, would you have taken steps to stop the criminal
22  prosecution against Amanda Hoskins and Jonathan Taylor
23  at that time?
24          MR. WRIGHT:  Object to form.
25          MR. KELLEY:  Object to form.

VIDEO DEPOSITION OF JACKIE STEELE, taken in Jamestown, Kentucky, 60 of

158..161

Page 158

1   A  Yes.
2   Q  If law enforcement officials had informed you
3  that statements obtained from witnesses against Ms.
4  Hoskins and Mr. Taylor were fabricated, is it fair to
5  say that you would have stopped the criminal prosecution
6  of them at that time?
7      MR. WRIGHT:  Object to form.
8      MR. KELLEY:  Join.
9      MR. WILLIAMS:  Join.
10   A  Make sure I understand your question.  If all
11  the statements -- if -- if they told me -- informed me
12  that all the statements had been fabricated or that a
13  statement had been fabricated and -- I guess I'm asking
14  if -- if -- we -- we routinely have witnesses that come
15  in and say, "Hey, look.  I -- I've lied," you know, "It
16  -- it's a false statement."  I'm made aware of it, I
17  reevaluate the case based on that being a false
18  statement.  If the questions was, and I'm sorry if I
19  zoned out of -- the statement -- the question was that
20  law enforcement has helped fabricate the statement, then
21  the answer would be yes.
22  BY MR. SLOSAR:
23   Q  Yes.  Okay.  That is my question.  I'll ask it
24  a better way.  If law enforcement officers had informed
25  you earlier in the prosecution that they had fabricated

Page 159

1  statements against Amanda Hoskins and Jonathan Taylor,
2  would you have stopped the criminal prosecution?
3      MR. WRIGHT:  Objection to form.
4      MR. KELLEY:  Objection.
5      MR. WILLIAMS:  Objection.
6   A  Yes.
7  BY MR. SLOSAR:
8   Q  Did you ultimately dismiss the criminal
9  charges against Amanda Hoskins because there was no
10  longer any credible evidence indicating that she was
11  responsible for the death of Katherine Mills?
12      MR. WRIGHT:  Object to form.
13   A  No.  I think the reason the -- the -- it's
14  laid out in my motion to dismiss that probably cause
15  could not be -- I do not think probable cause could be
16  met at that point in time.
17   Q  In your motion to dismiss, did you write that,
18  "The Commonwealth must be ever vigilant in the pursuit
19  of justice, not just to get -- gain a conviction, but to
20  be ever mindful of the duty of the prosecutor for the
21  people and not pursuing charges or moving forward in
22  matters in which probable cause of guilt is not
23  present"?
24   A  Yes, I did.
25   Q  At the time you filed this, did you believe

Page 160

1  that probable cause existed to continue the charges
2  against Amanda Hoskins or Jonathan Taylor?
3   A  I did not.
4   Q  Mr. Steele, sitting here today, do you have
5  any opinions as to whether Amanda Hoskins or Jonathan
6  Taylor were involved in the murder of Katherine Mills?
7      MR. WRIGHT:  Object to form.
8   A  I'm going to -- I'm going to decline to answer
9  that question for this reason: this is a case that was
10  dismissed without prejudice, which means that it could
11  be brought back up at a -- at another point in time.  My
12  opinions are not -- are not at issue in a criminal
13  prosecution.  My -- my thoughts are not at issue in a
14  criminal prosecution, only what I can prove.  And I'm
15  not trying to be crass with you, but -- and I'm not --
16  my opinion doesn't -- doesn't matter in a criminal
17  prosecution, and if I was to make an opinion as to a
18  criminal prosecution, it could have myself and my office
19  removed from the case for prosecution, so that's the
20  reason I'm going to -- I'm going to not answer that
21  unless I have a federal judge that tells me to answer
22  it.
23   Q  So is it your testimony here today that you
24  don't have a personal opinion one way or the other as to
25  whether Amanda Hoskins or Jonathan Taylor were involved

Page 161

1  in the death of Katherine Mills?
2   A  No.  No.  I think we all have our personal
3  opinions, I'm just not going to voice mine.
4   Q  Since the dismissal of charges against Ms.
5  Hoskins and Mr. Taylor in the summer of 2016, are you
6  aware of any investigation taking place by any law
7  enforcement agency into the death of Katherine Mills?
8   A  I know -- I believe I have referred a couple
9  -- from the family of Ms. Mills, I have referred them to
10  law enforcement when they contacted me, and -- and
11  unfortunately for the victim's families, especially in
12  small communities, people are always talking about it
13  and there's always speculation by the community and --
14  and as they hear these and they hear somebody's name
15  repeated over and over and over again, they want
16  somebody to look into it, so I don't know -- to answer
17  your question, I don't know if law enforcement's done
18  any independent investigation or if they had enough
19  information to answer the questions before them at that
20  point in time regarding the individuals, but I know
21  Diane, the victim's daughter, I've talked to her, I
22  think, two or three times, and maybe even the son once.
23   Q  Has Diane ever asked you to investigate Mike
24  Simpson?
25   A  I don't have any independent recollection

Video Deposition of Jackie STEELE taken on June 18, 2019

162..165

Page 162

1  other than to say that she, as most victims' families,
2  wants everybody investigated, wants everybody.
3      Q   What law enforcement agency did you refer her
4  to?
5      A   I would've referred her on the state police to
6  contact, because they're – they were the original
7  investigating agency, so...
8      Q   Have you referred any of the victim's family
9  to the state police since this lawsuit has been filed?
10     A   I don't – no, I don't think so.  When did you
11  file the lawsuit in – last fall, summer?
12         MS. STAPLES:  It was April or – April of last
13  year.
14     Q   April of 2017.
15     A   April – I – I don't – I don't think so.  It
16  was – I want to say it was fairly close to, you know,
17  when the – when the – when the case were dismissed and
18  – yeah, I – I've talked to – I've talked to Diane
19  since the suit has been filed and we – we've discussed
20  at issues in – in Pulaski Circuit Court in regards to
21  the –
22     Q   Sure.
23     A   – release of evidence, so, but it wasn't –
24  at that point in time, there wasn't any new suspects or
25  issues she had.  It was – it was prior to that.

Page 163

1      Q   If you were to testify at trial, would you
2  decline to give your opinion on whether or not Ms.
3  Hoskins or Mr. Taylor were in any way responsible for
4  the death of Katherine Mills under the same basis that
5  you gave here today?
6      A   Yes.  I would.
7      Q   Okay.  You understand why I asked that
8  question?  I don't want a surprise in front of a jury.
9      A   Oh, that's – I completely understand.  And
10  like I said, if I have a federal judge tells me to
11  answer the question, I'll answer the question.
12     Q   Let me ask you a few more questions and then
13  I'm going to be done, and I'm sorry I have to ask this.
14     A   Okay.
15     Q   Did you conspire with any police officer
16  deprive Amanda Hoskins of her constitutional rights?
17     A   No.
18     Q   Did you conspire with any police officer to
19  deprive Jonathan Taylor of his constitutional rights?
20     A   No.
21     Q   Did you withhold any exculpatory evidence for
22  Ms. Hoskins or Mr. Taylor?
23     A   No.
24     Q   Did Detective York present any exculpatory
25  evidence to you which you then withheld?

Page 164

1      A   No.
2      Q   Did Sheriff Pickard present any exculpatory
3  evidence to you which you then withheld?
4      A   No.
5      Q   Did Detective Mefford present any exculpatory
6  evidence to you which you then withheld?
7      A   No.
8      Q   Did Detective Johnson present any exculpatory
9  evidence to you which you then withheld?
10     A   No.
11     Q   Did Chief Mike Broughton from the Barbourville
12  Police Department present any exculpatory evidence to
13  you which you then withheld?
14     A   No.
15     Q   Did any Kentucky State Police officer present
16  any exculpatory evidence to you which you then withheld?
17     A   No.
18     Q   Did any Knox County deputy present any
19  exculpatory evidence to you which you then withheld?
20     A   No.
21     Q   How – or do you consider Detective York to be
22  a friend of yours?
23     A   An acquaintance.  I – I don't know that I'd
24  call him, I guess, a friend in that I guess if you
25  needed something, call and I'd help him and I'd hope

Page 165

1  vice versa, but he's never been to my house that I –
2  I'm aware of, never been to his house or socialized
3  together.  Working – I guess working acquaintance is
4  the best way to put it.
5      Q   Do you have any opinion one way or the other
6  as to Detective York's investigative abilities?
7      A   My – my impression of Detective York in –
8  with the cases I've worked with him on was that he was a
9  good detective.
10     Q   Do you still have that same opinion after
11  reviewing some of the evidence here today that he never
12  disclosed to you?
13     A   I would agree that Detective York may have
14  made mistakes.  There may have been some things even he
15  probably wished he'd done different now, but no.  My –
16  my general opinion of Detective York would be the same.
17     Q   After discovering that the lawsuit had been
18  filed, do you recall having a conversation with
19  Detective York?
20     A   I'm sure I did, but I don't have any – I
21  don't remember.
22     Q   Did you help Detective York obtain a lawyer in
23  this civil lawsuit?
24     A   Help him obtain a lawyer?  I may have referred
25  him to some lawyers.  I don't know – I think – do

VIDEO DEPOSITION OF JACKIE STEELE taken on June 28, 2018

166..169

Page 166

1 you –

2  MR. WRIGHT: I'm his attorney. I don't know

3  that I talked to you about representing him, though.

4  A  Yeah. I – I'm sure I haven't talked to Mr.

5  Wright about representing him. I – I do know Mr.

6  Wright. He's presented at a couple conferences, but I

7  know I never had any conversation with Mr. Wright about

8  representing Mr. York. No.

9  Q  Do you remember having a text message

10  communication with Detective York where you gave him the

11  phone number for an attorney named Matt?

12  A  I don't remember. Matt Feltner was – oh,

13  wait a minute. Hang on. If I'm not mistaken – oh,

14  this could be speculation. If I'm not mistaken, we did

15  – we did converse and he had – he just asked me about

16  some attorneys. Matt Feltner was a retired state police

17  post commander, if I'm not mistaken – captain, and I

18  advised him – Matt Feltner had worked with the KSP

19  legal team who does a lot of – obviously they do a lot

20  of – of representation of officers and I may have given

21  him Matt Feltner's number and contact information.

22  Q  Is something that you had ever done before for

23  an officer involved in a criminal investigation who was

24  in a suit?

25  MR. WRIGHT: Object to form.

Page 167

1  A  To be – I – I'm sure I have, but then again,

2  I guess as a small-town, you know, prosecuting attorney,

3  I get phone calls all the time about who – you know,

4  "Who should I contact for a property dispute? Who

5  should I contact for this?" And – and I typically

6  refer them several – several names.

7  Q  Did any law enforcement officer during the

8  time that you were handling the prosecution ever provide

9  evidence to you that implicated Mike Simpson or Allen

10  Helton in the murder of Katherine Mills?

11  A  Mike Simpson and Allen Helton were – were

12  suspects that were discussed and reviewed, but did they

13  ever hand me what?

14  Q  Any evidence implicating Mr. Helton or Mr.

15  Simpson?

16  A  No.

17  MR. SLOSAR: I don't think I have any further

18  questions. Thank you for your time.

19  THE WITNESS: You're welcome. All right. We're

20  done, right?

21  MR. KELLEY: No.

22  MR. WRIGHT: We can take a break before we get

23  going again.

24  MR. SLOSAR: Okay.

25  (OFF THE RECORD)

Page 168

1  CROSS EXAMINATION

2  BY MR. WRIGHT:

3  Q  Mr. Steele, my name is Derrick Wright. I'm an

4  attorney for defendant Jason York and defendant Jason

5  Bunch. I appreciate you being here and we'll just go

6  through some questions. I'm sorry I'm going to jump

7  around –

8  A  Oh, you're fine.

9  Q  – because you've already went through a lot

10  of it. I want to go first to Exhibit number 22. It's

11  one of the motions to dismiss.

12  A  Okay.

13  Q  You see that?

14  A  Yes, sir.

15  Q  We'll just go through it. The first paragraph

16  refers to Daniel Wilson; do you see that?

17  A  Yes, sir.

18  Q  About – it begins by mentioning a statement

19  that he told KSP detectives based on what Taylor told

20  him while in jail. That's the first couple of sentence;

21  do you see that?

22  A  Yes, sir.

23  Q  And then about halfway through it starts,

24  "This statement was confirmed by the Commonwealth

25  Attorney several months after the statement was made in

Page 169

1  person at the Knox County jail"; do you see that?

2  A  I do.

3  Q  Did you talk to Daniel Wilson?

4  A  I did.

5  Q  Did he – tell me what he told you.

6  MR. SLOSAR: Objection to form. Foundation.

7  A  It would've been a general conversation

8  between just, you know, me talking to an individual, not

9  as formal as a KSP interview. If I'm not mistaken, they

10  put us in the – the law library there at the Knox

11  County Detention Center. We were alone and I just spoke

12  to him again, I think it was in regards to some court

13  dates, where he was going to be at, what his – you're

14  always playing where – where are they locating them at

15  now, what his – where he was going to be going, what

16  his charges were, not from the meat and bones of the

17  charges he's in there on, but what's he anticipating,

18  does he have a sentencing date, where's he at, just so

19  we can get him back for court, at which point in time we

20  just had a – just – just a general conversation

21  regarding his statement, and – and that's – my

22  statement says he confirmed what he told.

23  Q  So had you seen Detective York's report of

24  what Daniel Wilson had said defendant Taylor had said?

25  MR. SLOSAR: Objection to form.

VIDEO DEPOSITION OF JACKIE STEELE, taken on Thursday, June 14, 2018

170..173

Page 170

1    A    I – again, I can't say if I'd seen the report
2    at that point in time or I had knowledge of the contents
3    of what – of what he said. I honestly can't tell you.
4    Q    To your memory, when you met with him, what he
5    told you was consistent with what he had told
6    Detective York?
7    A    That is correct.
8         MR. SLOSAR: Objection to form.
9         THE WITNESS: Sorry.
10        MR. SLOSAR: No, you're fine.
11   BY MR. WRIGHT:
12   Q    Now, did you speak to him again in phone; is
13   that correct?
14   A    Yes, sir.
15   Q    All right. And then, was anyone else on the
16   line with you?
17   A    No. Not – I – I believe – I don't know if
18   anybody was on the line with me at this point in time.
19   Yes. Mr. Jones, Brandon Jones in my office. We were
20   sitting in the conference room where I typically get
21   prepared for trial at – (coughs) excuse me – and I had
22   him on speaker phone. Mr. Jones was present in the
23   room, also. He was going to sit second chair with me on
24   this case.
25   Q    Did you ask him about – well, tell me what he

Page 171

1    told you on the phone.
2    A    Okay. Like I say in the statement, it was
3    just that he didn't remember: "I don't remember making a
4    – making any statements." He just – "I don't
5    remember" and that he was not going to testify as to his
6    previous statements.
7    Q    Okay. Did you talk with him the prior
8    statement that he'd had with you in person?
9    A    I did.
10        MR. SLOSAR: Objection to form.
11   Q    And what did he say about that?
12   A    Did I confront him – I'm sorry.
13   Q    Yeah.
14   A    Did I confront him about his previous
15   statement? Yes. I – and again, I – there's probably
16   a jail recording of it in Campbell County that would –
17   that would be specific to the content, but if my
18   memory's not – I don't know if I – I don't know if I
19   confronted him about making the prior statement to me,
20   but I – I would think I would have, and he just stated
21   he didn't remember.
22   Q    Do you know how long it would've been between
23   the time that you saw him in person and the time you saw
24   him – talked to him on the phone?
25   A    I do not, other than to say it would not have

Page 172

1    been a couple weeks or even a couple months. It
2    would've been a lengthy amount of time.
3    Q    Did he affirmatively deny what he had said to
4    Detective York and you again in person, or did he just
5    say he couldn't remember?
6         MR. SLOSAR: Objection to form.
7    A    He just said he didn't remember Mr. Taylor
8    making any statements of an elderly – of any elderly
9    lady or any mention of his cousin and that he didn't
10   know anything about those statements. And – and I used
11   the – the – you know, as I'm looking at my statement
12   and I'm looking at my motion to dismiss, I'm reading –
13   I used "statements" in the plural, which would indicate
14   his statement to the law enforcement officers and then
15   his statement to me, and – and he didn't remember
16   making them.
17   Q    Okay. Do witnesses to prosecutions, when
18   you're preparing for trial, do they tell you they don't
19   remember the statements they made? Is that something
20   that comes up?
21        MR. SLOSAR: Objection to form. Foundation.
22   A    Quite frequently. Yes.
23   Q    How long have you been a prosecutor?
24   A    15 plus years.
25   Q    Okay. And do you follow up with witnesses

Page 173

1    identified by police prior to trial?
2    A    Yes.
3    Q    And do they sometimes claim to have no memory
4    of the statements they gave to police?
5         MR. SLOSAR: Objection to form. Calls for
6         speculation. Foundation.
7    A    They do.
8    Q    Okay. All right. Let's move to Robert Beach.
9    He was interviewed in February 2014 it says; do you see
10   that, paragraph two?
11   A    Yes, sir.
12   Q    And you were present for that interview?
13   A    I was.
14   Q    And I believe you were asked how long – to
15   estimate how long you were in – in the prison; do you
16   recall that questioning?
17   A    I do.
18   Q    And how long did you estimate?
19   A    I think I estimated 30 to 45 minutes, and as
20   you say that, the time we were in the prison from the
21   time we checked in and checked out would probably –
22   would be a lot longer. I would say we were – we talked
23   to Mr. Beach for 30 to 45 minutes, and the way this
24   prison was laid out, we actually went through – we
25   checked in and went through, like, a – a yard area. It

Videotaped Video Depositionof of JasonJason YorkYork asFREDTakenERICK on December June 4, 20092009
174..177

Page 174

1  was a – not a mile walk or anything, but it was a – it
2  was a pretty decent walk to the facility which they took
3  us – the building they took us to and sat us three in,
4  and I want to say they brought Mr. Beach to us.  I don't
5  think he was present when we first came in, so we waited
6  some period of time for Mr. Beach to us.
7      Q    Now the recording isn't very long.  Do you
8  recall what was discussed before his recorded statement?
9      A    Yeah.  Just in general, we – we told him why
10  we were there, what we were there for.  He understood,
11  gave us just general what he knew.  We – you know, we
12  were just talking to him, what he was in there for, how
13  long – you know, what kind of sentence he got, how long
14  we – he was going to be there, just a very general
15  conversation, not anything pointed and got – you know,
16  we was just making him feel comfortable with us.  We was
17  – again, we spoke for a period of time and then he –
18  we kind of got down to exactly what – you know, where
19  they were at, where they may have – where they were
20  housed at, tried to get him to pinpoint specifics.  If
21  I'm not mistaken, Detective York or somebody had already
22  verified with the Whitley County Detention Center that
23  they had – were in the same area of – of – same area
24  while incarcerated so that they could've actually had a
25  conversation, so we knew we weren't wasting our time

Page 175

1  driving up there, and then it was just getting specifics
2  about that.  I remember us having a conversation about
3  – he was – he was upset that an elderly lady died
4  because of drugs.  He was upset that it was all over
5  drugs.  He'd had a drug problem.  If I'm not mistaken,
6  his brother had a drug problem.  He told us a story
7  about his brother and – had died while on drugs, and
8  think him and his brother would – were on drugs
9  together one night and had a – had a bad experience
10  with methamphetamine and his brother got tangled in some
11  – some barbed wire and got cut and – and – and that
12  he died.  I remember him telling us that story, also.
13      Q    Did he – was there any discussion about any
14  promises being made to him for his testimony in this
15  case?
16      A    No.  He had – he had asked – he did ask me,
17  I suppose asked us about getting him moved to Kentucky
18  because I think he had a – some prison time left in
19  Kentucky and Indiana both and wanted to go and get moved
20  to Kentucky and pull his time there, and I told him
21  there that day that, you know, he's a inmate of Indiana.
22  He's basically their property and – once they got
23  him released, then it – the Kentucky Department of
24  Corrections would pick him up at that point in time, but
25  at this point in time there was nothing myself or

Page 176

1  anybody could do for him in regards to where he's being
2  housed.
3      Q    Did you tell him that you would see what could
4  be done once he got into Kentucky, into the Kentucky
5  prison system?
6      A    I – I'm – I don't specifically recall, but
7  yeah, I – I mean, it wouldn't be uncommon for me to
8  say, "You know, you get to Kentucky, call me and we'll
9  – we'll see if we can get you" – because I think his
10  family's from Warren County or Pulaski County area, and
11  he wanted – just wanted to be in a general closer area
12  to them.
13      Q    Did you consider that any kind of promise or
14  consideration or incentive that you would need to
15  disclose under Brady or Giglio?
16      A    No.  I'd made him no promises that – that I
17  would move him, could move him, or would try to move
18  him.  Just, "Call me when, you know – make contact with
19  us when you get back to Kentucky."
20      Q    Okay.  Anything else you remember about the
21  conversation with Beach at the prison system?
22          MR. SLOSAR:  At the prison system?
23      Q    I'm sorry.  At the Indiana prison?
24      A    Not that I can recall off the top of my head.
25  No.

Page 177

1      Q    Okay.  Did you have any phone calls with him;
2  to your memory?
3      A    Not until the – the date that I was listed on
4  my motion to dismiss when I contacted him on
5  June 23, 2016 in preparation for trial.
6      Q    And that was by phone call?
7      A    That was.
8      Q    Okay.  Did you ever talk to him in person
9  again?
10      A    No, sir.
11      Q    Okay.  What did he tell you on the phone call
12  – well, let me strike that.
13      A    The – let – let me go back and answer that
14  question again.  I believe I testified earlier that I do
15  believe I did talk to him in person once, maybe twice,
16  because he'd already been transported for a trial date
17  that got continued and it was – it wasn't anything
18  about the case other than, "Sorry you had to be brought
19  down here," because it was – if my memory serves, it's
20  about a four- or five-hour drive from the prison
21  facility in Indiana down here, so it was a – you know,
22  it was a – it was a long drive him down and back, so –
23  let me rephrase that.  I – I'm pretty sure I did talk
24  to him in person again after this statement.
25      Q    Did he – that was before your phone call,

Page 178

1  though, right?
2      A  That was – yes, sir.
3      Q  Did he – did you talk about his statement at
4  that time?
5      A  No, sir.
6      Q  Did he indicate to you that his statement was
7  false?
8      A  No, sir.
9      Q  That he couldn't remember what had happened?
10         MR. SLOSAR:  Objection to form.
11     A  No, sir.
12     Q  So what prompted you to call him then on
13  June 23, 2016?
14     A  If I'm not mistaken, we had a trial date
15  coming up probably within a week, and I'd have to go
16  back and check the – the court records, but I believe
17  we had a trial date probably within a week of that, you
18  know, a – towards the end of June.  I – I know I have
19  a family vacation around the 4th, so it may have been
20  before that or after that and I was just doing some prep
21  work prior to trial just to make contact with him again,
22  go through his statement, make sure everything was same
23  as we discussed before.
24     Q  Okay.  And do you remember if anybody was on
25  the line with you that time?

Page 179

1      A  I can't remember if Mr. Jones was on the line
2  with me that time or not, and – and I – I'm thinking
3  he wasn't and that's why I had him come in when I –
4  when I was talking to Mr. Wilson, is because of the
5  conversation I had with Mr. Beach, and then I wanted
6  somebody eels in the room with me with – during Mr.
7  Wilson's conversation.
8      Q  So it looks like you called them on the same
9  day; is that right?
10     A  I did.  That's correct.
11     Q  Okay.  And just tell me what he told you on
12  the phone.
13         MR. SLOSAR:  Objection.  Asked and answered.
14  He's testified to this earlier here today, Derrick.
15         MR. WRIGHT:  Well, you don't – you're not the
16  only one that gets to ask question about it.
17         MR. SLOSAR:  But that – no, that's – but
18  that's not the rule.  I mean, he – if he's –
19  asked –
20         MR. WRIGHT:  If you're –
21         MR. SLOSAR:  If you have a different question
22  about his testimony from earlier, then ask it, but
23  to ask him the same exact question that I asked him
24  earlier is –
25         MR. WRIGHT:  You can make your objection.  I'm

Page 180

1  asking him what he remembers him saying.
2         THE WITNESS:  Can I go ahead?
3  BY MR. WRIGHT:
4      Q  Yeah.  Go ahead.
5      A  Okay.  And I state that on that – on that
6  June 23 date that his version of events had changed and
7  he stated Mr. Taylor was contacted after the robbery and
8  murder of Ms. Mills.
9      Q  Did you confront him with the statement that
10  he told you and Detective York while you visited him in
11  prison in Indiana?
12         MR. SLOSAR:  Objection to form.
13     A  Yes.  I – I would've obviously said, "You –
14  you know, you – you told us this when we were in
15  Indiana at – at the – and you just" – he was –
16  change – didn't want to change his testimony.
17     Q  Did he say he didn't remember talking to you
18  all?
19         MR. SLOSAR:  Objection to form.
20     A  No, he did not.
21     Q  Did he say that he had made it up?
22         MR. SLOSAR:  Objection to form.
23     A  No, he did not.
24     Q  Did he give you any explanation why his story
25  had changed?

Page 181

1      A  I remember him telling me that it had been
2  going on long enough and that he was done, and that's
3  the best explanation I – but that's all he told me.  I
4  don't know if you would call it a explanation of not,
5  but he'd been – and like I said, he'd been brought back
6  and forth to court a couple times and he just said it'd
7  been going on long enough and he was done.
8      Q  Anything else in that phone call that you
9  recall?
10     A  Not that I can recall.
11     Q  Kayla Mills is the third witness you list in
12  the motion to dismiss; do you see that?
13     A  Yes, sir.
14     Q  Do you know who she was with when she gave
15  that statement to Detective York?
16         MR. SLOSAR:  Objection to form.  Foundation.
17     Q  Were you there when she gave the statement to
18  Detective York?
19     A  No, I was not.
20     Q  Did you listen to the recording?
21     A  I have listened to the recording.  Yes.
22     Q  Do you recall whether it identifies who was
23  present for the statement?
24     A  I think it – I think it does, but I can't
25  recall off the top of my head trying.  It's probably in

Video Deposition of Jack Boggs 10/11/2018 Kayla Mills, et al. v. Barbourville, et al.

182..185

Page 182

1  the police report as far as Kayla's statement as to who
2  was there present – like, took it.  You want me to look
3  real quick?
4      Q   Sure.
5      MR. SLOSAR:  Here.  Oh, I've got the page in
6  front of me.  Not sure how it's relevant.  It's
7  25426. Derrick, do you have a question for him?
8      Q   I was letting him read it, if that's okay.
9      MR. SLOSAR:  Yes, sir.
10     A   Yeah.  And to answer your question, Mr. Boggs
11 which is an attorney in Knox County who is – who's now
12 deceased, individual name is Cricket Mills, Scott Mills
13 was present during the interview.
14     Q   Who's her – who's Cricket Mills; do you know?
15     A   I do not know.
16     Q   Okay.  Did you ever talk to Kayla Mills
17 yourself?
18     A   No.  Kayla Mills passed away, if I'm not
19 mistaken, just a matter of a few months after she made
20 this statement.  And that – I believe if you look at
21 the discovery we have, the – that black mark across
22 that is mine that I made indicating that she is no
23 longer available.
24     Q   No longer available?
25     A   That is correct.

Page 183

1      Q   All right.  Do you know whether her statement
2  was false?
3      A   I do not know.
4      Q   Okay.  Same question with Daniel Wilson; do
5  you know which of his statements were false, the one
6  that he gave to Detective York or the – afterwards when
7  he filed a statement in June of –
8      MR. SLOSAR:  Objection to form.
9      Q   – 2016?
10     MR. SLOSAR:  Objection to form.  Asked and
11 answered.  He has testified previously that he is
12 not here to testify as to the truth or falsity and
13 it's also not admissible evidence to illicit from
14 this witness as to what is true or false.  That's a
15 determination for a jury.
16     MR. WRIGHT:  I'm just asking him if he knows.
17     MR. SLOSAR:  Well, I'm – I mean, I'm telling
18 you that this line of questioning is inappropriate.
19     MR. WRIGHT:  Well, your questions assumed it.
20 You kept adding the "false and fabricated" in the
21 question, so I'm going to ask him –
22     MR. SLOSAR:  I say that –
23     MR. WRIGHT:  I objected to the form, so I'm
24 going to ask him if he knows whether this – which
25 one is false?

Page 184

1      MR. SLOSAR:  I mean, he's already testified
2  that he doesn't know which is true and which is
3  false as to anything.
4      MR. WRIGHT:  Well, I just want to get it on the
5  record.
6      MR. SLOSAR:  Even though it's on the record.
7  I think you're just –
8      MR. WRIGHT:  I don't know that it's been asked
9  that way.  I'm just asking a question to make a
10 record.  Do you want to – do we need to call a
11 magistrate?
12     MR. SLOSAR:  No.  I'm just trying to speed this
13 up, Derrick, because I think you're – I think you
14 could do this more efficiently and speak quicker and
15 that this could all go more quickly.
16     MS. KINCER:  Well, if Derrick doesn't ask it,
17 I'm asking it, so...
18 BY MR. WRIGHT:
19     Q   All right.  Let's go back.  Do you know which
20 of the statements – the statements that you heard from
21 Daniel Wilson were inconsistent, right?
22     A   They – they were.  Yes.
23     Q   Do you know which of them was false?
24     A   No, I do not.
25     Q   Same with Robert Beach; he gave you different

Page 185

1  statements, correct?
2      A   Yes.
3      Q   Do you know which of them was false?
4      A   No, I do not.
5      Q   All right.  Christy Branson – did you speak
6  to her in person?
7      A   I did.
8      Q   And she indicated to you she had no memory of
9  her statement to Detective York?
10     A   That is – Detective York or the events of
11 that timeframe.  Yes, sir.
12     Q   So does that make her unavailable to testify
13 at trial?
14     A   I – I believe under – under the rules of
15 evidence, she would be unavailable, and if not
16 unavailable, competency of a witness unable to recall
17 the time and events as they occurred would also be
18 challenged.
19     Q   Did you also speak with her attorney?
20     A   I spoke to her civil attorney who handled her
21 – I still say I can't remember if it was a car wreck,
22 but it was – he was a civil attorney so I'm going to
23 assume it was some type of civil litigation for a car
24 wreck.  That was –
25     MR. KELLEY:  Sam Castle?

