UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

AMANDA HOSKINS, et al.,           )
                                  )
        Plaintiffs,               )              No. 6:17-CV-84-REW-HAI
                                  )
v.                                )
                                  )              OPINION & ORDER
KNOX COUNTY, et al.,              )
                                  )
        Defendants.               )
                          ***  ***  ***  ***

## I. BACKGROUND

This civil-rights lawsuit followed in the aftermath of December 20, 2010, when Katherine

Mills was found dead outside her Flat Lick home. *See* DE 200-26 at 296 (KSP Investigative File).

Putting aside numerous questions about Katherine's death, the investigation that followed, and the

alleged misconduct by law enforcement throughout that investigation, the parties generally agree

about the sequence of key events in this years-long ordeal. The Court recites the uncontested

timeline.[1]

In the late afternoon of December 20, Katherine's granddaughter, Jennifer Lawson, and

Jennifer's husband, Jesse Lawson, drove together to Katherine's home. DE 200-12 at 6 (Jesse

Lawson Deposition, Part I). An unattended UPS truck was parked in Katherine's driveway.[2] *Id.* at

7. When Jennifer and Jesse approached Katherine's back door, they found Katherine lying on the

ground near the porch, unresponsive, and bleeding from the head. DE 200-26 at 39; DE 200-123

---

[1] The Court generally omits from the narrative references to those Defendants whom Plaintiffs
dismissed in their consolidated response to Defendants' motions for summary judgment (DE 204).
[2] A police report later indicated that the UPS driver, Stephen Parker, had discovered Katherine's
body minutes before Jennifer and Jesse arrived. *See* DE 200-26 at 296.

(Audio Recording of Jennifer Lawson). Jennifer called 911 just before 5:00 p.m. DE 200-26 at 296. Several officers with the Kentucky State Police, including Detectives Jason York and Mark Mefford, arrived at the scene. *Id.* at 48, 298. Both Jennifer and Jesse gave recorded statements. *Id.* at 41; DE-200-122 (Audio Recording of Jesse Lawson); DE 200-123. Jennifer told officers that Katherine recently sold her timber, for which she had earned about $15,000 over the past few months. DE 200-123. Further investigation would later reveal that Katherine was paid in cash for the timber and that approximately $12,000 was unaccounted for. DE 200-26 at 13.

At the scene, Mefford took photographs, created a diagram, and collected evidence. *Id.* at 48, 136. York documented the names and contact information of the individuals at the scene and described the physical appearance of Katherine's body and surroundings. *Id.* at 301–03. York observed that Katherine's purse was on the kitchen floor with its contents spilled; five $100 bills were arrayed on the floor next to the purse. *Id.* at 303. There was a skillet with food on the stove, and the oven was on. *Id.* Other than the purse on the floor, nothing in Katherine's home seemed to be disturbed or out of place. *Id.*

On December 21, Mefford attended the autopsy, which revealed injuries to Katherine's head and two broken ribs. *Id.* at 48, 121–24, 137–40. The cause of Katherine's death was determined to be "traumatic subarachnoid hemorrhage" and "blunt impacts of head, trunk, and extremities." *Id.* at 135. Clippings from Katherine's fingernails were taken during the autopsy. *See id.* at 49.

On December 22, KSP Detective Mike Cornett reported to the scene to help with the investigation and approached a bystander across the street from Katherine's house. *Id.* at 37–38. The bystander, Michael Crump, was a possible—though, at the time, unknowing—eyewitness. *See*

*id.* Cornett recorded[3] a statement from Crump, who, on the day of Katherine's death, had seen a blue car parked near Katherine's house. *Id.* Crump had also seen a white man, who was wearing a hooded camouflage coat and had tattoos on one or both hands, walking from the rear corner of Katherine's home. *Id.* As a result, officers attempted to locate a blue vehicle in the area near Katherine's home. *Id.* Investigators also later met with Crump and produced a sketch based on Crump's description of the potential suspect. *Id.* at 20; DE 200-60 (Crump Sketch).

York, who was the lead investigator on the case, DE 200-2 at 27 (York Deposition), began to conduct interviews shortly after Katherine's death. Early on, York went to the sawmill close to Katherine's house and spoke with employees who were working on December 20. DE 200-26 at 14–15. These contacts apparently produced no information other than a list of individuals that supposedly sold drugs in the area. *See id.* In late December, York interviewed two of these contacts, Mike Simpson and Allen Helton. *See id.* at 15; DE 200-23 at 18–21 (Michael Simpson Deposition); DE 200-17 at 11–12 (Helton Deposition). York learned from Simpson and Helton that the two had driven to Florida on December 20 and gotten back around December 24. DE 200-26 at 17–18; DE 200-23 at 18–21; DE 200-17 at 12. The purpose of the trip was to obtain prescription pain medication from clinics in Florida. *See* DE 200-26 at 17; DE 200-23 at 18; DE 200-17 at 34–35. During these discussions, Simpson gave York a sticky note with alibi witnesses that could corroborate his activities on December 20. DE 200-26 at 18; DE 200-23 at 19. York later noted that Simpson was a person of interest in the case. DE 200-26 at 17. Helton denied knowing anything about Katherine's death. DE 200-17 at 12. York likewise identified Helton as a person of interest. DE 200-30 at 2 (York Supplement).

---

[3] The record does not contain any recording of Crump's statement.

On January 4, 2011, Helton was the subject of a traffic stop, after which York cited Helton for, among other violations, operating a motor vehicle under the influence of drugs. DE 200-27 (Citation); DE 200-17 at 12. Officers took Helton to the hospital for a blood test and then to the Barbourville Police Department for questioning. DE 200-17 at 12. During this session, Helton signed a *Miranda* waiver and sat for an hour-long recorded interview. *See* DE 200-28 (Helton Waiver); DE 200-120 (Helton 1/4/11 Audio Recording). Helton talked about his activities on December 20, which included running errands with Simpson before leaving for Florida in an Enterprise rental car. DE 200-120. Helton recalled that Simpson had told Helton on December 19 that he (Simpson) would have money for the Florida trip the following day, but Helton did not know where the money was coming from. *Id.* Helton said that Simpson borrowed Helton's truck on December 20 to get money from Vernon Bennett. *Id.* Helton again denied knowledge about Katherine; he admitted knowing of her and where she lived but denied having been to her house, knowing about her money beforehand, or taking her money. *Id.* He claimed not to know what happened to Katherine or whether Simpson had killed her. *Id.* Helton mentioned that Jesse called Simpson on their return trip from Florida to tell Simpson about Katherine's death. *Id.* Helton also shared that he had heard Jesse say that Cleo Brown was spreading rumors about who was involved in Katherine's death. *Id.*

On January 21, 2011, York arranged for Helton and Jesse to take polygraph examinations. DE 200-30. Before the interview, Helton maintained his innocence, but indicated deception on the following series of questions: "Did you participate in any way in the death of that woman? Did you hit that woman in the head? Did you steal any of that missing money?" DE 200-26 at 117, 119. The examiner likewise reported that Jesse indicated deception on a substantially similar series: "Did you participate in anyway [sic] in the death of that woman? Did you hit that woman

in the head? Did you steal any of that money from that woman?" DE 200-31 (Polygraph Report). York's report on the polygraph examinations adds some additional details: Helton stated that Simpson started crying when Jesse shared the news about Katherine and that Jesse told Simpson the State Police were looking for him (Simpson). DE 200-30.

After Jesse completed the polygraph, he sat down for additional questioning in a video- and audio-recorded session. *See* DE 200-32 (Lawson Audio Recording). The recording picks up mid-conversation,[4] during which Jesse acknowledged that Cleo Brown said Helton and Simpson had been seen on Katherine's property. *Id.* Jesse recommended that the police talk to his "wife's dad's girlfriend" because "she steals off people all the time." *Id.* Jesse then identified Amanda Hoskins by name, said "she was on the needle real bad," and described Hoskins's alleged history of theft and other wrongdoing. *Id.* York entered the room close to thirty minutes after the recording began and told Jesse that William Lester (Jesse's wife's dad) was involved. *Id.* York referenced Hoskins being a "pill head" and Lester bragging about robbing Katherine. *Id.* Jesse agreed with York's statement that Simpson was involved. *Id.* Jesse hesitated to agree with York's other suggested suspects, including Hoskins and Lester, though he ultimately suggested that Helton might have split Katherine's money with Simpson. *Id.*

In late January or early February 2011, York went to Lester's home and found Lester in the driveway, working on his black Camaro. DE 200-107 at 38, 54–55 (Lester Deposition). York questioned Lester about the hooded coat Lester was wearing at the time and mentioned that "that [Lester] had been running [his] mouth over at Escoes." *Id.* at 55–56. York then photographed Lester in his coat, facing different directions with the hood up. *Id.* at 55. The interaction was short. *Id.* ("Five minutes, at the most."). York said that he would be back. *Id.* at 111. Lester talked to his

---

[4] The identity of the first person with whom Jesse was talking does not appear in the record.

family about York's visit, and they recommended that Lester get legal help. *Id.* at 110. York's report notes an unsuccessful attempt to interview Lester on February 4, 2011. DE 200-26 at 16. Per York, "[Lester] stated he wanted his attorney David Hoskins." *Id.*

On February 15, 2011, York sought search warrants for AT&T call logs for phone numbers associated with Lester, Jesse, and Simpson. DE 200-26 at 77–88. In each application, York provided some details from the investigation. *See id.* at 84, 86, 88. As to Lester, York noted that Lester had been bragging about Katherine's money and that Lester was friends with Simpson, who supposedly had been at Katherine's house on December 20. *Id.* at 84. York wrote that Lester had been married to Katherine's daughter Diane and would have known where to find Katherine's money. *Id.* As to Jesse, York described the phone call during which Jesse told Simpson that Katherine was dead. *Id.* at 86. York also repeated that a witness had identified Simpson as being at Katherine's house. *Id.* As to Simpson, York wrote that Crump had identified Simpson as the person he saw at Katherine's house on the morning of December 20. *Id.* at 88. York also explained that, per Helton and Jesse, Simpson started crying when Jesse called him to tell him about Katherine. *Id.*

That same day, Hoskins was arrested for a failure to appear. DE 200-1 at 11 (Hoskins Deposition). She was taken to the Barbourville Police Station, where York and Barbourville Police Officer Mike Broughton questioned her about Katherine's death. DE 200-1 at 11–12; DE 200-26 at 21. This meeting produced a twenty-minute recorded statement. *See* DE 200-125 (Audio Recording of Amanda Hoskins). During the recorded interview, Hoskins disclosed that she had an on-and-off relationship with Lester (Katherine's ex-son-in-law). *Id.* Hoskins stated that she had been dating Lester in December 2010 and that she had heard him talking on the phone about Katherine having sold her timber. *Id.* Per Hoskins, she had twice heard Lester talk about a plan to

rob Katherine by taking her purse when she went to use the outhouse: once to Simpson and another time to Joe King (who is the father of Hoskins's son). *Id.* Lester had apparently mentioned money troubles during these conversations, and Hoskins noted that Lester's bills were paid off all at once after Christmas, perhaps with gift money from family members. *Id.*

Also, Hoskins shared that she was with Lester on December 20 when Jesse called Lester to tell him that Katherine had been found in the yard. *Id.* She explained that she had been with Lester for several hours that day and that Lester had dropped her off at the doctor. *Id.* Hoskins denied being involved in the robbery or knowing who was involved and stated that she had not stolen from Katherine's or Lester's family. *Id.* She added that Jesse mentioned that he was going to call the tip line to say that Simpson had something to do with Katherine's death. *Id.* Toward the end of the recording, York asked Hoskins to call Lester on speakerphone. *See id.* Hoskins complied, but Lester provided little information other than to say that he had not told the police anything and that there was nothing to tell. *Id.* The recording of Hoskins's interview stops while Hoskins is mid-sentence, speaking with York after her call to Lester. *Id.*

Around this same time, Hoskins's cousin Jonathan Taylor was likewise brought to the Barbourville Police Department for questioning. *See* DE 200-4 at 38 (Taylor Deposition, Part I). The investigative file reveals next to nothing about Taylor's interview. *See* DE 200-26. At some point, Taylor consented to have his photograph taken. *See* DE 200-4 at 40. At York's direction, Broughton[5] used a camera available at the Barbourville Police Department to photograph Taylor. DE 200-4 at 60; DE 200-14 at 7 (Broughton Deposition). Taylor put on his hooded coat and complied with officer directions about where to stand and which direction to face. DE 200-4 at 40,

---

[5] There appears to be a dispute about who took the photographs. Taylor testified at his deposition that York was the photographer, DE 200-5 at 7, whereas Broughton at his deposition stated that he took the photographs at York's direction, DE 200-14 at 7.

60. Afterwards, Knox County Sheriff John Pickard transported Taylor to the Knox County Jail; Taylor ultimately served time in Bell County for unpaid fines on traffic violations. DE 200-4 at 39, 41, 60.

At some point during the investigation, Crump was shown photographs of Simpson and possibly Taylor.[6] DE 200-2 at 7; DE 200-20 at 8 (Crump Deposition). York testified that he had sent photographs of Taylor to a police department in Oklahoma, where Crump was living at the time. DE 200-2 at 7. Crump testified that he thought he had seen Taylor's photographs before but could not be certain, nor did he recall who had showed him the photographs. DE 200-20 at 8. Crump recalled that York had showed him photographs of Simpson and that Crump could not identify Simpson as being the person he saw on Katherine's property on December 20. *Id.* In his deposition, despite being unable to recall particular interactions, Crump was steadfast that, each and every time he was questioned by anyone, he could never say definitively who he had seen on December 20. *See id.* at 9–10. York confirmed in his deposition that Crump had never made a positive identification. DE 200-2 at 20–21.

On April 15, 2011, York took a recorded statement from Lester in the presence of Lester's lawyer, David Hoskins. *See* DE 200-124 (Audio Recording of William Lester). Lester confirmed (Amanda) Hoskins's claim that Lester had known about Katherine's money before her death; his daughter Jennifer had told him that Katherine sold her timber for $15,000. *Id.* Also, Lester did not dispute Hoskins's account that, before Katherine's death, Lester had talked about a plan to rob Katherine; Lester admitted he had this conversation with several people, including his son-in-law Jesse. *Id.* Lester said that Jesse had agreed it was a good plan, though Lester characterized the discussion as "joking." *Id.* Lester acknowledged that he had made a similar statement to King

---

[6] This information does not appear in the investigative file.

(without mentioning Katherine by name) in the presence of Hoskins, on one occasion in early December at the Pineville Walgreens. *Id.* Lester then provided information on various topics: King's vehicles (which, notably, did not include a blue car); King's relationship with Hoskins; King's drug habit; Hoskins's drug dealers (including Bob Smith and Cleo Brown); and Taylor. *Id.* Lester claimed that he did not know Taylor well and that he had met Taylor about six months before Taylor's accident (in November 2008). *Id.* Per Lester, Taylor had not talked to him about Katherine until after the police questioned Taylor. *Id.*

Lester then accounted for his activities leading up to Katherine's death. *Id.* Lester remembered Hoskins asking him for drugs on December 19, and he sold his washing machine in order to buy her some. *Id.* In the early morning of December 20, Lester went to see Simpson about another pill for Hoskins, got gas from Escoe's Market and breakfast from McDonald's, and sold an old Cadillac for $150. *Id.* Then, he stopped by the home of Linda Taylor, Hoskins's mother, with whom Hoskins lived and where Hoskins was in bed around 9:30 or 10:00 a.m. *Id.* Lester left to get a pill for Hoskins and then returned to wait for her while she got ready for her doctor's appointment with Dr. Larry Warren. *Id.* Lester took Hoskins and her two children to Dr. Warren's office and left after the appointment between 12:30 and 1:00 p.m. *Id.* They then filled Hoskins's prescription at the Pineville Walgreens around 2:00 p.m., stopped at McDonald's, and went to Lester's house to meet up with Lester's daughter Jennifer, who had called about getting some pills for her husband Jesse. *Id.* Hoskins and Lester were still at Lester's house when Jesse called Lester to tell him about Katherine. *Id.*

About a month later, on May 16, 2011, York recorded a statement from Christy Branson, who had been in Knox County and Harlan County Jail with Hoskins two or three months prior. DE 200-26 at 23; DE 200-113 (Branson Recording). Branson reported that, while they were in jail

together, Hoskins had talked on seven or eight occasions about killing Katherine. DE 200-113. According to Branson, there were five people involved in Katherine's death, including Hoskins, Taylor, King, and Kayla Mills[7] (reportedly Taylor's girlfriend); Branson was unsure whether the fifth person was Lester. *Id.* Branson relayed that Hoskins had pretended to have car trouble and asked Katherine to use her phone; that King hit Katherine; that Hoskins knew Katherine had money because an unidentified person had told her; and that Hoskins searched the house and found $15,000 in Katherine's purse. *Id.* Branson claimed that Hoskins took the purse, split the money with others, and used it to buy drugs—specifically, 30s—from Bob Smith. *Id.* Per York's report, Smith was a confirmed drug dealer. DE 200-26 at 23.

On June 24, 2011, York met with King at the Bell County Courthouse. DE 200-26 at 25. There is no recording of King in the record; York's report notes that King refused to be recorded. *See id.* York's report further summarizes King's statement as follows: on December 19, King saw Hoskins and Lester, who were in need of money to get a suboxone prescription filled. *Id.* King "arranged for [Hoskins] to get enough money to fill the prescription," and she did so at the Pineville Walgreens. *Id.* Also, King stated that he had heard Hoskins and Lester talking about robbing Lester's ex-mother-in-law by locking her in the outhouse. *Id.* Part of the plan apparently involved Hoskins dressing up like a home health nurse. *Id.* Also, Lester had told King that Katherine had money from selling timber. *Id.* The following day, when King saw the news story about Katherine's death, he tried to call Hoskins. *Id.* When he got in touch with Hoskins, she said she was buying stuff at County Gun and Pawn. *Id.* King asked where Hoskins had gotten the money— since she had no money the previous Sunday night—and Hoskins told him that she had gotten

---

[7] No known relation to Katherine Mills. For clarity, the Court throughout refers to Katherine Mills as "Katherine" and Kayla Mills as "Kayla."

$10,000 from a settlement. *Id.* King also told York that Hoskins was having an affair with Dr. Warren. *Id.*

York followed up on some of these details. For example, he reported seizing records from the Pineville Walgreens. *See id.* at 27. According to York, Dr. Warren wrote a prescription on December 20; Hoskins filled it on the same day around 3:00 p.m., paying cash. *See id.* York's report documents the inconsistency between this evidence and part of King's story, since he recounted Hoskins filling a prescription on the evening of December 19. *Id.* Additionally, York investigated King's allegations about Dr. Warren. York visited Hope Medical Center and talked with a nurse who advised that Dr. Warren had been fired for alleged inappropriate behavior with a female employee. *Id.* The nurse also provided a form to York that showed Hoskins had an appointment at 11:30 a.m. on December 20 and that she arrived at 11:54 a.m. that day. *Id.* York noted that Hoskins and Lester had previously told him Hoskins's appointment was around 9:30 a.m.[8] *Id.* The report further documents York's efforts to learn whether Hoskins had an inappropriate relationship with Dr. Warren. *Id.* Per the report, Dr. Warren had written Hoskins prescriptions without seeing her and after hearing from a nurse that Hoskins had fresh track marks on her arms. *Id.* When York spoke with Dr. Warren, he declined to be recorded but agreed to provide a letter and admitted that Hoskins had flirted with him in the past. *Id.*

On March 8, 2012, York and Pickard recorded another statement from Helton at the Knox County Sheriff's Office. DE 200-26 at 30; DE 200-40 (Helton Audio Recording). In this twelve-minute recording, Helton stated that Hoskins had approached him at Escoe's Market on December

---

[8] Neither Hoskins's nor Lester's recorded statement references a 9:30 a.m. doctor's appointment. *See* DE 200-124; DE 200-125. One of York's reports, dated June 29, 2011, indicates (without attribution) that both Hoskins and Lester claimed they were at the doctor "around 0930 hours." *See* DE 200-26 at 27.

19, 2010 and asked if he wanted to make some money by tying up Lester's ex-mother-in-law. DE 200-40. According to Helton, Hoskins explained that Lester knew Katherine's morning routine, and the plan was to lock her in the outhouse. *Id.* Helton described seeing Lester's Camaro driving near Katherine's house on the morning of December 20. *Id.* Later that day, around noon, Helton saw Hoskins at Simpson's house with a large sum of money and heard her say that they "got the job done." *Id.* Helton said that Simpson knew about the robbery plan (but not any plan to harm Katherine) beforehand. *Id.* Helton repeated a rumor about Taylor being involved but clarified that he had never heard Hoskins talk about Taylor or Kayla. *Id.*

On March 13, 2012, York met with Amber Simpson[9] at the Knox County Alternative School. DE 200-26 at 32. York recorded Amber's seven-minute statement in the presence of school guidance counselor Rhonda Abner. *See id.*; DE 200-51 (Amber Simpson Recording). Amber claimed that, in September 2011 at Taylor's apartment, Taylor had talked to Amber about Katherine's death. DE 200-51. According to Amber, Taylor said that Lester had planned the murder and that Kayla was the lookout. *Id.* Taylor had hit Katherine in the head twice with a hammer and placed $100 bills in a circle next to Katherine's purse. *Id.* Hoskins was the getaway driver in a blue or black Cavalier, which they paid someone in Stinking Creek to store for two months. *Id.* Although police thought that the Cavalier from the Children's Home was involved, Amber said that it was not. *Id.* Amber also relayed that Taylor was worried Kayla would turn on him while being questioned by law enforcement. *Id.* York noted that, per the medical examiner, a hammer could have caused Katherine's injuries and that police had not released details about the manner of Katherine's death or the left-behind money. *Id.*

---

[9] No known relation to Mike Simpson. For clarity, the Court throughout refers to Mike Simpson as "Simpson" and Amber Simpson as "Amber."

