IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF KENTUCKY

| | | |
|---|---|---|
| AMANDA HOSKINS, JONATHAN TAYLOR | ) | |
| | ) | Case No. 17-CV-84 |
| Plaintiff, | ) | |
| | ) | Hon. ROBERT E. WIER |
| v. | ) | |
| | ) | Mag. HANLEY A. INGRAM |
| KNOX COUNTY, ET AL., | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendants. | | |

**PLAINTIFFS' RESPONSE TO CERTAIN
KENTUCKY STATE POLICE DEFENDANTS' MOTION FOR RELIEF**

Plaintiffs, AMANDA HOSKINS and JONATHAN TAYLOR, through counsel, hereby

file their response to the Kentucky State Police Defendants' Motion for Relief. In response,

Plaintiffs state as follows:

**<u>INTRODUCTION</u>**

Patrick Baker was exonerated through a gubernatorial pardon on December 6, 2019.[1]

Although Mr. Baker was one of more than 600 Kentucky citizens granted a pardon on the eve of

Governor Bevin leaving office, no other pardon received more local and national scrutiny. As

shown below, the local media seized upon salacious allegations that Mr. Baker's pardon was the

product of political donations rather than his actual innocence. The false allegations turned Mr.

Baker's exoneration – and what should have been a moment of rejoice and happiness for his

family – into an untenable nightmare. For days on end, media camped outside his family

residence, relentlessly called their telephones, and raised new allegations on a daily basis. All of

this was done without any meaningful investigation into the merits of Mr. Baker's wrongful

---

[1] Ex. 1, Baker December 6, 2019 Pardon.

conviction claims. The Baker family had no voice nor method to defend themselves from the unrivaled attacks and the limitless damage that was being inflicted upon their family's hard-fought reputation and businesses. After a week of silence, Plaintiffs' counsel and client held a press conference to address his innocence, dispel any notion of pay-to-play politics, and encourage a criminal investigation of two Kentucky State Police officers who have been accused of misconduct in his case and others.

Several Kentucky State Police officers now take umbrage with calls for an investigation into allegations of misconduct while also claiming that statements made by Plaintiffs' counsel were prejudicial and misleading.[2] *See* Dckt. No. 248 at 9, 12. Yet, Defendants' motion is itself misleading and replete with instances where counsel's statements are taken out of context. To do so, Defendants' counsel quotes half sentences from Plaintiffs' counsel without ellipses, and more critically, without context. The quotes by Defendants are so egregiously taken out of context that Plaintiffs' provide a side-by-side comparison below for this Court:

> **Defendants' Brief**: "Officers who framed Patrick, whether they should be criminally prosecuted."[3]

> **Counsel's Quote**: "Denny Butler was the person who questioned Patrick Baker with regard to this case. And I think that when you all talk to Mr. Butler, you'll find there were conversations in the Justice Cabinet and with the former Commissioner of the Kentucky State Police, Rick Sanders, about whether these officers who framed Patrick, whether they should be criminally prosecuted. And I think you'll find some interesting stuff from Mr. Tilly and Mr. Sanders and what efforts they took to stop a criminal prosecution."[4]

---

[2] The KSP Defendants' prejudice argument is rendered moot due to this Honorable Court's summary judgment ruling. *See* Dckt. No. 256. As it stands, none of the KSP Defendants who filed this Motion remain for trial, and as a result, prejudice is lacking. Further, as is explained below, counsel did not mislead the public through the statements made.

[3] *See* Dckt. No. 248 at 3-4; quoting from 7:54-7:59.
[4] *See* Press Conference Link at 7:33-8:07

Context matters.  From Defendants' motion, one would be led to believe that Plaintiffs' counsel was actively and repeatedly calling for the criminal prosecution of Defendants.  The entire quote establishes that counsel merely provided a timeline of events within the Justice Cabinet and the Governor's Office regarding a criminal investigation into the Defendants.  Defendants' grammatical gamesmanship is grossly misleading and taints their motion.  The irony, Defendants claim Plaintiffs' counsel made misleading statements while intentionally doing so themselves.

The extraordinary relief Defendants seek is a correction and/or retraction of certain statements, maintaining that these Defendants suffered prejudice as they purportedly did not have an opportunity to correct the story.[5] In filing their motion, these same Defendants fail to inform the Court that their agency joined in a press release with Commonwealth's Attorney Jackie Steele on the date of the press conference calling for a criminal investigation into the Baker pardon and defending Detectives Johnson and York from allegations of misconduct.  Ex. 2, December 17, 2019 Richmond Register Article.   Defendants further decline to reveal that outgoing Kentucky State Police Commissioner Rick Sanders conducted an interview the following day with the Courier Journal where he again claimed Baker was guilty and rebuffed allegations of misconduct.  Ex. 3, December 21, 2019 CJ Article at 2; *see also* December 20, 2019 Courier Journal Online Article Link.  Thus, the Kentucky State Police come to this Court requesting extraordinary relief in terms of a correction and retraction, while at the same time having lodged their own media blitz attacking Baker's innocence, calling for a criminal investigation into his pardon, and defending Detectives York and Johnson from allegations of misconduct. Hutzpah aside, Defendants' motion fails for several reasons.

---

[5] As is explained below, Plaintiffs' counsel did not provide misleading information to the press.

First, as Defendants passively acknowledge midway through their brief, Plaintiffs'
counsel "is allowed under SCR 3.130(3.6)(c) to address the recent publicity of Mr. Baker's
pardon." *See* Dckt. No. 248 at 11. Second, as it relates to *Hoskins* and *Anderson*, the
information cited by Plaintiffs' counsel in the release and press conference was information
contained in a public record as is explicitly allowed pursuant to SCR 3.130(3.6)(b)(2). Third, not
only were counsel's comments consistent with the ethical obligations promulgated by the
Kentucky Supreme Court, but more fundamentally, counsel's call for a criminal investigation
into Kentucky State Police officers accused of misconduct is protected speech under the First
Amendment. *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1035–36 (1991). As is explained
below, an investigation into these detectives is warranted. Fourth, as is established below,
Plaintiffs' counsel did not provide misleading statements to the media, and the Defendants have
not suffered any prejudice in this case as a result of the public information to which counsel
referred. Fifth, given that there is no pending litigation regarding the Baker case, these
Defendants do not have standing to raise issues before this Court that implicate commentary
regarding the Baker prosecution and counsel's call for a criminal prosecution of the detectives
involved.[6] For the reasons discussed below, Defendants' motion is without merit and should be
denied.

---

[6] An analysis of Rule 3.6 reflects that the lawyer "must know comments will have a substantial likelihood
of materially prejudicing an adjudicative proceeding in this matter." As established, because counsel's
comments concerned the exoneration of Patrick Baker and the false allegations which flowed from that,
there was no adjudicative proceeding impacted. Given Mr. Baker's exoneration, there were no criminal
proceedings. Likewise, Mr. Baker had no lawsuit on file at the time of the press conference. Put simply,
counsel could not predict that his comments would have a likelihood of impacting any adjudicative
proceeding at the time of the press conference since none were pending. Given that Patrick Baker does
not have litigation pending before this Court, there are serious issues regarding the standing of Defendants
to bring this Motion and concerns about whether this Court has jurisdiction to hear Defendants' request.

