1

```
 1                    UNITED STATES DISTRICT COURT
 2                    EASTERN DISTRICT OF KENTUCKY
                       SOUTHERN DIVISION at LONDON
 3                              - - -

 4   AMANDA HOSKINS and JONATHAN   : Docket No. 17-CV-84-REW
     TAYLOR,                       :
 5                                 : London, Kentucky
                        Plaintiffs, :
 6                                 : Monday, March 14, 2022
     Versus                       : 8:30 A.M.
 7                                 :    EXCERPTED TRANSCRIPT OF
                                   :    OPENING STATEMENTS
 8   JASON YORK, Individually,    :
                                   :
 9                     Defendant.  :

10                              - - -
                         OPENING STATEMENTS
11          BEFORE THE HONORABLE ROBERT E. WIER
              UNITED STATES DISTRICT COURT JUDGE
12                              - - -
     APPEARANCES:
13
     On Behalf of the Plaintiff:
14                    JON LOEVY, Attorney at Law
                      ELLIOT SLOSAR, Attorney at Law
15                    AMY ROBINSON STAPLES, Attorney at Law
                      MARGARET ELIZABETH CAMPBELL,
16                    Attorney at Law
                      Loevy & Loevy
17                    311 North Aberdeen, 3rd Floor
                      Chicago, Illinois 60607
18   On Behalf of the Defendant:
                      DERRICK T. WRIGHT, Attorney at Law
19                    LYNDOL SCOTT MILLER, Attorney at Law
                      Sturgill, Turner, Barker & Moloney PLLC
20                    333 West Vine Street, Suite 1500
                      Lexington, Kentucky 40507
21   Court Reporter:  KATHLEEN E. MALONEY, RMR, FCRR
                      Official Court Reporter
22                    310 South Main Street
                      Room 370
23                    London, Kentucky 47041
                      kathleen_maloney@kyed.uscourts.gov
24   Proceedings recorded by mechanical stenography; transcript
     produced by computer.
25
```

1                              INDEX

2
    OPENING STATEMENT
3
        BY MR. LOEVY................................page 3
4        BY MR. WRIGHT...............................page 40

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*OPENING STATEMENT BY MR. LOEVY*                                        3

1                    *     *     *     *     *

2          [Excerpt of opening statements.]

3                    OPENING STATEMENT

02:26:52   4     BY MR. LOEVY:  May it please the Court, Counsel.  Before

02:26:58   5   I begin, obviously everybody has a lot of things --

02:27:01   6          THE COURT:  I'm sorry.  You have to stay at the

02:27:03   7   podium.

02:27:08   8          MR. LOEVY:  I want to thank you again for your

02:27:10   9   commitment to be here.

02:27:11   10    In this country, as Judge Wier explained, we take liberty

02:27:16   11   very seriously.

02:27:17   12    And if you have been injured by bad actors, by guns, by a

02:27:24   13   police officer, you have a right to come to court and have a

02:27:27   14   community, a cross section of your peers, decide what justice

02:27:36   15   is.

02:27:36   16    In this country, the police department doesn't decide,

02:27:37   17   the government doesn't decide, not even Judge Weir can decide.

02:27:42   18    You are, a cross section of the community.  You'll decide

02:27:44   19   what justice is.  And it only works if people show up.  So

20   thank you very much for doing that.  We appreciate it.

02:27:47   21    My name is John Loevy, and I said, joined by Elliot

02:27:52   22   Slosar, Molly Campbell, Amy Staples, and our clients, Amanda

02:27:56   23   and Jon.

02:27:57   24    Amanda is in her late 30s.  She's from Pineville.  She

02:28:04   25   has two children, three children, a 14-year-old, an

02:28:04   1    18-year-old, now a little five-year-old.  She works at

02:28:09   2    Appalachian Home for troubled kids.  She's been there for a

02:28:12   3    few years.  She's married.

02:28:14   4         Jonathan, a little bit younger.  He was in a pretty

02:28:16   5    serious car accident.  He's been dealing with trying to

02:28:22   6    overcome those things.  When he resumes his career, it's

02:28:24   7    probably going to be an outdoor kind of job.  He really likes

02:28:28   8    being outdoors.

02:28:30   9         Our clients are here because they were seriously and --

02:28:32   10   seriously injured and damaged.

02:28:33   11        They were accused of a murder they didn't commit.  They

02:28:36   12   spent eight years in jail between them, five and three, for

02:28:40   13   being accused of this crime that they had nothing to do with,

02:28:43   14   nothing to do with, away from their children, away from their

02:28:48   15   lives, sitting in jail waiting for their chance to have a

02:28:50   16   trial and prove their innocence.

02:28:52   17        I'm going to fast-forward to the end because there's

02:28:55   18   actually good news at the end.

02:28:58   19        When it came time for the state, after continuance after

02:29:00   20   continuance after continuance, they dropped the charges.  The

02:29:04   21   state did not prosecute.  The state said you can go home, you

02:29:08   22   are done.  And that's good, but, unfortunately, it didn't give

02:29:11   23   them back the eight years that they lost.

02:29:14   24        And they were not wrongfully prosecuted by accident.

02:29:17   25   What you are going to see over the next two weeks, you are

02:29:19  1   going to see evidence that the case against them by Detective

02:29:22  2   York was fabricated, it was a fake case, that witnesses were

02:29:27  3   coerced, that they were manipulated, that evidence was fed to

02:29:31  4   them, and that basically a whole false case was constructed,

02:29:35  5   and as a result, they suffered terribly.

02:29:37  6       I'm going to talk about the evidence in the case, but I

02:29:39  7   want to start with an extremely important development just in

02:29:43  8   the last two weeks.

02:29:44  9       And we have been litigating this case for five years, and

02:29:47  10  that's not the Court's fault.  That's not their fault.  It's

02:29:51  11  not our fault.  It's nobody's fault.  It just takes a long

02:29:53  12  time for cases to go through all the investigation, all the

02:29:56  13  discovery.

02:29:56  14      After five years of litigation, less than two weeks ago,

02:30:01  15  we find out that a critical fingerprint left at the crime

02:30:06  16  scene, that York always believed belonged to the killer, had a

02:30:10  17  match, had a match to a guy named John Whitehead, who you'll

02:30:15  18  meet in a couple hours.

02:30:17  19      Ladies and gentlemen, nobody ever told the plaintiffs

02:30:19  20  that.  For five years the case was being litigated, and they

02:30:24  21  were putting -- we were talking to witnesses, and they were

02:30:27  22  trying to say the plaintiffs are guilty, and the plaintiffs

02:30:29  23  are trying to say they are innocent.

02:30:30  24      The KSP neglected to inform us, until Mr. Slosar

02:30:35  25  discovered it less than two weeks ago through a witness

| | |
|---|---|
| 02:30:39 | 1 |
| 02:30:42 | 2 |
| 02:30:43 | 3 |
| 02:30:47 | 4 |
| 02:30:50 | 5 |
| 02:30:53 | 6 |
| 02:30:56 | 7 |
| 02:30:58 | 8 |
| 02:31:01 | 9 |
| 02:31:06 | 10 |
| 02:31:10 | 11 |
| 02:31:13 | 12 |
| 02:31:16 | 13 |
| 02:31:20 | 14 |
| 02:31:25 | 15 |
| 02:31:32 | 16 |
| 02:31:36 | 17 |
| 02:31:40 | 18 |
| 02:31:43 | 19 |
| 02:31:46 | 20 |
| 02:31:47 | 21 |
| 02:31:50 | 22 |
| 02:31:55 | 23 |
| 02:31:56 | 24 |
| 02:32:01 | 25 |

interview, Oh, by the way, the fingerprint from the crime scene matches somebody.

And that changes everything because when you hear that evidence and you hear that there's a party who's going to take the stand in two hours and is going to invoke his right against self-incrimination, then it's going to make you look at the evidence differently as you decide whether this was a real case or this was a fabricated case.

It's even deeper than that, ladies and gentlemen.  During the discovery, there's a file for this case.  This is the investigative file kept at the KSP.  During discovery we asked for this file, and we got a copy.

The copy we got is here.  This is Plaintiff's Exhibit 1. The problem is, when they gave us this copy five years ago, someone had removed the report talking about the fingerprint match.  So they gave us every piece of paper in this file except the report that linked the crime scene fingerprint to the person we're going to show you is the real killer.  And there's going to be no explanation for that.  It was in the file.  It belonged in the file.

And one of our second witnesses at the trial is going to have to explain why that somehow got removed from the file when they gave it to us.

Well, we did find it.  We found it two weeks ago, and it changes the complexion of the entire case.

02:32:04  1       Let's back up.  Let's talk about the crime.  Katherine

02:32:07  2   Mills was probably about 70 years old.  She lived in

02:32:12  3   Stinking Creek, Kentucky, and she had timber on her land.  She

02:32:19  4   sold her timber and got -- made about $20,000.  She's done it

02:32:22  5   in the past.  She put about half of it -- a little less than

02:32:24  6   half of it in the bank.

02:32:25  7       So it was known around town that she was somebody who had

02:32:29  8   a lot of money in her possession, a lot of cash.

02:32:32  9       One day, December 20, 2010, someone murdered her.  Nobody

02:32:39  10  saw her alive that day.  But when her family discovered -- the

02:32:40  11  UPS guy discovered her around 5:00 P.M., she had been brutally

02:32:46  12  attacked.  Her head had been smashed in.  There was blood.

02:32:48  13  She had broken ribs.  Her wrist -- her wrists had some

02:32:49  14  injuries.

02:32:49  15      So somebody had murdered her, and there were no -- and so

02:32:54  16  the police responded, and they had to figure out who did it.

02:32:59  17           Now, there were two clues, two important clues.

02:33:02  18      First, the killer -- there was money on the ground.  Five

02:33:06  19  $100 bills.  The killer got away with about $12,000 cash, but

02:33:13  20  five $100 bills were left on the ground.  And Detective York,

02:33:18  21  who was assigned the case, came to investigate.

02:33:20  22      His assumption was that the killer touched that money,

02:33:23  23  and the reason he thought the killer left all the hundred

02:33:25  24  dollar bills on the ground was to throw off the police, to

02:33:27  25  pretend there wasn't a financial motive.

02:33:29  1      So he took most of the money but left some hundred

02:33:34  2  dollars bills trying to confuse things, think that it wasn't a

02:33:37  3  financial motive.

02:33:38  4      When John Whitehead was interviewed last week -- because

02:33:41  5  the KSP never investigated this crime.  Not only did they not

02:33:46  6  turn the report over to us, but back in 2017, nobody talked to

02:33:52  7  Mr. Whitehead.

02:33:53  8      When we discovered it two weeks ago, they went and talked

02:33:57  9  to Mr. Whitehead, which he should have talked to him 17 years

02:34:02  10  ago -- or -- I'm sorry -- in 2017.

02:34:03  11      And Mr. Whitehead said -- of all the crazy coincidences,

12  the one fingerprint in the world, it could have been anybody

02:34:08  13  in the universe, it's a guy who lives five, ten minutes away.

02:34:11  14  He was kind of a drifter, in and out of town.

02:34:15  15      And he said -- at the time, he told the police, Boy, I

02:34:17  16  was addicted to drugs.  I don't really remember much about

02:34:19  17  that.  Had no explanation where he was, couldn't know anything

02:34:23  18  about it.  So he didn't have any explanation for why his print

02:34:29  19  was on that money.

02:34:30  20      The second clue was there was an eyewitness.  A guy named

02:34:35  21  Michael Crump was driving by the morning of the murder, and

02:34:39  22  the police found him in a canvass.  A canvass is they look for

02:34:43  23  witnesses.

