1

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF KENTUCKY
 2                    SOUTHERN DIVISION at LONDON
                                - - -
 3
      AMANDA HOSKINS and JONATHAN    : Docket No. 17-CV-84-REW
 4    TAYLOR,                        :
                                     : London, Kentucky
 5                      Plaintiffs,  :
                                     : Monday, March 16, 2022
 6    Versus                         : 8:30 A.M.
                                     :
 7                                   :     EXCERPTED TRANSCRIPT OF
      JASON YORK, Individually,      :   TESTIMONY OF JASON YORK
 8                      Defendant.   :          DAY 1
                                     :
 9
                                - - -
10                TRANSCRIPT OF TRIAL TESTIMONY OF
                         JASON YORK DAY 1
11            BEFORE THE HONORABLE ROBERT E. WIER
                UNITED STATES DISTRICT COURT JUDGE
12                              - - -
      APPEARANCES:
13
      On Behalf of the Plaintiff:
14                         JON LOEVY, Attorney at Law
                           ELLIOT SLOSAR, Attorney at Law
15                         AMY ROBINSON STAPLES, Attorney at Law
                           MARGARET ELIZABETH CAMPBELL,
16                         Attorney at Law
                           Loevy & Loevy
17                         311 North Aberdeen, 3rd Floor
                           Chicago, Illinois 60607
18    On Behalf of the Defendant:
                           DERRICK T. WRIGHT, Attorney at Law
19                         LYNDOL SCOTT MILLER, Attorney at Law
                           Sturgill, Turner, Barker & Moloney PLLC
20                         333 West Vine Street, Suite 1500
                           Lexington, Kentucky 40507
21    Court Reporter:      KATHLEEN E. MALONEY, RMR, FCRR
                           Official Court Reporter
22                         310 South Main Street
                           Room 370
23                         London, Kentucky 47041
                           kathleen_maloney@kyed.uscourts.gov
24
          Proceedings recorded by mechanical stenography;
25    transcript produced by computer.
```

```
                        INDEX
PLAINTIFF'S WITNESSES


JASON YORK...................................... page 3




                        - - -

PLAINTIFF'S EXHIBITS

Exhibit    Description              Identified Admitted
5 (45)     Sketch                                39
72A        Jesse Lawson interview                67
2          Michael Simpson interview             90
           Alibi note                           154
           Citation                             163
           William Lester/wireless number       183

                   - - -

DEFENDANT'S EXHIBITS

Exhibit    Description              Identified Admitted
2E         Stephanie Williams' interview.        57
```

*J. YORK - Direct Examination*                                          3

1                        *    *    *    *    *

2           [Excerpted testimony of Jason York.]

01:32:18   3              JASON YORK, DEFENDANT, DULY SWORN

01:32:18   4           THE COURT:  Council, one issue.

5           (Sidebar conference.)

01:32:20   6           THE COURT:  This examination will be as if on cross.

01:32:23   7    I assume you want that.

01:32:24   8           MR. LOEVY:  Oh, yeah.

01:32:25   9           THE COURT:  Any objection to that?

01:32:28   10          MR. MILLER:  None, Your Honor.

01:32:29   11          THE COURT:  Sir, good afternoon.  Do try to speak

01:32:32   12   toward that mic so we can all hear you during your testimony

01:32:33   13   here.  Begin by stating your name and spelling your last name.

01:32:36   14          THE WITNESS:  Jason York, Y-o-r-k.

01:32:40   15   BY MR. LOEVY:

01:32:41   16   Q.   What do you do for a living?

01:32:42   17   A.   I'm retired.

01:32:43   18   Q.   What was your former position?

01:32:45   19   A.   I worked for the Kentucky State Police.

01:32:47   20   Q.   How long were you there?

01:32:48   21   A.   21 years.

01:32:49   22   Q.   And how long were you a detective?

01:32:51   23   A.   Approximately five, six years.

01:32:57   24   Q.   All right.  Let's talk about the job of a detective.

01:33:01   25   Solve crimes, correct?

*J. YORK - Direct Examination*                                                    4

01:33:02  1    A.   Yes, sir.

01:33:02  2    Q.   And that includes murder?

01:33:04  3    A.   Yes, sir.

01:33:05  4    Q.   What years did you investigate murders?

01:33:10  5    A.   I started being a detective approximately late 2008, 2009

01:33:17  6    until when I promoted in 2015.

01:33:20  7    Q.   All right.  So 2008, 2009, did you jump right into

01:33:23  8    murders or start with smaller crimes?

01:33:25  9    A.   It was smaller -- first couple years or -- no.  Well,

01:33:31  10   this particular case we are here on was actually my first one,

01:33:34  11   but before that, I had worked on a couple cold-case murders

01:33:38  12   and other complaints, you know, like sex abuse and various

01:33:43  13   complaints like that.

01:33:44  14   Q.   All right.  This was your first murder case?

01:33:46  15   A.   Yes.

01:33:48  16   Q.   All right.  Let's talk about what it means to solve a

01:33:52  17   case.  You are supposed to get to the truth, right?

01:33:54  18   A.   Yes.

01:33:54  19   Q.   Catch the person who committed the crime, right?

01:33:57  20   A.   Yes.

01:33:58  21   Q.   Not just prove a case against your suspects.  You would

01:34:01  22   agree with that, right?

01:34:03  23   A.   Yes.

01:34:03  24   Q.   Let's, for a minute, tell the jury about police reports.

01:34:08  25   Is that an important tool in a police investigation?

*J. YORK - Direct Examination*                                          5

| | | |
|---|---|---|
| 01:34:11 | 1 | A.   Yes. |

A.   Yes.

Q.   Tell the jury why and how you create police reports.

A.   We create police reports to document what we found out.

And what was the second part?  I'm sorry.

Q.   That's all right.

MR. LOEVY:  I'll ask another question, if that's okay with you.

A.   Okay.  I don't care if I answer it.

MR. LOEVY:  I'm asking the judge.

THE COURT:  The question was why and how you create police reports.

THE WITNESS:  Okay.  How.  So when I first started the state police, everything was handwritten.  Then, you know, over the next decade, we went to documenting stuff on computer.  And I think, around this time, we had a computer software where we would go in, when we had time, at a computer and type it out, and then we would transmit it.

BY MR. LOEVY:

Q.   Would you take notes?

A.   At times.

Q.   Okay.  That's an important part of a police detective's arsenal; would you agree?

A.   Yes.

Q.   In a murder case, you don't know if it's going to be over in a day, a week, a year, or a decade, right?

*J. YORK - Direct Examination*                                      6

| | | |
|---|---|---|
| 01:35:16 | 1 | A.   That's correct. |
| 01:35:16 | 2 | Q.   And you don't know, at the beginning, what information is |
| 01:35:19 | 3 | going to be important until things play out, right? |
| 01:35:22 | 4 | A.   That is correct. |
| 01:35:23 | 5 | Q.   So you -- as a detective, you try to memorialize all the |
| 01:35:27 | 6 | information and then sort out later what turns out important. |
| 01:35:30 | 7 | Would you agree with that characterization? |
| 01:35:32 | 8 | A.   Could you define that moralize?  I'm not sure how you're |
| 01:35:35 | 9 | referring to that. |
| 01:35:35 | 10 | Q.   What I mean by "memorialize" is write down.  You are |
| 01:35:39 | 11 | supposed to gather information and put it on paper, right? |
| 01:35:42 | 12 | A.   Yes. |
| 01:35:42 | 13 | Q.   And that's important for multiple reasons, correct? |
| 01:35:46 | 14 | A.   Yes. |
| 01:35:46 | 15 | Q.   For example, if someone is later accused of a crime they |
| 01:35:50 | 16 | have a right to all the information in the investigation, |
|  | 17 | right? |
| 01:35:54 | 18 | A.   That is correct. |
| 01:35:54 | 19 | Q.   They have a constitutional right not just to the |
| 01:35:58 | 20 | information that points at them, but they also have a right to |
| 01:36:01 | 21 | information that might prove their innocence, right? |
| 01:36:03 | 22 | A.   That is correct. |
| 01:36:04 | 23 | Q.   So as you are gathering information, you understand |
| 01:36:08 | 24 | you're obligated not just to record on paper the stuff that |
| 01:36:12 | 25 | points at your suspects, but you are also supposed to record, |

01:36:14  1   on paper, the stuff that might help show their innocence,

        2   right?

01:36:18  3   A.   That is correct.

01:36:19  4   Q.   And then not only are you supposed to write it on paper,

01:36:21  5   but then you understand that those reports get turned over to

01:36:24  6   the criminal justice system, right?

01:36:27  7   A.   Yes.

01:36:27  8   Q.   And then the prosecutor decides what to do with all that

01:36:31  9   information, right?

01:36:32 10   A.   Yes.

01:36:32 11   Q.   Would it be fair to say that the Commonwealth attorney

01:36:35 12   trusts you, the homicide detective, to make sure that all the

01:36:39 13   information is memorialized and all of it is transmitted to

01:36:42 14   the criminal justice system?

01:36:50 15   A.   Can you repeat the question?

01:36:51 16   Q.   Sure.  You're the detective.  You know, you're the guy on

01:36:54 17   the front lines talking to the witnesses, right?

01:36:54 18   A.   Yes.

01:36:54 19   Q.   You are gathering the evidence, right?

01:36:56 20   A.   Yes.

01:36:56 21   Q.   And then it becomes your solemn responsibility to

01:36:59 22   transmit all of the evidence, in paper form, summarized to the

01:37:05 23   Commonwealth, right?

01:37:06 24   A.   Can I explain that because I -- I feel like this is a

01:37:10 25   leading question?

01:37:10   1          THE COURT:  Well, he's entitled to lead you --

01:37:12   2          THE WITNESS:  Okay.

01:37:12   3          THE COURT:  -- on cross -- on this type of

01:37:14   4   examination.

01:37:16   5       So answer the question first, and then you can explain.

01:37:18   6          THE WITNESS:  Okay.  Yes.  My follow-up to that is,

01:37:22   7   like, my reports are transmitted -- they are transmitted to

01:37:29   8   post and are kept there, and then -- I'm sorry -- the

01:37:35   9   attorneys would get those files from post, not necessarily me.

01:37:39   10  I just wanted to clarify that.

01:37:40   11  BY MR. LOEVY:

01:37:41   12  Q.   All right.  I think what you are clarifying is you are

01:37:42   13  saying you are not part of the investigative step of moving

01:37:45   14  the reports to the Commonwealth.  Is that what you mean?  Like

01:37:49   15  the administrative staff, I should say.  Is that what you are

01:37:51   16  saying?

01:37:51   17  A.   Not all the time.  I'm not saying there's not been

01:37:54   18  times where I -- there's obviously been times where I have

01:37:56   19  given stuff to the Commonwealth attorneys, but that's not my

01:38:00   20  sole responsibility of the complete case file.  I would not

01:38:03   21  have done that.  I would not have done that.  I just want to

01:38:07   22  clarify.

01:38:07   23  Q.   And just to be clear -- I don't want to get on a tangent

01:38:08   24  here, but doesn't the lead detective take responsibility for

01:38:11   25  gathering the documents?

01:38:12  1    A.   Yes, and transmitting them to post.

01:38:17  2    Q.   Okay.  Let's talk about the Mills investigation.  You

01:38:19  3    were the lead investigator on the Mills homicide, right?

01:38:24  4    A.   For part of the time.

01:38:25  5    Q.   And certainly when it started, for example, right?

01:38:27  6    A.   Yes.

01:38:28  7    Q.   For, what, a couple years?

01:38:29  8    A.   From 2010 until I promoted to sergeant, and I believe

01:38:34  9    that was like November of 2015.

01:38:37  10   Q.   Okay.  So let's talk about the very beginning, what you

01:38:42  11   knew about the crime.  Tell the jury who the victim was and

01:38:45  12   how old she was.

01:38:45  13   A.   The victim's name was Katherine Mills.  Obviously, that's

01:38:51  14   been two decades ago.  I'm sorry.  I don't remember her age.

01:38:53  15   Q.   Approximately?

01:38:54  16   A.   70s, late 60s.

01:38:59  17   Q.   All right.  And in fairness, it has been a long time.

01:39:01  18   You reviewed the file to prepare for your testimony, right?

01:39:03  19   A.   I have looked over it, yes.

01:39:05  20   Q.   All right.  Have you looked over it sort of carefully

01:39:07  21   before you testified today?

01:39:08  22   A.   No.  Not today, I haven't looked over it, no.

01:39:11  23   Q.   Okay.  But before you testified today --

01:39:13  24   A.   I have reviewed it.

01:39:13  25   Q.   In preparing for the trial --

01:39:15   1          THE COURT:  Just one at a time.

01:39:16   2   BY MR. LOEVY:

01:39:17   3   Q.   In the preparing for the trial, you carefully reviewed

01:39:19   4   the paper record?

01:39:19   5   A.   I have reviewed it, yes.

01:39:22   6   Q.   All right.  Do you remember where she lived, what address

01:39:24   7   it was?

01:39:24   8   A.   I don't remember the address.  She lived up the road

01:39:30   9   fork.  The community of Stinking Creek.

01:39:31   10   Q.   Did she live with anybody?

01:39:32   11   A.   She lived by herself.

01:39:34   12   Q.   And what time and day was the body discovered?

01:39:35   13   A.   It was December 20th, 2010.  Approximately in the later

01:39:43   14   afternoon or early evening.  A UPS man -- I don't know the

01:39:51   15   exact time -- but found her in late afternoon.

01:39:56   16   Q.   And she had some pretty gruesome-looking injuries, right?

01:40:02   17   A.   Just so we are clear, you want me to explain the entire

01:40:06   18   crime scene?  I was just trying to answer your question,

01:40:09   19   specifically.

01:40:10   20   Q.   Yeah, I'm going question by question.  We'll get there.

           21   A.   Okay.

01:40:12   22   Q.   Yeah, so she had some pretty gruesome injuries, right?

01:40:15   23   A.   Yes.

01:40:15   24   Q.   She looked like she had been pretty violently attacked?

01:40:18   25   A.   I'm not going to describe it as violently, but she had

01:40:27  1   severe injuries to her head.

01:40:30  2   Q.   And a lot of blood?

01:40:32  3   A.   Yes.   There was a lot of blood on the ground.   It looked

01:40:34  4   like -- well --

01:40:36  5   Q.   And on her body, right?   Instead of showing the crime

01:40:41  6   scene photos, would you agree with me they show a very bloody

01:40:45  7   woman?

01:40:45  8   A.   Yes, yes.

01:40:46  9   Q.   All right.   Where did the blows strike her?

01:40:48  10  A.   She had two injuries to her head.   I didn't find out

01:40:56  11  later, until after the autopsy, she also had some broken ribs

01:41:01  12  and I believe contusions to the hand.

01:41:05  13  Q.   All right.   When had she last been seen alive?

01:41:15  14  A.   I don't remember the last person or the date that she was

01:41:17  15  seen alive as far as like the day before 20 -- December the

01:41:25  16  20th.   I knew that she had been talking on the phone on the

01:41:32  17  19th.

01:41:32  18  Q.   So she was alive on the 19th, but nobody has admitting to

01:41:36  19  having seen her alive on the 20th, right?

01:41:38  20  A.   That is correct.

01:41:40  21  Q.   All right.   What -- were you able to make a time of

01:41:41  22  death?

01:41:42  23  A.   Oh, throughout the investigation.   So when we first got

01:41:47  24  there --

01:41:48  25  Q.   And let me focus on when you first got there.   I didn't

01:41:51   1   mean to interrupt you, but I'm asking, when you first got

01:41:53   2   there, before you knew anything else, were you able to

01:41:55   3   determine the time of death?

01:41:56   4        We'll talk about the investigation all afternoon, sir,

01:41:58   5   but were you able to determine at the beginning?

01:42:00   6   A.   I'm confused.

           7   Q.   Okay.

01:42:02   8   A.   You have asked me what I feel like -- the way I was able

01:42:07   9   to determine the time of death or when it happened.  I'm

01:42:10   10  trying to articulate that.

01:42:13   11  Q.   All right.  May I ask a tighter question?

01:42:14   12           THE COURT:  Let me reset it.

           13           MR. LOEVY:  Okay.

01:42:16   14           THE COURT:  You asked were you able to determine time

01:42:18   15  of death?

01:42:19   16           MR. LOEVY:  Yeah.

01:42:20   17           THE COURT:  I want him to answer that.

01:42:23   18           THE WITNESS:  Okay.  First.  I'll say not exactly,

01:42:27   19  but through the initial course of the investigation, we were

01:42:30   20  able to determine, for example, when we went into the

01:42:34   21  residence and, for example, she had dishes in the sink and she

01:42:40   22  also had -- her oven was on and there was food on.  Here's

01:42:47   23  something that is very important, too.  We soon found out that

01:42:51   24  she had no indoor plumbing, and so there was an outbuilding

01:42:58   25  out behind her house where there was a -- where she went to

01:43:01  1    the bathroom, but through the night, she would have a -- like

01:43:06  2    a pan or, you know, a bucket that she would use the bathroom.

01:43:11  3    You know, if you understand what I'm talking about.

01:43:13  4        So through the course of the investigation, you are given

01:43:17  5    the fact that -- what I described, and her son said the first

01:43:21  6    thing she always done, when she got up, was empty the pan.  I

01:43:27  7    mean, the container where she used the bathroom in.  It was

01:43:32  8    empty.

01:43:32  9        He also said that she would never leave dirty dishes in

01:43:40  10   the sink.  And so that was there.  Her breakfast food was

01:43:46  11   there.  On top of that --

01:43:50  12            THE COURT:  Mr. York, if you determined the time of

01:43:52  13   death, that's what the question is.  Did you?

01:43:55  14            THE WITNESS:  We determined it was in the morning.

01:43:57  15            THE COURT:  Okay.

01:43:58  16   BY MR. LOEVY:

01:43:58  17   Q.   And that was -- at the time, was a hypothesis, right?

01:44:04  18   A.   That is correct.

01:44:04  19   Q.   All right.  Now, do you know what time you were notified

01:44:07  20   of the homicide?

01:44:08  21   A.   It was in the later evening on the 20th.

01:44:11  22   Q.   All right.  If we could show you page 300 of the

01:44:14  23   investigative file.

01:44:16  24            MR. LOEVY:  All the investigative file is in

01:44:18  25   evidence, Your Honor, so may I publish this page?

01:44:21  1        THE COURT:  Is that stipulated that all of Exhibit 1

01:44:23  2   is in?

01:44:25  3        MR. MILLER:  Yes, Your Honor.

01:44:25  4        THE COURT:  Okay.  So it's --

01:44:28  5        MR. MILLER:  Just the reference.  If he can refer to

01:44:30  6   the Bates numbers.

01:44:32  7        MR. LOEVY:  The Bates here is KSP 1000.  It's page

01:44:37  8   300 of Exhibit 1.

         9        THE COURT:  The state will put it up for you.

01:44:41 10        MR. LOEVY:  Put it on this one, I guess.

01:44:43 11        THE COURT:  And let me just make sure we are on the

01:44:44 12   same page on this.  Let's talk for just a second.

        13        (Sidebar conference.)

01:44:54 14        THE COURT:  Okay.  So I just want to be clear.  So

01:45:02 15   Exhibit 1 has been referred to all the way through by specific

01:45:05 16   pages.  Everyone is stipulating that should be considered in

01:45:10 17   evidence in its entirety.  That's your position?

01:45:12 18        MR. LOEVY:  Yes, sir.

01:45:13 19        THE COURT:  Do you agree?

01:45:13 20        MR. MILLER:  Yes, Your Honor.

01:45:14 21        THE COURT:  Okay.  And is this highlight in the

01:45:19 22   original, or is that a lawyer highlight?  I just want to be

01:45:22 23   clear with the jury.

01:45:23 24        MR. LOEVY:  That is a lawyer highlight, Your Honor.

01:45:28 25   It's a lawyer highlight.

01:45:29  1      When I prepared the exam, I put the lawyer highlights on

01:45:32  2   it before trial started.

01:45:35  3      Can I clarify for the jury that that was not on the

01:45:37  4   original?

01:45:38  5          THE COURT:  Yes.  Every time I'm going to want to

01:45:41  6   clarify that.

01:45:42  7          MR. LOEVY:  Got it.  Thank you.

01:45:43  8          THE COURT:  But the one in the record does not have a

01:45:45  9   highlight, correct?

         10          MR. LOEVY:  Correct.

         11          THE COURT:  Okay.  Did you get that?

         12          MR. LOEVY:  Yes.

01:45:46 13          MR. MILLER:  Yes.  The only caveat is they have got

01:45:48 14   one file and we've got another, so I can't track along with

01:45:51 15   him on which ones he's referring to.  We need to find a

01:45:56 16   consistent manner throughout on how we are going to refer to

01:46:00 17   them.

01:46:00 18          THE COURT:  Let's try -- well, if we are using

01:46:03 19   Exhibit 1, then it will be Exhibit 1 page numbers.

01:46:05 20          MR. LOEVY:  Yeah.

01:46:06 21          THE COURT:  Do you have that as well?

01:46:08 22          MR. MILLER:  Well, there's a page number, there's a

01:46:10 23   Bates number from KSP, and then there's plaintiffs' Bates

01:46:13 24   number.  So I think we just need to be consistent with what we

01:46:15 25   are going to --

| | | |
|---|---|---|
| 01:46:15 | 1 | THE COURT:  What should it be? |
| 01:46:16 | 2 | MR. LOEVY:  I would like to use the plaintiffs' page |
| 01:46:18 | 3 | number because that's not -- |
| 01:46:19 | 4 | THE COURT:  Okay.  Plaintiffs' page number. |
| 01:46:21 | 5 | MR. MILLER:  I don't have plaintiffs' -- |
| 01:46:22 | 6 | THE COURT:  You didn't get the plaintiffs' exhibits? |
| 01:46:24 | 7 | MR. MILLER:  I don't have it here with me, like |
| 01:46:27 | 8 | sitting here. |
| 01:46:27 | 9 | THE COURT:  Okay.  Let's use Bates.  Bates should be |
| 01:46:29 | 10 | universal.  Let's use Bates numbers.  Okay. |
| 01:46:32 | 11 | (Sidebar conference concluded.) |
| 01:46:43 | 12 | BY MR. LOEVY: |
| 01:46:43 | 13 | Q.  Can you identify what is on the screen, sir? |
| 01:46:43 | 14 | A.  It's a supplement. |
| 01:46:45 | 15 | Q.  All right. |
| 01:46:45 | 16 | MR. LOEVY:  We move -- oh, it's -- we can move this? |
| 01:46:47 | 17 | THE COURT:  Are you guys seeing it?  Okay.  It can be |
| 01:46:50 | 18 | displayed. |
| 01:46:56 | 19 | The highlight on there is a lawyer highlight that's |
| 01:46:59 | 20 | not in the document.  So just be advised of that.  Go ahead, |
| 01:47:02 | 21 | Mr. Loevy. |
| 01:47:03 | 22 | BY MR. LOEVY: |
| 01:47:03 | 23 | Q.  All right.  This is an example of a police report you |
| 01:47:07 | 24 | created, correct? |
| 01:47:07 | 25 | A.  Yes, sir. |

*J. YORK - Direct Examination*                                    17

01:47:08    1   Q.   And it's full of text that you typed, right?

01:47:11    2   A.   Yes.

01:47:11    3   Q.   And did you transmit the information from your notes into

01:47:14    4   the report?

01:47:15    5   A.   Not all that's contained.  I would say probably some,

01:47:20    6   yes.

01:47:20    7   Q.   Sure.  And then you're a detailed report writer.  Would

01:47:25    8   you agree with me?

01:47:26    9   A.   Excuse me?

01:47:27   10   Q.   You're a detailed report writer.  Would you agree with

01:47:29   11   me?

01:47:30   12   A.   I'm not going to agree with that.  I mean, I try to be.

01:47:33   13   Q.   All right.  And that's how you know -- if you have to

01:47:34   14   testify, say 12 years later, you'll know exactly what time you

01:47:37   15   got dispatched, right?

01:47:41   16   A.   Yes.  This is what this typical supplement is for.

01:47:45   17   Q.   And you'll know who dispatched you, and you won't have to

01:47:48   18   rely on your memory, right?

01:47:50   19   A.   That is correct.

01:47:50   20   Q.   In fact, as a police officer, you are aware that it's not

01:47:53   21   uncommon that you get called to testify about events that

01:47:57   22   happened a long time ago, right?

01:48:00   23   A.   That is true.

01:48:00   24   Q.   So that's why it's very important to make a careful,

01:48:05   25   documented record, right?

01:48:06   1      A.   Yes.

01:48:07   2      Q.   And this report continues on to the second page with more

01:48:10   3      information, correct?

01:48:12   4      A.   Yes.

01:48:12   5      Q.   And, in fact, it's got a third page, too, doesn't it?

01:48:17   6      A.   I did not see no third page.

01:48:24   7      Q.   All right.  You were not the first law enforcement

01:48:26   8      officer who responded to the scene of the Mills murder,

           9      correct?

01:48:30  10      A.   That is correct.

01:48:31  11      Q.   And you know, from the records you kept, who got there

01:48:33  12      before you?

01:48:35  13      A.   Yes.

01:48:36  14      Q.   Who was that?

01:48:37  15      A.   There was a Trooper Shane Jacobs and I believe Trooper

01:48:47  16      Jason Bunch was already there.  I think Sergeant Jeremy Lee

01:48:51  17      was already there.  There was various Knox County coroners --

01:48:55  18      I don't know if you consider that law enforcement -- there as

01:48:59  19      well.

01:48:59  20      Q.   Now, you are not going from memory.  You reviewed the

01:49:02  21      reports, and that's what refreshed you?

01:49:05  22      A.   I don't have the report in front of me.  I'm going from

01:49:08  23      my memory.

01:49:08  24      Q.   Are you going from your memory of that day or your memory

01:49:10  25      from having reviewed reports to prepare your testimony?

01:49:12   1    A.   To be fair, I would say a combination of both.

01:49:17   2    Q.   All right.  What were your interactions with these other

01:49:20   3    law enforcement about the Lawsons and the crime lab?  What did

01:49:22   4    you learn?

01:49:23   5    A.   Could you say that again?

01:49:24   6    Q.   Did you learn anything about the interaction with the

01:49:26   7    Lawson family, Jesse and Jennifer?

01:49:28   8    A.   Yes.  Yes.  Yes.  Sorry.

01:49:33   9         So Jennifer and Jesse was there at the scene prior to my

01:49:38   10   arrival.  One of the troopers made initial contact with them.

01:49:44   11   And I don't know how far --

01:49:48   12   Q.   Well, you heard Jesse testify in court, right?

01:49:51   13   A.   Yes.

01:49:53   14   Q.   All right.  He described how he had come up and

01:49:55   15   discovered the victim's body.  Is that generally what you

01:49:58   16   learned about what Jesse was describing up to the point when

01:50:01   17   he found the body?

01:50:03   18   A.   I was understanding that the UPS man was always the one

01:50:09   19   that found her first, not Jesse, if that's what your

01:50:12   20   insinuating.

01:50:13   21   Q.   All right.  I didn't mean to imply that.  I think the UPS

01:50:16   22   guy found her first.  I think Jesse agreed with that.  But

01:50:19   23   other than that, you heard Jesse.  You have reason to dispute

01:50:23   24   that's what happened, right?

01:50:24   25   A.   I don't dispute the fact that him and Jennifer was there

*J. YORK - Direct Examination*                                          20

01:50:27  1    shortly after the UPS man.

01:50:31  2    Q.   Sounds like as a homicide detective, you are going to be

01:50:33  3    very careful about not assuming anything.  Is that the way you

01:50:36  4    approach these things?

01:50:37  5    A.   I try to.

01:50:38  6    Q.   All right.  You understood that the crime was financial,

01:50:40  7    the motive was financial, was your understanding?

01:50:42  8    A.   Not initially, we didn't, but if you want me to

01:50:51  9    elaborate, I'll explain how we came to that conclusion.

01:50:54  10   Q.   Please do.

01:50:54  11   A.   All right.  So, like I said, when I first arrived at the

01:50:58  12   scene, number one, there was people everywhere.  I'll go ahead

01:51:03  13   and tell you right now the scene was contaminated.  There was

01:51:06  14   people all --

01:51:06  15        MR. LOEVY:  We are talking about financially, Your

01:51:08  16   Honor.  The question was about financial.

01:51:10  17        THE COURT:  Well, he's trying to describe how he came

01:51:13  18   to that conclusion; so go ahead and --

01:51:15  19        THE WITNESS:  And I apologize.

01:51:17  20   Just repeat that question again because I'm not trying to

01:51:19  21   take up extra time or anything.

01:51:21  22   BY MR. LOEVY:

01:51:21  23   Q.   Sure.  So here's the question.

01:51:22  24   A.   Okay.

01:51:23  25   Q.   In your investigation you determined, I believe that

01:51:25  1    someone robbed her and that's why the murder happened, right?

01:51:28  2    A.   Yes.  Okay.  So --

01:51:29  3    Q.   So what were the clues for that?

01:51:31  4    A.   Okay.  So one of the -- when we got there, obviously,

01:51:38  5    Ms. Mills is laying in the backyard or in the rear of the

01:51:45  6    residence.  And she appears to have gray sweats on and her --

01:51:53  7    you know, grandma, she's laying there.

01:51:54  8         So -- and I hate to leave out any detail.

01:51:57  9    Q.   We are just talking about the money part.

01:51:58  10   A.   I'm going to try to get straight to the money.  So one of

01:52:03  11   the things that I initially observed when I walked in the

01:52:08  12   house was on the floor there was a purse and there was some

01:52:12  13   money there.  Obviously, that's strange.

01:52:16  14        And you know one of the first things that you would, you

01:52:19  15   know, consider on that, when you first walk, in her purse is

01:52:23  16   on the floor, and there's money there.  All right?  So I'm

01:52:26  17   trying to take, you know, what I observed and how I came to

01:52:29  18   what he's asking.