Videotaped Deposition of Jackie Steele taken on June 25, 2008

186..189

Page 186

1    A   Sam – thank you.  It was – which – Sam
2   Castle.  I did confirm with them after I spoke with her
3   that she had in fact had a head trauma and memory loss
4   was one of the issues he dealt with in the civil action.
5        Q   And you mentioned that Kayla Mills' attorney,
6   Ken Boggs has deceased.  Is Matt Castle – is he still
7   alive and practicing?
8        A   Sam.  Yes, he is.
9        Q   He is.  Now the – Joe King is the witness
10  listed in paragraph 5; do you see that?
11       A   Yes, sir.
12       Q   And I believe your testimony was you met with
13  him outside of the Laurel County Detention Center?
14       A   That is correct.
15       Q   Did you have your whole file with you?
16       A   No, sir.
17       Q   What did you have with you that day?
18       A   I don't think I had anything with me.  I don't
19  believe I – I had a – a notepad or anything, other
20  than the subpoena that I served him.  You know, I just
21  went there to – to discuss – same as I was with Mr.
22  Wilson and Mr. Beach, discuss their prior testimony in
23  anticipation of trial, which was – in his case, was a
24  – was a trial with Amanda and William was coming up in
25  close proximity, so I got him served, wanted to go over

Page 187

1   his statement again, so I don't think I had anything in
2   my hands.
3        Q   And I know we talked about this before, but
4   I'm – I want to make sure I understand it: Was his
5   statement to you that he could not remember what
6   happened or did he change his story; which was it?
7        MR. SLOSAR:  Objection to form.  Asked and
8   answered.
9        A   Based on my – and – and of course, this
10  motion was drafted several years ago, close in proximity
11  to my – my statement with Mr. King and – and it says
12  that he changed his story and that he had never heard
13  anyone talk about robbery of an elderly lady and he did
14  not see or know of Amanda spending money and that he had
15  since moved to a location unknown, so his...
16       Q   Did he recall having talked to Detective York
17  in your discussions with him?
18       MR. SLOSAR:  Objection to form.  Foundation.
19       Q   Did you ask him that?
20       MR. SLOSAR:  Same objection.
21       A   I did, and he – my memory was that he did not
22  recall.  He did tell me that he – he went to federal
23  prison, him and his – several family members for drugs.
24  He indicated to me that he was in – into some drug use
25  at the time is the reason – what I can remember him

Page 188

1   telling me the reason he just didn't remember the
2   conversation with Detective York.
3        Q   Did he ever tell you that – did he see the
4   police report that Detective York had drafted; did you
5   show that to him?
6        A   I did not.  No.
7        Q   Okay.  And then the sixth witness on the next
8   page is Michael Crump; do you see that?
9        A   I do.
10       Q   And you believe you may have but you're not
11  for sure if you may have spoken to him directly?
12       MR. SLOSAR:  Objection to form.  Foundation.
13       A   That is correct.
14       Q   Okay.  Your memory is that you may have talked
15  to him on the phone; is that right?
16       A   Yeah.  I – if I'm not mistaken, we found him
17  at one – some point in time in Mount Sterling and had
18  him served and that – I think that's how I got in
19  contact with him.   The subpoena would've had my name
20  and number at the bottom right-hand corner.  I believe
21  he contacted – I can't remember if he contacted me
22  or the – the – I think KSP's the one that served him,
23  got a phone number, and somehow we made contact.  If I'm
24  not mistaken, we made contact.  That's when he told me
25  he – he – you know, he wasn't going to appear.

Page 189

1        Q   Did he say any reason why he wouldn't appear?
2        A   Not – not that I can remember.  He just told
3   me he wasn't coming.
4        Q   Did you consider him unavailable?
5        A   I – well, we go to court that day and he
6   wasn't available, the – the trial was continued, but if
7   I'm not mistaken, we were there anyway to notice – to
8   notice some witnesses.  Mr. Crump was not available, he
9   was not present, and if I'm not mistaken I had a
10  material witness warrant issued for him.
11       Q   Okay.  Was it ever your understanding that
12  Michael Crump had positively identified who he saw at
13  Katherine Mills' home?
14       A   No.  It was – it was my understanding that he
15  was unable to identify.  As a person, you know, he knew
16  it was a – a white male in – in camo, but he did not
17  positively identify it as a certain individual.
18       Q   So you were going to call him as a witness,
19  correct?
20       A   That's correct.
21       Q   And you were going – was it your intention to
22  let him give a description of what he saw?
23       MR. SLOSAR:  Objection to form.  Calls for
24  speculation.
25       Q   Have him give a description of what he saw

Video Deposition of Jackie Steele taken 11/01/2018; Scott

190..193

Page 190

1  that day?

2    A   That –

3      MR. SLOSAR:  Same objection.

4    A   – that's what I would've asked him at the

5  stand, yes.

6    Q   Even though he couldn't point at Jason – or,

7  I mean at Jonathan Taylor and say he saw him?

8      MR. SLOSAR:  Objection.

9    A   From my standpoint, the fact that he couldn't

10  identify who it was wasn't as important to me, one,

11  because he didn't know any of these individuals, that

12  I'm aware of – that I was aware of, –

13    Q   Sure.

14    A   – but that he could identify the individual

15  having tattoos up and down their arms.  And Mr. Taylor

16  – because as we had argued as we had in court was that

17  they wanted the – they wanted to suppress the photos of

18  – which I agreed to, and I think some of the photos

19  actually show his hand like this with tattoos, but I

20  made a statement that I would be having him stand up and

21  show his hands to the jury and arms to the jury because

22  of the tattoos.

23    Q   So you agreed, then, to not use the photos

24  that were taken of him at trial; that's your memory?

25    A   That's my memory.  Yes, sir.

Page 191

1    Q   You were still going to call Mr. Crump to

2  testify as to give a description of what he saw that

3  day?

4    A   I was.  Yes.

5    Q   Okay.  Do you know whether Mr. Crump ever saw

6  any of the photos that were taken of Jonathan Taylor?

7    A   I did not show him any photos.

8    Q   Okay.  Did you ever get the chance to ask him

9  if he'd seen the photos?

10    A   I did not.  Not that I can recall.

11    Q   You mentioned this motion to dismiss; were the

12  charges dismissed without prejudice?

13    A   They were.

14    Q   Does that mean that the criminal defendants

15  could be re-prosecuted, potentially?

16    A   They could.  Yes.

17    Q   Okay.  Have you ever dismissed criminal

18  charges with prejudice?

19    A   I have not.  Judges have ordered to dismiss

20  with prejudice, but no, I don't know that – I don't

21  know that I have ever wanted to dismiss with – I mean,

22  short of a defendant dying during the proceedings,

23  obviously then would dismiss with prejudice, but – as

24  to that defendant, but I don't ever – I don't recall

25  right now ever dismissing with prejudice.

Page 192

1    Q   Okay.  Can you go to Exhibit 21.

2    A   The letter from the – Sheriff Pickard?

3    Q   Correct.

4    A   Yes, sir.

5    Q   Do you see in the middle of that where it

6  says, "I told James Helton that if this information was

7  true, I would see what could be done on the receiving

8  stolen property charges"; –

9    A   Yes.

10    Q   – do you see that?

11    A   I do.

12    Q   Is Sheriff Pickard's indication that he could

13  see what could be done – is that a promise, an

14  incentive, or a consideration that would, in your

15  opinion, be under Brady or Giglio?

16    A   No.

17    Q   Okay.  Did you disclose that as part of your

18  open-file policy?

19    A   Yes.  This letter was provided to defense in

20  the – in the discovery.  And – and I know that because

21  of we had many discussion and – and one of the – also,

22  as part of that exhibit I have stapled, from PL4844 to

23  PL4855, it also – where he was working for U.N.I.T.E.

24    back in 2009.

25    Q   Did you have any other information whether he

Page 193

1  was an informant for police?

2    A   No, and I – and I do remember having

3  conversations with him about this and – and – because

4  there was only one day of him actively working as a –

5  December 3, 2009, just one entry and they said it's the

6  only time he ever worked.

7    Q   Would you have been the prosecutor in that

8  case; do you know?

9    A   I don't – I don't know.  U.N.I.T.E. worked

10  20-something counties, so Tim – Tim Jordan doesn't ring

11  a bell to me.  He could've been a Bell County or Leslie

12  County or anybody.  I don't know.

13    Q   Okay.  Going to Exhibit number 15.

14    A   Yes, sir.

15    Q   This is the Kayla Mills arrest warrant.

16    A   Yes, sir.

17    Q   You don't know how this – you have no

18  knowledge of whether Detective York showed this to

19  Kayla, what he said about this to Ms. Mills, do you?

20    A   I have no knowledge.  No, sir.

21    Q   Okay.  Do you have any knowledge whether he –

22  what he may have told her attorney, Ken Boggs, about

23  this?

24      MR. SLOSAR:  Other than what he reviewed today?

25    A   No.  I – I –

VIDEO DEPOSITION OF JACKIE STEED taken on June 26, 2019

194..197

Page 194

1    Q   Were you ever –
2    A   – I – I have no knowledge of – of what he
3    may have told you or Mr. Boggs either.
4    Q   If this case had went to trial, would you have
5    argued that Jonathan Taylor could've fit the description
6    given by Michael Crump?
7        MR. SLOSAR:  Objection to form.
8    A   Yes.
9    Q   But he could not positively identify him,
10   correct?
11   A   That is correct.
12   Q   Is it possible that other people may have also
13   fit the description?
14       MR. SLOSAR:  Objection to form.
15   A   Yes.
16   Q   Could Mike Simpson have fit that description?
17   A   I really – I can't recall.  I don't know what
18   Mr. Simpson looks like, so I don't know.
19   Q   Was Mike Simpson a suspect in the case, to
20   your memory, at one point in time?
21   A   Yes.
22   Q   To your memory, do you remember if your office
23   had any follow-up communications with Detective York
24   about getting materials for you to disclose to defense
25   counsel?

Page 195

1    A   Yes, we did.
2    Q   Did he follow up and confirm or provide
3    additional info as that process went along?
4    A   He did.
5        MR. SLOSAR:  Objection to form.
6    A   I'm sorry.  He did.
7    Q   Okay.  Do you recall having any issues with
8    Detective York's responsiveness to your requests?
9        MR. SLOSAR:  Objection to form.
10   A   Other than attorneys want it done today, but
11   if you ask us to do something it means in the next 30
12   days.  It's – I always wanted it done quicker than when
13   I received it, but he always responded.
14   Q   Okay.  To the best of your memory?
15   A   Yeah.  To the best of my memory, he always
16   responded in a timely manner.
17   Q   Did you ever remember a – did you ever meet
18   with Robert Beach's sister, Margaret Polly?
19   A   I did not.
20   Q   Do you have any knowledge whether anybody did
21   talk to her from law enforcement or anybody else from
22   your office?
23   A   From my office, I can tell you no.
24   Q   You don't have any memory –
25   A   I don't, but I want to say somebody may – I

Page 196

1    know it's alleged in his complaint because I reviewed
2    the day before I came in here that they did, but I want
3    to – I think she may have given a location of where he
4    could be found in Indiana, where he was being housed.  I
5    – I think that – so I think somebody did, but I don't
6    know who – who it may have been.
7    Q   Okay.  You weren't there to witness –
8    A   I was not there.  No, sir.
9    Q   All right.  Do you know who Margaret Polly is;
10   if you saw her, would you –
11   A   No.
12   Q   – know who she is?
13   A   I do not.
14   Q   Just recognize the name?
15   A   Other than it's Allen – Mr. Beach's sister.
16   That's – and I had to remember that after I reviewed
17   the file today.
18   Q   Do you know Allen Helton, who he is; have you
19   prosecuted him in other cases, to your memory?
20       MR. SLOSAR:  Objection to form.
21   A   I honestly don't know.
22   Q   You wouldn't recognize him –
23   A   I – I wouldn't recognize him, no.  Whether or
24   not I've prosecuted him before, I – I have no – I – I
25   couldn't tell you.

Page 197

1    Q   That's fair enough, and I guess it's the same
2    with Mike Simpson; is that what you –
3    A   That's correct.
4    Q   Going back to the motion to dismiss, Exhibit
5    22.
6    A   Yes, sir.
7    Q   You talked that Tommy – or, I'm sorry.  I
8    think – believe it's Mikey Bruner was not listed in
9    there; do you recall that testimony?
10   A   I do.
11   Q   Is it also true that Amber Simpson also was
12   not listed in there?
13   A   That is correct.
14   Q   Did you consider both those witnesses
15   potentially available?  Were you –
16   A   I –
17   Q   – I'm sorry.  I guess what I was meaning was:
18       were you only listing the witnesses that were
19   no longer available to you?
20       MR. SLOSAR:  Objection to form.
21   A   I – I was.  I was laying out to the court the
22   witnesses that were no longer available or their
23   statements had changed.
24   Q   Okay.  Had you ever talked to Amber Simpson?
25   A   I'm sure I have.  I don't – it wasn't one of

Video Deposition of Jackie Steele taken on June 28, 2018

198..201

Page 198

1 the — I'm sure I have, but I don't have any independent
2 memory of it.
3    Q  Okay.  Do you know if anybody in your office,
4 any assistants would've contacted her?
5    A  No.  I — Mr. Jones, he — he may have, but I
6 — I doubt it, as he was sitting second chair on this
7 matter.
8    Q  And what was his full name?
9    A  Brandon Jones.  He's an assistant in the
10 office.  I — I seriously doubt he would talk to a
11 witness, one, without me being there since I was going
12 to sit first chair, but I'll — I'm not — I — I don't
13 have any independent memory of talking to her, but I can
14 tell you my regular practice.  I'm not going to start a
15 murder trial without talking to the witnesses going to
16 say, "This is what I was told."
17    Q  Sure.  To your memory, did she ever deny any
18 recollection or deny what she had told the police?
19    A  Not to my recollection.  If she would have, I
20 would've included it in this motion to dismiss.
21    Q  All right.  It had been your practice to
22 follow up with witnesses before going to trial?
23    A  That is correct.
24    Q  All right.  Do you know whether there had been
25 any contact with any members of her family?

Page 199

1    A  I have not.  No.  I had no contact with any
2 members of her family that I'm aware of.  Is there
3 anyone in particular?
4    Q  I believe her father's name is Larry Simpson.
5    A  Not that I know of.  No.
6    Q  Okay.  Was this case — was the trial date
7 continued on occasion in this case?
8    A  It was.  Yes.
9    Q  And were some of those by the Commonwealth on
10 your motion?
11    A  Yes.
12    Q  Do you remember how many?
13    A  Remember — I remember one.  I had a — we had
14 a bad snowstorm.  I was president of the Commonwealth
15 Attorneys' Association and we had our winter meeting
16 which I was responsible for running and getting
17 together.  Judge Jensen allowed a continuance on that
18 issue, because it actually — the only time we could the
19 hotel in was during the week the trial was set on, so —
20    Q  The weather?
21    A  — weather was one of them that I — I just —
22 for rescheduling issues, Judge Jensen allowed.  There
23 was another continuance —
24    Q  When Crump didn't show up and Helton?
25    A  — when Crump and Helton didn't show up.  I

Page 200

1 believe that was on my motion to continue.  I believe
2 when Mr. King changed his testimony, I don't think that
3 was my motion to continue.  That may have been Mr.
4 Hoskins' motion to continue.
5    Q  Okay.  And that was going to be my next
6 question: Do you recall the defendants moving to
7 continue the trial?
8    A  Yes.  A multitude of times.  And — and when I
9 say "a multitude," not as much her attorney — I don't
10 want to say "her" — Amanda's attorney.  Mr. Taylor's
11 attorney moved to continue repeatedly.
12    Q  Who were their attorneys?
13    A  Excuse me?
14    Q  Who was his attorney?
15    A  Mr. Cox and Heather Gatnarek were his
16 attorneys.  We had continuances for competency
17 evaluations.  Expert reports were being done, mitigating
18 evidence.  It was — it — there was some lengthy
19 continuances.  I — I — I remember Mr. Taylor filed
20 several continuances.
21    Q  I want to talk a little bit about one of the
22 continuances with Allen Helton not appearing; do you
23 have a memory of that?
24    A  Limited.  If I'm not mistaken, that was one of
25 the earlier trial dates, I think.

Page 201

1    Q  Do you recall whether Detective York contacted
2 Allen Helton?  How did that come up; do you know or
3 remember why Allen Helton could not be there?
4    A  Oh, wait a minute.  Yeah.  Allen Helton had a
5 — believe a medical condition.
6    Q  I don't know.  Just whatever you can remember.
7    A  I've had so many of these cases.  I think he
8 was coming from Lexington, had a medical issue arise,
9 had to go to the hospital.
10    Q  Do you recall whether they — you were in
11 contact with Allen Helton or his family the day before
12 trial about this, or the day of trial; do you have any
13 memory?
14    A  The day of trial, yeah, because — I do know
15 the day of trial because, if I'm not mistaken, Detective
16 York wasn't able to make contact with his wife,
17 girlfriend.  We had been — we've had a location that he
18 was residing in — I can't remember.  I might be getting
19 this confused with another murder case.
20    Q  All right.  Do you have any memory whether
21 Detective York — were you in — present at the
22 courthouse when he was making those phone calls, or is
23 it —
24    A  Yeah, I was getting two cases confused.  We
25 did have one in — in Lexington where we had a residence

Video Deposition of Jackie Steele taken on June 18, 2019
202..205

Page 202

1  and they went to Lake Cumberland and we were searching
2  for them on a different case. Mr. Helton, if I'm not
3  mistaken, had a medical issue. Detective York was
4  contacting him. I think he may have got – gotten in
5  touch with, actually, Mr. Helton who was – told us he
6  may have been on his way to the hospital or having to go
7  to the hospital for some medical condition. Then, you
8  know, of course I let the court know at that point in
9  time that Mr. Helton had a medical – if I'm not
10  mistaken, Mr. Helton had a medical issue and wasn't
11  going to be present. Mr. Cox objected regarding –
12  didn't know how long he'd be in the hospital and also
13  didn't know the extent of it – of the medical –
14     Q   Excuse?
15     A   – treatment. I believe Mr. Helton had a
16  documented issue that had had to be dealt with before by
17  a hospitalization stay. Those issues were taken to
18  Judge Jensen, I believe, this time and he continued the
19  trial.
20     Q   Did he end up doing a show cause for Allen
21  Helton; do you have any memory of that?
22     A   I don't know if it was a show cause or as much
23  as a – just for him to bring medical – medical records
24  for his –
25     Q   Excuse?

Page 203

1     A   – excuse. Yes. And that would've probably
2  been agreed to and asked for by both parties, myself and
3  them, because obviously we both spent a lot of time
4  getting ready for trial.
5     Q   Now you mentioned Lester – you had made a –
6  talked to his attorney, but Lester would not take
7  anything less – would not take a felony –
8     A   That is –
9     Q   – plea; is that right?
10     A   – that is correct.
11     Q   Did they indicate that they would make an
12  agreement if he was offered a misdemeanor?
13     A   I don't know that we got that far in a
14  conversation. (Clears throat.) Excuse me. I don't
15  know if we got that far in a conversation. Based on my
16  belief at the time, with the information that I had, I
17  would not have been willing to offer a misdemeanor. I
18  believe it was – I believe, if I'm not mistaken, it was
19  a – a felony on facilitation of murder, which would've
20  been a one to five range, if I'm not mistaken.
21     Q   And if that'd been the offer, do you know
22  whether his attorney would've made a counteroffer?
23        MS. STAPLES: Objection. Speculation.
24     Q   Do you have any memory of that?
25     A   I – I don't have a memory. I remember him

Page 204

1  saying he's going to talk to his client, but he – he'd
2  indicated to me before we got off the phone that he just
3  didn't think he do it – he wouldn't take it to his
4  client.
5     Q   And do you know – I don't do the criminal
6  side, but criminal defendants have the right to not
7  testify, their Fifth Amendment right, correct?
8     A   Yes, sir.
9     Q   As a prosecutor, just generally, how does that
10  right get exercised; how do you get notice of it? Can
11  you call a witness in trial and them say the Fifth in
12  front of a jury; how does all that work out?
13     A   No. If – if I have – if I have reason to
14  believe or have any indication that somebody's going to
15  assert their Fifth Amendment right, I have to bring it
16  before the court and the judge outside the presence of a
17  jury so that the judge can make a determination whether
18  or not their Fifth Amendment right does apply, because
19  it's very specific to somebody who could be charged with
20  a crime based upon their statement. So if it's somebody
21  who just doesn't want to testify and they say, "I assert
22  my Fifth," the judge says, "What's the basis of your
23  Fifth Amendment?" and they say, "Well, Judge, I don't
24  want to be here," well, that's not an assertion of your
25  Fifth – that's just not wanting to be there, because

Page 205

1  the judge can hold you in contempt, but it all has to be
2  done outside the presence of a jury.
3     Q   Okay. Is that done at the trial?
4     A   Yeah. I've seen it done both ways. I've seen
5  – I've – you know, I've witnesses subpoenaed for a –
6  a – what we call a final pretrial, usually a couple
7  weeks before the trial date for the court to address the
8  issue, and then I've also had – on the morning of
9  trial, I've – I've had witnesses come up and say, "I'm
10  not going to testify. I'm asserting my Fifth," and, you
11  know, at that point in time it's a scramble. You let
12  the court know. They have to be given counsel to advise
13  them. Most of the time, that alleviates any hearing
14  when the – their public defender talks to them, they
15  say, "You have to testify. You don't have a choice,
16  because you're going to go to jail if you don't. You
17  don't have a Fifth Amendment right here."
18     Q   Did you get far enough at all in the
19  prosecution of Ms. Hoskins, Mr. Taylor, and Mr. Lester
20  whether they would plan to assert their Fifth Amendment
21  rights and not testify?
22     A   No. I wouldn't be notified of a defendant
23  that is charged with a crime during their trial until,
24  one, they take the stand, or two, they rest their case
25  and at that point in time, they – they've asserted

Videotaped Deposition of BRIAN STEELE taken on June 25, 2018

Page 206

1  their right to remain silent. There's no – there's no
2  notification by them of them asserting their right.
3      MR. WRIGHT: Okay. I might be about done if we
4  just go off just one second and let me check off
5  what we've covered already.
6      MS. STAPLES: Can we have, like, a two-minute
7  break?
8          (OFF THE RECORD)
9  BY MR. WRIGHT:
10     Q   All right. I'm about finished. I know you've
11 heard that a bunch today, but I think I'm being honest
12 here, so I'm going to run you through a few quick-
13 hitters to finish up, Mr. Steele.
14     A   Okay.
15     Q   You mentioned that you were not personally
16 involved in assisting Detective York before he appeared
17 before the Grand Jury; is that correct?
18     A   To my knowledge, no.
19     Q   Is it possible that he could've coordinated
20 with any assistant prosecutors in your office?
21     A   It is possible.
22     Q   Okay. As far as the criminal complaint, your
23 office generally does not get involved with those, the
24 arrest warrant criminal complaint?
25     A   That is correct.

Page 207

1      Q   Is that something, though, that police
2  officers may consult at county attorney's office with?
3      A   He'd frequently consult the county attorney's
4  office.
5      Q   Do you have any personal knowledge whether
6  that was done in this case?
7      A   I do not. No. And let me go back. I think
8  you said – two questions ago, you said that he
9  contacted you – I don't – I don't – before these – I
10 don't have any recollection of if – if he did, I'm –
11 they will call me frequently and say, "Hey, this is what
12 I've got going on," just for some general guidance. But
13 I don't – I don't have any recollection. I hate to
14 say, "No, it did not happen," when – when I just may
15 not remember.
16     Q   When something is bound over from a
17 preliminary hearing to the Grand Jury, is that how it
18 works?
19     A   Yes, sir.
20     Q   How does your office become aware of that?
21     A   First, there's a – a generated docket out of
22 the clerk's office, the circuit clerk's office, they
23 will give us as the Grand Jury meets for cases to
24 consider by the Grand Jury. The officers – usually no
25 other case has been bound over to the Grand Jury, so

Page 208

1  they'll come to the next Grand Jury session or,
2  depending on the kind of case it is, it may be, you know
3  60, 90 days before they come out after waiting for the
4  lab to come back.
5      Q   Okay. Do you know who the prosecutor will be
6  who will be presenting the cases that day?
7      A   At this point in time in 2012, Danny Evans was
8  – was handling Grand Jury matters for the office in
9  Laurel and Knox County, so at that point in time they
10 would've been very familiar. Recently in the last few
11 years, I'm the one handling all the Grand Jury matters,
12 except for today because I had this scheduled along with
13 these , so Brandon Jones handled it today, but typically
14 they know it's going to be – at that point in time it
15 was Danny Evans.
16     Q   You indicated that your office maintains this
17 file when it gets it from the case officer; is that
18 correct?
19     A   That is correct.
20     Q   Do you know whether that's physically handed
21 over by the case officer or does your office coordinate
22 with the KSP administrative staff; do you know exactly
23 how that happens?
24     A   Those are typically handed over by the case
25 officer. Knox County's a little different because the

Page 209

1  – the post is in Harlan where the evidence is stored,
2  so that's a considerable trip from Harlan to London
3  sometimes, so occasionally we'll e-mail from Harlan post
4  to our office. Now more so, we probably take advantage
5  of e-mail and electronic communications more so, then
6  it's e-mailed to us.
7      Q   Okay. You were asked questions about whether
8  you rely on the information for police in making your
9  decisions on prosecution; do you recall that testimony?
10     A   Yes, sir.
11     Q   It is true in this case you did follow up with
12 witnesses to prepare for trial, correct?
13     A   That is correct.
14     Q   Okay. You were asked questions about whether
15 you would expect a truth – a report by a police officer
16 to be truthful and accurate; do you remember that
17 questioning?
18     A   I do.
19     Q   Did you consider the report regarding the
20 statement by Wilson to be truthful and accurate?
21     MS. STAPLES: Objection to form.
22     Q   You did confirm it, correct?
23     A   I did.
24     Q   Yeah.
25     A   So yes, I – to answer your – I did consider

Video Deposition of Jackie Steele taken 11 June, 2019

210..213

Page 210

1  it to be truthful.
2       MS. STAPLES: What was your answer? I'm sorry.
3       A   I did consider it to be truthful.
4       Q   Do you know whether there was a report done
5  for the Beach interview, or since you were in attendance
6  you were already aware of it?
7       A   I don't know that there was a report done. I
8  know there was an audio recording done that would've
9  been provided in discovery. I don't know that there was
10  a supplemental report done for it.
11      Q   So when you -- did you disclose that
12  statement, recorded statement by Mr. Beach to defense
13  counsel?
14      A   We did. Yes, sir.
15      Q   And did you consider that to be truthful and
16  accurate when you disclosed it?
17      MS. STAPLES: Objection.
18      A   I did.
19      Q   Because you sat there and heard it yourself?
20      A   I heard it on there.
21      Q   If there are any promises made or incentives,
22  consideration that you were asked about that you believe
23  would implicate Brady or Giglio, would that be put in a
24  writing or a plea agreement of some sort?
25      A   Yes. There - okay. So, yes, there's

Page 211

1  obviously -- any type of information would be handed to
2  defense counsel in some form or fashion, by a written
3  statement, just a notice of filing, could just be a
4  general letter to counsel notifying them of this, not in
5  a court filing. On a plea agreement, they're notified
6  and in the plea agreement itself is a document which
7  serves as notification.
8       Q   And what I was getting at is you were asked
9  questions about Allen Helton; do you recall that name
10  coming up --
11      A   I do.
12      Q   -- from plaintiff's counsel?
13      A   Yes, sir.
14      Q   And I believe that you referenced assistance
15  with other charges or bond on other charges; do you
16  recall that testimony?
17      A   Yes.
18      Q   Okay. If he was facing other charges, would
19  that be in a -- if he pled guilty, would that be
20  memorialized in a plea agreement that he was helping in
21  consideration for help on his pending charges in another
22  case?
23      MS. STAPLES: Objection to form.
24      A   Yes. Typically, it is, and it's done for
25  protection of the Commonwealth. So on a plea -- just

Page 212

1  throw a number out there -- on a plea of -- of five
2  years, probate five years on the condition the defendant
3  truthful -- truth --
4       A   Testified truthfully.
5       A   -- testified truthfully -- thank you -- in the
6  matter of Commonwealth vs. Jane Doe, John Doe. So it's
7  put in there so if they violate that term, we can go
8  back and reopen their case and possibly give them a
9  larger sentence.
10      Q   So if any promises, incentives, or that
11  consideration is made, the Commonwealth has an incentive
12  to document it, right?
13      A   Yes.
14      Q   We talked about the evidence listed in the
15  motion to dismiss, and I believe your testimony was
16  that's the evidence that was no longer available or the
17  statements had changed, correct?
18      A   Say it again.
19      Q   In your motion to dismiss, the itemized
20  evidence you listed were statements or expected
21  testimony from witnesses which was no longer available
22  or you expected their testimony to change?
23      A   You lost me there again.
24      Q   I'm sorry.
25      A   That's okay.