On March 14, 2012, York recorded a two-minute statement from Marcie Baker, who had been in rehab with Kayla. DE 200-126 (Audio Recording of Marcie Baker). Marcie said that Kayla had talked about Katherine being killed. *Id.* Per Marcie, Kayla had driven in a blue Cavalier with a boy named John and another boy who dated the old lady's granddaughter. *Id.* The unnamed boy had coaxed the old lady to the door and John hit the old lady in the head and robbed her. *Id.* They knew about the money from the unnamed boy. *Id.* In response to Marcie's comment that Katherine had been killed over $40, Kayla said it was way more than $40 and showed Marcie the track marks on her arms. *Id.* Kayla also said that the car would never be found because Kayla's mother had hidden the car somewhere in a barn on Stinking Creek. *Id.*

That same day, upon York's criminal complaint, a judge signed arrest warrants for Hoskins, Taylor, Lester, and Kayla. DE 200-26 at 106–13. Each criminal complaint recites, as the basis for issuance, only the offenses (murder and robbery in the first degree), the date and location of the offenses (December 20, 2010, at Katherine's residence), the name of the victim (Katherine Mills), and the amount of money suspected stolen ($12,280). *See id.* at 106–07, 109–10.

It appears that both Hoskins and Taylor were already in custody when they were notified of these charges. Hoskins had previously pleaded guilty to a burglary charge, for which she served a term of probation. *See* DE 200-1 at 34; DE 200-26 at 11 (Hoskins resident record card showing conviction for burglary, third degree).[10] Per her deposition testimony, in March 2012, Hoskins was on probation for the burglary charge. DE 200-1 at 34. Around March 12, 2012, she went to the Knox County Jail to turn herself in on a supposed violation after failing to report (which she

---

[10] There is a conflict between Hoskins's deposition testimony and this resident record card. Hoskins testified that she had already pleaded guilty to burglary and was on probation by the time she was charged with Katherine's death. *See* DE 200-1 at 34. The investigative file shows a third-degree burglary conviction on August 14, 2012. *See* DE 200-26 at 11.

described as getting "absconded"). *See id.* at 34–35. Hoskins was in jail on this violation when York came to charge her with robbery and murder. *See id.* at 35. At this same time, Taylor was in custody in Whitley County. *See* DE 200-4 at 42–44.[11]

On March 15, 2012, York came to the home of Donna Mills,[12] Kayla's mother, asking to speak with Kayla.[13] Donna advised that Kayla was not home and recalled talking to York about where Kayla was on the day of Katherine's death and the fact that Kayla had not been dating Taylor at that time. DE 200-52 at 13. Per Donna, York said that Kayla knew what she needed to say and that she would go to jail if she did not say it. *Id.* After York left, Donna looked for and found Kayla and got in touch with a lawyer, Kenneth Boggs. *Id.* Donna then went to the police station and arranged for Kayla to give a statement the following day. *Id.*

On March 16, 2012, York recorded an eight-minute statement from Kayla at the Barbourville Police Department. *See* DE 200-26 at 34; DE 200-54 (Kayla Mills Recording). Kayla attended this interview with her lawyer Boggs, her mother Donna (a/k/a Cricket), and Donna's then-fiancé Scott Mills. *See* DE 200-26 at 54. In the recording, York asked Kayla to tell him about the times that Taylor (her ex-boyfriend) had talked about killing Katherine. DE 200-54 Kayla stated that she knew Taylor had it in him to kill someone and that she had broken up with him because she thought he was going to kill her. *Id.* Taylor confessed a lot, by saying things about

---

[11] The basis for Taylor's detention is somewhat unclear. On February 12, 2012, Taylor was arrested on meth manufacturing charges. *See* DE 200-4 at 42–46; DE 200-5 at 14–15 (Taylor Deposition, Part II). But, the record also shows that Taylor was convicted of third-degree burglary on March 7, 2012. *See* DE 200-26 at 4. Taylor was committed to the Bell County Jail on March 5, 2012, and transferred to the Whitley County Detention Center that same day. *See id.* at 8.

[12] No known relation to Katherine Mills. For clarity, the Court throughout refers to Donna Mills as "Donna."

[13] The only record evidence of this particular interaction appears in Donna's deposition. *See* DE 200-52 at 12–14 (Donna Mills Deposition). In his deposition, York testified to having spoken with Kayla (either directly or through her attorney) and with Donna before Kayla's March 16, 2012 statement. *See* DE 200-2 at 42, 47.

"leaving another one laying" up on the creek. *Id.* Kayla said that Taylor had referenced "an old woman" but did not identify Katherine by name, though she knew Taylor was talking about Katherine. *Id.* Taylor was sometimes vague about details but seemed to want to confess and felt guilty, by Kayla's estimation. *Id.* Taylor never mentioned who was with him at the time or why they killed Katherine. *Id.* Taylor said that the police knew where Katherine's money went. *Id.* Lester also talked to Taylor about a lot of money going to drug dealers, and Kayla said that Lester was worried. *Id.* After her statement, despite having an arrest warrant in hand, York did not arrest Kayla. *See* DE 200-2 at 43–44.

## A. Preliminary Hearing

On March 27, 2012, York testified at a preliminary hearing for Hoskins and Taylor. *See* DE 200-66 at 2 (Preliminary Hearing Tr.). According to his testimony, Katherine was killed in the morning of December 20 by someone who knew where to find her money. *Id.* at 3. Hoskins and Lester were suspects because they had acknowledged in interviews that they knew about Katherine's money and that Lester had talked about a plan to take it. *Id.* York repeated details about the supposed interaction between Hoskins, Lester, and King at the Pineville Walgreens the day before Katherine was killed, including King's statement that Hoskins and Lester had no money on December 19 and that Hoskins planned to dress up like a home health nurse. *Id.* York also stated that Crump had identified Taylor as the person he saw at Katherine's house on the morning of her death. *Id.* York repeated Crump's description[14] of a second person at Katherine's house that morning: a female with blondish-brown hair, sitting in the blue car. *Id.* York referenced his

---

[14] The investigative file does not reveal when or to whom Crump gave this information. *See* DE 200-98 at 2 (Crump Report). In his deposition, Crump recalled telling York about a woman, whose face he could not see, who had blondish-brown hair and was sitting in the blue car at Katherine's house. *See* DE 200-20 at 6, 10–11. Pickard, in his deposition, confirmed Crump's mention of a woman. *See* DE 200-13 at 50 (Pickard Deposition).

interviews with Amber and Kayla ("Taylor's ex-girlfriends"), with whom Taylor had shared details about the crime scene. *Id.* at 3–4. York testified about Hoskins's supposed confession to Branson. *Id.* at 4. York also mentioned that Hoskins and Lester had given him alibis involving Hoskins's doctor's appointment at 9:30 a.m., that records showed Hoskins did not arrive until close to noon, that Hoskins and Lester had approached Helton on December 19 with their plan to steal Katherine's money, and that Helton had seen Hoskins and Lester at Simpson's house on December 20 with a large sum of money. *Id.* at 5–6. York added that Hoskins, Lester, and Simpson were all broke on December 19, that Helton and Simpson had money to go to Florida the following day, and that Hoskins had put in an order for pain pills for Helton and Simpson to bring back from Florida. *Id.* at 6.

Upon examination by Hoskins's lawyer, York disclosed that Hoskins's name had come up in the context of her stealing from Lester's daughters. *Id.* at 7. York also testified that Branson had first mentioned King's name, and that King had not received help with his criminal charges in exchange for giving York information. *Id.* at 9. When questioned about Crump, York clarified that Crump had not "recognized" Taylor but that he had "described an individual that looked like" Taylor. *Id.* at 11. Branson and King were the only ones to implicate Hoskins; there was no physical evidence linking Hoskins to the crime scene, and Katherine's exact time of death could not be established due to her body being outside in freezing temperatures. *Id.* at 12. Taylor's lawyer asked York about Crump's description, and York repeated that the suspect wore a hooded camouflage coat and had fuzzy hair sticking out of his hood, a scruffy beard, and a tattoo on his left hand. *Id.* at 16–17. Taylor's lawyer elicited that York had no knowledge of Taylor having a blue car matching Crump's description. *Id.* at 17. After York repeated Amber's statement implicating Taylor, the judge concluded that probable cause had been established. *Id.* at 19.

**B. Grand Jury**

On April 27, 2012, York testified before the grand jury and appeared against Hoskins, Taylor, and Lester. *See* DE 200-67 at 3 (Grand Jury Tr.). York described how he got involved with the case, starting with getting called to Katherine's home on December 20, 2010. *Id.* at 5. York testified that Hoskins, Taylor, and Lester knew Katherine and that Lester was Katherine's ex-son-in-law. *Id.* at 5–6. Hoskins and Taylor had been arrested, but Lester had not been located as he was working out of town. *See id.* at 5–7 (describing Lester as "on the run"). York detailed Katherine's injuries, the uncertain time of death, and the cause of death ("bleeding on the brain"). *See id.* at 8–10. York acknowledged that he did not have the murder weapon but indicated that it was a hammer, per Taylor's statement to Amber. *Id.* at 10–11. York shared additional information about the crime scene: Katherine's purse lying on the floor, the $100 bills placed beside the purse, the missing timber money, the lack of disturbance to other parts of Katherine's house, and the state of Katherine's kitchen (with food on the stove and dirty dishes in the sink). *Id.* at 11–13.

York explained that he had heard Lester's name from Pickard, who took a statement from Wesley Roark. *Id.* at 14–15. Roark had reportedly told Pickard that Lester was talking about his financial difficulties and his plan to tie Katherine up in the outhouse and take her timber money. *Id.* at 15. York then sought to interview Lester, who had hired an attorney. *Id.* at 15–16. York told the grand jury that, when York met with Lester and his attorney (David Hoskins), York believed Lester to be lying during the interview. *Id.* at 16. York then reviewed the identities of some of those who had given him statements and the substance of their statements: King (that Hoskins was dating Lester and had stolen off Lester's daughters, that Hoskins and Lester had a plan to steal from Katherine, and that Hoskins and Lester could not fill a Suboxone prescription the night of December 19 but filled one December 20); Hoskins (that Lester had mentioned wanting to tie up

Katherine in the outhouse and steal her money and that she (Hoskins) had a doctor's appointment at 9:30 a.m. on December 20); and Branson (that Lester was the mastermind and that King (rather than Taylor) killed Katherine). *Id.* at 17–22. York commented on some of the statements as he described them. For example, he noted that Hoskins actually went to the doctor around noon on December 20, and he testified that Hoskins was having an affair with Dr. Warren (based on Dr. Warren's history of prescription-writing). *See id.* at 20–21.

York went on to explain the circumstances surrounding Helton: that he was a person of interest in the case, that he was broke but able to go to Florida on December 20, that he had failed a polygraph examination. *Id.* at 22–23. York stated that Helton had been truthful about not killing Katherine but that he had lied when asked about her money. *Id.* at 23. York described harassing Helton and eventually getting a statement in which Helton claimed that he had seen Hoskins and Lester at Escoe's Market on December 19, where they talked about robbing Katherine. *Id.* at 23–24. York acknowledged that he had no leads after Katherine was killed and that his interviews with Stinking Creek drug dealers produced names of potential suspects. *Id.* at 25–26. Furthermore, York described Helton and Simpson's Florida trip. On the morning of his trip, before he left, Helton saw Lester drive by the sawmill close to Katherine's house. *Id.* at 27. Helton avoided the area and took a different route to Simpson's house. *Id.* Later that day, Helton saw Hoskins at Simpson's house with three- or four-thousand dollars, and she told Helton that they "got the job done." *Id.* at 28.

York testified about other developments in the case. York told the grand jury about Crump having seen both a blue car and a man on Katherine's property on the morning of December 20. *Id.* at 29–30. York said that Crump saw the man coming from the corner where Katherine's body was found. *Id.* at 30. York identified Taylor as the person Crump described and explained that another officer drew a sketch based on Crump's description. *Id.* at 30–31. York also explained that

Crump had seen a "blonde-headed girl" in the blue car in Katherine's driveway and pointed out that Hoskins had blonde hair. *Id.* at 31. York could not identify the blue car that was used on December 20 but stated that Taylor and Hoskins had access to several matching Crump's description (including Kayla's, which her parents had tried to hide, and one at the orphanage where Linda Taylor, Hoskins's mother, worked). *Id.* at 31–32.

Finally, York told the grand jury about his interviews with Amber and Kayla, whom York characterized as Taylor's girlfriends. *See id.* at 32–33, 37. York mentioned Amber's recorded statement in which she said that Taylor had confessed to her about killing Katherine by hitting her twice in the head with a hammer. *Id.* at 32–33. Amber knew about the $500 left at the crime scene, which York characterized as unusual, and said that Lester was the mastermind. *Id.* at 33–36. York added that Lester had "intimate knowledge" because of having been married to Katherine's daughter and because his daughters (Jennifer and Michelle) took care of Katherine and knew about her money. *Id.* at 36–37. Lester also knew that Katherine did not have an indoor bathroom, that she would go outside every morning, and that she kept a lot of money in her purse. *Id.* at 37. With respect to Kayla, York testified that Kayla said Taylor confessed to her that he had killed an old lady in Stinking Creek ("that he left one laying" and "wouldn't care to leave another one"). *Id.*

York concluded his testimony with a description of the evidence against Lester, including the fact that Lester admitted to having talked about robbing Katherine days before her death. *Id.* at 38–40. Despite Lester's claim (in his interview with York) not to know Taylor, phone records showed that Taylor and Lester had called each other multiple times on the day of Katherine's death ("six or seven times between eight o'clock in the morning and one o'clock"). *Id.* at 41–42.

### C. Additional Investigation and Developments

On July 18, 2012, York and Mefford drove to Roederer Correctional Complex to interview Daniel Wilson, who had been in custody with Taylor in Whitley County. *See* DE 200-58 (Daniel Wilson Report); DE 200-59 (Mark Mefford Wilson Report). According to York, Wilson declined to give a recorded statement. DE 200-58. Per York's summary, Taylor had talked to Wilson "about killing an old woman over money." *Id.* Wilson did not know any last names, but Taylor's cousin Amanda (Hoskins) had arranged it. *Id.* Taylor never told Wilson what he used to kill the old lady, but Taylor would move his arms and hands when he described beating her, as if he was using a club or a hammer. *Id.* Mefford's report indicates only that he was present while York interviewed Wilson. *See* DE 200-59 at 2.

On December 6, 2012, the KSP Laboratory generated a report summarizing the results of the fingerprint comparison on evidence taken from Katherine's house. *See* DE 200-10 (AFIS Report). Analysts processed the five $100 bills left beside Katherine's purse in an attempt to recover fingerprints. *Id.* at 2. One of the bills yielded a latent print "of value for comparison," which was compared to exemplars from Hoskins, Taylor, and Lester. *Id.* These comparisons did not establish an identification. *Id.*

On February 3, 2013, the KSP Laboratory completed an examination of some other physical evidence collected from Katherine's house. *See* DE 200-11 (KSP Forensic Report). Hoskins, Taylor, and Lester had provided DNA samples, and these samples were compared to swabs from Katherine's porch swing and fingernail clippings taken from Katherine's hands. *See* DE 200-26 at 302 (noting blood smear on plastic covering porch swing cushion); DE 200-11 at 2 (indicating buccal standard from Hoskins, Lester, and Taylor and fingernail clippings from Katherine). None of the DNA collected from the tested items inculpated Hoskins, Taylor, or

Lester. *See* DE 200-11 at 2 (noting that the DNA profile from Items 3.1, 5.1, and 6.1 matched Katherine and did not match Hoskins, Taylor, or Lester).

On April 3, 2013,[15] York interviewed Mike Simpson. DE 200-26 at 45. According to York's summary of Simpson's statement, Simpson had nothing to do with Katherine's death, but he did go toward where Katherine lived on December 20 because he went to Hales Creek to see a friend who owed him money. *Id.* That day, Simpson thought that Helton had arrived at his house before lunch and that Lester had showed up after lunch. *Id.* Simpson recalled Lester telling him that he (Lester) had to go pick up his mother from the doctor but could not remember if Helton and Lester were at his house at the same time. *Id.* Simpson denied that Lester ever told him about a plan to steal Katherine's money but acknowledged that Lester bought drugs from him for Hoskins. *Id.* Hoskins herself never bought drugs from him, and he did not know whether Hoskins and Lester had given Helton money to buy drugs in Florida. *Id.* Simpson stated that he gave York an alibi because Simpson's neighbors had told him he was a suspect. *Id.* Also, he clarified that he cried when Jesse gave him the news about Katherine because he thought Jesse was talking about Lester's mother, whom Simpson had known for a long time. *Id.*

On April 30, 2013, York interviewed Kayla's cousin, Heather Warren. *See* DE 200-26 at 47. Per York's report, Heather spoke about a conversation she had with Kayla after Hoskins and Lester got arrested. *Id.* Kayla, while under the influence of both alcohol and drugs, told Heather that she (Kayla) and Taylor, not Hoskins and Lester, had killed Katherine. *Id.* Heather recalled that Kayla was not allowed to drive after Katherine's death and that Kayla was always calling Heather

---

[15] The date of report is April 3, 2013, but the body of the report states that the interview occurred on April 3, 2012. *See* DE 200-26 at 45. During Simpson's deposition, he was questioned about the receiving stolen property charge on which he was detained at the time of his interview with York, and the line of questioning—as well as Simpson's answers—seems to suggest that the interview took place in 2013. *See* DE 200-23 at 22.

to come pick her up. *Id.* Heather added that Kayla would have done anything for a dollar at the time and that Taylor had a temper and was "different." *Id.* No one else was present for the conversation between Heather and Kayla. *Id.*

On February 26, 2014, York recorded a three-minute statement from Robert Beach while Beach was in custody in Indiana. *See* DE 200-69 (Robert Beach Recording); DE 200-2 at 95. York asked Beach about the time he spent in Whitley County jail when he shared a cell with Taylor. DE 200-69. Upon York questioning Beach about what Taylor had said to Beach about Katherine, Beach responded that a female relative (a niece or cousin) had contacted Taylor and told him that a lady had money or maybe drugs and that it would be an easy robbery. *Id.* Per Beach, the robbery had not gone well, and someone had died; Beach assumed the victim was a woman (although Taylor never said so). *Id.* Beach recalled that Taylor said the victim was an old person, and Beach agreed with York's statement that a female relative had set up the robbery. *Id.*

On June 4, 2014, the Commonwealth gave notice of its intent to seek the death penalty against Taylor. DE 200-114.

On April 29, 2015, York interviewed Mikey Bruner. *See* DE 200-75 (Mike Bruner Statement). Per York's summary, Taylor had confessed to Bruner at Taylor's apartment sometime in 2011 or 2012. *Id.* The two were alone at the apartment when Taylor, while intoxicated, told Bruner that he had killed an old lady for her purse and medication. *Id.* Hoskins knew about the money and the medication, came up with the plan, and told Taylor about it. *Id.* One night, Hoskins drove the car (which Bruner thought Taylor had identified as Hoskins's), and Taylor and Kayla went up to the door. *Id.* Kayla knocked, Taylor rushed in to try to take the pursue, but the old lady fought back and grabbed the purse. *Id.* Taylor hit her on the head, took her purse, "and left her laying." *Id.* Bruner thought that Taylor had used an aluminum little league bat to hit Katherine. *Id.*

Taylor said they got away with a couple hundred dollars, that they money was split between him and two women that participated, and that they used the money to buy drugs. *Id.* Per Bruner, Taylor had never mentioned Lester's name. *Id.*

On May 18, 2015, Helton called York. *See* DE 200-26 at 55. Per York's summary of the call, Helton said that he had infection around the metal plates in his head and that he was at UK Hospital. *Id.* Helton also told York that he had never seen Hoskins and Lester at Escoe's Market on December 19 and that he had lied when he gave a statement about it. *Id.*

The following day, Hoskins posted bond and was released from custody pending trial. *See* DE 200-119 at 1 (Hoskins Response to CW Motion to Dismiss).