# ARGUMENT

I. **Pursuant to Supreme Court Rule 3.130(3.6)(c), Counsel's Comments Were Necessary to Mitigate the Significant Prejudice Inflicted Upon Patrick Baker and His Family**

The statements made by Plaintiffs' counsel at the December 17, 2019 press conference were in conformance with SCR 3.130(3.6)(c), which provides that "a lawyer may make a statement that a reasonable lawyer would believe is required to protect a client from the substantial undue prejudicial effect of recent publicity not initiated by the lawyer or the lawyer's client." The rule cautions that the statements "shall be limited to such information as is necessary to mitigate the recent adverse publicity." *Id.* Even Defendants passively acknowledge midway through their brief that Plaintiffs' counsel "is allowed under SCR 3.130(3.6)(c) to address the recent publicity of Mr. Baker's pardon." *See* Dckt. No. 248 at 11. Defendants argue that Plaintiffs' counsel went too far. They are mistaken.

## A. Patrick Baker and his Family Suffer Through A Media Campaign Filled with False and Salacious Allegations

By December 17, 2019, the Baker family was suffering through a national media assault led by Knox County Commonwealth Attorney Jackie Steele. The Baker family was being unfairly accused of bribing Governor Bevin to obtain Patrick's exoneration. When that did not pan out, the gears shifted and the family was accused of using political connections to obtain the pardon. SCR 3.130(3.6)(c) provides that "a lawyer may make a statement that a reasonable lawyer would believe is required to protect a client from the substantial undue prejudicial effect of recent publicity not initiated by the lawyer or the lawyer's client." The Kentucky Supreme Court explains further in Comment 7:

> Finally, extrajudicial statements that might otherwise raise a question under this Rule may be permissible when they are made in response to statements made publicly by another party, another party's lawyer, or third persons, where a reasonable lawyer would

believe a public response is required in order to avoid prejudice to the lawyer's client. When prejudicial statements have been publicly made by others, responsive statements have the salutary effect of lessening any resulting adverse impact on the adjudicative proceeding. Such responsive statements should be limited to contain only such information as necessary to mitigate undue prejudice created by the statements made by others.

SCR 3.130(3.6), Comment 7.

This Rule and comment were drafted for situations like this.

The media surge was led by the Louisville-based Courier Journal. Between December 11, 2019 and January 13, 2020, the Courier Journal published 14 articles regarding the Baker case. The front-page headlines became more sensationalized by the day:

- December 11, 2019: Bevin pardons include convicted killer whose brother hosted campaign fundraiser for him[7]

- December 12, 2019: Bevin pardoned brother of donor[8]



---

[7] Ex. 4, December 11, 2019 Courier Journal Article at 1.
[8] Ex. 5, December 12, 2019 Courier Journal Article at 1

- December 13, 2019: 'Matt Bevin can rot in hell', Relatives furious at pardon for political donor's brother[9]





Then-Gov. Matt Bevin with Eric Baker, right, during a 2018 fundraiser at the Baker home in Corbin, Kentucky. Baker's brother was pardoned during Bevin's final days as governor.
COURTESY FROM A BUCKLE/NATIVE NEWS JOURNAL

- December 14, 2019: Editorial: Bevin's pardon of contributor's brother must be investigated

- December 17, 2019: Ex-justice chief: Bevin ignored pardon objections



---

See BEVIN, Page 14A

[9] Ex. 6, December 13, 2019 Courier Journal Article at 1; *see also* December 13, 2019 Courier Journal Online Article link.

- December 18, 2019: GOP megadonor pushed for pardon, Bevin's last-minute order freed convicted killer Baker[10]



On December 22, 2019, the Courier Journal sold a special Sunday paper dehumanizing the pardon recipients by including their mugshots in an illustration reminiscent of the Brady Bunch.[11]  That special section also included six articles referencing the Baker pardon and accusing the family of using their political donation to free a loved one.

At the frontlines of the assault on the legitimacy of Mr. Baker's pardon was Commonwealth Attorney Jackie Steele.  Ex. 3, December 12, 2019 CJ Article at 1. Mr. Steele is

---

[10] Ex. 7, December 18, 2019 CJ Article at 1.
[11] Ex. 8, December 22, 2019 Special Section at 1.

not a disinterested party as it relates to Detectives York and Johnson.[12]  In fact, when the *Hoskins* complaint was filed, Steele was one of the first people to who Detective York reached out.  Ex. 9, York Text Message at York 80.  At his deposition, Steele recalled referring York to an civil-defense attorney: "Matt Feltner had worked with the KSP legal team who does a lot of – obviously they do a lot of – of representation of officers, and I may have given him Matt Feltner's number and contact information."  Ex. 10, Steele Dep. Tr. at 166:18-166:21.  Steele's recollection is wrong.  As established, the Knox County Commonwealth Attorney did not just provide information to Detective York, but rather, reached out to the attorney himself on York's behalf.  According to the text, Steele "contacted Matt and I am sending him your contact information."  Ex. 9, York Text Message at York 80.

Given that Steele sought to retain civil-defense counsel for York, there is no reason to believe that the public could have any confidence that the Knox County Commonwealth Attorney is going to hold these law-enforcement officers accountable for wrongdoing in his community.  To this day, after repeatedly acknowledging at his deposition that Detective York included false information in search-warrant affidavits, failed to disclose promises of consideration to witnesses, and even withheld murder charges against a witness from the investigative file without informing the Commonwealth Attorney - Steele has declined to investigate or initiate charges against Detective York.

---

[12] Defendants curiously dedicate a paragraph of their brief to comments made about Prosecutor Jackie Steele. Dckt. No. 248 at 5-6.  As is easily established from a review of the article and this response, Steele interjected himself into the Baker media campaign and was arguably the ringleader.  Steele's role as a potential witness in the *Hoskins* case is irrelevant to whether counsel can make the comments at issue.  Steele is biased.  Whatever jury hears the *Hoskins* trial will learn that he attempted to retain civil-defense counsel for Defendant York after learning of the lawsuit.  That is not the role of an impartial prosecutor.  Further, Defendants include the following quote from Plaintiffs' counsel in their brief, "I think you know that I'm not going to call Jackie Steele a crooked prosecutor…what I would say is that he got it wrong in this case."  *See* Dckt. No. 248 at 6. Counsel's remark shows restraint to the following question: "Do you think he is a crooked prosecutor?" Responding, counsel declined to go that far and instead responded that he got it wrong in the *Baker* prosecution.