02:34:44  24      They found a guy.  Yeah, I was there.  I remember driving

02:34:46  25  by.  I'm new to the area, but I remember seeing a guy, one

02:34:49  1    person, a man, at her residence.  And he described the man,

02:34:55  2    had some tattoos, you know, was wearing a hoodie, had some

02:34:59  3    facial hair.  And he said the guy was driving a blue car,

02:35:03  4    maybe a blue Cavalier.

02:35:05  5        So that's two very good clues, that there's one killer

02:35:09  6    and he's driving a blue car.  So that's the clues that the

02:35:12  7    police had at the time.

02:35:13  8        They had some suspects.  At the time everybody was a

02:35:17  9    suspect.  They didn't know yet that the print was going to

02:35:20  10   come back to this Mr. Whitehead.

02:35:23  11       So their suspect was a family member, a guy named Mike

02:35:27  12   Mills.  He was the victim's grandson.  They were told by other

02:35:31  13   family members, Hey, this guy, Mike, he's stolen money from

02:35:33  14   his grandma; he's stolen tools from his grandma.  Sounds like

02:35:36  15   maybe he was addicted to drugs.  You know, he's been stealing

02:35:38  16   from his grandmother.

02:35:40  17       And then him and his friends give contradictory reports

02:35:42  18   on where they were and whether, you know, he says who -- he

02:35:46  19   says he lived with the grandma.  The friends said he didn't.

02:35:49  20   So there's a lot of confusion.  Then he can't be found.

02:35:52  21       So I'm not saying Mike Mills did it.  I'm just saying

02:35:55  22   there was a lot of reason to suspect, Hey, there's a suspect.

02:35:59  23       There were two far more serious suspects.  A guy named

02:36:02  24   Mike Simpson.  Mike Simpson lived down the road.  He was a

02:36:06  25   local drug dealer.  On the day of the murder, 12:20, he rented

02:36:12  1    a blue car.  We know that because Detective York went and

02:36:16  2    found his rental car records.  He rented a blue car.  The

02:36:19  3    eyewitness saw a blue car at the scene.

02:36:21  4        And then as soon as the murder was over -- and I'm sorry.

02:36:24  5    Later on the 20th, he drove to Florida for four days.  He blew

02:36:28  6    town for four days.  So he rented a blue car, the murder

02:36:31  7    happens, he leaves town for four days.

02:36:33  8        He had told witnesses -- and York confirmed this -- I'm

02:36:36  9    broke, on the 19th.  The day before he had no money, and he

02:36:39  10   was telling everybody -- he was talking to his partner, I'll

02:36:43  11   have money on the 20th, so we can go buy drugs in Florida and

          12   bring them back.

02:36:47  13       So he was broke on the 19th.  He says he's going to have

02:36:51  14   money.  This woman is killed.  He pays all cash for the rental

02:36:54  15   car, by the way, and he goes to Florida, buys the pills, and

02:36:59  16   then he comes back.

02:36:59  17       When he comes back, Detective York is waiting for him.

02:37:03  18   He would like to talk to Mike Simpson.  So he walks up to

02:37:07  19   Simpson's place and sees a blue car, just like was described.

02:37:10  20   And he walks in there, and the first thing Simpson does is he

02:37:14  21   hands him a yellow sticky note.  "What's that?"  He goes,

02:37:18  22   "That's my alibi."

02:37:21  23       That's suspicious behavior.  York thought that was

02:37:23  24   suspicious behavior.  He hadn't even asked him any questions,

02:37:26  25   hadn't told him why he was there.

02:37:27  1      Another thing York knew that was suspicious is somebody

02:37:30  2  had called the -- Simpson went to Florida with another guy

02:37:34  3  named Helton.  They drove down there together.

02:37:36  4      Helton says, You know what?  We got a call that somebody

02:37:39  5  had killed Katherine Mills, and Mike Simpson started crying.

02:37:43  6  That's suspicious behavior.  Why would he cry?  And so the

02:37:46  7  inference could be that he had intended to hurt her, hadn't

02:37:50  8  intended to kill her.  So he never had a good explanation for

02:37:53  9  why he started crying when he heard Katherine Mills was dead.

02:37:56  10      This is a good suspect.  At some point later, York fills

02:37:59  11  out an affidavit with the Court swearing to the Court that

02:38:03  12  Simpson was identified as the person present at the victim's

02:38:08  13  home.

02:38:09  14      We're going to have to ask Mr. York some more questions

02:38:13  15  about who identified him as present at the victim's home on

02:38:15  16  the day of the murder.

02:38:17  17      Excuse me.  On the day of the murder, he was identified

02:38:19  18  by someone as being present in that home.  And Simpson has

02:38:22  19  always denied that.

02:38:24  20      So, again, I don't know if Simpson killed her or not, you

02:38:26  21  don't know if Simpson killed her or not, but that's a pretty

02:38:28  22  good suspect.

02:38:29  23      There's another suspect who's in the car with Simpson.

02:38:35  24  Remember I told you right after the murder they blew to

02:38:38  25  Florida for four days.  They come back.

02:38:40    1        Simpson went with a guy named Allen Helton.  And York

02:38:44    2    interviews Helton, and Helton confirms everything I just told

02:38:47    3    you.  And they take Helton to take a polygraph.

02:38:50    4        "Do you know anything about that murder?  Do you know who

02:38:52    5    killed her?  Do you know anything about that?"  And he failed.

02:38:54    6    He failed the lie detector test.  So, again, who knows if he's

02:38:59    7    guilty or not, but they have got a suspect.  They've got a lot

02:39:02    8    of suspects.

02:39:02    9        In fact, we have York's note.  He had more than a dozen

02:39:05    10    suspects.  He had persons of interest:  Hank Smith, Bradley

02:39:10    11    Broughton, Dustin Abner, the Blankenship brothers.  And you

02:39:17    12    are going to have to have York explain to you how he thought

02:39:19    13    they were suspects and how he excluded them because another

02:39:23    14    theme that is going to come up a lot in this trial is there's

02:39:23    15    missing reports.

02:39:24    16        So you are going to hear over and over again, "Where's

02:39:27    17    the report?  Where's the report?"

02:39:29    18        The testimony is going to be, when police officers

02:39:32    19    conduct a murder investigation, they are supposed to write

02:39:33    20    stuff down.  They are supposed to write it in their reports,

02:39:36    21    which then gets turned over to the criminal justice system.

02:39:41    22        You don't know at the time what's going to be important,

02:39:43    23    what's not going to be important.

02:39:44    24        And the defendants who are accused of the crime have a

02:39:47    25    right to all the information.  That's not going to be

02:39:50  1    disputed.  So it's going to be a recurring theme, "Where are

02:39:53  2    the reports?  Where is the information?  Why is this missing?"

02:39:56  3          And you'll hear about that as we go.

02:39:58  4          So they have got a lot of suspects, and time goes by, and

02:40:04  5    he can't solve the crime.  It's probably hard to solve a

02:40:08  6    murder, when you think about it.

02:40:11  7          So six weeks goes by.  York picks up a new suspect.  I

02:40:13  8    don't know if he was new, but he decides -- York decides he

02:40:16  9    knows who did it.  There's a guy named William Lester who

02:40:19  10   lives in town who was actually married to the victim's

02:40:22  11   daughter for a while.

02:40:23  12         William Lester was overheard making a joke that he was

02:40:26  13   broke -- a lot of people were broke.  You know, I should tie

02:40:28  14   up my mother-in-law in the outhouse and steal her money.  A

          15   lot of people knew that she had money.

02:40:32  16         So because he made that joke, that was big trouble for

02:40:37  17   William Lester because York decided "I know who committed this

02:40:40  18   murder," and you are going to hear testimony that the proper

02:40:43  19   way to investigate a murder is to investigate the crime, to

02:40:45  20   try to determine who did the crime.

02:40:47  21         He changed it around and decided to investigate the

02:40:50  22   suspect.  And he went -- from that moment on, he decided to

02:40:53  23   try to prove that William Lester was the guilty party.

02:40:57  24         So what did he do?  Here's how he cracked the case open.

02:41:00  25   Basically, he went to jailhouse snitches, he went to people

02:41:03  1    who were in trouble with the law.  He put cases on people to

02:41:07  2    make them in trouble with the law, putting pressure on them

02:41:10  3    saying, "Say William Lester did it," and I'll talk quite a bit

02:41:14  4    more about that in a minute.

02:41:15  5        But the way he basically broke the case open was he took

02:41:18  6    two women.  One of them was named Kayla Mills, and one of them

02:41:19  7    was Amanda Hoskins.

02:41:21  8        Kayla was in her late teens and her early 20s.  Amanda

02:41:25  9    was probably in her mid-20s.

02:41:27  10       And he did the same thing to both of them about six weeks

02:41:29  11   into the investigation, maybe a little longer.

02:41:31  12       He gets a murder warrant, a murder warrant, charging both

02:41:35  13   Amanda and Kayla with murder.  We know that because they are

02:41:40  14   in the Court file.

02:41:42  15       He then goes and talks to both of them separately and

02:41:45  16   says, Listen, I got three witnesses that say you were involved

02:41:48  17   in this crime.  Here's the murder warrant.  You are going away

02:41:52  18   forever, and your bond is $1 million.  Says it right there in

02:41:56  19   the murder warrant.

02:41:57  20       Then he says to both of these women, Now, tell me that

02:42:00  21   William Lester was involved.

02:42:01  22       And Kayla went first.  And Kayla said, I don't know

02:42:05  23   anything about this crime.  I don't -- you know, I can't help

02:42:07  24   you.

02:42:08  25       I got a warrant for your arrest for murder.

02:42:11  1        Now, Kayla is deceased now, but her mother was present

02:42:15  2    for this.  And her mother is going to testify at this trial

02:42:18  3    this week.  And she's going to say she was disgusted by what

02:42:22  4    Detective York did.

02:42:24  5        Detective -- her daughter was saying, I don't know

02:42:25  6    anything about this crime.  Detective York was force-feeding

02:42:28  7    her the facts, things like the blue car, the money, telling

02:42:32  8    her the facts, not the other way around, and telling her she

02:42:35  9    was going to prison for murder unless she said what they were

02:42:38  10   trying to hear.

02:42:40  11       And he said, I got three witnesses against you.  And her

02:42:43  12   mother had to leave the room at one point and vomit, she was

02:42:47  13   so disgusted and so upset by what Detective York was doing to

02:42:52  14   her daughter.

02:42:53  15       Did the same thing to Amanda, York did.  Put a false case

02:42:57  16   on her.  She'll describe it.  Arrested her four times.  One

02:43:00  17   time he arrested her, he put a gun to her head, and he

02:43:02  18   basically tried to say, Say William Lester did it.

02:43:06  19       William Lester is a friend of Amanda's.  Say William

02:43:10  20   Lester did it.

02:43:11  21       Now, unfortunately, two different outcomes.  Kayla Mills,

02:43:12  22   she gave in.  She was 19.  She was weak.  She said, Fine.

02:43:18  23   William Lester did it.  He did it with Amanda.

02:43:23  24       Amanda said, No.  I don't know William Lester did it.