01:52:32  19        Here's an important part.  The house was an older house,

01:52:36  20   and it had a bunch of trinkets inside.  So I don't know what's

01:52:41  21   going on.  I can tell you I seen a purse and money there.  But

01:52:44  22   I noticed, when I walked through the house, if I would step,

01:52:50  23   stuff would rattle, which led me to believe, if there was, you

01:52:54  24   know, something -- some type of assault or anything like that

01:52:57  25   happened, it didn't happen there because there would be signs

01:53:01  1    of it, of stuff falling off.

01:53:04  2        As I walked into the next bedroom, if my memory serves me

01:53:11  3    correct, there was even a gun.  Here's what I did see -- I

01:53:13  4    didn't see no, like, you know, on a typical burglary, there

01:53:16  5    was no draws pulled out, there was nothing ransacked or

01:53:19  6    anything like that.  And then we have that money.

01:53:24  7        Well, as the investigation continues, given all that,

01:53:32  8    that we didn't -- you know, we didn't know what happened at

01:53:35  9    first, I talked to the family, and I come to find out that

01:53:39  10   over the past few months that Ms. Mills had sold some timber,

01:53:45  11   you know, sell timber.  She wanted, you know, number one, to

01:53:48  12   put like a bathroom in her house, but I found out that she,

01:53:53  13   you know, probably made somewhere over $20,000 in cash.  She

01:53:59  14   was -- y'all understand this if you got older people.  They

01:54:02  15   didn't trust banks, and she was on a fixed income.  So she

01:54:07  16   didn't put all the money that she got from selling timber into

01:54:12  17   her bank account.  Okay?

01:54:16  18       And I think that amount was -- after talking to her

01:54:20  19   daughter, Diane, we figured out somewhere in the neighborhood

01:54:24  20   of over $12,000 that she had kept at her house and she kept in

01:54:30  21   her purse.

01:54:32  22       And so at that point we started to feel -- because, like

01:54:36  23   I said, her purse was hanging in the kitchen area, and the

01:54:40  24   only thing that was disturbed in that entire house or -- was,

01:54:46  25   you know, her purse laying on the floor and that part -- the

*J. YORK - Direct Examination*                                    23

01:54:52  1   overwhelming majority of the money that she had.

01:54:55  2        And I will say this:  Another thing we found out is like

01:54:58  3   for, I believe, Jennifer, which is Jesse's wife, had

01:55:03  4   determined or even the week prior to that took her to the

01:55:07  5   store and confirmed to us that the money was still there.

01:55:14  6        Another important thing is that the -- they had been done

01:55:21  7   logging at her place going on over three weeks, going on to a

01:55:27  8   month, and I thought that was important as well.  I hope that

01:55:31  9   answers your question.

01:55:32  10  Q.  Well, let's try it again with leading.  You had reason to

01:55:35  11  believe she had recently sold some timber, right?

01:55:38  12  A.  Yes, through the family.

01:55:40  13  Q.  All right.  These are more yes-no questions.  Okay?

01:55:42  14       THE COURT:  Well, he can answer.  Let him answer.

01:55:44  15       MR. LOEVY:  All right.

01:55:44  16  BY MR. LOEVY:

01:55:45  17  Q.  You did learn that she had sold some timber, correct?

01:55:47  18  A.  Yes, we learned through the family.

01:55:48  19  Q.  All right.  And then you learned she had cleared more

01:55:50  20  than $20,000, right?

01:55:53  21  A.  Yes.

01:55:53  22  Q.  And you learned that she only put less than half of that

01:55:57  23  in the bank?

01:55:58  24  A.  I'm not -- say that again, please.

01:56:05  25  Q.  She was supposed to have about 12,000 on her, but when

01:56:08   1   you found the purse, the purse was empty, and there was a few

01:56:11   2   bills, but most of the money was gone, right?

01:56:14   3   A.   Yeah, but before I agree with you, you said something

01:56:17   4   about half in the bank or something like that.

01:56:18   5   Q.   Let's not get into fractions.  There was a lot of money

01:56:20   6   missing that was supposed to be in her purse, right?

01:56:23   7   A.   That is true.

01:56:24   8   Q.   All right.  So you decided that, you know what, I bet

01:56:26   9   this motive here was financial?

01:56:28   10   A.   That -- that is correct.

01:56:29   11   Q.   Now, there was also a clue at the scene in the form of

01:56:36   12   these bills that were on the ground, right?

01:56:40   13   A.   A clue?  I mean, that's part of the scene and part of the

01:56:45   14   evidence.  I mean, obviously -- excuse me?

01:56:48   15   BY MR. LOEVY:

01:56:49   16   Q.   No, I'm sorry.  You can continue.

01:56:52   17   A.   You know, we think it's motivated by the money,

01:56:58   18   obviously, because she's missing money, but yet there's a

01:57:02   19   purse and money there.

01:57:03   20   Q.   All right.  Let's take a look at what you found at the

01:57:07   21   scene.  1C.  This is 1C.  It's one of the photographs of the

01:57:11   22   crime scene.  Can you see that on your screen, sir?  Can

01:57:18   23   you --

01:57:18   24   A.   Yes.

01:57:19   25   Q.   All right.  Can you identify that that's what you saw on

*J. YORK - Direct Examination*                                              25

01:57:22  1    the floor of the crime scene?

01:57:25  2    A.   It appears to be.

01:57:26  3    Q.   All right.

01:57:27  4            MR. LOEVY:   Permission to publish.

01:57:29  5            THE COURT:   You may.  This is all part of 1, right?

          6            MR. LOEVY:   Yes.

01:57:33  7            THE COURT:   Anything in 1 you can publish because

01:57:35  8    it's already in evidence.

01:57:37  9    BY MR. LOEVY:

01:57:37  10   Q.   All right.  This shows, does it not, the victim's empty

01:57:41  11   purse and some $100 bills lying next to it, right?

01:57:48  12   A.   I'm going to agree.  I just know what I can see --

          13   Q.   All right.  Let's --

01:57:52  14   A.   -- but I'm going to agree.

01:57:53  15   Q.   Let's do a close-up.  1D, which is the next picture,

01:57:58  16   which has got a little closer, it looks like some hundred

01:58:03  17   dollars bills by the purse, right?

01:58:05  18   A.   I'm old, but I'm just going to say I'm assuming this is

01:58:07  19   an accurate representation of it, yes.

01:58:10  20   Q.   All right.  If these photos came from the crime scene

01:58:13  21   investigative file, you guys documented it with pictures,

          22   right?

01:58:17  23   A.   That is correct.  We did take pictures at the scene.

01:58:20  24   Q.   And you believed, in your memory, that it looked like the

01:58:22  25   money had been arranged on the floor, right?

01:58:27   1    A.   I felt like it was left there.

01:58:30   2    Q.   All right.  And your theory was always that the killer

01:58:34   3    touched those bills and left them there, right?

01:58:37   4    A.   My theory?  No.  That was a possibility because -- and

01:58:42   5    can I explain myself on that?

01:58:45   6            MR. LOEVY:  May I ask a yes-no question, Your Honor?

01:58:47   7            THE COURT:  Answer yes or no, and then I'll let you

01:58:50   8    explain it within reason.

01:58:51   9            THE WITNESS:  Ask your question again, please.

01:58:53  10    BY MR. LOEVY:

01:58:54  11    Q.   All right.  It was your -- it looked to you like those --

01:58:57  12    those bills were touched by the killer, correct?

01:59:00  13    A.   I feel like you're putting words in my mouth.

01:59:03  14         Yes, potentially it could be.

01:59:03  15    Q.   Well, it's a question.

01:59:04  16    A.   Potentially it could be touched by the killer.

01:59:06  17    Q.   I mean, it's either potentially touched by the killer or

01:59:09  18    they were potentially not touched by the killer, but wasn't it

01:59:12  19    true that it was your theory that they were touched by the

01:59:15  20    killer?

01:59:15  21    A.   They could have been.

01:59:16  22    Q.   All right.  Do you remember giving a deposition in this

01:59:19  23    matter, sir?

01:59:20  24    A.   Um-hum.

01:59:20  25    Q.   And this is on February 13, 2018.  Do you remember giving

*J. YORK - Direct Examination*                                          27

01:59:24   1    that deposition?

01:59:25   2    A.   In 2013?

01:59:30   3    Q.   '18, sir.

01:59:32   4    A.   Yes.

01:59:32   5    Q.   All right.  Can we please display page 139, line 19,

01:59:37   6    through 140, line 4.

01:59:48   7          (Video clip played in open court.)

02:00:02   8    BY MR. LOEVY:

02:00:03   9    Q.   All right.  That was your testimony under oath, right,

          10    sir?

02:00:05  11    A.   Yes.  Can I explain?

02:00:07  12    Q.   Well, first question was:  That was your testimony under

02:00:11  13    oath, right?

02:00:11  14    A.   Absolutely, absolutely.

02:00:13  15    Q.   All right.  Isn't it true that when you testified under

02:00:14  16    oath that you believed the killers put the bills on the floor.

02:00:18  17    You didn't know that we knew that there was a fingerprint

02:00:21  18    match on the bills?

02:00:22  19    A.   Let me explain myself.  Right now I thought we were still

02:00:30  20    talking about the initial investigation at the time of this

02:00:34  21    photograph.  You're talking about something that happened --

02:00:36  22          THE COURT:  Okay.  Just hang on.  Ask a question.

02:00:39  23    BY MR. LOEVY:

02:00:40  24    Q.   All right.  In the course of your investigation, you

02:00:42  25    developed a theory that the killer took $12,000 and placed

02:00:48   1   five $100 on the bill -- on the ground to try to throw off the

02:00:52   2   detectives, try to throw you off, think it wasn't financial,

           3   correct?

02:00:57   4   A.   That statement is correct.

02:00:58   5   Q.   All right.  So it was your theory of the case that the

02:01:00   6   killer placed that money on the ground?

02:01:03   7   A.   Yes.

02:01:04   8   Q.   All right.  So it was always your theory of the case that

02:01:07   9   the killer's fingerprints would be on that money, correct?

02:01:12   10  A.   Ideally we would hope so.

02:01:13   11  Q.   All right.  What did you decide to do with the $500

02:01:17   12  bills?  Did you inventory them?

02:01:20   13  A.   We photographed them, and then we packaged them up as

02:01:26   14  evidence, sent them to the post, and, at a later time, we sent

02:01:30   15  them to AFIS.

02:01:37   16  Q.   All right.  And it was your belief that some day,

02:01:39   17  hopefully, a fingerprint on those bills would lead you to the

02:01:42   18  killer, right?

02:01:43   19  A.   Yes.

02:01:44   20  Q.   And then fast-forwarding -- and I'm going to jump way out

02:01:47   21  of order.  But one day you sent Amanda and Jonathan and

02:01:54   22  Lester's prints to AFIS and said check and see if they match,

02:01:57   23  right?

02:01:57   24  A.   Yes.

02:01:58   25  Q.   And AFIS said no match?

*J. YORK - Direct Examination*                                        29

02:02:00  1   A.   That is correct.

02:02:00  2   Q.   But you knew there was a print, right?

02:02:03  3   A.   No.  Yes.  I -- yes.

02:02:05  4   Q.   You just didn't know whose it was?

02:02:08  5   A.   That is an accurate statement.

02:02:11  6   Q.   And the match didn't come back to a Mr. John Whitehead

02:02:17  7   until after you had already charged the plaintiffs, right?

02:02:21  8   A.   That is correct.

02:02:23  9   Q.   Now, the blood evidence at the scene was gathered, too,

02:02:29  10  by the forensics people?

02:02:32  11  A.   No.  We had no forensic or CSI team or anything of the

02:02:36  12  nature.  That was done by detectives at the scene.

02:02:41  13  Q.   All right.  But somebody who had training gathered the

02:02:44  14  blood evidence, right?

02:02:47  15  A.   That is correct.

02:02:48  16  Q.   In fact, there's a photo with the victim's hands with

02:02:51  17  bags on them.  Is that typical at a homicide scene?

02:02:55  18  A.   Yes.

02:02:55  19  Q.   Tell the jury why, without -- succinctly, why you put a

02:03:01  20  bag on the hand of the victim.

02:03:03  21  A.   You want to define succinctly?  I don't understand that.

02:03:06  22  Q.   Let's try it again.

02:03:06  23       THE COURT:  I'll judge succinctly.

          24       THE WITNESS:  All right.

02:03:07  25       THE COURT:  Just go ahead and give your answer.

02:03:09  1          THE WITNESS:  Okay.  On why the bags --

02:03:11  2          THE COURT:  A brief explanation.

02:03:13  3          THE WITNESS:  The easiest and quickest way I know to

02:03:16  4    explain to you, you want to preserve if there's potentially,

02:03:19  5    like in a fight, you know, if there's any scratching or

02:03:22  6    clawing, potentially skin, from the, possibly, perpetrator

02:03:28  7    getting underneath there.  So you want to put the paper bag to

02:03:35  8    prevent any contamination or anything like that.  You know,

02:03:37  9    like she was outside, you know, running, along those lines.

02:03:40  10   BY MR. LOEVY:

02:03:40  11   Q.   So that the DNA from under the fingerprints not

02:03:45  12   uncommonly can lead to the killer, right, because if there's a

02:03:49  13   struggle, the killer's DNA can get caught underneath the

02:03:56  14   fingerprints, right?

02:03:58  15   A.   That is correct.

02:03:58  16   Q.   All right.  And, of course, none of the plaintiff's DNA

02:04:01  17   was under her fingernails, correct?

02:04:04  18   A.   No, there wasn't.

02:04:06  19   Q.   All right.  Let's talk about Mr. Crump.  A few days later

02:04:09  20   there was neighborhood canvass conducted, correct?

02:04:13  21   A.   You want to be more specific?

02:04:16  22   Q.   I'll try to be.  In the early days of the

02:04:19  23   investigation -- she's killed on the 20th.  Was there a

02:04:23  24   canvass looking for witnesses?

02:04:23  25   A.   Yes.  There was more than one, but, yes.

*J. YORK - Direct Examination*                                        31

02:04:26  1    Q.   And at least one was done at your direction, right?

02:04:31  2    A.   That is correct.

02:04:31  3    Q.   And that canvass identified a critical eyewitness, right?

02:04:37  4    A.   Yes.

02:04:37  5    Q.   He had seen someone at the victim's home on the day she

02:04:42  6    was murdered, right?

02:04:44  7    A.   Yes, and that went ahead to confirm what we talked about

02:04:49  8    earlier, that it was at the time that -- what he's talking

02:04:50  9    about is Mr. Crump --

02:04:52  10             MR. LOEVY:  Your Honor, I move to --

02:04:52  11             THE COURT:  Mr. York?

          12             THE WITNESS:  Yes.

02:04:53  13             THE COURT:  Yes or no is fine on that one.  Go ahead.

02:04:56  14             MR. LOEVY:  Thank you.

02:04:56  15    BY MR. LOEVY:

02:04:57  16    Q.   And the eyewitness had seen the person present in the

02:05:00  17    morning at the victim's home, right?

02:05:03  18    A.   That is correct.

02:05:03  19    Q.   And that fit your theory of the case at the time?

02:05:06  20    A.   Yes, sir.

02:05:07  21    Q.   And this Mr. Crump, he was new to the area, right?

02:05:12  22    A.   Yes.

02:05:12  23    Q.   He lived not far from the victim, down the road a bit?

02:05:16  24    A.   I do not remember.

02:05:19  25    Q.   All right.  But you do remember what Mr. Crump saw,

02:05:23  1   right?

02:05:23  2        Without asking you, do you remember what Crump saw?

02:05:26  3   A.   Can you be more specific because I --

02:05:32  4   Q.   That's fair.  Maybe it wasn't clear.

02:05:34  5        I meant yes, no, but he saw one person, right?

02:05:39  6   A.   My understanding, he saw one coming around the house.  I

02:05:43  7   just wanted to make sure that we are clear on that.

02:05:45  8   Q.   It was a male, right?

02:05:46  9   A.   Yes.  Yes.  One male coming around from the corner of the

02:05:50  10  house where the body was lying.

02:05:51  11  Q.   And wearing facial hair, right?

02:05:54  12  A.   I believe so, yes.

02:05:55  13  Q.   And driving a blue car was the other clue, right?

02:05:58  14  A.   There was a blue car.  I think he described a female in

02:06:02  15  it.

02:06:02  16  Q.   Oh, well, let's take a look and see what he described.

02:06:06  17  This is Plaintiffs' Exhibit 16, which is the report that's

02:06:08  18  also in the investigative file.

02:06:11  19       This is Mr. Cornet's report, right, sir?

02:06:15  20            MR. LOEVY:  We'd ask permission to publish it.

02:06:17  21            THE COURT:  It's in already, right, Mr. Loevy?

02:06:20  22            MR. LOEVY:  Yes, sir.

02:06:21  23            THE COURT:  Okay.  Of course, it can be published.

02:06:23  24  BY MR. LOEVY:

02:06:23  25  Q.   Did you speak to Mr. Crump on -- on or about the day of

*J. YORK - Direct Examination*                                       33

02:06:29  1    the murder?  That's the question.  Did you speak to Mr. Crump

02:06:33  2    on or about the day of the murder?

02:06:35  3    A.   No, not on the day of the murder.

02:06:37  4    Q.   Okay.  So you came to understand that Mr. Cornett did,

02:06:41  5    right?

02:06:41  6    A.   I thought it was at the neighborhood canvass that we were

02:06:45  7    talking about, which was two days later.

02:06:47  8    Q.   You came to understand that Mr. Cornett talked to Crump

02:06:53  9    two days later?

02:06:53  10   A.   That is correct.

02:06:54  11   Q.   All right.  And you were in court when Mr. Cornett

02:06:57  12   described talking to Mr. Crump, correct?

02:07:00  13   A.   That is correct.

02:07:00  14   Q.   And Mr. Cornett, in his report and in his testimony,

02:07:05  15   said, look, I asked this guy what he saw.  He said he saw a

02:07:09  16   man.  And that's what he wrote in his report, right?

02:07:11  17   A.   That's what he said.

02:07:12  18   Q.   And there is no report anywhere that you've ever seen

02:07:17  19   that says Crump saw a woman in the car.  We agree about that,

02:07:22  20   too, right?

02:07:24  21   A.   Which file are you talking about?

02:07:27  22   Q.   Focus on the question, if you could, sir, please.

02:07:29  23   A.   Repeat it again.

02:07:30  24   Q.   There's no police report you've ever seen, ever, that

02:07:34  25   says anything about Crump seeing a woman in a car, correct?

| | | |
|---|---|---|
| 02:07:37 | 1 | A.   That is correct. |
| 02:07:42 | 2 | Q.   All right.  Is this what -- did you review Mr. Cornett's |
| 02:07:51 | 3 | report? |
| 02:07:51 | 4 | A.   Yes, I did. |
| 02:07:52 | 5 | Q.   Now, you talk to Crump yourself, right? |
| 02:07:55 | 6 | A.   Yes. |
| 02:07:57 | 7 | Q.   And where were you and who were you with? |
| 02:07:59 | 8 | A.   Detective Josh Bunch. |
| 02:08:05 | 9 | Q.   And Mr. Crump told you the exact same thing he told |
| 02:08:10 | 10 | Cornett, didn't he? |
| 02:08:11 | 11 | A.   No, that's not true. |
| 02:08:12 | 12 | Q.   You created a report, right?  That's the question.  You |
| 02:08:20 | 13 | created a report, right? |
| 02:08:21 | 14 | A.   Yes. |
| 02:08:21 | 15 | Q.   All right.  I'd like to show Plaintiffs' Exhibit 5, which |
| 02:08:24 | 16 | is also part of the investigative file.  I guess this is in |
| 02:08:27 | 17 | evidence then, Your Honor. |
| 02:08:30 | 18 | MR. MILLER:  What's the Bates? |
| 02:08:32 | 19 | MR. LOEVY:  It is Bates 272. |
| 02:08:36 | 20 | THE COURT:  Do you agree that's in 1?  Do you agree? |
| 02:08:40 | 21 | MR. MILLER:  (Nodding head.) |
| 02:08:41 | 22 | THE COURT:  Hang on.  So that's -- it's part of 1, so |
| 02:08:45 | 23 | you can display something that's part of 1. |
| 02:08:48 | 24 | MR. LOEVY:  Yes.  Although, Your Honor, the identical |
| 02:08:51 | 25 | document is marked separately but it's part of 1.  What page |

*J. YORK - Direct Examination*                                        35

| 02:08:54 | 1 | is it in 1? |

02:08:57  2        THE COURT:  Go ahead, Mr. Miller.

02:09:02  3        MR. MILLER:  No, I was going to say 272; so I'm

02:09:05  4  wrong.  But that's the Bates.

02:09:07  5        MR. LOEVY:  Well, it's also Plaintiffs' Exhibit 5.

02:09:09  6        THE COURT:  I'm just trying to help the jury track

02:09:11  7  because this is all -- a lot of this is in one exhibit.  I

02:09:15  8  want them to be able to know.  Somebody have it on the

02:09:17  9  plaintiffs' side?

10        MS. EK:  Page 19.

02:09:22  11        THE COURT:  Page 19, Exhibit 1.  Thank you.

12  BY MR. LOEVY:

02:09:24  13  Q.  Can you see that on the screen, sir?

02:09:25  14  A.  Yes.

02:09:26  15  Q.  All right.  There's some blue markings, and I want to be

02:09:28  16  clear; I made those lines there.

02:09:30  17        THE COURT:  Is that up for the jury?  Okay.

02:09:32  18  BY MR. LOEVY:

02:09:32  19  Q.  All right.  This is a report you created on February 2nd,

02:09:35  20  2011, right?

02:09:36  21  A.  Yes.

02:09:36  22  Q.  And that's you, Jason York?

02:09:38  23  A.  Yep.

02:09:38  24  Q.  You typed it?

02:09:41  25  A.  Yes, I did.

| | | |
|---|---|---|
| 02:09:41 | 1 | Q.   And this is a summary of your interview of Crump, right? |
| 02:09:47 | 2 | A.   This is a summary of the reason why I went there. |
| 02:09:52 | 3 | Q.   Okay. |
| 02:09:52 | 4 | A.   Can I explain that? |
| 02:09:53 | 5 | Q.   Well, we'll take it one question at a time if Your Honor |
| 02:09:57 | 6 | will permit that. |
| 02:09:57 | 7 |          THE COURT:  Go ahead. |
| 02:09:58 | 8 | BY MR. LOEVY: |
| 02:09:59 | 9 | Q.   All right.  It says, "This unit, along with Detective |
| 02:10:01 | 10 | Bunch, interviewed Crump."  Do you see that? |
| 02:10:06 | 11 | A.   Yes. |
| 02:10:06 | 12 | Q.   And "this unit" is you, right? |
| 02:10:09 | 13 | A.   Yes, sir. |
| 02:10:09 | 14 | Q.   And it says, "Crump gave a recorded statement to Cornett |
| 02:10:13 | 15 | concerning Mills," right? |
| 02:10:14 | 16 | A.   Yes. |
| 02:10:14 | 17 | Q.   "He stated he saw a blue card at Mills's residence in the |
| 02:10:17 | 18 | morning.  She was robbed and found dead.  He also stated he |
| 02:10:20 | 19 | saw a white male coming from the corner of Katherine's |
| 02:10:23 | 20 | residence where she was later found dead.  He described a male |
| 02:10:27 | 21 | as having a hood on his head and wearing a hunting jacket. |
| 02:10:30 | 22 | Cameo pattern was similar" to a sketch -- I'm sorry -- |
| 02:10:34 | 23 | "similar to a popular hunting cameo pattern called mossy oak." |
| 02:10:38 | 24 | And then you had Bunch do a sketch with Crump of the male, |
| | 25 | correct? |

*J. YORK - Direct Examination*                                    37

02:10:45  1   A.   That is correct.

02:10:47  2   Q.   All right.  You created this report describing what Crump

02:10:54  3   told you, correct, sir?

02:10:59  4   A.   When --

02:11:00  5            THE COURT:  That's a yes or no.

02:11:04  6            THE WITNESS:  Yes.

02:11:05  7            MR. LOEVY:  All right.

02:11:06  8            THE COURT:  Now, do you have an explanation to add?

02:11:09  9            THE WITNESS:  Absolutely.

02:11:09  10           THE COURT:  Okay.

02:11:10  11           THE WITNESS:  And so I went there because Detective

02:11:15  12  Josh Bunch is an artist.  We did not have no provisional

02:11:23  13  sketch artist on the CSI team.  So my sole purpose on this was

02:11:28  14  to go for Josh Bunch to create a potential, you know, sketch

02:11:33  15  of the artist.

02:11:34  16      I did not go there with the intention of taking another

02:11:38  17  statement.

02:11:39  18      I was under the understanding and impression, at the

02:11:43  19  time, that Detective Cornett had already done that.  And so

02:11:46  20  when I made this supplement, why I was there, and I believe

02:11:50  21  that Mr. Crump said that in a deposition, exactly what I said

02:11:55  22  before --

02:11:55  23           MR. LOEVY:  Objection.

02:11:56  24           THE COURT:  Don't relate what another witness said.

02:11:58  25           THE WITNESS:  Yes, sir.  I apologize.

02:12:00   1          Can I say what he said to me?

02:12:03   2               THE COURT:  No.

           3               THE WITNESS:  Okay.

02:12:04   4               THE COURT:  All right.  Let's cut it off there.

02:12:06   5    You've explained it.  Go ahead.

02:12:08   6    BY MR. LOEVY:

02:12:09   7    Q.   You did take Crump to get a sketch, right?

02:12:12   8    A.   Say that again.

02:12:12   9    Q.   You took Crump in early February to sketch the person he

02:12:16  10    saw, right?

02:12:17  11    A.   That's not true.  I took Bunch.

02:12:20  12    Q.   Well, Crump was the guy who saw the witness, right?

02:12:25  13    A.   You said that I took Crump to go do a sketch.  Me and

02:12:28  14    Bunch went to Mr. Crump's house to do a sketch.

02:12:32  15    Q.   Okay.  Then I misunderstood.  But the idea was the two of

02:12:35  16    you talked to Mr. Crump and then take him to see a sketch

02:12:39  17    artist to create a picture of what he saw, right?

02:12:42  18    A.   No, that's not accurate.

02:12:43  19    Q.   All right.  Showing you Plaintiff's Exhibit 45, can

02:12:49  20    you -- and this is also in the investigative file as -- do you

02:12:54  21    have the number of the sketch?

02:12:57  22               MR. MILLER:  KSP 368.  I don't have the page numbers.

02:13:02  23               MR. LOEVY:  It's Plaintiff's 45.  I was using

02:13:05  24    plaintiffs' exhibits.  I'll use the plaintiffs' exhibits.  If

02:13:05  25    it's okay, I would like to use plaintiffs' exhibits.

02:13:10   1        THE COURT:  Well, okay.  That's -- do you agree this

02:13:16   2   is part of Exhibit 1?

02:13:17   3        MR. LOEVY:  Yes.

02:13:18   4        THE COURT:  Okay.  And you want to admit it

02:13:20   5   separately as Exhibit 5 [sic]?

02:13:21   6        MR. LOEVY:  Yes.

02:13:21   7        THE COURT:  Okay.  I'll do that for -- I'm not going

02:13:24   8   to do it for a thousand pages.

           9        MR. LOEVY:  Right.

02:13:26  10        THE COURT:  So as long as it's not unduly

02:13:28  11   duplicative.  So that will be admitted.

02:13:32  12        MR. LOEVY:  All right.

02:13:33  13      (Plaintiffs' Exhibit No. 5 was received in evidence.)

02:13:33  14   BY MR. LOEVY:

02:13:33  15   Q.  If you can publish, Mr. Crump -- I'm sorry.  Mr. York,

02:13:37  16   tell the jury what Mr. Crump -- what this is.

02:13:40  17   A.  Yes.  This is a sketch that Detective Bunch did.  We did

02:13:44  18   not take him to see another sketch artist, as you said

02:13:48  19   earlier, and that's where I think the confusion is.

          20   Q.  All right.

02:13:51  21   A.  Detective Bunch is the one that done the sketch.  I just

02:13:54  22   want to clarify that to you all.

02:13:57  23   Q.  Okay.  Thank you.

02:13:58  24       So, in other words, Crump sort of describing to Bunch,

02:14:01  25   Hey, I think he had a nose, he had some eyes, facial hair; and

02:14:05  1    Bunch is sketching?

02:14:06  2    A.   Yes.  At Mr. Crump's residence.  We never did take

02:14:11  3    Mr. Crump.

02:14:13  4    Q.   All right.  So you were present the whole time?

02:14:15  5    A.   That is correct.

02:14:16  6    Q.   All right.  As a homicide detective, I realize you were

02:14:19  7    sort of new to this, but you can't be sure that this is going

02:14:22  8    to exactly look like the killer, right?

02:14:24  9    A.   That is fair to say, yes.

02:14:27  10   Q.   In fact, this is happening more than a month after,

02:14:29  11   right?

02:14:29  12   A.   I don't know the exact date, but I'm not going to argue

02:14:33  13   with you on that.

02:14:34  14   Q.   February 2nd to December 20th, right?

02:14:37  15   A.   Uh-huh.

02:14:37  16   Q.   But this is what Crump described, and this is what got

02:14:42  17   sketched, right?

02:14:43  18   A.   Yes.

02:14:54  19            THE COURT:  We are close to a break, Mr. Loevy?

02:14:54  20            MR. LOEVY:  We are, Your Honor.  This would be a good

02:14:57  21   place for a break.

02:14:57  22            THE COURT:  Okay.  This going to get us to our first

02:15:00  23   break of the afternoon.  Why don't we take about 15 minutes at

02:15:03  24   this point.  Under my same admonitions, I'll excuse the jury

02:15:06  25   at this time.  Thank you.