Page 213

1       Q   We talked earlier about the motion to dismiss
2  and you itemized several witnesses in your motion to
3  dismiss, correct?
4       A   Yes.
5       Q   And there were some witnesses that were not
6  listed on there, like Amber Simpson, correct?
7       A   Correct.
8       Q   And Mikey Bruner, correct?
9       A   Yes, sir.
10      Q   Was there other evidence in the case besides
11  just witnesses that could've went to the probable cause
12  or the guilt of the criminal defendants?
13      A   Yes.
14      Q   So for instance, did -- to your understanding
15  of the case, did William Lester have knowledge that the
16  victim had money --
17      MS. STAPLES: Objection to form.
18      Q   -- on her from selling timber?
19      A   Yes.
20      Q   Did he have knowledge of where she kept her
21  money?
22      A   Yes.
23      Q   Did your understanding of the case, did you
24  have reason to believe that Ms. Hoskins had that same
25  knowledge?

Video Deposition of Jackie Steele taken on June 27, 2018

214..217

Page 214

1        MS. STAPLES: Objection. Speculation.
2        A   Yes.
3        Q   Okay. Did you have any evidence of a motive
4    to steal that money, whether it's debts, drug use?
5        A   Yes.
6        MR. WRIGHT: Okay. That's all the questions I
7    have.
8            EXAMINATION
9    BY MR. KELLEY:
10       Q   Mr. Steele, Mr. Wright took most of my
11   questions, but I do have a few.
12       A   Okay.
13       Q   I'm John Kelley. I'm here today representing
14   Knox County. I also represent Sheriff John Pickard
15   who's no longer sheriff, of course, and I also represent
16   Deputy Derrick Eubanks, who now is a deputy I think at
17   Whitley County, still. From what I understand, having
18   15 years' experience as a prosecutor, much of that --
19   for much of that time, Sheriff Pickard was the sheriff
20   of Knox County during much of your term as the
21   prosecutor.
22       A   He was. Yes.
23       Q   All right. Have you ever known Sheriff
24   Pickard to be either the lead investigator or the case
25   officer for any murder cases during the time that you

Page 215

1    served as prosecutor?
2        A   Not to my recollection.
3        Q   Okay. Would I say a great majority and
4    perhaps all have been -- all of the investigations into
5    -- all murder investigations have been conducted by
6    Kentucky State Police?
7        A   No. I -- majority, yes. Barbourville Police
8    Department may have -- may have had a couple and even
9    the sheriff's department's carried a couple murder
10   cases, but primarily, yes, it would be the state police.
11   I think it was Sheriff Pickard's practice on murder
12   cases to get the state police involved quickly.
13       Q   All right. Would he -- would the Knox County
14   Sheriff's Department assist other law enforcement
15   agencies in murder investigations?
16       A   Yes.
17       Q   So there's was a corollary or secondary role
18   in most instances; is that fair?
19       A   That'd be correct.
20       Q   All right. Do you know what role, if any,
21   Deputy Eubanks played in the investigation of this
22   murder case, that is, Katherine Mills' death?
23       A   I don't know of any role.
24       Q   All right. Did you ever hear his name come up
25   during any of your preparation or review of the file?

Page 216

1        A   No. In my review of the file, he was not --
2    he was not considered a witness that I was going to call
3    to trial.
4        Q   All right.
5        A   If his name's in there, it would've been
6    because it's common practice in it to have two people in
7    a room during an interview. The sheriff's department
8    detective -- you know, Derek Eubanks and Sheriff Pickard
9    were really good at tracking people down. They just
10   knew the community better than state police, so I -- I
11   wouldn't be surprised if Deputy Eubanks and Sheriff
12   Pickard found people and brought them to the police
13   department, which is typically what they did in a lot of
14   the investigations.
15       Q   All right. Setting Sheriff Pickard aside for
16   just a second, do you know the involvement of any other
17   Knox County deputies or members of the sheriff's
18   department in the investigation of Katherine Mills'
19   death?
20       A   Not off the top of my head, no.
21       Q   Talking about Sheriff Pickard, I -- a lot of
22   the questions being asked of you by Mr. Slosar were if
23   law enforcement people fabricated or if law enforcement
24   or if the police did; I want to -- I only saw -- heard
25   Mr. -- Sheriff Pickard's name mentioned twice, or in two

Page 217

1    regards. First of all, with regard to Michael Crump,
2    and in particular the photos that were prepared for the
3    -- or that were sent to Mr. Crump; do you know what, if
4    any, involvement Sheriff Pickard had in that?
5        A   I do not know.
6        Q   Okay. As I understand it, as far as you knew,
7    Michael Crump never identified Jonathan Taylor or anyone
8    as being the person he saw at the -- at Ms. Mills'
9    house?
10       A   That is correct.
11       Q   In your evaluation of probable cause for
12   pursuing a -- this prosecution, obviously, you could not
13   and would not have relied upon Michael Crump's
14   observations alone?
15       MS. STAPLES: Objection to form.
16       A   That would be correct.
17       Q   With regard to Allen Helton and, in
18   particular, Exhibit 21, and I think Mr. Wright asked you
19   about this, and since Mr. Slosar's not here, I might get
20   away with a repetitive question, but --
21       THE WITNESS: Maybe not.
22       MR. KELLEY: I don't know. She's very --
23       MS. STAPLES: You got on me last time for
24   getting on you about that.
25   BY MR. KELLEY:

VIDEO DEPOSITION OF JACKIE STEELE taken on June 28, 2019
218..221

Page 218

1   Q   I know. But again, I'll read the – what I
2   consider a pertinent part of that letter from Sheriff
3   Pickard. It says, "James Allen Helton told me that if I
4   could – if I would help him with the receiving property
5   charges that he could give me a lot of information on
6   the Mills lady's murder. I told James Allen Helton that
7   if this information were true, I would see what could be
8   done on the receiving stolen property charges." Did
9   Sheriff Pickard do anything inappropriate or unethical
10  or do anything that you consider to be less than
11  professional?
12      MS. STAPLES: Objection to form.
13  Q   – in relaying that –
14      MS. STAPLES: I'm sorry.
15  Q   – information?
16  A   No.
17  Q   Or having that conversation with Mr. Helton?
18  A   No, I do not.
19  Q   Okay. You've already – believe I – think
20  you already said that this particular exhibit, number
21  21, was provided to the defense once sent to you?
22  A   Yes, sir.
23  Q   All right. You did talk to James Allen Helton
24  at some point concerning his statements?
25  A   Again, I don't – I don't have any independent

Page 219

1   recollection of – of a statement from him. I'm sure I
2   did, but I don't have any independent recollection of
3   that.
4   Q   Well, he was not mentioned in your motion to
5   dismiss; –
6   A   Correct.
7   Q   – is that fair?
8   A   That is fair.
9   Q   If he had come to you and said, "They coerced
10  me into making a statement," would you have considered
11  that to be grounds for a motion to dismiss?
12  A   Yes.
13      MS. STAPLES: Objection to form.
14  A   I'm sorry. Yes, I would.
15  Q   All right. Likewise, if he had recanted his
16  statement at some point, would you have included that in
17  your motion to dismiss?
18  A   Yes.
19      MS. STAPLES: Objection to form.
20  Q   It's my understanding that you believed you
21  had probable cause to prosecute Amanda Hoskins and
22  Jonathan Taylor for the murder of Ms. Mills until the
23  events that ultimately led to you filing the motion to
24  dismiss; is that fair?
25  A   That is fair.

Page 220

1   Q   Okay. And did you have plans to call Sheriff
2   Pickard at the trial in this case?
3       MS. STAPLES: I'm going to object on
4   speculation. He hadn't got to that point.
5   A   I had not had intentions to call him in my
6   case in chief, no.
7   Q   Okay. Likewise, any other Knox County deputy
8   or member of the sheriff's department?
9       MS. STAPLES: Same objection.
10  A   No.
11      MR. KELLEY: Okay. That's all I have. Thank
12  you.
13      MS. KINCER: Finally have you under oath.
14      MS. STAPLES: You going to ask him questions
15  about the prosecutor's conference? I've heard what
16  goes on there.
17      MS. KINCER: Nothing like the Kool-Aid drinking
18  DTA was.
19      MS. STAPLES: Right.
20          EXAMINATION
21  BY MS. KINCER:
22  Q   Mr. Steele, to my understanding, you've been a
23  Commonwealth Attorney for 15 years; do you also teach?
24  A   I've been the Commonwealth Attorney for 10
25  years, was an assistant for five-ish , but yes, I have

Page 221

1   taught classes, also. Yes, ma'am.
2   Q   Well, do you teach young prosecutors?
3   A   I do.
4   Q   Okay. Do you also teach sometimes the police?
5   A   Yes, I do.
6   Q   On the rights and wrongs and how to document
7   things?
8   A   Yes, ma'am.
9   Q   Okay. I want to turn your attention to
10  Exhibit 5, which is your cheat sheet.
11  A   Yes, ma'am.
12  Q   On there, you said one of the admin people, I
13  think, are the ones that fill this out for you all; is
14  this a documentation that you put in the front of the
15  file so that when you're in court you can refer to it
16  quickly and know what the case – kind of a brief
17  synopsis of the case is?
18  A   Yes.
19      MS. STAPLES: Objection to form.
20  A   So the – let me look it over to – so I can
21  – just looking at the same thing. So, if you're
22  looking at that form, you'll see number 13 circled at
23  the top of that. That would've been written by us. That
24  indicates the recorder number for the Grand Jury
25  testimony. When we go back to that day, it's going to

Video Deposition of Jackie Steele taken on June 4, 2008

222..225

---

Page 222

```
 1   be number 13 on that docket list.  Obviously, the "yes,
 2   no, continue," that's the yesses initialed by the four
 3   parts of the Grand Jury.  Detective York would've filled
 4   out everything that would've been typed.  The – the
 5   notation there beside "murder," "striking Katherine
 6   Mills in the head with a hammer," and the notation
 7   beside "Robert took 20 – $12,280 from Katherine Mills,"
 8   that appears to be the writing of a lady in my office
 9   who would've been preparing in – the indictment, so
10   that she knew the wording to put in the indictment."
11       Then the PFO second degree also would've been done by my
12   office because we will do the criminal record search
13   after the – presenting it to the Grand Jury.  On the
14   second page, which isn't uncommon for the officers to
15   leave out the witness – witnesses, that appears also to
16   be the writing of a lady in my office.  Again,
17   everything typed on that page would've been prepared by
18   Detective York.
19       Q    Okay.  When it talks about the witnesses, you
20   have Mark Mefford listed second –
21       A    Uh-huh.
22       Q    – not you, but the lady; does that – is
23   there any significance to the order of this or the
24   importance of the witness?
25       A    No, ma'am.
```

---

Page 223

```
 1       Q    Okay.  From my understanding, Mark Mefford
 2   accompanied Sergeant York to the Daniel Wilson
 3   interview; does that sound right to you?
 4       A    That does.  Yes.
 5       Q    Okay.  And you testified just a second ago
 6   that when detectives will – oftentimes will have two
 7   people go to an interview; why is that?
 8       A    If something was – God forbid something
 9   happened to Detective York from this to the – pending
10   to the action, getting that statement in could be
11   problematic.  Even – even if it's a recording, without
12   somebody to say it's a true and accurate depiction –
13   description of the – of the recording, you can't get it
14   in if the witness has recanted, so that's what they said
15   too, and also I think that they probably do it out of
16   abundance of caution, also, to say, you know, there –
17   people don't allege things that they were saying or
18   doing so that there's another witness present.
19       Q    Yeah.  With Mark Mefford attending that with
20   Daniel Wilson, –
21       A    Uh-huh.
22       Q    – but would the hears of – the rules of
23   hearsay, Daniel Wilson would've had to say what he said
24   on the stand, correct?
25       A    Yes, ma'am.
```

---

Page 224

```
 1       Q    And if he had said something different, he
 2   could've been impeached by either Mefford or Sergeant
 3   York?
 4       A    That is correct.
 5       Q    Okay.  Would you – do you – did you plan on
 6   calling Mark Mefford?  Because that's the only
 7   involvement that we had of – with him.
 8       A    No.  I take the – the only individual that I
 9   had planned to call in my case in chief would've been
10   Jason York – Detective York.
11       Q    All right.  So then is –
12       A    And – and again, as the lead officer, he
13   can't testify what anybody else says, –
14       Q    Correct.
15       A    – but more about the collection of evidence
16   and the procession of the investigation.
17       Q    Okay.  Well, I think you've already answered
18   my question, then: Did you have any intent of calling
19   Jackie Joseph who would have – just have been a
20   supervisor?
21       A    No.
22       Q    How about Brian Johnson who happened to be the
23   unlucky new kid on the block who drove up there to
24   Robert Beach?
25       A    No.  No.  Not Brian Johnson, no.
```

---

Page 225

```
 1       Q    Okay.  Kelley Farris, who apparently served a
 2   subpoena for somebody so that somebody else would come
 3   to – potentially come to the – one of the trials?
 4       A    No.
 5       Q    Okay.  Dallas Eubanks, who put up crime scene
 6   tape at the night of?
 7       A    No.
 8       Q    Okay.  All right.  I should probably stop
 9   there.  How common – I think Derrick Wright touched on
10   this a minute, but – ago, but how common is it for
11   witnesses to have troubled pasts when you're dealing
12   with criminal defendants and witnesses?
13       A    That is very common, especially in – in
14   murder – murder cases.  That – naturally, the – that
15   – especially in this type of – of murder case in which
16   a home invasion, robbery, when you talk about the
17   witnesses in this matter, the drug addiction, the drug
18   use.  They're not pillars of the community and their
19   testimony changes frequently.  That's why we like to get
20   them recorded if at all possible, as soon as possible,
21   but I've never had any – I don't remember a murder case
22   that I've ever had in which somebody didn't change
23   something.
24       Q    Okay.  So often then they have criminal histories?
25       A    Yes.
```

Video Deposition of Jackie Steele taken June 5, 2019

226..229

Page 226

1        MS. STAPLES:  Objection to form.
2     Q   Convicted felons?
3     A   Yes.
4     Q   Okay.  So, do you find a lot of what they have
5  to say untrustworthy; is that one of the reasons you
6  record – try to record the –
7        MS. STAPLES:  Objection to form.
8     A   Partially, yes.
9     Q   Okay.  Do you find in a criminal prosecution
10  that oftentimes somebody's inconsistency can just be as
11  important piece of evidence as a fingerprint or
12  something like that; if you can prove that they are not
13  telling the truth, they – as an alibi?
14     A   Yes.
15     Q   Okay.  And is that an important factor in
16  probable cause?
17     A   It can be, yes.  It – of course, that's
18  always case specific, but it absolutely can be.
19     Q   Okay.  In this particular case, it looks like
20  the arrest warrant was March 14 of 2012 and the Grand
21  Jury was April 27 of 2012; do you know if this case was
22  bound or held or waived?
23     A   If they filled it out.
24     Q   Would it be on your cheat sheet?
25     A   It should be on the cheat sheet.  On the top

Page 227

1  of PL26181, "Did this case start in district court?
2  Circle yes or no."  They didn't circle, but it gives a
3  date of March 27, 2012, action taken, Grand Jury, which
4  indicates to me that's the day it was bound over,
5  possibly.
6     Q   So there was a hearing in – a preliminary
7  hearing, or waived?
8     A   When – when was – I don't – now, that I
9  don't know.  That wouldn't have been on the cheat sheet
10  whether it was a preliminary hearing or a waiver of –
11  of a hearing.
12     Q   If it was bound over, would a judge have had
13  to make a determination of probable cause to bound it to
14  the Grand Jury?
15     A   For a judge to do it, yes, or there could've
16  been a stipulation of probable cause by the defendant
17  and it bound up about the hearing.
18     Q   Would they waive that?
19     A   They'd waive it.  Yes, ma'am.
20     Q   Okay.  But you don't know which one happened
21  in this –
22     A   I do –
23     Q   – particular case?
24     A   – I do not.  There was either a stipulation
25  to probable cause by the defendant and they waived up to

Page 228

1  Grand Jury, or there was a preliminary hearing and the
2  court found probable cause.
3     Q   Okay.  All right.  I'm going to ask you some
4  silly questions, but have you ever had a perfect case?
5     A   No.
6     Q   Have you ever had a smoking gun?
7     A   No.  I – I've had – I've had them confess
8  before, which I guess is as close to smoking gun as you
9  can get, but...
10     Q   Okay.  Have you ever had a perfect
11  investigation?
12     A   No.
13     Q   Okay.  Do you do absolutely your best to do
14  what is right in every single case?
15     A   Yes, ma'am.
16     Q   Okay.  Do you find the same true with the
17  Kentucky State Police troopers that you've worked with?
18     A   Yes.
19     Q   Okay.  Have you ever known any of the troopers
20  that are named in this lawsuit to ever have conspire or
21  frame or fabricate anything?
22     A   No.
23        MS. KINCER:  Okay.  That's all the questions I
24  have for you.
25        MR. FARAH:  Sir, I'm going to be very specific.

Page 229

1  I represent – need a break?
2     THE WITNESS:  Five minutes.
3     MR. FARAH:  Five minutes.
4     THE WITNESS:  All right.
5     MR. FARAH:  Let's go with that one.
6     MS. KINCER:  All right.  Wait.  Wait. Wait.
7  Wait.
8              EXAMINATION
9  BY MR. FARAH:
10     Q   I represent Mike Broughton and the
11  Barbourville Police Department.
12     A   Okay.
13     Q   I'm going to ask very specific questions about
14  them.
15     A   Okay.
16     Q   Are you familiar with Mike Broughton's role in
17  the murder investigation and the prosecution in this
18  case?
19     A   If I'm not mistaken, I believe Mr. Broughton
20  was in an interview, and I can't even tell you which
21  interview it was, but I think he was in a – in an
22  interview.
23     Q   I'll represent to you that he was present on
24  one day when Detective York brought in Amanda Hoskins
25  and Jonathan Taylor to the Barbourville Police

Video Deposition of William Reid Vaughn - July 10, 2019

230..233

Page 230

1  Department to be interviewed.

2      A   Okay.

3      Q   And I think some photographs were taken, as

4  well; that -- you -- that was discussed earlier today.

5      A   Correct.

6      Q   From your experience, when KSP's investigating

7  something in Knox County, is it common for them to

8  utilize either the Barbourville Police Department or the

9  Knox County Sheriff's office to bring witnesses or

10  suspects in to be interviewed?

11     A   Yes.  Typically, they will -- because like I

12  said, the -- the Harlan post is the post for the state

13  police, which is 45 minutes to an hour drive in -- from

14  Barbourville area.  There is a -- a location that the

15  KSP will use down there, but it is a public place.  It's

16  the RECC building in Letcher County.  They have a little

17  office in there for them to type and do everything. It's

18  not conducive to bringing individuals in for interviews,

19  long interviews, with the public coming in and out.  So

20  they will -- majority of the time, they will use the

21  Barbourville PD.  It's just a better facility for the

22  interview process, recording, and it's just a nicer

23  facility, too.

24     Q   And in your experience, is it common for

25  either Mike Broughton or other members of the

Page 231

1  Barbourville Police Department to sit in on interviews?

2      A   About 50-50.  I mean, sometimes they are,

3  sometimes they're not.  They just give them a room.  It

4  just -- it's 50-50.  I can't say if they always do or

5  they always don't.  Sometimes they do, sometimes they

6  don't.

7      Q   And in this case, again, you said earlier

8  Detective York was the lead officer, correct?

9      A   Yes, sir.

10     Q   And the KSP was the lead agency with regard to

11  this investigation, correct?

12     A   Yes, sir.

13     Q   Did you have any intention of calling Mike

14  Broughton as a witness if this matter had gotten to

15  trial?

16     A   No, sir.

17     Q   Did you present Mike Broughton to the Grand

18  Jury?

19     A   No, sir.

20     Q   Did you ever meet with Mike Broughton -- and

21  let me -- I think Mike -- I mean Mike Broughton and

22  anybody else in the Barbourville Police Department.

23     A   Okay.

24     Q   Did you ever meet with any of them in this

25  investigation?

Page 232

1      A   No.

2      Q   Did you ever meet with Mike Broughton or any

3  of the officers in the prosecution?

4      A   Not that I can recall.

5      Q   There were some exhibits earlier in the case

6  report that was submitted by, I think, Detective York

7  that contained, per your testimony, all the different

8  statements and reports from different law enforcement

9  officers; did that report contain any documents or

10  information from Mike Broughton or the Barbourville

11  Police Department?

12     A   Not that I can recall.  No.

13     Q   Mike Broughton didn't prepare any arrest

14  warrant applications, correct?

15     A   Not to my knowledge, no.

16     Q   And we got -- you know, obviously we got a

17  copy of your file from -- in discovery; there's no notes

18  or reports in that file from Barbourville or Mike

19  Broughton, are there?

20     A   No.  To my recollection, no.

21     Q   You weren't pressed to pursue an indictment

22  against either Ms. Hoskins or Mr. Taylor by Mike

23  Broughton or the Barbourville Police Department,

24  correct?

25     A   No.

Page 233

1      Q   There were -- I know there were a lot of --

2  what?  I'm not going to make it.  I know there were a

3  lot of hearings in the criminal case, different

4  motions --

5      A   Yes.

6      Q   -- and so forth; did Mike Brought -- was he

7  ever called as a witness at any of those hearings?

8      A   Not that I recall.  No.

9      Q   I'm getting there.  Are you aware of any

10  evidence or allegations that Mike Broughton withheld any

11  exculpatory evidence from you or from the counsel for

12  Ms. Hoskins and Mr. Taylor?

13     A   No.

14     Q   Are you aware of any evidence or allegations

15  that Mike Broughton or Barbourville fabricated any

16  evidence or fabricated any statements?

17     A   No.

18     Q   Did you consult with Mike Broughton or

19  Barbourville at all in this investigation or prosecution

20  at any level from the day you got the case referred to

21  you until you dismissed the case?

22     A   I don't -- I -- I can say no, I would not have

23  consulted with them on it.  I may have discussed --

24  discussed it with them you -- just in regards to where

25  it's going or what -- you know, what's going on, but as

Video Deposition of Jackie Steele taken on June 6, 2018                    234..237

Page 234

1  far as consulting them, no.
2      Q   As far as officially in the investigation and
3  prosecution, would you have?
4      A   No.  More of just an inquiry as to, "Hey,
5  what's going on in this case?" or – that – that would
6  be the nature of it.
7      Q   And obviously when the indictment was issued
8  against – and the Grand Jury returned the indictment
9  for Ms. Hoskins and Mr. Taylor, there was probable cause
10  established at that level, correct?
11     A   Yes.
12     Q   Okay.  And obviously, you – I'm sure you
13  agreed with what the Grand Jury did in that case,
14  correct; at that level, you agreed?
15         MS. STAPLES:  Objection to form.
16     Q   Your office presented the case to the Grand
17  Jury, they returned an indictment; I'm assuming you
18  agreed with their finding?
19     A   I – I – I will – well, let me put it this
20  way: Even if a Grand Jury returns an indictment and I do
21  not think probable cause can be sustained, I have a duty
22  to dismiss the indictment.  I did not do that once a
23  Grand Jury returned it, so I think probable cause, which
24  is what the Grand Jury's there for – probable cause had
25  been established at the time of the Grand Jury heard it.

Page 235

1          MR. FARAH:  I made it, didn't I?
2          MS. KINCER:  You're done.
3          MR. FARAH:  I'm done.  That's all I got.
4              REDIRECT EXAMINATION
5  BY MS. STAPLES:
6      Q   I just have a few follow-up questions. It
7  won't take long.  Mr. Wright touched on the number of
8  continuances that occurred in this case.
9      A   Uh-huh.
10     Q   Can you recall specifically how many times
11  this case was continued?
12     A   Specifically, I cannot.
13     Q   Can you recall how many times specifically Ms.
14  Hoskins' counsel requested continuances?
15     A   Specifically, I cannot.
16     Q   Can you recall Ms. Hoskins' counsel ever
17  requesting a continuance?
18     A   I can't remember if they did or did not,
19  specifically.
20     Q   Can you recall Ms. Hoskins' counsel filing a
21  motion for a fast and speedy trial?
22     A   Somebody filed a motion.  I can't remember
23  which party filed a motion.  I'm – I'm sorry I can't,
24  but somebody did file a motion for a fast and speedy
25  trial.

Page 236

1      Q   Okay.  Do you recall Ms. Hoskins being let out
2  on bond because the trial had not yet occurred?
3      A   She was, and I'd –
4          MR. WRIGHT:  Object to form.
5      A   – I'd forgot about that until Mr. Slosar was
6  talking about the difference in timeframes when we filed
7  a motion to dismiss, and I – as I was sitting here
8  thinking, "Why did I wait?"  And I – it dawned on me
9  that she was not being held at the time because she was
10  out on bond.  Mr. Taylor was not out on bond, so I filed
11  his a – just a matter of a few days, I think, after my
12  conversation with Mr. Beach and Mr. Wilson, and then
13  since she was out, I had a little more time, and they
14  had also separated the trial, so I filed hers later, but
15  I do remember her being out on bond.  Yes.
16     Q   Okay.  So speaking of the motion to dismiss,
17  you were asked if there was other evidence other than
18  what's mentioned in your motion to dismiss that you –
19     A   Uh-huh.
20     Q   – considered, and I think you were asked
21  specifically about Amber Simpson, Mikey Bruner, –
22     A   Uh-huh.
23     Q   – and the defendants having knowledge of
24  money that Ms. Mills had; is that correct?
25     A   That's correct.

Page 237

1          MR. WRIGHT:  Object to form.
2      Q   And you considered all that evidence when you
3  filed this motion to dismiss?
4      A   Yes.
5      Q   And despite having that evidence, you felt
6  like probable cause could not be found – that probable
7  cause no longer existed?
8      A   Yes.  I – do you want me to explain or
9  just –
10     Q   No.  You can just give me the answer, yes or
11  no.
12     A   Yes.
13         MS. STAPLES:  Okay.  That's all I need.
14         THE WITNESS:  Okay.
15              RECROSS EXAMINATION
16  BY MR. WRIGHT:
17     Q   Why don't you go on ahead and explain?
18     A   I had a feeling that was coming.  So, when I
19  looked at the – the case in its entirety at this – at
20  this juncture, and I knew that a multitude of witnesses
21  were not available or their testimony changed, the
22  remaining evidence taken in consideration, I thought
23  that there was so much evidence and testimony that
24  changed by witnesses, the Commonwealth would not be –
25  be successful at trial, to the point that I – I just

Video Deposition of Derrick Kelley - ORIGINAL - Thursday, June 20, 2019

238..241

Page 238

1  thought probable – that probable cause was no longer –
2  no longer available.  There was still evidence, but I
3  just didn't think it was going to overcome all the
4  changing of testimony that was out there.
5      Q   Did you – was there ever a point when the
6  defense identified who their witnesses would be for
7  trial?
8      A   No.  And in the Commonwealth of Kentucky,
9  there's no requirement for a witness list in criminal
10  cases, either by the prosecution or the defense.
11     Q   Okay.  When you prepared for trial, you said
12  you'd follow up with witnesses and this trial was
13  continued a couple different times.  Did you follow up
14  multiple times or did you just follow up one time; do
15  you have any memory?
16     A   I don't – I don't have any memory.  No, and
17  – and part – part of that is that once you've talked
18  to them once, like Mr. Beach, after I talked to him
19  there in the prison and I'd saw him a couple times at
20  court just about the transport issues, I didn't discuss
21  with him – you know, I figured if – if it's an issue
22  that comes up, he'll call me and say, "I'm not
23  testifying," or, "They made me say this," you know,
24  something of that nature and that never happened from
25  when I – you know, I did follow up because it had been

Page 239

1  a – a year more since I'd taken a statement from him, I
2  did follow up with him.
3      Q   All right.  Just have one other document to
4  look at.  This was in your file that was produced by
5  plaintiffs to us after the subpoena.
6      A   Okay.
7      Q   PL24722 through -728; did your office prepare
8  that?  Let you –
9      A   Give me – let me –
10     Q   Sure.
11     A   – give me one second.  I'm sorry.
12     Q   Take a second.
13         MS. STAPLES:  Are you getting a copy for us,
14  Derrick?
15         MR. WRIGHT:  Yeah.
16         MS. STAPLES:  Okay.  Thank you.
17         MR. FARAH:  Derrick, what is this document?
18         MR. WRIGHT:  It is a response that was filed by
19  their office to some of the motions that we talked
20  about.
21         MR. FARAH:  All right.
22  BY MR. WRIGHT:
23     Q   Let me get the – I'll get the number again.
24  I'm sorry.
25     A   It is – number's PL24722 to PL24728, and yes,

Page 240

1  this was – this was prepared by my office.
2      Q   I believe – I gave my copy over there – on
3  page 3, there's a paragraph there about Danny Wilson; do
4  you see that?
5      A   Yeah.  It'd be paragraph 2 under the heading
6  of "Additional Discovery Information."
7      Q   Right.  Page 3, paragraph 2.  You're right.
8      A   Yes, sir.
9      Q   And it indicates that Jason York relayed a
10  request to the Commonwealth Attorney about him wanting
11  to relocate from one part of a prison to another; do you
12  see that?
13     A   I do.
14     Q   Would that be some sort of promise, incentive,
15  or consideration that would implicate Brady or Giglio,
16  in your opinion?
17     A   No, it would not.
18     Q   Okay.  You can turn to the next page, the
19  paragraph at the top relating to Amber Simpson, do you
20  see that?
21     A   I do.
22     Q   And that paragraph indicates that her mother
23  had inquired about help for Amber's brother and that
24  Detective York would relay the request to the
25  Commonwealth Attorney; do you see that?