### D.  Dismissal of Charges

At some undetermined time between the indictment and the ultimate dismissal, Commonwealth Attorney Jackie Steele had contact with King, Branson, and Crump. *See* DE 200-8 at 22–25 (Steele Deposition). When Steele met with King at the Laurel County Detention Center, Steele learned that King had "changed his story in that he never heard anyone talking about robbing an elderly lady and that he did not see or know of Amanda spending money." *Id.* at 22; DE 200-6 at 3 (Motion to Dismiss, *Comm. v. Taylor*). Additionally, Steele met with Branson after getting notified that Branson had experienced head trauma in a motor vehicle accident. DE 200-8 at 22–23. During their meeting, Branson told Steele that she could not remember anything regarding Katherine's death or her previous statement to law enforcement. *Id.* Steele also had a phone conversation with Crump and learned that Crump "was not coming back to testify." *Id.* at 23.

On June 23, 2016, Steele spoke with Wilson, who was in custody in Campbell County. *See Id.*; DE 200-6 at 2–3. During this conversation, Steele learned that Wilson had changed his story; Wilson told Steele that he did not recall Taylor making any statements to him about Katherine's

death, Hoskins, or a robbery. DE 200-6 at 2–3. Wilson further stated that he did not remember making any statements himself. *Id.* at 3. On this same day, Steele also spoke to Beach, whose "version of the events had changed." *Id.*

On June 29, 2016, the Commonwealth moved to dismiss the charges against Taylor based on "the current status of the witnesses and evidence to be presented." *Id.* at 2. In particular, the motion cited the anticipated changes in testimony by Wilson, Beach, and King and the unavailability of Kayla, Branson, King, and Crump. *Id.* at 3–4. In addition to the developments described above, the motion noted that Kayla had died, King had moved to a location unknown to the Commonwealth, and Crump had recanted, refused to testify, and failed to appear. *Id.* Taylor responded to the Commonwealth's motion, urging the court to dismiss the charges with prejudice. DE 200-118. On June 30, 2016, the court granted the Commonwealth's motion, dismissed the charges without prejudice, and ordered that Taylor be released. DE 200-116 (June 30, 2016 Order). On July 29, 2016, the Commonwealth made a similar motion, for the same reasons, in Hoskins' case. DE 200-7 (Motion to Dismiss, *Comm. v. Hoskins*). Like Taylor, Hoskins sought a dismissal with prejudice. DE 200-119. On August 18, 2016, the trial court granted the motion and dismissed the charges without prejudice. DE 200-117 (August 18, 2016 Order). On April 4, 2017, this lawsuit followed.

### E. Plaintiffs' Allegations

With respect to almost all the interactions, interviews, or parts of the investigation described in the timeline above, Plaintiffs allege that Defendants engaged in serious misconduct. The Court summarizes the wrongdoing as alleged against and attributed to each Defendant.

### 1. Allen Helton

York failed to document having questioned Helton in December 2010, when Helton denied knowledge about Katherine's death. *See* DE 200-2 at 7; DE 200-26; DE 204 at 34.

During the January 4, 2011, traffic stop, York tried[16] to grab Helton's face and cursed and yelled at Helton. *See* DE 200-17 at 12; DE 204 at 35. York[17] found a wet coat on Helton's floorboard and commented that it was probably the coat Helton was wearing when he killed Katherine. *See* DE 200-17 at 13; DE 204 at 35. Pickard was nearby when this happened. *See* DE 200-17 at 30, 66; DE 204 at 35.

In the interview following the traffic stop, York and Mefford[18] questioned Helton. *See* DE 200-17 at 6–7; DE 204 at 35. York told Helton details about Katherine's death despite Helton claiming no knowledge. *See* DE 200-17 at 13–14; DE 204 at 35. Broughton told Helton to tell the truth. *See* DE 200-17 at 14. York failed to document any information disclosed to or obtained from Helton. *See* DE 200-2 at 54; DE 204 at 35. Broughton and Mefford were present when York fed Helton details during the interview but created no documentation. *See* DE 200-17 at 14; DE 200-26; DE 204 at 35.

During Helton's post-polygraph interview a few weeks later, York told Helton to say that Simpson got Katherine's money after her death, that Simpson split the money with Helton and someone else, and that Lester had killed Katherine with Simpson.[19] *See* DE 200-17 at 17–18; DE

---

[16] The record does not support the claim that York actually grabbed Helton's face. DE 200-17 at 30, 55.

[17] Per Helton, York, not Pickard, conducted the search and commented on the wet coat. DE 200-17 at 13, 32, 55.

[18] Helton did not testify that Broughton questioned him. *See* DE 200-17 at 7 ("[Mefford] and [York] did and [Broughton] stood at the door."); *id.* at 44 ("[Broughton] just told me I need to tell them the truth").

[19] The recording of Helton's post-polygraph interview is not part of the record. *See* DE 200-17 at 17–18 (referencing PL9689 and Exhibit 7, Helton's post-polygraph recording).

204 at 39. York continued questioning Helton despite his professed lack of knowledge. *See* DE 200-17 at 18; DE 204 at 39. Later, in spring 2011, when Helton went to the Knox County Courthouse on the January 4, 2011, DUI charge, York promised that he would take care of Helton's charges if Helton told York what he needed to hear. *See* DE 200-17 at 20; DE 204 at 44.

Pickard arrested Helton on March 7, 2012, and told Helton on the way to the jail that Helton would get a bond and that there would be no more charges if Helton told them what they needed to hear about the murder case. *See* DE 200-17 at 21; DE 204 at 44. During the interview that followed, York and Pickard spoke to Helton before turning on the recorder. *See* DE 200-17 at 21; DE 204 at 45. Pickard repeated the promise about Helton's bond and no more charges. *See* DE 200-17 at 21; DE 204 at 45. Also during the unrecorded session, York[20] told Helton what to say. *See* DE 200-17 at 21–22; DE 204 at 45. Pickard did nothing to stop York from feeding Helton details. *See* DE 200-17 at 26; DE 204 at 46. York drafted a report that omits consideration provided and details fed. *See* DE 200-41 (Helton Report); DE 204 at 46.

During the May, 18, 2015, phone call, Helton was on his way to the courthouse, but York told Helton not to worry about coming to court after Helton told him that he planned to testify that his earlier statement was false. *See* DE 200-17 at 27; DE 204 at 135 n.9. York drafted a report stating that Helton was at the hospital and omitting the fact that Helton said he "was coming." *See* DE 200-26 at 55; DE 204 at 135 n.9.

At his deposition, Helton testified that all the statements attributed to him in York's report were false. *See* DE 200-17 at 21–23; DE 204 at 47.

---

[20] Helton testified that Pickard did not tell him about Hoskins, Lester, Escoe's Market, or anything else that was part of Helton's statement. *See* DE 200-17 at 41–42 ("I mean, [Pickard] didn't say nothing.").

### 2. Jesse Lawson

Within two weeks of Katherine's death, York showed up at Jesse's house to take him in for questioning and cursed at Jesse. *See* DE 200-12 at 8–9; DE 204 at 36. At the Barbourville Police Station, York did not read Jesse his rights. *See* DE 200-12 at 11; DE 204 at 37. York "slammed" Jesse into a tiny room, questioned Jesse, and threatened to kill him if he lied. *See* DE 200-12 at 10–11; DE 200-32; DE 204 at 36. York also threatened a conspiracy to commit murder charge unless Jesse cooperated. *See* DE 200-29 at 20 (Lawson Deposition, Part II); DE 204 at 36. York stood behind Jesse's chair and hit both the chair and Jesse's head during questioning. *See* DE 200-29 at 20; DE 204 at 36. York then put a wire on Jesse and made him go to Cleo Brown's house to try to get a statement from her about what she had seen on December 20. *See* DE 200-12 at 11–12; DE 204 at 37. York[21] questioned Jesse when he returned to the station unsuccessful. *See* DE 200-12 at 13, DE 204 at 37. York again threatened to charge Jesse. *See* DE 200-12 at 13, 23; DE 204 at 37. Jesse was denied permission to go home until about 6:00 in the evening. *See* DE 200-12 at 12–13; DE 204 at 37.

On a different occasion, after Jesse took the polygraph, York told Jesse that he had failed miserably and screamed at him "to give him a name." *See* DE 200-12 at 16–17; DE 204 at 38. York also told Jesse that Hoskins and Lester were involved in Katherine's death. *See* DE 200-12 at 18; DE 200-32; DE 204 at 38.

---

[21] There is no indication in the record that Pickard questioned Jesse. DE 200-12 at 23 (Jesse testifying that he did not believe Pickard was present); DE 200-29 at 7 (Jesse testifying that he had never had an encounter with Pickard); *cf.* DE 200-29 at 19–20 ("Sheriff Pickard may have walked in.").

### 3. Amanda Hoskins

Neither York nor Broughton read Hoskins her rights before questioning. *See* DE 200-1 at 12; DE 204 at 42. At the beginning of the interview, York placed a citation for murder and robbery on the table. *See* DE 200-1 at 12; DE 204 at 42. York failed to record the entire interview. *See* DE 200-1 at 12; DE 204 at 42. During the unrecorded portion, York threatened to frame Hoskins for murder. *See* DE 200-38 (Amanda Hoskins Affidavit); DE 204 at 42. York also told Hoskins that he would charge her for the murder and robbery of Katherine unless she spoke with York and called Lester acting like she was panicked. *See* DE 200-1 at 12; DE 204 at 43. York stopped recording when Hoskins hung up with Lester, snatched the phone out of her hand, and started screaming in her face and hitting the table. *See* DE 200-1 at 14, 75; DE 204 at 44. When York later came to the Knox County Jail to charge Hoskins with robbery and murder, in response to Hoskins claiming not to know anything, York told her that he knew she did not have any involvement. *See* DE 200-1 at 35; DE 204 at 71.

York doctored the time on Hoskins's faxed medical record from December 20, 2010, making it appear as though she arrived at 12:54 a.m. *See* DE 202-130 (Medical Record for Amanda Hoskins from Hope Medical Center); DE 202-131 (Faxed Medical Record for Amanda Hoskins from Hope Medical Center); DE 204 at 47–49.

Broughton was present when York threatened to frame Hoskins for murder. *See* DE 200-38; DE 204 at 43. Broughton also asked York to step outside and commented that something "felt fishy." *See* DE 200-1 at 72; DE 204 at 43. In an unrecorded part of the interview, Broughton engaged with Hoskins, often following up on or repeating York's questions. *See* DE 200-1 at 71–73; DE 204 at 43. After Hoskins's call with Lester, Broughton did not calm York or tell him to stop hitting the table. *See* DE 200-1 at 75–76; DE 204 at 44. Broughton joined York in yelling in

Hoskins's face. *See* DE 200-38. *But see* DE 200-1 at 72–77 (testifying only that Broughton kept repeating questions and that he was present when York banged on the table and yelled at Hoskins).

### 4. Jonathan Taylor

When Taylor was brought in for questioning, York put crime scene photos in front of Taylor to "see what you've done, realize what you've done." *See* DE 200-4 at 39; DE 204 at 64. York and Pickard questioned Taylor despite his statement that he knew nothing about Katherine's death. *See* DE 200-4 at 39; DE 204 at 64–65. At one point, Broughton sat as close as he could to Taylor while he questioned him and told Taylor that he knew Taylor had something to tell him. *See* DE 200-5 at 6; DE 204 at 65. Broughton pressed Taylor for information despite his insistence that his only knowledge of the case came from news stories. *See* DE 200-5 at 7; DE 204 at 65.

York then directed Taylor to put on his hooded jacket, leaving some of his hair out of the hood, and to stand in various positions for photographs. *See* DE 200-4 at 40; DE 204 at 65. Pickard stood by while Broughton took multiple photographs of Taylor. *See* DE 200-4 at 60; DE 204 at 65, 67–69. Neither Broughton nor Pickard stopped the photographs from being taken or told York that Taylor should not wear the hooded jacket. *See* DE 200-5 at 18; DE 200-14 at 36; DE 204 at 67. Broughton failed to document his involvement in photographing Taylor. *See* DE 200-14 at 35, 46; DE 204 at 67.

Afterwards, York stood in the hallway with Broughton and talked about sending Taylor's photographs somewhere and charging Taylor with murder. *See* DE 200-4 at 40; DE 200-5 at 7; DE 204 at 68. Taylor heard York[22] comment to Broughton and Pickard, something to the effect of: "Yeah. We got him. . . . We're charging him with murder. It's him. We're sending him down." *See* DE 200-4 at 40; DE 204 at 68. York sent Taylor's photographs to Oklahoma so that Crump

---

[22] *See* DE 200-5 at 7 (clarifying that York was the speaker).

could view them but never told Steele that Crump failed to make an identification. *See* DE 200-2 at 7; DE 200-8 at 26–28; DE 204 at 69–70. Nor did York tell Steele about the procedure leading up to Taylor's photographs. *See* DE 200-8 at 26–28; DE 204 at 70. Broughton and Pickard never told Steele about the procedure used to photograph Taylor or that Crump failed to make an identification. *See* DE 200-8 at 26–28; DE 204 at 70.

Later, when York saw Taylor at the Whitley County Jail, he threw a wadded up arrest warrant at Taylor and threatened him ("I'm going to do everything in me for you to rot in the penitentiary on this."). *See* DE 200-4 at 44; DE 204 at 72.

### 5. Christy Branson

York spoke to Branson before turning on the recorder and did not document what he said to her during this time or how long the unrecorded portion of the meeting lasted. *See* DE 200-2 at 86; DE 200-45 (Branson Report); DE 200-113; DE 204 at 49.

At her deposition, Branson claimed not to remember anything about Hoskins, the interview with York, or the substance of her recorded statement. *See* DE 200-46 at 5–8 (Branson Deposition).

### 6. Joe King

York attempted to question King the day before he purportedly took King's statement. *See* DE 200-47 at 6–7 (King Deposition); DE 204 at 51. York ignored King's insistence that he did not know anything that would help York's investigation. *See* DE 200-47 at 6–7; DE 204 at 51. York played a recording from an unidentified woman who had been locked up with Hoskins in Harlan County, who mentioned getting time off her sentence and named people including Hoskins and King. *See* DE 200-47 at 7; DE 204 at 51. York started to play a second tape but then ended the meeting by promising to come back in twenty-four hours. *See* DE 200-47 at 7; DE 204 at 51.

During King's second interview, York provided details about the investigation. *See* DE 200-47 at 9–11; DE 204 at 51. York created a report that omitted that King had denied knowledge about Katherine and said that he was not going to give a statement. *See* DE 200-47 at 8; DE 200-48. York testified regarding the substance of King's interview at both the preliminary hearing and grand jury proceeding. *See* DE 200-66 at 4–5; DE 200-67 at 17–21. York learned before giving this testimony that Hoskins had not filled a prescription at the Pineville Walgreens on December 19. *See* DE 200-2 at 74–75.

At his deposition, King testified that he did not recall having made any of the statements attributed to him in York's report. *See* DE 200-47 at 8–11. King maintained that he had no firsthand knowledge of Katherine's death and no reason to believe that Hoskins or Taylor was involved. *Id.* at 13.

### 7. Amber Simpson

York told Amber's mother that Amber would be charged with "withholding evidence" unless she gave a statement against Taylor. *See* DE 200-49 at 6 (Simpson Deposition); DE 204 at 52–53. On the day of the interview, York had an unrecorded conversation with Amber in which he promised consideration—in the form of reward money or helping Amber's brother with his manufacturing charges—in exchange for her statement. *See* DE 200-49 at 7, 16; DE 204 at 53. Throughout the interview, York turned off the recorder, shared with Amber details that inculpated

Hoskins and Taylor, and then turned on the recorder to allow Amber to repeat the information.[23] *See* DE 200-49 at 7–9, 17; DE 204 at 53–54. York failed to document when the interview ended and created a report that omitted the fact that York had threatened charges, offered consideration, and provided inculpatory details. *See* DE 200-50 (Simpson Report); DE 204 at 54–55.

At her deposition, Amber testified that she had no knowledge of any of the details in her statement as memorialized by York. *See* DE 200-49 at 7–9.

### 8. Kayla Mills

Pickard approached Kayla several times prior to her March 16, 2012, interview and told her that she needed to cooperate and tell the police that Hoskins, Taylor, and Lester had killed Katherine. *See* DE 200-52 at 8; DE 204 at 55–56. Pickard told Kayla she would go to jail if she did not tell them the truth. *See* DE 200-52 at 9; DE 204 at 55–56. Pickard failed to document his interactions with Kayla. *See* DE 200-13 at 9–10, 43; DE 204 at 57.

York likewise approached Kayla prior to her March 16, 2012, interview and told her that she needed to implicate Hoskins, Taylor, and Lester. *See* DE 200-52 at 14–15; DE 204 at 57. York also charged Kayla with murder before taking her statement. DE 200-26 at 110–11; DE 204 at 57–58. York ignored Donna's assertion that Kayla was not involved in Katherine's death and told Donna that Kayla would go to jail if she did not give the statement. DE 200-52 at 13; DE 204 at 58. York spoke to Kayla about her arrest warrant before the interview and made an agreement with

---

[23] York argues that the Court should assess the recording itself to determine whether the record blatantly contradicts Amber's recollection of York stopping and starting the recorder during their conversation. *See* DE 205-1 at 31–33 (citing *Scott v. Harris*, 127 S. Ct. 1769, 1776 (2007)). Plaintiffs counter that a reasonable juror could believe this aspect of Amber's story and that, in any event, York engaged in other misconduct with respect to Amber's statement. *See* DE 204 at 143–45. The Court has listened to the recording as a part of its careful review of all record evidence. However, the Court views the alleged manipulation of the recorder as non-dispositive and concludes that a jury is best suited to listen to Amber's statement, assess witness credibility, and discern whether the recording suggests any York wrongdoing.

Kayla's lawyer that he would not proceed forward against Kayla if she gave a statement against Taylor. *See* DE 200-2 at 42–44; DE 204 at 60. During the interview, York stopped the recorder to tell Kayla what to say, ignored her claims that she did not know anything, and got angry when Kayla repeatedly denied knowledge. *See* DE 200-52 at 16–17, 19; DE 204 at 59–61. York drafted a report memorializing Kayla's statement but did not note that York had agreed not to proceed against her on the robbery and murder change in exchange for her statement. *See* DE 200-55 at 2 (Report of Kayla Mills' Statement); DE 204 at 60–61. Additionally, York failed to place the criminal complaint against Kayla in the investigative file. *See* DE 200-8 at 31 (Steele testifying at his deposition that he could not recall having seen the criminal complaint and arrest warrant for Kayla and that he had not known of any consideration promised to Kayla); DE 204 at 57.

At her deposition, Donna maintained that York's report memorializing Kayla's recorded statement was untrue.[24] *See* DE 200-52 at 18–19; DE 204 at 61.

### 9. Daniel Wilson

York told Wilson that he would discuss with the prosecutor whether Wilson could be moved closer to home but did not document this information in his report. *See* DE 200-2 at 95; DE 200-57 at 22 (Wilson Deposition); DE 200-58; DE 204 at 62. Mefford drove York to the Wilson interview and remained present for the entire conversation. *See* DE 200-15 at 15 (Mefford Deposition); DE 204 at 63. Both York and Mefford drafted reports documenting their involvement in and the substance of the interview but neither mentioned York's promise of consideration. *See* DE 200-58 at 1; DE 200-59 at 2; DE 204 at 62–64.

At his deposition, Wilson testified that Taylor had never confessed to him (or said anything about Katherine) and that he (Wilson) had never provided York with any information (other than

---

[24] *But see* DE 200-52 (Donna testifying that Kayla told her Taylor had said he "left one laying").

declining to be recorded and asking for help with his sentence). *See* DE 200-57 at 6–8; DE 204 at 62.

### 10. Robert Beach

An unidentified law enforcement officer contacted Beach's sister to ask about a letter that Beach had supposedly written (relating to the murder and robbery of an old woman) and to talk to Beach's sister about whether Beach wanted help getting closer to home. *See* DE 200-71 (2/24/14 Beach Recording); DE 204 at 84. York never documented any pre-interview conversations with Beach or Beach's sister or told Steele about any such conversation. *See* DE 200-26; DE 200-8 at 25, 52; DE 204 at 85. On the day of the interview, York recorded a three-minute statement from Beach, though Steele (who was present) estimated that the meeting lasted thirty to forty-five minutes. *See* DE 200-69; DE 200-8 at 24, 38; DE 204 at 83–84. In the recording, York prompted Beach by providing details about Taylor's supposed confession. *See* DE 200-69; DE 204 at 83.

After his interview, Beach talked to his sister in a recorded jail call about having met with detectives. *See* DE 200-73 (3/1/14 Beach Recording); DE 204 at 85. Beach told his sister that he would be in Knox County because he had agreed to help the detectives. *See* DE 200-73; DE 204 at 85.

### 11. Mikey Bruner

York approached Bruner's stepmother (Jennifer Bruner) and told her that Bruner did not have a choice about cooperating. *See* DE 200-74 at 19–21 (Bruner Deposition); DE 204 at 86. York stopped by Bruner's workplace asking for him. *See* DE 200-74 at 20; DE 204 at 86. When Bruner gave a statement, York failed to record the entire conversation,[25] *see* DE 200-74 at 23, 88; DE 204 at 86, and did not document (or otherwise notify Steele) that Bruner had "illicit substances"

---

[25] The record does not contain any recording of Bruner's statement.

in his body at the time of Taylor's alleged confession, *see* DE 200-74 at 14; DE 204 at 86; DE 200-75; DE 200-8 at 38–39. York also did not document that Bruner had expressed an inability to remember all the details about the night of Taylor's confession. *See* DE 200-74 at 18; DE 200-75.