With this backdrop, in the December 12, 2019 article, Steele informed the press that it would be an "understatement to say" he was "aggrieved" by Bevin's pardon. Ex. 5, December 12, Courier Journal Article at 2. According to the article:

> Steele noted Baker served two years of a 19-year sentence on his conviction for reckless homicide, robbery, impersonating a peace officer and tampering with evidence. Steele, who, like Bevin, is a Republican, also cited the fact that two of Baker's co-defendants are still in prison. "What makes Mr. Baker any different than the other two?" he asked.

> Answering that question, he said he believes Baker was pardoned while the others remain locked up because Baker's family has given generously to Bevin. State records show that Victoria Baker, who lives at the same Corbin address where the fundraiser was held, donated $1,000 in 2015 and that Kathryn Baker gave another $500 in March.

*Id.*

The following day, the Courier Journal published another front-page story which included a photograph of Mr. Baker's brother with Governor Matt Bevin at a 2018 fundraiser. Ex. 6, December 13, 2019 CJ Article at 1. The headline read: "'Matt Bevin can rot in hell' relatives furious at pardon for political donor's brother." *Id.* The Courier Journal reported in this article that the victim's family and attorneys who represented co-defendants "suggested Baker's freedom was bought by a wealthy family." *Id.* at 1. The Courier Journal quoted an attorney as stating that she was "extremely disappointed that Bevin would pardon the one who actually shot and killed Mr. Mills…[I]t's very clear to me that this pardon was purchased…my client doesn't have a wealthy family so he did not receive a pardon." *Id.* at 2. Disturbingly, the national USA Today article even included a photograph of the Baker family home, which was fully decorated for the Christmas season. By this time, not only was the Baker family being accused of criminal wrongdoing and Patrick Baker being falsely accused once again of murder, but the whole world now knew exactly where the Baker family lived and what their home looked like. Sadly, the Baker family nightmare only worsened from there.

In an editorial on December 14, 2019, the Courier Journal led calls for a criminal investigation into Mr. Baker's pardon. Ex. 11, December 14, 2019 CJ at 1. The following day, the Courier Journal reported that several state lawmakers called upon Attorney General-elect Daniel Cameron to appoint an independent special prosecutor to investigate potential criminal wrongdoing in Bevin's pardon of Baker. Included in that story were quotes from Senate President Robert Stivers, who called upon a federal investigation, "from what we know of former Governor Bevin's extreme pardons and commutations, the Senate Republican Majority condemns his actions as a travesty and perversion of justice…Our citizens, and especially the crime victims and their families, deserve better." Ex. 12, December 15, 2019 CJ Article at 1. Even Senator Mitch McConnell informed the media that he did not approve of the pardons and "it seems to me it was completely inappropriate. I expect he has the power to do it, but looking at the examples of people who were incarcerated as the result of heinous crimes, no, I don't approve of them." Ex. 13, December 14, 2019 CJ Online Article at 1.

### B. Plaintiffs' Counsel Held a Press Conference to Mitigate Prejudice to Mr. Baker and his Family

A crescendo was building. By December 16, 2019, the Courier Journal published front-page stories on a near daily basis about Governor Bevin's pardon of Patrick Baker. Senator McConnell voiced his opposition, as did state lawmakers from both parties. There were bipartisan calls for both state and federal criminal investigations into the pardon and whether it was purchased. The prosecuting attorney, Jackie Steele, was speaking to any local and national media outlet that gave him a voice. By December 14, 2019, Steele was quoted in the Washington Post and by CNN. Given these extraordinary events, a decision was made to hold a press conference to address the serious and false allegations that were being conveyed through the Commonwealth of Kentucky and beyond. Ex. 14, December 16, 2019 Press Release.

The press conference addressed the serious evidence of innocence that led to Mr. Baker's exoneration: (1) DNA evidence left at the crime scene; (2) descriptions from two eyewitnesses which did not match Baker; and (3) allegations of misconduct that have been levied against the two lead detectives in the Baker case and other criminal investigations. Further, given the serious and false allegations that were imposed against the family – namely, that there was no investigation conducted into the legitimacy of Baker's innocence claims and that the pardon was itself a sham – a detailed timeline of what occurred within the Kentucky Justice Cabinet and Governor's Office was also discussed in an effort to rebuke the allegation that the pardon was a product of political patronage.

### C. Contrary to Defendants' Distortions, Counsel's Statements Centered on the Baker Case, False Allegations Made Against the Baker Family, and the Related Governmental Investigation Into Defendants Prompting Baker's Exoneration

As is discussed at length above and below, Defendants' brief grossly mischaracterizes the substance of information provided at the press conference. To do so, Defendants' motion includes excerpts of sentences without the use of ellipses nor context. Context is critical. According to Defendants, counsel's "message during the press conference was that his clients (Hoskins, Taylor, and Anderson) are currently pursuing claims of civil rights violations against these officers because these officers framed innocent people for murder, should be charged with violating civil rights, and should be criminally charged for perjury and obstruction of justice." See Dckt. No. 248 at 3. A closer review of the press conference, however, illustrates a much different story.

Plaintiffs' counsel initially addressed the significant evidence of innocence supporting Patrick Baker's exoneration. *See* Press Conference Link at 0:00-4:00. There, counsel discussed the DNA exclusions to Baker, the eyewitness descriptions that did not match Baker, evidence

implicating an alternate suspect, and the plight that the Baker family suffered while Patrick was wrongfully convicted. *Id.* Immediately thereafter, Plaintiffs' counsel provided information about his firm's cooperation with an investigation conducted by members of the Justice Cabinet and Governor's Office into Detectives York and Johnson from the Kentucky State Police. *Id.* at 4:00 – 5:55. This information is critical to the mitigation and defense of the Baker family from the accusations of bribery that were being spewed about in the media. It is from this section of the press conference that Defendants begin to conveniently cherry-pick quotes from Plaintiffs' counsel to distort what was said. In doing so, Defendants selectively point this Court towards the following quote in support of their argument that the "message" of the press conference is that the officers should be criminally charged: "whether these officers should be charged with not only violating the constitutional rights of citizens in the state but whether they should be criminally charged for committing perjury and obstruction of justice."[13]

What Defendants deliberately decline to inform the Court is that Plaintiffs' counsel provided a timeline for the events which caused Governor Bevin to look at Baker's wrongful conviction in the first place. The full quote is as follows:

> Significant evidence was produced from our law firm to Mr. Butler for the purposes of an investigation taking place in the Justice Cabinet and hopefully at the Kentucky State Police into whether these officers should be charged with not only violating the constitutional rights of citizens in the state but whether they should be criminally charged for committing perjury and obstruction of justice. That was in March of 2018. What you'll find when you actually look at Mr. Baker's pardon application is that he didn't apply for a pardon until after that date. We had nothing to do with Mr. Baker's pardon efforts. And Denny Butler, as a member of the Justice Cabinet, was looking into these officers' misconduct from the Kentucky State Police before Patrick ever filed for a pardon application, before his family ever held a fundraiser. It had absolutely nothing to do with it.