02:43:26  25   I'm not going to do that.

| | | |
|---|---|---|
| 02:43:27 | 1 | And so guess who got arrested?  Amanda Hoskins gets |
| 02:43:32 | 2 | arrested for murder.  Kayla walks free.  They forget about it. |
| 02:43:36 | 3 | There was an arrest for her -- warrant for murder, and |
| 02:43:40 | 4 | when she said, Fine, I'll give you these suspects, I'll point |
| 02:43:44 | 5 | my finger somewhere else, they tear up the warrant. |
| 02:43:48 | 6 | And that's actually a bigger deal.  You're going to hear |
| | 7 | about that. |
| 02:43:50 | 8 | Jackie Steele is the prosecutor who prosecuted the case. |
| 02:43:54 | 9 | And you are going to hear Jackie Steele got deposed in the |
| 02:43:58 | 10 | case maybe years -- a couple years later. |
| 02:43:58 | 11 | And Jackie Steele learned at his deposition for the first |
| 02:44:02 | 12 | time that there had been a warrant for Kayla's arrest.  It had |
| 02:44:06 | 13 | always been represented to the state by York, that, Oh, Kayla |
| 02:44:09 | 14 | just came forward because she's a witness; she came forward |
| 02:44:11 | 15 | because she knows what's up. |
| 02:44:13 | 16 | The prosecutor finds out.  Wait a minute.  You had a |
| 02:44:15 | 17 | warrant for her arrest?  That sort of changes things, doesn't |
| 02:44:19 | 18 | it, Mr. York? |
| 02:44:20 | 19 | And Mr. York resigned two days later, resigned from the |
| 02:44:24 | 20 | Kentucky State Police. |
| 02:44:25 | 21 | Now, we don't know -- maybe it was a coincidence; maybe |
| 02:44:27 | 22 | it wasn't.  We are not really getting a lot of information on |
| 02:44:30 | 23 | that. |
| 02:44:30 | 24 | He did unresign after that, a few months later or some |
| 02:44:33 | 25 | time later.  But this was a big deal. |

02:44:35   1        There's another problem with the Kayla -- Kayla Mills

02:44:40   2   problem.

02:44:40   3        I already told you Mr. Crump, the eyewitness, saw a man.

02:44:45   4   He didn't see a woman in the car.  He didn't see anything

02:44:48   5   other than a man.

02:44:49   6        So why is York putting two women in there saying, You're

02:44:53   7   involved?  One man.

02:44:54   8        So Mr. York started saying, No, no, no.  Crump was

02:44:58   9   talking about a man and a woman.

02:45:00   10        And everybody said, Well, the report says a man.  The

02:45:03   11   report doesn't say anything about a woman.  What are you

02:45:05   12   talking about?

02:45:06   13        And there's a recording, an audio recording, of this

02:45:09   14   interview with Crump.  And there's 13 audio recordings.  All

02:45:13   15   of them -- we have all the audio recordings.

02:45:15   16        So everybody started saying to Mr. York, for the

02:45:19   17   prosecution, Jackie Steele, like, we need the audio recording,

02:45:20   18   give up the Crump audio recording so we can see what Crump

02:45:23   19   said.  Did he talk about a woman or he didn't talk about a

           20   woman?

02:45:24   21        And Mr. York said, It's missing.  I can't find the Crump

02:45:29   22   audiotape.  It's gotten lost.

02:45:33   23        So that's not supposed to happen in a murder

02:45:35   24   investigation.  You are not supposed to lose evidence like

02:45:38   25   that.  And you are not supposed to have witnesses change their

02:45:40  1    story.

02:45:41  2        So now they got a case.  They got Kayla saying -- you

02:45:47  3    know, pointing the finger, and they got other people pointing

02:45:50  4    the finger, and I'll talk about that.

02:45:52  5        But the case that they are prosecuting Jonathan and

02:45:55  6    Amanda -- so they finally get Jonathan and Amanda, and they

02:45:56  7    prosecute William Lester.  It's missing one thing, evidence.

02:46:00  8        There is no evidence against them.  There's no witnesses

02:46:05  9    who saw them do it.  There's no physical evidence.  You know,

02:46:10  10   I told you they took a fingerprint off the money that they

02:46:13  11   believed the killer had touched.  They took that fingerprint

02:46:17  12   to the lab, and it excluded them.  It excluded all three of

02:46:21  13   them.

02:46:21  14       So that's what they knew at the time, was that it wasn't

02:46:23  15   their print.  They didn't give them the additional information

02:46:25  16   that later the computer made a match to someone else, but the

02:46:29  17   print did exclude them.

02:46:32  18       There also was DNA evidence.  The victim had been -- when

02:46:35  19   a victim is in a struggle, they bag your fingers and they swab

02:46:39  20   under your fingernails for DNA, and no match.  No match.  So

02:46:46  21   no physical evidence.  No witnesses.  Nothing.

02:46:47  22       You know what the evidence was?  It was 100 percent they

02:46:49  23   got people to point their finger and say, They told me they

02:46:53  24   did it.  He told me they did it.

02:46:55  25       Just people pointing their finger.  Confession.  They

02:46:57  1    found 11 people, York did, who were willing to say this person

02:47:02  2    confessed to me that they did it.  This person -- Amanda

02:47:05  3    confessed to me that she did it.  Jonathan confessed to me.

02:47:09  4    11 people who were saying they did it.

02:47:12  5         Now, I'm going to talk about this detail in a minute, but

02:47:13  6    let me tell you how that went down.

02:47:16  7         York had the same modus operandi with all these

02:47:20  8    witnesses.  He would go talk to them.  He would talk to people

02:47:22  9    who were in trouble with the law or people he put in trouble

02:47:25  10   with the law, or he talked to jailhouse snitches.

02:47:27  11        Jailhouse snitches, you have heard of them.  You have

02:47:27  12   heard the term.

02:47:28  13        He would go to people that were in jail on criminal

02:47:31  14   charges, and they said, Yeah, yeah, I got information against

02:47:34  15   Amanda; I got information on Jonathan.  I remember Jonathan

02:47:37  16   once confessed to me about this crime.  Can I get out of

02:47:41  17   prison now?

02:47:41  18        There's like four jailhouse snitches in this case.  They

02:47:45  19   are all telling different stories.  But all of a sudden,

02:47:46  20   everybody in jail -- these guys are going around to everybody

02:47:48  21   they meet in jail and they're confessing.  That's the case

02:47:51  22   against them.

02:47:52  23        We have the protocol of how he did this.  He would do his

02:47:55  24   interviews in two parts.

02:47:56  25        First, he would have an off-the-record interview with the

02:47:59  1    witnesses, and he would feed them information.  He would say,

02:48:02  2    Hey, remember that time with the murder in Stinking Creek and

02:48:07  3    the blue car and the bills, and he would pressure them.

02:48:10  4    Sometimes he would yell at them.  Sometimes he would slam the

02:48:15  5    table.  These are witnesses, not suspects.  Sometimes he would

02:48:18  6    get mad at them, and he would say -- try to get them to say

02:48:20  7    this.

02:48:21  8        We know he did this for two reasons.  First of all, the

02:48:24  9    witnesses are going to come to court and say that's exactly

02:48:26  10   what he did.  You are going to hear multiple people say that's

02:48:30  11   what he did.  He fed us facts and he tried to get us to say

02:48:33  12   it.

02:48:33  13       In fact, he did it on tape sometimes.  He would -- you

02:48:38  14   can hear him on tape suggesting.  He's doing an interview, and

02:48:40  15   all of a sudden he's talking about a blue car, he's talking

02:48:43  16   about five $100 bills on the ground.  He's like, Hey, did they

02:48:47  17   confess to the blue car?  Did they confess to killing

02:48:50  18   Katherine Mills in Stinking Creek?  Not coming out of the

02:48:53  19   witness's mouth, but right there on the tape he's feeding the

          20   facts.

02:48:55  21       You know, how did he motivate these people to do it?

02:48:58  22   I've already told you.  He -- he was threatening people.  He

02:49:01  23   was giving people benefits, and there was something in it for

02:49:04  24   everybody.

02:49:04  25       So at the end of the day, he literally had 11 people

02:49:07  1    saying that they heard a confession, 11 people saying, Yeah,

02:49:11  2    you know, Amanda told me she did it; Jonathan told me he did

02:49:16  3    it.

02:49:16  4         And then there were three people who were saying, I don't

02:49:18  5    know anything about it, and I'm not pointing my finger at

02:49:21  6    anybody.

02:49:22  7         Guess which three got prosecuted?

02:49:24  8         Of this list of 14, Will Lester, Jonathan Taylor, and

02:49:29  9    Amanda Hoskins said, I don't care how much pressure you put on

02:49:31  10   me; I don't know anything about it, and I'm not going to

02:49:34  11   falsely put somebody else in it.  They are the three that got

02:49:37  12   prosecuted.

02:49:37  13        These 11 people, some of them jailhouse snitches -- many

02:49:41  14   of them, but not all of them -- York was accusing them of the

02:49:44  15   murder.  They said, Don't put me in jail.  They did it.  If

02:49:47  16   you want them to do it, they did it.

02:49:49  17        That's what happened.

02:49:49  18        Now, the problem with the confessions -- one of the

02:49:52  19   problems is none of them match.  None of them match each

02:49:55  20   other.  So I'm going to show you an example.

02:50:07  21        This is --

02:50:09  22             MR. WRIGHT:  Your Honor, I object.

02:50:10  23             MR. LOEVY:  Your Honor, I showed these to counsel

02:50:12  24   before.

02:50:12  25             THE COURT:  Hang on.  Headphones on please.

*OPENING STATEMENT BY MR. LOEVY* 22

02:50:18  1          MR. LOEVY:  Okay.

02:50:26  2       (Sidebar conference.)

02:50:26  3          THE COURT:  Mr. Loevy, can you hear?

02:50:27  4          MR. LOEVY:  Yes.

02:50:29  5          THE COURT:  Go ahead.

02:50:29  6          MR. WRIGHT:  We were supposed to disclose exhibits in

02:50:32  7    advance.  This was given to me today.  I said it hadn't been

02:50:36  8    given.  I objected.  He said, Okay.

02:50:38  9       And now here we are putting it on as a demonstrative in

02:50:44  10   an opening exhibit.

          11          MR. LOEVY:  Your Honor --

02:50:48  12          MR. WRIGHT:  They are doing this all at their own

02:50:50  13   timetable, whenever they want to.  We objected.  It shouldn't

02:50:54  14   be allowed to be used.

02:50:56  15          MR. LOEVY:  This is unfortunate, Your Honor.  It's

02:50:58  16   going to be a long two weeks because officers of the court are

02:51:02  17   now going to tell you completely opposite things.

02:51:04  18       I showed this to him.  I said I could write these names

02:51:08  19   on the easel.  I don't have good handwriting.  It's not a

02:51:13  20   demonstrative.  It's a list of names.  I showed it to him.  He

02:51:16  21   said, Okay.

02:51:17  22       I put highlighters on it with different colors.  He said,

02:51:20  23   Well, I don't want the highlighters on it.  I took the

02:51:24  24   highlighters off.

02:51:25  25       He -- there was an agreed one with Mr. Simpson.  He told

02:51:30   1    me, Take the picture off of the Mr. Simpson exhibit.  I said,

           2    Fine.

02:51:32   3        Now my opening has been interrupted after I showed these

02:51:35   4    to them, and he told me to modify them, and I did.

02:51:37   5            THE COURT:  It's just -- it's just a summary tool

02:51:40   6    you're using?

02:51:40   7            MR. LOEVY:  Yes, Your Honor.

02:51:41   8            THE COURT:  Only within your argument?

02:51:43   9            MR. LOEVY:  Yes.

02:51:44   10           THE COURT:  Mr. Wright.

02:51:45   11           MR. WRIGHT:  These things were supposed to be

02:51:48   12   disclosed in advance, and they weren't.

02:51:49   13       Now, he showed this to me.  I agreed to three or four of

02:51:51   14   them that I could deal with.  But I felt like these things

02:51:53   15   were supposed to be disclosed in advance, if we're going to be

02:51:56   16   showing them to the jury, and he didn't.

02:51:58   17           MR. LOEVY:  This is one of the agreed ones, Your

02:52:00   18   Honor.

02:52:00   19           MR. WRIGHT:  No.  That one right there is not.

02:52:03   20           THE COURT:  Okay.  It's simply a tool for him to use

02:52:06   21   during his opening.  I'm going to allow it.

02:52:09   22       Overruled.

02:52:16   23       (Sidebar conference concluded.)

02:52:16   24           MR. LOEVY:  May I continue, Your Honor?