*J. YORK - Direct Examination*                                         41

1          THE BAILIFF:  All rise for the jury.

2      (Jury exits.)

02:15:39    3          THE COURT:  All right.  Thank you.  Everybody can be

02:15:40    4      seated.  You can step down if you want to, Mr. York.  Thank

5      you.

02:15:44    6      The jury is outside the courtroom.  We'll take a

02:15:47    7      15-minute break.

02:15:48    8      Do you want to play that proffer before we break?

02:15:51    9          MR. LOEVY:  I do.

02:15:52   10          THE COURT:  Let's go ahead and play that.

02:15:53   11          MR. LOEVY:  And one more piece of context before we

02:15:55   12      play it, Your Honor.

02:15:56   13          THE COURT:  Um-hum.

02:15:57   14          MR. LOEVY:  This tape was not intended to be

02:15:59   15      disclosed.  My understanding was, in the middle of this murder

02:16:02   16      trial, somebody testified about a tape.  Everybody said, What

02:16:05   17      tape?  And then they had to go get the tape.  And the tape was

02:16:09   18      belatedly disclosed.  So this was never intended to be

02:16:12   19      disclosed or wasn't disclosed.

02:16:13   20          THE COURT:  What trial was it in?

02:16:14   21          MR. LOEVY:  William Anderson trial.

02:16:16   22          MR. SLOSAR:  Yes, Your Honor.  It's in the William

02:16:18   23      Anderson trial.  And, in fact, there's another parallel.  One

02:16:20   24      of the defendants that we flew here, that was dismissed,

02:16:25   25      Jackie Pickrell, now Jackie Joseph, she was the supervisor on

02:16:29   1   periods of this investigation.  She was also the supervisor of

02:16:32   2   Defendant York in the Anderson case.

02:16:36   3       She was on the stand and was asked, Oh, well, what about

02:16:39   4   the interview of Dave Fox?  And she said, Which one,

02:16:43   5   basically.  And it was like, What are you talking about,

02:16:45   6   "which one?"  We only got one interview.  She said, No, there

02:16:50   7   were two.  They should both be recorded.

02:16:52   8       They stopped the death penalty trial to go back to get

02:16:55   9   the tape, and that tape showed what we are about to proffer

02:17:02   10   here.

02:17:02   11       (Audio clip played in open court.)

02:17:18   12           MR. LOEVY:  That's the wrong clip.  I apologize, Your

02:17:21   13   Honor.  It's the one that you --

02:17:24   14           We are going to play it at a different time, Your

02:17:27   15   Honor.  I'm sorry.  That's the middle of it.  It backs up.

02:17:29   16   Can we pull the one that got e-mailed to me?

02:17:31   17           THE COURT:  Okay.  We'll take our break at this

02:17:33   18   point.

02:17:33   19           MR. LOEVY:  Sorry.

02:17:34   20           THE COURT:  Anything for the defense?

02:17:36   21           MR. MILLER:  I'll try to coordinate.

02:17:37   22       Are we going to go by Bates numbers for the --

02:17:40   23           THE COURT:  It would be really nice to have a

02:17:43   24   convention, right?  It's going to help the jury, when they

02:17:45   25   want to look at things, to know where to go to see it.  So I

*J. YORK - Direct Examination*                                     43

02:17:49   1   would encourage you to have a convention on it.

02:17:51   2        But we'll take our break at this point.  Thank you.

          3             THE BAILIFF:  All rise.

02:30:18   4        (Recess taken from 2:17 P.M. until 2:30 P.M.)

02:30:54   5             THE COURT:  We're back on the record with the jury

02:30:22   6   outside the courtroom.

02:30:23   7        Do you have your clip ready to play?

02:30:25   8             MR. LOEVY:  We do have it properly teed up.  Sorry

02:30:30   9   about that, Your Honor.

02:30:33  10        (Audio clip played in open court.)

02:31:51  11             MR. LOEVY:  So what we would suggest by that proffer

02:31:53  12   is, if the door is open, you know, motions in limine rulings

02:31:55  13   are provisional by definition.  We would ask the Court to be

02:32:00  14   mindful, if the door gets open, to play that as impeachment.

02:32:03  15             THE COURT:  Well, okay.  I've dealt with it twice.  I

02:32:06  16   think this is the third time I'm hearing about it.  Obviously,

02:32:08  17   things can change in the course of examination.  If that

02:32:12  18   occurs, I'll consider it.

02:32:14  19             MR. LOEVY:  Thank you.

02:32:15  20             THE COURT:  But the rulings are in place at this

02:32:17  21   time.

02:32:17  22             MR. LOEVY:  Fair enough.  And, Your Honor, I have a

02:32:19  23   quick question about your procedure.

02:32:20  24             THE COURT:  All right.

02:32:21  25             MR. LOEVY:  I use an easel sometimes so that I can

| | | |
|---|---|---|
| 02:32:25 | 1 | make like a report.  Like if I say like, list your suspects, |
| 02:32:28 | 2 | and I write it.  Instead of using the easel, I would rather |
| 02:32:31 | 3 | use the ELMO, if that's okay.  So I would say suspects, and he |
| 02:32:35 | 4 | would list them.  Do you have any objection to him -- |
| 02:32:35 | 5 | THE COURT:  You mean you're going to ask him, as he |
| 02:32:39 | 6 | gives you a name, you're going to write it down? |
| 02:32:41 | 7 | MR. LOEVY:  That's right. |
| 02:32:42 | 8 | THE COURT:  Okay.  Any objection to that? |
| 02:32:43 | 9 | MR. MILLER:  No. |
| 02:32:44 | 10 | MR. LOEVY:  All right.  We're ready, Your Honor. |
| 02:32:46 | 11 | THE COURT:  Anything else, Mr. Miller?  Okay.  You |
| 02:32:46 | 12 | can come onto the witness stand.  Thank you. |
| 02:33:00 | 13 | (Witness resumes witness stand.) |
| 02:33:00 | 14 | THE COURT:  All right.  Let's bring them in. |
| 02:33:38 | 15 | (Jury present.) |
| 02:33:39 | 16 | THE COURT:  The jury is back in the courtroom after |
| 02:33:40 | 17 | the break.  I appreciate your patience and attention |
| 02:33:47 | 18 | throughout the day to this point. |
| 02:33:48 | 19 | We are going to continue with Mr. York's testimony, and |
| 02:33:51 | 20 | you are, of course, still under oath, sir.  You understand |
| 02:33:53 | 21 | that? |
| 02:33:53 | 22 | Mr. Loevy. |
| 02:33:54 | 23 | BY MR. LOEVY: |
| 02:33:55 | 24 | Q.  All right.  Over the course of this investigation, you |
| 02:33:57 | 25 | investigated it for a long time, correct? |

*J. YORK - Direct Examination*                                          45

02:33:59  1    A.   Yes.

02:33:59  2    Q.   All right.  Let's make a list, if you would, of all the

02:34:04  3    people you considered suspects -- as possible suspects -- in

02:34:08  4    the murder.

02:34:08  5         Who were some of the people you considered?

02:34:10  6    A.   Mike Simpson.

02:34:16  7    Q.   All right.  I'll keep writing.  You keep telling me.

02:34:21  8    A.   Obviously, Amanda Hoskins, Jonathan Taylor, William

02:34:32  9    Lester.

02:34:32  10   Q.   Any other suspects?

02:34:34  11   A.   Kayla Mills.

02:34:39  12   Q.   Others?

02:34:40  13   A.   Allen Helton.

02:34:51  14        Off the top of my -- I can't think of anything other --

02:34:54  15   Q.   All right.  We can revisit.  If you can think of any more

02:34:56  16   as the trial goes, you let me know, and I'll add it.  Okay?

02:34:59  17   A.   Yes, sir.

02:34:59  18   Q.   All right.  The next category I want to ask you about is

02:35:03  19   anybody that you threatened.  And by threatened, I mean you

02:35:05  20   said to someone, I'm going to put charges on you, I'm going to

02:35:09  21   get you convicted, I'm going to do this unless you tell me

02:35:12  22   what I want to hear.  Did you threaten anybody with criminal

02:35:15  23   charges?

02:35:15  24   A.   I threatened people with criminal charges --

02:35:21  25   Q.   I will write it down.  Tell me who.

*J. YORK - Direct Examination*                                     46

02:35:23  1          THE COURT:  Go ahead and give your answer.

02:35:25  2          THE WITNESS:  All right.  Can you state that again

02:35:27  3     because there was something that you said that I thought

02:35:31  4     wasn't accurate -- go ahead.  State your question again,

02:35:34  5     please.

02:35:34  6     BY MR. LOEVY:

02:35:34  7     Q.   There were some people in this investigation, you said,

02:35:37  8     If you can't tell me who did it, I'm going to charge you,

02:35:41  9     right?

02:35:44  10    A.   Those words possibly came out of my mouth.  I charge -- I

02:35:51  11    would threaten them if they were -- if it was found out that

02:35:55  12    they were part of this crime, yes.  That is correct.

02:35:58  13    Q.   All right.  Did you tell any witnesses you were going to

02:36:00  14    put them in jail unless they cooperated and gave you

02:36:04  15    information?  Any witness at all?  I'll write down the name.

02:36:08  16    A.   I threatened them if they didn't tell me what I

02:36:12  17    understood to be the truth.

02:36:14  18    Q.   That's what I'm talking about.  So tell me the names.

02:36:17  19    I'll write them down.

02:36:18  20    A.   I don't remember any of them.  Obviously we talked about

02:36:23  21    Kayla Mills.

02:36:23  22    Q.   Does she belong on the list?  Kayla?

02:36:26  23    A.   I'm sorry.  I thought she was already on that list.

02:36:29  24    Q.   This is threatened.  This is a new list we're making.

02:36:32  25    People that you said you're going to be in big trouble unless

02:36:35  1   you cooperate.  Should Kayla Mills be on this list?

02:36:38  2   A.  Yes, sir.

02:36:39  3   Q.  All right.  Anybody else besides Kayla?  It doesn't have

02:36:42  4   to be a memory test.  I'll show you a list of some of the

02:36:47  5   suspects, and you tell me if any of them jar your memory.  Not

02:36:49  6   suspects.  Some of the witnesses.  Christy Branson, Joe King,

02:36:53  7   Helton, and Wilson?

02:36:55  8   A.  Helton.

02:36:56  9   Q.  Allen Helton?  All right.  Who else?

02:36:59  10  A.  Can you put that list back up there?

02:37:02  11  Q.  I will.

02:37:06  12  A.  Is that -- you just got two names?

02:37:08  13  Q.  I'm sorry, 11.  By the way, this is not the whole

02:37:11  14  universe.  This is just the witnesses that we got statements

02:37:14  15  from.

02:37:15  16  A.  All right.  Okay.  That's what I remember.  At least

02:37:33  17  those.

02:37:33  18  Q.  All right.  How about witnesses that you made -- offered

02:37:36  19  deals:  I'll help you with something if you give me

02:37:41  20  information?

02:37:42  21       MR. MILLER:  Your Honor, I'm going to object.

02:37:44  22       THE COURT:  What's the objection?

02:37:46  23       MR. MILLER:  He's coining the phrase, and then he's

02:37:52  24  providing the definition that he's going to try to use

02:37:54  25  throughout the trial, which is going to be prejudicial when

*J. YORK - Direct Examination*                                    48

02:37:55  1    he's coined the phrase that way, and that's not what any of

02:37:59  2    this is.

02:37:59  3            THE COURT:  He doesn't have to agree with his

02:38:03  4    characterization.  So go ahead and re-ask it, Mr. Loevy, if

02:38:07  5    you would.

02:38:07  6    BY MR. LOEVY:

02:38:07  7    Q.   Did you make any deals with any witnesses?

02:38:09  8    A.   The only deals I remember making -- and I don't know.  I

02:38:12  9    can't remember each one of them or specifically is, in fact,

02:38:15  10   if they told the truth and did not kill Katherine, then they

02:38:22  11   would not get in trouble.

02:38:23  12   Q.   All right.  So is there any witness you made a deal:

02:38:25  13   I'll help you on a criminal charge, I'll help you get out of

02:38:28  14   trouble, I'll help you.  I'll give you have a benefit.

02:38:31  15        That's what I mean by a deal.  Do you understand what I

02:38:34  16   mean?

02:38:34  17   A.   Yes.  I can't make deals.  What I would say is, if you

02:38:37  18   cooperate, then I would mention it to the Commonwealth

02:38:41  19   attorney or the judge.

02:38:55  20   Q.   All right.  What witnesses did you do that for?  Offer

02:38:55  21   them help?

02:38:55  22   A.   If you want to go through them one by one.

02:38:55  23   Q.   Yeah, any of them.  If you could just tell me any witness

02:38:55  24   that comes to mind on this list or any other that you made a

02:39:02  25   deal with.

02:39:02   1   A.   Well, Kayla.  Did you want me to explain that one or just

02:39:05   2   list the names?

02:39:05   3   Q.   Well, just list the names, and we'll talk about each in

02:39:10   4   detail.

02:39:10   5   A.   Wait a minute.  Put the list back up, please.

02:39:12   6   Q.   Sure.

02:39:16   7   A.   Helton.  But I want to clarify.  It wasn't in regards to

02:39:27   8   this particular case.

02:39:28   9   Q.   You offered him help on a different case?  That's what

02:39:31   10  you mean?

02:39:32   11  A.   I think we are on the same line.  Not helping out of this

02:39:36   12  case that we're going -- we're doing right now.

02:39:39   13  Q.   He helped you solve this case, and you helped him on a

02:39:42   14  different case.  That would be Helton, right?

02:39:44   15  A.   That is an accurate statement.

02:39:46   16  Q.   All right.  That's what I mean by deals when I say deals.

02:39:48   17  So it sounds like Helton belongs on this list.  Who else

02:39:53   18  should be on this list?

02:39:53   19  A.   Put the list back up, please.

02:39:55   20  Q.   Sure.  Again, this list or any other.

02:39:57   21  A.   For example -- well, as far as me helping them out of a

02:40:09   22  criminal case, is that your exact question?

02:40:12   23  Q.   That could be a deal, sure.

02:40:14   24  A.   I mean, I'm asking you.

02:40:16   25  Q.   The definition I'm giving to you is:  If you said to a

02:40:18   1   witness, I'll give you a benefit if you help me.  Did you make

02:40:22   2   any deals?

02:40:23   3   A.    Again, I just want to clarify "deals."  I would say -- I

02:40:28   4   would say something to the Commonwealth attorney, but I

02:40:35   5   believe the -- I said this is memory.  Did you -- either Beach

02:40:39   6   or Wilson, the one that's from Summerset.  I can't remember

02:40:43   7   off the top of my head which one's from Summerset.  Do you

02:40:46   8   know?

02:40:46   9   Q.    Tell me, is the guy who wanted to be moved closer to his

02:40:49   10  home?

02:40:49   11  A.    Yes.

02:40:49   12  Q.    And you promised him if he --

02:40:51   13  A.    No, I did not promise him.  I said I would mention it.

02:40:55   14  Q.    All right.  This was a witness many years after the

02:40:57   15  crime, right?

02:40:59   16  A.    Yes.  We talked to him, yes.

02:41:02   17  Q.    And it's after the case collapsed, right?

02:41:05   18         MR. MILLER:  Object.

02:41:06   19  BY MR. LOEVY:

02:41:07   20  Q.    After the charges were dismissed, right?

02:41:09   21  A.    No.

02:41:09   22  Q.    Well, it was right at the end when the prosecutor said,

02:41:11   23  We can't -- the prosecutor told you, at some point, we can't

02:41:14   24  go forward, right?

02:41:16   25  A.    I remember, if this is the one I'm thinking of, it's --

*J. YORK - Direct Examination*                                            51

02:41:23   1    it was during -- it was after, but actually the Commonwealth

02:41:27   2    attorney was there present in; so that wasn't an end result to

02:41:32   3    that.  The charges, if that makes sense, what I'm trying to

02:41:36   4    explain.

02:41:36   5    Q.   We'll confirm it later, but it was either Beach or

02:41:39   6    someone else.

02:41:39   7         Beach is the guy who wanted --

02:41:41   8    A.   Whoever which one is from Summerset.

02:41:43   9    Q.   Okay.  Summerset.  Anybody else get a deal?

02:41:47   10   A.   Amber Simpson.

02:41:56   11   Q.   You said you'd help her brother if she helped you?

02:42:01   12   A.   I said I would mention it to the Commonwealth attorney.

02:42:05   13   Q.   All right.  Anybody else get a deal?  We'll talk about

02:42:09   14   these later.  But anybody else?

02:42:10   15   A.   Put your list back up, please.

02:42:12   16   Q.   Sure.

02:42:18   17   A.   Not that I remember.

02:42:24   18   Q.   Okay.

02:42:24   19        Now, going back to your murder investigation, would it be

02:42:28   20   fair to say that one of your earliest suspects was Mike Mills?

02:42:34   21   A.   That is correct.

02:42:37   22   Q.   He was the victim's grandson?

02:42:40   23   A.   Yes.

02:42:40   24   Q.   And there were, at least, some reasons to suspect that he

02:42:44   25   might have had something to do with the crime, right?

*J. YORK - Direct Examination*                                          52

| | |
|---|---|
| 02:42:47 | 1 |

A.   Initially, yes.

02:42:48   2   Q.   He had shown up at the scene of the murder, right?

02:42:51   3   A.   Yes.

02:42:54   4   Q.   And one -- somebody told you -- was it Jesse Lawson --

02:42:58   5   that, you know what, this guy has stolen from grandma?

02:43:01   6   Somebody told you that?

02:43:02   7   A.   I don't remember which one, but it came from his own

02:43:05   8   family that he had stolen some money off of her before.

02:43:10   9   Q.   And that's someone who's a suspect, right, someone who

02:43:16   10   had previously robbed the grandma?

02:43:19   11   A.   Yes.

02:43:19   12   Q.   And, in fact, when you did a little digging, you learned

02:43:22   13   that he knew that she had this money from the timber, right?

02:43:27   14   A.   Yes.

02:43:27   15   Q.   And he gave a non-plausible explanation for why his

02:43:32   16   prints might be on the money, didn't he?

02:43:34   17   A.   I don't remember.

02:43:34   18   Q.   Do you remember him saying, in those interviews, that

02:43:37   19   Hey, I helped grandma count the money?

02:43:40   20   A.   Well, he said that.

02:43:43   21   Q.   All right.  Did you -- there was some other reasons.  He

02:43:47   22   knew about the timber, right?

02:43:48   23   A.   Yes.

02:43:48   24   Q.   And he told you an important lie, didn't he?

02:43:57   25   A.   I don't remember exactly what you're talking about.  Do

*J. YORK - Direct Examination*                                      53

02:44:01  1   you want to clarify that?

02:44:02  2   Q.   Sure.  I'm going to show you page 303 of Plaintiffs'

02:44:06  3   Exhibit 1 which is Bates -- this doesn't have a Bates on it,

02:44:11  4   but this is page 303 of the investigative file.

02:44:16  5           MR. MILLER:  It's Bates 556, KSP 556.

02:44:22  6           MR. LOEVY:  Thank you.

02:44:24  7   BY MR. LOEVY:

02:44:24  8   Q.   All right.  You see in the yellow lines -- as always,

02:44:27  9   were made by me.  They weren't on the originals, right, sir?

02:44:31  10  A.   I'm reading it, if you give me a second.  Can you get it

02:44:34  11  smaller?

02:44:34  12  Q.   How is that?

02:44:35  13  A.   Okay.

02:44:36  14          MR. LOEVY:  Your Honor, may we publish this to the

02:44:38  15  jury?

02:44:39  16          THE COURT:  You may.

02:44:52  17  BY MR. LOEVY:

02:44:52  18  Q.   This is your report, right?  This is your report?

02:44:52  19  A.   You want to scroll down?  Yes, I generated that.

02:44:52  20  Q.   It looks like you generated it the day after the murder,

02:44:56  21  right?

02:44:56  22  A.   Yes.  Can you scroll back up?

02:44:59  23  Q.   Sure.

02:45:13  24  A.   So what was your question again?

02:45:15  25  Q.   My first question is:  This is your report, including a

| 02:45:18 | 1 | lot of details, right? |
|---|---|---|
| 02:45:20 | 2 | A.   Yes. |
| 02:45:21 | 3 | Q.   All right.  My next question is:  Isn't it true that |
| 02:45:23 | 4 | Mills and his girlfriend gave you different times as to when |
| 02:45:27 | 5 | he was last at his grandmother's? |
| 02:45:29 | 6 | A.   That's what it says here, yes. |
| 02:45:30 | 7 | Q.   Do you remember that? |
| 02:45:31 | 8 | A.   No.  What I remember -- and I'm not saying -- what I |
| 02:45:37 | 9 | remember, the different times was Michael Mason, not Michael |
| 02:45:43 | 10 | Mills, gave me different times.  That's what I remember. |
| 02:45:47 | 11 | Q.   In other words, you interviewed a couple of his buddies, |
| 02:45:52 | 12 | Mason and a woman named, I think, Stephanie Williams? |
| 02:45:55 | 13 | A.   That sounds correct. |
| 02:45:57 | 14 | Q.   And you were getting different stories from people, |
|  | 15 | right? |
| 02:46:00 | 16 | A.   Yes.  That is true.  Can I elaborate? |
| 02:46:04 | 17 | Q.   Explain.  Sure. |
| 02:46:05 | 18 | A.   Yes, sir.  So Michael Mills was the grandson.  We had |
| 02:46:10 | 19 | information that he had stolen off her before in the past.  We |
| 02:46:14 | 20 | acted upon that.  We talked to him and see where he was at |
| 02:46:20 | 21 | throughout the day.  He gave us a statement that he had been |
| 02:46:25 | 22 | moving all day, and Tiffany told us -- I think it was Tiffany |
| 02:46:30 | 23 | Eaton.  I'm 90 percent sure on the name.  His girlfriend. |
| 02:46:36 | 24 | They had been moving with a couple friends.  So we went to the |
| 02:46:39 | 25 | residence where he was in Corbin -- this is after we left the |

02:46:43   1    scene -- just quickly observed what appears to be moving.  And

02:46:47   2    then we went to another residence in Laurel County, and this

02:46:50   3    is approximately the next day.  I mean, when I say, "next

02:46:53   4    day," just after midnight, to a residence where he actually

02:46:57   5    had been moving to.  And, you know, we observed what appeared

02:47:00   6    to be him moving.  And, you know, we didn't see no, like,

02:47:06   7    evidence of him having a large sum of money spinning and while

02:47:11   8    we were there, we took statements from Michael Mason and his

02:47:15   9    girlfriend, I think he said her name was.  And Michael Mason,

02:47:20   10   we asked him did -- When is the last time that Michael had

02:47:27   11   been at his grandmother's?

02:47:29   12        And -- and Mr. -- pronunciation -- Mr. Mason said that he

02:47:36   13   had been with Michael for like several weeks which was

02:47:38   14   inaccurate because Mr. Mills and I -- I thought Mrs. -- his

02:47:45   15   girlfriend had told us he had been there the week before.

02:47:49   16   Q.   All right.  So that doesn't make him a murderer, does it?

02:47:52   17   A.   No.

02:47:53   18   Q.   But different people were giving you different accounts

02:47:56   19   of when Michael Mills had seen his grandmother, correct?

02:47:59   20   A.   Yes, and I followed up with Mr. Mason and told him that

02:48:03   21   that was inaccurate because that's -- I mean, even Michael

02:48:06   22   Mills said that was not correct, and his explanation to me, as

02:48:10   23   you can imagine, police showing up, he said, you know, police

02:48:14   24   made him scared, and he was afraid and said he wasn't

02:48:19   25   thinking.  That was the explanation he gave to us.  Along

02:48:23  1    those lines.

02:48:23  2    Q.   So he basically said he lied because he had been afraid?

02:48:26  3    A.   He said the police made him nervous, if I remember

02:48:29  4    correctly.

02:48:30  5    Q.   All right.  How do you know he wasn't telling the truth

02:48:32  6    and Mike Mills was lying?

02:48:33  7    A.   Again, it's a case of common sense.  If Mr. Mason is

02:48:45  8    saying that Michael had not been to his grandmother's in

02:48:48  9    several weeks but Mr. Mills is saying, no, that's not true, I

02:48:53  10   had been to my grandmothers -- so, to me, common sense would

02:48:57  11   explain that, you know, if the person that we're trying to

02:48:59  12   investigate at the time or look into is saying that he -- no,

02:49:03  13   I've been there in the last, you know, week or two and this

02:49:06  14   guy is saying, no, he's not been there in five weeks, who

02:49:09  15   would you -- that's, you know, common sense.

02:49:10  16   Q.   All right.  One of his alibi witnesses, Stephanie

02:49:14  17   Williams, was somewhat unable to account for the whereabouts

02:49:18  18   that day, correct?

02:49:21  19   A.   I can't remember.  I'm not arguing with you.

02:49:24  20   Q.   Well, let's take a look at Defendant's 2E.  This is a

02:49:27  21   transcript with my yellow markings of this recording.  It

02:49:31  22   looks like --

02:49:32  23        MR. LOEVY:  And may we publish this, Your Honor?  2E?

02:49:35  24   We move this into evidence.

02:49:38  25        THE COURT:  Any objection?

*J. YORK - Direct Examination*                                          57

02:49:39  1          MR. MILLER:  That's not part of the case file; so I'm

02:49:42  2   not sure what he's looking at.  A transcript of what?

02:49:46  3          MR. LOEVY:  Stephanie Williams' interview.

02:49:48  4   Defendant's Exhibit 2.

02:49:49  5          MR. MILLER:  No objections.

02:49:50  6          THE COURT:  Okay.  How long is that?

02:49:52  7          MR. LOEVY:  I'm not going to play it.  I'm just going

02:49:54  8   to show him.

02:49:55  9       The exhibit itself is about six pages, four pages.

02:49:59  10         THE COURT:  Okay.  That'll be admitted.  It may be

02:50:01  11  displayed.

02:50:01  12      (Defense Exhibit No. 2E was received in evidence.)

02:50:01  13  BY MR. LOEVY:

02:50:02  14  Q.  All right.  It looks like, does it not, sir, that you're

02:50:04  15  interviewing her at 1:20 in the morning on the night of the

02:50:08  16  murder.  It's now carried into the 21st, but we're late after

02:50:11  17  the murder, right?

02:50:13  18  A.  Yes.

02:50:13  19  Q.  All right.  You asked her, you know, all four of you were

02:50:15  20  here, we wake up, did you go over to granny's house, and the

02:50:18  21  part I want to focus you on is when she said, "We went to

02:50:21  22  Speedway and honestly can't remember if we went to the other

02:50:24  23  stores.  I'm pretty sure that we didn't."  Do you see that?

02:50:28  24  A.  I see what you're saying.

02:50:28  25  Q.  Okay.  Now, here's my question:  As a homicide detective,

*J. YORK - Direct Examination*                                      58

02:50:32   1    if someone can't remember exactly what's the stores they went

02:50:34   2    to, that doesn't make them a murderer, right?

02:50:36   3    A.   That is correct.

02:50:36   4    Q.   And this is the day of the murder she can't remember what

02:50:41   5    stores, right?

02:50:41   6    A.   That's according, to that report I read, yes.

02:50:45   7    Q.   All right.  Did you hold that same standard when you

02:50:47   8    talked to other witnesses:  If they can't remember exactly

02:50:49   9    where they were, that doesn't make them guilty?

02:50:52   10   A.   I don't remember.  If you want to get more specific.

02:50:56   11   Q.   Like, for example, when you talked to the plaintiffs

02:50:58   12   months later, if they couldn't remember exactly if they went

02:51:01   13   to the Walgreen's before the doctor, et cetera, et cetera, did

02:51:03   14   you say, Well, you know, people don't always remember

02:51:05   15   meaningless things?  Did you use that same reasoning?

02:51:08   16   A.   I don't remember saying those to the plaintiffs.

02:51:12   17   Q.   All right.  There is no police report that Mike Mills'

02:51:16   18   alibi checked out.  Would you agree on that?

02:51:20   19   A.   Say that again.

02:51:21   20   Q.   Have you ever seen a police report that you checked out

02:51:23   21   Mike Mill's alibi and it checked out?

02:51:26   22   A.   I believe there is.  I think I read it earlier this

02:51:31   23   morning.

02:51:32   24   Q.   All right.  Sorry.  I didn't mean to interrupt you.

02:51:35   25   Sorry.  If you weren't finished, please do.

02:51:37  1    A.   I'm finished with what I'm saying.

02:51:39  2    Q.   Okay.  All right.  Jesse Lawson, at his interview, said,

02:51:42  3    The family has been trying to get a hold of Michael and they

02:51:45  4    can't.

02:51:46  5         That was part of your investigative information, right?

02:51:49  6    A.   Yes, but should we not go back to what you just said?

02:51:53  7    You said that was there no police report that would indicate

02:51:57  8    Mr. Mills' alibi.  Am I understanding that correctly?

02:52:02  9    Q.   No.  I was asking if there was --

02:52:04  10             THE COURT:  Hang on.  Hang on.  You asked if there

02:52:06  11   was such a report.  He answered.  You kind of talked over each

02:52:10  12   other.  I think he's talking about his answer to that

02:52:12  13   question, right?

02:52:13  14             THE WITNESS:  Yes, that's what I -- yes.

02:52:15  15             THE COURT:  And are you saying there was or was not

02:52:17  16   a -- is or is not a report?

02:52:19  17             THE WITNESS:  I'm saying there is a report --

02:52:21  18             MR. LOEVY:  Okay.

02:52:22  19             THE WITNESS:  -- that talks about Mr. Mills' alibi,

02:52:27  20   however you want to call it.

02:52:28  21   BY MR. LOEVY:

02:52:29  22   Q.   Okay.  All right.  Was Mr. Mills a suspect?

02:52:32  23   A.   Yes.