Page 241

1      A   I do.
2      Q   Would that implicate Brady or Giglio as a
3  incentive, promise, consideration, in your opinion?
4         MS. STAPLES:  Objection to form.
5      A   No.
6         MR. WRIGHT:  Okay.  That's all the – I'll make
7  this Exhibit – what are we on?
8         COURT REPORTER:  24.
9         MR. WRIGHT:  All right.  Exhibit 25.
10        (EXHIBIT 24 MARKED FOR IDENTIFICATION)
11        COURT REPORTER:  Here's – I've got it written
12  out there if you want it.
13        MR. WRIGHT:  Okay.  Thanks.
14        THE WITNESS:  I think I kept all these in
15  order.  I try my best.
16        COURT REPORTER:  Thank you.
17        MR. WRIGHT:  Anything else?
18             RE-EXAMINATION
19  BY MR. KELLEY:
20     Q   Have one.  Just – Danny Evans, how long has
21  he been a prosecutor?
22     A   Oh, Danny Evans was a prosecutor from 1978, I
23  believe, until 2008, which would've been 30 years.  He
24  was an assistant under Tom Handy for most of those years
25  and in 2003 he became the Commonwealth Attorney until

Page 242

1  2008 when he retired.  He came back in 2010, maybe --
2  either 2009 or 2010, came back to an assistant, was an
3  assistant in the office for me until he took an
4  appointment to the bench as a circuit judge.
5      Q   He was appointed to the --
6      A   He was --
7      Q   -- Circuit Court, Division 2, I believe.
8      A   That is correct.
9      Q   All right.  And am I correct -- did you have a
10  discussion with him at any point concerning this case;
11  would he have collaborated with you during that time?
12      A   During the time he was an assistant in my
13  office?
14      Q   During -- yes, during the time he was an
15  assistant in your office?
16      A   I mean, he would've talked to me about it
17  probably after the indictment.  If he would want to --
18  heard the -- heard the case in the Grand Jury, he
19  would've talked to me about it, about what kind of case
20  it was coming up.
21      Q   Did he ever indicate to you that he had any
22  doubts about probable cause being established at the
23  time the Grand Jury indicted?
24      A   He never indicated that to me, no.
25      Q   All right.  Did he ever indicate to you that

Page 243

1  probable cause didn't exist at any time during the
2  course of the proceedings?
3      A   No, and that's one thing he would've done or
4  any assistant in my office would've done if probable
5  cause did not exist.
6      MR. KELLEY:  That's all I have.  Thanks.
7      THE WITNESS:  Can I follow up with one issue?
8  You had mentioned he's in Division 2.  When he
9  became a circuit judge in Division 2, that was an --
10      another reason for a continuance and delays in this
11  matter because we had to get special judges.  I
12  completely forgot about that issue until you
13  mentioned him as Division 2.  I just wanted to
14  follow up on that.
15      (DEPOSITION CONCLUDED AT 5:55 P.M.)
16
17
18
19
20
21
22
23
24
25

Page 244

1  CERTIFICATE OF REPORTER
2  STATE OF INDIANA
3
4  I do hereby certify that the witness in the foregoing
5  transcript was taken on the date, and at the time and
6  place set out on the Title page hereof by me after first
7  being duly sworn to testify the truth, the whole truth,
8  and nothing but the truth; and that the said matter was
9  recorded by me and then reduced to typewritten form
10  under my direction, and constitutes a true record of the
11  transcript as taken, all to the best of my skills and
12  ability.  I certify that I am not a relative or employee
13  of either counsel, and that I am in no way interested
14  financially, directly or indirectly, in this action.
15
16
17
18
19
20
21
22  LACEE TOWNSEND,
23  COURT REPORTER / NOTARY
24  COMMISSION EXPIRES ON: 06/19/2024
25  SUBMITTED ON:  06/29/2018

## Exhibits

**exhibit 1** 14:6, 7,10 61:21 62:3,4

**exhibit 2** 16:13,17

**exhibit 3** 17:10,12 143:9

**exhibit 4** 19:21 20:2

**exhibit 5** 21:23 22:3 221:10

**exhibit 6** 32:2, 7

**exhibit 7** 34:8, 12 36:21 37:16

**exhibit 8** 35:15,19 37:19, 20

**exhibit 9** 38:15,19

**exhibit 10** 42:7

**exhibit 11** 44:14,15,18

**exhibit 12** 48:8,13 53:7 73:5,19 136:23

**exhibit 13** 50:13,18 51:4,8

**exhibit 14** 51:3 72:11,14 81:18, 19

**exhibit 15** 95:9 110:8,10 193:13

**exhibit 16** 94:21,22 95:1 111:10

**exhibit 17** 94:23 95:2

**exhibit 18** 95:17,18 96:9

**exhibit 19** 118:4,5,8,11

**exhibit 20** 118:7,12 121:12

**exhibit 21** 132:7,10 192:1 217:18

**exhibit 22** 141:5,12 168:10 197:4,5

**exhibit 23** 152:22 153:1

**exhibit 24** 241:10

## $

**$100** 152:25 153:2

**$12,280** 222:7

## -

**-728** 239:7

## 1

**1** 14:6,7,10,20 36:22,23 61:21 62:4 81:19 149:7

**10** 42:3,7 220:24

**11** 44:15,18

**11:02** 119:21

**12** 12:23 48:8, 13 52:18 53:7 73:5,19 136:23

**12-22-2010** 120:7

**12-CR-070** 50:14

**12-CR-70** 48:9

**13** 50:13,18 51:4,8,9 128:18,24 221:22 222:1

**14** 15:13,14 16:6,15 17:7,20 51:3 60:2 72:11,14 81:19 110:5,14 226:20

**15** 84:25 94:18 95:9,10 110:8, 10 119:21 121:14,15 122:6 172:24 193:13 214:18 220:23

**158** 111:11

**16** 94:22 95:1 109:13,19 111:5,10 113:2

**162** 111:11,15, 16

**17** 94:17,23 95:2 96:10

**18** 95:17,18,20 96:9 111:12 135:8,15

**19** 118:5,8,11

**1978** 241:22

## 2

**2** 16:13,17 37:15,21 42:16 83:17,18 100:20 146:15 240:5,7 242:7 243:8,9,13

**20** 101:7,20 102:2,8 118:7, 12 120:14 121:12 122:11, 19,25 124:9 222:7

**20-something** 193:10

**2001** 11:10

**2002** 28:9,11 52:17 113:2

**2003** 241:25

**2008** 241:23 242:1

**2009** 192:24 193:5 242:2

**2010** 23:3 101:7,20 102:2, 8 120:14 122:11,19,25 124:9 242:1,2

**2011** 12:8,13, 19,24 13:8 73:25 74:8 100:20 119:21 121:14,15,18 122:6 127:4 146:22

**2012** 15:13,17, 21 16:6,15 17:7,20 18:1,24 19:9,18 20:11, 17,20,25 21:6 24:12 26:18 29:22 31:5 34:20 36:7 45:18 47:6,14, 15 52:18 53:1 55:11 56:7 60:2,12 62:17, 23 63:24 64:7 66:23 67:13 109:13,19 110:5,14 111:5 119:25 128:18, 24 130:8,19 131:8 135:8,15 137:19 151:22 153:16 154:8, 13,15 156:8,13 208:7 226:20, 21 227:3

**2013** 33:5 36:1, 13,19 42:16

**2014** 137:2 138:13 139:11 173:9

**2015** 142:8,9 143:13

**2016** 29:23 72:13 80:16,17 81:4,14,20 83:21 109:12, 18 110:3 111:3

**122:16 124:22 127:4 128:18, 23 130:5,16 133:20 134:3 135:7,13 139:10 142:15, 18 143:17 148:21 149:17 155:13,19 157:3,16 161:5 177:5 178:13 183:9

**2017** 31:5 52:18 53:1 55:11 56:7 63:24 64:7 67:13 162:14

**21** 111:18,19 132:7,10 152:17 192:1 217:18 218:21

**22** 141:5,12 152:20 168:10 197:5

**23** 81:20 148:21 152:9,10,22 153:1 177:5 178:13 180:6

**24** 74:8 127:4 146:22 241:8, 10

**24458** 34:10

**24540** 42:5

**25** 241:9

**25251** 143:9

**25296** 50:15

**25414** 100:18, 23

**25418** 73:6,7

**25426** 182:7

**25461** 101:9,15

**25516** 48:10

**26** 137:2

**27** 20:11 73:25 226:21 227:3

**27th** 10:21

**29** 72:13 157:3

**3**

**3** 17:10,12 38:6 41:1 143:9 193:5 240:3,7

**3.8** 30:1,17 44:9 123:10

**30** 84:22 173:19,23 195:11 241:23

**338** 120:3

**383** 151:20

**4**

**4** 19:21 20:2 21:19,21 36:24, 25 41:19 121:18

**40** 149:2

**40070** 32:12

**45** 84:22 173:19,23 230:13

**4th** 178:19

**5**

**5** 21:23 22:3 36:19 72:22 73:23 146:14 186:10 221:10

**50-50** 231:2,4

**501** 38:16

**5:55** 243:15

**5th** 35:25

**6**

**6** 32:2,7 34:20 151:22 154:13, 15

**60** 208:3

**600** 12:12,14

**606-622-1780** 121:23

**7**

**7** 34:8,12 36:13, 21 37:16

**7.24** 37:7 45:3

**72** 32:14

**8**

**8** 12:22 35:15, 19 37:19,20 41:19 130:8,19 131:8

**9**

**9** 38:15,19 111:12,19

**90** 208:3

**9:30** 121:18

**A**

**a.m** 121:19

**a.m.** 119:21

**abilities** 165:6

**absolutely** 117:21 118:3 226:18 228:13

**abundance** 223:16

**access** 154:1

**accident** 28:14 78:4

**accompanied** 223:2

**accountable** 43:13

**accounting** 11:19

**accurate** 23:20 49:5,18 58:5 61:6 209:16,20 210:16 223:12

**accurately** 51:12

**accused** 22:24 29:9 30:7,21

**acquaintance** 164:23 165:3

**acquired** 59:20

**action** 91:7 186:4 223:10 227:3

**actions** 89:13 94:10,13 104:3, 22 105:15 106:8 107:1,19 108:12 109:4

**active** 55:14

**actively** 193:4

**activities** 55:23

**actual** 48:18

**addiction** 225:17

**adding** 183:20

**additional** 38:7 43:5 46:21 195:3 240:6

**address** 68:11 69:7 205:7

**admin** 221:12

**administered** 43:19

**administrative** 208:22

**admissible** 183:13

**admitted** 142:20

**advantage** 209:4

**advice** 126:19

**advise** 120:4 205:12

**advised** 126:12,14 166:18

**advising** 139:5

**affiant** 119:7 121:17

**Affiant's** 14:21

**affidavit** 118:5, 13,25 119:8,18 120:2,23 121:13 122:5 123:3

**affidavits** 119:3

**affirm** 8:4

**affirmative** 150:20

**affirmatively** 46:22 47:2 75:9 172:3

**affixed** 151:21

**afternoon** 8:11,12 68:23 151:7,10

**agencies** 52:21 53:3 56:25 57:13,21, 24 58:5,25 59:18 60:22 67:8,15 215:15

**agency** 49:1 56:9 102:25 112:9 117:4 161:7 162:3,7 231:10

**agree** 34:19 43:3 98:17 99:23 119:22 132:16,21 141:23 142:1 145:4,8,25 146:20 165:13

**agreed** 37:7 190:18,23

**191:21 203:2 234:13,14,18**

**agreement** 63:8 65:19 111:24 203:12 210:24 211:5,6, 20

**agreements** 43:12

**ahead** 18:19 27:11 46:25 50:19 52:4 84:13 145:22 180:2,4 237:17

**ahold** 68:25

**alcohol** 145:11

**alibi** 226:13

**alive** 186:7

**allegations** 10:1 233:10,14

**allege** 223:17

**alleged** 196:1

**Allen** 23:21 43:19,24 130:8, 17 131:25 139:3 167:9,11 196:15,18 200:22 201:2,3, 4,11 202:20 211:9 217:17 218:3,6,23

**alleviates** 205:13

**allowed** 113:25 114:9 199:17,22

**alter** 36:14,17

**alternative** 28:13

**Amanda** 10:8 14:8,15 19:8 20:7 22:25 29:20 33:6 34:16 43:1 44:7,16 48:2 52:25 53:22 58:8 60:3,11

66:13,18,25
68:9 70:15 71:7
72:12,18 73:12
74:15 75:18
77:1 79:4 81:25
88:3,6,10,14
103:14,24
104:15 110:2,
21 113:3,12,20
114:2,17
119:24 120:18
121:4 122:14
123:19 124:1
128:4,10,17,22
129:13 130:2,6,
15 131:11,20
132:3,19 133:8,
19 134:2,19,25
136:19 137:12,
16,25 138:5
141:11 146:2,
18 150:21
151:5,9 153:15
154:9,15,21
155:15,25
156:3,14,22
157:22 159:1,9
160:2,5,25
163:16 186:24
187:14 219:21
229:24

**Amanda's**
71:22 200:10

**Amber** 44:1
128:19,24
197:11,24
213:6 236:21
240:19

**Amber's**
240:23

**amend** 36:14,
17

**Amendment**
204:7,15,18,23
205:17,20

**amount** 172:2

**analysis** 154:6

**and/or** 44:10

**annex** 41:8

**annually** 28:11

**answering**
97:25

**answers** 9:13

**anticipating**
169:17

**anticipation**
186:23

**apologize** 19:1
27:12 28:16
29:6

**apparently**
225:1

**appeared**
206:16

**appearing**
200:22

**appears** 14:14,
22 15:1,24
16:22 32:6,11
34:15 35:25
49:12,14 74:4
119:13,19,20
146:1 222:8,15

**application**
118:7

**applications**
232:14

**apply** 204:18

**appointed**
242:5

**appointment**
242:4

**approved**
89:20 104:10
105:4,22
106:15 107:8
108:1,18 109:9

**approximately**
12:13 77:15
121:18

**April** 18:24
19:9,17 20:11,
20 142:9
162:12,14,15
226:21

**archives** 55:17

**area** 47:12
84:14 85:1
173:25 174:23
176:10,11
230:14

**argued** 45:8
190:16 194:5

**arise** 201:8

**arms** 190:15,21

**array** 90:12,17
126:15

**arrest** 13:15,
17,19,22 14:7,
15,18 15:4,9,
16,19,21 16:5,
11,13,23 17:1,
6,16,18 18:3,10
20:19 60:1,7,10
61:20 76:22
95:10 110:13
112:2 115:15,
22 193:15
206:24 226:20
232:13

**assert** 204:15,
21 205:20

**asserted**
205:25

**asserting**
205:10 206:2

**assertion**
204:24

**assess** 22:12

**assign** 57:8

**assist** 64:23
65:1 66:10
69:10 88:12
215:14

**assistance**
69:6 133:6,15
211:14

**assistant** 11:1,
3 19:5,15
20:10,18 21:2
26:22 28:2,3,7,
19 42:24 198:9
206:20 220:25
241:24 242:2,3,

12,15 243:4

**assistants**
198:4

**assisting**
42:25 69:14
206:16

**associate** 15:2

**Association**
199:15

**assume** 9:22
23:20 33:21
117:17,22
185:23

**assumed**
183:19

**assuming**
15:25 234:17

**assure** 34:2
126:20

**attach** 118:25

**attempt** 40:21
102:15

**attempted**
100:8

**attendance**
210:5

**attended** 28:11

**attending**
223:19

**attention** 99:8
153:17 221:9

**attorney**
10:21,25 11:4
12:1 19:5,16
20:10,18 21:2
28:4,8,9,20,24
31:17 45:12,19
58:23 59:7
63:21 64:9
65:14,18 78:7,8
139:4 151:8
166:2,11 167:2
168:4,25
182:11 185:19,
20,22 186:5
193:22 200:9,
10,11,14 203:6,

22 220:23,24
240:10,25
241:25

**attorney's**
18:2 28:1 31:23
46:12 47:5
54:11 56:8,23
57:4,12,20 58:3
59:1,12 62:18,
22,24 64:19
76:1 207:2,3

**attorneys** 8:18
18:23 42:25
46:17 61:24
93:6,24 126:3
144:22 166:16
195:10 200:12,
16

**Attorneys'**
199:15

**attributed**
70:17 148:1
149:21

**audio** 23:9,11
61:15 210:8

**autopsy** 25:2

**average** 12:11,
22

**aware** 30:23
31:4,24 39:9
40:6,12 41:4,5,
8,10,25 45:23
46:2,6 55:18
63:22 65:10,13
73:15 88:24
89:4,8,23 90:3,
11 92:22 93:20
94:3,6,9 96:24
97:11 100:6
101:22 102:3
103:12,22
104:14,18
105:8,11 106:1,
4,19,22 107:12,
15 108:5,8,22,
25 109:13,18
110:3 111:3,24
122:16 123:2
124:6,25
125:12 126:5
127:4,12
128:18,23

129:3 130:7,16,
24 134:9
135:20 138:15,
20,22 139:15
144:8,13,25
151:11 154:8,
12 155:14
158:16 161:6
165:2 190:12
199:2 207:20
210:6 233:9,14

**B**

**back** 12:6
15:17 28:18
75:15 78:2
79:24 83:9,14
92:3,4 93:20
119:12,13
126:22 145:22
160:11 169:19
176:19 177:13,
22 178:16
181:5 184:19
192:24 197:4
207:7 208:4
212:8 221:25
242:1,2

**background**
119:1

**bad** 46:15
175:9 199:14

**badge** 14:23

**bail** 15:11

**Barbara** 34:9,
17 36:6

**barbed** 175:11

**Barbourville**
56:14 59:10
92:25 93:13
96:15 100:8
125:2 164:11
215:7 229:11,
25 230:8,14,21
231:1,22
232:10,18,23
233:15,19

**based** 18:5
27:4 58:8,13,
18,24 59:8

60:20 94:24
97:7,16 98:10
148:19 156:18,
23 158:17
168:19 187:9
203:15 204:20

**basic** 142:7

**basically** 22:9
70:9 72:25
175:22

**basis** 163:4
204:22

**Bates** 32:3,12
33:15 42:5
48:10 50:14
96:4 118:5
132:8

**Beach** 79:17
80:2 82:19,20
83:21 84:4,7,
15,18 85:3,16,
20 86:9,13,17,
22 87:14
136:25 137:11,
15,24 138:4,11,
21,24 139:5
140:7,17,24
141:19 148:21,
25 173:8,23
174:4,6 176:21
179:5 184:25
186:22 210:5,
12 224:24
236:12 238:18

**Beach's**
139:11,21
140:1 195:18
196:15

**Beckner** 19:2

**Beckner's**
42:23

**beg** 98:11

**began** 28:7

**begin** 13:11,15
76:25 85:25

**begins** 168:18

**behalf** 42:3,11
43:4 44:15 97:6

**belief** 140:14
203:16

**believed** 141:9
152:5 153:5
157:3,9,16
219:20

**bell** 68:11 69:5,
7 193:11

**bench** 242:4

**big** 84:24

**bills** 152:25
153:2

**bit** 47:3 98:1
119:23 141:21
200:21

**black** 182:21

**blank** 142:6
143:3

**block** 224:23

**Boggs** 182:10
186:6 193:22
194:3

**bond** 66:11
211:15 236:2,
10,15

**bones** 169:16

**boring** 27:15

**born** 11:21,22

**bottom** 14:20
36:24 73:6
188:20

**bound** 20:22,
23 207:16,25
226:22 227:4,
12,13,17

**bounds** 18:17

**Brady** 29:3
31:9,13,18,24
34:5 35:7 41:17
44:10 112:20
123:11 140:15
144:15,18
145:1 151:13
176:15 192:15
210:23 240:15
241:2

**Brandon** 19:2
170:19 198:9
208:13

**Branson**
77:12,23 78:14,
22 79:4,13
86:22 87:15
185:5

**Branson's**
133:22 134:4,
17,23

**break** 9:11
87:21 88:16
167:22 206:7
229:1

**Brian** 84:9
224:22,25

**bring** 20:25
24:9 57:13
83:9,14 153:22
154:3 202:23
204:15 230:9

**bringing** 20:24
230:18

**brother** 175:6,
7,8,10 240:23

**brought** 52:4
56:10 57:20
58:8,13,18
66:17 75:19
85:8 99:7 126:4
160:11 174:4
177:18 181:5
216:12 229:24
233:6

**Broughton**
92:23 93:9
125:1 164:11
229:10,19
230:25 231:14,
17,20,21 232:2,
10,13,19,23
233:10,15,18

**Broughton's**
229:16

**Bruner** 141:23,
25 142:6,11,15,
19 143:4,13,19,
25 144:2,11
145:10 197:8

213:8 236:21

**Bruner's**
142:4,8,25

**building** 174:3
230:16

**bunch** 94:24
97:5,6 100:20
125:4 168:5
206:11

**C**

**call** 14:14
16:23 17:15
69:9 85:22 87:4
93:19 120:6
147:7 149:1
151:11 153:25
164:24,25
176:8,18 177:6,
11,25 178:12
181:4,8 184:10
189:18 191:1
204:11 205:6
207:11 216:2
220:1,5 224:9
238:22

**called** 26:22
84:13 120:4
179:8 233:7

**calling** 24:17
83:3 224:6,18
231:13

**calls** 167:3
173:5 177:1
189:23 201:22

**camo** 189:16

**Campbell**
80:8,9 81:22
171:16

**capacity**
118:16

**capital** 46:11
60:17 61:4,13
102:24 103:7
117:11,15

**captain** 166:17

**caption** 146:2

car 78:19
185:21,23

care 151:14,16

Carnes 34:9,17
36:6

carried 215:9

case 13:9
15:24 19:4,6
21:11 23:8,19
24:9 25:1,2,4,5,
6,9,11,15,18
26:8,25 27:6
29:4,17 32:20
33:18,20 34:23
35:1 41:13
44:17 45:14,25
46:11,17,23
47:22,23 48:9,
11,12,15,23,24
49:16 50:6,16
51:19 52:2,9,22
53:6,20,24
54:17 55:18
60:16,21 61:6,
14 62:20 63:1
64:2,11,16,20
65:6,13 68:8
69:3 73:1,20
75:20 76:5
77:24 79:25
82:11 83:25
84:16 86:2,6
88:24 89:4,23
90:3 101:9
102:25 103:8,
11 104:13
105:8,25
106:18 107:11
108:4,21
110:21 115:5,
14,21,25 117:1,
11,15,16
120:25 121:8
122:15 124:18,
24 136:23
141:6 146:3
151:2,3 153:18
155:6,8,25
157:15 158:17
160:9,19
162:17 170:24
175:15 177:18
186:23 193:8
194:4,19 199:6,

7 201:19 202:2
205:24 207:6,
25 208:2,17,21,
24 209:11
211:22 212:8
213:10,15,23
214:24 215:22
220:2,6 221:16,
17 224:9
225:15,21
226:18,19,21
227:1,23 228:4,
14 229:18
231:7 232:5
233:3,20,21
234:5,13,16
235:8,11
237:19 242:10,
18,19

cases 12:4,7,8,
18,20,25 50:3
55:14,15 57:14,
25 63:20 76:2
126:25 130:15
133:6,12,16
165:8 196:19
201:7,24
207:23 208:6
214:25 215:10,
12 225:14
238:10

cash 15:11

Castle 78:9,10
185:25 186:2,6

caught 8:24

caution 223:16

cautioned
126:16

Center 68:4,6,
22 69:17 74:25
169:11 174:22
186:13

certificate
34:19

chair 170:23
198:6,12

chairs 85:2

challenged
185:18

chance 191:8

change 150:2
151:13 180:16
187:6 212:22
225:22

changed 74:13
75:13 81:23
146:16 148:9,
11,22 150:16
180:6,25
187:12 197:23
200:2 212:17
237:21,24

changing
238:4

charge 13:4
14:15 60:17
155:18

charged 61:11
62:12 204:19
205:23

charges 12:25
13:9,12,14
17:17 18:3,13
21:6 22:20
26:14 29:22
56:6 61:12,23
110:1,4,15
111:2 113:5,12,
19 114:2,6,17
115:1,23
116:11 119:23
120:18 121:4
122:13 123:19,
25 124:22
127:3,21 128:4,
10,14,16,22
129:13,20
130:1,6 131:11,
19 132:2
133:19 134:2,
19,25 135:13
136:4,12,19
137:12,16,25
138:5 139:23
140:3,19 141:1
142:14,17
143:17 145:13
150:21 154:20,
25 155:13,23
156:7,12,17,22
159:9,21 160:1
161:4 169:16,

17 191:12,18
192:8 211:15,
18,21 218:5,8

charging 61:4

Chase 11:7

cheat 22:10
221:10 226:24,
25 227:9

check 15:4
154:2 178:16
206:4

checked 84:21
173:21,25

checklist 22:2
25:18 26:1
153:22

checks 50:2

chief 92:23
93:9 125:1
164:11 220:6
224:9

choice 205:15

Christy 77:12
79:13 86:22
87:15 133:22
134:4 185:5

circle 227:2

circled 221:22

circuit 10:22
32:12 162:20
207:22 242:4,7
243:9

circumstance
64:13

circumstance
s 91:18

cite 45:4

civil 47:22,23
50:24 78:7
165:23 185:20,
22,23 186:4

claim 145:3
173:3

claimed
144:12

claiming 78:5

claims 142:11
143:12

clarification
65:2 143:24

class 103:8

classes 221:1

clear 56:1
64:23

clears 141:15
203:14

clerk's 33:12
42:15 207:22

client 204:1,4

close 80:12
81:2,13 149:16
153:17 162:16
186:25 187:10
228:8

closer 176:11

coat 126:18

coerce 88:9,25

coerced 219:9

collaborated
242:11

collection
28:14 224:15

collective
38:22

college 11:7,
12,13,15,16

column 23:13

comfortable
174:16

commander
166:17

common 216:6
225:9,10,13
230:7,24

Commonwealt
h 10:21,25 11:3
12:1 18:2,23
19:5,16 20:10,
18 21:2 27:25

28:4,8,9,20,23
31:17,23 39:7
42:24 46:12
47:5 54:11
56:8,23 57:4,
12,19 58:3,23
59:1,7,12
62:17,21,24
64:9,19 65:14
76:1 139:3
159:18 168:24
199:9,14
211:25 212:6,
11 220:23,24
237:24 238:8
240:10,25
241:25

**Commonwealth's** 63:17,23
72:17

**communication** 166:10

**communications** 194:23
209:5

**communities** 161:12

**community** 161:13 216:10
225:18

**comparisons** 154:8

**competency** 78:12 185:16
200:16

**complaint** 10:3,12 13:24
14:8 16:14
17:19 18:3,10
20:19 26:7,13,
25 59:21 60:11
62:5,10 76:10,
15 95:11
110:13 112:3
115:15,22
196:1 206:22,
24

**complaints** 60:1 61:21

**complete** 10:6

49:17 58:5
143:3

**completed** 25:23

**completely** 56:1 163:9
243:12

**completing** 17:1,18

**compliance** 35:15

**complied** 31:18 35:5,10
36:10,15 37:13
44:4

**comply** 44:8

**complying** 34:3

**computer** 40:8,9,16

**concise** 74:6

**CONCLUDED** 243:15

**condition** 201:5 202:7
212:2

**conditions** 66:11

**conducive** 230:18

**conduct** 31:1
89:15,17,20,24
90:4 104:5,7,
10,24 105:1,4,
19,22 106:4,12,
15 107:5,8,23
108:1,15,18
109:8 116:3,6

**conducted** 154:9 215:5

**conducting** 103:1

**conference** 28:10 170:20
220:15

**conferences**

166:6

**confess** 228:7

**confessed** 142:12 144:12
156:3,10,14

**confession** 142:21 155:14,
21 156:18,24

**confidential** 45:5

**confirm** 78:10
186:2 195:2
209:22

**confirmed** 43:16 168:24
169:22

**confront** 171:12,14
180:9

**confronted** 171:19

**confused** 201:19,24

**considerable** 209:2

**consideration** 23:24 41:11
63:14 64:1,10
65:15 66:5
111:4 113:17
129:18 130:17
131:17,25
132:13,18
133:6 136:10
140:7,18,25
141:18 176:14
192:14 210:22
211:21 212:11
237:22 240:15
241:3

**considered** 98:22 155:11
216:2 219:10
236:20 237:2

**consistent** 170:5

**consists** 48:11

**conspire** 163:15,18
228:20

**constitute** 98:19

**constitutional** 163:16,19

**construct** 103:14

**consult** 207:2,
3 233:18

**consulted** 233:23

**consulting** 234:1

**contact** 68:15
121:23 162:6
166:21 167:4,5
176:18 178:21
188:19,23,24
198:25 199:1
201:11,16

**contacted** 81:22 139:2
148:21 151:7,
10 161:10
177:4 180:7
188:21 198:4
201:1 207:9

**contacting** 202:4

**contained** 75:3,8,9 76:15
123:3 146:22
148:13 232:7

**contemplation** 65:19

**contempt** 205:1

**content** 171:17

**contents** 43:16
79:9,22 170:2

**context** 69:23
70:7

**continually** 47:17

**continuance** 199:17,23
235:17 243:10

**continuances** 200:16,19,20,
22 235:8,14

**continuation** 128:3 130:1
132:2 140:3,19
141:1 145:13
156:17,22

**continue** 113:5,11,19
127:21 128:9
129:13,20
131:10,19
134:19 136:4,
12 138:5
139:23 157:4,
10,17 160:1
200:1,3,4,7,11
222:2

**continued** 83:8 115:1
127:21 154:24
177:17 189:6
199:7 202:18
235:11 238:13

**continuing** 27:17,20

**contributing** 154:17

**convenience** 50:21

**conversation** 40:4,8,22 43:21
65:24 69:16,22,
24 70:2,7,13
71:6 75:3 78:22
79:4,20,23
81:7,11,12
82:5,10 83:10,
20 85:25 87:8
138:21,23
139:8 143:20
144:12 150:9
165:18 166:7
169:7,20
174:15,25
175:2 176:21
179:5,7 188:2
203:14,15