At his deposition, Bruner maintained that he had been truthful in his statement to York but contradicted part of York's summary; Bruner testified that he had never used Hoskins's name. *See* DE 200-74 at 27–31; DE 200-75 at 2.

\* \* \* \* \*

Defendants, in four groups,[26] moved for summary judgment on all claims. DE 177; DE 178; DE 179; DE 180.[27] Plaintiffs filed a consolidated response in opposition to each of these motions. DE 195.[28] Defendants replied. DE 211; DE 213; DE 216; DE 225; DE 227.[29]

## II. STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A reviewing court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009).

---

[26] The joint representation and briefing are as follows: the City of Barbourville and Mike Broughton; Kelly Farris, Dallas Eubanks, Bryan Johnson, Mark Mefford, and Jackie Joseph; Knox County and John Pickard; and Jason York and Jason Bunch.

[27] The Court notes that these pending motions, respectively, correspond to the entries at DE 207, DE 201, DE 206, and DE 205. The later, duplicative filings are a feature of Defendants' compliance with DE 199, by which the Court ordered the parties to file a single collection of exhibits and amend their briefs to reference the contemplated master exhibit list. For citation purposes throughout, the Court cites the later-filed versions.

[28] Plaintiffs' consolidated response also appears at DE 204, which is the DE 199 compliant filing. As with Defendants' briefing, the Court cites Plaintiffs' later-filed response.

[29] Mefford and Joseph replied separately (though they had filed a joint motion for summary judgment). *See* DE 201; DE 211; DE 227.

Additionally, the court may not "weigh the evidence and determine the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986).

The burden of establishing the absence of a genuine dispute of material fact initially rests with the moving party. *Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986) (requiring the moving party to set forth "the basis for its motion, and identify[] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate an absence of a genuine issue of material fact"); *Lindsay*, 578 F.3d at 414 ("The party moving for summary judgment bears the initial burden of showing that there is no material issue in dispute."). If the moving party meets its burden, the burden then shifts to the nonmoving party to produce "specific facts" showing a "genuine issue" for trial. *Celotex Corp.*, 106. S. Ct. at 2253; *Bass v. Robinson*, 167 F.3d 1041, 1044 (6th Cir. 1999). However, "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 106 S. Ct. at 2552; *see also id.* at 2557 (Brennan, J., dissenting) ("If the burden of persuasion at trial would be on the non-moving party, the party moving for summary judgment may satisfy Rule 56's burden of production in either of two ways. First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second, the moving party may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." (emphasis in original)).

A fact is "material" if the underlying substantive law identifies the fact as critical. *Anderson*, 106 S. Ct. at 2510. Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual

disputes that are irrelevant or unnecessary will not be counted." *Id.* A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 2511; *Matsushita Elec. Indus. Co.*, 106 S. Ct. at 1356 ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'") (citation omitted). Such evidence must be suitable for admission into evidence at trial. *Salt Lick Bancorp v. FDIC*, 187 F. App'x 428, 444–45 (6th Cir. 2006).

## III. ANALYSIS

### A. Preliminary Matters

#### 1. Dismissed Claims and Defendants

Plaintiffs originally brought an eleven-count complaint against ten individual Defendants (Mike Broughton, John Pickard, Derek Eubanks, Jason York, Bryan Johnson, Mark Mefford, Dallas Eubanks, Kelly Farris, Jackie Joseph,[30] and Jason Bunch) and two entities (Knox County and the City of Barbourville). DE 1. In their consolidated response to Defendants' motions for summary judgment, Plaintiffs voluntarily dismissed all claims against the following Defendants: Derek Eubanks, Bryan Johnson, Dallas Eubanks, Kelly Farris, and Jason Bunch. DE 204 at 118 & n.2. Plaintiffs also dropped certain claims in their entirety: Count VII,[31] the *Monell* claim against the City of Barbourville; Count X, the state-law IIED claim; and Count XI, the respondeat superior claims against Knox County and the City of Barbourville. *Id.*

---

[30] The complaint named Jackie Pickrell, not Jackie Joseph. *See* DE 1. One of the motions for summary judgment clarifies that Pickrell is Joseph's former last name. *See* DE 201 at 1. The Court throughout refers to her as Joseph.

[31] There appears to be a typographical error in the complaint. Plaintiffs initially asserted a *Monell* claim against both Knox County and the City of Barbourville. DE 1 ¶¶ 172–76; ¶¶ 177–81. The complaint lists the two claims separately but characterizes both as "Count VI." *See id.* There is no Count VII, and Plaintiffs' next claim is Count VIII, state-law malicious prosecution. *See id.* ¶¶ 182–86. The Court therefore distinguishes between the two *Monell* claims—and the two Count VIs—by describing the *Monell* claim against the City of Barbourville as Count VII.

Plaintiffs' response thus trimmed the host of claims and raft of defendants, but there are loose ends: the status of the City of Barbourville and the scope of Counts III and IX (respectively, § 1983 supervisory liability and state-law negligent supervision). The Court addresses each in turn.

First, Plaintiffs' response dismissing some individual Defendants does not explicitly dismiss the City of Barbourville as a party, but it does drop two claims against the City: the *Monell* claim (presumably Count VII, which Plaintiffs characterize as a *Monell* claim) and the respondeat superior claim (Count XI). *See* DE 1 ¶¶ 177–81, ¶¶ 196–98; DE 204 at 118 & n.2. However, the complaint also alleged that the City of Barbourville, as a policymaker, is responsible for the supposed constitutional violations described in Counts I, IV, and V: malicious prosecution, failure to intervene, and conspiracy to deprive constitutional rights, respectively. *See* DE 1 ¶¶ 145–46 (Count I); *id.* ¶ 164 (Count IV); *id.* ¶ 171 (Count V). In contrast, the now-dropped Count VII faulted the City for ratifying the withholding of material exculpatory information. *Id.* ¶¶ 178–81.

Plaintiffs' response is therefore ambiguous: it neither drops the City as a party nor explicitly addresses the other potential *Monell* theories apparently contemplated by the complaint. In its motion for summary judgment, the City argued that no constitutional violation occurred and that the record was devoid of any City policy or custom that caused the alleged violations. DE 207-1 at 36–39. Plaintiffs did not counter the City's showing. *See* DE 204 at 118, 211–29 (discussing Knox County's—but not the City of Barbourville's—policies and customs). As a result, the Court reads Plaintiffs' voluntarily dismissal of "their *Monell* claim against Defendant City of Barbourville" to include all *Monell* theories embedded within the complaint, not just the one identified in Count VII. *See* DE 204 at 118 & n.2. This construction leaves no claims pending against the City. In effect, Plaintiffs dropped the City as a party without fully saying so.

As for Counts III and IX, Plaintiffs state that they "only pursue their claims of failure

to supervise and negligent supervision against Defendant Joseph." *Id.* But, the complaint once reached more broadly. Plaintiffs originally brought Count III against "supervisory defendants, including but not limited to Defendant Pickard and Defendant [Joseph]." DE 1 ¶ 154. Similarly, Plaintiffs asserted Count IX against "municipal defendants, as well as the supervisory defendants, including Defendant Pickard and Defendant [Joseph]." *Id.* ¶ 188. Elsewhere, Plaintiffs maintained several other counts against "Defendant Officers," a group defined to include Joseph. *See id.* ¶¶ 17–19; *id.* ¶¶ 138–47 (Count I); *id.* ¶¶ 148–52 (Count II); *id.* ¶¶ 160–64 (Count IV); *id.* ¶¶ 165–71 (Count V); *id.* ¶¶ 182–86 (Count VIII).

Based on these statements, Plaintiffs' position is imprecise: do they pursue only Counts III and IX—and no other counts—against Joseph? Or do they pursue Counts III and IX against only Joseph—and no other Defendant? These possibilities are not mutually exclusive, but clarity is paramount.[32] About one hundred pages after their initial summary of the argument, Plaintiffs unambiguously answer the first question in the affirmative. *See* DE 204 at 211 ("Plaintiffs only move forward on their failure to supervise (Count III) and negligent supervision (IX) claims against Defendant Joseph, *while dismissing the remaining counts against her*.") (emphasis added). Plaintiffs' answer to the second question is less transparent, as they never explicitly dismiss Counts III and IX as to Pickard or any other Defendant. *See id.* at 118. In his motion for summary judgment, Pickard acknowledged his inclusion within Counts III and IX and argued that all claims against him based on supervisory liability—both the § 1983 and state-law variety—must fail because Pickard did not supervise any remaining Defendant. *See* DE 206-1 at 31–32, 45–46. Plaintiffs' response is silent as to Counts III and IX against Pickard (or any other unnamed supervisory defendant or the municipal defendants alleged in these Counts of the complaint). *See*

[32] The Court notes that Plaintiff's placement of the adverb "only" permits either reading.

DE 204 at 202–11. Accordingly, the parties' briefing tacitly answers the second question in the affirmative; Plaintiffs assert Counts III and IX against only Joseph.

### 2. § 1983 Fabrication (Count II)

At the threshold, the parties' treatment of the fabrication allegations merits discussion. In Count II, Plaintiffs contend that Defendants fabricated evidence in violation of the Fourth and Fourteenth Amendments. DE 1 ¶¶ 148–52. In their motion to dismiss (DE 36), Defendants Eubanks, Bunch, and York argued that the Fourth Amendment fabrication claim was untimely, that any due-process fabrication theory should fail because there was neither a trial nor a conviction, and that the malicious-prosecution count subsumes the fabrication issue. *See id.* at 5–7. The Court, per Judge Bunning, rejected the timeliness argument, maintained that malicious prosecution and evidence fabrication merit separate analysis, and determined that the Fourth Amendment was the sole basis for the fabrication count. DE 119 at 10–13 ("Plaintiffs' fabrication-of-evidence claim has only one constitutional foundation: the Fourth Amendment."); *id.* at 21–31 (concluding that the fabrication claim accrued when criminal proceedings terminated in Plaintiffs' favor). The Fourteenth Amendment is inapplicable under the circumstances because Plaintiffs did not proceed to trial and thus allege no abridgment of fair-trial rights.[33] *Id.* at 11.

Notwithstanding the earlier ruling on the motion to dismiss, the Court perceives a need to clarify whether, at this stage, Plaintiffs' fabrication claim (Count II) may go forward independently

---

[33] Of course, the Fourteenth Amendment remains applicable insofar as it is the mechanism by which the Fourth Amendment applies to the state actors here. *See O'Brien v. City of Grand Rapids*, 23 F.3d 990, 996 (6th Cir. 1994) ("The Fourteenth Amendment incorporates the Fourth Amendment, prohibiting unreasonable searches and seizures by the states.").

from Plaintiffs' malicious-prosecution claim (Count I).[34] In previously allowing Plaintiffs to proceed on both theories, the Court observed that malicious-prosecution and evidence-fabrication claims have different elements. *Id.* at 10–13. That is, per the earlier ruling, fabrication does not "require[] a plaintiff to prove that there was a lack of probable cause to support the criminal charges." *Id.* at 12 (citing *Morris v. Boyd*, No. 00-1249, 2000 U.S. App. LEXIS 29187, at *3 (6th Cir. Nov. 7, 2000) and *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997)). The *Morris* court, addressing a theory evidently not pleaded before the district court, cited *Stemler* for the proposition that probable cause does not defeat a fabrication claim. *See Morris*, 2000 U.S. App.

---

[34] The Court notes that, like the § 1983 plaintiff in *McDonough v. Smith*, 139 S. Ct. 2149 (2019), Plaintiffs have not "explained the difference between [their malicious-prosecution] claim and [their] fabrication claim, which [they] insist[] is both analogous to the common-law tort of malicious prosecution and distinct from . . . [their] malicious-prosecution claim." *See id.* at 2161–62 (Thomas, J., dissenting). In other words, Plaintiffs have spoken out of both sides of their mouths. For their fabrication claim, they sought to borrow the accrual rule from malicious prosecution. *See* DE 55-1 at 22 ("[T]he closest common-law analogue to Plaintiffs' § 1983 fabrication claims is a claim of malicious prosecution."). Now, they reject the probable-cause and favorable-termination elements (which are part and parcel of malicious prosecution) and maintain that their fabrication claim exists independently. *See* DE 204 at 120–25.

LEXIS 29187, at *8. This is a correct statement of law, in the appropriate context.[35] Context, however, matters a lot. Whether independent probable cause forecloses an evidence-fabrication claim depends on the constitutional injury allegedly caused by the fabrication. *Cf. Soldal v. Cook Cty.*, 113 S. Ct. 538, 548 (1992) ("Certain wrongs affect more than a single right and, accordingly, can implicate more than one of the Constitution's commands."); *Gregory v. City of Louisville*, 444 F.3d 725, 750 (6th Cir. 2006) (noting that Fourth Amendment "malicious prosecution" and *Brady* claim can co-exist despite shared factual premise because "[t]he *situs* of the injury is distinct"). That is, whether a fabrication claim can stand on its own depends on its constitutional foundation (and that of any causes of action that the fabrication claim accompanies). The Court thus considers, on the full factual record, the basis of Plaintiffs' fabrication theory to determine whether it is meaningfully distinct from the evidence supporting Plaintiffs' malicious-prosecution claim.

---

[35] The *Stemler* court considered the constitutional tort of evidence fabrication *in violation of due-process rights. See Stemler*, 126 F.3d at 872. In state criminal proceedings, Stemler had twice stood trial—the first resulting in a hung jury, the second in an acquittal. *Id.* at 863–64. After acquittal, Stemler sued law-enforcement officers on various state-law theories. *Id.* at 864. At summary judgment, the state court concluded that the indisputable existence of probable cause precluded Stemler's state-law false-arrest and malicious-prosecution claims. *Id.* at 871. In the later § 1983 suit, the Sixth Circuit assessed the preclusive effect of this state-court ruling. *See id.* at 871–72. Naturally, Stemler could not bring federal constitutional claims—such as false arrest—that depended on a lack of probable cause. *Id.* But, probable cause aside, an evidence-fabrication claim based on Stemler's due-process rights might have been viable. *Id.* ("Wince would have violated Stemler's right to due process if he knowingly fabricated evidence against her, and if there is a reasonable likelihood that the false evidence could have affected the judgment of the jury."). The court did not explore the contours of such a claim because Stemler's amended complaint had not given adequate notice of the evidence-tampering theory. *Id.* at 872.

Plaintiffs appear to read *Stemler* to mean that probable cause is irrelevant whenever an injured party alleges evidence fabrication. *See* DE 204 at 123–24. ("[T]he standard in *Stemler* has been widely used in a litany of Sixth Circuit decisions—each confirming that probable cause is not an element of fabrication claims and that such a claim exists without trial or conviction."). As further explained below, Plaintiffs are mistaken for reasons that their own briefing concisely explains. *See id.* at 124 ("When police fabricate evidence, they are liable if that fabrication *causes any deprivation of liberty* . . . .") (emphasis added).

### a. Constitutional Basis for § 1983 Fabrication Claims

An essential inquiry for evaluation of any § 1983 claim is to identify the specific constitutional right at issue. *Manuel v. City of Joliet*, 137 S. Ct. 911, 920 (2017). Fabrication of evidence is not a constitutional violation "in and of itself." *See Zahrey v. Coffey*, 221 F.3d 342, 348 (2d Cir. 2000) ("The manufacture of false evidence, 'in and of itself,' in the District Court's phrase, does not impair anyone's liberty, and therefore does not impair anyone's constitutional right."); *Landrigan v. City of Warwick*, 628 F.2d 736, 744–45 (1st Cir. 1980) ("We do not see how the existence of a false police report, sitting in a drawer in a police station, by itself deprives a person of a right secured by the Constitution and laws."); *Madden v. Calvert*, No. 1:16-CV-P147-GNS, 2017 U.S. Dist. LEXIS 160830, at *6 (W.D. Ky. Sept. 29, 2017) (quoting *Zahrey*). Rather, the *use* of fabricated evidence *to some end* offends constitutional rights. The possible injuries flowing from the use of fabricated evidence include unlawful arrest or detention or an unfair trial resulting in wrongful conviction. *Manuel*, 137 S. Ct. at 919–20 (discussing wrongful arrest and detention); *Avery v. City of Milwaukee*, 847 F.3d 433, 441 & n.5 (7th Cir. 2017) (collecting cases that address due-process claims based on fabrication). In constitutional terms, the use of fabricated evidence may violate the Fourth Amendment or the due-process principles of the Fifth or Fourteenth Amendments. *See Manuel*, 137 S. Ct. at 918–19; *Miller v. Pate*, 87 S. Ct. 785, 788 (1967) ("[T]he Fourteenth Amendment cannot tolerate a state criminal conviction obtained by the knowing use of false evidence."); *Halsey v. Pfeiffer*, 750 F.3d 273, 292 & n.17 (3d Cir. 2014) ("[E]very court of appeals that has considered the question of whether a state actor has violated the defendant's right to due process of law by fabricating evidence to charge or convict the defendant has answered the question in the affirmative.") (collecting cases).

Because evidence fabrication is not itself a per se constitutional injury, an allegation of the same, on its own, does not give rise to a § 1983 suit. *Cf. Carey v. Piphus*, 98 S. Ct. 1042, 1049–50 (1978) ("In order to further the purpose of § 1983, the rules governing compensation for injuries caused by the deprivation of constitutional rights should be tailored to the interests protected by the *particular right* in question . . . .") (emphasis added). When the Fourth Amendment is the constitutional hook for § 1983 purposes, fabrication may be the means by which governmental authorities accomplish detention without probable cause. *See Morse v. Spitzer*, 07-CV-4793 (CBA) (RML), 2012 WL 3202963, at *6 (E.D.N.Y. Aug. 3, 2012) (observing that, when a plaintiff alleges that officers fabricated evidence to provide probable cause, "the question of whether the defendant fabricated evidence becomes synonymous with the question of whether genuine probable cause existed"). For example, a plaintiff may complain that the government continued detention without probable cause by fabricating inculpatory evidence, failing to disclose exculpatory evidence, or both. *See Gregory*, 444 F.3d at 750. Additionally, a plaintiff alleging wrongful conviction may assert that this same conduct—fabricating inculpatory evidence, failing to disclose exculpatory evidence, or both—deprived the plaintiff of a fair trial (in violation of the plaintiff's due-process rights). *See id.* These claims may proceed simultaneously when a plaintiff suffered, in sequence, each distinct injury (detention without probable cause and wrongful conviction) as a result of evidence fabrication. *See id*.; *see also Jackson v. City of Cleveland*, 925 F.3d 793, 815–17, 820–22 (6th Cir. 2019) (analyzing Fourth Amendment "malicious prosecution" separately from due-process claim, though both were based in part on evidence fabrication).

The Supreme Court has confirmed the viability of a Fourth Amendment claim involving pretrial confinement and probable-cause determinations based on fabricated evidence. *Manuel*, 137 S. Ct. at 914–16. During a traffic stop, officers searched Manuel and seized a vitamin bottle

containing pills, which the officers suspected to be illegal drugs. *Id.* at 915. Despite a negative field test, Manuel was arrested. *Id.* Both an evidence technician and one of the arresting officers later created reports that misrepresented the nature of the pills, claiming (respectively) that the pills tested "positive for the probable presence of ecstasy" or that the pills were known to be ecstasy. *Id.* A judge made a probable-cause determination, but that finding (and Manuel's resulting detention) was based solely on false statements. *Id.* A grand-jury indictment "based on similar false evidence" followed about two weeks later. *Id.* at 915 n.2. The laboratory eventually established that the pills contained no controlled substances, and Manuel was released. *Id.* at 915–16. In the § 1983 suit that followed, Manuel lodged two Fourth Amendment complaints: false arrest and detention "based entirely on made-up evidence." *Id.* at 916. Both the district court and the Seventh Circuit viewed the Fourth Amendment as inapplicable to the latter charge, but the Supreme Court disagreed. *Id.* at 916–17, 919. A Fourth Amendment violation can occur after "the start of legal process," when fabricated evidence taints that process; in such a case, though "[l]egal process has gone forward, . . . it has done nothing to satisfy the Fourth Amendment's probable-cause requirement." *Id.* at 918–19. "If the complaint is that a form of legal process resulted in pretrial detention unsupported by probable cause, then the right allegedly infringed lies in the Fourth Amendment." *Id.* at 919.