*Id.* at 5:48-6:46.

---

[13] Misleadingly, Defendants provide an out of context citation, asking this Court to consider just between 5:59-6:13.

Defendants' motion is replete with additional instances where counsel's statements are taken out of context. Another prime example is included *infra* at pg. 2. An impartial review of the press conference reveals that Plaintiffs' counsel continued to provide the timeline regarding the investigation into Defendants and how that predated Baker's exoneration efforts:

> There's overlap in the two lawsuits that have been filed, and certainly if there is one in this case, those officers would be named there, I presume, there as well. There is overlap not only between the officers but the type of misconduct that was occurring, so while people want to look at a fundraiser, what they really should be looking at is whether the people with badges in this state should have those badges. <u>And the question that should be asked is what Governor Bevin was doing within his administration to try to bring these officers – where serious allegations of misconduct have been alleged - what Governor Bevin was doing to get rid of them from the Kentucky State Police. And again, this is prior to the pardon application being filed.</u>

*Id.* at 8:43-9:35

Throughout the press conference, counsel continued to explain why Mr. Baker's pardon was considered by Governor Bevin and why Governor Bevin ultimately exonerated Baker:

> Sgt. York was questioned a couple of weeks ago under oath in a federal case and said that if he had the opportunity, he would do that same thing tomorrow. Mr. York was one of the detectives who was investigating Patrick Baker's case. So, when these questions are asked about why is Patrick here… Patrick is free today because DNA evidence clears him from committing the murder, because eyewitness descriptions have never matched him, and because egregious police misconduct was being looked into by Governor Bevin and people under his command, like Denny Butler."

*Id.* at 11:00-11:48.

Counsel responded directly to the salacious and false allegations alleged Mr. Baker and his family:

> "Patrick Baker's case was treated like any other pardon in the Commonwealth of Kentucky. That is why it was granted. It wasn't a fundraiser. Frankly, if you were going to pay off somebody who is a politician you probably wouldn't do it in a formal way where you disclose that to anybody in the state who wants to go on the government website to find out if you had a fundraiser. Probably not the best way to pay off a politician. There is absolutely nothing inappropriate with the Baker family supporting Mr. Bevin's re-election efforts. Even though citizens in Kentucky decided not to re-elect

Mr. Bevin, it doesn't mean that what he did with his pardons, and especially in this, was unjust. In fact, what we think that Mr. Bevin did here is justice at its best.

*Id*. at 13:17-14:05

At the conclusion of the eighteen-minute press conference,[14] the Baker family, through counsel, called for an investigation into police misconduct at the Kentucky State Police:

> One thing we are calling on is for Governor Beshear to authorize his Attorney General, who I believe got sworn in today, <u>to conduct an investigation into members of the Kentucky State Police officers, specifically the ones that have been sued in the cases that we have cited to and in relation to Mr. Baker's case, to see whether these officers should be criminally charged with violating the laws of Kentucky and violating the constitutional rights of its' citizens. That is something that the Baker family hopes can happen</u>.

*Id*. at 17:55-18:37.

This request was fully within the First Amendment rights of Baker and his counsel.[15] Given the egregious allegations of misconduct against both officers, an investigation is warranted. In any event, a call for an investigation at the conclusion of remarks is far different than the distorted picture painted by Defendants. As shown *supra*, counsel's statements were focused on the Baker exoneration, events which caused the Governor to look at the Baker case, and a recitation of the timeline regarding an investigation into the Defendant detectives to rebut the allegation of a pay-to-play scheme. The statements made by counsel are squarely allowed

---

[14] Counsel and his client responded to specific questions from the media for approximately twenty minutes after their initial remarks.

[15] Defendants again distort a quote from counsel in their brief. There, Defendants recite that Plaintiffs' counsel would "pick up the phone every day and I would call and ask for a criminal prosecution of police officers." *See* Dckt. No. 248 at 4. The inference is that Plaintiffs' counsel would call the Governor everyday about these Defendants if possible. In reviewing the actual question posed by the press, and responsive answer, Plaintiffs' counsel actually provided a generic answer: "If I had the power to call the Governor in the State and he would actually pick up the phone or she would pick up the phone, everyday I would call and ask for a criminal prosecution of police officers in Kentucky who are framing people for crimes they didn't commit. Absolutely." *See* <u>Press Conference Link</u> at 28:42-29:00.

under SCR 3.130(3.6)(c) and Comment 7 to mitigate against the significant prejudice suffered by the Baker family as a result of the media barrage. This Court's inquiry could candidly end here.

## II. Pursuant to Supreme Court Rule 3.130(3.6)(2), Counsel Was Permitted to Rely Upon Publicly Filed Documents

Additionally, pursuant to Kentucky Supreme Court Rule 3.130(3.6)(2), Plaintiffs' counsel was permitted to make statements based on information contained in the public record. Rule 3.130 (3.6), titled "Trial Publicity," specifically allows for attorneys to publicly state the following: 1) the claim, offense or defense involved; 2) information contained in a public record; 3) that an investigation of the matter is in progress; 4) the scheduling or result of any step in litigation; 5) a request for assistance in obtaining evidence and information necessary thereto; and 6) a warning of danger concerning the behavior of a person involved, when there is reason to believe that there exists the likelihood of substantial harm to an individual or to the public interest. Statements made by counsel that in any way relate to the *Hoskins* and *Anderson* cases easily satisfy the requirements set forth in KSCR 3.130(3.06). Given this, Defendants' complaints about references to evidence developed in the *Hoskins* or *Anderson* litigations are too without merit.[16]

Specifically, the press release includes links to the publicly filed complaints, deposition transcripts, and summary judgment pleadings in *Hoskins, et al v. Knox County, et al.,* and the complaint in *Anderson v. Knox County, et al*. Ex. 14, Baker Press Release. Although the Kentucky State Police Defendants complain about an audio clip of an interrogation of Dave Fox by Detective York that was played to the press, Defendants acknowledge that the audio recording and its' transcript have been publicly filed and/or referred to in both litigations.

---

[16] Initially, as explained above, the evidence developed in those cases was first provided to the Justice Cabinet and Governor's Office in 2018 so that an investigation could be conducted. That evidence, provided prior to his pardon request and family fundraiser, led to Mr. Baker's ultimate exoneration. That context was critical to defending against the salacious allegations raised.

Further, William Anderson was tried for capital murder in Bell County, Kentucky, and the complained about audio clip was played wholesale for the jury, again in public and covered by the media. Finally, the audio clip at issue has been on the Courier Journal's website since the lawsuit was filed on May 22, 2017. In short, the Defendants' complaints are without merit, as "the information contained in a public record" in nearly a half-dozen different ways.