02:52:18   25           THE COURT:  You may.

02:52:18  1        MR. LOEVY:  What this shows is whether -- this is a

02:52:21  2   summary of whether Kayla Mills was involved.  I told you Kayla

02:52:26  3   was the woman who overdosed and died but had -- was one of the

02:52:31  4   two blonde women that pointed the finger.

02:52:33  5        So what this shows is:  Was Kayla involved in the murder

02:52:36  6   or not?

02:52:38  7        There's a -- someone named Warren and someone named Baker

02:52:42  8   who both claim, when York interviewed them, that Kayla

02:52:46  9   confessed to them that she committed the murder with the other

02:52:50  10  suspects.

02:52:51  11       So York got confessions from Kayla.  Kayla supposedly

02:52:55  12  confessed to each of these two women that she committed it.

02:52:59  13       These four people, York claimed, confessed that Amanda

02:53:04  14  confessed to these four people that Amanda did it.

02:53:09  15       So the confessions don't match.

02:53:11  16       Then York got three people to confess, Branson, Amber,

02:53:14  17  and Bruner, that actually Kayla and Amanda did it together,

02:53:20  18  and then this person said, I got a confession from Brian Mills

02:53:23  19  who was neither of them.

02:53:26  20       So what he's saying -- York is saying about how, I would

02:53:27  21  go talk to these witnesses, and they would say, yeah, yeah,

02:53:28  22  Amanda was talking to me in jail, she was talking to me, and

02:53:32  23  she told me that she did it or she told me that she did it

02:53:35  24  with Kayla, but none of them match.

02:53:37  25       On the confessions -- on Amanda's supposed confessions,

02:53:41  1    none of the three confessions match the crime.  According

02:53:46  2    to -- according to York, Amanda confessed to King that her and

02:53:51  3    Lester did it without Taylor.  Same thing to Helton.  York is

02:53:55  4    claiming that Amanda claimed -- confessed to Helton without

02:54:00  5    Taylor, and then Branson -- York is claiming that Branson is

02:54:03  6    claiming that Amanda confessed that she did it with Kayla and

02:54:07  7    Taylor.

02:54:08  8        So none of -- that's wrong.  All three of those

02:54:10  9    confessions that Amanda -- supposedly she confessed wrong

02:54:13  10   three times.

02:54:14  11       What's going on?  How does somebody confess to a crime

02:54:17  12   wrong three times?

02:54:18  13       The next one, Your Honor -- can I use the one with color

02:54:23  14   or not with color for the same tool?

02:54:25  15           THE COURT:  Did you have an agreement?

02:54:26  16           MR. LOEVY:  He didn't agree with the color.

02:54:29  17           THE COURT:  The one that's agreed.

02:54:39  18           MR. LOEVY:  This is a summary of the various

02:54:41  19   confessions about who committed the murder.  So York talked to

02:54:46  20   Ms. Branson.  She was in jail.  And Branson says, Amanda

02:54:52  21   confessed to me that she committed the crime with Joe King and

02:54:58  22   Joe King committed the murder.  So according to this jailhouse

02:55:03  23   snitch, Joe King committed the murder.  According to

02:55:06  24   Kinningham, York took a confession that Brian Mills committed

02:55:11  25   the murder, that Mills confessed to Kinningham, according to

02:55:16   1   York, that he committed the murder.

02:55:18   2       York found four people that say that they -- that they

02:55:22   3   gave us -- that Amanda gave a confession and JT gave a

02:55:28   4   confession -- so this is Amanda and Amanda.  This is JT, JT --

02:55:33   5   that they confessed that JT was the one who killed her.  JT is

02:55:38   6   Jonathan Taylor -- that Jonathan admitted to murder with

02:55:38   7   Kayla, with Kayla, with Kayla, and with Amanda.

02:55:42   8       So none of this matches because all four of these people

02:55:45   9   said JT committed it alone.  Remember the state prosecuted

02:55:49   10  Taylor and Lester.  So all of these are wrong.  Every single

02:55:59   11  one of these confessions is wrong.

02:56:04   12      King didn't commit the murder, according to the state.

           13  According to the state, Mills didn't commit murder.

02:56:08   14      JT did not commit it alone.  The state prosecuted JT for

02:56:13   15  doing it with Lester.  So all four of those are wrong.  And

02:56:16   16  then two people supposedly got confessions that Lester did it

02:56:19   17  without JT.

02:56:20   18      So there's only two people who claim to have heard these

02:56:24   19  confessions that involved the three people that the state

02:56:26   20  prosecuted.

02:56:27   21      So the state is claiming these three people did it.  Only

02:56:29   22  two people actually claim that there was a confession that

02:56:33   23  those three people did it.

02:56:36   24      First is Amber Simpson.  She says that Jonathan Taylor

02:56:40   25  confessed to her that Amanda and Lester and Taylor did it with

02:56:45  1   Kayla.  But the state is saying Kayla didn't do it.  So that's

02:56:50  2   wrong too.

02:56:51  3       So there is literally one confession in the whole bunch

02:56:54  4   that got the facts right, and that's Kayla who I told you

02:56:58  5   after this happened was so upset by what happened that the day

02:57:03  6   before she died, there was -- she was watching videos of her

02:57:07  7   and Jonathan.  Her and Jonathan used to be

02:57:10  8   boyfriend/girlfriend, and then she overdosed the next day.

02:57:13  9   She's not here, but you'll hear from her mother.

02:57:16  10      So you can't build a case on confessions.  You know, they

02:57:18  11  took -- they took guys like -- they took Kayla; they took Joe

02:57:21  12  King.  They said, Joe King, you are going away for murder; I

02:57:23  13  got a guy saying you did it.  Point your finger.

02:57:27  14      They took Allen Helton, a confidential informant, career

02:57:30  15  criminal, constantly in trouble, constantly working with Jason

          16  York.

02:57:33  17      At the time he said, I don't know anything about it.  I

02:57:36  18  don't know anything about it.  I don't know anything about it.

02:57:38  19      15 months later, they tell him, You are in big trouble;

02:57:41  20  you were in the car with Simpson.  Fine.  Amanda and JT, they

02:57:45  21  confessed to me they did it.  It's ridiculous.  15 months

02:57:51  22  later he remembered a confession?  That's what he did.  He

02:57:52  23  pressured one witness to point the finger at another.

02:57:54  24      Not surprisingly, ladies and gentlemen, the case

02:57:58  25  collapsed.  I'll go through them one by one.  So what happened

02:58:06  1      was Jon and Amanda are sitting in jail.  Five years have now

02:58:12  2      gone by.  Seven continuances, over and over again.  We are

02:58:17  3      ready for trial, and the state says, We are not quite ready;

02:58:20  4      we are not quite ready; the witnesses -- we now know because

02:58:24  5      they are going to testify -- there was no case.  It was a fake

02:58:27  6      case.  It was a fabricated case.

02:58:29  7          Again, the issue for you to decide is not guilt or

02:58:32  8      innocence because it's not a criminal case.  There are no

02:58:35  9      criminal implications.

02:58:37  10         This is a civil case, and I'll talk a little bit later

02:58:41  11     about what your job is to decide.  But if we prove to your

02:58:44  12     satisfaction that John Whitehead committed this crime, not

02:58:49  13     them, then you are going to be asking yourself:  How did York

02:58:51  14     develop all this evidence that the wrong people confessed?

02:58:54  15         So here's what happened in the criminal case.  The first

02:58:56  16     person was Kayla.  I told you.  She didn't come to court.  She

02:59:00  17     overdosed, may have committed suicide, but her mother was

02:59:04  18     there when it happened.  Kayla didn't know anything.  They

02:59:08  19     said, You are going to prison for murder unless you tell our

02:59:11  20     story.

02:59:11  21         This woman, Christy Branson, she was a jailhouse person.

02:59:16  22     She was in jail.  They put Amanda in jail on a bogus charge.

02:59:19  23     And she was in a cell very briefly with this woman, Christy

02:59:23  24     Branson.

02:59:23  25         York goes to talk to Christy Branson.  Christy Branson

02:59:26    1    has got trouble of her own.  That's why she's in jail.

02:59:30    2    Christy Branson told investigators, You know what?  York said

02:59:32    3    he would get me out of trouble if I helped him.  So she helped

02:59:35    4    him.  She said, Oh, yeah, Amanda confessed to me, but, as I

02:59:39    5    showed you, the confession was all wrong, and then York

02:59:42    6    double-crossed her.  He didn't -- didn't help her.  He didn't

02:59:45    7    help her.

02:59:45    8        So it came time for the trial, and she wasn't going to

02:59:49    9    get up there in a capital murder trial and point her finger at

02:59:52   10    somebody and say -- say they did it.  I got in a car accident.

02:59:55   11    I don't remember anything.

02:59:56   12        You know, she wouldn't corroborate it.  So the state had

02:59:59   13    no witness right there.

02:59:59   14        The next witness was King.  King was Amanda's

03:00:03   15    ex-boyfriend.  They went to Joe King, and they said, Joe, I

03:00:06   16    got a witness saying that Amanda confessed that you committed

03:00:10   17    the murder with her; you are going to prison because we have

03:00:15   18    charges against you for murder.  Now, they didn't -- I'm

03:00:18   19    sorry.  I'll speak more carefully here.  They didn't charge

03:00:21   20    Joe.  They just had a witness saying Joe committed murder.

03:00:24   21    They say, What do you have to say about that?

03:00:26   22        And Joe is going to testify he said, I still -- I still

03:00:30   23    don't know anything about it.  York wrote up a police report

03:00:33   24    saying, Joe King admitted it.  He admitted it.  You know, he

03:00:36   25    got it wrong because he's one of the people who got it wrong.

03:00:40  1     King said that Lester did it without JT.  But York wrote up a

03:00:45  2     report that said that King said that Amanda had confessed to

03:00:49  3     him.

03:00:49  4          There's a problem there.  There's tape-recorded

03:00:53  5     statements.  Every other one of these witnesses gave a

03:00:56  6     tape-recorded statement.

03:00:57  7          That's how he did it.  Remember he would have his

03:00:59  8     interviews, and when they were ready to talk, he would turn on

03:01:03  9     the tape recorder.  There's no tape recorder for Joe King.

          10     There's no tape.

03:01:06  11         And Joe King says, There's no tape because I didn't say

03:01:10  12     it.  I wouldn't say, and I'm not going to say it, and I'm not

03:01:14  13     going to say it on tape.

03:01:14  14         York said, Well, he told me; he told me.  He just really

03:01:18  15     didn't want to put it on tape.

03:01:20  16         You'll have to decide whether that's credible.  Joe King

03:01:22  17     wants nothing to do with this.  He's Amanda's ex.  Amanda has

03:01:26  18     re-married.  She's moved on.  He's not going to come to court.

03:01:27  19     He's out of the subpoena power.  But he gave a deposition.

03:01:30  20     And unless we can talk him into testifying by video -- you are

03:01:33  21     going to hopefully see that deposition -- and he is going to

03:01:35  22     say, Look, I didn't like Amanda, but I didn't know anything

03:01:39  23     about this.  This guy York was trying to get me to say stuff.

03:01:43  24     None of it is true, none of it is true, and I wouldn't say it

03:01:46  25     on tape because it's not true.

03:01:48   1        Helton is the next one.  Helton is going to testify here

03:01:52   2   in court.  He's going to say, I didn't know anything about

03:01:55   3   this murder, which is probably true.  At best, he knew that --

03:01:59   4   remember he's the guy who went with Simpson on the pills.

03:02:02   5   He's the guy who failed the polygraph.

03:02:05   6        So York is going to say, Boy, I was talking to Helton

03:02:08   7   over and over and over again, many contacts, between early

03:02:12   8   days and 15 months later.