02:52:33  24   Q.   Was there probable cause to arrest him?

02:52:34  25   A.   No.

02:52:39   1    Q.   Is this the report you're talking about about Mr. Mills'

02:52:44   2    alibi?  This is KSP 294.  It's part of the investigative file.

02:52:49   3    It's Plaintiffs' 18.  Is this the report you're talking about?

02:52:57   4    A.   Who done this report?

02:52:59   5    Q.   This looks like a Eubanks report.

02:53:02   6    A.   No.  This is not the one I'm talking about.

02:53:05   7    Q.   Do you know why this report was created on 3-31-2012, you

02:53:09   8    know, a year and a half after the murder, documenting what

02:53:12   9    happened on 12-21-2010?

02:53:16   10   A.   No, I don't remember why Trooper Eubanks did it on that

02:53:21   11   particular day.

02:53:22   12   Q.   All right.

02:53:22   13        MR. LOEVY:  We ask permission to publish, Your Honor.

02:53:26   14   It's part of the file.

02:53:27   15        THE COURT:  It's within Exhibit 1, no?

02:53:29   16        MR. LOEVY:  Yes.

02:53:29   17        THE COURT:  Yeah, you may.

02:53:30   18        MR. LOEVY:  All right.  And these are my yellows.

02:53:32   19   Not on the original.

02:53:33   20   BY MR. LOEVY:

02:53:34   21   Q.   Was it protocol at the KSP to go back to an interview

02:53:37   22   that happened on -- right after the murder and not create a

02:53:40   23   report until 3-31-12?  Is that usual or unusual?

02:53:45   24   A.   That is unusual.

02:53:47   25   Q.   Did you ever backdate your reports like that?  "Backdate"

02:53:51   1    is probably a loaded word.  Did you ever, after the fact,

02:53:54   2    create reports from things that happened many months or weeks

02:53:58   3    before?

02:53:58   4    A.   Yes.  There were times, I think even throughout this

02:54:04   5    case, you know, that, you know, I would supplement or generate

02:54:07   6    a report on something that happened, you know, weeks before.

02:54:12   7    Q.   And you would -- you would still -- I take it you were

02:54:15   8    keeping notes then?

02:54:16   9    A.   I mean, if you want to be more specific.  I mean, on

02:54:21   10   some, yes.

02:54:21   11   Q.   I'm not a homicide detective, but I suspect you had a

02:54:24   12   notebook where you were writing down developments in the case,

02:54:27   13   weren't you?

02:54:28   14   A.   I don't remember using a notebook then, no.

02:54:30   15   Q.   Were you trained that, as you are doing your

02:54:33   16   investigation, you should write things down, take notes, keep

02:54:36   17   track of what people said?

02:54:37   18   A.   Yes.

02:54:38   19   Q.   And did you do that?

02:54:40   20   A.   Sometimes I did.  Sometimes -- you know, like I said,

02:54:46   21   specific --

02:54:47   22   Q.   Where did you keep them?

02:54:49   23   A.   Usually in my office.

02:54:53   24   Q.   And where did you keep them in your office?

02:54:56   25   A.   I don't remember.

02:54:59   1   Q.   All right.  And then Mike Mills --

02:55:04   2             MR. LOEVY:  And then, Your Honor, this is another

02:55:06   3   summary exhibit, but instead of writing it, I already printed

02:55:09   4   it.  I'd ask questions about this for the witness.  I'd ask

02:55:13   5   permission for that.

02:55:14   6             THE COURT:  Just to the witness.

02:55:15   7   BY MR. LOEVY:

02:55:16   8   Q.   You would agree that Mike Mills was a suspect because he

02:55:19   9   had arguments with the victim, too, correct?  You learned that

02:55:22  10   as well?

02:55:22  11   A.   Is it inappropriate that I ask about the report that I'm

02:55:26  12   talking about as alibi because I feel like they need to hear

          13   it?

02:55:33  14   Q.   Not alibi.  Arguments.

02:55:35  15             THE COURT:  You're talking about two different

          16   things.

          17             MR. LOEVY:  Yeah.

02:55:36  18             THE COURT:  Your lawyers are going to get to ask you

02:55:38  19   questions, and they can go back to that area if needed.

02:55:41  20             MR. LOEVY:  That's all right.  I moved on to a

02:55:42  21   different thing.

          22             THE COURT:  Yeah.

          23   BY MR. LOEVY:

02:55:43  24   Q.   You learned, through the investigation, that the grandson

02:55:45  25   and the grandma got into arguments, correct?

*J. YORK - Direct Examination*                                    63

| | | |
|---|---|---|
| 02:55:48 | 1 | A.   That is correct. |
| 02:55:49 | 2 | Q.   And you learned about the stolen money, and you covered |
| 02:55:52 | 3 | that, right? |
| 02:55:53 | 4 | A.   Yes. |
| 02:55:53 | 5 | Q.   This said, "lied," but somebody was lying about whether |
| 02:55:57 | 6 | he had been living with the victim, right? |
| 02:55:59 | 7 | A.   Yes.  And, you know, if you'll -- the supplement that I'm |
| 02:56:02 | 8 | talking about goes over that. |
| 02:56:04 | 9 | Q.   Right. |
| 02:56:05 | 10 | MR. LOEVY:  And, Your Honor, I think the confusion is |
| 02:56:06 | 11 | this is not a police report.  I didn't mean to mislead |
| 02:56:10 | 12 | anybody. |
| 02:56:11 | 13 | Can I publish this? |
| 02:56:14 | 14 | MR. MILLER:  No. |
| | 15 | THE COURT:  No. |
| 02:56:15 | 16 | MR. MILLER:  I meant object.  Sorry, Your Honor. |
| 02:56:17 | 17 | BY MR. LOEVY: |
| 02:56:18 | 18 | Q.   All right.  Let's talk about Jesse Lawson.  You were in |
| 02:56:20 | 19 | court when he testified, correct? |
| 02:56:21 | 20 | A.   That is correct. |
| 02:56:21 | 21 | Q.   Did you remember him? |
| 02:56:22 | 22 | A.   Yes. |
| 02:56:25 | 23 | Q.   Okay.  Would you agree that, in a homicide investigation, |
| 02:56:27 | 24 | witnesses should be treated different than suspects? |
| 02:56:32 | 25 | A.   Yes, that is a fair statement. |

*J. YORK - Direct Examination*                                      64

02:56:34   1    Q.   A suspect is someone you have a suspicion might be

02:56:37   2    involved, right?

02:56:38   3    A.   Yes, that is correct.

02:56:40   4    Q.   Whereas, a witness is just a person who might have

02:56:43   5    information about the murder, right?

02:56:45   6    A.   Yes.   That's a general and broad statement, yes.

02:56:48   7    Q.   All right.   You treat those two differently in your

02:56:52   8    investigation.   Would you agree with me?

02:56:53   9    A.   It depends on the circumstances.   I can't say in a broad

02:56:57   10   sense.

02:56:59   11   Q.   All right.   Well, did you generally treat suspects and

02:57:01   12   witnesses the same?

02:57:02   13   A.   It would depend.   Case by case.

02:57:06   14   Q.   All right.   Would you agree that, if someone is just a

02:57:08   15   witness, you shouldn't threaten them?

02:57:18   16   A.   Again, I feel like this is a trick question, but I'm

02:57:20   17   going to say yes.

02:57:21   18   Q.   All right.   You heard Mr. Lawson describe that he's a

02:57:27   19   member of the victim's family, right?

02:57:28   20   A.   Yes.

02:57:29   21   Q.   And he had lost a loved one?

02:57:30   22   A.   Excuse me?

02:57:31   23   Q.   He had lost a loved one.   He had lost someone in his

02:57:35   24   family?

02:57:35   25   A.   You're referring to Ms. Mills?

*J. YORK - Direct Examination*                                      65

02:57:37  1    Q.   Yes.

02:57:37  2    A.   Yes, sir.

02:57:37  3    Q.   And he told you and the other officers what he knew,

          4    right?

02:57:41  5    A.   That is a very general, broad statement over time.

02:57:46  6    Q.   All right.  You heard him describe the pressure he says

02:57:50  7    you put on him.  Was that true?

02:57:52  8    A.   Yes.  I heard him say that, yes.

02:57:55  9    Q.   Okay.  Good point.  But was it -- what he described, do

02:57:58  10   you agree that it was an accurate description?

02:57:59  11   A.   No.

02:57:59  12   Q.   What he described, would that have been proper?

02:58:02  13   A.   Which part?

02:58:05  14   Q.   All right.  How about using physical -- touching him,

02:58:07  15   physically, as a witness?  Would that have been proper?

02:58:10  16   A.   I did not physically touch that boy.

02:58:14  17   Q.   All right.  If we could -- do you remember admitting that

02:58:16  18   you did slam him?

02:58:17  19   A.   I never admitted to slamming Jesse Lawson.

02:58:21  20        MR. LOEVY:  All right.  If we could play 72A.  This

02:58:24  21   is from the same tape.  Hold on.  So this is 72, I believe

02:58:29  22   part of Jesse's transcript tape that has already been played.

02:58:32  23   This is a different clip.  72A.

02:58:35  24        THE COURT:  Of the interview --

          25        MR. LOEVY:  Yes.

| | | |
|---|---|---|
| 02:58:36 | 1 | THE COURT:  -- with Jesse Lawson? |
| 02:58:38 | 2 | MR. LOEVY:  Correct. |
| 02:58:39 | 3 | THE COURT:  Any objection? |
| 02:58:40 | 4 | MR. MILLER:  Is he going to play it -- |
| 02:58:42 | 5 | MR. LOEVY:  Clip. |
| 02:58:42 | 6 | MR. MILLER:  Okay.  No. |
| 02:58:44 | 7 | THE COURT:  That can be -- that can be played. |
| 02:58:46 | 8 | MR. LOEVY:  That's got visual, too.  This is from, I |
| 02:58:51 | 9 | think, the -- well, you'll set the context.  So we need the -- |
| 02:58:55 | 10 | THE COURT:  Hang on.  Is this -- is this in evidence? |
| 02:58:59 | 11 | MR. LOEVY:  This, yeah -- |
| 02:59:01 | 12 | MR. SLOSAR:  We did the -- |
| 02:59:02 | 13 | MR. LOEVY:  No, we did the Helton one.  We didn't do |
| 02:59:06 | 14 | Lawson.  If it's not in evidence, we're moving it into |
| 02:59:09 | 15 | evidence. |
| 02:59:10 | 16 | THE COURT:  Okay.  Any objection to that? |
| 02:59:10 | 17 | MR. MILLER:  Is this the polygraph?  Is that what |
| | 18 | we're -- |
| 02:59:12 | 19 | MR. LOEVY:  Yes. |
| 02:59:12 | 20 | MR. MILLER:  Understand what -- no. |
| 02:59:13 | 21 | THE COURT:  Okay.  So this can be admitted? |
| 02:59:16 | 22 | MR. MILLER:  Yes, Your Honor. |
| 02:59:16 | 23 | THE COURT:  Okay.  I'll admit 72A. |
| 02:59:18 | 24 | MR. LOEVY:  That's the clip. |
| 02:59:21 | 25 | MR. SLOSAR:  Is it B or A?  A.  It's A. |

02:59:28   1          THE COURT:  Okay.  I'll admit 72A.  It can be

02:59:31   2   displayed to the jury.

02:59:32   3          (Plaintiffs' Exhibit No. 72A was received in evidence.)

02:59:47   4   BY MR. LOEVY:

02:59:47   5   Q.  All right.  Did you -- is that you on the tape?

02:59:50   6   A.  Yes, it is.

02:59:50   7   Q.  He says you slammed him, right?

02:59:54   8   A.  Yes.

02:59:54   9   Q.  And then you said, I'll do it again, time and time again,

          10   didn't you?

02:59:58  11   A.  I'll say this again.  I did not ever slam Jesse Lawson,

03:00:03  12   pick him up or slam him to the ground.

03:00:05  13   Q.  All right.  But -- not to the ground, but you might have

03:00:07  14   slammed him?

03:00:09  15   A.  I'll say this again.  I never physically slammed Jesse

03:00:13  16   Lawson.  I don't know how else clear I can be.

03:00:17  17   Q.  All right.  Did you take him for the polygraph?

03:00:20  18   A.  Yes, I was -- took him to -- yes, that is true.

03:00:26  19   Q.  All right.  Why was he a suspect, or was he a suspect or

03:00:29  20   a witness?

03:00:30  21   A.  See, when we started this, Jesse and Allen, both,

03:00:37  22   continually would give us bits of information, and it got to

03:00:43  23   the point they started, like, telling on one another and

03:00:48  24   giving us bits and pieces of information, and we took them

03:00:53  25   both to a polygraph.

*J. YORK - Direct Examination*                                                68

03:00:56  1    Q.   All right, sir.  If I just heard you correctly, you're

03:00:59  2    saying Jesse and Allen started telling on each other?  That's

03:01:02  3    what you just said, right?

03:01:03  4    A.   You can hear that in the polygraph.

03:01:05  5    Q.   So why didn't you tell the prosecutor that Allen was

03:01:08  6    saying Jesse was involved?

03:01:11  7    A.   They were -- that's my mistake.  Okay?  When I say that,

03:01:19  8    they was not saying that each other one killed, but they was

03:01:23  9    saying, like, for example -- I'll give you an example because

03:01:29  10   I feel like he's trying to put words in my mouth.

03:01:30  11       After -- after Ms. Mills died, that Jesse was going

03:01:37  12   around to drug dealers and had plenty of money when he

03:01:42  13   shouldn't have.  That's an example I can give you.

03:01:44  14   Q.   All right.  Why didn't you memorialize any of that?

03:01:47  15   A.   If that's not written down, you know, that is absolutely

03:01:53  16   on me, and that should be written down, and that's my mistake,

03:01:56  17   and I own it.  But I did not fabricate anything.

03:01:58  18   Q.   All right.  But you do own that there is no reports

03:02:02  19   explaining why Jesse was a suspect, right?

03:02:05  20   A.   I think what you are just playing did.

03:02:08  21   Q.   Well, that's you yelling at him.  But there's no report

03:02:12  22   that says, I have reason to believe Jesse might have been

03:02:14  23   involved because he's got money or whatever the reasons are?

03:02:18  24   It's lost to time, right?

03:02:19  25   A.   We can agree that there's -- I did not do a supplement --

*J. YORK - Direct Examination* 69

03:02:22    1    Q.   Yeah.

03:02:23    2    A.   -- like they looked at before or that's outlined.  That

03:02:27    3    would be a fair and accurate statement.

03:02:29    4    Q.   So if you were to now remember why Jesse was a suspect at

03:02:33    5    the time, we would have to either rely on your memory or it's

03:02:36    6    gone, right?

03:02:36    7    A.   Can you say that again, please?

03:02:43    8    Q.   When Amanda and Jonathan were on trial, didn't they have

03:02:48    9    a right to know that there was a reason why Jesse might have

03:02:51    10    been guilty?  You would agree with that, right?

03:02:53    11    A.   It's my understanding that the polygraphs were available

03:02:56    12    to them.  If it wasn't, that's my bad.  I'm not saying

03:03:00    13    exactly -- but I just assumed that the polygraphs were

03:03:03    14    available to them.

03:03:03    15    Q.   The polygraphs were, sir, but the reason why Jesse Lawson

03:03:07    16    was taken down there and asked about the murder, you never

03:03:11    17    wrote that down, did you?

03:03:13    18    A.   That is correct, that I remember I didn't.

03:03:16    19    Q.   All right.  And, in fact, we have Plaintiffs' Exhibit 4,

03:03:19    20    which is KSP 270.

03:03:22    21        MR. LOEVY:  We could publish this.

03:03:24    22        THE COURT:  You may.

03:03:25    23    BY MR. LOEVY:

03:03:25    24    Q.   All it says is that you took him for a polygraph, right?

03:03:29    25        MR. MILLER:  Object.

03:03:30   1        THE COURT:  What's the objection?

03:03:32   2        MR. MILLER:  It's mischaracterizing.  That's not all

03:03:36   3   it says.  Ask it the right way.

03:03:39   4        THE COURT:  Mr. York can respond to the question as

03:03:42   5   he sees fit.

03:03:44   6        THE WITNESS:  Can you ask the question again, please?

03:03:46   7        MR. LOEVY:  Your Honor, may I withdraw the question?

03:03:51   8        THE COURT:  You may.

03:03:51   9   BY MR. LOEVY:

03:03:52   10  Q.   And I -- I think I owe you an apology, sir, because there

03:03:59   11  is some information in this report about Jesse Lawson.  Let me

03:04:02   12  show you.  And where we both got confused is you never made a

03:04:14   13  sup report on Jesse Lawson, right?

03:04:14   14  A.   I'm not going to speculate what was in your head or what

03:04:16   15  you was trying to get to.  I'm sorry.

03:04:20   16  Q.   I'm just asking you to agree, we both agree, that you

03:04:21   17  never made a sup report on Jesse Lawson, correct?

03:04:24   18  A.   Can you ask that question again?

03:04:26   19  Q.   You know how like for Simpson and Christy Brantly [sic]

03:04:30   20  and all the other suspects.  You made a sup case, right?

03:04:35   21  A.   A what?

03:04:35   22  Q.   Supplemental case report?

03:04:36   23  A.   Like this what we're looking at.  This is a supplement.

03:04:39   24  Q.   All right.  And down here you do talk about Jesse Lawson,

03:04:41   25  saying that he called Mike to buy a pain pill.  He stated to

03:04:45   1    Mike about Katherine.  Mike started to cry.  Jesse stated that

03:04:50   2    Cleo Brown told him that Simpson wanted to see Mills.  I

03:04:54   3    interviewed Jesse several times, and every time I interview

03:04:57   4    him, he gives me more information.  That's a summary of what

03:05:00   5    you've written there?

03:05:01   6    A.   Yes.

03:05:02   7    Q.   Okay.  Why didn't you write down the more information?

03:05:05   8    A.   Again, that's absolutely something that -- it should have

03:05:09   9    been written -- it should have been more written there, and

03:05:11   10   that's on me.

03:05:15   11   Q.   All right.  Did you ever check out Jesse's alibi?

03:05:18   12   A.   I don't remember Jesse's alibi ever being that he killed

03:05:28   13   or not.

03:05:28   14        What I remember is, like I said, every time we talked to

03:05:32   15   them, they would give more information.  And as this would

03:05:37   16   continue, we'd get more and more.

03:05:39   17        And so he brought up the polygraph test.  As a result of

03:05:46   18   the polygraph test, you know, they failed.  But one of the

03:05:50   19   things that later we found out is that he left out -- and this

03:05:55   20   is, you know, a possible explanation why he failed the

03:06:00   21   polygraph.

03:06:01   22   Q.   The question was about alibi.

03:06:03   23   A.   I'm sorry.

03:06:04   24        THE COURT:  Hang on.  Hang on.  Finish that thought.

03:06:05   25   And then he's going to ask the next question.

03:06:07   1          THE WITNESS:  Okay.  We wasn't looking as far as an

03:06:11   2    alibi where Jesse was.  But part of the polygraph was, you

03:06:16   3    know, did you have information or something pertaining to

03:06:18   4    that?  It was like three relevant questions.

03:06:21   5          But, anyway, when he failed, his explanation was, number

03:06:25   6    one, that he didn't give us information about Amanda, and I

03:06:31   7    think it was in regards to stealing a truck or something like

03:06:34   8    that, and that he had, I think, possible -- that he'd actually

03:06:41   9    heard William Lester, at some point, talked about Katherine

03:06:45   10   having money and talked about going to rob her and take the

03:06:49   11   money, tie her up or something to that effect.

03:06:52   12   BY MR. LOEVY:

03:06:53   13   Q.   Where is that coming from?  Is that in writing?

03:06:56   14   A.   The part about Amanda is on the polygraph video.

03:07:02   15   Q.   Where you are asking him?

03:07:04   16   A.   Um-hum.  And then I cannot remember if it was the

03:07:09   17   polygraph examiner or not, and then the part later about

03:07:13   18   the -- William Lester, obviously, that probably should have

03:07:20   19   been documented, but at the time William Lester, you know, has

03:07:24   20   told us he said it.

03:07:26   21   Q.   All right.  Well, I'm going to get back to the question

03:07:28   22   here.

03:07:28   23        You took Jesse Lawson to a polygraph, right?

03:07:30   24   A.   Yes.

03:07:31   25   Q.   You asked him, Did you participate in the death, did you

*J. YORK - Direct Examination*                                          73

03:07:33   1   hit her, did you steal her money?  Those were the questions,

           2   right?

03:07:36   3   A.   I did not ask him.

03:07:37   4   Q.   Somebody asked him, right?

03:07:38   5   A.   Yes.

03:07:38   6   Q.   He failed all three?

03:07:40   7   A.   Well, I need to explain this.  So --

03:07:43   8   Q.   Well, he asked the questions.  The polygrapher said he

03:07:46   9   failed.  There's nothing to explain.  He failed, right?

03:07:48  10        THE COURT:  Hang on.  You asked him if he failed all

03:07:50  11   three.  That's the question.

03:07:51  12        THE WITNESS:  It's my understanding, on a polygraph,

03:07:54  13   that if you fail one question, you failed the test.

03:08:00  14      It's my understanding that Jesse's only deception was

03:08:05  15   taken from one question, if my recollection is correct, but,

03:08:11  16   like I said, it's there on the polygraph.

03:08:14  17   BY MR. LOEVY:

03:08:14  18   Q.   He failed, though?  The polygrapher said "deception

03:08:21  19   indicated," right?

03:08:22  20   A.   That is true.

03:08:24  21   Q.   All right.  So did you say, Jesse, listen, we asked you

03:08:26  22   some questions about this murder, you failed the polygraph,

03:08:28  23   what's your alibi?

03:08:28  24   A.   I don't think those exact words ever came out.  Right

03:08:32  25   after the test, the polygraph examiner came in and talked to

03:08:38   1   him, and I feel like the best way, you know, instead of me

03:08:42   2   trying to articulate what was said, just play the -- play it.

03:08:46   3   Q.   All right.  You took no steps to investigate his alibi,

03:08:49   4   right?

03:08:50   5   A.   Again --

03:08:52   6           THE COURT:  Just yes or no, and then you can answer.

03:08:55   7           THE WITNESS:  No.  And to explain that some more, the

03:09:00   8   way I understood polygraphing and, like I said, this would

03:09:02   9   save so much time and headache if we just played it, but

03:09:06   10  Mr. -- the way I understood it, Jesse Lawson didn't fail the

03:09:10   11  part "Did you hit Katherine in the head?"  Is it -- that you

03:09:14   12  could possibly have knowledge or something to the effect.

03:09:17   13      And so as far as looking at him, where he was at or the

03:09:21   14  alibi, I didn't -- I didn't understand that's what was

03:09:27   15  coming -- from the polygraph.

03:09:28   16  BY MR. LOEVY:

03:09:29   17  Q.   All right.  Mr. Lawson alleged you basically came over

03:09:31   18  and kicked down his door and F this and F that.  Did that

03:09:35   19  happen?

03:09:35   20  A.   No.  I never did break in his house and kick the door

03:09:39   21  down.

03:09:40   22  Q.   All right.  Did you kick on his door?

03:09:41   23  A.   I never kicked his door, no.

03:09:46   24  Q.   All right.  How about F this, F, F?  Did you do that?

03:09:49   25  A.   I did not -- I did not ever F this, F that in his house

03:09:57   1    in front of his kids.

03:09:57   2         Could I possibly have said that during the course of this

03:10:01   3    investigation?  Absolutely.

03:10:02   4    Q.   All right.  So you're not ruling out that sometimes you

03:10:04   5    used rough language?

03:10:05   6    A.   No, I'm not.

03:10:06   7    Q.   All right.  I'm going to show you Plaintiffs' Exhibit 1,

03:10:10   8    page 117, which is the polygraph report.  This is the Lawson

03:10:17   9    polygraph report.  This is the second page.  Page 118.

03:10:21   10             MR. LOEVY:  Permission to publish this, Your Honor.

03:10:23   11             THE COURT:  You may.

03:10:24   12   BY MR. LOEVY:

03:10:24   13   Q.   This is the report 1-21-11, Jesse Lawson.  Victim

03:10:30   14   suffered wounds, was interviewed, denied the death, and on the

03:10:36   15   next page says, it was concluded that deception was indicated

03:10:39   16   when the examinee was asking the relevant questions.  Did you

03:10:42   17   participate in any way in the death of that woman?  No.  Did

03:10:45   18   you hit that woman in the head?  No.  Did you steal any of the

03:10:48   19   missing money?  No.

03:10:50   20        All right.  So that's what the report said, right?  Let's

03:10:53   21   start with that question.  That's what the report says, right?

03:10:56   22   A.   Yes.

03:10:56   23   Q.   I think you have already testified you had a different

03:10:58   24   understanding of what that report meant, right?

03:11:00   25   A.   Yes.

03:11:02  1    Q.   And did you -- for that reason --

03:11:07  2    A.   That was for Jesse; is that correct?

03:11:09  3    Q.   Yes.  All right.  You did take Jesse to the station,

03:11:12  4    right?

03:11:13  5    A.   What specific date?

03:11:14  6    Q.   How about the time he was talking about in court.  He

03:11:17  7    says you came to his house, dragged him to the station.  Did

03:11:20  8    that happen?

03:11:21  9    A.   No.  If I remember correctly, he drove.  And the reason

03:11:24  10   why I say that is he stated that we tried to use him as a

03:11:29  11   confidential informant, and he actually drove his truck, his

03:11:33  12   own truck, to Cleo Brown's, if I remember correctly.  I think

03:11:37  13   so.

03:11:37  14   Q.   And we would know if we had a report, right?

03:11:40  15   A.   That's true.

03:11:41  16   Q.   So you -- he says that he became a confidential informant

03:11:45  17   later.  Is that consistent with your memory?

03:11:47  18   A.   Define later.

03:11:51  19   Q.   Well, the first encounter he claims he had with this case

03:11:53  20   is you dragging him out of his house, bringing him down to

03:11:56  21   questioning.  Do you deny that?

03:11:57  22   A.   I deny dragging him out of the house.

03:12:02  23   Q.   How many times would you say you interviewed Mr. Lawson?

03:12:08  24   A.   I can't even begin to tell you an accurate number of time

03:12:13  25   I talked to Jesse Lawson in regards to this investigation.

*J. YORK - Direct Examination*                                      77

03:12:14   1   Q.   You probably should have had notes of that, right?

03:12:16   2   A.   Again, that's on me.  Absolutely, I should have had

03:12:20   3   notes, but, again, when we -- this first happened, like, we

03:12:25   4   would have family meetings, and Jesse's part of the family.

03:12:29   5   And we would meet, and at the time -- and I still -- I would

03:12:33   6   even do this today.  I wouldn't document, you know, if we had

03:12:37   7   a family meeting and there was nothing, you know, discussed

03:12:46   8   so...

03:12:47   9   Q.   All right.  Did you accuse Lawson of being a murderer?

03:12:51   10   A.   That could have came out of my mouth.  I don't remember

03:12:54   11   those specific words.

03:12:55   12   Q.   All right.  Did you give Jesse the impression that you,

03:12:57   13   the police, thought he was the murderer and, unless he gave

03:13:00   14   you something, he was going down for it?  Did you give him

03:13:03   15   that impression?

03:13:04   16   A.   I can't stipulate what Jesse thought or not.

03:13:08   17   Q.   Was it your intention to say to Jesse, Jesse, you failed

03:13:12   18   that polygraph, you're going to go down for this murder unless

03:13:15   19   you give me something?  Was that your intention?

03:13:18   20   A.   If I said anything, it would be -- if anybody -- and this

03:13:24   21   is anybody -- if they know something about a murder and not

03:13:27   22   telling us, absolutely, they could potentially be charged.

03:13:30   23   Q.   All right.  Because you agree with me there's a couple

03:13:34   24   ways you could do it.  You could say, Jesse, let's have a

03:13:36   25   conversation.  Do you know anything about it?  And he told

*J. YORK - Direct Examination*                                          78

| | | |
|---|---|---|
| 03:13:38 | 1 | you -- he told you he didn't know anything about it, right? |
| 03:13:41 | 2 | A.   At which specific time? |
| 03:13:43 | 3 | Q.   How about the first 100 times you asked him? |
| 03:13:45 | 4 | A.   I don't remember as far as that. |
| 03:13:48 | 5 | Q.   Do you appreciate the danger, though, if you tell someone |
| 03:13:52 | 6 | they're going to go down for murder unless you give me |
| 03:13:55 | 7 | something and you won't accept no for an answer, you might end |
| 03:13:59 | 8 | up getting bad information? |
| 03:14:01 | 9 | A.   Again, if somebody has knowledge about a murderer, then |
| 03:14:04 | 10 | absolutely, they would get in trouble, but if nobody |
| 03:14:08 | 11 | participated or had knowledge, no. |
| 03:14:12 | 12 | Q.   All right.  Jesse described this about Cleo Brown and |
| 03:14:14 | 13 | wearing a wire.  There's no reports about that, correct? |
| 03:14:21 | 14 | A.   Actually, I'm not trying to be smart.  I think you just |
| 03:14:23 | 15 | read it. |
| 03:14:24 | 16 | Q.   About wearing a wire? |
| 03:14:26 | 17 | A.   No.  About Cleo Brown. |
| | 18 | Q.   Yeah. |
| 03:14:27 | 19 | A.   I'm sorry.  I'm sorry. |
| 03:14:27 | 20 | Q.   How about the part where you sent your guy in there |
| 03:14:31 | 21 | wearing a wire and he didn't confirm what you hoped?  That you |
| 03:14:34 | 22 | didn't write down, right? |
| 03:14:36 | 23 | A.   That initial day I don't -- probably not because he |
| 03:14:40 | 24 | didn't talk to her. |
| 03:14:41 | 25 | Now -- and I can't remember later.  There could have been |

03:14:47   1   another time -- and I think -- I'm sure there was.  We sent

03:14:49   2   him back, and I can't remember that's documented or not.