218:17 236:12

**conversations**
19:15 43:22,24
70:14 79:17
83:22 86:13
122:22 124:14
138:10,15,20
193:3

**converse**
166:15

**convict**
117:19,24

**Convicted**
226:2

**conviction**
159:19

**cool** 137:6

**coordinate**
208:21

**coordinated**
206:19

**copied** 36:2

**copies** 38:9

**copy** 10:12
19:21 33:10
37:1,5,21 38:2,
6 47:25 63:22
151:18 232:17
239:13 240:2

**corner** 39:24,
25 42:17
188:20

**Cornett**
101:10,17

**corollary**
215:17

**coroner** 34:25

**correct** 10:10
13:7 16:10 26:5
31:1 34:21 36:9
54:25 60:15
87:5 89:18,19,
21,22 94:8 96:1
104:8,9,11,12
105:2,3,5,6,20,
21,23,24
106:13,14,16,

17 107:6,7,9,
10,24,25 108:2,
3,16,17,19,20
109:9,10 117:1
118:1 137:13
138:2 148:3,7,
8,12,23,24
149:4,6,22
154:18 157:6,
18 170:7,13
179:10 182:25
185:1 186:14
188:13 189:19,
20 192:3
194:10,11
197:3,13
198:23 203:10
204:7 206:17,
25 208:18,19
209:12,13,22
212:17 213:3,6,
7,8 215:19
217:10,16
219:6 223:24
224:4,14 230:5
231:8,11
232:14,24
234:10,14
236:24,25
242:8,9

**Corrections**
175:24

**coughs** 15:23
48:14 120:21
142:24 170:21

**could've**
174:24 193:11
194:5 206:19
213:11 224:2
227:15

**counsel** 41:12
44:11 51:6,11,
21 52:6 194:25
205:12 210:13
211:2,4,12
233:11 235:14,
16,20

**count** 31:17
74:5

**counteroffer**
203:22

**counties** 10:23

61:25 193:10

**county** 12:2
18:1 19:17
20:7,15 27:25
28:4,19 31:23
45:12,19 46:11
47:5,9,18 54:11
55:23 56:8,14,
23 57:4,5,11,19
58:3,23 59:1,7,
9,11 61:24
62:17,23 64:8,
18 65:14 68:2,
4,6,12,22 69:3,
5,7,17 74:25
75:25 78:3,24
80:8 81:22
139:4 164:18
169:1,11
171:16 174:22
176:10 182:11
186:13 193:11,
12 207:2,3
208:9 214:14,
17,20 215:13
216:17 220:7
230:7,9,16

**County's**
208:25

**couple** 70:11
81:6 83:5
144:23 161:8
166:6 168:20
172:1 181:6
205:6 215:8,9
238:13,19

**courses** 27:23

**court** 8:3 13:6
18:16 22:11
28:13 30:1,18
32:12 33:9 34:5
35:6,15,17
36:10,13,18
37:13 38:3,10,
12 39:14 41:16
44:3,9 45:2,14
47:17 50:21
60:8 62:13,14,
15 76:20 77:17
78:1 83:2,6,7
84:1 90:20
91:14 94:2 99:8
118:24 119:1

123:10 126:4
162:20 169:12,
19 178:16
181:6 189:5
190:16 197:21
202:8 204:16
205:7,12 211:5
221:15 227:1
228:2 238:20
241:8,11,16
242:7

**court's** 50:22
99:8

**courthouse**
78:3 201:22

**courtroom**
52:3

**courts** 47:8
92:17,21 98:23
126:23

**cousin** 81:25
172:9

**cover** 48:17

**covered** 206:5

**Cox** 32:12
200:15 202:11

**crass** 160:15

**create** 51:23

**created** 22:14,
16 54:1 74:10
101:23 125:3

**credible** 142:4
159:10

**Creek** 43:23

**Cricket** 182:12,
14

**crime** 62:12
63:9 103:13,23
152:25 153:2,
24 154:11
204:20 205:23
225:5

**crimes** 56:4,9,
10,24 57:6,9

**criminal** 10:7
12:8 13:23 14:7
16:14 17:19

18:3,10,13 19:8
20:19 26:7,13,
25 30:11 31:7
32:20 33:6
37:4,7 41:13,24
42:4,25 43:6
44:6,17 45:2,25
46:23 47:4 48:2
49:7,25 50:3,6,
9 51:6,15
52:13,19,24
53:3,9,22 54:2
56:6 57:14,25
59:21 60:1,11
61:20 62:4,10,
20 63:1 64:2,
10,16,20 66:5,
12,18,25 67:4
73:11,16 76:2,
5,10,15 77:8
79:15 86:24
88:2,6,13,23
89:3,23 90:3
95:11,22 103:1,
11 104:13
105:8,25
106:18 107:11
108:4,21 110:4,
13,21 111:2
112:3,10
114:17 115:15,
22 116:7
120:18 123:19
128:3,22 130:6,
15 131:10
132:2 133:6,12,
16,19 134:2
136:19 137:25
145:13 150:13,
20 152:3,23
153:14 154:20,
25 155:2,25
156:17 157:4,
10,17,21 158:5
159:2,8 160:12,
14,16,18
166:23 191:14,
17 204:5,6
206:22,24
213:12 222:12
225:12,24
226:9 233:3
238:9

**criminally**
117:8,12

**CROSS** 168:1

**Crump** 37:22
38:2 39:3,8,13,
21,22 40:5,8,
17,22 43:16
79:19,20 87:3,
4,16 89:25 90:5
96:17 97:1,4,
14,22 98:5,13,
19 99:25
100:21 101:5,
18,25 102:5
103:3 116:25
121:25 122:9,
17,22 123:4,17
124:5,7,14,20
126:11 188:8
189:8,12 191:1,
5 194:6 199:24,
25 217:1,3,7

**Crump's** 39:25
43:14 94:25
97:7 217:13

**crying** 120:6

**Cumberland**
11:16 202:1

**Cumberlands**
11:16

**currency**
154:10,17

**cut** 18:15
175:11

**D**

**dad** 68:21

**Dallas** 225:5

**Daniel** 79:17
80:2,6,7 81:2,8,
9,13 82:12
86:22 135:8,14
149:7 168:16
169:3,24 183:4
184:21 223:2,
20,23

**Danny** 19:2,4,
15 87:13 208:7,
15 240:3
241:20,22

**dark** 92:3

**date** 16:15 70:6
81:20 120:11
122:4,8 137:7
154:13 169:18
177:3,16
178:14,17
180:6 199:6
205:7 227:3

**dates** 169:13
200:25

**daughter**
161:21

**dawned** 236:8

**day** 20:15
35:25 52:3
66:20 69:25
70:5 72:7 80:22
120:8 175:21
179:9 186:17
189:5 190:1
191:3 193:4
196:2 201:11,
12,14,15 208:6
221:25 227:4
229:24 233:20

**day-to-day**
11:25 12:4

**days** 81:6
195:12 208:3
236:11

**dead** 120:9
122:1

**deal** 76:19

**dealer** 43:23

**dealing** 225:11

**deals** 41:2,5
43:11

**dealt** 186:4
202:16

**death** 23:2
49:8 50:10
53:10 73:17
77:1 81:24
117:24 153:7
159:11 161:1,7
163:4 215:22
216:19

**debts** 214:4

**deceased**
182:12 186:6

**December**
23:3 34:20 36:7
101:7,20 102:2,
8 120:14
122:11,19,25
124:9 151:22
154:7,13,15
193:5

**decent** 174:2

**decide** 76:20
99:8 150:5,10

**decided** 37:13

**decides** 18:19

**deciphering**
126:25

**decision** 26:24
60:16,19

**decisions**
209:9

**declared**
134:18

**decline** 160:8
163:2

**declined** 102:6

**defendant**
64:16 153:13
168:4 169:24
191:22,24
205:22 212:2
227:16,25

**defendant's**
38:17

**defendants**
50:3 115:2,25
191:14 200:6
204:6 213:12
225:12 236:23

**defender**
205:14

**defense** 30:6,
19 41:12 44:11
45:11,19,25
46:4,10,16
51:6,10,15,21,

23 52:6,13
63:20 89:11
93:6,23 99:12
104:1,20
105:13 106:6,
24 107:17
108:10 109:2
112:15,19
123:5 126:3
127:14 129:5,7
131:1 134:11
135:22 139:16
140:9 144:9,15,
22 145:7
192:19 194:24
210:12 211:2
218:21 238:6,
10

**define** 90:11

**defined** 112:20

**definition**
24:18

**degree** 16:25
17:17 222:11

**delays** 243:10

**denied** 75:9
146:7,11
147:23,25

**deny** 147:19
172:3 198:17,
18

**denying**
146:21

**department**
56:14,15 59:10
69:3 92:25
93:13 96:15
100:8 125:2
164:12 175:23
215:8,14 216:7,
13,18 220:8
229:11 230:1,8
231:1,22
232:11,23

**department's**
215:9

**depending**
208:2

**depicted** 90:18

**depiction**
223:12

**deposition**
8:13 94:22
111:10,23
243:15

**deprive**
163:16,19

**deputies**
216:17

**deputy** 164:18
214:16 215:21
216:11 220:7

**Derek** 216:8

**Derrick** 168:3
179:14 182:7
184:13,16
214:16 225:9
239:14,17

**describe** 46:9
48:11

**description**
94:25 97:8,16
99:20 189:22,
25 191:2 194:5,
13,16 223:13

**descriptions**
97:9

**desk** 85:1,2

**destroy** 29:17
105:9,12

**destroyed**
55:5,19

**detail** 62:16

**detective**
14:21,22,24
15:2,19,20 16:2
17:8,24 18:9
23:9,22 25:9,10
26:9,13,21 27:6
37:23 39:23
40:6,7,15,16,21
43:22 48:16
53:16 59:22
60:5,7 69:13
70:24 71:4
73:1,24 74:8
82:13,15 84:8,9

85:5,23 86:1,3, 8,12,16 92:23 93:9 96:24 97:13,16 98:3,6 99:9,18 100:20 101:17 108:5,8, 13 110:3,14 111:24 112:2 115:14 116:7, 10 119:14,16 120:11 122:5,8 123:3 124:4,18 125:1 137:1 146:22 148:2 149:2,3 153:16 163:24 164:5,8, 21 165:6,7,9, 13,16,19,22 166:10 169:23 170:6 172:4 174:21 180:10 181:15,18 183:6 185:9,10 187:16 188:2,4 193:18 194:23 195:8 201:1,15, 21 202:3 206:16 216:8 222:3,18 223:9 224:10 229:24 231:8 232:6 240:24

**detective's** 25:6 43:15

**detectives** 23:12 40:3 115:22 168:19 223:6

**Detention** 68:4,6,22 69:17 74:25 169:11 174:22 186:13

**determination** 141:10 183:15 204:17 227:13

**determine** 14:18 20:10 22:20 32:5 119:7,16

**developed** 58:24 59:8,19, 20

**Diane** 161:21, 23 162:18

**died** 115:7 120:5 150:25 175:3,7,12

**difference** 126:15 236:6

**differently** 141:21

**digest** 71:18

**digital** 40:2

**Dinkins** 22:9 153:21

**direct** 8:9 18:7

**directly** 23:23 188:11

**disagree** 145:8

**disclose** 36:5 38:10 44:3 63:25 64:9,15 123:12 176:15 192:17 194:24 210:11

**disclosed** 36:11 38:3 41:12,23 89:11 99:11 103:25 104:19 105:12 106:5,24 107:17 108:10 109:2 112:15, 18 123:5 127:13 129:4,7 130:25 134:10 135:21 139:16 140:8 144:9,14 165:12 210:16

**disclosing** 30:24 46:10 116:12

**disclosure** 30:19 34:3 63:13 99:16

**disclosures** 30:5

**discover** 68:5

**discoverable**

25:25 45:3

**discovered** 123:16

**discoveries** 47:2

**discovering** 165:17

**discovery** 32:3 33:1,22 34:2,9,16 35:13,16 36:6, 12 37:4 45:14 46:14,23 50:14, 16,20,23,24 51:2,5,14,19,20 52:1,7 151:2,3 182:21 192:20 210:9 232:17 240:6

**discovery's** 24:24

**discuss** 186:21,22 238:20

**discussed** 162:19 167:12 174:8 178:23 230:4 233:23, 24

**discussing** 33:1 93:23

**discussion** 175:13 192:21 242:10

**discussions** 37:11 45:2 187:17

**dismiss** 72:12, 17 73:23 75:4,8 80:11,16 81:3, 16 109:12,18 122:15 128:16, 21 130:6,14 133:19 134:1 135:12 139:9 141:5,8,22 142:2,14,17 145:18,20,25 146:5 149:18 150:12 152:20

157:2,8,15 159:8,14,17 168:11 172:12 177:4 181:12 191:11,19,21, 23 197:4 198:20 212:15, 19 213:1,3 219:5,11,17,24 234:22 236:7, 16,18 237:3

**dismissal** 29:22 124:22 135:6 143:16 155:13,18 161:4

**dismissed** 110:1 111:1 127:2 128:15 160:10 162:17 191:12,17 233:21

**dismissing** 191:25

**dispute** 33:4 167:4

**district** 13:6 18:16,17 20:22 119:19 227:1

**Division** 242:7 243:8,9,13

**docket** 207:21 222:1

**document** 14:9,12,17 15:12 16:16,19 17:5,10,23 19:24 20:5,9 21:24 22:5,14, 20 33:9,12 34:11,14,18,22 35:17 38:18 39:6 41:4 42:9, 13 49:4,12 72:13,16,20 101:3,12 102:23 103:1,9 110:9 118:10, 23 119:15 132:16,22 144:4 151:23, 24 152:2,3

211:6 212:12 221:6 239:3,17

**documentation** 221:14

**documented** 102:16 202:16

**documents** 25:19 27:5 33:15 46:21 47:19 50:8 53:25 54:14,18 55:2 100:7 232:9

**Doe** 212:6

**door** 92:4

**double** 11:19

**doubt** 198:6,10

**doubts** 242:22

**draft** 38:21 72:20

**drafted** 73:24 148:1 187:10 188:4

**drawing** 142:6 143:3

**dress** 100:9

**dressed** 100:17 125:1, 20 126:2

**drinking** 220:17

**drinks** 144:24

**drive** 83:15 177:20,22 230:13

**driving** 86:4 175:1

**drove** 84:11 224:23

**drug** 28:13 43:23 77:25 175:5,6 187:24 214:4 225:17

**drugs** 145:11 175:4,5,7,8

187:23

**drunk** 144:23

**drunks** 144:23

**DTA** 220:18

**due** 154:25

**DUI** 28:15

**duties** 27:19
29:19 115:5
151:12

**duty** 159:20
234:21

**Dyche** 19:2

**dying** 191:22

---

E

---

**e-mail** 209:3,5

**e-mailed** 33:23
209:6

**e-warrants**
15:25 16:1

**earlier** 20:21
26:6,11 59:22
76:14 123:23
132:12 138:9,
14,19 143:20
147:16 148:1
149:21 150:14,
19 151:6
153:21 157:20
158:25 177:14
179:14,22,24
200:25 213:1
230:4 231:7
232:5

**early** 94:2

**easy** 88:20

**education**
27:18,19,21

**eels** 179:6

**effect** 71:12
147:17

**efficiently**
184:14

**effort** 38:23

**efforts** 88:24
89:4,8,24 90:4
102:16 103:2,
12,22 104:14,
18 105:8,11
106:1,19,22
107:12,15
108:5,8,22,25

**elderly** 74:15
81:25 146:17
148:12 172:8
175:3 187:13

**elected** 12:1
28:23

**electronic**
47:25 48:8
50:13 51:1
209:5

**Elliot** 87:21
91:20,22,24,25

**emailed** 33:24

**emergency**
34:25

**employed**
57:2,3

**end** 70:8 85:12
87:10,14
178:18 202:20

**ends** 24:10

**enforcement**
15:9 18:4,6
20:20 27:1
34:24 35:3 40:9
49:1,6 52:21
53:3,11 54:9,
15,22 56:25
57:21,24 58:5,
9,14,19,25
60:21 67:1,8,
15,24 68:1 69:1
74:7 75:19
76:24 77:13
79:8 94:4 96:13
100:7 102:14,
25 104:23
105:16 109:5,
20 112:9 113:4,
10 114:14
117:3,6,10
118:19 120:17

121:2 125:19
126:6 127:6,20
128:2,8,25
130:9,18 131:9,
24 133:21
134:4 135:7,14,
16 136:16
138:11,17,23
139:2,11 140:6
142:19 143:18
153:5 155:1,13,
20 156:2,9,13
157:19 158:2,
20,24 161:7,10
162:3 167:7
172:14 195:21
215:14 216:23
232:8

**enforcement's**
161:17

**ensure** 49:17

**entertain**
65:25

**entire** 29:20
85:10,14,18

**entirety** 237:19

**entry** 193:5

**essence** 78:17
148:18

**established**
234:10,25
242:22

**estimate** 12:19
77:14 173:15,
18

**estimated**
173:19

**ethical** 28:21,
24 35:7 38:11
41:16 44:8
123:11 131:6
134:13 135:24
139:18 140:13

**Eubanks**
214:16 215:21
216:8,11 225:5

**evaluation**
217:11

**evaluations**
200:17

**Evans** 19:3,5,
15 208:7,15
241:20,22

**events** 98:15
148:22 180:6
185:10,17
219:23

**evidence** 19:7,
17 20:11,14
21:9 28:14
29:9,12,17
30:6,15,19,24
32:18 38:18
42:11 44:11,25
45:13,20,24
46:4,10 51:22
53:25 54:9,14,
18,21 58:8,13,
18,24 59:8,19
61:16 62:11
64:15 67:3
76:23 105:9,12
112:20,21
113:4,11,19
114:1,10,25
115:3 123:12,
15 127:17,21
128:9 129:8,13,
20 131:5,10,19
134:19 136:4,
12 139:23
140:15 141:7,9
153:6,10
159:10 162:23
163:21,25
164:3,6,9,12,
16,19 165:11
167:9,14
183:13 185:15
200:18 209:1
212:14,16,20
213:10 214:3
224:15 226:11
233:10,11,14,
16 236:17
237:2,5,22,23
238:2

**exact** 62:11
96:4 137:7
179:23

**EXAMINATIO
N** 8:9 168:1
214:8 220:20
229:8 235:4
237:15

**exception**
54:23

**excess** 11:1

**exchange**
63:9,15 65:8,15
66:11 115:17
130:18 131:17,
25 132:13,18,
24 133:7
136:10 140:7,
18,25

**exclude**
153:12

**excluded**
154:15

**exculpatory**
29:9 30:15,24
32:18 38:17
42:11 43:5
44:10,25 45:13,
20,24 46:4
112:20 163:21,
24 164:2,5,8,
12,16,19
233:11

**excuse** 15:23
48:14 120:21
141:15 142:24
170:21 200:13
202:14,25
203:1,14

**exercised**
204:10

**exhibit** 14:6,7,
10 16:13,17
17:10,12 19:21
20:2 21:23 22:3
32:2,7 34:8,12
35:15,19 36:21
37:16,19,20
38:15,19 42:2,7
44:14,18 48:8,
13 50:13,18
51:3,4,8,12
53:7 61:21 62:3
72:11,14 73:5,

19 81:18 94:16,
18,21,23 95:1,
2,9,17,18 96:9
110:8,10
111:10 118:4,7,
8,11,12 121:12
132:7,10
136:23 141:5,
12 143:9,11
152:8,16,22
153:1 168:10
192:1,22
193:13 197:4
217:18 218:20
221:10 241:7,9,
10

**exhibits** 88:21
145:21 232:5

**EXHIBTI** 95:20

**exist** 53:11
243:1,5

**existed** 13:8
157:4 160:1
237:7

**exists** 73:15

**expect** 33:8
45:12,19 48:24
50:17 53:23
67:1 116:7
209:15

**expectation**
54:6 61:5,13
103:7

**expected**
102:25 112:9
120:16 121:1
212:20,22

**expenditures**
65:3

**expenses**
64:24,25

**experience**
13:22 31:22
90:16 91:11,12
92:16 98:24
175:9 214:18
230:6,24

**Expert** 200:17

**expertise**
28:15

**explain** 15:15
20:17 23:13
118:18 237:8,
17

**explanation**
43:17 180:24
181:3,4

**extended**
46:16

**extent** 202:13

**extras** 19:23

**eye** 8:24

———

**F**

———

**fabricate**
104:14 158:20
228:21

**fabricated**
109:20 113:3,
10,18,25 114:9,
16,25 123:24
127:5,20 128:2,
25 129:12,19,
25 130:9 131:9,
18 132:1,14,19
133:7 134:5,18,
24 135:15
136:3,11,17
139:12,22
140:2 158:4,12,
13,25 183:20
216:23 233:15,
16

**fabricating**
88:12

**facilitation**
203:19

**facility** 174:2
177:21 230:21,
23

**facing** 211:18

**fact** 70:3 75:7
98:10 137:14
186:3 190:9

**factor** 226:15

**facts** 76:5
103:13,23

**factual** 61:22

**failure** 30:23

**fair** 9:19,20,23
16:4 18:22
26:24 27:4
33:21 35:21
39:7 40:22
41:22 45:11,18
51:1 52:11,18
53:1,6 54:20
57:11,23 58:3,
7,12,17,22 59:6
60:9 62:3 69:19
70:16 72:24
73:22 75:2,17,
24 87:9,12 94:6
125:11 133:4
137:8,23 138:3
146:6 152:5,22
154:24 155:7,
12,16 156:16,
21 157:1,7,14
158:4 197:1
215:18 219:7,8,
24,25

**fairly** 162:16

**fall** 28:11
162:11

**false** 88:25
89:5,9 103:14
109:14 113:3,
10,17,25 114:8,
15,25 123:24
127:5,20 128:2,
8,19 129:12,18,
25 130:9,18
131:9,18 132:1,
14,18 133:7,22
134:18,24
135:9 136:3,11,
17 139:12,22
140:2 157:21
158:16,17
178:7 183:2,5,
14,20,25 184:3,
23 185:3

**falsely** 103:24
108:6,9

**falsity** 183:12

**familiar** 17:11
29:4,8,11,16,
19,25 30:4,17
31:9,13 118:15
151:24,25
208:10 229:16

**families**
161:11 162:1

**family** 68:20
161:9 162:8
178:19 187:23
198:25 199:2
201:11

**family's**
176:10

**FARAH** 8:25
56:18 59:15
93:4,16 95:9,
12,14 100:10
125:9,25
228:25 229:3,5,
9 235:1,3
239:17,21

**Farris** 225:1

**farther** 66:1

**fashion** 211:2

**fast** 235:21,24

**father's** 199:4

**favorable**
41:2,5 43:12

**fears** 118:2

**February** 36:1,
13,19 100:20
119:21 121:14,
15,18 122:6
137:2 138:12
173:9

**federal** 62:15
68:13,14 69:11
116:22 126:23
160:21 163:10
187:22

**feel** 174:16

**feeling** 237:18

**felonies** 12:14,
15,16

**felons** 226:2

**felony** 12:3,25
13:4,9 46:10
66:1 103:8
110:21 203:7,
19

**felt** 237:5

**Feltner** 166:12,
16,18

**Feltner's**
166:21

**fidgety** 78:16

**field** 34:23
36:23 37:3,12

**figure** 83:4

**figured** 143:10
238:21

**file** 21:12
22:11,13 24:9,
13,17,18,19
25:2 33:7,8,12
34:16 36:14,22
40:1,9 42:15
46:14,19,20
47:3,15 50:15,
17,20,22 51:1,
20 53:6 54:10,
18,22 55:3
60:21 61:6,14
66:18 68:8
80:22 93:24
143:8 151:20
162:11 186:15
196:17 208:17
215:25 216:1
221:15 232:17,
18 235:24
239:4

**filed** 10:3 32:11
33:9,25 34:9,
16,20 36:6 41:7
42:3,14 43:4
44:15 47:10
50:22 72:12,19
80:11,15,24
81:3 109:12,17
112:3 122:15
130:5 139:9
141:6 146:1,2
149:17 150:12

157:2,8,14
159:25 162:9,
19 165:18
183:7 200:19
235:22,23
236:6,10,14
237:3 239:18

**files** 10:6,11
12:5 33:16,20
47:4,13,16
48:1,8 49:16,17
50:13 52:19,20
53:2 55:10,18

**filing** 36:17
47:8 54:7 61:2,
3 144:21 211:3,
5 219:23
235:20

**fill** 26:25
221:13

**filled** 15:20
222:3 226:23

**filling** 16:5
26:13 60:10

**fills** 18:9

**final** 14:23
205:6

**finally** 83:11
220:13

**finance** 11:20

**find** 10:15
40:14 68:10,13
69:8 143:6
151:20 226:4,9
228:16

**finding** 20:22
69:14 234:18

**findings** 48:12

**fine** 27:13 72:3
168:8 170:10

**fingerprint**
226:11

**fingerprints**
154:5

**finish** 32:8
206:13

**finished** 101:1
206:10

**fit** 54:24 194:5,
13,16

**five-hour**
177:20

**five-ish** 220:25

**folder** 151:20

**follow** 30:24
52:15 172:25
195:2 198:22
209:11 238:12,
13,14,25 239:2
243:7,14

**follow-up**
194:23 235:6

**forbid** 223:8

**forever** 77:25

**forgot** 75:5
236:5 243:12

**form** 13:25
16:8 19:10 21:4
22:9 24:1,16
25:8,14 26:19
27:2,8 29:15
30:10 31:2 35:8
36:8 39:10
40:10,18,24
43:7 45:15
46:25 49:9
50:19 51:7,17
52:1 53:12 54:3
55:1,6 56:17,18
57:15 58:11,15,
20 59:2,13,14,
15,24 60:6,14,
18,24,25 61:7
62:6 67:9,10,16
70:19 71:1 73:3
74:1,3 75:11,21
76:8,17,18
77:3,4 90:1,19
91:15,16 92:11,
19 93:2,3,4,14,
15,16 94:11,12
96:18,19 97:3,
19 98:8,21
99:4,13 100:2,
10,11 102:9,17,
18 103:4,5,16,

17,18 109:16,
21,22 110:6,17,
24 111:6,7
112:5,11,12,16,
24 113:6,7,14,
21 114:4,12,19,
21 115:19
116:2,4,8,14
120:20 121:6
122:20 123:7,
13,21 124:2,10
125:5,8,13,22,
23,25 126:13
127:8,9,23
128:5,11,12
129:1,16,22
130:3,10,11,20,
21 131:2,12,13,
14 132:4 133:1,
9,23,24 134:6,
15,21 135:2,10,
17 136:6,7,15
137:18 139:13
140:10,11,21
141:13 142:5,
23 143:21
144:10,17
145:5,6,15
146:9,23 147:4
148:4,17 149:5,
11,23 153:8,21
155:3,17
157:24,25
158:7 159:3,12
160:7 166:25
169:6,25 170:8
171:10 172:6,
21 173:5
178:10 180:12,
19,22 181:16
183:8,10,23
187:7,18
188:12 189:23
194:7,14 195:5,
9 196:20
197:20 209:21
211:2,23
213:17 217:15
218:12 219:13,
19 221:19,22
226:1,7 234:15
236:4 237:1
241:4

**formal** 144:21
169:9

**forms** 153:21

**forward** 8:16
18:2 61:12
112:2 155:10,
11 159:21

**forwarded**
138:18

**found** 18:16
31:14 39:23
69:11 92:17
120:9 122:1
154:10 188:16
196:4 216:12
228:2 237:6

**foundation**
26:19 54:3
59:24 60:6,14,
18 61:7 93:2,15
94:11 97:19
99:13 102:10
125:7,24
130:12 169:6
172:21 173:6
181:16 187:18
188:12

**four-** 177:20

**fourth** 74:12

**frame** 228:21

**framework**
79:7

**frequented**
68:11

**frequently**
172:22 207:3,
11 225:19

**Friday** 21:10

**friend** 164:22,
24

**front** 48:16
96:10 163:8
182:6 204:12
221:14

**full** 43:18 198:8

———

**G**

**gain** 159:19

**Gatnarek**
200:15

**gave** 21:20
32:17 40:4 48:8
84:14 99:20
111:25 121:23
126:19 127:1
148:25 156:18,
24 163:5
166:10 173:4
174:11 181:14,
17 183:6
184:25 240:2

**general** 21:14
27:17 49:20,21
69:23 79:7
82:21 90:16
165:16 169:7,
20 174:9,11,14
176:11 207:12
211:4

**generally** 18:1
32:15 43:3,10,
11 44:20,24
48:14 52:17
55:22 90:23
118:18 204:9
206:23

**generated**
76:23 207:21

**Giglio** 112:21
123:14 140:15
144:16,18
145:2 151:13
176:15 192:15
210:23 240:15
241:2

**girlfriend**
201:17

**give** 8:5 12:19,
21 32:8 44:22
65:5 77:14 79:8
88:1 94:20
101:17,24
145:22 163:2
180:24 189:22,
25 191:2
207:23 212:8
218:5 231:3
237:10 239:9,
11

giving 88:25 89:5,9 91:19 111:4 113:17 115:17 128:8 129:18 130:18 131:18 132:14, 18 136:11