Such an injury occurs as follows. The Fourth Amendment prohibits unreasonable seizures. U.S. Const. amend. IV. Both arrest and pretrial detention are seizures. *See Manuel*, 137 S. Ct. at 917–18. A seizure without probable cause is unreasonable. *Bailey v. United States*, 133 S. Ct. 1031, 1037 (2013). Fabricated evidence cannot satisfy the probable-cause requirement. *See Manuel*, 137 S. Ct. at 918–19. When only fabricated evidence supports a seizure, probable cause is lacking, and the seizure is unreasonable. *See Spurlock v. Satterfield*, 167 F.3d 995, 1006–07 (6th

Cir. 1999) ("[F]abricating probable cause, *thereby effectuating a seizure* . . . violate[s] a suspect's clearly established Fourth Amendment right to be free from unreasonable seizures.") (emphasis added). Inversely, when demonstrably untainted proof adequately supports a seizure, the mere existence of fabricated evidence does not constitute a Fourth Amendment violation. *See Robertson v. Lucas*, 753 F.3d 606, 616 & n.5 (6th Cir. 2014) (noting that there is no wrongful Fourth Amendment seizure when probable cause exists). The distinction is primarily one of causation: in the first scenario, the fabricated evidence undeniably *causes* the seizure, but in the second, seizure follows as a lawful consequence of legitimate evidence, which can elicit no reasonableness-based objection.[36]

Any statement to the contrary—namely, the suggestion that a Fourth Amendment claim premised on fabrication may proceed even when probable cause exists—has an explanation that does not spell victory for Plaintiffs on this score. First, as discussed above, evidence fabrication can violate *due-process rights*. *See Halsey*, 750 F.3d at 292 & n.17 (citing cases from the First, Second, Fourth, Sixth, Seventh, Eighth, and Ninth Circuits). Probable cause is not a defense to a *due-process-based* fabrication claim. *See Spencer v. Peters*, 857 F.3d 789, 801–02 (9th Cir. 2017) (contrasting the role of probable cause in fabrication claims based on the Fourth Amendment and due process). That is of no consequence here because Plaintiffs expressly abandoned any due-process fabrication theory. *See* DE 204 at 120 n.3 ("As this Court has previously held, Plaintiffs have a viable fabrication of evidence claim under the Fourth Amendment *and not the Fourteenth*.") (emphasis added); *id.* at 137 ("In this litigation, Plaintiffs have not alleged substantive due process claims.").

---

[36] That is not to say there can be no other objection (legal or otherwise) to an officer's deliberate or reckless fabrication of evidence. But there can be no objection *grounded in the Fourth Amendment*, which (in this context) is satisfied by a reliable showing of untainted probable cause.

Second, some courts have been something less than clear about which constitutional right is violated when fabrication occurs.[37] This ambiguity runs counter to Supreme Court dictates. *See Graham v. Connor*, 109 S. Ct. 1865, 1870–71 (1989); *Gregory*, 444 F.3d at 750 ("A plaintiff must pursue relief under the appropriate constitutional guarantee, and the Court must apply the appropriate legal standard."). The resulting haze merits clarification but does not create loopholes, ripe for exploitation by misinformed—or maybe worse, clever—lawyers. To the extent Plaintiffs argue that *Webb v. United States*, 789 F.3d 647 (6th Cir. 2015), suggests that independent, untainted probable cause does not foreclose a Fourth Amendment claim based on fabrication, that is wrong, as a logical[38] and precedential[39] matter. Absent further guidance from the *en banc* Sixth Circuit or the Supreme Court, taintless *probable cause* necessarily defeats Fourth Amendment claims for detention *without probable cause*. An allegation of evidence fabrication, which the Court views as intertwined with the probable-cause question in this case, is no elemental kryptonite.

* * * * *

---

[37] Litigants are likewise responsible for the regrettable lack of lucidity. *See* DE 55-1 at 33 (referring to Defendants' effort to dismiss "Plaintiffs' Fourth Amendment due process fabrication claim"). Section 1983 does not enliven such 'Franken'-claims.

[38] In *Webb*, the plaintiff's fabrication claim rested in the Fourth Amendment. *See Price v. Lucas*, No.1:09CV118, 2013 WL 1303783, at *15 (N.D. Ohio Mar. 28, 2013), *aff'd in part, rev'd in part sub nom. Webb v. United States*, 789 F.3d 647 (6th Cir. 2015). In reversing the district court's conclusion that independent probable cause doomed the plaintiff's fabrication theory, the Sixth Circuit cited *Stemler* for the proposition that "even if independent evidence establishes probable cause against a suspect, it would still be *unlawful* for law-enforcement officers to fabricate evidence in order to strengthen the case against that suspect." *Webb*, 789 F.3d at 670 (emphasis added). Two observations: *Stemler* had articulated a potential *due-process* fabrication theory (inapplicable in *Webb* and here), and "unlawful" is not the same as "unconstitutional in violation of the Fourth Amendment." A precise definition of the constitutional injury reveals the incongruity.

[39] One panel of the Sixth Circuit cannot overrule another. *United States v. Burris*, 912 F.3d 386, 406 (6th Cir. 2019). *Webb* does not diminish the continuing force of *Robertson*.

Here, Plaintiffs' asserted constitutional injury is "unlawful post-legal-process pretrial detention." DE 119 at 30. No one disputes that the Fourth Amendment underlies Plaintiffs' fabrication theory. *Id.* at 11; DE 204 at 120 n.3; DE 205-1 at 14–15. The Fourth Amendment is similarly relevant to Plaintiff's malicious-prosecution count. *See Gregory*, 444 F.3d at 750 ("[T]he subset of malicious prosecution claims which allege continued detention without probable cause must be pursued and analyzed under the Fourth Amendment."). This shared constitutional basis alone does not render one claim subsumed by the other; for example, the Fourth Amendment applies to both false-arrest and excessive-force claims, but the two violations meaningfully differ from one another and require separate analysis. *See, e.g.*, *Cty. of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1547–48 (2017) (referring to false arrest and excessive force as distinct Fourth Amendment claims); *Freeman v. Gore*, 483 F.3d 404, 417 (5th Cir. 2007) ("[Plaintiff's] excessive force claim is separate and distinct from her unlawful arrest claim, and we must therefore analyze the excessive force claim without regard to whether the arrest itself was justified."). However, that principle does not hold true here. Plaintiffs' wide-ranging allegations[40] reduce to a single foundational inquiry: whether (in material part, by fabricating evidence) Defendants caused Plaintiffs to suffer a Fourth Amendment injury—that is, detention without probable cause. Count

---

[40] For example, Plaintiffs repeatedly and forcefully reprove the questioning techniques used throughout the investigation and the "unduly suggestive identification procedure" involving Taylor. Though both coercive questioning and show-ups may violate constitutional guarantees, Plaintiffs nowhere show that this allegedly unconstitutional conduct violated *Plaintiffs' Fourth Amendment rights*. Plaintiffs acknowledge that they cannot lodge due-process claims for the "interrogation practices used with third-party witnesses." DE 204 at 137–38. Additionally, an unnecessarily suggestive identification procedure, like a show-up, may violate *due-process rights* by creating the risk of an "irreparable mistaken identification." *See Stovall v. Denno*, 87 S. Ct. 1967, 1972 (1967). However, Plaintiffs do not develop—and, in fact, expressly abandon—any due-process-based theory of recovery. DE 204 at 137 ("Plaintiffs have not alleged substantive due process claims."). In any event, all agree that Crump, suggestiveness or no, made no positive identification in this case. DE 200-2 at 20–21; DE 200-20 at 9–10; DE 204 ¶ 190.

I (malicious prosecution) adequately covers this ground because it requires the Court to consider the determinative issue of probable cause. *See* DE 1 ¶¶ 139–40. Count II does not, in the concrete context of this case, present a separately cognizable Fourth Amendment violation under § 1983.

### 3. § 1983 Malicious Prosecution (Count I)

A word on how the Court approaches Count I, Plaintiffs' malicious-prosecution theory. The Sixth Circuit has cautioned against styling a claim "as an action for 'malicious prosecution' under § 1983." *Gregory*, 444 F.3d at 750. Indeed, "designating the constitutional claim as one for 'malicious prosecution' is both unfortunate and confusing." *Sykes v. Anderson*, 625 F.3d 294, 310 (6th Cir. 2010) (internal quotation omitted). The malicious-prosecution label may encourage courts to import inapplicable common-law elements (like malice) or inapt statements of law from the bygone era when courts viewed the entire "basket" of malicious-prosecution claims as due-process violations. *See Sykes*, 625 F.3d at 308–10; *Gregory*, 444 F.3d at 750. Instead, while acknowledging that the Court was "stuck with that label," *Sykes* favored the term "unreasonable prosecutorial seizure," whereas *Gregory* endorsed framing the claim as "the right under the Fourth Amendment to be free from continued detention without probable cause." *Sykes*, 625 F.3d at 310 (internal quotation omitted); *Gregory*, 444 F.3d at 750. At some point, these oft-repeated and well-founded concerns ought to effect changes in nomenclature, pleading, and briefing.[41] For now, the Court

---

[41] "Wrongful detention" is perhaps a more accurate label, as it focuses the inquiry on the Fourth Amendment and the issue of probable cause. The Court borrows this term from *Manuel*, which is the Supreme Court's latest word on the subject. *See Manuel*, 137 S. Ct. at 919; *cf. McDonough*, 139 S. Ct. at 2154–55 (determining statute of limitations for fabricated-evidence claim *assumed to have a due-process basis*). Plaintiffs' and Manuel's claimed constitutional injuries are similar in nature (though not degree, based on the length of Plaintiffs' detention pending trial and the number of alleged fabrications). *See Manuel*, 137 S. Ct. at 914–16 & n.2 (noting that Manuel spent forty-eight days in pretrial detention and that an evidence technician and arresting officer created false reports).

retains the malicious-prosecution label[42] but stresses again that Plaintiffs' § 1983 claims seek recovery under only the Fourth Amendment for Plaintiffs' sole[43] decried constitutional injury.

### 4. Summary

In all, here's what remains for review: § 1983 malicious prosecution (Count I) against York, Pickard, Broughton, and Mefford; § 1983 supervisory liability (Count III) against Joseph; § 1983 failure to intervene (Count IV) against York, Pickard, Broughton, and Mefford; § 1983 conspiracy (Count V) against York, Pickard, Broughton, and Mefford; § 1983 *Monell* claim (Count VI) against Knox County; state-law malicious prosecution (Count VIII) against York, Pickard, Broughton, and Mefford; and state-law negligent supervision (Count IX) against Joseph.

### B. Count I: § 1983 Malicious Prosecution

"The prototypical case of malicious prosecution involves an official who fabricates evidence that leads to the wrongful arrest or indictment of an innocent person." *Mills v. Barnard*, 869 F.3d 473, 480 (6th Cir. 2017).[44] Per *Mills*, this Fourth Amendment cause of action "can also support a claim for 'continued detention without probable cause.'" *Id.* (internal quotation

---

[42] The allegations of evidence fabrication, though insufficient in this case to establish an independent claim for relief under § 1983, survive regardless of verbiage. The Court views Plaintiffs' basic Fourth Amendment theory as follows: Plaintiffs were wrongfully detained. Their detention was wrongful because probable cause did not exist. Probable cause did not exist, in part, because Defendants fabricated evidence for the purpose of trying to demonstrate probable cause.

[43] All other § 1983 claims—supervisory liability, failure to intervene, conspiracy, and *Monell*—hinge on an underlying constitutional violation, and Plaintiffs have not supported a constitutional injury other than wrongful detention in violation of the Fourth Amendment.

[44] Though *Mills* characterized the claim as "malicious prosecution," its description of the "prototypical case" precisely mirrors what occurred in *Manuel*: Manuel was wrongfully arrested and indicted based on false statements indicating that the seized pills were ecstasy. *See Manuel*, 137 S. Ct. at 919 ("All that the judge had before him were police fabrications about the pills' content. The judge's order holding Manuel for trial therefore lacked any proper basis. And that means Manuel's ensuing pretrial detention, no less than his original arrest, violated his Fourth Amendment rights.").

omitted).[45] Under the traditional formulation[46] as adopted by the Sixth Circuit, the plaintiff must prove four elements: "(1) a criminal prosecution was initiated against the plaintiff, and the defendant made[,] influenced, or participated in the decision to prosecute; (2) there was a lack of probable cause for the criminal prosecution; (3) the plaintiff suffered a deprivation of liberty, as understood under Fourth Amendment jurisprudence, apart from the initial seizure; and (4) the criminal proceeding was resolved in the plaintiff's favor." *King v. Harwood*, 852 F.3d 568, 580 (6th Cir. 2017).

Here, no party disputes that Plaintiffs suffered a deprivation of liberty. *See* DE 201 at 33; DE 205 at 34; DE 206 at 25–28; DE 207 at 17–23; DE 204 at 184. As a result, the Court considers only whether a reasonable juror could conclude: that Defendants had sufficient involvement to subject them to § 1983 liability, that there was not untainted probable cause, and that the proceeding was resolved in Plaintiffs' favor.

### 1. Made, Influenced, or Participated in the Decision to Prosecute

"[Section] 1983 'should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions.'" *Malley v. Briggs*, 106 S. Ct. 1092, 1098 n.7 (1986) (internal quotation omitted); *see Martinez v. California*, 100 S. Ct. 553, 559 (1980) ("Although a § 1983 claim has been described as 'a species of tort liability,' it is perfectly clear that not every injury in which a state official has played some part is actionable under that statute.")

---

[45] This injury, too, transpired in *Manuel*, because the supposed probable-cause determination was based entirely on fabrications. *See Manuel*, 137 S. Ct. at 918–19.

[46] *Manuel*, despite being otherwise on-point, does not answer whether traditional malicious-prosecution claim elements are applicable to a Fourth Amendment injury like Manuel's. *See Manuel*, 137 S. Ct. at 921–22. These elements are perhaps as unhelpful as the malicious-prosecution label itself. However, the Court, noting the lack of guidance and observing that the parties adhere to the traditional framework, organizes the analysis according to these putative and shopworn elements.

(internal quotation omitted); *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010) ("Each defendant's liability must be assessed individually based on *his own actions*.") (emphasis added).

"Within the meaning of the first element, 'the term "participated" should be construed within the context of tort causation principles.'" *Webb*, 789 F.3d at 660. "The first element of the malicious-prosecution claim is met when an officer 'could reasonably foresee that his misconduct would contribute to an independent decision that results in a deprivation of liberty' and the misconduct actually does so."[47] *Jackson*, 925 F.3d at 820–21. "[A] defendant's participation must be marked by some kind of blameworthiness, something beyond mere negligence or innocent mistake." *Johnson v. Moseley*, 790 F.3d 649, 655 (6th Cir. 2015).

### a. York

York does not claim no hand in Plaintiffs' prosecution; rather, his argument about this element centers on absolute immunity. *See* DE 205-1 at 43–47. Plaintiffs respond that York is not absolutely immune for his actions "prior to, and independent of, his grand-jury testimony." *See* DE 204 at 162 (internal quotation omitted). Per Plaintiffs, York's non-immune actions include fabricating statements, making material omissions in warrants, manipulating physical evidence, ignoring viable suspects, and concealing pertinent actions from the prosecutor.[48] *See id.* at 163. Plaintiffs further observe that York signed the criminal complaints against Plaintiffs and that

---

[47] The Court, for the reasons already stated, has doubts about the "traditional" formulation of this constitutional tort. But, the "made, influenced, or participated" verbiage does no harm as long as it does not obscure the fact that tort causation principles underlie this (and every) § 1983 claim.

[48] Plaintiffs also include in their allegations that York testified falsely at the preliminary hearing and grand jury and withheld exculpatory information from the grand jury. *See* DE 204 at 163. However, York is without question absolutely immune from suit for his testimony at these proceedings. *See King*, 852 F.3d at 590 ("Thus, evidence of an officer's actions prior to and independent of his grand-jury testimony may call into question the presumption of probable cause created by an indictment *even if a malicious-prosecution plaintiff may not bring in evidence of the grand-jury testimony itself to do so*.") (emphasis added).

prosecutor Steele had no role in the initiation of charges and relied on York's investigation. *See id.* at 164.

Because York sought arrest warrants and led the investigation, a reasonable juror could conclude that York's role in Plaintiffs' arrest and prosecution was active enough (and causally connected to their identified constitutional injuries) such that York could be liable.

### i. Absolute Immunity

The Supreme Court has "upheld absolute immunity from § 1983 suits for a police officer's testimony, even acknowledging that this could result in defendants being falsely convicted by knowing false testimony given by police officers." *See Miller v. Maddox*, 866 F.3d 386, 394 (6th Cir. 2017) (discussing *Briscoe v. Lahue*, 103 S. Ct. 1108 (1983)). Absolute immunity protects officers who testify at preliminary hearings and before the grand jury. *See Rehberg v. Paulk*, 132 S. Ct. 1497, 1506 (2012) ("[A] grand jury witness has absolute immunity from any §1983 claim based on the witness' testimony."); *Spurlock*, 167 F.3d at 1001 ("It is well-settled that witnesses are granted absolute immunity from suit for all testimony provided in judicial proceedings."). *But see Parnell v. City of Detroit*, 786 F. App'x 43, 47 n.3 (6th Cir. 2019) (suggesting that the Supreme Court's indication in *Rehberg* that absolute immunity "applies to preliminary hearing testimony" is merely dictum). Absolute immunity is broad enough to cover both testimony and "preparatory activity" such as discussions about the substance of intended testimony. *Rehberg*, 132 S. Ct. at 1506–07. However, such immunity does not protect non-testimonial acts, even if the acts ultimately lead to witness testimony. *See King*, 852 F.3d at 590 ("[A]n officer's actions of wrongly setting a prosecution in motion or falsifying or fabricating evidence may be material to the grand-jury indictment even though they do not constitute 'testimony' or related preparation for testimony, and nothing in the caselaw indicates that such actions somehow *mutate into* grand-jury testimony

simply because they are material to the return of an indictment.") (emphasis in original); *Spurlock*, 167 F.3d at 1004 (concluding that defendant was "not entitled to absolute testimonial immunity for the alleged non-testimonial acts that occurred outside of the judicial proceeding").

Here, absolute immunity does not bar York's liability for his alleged non-testimonial acts that materially contributed to Plaintiffs' arrest and detention. A reasonable juror could conclude that York's non-testimonial (and therefore non-immune) acts included fabricating witness statements and omitting material information from his investigate reports, upon which Steele relied to prosecute Plaintiffs. Accordingly, Plaintiffs' showing on this element, as to York, passes muster.

The Court has already recounted the allegations and chronology. Plucking a few of the central contentions: Plaintiffs directly allege whole fabrication of inculpatory evidence including critical statements from Amber and from Helton. Further, York swore out but then pocketed (and perhaps hid) a murder complaint against Kayla Mills. He used that pending official document, one that directed her arrest, in securing a statement. The prosecutor did not know of this methodology or the complaint's existence. He included false identification information in foundational phone warrants. He represented time discrepancies, as to Hoskins's alibi, that appear unsupported in the investigative record. He failed to record accurately Helton's recantation and his willingness to appear in May of 2015. York's active hand creates a jury question on this element. The truth, whatever it is, will out, and the record requires fact-finding.

### b. Pickard

Pickard argues that he did not make the decision to prosecute or otherwise participate in a way that aided the decision. *See* DE 206-1 at 26–28. Plaintiffs respond by highlighting Pickard's involvement in Helton's March 8, 2012, statement, which included offering consideration and

failing to stop York's misconduct.[49] *See* DE 204 at 165. Plaintiffs also reference Pickard's participation in Taylor's interview, when Pickard questioned Taylor and later observed Broughton photograph Taylor. *Id.* at 166. Finally, Plaintiffs focus on Pickard's interactions with Kayla, whom Pickard approached multiple times and threatened. *Id.* at 166–67. Pickard did not document his conversations with Kayla or notify Steele about the circumstances of Helton's and Kayla's statements. *Id.* at 168.

In contrast to York, there is not enough record evidence from which a reasonable juror could conclude that Pickard caused Plaintiffs' Fourth Amendment injury. First, Pickard's passive acquiescence in the supposed misconduct of others (like York, in the Helton interview, or Broughton, in the Taylor session) did not, as a rational conclusion, actually and foreseeably cause Plaintiffs' wrongful detention. *See Jackson*, 925 F.3d at 820–21.

To the extent Plaintiffs argue that Pickard himself acted culpably, the isolated acts of offering arguable consideration in exchange for a statement, asking questions of a suspect, or badgering someone thought to have information about a crime are not sufficiently connected to Plaintiffs' detention without probable cause. *See id.* To find otherwise, a reasonable juror would have to be able to conclude—for example—first, that it was reasonably foreseeable to Pickard that offering to help Helton would cause him to falsely implicate Plaintiffs; second, that Pickard's offer actually caused Helton to make a false statement; and third, that Helton's false statement actually and foreseeably caused Plaintiffs to be detained without probable cause. An untenable sequence, this. Moreover, it is worth noting that Helton admitted to initiating the discussion about getting help with his charges. *See* DE 200-17 at 60. Helton did not accuse Pickard of impropriety, and

---

[49] Plaintiffs misconstrue Helton's testimony. As discussed above in footnotes 17 and 20, and focusing on the proof itself, Pickard did not comment on Helton's wet coat, and Pickard did not tell Helton what to say.

Steele did not view Pickard's role as improper. *See* DE 200-17 at 41–42; DE 200-8 at 57–58. Additionally, Helton claimed that he created his statement based on rumors that he had heard, not from fed or seeded information. *See* DE 200-17 at 41–42.

Finally, there is insufficient evidence of Pickard's blameworthiness. *See Johnson*, 790 F.3d at 655. The closest that Plaintiffs come to putting Pickard, at the time of his conduct, on notice of Plaintiffs' supposed innocence (and the resulting *wrongful* detention) rests with Helton's and Kayla's denial of knowledge and York's priming Helton with details. *See* DE 204 at 165–67. The suggestions are inadequate to meet the element.