### III. Plaintiffs' Counsel Did Not Misrepresent Information at the Press Conference

Defendants' motion also claims that Plaintiffs' counsel provided misleading information at the press conference. *See* Dckt. No. 248 at 1. A close review of the Defendants' Motion includes two allegations of something they claim is misleading: "Mr. Slosar's message in the press release, was that his clients are currently pursuing claims of civil rights violations against Det. Johnson in both the Hoskins & Taylor case and the Anderson case." *See* Dckt. No. 248 at 12. Language is important. Here, Defendants' distort what Plaintiffs' counsel represented in the press release and later at the press conference as it relates to Detective Johnson. Specifically, the press release states that "KSP Officers Bryan Johnson and Jason York are currently facing two separate federal lawsuits…These suits accuse Johnson and York of…." Ex. 14, Press Release at 1. Indeed, at the time of the press conference, Detective Johnson was still a Defendant in the *Hoskins* litigation as no orders had been entered. To this day a final judgment has not been issued pursuant to Rule 54(b). Thus, he was still facing the suit, if only temporarily.

Further, although Plaintiffs voluntarily moved to dismiss Detective Johnson at the dispositive-motion stage, that dismissal did not absolve Detective Johnson of the allegations of misconduct by Plaintiffs in *Hoskins*. In the *Hoskins* case, Detective Johnson was present for Detective York's interview with Robert Beach, where Plaintiffs maintain that Beach's statement was fabricated. In their Summary Judgment Response, Plaintiffs set forth significant evidence

supporting their contention that Beach's statement was fabricated in Detective Johnson's presence.[17]  *See* Dckt. No. 204 at 83-85.  Although the evidence developed in *Hoskins* established that Detective Johnson did not draft Beach's statement (which Plaintiffs maintain is fabricated), he was present when this statement was drafted.  As recordings establish, Beach knew nothing about the case prior to Detectives Johnson and York arriving at the correctional center.  When their largely-unrecorded meeting with Beach was done, the Detectives left with a three-minute statement that captures Detective York prompting Beach and providing him with the details of the supposed confession.  Given discovery and difficulty obtaining Beach's deposition testimony, Plaintiffs voluntarily moved to dismiss Detective Johnson for strategic reasons based on the estimated viability of holding him accountable via their conspiracy and failure to intervene claims.  Given the Court's recent ruling in *Hoskins*, where it declined to award Plaintiffs a trial against any of York's co-defendants, Plaintiffs' concerns were valid.[18]

Additionally, as is further discussed below, Detective Johnson continues to face serious allegations of misconduct levied against him in the *Anderson* case at the time of the press-conference.  Although Plaintiffs dispute that the speech at issue was misleading – again, Detective Johnson was not yet dismissed as a Defendant, continued to face allegations of misconduct relating to Beach, and faced another pending lawsuit in *Anderson* with serious

_____

[17] In providing Plaintiffs a trial, the Court found: "Plaintiffs' claim of innocence hinges, at least in part, on the truth or falsity of several witness statements, including King, Wilson, and Beach.  The Commonwealth's motion and the state court's resulting order do not resolve when, if ever, these witnesses were telling the truth… This issue is inextricably bound up with Plaintiffs' fabrication argument.  Viewing the facts in the light most favorable to Plaintiffs, a reasonable juror could believe that the state's witnesses were lying when they inculpated Plaintiffs and telling the truth when they recanted to Steele or testified in their depositions.  Certainly, at the point of dismissal, the prosecutor viewed the proof as not even rising to the level of probable cause, much less to the level supporting a prima facie case or a conviction…" *See* Dckt. No. 256 at 65.

[18] Since the recent March 23, 2020 ruling in *Hoskins*, Plaintiffs have not had a chance to litigate the dismissed co-defendants and claims.

allegations of misconduct – Defendants' complaint does not warrant relief. On this front, Judge

Thapar recently addressed an allegation of misleading speech and held:

> Stripped down to its essence, the Commission's position is that the Court should uphold a ban on one type of misleading political speech. But the remedy for misleading speech is more speech, not less. *See* \*899 *Whitney v. California,* 274 U.S. 357, 377, 47 S.Ct. 641, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring) ("If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence."); *Alvarez,* 132 S.Ct. at 2550 (plurality opinion) ("The response to the unreasoned is the rational; to the uninformed, the enlightened; to the straightout lie, the simple truth."). And this makes sense. Often, whether a statement is misleading is in the eyes of the beholder. Take Kentucky native Muhammad Ali's statement, "I am the greatest." At the time he said it, many believed it to be true. But would Joe Frazier have thought it misleading? Of course. And, take, for example, a judicial election between two Republicans. If one judicial hopeful says, I am the best Republican for the job, would censorship or more speech better serve the public? The answer is more speech. Our Founders wisely left to the public—not to the government—the weighty determination of whether political speech is true or misleading. *See Whitney,* 274 U.S. at 375–76, 47 S.Ct. 641 (Brandeis, J., concurring). Even false statements, which are "inevitable in free debate," especially political debate, must have some protection so that freedom of speech has the "breathing space" necessary "to survive." *Brown v. Hartlage,* 456 U.S. 45, 60, 102 S.Ct. 1523, 71 L.Ed.2d 732 (1982) (internal quotation marks omitted). Misleading statements, therefore, deserve shelter under the First Amendment.

*Winter v. Wolnitzek*, 56 F. Supp. 3d 884, 898–99 (E.D. Ky. 2014)

So, too, should be the case here.

Second, Defendants dispute allegations by Plaintiffs' counsel that evidence was

destroyed in the *Baker* prosecution. On this score, Defendants seem to contest counsel's

representation that evidence was destroyed from Mr. Baker's phone. *See* Dckt. No. 248 at 7.

Defendants then cite to a portion of an appellate opinion that does not address the actual issue

raised by counsel. As the attached appellate motion reveals, the evidence was destroyed by a

member of the Kentucky State Police – coincidentally, with the permission of Commonwealth

Attorney Jackie Steele. Ex. 15, Baker Appellant Brief at 2-3, 8-11. Given the above, Plaintiffs'

counsel did not make misleading representations.

## IV. The First Amendment Protects Counsel and Client's Request for an Investigation

Next, Defendants spend an inordinate amount of their brief dedicated to the alleged

prejudice suffered by a call for an investigation into police misconduct at the Kentucky State

Police. Given the issues at stake, counsel and client were well within their First Amendment

rights to make the statements at issue. As the Supreme Court held in *Gentile v. State Bar of*

*Nevada*:

> In *Sheppard v. Maxwell,* 384 U.S. 333, 350, 86 S.Ct. 1507, 1515, 16 L.Ed.2d 600 (1966), we reminded that "[t]he press ... guards against the miscarriage of justice by subjecting the police, prosecutors, and judicial processes **2725 to extensive public scrutiny and criticism."
>
> Public awareness and criticism have even greater importance where, as here, they concern allegations of police corruption, see *Nebraska Press Assn. v. Stuart,* 427 U.S. 539, 606, 96 S.Ct. 2791, 2825, 49 L.Ed.2d 683 (1976) (Brennan, J., concurring in judgment) ("[C]ommentary *1036 on the fact that there is strong evidence implicating a government official in criminal activity goes to the very core of matters of public concern"), or where, as is also the present circumstance, the criticism questions the judgment of an elected public prosecutor. Our system grants prosecutors vast discretion at all stages of the criminal process, see *Morrison v. Olson,* 487 U.S. 654, 727–728, 108 S.Ct. 2597, 2637–2638, 101 L.Ed.2d 569 (1988) (SCALIA, J., dissenting). The public has an interest in its responsible exercise.

*Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1035–36 (1991)

The allegations facing Detectives York and Johnson are serious. There is nothing more

serious than allegations that law-enforcement officers at the Kentucky State Police framed

innocent people for crimes they did not commit. In *Hoskins*, Prosecutor Steele voluntarily

moved to dismiss the murder charges against all three defendants, having determined that

probable cause was not present. In *Anderson*, the Plaintiff was acquitted of capital murder in

spite of his co-defendant testifying against him in exchange for a deal. Even in *Baker*, whose

exoneration via pardon was the subject of such outcry, the jury acquitted him of murder and

found him guilty of a lesser offense. The jury - who clearly came to a compromised verdict -

rejected the Commonwealth's request for a much-longer sentence, recommending 19 years imprisonment for Mr. Baker. Contrary to the public protestations of the prosecutor and trial judge, the jury verdict indicates that Baker's case was anything but solid.

The basis of counsel's request for an investigation into Detectives York and Johnson is not just because their murder investigations frequently fall apart, but rather, how they were conducted in the first place. Discovery in the *Hoskins* and *Anderson* cases has unveiled significant misconduct by law-enforcement officials in Eastern Kentucky. Indeed, Plaintiffs were just provided a trial in *Hoskins* against the primary Defendant Jason York on "their Section 1983 and state-law malicious prosecution claims…" *See* Dckt. No. 256 at 91. There, Plaintiffs uncovered significant misconduct committed by Detective York as part of his quest to frame Plaintiffs for a crime they did not commit. As Plaintiff's Summary Judgment Response details, Detective York made admissions to testifying falsely before the grand jury, providing false information in search-warrant affidavits, making undisclosed promises of consideration to witnesses, and charging a witness with murder without disclosing such efforts to Commonwealth Attorney Steele. *See* Dckt. 204 at sections III(iv), III(viii), V, and IX. Plaintiffs have summarized the allegations against Detective Johnson in *Hoskins, supra*, but provide a glimpse below into the allegations against both officers in *Anderson*.

Although the dispositive motion stage is not yet ripe in *Anderson v. Knox County, et al*, the allegations of misconduct against Detectives York and Johnson is unrivaled. There, Detective York admits he threatened to "*fry*" witnesses and suspects while questioning them. Ex. 16, York September 10, 2019 Dep. Tr. at 13:18-20; 21:11-20. York explains that this "is a tactic I use. I do not remember how many times." *Id*. at 12:10-12. In fact, an audio recording captures Detective York threatening the Plaintiff, William Anderson, during his interrogation: "I

will fucking fry you, and I promise you that." *Id.* at 18:20-23. This threat occurred after the Plaintiff in that case voluntarily cooperated with questioning, did not request counsel, and provided his alibi witnesses. Ex. 17, York Dep. Tr. II at 58:3-20. Detective York also told Mr. Anderson that "trial was going to be fun, fun, fun, because he was going to hang." Ex. 16, York Dep. Tr. I at 39:7-12. Detective York takes offense to characterizing his questioning as threatening in nature when he informed citizens that they would hang or fry. *Id.* at 60:1-10. In his view, these are tactics, not threats. Ex. 17, York Dep. Tr. II. at 81:10-25. Detective Johnson never interfered with Detective York's "tactics" of threatening to hang and fry Mr. Anderson. *Id.* at 64:19-65:7. He not only allowed Detective York to do this but encouraged him to take the lead in questioning other witnesses and suspects. Predictably, Detective York's tactics worsened with those individuals.

One of those individuals is Dave Fox. Plaintiffs avoid characterizing the disturbing sequences of events which occurred during Detective York, Deputy Eubanks, and Sergeant Joseph's questioning of Fox. The audio speaks for itself, with the most disturbing clip attached here. *See* Dckts. 200-95, 208; *see also* Ex. 14, Press Release link. Plaintiffs have thoroughly briefed this as part of the *Hoskins*' Summary Judgment response at Dckt. No. 204 at 101-103. They will do so again – with additional testimony from Fox, York, Joseph, and Eubanks – in *Anderson*. Since the *Hoskins'* summary judgment response, Mr. Fox has been deposed and described a horrific scene where:

> [York] smacked my hat off my head. He was, you know, right up in my face, I – I don't know. I – I remember him kicking chairs around the room, doing all kinds of crazy stuff, you know, I think at one point he event flipped the table…up on its side. Just a lot of crazy stuff was going on, you know, because I don't know if he was trying to scare me or what, you know, trying to trick me into saying something that wasn't true or what the deal was there…

Ex. 18, Dave Fox Dep. Tr. at 88:4-13.

By the end, Mr. Fox "felt scared. I felt threatened. I felt like he was…in the process of going to hit me or something, you know, but what could I do. He was a – he was a policeman. I mean, I just felt like I was defenseless to him – to defending myself, really." *Id.* at 90:18-22.

Detective York's own admissions, the recording, and Mr. Fox's rendition of events appear to satisfy the elements for harassment under KRS Section 525.070. If Mr. Fox suffered an injury, Detective York's conduct could subject him to a criminal charge of assault.[19]

But it wasn't just Detective York who framed Plaintiff Anderson, Detective Johnson played a prime roll as well. For instance, Jeremiah Evans testified against Plaintiff Anderson at his capital murder trial. There, Evans claimed that Anderson confessed to him. In discovery, Evans revealed that his statement was a product of fabrication by Defendants Johnson and Lawson. Ex. 19, Jeremiah Evans Aff. at 1-3. Specifically, Evans recounts how he was "told to say that Bill had given me information about his case and was told what to repeat at Bill's trial. In response, I told everyone in that room that the information they wanted me to repeat was not true. Based on the conversation we had, I knew I had to go along with what they wanted me to say or there would be serious consequences for me. I felt threatened to repeat the false information that was told to me." *Id.* at 1. If the affidavit of Mr. Evans is credited, Detective Johnson could be charged with subordination of perjury under KRS Ch. 523.