03:02:13   9        We don't have any reports about those communications,

03:02:16  10   none.  There's no record of what Helton was saying.  All we

03:02:21  11   know is that Helton originally said, I don't know who killed

03:02:23  12   her, and then 15 months later, when Helton is in legal

03:02:27  13   trouble -- by the way, Helton is a confidential informant

03:02:30  14   which means he gets paid money to be a witness for the

03:02:33  15   Kentucky State Police.

03:02:36  16        15 months later, Helton remembers that Amanda supposedly

03:02:41  17   confessed to him that she had done this crime.

03:02:43  18        They didn't even know each other.  They never even talked

03:02:46  19   to each other.  Amanda was just running around, grabbing

03:02:48  20   anybody who will listen to her, Hey, I have got to confess to

03:02:52  21   this crime.  Amanda can tell you she didn't confess.  And, you

03:02:53  22   know what?  Allen Helton is going to tell you that she didn't

03:02:56  23   confess to him.  He's going to take the stand.  He's going to

03:03:01  24   say, York wouldn't take no for an answer.  York told me I'm

03:03:04  25   going down for this.  York made it very clear what he needed

03:03:07  1   me to say and so that's what I said.  I'm not proud of it, but

03:03:11  2   I wasn't willing to say it in court.

03:03:13  3       That's why the case collapsed.  He kept making excuses on

03:03:17  4   one of their continuances, they told the -- the state told the

03:03:19  5   Court, you know, Allen Helton has been in an accident.  In

03:03:22  6   fact, he wasn't in an accident.  They were making excuses

03:03:25  7   because their case was collapsing because it was a fabricated,

03:03:28  8   false case.

03:03:30  9       The next witness is Mr. Wilson, another jailhouse snitch.

03:03:36  10  He's in prison -- he's in jail with Jonathan.  He's in

03:03:39  11  trouble.  York goes and sees him, feeds him the information.

03:03:43  12  And what do you know?  Jonathan confessed to this guy.  I

03:03:47  13  don't think they found a single jailhouse snitch that Jonathan

03:03:50  14  didn't confess to.  He was just going around saying, I

03:03:53  15  committed this murder.  And Brian Williams [sic] is going to

03:03:56  16  tell you -- he's in the wind now.  He's addicted to drugs.

03:03:58  17  He's probably not going to be found for trial.  But he gave a

03:04:02  18  video deposition.  And he said, It's not true.  York basically

03:04:05  19  is, you know, fabricating a case.  I was in trouble.  I made

03:04:09  20  up this thing.  I'm not proud of it.  You know, I'm being

03:04:12  21  pressured and given advantages.  That's a jailhouse snitch for

03:04:16  22  you.

03:04:17  23      The next one is Amber Simpson, another witness who's

03:04:20  24  going to come to trial and say, He was putting pressure on me.

03:04:24  25  She's going to come to court and say, Look, I did claim that

03:04:27   1   they confessed to me or that somebody confessed to me.  It's

03:04:31   2   not true.  He was feeding me information.  He told me there

03:04:35   3   was a reward if I cooperated.  Amber Simpson is going to say,

03:04:40   4   He had arrested my brother.

03:04:42   5        So basically I told you they put a false case on Amanda.

03:04:47   6   They put a false case on Jonathan too.  They arrested him for

03:04:49   7   drugs.  Actually a serious drug.  They accused him of -- of a

03:04:51   8   meth crime because he lived in an apartment building, they

03:04:54   9   found something in a Dumpster that was common to everybody,

03:04:57   10  and they -- and they charged Jonathan.  The charges were

03:04:59   11  dismissed.  And they charged this other guy to put pressure.

03:05:02   12       And they said to Amber Simpson, Your brother is in

03:05:05   13  trouble.  We'll help your brother if you can remember that

03:05:09   14  maybe Jonathan confessed to it.

03:05:11   15       This was not a strong person so she remembered that --

03:05:14   16  that Jonathan had confessed to her.  And you know what?  She's

03:05:16   17  going to say it's not true and this was improper.

03:05:19   18       There's no witnesses left.

03:05:20   19       The next witness -- the next two, Bruner and Beach.  So

03:05:24   20  the case did collapse because there were no witnesses and

03:05:27   21  there was no evidence.  So instead of letting it go, Mr. York

03:05:32   22  went and found two more witnesses.

03:05:35   23       First he found a guy named Mikey Bruner.  So this is like

03:05:38   24  five years past.  Now we are into 2016, 2017 when the

03:05:43   25  charges -- when there's no case left because I just told you

03:05:45   1    the case completely collapsed.  He goes and finds this guy

03:05:49   2    Mikey Bruner who was a family friend.  He's known him since he

03:05:53   3    was a kid.

03:05:53   4        Mikey Bruner's own grandparents have said and will say,

03:05:57   5    if necessary, in court, He's a pathological liar, he's

03:06:00   6    addicted to drugs, he is not reliable.

03:06:03   7        And he's claiming to not have any evidence.  But, Oh,

03:06:06   8    yeah, once Jonathan confessed to me.  I don't know if he's

03:06:09   9    going to come to court.  If he does, we are going to call

03:06:12   10   multiple family members to say, He's a liar, he can't be

03:06:15   11   trusted, he's always in trouble, he's on drugs.

03:06:17   12       That's the witness he found, and that witness didn't show

03:06:19   13   up, as I said, until four or five years later after their case

03:06:23   14   collapsed.

03:06:24   15       The last witness, same thing, another jailhouse snitch.

03:06:28   16   Again, after the case collapsed, he went back to the drawing

03:06:31   17   board, found another guy who Jonathan supposedly confessed to.

03:06:35   18   This one's name is Beach.  This didn't go so good for him

03:06:38   19   because Beach had been recorded on the jail phone calls

03:06:41   20   saying, I don't know anything about this case.  They are

03:06:44   21   offering to move me closer to home.  Works for me.

03:06:48   22       That's -- he's somehow able to get all these people to

03:06:51   23   remember Jonathan confessed.

03:06:54   24       Now, again, is it an accident or is it intentional?

03:07:00   25       The witnesses who gave these confessions, who claim they

*OPENING STATEMENT BY MR. LOEVY*                                          35

03:07:01   1    heard these confessions, all knew the facts.

03:07:04   2        They knew what to say the person had confessed to:  Blue

03:07:08   3    car, hit in the head.  You know, different permutations of it.

03:07:11   4    Left five bills on the floor.

03:07:13   5        If none of this is true and none of these people -- if

03:07:16   6    they didn't confess, then how did they all have that

03:07:19   7    information?  And the evidence is going to show because York

03:07:21   8    was feeding it to them to try to manufacture witnesses.

03:07:26   9        The last witnesses, Warren, Kinningham, and Baker, none

03:07:28   10   of them are saying that these guys had anything to do with it.

03:07:33   11   They were saying Kayla did it.  So there's no case.

03:07:36   12       The case collapses, and that Mikey Bruner guy, the

03:07:38   13   pathological liar, he says, I'll come to court, and Jackie

03:07:41   14   Steele, the prosecutor, says, No, charges dismissed.

03:07:45   15       And so they are free, as I said, and they had to go on

03:07:50   16   with their lives, but I'm going to talk a little bit later

03:07:54   17   about how difficult that was.  It wasn't so simple after five

03:07:57   18   years and three years in prison.

03:07:58   19       And fast-forward now.  We now know that John Whitehead is

03:08:02   20   the person who committed this crime.  His fingerprints are on

03:08:06   21   the bill.  You'll meet him in less than an hour, and we are

03:08:08   22   going to ask him, Did you commit the crime?  And he's going to

03:08:11   23   say, I'm not going to answer that question on the grounds that

03:08:13   24   I could incriminate myself.

03:08:17   25       So that brings you to the claims in the case.  I'm going

03:08:20  1   to talk to you briefly about the claims against the defendant

03:08:22  2   and damages.

03:08:24  3       The case, again, it's not about who's innocent or guilty.

03:08:27  4   It's about probable cause.  We are alleging that they violated

03:08:31  5   our constitutional rights, Amanda and Jonathan's

03:08:34  6   constitutional rights, that they caused them to sit in prison

03:08:39  7   at that time for a case [sic] they didn't do by fabricating

03:08:42  8   the evidence against them, by feeding it to the witnesses, by

03:08:45  9   manufacturing a case.

03:08:46  10      You know, you were told -- during jury selection, Are you

03:08:49  11  pro or anti law enforcement?  Nobody is anti law enforcement.

03:08:51  12  Everybody has respect for law enforcement.  We are not suing

03:08:54  13  them for being police officers.  We are suing Detective York

03:08:57  14  for cheating.  We are suing Detective York for manufacturing

03:09:01  15  probable cause.  The standard has to be higher than what

03:09:04  16  happened here.

03:09:04  17      There's going to be two defenses, if -- if I understand

03:09:10  18  it.  Their first thing that they're going to say, Well,

03:09:10  19  Jonathan and Amanda are guilty.  That's what we spent the last

03:09:14  20  five years fighting about.  They are going to say, of course,

03:09:17  21  they did it.  And you'll meet them.  You'll decide for

03:09:19  22  yourself.  You'll decide, if they are really guilty, would

03:09:22  23  they be putting them through this?  They could be recharged.

03:09:24  24  If they were really guilty, would they expose themselves to

03:09:27  25  all this to let 40 witnesses get interviewed?

03:09:30   1      No.  We are going to prove to you that they aren't

03:09:33   2   guilty, and then, of course, the whole world changed

03:09:35   3   dramatically two weeks ago when we found out that they have

03:09:38   4   known the whole time that the real killer's fingerprint was on

03:09:42   5   that -- that murder scene.

03:09:43   6      The other thing they are going to say in defense, there's

03:09:45   7   going to be a lot of discussion at this trial about whether

03:09:48   8   York knew about the fingerprint match.  So the fingerprint

03:09:53   9   match I told you happened in 2017.  The charges were dropped

03:09:56   10  in like 2015, I believe.  This lawsuit gets filed.  Then they

03:10:02   11  make the fingerprint match.

03:10:03   12     To be clear, the fingerprint match was an automatic ping.

03:10:08   13  The computer alerted them that we got a match.  And when the

03:10:12   14  match happened, that was transmitted to Post 10 where York

03:10:15   15  worked.

03:10:15   16     And the second witness, Catron, is going to talk about

03:10:21   17  what happened when that fingerprint was transmitted to Post 10

03:10:25   18  in 2017 because it didn't get investigated, ladies and

03:10:29   19  gentlemen.  It didn't get investigated.  Nobody did anything

03:10:31   20  with that.

03:10:34   21     You know, Ms. Mills's family was still entitled to

03:10:36   22  justice.  Even if the case against these two collapsed, the

03:10:38   23  evidence is going to show they still had a duty to investigate

03:10:41   24  this murder, and it's going to be inexplicable why nobody

03:10:46   25  talked to Whitehead until we found out about that.  And

03:10:49  1    there's going to be testimony about whether York knew.

03:10:53  2         I anticipate he's going to take the witness stand and

03:10:55  3    say, Nobody told me about that match.  I had moved on to a

03:10:57  4    different -- he had went back and forth to posts.  Nobody told

03:11:00  5    me.  And you will evaluate that at that point, and you'll hear

03:11:03  6    evidence that, Wait a minute.  If you spent three years

03:11:06  7    investigating this murder and you were the guy in

03:11:10  8    Stinking Creek talking to witness after witness, meeting hours

03:11:13  9    after hours talking to everybody's brother, making countless

03:11:16  10   interview notes, if they knew that the print had matched a guy

03:11:20  11   named John Whitehead, he's going to tell you, Nobody mentioned

03:11:23  12   it to me, nobody asked me about that.  And you are going to

03:11:26  13   say that's not plausible.  There's no universe where this

03:11:29  14   didn't go to Detective York to say, Hey, did your

03:11:33  15   investigation -- you are not on this case anymore, but did

03:11:35  16   your investigation show anything about a John Whitehead?