03:14:52   3   Q.   The reason you can't remember is because you haven't seen

03:14:56   4   any reports on that, right?

03:14:57   5   A.   That's correct.

03:14:59   6   Q.   All right.  Did Jesse -- he sort of pointed his finger

03:15:02   7   over at Simpson, right?

03:15:03   8   A.   His entire -- I mean, he was one of them in his family,

03:15:12   9   yes.

03:15:12  10   Q.   And he never gave you any information that Amanda or

03:15:15  11   Jonathan were involved, correct?

03:15:18  12   A.   Who?

03:15:18  13   Q.   Jesse Lawson.

03:15:21  14   A.   Gave me information that Amanda?

03:15:24  15   Q.   Right.

03:15:25  16   A.   I want to elaborate and say that he gave us information

03:15:29  17   that Amanda possibly could be.

03:15:32  18   Q.   Because she stole the toy truck?  Is that what you mean,

          19   sir?

03:15:39  20   A.   No, not the toy truck, the real truck.

03:15:41  21   Q.   So you're saying that Jesse said she stole a truck?

03:15:44  22   A.   Uh-huh, yeah, that's the way I understood it.

03:15:46  23   Q.   Is that in a report?

03:15:47  24   A.   It's in the polygraph.

03:15:48  25   Q.   All right.  And if I'm understanding correctly, you'll

*J. YORK - Direct Examination*                                    80

03:15:50  1   show me during the break, if you could -- if you could find

03:15:53  2   that.  I don't want to take the jury's time, but if I'm wrong,

03:15:56  3   you'll show me.  Okay?  Can I ask you to --

03:15:57  4         MR. MILLER:  Object.

03:15:59  5         THE COURT:  We'll deal with that off the record.

          6   Thank you.

03:16:01  7         MR. LOEVY:  All right.

03:16:01  8   BY MR. LOEVY:

03:16:02  9   Q.   You did go to talk to Mike Simpson, correct?

03:16:08  10  A.   Yes, I have talked to Mike Simpson.

03:16:09  11  Q.   All right.  And Mike Simpson was a suspect, right?

03:16:12  12  A.   Yes.

03:16:13  13  Q.   Why was Mike Simpson a suspect?

03:16:16  14  A.   Through the course of the investigation, we discovered

03:16:21  15  that there was a trip to Florida that you've all heard about,

03:16:27  16  that December the 19th, and, like I said, I'm just -- I'm not

03:16:31  17  giving the chronological order.  But, for example, Mike

03:16:35  18  Simpson was like broke on like the 19th, but the next day, he

03:16:43  19  came up with the money and went to Florida and throughout the

03:16:48  20  course of the investigation, we felt like that he,

03:16:52  21  potentially, could have been involved in that way, and as

03:16:56  22  well, another thing, because I want to make sure I tell you

03:16:58  23  everything I know, is, like, when we did the vehicle

03:17:04  24  description from -- or Michael Crump, I think during a family

03:17:10  25  meeting, if I'm remember correctly, one of the granddaughters

03:17:15   1   said that that sounds like Mike Simpson.

03:17:21   2       Did I answer your question?

03:17:22   3   Q.   Yeah, but I want to go back to the last part because

03:17:25   4   that's new to me.  One of the granddaughters said it sounds

03:17:30   5   like Mike Simpson?  Who is that?

03:17:30   6   A.   Oh, I thought we were talking about -- I'm sorry.  I

03:17:32   7   thought we were talking about Mike Simpson.

03:17:33   8   Q.   We are talking about Mike Simpson, but what are you

03:17:36   9   talking about?

03:17:36   10   A.   I'm talking about, during one of the family meetings, if

03:17:38   11   I remember correctly, one of the granddaughters said, That

03:17:43   12   sounds like Mike Simpson, as far as, you know, Mr. Crump.

03:17:46   13   Q.   All right.  Mike Simpson was a drug dealer, right?

03:17:50   14   A.   Yes.

03:17:50   15   Q.   He had a lengthy criminal record?

03:17:52   16   A.   Yes.

03:17:53   17   Q.   And he did rent a blue car on the day of the murder,

            18   right?

03:18:01   19   A.   I think, in the opening, the way I understood it, he said

03:18:04   20   a blue Cavalier.  I'm under the understanding that it was a

03:18:08   21   Volkswagen bug, and I think -- my memory, it's silver or light

03:18:13   22   green.

03:18:13   23   Q.   All right.  Do we have a picture of Simpson's car?

03:18:18   24       While we are looking for that -- hold off on that for a

03:18:21   25   second.  Okay?

J. YORK - Direct Examination                                   82

03:18:22   1        Was Crump sure what kind of car it was?

03:18:24   2   A.   He -- if I remember, it was somewhere along the lines of

03:18:29   3   like a Cavalier or Pontiac Sunfire, along those lines.

03:18:33   4   Q.   All right.  So he wasn't claiming to be exactly positive

03:18:35   5   of what color.  It could have been something like that color?

03:18:38   6   Is that your memory, or was he certain?

03:18:39   7   A.   My memory, as far as he wasn't clear on the make and

03:18:45   8   model, but I thought it was -- he was sure on the blue.

03:18:49   9   Q.   All right.  And he did go to Florida on the day of the

03:18:51  10   murder, right?

03:18:53  11   A.   Yes.

03:18:53  12   Q.   And he went with Allen Helton?

03:18:55  13   A.   Yes.

03:18:56  14   Q.   And he was broke the day before and was telling somebody

03:19:00  15   he'd come into the money the next day, and sure enough he did?

03:19:03  16   A.   That is an accurate statement, yes.

03:19:05  17   Q.   All right.  As a homicide detective, you said to

03:19:08  18   yourself, wow, that's pretty powerful information, right?

03:19:12  19   A.   I can't articulate the words, but, yes, that was, you

03:19:16  20   know, something that needed to be looked at.  I can't say I

03:19:20  21   said, Oh, that's powerful.

03:19:21  22   Q.   And the purpose of the trip was to buy his pills, and

03:19:24  23   that's what he did?

03:19:25  24   A.   Yes.

03:19:26  25   Q.   And then you actually sent subpoenas to prove that he was

| | | |
|---|---|---|
| 03:19:29 | 1 | broke for his utility bills, didn't you? |
| 03:19:32 | 2 | A.   I don't remember subpoenas to determine that he was |
| 03:19:38 | 3 | broke.  Can you explain that? |
| 03:19:40 | 4 | Q.   Or maybe -- did you send subpoenas to his utility bills |
| 03:19:42 | 5 | to see if he paid them when he got back, or why did you send |
| 03:19:47 | 6 | subpoenas? |
| 03:19:47 | 7 | A.   During the course, yes.  I mean, I wanted -- well, I |
| 03:19:50 | 8 | don't want to jump ahead of you.  But it was determined that |
| 03:19:54 | 9 | Mike Simpson was involved, possibly. |
| 03:20:14 | 10 | Q.   All right.  Did Crump -- well, let me show you this. |
| 03:20:14 | 11 | This is Plaintiffs' Exhibit 27, and I'd ask you to identify |
| 03:20:18 | 12 | it.  You need to see more of it? |
| 03:20:20 | 13 | A.   Just which part do you want me to look at, sir? |
| 03:20:22 | 14 | Q.   Well, I just want you to see if you can identify what |
| 03:20:25 | 15 | this is so I can move to admit it. |
| 03:20:26 | 16 | MR. MILLER:  I will object to that exhibit after he |
| 03:20:28 | 17 | looks at it. |
| 03:20:29 | 18 | THE WITNESS:  Okay.  I got confused because you all |
| 03:20:32 | 19 | were arguing.  You asked me a question.  What's the question? |
| 03:20:36 | 20 | BY MR. LOEVY: |
| 03:20:36 | 21 | Q.   You know what this is, right? |
| 03:20:37 | 22 | A.   I know what it says. |
| 03:20:38 | 23 | Q.   Tell us what it is. |
| 03:20:39 | 24 | A.   It says Affidavit For Search Warrant. |
| 03:20:42 | 25 | Q.   Obtained by who? |

*J. YORK - Direct Examination*                                        84

03:20:43  1    A.   Myself.

03:20:45  2    Q.   And why did you obtain this search warrant?

03:20:48  3    A.   Could you hold it back up?

          4    Q.   Sure.

03:20:51  5    A.   I'm trying to read it.  Can you scroll up some more?

03:20:58  6    Q.   This way or this way?

03:21:00  7    A.   That -- keep going.  Hold it right there, please.

03:21:02  8    Q.   Sure.

03:21:08  9         MR. LOEVY:  Your Honor, we are going to move to admit

03:21:10 10    this evidence.

03:21:11 11         THE WITNESS:  Okay.  Can you go to the next page,

03:21:13 12    please?

         13    BY MR. LOEVY:

03:21:16 14    Q.   Sure.  These are my markings.

03:21:29 15    A.   Yes, I'm reading that, and I'm going to tell you,

03:21:33 16    obviously, that's a poor choice of words that I used.

03:21:34 17         THE COURT:  Hang on.  He's just asking about the

03:21:37 18    document.

03:21:37 19         MR. MILLER:  I'm going to object to the document,

03:21:40 20    Your Honor, before we get much further.

03:21:49 21         (Sidebar conference.)

03:21:49 22         THE COURT:  Can you hear, Mr. Loevy?

03:21:50 23         MR. LOEVY:  Yes.

03:21:51 24         THE COURT:  What's the objection?

03:21:53 25         MR. MILLER:  Your Honor, in similar fashion but not

03:21:55  1    under the same category is Rehberg versus Paulk, but there's

03:22:01  2    also an immunity case that says applications for arrest

03:22:06  3    warrants and/or search warrants, information placed inside

03:22:11  4    those or sworn statements, or similar to that effect, and also

03:22:13  5    carry with them the immunity that the others do.  I don't know

03:22:16  6    the exact case on point off the top of my head.

03:22:19  7             MR. LOEVY:  This is part of the investigative file.

03:22:22  8    I think I can shorten --

03:22:24  9             MR. MILLER:  It is not --

03:22:33  10            MR. SLOSAR:  Your Honor, he did four of these, which

03:22:37  11   are part of Plaintiff's 1.  If you go to 85, page 85, and it's

03:22:43  12   my understanding --

03:22:44  13            THE COURT:  Is it within Exhibit 1?

03:22:46  14            MR. MILLER:  Yes, Your Honor.

03:22:47  15            THE COURT:  Then it's in evidence.  Exhibit 1, all of

03:22:50  16   it is in evidence.

03:22:51  17            MR. MILLER:  All right.

03:22:52  18            THE COURT:  So if you find a case and you want to

03:22:55  19   make some kind of argument about it, I'll give it

03:22:59  20   consideration, but --

03:23:01  21            MR. LOEVY:  I lost the audio.

03:23:03  22            THE COURT:  I said if -- how about now?  Okay.  I

03:23:10  23   said, if you have a case and you want to cite it to me, I'll

03:23:13  24   be glad to look at it, but it's already in evidence.  The

03:23:17  25   horse is out of barn on that.  So if it's in evidence, it can

*J. YORK - Direct Examination*                                    86

03:23:21  1  be published.

 2          MR. MILLER:  Thank you, Your Honor.

 3       (Sidebar conference concluded.)

03:23:24  4          MR. LOEVY:  Your Honor, we move this exhibit in

03:23:27  5  evidence.

03:23:27  6          THE COURT:  It's in evidence, so it can be published.

03:23:29  7          MR. LOEVY:  We'd like to publish it.

 8  BY MR. LOEVY:

03:23:30  9  Q.  All right.  This is an affidavit for a search warrant

03:23:32 10  created by you, correct?

03:23:33 11  A.  Yes.

03:23:33 12  Q.  You were seeking phone records, it looks like?

03:23:35 13  A.  Yes.

03:23:37 14  Q.  And you submitted an affidavit in conjunction with it,

 15  correct?

03:23:44 16  A.  Yes.  This is what we're looking at, right?

03:23:47 17  Q.  February the 4th --

03:23:49 18          THE COURT:  Hang on.  Hang on.  Are you asking or

03:23:52 19  testifying that this is what you're looking at?  It didn't

03:23:54 20  sound like a question.

03:23:55 21          THE WITNESS:  Yeah, I asked him if this is the second

03:23:57 22  part, is this what you are saying is the affidavit?

03:23:59 23  BY MR. LOEVY:

03:24:00 24  Q.  Two pages.

03:24:00 25          THE COURT:  I want him to say what the document is.

*J. YORK - Direct Examination*                                    87

03:24:02  1   So the problem is you can't see the whole page.  So if you can

03:24:06  2   scroll out or zoom out.

03:24:10  3        MR. LOEVY:  Okay.

03:24:14  4        THE WITNESS:  I can't read that.

03:24:16  5        THE COURT:  A little bit too much?

03:24:18  6        THE WITNESS:  It's blurry.  But what's your question

03:24:21  7   again?  I'm sorry.

03:24:22  8   BY MR. LOEVY:

03:24:23  9   Q.   This is the affidavit that you submitted in support of

03:24:25  10  the search warrant?

03:24:26  11  A.   Yes.

03:24:27  12  Q.   All right.  Let's take a look at what you -- by the way,

03:24:32  13  the date is February 4th, about a month and a half after the

03:24:37  14  investigation had started, right?

03:24:38  15  A.   That is correct.

03:24:39  16  Q.   See if we can zoom it down so it can be readable.  Mike

03:24:50  17  Simpson gave this unit number -- I'm sorry -- gave this unit a

03:24:53  18  phone number as contact number for him.  Mr. Simpson has been

03:24:58  19  identified -- again my markings, not anybody else's.

03:25:02  20  Mr. Simpson has been identified by Mr. Crump, TK, being at

03:25:07  21  Katherine Mills' residence in the morning she was robbed and

03:25:10  22  found dead.

03:25:10  23       Also Jesse Lawson and Allen Helton, both, stated to this

03:25:14  24  unit that Mr. Simpson started crying when Jesse told him about

03:25:18  25  Katherine via telephone call Jesse made to him the day after

*J. YORK - Direct Examination*                                      88

03:25:22  1   Katherine was found dead.

03:25:23  2        You wrote that in your affidavit, right?

03:25:26  3   A.   Yes.

03:25:26  4   Q.   And you swore it under oath?

03:25:27  5   A.   Yes.  Can I elaborate?

03:25:31  6        MR. LOEVY:  It's up to Your Honor, but I'm asking

03:25:33  7   questions here.

03:25:34  8        THE COURT:  What's your next question?

03:25:38  9   BY MR. LOEVY:

03:25:39  10  Q.   Can you elaborate?

03:25:43  11  A.   Honestly, the part "Mr. Simpson has been identified by

03:25:51  12  Michael Crump," that supports poor choice words.  That's on

03:25:55  13  me.  It should have been described somebody who looked like

03:25:58  14  that.  That's a mistake.

03:25:59  15  Q.   All right.  You understood it was a mistake that has

03:26:01  16  significant consequences, right?

03:26:05  17  A.   Obviously with you, yes, but at the time that was an

03:26:11  18  honest mistake.

03:26:14  19  Q.   Because Simpson had not been identified by Crump?

03:26:17  20  A.   No.  And I've stated throughout this entire case that

03:26:22  21  Mr. Crump never did positively ID somebody as for sure.

03:26:44  22  Q.   You did hear that Mr. Simpson got this phone call on the

03:26:48  23  way back to Florida, right?

03:26:49  24  A.   Yes, the one that we're -- referring to the one where

03:26:54  25  Jesse and Allen said he started crying; is that correct?

03:26:58   1    Q.   Yeah, and that's an unusual reaction, right?

03:27:01   2    A.   Yes.

03:27:01   3    Q.   So you decided to go talk to him?

03:27:04   4    A.   Yes.

03:27:06   5    Q.   And you caught up with him on December 24th, the day he

03:27:09   6    got back from Florida?

03:27:10   7    A.   I believe that was the date, yes, uh-huh.

03:27:15   8    Q.   And did you see the car, the -- the VW?

03:27:19   9    A.   Yes.

03:27:20   10   Q.   And did you photograph Simpson?

03:27:23   11   A.   If I remember correctly, I did.

03:27:27   12   Q.   All right.  This is Plaintiffs' Exhibit 2.  It's pages

03:27:33   13   5 -- actually maybe the -- (unintelligible) maybe it -- are

03:27:36   14   you able to pull it up?  Is it hard to document over or --

03:27:43   15              THE COURT:  Hard to what?

03:27:44   16              MR. LOEVY:  Can she do it on her computer?  Thank

03:27:46   17   you.

03:27:48   18   BY MR. LOEVY:

03:27:49   19   Q.   That's page 5, page 6, page 7, and page 8.  All right.

03:27:56   20   Can you identify those?

03:27:57   21   A.   That's Michael Simpson.

03:28:01   22              MR. LOEVY:  Okay.  We move to admit those, Your

           23   Honor.

03:28:04   24              THE COURT:  Any objection?

03:28:04   25              MR. MILLER:  They're already admitted.

03:28:06  1      THE COURT:  Hang on.  They're within 1?  Okay.  But

03:28:08  2  you're moving to admit them as Exhibit 2?

03:28:13  3      MR. LOEVY:  Yes.

03:28:13  4      THE COURT:  Okay.  They are admitted.

03:28:13  5    (Plaintiffs' Exhibit No. 2 was received in evidence.)

03:28:13  6  BY MR. LOEVY:

03:28:15  7  Q.  Mr. Simpson cooperated and allowed himself to be

03:28:17  8  photographed?

03:28:17  9  A.  Yes.

03:28:18  10  Q.  And this is what you saw that day?  This is how he

03:28:24  11  appeared?  In other words, this is what Mr. Simpson looked

03:28:27  12  like?

03:28:27  13  A.  Yes.

03:28:29  14      MR. LOEVY:  All right.  Show him the next page, too,

03:28:31  15  and the next page and the next page.

         16  BY MR. LOEVY:

03:28:33  17  Q.  So it looked to you like there was some resemblance to

03:28:38  18  that sketch, right?  That's how you saw it?

03:28:40  19  A.  I think that's a fair statement, that there is possibly

03:28:43  20  some resemblance.

03:28:44  21  Q.  And when you walked up there, Simpson was wearing a

03:28:47  22  hoodie, right?

03:28:49  23  A.  I can't remember if he was wearing a hoodie when we first

03:28:52  24  arrived or not.  He could have been.  I don't remember.

03:28:55  25  Q.  Well, when you first arrived?  I mean are you drawing a

| | |
|---|---|
| 03:28:59 | 1 |

distinction?  Did you see Simpson wearing a hoodie?

03:29:01 | 2 | A.   I thought you asked me when I first arrived, he was

03:29:03 | 3 | wearing a hoodie?

03:29:04 | 4 | Q.   Did he put one on?

03:29:05 | 5 | A.   At some point he could have.  I mean, I just was

03:29:09 | 6 | answering your question.  I thought that's what you asked.

03:29:11 | 7 | Q.   Okay.  Was he's wearing a hoodie?

03:29:13 | 8 | A.   I don't remember if he was wearing a hoodie when we first

03:29:16 | 9 | got there.

03:29:18 | 10 | Q.   All right.  Maybe it's in the photograph.

03:29:23 | 11 |            MR. LOEVY:  Can you show the photograph again?

12 | BY MR. LOEVY:

03:29:27 | 13 | Q.   All right.  This does look like a thing with a hood,

03:29:31 | 14 | right?  Would you agree?  You have it on the screen.

03:29:37 | 15 | A.   What's the question?  I thought you was talking to

03:29:39 | 16 | somebody else.

03:29:40 | 17 | Q.   It looks like he's wearing a thing with a hood, right?

03:29:43 | 18 | A.   I would agree, yes, it's a sweatshirt with a hood on it.

03:29:48 | 19 | Q.   Okay.  That's all I was asking.  It looks like he's

03:29:50 | 20 | holding something there, too, right?

03:29:52 | 21 | A.   Yes.

03:29:54 | 22 | Q.   And was he a suspect?

03:29:55 | 23 | A.   Yes, he was.

03:29:56 | 24 | Q.   And he did something unusual when you walked up, right?

03:30:01 | 25 | A.   Yes.

| 03:30:02 | 1 | Q.   He handed you a yellow sticky note, right? |
| 03:30:06 | 2 | A.   Yes. |
| 03:30:06 | 3 | Q.   And he told you, This is my alibi? |
| 03:30:09 | 4 | A.   That is correct. |
| 03:30:10 | 5 | Q.   So you hadn't told him why you were there, right? |
| 03:30:13 | 6 | A.   No, I had not. |
| 03:30:15 | 7 | Q.   And he said, you know, this is -- you found that peculiar |
| 03:30:20 | 8 | as a homicide detective, right? |
| 03:30:21 | 9 | A.   Yes. |
| 03:30:22 | 10 | Q.   And you said, Hey, Mike, you know, hey, how about we take |
| 03:30:25 | 11 | a polygraph exam, right? |
| 03:30:26 | 12 | A.   I don't remember if I asked him or not. |
| 03:30:28 | 13 | Q.   All right.  Well, he didn't take one, right? |
| 03:30:31 | 14 | A.   No, he did not. |
| 03:30:32 | 15 | Q.   Did he refuse? |
| 03:30:33 | 16 | A.   I don't remember. |
| 03:30:35 | 17 | Q.   All right.  Do you remember, at your deposition, being |
| 03:30:37 | 18 | asked this question?  This is on page 267, line 14.  And we'll |
| 03:30:48 | 19 | play at lines 14 through 18. |
| 03:30:53 | 20 | (Video clip played in open court.) |
| 03:31:07 | 21 | BY MR. LOEVY: |
| 03:31:08 | 22 | Q.   All right.  Was that truthful, sir? |
| 03:31:10 | 23 | A.   If I said it, yes. |
| 03:31:10 | 24 | Q.   All right.  Isn't it true you were guessing when you said |
| 03:31:13 | 25 | it at the dep and you're guessing now because you didn't write |

*J. YORK - Direct Examination*                                          93

| | | |
|---|---|---|
| 03:31:17 | 1 | any of this down? |
| 03:31:17 | 2 | A.   No, I said I didn't remember, and that's been a few years |
| 03:31:19 | 3 | ago. |
| 03:31:19 | 4 | Q.   So the deposition was in 2018.  You're saying you |
| 03:31:22 | 5 | remembered better then? |
| 03:31:23 | 6 | A.   I said, if I said it then, then when I said it, I believe |
| 03:31:27 | 7 | that to be a true and accurate statement and that right now I |
| 03:31:31 | 8 | don't remember. |
| 03:31:31 | 9 | Q.   All right.  Don't you think you should have written it |
| 03:31:33 | 10 | down, that this suspect, you asked him, Hey, will you take a |
| 03:31:36 | 11 | polygraph, and he said no? |
| 03:31:37 | 12 | A.   Absolutely, that should have been written down. |
| 03:31:41 | 13 | Q.   And you went to speak to Simpson's alibi witness, right? |
| 03:31:47 | 14 | One of -- multiple ones? |
| 03:31:49 | 15 | A.   Can you be specific? |
| 03:31:51 | 16 | Q.   How about Vernon Bennett?  Did you speak to Vernon |
| 03:31:55 | 17 | Bennett? |
| 03:31:55 | 18 | A.   Yes. |
| 03:31:56 | 19 | Q.   And Vernon Bennett didn't back Mike Simpson's alibi for |
| 03:32:01 | 20 | that murder, did he? |
| 03:32:02 | 21 | A.   Not that I remember, no. |
| 03:32:04 | 22 | Q.   And but "not that you remember" means you talked to |
| 03:32:06 | 23 | Vernon Bennett and he was inconsistent with Simpson on the |
| 03:32:10 | 24 | alibi, right? |
| 03:32:11 | 25 | A.   If I remember correctly, yes. |

03:32:13   1    Q.   All right.  Why didn't you create a police report on

03:32:16   2    that, that Mike Simpson gave you an alibi witness and the guy

03:32:19   3    didn't back Simpson?  Wouldn't that have been meriting writing

03:32:23   4    down?

03:32:23   5    A.   Yes, that should have been written down, absolutely.  But

03:32:26   6    this was an ongoing investigation.

03:32:28   7    Q.   All right.  But when someone's charged with a crime, they

03:32:31   8    have a right to know that a key suspect gave you an alibi that

03:32:35   9    didn't check out?  Would you agree they had a right to that?

03:32:38   10   A.   Yes.

03:32:40   11   Q.   And you understood, at the time that you did this, that

03:32:42   12   they -- that you should have written it down?

03:32:45   13   A.   Say that again, please.

03:32:47   14   Q.   At the time you were doing this investigation, you did

03:32:51   15   understand that you were obligated to write it down?

03:32:54   16            MR. MILLER:  Object.

03:32:57   17            THE COURT:  What's the objection?

03:32:59   18            MR. MILLER:  Just the -- there's been no foundation

03:33:02   19   for that he was obligated to write it down, and the way he

03:33:06   20   said it was that he had already confirmed that it was

03:33:08   21   obligated.

03:33:10   22        If he wants to ask him, Is it obligated, I think that's a

03:33:14   23   fair question.

03:33:15   24            THE COURT:  Overruled.

03:33:15   25            THE WITNESS:  Ask your question again.

03:33:17   1   BY MR. LOEVY:

03:33:17   2   Q.   You understood that, as a law enforcement officer working

03:33:20   3   on murder cases, you were obligated to write down potentially

03:33:26   4   exculpatory information?  Exculpatory, meaning could help

03:33:31   5   someone prove their innocence, correct?

03:33:34   6   A.   Yes.  Exculpatory, yes.

03:33:36   7   Q.   All right.  And the fact that your lead suspect refuses

03:33:36   8   to take a polygraph, that's something that people accused had

03:33:42   9   a right to know, right?

03:33:43   10  A.   My understanding, with regards to the polygraph, that

03:33:46   11  they were not admissible in court as far as the polygraph

03:33:49   12  goes.

03:33:49   13  Q.   All right.  Was there probable cause to arrest Mike

03:33:52   14  Simpson for this murder?

03:33:55   15  A.   No.

03:33:55   16  Q.   Probable cause, very high burden, would you agree?

03:33:58   17  A.   I understand probable cause is a reasonable belief that

03:34:03   18  something occurred.

03:34:04   19  Q.   All right.  We've talked about a lot of reasons to

03:34:06   20  reasonably believe that Mike Simpson --

03:34:07   21       THE COURT:  Let me say, Mr. Loevy, the Court's going

03:34:10   22  to instruct the jury on the meaning of probable cause, and the

03:34:12   23  parties may talk about it from time to time, they may

03:34:15   24  characterize it, but I'm going to tell you what the law is on

03:34:18   25  it when it's time for you to make the decision in this case.

03:34:21   1        Go ahead, Mr. Loevy.

03:34:23   2   BY MR. LOEVY:

03:34:23   3   Q.   All right.  Whatever probable cause is, what you knew

03:34:25   4   about Mr. Simpson didn't clear that hurdle?

03:34:29   5   A.   I did not believe so.

03:34:32   6   Q.   All right.  Now this interview that you've talked about

03:34:35   7   in his home, that's a pretty important interview in a case,

03:34:40   8   wouldn't you agree?

03:34:41   9   A.   If I remember, there was no interview except for him

03:34:47  10   handing me the alibi note, saying, I don't know nothing.

03:34:52  11   Q.   Okay.  When you say, "If I remember," the problem is

03:34:56  12   there's no document we can look at that documents what you

03:34:59  13   talked about with Simpson, right?

03:35:01  14   A.   That's correct.

03:35:02  15   Q.   So you are saying 12 years later, I got no document, so I

03:35:08  16   don't remember talking about anything.  That's really what you

03:35:10  17   are saying, right?

03:35:13  18   A.   I don't remember him saying anything that -- in

03:35:19  19   regards -- that was relevant.  He just said he didn't know

03:35:24  20   what we were talking about.  He didn't -- you know, gave us

03:35:27  21   the alibi note.

03:35:28  22   Q.   That's your best guess at what happened, right?

03:35:31  23   A.   Yes.

03:35:32  24   Q.   Now, there should have been a sup report saying we spoke

03:35:35  25   to Mike Simpson on this day; we photographed him; he gave us a

03:35:38   1   sticky; you know, we asked him if he would take a polygraph;

03:35:42   2   he said no; we asked him where that -- all that should have

03:35:43   3   been written into a report, right?

03:35:45   4   A.   I have answered that and said yes.

03:35:46   5   Q.   All right.  Is it possible that that report once existed

03:35:49   6   and has gotten lost?

03:35:51   7   A.   No, I don't never remember doing that.

03:35:58   8   Q.   Did he deny killing Ms. Mills?

03:36:06   9   A.   The way I remember he didn't -- said he didn't know

03:36:08   10  nothing about it.

03:36:09   11  Q.   Is that a guess, or do you remember him saying he didn't

03:36:13   12  know anything about it?

03:36:15   13  A.   I don't remember he said them exact words, but he said he

03:36:19   14  didn't have nothing to do with it.

03:36:21   15  Q.   So it sounds like you did talk to him about the murder.

03:36:24   16       What's else did he say?

03:36:24   17  A.   No.  Again, when he handed me the alibi.  We didn't sit

03:36:28   18  down and have, you know, an interview statement like you've

03:36:32   19  seen here before.  He handed me the alibi note and said, I

03:36:35   20  don't know what you're talking about or didn't have nothing to

03:36:37   21  do with it.

03:36:38   22  Q.   All right --

03:36:39   23  A.   And that's, you know, again, like he said, suspicious,

03:36:42   24  but we didn't have a conversation or anything like that.

03:36:45   25  Q.   All right.  But he wanted to talk about his alibi, right?

*J. YORK - Direct Examination*                                        98

03:36:49   1    He wanted tell you, here's my alibi.  What was that all about?

03:36:51   2    A.   He didn't want to talk about it.  He handed it to me.

03:36:54   3    That's what was on the note.