God 223:8

good 8:11,12 46:15 153:19 165:9 216:9

graduate 11:9, 13,14

Graduated 11:15

grand 12:5 13:7,10,19 18:18,19 19:6, 17 20:7,11,15, 23,24 21:1,7,8, 11 22:1,15,17, 18 23:9,10,12, 17,19,23 24:7, 9,10,13,14 25:4,7,11,16, 19,24 76:25 108:6,9 114:11 121:3,9,11 124:4 141:16, 18 153:21,22 206:17 207:17, 23,24,25 208:1, 8,11 221:24 222:3,13 226:20 227:3, 14 228:1 231:17 234:8, 13,16,20,23,24, 25 242:18,23

great 9:4,14 62:16 215:3

grounds 219:11

group 51:12

guards 50:2

guess 33:24 54:13 84:19 94:15 114:7 116:15,23 121:9 158:13

164:24 165:3 167:2 197:1,17 228:8

guessed 29:3

guessing 84:20

guidance 127:1 207:12

guide 126:24

guides 119:1 126:22

guilt 30:7,21 159:22 213:12

guilty 63:8,14, 17,18 211:19

gun 228:6,8

———————

H

hair 126:9

hairs 99:14

halfway 168:23

hammer 222:6

Hammons' 119:21

hand 8:4 35:14 38:14 48:7 50:12 51:2 94:21,23 95:16 132:7 167:13 190:19

handcuffed 85:3

handed 19:25 145:23 208:20, 24 211:1

handle 12:17 61:25

handled 12:9, 11 185:20 208:13

handling 12:20 167:8 208:8,11

hands 99:21

187:2 190:21

handwriting 42:18,20,22

handwritten 15:24

Handy 28:8 241:24

Hang 166:13

happen 207:14

happened 43:15 178:9 187:6 223:9 224:22 227:20 238:24

happening 52:9 65:10 93:8

happy 147:6

hard 69:5

Harlan 209:1,2, 3 230:12

Harold 19:2

hate 207:13

he'll 238:22

head 49:14 78:5,21 93:1,12 96:16,25 97:15 126:9 176:24 181:25 186:3 216:20 222:6

heading 32:17 42:12 240:5

health 45:7

hear 10:1 21:9 54:13 161:14 215:24

heard 74:14 145:19 146:16 148:11 150:3 184:20 187:12 206:11 210:19, 20 216:24 220:15 234:25 242:18

hearing 13:1,6 18:14,20 35:11 91:14 205:13

207:17 227:6,7, 10,11,17 228:1

hearing's 18:15

hearings 233:3,7

hears 223:22

hearsay 97:20 223:23

Heather 200:15

held 10:24 18:15 80:8 117:7,12,16 226:22 236:9

helped 68:15 158:20

helpful 24:11

helping 211:20

Helton 24:3 43:19 130:8,17 131:16,25 132:17,23 133:5,12,16 167:10,11,14 192:6 196:18 199:24,25 200:22 201:2,3, 4,11 202:2,5,9, 10,15,21 211:9 217:17 218:3,6, 17,23

Helton's 23:21 43:24 131:8

Hey 92:2 158:15 207:11 234:4

hide 106:1,19, 23 107:12,16 108:22 109:1

high 91:4 92:7

highlighted 36:23

hired 28:19

histories 225:24

hit 91:20

hitters 206:13

hold 27:25 51:2 205:1

home 92:2 189:13 225:16

homicide 56:13 58:24 59:8 67:7,14 142:13

honest 206:11

honestly 10:18 51:18 69:15 77:24 80:23 87:16 170:3 196:21

honesty 10:17

Honorable 36:18

hood 93:1,12 96:25 97:15 126:8

hoodie 93:11, 25 94:13 96:16 126:8,18

hope 31:14 153:11 164:25

hoped 83:12

Hoskins 10:8 14:8,15,19 15:16 18:11 19:8 20:8 22:25 26:8,14 29:21 32:3,21 33:6 43:1 44:7,11,16 48:3 51:16 52:25 53:22 58:8 60:3,11 65:16,18,24 66:6,13,18,25 72:12,18 73:12 75:18 76:11 77:1,9 78:23 79:4 80:17 82:1 88:3,6,10,14 89:1,6,10 103:15,24 104:15 105:7 110:2,21 111:2

113:3,5,12,20
114:2,18
119:24 120:18
121:5 122:14
123:19 124:1
127:3,22 128:4,
10,17,22
129:14,21
130:2,7,15
131:11,20
132:3,19 133:8,
20 134:2,19,25
135:13 136:5,
13,19 137:12,
17,25 138:5
139:24 140:3,
20 141:2,11
150:21 151:8
153:15 154:9,
16,21 155:15,
25 156:3,14,22
157:8,22 158:4
159:1,9 160:2,
5,25 161:5
163:3,16,22
205:19 213:24
219:21 229:24
232:22 233:12
234:9 236:1

**Hoskins'**
34:16 35:16
88:23 89:3
105:25 106:18
107:11 108:4,
21 146:2
155:10 200:4
235:14,16,20

**hospital** 201:9
202:6,7,12

**hospitalizatio
n** 202:17

**hotel** 91:21
199:19

**hour** 230:13

**hours** 87:24

**house** 165:1,2
217:9

**housed** 47:15
84:12 174:20
176:2 196:4

**hurdle** 150:17

---

**I**

**idea** 26:21

**IDENTIFICAIT
ON** 95:2

**identification**
14:10 16:17
17:12 22:3 32:7
34:12 35:19
38:19 42:7
44:18 48:13
50:18 72:14
95:1,20 97:2,9,
17,22 98:7,14,
16 99:1,11,19
100:1 101:6,19,
25 102:7,15
103:2 110:10
116:25 118:11,
12 124:20
132:10 141:12
153:1 241:10

**identified**
39:23 87:1
120:7,12,22,23
121:24 122:9,
17,23 123:4,17
124:15 173:1
189:12 217:7
238:6

**identifies**
181:22

**identify** 99:16,
22 189:15,17
190:10,14
194:9

**identifying**
124:7

**ignore** 95:4

**illicit** 183:13

**imagine** 84:22

**immediately**
76:6 114:17
136:18 151:7,
12,17

**impeach** 29:13

**impeached**
224:2

**impeachment**
44:11 45:20,24
46:4 112:21
123:15 145:5

**implicate**
103:24 120:23
240:15 241:2

**implicated**
167:9

**implicates**
62:12

**implicating**
103:14 104:15
111:25 167:14

**implication**
9:3

**importance**
222:24

**important** 50:4
102:4,11,13
190:10 226:11,
15

**impression**
165:7

**Inactive** 55:15

**inappropriate**
183:18 218:9

**incarcerated**
79:5 174:24

**incentive**
176:14 192:14
212:11 240:14
241:3

**incentives**
41:2,5 43:11
62:19,25
210:21 212:10

**include** 12:4
48:21,25 61:22
90:17 153:12

**included** 25:1,
2,5,7 35:13
61:15 62:9
63:16 68:8
70:25 100:3

120:24 121:8
142:1 198:20
219:16

**includes** 10:22

**including** 35:1
38:8

**inconsistency**
226:10

**inconsistent**
41:20,23
184:21

**increases**
116:17

**independent**
32:22 33:2 52:8
53:18 56:13
59:11 67:7,15
71:19 82:21,23
84:3 86:23 87:7
90:8 91:25
161:18,25
198:1,13
218:25 219:2

**independently**
56:9,24 57:5,9
67:6,14 82:4,24

**Indiana** 82:25
84:11 149:4
175:19,21
176:23 177:21
180:11,15
196:4

**indicating**
159:10 182:22

**indication**
101:18,24
192:12 204:14

**indicted** 12:3
242:23

**indictment**
13:1,3,7,10
19:21 20:6 21:7
22:16 23:24
24:15 87:13
222:9,10
232:21 234:7,8,
17,20,22
242:17

**indictments**
21:9

**indifferent**
46:15

**individual**
53:14 63:8,10,
14 91:3 97:24
99:16,21,22
120:13,22
122:17,24
124:8 169:8
182:12 189:17
190:14 224:8

**individuals**
26:17 90:18
141:17 161:20
190:11 230:18

**info** 195:3

**inform** 93:10
97:14 115:24
120:17 122:9,
23 142:19
143:18

**informant**
193:1

**informants**
38:8

**information**
30:6,20 43:5,9,
14 44:4 48:21
55:2 57:13,20,
24 58:4 62:4
74:18,21,24
75:19 76:15,21
84:15 89:11
99:12 102:13
104:1,19
105:13 106:5,
24 107:17
108:10 109:2
112:8,14,18
120:16 121:1,
18,19 123:2,5
127:13 129:4
130:25 132:24
134:10 135:21
138:18 139:16
140:8 144:9
146:21 148:13,
25 161:19
166:21 192:6,
25 203:16

209:8 211:1 218:5,7,15 232:10 240:6

**information's** 102:11

**informed** 39:14 97:16 98:6 124:4,21,23 133:21 134:3 135:7,14 139:10 142:15 155:20 157:19 158:2,11,24

**initial** 49:25

**initialed** 37:10 222:2

**initiate** 12:25 13:3,9,14 21:6 114:2,6 121:4 129:20 131:19 136:12 137:24

**initiated** 14:18 16:2 17:6,23 22:21 60:4 110:4 122:13 139:8 153:15 154:4

**initiating** 26:14 110:14

**initiation** 13:12 18:13 87:13 113:12,19 116:11 119:23 128:9 137:11,16 155:23 156:7,12,16,21

**injury** 78:21

**inmate** 82:25 175:21

**inquired** 240:23

**inquiry** 234:4

**inside** 54:24

**instance** 45:23 46:2,6 59:21 63:12 146:10 149:25 213:14

**instances** 91:6 215:18

**instituted** 153:24

**instructs** 36:4

**intent** 224:18

**intention** 189:21 231:13

**intentions** 220:5

**interacting** 86:21

**interaction** 82:20

**interactions** 82:13 87:10

**internally** 54:10

**interrupt** 30:13

**interrupted** 100:5

**interview** 43:16 85:6 100:19 136:25 137:10 169:9 173:12 182:13 210:5 216:7 223:3,7 229:20, 21,22 230:22

**interviewed** 74:9 173:9 230:1,10

**interviews** 36:25 38:9 39:3 43:25 106:2,20 137:9 230:18, 19 231:1

**intoxicated** 142:16,20 143:19,25 144:1,7,11 145:3,11

**invasion** 225:16

**investigate** 56:9,12,24 57:6,9 67:6,14,

18,19 161:23

**investigated** 52:22 59:19 162:2

**investigating** 53:24 56:4 162:7 230:6

**investigation** 13:15 35:1 49:7 50:9 53:4,9 54:2 56:2 59:11 66:6,12 67:4 101:24 103:1 143:7 149:22 150:13 152:6, 24 155:2 161:6, 18 166:23 215:21 216:18 224:16 228:11 229:17 231:11, 25 233:19 234:2

**investigations** 116:7 215:4,5, 15 216:14

**investigative** 24:13,17,18,22 37:23 38:7 49:2 55:23 99:2 116:18 150:14 165:6

**investigator** 214:24

**involved** 18:18,21 35:1 48:21 53:3 66:5,21,24 86:24 102:15 137:9 160:6,25 166:23 206:16, 23 215:12

**involvement** 16:11 19:7 216:16 217:4 224:7

**ironed** 68:19

**issuance** 23:24 24:14 118:22

**issue** 35:11 36:20 69:4 76:20 90:21 93:5 94:1 151:2 154:17 160:12, 13 199:18 201:8 202:3,10, 16 205:8 238:21 243:7, 12

**issued** 15:13, 17 18:4 22:16 26:7 36:18 55:20 60:2 77:20 189:10 234:7

**issues** 45:7,9 91:8 151:17 162:20,25 186:4 195:7 199:22 202:17 238:20

**it--** 119:11

**item** 151:3

**itemized** 212:19 213:2

**items** 26:1

───────

**J**

**Jackie** 224:19

**jail** 38:8 68:2 78:24 81:22 168:20 169:1 171:16 205:16

**James** 32:12 192:6 218:3,6, 23

**Jane** 212:6

**Jason** 9:7 14:21,22 17:8, 24 48:16 60:5 94:22 95:4 119:14 138:15, 19,21,24 142:8 168:4 190:6 224:10 240:9

**Jensen** 36:19 199:17,22

202:18

**Jesse** 43:20

**Jessie** 43:20 120:4,5

**job** 102:20

**Joe** 67:25 68:2 69:14 70:23 72:6 73:16 74:9,13,18 75:3,5,8 77:7, 15 79:14 86:21 87:16 127:5 146:10,15,25 147:17 150:24 151:4 186:9

**John** 152:14,19 212:6 214:13, 14

**Johnathan** 103:25

**Johnson** 84:9 85:6 86:1 137:1 149:3 164:8 224:22,25

**join** 53:13 54:4 56:19 57:16 62:7 70:20 71:2 75:22 100:12 103:6 109:23 127:10,24 131:23 134:7 143:22 153:9 155:4 158:8,9

**joining** 86:14

**Jonathan** 10:8 16:14,24 17:2 19:8 20:7 22:25 29:21 42:4,11 43:1 44:7,16 48:3 52:25 53:22 58:18 60:3,11 61:4,12 66:13,19 67:1 73:12 75:18 77:1 88:3,7,10, 14 92:24 93:11 94:7 95:17,19 96:14,25 98:4 99:10 100:9 102:6 103:15

104:15 110:2, 22 111:5 112:1 113:2,13,20 114:2,18 119:24 120:19 121:5 122:14 123:20 124:1,5, 7,19 128:4,10, 17,22 129:14 130:2,7,15 131:11,20 132:3,19 133:8, 20 134:2,20 135:1 136:19 137:12,17,25 138:6 141:6,11 142:14,18,21 144:1 146:1 149:8 150:21 153:15 154:9, 16,21 155:19 156:1,3,9,17 157:2,22 159:1 160:2,5,25 163:19 190:7 191:6 194:5 217:7 219:22 229:25

**Jones** 19:2 170:19,22 179:1 198:5,9 208:13

**Jordan** 193:10

**Joseph** 224:19

**Josh** 100:20

**judge** 9:8 13:21 16:3 18:10,17 20:22 35:22,24 52:5 76:21 151:11 160:21 163:10 199:17,22 202:18 204:16, 17,22,23 205:1 227:12,15 242:4 243:9

**judges** 119:20 191:19 243:11

**judgment** 63:18

**Judicial** 10:22

**July** 42:16 72:13 80:16 109:12,18 135:8,13,15 157:15

**jump** 168:6

**juncture** 237:20

**June** 73:25 74:8 80:16,18 81:3,13,20 83:21 127:4 143:17 146:22 148:21 149:17 157:3 177:5 178:13,18 180:6 183:7

**jurors** 24:14 25:11

**jury** 12:5 13:7, 10,19 18:18,20 19:6,17 20:7, 11,15,23,24 21:1,7,8,11 22:1,15,17,18 23:9,10,12,17, 19,23 24:7,9, 10,13 25:4,7, 16,19,24 71:14 76:25 108:6,9 114:11 121:4,9, 11 124:4 141:16 150:10 153:21,22 163:8 183:15 190:21 204:12, 17 205:2 206:17 207:17, 23,24,25 208:1, 8,11 221:24 222:3,13 226:21 227:3, 14 228:1 231:18 234:8, 13,17,20,23,25 242:18,23

**Jury's** 141:18 234:24

**justice** 159:19

**juvenile** 44:1 45:6,9

---

**K**

**Katherine** 14:19 17:3 23:2 48:4 49:8 50:10 53:10 56:12 58:24 59:8 67:7,14 73:17 77:2 79:10 101:6,19,23 102:1,8 110:5, 15 112:1,4 116:12 120:5,8, 13 121:25 122:10,18,24 124:6,8,16 138:1 145:14 149:9 153:7 154:22 156:1, 23 157:11 159:11 160:6 161:1,7 163:4 167:10 189:13 215:22 216:18 222:5,7

**Kayla** 95:13 109:14,19 110:4,15 111:3, 25 113:1,9,16, 24 114:8,15 115:5,6,7 116:11 123:23 150:25 181:11 182:16,18 186:5 193:15, 19

**Kayla's** 182:1

**Kelley** 8:22 9:2,5 59:14 93:15 103:5,17 109:22 111:7 112:12 113:7, 22 114:20 125:7 127:9 128:12 130:11, 21 131:13 133:9,24 134:7 135:18 136:7 140:11 143:21 152:11,14 157:25 158:8 159:4 167:21 185:25 214:9,

13 217:22,25 220:11 225:1 241:19 243:6

**Ken** 186:6 193:22

**Kenton** 80:9

**Kentucky** 10:23 11:8,17, 21,23 28:9 30:1,11,25 34:4 35:6 38:11 40:11 41:16 44:9 56:13 59:9,23 60:5 69:9 80:8 123:10 164:15 175:17,19,20, 23 176:4,8,19 215:6 228:17 238:8

**kid** 224:23

**KINCER** 184:16 220:13, 17,21 228:23 229:6 235:2

**kind** 71:22 80:20 99:20 174:13,18 176:13 208:2 221:16 242:19

**King** 67:25 68:2,5,17 69:14,16,22 70:16,23 72:6 73:16 74:9,13, 19 75:3,5,8 77:7,15 79:14 86:22 87:16 127:5 128:7 146:10,15 147:17 150:2, 24 151:4 186:9 187:11 200:2

**King's** 71:19 74:6 127:19 128:1 147:1 151:13

**kitchen** 92:4

**knew** 68:11 79:24 115:8

174:11,25 189:15 216:10 217:6 222:10 237:20

**knowledge** 27:5 39:18 47:24 48:5 50:7 51:13 56:22 64:18 65:25 66:10 86:7 91:25 93:7 141:7 146:21 147:25 150:12, 14 170:2 193:18,20,21 194:2 195:20 206:18 207:5 213:15,20,25 232:15 236:23

**Knox** 10:22 12:1 18:1 19:17 20:6,15 27:25 28:4,19 31:17, 22 32:12 45:12, 19 46:11 47:5,9 50:14 54:11 55:23 56:8,13, 23 57:4,5,11,19 58:3,23,25 59:7,9,11 62:17,23 64:8, 18 65:14 69:3 75:25 78:3 164:18 169:1, 10 182:11 208:9,25 214:14,20 215:13 216:17 220:7 230:7,9

**Knoxville** 11:22

**Kool-aid** 220:17

**KSP** 166:18 168:19 169:9 208:22 230:15 231:10

**KSP's** 188:22 230:6

**KSP3** 119:9

**KSP337** 118:5 119:6

**KSP338** 119:13

**KSP339** 118:7 121:13

**KSP382** 151:19

---

**L**

**lab** 34:24 153:11,24 208:4

**label** 42:2

**labeled** 50:16 51:2

**Lack** 125:24 130:12

**lady** 25:24 74:15 81:25 146:17 148:12 149:10 172:9 175:3 187:13 222:8,16,22

**lady's** 132:25 218:6

**laid** 159:14 173:24

**Lake** 202:1

**language** 92:20

**larger** 212:9

**Larry** 199:4

**late** 143:7

**latent** 154:8,15

**LAUGHTER** 9:2

**Laurel** 10:22 12:1 47:9 68:3, 6,21 69:17 74:25 186:13 208:9

**law** 11:6,7,11 15:9 18:4,6 20:19 27:1,16 31:7,10,11,12, 15 34:24 35:3

40:9 49:1,6 52:21 53:3,10 54:9,15,21 56:25 57:21,24 58:4,9,14,19,25 60:21 67:1,7, 15,23 68:1 69:1,2 74:7 75:19 76:23 77:13 79:8 94:4 96:13 100:7 102:14,25 104:23 105:16 109:5,20 112:9 113:3,10 114:14 117:3,6, 10 118:19 120:17 121:2 125:19 126:6 127:5,20 128:2, 8,25 130:9,17 131:9,24 133:21 134:4 135:7,14,15 136:16 138:11, 17,23 139:2,10 140:6 142:19 143:18 153:5 155:1,13,19 156:2,8,13 157:19 158:2, 20,24 161:6,10, 17 162:3 167:7 169:10 172:14 195:21 215:14 216:23 232:8

**Lawson** 43:20 120:4,5

**Lawson's** 43:21

**lawsuit** 10:2,4, 16 78:9 162:9, 11 165:17,23 228:20

**lawyer** 165:22, 24

**lawyers** 31:23 165:25

**lay** 13:20

**laying** 197:21

**lays** 50:24

**lead** 25:6,10 27:1 30:25 53:16 85:20,21, 22 214:24 224:12 231:8, 10

**learn** 95:23 154:14

**learned** 74:18 76:5 89:14 104:4,24 105:17 106:9 107:20 109:6 113:1,9,16,24 114:8,14,25 121:17 123:17, 23 127:19 128:1,7 129:11, 17,24 131:8,16, 24 134:17,23 136:2,9,16 139:21 140:1,6, 17,24 143:18 145:10 146:7 150:18

**leave** 18:25 85:17 222:15

**leaving** 56:3 85:15 122:18, 24

**led** 219:23

**left** 40:3 84:9 91:21 152:25 153:2 175:18

**legal** 27:18,20 166:19

**lengthy** 83:15 172:2 200:18

**Leslie** 193:11

**Lester** 10:8 17:16,19 19:9 20:8 23:1 48:3 51:16 53:23 58:13 60:3 65:16,17,21 68:8 72:18 121:5 150:22 154:10,16 203:5,6 205:19 213:15

**Lester's** 146:3 151:8 157:15

**Letcher** 230:16

**letter** 132:8,9 133:13 139:5 152:19 192:2, 19 211:4 218:2

**letting** 182:8

**level** 78:12 116:17 145:1 233:20 234:10, 14

**Lexington** 201:8,25

**library** 169:10

**lie** 117:7,11,14

**lied** 158:15

**life** 11:23

**likelihood** 91:4,9 92:7

**Likewise** 219:15 220:7

**limited** 35:2 51:25 86:7 91:6 147:12 200:24

**lines** 111:12

**lineup** 92:5,8

**lineups** 126:24

**list** 23:6 181:11 222:1 238:9

**listed** 23:1,14, 21 24:3 32:25 62:4 70:24 177:3 186:10 197:8,12 212:14,20 213:6 222:20

**listen** 181:20

**listened** 181:21

**listing** 197:18

**litigation** 47:20,21 185:23

**local** 58:25

**locate** 40:21 69:8

**located** 39:16

**locating** 69:5, 10 169:14

**location** 187:15 196:3 201:17 230:14

**London** 84:10 209:2

**long** 10:24 28:17 69:16,19, 20 84:17 116:16 171:22 172:23 173:14, 15,18 174:7,13 177:22 181:2,7 202:12 230:19 235:7 241:20

**longer** 157:3,9, 16 159:10 173:22 182:23, 24 197:19,22 212:16,21 214:15 237:7 238:1,2

**looked** 73:19 98:5 99:25 102:5 237:19

**loss** 186:3

**lost** 140:22 212:23

**lot** 8:18 21:25 24:25 27:15 53:16 68:3 70:2 91:21 116:21 132:24 155:8 166:19 168:9 173:22 203:3 216:13,21 218:5 226:4 233:1,3

**lump** 65:7

---

**M**

**made** 21:12 36:5 40:6 41:11

46:21 50:1
51:20 60:16,19
61:1,2,3 64:10,
12,14 65:2,17
66:10,14 69:21
70:6 79:4 86:17
96:24 99:2,11,
15,17 109:13,
18 110:3 111:3,
24 116:25
119:17 122:16
123:2 124:25
125:11 127:4,
12 128:18,23
129:3 130:7,16,
24 131:24
132:23 134:9
135:20 139:15
144:8,13,21,24,
25 145:4 154:8,
12 155:14,15,
21 158:16
165:14 168:25
172:19 175:14
176:16 180:21
182:19,22
188:23,24
190:20 203:5,
22 210:21
212:11 235:1
238:23

**magistrate**
184:11

**main** 15:11

**maintained**
33:19 45:21
47:4,7,17 48:1,
24 50:17 52:19,
21 53:2 54:8,
10,17

**maintains**
208:16

**major** 11:18,19

**majority** 215:3,
7 230:20

**make** 8:20 9:8,
9 13:13 21:13
30:5,19 50:2
53:18 63:2,4,20
68:15 88:1
94:15 97:1,17,
22 98:7,13,16

99:25 101:5,19,
25 102:6,15
103:9 116:20,
21 124:20
139:6 151:11
158:10 160:17
176:18 178:21,
22 179:25
184:9 185:12
187:4 201:16
203:11 204:17
227:13 233:2
241:6

**makes** 25:25

**making** 37:2
64:23 65:14
78:23 81:24
82:3,16,17 83:7
146:7,11
147:19,23
149:8,14 150:2
171:3,4,19
172:8,16
174:16 201:22
209:8 219:10

**male** 101:6,19
102:1 120:13
122:10,17,24
124:5,8,15
189:16

**Man** 70:11 72:3

**manner** 18:5,7
21:16 93:22
126:21 195:16

**manners** 13:5

**March** 15:13,
14 16:6,15
17:7,20 20:20
26:18 29:21
60:2,12 109:13,
19 110:5,14
111:5 113:2
119:24 128:18,
24 130:8,19
131:8 137:19
153:16 156:8,
12 226:20
227:3

**Margaret**
195:18 196:9

**mark** 14:6 15:4

16:12 17:9
19:20 21:18,23
32:2 35:14
38:14 44:14
48:7 50:12
72:11 94:16,23
95:16 118:4,6
137:22 141:5
152:8 182:21
222:20 223:1,
19 224:6

**marked** 14:10
16:17 17:12
22:3 32:7 34:12
35:19 38:19
42:7 44:18
48:13 50:18
72:14 81:18
94:21 95:1,2,20
110:8,10
118:11,12
132:10 141:12
153:1 241:10

**marking** 34:8

**Maryland** 29:3
34:5 35:7 41:17
44:10 112:20

**massive** 22:13

**material** 29:17
127:17 129:8
131:5 140:15
189:10

**materials**
36:11 194:24

**Matt** 166:11,12,
16,18,21 186:6

**matter** 16:2
20:25 48:16
55:14 93:22
160:16 182:19
198:7 212:6
225:17 231:14
236:11 243:11

**matters** 159:22
208:8,11

**meaning**
197:17

**means** 23:13
160:10 195:11

**meat** 169:16

**medical** 201:5,
8 202:3,7,9,10,
13,23

**meet** 68:23
77:22 79:14,16
195:17 231:20,
24 232:2

**meeting** 71:23
77:7 84:4,6
85:10,12,14,16
86:9,17 138:12,
25 199:15

**meets** 21:8
207:23

**Mefford** 40:7,
16 164:5
222:20 223:1,
19 224:2,6

**member** 68:20
121:3 220:8

**members**
187:23 198:25
199:2 216:17
230:25

**memorandum**
44:25

**memorialized**
211:20

**memory** 36:20
143:1 170:4
173:3 177:2,19
185:8 186:3
187:21 188:14
190:24,25
194:20,22
195:14,15,24
196:19 198:2,
13,17 200:23
201:13,20
202:21 203:24,
25 238:15,16

**memory's**
171:18

**mental** 45:7

**mention**
141:22 172:9

**mentioned**

**meat** 169:16

**mentioning**
168:18

**message**
166:9

**met** 71:24
74:25 77:15
119:2 141:16
159:16 170:4
186:12

**methamphetamine** 117:15
175:10

**methodology**
40:12

**Michael** 37:22
38:2 40:22
87:16 89:25
90:5 94:25
96:17 97:1
99:25 100:21
103:2 116:25
121:25 122:9,
16 123:4 124:5
126:11 188:8
189:12 194:6
217:1,7,13

**middle** 22:11
192:5

**Mike** 19:2
101:10 120:4,6,
7,12 121:22
122:9,17,23
123:4,17
161:23 164:11
167:9,11
194:16,19
197:2 229:10,
16 230:25
231:13,17,20,
21 232:2,10,13,
18,22 233:6,10,
15,18

**Mikey** 141:23,
25 142:6,8,15,
19,25 143:3,19
145:10 197:8

213:8 236:21

**mile** 78:17
174:1

**Mills** 14:19
17:3 23:2 48:4
49:8 50:10
58:24 59:8
67:7,14 73:17
77:2 79:11
95:13 101:23
109:14,19
110:4,5,15,16
111:4,25 112:1,
4 113:16
114:15 115:7
116:11,12
120:5 132:24
138:1 142:12
145:14 149:9
150:25 154:10,
22 156:1,23
157:11 159:11
160:6 161:1,7,9
163:4 167:10
180:8 181:11
182:12,14,16,
18 193:15,19
218:6 219:22
222:6,7 236:24

**Mills'** 53:10
56:12 101:7,20
102:1,8 113:1,
9,24 114:8
115:6 120:8,13
121:25 122:10,
18,24 123:24
124:6,9,16
153:7 186:5
189:13 215:22
216:18 217:8

**mindful** 159:20

**mine** 161:3
182:22

**minimal** 62:5,8

**minimum**
90:21

**minute** 78:17
88:1 166:13
201:4 225:10

**minutes** 82:9
84:23 173:19,

23 229:2,3
230:13

**misdemeanor**
12:17 203:12,
17

**missing** 28:16
40:17 49:13

**mistaken**
35:11 39:24
68:21 78:1 80:7
83:3,6 94:3
99:18 151:5
166:13,14,17
169:9 174:21
175:5 178:14
182:19 188:16,
24 189:7,9
200:24 201:15
202:3,10
203:18,20
229:19

**mistakes**
116:20,21
165:14

**mitigates** 30:8,
21

**mitigating**
200:17

**mixed** 21:25

**moment** 80:15
151:23

**moments**
147:16

**Monday** 21:9,
10,17

**monetary** 65:7

**money** 64:19
65:7,8 74:16
88:5 146:18
187:14 213:16,
21 214:4
236:24

**months** 10:5
137:6 168:25
172:1 182:19

**morning**
21:10,17 122:1
205:8

**mother** 240:22

**motion** 32:3,5,
11,15 33:3,5
34:1,8,15 36:5,
14,17 38:21,25
39:2 41:7 42:3,
10,12 43:4,9
44:15,20 63:18
72:12,17 73:23
75:4,8 80:11,15
81:3,15,16 82:6
93:24 109:12,
17 122:15
141:5,8,21
142:2 145:18,
20,25 146:5,25
148:9 149:17
150:12 152:20
157:2,6,8,13,
15,18 159:14,
17 172:12
177:4 181:12
187:10 191:11
197:4 198:20
199:10 200:1,3,
4 212:15,19
213:1,2 219:4,
11,17,23
235:21,22,23,
24 236:7,16,18
237:3