### c. Broughton

Broughton argues that his involvement in the investigation and prosecution was limited to minimal participation on two dates: January 4, 2011, and February 15, 2011. *See* DE 207-1 at 4–13. Plaintiffs respond by pointing out that Broughton questioned both Hoskins and Taylor. DE 204 at 172. Plaintiffs also fault Broughton for failing to stop the objectionable conduct of others,[50] document the parts of the investigation in which he participated, and notify the prosecution of the circumstances of the Helton, Hoskins, and Taylor interviews and the Taylor photographs. *Id.* at 172–75. Moreover, Plaintiffs focus on the fact that Broughton was present during Helton's interrogation when York fed Helton details of the murder that would later comprise Helton's supposedly false statement. *Id.* at 130–37.

As with Pickard, Broughton's passive participation or failure to correct the conduct of others cannot expose Broughton to liability on the malicious-prosecution claim. *See Jackson*, 925

---

[50] The Court notes that Plaintiffs in this section cite Broughton's failure to intervene when York supposedly threatened to frame Hoskins for murder. *See* DE 204 at 172–73. The Court views this contention as directly relevant to the § 1983 failure-to-intervene claim analyzed below. The Court, for the reasons discussed in the context of that claim, declines to decide whether this supposed failure to intervene could equate to making, influencing, or participating in a decision to prosecute.

F.3d at 820–21; *Johnson*, 790 F.3d at 655. Even if a reprimand to York or disclosure to Steele would have changed the course of events, the constitutional violation alleged to have occurred was not reasonably foreseeable to Broughton given his limited role in the investigation. *See Jackson*, 925 F.3d at 820–21. Broughton's affirmative investigative steps were minimal: he told Helton to tell the truth; he warned York of something "fishy" in the Hoskins interview; he repeated or followed up on some of York's questions to Hoskins; he attempted (and evidently failed) to elicit a statement from Taylor; and he pressed the shutter-release button on the camera that captured Taylor's photographs (which ultimately produced no eyewitness identification). This conduct is not blameworthy or causally connected to Plaintiffs' wrongful detention such that a reasonable juror, under the correct measure, could conclude that Broughton made, influenced, or participated in the decision to prosecute. Broughton, as an early bit player, simply did not have a role that produced the result at issue.

### d. Mefford

Mefford maintains that his limited involvement in the investigation does not satisfy this element. *See* DE 201-1 at 16–19, 34–36. Plaintiffs argue that Mefford attended two interviews (Helton and Wilson) that produced statements used to initiate and continue charges against Plaintiffs. *See* DE 204 at 168–69. Plaintiffs highlight that Mefford was present when York fed Helton details in the January 4, 2011, interview, failed to document York's wrongdoing, and never told Steele that Helton's statement was false. *Id.* at 169–70. Furthermore, Plaintiffs fault Mefford for attending Wilson's interview knowing the goal was to obtain Wilson's statement to be used in the investigation. *Id.* at 170. In his Wilson report, Mefford did not document any promises of consideration or fabrication and never notified Steele about either. *Id.* at 170–71.

Almost all of Plaintiffs' allegations regarding Mefford deal with the misconduct of others or omissions by Mefford. *See Jackson*, 925 F.3d at 820–21. Putting aside the question whether omissions are actionable at all in this context, there is no doubt that the individual officer's conduct (or perhaps lack thereof) must be blameworthy. *See Johnson*, 790 F.3d at 655. As with Pickard, Mefford was not on notice about Plaintiffs' eventual wrongful detention merely because Helton supposedly denied knowledge and because the goal of the Wilson interview was (unsurprisingly) to obtain a statement. In terms of *active* involvement potentially rising to the level of tort causation, Mefford's sole contribution was during Helton's interview, more than a year before Plaintiffs' arrests, when Mefford questioned Helton. *See id.* Helton testified that he could not remember anything Mefford said to him. *See* DE 200-17 at 45. A reasonable juror could not conclude, in context, that an unknown number of unspecified questions posed during one interview within the first year of a six-year-long murder investigation constitutes making, influencing, or participating in the decision to prosecute Plaintiffs, resulting in their wrongful detention.

### 2. Probable Cause

Defendants argue that there was probable cause, in light of Branson's and Crump's statements, the fact that Hoskins admitted to knowing about Katherine's money and having heard Lester's plan to rob Katherine, the appearance of the crime scene (which revealed missing money and no forced entry), Hoskins's motive to rob Katherine and alleged history of theft from Katherine's family, and Hoskins and Taylor's opportunity to commit the robbery and murder. *See* DE 201-1 at 40–47; DE 205-1 at 39–46. York further contends that there is a presumption of probable cause based on the preliminary-hearing finding and grand-jury indictment. *See* DE 205-1 at 39–40. Plaintiffs argue that "*all* evidence implicating Plaintiffs in the Mills' homicide was fabricated." *See* DE 204 at 182 (emphasis in original). Plaintiffs maintain that a reasonable juror

could infer that Branson's statement was fabricated (based on her lack of recollection) and highlight that Crump never identified Taylor as the person he saw at Katherine's. *See id.* at 182–83.

"Probable cause exists where the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Skousen v. Brighton High Sch.*, 305 F.3d 520, 528 (6th Cir. 2002) (quoting *Brinegar v. United States*, 69 S. Ct. 1302, 1310–11 (1949)). "Probable cause is defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *See Sykes*, 625 F.3d at 306. The standard "is an objective inquiry; it matters not whether the officer subjectively believed that he had probable cause for an arrest [or prosecution]." *See Scheffler v. Lee*, 752 F. App'x 239, 244 (6th Cir. 2018) "When no material dispute of fact exists, probable cause determinations are legal determinations that should be made by a court." *Hale v. Kart*, 396 F.3d 721, 728 (6th Cir. 2005) But, "a jury trial is appropriate where reasonable disputes of material fact exist on facts underlying a probable cause determination." *Id.*

"[T]he finding of an indictment, fair upon its face, by a properly constituted grand jury, conclusively determines the existence of probable cause for the purpose of holding the accused to answer." *Higgason v. Stephens*, 288 F.3d 868, 876–77 (6th Cir. 2002). There is an exception to this conclusive presumption of probable cause when a defendant-officer wrongfully obtains an indictment by knowingly or recklessly presenting false testimony to the grand jury. *See Robertson*, 753 F.3d at 616.

> [W]here (1) a law-enforcement officer, in the course of setting a prosecution in motion, either knowingly or recklessly makes false statements (such as in affidavits or investigative reports) or falsifies or fabricates evidence; (2) the false statements and evidence, together with any concomitant misleading omissions, are material to

the ultimate prosecution of the plaintiff; and (3) the false statements, evidence, and omissions do not consist solely of grand-jury testimony or preparation for that testimony (where preparation has a meaning broad enough to encompass conspiring to commit perjury before the grand jury), the presumption that the grand-jury indictment is evidence of probable cause is rebuttable and not conclusive.

*King*, 852 F.3d at 587–588.

Here, viewing the record in Plaintiffs' favor, Plaintiffs argue and adequately support the claim that York knowingly or recklessly made false statements in investigative reports and falsified or fabricated evidence. Further, the false statements or evidence, along with misleading omissions, were material to Plaintiffs' prosecution. For example, York drafted a report summarizing King's unrecorded statement, but the report does not document King's denials of knowledge or York's supposed "putting words in [King's] mouth." *See* DE 204 ¶¶ 92–94; DE 200-48. King wholly denies the content. Also, York's reports on Helton's and Amber's recorded statements do not disclose that York promised consideration in exchange for their statements, that Helton denied knowledge, that York threatened to charge Amber with "withholding evidence," or that he, as alleged, provided details about the investigation before or during their statements. *See* DE 200-41; DE 200-50. Amber and Helton dispute all incriminating content. As a result, under these circumstances, the probable-cause presumption is rebuttable. The Court next considers whether any reasonable juror would conclude that (untainted) probable cause existed.

As far as undisputed evidence inculpating Hoskins and Taylor, viewed from the standpoint of an objectively reasonable officer at the time of the relevant decisions, the record reveals the following: Crump saw a blue car, a white man with tattoos wearing a hooded coat, and a blonde woman in the blue car at Katherine's house on the morning of December 20. Crump's description fit Plaintiffs insofar as Taylor had tattoos and Hoskins had blonde hair. The orphanage where Hoskins's mother worked had a blue Cavalier. Kayla likewise had a blue Pontiac. Lester had a

black Camaro. Hoskins had a drug habit but no job or steady income. Lester fed Hoskins's habit and sold items (like his own washing machine) in order to buy her pills. Lester knew about Katherine's timber money and had talked about the money in front of Hoskins. Hoskins had heard Lester talk about robbing Katherine on more than one occasion shortly before her death. Part of Lester's admitted plan involved catching Katherine in the outhouse, as Lester knew that Katherine did not have an indoor bathroom. Money was missing from Katherine's house at the time of her death. Katherine's purse was on the floor with its contents spilled, including five $100 bills. Nothing else in Katherine's home was disturbed. Katherine's time of death could not be established, but the state of the kitchen suggested that Katherine had died in the morning. Aside from statements by co-defendants in the criminal case or by family members, the only corroboration of Hoskins's whereabouts during the morning of December 20 was a medical record showing her arrival to Dr. Warren's office at 11:54 a.m. No independent evidence corroborated where Taylor was on the morning of December 20.

The Court also views Branson's statement as proper inculpatory evidence and rejects Plaintiffs' contention that a reasonable juror could infer York fabricated Branson's statement. "[S]ummary judgment 'does not allow, much less require that we draw strained and unreasonable inferences in favor of the nonmovant.'" *Fox v. Amazon.com, Inc.*, 930 F.3d 415, 425 (6th Cir. 2019). It is uncontested that Branson gave a statement and that she now claims an inability to recall anything from the relevant time period (including the substance of her statement, indeed talking to York at all). Plaintiffs attempt to explain away the existence of Branson's statement by suggesting that York accomplished the recording by telling Branson what to say. However, this theory is not internally consistent. Branson was the only witness to identify King as Katherine's killer—a fact that, per Plaintiffs, renders her statement unreliable. What Plaintiffs do not confront is how this

unhelpful admission logically could have come from York, who Plaintiffs claim orchestrated the rest of Branson's statement. That York, via Branson, would sabotage his own case by inserting a detail fundamentally inconsistent with his other evidence is an unreasonable inference.

On the other hand, the Court recognizes that many of Plaintiffs' other arguments regarding York's fabrication of witness statements involve questions of credibility; York maintains that he accurately memorialized witness statements, whereas witnesses in their depositions testified that York either fully coached or created their statements (King, Helton, Amber) or falsely claimed that they gave a statement when they gave none (Wilson). Such determinations are inappropriate at the summary-judgment stage, where the taint or lack of taint depends on the truthfulness of the teller.

Viewing the above-described evidence, including Branson's statement, the Court cannot conclude that any reasonable juror would find that probable cause existed. Because reasonable minds could differ on this score, a triable issue exists on the probable-cause element.

### 3. Resolved in Plaintiffs' Favor[51]

Defendants claim there was no favorable termination because there was no adjudication of guilt or innocence and because there is no bar to subsequent prosecution. *See* DE 201-1 at 36–40; DE 205-1 at 35–39; DE 206-1 at 28; DE 207 at 22–23. Moreover, Defendants point out that the Commonwealth's dismissal motion cited the unavailability of witnesses as well as changes in testimony and that the state court, in dismissing without prejudice, made no mention of Plaintiffs'

---

[51] In keeping with the Court's reliance on *Manuel* for guidance, the Court observes (as did the two *Manuel* dissenters) that the favorable-termination element does not fit comfortably with the Fourth Amendment basis of Plaintiffs' claim. *See Manuel*, 137 S. Ct. at 925–26 (Alito, J., dissenting) ("[M]alicious prosecution's favorable-termination element makes no sense when the claim is that a seizure violated the Fourth Amendment. The Fourth Amendment, after all, prohibits all unreasonable seizures—regardless of whether a prosecution is ever brought or how a prosecution ends."). The Court nonetheless analyzes this element, as no authority has yet severed it from the type of claim Plaintiffs pursue.

innocence. *See* DE 201-1 at 39; DE 2045-1 at 39. Plaintiffs argue that the dismissal was indicative of their innocence because Steele had opined in the motion that probable cause was not present and because the dismissal was unilateral, unconditional, and not the result of a technicality. *See* DE 204 at 185–91. Plaintiffs further rely on this Court's order denying Defendants' motion to dismiss (DE 39) and distinguish a recent case where this Court questioned whether dismissal without prejudice qualifies as favorable termination. *See id.* at 186–87 (discussing *Jones v. Clark Co.*, 5:15-CV-337, 2019 WL 637769 (E.D. Ky. Feb. 14, 2019)).

"There is no binding precedent in this circuit as to whether a dismissal without prejudice can constitute a favorable termination for § 1983 purposes." *Parnell*, 786 F. App'x at 51. In *Parnell*, the Sixth Circuit rejected the defendant-officers' argument "that a dismissal without prejudice can never constitute a favorable termination." *Id. Parnell* first observed that "the formal abandonment of the proceedings by the public prosecutor" is a favorable termination "so long as 'the final decision indicates that the accused is innocent.'" *Id.* (discussing Restatement (Second) of Torts § 659 (1977)). The court then reviewed the facts: the prosecutor had dismissed the charges upon learning about an undisclosed evidentiary report, "informed defense counsel that she would seek dismissal because of the contradictory evidence, and . . . later testified that she would never go to trial on the charges against Parnell, nor would she ever bring other charges arising out of the incident in question." *Id.* Viewed in the light most favorable to Parnell, these facts suggested that termination was favorable. *Id.*

The Restatement commentary provides that "a motion to dismiss the complaint" is one such means of formal abandonment. Restatement (Second) of Torts § 659 comment (e). There are exceptions, however to the general rule that formal abandonment by the prosecutor indicates innocence (and therefore favorable termination). The termination is not favorable when

"misconduct on the part of the accused or in his behalf . . . prevent[s] a proper trial" or when "the abandonment is due to the impossibility or impracticability of bringing the accused to trial." *Id.* §§ 660 comment (d), 661 comment (a). Misconduct includes "suppression of evidence, flight of the accused from the jurisdiction or the removal of witnesses, bribery of officials, tampering with a grand jury and all other similar conduct that prevents a fair hearing of the cause." *Id.* § 660 comment (d). Impossible or impracticable situations arise, for example, when the accused is absent from the jurisdiction or when the offense is not extraditable. *Id.* § 661 comment (a). The exceptions do not appear to contemplate recantations involving past or present untruthfulness or evidence fabrication. In light of this open question, another Restatement provision is instructive. Section 673 defines the functions of the court and the jury and provides that the favorable-termination question is for the court. *Id.* § 673(1)(b). But, the jury may consider "the circumstances under which the proceedings were terminated." *Id.* § 673(2)(c). "If there is no conflict in the testimony as to what the circumstances were, the court has no need for a finding of the jury." *Id.* § 673 comment (e).

Here, the determinative question is whether the dismissal without prejudice reflects upon Plaintiffs' innocence. *See Parnell*, 786 F. App'x at 51. It is beyond dispute that the Commonwealth unilaterally moved to dismiss—a means of formal abandonment—and that the dismissal was without prejudice, but the reasons underlying those decisions are less clear. It seems fair to say that the dismissal was less favorable than that at issue in *Parnell*. *See id.* In the motions, Steele declined to comment on Plaintiffs' guilt or innocence, and he did not promise that he would never pursue future charges. *See id.*; DE 200-6; DE 200-7; *see also* DE 200-8 at 43 ("[T]his is a case that was dismissed without prejudice, which means that it could be brought back up at a—at another point in time."). But, *Parnell* did not necessarily set a floor; it merely explained a set of

circumstances, without comment on which factor, if any, was decisive. *See Parnell*, 786 F. App'x at 51. Plaintiffs' claim of innocence hinges, at least in part, on the truth or falsity of several witness statements, including King, Wilson, and Beach. The Commonwealth's motion and the state court's resulting order do not resolve when, if ever, these witnesses were telling the truth. *See* DE 200-6; DE 200-7; DE 200-116; DE 200-117. This issue is inextricably bound up with Plaintiffs' fabrication argument. Viewing the facts in the light most favorable to Plaintiffs, a reasonable juror could believe that the state's witnesses were lying when they inculpated Plaintiffs and telling the truth when they recanted to Steele or testified in their depositions. Certainly, at the point of dismissal, the prosecutor viewed the proof as not even rising to the level of probable cause, much less to the level supporting a prima facie case or a conviction. The status may have changed over the course of the case, but the point of dismissal is where the evaluation of termination favorability pertains. By that juncture, the responsible prosecutor viewed the criminal targets as not even still chargeable with the crime. That reasonable minds could differ about the circumstances of the dismissal here means that the Court cannot resolve this issue on summary judgment. The course of trial testimony will guide the Court on the legal and factual nuances in the question.

## C. Count III: § 1983 Supervisory Liability

Joseph argues that there is no evidence she "was present during the alleged events, knew of the events beforehand, approved of them, participated in the investigation, or in the arrests or prosecution of the Plaintiffs." DE 201-1 at 28. Joseph maintains that nothing in her routine case review "would have alerted [her] to any of the actions alleged in the Complaint." *Id.* As far as Joseph's role regarding policymaking and training, Joseph maintains that she "did not have the authority to issue, adopt, or approve policies, and by law her job duties did not include training." *Id.* at 28–29. In response, Plaintiffs contend that Joseph knowingly acquiesced in York's and

Mefford's misconduct because she was on notice of York's interview techniques from her involvement in the *Anderson*[52] case (in which she also supervised York). *See* DE 204 at 205–06. Per Plaintiffs, Joseph's shortcomings include her failures to discipline York for his interviewing techniques, require him to complete quality control checklists, talk with him about this investigation, review his investigative reports, keep apprised of witness interviews, ensure that York documented exculpatory evidence, or follow through about a supplemental report based on Crump's eyewitness testimony. *See id.* at 207–09.

"Supervisory liability under § 1983 cannot attach where the allegation of liability is based upon a mere failure to act." *Gregory*, 444 F.3d at 751 (internal quotation omitted). "To hold a supervisory official liable under § 1983, a plaintiff must demonstrate that the actor engaged in some active unconstitutional behavior." *Stillwagon v. City of Delaware*, 747 F. App'x 361, 374 (6th Cir. 2018). "At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). For example, supervisory personnel do not face § 1983 liability for failing to take appropriate action after being made aware of instances of sexual harassment. *See id.* (discussing *Poe v. Haydon*, 853 F.2d 418, 429 (6th Cir. 1988)).

Here, the record does not support Plaintiffs' contention that Joseph had "personal participation in" the supposed violations of Plaintiffs' constitutional rights. *See* DE 204 at 202. In fact, it does not even support that Joseph was actually aware of York's alleged misconduct throughout *this* investigation. It is undisputed that, throughout the investigation into Katherine's death, Joseph attended no interviews, received no complaints about York, and discerned no witness coercion or fabrication from her review of the case file. *See* DE 200-18 at 22–24 (Joseph

---

[52] *Anderson v. Knox Cty. et al.*, 6:17-cv-00133-KKC-HAI (E.D. Ky.) (filed May 22, 2017).

Deposition). The record actually reflects that many case reports do not indicate whether Joseph reviewed them at all. *See id.* at 44. Plaintiffs may fault Joseph for not being more thorough and for not auditing her own detectives, but this goes to the heart of one of Plaintiffs' other grievances: York's practice of failing to report his supposed wrongdoing. If York did not document his allegedly unconstitutional behavior, as Plaintiffs contend, then Joseph had no reasonable means, by carrying out her prescribed supervisory functions, of discovering and remedying Plaintiffs' harm.[53]

Though Plaintiffs profess that they do not seek to hold Joseph liable merely because of her status as a supervisor or simply because she knew or should have known about York's misconduct, the record supports no other theory. *See* DE 204 at 203. Perhaps most telling is Plaintiffs' reference in their statement of facts regarding Joseph, which focuses on her (deficient) training, her (limited) capacity to actively supervise homicide detectives, and her (inadequate) efforts to supervise and discipline York or to ensure that he was conducting his investigations in an appropriate manner. *See* DE 204 at 204 (citing PSOF ¶¶ 259–88).[54] Regardless of Plaintiffs' conclusory statements to the contrary, each of these criticisms amounts to nothing other than a comment on Joseph's omissions or failures to act. Even assuming that Plaintiffs' allegations are true and that Joseph

---

[53] The Court notes that sovereign immunity would bar policy-based objections in that vein. *See Will v. Mich. Dep't of State Police*, 109 S. Ct. 2304, 2312 (holding that neither states nor state officials acting in their official capacities are "persons" for purposes of § 1983).