Detective Johnson's misconduct did not end there in *Anderson*. Rather, as he testified to at length at the grand ury, Detective Johnson decided to intentionally withhold critical evidence from the grand jury to obtain William Anderson's indictment for murder. Ex. 20, Bryan Johnson Dep. Tr. at 205:21-222:21. For instance, Detective Johnson declined to inform the grand jury

---

[19] And of course, through KRS Ch. 523, Detective York could be charged with perjury each time he signed a search warrant affidavit based on false information. If witnesses like Allen Helton, Amber Simpson, Joe King, and Daniel Wilson are to be believed, Detective York could also be exposed to charges of subordination of perjury.

that Mr. Anderson's co-defendant – and the only person alleging he had involvement in the murder – had provided a dozen different stories to law enforcement before settling on one. *Id*. At 218:17-22. He also withheld from the grand jury that Sizemore was told what to say by law enforcement and that his statements conflicted with the physical evidence. *Id*. at 219:8-18. He even declined to inform the grand jury of his belief that Sizemore lied to him while giving statements. *Id*. at 14:5-13. He declined to inform the grand jury of Anderson's alibi witnesses – and the information that implicated Sizemore and his uncle, Jeff Gray. *Id*. at 208:11-25; 220:1-221:1. Although Detective Johnson and York's actions are enough to hold each liable, they likewise warrant an investigation. *See, King v. Harwood*, 852 F.3d 568, 589 (6th Cir. 2017)

Given the above, Plaintiffs' counsel, on behalf of the Baker family, was well within his First Amendment right to call for an investigation into allegations of misconduct against the officers at issue. The conduct at issue is not only enough to hold the officers liable for violating the constitutional rights of Plaintiffs, but could also be criminal. As such, a legitimate and unbiased prosecutorial agency should investigate these officers. At the very least, as *Gentile* instructs, the public has a right to know about these serious issues given that these officers continue to be employed in their communities.

## V.     The Kentucky State Police Went on a Media Blitz Both Before and After the December 17, 2019 Press Conference

Although Defendants come before this Court claiming to have suffered so much prejudice that a retraction is necessary, they fail to inform the Court that their agency issued a joint press release with Jackie Steele on December 17, 2019 (the same date as the press conference) and that former Kentucky State Police Commissioner Sanders did an interview the following day with the Courier Journal which landed on the front page: "Police czar: Baker is guilty, Convicted killer was pardoned by Bevin." Ex. 3, December 21, 2019 CJ Article at 1.

The December 17, 2019 press release was released by Jackie Steele but appears to be jointly done, or at the very least, with authorization from the Kentucky State Police. The press release states:

> The voice of Donald (Mills) spilled blood is crying out from the ground because the justice done in this case has been undone…Myself, the Kentucky State Police and specifically these officers invite any investigation into the criminal prosecution of Patrick Baker.

*See* [December 20, 2019 Courier Journal Online Article Link](#); Ex. 3, December 21, 2019 CJ Article at 2.

So, while Defendants come before this Court claiming that calls for an investigation are improper, they publicly made the same request – on the *same exact* day – to the media via a press release. How the Defendants justify such contradictory positions is something only they can explain. In addition to issuing a press release, the outgoing Kentucky State Police Commissioner conducted a lengthy interview with the Courier Journal to criticize Governor Bevin, reassert the agency's position that Baker was a murderer and his exoneration illegitimate, and defend the Detectives from allegations of misconduct. In this interview, outgoing KSP Commissioner Sanders stated "I came back to the governor and said, 'I agree with (Commonwealth's Attorney) Jackie Steele – the prosecutor – the jury, the judge, and I think that Patrick Baker was, in fact, guilty in that case." *Id.* at 2. Sanders further revealed that he "saw no mismanagement or any issues with the way in which it was handled." *Id.* As it specifically relates to allegations against Detectives York and Johnson, the article reveals, "Sanders did note that no one has ever filed a complaint against York or Johnson for anything involving the case of the Mills killing, and the incidents from the previous lawsuits occurred before he became commissioner in 2016, when he was appointed by Bevin." *Id.* at 2.

**VI.      Defendants Have Not Been Prejudiced**

Importantly, Defendants fail to establish any prejudice in the *Hoskins* case as a result of the discussion above. Only Defendant Jason York remains for trial, not the remaining Kentucky State Police officers. How these Defendants[20] could suffer prejudice in a case that they are no longer a part of is perplexing.

Defendants point to the national extent of media coverage in support of their prejudice argument. Yet, the national media coverage was a campaign driven by people other than Plaintiffs' counsel and the Baker family, as is firmly established above, and was almost exclusively focused on criticism of Bevin's pardon process. Further, the national stories cited in Defendants' brief mostly predate the press conference. See Dckt. No. 248 at 11. Even the single *USA Today* article referred to by Defendants that did not predate the press conference is an article challenging the legitimacy of the pardon request. That article fuels another false allegation against the Baker family. The Kentucky State Police detectives are not even named in that article. To date, Plaintiffs' counsel has yet to find a national media story – and Defendants cite to none - that references the detectives. The allegations of prejudice due to national media exposure is simply without merit.

But these Defendants have equally failed to prove prejudice in the *Anderson* case. Given that discovery is ongoing and the world continues to suffer through a pandemic, an extension of that discovery period will be necessary. There cannot be a good-faith argument that at some distant trial date in the future these Defendants will suffer prejudice due to a press conference that people will have surely forgotten about. Further, in Plaintiffs' experience, it is routine to ask the venire what pretrial publicity they have been informed of during the jury selection process. Given that the *Hoskins'* trial is on the horizon, it is highly probable that another round of media

---

[20] On this score, the Defendants seeking relief are Detectives Bryan Johnson, Kelly Farris, Dallas Eubanks, Mark Mefford, and Jackie Joseph. See Dckt. No. 248 at 1. Given a recent summary judgment ruling, none of these Defendants are expected to stand trial in the *Hoskins* litigation.

coverage, and necessarily scrutiny as to Detective York's alleged misdeeds, will occur. That media coverage, too, will be something that counsel will need to question the venire in *Anderson* about when the time comes. In any event, none of these Defendants have suffered prejudice in *Hoskins* and the alleged prejudice in *Anderson* is far too remote and speculative to be a serious concern at this juncture.[21]

### VII. Defendants Reference to a State-Court Order from Elkhart is Frivolous. The Following Order by that Judge Was Recusal Due to Allegations of Bias.

Finally, Defendants reference a state court order from Elkhart, Indiana relating to *People v. Andrew Royer*. *See* Dckt. No. 248 at 13. Like other arguments, Defendants' decline to fill the gaps. As background, Plaintiffs' counsel has litigated wrongful conviction cases in Elkhart, Indiana for a number of years. In fact, he began working on Elkhart wrongful conviction cases as an investigator during law school. Currently, Plaintiffs' counsel serves as pro-bono counsel for wrongfully convicted individuals as an attorney for the Exoneration Project. In this capacity, he and students from Notre Dame Law School litigate post-conviction innocence cases in Elkhart. To date, four[22] individuals have been exonerated from Elkhart, a sobering statistic for a population of approximately fifty-thousand people. Several of counsel's additional clients are on pace to be next.