03:11:38  17        He's going to deny it.  You are not going to believe it.

03:11:41  18        That's the case, ladies and gentlemen.  The fact that it

03:11:43  19   didn't get investigated is going to show consciousness of

03:11:45  20   guilt.

03:11:46  21        He and they didn't want to catch the killer because, if

03:11:50  22   they caught the killer, that is going to proffer how did they

03:11:52  23   get 11 people to point their fingers at the wrong people and

03:11:56  24   have all the facts.

03:11:57  25        The last thing you are going to have to decide is damages

03:12:02  1    because liability in this case is going to be easy.  They did

03:12:06  2    have their rights violated.

03:12:08  3         So what is it to lose eight collective years sitting in

03:12:11  4    jail?  Amanda had a four-year-old and seven-year-old at the

03:12:15  5    time.  You know, you are going to hear a lot about her life.

03:12:18  6    She's struggled like a lot of people.  She's made mistakes

03:12:20  7    like a lot of people.  She's really, really turned it around.

03:12:23  8    The last ten years have been outstanding.  She went through

03:12:26  9    hard times, good times, bad times, like all of us, like any of

03:12:29  10   us.  But what this did to her life was not right and not fair.

03:12:33  11        Her four-year-old -- at the time they said to her

03:12:38  12   four-year-old, you know, Mom is just going to be gone for a

03:12:39  13   little while.  They thought it would be cleared up.  She

03:12:42  14   didn't do anything.  She thought it would be cleared up.  So

03:12:43  15   they told the little girl and little boy, Mom is going to be

03:12:46  16   home.  They actually tried to just say, you know, She's just

03:12:48  17   sick, which you probably shouldn't do to a kid, but they

03:12:51  18   didn't want to confuse a four-year-old and a seven-year-old.

03:12:54  19             THE COURT:  That's about your time.

03:12:55  20             MR. LOEVY:  All right.  May I wrap it up?

03:12:56  21             THE COURT:  Yes, two minutes or less.

03:12:59  22             MR. LOEVY:  Thank you, Your Honor.

03:12:59  23        So you'll hear a lot about damages.  You'll hear about

03:13:02  24   Jonathan.  You'll hear they tried to give Jonathan the death

03:13:05  25   penalty, capital murder.  The two of them are sitting in

03:13:09   1   prison thinking, Are they going to execute me over this?

03:13:12   2   Amanda is thinking, Are they going to put the death penalty on

03:13:15   3   me?  Are they going to spend the rest of their lives in

           4   prison?

03:13:17   5        We now know there was a happy ending, charges dismissed,

03:13:21   6   you can walk, but they suffered.  They suffered.  And they'll

03:13:25   7   tell you about it, and they are here asking for justice.

03:13:31   8        Thank you.

           9             THE COURT:  Mr. Wright.

          10                     OPENING STATEMENT

03:13:43  11   BY MR. WRIGHT:  Thank you, Your Honor.  Counsel, ladies and

03:13:43  12   gentlemen of the jury, again my name is Derrick Wright.  I

03:13:45  13   have with me Scott Miller, David Hobson.  I represent

03:13:49  14   Detective York.

03:13:50  15        I, too, want to express thanks for your service and

03:13:52  16   commitment, and I especially want to express thanks for your

03:13:57  17   patience.

03:13:57  18        I would like to go first, but I don't.  So I appreciate

03:14:01  19   you letting us both have our time.

03:14:03  20        Detective York was the investigator, the lead

03:14:09  21   investigator, for the Mills murder investigation from the

03:14:11  22   night she was found dead on December 20, 2010, to about late

03:14:17  23   2015 when he was off the case, got transferred to another

03:14:21  24   post.

03:14:22  25        It was a tragic crime.  She was an older lady, got hit in

03:14:27  1   the head, was left on her back porch to die in the freezing

03:14:30  2   cold.  She'd just sold some timber.  She didn't have an indoor

03:14:36  3   bathroom, was going to build one with that money, and it was

03:14:40  4   stolen.  So her money, her plans, and her life were all taken

03:14:44  5   from her on that day.

03:14:46  6        You have heard a lot of names.  It's been jumping around.

03:14:51  7   I'm going to try to break it down into the units of time like

03:14:54  8   this investigation unfolded.

03:14:56  9        It started with the first time he was called there.

03:14:59  10  There's the second and a third day.  Then you kind of look at

03:15:02  11  the week of Christmas.  Then it kind of spans into the next

03:15:08  12  month of January.  Then it kind of builds out to the first six

03:15:12  13  months.  Then you have a big gap and then a rush of activity

03:15:20  14  and the prosecution.

03:15:21  15       I'm going to go over that because it shows Detective York

03:15:24  16  wasn't going to frame anybody.  He was just following the

03:15:27  17  evidence where it led.

03:15:29  18       And Mr. Loevy is correct.  Eventually the charges were

03:15:35  19  dropped.  And it goes back to the units of time because this

03:15:38  20  thing lasted years.  And over that time, those witnesses --

03:15:42  21  some of them started to back out of their statements, and I'm

03:15:45  22  going to go over why because there's evidence of a pattern.

03:15:49  23       The judge has instructed you, Mr. Loevy has kind of

03:15:55  24  explained, they allege malicious prosecution.  The Court is

03:16:00  25  going to instruct you on that at the end of the case, but just

03:16:03  1   so you can kind of understand how the evidence you are going

03:16:06  2   to hear relates to the issues, there's just two main things:

03:16:09  3   Did Detective York have probable cause for the charges and

03:16:14  4   whether he acted with malice.

03:16:17  5       Probable cause is reasonable belief based on the

03:16:21  6   information he knew, not what other people thought or knew but

03:16:24  7   what he knew and whether it was reasonable.  That's going to

03:16:28  8   be the evidence you hear, what he knew.  And whether that adds

03:16:32  9   up to probable cause will be what you decide at the end of the

03:16:36  10  case.

03:16:37  11      Malice?  Just bad intent, evil intent.  And in this case

03:16:44  12  Mr. Loevy alleges the worst intent that could be alleged

03:16:48  13  against a police officer, that he intentionally framed

03:16:53  14  somebody for murder that they say they didn't commit.

03:17:02  15      There's three basic issues I'm going to go through that

03:17:08  16  show Detective York did not intentionally frame the

03:17:13  17  plaintiffs.  And it's their burden of proof.

03:17:18  18      And he said a lot, some fast talk, some big talk.  Hold

03:17:23  19  him to it.

03:17:25  20      And one -- I want to start first with something.  I did

03:17:29  21  not hear one piece of evidence that they are going to show

03:17:33  22  you, which is why.

03:17:37  23      Detective York is going to tell you he had no reason to

03:17:40  24  frame anybody.  He got a call, and he went out to do his job.

03:17:47  25  He did not know the victim personally.  He did not know the

*OPENING STATEMENT BY MR. WRIGHT*                    43

03:17:51  1   victim's family.  He did not know any of the suspects

03:17:55  2   personally who he investigated.  There was absolutely no

03:17:58  3   reason for him to risk his career and his future.

03:18:04  4       And to follow up on that point, the evidence will show

03:18:08  5   what I led with.  He just followed the investigation.  And it

03:18:14  6   did happen that a lot of the last pieces of evidence were

03:18:18  7   witnesses.  And Detective York did not go running to get

03:18:22  8   charges based on one witness statement.  It was several.

03:18:26  9       And if you noticed what Mr. Loevy said, they weren't

03:18:30  10  consistent.  That's not somebody intentionally framing

03:18:33  11  somebody.  That's an officer following the evidence.

03:18:37  12      So let me break down the first night.  He gets called out

03:18:49  13  that evening.  They interview some of the family at the scene.

03:18:54  14  They interview a grandson, Michael Mills.  They interview some

03:18:58  15  other family members, and they find out that the grandson,

03:19:01  16  Michael Mills, had been staying with the victim recently and

03:19:05  17  may have stolen a hundred dollars.  And they interviewed him

03:19:08  18  at the scene.

03:19:09  19      After Detective York cleared the scene at 10:44 P.M., him

03:19:15  20  and another group of officers go investigate Michael Mills.

03:19:19  21  They show up where he's staying at, interview him again,

03:19:23  22  interview his girlfriend, interview the friend he's staying

03:19:27  23  with, and interview the friend's girlfriend, all four of them

03:19:31  24  to check out this first suspect because the very first

03:19:34  25  evidence led to him.  His alibi checked out.

03:19:39  1     The next day it wasn't until 1:51 A.M. that Detective

03:19:46  2  York finished his work on that first night.  Probably didn't

03:19:49  3  get to bed until 3:00 A.M.  He's back to work the next day.

03:19:53  4  He goes down and interviews people at a sawmill that's close

03:19:57  5  to where the victim lives, and that's the 12 suspects that

03:20:02  6  Mr. Loevy referenced.  And they are not suspects.  He went to

03:20:05  7  those people to ask, Did you see anything when you drove by?

03:20:09  8  They saw no signs of life that day.  He asked, Who's some drug

03:20:13  9  dealers in this area because we are going to investigate them,

03:20:16  10  see who's spending some money?  That's why he wrote down all

03:20:19  11  those names.

03:20:20  12     The next day, two days after the murder, December 22,

03:20:26  13  they canvass the area, start asking people, meet with the

03:20:30  14  family.

03:20:31  15     Detective York met with the logger who bought the timber

03:20:35  16  so he could confirm how much money was stolen, over $12,000.

03:20:40  17     They get the first break in the case, which is a person

03:20:43  18  who lived down the road was driving by the home that morning

03:20:46  19  she was found dead.  He sees a blue car, looks like a Chevy

03:20:50  20  Cavalier.  He sees a man, a male subject, walking around the

03:20:54  21  back corner, long hair, camo hoodie, tattoos in the area of

03:21:01  22  his hands, on one or both hands, and he sees a female, but he

03:21:06  23  can't describe her.

03:21:10  24     Mr. Loevy says there's no reports of a female, no reports

03:21:13  25  of a female.  That was probably why, because he could not

*OPENING STATEMENT BY MR. WRIGHT*                                      45

03:21:16   1    describe her.

03:21:17   2         He did get a look at the male, and a couple months later

03:21:18   3    they went out and got a sketch with Detective Josh Bunch.

03:21:24   4         When that description was reported to the family, that

03:21:29   5    was the next lead.  Somebody said, That looks like a drug

03:21:33   6    dealer by the name of Mike Simpson.  And then he got some more

03:21:37   7    information.  Mike Simpson had traveled to Florida that day to

03:21:42   8    go buy prescriptions.  Kind of looks like -- kind of fits the

03:21:46   9    description.  Now those two are suspects.

03:21:49   10        The week of Christmas when they get back, Detective York

03:21:53   11   meets up with him to get their information.  Mike Simpson

03:21:58   12   doesn't give a statement, but they take pictures of him.  And

03:22:01   13   he does have long hair.  Does not have a tattoo.

03:22:05   14        Because Mike Simpson didn't talk, now we are onto the

03:22:11   15   next unit, January, the next month.  That's when he starts

03:22:14   16   talking to Allen Helton who gives bits and pieces of

03:22:19   17   information, says Mike Simpson was broke but came up with the

03:22:23   18   money the next day, talks about them going to Florida, talks

03:22:26   19   to the grandson, the victim's grandson, the victim's

03:22:29   20   granddaughter's husband, Jesse Lawson.

03:22:33   21        He gives some information about Mike Simpson crying on

03:22:34   22   the phone.  He's still investigating Mike Simpson.  They are

03:22:37   23   giving him all sorts of information he can't keep track of.

03:22:40   24   So he gives them both a polygraph, and they both fail.

03:22:45   25        The way the polygraphs are done, if you fail one, you've

03:22:51  1     failed them all.