03:36:56   4    Q.   All right.  Let's take a look at that note.  That is

03:36:58   5    Exhibit No -- do you have the exhibit number?  Here it is.

03:37:07   6    It's Plaintiffs' Exhibit 51, the second page.  You can see

03:37:12   7    this up only on your screen because it's already up.  That was

03:37:17   8    it.  Can you identify this, sir?

03:37:27   9    A.   It says 10-10 -- yes.  I know what it is.

03:37:30   10   Q.   All right.  Why did it -- can you identify it so we can

03:37:34   11   admit it?

03:37:35   12   A.   It says 10-10-1058.  It's got Lisa Evans' name at the top

03:37:40   13   of it and appears to be a, you know, copy -- a Xerox copy of

03:37:45   14   the alibi note that he gave me.

          15   Q.   All right.

03:37:48   16        MR. LOEVY:  We move to admit this into evidence, Your

          17   Honor.

03:37:51   18        THE COURT:  Any objection?

03:37:53   19        MR. WRIGHT:  None, Your Honor.

03:37:54   20        THE COURT:  All right.  That's admitted.  It will be

03:37:59   21   displayed.

03:37:59   22        (Plaintiffs' Exhibit No. 51 was received in evidence.)

03:37:59   23   BY MR. LOEVY:

03:38:00   24   Q.   All right.  So if he was giving you this alibi note, it's

03:38:04   25   pretty hard to read, but there are names on it, right?

*J. YORK - Direct Examination*                                      99

03:38:06   1    A.   Yes.

03:38:06   2    Q.   And you can't see it, but it's a yellow sticky that's

03:38:11   3    been photocopied away, right?

03:38:14   4    A.   Excuse me?

03:38:14   5    Q.   This looks like a white page, but would it be fair to say

03:38:17   6    that where the names are, that used to be a yellow Post-It

03:38:20   7    Note, little square?

03:38:21   8    A.   Yes.

03:38:21   9    Q.   All right.  So when he handed you this note -- thank

03:38:24   10   you -- did he explain to you why this was his alibi?

03:38:27   11   A.   He said somebody had told him, when he was gone, that we

03:38:32   12   were looking at him in connection with Katherine Mills's

03:38:37   13   murder.

03:38:37   14   Q.   So you did have a conversation with him?

03:38:40   15   A.   Again, it wasn't -- I wasn't asking a series of

03:38:49   16   questions.  He volunteered and told me all this.

03:38:52   17   Q.   Showing you Plaintiffs' Exhibit 6 and 3, these are Bates

03:38:58   18   No. 273 and 268.

03:39:00   19        MR. LOEVY:  This is part of the investigative file,

03:39:03   20   Your Honor, on the document camera.

           21   BY MR. LOEVY:

03:39:05   22   Q.   I'm going to show you two interviews that you

03:39:07   23   memorialized with Amanda Hoskins.  When you knew -- wanted to

03:39:11   24   write a police report, you knew how to write a police report,

03:39:15   25   right?

03:39:15  1        MR. LOEVY:  And if we could publish these?  Are they

03:39:18  2   published?

03:39:18  3        THE COURT:  If they're part of 1, they are admitted

03:39:21  4   and so can be published.

03:39:23  5   BY MR. LOEVY:

03:39:24  6   Q.   Showing you to a second report.  This is Plaintiffs'

03:39:26  7   Exhibit 3.  Same interview.  You wrote two police reports.

03:39:30  8   Multiple pages each, right?

03:39:32  9   A.   Yes.

03:39:32  10  Q.   So, when you had a suspect, it was your protocol to write

03:39:36  11  down what they told you, correct?

03:39:40  12  A.   Yes, that is correct.

03:39:41  13  Q.   And isn't it true you did have a Mike Simpson police

03:39:44  14  report?  When you decided you were going to go after these

03:39:48  15  two, that police report disappeared?

03:39:50  16  A.   That is not true whatsoever.

03:39:52  17  Q.   You made a police report of Mike Mills's girlfriend; you

03:39:57  18  made a police report of the Walgreen's manager for Amanda's

03:40:03  19  prescriptions, didn't you?

03:40:03  20  A.   Yes.

03:40:05  21  Q.   You made a -- you made a police report checking if Amanda

03:40:09  22  picked up her prescriptions that day, but you didn't make a

03:40:11  23  police report of your interview of Allen Helton or Mike

03:40:15  24  Simpson?

03:40:15  25  A.   You have said two names there.  Can you -- let's go back.

03:40:21  1  You want to ask me about Mike Simpson, or are you trying to

03:40:24  2  put both of them in there?

03:40:26  3  Q.  Well, let's just talk about the Walgreen's one, for

03:40:28  4  example.  Once you decided that you were going to try to

03:40:31  5  prosecute Amanda for this, you went and saw if she did pick up

03:40:34  6  her prescription that day, and you checked with Walgreen's,

03:40:37  7  and then you made a police report, right?

03:40:40  8  A.  That is correct.

03:40:42  9  Q.  All right.  Let's --

03:40:42  10       MR. LOEVY:  When are we going until the next break,

        11  Your Honor?

03:40:45  12       THE COURT:  We're about there.

03:40:46  13       MR. LOEVY:  This would be an okay place to stop.

03:40:48  14       THE COURT:  Okay.  All right.  We'll take about 15

03:40:50  15  minutes at this point.

03:40:52  16     The jury will be under the same admonition -- admonitions

03:40:56  17  they've been under.  And so I'll excuse the jury now for 15

03:40:59  18  minutes.

03:41:00  19       THE BAILIFF:  All rise for the jury.

03:41:27  20     (Jury exits.)

03:41:27  21       THE COURT:  Thank you.  Step down, sir.  All right,

03:41:29  22  the jury has exited.  Everybody can be seated.

03:41:33  23     All right.  We'll break until about five till.  Anything

03:41:40  24  to take up, Mr. Loevy?

03:41:41  25       MR. LOEVY:  Not from the plaintiff.

03:41:43   1        MR. MILLER:  None, Your Honor.

03:41:44   2        THE COURT:  Okay.  We'll be in break until then.

03:41:46   3   Thank you.

03:55:47   4        THE BAILIFF:  All rise.

           5     (Recess taken from 3:41 P.M. until 3:55 P.M.; jury

03:55:47   6   present.)

03:55:47   7        THE COURT:  Thank you.  We are back on the record

03:55:49   8   with all parties and counsel present.  Mr. York's on the

03:55:56   9   witness stand, still under oath.  The jury's returned.

03:56:00  10     We're going to knock off at 5:00 today partly because you

03:56:03  11   guys have put in a couple of long, hard days.  I appreciate

03:56:06  12   that.  So I want to break a little bit early.  And I think

03:56:09  13   we've got some Jaguar fans in the building who are probably

03:56:14  14   headed to Lexington for a big game tonight so I want to make

03:56:18  15   sure those folks can get out on the road and make it to that

03:56:21  16   event.  So we'll quit at 5:00 today.  Be advised.  All right,

03:56:25  17   Mr. Loevy.

03:56:26  18        MR. LOEVY:  Thank you, Your Honor.

03:56:28  19   BY MR. LOEVY:

03:56:29  20   Q.  I wanted to return to the things we talked about,

03:56:31  21   threatening with charges.

03:56:33  22     We should add Jesse Lawson to this list, based on your

03:56:36  23   testimony, right?

03:56:37  24     You did tell Jesse you thought he did it and that he was

03:56:42  25   in trouble unless he cooperated, right?

03:56:44  1  A.   I'm not going to agree with those exact words, but he

03:56:48  2  probably was threatened to be charged if he had any

03:56:52  3  involvement in the case.

03:56:54  4  Q.   All right.  No, let's talk about Allen Helton.  When did

03:56:59  5  you first cross paths with Allen Helton in the investigation?

03:57:02  6  A.   It was at the very beginning of it, when we found out

03:57:09  7  about Mike Simpson and Allen going to Florida.

03:57:13  8  Q.   All right.  And he was a suspect.  Tell the jury why

03:57:17  9  Allen Helton was a -- well, was he a suspect or a witness?

03:57:20  10  A.   At first I think it would be a fair and accurate

03:57:26  11  statement that he was a suspect at the first.

03:57:28  12  Q.   Tell the jury why Allen Helton was a suspect in this

03:57:32  13  murder.

03:57:32  14  A.   Well, I think, number one, he was, you know, with Mike

03:57:40  15  Simpson.  We knew that he had a criminal history, and I

03:57:45  16  believe, at some point -- I don't remember exactly when --

03:57:49  17  that somebody said that they might have seen him in the yard

03:57:55  18  or something to the effect.

03:57:58  19  Q.   Helton or Simpson?

03:58:00  20  A.   I think it was Helton.

03:58:04  21  Q.   Okay.  Who said they saw Helton in the yard at the

03:58:08  22  victim's home?

03:58:09  23  A.   I think that was who we was talking about earlier, Cleo

03:58:13  24  Brown.

03:58:13  25  Q.   But I think his testimony was, if I understood it,

03:58:15  1    Lawson.  You wanted Lawson to wear a wire to try to catch

03:58:19  2    somebody saying that Helton was in the yard?

03:58:23  3    A.  I'm understanding, at some point, that -- that we're

03:58:27  4    talking about the same incident.

03:58:28  5    Q.  All right.  Did you threaten to charge Helton with the

03:58:32  6    murder of Katherine Mills?

03:58:33  7    A.  Again, the words probably come out of my mouth if -- you

03:58:38  8    know, if he had anything to do with it and was responsible for

03:58:41  9    it.

03:58:43  10   Q.  All right.  What's the first date you interviewed him?

03:58:45  11   We don't know that date, do we?

03:58:51  12   A.  No.

03:58:51  13   Q.  We should.

03:58:52  14   A.  I don't remember the date.

03:58:53  15   Q.  And we should know it because you should have written it

03:58:55  16   down, right?

03:58:57  17   A.  Yes.

03:59:00  18   Q.  All right.  Mr. Helton.  You were in court when he

03:59:02  19   described you pulled him over for a traffic stop.  Did you

03:59:06  20   pull him over for a traffic stop?

03:59:08  21   A.  Are you referring to the January --

03:59:11  22   Q.  January 4th, 2011, did you pull him over?

03:59:13  23   A.  I think Sheriff Pickard initiated the initial stop.  I

03:59:19  24   can't remember.

03:59:19  25   Q.  This was for a seatbelt violation?  The initial stop?

03:59:23   1   A.   I believe that's what was -- that was one of the charges.

03:59:26   2   Q.   And after he got pulled over for the seatbelt, you

03:59:32   3   guys -- and I say that, "you guys" -- you and others charged

03:59:37   4   with him for driving while stoned?

03:59:40   5   A.   That would be a fair and accurate statement.

03:59:42   6   Q.   Now, were you just out there enforcing the seatbelt laws

03:59:46   7   that day, or were you like, let's go get Allen for the

03:59:49   8   investigation?

03:59:49   9   A.   Well, this is at the beginning of the investigation.  I

03:59:52   10  don't know exactly what we were doing.  I wasn't up there

03:59:55   11  writing seatbelt tickets.  But that might have been used to

04:00:01   12  pull him over if Sheriff Pickard recognized him, but we were

04:00:04   13  actively investigating Ms. Mills's --

04:00:10   14  Q.   All right.  So, in other words, you could have done one

04:00:13   15  of two things.  You could have said, Hey, Mr. Helton, we would

04:00:14   16  like you to come down and talk to us, or you could see him

04:00:18   17  driving and pull him over for a seatbelt and charge him with

04:00:20   18  DUI.  You could have done one of those two things, right?

04:00:23   19  A.   No.  I could not have, and I'll explain.  If we pull

04:00:27   20  somebody over for a seatbelt violation and -- they believe to

04:00:35   21  be under the influence, I just can't tell them to drive on

04:00:38   22  with that suspicion of them operating a vehicle under the

04:00:43   23  influence.

04:00:43   24  Q.   You wrote the citation on January 4th, charging him with

04:00:48   25  DUI, right?

04:00:50  1    A.   Yes.

04:00:51  2    Q.   All right.  And then you did bring him down and talk to

04:00:53  3    him, right?

04:00:54  4    A.   Yes.

04:00:59  5    Q.   Now, did you decide you wanted to polygraph Helton before

04:01:03  6    you found out he was DUI or after?

04:01:06  7    A.   I don't -- I don't remember exactly when I decided that.

04:01:11  8    Q.   Well, would it have been before or after you pulled him

04:01:14  9    over?  I mean, did --

04:01:15  10   A.   I thought I answered that.  I don't remember.

04:01:17  11   Q.   All right.  Let's try to narrow it down.  Did you pull

04:01:20  12   him over for DUI because you wanted to polygraph him?

04:01:24  13   A.   No.  No.

04:01:25  14   Q.   Now, it does look like --

04:01:32  15        MR. LOEVY:  And, Your Honor, this is Plaintiffs'

04:01:34  16   Exhibit 183.  This is -- can you identify this, Mr. York, your

04:01:40  17   signature at the bottom?

04:01:42  18   A.   It's the Kentucky -- I'm sorry.

04:01:45  19   Q.   Can you identify this?

04:01:46  20   A.   That's a citation.

04:01:48  21   Q.   This is the citation you wrote to Helton on January the

04:01:54  22   4th that we've been talking about, right?  Signed by you?

04:01:59  23   A.   Yes.

          24   Q.   Okay.

04:02:01  25        MR. LOEVY:  We move to admit this into evidence, Your

*J. YORK - Direct Examination*                                                107

04:02:04   1   Honor.

04:02:04   2          THE COURT:  Any objection?

04:02:05   3          MR. MILLER:  None, Your Honor.

04:02:06   4          THE COURT:  It will be admitted.

04:02:08   5      (Plaintiffs' Exhibit No. 183 was received in evidence.)

04:02:08   6          MR. LOEVY:  And if we could publish it, it does say

04:02:11   7   no seatbelt.

04:02:12   8          THE COURT:  Yes, you may publish it.

04:02:17   9          MR. LOEVY:  Okay.

04:02:19  10   BY MR. LOEVY:

04:02:19  11   Q.  We are reading it here.  You see this here?

04:02:22  12   A.  Which part did you want me to read?

04:02:25  13   Q.  Subject was not wearing a seatbelt.  Subject failed.  Can

04:02:28  14   you read it?  What does it say?

04:02:31  15   A.  I need my glasses.  One leg standing, walk and turn.

04:02:37  16   Subject advised this -- I think it says -- it says, Subject

04:02:47  17   was not wearing a seatbelt; subject failed the one-leg

04:02:51  18   standing, walk, and turn.  Subject advised this unit -- I

04:03:00  19   can't read that word.  Takes pain pills, Roxicet, also Xanax.

04:03:04  20   And other drugs.  Subject also advises unit -- I can't read

04:03:11  21   that.

04:03:12  22   Q.  All right.  That's good enough, if it's okay with you.

04:03:14  23   1-4-2011, right?  January 4th?

04:03:17  24   A.  Yes.

04:03:18  25   Q.  All right.  I'm going to show you what's already in

04:03:20   1   evidence, page 116 of the file.  This is the polygraph report,

04:03:24   2   correct?

04:03:25   3   A.   Yes.

04:03:27   4   Q.   And this actually shows that you made the date of the

04:03:29   5   request the day before you caught him for the seatbelt, right?

04:03:33   6   A.   That's what it says, yes.

04:03:36   7   Q.   All right.  Does that refresh your recollection?  That

04:03:38   8   you decided to polygraph him, then you saw him driving, and

04:03:40   9   you pulled him over and gave him a DUI?

04:03:44   10   A.   Restate the question, please.

04:03:46   11   Q.   Does that refresh your recollection that you decided to

04:03:49   12   polygraph him before the traffic arrest?

04:03:53   13   A.   I would agree that the date of the request is on

04:03:57   14   January the 3rd, the day prior to the DUI stop.

04:04:01   15   Q.   All right.  So you pull him over the DUI mand you bring

04:04:04   16   him into the room, right?

04:04:06   17   A.   Yes.

04:04:09   18   Q.   And you interrogated him with Mr. Mefford?

04:04:13   19   A.   Yes.

04:04:14   20   Q.   And you had him sign, what I think we've seen in court

04:04:16   21   already, a *Miranda* rights waiver?  You had him sign it?

04:04:20   22   A.   I think Detective Mefford was looking the part, but, yes.

04:04:25   23   Q.   All right.  So in other words, he has the right to remain

04:04:28   24   silent, he has the right to an attorney, and he acknowledged

04:04:30   25   that in writing?

04:04:31   1    A.   Yes.

04:04:31   2    Q.   Okay.  And you told him, We need you to help us with the

04:04:36   3    murder, right?

04:04:36   4    A.   Excuse me?

04:04:36   5    Q.   You told him, We need you to help us with this murder,

           6    right?

04:04:40   7    A.   That is possibly what I said at one point.

04:04:43   8    Q.   He said, I'd like to help you, but I don't know who

04:04:46   9    killed her, right?

04:04:47   10   A.   Do what?

04:04:47   11   Q.   He said he didn't know?

04:04:49   12   A.   I'm not going -- I don't remember him saying them exact

04:04:52   13   words.  He could have.  I mean, he told me so much over the

04:04:55   14   course of time, I can't remember exactly when he said what.

04:04:59   15   Q.   All right.  And that "so much," would you have written it

04:05:00   16   in your notes?

04:05:03   17   A.   If -- you're talking about when he was being recorded?

04:05:07   18   Q.   No, I'm talking about what you just said, "He told me so

04:05:11   19   much."  Would you have written it in your notes?

04:05:14   20   A.   Possibly.

04:05:15   21   Q.   Okay.  What happened to those notes?

04:05:18   22   A.   I don't remember.

04:05:21   23   Q.   When did they stop existing?

04:05:23   24   A.   I don't remember.

04:05:25   25   Q.   Was it before Amanda and Jonathan got prosecuted?

*J. YORK - Direct Examination*                              110

04:05:31   1    A.   I already answered that.  I said I don't remember.

04:05:33   2    Q.   Well, I'm asking more specifically, sir.  Did those notes

04:05:36   3    get destroyed before -- or lost or whatever they want --

04:05:40   4             MR. MILLER:  Objection.

04:05:40   5             THE COURT:  What's the objection?

04:05:42   6             MR. MILLER:  Mischaracterization of "They got

04:05:46   7    destroyed."  He said "They got destroyed," and then that's not

04:05:49   8    anything in the testimony.

04:05:52   9             MR. LOEVY:  I can withdraw and try again, Your Honor.

04:05:54   10            THE COURT:  Okay.

04:05:55   11   BY MR. LOEVY:

04:05:55   12   Q.   Did they get lost?

04:05:58   13   A.   I don't recall what notes that you're referring to.  I

04:06:04   14   don't remember the notes from that specific interview.

04:06:06   15   Q.   All right.  Any of your notes, sir.  They're all gone,

04:06:09   16   aren't they?

04:06:09   17   A.   No.  I thought I turned some -- all of them that I had in

04:06:14   18   my possession at the time over when I was asked for it.

04:06:16   19   Q.   What are you talking about?  How many pages?  I'm not

04:06:19   20   sure what you mean.  Can you help me understand?

04:06:22   21   A.   If I remember correctly, back when the criminal case was

04:06:26   22   going on, they asked for our field notes, and I turned in what

04:06:29   23   I had over.

04:06:30   24   Q.   How many pages was it?

04:06:31   25   A.   I don't remember.

04:06:32  1    Q.   More than one?

04:06:33  2    A.   Sir, I said I don't remember.

04:06:37  3    Q.   All right.  So what happened to the rest of your field

04:06:39  4    notes?

04:06:39  5    A.   That's all that I know that I have.

04:06:42  6    Q.   So any notes you've had you've disclosed?

04:06:45  7    A.   Yes.

04:06:47  8    Q.   Okay.  Where are the originals?

04:06:49  9    A.   I'm assuming they're with whoever we gave them to.

04:06:55  10   Q.   You would have given over copies of your field notes,

04:06:58  11   wouldn't you have, sir?

04:07:00  12   A.   I thought they -- I don't remember if I gave copies or

04:07:04  13   not.  It's been so long ago.

04:07:06  14   Q.   Wouldn't that have been your practice, though, on a

04:07:09  15   criminal case?  Make copies of your reports, make copies of

04:07:13  16   your notes, and hand over the copies?

04:07:15  17   A.   Again, this was my first case, and I do not remember.

04:07:18  18   Q.   You were involved in more than one criminal case, weren't

04:07:20  19   you, sir?

04:07:20  20   A.   Yes.

04:07:20  21   Q.   And your practice was, like all of your fellow

04:07:24  22   detectives, was it not, make copies of the notes, retain the

04:07:28  23   originals, right?

04:07:29  24   A.   Of the field notes, no, that was not a common practice.

04:07:32  25   Q.   To turn over originals?

04:07:34  1    A.   I've answered.  You said make copies, and I said, no, I

04:07:39  2    didn't, like, write something down and make copies in place of

04:07:43  3    them.

04:07:43  4    Q.   All right.  I don't want to get too bogged down.

04:07:46  5         Are you saying you gave your original notes to Jackie

04:07:50  6    Steele in the Commonwealth?

04:07:51  7    A.   I don't remember.  I gave them what I had, I thought.

04:07:53  8    It's been many years ago.

04:07:55  9    Q.   Let's get back to -- I'm sorry.  Let's get back to

04:07:58  10   Mr. Helton.

04:07:59  11        We don't have a police report from your January 4th

04:08:02  12   interview with Mr. Helton, correct?

04:08:04  13   A.   There's no supplements, correct.

04:08:06  14   Q.   And so we don't know how long this interview lasted?

04:08:09  15   A.   No.

04:08:10  16   Q.   We don't know what was said?

04:08:16  17   A.   No.  There's some parts of it recorded.

04:08:17  18   Q.   That's actually after you talked to him for a while, then

04:08:20  19   you took him and recorded the polygraph, right?

04:08:22  20   A.   I don't remember if it was before or after.

04:08:25  21   Q.   Well --

04:08:26  22   A.   Well, like I said, if I believe, I think Detective

04:08:29  23   Mefford took the lead on that.  I can't remember what --

04:08:33  24   Q.   All right.  Do you defer to Mr. Helton's recollection on

04:08:36  25   how it went down?

J. YORK - Direct Examination                                    113

04:08:36   1    A.   Can you -- what did he say?

04:08:38   2    Q.   You were in court, right?

04:08:40   3    A.   Yeah.  I don't remember exactly.  Be specific, please.

04:08:42   4    Q.   Did you disagree with anything he said?

04:08:44   5    A.   Yes.  But can you --

04:08:45   6    Q.   Which part?  Anything you disagreed with?

04:08:55   7    A.   Well, number one, I actually disagreed that I told him

04:09:00   8    anything to say.

04:09:01   9    Q.   Did you offer to make his case go away?

04:09:04   10   A.   This case, no.

04:09:08   11   Q.   I'm sorry.  The DUI.

04:09:09   12   A.   I could potentially have told him I would try to help him

04:09:15   13   out if, number one, he wasn't -- killed Katherine Mills and

04:09:19   14   then he corroborated and told us what he knew because he kept

04:09:25   15   on telling us little bits and pieces.

04:09:28   16   Q.   His DUI case did go away, correct?

04:09:31   17   A.   If you are saying it did.  I don't know.  I'm not looking

04:09:35   18   at CourtNet or anything.

04:09:36   19   Q.   If you told him, if you give me information I'll make

04:09:38   20   your case go away, you have an obligation, if you told him --

04:09:41   21   and I'm not saying you did or didn't -- let's just say the

04:09:45   22   hypothetic for a minute -- you would have had to disclose that

04:09:46   23   to Jackie Steel and the Commonwealth, right?

04:09:50   24   A.   Well, no.  Jackie -- that wouldn't have been Circuit

04:09:53   25   Court case.  That would have been a district court case.  So I

*J. YORK - Direct Examination*                                          114

04:09:55   1    don't know if that was David Jorgejoni (phonetic), Charlie

           2    Green Dixon --

           3         (Reporter clarification.)

04:10:04   4         THE WITNESS:  David Jorgejoni, and I couldn't even

04:10:04   5    begin to spell that for you.  And Charlie Green Dixon.

04:10:08   6    BY MR. LOEVY:

04:10:08   7    Q.   Mr. Helton also said that you found some cash in his

04:10:11   8    home.  Did that happen?

04:10:12   9    A.   Cash?  I don't remember him saying cash.  I'm sorry.

04:10:17  10    Q.   In a box.  I thought I heard him say you went into his

04:10:20  11    house and found some cash in a box and you tried to say it was

04:10:23  12    Katherine Mills's cash?

04:10:24  13    A.   I don't recollect him saying cash.

04:10:26  14    Q.   All right.  Did it happen?  What did you find?

04:10:29  15    A.   You need to restate the question again.

04:10:31  16    Q.   You heard his testimony.  You don't remember it was cash.

04:10:35  17    Do you remember him saying it was something else you found in

04:10:38  18    his house?

04:10:38  19    A.   I can't remember exactly.  If you can be more specific.

04:10:41  20    Q.   All right.  I'll just ask a specific question.

04:10:45  21         Did you go to Allen's house?

04:10:46  22         Oh, you know what, I'm confusing Allen and Jesse.  It is

04:10:49  23    confusing.

04:10:52  24         It was a computer box.  No, it was in computer boxes.  I

          25    am getting confused.

04:10:55   1        Allen Helton said you went into his house, and there was

04:10:58   2   computer boxes with cash, and you accused him of it?

04:11:02   3   A.   If he said that, then I absolutely disagree.

04:11:08   4   Q.   Nobody's perfect.  Here's what my understanding of what

04:11:14   5   he said is.  You went into his house; you found some computers

04:11:17   6   in boxes; and you accused him of using the cash to buy the

04:11:21   7   computers.

04:11:22   8        Is that your -- did that happen?

04:11:23   9   A.   Again, because you're -- you're confusing me.  Can you

04:11:26   10  state that again, please?

04:11:26   11  Q.   All right.  I'm sorry it got confusing.  Probably is more

04:11:30   12  my fault.

04:11:30   13  A.   People make mistakes.

04:11:32   14  Q.   Yeah, and it's more my fault than yours this time.

04:11:36   15       Mr. Helton said you went into his house and you were

04:11:39   16  looking in his closets, found some computers and accused him

04:11:43   17  of using Mills's money for that.  Did that happen?  Yes, no,

04:11:49   18  or I don't remember?

04:11:49   19  A.   I don't remember that.

04:11:50   20  Q.   Okay.  Did Helton have an alibi for the murder?

04:11:52   21  A.   I can't remember if he had a specific alibi or not.

04:12:01   22  Q.   That probably should have been written down, right?

04:12:05   23  A.   If he gave me an alibi, yes.

04:12:09   24  Q.   How about if he couldn't give you an alibi?

04:12:11   25  A.   Again, this was an ongoing investigation, and if he came

*J. YORK - Direct Examination* 116

04:12:18  1    up to me and said, I was here, here, here, whatnot, we would

04:12:22  2    have looked at it.

04:12:24  3    Q.   All right.  But did you say, Where were you?  I want to

04:12:27  4    look at it?

04:12:27  5    A.   I can't remember if those exact words came out.

04:12:30  6    Q.   Okay.  You did spend an awful lot of time on Amanda, her

04:12:34  7    alibi, right?

04:12:35  8    A.   Yes.

04:12:36  9    Q.   You were trying to track down what time she was at the

04:12:38  10   doctor, what time she went to Walgreen's, what time she went

04:12:41  11   to McDonald's.  You put investigative time into that, right?

04:12:44  12   A.   Yes.

04:12:44  13   Q.   Did you put that kind of investigative time into finding

04:12:47  14   out where Simpson and Helton were that morning?

04:12:50  15   A.   We -- we was looking into it and we were working, you

04:12:54  16   know, at the first of it nonstop, into that -- into them.

04:13:00  17   Q.   So --

04:13:01  18   A.   But you got to understand that Allen kept giving us

04:13:05  19   information, little bit by little bit.  I mean, for example,

04:13:09  20   he said -- I mean, I think you all maybe saw a clip like.  He

04:13:14  21   said, I know Mike Simpson had part of the money, and he said,

04:13:17  22   then I feel it or I believe it.  And, I mean, it was just that

04:13:22  23   constant.

04:13:22  24   Q.   Sir, if the work was done to check out their alibis, that

04:13:27  25   should have been documented, right?

04:13:30   1    A.   Yes.

04:13:30   2    Q.   And it wasn't?

04:13:31   3    A.   If it's not there, no.

04:13:36   4    Q.   All right.  Were there other -- if we go to the time

04:13:41   5    period -- the murder happens in December 2010, and the time

04:13:43   6    frame gets a little confusing because everybody's throwing

04:13:46   7    around dates, but December 2010 is when the murder happens.

04:13:52   8    And then you're into January 2011.  So now you've been

04:13:58   9    investigating about a month toward the end of January, right?

04:14:00   10   A.   Yes.

04:14:02   11   Q.   All right.  Were there other suspects, beyond those we've

04:14:04   12   talked about, as of the end of January 2011?

04:14:07   13   A.   Yes.

04:14:12   14   Q.   Who were some of those in January?

04:14:14   15   A.   In January?  I think even at the end of January -- let's

04:14:20   16   just be clear.  January 31st.  Can we agree on that?

04:14:24   17   Q.   Okay.

04:14:25   18   A.   Yes.  I think even then that even Amanda was probably a

04:14:31   19   suspect at that point.

          20   Q.   Okay.

04:14:32   21   A.   By given what we were told from Michelle Edwards and the

04:14:37   22   family.

04:14:39   23   Q.   All right.  Sir, would you agree with me -- and I'll ask

04:14:40   24   it carefully -- that as of January 2011, there was nothing

04:14:45   25   suggesting she had anything to do with the murder in the file?