**motions** 32:1
130:6 139:9
168:11 233:4
239:19

**motive** 214:3

**motorcycle**
78:20

**Mount** 188:17

**move** 173:8
176:17

**moved** 47:15
128:16,21
130:14 133:19
134:1 135:12
142:13,17
175:17,19
187:15 200:11

**moving** 159:21
200:6

**multiple** 50:5

238:14

**multitude**
200:8,9 237:20

**murder** 12:6,
20,25 14:16,19
16:24 17:2,16
25:18 46:11
48:4 60:17
61:4,13 79:10
102:24 103:8
110:5,15,21
112:1,4 115:16,
23 116:12
117:11,15
132:25 138:1
145:14 149:9
154:21 156:1,
23 157:11
160:6 167:10
180:8 198:15
201:19 203:19
214:25 215:5,9,
11,15,22 218:6
219:22 222:5
225:14,15,21
229:17

———————

**N**

**name's** 216:5

**named** 166:11
228:20

**names** 18:23
62:11 167:6

**narrative**
73:24

**naturally**
225:14

**nature** 138:17
234:6 238:24

**necessarily**
23:15

**needed** 21:14
71:18 164:25

**negate** 30:7,20

**negated** 76:5

**nice** 8:19,25
9:7 69:25

**nicer** 230:22

**night** 175:9
225:6

**nobody'd**
68:12

**non-** 9:13

**non-
defendants**
66:3

**Nonverbal** 9:2

**northern** 11:7
80:8

**notated** 15:11
157:12

**notation**
222:5,6

**noted** 157:6,18

**notepad**
186:19

**notes** 34:23
36:23,24,25
37:2,3,12
43:15,17,18,20,
21,24,25 45:3
53:25 232:17

**notice** 36:23
189:7,8 204:10
211:3

**notification**
206:2 211:7

**notified** 78:4
94:4 112:6
121:11 205:22
211:5

**notifying**
211:4

**number** 12:21
14:23 16:13
17:10 20:2
21:21,23 32:2,
12 34:8 35:3
36:21,25 38:15
42:3 44:15
50:16 61:21
62:4 73:5 81:19
90:21 100:22
101:14 118:5,7

121:23,24
136:23 146:7
152:10,15
166:11,21
168:10 188:20,
23 193:13
212:1 218:20
221:22,24
222:1 235:7
239:23

**number's**
239:25

**numbered**
39:4 41:1

**numbering**
119:12

**numerical**
47:10

───────

**O**

**oath** 117:7,11,
14 119:4
220:13

**object** 13:25
16:8 19:10 21:4
24:1,16 25:14
26:19 27:2,8
29:15 30:10
31:2 35:8 36:8
39:10 40:10,18,
24 43:7 45:15
46:25 49:9
50:19 51:7,17
53:12 54:3
55:1,6 56:17
57:15 58:11,15,
20 59:2,13,14,
15,24 60:6,14,
18,24,25 61:7,
18 62:6 67:9,
10,16 70:19
71:1 73:3 74:1,
3 75:11,21
76:8,17,18
77:3,4 90:1,19
91:16 92:11,19
94:11,12 96:18,
19 97:3,19,20
98:8,21 99:13
100:2,10,11
102:9,17 103:5,

16,18 109:16
110:6,17,24
111:7 112:5,11,
16,24 113:6,14,
21 114:4,12,21
115:19 116:2,4,
8,14 120:20
121:6 122:20
123:7,13,21
124:2,10 125:8,
13,23,25
126:13 127:9,
23 128:5,11
129:1,16,22
130:3,11,20
131:2,12,13
132:4 133:1,24
134:15,21
135:2,10,17
136:6,15
137:18 139:13
140:10,21
142:5,23
144:10,17
145:6,15 146:9,
23 147:3 148:4,
17 149:5,11,23
150:15 153:8
155:3,17
157:24,25
158:7 159:12
160:7 166:25
220:3 236:4
237:1

**objected** 37:5
183:23 202:11

**objection** 25:8
38:17 56:18
59:3 61:18
90:6,7 91:15,16
93:2,3,4,14,15,
16 99:4 102:18
103:4,17
109:21,22
111:6 112:12
113:7,22
114:19,20
125:5,7,9,22
127:8 128:12
130:10,21,22
131:14,22
132:5 133:9,23
134:6 135:18
136:7 140:11
141:13 143:21

147:2,3 159:3,
4,5 169:6,25
170:8 171:10
172:6,21 173:5
178:10 179:13,
25 180:12,19,
22 181:16
183:8,10 187:7,
18,20 188:12
189:23 190:3,8
194:7,14 195:5,
9 196:20
197:20 203:23
209:21 210:17
211:23 213:17
214:1 217:15
218:12 219:13,
19 220:9
221:19 226:1,7
234:15 241:4

**objections**
8:20 9:8 38:15

**obligation**
29:8,12,17 31:9

**obligations**
28:21,25 31:18,
24 34:4 35:7
38:11 41:16
44:8,9 123:11
131:6 134:14
135:25 139:19
140:14 144:15

**observations**
217:14

**obtain** 103:2
165:22,24

**obtained** 54:1
61:6 67:3 106:2
137:15,24
138:6,8 149:3
154:25 158:3

**occasion**
199:7

**occasionally**
209:3

**occasions**
51:25

**occurred**
185:17 235:8
236:2

**offense** 30:8,
21

**offer** 63:23
65:17,20 88:5
203:17,21

**offer's** 46:16

**offered** 203:12

**offers** 63:17
64:1

**office** 10:6
11:5 12:9,17,
20,25 13:2,3
18:2,12,18,24
22:8 25:25
26:22 28:1
31:23,24 33:13
34:3 36:4,11
38:1,8,22,23
39:13,19 40:16
41:5,23,25
42:15 43:10
44:8,21 45:13,
21 46:12,18,21
47:4,5,12,18
48:1,25 49:7
50:9 51:14
52:12,19 53:2
54:7,11,15
55:7,11,15,16
56:8,10,24
57:4,12,20,21,
23 58:4,9,14,19
59:1,12,20 60:9
62:18,22,24
63:2,3,7,13
64:4,8,14,19,22
65:3,11 66:14
67:2 76:1
84:11,25 85:1,2
96:1,9 114:1,6,
10 116:13
121:3 139:3
160:18 170:19
194:22 195:22,
23 198:3,10
206:20,23
207:2,4,20,22
208:8,16,21
209:4 222:8,12,
16 230:9,17
234:16 239:7,
19 240:1 242:3,
13,15 243:4

**office's** 55:3

**officer** 13:11
16:2 18:4,19
20:24,25 21:1,5
24:8,12 25:6
27:1 34:25
39:24 48:15
52:3 53:17
68:15 82:10
91:21 96:13
102:14 118:19
119:14 120:17
121:2 138:11,
23 142:19
143:18 155:20
156:9,13
163:15,18
164:15 166:23
167:7 208:17,
21,25 209:15
214:25 224:12
231:8

**officer's** 18:6
25:5 45:3 53:15

**officers** 13:9
15:10 45:1
48:20,22 49:6
53:24 54:22
67:2,21,24
69:2,13 75:19
76:24 88:24
89:4,9,14,24
90:4 93:7 94:9
100:8 102:14
103:12,23
104:4,14,23
105:9,12,16
106:1,9,19,23
107:2,12,16,20
108:22 109:1,5
113:4,11
114:15 116:20
117:4,7,11
125:19 126:2,6
127:20 128:2
136:16 140:6
153:5 154:2
155:1 158:24
166:20 172:14
207:2,24
222:14 232:3,9

**official** 155:14
156:2

**officially** 234:2

**officials** 20:20 35:3 54:10,15 58:9,14,19 109:20 127:6 128:25 130:9, 18 133:21 134:4 135:8,14 139:11 157:19 158:2

**oftentimes** 223:6 226:10

**Oklahoma** 97:1,12 98:5, 10,15 99:10 124:19,24

**older** 47:16

**on-the-job** 27:17

**one's** 150:5

**ongoing** 24:24 47:16 52:19 115:25 120:18

**open** 46:14

**open-file** 144:19 192:18

**opinion** 98:25 160:16,17,24 163:2 165:5,10, 16 192:15 240:16 241:3

**opinions** 160:5,12 161:3

**order** 13:11 15:21 35:15,18, 22 36:2,4,10, 13,15,18 37:17 38:4,10 44:4 45:14 63:19 96:17 115:13 222:23 241:15

**ordered** 44:3 191:19

**orders** 65:1

**original** 99:18 162:6

**originally** 74:9

**out-of-state** 83:1

**outlined** 36:13 141:8

**outlines** 30:2

**outstanding** 153:23 154:6

**overcome** 238:3

**Oversee** 12:3

---

**P**

---

**P.M.** 243:15

**pages** 49:11

**paid** 64:19

**paragraph** 36:22 37:21 38:6 39:4,12 41:1,19 72:22, 25 73:23 75:10 81:19 83:17,18 120:3 121:16 146:14 148:20 149:7 168:15 173:10 186:10 240:3,5,7,19,22

**parentheses** 37:2

**parentheticals** 37:6

**parking** 68:3 70:2 91:20

**parole** 68:13, 14,15 69:12

**part** 25:20,22 30:4,15,17 33:19 54:18 192:17,22 218:2 238:17 240:11

**Partially** 226:8

**participating** 136:25

**parties** 203:2

**parts** 222:3

**party** 235:23

**passed** 182:18

**past** 147:20 150:17

**pasts** 225:11

**PD** 230:21

**pendency** 56:6

**pending** 12:23 64:1,10,16 110:23 115:24 123:19,25 134:25 136:18 154:20,25 211:21 223:9

**penitentiary** 84:11

**people** 23:14 53:20 85:24 150:11 159:21 161:12 194:12 216:6,9,12,23 221:12 223:7, 17

**perfect** 228:4, 10

**perfectly** 9:16

**period** 79:2 138:7 174:6,17

**perpetrator** 152:24

**perpetrators** 152:25

**person** 25:10 27:4 62:12 80:3,10 84:4,7 92:6 97:24 102:7 115:17 118:24 126:17 141:22 169:1 171:8,23 172:4 177:8,15,24 185:6 189:15 217:8

**personal** 16:10 20:16 46:9 63:25 64:5 65:2 160:24 161:2 207:5

**personally** 15:18 17:4,21 20:14 64:21 65:3 74:21 79:16 86:21 206:15

**personnel** 34:25

**perspective** 102:21 145:7

**pertinent** 218:2

**petty** 67:17

**PFO** 222:11

**phase** 49:25

**phone** 27:9 79:20 80:3,4,6 82:8,22,24 83:10,20 87:4 149:1 151:11 166:11 167:3 170:12,22 171:1,24 177:1, 6,11,25 179:12 181:8 188:15, 23 201:22 204:2

**photo** 89:24 90:4,11,12,17, 23 91:1,2,5,9, 11,22 92:5,8,15 98:19,22 126:15,16

**photograph** 90:24 91:13 92:10,18 96:24 97:14 98:4,6,18 99:10 102:6

**photographs** 43:13,17 90:17 92:24 93:12 94:7,10 95:17, 19,23 96:14,17 98:4,18 99:25 124:19 125:12, 17 126:7 230:3

**photos** 93:21, 25 190:17,18, 23 191:6,7,9 217:2

**physical** 153:6,10

**physically** 54:23 208:20

**pick** 175:24

**Pickard** 92:23 93:10 124:25 132:17,23 133:5,11 164:2 192:2 214:14, 19,24 216:8,12, 15,21 217:4 218:3,9 220:2

**Pickard's** 152:14,19 192:12 215:11 216:25

**picked** 84:10

**piece** 226:11

**pillars** 225:18

**Pineville** 68:12 71:5,24

**pinpoint** 174:20

**PL24455** 34:10

**PL24490** 32:4

**PL24492** 32:4

**PL24494** 38:16

**PL24511** 42:5

**PL24722** 239:7,25

**PL24728** 239:25

**PL25239** 50:15

**PL25392** 19:23

**PL25393** 19:23

**PL25395** 48:10

**PL26180** 22:1

**PL26181** 227:1

**PL26182** 22:1

**PL4844** 132:8 192:22

**PL4855** 192:23

**place** 71:7 89:15 104:5,24 105:17 106:10 107:3,21 109:6 118:23 120:6 138:10 161:6 230:15

**plaintiff's** 211:12

**plaintiffs** 56:7 239:5

**plan** 205:20 224:5

**planned** 224:9

**plans** 28:13 220:1

**played** 215:21

**playing** 169:14

**plea** 63:18,22 65:19 66:1 203:9 210:24 211:5,6,20,25 212:1

**plead** 63:8

**pleas** 63:17

**pleasant** 70:2

**pled** 63:14 211:19

**plow** 8:16

**plural** 172:13

**point** 12:23 13:18 18:7,12, 20 25:1,3 26:22 32:23 39:16 46:16 47:10 69:7 71:17 73:5 76:11 79:21 83:15,19 85:16 124:21 138:17 141:9 142:25 146:6 151:1 154:7 156:7 159:16 160:11 161:20 162:24 169:19 170:2, 18 175:24,25

**pointed** 174:15

**police** 13:9,11 23:16 24:22 31:5 39:20 40:11 43:21,25 48:18,25 49:14 53:7,24 56:9, 13,14 57:13 59:9,10,23 60:5 67:21 69:10 70:18 73:10 88:24 89:4,8, 14,24 90:4 92:25 93:13 96:15 99:17,18, 24 100:6,8,19 102:22 103:12, 22 104:4,14 105:9,11 106:1, 2,9,19,23 107:2,12,13,16 108:22,25 113:17 115:17 125:2 129:12, 18,24 131:17 136:3,10 139:22 146:8, 12 150:7,19 153:24 155:15, 21 156:5,10,14, 19,24 162:5,9 163:15,18 164:12,15 166:16 173:1,4 182:1 188:4 193:1 198:18 207:1 209:8,15 215:6,7,10,12 216:10,12,24 221:4 228:17 229:11,25 230:8,13 231:1, 22 232:11,23

**policies** 62:24

**policy** 55:9,10, 13 62:18 63:13 64:5,7,8 102:21

**place** 144:19 192:18

**Polly** 195:18 196:9

**polygraph** 43:19

**position** 27:24 46:13 117:18, 23

**positively** 189:12,17 194:9

**possessed** 10:7 36:12 38:9

**possession** 39:9 54:8 117:15

**possibly** 45:7 86:4 212:8 227:5

**post** 166:17 209:1,3 230:12

**potential** 153:12

**potentially** 42:10 191:15 197:15 225:3

**practice** 12:24 24:12 46:9,14 54:7 56:23 63:25 64:7 198:14,21 215:11 216:6

**practicing** 45:12,19 186:7

**Pratt** 19:2

**precursory** 21:12

**predicate** 61:22

**prejudice** 160:10 191:12, 18,20,23,25

**preliminary** 13:1,6 18:14, 15,20 207:17 227:6,10 228:1

**prep** 178:20

**preparation** 12:5 46:17 81:21 177:5 215:25

**prepare** 65:1 209:12 232:13 239:7

**prepared** 22:17 25:16 48:15 59:22 170:21 217:2 222:17 238:11 240:1

**preparing** 172:18 222:9

**presence** 68:1 204:16 205:2

**present** 18:19 21:11 24:13 67:21,24 76:2 159:23 163:24 164:2,5,8,12, 15,18 170:22 173:12 174:5 181:23 182:2, 13 189:9 201:21 202:11 223:18 229:23 231:17

**presentation** 19:16 25:16

**presented** 19:6 20:11 25:4,12 48:12 60:8,21 61:14, 16 114:10 166:6 234:16

**presenting** 19:7 20:14 208:6 222:13

**president** 199:14

**pressed** 232:21

**pretrial** 205:6

**pretty** 174:2 177:23

**prep** 178:20

**previous** 21:20 82:1,14 149:13 171:6, 14

**previously** 183:11

**primarily** 215:10

**print** 154:8

**prints** 154:15, 17

**prior** 9:25 10:19 11:2,11 18:20 19:16 22:14 23:24 24:14 55:19 86:9,13,17 93:12 94:10 96:14,23 97:13 110:12 111:4, 23 116:24 119:23 120:11 121:3 122:4,8 124:21 126:7 138:12,16,24 139:9 141:4 143:16 155:12, 18,23 162:25 171:7,19 173:1 178:21 186:22

**prison** 83:4 84:12,17,20 86:10,14,18 116:22 138:12 149:4 173:15, 20,24 175:18 176:5,21,22,23 177:20 180:11 187:23 238:19 240:11

**probable** 18:16 20:23 76:2,5 118:21 141:10 157:4,9, 16 159:15,22 160:1 213:11 217:11 219:21 226:16 227:13, 16,25 228:2 234:9,21,23,24 237:6 238:1 242:22 243:1,4

probate 212:2

probation
68:14,15 69:12

problem
175:5,6

problematic
223:11

problems
68:10

proceed 18:5,7
112:2

proceeded
61:11 115:9

proceeding
22:11 41:25
42:5 43:6 94:2
121:4 126:4

proceedings
8:1 191:22
243:2

proceeds 18:2

process 13:8
15:15,25 17:23
18:1,12 20:17
21:5 24:24
25:21,23 26:12
33:2 83:1
118:19 195:3
230:22

procession
224:16

produce
39:13,19 42:10
45:13 47:25

produced 23:8
39:7 49:6 51:5
239:4

producing
47:19

professional
31:1 218:11

promise 63:14
64:12,15 65:14
176:13 192:13
240:14 241:3

promised 65:7
111:4 113:17

129:18 130:17
131:17 132:17
133:5 136:10
140:7,17,25

promises
41:10,12 62:19
63:2,4 64:9
66:10 86:17
88:2 131:25
132:13,23
175:14 176:16
210:21 212:10

promising
62:19,25 66:4

prompted
178:12

proper 53:20

property 167:4
175:22 192:8
218:4,8

prosecute
43:12 75:20
219:21

prosecuted
76:1 196:19,24

prosecuting
32:20 167:2

prosecution
10:7 12:3 19:8
26:4 29:20
33:6,16 41:3,6
42:25 44:6 48:2
51:6,15 52:13,
20,25 53:9,22
58:7,12,17,22
59:6 66:6,12,
18,22,25 73:11,
16 76:4,7,11,25
77:8 79:15
86:24 87:11,15
88:3,6,10,13
95:22 110:23
112:10 115:4,9,
16,24 117:4
146:6 152:3
153:14 157:5,
10,17,20,22
158:5,25 159:2
160:13,14,17,
18,19 167:8
205:19 209:9

217:12 226:9
229:17 232:3
233:19 234:3
238:10

prosecutions
172:17

prosecutor
28:21,25 30:1,
7,20,25 46:3,7
53:21 57:8
64:14 66:9
75:25 102:5
110:20 112:8
114:1,9 117:19,
25 118:16
134:14 135:25
139:19 140:14
153:17 159:20
172:23 193:7
204:9 208:5
214:18,21
215:1 241:21,
22

prosecutor's
29:8,11,16
56:10 220:15

prosecutorial
56:3 151:12

prosecutors
22:10 28:10
30:2,5,18 31:5
55:4,24 56:2,7
57:5 154:1
206:20 221:2

protection
211:25

prove 160:14
226:12

provide 39:17
53:10,15,24
67:2 77:21
103:13,23
112:9 133:15
167:8 195:2

provided 38:1
39:15 58:4 67:8
73:1,11 99:19
141:17 153:23
192:19 210:9
218:21

providing
121:10

proximity
186:25 187:10

public 63:19
205:14 230:15,
19

Pulaski 162:20
176:10

pull 91:22
175:20

pulled 33:16

purple 8:24

purport 42:10

purpose
126:11

pursuant 35:6
38:3,10 41:15
54:7

pursue 232:21

pursuing
159:21 217:12

pursuit 159:18

put 52:5 81:5,
19 93:1,11
96:16,22
117:18 126:8,
17,18 165:4
169:10 210:23
212:7 221:14
222:10 225:5
234:19

putting 94:13

**Q**

qualified
102:19

quash 93:25

question 9:17,
21 14:4 24:5
30:16 31:6
39:11 43:8 46:8
54:12,13 57:18
61:8,20 64:4
67:12 71:9
79:6,7 80:25

81:10 91:12
93:20 94:3
97:25 114:7
124:11 125:6,
24 128:15
138:14,19
142:16 144:8
147:8,15,18
155:24 158:10,
19,23 160:9
161:17 163:8,
11 177:14
179:16,21,23
182:7,10 183:4,
21 184:9 200:6
217:20 224:18

question's
98:1

questioning
85:20 173:16
183:18 209:17

questions
9:16 26:6 27:15
29:7 70:4 75:15
86:6 87:18
88:20 95:7
132:12 142:7
158:18 161:19
163:12 167:18
168:6 183:19
207:8 209:7,14
211:9 214:6,11
216:22 220:14
228:4,23
229:13 235:6

quick 8:16 45:6
65:23 182:3

quick- 206:12

quicker 184:14
195:12

quickly 22:12
29:7 184:15
215:12 221:16

quotations
43:22

Quoting 133:2

**R**

race 70:1

**raise** 8:3

**raised** 11:21, 23

**range** 33:15 48:10 50:14 96:5 203:20

**rare** 81:11

**RE-EXAMINATION** 241:18

**re-prosecuted** 191:15

**reach** 21:2

**reached** 63:7 111:24

**read** 10:3 24:6 32:24 82:7 111:12,18 182:8 218:1

**reading** 32:9 45:1 120:23 172:12

**ready** 203:4

**real** 8:16 45:6 78:16 182:3

**realize** 28:16

**reason** 33:4 55:4,7 65:23 127:1 152:11 159:13 160:9, 20 187:25 188:1 189:1 204:13 213:24 243:10

**reasons** 32:24 45:4 123:16 153:20 226:5

**recall** 12:8 18:23 19:6,12, 14,19 47:19 51:18 65:21,22, 23 66:17,21 69:18,21 70:24 77:7,22 78:15, 23,25 79:1 80:5 81:8,14 82:4,19 84:6 85:4,15 86:15 87:15

96:21 97:11 99:24 100:14 110:18 112:6 115:14,20,21 116:1 122:7,21 124:23 136:24 149:8 165:18 173:16 174:8 176:6,24 181:9, 10,22,25 185:16 187:16, 22 191:10,24 194:17 195:7 197:9 200:6 201:1,10 209:9 211:9,16 232:4, 12 233:8 235:10,13,16, 20 236:1

**recalled** 38:16

**recantations** 108:23 109:1

**recanted** 219:15 223:14

**RECC** 230:16

**receipt** 52:11

**receive** 20:18 28:6 31:6 45:20 152:2

**received** 39:15 125:16,17 154:19 195:13

**receiving** 34:1 125:12 192:7 218:4,8

**recently** 47:14 208:10

**reciprocal** 52:7

**recognize** 14:8,24 16:15 19:24 21:24 22:5 34:10 35:17 38:18 42:18 72:13 118:10 132:8 196:14,22,23

**recollection** 8:14 19:4

20:14,16 21:15 32:22 33:2 36:17 39:19 47:25 49:18 50:8 51:13 52:8 60:4 66:4 68:16 69:6 72:8 83:22,24 84:3 85:9,19 86:23 87:7 90:8 125:15,18 137:10,14 141:7 143:14 161:25 198:18, 19 207:10,13 215:2 219:1,2 232:20

**reconstruction** 28:15

**record** 9:9 45:9 52:5 63:19 84:20 88:17 167:25 184:5,6, 10 206:8 222:12 226:6

**recorded** 37:1, 8,22 38:2,9 39:3,7,20,21,22 40:2,8,21 61:15 85:7,10,11,13, 14 106:20 148:22 174:8 210:12 225:20

**recorder** 40:3 85:6 221:24

**recording** 23:9 40:13,17 43:15 149:2 171:16 174:7 181:20, 21 210:8 223:11,13 230:22

**recordings** 23:11 43:14,18, 20,21,23,25 53:25 106:23

**records** 44:1 45:5,6,7 77:17 178:16 202:23

**RECROSS** 237:15

**REDIRECT** 235:4

**reevaluate** 123:18,25 136:18 150:20 151:3 154:20 158:17

**reevaluated** 128:3 130:1 132:2 134:25 140:2,19 141:1 145:13

**refer** 22:8 162:3 167:6 221:15

**referenced** 211:14

**referred** 37:23 117:3 153:20 161:8,9 162:5,8 165:24 233:20

**referring** 68:25

**refers** 168:16

**reflect** 51:13

**reflected** 82:15

**refresh** 143:1, 13

**regard** 39:22 217:1,17 231:10

**regular** 198:14

**reimbursements** 64:22

**relate** 25:20

**relates** 52:24

**relating** 10:7 26:7 36:12 39:8,13,20,21 49:7 50:9 66:18 73:15,17 132:13 240:19

**relay** 240:24

**relayed** 240:9

**relaying** 218:13

**release** 162:23

**released** 115:16 175:23

**relection** 85:18

**relevant** 27:19 182:6

**relied** 75:18 217:13

**relies** 57:12,24 58:4

**relocate** 240:11

**rely** 57:17,20 76:23 209:8

**remain** 55:14, 15 206:1

**remaining** 237:22

**remember** 10:11,18 16:1 33:1 37:2,11 67:25 69:23,24 70:10,12,13,14 71:3,5,8,9,10, 13,21 72:10 75:5 78:6,13, 16,18,19,21 79:6,7,8,9,12, 19,22 80:23 81:23 82:3,9, 16,17 83:6,10 84:13 86:1,5,6 87:17 93:5 94:1 100:16 126:1 137:5 146:13 147:18 149:14 150:2,25 151:4, 9 165:21 166:9, 12 171:3,5,21 172:5,7,15,19 175:2,12 176:20 178:9, 24 179:1 180:17 181:1 185:21 187:5, 25 188:1,21 189:2 193:2 194:22 195:17 196:16 199:12,

13 200:19 201:3,6,18 203:25 207:15 209:16 225:21 235:18,22 236:15

**remembering** 79:10

**remembers** 180:1

**removed** 55:5, 8,19 160:19

**reopen** 212:8

**repeat** 79:11 113:8

**repeated** 161:15

**repeatedly** 200:11

**repeating** 114:15

**repetitive** 217:20

**rephrase** 61:8 67:12 91:2 177:23

**report** 24:22 25:5,11,15 37:23 48:9,11, 15,23,24 49:15 70:18,25 73:1, 10,15,20 74:10 98:12 99:17,18, 24 100:6,14,16 101:3,4,17 120:25 121:8, 11 136:23 144:4 150:8,19 151:21 154:13, 20 169:23 170:1 182:1 188:4 209:15, 19 210:4,7,10 232:6,9

**reported** 150:13,19

**REPORTER** 8:3 241:8,11,16

**reporting** 48:19

**reports** 25:7 34:23 38:7,9 39:20 43:18 48:25 49:6 53:8,11 54:8 61:5 100:19 101:22 107:13, 16 150:14 154:2 200:17 232:8,18

**represent** 23:16,18 33:14 214:14,15 229:1,10,23

**representation** 49:5 166:20

**represented** 70:23

**representing** 151:9 166:3,5,8 214:13

**reproduced** 96:7

**request** 32:17, 18 35:6,10,16 38:17 40:15 43:9 44:2,20 50:24 93:11 96:16 240:10, 24

**requested** 40:7 92:25 235:14

**requesting** 32:15 35:12 235:17

**requests** 34:23,24 36:5, 12 37:21 38:6 43:4 195:8

**require** 123:11

**required** 37:3 45:4 64:22 112:22 127:17 129:9 131:5

**requirement** 238:9

**requirements** 27:18

**requires** 30:5, 12,18 31:13 116:17

**requiring** 63:13

**rescheduling** 199:22

**residence** 101:7,20 102:1, 8 120:8,13,24 121:25 122:10, 18,25 124:6,9, 16 201:25

**residing** 201:18

**respect** 75:17 89:14 104:4,23 105:16 106:9 107:2,20 108:13 109:5

**respective** 61:25

**responded** 195:13,16

**responding** 55:19

**response** 35:20 41:23 45:14 47:20 49:19,23 51:24 98:11 239:18

**responsibilities** 11:25 30:2 115:5

**responsibility** 12:4 53:8,15,18

**responsible** 47:18 117:8,13, 16 153:7 159:11 163:3 199:16

**responsiveness** 195:8

**rest** 205:24

**restate** 39:11

147:14

**restated** 82:2

**rested** 27:1

**restroom** 9:10

**results** 153:17

**retained** 50:8

**retention** 55:9, 10

**retired** 166:16 242:1

**return** 21:9

**returned** 20:6 234:8,17,23

**returns** 234:20

**reveals** 132:23

**review** 12:5 17:5,22 24:14 25:12,20 45:6 46:18 76:16 100:25 101:12 151:22 215:25 216:1

**reviewed** 27:5 32:5 49:4,16 59:22 76:10 101:2,4,16 167:12 193:24 196:1,16

**reviewing** 10:11 46:20 165:11

**reviews** 50:5

**rewards** 43:11

**right-hand** 42:17 188:20

**rights** 163:16, 19 205:21 221:6

**ring** 193:10

**rises** 145:1

**Roark** 44:1

**robbed** 120:8 122:1

**robbery** 14:16, 19 16:25 17:3, 17 82:1 180:7 187:13 225:16

**robbing** 74:14 146:17 148:12

**Robert** 79:17 80:2 82:19 83:21 84:4 86:22 87:13 136:25 137:11, 15,24 138:4,11, 24 139:11 141:18 148:21, 25 173:8 184:25 195:18 222:7 224:24