[54] Plaintiffs highlight that Joseph participated during the questioning of a witness in the *Anderson* investigation and that she failed to correct York's techniques in that case, which supposedly empowered York to use similar tactics with Plaintiffs. *See* DE 204 at 205–06. This, according to Plaintiffs, supplies the necessary causal connection. *See id.* at 207–09. The Court observes that the *Anderson* allegations relate to pending litigation. Even assuming that Joseph observed a constitutional violation in *Anderson*—an issue yet to be determined—Joseph did not "encourage[] the *specific incident of misconduct* or in some other way directly participate[] in" any misconduct causally connected to Plaintiffs' supposed wrongful detention. *See Shehee*, 199 F.3d at 300. Joseph's conduct *in this case* indisputably amounts only to omissions or failures to act, which is not a viable hook for § 1983 supervisory liability. *See id.*

knew about the relevant misconduct, Plaintiffs nowhere suggest a triable issue, as the cases demand, on *Joseph's active unconstitutional behavior* relating to Plaintiffs' wrongful detention.

### D. Count IV: § 1983 Failure to Intervene

Though failure-to-intervene claims often arise in the context of excessive force, "a police officer can be liable under § 1983 when he or she fails to intervene and prevent [other] constitutional violations." *Virgil v. City of Newport*, No. 16-224-DLB-CJS, 2018 WL 344986, at *12 (E.D. Ky. Jan. 9, 2018). To establish a claim for § 1983 failure to intervene, a plaintiff must show that the defendant "observed or had reason to know that [constitutional harm] would be or was [taking place], and (2) . . . had both the opportunity and the means to prevent the harm from occurring." *Sheffey v. City of Covington*, 564 F. App'x 783, 793 (6th Cir. 2014) (internal quotation omitted).

#### 1. York

York makes a two-pronged argument challenging the failure-to-intervene claim: first, that there are no underlying constitutional violations, and second, to the extent Plaintiffs allege that York was the bad actor, he cannot have "failed to intervene against himself." *See* DE 205-1 at 48 (internal quotation omitted). Plaintiffs (in a footnote) aver that York failed to intervene in Pickard's promises of consideration to Helton and in any fabrication or withholding of evidence that York attributes to any other Defendant. *See* DE 204 at 197 n.20.

A promise of consideration in exchange for a statement is not, standing on its own, a constitutional violation. *Cf. United States v. Bagley*, 105 S. Ct. 3375, 3379–80, 3384–85 (implicitly recognizing that evidence bearing on "bias or interest arising from inducements offered by the Government" must be *disclosed*); *Giglio v. United States*, 92 S. Ct. 763, 766 (1972) (explaining prosecution's obligation to *disclose* impeachment material). The government regularly offers

consideration to witnesses and defendants in exchange for their cooperation or guilty pleas. *See United States v. Ligon*, 937 F.3d 714, 718 (6th Cir. 2019) (explaining prosecution's obligation to honor plea agreements); *Thomas v. Westbrooks*, 849 F.3d 659, 663–66 (6th Cir. 2017) (describing defendant's due process right to impeach paid government witnesses); *Bell v. Bell*, 512 F.3d 223, 234 (6th Cir. 2008) ("The government is free to reward witnesses for their cooperation with favorable treatment in pending criminal cases without disclosing to the defendant its intention to do so, *provided* that it does not promise anything to the witnesses prior to their testimony."). The potential for constitutional violations arises from the lack or timeliness of disclosure, not from the promise or reward itself. *See United States v. Presser*, 844 F.2d 1275, 1283–84 (6th Cir. 1988) (holding that no constitutional violation occurs "so long as the defendant is given impeachment material, even exculpatory impeachment material, in time for use at trial"). Taking Plaintiffs at their word, York observed Pickard promise consideration to Helton, and York failed to document or report it. Had this case proceeded to trial, a potential constitutional violation lurked. *See Brady v. Maryland*, 83 S. Ct. 1194, 1196–97 (1963). But, a trial never came. Therefore, Pickard's conduct in the Helton interview at most sowed the seeds for future (and unrealized) constitutional harm. Accordingly, a reasonable juror could not conclude that York failed to intervene.

### 2. Pickard

Pickard argues that he was unaware of and had no reason to know that there was a plan to frame Plaintiffs, that evidence was manipulated, withheld, or destroyed, or that witnesses were coerced and made to give false statements. *See* DE 206-1 at 33–35. Plaintiffs identify three examples of Pickard's opportunities to intervene: "(1) the coercion and fabrication of Allen Helton's false and fabricated statement; (2) the coercion and fabrication of Kayla Mills' false and

fabricated statement; and (3) the unduly suggestive identification procedure with Mr. Taylor." *See* DE 204 at 197.

None of the examples identified by Plaintiffs—and indeed, nothing in the record—would allow a reasonable juror to conclude that Pickard observed a constitutional violation and had an opportunity to prevent constitutional harm *to Plaintiffs*. The constitutional harm to be prevented was Plaintiffs' wrongful detention, not any violation of Helton's or Kayla's rights. With respect to Taylor's photographs, there was, at most, unripe constitutional harm. And, as already discussed, a promise of consideration is not a per se constitutional violation. In order for Pickard to have reasonably foreseen (and therefore have been a position to prevent) Plaintiffs' *wrongful* detention, he would have had to know that Helton's and Kayla's statements actually were false. There is no indication that he knew or should have known Plaintiffs were innocent. As in the context of malicious prosecution, Helton's and Kayla's professed ignorance and York's supposed threats were inadequate to alert Pickard to the possibility of wrongful detention.

### 3. Broughton

Broughton contends that he observed no constitutional violations, so there was nothing in which to intervene to prevent constitutional harm. *See* DE 207-1 at 25. Plaintiffs maintain that Broughton's liability on this count stems from his presence at Helton's interview, where York allegedly provided Helton details of the crime; his participation during Hoskins's interview; his involvement in photographing Taylor; and his failure to act when York voiced "his desire to concoct an unduly suggestive procedure to close the case against Mr. Taylor." *See* DE 204 at 198.

The Court notes that, by post-deposition affidavit dated July 9, 2019, Hoskins claimed that Broughton yelled at her and was present when York threatened to frame her for murder. *See* DE 200-38 at 2; DE 213 at 3–4 (Broughton's reply discussing affidavit). "Under the sham affidavit

doctrine, after a motion for summary judgment has been made, a party may not file an affidavit that contradicts his earlier sworn testimony." *France v. Lucas*, 836 F.3d 612, 622 (6th Cir. 2016). "If the affidavit directly contradicts prior sworn testimony, it should be stricken 'unless the party opposing summary judgment provides a persuasive justification for the contradiction.'" *Id.* At her deposition on March 15, 2018, Hoskins testified that York screamed in her face in Broughton's presence. *See* DE 200-1 at 75. Counsel for Broughton repeatedly asked Hoskins what Broughton should have done during the February 15, 2011, interview. *See id.* Nowhere did she testify that Broughton joined in the screaming or that York, in front of Broughton, threatened to frame Hoskins for murder. *See id.* The affidavit contradicts this testimony by glaringly adding new wrongdoing that might create a material fact concerning § 1983 liability. Plaintiffs offer no justification for the contradiction. The Court thus declines to consider DE 200-38 for purposes of any § 1983 claim.

Keeping in mind Broughton's limited role in the investigation, the pertinent questions are whether any of the conduct to which Broughton was privy evinced Plaintiffs' constitutional harm and, if so, whether Broughton realistically could have prevented it. Even accepting Plaintiffs' version of events, the following conduct does not equate to a violation of Plaintiffs' constitutional rights: listening to York provide Helton with details about Katherine's death, photographing Taylor in a suggestive manner (when no identification occurred), standing by while York talked about using Taylor's photographs to procure an identification. In sum, having only marginally participated in two interviews more than a year before Plaintiffs' arrests, Broughton did not observe hallmarks of future wrongful detention or have reason to know that Plaintiffs would be wrongfully detained.

### 4. Mefford

Mefford argues that "[h]e had no opportunity to observe or know of any of the alleged constitutional harm and had no realistic opportunity to intervene to prevent any alleged harm." DE 201-1 at 16. His reasonable lack of knowledge hinges on the fact that Mefford, with respect to Helton's and Wilson's statements, "was not responsible for the investigation, its content, or a review of it." *See id.* at 18. Plaintiffs claim that Mefford failed to intervene when York fed information to Helton and when York used promises of consideration to extract a false statement from Wilson. *See* DE 204 at 198.

As already discussed, Mefford did not observe a constitutional violation when York told Helton details about Katherine's death. Even if Mefford watched York prime Helton's statement, Mefford need not have known that the statement was untruthful or inconsistent with Helton's own personal knowledge. Nor was Mefford privy to a constitutional violation when York promised Wilson that he would talk to the prosecutor and get back to him. Furthermore, no reasonable juror could conclude that York fabricated Wilson's statement in Mefford's presence. To be precise about the record, and Wilson's deposition testimony in particular: Wilson testified that he never gave any type of statement. *See* DE 200-57 at 8, 12. He did not testify that, during his meeting with York and Mefford, York fed him information that he parroted back. *See id.* Nothing in the record suggests that Mefford knew about the contents of York's July 31, 2012, report memorializing Wilson's statement, one that Wilson and Plaintiffs aver is false. *See* DE 200-58.

### E. Count V: § 1983 Conspiracy

A plaintiff must prove three elements to make out a claim for conspiracy under § 1983: the existence of a single plan, a shared conspiratorial objective to deprive plaintiff of his or her constitutional rights, and an overt act in furtherance of the conspiracy that caused injury. *Jackson*,

920 F.3d at 362 (internal quotation omitted). "Rarely in a conspiracy case will there be direct evidence of an express agreement among all the conspirators to conspire, . . . circumstantial evidence may provide adequate proof of conspiracy." *Weberg v. Franks*, 229 F.3d 514, 528 (6th Cir. 2000). "Each conspirator need not have known all of the details of the illegal plan or all of the participants involved." *Hooks v. Hooks*, 771 F.2d 935, 944 (6th Cir. 1985). But, "conspiracy claims must be pled with some degree of specificity and . . . vague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim under § 1983." *Gutierrez v. Lynch*, 826 F.2d 1534, 1538–39 (6th Cir. 1987). Moreover, though conspirators need not know all plan details or participants, there must be evidence from which a reasonable juror could infer the existence of a single plan and shared objective. *See Stillwagon*, 747 F. App'x at 374 (finding sufficient evidence of conspiratorial agreement based on joint filing of criminal complaint and officers' knowledge that evidence did not establish probable cause); *Webb*, 789 F.3d at 671 ("While each of these alleged misdeeds may have occurred independently, they are sufficiently intertwined so as to suggest an agreement between the perpetrators.").

### 1. York

York makes no substantive argument on conspiracy liability other than to note that § 1983 conspiracy claims require an underlying constitutional violation, which York claims did not occur here. *See* DE 205-1 at 49–50. Plaintiffs argue that evidence of the conspiracy lies in York's fabrication of Helton's inculpatory statement, his coercion of Kayla, his direction of the "unduly suggestive lineup procedure" with Taylor, and his failure to document exculpatory evidence. *See* DE 204 at 192–95.

The Court concluded above that a reasonable juror could find that Plaintiffs were wrongfully detained and that York's non-immune misconduct (including fabrication) caused or at

least contributed to their injury. However, for the reasons explained below, there is insufficient evidence that any remaining Defendant (other than York) participated in a single plan or shared a conspiratorial objective. York cannot have been in a conspiracy by himself. *See Revis v. Meldrum*, 489 F.3d 273, 290 (6th Cir. 2007) (defining civil conspiracy as "an agreement between *two or more* persons to injure another by unlawful action.") (emphasis added). Therefore, this claim necessarily fails.

### 2. Pickard

Pickard challenges the conspiracy claim on the basis that there was no joint plan to charge Plaintiffs and no evidence showing Pickard's conspiratorial objective to frame Plaintiffs. *See* DE 206-1 at 35–36. Pickard merely located individuals and occasionally sat in on interviews; he did not initiate complaints, seek arrest warrants, or testify at any proceeding. *See id.* at 36–37. Nor did Pickard have any ill will toward either Plaintiff. *See id.* at 37. According to Plaintiffs, Pickard's March 2012 interactions with Helton reveal that Pickard had joined York in a conspiracy. *See* DE 204 at 192–93.[55] Pickard promised Helton a bond and no future charges if he would tell them what they needed to hear about Katherine's death. *See id.* Pickard was also present when York told Helton what to say. *See id.* at 193. Plaintiffs argue that Pickard's conduct related to Kayla and Taylor (discussed in the context of malicious prosecution and failure to intervene) is further evidence of the conspiracy. *See id.* at 193–94. Finally, as with York, Plaintiffs fault Pickard for

---

[55] As evidence of Pickard's involvement, Plaintiffs also represent that Pickard was present during Helton's January 4, 2011, questioning. DE 204 at 192 ("For starters, Defendant Pickard was present when Mr. Helton was questioned and provided the details of the Mills' homicide by Defendant York. PSOF ¶¶ 39–42, 69–78."). Helton did not testify to that effect. *Compare* DE 204 at 192, *with* DE 200-17 at 35–36 ("Q: [Pickard] was not there? He took you there and dropped you off. A: Right.").

failing to document evidence that may have exculpated Plaintiffs and inculpated others. *See id.* at 194.

On this evidence, a reasonable juror could not conclude that Pickard participated in a single plan or shared the conspiratorial objective to wrongfully detain Plaintiffs. In contrast to *Stillwagon*, Pickard did not jointly file the criminal complaint against Plaintiffs, and there is insufficient evidence to show that Pickard knew the full range of case evidence (or whether it amounted to probable cause). *See Stillwagon*, 747 F. App'x at 374. In order for the conspiracy claim to proceed, Pickard cannot have merely shared the objective to find those responsible for Katherine's death. Though he need not have known all the details about the supposed conspiracy, *Hooks*, 771 F.2d at 944, Pickard would need to have known that Plaintiffs were innocent or that the plan was to prosecute them regardless of their potential innocence. In the light most favorable to Plaintiffs, the evidence shows that Pickard made sporadic promises of consideration, put pressure on those he believed to have information (and watched others do the same), was present while another officer photographed a suspect, and failed to document any information—exculpatory or inculpatory—he received throughout the investigation. In sum, Pickard's involvement with Helton, Kayla, and Taylor does not fairly evince the conspiratorial objective to wrongfully detain Plaintiffs and was not adequately "intertwined" with the falsifications alleged to have been made by York such that a reasonable juror could deem Pickard a conspirator.

### 3. Broughton

Broughton contends that there is no record evidence of a single plan to fabricate or withhold evidence. *See* DE 207-1 at 29. As evidence of Broughton's role in the conspiracy to violate Plaintiffs' constitutional rights, Plaintiffs rely on the instances of Broughton's involvement already discussed in the context of the malicious-prosecution and failure-to-intervene claims. *See* DE 204

at 195–96. Plaintiffs highlight that Broughton was present when York threatened to frame Hoskins and when York fed Helton details and that Broughton "boasted" about having taken Taylor's photograph in what Plaintiffs deem an "unduly suggestive identification procedure." *See id.* at 196.

As already discussed, the Court declines to consider Hoskins's affidavit, which provides the only evidence that York threatened to frame Hoskins with murder (and that Broughton purportedly heard the threat). Moreover, though Plaintiffs attribute the "boast" about Taylor's photograph to Broughton in the context of this claim, Plaintiffs also claim that Broughton *heard* rather than *spoke* the words. *See id.* ("*Defendant York* spoke to Defendant Broughton - loudly enough for Mr. Taylor to overhear them - about sending the photographs that they had just taken of Mr. Taylor and a sketch of the suspect to 'someplace', saying, 'We got him. We're charging him with murder. It's him . . . . We're sending him down.'") (emphasis added). This evidence does not permit the reasonable inference that *Broughton* boasted of or, by another's utterance, joined in the conspiratorial plan to wrongfully detain Plaintiffs. Broughton's only other investigative contributions are his presence or limited participation during Helton's, Hoskins's, and Taylor's interviews. As with Pickard, there is no indication that Broughton knew the case evidence, that the evidence did not amount to probable cause, that Plaintiffs were innocent, or that the plan was to prosecute them under any circumstances. As a result, a reasonable juror could not conclude that Broughton joined in the single plan or shared the conspiratorial objective.

### 4. Mefford

Mefford avers that there is no evidence he was part of a plan or shared in the conspiratorial objective to violate Plaintiffs' rights. *See* DE 201-1 at 16–19. As evidence of Mefford's participation in the conspiracy, Plaintiffs' rely on Mefford's presence at the interviews of Helton and Wilson, where York reportedly fabricated both statements. *See* DE 204 at 196.

Again, record precision here is crucial. Despite their arguments, Plaintiffs have nowhere supported the claim that Mefford watched York fabricate Helton's and Wilson's statements. Rather, the evidence (in the light most favorable to Plaintiffs) shows only that Mefford was present during Helton's interview on January 4, 2011—more than twelve months before his purported statement inculpating Plaintiffs—when York began to feed Helton details about Katherine's death (that Helton later repeated, *see* DE 200-26 at 30; DE 200-40). *See* DE 200-17 at 6–7, 14. Additionally, as explained in the context of the failure-to-intervene claim, Wilson did not testify that York fabricated Wilson's statement *during their meeting*, so a reasonable juror, believing Wilson, could not conclude that Mefford was privy to the fabrication; that happened later, if at all, when York drafted his report. *See* DE 200-58. Given the lack of evidence showing Mefford's participation in the conspiratorial plan or his conspiratorial objective, and for many of the same reasons explained above, this claim, as to Mefford, must fail.

### F.  Qualified Immunity

York, Pickard, Broughton, and Mefford all assert qualified immunity as a defense to some or all of Plaintiffs' § 1983 individual-capacity claims. *See* DE 201-1 at 51–54 (Mefford and Joseph, Counts I through V); DE 205-1 at 14, 34 (York, Counts I and II); DE 206-1 at 19–25 (Pickard, Counts I through V); DE 207-1 at 30–33 (Broughton, Counts I through V). In response, Plaintiffs incorporate their earlier arguments and maintain that each Defendant violated their constitutional rights. *See* DE 204 at 201. Plaintiffs further contend that the relevant rights were clearly established at the time of Defendants' misconduct: that evidence fabrication violates due process; that officers may not falsify facts to establish probable cause; and that individuals have the right to be free from malicious prosecution, governmental conspiracies to violate civil rights, and unduly suggestive identification procedures. *See id.* at 200–01.

"Generally, summary judgment based on qualified immunity is proper if the officer was not on notice that his conduct was clearly unlawful." *Bletz v. Gribble*, 641 F.3d 743, 749 (6th Cir. 2011). "Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right." *Pearson v. Callahan*, 129 S. Ct. 808, 816 (2009). "Once raised, the plaintiff bears the burden of showing that a defendant is not entitled to qualified immunity." *Bletz*, 641 F.3d at 750. The plaintiff must make two showings: first, that the facts (viewed in the light most favorable to the plaintiff) show a constitutional violation; and second, that the right violated was clearly established at the time of the misconduct. *Id.* "The right must have been 'clearly established' not just in an abstract sense, but in a 'particularized' sense." *Cope v. Heltsley*, 128 F.3d 452, 458–59 (6th Cir. 1997). A plaintiff must show, "on a fact-specific, case-by-case basis . . . [that] a reasonable official in the defendants' position could [not] have believed that his conduct was lawful, in light of clearly established law and the information he possessed." *Pray v. City of Sandusky*, 49 F.3d 1154, 1157–58 (6th Cir. 1995). Otherwise, the movant-defendant who asserts qualified immunity is entitled to summary judgment. *See id.*

Here, viewing the record through the lens of qualified immunity does not change the substantive result. Plaintiffs have carried their burden to show, in a generic sense, that the intentional or reckless fabrication of probable cause offends the Fourth Amendment. *See Gregory*, 444 F.3d at 749–50 (noting that "right to be free of continued detention without probable cause was clearly established well before" the *Spurlock* decision in 1993); *see also King*, 852 F.3d at 582–83 ("[I]ndividuals have a clearly established Fourth Amendment right to be free from malicious prosecution by a defendant who has 'made, influenced, or participated in the decision to prosecute the plaintiff' by, for example, 'knowingly or recklessly' making false statements that are material to the prosecution either in reports or in affidavits filed to secure warrants.").

Additionally, Plaintiffs' specific York allegations, if true, show that an objectively reasonable officer in York's position (and with York's case knowledge) would have known that his conduct amounted to a constitutional violation.[56]

However, even if the involvement of Pickard, Broughton, Mefford, or Joseph rose to the level of a constitutional violation, qualified immunity would bar § 1983 liability for these Defendants. Plaintiffs have not carried their burden to show, in a particularized way, that objectively reasonable officers in Pickard's, Broughton's, Mefford's or Joseph's position would have known their conduct was unlawful. For many of the same reasons explained above, their participation was too passive and their knowledge too limited to put them on notice of Plaintiffs' supposed wrongful detention. Much of the alleged misconduct that these Defendants observed could have reasonably appeared, in isolation, part of a routine, lawful investigation. Plaintiffs have not pointed to particular cases that counsel a contrary result. In all, qualified immunity does not entitle York to summary judgment, but it does further shield Pickard, Broughton, Mefford, and Joseph from liability.