In 2018, Pro Publica joined the South-Bend Tribune and conducted a year-long investigative series into misconduct in Elkhart based on significant evidence of misconduct unearthed in two of counsel's cases: (1) one resulting in a multi-million-dollar settlement in

---

[21] Equally important to illustrating the lack of prejudice is the Kentucky Supreme Court's comments to SCR 3.130(3.6). There, the Supreme Court cautions that a relevant factor "in determining prejudice is the nature of the proceeding involved. SCR 3.130(3.6), Comment 6. Further, the Supreme Court notes that criminal jury trials will be most sensitive to extrajudicial speech while "civil trials may be less sensitive." Here, of course, there were no trials pending at the time of the press conference.

[22] Two of these are counsel's clients: Christopher Parish and Keith Cooper.

*Christopher Parish v. City of Elkhart* and (2) a 2017 exoneration through Indiana's first-ever actual innocence pardon for [Keith Cooper](). The series, [Accused in Elkhart](), dug into the dynamics of Elkhart in a way that hadn't been done before. The series resulted in national scrutiny of the broken system that existed in Elkhart. By the end, the [police chief]() was forced to resign. Due to revelations of police misconduct, the mayor did not seek [reelection](). The City sought an [investigation]() by the Department of Justice and the Indiana State Police into police misconduct. Ultimately, federal charges were brought against several police officers. In *Keith Cooper v. City of Elkhart, et al.*, the main Defendant committed suicide on the eve of his sanctions response for allegations of committing perjury and the withholding of evidence. See [February 6, 2019 Pro Publica Article](). These were the serious events taking place in Elkhart during the time-frame at issue.

Given the heightened public awareness and interest in police misconduct, Petitioner's counsel made short remarks after the filing of Mr. Royer's Petition for Post-Conviction Relief.[23] Prior to these remarks the elected Elkhart County Prosecutor informed the Indianapolis Star that Royer "can shout at the rain all he wants, but the bottom line is, the finders of fact in this case have unequivocally spoken. He is guilty, and his argument isn't credible." See [April 23, 2017 Indy Star Article.]() Counsel's remarks were within the framework of what the ethical rules allowed. Yet, the elected prosecutor was in the midst of election season and attempted to do damage control for herself and colleagues who were suffering from the political blowback from the heightened scrutiny. Related, the elected prosecutor was the person who tried both Mr. Royer and his co-defendant, Lana Canen. With this backdrop, the State filed a motion seeking to

---

[23] Mr. Royer's post-conviction petition should not have been controversial nor even contested. His co-defendant, Lana Canen, was exonerated seven years before through a motion by the Elkhart County Prosecutor's Office. Without counsel, and with the mind of a 12-year-old, Royer tragically lingered in prison for nearly a decade.

silence counsel from commenting on allegations of police misconduct in the Royer case. At the hearing, the State informed Judge Cataldo:

> Now the State of Indiana is <u>not seeking a formal injunction</u> because that type of remedy is not even available in this type of circumstance…What we are asking you to do is, based upon your discretion, ask the parties to refrain from additional public commentary at the time that this…case continues to pend. Ex. 21, Motion for Recusal at 7.

Yet, instead of granting a gag order on everyone, as the State requested, Judge Cataldo found that counsel's comments were "defamatory" and granted an injunction. The ruling occurred in spite of those issues not even being present before the Court. As shown above, the State informed the Court that an injunction "is not even available in this type of circumstance." To characterize the trial-court's opinion as over-reaching is an understatement. It was simply unconstitutional. But that issue awaits another day, as Mr. Royer's innocence claims are at the forefront of counsel's obligations.

Given that ruling, Mr. Royer withdrew the case from Judge Cataldo and proceeded to the Appellate Court for procedural reasons. After the Appellate Court granted relief – in the form of a permission to file a successive Post-Conviction Petition - Mr. Royer came back down to Judge Cataldo and filed the attached Motion for Recusal. Ex. 21, Motion for Recusal. That Motion informed Judge Cataldo that Petitioner "has asserted that systemic failures of the criminal justice system in Elkhart, Indiana led directly to his wrongful conviction." Id. at 2. After delving into various caselaw involving potential bias, Petitioner recounted how Judge Cataldo was a longtime colleague of the elected prosecutor while employed at the Elkhart County Prosecutor's Office,[24] worked with the individuals accused of framing Mr. Royer for a crime he did not commit, and "during the exact time-period that Petitioner will present evidence of systemic prosecutorial and police misconduct." Id. at 4-5. Further, recusal was also sought given the opinion at issue where

---

[24] None of this was disclosed by Judge Cataldo prior to her initial rulings. At no point did she reveal her professional connections to witnesses and parties in the case.

Judge Cataldo clearly "formed an opinion on the merits of the pending claims without hearing evidence." Id. at 6-7. On June 21, 2019, Judge Cataldo appropriately granted Mr. Royer's recusal motion. Ex. 22, Royer Docket at 19. Mr. Royer's case was then transferred outside Elkhart County to an impartial court who has since held a weeklong evidentiary hearing. The parties are awaiting the trial court's ruling.

As established, Defendants' reliance on a state-court order issued by a judge who recused herself due to allegations of bias is unavailing. Further, although Defendants attempt to draw parallels to the circumstances that prompted that hearing are completely distinguishable. Counsel had a right to speak on Patrick Baker's behalf regarding his exoneration. That right significantly heightened due to the egregious comments and allegations made by others – some aligned with the Kentucky State Police.

## CONCLUSION

As is explained above, counsel appropriately made statements in conformance with the ethical rules, which allow him to mitigate against prejudicial media coverage. SCR 3.130(3.6)(c) Any information mentioned about *Anderson* and *Hoskins* derived from public filings which have previously been reported on in the media and contained in a public record, as is explicitly allowed pursuant to SCR 3.130(3.6)(b)(2). Counsel's call for an investigation, on his client's behalf or otherwise, is protected speech under the First Amendment. *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1035–36 (1991). As is explained above, an investigation into these detectives is warranted. Further, Plaintiffs' counsel did not provide misleading statements to the media, and the Defendants have not suffered any prejudice in this case as a result of the public information to which counsel referred. Next, given that there is no pending litigation regarding the Baker case, these Defendants do not have standing to raise issues before this Court that

implicate commentary regarding the Baker prosecution and counsel's call for a criminal prosecution of the detectives involved. Finally, there is no need for this Honorable Court to admonish Plaintiffs' counsel to abide by the ethical rules as counsel is aware of those rules, has reviewed them exhaustively, and will continue to abide by them in this case and others.

For the reasons discussed above, Defendants' motion is without merit and should be denied.

RESPECTFULLY SUBMITTED,

/s/ Elliot Slosar
*One of Plaintiff's Attorneys*

Arthur Loevy
Jon Loevy
Michael Kanovitz
Elliot Slosar
Amy Robinson Staples
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, IL 60607
(312) 243-5900

## CERTIFICATE OF SERVICE

I, Elliot Slosar, an attorney, hereby certify that on March 27, 2020, I filed the foregoing motion via the Court's CM/ECF System and thereby served a copy on all counsel of record.

/s/ Elliot Slosar