03:22:51  2          But Detective York was of the belief that the question

03:22:54  3     they failed was knowledge, not necessarily whether they had

03:22:58  4     harmed her, just whether they knew something about the case

03:23:00  5     that they weren't telling him.

03:23:04  6          But at that point he couldn't go much farther with those

03:23:09  7     two, and that's when the evidence led to the next suspects,

03:23:17  8     William Lester, Amanda Hoskins, and Jonathan Taylor.  And it

03:23:21  9     all started with some reports that William Lester had

03:23:26  10    discussed stealing the victim's timber money before it

03:23:31  11    happened.

03:23:31  12         He got a report from a person in the area named Wesley

03:23:35  13    Roark who said that he had heard Lester talking about it at

03:23:39  14    the store.

03:23:40  15         The victim's husband-to-the-granddaughter said he had

03:23:45  16    heard it.  Jesse Lawson said he heard it.  Detective York

03:23:52  17    pursued him.  He heard from the family that Amanda Hoskins had

03:23:56  18    stolen from Michelle Edwards, who is another daughter --

03:23:59  19    granddaughter of the victim.

03:24:00  20         She had told him that she was -- had a bad addiction.

03:24:06  21    She also said that she had a cousin that was close to her,

03:24:11  22    Jonathan Taylor, who also resembled the suspect, and back then

03:24:16  23    Jonathan Taylor had long dark hair, tattoo on the hand.

03:24:24  24         Detective York will also tell you that he would have

03:24:27  25    reviewed their criminal histories when he's investigating

03:24:31    1    these people.

03:24:33    2        Jonathan Taylor had a charge of burglary in

03:24:37    3    December within two weeks of the -- of the Mills murder.

03:24:46    4    Amanda Hoskins had been reported to have stolen from the

03:24:49    5    family, drug use, was told by Michelle Edwards and Jesse

03:24:56    6    Lawson.  She also had a stolen firearm charge in February of

03:25:00    7    2011.  He picked her up on unrelated charges with a warrant

03:25:06    8    outstanding for her and interviewed her.  And she confirmed,

03:25:10    9    Yes, I overheard Lester talking about stealing the money to

03:25:16   10    Joe King, who she has a child in common with, who Lester said

03:25:21   11    was a drug user and drug seller.  I heard him say it to Mike

03:25:25   12    Simpson, the other suspect in the case a couple of days before

03:25:28   13    the murder.

03:25:30   14        And Amanda Hoskins told Detective York, He discussed

03:25:34   15    stealing her purse, which is exactly where the victim kept all

03:25:39   16    of her cash.  She didn't put it in the bank.  She didn't put

03:25:42   17    it in a safe or some secret spot.  She just kept it in her

03:25:46   18    purse by the back door.  That's exactly where they got it.

03:25:50   19        The crime scene was almost undisturbed except for a purse

03:25:55   20    that was laying on the floor, some money spilt, a few contents

03:26:01   21    there.

03:26:02   22        Detective York reasonably believed the suspects knew what

03:26:07   23    she had and where she had it.  Lester and Amanda Hoskins

03:26:10   24    seemed to fit that part of the case.

03:26:15   25        Amanda Hoskins also said Lester told Joe King, I'm going

03:26:21   1   to steal that bitch's money.  "That bitch" he referred to her.

03:26:27   2   Lester also told King about all of his money problems, that

03:26:31   3   his banks were going to take his trailer and his car, that his

03:26:36   4   utilities were getting cut off.  And there's been some

03:26:40   5   reference by Mr. Loevy to some threats and things against

03:26:44   6   Ms. Hoskins.

03:26:46   7       Detective York will tell you that interview was just an

03:26:50   8   ordinary interview.  It was attended by the chief of police of

03:26:55   9   Barbourville, and if you listen to the recording, it doesn't

03:26:59  10   match the allegations of any kind of wrongdoing.

03:27:07  11       The evidence will show Detective York arrested Jonathan

03:27:12  12   Taylor on an outstanding warrant for unrelated charges in

03:27:13  13   February of 2011.  I believe it was a burglary charge, a

03:27:16  14   probation violation or violation of a release condition.

03:27:20  15       He did not have direct knowledge that Jonathan Taylor

03:27:23  16   knew about the money, that he knew that he was a cousin, a

03:27:28  17   close cousin, stayed with her.  So he reasonably believed he

03:27:30  18   could have learned about it through there.  He also fit the

03:27:35  19   description best of all the suspects with his longer hair and

03:27:39  20   tattoo.  He did not provide a statement when Detective York

03:27:44  21   asked.

03:27:46  22       Then Detective York interviewed Lester in April of 2011.

03:27:54  23   I'm just about to the end of the six months.  Lester

03:27:57  24   corroborates, Yeah, I talked to Joe King about it; I talked to

03:28:03  25   Jesse Lawson.  He said, I talked to Wesley Roark.  And he

03:28:09   1    tried to make it sound like he was joking, and so did

03:28:13   2    Mr. Loevy.  But the police don't just accept that kind of

03:28:17   3    explanation.  They don't have to.  And not only that, it

03:28:19   4    wasn't made to sound like a joke, the way Amanda Hoskins said

03:28:23   5    it, calling Katherine Mills "that bitch," saying he's going to

03:28:27   6    take her money but not hurt her.  That's an odd thing to

03:28:32   7    caveat if you are just joking.

03:28:40   8        He confirmed that Amanda Hoskins would have overheard him

03:28:43   9    saying it.  He did not mention talking about it with Mike

03:28:47   10   Simpson, which was an inconsistency with Amanda Hoskins.  He

03:28:50   11   also described her as begging for drugs and that he was

03:28:54   12   supporting her.  He told Detective York that he sold the

03:28:58   13   washing machine out of his trailer to get her pills the night

03:29:02   14   before Katherine Mills was found dead.

03:29:06   15       Detective York does interview Joe King.  Detective York

03:29:11   16   will tell you he usually records witness interviews, but Joe

03:29:15   17   King asked not to, and he honored it, just to build rapport

03:29:20   18   with the witness.

03:29:23   19       Joe King now backed out.  We will give you an -- give you

03:29:27   20   evidence of possibly why that happened.  But Detective York

03:29:31   21   will deny that that was a made-up report.  And, in fact, after

03:29:37   22   Detective York took it, because Joe King said, Yeah, I heard

03:29:41   23   Lester and Amanda about stealing the money the night before in

03:29:45   24   Pineville, all three of them admitted that they talked about

03:29:48   25   it, but it was all a little different.

03:29:51   1          Joe said the night before.  Lester and Amanda said it was

03:29:55   2     a week before.  Amanda said he was calling her a bitch and not

03:29:59   3     going to hurt her.  Lester said it's all a big joke.  King

03:30:08   4     mentioned that she filled the prescription that night, that

03:30:11   5     she had a doctor that she may have had a relationship with,

03:30:14   6     and that doctor's office was part of their alibi; so York

03:30:18   7     followed up on it.

03:30:19   8          When he went to the Walgreen's, he found out they filled

03:30:22   9     the prescription on the day of the murder, and he noted the

03:30:25   10    inconsistency with King's report, statement, showing that it

03:30:31   11    wasn't fabricated.  He wouldn't make up a report and then

03:30:35   12    determine it to be inconsistent.

03:30:41   13         The medical records show that she had an appointment at

03:30:51   14    11:30, didn't show up until 11:54, 24 minutes late.  He also

03:30:55   15    got evidence of drug abuse through the medical records that

03:31:00   16    she had track marks on her arms but was still getting

03:31:06   17    prescribed medicine by the doctor in that January, February

03:31:11   18    time period right after the murder.

03:31:12   19         In that same period, in the Lester interview in April,

03:31:15   20    Amanda Hoskins and Joe King are at a house provided by

03:31:19   21    Mr. Lester.  They are both under an indictment warrant.  They

03:31:23   22    could be arrested by police at any time, and Lester provides

03:31:26   23    them a place to stay on the same day he's getting interviewed

03:31:30   24    by Detective York, and police go out there and arrest him and

03:31:35   25    take him into custody.

03:31:37    1        That's how Detective York got to Joe King.  He was in

03:31:38    2    custody.  That's how he got to Christy Branson.  She came

03:31:41    3    forward and said, I have been in jail with Amanda Hoskins, and

03:31:44    4    she confessed.

03:31:45    5        And it is absolutely true that statement had some

03:31:48    6    inconsistencies.  She said that Amanda told her that Joe King

03:31:53    7    was the one that hit the lady, that Jonathan Taylor was there;

03:31:57    8    Kayla Mills, who is Jonathan's girlfriend, was there, and she

03:32:01    9    thought William Lester could have possibly planned it.

03:32:08   10        So up to that point, that's where we had a break, big

03:32:11   11    break of inactivity of almost eight months.  But he had

03:32:18   12    evidence of planning.  They discussed stealing the money.

03:32:20   13    They had evidence of knowledge that she had the money and

03:32:24   14    where she kept it.  They had a possible description, Jonathan

03:32:27   15    Taylor being the best person who matched it.  They had

03:32:31   16    evidence of motive and capability, that Jonathan Taylor and

03:32:36   17    Amanda Hoskins were drug users, did not have income, that they

03:32:41   18    had committed thefts, that they fit the profile for the crime.

03:33:02   19        So what changed, what happened in March of 2012, three

03:33:02   20    more witnesses came forward on their own initiative.

03:33:05   21        Mr. Loevy made it sound like Detective York is out there

03:33:08   22    doing it.  He didn't.  It was inactive from July 2011 until

03:33:12   23    March 2012.  There was just one case supplement where somebody

03:33:14   24    said Brian Mills had confessed, and Detective York looked into

03:33:18   25    that, and another trooper said, No, he was out of state.  One

03:33:22  1    thing in eight months.

03:33:22  2         These people in March came forward on their own

03:33:25  3    initiative.  The first one was Allen Helton.  Mr. Loevy said,

03:33:28  4    you know that guy is giving all these statements; what

03:33:31  5    happened was he got arrested by the sheriff's office, and,

03:33:34  6    without any involvement by Detective York, he volunteered and

03:33:39  7    said, you know what, maybe I'll give some information on the

03:33:41  8    Mills murder.  And so Detective York came up and met him.  He

03:33:47  9    talked to Allen Helton several times, and Detective York will

03:33:50  10   say, What do you know, because Helton hadn't given him what he

03:33:56  11   needed.  And once Allen went over it, they put it on the

03:34:00  12   record.

03:34:00  13        But Detective York didn't run and get charges after Allen

03:34:06  14   Helton's statement.  Allen had said that he saw Lester and

03:34:10  15   Amanda at Mike Simpson's house at noon to drop off the money

03:34:14  16   to go get the pills.

03:34:16  17        After Allen Helton, he interviews with Amber Simpson on

03:34:20  18   March 13, 2011.  At that time Amber Simpson is a student in an

03:34:25  19   alternative school.  She's not in any kind of serious trouble.

03:34:29  20   At that point in time, Detective York was told she had

03:34:33  21   information from her mother.  They used to live by Jonathan

03:34:37  22   Taylor in that 2012 time period.  He interviewed her with the

03:34:41  23   school guidance counselor, and she gave a statement with

03:34:46  24   probably the most detail of any of it.  She said a man named

03:34:50  25   Will had planned it, which Detective York believed was Will

03:34:54   1   Les -- William Lester.  He said that Kayla Mills -- she said

03:34:58   2   Kayla Mills was the lookout.  She said Amanda Hoskins was the

03:35:02   3   driver and parked nearby.  And she said Jonathan Taylor told

03:35:04   4   her he struck her twice and laid the money down.  The "struck

03:35:10   5   twice" was not publicly released information.

03:35:28   6        He interviewed one other state- -- Marcy Baker who said

03:35:28   7   that Kayla Mills had told her it was her and Jonathan Taylor

03:35:28   8   and another kid.