04:14:50  1    A.   That -- that -- I believe that's true, yeah.

04:14:55  2    Q.   When you say, "might have had something to do with it,"

04:14:58  3    you're saying somebody in the family said she might have

04:15:01  4    stolen something from somebody?  That's what you meant?

04:15:03  5    A.   Yes.

04:15:04  6    Q.   All right.  But you had all kinds of little arrows

04:15:07  7    pointing in a lot of directions:  People stealing, people

04:15:11  8    lying, people -- you know, but that wasn't the only clue in

04:15:13  9    the whole case, right?

04:15:14  10   A.   That would be a true statement, yes.

04:15:16  11   Q.   In fact, some people stole from grandma?

04:15:18  12   A.   Yes.  Yes.

04:15:19  13   Q.   All right.  Take a look at Plaintiffs' Exhibit 38, which

04:15:22  14   is KSP 487, also part of the investigative file.  Can you

04:15:32  15   identify this, sir?

04:15:35  16   A.   Yeah, that's the field notes we were talking about.

04:15:38  17   Q.   All right.  So this is the -- these two pages?

04:15:45  18   A.   I don't mean to interrupt you, but can you turn that

04:15:48  19   second page.  I don't think that's --

04:15:49  20   Q.   Sure.  This looks like the crime scene.  The second page

04:15:52  21   is probably the --

04:15:53  22   A.   I was going to say I don't think that's my handwriting.

04:15:56  23   Q.   Yeah.  This is -- this is a two-page exhibit.  Page 2.

04:16:01  24   Let's just keep it page 1.  This is your handwriting, right?

04:16:04  25   A.   I would agree with that.

*J. YORK - Direct Examination*                                         119

04:16:06   1   Q.   All right.  Is this an example of your field notes?

04:16:08   2   A.   Yes.

04:16:10   3   Q.   Are you aware of any other examples of your field notes

04:16:13   4   in this file?

04:16:14   5   A.   No.  If you'll show them to me, I'll look at them.

04:16:17   6   Q.   All right.  You have the original of the file here.

04:16:23   7            MR. LOEVY:  May I approach, Your Honor?

04:16:25   8            THE COURT:  You may.

04:16:34   9        Jackie, can you clear those green dots off or the witness

04:16:39  10   needs to do that?  Somebody has maybe touched the monitor.

04:16:43  11   Thank you.

04:16:43  12   BY MR. LOEVY:

04:16:43  13   Q.   Rather than make you -- if you want to flip through it

04:16:45  14   fast, you can.  I'm not going to make you look through every

04:16:47  15   page.  I would like you to focus on this page.  All right,

04:16:50  16   sir?

          17   A.   Okay.

04:16:50  18   Q.   This page is your notes file.  It says, Persons of

04:16:52  19   interests and area drug dealers, right?

04:16:55  20   A.   Yes.

04:16:56  21   Q.   Since it's your handwriting, can you just quickly take

04:16:58  22   off the nine area drug dealer names?

04:17:01  23   A.   Please say that again?

04:17:02  24   Q.   Can you read the names there, one through nine?

04:17:05  25   A.   Ernie Hammons, Wendell Smith, Randy Burnett, Gillis

04:17:13   1   Mills, Pete Mills, Randy Marriott, Allen Helton, Dickey

04:17:20   2   Messer, Bob Smith.

04:17:22   3       Then on the next side of it, it's got Hell's Creek.  Then

04:17:25   4   it drops down and it says Briers Creek, Broughton Hollow.  Do

04:17:31   5   you want me to read that side?

04:17:31   6   Q.   I think we'll stop there for a minute.

04:17:33   7       So these are people to be investigated, right?

04:17:35   8   A.   You know what this was, obviously this is -- it's been my

04:17:40   9   experience, any time there's thefts, there's usually drugs

04:17:45   10  involved with the thefts.  And so I believe, if I remember

04:17:49   11  correctly, those names, when we did the canvass and we went to

04:17:53   12  the sawmill, I believe those names was given to us by, you

04:17:58   13  know, people that worked at the sawmill.  And the reason

04:18:01   14  behind that, you know, in my mind, if there was money taken

04:18:05   15  and drugs were involved, possibly that they went to these

04:18:11   16  dealers to buy.

04:18:12   17      Now, granted, you know, it's going to be hard to go up to

04:18:16   18  somebody and show up as a police officer and you're selling

04:18:19   19  drugs like, Hey, are you selling drugs?  You spend a whole

04:18:23   20  lot.  So, yeah.

04:18:25   21  Q.   All right.  And as a police officer, you had -- you spent

04:18:28   22  a lot of time on this file, right, tracking down leads?

04:18:32   23  A.   Yes.

04:18:33   24  Q.   All right.  And you had some persons of interest at the

04:18:35   25  bottom here.  Hank Smith, Brady Broughton, Mike Simpson, the

*J. YORK - Direct Examination*                                121

04:18:41  1   Blankenship brothers looks like they're crossed off.  Daffy

04:18:45  2   Helton, is that Allen Helton?

          3   A.   Yes, sir.

04:18:50  4   Q.   And Dustin Abner.

04:18:52  5   A.   There's a line -- and this copy is bad.  But I don't

04:18:58  6   know -- well, I'll agree with that, but there's a line drawn

04:19:01  7   underneath that.  I don't know if that was to mark that name

04:19:04  8   to start something else.

04:19:05  9   Q.   All right.  Did you take it seriously to investigate this

04:19:09  10  murder?

04:19:09  11  A.   Yes, sir.

04:19:10  12  Q.   Okay.  The first person of interest there, Hank Smith,

04:19:13  13  why was Hank Smith a person of interest in this murder?

04:19:16  14  A.   I don't remember right off.  That's probably somebody

04:19:24  15  gave me a name because, when we started this, you know, we

04:19:28  16  didn't have nothing.  So if the family told us a name, that

04:19:32  17  could have came from there.

04:19:33  18  Q.   All right.  So -- and you agree there's no reports

04:19:36  19  explaining why you thought Hank Smith was a person of

04:19:39  20  interest, right?

04:19:39  21  A.   That's correct.

04:19:40  22  Q.   All right.  And there should be a report explaining why

04:19:42  23  Hank Smith was a person of interest, right?

04:19:45  24  A.   Not necessarily.  If, you know -- it's like, for

04:19:54  25  example -- let's just use this up here, the drug dealers.  If

*J. YORK - Direct Examination*                                              122

04:19:57   1   I was talking to somebody, they say, Okay, these are a list of

04:20:01   2   drug dealers that I know.  Could they possibly have any

04:20:03   3   knowledge of that?  Maybe or maybe not.  And same way with

04:20:08   4   this list.

04:20:10   5       You know, I could've been told that, but as far as having

04:20:13   6   a -- something to write down about a specific one, why they

04:20:16   7   possibly could have been, no.

04:20:19   8   Q.   All right.  But somebody at some point told you you

04:20:21   9   should be suspicious of Hank Smith, Bradley Broughton and the

04:20:27   10  Blankenship brothers, correct?  Somebody must have told you

04:20:29   11  there's a reason to suspect them?

04:20:31   12  A.   That would be a fair statement, yes.

04:20:33   13  Q.   And whatever reason there was, it's long gone, correct?

04:20:35   14  A.   Yes.

04:20:37   15  Q.   And if the Blankenship brothers were crossed off, we

04:20:42   16  don't know how they were excluded, right?

04:20:46   17  A.   That is true.

04:20:46   18  Q.   Would you agree with me that there was a lot of work on

04:20:48   19  this investigation that was off the books, off the records?

04:20:51   20  A.   What I would agree with, there is -- we've been doing a

04:20:56   21  lot of work and talking to a lot of people, and that wasn't --

04:21:01   22  not everything was documented as far as each person we talked

04:21:04   23  to and stuff like that.  I'll give you an example.  Like, if

04:21:08   24  I -- there was a street and there was, you know, a burglary

04:21:13   25  happened, if we went to a house and they didn't know anything

04:21:16   1    or didn't see anything, we didn't document that and so on.

04:21:23   2    Q.   All right.  But the reason that somebody thought that the

04:21:26   3    Blankenship brothers might be involved in the murder, that

04:21:29   4    would merit a report, correct?

04:21:31   5    A.   Not necessarily.  I don't remember why somebody said

04:21:34   6    that.

04:21:35   7    Q.   All right.  But as a criminal defendant accused of the

04:21:37   8    murder, they're entitled to that information, right?

04:21:42   9    A.   Say that again.

04:21:43   10   Q.   If you are accused of a crime in this country --

04:21:46   11   A.   Um-hum.

04:21:47   12   Q.   -- you're supposed to get the information that's good for

04:21:49   13   you and the information that's bad for you, right?

04:21:51   14   A.   I would agree with that.

04:21:53   15   Q.   And if you're accused of a crime and there's reason to

04:21:56   16   suspect somebody else did it, then you're entitled to get that

04:21:58   17   information, too, right?

04:22:00   18   A.   Yes.

04:22:00   19   Q.   And they have to depend on you, the police officer, to

04:22:03   20   write that down in a police report and turn it over, don't

04:22:07   21   they?

04:22:07   22   A.   Yes.  But if I thought -- if there was any legitimate

04:22:12   23   leads on these -- you know, again, I went over, well, they

04:22:16   24   could possibly be there, but if there was anything to that we

04:22:20   25   found out, that would have been investigated more and

04:22:24   1    obviously available to them.

04:22:26   2    Q.   All right.  Were you feeling pressure, as we got to the

04:22:29   3    end of January, to start solving the case?

04:22:32   4    A.   I don't think there's pressure.  Obviously I wanted to

04:22:41   5    give closure to the family and help them.  They lost a loved

04:22:45   6    one, and they're wanting answers.  So in that aspect, to the

04:22:49   7    family, absolutely.

04:22:49   8    Q.   All right.  So you were feeling some pressure as time

04:22:51   9    went by, I better start showing some results?

04:22:54   10   A.   No, I didn't feel that pressure.

04:22:56   11   Q.   Not that kind of pressure?

04:22:57   12   A.   No.  The pressure I'm talking about is, again, you know,

04:23:04   13   somebody -- a lady died.  There's a family that's hurting.

04:23:09   14   That's pressure.  But, you know, the investigation leads where

04:23:13   15   it leads.

04:23:14   16   Q.   All right.  So when you were feeling that pressure for

04:23:17   17   the family, you understood the family actually wanted you to

04:23:19   18   catch the right person, not just catch anybody, right?  You

04:23:21   19   understood the difference?

04:23:22   20   A.   That is a fair statement.

04:23:25   21   Q.   All right.  You came to suspect, at some point, now we're

04:23:28   22   still at the end of January, and there's nothing in the file

04:23:30   23   that suggests that Amanda or Jonathan had anything to do with

04:23:34   24   it, right?  We've already covered that except for the

04:23:37   25   stealing.  You know, you said stealing a truck or whatever,

04:23:40   1   whatever you said it was.  I'm talking about the murder.

04:23:42   2        There's nothing in the file that anybody is accusing

04:23:45   3   Jonathan or Amanda of being involved in the murder at the end

04:23:48   4   of January 2011, right?

04:23:50   5   A.   I don't remember when we came aware about the money, but

04:23:56   6   I think that might be a fair statement.

04:23:57   7   Q.   What money?

04:23:58   8   A.   I mean, about William Lester bragging about her having

04:24:02   9   money.  You know, like when Amanda admitted that William

04:24:06   10  Lester was bragging about money, tying her up.

04:24:08   11       At some point, you know, we found that out.  I don't

04:24:10   12  remember exactly because the first person I found that out

04:24:13   13  that William Lester was bragging was, I think, from Sheriff

04:24:23   14  Pickard and Wesley Roark.

04:24:23   15  Q.   So let's talk about that.  All right, sir?  At some

04:24:26   16  point, William Lester became a person of interest, right?

04:24:28   17  A.   Yes.

04:24:30   18  Q.   And someone named Wesley Roark told you that, Hey, I

04:24:34   19  heard Lester, you know, made a comment about I should tie up

04:24:40   20  the victim in the outhouse and steal her money, something like

04:24:43   21  that, right?

04:24:43   22  A.   That's an inaccurate statement.

04:24:45   23       He told Sheriff Pickard that.  He didn't tell me that.

04:24:48   24  Q.   Sorry, but it came to you?

04:24:51   25  A.   Through Sheriff Pickard, yes.

04:24:52   1    Q.   So Roark tells Pickard who tells you, Lester made a

04:24:56   2    comment about locking her up in the outhouse and stealing

04:24:59   3    money, something like that?

04:25:03   4    A.   Yes.

04:25:03   5    Q.   And that became a suspect for you, right?

04:25:05   6    A.   William Lester, yes.

04:25:05   7    Q.   He was -- he was married to the victim's daughter?

04:25:11   8    A.   I think at the time they were divorced.

04:25:13   9    Q.   Previously married.  Thank you.

04:25:14  10         So he was Jennifer Lawson's father?

04:25:17  11    A.   Yes.

04:25:18  12    Q.   All right.  And when you decided Lester was a person of

04:25:28  13    interest, you decided to investigate him, right?

04:25:31  14    A.   Yes.

04:25:33  15    Q.   You didn't create any police reports about why Lester was

04:25:36  16    a person of interest in this time period, right?

04:25:41  17    A.   I think there is police reports about William Lester.

04:25:44  18    Q.   Months later, right?

04:25:45  19    A.   I'm not going to argue with you on the date, but if

04:25:48  20    you're saying there's nothing specific, then I agree with you.

04:25:51  21    Q.   Well, let's take a look at when Lester came in the

04:25:55  22    investigation.  This is Plaintiffs' Exhibit 25.

04:26:00  23         MR. LOEVY:  And, Your Honor, this is part of the

04:26:02  24    investigative file as 335.

04:26:06  25         THE COURT:  Do you agree with that, Mr. Miller?

04:26:08   1          MR. MILLER:  Yes.

04:26:10   2          THE COURT:  Okay.  It's in through Exhibit 1.  Are

04:26:13   3   you wanting to make it a separate exhibit?

04:26:15   4          MR. LOEVY:  Yes, Your Honor.  Plaintiffs' 25.

04:26:16   5          THE COURT:  All right.  That'll be admitted and may

04:26:19   6   be displayed.

           7      (Plaintiffs' Exhibit No. 25 was received in evidence.)

           8   BY MR. LOEVY:

04:26:20   9   Q.  All right.  You can identify this, can you not?

04:26:22  10   A.  That's -- what I can read, it says, William Lester,

04:26:28  11   wireless phone number.

04:26:29  12   BY MR. LOEVY:

04:26:30  13   Q.  All right.  So --

04:26:31  14          MR. LOEVY:  We move to admit it, and we'll go through

04:26:34  15   it.

04:26:34  16          THE COURT:  Yeah, it's admitted.  It may be

04:26:36  17   displayed.

04:26:37  18          MR. LOEVY:  Thank you.

04:26:38  19          THE COURT:  Just be sure he has time to look at it.

04:26:41  20   You're flipping it so quickly.

04:26:42  21          MR. LOEVY:  I just wanted to identify it, Your Honor.

           22   BY MR. LOEVY:

04:26:43  23   Q.  Now, let's look at it carefully.

04:26:46  24   A.  Can you shrink it down a little bit?  It's like over the

04:26:50  25   lines, if that makes sense.

*J. YORK - Direct Examination*                                           128

04:26:53  1        THE COURT:  As he's questioning you from there,

04:26:54  2  you're tending to be away from your mic.  And so if you'll

04:26:58  3  tilt it around.  There you go.  Thank you.

04:27:00  4  BY MR. LOEVY:

04:27:00  5  Q.  All right.  This is an affidavit that you created on

04:27:03  6  February 4th, correct?

04:27:05  7  A.  Yes.

04:27:06  8  Q.  And you put out the reasons why you suspected him?

04:27:09  9  A.  Can you give just a second to read it?

04:27:11  10  Q.  Take your time and tell me when you are finished.

04:27:51  11  A.  Okay.

04:27:52  12  Q.  All right.  So now, at this point now you have got

04:27:55  13  another suspect, right?

04:27:56  14  A.  Yes.

04:27:58  15  Q.  Fair to say one of many suspects, right?

04:28:01  16  A.  That would be fair, yes.

04:28:02  17  Q.  So you have to investigate them.  That's your job, right?

04:28:05  18  A.  Yes.

04:28:06  19  Q.  Now, this was a subpoena for phone records, right?

04:28:10  20  A.  Yes.

04:28:11  21  Q.  And one of the phone records that came back was Jonathan

04:28:13  22  Taylor, right?

04:28:14  23  A.  I think that I did -- I just explained.  This is just

04:28:20  24  going from William Lester's phone records.

04:28:23  25  Q.  Right.  And then you determined that Lester, on the day

04:28:26   1   of the murder, had talked to Jonathan Taylor?

04:28:27   2   A.   If I remember correctly, there's a number that we

04:28:30   3   suspected to be Jonathan Taylor.  I can't remember and tell

04:28:34   4   you exactly why we thought that particular number.  I can't

04:28:37   5   tell you the number off the top of my head.

04:28:40   6   Q.   All right.  So Jonathan Taylor would be someone to talk

04:28:41   7   to, right?

04:28:43   8   A.   Yes.

04:28:46   9   Q.   And if you could get Jonathan Taylor to implicate your

04:28:50   10  suspect, William Lester, that would help you solve the crime,

04:28:__   11  right?

04:28:56   12  A.   If he had knowledge that William Lester did that,

04:29:00   13  absolutely.

04:29:01   14  Q.   And, of course, if William Lester had nothing to do with

04:29:04   15  the crime, then the fact that Jonathan talked to William

04:29:07   16  Lester that day, would be completely relevant, right?

04:29:10   17  A.   Say that again, please?

04:29:12   18  Q.   If Lester wasn't the murderer then Jonathan didn't do

04:29:17   19  anything wrong by talking to William Lester that day, right?

04:29:19   20  A.   I never did say that making a phone call was wrong.  You

04:29:23   21  said it, not me.

04:29:23   22  Q.   All right.  But you're trying to connect Taylor to your

04:29:26   23  suspect, Lester, right?

04:29:29   24  A.   Just by the -- these phone records?

04:29:32   25  Q.   Yeah.

*J. YORK - Direct Examination*                                      130

04:29:33  1    A.   If that's what it shows, then, obviously, yes.

04:29:36  2    Q.   You had never heard of Jonathan Taylor?

04:29:41  3    A.   I don't remember exactly when I heard about him as far as

04:29:46  4    the date and time.

04:29:46  5    Q.   And you wanted some leverage on Jonathan to help you

04:29:51  6    point the finger at Lester, right?

04:29:54  7    A.   No, I think that -- no.

04:29:55  8    Q.   You were involved in the drug case that got put on

04:29:58  9    Jonathan, right?

04:29:59  10   A.   What drug case?

04:30:00  11   Q.   The case that got dismissed?

04:30:02  12   A.   On Jonathan?

04:30:04  13   Q.   Yes.

04:30:04  14   A.   No.  I don't ever remember being a part of a drug case

04:30:11  15   involving Jonathan.

04:30:11  16   Q.   Did you interrogate Jonathan in connection with that

04:30:14  17   investigation?

04:30:14  18   A.   No.

04:30:15  19   Q.   When did you interrogate Jonathan?

04:30:17  20   A.   Well, Jonathan never did give a statement, but -- can you

04:30:24  21   be specific about that drug case because I don't know what

04:30:27  22   you're talking about.

04:30:27  23   Q.   Let me ask you this way:  When did you interrogate

04:30:31  24   Jonathan Taylor?

04:30:32  25   A.   I never did interrogate Jonathan Taylor.  He never did

*J. YORK - Direct Examination*                                      131

| | | |
|---|---|---|
| 04:30:35 | 1 | give me a statement. |
| 04:30:36 | 2 | Q.  All right.  So you are saying -- surely, you wanted to |
| 04:30:38 | 3 | talk to him, right? |
| 04:30:39 | 4 | A.  At one point, but I'm not -- I don't remember what day. |
| 04:30:44 | 5 | You are asking everything so fast.  I'm trying to keep it |
| 04:30:47 | 6 | clear. |
| 04:30:47 | 7 | Q.  I slow down.  I do tend to keep it moving fast.  I agree |
| 04:30:52 | 8 | with you there.  I'm going to slow it down. |
| 04:30:54 | 9 | At some point you decided you had a real reason to talk |
| 04:30:57 | 10 | to Jonathan Taylor, right? |
| 04:30:58 | 11 | A.  At one point in the investigation, yes, yes. |
| 04:31:01 | 12 | Q.  And you were hoping that Jonathan Taylor could give you |
| 04:31:06 | 13 | information that would help you get William Lester for this |
| 04:31:09 | 14 | crime?  That was your hope, right? |
| 04:31:12 | 15 | A.  I think that's inaccurate.  You know, was I hoping that I |
| 04:31:17 | 16 | would get information to solve a murder?  Absolutely.  I can't |
| 04:31:22 | 17 | speculate that I was hoping or nothing like that. |
| 04:31:28 | 18 | Q.  Okay.  And you do admit that, in this capital murder |
| 04:31:33 | 19 | case, you did speak to Jonathan Taylor about the crime?  Can |
| 04:31:36 | 20 | we agree on that? |
| 04:31:37 | 21 | A.  You -- and I hate to be -- he never did give a statement. |
| 04:31:45 | 22 | Did I say words to Jonathan?  Yes.  He never gave a statement. |
| 04:31:49 | 23 | Q.  Now, you are saying that because there's no report. |
| 04:31:52 | 24 | That's why you are saying that, right? |
| 04:31:54 | 25 | A.  No.  I'm saying that because he never gave a statement. |

04:31:56   1    Q.   How do you know?

04:31:57   2    A.   Because if he would have gave a statement, you know,

04:32:02   3    being charged with murder, I would absolutely write that down.

04:32:05   4    Q.   So why didn't you try to talk to Jonathan Taylor, Hey, do

04:32:09   5    you know anything about William Lester?  I'll help you get out

04:32:13   6    of your case if you give me something on Lester?

04:32:16   7         You did do that, right?

04:32:16   8    A.   Yes, and he never did give me a statement.

04:32:18   9    Q.   All right.  And there is no report?  Whatever was said or

04:32:22   10   wasn't said that -- there is no document about it, right?

04:32:25   11   A.   I would agree with that, yes.

04:32:28   12   Q.   All right.  So when you say he didn't give a statement,

04:32:31   13   you are not saying you have checked the document and he didn't

04:32:33   14   give a statement.  You are saying I don't remember what

04:32:35   15   happened.  That's really what you are saying, right?

04:32:38   16   A.   No.  He's trying to put words in my mouth.

04:32:41   17        He never did sit down and want to give me a statement.

04:32:45   18   Q.   Where were you?

04:32:46   19   A.   When?

04:32:49   20   Q.   When he refused to talk to you?

04:32:50   21   A.   I think one time I remember -- and I don't know the exact

04:32:56   22   date.  I think he was charged with Warren's house --

04:33:00   23   Q.   The drug case?

04:33:02   24   A.   Excuse me?

04:33:02   25   Q.   The drug case?

*J. YORK - Direct Examination*                                    133

04:33:04   1   A.   Again, are you trying to insinuate that I was part of

04:33:07   2   that drug case?

04:33:08   3            THE COURT:  Just say what you know.

04:33:11   4            THE WITNESS:  All right.  Yes.  I don't know what

04:33:13   5   it's for, but he was charged with a warrant, and I tried to

04:33:16   6   talk to him that day.  And then I think the day -- he had an

04:33:21   7   opportunity to talk the day he was -- he was already in jail,

04:33:26   8   and I think I served a warrant on him.

04:33:29   9   BY MR. LOEVY:

04:33:29   10   Q.   So you tried a couple times to talk to him, right?

04:33:32   11   A.   Yes.

04:33:33   12   Q.   Wouldn't it be relevant to your investigation if, boy, I

04:33:36   13   tried to talk to Jonathan Taylor and I said, Hey, know

04:33:39   14   anything about this murder, and he said, I'm not talking to

04:33:42   15   you?  That would have been very relevant, wouldn't it have?

04:33:44   16   A.   There's -- I did not feel like by him saying he would

04:33:49   17   refuse to talk to me that was relevant to the case.

04:33:52   18   Q.   Well, who else in the case -- you tried to talk to him

04:33:58   19   twice, and what exactly did he say?  He said --

04:34:04   20   A.   I don't remember the exact words, but he did not give me

04:34:07   21   a statement.

04:34:08   22   Q.   All right.  Is it possible 12 years ago what actually

04:34:11   23   happened was you said, Jonathan, I need to ask you about this

04:34:15   24   murder, William Lester, you know anything about it, and he

04:34:18   25   said, No, I don't know what you are talking about.  Is that

*J. YORK - Direct Examination*                                  134

04:34:20    1    what happened?

04:34:20    2    A.   I don't remember the exact words.

04:34:22    3    Q.   But that might have been what happened, right?

04:34:24    4    A.   I'm not --

04:34:25    5    Q.   He didn't give you anything helpful.  You said, Hey,

04:34:28    6    Jonathan, do you anything about this murder?  He said, I don't

04:34:30    7    know what you are talking about; I can't help you.  That might

04:34:33    8    have been what happened, right?

04:34:33    9    A.   My answer is I don't remember the exact words.  I don't

04:34:37   10    know how else to say that to you.

04:34:39   11    Q.   Well, then I think we are agreeing that you can't rule

04:34:44   12    out that he said, I don't want to say a word to you about that

04:34:44   13    murder, or he said, Sir, I don't know anything about that

04:34:48   14    murder; I'm innocent; I can't help you.  He might have done

04:34:50   15    one of those two things; you can't remember which he did?

04:34:53   16    A.   I feel like we are going around in circles, but I would

04:34:57   17    agree that I can't remember exactly.

04:34:59   18    Q.   And, in fact -- I'm sorry.  If he had given a statement

04:35:02   19    to you say, I can't help you about William Lester because I

04:35:06   20    don't know anything about it, that could have been helpful to

04:35:09   21    William Lester if he tried to change his story later, right?

04:35:13   22    A.   Say that again.

04:35:14   23    Q.   Isn't it important to lock in witnesses even if they say

04:35:18   24    they don't remember or they are not involved so they can't

04:35:20   25    change it later?

04:35:21   1   A.   This is what you are -- is this a different question?

04:35:24   2   Q.   Yes, it is.

04:35:25   3   A.   Okay.  So -- I asked you to repeat the question before.

04:35:29   4   Q.   You did.  I don't remember the question before.  So I'm

04:35:31   5   going to have to do my best.  Try again.

04:35:34   6   A.   Okay.

04:35:35   7   Q.   Isn't it true that, if William Lester is going to become

04:35:39   8   your suspect and Jonathan's story to you is, I don't know

04:35:43   9   anything about this crime, then it's critical that you write

04:35:47   10  down that Jonathan doesn't know anything about this crime so

04:35:50   11  that later he can't change his story?

04:35:54   12  A.   No.  I don't -- I don't see the relevance in that if he

04:35:59   13  says he don't know anything about it.

04:36:07   14  Q.   If there was a police report of Jonathan's interrogation

04:36:11   15  and it got destroyed, that would be a criminal act, correct?

04:36:18   16  A.   If there was a report and it got destroyed, your -- how

04:36:26   17  did it get destroyed?

04:36:27   18  Q.   I'm saying, if someone intentionally destroyed a police

04:36:30   19  report, that's a felony right?

04:36:32   20  A.   I don't know that.  I mean, I don't know the KRS behind

04:36:38   21  that.

04:36:38   22  Q.   Police reports are evidence, correct?

04:36:40   23       MR. MILLER:  Object.

04:36:41   24       MR. LOEVY:  His subjective understanding is relevant,

04:36:44   25  Your Honor.

04:36:44  1         THE COURT:  What's the objection?  Let's talk.

04:36:51  2      (Sidebar conference.)

04:36:51  3         THE COURT:  Okay.  What's the objection?

04:36:54  4         MR. MILLER:  Your Honor, it's mischaracterization.  I

04:36:58  5  know that Detective York can clean it up in the answer, but

04:37:01  6  it's becoming so repetitive that he's mischaracterizing

04:37:05  7  statements as evidence when reports are not evidence.  I'm

04:37:10  8  just -- answer -- ask the question the right way and be

04:37:14  9  simple.

04:37:14  10         THE COURT:  It depends on the proceeding whether

04:37:16  11  reports are evidence.  I mean, he's asking whether they are

04:37:19  12  evidence.  This guy is a KSP detective, he can handle that

04:37:23  13  question.  I think it's a legitimate question.  So overruled.

04:37:27  14         MR. MILLER:  Thank you, Your Honor.

04:37:32  15         MR. LOEVY:  All right.  Can we have the last question

04:37:35  16  read back so we don't get it wrong?

04:37:43  17         THE COURT:  Police reports are evidence, correct?

04:37:50  18         THE WITNESS:  I am not saying they are not.  That's

04:37:52  19  not the terminology, I understand, as far as the supplement.

04:37:55  20      What I consider evidence is, you know, fingerprints.

04:37:57  21  BY MR. LOEVY:

04:37:58  22  Q.  All right.  So you thought you could maybe throw away a

04:38:00  23  police report?

04:38:01  24  A.  I did not say that.

04:38:04  25  Q.  All right.  Did you, in talking to Jonathan, try to

04:38:06   1   pressure him into giving you information about William Lester?

04:38:11   2   A.   Again, I have answered this.

04:38:16   3        Jonathan Taylor never gave me a statement.  I don't know

04:38:18   4   how else you want me to answer that.

04:38:21   5             THE COURT:  Hang on.  It's a different question.

04:38:23   6   He's asking if you pressured him.

04:38:26   7             THE WITNESS:  No, I did not pressure him.  There was

04:38:29   8   never no interview, no interrogation to pressure him.