**role** 16:5 17:1, 18 26:12 53:21 56:3 60:10 215:17,20,23 229:16

**room** 22:18 47:15 78:2 84:24 85:15,17, 18,25 170:20, 23 179:6 216:7 231:3

**routinely** 158:14

**row** 117:24

**rule** 30:1,4,11, 17,18 37:7 44:9 123:10 179:18

**rules** 8:15 30:24 31:1 34:4 35:6 37:4 38:12 41:17 45:2 185:14 223:22

**run** 92:3 206:12

**running** 69:25 145:21 199:16

**S**

**safety** 50:1

**Salmon** 11:7

**Sam** 78:9,10 185:25 186:1,8

**sat** 174:3 210:19

**scene** 152:25 153:3 154:11 225:5

**scheduled** 151:6 208:12

**scheduling** 84:1 87:5

**school** 11:6,11 27:16 31:7,10, 11,12,15

**scientific** 153:18

**Scott** 182:12

**scramble** 205:11

**search** 40:7,16 118:6,8,13,20, 22,23,24,25 119:4,7,8 122:5 222:12

**searching** 40:13 202:1

**secondary** 215:17

**seconds** 82:8

**secretary's** 47:18

**self-initiate** 13:4

**selling** 213:18

**send** 99:9 117:24 153:11

**sending** 97:11 98:17 133:12

**sentence** 74:12 75:12 168:20 174:13 212:9

**sentences** 72:25 73:23 74:5

**sentencing** 28:13 169:18

**separate** 47:8 52:20 53:2

**separated** 236:14

**sequence** 47:11 98:15

**Sergeant** 223:2 224:2

**series** 32:1

**serve** 15:10

**served** 70:5,6 71:17,25 186:20,25 188:18,22 215:1 225:1

**serves** 15:8 177:19 211:7

**service** 34:19

**session** 22:15 208:1

**set** 51:3 52:20 53:2 102:21 199:19

**Setting** 216:15

**she'd** 78:9,13, 18,20

**sheet** 22:10 48:17 49:12 50:23 221:10 226:24,25 227:9

**sheriff** 92:23 93:10 124:25 132:17,22 133:4,11 164:2 192:2,12 214:14,15,19, 23 215:11 216:8,11,15,21, 25 217:4 218:2, 9 220:1

**sheriff's** 56:14 59:9 69:3 215:9,14 216:7, 17 220:8 230:9

**shock** 116:3, 13,17,19,23

**shocked** 116:10

**short** 65:23 70:4 115:13 191:22

**should've** 121:8

**show** 14:6 16:12 17:9 19:13,20 21:16, 18,22 32:1,2 34:7 42:2 44:14 84:21 88:20 92:5 94:16 110:8 118:4,6 141:4 151:18 188:5 190:19, 21 191:7 199:24,25 202:20,22

**show-up** 89:25 90:5,11,23 91:1,3,5,9,11 98:20,22 126:15,17

**show-ups** 126:24

**showed** 21:10 193:18

**showing** 72:11 92:9,17

**shown** 91:13

**side** 204:6

**sign** 15:22 18:11 38:24 76:22

**signature** 14:22,23,25 15:1,24 26:9 119:14,20

**signatures** 43:17

**signed** 35:22, 24,25 37:10 60:7 110:14 115:14,22 119:4 121:14 122:5

**significance** 222:23

**silent** 206:1

**silly** 228:4

**similar** 37:9 96:5 125:3 126:10

**similarly** 90:17

**simple** 24:22

**Simpson** 44:1 120:4,6,7,12 121:22,24 122:9,17,23 123:4,18 128:19,24 129:17,25 161:24 167:9, 11,15 194:16, 18,19 197:2,11, 24 199:4 213:6 236:21 240:19

**Simpson's** 45:9 129:11

**single** 90:23 91:13 92:9,15, 17 99:24 115:14,21 228:14

**sir** 9:15,24 10:14 15:6,7,14 17:25 26:10,15 28:5 31:19,21 37:14 42:6 44:13,19 72:13, 23 73:4 95:18 96:12,23 110:9 111:9 117:5 120:9 121:14, 20 122:2,7 124:4,18 132:7 136:22 143:15 146:4 168:14, 17,22 170:14 173:11 177:10 178:2,5,8,11 181:13 182:9 185:11 186:11, 16 190:25 192:4 193:14, 16,20 196:8 197:6 204:8

207:19 209:10 210:14 211:13 213:9 218:22 228:25 231:9, 12,16,19 240:8

**sister** 195:18 196:15

**sit** 77:16 85:2 87:7 150:6 170:23 198:12 231:1

**sitting** 19:14 20:13,16 36:16 39:19 63:21 73:14 80:5 90:10 92:22 115:13 138:22 156:8 160:4 170:20 198:6 236:7

**situations** 51:22

**sixth** 188:7

**sketch** 43:18 94:24 96:11,25 97:4,5,15 98:5, 19 100:9 125:3, 21 126:3,10

**Skip** 119:20

**Skipped** 94:18

**Slosar** 8:10,23 9:6 27:14 56:21 59:16 87:22,25 88:16,18 91:20, 22,24,25 93:17 95:10,13,15 100:13 103:19 109:25 111:15, 17 114:23 127:11 130:13 140:22 147:2,5, 9 152:13,18,21 158:22 159:7 167:17,24 169:6,25 170:8, 10 171:10 172:6,21 173:5 176:22 178:10 179:13,17,21 180:12,19,22 181:16 182:5,9

The Deposition of MICKEY STEELE, taken on June 28, 2018

271

183:8,10,17,22
184:1,6,12
187:7,18,20
188:12 189:23
190:3,8 193:24
194:7,14 195:5,
9 196:20
197:20 216:22
236:5

**Slosar's**
217:19

**small** 161:12

**small-town**
167:2

**Smith** 81:8

**smoking**
228:6,8

**snowstorm**
199:14

**socialized**
165:2

**Solely** 57:17

**solemnly** 8:4

**solve** 153:6

**somebody's**
145:3 161:14
204:14 226:10

**son** 161:22

**sort** 13:8 27:24
28:6 55:10
210:24 240:14

**sound** 223:3

**speak** 67:23
69:15 78:11
80:3 84:15
170:12 184:14
185:5,19

**speaker**
170:22

**speaking**
21:14 72:9 78:7
86:23 236:16

**speaks** 75:12,
14

**special** 30:2
243:11

**specific** 12:21
34:9,15 36:6
91:18 94:15
171:17 204:19
226:18 228:25
229:13

**specifically**
12:10 35:12
67:25 79:6
149:12 151:4
176:6 235:10,
12,13,15,19
236:21

**specifics**
87:20 174:20
175:1

**speculate** 99:5

**speculation**
161:13 166:14
173:6 189:24
203:23 214:1
220:4

**speed** 184:12

**speedy**
235:21,24

**spending**
74:16 146:18
187:14

**spent** 203:3

**split** 99:14

**spoke** 77:12
78:2,14 80:6,10
81:20 86:8
90:20 139:7
147:24 149:16
150:11 151:5
169:11 174:17
185:20 186:2

**spoken** 81:2
188:11

**spring** 21:6

**staff** 208:22

**staged** 92:24

**stamp** 33:8
43:13

**stamped** 32:4
33:12 42:5,15

118:5 132:8

**stand** 190:5,20
205:24 223:24

**standpoint**
190:9

**stapled** 192:22

**STAPLES** 9:4
162:12 203:23
206:6 209:21
210:2,17
211:23 213:17
214:1 217:15,
23 218:12,14
219:13,19
220:3,9,14,19
221:19 226:1,7
234:15 235:5
237:13 239:13,
16 241:4

**start** 9:4 87:19
198:14 227:1

**started** 120:6

**starts** 168:23

**state** 40:11
48:17 55:17
56:13 59:9,23
60:5 62:13
69:10 81:21
90:2 102:21
153:24 162:5,9
164:15 166:16
180:5 215:6,10,
12 216:10
228:17 230:12

**state's** 29:13

**stated** 40:1,2
120:4,5 149:12
171:20 180:7

**statement**
23:22 24:6
30:14 37:1,6,8,
9,10,22 38:2
39:22,25 65:15,
18 66:11 68:7
70:8,9,17
71:19,21,22
74:6,7 79:8,9
82:14 85:11,13
103:14 109:14,
19 111:5,25

113:2,10,18,24
114:8,16 115:6,
7,8,18 123:24
127:5,19 128:1,
8,19,24 129:11,
19,25 130:8,19
131:9,18 132:1,
14,19 133:2,3,
7,22 134:5,17,
23 135:8,15
136:2,11,17
137:11,15,23
138:4 139:6,11,
21 140:1,8,18,
25 142:4,8,25
143:12 145:4,
12 146:22
147:19,23
148:1,10,14,23
150:3 152:14
155:10 158:13,
16,18,19,20
168:18,24,25
169:21,22
171:2,8,15,19
172:11,14,15
174:8 177:24
178:3,6,22
180:9 181:15,
17,23 182:1,20
183:1,7 185:9
187:1,5,11
190:20 204:20
209:20 210:12
211:3 219:1,10,
16 223:10
239:1

**statements**
23:16 38:7
39:8,15,20,21
41:20,24 43:14
61:5,15 67:2
69:21 73:16
75:9 78:23 79:5
81:24 82:2,3,18
88:12,25 89:5,
10 104:15
106:2 115:11
119:17 141:17
144:22,24
146:8,12
148:19 149:9,
13,14,21
150:18 154:25
155:7,9 157:20

158:3,11,12
159:1 171:4,6
172:8,10,13,19
173:4 183:5
184:20 185:1
197:23 212:17,
20 218:24
232:8 233:16

**station** 115:17

**stay** 202:17

**steal** 214:4

**Steele** 8:11
9:25 16:16
17:10 19:24
21:23 22:5
32:4,16 34:10
35:16 38:18
45:11 48:9,10
50:15 88:19
100:15 117:17
118:8 136:24
151:22 160:4
168:3 206:13
214:10 220:22

**step** 18:12 69:9

**steps** 34:2
40:20 46:22
49:17 76:6
114:16 123:18,
25 136:18
150:20 157:21

**Sterling**
188:17

**stick** 37:17

**Stinking** 43:23

**stipulation**
227:16,24

**stolen** 192:8
218:8

**stood** 70:1

**stop** 76:6
114:17 157:21
225:8

**stopped** 115:4
158:5 159:2

**stored** 209:1

**story** 74:13

75:13 81:23
146:16 148:9,
11 175:6,12
180:24 187:6,
12

**straight** 20:24
21:1

**straightened**
68:19

**street** 56:3

**strike** 177:12

**striking** 222:5

**stuff** 70:24

**subject** 102:1

**submission**
25:7

**submit** 15:21
16:3

**submitted**
23:17,23 25:19
54:15 232:6

**subpoena**
47:20 49:19,23
50:4 55:19 69:2
70:5 71:15,17,
25 77:20
186:20 188:19
225:2 239:5

**subpoenaed**
72:5 77:18
205:5

**subpoenas**
64:24 69:4

**subsequently**
74:9 79:25

**substance**
83:10,25

**successful**
237:25

**sued** 31:5

**suggestive**
92:18

**suit** 162:19
166:24

**sum** 65:7

**summaries**
36:25

**summary**
25:18 72:25
73:24 74:6
75:2,7

**summer** 29:22
110:2 111:3
122:16 124:22
127:3 128:17,
23 130:5,16
133:20 134:3
135:6 139:10
142:14,18
155:19 161:5
162:11

**Sunday** 68:22,
23 151:5,7,10

**sunny** 69:25

**supervised**
46:3

**supervision**
26:17

**supervisor**
224:20

**supplement**
40:1,4 46:22
53:19 101:9
142:25

**supplemental**
47:1 50:23
51:5,14,18,23
52:1 151:21
210:10

**supplemental
s** 48:22

**supplements**
34:24 143:8,9

**supported**
141:10

**suppose**
175:17

**supposed**
142:20 145:12

**suppress**
93:24 190:17

**suppressed**

91:5,7,10,14
92:7 99:3

**suppression**
91:8,10

**supreme** 30:1,
18 34:5 35:6
38:11 41:16
44:9 90:20
123:10 126:23

**surprise** 163:8

**surprised**
216:11

**suspect** 92:18
194:19

**suspects**
43:18 162:24
167:12 230:10

**sustained**
234:21

**swear** 8:4

**sworn** 119:4,
17,19

**synopsis**
221:17

**system** 47:3
48:17,19 84:12
119:12 153:25
154:1,4 176:5,
21,22

**systems** 47:8

———————

**T**

**tactic** 99:2

**taking** 89:15
93:12 94:10
104:5,24
105:17 106:10
107:3,21 109:6
126:7 161:6

**talk** 29:2 47:3
55:22 67:20
68:2,18 72:6
169:3 171:7
177:8,15,23
178:3 182:16
187:13 195:21
198:10 200:21

204:1 218:23
225:16

**talked** 78:9
79:19 85:23
92:9 138:18
139:1 161:21
162:18 166:3,4
171:24 173:22
187:3,16
188:14 197:7,
24 203:6
212:14 213:1
238:17,18
239:19 242:16,
19

**talking** 13:13
24:19 45:10
56:2 63:5 67:25
68:16 71:4
74:14 78:17
82:21,22 83:7
91:23 93:5,23
94:14 143:25
144:22 146:16
148:11 161:12
169:8 174:12
179:4 180:17
198:13,15
216:21 236:6

**talks** 205:14
222:19

**tangled** 175:10

**tape** 225:6

**taped** 37:1,5
38:7

**tattoos** 99:20
190:15,19,22

**taught** 221:1

**Taylor** 10:8
16:14,24 17:2,6
18:11 19:9 20:7
22:25 29:21
32:21 42:4,11
43:1,4 44:7,12,
16 48:3 51:16
52:25 53:23
58:18 60:3,12,
17 61:4,12
65:16 66:7,13,
19 67:1 73:12
75:18 76:12

77:1,9 80:16
81:24 88:3,7,
10,14 89:1,6,10
92:24 93:1,6,11
94:7 95:17,19,
23 96:14,16,25
97:15,18,23
98:4,7,18 99:10
100:9 102:6
103:15,25
104:16 105:7
110:2,22 111:2,
5 112:1 113:2,
5,13,20 114:3,
18 119:24
120:19 121:5
122:14 123:20
124:1,5,7,15,19
125:1,20 126:7
127:3,22 128:4,
10,17,23
129:14,21
130:2,7,16
131:11,20
132:3,20 133:8,
20 134:3,20
135:1 136:5,13,
20 137:12,17
138:1,6 139:24
140:4,20 141:2,
11 142:11,14,
18,22 143:17,
20 144:5
145:12,14
146:1 149:8
150:21 153:15
154:9,16,21
155:19,21
156:1,3,9,18
157:2,12,22
158:4 159:1
160:2,6,25
161:5 163:3,19,
22 168:19
169:24 172:7
180:7 190:7,15
191:6 194:5
200:19 205:19
217:7 219:22
229:25 232:22
233:12 234:9
236:10

**Taylor's** 88:23
89:3,23 90:3
98:6 105:8,25

106:18 107:11
108:4,21 141:6
200:10

**teach** 220:23
221:2,4

**team** 49:2
166:19

**telephone**
68:17 86:13
150:8

**telling** 9:7
81:8,14 83:11
126:2 175:12
181:1 183:17
188:1 226:13

**tells** 83:19
160:21 163:10

**ten** 11:1 82:8

**tend** 9:16

**tender** 33:9
51:22 52:4

**tendered** 10:6
32:20 33:5,11,
22 46:23 49:1
51:15 52:2,6,12
54:9,21

**tendering**
44:10

**Tennessee**
11:22 68:11

**term** 212:7
214:20

**terms** 66:3

**Terry** 19:1
42:23

**testified** 23:15,
22 24:7,12
25:10 26:8,11
86:21 124:18
138:9 177:14
179:14 183:11
184:1 212:4,5
223:5

**testify** 62:20
63:1 64:20
71:11 72:2,3
79:24 108:6,9

147:5 163:1
171:5 183:12
185:12 191:2
204:7,21
205:10,15,21
224:13

**testifying**
23:9,12 63:15
65:8 121:3
238:23

**testimony** 8:5
24:10 63:9
66:11 76:24
114:24 147:12
148:5 151:14
160:23 175:14
179:22 180:16
186:12,22
197:9 200:2
209:9 211:16
212:15,21,22
221:25 225:19
232:7 237:21,
23 238:4

**testing** 153:11,
18

**tests** 43:19

**text** 166:9

**that'd** 9:14
203:21 215:19

**them's** 150:4

**theory** 152:24

**thing** 13:14,23
63:5 72:4 81:12
83:12 221:21
243:3

**things** 24:24,
25 26:2 29:2
32:25 35:12
54:23 68:18
86:5 116:16,23
165:14 221:7
223:17

**thinking** 179:2
236:8

**third-party**
23:11

**Thomas** 36:19

**thought**
237:22 238:1

**thoughts**
160:13

**threaten** 89:5,
9

**threatened**
113:16 114:15
128:7 129:17,
24 131:16
136:9

**threw** 80:20

**throat** 141:15
203:14

**throw** 85:24
212:1

**thrown** 22:10
86:4

**tie** 8:19,21 9:5

**ties** 9:1

**Tim** 193:10

**timber** 213:18

**time** 11:16
12:23 13:18
18:8,21 25:1,3,
16 26:23 29:20,
25 32:23 39:16
41:6,9 47:10
61:1,3,11 66:24
69:5,8,19,20
71:8,18 75:25
76:4 77:17 78:8
79:2,21 80:12
81:3,13 83:9,
13,15,19 84:9
85:18 88:22
90:2 109:11,12,
17 110:1 111:1
122:13,14
127:2 128:14,
16,21 130:14
133:18 134:1
135:4,12 138:7,
17 141:9,16
142:13,17
143:16,19
145:12 149:17
150:11 151:1,9
154:19 155:24

157:1,7,14,23
158:6 159:16,
25 160:11
161:20 162:24
167:3,8,18
169:19 170:2,
18 171:23
172:2 173:20,
21 174:6,17,25
175:18,20,24,
25 178:4,25
179:2 185:17
187:25 188:17
193:6 194:20
199:18 202:9,
18 203:3,16
205:11,13,25
208:7,9,14
214:19,25
217:23 230:20
234:25 236:9,
13 238:14
242:11,12,14,
23 243:1

**time-date**
43:13

**timeframe**
185:11

**timeframes**
236:6

**timely** 30:5,19
195:16

**times** 24:23
53:16 72:1 83:5
161:22 181:6
200:8 235:10,
13 238:13,14,
19

**title** 10:20,24

**titled** 48:9
50:13

**today** 9:8 10:1
19:14 20:13
29:3 36:16
39:19 46:13
47:21 52:6
59:22 62:1
73:14 76:14
77:16 80:5 87:7
90:10 92:22
96:23 97:13
110:12 114:24

115:13 116:24
138:9,22 155:9
156:8,13 160:4,
23 163:5
165:11 179:14
193:24 195:10
196:17 206:11
208:12,13
214:13 230:4

**today's** 111:23
120:11 122:4,8

**told** 68:17,19
70:16,21 71:13
74:21,24 83:16
84:14 126:6
133:5 147:17,
24,25 148:13
149:7,20 156:2,
9,14 158:11
168:19 169:5,
22 170:5 171:1
174:9 175:6,20
179:11 180:10,
14 181:3
188:24 189:2
192:6 193:22
194:3 198:16,
18 202:5 218:3,
6

**tolerated**
89:18 104:8
105:2,20
106:13 107:6,
24 108:16
109:9

**Tom** 28:8
241:24

**Tommy** 197:7

**top** 36:24 49:14
50:22,23
176:24 181:25
216:20 221:23
226:25 240:19

**touch** 68:9
202:5

**touched** 225:9
235:7

**track** 52:12

**tracking** 216:9

tracks 53:17

trained 28:3

training 27:16, 17,18 28:6,15, 20,24 31:7

trainings 28:12

transcript 95:4 111:10

transcripts 24:25

transport 83:13 238:20

transported 83:5 177:16

transporters 84:2

trauma 78:5 186:3

travel 64:25

treatment 41:3,6 43:12 202:15

trial 12:6 28:15 46:17,18 70:6 71:12,16 72:5 81:21 151:6 163:1 170:21 172:18 173:1 177:5,16 178:14,17,21 185:13 186:23, 24 189:6 190:24 194:4 198:15,22 199:6,19 200:7, 25 201:12,14, 15 202:19 203:4 204:11 205:3,7,9,23 209:12 216:3 220:2 231:15 235:21,25 236:2,14 237:25 238:7, 11,12

trials 225:3

Trimble 139:4

Trimble's 139:3

trimmed 12:6

trip 209:2

Trooper 94:24

troopers 228:17,19

trouble 68:24

troubled 225:11

true 26:16 61:16 133:10 148:16 149:22 150:1,4,5,8,9 156:20,25 183:14 184:2 192:7 197:11 209:11 218:7 223:12 228:16

truth 8:5,6 183:12 209:15 212:3 226:13

truthful 61:6 70:18,21 209:16,20 210:1,3,15 212:3

truthfully 212:4,5

turn 29:8,12 111:10 112:22 121:12 145:9 221:9 240:18

turned 33:18, 20 37:4,10 50:2,10 51:10 127:17 129:9 131:5

turning 50:25 101:9

turnover 19:1

two-minute 149:1 206:6

two-year 137:22

type 43:9 63:20 65:25 78:5

89:15 99:1,2 104:5,24 106:4 116:3,6,18 118:10 185:23 211:1 225:15 230:17

typed 222:4,17

typically 21:8 57:23 62:9 69:2 167:5 170:20 208:13,24 211:24 216:13 230:11

——————

U

U.N.I.T.E. 192:23 193:9

Uh-huh 54:16 72:23 73:21 101:11 132:15 146:19 148:15 222:21 223:21 235:9 236:19, 22

ultimately 37:12 159:8 219:23

unable 101:25 185:16 189:15

unavailable 185:12,15,16 189:4

unaware 138:10

uncommon 176:7 222:14

underlying 41:13,24 42:4 43:5 44:16 51:6 54:1 61:22 66:12 67:3 88:2,6,9,13 103:11 104:13 152:6 155:1

understand 9:17 14:2,4 54:12 158:10 163:7,9 187:4 214:17 217:6

understanding 61:14 90:22 116:24 117:2 119:3 153:4 189:11,14 213:14,23 219:20 220:22 223:1

understood 9:22 31:17 174:10

unduly 92:18

unethical 218:9

unfortunate 116:18

unit 121:23

University 11:8,15

unknown 92:18 187:15

unlucky 224:23

untrustworthy 226:5

unwritten 62:18,25

updated 26:4

upper 42:17

upset 70:3 175:3,4

utilize 230:8

——————

V

vacate 36:15, 18

vacation 178:19

vehicle 78:4 91:20

verbal 9:13,14 35:20

verbatim 37:8

verification

71:20

verified 71:22 78:8 174:22

verify 83:3

versa 165:1

version 148:21 180:6

vibrates 27:9

vice 165:1

victim 213:16

victim's 161:11,21 162:8

victims' 162:1

view 96:17

viewed 97:14

vigilant 159:18

violate 212:7

violations 30:25

visit 68:20 86:14,18

visited 180:10

voice 161:3

volition 40:23

volunteering 28:7

——————

W

wait 166:13 201:4 229:6,7 236:8

waited 154:6 174:5

waiting 154:2 208:3

waive 227:18, 19

waived 226:22 227:7,25

waiver 227:10

waives 18:17

**Walgreens** 71:6,23

walk 174:1,2

walking 124:8, 16

wanted 20:25 21:11 32:24 68:18 71:15,25 110:22 139:5 175:19 176:11 179:5 186:25 190:17 195:12 243:13

wanting 204:25 240:10

warrant 13:20, 23 14:7,15,18 15:4,9,10,16, 20,21 16:6,11, 13,23,24 17:2, 6,16,19 18:3,10 20:19 60:10 61:20 76:22 95:10 110:13 112:3 115:15, 23 118:6,8,14, 20,22,25 119:7, 8 122:5 189:10 193:15 206:24 226:20 232:14

warrants 60:2, 8 119:4

Warren 176:10

wasting 174:25

watches 63:21

ways 70:11 205:4

weather 199:20,21

week 151:6 178:15,17 199:19

weeks 172:1 205:7

Wendell 119:20

**Wesley** 43:25

When'd 11:9

where'd 11:11

white 189:16

Whitley 139:4 174:22 214:17

wife 201:16

**William** 10:8 17:16,19 19:9 20:8 23:1 48:3 53:23 58:13 60:3 70:15 71:7 72:18 121:5 146:3 150:22 151:6 154:10, 16 157:15 186:24 213:15

**Williams** 53:13 54:4 56:17 57:16 59:3 60:25 62:7 67:10 70:20 71:2 75:22 76:18 77:4 81:9 87:24 90:1,7 91:16 93:3 94:12 96:19 97:20 99:5 100:12 102:10, 18 103:6,18 109:16,21 114:19 125:8, 23 127:10,24 130:12,22 131:14,22 132:5 153:9 155:3 158:9 159:5

**Williamsburg** 11:17

**Wilson** 79:17 80:2,6,7 81:2,9, 13,14,23 82:12, 25 86:22 87:13 136:9 149:7 150:1 168:16 169:3,24 179:4 183:4 184:21 186:22 209:20 223:2,20,23 236:12 240:3

**Wilson's** 135:8,15 136:2, 17 179:7

winter 137:6 199:15

wire 175:11

wished 165:15

withdraw 31:6 43:8 46:8 57:18 58:2 80:25 81:10 91:12 101:3 114:7 128:15 142:16 155:24

withheld 45:24 46:3 163:25 164:3,6,9,13, 16,19 233:10

withhold 163:21

witnesses 23:6,11,18,19 29:13 38:8 41:3,6,11,24 43:13 48:19 62:11,19 63:1,3 66:4 67:3,20,23 72:1 77:8 79:14 86:20 87:10 88:2,5,9,13,25 89:5,9 103:13, 23 106:2,20,23 146:7 149:16, 20 158:3,14 172:17,25 189:8 197:14, 18,22 198:15, 22 205:5,9 209:12 212:21 213:2,5,11 222:15,19 225:11,12,17 230:9 237:20, 24 238:6,12

wording 222:10

words 46:8 148:18

work 116:18 178:21 204:12

**worked** 46:7 165:8 166:18 193:6,9 228:17

working 14:25 18:24 26:17 165:3 192:23 193:4

workload 12:6

works 207:18

worse 116:21

worst 118:2

would've 12:11,14,15,20 15:16 16:3 21:12 25:19,22, 24 26:22 27:1,6 28:2,10 33:19, 21 37:5,6,10, 13,15 50:1,5,21 51:10 55:5 60:19 66:23 69:1 77:12,18, 19,25 80:10,18 81:5 86:7 89:20 99:7 102:13 104:10 105:4, 19,22 106:12, 15 107:5,8,23 108:1,15,18 109:8 110:22 112:9,15 115:1 120:16 121:1,9 126:14,16,19, 25 137:19 139:2 141:17 144:20,25 154:5 162:5 169:7 171:22 172:2 180:13 188:19 190:4 198:4,20 203:1, 19,22 208:10 210:8 216:5 221:23 222:3,4, 9,11,17 223:23 224:9 241:23 242:16,19 243:3,4

wreck 78:11,20 185:21,24

**Wright** 8:21 9:3 13:25 16:8,21

19:10 21:4 24:1,16 25:8,14 26:19 27:2,8, 11,13 29:15 30:10 31:2 35:8 36:8 39:10 40:10,18,24 43:7 45:15 46:25 49:9 50:19 51:7,17 53:12 54:3 55:1,6 56:19 57:15 58:11,15, 20 59:2,13,24 60:6,14,18,24 61:7,18 62:6 67:9,16 70:19 71:1 73:3 74:1, 3 75:11,21 76:8,17 77:3 87:21 90:6,19 91:15 92:11,19 93:2,14 94:11 96:18 97:3,19 98:8,21 99:4,13 100:2,11 101:14 102:9, 17 103:4,16 109:23 110:6, 17,24 111:6,14 112:5,11,16,24 113:6,14,21 114:4,12,21 115:19 116:2,4, 8,14 120:20 121:6 122:20 123:7,13,21 124:2,10 125:5, 13,22 126:13 127:8,23 128:5, 11 129:1,16,22 130:3,10,20 131:2,12,23 132:4 133:1,23 134:6,15,21 135:2,10,17 136:6,15 137:18 139:13 140:10,21 141:13 142:5, 23 143:22 144:10,17 145:6,15 146:9, 23,25 147:3,7, 12 148:4,17 149:5,11,23

150:15 153:8
155:4,17
157:24 158:7
159:3,12 160:7
166:2,5,6,7,25
167:22 168:2,3
170:11 179:15,
20,25 180:3
183:16,19,23
184:4,8,18
206:3,9 214:6,
10 217:18
225:9 235:7
236:4 237:1,16
239:15,18,22
241:6,9,13,17

**write** 159:17

**writing** 147:1
210:24 222:8,
16

**written** 61:15
62:18,25 82:5
152:12 211:2
221:23 241:11

**wrongfully**
117:19,23

**wrongs** 221:6

**wrote** 139:4

———————

**Y**

———————

**yard** 173:25

**year** 12:11 62:2
66:21 119:23
162:13 239:1

**years** 11:1
14:25 55:16
137:16 138:3
142:12,21
143:20 172:24
187:10 208:11
212:2 220:23,
25 241:23,24

**years'** 214:18

**yesses** 222:2

**York** 14:21
15:2 17:8,24
18:9 23:9,22
25:9 26:13,21

27:6 37:24
40:6,15,21
48:16 59:22
60:5,7 69:13
70:13 71:4
73:2,25 74:8
82:13,15 84:8
85:5,23 86:8,
12,16 92:23
93:9 94:22
96:24 97:13,17
98:3,6,12 99:9,
18 100:20
108:5,9,13
110:3,14
111:24 112:2
116:7 120:11
122:5,8 124:4,
18 125:1 137:1
138:15,19,21,
24 142:8
143:12 148:2
149:3 153:16
163:24 164:21
165:7,13,16,19,
22 166:8,10
168:4 170:6
172:4 174:21
180:10 181:15,
18 183:6 185:9,
10 187:16
188:2,4 193:18
194:23 201:1,
16,21 202:3
206:16 222:3,
18 223:2,9
224:3,10
229:24 231:8
232:6 240:9,24

**York's** 14:22,
24 26:9 43:22
70:24 95:4
116:11 119:14,
17 123:3
146:22 165:6
169:23 195:8

**young** 221:2

**Yup** 91:24

———————

**Z**

———————

**zoned** 158:19