### G.  Count VI: *Monell* Claim Against Knox County

Knox County argues that the *Monell* claim fails for two reasons: Pickard did not violate Plaintiffs' constitutional rights, and Plaintiffs have not shown a Knox County policy that was the "moving force" behind their injury. DE 206-1 at 37–40. Plaintiffs maintain that Knox County is liable for its lack of policies on *Brady* obligations, evidence fabrication, and criminal investigations; for its "widespread custom [or] practice of violating the constitutional rights of citizens;" for Pickard's actions as a policymaker; and for its failure to train and supervise officers.

---

[56] Although courts have admittedly struggled to name and define the contours of malicious prosecution and related torts, officers cannot claim ignorance based on shifting nomenclature. The fundamentals, if not the foundation, of wrongful detention are clear.

*See* DE 204 at 211–13. Per Plaintiffs, Knox County made a deliberate choice not to have a policy regarding *Brady* evidence, fabrication, or the use of threats and thereby "ignored a plainly obvious danger." *See id.* at 214–15. Additionally, Plaintiffs contend that their injury was a "'highly predictable consequence' of deficient training." *See id.* at 219 (internal quotation omitted). Lastly, Plaintiffs point to Pickard's alleged conduct in the *Anderson* case as evidence of Knox County's "custom of misconduct." *See id.* at 222–28.

None of Plaintiffs' claims survives summary judgment as to Pickard individually. Knox County is entitled to judgment on this basis alone. "If no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983." *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001). Though Plaintiffs cite *Garner v. Memphis Police Dep't*, 8 F.3d 358 (6th Cir. 1993), for the proposition that Knox County should remain in the case even if Pickard is dismissed, *Garner* actually held that "a municipality may not escape liability for a § 1983 violation merely *because the officer who committed the violation is entitled to qualified immunity*." *See id.* at 365 (emphasis added); *see also Scott v. Clay Cty.*, 205 F.3d 867, 879 (6th Cir. 2000) ("[I]f the legal requirements of municipal or county civil rights liability are satisfied, qualified immunity will not automatically excuse a municipality or county from constitutional liability, even where the municipal or county actors were personally absolved by qualified immunity, if those agents in fact had invaded the plaintiff's constitutional rights."). In *Garner*, "there [was] no doubt that a constitutional violation occurred." *Garner*, 8 F.3d at 365. Here, the Court has *not* concluded that Pickard committed a constitutional violation but that qualified immunity protects him from liability. Instead, none of Pickard's conduct rises to the level of a constitutional violation on any of Plaintiffs' § 1983 theories. As a result, the *Monell* claim against Knox County must fail.

Even if Pickard could be liable on one or more of the § 1983 claims, Plaintiffs have not satisfied "the legal requirements of municipal or county civil rights liability." *See Scott*, 205 F.3d at 879. Respondeat superior is not a basis for county liability under § 1983. *Jackson*, 920 F.3d at 374. "Instead, a plaintiff must show that 'through its deliberate conduct, the municipality was the "moving force" behind the injury alleged.'" *Id.* (internal quotation omitted). There are four ways to make this showing: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Id.* (internal citation omitted). Plaintiffs attempt, though unsuccessfully, to suggest a triable issue on each *Monell* theory.

### 1. Lack of Policy

To begin, Plaintiffs' wrongful detention was not a "plainly obvious" consequence of Knox County's supposed failure to create a policy regarding *Brady* obligations. *See Gregory*, 444 F.3d at 752–53 ("[T]he risk of a constitutional violation arising as a result of the inadequacies in the municipal policy must be 'plainly obvious.'"); *see also Bd. of the Cty. Comm'rs v. Brown*, 117 S. Ct. 1382, 1392 (1997) ("Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."). It bears repeating that Plaintiffs did not proceed to trial and have asserted no *Brady* claim. It is conceivable that an inadequate *Brady* policy could lead to constitutional violations, but those potential harms are irrelevant here; Plaintiffs' injury is *wrongful detention*, not abridgement of trial rights.

As far as Knox County's failure to adopt a policy regarding evidence fabrication, the determinative issue is not one of causation but common sense. Certain police misconduct is so patently wrong that municipalities need not enact policies prohibiting the behavior. For example,

the fact that officers must "[r]efrain[] from raping women in police custody is so obvious that even if [county policy] were silent about such conduct, it would not give rise to a constitutional violation." *See Campbell v. Anderson Cty.*, 695 F. Supp. 2d 764, 774–75 (E.D. Tenn. 2010). Similarly, there was no need for a Knox County policy stating that officers should not cook up evidence.[57] As a result, Knox County's lack of such policy does not expose it to liability for the alleged fabrication that occurred and caused Plaintiffs' injury.

To the extent Plaintiffs contend that Pickard's wrongdoing itself constituted Knox County policy, the Court observes that not "every 'law enforcement' activity (e.g., stop, arrest, etc.) by a sheriff (or other chief law enforcement official)—whether a matter of official business or a misuse of power to advance a private agenda—represents the 'official policy' of the local government." *See Wooten v. Logan*, 92 F. App'x 143, 146–47 (6th Cir. 2004). Plaintiffs perhaps have supported that Pickard was a policymaker, *see* DE 204 at 218, 222 n.22, but not that he was acting in a policymaking capacity when he committed the misconduct attributed to him. "Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy *with respect to the action ordered*." *Pembaur v. City of Cincinnati*, 106 S. Ct. 1292, 1299 (1986) (emphasis added).

Finally, Plaintiffs' argument that Knox County had no policies on "how to conduct a criminal investigation" does not adequately explain how any *specific* policy would have prevented Plaintiffs' constitutional injury in this case. *See* DE 204 at 216–17. Generic mentions of deficient policies on witness interviews and documentation do not comport with the "rigorous standards of

---

[57] The Court notes important differences between *Brady* policy and fabrication policy. *Brady* policy may advise government actors about the timing, mechanics, and scope of required disclosure. With fabrication, an adequate policy would consist of a few choice words: *do not fabricate.*

culpability and causation" that Plaintiffs must meet in order to hold Knox County responsible for the acts of its employee. *See Brown*, 117 S. Ct. at 1389.

### 2. Inadequate Training or Supervision

"[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *See City of Canton v. Harris*, 109 S. Ct. 1197, 1204–05 (1989). "In order to establish a failure-to-train claim, [Plaintiffs] must establish that: 1) the [County's] training program was inadequate for the tasks that [Pickard] must perform; 2) the inadequacy was the result of the [County's] deliberate indifference; and 3) the inadequacy was closely related to or actually caused the injury." *See Ciminillo v. Streicher*, 434 F.3d 461, 469 (6th Cir. 2006). Deliberate indifference may be shown by "either (1) 'prior instances of unconstitutional conduct demonstrating that the City had notice that the training was deficient and likely to cause injury but ignored it' or (2) 'evidence of a single violation of federal rights, accompanied by a showing that the City had failed to train its employees to handle recurring situations presenting an obvious potential for such a violation.'" *Jackson*, 920 F.3d at 382.

Here, Pickard is the only remaining individual Knox County Defendant (after Plaintiffs' voluntary dismissal). Sheriffs are "peace officers" under Kentucky law, but they are statutorily exempt from the training requirements that apply to most other peace officers. *See* KRS 446.010(31); KRS 15.380(5)(a). "The statute has a three-part scheme by which certain officers must be certified, other officers may be certified 'upon request of the employing agency,' and still others 'shall be exempted from the certification requirements' unless the officer himself requests certification." *Stanley v. Smith*, No. 6:16-CV-264-REW-HAI, 2019 WL 4786053, at *16 (E.D. Ky. Sept. 30, 2019). Pickard was in this third category. *See* KRS 15.380(5)(a). Plaintiffs emphasize

that Pickard was not required to attend the police academy, *see* DE 204 ¶ 225, but do not develop or support the argument that Kentucky's statutory scheme governing law-enforcement training requirements is constitutionally inadequate such that municipalities may face § 1983 liability for complying with the scheme. Further, the scheme comes from the General Assembly, and is not a creation of the county.

### 3. Policy or Custom of Rights Violations

This theory requires that Plaintiffs show "(1) the existence of a clear and persistent pattern of [illegal activity]; (2) notice or constructive notice on the part of the [Knox County]; (3) [Knox County's] tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and (4) that [Knox County's] custom was the 'moving force' or direct causal link in the constitutional deprivation." *See Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005).

As evidence of Knox County's custom of misconduct, Plaintiffs rely on hearsay and unproven assertions about Pickard's conduct in the pending *Anderson* case. *See* DE 204 at 222–28. Even if these allegations could constitute the required "clear and persistent pattern," the only Knox County official (joined in this matter) alleged to have been on notice about and have tacitly approved Pickard's misconduct is Pickard himself. To inculpate Knox County for two instances of Pickard's supposed wrongdoing—which Plaintiffs do not claim was known to any Knox County official other than Pickard—would effectively extend § 1983 liability to include *respondeat superior*, a result the Supreme Court has explicitly disallowed. *See Monell v. Dep't of Soc. Servs.*, 98 S. Ct. 2018, 2035–36 (1978) ("Congress included customs and usages [in § 1983] because of the persistent and widespread discriminatory practices of state officials . . . . Although not authorized by written law, such practices of state officials could well be so permanent and well

settled as to constitute a 'custom or usage' with the force of law.") (internal quotation omitted); *see id.* at 2036 ("[A] municipality cannot be held liable solely because it employs a tortfeasor— or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory.").

### H. Count VIII: State-Law Malicious Prosecution

There are five elements of malicious prosecution under Kentucky law:

1) the defendant initiated, continued, or procured a criminal or civil judicial proceeding, or an administrative disciplinary proceeding against the plaintiff;
2) the defendant acted without probable cause;
3) the defendant acted with malice, which, in the criminal context, means seeking to achieve a purpose other than bringing an offender to justice; and in the civil context, means seeking to achieve a purpose other than the proper adjudication of the claim upon which the underlying proceeding was based;
4) the proceeding, except in ex parte civil actions, terminated in favor of the person against whom it was brought; and
5) the plaintiff suffered damages as a result of the proceeding.

*Martin v. O'Daniel*, 507 S.W.3d 1, 11–12 (Ky. 2016).

Procuring a criminal proceeding includes arresting, filing a criminal complaint, indicting, or inducing the prosecutor to commence proceedings by providing "inaccurate, false, and misleading information." *See id.* The Kentucky probable-cause inquiry mirrors that under federal law. *Williams v. Commonwealth*, 147 S.W.3d 1, 11–12 (Ky. 2004) (quoting *Beck v. Ohio*, 85 S. Ct. 223, 228 (1964). "[M]alice may be inferred from a lack of probable cause." *Massey v. McKinley*, 690 S.W.2d 131, 133 (Ky. Ct. App. 1985).

The jury, however, may not invariably imply malice from the mere want of probable cause if all the facts disclosed lead to a different conclusion. If malice was to be inferred from want of probable cause alone, then there would be no necessity for having a distinct requirement that malice be proven, for want of probable cause would then be the only element necessary to be established.

*Mosier v. McFarland*, 106 S.W.2d 641, 642 (Ky. 1937). "The termination must go to the merits of the accused's professed innocence for the dismissal to be 'favorable' to him." *Ohnemus v.*

*Thompson*, 594 F. App'x 864, 867 (6th Cir. 2014) (interpreting Kentucky law). Excepting malice, Kentucky's elements resemble those of a § 1983 malicious-prosecution claim, so much of the earlier analysis applies with similar force here. *See Hall v. City of Williamsburg*, No. 6:16-304-DCR, 2017 WL 3668113, at *10 (E.D. Ky. Aug. 24, 2017).

### 1. York

York disputes the probable-cause and favorable-termination elements of this claim. *See* DE 205-1 at 50–51. Plaintiffs rely on the evidence discussed in the § 1983 malicious-prosecution context to suggest a disputed material question of fact on York's liability for state-law malicious prosecution. *See* DE 204 at 229.

Kentucky courts recognize a rebuttable presumption of probable cause based on a preliminary-hearing finding or a grand-jury indictment. *See Craycroft v. Pippin*, 245 S.W.3d 804, 806–07 (Ky. Ct. App. 2008) (preliminary hearing); *Davidson v. Castner-Knott Dry Goods Co.*, 202 S.W.3d 597, 606 (Ky. Ct. App. 2006) (grand jury). A plaintiff may rebut this presumption by presenting evidence to suggest that probable cause did not exist. *See Craycroft*, 245 S.W.3d at 806 n.2 ("[Plaintiff] is entitled to produce evidence that shows a lack of probable cause which could result in establishing one of the necessary elements for a malicious prosecution claim."); *Davidson*, 202 S.W.3d at 607 ("Consequently, while a grand jury indictment raises a presumption of probable cause, this presumption can be rebutted by the plaintiff."). Here, Plaintiffs have produced such evidence. The Court has already concluded that, on the fully developed record, reasonable minds could differ as to the existence of probable cause. For this reason, York is not entitled to summary judgment on this ground.

"[T]he determination of whether a termination is sufficiently favorable ultimately rests with the trial court as a matter of law, absent a factual dispute relative to the circumstances of the

dismissal." *Davidson*, 202 S.W.3d at 606 (citing Restatement (Second) of Torts § 673(1)(b) & comment (e)). As with the federal variant of this claim, the termination must "indicate the innocence of the accused." *See id.* (internal citation omitted). Here, as discussed above, there is a factual dispute regarding the circumstances and character of this dismissal without prejudice. Reasonable minds could differ about whether the dismissal reflected sufficiently upon Plaintiffs' innocence. As a result, favorable termination presents a jury question.

### 2. Pickard, Broughton, and Mefford

Defendants Pickard, Broughton, and Mefford seek summary judgment on this claim for various reasons: Pickard, Broughton, and Mefford "did not initiate, continue, or procure criminal charges against Plaintiffs," *see* DE 201-1 at 32–36; DE 206-1 at 44; DE 207-1 at 34, and Plaintiffs failed to make a showing of malice (as to Pickard, *see* DE 206-1 at 45; Broughton, *see* DE 207-1 at 34–35; and Mefford, *see* DE 201-1 at 48). As with York, Plaintiffs offer no independent argument to support their state-law malicious-prosecution claim; instead, they incorporate the earlier-discussed evidence that shows Pickard, Broughton, and Mefford "influencing or continuing the prosecution." *See* DE 204 at 229.

The Court already determined that Pickard, Broughton, and Mefford had insufficient involvement in Plaintiffs' prosecution to render them liable under § 1983. Kentucky's standard does not counsel a contrary result on the state-law claim. Under Kentucky's formulation, an officer who fills out a citation and makes an arrest satisfies the first element of malicious prosecution, but liability does not attach to those whose conduct does not rise to the level of initiating or maintaining the prosecution (such as testifying at a suppression hearing). *See Arnold v. Wilder*, 657 F.3d 353, 365–66 (6th Cir. 2011); *Shamaeizadeh v. Cunigan*, 338 F.3d 535, 556 (6th Cir. 2003). Pickard, Broughton, and Mefford did not arrest Plaintiffs and did not testify at any proceeding. They did

not formally or substantively begin or further the case. Because of their ancillary roles, a reasonable juror could not deem Pickard, Broughton, or Mefford liable for state-law malicious prosecution.

### 3. Qualified Official Immunity

Pickard raised qualified official immunity as a defense to Plaintiffs' state-law claims. *See* DE 206-1 at 41–43. In contrast, York, Mefford, and Broughton did not specifically address state-law immunity, though they asserted qualified immunity as a defense to Plaintiffs' *federal* claims. *See* DE 201-1 at 2 (summarizing arguments and raising qualified official immunity only as to Joseph); DE 205-1 at 50–51 (discussing state-law malicious prosecution without mention of immunity); DE 207-1 at 33–35 (same).

Notwithstanding the above grant of summary judgment for Pickard on this claim, this ruling does not depend on Pickard's qualified official immunity. "[Q]ualified official immunity is available only to officials acting in good faith." *Martin*, 507 S.W.3d at 5. Good faith and malice are mutually exclusive concepts. *Id.* "Malice is a material fact that a plaintiff must prove to sustain a malicious prosecution claim." *Id.* Accordingly, "in the context of a malicious prosecution claim against state law enforcement officers, the issue of qualified official immunity is superfluous." *Id.* at 5–6. Because qualified official immunity is not a viable defense to state-law malicious prosecution, the Court undertakes no further analysis.

### I. Count IX: State-Law Negligent Supervision

Per Joseph, she is entitled to summary judgment on this claim because her duties did not include policymaking or training and because Kentucky law bars negligence claims based on the same conduct as malicious-prosecution claims. *See* DE 201-1 at 28–32. Joseph also asserts qualified official immunity for her good-faith discretionary acts within the scope of her authority.

*See id.* at 49–51. In response, Plaintiffs do not give separate treatment to their state-law negligent supervision claim against Joseph, other than to argue that state-law negligence claims may be brought alongside malicious-prosecution claims. *See* DE 204 at 202–11. Plaintiffs are also silent on Joseph's claimed qualified official immunity for state-law negligent supervision. *See id.* at 201–02 (arguing that Pickard is not entitled to qualified official immunity without any mention of Joseph).

Kentucky law recognizes the torts of negligent training and negligent supervision. *See MV Transp. Inc. v. Allgeier*, 433 S.W.3d 324, 336 n.10 (Ky. 2014) (collecting cases). "[T]he plaintiff must allege that the defendant knew or had reason to know of the employee's harmful propensities; that the employee injured the plaintiff; and that the hiring, supervision, or retention of such an employee proximately caused the plaintiff's injuries." *Grand Aerie Fraternal Order of Eagles v. Carneyhan*, 169 S.W.3d 840, 844 (Ky. 2005). "[A]n employer may be held liable for negligent supervision only if he or she knew or had reason to know of the risk that the employment created." *Booker v. GTE.net LLC*, 350 F.3d 515, 517 (6th Cir. 2003) (interpreting Kentucky law and citing Restatement (Second) of Agency § 213 (1958)); *see also Doe v. Magoffin Cty. Fiscal Court*, 174 F. App'x 962, 973–74 (6th Cir. 2006) ("Where there is no foreseeability, there is no duty under Kentucky law."). "Kentucky conflates the negligent training and negligent supervision standards." *J.B.F. v. Ky. Dep't of Educ.*, No. 5:15-CV-33-REW, 2016 U.S. Dist. LEXIS 72419, at *48 (E.D. Ky. June 3, 2016); *see Carberry v. Golden Hawk Transp. Co.*, 402 S.W.3d 556, 564 (Ky. Ct. App. 2013) (discussing knowledge of employment risk as relevant to both negligent training and supervision).

Here, for the reasons discussed regarding Plaintiffs' § 1983 supervisory liability claim, a reasonable juror could not conclude that Joseph knew that York used fabricated evidence to

wrongfully detain Plaintiffs. Her limited substantive involvement indicates a largely administrative role and does not create a reasonable inference of knowledge about the truth or falsity of witness statements, Plaintiffs' supposed innocence, or York's alleged misconduct. Nor have Plaintiffs shown that Joseph reasonably should have known about the risk of fabrication based on the allegedly coercive interviewing in the *Anderson* case. Even assuming that York's tactics were impermissibly coercive in the *Anderson* investigation, Joseph's experience did not make foreseeable the alleged wrongdoing in this case, which does not involve claims that Plaintiffs were unconstitutionally coerced. As a result, it was not foreseeable to Joseph that her training and supervision decisions would cause Plaintiffs harm. In sum, there is no triable issue on this claim.

### 1. Qualified Official Immunity

Even if Plaintiffs could suggest a jury question on Joseph's liability on this count, Plaintiffs have not overcome Joseph's defense of qualified official immunity.

"Qualified immunity applies when public officials perform (1) discretionary acts, (2) in good faith, and (3) within their scope of authority." *Hill v. Adkins*, 59 F. Supp. 3d 814, 820 (E.D. Ky. 2014) (citing *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001). "If the act was discretionary and within the scope of authority, the burden shifts to the plaintiff 'to establish by direct or circumstantial evidence that the discretionary act was not performed in good faith.'" *Id.* (quoting *Yanero*, 65 S.W.3d at 523). Objective bad faith means "objective unreasonableness" (or the violation of a clearly established right) whereas subjective bad faith implies malice or a corrupt motive. *Yanero*, 65 S.W.3d at 523. "Supervision and training are discretionary functions." *Nichols v. Bourbon Cty Sheriff's Dep't*, 26 F. Supp. 3d 634, 642 (E.D. Ky. 2014).

Here, there is no dispute that Joseph acted within the scope of her authority, and Plaintiffs do not contest the discretionary nature of training and supervision. Moreover, Plaintiffs have not

suggested that Joseph directly violated Plaintiffs' clearly established constitutional rights or that she acted maliciously or with a corrupt motive. Accordingly, this claim, unargued by Plaintiffs, cannot survive summary judgment.

## IV. CONCLUSION

For the above reasons, the Court **ORDERS** as follows:

1. The Court **GRANTS** DE 177, DE 178, and DE 179. None of Plaintiffs' claims against Pickard, Broughton, Mefford, Joseph, or Knox County survives summary judgment; and

2. The Court **GRANTS IN PART AND DENIES IN PART** DE 180. Plaintiffs may proceed on their § 1983 and state-law malicious prosecution claims against York, individually.

This the 23rd day of March, 2020.

Signed By:

_Robert E. Wier_

**United States District Judge**