03:35:33   9        At that point is when he pursued his charges.  He gets

03:35:34   10  them for four:  William Lester, Amanda Hoskins, Jonathan

03:35:37   11  Taylor, and his girlfriend, Kayla Mills.

03:35:41   12       Kayla Mills never talked to Detective York.  Her family

03:35:44   13  got an attorney.  You have talked about -- Mr. Loevy said

03:35:46   14  she's now deceased and her mom is going to come here.  Her mom

03:35:49   15  got a defense attorney and arranged for that defense attorney

03:35:54   16  to have York give an interview.  And Detective York, not

03:36:00   17  having heard from her, said he would.  He did.

03:36:02   18       She said she didn't have anything to do with it.  She

03:36:07   19  said Jonathan Taylor had indicated that he left one laying up

03:36:11   20  on the creek, referring to the deceased, Katherine Mills.

03:36:17   21       He did not make any promises to her.  He could have

03:36:20   22  arrested her at any time later if he determined her statement

03:36:23   23  was false, but because she came forward, because he believed

03:36:27   24  her, he put the warrant in the file, the KSP file.

03:36:33   25       They have indicated that that was withheld.  It was not.

03:36:38  1    Commonwealth attorney Jackie Steele will explain to you, when

03:36:42  2    they transfer a file, there's a whole section in there for

03:36:45  3    warrant materials and none of those get transferred.

03:36:49  4        There were a few more witnesses that came forward after

03:36:55  5    the prosecution started.  Daniel Wilson, who had been a

03:37:01  6    cellmate with Jonathan, indicated that Jonathan had confessed.

03:37:05  7    Robert Beach did the same thing.

03:37:07  8        Mr. Loevy said all -- he was on phone calls saying he

03:37:09  9    didn't know anything.  The truth is he sent a letter to the

03:37:13  10   Commonwealth attorney saying, I have information.  That's the

03:37:16  11   whole reason the police went to interview him.

03:37:18  12       And not only that, but Commonwealth attorney Jackie

03:37:24  13   Steele sat in on the interview.  It wasn't just Detective York

03:37:28  14   who was there.  After hearing that firsthand, Commonwealth

03:37:31  15   attorney Jackie Steele filed his motion to seek the death

03:37:35  16   penalty.

03:37:41  17       As Mr. Loevy said, there was one more witness who came

03:37:44  18   forward in 2015, and that was Mikey Bruner.  He gave -- he

03:37:49  19   said that Jonathan Taylor had confessed to him, but it was

03:37:53  20   also inconsistent.  He said that he used a bat.  Amber Simpson

03:37:56  21   said he had used a hammer.  Mikey Bruner said it happened at

03:38:02  22   night.  The evidence suggested it was in the morning.  Mikey

03:38:08  23   Bruner thought they only stole a few hundred dollars when the

03:38:11  24   evidence indicated they stole over 12,000.

03:38:15  25       But what's an officer supposed to do?  Wait until every

03:38:20  1    piece of evidence is perfect?  So he took the information as

03:38:26  2    it came, and during that time William Lester, Jonathan Taylor,

03:38:30  3    and Amanda Hoskins were the best suspects.

03:38:48  4        So what went wrong?  Mr. Loevy indicated that it was York

03:38:48  5    fabricating all this and using jailhouse snitches.  There were

03:38:52  6    some cellmates who gave statements, but maybe the more

03:38:55  7    appropriate thing to say here is that snitches get stitches

03:39:00  8    because what happens is, when we go through this list, the

03:39:20  9    pattern that emerges is that Kayla Mills, the evidence will

03:39:23  10   show, gave a statement against them.  She gets picked up on

03:39:28  11   different charges the next month, April 2012, and is in jail.

03:39:34  12       The evidence will show that she's in the same detention

03:39:37  13   facility as Amanda Hoskins.  As soon as she gets out in

03:39:41  14   July of 2012, she moves to Louisville.  And then she ends up

03:39:45  15   overdosing and dying before she's set to go to trial and

03:39:50  16   possibly return to jail.

03:39:55  17       Christy Branson, she had been in jail with Amanda Hoskins

03:39:59  18   and reported overhearing something after she got out.  That

03:40:03  19   was in 2011 after the Lester interview.  Guess what?  She

03:40:08  20   violates her probation, goes back to jail, just like Kayla

03:40:15  21   Mills is in the same detention facility.  She ends up

03:40:18  22   contacting Commonwealth attorney Jackie Steele and said, I

03:40:22  23   have been in an accident; I have a head injury; I don't

03:40:26  24   remember anything, after being in the same detention facility

03:40:31  25   with Amanda Hoskins.

03:40:38   1        I'll skip to No. 4 on the list, Allen Helton, because he

03:40:43   2   was in the same detention facility as Amanda Hoskins.  They

03:40:46   3   were all in Laurel County Detention Center, Christy Branson,

03:40:50   4   Kayla Mills, Allen Helton.

03:40:52   5        So he had volunteered to give that statement earlier.

03:40:54   6   He's in the same facility.  There's evidence that he gave a

03:40:57   7   report that Amanda Hoskins called him a rat and caused him a

03:41:00   8   lot of problems.  He ends up entering into a plea agreement in

03:41:07   9   2013, no promise to testify against them in that plea

03:41:12   10  agreement.  He gets out of jail.  He has no more obligation.

03:41:16   11  He's done.  He backs out of his statement.

03:41:25   12       Joe King, Detective York will tell you he talked to him

03:41:29   13  when he was in custody in 2011.  There may be evidence to

03:41:33   14  indicate that he corroborated his statement to a third party

03:41:37   15  while he was in custody, but then he gets out of jail.  He has

03:41:42   16  a child in common with Amanda Hoskins, and there's evidence

03:41:45   17  that they are getting on friendly terms again with their child

03:41:50   18  in custody, that they share.  One month after you see that

03:41:57   19  evidence of them interacting again, he meets with Commonwealth

03:42:01   20  attorney Jackie Steele, is served a subpoena, and he says, I

03:42:05   21  don't remember anything.

03:42:23   22       Daniel Wilson, he contacted police, said, I was in -- I

03:42:23   23  believe it was -- Whitley County Jail with Jonathan Taylor,

03:42:23   24  and I heard him make some statements.  And after Daniel Wilson

03:42:28   25  got transferred somewhere else in northern Kentucky, that's

03:42:30  1   when he reached out to police.  Detective York takes the

03:42:32  2   statement.

03:42:33  3       Before trial, they ship him back to Knox County, and he

03:42:36  4   ends up in the same detention facility as Jonathan Taylor.

03:42:39  5   And after that happens, he backs out of his statement.

03:42:43  6       He will tell you that jail is not a good place for

03:42:46  7   informants.  Christy Branson will tell you jail is not a good

03:42:50  8   place for informants.  Amber Simpson will tell you the same

03:42:54  9   thing.

03:42:56  10       And it's Amber Simpson who's next on the list.  I

03:43:00  11   mentioned to you that her mom had told Detective York -- he

03:43:03  12   wasn't chasing her down.  Her mom said she has information.

03:43:07  13   He interviewed her with a guidance counselor.  After that, she

03:43:12  14   confirmed the statement twice to two other people.  She's

03:43:16  15   still not in any serious legal trouble.  But guess what;

03:43:20  16   around 2014, 2015, she starts coming in and out of jail, and

03:43:24  17   in 2015, when she's in the same detention facility as Amanda

03:43:29  18   Hoskins, she backs out of her statement too.

03:43:43  19       Warren, Baker, and Kinningham are kind of unrelated to

03:43:46  20   them.  They heard statements from Kayla Mills, and because she

03:43:52  21   died, their statements that they overheard from her weren't

03:43:55  22   needed anymore.

03:43:58  23       Robert Beach was the same witness that Detective York

03:44:05  24   interviewed with Commonwealth attorney Jackie Steele.  Jackie

03:44:10  25   Steele heard it himself.  And by the time Beach came back to

03:44:13   1   testify, I believe his time in jail was almost up, and Jackie

03:44:20   2   Steele will tell you that Robert Beach was just, I'm done.

03:44:37   3        So the evidence will be that all these witnesses who

03:44:37   4   backed out had a reason to do so.  There's going to be

03:44:41   5   evidence that, before they had a reason to do so, they stuck

03:44:41   6   by their statements.  So it's unfortunate that there was quite

03:44:47   7   a bit of evidence in the case that were jailhouse snitches.

03:44:50   8   But it's also unfortunate that there's a snitches-get-stitches

03:44:55   9   problem in the jails.

03:44:58   10       Let me talk about the breaking news that Mr. Loevy

03:45:06   11  brought up, this fingerprint match.  That has nothing to do

03:45:12   12  with Detective York's investigation.

03:45:15   13       Detective York, as I told you, started on the first

03:45:18   14  night, December 20th, 2010, and he worked it until 2015 when

03:45:24   15  he got promoted and transferred to another post.

03:45:28   16       At that point another case officer took over.  I believe

03:45:32   17  the name is Detective Jake Wilson who's still the case

03:45:36   18  officer.  There's a supplement to that effect in the file.

03:45:41   19       Detective York did not return to the Harlan post where

03:45:46   20  this investigation was until August of 2017.  The hit with the

03:45:54   21  fingerprint I believe was May 2017.  He wasn't on the case.

03:45:58   22  He wasn't even at the post.

03:46:01   23       When he did come back in August of 2017, he already had

03:46:06   24  been sued in this case.  He didn't want to have anything to do

03:46:11   25  with it because, guess what, if he did, they would be pointing

03:46:15   1   the finger at him.  And now that he's not having anything to

03:46:19   2   do with it, they are still pointing the finger at him.

03:46:22   3       How in the world can he not hear about this case that you

03:46:23   4   were on?  He told them he didn't want to hear about it, he

03:46:26   5   didn't want to have anything to do with it, and this is

03:46:30   6   exactly why.

03:46:31   7       Now, there was a period of time where they were

03:46:33   8   shorthanded and they asked him, as a sergeant, can you be in

03:46:37   9   charge of the investigations, and he did, but he said, I'm not

03:46:40  10   being involved with that case, and he wasn't.  And that case

03:46:45  11   was locked up and reviewed by the captain, not by Jason York.

03:46:50  12   So they can make whatever they want out of this fingerprint

03:46:54  13   evidence, but Detective York had nothing to do with it.

03:46:57  14       One other point, the fingerprint match does not prove

03:47:01  15   he's the real killer.  Money, probably more than anything else

03:47:06  16   in our lives, is touched and handled and passed around than

03:47:12  17   anything else.

03:47:13  18       So it does not prove that he was at the scene, unlike

03:47:17  19   touching a door handle or a window or something there.

03:47:21  20   There's lots of explanation how that fingerprint on a piece of

03:47:26  21   money could have gotten there.  It could be a lead.  It could

03:47:33  22   be a dead end.  Or it could be a diversion.

03:47:38  23       Mr. Loevy said that Detective York believed they had left

03:47:41  24   it behind to make it look like it wasn't a robbery.  That's

03:47:45  25   not real effective since they stole $12,000.  Maybe it was

*OPENING STATEMENT BY MR. WRIGHT*                                    60

03:47:50  1    left behind for this very reason.

03:48:03  2         I thank you for your time, your patience, your service,

03:48:06  3    and your attention.  They have the burden of proof.  They said

03:48:11  4    a lot.  Hold them to it.  Thank you.

          5         [Excerpt of opening statements concluded.]

          6              *     *     *     *     *

          7                   REPORTER'S CERTIFICATE

          8         I certify that the foregoing is a correct transcript
               from the record of proceedings in the above-entitled matter.

          9

         10                                          Date:  3/21/22

               /s/ Kathleen Maloney, RMR, FCRR
         11         United States Court Reporter

         12

         13

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25