04:38:32   9   BY MR. LOEVY:

04:38:33   10  Q.   Well, when you said, Hey, I want to talk to you, you had

04:38:34   11  to tell him what you want to talk to him about, right?

04:38:37   12  A.   Yes.

04:38:37   13  Q.   And he was present with you, right?

04:38:39   14  A.   Yes.

04:38:40   15  Q.   Did you start telling him, Hey, man, if you don't

04:38:42   16  cooperate, I got the goods on you; you are going to go down

04:38:46   17  with William Lester?  Did you say anything like that to him?

04:38:49   18  A.   I don't remember saying anything like that.

04:38:52   19  Q.   All right.  You believed he had spoken to William Lester

04:38:54   20  on the day that your suspect, William Lester, may have

04:38:58   21  committed the murder, right?

04:39:00   22  A.   I don't know.  What's the date on this?

04:39:04   23  Q.   On which?  The search warrant?

04:39:09   24  A.   Yeah, the time I got -- because I'm getting confused on

04:39:12   25  the dates.

04:39:12   1      So this is an affidavit for the phone records.  Does it

04:39:16   2   say when I actually got them?

04:39:18   3   Q.   The affidavit is dated 2-4.  Of course, we don't have any

04:39:21   4   record of when you talked to Jonathan.  We have established

04:39:24   5   that.

04:39:25   6      I'm now just asking about the content of the

04:39:27   7   conversation.

04:39:30   8   A.   I was under the understanding that you were trying to

04:39:31   9   refer to in February.

04:39:36   10  Q.   All we know --

04:39:37   11  A.   That's what you are trying to do.

04:39:39   12  Q.   -- you sought the phone records in February and it's lost

04:39:41   13  to time when you talked to Jonathan because there's no report,

           14  correct?

04:39:45   15  A.   That's true.

04:39:46   16  Q.   All right.  When you talked to Jonathan and he said he

04:39:49   17  wasn't inclined to talk to you, did you pressure him that, if

04:39:52   18  he doesn't start talking, he's going to jail?

04:39:54   19  A.   No.  There was never -- no interrogation.  He never did

04:40:02   20  give a statement.

04:40:03   21  Q.   Of course, you did that to plenty of other witnesses,

           22  right?

04:40:06   23  A.   Can you be more specific?

04:40:07   24  Q.   You told Allen Helton, if he doesn't cooperate, he's

04:40:09   25  going to prison; you told Jesse Lawson, if he doesn't

04:40:11   1    cooperate, he's going to prison.

04:40:13   2        Did you say that to Jonathan Taylor?

04:40:14   3    A.   No.  And I hope you see the key difference here.  I

04:40:18   4    actually interviewed Allen Helton and Jesse Lawson.  Again, I

04:40:26   5    did not interview Jonathan Taylor.

04:40:35   6    Q.   When you do interview people, you use tactics sometimes,

           7    right?

04:40:40   8    A.   Yes.

04:40:41   9    Q.   Sometimes you yell at people?

04:40:42  10    A.   Yes.

04:40:44  11    Q.   During the interrogation of witnesses, sometimes you say,

04:40:47  12    Hey, you know -- you are trying to intimidate them, right?

04:40:51  13    A.   Can you say that again?

04:40:52  14    Q.   Sometimes you raise your voice and try to scare people as

04:40:56  15    a tactic?

04:40:56  16    A.   Again, I asked you what you said before, and you said

04:41:01  17    something totally different, I believe.

04:41:03  18    Q.   Sorry.  I'm trying to say sometimes don't you yell at

04:41:06  19    witnesses to try to intimidate them to say what you want them

04:41:10  20    to say?

04:41:10  21    A.   Sometimes I yell at witnesses to try to get the truth out

04:41:16  22    of them.

04:41:17  23    Q.   All right.  Did you do that to Jonathan?

04:41:20  24    A.   Again, I did not take a statement from Jonathan Taylor.

04:41:25  25    Q.   No.  I'm saying, when you said to Jonathan, I need you to

*J. YORK - Direct Examination*                                    140

04:41:28   1   talk to me, he said, I don't want to talk to you, did you then

04:41:33   2   try other tactics?

04:41:35   3              MR. MILLER:  Asked and answered.

04:41:37   4              THE COURT:  Overruled.  Answer that question.

04:41:39   5              THE WITNESS:  What was the question again?

04:41:40   6   BY MR. LOEVY:

04:41:41   7   Q.  When you tried to get him to talk and you are saying he

04:41:43   8   wouldn't talk, did you resort to other tactics to try to get

04:41:47   9   him to talk?

04:41:48  10   A.  No, and let me clarify.

04:41:51  11       When I'm using tactics, that's because somebody is -- I'm

04:41:54  12   actually interviewing somebody.

04:41:57  13   Q.  All right.  When you were done interviewing Jonathan, did

04:41:59  14   you have probable cause to arrest him for murder?

          15   A.  (No verbal answer.)

          16       (Reporter clarification.)

04:42:05  17              THE COURT:  What was your answer?

04:42:07  18              THE WITNESS:  I didn't interview him and -- at which

04:42:11  19   one are you talking about as far as probable cause?

04:42:14  20   BY MR. LOEVY:

04:42:14  21   Q.  At any time when you were finished trying to get or

04:42:18  22   having interactions with Mr. Taylor, did he say anything that

04:42:23  23   was incriminating?

04:42:24  24   A.  No.

04:42:26  25   Q.  Okay.  Let's talk about Amanda.

04:42:28  1      Now, you had Lester who was your suspect, right?

04:42:31  2  A.   He was one of them, yes.

04:42:34  3  Q.   And you figured Jonathan could put pressure on Lester if

04:42:38  4  he'd talk, right?

04:42:39  5  A.   Again, if Jonathan would have said a statement and it,

04:42:47  6  you know, could be used, you know, in conjunction with this

04:42:49  7  murder.

04:42:49  8  Q.   Yes.

04:42:49  9  A.   Yes, but the way you are saying that, I'm not going to go

04:42:53  10  along with it.

04:42:54  11  Q.   What's objectionable about that?

04:42:56  12      You are trying to get Lester, and you thought Jonathan --

04:42:59  13          THE COURT:   That's argumentative.

04:43:02  14  BY MR. LOEVY:

04:43:03  15  Q.   All right.  And then another person who might be able to

04:43:04  16  put pressure on Lester was Amanda, right?

04:43:07  17  A.   We suspected that Amanda possibly had information, and I

04:43:13  18  believe at the time -- you know, I think at that time it was

04:43:15  19  already developed that Mr. Roark had told us about Lester

04:43:23  20  going around talking about Katherine having money and joking

04:43:28  21  about robbing her.  And so, yes.

04:43:33  22  Q.   All right.  Your objective walking into that room was to

04:43:35  23  get Amanda to confirm that, correct?

04:43:41  24  A.   That would be a fair and accurate statement.

04:43:43  25  Q.   All right.  And you were able to accomplish that, right?

04:43:46   1   A.   Yes.  She stated that --

04:43:49   2   Q.   That was a yes-no question.

04:43:51   3   A.   Yes.

04:43:51   4   Q.   You were able to accomplish that.

04:43:53   5        And there was a lot of conversation you had before the

04:43:56   6   tape recorder got on, right?

04:43:58   7   A.   I'm not going to say a lot.  But, yes, there was a time

04:44:02   8   before we recorded it, yes.

04:44:04   9   Q.   And this thing that you were able to confirm for

04:44:07  10   Mr. Roark, is that in another police report, that -- this

04:44:11  11   outhouse comment?

04:44:11  12   A.   And I'm going to answer that, and I think I understand

04:44:14  13   your question.  William Lester told us that he told Wesley

04:44:20  14   Roark.

04:44:21  15   Q.   But is that in any police report?

04:44:23  16   A.   I don't know if that's a supplement, but that's in a

04:44:25  17   recording of Will Lester with his attorney.

04:44:28  18   Q.   I'm saying you confronted Will Lester with it, but why is

04:44:31  19   there no report about this rumor that you heard that Lester

04:44:35  20   said it from Roark?  Why is there no report about that?

04:44:39  21   A.   If there's not -- I thought there was, but if there's

04:44:45  22   not, then obviously there should have been, but, again, with

04:44:50  23   Wesley Roark, I didn't talk to him, and again Amanda stated it

04:44:55  24   and Will did.  There was never an issue whether or not William

04:44:59  25   Lester said it.

*J. YORK - Direct Examination*                                        143

04:45:00   1    Q.   Did you put pressure on Amanda to try to get her

04:45:03   2    statement?

04:45:04   3    A.   No.

04:45:04   4    Q.   You heard her testify about the gun case, right?

04:45:06   5    A.   The gun case?

04:45:07   6    Q.   You were in court when Amanda testified that you arrested

04:45:11   7    her for a gun that she says she never touched, saw, or knew

04:45:16   8    anything about.  You were in court when she described that,

04:45:19   9    right?

04:45:20   10   A.   I was in court, but I was not the case officer on that

04:45:22   11   case.

04:45:22   12   Q.   All right.  Did you show up at her door while she was

04:45:25   13   holding her four-year-old Lexi, put a gun on her forehead and

04:45:29   14   move her head backwards to arrest her for that crime?

04:45:33   15   A.   That is absolutely not true.

04:45:35   16   Q.   Did you arrest her at all?

04:45:35   17   A.   Yes.  There was times I arrested her.

04:45:38   18   Q.   On this gun case and the probation that followed,

           19   correct?

04:45:43   20   A.   I don't remember the warrant.

04:45:44   21   Q.   Well, I thought you said you weren't involved in the

04:45:47   22   criminal stuff against Amanda.  You were or you weren't?

04:45:50   23   A.   What I said was I don't remember.  You know, she was

04:45:54   24   arrested.  I don't remember what the warrant was for.

04:45:57   25   Q.   Did you ever tell Amanda that, you know, Hey, I got you

04:46:01   1   in this, I got witnesses who say you are going -- that you did

04:46:04   2   it.  You better give me Will Lester, or you are going down for

04:46:09   3   it?

04:46:09   4   A.   I think when -- you are referring to her statement, sir?

04:46:13   5   Q.   Well, I'm saying did you ever, ever, say to Amanda, I got

04:46:19   6   witnesses who said you did it.  If you don't tell me what I

04:46:22   7   want to hear against William Lester, you are going down for

04:46:25   8   this murder?  It's really a yes-no question.  Did you ever say

04:46:28   9   words to this effective to her?

04:46:29   10  A.   I could have said that, but, again, if you want to give a

04:46:36   11  specific day -- the reason I ask that, because at one point,

04:46:40   12  you know, when I first -- when Amanda gave her statement, she

04:46:46   13  gave a statement against William Lester, but at one point we

04:46:49   14  got statements against Amanda.

04:46:54   15  Q.   And those statements against Amanda came after she was

04:46:59   16  unwilling to say that William Lester -- she had any real

04:47:01   17  knowledge about William Lester being involved in the crime,

           18  right?

04:47:04   19  A.   No.

04:47:04   20  Q.   Who -- before Amanda told you she didn't have any

04:47:08   21  knowledge of the crime, who told you that Amanda had something

04:47:11   22  to do with this?

04:47:11   23  A.   Say that again now.

04:47:15   24  Q.   All right.  It is confusing; so we'll take it slow.

04:47:17   25       Amanda told you, I can't help you with William Lester.

*J. YORK - Direct Examination*                                          145

04:47:21   1   That's the first thing that happened, right?

04:47:22   2   A.   No.

04:47:23   3   Q.   Who told you -- who put -- who put pressure on Amanda?

04:47:28   4   A.   She told us that -- just confirmed what Will told us,

04:47:32   5   that he, in fact, did say that.

04:47:34   6   Q.   Right.  So you put her in a room.  She was a young woman.

04:47:37   7   And she was scared, right?

04:47:38   8   A.   I can't speculate how she feels.

04:47:40   9   Q.   And you confronted her with, Hey, I got Mr. York --

04:47:46  10   Mr. Roark -- excuse me -- saying he heard this comment about

04:47:48  11   the outhouse, and you better -- you better tell me that's what

04:47:52  12   happened, or you are in real trouble.  That's what you said

04:47:54  13   off the tape, right?

04:47:56  14   A.   That is not what I would have said because at the time

04:47:59  15   that's not -- that is nowhere near that.

04:48:01  16   Q.   Can be we clear that Amanda said she knew nothing about

04:48:06  17   the murder?

04:48:06  18   A.   No.  She gave a statement saying that she heard Will talk

04:48:10  19   about, you know, robbing her.

04:48:13  20   Q.   She confirmed for you what you were asking her about?

04:48:15  21   She confirmed Roark's story that she had overheard Lester say

04:48:20  22   something about an outhouse, right?

04:48:22  23   A.   Yes.  She confirmed that that's what Will Lester said.

04:48:27  24   Q.   All right.  And before she confirmed it, did you ask her

04:48:30  25   if it was true, or she volunteered it to you?

*J. YORK - Direct Examination* 146

04:48:33  1    A.  I don't remember.

04:48:34  2    Q.  Well, you went in there with this Will [sic] Roark

04:48:37  3    information, right?

04:48:38  4    A.  Yes.

04:48:41  5    Q.  And she was scared, right?

04:48:45  6    A.  Again, I can't speculate on how she felt.

04:48:48  7    Q.  All right.  And isn't it true, sir, what you said to her

04:48:51  8    is, You are in real trouble unless you remember this --

04:48:53  9    this -- you know, did this happen with Lester?  Did he make

04:48:56  10   this comment to Roark?

04:48:58  11       Did you say something like that?

04:48:59  12   A.  At that time, no.

04:49:01  13   Q.  Okay.  Who brought it up first?

04:49:03  14       Were you trying to get her to confirm the Roark comment,

04:49:05  15   or did Amanda say, I would like to tell you something.  I

04:49:08  16   overheard this comment and matched Roark?  Who brought it up

04:49:12  17   you or her?

04:49:13  18   A.  I don't remember, but at that point in the investigation,

04:49:15  19   I would not have said, If you don't say that, then this is

04:49:19  20   going to happen, at that point, no.

04:49:22  21       Let me -- because that was poor choice of words on my

04:49:25  22   part.

04:49:26  23       I would have never said -- what I want to say -- I would

04:49:29  24   have said, If you have knowledge or the truth about something

04:49:33  25   and you lie about it and you're connected with a -- a criminal

J. YORK - Direct Examination                                      147

04:49:40   1   act, then you could have been charged.  That should have been

04:49:43   2   a better way of saying it.

04:49:44   3   Q.   All right.  How about with -- before we -- did you do the

04:49:49   4   same thing to Kayla?

04:49:50   5   A.   Can you be more specific then?

04:49:53   6   Q.   That's fair.

04:49:54   7        Did you say to Kayla, Hey, listen, if you don't remember

04:49:56   8   that Will Lester did this crime, then you are going to go down

04:49:59   9   for murder?

04:50:00  10   A.   No.

04:50:03  11   Q.   And --

04:50:07  12   A.   I have answered the question.

04:50:10  13   Q.   Kayla is the young girl who's mother was in court today,

          14   right?

04:50:14  15   A.   Yes.

04:50:14  16   Q.   You accused her of murder, right?

04:50:16  17   A.   Yes.

04:50:17  18   Q.   And you told her, Kayla, if you don't tell me Will Lester

04:50:22  19   and Amanda did it, then you are going away, right?

04:50:25  20   A.   I think it's important at this point to let you know

04:50:29  21   what -- what Kayla said.

04:50:32  22        Kayla did not implicate Amanda or Will.  The only person

04:50:38  23   she implicated at that statement that he's talking about is

04:50:42  24   Jonathan.

04:50:42  25   Q.   All right.  But did you say to her, You are going away

04:50:45   1    for life unless you point the finger at your old boyfriend,

04:50:50   2    Jonathan?

04:50:50   3    A.   That's not true.  You just said earlier that I said that

04:50:59   4    against William, and that is not accurate.

04:51:02   5    Q.   Let me ask it -- back to Amanda -- and I'm sorry to jump

04:51:06   6    around.  So I'll give you a second to orient yourself.

04:51:09   7         Back to Amanda.  If Amanda really did the crime -- okay?

04:51:12   8    She was involved with Will Lester.  I want you to put on your

04:51:16   9    investigator hat.

04:51:17   10        If she knew that Lester did it with her, when you said to

04:51:21   11   her, Hey, did Will Lester say she was going to commit this

04:51:25   12   crime, then why would someone say to you, Yeah, you know, he

04:51:27   13   once told me, he made a joke, he made a comment he was going

04:51:30   14   to tie her up -- if she was involved, why would she tell the

04:51:34   15   police that?

04:51:34   16   A.   Say that first person again.

04:51:37   17   Q.   Sure.  Why would someone who really had something to

04:51:39   18   hide --

04:51:39   19   A.   Before that.

04:51:41   20   Q.   You were trying to get her to say she had heard Lester

04:51:44   21   say something suspicious and guilty, right?

04:51:46   22   A.   No.  I was just trying to find out what she knew.

04:51:49   23   Q.   And you wanted her to confirm the Roark statement that

04:51:53   24   Lester had said he had -- he was going to try up the victim

04:51:56   25   and steal her money, right?

*J. YORK - Direct Examination*                                        149

04:51:58  1   A.   Yes.  That would have been one of the questions.

04:52:00  2   Q.   So did you say to yourself, as an investigator, Boy, if

04:52:04  3   Amanda really was guilty, why would she confirm that the guy

04:52:07  4   she did it with was going to go do this?

04:52:11  5   A.   I can give you, as an investigator --

04:52:16  6   Q.   That's what I'm asking.

04:52:18  7   A.   It could --

04:52:19  8   Q.   I'm saying that's what I was asking.

04:52:21  9   A.   Sorry to interrupt you.

04:52:22  10       So an investigator, if I understand the question, he's

04:52:26  11  asking, if Amanda was involved, why would she give that

04:52:32  12  statement against Will Lester.  Am I understanding that

04:52:36  13  correct?

04:52:37  14  Q.   Right.

04:52:37  15  A.   That's very easy.

04:52:40  16       She didn't want to get caught herself and tell on

04:52:43  17  somebody else.

04:52:43  18  Q.   But if she knew she and Lester did the crime together,

04:52:47  19  then getting you after Lester is the dumbest thing a human

04:52:52  20  being could do, right?

04:52:54  21  A.   What's the question on that?

04:52:56  22  Q.   If she knew that her and Lester committed this crime, why

04:53:00  23  would she be telling the police to go catch Lester if that's

04:53:05  24  going to take her down?

04:53:06  25  A.   I'll say the same thing again.  As an investigator, you

*J. YORK - Direct Examination*                                     150

04:53:13   1   know -- I apologize for this.  If -- one reason that I can

04:53:18   2   think of is just what I said before, is if Amanda was involved

04:53:26   3   in -- with it with him, what would motivate somebody who was

04:53:30   4   involved with somebody in a murder to tell the other person.

04:53:35   5   Hey -- if she cooperated and gave a statement against him,

04:53:42   6   then -- and he was eventually charged for it and her statement

04:53:47   7   stood against him, she could -- he could turn around, you

04:53:50   8   know, and potentially say, Hey, she was involved with me, and

04:53:53   9   then she could turn around and say, No, I didn't; he's just

04:53:56   10  mad because I told on him.

04:53:58   11      Am I making myself clear?  Yeah.

04:54:01   12  Q.   You are not allowed to do that.

04:54:03   13      THE COURT:  You don't get to ask the jury questions.

04:54:05   14  BY MR. LOEVY:

04:54:06   15  Q.   All right.  I want to shift you to Kayla.  You heard

04:54:10   16  Ms. Mills testify in court today, correct?

04:54:12   17  A.   Do what now?

04:54:16   18  Q.   You heard Ms. Mills, Kayla's mom, testify?

04:54:17   19  A.   Yes, sir.

04:54:18   20  Q.   She said, look, Kayla has got an alibi; she was with her

04:54:19   21  boyfriend.  And you didn't want to hear that.  Did that

04:54:23   22  happen?

04:54:26   23  A.   Did I not want to hear what now from Kayla's mom?

04:54:29   24  Q.   Kayla's mom described you bothering Kayla, saying, If you

04:54:31   25  don't point your finger at these two with Lester, you are

*J. YORK - Direct Examination*                                            151

04:54:35   1   going down for murder.  Did that happen?

04:54:37   2   A.   No.  And again I'll -- Kayla did not give a statement

04:54:43   3   saying that Amanda and Will Lester had anything to do with it.

04:54:48   4   Q.   No, but that doesn't mean you weren't pressuring her to

04:54:51   5   say that, right?

04:54:52   6   A.   No.  I was wanting her to tell me what she knew and the

04:54:56   7   truth.

04:54:57   8   Q.   All right.  Her mother says they gave you her alibi, this

04:55:00   9   guy Derrick Waters, and you didn't write that down.  Did that

04:55:06   10  happen?

04:55:06   11  A.   No, because one thing about this morning is that, her

04:55:13   12  attorney was present, and, like I said, her attorney reached

04:55:16   13  out to me and --

04:55:17   14  Q.   Just the Waters thing.  Did that happen?

04:55:20   15  A.   I don't remember it happening.  I just remember what, you

04:55:22   16  know, was relevant to what the attorney was telling me.

04:55:26   17  Q.   All right.  Before you ever met the attorney, if the

04:55:28   18  mother would have given you her alibi witness, would you have

04:55:31   19  checked it out?

04:55:31   20  A.   Once that Kayla became a person of interest, yes.

04:55:40   21  Q.   All right.  How about she said she told you, Get the

04:55:43   22  video from the Walmart; you'll see my daughter was in Walmart,

04:55:46   23  did that happen?

04:55:47   24  A.   I don't remember that.

04:55:47   25  Q.   All right.  Did you do that?  Did you try to check out if

04:55:51  1   Kayla had an alibi?

04:55:52  2   A.   I don't remember nothing about no Walmart video.

04:55:55  3   Q.   You believe 18- or 19-year-old Kayla was involved in this

04:55:58  4   crime?

04:55:58  5   A.   I had at one point suspicion and reason to believe that.

04:56:06  6   Q.   You sure you weren't using it to try to point the finger

04:56:10  7   at somebody else?

04:56:12  8   A.   No.

04:56:13  9   Q.   All right.  Did you play Amber's statement for Kayla

04:56:16  10  where Amber says, Oh, I know who did it.  Lester did it;

04:56:20  11  Amanda did it; Taylor did it; Kayla did it?  Did you play that

04:56:24  12  for Kayla?

04:56:25  13  A.   There was several, and I don't remember which ones I

04:56:28  14  played.

04:56:29  15  Q.   All right.  So that wouldn't have been proper at all,

04:56:31  16  would it have?

04:56:33  17  A.   I think it is.

04:56:36  18  Q.   Kayla is a witness.  She's feeling heat.  You played her

04:56:40  19  another witness claiming that these people did the crime, and

04:56:43  20  you think that's okay?

04:56:45  21  A.   I played a statement that said that she was involved.

04:56:49  22  Q.   All right.  But Amber accused her, him, Lester, Kayla.

04:56:54  23  She accused everybody, right?

04:56:56  24  A.   I'm not saying everybody.  I can't remember exactly, but

04:57:00  25  Kayla was one of them.

*J. YORK - Direct Examination*                                       153

04:57:02   1    Q.   So when you played the statement for Kayla saying, Hey,

04:57:05   2    this person, Amber, she's saying all four of you did it, then

04:57:09   3    you were telling Kayla what you wanted to hear?  You wanted to

04:57:13   4    hear the other people, weren't you?

04:57:15   5    A.   I'll go back to Kayla's statement.  Kayla never did give

04:57:21   6    me a statement on Will Lester or Amanda Hoskins even after she

04:57:30   7    heard that.  That was one reason that I believe she was

04:57:32   8    telling me the truth, because this notion that I was

04:57:35   9    pressuring her into getting her to say what I wanted her to

04:57:41   10   say is, to me, just absolutely insane because she never did at

04:57:48   11   this say anything about those two.  Whatever I put -- they

04:57:53   12   told me is what I put down.

04:57:55   13   Q.   All right.  You did put a murder warrant in front of

04:57:58   14   Kayla, correct?

04:57:59   15   A.   That is correct.

04:58:03   16             MR. LOEVY:  Can we show PL1?

04:58:06   17             MR. SLOSAR:  PL1 and 109.

04:58:11   18             THE COURT:  We are pretty close to the end today,

04:58:15   19   Mr. Loevy.

04:58:15   20             MR. LOEVY:  Yes, I will definitely be done in five

04:58:18   21   minutes.

04:58:19   22   BY MR. LOEVY:

04:58:19   23   Q.   Can you identify this document?

04:58:21   24   A.   Yes.  You want me to go into detail?

04:58:25   25             MR. LOEVY:  May we publish it, Your Honor?

*J. YORK - Direct Examination*                                      154

04:58:26   1           THE COURT:  That's part of Exhibit 1?

04:58:28   2           MR. SLOSAR:  Yes, Your Honor.

04:58:29   3           MR. LOEVY:  Yes.

04:58:30   4           THE COURT:  Yes.  That's in the record.  It can be

04:58:32   5    published.

04:58:33   6    BY MR. LOEVY:

04:58:34   7    Q.   Showing you the next page, this is the murder warrant you

04:58:38   8    got for Kayla Mills, correct?

04:58:41   9    A.   Yes, sir.

04:58:42   10   Q.   And you set a million-dollar bond for murder and robbery

04:58:47   11   first degree?

04:58:48   12   A.   That's what it says.

04:58:49   13   Q.   And you showed up at Kayla's house, and you said, I have

04:58:52   14   a warrant for your arrest for murder, right?

04:58:58   15   A.   Yes, but I did not -- which time are you talking about?

04:59:02   16   Q.   How about the time you showed up at her house with the

04:59:06   17   murder warrant?

04:59:06   18   A.   Yes, but Kayla wasn't there.

04:59:08   19   Q.   Excuse me?

04:59:09   20        So now you remember that you didn't show her the murder

04:59:12   21   warrant?

04:59:12   22   A.   No, I just -- at the interview, she was -- she saw the

04:59:18   23   warrant.  What I'm saying is I never physically remember

04:59:22   24   seeing Kayla until at that -- when we met.

04:59:28   25   Q.   Just a couple minutes left, but I'm trying to establish

04:59:31   1    you did tell Kayla, I got a million-dollar bond; you are going

04:59:34   2    to prison for murder unless you start cooperating, right?

04:59:40   3    A.   What I said was, I want to know the truth.  If you --

04:59:46   4    because I had information that would implicate Kayla.  And I

04:59:54   5    think it's important to say that I believed her.  I believed

04:59:59   6    Kayla when I left there that -- because, number one, she

05:00:05   7    didn't implicate the two we are talking -- the two that's

05:00:08   8    sitting here.  She implicated -- correction.  She didn't

05:00:11   9    implicate Amanda or Will Lester.  And I believed her that she

05:00:16   10   was -- what she said, without getting into it.

05:00:20   11        And it is also important to say, at any time after that,

05:00:27   12   she could have been charged at any time if it -- if the

05:00:33   13   Commonwealth attorney deemed or believed so that she should

05:00:37   14   have been.

05:00:38   15   Q.   Just a few more questions.

05:00:39   16        Of course, the Commonwealth attorney claims that you

05:00:41   17   never told him that you had sought this arrest warrant; is

           18   that true?

05:00:47   19   A.   All I can say is that that warrant is obviously in front

05:00:53   20   of us and that was in the case file.

05:00:55   21   Q.   All right.

05:00:56   22   A.   Now, whether or not Jackie Steele had it or not, I can't

05:01:01   23   speculate.

05:01:01   24   Q.   He says you didn't tell him.  Do you deny that?

05:01:05   25   A.   I'm not denying that he's telling you that.

*J. YORK - Direct Examination*                                          156

05:01:08   1        What I'm saying is I did not intentionally keep nothing

05:01:11   2   from Jackie Steele, and I'm also telling you that at any time

05:01:14   3   Jackie Steele could have charged Kayla Mills because

05:01:18   4   everything -- her statements -- statements against her were in

05:01:22   5   the case file.

05:01:22   6   Q.   All right, sir.  You would agree with me that, if Kayla

05:01:26   7   really knew nothing about the murder -- and I want you to

05:01:29   8   assume that hypothetical.  Assume she told you many times,

05:01:32   9   Look, man I don't know who killed her, and then you put a

05:01:36   10  murder warrant in front of her and say, You are going to

05:01:39   11  prison, and then you play a tape of exactly what you want her

05:01:42   12  to say, that you create the risk of creating bad evidence.

05:01:46   13       Do you agree with me that creates the risk of bad

05:01:49   14  evidence?

05:01:50   15  A.   I don't agree with nothing that you said.

05:01:52   16       Again, I played the tape.  What she told me was nothing

05:01:57   17  what the recording was saying.

05:02:00   18       If I did not think that she was -- when -- I'm telling

05:02:05   19  you all I did not think after talking to her and her attorney

05:02:09   20  that she was guilty.  If I did, I would have charged her.

05:02:14   21  And, again, if Jackie Steele -- Jackie Steele, the

05:02:19   22  Commonwealth attorney, had in the case file everything that I

05:02:24   23  had.

05:02:25   24            MR. LOEVY:  I don't have any other questions, Your

05:02:27   25  Honor.  I mean, I have more questions but --

05:02:29   1            THE COURT:  Very good.  All right.

2         [End of excerpt of testimony of Jason York.]

3                     REPORTER'S CERTIFICATE

4            I certify that the foregoing is a correct transcript
      from the record of proceedings in the above-entitled matter.

5

6                                        Date:  3/20/22

        /s/ Kathleen Maloney, RMR, FCRR
7            United States Court Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25